**EXHIBIT B  (contd.)**

**Copy of All Filings with State Court**

7/19/2018 10:33 AM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Hector Gaucin-Tijerina**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## NOTICE OF HEARING

Please take notice that a hearing on Defendants' Motion to Dismiss under the Texas Citizens Participation Act (*filed July 13, 2018*) will be heard by the Court on its Central - Short Docket on **Thursday, August 30, 2018 at 2:00 p.m.** Two (2) hours have been allotted for this hearing. The hearing will be held at the Heman Marion Sweatt Travis County Courthouse located at 1000 Guadalupe, Austin, Texas 78701.

GLAST, PHILLIPS & MURRAY, P.C.

*/s/ Mark C. Enoch*

Mark C. Enoch
State Bar No. 06630360

GLAST, PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone: 972-419-8366
Facsimile: 972-419-8329
fly63rc@verizon.net

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via email and via efile.txcourts.gov's e-service system on July 19, 2018:

Mark Bankston
Kyle Farrar
Kaster, Lynch, Farrar & Ball, LLP.
1010 Lamar, Suite 1600
Houston, Texas 77002


                                      */s/ Mark C. Enoch*
                                    Mark C. Enoch

# GLAST, PHILLIPS & MURRAY

### A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

July 16, 2018

**Filed in The District Court
of Travis County, Texas**

**JUL 2 3 2018**

At _____ 10 45 A. M.

**Velva L. Price, District Clerk**

*Via First Class Mail*

Travis County 261st
  Judicial District Clerk
P.O. Box 679003
Austin, TX 78767-9003

Re:    *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems,
       LLC and Owen Shroyer; Cause No. D-1-GN-18-001835, 261st
       District Court, Travis County, Texas*

Dear Clerk

On July 13, 2018 counsel for Defendants in the captioned case filed (1) Defendants' First Amended Answer; and (2) Defendants' Motion to Dismiss under the Texas Citizens' Participation Act. Several of the exhibits to these two filings are video exhibits. Pursuant to the instructions received from your office, we have enclosed a file-stamped copy of each of these filings along with thumb drive containing the video exhibits to each.

If there are any questions please do not hesitate to contact my assistant, Melanie Illig, at 972-419-8347. Thank you for your assistance.

Very truly yours,

Mark C. Enoch

:mji

enclosures

cc:    Mr. Mark Bankston

Filed In The District Court
of Travis County, Texas

AUG 10 2018 JC

At _____ 4:30 P.M.
Velva L. Price, District Clerk

**LORA J. LIVINGSTON**
Local Administrative Judge

**DISTRICT COURTS**

Travis County Courthouse
P. O. Box 1748
Austin, TX 78767

(512) 854-9309
FAX (512) 854-9332

August 9, 2018

Eric J. Taube
WALLER LANSDEN DORTCH & DAVIS, LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701-4042

Mark Duquesnay Bankston
FARRAR & BALL, LLP
1010 Lamar St., Suite 1600
Houston, Texas 77002-6325

Mark Charles Enoch
GLAST PHILLIPS & MURRAY, PC
14801 Quorum Dr., Suite 500
Dallas, Texas 75254-1449

> **Re: Cause No. D-1-GN-18-001605**; *Marcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*
>
> **Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFORWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*
>
> **Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFORWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

Dear Counsel:

In accordance with Chapter 2.6, the above-cases has been assigned to **JUDGE SCOTT JENKINS** for the handling of all pre-trial, trial and post-judgment proceedings.

Thank you.

Sincerely,

LORA J. LIVINGSTON
Local Administrative Judge
Travis County, Texas

LJL/lme/lg
xc: Ms. Velva Price, District Clerk



Filed in The District Court
of Travis County, Texas

AUG 16 2018 SL
At_____11:14 A. M.
Velva L. Price, District Clerk

# 53RD DISTRICT COURT
TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX (512) 854-9332

**SCOTT H. JENKINS**
Judge
(512) 854-9308

**Tiffaney Gould**
Court Operations Officer
(512) 854-7278

**Elissa Hogan**
Staff Attorney
(512) 854-9366

**Chavela Crain**
Official Reporter
(512) 854-9322

**Selene Cruz Lara**
Court Clerk
(512) 854-9991

August 15, 2018

Eric Taube
WALLER LANSDEN DORTCH & DAVIS, LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
*Via Email: eric.taube@wallerlaw.com*

Mark Duquesnay Bankston
FARRAR & BALL, LLP
1010 Lamar St., Suite 1600
Houston, Texas 77002
*Via Email: mark@fbtrial.com*

Mark Charles Enoch
GLAST PHILLIPS & MURRAY, PC
14801 Quorum Dr., Suite 500
Dallas, Texas 75254
*Via Email: fly63rc@verizon.net*

Re: **Cause No. D-1-GN-18-001605**; *Marcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

Re: **Cause No. D-1-GN-18-001842**; *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

Re: **Cause No. D-1-GN-18-001835**; *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

Dear Counsel:

As you know, the cases referenced above have been assigned to me pursuant to Local Rule 2.6. Please confer with each other prior to setting any hearings, and have them placed on my calendar through my Court Operations Officer, Tiffaney Gould. You must also have them set on the central docket through the Court Administrator's Office. Remember to announce during docket call to avoid losing your setting (Local Rules 3.1, 3.2, and 3.7).

When conferring about scheduling, please note that the <u>last</u> brief on any motion must be filed and a copy delivered to me **no later than 30 days prior** to the scheduled hearing date. Exceptions to this may only be made through joint communications with the Court's staff attorney. Please also provide courtesy copies of any legal authorities cited in your briefs that are unique to the issue or issues before me.

I look forward to working with you on these cases.

Sincerely,

SCOTT H. JENKINS
JUDGE
53rd District Court
Travis County, Texas

SHJ/tg

Orig:  Ms. Velva L. Price, Travis County District Clerk

8/17/2018 1:59 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S MOTION FOR SANCTIONS
## FOR INTENTIONAL DESTRUCTION OF EVIDENCE

Plaintiff moves for sanctions against Defendants for the willful destruction of relevant evidence. While in the midst of researching evidence to respond to Defendants' TCPA motion, Plaintiff's counsel discovered that on August 9, 2018, InfoWars intentionally deleted a variety of social media pages and video content relating to the Sandy Hook shooting. These materials were unquestionably relevant to Plaintiff's claim, and InfoWars had written notice of the obligation to preserve this evidence. InfoWars' willful deletion of evidence merits punitive and remedial sanctions, including an adverse inference by the fact-finder regarding the content of the deleted materials.

## I. FACTUAL BACKGROUND

On August 9, 2010, CNN published an article discussing the decision by Twitter to allow Alex Jones to remain on its platform.[1] Twitter had originally claimed that unlike Mr. Jones' conduct on YouTube and Facebook, he had not posted offending content to its website. However, CNN journalist Oliver Darcy discovered extensive content and commentary that violated Twitter's rules, including social media messages and "hundreds of hours of video available on the accounts

---

[1] https://money.cnn.com/2018/08/09/media/twitter-infowars-alex-jones/index.html

that Jones and InfoWars maintain on Twitter and Periscope, a livestreaming video service that Twitter owns."[2]

According to the CNN article, the offending materials included content about the Sandy Hook and Parkland school shootings. CNN did not fully quote or reproduce the content in its article, but provided links to "examples of some of the content CNN has found."[3] However, the links direct to the following error message:



The following day, Mr. Jones appeared on his news show, and he admitted that he instructed his staff to delete the materials. Mr. Jones stated that "CNN…was doing reports on things I said out of context about David Hogg, about Parkland, and about other events, and I just said 'Delete that stuff.'"[4] A few moments later in the video, Mr. Jones repeated his admission that he instructed his staff to "delete it."[5]

Plaintiff has submitted the declaration of online researcher and journalist Brooke Binkowski, who was able to confirm that specific InfoWars messages cited by CNN have been

---

[2] *Id.*

[3] *Id.*

[4] Video at: https://www.infowars.com/msm-spreads-more-spin-stories-about-infowars-twitter-account/

[5] *Id.*

2

deleted. Ms. Binkowski checked a variety of links from the CNN article.[6] She found they are no longer functioning, and the links she reviewed were not indexed on the Internet Archive:



On August 12, 2018, Plaintiff's counsel wrote to InfoWars' counsel asking him "to confirm whether these [news] reports are accurate and these items have indeed been destroyed."[7] InfoWars' counsel did not respond. Plaintiff's counsel wrote again on August 14, and again InfoWars' counsel did not respond.[8]

Despite counsel's silence, it is clear from Mr. Jones' own admissions that relevant evidence has been lost. As pressure mounted from pending defamation lawsuits and growing public indignation, Mr. Jones chose to destroy the evidence of his actual malice and defamatory conduct uncovered by Mr. Darcy. InfoWars deleted critical evidence at the precise moment Plaintiff and his experts were attempting to marshal that evidence. At this stage, it is unknown exactly how

---

[6] Exhibit 1, Declaration of Brooke Binkowski.
[7] Exhibit 2, Plaintiff counsel's August 12 email.
[8] Exhibit 3, Plaintiff counsel's August 14 email.

In addition to deletions discovered by CNN, Plaintiff's counsel suspects that Mr. Jones also deleted YouTube content. On August 3, 2018, Plaintiff's counsel attempted to visit the YouTube page where the challenged video was published. However, the video had been deleted. Plaintiff's counsel initially thought the video was deleted by YouTube, but subsequent news reports confirmed that YouTube did not remove any of Mr. Jones's videos until August 6, 2018. *See* https://www.theguardian.com/technology/2018/aug/06/apple-removes-podcasts-infowars-alex-jones

Based on these reports, the August 14 email also requested InfoWars' counsel to "confirm whether the June 26 and July 20 YouTube videos relevant to this litigation were deleted by YouTube or your clients."

much content has been deleted, though it includes extensive social media materials and reportedly hundreds of hours of video.

## II.     LEGAL STANDARD

Under Texas law, a party who establishes that spoliation has occurred may be entitled to a presumption that the destroyed evidence would not have been favorable to the destroyer. *Rico v. L–3 Commc'ns Corp.*, 420 S.W.3d 431, 437 (Tex.App.–Dallas 2014, no pet.). This evidentiary a presumption is appropriate when a party has deliberately destroyed evidence or has failed to either produce or explain the evidence's nonproduction. *Id*. In determining whether a spoliation presumption is justified, a trial court considers whether (1) there was a legal duty to preserve the evidence; (2) the alleged spoliator breached this duty; and (3) the spoliation prejudiced the non-spoliator's ability to present its case or defense. *Id*.

## III.    ARGUMENT

### A.     InfoWars had a Duty to Preserve this Evidence.

First, there is no dispute that InfoWars understood it was an under a duty to preserve this evidence. In a letter delivered on April 11, 2018, Plaintiff instructed InfoWars and its counsel to ensure the preservation of all documents and communications "relating to my client, the [challenged statements], or the Sandy Hook shooting."[9] Mr. Jones was specifically "notified that the destruction or loss of these items may constitute spoliation of evidence under Texas law."[10] Nonetheless, InfoWars willfully deleted the evidence.

---

[9] Exhibit 4, Plaintiffs' April 11, 2018 Demand Letter
[10] *Id.*

### B.      Plaintiff has Suffered Prejudice from InfoWars Breaching its Duty.

The loss of this evidence prejudices Plaintiff's case because InfoWars deleted social media and video evidence relating to the Sandy Hook shooting. This evidence could have established key elements of Plaintiffs' defamation claim. First, these materials could have provided evidence of actual malice, since "actual malice may be inferred…from the defendant's words or acts before, at, or after the time of the communication." *Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781, 805 (Tex. App.—Austin 2017, pet. filed). The evidence could have also established defamatory meaning by "connect[ing] the words published with sic or explanatory circumstances alleged." *Billington v. Hous. Fire & Cas. Ins.*, 226 S.W.2d 494, 497 (Tex. Civ. App.- Fort Worth 1950, no writ). The evidence could have also established whether InfoWars' defamation was germane to Plaintiff's public acts.

While the CNN article discusses some of the Sandy Hook content in broad strokes, it is unknown how many messages or videos were deleted. Moreover, the CNN article reported that InfoWars deleted content from Twitter's live-streaming service Periscope, and it is believed this evidence is likewise lost forever. Finally, it appears that InfoWars was also deleting YouTube videos relating to this case. All of these materials are fruitful sources of evidence.

Furthermore, Ms. Binkowski's declaration explains that given the nature of social media, "pages and content become interrelated in a complex web. Social media posts become interactive discussions in which conversations develop through user comments and in which content becomes linked to other content."[11] Ms. Binkowski noted that "even if a copy of a particular post is saved locally, its meaning is often inscrutable when isolated from the web of context."[12] Additionally, that web of context, discussion, and linked content can lead to further evidence. The same holds

---

[11] Exhibit 1, Declaration of Brooke Binkowski.
[12] *Id.*

true of online video content. According to Ms. Binkowski, "[e]ven if a local copy of a video is saved, the social media page on which it was hosted contains information and discussion, including descriptive text and commentary authored by InfoWars which accompany its video content."[13] In short, Plaintiff has been denied the wealth of relevant evidence uncovered by Mr. Darcy, as well as avenues to find even more relevant evidence.[14]

InfoWars might dishonestly claim that the social media materials and videos they deleted were not relevant. However, in light of the Sandy Hook-related content reported by CNN, much of this material was facially relevant. Moreover, as this Court is acutely aware, Mr. Jones meanders from topic to topic in his videos, and a title or description of a video is not indicative of its full content. It is therefore likely that relevant evidence was present in other deleted materials not explicitly identified with Sandy Hook. Moreover, CNN reported that some of the content related to InfoWars' commentary about other mass shootings, which is also relevant evidence in this lawsuit.

In any case, the Court need not make any relevance determination on the other deleted materials, as the Supreme Court held that a party's intentional destruction of evidence can be "sufficient by itself to support a finding that the spoliated evidence is both relevant and harmful to the spoliating party." *Brookshire Bros., Ltd. v. Aldridge,* 438 S.W.3d 9, 22 (Tex. 2014); *see also Thompson v. U.S. Dept. of Hous. & Urban Dev.,* 219 F.R.D. 93, 101 (D. Md. 2003) ("When evidence is destroyed in bad faith (*i.e.* intentionally or willfully), that fact alone is sufficient to demonstrate relevance.").

---

[13] *Id.*

[14] To help the court understand the "needle-in-a-haystack" challenge which Plaintiff has faced, Mr. Jones' twitter account contains 49,142 posts as of August 17, 2018. The InfoWars account contains 51,597 posts. Owen Shroyer's account contains an additional 6,950 posts. *See* https://twitter.com/RealAlexJones; https://twitter.com/infowars; https://twitter.com/allidoisowen.

## C.     A Remedial Sanction is Necessary.

A remedial sanction should be given when "the spoliating party acted with intent to conceal discoverable evidence." *Petroleum Sols., Inc. v. Head,* 454 S.W.3d 482, 489 (Tex. 2014). The most severe of sanctions is needed because InfoWars "intentionally destroyed relevant and material evidence with the purpose of concealing relevant evidence." *Smith v. Williams,* 2015 WL 3526089, at *7 (Tex. App.—Texarkana May 29, 2015, no pet.). Courts have typically addressed the spoliation of social media materials with an adverse inference, in which the fact-finder assumes the destroyed evidence would have been unfavorable. This evidentiary presumption is appropriate when a party acts with the "purpose of concealing or destroying discoverable evidence." *Brookshire Bros.,* 438 S.W.3d at 24. For example, in a discrimination case, it would be appropriate for a fact-finder to be "instructed that it may infer that the contents of the Facebook Post indicated discriminatory animus." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 393 (S.D.N.Y. 2015).

A week ago, a California federal court issued an opinion under strikingly similar facts. A defendant in a false advertising suit deleted social media posts relating to the marketing of its product. Although the plaintiff found some social media posts, it could not obtain the posts that had been deleted. The court explained that:

> Contrary to Defendants' contention that "Plaintiff complains about 'social media documents' not produced (but which Plaintiff already has)," Plaintiff only has some Facebook and Twitter posts regarding the challenged products which it obtained during its pre-lawsuit investigation. Plaintiff does not have all of the posts and cannot obtain them because all relevant social media posts including the "advertisements, photos, marketing and misleading statements at issue in this action" have been destroyed by Defendants.

*Nutrition Distribution, LLC v. Pep Research, LLC*, 2018 WL 3769162, at *16 (S.D. Cal. Aug. 9, 2018) (recommendation adopted). The court noted that the deletion of evidence "threatened to

7

interfere with the rightful decision of the case, or forced the non-spoiling party to rely on incomplete and spotty evidence." *Id.* For this reason, the court entered an adverse inference:

> Because the Court finds that Defendants destroyed relevant social media evidence…the Court recommends that the adverse inference instruction requested by Plaintiff that "the social media posts deleted were false advertising of products that compete with Plaintiff," be given.

*Id.* at *18; *see also Gatto v. United Air Lines, Inc.,* 2013 WL 1285285, at *3 (D.N.J. Mar. 25, 2013) (Adverse inference instruction against plaintiff who deactivated his social media accounts). Here, a similar inference is justified in which the fact-finder presumes that the deleted messages and videos were either defamatory in their own right or otherwise established the defamatory meaning and actual malice underlying the June 26, 2017 and July 20, 2017 defamations described in Plaintiff's petition.

### D.    A Punitive Sanction is Necessary.

Finally, courts also take severe punitive steps when social media content is spoliated. For example, in *Allied Concrete Co. v. Lester*, 736 S.E.2d 699 (Va. 2013), the court approved sanctions of $542,000 against a lawyer and $180,000 against his client for spoliation when the client, at the lawyer's direction, deleted photographs from client's social media page. In the disciplinary context, at least one lawyer has been suspended for five years for advising a client to clean up his Facebook page, causing the removal of photographs and other material. *In the Matter of Matthew B. Murray*, 2013 WL 5630414, VSB Docket Nos. 11-070-088405 and 11-070-088422 (Virginia State Bar Disciplinary Board July 17, 2013); *see also Florida Bar News,* Bar Ethics Opinion on "Cleaning Up" Social Media Pages Before Litigation, 2/15/2015 FLBN 24. Here, InfoWars' conduct was likewise egregious, and a severe punitive sanction is necessary to deter future misconduct in this litigation. In addition, Plaintiff requests fees and costs to address the time spent

on this matter, which was especially burdensome in the midst of responding to an anti-SLAPP motion.

## CONCLUSION

Due to the intentional destruction of evidence by InfoWars, Plaintiff prays that this Court grants his Motion, enters an adverse inference in favor of the Plaintiff, assesses punitive sanctions, and takes whatever other actions necessary to address this flagrant misconduct.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2018 the forgoing document was served upon the following in accordance to Rule 21 of the Texas Rules of Civil Procedure:

***Via E-Sevice: fly63rc@verizon.net***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

## DECLARATION OF BROOKE BINKOWSKI

STATE OF CALIFORNIA           §
                              §
SAN DIEGO COUNTY              §

    I, Brooke Binkowski, declare under penalty of perjury the following is true and correct.

1.    My name is Brooke Binkowski. I am over the age of 21 and competent to make this declaration. I reside in San Diego County, California. Given the nature of my work and the history of InfoWars publicizing personal information to its audience, I prefer not to provide my date of birth or address. I have been informed that substantial compliance with Texas law does not require me to provide this information, and I wish to exercise that right.

2.    I have over twenty years of experience as a multimedia journalist and professional researcher.

3.    I possess a Bachelor of Arts from the University of California in International Studies – Linguistics – Anthropology, and I am currently completing my Master's thesis. I am also a Fellow in Global Journalism at the Munk School of Global Affairs.

4.    Over my career, I have worked in reporting, editing, and producing roles for CNN, CBS Radio, National Public Radio, Southern California Public Radio, Foreign Policy, Latino USA, and others as a freelance reporter. I also served as the Managing Editor of Snopes.com from 2015 to 2018.

5.    I possess expertise in online research and the infrastructure of social media.

6.    I reviewed an August 9, 2018 article from CNN available at: https://money.cnn.com/2018/08/09/media/twitter-infowars-alex-jones/index.html

7.    I visited a variety of links provided in the CNN article, which related to both written and video content published by InfoWars. I also searched the web addresses for these links in the Internet Archive.

8.    The links and web archive pages I checked included:

- https://twitter.com/RealAlexJones/status/514913471972925440
- https://web.archive.org/web/*/https://twitter.com/RealAlexJones/status/514913471972925440

- https://twitter.com/RealAlexJones/status/281595030966267905
- https://web.archive.org/web/*/https://twitter.com/RealAlexJones/status/281595030966267905

- https://twitter.com/RealAlexJones/status/539839454018433024
- https://web.archive.org/web/*/https://twitter.com/RealAlexJones/status/539839454018433024

- https://twitter.com/RealAlexJones/status/618570610143203328
- https://web.archive.org/web/*/https://twitter.com/RealAlexJones/status/618570610143203328

- https://twitter.com/infowars/status/920461933806882816
- https://web.archive.org/web/*/https://twitter.com/infowars/status/920461933806882816

- https://twitter.com/infowars/status/1021870547964026882
- https://web.archive.org/web/*/https://twitter.com/infowars/status/1021870547964026882

- https://twitter.com/infowars/status/1004479505115766785
- https://web.archive.org/web/*/https://twitter.com/infowars/status/1004479505115766785

- https://twitter.com/infowars/status/991399355813957632
- https://web.archive.org/web/*/https://twitter.com/infowars/status/991399355813957632

9. In each case, the original content had been deleted, and there was no copy available on the Internet Archive.

10. Not only is the primary content inaccessible, but also the related discussion, commentary, or hyperlinks to other content.

11. One feature of social media is that pages and content become interrelated in a complex web. Social media posts become interactive discussions in which conversations develop through user comments and in which content becomes linked to other content.

12. Even if a copy of a particular social media message is saved locally, its meaning is often inscrutable when isolated from the web of context.

13. The CNN article also discusses video content deleted by InfoWars. InfoWars distributes video content on social media networks. When a social media video is deleted, additional information is also lost.

14. Even if a local copy of a video is saved, the social media page on which it was hosted contains information and discussion, including descriptive text and commentary authored by InfoWars which accompany its video content.

Executed by Brooke Binkowski in San Diego County, California on August 17, 2018.


Brooke Binkowski

## Eric Tellez

**From:** Mark Bankston
**Sent:** Sunday, August 12, 2018 4:42 PM
**To:** Mark Enoch
**Cc:** Bill Ogden
**Subject:** Deletion of InfoWars content

Mr. Enoch:

An August 10th report from *The Hill,* as well as Mr. Jones' statements on the August 10th episode of *The Alex Jones Show*, indicate that Mr. Jones instructed his employees to delete certain InfoWars content available on Twitter and its livestreaming service Periscope. An August 9th report from CNN indicates that the deleted materials include social media messages and video content relating to the Sandy Hook and Parkland school shootings.

My clients in the *Fontaine*, *Pozner*, and *Heslin* matters would like you to confirm whether these reports are accurate and these items have indeed been destroyed.

**Mark Bankston**
**Kaster Lynch Farrar & Ball**
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300

Ex. 2

## Eric Tellez

**From:** Mark Bankston
**Sent:** Tuesday, August 14, 2018 1:33 PM
**To:** fly63rc@verizon.net
**Cc:** Bill Ogden
**Subject:** Follow up on InfoWars

Mr. Enoch:

Following up on my prior emails, please produce a copy of the August 10, 2018 episode of The Alex Jones Show.

Please also confirm whether the June 26 and July 20 YouTube videos relevant to this litigation were deleted by YouTune or your clients.

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300

Ex. 3



KASTER LYNCH
FARRAR & BALL LLP

TEXAS | FLORIDA

April 11, 2018

*__Via Electronic Mail: Eric.Taube@wallerlaw.com__*
Alex Jones
Free Speech Systems, LLC
InfoWars, LLC
c/o Eric Taube
100 Congress Avenue, 18th Floor
Austin, TX 78701

### Re: Defamatory Publications

To Whom It May Concern:

I write to inform you that our office represents Neil Heslin in a claim for damages against Alex Jones, Free Speech Systems LLC, InfoWars LLC, and Owen Shroyer arising from defamatory statements. Mr. Heslin is the father of Jesse Lewis, a victim of the Sandy Hook massacre.

On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son's body and see his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes. This assertion was manifestly false.

Over the past four years, InfoWars has also made statements -- far too numerous to effectively discover and catalog -- which are consistent with Mr. Shroyer's statements in 2017, including repeated references to the alleged faked "blue-screen" interview, references to a sinister re-opening of the school, references to individuals found in the woods with SWAT gear, allegations casting doubt on the death of certain victims, as well as general allegations that nobody died. The gist of these statements is that my client is a liar. These prior statements are evidence of InfoWars' egregious defamatory intent when it later made statements in 2017. We are aware of such notable prior statements from April 2013, March 2014, May 2014, September 2014, December 2014, January 2015, July 2015, and November 2016, although we are sure there are many others as yet unknown. Each of these statements addresses the same core set of false statements conveyed by the 2017 statements, which my client now demands you correct as provided by Sec. 73.055 of the Texas Civil Practice & Remedies Code.

Specifically, my client demands that InfoWars immediately and publicly acknowledge that it has spread false information about him and made false accusations about his conduct following the tragedy. My client demands that InfoWars publicly admit it made false statements about Mr. Heslin holding his son's body and seeing his injury. My client also demands that

InfoWars publicly admit that Mr. Heslin is not a "crisis actor" or otherwise involved in any kind of conspiracy to cover up the truth about the Sandy Hook massacre or the death of his son.

Finally, my client demands that you take immediate steps to ensure the preservation of the following items:

- All communications within InfoWars relating to my client, the above broadcasts, or the Sandy Hook shooting.

- All communications between any employee or representative of InfoWars and any third parties relating to my client, the above broadcasts, or the Sandy Hook shooting.

- All notes, drafts, or documents relating to my client, the above broadcasts, or the Sandy Hook shooting.

- All documents reflecting policies or editorial standards for the factual vetting of information published by InfoWars, as in effect on April 22 – June 26, 2017.

You are further notified that the destruction or loss of these items may constitute spoliation of evidence under Texas law.

I ask that you respond immediately, detailing the steps InfoWars will be taking to comply with each of the above demands.

Most sincerely,

Mark Bankston

8/17/2018 1:59 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY
IN AID OF PLAINTIFF'S RESPONSE TO DEFENDANTS' TCPA MOTION**

---

Pursuant to Tex. Civ. Prac. Rem. Code 27.006, Plaintiff moves this Court to allow discovery relevant to Defendants' TCPA motion, and would show the Court as follows:

**I.**

In responding to a TCPA motion, Plaintiff must address each element of his claim, and the act provides a mechanism to secure "additional discovery to meet this burden." *Grant v. Pivot Tech. Sols., Ltd.*, 2018 WL 3677634, at *12 (Tex. App.—Austin Aug. 3, 2018, no pet. h.). "On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion." Tex. Civ. Prac. Rem. Code 27.006(b).

**II.**

That statute does not define "good cause," but in cases where a particular statute leaves the term undefined, courts have held that good cause exists when it "is based on equity or justice." *Barton-Rye v. State,* 2016 WL 4678963, at *1 (Tex. App.—Amarillo Sept. 1, 2016, pet. ref'd). The definition "no doubt connotes something akin to a legitimate or substantial reason, as opposed to mere arbitrariness." *Id.*; *see also In re Gandara,* 2017 WL 2822514, at *4 (Tex. App.—El Paso

1

June 30, 2017, no pet.) ("The Amarillo Court's decision is well-reasoned and we will apply its definition of good cause in this case."). Here, discovery will aid Plaintiff is meeting his burden, and there are several legitimate non-arbitrary reasons to grant the motion.

## III.

First, discovery will aid Plaintiff in securing evidence about the responsibility of the various named parties. Though extrinsic evidence makes it clear the Defendants act in concert, InfoWars is determined to contest the involvement and culpability of various Defendants. As such, discovery will help resolve various Defendants' protestations of innocence.

## IV.

Discovery will also aid in developing evidence relating to Defendants' spoliation of relevant documents. Plaintiff has filed a Motion for Sanctions concerning the deletion of social media materials and video content. These social media materials related to Mr. Jones' statements about the Sandy Hook shooting, and they were deleted by InfoWars when a CNN journalist uncovered their existence. These materials could have supported the elements of Plaintiff's cause of action. As such, Mr. Jones' spoliation provides further good cause for discovery.

## V.

Discovery will also aid Plaintiff is securing evidence of actual malice. Though Plaintiff can prove malice through circumstantial evidence and inference, Defendants will certainly argue that Plaintiff lacks direct evidence of Defendants' state of mind. Discovery will allow Plaintiff to develop further evidence on this point.

## VI.

Discovery will also aid in determining whether Defendants' affirmative defenses have been asserted in good faith. Discovery will show if the statutes relied upon in affirmative defenses actually apply to these Defendants.

## VII.

Discovery will also aid Plaintiff in securing evidence relevant to whether the challenged statement was an opinion or assertion of fact. Defendants' internal documents prior to the defamation will help establish the context of the video and Defendant's motivation in making a statement of fact rather than an opinion. Defendants' internal statements and testimony are also relevant to whether the defamatory remarks arose from any public participation by Plaintiff.

## VIII.

Finally, discovery will also aid in securing full copies of the challenged statements. As the Court is aware, Defendants objected to the use of transcripts and video clips in the *Pozner* matter, requiring Plaintiffs to submit a full copy of the "Sandy Hook Vampires Exposed" video. In this case, Plaintiff intended on submitting a full video copy of the June 26, 2017 and July 20, 2017 InfoWars videos at issue. Plaintiffs in the *Pozner* matter relied on the public availability of Defendants' videos on YouTube, but those videos were recently removed either by YouTube or by InfoWars. Plaintiffs' counsel wrote to InfoWars' counsel on August 9, 2018 requesting copies of these videos, but InfoWars' counsel ignored the request.[1] As such, Mr. Heslin should be permitted to conduct discovery on video evidence.

---

[1] *See* Exhibit 1, Plaintiff counsel's August 9, 2018 email.

3

**PRAYER**

For these reasons, Plaintiffs pray that this Court resets the hearing on the Defendants' TCPA Motion and allows the Plaintiff to serve written discovery as well as take the depositions of Owen Shroyer, Alex Jones, InfoWars, LLC, and Free Speech Systems, LLC.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on August 17, 2018 the forgoing document was served upon the following in accordance to Rule 21 of the Texas Rules of Civil Procedure:

***<u>Via E-Sevice: fly63rc@verizon.net</u>***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

## Eric Tellez

| | |
|---|---|
| **From:** | Mark Bankston |
| **Sent:** | Thursday, August 9, 2018 6:39 PM |
| **To:** | Mark Enoch |
| **Cc:** | Bill Ogden |
| **Subject:** | July 20, 2017 InfoWars Video |

I write regarding the July 20, 2017 InfoWars video segment in which Mr. Jones re-airs the June 26, 2017 video segment featuring Mr. Shroyer's statements about Mr. Heslin. Plaintiff had not previously intended to introduce the June 20, 2017 video into evidence at the TCPA hearing, but given your insistence on video copies being admitted, that intention has changed.

As you know, the *Pozner* plaintiffs relied on Mr. Jones' distribution of his video content on YouTube and Facebook, and videos can be easily downloaded from these sources. However, these providers recently decided they would prefer to stop associating with your client, and his video content can no longer be accessed on their platforms.

As such, I would like you to confirm whether the June 20, 2017 video still exists, and if it does, I'd ask that you produce a copy to Mr. Heslin in the next seven days.

**Mark Bankston**
**Kaster Lynch Farrar & Ball, LLP**
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300

Ex. 1

8/21/2018 10:05 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Terri Juarez**

GLAST, PHILLIPS & MURRAY
A PROFESSIONAL CORPORATION

MARK C. ENOCH, J.D., M.B.A.
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

August 21, 2018

*Via efiling*

Clerk, 261st District Court
Travis County
1000 Guadalupe, 5th floor
Austin, TX 78701

Re:    *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech
       Systems, LLC and Owen Shroyer;* Cause No. D-1-GN-18-
       001835, 261st District Court, Travis County, Texas

Dear Clerk:

I am currently on vacation with very limited phone service and internet access and
have been so since before Plaintiff's Motion for Sanctions for Intentional Destruction of
Evidence and Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response
to Defendants' TCPA Motion were filed. A vacation letter was filed with the Court on
June 29, 2018 regarding this vacation.

I am diligently working to have responses to both motions completed and filed by
tomorrow or Thursday at the latest. We strongly oppose both motions. Nothing was
destroyed as claimed.

I respectfully request that no hearings be scheduled and that the Honorable Judge
Jenkins not make any determinations regarding these motions during this time until
Defendants' responses have been filed. Thank you for your attention to this matter,

Very truly yours,

*/s/ Mark C. Enoch*

Mark C. Enoch

Clerk, 261th  District Court

August 21, 2018
Page 2

MCE:mji
cc:    Mr. Mark D. Bankston (*via e-service*)

8/23/2018 7:11 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Terri Juarez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

### DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS AND MOTION FOR EXPEDITED DISCOVERY

-----------------------------------------------------------------------------------------------------

Defendants file this response to Plaintiff's Motion for Sanctions and his Motion for Expedited Discovery.

### I. SUMMARY

Plaintiff's Motion for Sanctions and counsels' arguments are simply disingenuous considering that he and his client have sought and continue to seek the removal of Defendants' content from social media and other platforms, through numerous public statements and appearances in the media, appeals to Twitter, YouTube, Facebook and numerous other social media platforms and now the court system. Now after four twitter posts have been removed but preserved by Defendants, and after the two videos Plaintiff claims in this case were defamatory were removed by YouTube at Plaintiff's insistence, Plaintiff's counsel seeks a spoliation ruling and punitive sanctions.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS AND
MOTION FOR EXPEDITED DISCOVERY -- Page 1 of 13**

First, Plaintiff's counsel has alleged four Twitter tweets that have been public for years and two videos already given to them have been destroyed by Defendants. Plaintiff's counsel is misinformed:

1. Defendants have not destroyed any relevant evidence. Defendants have preserved all relevant evidence of Defendants' publications.

2. Any comments of unknown internet users that were attached to the tweets:

    a. are not relevant evidence to Plaintiff's claims,

    b. were preserved to the best of Defendants' ability and although 17 comments in total appear to have not been recoverable because the commenter deleted the comment, the commenter's account was deleted, Twitter deleted the commenter's account or comment, or because the comment was lost from Defendants' cache, they were not intentionally deleted by Defendants and the vast majority of the comments were maintained,[1]

    c. were never requested by Plaintiff from either Defendants or Twitter,

    d. were accessible to Plaintiff and his lawyers for years at any time before August 10, 2018,

Plaintiff's motion for sanctions should be denied.

---

[1] The comments that were not able to be maintained were either previously deleted by the Twitter commenter or the commenter's account was deleted, which Defendants have no control over and could have been done years ago, or inadvertently lost on Defendants' cache. See attached Exhibit "C" paragraph 6. Defendants' intended only to remove the tweets from public access because of the imminent possibility, if found to be in violation of Twitter policies, of being banned completely by Twitter. See attached Exhibit "C" paragraph 5. This would have resulted in losing all posts and information permanently. See attached Exhibit "C" paragraph 5. There was absolutely no intent to destroy or hide any evidence at all and Defendants attempted to maintain as much information as possible. See attached Exhibit "C" paragraphs 6 and 11.

Second, Plaintiff's motion for TCPA pre-hearing discovery should be denied because Plaintiff has not asserted good cause as the only asserted basis to do the discovery, his motion for spoliation sanctions, is unfounded. Further, the broad and extensive discovery sought is not permitted by the statute and would defeat the purpose behind the statute, which is designed to be an efficient and cost effective safeguard of constitutional rights.

Third, Plaintiff's lawyers have breached their Rule 13 and Chapter 10 duties to make reasonable inquiry before filing their motion for sanctions and filing those sanctions for improper purposes. The Court should consider imposing appropriate sanctions upon Plaintiff's lawyers for their failure to make reasonable inquiry and filing the sanctions motion for improper purposes. As fully described in the Defendants' motions to dismiss in the Pozner and Heslin cases, Plaintiffs in both cases and their common counsel have sought and obtained wide-spread publicity in their extra-judicial attempts to silence Jones and those who agree with him on various political issues.[2] Just as with their national media appearances and letters to editors[3] designed in part to shame public use platforms such as Google, YouTube, Facebook, and Twitter into removing all of Jones' content, counsel filed their baseless motion for sanctions to stir additional negative publicity about Defendants.

## II. TEST FOR SPOLIATION

To establish spoliation, Plaintiff must show: (1) Defendants had a duty to preserve the particular relevant evidence, (2) Defendants wrongfully did not preserve the relevant evidence,

---

[2] Mr. Bankston's letter dated May 25, 2018 makes his intentions clear when he states that they "plan to make available to the general public and media copies of all correspondence and pleading which arise in this lawsuit, including this letter." See attached Exhibit "A".
[3] See New York Times article attached as Exhibit "B".

and (3) Defendants' conduct prejudiced Plaintiff. *See Clark v. Randalls Food*, 317 S.W.3d 351,356 (Tex. App.-- Houston [1st Dist.] 2010, pet. denied).

### III. DEFENDANTS HAVE COMMITTED NO SPOLIATION AND HAVE PRESERVED ALL RELEVANT EVIDENCE.

#### A. Plaintiff complains of four year-old tweets and two delivered videos.

Plaintiff complains that four tweets, one from 2012, two from 2014, and one from 2015, have been deleted from public viewing on Twitter. Plaintiff complains these four tweets were deleted this month after being up for public viewing and viewing and copying by him and his lawyers for years. Plaintiff complains this removal of tweets from public viewing is spoliation of relevant evidence. Plaintiff also complains that two videos have been deleted from public viewing on YouTube, and claims that this deletion from public viewing is spoliation.

#### B. Defendants have destroyed no relevant evidence but have preserved all relevant evidence.

Plaintiff is confused about how social media and computers work. Stopping publication by removing a page from a computer screen accessed by the public does not destroy the file on the computers providing the screen with the file in the first place.

The four tweets have not been destroyed and have been preserved by Defendants.[4] The two videos, one of June 25, 2017[5], and one of July 20, 2017 are actually in Plaintiff's own

---

[4] See attached Exhibit "C" paragraph 6.
[5] The video about which Plaintiff complains did not occur on June 26, but instead on June 25, 2017.

lawyers' possession and have been since Defendants delivered copies to Plaintiff's lawyers on July 13, 2018, as evidence in support of Defendants' TCPA motion.[6]

### C. Defendants did not intentionally or negligently destroy any evidence.

"[A] party must intentionally spoliate evidence in order for a spoliation instruction to constitute an appropriate remedy." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 23-24 (Tex. 2014). "By 'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation, we mean that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Id.* at 24. "[A] trial court's finding of intentional spoliation . . . is a necessary predicate to the proper submission of a spoliation instruction to the jury." *Id.* at 25. Moreover, showing that the evidence in question was not destroyed with a fraudulent purpose or intent rebuts a spoliation claim. *Buckeye Ret. Co., L.L.C. v. Bank of Am., N.A.*, 239 S.W.3d 394, 401 (Tex. App.—Dallas 2007, no pet.)

Defendants removed from publication the four Twitter posts that were years old because of concerns that they may have been in violation of Twitter's new terms of service. This was a serious and immediate concern as Defendants had just had several of its accounts banned on numerous other social media platforms after mounting media pressure.[7] If Defendants did not remove such complained-about posts, and they would have likely been found to have violated Twitter policies, the entire account could have been permanently shut down resulting in serious injury to Defendants and the potential loss of all information related to Defendants account.[8]

---

[6] See July 13, 2018 Motion at footnotes 172 and 304 as well as its Exhibit B, D. Jones Affidavit at paragraph 40 for video of June 25 broadcast and footnotes 79 and 80 as well as D. Jones Affidavit at paragraph 41 for video of July 20 broadcast.

[7] See attached Exhibit "C" paragraph 5.

[8] Id.

Twitter can potentially shut down the whole Twitter site for the user, non-violating posts as well as violating posts.[9] Moreover, Plaintiff admits in his motion that Mr. Jones was open about his removal of the old tweets and admits Mr. Jones expressly stated his reasoning for the tweets being removed. Defendants have openly and previously delivered copies of the two videos to Plaintiff's lawyers.[10] There is no evidence Defendants destroyed any tweets or videos at all, much less to conceal or destroy evidence.

### D. Defendants used reasonable efforts to preserve all relevant evidence

A party must exercise reasonable care in preserving evidence, but does not have to go to extraordinary measures to preserve evidence. *Miner Dederick Constr., LLP v. Gulf Chem. & Metallurgical Corp.*, 403 S.W.3d 451,466-67 (Tex. App.--Houston [1st Dist.] 2013, pet. denied).

Defendants copied the four tweets before deleting them from publication in order to avoid being in violation of Twitter policies.[11] Despite the urgency and seriousness of the situation, Defendants diligently worked to preserve all posts and comments to the posts. Although 17 comments were inadvertently lost on Defendants' cache, the vast majority of the comments were able to be maintained.[12] Moreover, Defendants have openly delivered copies of the two videos to Plaintiff's lawyers, a fact that Plaintiff's lawyers failed to inform this Court of in Plaintiff's motion for sanctions and motion for discovery.[13] No other reasonable efforts are required.

### E.  Plaintiff and his lawyers have had open access to the Twitter pages for years

---

[9] Id.
[10] See footnote 6.
[11] See attached Exhibit "C" paragraph 5.
[12] See attached Exhibit "C" paragraphs 6-10.
[13] See footnote 6.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS AND MOTION FOR EXPEDITED DISCOVERY -- Page 6 of 13**

**and the videos were delivered to his lawyers – they are not prejudiced.**

The Twitter posts that Plaintiff complains have been deleted were posted in 2012, 2014 and 2015.[14] Any Twitter user in the whole world has had access for years to those posts in their native settings and format and, for years, could copy those posts, and all the comments to those posts. Plaintiff offers no excuse of why he and his lawyers did not do so even though this suit was filed more than four months ago.

The complained of Twitter posts have been public since 2012 through 2015. Plaintiff filed his suit April 16, 2018, after the posts were available to all the world for up to six years. When Plaintiff filed this suit, he served only a request for disclosure and no request for production. Defendants answered June 18. Plaintiff has still not served a request for production or conducted any other discovery. Plaintiff has not been prejudiced in preparing his case by anything any Defendant did.

### F. Plaintiff's witness's hearsay and conclusory complaints are no evidence of spoliation.

Plaintiff attaches a set of hearsay statements from a witness who writes she is an expert "in online research and the infrastructure of social media." The witness's hearsay statements do not show any spoliation of relevant evidence.

First, the witness's statements are hearsay.

Second, the witness complains that she checked a "variety of links" provided by a hearsay CNN article and she searched something called the "Internet Archive," and found the "original content" deleted from those two sources (she makes no assertion about other sources having the "content" or not), found the "primary content inaccessible" to her, and the "related

---

[14] See attached Exhibit "C" paragraphs 7-10.

discussion, commentary, or hyperlinks" inaccessible to her. She also says saved copies of a social media message leave the message somehow where "its meaning" may "often" be "inscrutable" to her. These statements are vague, ambiguous and conclusory without sufficient predicate or foundation to show the bases of her opinions.

Third, the witness does not have knowledge, personal or otherwise, or the bases thereof, of the content of the tweets or comments though she seems to complain that the comments of unknown persons on the Twitter pages that are not now published are somehow material and relevant to Plaintiff's defamation claim -- she complains that "related" "discussion" and "commentary" are "inaccessible" to her. Spoliation requires the claimed lost evidence must be not only in Defendants' possession or control, but that it must be material and relevant to the Plaintiff's claim. *Wal-Mart Stores v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003). Thus, even if Defendants had evidence of "related commentary," it is immaterial to spoliation -- what unknown persons on the web say is not relevant to Plaintiff's claims for defamation. The test is whether a defendant's published statement is defamatory in "an objectively reasonable reading," to a "the hypothetical reasonable reader," [*see Dallas Morning News, Inc. v. Tatum*, No. 16-0098, 2018 Tex. LEXIS 404, at *27 - 29 (May 11, 2018).], not whether the statement may be defamatory to some polling of people who give related discussion or commentary on Twitter posts, and not whether the unknown person's statement is defamatory.

Moreover, even a negligent act of destruction is spoliation allowing a presumption only if it "so prejudices the nonspoliating party that it is irreparably deprived of having any meaningful ability to present a claim or defense." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 25-26

(Tex. 2014). Given the remote or lack of relevance of these "related" "commentaries," even if they are lost, there is no prejudice to Plaintiff.

In short, Plaintiff's witness tenders only her conclusions without evidentiary predicate, and she does not show the relevance of any evidence that is "inaccessible" to her, or that any relevant evidence was destroyed, or that Plaintiff is prejudiced by any of this. She further fails to describe the data on which she relies, she doesn't testify that experts such as she typically rely on these data and she references no credentials or methodology to her "testing" or conclusions thus both the data and her opinions are not reliable.

### G. Plaintiff's lawyers seek to pull themselves up by their own boot straps to use a spoliation presumption to substitute for their failure to meet their evidentiary burden under TPCA.

As Defendants show above, the four Twitter posts have been public since 2012 through 2015. Plaintiff filed his suit April 16, 2018, after the posts were available to all the world for up to six years. When Plaintiff filed this suit, he served only a request for disclosure and no request for production. Defendants answered June 18. Plaintiff still served no request for production and still did no discovery. Defendants filed their motion to dismiss under the TCPA on July 13. The statute's automatic stay on discovery became effective that day.

Under the TCPA, on July 13, the burden shifted to Plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question" in order to avoid dismissal. TEX. CIV. PRAC. & REM. CODE §27.005(c). Plaintiff still sought no leave of the Court to do any discovery for good cause or otherwise. Only now, nine days away from the Court's hearing of Defendants' TCPA motion, does Plaintiff simultaneously file a motion for

sanctions about some evidence his lawyers and those supporting his efforts have had access to for years and other evidence expressly delivered to his lawyers weeks ago, and seeks to do discovery or make reasonable inquiry. This timing suggests that Plaintiff's lawyers' have ulterior motives here.

The very purpose of the TCPA is that it "protects citizens who… speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them," and "professes an overarching purpose of 'safeguard[ing] the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government'" against infringement by meritless lawsuits. . . ." *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *16 (Tex. App.--Austin, July 14, 2017). The TCPA further commands us that the statute is to be "construed liberally to effectuate its purpose and intent fully" and that we pursue "any such goals chiefly by defining a suspect class of legal proceedings that are deemed to implicate free expression, making these proceedings subject to threshold testing of potential merit, and compelling rapid dismissal -- with mandatory cost-shifting and sanctions -- for any found wanting." *Id.* Plaintiff seeks to do an end-around that legislative command and substitute an unfounded spoliation motion so that his motion can supply what he lacks -- "clear and specific evidence a prima facie case for each essential element of the claim in question" as required by the statute.

### IV. PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY IS WITHOUT GOOD CAUSE.

Plaintiff seeks expedited discovery based on his lawyers' motion for sanctions. As Defendants have said, the very purpose of the TCPA is protect citizens from retaliatory lawsuits and the expense and delay of such suits, and subject those suit to threshold testing of potential merit, and compelling rapid dismissal -- with mandatory cost-shifting and sanctions -- for any

found wanting. *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *16 (Tex. App.--Austin, July 14, 2017). The TCPA expressly stays all discovery before a defendant's TCPA motion is heard to avoid the heavy burden of a defendant having to participate in pre-hearing discovery.

Plaintiff seeks to dodge that stay and impose that statutorily-barred burden. The statute expressly declares Plaintiff can do discovery only if Plaintiff shows "good cause." TEX. CIV. PRAC. & REM. CODE §27.006(b). But, wisely, "[g]ood cause must be based on more than mere conjecture; it must have a firm foundation." *Esparza v. State*, 31 S.W.3d 338, 340 (Tex. App.— San Antonio 2000, no pet.). As Defendants show above, Plaintiff's basis for his motion seeking the statute discouraged pre-TCPA hearing discovery does not have a firm foundation, but is unfounded, relying only on hearsay and factual conclusions, not evidence. Plaintiff's motion for expedited discovery should be denied.

### V. SANCTIONS UNDER RULE 13 AND CHAPTER 10, TEX. CIV. PRAC. & REM. CODE

The material facts are: (1) the June 25 and July 20 videos have not been destroyed and were previously provided to Plaintiff's lawyers, and (2) the four tweets Plaintiff alleges were destroyed that referenced Sandy Hook have not been destroyed and copies of each tweet and relevant evidence were made and have been preserved by Defendants.

The facts establish that no relevant evidence has been destroyed and Plaintiff has not been prejudiced in the ability to present his case. Plaintiff's counsels' unsupported arguments, misstatements and omission of vital facts shows that this motion and Plaintiff's motion for expedited discovery have no basis in law or fact and were filed in bad faith and for an improper purpose. One of those purposes, in addition to delaying the TCPA hearing and substituting a

spoliation finding for otherwise absent evidence, is Plaintiff's counsel's desire for media coverage and publicity.[15]

The evidence and the Court's file show Plaintiff's lawyers filed this motion and the motion for expedited discovery and in both made statements that they knew or should have known were unfounded if they had made the reasonable inquiry as required of them under Rule 13 and should not have filed the motions for the improper purpose of delay, increasing costs and expenses to Defendants, and seeking to avoid their failure to meet their burden under the TCPA. Plaintiff relies heavily on the failure of Defendants' counsel to respond to his emails in the days preceding these motions, despite being fully aware that Defendants' counsel was on vacation.[16] Defendants therefore seek sanctions against Plaintiff's lawyers under Rule 13 and Section 10.004, TEX. CIV. PRAC. & REM. CODE, in a form and amount the Court may find just.

## VI. RELIEF REQUESTED

Defendants request that upon hearing hereof, Plaintiff's Motion for Sanctions be denied, that Plaintiff's Motion for Expedited Discovery be denied, the Court award Defendants attorneys' fees against Plaintiff's lawyers for Defendants responding to this motion, and general relief.

---

[15] Mr. Bankston's letter dated May 25, 2018 makes his desire to create a media frenzy around himself and this case clear when he states that they "plan to make available to the general public and media copies of all correspondence and pleading which arise in this lawsuit, including this letter." See attached Exhibit "A".

[16] Plaintiff's counsel did not copy or otherwise send either of the emails on which he relies to Defendants counsel's legal assistant.

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

*/s/ Mark Enoch*

Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449

Telephone: 972-419-8366
Facsimile: 972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2018, the foregoing was sent via email and via Texas Online electronic service to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

/s/ Mark C. Enoch

Mark C. Enoch



# KASTER LYNCH
# FARRAR & BALL LLP

TEXAS | FLORIDA

May 25, 2018

<u>*Via Facsimile: 512-472-5248*</u>

Mr. Eric Taube
Registered Agent for Free Speech Systems, LLC
Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Ste. 1800
Austin, Texas 78701

Re:  Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, et al.*, In the 345th District Court of Travis County, Texas.

Dear Mr. Taube,

I understand from discussions with my associate Mr. Ogden that you contacted my office today asking that my clients grant a favor to Mr. Jones and Infowars by allowing them an extension of time to file an answer to the lawsuit brought by the Pozners. It is my understanding that Mr. Jones has requested we grant him this favor because he has not yet been able to secure counsel to defend him against these claims.

Frankly, Mr. Jones' failure to secure legal representation is none of our concern. We expect Mr. Jones and Infowars to file a timely answer regardless of when he is able to locate an attorney willing to defend him. Additionally, in light of the years of torment Mr. Jones has inflicted on my clients, and in light of his continuing slander against my clients and our law firm, we have absolutely no inclination to do any favors for Mr. Jones. Indeed, during Mr. Jones' unhinged rant broadcast yesterday on Infowars, Mr. Jones referred to the members of my law firm as "devil-people." His request for an extension is therefore denied.

Furthermore, Mr. Jones needs to understand that the only focus of our law firm is to safeguard the interests and well-being of our clients. We will never take any action in this suit which provides Mr. Jones any benefit at their detriment. As such, there will be no favors or extensions in this case. This case will proceed according to the Texas Rules of Civil Procedure, and we expect Mr. Jones to comply with the commands of the law.

Finally, I would like to note that for the record that our law firm is committed to transparency through the pendency of these lawsuits. For that reason, we plan to make available to the general public and media copies of all correspondence and pleadings which arise in this lawsuit, including this letter.

Sincerely,

Mark D. Bankston
Kaster Lynch Farrar & Ball

1010 Lamar St. | Suite 1600 | Houston, Texas 77002 | p 713.221.8300 | 800.311.1747 | f 713.221.8301


EXHIBIT
A

# The New York Times

## Alex Jones of Infowars Destroyed Evidence Related to Sandy Hook Suits, Motion Says

By Elizabeth Williamson

Aug. 17, 2018

WASHINGTON — Lawyers for the families of two Sandy Hook shooting victims are accusing the conspiracy theorist Alex Jones and his Infowars media business of intentionally destroying evidence relevant to the defamation cases against him, according to a motion filed on Friday in a Texas court.

Mr. Jones is being sued by the families of nine Sandy Hook victims for spreading false claims that the 2012 shooting at the elementary school in Newtown, Conn., that killed 20 first graders and six adults was a government-backed hoax, and that the families of the dead were actors.

Mr. Jones said on his broadcast last week that he had told his staff to delete material after CNN cited Infowars content that violated Twitter's policies, according to the motion filed on Friday.

*[Read a copy of the motion.]*

Mr. Jones has been protesting an unprecedented effort this month by Apple, Facebook, YouTube and other services to remove Infowars content from their platforms for violating policies on hate speech, child endangerment and inciting violence.

At least some of the deleted content was considered evidence in the Sandy Hook cases, and Mr. Jones had been informed in writing in April that he was obligated by law to preserve all relevant material, according to the court filing in District Court in Travis County in Austin.

"As pressure mounted from pending defamation lawsuits and growing public indignation, Mr. Jones chose to destroy evidence of his actual malice and defamatory conduct," the motion filed on Friday said. "Infowars deleted critical evidence at the precise moment plaintiff and his experts were attempting to marshal that evidence."

**You have 4 free articles remaining.**
**Subscribe to The Times**

The suit said that it was not known how much content had been deleted, but that it included written social media materials and videos. The motion was filed on behalf of Neil Heslin, father of Jesse Lewis, a 6-year-old killed at Sandy Hook, by Mark Bankston, Kyle Farrar and William Ogden of Farrar & Ball in Houston.



EXHIBIT
B

8/23/2018 3:56 PM

Over the five years since the shooting, families of the Sandy Hook victims have been stalked, threatened and subjected to online abuse by Mr. Jones's followers, after he spread false claims about the mass shooting, calling it "synthetic, completely fake with actors, in my view, manufactured," according to court documents.

Friday's allegations come amid difficult times for Mr. Jones and Infowars, which has become symbolic of a national conversation about online standards in a so-called post-truth era, in which false information spreads online to millions in minutes.

Mr. Jones peddles diet supplements, survivalist gear and gun-related paraphernalia on radio broadcasts and videos that spread outlandish claims like the government is trying to infringe on Americans' rights, destroy their health or control their minds.

On Tuesday, Twitter suspended Mr. Jones for a week after he posted a link to a video calling for supporters to get their "battle rifles" ready for a fight against the press and others, violating the company's rules against inciting violence.

Also this week, the Federal Communications Commission shut down a pirate radio station that served as Infowars' flagship outlet, and which has operated without a federal license since at least 2013, The Austin American-Statesman reported.

Friday's motion is the latest legal salvo in three separate defamation lawsuits filed by Sandy Hook families, which seek tens of millions of dollars in damages and pose an existential threat to Mr. Jones's business. Should the court find that Mr. Jones and Infowars willfully destroyed evidence, he, and possibly his lawyer, could be assessed thousands of dollars in fines and be subject to punitive action. Most important, the material that was destroyed could be presumed by the court as supporting Mr. Heslin's claims against Mr. Jones, bolstering his case.

Besides the two cases in Texas, the families of seven more Sandy Hook victims and an emergency medical worker subjected to harassment filed a separate defamation suit against Mr. Jones and his associates in May in Connecticut. The families in the larger case are represented by Koskoff, Koskoff & Bieder, a Bridgeport, Conn., firm that also represents Sandy Hook families in a lawsuit against Remington, the maker of the AR-15-style weapon used in the shooting.

The first court appearance in the Sandy Hook lawsuits was in Texas this month, when the court heard arguments in Mr. Jones's motion to dismiss the defamation case brought by Leonard Pozner and Veronique De La Rosa, the parents of Noah Pozner, a 6-year-old killed at Sandy Hook. A decision is expected early next month. A hearing is scheduled for Aug. 30 in Mr. Jones's motion to dismiss the second Texas case, brought by Mr. Heslin.

A ruling on Friday's motion alleging destruction of evidence is expected before the Aug. 30 hearing.

In a recent interview, Mr. Jones said he had previously considered removing Sandy Hook-related material from Infowars' archives. Turning to Rob Dew, another Infowars personality, Mr. Jones asked him, "How many years ago did I say, 'Take all the Sandy Hook videos down because I was tired of them'" — meaning his critics — "'editing them out of context'?"

"We had a big serious meeting about that, actually," Mr. Dew replied. "But then I think in the end we made the decision to leave the stuff up there, because then we could go back and use it as our defense later and say, 'Look, this is what we really said.'"

A version of this article appears in print on Aug. 17, 2018, on Page A16 of the New York edition with the headline: Conspiracy Theorist Faces Claim of Destroying Evidence

8/23/2018 3:56 PM

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## AFFIDAVIT OF ROB DEW

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared ___Rob Dew___, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.      My name is Rob Dew.  I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I am directly in charge and oversee all news media and social media for Defendants. I have personal knowledge of the facts herein stated and they are true and correct.

2.      The June 25, 2017[1] broadcast about which Plaintiff complains was not deleted from YouTube or destroyed by any of the Defendants. Defendants have preserved this video. In fact, this video was provided to Plaintiff as attachment B-36 to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

---

1 The video about which Plaintiff complains did not occur on June 26, but instead on June 25, 2017.



EXHIBIT
C

3.    The July 20, 2017 broadcast about which Plaintiff complains was not deleted from YouTube or destroyed by any of the Defendants. Defendants have preserved this video. In fact, this video was provided to Plaintiff as attachment B-37 to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

4.    The four tweets referenced in the August 9, 2018 CNN article cited in Plaintiff's Motion for Sanctions for Intentional Destruction of Evidence and were dated December 19, 2012, September 24, 2014, December 2, 2014, and July 7, 2015.

5.    Those tweets were removed out of an immediate and serious concern they may have violated Twitter's terms of service as argued in the article. I believed this was a valid concern and important given that several social media accounts had just recently been banned on Aug. 6. I believe that it was highly likely that after the CNN article cited by Plaintiff was published, Twitter, like many others such as YouTube, Facebook and Apple, would succumb to the public pressure and ban the twitter account permanently. I believed that this would have resulted in the permanent loss by Defendants of access to every post ever made under the account.

6.    Defendant did not intend to destroy any evidence nor did it destroy any evidence regarding these tweets. Defendants have preserved copies of each of the 4 tweets. They also attempted to preserve copies of each of the comments posted on each tweet and were able to preserve the vast majority of them. However, despite these efforts 17 comments were not able to be retrieved, because they were either deleted by the users who made the comments or those users accounts have been deleted or removed by Twitter, which are the most likely causes and something that Defendants have no control

---

AFFIDAVIT OF ROB DEW -- Page 2

over and could have happened at any time since the posting, or were inadvertently lost from Defendant's cache.

7.    The tweet posted December 19, 2012 had only 23 comments since it was posted in 2012. Defendants were able to preserve 18 of those 23 comments.

8.    The tweet posted September 24, 2014 had only 18 comments since it was posted in 2014. Defendants were able to preserve 16 of those 18 comments.

9.    The tweet posted December 2, 2014 had on 5 comments since it was posted in 2014. Defendants were able to preserve 3 of those 5 comments.

10.    The tweet posted July 7, 2015 had only 8 comments since it was posted in 2015. All of the 8 comments to this tweet were unfortunately lost.

11.    The loss of these few comments was completely unintentional and Defendants in no way intended to destroy evidence.

12.    The four tweets removed from the twitter account regarding Sandy Hook do not mention or reference Plaintiff or his son in any manner.

Further Affiant Sayeth Not.

AFFIDAVIT OF ROB DEW – Page 3

SWORN TO and SUBSCRIBED before me by Rob Dew on August 23, 2018.



TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022
_____

8/27/2018 8:42 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Sandra Henriquez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
|    *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
|    *Defendants* | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
UNDER THE TEXAS CITIZENS PARTICIPATION ACT**

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I. The InfoWars Video Created a False Impression ....................................... 7

II. The InfoWars Video was Susceptible to a Defamatory Meaning ................... 11

III. The InfoWars Video Presented Assertions of Fact ................................. 13

IV. The InfoWars Video Concerned Mr. Heslin ........................................... 15

V. InfoWars Cannot Hide Behind Zero Hedge ............................................ 16

    A. InfoWars is not entitled to claim protection under Tex. Civ. Prac. & Rem. Code § 73.005 ............................................................ 16

    B. The InfoWars video goes beyond allegation reporting .................... 18

    C. The InfoWars video did not accurately mirror the Zero Hedge blog post ........................................................................... 21

    D. There is no evidence of a third-party ......................................... 22

    E. InfoWars' allegation was not a matter of public concern ................ 23

VI. Mr. Heslin is not a Limited Purpose Public Figure for the Topic of the InfoWars Video .......................................................................... 23

    A. The controversy over Alex Jones's statements about Sandy Hook ................................................................................... 24

    B. The controversy over gun regulation ....................................... 26

VII. Defendants Acted with Actual Malice ................................................. 31

    A. The accusation was inherently improbable ............................... 31

B.  InfoWars used dubious third-party sources ..........................................32

1.  Zero Hedge ..........................................................................................32

2.  Jim Fetzer.............................................................................................34

C.  InfoWars acted deceptively ..................................................................36

1.  Interview with Dr. Carver..................................................................36

2.  Interview with Chris and Lynn McDonnel ...............................37

D.  InfoWars' prior conduct shows actual malice .....................................38

E.  InfoWars drives profits by recklessly stating that national tragedies are fake..........................................................................................40

F.  InfoWars consciously chose to disregard accuracy in its reporting ...................................................................................................42

VIII.  InfoWars' 2017 Statements Caused Damages to Plaintiff .................................43

IX.  InfoWars Cannot Rely on the Fair Comment or Broadcaster Privileges.......45

X.  There is *Prima Facie* Evidence of InfoWars, LLC's Liability.............................46

XI.  Plaintiff's Claims Against Shroyer's Employer(s) Arise via *Respondeat Superior* ........................................................................................................................4

XII.  Derivative Torts such as Civil Conspiracy are not Examined under the TCPA ...........................................................................................................................48

XIII.  This Court Should Order Discovery Prior to Ruling on the Motion ...............49

CONCLUSION ...........................................................................................................................50

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page**

*Allied Mktg. Group, Inc. v. Paramount Pictures Corp.,* 111 S.W.3d 168 (Tex. App.—
Eastland 2003, pet. denied) ...................................................................................15, 30, 31

*Backes v. Misko*, 486 S.W.3d 7 (Tex. App.—Dallas 2015, pet. denied).....................15, 16

*Bentley v. Bunton,* 94 S.W.3d 561, 593 (Tex. 2002) ..................................................14, 22, 31

*Campbell v. Clark,* 471 S.W.3d 615 (Tex. App.—Dallas 2015, no pet.) ........................... 14

*Cox Texas Newspapers, L.P. v. Penick,* 219 S.W.3d 425 (Tex. App.—Austin 2007, pet.
denied) ......................................................................................................................... 16

*D Magazine Partners, L.P. v. Rosenthal,* 529 S.W.3d 429 (Tex. 2017) ...................... 12, 45

*Dallas Morning News, Inc. v. Hall,* 524 S.W.3d 369 (Tex. App.—Fort Worth 2017, pet.
filed).............................................................................................................................. 21

*Dallas Morning News, Inc. v. Tatum,* 16-0098, 2018 WL 2182625 (Tex. May 11, 2018).......... 13

*Exxon Mobil Corp. v. Rincones,* 520 S.W.3d 572 (Tex. 2017)...................................................7

*Fitzgerald v. Penthouse Intern., Ltd.,* 691 F.2d 666 (4th Cir. 1982)...................................... 29

*Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541 (4th Cir. 1994)...................................... 26

*Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847 (Tex. 2005).................................. 32

*G&H Towing Co. v. Magee*, 437 S.W.3d 293 (Tex. 2011)......................................................... 48

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) ..............................................................27, 28

*Goguen ex rel. Estate of Goguen v. Textron, Inc.*, 234 F.R.D. 13, 69 Fed. R. Evid. Serv. 726
(D. Mass. 2006) ......................................................................................................17, 18

*Grant v. Pivot Tech. Sols., Ltd.*, 2018 WL 3677634 (Tex. App.—Austin Aug. 3, 2018, no
pet. h.).......................................................................................................................... 49

*Hutchinson v. Proxmire,* 443 U.S. 111 (1979) ....................................................................24, 25

*KBMT Operating Co., LLC v. Toledo,* 492 S.W.3d 710 (Tex. 2016)........................................ 19

*Klentzman v. Brady*, 312 S.W.3d 886 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ........ 24, 28

*Lluberes v. Uncommon Productions, LLC,* 663 F.3d 6 (1st Cir. 2011)................................. 25

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ....................................................25, 29

*Means v. ABCABCO, Inc.,* 315 S.W.3d 209 (Tex. App.—Austin 2010, no pet.)................................ 12

*Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573 (Tex. 2002)...................................... 48

*Musser v. Smith Protective Services, Inc.,* 723 S.W.2d 653 (Tex. 1987) ............................................ 11

*Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013) ................................................................17, 18, 24

*Reuters Am., Inc. v. Sharp,* 889 S.W.2d 646 (Tex. App.—Austin 1994, writ denied)................... 17

*San Antonio Exp. News v. Dracos,* 922 S.W.2d 242 (Tex. App.—San Antonio 1996, no writ) ........................................................................................................................... 29

*Scripps NP Operating, LLC v. Carter,* 13-15-00506-CV, 2016 WL 7972100 (Tex. App.—Corpus Christi Dec. 21, 2016, pet. filed)................................................. 18, 19, 22, 29

*Skipper v. Meek,* 03-05-00566-CV, 2006 WL 2032527 (Tex. App.—Austin July 21, 2006, no pet)................................................................................................................. 11

*Snyder v. Phelps,* 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) .............................. 23

*Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ............................................................. 48

*Turner v. KTRK TV, Inc.,* 38 S.W.3d 103 (Tex. 2000).........................................................31, 39

*Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1297 (D.C. Cir. 1980) ......................... 26

*Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781 (Tex. App.—Austin 2017, pet. filed)................................................................18, 21, 31, 32, 39, 46, 47, 48, 49

*WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998)....................................................... 26

**Statutes**:

Tex. Civ. Prac. Rem. Code 27.006 ................................................................................... 49

Tex. Civ. Prac. & Rem. Code §73.002 ........................................................................................... 45

Tex. Civ. Prac. & Rem. Code §73.004 ......................................................................................18, 45, 46

Tex. Civ. Prac. & Rem. Code §73.005 ........................................................................................... 17

**Commentary:**

1 Tex. Prac. Guide Civil Trial § 6:131, Character evidence—Evidence of other wrongs
or acts—Intent/Malice ................................................................................................................... 39

50 Tex. Jur. 3d Libel and Slander § 76; 133 ......................................................................... 32, 45

## INTRODUCTION

It was only a couple of hours after Neil Heslin dropped off his son at Sandy Hook Elementary when he got an automated call telling him the school was on lockdown. A short time later, another call instructed parents to return to the school. Mr. Heslin was not overly alarmed. There was no indication a mass shooting had occurred, and nobody would ever have imagined in December 2012 that someone would brutally attack a group of first-graders.

When he arrived to pick up his son, the scene was crowded with confused parents and conflicting information, but Mr. Heslin eventually learned that his son lay inside one of the twenty small body-bags in a makeshift mortuary erected in the parking lot of the school. In the course of learning about the dreadful events of that morning, Mr. Heslin was told of his son's last actions. While the story relayed by law enforcement was surreal and heart-wrenching, for Mr. Heslin it was not surprising, knowing his son as he did. As disturbed gunman Adam Lanza entered the classroom and murdered his teacher, Mr. Heslin's son leapt from under his desk and sprinted at Lanza, yelling at his classmates to run. During the commotion caused by this courageous six-year-old, nine children escaped from the classroom unharmed.

In all the painful memories of those events, Mr. Heslin found refuge in the last moments he spent with his son. Mr. Heslin was able to hold his son's body in his arms, run his fingers through his shaggy mop of hair, and give him a final kiss on the cheek before laying his little hero to rest.

InfoWars, in its malicious campaign of incomprehensible lies about Sandy Hook, sullied and tarnished that pure memory, cast Mr. Heslin as a liar, and ultimately placed him

1

and his family in danger. As far back as 2013, Mr. Heslin had been distressed over InfoWars and its maniacal fabrications about Sandy Hook, but he was determined not to dignify the allegations by acknowledging their existence.[1] Five years ago, InfoWars was still a fringe operation with little recognition outside conspiracy circles. But over the years, as InfoWars continued its sensationalist lies, its audience and influence steadily grew.

As Jones' inflammatory statements reached a wider audience, it was accompanied by a growing tide of public indignation. In June 2017, Megyn Kelly produced a feature story on the fallout from InfoWars' various accusations. Ms. Kelly convinced Mr. Heslin to appear for an interview to discuss the pain caused by InfoWars' lies about Sandy Hook.[2] Mr. Heslin briefly appeared in Ms. Kelly's segment, and he stated that "I lost my son. I buried my son. I held my son with a bullet hole through his head."[3]

One week later, InfoWars retaliated with a cruel and false accusation against Mr. Heslin, delivered by InfoWars host Owen Shroyer. The premise of Mr. Shroyer's video was that Mr. Heslin was lying about having held his son's body and having seen his injury. Mr. Shroyer began the video by citing a blog post he found on an anonymous website called "Zero Hedge." Mr. Shroyer used the article as a launching point to make defamatory accusations against Mr. Heslin. He accomplished his defamation by using deceptively edited footage which he misrepresented as evidence of Mr. Heslin's guilt.

During the video, Mr. Shroyer showed a portion of an interview with medical examiner Dr. Wayne Carver as he described the identification of the victims. Mr. Shroyer misrepresented this portion of Dr. Carver's interview, along with a deceptively edited clip of

---

[1] Exhibit C, Affidavit of Neil Heslin.
[2] *Id,* para. 10.
[3] Exhibit B, Affidavit of Brooke Binkowski, para. 25.

Sandy Hook parent Lynn McDonnel, to falsely claim that the victims' parents were not allowed access to their children's bodies before burial. With an air of arrogant mockery, Mr. Shroyer claimed that Mr. Heslin's statements were "not possible." When Plaintiff learned about the video, he brought this lawsuit.

Given this background, Plaintiff was dismayed when he learned InfoWars had pled the defense of "substantial truth," and he was shocked when he read the following sentence written by InfoWars counsel:

> Plaintiff cannot avoid the clear fact that there was in fact a contradiction arising from the medical examiners statements when he claimed the bodies were not released to the parents.[4]

This statement is an outrageous falsehood. There is no contradiction, and the medical examiner did *not* claim the bodies were not released to the parents, a fact which is obvious from his repeated statements *in the same interview* when he confirms multiple times that *the bodies were released to the parents*. In one example, shortly following the portion edited by Mr. Shroyer, a reporter asked Dr. Carver if "all the children's bodies have been returned to the parents or mortuaries," and Dr. Carver confirmed that "as of 1:30, the paperwork has been done."[5] In the portion purposefully used out-of-context by InfoWars, Dr. Carver was only discussing the initial identification process.

Nonetheless, despite Dr. Carver's clear statements, and despite copious media coverage of open-casket funerals, InfoWars has fabricated an absurd claim in its Sandy Hook hoax mythology in which the parents were prohibited by authorities from seeing their children's bodies before burial. Mr. Jones has told his viewers that "the coroner said none of

---

[4] *See* Defendants' Motion to Dismiss, p. 78.
[5] Exhibit B, Affidavit of Brooke Binkowski, para. 59.

the parents were allowed to touch the kids" and that "the stuff I found was they never let them see their bodies."[6] Now, InfoWars' counsel has advanced this disgraceful falsehood in an official pleading. It is reckless and dangerous to claim that Dr. Carver said, "the bodies were not released to the parents."[7] He said *no such thing*, and distorting his words only feeds the fanaticism of Jones' followers. That was exactly Mr. Shroyer's purpose in the defamatory video, but it is unsettling to see this strategy spill over into litigation.

In this Response, the Court will see how InfoWars dishonestly manipulated and misrepresented video footage in a "calculated and unconscionably cruel hit-job intended to smear and injure a parent who had the courage to speak up about InfoWars' falsehoods."[8] These facts establish a clear *prima facie* case for defamation, and none of InfoWars' frivolous defenses apply. For these reasons, Plaintiff asks the Court to deny InfoWars' motion and award costs in his favor.

## FACTUAL BACKGROUND

In his affidavit, former editor of the *Austin American-Statesman* and University of Texas professor Fred Zipp described the origin of the June 26, 2017 InfoWars video:

> After Mr. Heslin condemned InfoWars' false statements about Sandy Hook during an interview with Megyn Kelly on NBC TV, InfoWars produced a video in which it claimed that Mr. Heslin's statements about his last moments with his child were a lie. InfoWars host Owen Shroyer began the video by citing an article from an anonymous blog called "Zero Hedge." The video shows that the anonymous blog post had been "shared" only three times before it was featured on InfoWars' video. InfoWars took this obscure blog post that almost nobody in the world had seen and used it to smear Mr. Heslin.[9]

---

[6] *See* Defendants' Exhibit B-35.
[7] *See* InfoWars Motion to Dismiss, p. 78
[8] Exhibit A, Affidavit of Fred Zipp, p. 4.
[9] *Id.*, p. 3.

4

In his interview, Mr. Heslin told Ms. Kelly that he buried his son, held his body, and saw his fatal injury. With regards to Mr. Heslin's interview, Mr. Shroyer stated the following in the June 26, 2017 video:

> The statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible.
>
> And so one must look at Megyn Kelly and say, Megyn, I think it's time for you to explain this contradiction in the narrative because this is only going to fuel the conspiracy theory that you're trying to put out, in fact.
>
> So -- and here's the thing too, you would remember -- let me see how long these clips are. You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on. So let's roll the clip first, Neil Heslin telling Megyn Kelly of his experience with his kid.[10]

Mr. Shroyer then played a clip from the Mr. Heslin's interview in which he stated, "I lost my son. I buried my son. I held my son with a bullet hole through his head."[11] After playing the clip, Mr. Shroyer stated:

> So making a pretty extreme claim that would be a very thing, vivid in your memory, holding his dead child. Now, here is an account from the coroner that does not corroborate with that narrative.[12]

Mr. Shroyer then played a short clip from a news conference with Dr. Wayne Carver, the medical examiner at Sandy Hook. In the clip, Dr. Carver stated that "we did not bring the bodies and the families into contact. We took pictures of them." Dr. Carver stated in the clip that "we felt it would be best to do it this way." Mr. Shroyer also showed a dishonestly edited

---

[10] Exhibit A-1, 2017-06-26 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)
[11] Exhibit A, Affidavit of Fred Zipp, p. 3.
[12] *Id.*

clip of an interview with Chris and Lynn McConnel in which Anderson Cooper states, "It's got to be hard not to have been able to actually see her." As will be shown below, these video clips were edited and intentionally presented in a deceptive fashion.

At the end of the video, Mr. Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[13] On July 20, 2017, during an episode of The Alex Jones Show, Mr. Jones republished Mr. Shroyer's story in full ("And so I'm going to air this again, and I'm going to challenge that it doesn't violate, uh, the rules.").[14] Free Speech Systems, LLC employs Mr. Shroyer as a reporter.[15] InfoWars, LLC operates the InfoWars.com website, where the challenged statements were also published.[16] InfoWars, LLC is also involved in the sale of dietary supplements sold during InfoWars programming and through the InfoWars.com website.[17]

## LEGAL STANDARD

To survive a motion to dismiss under the TCPA, a defamation plaintiff must show *prima facie* evidence of the following:

(1)     a publication of a false statement of fact to a third party
        that was defamatory concerning the plaintiff,

(2)     with the requisite degree of fault, and

(3)     damages.

---

[13] *Id.*
[14] *See* Defendants' Exhibit B-35.
[15] *See* Defendants' Motion to Dismiss, p. 17.
[16] Exhibit G, Affidavit of Marcus Turnini.
[17] Exhibit I, Notice of Violation issued against InfoWars, LLC by the State of California, Center for Environmental Health, regarding "lead in InfoWars Life dietary supplements," publicly available at: https://oag.ca.gov/system/files/prop65/notices/2017-02319.pdf

*Exxon Mobil Corp. v. Rincones,* 520 S.W.3d 572, 579 (Tex. 2017). *Prima facie* refers to the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky,* 460 S.W.3d 579, 590 (Tex. 2015). The statute does not define 'clear and specific evidence,' but in *Lipsky,* the Supreme Court interpreted the phrase to mean more than "mere notice pleading." *Id.* "Though the TCPA initially demands more information about the underlying claim, the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence." *Id.* at 591. As such, the Supreme Court "disapprove[d] those cases that interpret the TCPA to require direct evidence of each essential element of the underlying claim to avoid dismissal." *Id.* Instead, "pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Id.* Plaintiff far exceeds this burden, as he can produce direct *prima facie* evidence on each element of his claim.

## ARGUMENT

### I.    The InfoWars Video Created a False Impression.

In the June 26, 2017 InfoWars video, Mr. Shroyer asserts that Mr. Heslin's statement -- "I lost my son. I buried my son. I held my son with a bullet hole through his head." -- was not possible. Yet as Mr. Heslin stated in his affidavit, "the June 26, 2017 video is false. I buried my son. I held his body. I saw a bullet hole through his head."[18]

Plaintiff has submitted the affidavit Dr. Wayne Carver, the Connecticut chief medical examiner featured in the InfoWars video who "oversaw the process by which medical

---

[18] Exhibit C, Affidavit of Neil Heslin, para. 21.

examinations were performed on victims of the Sandy Hook massacre."[19] Dr. Carver stated that "upon completion of the medical examinations, the victim's bodies were released to the custody of funeral homes who had been engaged by the families," and that postmortem examination procedures "are designed so as not to interfere with usual American funereal practices."[20] As such, "medical examiners made no efforts to conceal injuries."[21] Dr. Carver stated that based on his personal knowledge, he knows "Mr. Heslin would have had an opportunity to hold his son's body and see his injuries if he chose to do so."[22]

In addition to the affidavits of Mr. Heslin, Dr. Carver, and Mr. Zipp, the validity of Mr. Shroyer's accusation is also addressed in the affidavit of Brooke Binkowski. As this Court is aware from the *Pozner* matter, Ms. Binkowski is a Fellow in Global Journalism at the Munk School of Global Affairs with over twenty years of experience as a multimedia journalist and professional researcher. As part of her work, she has "routinely investigated claims made in media and on the internet to assess their validity," winning acclaim and awards from her colleagues for her anti-disinformation work.[23] In her affidavit, Ms. Binkowski explains that the statements in the video created a false impression:

> Mr. Shroyer's statement was false. Mr. Heslin stated to Megyn Kelly that "I lost my son. I buried my son. I held my son with a bullet hole through his head." The evidence shows that Mr. Heslin lost his son, and that he buried his son, and that it was indeed possible for Mr. Heslin to hold his child and see the bullet wound.

> I have reviewed the affidavit of Dr. Wayne Carver, the Connecticut Medical Examiner cited in Mr. Shroyer's video...

---

[19] Exhibit D, Affidavit of Dr. Wayne Carver, para. 2-3.
[20] *Id.* para. 8-9.
[21] *Id.* para. 10.
[22] *Id.* para. 18.
[23] Exhibit B, Affidavit of Brooke Binkowski, para. 9.

In addition, the funeral services in which the bodies were in the possession of the parents were widely reported in the press. Several of these services had open caskets.

It was widely reported in the media that Connecticut Governor Dannel Malloy personally observed the body of a Sandy Hook victim during one of the services.

There is no reasonable basis to conclude that Mr. Heslin would have been unable to hold his son and see his wound merely because the initial identification was performed by photograph, and there is no doubt that he did in fact bury his son.[24]

As noted above, InfoWars' Motion disingenuously argues that "Plaintiff cannot avoid the clear fact that there was in fact a contradiction arising from the medical examiners statements when he claimed the bodies were not released to the parents."[25] InfoWars' Motion emphasizes this falsehood, stating that "regardless of what others reported, the medical examiner stated that the bodies were not released."[26] This is the same blatant fabrication advanced by Mr. Shroyer. In the portion of the interview shown in the InfoWars video, Dr. Carver discusses the process for initial identification of the victims, which was performed by photograph. Regarding this process, Dr. Carver stated, that "we did not bring the bodies and the families into contact. We took pictures of them." A few questions later, a reporter asks Dr. Carver if "all the children's bodies have been returned to the parents or mortuaries." Dr. Carver responds, "I don't know. The mortuaries have all been called." The reporter asks, "But they're ready to be released at this time?" Dr. Carver responds, "As of 1:30, the paperwork has been done. The usual drill is that the funeral homes call us, and as soon as the paperwork is done, we call them back. That process was completed for the

---

[24] *Id.*, para. 25-30.
[25] InfoWars Motion to Dismiss, p. 78
[26] *Id.*

children at 1:30 today."[27] In response to another question, Dr. Carver stated that his "goal was to get the kids out and available to the funeral directors first, just for, well, obvious reasons."[28]

In addition to misrepresenting Dr. Carver's statements, InfoWars also created a false impression by editing and misrepresenting a CNN interview with Sandy Hook parents Chris and Lynn McDonnel. In the clip used by InfoWars, Mrs. McDonnel was asked: "It's got to be hard not to have been able to actually see her." Mrs. McDonnel began her answer by stating, "And I had questioned maybe wanting to see her." InfoWars used this clip to show that Sandy Hook parents were not allowed to see their children's bodies. However, Ms. Binkowski pointed out in her affidavit that the InfoWars clip "cut off the end of Mrs. McDonnel's answer."[29] Her full answer stated:

> *And I had questioned maybe wanting to see her,* but then I thought, she was just so, so beautiful, and she wouldn't want us to remember her looking any different than her perfect hair bow on the side of her beautiful long blond hair.[30]

A couple questions earlier, Mrs. McDonnel stated that they "went to funeral home" where they were "able to be with her."[31] Mrs. McDonnel later said that "when we left the room, it was certainly so hard to leave her because that would be the last time that we would be able to be with her."[32] In other words, it would have been clear to anyone who watched the interview that the McDonnels had the opportunity to see their child's body. As Mr. Zipp stated in his affidavit, "Mr. Shroyer was only able to support his bogus accusations by using

---

[27] Exhibit B, Affidavit of Brooke Binkowski, para. 59; *see also* Exhibit B-1, Dr. Carver Video Interview.
[28] *Id.*, para. 58.
[29] Exhibit B, Affidavit of Brooke Binkowski, para. 61.
[30] *Id.*
[31] Exhibit B-2, McDonnel Interview Transcript.
[32] *Id.*

deceptively edited footage."[33] In doing so, InfoWars manufactured "false statements about [Plaintiff's] honesty or integrity."[34]

## II.     The InfoWars' Video was Susceptible to a Defamatory Meaning.

InfoWars next argues that the statements could not be interpreted as defamatory. The determination to be made under the TCPA is whether "the statements were reasonably susceptible of a defamatory meaning." *Musser v. Smith Protective Services, Inc.,* 723 S.W.2d 653, 654 (Tex. 1987). In other words, the court must determine if the video "is capable of bearing the meaning ascribed to it by [Plaintiff] and whether that meaning is capable of a defamatory meaning." *Skipper v. Meek,* 03-05-00566-CV, 2006 WL 2032527, at *5 (Tex. App.—Austin July 21, 2006, no pet.) Here, the only meaning of the statements is defamatory. Regarding the meaning of the video, Mr. Zipp outlined the reasons Mr. Shroyer's statements would be interpreted as defamatory:

> It is my opinion that the Shroyer video defamed Neil Heslin by impunging his reputation with false statements about his honesty or integrity. Mr. Shroyer arranged edited footage in a misleading and dishonest way to attack Mr. Heslin. At best, the InfoWars video is a mishmash of out-of-context statements that creates a dishonest portrait of Mr. Heslin, his statements and the events of Sandy Hook. At worst, it was a calculated and unconscionably cruel hit-job intended to smear and injure a parent who had the courage to speak up about InfoWars' falsehoods. In either case, InfoWars recklessly disregarded journalistic standards in approaching this story because disregarding those standards was necessary to carry out its distortion of events.[35]

---

[33] Exhibit A, Affidavit of Fred Zipp, p. 16.
[34] *Id.*, p. 4.
[35] *Id.*, p. 4.

Moreover, Mr. Zipp points out that "Mr. Shroyer also made it clear that he was not accusing Mr. Heslin of an innocent mistake."[36] Mr. Zipp emphasized Mr. Shroyer's comment that the event is "not something that you would just misspeak on" because "you would remember if you held your dead kid in your hands with a bullet hole."[37] Under Texas law, a statement can be defamatory if it contains "the element of disgrace or wrongdoing." *Means v. ABCABCO, Inc.,* 315 S.W.3d 209, 215 (Tex. App.—Austin 2010, no pet.). Here, an element of disgrace or wrongdoing is "a reasonable construction of the [video's] gist." *D Magazine Partners, L.P. v. Rosenthal,* 529 S.W.3d 429, 441 (Tex. 2017), *reh'g denied* (Sept. 29, 2017). Indeed, it is the only possible gist.

Plaintiff has also submitted the affidavits of Dr. Wayne Carver and Scarlet Lewis. Both are personally acquainted with Neil Heslin. Dr. Carver understood that "the InfoWars host was asserting that it was impossible for Mr. Heslin to have held his son and seen his injuries."[38] He also "understood the comments by InfoWars to be an attack on Mr. Heslin's honesty and integrity," and that the video "was intended to reinforce the validity of Mr. Jones' prior statements about Sandy Hook, and act as further evidence that the event was staged."[39] As such, Dr. Carver "also understood the InfoWars' comments to implicate Mr. Heslin in criminal conduct, such as making false statements to government officials or engaging in other forms of criminal misrepresentation."[40] Similarly, Scarlet Lewis testified that she understood the video to be asserting that Plaintiff "was lying about having held the body of his son, and that Mr. Heslin was engaging in a fraud or cover-up of the truth regarding the

---

[36] *Id.*, p. 5.
[37] *Id.*
[38] Exhibit D, Affidavit of Dr. Wayne Carver, para. 17.
[39] *Id.*, para. 16; 19.
[40] *Id.*, para. 20.

Sandy Hook massacre."[41] Ms. Lewis also testified that she "understood Mr. Shroyer to be making the claim that Mr. Heslin was working in collusion with the media, specifically Megyn Kelly, to perpetrate a fraud on the public."[42] Based on the context of the statements, Ms. Lewis also understood the video "to implicate Mr. Heslin in criminal conduct."[43]

In addition, Mr. Zipp explained that "[t]he InfoWars video was not only false and disparaging, but also influential; after it appeared, a group of irrational and dangerous conspiracy fanatics turned their attention to Mr. Heslin."[44] Mr. Zipp's affidavit provides several examples of conspiracy fanatics fixating on Mr. Heslin in the weeks and months after the InfoWars video. One website "alleged that Mr. Heslin's name was actually an anagram hiding his secret purpose with the Illuminati," while another claimed that he was a "crisis actor" who also played the "role" of a fireman killed in the 9/11 terror attack. As Mr. Zipp explained, "[o]nce a person's name enters conspiracy culture, there is no limit for how bizarre the accusations can become."[45] Mr. Zipp concluded that "[t]he InfoWars video exposes Mr. Heslin to ridicule and contempt, and it is reasonable to believe that it could encourage bad actors who could become a threat to his safety."[46]

## III.  The InfoWars Video Presented Assertions of Fact.

A statement is considered a fact if it is verifiable, and, if in context, it was intended as an assertion a fact. "A statement that fails either test—verifiability or context—is called an opinion." *Dallas Morning News, Inc. v. Tatum,* 16-0098, 2018 WL 2182625, at *16 (Tex. May 11, 2018). Here, both Mr. Zipp and Ms. Binkowski concluded that Mr. Shroyer was making an

---

[41] Exhibit E, Affidavit of Scarlet Lewis, para. 7.
[42] *Id.*, para. 9.
[43] *Id.*, para. 10.
[44] Exhibit A, Affidavit of Fred Zipp, p. 7.
[45] *Id.,* p. 6.
[46] *Id.*, p. 7.

assertion of fact. As Ms. Binkowski noted, Mr. Shroyer "asserted that Mr. Heslin's statement is not possible, and he cited evidence. He was unequivocal in his statements."[47] Mr. Zipp observed that:

> Mr. Shroyer did not equivocate in his statements about Mr. Heslin. Mr. Shroyer claimed Mr. Heslin's statement about holding his son was "not possible." He also referenced the involvement of unspecified "fact-checkers," which obviously signals an assertion of fact, not an opinion.[48]

Mr. Shroyer's language leaves no room for anything but a factual accusation. Mr. Shroyer indicated his accusation was based on his review of evidence, not his personal opinion ("According to a timeline of events and a coroner's testimony...").[49] He did not use any terms to qualify his statements. Yet even hedge words would not shield Mr. Shroyer's accusation. "As Judge Friendly aptly stated: '[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Bentley v. Bunton,* 94 S.W.3d 561, 583–84 (Tex. 2002). After all, "an opinion, like any other statement, can be actionable in defamation if it expressly or impliedly asserts facts that can be objectively verified." *Campbell v. Clark,* 471 S.W.3d 615, 625 (Tex. App.—Dallas 2015, no pet.). Moreover, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Campbell,* 471 S.W.3d at 627–28.

Here, the tone of the video was presented as an informational news broadcast, not as political and personal commentary. The style of the video is consistent with its explicit text

---

[47] Exhibit B, Affidavit of Brooke Binkowski, para. 24.
[48] Exhibit A, Affidavit of Fred Zipp, p. 15.
[49] *See* Exhibit B-1.

claiming Mr. Heslin's statements are "impossible" due to evidence discovered by "fact-checkers." The video can only be interpreted as a statement of fact, not opinion.

## IV.    The InfoWars Video Concerned Mr. Heslin.

InfoWars makes the frivolous argument that the video was not "of or concerning" Mr. Heslin, based primarily on its assertion that it did not intend to refer to Mr. Heslin in the video. Yet under Texas law, "[i]t is not necessary for the plaintiff to prove that the defendant intended to refer to the plaintiff." *Allied Mktg. Group, Inc. v. Paramount Pictures Corp.,* 111 S.W.3d 168, 173 (Tex. App.—Eastland 2003, pet. denied). The argument is frivolous because regardless of InfoWars' intention, the video directly implicates Mr. Heslin, who is named, shown, and directly criticized.

Next, InfoWars argues that it is immune from suit because the video also refers to Megyn Kelly. According to InfoWars, a defendant can escape liability so long as it defames more than one individual in a single publication. InfoWars argues that Plaintiff's case should be dismissed because Mr. Shroyer also "referenced the lack of journalistic credibility from Kelly and NBC."[50] InfoWars tells this Court that Plaintiff has no claim because "the alleged defamatory statements were not just about him."[51] Obviously, this is not the law.

In Texas, "a publication is 'of and concerning' the plaintiff if persons who knew and were acquainted with the plaintiff understood from viewing the publication that the allegedly defamatory matter referred to the plaintiff." *Id.* A plaintiff is implicated "if those who knew and were acquainted with her understood from reading that it referred to her." *Backes v. Misko*, 486 S.W.3d 7, 24-25 (Tex. App.—Dallas 2015, pet. denied). It is enough that

---

[50] *See* Defendants' Motion to Dismiss, p. 54.
[51] *Id.* at p. 55.

the evidence supports a "reasonable inference that some people" who saw the statements believed they concerned the plaintiff. *Tatum*, 2015 Tex. App. LEXIS 13067, at *16 (*rev'd on other grounds*). "The plaintiff may satisfy his burden on the 'of and concerning' element by offering proof that persons acquainted with the plaintiff would understand the publication to refer to him." *Cox Texas Newspapers, L.P. v. Penick,* 219 S.W.3d 425, 433 (Tex. App.—Austin 2007, pet. denied). Thus, in *Backes*, *Tatum*, and *Penick*, affidavits showing that people understood the defamatory remarks to concern individuals in the statements were sufficient to carry the plaintiffs' burden under the TCPA.

As shown above, such evidence is found in the affidavits of Dr. Wayne Carver and Scarlett Lewis. Both witnesses are familiar with Neil Heslin, and they both viewed the challenged video. They both testified they understood the video implicated Neil Heslin. As such, there is *prima facie* evidence that the broadcast is reasonably susceptible of a meaning that is "of and concerning" the Plaintiffs. The broadcast directly concerns Mr. Heslin, and the affidavits are evidence that a viewer acquainted with him could "understand the individual publication at issue to implicate [Mr. Heslin]." *Penick,* 219 S.W.3d at 437.

## VI.    InfoWars Cannot Hide Behind Zero Hedge.

InfoWars argues that its defamatory video is protected because it was merely reporting the allegations made by a third party. However, InfoWars is not entitled to the benefit of the new third-party allegation statute, and its video was clearly defamatory under the existing common law rules, which the statute only modified for certain defendants. Even if the statute did apply, InfoWars' conduct would nonetheless prevent its application.

A.    **InfoWars is not entitled to claim protection under Tex. Civ. Prac. & Rem. Code § 73.005.**

InfoWars claims that it is entitled to protections of the new third-party allegation statute, which reads: "In an action brought against a newspaper or other periodical or broadcaster, the defense [of substantial truth] applies to an accurate reporting of allegations made by a third party regarding a matter of public concern." Tex. Civ. Prac. & Rem. Code § 73.005. This statute was created as an exception for certain defendants to the Supreme Court's decision in *Neely,* which held that "there is no rule in Texas shielding media defendants from liability simply because they accurately report defamatory statements made by a third party." *Neely v. Wilson,* 418 S.W.3d 52, 59 (Tex. 2013). Therefore, the *Neely* court ruled that Texas common law does not support "a substantial truth defense for accurately reporting third-party allegations." *Id.* at 64.

Upon lobbying by the Texas Association of Broadcasters in 2015, the legislature passed a statutory exception to *Neely* limited to newspapers, periodicals, and broadcasters. The problem with InfoWars' use of this defense is that InfoWars is not a newspaper, periodical, or broadcaster. First, InfoWars is obviously not a newspaper. Under Texas law, "'newspaper' means a publication that is printed on newsprint." *Reuters Am., Inc. v. Sharp,* 889 S.W.2d 646, 650 (Tex. App.—Austin 1994, writ denied), *citing* Tax Code § 151.319(f).

Likewise, InfoWars is not a periodical. The term "periodical" is well defined in the law, and "comprises magazines, trade publications, and scientific and academic journals with weekly, monthly, or quarterly circulation and does not necessarily include other publications with such circulation even where the publications are published at regular intervals." *See* 58 Am. Jur. 2d Newspapers, etc. § 4, *citing Goguen ex rel. Estate of Goguen v. Textron, Inc*., 234 F.R.D. 13, 69 Fed. R. Evid. Serv. 726 (D. Mass. 2006); *see also Oxford English Dictionary Online*,

17

at http://www.oed.com (defining periodical as "a magazine or journal issued at regular or stated intervals (usually weekly, monthly, or quarterly)"). "The United States Postal Service uses a similar definition of 'periodical' to determine mailing rates." *Goguen*, 234 F.R.D. at 18. InfoWars does not meet this definition.

Finally, InfoWars is not a broadcaster. Under the TCPA, a "broadcaster means an owner, licensee, or operator of a radio or television station or network of stations and the agents and employees of the owner, licensee, or operator." Tex. Civ. Prac. & Rem. Code Ann. § 73.004(b). The definition in common usage likewise refers to an entity who transmits a television or radio signal. According to an August 17, 2018 article on its website, "Infowars does not operate any radio or TV stations."[52] It does not broadcast any signals over public airwaves. Instead, InfoWars produces video and audio content, and it provides that content to other entities for distribution.

Because InfoWars cannot show it is one of the three specified entities described in the statute, the video is governed by the the common law framework as set forth in *Neely.* Under that framework, "we note that the Texas Supreme Court has reaffirmed the 'well-settled legal principle that one is liable for republishing the defamatory statement of another.'" *Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781, 810 (Tex. App.—Austin 2017, pet. filed).

### B.  The InfoWars video goes beyond allegation reporting.

In any case, InfoWars cannot be entitled to third-party allegation protection because the "defamatory statements at issue here went beyond mere 'allegation reporting.'" *Scripps*

---

[52] https://www.infowars.com/mass-correction-mainstream-media-retracts-false-infowars-pirate-radio-story/

*NP Operating, LLC v. Carter,* 13-15-00506-CV, 2016 WL 7972100, at *13 (Tex. App.—Corpus Christi Dec. 21, 2016, pet. filed). First and foremost, InfoWars "did not consistently attribute the allegations to a third-party source." *Id.* at *13. Ms. Binkowski observed that "it is notable that Mr. Shroyer only said the phrase 'Zero Hedge' one time in the entire segment. Mr. Shroyer did not consistently attribute the allegations to Zero Hedge."[53]

However, most important is Mr. Shroyer's enthusiastic endorsement of the allegations. Although Mr. Shroyer's video noted "that the allegations had initially been made by [a third party], its 'gist or sting' was that the allegations were, in fact, true." *Scripps* at *13. Under those circumstances, the statements "were not merely reports of allegations." *Id.* A report of an allegation must be "a simple, accurate, fair, and brief restatement." *KBMT Operating Co., LLC v. Toledo,* 492 S.W.3d 710, 717 (Tex. 2016). Mr. Shroyer's video was anything but.

In her affidavit, Ms. Binkowski reviewed the statements in the video and identified "several parts of the language used in the video which [she] found quite significant."[54] Under Texas law, the character of these statements can provide "additional affirmative evidence from the text itself that suggests the defendant objectively intended or endorsed the defamatory inference." *Tatum,* 2018 WL 2182625 at *20. Ms. Binkowski first explained how an ordinary viewer would see Mr. Shroyer making his own accusations and citing his own evidence:

> Mr. Shroyer stated: "[Heslin] is claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible." A viewer of ordinary intelligence could hear this statement and conclude that Mr. Shroyer is making his own

---

[53] Exhibit B, Affidavit of Brooke Binkowski, para. 18.
[54] *Id.*, para. 17.

assertion. Zero Hedge is not mentioned. In fact, Mr. Shroyer's citation of "a timeline of events and a coroner's testimony" as the basis for his conclusion strongly suggests that InfoWars had examined the evidence itself.[55]

Ms. Binkowski also examined Mr. Shroyer's ambiguous use of the phrase "fact-checkers," and the ways that statement could be understood:

> This language is ambiguous in context. It can reasonably be interpreted in three ways. First, the "fact checkers" who purportedly examined the issue could work for InfoWars. Second, the "fact checkers" could be associated with Zero Hedge. Third, the "fact checkers" are some other unnamed source relied on by InfoWars.

> A viewer of ordinary intelligence could hear this statement and reasonably believe that InfoWars had confirmed the accuracy of the Zero Hedge report with its own "fact checkers." This interpretation is supported by the remainder of the segment in which Mr. Shroyer makes his own comments and shows footage assembled and edited by InfoWars.[56]

Ms. Binkowski also discusses how Mr. Shroyer signaled to the viewer that he was making his own allegations:

> Later in the InfoWars video, Mr. Shroyer asserted that there was a "contradiction in the narrative." This was clearly Mr. Shroyer's own conclusion.

> Mr. Shroyer also callously stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on." Not only is this statement sickening, but it further reinforces that Mr. Shroyer has taken his own position.

> Later in the video, when speaking about Mr. Heslin's statements to Megyn Kelly, Mr. Shroyer stated: "Here is an account from the coroner that does not corroborate with that narrative." Again, Zero Hedge was not mentioned or attributed. Mr. Shroyer was presenting his own assertion that Mr. Heslin's interview is

---

[55] *Id.*, para. 22-23.
[56] *Id.*, para. 20-21

contradicted by the coroner. However, this is false. Mr. Heslin's interview is not contradicted by the coroner.[57]

Finally, Mr. Binkowski explained how all the circumstances of the video shows that it went beyond allegation reporting:

> The June 26, 2017 InfoWars video was not merely a report on a third-party's allegations. Rather, InfoWars adopted the allegations of a dubious anonymous website and reasserted them as their own. InfoWars presented the allegations as true, and it made statements and played deceptive video edits which were meant to convince its viewers that Mr. Heslin's statements were not possible.[58]

### C.   The InfoWars video did not accurately mirror the Zero Hedge blog post.

Even if InfoWars were entitled to the new statute's protections, the video was not an accurate report of the third-party statements. A publisher's "omission of facts may be actionable if it so distorts the viewers' perception that they receive a substantially false impression of the event." *Warner Bros.,* 538 S.W.3d at 810. Texas recognizes that "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Dallas Morning News, Inc. v. Hall*, 524 S.W.3d 369, 382 (Tex. App.—Fort Worth 2017, pet. filed). In other words, a publication does not accurately report a third-party source when it omits a pertinent fact.

In this case, Ms. Binkowski notes that both Zero Hedge and Mr. Shroyer alleged "that Dr. Carver told the media that 'the parents of the victims weren't allowed to see their children's bodies.'"[59] However, she explained one key difference:

---

[57] *Id.*, para. 31-33.
[58] *Id.*, para. 51.
[59] *Id.,* para. 67.

> In the Zero Hedge blog post, the author later admits that "it's entirely possible that Mr. Heslin had access to his son after the shooting." Mr. Shroyer's video contains no such statements.[60]

In the InfoWars' mythology, the parents were never allowed to see their children. As such, Plaintiff would still have a cause of action even under the new third-party statute because Mr. Shroyer's video "created a gist that cast [him] in a worse light than…the source of the allegations themselves." *Hall,* 524 S.W.3d at 382–83.

### D.    There is no evidence of a third-party.

Even if the new statute did apply to InfoWars, the statute does not protect the publication of dubious anonymous statements. In order to claim the defense, the article must "attribute the allegations to a third-party source." *Scripps* at *13. In her affidavit, Ms. Binkowski explains that the content posted on Zero Hedge does not point to any ascertainable third-party:

> Zero Hedge is anonymous blog. Zero Hedge has no named editor-in-chief, and its articles are submitted by anonymous authors. The publication has no listed address nor phone number. Its website is registered anonymously.[61]

Instead, InfoWars merely printed anonymous hearsay as its own defamation. InfoWars cannot name any individual whose statement it claims to have reported. For all we know, the anonymous author could be an InfoWars employee or agent. Publishing anonymous accusations is not a defense; it is evidence of actual malice. *See, e.g., Bentley,* 94 S.W.3d at 596; *see also* 1 Law of Defamation § 3:62 (2d ed.) ("[R]eliance on an anonymous source…is admissible as evidence of actual malice.").

---

[60] *Id.*
[61] *Id.,* para. 39.

### E.      InfoWars' allegation was not a matter of public concern.

Even if the new third-party allegation did apply InfoWars, it would require a showing that the video related to "a matter of public concern." A video which solely concerns whether Mr. Heslin held his child's body is not a matter of public concern. Rather, it was a calculated personal attack on Mr. Heslin in retaliation for his interview with Megyn Kelly. "Matter of public concern" is defined in Civil Practice and Remedies Code, specifically, Sec. 27.001, which reads: "An issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace." Here, accusing Mr. Heslin of lying about holding the body of his dead son does not amount to a matter of public concern. "Speech deals with matters of public concern when it can be *fairly* considered as relating to any matter of political, social, or other concern to the community ... or when it is a subject of *legitimate* news interest; that is, a subject of general interest and of *value* and concern to the public..." *Snyder v. Phelps,* 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). Mr. Shroyer's video was none of these things. The third-party allegation defense is inapplicable for this reason and the many others cited above.

## VI.      Mr. Heslin is not a Limited Purpose Public Figure for the Topic of the InfoWars Video.

Just as in the *Pozner* matter, InfoWars contends that the Plaintiff is a public figure for the purposes of the controversy over InfoWars' hoax allegations, or alternatively, that Plaintiff is a public figure due to his advocacy for gun regulation. In either case, InfoWars' argument fails for the reasons set forth below.

### A.     The controversy over Alex Jones's statements about Sandy Hook.

InfoWars first identifies the controversy as the public dismay over InfoWars' statements about Sandy Hook and his attacks on the credibility of the parents. Megyn Kelly's feature story addressed this controversy head-on. Mr. Heslin was asked to grant an interview regarding Mr. Jones' years of lies about the death of his son and the twenty-five other victims of the tragedy. InfoWars claims that Plaintiff is a public figure because he "volunteered to be interviewed on camera and volunteered to provide his thoughts on Jones' opinions."[62]

To the extent Plaintiff had any notoriety in the controversy over whether Sandy Hook is a hoax, it is only because Mr. Jones inflicted that notoriety with his incessant attacks and accusations that the victims were not real. "A person does not become a public figure merely because he is 'discussed' repeatedly by a media defendant or because his actions become a matter of controversy as a result of the media defendant's actions." *Klentzman v. Brady*, 312 S.W.3d 886, 905 (Tex. App.—Houston [1st Dist.] 2009, no pet.), *quoting Hutchinson v. Proxmire,* 443 U.S. 111, 135 (1979) (noting that "[c]learly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.") Under well settled Texas law, a defendants' conduct "cannot be what brought the plaintiff into the public sphere." *Neely*, 418 S.W.3d at 71 (Tex. 2013).

Mr. Heslin agreed to appear on camera after four years of lies to give defensive statements, and defensive statements do not transform a plaintiff into a public figure. *See* Defamation: A Lawyer's Guide § 5:9. Vortex or limited purpose public figure – The preexistence requirement and rejection of media "bootstrapping." (Collecting cases refusing to find "that purely defensive truthful statements constitute a purposeful injection."); *see*

---

[62] *See* Defendants' Motion to Dismiss, p. 62.

*also, e.g., Hutchinson,* 443 U.S. at 135 (Plaintiff must be "a public figure prior to the controversy engendered by the [defendant's conduct]."); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1281-82 (D.C. Cir. 2003) (plaintiff's "attempts to defend herself through the media against allegedly defamatory statements" did not make her a public figure). As Mr. Heslin explained in his affidavit:

> I never sought to participate in any public debate over whether the events at Sandy Hook were staged. Nor did I seek to participate in any public debate over whether my son died.
>
> Over the years, I remained silent as Mr. Jones continued to make disgusting false claims about Sandy Hook, telling his viewers that the children were fake and that the parents were liars and evil conspirators.
>
> In 2017, Megyn Kelly was in the process of producing a profile on Mr. Jones when she asked me for an interview. Though I was very conflicted as to whether to grant an interview, I agreed to speak on camera only to help set the record straight about the lies told by Mr. Jones about Sandy Hook, specifically that the event was staged and involved actors.
>
> I gave comments to Ms. Kelly stating the reality: The shooting happened. I stated that I buried my son, that I held my son's body, and that I saw a bullet hole through his head.
>
> I made these statements not to invite debate, but to clear my name and protect the memory of my son.[63]

"An individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character." *Lluberes v. Uncommon Productions, LLC,* 663 F.3d 6, 19 (1st Cir. 2011). Court have found "no good reason why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from

---

[63] Exhibit C, Affidavit of Neil Heslin, para. 10-14.

defamation." *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1564 (4th Cir. 1994). The "actual-malice standard here would serve only to muzzle persons who stand falsely accused of heinous acts and to undermine the very freedom of speech in whose name the extension is demanded." *Id.* In this case, granting Ms. Kelly's interview request was a reasonable and proportional response to four years of vile falsehoods on a national scale.

### B. Controversy over gun regulation.

Limited purpose public figures "are only public figures for a limited range of issues surrounding a particular public controversy." *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998). Here, InfoWars contends that Mr. Heslin is a public figure because of his advocacy for gun regulation in the wake of the Sandy Hook tragedy. While Mr. Heslin has made public appearances in support of gun regulation, his participation is trivial to the overall national debate, which is a broad controversy with countless participants. As explained in the D.C. Circuit's oft-cited *Waldbaum* opinion, a broad controversy makes it less likely than minor actor is public figure:

> A broad controversy will have more participants, but few can have the necessary impact. Indeed, a narrow controversy may be a phase of another, broader one, and a person playing a major role in the "subcontroversy" may have little influence on the larger questions or on other subcontroversies. In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.

*Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1297 (D.C. Cir. 1980). Mr. Heslin did participate in some advocacy on gun regulation, but as he stated in his affidavit, his participation was limited:

26

> Following the tragedy, I was asked to appear before the U.S. Senate and Connecticut legislators to give testimony about my experience and my opinion on school safety.
>
> I never sought to be any kind of public figure. I merely recognized that I was involved in a matter that had attracted public attention. It was not my intention to give up my privacy or surrender my interest in the protection of my own name in all aspects of my life.
>
> I had some tangential involvement in speaking out on sensible gun regulations, but I do not consider myself an activist. I have not been a vigorous participant or a noteworthy part of that on-going debate.[64]

In any case, the scope or significance of Mr. Heslin's civic involvement in the gun regulation debate is irrelevant in this case. Objectively, the InfoWars video had absolutely nothing to do with guns and nothing to do with Mr. Heslin's gun-related advocacy. Neither guns nor gun regulation are ever mentioned or implicated anywhere in Mr. Shroyer's video.

A plaintiff's status depends on "an individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352 (1974). Therefore, it is required that "the alleged defamation is germane to the plaintiff's participation in the controversy." *McLemore*, 978 S.W.2d at 573. Here, the defamation has nothing to do with Mr. Heslin's gun advocacy, and a hypothetical viewer would not glean from Mr. Shroyer's video that Mr. Heslin ever participated in the gun issue or that guns are implicated in any way. The defamation clearly arose from the "Alex Jones controversy" and not from any issues relating to Mr. Heslin's 2013 gun advocacy.

In this case, InfoWars defines the controversy even more broadly, asserting an unbounded and vague "controversy" concerning the "the government and MSM's use of

---

[64] *Id.*, para. 6-8.

national tragedies in order to push political agendas."[65] But that is not a "controversy" as the term is used in First Amendment defamation jurisprudence. Under Texas law, a "general concern or interest will not suffice," and a public controversy is more than simply a "controversy of interest to the public." *Klentzman*, 312 S.W.3d at 905 (Tex.App. Houston [1 Dist.] 2009), *quoting Firestone*, 424 U.S. at 454 (internal citation omitted). The Court must instead determine "whether persons actually were discussing some *specific question.*" *Id.* (emphasis added).

At most, InfoWars identifies a potential trait of the media and/or government, *i.e.*, that they use current events to drive their agendas. That is not a "question" that is capable of being resolved such that the public could "feel the impact of its resolution." *McLemore*, 978 S.W.2d at 573. The notion that there must be an issue susceptible of resolution is central to the *Gertz* limited purpose public figure framework, which defined limited purpose public figures as those who "thrust themselves into the vortex of a [public controversy] . . . *in an attempt to influence its outcome.*" *Gertz*, 418 U.S. at 345 (emphasis added). One cannot "influence" the "outcome" of a matter that does not call for some definite resolution.

Even if the Court were to accept InfoWars' assertion that there is a public controversy (in the *Gertz* meaning) about the media and/or government's use of tragedies to push agendas, InfoWars has not demonstrated that Plaintiff sought any role in such a controversy, much less the "central" role required to characterize him as a public figure. InfoWars has identified precisely zero instances where Plaintiff injected himself into any discussion about whether the government or media were using tragedies to push an agenda.

---

[65] *See* Defendants' Motion to Dismiss, p. 56.

The extremely narrow standards of the "limited purpose" for public figures in Texas is illustrated in the Corpus Christi court's decision in *Scripps*. There, a president of a chamber of commerce was a public figure for a city tax agreement because of his strenuous advocacy for that agreement, but he was not a public figure for his own job performance and financial stewardship of the chamber, which arguably influenced and motivated his advocacy. The court analyzed the issue as follows:

> We must determine whether the alleged defamation was germane to Carter's participation in the controversy. In his petition, Carter alleged that Scripps defamed him by publishing written statements concerning his job performance, specifically, his financial stewardship of the financial affairs of the Chamber of Commerce…Scripps acknowledges that the "articles at issue concern Carter's job performance and financial stewardship of the Chamber." However, they argue that by speaking at the city council meeting, Carter "assumed the risk that the press, in covering the controversy, [would] examine" him with a critical eye. We do not agree that Carter's job performance and financial stewardship of the Chamber of Commerce is germane to [the challenged statement regarding] the financing agreement."

*Scripps*, at *5; *see also Lohrenz,* 350 F.3d at 1279 (Plaintiff is "a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases."). These decisions are consistent with the maxim that "an individual should not be deemed a public personality for all aspects of his life." *San Antonio Exp. News v. Dracos,* 922 S.W.2d 242, 251 (Tex. App.—San Antonio 1996, no writ)*.* Therefore, the court must ask "whether the plaintiff is a public figure with respect to the topic of the publication." *Fitzgerald v. Penthouse Intern., Ltd.,* 691 F.2d 666, 669 (4th Cir. 1982). In this case, the publication contains no content whatsoever relating to gun regulation or Mr. Heslin's civic activities. In other words, it is immaterial whether Mr. Heslin is a public figure for the gun regulation debate. He is not a public figure for whether he held

his child's body, which is the only topic of the video. The video is germane to only one controversy -- the controversy over Mr. Jones' years of accusations about the Sandy Hook victims.

Finally, a publication cannot be germane to a plaintiff or his participation if the publication did not arise because of that plaintiff. Here, InfoWars' argues that its video did not intend to refer to Plaintiff as an "ascertainable person," and that its video was instead "directed at NBC and Kelly," and "directed at the government and MSM."[66] In other words, InfoWars admits that the video arose *not* due to Mr. Heslin's civic participation, but that it arose from its criticisms of Megyn Kelly, NBC, the government, and what it has termed "the MSM." InfoWars insists that "the statements were not accusatory of the Plaintiff," and therefore the publication could not have arisen from Mr. Heslin or his public acts.[67]

This principle is well illustrated by a case from the Eastland court involving Paramount Pictures. Paramount aired a broadcast which Paramount did not intend to direct at Allied Marketing, but it nonetheless included content which could be understood as defamatory to Allied. The court noted that "from Paramount's perspective, the segment had nothing to do about Allied…[so] Paramount could not establish that it was germane to Allied's participation." *Allied Mktg. Group, Inc.,* 111 S.W.3d at 177. The court noted that Paramount's intent was the only relevant issue, because "the limited purpose public figure test does not take into consideration the understanding of the publication's viewers." *Id.* at 178. Here, InfoWars asserts that it directed the broadcast at the media, and that its

---

[66] *Id.*
[67] *Id.*

defamation of Mr. Heslin was coincidental, as in *Allied*. As such, its defamation did not arise from Mr. Heslin's public acts.

## VII. Defendants Acted with Actual Malice.

Plaintiff's status ultimately makes no difference because there is clear evidence of actual malice. Malice exists in defamation when a publisher shows a "reckless disregard for the falsity of a statement." *Bentley,* 94 S.W.3d at 591. A showing of actual malice can be satisfied when there is *prima facie* circumstantial evidence that a defendant would have "entertained serious doubts as to the truth of his publication." *Warner Bros.,* 538 S.W.3d at 805. A plaintiff may offer circumstantial evidence suggesting that a defendant made statements which he "knew or strongly suspected could present, as a whole, a false and defamatory impression of events." *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 120-121 (Tex. 2000). Here, there are several reasons to find that InfoWars acted with reckless disregard for the truth.

### A. The accusation was inherently improbable.

When assessing actual malice, the court should "begin by noting the gravity of the accusations made against [plaintiff]." *Warner Bros.,* 538 S.W.3d at 806. As Mr. Zipp stated, "serious claims require serious evidence,"[68] and accuracy becomes "more important in proportion to the seriousness of the facts asserted."[69] The Austin Court of Appeals echoed that sentiment last year, noting "[c]harges as serious as the ones leveled against [plaintiff] in this article deserve a correspondingly high standard of investigation." *Id.* at 806. Mr. Zipp found that "given the seriousness of the accusations, Mr. Shroyer acted recklessly."[70]

---

[68] Exhibit A, Affidavit of Fred Zipp, p. 16.
[69] *Id.*, p. 2.
[70] *Id.*, p. 16.

Ms. Binkowski noted that "[t]he allegation made by Mr. Shroyer was outlandish, inherently improbable, and obviously dubious."[71] Malice is shown when the circumstances were "so improbable that only a reckless publisher would have made the mistake." *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 855 (Tex. 2005). "Inherently improbable assertions and statements made on information that is obviously dubious may show actual malice." *See* 50 Tex. Jur. 3d Libel and Slander § 133.

**B.    InfoWars used dubious third-party sources.**

In a case involving allegations originating with a third-party source, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Warner Bros.,* 538 S.W.3d at 806, *citing Harte-Hanks*, 491 U.S. at 688. Here, both of the sources cited by InfoWars are extraordinarily unreliable.

### 1.    Zero Hedge

Ms. Binkowski's affidavit provides the Court with an understanding of Zero Hedge. Ms. Binkowski states that she has "personal professional knowledge about the website 'Zero Hedge,'" and that "researchers at Snopes continuously debunked claims made in Zero Hedge articles."[72] According to Ms. Binkowski, "[n]early everything about Zero Hedge calls its reliability into question."[73] Ms. Binkowski explained the history of this anonymous website:

> Zero Hedge began in 2009 as an anonymous blog focusing on Wall Street and investment rumors. Even from the beginning, its content consisted of unsourced hearsay and conspiracy theories about Wall Street. However, over the past several years of my work, I have witnessed the website become increasingly flagrant as a producer of fake information and malicious accusations. Zero Hedge's history of publishing egregiously fake

---

[71] Exhibit B, Affidavit of Brooke Binkowski, para. 54
[72] *Id.*, para. 37.
[73] *Id.* at para. 38.

information had been well-documented since at least the time of the 2016 presidential election.[74]

Ms. Binkowski also included "a small selection of recent erroneous reporting and intentional agitation by Zero Hedge" in which she detailed sixteen instances of hoaxes and demonstrably fake news items published by Zero Hedge which had been debunked by the Snopes staff over the past two years. In this case, Ms. Binkowski noted that "the article in question purports to be authored by an anonymous individual(s) using the name ZeroPointNow," who is a "contributor to an anonymous website called 'iBankCoin.com,' a cryptocurrency website which likewise traffics fake news items."[75]

InfoWars was fully aware of Zero Hedge's past content. In fact, InfoWars had frequently published materials written by Zero Hedge on its own website. Ms. Binkowski "reviewed seven articles on InfoWars.com which were published under the author by-line 'Zero Hedge' in just the two weeks leading up to Mr. Shroyer's June 26, 2017 video."[76] Ms. Binkowski stated that she has "seen InfoWars and Zero Hedge, along with several other fake news websites, forge a cooperative relationship in which they publish, promote and endorse each other's content."[77] According to Ms. Binkowski, "this pattern of amplification and endorsement is a key part of how fake news spreads."[78]

InfoWars attempts to establish the credibility of Zero Hedge with an article from the Time website. In Defendants' Exhibit B-53, InfoWars offers what they contend is an endorsement of Zero Hedge from seven years ago by Time Magazine. The text of the exhibit

---

[74] *Id.* at para. 43-45.
[75] *Id.* at para. 41.
[76] *Id.* at para. 48.
[77] *Id.* at para. 49.
[78] *Id.* at para. 50.

33

makes it clear that this online list of 25 Financial Blogs was meant to include websites that offered "useful financial advice" as well as websites that "were just fun."[79] In addition, the entries were not authored by Time Magazine. Rather, the exhibit states the entries were written by "bloggers on the list." In the entry for Zero Hedge, the blogger refers to the website as "a morning zoo," and he compares it to *The X-Files,* a popular show from the 1990s about wacky government conspiracies and aliens. The author states, "I can't read it for long," and "I don't read Zero Hedge regularly," describing the website "too conspiratorial." In any case, the author's seven-year-old opinions about Zero Hedge are hearsay, and they do not provide any indicia of reliability, nor can they rebut the testimony of Ms. Binkowski.

Ms. Binkowski concluded that "[n]o competent journalist would republish allegations from an anonymous message on Zero Hedge without corroborating the accuracy of the allegations. However, in this case, it is clear that InfoWars not only understood Zero Hedge's reputation, but it was actively collaborating with Zero Hedge to spread fake news and dangerous conspiracy claims."[80]

### 2.    Jim Fetzer

The anonymous blog post on Zero Hedge cites an individual named Jim Fetzer to support the accusation that Mr. Heslin was lying. In its Motion, InfoWars presents Mr. Fetzer as a credible source. However, Mr. Zipp provides context on Mr. Fetzer's background:

> In its Motion to Dismiss, InfoWars described Mr. Fetzer with an air of respectability, referring to him as "Professor Emeritus of the University of Minnesota." In truth, the retired professor has long been understood to be an unhinged crank. I do not use these terms lightly. Mr. Fetzer, author of the disturbingly titled self-published book "Nobody Died at Sandy Hook" has spent years spreading ridiculous and bizarre claims about the event.

---

[79] *See* Defendants' Exhibit B-53.
[80] Exhibit B, Affidavit of Brooke Binkowski, para. 52.

> For example, Mr. Fetzer is convinced that Sandy Hook parent Leonard Pozner is actually a different man named Reuben Vabner...Mr. Fetzer's bizarre writings feature notably anti-Semitic rants about Mr. Pozner, who he insists is part of some international Jewish conspiracy...Mr. Fetzer is obsessed with the notion of faked identifies, and he makes similar accusations about the shooting victims, posting photo comparisons which he claims prove that the photos of children are actually adults.[81]

Mr. Zipp notes that Mr. Fetzer even told his readers "that he has located a photograph containing the female shooting victims, who are now allegedly adolescents." Shown below is Mr. Fetzer's purported photo of the "crisis actors" reunion:



According to Mr. Zipp, "Mr. Fetzer has claimed, with no evidence, that the death certificates for shooting victims have been faked and that a shooting victim's gravestone was actually a computer-generated graphic."[82] In short, Mr. Fetzer is well known for being an outrageous crank and grifter, selling books and collecting donations from confused outcasts,

---

[81] Exhibit A, Affidavit of Fred Zipp, p. 16-17.
[82] *Id.* at p. 19.

all of which he has based on either malicious lies or his own preposterous delusions. Mr. Zipp concluded that "no rational journalist would ever rely on Mr. Fetzer as a source for anything, especially an allegation as improbable and serious as accusing a parent of lying about holding their dead child. InfoWars' uncritical endorsement of accusations being promoted by Mr. Fetzer demonstrates its reckless and deceptive conduct."[83]

### C. InfoWars acted deceptively.

Most importantly, this is not merely a case where Mr. Shroyer and InfoWars recklessly disregarded the truth. Rather, it is the clear from the source material and the underlying facts that Mr. Shroyer was acting deceptively. As Ms. Binkowksi noted, "Mr. Shroyer used contemporary press coverage in a misleading and dishonest way, with the clear goal of misleading his viewers."[84]

### 1. Interview with Dr. Carver

Ms. Binkowski viewed the full video of Dr. Carver's interview, which is publicly available online. In the interview, "there is additional footage from the interview -- not shown by InfoWars -- which directly contradicts the assertion made by Mr. Shroyer."[85] Ms. Binkowski described the relevant portion omitted by InfoWars:

> At 11:03 in the video, a reporter asks Dr. Carver if there was a protocol as to the order he did the medical examinations. Dr. Carver states that it was his "goal was to get the kids out and available to the funeral directors first, just for, well, obvious reasons."
>
> At 13:27 in the video, a reporter asks Dr. Carver if "all the children's bodies have been returned to the parents or mortuaries." Dr. Carver responds, "I don't know. The mortuaries have all been called." The reporter asks, "But they're ready to be

---

[83] *Id.*

[84] Exhibit B, Affidavit of Brooke Binkowski, para. 56.

[85] *Id.*, para. 57.

> released at this time?" Dr. Carver responds, "As of 1:30, the paperwork has been done. The usual drill is that the funeral homes call us, and as soon as the paperwork is done, we call them back. That process was completed for the children at 1:30 today."[86]

Despite these answers given in Dr. Carver's interview, InfoWars used an edited portion of his interview where he stated that "we did not bring the bodies and the families into contact," and that "we felt it would be best to do it this way." InfoWars used this video clip to suggest that the parents were not allowed to see their children before burial. However, it is clear in context that Dr. Carver was only referring to the initial identification process. Given the content of Dr. Carver's interview, Mr. Zipp agreed that InfoWars "intentionally distorted the evidence in a malicious way to attack and retaliate against Mr. Heslin."[87]

## 2.    Interview with Chris and Lynn McDonnel.

Ms. Binkowsi also reviewed a transcript of Anderson Cooper's interview with Sandy Hook parents Chris and Lynn McDonnel. InfoWars used a clip of the interview "to suggest that the McDonnel's were not allowed access to their child prior to burial."[88] However, InfoWars used an edited clip to omit statements by the parents showing they were allowed to see their child. Mr. Binkowski explained that:

> The use of the clip in this way was dishonest. The transcript shows that the InfoWars video clip cut off the end of the Mrs. McDonnel's answer. She stated, "And I had questioned maybe wanting to see her, *but then I thought, she was just so, so beautiful, and she wouldn't want us to remember her looking any different than her perfect hair bow on the side of her beautiful long blond hair.*"

> In the interview, Mr. McDonnel stated, "But when we left the room, it was certainly so hard to leave her because that would

---

[86] *Id.* para. 58-59.
[87] Exhibit A, Affidavit of Fred Zipp, p. 16.
[88] Exhibit B, Affidavit of Brooke Binkowski, para 60-62.

be the last time that we would be able to be with her." It is clear that the parents had to the opportunity to see their child's body, yet they chose not to do so.[89]

Ms. Binkowski concluded "that InfoWars and Mr. Shroyer used a deceptively edited copy of the interview to give the appearance that the parents were not allowed to see their daughter."[90] This clip was used to accuse Mr. Heslin of lying about holding his son. In the July 20, 2017 video in which Mr. Jones republished Mr. Shroyer's video, Jones stated, "you've got CNN and MSNBC both with different groups of parents and the coroner saying we weren't allowed to see our kids basically ever."[91]

InfoWars' actions were malicious because "[t]he only way a journalist could support such a conclusion is by intentionally distorting the evidence and Mr. Heslin's statements."[92] According to Ms. Binkowski, "[t]he source material demonstrates that is exactly what occurred in this case."[93] Mr. Zipp agreed that "Mr. Shroyer was only able to support his bogus accusations by using deceptively edited footage."[94] Mr. Zipp concluded that "These actions were aimed at manufacturing a controversy where none existed."[95]

### D.  InfoWars' prior conduct shows actual malice.

As Mr. Zipp noted, "InfoWars has made wild claims about the Sandy Hook massacre from the beginning," and it has "continually repeated these falsehoods over the course of five years."[96] According to Mr. Zipp, "[c]ountless individuals and media organizations have

---

[89] *Id.*, para. 61-62.
[90] *Id.,* para. 63.
[91] *See* Defendants' Exhibit B-35.
[92] Exhibit B, Affidavit of Brooke Binkowski., para. 66.
[93] *Id.*
[94] Exhibit A, Affidavit of Fred Zipp, p. 16.
[95] *Id.*, p. 14.
[96] *Id.*, p. 19.

thoroughly debunked each of InfoWars' claims over the years. Nonetheless, InfoWars has persisted in this malicious campaign."[97]

Defendants' five-year campaign of lies and harassment of the Sandy Hook victims shows actual malice because "evidence of extraneous conduct is admissible, as prior bad act evidence, to show malice, in a defamation suit." *See* 1 Tex. Prac. Guide Civil Trial § 6:131, Character evidence—Evidence of other wrongs or acts—Intent/Malice. "[A]ctual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication." *Warner Bros.,* 538 S.W.3d at 805, *citing Dolcefino v. Turner*, 987 S.W.2d 100, 111-12 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). Under Texas law, Mr. Jones' five-year campaign of lies against the Sandy Hook families in the face of irrefutable affirmative evidence is relevant to establishing the malicious nature of his statements.

Mr. Zipp's affidavit provides a lengthy yet only partial history of InfoWars' constant harassment of these parents.[98] The attack on Mr. Heslin was meant to further these hoax allegations. In the July 20, 2017 video, when Mr. Jones chose to republish Mr. Shroyer's accusations, Jones launched into a rant listing some of the familiar lies he had spread about Sandy Hook:

> Is there a blue screen when Anderson Cooper's face disappearing? Are there kids going in circles in the video shots? Did they hold back the helicopters? Did they have porta-pottys there in an hour and a half? Did they run it like a big PR operation? Do they get all these conflicting stories in the media? Absolutely.[99]

---

[97] *Id.*
[98] Exhibit A, Affidavit of Fred Zipp, p. 7-13.
[99] *See* Defendants' Exhibit B-35.

These false allegations are familiar to this Court from the *Pozner* matter, where they were discussed in Mr. Zipp's affidavit. Mr. Zipp's affidavit from *Pozner* debunking these reckless claims is attached and incorporated by reference.[100] As Ms. Binkowski stated, it is clear "that Mr. Shroyer's video segment was part of InfoWars' ongoing effort to support and justify its vile five-year lie that the Sandy Hook shooting was staged."[101] When Mr. Heslin had the courage to defend himself and his community against these lies, InfoWars targeted him with a cruel and dishonest accusation, all in the attempt to perpetuate their insane allegations.

### E. InfoWars drives profits by recklessly stating that national tragedies are fake.

In his affidavit, Fred Zipp points out that InfoWars has built a strong brand identity around news stories claiming that national tragedies are actually "false flags" conducted by a shadowy cabal for sinister political purposes. Mr. Zipp notes that "Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government," and "[h]is current promotional materials boast that 'Alex Jones is considered by many to be the grandfather of what has come to be known as the 9/11 Truth Movement.'"[102] Mr. Zipp described InfoWars reckless history of telling its audience that national tragedies are fake:

> Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100% false flag." Jones claimed that Columbine "had globalist operations written all over it." Regarding the Oklahoma City bombing, Jones said the bombing was a "false flag" and that "we've never had one so open and shut." He added that

[100] Exhibit J, Affidavit of Fred Zipp in *Pozner v. Jones, et. al.*
[101] Exhibit B, Affidavit of Brooke Binkowski, para. 70.
[102] *Id.*, p. 19.

convicted bomber Timothy McVeigh "was a patsy, that was a staged event."

Mere hours after James Holmes killed twelve people in a movie theater in Aurora, CO, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind-control event." After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven." Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."

An April 18, 2013 headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up." A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now." Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies." Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA.

Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90% probability that it was a false flag.[103]

Mr. Zipp concluded that "a major element of the InfoWars brand is built on his allegations that major national tragedies are actually the result of orchestrated government actions."[104] In light of this history, Mr. Zipp found "that InfoWars' pattern of predictably asserting that events are 'false flags,' sometimes within hours of the event, is circumstantial evidence that InfoWars recklessly disregarded whether his broadcast was true in this case."[105]

---

[103] *Id.* at p. 20
[104] *Id.* at p. 21.
[105] *Id.*

**F.      InfoWars consciously chose to disregard accuracy in its reporting.**

Finally, the evidence shows that in the years leading up to the Sandy Hook shooting, Mr. Jones willfully decided to sacrifice the accuracy of his reporting in order to publish sensational and outrageous new stories. Plaintiffs have submitted the affidavit of John Clayton, a journalist who "maintained a close professional association with Alex Jones during the years 2002 through 2009."[106] Mr. Clayton "hosted or appeared on InfoWars programming on numerous occasions," and he "worked alongside Mr. Jones is investigating, researching, and creating news content."[107] Mr. Clayton testified that he stopped working with Mr. Jones because "it became apparent that he had made the conscious decision not to care about accuracy," and Mr. Jones "made it clear that his goal was to produce views on InfoWars content."[108]

As a result, Mr. Clayton "personally observed that it become standard practice in InfoWars to disregard basic protocols in journalism."[109] Mr. Clayton testified that he "personally observed countless situations in which Mr. Jones made claims on the air for which he knew had no substantiating evidence."[110] Mr. Clayton testified that "[f]rom my personal experience, I knew that Mr. Jones understood that the information he put on the air had not been adequately checked for accuracy, and in many cases, he knew the information was false. He did not care."[111] Mr. Clayton stated that "[o]ne of the differences of opinion I had with Mr. Jones is that I believe it is good and healthy for journalists to ask questions, but

---

[106] Exhibit F, Affidavit of John Clayton, para. 3.
[107] *Id.* at para. 4.
[108] *Id.* at para. 8.
[109] *Id.* at para. 9.
[110] *Id.* at para. 10.
[111] *Id.* at para. 11.

I believe it is dangerous to assert facts with no evidence."[112] Based on his experience, Mr. Clayton stated that "I felt the way in which Mr. Jones and InfoWars came to operate was dangerous and wrong."[113] Finally, Mr. Clayton stated that "[g]iven my intimate and personal discussions with Mr. Jones on these topics, and after seeing Mr. Jones consciously discard any sense of journalistic obligation, there is no question in my mind that Mr. Jones made the choice to willfully disregard accuracy in pursuit of a larger audience."[114] Based on these circumstances and the many others described above, there is clear *prima facie* evidence that InfoWars acted with actual malice.

## VIII.    InfoWars' 2017 Statements Caused Damages to Plaintiff.

InfoWars' act of retaliation against Mr. Heslin caused him damages, including severe mental anguish, medical expenses, and other pecuniary loss. These damages are best explained by Mr. Heslin in his affidavit:

> Mr. Jones' prior videos had deeply disturbed me, but this 2017 InfoWars video was far worse.
>
> This broadcast was the first time that InfoWars had featured me by name. In the past, when InfoWars discussed other specific parents, they had become subject to terrible harassment. For example, I was aware of the case of Lucy Richards, an InfoWars fan who was arrested and sentenced to federal prison for death threats against Sandy Hook parent Leonard Pozner. I was also aware of threats and harassment being directed at other parents.
>
> I was also aware that some conspiracy fanatics online had become convinced I was a "crisis actor." There is even an insane theory that I am a fireman who supposedly died on 9/11. Upon seeing Mr. Shroyer's video, I became intensely alarmed that his lie would embolden these dangerous people.

---

[112] *Id.* at para. 12.
[113] *Id.* at para. 13.
[114] *Id.* at para. 14.

When I learned about Mr. Shroyer's video and InfoWars' other 2017 statements, I knew that my safety and the safety of my family had been placed at risk. This fear dominated my thoughts.

I have suffered a high degree of psychological stress and mental pain due to InfoWars using me and my child to revive the Sandy Hook hoax conspiracy in 2017. I had hoped that this ugly lie would go away, but now Mr. Jones had singled me out in his campaign of harassment, along with the memory of my son. This realization has caused a severe disruption to my daily life.

I find that I can think of little else. I have experienced terrible bouts of insomnia, and periods in which I am filled with nothing but outrage, and I find that I am unable to do anything productive. Other times, I am filled with grief knowing that InfoWars has ensured that its sick lie continues, and I am dismayed that my last moments with my son have become a part of that. I decided to return to grief counselling to help address these issues, but I feel that I have been changed in a way that can never be fixed.[115]

In terms of pecuniary loss, Mr. Heslin has incurred numerous expenses which are detailed in his affidavit. These include expenses for counselling which "has been aimed at helping [him] cope with becoming a featured part of the Sandy Hook hoax claims."[116] Mr. Heslin also purchased "a one-year, two-person plan for the DeleteMe Privacy Protection service, which provides online monitoring and removal of your personal information," which he purchased "to prevent an InfoWars follower from discovering my family's personal details and location."[117] Mr. Heslin also purchased "a year's plan for the LifeLock service" because he was "concerned that conspiracy fanatics may use identify theft techniques to gain access to [his] personal details."[118] Finally, Mr. Heslin incurred expenses for home security

---

[115] Exhibit C, Affidavit of Neil Heslin, para. 22-27.
[116] *Id.*, para. 28.
[117] *Id.*, para. 29.
[118] *Id.*, para. 30.

monitoring products, which he purchased "due to the fear that InfoWars' false statements would cause individuals to confront my family."[119]

## IX.    InfoWars Cannot Rely on the Fair Comment or Broadcaster Privileges.

InfoWars' frivolously argues that its video is protected by the fair comment privilege under Tex. Civ. Prac. & Rem. Code §73.002. "This privilege grants legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." 50 Tex. Jur. 3d Libel and Slander § 76, citing *Hearst Corp. v. Skeen*, 130 S.W.3d 910 (Tex. App. Fort Worth 2004), *review granted, judgment rev'd on other grounds*, 159 S.W.3d 633 (Tex. 2005). "The imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such does not fall within the defense of fair comment." *Id*. Therefore, the defense cannot apply here because "a false statement of fact...even if made in a discussion of matters of public concern, is not privileged as fair comment." *Id.*

The Texas Supreme Court has said "if a comment is based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege." *D Magazine Partners, L.P.,* 529 S.W.3d at 441. Here, where Mr. Shroyer endorsed the substantially false statements as true, his statements are not fair comment, even if they could be considered a matter of public concern.

Likewise, InfoWars frivolously asserted the broadcaster privilege found in §73.004, but the statute only applies to a "broadcaster" when there is "a defamatory statement published or uttered in or as a part of a radio or television broadcast." As noted above, InfoWars is not a broadcaster, and the video was not a broadcast. Even if InfoWars were a

---

[119] *Id.*, para. 31.

broadcaster, it would be required to "exercise due care to prevent the publication or utterance of the statement in the broadcast." *See* Tex. Civ. Prac. & Rem. Code §73.004. Here, the statement was intentionally made.

## X.  There is *Prima Facie* Evidence of InfoWars, LLC's Liability.

There is no question that three of the named Defendants are potentially liable to Plaintiff. The parties do not dispute that Owen Shroyer, a reporter for Free Speech Systems, LLC, made his accusations while hosting The Alex Jones Show, in a video that was published on the InfoWars website[120] and various social media websites. Alex Jones chose to republish Mr. Shroyer's video on his show soon thereafter. Defendants only dispute the involvement of InfoWars, LLC.

However, Plaintiff has produced *prima facie* evidence that InfoWars, LLC operates the InfoWars.com website. Plaintiff has provided the "Terms of Use & Privacy Policy" found on the InfoWars website. This document identifies InfoWars, LLC as the administrator of the website, and the text informs users of agreements they have made "by using Infowars.com."[121] Indeed, the document states that InfoWars, LLC administers every "Uniform Resource Identifier we use to provide our Products and Services."[122] However, InfoWars has produced an affidavit disclaiming any involvement by InfoWars, LLC.

Last year in *Warner Bros.*, the Austin court discussed how to resolve this exact conflict. Just as here, the plaintiff presented evidence of the defendants' "Terms of Use" and "Privacy Policy" webpages as they existed "at the time of the motion to dismiss." *Warner Bros. Entm't, Inc. v. Jones,* 538 S.W.3d 781, 801–02 (Tex. App.—Austin 2017, pet. filed). These

---

[120] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/
[121] Exhibit G, Affidavit of Marcus Turnini.
[122] *Id.*

various webpages identified the named defendants as operating the website. The court noted that the documents "establish a *prima facie* case." *Id.* at 802. However, the defendants filed an affidavit in which their corporate officer "disclaimed responsibility for publication by three of the six defendants." *Id.*

The *Warner Bros.* court noted that the "affidavit is the testimony of an interested witness," which is "contradicted by the statements on the website." *Id.* The court also noted that the defendants' affidavit consisted of "bare, baseless opinions" and "conclusory testimony." *Id.* The court ruled that the "inconsistency between the website's public disclosures and [defendant's] interested testimony precludes us from viewing his testimony as conclusive proof that TMZ Productions, Inc. did not publish the article." *Id.* at 803.

In this case, Plaintiff produced the same evidence, and InfoWars produced the same conclusory affidavit. With respect to this topic, the affidavit merely stated: "Defendant InfoWars, LLC does not own or operate the domain name or website located at http://www.infowars.com."[123] This conclusory affidavit conflicts with the statements on the website, and therefore must be ignored under *Warner Bros.*

Finally, in addition to the website evidence, Plaintiff has submitted a Notice of Violation issued to InfoWars, LLC by the State of California concerning illegal lead content in supplements sold through the InfoWars website and marketed on InfoWars programming, including The Alex Jones Show.[124] As such there is *prima facie* evidence that InfoWars, LLC was involved in or profited from the video.

---

[123] *See* Defendants' Exhibit B.

[124] Exhibit I, Notice of Violation issued against InfoWars, LLC by the State of California, Center for Environmental Health, regarding "lead in InfoWars Life dietary supplements," publicly available at: https://oag.ca.gov/system/files/prop65/notices/2017-02319.pdf

XI.     **Plaintiffs' Claims Against Shroyer's Employer(s) Arise via *Respondeat Superior*.**

In Texas, "[a]n action is sustainable against a corporation for defamation by its agent, if such defamation is referable to the duty owing by the agent to the corporation, and was made while in the discharge of that duty. Neither express authorization nor subsequent ratification is necessary to establish liability." *Warner Bros.,* 538 S.W.3d at 802, *quoting Texam Oil Corp. v. Poynor*, 436 S.W.2d 129, 130 (Tex. 1968); *see also Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (holding that general rule that employer is liable for its employee's tort "when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business" applies in defamation context).

Here, Plaintiff can recover based upon *respondeat superior* if (1) he was injured as a result of an independent tort, (2) the tortfeasor was an employee of the defendant and (3) the tort was committed while the employee was acting within the scope of his employment. *G&H Towing Co.* v. *Magee*, 437 S.W.3d 293, 296 (Tex. 2011). Here, Owen Shroyer is an employee or agent of one or more Defendants. Moreover, any acts revealed in discovery committed by employees of Mr. Jones in the InfoWars organization in the scope of their employment can trigger liability or evidence of malice. Here, Plaintiff had pled a claim under *respondeat superior* sufficient to survive a motion to dismiss.

XII.    **Derivative Torts such as Civil Conspiracy are not Examined under the TCPA.**

Civil conspiracy can be pled as "a derivative tort." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). As the Austin court wrote last year, civil conspiracy and other derivative forms of recovery are not analyzed in a motion under TCPA when based on another underlying tort:

> The tort is derivative because "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." Consequently, courts "do not analyze the trial court's refusal to dismiss plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action." In other words, if the trial court did not err by refusing to dismiss the defamation claim, then it did not err by refusing to dismiss the conspiracy claim related to the defamation claim. Accordingly, we conclude that the trial court did not err by refusing to dismiss Jones's conspiracy claim, which is dependent on his defamation claim.

*Warner Bros.*, 538 S.W.3d at 813–14. (citations omitted). In short, a plaintiff need only prove the *prima facie* elements of his underlying case, not his derivative theories of recovery. Conspiracy claims can only be dismissed under the TCPA if the primary defamation claim fails or if the conspiracy claim alleges acts and omissions independent from the defamation claim.

## XIII.   This Court Should Order Discovery Prior to Ruling on the Motion.

In responding to a TCPA motion, Plaintiff must address each element of his claim, and the act provides a mechanism to secure "additional discovery to meet this burden." *Grant v. Pivot Tech. Sols., Ltd.*, 2018 WL 3677634, at \*12 (Tex. App.—Austin Aug. 3, 2018, no pet. h.). "On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion." Tex. Civ. Prac. Rem. Code 27.006(b). On August 17, 2018, Plaintiff filed a Motion for Expedited Discovery under this section. That motion is incorporated here by reference by all purposes. Before ruling on the motion, Plaintiff asks the Court to allow depositions of the parties and to allow Plaintiff to serve written discovery, which Plaintiff has attached as Exhibit H.[125]

---

[125] Exhibit H, Plaintiff's Proposed Written Discovery.

In addition, Plaintiff also filed a Motion for Sanctions due to destruction of evidence when CNN reported that Mr. Jones was deleting social media materials. While InfoWars now claims it saved the primary materials, it admits sub-content has been lost, consistent with the prediction in Ms. Binkowski's declaration. Discovery will also allow Plaintiff to explore the circumstances of InfoWars' conduct, providing further good cause.

## CONCLUSION

For these reasons, Plaintiff prays that this Court reset the hearing on InfoWars' motion so that Plaintiff can learn the full extent of InfoWars' malicious conduct and responsibility. Alternatively, Plaintiff prays that this Court denies the motion and awards reasonable costs.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2018 the forgoing document was served upon the following in accordance to Rule 21 of the Texas Rules of Civil Procedure:

***<u>Via E-Sevice: fly63rc@verizon.net</u>***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

# EXHIBIT A

# Affidavit of Fred Zipp

## **AFFIDAVIT OF FRED ZIPP**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared FRED ZIPP, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

### **PERSONAL BACKGROUND**

I have spent 39 years in daily newspaper journalism and journalism education.

From 1979 to 1984, I was a reporter and assistant city editor at the Beaumont Enterprise in Beaumont, Texas. From 1984 to 1987, I was a sports copy editor, assistant sports editor and assistant city editor at the Austin American-Statesman in Austin, Texas. From 1987 to 1998, I was assistant metro editor, deputy metro editor, news editor and metro editor the Palm Beach Post in West Palm Beach, Florida. In 1998, I returned to the American-Statesman as assistant managing editor, managing editor, and editor. Over the course of my career, I gained extensive experience and expertise in the responsible delivery of news content to a mass media audience.

In 2012, I began teaching at the University of Texas at Austin. At the University of Texas, I supervise a digital media initiative known as *Reporting Texas* which functions similarly to a newsroom; students are the reporters, and I am their editor. I help them conceive, report and write stories that are posted on the reportingtexas.com website.

I have been a director and officer of the Freedom of Information Foundation of Texas and the Headliners Foundation of Texas, an organization that promotes journalism excellence in the state.

### **SCOPE OF REVIEW**

In arriving at my opinions in this case, I have used the same principles and analysis as I have used throughout my journalism career to determine whether particular assertions could be responsibly published. This review included an examination of the disputed statements as well as a variety of relevant background materials. I have reviewed numerous background items, including:

- Public domain materials relating to the Sandy Hook shooting.

- Materials from the final report published by the Connecticut Department of Emergency Services and Public Protection, available at: http://cspsandyhookreport.ct.gov/

1

- Various articles and social media content from InfoWars.

- Various articles and reference materials concerning InfoWars

- My own personal reference materials and texts.

- Video clips containing statements by InfoWars about Sandy Hook, along with transcripts of those video clips created by a court reporter. Those transcripts are attached to my affidavit.

- A July 26, 2017, YouTube video from InfoWars entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece." A digital copy is attached to this affidavit.

- A July 20, 2017, segment of the Alex Jones show in which the July 26, 2017, video was republished.

It is my belief that discovery will likely produce further relevant evidence, but I am confident that enough material exists in the public domain to reach reliable opinions for the purposes of these initial findings.

## BACKGROUND KNOWLEDGE OF INFOWARS

Having been involved in media in Austin for 23 years, I was aware of Alex Jones and InfoWars but felt no need to pay close attention to either one before agreeing to review the materials in this lawsuit. Nonetheless, I was aware of InfoWars' extremely poor reputation in the media industry with respect to the reliability of the information it publishes, and I also knew Mr. Jones had alleged the Sandy Hook Elementary School shooting was a government hoax involving actors.

After I asked to review the events of this lawsuit, I have spent a significant amount of time reading articles on InfoWars.com and reviewing audio and video recordings posted to the website. While the site purports to be a news and information operation, it is clear that it is actually a propaganda outlet for Mr. Jones' theories about a global conspiracy to control and enslave the world's population.

Alex Jones and InfoWars generally have a signature style: rapid-fire assertion of various data points with little or, more often, no attribution. The assertions are presented to the viewer as facts. Underlying the presentation is the premise that Jones is at war with "the globalists" – or their various stand-ins, including the Illuminati, Jews and Communists -- and that he wins the war by marshaling his assertions more effectively than they do. In traditional journalism, by contrast, attributing assertions to sources is an essential element of the work, and the attribution becomes more important in proportion to the seriousness of the facts asserted.

According to the American Press Institute, "Journalism is the activity of gathering, assessing, creating, and presenting news and information. It is also the product of these activities…These elements not only separate journalism from other forms of communication, they are what make it indispensable to democratic societies."[1] The process of journalism is dependent on responsible verification in which information is gathered and its accuracy is evaluated. In coming to my opinions, I have analyzed InfoWars' conduct against the well-established standards of the journalism profession.

## INFOWARS' 2017 BROADCASTS

### 1.    InfoWars' June 26 and July 20 Videos.

After Mr. Heslin condemned InfoWars' false statements about Sandy Hook during an interview with Megyn Kelly on NBC TV, InfoWars produced a video in which it claimed that Mr. Heslin's statements about his last moments with his child were a lie. InfoWars host Owen Shroyer began the video by citing an article from an anonymous blog called "Zero Hedge." The video shows that the anonymous blog post had been "shared" only three times before it was featured on InfoWars' video. InfoWars took this obscure blog post that almost nobody in the world had seen and used it to smear Mr. Heslin.

In the interview, Mr. Heslin told Ms. Kelly that he buried his son, held his body, and saw his fatal injury. Concerning Mr. Heslin's claim, Mr. Shroyer stated the following:

> The statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible. And so one must look at Megyn Kelly and say, Megyn, I think it's time for you to explain this contradiction in the narrative because this is only going to fuel the conspiracy theory that you're trying to put out, in fact.
>
> So -- and here's the thing too, you would remember -- let me see how long these clips are. You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on. So let's role the clip first, Neil Heslin telling Megyn Kelly of his experience with his kid.[2]

Mr. Shroyer then played a clip from the interview in which Mr. Heslin stated, "I lost my son. I buried my son. I held my son with a bullet hole through his head." After playing the clip, Mr. Shroyer stated:

---

[1] https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/
[2] Exhibit A-1, 2017-06-26 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)

So making a pretty extreme claim that would be a very thing, vivid in your memory, holding his dead child. Now, here is an account from the coroner that does not corroborate with that narrative.[3]

Mr. Shroyer then played a short clip from a news conference with Dr. Wayne Carver, the medical examiner at Sandy Hook. In the clip, Dr. Carver stated that "we did not bring the bodies and the families into contact. We took pictures of them." Dr. Carver stated in the clip that "we felt it would be best to do it this way." Mr. Shroyer also showed an edited clip of an interview with Chris and Lynn McConnel in which Anderson Cooper states, "It's got to be hard not to have been able to actually see her."

At the end of the video, Mr. Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[4]

On July 20, 2017, during an episode of The Alex Jones Show, Mr. Jones republished the entire segment with Mr. Shroyer.

My review shows that the InfoWars video creates a false impression, both in its explicit text and in its implications. The video creates the false impression by incorporating, contrary to widely accepted journalistic standards,[5] an edited, incomplete account of Dr. Carver's and an edited, incomplete account of the McDonnel interview. It is clear to me that any publisher would have serious doubt about stating that Mr. Heslin could not have held his child nor seen his wound and that any publisher would entertain serious doubt about the truth of such a claim. In fact, the evidence I reviewed makes it clear that InfoWars was being purposely deceptive in an act of retaliation.

## OPINIONS

### 1.    InfoWars' False Statements in 2017 Impugned the Reputation of the Plaintiffs.

It is my opinion that the Shroyer video defamed Neil Heslin by impugning his reputation with false statements about his honesty or integrity. Mr. Shroyer arranged edited footage in a misleading and dishonest way to attack Mr. Heslin. At best, the InfoWars video is a mishmash of out-of-context statements that creates a dishonest portrait of Mr. Heslin, his statements and the events of Sandy Hook. At worst, it was a calculated and unconscionably cruel hit-job intended to smear and injure a parent who had the courage to speak up about InfoWars' falsehoods. In either case, InfoWars recklessly disregarded journalistic standards in approaching this story because disregarding those standards was necessary to carry out its distortion of events.

---

[3] *Id.*

[4] *Id.*

[5] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Provide context…" and "Never deliberately distort…"

Mr. Shroyer attributes the defamatory statements about Mr. Heslin to the anonymous Zero Hedge website. Republishing material by an anonymous author as if it were fact is inconsistent with journalistic standards.[6] Clearly, the point of Mr. Shroyer's video was that the allegations are true. It was not a neutral report about the Zero Hedge allegation. Rather, InfoWars adopted the allegations and attempted to persuade its audience that Mr. Heslin's description of his actions was not possible. Mr. Shroyer's callous statements about the "dead kid" throughout the video are intended to support and bolster an allegation that Mr. Heslin is lying. Mr. Shroyer also made it clear that he was not accusing Mr. Heslin of an innocent mistake. Mr. Shroyer asserts the event is "not something that you would just misspeak on" because "you would remember if you held your dead kid in your hands with a bullet hole."[7]

After the accusations appeared on InfoWars, Mr. Heslin was featured on numerous conspiracy websites and social media networks as internet users made wild speculations about him. Mr. Heslin had now become fodder for the Sandy Hook conspiracy fanatics. For example, he appeared in an internet meme accusing him of being an actor who also "played" a fireman killed on 9/11:



[8]

---

[6] *Id.*, esp., "Identify sources clearly…"
[7] Exhibit A-1, 2017-06-26 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)
[8] https://busy.org/@barrysoetoro/neil-heslin-is-dead-9-11-fireman

Once a person's name enters conspiracy culture, there is no limit for how bizarre the accusations can become. One conspiracy website alleged that Mr. Heslin's name was actually an anagram hiding his secret purpose with the Illuminati:



⁹

Anti-Semitism appears to be common among conspiracy fanatics, who believe the "Globalists" are controlled by Jewish interests. In the weeks after the InfoWars video appeared, Mr. Heslin became the target of these bigots:



¹⁰

---

⁹ http://theconspiracyzone.podcastpeople.com/posts/68433
¹⁰ https://www.johndenugent.com/how-the-whole-anti-confederate-hysteria-began-the-fake-charleston-church-shooting-using-crisis-actor-john-graas/

The InfoWars video was not only false and disparaging, but also influential; after it appeared, a group of irrational and dangerous conspiracy fanatics turned their attention to Mr. Heslin. The InfoWars video exposes Mr. Heslin to ridicule and contempt, and it is reasonable to believe that it could encourage bad actors who could become a threat to his safety.

## A.    Background Context of the 2017 Statements.

InfoWars' 2017 statements were not made in isolation. The 2017 statements were the latest allegation in a series of reckless falsehoods InfoWars has been making about Sandy Hook for five years. Mr. Jones used these false statements as evidence for his contention that the Sandy Hook shooting was faked or staged, and that the participants are engaged in a sinister cover-up.

In a January 27, 2013, broadcast entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones first alleged that the event had been faked:

> In the last month and a half, I have not come out and said that this was clearly a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction…Something serious is going on here, and CNN over and over again is at the heart of the fishy things that are happening…
>
> Now, ladies and gentlemen, the finale. I saw this footage where Anderson Cooper turns. He's supposedly there at Sandy Hook in front of the memorial, and his whole forehead and nose blurs out. I've been working with blue screen, again, for 17 years. I know what it looks like. It's clearly blue screen, clearly.[11]

In an April 16, 2013, broadcast entitled "Shadow Govt Strikes Again," Mr. Jones was discussing was various plots behind various national tragedies. During his remarks, he stated: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."[12]

In a March 14, 2014, broadcast entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones again repeated numerous false and irresponsible claims. Mr. Jones then asserted that the event was pre-planned and featured actors as a part of a cover-up:

> Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him…I've looked at it and undoubtedly,    there's    a    cover-up,    there's    actors,    they're

---

[11] Exhibit A3 - Transcript - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 12m58)
[12] Exhibit A4 - Transcript - 2013-04-16 - Shadow Govt Strikes Again (Clip at 13m20s)

manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it.[13]

In a May 13, 2014, broadcast entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Mr. Jones again repeated his false statements:

> They don't even hide this stuff, ladies and gentlemen. Anderson Cooper, CIA, up there, who cares if it's blue screen…You're looking at how they don't any of the standard stuff, the paperwork, the police reports, no helicopter sent, no rescue, kids going in circles totally staged, men with guns in the woods getting grabbed, no names released. They deny it went on. Later have to admit it went on but say we're not answering questions. I mean, clearly it's a drill, just like the Boston bombing. I don't know exactly what's going on, but it just -- the official story isn't true.[14]

In a September 25, 2014, broadcast entitled "Connecticut PD Has FBI Falsify Crime Statistics," Mr. Jones stated:

> This is not a game. They are hopping mad we're covering this. CNN admits they did fake scud attacks on themselves back in 1991, 1990. Would they stage this? I don't know. Do penguins live in Antarctica? Wolfgang W. Halbig's our guest, former state police officer, then worked for the customs department, and then over the last decade's created one of the biggest, most successful school safety training grips. And he just has gone and investigated, and it's just phony as a three-dollar bill…[15]

> If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.[16]

---

[13] Exhibit A5 - Transcript - 2014-03-14 - Sandy Hook, False Narratives Vs. The Reality (Clip at 26s)
[14] Exhibit A6 - Transcript - 2014-05-13 - Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert (Clip at 17m)
[15] Exhibit A7 - Transcript - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[16] Exhibit A8 - Transcript - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)

In a December 27, 2014, broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones stated:

> All I know is I saw Cooper with blue screen out there, green screen. I know I saw the kids doing fake, you know, rotations in and out of the building. They tore it down, all the unprecedented gag orders, you know, the police in anti-terror outfits in the woods. Then they denied that, that had been in the news. I mean, something is being hidden there…[17]
>
> I said they may have killed real kids, but they're practicing how to propagandize, and how to control the press, and how to put out a product that's a fraud when I just saw the heavy, heavy, heavy scripting. That was what was so clear. And then the parents laughing and then one second later doing the actor breathing to cry. I mean, it just -- it's just over the top. Over the top sick.[18]

In a December 29, 2014, broadcast entitled "America the False Democracy," Mr. Jones continued to insist that Sandy Hook was fake:

> I've had investigators on. I've had the state police have gone public, you name it. The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? I mean it's just -- how do you even convince the public something is a total hoax?
>
> The general public doesn't know the school was actually closed the year before. They don't know. They've shielded it all, demolished the building. They don't know that they had their kids going in circles in and out of the building as a photo op. Blue screen, green screens, they got caught using. I mean the whole thing.
>
> But remember, this is the same White House that's been caught running the fake Bin Laden raid that's come out and been faked. It's the same White House that got caught running all these other fake events over and over again, and it's the same White House that says I never said that you could keep your doctor when he did say you could keep doctor. People just instinctively know that there's a lot of fraud going on, but it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up, but then I did deep research; and my gosh, it just pretty much didn't happen.[19]

---

[17] Exhibit A9 - Transcript - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 3m08s)
[18] Exhibit A10 - Transcript - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 4m34s)
[19] Exhibit A11 - Transcript - 2014-12-29 - America the False Democracy (Clip at 11m53s)

In a January 13, 2015, broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook. He asserted that the event was "completely fake" and "manufactured":

> You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting.
>
> Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit.[20]

In a February 12, 2015, broadcast with an unknown title, Mr. Jones continued to repeat his false claims. Mr. Jones stated, "I know they're using blue screens…There are literally hundreds of smoking guns here that this thing doesn't add up."[21]

In a March 4, 2015, broadcast entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones stated, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake. How fake we don't know. It's sick."[22]

In a July 7, 2015, broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behind the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.[23]

In a July 7, 2015, broadcast entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his prior false claims about Sandy Hook:

---

[20] Exhibit A12 - Transcript - 2015-01-13 - Why We Accept Gov't Lies (Clip at 10m36s)
[21] Exhibit A13 - Transcript - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 0m26s)
[22] Exhibit A14 - Transcript - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 32m30s)
[23] Exhibit A15 - Transcript - 2015-07-07 - Government Is Manufacturing Crises (Clip at 32m)

No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.

Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.

We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method…

But I mean, this is just so big. And the more we look at Sandy Hook, I don't want to believe it's a false flag. I don't know if kids really got killed. But you got green screen with Anderson Cooper where I was watching the video and the flowers and plants are blowing in some of them, and then they blow again the same way. It's looped, and then his nose disappears. I mean, it's fake.

The whole thing is just -- I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House, you know. I don't know how they do it, but it's not real. When you take your kids to see, you know, the Haunted House and ghosts are flying around, they're not real, folks. It's staged.[24]

Mr. Jones also stated, "It's 101, they're covering up…This is mega-massive cover-up. My God." Mr. Jones stated that the tragedy was "totally made up with green screens, everything. And we've got them on green screens." Mr. Jones stated, "That's how evil these people are is that they can have CNN involved, all these people."[25]

In a November 18, 2016, broadcast entitled "Alex Jones Final Statement on Sandy Hook," Mr. Jones directly addressed the growing public controversy caused by his statements. In doing so, he began by repeating the numerous false claims he has made over the years.

Number one, the day before this tragic event happened an email was sent out by Bloomberg's anti-gun group saying prepare for a big

---

[24] Exhibit A16 - Transcript - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 0-5m)
[25] Exhibit A17 - Transcript - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip at 9m40s)

event. But the biggest piece of evidence, the smoking gun, if you would, of a cover-up, of whatever really happened is the Wayback Machine, the internet archive. We see Sandy Hook's Newtown website K through 12 having zero traffic 2008, '09, '10, '11, '12, and then all of a sudden it just explodes. It's impossible to have zero traffic to a K through 12 entire school system. And the word is that school system was shut down for those years. That's what the records show. They tell us it was open…

And early on, that day we watched footage of kids going in circles in and out of the building. You'd be running them away from the building. Emergency helicopters weren't called. Instead port-potties were prepared for the press within hours of the event. I saw the helicopters that did respond, the police helicopters saying that there were men or a man in the woods in camouflage…

And then I saw Anderson Cooper -- I've been in TV for 20-something years; I know a blue screen or a green screen -- turn, and his nose disappears. Then I saw clearly that they were using footage on the green screen looped because it would show flowers and other things during other broadcasts that were moving and then basically cutting to the same piece of footage…

Then we see footage of one of the reported fathers of the victims, Robby Parker, doing classic acting training where he's laughing and joking. And they say, hey, we're live, and he goes, oh. [Jones mock cries]. And maybe that's real. I'm sure it is.

But you add it to all the other things that were happening and all the other fake news the media has been caught in, and CNN back in 1991 openly faking scud missile attacks on Saudi Arabia and Israel when they were back in Atlanta; and the satellite feeds caught them admitting that it was all fake. We'd be crazy not to question this because bare minimum they were faking some of the shots and some of the coverage.

So to be clear, we point out clear chroma key, also known as blue screen or green screen being used, and we're demonized. We point out they're clearly doing fake interviews.[26]

    In other words, Mr. Jones used his false claims as proof that the truth about Sandy Hook was being artificially manipulated. In a chilling finale, Mr. Jones told his audience that the parents were actors:

---

[26] Exhibit A18 - Transcript - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)

And why should anybody fear an investigation if they have nothing to hide. In fact, isn't that in Shakespeare's Hamlet, "me thinks you protest too much."

But this particular case they are so scared of an investigation. So everything they do basically ends up blowing up in their face. So you guys are going to get what you want now. I'm going to start reinvestigating Sandy Hook and everything else that happened with it…

And so if children were lost in Sandy Hook, my heart goes out to each and every one of those parents and the people that say they're parents that I see on the news. The only problem is I've watched a lot of soap operas, and I've seen actors before. And I know when I'm watching a movie and when I'm watching something real.[27]

On April 22, 2017, InfoWars aired the "Sandy Hook Vampires Exposed" broadcast, which is the subject of a separate lawsuit brought by Leonard Pozner and Veronique De La Rosa. During that video, InfoWars once again made the false accusation that Ms. De La Rosa conducted a fake interview with Anderson Cooper as evidence of a conspiracy to cover up the truth about Sandy Hook.

On June 13, 2017, Mr. Jones stated in a Facebook video that "there's been a cover-up, and Anderson Cooper got caught faking where his location was with blue screen."[28] On June 19, 2017, Mr. Jones appeared for an interview with Megyn Kelly. During this interview, Mr. Jones continued to insist there had been a cover-up. While he waffled on whether he now believed children were killed, he did not abandon his accusations about a cover-up. Mr. Jones claimed it was suspicious that the children's autopsy records were not released to the public, and he again claimed to have seen video of kids going in circles in and out of Sandy Hook Elementary. Mr. Jones stated, "I do think there's some cover-up and some manipulation."[29]

In an October 26, 2017, broadcast entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones again returned to the subject of Sandy Hook. In this broadcast, he repeated his accusation that "it's as phony as a three-dollar bill with CNN doing fake newscasts, with blue screens."[30]

### B.    The reasonable meaning of InfoWars' June 26, 2017 Video.

Before publishing, journalists must evaluate how their story will be received by the public. The editorial process includes an analysis of how ordinary readers of average intelligence will understand and interpret the story. During my years in newspaper journalism, I gained extensive

---

[27] Exhibit A19 - Transcript - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 15m22s)
[28] Exhibit A20 - Transcript - 2017-06-13 - Media Refuses To Report Alex Jones' Real Statements On Sandy Hook (Clip at 14m)
[29] Exhibit A21 - Transcript - 2017-06-19 - Megyn Kelly Profile (Clip at 7m55s)
[30] Exhibit A22 - Transcript - 2017-10-26 - JFK Assassination Documents To DROP Tonight (Clip at 1h13m30s)

expertise in assessing the reasonable meanings of a text. As editor, I routinely applied this expertise in an effort to avoid creating a misimpression among our readership. In this case, I likewise analyzed the publication to determine what meaning could be reasonably understood by a person of average intelligence.

It is my opinion that a person of ordinary intelligence would understand the June 26, 2017, video as an accusation that Mr. Heslin was lying about the circumstances of his son's death. Unquestionably, the gist of the video is that Mr. Heslin's claim of holding his son was not possible. InfoWars used a deceptively edited clip of Lynn McDonnel to convince it viewers that she was not allowed to see her child's body. It also used an out-of-context clip of Dr. Carver to convince viewers that parents were only allowed to see photographs of their dead children. These actions were aimed at manufacturing a controversy where none existed.

Moreover, the allegation against Mr. Heslin was merely the latest part of a calculated five-year campaign to convince InfoWars' viewers that the Sandy Hook massacre was staged and that the parents were actors in a "false flag" event. In the context of this five-year course of harassment and deception, it is clear that a reasonable person could understand InfoWars to be implying that Mr. Heslin's "impossible" claim about holding his alleged son is evidence that he was an actor in the "false flag" and not a real parent. As such, a reasonable viewer could understand that the video ultimately accuses Mr. Heslin of criminal conduct, such as falsifying a police report or fraud.

Not only is it my opinion that these statements could be understood in this manner, but there is ample evidence that InfoWars' statements were indeed understood in this manner by the public at large. The nature of InfoWars' statements about Sandy Hook have been widely reported in the media. The national outrage created by the unmistakable meaning of Mr. Jones' statements about Sandy Hook is well documented. In an April 19, 2018, editorial entitled "Thank You for Suing Alex Jones," the Hartford Courant editorial board wrote:

> Alex Jones and his website Infowars offer the worst kind of free speech — incendiary malice, based in falsehood, with no social value…They claim the Sandy Hook parents are actors. They claim the children never existed. They weave wild conspiracies from thin air. They have no regard for human suffering.[31]

The New York Daily News Editorial Board wrote about Jones' statements in an editorial on April 17, 2018, entitled "Defamed by the devil: Sandy Hook parents take on Alex Jones' lies." The Board wrote:

> All decent people should cheer on Leonard Pozner, Veronique De La Rosa and Neil Heslin…for filing a defamation lawsuit in Texas court against Alex Jones. As a radio show host and the grand poobah of Infowars.com, Jones has peddled wretched whole-cloth lies about

---

[31] http://www.courant.com/g00/opinion/editorials/hc-ed-alex-jones-sandy-hook-hoax-lawsuit-20180417-story.html?i10c.encReferrer=&i10c.ua=1&i10c.dv=14

the 2012 Newtown massacre: that it was all a hoax, that the victims and their mourning mothers and fathers are actors.[32]

In short, nobody who has been paying attention to InfoWars has any doubt about the meaning of its claims. InfoWars' statements about Mr. Heslin are the latest part of its years-long campaign to convince Mr. Jones' viewers that the events of Sandy Hook should not be believed. Given the persistence of the Sandy Hook hoax conspiracy online, it is clear that many of Mr. Jones' followers have accepted his allegations as true. A 2016 poll conducted by Fairleigh Dickinson University found that 24 percent of Americans believe Sandy Hook was either "definitely" or "possibly" faked.[33]

Additionally, it is clear from my review that InfoWars' statements would be reasonably understood as assertions of fact, not opinions. Mr. Shroyer did not equivocate in his statements about Mr. Heslin. Mr. Shroyer claimed Mr. Heslin's statement about holding his son was "not possible." He also referenced the involvement of unspecified "fact-checkers," which obviously signals an assertion of fact, not an opinion. It is my conclusion that that InfoWars' 2017 statements about Mr. Heslin would tend to injure his reputation, impeach his honesty and integrity and expose him to contempt or ridicule.

## 2. InfoWars' accusations about Mr. Heslin were made with reckless disregard for truth.

I have reviewed materials which lead me to believe that InfoWars demonstrated a reckless disregard for truth. It is my opinion that InfoWars not only had serious doubts about the truth of their 2017 statements about Mr. Heslin, but that they were motivated by a desire to mislead and deceive.

### A. InfoWars' accusations were inherently improbable and manufactured using edited out-of-context footage.

Mr. Shroyer's statements about Mr. Heslin were farfetched and shocking on their face. It required an extraordinary level of verification before being repeatedly stated as fact. Yet it is clear that InfoWars not only performed no verification, but also used edited source material in a misleading way. Both are serious departures from standard journalism practice.[34] For example, there is a full copy of Dr. Carver's interview posted on YouTube,[35] and portions of the interview show that Mr. Shroyer has edited out a small part to create the impression that the parents were not allowed access to their children. Dr. Carver clearly stated that at the time of his interview, the bodies had been released to private funeral homes on behalf of the families. Mr. Shroyer used the same dishonest tactic to edit a portion of an interview with Sandy Hook parents Chris and Lynn McDonnel. Mr. Shroyer cut off the end of Ms. McDonnel's answer to make it appear that she was not allowed to see her daughter's body. A full copy of the transcript shows that Ms. McDonnel

---

[32] http://www.nydailynews.com/opinion/defamed-devil-sandy-hook-parents-alex-jones-lies-article-1.3939094
[33] https://view2.fdu.edu/publicmind/2016/161011/
[34] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Take responsibility…", Provide context…" and "Never deliberately distort…"
[35] https://www.youtube.com/watch?v=k3NS1lLo6As

had the opportunity to see her daughter's body.[36] Mr. Shroyer was only able to support his bogus accusations by using deceptively edited footage.

Serious claims require serious evidence. Here, Mr. Shroyer used sham evidence. Not only did InfoWars ignore basic precautions taken by journalists, but it intentionally distorted the evidence in a malicious way to attack and retaliate against Mr. Heslin.

### B.    InfoWars relied upon dubious and unhinged sources.

As noted above, Mr. Shroyer began the video by referencing a post on an anonymous blog known as "Zero Hedge." It appears that Mr. Shroyer aired his segment within hours of seeing the Zero Hedge blog post. It does not appear that Mr. Shroyer did anything to investigate the author behind the anonymous post. Given the seriousness of the accusations, Mr. Shroyer acted recklessly and in a manner contrary to standard journalism practice[37] by hastily endorsing the accusations of this anonymous author.

In addition, the Zero Hedge article cites accusations made by an individual named Jim Fetzer. In its Motion to Dismiss, InfoWars described Mr. Fetzer with an air of respectability, referring to him as "Professor Emeritus of the University of Minnesota." In truth, the retired professor has long been understood to be an unhinged crank. I do not use these terms lightly. Mr. Fetzer, author of the disturbingly titled self-published book "Nobody Died at Sandy Hook"[38] has spent years spreading ridiculous and bizarre claims about the event. For example, Mr. Fetzer is convinced that Sandy Hook parent Leonard Pozner is actually a different man named Reuben Vabner. Mr. Fetzer wrote:

> Do not let the difference in Reuben and Lenny's ears fool you: they are still lopsided in the same direction even though the tops are bigger on Lenny, which we take to be one of the means they faked to deny they are the same. Fotoforensics demonstrates to anyone interested that Lenny's ears were extended at the tips. His chin was fattened up as well, which you can also see in photo forensics. Take away the ear tips and the double chin and you have Reuben Vabner.[39]

Mr. Fetzer also posts his purported "photo forensics" which he claims prove that Mr. Pozner is actually Mr. Vabner:

---

[36] http://transcripts.cnn.com/TRANSCRIPTS/1212/18/acd.02.html
[37] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Take responsibility…." and "Identify sources…"
[38] https://books.google.com/books/about/Nobody_Died_at_Sandy_Hook.html?id=DH8cjwEACAAJ&source=kp_book_description
[39] http://jamesfetzer.blogspot.com/2018/06/philip-kraske-sandy-hook-alex-jones.html



Reuben Vabner          Leonard Pozner

[40]

Mr. Fetzer's bizarre writings feature notably anti-Semitic rants about Mr. Pozner, who he insists is part of some international Jewish conspiracy:

> Pozner is the true picture of a traitor that has sold out his fellow man. He is a banker/financial consultant and an NWO shill that seems to have no remorse for lying and stealing everyone's donations. Not to mention the trauma our people in the U.S. have endured since 9/11.
>
> Oh I know it's nothing like the Zionists say they went through during their years in the wilderness. Especially, since they are so much better than us and why Leonard Pozner thinks this is all ok to do.[41]

Mr. Fetzer is obsessed with the notion of faked identifies, and he makes similar accusations about the shooting victims, posting photo comparisons which he claims prove that the photos of children are actually adults:

---

[40] *Id.*
[41] *Id.*



Jim Fetzer asked Larry Rivera to perform a superposition to test the hypothesis that they are indeed one and the same, which produced the following confirmation We have established far beyond a reasonable doubt that ▓▓▓ and "Michael" are the same person since this proof demonstrates that no alternative hypothesis is reasonable

[42]

Mr. Fetzer tells his readers that he has located a photograph containing the female shooting victims, who are now allegedly adolescents:



[43]

---

[42] *Id.*
[43] *Id.*

Mr. Fetzer has claimed, with no evidence, that the death certificates for shooting victims have been faked and that a shooting victim's gravestone was actually a computer-generated graphic.[44] In short, no rational journalist would ever rely on Mr. Fetzer as a source for anything, especially an allegation as improbable and serious as accusing a parent of lying about holding their dead child. InfoWars' uncritical endorsement of accusations being promoted by Mr. Fetzer demonstrates its reckless and deceptive conduct.

C.    **InfoWars has a long history of making false statements about Sandy Hook.**

InfoWars has made wild claims about the Sandy Hook massacre from the beginning. InfoWars suggested the event was a "false flag" on the day on the shooting[45], and InfoWars explicitly made that claim over the next five years. The accusation about Mr. Heslin is simply the latest element of InfoWars' claim that the official story of Sandy Hook was a lie. He has continually repeated these falsehoods over the course of five years. Countless individuals and media organizations have thoroughly debunked each of InfoWars' claims over the years. Nonetheless, InfoWars has persisted in this malicious campaign.

As part of my evaluation in this case, I reviewed video clips from over twenty InfoWars' broadcasts between 2013-2016, all of which discuss the alleged conspiracy behind Sandy Hook. In the videos I reviewed, InfoWars made a variety of factual allegations which are readily disproved by basic journalistic efforts. The various claims made by Jones have been debunked from numerous groups and individuals using a wide variety of sources in the public record.

InfoWars had ample opportunity to investigate the accuracy of its assertions. It has devoted an enormous amount of airtime to the tragedy, with videos and articles making extreme assertions years after the event. Given the enormous public attention and outcry over InfoWars' allegations, I find it unlikely that InfoWars researchers could have avoided the widespread debunking efforts unless they were doing so intentionally. It is my opinion that any reasonable journalist who continued to publish these claims in 2017 would entertain serious doubts about the truth of their statements and that they would be acting with a desire to mislead their audience.

D.    **InfoWars has a long history of recklessly claiming that national tragedies were staged by the government.**

Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government. InfoWars' current promotional materials boast that "Alex Jones is considered by many to be the grandfather of what has come to be known as the 9/11 Truth Movement."[46] Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100 percent false flag."[47] Jones claimed that

---

[44] *Id.*

[45] Exhibit A23 - Transcript - 2012-12-14 - Connecticut School Massacre Looks Like False Flag Says Witnesses (Clip at 9m30)

[46] Free Speech Systems, LLC Media Kit, p. 1.

[47] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51244/gcn-alexjones-20120720-columbinefalseflag

Columbine "had globalist operations written all over it."[48] Regarding the Oklahoma City bombing, Jones said the bombing was a "false flag" and that "we've never had one so open and shut." He added that convicted bomber Timothy McVeigh "was a patsy, that was a staged event."[49]

Mere hours after James Holmes killed twelve people in a movie theater in Aurora, Colorado, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind control event."[50]

After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven."[51] Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."

An April 18, 2013, headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up."[52] A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now."[53] Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies."[54] Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA.[55]

Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90 percent probability that it was a false flag:

---

[48] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51241/gcn-alexjones-20120720-columbine
[49] The Alex Jones Show, April 19, 2015, video available at:
https://www.mediamatters.org/embed/clips/2016/11/21/51199/youtube-jones-20150419-okc
[50] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51243/gcn-alexjones-20120720-100
[51] Interview with Rolling Stone, March 2, 2011, available at:
http://www.rollingstone.com/politics/news/talk-radios-alex-jones-the-most-paranoid-man-in-america-20110302
[52] http://www.infowars.com/proof-boston-marathon-bombing-is-staged-terror-attack/
[53] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51269/youtube-alexjones-20130426-staged
[54] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51271/youtube-alexjones-20130426-boston
[55] The Alex Jones Show, April 8, 2015. Available at:
http://mediamatters.org/video/2015/04/08/rand-pauls-ally-alex-jones-boston-marathon-bomb/203215



In short, a major element of the InfoWars brand is built on allegations that major national tragedies are actually the result of orchestrated government actions. Given this background, I find that InfoWars' pattern of predictably asserting that events are "false flags," sometimes within hours of the event, is circumstantial evidence that InfoWars recklessly disregarded whether Jones' broadcast was true in this case.

## CONCLUSION

Based on the evidence I have reviewed at this early stage, it is my opinion that the Defendants failed to use reasonable care to ascertain the accuracy of their statements. Moreover, it is my opinion that the Defendants not only entertained serious doubts about the truth of their statements regarding the Plaintiffs, but that they were acting with the intent to deceive. Given the evidence I have reviewed, I conclude that the statements were published with reckless disregard for falsity. It is also my opinion that the statements by InfoWars were harmful to the Plaintiff, and could subject him to public contempt, hate or ridicule.

FURTHER YOUR AFFIANT SAYETH NOT

Fred Zipp

THE STATE OF TEXAS      §
                        §
COUNTY OF HARRIS        §

SWORN to and SUBSCRIBED before, the undersigned authority, on the 21st day of August, 2018, by Mr. Fred Zipp.



_____
Notary Public, State of Texas

My commission expires: _____ 4-6-21 _____

# EXHIBIT A-1

1

2

3

4                CONNECTICUT MASSACRE SHOOTING

5

6

7

8            TRANSCRIPT OF INFOWARS BROADCAST

9      ZERO HEDGE DISCOVERS ANOMALY IN ALEX JONES HIT PIECE

10                    JUNE 26, 2017

11                    FULL SEGMENT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 135 of 608

2

```
 1            MR. SHROYER:  So, folks, now here's another story.
 2   You know, I don't even know if Alex knows about this, to be
 3   honest with you.  Alex if you're listening and you want to --
 4   or if you just want to know what's going on, Zero Hedge has
 5   just published a story, "Megyn Kelly fails to fact-check
 6   Sandy Hook's -- Sandy Hook father's contradictory claim in
 7   Alex Jones Hit Piece."
 8            Now, again, this broke -- I think it broke today.
 9   I don't know what time.  But featured in Megyn Kelly's
10   expose, Neil Heslin, a father of one of the victims, during
11   the interview described what happened the day of the
12   shooting, and basically what he said -- the statement he
13   made, fact checkers on this have said cannot be accurate.
14   He's claiming that he held his son and saw the bullet hole in
15   his head.  That is his claim.
16            Now, according to a timeline of events and a
17   coroner's testimony, that is not possible.  And so one must
18   look at Megyn Kelly and say, Megyn, I think it's time for you
19   to explain this contradiction in the narrative because this
20   is only going to fuel the conspiracy theory that you're
21   trying to put out, in fact.
22            So -- and here's the thing too, you would remember
23   -- let me see how long these clips are.  You would remember
24   if you held your dead kid in your hands with a bullet hole.
25   That's not something that you would just misspeak on.
```

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 136 of 608

3

1           So let's role the clip first, Neil Heslin telling

2   Megyn Kelly of his experience with his kid.

3           (Video played - not transcribed)

4           Okay.  So making a pretty extreme claim that would

5   be a very thing, vivid in your memory, holding his dead

6   child.

7           Now, here is an account from the coroner that does

8   not corroborate with that narrative.

9           (Video played - not transcribed)

10          Okay.  So just another question that people are now

11  going to be asking about Sandy Hook.  The conspiracy

12  theorists on the internet out there that have a lot of

13  questions that are yet to get answered.  I mean, you can say

14  whatever you want about the event.  That's just a fact.  So

15  there's another one.  Will there be a clarification from

16  Heslin or Megyn Kelly?  I wouldn't hold your breath.  So now

17  they're fueling the conspiracy theory claims.  Unbelievable.

18          We'll be back with more.

19          (Segment ended)

20          (Commercial - not transcribed)

21          (END OF AUDIO FILE)

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 137 of 608

4

<div align="center">CERTIFICATE OF TRANSCRIPTIONIST</div>

I certify that the foregoing is a true and accurate transcript of the digital recording provided to me in this matter.

    I do further certify that I am neither a relative, nor employee, nor attorney of any of the parties to this action, and that I am not financially interested in the action.

_____

Julie Thompson, CET-1036

# EXHIBIT A-2

```
1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8    TRANSCRIPT OF INFOWARS BROADCAST

9 LOOKS LIKE FALSE FLAG SAYS WITNESSES

10             DECEMBER 14, 2012

11              CLIP AT 9M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1          **MR. JONES:**  ... with all sorts of information on

2 this subject.  But get ahold of your cousin when she settles

3 down and get her to talk to us for any other information.  We

4 need to know: were there any drills that day or the day

5 before?  Does she have anything about other shooters, or was

6 it that she never saw the shooters?

7          **UNIDENTIFIED CALLER:**  Well, I had asked them if it

8 was supposedly too -- because they have a lot of security at

9 that school.  You have to ring a doorbell in order to get

10 into the school.

11          **MR. JONES:**  Yeah, of course.  Which is another side

12 of that.  Yeah.  It's one of these federal model schools.

13          **UNIDENTIFIED CALLER:**  The thing that just scared

14 the daylights out of me -- I had to call right away -- is I

15 asked them, "Did they ever train for this?"  And my uncle

16 said, "Yes."  Within this school year, since September, they

17 have trained for incidents like this.

18          **MR. JONES:**  Well, that in and of itself isn't proof

19 of it, but they could use a drill to then bring in a patsy.

20 It could just be a Prozac head.  We'll find out.  God bless

21 you, sir.  I appreciate your call.  Stay in contact.

22          We're going to go to Rob who says email --

23          (END OF AUDIO FILE)

24

25

3

1              CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12            Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-3

```
1

2

3

4    CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9  WHY PEOPLE THINK SANDY HOOK IS A HOAX

10           JANUARY 27, 2013

11            CLIP AT 1M 12S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  Now again, in the last month and a half

2 I have not come out and said that this was clearly a staged

3 event.  Unfortunately, evidence is beginning to come out that

4 points more and more in that direction, and we're going to

5 show you that information in a moment.

6          Now, a lot of the tens of millions of video views

7 on YouTube concerning the Sandy Hook hoax surrounds CNN and

8 what appears to be people who have been coached, people who

9 have been given cue cards, people who are behaving like

10 actors.  And we see CNN criticizing all the witnesses from

11 the helicopter, and the news crews, and witnesses, adults,

12 that saw multiple people being detained who were in camo.

13 We're told, oh, those are five-year-olds saying that.  It's a

14 conspiracy theory, when it's not five-year-olds saying that.

15 It's adults.  It's police admitting that "police officers"

16 were arrested from other jurisdictions creeping around in the

17 woods.

18          Something serious is going on here, and CNN over

19 and over again is at the heart of the fishy things that are

20 happening.

21          Now, remember, in 1990-1991 when the Gulf War

22 started, CNN would send out their raw feeds to their news

23 affiliates, and on it there was clear blue screens on top of

24 the roof of CNN Center in Atlanta with their top reporters

25 claiming they were in Israel under sarin nerve gas attack

3

1 from scuds.  And later they had to admit, quietly -- this is

2 on record; we're going to show you some clips -- that indeed

3 they were in Atlanta, Georgia, and that they were not being

4 attacked by scud missiles with sarin gas.

5          CBS News got caught scripting videos as well, and

6 there's a lot of examples of this.

7          (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-4

1

2

3

4    CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9   SHADOW GOVERNMENT STRIKES AGAIN

10            APRIL 16, 2013

11            CLIP AT 13M 20S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1        **MR. JONES:** Let's -- and again, there's maybe a 5

2 percent chance out of 100 that this could be real Muslim

3 terrorists, or I guess there could be some domestic group

4 freaked out that would go stage this.

5        To be clear, I've never seen an Easter Bunny, but

6 some say it's real.  To be clear, I've never seen Santa

7 Claus.  Some say it's real.  Never seen a unicorn.  Some say

8 it's real.  Now, I don't think it exists, but it may.

9        Same thing with domestic terror groups.  I mean,

10 I've interviewed the cops and the people that saw the feds

11 plant the bombs in Oklahoma City.  You saw them stage Fast

12 and Furious.  Folks, they staged Aurora.  They staged Sandy

13 Hook.  The evidence is just overwhelming, and that's why I'm

14 so desperate and freaked out.  This is not fun, you know,

15 getting up here telling you this.  Somebody has got to tell

16 you the truth.  Somebody has got to stand against these

17 people.  Somebody has got to do it.

18        And I just hope everybody that is watching out

19 there that serves the system, who thinks they're going to get

20 away with all this, I hope you understand that you're not

21 going to get away with this.  You get rid of our checks and

22 balances, our protections, you're going to lose yours as

23 well.

24        And you want to throw your children out in the

25 cold.  You think you're cold-blooded.  You think you're a

Discovery Resource
713-223-3300

3

1 winner doing stuff like this.  You're not.

2          (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12        Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-5

```
1

2

3

4          CONNECTICUT MASSACRE SHOOTING

5

6

7

8       TRANSCRIPT OF INFOWARS BROADCAST

9  SANDY HOOK, FALSE NARRATIVES VERSUS THE REALITY

10              MARCH 14, 2014

11               CLIP AT 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  ...major universities he's consulted

2 for.  I mean, he's a top consultant, long career as a state

3 police officer in Miami, Florida.  If you're just joining us,

4 he's been in customs, and then he got into being an educator

5 and then security.  And he's looking at it and dissecting it

6 like everybody else did.

7          I mean, folks, we've got video of Anderson Cooper

8 with clear blue screen out there.  He's not there in the town

9 square.  We've got people clearly coming up and laughing and

10 then doing the fake crying.  We've clearly got people where

11 it's actors playing different parts of different people, the

12 building bulldozed, covering up everything.  Adam Lanza

13 trying to get guns five times we're told.  The witnesses, you

14 know, not saying it was him.  People out in the woods.

15          But we've got the investigator here, Wolfgang W.

16 Halbig.  I'm going to give you the floor, sir.  Go over your

17 16 points, the problems, the issues, and break down what you

18 believe is a total hoax.

19          I've looked at it, and undoubtedly there's a cover-

20 up.  There's actors.  They're manipulating.  They've been

21 caught lying, and they were preplanning before it and rolled

22 out with it.  So clearly I agree with you that something is

23 rotten under the floorboard.  But is it a possum, or is it a

24 human?

25          Well, regardless, they're not letting a good crisis

1 go to waste.  But you're the expert.  Break it down for us.

2           (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12               Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-6

1

2

3

4                  CONNECTICUT MASSACRE SHOOTING

5

6

7

8              TRANSCRIPT OF INFOWARS BROADCAST

9      BOMBSHELL SANDY HOOK MASSACRE WAS A DHS ILLUSION

10                 SAYS SCHOOL SAFETY EXPERT

11                     MAY 13, 2014

12                     CLIP AT 17M

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 154 of 608

2

1    MR. JONES:  They don't even hide this stuff,

2  ladies and gentlemen.  Anderson Cooper, CIA, up there, who

3  cares if it's blue screen.  Just like CNN -- I'm going back

4  to our guest. Just like CNN back there in the first Gulf

5  War was at the broadcast center in Atlanta on top of a roof

6  with a blue screen behind them saying they were in Riyadh,

7  Saudi Arabia, and Israel different days being hit by nerve

8  gas.  And then they went on air for parts of it with the

9  blue screen not even turned on with blue behind them.

10    And then there were live feeds back in that day.

11  Remember the whole thing where David Letterman was getting

12  mad that people could tape his show as it was being taped

13  and sent over, same thing with Jay Leno.  Same thing was

14  happening with Johnny Carson before he retired because they

15  would tape it during the day and then beam it back to New

16  York to be edited.  Well, it's the same deal.

17    CNN was sending that raw feed out all over the

18  world, and people knew how to descramble them and get them.

19  And it's on record that CNN did fake scud missile attack

20  videos.  So they've done it over and over again.

21    We've got Wolfgang here with us.  Sir, I'm going

22  to give you about three minutes to make any other points

23  that you didn't make to the school board.  Then we're going

24  to play a special report that aired actually last Friday of

25  you in there talking to them.  I didn't know the video was

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 155 of 608

3

1  actually out or had been on the nightly news.  I missed

2  Friday's show.  I usually watch it almost every night, but

3  I missed that one.  I was with family.

4       But, look, let's say you got three minutes in a

5  nutshell of what's going on here to the layperson out there

6  as a school safety expert, renowned nationally, Mr. Halbig,

7  of what really happened here.  And then what you would say

8  to that school board?

9       MR. HALBIG:  Well, the first thing I got to say

10  before I get into that is that thank God I've had 67 great

11  years of great life.  I got a beautiful family.  You know,

12  I mean, I'm getting threats all the time.  I got some crazy

13  people out there, you know.  They're attacking my wife.

14  They're attacking me and everything else.

15       But you know what, all they have to do is answer

16  16 simple questions.  You and I wouldn't even be talking

17  today.  It's just -- it's unheard of, okay.  And I think

18  the school board members and the superintendent, they have

19  a responsibility of telling the truth.

20       Alex, there's no -- I cannot believe that a

21  public school system -- and you know, when you look at the

22  school itself, when you look at Sandy Hook, it is a filthy

23  school.  That's what I wanted to talk to the school board

24  members about.  It is a toxic waste dump.  When you look at

25  the data -- and here's what they didn't realize.  They put

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 156 of 608

4

1   it in their own newspaper before they demolished it.  Sandy

2   Hook had the highest level of lead paint throughout the

3   entire school.  Sandy Hook had the highest level of

4   asbestos in the ceiling tiles and the ceiling floors.  It

5   had the highest level of PCP, and the ground water is

6   contaminated.

7          Now, here's the question: Connecticut law

8   requires that every parent must be notified of those

9   hazardous chemicals because they have serious health

10  effects on children which may not be seen until five years

11  later.  Now, why would any parent -- why would those 18 of

12  the 20 parents that moved into Newtown in 2009 enroll their

13  child in a school with all those hazardous chemicals?

14  Parents just don't that.  They don't expose their little

15  children to chemical hazards.

16         MR. JONES:  Well, let me just stop you.  As an

17  investigator, kind of like they got Al Capone for tax

18  evasion, not for all the murders or money laundering.

19  You're looking at how they don't any of the standard stuff,

20  the paperwork, the police reports, no helicopter sent, no

21  rescue, kids going in circles totally staged, men with guns

22  in the woods getting grabbed, no names released.  They deny

23  it went on.  Later have to admit it went on but say we're

24  not answering questions.  I mean, clearly it's a drill,

25  just like the Boston bombing.

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 157 of 608

5

1       I don't know exactly what's going on, but it just
2  -- the official story isn't true.  And again, I've read a
3  lot of criminology.  I'm not -- you know, I'm not a cop,
4  but I've studied a lot of it.  And just from a lay media
5  investigative journalist perspective, something is rotten
6  here, and then you see it duplicated over and over again.

7       What's your bottom line?  What do you think
8  really happened at Sandy Hook?  People could see your 16
9  questions at Sandyhookjustice.com.  And we just salute your
10 will to go up there and have eight police car blocks you at
11 the United Way and have them shut you down at the school
12 board, at the commission.  But bottom line, what do you, as
13 an almost 40-year, you know, investigator, police officer,
14 you name it -- what do you think is happening here?

15      MR. HALBIG:  Well, until they answer those
16 questions, I can tell you children did not die.  Teachers
17 did not die on December 14, 2012.  It just could not have
18 happened, and it's in their words.  It's not what Wolfgang
19 thinks, or it's just my opinion.  It's what they say.

20      I mean, their own words actually show that it
21 could not have happened.  Who declares 27 people legally
22 dead within 8 minutes?  Nobody does that.  Who has a 99.9
23 percent kill rate shooting children in a school within 8
24 minutes?  There isn't an FBI agent, there isn't a Navy Seal
25 that's, that good of a shot within eight minutes and then

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 158 of 608

6

1 kill himself.  I mean, that's reasonable doubt.  I mean,

2 that in itself is reasonable doubt to show that --

3          MR. JONES:  That's right.

4          MR. HALBIG:  -- Adam Lanza could not have done

5 that.  I mean, he's an autistic child.  He's got

6 Asperger's.  Alex, nobody has a 99.9 percent kill rate, not

7 even the New York Police Department.

8          MR. JONES:  But he's a perfect cutout.  And for

9 those that don't know, the reason that is, even if you're

10 shooting people point blank in the head, the bullets change

11 direction.  They go different directions, and I mean, a lot

12 of times I've shot a wild hog, a deer, you name it, and the

13 bullet deflects off, even if you hit them broad side.

14 Sometimes it just deflects through.  You don't get 99.99

15 kill rates.  It's just incredibly hard to do.

16          MR. HALBIG:  It is.  And you know -- and the

17 thing that -- people, they haven't had time to read that

18 7000 page report that was put out by Steven Sedensky, who

19 is the state attorney in Danbury, Connecticut.

20          Even the Governor's own commission -- Alex, the

21 Governor's own handpicked Sandy Hook Advisory Commission

22 calls this 7000-page report the biggest data dump that

23 they've ever seen.  Now, this is his handpicked commission,

24 and it's redacted.  This is a commission who is supposed to

25 read it, study it, and come up with recommendations, and

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 159 of 608

7

1  they get a redacted report.  Now, what does that tell us?

2          MR. JONES:  Well, everybody's compartmentalized,

3  and everybody is just playing along with the peer pressure.

4          MR. HALBIG:  Yes, there are.

5          MR. JONES:  Just like the police officers on

6  9/11, you know, were told get back.  They're going to blow

7  up building 7.

8          MR. HALBIG:  Yeah.

9          MR. JONES:  It's on video.  I heard it on CNN.

10  Heard it on CBS News.  Have the video.  The cops saying,

11  "Get back; they're blowing it up."

12          I'm not saying the cops blew it up.  I've

13  interviewed the police officers on this show that are on

14  CNN saying, "Get back.  They're going to blow it up."  And

15  they said, "No.  We were told on the radio they're going to

16  blow up Building 7.  Get back."

17          And there was a countdown on the Red Cross radio.

18  They were running it, and again, they used United Way Red

19  Cross as the CIA cutouts.  If you look that up, that's

20  mainstream news.  And they were there telling the cops what

21  to do that afternoon.  Incredible.  And they're there,

22  hearing the countdown.

23          I've interviewed not one but two.  One of them

24  was an EMT, the other a cop.  And, boy, did they get

25  threatened over it.  They wouldn't even do more interviews

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 160 of 608

8

1  after it.  And they go, "No.  We heard the countdown."  And

2  the Red Cross guy said, "You know, morally I got to just

3  tell all you cops, get back.  They're going to blow it up

4  in a couple of minutes."  He goes, I'm not supposed to tell

5  you this, and then the countdown.  And the cops were like,

6  "Countdown."  So the cops are like, "Get back, get back."

7          And then the media spins it.  You're saying the

8  cops blew up the World Trade Centers.  All I know is it's

9  on CNN, cops going, "Get back.  They're going to blow that

10  building up."  They weren't even brought in on it.  They

11  got told by people warning them who were compartmentalized,

12  and it's just so incredible.  I don't mean to get off in

13  another subject, Wolfgang.  It's just that I've seen this

14  over and over again how the compartmentalization works.

15          MR. HALBIG:  I agree, but I think the same --

16  Alex, we've never had a time in our history where Sandy

17  Hook, a school massacre, the biggest illusion ever

18  portrayed by Homeland Security and FEMA.  It can bring down

19  the house.  I think America -- I cannot tell America.  This

20  is probably our only chance to unite and come together and

21  look for the truth, and this house needs to fall because

22  Sandy Hook is taking away our guns across the country.

23  Sandy Hook is messing with our freedom of speech.  That's

24  not the America that we -- you and I know, Alex.

25          MR. JONES:  And they raised hundreds of millions

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 161 of 608

9

1  of dollars, billions in the case of 9/11, collecting money

2  off of people's goodwill and then giving it to anti-gun

3  groups.   The United Way is an anti-gun cesspit.

4          MR. HALBIG:   It is, and I hope nobody ever

5  donates another dime to United Way until they answer every

6  question.

7               (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 162 of 608

10

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-7

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

CONNECTICUT PD HAS FBI FALSIFY CRIME STATISTICS

SEPTEMBER 25, 2014

CLIP AT 22M

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 164 of 608

2

1           MR. JONES:  We're fearless, folks.  Support us.

2  Support Wolfgang.  This is not a game.  They are hopping mad

3  we're covering this.  CNN admits they did fake scud attacks

4  on themselves back in 1991, 1990.  Would they stage this?  I

5  don't know.  Do penguins live in Antarctica?  Wolfgang W.

6  Halbig's our guest, former state police officer, then worked

7  for the customs department, and then over the last decade's

8  created one of the biggest, most successful school safety

9  training grips.  And he just has gone and investigated, and

10  it's just phony as a $3 bill.  And they've been --

11          But man, Wolfgang, you dropped a bombshell of yours

12  scores of points, your 16 questions.  If you've got a school

13  of 100 kids and then nobody can find them, and you've got

14  parents laughing going ha, ha, ha; and then they walk over to

15  the camera and go (crying), and I mean, not just one, but a

16  bunch of parents doing this and then photos of kids that are

17  still alive they said die.  I mean, they think we're so dumb

18  that it's really hidden in plain view, and so the

19  preponderance -- I mean, I thought they had some scripting

20  early on to exacerbate and milk the crisis as Rahm Emmanuel

21  said, but when you really look at it, where are the lawsuits?

22  There would be incredible lawsuits and payouts, but there

23  haven't been any filed, nothing.  I've never seen this.  This

24  is incredible.

25          (END OF AUDIO FILE)

3

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-8

1

2

3

4
CONNECTICUT MASSACRE SHOOTING

5

6

7

8
TRANSCRIPT OF INFOWARS BROADCAST

9
CONNECTICUT PD HAS FBI FALSIFY CRIME STATISTICS

10
SEPTEMBER 25, 2014

11
CLIP AT 22M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 167 of 608

2

1          MR. JONES:  We're fearless, folks.  Support us.

2    Support Wolfgang.  This is not a game.  They are hopping mad

3    we're covering this.  CNN admits they did fake scud attacks

4    on themselves back in 1991, 1990.  Would they stage this?  I

5    don't know.  Do penguins live in Antarctica?  Wolfgang W.

6    Halbig's our guest, former state police officer, then worked

7    for the customs department, and then over the last decade's

8    created one of the biggest, most successful school safety

9    training grips.  And he just has gone and investigated, and

10   it's just phony as a $3 bill.  And they've been --

11         But man, Wolfgang, you dropped a bombshell of yours

12   scores of points, your 16 questions.  If you've got a school

13   of 100 kids and then nobody can find them, and you've got

14   parents laughing going ha, ha, ha; and then they walk over to

15   the camera and go (crying), and I mean, not just one, but a

16   bunch of parents doing this and then photos of kids that are

17   still alive they said die.  I mean, they think we're so dumb

18   that it's really hidden in plain view, and so the

19   preponderance -- I mean, I thought they had some scripting

20   early on to exacerbate and milk the crisis as Rahm Emmanuel

21   said, but when you really look at it, where are the lawsuits?

22   There would be incredible lawsuits and payouts, but there

23   haven't been any filed, nothing.  I've never seen this.  This

24   is incredible.

25         (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 168 of 608

3

1                  CERTIFICATE OF TRANSCRIPTIONIST

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5       I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11                            _____

12                            Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-9

1

2

3

4                    CONNECTICUT MASSACRE SHOOTING

5

6

7

8           TRANSCRIPT OF INFOWARS BROADCAST

9  LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10                    DECEMBER 27, 2014

11                    CLIP AT 3M 8S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          **MR. JONES:**  What do you guys think of Halbig?  I

2  mean, he was a big, you know, successful, famous school

3  safety guy, wrote the book on a lot of it.

4          All I know is I saw Cooper with blue screen out

5  there, green screen.  I know I saw the kids doing fake, you

6  know, rotations in and out of the building.  They tore it

7  down, all the unprecedented gag orders, you know, the police

8  in anti-terror outfits in the woods.  Then they denied that,

9  that had been in the news.  I mean, something is being hidden

10  there.  You guys are on the East Coast.  You have a lot of

11  sources.  What do you really think happened?

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1              CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12        Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-10

1

2

3

4            CONNECTICUT MASSACRE SHOOTING

5

6

7

8         TRANSCRIPT OF INFOWARS BROADCAST

9  LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10                 DECEMBER 27, 2014

11                  CLIP AT 4M 34S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          **MR. JONES:**  Very astute.  That's what I said a few

2 weeks into it.  I said they may have killed real kids, but

3 they're practicing how to propagandize, and how to control

4 the press, and how to put out a product that's a fraud when I

5 just saw the heavy, heavy, heavy scripting.  That was what

6 was so clear.  And then the parents laughing and then one

7 second later doing the actor breathing to cry.  I mean, it

8 just -- it's just over the top.

9          **UNIDENTIFIED MALE:**  Agreed, yep.

10          **MR. JONES:**  Over the top sick.  And we know they've

11 staged other stuff before.

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-11

1

2

3

4  CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9  AMERICA THE FALSE DEMOCRACY

10  DECEMBER 29, 2014

11  CLIP AT 11M 53S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 176 of 608

2

1        MR. JONES:  Let's talk to, Kevin.  Kevin, go ahead.

2   You're on the air.

3        KEVIN:  Hi, Alex.  Calling about Sandy Hook.

4   Basically my take on it is I live about 50 miles from

5   Newtown, and the whole thing is pretty much the next step in

6   reality TV because with other false flags like 9/11, or

7   Oklahoma City, or the Boston bombing, at least something

8   happened.  With Sandy Hook, there's no there, there.  You've

9   got a bunch of people walking around a parking lot is pretty

10  much what it comes down to and none of the --

11       MR. JONES:  No, no.  I've had investigators on.

12  I've had the state police have gone public, you name it.  The

13  whole thing is a giant hoax.  And the problem is how do you

14  deal with a total hoax?  I mean it's just -- how do you even

15  convince the public something is a total hoax?

16       KEVIN:  Very hard because, you know, anytime I talk

17  about this issue with people, you know, they -- you get

18  criticized, black balled, ridiculed, called every name in the

19  book, or they respond with the magic words they were saying

20  on TV.  There's no statement more proof positive of somebody

21  that's been brainwashed by that stuff, mainstream media, than

22  those words.  They were saying it on TV.

23       Well, I always tell people the same thing.  Go out

24  and prove the official story.  And there's been -- I knew the

25  millisecond this happened with that now fake picture of the

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 177 of 608

3

1  kids being lead out of the school that this -- there's

2  nothing that's going to sell this agenda like dead elementary

3  school kids.  Nothing --

4         MR. JONES:  Well, that's right.  The general public

5  doesn't know the school was actually closed the year before.

6  They don't know.  They've shielded it all, demolished the

7  building.  They don't know that they had their kids going in

8  circles in and out of the building as a photo op.  Blue

9  screen, green screens, they got caught using.  I mean the

10  whole thing.

11         But remember, this is the same White House that's

12  been caught running the fake Bin Laden raid that's come out

13  and been faked.  It's the same White House that got caught

14  running all these other fake events over and over again, and

15  it's the same White House that says I never said that you

16  could keep your doctor when he did say you could keep doctor.

17  People just instinctively know that there's a lot of fraud

18  going on, but it took me about a year with Sandy Hook to come

19  to grips with the fact that the whole thing was fake.  I

20  mean, even I couldn't believe it.  I knew they jumped on it,

21  used the crisis, hyped it up, but then I did deep research;

22  and my gosh, it just pretty much didn't happen.

23         UNIDENTIFIED MALE:  Everything we said came true.

24  Everything we've done been's --

25         (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 178 of 608

4

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5     I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12  Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-12

1

2

3

4  CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9  WHY WE ACCEPT GOVERNMENT LIES

10  JANUARY 13, 2015

11  CLIP AT 10M 36S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 180 of 608

2

1          MR. JONES:  Yeah.  When you're trying to, I mean,

2    decipher cloak and dagger, dirty tricks, it's pretty hard to

3    do.  It's just that when you -- then you learn that they were

4    funded by western funding.  Then you learn that it was the

5    same Amerall-Locky (phonetic) connection underwear bomber.

6    Then those are big red flags that they were patchy

7    provocateurs.  The classic MO has been followed.

8          And then, yeah, it kind of becomes a red herring,

9    you know, to say the whole thing was staged because they have

10   staged events before, but then you learn the school had been

11   closed and reopened.  And you got video of the kids going in

12   circles in and out of the building, and they don't call the

13   rescue choppers for two hours.  Then they tear the building

14   down and seal it.  And they get caught using blue screens,

15   and an email by Bloomberg comes out in the lawsuit where he's

16   telling people get ready in the next 24 hours to capitalize

17   on a shooting.

18         Yeah.  So Sandy Hook is a synthetic, completely

19   fake with actors, in my view, manufactured.  I couldn't

20   believe it at first.  I knew they had actors there clearly,

21   but I thought they killed some real kids; and it just shows

22   how bold they are that they clearly used actors.  I mean,

23   they even ended up using photos of kids killed in mass

24   shootings here in a fake mass shooting in Turkey.  So, yeah -

25   - or Pakistan.  The sky is now the limit.  I appreciate your

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 181 of 608

3

1    call.

2         Shirley in Louisiana.  You're on the air, welcome.

3         (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 182 of 608

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11   _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-13

1

2

3

4  CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9  INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10  FEBRUARY 12, 2015

11  CLIP AT 0M 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 184 of 608

2

1       MR. JONES:  And again, if they can do this to us,

2  they can do it to anybody.  And we're going to give you the

3  name of the video as well that they are trying to sensor.

4  Mystery Sandy Hook victim dies again in Pakistan, and I'm

5  going to show you some of these photos from the BBC of people

6  in Pakistan holding up photos of children they say were

7  killed by terrorists; and it is one of the Sandy Hook

8  victims.  So we just said, man, what's going on in Pakistan?

9  What are they faking?

10      Well, the answer to that was the HONR or HONR

11  network, Lenny Pozner reportedly lost his son there came in

12  and filed a copyright claim on us showing a BBC news article.

13  You can't do that.  For those that don't know how copyright

14  works, I could show a clip off the news if I was analyzing it

15  in commentary, but I could certainly show newspapers all day

16  long.

17      I've been doing this for 20 years.  I took RTF.

18  That was the first thing they taught us.  I've had to sit in

19  on lawyer meetings.  I've been involved in lawsuits that

20  we've won dealing with this, and I've countersued people.

21  It's all on record.  I know what I'm talking about.  I know

22  what I'm talking about on defamation.  Knock on wood, we've

23  never had that problem.  Other people have and have settled

24  with us out of court twice.  So I know of what I speak.

25      And you can't go to somebody's YouTube channel and

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 185 of 608

3

1   say they showed a news article from the BBC, and then say

2   that you can't show that because someone in Pakistan was

3   holding up a photo of your son, who reportedly died at Sandy

4   Hook, and they're saying the same person died in a terror

5   attack in Pakistan.  Obviously, we've got to investigate

6   this, just like we investigated Brian Williams and his

7   claims.

8          So, you know, we're sorry for everybody's losses,

9   whatever.  We're investigating this though because we live in

10  a system where the media exploits things and twists things.

11         Paul Watson thinks the official story of Sandy Hook

12  is true.  He's my chief reporter, and we get major heat from

13  the folks that think Sandy Hook was totally staged, saying

14  why aren't you on the same page.  Because we're

15  investigating.

16         I think there's some cover-ups there.  I know

17  they're using blue screens.  I've seen the footage of people

18  going in and out in circles in the building.  It doesn't look

19  right.  It doesn't pass the smell test.  There are literally

20  hundreds of smoking guns here that this thing doesn't add up.

21         (END OF AUDIO FILE)

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 186 of 608

4

1                  CERTIFICATE OF TRANSCRIPTIONIST

2      I certify that the foregoing is a true and accurate

3      transcript of the digital recording provided to me in this

4      matter.

5          I do further certify that I am neither a relative, nor

6      employee, nor attorney of any of the parties to this

7      action, and that I am not financially interested in the

8      action.

9

10

11                          _____

12                          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-14

1

2

3

4       CONNECTICUT MASSACRE SHOOTING

5

6

7

8       TRANSCRIPT OF INFOWARS BROADCAST

9   NEW BOMBSHELL SANDY HOOK INFORMATION IN-BOUND

10          MARCH 04, 2015

11          CLIP AT 32M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 188 of 608

2

1          MR. JONES:  Wolfgang --

2          MR. HALBIG:  You know, I agree with you.  And I'll

3   say this to you:  I'm begging that I'm wrong.  And if they

4   answer my questions to my satisfaction and to Alex's

5   satisfaction, if they answer it to the people of America to

6   their satisfaction, I will run to the nearest mental health

7   facility -- and I've said it before -- I'll voluntarily

8   enroll myself because if I dare upset these parents or

9   children or school, I need mental health.

10          But I tell you what, I have spent my life doing

11  this, and when people refuse to answer simple, logical

12  questions, it raises the red flag.  And I am telling you I'm

13  not going to stop until we get the answers.

14          MR. JONES:  We know it stinks.  I mean, it's phony.

15  The question is what is going on.  We don't know.  We just

16  know it's fake.  How fake we don't know.  It's sick.

17          Thank you, John.

18          Kyle, Jay, Jimmy, Erik, your calls are straight

19  ahead.

20          (END OF AUDIO FILE)

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 189 of 608

3

1            CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                          _____

12                          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-15

1

2

3

4          CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9          GOVERNMENT IS MANUFACTURING CRISES

10                  JULY 7, 2015

11                 CLIP AT 32M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 191 of 608

2

1        MR. JONES:  I didn't watch the nightly news one

2   night last week.  I tend to watch it in the morning on my

3   iPad while I get on the elliptical, and I've got, you know,

4   televisions in there that I monitor as well in the gym, in

5   the public gym I go to.

6        And I heard them back there talking yesterday

7   afternoon about a show they did last week, and I knew that we

8   had sent our East Coast reporter, Dan Bidondi, up there to

9   cover it.  And I heard Dew talking about his uncle, who I

10  know was a Navy Seal and a decorated FBI agent, who retired a

11  few years ago, and is part of a big security firm.

12       And I heard Dew talking, and I was like, "Are you

13  kidding me?"  His uncle talking to other FBI people, who I

14  guess are still in, was told, "You ought to go check out

15  Sandy Hook.  We're not allowed to.  It doesn't add up."  And

16  his uncle went to the hearings, and I didn't even realize, we

17  have video of him at the hearings and Bidondi interviewing

18  him and what he said on air, and what he said off air.  And

19  he told Dew, "Yeah.  You can repeat what I said."

20       He's been in the John Gotti trial.  He's a well-

21  known FBI agent.  He's been in a whole bunch of stuff, a

22  bunch of big cases.  And he told Dew, "I have never seen

23  people acting so weird and so suspicious and saying no one

24  knows anything and no paperwork on anything."  He's a former

25  Navy Seal, retired FBI agent, and I'm --

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 192 of 608

3

1        And I know what will happen.  These guys are

2   compartmentalized.  They're like Mr. America most of them.

3   They really think they're the good guys, and overall they are

4   good guys.  But they're compartmentalized.  Right next to

5   them is the devil and above them people like Eric Holder, as

6   bad as it gets.

7        They'll go investigate something, find out it's

8   true, and then be shut down.  And I would imagine after we

9   talk about this, he's going to -- he's going to get a visit

10  because he's now investigating Sandy Hook.  Rob Dew's uncle

11  is now investigating Sandy Hook, former FBI agent, retired.

12  That's got to really freak them out.  And I'm not going to

13  put words in his mouth, but he said he's never seen something

14  that looks this fake.  It's because it is, folks.

15       I don't know if they really killed kids.  I don't

16  know, but they -- we got emails and memos that school was

17  shut down a year before.  They tore it down.  They covered it

18  up.  No rescue helicopters, no ambulances.  Within an hour

19  and a half they had a sign saying, "Check in here."  It was a

20  media event.

21       If they did kill kids, they knew it was coming,

22  stocked the school with kids, killed them, and then had the

23  media there, and that probably didn't even happen.  I mean,

24  no wonder we get so many death threats and so much heat and

25  so much other stuff I'm not going to get into, behinds the

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 193 of 608

4

1    scenes, when we touch Sandy Hook because, folks, it's as

2    phony as a $3 bill.

3              (END OF AUDIO FILE)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 194 of 608

5

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                           _____

12                           Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-16

1

2

3

4    CONNECTICUT MASSACRE SHOOTING

5

6

7

8    TRANSCRIPT OF INFOWARS BROADCAST

9    RETIRED FBI AGENT INVESTIGATES SANDY HOOK

10    MEGA MASSIVE COVER-UP

11    JULY 07, 2015

12    CLIP AT 0-5M

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 196 of 608

2

1          MR. JONES:  We have been warned.  We have been

2    warned.  We have been threatened.  We have been told through

3    official channels, unofficial channels, threats, you name it,

4    stop investigating Sandy Hook.

5          Now, when this first happened a few years ago, I

6    didn't come out of the gate saying it was a false flag, and I

7    got criticized by a lot of our listeners who were smart folks

8    and who went and really investigated that, hey, Alex, you

9    need to look at this again.

10          All I know is that the official story doesn't add

11    up, and that when retired state police officers, and school

12    investigation experts, and school safety experts, and others

13    began to investigate it, they were threatened.

14          No emergency helicopters were sent.  The ambulances

15    came an hour and a half later and parked down the road.  DHS

16    an hour and a half later with the time stamp put up signs

17    saying sign in here.  They had porta-potties being delivered

18    within an hour and a half.  It looked like a carnival.  It

19    looked like a big PR stunt.

20          Came out that Bloomberg a day before sent an email

21    out to his gun control groups in all 50 states saying,

22    "Prepare to roll, maybe operation coming up."  That came out

23    in the news.

24          We have the emails from city council back and forth

25    and the school talking about it being down a year before.  We

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 197 of 608

3

1 have the school then being demolished, and the records being

2 sealed.

3       We have videos that look just incredibly suspicious

4 where people are laughing and everything, and then they start

5 huffing and puffing and start crying on TV, which is pure

6 acting method.  You've got a degree, Rob, in theater.  I

7 mean, this is -- this is something that even laypeople

8 notice.  So I began to investigate.

9       They had a weird anti-terrorism unit from the state

10 nearby with men in the woods, which were on video from

11 helicopter.  Then they said that didn't exist.  And so we'll

12 recap some of the history of this.

13       But now, your uncle, John Dew, Navy Seal, retired

14 FBI agent, works for a successful security company, I had

15 missed this episode of the nightly news back on June 4th and

16 then again last week when you did an update.  And then I

17 heard you talking about it yesterday.  I knew that we'd sent

18 our reporter down, Dan Bidondi, there for days to cover the

19 city council hearings about it and the fact that they're

20 sealing everything.

21       And then you just said, "Oh, yes, and that's why

22 I'm trying to get my uncle to tell me more."  Because he's

23 been in John Gotti hearings and been involved in huge cases,

24 pretty prominent FBI agent before he retired, and in his

25 words he said he seen the most secretive mafia stuff ever,

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg 198 of 608

4

1  and he's never seen people more closed-lipped.  He's never

2  seen something where it basically stinks.  And we'll use his

3  words, but the headline here is retired FBI agent

4  investigating Sandy Hook.  I mean, that was just amazing to

5  me that so much goes on around here that I miss some of

6  what's happening.

7       Next time a former Navy Seal FBI agent -- I don't

8  care if it's your uncle --

9       MR. DEW:  Yeah.

10       MR. JONES:  -- you know, is investigating something

11  like this, we want to hear about it.  I want to try to get

12  him on.  I know he's going to get heat probably, and they'll

13  probably try to threaten him.  But really kudos to him.

14       I mean, you told me that he went and investigated

15  it because other insiders said you need to go look at this.

16  I guess people currently in the FBI aren't allowed to, but,

17  man, the fix is in.

18       So, Rob Dew, tell us about your uncle, tell us

19  about all this.  I wish we would have gotten more than a two-

20  minute interview with him with Bidondi.  Bidondi did a great

21  job.  I just wish I would have known about this.  I would

22  have gone up there.  Halbig tried to get me to go.  I just am

23  trying to launch the TV network, and the new website, and

24  everything else.

25       But I mean, this is just so big.  And the more we

1   look at Sandy Hook, I don't want to believe it's a false

2   flag.  I don't know if kids really got killed.  But you got

3   green screen with Anderson Cooper where I was watching the

4   video and the flowers and plants are blowing in some of them,

5   and then they blow again the same way.  It's looped, and then

6   his nose disappears.

7           MR. DEW:  Uh-huh (affirmative).

8           MR. JONES:  I mean, it's fake.  The whole thing is

9   just -- I don't know what happened.  It's kind of like if you

10  see a hologram at Disney World in the Haunted House, you

11  know.  I don't know how they do it, but it's not real.  When

12  you take your kids to see, you know, the Haunted House and

13  ghosts are flying around, they're not real, folks.  It's

14  staged.  I mean, a magician grabs a rabbit out of his hat.  I

15  know he's got a box under the table that he reaches in and

16  gets the rabbit.

17          I don't know what the trick is here.  I got a good

18  suspicion, but when you've got Wolfgang Halbig, who was the

19  top -- I mean, 20/20, CNN, I mean, ran the most successful

20  school safety course in the country, got the contracts at

21  Columbine, making millions of dollars a year, he believed it

22  was real.  People called him.  He went and investigated.  No

23  paperwork, no nothing.  It's bull.  And now an FBI retired

24  agent who retired, you know, with decorations --

25          I mean, Dew, this is just unprecedented.  I can't

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 200 of 608

6

1   believe I missed this.  Recap what happened, and then we've

2   got some of the questions from Bidondi.  He told you a lot

3   more.  Well, just tell us what he said.

4               (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 201 of 608

7

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                            _____

12                            Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-17

1

2

3

4                   CONNECTICUT MASSACRE SHOOTING

5

6

7

8            TRANSCRIPT OF INFOWARS BROADCAST

9        RETIRED FBI AGENT INVESTIGATES SANDY HOOK

10                MEGA MASSIVE COVER-UP

11                  JULY 07, 2015

12                  CLIP AT 9M 40S

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 203 of 608

2

1    MR. DEW:  So they were already on the scene right

2  after it happened.  That using u

3    MR. JONES:  Let's remember, they ran fast and

4  furious killing thousands of Mexicans, hundreds of Americans,

5  including six law enforcement to blame the Second Amendment.

6  CBS News got the memo.

7    MR. DEW:  Yeah.

8    MR. JONES:  That was a false flag killing thousands

9  to blame the Second Amendment and martyr Mexicans and say

10  you're racist if you don't turn your guns in.  So they've

11  done it before, and, my gosh, they've done it again.

12    MR. DEW:  Yeah.

13    MR. JONES:  Keep going.

14    MR. DEW:  Well, guys, actually, let's play the clip

15  from my uncle.  It's actually clip number two.  We'll play

16  that one first.  It's really short.

17    MR. JONES:  I want to play it, but tell us more of

18  what he said because you told me more than that.

19    MR. DEW:  Okay.  Well, he was concerned that there

20  -- because he had believed in the initial story, the official

21  story.  He said, well, now this doesn't add up.  If you have

22  all these people, they should just be giving the paperwork

23  and going on with their lives, if they don't want, you know

24  -- because right now it's all being --

25    MR. JONES:  It's 101 they're covering up.

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 204 of 608

3

1      MR. DEW:  He goes nobody acts like that if they're
2  on the up and up.

3      MR. JONES:  It's like if a cop pulls you over and
4  you're busy cramming stuff under the -- under the seat.

5      MR. DEW:  Right.  Saying, don't worry.  Hold on.
6  I'm looking for my license or whatever.

7      MR. JONES:  Yeah.

8      MR. DEW:  You know, nobody has the proper
9  paperwork.  Nobody can deliver it.  They deliver videos
10 without time stamps from police squad cars.  There's videos
11 without time stamps that they give to them and say these are
12 the copies from the squad car.  Yet you go online and you
13 could see squad car video from the same squad car, and it's
14 got time code on it.  So how did they give him video without
15 time code, and he's viewing it at the police station?

16     MR. JONES:  This is mega-massive cover-up.

17     MR. DEW:  It's crazy.  So you know --

18     MR. JONES:  My God.

19     MR. DEW:  -- he just basically -- my uncle doesn't
20 say much.  He's the kind of guy that doesn't say a lot.  He
21 just -- he kind of, you know -- so Dan -- I don't know how
22 Dan figured out he was my uncle.  But he went over and talked
23 to --

24     MR. JONES:  Oh, your uncle is not telling you he's
25 up there?

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg 205 of 608

4

1            MR. DEW:  No, no, no.  He never told me he was

2    going up there.  I got the text from Dan.  That's how I found

3    out he was there, and then I texted him; and the I called him

4    the next day because he couldn't talk at the time.  It was

5    probably 11:30 at night that night.  It was June --

6            MR. JONES:  Well, I suggest you call him and see

7    what he thinks now, see if he's been threatened or anything.

8    But please continue with what else he told you.  So former

9    Navy Seal, retired FBI agent.  Sandy Hook doesn't add up.  He

10   said -- that's the quote, "Doesn't add up"?

11           MR. DEW:  Well, we can take the quote from him.  He

12   said he's never seen anything like this before.

13           MR. JONES:  But to you what did he say?

14           MR. DEW:  That -- and then that's what -- to me

15   what he's saying is that from all of his experience in the

16   years that he has worked as an FBI agent.  He's retired.  He

17   went into the FBI pretty much out of -- out of the Navy.  He

18   was a -- he went to the Naval Academy.  He was a Navy Seal.

19   This guy is on the up and up.  I've known him all my life,

20   you know.  Very --

21           He doesn't tell you what he does in terms of -- you

22   know, we used to go up there and visit him when he was

23   working, and he would just leave and come back.  And you

24   know, he was doing his -- doing casework or whatever.

25           But from what he told me, he said that this thing

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 206 of 608

5

1    doesn't add up, and it's the weirdest court proceeding he's

2    ever been in, in his entire life.  And he's been in a lot of

3    court proceedings.  He was in New York City, stationed in New

4    York City.

5          MR. JONES:  Well, let me tell you, we get more

6    threats over this than anything.  I mean, they --

7          MR. DEW:  Yeah.

8          MR. JONES:  They're hiding something.

9          MR. DEW:  They definitely are.

10         MR. JONES:  Let's ask your opinion, your gut level,

11   without getting into the personalities involved.  You can

12   clearly see they're scared.  The wagons are circled.  They

13   could just release all this.  There is no paperwork.

14         MR. DEW:  Oh, there is none.

15         MR. JONES:  I mean, that's what they -- it's all --

16   so, I mean, I guess totally made up with green screens,

17   everything.  And we've got them on green screens.

18         MR. DEW:  Yeah.

19         MR. JONES:  I mean, what is going on here?

20         MR. DEW:  On top of that --

21         MR. JONES:  That's how evil these people are is

22   that they can have CNN involved, all these people.  It's like

23   a Manhattan project of the gun grabbers.

24              (END OF AUDIO FILE)

25

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 207 of 608

6

1                   CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11                         _____

12                         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-18

1

2

3

4                 CONNECTICUT MASSACRE SHOOTING

5

6

7

8               TRANSCRIPT OF INFOWARS BROADCAST

9          ALEX JONES FINAL STATEMENT ON SANDY HOOK

10                 NOVEMBER 18, 2016

11                   CLIP AT 4M 59S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 209 of 608

2

1    MR. JONES:  Number one, the day before this tragic

2  event happened an email was sent out by Bloomberg's anti-gun

3  group saying prepare for a big event.  But the biggest piece

4  of evidence, the smoking gun, if you would, of a cover-up, of

5  whatever really happened is the Wayback Machine, the internet

6  archive.  We see Sandy Hook's Newtown website K through 12

7  having zero traffic 2008, '09, '10, '11, '12, and then all of

8  a sudden it just explodes.  It's impossible to have zero

9  traffic to a K through 12 entire school system.  And the word

10  is that school system was shut down for those years.  That's

11  what the records show.  They tell us it was open.

12    I don't know if the moon landings were faked, but I

13  don't put anything past these anti-gunners.  And early on,

14  that day we watched footage of kids going in circles in and

15  out of the building.  You'd be running them away from the

16  building.  Emergency helicopters weren't called.  Instead

17  port-potties were prepared for the press within hours of the

18  event.

19    I saw the helicopters that did respond, the police

20  helicopters saying that there were men or a man in the woods

21  in camouflage.  The media later said that was a conspiracy

22  theory.  So early on I'm like, well, I saw local news of the

23  guy in the woods, and they took him in custody.  Now they're

24  saying it never happened.  So that shows there some kind of

25  cover-up happening.

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 210 of 608

3

1        And then I saw Anderson Cooper -- I've been in TV

2    for 20-something years; I know a blue screen or a green

3    screen -- turn, and his nose disappear.  Then I saw clearly

4    that they were using footage on the green screen looped

5    because it would show flowers and other things during other

6    broadcasts that were moving and then basically cutting to the

7    same piece of footage.

8        Then I saw CNN do faked satellite interviews with

9    reporters clearly with the same traffic and the same cars

10   right behind them conducting the interview face to face.

11       Then we see footage of one of the reported fathers

12   of the victims, Robby Parker, doing classic acting training

13   where he's laughing and joking.  And they say, hey, we're

14   live, and he goes, oh.  And maybe that's real.  I'm sure it

15   is.

16       (Video played - not transcribed)

17       But you add it to all the other things that were

18   happening and all the other fake news the media has been

19   caught in, and CNN back in 1991 openly faking scud missile

20   attacks on Saudi Arabia and Israel when they were back in

21   Atlanta; and the satellite feeds caught them admitting that

22   it was all fake.  We'd be crazy not to question this because

23   bare minimum they were faking some of the shots and some of

24   the coverage.

25       (Video played - not transcribed)So to be clear, we

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 211 of 608

4

1   point out clear chroma key, also known as blue screen or

2   green screen being used, and we're demonized.  We point out

3   they're clearly doing fake interviews.  We point out that

4   normal emergency procedures weren't followed, and their

5   answer is to say that we said nothing died.

6                    (END OF AUDIO FILE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 212 of 608

5

1                      CERTIFICATE OF TRANSCRIPTIONIST

2 I certify that the foregoing is a true and accurate

3 transcript of the digital recording provided to me in this

4 matter.

5      I do further certify that I am neither a relative, nor

6 employee, nor attorney of any of the parties to this

7 action, and that I am not financially interested in the

8 action.

9

10

11                        _____

12                      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-19

1

2

3

4　　　　　　　CONNECTICUT MASSACRE SHOOTING

5

6

7

8　　　　　TRANSCRIPT OF INFOWARS BROADCAST

9　　　ALEX JONES FINAL STATEMENT ON SANDY HOOK

10　　　　　　　　NOVEMBER 18, 2016

11　　　　　　　　CLIP AT 15M 22S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 214 of 608

2

1          MR. JONES:  And why should anybody fear an

2    investigation if they have nothing to hide.  In fact, isn't

3    that in Shakespeare's Hamlet, me thinks you protest too

4    much."

5          So here is my statement for the media when they

6    call up saying where do you stand on this: where I've always

7    stood.  When there were other mass shootings, I would simply

8    point out that they're very rare statically, and why should

9    we all give up our rights because some other bad person does

10   something.  A guy with a car runs over 50 people.  Do we ban

11   driving cars?  It's the same thing.

12         And there have been other instances of shootings

13   that are very suspicious.  Aurora is one, just look into

14   that.

15         But this particular case they are so scared of an

16   investigation.  So everything they do basically ends up

17   blowing up in their face.  So you guys are going to get what

18   you want now.  I'm going to start reinvestigating Sandy Hook

19   and everything else that happened with it.

20         I'm Alex Jones signing off for InfoWars.com.  If

21   you're watching this transmission, think for yourself.  I

22   know it's a thought a crime (sic).  And then ask yourself:

23   what is so strange about Sandy Hook and that tragedy?

24         But I will say this finally.  My heart does goes

25   out to all parents that lose children, whether it's to

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 215 of 608

3

1 | stabbings, or whether it's to car wrecks, or whether it's to

2 | stranglings, or whether it's to blunt force trauma, or

3 | murder, firearms, whatever the case is.  I'm a parent, and my

4 | heart goes out to all parents that have lost children in

5 | these tragic events.

6 |      And so if children were lost in Sandy Hook, my

7 | heart goes out to each and every one of those parents and the

8 | people that say they're parents that I see on the news.  The

9 | only problem is I've watched a lot of soap operas, and I've

10 | seen actors before.  And I know when I'm watching a movie and

11 | when I'm watching something real.  Let's look into Sandy

12 | Hook.

13 |      (END OF AUDIO FILE)

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 216 of 608

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-20

1

2

3

4              CONNECTICUT MASSACRE SHOOTING

5

6

7

8            TRANSCRIPT OF INFOWARS BROADCAST

9       WHAT ALEX JONES REALLY BELIEVES ABOUT SANDY HOOK

10                   JUNE 13, 2017

11                   CLIP AT 14M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 218 of 608

2

1        MR. JONES:  And how they're all colluding and the

2  fake polls.  You guys are the globalists.  You're the

3  enemies.  You're the people that have hijacked America.

4  You're the threat to our children.  You're the people that

5  are cold and heartless and don't care, not us.

6        But again, I want to encourage people to read the

7  Zero Hedge article that breaks it all down because they

8  absolutely are on target with this report where they ask the

9  questions that the media seems so scared that I might even

10  actually talk about if the Megyn Kelly interview aired.

11        Why does the Sandy Hook Elementary School website

12  have zero traffic for four years before the event and show it

13  was closed?

14        Why were there several reports of other shooters

15  dressed in camouflage in the woods that fled, whom the police

16  allegedly detained?

17        Why were porta-potties, sandwiches, and fruit

18  drinks, and chips brought up and set up for the crime scene

19  in just an hour or so?

20        Sandy Hook -- it just goes on and one.  An FBI

21  crime stat which shows no murders occurred in Newtown in

22  2012.

23        Why didn't they let paramedics and EMTs in the

24  building if 27 children were declared dead in 8 minutes?

25        Why was Adam Lanza's home burned to the ground by

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 219 of 608

3

1  the bank?

2        Why have they declared all the records totally

3  secret?

4        These are questions the public has.  They're the

5  ones asking it.  They're the ones demanding it.  I've said I

6  believe children did die there, but PR firms were involved,

7  admittedly, hyping it up as much as possible.  But there's

8  been a cover-up, and Anderson Cooper got caught faking where

9  his location was with blue screen.

10        I mean, it's all there.  We don't know what

11  happened.  I believe kids died.  But the same media that's

12  faking a bunch of other stuff and faking war propaganda is

13  saying that I have said things that I never said that have

14  been taken out of context, and now won't report when I'm

15  saying don't air the interview on Father's Day to hurt

16  fathers, and demonize men, and that you edited me out of

17  context; and that I don't want it aired.  Why won't they

18  actually report on what I'm saying?

19        I'm Alex Jones.  This is the InfoWars.  Coming up,

20  Owen Shroyer in the studio for the next 30 minutes.  Then

21  I'll be back in the studio coming up live.  Please spread the

22  word because the truth lives at InfoWars.com.

23        (Cut to different clip)

24        MR. JONES:  Let's go to Devin in Florida.  Devin in

25  Florida, you're on the air.

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 220 of 608

4

1              UNIDENTIFIED MALE:  Great.  Hey, thank you so much.

2    Listen, I --

3              (END OF AUDIO FILE)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 221 of 608

5

```
1                  CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                         _____

12                         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT A-21

1

2

3

4 CONNECTICUT MASSACRE SHOOTING

5

6

7

8

9 MEGYN KELLY PROFILE

10 JUNE 19, 2017

11 CLIP AT 7M 55S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 223 of 608

2

1    MS. KELLY:  At the top of that list is Jones'
2  outrageous statement that the slaughter of innocent children
3  and teachers at Sandy Hook Elementary School, one of the
4  darkest chapters in American history, was a hoax.
5    MR. HESLIN:  I watched my son.  I buried my son.  I
6  held my son with a bullet hole through his head.
7    MS. KELLY:  Neil Heslin's son Jessie, just six
8  years old, was murdered along with 19 of this classmates and
9  6 adults on December 14, 2012, in Newtown, Connecticut.
10    MR. HESLIN:  I dropped him off at 9:04.  That's
11  when we dropped him off at school with his book bag.  Hours
12  later I was picking him up in a body bag.
13    MS. KELLY:  Alex Jones repeatedly claimed that the
14  shooting never happened.  Here he is on InfoWars in December
15  2014.
16    MR. JONES:  But it took me about a year with Sandy
17  Hook to come to grips with the fact that the whole thing was
18  fake.
19    MS. KELLY:  You said the whole thing is a giant
20  hoax.  How do you deal with a total hoax?  It took me about a
21  year with Sandy Hook to come to grips with the fact that the
22  whole thing was fake.  I did deep research, and, my gosh, it
23  just pretty much didn't happen.
24    MR. JONES:  At that point -- and I do think there's
25  some cover-up and some manipulation -- that is pretty much

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 224 of 608

3

1  what I believed.  But then I was also going in devil's

2  advocate.  But then we know there's mass shootings and these

3  things happen.  So again --

4          MS. KELLY:  You're trying to have it all ways,

5  right?

6          MR. JONES:  No, I'm not.

7          MS. KELLY:  If you wrongly went out there and said

8  it was a hoax, that's wrong.

9          MR. JONES:  But what I already answered your

10  question was listeners and other people are covering this.  I

11  didn't create that story.

12          MS. KELLY:  But, Alex, the parents, one after the

13  other, devastated, the dead bodies that the coroner

14  autopsied.

15          MR. JONES:  And they blocked all that, and they

16  won't release any of it.  That's unprecedented, even --

17          MS. KELLY:  All of the parents --

18          MR. JONES:  -- the reports.

19          MS. KELLY:  -- decided to come out and lie about

20  their dead children.

21          MR. JONES:  I didn't say that.

22          MS. KELLY:  What happened to the children?

23          MR. JONES:  I will sit there on the air and look at

24  every position and play devil's advocate.

25          MS. KELLY:  Was that devil's advocate; the whole

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 225 of 608

4

1  thing is a giant hoax; the whole thing was fake?

2          MR. JONES:  Yes.  Because I remember in -- even

3  that day I go back from memory, them saying but then some of

4  it looks like it's real.  But then what do you do when

5  they've got the kids going in circles in and out of the

6  building with their hands up?  I've watched the footage, and

7  it looks like a drill.

8          MS. KELLY:  When you say parents faked their

9  children's death, people get very angry.

10          MR. JONES:  Yeah.  Well, let's -- oh, I know.  But

11  they don't get angry about the half million dead Iraqis from

12  the sanctions, or they don't get angry about --

13          MS. KELLY:  That's a dodge.

14          MR. JONES:  No, no.  It's not a dodge.  The media

15  never covers all the evil wars it has promoted, all the big

16  things.

17          MS. KELLY:  That doesn't excuse what you did and

18  said about Newtown.  You know it.

19          MR. JONES:  But I -- here's the difference.  Here's

20  the difference.  I looked at all the angles of Newtown, and I

21  made my statements long before the media even picked up on

22  it.

23          MS. KELLY:  In our interview we asked Jones

24  numerous times what he now believes, and he never completely

25  disavowed his previous statements.

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 226 of 608

5

1          MR. JONES:  I tend to believe that children

2    probably did die there, but then you look at all the other

3    evidence on the other side.  I can see how other people

4    believe that nobody died there.

5          MS. KELLY:  Of course, there --

6          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 227 of 608

6

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                   Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-22

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

JFK ASSASSINATION DOCUMENTS TO DROP TONIGHT

OCTOBER 26, 2017

CLIP AT 1HR 13M 30S

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 229 of 608

2

1          MR. JONES:  ...top trend forecaster.  But look at

2    this article that was on Infowars.com a few days ago that I

3    read.  I meant to cover, and then I heard Lee Ann McAdoo

4    during the break.  A lot of our radio ads aren't radio ads.

5    They're just one minute little information news pieces,

6    something we do.  We just change things up.  And I'd

7    forgotten in the documents the CIA visited Lanza and

8    reportedly recruited him about a year before the shooting.  I

9    mean, they bulldozed the house to get rid of it.

10          I don't know what really happened with Sandy Hook,

11   folks.  We've looked at all sides.  We played devil's

12   advocate from both sides, but I mean, it's as phony as a $3

13   bill with CNN doing fake newscasts, with blue screens.  I

14   mean, Nancy Grace got caught doing it, Anderson Cooper.  I

15   mean, that is just a crazy -- that's the kind of stuff that I

16   read on InfoWars.com that I don't even get to.

17          Speaking of that --

18          (END OF AUDIO FILE)

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 230 of 608

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                              _____

12                              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-23

```
 1

 2

 3

 4      CONNECTICUT MASSACRE SHOOTING

 5

 6

 7

 8    TRANSCRIPT OF INFOWARS BROADCAST

 9  LOOKS LIKE FALSE FLAG SAYS WITNESSES

10            DECEMBER 14, 2012

11              CLIP AT 9M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Discovery Resource
713-223-3300

2

1         **MR. JONES:** ... with all sorts of information on

2  this subject.  But get ahold of your cousin when she settles

3  down and get her to talk to us for any other information.  We

4  need to know: were there any drills that day or the day

5  before?  Does she have anything about other shooters, or was

6  it that she never saw the shooters?

7         **UNIDENTIFIED CALLER:**  Well, I had asked them if it

8  was supposedly too -- because they have a lot of security at

9  that school.  You have to ring a doorbell in order to get

10 into the school.

11        **MR. JONES:**  Yeah, of course.  Which is another side

12 of that.  Yeah.  It's one of these federal model schools.

13        **UNIDENTIFIED CALLER:**  The thing that just scared

14 the daylights out of me -- I had to call right away -- is I

15 asked them, "Did they ever train for this?"  And my uncle

16 said, "Yes."  Within this school year, since September, they

17 have trained for incidents like this.

18        **MR. JONES:**  Well, that in and of itself isn't proof

19 of it, but they could use a drill to then bring in a patsy.

20 It could just be a Prozac head.  We'll find out.  God bless

21 you, sir.  I appreciate your call.  Stay in contact.

22         We're going to go to Rob who says email --

23         (END OF AUDIO FILE)

24

25

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT J

# Affidavit of Fred Zipp from

# *Pozner v. Jones, et al.*

## AFFIDAVIT OF FRED ZIPP

STATE OF TEXAS  §
                §
TRAVIS COUNTY  §


Before me, the undersigned notary, on this day personally appeared FRED ZIPP, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

### PERSONAL BACKGROUND

I have spent 39 years in daily newspaper journalism and journalism education.

From 1979 to 1984, I was a reporter and assistant city editor at the Beaumont Enterprise in Beaumont, Texas. From 1984 to 1987, I was a sports copy editor, assistant sports editor and assistant city editor at the Austin American-Statesman in Austin, Texas. From 1987 to 1998, I was assistant metro editor, deputy metro editor, news editor and metro editor the Palm Beach Post in West Palm Beach, Florida. In 1998, I returned to the American-Statesman as assistant managing editor, managing editor, and retired as editor. Over the course of my career, I gained extensive experience and expertise in the responsible delivery of news content to a mass media audience.

In 2012, I began teaching at the University of Texas at Austin. At the University of Texas, I supervise a digital media initiative known as *Reporting Texas* which functions similarly to a newsroom; students are the reporters, and I am their editor. I help them conceive, report and write stories that are posted on the reportingtexas.com website.

I have been a director and officer of the Freedom of Information Foundation of Texas and the Headliners Foundation of Texas, an organization that promotes journalism excellence in the state.

### SCOPE OF REVIEW

In arriving at my opinions in this case, I have used the same principles and analysis as I have used throughout my journalism career to determine whether particular assertions could be responsibly published. This review included an examination of the disputed statements as well as a variety of relevant background materials. I have reviewed numerous background items, including:

- Public domain materials relating to the Sandy Hook shooting.

- Materials from the final report published by the Connecticut Department of Emergency Services and Public Protection, available at: http://cspsandyhookreport.ct.gov/

- Various articles and social media content from InfoWars.

- Various articles and reference materials concerning InfoWars

- My own personal reference materials and texts.

- Video clips containing statements by InfoWars about Sandy Hook, along with transcripts of those video clips created by a court reporter. Those transcripts are attached to my affidavit.

It is my belief that discovery will likely to produce further relevant evidence, but I am confident that enough material exists in the public domain to reach reliable opinions for the purposes of these initial findings.

## BACKGROUND KNOWLEDGE OF INFOWARS

Having been involved in media in Austin for 23 years, I am aware of Alex Jones and InfoWars, although I felt no need to pay close attention to either one before agreeing to review the materials in this lawsuit. Nonetheless, I was aware of InfoWars' extremely poor reputation in the media industry with respect to the reliability of the information it publishes, and I also knew Mr. Jones had alleged the Sandy Hook Elementary School shooting was a government hoax involving actors.

After I asked to review the events of this lawsuit, I have spent a significant amount of time reading articles on InfoWars.com and reviewing audio and video recordings posted to the website. While the site purports to be a news and information operation, it is clear that it is actually a propaganda outlet for Mr. Jones' theories about a global conspiracy to control and enslave the world's population.

Alex Jones and InfoWars generally have a signature style: rapid-fire assertion of various data points with little or, more often, no attribution. The assertions are presented to the viewer as facts. Underlying the presentation is the premise that Jones is at war with "the globalists" and that he wins the war by marshaling his assertions more effectively than they do. In traditional journalism, by contrast, attributing assertions to sources is an essential element of the work, and the attribution becomes more important in proportion to the seriousness of the facts asserted.

According to the American Press Institute, "Journalism is the activity of gathering, assessing, creating, and presenting news and information. It is also the product of these activities...These elements not only separate journalism from other forms of communication, they are what make it indispensable to democratic societies."[1] The process of journalism is dependent on responsible verification in which information is gathered and its accuracy is evaluated. In

---

[1] https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/

coming to my opinions, I have analyzed InfoWars' conduct against the well-established standards of the journalism profession.

## INFOWARS' 2017 BROADCASTS

1. **InfoWars' April 22, 2017 broadcast falsely stated that Plaintiff Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper to cover up the truth about Sandy Hook.**

A central element of Mr. Jones' years of allegations that Sandy Hook was staged fake focuses an interview between Sandy Hook parent Veronique De La Rosa and Anderson Cooper. Mr. Jones insists this interview was fake, and that it was conducted in front of blue-screen. On the April 22, 2017 InfoWar's broadcast entitled "Sandy Hook Vampires Exposed," Alex Jones made the following statements:

> So here are these holier than thou people, when we question CNN, who is supposedly at the site of Sandy Hook, and they got in one shot leaves blowing, and the flowers that are around it, and you see the leaves blowing, and they go [gestures]. They glitch. They're recycling a green-screen behind them...
>
> [Shows video footage of interview between Veronique De La Rosa and Anderson Cooper]
>
> And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists (sic), if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists (sic) attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, *how could you believe any of it if you have a memory?* If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that.[2]

My review suggests this statement is false, both in their explicit text and in their implications. The available public evidence suggests that Anderson Cooper interviewed Veronique

---

[2] Ex. A26 - 2017-04-22 - Sandy Hook Vampires Exposed (Clip at 29m)

De La Rosa in Newtown. An expert review by video analyst Grant Fredericks concluded that there is no reasonable basis to believe the interview used a blue-screen and that the compression artifact would be understand by anyone with a basic understanding of digital video.[3] For this reason and other discussed more fully below, is clear to me that any broadcaster would have serious doubts about stating a blue-screen was used. In sum, there was no reasonable basis to believe that Veronique De La Rosa participated in a faked interview, and any publisher would entertain serious doubts about the truth of such a claim.

**2.      InfoWars' April 22, 2017 broadcast made additional false statements about the Sandy Hook shooting and investigation meant to imply that Mrs. De La Rosa's interview is covering up a terrible secret truth.**

In order to justify the implication that the Sandy Hook shooting was a hoax, Mr. Jones has repeatedly provided his viewers with false assertions which he claims are evidence of a cover-up. In the April 22, 2017 broadcast, Mr. Jones followed this pattern by making several statements of fact which are contradicted by the publicly available evidence. These statements have been made by Mr. Jones on numerous prior occasions, and they are used as part of his efforts to convince his audience that a terrible secret truth about Sandy Hook is being covered up by the Plaintiffs and many others.

**A.      In the April 22, 2017 broadcast, InfoWars falsely asserted that "the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it."**

In the April 22, 2017 broadcast, Mr. Jones asserted that Sandy Hook Elementary School had not been open for years, and the incident was staged in a decaying school which had not been in operation. Mr. Jones has repeated this argument many times over the years.

I have reviewed the affidavit Dr. H. Wayne Carver, the chief medical examiner who attended to the dead at Sandy Hook. Dr. Carver stated that the school was operational and not rotting or falling apart. I have also viewed publicly available photos of the school's interior taken by law enforcement, as well as video taken by law enforcement, both of which were included in the official Sandy Hook report. The school appears perfectly normal, bearing all the signs of an operational school. The school is not rotting or falling apart, just as Dr. Carver stated.

In order to believe Mr. Jones' statements, one must believe that all photos taken inside Sandy Hook are actually older photos, since Jones alleged that the school was shut down for several years. However, the most well-known and widely publicized photo of Sandy Hook victim N.P. was taken inside Sandy Hook Elementary School. N.P. is wearing a t-shirt made to promote the movie The Amazing Spiderman, which he is also seen wearing other photos.[4]

---

[3] Affidavit of Grant Fredericks
[4] Photos provided and used with permission of the Pozner family.

 

Given the production date of the film, the t-shirt worn by N.P. establishes that the photos could not have been taken before 2012, indicating that the school was open and in operation during that year.

 

Similarly, there is a photograph of N.P. taken on the same day in which he is holding a copy of a LEGO Star Wars book entitled "Anakin to the Rescue." The book was published on September 1, 2012.

 

Finally, N.P. and his sisters are present in a photo taken inside Sandy Hook Elementary School for a Veteran's Day celebration, which matches footage recorded in the school on the day of the shooting.

 

Researchers have catalogued at least 180 news articles appearing in the Newtown Bee, the Danbury Newstimes, and the Newtown Patch between 2008-2012 which discuss activities at Sandy Hook Elementary.[5] The Newtown Bee hosts a photo archive which contains pictures from stories on Sandy Hook, along with viewable metadata. For example, a photo taken in 2011 shows choir practice in Sandy Hook.[6]

---

[5] http://www.crisisactorsguild.com/2016/08/25/sandy-hook-elementary-was-open-part-eleven-180-articles-referencing-sandy-hook-school-written-between-2008-2012/
[6] https://photos.newtownbee.com/Journalism/Photos-from-the-issue-59/i-p8G52Rv



There are countless examples of the school's operation between 2008-2012 in the form of social media posts, photographs, and school publications. The evidence I have reviewed shows that the school was not shut down in the years leading up to the shooting. Rather, all evidence indicates that N.P. was a student attending Sandy Hook Elementary School and that it was operational through 2012.

**B.    In the April 22, 2017 broadcast, InfoWars falsely asserted that "the kids are going in circles, in and out of the building with their hands up."**

In the April 22, 2017 broadcast, Mr. Jones repeated a false statement he has made many times about kids walking in circles back into Sandy Hook Elementary School with their hands up. In an earlier broadcast on November 18, 2016, Mr. Jones discussed this claim, stating "We watched footage of kids going in circles, in and out of the building. You'd be running them away from the building."[7] Mr. Jones showed news helicopter footage taken on the afternoon of the incident showing a line of people exiting the rear of a building and walking in a line to the building's front entrance.

---

[7] Ex. A24 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)

7



Mr. Jones lead his audience to believe this building is Sandy Hook Elementary School. The building is actually a Newtown fire station. The fire station was used as a staging location near the school. This fact is obvious from the same news helicopter footage.



As can be seen in the footage, the shooting has long since ended, and there was no danger to any of the individuals in the staging area. Moreover, none of these individuals walking in line are elementary-aged children. Rather, they are adults with some late adolescent children. None of the individuals have their hands up.



The footage shows people were calmly walking to the front of the firehouse. The reasonable inference is that this group of parents had been ordered by authorities to walk to the front of the building, and they could not travel through the building without disrupting official operations occurring inside.[8] Whatever the reason for these individuals walking in a line to the front of the building, it did not involve kids with their hands up, nor did it reasonably suggest any cover-up or manipulation. In short, there is no truth to the claim on the April 22, 2017 broadcast that "the kids are going in circles, in and out of the building with their hands up." Furthermore, any reasonable publisher would have known the claim was not true.

### C. In the April 22, 2017 broadcast, InfoWars asserted that "they had Port-A-Potties being delivered an hour after it happened, for the big media event."

To reinforce the idea that the event was staged, Mr. Jones claimed that port-a-potties were delivered to Sandy Hook Elementary School within an hour. However, the arrival of port-a-potties was recorded by an officer's dashboard camera, which was part of the publicly available report. The dashboard camera shows the port-a-potties arrived around 1:30 p.m., nearly four hours after the shooting.

---

[8] Sandy Hook Official Report - Book 6, Document 40345.



D.      **In the April 22, 2017 broadcast, InfoWars asserted that law enforcement was "pulling guns out of cars."**

During the April 22, 2017 broadcast, InfoWars reporter Rob Dew alleged that authorities found multiple guns in Adam Lanza's car. On prior occasions, Mr. Jones has stated that the shooter's semi-automatic rifle was found inside his car. On January 4, 2013, Mr. Jones stated: "They said he had an AR-15...M4 inside, and it was in the car."[9] The implication is that Lanza could not have used his semi-automatic rifle to commit the crime because he did not take it into the building.

However, there was only one weapon found in Lanza's vehicle. That weapon was a shotgun, not his semi-automatic rifle. Lanza took his rifle and pistols into the building. Newtown Police Officer Leonard Pena found a shotgun in Lanza's vehicle and secured it in the trunk in the early moments of the response.[10] A police photo[11] shows the Saiga 12 shotgun in the truck of Lanza's car.

---

[9] Ex. A2 - 2013-01-04 - Callers React to Foreign Media Pushing Total Gun Confiscation (Clip at 20m25s)
[10] Sandy Hook Official Report - Book 6 Doc 258036
[11] Sandy Hook Official Report - Meehan Parking Lot Photo 37



There is no evidence that police found any other weapon in Lanza's vehicle. Likewise, there is no evidence that police were "pulling guns out of cars." The statements in the April 22, 2017 broadcast were false.

### E. In the April 22, 2017 broadcast, InfoWars asserted that law enforcement authorities were "finding people in the back woods who are dressed up in SWAT gear."

In the April 22, 2017 broadcast, InfoWars reporter Rob Dew claimed that men wearing SWAT gear were detained in the woods behind Sandy Hook Elementary School. Mr. Jones responded: "And that's on helicopter footage, and then they say it never existed, and later admit it does."

The helicopter footage referenced by Mr. Jones depicts police detaining two reporters who were walking through the woods carrying cameras. The helicopter footage of this encounter has been available online through the Associated Press' YouTube channel since the day of the shooting.[12] Multiple police reports also described this encounter and identified the individuals as reporters. Newtown Police Officer Jason Flynn discussed the encounter in his post-incident interview.[13] He described running into the woods and detaining the reporters with fellow officers:

> I then remained outside and assisted Officers with securing the scene. I was near Ofc. Hull near the dumpsters when we heard some Officers in the woods yelling "show me your hands". Ofc. Hull and I then ran into the woods with our sidearm drawn, where several Connecticut Environmental Conservation Officers had two males at gunpoint. As I approached the males I observed they had several straps around their bodies with cameras

---

[12] https://www.youtube.com/watch?v=-uor8MnOTM8
[13] Sandy Hook Official Report - Book 6, Document 28227



Newtown Police Officer Liam Seabrook also discussed the encounter with the reporters in his post-incident interview.[14]

> While at the front of the school, Newtown Police Officer Hull, who was standing on the front right corner of the school, yelled that he heard people shouting "put your hands up". I then ran over to the location to where Ofc. Hull indicated he heard the shouts. I observed three DEP police officers, with their weapons pointed at two male individuals that were in the woods on the right side of the school. I then ran up the hill, in the woods, to the

> three DEP police officers. As I approached the three DEP officers, I also pointed my rifle at the two males standing with their hands in the air. I approached the male on the right and handcuffed him. I then searched the male for weapons with negative results. Newtown Police Ofc. Flynn then ran both parties over the radio. One of the DEP officers recorded the two males information. The two males were then identified as reporters for newspapers. It was then determined that the two reporters were going to be set free for the time being. The two reporters were then told to immediately leave the area. I then returned to the front of the school.

Two other individuals were known to be detained in the aftermath of the shooting, but neither were in the woods wearing SWAT gear. First, a parent of a child attending Sandy Hook, Chris Manfredoni, was briefly detained. His detention was described in contemporary press accounts.[15] His detention was also discussed in a post-incident report.[16] This parent was not in the woods, and he was certainly not in SWAT gear. Second, an unarmed man was detained for getting too close to the school. Police reports indicate he had an app on his phone that alerted him to police emergencies.[17] There was also a news interview with a witness who saw this man detained.[18] Finally, there was a report in the Newtown Bee that a man in civilian clothes seen by residents in the woods with a gun was an off-duty police officer responding to the emergency.[19] There were no reports of anybody wearing SWAT gear, and there is no report that this off-duty officer was detained. In sum, there is no reasonable basis for an assertion that police found men in the woods wearing SWAT gear.

It was not necessary to obtain a subpoena to secure the materials needed to fact-check these claims. All these materials exist in the public domain, and they have been discussed by Sandy

---

[14] Sandy Hook Official Report - Book 6, Document 29085
[15] http://articles.latimes.com/2012/dec/14/nation/la-na-1215-newtown-school-shooting-20121215
[16] Sandy Hook Official Report - Book 5, Document 14498
[17] Sandy Hook Official Report - Book 6, Document 2060; Book 6, Document 40345
[18] https://www.youtube.com/watch?v=PqY9Xvr0Ts8  [19]https://www.snopes.com/fact-check/sandy-hook-exposed/ ;
https://www.salon.com/2013/01/18/your_comprehensive_answer_to_every_sandy_hook_conspiracy_theory/ ;
https://www.huffingtonpost.com/2013/02/11/sandy-hook-hoax-theories-explained-debunking-newtown-truther_n_2627233.html

Hook researchers online. A variety of individuals have debunked these claims over the years while providing verifiable information from the public record. Any responsible publisher would have known Mr. Jones' claims were false, or otherwise entertained serious doubts about their accuracy.

## OPINIONS

### 1.    InfoWars' False Statements in 2017 Impugned the Reputation of the Plaintiffs.

It is my opinion that the statements made in the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed" were capable of defaming Veronique De La Rosa and Leonard Pozner by impugning their reputation with false information about their honesty or integrity.

### A.    Background

InfoWars' April 22, 2017 statements were not made in isolation. The 2017 statements repeated and elaborated on allegations that InfoWars had been making for over four years. Mr. Jones used these false statements as evidence for his contention that the Sandy Hook shooting was faked or staged, and that the participants are engaged in a sinister cover-up.

In a January 27, 2013 broadcast entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones first alleged that Veronique De La Rosa's interview was evidence of a cover-up:

> In the last month and a half, I have not come out and said that this was clearly a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction...Something serious is going on here, and CNN over and over again is at the heart of the fishy things that are happening...
>
> We've got Anderson Cooper supposedly at Sandy Hook, and it's clearly blue screen. I've worked with blue screen for 17 years. We've got it right in there. We know what it looks like. We know what the anomalies look like, and we know what happens when you don't tune it properly. It's clearly blue screen, and you can draw from that what you want...[20]
>
> Now, ladies and gentlemen, the finale. I saw this footage where Anderson Cooper turns. He's supposedly there at Sandy Hook in front of the memorial, and his whole forehead and nose blurs out. I've been working with blue screen, again, for 17 years. I know what it looks like. It's clearly blue screen, clearly.[21]

In an April 16, 2013 broadcast entitled "Shadow Govt Strikes Again," Mr. Jones was discussing was various plots behind various national tragedies. During his remarks, he stated:

---

[20] Ex. A3 - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 1m12s)
[21] Ex. A4 - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 12m58)

"They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."[22]

In a March 14, 2014 broadcast entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones again repeated his false claim about Mrs. De La Rosa's interview with Anderson Cooper, along with several other irresponsible claims. Mr. Jones then asserted that the event was pre-planned and featured actors as a part of a cover-up:

> Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it.[23]

In a May 13, 2014 broadcast entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Mr. Jones again repeated his false statements,

> They don't even hide this stuff, ladies and gentlemen. Anderson Cooper, CIA, up there, who cares if it's blue screen. Just like CNN - - I'm going back to our guest -- Just like CNN back there in the first Gulf War was at the broadcast center in Atlanta on top of a roof with a blue screen behind them saying they were in Riyadh, Saudi Arabia, and Israel different days being hit by nerve gas. And then they went on air for parts of it with the blue screen not even turned on with blue behind them...

> You're looking at how they don't any of the standard stuff, the paperwork, the police reports, no helicopter sent, no rescue, kids going in circles totally staged, men with guns in the woods getting grabbed, no names released. They deny it went on. Later have to admit it went on but say we're not answering questions. I mean, clearly it's a drill, just like the Boston bombing. I don't know exactly what's going on, but it just -- the official story isn't true.[24]

In a September 25, 2014 broadcast entitled "Connecticut PD Has FBI Falsify Crime Statistics," Mr. Jones stated

---

[22] Ex. A5 - 2013-04-16 - Shadow Govt Strikes Again (Clip at 13m20s)
[23] Ex. A6 - 2014-03-14 - Sandy Hook, False Narratives Vs. The Reality (Clip at 26s)
[24] Ex. A7 - 2014-05-13 - Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert (Clip at 17m)

This is not a game. They are hopping mad we're covering this. CNN admits they did fake scud attacks on themselves back in 1991, 1990. Would they stage this? I don't know. Do penguins live in Antarctica? Wolfgang W. Halbig's our guest, former state police officer, then worked for the customs department, and then over the last decade's created one of the biggest, most successful school safety training grips. And he just has gone and investigated, and it's just phony as a three-dollar bill...[25]

If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.[26]

In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones stated:

All I know is I saw Cooper with blue screen out there, green screen. I know I saw the kids doing fake, you know, rotations in and out of the building. They tore it down, all the unprecedented gag orders, you know, the police in anti-terror outfits in the woods. Then they denied that, that had been in the news. I mean, something is being hidden there... [27]

I said they may have killed real kids, but they're practicing how to propagandize, and how to control the press, and how to put out a product that's a fraud when I just saw the heavy, heavy, heavy scripting. That was what was so clear. And then the parents laughing and then one second later doing the actor breathing to cry. I mean, it just -- it's just over the top. Over the top sick. [28]

In a December 29, 2014 broadcast entitled "America the False Democracy," Mr. Jones continued to insist that Sandy Hook was fake:

---

[25] Ex. A8 - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[26] Ex. A8 - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[27] Ex. A9 - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 3m08s)
[28] Ex. A10 - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 4m34s)

I've had investigators on. I've had the state police have gone public, you name it. The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? I mean it's just -- how do you even convince the public something is a total hoax?

The general public doesn't know the school was actually closed the year before. They don't know. They've shielded it all, demolished the building. They don't know that they had their kids going in circles in and out of the building as a photo op. Blue screen, green screens, they got caught using. I mean the whole thing.

But remember, this is the same White House that's been caught running the fake Bin Laden raid that's come out and been faked. It's the same White House that got caught running all these other fake events over and over again, and it's the same White House that says I never said that you could keep your doctor when he did say you could keep doctor. People just instinctively know that there's a lot of fraud going on, but it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up, but then I did deep research; and my gosh, it just pretty much didn't happen. [29]

In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook, including his allegation about Mrs. De La Rosa's interview, as well allegations about her son. He asserted that the event was "completely fake" and "manufactured":

You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting.

Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit.[30]

---

[29] Ex. A11 - 2014-12-29 - America the False Democracy (Clip at 11m53s)
[30] Ex. A12 - 2015-01-13 - Why We Accept Gov't Lies (Clip at 10m36s)

In a February 12, 2015 broadcast with an unknown title, Mr. Jones continued to repeat his false claims. Mr. Jones stated, "I know they're using blue screens...There are literally hundreds of smoking guns here that this thing doesn't add up."[31]

In a March 4, 2015 broadcast entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones stated, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake. How fake we don't know. It's sick."[32]

In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.[33]

In a July 7, 2015 broadcast entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his prior false claims about Sandy Hook:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.
>
> Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.
>
> We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method...
>
> But I mean, this is just so big. And the more we look at Sandy Hook, I don't want to believe it's a false flag. I don't know if kids really got killed. But you got green screen with Anderson Cooper where I was watching the video and the flowers and plants are blowing in some

[31] Ex. A13 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 0m26s)
[32] Ex. A20 - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 32m30s)
[33] Ex. A21 - 2015-07-07 - Government Is Manufacturing Crises (Clip at 32m)

of them, and then they blow again the same way. It's looped, and then his nose disappears. I mean, it's fake.

The whole thing is just -- I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House, you know. I don't know how they do it, but it's not real. When you take your kids to see, you know, the Haunted House and ghosts are flying around, they're not real, folks. It's staged.[34]

Mr. Jones also stated, "It's 101, they're covering up...This is mega-massive cover-up. My God." Mr. Jones stated that the tragedy was "totally made up with green screens, everything. And we've got them on green screens." Mr. Jones stated, "That's how evil these people are is that they can have CNN involved, all these people."[35]

In a November 18, 2016 broadcast entitled "Alex Jones Final Statement on Sandy Hook," Mr. Jones directly addressed the growing public controversy caused by his statements. In doing so, he began by repeating the numerous false claims he has made over the years.

Number one, the day before this tragic event happened an email was sent out by Bloomberg's anti-gun group saying prepare for a big event. But the biggest piece of evidence, the smoking gun, if you would, of a cover-up, of whatever really happened is the Wayback Machine, the internet archive. We see Sandy Hook's Newtown website K through 12 having zero traffic 2008, '09, '10, '11, '12, and then all of a sudden it just explodes. It's impossible to have zero traffic to a K through 12 entire school system. And the word is that school system was shut down for those years. That's what the records show. They tell us it was open...

And early on, that day we watched footage of kids going in circles in and out of the building. You'd be running them away from the building. Emergency helicopters weren't called. Instead port-potties were prepared for the press within hours of the event. I saw the helicopters that did respond, the police helicopters saying that there were men or a man in the woods in camouflage...

And then I saw Anderson Cooper -- I've been in TV for 20-something years; I know a blue screen or a green screen -- turn, and his nose disappears. Then I saw clearly that they were using footage on the green screen looped because it would show flowers and other things during other broadcasts that were moving and then basically cutting to the same piece of footage...

---

[34] Ex. A22 - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 0-5m)
[35] Ex. A23 - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip at 9m40s)

> Then we see footage of one of the reported fathers of the victims, Robby Parker, doing classic acting training where he's laughing and joking. And they say, hey, we're live, and he goes, oh. And maybe that's real. I'm sure it is.
>
> But you add it to all the other things that were happening and all the other fake news the media has been caught in, and CNN back in 1991 openly faking scud missile attacks on Saudi Arabia and Israel when they were back in Atlanta; and the satellite feeds caught them admitting that it was all fake. We'd be crazy not to question this because bare minimum they were faking some of the shots and some of the coverage.
>
> So to be clear, we point out clear chroma key, also known as blue screen or green screen being used, and we're demonized. We point out they're clearly doing fake interviews.[36]

In other words, Mr. Jones used Mrs. De La Rosa's "fake" interview as proof that the truth about Sandy Hook was being artificially manipulated. In a chilling finale, Mr. Jones told his audience that the parents were actors:

> And why should anybody fear an investigation if they have nothing to hide. In fact, isn't that in Shakespeare's Hamlet, "me thinks you protest too much."
>
> But this particular case they are so scared of an investigation. So everything they do basically ends up blowing up in their face. So you guys are going to get what you want now. I'm going to start reinvestigating Sandy Hook and everything else that happened with it...
>
> And so if children were lost in Sandy Hook, my heart goes out to each and every one of those parents and the people that say they're parents that I see on the news. The only problem is I've watched a lot of soap operas, and I've seen actors before. And I know when I'm watching a movie and when I'm watching something real.[37]

On April 22, 2017, InfoWars aired the "Sandy Hook Vampires Exposed" broadcast. During that broadcast, InfoWars once again made the false accusation that Ms. De La Rosa conducted a fake interview with Anderson Cooper as evidence of a conspiracy to cover up the truth about Sandy Hook. This broadcast was not an isolated statement, and it was clearly meant to reinforce years of claims about Sandy Hook. InfoWars should have known these claims were not true.

---

[36] Ex. A24 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)
[37] Ex. A25 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 15m22s)

The statements made in the April 22, 2017 broadcast were further reinforced by comments Mr. Jones and InfoWars made later in 2017. On June 13, 2017, Mr. Jones stated in a Facebook video that "there's been a cover-up, and Anderson Cooper got caught faking where his location was with blue screen."[38] On June 19, 2017, Mr. Jones appeared for an interview with Megyn Kelly. During this interview, Mr. Jones continued to insist there had been a cover-up. While he waffled on whether he now believed children were killed, he did not abandon his accusations about a cover-up. Mr. Jones claimed it was suspicious that the children's autopsy records were not released to the public, and he again claimed to see video of kids going in circles in and out of Sandy Hook elementary. Mr. Jones stated, "I do think there's some cover-up and some manipulation."[39]

In an October 26, 2017 broadcast entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones again returned to the subject of Sandy Hook. In this broadcast, he repeated his accusation that "it's as phony as a three-dollar bill with CNN doing fake newscasts, with blue screens."[40]

## B.    The reasonable meaning of InfoWars' 2017 broadcasts

Before publishing, journalists must evaluate how their story will be received by the public. The editorial process includes an analysis of how ordinary readers of average intelligence will understand and interpret the story. During my years in newspaper journalism, I gained extensive expertise in assessing the reasonable meanings of a text. As editor, I routinely applied this expertise in order to avoid creating a misimpression among our readership. In this case, I likewise analyzed the publication to determine what meaning could be reasonably understood by a person of average intelligence.

It is my opinion that a person of ordinary intelligence could reasonably understand InfoWars' 2017 statements to accuse Ms. De La Rosa in colluding in an act of technical trickery to simulate her presence in Newtown when she was not actually there. A person of ordinary intelligence could reasonably understand that Mr. Jones was claiming this trickery was consistent with a series of deceptions perpetrated by CNN to facilitate violence and abuses of power. Unquestionably, the gist of the broadcast is that Ms. De La Rosa's fake interview is evidence of an evil conspiracy underlying Sandy Hook. Given the circumstances, it is my opinion that a person of ordinary intelligence could reasonably draw the implication that InfoWars was alleging Mrs. De La Rosa's interview is evidence that Sandy Hook was staged and that the alleged parents are participating in a cover-up. A person of ordinary intelligence could also reasonably draw the implication that InfoWars was alleging that Ms. De La Rosa is not a parent, but rather an actor participating in CNN's insidious scheme.

While the statements do not feature him specifically, a person of ordinary intelligence acquainted with Leonard Pozner, who was Ms. De La Rosa's husband, could reasonably have understood that the allegations also implicated him. Given the nature of the allegations about Ms. De La Rosa's conduct, and given the allegations that Sandy Hook was a staged event, a person of

---

[38] Ex. A28 - 2017-06-13 - What Alex Jones Really Believes About Sandy Hook (Clip at 14m)
[39] Ex. A29 - 2017-06-19 - Megyn Kelly Profile (Clip at 7m55s)
[40] Ex. A30 - 2017-10-26 - JFK Assassination Documents To DROP Tonight (Clip at 1h13m30s)

ordinary intelligence could reasonably draw the implication that Leonard Pozner must also have been participating in a cover-up of the event.

Not only is it my opinion that these statements could be understood in this manner, but there is ample evidence that Mr. Jones' statements were indeed understood in this manner by the public at large. The nature of Mr. Jones' statements about Sandy Hook have been widely reported in the media. The national outrage created by the unmistakable meaning of Mr. Jones' statements about Sandy Hook is well documented. In an April 19, 2018 editorial entitled "Thank You for Suing Alex Jones," the Hartford Courant editorial board wrote:

> Alex Jones and his website Infowars offer the worst kind of free speech — incendiary malice, based in falsehood, with no social value...They claim the Sandy Hook parents are actors. They claim the children never existed. They weave wild conspiracies from thin air. They have no regard for human suffering.[41]

The New York Daily News Editorial Board wrote about Jones' statements in an editorial on April 17, 2018 entitled "Defamed by the devil: Sandy Hook parents take on Alex Jones' lies." The Board wrote:

> All decent people should cheer on Leonard Pozner, Veronique De La Rosa and Neil Heslin...for filing a defamation lawsuit in Texas court against Alex Jones. As a radio show host and the grand poobah of Infowars.com, Jones has peddled wretched whole-cloth lies about the 2012 Newtown massacre: that it was all a hoax, that the victims and their mourning mothers and fathers are actors.[42]

In short, nobody who has been paying attention to Mr. Jones has any ambiguity about the meaning of his claims. His statements about Mrs. De La Rosa's interview form a central part of his years-long campaign to convince his viewers that the events of Sandy Hook should not be believed. Given the persistence of the Sandy Hook hoax conspiracy online, it is clear that many of Mr. Jones' followers have accepted his allegations as true. A 2016 poll conducted by Fairleigh Dickinson University found that 24% of Americans believe Sandy Hook was either "definitely" or "possibly" faked.[43]

Additionally, it is clear from my review that Mr. Jones' statements would be reasonably understood as assertions of fact, not opinions. Mr. Jones did not equivocate in his statements about a blue-screen or his other false statements about Sandy Hook. Mr. Jones has frequently claimed special expertise and assured his audience that the interview "clearly" used a blue screen. In the April 22, 2017 broadcast, Mr. Jones confidently stated that "the green-screen isn't set right."[44]

---

[41] http://www.courant.com/g00/opinion/editorials/hc-ed-alex-jones-sandy-hook-hoax-lawsuit-20180417-story.html?i10c.encReferrer=&i10c.ua=1&i10c.dv=14
[42] http://www.nydailynews.com/opinion/defamed-devil-sandy-hook-parents-alex-jones-lies-article-1.3939094
[43] https://view2.fdu.edu/publicmind/2016/161011/
[44] Ex. A26 - 2017-04-22 - Sandy Hook Vampires Exposed (Clip at 29m)

It is my opinion that that InfoWars' 2017 statements would tend to injure a person's reputation and impeach their honesty and integrity. It is also clear these statements could expose a person to contempt or ridicule.

## 2.   InfoWars' accusations about Sandy Hook and Ms. De La Rosa's interview were made with reckless disregard for truth.

I have reviewed materials which lead me to believe that InfoWars demonstrated a reckless disregard for truth. It is my opinion that InfoWars had serious doubts about the truth of their 2017 broadcasts and were motivated by a desire to mislead.

### A.   InfoWars's accusations were inherently improbable.

Mr. Jones' assertion about the blue-screen was farfetched to the say the least. It required an extraordinary level of verification before being repeatedly stated as fact. Yet it is clear that InfoWars performed no verification because any genuine inquiry would have shown the accusation was bogus. As demonstrated by video analyst Grant Fredericks, any minimal competent video professional would have understood that the blue-screen was not used.

Another problem with InfoWars' allegation is that it makes no sense to use a blue screen to simulate an interview in a location that is a short drive from Anderson Cooper's office in New York City. In addition, there is copious third-party evidence that Mr. Cooper was in Newtown. For example, on December 15, 2012, an Anderson Cooper fan blog, "All Things Anderson," posted photographs of Mr. Cooper in Newtown.[45]

 

Mr. Jones' accusation proves the adage that serious claims require serious evidence. Yet it does not appear that Mr. Jones had any evidence to make his assertions, relying instead on his own self-professed expertise in video technology. As such, Mr. Jones ignored basic precautions taken

---

[45] http://www.allthingsandersoncooper.com/2012/12/anderson-cooper-live-in-newtown-ct.html

by journalists. Rather than meaningfully investigate his claim or produce corroborating evidence, Mr. Jones made these statements with reckless disregard for whether they were true or not.

### B.     InfoWars has a long history of making false statements about Sandy Hook.

InfoWars has made wild claims about the Sandy Hook massacre from the beginning. Mr. Jones suggested the event was a "false flag" on the day on the shooting[46], and InfoWars explicitly made that claim over the next five years. The accusation that Ms. De La Rosa's interview was conducted in front of a blue-screen became a central element of InfoWars' claim that the official story of Sandy Hook was a lie. In a 2013 broadcast entitled "Why People Think Sandy Hook is Hoax," Mr. Jones called Ms. De La Rosa's interview footage "the finale" in his parade of evidence that the event was staged. He continued to repeat this falsehood on numerous broadcasts over the new five years, along with other false assertions about Sandy Hook.

As part of my evaluation in this case, I reviewed video clips from over twenty InfoWars' broadcasts between 2013-2016, all of which discuss the alleged conspiracy behind Sandy Hook. In the videos I reviewed, InfoWars made a variety of factual allegations which are readily disproved by basic journalistic efforts. The various claims made by Jones have been debunked from numerous groups and individuals using a wide variety of sources in the public record.

InfoWars had ample opportunity to investigate the accuracy of its assertions. It has devoted an enormous amount of airtime to the tragedy, with broadcasts making extreme assertions years after the event. Given the enormous public attention and outcry over Jones' allegations, I find it unlikely that InfoWars researchers could have avoided the widespread debunking efforts unless they were doing so intentionally. It is my opinion that any reasonable journalist who continued to publish these claims in 2017 would entertain serious doubts about the truth of their statements, and that they would be acting with a desire to mislead their audience.

### C.     InfoWars has a long history of recklessly claiming that national tragedies were staged by the government.

Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government. His current promotional materials boast that "Alex Jones is considered by many to be the grandfather of what has come to be known as the 9/11 Truth Movement."[47] Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100% false flag."[48] Jones claimed that Columbine "had globalist operations written all over it."[49] Regarding the Oklahoma City bombing, Jones said

---

[46] Ex. A1 - 2012-12-14 - Connecticut School Massacre Looks Like False Flag Says Witnesses (Clip at 9m30)
[47] Free Speech Systems, LLC Media Kit, p. 1.
[48] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51244/gcn-alexjones-20120720-columbinefalseflag
[49] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51241/gcn-alexjones-20120720-columbine

the bombing was a "false flag" and that "we've never had one so open and shut." He added that convicted bomber Timothy McVeigh "was a patsy, that was a staged event."[50]

Mere hours after James Holmes killed twelve people in a movie theater in Aurora, CO, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind control event."[51]

After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven."[52] Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."

An April 18, 2013 headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up."[53] A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now."[54] Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies."[55] Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA. [56]

Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90% probability that it was a false flag:

---

[50] The Alex Jones Show, April 19, 2015, video available at:
https://www.mediamatters.org/embed/clips/2016/11/21/51199/youtube-jones-20150419-okc
[51] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51243/gcn-alexjones-20120720-100
[52] Interview with Rolling Stone, March 2, 2011, available at:
http://www.rollingstone.com/politics/news/talk-radios-alex-jones-the-most-paranoid-man-in-america-20110302
[53] http://www.infowars.com/proof-boston-marathon-bombing-is-staged-terror-attack/
[54] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51269/youtube-alexjones-20130426-staged
[55] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51271/youtube-alexjones-20130426-boston
[56] The Alex Jones Show, April 8, 2015. Available at:
http://mediamatters.org/video/2015/04/08/rand-pauls-ally-alex-jones-boston-marathon-bomb/203215



In short, a major element of Mr. Jones' brand is built on his allegations that major national tragedies are actually the result of orchestrated government actions. Given this background, I find that Mr. Jones' pattern of predictably asserting that events are "false flags," sometimes within hours of the event, is circumstantial evidence that Mr. Jones recklessly disregarded whether his broadcast was true in this case.

### D.     There is evidence of personal animus to the Pozner family.

According to his affidavit, Plaintiff Leonard Pozner has spent significant effort online attempting to stop the spread of Mr. Jones' hoax fantasies. Mr. Pozner started a non-profit known as the HONR Network that seeks to have false statements about victims of mass shooting events removed from the internet.

In 2015, HONR lodged a complaint with YouTube over an InfoWars video that featured photographs of Mr. Pozner's son. When these complaints caused the video to be deleted, a visibly angry Jones discussed the issue on his February 12, 2015 broadcast. Mr. Jones stated, "We're going to be countering this, and we're going to be dealing with this."[57] Mr. Jones then stated, "We need to stop cowing down to these people, and let them know we're not putting up with their bullying anymore."[58]

Mr. Jones later took a live phone call from a fellow Sandy Hook denier who was also upset with Mr. Pozner. The caller stated, "Lenny, if you're listening, your day is coming, my friend. It is coming." Mr. Jones responded, "This sounds like a war is going on. I think they made a major mistake involving us." The caller then stated, "Oh, I totally agree. They don't know what they bit off. Go after them, Alex. Crush them." Mr. Jones responded, "I'm not somebody to mess with."[59]

---

[57] Ex. A14 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 23m34s)
[58] Ex. A15 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 31m14s)
[59] Ex. A16 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 34m10s)

Following this call, InfoWars reporter Rob Dew showed personal addresses of Mr. Pozner and displayed maps of these locations.[61] Mr. Jones stated that, "I guess I'm going to have to probably go on up to Newtown. I'm going to have to probably go investigate Florida as well."[62]

A few weeks after the broadcast discussing Mr. Pozner, InfoWars featured another broadcast about Sandy Hook on March 4, 2015 entitled "New Bombshell Sandy Hook Information In-Bound." Over the course of the one-hour broadcast, Mr. Jones made repeated reference to Mrs. De La Rosa's interview, such as:

> If we've seen false flags over and over again and then you've got all these anomalies and clear loop tapes and clear blue screen/green screens -- I mean, they really screwed up. CNN screwed up during the Gulf War with fake green screen stuff. It was blue screen in that case, chroma key…And you know, fake scud attacks that are admitted. So I just -- it had all the signs too. How they were so ready that day, how they capitalized them, how they rolled out all these groups.[63]

Mr. Jones and InfoWars continued to make false statements over the next year, culminating the statements in the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed." I find there is circumstantial evidence that InfoWars' continuing allegations were motivated in part by personal malice towards Leonard Pozner.

## CONCLUSION

Based on the evidence I have reviewed at this early stage, it is my opinion that the Defendants failed to use reasonable care to ascertain the accuracy of their statements. Moreover, it is my opinion that the Defendants entertained serious doubts about the truth of their statements regarding the Plaintiffs. Given the evidence I have reviewed, I conclude that the statements were published with reckless disregard for falsity. It is also my opinion that the statements by InfoWars were harmful to the Plaintiff, and could subject them to public contempt, hate, or ridicule.

ERIC TELLEZ
Notary Public State of Texas
My Commission# 124709495
My Comm. Exp. Apr. 06, 2021

Fred Zipp

Eric Teller

My commision expires 4-6-21

---

[60] Ex. A17 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 38m59s)
[61] Ex. A18 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 42m23s)
[62] Ex. A19 - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 16m53s)

# EXHIBIT B

# Affidavit of Brooke Binkowski

# AFFIDAVIT OF BROOKE BINKOWSKI

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF SAN DIEGO | § |

Before me, the undersigned notary, on this day personally appeared Brooke Binkowski, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

## BACKGROUND

1. My name is Brooke Binkowski. I am over the age of 21 and competent to make this affidavit.

2. I have over twenty years of experience as a multimedia journalist and professional researcher.

3. I possess a Bachelor of Arts from the University of California in International Studies – Linguistics – Anthropology, and I am currently completing my Master's thesis.

4. I am also a Fellow in Global Journalism at the Munk School of Global Affairs.

5. Over my career, I have worked in reporting, editing, and producing roles for CNN, CBS Radio, National Public Radio, Southern California Public Radio, Foreign Policy, Latino USA, and others as a freelance reporter.

6. I also served as the Managing Editor of Snopes.com from 2015 to 2018.

7. The Snopes.com website was founded in 1994 to research urban legends, and it has since grown into the oldest and largest fact-checking site on the Internet.

8. Over twenty years later, Snopes.com has come to be regarded as an essential source for research on rumors and misinformation. The work which I oversaw has been described as painstaking, scholarly, and reliable, and it has been lauded by the world's top folklorists and journalists.

9. As part of my work with Snopes, I routinely investigated claims made in media and on the internet to assess their validity; last year, I received recognition from my colleagues in the form of what is called the Sunshine Award for my anti-disinformation work.

10. As part of my work, I have been called upon to assess the content and meaning of a variety of statements, ranging from news articles, video or written news content, oral

interviews, social media content, forwarded emails, anonymous viral content, and an endless supply of other materials.

11.    As part of my work, I have years of experience in assessing the tone and intent of a given text, as well as expertise in parsing meaning and innuendo.

12.    In the course of this work, I have become very familiar with InfoWars.

13.    InfoWars frequently made factual claims in its videos and online articles which were the subject of fact-checking by the Snopes staff.

14.    I am extremely familiar with the overall tone and style of the content produced by InfoWars.

## THE JUNE 26, 2017 VIDEO

15.    I have reviewed a video published by InfoWars on YouTube on June 26, 2017 relating to an interview given by Sandy Hook parent Neil Heslin. I have enclosed a USB flash drive with a copy of the video for filing with the Court.

16.    The gist of the video segment is that Mr. Heslin is not telling the truth about having held his son and having seen a bullet wound in his head.

17.    There are several parts of the language used in the video which I found quite significant.

18.    First, it is notable that Mr. Shroyer only said the phrase "Zero Hedge" one time in the entire segment. Mr. Shroyer did not consistently attribute the allegations to Zero Hedge.

19.    In discussing Mr. Heslin's interview, Mr. Shroyer stated: "The statement he made, fact checkers on this have said cannot be accurate."

20.    This language is ambiguous in context. It can reasonably be interpreted in three ways. First, the "fact checkers" who purportedly examined the issue could work for InfoWars. Second, the "fact checkers" could be associated with Zero Hedge. Third, the "fact checkers" are some other unnamed source relied on by InfoWars.

21.    A viewer of ordinary intelligence could hear this statement and reasonably believe that InfoWars had confirmed the accuracy of the Zero Hedge report with its own "fact checkers." This interpretation is supported by the remainder of the segment in which Mr. Shroyer makes his own comments and shows footage assembled and edited by InfoWars.

22.    Later in the video, Mr. Shroyer stated: "[Heslin] is claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

2

23.     A viewer of ordinary intelligence could hear this statement and conclude that Mr. Shroyer is making his own assertion. Zero Hedge is not mentioned. In fact, Mr. Shroyer's citation of "a timeline of events and a coroner's testimony" as the basis for his conclusion strongly suggests that InfoWars had examined the evidence itself.

24.     At this point in the video, it is clear that Mr. Shroyer was making an assertion of fact, not giving his opinion. He asserted that Mr. Heslin's statement is not possible, and he cited evidence. He was unequivocal in his statements.

25.     Mr. Shroyer's statement was false. Mr. Heslin stated to Megyn Kelly that "I lost my son. I buried my son. I held my son with a bullet hole through his head." The evidence shows that Mr. Heslin lost his son, and that he buried his son, and that it was indeed possible for Mr. Heslin to hold his child and see the bullet wound.

26.     I have reviewed the affidavit of Dr. Wayne Carver, the Connecticut Medical Examiner cited in Mr. Shroyer's video.

27.     Dr. Carver's affidavit stated that the bodies of the victims were released to funeral homes chosen by the families. He also stated Mr. Heslin had the opportunity to hold his son.

28.     In addition, the funeral services in which the bodies were in the possession of the parents were widely reported in the press.[1] Several of these services had open caskets.[2]

29.     It was widely reported in the media that Connecticut Governor Dannel Malloy personally observed the body of a Sandy Hook victim during one of the services.[3]

30.     There is no reasonable basis to conclude that Mr. Heslin would have been unable to hold his son and see his wound merely because the initial identification was performed by photograph, and there is no doubt that he did in fact bury his son.

31.     Later in the InfoWars video, Mr. Shroyer asserted that there was a "contradiction in the narrative." This was clearly Mr. Shroyer's own conclusion.

32.     Mr. Shroyer also callously stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on." Not only is this statement sickening, but it further reinforces that Mr. Shroyer has taken his own position.

---

[1] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting; https://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101

[2] https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html

[3] https://www.nhregister.com/connecticut/article/CONNIE-SCHULTZ-In-open-casket-boy-s-body-shows-11399159.php; https://forward.com/opinion/168707/wrestling-with-details-of-noah-pozners-killing/

33.  Later in the video, when speaking about Mr. Heslin's statements to Megyn Kelly, Mr. Shroyer stated: "Here is an account from the coroner that does not corroborate with that narrative." Again, Zero Hedge was not mentioned or attributed. Mr. Shroyer was presenting his own assertion that Mr. Heslin's interview is contradicted by the coroner. However, this is false. Mr. Heslin's interview is not contradicted by the coroner.

34.  Mr. Shroyer also showed a video of an interview with Sandy Hook parents Chris and Lynn McDonnel to support his claim that the parents were not allowed access to their children, but as discussed below, this interview has been deceptively edited.

35.  When ending his segment, Mr. Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]." Mr. Shroyer's comment further reinforces InfoWars' endorsement of the truth of the allegations.

36.  InfoWars should have known that it was reckless to endorse the truth of the statements made by a dubious anonymous blog. Indeed, the evidence shows that InfoWars was not only aware of Zero Hedge's dubious nature, but it was actively collaborating with Zero Hedge.

## ZERO HEDGE

37.  I have personal professional knowledge about the website "Zero Hedge." Researchers at Snopes continuously debunked claims made in Zero Hedge articles.

38.  Nearly everything about Zero Hedge calls its reliability into question.

39.  Zero Hedge is anonymous blog. Zero Hedge has no named editor-in-chief, and its articles are submitted by anonymous authors. The publication has no listed address nor phone number. Its website is registered anonymously.

40.  The article in question purports to be authored by an anonymous individual(s) using the name "ZeroPointNow."

41.  This anonymous individual(s) also appears to be a contributor to an anonymous website called "iBankCoin.com," a cryptocurrency website which likewise traffics fake news items.

42.  The article in question contains a link at the bottom of the page for the YouTube channel for "ZeroPointNow," registered under the YouTube username "ibankcoin."[4] However, the YouTube account page states: "This account has been terminated for violating YouTube's Community Guidelines."

---

[4] https://www.youtube.com/subscription_center?add_user=ibankcoin

43.     Zero Hedge began in 2009 as an anonymous blog focusing on Wall Street and investment rumors. Even from the beginning, its content consisted of unsourced hearsay and conspiracy theories about Wall Street.

44.     However, over the past several years of my work, I have witnessed the website become increasingly flagrant as a producer of fake information and malicious accusations.

45.     Zero Hedge's history of publishing egregiously fake information had been well-documented since at least the time of the 2016 presidential election.

46.     A small selection of recent erroneous reporting and intentional agitation by Zero Hedge includes:

- Falsely reporting that California Governor Jerry Brown had made it illegal to take a shower and do laundry on the same day.[5]

- Publishing false information about non-existent restrictions on the use of solar panels in Florida.[6]

- Publishing forged documents from the notorious website 4chan targeting French presidential candidate Emmanuel Macron.[7]

- Falsely claiming anti-Trump protesters were bused into cities after the 2016 election.[8]

- Falsely claiming that the Seattle Police Department had begun confiscating guns without a warrant or any crime being committed.[9]

---

[5] https://www.snopes.com/fact-check/california-laundry-and-shower/; https://www.zerohedge.com/news/2018-06-03/its-now-against-law-california-shower-and-do-laundry-same-day

[6] https://www.snopes.com/fact-check/is-it-illegal-florida-power-home-solar-storm/; https://www.zerohedge.com/news/2017-09-18/florida-you-cant-use-your-own-solar-panels-crisis

[7] https://www.mediamatters.org/blog/2017/05/05/fake-news-and-alt-right-are-pushing-forged-documents-aid-marine-le-pen-frances-election/216305; https://www.zerohedge.com/news/2017-05-03/documents-indicate-emmanuel-macron-may-be-engaging-tax-evasion

[8] https://www.snopes.com/fact-check/anti-trump-protesters-bused-into-austin/; https://www.zerohedge.com/news/2016-11-13/blocks-anti-trump-protest-buses-caught-tape;

[9] https://www.snopes.com/fact-check/seattle-police-confiscate-mans-guns-without-warrant/ https://www.zerohedge.com/news/2018-03-06/seattle-police-begin-gun-confiscations-no-laws-broken-no-warrant-no-charges

- Publishing false information to suggest that former President Obama was secretly behind a Hawaii federal judge's ruling that blocked President Trump's Muslim ban.[10]

- Publishing false information to suggest that a Bernie Sanders activist had been murdered in a coverup.[11]

- Falsely claiming that 4chan users made up what is now known as the "pee tape" portion of the Trump dossier.[12]

- Falsely claiming that former Attorney General Loretta Lynch was "busted" for secretly using an alias to communicate with DOJ officials.[13]

- Publishing false information to suggest Jason Kessler, organizer of the white supremacist rally in Charlottesville, VA, was a liberal spy with past employment at CNN.[14]

- Falsely claiming that the participants in the Charlottesville protests were paid actors.[15]

- Reporting that the Defense Department would conduct a national blackout drill on the day protest group "Antifa"

---

[10] https://www.snopes.com/news/2017/03/21/ijr-obama-conspiracy-theory/; https://www.mediamatters.org/research/2017/03/16/new-alt-right-theory-obama-was-secretly-behind-judicial-halt-trumps-muslim-ban/215712; https://www.zerohedge.com/news/2017-03-17/online-observers-accuse-obama-improper-intervention-hawaii-immigration-ruling

[11] https://www.snopes.com/news/2016/08/10/4th-mysterious-death-connected-to-the-dnc/; https://www.zerohedge.com/news/2016-08-05/lead-attorney-anti-clinton-dnc-fraud-case-mysteriously-found-dead

[12] http://nymag.com/selectall/2017/01/4chan-really-wants-to-take-credit-for-trump-russia-rumors.html; https://www.zerohedge.com/news/2017-01-11/how-4chan-mcfooled-john-mccain-buzzfeed-and-cia-believing-trumps-golden-showers

[13] https://www.mediamatters.org/blog/2017/08/07/Pro-Trump-media-and-Russian-bots-push-self-debunking-story-attacking-Obama-attorney-genera/217541; https://www.zerohedge.com/news/2017-08-05/loretta-lynch-communicated-doj-officials-using-grandmothers-name-alias-0

[14] https://www.snopes.com/news/2017/08/17/jason-kessler-soros-deep-state-plant/; https://www.zerohedge.com/news/2017-08-14/report-%E2%80%98unite-right%E2%80%99-organizer-jason-kessler-was-occupy-movement-obama-supporter-8-m

[15] https://www.factcheck.org/2017/08/counterprotesters-paid-charlottesville/; https://web.archive.org/web/20180327154606/https://www.zerohedge.com/news/2017-08-16/why-was-crowd-hire-company-recruiting-25-hour-political-activists-charlotte-last-wee

was supposedly planning to hold a violent revolution, both of which claims were false.[16]

- Falsely claiming that Coretta Scott King thanked Jeff Sessions for his help.[17]

- Publishing false information to suggest that the Clintons murdered a former Haitian government official.[18]

- Publishing false information to suggest there was a second shooter at the Las Vegas massacre.[19]

47. In the course of my work at Snopes, I observed that nearly all of these fake new items were also spread by InfoWars.

48. In addition, I have reviewed seven articles on InfoWars.com which were published under the author by-line "Zero Hedge" in just the two weeks leading up to Mr. Shroyer's June 26, 2017 video.[20] Two such examples are shown below:

---

[16] https://www.snopes.com/fact-check/dod-drill-coincide-november-demonstrations/; https://www.zerohedge.com/news/2017-10-26/dod-plans-solar-storm-based-national-blackout-drill-during-antifa-protests-november; http://time.com/5008829/antifa-november-4-rumors/

[17] https://www.snopes.com/fact-check/coretta-scott-king-thanked-jeff-sessions/; https://www.zerohedge.com/news/2017-02-08/elizabeth-warren-silenced-again-after-video-surfaces-mlks-wife-thanking-senator-sess

[18] https://www.snopes.com/fact-check/klaus-eberwein/; https://www.zerohedge.com/news/2017-07-16/haiti-official-who-exposed-clinton-foundation-found-dead

[19] https://www.snopes.com/fact-check/second-gunman-shoot-fourth-floor-mandalay-bay/; https://www.zerohedge.com/news/2017-10-03/was-there-second-shooter-vegas

[20] https://www.infowars.com/citi-warns-inversion-looms-as-treasury-yield-curve-slumps-to-8-month-lows/; https://www.infowars.com/heres-the-real-reason-tesla-makes-no-money/; https://www.infowars.com/unable-to-pay-bills-illinois-sends-dear-contractor-letter-telling-firms-to-halt-road-work-on-july-1/; https://www.infowars.com/trump-reports-income-of-594-million-net-worth-of-at-least-1-1-billion/; https://www.infowars.com/scientists-fear-supervolcano-eruption-as-earthquake-swarm-near-yellowstone-soars-to-800/; https://www.infowars.com/mcdonalds-is-replacing-2500-human-cashiers-with-digital-kiosks-here-is-its-math/; https://www.infowars.com/59-of-brits-agree-with-marxist-corbyn-empty-luxury-london-flats-should-be-used-to-house-homeless/

7





49.    From my personal knowledge, I have seen InfoWars and Zero Hedge, along with several other fake news websites, forge a cooperative relationship in which they publish, promote and endorse each other's content.

50.    This pattern of amplification and endorsement is a key part of how fake news spreads.

51.    The June 26, 2017 InfoWars video was not merely a report on a third-party's allegations. Rather, InfoWars adopted the allegations of a dubious anonymous website and reasserted

them as their own. InfoWars presented the allegations as true, and it made statements and played deceptive video edits which were meant to convince its viewers that Mr. Heslin's statements were not possible.

52.  No competent journalist would republish allegations from an anonymous message on Zero Hedge without corroborating the accuracy of the allegations. However, in this case, it is clear that InfoWars not only understood Zero Hedge's reputation, but it was actively collaborating with Zero Hedge to spread fake news and dangerous conspiracy claims.

## INTENTIONAL DECEPTION

53.  It is my opinion from the context of the video and the surrounding factual circumstances that Mr. Shroyer was being intentionally deceptive in the video segment. This is not merely a case where Mr. Shroyer recklessly disregarded the truth. Rather, it is the clear from the source material and the underlying facts that Mr. Shroyer was acting deceptively.

54.  The allegation made by Mr. Shroyer was outlandish, inherently improbable, and obviously dubious.

55.  The circumstances also show that Mr. Shroyer knew what he was claiming was false, or that he had serious doubts about its truth, based on the original Zero Hedge report and based on how he used the news footage in his segment.

56.  Mr. Shroyer used contemporary press coverage in a misleading and dishonest way, with the clear goal of misleading his viewers.

57.  I have located a copy of the same interview with Dr. Carver which InfoWars used in the video segment with Mr. Shroyer.[21] There is additional footage from the interview -- not shown by InfoWars -- which directly contradicts the assertion made by Mr. Shroyer. I have included this footage on the USB flash drive enclosed with this affidavit.

58.  At 11:03 in the video, a reporter asks Dr. Carver if there was a protocol as to the order he did the medical examinations. Dr. Carver states that it was his "goal was to get the kids out and available to the funeral directors first, just for, well, obvious reasons."

59.  At 13:27 in the video, a reporter asks Dr. Carver if "all the children's bodies have been returned to the parents or mortuaries." Dr. Carver responds, "I don't know. The mortuaries have all been called." The reporter asks, "But they're ready to be released at this time?" Dr. Carver responds, "As of 1:30, the paperwork has been done. The usual drill is that the funeral homes call us, and as soon as the paperwork is done, we call them back. That process was completed for the children at 1:30 today."

60.  I have also located a transcript on the CNN website of Anderson Cooper's interview with Sandy Hook parents Chris and Lynn McDonnel. Mr. Shroyer used a clip of the interview to suggest that the McDonnel's were not allowed access to their child prior to burial.

---

[21] https://www.youtube.com/watch?v=k3NS1lLo6As

61.  The use of the clip in this way was dishonest. The transcript shows that the InfoWars video clip cut off the end of the Mrs. McDonnel's answer. She stated, "And I had questioned maybe wanting to see her, *but then I thought, she was just so, so beautiful, and she wouldn't want us to remember her looking any different than her perfect hair bow on the side of her beautiful long blond hair*."[22]

62.  In the interview, Mr. McDonnel stated, "But when we left the room, it was certainly so hard to leave her because that would be the last time that we would be able to be with her."[23] It is clear that the parents had to the opportunity to see their child's body, yet they chose not to do so.

63.  It also clear that InfoWars and Mr. Shroyer used a deceptively edited copy of the interview to give the appearance that the parents were not allowed to see their daughter.

64.  As noted above, there is also an abundance of primary sources that report the families having access to their children's bodies prior to burial.

65.  There was no reasonable basis to conclude that it was impossible for Mr. Heslin to have held his son's body and seen his wound in connection with burying his son.

66.  The only way a journalist could support such a conclusion is by intentionally distorting the evidence and Mr. Heslin's statements. The source material demonstrates that is exactly what occurred in this case.

67.  Furthermore, in the Zero Hedge blog post mentioned by Mr. Shroyer, the author claims that Dr. Carver told the media that "the parents of the victims weren't allowed to see their children's bodies." But in the Zero Hedge blog post, the author later admits that "it's entirely possible that Mr. Heslin had access to his son after the shooting." Mr. Shroyer's video contains no such statements.

68.  The surrounding circumstances show that Mr. Shroyer, Mr. Jones and InfoWars had an injurious motive. The broadcast was clearly an attack on Mr. Heslin, and to a lesser extent, on Megyn Kelly as well. Shortly prior to this video, Mr. Heslin had appeared on Ms. Kelly's show and pleaded with the public not to believe Mr. Jones' false statements about Sandy Hook.

69.  By speaking out against Mr. Jones' claims that the families were actors, Mr. Heslin clearly provoked a retaliation from InfoWars in the form of Mr. Shroyer's video.

70.  It is also clear that Mr. Shroyer's video segment was part of InfoWars' ongoing effort to support and justify its vile five-year lie that the Sandy Hook shooting was staged.

---

[22] http://transcripts.cnn.com/TRANSCRIPTS/1212/18/acd.02.html
[23] *Id.*

71.  Over the past five years, I have watched in horror along with the rest of America as InfoWars has repeatedly and systematically distorted facts and misrepresented video footage in order to make false claims about Sandy Hook.

72.  InfoWars' past conduct with respect to Sandy Hook is clear evidence that its statements about Mr. Heslin were made in bad faith and with utter contempt for the truth.

FURTHER YOUR AFFIANT SAYETH NOT


_____

Brooke Binkowski


A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Diego

Subscribed and sworn to (or affirmed) before me on this 17th day of August , 20 18 , by Kimberly Brooke Binkowski ,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

TRUE FLORES
Notary Public – California
San Diego County
Commission # 2196941
My Comm. Expires May 13, 2021

(Seal)                    Signature _____

THIS EXHIBIT IS A PAPER COPY PLACEHOLDER FOR

Exhibit B1 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)

THIS EXHIBIT IS A PAPER COPY PLACEHOLDER FOR

Exhibit B2 - Carver Interview

Exhibit B3 - McDonnel Interview Transcript

Home



CNN

EDITION:  U.S.
INTERNATIONAL
MÉXICO
ARABIC


TV:
CNN
CNNi
CNN en Español
HLN

Sign up
Log in

SEARCH

Home
TV & Video
CNN Trends
U.S.
World
Politics
Justice
Entertainment
Tech
Health
Living
Travel
Opinion
iReport
Money ▸
Sports ▸

TRANSCRIPTS   Transcript Providers

Shows By Category:

Home

**Remembering Connecticut Victims**

Aired December 18, 2012 - 22:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY
MAY NOT BE IN ITS FINAL FORM AND
MAY BE UPDATED.

ANDERSON COOPER, CNN ANCHOR: Good
evening, everyone. It's 10:00 here on the East
Coast.

And we are bringing you another broadcast tonight from Newtown, Connecticut, a town where many
students returned to school today. Schools reopened, with the exception, of course, of Sandy Hook
Elementary, the school that is now a crime scene.

The students of Sandy Hook will go back to school after the holidays in a different building eight miles
away with 20 bright young faces missing from the halls and the classrooms. Everything is different now
The children in this town are facing a new reality, doing things they never should have to do at this
young age, like writing goodbye letters to their friends.

Six-year-old Jack Pinto was buried yesterday. At the funeral, a note from his friend John reads: "Jack,
you're my best friend. We had fun together. I will miss you. I will talk to you in my prayers. I love you,
Jack. Love, John."

There were two more funerals today for two more 6-year-olds. Jessica Rekos and James Mattioli were
laid to rest today. We will remember them tonight and honor them tonight. Our hearts and our thoughts
are with their families and their friends and we wish peace and strength to all the people whose lives
that Jessica and James touched in just six short years.

(BEGIN VIDEOTAPE)

COOPER: James Mattioli was known as And. Six years old, he was full of energy. He loved baseball,
basketball, arm wrestling, but he especially loved swimming. His parents used to say he swam like a
fish. And he loved to visit his grandparents and swim in their pools.

James also used to love ride his bike, no training wheels for him and he was proud of it. He tried to wea
shorts and T-shirts all year round and loved to use hair gel in order to spike up his brown hair. He was a
little boy who looked forward to growing up. He liked to sing at the top of his lungs and would ask how
old do I have to be before I can sing on a stage? He also wanted to know when he'd be old enough to
order a foot-long ham sandwich at Subway, one of his favorite places to stop for dinner.

James was born four weeks prematurely, and his family used to joke that he came into the world
because he was hungry. His parents say he was an early riser, always the first to wake the family up,
always eager to start the day. At the end of each day, he loved nothing more than to cuddle up with this
mom under a blanket on the couch.

Home

his dad's minute mini look-alike."

Jessica Rekos loved everything about horses. She'd spend her free time reading books about them, watching movies about them, drawing horses, even writing stories about them. Six years old, she was waiting for the day she could get her very own horse. Her parents both raised in Newtown called her a beautiful, creative little girl who spent time writing in journals and making up stories. They spoke to ABC News.

UNIDENTIFIED FEMALE: I found a little journal. I don't even know what it's from. But I just opened the book and it was exactly what I needed. It says, "I love you so much, mama." It's like she knew we were going to need something to help us get through this. It's just like what an amazing girl she was.

COOPER: Jessica also became passionate about orca whales after watching the movie "Free Willy." She said her dream was to see a real orca and just a few months ago, she was able to see one in person at a trip to SeaWorld.

Jessica's has two younger brothers and was known as the little CEO of the family, the rock who kept everyone together. In a statement, her parents write, "We cannot imagine our life without her. We are mourning our loss, sharing our beautiful memories we have of her, and trying to help her brother Travis understand why he can't play with his best friend. We are devastated."

(END VIDEOTAPE)

COOPER: Two more little children laid to rest.

One thing that we have been doing here is really trying to keep focus on the lives that have been lost. We're not focusing on the killer, because he's gone, and frankly, we don't want him to be remembered. Certainly not by name. We have tried to be careful and respectful of what the families are going through, tried to not ever intrude on their suffering.

But after Sunday night's program, we got a call from the McDonnell family, 7-year-old Grace McDonnell's family. I spoke with Grace's parents, Chris and Lynn, at length. They told me about who Grace was, the light of their family, a little girl who loved school and her brother, Jack, a talented artist that lived life to the fullest, made the most of every day of her far-too-short life.

I was amazed at the strength that Grace's parents showed and they say it's Grace who is guiding them through these difficult days. Here's our conversation. Tonight, we honor Grace. We will remember her. (BEGIN VIDEOTAPE)

COOPER: What do you want people to know about Grace?

LYNN MCDONNELL, MOTHER OF GRACE MCDONNELL: Well, Grace had such a great spirit. She was a kind and gentle soul.

And she was just the light and love of our family. She was just truly a special, special little girl that we loved and she loved her brother so much. And she loved her school, Sandy Hook. In fact, this week, I was telling somebody she had a stomach ache one day, and I said to her, why don't you stay home with

night before and ready to get on the bus in the morning and head off to school.

We would blow kisses every morning to each other. I remember that morning, putting her on the bus, she had a habit of blowing kisses, but then she would give me a big liver lip like, ooh.

(LAUGHTER)

L. MCDONNELL: But then I knew she was so happy to go off and get there. I would like to say is she was at a place that she loved, and so we take comfort in that, that we know she was in a place that she really loved.

COOPER: And with friends?

L. MCDONNELL: And with friends.

CHRIS MCDONNELL, FATHER OF GRACE MCDONNELL: And with friends, people that loved her.

The whole community and the school and the teachers, they're all raising your child.

L. MCDONNELL: Exactly.

C. MCDONNELL: And it's a special place.

L. MCDONNELL: It is. And I take comfort that she was with all her friends.

And I just envision all of them holding hands. And they're all together up there. And they're up there with their wonderful principal. I mean, they have so many people up there helping them. And I said to somebody, Sandy Hook, we have so many angels and so many bright stars shining over all of us in this town right now.

And each one of those children was -- you look at their pictures, they were so beautiful. And they all had a story and a talent.

COOPER: What did you say to Jack? I mean, how did you -- because there's a lot of parents right now who are trying to figure out what to say to their children all around the world about this.

C. MCDONNELL: Telling him was by far the toughest thing to do. And I think what we did was truthful, honest, words that he could understand, and hoping that he will be able to process this and how we help to guide him to process this over the long journey ahead.

COOPER: You met with President Obama yesterday. What was that like?

L. MCDONNELL: I did.

You know, I know he's the leader of our country, when he walked into that room, it was a very private meeting. But when he walked in the room to greet us, it was just a dad. He's just a dad coming in to meet a dad and a mom and a son. And we really felt that. We felt his support and it was really -- it was

L. MCDONNELL: We did. We told him that Grace had two things in common with him, their love for Martha's Vineyard and Hawaii. And Grace's dream was to live on the beach and be a painter. And so we offered him one of her paintings, which he said he would treasure. So that gave us great comfort, too.

But really it just felt like a dad surrounding us and feeling our pain. You know, when he walked in the room, I realized he has to go to so many families today, and this is not the first time he's had to do this. So, I have to look at him and pray for him for strength.

COOPER: I was talking to you before we began. One of the things we were saying is you don't want to have hate or anger in your heart.

L. MCDONNELL: No. I had said that to Jack that it's OK to be angry because, sure, we have anger and we're upset and we don't know why. But I told Jack that he could never live with hate. Grace didn't have an ounce of hate in her. And so we have to live through Grace and realize that hate is not how our family is and not -- certainly not how Grace is.

And I know all those beautiful little children, they didn't have any hate in them either. So we will just take the lead from them, and we will not go down that road. But we will let them guide us.

COOPER: It's a hard thing, though, isn't it to not feel that?

C. MCDONNELL: We're going to go on and we're going to use her positive energy to help guide us forward.

L. MCDONNELL: One of Gracie's favorite thing to paint or draw was a peace sign. And she just had a birthday in November when she turned 7. And she requested -- I said, what would you like your cake to look like, Grace? And she said, I want a purple cake with a turquoise peace sign and polka dots.

And, sure enough, her cake was purple, turquoise, and polka dots. It was totally Grace. It was so colorful.

C. MCDONNELL: It's one of a kind, too.

(LAUGHTER)

L. MCDONNELL: And it was all -- she was all about peace. She really was. And I was looking -- the morning after, I was in the bathroom, and I used to dry her hair next to the window. And the window would fog up and she would write notes in the window to me.

And on Saturday morning, I was standing at that window in the bathroom, and it had fogged up. And I looked, and there was her peace sign in the window. And I was like, that's a sign from my Grace. And the pane above it said, "Grace, mom," and she drew a heart. So, she was all about peace and gentleness and kindness.

COOPER: You went to the funeral home, and you were telling me the story of -- she has a white casket

Home

But earlier in the morning, I decided because Grace loved art so much, we were packing sharpies in our pockets. And when we got in, after we did our big family hug with Grace, we sat down and we busted out the sharpies. And we decided that were -- at first, I envisioned maybe a little heart. But by the time we were done, there wasn't an inch of white. It was so covered with all the things that she loved.

And her brother, we wrote her notes and her nicknames and all the things that she loved, cupcakes.

C. MCDONNELL: The places we had been together.

L. MCDONNELL: Ice cream cones, lighthouses, seagulls. And we were saying, she's laughing at us right now because our artwork was terrible.

(LAUGHTER)

L. MCDONNELL: But when we left the room, it was certainly so hard to leave her because that would be the last time that we would be able to be with her.

We had to take great joy in knowing that when we walked in there it was so white and our breath was taken away. But when we walked out of there, it was like we had joy again. It had so much color and it was Grace. It was so Grace.

COOPER: You were able to give her things as well?

L. MCDONNELL: Yes. We brought her her favorite pocketbook. And we had seashells and flip-flops and sunglasses. And she loved to cook. We had a frying pan. And she loved music. She has Taylor Swift Christmas song in there.

She has her dad's New York Yankee hat. So she had all the things that she loved with her. So we took -- we had peace when we left last night.

COOPER: It's got to be hard not to have been not actually to see her.

L. MCDONNELL: Well, at first, I thought that. And I had questioned maybe wanting to see her, but then I thought, she was just so, so beautiful, and she wouldn't want us to remember her looking any different than her perfect hair bow on the side of her beautiful long blond hair.

And so we will take comfort in looking. We have so many beautiful pictures of her. We will take comfort in remembering her beautiful smile. And I will remember her blowing the kisses that day, getting off the bus, going off to school.

(END VIDEOTAPE)

COOPER: I want to thank the McDonnells for inviting us into their home. It was a true honor getting to hear about Grace.

After that interview, I gave them my number, and I said that if there's anything that they forgot to say,

Home

And I'm not going to share the whole note with you because some of it is private, but she wrote: "When Anderson visited our house, I showed him one of our picture books in Martha's vineyard. I have always said that I took my photographs to be my children's eyes. I wanted them to remember everything from our adventures together. And now I'm not only going to be Grace's eyes, but I'm going to be her voice. But I feel fearless. I will never feel any pain greater than I do right now. I'm going to take on the world for our Gracie girl, for I myself have nothing to lose and everything to gain. Jack and Grace always said you have conquer your fear. I'm doing it now for both of them."

Such strength. I will not forget the McDonnells or their amazing Grace.

You heard Lynn talk about giving President Obama one of Gracie's pictures. She gave me the same picture, a Xerox copy of it. This is an owl that Grace had drawn it. And President Obama said that he would cherish it. And I'm certainly going to frame this and cherish it as well.

Here are a few more pictures as we go to break.

(COMMERCIAL BREAK)

COOPER: You're looking at one of the many memorials to the victims here in Newtown tonight.

As we mentioned earlier, for the first time today since Friday's tragedy, Newtown students returned to classrooms. Every school but Sandy Hook Elementary has reopened. The question is, what should be routine, of course, is no more. Returning students and staff were met by more police officers and counselors than there were before.

For some today, it was their first chance really to talk about what happened with their friends and with their teachers.

Kyung Lah joins me now with more.

It had to be an extraordinarily difficult day for these students.

KYUNG LAH, CNN CORRESPONDENT: A difficult day, but a really necessary day. We spoke to parents and students who were returning.

And what we are really hearing from them, Anderson, is that parents say they're eager to get back to the routine. They know that kids like routine. If you're a parent, you know that's what your kids want. The students say when they were on the bus it was extraordinarily quiet. They were starting to have those quiet conversations.

Inside school, an 11-year-old boy told us he actually felt better being in school. He felt protected there. His teacher was reaching out to them. Those counseling sessions were happening inside school. As a sign of comfort, it was across Newtown and in the surrounding communities. There were police cars at every single school.

The high school I was at here at Newtown, three police cars. And the students say it made them feel better.

Home

It's been particularly difficult, obviously, for students to go back to school.

Dr. David Schonfeld is a crisis counselor who gave a presentation to teachers in Newtown about how to talk to children at this incredibly difficult time. He's the director of the National Center for School Crisis and Bereavement. And he joins me now right now live.

Thank you very much for being with us.

DR. DAVID SCHONFELD, DIRECTOR, NATIONAL CENTER FOR SCHOOL CRISIS AND BEREAVEMENT: Thank you.

COOPER: You met with teachers, administrators, and basically all employees of the school. What was your message to them?

SCHONFELD: Well, there were a couple messages I wanted to get across. The first thing is to recognize how heroic it is to be able to help students in a time like this, because we have to remember all of the staff are -- they're grieving some of their own members of the staff. They're definitely grieving the loss of the children that they were close to and that they care about.

COOPER: Sure.

SCHONFELD: They're also impacted by going through a traumatic event.

The first thing is to recognize what they're doing and how courageous that is.

COOPER: One of the things I heard you say, too, is that it's OK for them -- it's OK for them to show emotion when talking with the students.

SCHONFELD: Right.

A lot of times, we don't want to upset children and so we don't want to show them that we're upset. But really, the kids are already upset. They already know about this. We want to do is help them be able to cope with the feelings. But if we never so them distress, we can't model for them how to cope with it.

Seeing some distress among adults that they care about, particularly when it's followed by suggestions about how to deal with that and cope with it effectively is really helpful for them to start to heal.

COOPER: What else did you want them to know?

SCHONFELD: I also wanted them to know we had to change some of the expectations of what we could accomplish in terms of learning over the next week. I told the teachers that really we have to meet the students where they are right now.

And we also have to meet the teachers and the other school staff where they are. I told them that as far as I was concerned there was only one lesson plan that they needed to teach before they broke for the New Year's. And that was to make sure that the children knew they were safe, and that they cared about

8/21/2018 22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd. Pg 284 of 608

Home

death, that they have had to deal with this at all.

SCHONFELD: It is for many of the children. Unfortunately, we know that nine out of 10 children are going to experience a significant loss, the death of a family member or friend, by the time they complete high school. So for many children, it will not be a new experience, but obviously, this is a profound experience for anyone.

COOPER: And how do you -- I mean, do you talk to kids? Or I guess part of the lesson is that not all teachers will be counselors, that if somebody needs extensive conversation, there are other people to refer them to.

SCHONFELD: I think it's important that we underscore what we're asking the teaching staff to do and the rest of the staff in the school, the support staff, is to create a supportive environment, not to provide counseling. It doesn't need to be -- it's not their responsibility to provide therapy.

There are others in the school that will do that and others in the community that have that role. But what we want from the school staff is to be is to be able to create a safe and supportive environment.

COOPER: You have obviously dealt with this sort of thing before. How do you think this community is doing?

SCHONFELD: Well, I arrived here Saturday night. Actually, the American Federation of Teachers reached out to me on Friday and asked me to come and help their staff and then I arrived here on Saturday. I was greeted immediately by the commissioner of education, Stefan Pryor. And we met well into the night about what to do.

And then when I came and actually was able to meet with the superintendent, Janet Robinson, and the other staff, I was really impressed by the concern, the caring, and the profound commitment that they have to these children.

COOPER: It's a very close-knit community. Dave, I appreciate you being with us. Thank you very much.

SCHONFELD: Thank you very much.

COOPER: I know it's been a long day for you.

But up next, a special mission for Noah, 6-year-old Noah Pozner, laid to rest yesterday. His cousin couldn't make it to the funeral but wanted to make sure he got his goodbye letter. Ahead, see who answered the call for help and made sure that Noah got that letter. We will talk to Noah's uncle.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: The look and fear and uncertainty in everybody's eyes that day is probably what I will never forget.

UNIDENTIFIED MALE: The sounds of the sirens just kept coming and coming and coming. And it seems like it never ended that day.

(END VIDEO CLIP)

COOPER: Those 20 families here in Newtown face the unimaginable task of burying their 6- and 7-year-old children.

We want to share with you a poignant story about the funeral of Noah Pozner, 6 years old, laid to rest yesterday. Noah's mother wanted to bury handwritten notes from family members with her son. Noah's cousin, Ethan, also 6 years old, almost 6 years old, lives in Seattle, he made a card for Noah.

The problem is getting it to Connecticut in time for the funeral. On Sunday, Ethan's mom took to Twitter looking for help and soon enough got this message from JetBlue airline. "We're sorry for your loss. Please D.M. us your best contact phone number. And we will have someone reach out to you."

With JetBlue's help, Ethan's finale note to his cousin made it to Connecticut in time to be buried with Noah. Ethan's mom shared the card on Twitter. She wrote, "Noah is shown with a heart body, and the flower represents his life, life in general. The inside says I love you, Noah."

Joining me now is Alexis Haller, Noah Pozner's uncle.

Alexis, I appreciate you joining us.

ALEXIS HALLER, UNCLE OF NOAH POZNER: Thank you.

COOPER: Just a little bit, what do you want people to know about Noah?

HALLER: Well, Noah was a great kid. He was smart as a whip, bit of a maverick.

COOPER: Mischievous, I heard.

HALLER: Mischievous. Loved his family more than anything else.

When his mom would say I love you, Noah would respond, not as much as I love you. And he loved his siblings, too. He had a twin sister.

COOPER: They were very, very close.

HALLER: Extremely close. When they were babies, they would babble at each from their cribs.

COOPER: Really?

HALLER: And got into all sorts of trouble, and inseparable.

COOPER: I heard he used to tell his other siblings that he worked at a taco factory?

(LAUGHTER)

COOPER: That's great. I love that story.

HALLER: Yes. But Noah was also just a normal little kid, a real little kid. He loved "Mario Brothers" and animals and LEGOs and superheroes. and all the stuff that a normal 6-year-old loves.

You know, that's Noah.

COOPER: I know you wanted to talk about -- there's some scams out there that the family is obviously concerned about. What are you hearing?

HALLER: That's correct.

Today, we found out that there was a domain name set up in Noah's name. And we have since challenged that. And it's been taken offline by GoDaddy. But we also were made aware of an e-mail scam where somebody was...

COOPER: Oops, sorry, sorry.

HALLER: ... purporting -- somebody was purporting to solicit money on behalf of the family.

COOPER: That's unbelievable.

HALLER: Yes. And it was going to an address in the Bronx. There are misspellings in the e-mail, so you have to look at pretty carefully to discern. But there's also a lot of information.

And it sounds like it is potentially in from a family friend.

COOPER: But it's not?

HALLER: And it's not. I guess we want to get it out there for the public, so that if people want to contribute, that they're aware to be careful.

COOPER: You have set up a Web site?

HALLER: That's right. We have set up a Web site, and there's also an address. The Web site is NoahsArkofHopeFund.com.

COOPER: And we are putting that up on the screen.

HALLER: And there's also a few other friends. We have Friends of Maddie, for example, that was set up. And that is a legitimate donations site.

But there are also ones that are scams. And we want to get that out to the public. And we also want to get it out, frankly, to the other victims' families so that...

Home

word out.

COOPER: I saw a Twitter page set up in the name of another child that I thought was real at first. And I contacted the family, and they said they don't know anything about it. So there are these horrible people out there. The idea that anybody out there could do this is just disgusting, but I'm glad you cleared it up And again, we're putting the correct Web site's name up on our screen.

What -- I mean, it's a dumb question, but how are you -- how are you holding up? How is the family holding up?

HALLER: The family is devastated. It was, you know, the worst four days of our lives. It's kind of like you're in a waking nightmare. Never experienced anything even remotely close to it, felt like, four years. And as bad as -- as devastated as the family was, the parents, you know, they were suffering -- they were suffering so much more.

COOPER: Of course.

HALLER: Everybody was suffering so much. And it's been a horrible, horrible -- you know, but we're sticking together and we're coming together as a family very strongly. And we want to, you know, focus on making something positive out of it.

And frankly, the only positive parts to the last two days. There's two things. First when I see Noah's siblings, Ariela (ph) and Sophia (ph), they both survived. So they...

COOPER: They were in the school?

HALLER: They were in the school. Sophia, as I understand it, her teacher put all the kids in the closet and shushed them. And as I understand it, the killer opened the door and thought there were no kids there and didn't find them.

And so whenever I see them, the family, I just see them, and that brings me joy that they made it.

And the other thing that brings me joy is just the outpouring of support from everybody. Friends, community, the country, everything. And that's made a huge difference.

And -- and, finally, the other thing that kind of got us through was certain people that played kind of guardian angels. And we had a state trooper assigned to us, Sean Hickey, who is kind of a rock for us. And made a huge difference. We had a grief counselor, Dr. Laura Asher. Another rock. And for families to get through stuff like this, you need those rocks, and you need wind at -- wind at your back, to kind o push you forward. And we got that. We got that from friends and community.

COOPER: I know there's a lot of difficult weeks and months even years ahead. But I appreciate you talking tonight. And I wish you the best.

HALLER: Thank you. Appreciate it.

COOPER: Thanks very much, Alexis.

Home

Five days ago -- the violence that shattered this community, five days ago is raising some familiar questions about those killings. Investigators are digging through the gunman's medical history for possible clues. We're going to talk to chief medical correspondent Dr. Sanjay Gupta about -- about that ahead. We'll be right back.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: I feel worried, nervous, but at the same time, I'm feeling happy to be back at school, because the -- the whole thing just, everyone will be together will probably be a good thing for the victims as well -- the siblings, the families of the victims.

(END VIDEO CLIP)

COOPER: One of Newtown's students talking about his mixed feelings about returning to class today.

As we mentioned Sandy Hook Elementary remains closed, of course, but other schools in Newtown are reopening their doors.

The tragedy here sparking, obviously, nationwide dialogue on issues like gun control, mental health, school security. Today, the National Rifle Association announced a news conversation set for Friday and released this statement, saying in part, "The National Rifle Association of America is made up of four million moms and dads, sons and daughters, and we were shocked, saddened and heartbroken by the news of the horrific and senseless murders in Newtown. Out of respect for the families, and as a matter of common decency, we have given time for mourning, prayer and a full investigation of the facts before commenting. The NRA is prepared to offer meaningful contributions to help make sure this never happens again."

What exactly that means, we're not sure. We'll see more of what they say on Friday.

Making sure it never happens again is also obviously a top priority for many here in this community. Lillian Bittman joins me now. She's the former chairwoman of the Newtown Board of Education and a former Sandy Hook parent.

You were at a wake earlier for Daniel.

LILLIAN BITTMAN, FORMER CHAIRWOMAN, NEWTOWN BOARD OF EDUCATION: Daniel Barden.

COOPER: Daniel Barden. You were a friend of the family. What...

BITTMAN: That's the family we're closest to. And the family very much wanted me to deliver something tonight. They were interviewed on another network and they're just -- I'm sorry.

COOPER: That's OK.

Obama question when they met before the vigil.

COOPER: Right.

BITTMAN: And she was -- one of my best reporters. And this really -- she was one of these usually gung-ho little kids, but you know, she obviously was intimidated. And -- and anyway, they were hoping that President Obama would hear her words tonight if we could get them read on air.

So she gave me a letter, and unfortunately, there were too many people at the wake for me to get up to actually see the family. So the letter was passed back to me. But this is what she wrote. If you could rea it because I can't.

COOPER: OK. The family gave permission?

BITTMAN: The family wants -- they told me to bring it to you.

COOPER: OK. It says, "My name is Natalie Barden, and I wanted to tell the president that only police officers and the military should get guns. If people want to do it as a sport then they could go to a shooting range, and the guns would not be able to leave there."

That's what she wanted President Obama to here?

BITTMAN: Yes, that is what the question she wanted to ask him. And when she told me this, we were talking about this, and she wrote the letter, I had told her, I said, "Well, now you're a member of the White House press corps." And she giggled at that. And that was really good, because she wants to make a difference. And this was her little way of making a difference.

And in a -- kind of one of those wonderful things, it's helping her heal, because now she can make Daniel's life count for something and try to get this to the president and hopefully to Congress and everyone else.

COOPER: You can tell her that the world has heard her letter tonight.

BITTMAN: I will.

COOPER: And hopefully, the White House has, as well.

BITTMAN: I will.

COOPER: You were telling me earlier at the memorial service. I mean, conversations are already being had here about -- that something has to come out of this. This cannot go...

BITTMAN: Yes, yes. Over and over again at this wake, I was standing with people, and also in other conversations, and everyone is saying we have to make this count for something. We have to make change.

And there's lots of different things happening to try to do that, but the most important thing that

Home

COOPER: And you're hearing civil conversations?

BITTMAN: I am. And actually, earlier today I was invited to be part of an online panel, and I was with a gun proponent and a woman out of Virginia Tech, an English teacher in that situation and several others. And we had a civil discourse online for about an hour. That's what we need to do, us have that civil discourse, so that we can find the solutions. It's not just one thing. It's a multitude of things. But we'll never get there if we can't talk to each other.

COOPER: But the idea that, you know, the media will go away...

BITTMAN: Right.

COOPER: ... and things will just kind of quiet down and nothing will change, that would break the hearts of people here?

BITTMAN: Well, somebody called me Cinderella because they thought that my trying to get this message out and trying to keep this in the forefront before our politicians would never happen. I say it can.

I say we can effect change if we stand together and we work with all the countries across this country that have been affected by mass shootings, and we hold our politicians accountable to make change. Not just in one area, but let's find a way so that these kinds of things don't happen again. We have to have that discussion.

COOPER: How are you holding up?

BITTMAN: Oh, today was -- today took me off guard. Our schools were two hours delayed. And I have my seventh grader, so I drove him to the bus stop, just because, and all the moms were there. And I was just crying. And I didn't see that coming, and telling my high- schooler goodbye when he drove away. And then suddenly, everybody was texting me, and all the moms were crying.

And I think it was not just the fear of sending them to school. I truly wasn't afraid of that. It was just that it was kind of returning to normal, and that doesn't feel right. And then -- I think we just sort of collapsed because of that. So... COOPER: We find that tears come at odd times, too.

BITTMAN: Very odd times.

COOPER: It's like it comes in waves.

BITTMAN: Yes.

COOPER: And when you least expect it, suddenly, you find yourself crying.

BITTMAN: My husband actually is crying anytime someone does something nice for him or says something nice. He just loses it. And he's not someone to cry like that. So yes.

I mean, it's typical grief, I mean, but it's more horrific because we -- you know, there's something else

Home

that's associated with these families.

You know, think about that. When you have a child that's playing soccer, that little baby in the stroller, you kind of know about that little sibling, but you focus on the child playing soccer. Those are the connections that we're -- that we're figuring out.

COOPER: One of the things that Lynn McDonnell said to me about Grace, is that it gives her comfort to know that Grace was with her friends and that they were -- that they were holding hands in her mind. And she likes to think of them all in heaven right now holding hands together.

BITTMAN: Yes, I understand that.

COOPER: Thank you very much.

BITTMAN: Thank you, Anderson, I appreciate it.

COOPER: Next, we've got new information from the medical examiner on the gunman. We'll talk about it with Sanjay Gupta about that. We'll be right back.

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

LT. PAUL VANCE, CONNECTICUT STATE POLICE: People responded once they heard about the scene, about the situation. They responded to come and retrieve their children. And when they couldn't find their children, fear set in. Panic set in. Pain set in. It was fear of the unknown. And when the notification finally had to be made, it was absolutely heartbreaking.

(END VIDEO CLIP) COOPER: Well, we said repeatedly, we're not going to focus on the gunman who destroyed all these families five days ago. We don't say his name hardly at all. We frankly don't want history to remember his name or him.

But at the same time as the investigation unfolds, we do have to talk about the killer. Authorities are digging through every facet of his life, including his medical history.

Today, the medical examiner told our sister network, HLN, that they'd been told the 20-year-old was diagnosed with Asperger's Syndrome but didn't know if that diagnosis was actually correct.

The former director of security for Newtown public schools also told CNN the gunman had Asperger's Syndrome, based on documents he'd seen and conversations with his mother years ago.

Until now, no one in any official capacity had commented directly on this possible piece of the case, if it, in fact, has anything to do with the case at all. It's a very sensitive issue. Many people worry that violence will somehow be incorrectly linked to Asperger's Syndrome.

Chief medical correspondent Dr. Sanjay Gupta joins -- joins me now.

Home

DR. SANJAY GUPTA, CNN CORRESPONDENT: Well, Asperger is something that is typically on something known as the autism spectrum, and they use this term "spectrum" sort of on purpose to be a little bit vague, because there's all sorts of different, you know, sort of symptoms with this.

But Asperger's sort of considered the highest functioning form of autism, in some ways. People, you know, it's -- they're oftentimes socially awkward. They have a hard time making eye contact, strong social connections.

But again, you know, Anderson, you and I talked about this, there are people who are running major companies in this country who have come out and said they also have Asperger's. So you can be very highly functional with this. And it's hard to characterize or pinpoint specific symptoms.

COOPER: I know several people with Asperger's. Oftentimes, they're particularly experts in one particular realm or have particular interests. But just have sort of -- as you said, they're socially awkward.

I know you've dug into this. Is there any evidence at all that autism spectrum disorders, which are not mental disorders, are linked to violence, planned violence in particular?

GUPTA: There's not. And you know, I don't want to dance around the edges here at all or beat around the bush, because this has come up quite a bit. And I knew that there wasn't -- since we started reporting on this, I talked to several experts in this about this specific issue. There just isn't.

There's a paper that's sort of the most often quoted paper with regard to this issue, Anderson. It's a study of 132 people who had -- were high-functioning -- had high-functioning autism. Out of those 132 people, three episodes of violence. None of those episodes were, as you say, preplanned violence. It was typically reactive violence or outbursts. You know, so just a very different thing.

So I think we can just dispense with this myth, frankly, that there's a connection between Asperger and planned violence.

COOPER: And autism spectrum disorders, again, I want to repeat this, are not mental illnesses. And people who suffer from autism spectrum disorders, do we know if they are any more likely than anybody else to suffer from a mental illness?

GUPTA: There has been some data on that second party oppression (ph), that there could be more likely of a concordance mental illness. Or you know, somebody who would develop mental illness later on.

But I want to be clear about something. These terms, again, as you always say, Anderson, matter, but when you say something is a neurodevelopmental disorder, what that really is saying is this is something that the person has probably had since birth. Something that has an inherent quality to it.

Whereas you know -- we've been talking about this -- several of these mental illnesses that develop late on in life, meaning, you know, late teens, early 20s, that's one of the differences between neurodevelopment disorder and what they call mental disorder, mental illness. The Asperger's is a neurodevelopmental disorder.

GUPTA: Yes, and I think, you know, the evidence is pretty sketchy. So over the last couple of days I looked at the data pretty carefully. I will tell you since 1972, before these videogames were even out there, there was concerns about violent programming. The surgeon general, actually, was warning 40 years ago about could violent programming lead to aggressive behavior?

There's been a couple of studies looking specifically at increase in heart rate and blood pressure in people who are playing. There were some -- one study that showed an increased lack of empathy overall. Case studies (AUDIO GAP) also, that the game makes a person more aggressive. Or are aggressive people more likely to play the game? I just think it's hard to draw this connection, Anderson.

COOPER: All right, Sanjay, appreciate that. Thanks very much. We'll be right back. A lot more ahead. (COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

UNIDENTIFIED FEMALE: It just doesn't seem like Christmas, you know. It's really, really hard.

(END VIDEO CLIP)

COOPER: Burying little boys and girls days before Christmas, days after Hanukkah, no one should have to face that.

You can feel the sadness in Newtown. You can also feel incredible strength. I want to show you a picture we just got of one of the little girls who was killed. This is Allison Wyatt. A family friend of the Wyatts just came by, asked us to mention Allison tonight.

In a statement, Allison's parents said she was kind-hearted, loved drawing, loved to laugh. Was sweet, creative, funny and intelligent. They said, "She was developing her own wonderful sense of humor that went from being a silly 6-year-old to coming up with observations that more than once had us crying with laughter." Those are the words of their -- of Allison's parents, 6 years old. We will remember her.

Earlier you heard Lynn and Chris McDonnell talk so movingly about their 7-year-old daughter Grace. The joy she brought them and her brother Jack and everyone she touched.

Lynn told me their family will open presents on Christmas like they always do, because that's what Grace would want.

It's hard to hear the song "Amazing Grace." I told her -- I told Lynn that it's one of my favorite songs and that from now on, every time I hear it, I'll think of their amazing Grace.

Lynn said she believes that all the little children, as I mentioned, who are gone are holding hands together in heaven, bright stars shining down over Newtown.

She said none of the kids had hate in their hearts. And she acknowledged that the journey ahead is difficult, but she'll let the children guide them.

Home

(BEGIN VIDEOTAPE)

(MUSIC: "Amazing Grace")

(END VIDEO CLIP)

COOPER: "Amazing Grace." That does it for us here in Newtown. "ERIN BURNETT OUTFRONT" starts now.

Search CNN...                                                          .

U.S.

World

Opinion

Home

Video

Shop

**new**

More…

U.S. Edition **+**

© 2018 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Terms of Use | Privacy Policy | Accessibility & CC | AdChoices | About us | CNN Studio Tours |
CNN Store | Newsletters | Transcripts | License Footage | CNN Newsource

# EXHIBIT C

# Affidavit of Neil Heslin

## <u>AFFIDAVIT OF NEIL HESLIN</u>

STATE OF CONNECTICUT      §

                                 §   Shelton

FAIRFIELD COUNTY         §

       Before me, the undersigned notary, on this day personally appeared NEIL HESLIN, a person whose identity is known to me. Upon being duly sworn, Affiant states:

1. My name is Neil Heslin. I am over the age of 21 and competent to make this affidavit.

2. Mr. Jones and InfoWars began spreading lies about Sandy Hook and the death of my son within the first month following the tragedy.

3. I have seen Mr. Jones claim on numerous occasions that the Sandy Hook shooting was fake, phony, and synthetic.

4. For many years, I made a conscious effort not to get drawn into the hoax "controversy" caused by Mr. Jones' statements. I had no interest in dignifying Mr. Jones by participating in the discussion.

5. Before this tragedy, I had no contact with the media. In the aftermath of the shooting, I granted some of the interview requests to media outlets who wanted to speak to me about my experience.

6. Following the tragedy, I was asked to appear before the U.S. Senate and Connecticut legislators to give testimony about my experience and my opinion on school safety.

7. I never sought to be any kind of public figure. I merely recognized that I was involved in a matter that had attracted public attention. It was not my intention to give up my privacy or surrender my interest in the protection of my own name in all aspects of my life.

8. I had some tangential involvement in speaking out on sensible gun regulations, but I do not consider myself an activist. I have not been a vigorous participant or a noteworthy part of that on-going debate.

9. Contrary to the claims in InfoWars' Motion to Dismiss, I do not seek to destroy the Second Amendment, and this lawsuit has nothing to do with the Second Amendment or political purposes. I am an NRA member and registered Republican. I have no desire to limit Mr. Jones' rights under the First Amendment or prevent his ability to speak about his personal opinions, however bizarre. I object to his malicious pattern of lies, especially about Sandy Hook and my son.

10. I never sought to participate in any public debate over whether the events at Sandy Hook were staged. Nor did I seek to participate in any public debate over whether my son died.

Exhibit C

11. Over the years, I remained silent as Mr. Jones continued to make disgusting false claims about Sandy Hook, telling his viewers that the children were fake and that the parents were liars and evil conspirators.

12. In 2017, Megyn Kelly was in the process of producing a profile on Mr. Jones when she asked me for an interview. Though I was very conflicted as to whether to grant an interview, I agreed to speak on camera only to help set the record straight about the lies told by Mr. Jones about Sandy Hook, specifically that the event was staged and involved actors.

13. I gave comments to Ms. Kelly stating the reality: The shooting happened. I stated that I buried my son, that I held my son's body, and that I saw a bullet hole through his head.

14. I made these statements not to invite debate, but to clear my name and protect the memory of my son.

15. On Ms. Kelly's show, Mr. Jones did not apologize for his comments. He also said he there was a cover-up, and that he wasn't sure kids actually died.

16. After my interview with Ms. Kelly, I tried my best to avoid any coverage of Mr. Jones. Yet almost a year later, I was alarmed that people seemed to still be talking online about Sandy Hook being a hoax.

17. During the first week of April 2018, I became aware that InfoWars had made numerous videos over the past year trying to convince its viewers that Sandy Hook was a hoax, including a segment on June 26, 2017, featuring reporter Owen Shroyer which focused on me.

18. The June 26, 2017 video directly addressed the comments I made to Megyn Kelly. Mr. Shroyer claimed in the video that my statements about holding my son and seeing a bullet wound are not possible.

19. Mr. Shroyer further stated in the video that statements made by the authorities do not corroborate with my statement.

20. Mr. Shroyer then accused me of lying, saying "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."

21. The June 26, 2017 video is false. I buried my son. I held his body. I saw a bullet hole through his head.

22. Mr. Jones' prior videos had deeply disturbed me, but this 2017 InfoWars video was far worse.

23.   This broadcast was the first time that InfoWars had featured me by name. In the past, when InfoWars discussed other specific parents, they had become subject to terrible harassment. For example, I was aware of the case of Lucy Richards, an InfoWars fan who was arrested and sentenced to federal prison for death threats against Sandy Hook parent Leonard Pozner. I was also aware of threats and harassment being directed at other parents.

24.   I was also aware that some conspiracy fanatics online had become convinced I was a "crisis actor." There is even an insane theory that I am a fireman who supposedly died on 9/11. Upon seeing Mr. Shroyer's video, I became intensely alarmed that his lie would embolden these dangerous people.

25.   When I learned about Mr. Shroyer's video and InfoWars' other 2017 statements, I knew that my safety and the safety of my family had been placed at risk. This fear dominated my thoughts.

26.   I have suffered a high degree of psychological stress and mental pain due to InfoWars using me and my child to revive the Sandy Hook hoax conspiracy in 2017. I had hoped that this ugly lie would go away, but now Mr. Jones had singled me out in his campaign of harassment, along with the memory of my son. This realization has caused a severe disruption to my daily life.

27.   I find that I can think of little else. I have experienced terrible bouts of insomnia, and periods in which I am filled with nothing but outrage, and I find that I am unable to do anything productive. Other times, I am filled with grief knowing that InfoWars has ensured that its sick lie continues, and I am dismayed that my last moments with my son have become a part of that. I decided to return to grief counselling to help address these issues, but I feel that I have been changed in a way that can never be fixed.

28.   Since learning of Mr. Shroyer's video, I have incurred counselling expenses of $875. This counselling has been aimed at helping me cope with becoming a featured part of the Sandy Hook hoax claims.

29.   Since learning of Mr. Shroyer's video, I purchased a one-year, two-person plan for the DeleteMe Privacy Protection service, which provides online monitoring and removal of your personal information. Given that I had specifically targeted by InfoWars, I wanted to take action to prevent an InfoWars follower from discovering my family's personal details and location. A year of this service cost me $229.

30.   For the same reasons, I also purchased a year's plan for the LifeLock service, which guards against the unauthorized use of personal information and identity theft attacks. I was concerned that conspiracy fanatics may use identify theft techniques to gain access to my personal details. This service cost me $360.

31.   Since learning of Mr. Shroyer's video, I have incurred expenses of $598 in purchases for home security. I strongly prefer not to disclose the exact nature of the security items in a

public document, but suffice to say they consist of consumer products for my home and my ex-wife's home to detect, monitor, record, and alert of potential intruders. I purchased these items due to the fear that InfoWars' false statements would cause individuals to confront my family. I felt these items were necessary to help address my mental stress.


FURTHER YOUR AFFIANT SAYETH NOT



_____
Neil Heslin


Subscribed and sworn to before me, this 22nd day of August, 2018 by **Neil Heslin.**



_____
Caroline Allegretta
Notary Public
My Commission Expires:  07/31/2020

# EXHIBIT D

# Affidavit of Dr. Wayne Carver

## AFFIDAVIT OF H. WAYNE CARVER II, M.D.

STATE OF Connecticut §
New haven COUNTY § Old lyme
§

Before me, the undersigned notary, on this day personally appeared H. Wayne Carver II, M.D., a person whose identity has been established to me. Upon being duly sworn, Affiant states:

1. My name is H. Wayne Carver, M.D. I am over the age of 21 and competent to make this affidavit.

2. For 26 years, I was the State of Connecticut's chief medical examiner.

3. I oversaw the process by which medical examinations were performed on victims of the Sandy Hook massacre.

4. I was one of the many state employees who entered Sandy Hook Elementary School on December 14, 2012.

5. Upon entering the building, it was obvious that Sandy Hook was a functioning elementary school. It was not rotting or falling apart. The school was filled with evidence that it had been in operation.

6. I am personally familiar with individuals who had children attending Sandy Hook Elementary School between 2008-2012.

7. Based on my firsthand observations, I know that paramedics and tactical paramedics entered the building to assess and triage the victims.

8. Upon completion of the medical examinations, the victim's bodies were released to the custody of funeral homes who had been engaged by the families.

9. Autopsy and or postmortem examinations had been performed. These procedures are designed so as not to interfere with usual American funereal practices.

10. Medical examiners made no efforts to conceal injuries.

1

Exhibit D

11.  I am familiar with Alex Jones and InfoWars. I am aware of prior statements by Mr. Jones in which he has asserted that the Sandy Hook massacre was staged. These comments have generated significant pain in the Newtown community.

12.  I have viewed a June 26, 2017 video segment hosted broadcast by InfoWars entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece."

13.  This video make claims about Sandy Hook parent Neil Heslin, the father of deceased minor J.L.

14.  After watching these segments, I understood InfoWars was claiming that Mr. Heslin could not have held his son's body and seen the bullet wound in his head.

15.  The InfoWars reporter stated: "According to a timeline of events and a coroner's testimony, that is not possible." I understood this statement to be InfoWars' assessment of the truth of Mr. Heslin's account.

16.  After viewing the statements, it was my understanding that the broadcast was intended to reinforce the validity of Mr. Jones' prior statements about Sandy Hook, and act as further evidence that the event was staged.

17.  Based on all the comments made in the video, it was clear to me that the InfoWars host was not merely reporting what an internet article had said. Rather, it was clear that the InfoWars host was endorsing the factual assertions in the article, and that the InfoWars host was asserting that it was impossible for Mr. Heslin to have held his son and seen his injuries.

18.  Given my personal involvement in the events of the Sandy Hook massacre, I know that Mr. Heslin would have had an opportunity to hold his son's body and see his injuries if he chose to do so.

19.  I also understood the comments by InfoWars to be an attack on Mr. Heslin's honesty and integrity.

20.  In the context of Mr. Jones' years of accusations about Sandy Hook, I also understood the InfoWars' comments to implicate Mr. Heslin in criminal conduct, such as making false statements to government officials or engaging in other forms of criminal misrepresentation.

21.  After viewing the video segments, I also drew the conclusion that InfoWars was accusing other families and state officials, including myself, of engaging in a fraud or cover-up of the truth regarding the Sandy Hook massacre, since I understood the underlying point of InfoWars argument about Sandy Hook was that the event was staged.

FURTHER YOUR AFFIANT SAYETH NOT

_____
H. Wayne Carver II, M.D.

KAREN C. POMPEA
NOTARY PUBLIC OF CONNECTICUT
MY COMMISSION EXPIRES 10/31/2020

3

# EXHIBIT E

# Affidavit of Scarlet Lewis

## <u>AFFIDAVIT OF SCARLETT LEWIS</u>

STATE OF CONNECTICUT     §
                                 §

FAIRFIELD COUNTY         §

      Before me, the undersigned notary, on this day personally appeared SCARLETT LEWIS, a person whose identity is known to me. Upon being duly sworn, Affiant states:

- My name is SCARLETT LEWIS. I am over the age of 21 and competent to make this affidavit.

- I am personally acquainted with Neil Heslin.

- I have viewed a June 26, 2017 broadcast from InfoWars featuring Owen Shroyer discussing Neil Heslin. (https://www.youtube.com/watch?v=_W1NB5FWUmY)

- I am also generally familiar with the prior allegations from InfoWars that the Sandy Hook massacre was staged or a hoax.

- After viewing the June 26, 2017 broadcast, I understood Mr. Shroyer to be making the claim that it was impossible for Neil Heslin to have held his child's body.

- After viewing the June 26, 2017 broadcast, I understood Mr. Shroyer to be making the claim that it was impossible for Neil Heslin to have seen his child's injuries firsthand.

- After viewing the June 26, 2017 broadcast, I understood Mr. Shroyer to be making the claim that Mr. Heslin was lying about having held the body of his son, and that Mr. Heslin was engaging in a fraud or cover-up of the truth regarding the Sandy Hook massacre.

- After viewing the June 26, 2017 broadcast, I understood Mr. Shroyer to be making the claim that Mr. Heslin was working in collusion with the media, specifically Megyn Kelly, to perpetrate a fraud on the public.

- After viewing the June 26, 2017 broadcast, I understood Mr. Shroyer to be making an attack on Mr. Heslin's honesty and integrity.

- Due to the nature of Mr. Shroyer's statements and the general context of InfoWars prior statements about Sandy Hook, I understood the June 26, 2017 broadcast to

implicate Mr. Heslin in criminal conduct, such as making false statements to government officials or engaging in other forms of criminal misrepresentation.

FURTHER YOUR AFFIANT SAYETH NOT

Scarlett Lewis

7/7/18

KERRY KAZMERCYK
NOTARY PUBLIC
CONNECTICUT

# EXHIBIT F

# Affidavit of John Clayton

## AFFIDAVIT OF JOHN CLAYTON

STATE OF WASHINGTON     §
                        §
KING COUNTY             §

      Before me, the undersigned notary, on this day personally appeared JOHN CLAYTON, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

1. My name is John Clayton. I am over the age of 21 and competent to make this affidavit.

2. For the past twenty years, I have been a radio talk show host and independent journalist.

3. I maintained a close professional association with Alex Jones during the years 2002 through 2009.

4. During those years, I hosted or appeared on InfoWars programming on numerous occasions. I worked alongside Mr. Jones in investigating, researching, and creating news content. I gained an extensive understanding of Mr. Jones' media operation.

5. I stopped working with Mr. Jones in 2009.

6. My primary motivations for no longer working with Mr. Jones was that he no longer had any commitment to the principles and philosophy of the independent media movement.

7. One of those principles is the practice of rigorous journalism. In alternative media, it is imperative that we get our facts right.

8. Near the end of my work with Mr. Jones, it became apparent that he had made the conscious decision not to care about accuracy. He made it clear that his goal was to produce views on InfoWars content.

9. I personally observed that it become standard practice in InfoWars to disregard basic protocols in journalism.

10. I personally observed countless situations in which Mr. Jones made claims on the air for which he knew had no substantiating evidence.

1

11. From my personal experience, I knew that Mr. Jones understood that the information he put on the air had not been adequately checked for accuracy, and in many cases, he knew the information was false. He did not care.

12. One of the differences of opinion I had with Mr. Jones is that I believe it is good and healthy for journalists to ask questions, but I believe it is dangerous to assert facts with no evidence.

13. I felt the way in which Mr. Jones and InfoWars came to operate was dangerous and wrong.

14. Given my intimate and personal discussions with Mr. Jones on these topics, and after seeing Mr. Jones consciously discard any sense of journalistic obligation, there is no question in my mind that Mr. Jones made the choice to willfully disregard accuracy in pursuit of a larger audience.

FURTHER YOUR AFFIANT SAYETH NOT

John Clayton

NOTARY

HABIBULLAH ABYAZ MAHMUD
Notary Public
State of Washington
My Appointment Expires
Aug 20, 2021

7/18/18

2

# EXHIBIT G

# Affidavit of Marcus Turnini

## AFFIDAVIT OF MARCUS TURNINI

STATE OF TEXAS §
§
HARRIS COUNTY §

Before me, the undersigned notary, on this day personally appeared Marcus Turnini, a person

whose identity is known to me. Upon being duly sworn, Affiant states:

1. My name is Marcus Turnini. I am over the age of 21 and competent to make this affidavit.

2. I am employed by the law firm Kaster Lynch Farrar & Ball, LLP as a paralegal.

3. Attached to this affidavit is a true and correct copy of the website located at the URL https://web.archive.org/web/20180214101615/https://www.infowars.com/terms-of-service/. I visited the website on August 1, 2018, and I saved a PDF copy of the website's contents.

4. Attached to this affidavit is a true and correct copy of the website located at the URL https://www.infowars.com/terms-of-service/. I visited the website on August 1, 2018, and I saved a PDF copy of the website's contents.

FURTHER YOUR AFFIANT SAYETH NOT

_____
Marcus Turnini

STATE OF TEXAS §
§
HARRIS COUNTY §

SWORN to and SUBSCRIBED before, the undersigned authority, on the 2nd day of August 2018, by Marcus Turnini.

ERIC TELLEZ
Notary Public State of Texas
My Commission# 124709495
My Comm. Exp. Apr. 06, 2021

_____
Notary Public, State of Texas

My commission expires: _4-6-21_

THE
THE ALEX JONES RADIO SHOW

LISTEN NOWWATCH NOW



SUBSCRIBE

RADIO SHOWNEWSVIDEOSSTORE

BREAKING NEWSCONTACT

WATCH LIVE

BREAKING

STORE

# INFOWARS LLC, TERMS OF USE & PRIVACY POLICY

# IMPORTANT - PLEASE READ

Reading and accepting the following terms of use and incorporated privacy policy, as they are periodically updated, are required before you may begin or continue to interact with this website. Your use of this website for any purpose other than to read the terms of use and privacy policy is considered as your full consent to all provisions of the most current versions of the terms of use and privacy policy.

1. DEFINITIONS

2. GENERAL PROVISIONS

3. PRIVACY

4. PAYMENTS

5. REFUNDS/NO CHARGEBACKS

6. PAYMENT

7. SHIPPING

8. POSTED CONTENT

9. INTELLECTUAL PROPERTY

10. NO THIRD-PARTY BENEFICIARIES

11. LIMITATION OF LIABILITY

12. INDEMNITY

13. REPRESENTATIONS AND WARRANTIES

14. BREACH, REVOCATION AND CANCELLATION

15. SEVERABILITY

16. GOVERNING LAW

17. EXCLUSIVE VENUE

18. DISPUTE FEES AND COSTS

19. PUBLISHING RULES (WHEN CREATING ARTICLES)

20. COMMENT RULES

21. GROUPS

# 1. DEFINITIONS

1.1. "Agreement" means the most current version of this terms of use agreement, including the incorporated privacy policy, between us and you.

1.2. "Licensed Materials" means our intellectual property, including but not limited to, our logos, trade names, service marks, trademarks, and trade dress.

1.3. "Membership" means anyone holding an account in compliance with this Agreement.

1.4. "Profile" means the membership information, including but not limited to your legal name, address, telephone, fax, email.

1.5. "Product" means each and every product we offer.

1.6. "Profile Page" means the page of the same name on the Website where your membership information is shown.

1.7. "Services" means each and every service we offer.

1.8. "Website" means planet.infowars.com and all other Uniform Resource Identifier we use to provide our Products and Services.

1.9. "System" means all of our software and hardware, whether owned or leased or otherwise contracted.

1.10. "We," "us," and "our" means Infowars, LLC, a Texas limited liability company.

1.11. "You," "your," and "yourself" means any person, organization or business entity that seeks to use our Services, as well as their agents, assigns, and successors.

1.12. "Active" (Group) means users post comments, group information is updated, events and missions are created. If a group is inactive for more than 30 days it will be deleted.

Back to Top ^

## 2. GENERAL PROVISIONS

2.1. Please direct any questions not answered by reading this Agreement to us at support@Infowars.com.

2.2. You may not access the Website or utilize our Services if you are under eighteen (18) years of age or otherwise not competent to enter into a binding contract.

2.3. Before you may use any of our Services, you must:

2.3.1. read and agree to comply with this Agreement and

2.3.2. understand and accept that this Agreement:

2.3.2.1. takes effect the moment you access the Website;

2.3.2.2. may only be amended or modified by us, unless we agree otherwise in writing with you;

2.3.2.3. may be amended or modified by us at any time and all such changes shall take full effect as soon as they are posted on the Website and your continued use of our Services shall be irrefutable proof of your consent to the terms and conditions of the most current version of this Agreement;

2.3.2.4. is the entire and only agreement between you and us;

2.3.2.5. contain all terms and conditions of your relationship with us and your use of our Services; and

2.3.2.6. shall only terminate under the conditions provided for herein.

2.4. This Agreement shall in no way create an agency, employee-employer, franchis or franchisee, joint enterprise, joint venture, or partnership relationship between you and us.

2.5. Our failure to require your performance of any provision of this Agreement shall not affect our right to require subsequent performance at any time of the same provision.

2.6. Should we determine, in our sole discretion, that you have violated any provisions of this Agreement or applicable laws, we may, with subsequent notice to you:

2.6.1. immediately lower, suspend or cancel your account and membership with us;

2.6.2. use your personal information to collect all pending and applicable fees and other amounts due;

2.6.3. charge you for all administrative costs in connection with any violation by you of any provision of this Agreement; and

2.6.4. bring legal action to enjoin violations and/or to collect all damages caused by your violations of this Agreement.

2.7. We cooperate with law enforcement and all other appropriate authorities and organizations.

2.8. Unless otherwise provided herein, you agree that:

2.8.1. all notices from us to you shall be sent to the most recent email address on file with us and will be deemed immediately delivered even if you have allowed your email address on file to no longer be valid and

2.8.2. all notices from you to us shall be:

2.8.2.1. sent to support@Infowars.com and deemed immediately delivered.

Back to Top ^

# 3. PRIVACY

3.1. Protecting your privacy is very important to us; so we do not sell your personal information and will only use it for obvious, legitimate business purposes.

3.2. You agree that we may use your personal identifying information to enforce this Agreement, and when complying with an order of a court or other government entity of competent jurisdiction.

3.4. We us cookies, log files, and third parties to create a profile of our users and the information gathered is personally identifiable as belonging to you so that we can better determine what Services and System adjustments will optimize your experience at the Website. We may share this information with third parties but only in a way that does not identify you or any particular person individually.

3.5. The System allows you to use and purchase our Products and Services online. PayPal or another merchant account service provider processes your payments, and we do not store your financial information.

3.6. We may offer you opportunities to communicate with third parties, whether other on our Website or that of an affiliate. Please remember that we do not control or guarantee in any way the accuracy or safety of the content on websites not operated by us or even content provided by others on our Website.

3.7. Any information you disclosed to third parties on our Website or other websites becomes public information, and you should exercise caution when deciding to disclose any personal information.

3.8. We follow established security procedures to keep your personal information safe from unauthorized third parties.

3.9. You alone are responsible for maintaining the security of your account access information—i.e., username, password and email address.

3.10. You alone are responsible for confirming the accuracy of your personal information that we use to contact you. Any email messages we receive that appear to be from the email address we have on file for you shall be deemed to have been sent by you or your duly authorized agent with full authority to act on your behalf.

Back to Top ^

# 4. PAYMENTS

4.1. You are responsible for making timely payment of all amounts you owe us when they come due.

4.2. Should we charge fees, we may change our fees at any time, and the new fees shall take immediate effect.

4.3. Your obligation to make due payments shall survive termination of this Agreement.

Back to Top ^

# 5. REFUNDS/NO CHARGEBACKS

5.1. No payments, whether purchases or donations, shall be refunded and sales are final.

5.2. You shall not chargeback any payments to us, unless you have been the victim of identity theft and provide us with a valid police report. Your failure to comply with this section may result in immediate termination of your use of our Services.

5.3. Except for confirmed manufacturer defects, you are responsible for all freight and shipping charges as well as a restocking fee of 15%, of the sale price, for unaccepted or refused delivery shipments.

Back to Top ^

# 6. MEMBERSHIPS

6.1. We may offer you the opportunity to enjoy a pay membership at various levels with each level priced differently and granting you the opportunity to make use of a greater number of our Services.

6.2. Members with a pay membership pay for their particular pay membership level and fees at all levels shall be recurring with a $100 administrative fee applied to every chargeback you make on charges for payment to us; see 4.6 above for more details.

6.3. We may lower, suspend or terminate your Membership if we determine, in our sole discretion, that you have violated the terms of this Agreement.

6.4. You may terminate your Membership by simply writing us at support@Infowars.com, and your cancellation shall take effect twenty-four (24) hours later.

6.5. Planetinfowars.com (Planet.infowars.com) does not require a membership and/or service fee.

Back to Top ^

# 7. SHIPPING

7.1. Shipping Methods: We highly recommend that you choose UPS for the shipping method. UPS provides tracking information for all orders and insurance for lost or damaged packages. If you choose another method of shipping, you hereby accept all liability for lost or damaged orders. We will not and cannot do anything for lost or damaged orders that were not sent via UPS.

7.2. Shipping: Shipping charges are nonrefundable. You are responsible for all freight charges for refused shipments and they will be added to the invoice total. Freight/insurance costs are prepaid. All items are shipped via USPS or UPS. Items will be shipped within one week of receipt of order, though generally much sooner. Out of stock items will be shipped according to availability of product. Dimensions/oversize weights are applied to freight charges when applicable.

7.3. Backorders: If your order contains a pre-ordered item, or a back-ordered item, the entire order will ship once all items are in stock. If you would like to have a partial order shipped immediately and are willing to pay an additional shipping charge, please contact our offices at (512) 291-5750 Ext. 56 or 96.

7.4. Damage/Loss: All claims for damage/pilferage must be filed by you with the delivering carrier. We cannot file these for you. All claims for incorrect shipments/billing must be made within 10 days of receipt. In the event of a faulty product, meaning the manufacturer has confirmed the defect, we will request that you return the product, after which we will ship out a replacement product.

7.5. For Products shipped within the State of Texas, applicable sales taxes are automatically applied to the purchase total and must be paid as part of the total purchase amount. You alone are responsible for sales taxes due outside the State of Texas.

Back to Top ^

# 8. POSTED CONTENT

8.1. We may review and delete any content you post on the Website or elsewhere utilizing our Services or System if we determine, in our sole discretion, that the content violates the rights of others, is not appropriate for the Website, or otherwise violates this Agreement.

8.2. We may allow you to upload content, such as photographs, but only to your account with us.

8.3. You must hold all intellectual rights to content, such as text or photographs, you upload to the Website.

Back to Top ^

# 9. INTELLECTUAL PROPERTY

9.1. You may not copy or otherwise attempt to benefit or assist others to benefit, directly or indirectly, from use of our Licensed Materials or intellectual property of third parties other than through normal use of the Website.

9.2. You retain all of your rights, titles, and interests in and to the content provided by you.

9.3. You hereby grant us a perpetual, worldwide license to use, host, store, reproduce, modify, create derivative works, communicate, publish, publicly perform, publicly display, distribute and otherwise use all content that you post on the Website or otherwise through the use of our Services or System.

9.4. If you did not create or obtain a license to use content on the Website, you may not use content on the Website other than through normal use of the Website, as intended by us.

9.5. If you believe that your intellectual property rights have been violated, please contact us at support@Infowars.com and provide a brief but complete description of the intellectual property at issue.

Back to Top ^

# 10. NO THIRD-PARTY BENEFICIARIES

There shall be no third-party beneficiaries to this Agreement. All assignments are void unless consented to by us in writing. Back to Top ^

## 11. LIMITATION OF LIABILITY

11.1. You agree that we will not be liable for any harm or loss that may occur in connection with:

11.1.1. any act or omission by you or your agent, whether authorized or unauthorized;

11.1.2. your use or inability to use our Services;

11.1.3. public or private information, whether accurate or inaccurate or fraudulent, provided by you or a third party;

11.1.4. access delays or access interruptions to our Services;

11.1.5. the failure to deliver or erroneous delivery of information;

11.1.6. any breach of contract you have with a third party, such as an employer;

11.1.7. any breach of a 3rd party's intellectual property as a result of information posted by you;

11.1.8. your failure to pay us any applicable due payment;

11.1.9. the actions, orders and judgments of administrative, judicial and other governmental bodies.

11.2. We shall not be liable to you or anyone else for delays in or failures to perform our obligations under this Agreement that directly or indirectly result from events or causes beyond our reasonable control including, but not limited to: hardware or software failures, other equipment failures, electrical power failures, labor disputers, strikes, riots, hurricanes, fires, floods, storms, explosions, acts of God, war, governmental actions, orders of domestic or foreign courts or administrative bodies, or the non-performance of third parties.

11.3. We shall not be liable for any direct, indirect, consequential, incidental, special or exemplary damages of any kind, including but not limited to lost: profits, goodwill, use, data or other intangibles whether in contract, tort or negligence even if you we are aware of the possibility or probability of such damages.

11.4. If a competent court deems us liable to you, our maximum possible liability to you for any reason shall not exceed $100.

Back to Top ^

# 12. INDEMNITY

12.1. YOU AGREE TO DEFEND, INDEMNIFY AND HOLD US AND OUR MEMBERS, OFFICERS, EMPLOYEES, AFFILIATES AND AGENTS HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES OR COSTS, INCLUDING ALL ATTORNEY FEES, COLLECTION FEES AND COURT COSTS, RELATED TO ANY DEMAND OR LITIGATION IN ANY WAY RELATED TO:

12.1.1. YOUR USE OF OUR SERVICES;

12.1.2. YOUR BREACH OF THIS AGREEMENT;

12.1.3. INACCURATE OR FRAUDULENT INFORMATION PROVIDED BY YOU OR A THIRD PARTY;

12.1.4. THE CANCELLATION OR LIMITATION OF YOUR ABILITY TO USE OUR SYSTEM AND SERVICES, INCLUDING BUT NOT LIMITED TO OUR WEBSITE; OR

12.1.5. INFRINGEMENT OF ANY THIRD-PARTY RIGHTS ARISING FROM YOU'RE YOUR USE OF OUR SYSTEM OR SERVICES.

Back to Top ^

# 13. REPRESENTATIONS AND WARRANTIES

13.1. You represent and warrant that:

13.1.1. all Profile information you provide to us is accurate and none of the Profile information or documents your provide to us contain fraudulent or otherwise inaccurate information.

13.1.2. you will immediately update your Profile information after it becomes inaccurate;

13.1.3. you will not directly or indirectly infringe the legal rights of third parties or our Licensed Materials;

13.1.4. you have not entered into this Agreement and will not enter into any additional agreements with us in bad faith; and

13.1.5. you are at least legally competent to enter into a binding contract with us.

13.2. We make no representations or warranties of any kind in connection with this Agreement.

13.3. With regard to the Website and our Services:

13.3.1. We expressly disclaim all warranties, express or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose.

13.3.2. We do not warrant that our Services will meet your requirements, be uninterrupted or error free.

13.3.3. We do not make any warranties or representations regarding use, correctness, accuracy, or reliability.

13.4. You agree that:

13.4.1. you use the Website and our Products and Services at your own risk;

13.4.2. you use the Website and our Products and Services on an "as-is" and "asavailable" basis and at your own risk and discretion;

13.4.3. you alone are responsible for any damage to your hardware and software or loss of data in any way related to your use of the Website or our Services;

13.4.4. neither we nor our members, officers, employees or agents shall have any liability to you; and

13.4.5. no advice or information, whether oral or written, obtained by you from us shall create any warranty not expressly stated in this Agreement.

Back to Top ^

# 14. BREACH, REVOCATION AND CANCELLATION.

14.1. In the event that you breach any provision of this Agreement, you agree that we may immediately terminate your use of our Services and System.

14.2. In the event such a breach occurs by you, we may post on the Website that you have violated our terms and conditions of service.

14.3. In the event we determine that you have or continue to violate this Agreement:

14.3.1. We reserve the right to prosecute civil and/or criminal actions against you for any abusive behavior you engage in regarding your use of our Services and System; and

14.3.2. You will also be subject to legal ($200 per hour), administrative ($75 per hour), and technical ($150 per hour) fees in a reasonable amount for damages incurred by us for any violations of this Agreement.

Back to Top ^

# 15. SEVERABILITY

15.1. In the event that one or more provisions of this Agreement is deemed unenforceable or invalid, the unaffected provisions of this Agreement shall continue in effect, and the unenforceable or invalid provisions shall be amended or replaced by us with a provision that is valid and enforceable and which achieves, to the greatest extent possible, the objectives and intent of the original provisions.

Back to Top ^

# 16. GOVERNING LAW

16.1. This Agreement shall be governed by the federal laws of the United States and the laws of the State of Texas, without regard to any conflict of laws provisions.

Back to Top ^

# 17. EXCLUSIVE VENUE

17.1. Any actions relating to or arising out of this Agreement or any use of our Website or Services that include us as a party shall be brought exclusively in the federal and state courts for Travis County, Austin, Texas, and you consent to the exercise of personal jurisdiction over you by these courts in all such actions.

17.2. You agree that you shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts of your domicile and Travis County, Austin, Texas.

Back to Top ^

# 18. DISPUTE RELATED FEES AND COSTS

18.1. If we reasonably decide to retain an attorney or a collection agency to enforce this Agreement, the prevailing party will be entitled to an award of all reasonable fees and costs, regardless of whether a judgment is rendered or suit is ever filed.

Back to Top ^

# 19. PUBLISHING RULES (WHEN CREATING ARTICLES)

You will stay on topic. (Post under the proper category)

You will post articles to the ONE category that best applies.

You will not spam. (Spam is flooding the Internet with many copies of the same message, in an attempt to force the message on people who would not otherwise choose to receive it.)

You will not include links to websites and videos not associated with the topic.

You will not post the same comment or article multiple times or multiple categories.

You will not solicit anyone to buy or sell products or services, or to make donations of any kind. You will not include links to products in your status updates, comments, articles or groups.

You will not post anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

You will not make threats to other users or people not associated with the site.

If you violate these rules, your posts and/or user name will be deleted.

Remember: you are a guest here. It is not censorship if you violate the rules and your post is deleted. All civilizations have rules and if you violate them you can expect to be ostracized from the tribe. Back to Top ^

## 20. COMMENT RULES

By using Infowars.com, you agree to the following when making a comment:

You will stay on topic.

You will not spam. (Spam is flooding the Internet with unnecessary or out of topic comments)

You will not include links to websites and videos not associated with the topic.

You will not post the same comment multiple times on the same of different articles

You will not solicit anyone to buy or sell products or services, or to make donations of any kind. You will not include links to products in your status updates, comments, articles or groups.

You will not post anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

You will not make threats to other users or people not associated with the site.

If you violate these rules, your comment(s) and/or user name will be deleted.

Back to Top ^

## 21. Groups

Your group must remain active, otherwise, after 30 days it will be deleted. (See 'active' definition above in section 1.12)

Your group will not be based on anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

Your group will not solicit anyone to buy or sell products or services, or to make donations of any kind.

© 2018 Infowars.com is a Free Speech Systems, LLC Company.      © 2018 All rights reserved. Digital Millennium Copyright Act Notice. Infowars.com is a Free Radio      Archive      About Alex Jones Show

Video      Watch Alex Jones ShowSubscribe

Store      Most Recent      Contact

Infowars LifeD.M.C.A.

T.O.S.      Corrections

Speech Systems, LLC Company.

All rights reserved. Digital Millennium Copyright Act Notice.

8/1/2018

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 334 of 608

https://www.infowars.com/terms-of-service/                    Go   JAN **FEB** MAR

266 captures                                                  ◀ **14** ▶
24 Apr 2013 - 21 Feb 2018                                     **2017** **2018** 2019    ▼ About this capture



THE
THE ALEX JONES SHOW
LISTEN NOWWA

ALU SI OWLIWSWALSSTORETOP STORIES

BREAKING NEWSCONTACT

WATCH LIVE                     BREAKING                        STORE

8/1/2018

https://www.infowars.com/terms-of-service/ Go

266 captures
24 Apr 2013 - 21 Feb 2018

JAN FEB MAR
◀ 14 ▶
2017 2018 2019

About this capture

8/1/2018

https://www.infowars.com/terms-of-service/          Go

266 captures
24 Apr 2013 - 21 Feb 2018

JAN  FEB  MAR

◀ 14 ▶

2017  2018  2019

About this capture

are required before you may begin or continue to interact with this website. Your use of this website for any purpose other than to read the terms of use and privacy policy is considered as your full consent to all provisions of the most current versions of the terms of use and privacy policy.

8/1/2018                                    Terms of Service » Alex Jones' Infowars: There's a war on for your mind!

https://www.infowars.com/terms-of-service/                                    Go    JAN   **FEB**   MAR

**266 captures**                                                                    ◀  **14**  ▶     
24 Apr 2013 - 21 Feb 2018                                                      **2017**  **2018**  2019    ▼ About this capture

3. PRIVACY

4. PAYMENTS

5. REFUNDS/NO CHARGEBACKS

6. PAYMENT

7. SHIPPING

8. POSTED CONTENT

9. INTELLECTUAL PROPERTY

10. NO THIRD-PARTY BENEFICIARIES

11. LIMITATION OF LIABILITY

12. INDEMNITY

13. REPRESENTATIONS AND WARRANTIES

14. BREACH, REVOCATION AND CANCELLATION

15. SEVERABILITY

16. GOVERNING LAW

17. EXCLUSIVE VENUE

18. DISPUTE FEES AND COSTS

19. PUBLISHING RULES (WHEN CREATING ARTICLES)

20. COMMENT RULES

21. GROUPS

https://www.infowars.com/terms-of-service/ | Go |

266 captures
24 Apr 2013 - 21 Feb 2018

JAN **FEB** MAR
◀ **14** ▶
**2017 2018** 2019

About this capture

the incorporated privacy policy, between us and you.

1.2. "Licensed Materials" means our intellectual property, including but not limited to, our logos, trade names, service marks, trademarks, and trade dress.

1.3. "Membership" means anyone holding an account in compliance with this Agreement.

1.4. "Profile" means the membership information, including but not limited to your legal name, address, telephone, fax, email.

1.5. "Product" means each and every product we offer.

1.6. "Profile Page" means the page of the same name on the Website where your membership information is shown.

1.7. "Services" means each and every service we offer.

1.8. "Website" means planet.infowars.com and all other Uniform Resource Identifier we use to provide our Products and Services.

1.9. "System" means all of our software and hardware, whether owned or leased or otherwise contracted.

1.10. "We," "us," and "our" means Infowars, LLC, a Texas limited liability company.

1.11. "You," "your," and "yourself" means any person, organization or business entity that seeks to use our Services, as well as their agents, assigns, and successors.

1.12. "Active" (Group) means users post comments, group information is updated, events and missions are created. If a group is inactive for more than 30 days it will be deleted.

Back to Top ^

8/1/2018

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 339 of 608

https://www.infowars.com/terms-of-service/

Go

266 captures
24 Apr 2013 - 21 Feb 2018

JAN **FEB** MAR

◀ **14** ▶

**2017** **2018** 2019

▼ About this capture

https://www.infowars.com/terms-of-service/      Go    JAN **FEB** MAR
266 captures                                          ◀ **14** ▶
24 Apr 2013 - 21 Feb 2018                        **2017** **2018** 2019    ▼ About this capture

2.2. You may not access the Website or utilize our Services if you are under eighteen (18) years of age or otherwise not competent to enter into a binding contract.

2.3. Before you may use any of our Services, you must:

2.3.1. read and agree to comply with this Agreement and

2.3.2. understand and accept that this Agreement:

2.3.2.1. takes effect the moment you access the Website;

2.3.2.2. may only be amended or modified by us, unless we agree otherwise in writing with you;

2.3.2.3. may be amended or modified by us at any time and all such changes shall take full effect as soon as they are posted on the Website and your continued use of our Services shall be irrefutable proof of your consent to the terms and conditions of the most current version of this Agreement;

2.3.2.4. is the entire and only agreement between you and us;

2.3.2.5. contain all terms and conditions of your relationship with us and your use of our Services; and

2.3.2.6. shall only terminate under the conditions provided for herein.

2.4. This Agreement shall in no way create an agency, employee-employer, franchis or franchisee, joint enterprise, joint venture, or partnership relationship between you and us.

2.5. Our failure to require your performance of any provision of this Agreement shall not affect our right to require subsequent performance at any time of the same provision.


https://www.infowars.com/terms-of-service/ Go
266 captures
24 Apr 2013 - 21 Feb 2018
JAN FEB MAR
◄ 14 ►
2017 2018 2019
About this capture

2.6.1. immediately lower, suspend or cancel your account and membership with us;

2.6.2. use your personal information to collect all pending and applicable fees and other amounts due;

2.6.3. charge you for all administrative costs in connection with any violation by you of any provision of this Agreement; and

2.6.4. bring legal action to enjoin violations and/or to collect all damages caused by your violations of this Agreement.

2.7. We cooperate with law enforcement and all other appropriate authorities and organizations.

2.8. Unless otherwise provided herein, you agree that:



on file to no longer be valid and

2.8.2. all notices from you to us shall be:

2.8.2.1. sent to support@Infowars.com and deemed immediately delivered.

Back to Top ^

# 3. PRIVACY

8/1/2018

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 343 of 608

https://www.infowars.com/terms-of-service/    Go    JAN  **FEB**  MAR

266 captures                                         ◀ **14** ▶

24 Apr 2013 - 21 Feb 2018                          2017 **2018** 2019    ▼ About this capture

3.2. You agree that we may use your personal identifying information to enforce this Agreement, and when complying with an order of a court or other government entity of competent jurisdiction.

3.4. We us cookies, log files, and third parties to create a profile of our users and the information gathered is personally identifiable as belonging to you so that we can better determine what Services and System adjustments will optimize your experience at the Website. We may share this information with third parties but only in a way that does not identify you or any particular person individually.

3.5. The System allows you to use and purchase our Products and Services online. PayPal or another merchant account service provider processes your payments, and we do not store your financial information.

3.6. We may offer you opportunities to communicate with third parties, whether other on our Website or that of an affiliate. Please remember that we do not control or guarantee in any way the accuracy or safety of the content on websites not operated by us or even content provided by others on our Website.

3.7. Any information you disclosed to third parties on our Website or other websites becomes public information, and you should exercise caution when deciding to disclose any personal information.

3.8. We follow established security procedures to keep your personal information safe from unauthorized third parties.

8/1/2018

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 344 of 608

https://www.infowars.com/terms-of-service/    Go    JAN  FEB  MAR

266 captures
24 Apr 2013 - 21 Feb 2018

◀ **14** ▶

2017  **2018**  2019     ▼ About this capture

3.10. You alone are responsible for confirming the accuracy of your personal information that we use to contact you. Any email messages we receive that appear to be from the email address we have on file for you shall be deemed to have been sent by you or your duly authorized agent with full authority to act on your behalf.

Back to Top ^

## 4. PAYMENTS

4.1. You are responsible for making timely payment of all amounts you owe us when they come due.

4.2. Should we charge fees, we may change our fees at any time, and the new fees shall take immediate effect.

4.3. Your obligation to make due payments shall survive termination of this Agreement.

Back to Top ^

## 5. REFUNDS/NO CHARGEBACKS

5.1. No payments, whether purchases or donations, shall be refunded and sales are final.

5.2. You shall not chargeback any payments to us, unless you have been the victim of identity theft and provide us with a valid police report. Your failure to comply with this section may result in immediate termination of your use of our Services.

5.3. Except for confirmed manufacturer defects, you are responsible for all freight and shipping charges as well as a restocking fee of 15%, of the sale price, for unaccepted or refused delivery shipments.

8/1/2018

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 345 of 608

https://www.infowars.com/terms-of-service/   Go   JAN FEB MAR

266 captures
24 Apr 2013 - 21 Feb 2018

◀ 14 ▶
2017 2018 2019

About this capture

6.1. We may offer you the opportunity to enjoy a pay membership at various levels with each level priced differently and granting you the opportunity to make use of a greater number of our Services.

6.2. Members with a pay membership pay for their particular pay membership level and fees at all levels shall be recurring with a $100 administrative fee applied to every chargeback you make on charges for payment to us; see 4.6 above for more details.

6.3. We may lower, suspend or terminate your Membership if we determine, in our sole discretion, that you have violated the terms of this Agreement.

6.4. You may terminate your Membership by simply writing us at support@Infowars.com, and your cancellation shall take effect twenty-four (24) hours later.

6.5. Planetinfowars.com (Planet.infowars.com) does not require a membership and/or service fee.

Back to Top ^

# 7. SHIPPING

https://www.infowars.com/terms-of-service/                         Go   JAN  **FEB**  MAR   

**266 captures**                                                          ◀  **14**  ▶
24 Apr 2013 - 21 Feb 2018                                               **2017  2018**  2019      ▼ About this capture

packages. If you choose another method of shipping, you hereby accept all liability for lost or damaged orders. We will not and cannot do anything for lost or damaged orders that were not sent via UPS.

7.2. Shipping: Shipping charges are nonrefundable. You are responsible for all freight charges for refused shipments and they will be added to the invoice total. Freight/insurance costs are prepaid. All items are shipped via USPS or UPS. Items will be shipped within one week of receipt of order, though generally much sooner. Out of stock items will be shipped according to availability of product. Dimensions/oversize weights are applied to freight charges when applicable.

7.3. Backorders: If your order contains a pre-ordered item, or a back-ordered item, the entire order will ship once all items are in stock. If you would like to have a partial order shipped immediately and are willing to pay an additional shipping charge, please contact our offices at (512) 291-5750 Ext. 56 or 96.

7.4. Damage/Loss: All claims for damage/pilferage must be filed by you with the delivering carrier. We cannot file these for you. All claims for incorrect shipments/billing must be made within 10 days of receipt. In the event of a faulty product, meaning the manufacturer has confirmed the defect, we will request that you return the product, after which we will ship out a replacement product.



https://www.infowars.com/terms-of-service/     Go

266 captures
24 Apr 2013 - 21 Feb 2018

amount. You alone are responsible for sales taxes due outside the State of Texas.

Back to Top ^

## 8. POSTED CONTENT

8.1. We may review and delete any content you post on the Website or elsewhere utilizing our Services or System if we determine, in our sole discretion, that the content violates the rights of others, is not appropriate for the Website, or otherwise violates this Agreement.

8.2. We may allow you to upload content, such as photographs, but only to your account with us.

8.3. You must hold all intellectual rights to content, such as text or photographs, you upload to the Website.

Back to Top ^

## 9. INTELLECTUAL PROPERTY



than through normal use of the Website.

9.2. You retain all of your rights, titles, and interests in and to the content provided by you.

9.3. You hereby grant us a perpetual, worldwide license to use, host, store, reproduce, modify, create derivative works, communicate, publish, publicly perform, publicly display, distribute and otherwise use all content that you post on the Website or otherwise through the use of our Services or System.

9.4. If you did not create or obtain a license to use content on the Website, you may not use content on the Website other than through normal use of the Website, as intended by us.

9.5. If you believe that your intellectual property rights have been violated, please contact us at support@Infowars.com and provide a brief but complete description of the intellectual property at issue.

Back to Top ^

## 10. NO THIRD-PARTY BENEFICIARIES

There shall be no third-party beneficiaries to this Agreement. All assignments are void unless consented to by us in writing. Back to Top ^

## 11. LIMITATION OF LIABILITY



8/1/2018

https://www.infowars.com/terms-of-service/                    Go    JAN  **FEB**  MAR

266 captures                                                          ◀  **14**  ▶
24 Apr 2013 - 21 Feb 2018                                        2017 **2018** 2019     ▼ About this capture

11.1.1. any act or omission by you or your agent, whether authorized or unauthorized;

11.1.2. your use or inability to use our Services;

11.1.3. public or private information, whether accurate or inaccurate or fraudulent, provided by you or a third party;

11.1.4. access delays or access interruptions to our Services;

11.1.5. the failure to deliver or erroneous delivery of information;

11.1.6. any breach of contract you have with a third party, such as an employer;

11.1.7. any breach of a 3rd party's intellectual property as a result of information posted by you;

11.1.8. your failure to pay us any applicable due payment;

11.1.9. the actions, orders and judgments of administrative, judicial and other governmental bodies.

11.2. We shall not be liable to you or anyone else for delays in or failures to perform our obligations under this Agreement that directly or indirectly result from events or causes beyond our reasonable control including, but not limited to: hardware or software failures, other equipment failures, electrical power failures, labor disputers, strikes, riots, hurricanes, fires, floods, storms, explosions, acts of God, war, governmental actions, orders of domestic or foreign courts or administrative bodies, or the non-performance of third parties.

https://www.infowars.com/terms-of-service/                                    Go      JAN    FEB    MAR
266 captures                                                                          ◀    14    ▶
24 Apr 2013 - 21 Feb 2018                                                      2017   2018   2019      ▼ About this capture

or other intangibles whether in contract, tort or negligence even if you we are aware of the possibility or probability of such damages.

11.4. If a competent court deems us liable to you, our maximum possible liability to you for any reason shall not exceed $100.

Back to Top ^

## 12. INDEMNITY

12.1. YOU AGREE TO DEFEND, INDEMNIFY AND HOLD US AND OUR MEMBERS, OFFICERS, EMPLOYEES, AFFILIATES AND AGENTS HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES OR COSTS, INCLUDING ALL ATTORNEY FEES, COLLECTION FEES AND COURT COSTS, RELATED TO ANY DEMAND OR LITIGATION IN ANY WAY RELATED TO:

12.1.1. YOUR USE OF OUR SERVICES;

12.1.2. YOUR BREACH OF THIS AGREEMENT;

12.1.3. INACCURATE OR FRAUDULENT INFORMATION PROVIDED BY YOU OR A THIRD PARTY;

12.1.4. THE CANCELLATION OR LIMITATION OF YOUR ABILITY TO USE OUR SYSTEM AND SERVICES, INCLUDING BUT NOT LIMITED TO OUR WEBSITE; OR

12.1.5. INFRINGEMENT OF ANY THIRD-PARTY RIGHTS ARISING FROM YOU'RE YOUR USE OF OUR SYSTEM OR SERVICES.

Back to Top ^

https://web.archive.org/web/20180214101615/https://www.infowars.com/terms-of-service/

https://www.infowars.com/terms-of-service/          Go    JAN  FEB  MAR
266 captures                                                            ◀  **14**  ▶
24 Apr 2013 - 21 Feb 2018                                              2017 **2018** 2019
                                                                                    ▼ About this capture

information or documents your provide to us contain fraudulent or otherwise inaccurate information.

13.1.2. you will immediately update your Profile information after it becomes inaccurate;

13.1.3. you will not directly or indirectly infringe the legal rights of third parties or our Licensed Materials;

13.1.4. you have not entered into this Agreement and will not enter into any additional agreements with us in bad faith; and

13.1.5. you are at least legally competent to enter into a binding contract with us.

13.2. We make no representations or warranties of any kind in connection with this Agreement.

13.3. With regard to the Website and our Services:

13.3.1. We expressly disclaim all warranties, express or implied, including, but not limited to, the implied warranties of merchantability and fitness for a particular purpose.

13.3.2. We do not warrant that our Services will meet your requirements, be uninterrupted or error free.

13.3.3. We do not make any warranties or representations regarding use, correctness, accuracy, or reliability.

8/1/2018

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 353 of 608

https://www.infowars.com/terms-of-service/    [Go]    JAN  FEB  MAR

266 captures
24 Apr 2013 - 21 Feb 2018

◀ 14 ▶
2017  2018  2019

👤

▼ About this capture

13.4.2. you use the Website and our Products and Services on an "as-is" and "asavailable" basis and at your own risk and discretion;

13.4.3. you alone are responsible for any damage to your hardware and software or loss of data in any way related to your use of the Website or our Services;

13.4.4. neither we nor our members, officers, employees or agents shall have any liability to you; and

13.4.5. no advice or information, whether oral or written, obtained by you from us shall create any warranty not expressly stated in this Agreement.

Back to Top ^

## 14. BREACH, REVOCATION AND CANCELLATION.

14.1. In the event that you breach any provision of this Agreement, you agree that we may immediately terminate your use of our Services and System.

14.2. In the event such a breach occurs by you, we may post on the Website that you have violated our terms and conditions of service.

14.3. In the event we determine that you have or continue to violate this Agreement:

14.3.1. We reserve the right to prosecute civil and/or criminal actions against you for any abusive behavior you engage in regarding your use of our Services and System; and

14.3.2. You will also be subject to legal ($200 per hour), administrative ($75 per hour), and technical ($150 per hour) fees in a reasonable amount for damages incurred by us for any violations of this Agreement.

8/1/2018

https://www.infowars.com/terms-of-service/   Go   JAN **FEB** MAR

◀ **14** ▶

**2017 2018** 2019

266 captures
24 Apr 2013 - 21 Feb 2018

About this capture

15.1. In the event that one or more provisions of this Agreement is deemed unenforceable or invalid, the unaffected provisions of this Agreement shall continue in effect, and the unenforceable or invalid provisions shall be amended or replaced by us with a provision that is valid and enforceable and which achieves, to the greatest extent possible, the objectives and intent of the original provisions.

Back to Top ^

## 16. GOVERNING LAW

16.1. This Agreement shall be governed by the federal laws of the United States and the laws of the State of Texas, without regard to any conflict of laws provisions.

Back to Top ^

## 17. EXCLUSIVE VENUE

17.1. Any actions relating to or arising out of this Agreement or any use of our Website or Services that include us as a party shall be brought exclusively in the federal and state courts for Travis County, Austin, Texas, and you consent to the exercise of personal jurisdiction over you by these courts in all such actions.

17.2. You agree that you shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts of your domicile and Travis County, Austin, Texas.

Back to Top ^

https://www.infowars.com/terms-of-service/    Go

266 captures
24 Apr 2013 - 21 Feb 2018

JAN **FEB** MAR

◀ **14** ▶

2017 **2018** 2019    ▼ About this capture

Agreement, the prevailing party will be entitled to an award of all reasonable fees and costs, regardless of whether a judgment is rendered or suit is ever filed.

Back to Top ^

## 19. PUBLISHING RULES (WHEN CREATING ARTICLES)

You will stay on topic. (Post under the proper category)

You will post articles to the ONE category that best applies.

You will not spam. (Spam is flooding the Internet with many copies of the same message, in an attempt to force the message on people who would not otherwise choose to receive it.)

You will not include links to websites and videos not associated with the topic.

You will not post the same comment or article multiple times or multiple categories.

You will not solicit anyone to buy or sell products or services, or to make donations of any kind. You will not include links to products in your status updates, comments, articles or groups.

You will not post anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

You will not make threats to other users or people not associated with the site.

If you violate these rules, your posts and/or user name will be deleted.

Remember: you are a guest here. It is not censorship if you violate the rules and your post is deleted. All civilizations have rules and if you violate them you can expect to be

8/1/2018

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 356 of 608

https://www.infowars.com/terms-of-service/          Go    JAN  **FEB**  MAR

266 captures
24 Apr 2013 - 21 Feb 2018

◀  **14**  ▶

2017  **2018**  2019          ▼ About this capture

By using Infowars.com, you agree to the following when making a comment:

You will stay on topic.

You will not spam. (Spam is flooding the Internet with unnecessary or out of topic comments)

You will not include links to websites and videos not associated with the topic.

You will not post the same comment multiple times on the same of different articles

You will not solicit anyone to buy or sell products or services, or to make donations of any kind. You will not include links to products in your status updates, comments, articles or groups.

You will not post anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

You will not make threats to other users or people not associated with the site.

If you violate these rules, your comment(s) and/or user name will be deleted.

Back to Top ^

# 21. Groups

https://www.infowars.com/terms-of-service/ | Go | JAN FEB MAR
266 captures
24 Apr 2013 - 21 Feb 2018
2017 2018 2019
About this capture

Your group will not be based on anything libelous, defamatory, harmful, threatening, harassing, abusive, invasive of another's privacy, hateful, racially or ethnically objectionable, or otherwise illegal.

Your group will not solicit anyone to buy or sell products or services, or to make donations of any kind.

8/1/2018

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 358 of 608

https://www.infowars.com/terms-of-service/ Go

266 captures
24 Apr 2013 - 21 Feb 2018

JAN **FEB** MAR
◀ **14** ▶
**2017** **2018** 2019

▼ About this capture

© 2018 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

| | | |
|---|---|---|
| Radio | Archive | About Alex Jones Show |
| Video | Watch Alex Jones Show | Subscribe |
| PPTV | Most Recent | Contact |
| Store | D.M.C.A. | |
| Infowars Life | Corrections | |
| T.O.S. | | |

© 2018 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

# EXHIBIT H

# Plaintiff's Proposed Written Discovery

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

**PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, ALEX E. JONES**

---

TO:     Defendant, Alex E. Jones, by and through his attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Alex E. Jones, under the Texas Rules of Civil Procedure.  Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN

State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of  record in compliance with the Texas Rules of Civil Procedure on this 27th day of August,  2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.


***<u>Via E-Sevice: fly63rc@verizon.net</u>***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

_____
MARK D. BANKSTON

## <u>DEFINITIONS</u>

As used herein, the words defined below shall be deemed to have the following meanings:

1.    "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession.

2.    "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession.

3.    "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.    "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5.    "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT ALEX E. JONES

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that as of June 26, 2017, you had the right to direct or control the work performed by employees of Free Speech Systems, LLC and InfoWars, LLC.

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT ALEX E. JONES

**INTERROGATORY NO. 1:** Describe your job duties, responsibilities, and authority with Free Speech Systems, LLC as of June 26, 2017.

**ANSWER:**

**INTERROGATORY NO. 2:** Describe your job duties, responsibilities, and authority with InfoWars, LLC as of June 26, 2017.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe your education and training in journalism.

**ANSWER:**

**INTERROGATORY NO. 4:** Describe your process for ensuring that factual assertions made in InfoWars programming are vetted for accuracy as of June 26, 2017.

**ANSWER:**

**INTERROGATORY NO. 5:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
## TO DEFENDANT ALEX E. JONES

**REQUEST FOR PRODUCTION NO. 1:** All communications, including letters, memoranda, emails, text messages, instant messenger logs, or other electronic communications in which the follow topics are referenced:

        a) Sandy Hook
        b) Neil Heslin or his son
        c) Dr. Wayne Carver
        d) Zero Hedge
        e) Jim Fetzer

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications between you and Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding policies and procedures for the factual vetting for reporting on InfoWars programming.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All communications between you and Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding Megyn Kelly.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All contracts between you, Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF** _____ | § |

    **BEFORE ME**, the undersigned notary public, on this day personally appeared ALEX E. JONES, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.

_____
ALEX E. JONES

**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

**PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, OWEN SHROYER**

---

TO:    Defendant, Owen Shroyer, by and through his attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Owen Shroyer, under the Texas Rules of Civil Procedure. Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066

mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 27th day of August, 2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.

***<u>Via E-Sevice: fly63rc@verizon.net</u>***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

_____
MARK D. BANKSTON

## <u>DEFINITIONS</u>

As used herein, the words defined below shall be deemed to have the following meanings:

1.  "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession.

2.  "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession.

3.  "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.  "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5.  "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

<div align="center">

**PLAINTIFF'S FIRST SET OF ADMISSIONS**
**TO DEFENDANT OWEN SHROYER**

</div>

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that on June 25-26, 2017, you knew it was possible that Neil Heslin held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that on June 25-26, 2017, you had no legitimate basis to claim it was impossible for Neil Heslin to have held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that as of June 26, 2017, you were employed by Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 5:** Admit that as of June 26, 2017, Alex Jones had the right to direct or control the work you perform.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:** Admit that as of June 26, 2017, agent(s) of InfoWars, LLC had the right to direct or control the work you perform.

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT OWEN SHROYER

**INTERROGATORY NO. 1:** Identify every step you took in assessing the credibility of Jim Fetzer.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify every step you took in assessing the credibility of Zero Hedge.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe your education and training in journalism.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
TO DEFENDANT OWEN SHROYER**

**REQUEST FOR PRODUCTION NO. 1:** All communications, including letters, memoranda, emails, text messages, instant messenger logs, or other electronic communications in which the follow topics are referenced:

    a)  Sandy Hook
    b)  Neil Heslin or his son
    c)  Dr. Wayne Carver
    d)  Zero Hedge
    e)  Jim Fetzer

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications between you and Alex Jones, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding policies and procedures for the factual vetting for reporting on InfoWars programming.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All communications between you and Alex Jones, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding Megyn Kelly.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

**STATE OF TEXAS**           §
                             §
**COUNTY OF _____** §

    **BEFORE ME**, the undersigned notary public, on this day personally appeared OWEN SHROYER, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.


_____
OWEN SHROYER


**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.


_____
Notary Public in and for the State of Texas


My Commission Expires:


_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, FREE SPEECH SYSTEMS, LLC

TO:   Defendant, Free Speech Systems, LLC, by and through its attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Free Speech Systems, LLC, under the Texas Rules of Civil Procedure.  Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules.  Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com

KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 27th day of August,  2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.


***<u>Via E-Sevice: fly63rc@verizon.net</u>***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254


_____
MARK D. BANKSTON

## **DEFINITIONS**

As used herein, the words defined below shall be deemed to have the following meanings:

1.    "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession, including communications in the custody of any employee or agent of Free Speech Systems LLC.

2.    "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession, including documents in the custody of any employee or agent of Free Speech Systems LLC.

3.    "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.    "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5.    "Organizational chart" means a diagram that shows the structure of an organization and the relationships and relative ranks of its parts and positions/jobs.

6.    "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that on June 26, 2017, Free Speech Systems, LLC knew it was possible that Neil Heslin held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that Free Speech Systems, LLC was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that Free Speech Systems, LLC possesses intellectual property rights and copyright over the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these discovery requests and identify their job duties at Free Speech Systems, LLC.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

**INTERROGATORY NO. 3:** Identify every employee or agent of Free Speech Systems, LLC who was involved in the creation, research, editing, marketing, funding, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," and describe their specific role.

**ANSWER:**

**INTERROGATORY NO. 4:** State your principal place of business, including mailing address, physical address, and telephone number.

**ANSWER:**

**INTERROGATORY NO. 5:** For each person who had ownership interest in Free Speech Systems, LLC on June 26, 2017, state:

     a)    their full name, address, telephone number, as well as each business address and each business telephone number.

     b)    the date(s) upon which the person acquired their ownership interest.

     c)    the consideration paid or promised for the ownership interest and the date(s) on which it was paid or promised.

     d)    the nature of percentage of that individual's ownership interest.

     e)    whether the person is related by blood or marriage to any other person who is or has been a shareholder, officer, or director of Free Speech Systems, LLC, and, if so, the identity of the other person and the nature of the relationship.

**ANSWER:**

**INTERROGATORY NO. 6:** Identify each person who has served as an officer, director, or management-level employee of Free Speech Systems, LLC at any time during the past five years.

**ANSWER:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**REQUEST FOR PRODUCTION NO. 1:** A copy of all documents relating to Sandy Hook which have been deleted or removed from public availability since the inception of this lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications which reference the following topics:

- a) Neil Heslin or his son
- b) Dr. Wayne Carver
- c) Zero Hedge
- d) ZeroPointNow
- e) iBankCoin.com
- f) Jim Fetzer

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** Transcripts of all InfoWars videos in which Sandy Hook is discussed.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** Transcripts of all InfoWars videos in which the Plaintiff is discussed.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications, including letters, memoranda, emails, text messages, instant messenger logs, or other electronic communications in which Sandy Hook is discussed.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** A copy of all articles featuring Sandy Hook posted on a website operated under the brand name "InfoWars" from December 14, 2012 to June 25, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** All documents or communications relating to the July 20, 2017 video in which the June 26 video featuring Mr. Shroyer was re-published.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** All documents or communications relating to the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed."

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** All documents relating to disciplinary or corrective actions taken against any employee or agent of InfoWars due to the publication of false or incorrect information during the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** All documents used to train or instruct InfoWars' employees of the vetting of factual information for publication, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** All documents reflecting policies for the factual vetting of information published by InfoWars, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** All documents setting forth InfoWars' editorial standards or guidelines, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:** All documents setting forth InfoWars' prior or superseded editorial standards or guidelines, as in effect between December 14, 2012 and June 25, 2017.
**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:** All documents setting forth InfoWars' disciplinary rules or code of conduct for reporters and editorial staff, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:** All documents setting forth InfoWars' prior or superseded disciplinary rules or code of conduct for reporters and editorial staff, as in effect between December 14, 2012 and June 25, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:** All documents contained within Owen Shroyer's personnel file.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:** Owen Shroyer's employment agreement.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:** An organizational chart for Free Speech Systems, LLC as of June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 22:** All documents or communications exchanged between any agent of Free Speech Systems, LLC and any agent of InfoWars, LLC regarding the operation of the InfoWars website, the operation or maintenance of the InfoWars studios, the sale or promotion of supplements or other products on the InfoWars website or in InfoWars' programming, or the employment or compensation of on-air personalities, researchers, journalists, editors, videographers, visual effect artists, camera operators, or crew involved in the production of The Alex Jones Show.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 23:** All documents or communications reflecting the ownership of The Alex Jones Show, InfoWars.com, the InfoWars' brand, and its related intellectual property from 2017 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 24:** All contracts in effect between Free Speech Systems, LLC and InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25:** All documents or communications relating to any parent of a child killed in the Sandy Hook massacre.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26:** All incorporating documents for Free Speech Systems,

LLC, including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 27:** All documents reflecting any loans made to Free Speech Systems, LLC by any named party or any shareholder, officer, or director of Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 28:** All documents reflecting any loans made to any named party or any shareholder, officer, or director of Free Speech Systems, LLC by Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 29:** All documents reflecting any occasion in which a person or entity ever agreed to guaranty or cosign any obligation of Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 30:** All documents reflecting any occasion in which Free Speech Systems, LLC ever agreed to guaranty or cosign any obligation of another person or entity.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 31:** Copies of the minutes of all meetings of shareholders or Board of Directors of Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 32:** For each bank account maintained in the name of Free Speech Systems, LLC, a copy of the monthly statement for the period beginning April 2015 and ending in April 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 33:** Copies of the federal tax returns of Free Speech Systems, LLC, including all schedules and attachments, for each of the past five years.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

**STATE OF TEXAS**       §
                                           §
**COUNTY OF** _____ §

      **BEFORE ME**, the undersigned notary public, on this day personally appeared _____, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.

_____
AFFIANT

**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

**PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, INFOWARS, LLC**

---

TO:     Defendant, InfoWars, LLC, by and through its attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, InfoWars, LLC, under the Texas Rules of Civil Procedure. Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com

KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 27th day of August,  2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.

***Via E-Sevice: fly63rc@verizon.net***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

_____

MARK D. BANKSTON

# <u>DEFINITIONS</u>

As used herein, the words defined below shall be deemed to have the following meanings:

1.  "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession, including communications in the custody of any employee or agent of InfoWars LLC.

2.  "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession, including documents in the custody of any employee or agent of InfoWars LLC.

3.  "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.  "Organizational chart" means a diagram that shows the structure of an organization and the relationships and relative ranks of its parts and positions/jobs.

5.  "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT INFOWARS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that InfoWars, LLC was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that InfoWars, LLC possesses intellectual property rights and copyright over any part of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that InfoWars, LLC derives revenue from the sale of supplements promoted in InfoWars programming and on the InfoWars website.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that InfoWars, LLC has the authority to remove content from InfoWars.com if InfoWars, LLC determines that the content violates the rights of others or is not appropriate for the website.

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## <u>TO DEFENDANT INFOWARS, LLC</u>

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these discovery requests and identify their job duties at InfoWars, LLC.

**ANSWER:**

**INTERROGATORY NO. 2:** Describe the business purpose of InfoWars, LLC.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe all the ways in which InfoWars, LLC generates revenue.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify every employee or agent of InfoWars, LLC who was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," and describe their specific role.

**ANSWER:**

**INTERROGATORY NO. 5:** Identify the factual basis for any defense(s) to the causes of actions asserted in Plaintiff's petition.

**ANSWER:**

**INTERROGATORY NO. 6:** Does InfoWars, LLC share office space with any other named party?

**ANSWER:**

**INTERROGATORY NO. 7:** Does InfoWars, LLC share common employees with any other named party?

**ANSWER:**

**INTERROGATORY NO. 8:** Has an employee or agent of InfoWars, LLC ever rendered services on behalf on any named other party, or has an employee or agent of any named party ever rendered services on behalf on InfoWars, LLC? Describe.

**ANSWER:**

**INTERROGATORY NO. 9:** Has InfoWars, LLC ever made an undocumented transfer of funds to any named party, or has any named party ever made an undocumented transfer of funds to InfoWars, LLC? Describe.

**ANSWER:**

**INTERROGATORY NO. 10:** State your principal place of business, including mailing address, physical address, and telephone number.

**ANSWER:**

**INTERROGATORY NO. 11:** For each person who had ownership interest in InfoWars, LLC on June 26, 2017, state:

      a)      their full name, address, telephone number, as well as each business address and each business telephone number.

      b)      the date(s) upon which the person acquired their ownership interest.

      c)      the consideration paid or promised for the ownership interest and the date(s) on which it was paid or promised.

      d)      the nature of percentage of that individual's ownership interest.

      e)      whether the person is related by blood or marriage to any other person who is or has been a shareholder, officer, or director of InfoWars, LLC, and, if so, the identity of the other person and the nature of the relationship.

**ANSWER:**

**INTERROGATORY NO. 12:** Identify each person who has served as an officer, director, or management-level employee of InfoWars, LLC at any time during the past five years.

**ANSWER:**

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION**
**TO DEFENDANT INFOWARS, LLC**

**REQUEST FOR PRODUCTION NO. 1:** An organizational chart for InfoWars, LLC as of June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications exchanged between any agent of InfoWars, LLC and any agent of Free Speech Systems, LLC or Alex Jones regarding the operation of the InfoWars website, the operation or maintenance of the InfoWars studios, the sale or promotion of supplements or other products on the InfoWars website or in InfoWars' programming, or the employment or compensation of on-air personalities, researchers, journalists, editors, videographers, visual effect artists, camera operators, or crew involved in the production of The Alex Jones Show.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All contracts in effect between InfoWars, LLC and any other party.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All documents in the possession of InfoWars, LLC regarding the ownership, management, or administration of the InfoWars.com website.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All incorporating documents for InfoWars, LLC, including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All documents reflecting any loans made to InfoWars, LLC by any named party or any shareholder, officer, or director of InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All documents reflecting any loans made to any named party or any shareholder, officer, or director of InfoWars, LLC by InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** All documents reflecting any occasion in which a person or entity ever agreed to guaranty or cosign any obligation of InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** All documents reflecting any occasion in which InfoWars, LLC ever agreed to guaranty or cosign any obligation of another person or entity.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** Copies of the minutes of all meetings of shareholders or Board of Directors of InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** For each bank account maintained in the name of InfoWars, LLC, a copy of the monthly statement for the period beginning April 2015 and ending in April 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** Copies of the federal tax returns of InfoWars, LLC, including all schedules and attachments, for each of the past five years

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** All documents or communications reflecting the ownership of The Alex Jones Show, InfoWars.com, the InfoWars' brand, and its related intellectual property from 2017 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** All contracts in effect between Free Speech Systems, LLC and InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** All documents or communications in the possession of InfoWars, LLC relating to The Alex Jones Show.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:** All incorporating documents for InfoWars, LLC, including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:** All documents reflecting any loans made to InfoWars, LLC by any named party or by any shareholder, officer, or director of Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 28:** All documents reflecting any loans made to any named party or any shareholder, officer, or director of Free Speech Systems, LLC by InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 29:** All documents reflecting any occasion in which a person or entity ever agreed to guaranty or cosign any obligation of InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 30:** All documents reflecting any occasion in which InfoWars, LLC ever agreed to guaranty or cosign any obligation of another person or entity.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 31:** Copies of the minutes of all meetings of shareholders or Board of Directors of InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 32:** For each bank account maintained in the name of InfoWars, LLC, a copy of the monthly statement for the period beginning April 2015 and ending in April 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 33:** Copies of the federal tax returns of InfoWars, LLC, including all schedules and attachments, for each of the past five years.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

**STATE OF TEXAS**    §
                      §
**COUNTY OF _____**    §

      **BEFORE ME**, the undersigned notary public, on this day personally appeared _____, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.


_____
AFFIANT


**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.


_____
Notary Public in and for the State of Texas


My Commission Expires:


_____

# EXHIBIT I

# Notice of Violation to InfoWars, LLC by the State of California

**NOTICE OF VIOLATION**

California Safe Drinking Water
and Toxic Enforcement Act

Lead in Infowars Life Dietary Supplements
Sold in Capsule & Powder Form

October 16, 2017

      This Notice of Violation is provided to you pursuant to and in compliance with California Health and Safety Code section 25249.7(d).

- For general information regarding the California Safe Drinking Water and Toxic Enforcement Act, see the attached summary provided by the California EPA (copies not provided to public enforcement agencies).

- This Notice of Violation is provided by the Center for Environmental Health ("CEH"), 2201 Broadway, Suite 302, Oakland, CA 94612, (510) 655-3900.  CEH is a nonprofit corporation dedicated to protecting the environment, improving human health, and supporting environmentally sound practices.  Charlie Pizarro is the Associate Director of and a responsible individual within CEH.

**Description of Violation:**

- <u>Violators</u>:  The names of the violators are Free Speech Systems, LLC and Infowars, LLC.

- <u>Time Period of Exposure</u>:  The violations have been occurring since at least October 16, 2014, and are ongoing.

- <u>Provision of Proposition 65</u>:  This Notice of Violation covers the "warning provision" of Proposition 65, which is found at California Health and Safety Code Section 25249.6.

- <u>Chemical(s) Involved</u>:  The names of the listed chemicals involved in these violations are lead and lead compounds ("Lead").  Exposures to Lead occur from consumption of the products identified in this Notice.

- <u>Type of Product</u>:  The specific type of product causing these violations is Infowars Life dietary supplements sold in capsule and powder form.  Non-exclusive examples of this specific type of product are the Infowars Life Caveman True Paleo Formula Powder, Chocolate Formula, SKU No. IWL-CAVEMAN-1, and the Infowars Life Myco-ZX Dietary Supplement, SKU No. IWL-MYCOZX-1, UPC No. 7-89185-75865-3.

- <u>Description of Exposure</u>:  This Notice addresses consumer exposures to Lead. Consumption of the products identified in this Notice results in human exposures to Lead.  The products contain Lead.  The primary route of exposure for the

Exhibit I

violations is direct ingestion when individuals consume the products.  These exposures occur in homes, workplaces and everywhere else throughout California where the products are consumed.  No clear and reasonable warning is provided with these products regarding the carcinogenic or reproductive hazards of Lead.

**Resolution of Noticed Claims:**

Based on the allegations set forth in this Notice, CEH intends to file a citizen enforcement lawsuit against the alleged violators unless such violators agree in a binding written instrument to: (1) recall products already sold; (2) provide clear and reasonable warnings for products sold in the future or reformulate such products to eliminate the Lead exposures; and (3) pay an appropriate civil penalty based on the factors enumerated in California Health and Safety Code section 25249.7(b).  If the alleged violators are interested in resolving this dispute without resort to expensive and time-consuming litigation, please feel free to contact CEH through its counsel identified below.  It should be noted that CEH cannot: (1) finalize any settlement until after the 60-day notice period has expired; nor (2) speak for the Attorney General or any District or City Attorney who received CEH's 60-day Notice.  Therefore, while reaching an agreement with CEH will resolve its claims, such agreement may not satisfy the public prosecutors.

**Preservation of Relevant Evidence:**

This Notice also serves as a demand that each alleged violator preserve and maintain all relevant evidence, including all electronic documents and data, pending resolution of this matter.  Such relevant evidence includes but is not limited to all documents relating to the presence or potential presence of Lead in Infowars Life dietary supplements sold in capsule and powder form; purchase and sales information for such products; efforts to comply with Proposition 65 with respect to such products; communications with any person relating to the presence or potential presence of Lead in such products; and representative exemplars of each lot of each variety of any such product sold by each alleged violator since one year prior to the date of this Notice through the date of any trial of the claims alleged in this Notice.

Please direct any inquiries regarding this Notice to CEH's counsel Eric S. Somers at Lexington Law Group, 503 Divisadero Street, San Francisco, CA 94117, (415) 913-7800, ssomers at lexlawgroup.com.

**CERTIFICATE OF MERIT**
**Health & Safety Code § 25249.7(d)**

I, Eric S. Somers, hereby declare:

1.      This Certificate of Merit accompanies the attached sixty-day notice in which it is alleged that the parties identified in the notice have violated Health & Safety Code § 25249.6 by failing to provide clear and reasonable warnings.

2.      I am an attorney with the Lexington Law Group, and I represent the noticing party, the Center for Environmental Health.

3.      Members of my firm and I have consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies or other data regarding the exposures to the listed chemical that is the subject of the action.

4.      Based on the information obtained through those consultations, and on other information in my possession, I believe there is a reasonable and meritorious case for the private action.  I understand that "reasonable and meritorious case for the private action" means that the information provides a credible basis that all elements of the plaintiff's case can be established and the information did not prove that the alleged violators will be able to establish any of the affirmative defenses set forth in the statute.

5.      The copy of the Certificate of Merit served on the Attorney General attaches to it factual information sufficient to establish the basis for this certificate, including the information identified in Health & Safety Code § 25249.7(h)(2), i.e. (1) the identity of the persons consulted with and relied on by the certifier, and (2) the facts, studies or other data reviewed by those persons.

October 16, 2017

Eric S. Somers
Attorney for CENTER FOR
ENVIRONMENTAL HEALTH

**PROOF OF SERVICE BY MAIL AND ELECTRONIC MAIL**

I declare that:

    I am employed in San Francisco County, California; my business address is 503 Divisadero Street, San Francisco, California 94117. I am over the age of 18 years and not a party to the within cause and my electronic notification address is aklompus@lexlawgroup.com.

    On October 16, 2017, I served true copies of the following documents:

        **NOTICE OF VIOLATION OF CALIFORNIA SAFE DRINKING WATER AND TOXIC ENFORCEMENT ACT;**

        **CERTIFICATE OF MERIT;** and

        **THE SAFE DRINKING WATER AND TOXIC ENFORCEMENT ACT OF 1986 (PROPOSITION 65): A SUMMARY** (only sent to those on service list marked with an asterisk).

    On this date, I deposited fully prepaid and sealed envelopes containing the above-mentioned documents with the United States Postal Service, addressed to the following individuals:

        *Please see attached service list.*

    Also on this date, I transmitted via electronic mail the documents listed above to the electronic mail addresses set forth below at 5 : 20 p.m. on October 16, 2017:

Stacey Grassini, Deputy District Attorney
Contra Costa County
900 Ward Street
Martinez, CA 94553
sgrassini@contracostada.org

Michelle Latimer, Program Coordinator
Lassen County
220 S. Lassen Street
Susanville, CA 96130
mlatimer@co.lassen.ca.us

Yen Dang
Supervising Deputy District Attorney
Santa Clara County
70 West Hedding Street, West Wing
San Jose, CA 95110
epu@da.sccgov.org

Allison Haley, District Attorney
Napa County
931 Parkway Mall
Napa, CA 94559
CEPD@countyofnapa.org

Stephan R. Passalacqua, District Attorney
Sonoma County
600 Administration Drive, Rm. 212J
Santa Rosa, CA 95403
jbarnes@sonoma-county.org

Phillip J. Cline, District Attorney
Tulare County
221 S. Mooney Avenue, Rm. 224
Visalia, CA 93291
Prop65@co.tulare.ca.us

Paul E. Zellerbach, District Attorney
Riverside County
4075 Main Street
Riverside, CA 92501
Prop65@rivcoda.org

Jeff W. Reisig, District Attorney
Yolo County
301 Second Street
Woodland, CA 95695
cfepd@yolocounty.org

Dije Ndreu, Deputy District Attorney
Monterey County
1200 Aguajito Road
Monterey , CA  93940
Prop65DA@co.monterey.ca.us

Tori Verber Salazar, District Attorney
San Joaquin County
222 E. Weber Avenue, Room 202
Stockton, CA  95202
DAConsumer.Environmental@sjcda.org

Gregory D. Totten, District Attorney Ventura
County
800 South Victoria Avenue
Ventura, CA 93009
daspecialops@ventura.org

Gregory Alker, Assistant District Attorney
San Francisco County
732 Brannan Street
San Francisco, CA  94103
gregory.alker@sfgov.org

Anne Marie Schubert, District Attorney
Sacramento Country
901 G Street
Sacramento, CA  95814
Prop65@sacda.org

Eric J. Dobroth, Deputy District Attorney
San Luis Obispo County
County Government Center Annex, 4th Floor
San Luis Obispo, CA  93408
edobroth@co.slo.ca.us

The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on October 16, 2017, at San Francisco, California.

.

Signed: _____
              Adriana Klompus

**SERVICE LIST**

District Attorney of Alameda County
1225 Fallon Street, Rm. 900
Oakland, CA 94612

District Attorney of Alpine County
P.O. Box 248
Markleeville, CA 96120

District Attorney of Amador County
708 Court Street, Ste. 202
Jackson, CA 95642

District Attorney of Butte County
Administration Building
25 County Center Drive
Oroville, CA 95965

District Attorney of Calaveras
County
891 Mountain Ranch Road
San Andreas, CA 95249

District Attorney of Colusa County
346 Fifth Street, Suite 101
Colusa, CA 95932

District Attorney of Del Norte County
450 H Street, Ste. 171
Crescent City, CA 95531

District Attorney of El Dorado
County
515 Main Street
Placerville, CA 95667

District Attorney of Fresno County
2220 Tulare Street, Ste. 1000
Fresno, CA 93721

District Attorney of Glenn County
P.O. Box 430
Willows, CA 95988

District Attorney of Humboldt County
825 5th Street
Eureka, CA 95501

District Attorney of Imperial County
939 Main Street, Ste. 102
El Centro, CA 92243

District Attorney of Inyo County
P.O. Drawer D
Independence, CA 93526

District Attorney of Kern County
1215 Truxtun Avenue
Bakersfield, CA 93301

District Attorney of Kings County
1400 West Lacey Blvd.
Hanford, CA 93230

District Attorney of Lake County
255 N. Forbes Street
Lakeport, CA 95453

District Attorney of Los Angeles
County
Hall of Justice
211 W. Temple Street, Ste. 1200
Los Angeles, CA  90012-3210

District Attorney of Madera County
209 West Yosemite Avenue
Madera, CA 93637

District Attorney of Marin County
3501 Civic Center Drive, Rm. 130
San Rafael, CA 94903

District Attorney of Mariposa County
P.O. Box 730
Mariposa, CA 95338

District Attorney of Mendocino
County
P.O. Box 1000
Ukiah, CA 95482

District Attorney of Merced County
2222 "M" Street
Merced, CA 95340

District Attorney of Modoc County
204 S. Court Street, Rm. 202
Alturas, CA 96101-4020

District Attorney of Mono County
P.O. Box 617
Bridgeport, CA 93546

District Attorney of Nevada County
201 Commercial Street
Nevada City, CA 95959

District Attorney of Orange County
401 Civic Center Drive West
Santa Ana, CA 92701

District Attorney of Placer County
10810 Justice Center Drive, Ste.
240
Roseville, CA 95678

District Attorney of Plumas
County
520 Main Street, Rm. 404
Quincy, CA 95971

District Attorney of San Benito
County
419 Fourth Street, 2nd Fl.
Hollister, CA 95023

District Attorney of San
Bernardino County
316 N. Mountain View Avenue
San Bernardino, CA 92415

District Attorney of San Diego
County
330 West Broadway, Ste. 1300
San Diego, CA 92101

District Attorney of San Mateo
County
400 County Center, 3rd Fl.
Redwood City, CA 94063

District Attorney of Santa Cruz
County
701 Ocean Street, Rm. 200
Santa Cruz, CA 95060

District Attorney of Santa
Barbara County
1112 Santa Barbara Street
Santa Barbara, CA 93101

District Attorney of Shasta
County
1355 West Street
Redding, CA 96001

District Attorney of Sierra County
Courthouse
100 Courthouse Sq., 2nd Fl.
Downieville, CA 95936

District Attorney of Siskiyou
County
P.O. Box 986
Yreka, CA 96097

District Attorney of Solano County
675 Texas Street, Ste. 4500
Fairfield, CA 94533

District Attorney of Stanislaus County
832 12th Street, Ste. 300
Modesto, CA 95354

District Attorney of Sutter County
446 Second Street
Yuba City, CA 95991

District Attorney of Tehama County
P.O. Box 519
Red Bluff, CA 96080

District Attorney of Trinity County
P.O. Box 310
11 Court Street
Weaverville, CA 96093

District Attorney of Tuolumne County
423 N. Washington Street
Sonora, CA 95370

District Attorney of Yuba County
215 Fifth Street
Marysville, CA 95901

Los Angeles City Attorney's Office
City Hall East
200 N. Main Street, Rm. 800
Los Angeles, CA  90012

San Diego City Attorney's Office
1200 Third Avenue, Ste. 1620
San Diego, CA  92101

San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102

San Jose City Attorney's Office
200 East Santa Clara Street
San Jose, CA  95113

California Attorney General's Office
Attention: Proposition 65 Coordinator
and Robert Thomas
1515 Clay Street, Ste. 2000
P.O. Box 70550
Oakland, CA 94612-0550

Alex Jones, Manager*
Free Speech Systems, LLC
3005 S. Lamar Blvd., Ste D109-317
Austin, TX 78704

Free Speech Systems, LLC
c/o Eric Taube
100 Congress Avenue, 18th Floor
Austin, TX 78701

Infowars, LLC*
c/o Elizabeth M. Schurig
100 Congress Avenue, 22nd Floor
Austin, TX 78701

Alex Jones, Manager*
Infowars, LLC
P.O. Box 19549
Austin, TX 78760

8/27/2018 5:39 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT

COME NOW, Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively, the "Defendants"), and hereby file this supplemental affidavit in support of their Motion to Dismiss Under the Texas Citizens' Participation Act.

Defendants' hereby file the Affidavit of Mark C. Enoch attached hereto."

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

        */s/ Mark C. Enoch*
Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:    972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August, 2018, the foregoing was sent via efiletxcourts.gov's e-service system to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com


_____/s/ Mark C. Enoch_____
Mark C. Enoch

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF MARK C. ENOCH</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

I, Mark C. Enoch, do hereby declare under penalty of perjury that the following is true and correct.

1.      My name is Mark C. Enoch.  I am fully competent and capable in all respects to make this Affidavit. As lead counsel in this case, I have become familiar with the facts by reviewing documents and speaking with witnesses, I have read the pleadings and discovered and reviewed evidence and have studied the statutory and common law relating to the causes of action alleged by Plaintiff, the law relating to the defenses and the law relating to application of the Texas Citizens Participation Act. Based upon my role as lead counsel in this case and the work that I have done, I have personal knowledge of all of the facts stated in this Affidavit, and they are true and correct.  This Affidavit is submitted in connection with Defendants' Motion to Dismiss filed in the above-styled litigation.

2.      I am an attorney duly licensed to practice law in the State of Texas and have been continuously licensed and have practiced civil trial and appellate law since 1979.  I am with the law firm of Glast, Phillips & Murray, P.C. which represents the Defendants in the above-styled litigation.  My practice has been devoted to civil litigation such as this in state and federal court. I have been continuously certified in civil trial law by the Texas Board of Legal Specialization since 1988. I have also been involved in civil appeals and have prepared appellate briefs and arguments.

3.      My standard hourly billing rate and my hourly billing rate for this matter is $535. The other senior-level attorneys, associate attorneys and paralegal who have worked on this matter also have billed at the firm's standard hourly billing rates for each such senior-level attorney, associate attorneys and paralegal. The hourly billing rates for the two other senior-level attorneys is $390 and $400 respectively.  The hourly billing rates for the two associates are $290 and $300 respectively. The firm's standard hourly billing rate for the paralegal who has worked on this matter is $110.

4.      I am familiar with rates charged by attorneys and paralegals in Dallas and surrounding counties as well as rates charged by attorneys and paralegals in Travis and surrounding counties for civil litigation matters and these hourly rates are reasonable when compared to customary and typical hourly rates charged in those areas of Texas for attorneys with similar education, experience, training and abilities.

5.      The total of fees billed by Glast, Phillips & Murray and incurred by Defendants through August 26, 2018 in connection with this matter is $130,478.90. Based on my education, experience and training, it is my opinion that a.) the law firm's

hourly rates are reasonable and typical and customary for similar legal services in Travis and Dallas Counties and b.) that the total fees billed as of that date were and are both reasonable and necessary to properly defend Plaintiff's claims. It is my further opinion based upon my education, training and experience that the time expended on each individual task completed by Glast, Phillips & Murray in this matter was appropriate, reasonable and necessary and that the lawyer and/or paralegal was appropriately assigned to each task. The total amount incurred by Defendants includes fees associated with, among other things, reviewing the lawsuit pleadings, reviewing broadcasts and videos relevant to Plaintiff's claims and the defenses, investigating the allegations, interviewing witnesses, drafting a response to the lawsuit, researching the Motion to Dismiss, drafting, editing and revising the Motion to Dismiss, determining what evidence is appropriate, researching Plaintiff and his public activities, editing and revising affidavits for evidence, researching appropriate defenses, drafting the First Amended Answer, reviewing Plaintiff's Motion for Sanctions and Plaintiff's Motion for Expedited Discovery, researching, drafting and filing a response to same, and reviewing and responding to communications with counsel and others.

6.      Furthermore, I estimate that further legal work will be reasonable and necessary to supplement the Motion to Dismiss and affidavits, receive, review and respond to additional filings by Plaintiff, prepare for the hearing on the Motion to Dismiss, travel to Travis County for the hearing and argue the motion and prepare correspondence and draft orders regarding the hearing and the Court's rulings. For this anticipated legal work, I estimate, and my opinion is, based on my education, experience

and training, that Defendants will incur additional reasonable and necessary attorney fees in an amount of approximately $43,725.00. I estimate that Defendants will incur additional expenses related to the hearing in an amount of approximately $300.00. I estimate that reasonable and necessary travel expenses for two lawyers will be approximately $1,100.00.

7.      Additionally, I estimate, and my opinion is, that in the event of an appeal by either Plaintiff or Defendants from a decision of this Honorable Court to the Court of Appeals, Defendants will incur an additional amount of at least $32,000.00 in reasonable and necessary attorney fees. If Defendants appeal to the Court of Appeals, I estimate $30,000.00 in reasonable and necessary attorney fees. If Plaintiff appeals to the Supreme Court of Texas and briefing is not requested, I estimate, and my opinion is, that Defendants will incur additional reasonable and necessary attorney fees in the amount of $5,000.00. If the Texas Supreme Court requests briefing, I estimate, and my opinion is, that Defendants will incur additional reasonable and necessary attorney fees in an amount of at least $28,000.00. Finally if Defendants appeal to the Supreme Court of Texas, I estimate, and my opinion is, that Defendants will incur additional reasonable and necessary attorney's fees in an amount of at least $30,000.00.

8.      Based upon my education, experience and training, it is my opinion that the above rates and amounts are reasonable and necessary for the services rendered and to be rendered considering, among other things, the novelty and difficulty of the issues involved, the skill and training of the lawyers involved and the skill required to provide the legal services properly, the time and labor involved to perform the legal services

properly, the fee customarily charged in the community for similar services, time constraints placed on the lawyers by the clients and circumstances of the case and the issues and amounts involved and the results obtained.

Executed in Dallas County, State of Texas.

_____
Mark C. Enoch

SWORN TO and SUBSCRIBED before me by Mark C. Enoch on August __27__, 2018.



_____
Notary Public in and for
the State of Texas

My Commission Expires:

__7/3/21__

MELANIE J ILLIG
Notary Public
STATE OF TEXAS
ID#78994-4
My Comm. Exp. July 3, 2021

8/27/2018 8:38 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Terri Juarez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## DEFENDANTS' FIRST AMENDED RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS AND MOTION FOR EXPEDITED DISCOVERY AND DEFENDANTS' MOTION FOR SANCTIONS

I.

Defendants file this their First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Motion for Sanctions, in part, to insure proper notice to Plaintiff and his counsel of Defendants' request and motion for sanctions previously stated in the body of their original response at section V. but not in the heading of the pleading.

In this connection, Defendants seek sanctions against Plaintiff's counsel under Rule 13 of the Texas Rules of Civil Procedure and contend that the Plaintiff's counsel, at the time of his filing of the Motion for Sanctions, did not have a reasonable belief that the Motion was not groundless and not filed in bad faith or groundless and brought for the purpose of harassment. Furthermore, Defendants contend that Plaintiff's counsel failed to make reasonable inquiry of the facts prior to filing the Motion for Sanctions.

Defendants also seek sanctions against Plaintiff's counsel under CPRC §10.001 and §10.004. In this connection, Defendants contend that the Motion for Sanctions was filed with

little if any inquiry, that any such inquiry was not reasonable, that the pleading was filed for improper purposes, including to harass and to needlessly increase the cost of litigation, that the legal contentions in the motion were not warranted by existing law nor by a non-frivolous argument for extension, modification, or reversal of existing law or the establishment of new law and that each allegation or other factual contention in the motion did not have evidentiary support nor was any particular allegation or contention likely to have such support after reasonable opportunity for investigation and discovery.

Pursuant to Rule 13, Defendants seek their reasonable expenses, including attorney fees under Rule 215.2. Pursuant to Chapter 10 of the Texas Civil Practice and Remedies Code, §10.004 (3), Defendants also seek their reasonable expenses that they incurred because of the filing of the motion, including reasonable attorney fees.[1]

## II. SUMMARY

Plaintiff's Motion for Sanctions and counsels' arguments are simply disingenuous considering that he and his client have sought and continue to seek the removal of Defendants' content from social media and other platforms, through numerous public statements and appearances in the media, appeals to Twitter, YouTube, Facebook and numerous other social media platforms and now the court system. Now after four twitter posts have been removed but preserved by Defendants, and after the two videos Plaintiff claims in this case were defamatory were removed by YouTube at Plaintiff's insistence, Plaintiff's counsel seeks a spoliation ruling and punitive sanctions.

---

[1] Attached hereto as Exhibit "D" is the Affidavit of Mark C. Enoch.

First, Plaintiff's counsel has alleged four Twitter tweets that have been public for years and two videos already given to them have been destroyed by Defendants. Plaintiff's counsel is misinformed:

1.  Defendants have not destroyed any relevant evidence. Defendants have preserved all relevant evidence of Defendants' publications.

2.  Any comments of unknown internet users that were attached to the tweets:

    a.  are not relevant evidence to Plaintiff's claims,

    b.  were preserved to the best of Defendants' ability and although 17 comments in total appear to have not been recoverable because the commenter deleted the comment, the commenter's account was deleted, Twitter deleted the commenter's account or comment, or because the comment was lost from Defendants' cache, they were not intentionally deleted by Defendants and the vast majority of the comments were maintained,[2]

    c.  were never requested by Plaintiff from either Defendants or Twitter,

    d.  were accessible to Plaintiff and his lawyers for years at any time before August 10, 2018,

Plaintiff's motion for sanctions should be denied.

---

[2] The comments that were not able to be maintained were either previously deleted by the Twitter commenter or the commenter's account was deleted, which Defendants have no control over and could have been done years ago, or inadvertently lost on Defendants' cache. See attached Exhibit "C" paragraph 6. Defendants' intended only to remove the tweets from public access because of the imminent possibility, if found to be in violation of Twitter policies, of being banned completely by Twitter. See attached Exhibit "C" paragraph 5. This would have resulted in losing all posts and information permanently. See attached Exhibit "C" paragraph 5. There was absolutely no intent to destroy or hide any evidence at all and Defendants attempted to maintain as much information as possible. See attached Exhibit "C" paragraphs 6 and 11.

Second, Plaintiff's motion for TCPA pre-hearing discovery should be denied because Plaintiff has not asserted good cause as the only asserted basis to do the discovery, his motion for spoliation sanctions, is unfounded. Further, the broad and extensive discovery sought is not permitted by the statute and would defeat the purpose behind the statute, which is designed to be an efficient and cost effective safeguard of constitutional rights.

Third, Plaintiff's lawyers have breached their Rule 13 and Chapter 10 duties to make reasonable inquiry before filing their motion for sanctions and filing those sanctions for improper purposes. The Court should consider imposing appropriate sanctions upon Plaintiff's lawyers for their failure to make reasonable inquiry and filing the sanctions motion for improper purposes. As fully described in the Defendants' motions to dismiss in the Pozner and Heslin cases, Plaintiffs in both cases and their common counsel have sought and obtained wide-spread publicity in their extra-judicial attempts to silence Jones and those who agree with him on various political issues.[3] Just as with their national media appearances and letters to editors[4] designed in part to shame public use platforms such as Google, YouTube, Facebook, and Twitter into removing all of Jones' content, counsel filed their baseless motion for sanctions to stir additional negative publicity about Defendants.

### III. TEST FOR SPOLIATION

To establish spoliation, Plaintiff must show: (1) Defendants had a duty to preserve the particular relevant evidence, (2) Defendants wrongfully did not preserve the relevant evidence,

---

[3] Mr. Bankston's letter dated May 25, 2018 makes his intentions clear when he states that they "plan to make available to the general public and media copies of all correspondence and pleading which arise in this lawsuit, including this letter." See Exhibit "B," Declaration of David Jones paragraph 15, Exhibit B-89

[4] See Affidavit of Mark C. Enoch attached hereto as Exhibit A and Huffington Post article attached as Exhibit "A-1"

and (3) Defendants' conduct prejudiced Plaintiff. *See Clark v. Randalls Food*, 317 S.W.3d 351,356 (Tex. App.-- Houston [1st Dist.] 2010, pet. denied).

## IV. DEFENDANTS HAVE COMMITTED NO SPOLIATION AND HAVE PRESERVED ALL RELEVANT EVIDENCE.

### A. Plaintiff complains of four years-old tweets and two delivered videos.

Plaintiff complains that four tweets, one from 2012, two from 2014, and one from 2015, have been deleted from public viewing on Twitter. Plaintiff complains these four tweets were removed this month after being up for public viewing and viewing and copying by him and his lawyers for years. Plaintiff complains this removal of tweets from public viewing is spoliation of relevant evidence. Plaintiff also complains that two videos have been removed from public viewing on YouTube, and claims that this removal from public viewing is spoliation.

### B. Defendants have destroyed no relevant evidence but have preserved all relevant evidence.

Plaintiff is confused about how social media and computers work. Stopping publication by removing a page from a computer screen accessed by the public does not destroy the file on the computers providing the screen with the file in the first place.

The four tweets have not been destroyed and have been preserved by Defendants.[5] The two videos, one of June 25, 2017[6], and one of July 20, 2017 are actually in Plaintiff's own lawyers' possession and have been since Defendants delivered copies to Plaintiff's lawyers on July 13, 2018, as evidence in support of Defendants' TCPA motion.[7]

---

[5] See attached Exhibit "C" paragraph 6.

[6] The video about which Plaintiff complains did not occur on June 26, but instead on June 25, 2017.

[7] See July 13, 2018 Motion at footnotes 172 and 304 as well as its Exhibit B, D. Jones Affidavit at paragraph 40 for video of June 25 broadcast and footnotes 79 and 80 as well as D. Jones Affidavit at paragraph 41 for video of July 20 broadcast.

---

### C. Defendants did not intentionally or negligently destroy any evidence.

"[A] party must intentionally spoliate evidence in order for a spoliation instruction to constitute an appropriate remedy." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 23-24 (Tex. 2014). "By 'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation, we mean that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Id.* at 24. "[A] trial court's finding of intentional spoliation . . . is a necessary predicate to the proper submission of a spoliation instruction to the jury." *Id.* at 25. Moreover, showing that the evidence in question was not destroyed with a fraudulent purpose or intent rebuts a spoliation claim. *Buckeye Ret. Co., L.L.C. v. Bank of Am., N.A.*, 239 S.W.3d 394, 401 (Tex. App.—Dallas 2007, no pet.)

Defendants removed from publication the four Twitter posts that were years old because of concerns that they may have been in violation of Twitter's new terms of service. This was a serious and immediate concern as Defendants had just had several of its accounts banned on numerous other social media platforms after mounting media pressure.[8] If Defendants did not remove such complained-about posts, and they would have likely been found to have violated Twitter policies, the entire account could have been permanently shut down resulting in serious injury to Defendants and the potential loss of all information related to Defendants account.[9] Twitter can potentially shut down the whole Twitter site for the user, non-violating posts as well as violating posts.[10]

Just as Defendants protected content that they feared would be destroyed by Twitter – Defendants took steps to protect other content as well. When Defendants were advised by

---

[8] See attached Exhibit "C" paragraph 5.
[9] *Id.*
[10] *Id.*

Google that their content would be removed, they hired counsel to demand that Google preserve all content.[11]

Moreover, Plaintiff admits in his motion that Mr. Jones was open about his removal of the old tweets and admits Mr. Jones expressly stated his reasoning for the tweets being removed. Defendants have openly and previously delivered copies of the two videos to Plaintiff's lawyers.[12] There is no evidence Defendants destroyed any tweets or videos at all, much less to conceal or destroy evidence.

Additionally, Plaintiff's counsel attached a declaration from Brooke Binkowski relying on her supposed expertise in online investigation. Based on her work, Plaintiff's counsel alleged that "relevant evidence has been lost" and that Mr. Jones destroyed it. In particular, Plaintiff's counsel alleges that "...it appears that this evidence is likewise lost forever." ***Yet, nowhere in Ms. Binkowski's declaration does she state that she could not and did not find the Twitter posts for which she allegedly searched.***

Indeed, in an interview she gave to NBC News which was reporting on Mr. Bankston's motion - and on the *same day that she signed her declaration* in this case, Ms. Binkowski took time for a press interview.[13]

> "Southern California journalist Brooke Binkowski has been tracking Jones' social media, and her work was cited in the Texas claim. It states Binkowski "was able to confirm that specific Infowars messages" were delsted after news reports came out about their apparent violation of Twitter's rules.
>
> "I think he might have deleted every single reference to Sandy Hook parents," she told NBC News.

---

[11] See Exhibit "B," Declaration of David Jones paragraphs 13 and 14, Exhibits B-87 and B-88.
[12] See footnote 6.
[13] See Exhibit "B," Declaration of David Jones paragraph 12, Exhibit B-86. (emphasis supplied)

---

But while the filing claims "these materials are fruitful sources of evidence," Binkowski ***says she has preserved it. "I got it all***," she said."

### D. Defendants used reasonable efforts to preserve all relevant evidence

A party must exercise reasonable care in preserving evidence, but does not have to go to extraordinary measures to preserve evidence. *Miner Dederick Constr., LLP v. Gulf Chem. & Metallurgical Corp.*, 403 S.W.3d 451,466-67 (Tex. App.--Houston [1st Dist.] 2013, pet. denied).

Defendants copied the four tweets before removing them from publication in order to avoid being in violation of Twitter policies.[14] Despite the urgency and seriousness of the situation, Defendants diligently worked to preserve all posts and comments to the posts. Although 17 comments were inadvertently lost on Defendants' cache, the vast majority of the comments were able to be maintained.[15]   Moreover, Defendants have openly delivered copies of the two videos to Plaintiff's lawyers, a fact that Plaintiff's lawyers failed to inform this Court of in Plaintiff's motion for sanctions and motion for discovery.[16]   No other reasonable efforts are required.

### E.  Plaintiff and his lawyers have had open access to the Twitter pages for years and the videos were delivered to his lawyers – they are not prejudiced.

The Twitter posts that Plaintiff complains have been removed were posted in 2012, 2014 and 2015.[17] Any Twitter user in the whole world has had access for years to those posts in their native settings and format and, for years, could copy those posts, and all the comments to those posts.  Plaintiff offers no excuse of why he and his lawyers did not do so even though this suit was filed more than four months ago.

---

[14] See attached Exhibit "C" paragraph 5.
[15] See attached Exhibit "C" paragraphs 6-10.
[16] See footnote 6.
[17] See attached Exhibit "C" paragraphs 7-10.

---

The complained of Twitter posts have been public since 2012 through 2015. Plaintiff filed his suit April 16, 2018, after the posts were available to all the world for up to six years. When Plaintiff filed this suit, he served only a request for disclosure and no request for production. Defendants answered June 18. Plaintiff has still not served a request for production or conducted any other discovery. Plaintiff has not been prejudiced in preparing his case by anything any Defendant did.

### F. Plaintiff's witness's hearsay and conclusory complaints are no evidence of spoliation.

Plaintiff attaches a set of hearsay statements which themselves contain hearsay from a witness who states, without proper foundation and as a conclusion that she is an expert "in online research and the infrastructure of social media." The witness's hearsay statements do not show any spoliation of relevant evidence.

First, the witness's statements are hearsay and contain hearsay within hearsay.

Second, the witness has not established the predicate required under TRE 702.

Third, she does not lay the proper predicate for her use of hearsay information under TRE 703.

Fourth, the witness complains that she checked a "variety of links" provided by a hearsay CNN article and she searched something called the "Internet Archive," and found the "original content" deleted from those two sources (she makes no assertion about other sources having the "content" or not), found the "primary content inaccessible" to her, and the "related discussion, commentary, or hyperlinks" inaccessible to her. She also says saved copies of a social media message leave the message somehow where "its meaning" may "often" be "inscrutable" to her.

These statements are vague, ambiguous and conclusory without sufficient predicate or foundation to show the bases of her opinions.

Fifth, the witness does not have knowledge, personal or otherwise, or the bases thereof, of the content of the tweets or comments though she seems to complain that the comments of unknown persons on the Twitter pages that are not now published are somehow material and relevant to Plaintiff's defamation claim -- she complains that "related" "discussion" and "commentary" are "inaccessible" to her.  Spoliation requires the claimed lost evidence must be not only in Defendants' possession or control, but that it must be material and relevant to the Plaintiff's claim. *Wal-Mart Stores v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003).  Thus, even if Defendants had evidence of "related commentary," it is immaterial to spoliation -- what unknown persons on the web say is not relevant to Plaintiff's claims for defamation.  The test is whether a defendant's published statement is defamatory in "an objectively reasonable reading," to a "the hypothetical reasonable reader," [*see Dallas Morning News, Inc. v. Tatum*, No. 16-0098, 2018 Tex. LEXIS 404, at *27 - 29 (May 11, 2018).], not whether the statement may be defamatory to some polling of people who give related discussion or commentary on Twitter posts, and not whether the unknown person's statement is defamatory.

Moreover, even a negligent act of destruction is spoliation allowing a presumption only if it "so prejudices the nonspoliating party that it is irreparably deprived of having any meaningful ability to present a claim or defense." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 25-26 (Tex. 2014).  Given the remote or lack of relevance of these "related" "commentaries," even if they are lost, there is no prejudice to Plaintiff.

---

In short, Plaintiff's witness tenders only hearsay and her conclusions without evidentiary predicate, and she does not show the relevance of any evidence that is "inaccessible" to her, or that any relevant evidence was destroyed, or that Plaintiff is prejudiced by any of this. She further fails to describe the data on which she relies, she doesn't testify that experts such as she typically rely on these data and she references no credentials or methodology to her "testing" or conclusions thus both the data and her opinions are not reliable.

### G. Plaintiff's lawyers seek to pull themselves up by their own boot straps to use a spoliation presumption to substitute for their failure to meet their evidentiary burden under TPCA.

As Defendants show above, the four Twitter posts have been public since 2012 through 2015. Plaintiff filed his suit April 16, 2018, after the posts were available to all the world for up to six years. When Plaintiff filed this suit, he served only a request for disclosure and no request for production. Defendants answered June 18. Plaintiff still served no request for production and still did no discovery. Defendants filed their motion to dismiss under the TCPA on July 13. The statute's automatic stay on discovery became effective that day.

Under the TCPA, on July 13, the burden shifted to Plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question" in order to avoid dismissal. TEX. CIV. PRAC. & REM. CODE §27.005(c). Plaintiff still sought no leave of the Court to do any discovery for good cause or otherwise. Only now, nine days away from the Court's hearing of Defendants' TCPA motion, did Plaintiff simultaneously file a motion for sanctions about some evidence his lawyers and those supporting his efforts have had access to for years and other evidence expressly delivered to his lawyers weeks ago, and seeks to do

discovery or make reasonable inquiry.  This timing suggests that Plaintiff's lawyers' have ulterior motives here.

The very purpose of the TCPA is that it "protects citizens who... speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them," and "professes an overarching purpose of 'safeguard[ing] the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government" against infringement by meritless lawsuits. . . ." *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *16 (Tex. App.--Austin, July 14, 2017).  The TCPA further commands us that the statute is to be "construed liberally to effectuate its purpose and intent fully" and that we pursue "any such goals chiefly by defining a suspect class of legal proceedings that are deemed to implicate free expression, making these proceedings subject to threshold testing of potential merit, and compelling rapid dismissal -- with mandatory cost-shifting and sanctions -- for any found wanting." *Id.*  Plaintiff seeks to do an end-around that legislative command and substitute an unfounded spoliation motion so that his motion can supply what he lacks -- "clear and specific evidence a prima facie case for each essential element of the claim in question" as required by the statute.

### V. PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY IS WITHOUT GOOD CAUSE.

Plaintiff seeks expedited discovery based on his lawyers' motion for sanctions.  As Defendants have said, the very purpose of the TCPA is protect citizens from retaliatory lawsuits and the expense and delay of such suits, and subject those suit to threshold testing of potential merit, and compelling rapid dismissal -- with mandatory cost-shifting and sanctions -- for any found wanting. *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *16 (Tex. App.--Austin, July 14,

2017).  The TCPA expressly stays all discovery before a defendant's TCPA motion is heard to avoid the heavy burden of a defendant having to participate in pre-hearing discovery.

Plaintiff seeks to dodge that stay and impose that statutorily-barred burden.  The statute expressly declares Plaintiff can do discovery only if Plaintiff shows "good cause."  TEX. CIV. PRAC. & REM. CODE §27.006(b).  But, wisely, "[g]ood cause must be based on more than mere conjecture; it must have a firm foundation." *Esparza v. State*, 31 S.W.3d 338, 340 (Tex. App.— San Antonio 2000, no pet.).  As Defendants show above, Plaintiff's basis for his motion seeking the statutorily discouraged pre-TCPA hearing discovery does not have a firm foundation, but is unfounded, relying only on hearsay and factual conclusions, not evidence.  Plaintiff's motion for expedited discovery should be denied.

## VI. SANCTIONS UNDER RULE 13 AND CHAPTER 10, TEX. CIV. PRAC. & REM. CODE

The material facts are: (1) the June 25 and July 20 videos have not been destroyed and were previously provided to Plaintiff's lawyers, and (2) the four tweets Plaintiff alleges were destroyed that referenced Sandy Hook have not been destroyed and copies of each tweet and relevant evidence were made and have been preserved by Defendants.

The facts establish that no relevant evidence has been destroyed and Plaintiff has not been prejudiced in the ability to present his case. Plaintiff's counsels' unsupported arguments, misstatements and omission of vital facts shows that Plaintiff's motion for sanctions has no basis in law or fact and was filed in bad faith and for an improper purpose. One of those purposes, in addition to delaying the TCPA hearing by supporting extensive discovery and substituting a

spoliation finding for otherwise absent evidence, is Plaintiff's counsel's desire for media coverage and publicity.[18]

Plaintiff's counsel also sought sanctions against parties against whom *he did not even allege any wrongdoing*. At no point in the motion, did Plaintiff's counsel mention - let alone claim - wrongdoing against Defendant Shroyer; yet he sought a spoliation instruction and monetary sanctions against him, just as he did against Jones.[19]

The evidence and the Court's file show Plaintiff's lawyers filed this motion and made statements that they knew or should have known were unfounded if they had made the reasonable inquiry as required of them under Rule 13 and should not have filed the motions for the improper purpose of delay, increasing costs and expenses to Defendants, and seeking to avoid their failure to meet their burden under the TCPA. Plaintiff relies heavily on the failure of Defendants' counsel to respond to his emails in the days preceding these motions, despite being fully aware that Defendants' counsel was on vacation.[20]   Defendants therefore seek sanctions against Plaintiff's lawyers under Rule 13 and Section 10.004, TEX. CIV. PRAC. & REM. CODE, in a form and amount the Court may find just.

## VII. RELIEF REQUESTED

Defendants request that upon hearing hereof, Plaintiff's Motion for Sanctions be denied, that Plaintiff's Motion for Expedited Discovery be denied, the Court award Defendants

---

[18] Mr. Bankston's letter dated May 25, 2018 makes his desire to create a media frenzy around himself and this case clear when he states that they "plan to make available to the general public and media copies of all correspondence and pleading which arise in this lawsuit, including this letter." See Exhibit "B," Declaration of David Jones paragraph 15, Exhibit B-89.
[19] See motion at page 1.
[20] Plaintiff's counsel did not copy or otherwise send either of the emails on which he relies to Defendants counsel's legal assistant.

attorneys' fees against Plaintiff's lawyers for Defendants responding to this motion, and general relief.

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

_____/s/ Mark C. Enoch_____
Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:   972-419-8366
Facsimile:    972-419-8329
fly63rc@verizon.net

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via email and via efile.txcourts.gov's e-service system on August 27, 2018:

Mark Bankston
Kyle Farrar
Kaster, Lynch, Farrar & Ball, LLP.
1010 Lamar, Suite 1600
Houston, Texas 77002

_____/s/ Mark C. Enoch_____
Mark C. Enoch

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## AFFIDAVIT OF MARK C. ENOCH

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Mark C. Enoch, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.      My name is Mark C. Enoch.  I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit.  I have personal knowledge of the facts herein stated and they are true and correct.

2.      Attached to this affidavit marked as Exhibit "A-1"  is a true and correct copy of an article that I found posted at the url https://www.huffingtonpost.com/entry/sandy-hook-parents-lawyers-ted-cruz-alex-jones_us_5b7eccd4e4b0348585fe5ce9. This exhibit which I printed is a true and correct copy of the article on that website as of the date of this affidavit.



EXHIBIT

A

Further Affiant Sayeth Not.

_____

Mark C. Enoch

SWORN TO and SUBSCRIBED before me by Mark C. Enoch on August  27, 2018.

_____

Notary Public in and for
the State of Texas

My Commission Expires:

_____

MELANIE J ILLIG
Notary Public
STATE OF TEXAS
ID#78994-4
My Comm. Exp. July 3, 2021

# Lawyers Of Sandy Hook Parents To Ted Cruz: Stop Defending Alex Jones

Two lawyers representing parents of the Sandy Hook tragedy in defamation lawsuits against conspiracy theorist Alex Jones have a message for Sen. Ted Cruz (R-Texas): Stop defending the man who has helped further devastate innocent families.

Jones has been hit with multiple lawsuits for claiming the 2012 school shooting in Newtown, Connecticut, was a "hoax" perpetrated by "crisis actors" pretending to be the parents of dead children. Jones' followers have harassed and threatened the parents of the shooting victims.

Several platforms, including Facebook, YouTube and Spotify, removed accounts belonging to Jones and his website Infowars earlier this month for violating their terms of services.

"When users violate these policies repeatedly, like our policies against hate speech and harassment or our terms prohibiting circumvention of our enforcement measures, we terminate their accounts," YouTube said in an email at the time.

Cruz — who pointed out he has also been unfairly attacked by the Infowars host — came to Jones' defense.

"Who the hell made Facebook the arbiter of political speech?" Cruz tweeted at the time. "Free speech includes views you disagree with."

Cruz tweeted again last week, this time to say it's important to stand up to "tech censorship online — which many on the Left are embracing."

Mark Bankston and William Ogden of the Houston law firm Farrar & Ball represent two Sandy Hook families suing Jones, and they're wondering why Cruz has chosen to take up this cause.

"When it comes to Jones, we can only presume that you are speaking from ignorance and that you do not know the nature of the conduct you are now zealously defending, nor the harm that has befallen my clients and many others," the lawyers wrote in an op-ed published by the Austin American-Statesman.

"This is not a question of free speech," they added. "This is not a question of disagreeing with a person's political views. This is a question of just how much damage we're prepared to let a madman inflict on the lives of innocent victims through malicious lies and willful harassment."

EXHIBIT
A-1

The lawyers "beg" Cruz to read the suit filings before commenting on them.

"We're not sure what it will take for you to stop defending Jones," they wrote. "Does a Sandy Hook parent need to die before Facebook is allowed to deny this man a platform for his mayhem on their private service? Our clients fully recognize that if Jones wants to tell lies about them in the public square, there is very little anyone can do outside a courtroom to stop him. But we ask you not to defend the idea that private companies like Facebook must empower Jones to harass and endanger the lives of innocent victims."

Read the full piece in the Austin American-Statesman.

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## DECLARATION OF DAVID JONES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

1.     My name is David Jones.  I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this declaration.  I have personal knowledge of the facts herein stated and they are true and correct.

2.     In preparing for this declaration, I reviewed internet websites, articles and videos published on the internet and found several that are relevant to the issues in this case.

3.     All of these articles were downloaded and/or printed directly from the identified internet websites. If I didn't personally download or print them, I compared the printed exhibit to the article on the website.  All of the attached exhibits are true and correct copies of the online articles.



4.     Attached to this declaration marked as Exhibit B-78 is a true and correct copy of an article posted at the url address   https://www.washingtonpost.com/news/the-intersect/wp/2018/07/14/facebook-wants-to-cut-down-on-misinformation-so-why-isnt-it-doing-anything-about-infowars/?noredirect=on&utm_term=.ae011c037fce.   This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

5.     Attached to this declaration marked as Exhibit B-79 is a true and correct copy of a *Guardian* article posted at the url address shown on the exhibit.   This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

6.     Attached to this declaration marked as Exhibit B-80 is a true and correct copy of a *Reuters* article posted at the url address   https://www.reuters.com/article/us-usa-lawsuit-alexjones/conspiracy-theorist-jones-seeks-halt-of-sandy-hook-defamation-suit-idUSKBN1KM4GI.   This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

7.     Attached to this declaration marked as Exhibit B-81 is a true and correct copy of an article posted at the url address shown on the exhibit.   This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

8.     Attached to this declaration marked as Exhibit B-82 is a true and correct copy of an article from *The Hill* posted at the url address http://thehill.com/homenews/media/402393-lawyers-for-sandy-hook-victims-say-alex-jones-destroyed-evidence-relating-to. This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

9.      Attached to this declaration marked as Exhibit B-83 is a true and correct copy of a Money.cnn article posted at the url address https://money.cnn.com/2018/08/17/media/alex-jones-sandy-hook-defamation-lawsuit/index.html.   This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

10.      Attached to this declaration marked as Exhibit B-84 is a true and correct copy of a *New York Times* article posted at the url address  shown on the exhibit.  This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

11.      Attached to this declaration marked as Exhibit B-85 is a true and correct copy of a Mystatesman article posted at the url address https://www.mystatesman.com/news/opinion/commentary-why-are-you-sen-ted-cruz-defending-alex-jones/Rgdlpn3a4oxObMMCCb2XOK/.  This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

12.      Attached to this declaration marked as Exhibit B-86 is a true and correct copy of an NBC News article posted at the url address https://www.nbcnews.com/news/us-news/alex-jones-destroyed-evidence-sandy-hook-case-claim-says-n901811.  This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

13.      Attached to this declaration marked as Exhibit B-87 is a true and correct copy of a letter from Philip Schindler at Google dated August 9, 2018 addressed  Attn:

Alex Jones and Buckley Hamman Free Speech Systems, LLC ("Partner"). This letter was also received by me on that date.

14.     Attached to this declaration marked as Exhibit B-88 is a true and correct copy of a response letter from one of our attorneys, Mark I. Bailen with the firm of Baker & Hostetler LLP, dated August 16, 2018 addressed to Philipp Schindler with Google LLC. This letter was also received by me on that date.

15.     Attached to this declaration marked as Exhibit B-89 is a true and correct copy of a letter from Mark D. Bankston with the firm of Kaster Lynch Farrar & Ball dated May 25, 2018 addressed to Mr. Eric Taube. This letter was also received by me from Mr. Taube on that date.

16.     Attached to this declaration marked as Exhibit B-90 is a true and correct copy of a CNBC article posted at the url address https://www.cnbc.com/2018/08/06/youtube-removes-alex-jones-account-following-earlier-bans.html. This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

17.     Attached to this declaration marked as Exhibit B-91 is a true and correct copy of a *The Hill* article posted at the url address shown on the exhibit. This exhibit is a true and correct copy of the article on that website as of the date of this declaration.

18.     In my declaration filed on July 13, 2018, I attached a page labeled as a marker for Exhibit B-36 that inaccurately reflected the date of June 26. Instead the true date of the broadcast was June 25, 2017.

My name is David Jones, my date of birth in November 27, 1950, and my address is 3005 S. Lamar, Suite D 109-317, Austin, Texas 78704, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 27th day of August, 2018.

David Jones

8/26/2018          Facebook wants to cut down on misinformation. So why isn't it doing anything about Infowars? - The Washington Post
22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 437
of 608

The Washington Post

**The Intersect**

# Facebook wants to cut down on misinformation. So why isn't it doing anything about Infowars?

By Eli Rosenberg
, Reporter
July 14



Facebook has spent much of the last year and a half attempting to tamp down the spread of false and malicious information that bloomed on its platform during the 2016 election.

After a slew of negative publicity, the company adjusted its algorithms, sought to study the political effects of misinformation and issued mea culpas, in the form of congressional testimony and slick advertisements aplenty.

But critics point to one thing it has not done: banned or blocked the site Infowars — one of the most prominent outlets known for spreading baseless information and conspiracy theories — which enjoys many verified Facebook pages with millions of followers. The right-wing media channel's relationship to Facebook has come under closer scrutiny as social media giant has begun touting the other measures it says it has undertaken to try to reduce the amount of misleading information on its site.

At a private event Wednesday, reporters asked John Hegeman, the head of Facebook's News Feed, and Sara Su, a Facebook product specialist, about the issue.

"I guess just for being false, that doesn't violate the community standards," Hegeman said, according to CNN. He explained that Infowars has "not violated something that would result in them being taken down."

Pressed by reporters, other representatives for Facebook struggled to come up with a convincing explanation for why Infowars was permitted on the site if the company was committed to reducing the spread of false information.

"I asked them why Infowars is still allowed on the platform," CNN reporter Oliver Darcy wrote on Twitter later. "I didn't get a good answer."

Facebook's response set off a cascade of reactions, striking at the heart of a sensitive debate about the spread of false and hateful information that has churned since the 2016 election.

"By refusing to ban InfoWars, @facebook is choosing profit off a vile conspiracy theorist who harasses the families of the children killed at Sandy Hook," former Obama administration official Dan Pfeiffer

8/26/2018      Facebook wants to cut down on misinformation. So why isn't it doing anything about Infowars? - The Washington Post

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg 438
of 608

wrote on Twitter. "Please spare me the self righteousness about freedom of speech."

Infowars, founded by Alex Jones, has gained notoriety for the volume of conspiracy theories that it has helped spread, sowing doubt by questioning the government's potential role in tragedies like 9/11 and the Sandy Hook massacre. In recent days, it has warned that the Democrats were planning to "launch a civil war" on the Fourth of July and that liberal billionaire George Soros was attempting to "seize U.S. voting machines."

President Trump has appeared on Jones's Infowars and has at times appeared to echo some of its talking points.

Facebook representatives tried to tamp down on the rising tide of anger this week, responding on social media that there were Facebook pages "on both the left and the right pumping out what they consider opinion or analysis — but others call fake news," and citing free speech.

But that response was quickly criticized, as some reporters compared it to Trump's infamous comment equivocating white nationalists and counterprotesters during the clashes in Charlottesville last year.

"Facebook's inability to distinguish Infowars (which says Sandy Hook is a hoax) from normal political dialogue should concern us all," Sen. Chris Murphy (D-Conn.) wrote on Twitter.



**Jason Schwartz**
@JasonSchwartz

Facebook's inability to place InfoWars outside the usual right/left paradigm in response to @oliverdarcy's story is pretty remarkable. The site *objectively* publishes false information-- not a matter of "some consider it opinion or analysis."

> **Facebook**    @facebook
> Replying to @oliverdarcy
> We see Pages on both the left and the right pumping out what they consider opinion or analysis – but others call fake news. We believe banning these Pages would be contrary to the basic principles of free speech.

2:08 PM - Jul 12, 2018

1,033     439 people are talking about this

The Infowars flap is a sign of the complicated position Facebook finds itself in. With billions of pieces of content shared on its site every day, the company has said that vetting the veracity of every single one would be a nearly impossible task. But it has responded to social and political pressure by taking steps

toward reducing harmful uses of its service, including the posting of false information to intentionally mislead or harm others. The company did not respond to a request for comment.

"Despite investing considerable money into national ad campaigns and expensive mini documentaries, Facebook is not yet up to the challenge of vanquishing misinformation from its platform," Charlie Warzel wrote at BuzzFeed.

TechCrunch's Josh Constine saw it as evidence that "Facebook hides behind political neutrality" for fear of alienating conservative users and compromising its business model.

"That strategy is exploited by those like Jones who know that no matter how extreme and damaging their actions, they'll benefit from equivocation that implies 'both sides are guilty,' with no regard for degree," Constine wrote.

Facebook told the publication that it would be nearly impossible to ensure everything posted on the site was true, pointing out that it "down-ranks" certain types of content, such as clickbait and fake news.

"In other words, we allow people to post it as a form of expression, but we're not going to show it at the top of News Feed."

Still, though Constine argued for stricter controls and penalties for those like Infowars that spread false information, he said he did not think a complete ban would be the best approach.

"If Facebook deleted the pages of Infowars and their ilk, it would be used as a rallying cry that Jones' claims were actually clairvoyant," he wrote. "If Facebook wants to uphold a base level of free speech, it may be prudent to let the liars have their voice. However, Facebook is under no obligation to amplify that speech."

Far-right activists, some of whom have been banned from social media outlets after running afoul of rules against harassment or hate speech, have long complained that they are the victims of censorship.

Diamond and Silk, two Trump supporters who have gained renown for their videos on Facebook, became a cause celebre in the conservative world after they said they were the victims of overreach by Facebook after the company had deemed some of their content "unsafe." Facebook later said the communication had been sent in error.

 **Ben Collins**
@oneunderscore__

This is Facebook equating having Infowars, which once accused a pizza shop of being part of a child sex ring and denied the Sandy Hook shooting was real, with "pages on both the left and

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 440
of 608

the right pumping out what they consider opinion or analysis –
but others call fake news."

**Facebook**  @facebook
Replying to @oliverdarcy
We see Pages on both the left and the right pumping out what they
consider opinion or analysis – but others call fake news. We believe
banning these Pages would be contrary to the basic principles of free
speech.

1:55 PM - Jul 12, 2018

7,634     2,508 people are talking about this

Jonathan Albright, research director at Columbia University's Tow Center for Digital Journalism, agreed
that attempts at outright bans could backfire.

"If they were to go and ban Infowars, it very well could make the problem worse," he said in an interview.
"It's a Catch-22."

Despite what has seemed to be a steady stream of negative disclosures in American media in recent
months, Facebook's business continues to boom. The company posted record profits in the first quarter
of 2018, despite the data protection scandal that unfolded at the time, sending its stock rising to its
largest gains in nearly three years.

And those numbers lead to more pessimistic conclusions about Facebook's commitment to change.

"Facebook's milquetoast method of dealing with accounts in these so-called gray areas seems to conflict
with its stated goals, both of building community and of weeding out misinformation," Vanity Fair's
Maya Kosoff wrote. "In glibly allowing bad actors like Infowars to continue existing on its platform,
Facebook is enabling the persistent spread of low-truth stories intended to mislead. And until doing so
affects its stock value or its ability to turn a profit, Facebook has little incentive to change."

**Read more:**

A vice mayor faces calls for resignation after proclaiming July 'Straight Pride American Month'

'What I'm about to tell you is off the record': How a journalist scooped the deputy attorney general

Johnson & Johnson ordered to pay $4.7 billion to women who say baby powder gave them cancer



**Eli Rosenberg**
Eli Rosenberg is a reporter on The Washington Post's General Assignment team. He has worked at the
New York Times and the New York Daily News. Follow 🐦

8/26/2018    Facebook wants to cut down on misinformation. So why isn't it doing anything about Infowars? - The Washington Post

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 441
of 608

# The Washington Post

# The story must be told.

Your subscription supports journalism that matters.

# The Guardian

# Facebook's pledge to eliminate misinformation is itself fake news

Zuckerberg is trying to have it both ways: claiming credit for fighting fake news but insisting that false information be distributed on Facebook

*Judd Legum*

Fri 20 Jul 2018 10.05 EDT

EXHIBIT
B-79
PENGAD-Bayonne, N. J.



The production values are high and the message is compelling. In an 11-minute mini-documentary, Facebook acknowledges its mistakes and pledges to "fight against misinformation".

"With connecting people, particularly at our scale, comes an immense amount of responsibility," an unidentified Facebook executive in the film solemnly tells a nodding audience of new company employees.

An outdoor ad campaign by Facebook strikes a similar note, plastering slogans like "Fake news is not your friend" at bus stops around the country.

8/26/2018    Facebook's pledge to eliminate false information is itself fake news | Opinion | The Guardian
22-01023-tmd   Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B  cont'd.  Pg 443
of 608

But the reality of what's happening on the Facebook platform belies its gauzy public relations campaign.

Last week CNN's Oliver Darcy asked John Hegeman, the head of Facebook's News Feed, why the company was continuing to host a large page for InfoWars, a fake news site that traffics in repulsive conspiracy theories. Alex Jones, who runs the site, memorably claimed that the victims of the Sandy Hook mass shooting were child actors.

Hegeman did not have a compelling answer. "I think part of the fundamental thing here is that we created Facebook to be a place where different people can have a voice. And different publishers have very different points of view," Hegeman said.

Claiming the Newtown massacre is a hoax is not a point of view. It's a disgusting lie – but a lie that, apparently, Facebook does not see as out of bounds.

Facebook does not just tolerate Infowars. It seeks to profit from Infowars and its audience. Facebook's advertising tools, at time of writing, allow advertisers to pay Facebook to target the 743,220 users who "like" the InfoWars page.



Infowars targeting. Photograph: Facebook

In the Facebook documentary, Eduardo Ariño de la Rubia, a data science manager at Facebook, provides more insight on what kind of content the company believes is unacceptable. De la Rubia says Facebook looks at content along two metrics, "truth" and "intent to mislead".

De la Rubia draws a simple chart with "truth" on the x-axis and "intent to mislead" on y-axis, creating four quadrants. Only information in the upper left of the chart, low on "truth" and high on "intent to mislead", should be purged from Facebook, he says. (Without an "intent to mislead", De la Rubia says, it's just being "wrong on the internet".)



Photograph: Facing Facts/Facebook

De la Rubia offered "Pizzagate", the hoax that claimed prominent Democrats were running a child sex trafficking ring out of a basement of a DC pizza parlor, as an example of the kind of unacceptable content that would fall into the upper-left quadrant.

That conspiracy was promoted by none other than Infowars' Alex Jones. (Jones apologized after a man entered the pizza shop and opened fire.)

The problem with Facebook's strategy seems to be less their theoretical framework than their practical refusal to place almost anything into the upper-left quadrant. Zuckerberg placed his deeply flawed approach in stark relief during an interview with Recode's Kara Swisher on Wednesday.

Interrupting Swisher, Zuckerberg volunteered that he found Holocaust denial "deeply offensive" but would not ban Holocaust deniers from Facebook because it's "hard to impugn intent and to understand the intent".

Zuckerberg's position echos the company's promotional video. "There is a lot of content in the gray area. Most of it probably exists where people are presenting the facts as they see them," Tessa Lyons, Facebook's project manager for News Feed integrity, says to the camera.

This is where Facebook's approach completely breaks down. If Zuckerberg is willing to give Holocaust deniers the benefit of the doubt - and therefore keep them on the Facebook platform - it's clear that Facebook's pledge to eliminate misinformation is itself fake news.

Zuckerberg, facing an avalanche of criticism, later released a statement saying he "absolutely didn't intend to defend the intent of people who deny" the Holocaust. He did not, however, back away from his core position - that Holocaust deniers have a place on Facebook.

Facebook is trying to have it both ways. The company is actively seeking credit for fighting misinformation and fake news. At the same time, its CEO is explicitly saying that information he acknowledges is fake should be distributed by Facebook.

Zuckerberg seems to believe that technology will get the company out of this jam. "We have to do everything in the form of machine learning," Henry Silverman, an operations specialist for News Feed integrity, says earnestly in Facebook's documentary about fighting fake news.

The solution, in Zuckerberg's view, appears to be to allow virtually anything to be posted but then drowning it out with heaps of baby pictures. In his statement clarifying his comments on Holocaust deniers, Zuckerberg said that verifiably false information would "lose the vast majority of its distribution in News Feed", adding that he believed "the best way to fight offensive bad speech is with good speech".

But the idea that people will be willing to tolerate Holocaust deniers on Facebook if those posts reach a few less people ignores the moral component of these decisions. There is no algorithm for human decency.

*Judd Legum writes Popular Information, a political newsletter*

# Since you're here...

... we have a small favour to ask. More people are reading the Guardian's independent, investigative journalism than ever but advertising revenues across the media are falling fast. And

22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd. Pg 445
of 608

unlike many news organisations, we haven't put up a paywall – we want to keep our journalism as
open as we can. So you can see why we need to ask for your help.

The Guardian is editorially independent, meaning we set our own agenda. Our journalism is free
from commercial bias and not influenced by billionaire owners, politicians or shareholders. No
one edits our Editor. No one steers our opinion. This is important because it enables us to give a
voice to the voiceless, challenge the powerful and hold them to account. It's what makes us
different to so many others in the media, at a time when factual, honest reporting is critical. The
Guardian's investigative journalism uncovers unethical behaviour and social injustice, and has
brought vital stories to public attention; from Cambridge Analytica, to the Windrush scandal to
the Paradise Papers.

If everyone who reads our reporting, who likes it, helps to support it, our future would be much
more secure. **For as little as $1, you can support the Guardian – and it only takes a minute. Thank
you.**

Support The Guardian

  

Topics
- Facebook
- Opinion
- Mark Zuckerberg
- comment

Conspiracy theorist Jones seeks halt of Sandy Hook defamation suit | Reuters

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 446 of 608

Page 1 of 4



Discover Thomson Reuters

Directory of sites   Login   Contact   Support

**REUTERS** World   Business   Markets   Politics   TV   Search...

**U.S.**   AUGUST 1, 2018 / 5:10 AM / 25 DAYS AGO

# Conspiracy theorist Jones seeks halt of Sandy Hook defamation suit

Jon Herskovitz                                            3 MIN READ     

AUSTIN, Texas (Reuters) - Lawyers for conspiracy theorist Alex Jones asked a Texas court on Wednesday to dismiss a defamation lawsuit against him and his InfoWars website, filed by parents of two children killed in the 2012 Sandy Hook massacre.



EXHIBIT
B-80

Conspiracy theorist Jones seeks halt of Sandy Hook defamation suit | Reuters    Page 2 of 4

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg 447 of 608

FILE PHOTO: Alex Jones from Infowars.com speaks during a rally in support of Republican presidential candidate Donald Trump near the Republican National Convention in Cleveland, Ohio, U.S., July 18, 2016. REUTERS/Lucas Jackson/File Photo

Jones, who lives in Travis County, Texas, has used his media platform to call the mass shooting at a Connecticut elementary school that killed 26 people a hoax, and suggested a political cover-up took place by left-wing forces seeking to take advantage of the shooting to promote gun control.

Mark Enoch, an attorney for Jones, described his client as a political commentator expressing his views and played a 2017 broadcast where Jones said he did not believe the Sandy Hook shooting took place. Jones was not in court.

"Maybe it's fringe speech. Maybe it's dangerous speech, but it is not defamation," he told Judge Scott Jenkins, who has 30 days to rule on the motion to dismiss the case.

In 2013, Jones called the massacre "staged" and continued to stoke his conspiracy theory for years.

Conspiracy theorist Jones seeks halt of Sandy Hook defamation suit | Reuters          Page 3 of 4

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 448 of 608

"Sandy Hook is a synthetic, completely fake, with actors, in my view, manufactured," he said in a January 2015 broadcast.

Although his theory is false, people who believe Jones have for years harassed and taunted families of the victims, court papers showed and the families have said. The lawsuit filed in April by Leonard Pozner, Veronique De La Rosa seek at least $1 million in damages. They claim they were subject to harassment that forced them to move seven times after Jones claimed the parents were liars and frauds who helped in a cover-up, according to court documents.

Mark Bankston, an attorney for the parents, told the judge that InfoWars viewers understood Jones was alleging that the parents were part of a criminal conspiracy and subjected the parents to years of threats.



**Facebook Inc**          174.645
FB.O NASDAQ          +1.75 (+1.01%)

FB.O

A gunman killed 20 young children and six adults at Sandy Hook Elementary School in Newtown, Connecticut, on Dec. 14, 2012, in an attack that ranks among the five deadliest mass shootings by a single gunman in U.S. history.

Facebook (FB.O) last week suspended Jones from its social network for bullying and hate speech, after Google's YouTube removed four of his videos from its site.

Conspiracy theorist Jones seeks half of Sandy Hook defamation suit | Reuters Page 4 of 4

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 449 of 608

The lawsuits in Texas were the first defamation cases brought by parents of Sandy Hook victims against Jones. He is also facing civil action in Connecticut by additional Sandy Hook parents.

Bankston said after the hearing he sees the cases as a building wave that could topple Jones.

"The dam has broken and people are not scared to come forward. For years, people were afraid to take on Alex Jones," he said.

Jones' lawyer declined to speak after to media the hearing.

Reporting by Jon Herskovitz; Editing by Bill Tarrant and Bill Berkrot

*Our Standards:* *The Thomson Reuters Trust Principles.*

Apps   Newsletters   Advertise with Us   Advertising Guidelines   Cookies   Terms of Use
Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

8/26/2018  Alex Jones and Infowars Content Is Removed From Apple, Facebook and YouTube - The New York Times

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 450 of 608

## The New York Times

# *Alex Jones and Infowars Content Is Removed From Apple, Facebook and YouTube*

**By Jack Nicas**

Aug. 6, 2018

Top technology companies erased most of the posts and videos on their services from Alex Jones, the internet's notorious conspiracy theorist, thrusting themselves into a fraught debate over their role in regulating what can be said online.

Apple, Google, Facebook and Spotify severely restricted the reach of Mr. Jones and Infowars, his right-wing site that has been a leading peddler of false information online. Mr. Jones and Infowars have used social media for years to spread dark and bizarre theories, such as that the Sandy Hook school shooting was a hoax and that Democrats run a global child-sex ring. Apple made its move on Sunday and the others followed on Monday.

The actions, one of the tech companies' most aggressive efforts against misinformation, highlighted a difficult dilemma for their businesses. They have long desired to combat misinformation online, but they have also been reluctant to be arbiters of truth.

But since a rise of misinformation online around elections, such as the 2016 presidential vote, the tech companies have faced increasing calls from lawmakers and the news media to address their role in that spread of false information and a related increase in partisan divisions. The tech companies have recently stepped up enforcement — but that has led to accusations of political bias, largely from conservatives.

The moves over the last two days helped fuel that debate. "Whether you like @RealAlexJones and Infowars or not, he is undeniably the victim today of collusion by the big tech giants," Nigel Farage, a British conservative politician, said on Twitter. Mr. Farage helped lead the successful campaign for the country to leave the European Union and has been interviewed by Mr. Jones. "What price free speech?"

Apple on Sunday removed five of the six Infowars podcasts on its popular Podcasts app. Commenting on the move, a spokeswoman said, "Apple does not tolerate hate speech."

**You have 3 free articles remaining.**
**Subscribe to The Times**



8/26/2018        Alex Jones and Infowars Content Is Removed From Apple, Facebook and YouTube - The New York Times
22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 451
of 608

Facebook, Spotify and Google's YouTube site, which removed some Infowars content last week, followed with stronger measures on Monday. Facebook removed four pages belonging to Mr. Jones, including one with nearly 1.7 million followers as of last month, for violating its policies by "glorifying violence" and "using dehumanizing language to describe people who are transgender, Muslims and immigrants." Facebook said the violations did not relate to "false news."

YouTube terminated Mr. Jones's channel, which had more than 2.4 million subscribers and billions of views on its videos, for repeatedly violating its policies, including its prohibition on hate speech. Spotify cited its own prohibition on hate speech as the reason for removing a podcast by Mr. Jones.

Mr. Jones and Infowars are leaders in using the internet to spread right-wing conspiracy theories, an effort that was aided after Donald J. Trump appeared on Mr. Jones's show during the 2016 presidential campaign and praised Mr. Jones's reputation as "amazing." Mr. Jones has repeatedly claimed that the government staged the Oklahoma City bombing, the Sept. 11 terrorist attacks and numerous other mass shootings and tragedies.

Mr. Jones is facing defamation lawsuits filed by the parents of victims of the Sandy Hook school shooting for claiming that the shooting was an elaborate hoax. Most of Mr. Jones's conspiracies push a theme that a global cabal of political and corporate leaders run the world's institutions to brainwash citizens and take away their rights. Mr. Jones partly finances his operation by selling expensive nutritional supplements and vitamins between Infowars segments.

"To many, Jones is a bad joke," said the Southern Poverty Law Center, which tracks hate groups. "But the sad reality is that he has millions of followers who listen to his radio show, watch his 'documentaries' and read his websites, and some of them, like Boston Marathon bomber Tamerlan Tsarnaev, resort to deadly violence."

Mr. Jones and Infowars did not respond to requests for comment.

In a message posted on Twitter on Monday, Mr. Jones said: "The censorship of Infowars just vindicates everything we've been saying. Now, who will stand against Tyranny and who will stand for free speech? We're all Alex Jones now." He railed against the tech companies on his live show on Monday, which was streamed on the Infowars website, saying their moves were part of a leftist agenda in advance of the midterm elections. "I told you this was coming," he said to viewers.

The big tech firms that control, via their websites and apps, how much of the world's media content is distributed have faced criticism in recent weeks for enabling Mr. Jones and Infowars.

8/26/2018
Alex Jones and Infowars Content Is Removed From Apple, Facebook and YouTube - The New York Times
22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 452

Some tech companies, including Facebook and Google, had appeared reluctant to remove Mr. Jones's pages entirely and were instead taking action against specific videos or podcasts. YouTube, for instance, recently deleted four of Mr. Jones's videos.

A Google spokesman said on Monday that YouTube terminated Mr. Jones's channel outright because he continued to flout policies he had already been penalized for violating.

Mr. Jones had amassed millions of followers, but limiting his influence does not solve the problem of false news. Hundreds of smaller publishers promote similar conspiracy theories, and millions of followers help spread those theories by reposting them. A new conspiracy theory called Qanon, for instance, has been gaining traction outside of Mr. Jones's sphere. And Infowars followers can also still repost videos and articles from the site onto YouTube and Facebook.

But the moves are a significant hit to Mr. Jones's ability to reach wide audiences, and particularly new followers. YouTube was a particularly important distribution channel, in part because YouTube's recommendation engine frequently surfaced past Infowars videos to users who had shown interest in conservative topics. Terminating his YouTube channel erases all of its past videos and restricts it from posting new ones.

Mr. Jones and Infowars still have other ways to reach listeners and readers. They have increasingly been directing viewers to visit the Infowars website, which would limit their reliance on the tech companies, presumably foreseeing the bans. Twitter has not restricted the accounts of Mr. Jones or Infowars. A Twitter spokesman said the accounts were not in violation of Twitter's rules.

Other tech companies' approach has been uneven; they have left up Infowars content on some of their services despite removing it from others.

Infowars introduced a new smartphone app last month that is finding users on Apple's App store and Google's Play Store. From July 12 through Monday, the Infowars app was, on average, the 23rd most popular news app on the Google Play store and the 33rd most popular news app on Apple's App Store, according to App Annie, an app analytics firm. On Monday, the Infowars app ranked ahead of apps like BuzzFeed and The Wall Street Journal on Google, and ahead of apps like MSNBC and Bloomberg on Apple.

Apple decided to allow the Infowars app on its store after reviewing it, according to a person close to the company who spoke on condition of anonymity. The Google Play Store has different policies than YouTube, a Google spokesman said.

Matt Rivitz, a freelance copywriter who helps run a Twitter account, Sleeping Giants, that pressures companies to distance themselves from far-right groups, said Monday that the tech companies' nearly simultaneous moves against Mr. Jones proved they were acting in response to public pressure, not new data showing he broke rules.

8/26/2018      Alex Jones and Infowars Content Is Removed From Apple, Facebook and YouTube - The New York Times

22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd.   Pg 453

"The timing is very puzzling because he's been saying this stuff for years and they haven't done anything," Mr. Rivitz said.

Conservatives warned that more sites would be cut off soon.

"To all other conservative news outlets — you are next," Paul Joseph Watson, a right-wing commentator and Infowars contributor, said on Twitter on Monday. "The great censorship purge has truly begun."

Follow Jack Nicas on Twitter: @jacknicas.

A version of this article appears in print on Aug. 6, 2018, on Page A1 of the New York edition with the headline: Tech Giants Push Infowars Off Digital Soapbox

Lawyers for Sandy Hook victims accuse Alex Jones of destroying evi...    http://thehill.com/homenews/media/402393-lawyers-for-sandy-hook-v...

22-01023-tmd  Doc#1-0  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 454 of 608



# Lawyers for Sandy Hook victims accuse Alex Jones of destroying evidence

BY ARIS FOLLEY - 08/17/18 04:05 PM EDT

Just In...

**Please, no more knee-jerk decisions on North Korea**
OPINION — 11M 6S AGO

**US, Mexico reach preliminary deal on NAFTA, Canada awaits**
FINANCE — 17M 50S AGO

**Facebook bans Myanmar military accounts, pages including military chief**
TECHNOLOGY — 32M 30S AGO

**Erdoğan to visit Iran**
INTERNATIONAL — 36M 45 AGO

**Mexico's new government should make press freedom a priority**
OPINION — 41M 6S AGO

**Trump praises Tiger Woods for comments: 'Wouldn't play the game'**
ADMINISTRATION — 43M 45S AGO

**Jailer who ran 'Hanoi Hilton' says he liked, respected McCain**
BLOG BRIEFING ROOM — 46M 53S AGO

**Report: Russian hackers targeted Orthodox clergy**
BLOG BRIEFING ROOM — 47M 37S AGO

VIEW ALL

**1,177** SHARES          SHARE          TWEET          PLUS ONE



Lawyers representing the families of victims of the 2012 Sandy Hook Elementary School shooting are accusing Alex Jones and his Infowars business of intentionally destroying evidence relevant to a defamation case they are bringing against him.

According to the motion obtained by The New York Times, Jones instructed his staff to delete tweets after CNN reported his platform had content that violated Twitter's policies.

The families suing Jones claim that at least some of the deleted content was deemed relevant evidence in their defamation suit. The filing also says Jones was told earlier this year that he was obligated by law to preserve all material relevant to the cases.

The InfoWars owner is currently being sued by the families of nine victims who were killed in the 2012 shooting in Connecticut for spreading lies about the shooting.

Jones, a noted conspiracy theorist, has claimed the shooting was staged and that the parents were involved in a cover up. The families say Jones's conspiracy theories have led to them being harassed and threatened.

Jones has been under the spotlight in recent weeks as tech and social media companies have faced pressure to prevent him from spreading false content online.

In recent days, Apple, Facebook, YouTube and other services have blocked him for sharing content that violated their policies against hate speech, inciting violence and child endangerment.

"As pressure mounted from pending defamation lawsuits and growing public indignation, Mr. Jones chose to destroy evidence of his actual malice and defamatory conduct," the motion stated.

"InfoWars deleted critical evidence at the precise moment plaintiff and his experts were attempting to marshal that evidence."

It is unclear how much content had been deleted to could be relevant to the suit.

Related News

EXHIBIT
B-82
PENGAD-Bayonne, N.J.

Lawyers for Sandy Hook victims accuse Alex Jones of destroying evi... http://thehill.com/homenews/media/402393-lawyers-for-sandy-hook-v...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 455 of 608



April Ryan: Sarah
Sanders should have...



Poll: Dem leads by 24
points in race to...



Get Your Master's in
Cybersecurity at...
Inside Higher Ed



Conway blasts Brennan:
'Why is he screaming...

Earlier this week, Twitter also took action against Jones, blocking him from
tweeting from his personal Twitter account for one week after one of his
posts violated the platform's policies.

SHARE          TWEET          PLUS ONE



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX**
THE CONTENTS OF THIS SITE ARE ©2018 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

Alex Jones, InfoWars accused of destroying evidence related to Sand...    https://money.cnn.com/2018/08/17/media/alex-jones-sandy-hook-def...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 456 of 608

# Alex Jones, InfoWars accused of destroying evidence related to Sandy Hook suit

*Tom Kludt*

## Attorneys representing the father of a Sandy Hook shooting victim alleged Friday that far-right conspiracy theorist Alex Jones destroyed evidence related to their defamation lawsuit against him.

In a motion filed in a Texas state court on behalf of Neil Heslin, the plaintiff's lawyers said that Jones deleted Twitter posts, some of which dealt with the 2012 mass shooting, following a CNN investigation that found Jones in violation of the social media platform's rules.

Heslin, who lost his six-year-old son in the Sandy Hook massacre, is a plaintiff in one of three separate defamation suits brought by victims' families against Jones, who has falsely claimed that the shooting was a hoax carried out by actors.

Attorneys Mark Bankston, Kyle Farrar and William Ogden, who are representing other Sandy Hook family members in a separate suit against Jones, said in the motion Friday that they reached out to legal counsel for InfoWars, the conspiratorial website run by Jones, to "confirm whether these [news] reports are accurate and these items have indeed been destroyed." They said that InfoWars' attorney did not respond.

"Despite counsel's silence, it is clear from Mr. Jones' own admissions that relevant evidence has been lost. As pressure mounted from pending defamation lawsuits and growing public indignation, Mr. Jones chose to destroy the evidence of his actual malice and defamatory conduct uncovered by [CNN]," the attorneys said in the motion.

"InfoWars deleted critical evidence at the precise moment Plaintiff and his experts were attempting to marshal that evidence," the motion continued. "At this stage, it is unknown exactly how much content has been deleted, though it includes extensive social media materials and reportedly hundreds of hours of video."

**EXHIBIT**
**B-83**

Alex Jones, InfoWars accused of destroying evidence related to Sand...       https://money.cnn.com/2018/08/17/media/alex-jones-sandy-hook-def...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 457 of 608

The attorneys for the plaintiff have requested "fees and costs to address the time spent on this matter," which could be as much as hundreds of thousands of dollars.

Jones' attorney did not immediately respond to a request for comment. Jones said on his program that he had his staff delete the tweets in order to "take the super high road."

The defamation lawsuits are only part of Jones' mounting turmoil as of late. His social media presence has disintegrated, after Apple removed the full library of his podcasts, YouTube terminated his account and Facebook unpublished his pages. And following CNN's investigation, Twitter admitted late last week that Jones was in violation of its rules but would remain on the platform.

That changed on Tuesday, when Twitter suspended Jones from the platform for one week.

CNNMoney (New York) First published August 17, 2018: 6:23 PM ET

Twitter Suspends Alex Jones and Infowars for Seven Days - The New York Times

# The New York Times

# *Twitter Suspends Alex Jones and Infowars for Seven Days*

**By Cecilia Kang and Kate Conger**

Aug. 14, 2018



EXHIBIT
B-84

WASHINGTON — Twitter on Tuesday suspended the account of the far-right conspiracy theorist Alex Jones for a week after he tweeted a link to a video calling for supporters to get their "battle rifles" ready against media and others, in a violation of the company's rules against inciting violence.

The social media company followed up on Wednesday by also suspending the account for Infowars, the media website founded by Mr. Jones, for posting the same video.

The twin actions effectively prevent Mr. Jones and Infowars from tweeting or retweeting from their Twitter accounts for seven days, though they will be able to browse the service.

The moves were Twitter's harshest against Mr. Jones and Infowars after other tech companies took steps last week to ban them from their platforms. The removals began when Apple announced it would purge videos and other content by Mr. Jones and Infowars because of hate speech, followed by Facebook, YouTube and then Spotify. Twitter was the sole holdout among the major tech companies in not taking down content from Infowars and Mr. Jones, who has called the Sandy Hook shooting a hoax conducted by crisis actors.

Twitter's chief executive, Jack Dorsey, has been resolute in the company's decision to keep Mr. Jones's account online. He has said Twitter did not think that Infowars and Mr. Jones violated its rules, which prohibit direct threats of violence and some forms of hate speech but allow deception or misinformation.

But the lack of action prompted criticism of Twitter from its users — and even from some of its own employees. Late last week, Twitter began softening its tone, especially after CNN and others found more than half a dozen tweets from Mr. Jones that clearly violated the company's policies. Twitter said it ordered Mr. Jones to take those tweets down.

Even so, Twitter's actions stop short of a full ban of Mr. Jones and his publication from Twitter and leaves many questions unanswered about what actually gets people or organizations booted off the service. The company's policy calls for the short-term suspension of an account after repeated violations, but Twitter declined to clarify how many offenses would terminate Mr. Jones's account permanently.

The suspension began after Mr. Jones tweeted or retweeted more than a dozen times during the day on Tuesday, including one post that linked to a live video session in which he apparently called for violence against certain groups, including the media. After a user flagged the tweet, Twitter said it determined the post violated its safety rules. Mr. Jones was ordered to take down the tweet linking to the video broadcast on Periscope, the live-streaming service that is owned by Twitter.

A Twitter spokesman declined to comment on Tuesday beyond confirming that Mr. Jones's new tweet broke its rules and that he was frozen out of using the service for a week.

Not long after Mr. Jones's Twitter account was suspended, the Twitter account for Infowars sprang into action. "@RealAlexJones is now in @Twitter prison!" the Infowars account tweeted.

Then on Wednesday, the Infowars account posted the same offending video — and soon got the same timeout. Twitter said it had no further comment.

"I feel any suspension, whether it be a permanent one or a temporary one, makes someone think about their actions and their behaviors," Mr. Dorsey told NBC News in an interview on Wednesday. Referring to Mr. Jones, he added, "Whether it works within this case to change some of those behaviors and some of those actions, I don't know."

*Follow Cecilia Kang and Kate Conger on Twitter: @ceciliakang and @kateconger.*

Cecilia Kang reported from Washington and Kate Conger from New York.

A version of this article appears in print on Aug. 14, 2018, on Page B2 of the New York edition with the headline: Twitter Suspends Infowars Founder's Account Over a Tweet

# Why are you, U.S. Sen. Ted Cruz, defending Alex Jones?

*by Kirkus Reviews*

Dear U.S. Sen. Ted Cruz,

As counsel for the Sandy Hook parents in their Texas defamation lawsuits, we ask that you reconsider your recent statements about InfoWars host Alex Jones.

Over the past month, you have repeatedly defended Jones against Facebook's decision to ban his account. Just a few days ago, you wrote yet another tweet defending InfoWars against what you called "tech censorship online."

**ALSO READ: Lawyers accuse Alex Jones of deleting evidence in Sandy Hook case.**

When it comes to Jones, we can only presume that you are speaking from ignorance and that you do not know the nature of the conduct you are now zealously defending, nor the harm that has befallen my clients and many others. This is not a question of free speech. This is not a question of disagreeing with a person's political views. This is a question of just how much damage we're prepared to let a madman inflict on the lives of innocent victims through malicious lies and willful harassment.

We beg that you have your staff provide you the court filings in Pozner v. Jones, Cause No. D-1-GN-18-001842, and that you read the affidavit of former Statesman editor Fred Zipp, who details the monstrous five-year campaign of lies and dangerous harassment waged against the Sandy Hook families. You'll learn that when Leonard Pozner had videos about his son removed from YouTube, Jones retaliated by revealing addresses and displaying maps that could be used to find the family. You'll learn that in 2017, an InfoWars follower was sentenced to prison when law enforcement caught her stalking the Pozner family and threatening their lives.

**INSIGHT: Why Alex Jones, or someone like him, will be back on social platforms.**

Have your staff provide you the court filings in Heslin v. Jones, Cause No. D-1-GN-18-001835, and you'll learn that an InfoWars host laughed as he mocked a Sandy Hook father as a fake, claiming he could prove the father was lying about having held his dead child. Read these filings and understand what he and his reporters have done to endanger the community in Newtown, Conn., before you say anything else about Jones.

It doesn't stop with Sandy Hook. Consult the court filings in Fontaine v. Jones, Cause No. D-1-GN-18-001605, and read the affidavit of former Snopes.com editor Brooke Binkowski.

You'll learn that InfoWars maliciously accused an innocent young man of being the shooter in Parkland, Fla., based on a tip from neo-Nazi trolls on a gutter website famous for child pornography and other illegal activity. After InfoWars spread his image to millions, and as Jones insisted Parkland was a "false flag," conspiracy fanatics harassed this young man and threatened his life, alleging he was a "crisis actor."

EXHIBIT
B-85

8/25/2018, 3:47 PM

Why are you U.S. Sen. Ted Cruz, defending Alex Jones?          https://www.mystatesman.com/news/opinion/commentary-why-are-y...

22-01023-tmd Doc#1-6 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 461 of 608

**LIKE US ON FACEBOOK: <u>Our Viewpoints page brings the latest opinions to your feed.</u>**

Nor does it stop with the cases we are handling here in Texas. Jones also faces lawsuits in Virginia, Connecticut and Ohio. An armed InfoWars follower opened fire inside a pizzeria following Jones' bizarre lies about a pedophile dungeon in the basement run by Washington, D.C., elites. Jones told his followers that "you have to go investigate it for yourself." After Jones told his viewers that the Sutherland Springs church shooting was an operation ordered by the "deep state," conspiracy fanatics yelled violent threats at the pastor.

We're not sure what it will take for you to stop defending Jones. Does a Sandy Hook parent need to die before Facebook is allowed to deny this man a platform for his mayhem on their private service? Our clients fully recognize that if Jones wants to tell lies about them in the public square, there is very little anyone can do outside a courtroom to stop him. But we ask you not to defend the idea that private companies like Facebook must empower Jones to harass and endanger the lives of innocent victims.

**LETTERS TO THE EDITOR: <u>Click this link to submit your opinions.</u>**

Nor is this a political issue, nor a fight between Democrats and Republicans. Jones accused President Bush of staging 9/11, and he attacked your family, claiming your father, Rafael Cruz, killed JFK. Ever since the 2016 campaign, we have never understood why you refused to stand up for your family against the people who spread these lies — and you worked hard to ingratiate yourself to them. We are sure you had your reasons. And we are not asking you to stand up for the Sandy Hook families now; we just want you to fully understand what you are defending before you throw the weight of your office behind the man who has tormented their lives and so many others.

*Bankston and Ogden are attorneys representing Sandy Hook parents in Texas defamation lawsuits against Jones.*

Alex Jones destroyed evidence in Sandy Hook case, claim says    https://www.nbcnews.com/news/us-news/alex-jones-destroyed-eviden...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 462
of 608

# Alex Jones destroyed evidence in Sandy Hook case, claim says



Get breaking news alerts and special reports. The news and stories that matter, delivered weekday mornings.

Far-right agitator Alex Jones has been deleting social media posts about his conspiracy theory that the 2012 Sandy Hook mass shooting, which took the lives of 20 children and six adults, was a government hoax.

A Friday court filing on behalf of the father of a victim of the attack claims the removal amounts to destruction of evidence. The deletion of content that reflects Jones' view of the tragedy as a manufactured story using actors means that evidence is lost, the motion for sanctions claims.

Jones has been under pressure from critics who believe he and his Infowars brand shouldn't have free reign to inflict pain on victims via social media platforms. Facebook, YouTube and Apple have taken steps to remove Jones and Infowars. Twitter put Jones' account on a seven-day timeout Tuesday after finding that a post linking to a video in which he told his listeners to get "battle rifles" ready was a violation of its terms.

Infowars' reports and videos on Sandy Hook have blamed victims' parents, as well as the government, for manufacturing what it states was a hoax. Parents have been singled out by Jones, and his followers have issued threats against them.

Jones said during an Infowars broadcast last week that he instructed staffers to delete some social media posts in reaction to a news report the previous day that pointed out several posts appeared to violate Twitter's rules.

" ... It is clear from Mr. Jones' own admissions that relevant evidence has been lost," the filing reads. "As pressure mounted from pending defamation lawsuits and growing public indignation, Mr. Jones chose to destroy the evidence of his actual malice and defamatory conduct ... "

Southern California journalist Brooke Binkowski has been tracking Jones' social media, and her work was cited in the Texas claim. It states Binkowski "was able to confirm that specific InfoWars messages" were deleted after news reports came out about their apparent violation of Twitter's rules.

"I think he might have deleted every single reference to Sandy Hook parents," she told NBC News.

But while the filing claims "these materials are fruitful sources of evidence," Binkowski says she has preserved it. "I got it all," she said.



August 9, 2018                                                    Via Federal Express and Email

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

**Attn:** Alex Jones and Buckley Hamman
Free Speech Systems, LLC (**"Partner"**)
3019 Alvin DeVane Blvd Suite 350
Austin, Texas 78741
infowarsmain76@gmail.com, buckley@infowars.com

**Attention: Legal Department**
**Re: Termination of Content Agreements**

Dear Sir:

We write on behalf of Google LLC f/k/a Google Inc. ("**Google**") to inform you that we are exercising our contractual rights to terminate the Content Hosting Services Agreement ("**CHSA**"), dated December 12, 2013, and as amended on July 24, 2015. This letter serves as written notice that Google is exercising its right to terminate the **CHSA** on 30 days prior written notice under section 11.2.

Accordingly, the **CHSA** will be terminated as of **September 10, 2018**. The Sections that are described as surviving in the **CHSA** will survive termination. Upon termination, your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain.

This notice is not a waiver of any claims or defenses available to Google, including those set forth under the agreements

Signed by an authorized representative of Google:

By:

Name:        Philipp Schindler        2018.08.10
             Authorized Signatory     07:08:00 -07'00'

Date:



# BakerHostetler

Baker&Hostetler LLP

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5403

T 202.861.1500
F 202.861.1783
www.bakerlaw.com

Mark I. Bailen
direct dial: 202.861.1715
MBailen@bakerlaw.com

August 16, 2018

**VIA FEDEX**

Philipp Schindler
Senior Vice President
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Schindler:

We represent Free Speech Systems, LLC ("Free Speech") in certain federal court matters. Free Speech has forwarded to us your letter of August 9, 2018 regarding notice of termination of a Content Hosting Services Agreement ("CHSA"), dated December 12, 2013 and as amended on July 24, 2015. In accordance with its obligations in the court cases referenced above (as well as other litigated matters), Free Speech is required to preserve evidence including documents and videos posted pursuant to the CHSA.

It is not clear from your letter the specific grounds upon which Google is relying to terminate the CHSA. It is also not clear what is meant by your statement that "your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain." Please clarify what you mean by this statement and send us a copy of the CHSA, including all amendments, and any other documents that define "Content Owner" as referenced in the statement above.

Further, in light of its preservation obligations, Free Speech asks that Google refrain from deleting, destroying, dissolving, or otherwise rendering inoperable any videos or other documents posted by Free Speech or Alex Jones (or others at their direction) until Free Speech has retrieved all of the materials. We understand that Free Speech is currently unable to access these materials because its account is frozen.

You can email a copy of the CHSA to me at mbailen@bakerlaw.com. Please do so as soon as possible.

Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver
Houston    Los Angeles    New York    Orlando    Philadelphia    Seattle    Washington, DC



EXHIBIT
B-88

August 16, 2018
Page 2

Thank you for your attention to this matter and please feel free to contact me if you have any questions or would like to discuss further.

Sincerely,

Mark I. Bailen
Partner



# KASTER LYNCH
# FARRAR&BALL LLP

TEXAS | FLORIDA

May 25, 2018

*Via Facsimile: 512-472-5248*

Mr. Eric Taube
Registered Agent for Free Speech Systems, LLC
Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Ste. 1800
Austin, Texas 78701

Re: Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, et al.*, In the 345th District Court of Travis County, Texas.

Dear Mr. Taube,

I understand from discussions with my associate Mr. Ogden that you contacted my office today asking that my clients grant a favor to Mr. Jones and Infowars by allowing them an extension of time to file an answer to the lawsuit brought by the Pozners. It is my understanding that Mr. Jones has requested we grant him this favor because he has not yet been able to secure counsel to defend him against these claims.

Frankly, Mr. Jones' failure to secure legal representation is none of our concern. We expect Mr. Jones and Infowars to file a timely answer regardless of when he is able to locate an attorney willing to defend him. Additionally, in light of the years of torment Mr. Jones has inflicted on my clients, and in light of his continuing slander against my clients and our law firm, we have absolutely no inclination to do any favors for Mr. Jones. Indeed, during Mr. Jones' unhinged rant broadcast yesterday on Infowars, Mr. Jones referred to the members of my law firm as "devil-people." His request for an extension is therefore denied.

Furthermore, Mr. Jones needs to understand that the only focus of our law firm is to safeguard the interests and well-being of our clients. We will never take any action in this suit which provides Mr. Jones any benefit at their detriment. As such, there will be no favors or extensions in this case. This case will proceed according to the Texas Rules of Civil Procedure, and we expect Mr. Jones to comply with the commands of the law.

Finally, I would like to note that for the record that our law firm is committed to transparency through the pendency of these lawsuits. For that reason, we plan to make available to the general public and media copies of all correspondence and pleadings which arise in this lawsuit, including this letter.

Sincerely,

Mark D. Bankston
Kaster Lynch Farrar & Ball

1010 Lamar St. | Suite 1600 | Houston, Texas 77002 | p 713.221.8300 | 800.311.1747 | f 713.221.8301



EXHIBIT
B-89

YouTube removes Alex Jones' page, following earlier bans          https://www.cnbc.com/2018/08/06/youtube-removes-alex-jones-accou...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 467
of 608

# YouTube removes Alex Jones' page, following earlier bans

*Sara Salinas*

YouTube has removed Alex Jones' page, following bans earlier Monday from Apple and Facebook.

The Alex Jones Channel, which counts 2.4 million subscribers, still appeared in YouTube search results by midday Monday, but presented only a take-down notice when users clicked in.

"This account has been terminated for violating YouTube's Community Guidelines," the notice said.





This account has been terminate

EXHIBIT
B-90

Google had previously declined to comment on the InfoWars host's standing, but said in a statement to CNBC in response to the removal of the page: "All users agree to comply with our Terms of Service and Community Guidelines when they sign up to use YouTube. When users violate these policies repeatedly, like our policies against hate speech and harassment or our terms prohibiting

YouTube removes Alex Jones' page, following earlier bans          https://www.cnbc.com/2018/08/06/youtube-removes-alex-jones-accou...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 468
of 608

circumvention of our enforcement measures, we terminate their accounts."

YouTube counts "strikes" against pages for posts that violate the company's policies. Jones received a strike in July when he posted four videos that violated YouTube policies against child endangerment and hate speech, the company said in a statement to CNBC.

A page with one strike against it is suspended from live streaming for 90 days, YouTube said, but Jones attempted to circumvent the suspension by live streaming on other channels. As a result, his page was terminated, the company said.

The InfoWars YouTube page, which has significantly fewer subscribers, was still live as of noon ET.

Jones and his controversial radio show have for several weeks been at the center of a debate around fake news and misinformation on digital platforms. Facebook and CEO Mark Zuckerberg drew criticism last month for declining to remove the InfoWars page.

Music streaming service Spotify removed InfoWars podcasts last week, and Apple and Facebook each cited violations of company policies regarding hate speech in banning Jones on Monday.

Jones confirmed on Twitter that he had been banned by Facebook, Apple and Spotify.

"What conservative news outlet will be next?" he tweeted.



## Facebook, YouTube and Apple delete Alex Jones content

Apple confirmed on Monday that it had removed five out of six podcasts, which includes Alex Jones' infamous The Alex Jones Show. Facebook has also removed four pages that belong to Jones. YouTube followed suit later, removing his channel from its platform. YouTube removed Jones' official channel because he continued to livestream on other channels even though he was banned for 90 days due to previous violations.

01:13



EXHIBIT
B-91



# Poll: Majority believe Alex Jones should be banned from social platforms

BY **HARPER NEIDIG** - 08/27/18 12:02 PM EDT

**56** SHARES



A majority of voters think social media companies should ban Infowars founder Alex Jones from their platforms, according to a Harvard CAPS/Harris poll released exclusively to The Hill.

The poll showed 61 percent of registered voters surveyed believed Jones, who spreads unfounded conspiracy theories through his radio show Infowars, should be banned from the sites of tech companies, while 39 percent disagree.

Jones, who has claimed that the 9/11 terrorist attacks were perpetrated by the government and that the Sandy Hook massacre was a hoax, was banned from Facebook for 30 days and from Twitter for a week for violating the company's guidelines. Other social media companies have also followed suit.

However, some conservatives such as Sen. Ted Cruz (R-Texas) have objected, saying it violated Jones's First Amendment rights. Meanwhile, Republicans including President Trump have accused social media companies of censoring conservative voices.

Sixty-four percent of those polled said platforms like Facebook and Twitter should be held legally liable for the content that's published on their sites. Websites currently have broad legal protections related to what their users post, though some lawmakers advocate cutting into that immunity.

## Just In...

**Why bailouts won't make the electric grid more resilient**
OPINION — 1M 48S AGO

**Lawmakers demand action, hearing in response to VA improperly denying sexual trauma claims**
DEFENSE — 11M 59S AGO

**Poll: GOP Rep. Duncan Hunter up by 8 points despite indictment**
CAMPAIGN — 13M 6S AGO

**New York City fines Kushner Companies $210,000 for filing false paperwork**
ADMINISTRATION — 20M 38S AGO

**Trump administration to disburse first $6 billion in farm bailout**
ADMINISTRATION — 23M 18S AGO

**GOP lawmakers urge improvements to cyber vulnerabilities resource**
CYBERSECURITY — 26M 57S AGO

**Top Japanese official: China tech success aided by totalitarianism**
TECHNOLOGY — 30M 50S AGO

**Trump damages law enforcement by condemning 'flipping' of criminals like Cohen**
OPINION — 31M 47S AGO

Poll: Majority believe Alex Jones should be banned from social media platforms | TheHill

VIEW ALL

Voters are slightly less sure about whether tech companies should be able to take down or censor content.

When asked if internet users should be allowed to freely access all internet content or if some things should be censored, 51 percent favored censorship while 49 percent said all content should be accessible.

"Most Americans believe that big tech companies should censor some content but they believe such censorship should be limited to the standards of the First Amendment and community decency standards," said Harvard CAPS/Harris Poll co-director Mark Penn.

"They believe Alex Jones should have had only material related to false conspiracies removed, not wholesale removal of all his material," he added.

"But if tech companies continue to act like and be seen as media companies then most of the public thinks they should be held accountable for all of the material they carry, which would be a sea change in liability for these companies," he also noted.

When asked about specific companies, 65 percent of those polled said they believed Facebook was neutral, while 56 percent thought that was the case with Twitter and 55 percent with Google and YouTube. Meanwhile, 50 percent thought of Instagram as neutral.

The Harvard CAPS/Harris Poll online poll consisted of surveys of 1,330 registered voters conducted Aug. 22-23. The partisan breakdown is 37 percent Democrat, 32 percent Republican, 29 percent independent and 2 percent other.

The Harvard CAPS/Harris Poll is a collaboration of the Center for American Political Studies at Harvard University and The Harris Poll. The Hill will be working with Harvard/Harris Poll throughout 2018.

The Harvard CAPS/Harris Poll survey is an online sample drawn from the Harris Panel and weighted to reflect known demographics. As a representative online sample, it does not report a probability confidence interval.

TAGS  DONALD TRUMP  TED CRUZ  TWITTER  FAKE NEWS  INFOWARS  CENSORSHIP  FACEBOOK  SOCIAL MEDIA

Related News  by



Cohen attorney jeered on NBC after soliciting...



5 Great Email Marketing Services For Your...
Sponsored | WordPress.com



Second ex-Walker Cabinet member backs...



Hunter's hometown paper demands his...



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2018 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## AFFIDAVIT OF ROB DEW

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared ___Rob Dew___, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.      My name is Rob Dew. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I am directly in charge and oversee all news media and social media for Defendants. I have personal knowledge of the facts herein stated and they are true and correct.

2.      The June 25, 2017[1] broadcast about which Plaintiff complains was not deleted from YouTube or destroyed by any of the Defendants. Defendants have preserved this video. In fact, this video was provided to Plaintiff as attachment B-36 to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

---

1 The video about which Plaintiff complains did not occur on June 26, but instead on June 25, 2017.



EXHIBIT
*C*
PENGAD-Bayonne, N. J.

3.     The July 20, 2017 broadcast about which Plaintiff complains was not deleted from YouTube or destroyed by any of the Defendants. Defendants have preserved this video. In fact, this video was provided to Plaintiff as attachment B-37 to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

4.     The four tweets referenced in the August 9, 2018 CNN article cited in Plaintiff's Motion for Sanctions for Intentional Destruction of Evidence and were dated December 19, 2012, September 24, 2014, December 2, 2014, and July 7, 2015.

5.     Those tweets were removed out of an immediate and serious concern they may have violated Twitter's terms of service as argued in the article. I believed this was a valid concern and important given that several social media accounts had just recently been banned on Aug. 6. I believe that it was highly likely that after the CNN article cited by Plaintiff was published, Twitter, like many others such as YouTube, Facebook and Apple, would succumb to the public pressure and ban the twitter account permanently. I believed that this would have resulted in the permanent loss by Defendants of access to every post ever made under the account.

6.     Defendant did not intend to destroy any evidence nor did it destroy any evidence regarding these tweets. Defendants have preserved copies of each of the 4 tweets. They also attempted to preserve copies of each of the comments posted on each tweet and were able to preserve the vast majority of them. However, despite these efforts 17 comments were not able to be retrieved, because they were either deleted by the users who made the comments or those users accounts have been deleted or removed by Twitter, which are the most likely causes and something that Defendants have no control

over and could have happened at any time since the posting, or were inadvertently lost from Defendant's cache.

7.     The tweet posted December 19, 2012 had only 23 comments since it was posted in 2012. Defendants were able to preserve 18 of those 23 comments.

8.     The tweet posted September 24, 2014 had only 18 comments since it was posted in 2014. Defendants were able to preserve 16 of those 18 comments.

9.     The tweet posted December 2, 2014 had on 5 comments since it was posted in 2014. Defendants were able to preserve 3 of those 5 comments.

10.    The tweet posted July 7, 2015 had only 8 comments since it was posted in 2015. All of the 8 comments to this tweet were unfortunately lost.

11.    The loss of these few comments was completely unintentional and Defendants in no way intended to destroy evidence.

12.    The four tweets removed from the twitter account regarding Sandy Hook do not mention or reference Plaintiff or his son in any manner.

Further Affiant Sayeth Not.

SWORN TO and SUBSCRIBED before me by Rob Dew on August 23, 2018.



Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## AFFIDAVIT OF MARK C. ENOCH

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

I, Mark C. Enoch, do hereby declare under penalty of perjury that the following is true and correct.

1.      My name is Mark C. Enoch. I am fully competent and capable in all respects to make this Affidavit. As lead counsel in this case, I have become familiar with the facts by reviewing documents and speaking with witnesses, I have read the pleadings and discovered and reviewed evidence and have studied the statutory and common law relating to the causes of action alleged by Plaintiff, the law relating to discovery that may be allowed under the Texas Citizens Participation Act, and the law relating to sanctions. Based upon my role as lead counsel in this case and the work that I have done, I have personal knowledge of all of the facts stated in this Affidavit, and they are true and correct. This Affidavit is submitted in connection with Defendants' Response to



Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions contained therein filed in the above-styled litigation.

2.    I am an attorney duly licensed to practice law in the State of Texas and have been continuously licensed and have practiced civil trial and appellate law since 1979. I am with the law firm of Glast, Phillips & Murray, P.C. which represents the Defendants in the above-styled litigation. My practice has been devoted to civil litigation such as this in state and federal court. I have been continuously certified in civil trial law by the Texas Board of Legal Specialization since 1988. I have also been involved in civil appeals and have prepared appellate briefs and arguments.

3.    My standard hourly billing rate and my hourly billing rate for this matter is $535. The other senior-level attorneys, associate attorneys and paralegal who have worked on this matter also have billed at the firm's standard hourly billing rates for each such senior-level attorney, associate attorneys and paralegal. The hourly billing rates for the two other senior-level attorneys is $390 and $400 respectively. The hourly billing rates for the associate is $290. The firm's standard hourly billing rate for the paralegal who has worked on this matter is $110.

4.    I am familiar with rates charged by attorneys and paralegals in Dallas and surrounding counties as well as rates charged by attorneys and paralegals in Travis and surrounding counties for civil litigation matters and these hourly rates are reasonable when compared to customary and typical hourly rates charged in those areas of Texas for attorneys with similar education, experience, training and abilities.

5.      On August 17, 2018 Plaintiff's counsel filed his Motion for Sanctions for Intentional Destruction of Evidence.  He did this when he knew that I was away from the office on a vacation of which he was properly notified on June 29, 2018.  A true and correct copy of that  vacation/unavailability letter sent to Plaintiff's counsel is attached hereto marked as Exhibit A.  In addition, I had informed Plaintiff's counsel before my vacation that during my time away I would be "largely unavailable" for my two week vacation.

6.      As a result of this filing, Defendants incurred reasonable and necessary attorney's fees and costs directly related to responding to this motion.

7.      Because I was out of the office with limited phone and internet service, communication with attorneys and staff in the office was inefficient.  For example, I spent more than three hours in the days after Plaintiff's filing just trying to send and receive emails that otherwise would have taken seconds.

8.      The total of fees billed by Glast, Phillips & Murray and incurred by Defendants as a direct result of Plaintiff's Motion for Sanctions through the date of this affidavit in connection with responding to that motion is $28,162.00 and the communication expenses total $75.00.  Based on my education, experience and training, it is my opinion that a.) the law firm's hourly rates are reasonable and typical and customary for similar legal services in Travis and Dallas Counties and b.) that the total fees billed as of this date were and are both reasonable and necessary to properly defend against Plaintiff's motion. It is my further opinion based upon my education, training and experience that the time expended on each individual task completed by Glast, Phillips &

Murray in this matter in preparing the response was appropriate, reasonable and necessary and that the lawyer and/or paralegal was appropriately assigned to each task. The total amount incurred by Defendants includes fees associated with, among other things, reviewing the motion and exhibits, reviewing case law, reviewing emails and correspondence relevant to the motion, reviewing and commenting on drafts of the response, preparing a letter to the Court dated August 21, 2018 and investigating the allegations.

9.     Furthermore, I estimate that further legal work will be reasonable and necessary to prepare for and attend the August 30 hearing.  For this anticipated legal work, I estimate, and my opinion is, based on my education, experience and training, that Defendants will incur additional reasonable and necessary attorney fees in an amount of approximately $3,275.00.

10.     Based upon my education, experience and training, it is my opinion that the above rates and amounts are reasonable and necessary for the services rendered and to be rendered considering, among other things, the novelty and difficulty of the issues involved, the skill and training of the lawyers involved and the skill required to provide the legal services properly, the time and labor involved to perform the legal services properly, the fee customarily charged in the community for similar services, time constraints placed on the lawyers by the clients and circumstances of the case and the issues and amounts involved and the results obtained.

Executed in Dallas County, State of Texas.

_____
Mark C. Enoch

       SWORN TO and SUBSCRIBED before me by Mark C. Enoch on August 27, 2018.

_____
Notary Public in and for
the State of Texas

My Commission Expires:

_____7/3/21_____

MELANIE J ILLIG
Notary Public
STATE OF TEXAS
ID#78994-4
My Comm. Exp. July 3, 2021

---

AFFIDAVIT OF MARK C. ENOCH (Sanctions)                                    Page 5

6/29/2018 9:55 AM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Hector Gaucin-Tijerina**

# GLAST, PHILLIPS & MURRAY

A PROFESSIONAL CORPORATION

MARK C. ENOCH, J.D., M.B.A.
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

June 29, 2018

*Via efiling*

Clerk, 261st District Court
Travis County
1000 Guadalupe, 5th floor
Austin, TX 78701

Re:     **Amended Vacation/Unavailability Letter;** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer;* Cause No. D-1-GN-18-001835, 261st District Court, Travis County, Texas

Dear Clerk:

I will be on vacation/unavailable on the following dates:

July 14 – August 1
August 12 – August 26

Please do not schedule any hearings or court trial dates during this time-frame. By copy of this letter I am requesting that opposing counsel not schedule any hearings or depositions during this time period as well. Thank you for your attention to this matter.

Very truly yours,

/s/ *Mark C. Enoch*

Mark C. Enoch

MCE:mji
cc:    Mr. Mark D. Bankston (*via e-service*)


EXHIBIT
**A**

8/28/2018 5:59 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Terri Juarez**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## SUPPLEMENTAL AFFIDAVITS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT

COME NOW, Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively, the "Defendants"), and hereby file supplemental affidavits in support of their Motion to Dismiss Under the Texas Citizens Participation Act.

Defendants hereby file the Affidavit of Alex Jones attached hereto as Exhibit "A" and the Affidavit of Owen Shroyer attached hereto as Exhibit "B."

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

*/s/ Mark C. Enoch*
Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:    972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August, 2018, the foregoing was sent via efiletxcourts.gov's e-service system to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com


_____ */s/ Mark C. Enoch*_____
Mark C. Enoch

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN,<br>    *Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| V. | §<br>§ | TRAVIS COUNTY, T E X A S |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER,<br>    *Defendants* | §<br>§<br>§<br>§<br>§ | <br><br><br>261st JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF ALEX E. JONES</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Alex E. Jones, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.  My name is Alex E. Jones. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts herein stated and they are true and correct.

2.  I have reviewed the affidavit of Brooke Binkowski filed as part of the response to the Defendants' Motion to Dismiss. While she claims a "cooperative relationship" between Infowars and Zero Hedge with some sort of agreement to promote and endorse each other's contents, this statement is false. None of the Defendants has



ever cooperated in any way with Zero Hedge nor have Defendants and Zero Hedge ever promoted or endorsed each other's content. At times, Infowars has cited, discussed and commented on articles posted by Zero Hedge as was done in this case. Many, many others have cited their work besides Defendants. Neither I nor anyone affiliated with the Defendants has ever known the identity of any contributor to or editor of, or owner of, either iBankcoin or Zero Hedge. It has always been my understanding that whoever they are, they guard their personal identities zealously because of concerns for personal reprisals such as I and other conservatives have experienced.

3.      Ms. Binkowski's statement that Infowars was collaborating with Zero Hedge is false. Defendants have never nor on this occasion did Defendants collaborate, cooperate or communicate with Zero Hedge about any article including the article that was discussed in the broadcasts which are the subject of this lawsuit.

4.      Ms. Binkowski's additional statements that Defendants' broadcasts which are the subject of this action were provoked and in retaliation for Ms. Heslin's appearance on the NBC broadcast, are false as well. The statements I made during the July 20 broadcast and the statements made by Owen Shroyer which I showed in the broadcast were motivated only by my desire to criticize Megyn Kelly and NBC's slanted coverage of my views.

5.      Finally, Ms. Binkowski alleges that Zero Hedge is a "dubious" source of information and promotes only "fake news." While she may have this personal opinion,

my opinion is otherwise. I do not and have never considered either iBankcoin or Zero Hedge a " dubious" source.

6.      It appears that Ms. Binkowski's opinion of them is based upon her own perception and personal liberal bias.   For example, she claims that "no competent journalist would republish allegations from an anonymous" source.   Journalists and reporters all over the world have and continue to accept information from anonymous sources.

7.      Further, Ms. Binkowski is not a disinterested person.  Attached hereto and marked as Exhibit 1 is a true and correct copy of Brooke Binkowski's Tweet dated April 16, 2018, the day this lawsuit was filed against Defendants, which attaches comments. Her Tweet that date was "Okay, God, now do Alex Jones." I interpret that to mean she wanted me and Infowars to suffer harm.  Evidently her followers did as well because they wanted to "throw in" other well-known politically conservative personalities into God's "doing" including Rush Limbaugh, Laura Ingraham, Nancy Grace and Ann Coulter.

8.      Regarding Megyn Kelly's interview of me for NBC, I told Ms. Kelly that with respect to Sandy Hook, "In hindsight, I think it probably did happen." but she did not include this in the aired broadcast.

Further Affiant Sayeth Not.

SWORN TO and SUBSCRIBED before me by Alex E. Jones on August 28 , 2018.



TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4 - 21 - 2022

8/25/2018                          Brooke Binkowski on Twitter: "Okay, God, now do Alex Jones."

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 487
of 608



**Brooke Binkowski** ✔
@brooklynmarie

( Follow )     ⌄

# Okay, God, now do Alex Jones.

12:00 PM - 16 Apr 2018

**547** Retweets  **3,373** Likes     

💬 **65**        ⟲ **547**          **3.4K**

 **Satan** @LuciferGOP · Apr 16                                    ⌄
Replying to @brooklynmarie @AngrierWHStaff
Just spoke with the big guy, he's willing to do Alex Jones if I throw in Rush
Limbaugh.

💬 **3**        ⟲ **13**          **141**

 **Paul Clewell** @paulclewell · Apr 16                              ⌄
I don't see a problem here.

💬 **3**        ⟲            **40**

 **Satan** @LuciferGOP · Apr 16                                    ⌄
None whatsoever

💬 **1**        ⟲            **17**

 **todd harms** @TfredharmsTodd · Apr 16                          ⌄
Could we throw in Laura Ingrham too?

💬 **2**        ⟲            **29**

 **Paul Clewell** @paulclewell · Apr 16                              ⌄
Oh! Oh! And Nancy Grace, please!

💬 **1**        ⟲            **15**

 **#memoriesoneatatime** @bcyn66 · Apr 16                        ⌄
Ann Coulter?

💬 **2**        ⟲            **4**

 **Paul Clewell** @paulclewell · Apr 16                              ⌄
Also good.

EXHIBIT
1
PENGAD-Bayonne, N.J.

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## AFFIDAVIT OF OWEN SHROYER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Owen Shroyer, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.     My name is Owen Shroyer. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts herein stated and they are true and correct.

2.     I have reviewed Ms. Binkowski's affidavit attached to the Plaintiff's Response to Defendants' Motion to Dismiss. In her affidavit she alleges that there was a cooperative relationship between the Defendants and Zero Hedge and by implication, iBankcoin. She alleges that we and I were actively collaborating with Zero Hedge to



spread "fake news." She further states that I was motivated by retaliation in making my statements having been provoked by Mr. Heslin. Each of these statements is false.

3.    Neither I nor anyone I know associated with Defendants has ever had a cooperative relationship in which they published, promoted or endorsed each other's content. Indeed, neither I nor anyone I am familiar with at the Defendants knows of the identities of any contributor, editor, owner or other person affiliated with either of those two websites. Neither I nor anyone I know associated with Defendants had any communications with them other than simply obtaining information from the Zero Hedge website as we do from many, many other websites. In short, there is no affiliation or familiarity between any of the Defendants or myself and any person affiliated with Zero Hedge or iBankcoin.

4.    Furthermore, the purpose of my statements in the June 25 broadcast was to point out that Zero Hedge article (reprinting the iBankcoin article) criticizing Megyn Kelly and NBC. I was not at all motivated by what Mr. Heslin did. Rather I was responding to learning of that day's publication of the Zero Hedge article criticizing Kelly and NBC.

5.    Furthermore, Ms. Binkowski alleges that Zero Hedge is a "dubious" source and has spread "fake news." While she is entitled to her personal opinion, it is no more valid than my opinion that many reporters and editors in main stream media regularly misrepresent facts and omit other material facts to tilt their broadcast and "news" stories toward their liberal agenda. I am not alone in this opinion as reflected by large viewership of Fox News as just one example.

6.     I do not consider Zero Hedge to be a dubious source, nor do I consider just because it is posted by anonymous people, dubious. Ms. Binkowski appears to believe that if a website is criticized by *some* as promoting "fake news" then it could not be reasonable for any other to disagree with that opinion and believe it is not a "fake news" site. While it is true that some claim Zero Hedge is a source of "fake news," it is also true that I and many others believe otherwise. Zero Hedge has also been praised by others, including the *Columbia Journalism Review*, *New York Magazine*, the *New York Times*, *Business Time*, and *Time*.

7.     The *Columbia Journalism Review* reported that its "...news accounts have been pretty straightforward."[1]  And while Ms. Binkowski alleges that Zero Hedge is all about "conspiracy theories," one such "theory" about trading became the "talk of the industry." Joe Hagan, writing in *New York Magazine*, noted that Zero Hedge's founder was a "zealous believer in a sweeping conspiracy at the helm of U. S. policy," with collusion between "the Treasure and the Federal Reserve."  Nevertheless, he concluded the Zero Hedge allegations resulted in Senator Chuck Schumer sending a letter to the SEC that caused that agency to quickly say it was considering a ban on the trading that Zero Hedge had attacked.[2]

---

[1] Attached hereto and marked as Exhibit 1 is a true and correct copy of the *Columbia* article posted at the url: https://archives.cjr.org/the_audit/good_goldman_question_from_zer.php

[2] Attached hereto and marked as Exhibit 2 is a true and correct copy of Mr. Hagan's article in *New York Magazine* posted at the url: http://nymag.com/guides/money/2009/59457/

8. The *New York Times* has described Zero Hedge as a "well-read and controversial financial blog." In that article, the *Times* noted that Zero Hedge's reports about Morgan Stanley – which the *Times* called a "potent cocktail of information" - were so effective among its readers that Morgan's stock price immediately fell 10%, its lowest price since the 2008 financial crisis.[3]

9. By 2009, Zero Hedge already had 333,000 unique visitors each month.[4] By 2011, *Time* recognized it as the ninth best financial blog.[5]

10. In the past I have reviewed articles from Zero Hedge that I have found to be credible and factually correct. While Ms. Binkowski attempts to buttress her opinion of Zero Hedge by alluding to Snopes.com articles, neither Snopes.com nor Ms. Binkowski is a disinterested person or group. She and Snopes regularly attack Jones on their site and on other media platforms. Ms. Binkowski herself has tweeted "Okay, God, now do Alex Jones." She did this on April 16, the day the Defendants were sued in this case. Her ugly tweet caused dark and threatening comments from her obviously liberal followers. Clearly her text summarizes her deep seated contempt for Alex and Infowars that she wished to spread among many others. Attached hereto and marked as Exhibit 5 is a true and correct copy of Brooke Binkowski's tweet that I reviewed at her Twitter account on the internet.

---

[3] Attached hereto and marked as Exhibit 3 is a true and correct copy of *The New York Times* article at the url: https: https://dealbook.nytimes.com/2011/10/04/morgan-tries-to-quell-rumors-about-its-holdings/
[4] Attached hereto and marked as Exhibit 4 is a true and correct copy of a *Business Times* article posted at the url: http://business.time.com/2009/10/01/wall-streeters-like-conspiracy-theories-always-have/
[5] See D. Jones Affidavit filed July 13, 2018 and its attached exhibit B-53.

Further Affiant Sayeth Not.

_____
Owen Shroyer

   SWORN TO and SUBSCRIBED before me by Owen Shroyer on August 28 ,
2018.



TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022
_____

# Columbia Journalism Review.

(https://www.cjr.org/) (https://www.cjr.org/)

The voice of journalism

# Good Goldman Question From Zero Hedge

Seems reasonable to me:

"What Is The Rationale Behind The SEC's Hiring A 29 Year Old Goldmanite As Its COO?" (http://www.zerohedge.com/article/what-rationale-behind-secs-hiring-29-year-old-goldmanite-its-coo)



EXHIBIT

1

PENGAD-Bayonne, N.J.

8/28/2018    Good Goldman Question From Zero Hedge - Columbia Journalism Review

22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd. Pg 494 of 608

*While one may or may not have feelings about Goldman's tentacled capture of various regulatory agencies, the most recent news out of the SEC that it would be hiring a 29 year old former Goldman Vice President Adam Storch as its COO, questions the rationale behind this move. First, and not being ageist here, but a 29 year old to run what is arguably the most critical post at the SEC - that in charge of operations?*

So far, news accounts have been pretty straightforward (http://www.bloomberg.com/apps/news?pid=20601087&sid=a6ItnK32Cl6Y).

I'm not the fan of ZH that some are. To pick nits, the first sentence isn't grammatical: "the most recent news...questions the rationale behind this move." And this SEC position is actually COO of the enforcement division, which, true, is just as problematic, but it still isn't arguably the most critical post at the SEC. Listen, we make mistakes all the time—and they don't help us, either.

*New York*'s Joe Hagan makes a good case (http://nymag.com/guides/money/2009/59457/) for Zero Hedge's (and other financial blogs') rising influence, with the high-frequency trading issue presented as "Exhibit A." In that case, an esoteric issue was bandied around specialty blogs for a while before exploding onto the front page (http://www.nytimes.com/2009/07/24/business/24trading.html?_r=2&ref=todayspaper) of *The New York Times* and into the halls of Congress. We had problems (http://www.cjr.org/the_audit/nyt_flashes_confusion_in_hft_r.php?page=1)with some of how it all went down, but the heat on the issue also generated plenty of light. *Time* summarizes the thinking about ZH here (http://curiouscapitalist.blogs.time.com/2009/10/01/wall-streeters-like-conspiracy-theories-always-have/).

This is all a long way of saying I don't know whether it's okay to rely on Zero Hedge's facts, like:

*Based on his record, Mr. Storch is not even a licensed (Series 7/63) broker:*

But dagnabit, this isn't about Zero Hedge!

8/28/2018 Good Goldman Question From Zero Hedge - Columbia Journalism Review

22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd.   Pg 495 of 608

The SEC says Storch worked for five years in a unit that reviewed contracts and transactions for signs of fraud. Also the enforcement chief says his "skill in technology systems, workflow process, and project management will greatly benefit the division."

And yet the question remains. What's the answer?

> *Has America ever needed a media watchdog more than now? Help us by joining CJR today (https://ssl.palmcoastd.com/18801/apps/MEMBER1?ikey=5\*\*M02).*

Dean Starkman Dean Starkman runs The Audit, CJR's business section, and is the author of *The Watchdog That Didn't Bark: The Financial Crisis and the Disappearance of Investigative Journalism* (http://www.deanstarkman.com/book/) (Columbia University Press, January 2014). Follow Dean on Twitter: @deanstarkman (https://twitter.com/deanstarkman).

8/28/2018                The Rising Power of Financial Blog Zero Hedge - Money 2009 - New York Magazine

22-01023-tmd   Doc#1-6   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd. Pg 496
of 608

# The Dow Zero Insurgency

**The nothing-can-be-believed chaos of the financial crisis created a golden opportunity for a blog run by a mysterious ex-hedge-funder with a dodgy past and conspiracy theories to burn.**

By Joe Hagan   Published Sep 27, 2009 ShareThis                                                        **3 Comments**



*Illustration by Matthew Woodson*

Last spring, in a far corner of the Internet, an unknown blogger began to piece together a conspiracy theory: The investment bank Goldman Sachs was using sophisticated, high-speed computers to siphon hundreds of millions of dollars in illegitimate trading profits from the New York Stock Exchange, invisibly undercutting the market and sidestepping the regulatory reach of the Securities and Exchange Commission.

Only a few loyal readers paid attention to the blog called Zero Hedge, a no-frills site full of arcane analysis decipherable only by finance professionals. But when a former Goldman Sachs computer programmer was arrested for allegedly stealing software codes used for the firm's electronic trading arm, and a federal prosecutor was quoted saying the codes could be used to "manipulate markets in unfair ways," the once-obscure blog ignited a chain reaction. While on a golf outing, an editor at the New York *Times* learned from a friend who worked on Wall Street that the Zero Hedge allegation was the talk of the industry, and an assignment ensued. On July 24, the *Times* published a front-page article on so-called high-frequency trading and its potential abuses, which in turn prompted Chuck Schumer, a member of the Senate Finance Committee, to draft a letter to the SEC that same day. Twelve days later, the SEC signaled that it was considering a ban on the very computerized trading that Zero Hedge had attacked.

Suddenly, the shadowy figure behind Zero Hedge was a full-blown cult hero—a blogger with a bullet. His readership of angry traders and anti-government malcontents celebrated his newfound power. "Welcome to the party pal!!!" declared one of his fans in the comments section.

In a sign of just how radically the order has shifted in the political and media world, neither the *Times* nor Schumer had a clue about the identity of the pseudonymous author behind Zero Hedge. As it happens, the founder is a 30-year-old Bulgarian immigrant banned from working in the brokerage business for insider trading. A former hedge-fund analyst, he's also a zealous believer in a sweeping conspiracy that casts the alumni of Goldman Sachs as a powerful cabal at the helm of U.S. policy, with the Treasury and the Federal Reserve colluding to preserve the status quo. His antidote? A purifying market crash that leads to the elimination of the big banks altogether and the reinstatement of genuine free-market capitalism.

Never mind Dow 10,000. Dan Ivandjiiski is all about Dow Zero.

Last year's financial implosion left the investing public deeply unsettled about who or what to trust. The information that flowed from the banks, the ratings agencies, the regulatory agencies, and the mainstream media—the bedrock of the financial markets, in a sense—was viewed with great suspicion, and that created an opportunity for financial bloggers: a motley assortment of amateurs and professionals from all over the map. There are traders, economists, venture capitalists, financial advisers, and pajama-clad cranks all vying to explain the complex machinations that got us into this mess and to critique governmental solutions. Sites like Naked Capitalism, Seeking Alpha, the Big Picture, Infectious Greed, Angry Bear, Calculated Risk, and Zero Hedge have hatched communities based on discontent and disbelief, forming a kind of ragtag insurgency against the financial Establishment and what they view as its feckless lackeys in the government and media.

"We're all happily cruising along, doing our financial-journalism thing, until late 2007," explains Felix Salmon, who now blogs for Reuters. "We have relationships with flacks, and suddenly they started lying to us. Outright lies. And you're like, 'Wait, that's not kosher, you can't do that.' " Among bloggers, Salmon is more of the Establishment type, with little tolerance for the sloppy thinking of excitable bloggers.

Financial blogs grew out of the message boards launched by Yahoo! Finance in the late nineties, which were primarily a forum for day traders to argue investment ideas and vent little-guy frustrations about

MONEY 2009

## What's It All Worth?

- The Rise of Apocalyptic Financial Bloggers
- Madoff Victims in Exile
- The Markup on Eli Manning
- Is Being Cheap Genetic?
- Real Estate Vultures
- The Micro-Economy of Union Square
- Are New Yorkers Thrifty?



EXHIBIT
2

8/28/2018                    The Rising Power of Financial Blog Zero Hedge - Money 2009 - New York Magazine

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 497
of 608

the Wall Street power structure.

The first financial blogger, according to Barry Ritholtz of the Big Picture, was Todd Harrison, the head trader for the hedge fund run by CNBC talking head Jim Cramer (also a *New York* Magazine contributing editor) in the early aughts. Harrison, who wrote a daily market column for Cramer's TheStreet.com, "would crank out these little notes intraday," recalls Ritholtz. "It was a real-time trader with real assets under management discussing trading flow."

In the years that followed, blogs proliferated. They were mostly side projects, updated sporadically. Ritholtz, who started the Big Picture in 2003, was a market strategist who zeroed in on flaws in the government's inflation data. Calculated Risk was started by a retired businessman in Southern California who took an obsessive interest in exotic mortgages and saw the housing collapse years in advance. Naked Capitalism, which features the work of a small gang of contributors, is overseen by a former Goldman Sachs and McKinsey executive who goes by the pseudonym Yves Smith.

Next: How Zero Hedge distinguished itself.

1 | 2 | 3 | 4 | 5 | 6 | 7    Next



Copyright © 2018, New York Media LLC. All Rights Reserved.

8/28/2018    Morgan Tries to Quell Rumors About Its Holdings - The New York Times

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 498
of 608

# The New York Times

# Morgan Tries to Quell Rumors About Its Holdings

**By Susanne Craig**    October 4, 2011 9:26 pm

Morgan Stanley executives are battling a daily barrage of speculation and nay-saying to try to stem a sharp slide in the company's stock.

It is a war that is being fought in large part in the shadows: against anonymous blogs and market whispers, but also against undefined fears about exposure to troubled European banks. While those worries are common to all the big Wall Street banks, Morgan Stanley, as the smallest, is perhaps the most vulnerable among them.

In response, Morgan Stanley executives have been rallying employees and talking to the company's biggest shareholders. The campaign culminated late on Monday, with the Mitsubishi UFJ Financial Group, which owns approximately 22 percent of Morgan Stanley, publicly reaffirming its support for the company.

The push may have helped on Tuesday. Shares of Morgan Stanley rose 12.4 percent, after falling nearly 29 percent since the beginning of September. Morgan and other banks were primarily buoyed on Tuesday by a suggestion that European officials would look at bank recapitalizations.

Nonetheless, there has been a bloodbath in bank stocks. Morgan Stanley is down 48.5 percent for the year; Goldman Sachs has fallen 44 percent; and Bank of America is off about 57 percent. And the cost of insuring Morgan Stanley's debt for five years through credit-default swaps, though it eased on Tuesday, remains at levels that were seen during the financial crisis.

EXHIBIT
**3**
PENGAD-Bayonne, N. J.

8/28/2018    Morgan Tries to Quell Rumors About Its Holdings - The New York Times

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 499 of 608

Morgan Stanley's war-roomlike approach to market volatility highlights the difficulties of stamping out speculation in a world of instant, and often anonymous, information.

Its latest round of troubles began on Friday morning before the markets opened at 9:30 a.m. Zero Hedge, a well-read and controversial financial blog, linked to a Bloomberg News article that noted Morgan's credit-default swap spreads had been widening. The Zero Hedge post also directed readers to a previous Zero Hedge article that pegged Morgan Stanley's net exposure to French banks at $39 billion, about $12 billion more than the bank's current market capitalization, reigniting fears about its exposure.

It was a potent cocktail of information. The company's stock opened down more than 3 percent, prompting a flood of calls to Morgan's investor relations and press offices.

Calling Zero Hedge for damage control was not an option. The post was written by an anonymous blogger who goes by the name of "Tyler Durden," a character in the movie "The Fight Club," and the Web site does not give readers a way to readily reach its writers.

Adding to Morgan Stanley's woes, Friday was the last day of Morgan Stanley's third quarter. The company is set to release its earnings in a few weeks, and securities laws limit what it can say about its financial condition. Unable to reach Zero Hedge, Morgan Stanley's investor relations department went into overdrive, quickly pulling together talking points for callers that were circulated to both media and investor relations staff members.

According to the talking points, reviewed by The New York Times, the numbers cited by Zero Hedge "represent gross asset positions and thus do not reflect the benefit of collateral or other hedges and protection, and the more relevant exposure to consider is the net exposure."

So what is its net exposure? The company was limited in what it could say because of the pending earnings announcement. To address this point, staff

members were told to direct callers to pre-existing stock research. "Analysts estimate that the actual net exposure is meaningfully lower," the talking points read.

In particular, they cited a recent report by Brad Hintz, an analyst with Sanford C. Bernstein & Company, who estimated that Morgan's "total risk to France and its banks is less than $2 billion net of collateral and hedges."

Zero Hedge could not be reached for comment.

Despite Morgan Stanley's efforts, the stock ended on Friday down about 10 percent, at $13.51, its lowest close since the fall of 2008 and the depth of the financial crisis. The stock price was particularly frustrating to James P. Gorman, the company's chief executive since early 2010. He has been leading the effort to rebuild the company; he even bought 100,000 shares of Morgan Stanley in early August at approximately $20 a share.

On Friday, Mr. Gorman shared his concerns with senior executives at Mitsubishi, conversations that culminated with discussions over the weekend between Mr. Gorman and Nobuyuki Hirano, his counterpart at the Japanese bank. The two men discussed the market rumors, concurring that they ran contrary to what they felt was going on in the market, said two people briefed on the conversation.

The company is expected to report third-quarter results in two weeks. Those results, these people said, are solid in light of the recent stock market rout. Analysts polled by Thomson Reuters estimated that the bank would report a profit of 36 cents a share.

Mr. Gorman and Mr. Hirano agreed that it would be helpful if Mitsubishi issued a news release expressing its support. That did not come, however, until Monday after the close.

Early on Monday Mr. Gorman decided to speak out himself. "In fragile markets, where fear triumphs over common sense, these things are bound to happen. It is easy to respond to the rumor of the day, but that is not usually productive," he wrote in a note to employees. "Instead we should let balanced third parties do their own analysis and let the facts speak."

On Monday, despite Mr. Gorman's efforts, the company's stock tumbled 7.7 percent.

Six minutes after the close, Mitsubishi issued its statement. "In response to recent market volatility M.U.F.G. wishes to reiterate that we are firmly committed to our long-term strategic alliance with Morgan Stanley. The special relationship we have formed remains core to our global business strategy."

Initially, the statement seemed to have little effect on the stock. The cost to insure Morgan Stanley's bank debt with credit-default swaps on its debt continued to rise Tuesday morning, but then fell back, according to Markit, a financial information company. Its shares closed at $14.01, up $1.54, or more than 12 percent.

"Mitsubishi's announcement was the equivalent of a Japanese firm saying you are part of the family," Mr. Hintz said.

---

© 2017 The New York Times Company

# Zero Hedge, Felix Salmon, Joe Hagan and conspiracy theories

Felix Salmon, after previously describing the readers of the blog sensation Zero Hedge as loser day traders and getting called out for it by my old friend The Equity Private (now blogging at Zero Hedge as Marla Singer), reconsiders:

> Far from reflecting the conspiracy-minded and often-disjointed ramblings of harmful-only-to-themselves retail day-traders, could ZH actually be holding up a mirror to what the market's really like, once you strip away the artificial polish of the PR departments and the urbane investment-banking types?

Uh, yeah. And this is a surprise why? Wall Street traders are among the most conspiracy-minded group of people on the planet. Always have been, as far as I can tell.

That's because (1) some financial market conspiracies are real and (b) without theories of some sort to grasp on to, you're going to get completely lost in the chaos of the market's day-to-day movements. The same goes for technical analysis, a.k.a. chart-reading. Most of it is nonsense, some of it isn't, and without it a lot of succeful traders would be completely lost. Ditto for Austrian economics.

Joe Hagan plays up the conspiracy angle in his excellent article on Zero Hedge in this week's *New York* mag—as Hagan recounts it, the blog didn't get any traction until founder Dan Ivandjiiski began pumping up the paranoia:

> [A]s his posts got more detailed, a theme began to emerge: Wall Street was a vast conspiracy. Nothing could be trusted. All markets were corrupt. The darker his vision the more popular he became.

Former hedge-fund analyst Ivandjiiski (he blogs as Tyler Durden—the New York Post tentatively outed him last month and Hagan does so definitively in his article) had figured out how to tap into that trading-floor longing for order in the chaos. That, plus he's is a wonderfully persistent investigative reporter. Most good investigative reporters are conspiracy theorists, by the way. Ivandjiiski singlehandedly turned high-frequency trading into a big political issue. In the process I'm pretty sure he wildly overstated its significance and dastardliness, but that's part of his appeal.

I always have the feeling when I go to Zero Hedge that I'm eavesdropping on a bunch of conversations between traders. Most of what's said in those conversations is half-baked hooey—as is most of what Ivandjiiski writes. But there is still truth to be gleaned from it. (I should add that most "serious"

EXHIBIT

4

PENGAD-Bayonne, N.J.

Zero Hedge, Felix Salmon, Joe Hagan and conspiracy theories   http://business.time.com/2009/10/01/wall-streeters-like-conspiracy-th...

22-01023-tmd  Doc#1-6  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 503
of 608

journalism—including mine—is probably half-baked hooey as well. It pays to be a critical information consumer.)

So I don't find it all that surprising that lots of serious financial types and journalists looking for scoops read the blog. I can't bring myself to read it more than once every couple of days. But then, I wouldn't survive 30 seconds on a Wall Street trading floor.

Of course, there aren't enough serious financial types out there to account for Zero Hedge's impressive 333,000 unique visitors a month. I would think a significant percentage of current readers are regular folks who are furious about the financial crisis, the bailouts and the state of the economy, and are attracted to Ivandjiiski's paranoid and apocalyptic worldview. Some are also just plain nutters (read the comments to Hagan's article for a taste), but that's true of at least some portion of the readership of every publication/blog on the planet except of course this one.

I would guess that the site's growth will slow as the predicted apocalypse keeps getting pushed into the future (unless of course Ivandjiiski's right about everything, in which case I will start checking Zero Hedge 20 times a day until the electricity goes out). But I don't think it's necessarily a flash in the pan—as long as Ivandjiiski & Co. keep digging up new conspiracy theories and every once in a while one of them turns out to be at least partly true.

**Update:** I missed Matt Taibbi's take from a couple of days ago on the meaning of Zero Hedge. Don't make the same mistake—it's really smart.

Brooke Binkowski on Twitter: "Okay, God, now do Alex Jones."



**Brooke Binkowski** ✓
@brooklynmarie

〔 Follow 〕 ⌄

# Okay, God, now do Alex Jones.

12:00 PM - 16 Apr 2018

**547** Retweets   **3,373** Likes

💬 65    ⟲ 547    **3.4K**

**Satan** @LuciferGOP · Apr 16    ⌄
Replying to @brooklynmarie @AngrierWHStaff
Just spoke with the big guy, he's willing to do Alex Jones if I throw in Rush Limbaugh.

💬 3    ⟲ 13    141

**Paul Clewell** @paulclewell · Apr 16    ⌄
I don't see a problem here.

💬 3    ⟲    40

**Satan** @LuciferGOP · Apr 16    ⌄
None whatsoever

💬 1    ⟲    17

**todd harms** @TfredharmsTodd · Apr 16    ⌄
Could we throw in Laura Ingrham too?

💬 2    ⟲    29

**Paul Clewell** @paulclewell · Apr 16    ⌄
Oh! Oh! And Nancy Grace, please!

💬 1    ⟲    15

**#memoriesoneatatime** @bcyn66 · Apr 16    ⌄
Ann Coulter?

💬 2    ⟲    4

**Paul Clewell** @paulclewell · Apr 16    ⌄
Also good.

EXHIBIT
5

8/28/2018 6:02 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Terri Juarez

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF DEFENDANTS' FIRST AMENDED RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS AND MOTION FOR EXPEDITED DISCOVERY AND DEFENDANTS' MOTION FOR SANCTIONS

COME NOW, Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively, the "Defendants"), and hereby file a supplemental affidavit in support of their First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions.

Defendants hereby file the Affidavit of Rob Dew attached hereto as Exhibit "A."

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

_____*/s/ Mark C. Enoch*_____
Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:     972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2018, the foregoing was sent via efiletxcourts.gov's e-service system to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

*/s/ Mark C. Enoch*
Mark C. Enoch

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261ˢᵗ JUDICIAL DISTRICT |

## AFFIDAVIT OF ROB DEW

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Rob Dew, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.     My name is Rob Dew. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I am directly in charge and oversee all news media and social media for Defendants. I have personal knowledge of the facts herein stated and they are true and correct.

2.     Defendants did not delete or remove any video on Periscope that related in any way to Plaintiff, Mr. Pozner, Ms. De La Rosa, any parent or victim, Sandy Hook, Newtown, any investigation thereof or reports thereon, or any other person connected to that tragedy.



EXHIBIT
*A*

Further Affiant Sayeth Not.

_____
Rob Dew

SWORN TO and SUBSCRIBED before me by Rob Dew on August  28, 2018.

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

8/29/2018 5:11 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Irene Silva

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## DEFENDANTS' OBJECTIONS TO
## PLAINTIFF'S EVIDENCE SUBMITTED IN RESPONSE TO DEFENDANTS' MOTION
## TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT

COME NOW, Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively, the "Defendants"), and hereby file this, their Objections to Plaintiff's Evidence Submitted in Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act. These objected-to affidavits and evidence should not be considered by the Court for any purpose for the reasons hereinafter stated. In support of the requested relief, Defendants present the following objections, argument and authorities.

For the Court's convenience, the objections, argument and authorities of each objected-to affidavit and evidence begin at the page listed below:

1.  Fred Zipp (*Exhibit A to Plaintiff's Response*) – Page 2
2.  Brooke Binkowski (*Exhibit B to Plaintiff's Response*) – Page 34
3.  Neil Heslin (*Exhibit C to Plaintiff's Response*) – Page 66
4.  H. Wayne Carver, II, M.D. (*Exhibit D to Plaintiff's Response*) – Page 69
5.  Scarlett Lewis (*Exhibit E to Plaintiff's Response*) – Page 71
6.  John Clayton (*Exhibit F to Plaintiff's Response*) – Page 72
7.  Marcus Turnini (*Exhibit G to Plaintiff's Response*) – Page 74
8.  Plaintiff's proposed written discovery to Defendants (*Exhibit H to Plaintiff's Response*) – Page 74
9.  Notice of Violation (*Exhibit I to Plaintiff's Response*) – Page 74
10. Fred Zipp [*Pozner and DeLaRosa v. Jones et al* case] (*Exhibit J to Plaintiff's Response*) – Page 75

---

### 1.     OBJECTIONS TO AFFIDAVIT OF FRED ZIPP

Defendants Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC, (collectively, the "Defendants"),file Defendants' Objections to Zipp Affidavit filed by Plaintiff in his Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

In *E.I. dePont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) the Court says "[p]rofessional expert Improper for opinion witnesses are available to render an opinion on almost any theory, regardless of its merit."   Thus we see Mr. Zipp's opinions tendered in this case.

### a.     *Zipp's opinions on his view of questions of law are inadmissible*

An opinion is inadmissible because it is an opinion on a question of law.

Whether a statement is defamatory is a question of law.   See, *Bently v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2003); *Campbell v. Clark*, 471, S.W.3d 615, 624 (Tex. App. – Dallas 2015, no pet.); *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App. – Dallas 2011, no pet.).

Expert opinions on questions of law are not admissible.   See *Mega Child Care v. Texas Dep't of Protective & Regulatory Svcs.*, 29 S.W.3d 303, 307 (Tex. App. – Hou. [14th Dist.] 2000, no pet.); *Holden v. Weidenfeller*, 929 S.W.2d 124, 133 (Tex. App. – Austin 1996, writ den.).

### b.     *Zipp's opinions on his view of malice or reckless state of mind of other persons are inadmissible*

Knowledge of falsity or reckless disregard for the truth are the quintessence of malice. See *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016); *Bentley*, 94 S.W.3d at 600-60`. Expert opinion on malice is inadmissible.  See *Jianguang Wang v. Tang*, 260 S.W.3d 149,160 (Tex. App. – Houston [1st Dist.] 2008, pet. den.), cert. den. 2009 U.S. LEXIS 1581 (2009); *Gonzles v. Hearst Corp.*, 930 S.W.2d 275, 284 (Tex. App. – Houston [14th Dist.] 1996, no pet.)

*c. Zipp's opinions based on unidentified publications, or on publications that are irrelevant because of the statute of limitations or the subject matter of the instant lawsuit are inadmissible*

Mr. Zipp relies on snippets of prior publications many of which are not identified, as the foundation for his opinions as to both the defamatory nature of the publications at issue and reckless disregard for the truth. Tex. R. Evid. R. 703 allows an expert to rely on data not otherwise admissible if it is of the type of data reasonably relied upon by experts in the field. Mr. Zipp's reliance on publications other than those made the basis of the defamation claims, especially those published outside the one-year limitations period, are nothing more than a "back door" attempt to get those prior publications into evidence. Further, Mr. Zipp does not lay the necessary foundation or predicate required under Tex. R. Evid. R. 703.

The publications referred to by Mr. Zipp are mentioned because the publication at issue was "not made in isolation." (Affidavit p. 7) The inference Mr. Zipp presses upon the court is that because the statement at issue was but one of several, going back a number of years, it is defamatory of Plaintiffs and was knowingly or recklessly made.

The earlier publications would not be admissible under Tex. R. Evid. R. 401-403, 404, 406 and 608(b).

His stated portions and summaries of these snippets also violate Tex. R. Evid. R. 1002.

Whether the statements at issue in 2017 were made is undisputed; thus it is unnecessary to introduce the earlier publications as proof that the statement at issue was made. Mr. Zipp argues, however, that the earlier publications somehow make it more likely than not that the statement at issue is defamatory and was made with intentional or reckless disregard for the truth. The problem, for plaintiffs and Mr. Zipp, is that he doesn't "connect the dots," that is, he doesn't say how the earlier publications inform the decision that the publication at issue is

defamatory or the product of mal- or mis-feasance.  Either it is, or it isn't.

*A priori*, Mr. Zipp's reliance on earlier publications is inappropriate.  His opinions rest almost entirely on these earlier partial publications.   That the earlier publications make the defamatory nature of the publication at issue more likely than not defamatory, or was made with intentional or reckless disregard for the truth, depends alone on Mr. Zipp's *ipse dixit*.  As such, his opinions are inadmissible.  See *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

### d. Objections to Exhibits A-1 to A-23 attached to Zipp affidavit

Defendants make the following objections to the admissibility of Exhibits A- 1 to A-23 attached to the Zipp affidavit:

Hearsay Tex. R. Evid. R. 802

Not relevant – Tex. R. Evid. R. 402

Prejudice outweighs relevance – Tex. R. Evid. 403

Violates best evidence rule Tex. R. Evid. R. 1002, 1003

No authentication – Tex. R. Evid. R. 901

### 5.    Objections to Specific Statements

In addition to the above objections to the Zipp opinion, Defendants make the following specific objections to the Zipp opinion:

| Affidavit Statements | Objections |
| --- | --- |
| Page 1, First paragraph under Scope of Review "whether assertions could be responsibly published" | Lack of foundation/predicate<br><br>Not Relevant<br><br>Vague and Ambiguous<br><br>Hearsay |
| 8 bullet points under Scope of Review | Lack of foundation/predicate |

| | |
|---|---|
| | Lack of identification of materials reviewed<br><br>Hearsay |
| Page 2, First paragraph under Background Knowledge of InfoWars, second sentence | Not relevant<br><br>Hearsay |
| Second paragraph under Background Knowledge of InfoWars "significant amount of time" | Vague and Ambiguous<br><br>Conclusory |
| Second paragraph under Background Knowledge of Infowars, second sentence | Conclusory<br><br>Lack of foundation/predicate<br><br>Not relevant |
| Third paragraph under Background Knowledge of Infowars, second sentence | Conclusory<br><br>Violates TRE 404<br><br>Lack of foundation/predicate |
| Fourth  paragraph under Background Knowledge of Infowars, | Not relevant<br><br>Hearsay<br><br>Lack of predicate/foundation<br><br>Conclusory |
| Page 3, First paragraph under number 1, first sentence | Conclusory<br><br>Lack of foundation/predicate<br><br>Not relevant<br><br>Lack of personal knowledge |

|  |  |
|---|---|
|  | Statements of what was in June 26 and July 20 videos are hearsay, lack a foundation and predicate and are not complete<br><br>Best evidence rule |
| Page 3, middle three paragraphs | Violates TRE 1002 – best evidence rule<br><br>Hearsay |
| Last paragraph under number 1 at bottom of page 3 and continuing to page 4 beginning "My review…"<br><br>Paragraph beginning "My review…" | Statements of what was in June 26 and July 20 videos are hearsay, lack a foundation and predicate and are not complete<br><br>Speculation<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate<br><br>Conclusory<br><br>Not relevant<br><br>Violates TRE 403 |
|  |  |
| Same paragraph, fourth and fifth sentence | Not relevant<br><br>Not probative<br><br>Improper opinion of expert on question of law<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate |

|  | Speculation |
|---|---|
| Under "Opinions" Page 4, first paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 5, 1st paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 5, 2nd paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 6, 1st paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 6, 2nd paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 7, 1st paragraph | Not relevant, violates TRE 404, violates best evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 7, under A., 1st paragraph | Not relevant, violates best |

| | |
|---|---|
| | evidence rule, conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge, speculation as to state mind and intent |
| p. 7 second paragraph through penultimate paragraph on p. 13 | Hearsay TRE 801<br><br>Violates best evidence rule TRE 1002, 1003<br><br>Repeating videos needless presentation of cumulative evidence TRE 403<br><br>Not relevant TRE 402<br><br>No predicate of personal knowledge TRE 602 |
| p. 7, last paragraph, 1st sentence, "numerous false and irresponsible claims" | Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 7, 1st full paragraph, "false statements" | Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 10, 2nd paragraph, 1st sentence "false claims" | Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 10, last paragraph, "prior false claims" | Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides |

| | |
|---|---|
| | on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 11, last paragraph, 2nd sentence – "numerous false claims . . . made over the years" | Not relevant TRE 402<br><br>No predicate of personal knowledge TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Violates best evidence rule TRE 1002, 1003<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 12, last paragraph – "false claims … chilling finale" | Not relevant -- TRE 402<br><br>No predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, |

| | |
|---|---|
| | 998 S.W. 2d 605, 620 |
| | Violates best evidence rule -- TRE 1002, 1003 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 13, 1st full paragraph – "is the subject of a separate lawsuit . . . De La Rosa" | Not relevant TRE 402<br><br>Prejudice outweighs relevance – TRE 403 |
| p. 13, 1st full paragraph, 2nd sentence – "false accusation" | Not relevant TRE 402<br><br>Prejudice outweighs relevance – TRE 403<br><br>No predicate of personal knowledge TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Violates best evidence rule TRE 1002, 1003<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides |

| | |
|---|---|
| | on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 13, 2nd full paragraph, 3rd sentence – "waffled on" | Not relevant TRE 402 <br><br> Prejudice outweighs relevance – TRE 403 <br><br> Outside scope of expert specialty -- TRE 702 <br><br> Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620 <br><br> Violates best evidence rule TRE 1002, 1003 <br><br> Conclusory without bases – TRE 703 <br><br> Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 14, 1st full paragraph | Opinion not relevant TRE 402 <br><br> Speculation, no predicate of personal knowledge -- TRE 602 <br><br> Outside scope of expert specialty -- TRE 702 |

| | |
|---|---|
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Violates best evidence rule TRE 1002, 1003 |
| p. 14, 2nd full paragraph | Opinion not relevant -- TRE 402<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |

| | |
|---|---|
| | Violates best evidence rule TRE 1002, 1003 |
| p. 14, 3rd full paragraph | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Last sentence and quote: Hearsay TRE 802 Not relevant – TRE 402 Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| p. 14, last paragraph | Hearsay TRE 802 |
| | Not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule |

| | |
|---|---|
| | TRE 1002, 1003 |
| p. 15, 1ˢᵗ full paragraph | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Last sentence and quote: Hearsay TRE 802 Not relevant – TRE 402 Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| p. 15, 2ⁿᵈ full paragraph | Opinion not relevant -- TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |

| | |
|---|---|
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 15, heading at 2. | Opinion not relevant TRE 402<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 15, under heading 2, 1st | Opinion not relevant TRE |

| paragraph | 402 |
|---|---|
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 15, heading A | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides |

| | |
|---|---|
| | on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 15, last paragraph | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Sentences 5, 6, 7, 8, & 9: Hearsay TRE 802 Not relevant – TRE 402 Prejudice outweighs relevance – TRE 403 Violates best evidence rule TRE 1002, 1003 |
| p. 16, 1st paragraph | Opinion not relevant TRE 402 |

| | |
|---|---|
| | Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 16, heading B | Opinion not relevant TRE 402<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04- |

| | |
|---|---|
| | 03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| p. 16, 2nd full paragraph | Opinion not relevant TRE 402

Speculation, no predicate of personal knowledge -- TRE 602

Outside scope of expert specialty -- TRE 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Conclusory without bases – TRE 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)

Hearsay TRE 802

Not relevant – TRE 402

Prejudice outweighs relevance – TRE 403

Violates best evidence rule TRE 1002, 1003 |
| p. 16, 3rd full paragraph with indent | Opinion not relevant TRE 402 – "unhinged crank," "disturbing," "ridiculous," "bizarre" |

| | |
|---|---|
| | Speculation, no predicate of personal knowledge -- TRE 602 <br><br> Outside scope of expert specialty -- TRE 702 -- "unhinged crank," "disturbing," "ridiculous," "bizarre" <br><br> Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 -- "unhinged crank," "disturbing," "ridiculous," "bizarre" <br><br> Conclusory without bases – TRE 703 -- "unhinged crank," "disturbing," "ridiculous," "bizarre" <br><br> Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) <br><br><br> Indent: <br> Hearsay TRE 802 <br> Not relevant – TRE 402 <br> Prejudice outweighs relevance – TRE 403 <br> Violates best evidence rule TRE 1002, 1003 |
| p. 16, last paragraph and photo on page 17 | Opinion not relevant TRE 402 – "purported" <br><br> Speculation, no predicate of |

| | |
|---|---|
| | personal knowledge -- TRE 602 |
| | No authentication – TRE 901 -- photo |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| p. 17, 1st full paragraph with indent | Opinion not relevant TRE 402 – "bizarre," "anti-Semitic rants" |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – |

| | |
|---|---|
| | TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Indent:<br>Hearsay TRE 802<br>Not relevant – TRE 402<br>Prejudice outweighs relevance – TRE 403<br>Violates best evidence rule TRE 1002, 1003 |
| p. 17, last full paragraph an 1ST photo on p. 18 | Opinion not relevant TRE 402 – "obsessed"<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |

| | |
|---|---|
| | Hearsay TRE 802 |
| | Not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| | No authentication – TRE 901 - photo |
| p. 18, only paragraph and photo | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Conclusory without bases – TRE 703 |
| | Hearsay TRE 802 |
| | Not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| p. 19, 1st paragraph | Opinion not relevant TRE 402 – "no rational journalist," "for anything," "improbable," "uncritical," "reckless," "deceptive" |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Conclusory without bases – TRE 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)

Hearsay TRE 802

Statements not relevant – TRE 402

Prejudice outweighs relevance – TRE 403

Violates best evidence rule TRE 1002, 1003 |
| p. 19, heading C | Opinion not relevant TRE 402

Speculation, no predicate of personal knowledge -- TRE 602

Outside scope of expert specialty -- TRE 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Conclusory without bases – TRE 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04- |

| | |
|---|---|
| | 03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Hearsay TRE 802<br><br>Violates best evidence rule TRE 1002, 1003 |
| p. 19, 2nd full paragraph | Opinion not relevant TRE 402 – "wild," falsehoods," "debunked," "malicious"<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Hearsay TRE 802<br><br>Not relevant – TRE 402 – "five years"<br><br>Prejudice outweighs relevance – TRE 403 |

| | Violates best evidence rule TRE 1002, 1003 |
|---|---|
| p. 19, 3rd full paragraph | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Hearsay TRE 802 |
| | Not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Ambiguous and vague – "made a variety of factual allegations," "various claims," "wide variety" |
| p. 19, 4th full paragraph | Opinion not relevant TRE 402 – "ample," "enormous," |

|  | |
|---|---|
|  | extreme," "outcry," "unlikely," "intentionally," "reasonable," "entertain serious doubts," "desire to mislead" |
|  | Speculation, no predicate of personal knowledge -- TRE 602 -- "ample," "enormous," extreme," "outcry," "unlikely," "intentionally," "reasonable," "entertain serious doubts," "desire to mislead" |
|  | Outside scope of expert specialty -- TRE 702 -- "ample," "enormous," extreme," "outcry," "unlikely," "intentionally," "reasonable," "entertain serious doubts," "desire to mislead" |
|  | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
|  | Conclusory without bases – TRE 703 |
|  | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
|  | Not relevant – TRE 402 |
|  | Prejudice outweighs |

| | |
|---|---|
| | relevance – TRE 403 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Vague and ambiguous -- "ample," "enormous," extreme," "outcry," "unlikely," "intentionally," "reasonable," "entertain serious doubts," "desire to mislead" |
| p. 19, heading D | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| | Hearsay TRE 802 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Ambiguous and vague |

| | |
|---|---|
| p. 19, last paragraph, continuing to p. 20 – "rise to notoriety," coincided," "boast," "considered by many" | Opinion not relevant TRE 402<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Hearsay TRE 802<br><br>No authentication or predicate for documentary cites – TRE 902, TRE 802<br><br>Violates best evidence rule TRE 1002, 1003<br><br>Statements not relevant – TRE 402<br><br>Prejudice outweighs relevance – TRE 403 |
| p. 20, 1st full paragraph | Hearsay TRE 802<br><br>No authentication or predicate for documentary |

| | |
|---|---|
| | cites – TRE 902, TRE 802 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Statements not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| p. 20, 2nd full paragraph | Hearsay TRE 802 |
| | Statements not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| p. 20, 3rd full paragraph | Hearsay TRE 802 |
| | No authentication or predicate for documentary cites – TRE 902, TRE 802 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Statements not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| p. 20, last paragraph and photo on p. 21 | Opinion not relevant TRE 402 – "similar" |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Conclusory without bases – TRE 703 |
| | Hearsay TRE 802 |
| | No authentication or predicate for photo – TRE 902, TRE 802 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Statements not relevant – TRE 402 |
| | Prejudice outweighs relevance – TRE 403 |
| p. 21, 1st full paragraph | Opinion not relevant TRE 402 |
| | Speculation, no predicate of personal knowledge -- TRE 602 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory without bases – TRE 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |

| | |
|---|---|
| | Statements not relevant – TRE 402<br><br>Prejudice outweighs relevance – TRE 403 |
| p. 21, after Conclusion – "evidence I have reviewed," "failed to use reasonable care," "entertained serious doubts," "acting with intent to deceive," "reckless disregard," "falsity," "harmful," "subject him to public contempt, hate or ridicule" | Opinion not relevant TRE 402<br><br>Speculation, no predicate of personal knowledge -- TRE 602<br><br>Outside scope of expert specialty -- TRE 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory without bases – TRE 703<br><br>Vague and ambiguous.<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005)<br><br>Hearsay TRE 802<br><br>Statements not relevant – TRE 402<br><br>Prejudice outweighs relevance – TRE 403<br><br>Vague and ambiguous |

## 2.    OBJECTIONS TO AFFIDAVIT OF BROOKE BINKOWSKI

Defendants file their Objections to the Brooke Binkowski Affidavit submitted in response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act.

In *E.I. dePont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) the Courts says "[p]rofessional expert witnesses are available to render an opinion on almost any theory, regardless of its merit."  The Court's ominous warning is especially applicable to the testimony of Ms. Binkowski.

### a.    *Qualifications*

Ms. Binkowski does not list her credentials other than to say that she is "a multimedia journalist and professional researcher and the [Managing [e]ditor of Snopes.com."  She provides no *curriculum vitae* listing her education, training or experience.  She lists no publications, grants, research projects, fellowships, theses, dissertations or any other data from which to evaluate her expertise.  Plaintiffs bear the burden of establishing Ms. Binkowski's  credentials. See *Broders v. Heise*, 924 S.W.2d 148, 152-53 (Tex. 1996).  Opinion testimony offered by a witness lacking the requisite expertise is no evidence at all.  See *City of Keller v. Wilson*, 168 S.W.3d 802, 812-13 (Tex. 2005).

### b.    *Relevance: Question of Law*

Whatever Ms. Binkowski's qualifications may be, the expressions of opinion stated in her report are not relevant for the purpose of Tex. R. Evid. R. 703 in that they are of no assistance to the trier of fact.  If the issue is whether Defendants defamed Plaintiff by *innuendo*, this is a question of law.  See *Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. Civ. App. – Dallas 1968, no writ).  Because it is a question of law, Ms. Binkowski's opinion on the matter is irrelevant.  See *Upjohn Co. v. Rylander*, 38 S.W.3d 600, 611 (Tex. App. – Austin 2000, pet. den.)

Likewise, Ms. Binkowski's statement (last paragraph on page 2) to the effect that a

viewer "could reasonably interpret these comments as asserting that the Sandy Hook shooting was staged and that [Plaintiffs] were not real parents" is an opinion on a question of law and as such is inadmissible.  In addition to being an opinion on a question of law, this opinion is flawed because there is "to great an analytical gap" between the data and the opinion.  In this instance, there are not merely gaps, but yawning chasms.  First, Ms. Binkowski does not identify what "other statements made in the broadcast" inform her opinion.  Second, even if one were to view the entire broadcast so that every other statement were taken into account, Ms. Binkowski does not say how she arrived at her conclusion.  Because of these flaws, this opinion too is inadmissible.  See *Exxon Pipeline Co. v. Zwzhr*, 88 S.W.3d 623, 629 (Tex. 2002).

Finally, Ms. Binkowski's last opinion (on page 3), that "this" (whatever "this" is) "fits a larger pattern of behavior [of routinely denigrating victims of shootings]" is no more than Ms. Binkowski's editorial comment; as such, it has no place in a forensic setting.  Again, Ms. Binkowski does not identify the data; she says that because she's an expert (in some unidentified discipline) her opinion may be trusted without more.  Texas does not recognize this as a basis for admitting opinion testimony.  See *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010).

In addition to the broader objections to the Binkowski opinion, Defendants make the following specific objections to the Binkowski opinion:

| Paragraph | Affidavit Objections |
|---|---|
| 11 | Not relevant TRE 402

No assistance to fact finder -- TRE 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Conclusory without |

| | |
|---|---|
| | bases – TRE 703 |
| 14 | Not relevant TRE 402 |
| | No predicate of personal knowledge TRE 602 |
| | No assistance to fact finder -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Violates best evidence rule TRE 1002, 1003 |
| | Conclusory without bases – TRE 703 |
| 16 | Not relevant TRE 402 |
| | Outside scope of expert specialty -- TRE 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Violates best evidence rule TRE 1002, 1003 |
| | "significant:" Conclusory without bases – TRE 703 |
| 17 | Not relevant – TRE 401, 402 |

| | |
|---|---|
| 18 | Not relevant TRE 402<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Violates best evidence rule TRE 1002, 1003<br><br>"notable," "not consistently" -- Conclusory without bases – TRE 703 |
| 19 | Violates best evidence rule TRE 1002, 1003 |
| 20 | Not relevant TRE 402<br><br>No assistance to fact finder -- TRE 702<br><br>"ambiguous," "reasonably" -- Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Violates best evidence rule TRE 1002, 1003<br><br>Conclusory without bases – TRE 703 |
| 21 | Not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>No predicate for |

| | | |
|---|---|---|
| | | expert testimony – TRE 703 |
| | | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 22 | | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | | No authentication – TRE 901 |
| 23 | | Not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | | Hearsay – TRE 801(d), 802 |
| | | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | | No authentication – TRE 901 |
| | | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 24 | | Not relevant & no assistance to fact finder – TRE 401, 402, 702 |

| | |
|---|---|
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Hearsay – TRE 801(d), 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 25 | Not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Hearsay – TRE 801(d), 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE |

| | |
|---|---|
| | 701, 702, 703 |
| 27 | Hearsay – TRE 801(d), 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| 28 | Not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Hearsay – TRE 801(d), 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 29 | Not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Hearsay – TRE 801(d), 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – |

| | |
|---|---|
| | TRE 901 |
| 30 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 31 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 32 | "callously," "sickening," and "own opinion" -- Opinion not relevant & no assistance to |

| | |
|---|---|
| | fact finder – TRE 401, 402, 702

Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620

Best Evidence Rule – TRE 1001, 1002, 1007

No authentication – TRE 901

Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 33 | "own assertion," "false," "not contradicted" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620

Best Evidence Rule – TRE 1001, 1002, 1007

No authentication – TRE 901

Conclusory, lack of foundation/predicate, lack of personal |

| | |
|---|---|
| | knowledge – TRE 701, 702, 703 |
| 34 | "deceptively edited" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 34 | "deceptively" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – |

| | |
|---|---|
| | TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 35 | "reinforces" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 36 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, |

| | |
|---|---|
| | 1007 |
| | No authentication – TRE 901 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation – TRE 701, 702, 703 |
| 37 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | "continuously debunked"-- Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 38 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder – TRE |

| | |
|---|---|
| | 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 39 | Best Evidence Rule – TRE 1001, 1002, 1007<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 40 | Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 41 | "likewise traffics fake news" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. |

| | |
|---|---|
| | 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 42 | Not relevant – TRE 401, 402<br><br>Hearsay – TRE 802<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 43 | Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE |

| | |
|---|---|
| | 701, 702, 703 |
| 44 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 45 | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 46 | Not relevant – TRE 402<br><br>Relevance outweighed by unfair prejudice, confusion, |

| | |
|---|---|
| | & misleading – TRE 403 |
| | Hearsay – TRE 802 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 47 | "fake news items" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 48 and two photos | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – |

| | |
|---|---|
| | TRE 901 Hearsay – TRE 802 Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 49 | "fake news" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation – TRE 701, 702, 703 |
| 50 | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 51 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 52 | "fake news," "dangerous," "conspiracy" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation as to intent – TRE 701, 702, 703 |
| 53 | "intentionally deceptive," "recklessly disregarded," "deceptive" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |

| | |
|---|---|
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation – TRE 602, 701, 702, 703 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 54 | "outlandish," "inherently improbable," "obviously dubious" - - Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| | Improper for opinion witness just choosing |

| | |
|---|---|
| | sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 55 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation as to state of mind – TRE 701, 702, 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 56 | Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |

| | |
|---|---|
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 57 | "directly contradicts" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of |

| | | |
|---|---|---|
| | | foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 58 | | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | | No authentication – TRE 901 |
| | | Hearsay – TRE 802 |
| | | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| | | Relevance outweighed by unfair prejudice, confusion, misleading and cumulative – TRE 403 |
| 59 | | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | | No authentication – TRE 901 |
| | | Hearsay – TRE 802 |
| | | Relevance outweighed by unfair prejudice, confusion, misleading and cumulative – TRE 403 |
| 60 | | "too suggest" some |

| | |
|---|---|
| | fact -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703<br><br>Relevance outweighed by unfair prejudice, confusion, misleading and cumulative – TRE 403 |
| 61 | "dishonest" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Best Evidence Rule – TRE 1001, 1002, 1007 |
| | No authentication – TRE 901 |
| | Hearsay – TRE 802 |
| | Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| | Relevance outweighed by unfair prejudice, confusion, misleading and cumulative – TRE 403 |
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 62 | "clear" "chose not to do so" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620 |

| | |
|---|---|
| | Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation as to state of mind – TRE 701, 702, 703<br><br>Relevance outweighed by unfair prejudice, confusion, misleading and cumulative – TRE 403<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 63 | "clear" "deceptively edited" "give the appearance" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702 |

| | |
|---|---|
| | Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 64 | "abundance of primary sources" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – |

| | |
|---|---|
| | TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 65 | "no reasonable basis" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703<br><br>Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 66 | "only way a journalist |

| | |
|---|---|
| | could support" "intentionally distorting" "source material demonstrates that is exactly what occurred in this case" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 67 | "video contains no such statements" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. |

| | |
|---|---|
| | 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |
| 68 | "injurious motive" "clearly an attack" "pleaded" "false" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703 |

| | |
|---|---|
| | Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 69 | "clearly provoked a retaliation" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702<br><br>Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620<br><br>Best Evidence Rule – TRE 1001, 1002, 1007<br><br>No authentication – TRE 901<br><br>Hearsay – TRE 802<br><br>Conclusory, lack of foundation/predicate, lack of personal knowledge, speculation as to state of mind – TRE 701, 702, 703<br><br>Improper for opinion witness just choosing sides on the case |

| | |
|---|---|
| | outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 70 | "clear" "part of ongoing effort to support and justify" "vile five-year lie" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Best Evidence Rule – TRE 1001, 1002, 1007

Hearsay – TRE 802

Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |

| | |
|---|---|
| 71 | "in horror" "repeatedly" "systematically" "distorted" "misrepresented" "false" -- Opinion not relevant & no assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder – TRE 702, *GTE*, 998 S.W. 2d 605, 620

Best Evidence Rule – TRE 1001, 1002, 1007

Hearsay – TRE 802

Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |
| 72 | "clear" "in bad faith" "utter contempt for the truth" -- Opinion not relevant & no |

|  | assistance to fact finder – TRE 401, 402, 702

Invades province of the fact finder –  TRE 702, *GTE*, 998 S.W. 2d 605, 620

Conclusory, lack of foundation/predicate, lack of personal knowledge – TRE 701, 702, 703

Improper for opinion witness just choosing sides on the case outcome. *See Gutierrez v. State*, No. 04-03-00396-CR, 2005 Tex. App. LEXIS 1430, at *7 (App.—San Antonio Feb. 23, 2005) |

### 3.      OBJECTIONS TO AFFIDAVIT OF NEIL HESLIN

Defendants object to consideration of the Neil Heslin affidavit for the follows reasons:

**a.**      *Paragraph 2*

Mr. Heslin's assertion, without specifying what publications he claims constitute "lies" make his assertion irrelevant and thus inadmissible under Tex. R. Evid. R. 401.  The assertion also violates the "best evidence" rule (Tex. R. Evid. R. 1002).   Mr. Heslin's assertion without specifying what "occasions" make his assertion irrelevant and thus inadmissible under Tex. R. Evid. R. 401.  The assertion also violates the "best evidence" rule (Tex. R. Evid. R. 1002).

**b.**      *Paragraph 4*

This paragraph is evidently calculated to portray Mr. Heslin as not a public figure or quasi-public figure. As such it is irrelevant under Tex. R. Evid. R. 401 and R. 701 because whether someone is a public figure is a question of law for the Court. See *Klentzman v. Brady*, 312 S.W.3d 886, 904 (Tex. App. - Houston [1st Dist.] 2009, no pet.) Also Mr. Heslin's subjective intent is irrelevant; whether he is a public figure can only be determined by compiling and analyzing objective facts. Accordingly this paragraph is irrelevant under Tex. R. Evid. R. 401 and R. 701.

**c.** *Paragraphs 5, 6*

Relevance (Tex. R. Evid. R. 401). Whether Mr. Heslin was invited or sought out the public fora doesn't matter. No one told him he had to give interviews; he was not under subpoena. As long as he was not coerced, only the fact that he made public appearances matters.

**d.** *Paragraphs 7 - 14*

Relevance, Tex. R. Evid. R. 401. Mr. Heslin's subjective feelings, motive and intent are irrelevant; it's what he did that matters.

**e.** *Paragraph 15*

The authentic record of the interview is the best evidence of what was said or not said. Mr. Heslin's summation violates the best evidence rule (Tex. R. Evid. R. 102).

**f.** *Paragraph 16*

Relevance, Tex. R. Evid. R. 401. This is Mr. Heslin's own summary of his actions and reactions.

**g.** *Paragraph 17*

Relevance, Tex. R. Evid. R. 401. Mr. Heslin's subjective feelings, motive and intent are irrelevant; it's what he did that matters. The authentic record of the interview is the best evidence of what was said or not said. Mr. Heslin's summation violates the best evidence rule

(Tex. R. Evid. R. 1002).

**h.** *Paragraphs 18 - 21*

The authentic record of the interview is the best evidence of what was said or not said. Mr. Heslin's summation violates the best evidence rule (Tex. R. Evid. R. 1002).

**i.** *Paragraphs 22 - 27*

In these paragraphs Mr. Heslin attempts to present evidence to establish mental anguish as an element of damages. These paragraphs are irrelevant and inadmissible under Tex. R. Evid. R. 401 because the substantive law applicable to such damages, and in defamation cases in particular, makes the averments irrelevant.

- Mental anguish damages may not be recovered in a *per quod* case. Mr. Heslin has alleged – but has produced no evidence to establish-defamation *per se*.

- Perhaps words cannot describe the mental anguish Mr. Heslin has sustained as a result of the death of his son, but that does not mean it does not exist. However, Mr. Heslin does not take this into account. In paragraphs 26 and 27 he attempts to attribute his alleged mental anguish to the June 26, 2017 publication alone and provides no evidence of how this was caused by that video.

- In the entirety of paragraphs 21 -27 Mr. Heslin fails to account for other actors who may have caused his alleged mental anguish. Mr. Heslin is attributing to this publication the criminal activity of others over whom Defendants have no control and provides no evidence of how this was caused by that video.

- As for out-of-pocket expenses (paragraphs 28-31) Mr. Heslin's declaration does not amount to legally sufficient evidence because (1) the evidence that the publication at issue was a producing cause or a proximate cause is legally insufficient to establish that Mr. Heslin's need for counseling was a result of the

DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EVIDENCE SUBMITTED IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT – Page 68

publication and not something else; the evidence is legally insufficient to establish a temporal nexus between the publication and the counseling thus raising the inference that the counseling was a result of the publication and not something else (paragraph 28). The same is true of the other expenses (paragraphs 29-31): even assuming that Mr. Heslin's security concerns were justified, the evidence that the publication – and not the actions of others – was a producing cause is legally insufficient; (2) There is no evidence that these out-of-pocket expenditures were reasonable in amount.

### 4. OBJECTIONS TO AFFIDAVIT OF H. WAYNE CARVER, II, M.D.

Defendants object to consideration of the H. Wayne Carver, II, M.D. affidavit for the follows reasons:

### a. *Paragraphs 3 – 10: Relevance*

The averments of these paragraphs do not make any relevant fact more likely than not and do not aid the fact-trier in resolving any issue. Thus these statements are irrelevant under Tex. R. Evid. R. 401 and 701.

### b. *Paragraph 11*

Dr. Carver's professed "familiar[ity]" with Defendants is irrelevant under Evid. Rules 401 and 701. He does not state the source of his averred familiarity. Is he a regular viewer? Or is his "familiar[ity]" based on what others have told him? (In which case his averment is inadmissible hearsay.) The second sentence of paragraph 11 is objectionable for the same reasons. The third sentence is objectionable because (a) Newtown, Connecticut's at-large population is not a party to this case so any community feeling of angst is irrelevant (Tex. R. Evid. R. 401); (b) Dr. Carver does not state his qualifications to express an opinion on public sentiment in Newtown, Connecticut; and (c) Dr. Carver does not state the underlying basis for

his opinion.

    **c.**       ***Paragraphs 12 and 13: Relevance (Tex. R. Evid. R. 401); Authenticity (Tex. R. Evid. R. 1002)***

Dr. Carver does not adequately establish that what he viewed is the original publication or some other iteration. Whether the statements referred to the Plaintiff is a matter of law for the Court. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

    **d.**       ***Paragraphs 14 – 17: Relevance (Tex. R. Evid. R. 401)***

Whether a statement is defamatory is a question of law for the Court. His opinion is therefore not probative. See *Bingham v. Southwestern Bell Yellow Pages, Inc*., 2008 Tex. App. LEXIS 463 *9 - *10 (Tex. App. – Ft. Worth 2001, no pet.) (citing *Musser v. Smith Protective Svcs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). The test is how the statement would be construed by the average reasonable person or the general public. See *Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. App. – Dallas 1968, no writ). Whether the statements referred to the Plaintiff is a matter of law for the Court. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

Whether Dr. Carver is an "average reasonable person," or falls in some other category, his idiosyncratic spin on the broadcast at issue is irrelevant because it usurps the function of the Court.

    **e.**       ***Paragraph 18: Relevance (Tex R. Evid. R. 401, 701 and 703)***

Dr. Carver does not state any facts that support his opinion. His "personal involvement" is too vague to comprise an adequate basis for his opinion.

    **f.**       ***Paragraphs 19 – 21: Relevance (Tex. R. Evid. R. 401)***

Whether a statement is defamatory is a question of law for the Court. His opinion is therefore not probative. See *Bingham v. Southwestern Bell Yellow Pages, Inc.*, 2008 Tex. App.

LEXIS 463 *9 - *10 (Tex. App. – Ft. Worth 2001, no pet.) (citing *Musser v. Smith Protective Svcs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). The test is how the statement would be construed by the average reasonable person or the general public. See *Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. App. – Dallas 1968, no writ).

Whether Dr. Carver is an "average reasonable person," or falls in some other category, his idiosyncratic spin on the broadcast at issue is irrelevant because it usurps the function of the Court. Whether the statements referred to the Plaintiff is a matter of law for the Court. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

### 5. OBJECTIONS TO AFFIDAVIT OF SCARLETT LEWIS

Defendants object to consideration of the Scarlett Lewis affidavit for the follows reasons:

In bullet points 5-10, Ms. Lewis sets out her "understanding[s]" derived from watching a youtube video. None of her alleged understandings is relevant under Tex. R. Evid. R. 401 because whether a statement is defamatory is a question of law. Whether a statement is defamatory is a question of law for the Court. Her "understanding" (*ie.* opinion) is therefore not probative. See *Bingham v. Southwestern Bell Yellow Pages, Inc*., 2008 Tex. App. LEXIS 463 *9 - *10 (Tex. App. – Ft. Worth 2001, no pet.) (citing *Musser v. Smith Protective Svcs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987). The test is how the statement would be construed by the average reasonable person or the general public. See *Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. App. – Dallas 1968, no writ). Whether the statements referred to the Plaintiff is a matter of law for the Court. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

Whether Ms. Lewis is an "average reasonable person," or falls in some other category, her idiosyncratic spin on the broadcast at issue is irrelevant because it usurps the function of the Court. Whether the statements referred to the Plaintiff is a matter of law for the Court.

*Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960).

### 6.      OBJECTIONS TO AFFIDAVIT OF JOHN CLAYTON

Overall, the most that can be said for Mr. Clayton's affidavit is that he doesn't have a very high opinion of Alex Jones as a journalist.  Mr. Clayton's opinion is inadmissible for these reasons:

#### a.      *Rule 703 Relevance*

The issue before the Court is whether the 2017 publication made the basis of this case is defamatory.  This is a question of law.  See *Bently v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2003); *Campbell v. Clark*, 471 S.W.3d 615, 624 (Tex. App. – Dallas 2015, no pet.);  *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App. – Dallas 2011, no pet.).   Mr. Clayton's unsupported opinions regarding Mr. Jones's fidelity to some unidentified journalistic standard(s) has no bearing on this issue.

There is no basis for Mr. Clayton's implied premise that persons who disseminate information through the use of social media (or "alternative media" in Mr. Clayton's words) are to be held to the same standards of journalism as print or electronic (radio, TV) reporters. Indeed, there is much debate and no consensus on the question.  This Court is not the forum for resolving this issue.

#### b.      *Reliability*

Mr. Clayton's tirade against his former employer is filled with conclusions, but is woefully short on facts to support his opinions.  From the affidavit, it appears that Mr. Clayton last worked for or with Mr. Jones some nine years ago.  (Affidavit paragraph 5)  It does not appear that Mr. Clayton is familiar with the publications at issue in this case.  One of the requisites of reliability is that the opinion testimony must be tied to the facts of the case.  *Exxon*

---

*Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).  It is difficult to see how Mr. Clayton's testimony can meet this test when he does not even profess to have any knowledge of those facts.

### c.    *Rule 404 Relevance*

The accusations that Mr. Jones "no longer had any commitment to the principles and philosophy of the independent media movement (*Id.*, paragraph 6)," "it became apparent that he made a conscious decision not to care about accuracy" (*Id.*, paragraph 8)  and "it become [sic] standard practice in InfoWars to disregard basic protocols in journalism" (*Id.*, paragraph 9) violate Tex. R. Evid. R. 404(a)(1) prohibiting evidence of a character trait to prove that in a particular instance the actor acted in accordance with that trait.

### d.    *Rule 406 Relevance*

For evidence of routine or habit to be admissible under Rule 406, it must establish a regular response to a repeated specific situation.  See *Ortiz v. Glusman*, 334 S.W.3d 812, 816 (Tex. App. – El Paso 2011, pet. den.); *Johnson v. City of Houston*, 928 S.W.2d 251, 254 (Tex. App. – Houston [14th Dist.] 1996 no writ).  Although Mr. Clayton alludes to many occasions, he cites no examples.  This Court must take his word that they exist and that the undescribed incidents are sufficiently similar.

### e.    *Rule 403 Relevance*

Finally, even if the Court determines that the undescribed (as to time, place, parties or substance) incidents are relevant, the prejudice of allowing Mr. Clayton's testimony is far outweighed by the danger of unfair prejudice and confusing the issues.  In order to determine admissibility, the Court would have to try each instance to determine whether it occurred and whether it evidences malice toward the truth in connection with the publication made the basis of this case.  Certainly Mr. Clayton has no right to usurp the Court's duties in this regard by substituting his judgment for the Court's.

If the undescribed incidents are inadmissible, because Plaintiffs have failed to make any showing that they were reasonably relied upon by Mr. Clayton (Indeed, how can the Court make such a determination absent any description?) Mr. Clayton's opinions founded upon them are not admissible.

## 7. OBJECTIONS TO AFFIDAVIT OF MARCUS TURNINI

Defendants object to consideration of the exhibits attached to the Marcus Turnini affidavit for the follows reasons:

1. The exhibits were unlawfully obtained in that they were evidently obtained for use in the litigation in violation of §9.1 of the Infowars terms of service which provides:

> "You may not copy or otherwise attempt to benefit or assist others to benefit, directly or indirectly, from use of our Licensed Materials or intellectual property of third parties other than through normal use of the Website."

2. Relevance (Evid. R. 401). The material deals with use by licensed subscribers of the Infowars Website. It has nothing to do with whether the publication made the basis of this case is defamatory or any of the sub-issues (i.e. public or quasi-:public figure, malice).

## 8. OBJECTIONS TO PLAINTIFF'S PROPOSED WRITTEN DISCOVERY TO DEFENDANTS

Defendants will provide objections if and when Plaintiff is allowed to issue discovery. However, it is initially apparent that none of the requested discovery is aimed at the false claim of destroyed documents and instead is overbearing discovery seeking, among other things, tax returns.

## 9. OBJECTIONS TO EXHIBIT I

The "Notice of Violation to Infowars, LLC" (the "Notice") is not admissible for these reasons:

1.     It is not authenticated as required by Tex. R. Evid. R. 901.

2.     It is not self-authenticating as permitted under Tex. R. Evid. R. 902(2);

3.     It is not relevant under Tex. R. Evid. R. 401.

4.     Any relevancy is far outweighed by the prejudice engendered by the document under Tex. R. Evid. R. 403.

5.     It is hearsay and contains hearsay within hearsay.

### 10.     OBJECTIONS TO EXHIBIT J

a.     *First Opinion*

Mr. Zipp's first opinion, stated on page 13 of his report, is that:

> "[T]he statements made in the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed" were capable of defaming Veronique De La Rosa and Leonard Pozner by impugning their reputation with false information about their honesty or integrity."

This opinion is inadmissible because it is an opinion on a question of law.

Whether a statement is defamatory is a question of law.  See, *Bently v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2003); *Campbell v. Clark*, 471, S.W.3d 615, 624 (Tex. App. – Dallas 2015, no pet.); *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App. – Dallas 2011, no pet.).

Expert opinions on questions of law are not admissible.  See *Mega Child Care v. Texas Dep't of Protective & Regulatory Svcs*., 29 S.W.3d 303, 307 (Tex. App. – Hou. [14th Dist.] 2000, no pet.); *Holden v. Weidenfeller*, 929 S.W.2d 124, 133 (Tex. App. – Austin 1996, writ den.)

b.     *Second Opinion*

Mr. Zipp's second opinion, stated on page 22 of his affidavit is that "InfoWars' accusations about Sandy Hook and Ms. De La Rosa's interview were made with reckless disregard for truth."

Knowledge of falsity or reckless disregard for the truth are the quintessence of malice.

See *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016); *Bentley*, 94 S.W.3d at 600-60`. Although Zipp is careful not to use the word "malice" his opinion can only be read as an opinion that Defendants published with malice.  As such, his opinion is inadmissible.  See *Jianguang Wang v. Tang*, 260 S.W.3d 149,160 (Tex. App. – Houston [1st Dist.] 2008, pet. den.), cert. den. 2009 U.S. LEXIS 1581 (2009); *Gonzles v. Hearst Corp.*, 930 S.W.2d 275, 284 (Tex. App. – Houston [14th Dist.] 1996, no pet.)

### c. *Both Opinions Unreliable*

Mr. Zipp relies on snippets of prior publications many of which are not identified, as the foundation for his opinions as to both the defamatory nature of the publications at issue and reckless disregard for the truth.  Tex. R. Evid. Rule 703 allows an expert to rely on data not otherwise admissible if it is of the type of data reasonably relied upon by experts in the field. Mr. Zipp's reliance on publications other than those made the basis of the defamation claims, especially those published outside the one-year limitations period, are nothing more than a "back door" attempt to get those prior publications into evidence.  Further, Mr. Zipp does not lay the necessary foundation or predicate required under Tex. R. Evid. R. 703.

The publications referred to by Mr. Zipp (at pages 13-19 of his opinion) are mentioned because the publication at issue was "not made in isolation."  (*Id.* p. 13)  The inference Mr. Zipp presses upon the court is that because the statement at issue was but one of several, going back a number of years, it is defamatory of Plaintiffs and was knowingly or recklessly made.

The earlier publications would not be admissible under Tex. R. Evid. R. 401-403, 404, 406 and 608(b).

His stated portions and summaries of these snippets also violate Tex. R. Evid. R. 1002.

Whether the statements at issue in 2017 were made is undisputed; thus it is unnecessary to introduce the earlier publications as proof that the statement at issue was made.  Mr. Zipp

argues, however, that the earlier publications somehow make it more likely than not that the statement at issue is defamatory and was made with intentional or reckless disregard for the truth. The problem, for plaintiffs and Mr. Zipp, is that he doesn't "connect the dots," that is, he doesn't say how the earlier publications inform the decision that the publication at issue is defamatory or the product of mal- or mis-feasance. Either it is, or it isn't.

A priori, Mr. Zipp's reliance on earlier publications is inappropriate. His opinions rest almost entirely on these earlier partial publications. That the earlier publications make the defamatory nature of the publication at issue more likely than not defamatory, or was made with intentional or reckless disregard for the truth, depends alone on Mr. Zipp's *ipse dixit*. As such, his opinions are inadmissible. See *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

   **d.**    ***Objections to Specific Statements***

In addition to the broader objections to the Zipp opinion, Defendants make the following specific objections to the Zipp opinion:

| Affidavit Statements | Objections |
|---|---|
| Page 1, First paragraph under Scope of Review "whether assertions could be responsibly published" | Lack of foundation/predicate<br><br>Not Relevant<br><br>Vague and Ambiguous<br><br>Hearsay |
| Six bullet points under Scope of Review | Lack of foundation/predicate<br><br>Lack of identification of materials reviewed<br><br>Hearsay |
| Page 2, First paragraph under Background | Not relevant |

| | |
|---|---|
| Knowledge of InfoWars, second sentence | Hearsay |
| Second paragraph under Background Knowledge of InfoWars "significant amount of time" | Vague and Ambiguous<br><br>Conclusory |
| Second paragraph under Background Knowledge of Infowars, second sentence | Conclusory<br><br>Lack of foundation/predicate<br><br>Not relevant |
| Third paragraph under Background Knowledge of Infowars, second sentence | Conclusory<br><br>Violates TRE 404<br><br>Lack of foundation/predicate |
| Fourth  paragraph under Background Knowledge of Infowars, | Not relevant<br><br>Hearsay<br><br>Lack of predicate/foundation<br><br>Conclusory |
| Page 3, First paragraph under number 1, first sentence | Conclusory<br><br>Lack of foundation/predicate<br><br>Not relevant<br><br>Lack of personal knowledge<br><br>Exhibit A-26 is hearsay, lacks a foundation and predicate and is not complete |
| Page 3, middle three paragraphs | Violates TRE 1002 |

| | |
|---|---|
| Last paragraph under number 1 at bottom of the page and continuing to page 4 beginning "My review…" First and second sentence. | Vague and Ambiguous ("suggests")<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate<br><br>Conclusory<br><br>Not relevant<br><br>Hearsay as to second and third sentence |
| Same paragraph, third sentence | Defendants incorporate the same objections to this sentence as they stated to the affidavit and conclusions of Mr. Fredericks.<br><br>Not relevant<br><br>Violates TRE 403<br><br>Hearsay<br><br>Lack of foundation/predicate |
| Same paragraph, fourth and fifth sentence | Not relevant<br><br>Not probative<br><br>Improper opinion of expert on question of law<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate<br><br>Speculation |
| Page 4, first paragraph under paragraph 2. | First sentence: Not relevant, violates TRE 404, |

| | |
|---|---|
| | conclusory, lack of foundation/predicate, hearsay, lack of personal knowledge

Second sentence: Not relevant, vague and ambiguous, conclusory, lack of foundation/predicate, lack of personal knowledge, hearsay

Third sentence: Not relevant, vague and ambiguous, conclusory, lack of foundation/predicate, lack of personal knowledge, |
| First paragraph under 2. A. | Not relevant
Lack of persona knowledge |
| Second paragraph under 2. A. | Not relevant

Hearsay

Lack of foundation/predicate |
| Third paragraph under 2. A. | First sentence: Not relevant, conclusory, speculative

Second and third sentence: Not relevant, hearsay, lack of personal knowledge, lack of foundation/predicate, |
| Page 5, top paragraph (under two top photos) | Not relevant,

speculative,

hearsay,

conclusory,

lack of personal knowledge, |

| | |
|---|---|
| | lack of foundation/predicate |
| Bottom paragraph (under two lower photographs) | Not relevant, speculative, hearsay, conclusory, lack of personal knowledge, lack of foundation/predicate |
| Page 6 , top paragraph (under two top photos) | Not relevant, speculative, hearsay, conclusory, lack of personal knowledge, lack of foundation/predicate |
| Bottom paragraph (under two lower photographs) | Not relevant, speculative, hearsay, conclusory, lack of personal knowledge, lack of foundation/predicate |
| Page 7, photo | Not relevant Hearsay Lack of foundation/predicate |
| Page 7, top paragraph (under photo and above B.) | Not relevant, speculative, |

| | |
|---|---|
| | hearsay, conclusory, lack of personal knowledge, lack of foundation/predicate |
| Paragraph B. | Not relevant Conclusory lack of personal knowledge, lack of foundation/predicate |
| Last paragraph (under B) | Not relevant Conclusory lack of personal knowledge, lack of foundation/predicate Exhibit 24 is not complete |
| Page 8, top photo | Not relevant Hearsay Lack of foundation/predicate |
| Page 8, top paragraph | Not relevant Conclusory Hearsay Lack of foundation/predicate Lack of personal knowledge Violates TRE 1002 |

| Lower photo | Hearsay<br><br>Not relevant<br><br>Lack of foundation/predicate |
|---|---|
| Bottom paragraph | Not relevant<br><br>Hearsay<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate<br><br>Conclusory<br><br>Violates TRE 1002 |
| Page 9 photo | Not relevant<br><br>Hearsay<br><br>Lack of foundation/predicate |
| First paragraph | First sentence: Not relevant, Lack of personal knowledge, Lack of foundation/predicate, conclusory<br><br>Second sentence: Not relevant, Lack of personal knowledge, Lack of foundation/predicate, conclusory, speculative<br><br>Third sentence: "did not reasonably suggest any cover-up or manipulation": Not relevant, Lack of foundation/predicate, |

| | |
|---|---|
| | conclusory, speculative<br><br>Fourth sentence: Not relevant,<br>Lack of personal knowledge, Lack of foundation/predicate, conclusory<br><br>Violates TRE 1002 |
| Paragraph C. | Not relevant<br><br>Lack of personal knowledge |
| Last paragraph | First sentence: Not relevant, Lack of personal knowledge<br><br>Second and third sentence: Not relevant,<br>Lack of personal knowledge, Lack of foundation/predicate, conclusory, hearsay<br><br>Violates TRE 1002 |
| Page 10 photo | Not relevant<br><br>Hearsay<br><br>Lack of foundation/predicate |
| Paragraph D. | Not relevant, Lack of personal knowledge |
| First paragraph under D. | First sentence: Not relevant, lack of personal knowledge<br><br>Second sentence: Not relevant, lack of personal knowledge<br><br>Third sentence: Not relevant, lack of personal knowledge, hearsay |

| | |
|---|---|
| | Exhibit A2 is hearsay, lacks a foundation and predicate and is not complete.<br><br>Last sentence: Not relevant, lack of personal knowledge |
| Bottom paragraph | Not relevant<br><br>Hearsay<br><br>Lack of personal knowledge<br><br>Lack of foundation/predicate<br><br>Conclusory |
| Page 11, photo | Not relevant<br><br>Hearsay<br><br>Lack of foundation/predicate |
| First paragraph (above E) | First sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate conclusory<br><br>Second sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate conclusory<br><br>Last sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate conclusory |
| Paragraph E | Not relevant, Lack of personal knowledge<br><br>Violates TRE 1002 |

| First paragraph under E. | Both sentences: Not relevant, Lack of personal knowledge<br><br>Violates TRE 1002 |
| --- | --- |
| Bottom paragraph | First sentence: Not relevant, Lack of personal knowledge, lack of foundation/predicate, speculative, hearsay, conclusory – Violates TRE 1002<br><br>Second sentence: Not relevant, Lack of personal knowledge<br><br>Third sentence: Not relevant, Lack of personal knowledge, lack of foundation/predicate, hearsay<br><br>Fourth and fifth sentence including caption continuing on page 12: lack of foundation/predicate, hearsay |
| Page 12, top paragraph and captions | Not relevant, Hearsay, lack of foundation/predicate |
| Middle paragraph | First and second sentence: Not relevant, lack of foundation/predicate, lack of personal knowledge<br><br>Third and fourth sentence: Not relevant, Hearsay. Lack of personal knowledge, lack of foundation/predicate<br><br>Fifth and sixth sentence: Not relevant, lack of |

| | |
|---|---|
| | foundation/predicate, lack of personal knowledge<br><br>Seventh through ninth sentences: Not relevant, Hearsay. Lack of personal knowledge, lack of foundation/predicate<br><br>Tenth sentence: Not relevant, lack of foundation/predicate, lack of personal knowledge, speculation<br><br>Eleventh sentence: Not relevant, conclusory, lack of foundation/predicate, speculation |
| Last paragraph continuing to page 13 | First sentence: Not relevant<br>Second sentence: Not relevant, vague and ambiguous, hearsay, lack of foundation/predicate<br><br>Third sentence: Not relevant, hearsay, lack of foundation/predicate, lack of personal knowledge<br><br>Last sentence: Not relevant, conclusory, lack of foundation/predicate, speculative |
| Page 13, paragraph 1 | Not relevant, conclusory, lack of foundation/predicate, Expert testimony not probative on matters of law |
| First paragraph under 1 | Not relevant, conclusory, lack of foundation/predicate Expert testimony not probative on matters of law |

| | |
|---|---|
| All paragraphs under A starting on page 13 and continuing to the second to the last paragraph on page 19 | Not relevant, previous acts are outside of statute of limitations, violates TRE Rule 403, lack of personal knowledge, lack of foundation/predicate, hearsay<br>Violates TRE 1002<br><br>Exhibits A3-A13 and A20-25 are not relevant, contain statements outside of statute of limitations, hearsay and lack foundation and predicate. |
| Page 19, bottom paragraph | First sentence: Lack of personal knowledge<br><br>Second sentence: Lack of personal knowledge, lack of foundation/predicate, speculative, conclusory, expert opinion not reliable, expert opinion not needed to assist fact finder to interpret words used in broadcast (TRE Rule 702), opinion not based on stated broadcast (TRE Rule 703) – Violates TRE 1002<br><br>Third sentence: Not relevant; conclusory, lack of foundation/predicate, speculative, Expert opinion not probative on question of law or actual malice<br><br>Last sentence: Not relevant; conclusory, lack of foundation/predicate, speculative, Expert opinion |

| | |
|---|---|
| | not probative on question of law or actual malice |
| Page 20, top paragraph | First sentence: Not relevant, lack of personal knowledge Violates TRE 1002

Second and third sentence: Not relevant, lack of personal knowledge, conclusory, lack of foundation/predicate Violates TRE 1002

Exhibit A28 is not authenticated, it is not relevant and it is not a complete transcript of that broadcast.

Fourth sentence: Not relevant regarding accusations about a cover-up, lack of personal knowledge

Fifth and sixth sentences: Not relevant,, lack of personal knowledge

Exhibit A29 lacks authentication, is not relevant and is not a complete copy of the broadcast. |
| Second paragraph, page 20 | Both sentences: Not relevant and lack of personal knowledge.

Exhibit A30 lacks authentication, is not relevant and is not a complete copy of the broadcast. |

| | |
|---|---|
| Third paragraph , page 20 (paragraph under B) | Not relevant, lack of foundation/predicate |
| Fourth paragraph, page 20 | All sentences: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative |
| Fifth paragraph, page 20 continuing to page 21 | All sentences: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative |
| Page 21, first paragraph | First sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory, lack of personal knowledge, hearsay

Second sentence: Not relevant, hearsay, lack of foundation/predicate

Third sentence: Not relevant, hearsay, lack of foundation/predicate, conclusory

Fourth sentence and quotation: Not relevant, hearsay, lack of foundation/predicate, Quotation violates TRE 1002 |
| Second paragraph, page 21 | paragraph and quotation: Not relevant, hearsay, lack of foundation/predicate, violates TRE 1002 |
| Third paragraph, page 21 | First sentence: Not relevant, |

| | |
|---|---|
| | speculative, Expert opinion not probative on question of law, conclusory, lack of foundation/predicate<br><br>Second sentence: Not relevant, speculative, Expert opinion not probative on question of law and actual malice, conclusory, lack of foundation/predicate, vague and ambiguous<br><br>Third sentence: Not relevant, speculative, lack of personal knowledge, lack of foundation/predicate, conclusory. |
| Last paragraph, page 21 | First sentence: Not relevant, Expert opinion not probative on question of law, lack of foundation/predicate, speculative, conclusory<br><br>Second sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory<br><br>Third sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate, conclusory<br><br>Last sentence: Lack of personal knowledge<br><br>Exhibit A26 is not |

| | |
|---|---|
| | authenticated, and is not a complete transcript of the broadcast |
| Page 22, first paragraph: | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory |
| Paragraph 2 | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory |
| Second paragraph (under 2) | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory |
| Paragraph A | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, speculative, conclusory |
| Third paragraph, page 22 (under A) | First through third sentences: Not relevant, lack of foundation/predicate, speculative, conclusory<br><br>Fourth sentence: Defendants incorporate their objections to Mr. Fredericks affidavit, not relevant, hearsay, lack of personal knowledge, lack of foundation/predicate<br><br>Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law |

| | |
|---|---|
| Fourth paragraph, page 22 | First sentence: Not relevant, speculative, lack of foundation/predicate, conclusory<br><br>Second sentence: Not relevant, hearsay, lack of foundation/predicate, conclusory<br><br>Last sentence and photos: Not relevant, hearsay, lack of foundation/predicate<br><br>Photos are hearsay; lack of personal knowledge; lack of authentication; lack of foundation/predicate; violates TRE 1002 |
| Last paragraph, page 22 continuing to page 23 | Second sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative<br><br>Third sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative<br><br>Fourth sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative |
| Page 23, paragraph B | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, |

| | |
|---|---|
| | conclusory, speculative; Violates TRE 403, 404 and 608(b) |
| First paragraph (under B) | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative<br><br>Second sentence: Not relevant, lack of personal knowledge, conclusory, lack of foundation/predicate<br><br>Exhibit A1 is not authenticated, is not relevant and is not a complete transcript of the broadcast.<br><br>Third sentence:  Not relevant, lack of personal knowledge, conclusory, lack of foundation/predicate<br><br>Fourth sentence: Not relevant, lack of personal knowledge, conclusory, lack of foundation/predicate,<br><br>Last sentence: Not relevant, lack of personal knowledge, conclusory, lack of foundation/predicate<br><br>Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law |
| Second paragraph, page 23 | First paragraph: Not relevant<br><br>Second sentence: Not |

| | |
|---|---|
| | relevant, violates TRE 404, lack of foundation/predicate, lack of personal knowledge, hearsay, vague and ambiguous

Third sentence: Not relevant, hearsay, lack of foundation/predicate, conclusory

Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law |
| Third paragraph, page 23 (above C) | First sentence Not relevant, speculative, conclusory, lack of personal knowledge, lack of foundation/predicate

Second sentence: Not relevant, vague and ambiguous, lack of personal knowledge

Third sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative

Last sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative

Entire paragraph is objectionable as it seeks to bolster improper expert |

| | opinion on question of law |
|---|---|
| Paragraph C | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative; violates TRE 403, 404, and 608(b) |
| Last paragraph, page 23 (under C) continuing to page 24 | Each sentence: Not relevant, entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law and actual malice, violated TRE 404,403 |
| All other paragraphs on page 24 | Not relevant, violates TRE 404, 403, all paragraphs are objectionable as they seek to bolster improper expert opinion on question of law and actual malice |
| Page 25 photo | Not relevant, violates TRE 404, 403 |
| Page 25, first paragraph (under photo) | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, speculative |
| Paragraph D | Not relevant, Expert opinion not probative on question of law and actual malice, lack of foundation/predicate, conclusory, |
| Second paragraph, page 25 (under D) | Not relevant, Defendants also incorporate herein all objections to Mr. Pozner's affidavit |
| Third paragraph | First sentence: Not relevant, hearsay, lack of personal |

| | |
|---|---|
| | knowledge, |
| | Second sentence: Not relevant, hearsay, lack of foundation/predicate, lack of personal knowledge |
| | Exhibit A14 is not authenticated, is not relevant and is not a complete transcript of the broadcast. |
| | Last sentence: Not relevant, hearsay, lack of foundation/predicate, lack of personal knowledge |
| | Exhibit A15 is not authenticated, is not relevant and is not a complete transcript of the broadcast. |
| | Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law and actual malice |
| Fourth paragraph | Each sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate, |
| | Exhibit A16 is not authenticated, is not relevant and is not a complete transcript of the broadcast. |
| | Entire paragraph is |

| | objectionable as it seeks to bolster improper expert opinion on question of law and actual malice |
|---|---|
| Page 26, first paragraph | Each sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate<br><br>Exhibits A17 and A18 are not authenticated, are not relevant and are not complete transcripts of the broadcasts.<br><br>Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law and actual malice |
| Second paragraph and quotation | Not relevant, lack of personal knowledge<br><br>Exhibit A19 is not authenticated, is not relevant and is not a complete transcript of the broadcast.<br><br>Entire paragraph is objectionable as it seeks to bolster improper expert opinion on question of law and actual malice |
| Third paragraph | First sentence: Not relevant, lack of personal knowledge, lack of foundation/predicate, conclusory |

| | |
|---|---|
| | Second sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of personal knowledge, lack of foundation/predicate, conclusory, speculative |
| Conclusion | First sentence: Not relevant, Expert opinion not probative on question of law and actual malice lack of personal knowledge, lack of foundation/predicate, conclusory, speculative

Second sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of personal knowledge, lack of foundation/predicate, conclusory, speculative

Third sentence: Not relevant, Expert opinion not probative on question of law and actual malice lack of personal knowledge, lack of foundation/predicate, conclusory, speculative

Last sentence: Not relevant, Expert opinion not probative on question of law and actual malice, lack of personal knowledge, lack of foundation/predicate, conclusory, speculative |
| All websites listed in footnotes | Lack of authentication; lack of foundation/predicate; not relevant; violate TRE 404, 608(b) and 703.  In |

| | addition, footnotes 5, 6, 12, 13, 14-18, 41-43, 45 and 47 are hearsay. |
|---|---|

## 11.    CONCLUSION

None of the purported expert and lay opinions tendered by Plaintiff in opposition to Defendants' TCPA Motion to Dismiss can properly be considered by the Court in ruling on Defendants' motion.  Defendants pray that each of their objections be sustained.

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

_/s/ Mark C. Enoch_

Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:     972-419-8366
Facsimile:      972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2018, the foregoing was sent via efiletxcourts.gov's e-service system to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

_/s/ Mark C. Enoch_

Mark C. Enoch