**EXHIBIT B  (contd.)**

**Copy of All Filings with State Court**

10/2/2018 12:34 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, AND OWEN SHROYER'S NOTICE OF INTERLOCUTORY APPEAL

No Order having been entered by this Court in the thirty day time period following the August 30, 2018 hearing on Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer's Motion to Dismiss Under the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code §§27.001-27.011, that Motion has been denied by operation of law and all Defendants intend to appeal that denial.  Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer hereby give notice of their interlocutory appeal to the Third District Court of Appeals pursuant to Tex. Civ. Prac. & Rem. Code §51.014(a)(12).  The appeal shall be expedited as provided by Tex. Civ. Prac. & Rem. Code §27.008(b).  All other proceedings in the trial court are stayed pending resolution of the appeal.  Tex. Civ. Prac. & Rem. Code §51.014(b).

---

Dated: October 2, 2018.

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.

_____*/s/ Mark C. Enoch*_____
Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:      972-419-8366
Facsimile:      972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2018, the foregoing was sent via efiletxcourts.gov's e-service system to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

_____*/s/ Mark C. Enoch*_____
Mark C. Enoch

10/2/2018 4:47 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Irene Silva

# GLAST, PHILLIPS & MURRAY

A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

October 2, 2018

*Via email and via e-filing*
*Tiffaney Gould [Tiffaney.Gould@traviscountytx.gov]*

Honorable Scott Jenkins
Heman Marion Sweatt Travis
 County Courthouse
1000 Guadalupe, 5th Floor
Austin, Texas 78701

Attn:   Ms. Tiffaney Gould,
        Court Operations Officer for
        District Judge Scott Jenkins

Re:   *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems,*
      *LLC and Owen Shroyer; Cause No. D-1-GN-18-001835, 261st*
      *District Court, Travis County, Texas*

Dear Judge Jenkins:

       As you know, our clients' Motion to Dismiss Under the Texas Citizens Participation Act was timely filed on July 13, 2018. As required, we obtained a hearing on that motion within sixty days of its filing. This Honorable Court set it for hearing on August 30, 2018. Proper notice was given to Plaintiff's counsel and a week prior to that hearing, Plaintiff's counsel announced ready. As noticed, the hearing occurred on August 30.

       Notwithstanding the order that you signed on August 31, 2018, and as we discussed off the record at the conclusion of this August 30 hearing, we believe that since the hearing occurred on August 30, this Court had only until the thirtieth day after that hearing to grant this motion. Since Your Honor did not grant the motion prior to that time, we believe it was denied by operation of law and have accordingly filed our clients' notice of appeal, staying further proceedings in the trial court.

Respectfully,

Mark C. Enoch

Honorable Scott Jenkins
October 2, 2018
Page 2


MCE:mji

cc:     Mr. Mark Bankston (*via e-service*)

FILE COPY



# COURT OF APPEALS

## THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE
MICHAEL TOTH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed In The District Court
of Travis County, Texas
on  October 3, 2018
at  6:05  PM.  DS
Velva L. Price, District Clerk

October 3, 2018

Mr. Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Dr Ste 500
Dallas, TX 75254-1449
\* DELIVERED VIA E-MAIL \*

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
10 IO Lamar, Suite 1600
Houston, TX 77002
\* DELIVERED VIA E-MAIL \*

RE:  Court of Appeals Number:  03-18-00650-CV
     Trial Court Case Number:  D-1-GN-18-001835

Style:  Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
        v. Neil Heslin

Dear Counsel:

The Court has been advised that appellant has given notice of appeal. The cause in this Court will bear the number and style shown above. Cases in the Third Court of Appeals are governed by the Texas Rules of Appellate Procedure (Tex. R. App. P.) which may be accessed on the Court's website at http://www.txcourts.gov/rules-forms/rules-standards/. The Court provides all notices, orders, or other communications about a case by email. All documents filed with this Court must include the filer's email address in addition to any other information required by the Texas Rules of Appellate Procedure. It is the filer's responsibility to update the Court with any changes to their email address. In addition, at or before the time of a document's filing, the filing party must serve a copy of the document(s) on all parties to the proceeding. *See* Tex. R. App. P. 9.5.

Appellant is requested to forward the following items to this Court on or before **October 12, 2018**:

- **Challenge to Constitutionality of a State Statute** - Pursuant to Section 402.010 (a-1) of the Texas Government Code, any party challenging the constitutionality of a Texas Statute must file a "Challenge to the Constitutionality of a State Statute" form with the court in which the challenge is pending. This form can be accessed on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/forms/.

22-01023-tmd Doc#1-10 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 7 of 285

FILE COPY

- **$205.00 Filing Fee** – Unless an appellant is exempt by law or is presumed unable to afford payment of court costs, the appellant must pay the required $205.00 filing fee to prosecute the appeal. *See* Tex. R. Civ. P. 145; Tex. R. App. P. 20. 1. Failure to pay the filing fee may result in dismissal of the cause in accordance with Tex. R. App. P. 5 and 42.3. If you are excused by statute or the appellate rules from paying costs, please notify the Court. Payment should be submitted electronically through the eFileTexas.gov electronic filing system.

  o <u>Persons not represented by an attorney</u> may pay in person at the Clerk's office or by mailing a money order or check made payable to "The State of Texas."

- **Docketing Statement** – *See* Tex. R. App. P. 32. Until the clerk's record is filed, the docketing statement is the primary source of important information about an appeal, including contact information for the parties and information about the order being appealed. A copy of the docketing statement is available on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/forms/.

Unless an appellant is exempt by law or is presumed unable to afford payment of court costs, the trial-court clerk and court reporter are not required to file the clerk's and reporter's records until appellant has paid the required fees, or has made satisfactory arrangements to pay the fees. *See* Tex. R. App. P. 35.3(a)(2), (b)(3). If appellant has not already done so, written requests and arrangements for payment of the following records must be made on or before **October 12, 2018**.

- **Clerk's Record** - The Court may dismiss an appeal for want of prosecution if the clerk's record is not filed and it is appellant's fault. See Tex. R. App. P. 37.3(b); 42.3. Appellant should make arrangements for the clerk's record with the trial-court clerk and may file a written designation specifying additional items to be included in the clerk's record. *See* Tex. R. App. 34.5(b)(2).

- **Reporter's Record** - If appellant decides to include a reporter's record as part of the appellate record, a request in writing to the court reporter must be made. *See* Tex. R. App. P. 34.6(b). The request to the court reporter must designate the portions of the proceedings to be included in the record including any exhibits. Appellant must also file a copy of the request with the trial-court clerk. *See* Tex. R. App. P.34.6. If a reporter's record is not filed, the Court may decide the appeal on those issues or points that do not require a reporter's record for a decision. *See* Tex. R. App. P. 37.3(c).

More information about the courts practices are available on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/. Please note, Tex. R. App. P. 9.6 requires that parties and counsel communicate with the appellate court about a case only through the clerk of the court.

Very truly yours,

JEFFREY D. KYLE, CLERK


BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

FILE COPY

cc:     The Honorable Velva L. Price

10/10/2018 2:22 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | 261ST DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSEMS, LLC and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

## DESIGNATION OF COURT REPORTER'S RECORD

TO THE CLERK OF THE COURT:

Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer, Defendants, filed a notice of appeal in this case on October 2, 2018. Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer request the court reporter to prepare a transcript of the August 30, 2018, hearing conducted before Judge Jenkins on the 2:00 p.m. short docket for inclusion in the appellate record.

Respectfully submitted,

**GLAST, PHILLIPS & MURRAY, P.C.**

By: ___*/s/ Mark C. Enoch*___
Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:     972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

---

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of October, 2018, the foregoing was served by Texas Online electronic service to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

*/s/ Mark C. Enoch*
Mark C. Enoch

10/10/2018 2:42 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | 261ST DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSEMS, LLC and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

<u>**DESIGNATION OF FILINGS FOR CLERK'S RECORD**</u>

TO THE CLERK OF THE COURT:

Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC AND Owen Shroyer, Defendants, filed a notice of appeal in this case on October 2, 2018. In accordance with APPELLATE RULE 34.5(a) and (b), Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer, Defendants, request the clerk to prepare a clerk's record of the proceedings in this case for inclusion in the appellate record.

Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer, Defendants, request the following items be included in the clerk's record. This list includes those items required by Appellate Rule 34.5(a).

1.  Plaintiff's Original Petition and Request for Disclosure (filed April 16, 2018)

2.  Letter from Plaintiff's attorney requesting issuance of Citations (filed April 23, 2018)

3.  Citation to Alex Jones (dated May 2, 2018)

4.  Citation to Infowars, LLC (dated May 2, 2018)

5.  Citation to Free Speech Systems, LLC (dated May 2, 2018)

6.      Citation to Owen Shroyer (dated May 2, 2018)

7.      Defendants' Original Answer (filed June 18, 2018)

8.      Defendants' attorney's vacation letter (filed June 27, 2018)

9.      Plaintiff's attorney's vacation letter (filed June 28, 2018)

10.     Defendants' attorney's amended vacation letter (filed June 29, 2018)

11.     Letter from Defendants' attorney regarding removal of former associate as counsel for Defendants (filed June 29, 2018)

12.     Defendants' First Amended Answer (filed July 13, 2018)

13.     Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 13, 2018)

14.     Defendants' Notice of Hearing on Motion to Dismiss (filed July 19, 2018)

15.     Letter from Defendants' attorney transmitting thumb drive containing video exhibits to (1) Defendants' First Amended Answer, and (2) Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 23, 2018)  Note:  Thumb drives to be included in Clerk's Record.

16.     Assignment by Presiding Judge (filed August 10, 2018)

17.     Letter from Judge Scott Jenkins regarding assignment of case (filed August 16, 2018)

18.     Plaintiff's Motion for Sanctions for Intentional Destruction of Evidence (filed August 17, 2018)

19.     Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion (filed August 17, 2018)

20.     Letter from Defendants' attorney requesting no hearing be held subject to previously filed vacation letter and opposition to Plaintiffs' Motion for Sanctions and Plaintiff's Motion for Expedited Discovery (filed August 21, 2018)

21.     Defendants' Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery (filed August 23, 2018)

22. Plaintiff's Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

23. Supplemental Affidavit in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

24. Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 27, 2018)

25. Supplemental Affidavits in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 28, 2018)

26. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 28, 2018)

27. Defendants' Objections to Plaintiff's Evidence Submitted in Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

28. Defendants' First Supplement to Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

29. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 29, 2018)

30. Defendants' Second Amended Answer (filed August 29, 2018)

31. Defendants' Second Supplement to Motion to Dismiss Under the Texas Citizens Participation Act (filed August 30, 2018)

32. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 30, 2018)

33. Letter from Defendants' attorney transmitting thumb drive containing video exhibits to Defendants' Second Supplement to Motion to Dismiss (filed August 30, 2018). Note: Thumb drives to be included in Clerk's Record.

34. Letter from Plaintiff's attorney transmitting flash drive containing exhibits to Plaintiff's Response to Defendants' Motion to Dismiss (filed August 30, 2018)

35.     Order of Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion (filed August 31, 2018)

36.     Defendants' Request for Rulings on Timely Filed Objections to Plaintiff's Evidence (filed September 11, 2018)

37.     Letter from Defendants' attorney requesting assistant be copied on email correspondence and filings entered by the Court (filed September 14, 2018)

38.     Defendants' Second Renewed Request for Rulings on Timely Filed Objections to Plaintiff's Evidence (filed September 25, 2018)

39.     Defendants' Motion for Protective/Confidentiality Order (filed September 28, 2018)

40.     Plaintiff's Motion for Contempt Under Rule 215 (filed October 1, 2018)

41.     Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer's Notice of Interlocutory Appeal (filed October 2, 2018)

42.     Letter from Defendants' attorney advising Court of the filing of Defendants' Notice of Appeal and staying proceedings (filed October 2, 2018)

43.     Letter from Third Court of Appeals confirming notice of appeal and outlining procedures (filed October 3, 2018)

44.     Designation of Court Reporter's Record (filed October 10, 2018)

Respectfully submitted,

**GLAST, PHILLIPS & MURRAY, P.C.**

By: ___*/s/ Mark C. Enoch*___
Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:      972-419-8366
Facsimile:      972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October, 2018, the foregoing was served by Texas Online electronic service to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com

*/s/ Mark C. Enoch*
Mark C. Enoch

10/10/2018 2:42 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | 261ST DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSEMS, LLC and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

## DESIGNATION OF FILINGS FOR CLERK'S RECORD

TO THE CLERK OF THE COURT:

Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC AND Owen Shroyer, Defendants, filed a notice of appeal in this case on October 2, 2018.  In accordance with APPELLATE RULE 34.5(a) and (b), Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer, Defendants, request the clerk to prepare a clerk's record of the proceedings in this case for inclusion in the appellate record.

Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer, Defendants, request the following items be included in the clerk's record. This list includes those items required by Appellate Rule 34.5(a).

1. Plaintiff's Original Petition and Request for Disclosure (filed April 16, 2018)

2. Letter from Plaintiff's attorney requesting issuance of Citations (filed April 23, 2018)

3. Citation to Alex Jones (dated May 2, 2018)

4. Citation to Infowars, LLC (dated May 2, 2018)

5. Citation to Free Speech Systems, LLC (dated May 2, 2018)

6.      Citation to Owen Shroyer (dated May 2, 2018)

7.      Defendants' Original Answer (filed June 18, 2018)

8.      Defendants' attorney's vacation letter (filed June 27, 2018)

9.      Plaintiff's attorney's vacation letter (filed June 28, 2018)

10.     Defendants' attorney's amended vacation letter (filed June 29, 2018)

11.     Letter from Defendants' attorney regarding removal of former associate as counsel for Defendants (filed June 29, 2018)

12.     Defendants' First Amended Answer (filed July 13, 2018)

13.     Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 13, 2018)

14.     Defendants' Notice of Hearing on Motion to Dismiss (filed July 19, 2018)

15.     Letter from Defendants' attorney transmitting thumb drive containing video exhibits to (1) Defendants' First Amended Answer, and (2) Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 23, 2018) Note: Thumb drives to be included in Clerk's Record.

16.     Assignment by Presiding Judge (filed August 10, 2018)

17.     Letter from Judge Scott Jenkins regarding assignment of case (filed August 16, 2018)

18.     Plaintiff's Motion for Sanctions for Intentional Destruction of Evidence (filed August 17, 2018)

19.     Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion (filed August 17, 2018)

20.     Letter from Defendants' attorney requesting no hearing be held subject to previously filed vacation letter and opposition to Plaintiffs' Motion for Sanctions and Plaintiff's Motion for Expedited Discovery (filed August 21, 2018)

21.     Defendants' Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery (filed August 23, 2018)

22. Plaintiff's Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

23. Supplemental Affidavit in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

24. Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 27, 2018)

25. Supplemental Affidavits in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 28, 2018)

26. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 28, 2018)

27. Defendants' Objections to Plaintiff's Evidence Submitted in Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

28. Defendants' First Supplement to Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

29. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 29, 2018)

30. Defendants' Second Amended Answer (filed August 29, 2018)

31. Defendants' Second Supplement to Motion to Dismiss Under the Texas Citizens Participation Act (filed August 30, 2018)

32. Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants' Motion for Sanctions (filed August 30, 2018)

33. Letter from Defendants' attorney transmitting thumb drive containing video exhibits to Defendants' Second Supplement to Motion to Dismiss (filed August 30, 2018). Note: Thumb drives to be included in Clerk's Record.

34. Letter from Plaintiff's attorney transmitting flash drive containing exhibits to Plaintiff's Response to Defendants' Motion to Dismiss (filed August 30, 2018)

35.    Order of Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion (filed August 31, 2018)

36.    Defendants' Request for Rulings on Timely Filed Objections to Plaintiff's Evidence (filed September 11, 2018)

37.    Letter from Defendants' attorney requesting assistant be copied on email correspondence and filings entered by the Court (filed September 14, 2018)

38.    Defendants' Second Renewed Request for Rulings on Timely Filed Objections to Plaintiff's Evidence (filed September 25, 2018)

39.    Defendants' Motion for Protective/Confidentiality Order (filed September 28, 2018)

40.    Plaintiff's Motion for Contempt Under Rule 215 (filed October 1, 2018)

41.    Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer's Notice of Interlocutory Appeal (filed October 2, 2018)

42.    Letter from Defendants' attorney advising Court of the filing of Defendants' Notice of Appeal and staying proceedings (filed October 2, 2018)

43.    Letter from Third Court of Appeals confirming notice of appeal and outlining procedures (filed October 3, 2018)

44.    Designation of Court Reporter's Record (filed October 10, 2018)

Respectfully submitted,

GLAST, PHILLIPS & MURRAY, P.C.

By: ___ */s/ Mark C. Enoch* _____

Mark C. Enoch
State Bar No. 06630360

14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:     972-419-8366
Facsimile:      972-419-8329
fly63rc@verizon.net

ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of October, 2018, the foregoing was served by Texas Online electronic service to the following:

Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com


*/s/ Mark C. Enoch*
Mark C. Enoch

# Velva L. Price
## District Clerk, Travis County
### P. O. Box 679003
### Austin, TX 78767

# BILL OF COST FOR CLERK'S RECORD

October 10, 2018

MARK CHARLES ENOCH
14801 QUORUM DR STE 500
DALLAS, TX 75254-1449

**CASE NUMBER:** D-1-GN-18-001835

NEIL HESLIN

VS

ALEX E. JONES, INFOWARS, LLC., FREE SPEECH SYSTEMS, LLC, AND OWEN
SHROYER

BALANCE DUE FOR CLERK'S RECORD OBO DF-1: **$3192.00**
**\*\*\*You can now pay your bill ONLINE\*\*\***
Visit **https://www.traviscountytx.gov/district-clerk** and click on **Online Payment**

THE RECORD WAS REQUESTED BY: CHARLES ENOCH
Please direct your payment to the attention of the undersigned, "**Court Costs, Fines, or Fees are
due to the Travis County District Clerk no later than 10 business days from the date of this
"Bill of Costs".**

If you have any questions, or need further assistance, please contact the District Clerk's office.

Thank You,

*Selina Hamilton*

HAMILTON LYNDA SELINA

Type/Form Number: B03 - 000002686

**Velva L. Price**
**Travis County District Clerk**
**Travis County Courthouse Complex**
**P.O. Box 679003**
**Austin, Texas 78767-9003**

RECEIVED

OCT 1 1 2018

THIRD COURT OF APPEALS
JEFFREY D. KYLE

THIRD COURT OF APPEALS
JEFFREY D. KYLE

October 11, 2018

A Disk containing a complete copy of the clerk's record in cause number D-1-GN-18-00001835 // 03-18-00650-CV, styled NEIL HESLIN VS. ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, AND OWEN SHROYER, was hand delivered by Selina Hamilton to the Third Court of Appeals clerk on OCTOBER 11, 2018.  The cost of the clerk's record was $3192.00, and it was paid for on OCTOBER 11, 2018.

_____
3rd Court of Appeals Clerk

*Selina Hamilton*

Court Clerk II
Travis County District Clerk's Office
Civil Division

Administrative Offices
(512) 854-9457
fax: 854-4744

Civil and Family Division
(512) 854-9457
fax: 854-9549

Criminal Division
(512) 854-9420
fax: 854-4566

Jury Office
(512) 854-9669
fax: 854-4457

**Velva L. Price**
**Travis County District Clerk**
**Travis County Courthouse Complex**
**P.O. Box 679003**
**Austin, Texas 78767-9003**





October 11, 2018

A Flash Drive/Thumb Drive containing video exhibits to (1) Defendants' First Amended Answer, and (2) Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 23, 2018) and Letter from Defendants' attorney transmitting thumb drive containing video exhibits to Defendants' Second Supplement to Motion to Dismiss (filed August 30, 2018) in cause number D-1-GN-18-001835 // 03-18-00650-CV, styled NEIL HESLIN VS. ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, AND OWEN SHROYER, was hand delivered by Selina Hamilton to the Third Court of Appeals clerk on October 11 2018.

_____
3ʳᵈ Court of Appeals Clerk

*Selina Hamilton*

Court Clerk II
Travis County District Clerk's Office
Civil Division

**CERTIFIED MAIL # 7014-2120-0000-8248-0706**

Administrative Offices
(512) 854-9457
fax: 854-4744

Civil and Family Division
(512) 854-9457
fax: 854-9549

Criminal Division
(512) 854-9420
fax: 854-4566

Jury Office
(512) 854-9669
fax: 854-4457

10/15/2018 10:14 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

# GLAST, PHILLIPS & MURRAY

A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

_____

October 15, 2018

*Via email and via e-filing*
*Tiffaney Gould [Tiffaney.Gould@traviscountytx.gov]*

Ms. Tiffaney Gould,
Court Operations Officer for
 District Judge Scott Jenkins
Heman Marion Sweatt Travis
 County Courthouse
1000 Guadalupe, 5th Floor
Austin, Texas 78701

Re: *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer;* Cause No. D-1-GN-18-001835, 261st District Court, Travis County, Texas

Dear Ms. Gould:

We received an email from Elissa Hogan inquiring about the hearing time on November 1, 2018 on Defendants' Motion to Dismiss. Since the case is stayed by the appeal this hearing will not take place on November 1.

Respectfully,

*/s/ Mark C. Enoch*

Mark C. Enoch

MCE:mji

cc: Mr. Mark Bankston (*via e-service*)

FILE COPY



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE
MICHAEL TOTH, JUSTICE

JEFFREY D. KYLE, CLERK

October 26, 2018

Filed In The District Court
of Travis County, Texas

on ___October 26, 2018___ DS
at ___6:05___ P.M.
Velva L. Price, District Clerk

Mr. Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Dr Ste 500
Dallas, TX 75254-1449
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
10 IO Lamar, Suite 1600
Houston, TX 77002
* DELIVERED VIA E-MAIL *

RE:     Court of Appeals Number:   03-18-00650-CV
        Trial Court Case Number:    D-1-GN-18-001835

Style:   Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
         v. Neil Heslin

Dear Counsel:
        On October 11, 2018, the one-volume clerk's record was filed in this Court.
        The due date for appellant's brief is extended to November 15, 2018, on this Court's own motion.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc:     The Honorable Velva L. Price

FILE COPY



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE
MICHAEL TOTH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed in The District Court
of Travis County, Texas

on ____October 26, 2018___ DS

at _____6:05_____ PM.

Velva L. Price, District Clerk

October 26, 2018

Mr. Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Dr Ste 500
Dallas, TX 75254-1449
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
10 IO Lamar, Suite 1600
Houston, TX 77002
* DELIVERED VIA E-MAIL *

RE:   Court of Appeals Number:   03-18-00650-CV
        Trial Court Case Number:   D-1-GN-18-001835

Style:   Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
      v.

      Neil Heslin

Dear Counsel:

Two volumes of exhibits were filed in this Court on 10/11/2018.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc: The Honorable Velva L. Price

FILE COPY



# COURT OF APPEALS

## THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE
MICHAEL TOTH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed in The District Court
of Travis County, Texas
on _____ October 26, 2018 __ PS
at _____ 6:05 _____ P M
Velva L. Price, District Clerk

October 26, 2018

Mr. Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Dr Ste 500
Dallas, TX 75254-1449
\* DELIVERED VIA E-MAIL \*

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
10 IO Lamar, Suite 1600
Houston, TX 77002
\* DELIVERED VIA E-MAIL \*

RE:  Court of Appeals Number:  03-18-00650-CV
     Trial Court Case Number:  D-1-GN-18-001835

Style:  Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
        v.

        Neil Heslin

Dear Counsel:

One volume of exhibits was filed in this Court on 10/11/2018.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc: The Honorable Velva L. Price

11/6/2018 9:32 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

## GLAST, PHILLIPS & MURRAY

A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

—————

November 6, 2018

*Via e-filing*

Travis County 261st
 Judicial District Clerk
P.O. Box 679003
Austin, TX 78767-9003

      Re:    *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer;* Cause No. D-1-GN-18-001835, 261st District Court, Travis County, Texas; Third Court of Appeals Case No. 03-18-00650-CV

Dear Clerk:

     Please accept this letter as our request that you supplement the clerk's record in the appeal pending in the Third Court of Appeals to include the October 15, 2018 e-filed correspondence from the undersigned to Ms. Tiffaney Gould.

     If there are any questions or if there is any additional charge to supplement the record as requested, please do not hesitate to contact my assistant, Melanie Illig, at 972-419-8347. Thank you for your assistance.

                    Very truly yours,

                    */s/ Mark C. Enoch*

                    Mark C. Enoch

:mji

cc:   Mr. Mark Bankston



# Velva L. Price
## District Clerk, Travis County
### P. O. Box 679003
### Austin, TX 78767

## BILL OF COST FOR CLERK'S RECORD

November 07, 2018

MARK CHARLES ENOCH
14801 QUORUM DR STE 500
DALLAS, TX 75254-1449

**CASE NUMBER:** D-1-GN-18-001835

NEIL HESLIN

VS

ALEX E. JONES, INFOWARS, LLC., FREE SPEECH SYSTEMS, LLC, AND OWEN SHROYER

BALANCE DUE FOR CLERK'S RECORD OBO DF-: **$11.00**
***You can now pay your bill ONLINE***
Visit https://www.traviscountytx.gov/district-clerk and click on **Online Payment**

THE RECORD WAS REQUESTED BY: MARK C. ENOCH
Please direct your payment to the attention of the undersigned, "**Court Costs, Fines, or Fees are due to the Travis County District Clerk no later than 10 business days from the date of this "Bill of Costs".**

If you have any questions, or need further assistance, please contact the District Clerk's office.

Thank You,

*Selina Hamilton*

HAMILTON LYNDA SELINA

Type/Form Number: B03 - 000002709

12/7/2018 3:05 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Irene Silva

# GLAST, PHILLIPS & MURRAY

### A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE  (469) 206-5022
_____

December 7, 2018

*via e-filing*

Ms. Tiffaney Gould,
Court Operations Officer for
 District Judge Scott Jenkins
Heman Marion Sweatt Travis
 County Courthouse
1000 Guadalupe, 5th Floor
Austin, Texas 78701

      Re:    *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer;* Cause No. D-1-GN-18-001835, 261st District Court, Travis County, Texas

Dear Ms. Gould:

      I will be on vacation/unavailable from February 3 through February 18, 2019 and March 24, 2019 through April 9, 2019.

      Please do not schedule any hearings or court trial dates during this time-frame. By copy of this letter I am requesting that opposing counsel not schedule any hearings or depositions during this time period as well.  Thank you for your attention to this matter.

      Respectfully,

      */s/ Mark C. Enoch*

      Mark C. Enoch

MCE:mji

cc:    Mr. Mark Bankston (*via e-service*)



# Velva L. Price
## District Clerk, Travis County
P. O. Box 679003

Austin, TX 78767

## SECOND NOTICE
## BILL OF COST FOR CLERK'S RECORD

December 07, 2018

ENOCH MARK CHARLES
14801 QUORUM DR STE 500
DALLAS, TX 75254-1449

**CASE NUMBER:** D-1-GN-18-001835

NEIL HESLIN

VS

ALEX E. JONES, INFOWARS, LLC.,

BALANCE DUE FOR CLERK'S RECORD OBO DF-1: $11.00

***You can now pay your bill ONLINE***

Visit **https://www.traviscountytx.gov/district-clerk** and click on **Online Payment**

THE RECORD WAS REQUESTED BY:

**Please direct your payment to the attention of the undersigned, "Court Costs, Fines, or Fees are due to the Travis County District Clerk no later than 10 business days from the date of this "Bill of Costs".**

If you have any questions, or need further assistance, please contact the District Clerk's office.



Type/Form Number: B04 - 000000162

Administrative Offices
(512) 854-9737
Fax: 854-4744

Civil and Family Division
(512) 854-9457
Fax: 854-6610

Criminal Division
(512) 854-9420
Fax: 854-4566

Jury Office
(512) 854-4295
Fax: 854-4457

## Selina Hamilton

| | |
|---|---|
| **From:** | noreply@txcourts.gov |
| **Sent:** | Monday, December 10, 2018 3:55 PM |
| **To:** | Selina Hamilton |
| **Subject:** | [CAUTION EXTERNAL] 3rd Court of Appeals Successful Record Submission |

**CAUTION**: This email is from OUTSIDE Travis County. Links or attachments may be dangerous. Click the Phish Alert button above if you think this email is malicious.

Your upload to http://rsp.txcourts.gov has completed successfully. Please reference the following Trace Number when inquiring about this record.

Trace Number: 9493
Appellate Court: 3rd Court of Appeals
Appellate Case Nbr: 03-18-00650-CV
Trial Court County: Travis
Trial Court: 261st District Court
Trial Case: D-1-GN-18-001835
File Count: 1

Files Submitted:
GN-18-001835 SUPPLEMENTAL CLERK'S RECORD.pdf: FileSize: 505 kb

If there is a problem with this Trace Number, please forward this email to ServiceDesk@txcourts.gov with a summary of the problem.



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
DAVID PURYEAR, JUSTICE
MELISSA GOODWIN, JUSTICE
SCOTT K. FIELD, JUSTICE
CINDY OLSON BOURLAND, JUSTICE
MICHAEL TOTH, JUSTICE

JEFFREY D. KYLE, CLERK

December 11, 2018
6:06          PM  DJ

December 11, 2018

Mr. Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Dr Ste 500
Dallas, TX 75254-1449
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
* DELIVERED VIA E-MAIL *

RE:     Court of Appeals Number:     03-18-00650-CV
        Trial Court Case Number:     D-1-GN-18-001835

Style:  Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
        v. Neil Heslin

Dear Counsel:

A supplemental clerk's record (one-volume) was filed in this Court on **December 10, 2018**.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc:     The Honorable Velva L. Price

6/26/2019 10:13 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Daniel Smith**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

Plaintiff NEIL HESLIN files this First Amended Petition against Defendants, ALEX JONES, INFOWARS, LLC, and FREE SPEECH SYSTEMS, LLC, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.     Plaintiff intends to seek a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.     Plaintiff Neil Heslin in an individual residing in the State of Connecticut.

3.     Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com. Mr. Jones has answered through his respective counsel.

4.      Defendant InfoWars, LLC is a Texas limited liability company with principal offices located in Austin, Texas and has answered through its respective counsel of record.

5.      Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas and has answered through its respective counsel of record.

6.      Defendant Owen Shroyer is an individual residing in Travis County. At all times relevant to this suit, Mr. Shroyer has been a reporter for InfoWars. Mr. Shroyer has answered through his respective counsel.

7.      At all times relevant to this Petition, Defendants Alex Jones, InfoWars, LLC, and Free Speech Systems, LLC operated as a joint-venture, joint-enterprise, single business enterprise, or alter ego.

## JURISDICTION & VENUE

8.      The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

9.      Venue is proper in Travis County under Tex. Civ. Prac. & Rem. Code §15.002 because it is the county of Defendants' residence at the time the cause of action accrued.

## FACTUAL BACKGROUND

10.      Plaintiff Neil Heslin is the parent of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School shooting.

2

11.    This case arises out of the intentional infliction of emotional distress committed against Plaintiff for the past five years through InfoWars' recklessly false statements concerning the circumstances of the death of his child, as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents.

12.    In addition, InfoWars has repeatedly promoted a dreadful and despicable false narrative about Sandy Hook in which it mocks the families as liars and accuses them of a sinister conspiracy. Plaintiff's family has been specifically targeted in this campaign of harassment.

13.    In addition to the mockery of the families, InfoWars has spent years advancing a vast collection of grotesque and outrageous falsehoods about the circumstances of the shooting and the subsequent law enforcement investigation and media coverage.

14.    All of these baseless and vile accusations, which have been pushed by InfoWars and Mr. Jones on a continuous basis since the shooting, advance the idea that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using carefully placed actors, or that the families of the victims are also participants in a horrifying cover-up. InfoWars knew its assertions were false or made these statements with reckless and outrageous disregard for their truth.

15.     In addition, Plaintiff brings a cause of action for defamation arising out of accusations by InfoWars in the summer of 2017 that Plaintiff was lying about whether he actually held his son's body and observed a bullet hole in his head. This heartless and vile act of defamation re-ignited the Sandy Hook "false flag" conspiracy and tore open the emotional wounds that Plaintiff has tried so desperately to heal.

## INFOWARS' FIVE YEARS OF HARASSING COVERAGE OF SANDY HOOK

16.     Beginning in the month of the shooting, in December 2012, InfoWars published multiple videos with false information while claiming the incident was a "false flag" or otherwise staged.

17.     InfoWars continued with a video on January 27, 2013 entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones introduced a variety of completely baseless claims which he would continually repeat with malicious obsession for the next five years.

18.     On March 28, 2013, InfoWars published an article advancing its hoax claim, entitled "Cover-Up of Adam Lanza Link to Psychotropic Drugs."

19.     In an April 9, 2013 video entitled "Obama Gun Grabbing Psyop Speech of Evil," Mr. Jones warned his viewers that recent mass shootings were actually "a government operation," and that Sandy Hook was an "inside job."

20.     In an April 16, 2013 video entitled "Shadow Govt Strikes Again," Mr. Jones discussed his allegation that the government was staging various national

4

tragedies. He told his audience: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."

21.     On January 27, 2014, InfoWars published an article advancing its hoax claim, entitled "Exposed: Sandy Hook Shooter's Biggest Threat Still Lives."

22.     On February 18, 2014, InfoWars published an article advancing its hoax claim, entitled "School Shooting Expert Threatened Over Sandy Hook Investigation."

23.     In a March 14, 2014 video entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones said, "Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him…I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

24.     On May 9, 2014, InfoWars published an article advancing its hoax claim, entitled "Revealed: Sandy Hook Truth Exposed."

25.     On May 13, 2014, InfoWars published an article advancing its hoax claim, entitled "Connecticut Tries to Hide Sandy Hook Truth."

26.     On May 13, 2014, InfoWars published a video entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert." Mr. Jones hosted a

notorious crank, Wolfgang Halbig, who solicits donations to support his "investigation" into Sandy Hook. Mr. Halbig maintains that the event was staged and that the parents are actors. Mr. Jones agreed with Mr. Halbig during the video, and he asked his viewers to financially support Halbig. Over the coming years, Mr. Halbig was a frequent guest, and InfoWars continued to provide support and encouragement to Mr. Halbig to carry out his campaign of harassment against the Sandy Hook parents.

27.    On September 24, 2014, InfoWars published an article advancing its hoax claim, titled: "FBI Says No One Killed At Sandy Hook."

28.    InfoWars also published a video on September 25, 2014 entitled "Connecticut PD Has FBI Falsify Crime Statistics." Mr. Jones again hosted Mr. Halbig for a lengthy discussion in which they accused Plaintiff and other parents of lying about the tragedy for a nefarious purpose. Mr. Jones stated:

> This is not a game…If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.

29.    On September 26, 2014, InfoWars published an article advancing its hoax claim, entitled: "Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime Statistics."

30.    On December 2, 2014, InfoWars published an article promoting the hoax video entitled "We Need to Talk About Sandy Hook."

31.    On December 9, 2014 published an article advancing its hoax claim, entitled: "Internet Censors Viral Sandy Hook Truth Documentary."

32.    In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones made numerous false claims about Sandy Hook, including his false allegations about "rotations in and out of the building," "blue-screen," "police in anti-terror outfits in the woods," and many others. Mr. Jones described the alleged "acting" by the parents as "just over the top, over the top sick." The video also featured claims that the event was undertaken as a Satanic ritual by global elites.

33.    In a December 29, 2014 broadcast entitled "America the False Democracy," Jones again discussed Sandy Hook, telling his audience, "The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? How do you even convince the public something is a total hoax?" Mr. Jones stated, "It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."

34.     In the same December 2014 broadcast, Jones continued with more false assertions: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

35.     On January 2, 2015, InfoWars published an article advancing its hoax claim, entitled "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

36.     In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook. During his discussion, he stated:

> You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."

37.     Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones helped spread involving a Sandy Hook victim whose photograph appeared at vigil for children slain a school attack in Peshawar. InfoWars' story was meant to reinforce Mr.

8

Jones' persistent lie that the victims of the shooting, such as Plaintiff's deceased son J.L., are not real, or that some sinister conspiracy murdered his child.

38.     In a February 12, 2015 video with an unknown title, Mr. Jones continued to repeat his false claims. During his discussion, Mr. Jones stated, "I know they're using blue screens…There are literally hundreds of smoking guns here that this thing doesn't add up."

39.     In a March 4, 2015 video entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones continued to promote Mr. Halbig, hosting him for a wide-ranging discussion accusing the parents of evil acts. Mr. Jones told Mr. Halbig, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake."

40.     In June of 2015, InfoWars sent its reporter Dan Bidondi to Newtown, Connecticut to accompany Mr. Halbig. While in Newtown, Bidondi and Halbig confronted Newtown residents and civil servants. Mr. Bidondi, a former cage-fighter, aggressively berated several individuals with profanity, false claims, and outrageous threats to publicize their crimes. Their activities created a climate of fear in the community.

41.     In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so

much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.

42.     In a July 7, 2015 video entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his false claims about Sandy Hook. During his discussion, Mr. Jones stated:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.
>
> Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.
>
> We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method…
>
> You've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is…I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick

> is here. I've got a good suspicion. But when you've got Wolfgang Halbig…He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull. And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented.

43.     On July 10, 2015, InfoWars published an article advancing its hoax claim, entitled "Sandy Hook FOIA Killed by Commission."

44.     On January 5, 2016, InfoWars published an article advancing its hoax claim, entitled "Obama's Crying Fuels Speculation It Was Faked."

45.     In January of 2016, InfoWars follower Lucy Richards began stalking and making death threats to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Scarlett Lewis. The threats included messages stating: "Death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."[1] When Richards was later sentenced, Senior U.S. District Judge James Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'…Your words were cruel and insensitive. This is reality and there is no fiction. There are no alternative facts."[2] As part of her sentence, Ms. Richards will not be permitted to access a list of conspiracy-based websites upon her release, including InfoWars.[3] Ms. Richard's arrest and sentencing are an ominous

---

[1] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396

[2] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754

[3] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a

reminder to the Plaintiff of the danger posed by InfoWars' continuing lies about Sandy Hook.

46.     Mr. Jones and InfoWars were well-aware of the unhinged community of "Sandy Hook Investigators" they had fostered. Mr. Jones knew that a large collection of Sandy Hook deniers were coordinating their harassment. Plaintiff and his family have suffered harassment and threats from this community. Mr. Jones and InfoWars have frequently communicated with the hoax community and have interviewed or promoted members of this dangerous community on their programming. During a February 2015 video, one prominent member of the Sandy Hook denier community issued a threat to a Sandy Hook parent on the air. During the same video, Mr. Jones showed maps and addresses used by the parent. This parent was the leader of a Sandy Hook non-profit who had complained to YouTube about the emotional distress caused by Jones. Since that time, Mr. Jones' open animosity towards the Sandy Hook parents has been on full display.

47.     By November 2016, a growing tide of public outrage caused Mr. Jones to appear on InfoWars and rant about his false Sandy Hook claims for twenty minutes in what he called his "Final Statement on Sandy Hook," published on November 18, 2016.

48.     During the outrageous video, Mr. Jones directly addressed the public outcry over his statements by doubling down on his accusations. For example, Mr. Jones stated: "That shows some kind of cover-up happening. And then I saw Anderson

Cooper -- I've been in TV for twenty-something years, I know a blue-screen or a green-screen -- turn and his nose disappeared. Then I saw clearly that they were using footage on the green-screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage…Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training."

49.     The gist of these statements was that some Sandy Hook parents are actually participating in a sinister manipulation plan to fool the public, or that a shadowy cabal of elites pre-planned the murder of their children and controlled the coverage of the event through the media manipulation.

50.     During the November 2016 broadcast, Mr. Jones played video footage of Anderson Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We point out clear chromakey, also known as blue-screen or greenscreen being used, and we're demonized. We point out that they're clearly doing fake interviews…and their answer is to say that we said nobody died." In other words, Mr. Jones admitted that Plaintiff's son actually died and that Plaintiff may not be lying, but Jones still maintained the event was a pre-planned government operation. Mr. Jones' statements in support of this assertion were recklessly false.

51.     Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't

that in Shakespeare's Hamlet? Methinks you protest too much…This particular case, they are so scared of investigation."

52.     Mr. Jones concluded the video by accusing certain parents seen on television of being actors. Mr. Jones stated, "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."

53.     The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless attacks on the Sandy Hook parents and his assertions that they were liars and actors engaged in a fraud on the American people.

54.     As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave some hope to Plaintiff that Mr. Jones' harassment might be coming to an end after four long years.

55.     Those hopes were soon dashed. Instead, InfoWars continued its cruel campaign in 2017.

56.     In a March 8, 2017 video, Mr. Jones praised the credibility of Steve Pieczenik, who had previously claimed on InfoWars programming that Sandy Hook was "a Homeland Security drill that they passed off as a real event." Mr. Jones admitted that despite his years of prior statements, "I can't prove it one way or the

other." Nonetheless, Mr. Jones repeated his accusation that Veronique De La Rosa's interview with Anderson Cooper was faked in front of a blue screen. He also told his audience that Anderson Cooper was in the CIA, hoping to convince them that the agency was part of the plot.

57.    On April 22, 2017, InfoWars published a video entitled "Sandy Hook Vampires Exposed." This video again repeated the large collection of false accusations which Mr. Jones had been using for years to support his ceaseless attacks on the Sandy Hook families, including the false claims that Sandy Hook parent Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper, that the school was closed until that year and was rotting and falling apart in videos, that the children were "going in circles, in and out of the building with their hands up," that port-a-potties had been delivered "an hour after it happened, for the big media event," and that police were "pulling guns out of cars" and "finding people in the back woods who are dressed up in SWAT gear." Not only did this video continue to advance these hideous and reckless lies about the tragedy, but Mr. Jones and his employee Rob Dew mocked the families as actors and discussed their desire to see photographs of the children's dead bodies.

58.    On June 13, 2017, in a video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook," Mr. Jones addressed what he knew would be a highly embarrassing interview with Megyn Kelly that was scheduled to air several days later. During this video, Mr. Jones pointed his viewers to a list of questions

published by Zero Hedge, a notorious anonymous website that spreads misinformation. These questions were all based on Mr. Jones' baseless lies, including his allegation that school's website received no internet traffic in the years before the attack, that there had been reports of other shooters in the woods who fled, that port-a-potties had been delivered within an hour, that FBI crime statistics show no murders in Newtown in 2012, that EMTs were not allowed in the building, and that Mrs. De La Rosa's interview was faked using a blue-screen.

59.     On June 18, 2017, NBC aired Ms. Kelly's profile of Jones. During his interview, Mr. Jones stated that there had been a "cover-up" and "manipulation." He also falsely claimed that children were filmed going in circles in and out of the school.

60.     The following exchange took place:

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied…
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.

61.     Mr. Jones and Ms. Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis

from the sanctions. Or they don't get angry about all
the illegals pouring in.

### INFOWARS' 2017 VIDEOS DEFAMING PLAINTIFF

62.    During her profile of Mr. Jones, Ms. Kelly interviewed Plaintiff Neil Heslin about the claims made by Mr. Jones. Addressing Mr. Jones' hateful lies, Mr. Heslin told Ms. Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

63.    On June 26, 2017, InfoWars published a video segment hosted by reporter Owen Shroyer in which Mr. Shroyer claimed to have reviewed evidence -- again, from notorious website Zero Hedge -- showing it was impossible for Mr. Heslin to have held his son and see his injury.

64.    During the broadcast, Shroyer said, "The statement [Mr. Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

65.    As support for these malicious statements, Mr. Shroyer played deceptively edited video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. Mr. Shroyer also used a video clip of Sandy Hook parent Lynn McDonnel which had been deceptively edited to suggest that she was never allowed access to her child's body. In truth, Mrs. McDonnel stated in her interview that she was in possession of her child's body.

66.    Mr. Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."

67.    Mr. Shroyer continued by stating that Mr. Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

68.    Mr. Shroyer also stated, "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."

69.    At the conclusion of his report, Mr. Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

70.    Mr. Shroyer's report was recklessly false and outrageous. A minimal amount of research would have caused any competent journalist not to publish the defamatory accusation. According to contemporary news accounts, the bodies of the victims were released from the medical examiner into the custody of the families.[4] Funerals where the children's bodies were in the custody of their parents were widely reported on by the press.[5] More importantly, the full versions of the deceptively edited interviews used by Mr. Shroyer explicitly contradict his allegations.

---

[4] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[5] http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101;
https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100

71.     On July 20, 2017, InfoWars programming featured a segment hosted by Mr. Jones in which Mr. Shroyer's report was re-broadcast in full. When introducing the segment, Mr. Jones demanded that Mr. Heslin "clarify" what actually happened.

72.     Mr. Jones said he told Mr. Shroyer, "I could never find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this." Dripping with sarcasm, Mr. Jones stated, "But maybe they did. So I'm sure it's all real. But for some reason they don't want you to see [Shroyer's segment]."

73.     After five years of torment by Mr. Jones, the harassment had become directly and aggressively focused on Plaintiff's family. Mr. Jones had cast the attention of his dangerous followers specifically towards J.L.'s' death and Plaintiff's family.

## INFOWARS CONTINUED HARASSMENT

74.     Over the next year, Mr. Jones continued to gaslight Mr. Heslin and other victims by insisting that he admitted for years that Sandy Hook was real. He even claims to have apologized in a video released on the day of Megyn Kelly profile, on June 18, 2017. Yet his video did not actually contain any apology, and soon thereafter, Mr. Jones continued to tell his viewers that the shooting was the result of a conspiracy. Ultimately Jones waffles and back forth on whether Mr. Heslin's son and the other children actually died, but he consistently maintains the event is "phony," and repeats his dozens of recklessly false assertions to support his conclusion.

75.     For example, in an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones claimed that the CIA visited Sandy Hook

shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

76.     Despite his well-documented conduct, Mr. Jones decided to cast the families as dishonest not only about Sandy Hook, but about their own torment at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Mr. Jones once again proved himself to be an emotionally manipulative liar while mocking the parents with a cruel and juvenile imitation:

> I think they almost do this to mess with us or something. I'm serious, man...They go, "Oh, my gosh, why are you doing that? You hurt me." And we're like, "No, no. We're sorry." "You've hurt me." And like five years later, "You hurt me. Stop hurting me." And we're like, "But we're not bringing you up."

77.     In truth, Mr. Jones has continuously leveled his accusations against the parents, repeated a collection of false claims about the shooting, and even claimed the incident was phony a few months before the first lawsuits were filed against him.

78.     In the same video on April 20, 2018, Mr. Jones continued to accuse the parents of lying about his conduct, and he falsely claimed that he had not discussed Sandy Hook in many years. In a mocking imitation, he stated, "'Oh, my gosh. Alex has no heart. He is -- nothing is sacred. He brought it up again.' No. You did and lied about it."

79.     In the April 20, 2018 video, Mr. Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents…Who in the hell would try to go after people's parents who have dead children?"

80.     In the April 20, 2018 video, Mr. Jones also continued to make recklessly false claims about Sandy Hook. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the video, he repeated his claim that there was a police "stand down" at Sandy Hook.

81.     In the April 20, 2018 video, Mr. Jones also continued his bizarre allegations about Veronique De La Rosa's interview with Anderson Cooper, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chroma key." Mr. Jones also repeated his claim that Anderson Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

82.     Finally, it must be noted that the above descriptions of InfoWars' conduct are not exhaustive. InfoWars has published an enormous amount of video and written content regarding its Sandy Hook hoax claim. Much of that material has been removed from the public domain over the last few months and cannot be identified by date and title. It is impossible for the Plaintiff to present the full scope of

InfoWars' actions over the past five years without testimony and documents from the participants.

83.    Nonetheless, it is clear that InfoWars did not merely "cover" the Sandy Hook conspiracy. Instead, its malicious allegations about Sandy Hook quickly become a core element of its programming and soon turned into an outrageous five-year obsession.

## CAUSES OF ACTION

### I.    Defamation and Defamation *Per Se*

84.    All previous allegations are incorporated by reference.

85.    Plaintiff is a private individual and is neither a public official nor a public figure.

86.    The June 26, 2017 and July 20, 2017 broadcasts by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

87.    The June 26, 2017 and July 20, 2017 broadcasts by Defendants, while defamatory in their own right, were also continuations and elaborations of an underlying defamatory assertion which Defendants have advanced since 2013, namely that Plaintiff has lied to the American people about the death of his son and has participated in a horrifying criminal cover-up.

88. In viewing the June 26, 2017 and July 20, 2017 broadcasts, a reasonable member of the public would be justified in inferring that the publications implicated the Plaintiff.

89. The June 26, 2017 and July 20, 2017 broadcasts were also defamatory because they are reasonably susceptible to a defamatory meaning by innuendo. A reasonable person, reviewing the statements in question, could conclude the Plaintiff was being accused of engaging in fraudulent or illegal activity. In context, the gist of the statements could be construed as defamatory to the Plaintiff by an average member of general public.

90. Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

91. Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

92. Defendants' defamatory publications were not privileged.

93. Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

94. Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

23

95.     Defendants' defamatory publications have injured Plaintiff's reputation and image, and they have exposed Plaintiff to public and private hatred, contempt, and ridicule.

96.     In light of their prior experience with these kinds of reckless statements, Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence.

97.     Defendants' defamatory publications have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

**II.     Intentional Infliction of Emotional Distress.**

98.     All previous allegations are incorporated by reference.

99.     Defendants knew or should have known that their videos on November 18, 2016, March 8, 2017, April 22, 2017, June 13, 2017, June 19, 2017, June 26, 2017, July 20, 2017, October 26, 2017, and April 20, 2018 would cause Plaintiff severe emotional distress and cause his family to be the subject of harassment, ridicule, and threats to their safety.

100.     Defendants made the statements in these videos in bad faith and with malicious motives, knowing the statements were false or in reckless disregard for the truth, and knowing they would cause severe emotional distress.

101.     Defendants consistently published false assertions about the circumstances of the death of Plaintiff's child in scores of videos and articles for years,

long after it should have known its allegations were false and causing emotional distress and danger.

102.   In addition, Defendants have been acting in a continuing course of conduct against Plaintiff since at least January 27, 2013, when Mr. Jones first made his outrageous and false Sandy Hook hoax allegation. Since that time, Defendants have been engaged in a continuous campaign of cruel and dishonest harassment as detailed above.

103.   Defendants' malicious statements were part of a continuous pattern of five years of intentional and reckless harassment accomplished through dozens of disturbing videos, a relentless stream of recklessly false articles published on InfoWars.com, harassing social media content, as well as the encouragement, aid, and financial support to third parties in furthering this harassment. The cumulative quality and quantity of the harassment has been extreme and has shocked the nation.

104.   Defendants recognized the existence and distress of the Sandy Hook parents and often addressed the parents directly in their outrageous videos.

105.   In light of their prior experience with these kinds of reckless statements, Defendants knew or should have known that their conduct could cause Plaintiff and her family to suffer harassment and violence. Defendants knew or should have known their reckless conduct was likely to prompt its audience to contact or communicate with Sandy Hook victims in a hostile or harassing manner.

106.   Severe emotional distress was the primary risk created by Defendants' reckless conduct.

107.   Defendants' conduct, as a whole, was outrageous and intolerable, going beyond all possible bounds of decency.

108.   Defendants' five-year campaign of willful lies and malicious harassment was utterly intolerable in a civilized community.

109.   No reasonable person could be expected to endure the emotional distress inflicted upon Plaintiff.

110.   Plaintiff is a private individual and is neither a public official nor a public figure.

111.   Defendants' actions were not conducted in a public space. Rather, Defendants' actions were conducted on its own private property for the purpose of profit.

**III.   Conspiracy**

112.   All previous allegations are incorporated by reference.

113.   Defendants acted together, as a cabal, to accomplish their campaign of defamation. Defendants had a meeting of the minds on the object or course of action underlying their pattern of conduct.

114.   As a result of this meeting of the minds, Defendants collectively committed the unlawful overt acts detailed above.

115.   Defendants are jointly and severally liable for the injuries Mr. Heslin suffered due to Defendants' wrongful actions.

## IV.   Respondeat Superior

116.   All previous allegations are incorporated by reference.

117.   When InfoWars employees acted in the manner described in this Petition, they did so as agents of InfoWars and within the scope of their authority from Mr. Jones.

118.   InfoWars and Alex Jones are liable for the damages proximately caused by the conduct of employees and agents, including Owen Shroyer, pursuant to the doctrine of *respondeat superior*.

## DAMAGES

119.   Defendants' actions have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, Plaintiff has suffered and continue to suffer substantial damages in an amount to be proven at trial.

120.   Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which disrupted her daily routine and caused a high degree of psychological pain.

121.   Plaintiff is also entitled to exemplary damages because the Defendants acted with gross negligence, ill-will, and malice.

122.   Plaintiff is entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

123.    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking an amount in relief which exceeds $1,000,000.

## JURY DEMAND

124.    Plaintiff demands a jury trial and tendered the appropriate fee with his Original Petition.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Neil Heslin asks that the Court issue citation for each Defendant to appear and answer, and that Plaintiff be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiff is justly entitled.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, the forgoing pleading was served upon all counsel of record via electronic service, as follows.

***Via E-Sevice: fly63rc@verizon.net***

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

_____
MARK D. BANKSTON

8/8/2019 3:03 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Adrian Rodriguez**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## PLAINTIFF'S THIRD AMENDED PETITION

---

Plaintiff NEIL HESLIN files this Third Amended Petition against Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.     Plaintiff intends to seek a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.     Plaintiff Neil Heslin in an individual residing in the State of Connecticut.

3.     Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com. Mr. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

4.      Defendant InfoWars, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its attorney, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

5.      Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

6.      Defendant Owen Shroyer is an individual residing in Travis County. At all times relevant to this suit, Mr. Shroyer has been a reporter for InfoWars. Mr. Shroyer can be served at the address of his employer, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

7.      At all times relevant to this Petition, Defendants Alex Jones, InfoWars, LLC, and Free Speech Systems, LLC operated as a joint-venture, joint-enterprise, single business enterprise, or alter ego.

## JURISDICTION & VENUE

8.      The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

9.      Venue is proper in Travis County under Tex. Civ. Prac. & Rem. Code §15.002 because it is the county of Defendants' residence at the time the cause of action accrued.

## FACTUAL BACKGROUND

10.     Plaintiff Neil Heslin is the parent of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School shooting.

11.     This case arises out of accusations by InfoWars in the summer of 2017 that Plaintiff was lying about whether he actually held his son's body and observed a bullet hole in his head. This heartless and vile act of defamation re-ignited the Sandy Hook "false flag" conspiracy and tore open the emotional wounds that Plaintiff has tried so desperately to heal.

12.     This conspiracy theory, which has been pushed by InfoWars and Mr. Jones since the day of the shooting, alleges that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using actors, and that the parents of the victims are participants in a horrifying cover-up.

13.     During the June 18, 2017 profile of Jones for her NBC show *Sunday Night with Megyn Kelly,* Ms. Kelly interviewed Plaintiff about the claims made by Jones in the past, including that "the whole thing was fake" and "a giant hoax."[1] Addressing this hateful lie, Plaintiff told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."[2]

14.     On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Plaintiff to have held his son and see his injury.

---

[1] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[2] *Id.*

3

15.     During the broadcast, Shroyer said, "The statement [Plaintiff] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."[3]

16.     As support for these defamatory statements, Shroyer played video footage where the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person.

17.     Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."[4]

18.     Stroyer continued by stating that Plaintiff was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."[5]

19.      "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."[6]

20.     At the conclusion of his report, Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[7]

---

[3] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

21.     The underlying point or gist of Shroyer's report is that Plaintiff's version "is not possible" and "cannot be accurate," and that Plaintiff was lying about the circumstances of his son's tragic death for a nefarious and criminal purpose.

22.     Shroyer's report was manifestly false. In addition, a minimal amount of research would have caused any competent journalist not to publish the defamatory accusation. According to contemporary news accounts, the bodies of the victims were released from the medical examiner into the custody of the families.[8] Funerals where the children's bodies were in the custody of their parents were widely reported on by the press.[9]

23.     On July 20, InfoWars programming featured a segment hosted by Alex Jones in which Shroyer's report was re-broadcast in full. When introducing the segment, Jones demanded that Plaintiff "clarify" what actually happened.

24.     After showing the segment, Jones said he told Shroyer, "I could never find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this. But maybe they did. So I'm sure it's all real. But for some reason they don't want you to see [Shroyer's segment]."[10]

---

[8] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[9] http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101;
https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100
[10] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333

25.     Regarding the Sandy Hook shooting, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. But you can't blame people for asking."[11]

26.     Mr. Jones was lying. In the five years following the tragedy, he has repeatedly and unequivocally called the Sandy Hook shooting a hoax.

## BACKGROUND TO INFOWARS' 2017 DEFAMATORY STATEMENTS

27.     In order to appreciate the full defamatory impact and the extent of the mental anguish caused by InfoWars' 2017 statements, it is necessary to understand InfoWars' long history of harassing the Sandy Hook parents. InfoWars' 2017 statements are but the latest in a series of false, hurtful, and dangerous assertions about the tragedy.

28.     In 2013, Jones called the shooting "staged" and said, "It's got inside job written all over it."[12]

29.     In March 2014, Jones said, "Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly,

---

[11] *Id.*

[12] https://www.mediamatters.org/blog/2013/04/15/alex-jones-on-boston-blasts-us-govt-is-prime-su/193635; https://www.mediamatters.org/embed/clips/2016/11/29/51289/gcn-alexjones-20130409-sandyhook

6

there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."[13]

30.     In May 2014, InfoWars published an article titled: "CONNECTICUT TRIES TO HIDE SANDY HOOK TRUTH."[14]

31.     In September 2014, InfoWars published an article titled: "FBI SAYS NO ONE KILLED AT SANDY HOOK."[15]

32.     In December 2014, Jones said on his radio program, "The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."[16]

33.     In the same December 2014 broadcast, Jones continued: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."[17]

34.     Jones made similar comments in January 2015, stating on InfoWars: "You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for

---

[13] https://www.mediamatters.org/embed/clips/2016/11/29/51283/gcn-alexjones-20140314-shooting
[14] https://www.infowars.com/connecticut-tries-to-hide-sandy-hook-truth/
[15] https://www.infowars.com/fbi-says-no-one-killed-at-sandy-hook/
[16] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[17] https://www.mediamatters.org/embed/clips/2016/11/29/51292/gcn-alexjones-20141228-sandyhook

two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."[18]

35.     Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones helped spread involving deceased minor child N.P., a Sandy Hook victim whose photograph appeared at vigil for children slain a school attack in Peshawar. On the day of the Peshawar incident, a Pakistani woman created a collage of photographs of young people killed in school attacks and posted it to Facebook with the caption "They Went to School and Never Came Back."[19] Because the Peshawar shooting occurred very close to the anniversary of the Sandy Hook massacre, she included a picture of a child from the latter event, along with pictures of Peshawar victims.[20] That collage was then printed out and cut up into the individual photographs displayed by mourners at a vigil for the Peshawar victims.[21]

---

[18] https://www.mediamatters.org/embed/clips/2016/11/29/51290/gcn-alexjones-20150113-shooting
[19] https://www.snopes.com/fact-check/info-boors/
[20] *Id.*
[21] *Id.*

36.     In the same month, January of 2015, InfoWars published an article titled: "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."[22] The article states: "A large-scale attack on a school in Peshawar, Pakistan, last month left 132 school children and 10 teachers dead. Among the alleged victims emerged the familiar face of [deceased minor N.P.], one of the children supposedly killed in the December 2012 Sandy Hook school shooting in Newtown, Connecticut." InfoWars' story was meant to reinforce Mr. Jones' persistent lie that N.P. and the other victims of the shooting, such as Plaintiff's son J.L., are not real.

37.     In July 2015, Mr. Jones stated on InfoWars: "But you've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is…I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick is here. I've got a good suspicion. But when you've got Wolfgang Halbig…He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull.

---

[22] https://www.infowars.com/mystery-sandy-hook-victim-dies-again-in-pakistan/

And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented."[23]

38.    In the same month, InfoWars published an article titled: "MEGA MASSIVE COVER UP: RETIRED FBI AGENT INVESTIGATES SANDY HOOK."[24]

39.    In January of 2016, Florida resident Lucy Richards left threatening voicemail messages and sent violent emails to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Neil Heslin. The threats included messages stating: "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."[25] When Richards was later sentenced, Senior U.S. District Judge James Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'…Your words were cruel and insensitive. This is reality and there is no fiction. There are no alternative facts."[26] As part of her sentence, Ms. Richards will not be permitted to access a list of conspiracy-based websites upon her release, including InfoWars.[27] Ms. Richard's arrest and sentencing are an ominous reminder to the Plaintiff of the danger posed by InfoWars' continuing lies about Sandy Hook.

---

[23] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting
[24] https://www.infowars.com/mega-massive-cover-up-retired-fbi-agent-investigates-sandy-hook/
[25] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[26] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754
[27] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a

40.     In November 2016, Mr. Jones appeared on InfoWars and ranted about false Sandy Hook claims for twenty minutes.[28]

41.     During the November 2016 video broadcast, Mr. Jones stated: "That shows some kind of cover-up happening. And then I saw Anderson Cooper -- I've been in TV for twenty-something years, I know a blue-screen or a green-screen -- turn and his nose disappeared. Then I saw clearly that they were using footage on the green-screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage...Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training."[29]

42.     During the November 2016 broadcast, Jones played video footage of Anderson Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We point out clear chromakey, also known as blue-screen or greenscreen being used, and we're demonized. We point out that they're clearly doing fake interviews."[30] This false statement was likewise used to support Mr. Jones' vicious lie.

43.     Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't that in Shakespeare's Hamlet? Methinks you protest too much...This particular case,

---

[28] https://www.youtube.com/watch?v=MwudDfz1yAk
[29] *Id.*
[30] *Id.*

they are so scared of investigation. Everything they do ends up blowing up in their face, so guys are going to get what you want now. I'm going to start re-investigating Sandy Hook and everything else that happened with it."[31]

44.    Mr. Jones concluded the video by stating: "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."[32]

45.    The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless attacks on the Sandy Hook parents and his assertions that they were liars and actors engaged in a fraud on the American people.

46.    As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave hope to Plaintiff that his harassment and defamation by Mr. Jones might be coming to an end after four long years.

47.    Those hopes were soon dashed. Instead, InfoWars made continuing defamatory comments in 2017 as outlined above.

48.    Mr. Jones also made additional comments in April of 2017 which repeated the claims which form the rickety structure of Mr. Jones' colossal lie about Sandy Hook, including the allegation that fellow Sandy Hook parent Veronique De La

---

[31] *Id.*
[32] *Id.*

Rosa conducted a fake interview with Anderson Cooper to hide the truth, while telling his viewers not to "believe any of it."[33]

49.     On June 18, 2017, Mr. Jones made additional comments when interviewed by Megyn Kelly, during which he stated: "I do think there's some cover-up and some manipulation."[34] The following exchange took place:

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied …
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.[35]

Jones and Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.[36]

50.     Shortly following the Megyn Kelly interview, on June 26, 2017, InfoWars reporter Owen Shroyer made the defamatory statements referenced above.

51.     As such, the broadcasts made by InfoWars on June 26, 2017 and July 20, 2017 defaming Mr. Heslin did not occur in isolation. Rather, the statements were a

---

[33] https://www.youtube.com/watch?v=rUn1jKhWTXI
[34] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[35] *Id.*
[36] *Id.*

continuation and elaboration of a years-long campaign to falsely attack the Sandy Hook parents, casting them as participants in a ghastly conspiracy and cover-up.

52.    By making defamatory accusations about Plaintiff in 2017, InfoWars breathed new life into this conspiracy and caused intense emotional anguish and despair. For that reason, Plaintiff brings this suit against Defendants.

## CAUSES OF ACTION

### I.    Defamation and Defamation *Per Se*

53.    All previous allegations are incorporated by reference.

54.    Plaintiff is a private individual and is neither a public official nor a public figure.

55.    The June 26, 2017 and July 20, 2017 broadcasts by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

56.    In viewing the June 26, 2017 and July 20, 2017 broadcasts, a reasonable member of the public would be justified in inferring that the publications implicated the Plaintiff. Individuals who know the Plaintiff understood the publications to concern Plaintiff.

57.    The June 26, 2017 and July 20, 2017 broadcasts were also defamatory because they are reasonably susceptible to a defamatory meaning by innuendo. A reasonable person, reviewing the statements in question, could conclude the Plaintiff was being accused of engaging in fraudulent or illegal activity. In context, the gist of

the statements could be construed as defamatory to the Plaintiff by an average member of general public. Individuals who know the Plaintiff understood the publications to implicate criminal conduct by Plaintiff.

58.     Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

59.     Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

60.     Defendants' defamatory publications were not privileged.

61.     Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

62.     Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

63.     Defendants' defamatory publications have injured Plaintiff's reputation and image, and they have exposed Plaintiff to public and private hatred, contempt, and ridicule.

64.     In light of their prior experience with these kinds of reckless statements, Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence.

65.     Defendants' defamatory publications have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## DAMAGES

66.     Defendants' actions have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, Plaintiff has suffered and continue to suffer substantial damages in an amount to be proven at trial.

67.     Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which disrupted his daily routine and caused a high degree of psychological pain.

68.     Plaintiff is also entitled to exemplary damages because the Defendants acted with gross negligence, ill-will, and malice.

69.     Plaintiff is entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

70.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking an amount in relief which exceeds $1,000,000.

## JURY DEMAND

71.     Plaintiff demands a jury trial and tendered the appropriate fee with his Original Petition.

**PRAYER**

WHEREFORE PREMISES CONSIDERED, Plaintiff Neil Heslin asks that the Court issue citation for each Defendant to appear and answer, and that Plaintiff be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiff is justly entitled.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2019, the forgoing pleading was served upon all counsel of record via electronic service, as follows.

***Via E-Sevice: mburnett@BurnettTurner.com***

Michael Burnett
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730

_____
MARK D. BANKSTON

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00650-CV

---

**Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer, Appellants**

v.

**Neil Heslin, Appellee**

Filed in The District Court
of Travis County, Texas

AUG 3 0 2019

At ___6 :02___ P. os M.

Velva L. Price, District Clerk

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001835, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

---

### O P I N I O N

Appellants Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer seek to appeal what they assert is a denial by operation of law of their motion to dismiss the claims asserted against them by Appellee Neil Heslin. Because we determine there is no order from which to appeal, we dismiss the appeal for want of jurisdiction.

### BACKGROUND

Heslin's son was killed in the Sandy Hook Elementary School shooting in December 2012. Heslin sued Appellants for defamation and defamation per se related to Appellants' statements disputing Heslin's statement, "I lost my son. I buried my son. I held my son with a bullet hole through his head." On July 13, 2018, Appellants filed a motion to dismiss Heslin's claims under the Texas Citizens Participation Act (TCPA). In August 2018, Heslin

filed a "Motion for Sanctions for Intentional Destruction of Evidence" and a motion for expedited discovery. Heslin also responded to the motion to dismiss. On August 30, 2018, the district court held a hearing to consider the pending motions. At that hearing, the court determined that it would grant limited discovery relevant to the motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code § 27.006(b). The following day, the court signed the order granting the motion for expedited discovery. That order states:

> As authorized by Tex. Civ. Prac. & Rem. Code Sec. 27.004, the court will "extend the hearing date to allow discovery." Oral hearing on Defendants' Motion to Dismiss under the Texas Citizen's Participation Act is recessed and extended until November 1, 2018, which is less than 120 days after the service of the motion under Tex. Civ. Prac. & Rem. Code Sec. 27.003.

Appellants' responses to Heslin's discovery were due on October 1, 2018, but Appellants did not respond. On October 2, Heslin filed a motion for contempt. That same day, Appellants, taking the position that their motion to dismiss had been overruled by operation of law, filed a notice of appeal. *See id.* § 27.008(a) (providing for denial by operation of law if a trial court does not rule within the time limits prescribed by the TCPA). Although the district court set an extended hearing on the motion to dismiss for November 1, 2018, that hearing could not proceed while this appeal was pending. *See id.* 51.014(b) (providing that an interlocutory appeal of a denial of a TCPA motion to dismiss "stays all other proceedings in the trial court pending resolution of that appeal").

## DISCUSSION

The parties present several arguments relating to the merits of Appellants' motion to dismiss. However, the threshold question of whether Appellants' motion to dismiss was

overruled by operation of law is dispositive of this interlocutory appeal. We therefore address only that issue. *See* Tex. R. App. P. 47.1 (requiring an "opinion that is as brief as practicable" that addresses issues "necessary to final disposition of the appeal").

The TCPA generally provides that a motion to dismiss is overruled by operation of law if the trial court does not rule on the motion within 30 days following the date of the hearing on the motion, Tex. Civ. Prac. & Rem. Code §§ 27.005(a), .008(c), but the Act also allows the district court to "extend the hearing date to allow discovery," so long as the hearing occurs no more than "120 days after the service of the [TCPA motion to dismiss]," *id.* § 27.004(c). Prior to section 27.004(c)'s enactment, the Dallas Court of Appeals considered a case in which the trial court began a hearing on a TCPA motion to dismiss and in the course of the hearing determined that the nonmovant was entitled to discovery. *Avila v. Larrea*, 394 S.W.3d 646, 652-53, 656 (Tex. App.—Dallas 2012, pet. denied). The Dallas court determined that the statute provided no mechanism for extending the 30-day limit to rule on the motion once the trial court commenced a hearing on the motion to dismiss, even if the trial court granted discovery. *Id.* However, "the Legislature amended the TCPA after the Dallas Court decided *Avila*, thereby allowing trial courts to grant continuances so that parties could conduct limited discovery on issues raised by motions to dismiss under the TCPA." *Fairlawn Assets LLC v. Booker*, No. 09-19-00208-CV, 2019 Tex. App. LEXIS 6384, at *3 (Tex. App.—Beaumont July 25, 2019, no pet. h.) (mem. op.); *see* Act of May 24, 2013, 83d Leg., R.S., ch. 1042, § 1, sec. 27.004(c), 2013 Tex. Gen. Laws 2501, 2501 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 27.004(c)). We conclude that section 27.004(c)'s language allowing the trial court to "extend the hearing date" permitted the district court in this case to recess the hearing for the purpose of allowing discovery and to resume that hearing at any point within 120 days from "the

3

service of the motion [to dismiss]." Tex. Civ. Prac. & Rem. Code Ann. § 27.004(c). Thus, the 30-day timeline for ruling on the motion would have been reset in accordance with the extended hearing date. *See In re Bandin*, 556 S.W.3d 891, 895 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding) (Busby, J., concurring) (noting, in a case where the trial court held a hearing on a motion to dismiss, then ordered discovery, that "the trial court could also choose to 'extend the hearing date' under section 27.004(c) to allow completion of the ordered discovery and then hold a new hearing with the benefit of that discovery"). As a result, the motion to dismiss was not overruled by operation of law, but instead remained pending in the district court when Appellants filed the notice of appeal, which stayed the district court's proceedings. *See* Tex. Civ. Prac. & Rem. Code § 51.014(b). Because the motion remained pending in the district court, there is no order that could support an interlocutory appeal, and we must dismiss this appeal. *See id.* § 51.014(a)(12) (allowing interlocutory appeal from a denial of a motion to dismiss under the TCPA).

## CONCLUSION

We agree with Heslin that the district court has not yet ruled on Appellants' motion to dismiss, nor has the motion been overruled by operation of law. Accordingly, we dismiss the appeal for lack of jurisdiction.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Kelly

Dismissed for Want of Jurisdiction

Filed:  August 30, 2019

4

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## JUDGMENT RENDERED AUGUST 30, 2019

### NO. 03-18-00650-CV

**Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer, Appellants**

v.

**Neil Heslin, Appellee**

---

**APPEAL FROM 261ST DISTRICT COURT OF TRAVIS COUNTY**
**BEFORE CHIEF JUSTICE ROSE, JUSTICES TRIANA AND KELLY**
**DISMISSED FOR WANT OF JURISDICTION -- OPINION BY JUSTICE TRIANA**

---

Having reviewed the record, it appears that the Court lacks jurisdiction over this appeal. Therefore, the Court dismisses the appeal for want of jurisdiction. Appellant shall pay all costs relating to this appeal, both in this Court and in the court below.

**COURT OF APPEALS**
**FOR THE**
**THIRD DISTRICT OF TEXAS**
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
(512) 463-1733

Date:          August 30, 2019

Appeal No.:    03-18-00650-CV
Trial Court No.: D-1-GN-18-001835

Style:         Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
               v. Neil Heslin

---

Please be advised that Appellants' Motion to Supplement Initial Brief was dismissed as moot on the date noted above.  Also, the enclosed opinion and judgment were sent this date to the following persons:

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

The Honorable Scott H. Jenkins
Judge, 53rd District Court
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

Mr. Michael Burnett
Burnett Turner
6034 West Courtyard Drive, Suite 140
Austin, TX 78730
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
* DELIVERED VIA E-MAIL *

The Honorable Billy Ray Stubblefield
Administrative Judge
Williamson County Courthouse
405 Martin Luther King, Box 2
Georgetown, TX 78626
* DELIVERED VIA E-MAIL *

9/30/2019 9:13 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Kyla Crumley**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT

Comes now, Plaintiff Neil Heslin, and files this Supplemental Response to InfoWars' TCPA Motion to provide further evidence of actual malice revealed in a similar IIED lawsuit, *Lewis v. Jones*. This response includes evidence relating to InfoWars Chief Reporter Paul Watson, testimony from Alex Jones, and testimony from InfoWars producer Robert Jacobson. Finally, this response includes a declaration from Plaintiff's counsel regarding fees incurred in the TCPA process.

## I.    Paul Watson's Warnings Demonstrate Actual Malice.

Paul Watson has served as InfoWars' Chief Reporter since 2014.[1] From the beginning, Mr. Watson had expressed strong reservations about InfoWars' reckless treatment of Sandy Hook information. Mr. Jones testified Mr. Watson frequently warned him about InfoWars' coverage of Sandy Hook:

---

[1] Exhibit 1, Deposition of Alex Jones in *Lewis,* at 72:17.

1

Q.     And he frequently warned you about what you were saying about Sandy Hook?

A.     Well, I mean, we had discussions about it, yes.  We're not running a cult. We have different views.[2]

Mr. Jones testified Paul Watson "was saying that some of the people that were out there putting stuff out, like Fetzer and others in that, were not good."[3] This is quite an understatement. On December 17, 2015, Paul Watson wrote to two of his co-workers to let them know he had sent Alex Jones the following message:

> This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show. Plus the event happened 3 years ago, why even risk our reputation for it?[4]

Despite Mr. Watson's warning in 2015 that the conspiracy theorists InfoWars was relying on were "batshit crazy," Mr. Jones continued to spread their absurd claims until he was sued in 2018. It is a rare and outrageous case where a media outlet's Chief Reporter acknowledges their source is mentally disturbed.[5]

## II.     Alex Jones' *Lewis* Deposition Demonstrates Actual Malice.

Mr. Jones' deposition testimony in the *Lewis* case was a three-hour admission of actual malice. During his deposition, Mr. Jones candidly admitted he performed no

---

[2] *Id.* at 71:2 to 71:6.
[3] *Id.* at 77:19-21.
[4] Exhibit 2, December 17, 2015 email - FSSTX-027752
[5] Plaintiff also asks the Court to take judicial notice of its file in the *Pozner v. Jones* matter, in which Mr. Fetzer filed a disturbingly unhinged "Motion to Appear as Friend of the Court" and "Argument of Amicus Curiae" on August 23, 2018.

corroboration of the conspiracy claims being given to InfoWars by self-styled investigators Jim Fetzer and Wolfgang Halbig. Mr. Jones claimed he relied on "other people that were investigating."[6] Mr. Jones admitted, "We did not ourselves investigate Sandy Hook."[7] These actions show actual malice because InfoWars "failed to meaningfully seek corroboration … from any other sources." *Warner Bros. Entm't, Inc.,* 538 S.W.3d at 808. In one exchange concerning Mr. Halbig, Mr. Jones testified about his reliance on this dubious source:

> Q.   You didn't know one way or the other, right, whether the school was open? You had some doubts. You didn't know one way or another; you couldn't confirm it one way or another?
>
> A.   I know that some investigators who were accreditated school safety folks who thought were credible experts were the ones -- professors and others that were in good standing -- were the ones that were really doing these investigations; and that I was in some cases taking what they said incorrectly.  And I've admitted to that.
>
> Q.   And with no corroboration? You just take what they said, and you trusted these guys, right?
>
> A.   I mean, I'd seen one of the guys, like, on national television before on the Columbine stuff as a national safety expert; and he sounded pretty credible.
>
> Q.   Mr. Halbig, right?
>
> A.   Yes.

---

[6] Exhibit 1, Deposition of Alex Jones in *Lewis,* at 58:25.
[7] *Id.* at 58:25-59:1.

Q.   And he had sent you something in the neighborhood of 4,000 e-mails?

A.   It's a lot, yeah.

Q.   And looking at those e-mails, taking a look at them, you wouldn't agree with me that that man is a raving lunatic?

A.   He seemed very credible and put together earlier on, but -- I can't remember the exact number -- he seemed to get agitated about four years ago, three years ago.[8]

Though Mr. Jones became aware Mr. Halbig was "agitated" in 2015 or 2016,

InfoWars was still repeating his claims when Mr. Heslin was defamed in 2017. When

discussing one of those false claims -- the "Port-a-Potty" allegation -- Mr. Jones

claimed "I was going off what Halbig was saying."[9] Mr. Jones then admitted InfoWars

did not perform any confirmation, even though the dashcam video necessary to fact-

check the claim was publicly available and had been discussed on the show:

Q.   You did no confirmation whatsoever of Mr. Halbig's statements about the Port-A-Potties, did you?

A.   I don't believe these videos were released for a long time.

Q.   If they were, if those videos were released in 2013, it certainly would have been reckless to say the Port-A-Potties arrived in an hour in 2017, wouldn't it, Mr. Jones?

A.   I just don't know how to respond to the fact that -- that how do we know more weren't arriving later

---

[8] *Id.* at 42:17 to 43:19.
[9] *Id.* at 62:2.

and that there's other Port-A-Potties or whatever? I'm not saying that's what happened. You just showed me one still off something and tell me to answer questions.

Q.    Yeah. So one thing you could do is go back into the dashcam video and scroll through and find out if something did arrive earlier? That's something you could do, right? It's not hidden information, right? Correct?

A.    I guess correct.[10]

Similarly, when discussing his claim that paramedics were not allowed inside of Sandy Hook, Mr. Jones confirmed that he merely repeated dubious information with no fact checking:

Q.    You've said repeatedly on your web show paramedics weren't allowed inside of Sandy Hook? You've said that; you're not going to deny that?

A.    I've read other people's reports saying.

Q.    Okay. And you did nothing to confirm those reports, literally nothing?

A.    I went out and I covered news that was being covered.[11]

Mr. Jones also admitted InfoWars had been provided information from various people who had been debunking the claims made on Mr. Jones' show. In particular, InfoWars News Director Rob Dew had been receiving information with the correct facts regarding Mr. Jones' claims:

---

[10] *Id.* at 62:3-63:3.
[11] *Id.* at 54:2 to 54:16.

5

Q. Mr. Dew, in addition to those debates, has been provided written information from a lot of these debunking people seeking to stop the allegation that it's a hoax. You would agree with that?

A. Yes. There was a big Internet fight going on, and we were showing both sides.[12]

In truth, Mr. Jones had not been "showing both sides." Instead, InfoWars videos uncritically repeated the absurd claims of Jim Fetzer and Wolfgang Halbig, just as they did in the 2017 video defaming Mr. Heslin. Mr. Jones admitted that he accepted Fetzer and Halbig's conspiracy claims at face value because he had a form of psychosis:

And I, myself, have almost had like a form of psychosis back in the past where I basically thought everything was staged, even though I'm now learning a lot of times things aren't staged.[13]

Mr. Jones said, "I would kind of get into that mass group-think of the communities that were out there saying that."[14] This mass group-think caused InfoWars to act recklessly when covering Sandy Hook, publishing the most absurd and easily debunked allegations. During his deposition, Mr. Jones was repeatedly confronted with video clips of the bizarre claims made on his show, and he was completely unable to provide a coherent explanation as to how those allegations ever made it to air.  In sum, Mr. Jones admitted InfoWars published inherently improbable and dubious claims about Sandy Hook with no corroboration.

---

[12] *Id.* at 146:14 to 146:19.

[13] *Id.* at 184:9-12.

[14] *Id.* at 185:10 to 185:12.

6

### III.      The Deposition of Robert Jacobson Demonstrates Actual Malice.

Robert Jacobson worked at InfoWars producing content for thirteen years, from 2004 to 2017.[15] Mr. Jacobson contacted Plaintiff's counsel because he "was concerned" and "felt terrible about what happened," and he "[felt he had] to right a wrong that [he] was involved in."[16] Mr. Jacobson was deposed in the *Lewis* case, and he testified about his interactions with InfoWars writers on the subject of Sandy Hook. Mr. Jacobson testified he was bothered by the flagrant violations of ethics:

> Q.      What did you hear that bothered you?
>
> A.      I heard them making accusations based on extremely narrow cross-sections of information, that I did my best to make the writers and the staff aware that what they were doing was speculation based on not enough information. It bothered me. That bothered me that I felt they had no concept of journalist ethics.
>
> Q.      Did you tell anyone at InfoWars your feelings about the Sandy Hook coverage?
>
> A.      I attempted to make it as clear as possible to the writers that there is something called journalist ethics and how what they were doing was in a direct violation of that anytime I caught wind of the Sandy Hook story on InfoWars.[17]

Mr. Jacobson testified about his repeated visits to the writers room in which he explained the ethical problem and the consequences of those actions:

> I would make it my business to go in to the writers and explain to them as clearly as possible that there is

---

[15] Exhibit 3, Deposition of Robert Jacobson, at 22:4-16.

[16] *Id.* at 32:16-22.

[17] *Id.* at 33:13-34:1.

journalist ethics; and I tried to demonstrate what those ethics are and why they are violating them and what the damage could possibly be. In fact, I remember -- I must have been in that room four to five times, at least, and only to be received with laughter and jokes.[18]

Mr. Jacobson testified that InfoWars News Director Rob Dew was acting recklessly, stating that "Mr. Dew was overzealous to receive any type of hint that perhaps this might have been a phony act, a staged act. Any type of whisper that came through to him, he would celebrate."[19] Whenever he raised the issue, Mr. Jacobson testified that the writers "mocked [his] concerns about Sandy Hook coverage."[20]

Mr. Jacobson also testified about InfoWars writer Adan Salazar. Mr. Jacobson attempted to explain to Mr. Salazar the problems with relying on Wolfgang Halbig, but Mr. Jacobson was met with derision:

What I've pointed out to Adan specifically is that you're taking the word of one witness primarily and a couple of speculative other facts and calling it the truth without actually going down and investigating it ourselves or actually going with our own reporters and corroborating what these people are saying. I made it aware to Adan that Wolfgang Halbig could have a lot of issues that we're not considering, that by taking the word of this one man so heavily with such a great accusation that he's accusing people of is so irresponsible, so damaging. I asked him to consider the size of the audience. And Adan Salazar responded with – and I'm going to quote him because he said it to me many times – "I want to print up a T-shirt that says, 'Halbig was right.' I want bumper stickers that say, 'Halbig was right,'" to a laughing room.[21]

---

[18] *Id.* at 34:6-12.
[19] *Id.* at 36:13-16.
[20] *Id.* at 38:5.
[21] *Id.* at 37:9-25.

Adan Salazar showed a willingness to publish any Sandy Hook allegation, no matter how absurd. For example, Mr. Salazar wrote to the author of the horror movie blog "A Slash Above" because in the months before the Newtown shooting, the blog author had written a review of the 2000 horror movie "Sandy Hook Lingerie Party Massacre." Mr. Salazar sought comment on a rumor that "your review of 'Sandy Hook Lingerie Party Massacre' on your site aslashabove.com shows foreknowledge or prior planning of the events that have taken place as of late."[22] Mr. Salazar stated, "we thought this was surely ridiculous, however, we're (Infowars.com) going to point it out in an article anyway."[23] The author of the blog replied, "You are seriously ill to send me something like that – Don't contact me anymore or I will report you for harassment you bunch of weirdos."[24]

Mr. Jacobson also testified about InfoWars' allegation that there exist photographs of Sandy Hook children who are actually still alive:

> Q.    Have you ever heard the allegation that there are photographs of children who are supposedly dead who are actually alive?
>
> A.    Yes, I've heard that allegation.
>
> Q.    From what you have seen inside of InfoWars, have you seen anything that has caused you to form an opinion about that allegation?
>
> A.    I mean, you know, my opinion is it's so distasteful -- and it happened a while ago, that – you know, it happened a while ago. So it was just all these things

---

[22] Exhibit 4, December 21 email by Adan Salazar, FSSTX-077825.

[23] *Id.*

[24] *Id.*

> seem to -- all of the little allegations that Halbig and all these other people set forward, I sort of see it as individual cross-sections of information that each one was improperly handled.[25]

Mr. Jacobson testified that he was shocked at the lack of fact-checking considering the serious nature of the allegations being made:

> The weight of the accusation in this particular case, it was shocking that they didn't do more research. They didn't go further into it. They didn't -- I mean, what I constantly tried to clarify is a story of this level should not be brought forward unless they are -- I tried to make it clear that they need as much evidence in this story as if they were going to court to prove their case; and if they didn't have that, they didn't have a story.[26]

When Mr. Jacobson was asked to assess the level of outrageousness he saw, he described the InfoWars staff laughing about the pain they were causing to the Sandy Hook parents:

> Q.     Can you describe to me on a scale of one, being not outrageous at all, and ten, being extremely outrageous, on that one-to-ten scale, what is the level of outrageousness of this conduct that you were trying to impart?
>
> A.     It was a ten.
>
> Q.     Tell me why you thought that.
>
> A.     I mean, it's one thing to make a mistake. It's another thing to have somebody come in – and I don't even – I'm not aware if I was the only person or not, but I know I was doing it – to come in and say, "Hey, this is wrong. You're making a mistake." It's one thing,

---

[25] *Id.* at 42:8-22.
[26] *Id.* at 52:9-17.

> you know, to actually have a mistake and something else to have it pointed out to you, not just once but over and over and over again, and to not only hear the damage that you're doing to people outside of your zone but to actually laugh about it, I thought that's a ten.[27]

The InfoWars writers ignored the warnings of Robert Jacobson, just as Mr. Jones had ignored the warnings of Paul Watson. This testimony provides clear and specific *prima facie* evidence that InfoWars acted with actual malice in its Sandy Hook allegations.

## CONCLUSION

Based on Plaintiff's August 27, 2018 response and based on this supplemental response, Plaintiff asks the Court to deny InfoWars' TCPA motion and to award all costs in connection with the TCPA process. Alternatively, Plaintiff asks the Court to grant his Motion for Contempt, strike the TCPA motion, and likewise award costs. Plaintiff has attached as "Exhibit 5" a declaration of fees incurred as a result of the TCPA motion.[28]

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828

---

[27] *Id.* at 65:24-66:19.
[28] Exhibit 5, Declaration of Mark Bankston.

WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2019 the forgoing pleading was served upon all counsel of record via electronic service, as follows:

Michael Burnett
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
mburnett@BurnettTurner.com


_____
MARK D. BANKSTON

CAUSE NO. D-1-GN-18-006623

SCARLETT LEWIS          *   IN THE DISTRICT COURT OF
   Plaintiff            *
                    *
                    *
VS.                     *   TRAVIS COUNTY, TEXAS
                    *
ALEX E. JONES, INFOWARS,  *
LLC, AND FREE SPEECH    *
SYSTEMS, LLC,           *
   Defendants           *   53RD JUDICIAL DISTRICT

ORAL/VIDEOTAPED DEPOSITION

OF

ALEX E. JONES

Thursday, March 14, 2019

       ORAL/VIDEOTAPED DEPOSITION OF ALEX E. JONES,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on Thursday, March 14, 2019, from

12:02 p.m. to 4:33 p.m., before Debbie D. Cunningham,

CSR, reported via Machine Shorthand at the offices of

Waller Lansden Dortch & Davis, LLP, 100 Congress Avenue,

Suite 1800, Austin, Texas, pursuant to the Texas Rules

of Civil Procedure and/or any provisions stated on the

record or attached hereto.

**2**

1      APPEARANCES
2
3   COUNSEL FOR PLAINTIFF:
4        KASTER LYNCH FARRAR & BALL, LLP
         1010 Lamar, Suite 1600
5        Houston, Texas
         (T) 713.221.8300
6          By:  Mark D. Bankston, Esq.
           mark@fbtrial.com
7            AND
           William Ogden, Esq.
8
9   COUNSEL FOR DEFENDANTS:
10       GLAST, PHILLIPS & MURRAY, P.C.
         14801 Quorom Drive, Suite 500
11       Dallas, Texas
         (T) 972.419.8300
12         By:  Mark Enoch, Esq.
           mkenoch@gpm-law.com
13
             AND
14
         BARNES LAW, LLP          (PRO HAC VICE)
15       601 South Figueroa St., Suite 4050
         Los Angeles, California
16       (T) 213.294.3006
           By:  Robert E. Barnes, Esq.
17           barneslaw@barneslawllp.com
18
19
     VIDEOGRAPHER:
20       Joe Bazan
21
     ALSO PRESENT:
22       Fred Zipp
         Rob Dew
23
24
25

**4**

1              EXHIBIT INDEX
2   Exhibit Number    Description          Page
3   Exhibit 1   7/27/18 First Supplemental      8
            Affidavit of Alex E. Jones
4
5   Exhibit 2   Trooper Jeremy Combes State of   47
            Connecticut Department of Public
6           Safety Investigation Report
7   Exhibit 3   Sgt. William F. Cario State of   51
            Connecticut Department of Public
8           Safety Investigation Report
9   Exhibit 4   Photograph date and time stamped  60
            12-14-12 13:28:11
10  Exhibit 5   Photograph of man wearing      83
            INFOWARS.COM T-shirt, with
11          background caption of:
            TRUTHRADIOSHOW.COM Declaring War
12          on the -New World Order-
13  Exhibit 6   Affidavit of Fred Zipp      110
14  Exhibit 7   Affidavit of Alex E. Jones   118
15  Exhibit 8   Photograph of two men with the   125
            caption of Carl Rochelle, Saudi
16          Arabia, CNN Live, with a
            background caption of InfoWars
17          Nightly News with Alex Jones and
            a caption under the photo of
18          INFOWARS.com
19  Exhibit 9   Photograph of two men dressed in  127
            military type desert camouflage
20          clothing standing in front of a
            white building with palm trees
21
    Exhibit 10  Photograph of a man in a green   127
22          fatigue jacket standing front of
            palm trees, with the caption of
23          Forrest Sawyer ABC News
24
25

**3**

1              INDEX
2   APPEARANCES                    2
3
4   EXAMINATION OF ALEX E. JONES:
5   BY MR. BANKSTON                7
6
7
8   CHANGES AND SIGNATURE        189
9   REPORTER'S CERTIFICATION     191
10  FURTHER CERTIFICATION        194
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

1   Exhibit 11   Photograph of satellite       128
            communication dishes and other
2           equipment next to a blue and
            white building
3
    Exhibit 12   Flash drive                   188
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1      (Thursday, March 14, 2019, 12:02 p.m.)
2           P R O C E E D I N G S
3           THE VIDEOGRAPHER:  We're on the record for
4  the videotaped deposition of Alex Jones, taken on
5  Thursday, March 14, 2019.  The time is approximately
6  12:02 p.m.
7           Will the court reporter please swear in
8  the witness.
9           ALEX E. JONES,
10  having taken an oath to tell the truth, the whole truth,
11  and nothing but the truth, was examined and testified as
12  follows:
13           EXAMINATION
14  BY MR. BANKSTON:
15      Q.   Mr. Jones --
16           MR. BARNES:  When do you want me to go on
17  the record?
18           MR. BANKSTON:  Oh, yeah, let's do that
19  now, actually, Mr. Barnes.  Why don't you do that for
20  me?
21           MR. BARNES:  Thank you.
22           This is Robert Barnes.  I'm General
23  Counsel for InfoWars and Mr. Jones and in this context
24  Free Speech Systems, LLC, here representing him.  I have
25  a motion for pro hac pending; and the agreement is I can

7

1  represent the Defendant, Mr. Jones, here with the
2  acknowledgment that I am bound by the Texas Rules of
3  Civil Procedure, the Texas Ethical and Professional
4  Rules, and the Texas Sanctions Rules and will be bound
5  by them accordingly.
6           MR. BANKSTON:  Thank you, Mr. Barnes.
7           MR. BARNES:  Oh, you do want the mic on?
8  No problem.
9           EXAMINATION
10  BY MR. BANKSTON:
11      Q.   Mr. Jones?
12      A.   (No audible response.)
13      Q.   Mr. Jones?
14      A.   Uh-huh.
15      Q.   I want to go back to when this all started.
16  And in fairness to you, one of the things that you've
17  tried to make clear is that you're not the one who
18  started the theory that Sandy Hook was a false flag,
19  correct?
20      A.   Yes, sir.
21      Q.   And that's something that was borne out by
22  InfoWars archives and that you've been able to rely on
23  in court, correct?
24      A.   I don't exactly understand what you're saying.
25      Q.   Okay.  Let me help you with that.

8

1      (Exhibit 1 marked.)
2      Q.   (BY MR. BANKSTON)  I'm going to be showing you
3  what I'm now marking as Exhibit 1.  It's a double-sided
4  document.  Mr. Jones, that is a July 27th, 2018
5  Affidavit which you executed, correct?
6      A.   Yes, sir.
7      Q.   I want to go through this affidavit with you
8  and the highlighted part sentence by sentence.  Do you
9  see the pale orange part which I'm now going to read to
10  you?  "Plaintiffs claim that I started the controversy
11  and/or conspiracy about Sandy Hook being a hoax.  This
12  is not true."  I read that correctly?
13      A.   I need to read the full page.
14      Q.   Please take a moment to read it.
15      A.   (Witness silently reading document.)
16           It's just the orange part you want me to
17  read?
18      Q.   I actually just read it to you and wanted to
19  know if I had read it correctly.  Allow me to read it
20  for you again, Mr. Jones.  "Plaintiffs claim that I
21  started the controversy and/or conspiracy theory about
22  Sandy Hook being a hoax.  This is not true."  I read
23  that correctly?
24      A.   Yes, uh-huh.
25      Q.   Okay.  The next sentence says, "Before I ever

9

1  publicly commented on any issues relating to Sandy Hook,
2  I learned that others with whom I have no affiliation or
3  relationship had already posted articles" -- excuse me,
4  Mr. Jones, if you would like to flip the page --
5  "relationship had already posted articles online making
6  this claim and questioning the events as reported."  I
7  read that sentence correctly?
8      A.   Yes, sir.
9      Q.   So there were a variety of articles and
10  YouTube videos questioning the events that started
11  getting popular in the time period after the shooting.
12  I assume you saw some of those?
13      A.   Yes, sir.
14      Q.   How long is this are we talking?  Are we
15  talking days, weeks, months?
16      A.   I don't know.  I don't want to answer
17  incorrectly.  I don't remember the exact times.  So I
18  really can't state that time, but I think a month or
19  longer.
20      Q.   Sure.  Okay.  I remember there was -- about a
21  month after the shooting, there was a relatively popular
22  YouTube video that went viral.  Do you recall this
23  video?
24      A.   There were a lot of -- 2 million, 10 million.
25  It was a bunch of videos.  It was a firestorm of -- on

10

1  the Internet about it.
2      Q.  Okay.  And it was then, when you saw that,
3  that you started covering it and started commenting on
4  Sandy Hook?
5          MR. BARNES:  Objection as to define Sandy
6  Hook.  Object as to form.
7      Q.  (BY MR. BANKSTON)  You can go ahead and
8  answer, Mr. Jones.
9      A.  No, I started commenting on Sandy Hook that
10  they would use it to go after our guns and that the
11  media always hyped up school shootings and was causing
12  copycat events, that the mainstream media were basically
13  psychic vampires promoting mass shootings so they could
14  blame gun owners and try to take the Second Amendment
15  away, which they pushed to repeal the Second Amendment.
16          So for the first month or so -- and,
17  again, this was almost seven years ago -- but we've gone
18  back and looked at some of it in trying to find -- at
19  least three weeks, four weeks or so.  And then it was
20  such a firestorm on the Internet, it's like, no, this
21  isn't Prozac; this isn't video games, like I was saying,
22  I thought, like other shootings that happened.  This
23  was, you know, some type of staged event or multiple
24  shooters or people in the woods, things like that.  It
25  was a whole range of theories in a big Internet debate

11

1  going on that I then reported on and gave analysis to my
2  opinions.
3      Q.  Correct.  Okay.
4      A.  And I think that's what was weeks after.  I
5  can't remember the exact number.  I immediately when it
6  happened, you know, said, "Oh, look another person in a
7  black trench coat, you know, a loner on psychotropics
8  that came out, shoot-'em-up video games."  And I
9  remember being criticized by the video game industry
10  saying, "Don't you blame video games."
11      Q.  What I'm curious about, Mr. Jones, can you
12  flip the page back over again and look at the beginning
13  of the yellow sentence?  So when you say, "Before I ever
14  publicly commented on any issues relating to Sandy
15  Hook," you saw other stuff going on, right, you mean
16  whether it was staged or not?  In other words, you made
17  some comments about Sandy Hook when it first happened;
18  but in terms about it being a false flag or staged or
19  some sort of hoaxed event, right, that came later?
20  You're not the one who started that?
21          MR. BARNES:  Objection as to form.
22      A.  I know that I didn't start it.  And I think
23  it's a boilerplate.  Anytime there's a big public event,
24  like Jussie Smollett or babies in incubators in Iraq, a
25  lot of people question, you know, whether it's real.

12

1  President Trump questioned right after he got elected
2  and was first in office whether the attacks on the
3  Jewish cemeteries were being staged, and it turned out
4  they were.
5          So, I mean, again, going from memory, I
6  remember looking at it as your standard horrible tragedy
7  of psychotropic drugs, a kid in a cult, you know, type
8  stuff, like Columbine, shoot-'em-up video games.  I
9  remember that's where I was going because that's where
10  all the other shootings basically came from.
11      Q.  Sure.
12      A.  And so I can't specifically -- I mean, I'm
13  going from the best of my memory.
14      Q.  Okay.  Well, Mr. Jones, I want to show you
15  some video clips of some things you were saying as the
16  news broke of Sandy Hook and in a video that day that
17  you titled Connecticut School Massacre Looks Like False
18  Flag, Says Witnesses.
19          MR. BANKSTON:  Can you play the clip Day
20  of Sandy Hook?
21          (Video playing.)
22      Q  (BY MR. BANKSTON)  Mr. Jones, this is a video
23  where you made comments on issues relating to Sandy Hook
24  and you put forward a theory that it could be staged by
25  the Government to take away our guns, correct?

13

1          MR. BARNES:  Objection.  It seems like
2  this is a video, from watching it, that's different
3  pieces put together.
4          MR. BANKSTON:  Correct.
5          MR. BARNES:  Okay.  So it's not from --
6  so different things are out of context.  Is there any
7  way to get, like, the whole --
8          MR. BANKSTON:  You own the whole video,
9  and it's been produced with Mr. Zipp's affidavit.
10          MR. BARNES:  But for his purposes --
11          MR. BANKSTON:  If he wants to go watch an
12  entire four-hour video, I'm not going to have time --
13          MR. ENOCH:  Mark, it has not been
14  produced with Zipp's --
15          MR. BANKSTON:  Actually, Connecticut
16  False Claim full video has been produced; and it's been
17  in a court.  If you want to argue about that and object,
18  you can object at that time when it's offered.  That
19  objection's preserved.  You don't have to object to form
20  on that one.
21      Q.  (BY MR. BANKSTON)  Mr. Jones, that was a video
22  in which you made statements about Sandy Hook in which
23  you said -- put forth the theory it could be staged to
24  take away our guns?
25      A.  That's a Media Matters edited -- that's Media

Alex Jones - 3/14/2019

14

1  Matters edited derivative.
2     Q.  Is that you on that tape?
3     A.  It's edited.
4     Q.  And that's you talking about:  Don't think
5  this couldn't be staged.  Our Government kills little
6  kids all the time.  That's you saying those words?
7     A.  With SMART moms and things, yeah.  It's edited
8  out of context.
9     Q.  The truth is, Mr. Jones, you were the first
10 person in the world to make the false flag theory about
11 Sandy Hook and you did it before the bodies were even
12 cold; that's the truth?
13        MR. BARNES:  Objection as to form and to
14 the defin- -- are we going to have, like, set
15 definitions of the words, like --
16        MR. BANKSTON:  No, you can object to
17 form.  Yeah, that's Rule 199.  Just object to form.
18        MR. BARNES:  That's fine.
19     Q.  (BY MR. BANKSTON)  Mr. Jones, you said in your
20 affidavit that before you commented on any issues
21 relating to Sandy Hook, you saw other things that other
22 people were doing.  That affidavit has false statements,
23 doesn't it?
24     A.  No.
25     Q.  So we didn't just see you commenting on issues

15

1  relating to Sandy Hook?
2     A.  That was callers calling up.
3     Q.  You're going to tell me you watched that video
4  and you weren't commenting on Sandy Hook?
5     A.  I told you five minutes ago before you played
6  it that as a boilerplate of any big public event,
7  whether it's Jussie Smollett or whether it's babies
8  having their brains bashed out in incubators or WMDs,
9  that I upfront questioned it because of things from
10 Operation Northwoods and hundreds of declassified real
11 staged events where our Government admits that it staged
12 events.  Now, I always boilerplate say that we need to
13 investigate the news reportage of this and see what's
14 true.  There's such a long history of governments and
15 corporations and legal groups engaging in fraud.  And I
16 said that before you played the clip.
17        MR. BANKSTON:  Objection, nonresponsive.
18     Q.  (BY MR. BANKSTON)  Mr. Jones, I have a very
19 simple question for you:  That video you just saw of you
20 talking, were you talking about Sandy Hook?
21     A.  The edited pieces were.
22     Q.  The pieces that I edited and put together of
23 you speaking, I edited them.  When I edited those pieces
24 together and put them in front of you, was that you on
25 the camera?

16

1     A.  I saw a Media Matters video of that before.
2  You're saying you edited that?
3     Q.  It's not an important deal.
4     A.  But you did edit it?
5     Q.  I did, yes.  I'm not here to answer questions.
6     A.  Three-second clips together.
7     Q.  Those clips were edited together by me two
8  weeks ago.
9     A.  Why didn't you just play them unedited?
10    Q.  That's -- Mr. Jones, I'm not here to answer
11 your questions.  You understand you're here because
12 people have sued you and you have four hours in which
13 they're to ask you questions.  Are you going to do that
14 for me today?
15    A.  Yes, I'm answering your questions.
16    Q.  So in that video, "yes" or "no," you were
17 commenting about Sandy Hook?
18    A.  In the edited video I was commenting on Sandy
19 Hook.
20    Q.  You'll agree over the years you've seen
21 various anomalies relating to Sandy Hook?
22    A.  I've seen reported anomalies.
23    Q.  A lot of those anomalies are in videos, things
24 like the helicopter video of people being detained in
25 the woods.  Do you know what I'm talking about?

17

1     A.  Yes.
2     Q.  Okay.  There's the Anderson Cooper interview
3  with Ms. De La Rosa.  Do you know what I'm talking about
4  there?
5     A.  I know who Anderson Cooper is.
6     Q.  You know what the blue screen video is --
7     A.  Yes.
8     Q.  -- where his nose disappears?
9     A.  Yes.
10    Q.  Okay.  You know that there's some videos of
11 some interviews that were just kind of strange, right?
12 Those are something you've seen?
13    A.  Yes.
14    Q.  There's been discussion on InfoWars about the
15 interior videos taken of the school itself, right?
16    A.  Yes.
17    Q.  There's been discussion on InfoWars about dash
18 cam video footage at Sandy Hook?  Remember Mr. Dew
19 talking about videos of the officers eating their
20 lunches on top of their cars?
21    A.  I don't remember that.
22    Q.  Okay.  But if there was -- if Mr. Dew talks
23 about dash cam footage, you have no reason to believe
24 he's lying, do you?
25    A.  I'm still not familiar with what you're

18

1  talking about.
2      Q.  Okay.  And InfoWars has also discussed
3  questioning the official story from time to time,
4  correct?
5      A.  Uh-huh.
6      Q.  Including the official report about Sandy Hook
7  that was released?  There's some weird things in there
8  that have been questioned on InfoWars?
9      A.  The one that came out, like, five or six years
10  later.
11      Q.  I think in December of 2013, so about a year
12  later.
13      A.  The state police report?
14      Q.  The state police report.  Are you familiar
15  with what I'm talking?
16      A.  That's so long ago, six years ago, I just...
17      Q.  Well, I mean, there's anomalies all over the
18  place is what I'm saying.  You've seen --
19      A.  There have been a lot of people asking a lot
20  of questions that isn't legal yet in this country.
21      Q.  Right.  Recently your lawyer said in a legal
22  document, "There is no dispute that the Sandy Hook
23  tragedy was real with tragic loss of life."  Do you
24  stand by that?
25      A.  I'm sorry.  You're talking so fast.

19

1      Q.  Sure, sure.  Let me slow down a little bit for
2  you, Mr. Jones.  Recently your lawyer said in a legal
3  document, "There is no dispute that the Sandy Hook
4  tragedy was real with tragic loss of life."  You stand
5  by that; that's what you admit is true now?
6      A.  Yes.
7      Q.  Okay.  But in the past -- before you had all
8  the information, in the past, you didn't know exactly
9  what happened at Sandy Hook?  You've questioned it?
10      A.  Oh, certainly in the past.  You mean in the
11  last seven years?
12      Q.  Sure.
13      A.  Yes.
14      Q.  And, in fact, over the course of covering
15  Sandy Hook over the past six or so years, you've always
16  entertained serious doubts about what really happened
17  that day?
18      A.  I'm sorry.  I don't understand.
19      Q.  Sure.  Over the course of Sandy Hook, you've
20  questioned the official story.  You've had serious
21  doubts that the official story was true?
22      A.  I've always, from the beginning, had questions
23  about any big public event that's hyped up because so
24  many times parts of it are being covered up or things
25  are being staged or they're not letting a new crisis go

20

1  to waste.  Sometimes things are completely made up, like
2  the babies in the incubators, which is admitted.  You
3  know, they've got the PR firm that said the babies
4  brains were all bashed out and we lost all those wars.
5      Q.  I've heard you say that.
6      A.  And so it's just been -- and the WMDs.  The
7  WMDs were a lie, too, and then watched -- that have
8  killed millions of people.
9          MR. BANKSTON:  Objection, nonresponsive.
10      A.  Well, I'm trying to answer the question.
11      Q.  (BY MR. BANKSTON)  Oh, do you know what
12  question you're answering?
13      A.  Well, you were asking a question of, like --
14  I'm not sure.  You said you've always questioned; and
15  I'm saying, no, I questioned it up front.  The public
16  questioned it.  And then, as I had time to go over it, a
17  lot of the anomalies turned out to not be accurate; and
18  I believe school shootings happen.
19      Q.  All right.  So I think a shorter way is you
20  had doubts; you had questions until you didn't.  At some
21  point -- I mean, things change; I understand that.  But
22  there have been points in which you've questioned the
23  official narrative.  You've had serious doubts about
24  some of these things?
25      A.  Yes.

21

1      Q.  And these anomalies that have come up, these
2  things have raised serious doubts.  You've had serious
3  doubts about the anomalies, too?
4      A.  Yes.
5      Q.  Okay.  By the spring of 2013 or so, let's say
6  just a few months after the shooting, by that point, you
7  had gone from theory to just straight up telling your
8  audience, "Sandy Hook was staged, and the evidence is
9  overwhelming"?
10          MR. BARNES:  Objection as to form.
11      Q.  (BY MR. BANKSTON)  Correct?
12      A.  Well, what does "staged" mean?
13      Q.  I'm just asking what you were telling your
14  audience.
15      A.  No, no --
16      Q.  I'm not answering your questions, Mr. Jones.
17  You're going to tell me what "staged" means when you
18  said it.  So what I'm asking you is:  A few months after
19  the shooting, you had gone from theory to straight up
20  telling your audience, "Sandy Hook was staged, and the
21  evidence was overwhelming."  True or false?
22      A.  But I'm asking you to define what you mean by
23  "staged."
24      Q.  I'm not asking -- I'm not asking for a
25  definition of "staged."  I don't care what "staged"

Alex Jones - 3/14/2019

22

1 means. I'm asking: Did you say it?
2      A.  I don't have it in front of me; but, I mean, I
3 did say that I saw a lot of anomalies that I thought
4 that certainly large parts of the way it was being
5 handled, you know, the Supreme Court came out saying
6 they covered up some of the reports on what happened
7 with the incident.  I think a lot of that's been borne
8 out that when you see a cover-up going on, you're not
9 sure what's happening inside of it.
10           And later we just learned it was a
11 cover-up of, I think, some of the negligence there in
12 the town and with the school.  I don't know the teacher
13 that tried to save the kids was negligent -- that
14 person's a hero -- and sadly got sued.  But I do, you
15 know, clearly think there was some cover-up, but it
16 wasn't in that it was all, the whole thing, staged, but
17 that the way the media handled it was synthetic.  They
18 way it was used against gun owners was synthetic.
19           MR. BANKSTON:  All right, Mr. Jones.
20 Objection, nonresponsive.
21           Can you play the clip Overwhelming for
22 me, please?
23      Q.  (BY MR. BANKSTON)  Mr. Jones, I want to show
24 you clip from April 16th, 2013.
25           (Video playing.)

23

1      Q.  (BY MR. BANKSTON)  That's you on the video,
2 right?
3      A.  Yes, that's me on the short video.
4      Q.  Yeah, it's a short video.  I understand.
5           By the end of 2014 you had personally
6 done intensive research, and you concluded Sandy Hook
7 was all fake?
8           MR. BARNES:  Objection as to form.  And
9 are you asking him to repeat a quote?
10           MR. BANKSTON:  No.  I'm asking him --
11      Q.  (BY MR. BANKSTON)  By the end of 2014 you had
12 personally done intensive research; and you concluded it
13 was all fake, correct?
14           MR. BARNES:  Still objection as to form.
15      A.  The specific areas I was talking about being
16 fact, not in a totality.
17           MR. BANKSTON:  Okay.  Can you play the
18 clip for me?
19      Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
20 play you a clip from December 29th, 2014.
21           MR. BANKSTON:  Go ahead and play that for
22 me, please.
23           (Video playing.)
24      Q   (BY MR. BANKSTON)  That's you saying you did
25 deep research, correct?

24

1           MR. BARNES:  The same objection as to
2 form and that these are highly edited excerpts from --
3           (Simultaneous speakers.)
4           MR. BANKSTON:  Can you stop with speaking
5 objections.
6           MR. BARNES:  Obviously --
7           MR. BANKSTON:  Yeah, I know exactly what
8 you're doing; and you need to say:  Objection, form;
9 objection, leading; assert a privilege or stay quiet.
10 You do not need to be making suggestive objections about
11 the content of the evidence and what its form is.  You
12 don't need to be doing that, Mr. Barnes.
13           MR. BARNES:  I'm not trying to do that.
14 I'm just saying that these are videos that are highly --
15           MR. BANKSTON:  That's a great opinion.  I
16 don't understand why your opinion is relevant to these
17 questions right now.  You wouldn't be doing this in a
18 courtroom.  Don't do it in my deposition right now.
19           MR. BARNES:  Oh, yeah, in a courtroom it
20 wouldn't come in because it wouldn't be admissible
21 because of the rule of completeness.
22           MR. BANKSTON:  Mr. Barnes, that's why
23 your objection's preserved as to the form of that
24 evidence.  You don't have to raise an objection.  The
25 only reason you would be doing it is to possibly

25

1 influence the witness.
2           MR. BARNES:  So can we have a standing
3 stipulation that when I object to form, that includes an
4 objection to the rule of completeness?
5           MR. BANKSTON:  Absolutely.
6           MR. BARNES:  Thank you.  Then we're good.
7           MR. BARNES:  And for the record every
8 objection to every piece of evidence is preserved under
9 the Texas Rules, which --
10           MR. BARNES:  I was objecting in a way
11 that --
12           MR. BANKSTON:  Mr. Barnes --
13           (Simultaneous speakers.)
14           THE REPORTER:  Excuse me, Counsel.  You
15 are speaking over one another.  You're making the record
16 very muddled.
17           MR. BARNES:  I'm sorry.
18           So we have a standing stipulation that
19 when I object to form, that includes an objection on
20 rule of completeness grounds to any evidence that -- or
21 a document or exhibit would otherwise include other
22 excerpts.
23           MR. BANKSTON:  Thank you, Mr. Barnes.
24           MR. BARNES:  Perfect.
25      Q   (BY MR. BANKSTON)  Over the next few years,

26

1  Mr. Jones, you did dozens and dozens of videos with that
2  same message about Sandy Hook being staged, correct?
3          MR. BARNES:  Objection as to form.
4      A.  No.
5      Q.  (BY MR. BANKSTON)  Okay.  Well, I want to talk
6  about some of the claims you've made over the years.
7  The first thing I want to talk to you about is circles
8  and I want to show you a video clip of something you
9  said on November 18, 2016; April 22nd, 2017; and
10  June 13, 2017.
11          MR. BANKSTON:  Can you play me the video
12  clip Going in Circles?
13          (Video playing.)
14          MR. BANKSTON:  Can you give me the last
15  frame, please?
16      Q.  (BY MR. BANKSTON)  Mr. Jones, when you said
17  you'd be running them away from the building, what did
18  you mean by that?
19      A.  The police should be getting the children away
20  from the building.
21      Q.  Right.  Okay.  So the police should be --
22  scratch that.
23          No doubt there's a dangerous situation, a
24  shooter on campus?  Is it dangerous when there's
25  somebody shooting up a school?

27

1      A.  Yes.
2      Q.  Okay.  And so you would think if proper
3  procedures were being followed in keeping them safe,
4  this looks pretty weird, doesn't it, if they're not
5  being run away from the building, right?
6      A.  Yes.
7      Q.  But, Mr. Jones, when you said this to your
8  audience, you knew that wasn't the school.  You knew
9  that, right?
10          MR. ENOCH:  Are you saying that's part of
11  his broadcast?
12          MR. BANKSTON:  Yes.  It says InfoWars
13  right there on the bottom.
14          MR. ENOCH:  Is that part of the same
15  broadcast?
16          MR. BANKSTON:  Yes.  Do you see where it
17  says InfoWars?
18          MR. ENOCH:  As long as you're
19  representing that the video that you're showing him now
20  with the people walking across was part of the same
21  broadcast --
22          MR. BANKSTON:  Okay.  First of all --
23          MR. ENOCH:  -- statements.
24          MR. BANKSTON:  First of all, there's
25  only going to be one lawyer defending this deposition,

28

1  Mr. Enoch; and one was already chosen.  And, no,
2  Mr. Enoch, there will be one lawyer speaking on the
3  record.  There is one lawyer defending the deposition.
4  I am not being tag-teamed by the two of you.  And so I
5  would appreciate it if you kept your mouth shut for this
6  deposition and let Mr. Barnes defend the deposition.
7          For the record in the bottom corner of
8  this screen is a large InfoWars logo.  This was
9  broadcast on InfoWars.
10      Q.  (BY MR. BANKSTON)  So, Mr. Jones, my question
11  to you is:  When you broadcast this to your audience and
12  told them this, you knew that wasn't the school,
13  correct?
14          MR. ENOCH:  Mark, would you please answer
15  my question?  And it's a simple question:  If you
16  represent that the video of the school that you're
17  showing, the firehouse, was part of the same broadcast
18  in which he made his statements --
19          MR. BANKSTON:  Yes.  Mr. Enoch, we just
20  watched it.  Do you really think I edited his words over
21  a different video?
22          MR. ENOCH:  Well, what I think doesn't
23  matter.  Thank you for answering the question.
24          MR. BANKSTON:  Mr. Enoch, I would
25  appreciate it if you kept quiet the remainder of this

29

1  deposition and let Mr. Barnes defend the deposition.
2      Q.  (BY MR. BANKSTON)  Mr. Jones, you knew that
3  wasn't the school?
4          MR. BARNES:  Object to the form.
5      Q.  (BY MR. BANKSTON)  Correct?
6      A.  I did not know that.  This is so edited it
7  looks like two different shows together.  Can you play
8  it again?  It's so edited.  I've never...
9          MR. BANKSTON:  Can you play at least the
10  last part there where he's doing the video?
11          THE WITNESS:  Just play the whole thing.
12          MR. BANKSTON:  Play the whole video again
13  for him.
14      Q.  (BY MR. BANKSTON)  These are three different
15  clips.  And I'll remind you, Mr. Jones, these are from
16  November 18, 2016; April 22nd, 2017; and June 13, 2017.
17      A.  You just told him it was the same broadcast.
18      Q.  And this one right here is the same broadcast,
19  Mr. Jones.
20          MR. ENOCH:  Is this the --
21          MR. BANKSTON:  This is November 18th,
22  2016.
23          (Video playing.)
24      Q.  (BY MR. BANKSTON)  Let's see if we can help
25  you understand this.  Hold on, Mr. Jones.  Let's see if

Alex Jones - 3/14/2019

30

1  we can help you understand this.  You understand this
2  first video where it says Sandy Hook Vampires Exposed,
3  you see that?
4     A.  Yes.  That's about the media.
5     Q.  Correct.  That's April 22nd, 2017.  That's an
6  InfoWars video.
7     A.  It's blurred.  I can't see that.
8     Q.  In other words, you know that there was an
9  InfoWars video with that title, correct?
10    A.  I believe so.
11    Q.  Okay.  And then we saw a second clip from your
12  Megyn Kelly interview, right?
13    A.  Which was highly edited.
14    Q.  Sure.  And I edited a piece of it in here,
15  correct?  That was from the Megyn Kelly --
16        MR. ENOCH:  Wait.  Time out.  Time out.
17  We need to take a break.  You just told me that
18  everything you showed him was from one video.
19        MR. BANKSTON:  No, Mr. Enoch.  I told you
20  what was on the screen and the audio were from the same
21  video.
22        MR. ENOCH:  If you want to take a fair
23  deposition, you're entitled to do that.  You are not
24  entitled to misrepresent to the witness three different
25  dates in deposition and say -- three different dates of

31

1  video and say this was the same video.  Were these, all
2  the clips that you showed him the same video, "yes" or
3  "no"?
4         MR. BANKSTON:  No.  And we've said that
5  repeatedly from the moment I asked him.  They were three
6  different dates.  I read the three different dates to
7  you, Mr. Enoch.  So your indignation can calm down, and
8  I'd like you to be quiet in this deposition.
9         MR. ENOCH:  In what video --
10        MR. BANKSTON:  Mr. Barnes, can you please
11  instruct your counsel to be quiet?  You are defending
12  this deposition.
13        MR. ENOCH:  Let's take a break.
14        MR. BANKSTON:  Actually, I've got a
15  question on the floor.  We're not taking a break.
16        MR. BARNES:  You're entitled to do
17  depositions the way you want, but I'm just saying it's
18  creating a lot of unnecessary confusion.
19        MR. BANKSTON:  And, hey, I'm walking
20  through it with him right now.
21        MR. BARNES:  Okay.
22        MR. BANKSTON:  We're going to clear up
23  all that confusion.  All right?  That's what we're going
24  to do.  Okay?
25    Q.  (BY MR. BANKSTON)  Mr. Jones, we've talked

32

1  about this one.  This is the Sandy Hook Vampires
2  Exposed.  And we've talked about the second clip being
3  from the Megyn Kelly interview, right?  Correct?
4     A.  Yes.
5     Q.  Okay.  Now then, the third clip that starts at
6  the end where it shows the video that we were talking
7  about and you remember there was something you did
8  called Final Statement on Sandy Hook in November of
9  2016?
10        MR. ENOCH:  Mark --
11        MR. BANKSTON:  Mr. Enoch --
12        MR. ENOCH:  -- you are -- maybe you don't
13  intend to do it, Mark; but you're stating something
14  that's not correct.  You just said one is from the Megyn
15  Kelly interview and you gave us three dates and none of
16  them are the Megyn Kelly date.
17        MR. BANKSTON:  I'm sorry if I've given
18  you a wrong date.  It was June 13th, 2017.
19        MR. ENOCH:  That is not the Megyn Kelly
20  broadcast.
21        MR. BANKSTON:  Okay.  If I've misstated
22  the date, that's my -- and you can object to that or you
23  can do whatever you want.
24    Q.  (BY MR. BANKSTON)  Do you agree that's the
25  Megyn Kelly broadcast we were watching?  That interview

33

1  in the middle was from the Megyn Kelly interview?
2     A.  I saw part of that.  I mean, it was so fast,
3  I...
4     Q.  We'll keep it slow.  We'll keep going --
5     A.  I watch Court TV and stuff.  Nobody plays
6  edited tapes.
7     Q.  Okay.  This video here that we're looking at
8  is something from Final Statement on Sandy Hook.  Do you
9  remember doing a video from Final Statement on Sandy
10  Hook?
11    A.  I do remember that.
12    Q.  Okay.  And this video here is where you showed
13  this footage, and you made some comments about kids
14  going in circles, right?
15        MR. BARNES:  Objection as to form.
16    A.  If that's from it, I remember making comments.
17    Q.  (BY MR. BANKSTON)  Okay.  Mr. Jones, do you
18  see that ambulance right there?
19    A.  Yes.
20    Q.  Okay.  I want to play you a couple of clips.
21        MR. BANKSTON:  Can you play me --
22    Q.  (BY MR. BANKSTON)  I want to play you
23  something from July 5th, 2015.
24        MR. BANKSTON:  Can you play me the clip
25  called Ambulance?

**34**

1    Q.  (BY MR. BANKSTON)  These are two things that
2  you and Mr. Dew --
3            (Video playing.)
4    Q.  (BY MR. BANKSTON)  Mr. Jones, if you saw
5  ambulances parked next to that building, you knew it
6  wasn't the school, didn't you?
7            MR. BARNES:  Objection as to form.
8    A.  No, I didn't.  And later I corrected, before I
9  was ever sued that that was one of the things that had
10  been said that wasn't true was that they were at the
11  firehouse.  There was other footage, too, from the
12  school.  So it's all edited.  So it's hard to respond to
13  this.  I want to respond to your questions.  It's so
14  edited, like, two- or three-second clips sandwiched in
15  with others.  It looks like more than three broadcasts.
16    Q.  (BY MR. BANKSTON)  Well, let's look right
17  there.  That was just two things, something you said,
18  something Mr. Dew said.
19    A.  Yeah, I --
20    Q.  Hold on.  Ambulances are parked down the road;
21  they didn't even go to the school.  Then a year later,
22  you showed your audience a video of a building with an
23  ambulance to it; and you told them it was the school?
24    A.  I talk four hours a day, and I can't remember
25  what I talked about sometimes a week ago.  Sandy Hook

**35**

1  has been, in the aggregate, less than one-tenth of
2  1 percent of what I cover.  And I understand that you've
3  been living this and pouring over it constantly.  I have
4  done almost no preparation for this.  It's very -- it
5  gives me a headache, and I just -- you're just showing
6  me a bunch of edited tapes.
7    Q.  What question are you answering?
8    A.  You're asking me about a bunch of edited --
9  how does someone answer...
10    Q.  Mr. Jones, what question were you answering?
11    A.  If you put a bunch of pages in a blender with
12  writing on it and blended it all up and you asked me
13  what's in the blender, I can't answer you a question
14  with a bunch of blended words.
15    Q.  Mr. Jones, I'm asking you:  If there's
16  ambulances next to the building, you know it's not the
17  school?
18            MR. BARNES:  Objection as to form.
19    Q.  (BY MR. BANKSTON)  Correct?
20    A.  No, that's not what I meant.
21    Q.  Okay.  I want to play you a piece of video
22  footage from the helicopter footage.  Let's take a look
23  at that really quick.
24            MR. BANKSTON:  Can you play the
25  December 14th, 2012 Helicopter Firehouse Footage?

**36**

1            (Video playing.)
2    Q.  (BY MR. BANKSTON)  Mr. Jones, there are no
3  elementary aged children in this line of people walking,
4  is there?
5    A.  No.  It's another clip we're talking about.
6    Q.  Yeah.  Do you see here is where they're
7  walking in the circles?  None of those people have their
8  hands up, do they?
9    A.  But here is footage I've seen that shows
10  that.  So you're conflating two different things.
11    Q.  Really?  Because you were talking about the
12  footage on your show.  You're saying there's actually a
13  different piece of video footage with children with
14  their hands up being led in circles in and out of --
15    A.  From my memory it's a live show, so the people
16  in there was throwing stuff up.  Many times it's not
17  accurate, sure.
18    Q.  So the video clip you were showing wasn't even
19  of the school?
20            MR. BARNES:  Objection as to form.
21    Q.  (BY MR. BANKSTON)  Correct?
22    A.  I'm not sure about what video this is it's so
23  edited, but I wrongly have said in the past, off of news
24  reports that I was relying on, that the children were
25  going around with their hands up at the school when it

**37**

1  was the firehouse.  And that's one of the main anomalies
2  that ended up to not be true and the reason I changed my
3  mind about a lot of things.
4    Q.  Sure.  After 2017, right?
5    A.  Well, I've gone back when I've been asked
6  about anomalies and I've repeated those anomalies and
7  those tapes have been edited and that's why I do not do
8  interviews now and talk about the anomalies, because
9  those are edited.
10    Q.  Right.  Let's talk about the school itself.  I
11  want to show you two comments that you made on July 7th,
12  2015 and April 22nd, 2017.
13            MR. BANKSTON:  Can you play The School
14  was Closed?
15            (Video playing.)
16    Q   (BY MR. BANKSTON)  The first thing, you admit
17  now there are no e-mails between City Council and the
18  School in which Sandy Hook was being shut down; that's
19  not a real thing?
20            MR. BARNES:  Objection as to form.
21    A.  This is almost seven years old, but I do
22  believe that we wouldn't -- I mean, sometimes we're
23  wrong about things; but there's always some news we're
24  covering or a witness or something.  So I can't answer
25  that because of just memory.

38

1    Q.   (BY MR. BANKSTON)  Mr. Jones, you said it was
2  seven years ago?
3    A.   Six years ago, whatever it was.
4    Q.   You just -- that stuff we just played you was
5  April 22nd, 2017.  That was a year before you were sued,
6  right?
7    A.   It was 3 seconds long.
8    Q.   Right.  But it's not seven years ago, is it,
9  Mr. Jones?  You were saying that a year before you were
10  sued.
11        MR. BARNES:  Objection as to form.
12    A.   I can't answer.  It's out of context.  I don't
13  know what you're showing me.
14        MR. BANKSTON:  Of course.  Objection.
15  nonresponsive.
16    Q.   (BY MR. BANKSTON)  When you said in the video
17  it's all rotting and falling apart, we'd talked earlier,
18  you'd seen the interior video of Sandy Hook; that's
19  something you'd seen before?
20    A.   The photos of the mold and the rotting doors.
21    Q.   And you said on the video it was falling
22  apart.  You just said that on the video?
23        MR. BARNES:  Objection as to form.
24    Q.   (BY MR. BANKSTON)  Right?
25    A.   I saw the edited video.  I don't know where

39

1  it's from.  I don't know the context.
2    Q.   Sure.  But you said in this video, in the
3  video, the school's rotting and all falling apart and
4  nobody's even in it.
5        MR. BARNES:  Objection --
6    Q.   (BY MR. BANKSTON)  Right?  That's what you
7  said?
8        MR. BARNES:  Objection as to form.
9    A.   I have no idea what the context of this is.
10    Q.   (BY MR. BANKSTON)  So wait.  There's a context
11  in which saying in the video that the school was all
12  rotting and falling apart and nobody's even in it --
13    A.   Why are these videos all 3 seconds long?
14    Q.   Because I'm focusing in on specific issues,
15  Mr. Jones.  And I want to know:  This claim you made
16  that there is a video of the school where's it's
17  rotting and falling apart -- that's all I care about
18  right now -- you saw such a video?
19        MR. BARNES:  Objection as to form.
20    A.   I have seen, from memory, news reports showing
21  photos and images.  And my memory fails, but I do
22  remember seeing photos put to video of the school being
23  in disrepair in the reports.
24    Q.   (BY MR. BANKSTON)  Let's play for you really
25  quick -- I want to show you this video, the interior

40

1  video of Sandy Hook that was taken that day.  I want to
2  show you a clip from that, and I want you to note that
3  every time they're going to go -- there's a couple of
4  times they're going to go in the hallway; and there's
5  part of the hallway they go in that has to be redacted
6  because that's where Ms. Hochsprung and Ms. Sherlach's
7  blood is all over that hallway.  But I want you to take
8  a look at the hallways and the classrooms for me as you
9  watch this video.
10        MR. BANKSTON:  Can you play Interior of
11  Sandy Hook?
12        (Video playing.)
13    Q   (BY MR. BANKSTON)  Mr. Jones, that school is
14  not rotting, falling apart, or abandoned, is it?
15        MR. BARNES:  Objection as to form.  I
16  assume that includes any authentication disputes that I
17  have about whether something is --
18        MR. BANKSTON:  Under the Texas Rules
19  every bit of evidence that is offered in deposition is
20  not -- there's no waiver of any objections.
21    Q.   (BY MR. BANKSTON)  That video's not rotting --
22  that school's not rotting and falling apart and it's not
23  abandoned, is it, Mr. Jones?
24    A.   I've never seen that video.
25    Q.   I'm perfectly confident you haven't.

41

1  Absolutely, I know that.  But what I'm asking you --
2    A.   I don't even know --
3    Q.   -- is seeing it right now, what I just showed
4  you, regardless of what school it was or if I just went
5  and took it over at Eastside Elementary, that school
6  that you just saw on the screen is not rotting, is not
7  falling apart, and does not look to be abandoned, does
8  it?
9    A.   It looks dilapidated.
10    Q.   Okay, Mr. Jones.  You've seen Mr. Zipp's
11  affidavit, correct?
12    A.   Mr. Zipp?
13    Q.   Mr. Zipp, Fred Zipp, Plaintiff's expert who's
14  sitting with us in the room today, you've seen his
15  affidavit in this case?
16    A.   No.
17    Q.   Okay.  So you didn't know that there were 180
18  news articles from 2009 to 2011 about the Sandy Hook
19  school with photos of the children doing things from
20  multiple sources; that's not something you've ever
21  known?
22    A.   I didn't know that number.  I mean, I've seen
23  photos and things showing mold and the place dirty and
24  messed up if that's what you're talking about.
25    Q.   No.  I asking you that the school was open

42

1  during those years, right?  During 2009 to 2011 there's
2  plenty of evidence the school was open, right?
3      A.  There's been controversy, like, on Google,
4  showing their deliveries and things like that.  I mean,
5  that was controversy we covered.
6      Q.  Okay.  So based on what you knew at the time,
7  you entertained serious doubts about whether the school
8  was open?
9          MR. BARNES:  Objection as to form.
10     Q.  (BY MR. BANKSTON)  In other words -- let me
11  pull that back, Mr. Jones.
12     A.  I had said stuff about Jussie Smollett.
13     Q.  Sure.  Okay.
14     A.  I was the first person to question it.
15     Q.  Sure.  And I'm not going to try to pin you
16  down on here.  Let's just be straight up and upfront
17  about it.  You didn't know one way or the other, right,
18  whether the school was open?  You had some doubts.  You
19  didn't know one way or another; you couldn't confirm it
20  one way or another?
21     A.  I know that some investigators who were
22  accreditated school safety folks who thought were
23  credible experts were the ones -- professors and others
24  that were in good standing -- were the ones that were
25  really doing these investigations; and that I was in

43

1  some cases taking what they said incorrectly.  And I've
2  admitted to that.
3      Q.  And with no corroboration?  You just take what
4  they said and you trusted these guys, right?
5      A.  I mean, I'd seen one of the guys, like, on
6  national television before on the Columbine stuff as a
7  national safety expert; and he sounded pretty credible.
8      Q.  Mr. Halbig, right?
9      A.  Yes.
10     Q.  And he had sent you something in the
11  neighborhood of -- ten fours -- 4,000 e-mails?
12     A.  It's a lot, yeah.
13     Q.  And looking at those e-mails, taking a look at
14  them, you wouldn't agree with me that that man is a
15  raving lunatic?
16     A.  He seemed very credible and put together
17  earlier on, but -- I can't remember the exact number --
18  he seemed to get agitated about four years ago, three
19  years ago.
20     Q.  Let's talk a little bit about EMTs, emergency
21  medical technicians; and I want to show you a clip of
22  something that you said.  And this, to address
23  Mr. Enoch, is I think where this got messed up.  There's
24  a clip, again, on June 13, '27 [sic.] right before the
25  Megyn Kelly interview.  In other words, the Megyn Kelly

44

1  interview's coming up; and let's just be upfront about
2  it.  It was edited, and you didn't think that was fair,
3  right?  I mean, it was pretty heavily edited?
4      A.  I think they call it deceptively jump titles.
5  I mean, your videos are worse; but sure.  Sure.
6      Q.  Yeah, I get that.  I get that.
7          Let's take a look at something you said
8  right before the Megyn Kelly interview.  Okay?  And this
9  is on June 13th, 2017.
10         MR. BANKSTON:  Will you play the clip
11  called EMTs?
12         (Video playing.)
13     Q.  (BY MR. BANKSTON)  How did you determine that?
14         MR. BARNES:  Objection as to form.
15     A.  I was reading someone else's report.
16         MR. BANKSTON:  Okay.  Hold on.
17         Bring up the last frame again.
18     Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
19  lean up here so I can kind of point a little bit.  Do
20  you see here where it says, "What Alex Jones really
21  believes about Sandy Hook?"
22     A.  Yes, I do.
23     Q.  Do you see where it says, "Among his
24  questions?"  Do you see that?
25     A.  Yes.

45

1      Q.  Do you see it says, "In closing Jones
2  says..."?
3      A.  I believe that's where I'm saying I think
4  Sandy Hook happened.
5      Q.  Right.  What I'm asking you is:  When it's
6  talking "his questions," that's Zero Hedge reporting on
7  your questions.  And when it says, "In closing Jones
8  says," that's Zero Hedge reporting on what you said.
9          And now, in some sort of inception, this
10  is you reporting on Zero Hedge reporting on what you
11  said?
12     A.  Can you make it bigger?  I can't read that.
13     Q.  I cannot make that bigger, Mr. Jones; but I'm
14  asking --
15         THE WITNESS:  May I approach it, your
16  Honor?
17         MR. BANKSTON:  You may approach it.
18  Yeah, go ahead.
19         THE WITNESS:  I can't even see it.  My
20  god.  There's no way to blow it up maybe?
21         MR. BANKSTON:  I don't think I can blow
22  that up.
23     A.  "My heart goes out to the" -- I can't read it.
24  "My heart goes out to the parents of lost children."
25     Q.  (BY MR. BANKSTON)  Okay.  That's great.  What

46

1   I'm asking you, Mr. Jones, is: Do you see the word
2   "his"?
3       A.  Yes.
4       Q.  Who does "his" refer to?
5       A.  I believe it refers to me.
6       Q.  Okay.
7           MR. BANKSTON:  You can take a seat,
8   Mr. Jones.
9       Q.  (BY MR. BANKSTON)  So how did you come to the
10  conclusion that they never let paramedics or EMTs in the
11  building?
12          MR. BARNES:  Objection as to form.
13      A.  I went off of the professors and all the
14  so-called experts.
15      Q.  (BY MR. BANKSTON)  Okay.
16      A.  And they wouldn't release a bunch of the
17  reports.  There were a bunch of lawsuits about the
18  secrecy, which added to all of the -- and as more of the
19  stuff got released, then it proved the official story.
20      Q.  When do you think that the police reports on
21  Sandy Hook were released?  When do you think that
22  happened?
23      A.  I know there was one report -- you know, I
24  don't know the date, so I don't want to be inaccurate.
25      Q.  Okay.

47

1       A.  I believe one took over five years.
2       Q.  Okay.  Well, let me show you one that didn't
3   take five years.  Okay?  We're going to talk about one
4   of those, and I'm going to mark it for you right now as
5   Exhibit 2.
6           MR. BANKSTON:  We're actually going to
7   the videos after the sequence.  I think that's going to
8   be lot easier.
9           (Exhibit 2 marked.)
10      Q.  (BY MR. BANKSTON)  Mr. Jones, I have handed
11  you a State of Connecticut Department of Public Safety
12  Investigation Report.  Do you see that at the top?
13      A.  Uh-huh.
14      Q.  Okay.  And you see kind of in the middle
15  there, "Place of Interview:  Newtown Police Department,"
16  right in the middle of the interview report?
17      A.  I need to read this.
18      Q.  In fact, you know what, just to be fair to you
19  about this, it's a long report, right?  I mean, it's
20  five, six pages?  Let's let you read the whole thing.
21  Don't you think that'd be fair?
22      A.  Sure.
23          MR. BANKSTON:  In fact, let's go off the
24  record.  We'll take a little break.
25          THE WITNESS:  Well, I mean --

48

1           MR. BANKSTON:  You can sit there and read
2   that.  Does that sound good?
3           THE WITNESS:  Well, I may need to -- if
4   we're taking a break, I'm going to go to the bathroom
5   and stuff.
6           MR. BANKSTON:  Sure, you can go to the
7   bathroom.  I'm not going to stop you from that,
8   Mr. Jones.  I'm not -- your bodily functions are your
9   own.
10          Let's go ahead and go off the record.
11          THE VIDEOGRAPHER:  We're off the record
12  at 12:44 p.m.
13          (Off the record from 12:44 to 12:58 p.m.)
14          THE VIDEOGRAPHER:  We are back on the
15  record at 12:58 p.m.
16      Q.  (BY MR. BANKSTON)  Mr. Jones, before we went
17  on a break we were talking about the issue of whether
18  there were EMTs allowed into the building, and I
19  provided you with a couple of findings of some police
20  reports.  I have put in front of you Exhibit 2, the
21  statement of Lieutenant Vanghele, correct?  You've had a
22  chance to read that?
23      A.  Vanghele.  I did read most of it, but I didn't
24  get to the second one.
25      Q.  Oh, okay.  Well, let's look at Exhibit 2.  You

49

1   have Exhibit 2 in your hand?
2       A.  I'm on 2.
3       Q.  Let's go to page 5.  Do you see the
4   highlighted portion?
5       A.  Yes.
6       Q.  I'm going to read that, and you're going to
7   follow along with me.  Okay?  "I then walked into a room
8   with Sergeant Carrio.  At first glance it did not appear
9   there were any casualties.  To the left of the room as
10  you walk in, there was a bathroom in the corner.  There
11  was a massive pileup of bodies in this room.  At this
12  time I did not know it was a bathroom and I wondered how
13  the suspect had the time to kill that many people and
14  stack them in the corner of the room.  Sergeant Carrio
15  stated he was an EMT or maybe a paramedic and that he
16  had to check to see if anyone in the pile might have
17  survived -- may have survived.  I agreed as the bodies
18  were stacked two and three high and that some of the
19  children at the bottom, who were able to cram in first,
20  may have escaped bullets.
21          "He began to check for life signs,
22  wounds, and attempts to find a pulse.  The victims on
23  the top of the pile" -- redacted -- "and many of the
24  bodies had injuries that were obviously fatal.  It
25  appeared as if the teachers in the room immediately upon

50

1 hearing gunshots began to pack children into the
2 bathroom. The children that were sitting on the floor
3 of the bathroom were packed in like sardines. One
4 little girl was sitting, crouched in between the toilet
5 seat and the back corner of the room. I thought that
6 she might have the best chance for survival. As
7 Sergeant Carrio got to the last bodies, it was clear
8 that no one had survived."
9        You've never heard of Sergeant Carrio,
10 have you?
11    A. I haven't.
12    Q. And you didn't know what he did in the
13 building that day?
14        MR. BARNES: Objection as to form for the
15 time.
16    Q. (BY MR. BANKSTON) You can answer. You didn't
17 know what he did in the building?
18    A. (No audible response.)
19    Q. Correct, Mr. Jones?
20    A. It's, again, over seven years. I don't
21 remember a lot of this stuff.
22    Q. Okay. So either you didn't know what he did
23 in the building, or you did know what he did in the
24 building. One of those two things has to be true,
25 right?

51

1    A. I think I do know now.
2    Q. Sure.
3    A. It's just there's so much. It all becomes a
4 big paste.
5    Q. So we can agree that in 2017, when you raised
6 the question, "Why were no paramedics let in the
7 building," you either did know what Sergeant Carrio did
8 or you didn't know what Sergeant Carrio did. One of
9 those two things has to be true, obviously, right?
10        MR. BARNES: Objection as to form.
11    A. The tape was so edited, I don't remember.
12        (Exhibit 3 marked.)
13    Q  (BY MR. BANKSTON) Okay. Let's look at
14 Exhibit 3. Do you want to pull Exhibit 3 for me? Can
15 you go to the final page, just flip it on its back, onto
16 the back. Do you see at the very bottom of the page,
17 the very bottom of the left corner it says
18 Sergeant William F. Carrio?
19    A. Yes.
20    Q. Okay. I'm going to read the highlighted part
21 to you. "Paramedic Matt Cassavechia approached me. I
22 had known Cassavechia for many years and recognized him
23 as the head of EMS for Danbury Hospital. Cassavechia
24 asked how long it would be until he could get into the
25 building. I told him the building was not yet secured,

52

1 that all the injured were out, and that numerous dead
2 persons remained in the school. Cassavechia said, 'You
3 know I've got to get into that building.' I realized at
4 some point those victims presumed dead would have to be
5 officially pronounced dead. We also needed to impact
6 the fewest number of EMS personnel that we needed
7 preserve the integrity of the scene. Looking around I
8 recognized two other senior paramedics that I believed
9 had the experience and training to handle the situation
10 tactically. I told Cassavechia I would bring myself
11 [sic], Paramedic Bernie Meehan, and Paramedic John Reed
12 into the front of the school, which was secured by that
13 point. They were told to bring minimal equipment. As
14 we walked to the school, I tried to prepare them for
15 what they were about to see. I told them the number of
16 the victims and the nature of the wounds. I told
17 Cassavechia, 'This will be the worst day of your life?'"
18        You have never heard of Matt Cassavechia,
19 Bernie Meehan, or John Reed, have you, Mr. Jones?
20    A. I mean, I just read their names.
21    Q. Prior to me putting that sheet of paper in
22 front of you, you've never heard of those gentlemen,
23 have you?
24    A. I can't say that. It's too much -- too much
25 information.

53

1    Q. In fact, it's possible when you said that
2 paramedics weren't let into the building, you knew those
3 three gentlemen and you knew they had been in the
4 building; that's possible, true?
5    A. I wouldn't consciously do that.
6    Q. If -- those reports sitting right there, if
7 those reports were available and online and had been
8 discussed by InfoWars as early as 2013, if that's
9 something that was public, you would agree with me that
10 saying no paramedics went into the building is reckless,
11 correct?
12        MR. BARNES: Objection as to form.
13    A. I just don't know what you're talking about
14 off a 3-second video and this.
15    Q. (BY MR. BANKSTON) You're not going to dispute
16 with me that you've repeatedly said on your television
17 show -- or your web broadcast that paramedics weren't
18 allowed in the building; you've said that over and over
19 and over, right, Mr. Jones?
20        MR. BARNES: Objection as to the form.
21    Q. (BY MR. BANKSTON) Right?
22    A. It's edited the way you -- what you've shown
23 me, so I can't comment.
24    Q. I'm not talking about what I -- what was on
25 the video. I'm not talking about that. Ignore what you

54

1 just saw on the video. I'm asking you -- me and you
2 right now -- you've said repeatedly on your web show
3 paramedics weren't allowed inside of Sandy Hook? You've
4 said that; you're not going to deny that?
5 A. I've read other people's reports saying.
6 Q. Okay. And you did nothing to confirm those
7 reports, literally nothing?
8 A. I went out and I covered news that was being
9 covered.
10 Q. How did you confirm the reports that you were
11 given that paramedics weren't allowed in the building?
12 How did you confirm --
13 A. We generally go through the reports, and then
14 we look at what they link to. And I don't have all the
15 dates, but one report took over five years; another,
16 three years; another, a year. And so it's all -- I
17 mean, again, this has not been a large part of what I've
18 covered. Sandy Hook has been a very -- not even one-
19 tenth of 1 percent of what we cover and I know that you
20 think that that's the case, but that's not the case.
21          MR. BANKSTON: Objection to the
22 nonresponsive portion.
23 Q. (BY MR. BANKSTON) Hearing that your murdered
24 child received no medical attention, that's obviously
25 distressing?

55

1          MR. BARNES: Objection as to the form.
2 Q. (BY MR. BANKSTON) Right, Mr. Jones?
3 A. (No audible response.)
4 Q. Can you -- let's do it this way --
5          Withdraw the question.
6          Can you imagine a universe where hearing
7 that your murdered child received no medical attention
8 is not distressing?
9          MR. BARNES: Objection as to the form.
10 A. I think there were even lawsuits by the
11 parents saying things weren't done right sometimes, and
12 that's a terrible thing.
13 Q. (BY MR. BANKSTON) That's not my question,
14 though, is it, Mr. Jones?
15 A. Oh.
16 Q. Is it? That's not my question.
17          So my question is: If you heard your
18 murdered child received no medical care, that's
19 distressing?
20          MR. BARNES: Objection as to form.
21 A. It is distressing. That's why I was
22 distressed just in general hearing those reports.
23 Q. (BY MR. BANKSTON) Wait. When you say you
24 were distressed hearing those reports, what reports are
25 you talking about? What reports?

56

1 A. Those -- I mean, this is over -- that was
2 seven years ago.
3 Q. You know this is the one day you were to come
4 down here and testify about Sandy Hook, and are you
5 going to tell me you haven't done anything to try to
6 figure out what happened in those seven years?
7          MR. BARNES: Objection as to form.
8 Q. (BY MR. BANKSTON) Is that what you're saying,
9 you walked in here totally unprepared, just winging it
10 today?
11          MR. BARNES: Objection as to form.
12 A. I don't know how to respond to that.
13 Q. (BY MR. BANKSTON) Do you have the respect
14 enough for these parents in this lawsuit to actually go
15 back and try to find out what happened? Did you do
16 that?
17          MR. BARNES: Objection as to form.
18 A. I covered it when it first happened. And you
19 can look at six shows a week, three to four hours a day
20 and find spots and edit them and things. It's the
21 media's claim that my life is about Sandy Hook, and it's
22 not even one of the major issues I've ever covered. And
23 so you're asking me to do the impossible, to go back
24 through a whole compendium and then give some
25 quantifiable statement to you off 3-second edited

57

1 videos. It's like -- it's square pegs in round holes.
2          MR. BANKSTON: Objection to the
3 nonresponsive portion.
4 Q. (BY MR. BANKSTON) I want to talk to you about
5 death certificates. I want to play you a clip of
6 something you and Mr. Dew said February 12th, 2015 and
7 November 18, 2016.
8          MR. BANKSTON: Can you play School and
9 Death Certificates for me?
10          (Video playing.)
11 Q. (BY MR. BANKSTON) What did you do to confirm
12 that?
13          MR. BARNES: Objection as to form.
14 A. Again, these are highly edited, spliced tapes.
15 The audio's been altered. I don't even know what
16 context this is in.
17 Q. (BY MR. BANKSTON) Sir, the context is Sandy
18 Hook death certificates are sealed; and you said that.
19 What did you do to confirm it, Mr. Jones?
20          MR. BARNES: Objection as to form. It
21 misstates the evidence.
22          MR. BANKSTON: You don't have to do
23 speaking objections, Mr. Barnes.
24          MR. BARNES: This is one of the worst
25 depositions I've ever witnessed.

58

1     MR. BANKSTON:  That's fine.  You can make
2  your objections.  Go make all the objections you want,
3  but make them in accordance with the Texas Rules which
4  you agreed to be bound with before you --
5     MR. BARNES:  I am.  Okay.  Fine, fine.
6     Q.  (BY MR. BANKSTON)  Mr. Jones, sealing the
7  death certificates, the fact that they were sealed,
8  something you and Mr. Dew both said, how did you confirm
9  that?
10     MR. BARNES:  Objection as to form.
11     A.  I don't want to answer these things
12  incorrectly.  So my memory is -- I remember that this
13  thing was the most sealed case ever and that it was in
14  the news, that there were all these lawsuits about
15  unsealing things and that the records and the redacted
16  police reports -- like what you gave me is almost all
17  blacked out -- this is what people were talking about.
18  And so I can't accurately answer off of edited tapes.
19  I've never seen anything like that.  So I'm trying to
20  answer your questions.
21     Q.  You never -- have you ever tried to order a
22  death certificate?  They're $20.  Anybody can get any
23  one of them.  Did you ever try?
24     A.  As I told you, we went off news reports and
25  other people that were investigating.  We did not

59

1  ourselves investigate Sandy Hook.
2     Q.  Thank you, Mr. Jones.
3        I want to talk to you about something you
4  said about Port-A-Potties.  You know what I'm talking
5  about when I talk about Port-A-Potties, right?
6  Port-A-Potties showed up to Sandy Hook?
7     A.  Port-A-Potties?
8     Q.  Yeah.  Do you know what I'm talking about when
9  I say that allegation, when you talked about on your
10  show Port-A-Potties showing up to Sandy Hook?  Do you
11  remember talking about Port-A-Potties?
12     A.  I do remember talking about them.
13     Q.  Okay.  And you remember how your point was
14  they showed up within an hour for a big media event,
15  showed that it was clearly -- something's going on
16  because they showed up way too quick?
17     MR. BARNES:  Objection as to form.
18     Q.  (BY MR. BANKSTON)  Correct?
19     A.  I was reporting on what other people had
20  reported.
21     Q.  Okay.  Let me play you a clip of something
22  that you said on July 7th, 2015 and April 22nd, 2017.
23     MR. BANKSTON:  Could you play
24  Port-A-Potties for me?
25        (Video playing.)

60

1     Q.  (BY MR. BANKSTON)  That's consistent with what
2  we were just talking about, right --
3     MR. BARNES:  Objection --
4     Q.  -- Port-A-Potties showing up an hour before a
5  big media event?
6     MR. BARNES:  Objection as to form.
7     Q.  (BY MR. BANKSTON)  Correct, Mr. Jones?
8     A.  Yes.  I mean, I did talk about that on some of
9  your edited tape.  I don't know the context.
10     Q.  Sure.
11        (Exhibit 4 marked.)
12     Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
13  hand you a copy of what I have marked as Exhibit 4.
14  Have you ever seen that before?
15     A.  I don't remember.
16     Q.  You're not sure if you've seen this before?
17     A.  No.
18     Q.  Okay.  You'll see at the top it has a time
19  stamp 12-14-12?
20     A.  Yes.
21     Q.  You know that's the date of Sandy Hook, right?
22     A.  I don't know.
23     Q.  You don't know that?
24     A.  Was that the day?
25     Q.  It is.

61

1     A.  Okay.
2     Q.  It is, Mr. Jones.
3        We had talked earlier about the dash cam
4  videos and the official report and if there's police
5  cars sitting out in front of Sandy Hook with their dash
6  cams on, it would be a pretty simple matter of just
7  going to video and scrolling through to see when various
8  stuff arrives.  That's something you can do, right?
9     A.  I would imagine, yeah.
10     Q.  Yeah.  InfoWars didn't do that, did they?
11     A.  I can't say that.  I don't know what we did.
12     Q.  Okay.  Well, if InfoWars did do that, they
13  would have come across this picture of Port-A-Potties
14  showing up at 1:30 p.m., right?  That's what that time
15  is right there?  Are you familiar with military time?
16     A.  Uh-huh.
17     Q.  Okay.  And that's 1:30, right?
18     A.  Uh-huh.
19     Q.  Right.  So that's not an hour after the
20  shooting, is it, Mr. Jones?  Correct?
21     A.  It's pretty darn soon after.
22     Q.  Is it?  Is it maybe more like four hours
23  after?
24     A.  Again, I was going off of what I believed to
25  be -- and he was -- an accreditated national school

Alex Jones - 3/14/2019

62

1  safety person who'd been on national television programs
2  as an expert. I was going off what Halbig was saying.
3      Q.  You did no confirmation whatsoever of
4  Mr. Halbig's statements about the Port-A-Potties, did
5  you?
6      A.  I don't believe these videos --
7          MR. BARNES:  Objection as to form.
8      A.  -- were released for a long time.
9      Q.  (BY MR. BANKSTON)  If they were, if those
10 videos were released in 2013, it certainly would have
11 been reckless to say the Port-A-Potties arrived in an
12 hour in 2017, wouldn't it, Mr. Jones?
13         MR. BARNES:  Objection as to form.
14     A.  I just don't know how to respond to the fact
15 that -- that how do we know more weren't arriving later
16 and that there's other Port-A-Potties or whatever?  I'm
17 not saying that's what happened.  You just showed me one
18 still off something and tell me to answer questions.
19     Q.  (BY MR. BANKSTON)  Yeah.  So one thing you
20 could do is go back into the dash cam video and scroll
21 through and find out if something did arrive earlier?
22 That's something you could do, right?
23         MR. BARNES:  Objection as to form.
24     Q.  (BY MR. BANKSTON)  It's not hidden
25 information, right?

63

1          MR. BARNES:  Objection as to form.
2      Q.  (BY MR. BANKSTON)  Correct?
3      A.  I guess correct.
4      Q.  Okay.  Thank you, Mr. Jones.
5          Mr. Jones, I've noticed on a lot of these
6  answers you've said, "Well, I'm just going off what
7  Mr. Halbig said."  So what I want to know is:  When you
8  talked earlier about you did deep research, what was
9  that?  What deep research did you do?
10     A.  Well, I mean, I did look at the news articles
11 saying they were being very secretive about the case,
12 that a lot of things were sealed, which is unusual.
13 There were lawsuits involved with that, and I did do
14 research on Bloomberg putting out an e-mail the day
15 before saying, "Get ready.  There's going to be a big
16 event," you know, just straight up, people waiting
17 around for mass shootings or whatever.  And just the way
18 the media made a spectacle out of it right away is what
19 really made me question.  That scene like with the WMDs
20 or babies in the incubators, I just saw the media so on
21 it, so ready; and I thought that added credibility to
22 it.
23     Q.  Okay.  I mean, I'm glad you brought up the
24 Bloomberg thing.  I remember there was a couple of
25 episodes where you talked about this Bloomberg e-mail

64

1  and you said to your audience that there was an e-mail
2  that came out in the lawsuit where Bloomberg told his
3  people:  Get ready in the next 24 hours to capitalize on
4  a mass shooting.
5          That didn't happen; that's not a real
6  e-mail, is it?
7          MR. BARNES:  Objection as to form.
8      A.  I mean, I don't think it's exactly that; but
9  there's one similar to that.
10     Q.  (BY MR. BANKSTON)  Yeah.  I mean, what you
11 said is not real?
12         MR. BARNES:  Objection as to form.
13     Q.  (BY MR. BANKSTON)  Bloomberg never told his
14 people:  Get ready in the next 24 hours to capitalize on
15 a mass shooting; that did not happen?
16     A.  What does his gun organization do?
17         MR. BANKSTON:  Okay, Mr. Jones.
18         THE REPORTER:  I'm sorry.  Could you
19 repeat the answer?
20         THE WITNESS:  I believe his anti-gun
21 organization said:  Get ready.  Get ready to move quick,
22 you know.  I don't have it in front of me.  It's from
23 years ago.
24     Q.  (BY MR. BANKSTON)  Let's -- I want to ask you

65

1  about photos of the children, so I'm going to play you a
2  video clip of something you said about the photos of the
3  children.  This is something you said on September 25th,
4  2014.
5          MR. BANKSTON:  Can you play Photos of
6  Children?
7          (Video playing.)
8      Q.  (BY MR. BANKSTON)  Mr. Jones, you can admit
9  that that statement was absolutely nonsense; there are
10 not photos of children who died who are actually still
11 alive?
12     A.  That is and out-of-context clip.  I can't even
13 respond to something like that.
14     Q.  You said it, though, didn't you?
15     A.  I don't know what it's in context with.
16     Q.  Is there a good context to that, Mr. Jones,
17 that people's children who are dead, there's actually
18 photos of them still alive?  Can you give me the good
19 context?
20     A.  There is no way --
21         MR. BARNES:  Objection as to form.
22     A.  There's no way to respond to -- I mean, I
23 don't know what it is.
24     Q.  (BY MR. BANKSTON)  I know what it is.  It's a
25 video of you saying that there are photos of children

---

66

1  who died who are still alive.  And I'm asking you:
2  That's absolute nonsense, isn't it, Mr. Jones?
3      MR. BARNES:  Objection as to form.
4      A.  No, it's -- no, it's not.  I don't know the
5  context of that video.
6      Q.  (BY MR. BANKSTON)  Okay.
7      A.  Okay?  There have been cases where the
8  Associated Press major groups ran pictures of Sandy
9  Hook children in Pakistan after a mass bombing; and in
10  the lineup of dead kids -- or parents about their dead
11  kids -- because I believe a bombing happened in
12  Pakistan -- bizarrely, they've got a Sandy Hook kid in
13  there, admitted.  And then we've seen other cases.  It's
14  very bizarre and that's where people call in and ask and
15  then I respond to it.  And I don't know if that's even
16  that clip because it's a couple of seconds long.
17      Q.  Yeah, well, clearly, it's not the kid in
18  Pakistan because that's not a kid who's still alive,
19  right?  When Noah Pozner's picture appeared in Pakistan,
20  that's not Noah Pozner's still alive, right?
21      MR. BARNES:  Objection as to form.
22      Q.  (BY MR. BANKSTON)  Correct?
23      A.  I wasn't saying Noah Pozner's still alive.
24      Q.  Okay.  It was widely reported during your
25  divorce that your attorney said to the judge that you're

---

67

1  playing a character, that you're a performance artist.
2  So I want to ask you -- I want to know:  When you were
3  making these claims about Sandy Hook, were you being a
4  journalist; or was this all performance art?
5      MR. BARNES:  Objection as to form.
6      A.  When I say things on air, I believe it.  I
7  had -- when I made a radio talk show host.  That was my
8  ex-wife trying to enter into evidence, like ten years
9  ago, me in a Joker outfit doing a satire piece about
10  chemicals in the water; and she was trying to say that I
11  was crazy and was really the Joker.
12      And we said, "No.  When Jack Nicholson
13  plays the Joker, your Honor, he's not really the Joker.
14  He's playing a part."
15      And then the media ran with it, saying
16  that I said that what I regularly do on air is
17  entertainment.
18      So it's very clear when I'm being serious
19  on air; and it's very clear if I'm wearing a Gorn mask,
20  you know, and reenacting Star Trek as a joke, that I'm
21  not literally believing that the Gorn's a real lizard
22  creature.  I was making fun of the media in that case
23  for saying that -- you know, saying that I believe the
24  Government's talking about lizards.  That's on me.
25      Q.  Sure.

---

68

1      A.  And so I wore a lizard mask.  They also tried
2  to introduce that.  And we explained that, "No, your
3  Honor" -- the judge agreed, yes, we understand satire
4  versus reality.
5      So, no, I was -- I believe what I say on
6  air.  Now, when I cover what somebody else is covering
7  or I have a war game, I look on both sides of something,
8  that doesn't mean that I believe in both sides of what
9  I'm covering.  It means I'm looking at the different
10  angles, and then that's taken out of context.
11      Q.  Well, what I'm getting at is:  This stuff
12  we're looking at today, kids going in circles, the
13  school was closed, e-mails, EMTs not in the building,
14  Port-A-Potties, these aren't comedy skits; this is
15  journalism?
16      A.  Yes -- well, this is punditry because I wear a
17  journalist hat, a punditry hat, satire hat, you know,
18  just reading news.  I mean, just being a news reader, I
19  mean, I do that as well.  So I do a lot of things; but
20  when I was covering Sandy Hook, I was genuinely trying
21  to get to the truth of it.
22      Q.  Okay.  At InfoWars it was known from the very
23  start that parents were being harassed by believers in
24  the Sandy Hook Conspiracy?  You would agree to that,
25  right?

---

69

1      A.  No.
2      MR. BARNES:  Objection as to form.
3      Q.  (BY MR. BANKSTON)  Well, you would also at
4  least agree that -- because of the potential for that
5  harassment, you would agree with me that InfoWars needed
6  to treat Sandy Hook allegations with extreme caution,
7  given it was a traumatic event; you'd agree with that?
8      MR. BARNES:  Objection as to form.
9      A.  I mean, I think it's the American birthright
10  and it's important when you have big events, whether
11  they're wars or WMDs or mass shootings, that -- I mean,
12  I think the right to question is an absolute right.
13      Just like the Jussie Smollett situation,
14  I took a risk saying I thought that was fake and I was
15  the first person to question it and I was proven right.
16  So I just really -- I questioned Jussie Smollett from a
17  position of looking at the facts; and if I had been
18  proven wrong, then I would have, you know, apologized
19  for it.  I mean, that's what I do.
20      Q.  (BY MR. BANKSTON)  Okay.  But with Sandy Hook,
21  not with Jussie Smollett, with Sandy Hook, you would
22  agree with me you were under an obligation, InfoWars,
23  you needed to treat this with extreme caution --
24      MR. BARNES:  Objection --
25      Q.  (BY MR. BANKSTON)  -- agreed or not agreed?

Alex Jones - 3/14/2019

70

1        MR. BARNES: Objection as to form.
2        A. Well, I mean, we always covered things from
3    the perspective of caution. We were covering other
4    people's reports and also questioning the historical
5    fact that, you know, things like Operation Northwoods,
6    the Government planned to stage mass shootings in the
7    U.S.; but Kennedy said no to the plan. But the Chairman
8    of the Joint Chiefs had green-lighted it. And so
9    because of things like that, we are forced to then
10   question these events. And I think that's -- you know,
11   it's just part of the process in this country.
12       Q. (BY MR. BANKSTON) Okay. So that's part of
13   the process; and to be fair to you, InfoWars didn't know
14   from the very start that Sandy Hook parents were being
15   harassed?
16       A. No, we didn't know, not from the very start.
17       MR. BANKSTON: Can you --
18       Q. (BY MR. BANKSTON) I want to play something --
19   I want to play a clip from the InfoWars episode on
20   January 18, 2013. Okay?
21       MR. BANKSTON: Can you play the clip
22   Extreme Caution?
23       (Video playing.)
24       Q (BY MR. BANKSTON) That clip is Mr. Paul
25   Watson, who is your chief reporter at InfoWars, right?

71

1        A. He is now.
2        Q. And he frequently warned you about what you
3    were saying about Sandy Hook?
4        A. Well, I mean, we had discussions about it,
5    yes. We're not running a cult. We have different
6    views.
7        Q. Right. For instance, one of the gentlemen in
8    the room with us right now, Rob Dew, Mr. Watson
9    disagreed with Mr. Dew and said, "Mr. Dew's wrong, and
10   you need to stop this, Mr. Jones"? That's what
11   Mr. Watson told you?
12       MR. BARNES: Objection as to form.
13       Q. (BY MR. BANKSTON) Correct?
14       A. That there were external and internal debates,
15   as you just saw. We've looked it up. It's 90-something
16   percent of my reporting saying that it happened, even
17   going back with -- I don't do this anymore because
18   people can edit stuff -- but we would go on air and say:
19   Real shootings happen, you know, the black trench coat,
20   on the drugs, all the regular things we see in mass
21   shootings. And then we would have the other side of
22   that because the Internet didn't believe it happened.
23       Q. Let me put it this way: Mr. Watson was right;
24   Mr. Dew was wrong, correct?
25       MR. BARNES: Objection as to form.

72

1        A. It's not in context. I can't answer that.
2        Q. (BY MR. BANKSTON) Okay. I want to play you
3    some comments you made about Mr. Watson. I want to
4    show you something you said about Mr. Watson on
5    February 12th, 2015 and on April 20th, 2018, the day
6    after you were sued.
7        MR. BANKSTON: Can you play the clip for
8    me Jones Comments on Mr. Watson?
9        (Video playing.)
10       Q. (BY MR. BANKSTON) So your chief reporter was
11   right when he was warning you not to say it was phony or
12   there were crisis actors?
13       MR. BARNES: Objection as to form.
14       A. He was not the chief reporter then.
15       Q. (BY MR. BANKSTON) When did he become chief
16   reporter?
17       A. About five years ago -- well, about six --
18   well, about five years ago.
19       Q. Five years ago, 2014?
20       A. I'd have to look it up.
21       Q. Okay. So at the time you were saying that
22   clip in 2015, when you said, "He's my chief reporter,"
23   that's when he became your chief reporter?
24       A. And I said his instincts are right. So you
25   played, finally, one clip where I'm saying it happened

73

1    instead of editing clips.
2        Q. Well, no, I was actually talking about the one
3    before, on February 12th, 2015, you called him your
4    chief reporter.
5        A. I think I said by then he was.
6        Q. Okay. Over the years there's been some
7    tension between you and the parents after they started
8    complaining about what you were doing, correct?
9        MR. BARNES: Objection as to form.
10       MR. BANKSTON: What's your basis on that
11   one?
12       MR. BARNES: It's --
13       MR. BANKSTON: A legal objection, not a
14   speaking objection, a legal. What's your legal basis
15   for that one?
16       MR. BARNES: Okay. Well, explain the
17   legal -- it's time, date, context, definitions.
18       MR. BANKSTON: Those aren't legal
19   objections, Mr. Barnes.
20       MR. BARNES: Yes, they are because if the
21   form of the objection [sic] is misleading or leading in
22   the nature in which it --
23       MR. BANKSTON: I'm allowed to lead the
24   witness; he's adverse to me.
25       MR. BARNES: You are; but if I say -- if

74

1  I don't give you context of time and date...
2          MR. BANKSTON:  No, that's fine.  It's not
3  an objection.  It's baseless.
4          MR. BARNES:  Oh, yes, it is.  It's a
5  basic objection.  It's Lawyering 101 on how to ask
6  questions.  I mean, come on.
7          MR. BANKSTON:  Okay.
8          MR. BARNES:  It would be easier for you
9  and for everybody if it was --
10         MR. BANKSTON:  Have you got a rule of
11  evidence for me, maybe?
12         MR. BARNES:  Oh, sure.  It gives
13  specificity as to both date and time so that the person
14  can answer the question meaningfully.  When you say --
15         MR. BANKSTON:  So is that 403?
16         MR. BARNES:  That could be.
17         MR. BANKSTON:  That's not to form.
18  That's not -- you don't have to object to that.  It's
19  preserved, Mr. Barnes.
20    Q    (BY MR. BANKSTON)  Let's talk about this
21  question:  Over the years there started to develop
22  tension between you and the Sandy Hook parents after
23  they started complaining about what you were doing,
24  correct?
25    A    No.

75

1    Q.   Okay.  No tension.
2          You will admit, I mean, you've done
3  mocking imitations of Sandy Hook parents crying,
4  correct?
5    A.   No.
6    Q.   I want to play you a video clip -- two, from
7  September 24th, 2014 and November 11th, 2016.
8          MR. BANKSTON:  Will you play the video
9  clip called Crying?
10         (Video playing.)
11    Q    (BY MR. BANKSTON)  You realize now you were
12  mocking the difficult emotional reactions of people who
13  provably lost their children?
14    A.   No, I was not mocking.  I was showing what
15  people were questioning.  It was not to mock the
16  parents.  It was showing why people were questioning.
17  It's you that is projecting mocking onto it.  I was
18  showing what he did.
19    Q.   When you did this stuff about the crying and
20  your imitations, this was all in service of an argument
21  that some of these parents were actors, right?
22         MR. BARNES:  Objection as to form.
23    A.   No.
24         MR. BANKSTON:  Can you play me --
25    Q    (BY MR. BANKSTON)  I want to play you a clip

76

1  from March 14th, 2014.
2          MR. BANKSTON:  Can you play me the clip
3  called Actors?
4          (Video playing.)
5    Q    (BY MR. BANKSTON)  Who were the actors playing
6  the different -- what are the different people where the
7  same actor was playing different parts?
8    A.   I'd have to see the context.
9    Q.   But that was something you believed that was
10  true?
11    A.   From an edited tape I don't know what the
12  context is.
13    Q.   Well, I mean, look, Mr. Jones, you can see
14  you say "actors" enough times that you and I can both
15  admit -- you can just admit right now there have been
16  multiple, repeated times where you have accused some of
17  the parents of being actors?
18         MR. BARNES:  Objection as to form.
19    Q.   (BY MR. BANKSTON)  Right?
20    A.   No, I never -- I covered the Internet, talking
21  about how people looked like actors.  This is edited.  I
22  can't comment on it.
23    Q    Okay.  So let me understand this, Mr. Jones:
24  Unless we play you a full four-hour InfoWars clip, you
25  just can't answer questions today, can you?

77

1    A.   It's not a four-hour clip.  It's that these
2  were maybe a-minute-long clips, not -- five seconds, two
3  seconds.
4    Q.   Well, you're telling your audience there:
5  We've clearly got people where it's actors playing
6  different parts of different people.  So you were pretty
7  certain, weren't you?
8    A.   I have -- because of all the strange things
9  we've seen, there have been points in my mind where I've
10  gone back and forth in the earlier years, you know,
11  really thinking maybe the whole thing has been staged;
12  and then later, I realized it was just mainly media
13  hyping it and then trying to choreograph, you know,
14  turning it into a political situation after the case.
15    Q.   Okay.  Well, regardless of whatever that was,
16  this thing we just saw you say about actors, the mocking
17  imitations of crying, this is exactly the stuff that
18  Paul Joseph Watson was warning you about, correct?
19    A.   No.  He was saying that some of the people
20  that were out there putting stuff out, like Fetzer and
21  others in that, were not good.
22    Q.   Yeah.  He was really opposed to the crisis
23  actor angle, correct?
24         MR. BARNES:  Objection as to form.
25    Q.   (BY MR. BANKSTON)  And If I get -- Mr. Jones,

78

1 if I get Paul Watson here to testify, he's going to tell
2 me he never believed in the crisis actor thing and
3 thought it was a bad idea to talk about crisis actors.
4 That's what he's going, isn't he?
5      MR. BARNES: Objection as to form.
6      A. Yeah, because, I mean, he legitimately is his
7 own person; and we don't tell people what to say or what
8 to do. I respect him, and we have different points of
9 view. We've had debates about Sandy Hook on air.
10      Q. (BY MR. BANKSTON) You have different views
11 about journalistic ethics, too?
12      A. Well, I mean, when there's a big Internet
13 debate that's going on and we cover that debate, I give
14 my opinion on it. That's what happens.
15      Q. Okay. As time went on, starting into 2015,
16 you learned that a Sandy Hook parent named Leonard
17 Pozner was behind a group called HONR Network, correct,
18 that was fighting online abuse of Sandy Hook victims?
19      A. I did, I think.
20      Q. And when you learned that and when HONR
21 complained to YouTube in 2015, you told your viewers
22 that HONR was run by Mr. Pozner. You showed addresses
23 being used by Mr. Pozner; and you said he needed to be
24 investigated, in Florida. Didn't you say that?
25      MR. BARNES: Objection as to form.

79

1      A. No.
2      Q. (BY MR. BANKSTON) Okay. Let's play a clip
3 here. I'm going to show you something that you and
4 Mr. Dew were talking about on February 12th, 2015.
5      MR. BANKSTON: Can you play Addresses for
6 me?
7      (Video playing.)
8      Q. (BY MR. BANKSTON) If a person were to stake
9 out those addresses, they could wait for Mr. Pozner to
10 come pick up his mail, couldn't they?
11      MR. BARNES: Objection as to form.
12      Q. (BY MR. BANKSTON) True?
13      A. I mean, the guy's running an anti-free speech
14 foundation.
15      Q. And you're the one who outed him as doing
16 that, right? There's nothing on the HONR Network
17 website that said Mr. Pozner was running it; you outed
18 him.
19      MR. BARNES: Objection as to form.
20      A. I believe he was public on that.
21      Q. (BY MR. BANKSTON) Do you? You don't think
22 that InfoWars was the first one to break that in an
23 article? You don't think that?
24      A. That he was running a site, trying to get
25 people's websites and things taken down?

80

1      Q. Correct, that Mr. Pozner was running, as an
2 anonymous front, the HONR Network to help make
3 complaints against various sites so that individual
4 parents wouldn't be the subject of retribution. Yeah,
5 that's what I'm asking you if you knew.
6      A. No, I was not aware of that. We were -- I
7 believe, from memory, Dew was covering a news article
8 about how the -- but then that's been conflated by you
9 guys, sneaking into people's houses or putting out their
10 addresses to go after them; and we never did that.
11      Q. So InfoWars -- well, if it happened that
12 InfoWars went and searched and dug through records for
13 private business filings and used DMCA reports that it
14 had gotten to suss out that Mr. Pozner was the head of
15 HONR and then reported it to its audience, that wouldn't
16 be a good thing if that happened, right?
17      MR. BARNES: Objection as to form.
18      A. Well, I don't have any knowledge of what
19 you're talking about there.
20      Q. (BY MR. BANKSTON) I'm just saying: If it
21 happened hypothetically -- if, hypothetically, InfoWars
22 went to some lengths to unmask a person who was running
23 a charity that was trying to stop people from being
24 abused and then disclosed that to its audience with
25 maps, that wouldn't be a good thing?

81

1      A. That's, from my memory, not what happened. I
2 can't comment on hypotheticals.
3      Q. So if I was to say to you if somebody was to
4 come along and strike your hand with a hammer, would it
5 hurt, you can't answer that question?
6      MR. BARNES: Objection as to --
7      A. I'm not striking anybody with hammers.
8      Q. (BY MR. BANKSTON) If I asked you: If I gave
9 you a big bowl of chili, might it affect your memory,
10 you can't answer that; that's hypothetical? Correct?
11 You're just not going to answer those kind of questions?
12      A. (No audible response.)
13      Q. I'll take it that's a no. Let's move on.
14      MR. BARNES: I'll take it that was a
15 question? Is that a question? That's a comment; that's
16 not a question. This is becoming one of the most
17 harassing -- this is for TV and for PR, not for a
18 legitimate suit. That's what this is. That's what this
19 is. You want to put it on TV. That's all -- and this
20 is just a show, and it's a bad show at that. It's a
21 show of how-not-to-be-a-lawyer-in-deposition-of-a-case
22 show.
23      I mean, if you want to be fair and you
24 want to ask real questions, go ahead; but don't make
25 comments and then try to reinterpret those comments as a

82

1  question and then try to put words in the mouth of the
2  witness. I mean, a first year law student should know
3  that.
4       MR. BANKSTON:  What was your objection?
5       MR. BARNES:  The objection was to your
6  comment saying that there was an answer; and my point
7  was you didn't ask a question so there couldn't have
8  been an answer. And I was objecting for the record
9  purposes that no answer had been given to a question
10  that had not been asked.
11       MR. BANKSTON:  Do you maybe want to take
12  a break so we can have a few breaths?
13       MR. BARNES:  Yes.
14       MR. BANKSTON:  Yeah, you might need to do
15  that.
16       MR. BARNES:  Yeah, absolutely. And maybe
17  you can go back and read how to ask people questions.
18       MR. BANKSTON:  We're off the record.
19       THE VIDEOGRAPHER:  Off the record
20  1:34 p.m.
21       (Off the record from 1:34 to 1:48 p.m.)
22       THE VIDEOGRAPHER:  We are back on the
23  record at 1:48 p.m.
24    Q.  (BY MR. BANKSTON)  Mr. Jones, I want to talk a
25  little bit more about that episode on February 12, 2015,

83

1  the one we had looked at with the maps; and I want to
2  show you a clip of your message to the parents that were
3  complaining and ask you some questions. This clip,
4  again, is from February 12th, 2015.
5       MR. BANKSTON:  Can you play Hornets?
6       (Video playing.)
7    Q.  (BY MR. BANKSTON)  So for complaining, you
8  were going to bring InfoWars to their hometown?
9       MR. BARNES:  Objection as to form.
10    A.  I have no idea what that 3-second clip was.
11    Q.  (BY MR. BANKSTON)  Well, forget the 3-second
12  clip. For complaining, you were going to bring InfoWars
13  to their hometown?
14    A.  That is not what I said.
15    Q.  Okay. Well, a couple months later -- hang on,
16  Mr. Jones. I'm going to hand you what I am now marking
17  as Exhibit 5.
18       (Exhibit 5 marked.)
19    Q.  (BY MR. BANKSTON)  A couple of months later,
20  in the spring of 2015, you sent this man, a cage
21  fighter, to go badger and yell obscenities at Sandy Hook
22  residents, right?
23    A.  No.
24    Q.  No? You know who that is, right?
25    A.  Yes.

84

1    Q.  Okay. That's Mr. Bidondi?
2    A.  Yes.
3    Q.  I want to play you a clip of Mr. Bidondi in
4  Newtown. This is from June 8th, 2015.
5       MR. BANKSTON:  Can you play the clip of
6  Bidondi?
7       (Video playing.)
8    Q.  (BY MR. BANKSTON)  And, Mr. Jones, those are
9  hardly the only people that Mr. Bidondi harassed on his
10  multiple trips to Newtown, correct?
11       MR. BARNES:  Objection as to form.
12    Q.  (BY MR. BANKSTON)  Correct?
13    A.  I mean, almost everything you said is not
14  true. So there's no way to respond to it. No, not
15  correct.
16    Q.  Okay. That was Mr. Bidondi calling people who
17  were involved in Sandy Hook crooked, corrupt, piece-
18  of-shit motherfuckers, right? That's what we just saw?
19       MR. BARNES:  Objection as to form.
20    Q.  (BY MR. BANKSTON)  That's what we saw on the
21  video, Mr. Jones, correct?
22    A.  I didn't quite hear all of it.
23    Q.  Okay. I want to show you something you said
24  after Mr. Bidondi went to Sandy Hook about the school
25  itself; and I'm going to show you a clip from July 7th,

85

1  2015.
2       MR. BANKSTON:  Can you play Stocked the
3  School?
4       (Video playing.)
5    Q.  (BY MR. BANKSTON)  First, Mr. Jones, you see
6  the headline at the top of that screen, "The FBI says no
7  one killed at Sandy Hook"?
8    A.  Yes.
9    Q.  You're familiar that's an article that
10  InfoWars published at one time?
11    A.  Yes, the FBI said no deaths that year in Sandy
12  Hook on their website.
13    Q.  Is that what they say?
14    A.  I'm going from memory. You can pull it up.
15    Q.  So you say that headline's true?
16    A.  The FBI later amended it and said that it was
17  an error.
18    Q.  Oh, they amended it? That happened?
19    A.  Uh-huh.
20    Q.  Okay. Let's move on to 2016. And in the 2016
21  election you found yourself having to discuss Sandy Hook
22  because Hillary Clinton actually brought you up
23  specifically in a campaign speech, didn't she?
24    A.  Yes.
25    Q.  And that she -- she wanted to put light on

Alex Jones - 3/14/2019

86

1    you, in other words?  That was part of her campaign
2    strategy?
3        A.   Yes.
4        Q.   Now, after the campaign was over, in November
5    2016, you directly addressed the parents in a video
6    called your final statement and accused some of them
7    being actors, right?
8        A.   No.
9        Q.   Okay.  I'm going to show you the very end of
10   your clip, your message to the parents on November 11th,
11   2016 in the final statement on Sandy Hook.
12           MR. BANKSTON:  Can you play the video
13   clip titled Soap Opera?
14           (Video playing.)
15       Q   (BY MR. BANKSTON)  That was not the extreme
16   caution that your chief reporter, Mr. Watson, had been
17   urging, correct?
18           MR. BARNES:  Objection as to form.
19       Q.   (BY MR. BANKSTON)  Correct?
20       A.   I mean, if people had been coached about
21   certain political anti-gun statements, I have a right to
22   say that they're putting out political talking points.
23       Q.   "I know when I'm watching a movie, and I know
24   when I'm watching something real.  We have seen soap
25   operas before."  I mean, this is an accusation about

87

1    actors, correct?
2        A.   No, not specifically about that.  I was saying
3    politically it turned into something synthetic to go
4    after guns, and I think that's why you don't play the
5    whole clip.
6        Q.   And then at the end of the clip, you point
7    into the camera and say, "Let's look into Sandy Hook."
8    And then there's a title card that says, "InfoWars you
9    are the resistance."  The "you" in the "You are the
10   resistance," that's your audience, correct?
11       A.   That's a tagline on everything, so it wasn't a
12   specific Sandy Hook message.
13       Q.   But I'm asking you the meaning of that
14   tagline, "You are the resistance."  "You" means your
15   audience?
16       A.   It means -- yes, uh-huh, or it means -- it
17   just means the American people.
18       Q.   Am I part of the resistance?
19       A.   Well, all the Democrats.
20       Q.   I'm sorry?  Did I...
21       A.   Well, that's a Democratic tagline that they
22   took from me:  You are the resistance.
23       Q.   Okay.
24       A.   You're not a Democrat?
25       Q.   I don't know why you -- where you're getting

88

1    that from.
2        A.   All I'm saying it's a -- Democrats use that.
3        Q.   Okay.  Mr. Jones, we've talked a little bit
4    about the Sandy Hook investigators, one of them,
5    Mr. Halbig and one of them, like, Mr. Fetzer.  These are
6    people who have been investigating Sandy Hook.
7    Mr. Halbig's been a considerable source of information
8    for you.  You will admit that, correct?
9        A.   Yes.
10       Q.   Now, these Sandy Hook investigators, these
11   people were so crazy that you had to realize at some
12   point that what they're saying isn't true and that Sandy
13   Hook wasn't a fake, right?
14           MR. BARNES:  Objection as to form.
15       A.   I found out some of what they were saying was
16   not accurate.
17       Q.   (BY MR. BANKSTON)  Okay.  Let me play a clip
18   for you that's something you said just a little while
19   ago, on January 19th, 2019.
20           MR. BANKSTON:  Can you play Kooky?
21           (Video playing.)
22       Q   (BY MR. BANKSTON)  When did you finally
23   realize that these crazy people were crazy?
24           MR. BARNES:  Objection as to form.
25       A.   I can't answer exactly because it's so many

89

1    years; but about three years ago, I found that some of
2    what they said was inaccurate.
3        Q.   (BY MR. BANKSTON)  Okay.  So, essentially,
4    then, I think what you're getting at is you haven't been
5    saying Sandy Hook is fake for years?
6        A.   I have been more on the side, going back about
7    three or four years ago, that it did happen and then
8    started talking about some of the anomalies that were
9    not anomalies; and then that triggered more of the ire
10   of those folks as they got more, I think, extreme.
11   That's what I'm saying:  This is all cherry-picked here.
12       Q.   Well, I'm just trying to understand,
13   Mr. Jones.  At some point you learned that those people
14   were crazy; you couldn't believe what they were saying.
15   You couldn't say it was synthetic or completely fake
16   anymore.  When did you stop saying it was --
17       A.   I don't know.  It was probably four years ago
18   I told Bidondi not say he worked with the InfoWars,
19   because he didn't.  And he's a professional wrestler,
20   not a cage fighter.  I mean, I remember that.  That's a
21   date we could find when we sent him e-mails and said,
22   "You don't work here.  Stop saying our name.  Don't do
23   that in our name," because I saw that stuff; and I was
24   like -- I remember seeing it in the paper.  And I was
25   like, "Bidondi doesn't work here."  I mean, he did stuff

90

1 for us years before that, you know.
2        MR. BANKSTON: Objection, nonresponsive.
3    A. I mean, I'm really answering your question.
4    Q. (BY MR. BANKSTON) No, Mr. Jones. I'm asking
5 you about Mr. Halbig, the sources that you had, not your
6 employees.
7    A. He's not my employee.
8    Q. I'm talking about these investigators, right?
9 These investigators, at some point -- we just saw a
10 clip -- you realized they were kooky, couldn't say it
11 was synthetic anymore. When do you think is the last
12 time you -- like, that ended? When did you stop calling
13 it fake?
14        MR. BARNES: Objection as to form.
15    A. I mean, I can't accurately say that.
16    Q. (BY MR. BANKSTON) Okay. Let's try to -- hold
17 on for a second. Let me take you back to April 20th,
18 2018. I want to play you a clip on April 20th, 2018. I
19 believe it was a day or two after you were first sued.
20        MR. BANKSTON: Can you play the clip Not
21 Doing It?
22        (Video playing.)
23    Q. (BY MR. BANKSTON) When you say you're not
24 doing it, is this meaning that you haven't been saying
25 Sandy Hook was fake for several years?

91

1    A. No. What it means is the media currently and
2 then says, "Jones is saying it. Jones is sending
3 people."
4        And then never showing me saying, "Don't
5 go investigate it. I believe mass shootings have
6 happened. And I'm sorry and some of the anomalies we
7 were told were wrong." And I've said it -- I've
8 probably been saying that for four years.
9    Q. Okay.
10    A. And then the media, the corporate media, wants
11 to use it to, I guess, to bring back gun control or
12 anti-free speech stuff, whatever it is; and so it
13 continues to do that over and over again.
14    Q. Right. You kind of -- you end up in the
15 crosshairs because they want to generate clips, right?
16    A. Well, I'm not sure how all that works; but I
17 can tell you: Sandy Hook is not my identity. I covered
18 it less than one-tenth of 1 percent until Hillary gave
19 her All Right Speech; and then there were thousands of
20 articles, you know, saying, "Jones is doing this. Jones
21 is sending people there." And it kind of restarted. A
22 big resurgence happened on the street saying, "How dare
23 you not -- you not say it happened; you don't think it
24 happened?" It's a big thing. It was, like, spray
25 painted on the walls here in Austin on the side of the

92

1 highway that, you know, Sandy Hook was staged. That's a
2 big thing on the Internet.
3        And so the media made -- Hillary made it
4 this huge thing on which she said Pepe the Frog was a
5 white supremacist; and made the frog a white
6 supremacist. She had a lot of power at that point in
7 the news.
8        And so I've been trying to say,
9 particularly, you know, "Hey, it's not my identity. And
10 I believe it happened and I'm sorry for your -- you
11 know, any pain you've had." But I'm not going to be
12 Sandy Hook man and then take what everybody else did as
13 if what people have said and done is all me and then I'm
14 kind of like the sin eater and it's all put on me when
15 that's not my identity.
16        I mean, this idea -- I know they have
17 shows, like Homeland, and things where there's
18 supposedly Alex Jones and he does all these things.
19 That's not a real person. That's an actor. And then
20 kind of the media fantasizes that they're fighting, you
21 know, this big boogyman that's on Homeland; and that's
22 not who I am.
23    Q. Do you remember what my question was? What
24 was my question?
25    A. But I just answered your question. I mean,

93

1 ask your question again. There's no yes-or-no answer to
2 something like that.
3    Q. Well, I mean, you don't even know what the
4 question was because you were just talking. You were
5 just ranting, like you do on your show, right?
6    A. No, I was being honest with you about the
7 situation.
8    Q. All right. Well, let's walk through it,
9 Mr. Jones. We know you started making videos calling it
10 fake in 2013, right? No doubt there?
11        MR. BARNES: Objection as to form.
12    Q. (BY MR. BANKSTON) Right?
13        MR. BARNES: Objection as to form.
14    A. I can't comment on edited videos you've got
15 here.
16    Q. (BY MR. BANKSTON) I'm not asking you about
17 edited video, Mr. Jones. I'm asking you: In 2013 you
18 made videos calling it fake, correct?
19        MR. BARNES: Objection as to form.
20    A. I think I was asking if it was fake, yes.
21    Q. (BY MR. BANKSTON) Admittedly, you weren't
22 asking; you were saying it was fake, and the evidence is
23 overwhelming, right?
24    A. I mean, we have a right in this country to
25 question things.

Alex Jones - 3/14/2019

---

94

1    Q.  I'm not saying what you did and didn't have a
2  right to do.  I'm just asking you what you did.  You
3  made videos in 2013 saying it was fake, right?
4    A.  I think saying -- I remember making statements
5  that it looks fake to me, but we're not a hundred
6  percent.
7    Q.  Okay.  And then in 2014 and 2015 you were
8  making videos, calling it synthetic, completely fake,
9  manufactured, phony as a three-dollar bill.  That was
10 happening all through 2014 and 2015, right?
11       MR. BARNES:  Objection as to form.
12   Q.  (BY MR. BANKSTON)  And there's transcripts of
13 that, right?
14   A.  I'm not denying that I've questioned Sandy
15 Hook.
16   Q.  Okay.  That's all I'm asking.
17       Then in 2016 we know it became an issue
18 because of the campaign.  We saw a video called your
19 final statement.  We've looked at that.  And we've seen
20 you saying really false things about Sandy Hook all
21 through 2017 in these videos, too, right?
22       MR. BARNES:  Objection as to form.
23   A.  Edited videos.  I can't respond to it.
24   Q.  (BY MR. BANKSTON)  Okay.  If you just say --
25 for instance, if you say that there are Port-A-Potties

---

95

1  showing up within an hour in 2017, that's not true,
2  right?
3    A.  We don't know that.
4    Q.  Exactly, right?  You don't know that, but you
5  said they did?
6    A.  That's what the reports were from people we
7  believed were credible.
8    Q.  Okay.  But in 2017 you're still calling it
9  fake?
10       MR. BARNES:  Objection as to form.
11   A.  No.  I was -- the media would get me to
12 respond and say, "Well, what were the anomalies?"  And
13 then I would -- like Megyn Kelly, I said, "I believe it
14 happened."
15       She goes, "But what are the anomalies?"
16   Q.  (BY MR. BANKSTON)  Okay.
17   A.  And then they edited it together to have me
18 saying it didn't happen.  That's just incredibly
19 deceptive.
20   Q.  Okay.  I want to show you something you said
21 on October 26th, 2017; and this is a video called $3
22 Bill.
23       MR. BANKSTON:  Can you play that?
24       (Video playing.)
25   Q   (BY MR. BANKSTON)  That video, that was made

---

96

1  October 26th, 2017.  That's just a couple of months
2  before you were sued, wasn't it?
3    A.  I would guess if the date's right.
4    Q.  And that was almost five years after the
5  parents had told you how distressing what you were doing
6  was to them, right?
7    A.  I say right there I don't know what happened
8  at Sandy Hook.
9    Q.  It says it's as phony as a 3-dollar bill.
10       MR. BARNES:  Objection as to form.
11   A.  Talking about Nancy Grace where she says she's
12 on location and they've got trucks and you see the same
13 trucks driving behind her and the guest, that's what I
14 mean.  It's the media creating a synthetic thing around
15 it to script the outcome of what they want.  You're
16 taking it out of context.
17   Q.  (BY MR. BANKSTON)  Oh, really?  That's what
18 "phony as a 3-dollar bill" means?  That's how you've
19 used that term over the years?
20   A.  Talking about Nancy.  That clip is long enough
21 where I can tell what I'm talking about.  I mean,
22 Nancy's sitting there, where she's sitting there in a
23 roundabout; and she says the other person is...
24   Q.  I'm familiar, Mr. Jones.  Ashleigh Banfield
25 sitting in a chair.  They're both in the same parking

---

97

1  lot.  As a result of the satellite feed, you see the
2  same cars going behind them; and it shows they're
3  actually in the same location, even though they're
4  trying to do it like a satellite feed, right?
5    A.  Yeah.
6    Q.  Right.  And then, obviously, they didn't have
7  a guest to put on.  They put those two people together.
8  To you, that's an anomaly, right?  That's one of the
9  anomalies that caused you to have doubts?
10   A.  They lied and said they were on location.
11   Q.  Yeah, sure, they lied.  Yeah, they said, "Hey,
12 she's over here; and I'm over here."  And they're
13 actually in the same place?
14   A.  Yeah.
15   Q.  They were pulling a -- they pulled a trick?
16   A.  She said she had just got a text from The
17 Atlanta --
18   Q.  We'll talk about that.
19   A.  -- rooftop.
20   Q.  Put a pin in that, Mr. Jones.  We'll talk
21 about that.  I definitely want to get back and talk
22 about that; but in terms of what you were saying in that
23 video, you said, "We've looked at both sides.  We've
24 tried coming at it from all angles; but, folks, it's as
25 phony as a 3-dollar bill."  That's what you said?

---

98

1    A.  Talking about the media coverage, yes, in
2  context.
3    Q.  Oh, in that you were talking about the media
4  coverage?
5    A.  Yeah, that's what I'm talking about.  That's
6  what I'm talking about, Nancy Grace.
7    Q.  And Anderson Cooper, right?
8    A.  Yes.
9    Q.  The blue screen, you said:  It's fake, wasn't
10  there.  It didn't happen.  They weren't on location.
11        That's what you said?
12        MR. BARNES:  Objection as to form.
13    A.  Now, generally when someone is on location, it
14  doesn't mean that the person being interviewed is even
15  part of it.  It means that they'll say, "Hey, you're
16  going to be standing here, talking to Anderson Cooper."
17  And they're not talking.  At that level of television
18  they routinely do that.
19        CNN is famous for it.  They'll even run
20  audio in the back of the video and, like, you'll hear
21  is -- another that happened a few months ago is CNN, you
22  hear a bunch of crickets and the cars.  All of sudden
23  the tape stops and they have to start it back up, and
24  they're supposedly on location in Gaza.
25    Q.  (BY MR. BANKSTON)  I have no idea what you're

99

1  talking about, but it's not important.  What I'm asking
2  you is --
3    A.  Oh, okay.  Okay.
4    Q.  -- in terms of Anderson Cooper, you said that
5  Anderson Cooper wasn't at Sandy Hook; he was not there?
6        MR. BARNES:  Objection as to form.
7    Q.  (BY MR. BANKSTON)  Right, you said that?
8        MR. BARNES:  Objection as to form.
9    A.  I don't know how to respond to that.  Yes, I
10  believe that he used -- that he faked being on location
11  once.  That doesn't mean that the people involved aren't
12  the parents or that it didn't happen.  It means CNN's
13  famous for faking locations.
14    Q.  (BY MR. BANKSTON)  Okay.  I want to show you a
15  clip of something you said in 2015, and this is a clip
16  that's become kind of famous.  And so I want to get your
17  input on something you said in 2015 on January 13th.
18  And let me show you a clip called Hoax.
19        (Video playing.)
20    Q.  (BY MR. BANKSTON)  Mr. Jones, can you now
21  admit that these statements were reckless?
22    A.  No.  I think at that point in my life, in
23  whatever the context was that I was saying I think
24  basically the whole thing was fake, I mean, that's my
25  right to do that.  I legitimately had believed that

100

1  Sandy Hook was probably completely staged at different
2  periods of my life.  Like, I believed Jussie Smollett
3  was staged or the WMDs were staged.  And I'm on record
4  on hundreds of these events when I think they're staged.
5  I've learned sometimes I'm wrong.
6        And so, no, I stand by the fact that I
7  genuinely believed that.  And one of my best reporters,
8  Paul, thought that was wrong; and so that shows that we
9  have real debates, real discussions.  And what people
10  believe, as long as I think they really believe it, it's
11  what we debate and discuss.  And that's like most any
12  talk radio show there is.
13    Q.  Everything -- every last word of factual claim
14  in those statements are things that you repeated with no
15  confirmation from people you now admit are crazy, right?
16    A.  Well, I don't want to call people crazy and
17  get sued by somebody else.  I have found that some of
18  what they said and then the reports they put out were
19  not accurate.
20    Q.  Well, you certainly have no problem calling
21  them kooky, right?  You've said it on the air to, like,
22  millions of people?
23    A.  Yeah.  I mean, yeah, I mean, I think it's --
24    Q.  These people are kooky, and everything you
25  said in that was based on what they told you and with no

101

1  confirmation?
2    A.  I wouldn't say everything.  There was a lot of
3  different sources, a lot of different things; and then
4  there was a cover-up on the files and the reports and
5  Lanza and his background.  And so you've got a cover-up,
6  and you're not sure exactly what's going on and the
7  extent of it.
8    Q.  Let me make sure I have this really clear.
9    A.  Uh-huh.
10    Q.  You don't believe the official story of Sandy
11  Hook.  You think there was a cover-up.  You think there
12  was manipulation.  You think there was some sinister
13  thing going on.
14    A.  I still -- yes, I still think -- I think
15  children died.  I believe mass shootings happen.  They
16  just had one in Brazil, a tragedy.  And I believe it's a
17  crisis.  And I go back to the point of all gun owners
18  being collectively blamed.  Then it's traumatic and so
19  people go and they find anomalies.  And then I've kind
20  of retrospectively gone back and seen how I did believe
21  that stuff.
22        And then I go back and I'm now, studying
23  more, actually, the real anomalies; and it's just the
24  School System and Government trying to covering its rear
25  end from liability.  And so there definitely has been a

102

1    cover-up of the events.
2           And I think there's a lot of evidence
3    showing there could have been a second shooter.  There
4    is the helicopter footage of the man in woods.
5    I still have questions about Sandy Hook,
6    but I know people that know some of the Sandy Hook
7    families.  They say, "No, it's real," people I think are
8    credible.  And so over the years, I've -- you know,
9    especially as it's become a huge issue, had time to
10   really retrospectively think about it.  And as the whole
11   thing matured, I've had a chance to believe that
12   children died and it's a tragedy; but there are still
13   real anomalies in the attempt to basically keep it
14   blacked out that generally, when you see that in
15   government, something's being covered up.
16       Q.   And after you were sued, you said there was a
17   police stand down in Sandy Hook, right?  You said that?
18       A.   I said that about Parkland, too.  I think
19   there was a very slow response on both.
20       Q.   Now, you're a parent.  Just imagine with me
21   for a moment that you lost one of your children.  One of
22   your children was murdered and you think you know who
23   did it and there's been a justice system that worked
24   that said this is who did it.  And then someone who
25   thinks that they have information comes to you and says,

103

1    "Mr. Jones, the person who killed your son, information
2    about him is being covered up.  There's a government
3    conspiracy.  They're manipulating.  There's a police
4    stand down."  Those things would be upsetting to you,
5    wouldn't they?
6           MR. BARNES:  Objection as to form.
7       A.   I think the whole thing's upsetting, and
8    everybody's upset by it.  And people see anomalies, and
9    citizens have rights to ask questions.
10       Q.   (BY MR. BANKSTON)  Right.  So if there was a
11   police stand down, that'd be upsetting, right?  I mean,
12   come on, if the police chose not to react, that's
13   upsetting, isn't it?
14       A.   Well, there was -- in Columbine, there was --
15   at Parkland that -- they've ruled in Florida there was a
16   police stand down.  I was the first to report that
17   because we had students call in.
18       Q.   I'm not asking --
19       A.   And CNN said they were actors.
20       Q.   I'm not asking if there was a police stand
21   down in Parkland.  I'm not asking if one happened at
22   Sandy Hook.  I'm saying that if children are being
23   attacked and the police anywhere stand down, that's
24   upsetting?
25       A.   Yes.

104

1       Q.   Now, by the same token, if the police didn't
2    stand down but somebody was told -- a parent, a victim,
3    was told that the police did stand down, falsely, that's
4    also upsetting?
5       A.   I believe there's been lawsuits by the
6    families about a lack of response.
7       Q.   Was that my question?  Is that in any way my
8    question, Mr. Jones?
9       A.   Well, I don't understand your question.
10       Q.   My question is:  If somebody was to lie to
11   you -- your children were killed and then somebody came
12   to you and lied to you and said the police stood down,
13   that'd be distressing?
14          MR. BARNES:  Objection as to form.
15       A.   I don't know of anyone -- if people believed
16   there was a stand down, then it's not a lie.
17       Q.   (BY MR. BANKSTON)  If somebody came to you
18   about your murdered child and said, "Your murdered child
19   wasn't actually murdered; he was stolen by aliens" and
20   lied to you about that, that's upsetting, right?
21       A.   Yeah, uh-huh.
22       Q.   Can you now admit that you've done an
23   outrageous wrong to these parents?  Can you admit that?
24       A.   You know, the mainstream media is who always
25   takes it and makes it a huge issue and then says that

105

1    I'm saying it and gets me to respond.  And it's lawyers
2    like you and people that glom onto this for fame that
3    then try to get the fame and then say that I'm the
4    person that's promoting it.  And it's obscene, in my
5    view.
6       Q.   So that's "no"?
7       A.   No.  I genuinely questioned it.  You know, I
8    think the Government and the media that's been caught
9    lying so much has created an atmosphere where people
10   don't know what's true.
11       Q.   So you do not believe that you've done an
12   outrageous wrong to these parents?
13       A.   No, I've not done an outrageous wrong to the
14   parents.
15       Q.   Okay.  In that clip you said the state police
16   have gone public.  Have you ever argued anything about
17   the state police?
18       A.   Like I told you, most of this stuff I can't
19   even remember.
20       Q.   Do you, sitting here today, remember anything
21   about the state police going public?  Is there anything
22   that occurs to you today?
23       A.   I can't remember.
24       Q.   Okay.  I want to talk to you about rescue
25   helicopters.  You mentioned rescue helicopters a lot.

106

1  It was puzzling to you that rescue helicopters weren't
2  called, correct?
3      A.  Yes.
4      Q.  Okay.  I take it you don't know how long it
5  takes for a LifeStar crew from Hartford Hospital to be
6  dispatched, travel to Sandy Hook, and for the engine to
7  calm down to safely approach the vehicle?  From
8  Hartford, you don't know how long that takes?
9      A.  No, I don't.
10     Q.  And, by the same token, you don't know how
11 long it takes for an ambulance crew to be dispatched to
12 loading of the patient from Danbury Hospital, 9 miles
13 down I-84?  You don't know that?
14     A.  No, I was going off Halbig's and others, that
15 professor's analysis of it.
16     Q.  Okay.  I think we've agreed before that Sandy
17 Hook was real.  It was not staged.  It was not phony.
18 You were wrong about that and --
19     A.  Well, I want to be clear:  I believe children
20 died.  I believe there was a mass shooting.  I still
21 think that there was a man in the woods in camo.  There
22 were other reports.  I saw the video.  And I believe
23 that, you know, normally after every person -- remember,
24 it's happened before -- every person in a shooting died;
25 and just a lot of experts I've talked to, including

107

1  retired FBI agents and other people and people high up
2  in the Central Intelligence Agency, have told me that
3  there is a cover-up in Sandy Hook.
4      Q.  Okay.  Have there ever been any InfoWars
5  employees who have been terminated or formally
6  disciplined for allowing false Sandy Hook information to
7  reach the air?
8          MR. BARNES:  Objection on two grounds:
9  One is to form; and secondly, Mr. Jones is only here in
10 his personal capacity.  He's not here as a
11 representative of Free Speech.
12         MR. BANKSTON:  I'm not asking to bind
13 him.  If he has personal knowledge, he can tell me.
14     A.  Bidondi was not working for us when he went to
15 Sandy Hook.  I told him not to.  And then I told him to
16 stop using InfoWars, over and over, repeatedly, until I
17 had to tell him that I'm going to go public on air and
18 say that he's a bad person if he didn't stop using my
19 name.
20     Q.  (BY MR. BANKSTON)  So you're going to tell me
21 that after that episode in Newtown happened, Mr. Dew
22 didn't communicate with Mr. Bidondi and ask him to cover
23 Sandy Hook some more?
24     A.  I haven't reviewed all the things that went on
25 with the other reporters and people.  I know I said to

108

1  him, "Stop doing it."  Even the year before that I said,
2  "Don't go in our capacity to any of these places."  And
3  I'm just going off memory about that because we told him
4  we did not want him covering Sandy Hook, and the last
5  thing he covered for us was the Boston bombing.
6      Q.  Who is "we" when you say, "We told him not to
7  cover Sandy Hook"?
8      A.  I mean, I told him.
9      Q.  Okay.
10     A.  He lives up there.
11     Q.  How did you tell him?
12     A.  Over the telephone, and I believe in e-mails.
13     Q.  Okay.  You use e-mails to communicate with
14 employees and people like Mr. Bidondi?
15     A.  I remember saying in a meeting around eight
16 years ago -- I said, "Listen, it's funny.  He's a
17 professional wrestler.  He likes to clown around.  I
18 don't want to be a bunch of clowns.  We're not the
19 Howard Stern Show.  So tell him to stop doing stuff in
20 our name."  And, basically, he just wouldn't stop.
21     Q.  You've repeatedly said the 9/11 Attacks were
22 orchestrated by the Government, right?
23     A.  Well, I believe criminal elements of our
24 Government were involved in 9/11.
25     Q.  Regarding Columbine, you said, "Columbine we

109

1  know was a false flag; I'd say 100 percent false flag, a
2  globalist operation."
3      A.  By "false flag," they knew it was coming; and
4  they let it happen.
5      Q.  Okay.  The Oklahoma City bombing you said was
6  a false flag, "We've never had one so open and shut."
7      A.  A hundred percent.  I can name the names.
8      Q.  And that Tim McVeigh was an innocent patsy?
9      A.  He was set up, yeah.
10     Q.  Okay.  Hours after James Holmes shot up the
11 Aurora movie theater, you said that was 100 percent a
12 false flag, mind-control event?
13     A.  He told the jailers that he was in a mind
14 control program, like Theodore Kaczynski, the Unabomber.
15     Q.  Okay.  The shooting of Gabrielle Giffords you
16 called a staged mind-control operation?
17     A.  Say that again.
18     Q.  The shooting of Gabrielle Giffords you called,
19 quote, "a staged mind-control operation"?
20     A.  I believe we looked at those possibilities.
21     Q.  The Douglas High School shooting in Parkland,
22 Florida, you told your audience you were nearly certain
23 it was a false flag to start a civil war, right?
24     A.  That's out of context.  What I said was I
25 believe the shooting happened, but that the way it was

Alex Jones - 3/14/2019

110

1 being hyped, that the police stood down. We talked to
2 the students, and it was later confirmed.
3         (Exhibit 6 marked.)
4     Q. (BY MR. BANKSTON) I want to show you the
5 context so we can make sure we're not taking it out of
6 context. I'm going to hand you the Affidavit of Fred
7 Zipp. I would like you to turn the document onto its
8 back and flip one page to page 25. Do you see that
9 tweet right there? There's a tweet at the top of the
10 page, right?
11    A. Uh-huh.
12    Q. A tweet is a message distributed to InfoWars'
13 thousands -- hundreds of thousands of Twitter followers,
14 correct?
15    A. Yes.
16    Q. That tweet reads, "Probability Florida Attack
17 False Flag For Civil War 90 percent," correct?
18    A. Yes.
19    Q. The remainder of that tweet says, "Alex Jones
20 calculates the probability of the Florida school
21 shooting being a false flag of the Deep State to create
22 resentment towards conservatives, gun owners, and sew
23 the seeds of civil war," correct?
24    A. That's a tweet.
25    Q. That's the context of that message, correct?

111

1     A. I didn't put this out, but they took a
2 derivative of what I said on air and put it out.
3     Q. InfoWars published that?
4     A. Well, the video that it links to is in the
5 context.
6     Q. I'm asking you: That tweet --
7     A. Yes.
8     Q. -- InfoWars published that tweet?
9     A. I believe so.
10    Q. Thank you, Mr. Jones.
11        The November 2017 church shooting in
12 Sutherland Springs, Texas, you put forth the theory that
13 it was, quote, "Part of the Antifa Revolution against
14 Christians and conservatives or an ISIS op," correct?
15    A. Well, I, that's out of -- I was giving, like,
16 possible things; and then it turned out -- it turned out
17 that he -- you know.
18    Q. In November 2017, the same month, there was a
19 horrific mass shooting at the Las Vegas music festival.
20 You remember that, correct?
21    A. Uh-huh.
22    Q. And you said, quote, "Vegas is as phony as a
23 three-dollar bill or as Obama's birth certificate,"
24 correct?
25    A. Yes.

112

1     Q. Okay. So it really wasn't a surprise that you
2 said the exact same thing about Sandy Hook that you've
3 said about all of these other shootings, correct?
4     A. Yeah, well, I talked to the FBI hostage rescue
5 team on the thing in Las Vegas.
6     Q. Okay. Let's talk a little bit about
7 Pizzagate. You told your audience -- first, let's start
8 off, Pizzagate is the allegation that there was a
9 pedophile sex dungeon in a Washington D.C. pizzeria with
10 connections to Hillary Clinton and the DNC, right?
11        MR. BARNES: Objection --
12    Q. (BY MR. BANKSTON) That's what Pizzagate is?
13        MR. BARNES: Objection as to form.
14    A. Does that mean to ask it again?
15    Q. (BY MR. BANKSTON) No, you can answer,
16 Mr. Jones.
17    A. Say it again.
18    Q. Pizzagate is the allegation that there was a
19 pedophile sex dungeon being operated out of the basement
20 of a pizzeria in Washington, D.C., with connection to
21 Hillary Clinton and the DNC?
22    A. No.
23    Q. Okay. Tell me what Pizzagate was.
24    A. Pizzagate came out of the John Podesta
25 e-mails, head of Hillary's campaign. I'm talking about

113

1 Aleister Crowley rituals. And then the media diverted
2 onto 4chan and covered a pizza place that the DNC went
3 to and that was going on and created the dis-info about
4 these dungeons and basements and everything to then
5 distract onto that away from the serious stuff in the
6 FBI manual that they use things, you know, things like
7 cheese pizza means, you know, child pornography; and
8 those are code words used for pedophilia. And so that
9 was basically a diversion story, kind of a Karl Rove
10 type trick, where we have a big story and they slip this
11 info into it so that everybody then covers that.
12    Q. You told your audience, "Something's going on
13 in that pizzeria," right?
14        MR. BARNES: Objection as to form.
15    A. I mean, I did point out there was a lot of
16 really bizarre art and that Tony Podesta did not hide
17 the fact in the Washington Post 2007, a big write-up
18 about his deviant art, that he likes art that most
19 people would be arrested for, yeah.
20    Q. (BY MR. BANKSTON) You said, "Something's
21 being covered up in that restaurant," right?
22    A. I don't remember saying that specifically.
23    Q. You said, "You have to go investigate it for
24 yourself." Didn't you say that?
25    A. I don't know if that's the exact quote.

114

1    Q.   So if Mr. Zipp reported that in that affidavit
2  in front of you, he would be wrong?
3    A.   I don't know Zipp.  I mean, I don't know
4  Mr. Zipp, so.
5    Q.   Well, Mr. Zipp who's sitting with us, who's
6  the former editor of the Austin-Statesman, he's a UT
7  Journalism Professor.  He prepared that affidavit.  If
8  he messed up and misquoted you, that's a problem, isn't
9  it?
10   A.   Where is it?  I mean, I haven't had a chance
11  to read this.
12   Q.   Well, I'm just asking you --
13   A.   Well, let me read it.  Let me read it then.
14       MR. BARNES:  Which page are we supposed
15  to be at, by the way?
16       MR. BANKSTON:  I'm not actually referring
17  him to a specific page number, but I can.  Let's do
18  that.
19       MR. BARNES:  That would be helpful.
20   Q.   (BY MR. BANKSTON)  I believe that's going to
21  be in the Heslin affidavit.
22       Let's talk about the Plaintiff's Petition
23  then.  Have you seen these statements in the Plaintiff's
24  Petition about Pizzagate?
25   A.   I'm confused.

115

1    Q.   I'm telling you right now that there's a
2  different affidavit that I'm not going to ask you about,
3  about Pizzagate; but I am going to ask you about
4  Plaintiff's Petition, the lawsuit that was served on
5  you.
6    A.   Okay.  Can I see it?
7    Q.   I'm not even interested in reading it right
8  now.  I'm just wanting to know:  Do you remember
9  Pizzagate being a subject that came up?  Is that
10  something you've looked into in the past couple of
11  months?
12   A.   I have been very clear the last two years that
13  I believe that there was no illegal activity going on at
14  that pizza place, and I've told people that on record.
15  So I don't know if you're looking for clips to put on
16  the news of me saying something about that, but...
17   Q.   Well, what I'm really getting at, Mr. Jones,
18  is that after you told people to go and investigate it,
19  somebody did and then opened fire there, right?  That
20  happened?
21   A.   No, there's evidence that person did that from
22  any directions I gave him.
23   Q.   Okay.  You made similar allegations on
24  InfoWars.  There are videos about an Austin pizza place,
25  East Side Pies, similar allegations made on InfoWars,

116

1  right?
2    A.   I don't know if I've made those allegations.
3    Q.   You apologized for them, though, didn't you?
4    A.   I think a reporter went and pointed out the
5  same symbol or something.
6    Q.   Did you apologize?
7    A.   I don't remember.
8        MR. BARNES:  Objection as to form.
9    Q.   (BY MR. BANKSTON)  You apologized to Chobani,
10  though, right for publishing stories that they were
11  caught importing migrant rapists, right?
12   A.   That was a technical thing versus there were
13  rapes in the town, but it wasn't the company themselves
14  that brought the rapists in.  It was the policies of the
15  Federal Reserve Board member who owns Chobani.
16   Q.   You apologized?
17   A.   I did.
18   Q.   You also just recently apologized for false
19  reporting on the murder of DNC Staffer Seth Rich?
20       MR. BARNES:  Objection as to form.
21   A.   That was on reporting of another reporter.
22   Q.   (BY MR. BANKSTON)  And last year InfoWars had
23  to apologize for misidentifying an innocent young man as
24  the Parkland High School shooter?
25   A.   I think we did.

117

1        MR. BANKSTON:  I'll tell you what,
2  Mr. Jones, let's take a little break.
3        THE VIDEOGRAPHER:  Off the record
4  2:28 p.m.
5        (Off the record from 2:28 to 2:51 p.m.)
6        THE VIDEOGRAPHER:  We are back on the
7  record at 2:51 p.m.
8    Q    (BY MR. BANKSTON)  Mr. Jones, some of your
9  Sandy Hook reporting -- hold on.  Excuse me, Mr. Jones.
10  I need to grab a file.
11       Mr. Jones, some of your reporting on
12  Sandy Hook involved an anonymous website known as Zero
13  Hedge.  Do you know what Zero Hedge is?
14   A.   Yes.
15   Q.   Okay.  You'll remember that there was an
16  affidavit submitted by one of the Plaintiff's experts
17  that said InfoWars and Zero Hedge promoted and endorsed
18  each other's content.  Do you remember that affidavit?
19   A.   No.
20   Q.   Okay.  You've taken issue with that statement,
21  though?  You don't believe -- that statements not true?
22   A.   I don't know who runs Zero Hedge.  I wouldn't
23  say we have a relationship with them.
24   Q.   Okay.  I want to show you what I'm now marking
25  as Exhibit 7.

118

1    (Exhibit 7 marked.)
2    Q.  (BY MR. BANKSTON)  If you want to take a
3    minute to read this, Mr. Jones, what I have handed you
4    is the August 28th affidavit that you executed in the
5    Heslin case.  Do you want a minute to read that?
6    A.  Sure.  Thank you.
7         (Witness silently reading document.)
8         I'm finished.
9    Q.  Okay.  Mr. Jones, I'd like to direct your
10   attention there at the end of page 1 and spilling onto
11   page 2.  I'm going to read a sentence there for you
12   that's highlighted.  It states, "None of the defendants
13   ever cooperated in any way with Zero Hedge nor have
14   defendants and Zero Hedge ever promoted or endorsed each
15   other's content."  Did I read that correctly?
16   A.  Yes.
17   Q.  Okay.  Now, the next sentence there -- there's
18   been times where Zero Hedge has been cited?
19   A.  Yes.
20   Q.  And commented about?
21   A.  Yes.
22   Q.  Right.  But to talk about you engage in the
23   promotion or endorsement of Zero Hedge content, that was
24   wrong; that's what this document states?
25   A.  Yes, that's wrong.  I mean, I don't know who

119

1    Zero Hedge is.  I've reached out to them before and
2    said, "Hey, who are you?  I would like to you to come on."
3    And there's been no response back.
4         I've said, "Wow, this is a good article
5    from Zero Hedge," like I've said The New York Times has
6    a good story; but I don't have any relationship with
7    them.
8    Q.  Right.  Okay.  Well, I want to show you a
9    video of you talking about Zero Hedge that was taken on
10   June 13, 2017.  This clip, unfortunately, is not
11   available online anymore.  What you're about to see has
12   been downloaded from a website called
13   sandyhookfacts.com.  So I want to show you that video,
14   which is just a recording of yours.
15        MR. BANKSTON:  Can you play the clip
16   called Zero Hedge?
17        (Video playing.)
18   Q   (BY MR. BANKSTON)  When you said in your
19   affidavit that InfoWars and you have never promoted or
20   endorsed Zero Hedge's content, that was a false
21   statement?
22        MR. BARNES:  Objection as to form.
23   A.  I just said before you played the clip that
24   I've said they've done good reporting.
25   Q.  (BY MR. BANKSTON)  Sure.  But, Mr. Jones --

120

1    A.  That's not an endorsement.  I don't know who
2    they are.
3    Q.  You're going to tell us that that clip we just
4    saw was not you promoting and endorsing Zero Hedge's
5    content?
6         MR. BARNES:  Objection as to form.
7    A.  I just told you I said I think they do good
8    reporting.
9    Q.  (BY MR. BANKSTON)  You think that the
10   statements that you've made in that affidavit were
11   honest, forthright, and complete?
12   A.  Yes.
13   Q.  Okay.  Mr. Jones, you've said in testimony in
14   this case that you've used blue screens before, you have
15   experience with blue screens, and that there can be
16   anomalies if the blue screen is not properly aligned,
17   correct?
18   A.  Yes.
19   Q.  Tell me how to align a blue screen.
20   A.  It depends if it's an older Chromakey model or
21   it depends if it's dozens and dozens of different
22   digital units; but if the lighting isn't correctly
23   displayed against the green screen or blue screen --
24   it's whatever color you really dial it to.  TVs use blue
25   screens; a lot of entertainment stuff, green.  But it

121

1    doesn't matter.  It can be any color that's not really
2    common that's not going to be on your shirt or on your
3    tie because it will make that disappear as well.
4         And, also, if there's kind of a blue hue
5    to your nose or in the event of a rising point, noses
6    turning is generally the Number 1 thing that disappears;
7    or any hairs that are amiss can create a blue shimmer
8    off of television lights and you'll see areas that
9    disappear.  And so that's a telltale sign not of digital
10   breakup, but it's squares.
11   Q.  How do you align it?  What does that mean,
12   aligning the blue screen?
13   A.  I mean, that's not even really a technical
14   term.  You have to turn the lights on, put people in a
15   chair, and make sure the lights are properly set up to
16   then work in the blue screen system.
17   Q.  Can you pull up Exhibit 1?
18   A.  This is 7.
19   Q.  And can you look at Paragraph 3 of Exhibit 1?
20   This not technical term, "aligned," that's your term,
21   right?  You used it in this sworn affidavit, correct?
22   A.  Well, yeah.  I mean, I would call -- when you
23   dial just like two different dials, lights, and a thing
24   to make them work together, I'd call that aligned.  I
25   mean, that's a pretty good word.  I guess you could call

---

**122**

1  it "sync" or --

2      Q.  So the lights -- you're talking about the

3  lights need to be aligned, not a blue screen?  You've

4  got to dial something on a light?

5      A.  Well, no, the lights and the computer program

6  have to be aligned.  You have to look at a color scope.

7  You have to make sure the colors are all lined up or it

8  won't work.  You have to be perfectly aligned.  And

9  that's either on an old spectrum system or you align

10  them on a digital system.  That's called -- that's

11  aligning on that.  It's on the scope.  And now those

12  scopes are digital.  So you align the scope,

13  technically.  After you align the scope, then you have

14  to align the lights with the scope so that it hits the

15  settings of the Chromakey system.

16      Q.  You would be able to, I think, through your

17  years of experience and exposure to these kinds of

18  videos -- you've seen them before, the most common type

19  of nose disappearing stuff -- you would be able to

20  produce to us examples of blue screen videos with noses

21  disappearing, just like Anderson Cooper's, right?

22      A.  I think I could probably find those.

23      Q.  Yeah, that's something that you could produce?

24      A.  I can't guarantee it, but that's pretty --

25  like, have you ever seen, like, the weather person and

---

**123**

1  they're, like, wearing the wrong colored tie and it does

2  that?  I mean...

3      Q.  Absolutely.  And so if they're wearing a blue

4  shirt, all of a sudden it looks like their shirt's

5  invisible, right, because it's the same color as the

6  blue screen, right?

7      A.  Or it might be set to green and then somebody

8  sets it blue and, you know -- or somebody hits it; and

9  it goes to brown and all of a sudden the rest of their

10  clothes disappear.

11      Q.  And the whole shirt disappears?

12      A.  There is a dial.  You can dial it to any color

13  you want.

14      Q.  Okay.

15      A.  At least on those units, older units.

16      Q.  Okay.  What kind do you have at InfoWars?  You

17  said you have one in the back?

18      A.  Oh, we have quite -- most of them that we

19  have -- we probably have about ten of them.

20      Q.  Okay.

21      A.  The average news computer system has them.

22      Q.  You still have them, all ten of them?

23      A.  That's not an accurate statement.  We probably

24  have 50.

25      Q.  You have 50 blue screen mechanical devices?

---

**124**

1      A.  No, I said I have blue screens still.  They're

2  on all your major video editing software now.

3      Q.  Okay.

4      A.  And then we have -- somewhere we might

5  actually have an old-fashioned tube-based one.  And I

6  say 50.  Do we have 50 computers?  I mean, we probably

7  have 50 computers, old and new.

8      Q.  Now, those blue screens -- in other words,

9  what InfoWars uses to create blue screens, that still

10  exists, is available for inspection, correct?

11      A.  Well, it's standard on Final Cut Pro.  It's

12  standard on all those editing systems.  Just you can go

13  to the store and buy them.

14      Q.  Okay.  So whatever InfoWars has that it's

15  claiming gives it knowledge of how blue screens work,

16  that still exists; you haven't gotten rid of that stuff,

17  right?

18      A.  No.  We've got a couple of green screens up on

19  the walls.

20      Q.  Perfect.  Okay.  One of the things that you

21  talked about -- remember we said we were going to put a

22  pin in it, about blue screens is one of the reasons that

23  you were suspicious about this interview and blue

24  screens is because CNN's got caught using blue screens

25  before, right?

---

**125**

1      A.  Uh-huh.

2      Q.  And, in fact, one of the things you brought up

3  was about CNN getting caught using blue screens in the

4  Gulf War?

5      A.  Uh-huh.

6      Q.  On the satellite feeds, right?

7      A.  Yes.

8      Q.  Okay.  I want to play you a video really quick

9  from something you said on May 13th, 2014 about these

10  blue screens.

11          MR. BANKSTON:  Can you play CNN Blue

12  Screen for me?

13          (Video playing.)

14      Q  (BY MR. BANKSTON)  Now, Mr. Jones, you've seen

15  there was actually a satellite feed leak -- a leak of

16  this that you've seen, right?

17      A.  Uh-huh.

18      Q.  Okay.  Is that a "yes"?

19      A.  Yes.

20      Q.  Okay.

21          (Exhibit 8 marked.)

22      Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to

23  hand to you what I've marked as Exhibit 8.  You

24  recognize this leak from the Charles Jaco CNN broadcast

25  where he's got the blue screen behind him?  You

---

126

1  recognize that?

2    A.  Yes.

3    Q.  Okay.  And this was something that some people

4  recorded off of a satellite leak?

5    A.  I believe so, a long time ago.

6    Q.  Okay.  And you've done some reporting about

7  this on InfoWars.  You've shown this video and what

8  happened that day?

9    A.  Yes.

10    Q.  Okay.  And as we see from here, you can see

11  kind of on the left-hand side and on the right-hand of

12  the screen, there's this big blue screen up behind them,

13  right?

14    A.  Uh-huh.

15    Q.  Right?  Because they left it on.  I mean, they

16  didn't put anything on it because they were on a

17  satellite kind of practice feed, I think, right?

18    A.  I don't remember all the particulars, but they

19  admitted they weren't on location.

20    Q.  Okay.

21    A.  And then, again, it's not like the background

22  turns on.  It's that the computer overlays it.

23    Q.  Right.  It's not like actually on the --

24  there's something up on the screen.  The computer takes

25  care of that in postproduction?

127

1    A.  Or does it live.

2    Q.  Or does it live, right.  Okay.

3       But that CNN studio, that setup -- what

4  I'm going to hand you now is what's been marked as

5  Exhibit 10.

6       (Exhibit 10 marked.)

7    Q.  (BY MR. BANKSTON)  Do you think ABC News and

8  Forrest Sawyer was given access to Ted Turner's secret

9  studio?

10       MR. BARNES:  Objection as to form.

11    A.  I don't even know anything about this.  I

12  mean, I know they were...

13    Q.  (BY MR. BANKSTON)  You've never seen that

14  picture?

15    A.  No.  I believe that CNN and others, especially

16  CBS partners with other groups routinely; but that's

17  conjecture.  I don't know.

18    Q.  Okay.  So I take it you've never done any sort

19  of research as to where these interviews were allegedly

20  done or CNN says they were done?

21    A.  You know, this was so long ago.  I remember

22  seeing PBS documentaries about this.

23    Q.  Let me show you an exhibit about that.

24       (Exhibit 9 marked.)

25    Q.  (BY MR. BANKSTON)  I'm going to hand you now

128

1  what I've marked as Exhibit 9.  You've never seen the

2  International Hotel in Riyadh, Saudi Arabia, have you?

3    A.  No.  I know that's where they said they were

4  broadcasting from.

5    Q.  I'm going to show you what I'm marking as

6  Exhibit Number 11.

7       (Exhibit 11 marked.)

8    Q.  (BY MR. BANKSTON)  You've never seen the

9  photographs for the satellite setups for the major

10  networks at the International Hotel in Riyadh, Saudi

11  Arabia, have you?

12    A.  Nope.  I just know Jaco says that they staged

13  a chemical attack that didn't happen.

14    Q.  You know that Jaco admits is what you're

15  saying?  You've seen clips of Charles Jaco saying it

16  was --

17    A.  Yeah, it came out later that there wasn't

18  nerve gas in the air and all that and that they staged

19  some of the shots on blue screen.

20    Q.  So you're maintaining that that thing behind

21  them in that shot is a blue screen used for compositing

22  and not just the walls of the International Hotel in

23  Riyadh that was on every broadcast during that time?

24       MR. BARNES:  Objection --

25    Q.  (BY MR. BANKSTON)  That's what you're saying?

129

1       MR. BARNES:  Objection as to form.

2    A.  Well, no.  They were saying they were there.

3  They weren't saying they were projecting that behind

4  them.  I get your confusion about the blue thing or my

5  confusion.  This was a long time ago.  It's not debated

6  that CNN staged location shots.

7    Q.  (BY MR. BANKSTON)  They didn't stage that

8  shot, did they?  That shot was in front of the

9  International Hotel in Riyadh.  That was not a staged

10  shot.

11    A.  Yeah, they put the gas masks on through the

12  whole thing and then they stopped during the breaks and

13  it's all a big joke.

14    Q.  I'm not really concerned with what they did on

15  the broadcast.  You said that they were in a secret

16  broadcast center in Atlanta when they said they were in

17  Riyadh.  You were wrong.  That was false.  They were

18  actually in Riyadh.  You can admit that?

19    A.  I can't say that.

20    Q.  In fact, you don't know.  When you were saying

21  that they were not in Riyadh, you had no idea?

22    A.  I think you're mixing things together.

23    Q.  Okay, Mr. Jones.

24    A.  You're right.  Colin Powell, the anthrax was

25  real.  You're right.  Nothing sticks.

130

1    Q.  There was a lot of reporting during the Gulf
2  War, a lot of people doing really hard work to uncover
3  the fact that those aluminum tubes were total bunk.
4  That wasn't WMDs, right?
5    A.  Were they wrong to question that.
6    Q.  Absolutely.  There was a lot of people
7  questioning that.  They did some really good reporting.
8  They found out, for instance, that some of the
9  allegations of torture in Kuwait were total bunk; it was
10  total propaganda.  Some good journalists found that --
11    A.  The babies in the incubators?
12    Q.  I think that's some of it, isn't it?  Not just
13  the babies in the incubators, though.  There was a lot
14  of false things being told to the American public to get
15  them to go to war, wasn't there?
16    A.  Yeah.
17    Q.  And a lot of reporters did really good work
18  doing it and finding out what those things were.  There
19  were some really good reports, right, an incubator
20  report, for instance?
21    A.  Yeah.  Yeah.  I was pretty young then, but
22  yeah.
23    Q.  So those good journalists did good work
24  uncovering those facts; but your work on the blue screen
25  allegation in the Gulf War, that wasn't good journalism,

131

1  was it, Mr. Jones?
2    A.  No.  They admitted they did blue screen shots
3  from Atlanta and a whole bunch of places.
4    Q.  That's where you're doubling down; you're
5  saying that that's a fact?
6    A.  I'm saying you're mixing things together, so I
7  can't say anything further.
8    Q.  Okay.  I want to talk a little bit --
9  actually, I want to go back to something you said
10  earlier, which is that you have CIA sources who told you
11  that something's up in Vegas --
12    A.  Yep.
13    Q.  -- something funny's going on in Vegas.  Who?
14        MR. BARNES:  Objection, and we'll
15  instruct the witness not to answer on journalistic
16  privilege.
17        MR. BANKSTON:  Gotcha.
18    Q.  (BY MR. BANKSTON)  Well, what did you hear?
19  What did this person tell you?
20        MR. BARNES:  The same instruction not to
21  answer if it in any way will disclose their identity.
22        MR. BANKSTON:  Yeah, I'm not asking for
23  their identity.
24        THE WITNESS:  Go ahead.
25    Q.  (BY MR. BANKSTON)  What did they tell you?

132

1    A.  I got contacted in the morning with -- I got
2  contacted by an individuals assigned to the SERF Teams
3  CIA Assassination squads who had people inside the
4  hostage rescue team in Vegas and they said that he was
5  selling weapons to the Gihadies and that they had
6  paraphernalia for the Gihadies in the Middle East, that
7  he was an arms dealer.  I mean, the Saudis were having a
8  civil war.
9        They were having an event with the Saudi
10  military, over 10,000 of them in Las Vegas that weekend
11  as part of a larger event, and that as basically inside
12  the Saudi Arabia civil war that they used the arms deal
13  to get weapons inside of the United States and that they
14  then killed the patsy and then carried out the operation
15  and that the whole thing was basically a Saudi civil
16  war.  And a lot of that later came out.
17    Q.  Came out where?
18    A.  It came out in the news that he went to the
19  Middle East.  It came out that he had been involved in
20  arms dealing.  And I also had to sign nondisclosures
21  that I can't get into subsequently with other
22  information.
23    Q.  You've signed nondisclosures?
24    A.  Uh-huh.
25    Q.  With whom?

133

1    A.  I can't talk about it.
2    Q.  Okay.  Well, what about:  What's the general
3  topic that you can't disclose?
4    A.  I can't talk about it.
5    Q.  Okay.  So apparently there's some
6  nondisclosure agreement that you've signed with some
7  unnamed person that is relevant to the allegations that
8  you were making about Las Vegas?
9    A.  Yes.
10    Q.  Okay.  And you can't -- for reasons of that
11  nondisclosure, you can't disclose anything about that
12  today?
13    A.  No, I can't.
14    Q.  Was that a government person that you did the
15  nondisclosure with?
16        MR. BARNES:  Objection, and we'll
17  instruct the witness not to answer to the degree it
18  could disclose his identity, which that question
19  basically would.
20    Q.  (BY MR. BANKSTON)  Was it a corporate entity?
21        MR. BARNES:  The same instruction not to
22  answer on the grounds of the journalistic privilege
23  shield as something that may identify or lead to the
24  identification of the individual person.
25    Q.  (BY MR. BANKSTON)  Was it a real person or an

Alex Jones - 3/14/2019

**134**

1  imaginary person?
2  A.  Oh, it's real.
3  Q.  It's a real person.  So there is a contract.
4  If we needed it, we could get it?  It exists?  Do you --
5  A.  I already told you it exists.
6  Q.  Do you own a copy?
7  THE WITNESS:  We have a copy of that,
8  don't we?
9  MR. BARNES:  Well, he's just asking
10  whether you --
11  A.  Yes, we have a copy.
12  Q.  (BY MR. BANKSTON)  Okay.  Thank you,
13  Mr. Jones.
14  Let's talk a little bit about sources.
15  What is InfoWars' policy on using unnamed sources?
16  A.  If they've been credible in the past and have
17  been good sources, then we report from an unnamed
18  source.
19  Q.  Who is in charge or makes the decision on if
20  the source is credible?
21  A.  Paul Watson, myself, Rob Dew.
22  Q.  Okay.  You talked a lot about covering
23  Internet --
24  A.  Let me be clear:  Paul does his own thing.  So
25  he does his reporting and then helps us out with other

**135**

1  stuff.
2  Q.  Okay.  So it's you and Rob who assign
3  credibility to sources?
4  A.  Yes.
5  Q.  Okay.  You talked a bit about covering the
6  Internet and what's being said on the Internet.  On when
7  you cover the Internet and the stuff that's being said
8  there, are there particular places that you consider
9  important places to look on the Internet for what's
10  really being said and what's happening?
11  A.  Yes.
12  Q.  What are some of your primary sources on the
13  Internet to get Internet chatter?
14  A.  I mean, everything from the Intercept to the
15  New York Times to Drudge Report to CNN -- I mean, we
16  just look at everything -- to the Congressional Record.
17  Q.  Well, I mean, I understand you look at media,
18  mass media and government reports; but I'm talking about
19  Internet chatter, what the people are talking about
20  online.  How do you get a pulse of that?
21  A.  It's not even getting a pulse.  In the past we
22  would cover whatever the big chatter was if I thought it
23  was interesting and the crew did.  We basically try not
24  to even do that anymore because it always gets assigned
25  on us when we cover even big stories because if, like,

**136**

1  CNN takes the angle on Pizzagate and makes it huge --
2  Washington Post, New York Times, CNN -- they make
3  whatever they're reporting on the huge thing; and then
4  we go report on this huge thing that the media, the
5  corporate media, actually went, like, a honey pot and
6  set up.  So more and more I try to not even report on
7  whatever the big thing on 4chan or, you know, any of
8  these sites are talking about.  I directly stay away
9  from them now.
10  Q.  Okay.  4chan, let's just pick that one up
11  first.
12  A.  Yes.
13  Q.  That's an anonymous image board, right?
14  A.  Yes.
15  Q.  The posters there are assigned a random
16  number, right?
17  A.  Yes.
18  Q.  InfoWars has frequently used 4chan as a
19  source?
20  A.  We've reported on things being reported at
21  4chan.
22  Q.  As a source, right?  That's what a source is,
23  isn't it?
24  A.  Yes.
25  Q.  Okay.

**137**

1  A.  I mean, if somebody was e-mailing you, you
2  could say technically it was a source --
3  Q.  Sure.
4  A.  -- even if you never even open it.
5  Q.  Any piece of information that you're going to
6  report secondhand is a source, right?
7  A.  Yeah.
8  Q.  It was the source of that information?
9  A.  Yeah.  Like, if somebody draws on a bathroom
10  wall, it could be a source.
11  Q.  Now, for instance, one of the things we've
12  talked about is misidentifying the Parkland shooter.  We
13  talked earlier about misidentifying the Parkland shooter
14  last year.  InfoWars' source was 4chan, right?
15  A.  I don't remember that, but we corrected it
16  within a day.
17  Q.  Well, I mean, I didn't ask you anything about
18  correction, right?  What I'm asking is:  Do you or do
19  you not know if 4chan was your source?
20  A.  I believe it was one of the places that put it
21  up.
22  Q.  Okay.
23  A.  That's why I told --
24  Q.  So that's what I was kind of asking when I
25  say:  Where do you get your chatter?  4chan is one.  Do

138

1  you have any others for us?
2      A.  Yeah, e-mail, what people are talking about on
3  the street.
4      Q.  Well, I mean, specifically we're talking about
5  honing in on this idea that there were people on the
6  Internet chattering about Sandy Hook.  The Internet was
7  talking about it.  You know --
8      A.  I would say YouTube.  The videos within the
9  first two weeks with, like, 5 million, 10 million views,
10  plus; and they were showing a lot of things that when
11  you looked at it, looked pretty compelling.
12     Q.  Okay.  So there were people making videos on
13  YouTube.  You had some of those people on your show,
14  right?
15     A.  I'm not -- I can't remember.
16     Q.  Okay.  You know Q.K. Ultra is?  Have you
17  heard that name?
18     A.  (No audible response.)
19     Q.  Do you know who the Independent Media
20  Solidarity Group is?  Have you ever heard that name?
21     A.  No.
22     Q.  Do you know Peter Klein and his film, Let's
23  Talk About Sandy Hook?
24     A.  No.
25     Q.  Do you know the book Nobody Died at Sandy

139

1  Hook?
2      A.  I've not read it.
3      Q.  Okay.  All of these things have been sources
4  for you, though, right?
5      A.  No, I don't think Fetzer, by the time he wrote
6  that book, was a source.
7      Q.  There was a broadcast with Mr. -- discussing
8  Mr. Heslin in 2017 about his statements on the Megyn
9  Kelly show.  Do you know what I'm talking about?
10     A.  Can you give me specifics?
11     Q.  Yeah, you were sued over it by Mr. Heslin.  Do
12  you know what broadcast I'm talking about now?
13     A.  Well, I mean, what specifically?
14     Q.  Mr. Jones, do you understand that Neil Heslin
15  sued you?  Do you understand that?
16     A.  Well, you're asking me about a specific
17  broadcast; and I'm saying:  What broadcast?
18     Q.  Right.  First, I'm asking you:  Do you
19  understand Neil Heslin sued you?
20     A.  Yes.
21     Q.  Okay.  Are you telling me that you don't know,
22  sitting right now, what broadcast he sued you for?
23     A.  I mean, I'm asking you to give me the
24  specifics, like, so you can get me to comment.
25     Q.  No, I'm asking you right now.  That's what I

140

1  want to know a question to.  Do you even know what
2  Mr. Heslin sued you for?
3          MR. BARNES:  Objection as to this being
4  outside of the scope.
5          MR. BANKSTON:  He's an individual.
6          THE WITNESS:  This is Scarlett Lewis,
7  right?
8          MR. BANKSTON:  Right.  There's no
9  30(b)(6) Notice here.  He don't have a scope.
10         MR. BARNES:  Sure there is.
11         MR. BANKSTON:  If he has personal
12  knowledge, he can answer it.  Are you instructing him
13  not to answer?
14         MR. BARNES:  It's an objection.
15     Q.  (BY MR. BANKSTON)  Okay.  Then you can go
16  ahead and answer, Mr. --
17         MR. ENOCH:  Well, don't tell him there's
18  no scope, Mark.
19         MR. BANKSTON:  I have no idea, Mr. Enoch,
20  what you mean.  Is there something in the Order that you
21  think there's a scope?  I don't see a scope.
22         MR. ENOCH:  The Court said you were
23  allowed to ask things consistent with your RFPs.
24         MR. BANKSTON:  Yeah, whether Mr. Heslin
25  was defamed is relevant to my case.  You know that.  The

141

1  document request was all about Mr. Heslin.
2          MR. ENOCH:  I --
3          MR. BANKSTON:  Don't even start this with
4  me.
5          MR. ENOCH:  Let me finish, please.
6          MR. BANKSTON:  I would rather you not
7  because you're not defending this deposition, Mr. Enoch.
8  I've had an extraordinary amount of patience with you
9  speaking during this deposition, but we're not going to
10  do this to you when we defend depositions.
11         MR. ENOCH:  Do not misrepresent to this
12  lawyer that the Judge did not restrict the scope to the
13  limit -- limited to the RFPs.  Do you agree that he
14  limited it to that?
15         MR. BANKSTON:  No, I don't think so --
16         MR. ENOCH:  Okay.
17         MR. BANKSTON:  -- not to an RFP, no, I
18  don't think so.
19         MR. ENOCH:  You don't think so?
20         MR. BANKSTON:  No, Mr. Enoch, I don't
21  think the scope of written discovery on a Request For
22  Production was identical to the scope of deposition.
23  And many, many times, Mr. Enoch, the Judge said, "No,
24  you can't ask that question for a Request For
25  Production; but you can just ask it in deposition."  So,

142

1  no, I don't agree with you at all; and I would
2  appreciate it if kept quiet for the remainder of the
3  deposition. You are not defending this deposition.
4        MR. ENOCH: Mr. Bankston, I will speak if
5  it's appropriate for to speak.
6        MR. BANKSTON: It is not appropriate for
7  you to speak.
8        MR. ENOCH: Please don't interrupt me,
9  sir. That's not courteous.
10        MR. BANKSTON: Sir, I'm going to ask you
11  to leave my deposition.
12        Go off the record for a second.
13        MR. ENOCH: No, I do not agree to go off
14  the record.
15        MR. BANKSTON: All right. Don't go off
16  the record.
17        Mr. Enoch, I'm asking you to leave my
18  deposition. You are being obstructive. You are
19  talking. You are not appearing at this deposition. You
20  are not defending it. If you do not agree to be quiet,
21  I'm asking you to leave the deposition. Are you going
22  to stay and be quiet, or am I going to have to ask you
23  to leave?
24        MR. ENOCH: Mr. Bankston, I am not
25  leaving the deposition.

143

1        MR. BANKSTON: Then you're going to stay
2  quiet.
3        MR. ENOCH: Would you like to continue
4  your deposition?
5        MR. BANKSTON: I am. And if you leave
6  again -- if you keep speaking, I guarantee you I will
7  seek sanctions against you, Mr. Enoch.
8    Q    (BY MR. BANKSTON) Mr. Jones, does --
9  interactions with readers and viewers, that tends to
10  help drive what you do on the show, right?
11    A    Somewhat.
12    Q    I mean, if viewers want you to cover
13  something, that's a motivator for you to cover it?
14    A    Sometimes. Not so much.
15    Q    And, in fact, you've said about Sandy Hook,
16  "This is what our viewers wanted us to cover. That's
17  why we were covering it."
18    A    Yes, it was an Internet sen -- a big deal
19  early on.
20    Q    And, in fact, when you weren't covering it so
21  much, whenever you stopped covering it for a little bit,
22  your viewers would get upset. And they'd be like, "Why
23  aren't you covering Sandy Hook; it's a hoax"?
24    A    Yes, people, the public -- the public in
25  general had major questions. I mean, even the Hartford

144

1  Current did. They said that they'd never seen stuff
2  covered up like this.
3    Q    Right.
4    A    I mean, I knew FBI agents and people that
5  said there was something weird going on with it.
6    Q    One of them was his uncle, right?
7    A    Yes, Rob Dew's uncle, right.
8    Q    Yeah. He was up there with Mr. Halbig and
9  Mr. Bidondi and Mr. Reich.
10    A    We didn't even know he was going.
11    Q    Right. I'm not saying you did. I'm saying he
12  was up there?
13    A    Yep.
14    Q    Yeah.
15    A    Career, retired FBI, yep.
16    Q    Right. With Mr. Halbig and Mrs. Kay Wilson,
17  Mr. Bidondi --
18    A    There was a big City Council meeting there.
19    Q    Yeah. Mr. Reich was there?
20    A    I don't know who those folks are.
21    Q    Okay. Now, Mr. Dew, he has been frequently
22  sent as the news director of InfoWars -- hold on. Let
23  me back that up because I'm making an assumption.
24        Mr. Dew's the news director of InfoWars?
25    A    For some of the programs. We don't do the

145

1  nightly news anymore; but he was directing those shows,
2  yes.
3    Q    Okay. So Mr. Dew had been, over the years,
4  sent e-mails and communications and tweets from Sandy
5  Hook debunkers. Do you know what I mean when I say
6  that?
7    A    Yes.
8    Q    Okay. And Mr. Dew had been told by these
9  people, "What you're saying is wrong. You need to stop
10  saying it. Here's the real truth"? You understand --
11    A    Oh, I thought you meant debunkers debunking
12  the official story.
13    Q    No, I mean those who were debunking what you
14  were saying about Sandy Hook.
15    A    Yes, and then we would offer for them to come
16  on air and cover what they said.
17    Q    And, in fact, you had been given information
18  by them; they had given you information?
19    A    And we put it on air.
20    Q    And you had a debate with a guy named Keith
21  Johnson, right?
22    A    I don't think I did.
23    Q    Well, okay. So there was a debate hosted on
24  InfoWars between Keith Johnson and Mr. Halbig?
25    A    Was that the -- I forget the name of the

---

146

1  newspaper guy.  I can't remember the name.
2      Q.  Well, Keith Johnson, he's a former InfoWars
3  contributor, right?
4      A.  Well, there's a lot of articles that people
5  contribute, whether a letter to the editor or --
6      Q.  That's not what I'm not talking about,
7  Mr. Jones.  Keith Johnson was a paid contributor to
8  InfoWars?
9      A.  Not to my memory.
10     Q.  Okay.  So there was this debate that Mr. Dew
11 hosted, and would you agree with me that was sometime
12 around 2015?
13     A.  I don't remember.
14     Q.  Okay.  Mr. Dew, in addition to those debates,
15 has been provided written information from a lot of
16 these debunking people seeking to stop the allegation
17 that it's a hoax.  You would agree with that?
18     A.  Yes.  There was a big Internet fight going on,
19 and we were showing both sides.
20     Q.  Right.  And so in terms of information about
21 these anomalies, some of the things that I've been
22 showing you today were in Mr. Dew's possession, correct?
23         MR. BARNES:  Objection as to form.
24     A.  I don't understand.  There's been an ongoing
25 debate back and forth on these issues.

---

147

1      Q.  (BY MR. BANKSTON)  Okay.  Do you know who a
2  person named C.W. Wade is?
3      A.  No.
4      Q.  Okay.  You've never heard of that person's
5  debunking efforts about what you've been saying?
6      A.  I've told you like, I don't live, eat,
7  breathe, sleep, this stuff.
8      Q.  I get you.  I'm just asking questions.
9      A.  I'm just really -- if I had it all over to do,
10 I'd do a better job; but I didn't do it on purpose be
11 malicious.  And everybody wanted to have debates about
12 it; and I said years ago -- probably, like, five years
13 ago I said, "No more of this.  I'm sick of it.  It's a
14 tar baby.  I think it probably happened."
15         But then we'd see stuff in the cover-up
16 and them never releasing documents and the Hartford
17 Current saying, "It looks like a cover-up's going on.
18 We don't think it's a hoax; but, you know..."
19         And so it's just a tar baby.  I'm sick of
20 it.  And so that's why there's so many apologies and
21 statements that I'm sorry, you know, that I was even
22 ever covering it because I don't want it to be my
23 identity.  I'm tired of it.
24     Q.  What question are you answering?
25     A.  I mean, I'm answering your question about, you

---

148

1  know, these debates in this; and I'm trying to state --
2  what I'm saying is we invited everybody on.  We had
3  debates.  And if I remember that debate correctly, isn't
4  that when Halbig really got mad was because we pretty
5  much, you know, disagreed with him?
6          MR. BANKSTON:  Can you scroll up?
7          (The reporter complies.)
8          THE WITNESS:  I mean, I'm really trying
9  to be helpful.
10     Q.  (BY MR. BANKSTON)  Mr. Jones, I asked you:  Do
11 you know C.W. Wade?
12     A.  I don't know him, no.
13     Q.  Thank you, sir.
14         I want to talk a little bit about
15 InfoWars, LLC.  Have you ever taken money from InfoWars,
16 LLC?
17         MR. BARNES:  Objection.  And my
18 instruction is to privacy.  Unless it's Sandy Hook
19 specific or relevant, I'll instruct the witness not to
20 answer consistent with the constitutional right to
21 privacy protected under both the Texas Constitution and
22 the United States Constitution.
23         MR. BANKSTON:  Wow.  Okay.  We'll take
24 that up another day, I guess.  Wow.
25         MR. BARNES:  I mean, I can go to other

---

149

1  cases if you want me to.
2          MR. BANKSTON:  I mean, I don't at all,
3  Mr. Barnes.
4      Q.  (BY MR. BANKSTON)  InfoWars, LLC, has it ever
5  had any money?
6          MR. BARNES:  Objection, same instruction
7  to the witness not to answer on the grounds of privacy.
8      Q.  (BY MR. BANKSTON)  What is InfoWars, LLC?
9      A.  I don't believe it's even an operating
10 company.
11     Q.  So it's your allegation it's not an active
12 corporation by the Secretary of State?
13     A.  You know, I'm not the expert on this.  So I
14 probably shouldn't answer it because I don't want to
15 state it wrong, but I...
16     Q.  Okay.  You made InfoWars, LLC; you created it?
17     A.  You know, I'm not one of the lawyers.  So I
18 don't want to answer it wrong.
19     Q.  Nobody else is involved.  It's nobody else's
20 company, right?
21         MR. BARNES:  Objection and instruct the
22 witness not to answer on the grounds of privacy that
23 could also invade the privacy of third parties.
24         MR. BANKSTON:  Okay.
25     Q.  (BY MR. BANKSTON)  InfoWars, LLC, what does it

---

Alex Jones - 3/14/2019

150

1  do?  What has it ever done as a business?
2      A.  I don't know.
3      Q.  Okay.  Do you have any job duties at InfoWars,
4  LLC?
5      A.  I mean, as you heard, I'm not going to get
6  into structure of things.  Plus, I'm not a CPA or a
7  lawyer.  I don't want to say it wrong.
8      Q.  Okay.  Have you ever had job duties at
9  InfoWars, LLC in the past?
10      A.  I don't want to say -- I mean, I think I'm the
11  only -- it's -- I'm the sole person.
12      Q.  Has InfoWars, LLC ever had an office?
13      A.  I really don't understand.  I don't know what
14  you're getting at.
15      Q.  Do you know what an office is?
16      A.  No, I don't understand.  Like, you're asking
17  me whether a corporation has an office.
18      Q.  Uh-huh.
19      A.  The company has offices at Free Speech
20  Systems.
21      Q.  Well, so if I was to ask you:  Does Free
22  Speech Systems have an office, the answer's "yes"?
23      A.  I think, yeah, it's on the letterhead, yeah,
24  that's what...
25      Q.  Okay.  Let's try InfoWars.  Does InfoWars, LLC

151

1  have an office?
2      A.  You know, I don't want to inaccurately answer
3  that, so I can't.
4      Q.  Okay.  Who would be the person at InfoWars,
5  LLC who could answer that?
6      A.  You know, the corporation got set up a long
7  time ago; and I'm not sure who you'd ask those
8  questions.
9      Q.  Okay.  Now, when it comes to Free Speech
10  Systems, LLC, you're the boss?
11      A.  Uh-huh.
12      Q.  There's nobody with more power at Free Speech
13  Systems, LLC than you?
14      A.  I make all the major decisions.  I'm the --
15  the buck stops with me.
16      Q.  You make final call on anything that goes to
17  air?
18      A.  I mean, I don't sit there and watch over
19  everything.  I try to have good people that are smart
20  and are trying to tell the truth.
21      Q.  But, I mean, you have the authority.  If
22  something's going to air and you find out and you don't
23  want it on air, you can stop it?
24      A.  Yes.  I told you:  The buck stops with me.
25      Q.  Okay.

152

1          THE WITNESS:  Can I have a water, please?
2  Thanks.
3          MR. ENOCH:  Sure.  There's not an extra
4  cup.
5          THE WITNESS:  It's fine.
6          MR. ENOCH:  I'll just give you a coffee
7  cup.
8          THE WITNESS:  Thank you.
9          Is it okay to break for ten minutes and
10  eat?
11          MR. BANKSTON:  Yeah.  You know what, this
12  is not a bad spot.  We're at 3:30 right now.
13          THE WITNESS:  Thanks.  All I need is ten
14  minutes.
15          MR. BANKSTON:  Ten or fifteen is fine.  I
16  mean, if we can come back here by 3:50, I can get us out
17  of here before 5:00.
18          THE VIDEOGRAPHER:  Off the record at
19  3:29 p.m.
20          (Off the record from 3:29 to 3:42 p.m.)
21          THE VIDEOGRAPHER:  We're back on the
22  record at 3:42 p.m.
23      Q   (BY MR. BANKSTON)  When was the last time you
24  did anything for InfoWars, LLC?
25      A.  I'm sorry.  I can't accurately answer that.

153

1      Q.  Was InfoWars, LLC in the news business?
2      A.  I don't think I can accurately answer that.
3      Q.  We've talked a lot about Free Speech Systems
4  employees today, like Mr. Dew.  Did Mr. Dew ever do
5  anything for InfoWars, LLC?
6      A.  InfoWars, LLC's a real corporation.  It's
7  inactive.  And it was set up to deal with something like
8  intellectual properties or something, like, ten years
9  ago; and that was just kind of like a basic corporate
10  structure.  It's pretty standard, I'm told; but I'm not
11  a lawyer.  And so -- but, I mean, it's filed with the
12  State.  It's up to date.  It's just not -- I think the
13  things we were going to do with it we never did fully.
14  I think that's -- but I'm not a lawyer, but that's the
15  best of my understanding of that.
16          MR. BANKSTON:  Object as nonresponsive.
17      Q.  (BY MR. BANKSTON)  I asked you if Mr. Dew had
18  ever done anything for InfoWars, LLC.  Is that "yes" or
19  "no"?
20      A.  I don't believe so.
21      Q.  Okay.  What about -- help me with this name --
22  Tim Fruge?
23      A.  "Fruge."
24      Q.  "Fruge."  Did Tim Fruge do anything for
25  InfoWars, LLC?

---

154

1    A.  No.

2    Q.  Does InfoWars, LLC have anything to do with

3  the InfoWars, LLC website?

4    A.  I don't want to state it wrong, but I think

5  so.  Yeah, I think that's the whole point is that

6  different things had a different company.

7    Q.  Okay.  Regarding sourcing, would you put

8  information on the air from a source if nobody at

9  InfoWars knew their identity?

10   A.  No, not generally.

11   Q.  Okay.  And that's because if you can't verify

12  their identity of who's telling you the information, you

13  can't assess its credibility, can you?

14   A.  Well, if we got an anonymous call that there

15  had been a gas explosion in South Austin, we'd go see if

16  that was the case or if we looked up and saw smoke, not

17  that I'd normally cover something like that; but we've

18  actually got calls like that before.

19       Like, the morning of 9/11 I got a call,

20  "Hey, have you seen that something flew into The World

21  Trade Center?"

22   Q.  Sure.

23   A.  I mean, it was just -- so it's not -- I'm

24  trying to answer the question simply.  But if somebody

25  calls up and say somebody's a bank robber and there's no

---

155

1  evidence of that, we don't cover it.  99 percent of the

2  time we report on what is already in the news or

3  something that's said in Congress or something that is

4  already out there and we just give our comment on it.

5    Q.  Let me go back to your example.  Say you got

6  an anonymous call that in South Austin there'd been an

7  explosion, right?  You would take steps to confirm that

8  that explosion had occurred?  Send somebody over there?

9    A.  Yes.

10   Q.  And in corroborating, once you were -- felt

11  confident that there was an explosion, then at that

12  point you should notify the public because that could

13  save lives, couldn't it?

14   A.  Sure, yes.

15   Q.  Okay.  Now, if an anonymous person called you

16  and told you that there was an explosion and you didn't

17  send anybody out to go confirm the explosion, reporting

18  the explosion on the air could cause problems, correct?

19   A.  Yes.

20   Q.  Okay.  Let me just ask you really quick going

21  back to this nondisclosure agreement that we discussed

22  earlier that you can't tell me about the identity or the

23  subject matter.  Okay?  I do want to know:  What did you

24  agree to do?

25   A.  I can't get into the specifics of the

---

156

1  nondisclosure agreement.  You were asking sources on

2  Vegas, and we have particularly good ones on that.

3    Q.  Okay.

4    A.  And then...

5    Q.  But in terms of your legal obligations, that's

6  also something you're not prepared to talk about today?

7    A.  Yes.  I had to sign a nondisclosure agreement

8  before I was allowed to see something.

9    Q.  Okay.  I want to ask you a little bit more

10  about Wolfgang Halbig.  Now, Wolfgang Halbig was a

11  former security officer at a school, correct?

12   A.  Yes.

13   Q.  He has sold security plans and security

14  consulting services across the nation, correct?

15   A.  Yes.

16   Q.  He was one of the -- you would agree with me

17  he was one of the most aggressive people in trying to

18  publicize the idea that Sandy Hook was a fake?

19   A.  Yes.

20   Q.  How did you meet?

21   A.  I never met him -- well, no.  I don't know if

22  he's ever been in the studio.  I've never met him.  It

23  all blurs, with Skype or audio; but I don't remember.

24   Q.  So your conversations with him generally

25  aren't face to face?

---

157

1    A.  They were on air.

2    Q.  On your radio or web show, you mean?  Those

3  are the places you would typically talk to Wolfgang?

4    A.  Yes, uh-huh.

5    Q.  Did you ever communicate in any other ways?

6    A.  I vaguely remember talking to him on the phone

7  a couple of times.

8    Q.  Okay.  Do you think you've ever e-mailed

9  Wolfgang Halbig?

10   A.  I think we've responded back to his e-mails,

11  yes.

12   Q.  Okay.  And he's e-mailed people on your staff?

13   A.  A lot.

14   Q.  A lot.  What did you do to vet him?  How did

15  you assess his credibility?

16   A.  We looked him up and he'd been on national

17  television as an expert and he'd been with the state

18  police and then he'd been a security -- head of security

19  at a school.  And at first a lot of what he said

20  sounded -- he was more credible, and I think he

21  genuinely believed what he was saying.  And then he had

22  that professor coming out from Florida -- I forget his

23  name -- and just a bunch of other people.  It was just a

24  big firestorm on the Internet and we covered that

25  firestorm and I gave my opinions on it.

---

158

1    Q.  So what I think I'm hearing from you is he's
2  been on TV?  He was --
3    A.  Well, no.  I mean, he was a state police
4  officer and then he was the head of school security at a
5  school and then he was a nationally recognized -- as
6  least according to the big national shows I saw, I guess
7  that were mainstream; they must have vetted it -- that
8  he was this really big credible guy.
9    Q.  So are you saying that he had a resume of such
10  that you did not feel the need to fact-check or
11  corroborate his allegations?
12        MR. BARNES:  Objection as to form.
13    A.  We did try to fact-check it; but because there
14  was such a wall of secrecy up around it, around Sandy
15  Hook, that the Hartford Current and others noted,
16  unprecedented, that allowed that darkness for, you know,
17  things not to be checked out.
18    Q.  (BY MR. BANKSTON)  Well, let's take them one
19  by one.  Mr. Halbig said the thing about the
20  Port-A-Potties, right?  Do you know what I'm talking
21  about, the Port-A-Potties?
22    A.  Yes.
23    Q.  Okay.  That wasn't hidden behind a cloak of
24  secrecy.  That's in a video that's been public for six,
25  seven years, right?

159

1    A.  Well, I don't think that that piece of
2  information has been proven one way or the other.  I
3  think they did deliver Port-A-Potties pretty quick.
4    Q.  EMTs were in the building, right?  And that's
5  been public for six or seven years.
6    A.  Most of those reports were blacked out.
7    Q.  You know EMTs were in the building?  That's
8  borne out in multiple reports.
9    A.  In the report itself, the police officer said
10  it didn't look normal; things didn't look right.  That
11  was the kind of thing we were reading.
12    Q.  Okay, Mr. Jones.  You know about what
13  Mr. Halbig did up in Newtown, right?  You know about his
14  activities there?
15    A.  Earlier you played the Bidondi tape.  That was
16  Bidondi saying those things, you notice.  So I'm not
17  sure what you're going to ascribe to me that I'm not
18  involved in.  I don't know what Bidondi did in Newtown
19  after a certain -- after about a year or so.
20    Q.  You know he almost got arrested at the United
21  Way.  You know about that, right?
22    A.  No.
23    Q.  You've talked about that on your show.
24    A.  I don't remember.
25    Q.  You don't remember what happened at the United

160

1  Way with Mr. Halbig?
2    A.  I don't remember some things I talked about
3  two weeks ago on my show.
4    Q.  Definitely you don't remember him almost
5  getting in a brawl with a fireman at a firehouse in
6  Newtown?
7    A.  No.
8    Q.  You certainly knew he was harassing parents up
9  there?
10    A.  No.  I remember hearing that there were some
11  fracases going on; and that's when I said, "I don't want
12  to have him on the show anymore."
13    Q.  And then e-mailed about his associate,
14  Jonathan Reich, who was up there with Mr. Bidondi and
15  Mr. Halbig, getting arrested for harassing a Sandy Hook
16  parent?  You knew about that?
17    A.  Vaguely aback at the time.
18    Q.  Yeah, you know who Jonathan Reich is, don't
19  you?  That's been told to you plenty of times.
20  Mr. Halbig tried to get you to support his case, right?
21    A.  He sent thousands of e-mails.  I haven't read
22  any of them, really.
23    Q.  You know who Lucy Richards is, don't you?
24    A.  No.
25    Q.  Even today, you don't -- sitting here today,

161

1  you don't know who Lucy Richards is?
2    A.  I don't.
3    Q.  Okay.  You don't know that there was a woman,
4  an InfoWars follower, who went to Federal prison for
5  stalking and threatening to kill Sandy Hook parents and
6  that she's now barred from ever seeing InfoWars again by
7  court order?
8    A.  I read about a woman and the media alleging
9  that.
10    Q.  And you know that happened in central Florida
11  very shortly after you disclosed Mr. Pozner's personal
12  e-mail address and maps to where he picks up his mail;
13  you know that, right?
14    A.  No, I do not.
15    Q.  Okay.  You didn't know where that occurred?
16    A.  No, I did not do what you said I did.
17    Q.  Okay.  One of the things that you told me,
18  Mr. Jones, is that Sandy Hook has been one-tenth of
19  1 percent of what InfoWars covered, correct?
20    A.  Yes.
21    Q.  How did you determine that?
22    A.  It's a dead reckoning.  I mean, if you look at
23  four hours on average a day, five days a week, a couple
24  of hours on the weekend or more, probably three or four
25  every weekend, you add -- I mean, I've sat there and

162

1  added it up and talked to everybody around the office,
2  it's like we covered it.  You know, somewhere it
3  happened and we're into it and then it was just all over
4  the Internet with debates back and we looked it up and
5  went over the videos and maybe there were part of maybe
6  20 shows or so.  And then you look at some were, like,
7  usually 30 minutes to an hour; some were a little
8  longer.  And then you add that to just the 300 and
9  something days a year we're on air -- 340 or so, I'd
10  say -- and you look at all that and you add it into all
11  the shows and everything and it's just, like, tiny.
12           And then once Hillary announces that it's
13  my identity, then the media kind of just took who I was
14  at InfoWars and applied it to everybody else; and then
15  just the whole thing became this big tornado.  And, I
16  mean, I -- so in this instance it's been somewhat more
17  of me responding to it and things.
18           And then when the media was editing what
19  I was saying to make it look like I was, you know,
20  making statements that they wanted to be hearing so it
21  could be an ongoing thing.
22           And I really woke up when Parkland
23  happened and they said that I was saying nobody died and
24  they were all actors.  I was like, "Whoa," because I was
25  dead clear on that when that happened.  I just said they

163

1  picked the kids from the drama club that they
2  interviewed, saying, "We're in the drama club, and we're
3  anti-guns."  And I said that they picked good-looking,
4  well-spoken people out of 3,000 who wanted to be the
5  spokespersons against guns.  That didn't mean that the
6  event didn't happen.
7           And I did -- we did break that the police
8  stood down, and that's now come out.  I don't know why
9  they stood down.  We did point that out.
10           So I really was like:  Whoa.  You're not
11  going to say every mass shooting that happens that I'm
12  saying it didn't happen.
13           MR. BANKSTON:  Can you scroll back to my
14  question?
15           (Reporter complies.)
16           THE WITNESS:  That was the scary point
17  when every mainstream media was like -- I was like:
18  Wow, these people really are crooks.
19           MR. BANKSTON:  Thank you.
20      Q.  (BY MR. BANKSTON)  Here's my question,
21  Mr. Jones:  How in the world would you know how much
22  you've covered Sandy Hook, one-tenth of 1 or -- 10
23  percent [sic] when we, the Plaintiffs, have asked you to
24  produce us every video that has Sandy Hook in the title;
25  and you can't even do that?  You haven't produced those

164

1  to us.
2      A.  Videos from where?
3      Q.  From you.
4      A.  No, from after -- after you and other law
5  firms lobbied to have us taken off the Internet, which
6  had the index of it on YouTube and other platforms, like
7  Roku, "Oh, he's doing it right now.  Get it off right
8  now.  He's coming after the kids right now," knowing
9  full well that's not going on.
10           You're lobbying against the First
11  Amendment and you are then at the same time trying to
12  take down all of what I really said and then edit things
13  together and that's the only record.  And we went and
14  looked.  There's maybe 20 shows, maybe another probably
15  50 times callers calling up.  That's what we know of.
16  I'm sure there's more we don't know about.  And we added
17  all that together with a calculator and we looked at the
18  number and it's literally not even one -- maybe
19  one-tenth of 1 percent of all the air time we've done is
20  Sandy Hook.
21      Q.  So you found some shows, 20 something shows
22  with Sandy Hook in it?
23      A.  That's a dead reckoning, but yes.
24      Q.  Why haven't you given them to me, Mr. Jones?
25           MR. BARNES:  Objection and, in fact --

165

1      A.  We have given you everything we could find.
2      Q.  (BY MR. BANKSTON)  Because the truth is you
3  can't even search by title, can you?  You don't have an
4  index.  You have no idea, correct?  You can't search by
5  title?
6      A.  No, but we have -- we -- well, actually, we do
7  have it.  It's Prism planted on tv, and we can search.
8  And we searched all the names they had in the title, but
9  that doesn't mean that a caller didn't call in and it
10  didn't get said somewhere, but we've done the best we
11  can to go through all that stuff.
12      Q.  Really?  If you go to tvinfowars.com and you
13  search Sandy Hook Vampires Exposed, that'll come up?
14      A.  tv.infowars.com is a defunct URL that pointed
15  at Prism planted, not tv.
16      Q.  Okay.
17      A.  So -- and you know that.  We've put -- there
18  was a big deal about that.
19      Q.  Yeah, I just got sent a link that said --
20      A.  Okay.  Well, let me -- listen.  We've never --
21  we don't take our stuff down unless Twitter -- because
22  the lawyers on your side complain and say, "He's doing
23  this.  Take it down."  And then Twitter doesn't take
24  your stuff down; they order you to.
25      Q.  Uh-huh.

166

1    A.   Okay?  But that's the same thing as taking it
2  down.
3    Q.   And when that happened, Mr. Dew, when he tried
4  to preserve that, when he deleted that stuff --
5    A.   No, we had it preserved when we did it.
6    Q.   Yeah, but he said in his affidavit he lost
7  user comments, didn't he?
8    A.   Those are us.  Twitter's us, not user
9  comments.
10   Q.   No, I know.  There's user comments on your
11 Twitter threads, and they were lost when you deleted
12 them, weren't they?
13   A.   You guys were the ones lobbying to have me
14 taken off the Internet.
15   Q.   I'm not --- I don't care about any of that.
16 I'm just asking you:  Were those deleted?
17   A.   (No audible response.)
18   Q.   Those comments are lost and will never be
19 recovered and Mr. Dew admits it.
20   A.   Sandy Hook lobbied to have my Twitter taken
21 down.  The whole thing was taken down.
22   Q.   I know.  And you didn't do anything to
23 preserve it before that happened, did you?
24   A.   Oh, so you get it taken down; and then it's my
25 fault?

167

1    Q.   No.  I'm asking you:  When did -- you
2  reasonably anticipated litigation the moment you were
3  sued, right?  When you were sued on April of 2018, you
4  knew that all that information was relevant, right?
5         MR. BARNES:  Objection, calls -- as to
6  form.  Also objection to the degree any of the questions
7  are asking about attorney-client communications, then
8  you're instructed not to answer to disclose any
9  information that comes from attorney-client
10 communications.
11   Q.   (BY MR. BANKSTON)  Let me ask it a different
12 way, Mr. Jones --
13   A.   We sent letters to Twitter and to Google
14 requesting that they not take us down and that they save
15 it.  When they did, we said, "Please turn it back on or
16 give us the full records."
17   Q.   Let me make it very clear.  After you were
18 sued, the information existed; it was available to you.
19 And then, later, it was deleted; and those comments are
20 gone.  That's true?
21         MR. BARNES:  Objection as to form.
22   A.   By Twitter.  Twitter took the account down.
23   Q.   (BY MR. BANKSTON)  Right.  I understand that.
24 So before Twitter took that account down, you took no
25 efforts to preserve any of that information?

168

1    A.   Yes, we did.  It's all -- I think that stuff's
2  saved on their site.  The full service is to copy it.
3  What you're saying's not true.
4    Q.   And Mr. Dew admits that in his affidavit, that
5  InfoWars didn't save that in its local capture, it
6  didn't, right?
7         MR. BARNES:  Objection, calls -- as to
8  form.
9    A.   I'm not an IT person.  I can't accurately
10 answer all that.
11   Q.   (BY MR. BANKSTON)  Okay.  So in terms of
12 whether InfoWars failed to preserve evidence that might
13 be relevant to this claim, you're not the right person
14 to ask?
15         MR. BARNES:  Objection as to form.
16   A.   I mean, I think despite the -- according to
17 effort by the media and universally establishment to
18 take all our content offline, we've done a pretty good
19 job of saving almost all of it at infowars.com and at
20 prismplay.com.  So that's really not an accurate
21 statement.
22   Q.   (BY MR. BANKSTON)  But you can't even search
23 it by title?  You have no idea how many videos have
24 Sandy Hook in the title?
25         MR. BARNES:  Objection as to form.

169

1    Q.   (BY MR. BANKSTON)  We know there's videos of
2  Sandy Hook in the title that don't show up on these
3  planetinfowars searches, right?  We know that.
4         MR. BARNES:  Objection as to form.
5    A.   There's no planetinfowars.
6    Q.   (BY MR. BANKSTON)  Whatever you want to call
7  it, Mr. Jones, you have a video archive that's up right
8  now, right?  You have a video archive that's searchable
9  online.  Do you agree or disagree?
10        MR. BARNES:  Objection as to form.
11   A.   Yes.
12   Q.   (BY MR. BANKSTON)  Okay.  On that archive
13 there are videos that have been produced in this lawsuit
14 with Sandy Hook in the title that are not in that
15 archive?
16   A.   Well, that's because you're getting other
17 people's videos offline.  Like, you get them from Media
18 Matters and then you say that's our video and then you
19 want us to produce someone's edited video.
20   Q.   Sorry, Mr. Jones.  When you upload a video to
21 YouTube, you choose the title, don't you; or does
22 YouTube give you the title?
23   A.   I don't think you understand.
24   Q.   No.  So let's take an example of a video.
25 Sandy Hook Narratives, False Narratives Versus the

170

1  Realty, a video that has that title should be showing up
2  in your archives, right?  That's what you're saying?
3      A.  The vast majority of videos of us are not us.
4  Other people get our videos and then put them together
5  with other things.  You understand that.
6      Q.  No, no, Mr. Jones, that's not what I'm saying.
7          Do you have Mr. Zipp's affidavit in front
8  of you?  Hold on.  No, in fact, Mr. Jones, I don't need
9  to make you run back through that.  Let's not even worry
10  about it.
11         I've just got a couple more questions for
12  you, Mr. Jones.  The year before you were sued, you said
13  that, "Everything I've heard is that the parents weren't
14  allowed to touch the children."  Who did you hear it
15  from, and what did they say?
16         MR. BARNES:  Objection as to form.
17      A.  I don't know the specifics of what you're
18  talking about, so I don't want to state something
19  incorrectly.
20      Q.  (BY MR. BANKSTON)  Okay.  So this statement,
21  everything you've heard is that the parents weren't
22  allowed to touch the children, you can't comment on that
23  today?
24         MR. BARNES:  Objection as to the form.
25      A.  I don't want to state it exactly -- I want it

171

1  to be exactly right or I don't want to state it.  So
2  that's -- I mean, you say everything I've heard.  I
3  don't know the specifics, but I remember complaints and
4  things that the parents couldn't get to their kids until
5  they'd been taken later to the morgue and things like
6  that.
7      Q.  (BY MR. BANKSTON)  Can you show me any one
8  human being in the world who told you the parents
9  weren't allowed to touch the children?
10      A.  I believe that was in the newspapers.
11      Q.  Okay.  What about, "They're finding people in
12  the back woods that are dressed up in SWAT gear"?
13  That's not true, is it?
14      A.  I saw it on the national news.
15      Q.  You saw somebody in SWAT gear in the woods?
16      A.  Yeah, black and camouflage.  The police
17  arrested him and there was a SWAT drill in the area.
18      Q.  No, Mr. Jones.  I'm asking you:  Did you see a
19  video of a man in SWAT gear being arrested?
20      A.  I saw them -- the helicopter talking about
21  him, and they said they later arrested a man.
22      Q.  So when you told your audience he was dressed
23  up in SWAT gear, that's just something you made up,
24  isn't it?  There's nobody dressed up in SWAT gear?
25      A.  I do remember that being on the news.

172

1      Q.  What being on the news?
2      A.  The helicopter and the man behind the school
3  and the report of the guy in the SWAT gear and the
4  police saying they arrested him, and later they said
5  they didn't.
6      Q.  Yeah, two reporters with cameras made reports
7  about that.  There's no man in SWAT gear in that video,
8  is there?  That's just something you made up.
9      A.  Nope, I didn't make it up.
10      Q.  So you think you can produce to me a video of
11  a man in SWAT gear in the woods?
12      A.  I remember that's what was being reported on
13  the news.
14      Q.  Okay.  So now it's not you saw it in a video.
15  Now, it's somebody else saying it?
16      A.  But I remember seeing a guy and it looked like
17  in the video that he was in camo and black.
18      Q.  Okay.  First of all, camo and black, what does
19  that mean?  He had camo pants on?
20      A.  I mean, I would tend to think that means kind
21  of a paramilitary outfit.
22      Q.  Okay.  So anybody you see who has camo pants
23  on when you're walking down the street, you're like:
24  That guy's paramilitary?
25         MR. BARNES:  Objection --

173

1      Q.  (BY MR. BANKSTON)  Is that your belief?
2         MR. BARNES:  Objection as to the form.
3      A.  I really -- I told you what my memory is.
4      Q.  (BY MR. BANKSTON)  Is it fair to describe any
5  gentleman wearing camo pants as being dressed in SWAT
6  gear?  Do you think that's an honest and accurate way to
7  describe that?
8         MR. BARNES:  Objection as to the form.
9      A.  Yeah, I think that's a fair way to describe
10  it.
11      Q.  (BY MR. BANKSTON)  Oh, so you -- what I'm
12  trying to get at, Mr. Jones, is:  You don't think saying
13  that a man who is dressed up in SWAT gear found behind
14  the school when he's not actually wearing any SWAT gear
15  is in any way alarmist or dangerous to say?
16         MR. BARNES:  Objection as to the form.
17      Q.  (BY MR. BANKSTON)  Oh, you can answer,
18  Mr. Jones.
19      A.  I mean, this is like seven years ago, so I'm
20  trying to remember.  I mean, I remember seeing the guy
21  in looked like what I'd call police gear, kind of
22  paramilitary gear.  I remember, like, camo and black or
23  something.  I'm not -- again, I'm not living this every
24  day.  I'm not -- and I -- and I'm very sad for folks,
25  you know, who have had to go through it and I'm sorry

22-01023-tmd Doc#1-10 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 143 of 285

Alex Jones - 3/14/2019

174

1 for tragedies. And I kind of feel sorry for you having
2 to live through it all the time and knowing every detail
3 and every angle and everything else, but I just...
4    Q.   It's hard.
5         Mr. Jones, what we were just talking
6 about, men being arrested in SWAT gear in the woods --
7    A.   I don't think I said "men." If I said that, I
8 misspoke.
9    Q.   Okay. Well, even if you said "man" in SWAT
10 gear in the woods, you said that just a year before you
11 were sued. That's not seven years ago, is it?
12   A.   I was going over why people had -- the
13 anomalies -- some accurate, some not accurate -- why
14 people had questions.
15   Q.   Yeah, but it's real recent, Mr. Jones. This
16 thing about, "Oh, it was seven years ago, I can't" --
17 that was just three --
18   A.   I questioned Jussie Smollett just the day it
19 happened.
20   Q.   And now --
21   A.   That was just like a month ago.
22   Q.   Exactly. And you know about that. You have
23 no memory problems there.
24   A.   I'm proud of it.
25   Q.   You just have memory problems when it comes to

175

1 Sandy Hook?
2    A.   Well, seven years from now the specifics of,
3 like, if I've done 20 broadcasts on it --
4    Q.   Mr. Jones, this isn't seven years ago. I'm
5 asking you about 2017.
6    A.   I know; but is it okay to question Jussie
7 Smollett, or was that act evil?
8    Q.   Mr. Jones, I'm asking you about 2017. Was
9 2017 so long ago it's hard for you to remember?
10        MR. BARNES: Objection as to the form.
11   A.   I have gone over the anomalies, and I remember
12 seeing that footage and I -- that's why people
13 questioned.
14   Q.   (BY MR. BANKSTON) Who was involved in fact-
15 checking those anomalies? Tell me all the employees who
16 would be involved in that.
17   A.   All right. I think myself and Rob Dew and a
18 few others. Like I said, normally, we're just reporting
19 on news that's already out there. I'd say 98, 99
20 percent, it's just going: Hey, look this just happened.
21 Trump just said this. Hillary just said that. What do
22 you think?
23   Q.   Okay, Mr. Jones. You will admit to me that of
24 all these things that you have said, all the factual
25 claims you've made about Sandy Hook over the years, that

176

1 if you were wrong about them, that it would be
2 reasonable to understand that the parents would be very
3 upset?
4         MR. BARNES: Objection as to the form.
5    A.   I am not the only person who questioned Sandy
6 Hook, and I legitimately asked those questions because I
7 had concerns. And I resent the fact that the media and
8 the corporate lawyers and the establishment, the
9 Democratic party, who are trying to make this my
10 identity, brought it up, constantly repeated it, tricked
11 me into debating it with them so that they could say
12 that I was injuring people. And I see the parties that
13 continually bring this up and drag these families
14 through the mud as the real villains, the conscious
15 villains attempting to shore up the First Amendment in
16 the process. I do not consider myself to be that
17 villain.
18        I could have done a better job, in
19 hindsight, and I've apologized for that; but I've seen
20 the very same corporate media and lawyers continue to
21 say that I'm saying all these things and exaggerating
22 and using it against the First Amendment and I think
23 that's very dangerous and despicable.
24   Q.   Mr. Jones, do you think I'm a corporate
25 lawyer?

177

1    A.   Well, I know full well that when Hillary
2 Clinton lost the election is when all this started. And
3 I'm like, "Hey, I think Sandy Hook happened." And you
4 and others continually are in the news; and I remember
5 first in this lawsuit you were like, "All Jones needs to
6 do is say he's sorry to some parents." I'm like: I am
7 sorry that this has all been out of context and that
8 your kids died, and that was all ignored. So I've seen
9 the real disingenuousness and the fact that this is all
10 just a cold-blooded, you know, fit because Hillary lost
11 the election.
12   Q.   So do you think I work for Hillary Clinton or
13 something or George Soros gives me money or something
14 like that?
15   A.   Well, I mean, I know this: When Hillary lost,
16 the light switch went on. I'd never been sued, and I
17 got sued a bunch.
18        And then you've got all the corporate
19 media --
20   Q.   Wait, wait, wait.
21   A.   -- working in tandem. And I know you're
22 working with a Connecticut case and doing all that and
23 triangulating all that stuff. So let's not -- let's
24 not -- and there's going to be some other things coming
25 down the road where all that will come out.

178

1    Q.  When were you sued?
2    A.  I think it was early last year.
3    Q.  Yeah, like a year and a half after Hillary
4  Clinton lost, right?
5    A.  But they hadn't -- but they hadn't ever put
6  the final report out.  You needed the report because
7  they never would put the report out.
8    Q.  What report?
9    A.  The report came out a month before you sued
10  me.
11    Q.  Okay, Mr. Jones.  Wait.  What report, who --
12  what --
13    A.  The official Sandy Hook report.
14    Q.  What entity issued this report?
15    A.  It was put out by the local, state, and
16  federal government.
17    Q.  So you are going to sit here today and deny
18  that there has been an official Sandy Hook report, books
19  of it, online since December of 2013?
20    A.  Oh, there have been some redacted reports put
21  out; but it was a big deal in -- it went up to the
22  Connecticut Supreme Court.  It's a hugely litigated
23  situation of this thing being so suppressed.
24    Q.  Okay.  So you and your attorney have appeared
25  on your show to talk about this entire lawsuit being a

179

1  conspiracy against you to take you down?
2        MR. BARNES:  Objection as to form.
3    Q.  (BY MR. BANKSTON)  Correct?
4    A.  It's a conspiracy, as Clarence Thomas admits,
5  to get rid of New York Times versus Sullivan.
6    Q.  And you've called me and members of my law
7  firm devil people, correct?
8    A.  Not specifically, no.
9    Q.  Okay.  You've made money from every single one
10  of these broadcasts we saw today, right?
11    A.  No.  We actually lose money on really
12  controversial stuff.  We can actually see it.
13    Q.  Oh, so you can produce that to me?  You have
14  data on that?
15    A.  Absolutely.  We'd love to.
16    Q.  Okay.  And you have supplements you sell, too,
17  with these videos, correct?
18    A.  No, no.  The advertisement's separate from the
19  news.
20    Q.  Well, I mean, in these news broadcasts, you
21  advertise the sale of supplements, right?
22    A.  The two don't go together.
23    Q.  How do you mean they don't go together?
24  You're talking about the news and you put the news down
25  and all of a sudden you're talking Bone Broth and male

180

1  vitality and fluoride-free toothpaste and everything
2  else.
3    A.  Well, if we're talking about WMDs --
4    Q.  Hold on, Mr. Jones.  And then you put that
5  back down and you pick up the news and you start talking
6  about it in the same video, correct?
7        MR. BARNES:  Objection as to form.
8    A.  Well, it's like saying the Super Bowl goes
9  to -- and then the Super Bowl has Budweiser ads on the
10  walls.
11    Q.  (BY MR. BANKSTON)  Yeah, NBC makes money off
12  of its broadcasting, doesn't it?
13    A.  But, technically, that's not how -- our
14  advertising is separate from what is going on during the
15  program.  We don't do product placement.  And so, no,
16  the answer is:  Sandy Hook, before I was ever sued, lost
17  money.
18        9/11 Truth lost me almost all my radio
19  stations and lost money.
20        Those type of really controversial
21  stands, people don't like them; and they have crippled
22  us before these lawsuits.  And, I mean, in fact, we look
23  back and you can see where we're talking about Sandy
24  Hook and the listeners and everything goes down.
25    Q.  I mean, and really, if we look at this at the

181

1  end of the day, I mean, really you're the victim, aren't
2  you?
3    A.  No, but I've certainly learned a lot in the
4  process.
5    Q.  You've learned how not to be a reckless
6  journalist, right?
7        MR. BARNES:  Objection as to form.
8    A.  Well, I think certainly I have experienced
9  real fake news, watching the corporate media lie in my
10  name and put things out that I never did, in a concerted
11  effort.  So I've learned what I -- certainly the polar
12  opposite of what I want to be because I've never
13  consciously tried to lie or hurt people.
14        And I did not make money off saying 9/11
15  was an event where we allowed Saudis to attack us.
16  That's now come out.  I lost 127 something stations.  I
17  went down to about 30.
18        A lot of stations dumped us when we were
19  talking about Sandy Hook.  So if the statement is I say
20  these things and do these things to make money, that is
21  not what we are doing.  Money coming in is to fund the
22  operation, to promote really questioning things, and to
23  build an alternative system.  And it doesn't mean then
24  when you're being an alternative system that you're
25  perfect, but that's basically where I stand on that.

182

1    Q.  Okay.  I just do want to make sure.  It's not
2  a nonprofit situation; you're not doing this for the
3  charity of your own heart?
4    A.  No, I'm not like the nonprofits, the whole
5  conspiracy where they're buying the college admissions
6  and they call that a charity or Hillary's foundation,
7  no, I'm not running anything like that.
8    Q.  I have no idea what you're talking about,
9  Mr. Jones.
10    A.  Where these people make millions of dollars on
11  their tax-free charities, I don't do that.
12    Q.  Okay.  So --
13    A.  You were asking me if I was running a
14  nonprofit scam; and the answer is "no."  What I do is I
15  pay taxes.
16        MR. BANKSTON:  Mr. Jones, I think we're
17  about wrapped up today if you could give me just a small
18  break to make sure that we're all wrapped up, I think
19  we've got about 45 minutes left in the day; but I'm not
20  going to use it for you.  I'm going to let you get out
21  of here.
22        THE WITNESS:  I'm happy to.
23        MR. BANKSTON:  I mean, hey, if you want
24  to stick around and talk, we can talk; but we might need
25  to do that off the record.  We might not need to put

183

1  that on the testimony, but I'm happy to do that.  But
2  let's take just a quick break, and why don't ya'll give
3  us about five minutes?
4        MR. BARNES:  Okay.
5        THE VIDEOGRAPHER:  We're off the record,
6  4:14 p.m.
7        (Off the record from 4:14 to 4:28 p.m.)
8        THE VIDEOGRAPHER:  We're back on the
9  record at 4:28 p.m.
10    Q.  (BY MR. BANKSTON)  There's a couple of things
11  I was curious about, Mr. Jones.  Do you think that
12  there's a question that I should have asked you today in
13  deposition that I didn't?
14    A.  That's a good question.  What question you
15  should have asked me.  I can't think of any.
16    Q.  Okay, Mr. Jones.  You would agree with me that
17  when some damage happens, when you break something, when
18  you cause something to be lost, when you hurt somebody,
19  whether it's intentional or whether it's a mistake,
20  there's consequences for that, right?  People should be
21  accountable for the people they hurt?
22        MR. BARNES:  Objection as to form.
23    A.  Well, sometimes people claim they've been hurt
24  when they haven't been.  So you have to look at the
25  agenda behind things.  You have to balance things about

184

1  why has the mainstream media lied so much, why our
2  Government's lied so much, the fact that the public
3  doesn't believe what they're told anymore, and are we
4  going to criminalize questioning Jussie Smollett or WMDs
5  or babies in incubators.  And it really is the fact that
6  we've allowed the Government and institutions to become
7  so corrupt that people have lost any compass of what's
8  real.
9        And I, myself, have almost had like a
10  form of psychosis back in the past where I basically
11  thought everything was staged, even though I'm now
12  learning a lot of times things aren't staged.  So I
13  think as a pundit, someone giving an opinion, that, you
14  know, my opinions have been wrong; but they were never
15  wrong consciously to hurt people.
16        And so I think it's part of that process
17  of me growing up in Rockwall, Texas and watching the
18  police deal drugs and then conduct anti-drug programs in
19  the school, I think that shook my opinion of police in
20  general.  And I was very anti-law enforcement until I
21  grew up and learned more things, and now I'm pretty much
22  pro police.  So it's been a process.
23    Q.  (BY MR. BANKSTON)  You said false things about
24  Sandy Hook because it was psychosis?
25    A.  I --

185

1        MR. BARNES:  Objection as to the form.
2    Q.  (BY MR. BANKSTON)  Correct?
3    A.  Well, I'm just saying that the trauma of the
4  media and the corporations lying so much, then
5  everything begins -- you don't trust anything anymore,
6  kind of like a child whose parents lie to them over and
7  over again, well, pretty soon they don't know what
8  reality is.
9        So long before these lawsuits I said that
10  in the past I thought everything was a conspiracy and I
11  would kind of get into that mass group think of the
12  communities that were out there saying that.  And so now
13  I see that it's more in the middle.  All right?  So
14  that's where I stand.
15    Q.  (BY MR. BANKSTON)  And I'm little concerned
16  about something I heard in your answer, that it seemed
17  to be you suggesting that you weren't sure if these
18  parents have suffered pain from what you did.
19    A.  Well, I was stating that I was reporting on
20  the general questioning when others were questioning.
21  And, you know, it's painful that we have to question big
22  public events.  I think that's an essential part of the
23  First Amendment in America.  And I do not take
24  responsibility for the entire train of things that
25  lawyers and the media have said I've done.  So I do not

186

1  take the responsibility.  I do not take your indictment
2  or your presumed conviction of me as the villain or the
3  star of Homeland because that's not who I am.  And so I
4  reject it.
5      Q.  Saying, "The school is closed and was closed
6  for years," that's not questioning.  That's a statement
7  of fact, Mr. Jones, isn't it?
8          MR. BARNES:  Objection as to the form.
9      A.  I was going off what other people were saying
10  and the fact that the records were not forthcoming and
11  the Hartford Current headlined:  Why is There a
12  Cover-up?  Why Aren't There Documents Being Released?
13  Why is it Taking so Long?
14      Q.  (BY MR. BANKSTON)  "The EMTs weren't allowed
15  in the building," that's not a question, Mr. Jones.
16  That's a statement, correct?
17          MR. BARNES:  Objection as to the form.
18      A.  Again, that was my going off what someone else
19  who I believed to be a credible expert was saying.
20      Q.  (BY MR. BANKSTON)  Mr. Jones, are you finally
21  prepared to admit that you have, indeed, caused these
22  families a substantial amount of pain?  Are you prepared
23  to admit that?
24      A.  I am not prepared to sign on to whatever you
25  and the mainstream media make up about me.

187

1          MR. BANKSTON:  All right, Mr. Jones.
2  That will have to be it.  I will see you next time.
3          MR. BARNES:  One thing I was going to do
4  is just put this on record, just to make it -- the
5  confidentiality part.  Is that okay?
6          MR. BANKSTON:  Oh, yeah, that's stating
7  you're designating on the trial court?
8          MR. BARNES:  Yes.
9          MR. BANKSTON:  Please go ahead.
10          MR. BARNES:  So what we have is a
11  Protective Order for the 30 days following any
12  deposition, that the parties must treat all of the
13  deposition testimony and the exhibits and other
14  documents produced at any deposition as attorneys' eyes
15  only and so they're marked confidential until that time.
16  Thank you.
17          MR. ENOCH:  So no designation of
18  confidentiality is being made today.  We'll look at it.
19          MR. BANKSTON:  Absolutely.  The whole
20  thing's confidential right now.
21          MR. ENOCH:  That is the order, and we
22  have 30 days to designate confidential thereafter.
23          MR. BANKSTON:  Absolutely.
24          MR. ENOCH:  Very well.
25          MR. BANKSTON:  Okay.  I think we're done.

188

1          THE VIDEOGRAPHER:  We're off the record
2  at 4:33 p.m.
3          (Exhibit 12 marked.)
4          (Deposition adjourned at 4:33 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

189

1              CHANGES AND SIGNATURE
2  WITNESS NAME:        DATE OF DEPOSITION:
3  ALEX E. JONES        March 14, 2019
4  PAGE/LINE   CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____



190

1  _____

2  _____

3       I, ALEX E. JONES, have read the foregoing

4  deposition and hereby affix my signature that same is

5  true and correct, except as noted herein.

6

7            _____

8            ALEX E. JONES

9

10 THE STATE OF _____ )

11     BEFORE ME, _____, on

12 this day personally appeared ALEX E. JONES, known to me

13 (or proved to me under oath or through _____)

14 (description of identity card or other document) to be

15 the person whose name is subscribed to the foregoing

16 instrument and acknowledged to me that they executed

17 same for the purposes and consideration therein

18 expressed.

19     Given under my hand and seal of office on

20 this, the _____ day of _____, _____.

21

22

23            _____

24            NOTARY PUBLIC IN AND FOR

           THE STATE OF _____

           My Commission Expires:_____

25

191

1          CAUSE NO. D-1-GN-18-006623

2  SCARLETT LEWIS      * IN THE DISTRICT COURT OF
           Plaintiff        *

3                           *
                            *

4  VS.              * TRAVIS COUNTY, TEXAS
                            *

5  ALEX E. JONES, INFOWARS, *
   LLC, AND FREE SPEECH    *

6  SYSTEMS, LLC,           *
           Defendants     * 53RD JUDICIAL DISTRICT

7

8

9          REPORTER'S CERTIFICATION

         ORAL/VIDEOTAPED DEPOSITION

10              OF

           ALEX E. JONES,

11

       Taken on March 14, 2019

12

13     I, Debbie D. Cunningham, Certified

14 Shorthand Reporter in and for the State of Texas, hereby

15 certify to the following:

16     That the witness, ALEX E. JONES, was duly

17 sworn by me, and that the transcript of the oral

18 deposition is a true record of the testimony given by

19 the witness;

20     That the deposition transcript was

21 submitted on _____ to the witness

22 or to the attorney for the witness for examination,

23 signature, and return to me by _____;

24     That the amount of examination time used

25 by each party at the deposition is as follows:

192

1      BY MR. BANKSTON:

2      BY MR. ENOCH:

3      BY MR. OGDEN:

4      BY MR. BARNES:

5      That pursuant to information given to the

6  deposition officer at the time said testimony was taken,

7  the following includes counsel for all parties of

8  record:

9  COUNSEL FOR PLAINTIFF:

10     KASTER LYNCH FARRAR & BALL, LLP

       1010 Lamar, Suite 1600

11     Houston, Texas

       (T) 713.221.8300

12     By:  Mark D. Bankston, Esq.

       mark@fbtrial.com

13           AND

       William Ogden, Esq.

14

15 COUNSEL FOR DEFENDANTS:

16     GLAST, PHILLIPS & MURRAY, P.C.

       14801 Quorom Drive, Suite 500

17     Dallas, Texas

       (T) 972.419.8300

18     By:  Mark Enoch, Esq.

       mkenoch@gpm-law.com

19

           AND

20

       BARNES LAW, LLP          (PRO HAC VICE)

21     601 South Figueroa St., Suite 4050

       Los Angeles, California

22     (T) 213.294.3006

       By:  Robert E. Barnes, Esq.

23     barneslaw@barneslawllp

24     I further certify that I am neither

25 counsel for, related to, nor employed by any of the

193

1  parties or attorneys in the action in which this

2  proceeding was taken, and further that I am not

3  financially or otherwise interested in the outcome of

4  the action.

5      Further certification requirements

6  pursuant to Rule 203 of TRCP will be certified to after

7  they have occurred.

8      Certified to by me this day, March 25,

9  2019.

10

11

           _____

12     Debbie D. Cunningham, CSR

       Texas CSR 2065

13     Expiration:  June 30, 2021

       INTEGRITY LEGAL SUPPORT SOLUTIONS

14     3100 West Slaughter Lane, Suite A-101

       Austin, Texas 78748

15     www.integrity-texas.com

       512-320-8690; FIRM # 528

16

17

18

19

20

21

22

23

24

25

194

1    FURTHER CERTIFICATION UNDER RULE 203, TRCP

2    The original deposition/errata sheet was / was not

3  returned to the deposition officer on _____;

4    If returned, the attached Changes and Signature

5  page contains any changes and the reasons therefor;

6    If returned, the original deposition was delivered

7  to MR. BANKSTON, Esq., Custodial Attorney;

8    That $_____ is the deposition officer's

9  charges to the Plaintiff for preparing the original

10  deposition transcript and copies of exhibits, if any;

11    That the deposition was delivered in accordance

12  with Rule 203.3, and that a copy of this certificate was

13  served on all parties shown herein on _____

14  and filed with the Clerk.

15    Certified to by me on _____.

16

17

18

    _____

19  Debbie D. Cunningham, CSR
    Texas CSR 2065

20  Expiration:  June 30, 2021
    INTEGRITY LEGAL SUPPORT SOLUTIONS

21  3100 West Slaughter Lane, Suite A-101
    Austin, Texas 78748

22  www.integrity-texas.com
    512-320-8690; FIRM # 528

23

24

25

**From:** Paul Joseph Watson <watson-paul3@sky.com>
**To:** Buckley <buckley@infowars.com>, "anthony@infowars.com" <anthony@infowars.com>
**Subject:** Sandy Hook
**Date:** 2015-12-17 21:15:38 +0000

---

Sent this to Alex.

This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show. Plus the event happened 3 years ago, why even risk our reputation for it?

Sent from my iPhone

FSSTX-027752

CAUSE NO. D-1-GN-18-006623

SCARLETT LEWIS               *   IN THE DISTRICT COURT OF
    Plaintiff               *
                            *
                            *
VS.                         *   TRAVIS COUNTY, TEXAS
                            *
ALEX E. JONES, INFOWARS,    *
LLC, AND FREE SPEECH        *
SYSTEMS, LLC,               *
    Defendants              *   53RD JUDICIAL DISTRICT

ORAL/VIDEOTAPED DEPOSITION

OF

ROBERT JACOBSON

Wednesday, March 20, 2019


          ORAL/VIDEOTAPED DEPOSITION OF ROBERT JACOBSON,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on Wednesday, March 20, 2019, from

12:01 p.m. to 1:55 p.m., before Debbie D. Cunningham,

CSR, reported via Machine Shorthand at the offices of

Kirker Davis, LLP, 8310-1 N. Capital of Texas Highway,

#350, Austin, Texas 78731, pursuant to the Texas Rules

of Civil Procedure and/or any provisions stated on the

record or attached hereto.

2

1          APPEARANCES

2

3   COUNSEL FOR PLAINTIFF:

4        KASTER LYNCH FARRAR & BALL, LLP
          1010 Lamar, Suite 1600

5        Houston, Texas
          (T) 713.221.8300

6        By:  Mark D. Bankston, Esq.
              mark@fbtrial.com

7              AND
          William Ogden, Esq. (VIA PHONE)

8

9   COUNSEL FOR DEFENDANTS:

10       GLAST, PHILLIPS & MURRAY, P.C.
          14801 Quorom Drive, Suite 500

11       Dallas, Texas
          (T) 972.419.8300

12       By:  Mark Enoch, Esq.
              mkenoch@gpm-law.com

13

14

15   VIDEOGRAPHER:
          Joe Bazan

16

17

18

19

20

21

22

23

24

25

3

1               INDEX

2

3   APPEARANCES                    2

4

5   EXAMINATION OF ROBERT JACOBSON:

6   BY MR. BANKSTON                4

7

8

9   REPORTER'S CERTIFICATE         86

10

11

12

13          EXHIBIT INDEX

14  Exhibit Number   Description        Page

15  Exhibit 1   Non-Disclosure Agreement      10

16  Exhibit 2   12/17/18 Mark Enoch letter to   23
                Robert Jacobson

17

      Exhibit 3   Video clip          55

18

19

20

21

22

23

24

25

4

1       (Wednesday, March 20, 2019, 12:01 p.m.)

2          P R O C E E D I N G S

3          THE VIDEOGRAPHER:  We are on the record

4   for the videotaped deposition of Robert Jacobson taken

5   on Wednesday, March 20th, 2019.  The time is

6   approximately 12:01 p.m.

7          Will the court reporter please swear in

8   the witness?

9          ROBERT JACOBSON,

10   having been duly sworn, testified as follows:

11          EXAMINATION

12   BY MR. BANKSTON:

13     Q.  Good afternoon, Mr. Jacobson.  Can you

14   introduce yourself for our record?

15     A.  I am Robert Jacobson.

16     Q.  Okay.

17          MR. ENOCH:  Mark, I'd like to ask a

18   couple of questions and make a comment real quickly.

19          MR. BANKSTON:  I don't think you've been

20   given any orders from the Court to do any discovery.

21   So, no, Mr. Enoch, you're not asking this witness any

22   questions.

23          MR. ENOCH:  Mr. Jacobson --

24          MR. BANKSTON:  Mr. Enoch --

25          MR. ENOCH:  -- were you served with a

5

1   subpoena?

2          MR. BANKSTON:  Mr. Enoch, please point me

3   to the order in which you've been allowed to do any

4   discovery or take any questions of any witness.  Point

5   me to it, Mr. Enoch.

6          MR. ENOCH:  Please do not --

7          MR. BANKSTON:  Right now, point me to it.

8          MR. ENOCH:  Please do not interrupt.

9          MR. BANKSTON:  Then you're going to --

10   Mr. Enoch, stop talking to the witness.

11          MR. ENOCH:  Mr. Jacobson --

12          MR. BANKSTON:  Mr. Enoch, this deposition

13   will be suspended; and I will seek sanctions if you

14   speak one more time to this witness.

15          MR. ENOCH:  Mr. Jacobson, have you been

16   served with a deposition subpoena?

17          MR. BANKSTON:  Mr. Enoch, we're going off

18   the record.  We're done.  The deposition's done.

19          MR. ENOCH:  We are not going off the

20   record.

21          MR. BANKSTON:  The deposition is

22   suspended.

23          MR. ENOCH:  We are not going off the

24   record.

25          MR. BANKSTON:  You have no ability to

**6**

1  take any testimony, Mr. Enoch.  None.  Zero.
2        MR. ENOCH:  Mr. Bankston, I suggest
3  instead of getting emotional about it, if you'd let me
4  ask this question --
5        MR. BANKSTON:  No, we're not going to
6  allow you any questions, Mr. Enoch.
7        MR. ENOCH:  Please don't interrupt me
8  again.
9        MR. BANKSTON:  Mr. Enoch, you have no
10  right to ask your questions.  Before you ask that
11  question -- a single question to that witness again,
12  direct me to what authority you think you have to --
13        MR. ENOCH:  Did you serve a subpoena on
14  this witness?
15        MR. BANKSTON:  I don't -- I served a
16  Notice of Deposition on this witness.
17        MR. ENOCH:  Sir, if you didn't serve a
18  subpoena, he's under an NDA and a confidentiality
19  agreement.  He is not excused from that.  You did not
20  provide him with an order from this Court.  He cannot
21  testify today.  You should have served him with a
22  subpoena, and you did not.
23        MR. BANKSTON:  Do you want to take this
24  up with the judge --
25        MR. ENOCH:  No, sir.

**7**

1        MR. BANKSTON:  -- or are you going to let
2  him testify today?
3        MR. ENOCH:  That's what I want to talk
4  with this witness about.
5        MR. BANKSTON:  You're not going to talk
6  to him about it.
7        MR. ENOCH:  Well --
8        MR. BANKSTON:  You don't have the ability
9  to do discovery.  I'm going to ask this witness
10  questions.  If you --
11        MR. ENOCH:  Mr. Bankston --
12        MR. BANKSTON:  If you instruct him not to
13  answer and try to prevent this deposition from
14  happening, I will take it up to the Court.
15        MR. ENOCH:  Mr. Bankston, you are the one
16  preventing me from asking any questions.
17        MR. BANKSTON:  I am.
18        MR. ENOCH:  Then do what you need to do,
19  sir.
20        MR. BANKSTON:  That's what we're gonna
21  do.
22        MR. ENOCH:  I'm going to make sure this
23  witness knows of his obligations under the
24  non-disclosure agreement and confidentiality agreement
25  that he signed.  Are you going to --

**8**

1        MR. BANKSTON:  You sent him a letter
2  telling him what his confidentiality agreements are,
3  telling him to observe them.  You have already had these
4  communications with this witness.  You have no reason to
5  ask this witness any questions today.  The Court has not
6  granted your client any discovery whatsoever, and you
7  will stop interfering with this deposition.  You have no
8  reason to be asking this client about confidentiality
9  when you have already informed him of his obligations.
10        MR. ENOCH:  Mr. Bankston, I'm going to
11  ask the question; and if you instruct him not to
12  answer --
13        MR. BANKSTON:  I don't represent this
14  witness.
15        MR. ENOCH:  Mr. Jacobson, did you receive
16  a letter from me in December or so advising of my
17  client's insistence that you maintain confidentiality
18  under your agreement which you reached with Alex Jones
19  and with Free Speech?
20        THE WITNESS:  I don't recall.
21        MR. ENOCH:  Okay.  Do you still have
22  those confidentiality and non-disclosure agreements?
23        THE WITNESS:  I don't recall.  I don't --
24  I have -- since traumatic -- since whatever happened to
25  me at work, my files have been scattered around.  I'd

**9**

1  also like to add that that non -- that NDA was forced
2  upon me after employment with Alex for over eight
3  years --
4        MR. ENOCH:  Sir --
5        THE WITNESS:  -- on the record.
6        MR. ENOCH:  Sir, you can -- I'm not
7  arguing with you.
8        MR. BANKSTON:  Mr. Enoch, you --
9  objection.
10        You've already done what you said you
11  were going to do.  Don't start have conversations with
12  the witness.  Don't do it.  Don't influence his
13  testimony, Mr. Enoch.
14        MR. ENOCH:  Mr. Bankston, please stop
15  interrupting me.
16        MR. BANKSTON:  Well, then I will put --
17  first, before you ask your question --
18        MR. ENOCH:  Rule 99 --
19        MR. BANKSTON:  I object to the record --
20  I object; and my objection is to the form of your
21  question.
22        MR. ENOCH:  Very well.
23        Mr. Jacobson, are you familiar with the
24  requirements in the documents that you signed that you
25  maintain confidentiality unless you are subpoenaed or

10

1  ordered by the Court?
2        THE WITNESS:  I'm familiar with the
3  action that was forced upon me after being employed by
4  him, with language in that NDA which includes things
5  like "the known universe" and stuff.  It's garbage, and
6  I --
7        MR. ENOCH:  So you're not --
8        THE WITNESS:  No, no, I am not aware
9  of -- I know that it was forced upon me.  I was employed
10  by Alex for over eight years, and they forced it upon
11  me.  I was a -- so I don't know where it is.  I don't
12  know what the language is, and I don't recall anything.
13        MR. ENOCH:  I'd like to mark as an
14  exhibit, please, madam --
15        (Exhibit 1 marked.)
16        MR. BANKSTON:  Object to any exhibits
17  being offered by you.
18        Mr. Enoch, what are you doing?  Let's
19  just talk.  What do you think you're doing?
20        MR. ENOCH:  I want to make sure --
21        MR. BANKSTON:  You're not questioning
22  this witness anymore.
23        MR. ENOCH:  Mr. Bankston --
24        MR. BANKSTON:  This is not your
25  deposition.  You have no ability to do discovery.  I've

11

1  had extraordinary patience with allowing you to ask
2  questions of the witness to ascertain whether he knows
3  there's a confidentiality agreement.  I will also be
4  asking him about that same confidentiality agreement.
5        Now that that's been done, you have no
6  reason to be questioning him.  The only reason you're
7  doing it is to influence this witness.  That's literally
8  the only reason you're doing it.  I consider what you're
9  doing highly improper; and I am asking you once again:
10  Knock this off, Mr. Enoch.  What are you do?
11        MR. ENOCH:  Mr. Jacobson, do you
12  recognize Exhibit Number 1?
13        THE WITNESS:  I don't have any recall of
14  this exhibit.
15        MR. ENOCH:  Would you look at your
16  signature on the last page and please identify that?
17        MR. BANKSTON:  We need to go off the
18  record and call the Court right now, Mr. Enoch --
19        MR. ENOCH:  Do you recognize your
20  signature?
21        MR. BANKSTON:  -- and Mr. Jacobson.
22        THE WITNESS:  I -- I want you to notice
23  the date.
24        MR. ENOCH:  Did you --
25        THE WITNESS:  When was my employment

12

1  started, sir?  Sir, I don't have any representation
2  here.  When was my employment started?  When was the
3  first day I started working?
4        MR. BANKSTON:  Mr. Jacobson, let's stop
5  for a second.
6        (Simultaneous speakers.)
7        MR. BANKSTON:  Mr. Enoch, stop.  We're
8  going off the record right now.  We're calling the
9  Court.
10        MR. ENOCH:  Very well.
11        THE VIDEOGRAPHER:  Off the record at
12  12:07 p.m.
13        (Off the record from 12:07´ to 12:08´ p.m.)
14        (The following is only on the
15  stenographic record:
16        THE REPORTER:  Do you want the telephone
17  conversation on the record?
18        MR. BANKSTON:  No, ma'am, you can go off
19  the record.
20        MR. ENOCH:  No, I do not agree to go off
21  the record.
22        MR. BANKSTON:  Apparently they're
23  transcribing this phone call.
24        MR. OGDEN:  The court administrator?
25        MR. BANKSTON:  Excuse me.  If that's to

13

1  the court administrator, yeah, can you give me Elissa or
2  Tiffany's number?
3        MR. OGDEN:  Sure.  Elissa is 512.854 --
4        MR. BANKSTON:  No, keep the video on and
5  put it on Mr. Enoch.
6        854 --
7        MR. OGDEN:  9366.
8        MR. BANKSTON:  -- 66.  Thank you.)
9        THE VIDEOGRAPHER:  On the record at
10  12:08 p.m.
11        (Phone ringing followed by a recording
12  stating:  Please leave a message for Elissa Hogan.
13  After the tone, please record your message.)
14        MR. BANKSTON:  Have you got a separate
15  number for Tiffany?
16        MR. OGDEN:  Yes.  512.854.7278.
17        (Phone ringing followed by a recording
18  stating:  Please leave a message for Tiffaney Gould.)
19        MR. BANKSTON:  All right.  For the
20  record's purposes, I have attempted to --
21        MR. OGDEN:  Mark -- sorry -- try the
22  court administration.
23        MR. BANKSTON:  All right.  Well, no.
24  That's a totally different office, Bill.  That's Judge
25  Livingston's court administration office.

14

1    MR. OGDEN:  Well, right now --
2    MR. BANKSTON:  Okay.  Go back on mute.
3        For the record, I have attempted to call
4    the Court on an emergency basis.  I have been unable to
5    get ahold of Staff Attorney Elissa Hogan or Court
6    Coordinator Tiffany Gould.
7        I have properly Noticed this deposition.
8    I am entitled to question the witness first.  I'm
9    entitled to question the witness about the topics that
10   the Court ordered that I am allowed to question him on.
11       Mr. Enoch did not Notice this deposition.
12   He is not entitled to question the witness first.  While
13   I attempted to stop him from this highly improper
14   conduct, he completely ignored me and continued to
15   question the witness, agitating the witness, who is not
16   represented by counsel.
17       This witness has agreed to appear
18   voluntarily with the understanding that Plaintiff was
19   conducting discovery today, has never made any agreement
20   to appear unrepresented to be inquizited [sic] by
21   his former employee's [sic] counsel.  He never made that
22   agreement.
23       Mr. Enoch knows it is highly improper to
24   interrupt my questioning, prevent me from questioning
25   the witness first, and just start his own examination.

15

1    That would be true under even normal deposition
2    circumstances; but today we are here on expedited
3    discovery under the Texas Civil Participation Act, which
4    grants my client the right to discovery, to respond to a
5    Special Motion to Dismiss brought my Enoch's client.  It
6    gives him absolutely no right to conduct any discovery.
7        This deposition has been highly improper,
8    and so this is the agreement I'm going to make:  I have
9    not been able to contact the Court.  I've not been able
10   to do that.  Mr. Enoch insists on questioning.  He won't
11   let me question and just ignores what I'm doing.  Under
12   those circumstances and given the level of agitation by
13   Mr. Jacobson, who is here today without counsel, I am
14   suspending the deposition unless Mr. Enoch agrees to
15   cease his improper efforts to question this witness and
16   continues to act appropriately in just defending the
17   deposition.
18       Mr. Enoch, if you cannot agree to do
19   that, this deposition is suspended; and it will be added
20   to my Motion for Sanctions being filed with the Court
21   today.  What would you like to do?
22       MR. ENOCH:  Well, I don't agree with
23   anything you just said.  It was all self-serving.  It
24   doesn't accurately reflect what was happening.
25       The only reason I asked him a question

16

1    about this document is to show his signature.  Now that
2    I've shown it to him, you may go ahead and question him.
3    Under Rule 199 I don't know of anything that prevents me
4    from asking questions out of order, sir.  Are you aware
5    of anything?
6        MR. BANKSTON:  Yeah, I am, actually.
7        MR. ENOCH:  The parties may attend and
8    ask questions.
9        MR. BANKSTON:  I actually agreed -- I
10   actually am aware of it under Chapter 26 of the Remedy
11   Code.  You have no right to conduct the deposition; only
12   I do.
13       MR. ENOCH:  I disagree with that; and
14   rather than talk about it now --
15       MR. BANKSTON:  We'll take it up with the
16   Court.  I agree.
17       MR. ENOCH:  I think that would be an
18   appropriate --
19       MR. BANKSTON:  I agree.  So, Mr. Enoch --
20       MR. ENOCH:  Please continue your
21   deposition.
22       MR. BANKSTON:  Well, Mr. Enoch, before I
23   stopped my deposition and you said that you were going
24   to ask him one thing about one document and whether it
25   was his signature; and now you say you're done, when I

17

1    asked --
2        MR. ENOCH:  And he refused to answer the
3    question.
4        MR. BANKSTON:  He sure did.
5        And when I asked you, "Okay.  You've
6    asked him.  Are you done," you completely ignored me,
7    continued to berate this client -- I mean, this person;
8    and he expressed to you that he was very --
9        MR. ENOCH:  Mr. --
10       MR. BANKSTON:  Hold on, Mr. Enoch.  He
11   expressed to you that he was agitated.  Are you now
12   saying you have asked the totality of the questions you
13   intend to ask this witness?
14       MR. ENOCH:  Of course not.
15       MR. BANKSTON:  Then we are suspending
16   this deposition.
17       MR. ENOCH:  I don't know what I'm going
18   to ask or if I'm going to ask anything until you're done
19   with your examination, Mr. Bankston.
20       MR. BANKSTON:  Well, apparently you did
21   because you started asking questions before I even
22   started my examination, Mr. Enoch; and you know that's
23   highly improper.
24       I'm asking you right now:  Do you intend
25   to question this witness today?

18

1      MR. ENOCH:  Mr. Bankston, I am alarmed
2  that this witness is not represented by counsel.  I am
3  concerned that he is not aware of his rights and
4  obligations under legally binding contracts with my
5  client.  I want to make sure he is aware of those to
6  protect himself or to get counsel of his own choosing.
7      MR. BANKSTON:  You've been able to do
8  that --
9      MR. ENOCH:  Excuse me.  Do not interrupt
10  me, again.  I did not interrupt you.
11      It appears that you have not counseled
12  him one bit about this.  You're interested in getting
13  him to voluntarily disclose information that he's
14  obligated not to do without court order.  You did not
15  serve a subpoena.  You did not tell him of the effect of
16  that under his agreement.  He now knows it.  You may
17  continue your deposition.
18      MR. BANKSTON:  Mr. Enoch, let's make this
19  clear for the record:  I do not have his agreement.
20  When you sent this letter that informed him of that
21  agreement --
22      MR. ENOCH:  You do now.
23      MR. BANKSTON:  -- I asked you at the
24  time -- didn't I, Mr. Enoch -- I sent you a letter and
25  said, "Your letter's very unclear.  It could, in fact,

19

1  cause this witness to think he's not supposed to testify
2  today.  Wouldn't it be best if you disclosed to
3  everybody what that agreement is?"  You didn't do that.
4  You waited until we walked into this room to put it down
5  on the table.
6      You say you have every right to inform
7  this client -- or this person of his obligations and you
8  were worried that he doesn't understand what those were.
9  I understand that, which is why you sent that letter,
10  which I think is a perfectly reasonable thing to do; and
11  if you wanted to call this witness, talk to him, or
12  contact him, that's perfectly appropriate.  To ambush
13  him at the moment of his testimony is not appropriate,
14  and it is not appropriate to start asking questions
15  before I even ask questions.
16      MR. ENOCH:  Mr. --
17      MR. BANKSTON:  If you intend to ask more
18  questions today, let me know because we will suspend the
19  deposition so that Mr. Jacobson can get counsel and so
20  that we can take it up with the Court to see if your
21  actions today were proper.  Do you want to ask questions
22  today or not, Mr. Enoch?
23      MR. ENOCH:  Mr. Bankston, I did not know
24  until my first question of this witness that you had not
25  served him with a subpoena, as I think you were

20

1  obligated to do to obtain his testimony.  Therefore, I
2  wanted to make sure he was aware of Exhibit 1.  It does
3  not allow his voluntarily participation in your
4  discovery without a court order or subpoena.
5      Now, with respect to questions of this
6  witness, I can't answer that now because I haven't heard
7  your questions.  I think I'm entitled to ask questions
8  under the Rules; you think I'm not.  So go ahead and ask
9  your questions.  Let's see if I have questions.  If I
10  do, the Rules allow me to make my record.  You can
11  object as you wish, and then we can take it up with the
12  judge.  We've spent a lot of time haggling right now.
13  We've taken the witness' time.  Ask your questions.
14      MR. BANKSTON:  You've taken the witness'
15  time.
16      MR. ENOCH:  Ask your questions.
17      MR. BANKSTON:  You've taken my time,
18  Mr. Enoch.  That's what you've done.
19      MR. ENOCH:  Ask your questions.
20      MR. BANKSTON:  And I can tell you this:
21  I don't represent this witness; and when I'm done asking
22  my questions, if he wants to get up and walk out of this
23  room without saying another word to you, I'm not
24  stopping him.
25      MR. ENOCH:  On what basis?

21

1      MR. BANKSTON:  I'm not stopping him.  I
2  have no control over this man, Mr. Enoch.  I have none.
3  I don't represent him.
4      MR. ENOCH:  Well, you understand that
5  your Notice says we're here from day to day; and you
6  understand cross-examination is allowed.
7      MR. BANKSTON:  Yeah.  And what do you
8  want me to do to stop him?  What do you want me to do --
9      MR. ENOCH:  Why don't you just ask your
10  questions?
11      MR. BANKSTON:  Should I chain him to the
12  chair, Mr. Enoch?
13      MR. ENOCH:  Mark, please start asking
14  your questions.  Let's get on with the deposition.  Will
15  you do that, please?
16      MR. BANKSTON:  Yeah, now we'll do that,
17  Mr. Enoch.  We sure will.
18      MR. ENOCH:  Do.
19      Q.  (BY MR. BANKSTON)  Mr. Jacobson, I'm really
20  sorry about all that.
21      A.  Yes, sir.
22      Q.  I believe the only -- I'm not sure if we got
23  this question out.  Did you introduce yourself for the
24  record?
25      A.  Yes, sir.  I am Robert Jacobson.

22

1    Q.   Okay.  Did you used to work at InfoWars?
2    A.   Yes, sir.
3    Q.   When were you hired by InfoWars?
4    A.   I was hired in 2004 by Alex Jones.
5    Q.   Do you know what corporate entity you were
6  hired by?
7    A.   At the time I felt I was hired by Alex Jones,
8  and he was an independent proprietor.
9         MR. ENOCH:  Objection, nonresponsive.
10    Q.   (BY MR. BANKSTON)  Do you know today what
11  entity your former employer claims you worked for?
12    A.   Yes.
13    Q.   What entity is that?
14    A.   Free Speech Systems, LLC.
15    Q.   Okay.  When did your employment end?
16    A.   My employment ended on May 1st of 2017 -- or
17  April 30th.
18    Q.   So am I right that that's over a decade that
19  you were at InfoWars?
20    A.   I was there for around 13 years,
21  approximately.
22    Q.   As an employee, did you have a confidentiality
23  agreement of any kind?
24    A.   Not for the first six years or so.
25    Q.   Okay.  So does that mean around 2010 or so the

23

1  idea of confidentiality came up?
2    A.   Confidentiality was passed around the office
3  but was never given to me until years after; and it was
4  more of a -- you know, sort of an ultimatum, sort of
5  suggested, putting my livelihood at risk.
6    Q.   Apparently -- I wanted to show you something I
7  wanted to mark as Exhibit 1, but I believe Mr. Enoch has
8  already highjacked that exhibit.  So I am going to mark
9  this as Exhibit 2.
10        MR. ENOCH:  Object to the sidebar.  Move
11  to strike.
12        (Exhibit 2 marked.)
13    Q.   (BY MR. BANKSTON)  Mr. Jacobson, I've handed
14  you what's been marked as Exhibit 2.  Have you ever seen
15  a copy of that before, or do you remember seeing that?
16    A.   Yes.
17    Q.   I want to direct you to the second page.  I'm
18  going to read the paragraph that appears on this page 2.
19  "You are reminded that you have important continuing
20  obligations under your confidentiality non-disclosure
21  agreements with my client.  You are expected to strictly
22  observe those duties and obligations."  Do you feel like
23  you understand what obligations are being referred to
24  here?
25    A.   I do.

24

1    Q.   Have you abided by those obligations?
2    A.   Yes, sir.  In fact, may I add something?  My
3  understanding of the non-disclosure is not to reveal any
4  company secrets.  I don't think abuse or abusive
5  behavior inside the company constitutes company secrets.
6  I don't think misbehavior inside the company by an adult
7  who runs the business constitutes company secrets.  In
8  fact, I'm here to try to bring light to the truth of
9  abusive behavior inside the walls of InfoWars; and I
10  don't think anything I say today violates the NDA, which
11  would be constituting of company secrets, their formulas
12  in how they produce the news.  Nothing like that is
13  going to be revealed today.  What will be revealed is
14  abusive behavior and the behavior of Mr. Jones and his
15  staff.
16        MR. ENOCH:  Objection, nonresponsive.
17    Q    (BY MR. BANKSTON)  Did you understand that
18  there was a judge here in Travis County who issued an
19  order concerning this deposition today going forward?
20    A.   No -- not sure, actually.
21    Q.   Okay.
22    A.   Fuzzy.
23    Q.   Sitting here today, do you recall seeing a
24  court order concerning your deposition?
25    A.   Yes.

25

1    Q.   Okay.  Did you feel comfortable appearing for
2  deposition without a court order?
3        MR. ENOCH:  Objection to form.  Assumes
4  facts not in evidence.  Leading.
5        You can go ahead and answer subject to
6  those objections.
7    A.   Again, I'm not sure of that.  I mean, with or
8  without a court order, I just feel it's the right thing
9  to do.
10    Q    (BY MR. BANKSTON)  When you first joined
11  InfoWars, did you believe in its mission?
12    A.   For the most part, yes.
13    Q.   Tell me about the kinds of stories or things
14  that you wanted to be working on when you first came to
15  InfoWars.
16    A.   When I first --
17        MR. ENOCH:  Objection, form.
18    A.   When I first arrived at InfoWars, my
19  understanding of InfoWars and Alex's subject matter was
20  the occult, esoteric politics, let's say, what's going
21  on behind the curtain, things that politicians don't
22  tell us in expos", in that fashion.  Fringe media, off
23  the mainstream, but still honest was my impression.
24    Q.   (BY MR. BANKSTON)  Were you passionate about
25  journalism at that time?

26

1        MR. ENOCH:  Objection to form.

2        A.  I was passionate about filmmaking, and I

3    wanted to be a documentary filmmaker.  So in that

4    aspect, yes, that does, I believe, fall under a broader

5    umbrella of journalism.  So when it comes to documentary

6    films, I was on board.

7        MR. ENOCH:  Objection, nonresponsive.

8        Q.  (BY MR. BANKSTON)  Did you want to do good

9    journalism?

10       A.  I did.

11       MR. ENOCH:  Objection, form.

12       MR. BANKSTON:  What's the form?

13       MR. ENOCH:  Well, under the Rules, I'm

14   not sure it's -- I think you're leading the witness; and

15   I think -- I'm not sure if I'm supposed to say

16   objection, leading or form.  I think I'm supposed to say

17   both.  So that's my objection.  You're leading the

18   witness.

19       MR. BANKSTON:  Okay.

20       Can you scroll up to my last question?

21       (Reporter complies.)

22       Q.  (BY MR. BANKSTON)  Mr. Jacobson, what does

23   good journalism mean to you?

24       A.  Good journalism means an objective reporting

25   of facts.  Somebody who can -- or if the journalist can

27

1    remove his emotion and theory as much as possible from

2    reporting what he sees or she sees with their own eyes

3    and ears, empirical evidence reported to the public with

4    very little bias.

5        Q.  In your mind, what is the relationship between

6    good journalism and corroboration of facts?

7        A.  I think good journalism, if you're going to

8    have a corroboration of facts, I believe the more

9    witnesses and points of view of the same action or

10   activity that is being reported on, the better.  And,

11   for example, just theoretically thinking, one person

12   can't see both sides of the cup at once.  So when two

13   people are observing it at the same time, you get a

14   better description of the object in question.  And so

15   the more witnesses that have viewed it, the more

16   impressions we can get after the fact of what has

17   actually happened with the object that we're observing.

18       Q.  In your first few years at InfoWars were you

19   comfortable with the style of journalism and the stories

20   you were working on?

21       MR. ENOCH:  Objection, form and leading.

22       Anytime I make an objection like that,

23   sir, you can go ahead and answer.

24       THE WITNESS:  Okay.

25       MR. ENOCH:  Let me say one thing.  I may

28

1    ask you not to answer based on a privilege.  That's your

2    choice.  That's my client trying to protect a privilege;

3    but when I object, say "Objection, form or leading," you

4    can go ahead and answer.

5        THE WITNESS:  Okay.

6        Q.  (BY MR. BANKSTON)  Would you like me to ask

7    that question again?

8        A.  Yes, please.

9        Q.  In those first few years at InfoWars, were you

10   comfortable with the style of journalism and the stories

11   you were working on?

12       MR. ENOCH:  Same objections.

13       A.  I was comfortable with the films I was

14   producing and helping Alex produce.  I found them

15   interesting; and I found that Alex did present enough

16   expert testimony that it held water, in my mind.

17       Q.  (BY MR. BANKSTON)  All right, Mr. Jacobson.

18   You understand this lawsuit has to do with Sandy Hook?

19       A.  Yes, sir.

20       Q.  I want to direct your attention then to that

21   event, which is end of 2012, very beginning of 2013.

22       A.  Okay.

23       Q.  For that time period, the start of 2013, by

24   that time, had the company changed, in your mind?

25       A.  Absolutely.

29

1        MR. ENOCH:  Objection, form.  Leading.

2        A.  Absolutely.

3        Q.  (BY MR. BANKSTON)  Okay.  Mr. Jacobson, I have

4    a feeling that Mr. Enoch is going to object to just

5    about every question I ask.

6        A.  Okay.

7        Q.  So what I would like you to do to accommodate

8    this, because otherwise it's going to be super-

9    disruptive on the deposition, take a couple-of-second

10   pause before you answer my questions because he's going

11   to step on your answers.  Okay?

12       A.  Okay.

13       Q.  If you can, just take a second pause.  And

14   what I'm going to do is ask you that question again

15   because it got kind of disrupted, and I think

16   Mr. Enoch's going to object again.

17       A.  Okay.

18       Q.  And just for reminders, we may in typical

19   conversations tend to try to finish each other sentences

20   or talk over each other, not to interrupt each other,

21   but to help us get to the point faster.  It makes it

22   very difficult on her.

23       A.  Right.

24       Q.  She has trouble writing down when two people

25   are speaking at the same time.  So this is why, if you

30

1   can, if you can take a pause -- you might even want to
2   check and look over to your former employer's counsel to
3   see if there is going to be an objection -- that way we
4   can keep the record clear.)
5       A.  (Witness nods head.)
6       Q.  At the start of 2013, around that time period,
7   in your mind, had the company changed?
8           MR. ENOCH:  Objection to form, leading.
9       A.  Yes.
10      Q.  (BY MR. BANKSTON)  Tell me about that.
11      A.  When I first started working for InfoWars, it
12  was an operation with just a handful of employees as far
13  as I know, possibly five or less; maybe a few more than
14  I'm aware of.  But I was working out of my own private
15  office.  Alex had a tiny office in the far south of
16  Austin.  He had one employee that I knew of, Ryan
17  Schlickeisen; another employee who I'm not sure of her
18  name.  I can't really recall.  But she was a woman who
19  tended his warehouse, which was in the far south side of
20  Austin.  And I'm not even sure where Alex was
21  broadcasting out of.
22          In 2010 he had a full-size facility.  He
23  had, as far as I know, over 60 people on his staff, if
24  not more; and he had a full-blown studio.  So it wasn't
25  just different.  It was dramatically different in every

31

1   way, shape, and form.
2       Q.  One of the aspects I want to direct your
3   attention to is whether you, in your mind, felt that
4   anything had changed in the company with regards to how
5   it performed journalism.
6       A.  I do.
7       Q.  What are your thoughts about that?
8       A.  I --
9           MR. ENOCH:  Objection, form and -- yeah,
10  objection, form.
11          Excuse me.  Go ahead.
12      A.  I feel that Alex's formula definitely changed.
13  He changed his formula from a complement of the website
14  and films to no films anymore and more or less the
15  radio -- the website, radio show, and films was the
16  original form.  He took the film part out, which I
17  felt -- I felt the films were part of his kind of thing;
18  and he went more radio show.  And that's it -- website,
19  as far as I know.  So in that form of media, I kind of
20  just felt like he just ditched an important part of his
21  media.  That's all.
22          THE VIDEOGRAPHER:  Would you mind
23  clipping it just a little bit higher?
24          Thank you.
25      Q.  (BY MR. BANKSTON)  Mr. Jacobson, in terms of

32

1   InfoWars' consistency or process for corroborating
2   facts, in your mind, had that changed between the start
3   of your employment and the end of your employment?
4           MR. ENOCH:  Objection to form and --
5   object to form.
6       A.  I feel that from the beginning, when I first
7   started working there, the fact collection was mostly
8   Alex and -- mostly himself was the researcher.  By the
9   end, Alex let a lot of others do research for him; and I
10  don't know if these people were specifically qualified
11  or experienced enough to do that kind of work.
12      Q.  (BY MR. BANKSTON)  A few months back do you
13  remember calling me about this case?
14      A.  Yes, sir.
15      Q.  Why'd you do that?
16      A.  I was concerned.  I wanted to make sure -- I
17  felt I was part of something, just being in that
18  building, when all this was going down.  I felt terrible
19  what happened, even though I, myself, know I wasn't
20  directly involved in, you know, putting this out there
21  directly, just being in the building, I feel complicit.
22  I feel I have to right a wrong that I was involved in.
23  Even though I was part of that wrong, I want to at least
24  stack a couple of correct decisions up with some of the
25  mistakes that I have made in the past.

33

1       Q.  When you say that you weren't directly
2   involved in putting this out there, what is "this"?
3       A.  "This" would be Sandy Hook.  Anything that
4   InfoWars put out concerning Sandy Hook, I had absolutely
5   no involvement in.
6       Q.  During your employment, were you exposed to
7   InfoWars' coverage of Sandy Hook?
8       A.  During my employment, I had other assignments
9   to do; and I wouldn't much pay attention to the show.
10  However, when I did and I heard about Sandy Hook, it
11  actually bothered me.
12      Q.  Tell me what you mean by that.  What did you
13  hear that bothered you?
14      A.  I heard them making accusations based on
15  extremely narrow cross-sections of information, that I
16  did my best to make the writers and the staff aware that
17  what they were doing was speculation based on not enough
18  information.  It bothered me.  That bothered me that I
19  felt they had no concept of journalist ethics.
20      Q.  Did you tell anyone at InfoWars your feelings
21  about the Sandy Hook coverage?
22      A.  I attempted to make it as clear as possible to
23  the writers that there is something called journalist
24  ethics and how what they were doing was in a direct
25  violation of that anytime I caught wind of the Sandy

34

1   Hook story on InfoWars.
2          Now, mind you, I would like to add that
3   it's not something I was thinking about all the time,
4   considering I had other things to do.  I'd be working on
5   other projects.  But when it would come on the screen, I
6   would make it my business to go in to the writers and
7   explain to them as clearly as possible that there is
8   journalist ethics; and I tried to demonstrate what those
9   ethics are and why they are violating them and what the
10  damage could possibly be.  In fact, I remember -- I must
11  have been in that room four to five times, at least, and
12  only to be received with laughter and jokes.
13         MR. ENOCH:  Objection, nonresponsive.
14  Q    (BY MR. BANKSTON)  When you say "the room," is
15  there a specific room you're talking about?
16  A    The room I'm talking about is the room in
17  which the writers worked.
18  Q    About how many writers are we talking about
19  involved in working on Sandy Hook?
20         MR. ENOCH:  Objection to form.
21  A    I believe that there were two -- one primary
22  writer and perhaps one other that were definitely
23  involved in Sandy Hook.
24         MR. BANKSTON:  Just so I can possibly
25  clear up that objection, what is the objection to how

35

1   many writers worked on Sandy Hook?
2          MR. ENOCH:  You haven't established he
3   has personal knowledge, sir.
4          MR. BANKSTON:  Okay.
5   Q    (BY MR. BANKSTON)  Just to help clear up this
6   issue -- and I believe this has been asked if; so you
7   have to answer it again, I'm sorry -- but you were
8   exposed to InfoWars' coverage of Sandy Hook?
9   A    Yes.
10  Q    You would know how many people are working on
11  Sandy Hook --
12         MR. ENOCH:  Objection --
13  Q    -- inside InfoWars?
14         MR. ENOCH:  Objection to form and
15  leading.
16  A    I'm aware of every staff member that worked at
17  InfoWars as of up to May of 2017.
18  Q    (BY MR. BANKSTON)  When it came to coverage of
19  Sandy Hook and the work that was being done by the
20  writers, did you see things that you would consider
21  reckless?
22  A    Yes.
23  Q    Can you tell me, are there any individual
24  employees that you believed engaged in reckless conduct
25  regarding Sandy Hook?

36

1   A    Yes.
2          MR. ENOCH:  Objection to form and
3   leading.
4   A    Yes, I do.
5   Q    (BY MR. BANKSTON)  Okay.  Tell me who the
6   employees are that you developed opinions about their
7   work on Sandy Hook.
8   A    First and foremost would be Rob Dew.
9   Q    Okay.  Let's start with Mr. Dew.  What is your
10  observations about Mr. Dew's journalistic integrity as
11  it respects Sandy Hook allegations?
12         MR. ENOCH:  Objection to form.
13  A    I feel that Mr. Dew was overzealous to receive
14  any type of hint that perhaps this might have been a
15  phony act, a staged act.  Any type of whisper that came
16  through to him, he would celebrate.
17         MR. ENOCH:  Objection, nonresponsive.
18  Q    (BY MR. BANKSTON)  Do you know Adan Salazar?
19  A    Yes, sir.
20  Q    Have you seen or did you ever observe any work
21  being done by Adan Salazar on Sandy Hook?
22  A    Yes.
23  Q    Do you have an opinion as to whether that work
24  was done responsibly by Mr. Salazar?
25         MR. ENOCH:  Objection to form.

37

1   A    I do have an opinion of that.
2   Q    (BY MR. BANKSTON)  Can you tell me what facts
3   and observations you may have seen that would inform
4   that opinion of Mr. Salazar?
5          MR. ENOCH:  Objection to form.
6   A    Like I've stated already, whenever the subject
7   came up, I would immediately clarify to the writers that
8   there is a journalistic ethics that they're violating;
9   and what I've pointed out to Adan specifically is that
10  you're taking the word of one witness primarily and a
11  couple of speculative other facts and calling it the
12  truth without actually going down and investigating it
13  ourselves or actually going with our own reporters and
14  corroborating what these people are saying.
15         I made it aware to Adan that Wolfgang
16  Halbig could have a lot of issues that we're not
17  considering, that by taking the word of this one man so
18  heavily with such a great accusation that he's accusing
19  people of is so irresponsible, so damaging.  I asked him
20  to consider the size of the audience.
21         And Adan Salazar responded with -- and
22  I'm going to quote him because he said it to me many
23  times -- "I want to print up a T-shirt that says,
24  'Halbig was right.'  I want bumper stickers that say,
25  'Halbig was right,'" to a laughing room.

38

1      MR. ENOCH:  Objection, nonresponsive.
2   Q.   (BY MR. BANKSTON)  Do you feel that
3  Mr. Salazar ever mocked your concerns about Sandy Hook
4  coverage?
5   A.  Absolutely.
6      MR. ENOCH:  Objection to form.
7   A.  Absolutely.
8   Q   (BY MR. BANKSTON)  Let's talk about -- you
9  mentioned the name Mr. Halbig, correct?
10   A.  Yes, sir.
11   Q.  Can you briefly describe who Mr. Wolfgang
12  Halbig is?
13   A.  As far as I can recall, whenever Sandy Hook
14  was on the air or Alex or whoever was hosting was
15  covering Sandy Hook, it was always accompanied by
16  Mr. Halbig.  And when I took a look at Mr. Halbig and
17  considering he was the one and only person and the
18  claims -- or as far as I know, he was the one and only
19  person because whenever I would tune in, he was always
20  on.
21      So based on that impression, I would say
22  he was the one and only person.  And every time I saw
23  him, I saw somebody that if he was amongst a group, a
24  large group of people, okay; but a one and only person,
25  I felt that this person may have mental problems.  This

39

1  person may have a lot of emotional problems.  He could
2  be a lonely man.  He could be somebody looking for
3  attention.  There could be a lot of questions to be
4  asked before we present forward as a news organization
5  such a heavy accusation as accusing the parents of
6  slaughtered children of being liars.
7      I think that perhaps we should have asked
8  the question "what is Wolfgang Halbig's story" before we
9  put this story to the public.  This story should never
10  have been put forward to the public at all without --
11  and if they knew ethics in journalism, they would have
12  known that immediately; but they have absolutely no
13  ethics experience, in my opinion.  Therefore, the story
14  went forward; and the damage was caused.
15      MR. ENOCH:  Objection, nonresponsive.
16   Q.  (BY MR. BANKSTON)  Mr. Jacobson, I think it's
17  fair to say you have strong opinions about Mr. Halbig?
18   A.  I do.  I have strong opinions about his
19  validity as a sole witness.
20   Q.  Okay.
21      MR. ENOCH:  Objection to form -- same
22  objection, nonresponsive.
23   Q.  (BY MR. BANKSTON)  Who is Halbig's points of
24  contact at InfoWars?  Who did he talk to?
25      MR. ENOCH:  Object to form.

40

1   A.  I don't know.  As far as I know, it's the
2  people handling who were handling the Sandy Hook story.
3      MR. ENOCH:  Objection, nonresponsive.
4      MR. BANKSTON:  What's the form to asking
5  him who Halbig's point of contact is?
6      MR. ENOCH:  Speculation, sir.
7      Mr. Bankston, when I -- when you ask me a
8  question, the Rules require that I respond to you
9  clearly.  I did so.
10      MR. BANKSTON:  You did.
11      MR. ENOCH:  No reason to chuckle, sir.
12      MR. BANKSTON:  It's funny, Mr. Enoch.
13  I'm sorry if the things that happen in this deposition
14  are funny.
15      MR. ENOCH:  I think it's unprofessional,
16  sir.
17      MR. BANKSTON:  I think it's
18  unprofessional for a witness to talk about having
19  information from CIA kill teams about Las Vegas, and
20  that's why I chuckle at it.
21      I think it's unprofessional for you to
22  make constant objections even when they have no legal
23  basis.  That's why occasionally, yes, you will see the
24  corners of my mouth turn and smile.
25      I'm obviously asking about his personal

41

1  knowledge.  That's what I'm asking him about.  So that
2  is why I smile.
3   Q.  (BY MR. BANKSTON)  Are you familiar with the
4  types of claims made by Mr. Halbig?
5   A.  Some of them.
6   Q.  I want to ask you about some claims and if you
7  know what they are.  Have you ever heard the claim from
8  Mr. Halbig or repeated from Mr. Halbig by somebody else
9  that the school was actually closed before the shooting?
10      MR. ENOCH:  Objection to form.
11   A.  I have heard, yes.
12   Q.  (BY MR. BANKSTON)  Did you see anything in
13  your time at InfoWars that would make you think that
14  people were acting irresponsibly as it concerns that
15  particular claim?
16      MR. ENOCH:  Objection to form.
17      You may answer.
18   A.  Yes.
19   Q.  (BY MR. BANKSTON)  What kinds of things did
20  you see -- excuse me.  Scratch that.
21      Who did you see acting irresponsibly with
22  respect to that claim?
23      MR. ENOCH:  Objection to form.
24   A.  Mr. Robert Dew and Mr. Adan Salazar.
25   Q.  (BY MR. BANKSTON)  Are you familiar with the

42

1  claim that no paramedics were allowed inside of the
2  building?
3      A.  I mean, I've heard it.
4      Q.  Okay.  It's not something you had direct
5  exposure to?
6      A.  No, outside of me just briefly watching it on
7  a video as if I was audience.
8      Q.  Have you ever heard the allegation that there
9  are photographs of children who are supposedly dead who
10  are actually alive?
11      A.  Yes, I've heard that allegation.
12      Q.  Do you -- from what you have seen inside of
13  InfoWars, have you seen anything that has caused you to
14  form an opinion about that allegation?
15         MR. ENOCH:  Objection to form.
16      A.  I mean, you know, my opinion is it's so
17  distasteful -- and it happened a while ago, that -- you
18  know, it happened a while ago.  So it was just all these
19  things seem to -- all of the little allegations that
20  Halbig and all these other people set forward, I sort of
21  see it as individual cross-sections of information that
22  each one was improperly handled.
23         MR. ENOCH:  Objection, nonresponsive.
24      Q.  (BY MR. BANKSTON)  Did you ever voice any
25  criticism of Mr. Halbig specifically while you were at

43

1  InfoWars?
2      A.  Yes, I did.
3      Q.  Who did you voice that criticism to?
4      A.  Adan Salazar.
5      Q.  Are you familiar with the Sandy Hook parent
6  Leonard Pozner?  Have you heard that name?
7      A.  I have heard the name.
8      Q.  Okay.  Have you ever seen written
9  communications, like e-mails, from Mr. Halbig?  Have you
10  seen what his e-mails look like?
11      A.  No, I haven't.
12      Q.  Okay.  Do you know if Mr. Halbig ever came to
13  InfoWars?  Did he ever came to the Austin location?
14      A.  I'm not aware of that.
15      Q.  Okay.  Do you happen to know whether anybody
16  ever from InfoWars went to visit Mr. Halbig in Florida?
17      A.  Again, I'm not sure.
18      Q.  Okay.  Do you know anything about InfoWars
19  helping raise money for Mr. Halbig?
20         MR. ENOCH:  Objection to form.
21      A.  I'm unaware of anything like that.
22      Q.  (BY MR. BANKSTON)  Okay.  Are you aware of
23  Mr. Halbig ever engaging in any sort of harassing
24  behavior towards people involved in Sandy Hook?
25      A.  I've never heard of Halbig himself engaging in

44

1  that kind of behavior.
2      Q.  Okay.  Do you know who Dan Bidondi is?
3      A.  Yes, sir.
4      Q.  Can you describe what Mr. Bidondi has ever
5  done for InfoWars?
6      A.  Mr. Bidondi worked for InfoWars briefly, for
7  about a year or so; and he served as an on-air reporter
8  and journalist.
9      Q.  Okay.  Are you aware if Mr. Bidondi ever went
10  to Newtown to cover Sandy Hook?
11      A.  I'm not sure.  I don't know.
12      Q.  Have you ever met Mr. Bidondi?
13      A.  Yes, sir.
14      Q.  Okay.  If you were going to pick someone to
15  treat this story with respect and sensitivity, would you
16  pick Mr. Bidondi?
17      A.  No, sir.
18         MR. ENOCH:  Objection to form and
19  leading.
20      A.  No, I wouldn't.
21      Q.  (BY MR. BANKSTON)  Can you explain why not?
22         MR. ENOCH:  Same objections.
23      A.  Because Mr. Bidondi is very emotional and
24  when -- and he's also very belief based and I always
25  viewed him as more of somebody who could be a character

45

1  than more of a journalist.  And to send somebody like
2  that with such a serious accusation to cover that,
3  especially to talk and conversate with Mr. Halbig,
4  knowing Bidondi, how impassioned he gets over these
5  things and how impressionable he is with these kinds of
6  scenarios, especially with conspiracy kinds of
7  situations -- Mr. Bidondi gloms onto conspiracy kind of
8  situations; he really magnates towards them -- no, I
9  wouldn't because he would, I think, bias the situation
10  and not fairly report it and be over-emotional.
11         MR. ENOCH:  Objection, nonresponsive.
12      Q.  (BY MR. BANKSTON)  When you say that
13  Mr. Bidondi tends to glom onto conspiracy scenarios, can
14  you tell me what you mean by that?
15         MR. ENOCH:  Objection to form.
16      A.  I mean that he really -- you know, a lot of
17  his programming when he was working at InfoWars had to
18  do with the occult and all this stuff; but a lot of it
19  also has to do with, for example, a big claim to fame
20  for Dan Bidondi would be the Boston -- his appearance as
21  a reporter for the Boston bombing.  He made a national
22  spectacle of himself and in an unprofessional way,
23  which, of course, made him a celebrity at InfoWars.
24         MR. ENOCH:  Objection, nonresponsive.
25      Q.  (BY MR. BANKSTON)  When you say that him

46

1  making a spectacle made him a celebrity at InfoWars, can
2  you tell me what you mean by that?
3        MR. ENOCH:  Objection to form, leading.
4        A.  He basically accused -- instead of asking a
5  question at the Boston bombing situation, he made an
6  accusation in which case he was escorted out of the
7  building in typical, you know, journalist activist
8  style, which has been popularized by InfoWars; and
9  because he did that, he was much celebrated by the
10  people at InfoWars.  And for a moment there, you know,
11  he was on the top of his game, I suppose, inside that
12  office.
13        MR. ENOCH:  Objection, nonresponsive.
14        Q.  (BY MR. BANKSTON)  When you were at InfoWars,
15  in general, if a person did something in public that was
16  agitating, was that good for their career at InfoWars or
17  bad for their career at InfoWars?
18        A.  It was --
19        MR. ENOCH:  Objection to form.
20        A.  It was excellent for their career.  I can
21  point to several examples where it's not reporting at
22  all; it's pure agitation by many members of the staff.
23  And I have also been very critical of that.  It's been
24  pure -- in fact, some of it is so agitating it's almost
25  to the level of public disruption, so -- including --

47

1  can I go on?
2        Q.  (BY MR. BANKSTON)  Please.
3        MR. ENOCH:  Objection, nonresponsive so
4  far.
5        Q.  (BY MR. BANKSTON)  Let me ask you another
6  question.  Can you give me an example of some of the
7  things you're talking about when you say "agitation"?
8        A.  Yes.  Ms. Millie Weaver last year or the year
9  before that -- I'm not sure when; but it was in the
10  last, perhaps, twelve months, I believe, because it was
11  after I left -- she showed up at a Hillary Clinton book
12  signing event that was at BookPeople.  These people were
13  not there to protest.  These people were not there
14  to...Hillary.  This was far after the election.  Nobody
15  was campaigning.  But Ms. Millie Weaver decided to show
16  up with a lot of Trump gear, which obviously is going to
17  be -- as we follow the news, we know it's agitating
18  towards -- in a very political way, you know.
19        And so, in my opinion, just by looking at
20  that, I noticed that reporters don't show up sponsoring
21  politicians.  So for her to go there and say -- and, in
22  fact, the name of this video on YouTube is called
23  Journalists Harassed or something.  She identifies
24  herself as a journalist while she shows up wearing
25  political gear directly aiming at the opposite end of

48

1  the spectrum, asking abrasive questions about Hillary
2  Clinton.  Now, that's not journalism.  That's agitation;
3  and that is a clear-cut case example of them swapping
4  out the words "agitation" for "journalism" and vice
5  versa.
6        MR. ENOCH:  Objection, nonresponsive.
7        Q.  (BY MR. BANKSTON)  Have you ever seen anyone
8  at InfoWars engaged in conduct that you believed was
9  designed to elicit a negative emotional reaction from
10  the subject being interviewed?
11        MR. ENOCH:  Objection to form and
12  leading.
13        A.  I've never been involved in, let's say, people
14  planning such things.  However, I've never worked with
15  Millie Weaver closely or Owen Schroeder closely.  These
16  guys show up -- both of them show up --
17        Owen, I don't find to be -- I think he's
18  very -- in my opinion, he's a very smart guy.  So he
19  must know what he's doing by showing up at these
20  political events wearing Trump hats and whatnot.  He
21  must know the difference between a journalist and an
22  agitator, how a journalist has to appear neutral in his
23  stance and how an agitator appears politically motivated
24  on one side or the another at the moment, present in the
25  spot.  So I don't know about Millie, but I do know that

49

1  Owen Schroeder should definitely know the difference.
2        So that being said, I mean, I've never
3  been involved in, let's say, let's go down there and
4  cause a fight kind of discussion; but I do know that
5  they should know better, showing up at these places with
6  these kinds of -- you know, this kind of gear that will
7  affect people's emotions is pretty obvious.
8        MR. ENOCH:  Object, nonresponsive.
9        Q  (BY MR. BANKSTON)  While you were at InfoWars,
10  did you ever hear anybody inside the organization
11  express negative feelings about the Sandy Hook parents?
12        MR. ENOCH:  Objection to form.
13        A.  No, except for what Alex said live on the air.
14        Q.  (BY MR. BANKSTON)  Were you uncomfortable with
15  the things that Mr. Jones said on the air?
16        A.  Yes, I was.
17        MR. ENOCH:  Objection to form and
18  leading.
19        I'm sorry.  Would you just hesitate,
20  please, before you give your answer?
21        THE WITNESS:  Yes, sir.
22        MR. ENOCH:  Thank you.
23        Q  (BY MR. BANKSTON)  Specifically as it regards
24  to comments about the Sandy Hook parents, were you ever
25  disturbed by anything you saw at the set on InfoWars?

50

1        MR. ENOCH:  Objection to form.
2     A.  I was disturbed by the way they said
3  Mr. Pozner changed; he went from a laughing stance to a
4  serious stance when the camera was on him briefly before
5  he was asked to call.  I wanted to -- you know, again,
6  this is another thing I attempted to clarify with
7  Mr. Salazar and others that when you go through an
8  extreme tragedy, your emotions are all over the place.
9  And this is a known fact.
10        Just because somebody laughs at a joke
11  somebody tries to -- you know, you're not immune to
12  humor even if you went through a massive tragedy.  For a
13  brief moment somebody could say something; and it's,
14  "Oh, ha, ha."  You know, you don't have any really
15  control over if somebody makes you laugh.  You don't
16  have that control.  And I tried -- just because somebody
17  went through a massive tragedy doesn't mean that you
18  have to jump on the guy for smiling right before the
19  camera was on him.
20        In fact, a lot of people who experience
21  this level -- well, I don't know about this level -- but
22  tragedy in their life, they don't begin to even mourn
23  until days after.  They go through shock.  So I was
24  disgusted and I did attempt to clarify to everybody that
25  people go through a range of emotions after a traumatic

51

1  event.
2        MR. ENOCH:  Objection, nonresponsive.
3     Q.  (BY MR. BANKSTON)  Have you ever while working
4  at InfoWars heard the term "crisis actors"?
5     A.  Yes.
6     Q.  What do you understand that term to mean?
7     A.  I believe it means that there are people from
8  Special Forces, let's -- per se, or something like that.
9  They are people from a nefarious group run through the
10  government or outside for special -- special interest
11  money, let's say, who will then attempt to cause a phony
12  event to -- like, for example, crisis actors faking
13  their death or things like that to change a shift in
14  policy or things like that.  That's what I understand a
15  crisis actor to be.
16     Q.  Have you ever heard while at InfoWars the term
17  crisis actors or a similar allegation being attached to
18  the Sandy Hook event?
19        MR. ENOCH:  Objection to form.
20     A.  Yes, I have.
21     Q.  (BY MR. BANKSTON)  While you were at InfoWars
22  did you feel that you would ever see evidence which you
23  would consider sufficient to responsibly make that
24  allegation on the air?
25        MR. ENOCH:  Objection to form.

52

1     A.  No.
2     Q.  (BY MR. BANKSTON)  What is your personal
3  feeling, sitting here today, about an allegation that
4  there were crisis actors in use at Sandy Hook?
5        MR. ENOCH:  Objection to form.
6     A.  I mean, my opinion is -- my personal feeling
7  is it was shocking to hear -- well, it wasn't shocking
8  that they went down that line because they went down
9  that line of thought before; but the weight of the
10  accusation in this particular case, it was shocking that
11  they didn't do more research.  They didn't go further
12  into it.  They didn't -- I mean, what I constantly tried
13  to clarify is a story of this level should not be
14  brought forward unless they are -- I tried to make it
15  clear that they need as much evidence in this story as
16  if they were going to court to prove their case; and if
17  they didn't have that, they didn't have a story.
18        MR. ENOCH:  Objection, nonresponsive.
19     Q.  (BY MR. BANKSTON)  Can you tell us who Paul
20  Watson is?
21     A.  Paul Watson is sort of Alex's alternate host.
22  He's basically like Alex's sidekick.
23     Q.  Okay.  Have you ever been aware of
24  Mr. Watson's opinions about the Sandy Hook hoax
25  allegations?

53

1     A.  No.
2     Q.  Do you know of anyone else at InfoWars who
3  ever voiced an objection regarding any element of the
4  Sandy Hook coverage or the coverage as a whole?
5     A.  I don't know if -- I mean, did it
6  independently on my own; and then I would have talk to
7  others about it.
8        MR. ENOCH:  Objection, nonresponsive.
9     Q.  (BY MR. BANKSTON)  Have you ever had any
10  private conversations with any of your coworkers at
11  InfoWars about negative reservations about the Sandy
12  Hook coverage?
13        MR. ENOCH:  Objection to form.
14     A.  Yes.
15     Q.  (BY MR. BANKSTON)  And what coworkers would
16  that be?
17     A.  I spoke with Ashley Beckford.  I spoke with...
18  I spoke with Adan Salazar.  I spoke with Kit Daniels.  I
19  spoke with...  I must have spoken -- and others I don't
20  recall.  I have spoken quite a bit.
21     Q.  Can you tell us:  Who is Kit Daniels?
22     A.  Kit Daniels is a writer at InfoWars.
23     Q.  Was Kit Daniels ever involved in any of the
24  Sandy Hook coverage?
25     A.  I'm unsure.

22-01023-tmd Doc#1-10 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 164 of 285

Robert Jacobson - 3/20/2019

54

1    Q.  Okay.  Are you familiar with an allegation
2  concerning an alleged blue screen video interview with
3  Anderson Cooper?
4    A.  I am.
5    Q.  When you were at InfoWars, did you ever work
6  in video technology?
7    A.  Yes, I did.
8    Q.  Okay.  Can you explain to us kind of your
9  background and your training and experience in video
10  technology?
11    A.  My background began in New York City.  I was
12  working for several audio recording studios, including
13  The Hit Factory in New York City, which is a legendary
14  studio.  I moved to Austin shortly after that.  I worked
15  for the Austin Music Network -- before that I worked for
16  a music studio here, in Austin, Texas.  I then worked
17  for the Austin Music Network for about three and a half
18  years, where I got even better.  Then I moved from there
19  and I worked for Alex for 13 years producing roughly ten
20  of his feature-length documentaries.
21        MR. ENOCH:  Objection to form --
22  objection, nonresponsive.
23    Q.  (BY MR. BANKSTON)  Can you explain to us:
24  What is blue screen compositing?
25    A.  Blue screen compositing is when you can stand

55

1  in front of a blue screen and you can add any background
2  you'd like behind you, so.
3    Q.  Okay.  Mr. Jacobson, I am going to play you a
4  video clip that is going to be Exhibit 2 to this
5  deposition.
6        MR. ENOCH:  I think it's Exhibit 3.
7        MR. BANKSTON:  Oh, it will be, yeah.
8  Change that number.
9        (Exhibit 3 marked.)
10        MR. BANKSTON:  Let me ask that question
11  again, Mr. Jacobson.
12    Q.  (BY MR. BANKSTON)  Mr. Jacobson, I'm going to
13  show you a video clip that is going to be Exhibit 3 to
14  this deposition.  That is a video clip from a part of an
15  InfoWars episode.  So I'd like you to watch it, and I'm
16  going to ask you some questions about it.  Okay?
17    A.  Okay.
18        (Video playing.)
19    Q.  (BY MR. BANKSTON)  First, Mr. Jacobson, based
20  on your training and experience in video technology, was
21  what we just saw clearly blue screen?
22    A.  It was --
23        MR. ENOCH:  Objection to form.
24    A.  It was not clearly blue screen.
25    Q.  (BY MR. BANKSTON)  Okay.  Would anybody with

56

1  competent video experience think this was blue screen?
2        MR. ENOCH:  Objection to form.
3    A.  Not at first view.
4    Q.  (BY MR. BANKSTON)  Would anybody with
5  competent video experience have serious doubts about
6  saying this was blue screen?
7        MR. ENOCH:  Objection to form.
8    A.  I feel they would.  They would be on the
9  fence.  If they saw this video, they would have
10  questions.
11    Q  (BY MR. BANKSTON)  Okay.
12    A.  Can I go further and explain that?
13    Q.  Actually, let me ask you a question on that.
14  Okay?
15    A.  Okay.
16    Q.  Your opinion about whether or not it could be
17  fairly asserted that this is clearly blue screen, in
18  forming your opinion on whether that could be asserted,
19  can you tell me about any of the things you see in this
20  video or any of your experience that would inform that
21  opinion?
22    A.  There's nothing --
23        MR. ENOCH:  Objection -- I'm sorry.
24  Objection to form.
25        Please continue.

57

1    A.  There's nothing in that video that will
2  clearly indicate to me that that was a blue screen
3  event.
4    Q  (BY MR. BANKSTON)  Okay.  And so if a
5  witness -- if anyone was to say, "I can look at that
6  video.  I work with blue screen.  It's got all the
7  telltale signs.  That's clearly blue screen," in your
8  opinion, is that person acting responsibly?
9        MR. ENOCH:  Objection to form.
10    A.  No, I don't.  I think that, based on what we
11  see on that screen, that could be -- that error in the
12  nose would have been caused by a number of different
13  reasons; and none of them are clear from what we see
14  there without knowing what happened behind the scenes
15  with the operating room controllers, so on and so forth.
16  That could have been a natural glitch that happens all
17  the time on YouTube.  We see it all the time where
18  pixels smudge.  There is no secret about that.  There
19  must be a million videos or more where pixels smudge all
20  the time.
21        In order for that -- should I continue?
22    Q.  If you do have more facts that you are basing
23  your opinion on.
24    A.  The only thing I can tell you about that is
25  the only way that that is possibly green screen is if

## 58

1 Anderson Cooper is not standing next to that woman.
2      MR. ENOCH: Objection, nonresponsive to
3 the entire answer, including after the continuation of
4 the question "if you have more facts."
5      Q   (BY MR. BANKSTON) When you say, "That means
6 Anderson Cooper wasn't standing next to that woman," are
7 you making an opinion about whether the woman in the
8 video was actually on location?
9      MR. ENOCH: Objection to form, leading.
10     A.   I'm not making opinion on anything. What I'm
11 saying is: If his nose was cutting off, that means he
12 stepped out of the green screen or the blue screen
13 bounds; and his nose was cut off, which would suggest
14 she was somewhere else. He was standing in one room,
15 she's standing somewhere else. That's what it would
16 mean.
17      If he stepped outside the -- and she's
18 not outside the green screen bounds, how could he have
19 stepped outside the green screen bounds if she is -- she
20 would be disappeared. She wouldn't even be on the
21 screen. We would see -- if that was green screen, we
22 would see -- she would either -- it would be a cut-out.
23      See, what they're suggesting is Anderson
24 Cooper, okay, would be in this screen. Everything else
25 would be green. He would be -- they would composite

## 59

1 behind him the town hall scene that you see behind him.
2 He would step outside, and his nose would get cut off.
3 She would also be outside that box. If the box is only
4 this big and he steps outside, she would also be outside
5 that box, part of the composite, which would mean that
6 she would have to be on location while he was somewhere
7 else.
8      MR. ENOCH: Objection, nonresponsive.
9      Q   (BY MR. BANKSTON) Would it be accurate to say
10 if this theory of how -- if the setup that you're
11 describing is true, would it be accurate to say then
12 that the woman in the interview would not be actually
13 looking at Anderson Cooper?
14      A.   That's what it would mean.
15      MR. ENOCH: Objection to form and
16 leading.
17      A.   It would mean that what you see in there is
18 two people who are acting remarkably responsive to each
19 other on a super-human level, in my opinion, because,
20 you know, they wouldn't be looking at each other. She
21 would be in one location. He would potentially be,
22 according to this theory, in a CNN studio around the
23 corner, down the block, miles away, if not on the other
24 side of the globe. So they would not be in the same
25 place at the same time to have that interaction if he

## 60

1 stepped outside the bounds of the green screen and his
2 nose got cut off.
3      MR. ENOCH: Objection, nonresponsive.
4      Q   (BY MR. BANKSTON) Now, if somebody is wearing
5 glasses in a green screen shot --
6      A.   Uh-huh.
7      Q.   -- will the green screen background that's
8 being composited, will that show up in the reflection of
9 their glasses?
10      MR. ENOCH: Objection to form.
11      A.   Sometimes.
12      Q.   (BY MR. BANKSTON) If there's a projection
13 being used?
14      MR. ENOCH: Objection to form.
15      A.   Depending how the lights are. If the lights
16 are blasting against that green screen, yes. If the
17 lighting guy takes that into accounts, they can -- you
18 know, depending on the lights. If the lights are bright
19 and blasting at them, yes, you would see green screen.
20 Also depending on his proximity to the screen.
21      Q.   (BY MR. BANKSTON) Okay. Maybe -- I think
22 maybe I didn't ask -- the question was a little inartful
23 there. Let's come back up here. If there's lights
24 being shined on the green screen --
25      A.   Uh-huh.

## 61

1      Q.   -- then it might be possible to see green in
2 some glasses?
3      A.   Yes.
4      MR. ENOCH: Objection to form.
5      Q.   (BY MR. BANKSTON) My question is: If there's
6 a background being put on that green screen, does it
7 show up live there on the green screen; or is that just
8 in the computer?
9      MR. ENOCH: Objection to form.
10      A.   It's just in the computer.
11      Q.   (BY MR. BANKSTON) If a person's wearing
12 glasses and they're being filmed against a green screen,
13 will the projected image that's in the computer of the
14 town hall, or whatever, appear in their glasses?
15      MR. ENOCH: Objection to form.
16      A.   Absolutely not.
17      Q.   (BY MR. BANKSTON) Okay. Did you -- as a part
18 of your discussions with people at InfoWars about Sandy
19 Hook, have you raised complaints about this video
20 allegation?
21      MR. ENOCH: Objection to form, leading.
22      A.   Not -- no. I mean, it was one of those
23 things. I just kind of mixed it in with all the rest of
24 it. It wasn't -- it was just one of those points that
25 was just so silly. It's just I can't -- I couldn't

Robert Jacobson - 3/20/2019

62

1  believe that Alex was jumping all over that when he
2  knows perfectly well YouTube pixels smudge.
3      MR. ENOCH:  Objection, nonresponsive.
4      Q.  (BY MR. BANKSTON)  Was any -- were you -- at
5  any time during your time at InfoWars past 2013, were
6  you aware that parents had been complaining about this
7  coverage?
8      A.  No, not immediately.  I really became aware of
9  it sometime afterwards when I saw, actually, I think, a
10  PBS special on what was going on; and it really hit home
11  at that point.  I was like, this is...
12      Q.  Well, you understand -- what is your
13  understanding -- scratch that.
14      Was the InfoWars staff aware of the
15  public controversy they were causing with Sandy Hook
16  allegations?
17      MR. ENOCH:  Object to form.
18      A.  I believe they were.
19      Q  (BY MR. BANKSTON)  Was the staff aware of the
20  public opinion about their Sandy Hook coverage?
21      MR. ENOCH:  Object to form.
22      A.  I believe they were.  I believe that they were
23  aware of a dual opinion at the same time, and they got a
24  rush out of it.
25      MR. ENOCH:  Objection, nonresponsive.

63

1      Q.  (BY MR. BANKSTON)  Were you still employed at
2  InfoWars at the time that Mr. Jones was interviewed by
3  Megyn Kelly?
4      A.  No.
5      Q.  Did you ever become aware that parents were
6  being harassed by believers in the Sandy Hook hoax
7  conspiracy theory?
8      A.  Yes, I became aware of that.
9      Q.  When do you think you became aware of that?
10      A.  Somewhere around 2014, 2015.  Maybe 2015.
11  Like I said, when I saw that PBS documentary.
12      Q.  So the PBS documentary you saw, that was when
13  you were employed at InfoWars?
14      A.  I was still employed there.
15      Q.  In light of the harassment that you became
16  aware of, did it cause you to form any opinions about
17  the level of caution that would be required in covering
18  Sandy Hook from then on out?
19      MR. ENOCH:  Objection to form, leading.
20      A.  Absolutely.  Like I've already stated, I
21  marched into the writers' room several times and
22  attempted to point out that they have an ethical
23  responsibility to abide by.
24      MR. ENOCH:  Objection, nonresponsive.
25      Q.  (BY MR. BANKSTON)  Do you feel, based on your

64

1  personal knowledge inside the company, that InfoWars was
2  responsive to those criticisms and began to act
3  appropriately?
4      MR. ENOCH:  Objection to form.
5      A.  No, I don't.
6      Q  (BY MR. BANKSTON)  Okay, Mr. Jacobson.  We are
7  about an hour in.
8      A.  Uh-huh.
9      Q.  As you know, your deposition was ordered for,
10  I believe it was two or two and a half hours today.
11      A.  Uh-huh.
12      Q.  I'm not going to keep you that long, but I am
13  going to take a short break.
14      A.  Uh-huh.
15      Q.  And we do have some more to cover.
16      A.  Okay.
17      Q.  We might get near two hours -- I don't know --
18  but I'm going to try to get you out as soon as I can
19  today.  But why don't we for the moment -- we'll take a
20  15-minute break.
21      A.  Uh-huh.
22      Q.  And then we'll come back and resume after our
23  break.  Thank you.
24      MR. OGDEN:  Hey, Mark.  Will you call my
25  cell phone?

65

1      MR. BANKSTON:  Absolutely.
2      THE VIDEOGRAPHER:  We are off the record
3  at 1:12 p.m.
4      (Off the record from 1:12 to 1:30 p.m.)
5      THE VIDEOGRAPHER:  We're back on the
6  record at 1:30 p.m.
7      Q.  (BY MR. BANKSTON)  Mr. Jacobson, earlier we
8  had talked about a writing room; and I want to ask you
9  questions about that room itself.  That room was the
10  center of the writing process at InfoWars; is that
11  right?
12      A.  Yes, up until the last three years that I
13  worked there.
14      Q.  Okay.  From your personal knowledge and
15  observations of the writers, can you tell me, as it
16  concerns the writing process for coverage of Sandy Hook,
17  what, if anything, concerned you about that process?
18      MR. ENOCH:  Objection to form.
19      A.  The fact that they took Halbig's word for it,
20  and that was the article.  The article was:  Whatever
21  came out of Halbig's mouth was news.
22      Q  (BY MR. BANKSTON)  When you were, as you
23  mentioned earlier, communicating your thoughts to people
24  at InfoWars about the Sandy Hook coverage, can you
25  describe to me on a scale of one, being not outrageous

66

1  at all and ten, being extremely outrageous, on that
2  one-to-ten scale, what is the level of outrageousness of
3  this conduct that you were trying to impart?
4      MR. ENOCH:  Objection, leading and form.
5  A.  It was a ten.
6  Q.  (BY MR. BANKSTON)  Tell me why you thought
7  that.
8      MR. ENOCH:  Same objections.
9  A.  I mean, it's one thing to make a mistake.
10  It's another thing to have somebody come in -- and I
11  don't even -- I'm not aware if I was the only person or
12  not, but I know I was doing it -- to come in and say,
13  "Hey, this is wrong.  You're making a mistake."  It's
14  one thing, you know, to actually have a mistake and
15  something else to have it pointed out to you, not just
16  once but over and over and over again, and to not only
17  hear the damage that you're doing to people outside of
18  your zone but to actually laugh about it, I thought
19  that's a ten.
20      MR. ENOCH:  Objection, nonresponsive.
21  Q.  (BY MR. BANKSTON)  How long have you known
22  Mr. Jones?
23  A.  I've known Mr. Jones since he employed me in
24  2004.
25  Q.  In your 15 years of knowing Mr. Jones, have

67

1  you arrived at any kind of opinion about whether
2  Mr. Jones is capable of rational action or whether he is
3  too mentally unwell to even be capable of rational
4  action?
5      MR. ENOCH:  Objection to form and
6  leading.
7  A.  In my 15 years of knowing Alex, I feel he is
8  very capable of rational actions, and I think the growth
9  of his business is evidence of that.  Like, while his
10  opinions may be tasteless, he definitely made conscious
11  decisions to run a business.  He flipped the switches
12  himself.  In fact, he micromanages that place; and,
13  obviously, some of the decisions he made were
14  successful.  He took a business from a few handful of
15  people to what it is today.  So based on that evidence,
16  I do feel that he's more than rational in his decisions.
17      MR. ENOCH:  Objection, nonresponsive.
18  Q.  (BY MR. BANKSTON)  Based on your conversations
19  and years with Mr. Jones, do you have an opinion on
20  whether or not Mr. Jones can understand right from
21  wrong?
22      MR. ENOCH:  Objection to form.
23  A.  Yes.
24  Q.  (BY MR. BANKSTON)  Okay.  What is your
25  opinion?

68

1  A.  I think he --
2      MR. ENOCH:  Objection to form.
3  A.  I think he knows right from wrong, and he can
4  definitely distinguish it.  And, again, it's not just my
5  opinion on this.  He goes on the air and proselytizes
6  morality all the time, which, clearly, he knows what's
7  going on; and he's making a conscious decision.  If he
8  can proselytize it and verbalize it and actually
9  articulate it that well to everybody, then, he's
10  definitely thinking about it; and he's aware of what's
11  going on.
12      MR. ENOCH:  Objection, nonresponsive.
13  Q.  (BY MR. BANKSTON)  With respect to your
14  background, have you -- what is your level of experience
15  and exposure to compositing live shots onto backgrounds?
16  A.  I mean, in my experience, I've been asked to
17  do it; and I've done it.
18  Q.  Okay.
19  A.  I've produced those videos.
20  Q.  The films and things that you would make for
21  InfoWars, did you perform any graphics work or
22  compositing work while working on those videos?
23  A.  Mostly graphics works.  I mean, aside from my
24  video editing, I would do graphics much more than video
25  compositing for the films.

69

1  Q.  Does InfoWars in it's studio -- during the
2  years you were there, did it perform any green screen or
3  blue green compositing there at the facility?
4  A.  Yes.
5  Q.  When it comes to video technology, does that
6  remain your profession today?
7  A.  Yes.
8      MR. ENOCH:  Objection to form.
9  A.  Yes.
10      MR. BANKSTON:  What's the basis on that?
11      MR. ENOCH:  I don't know what you mean by
12  "video technology."  It's vague and ambiguous.
13  Q.  (BY MR. BANKSTON)  Do you know what video
14  technology is?
15  A.  Yes, sir.
16  Q.  When I ask you the question, you work in video
17  technology, can you tell me what you mean by video
18  technology?
19  A.  I take technology designed to work on video as
20  my tools and create a product for my clients.
21  Q.  When it comes to video technology, are you
22  someone who considers himself to have specialized
23  knowledge or skill in that technical field?
24      MR. ENOCH:  Object to form.  Speculating,
25  form, and leading.

70

1    A.  Yes.
2    Q    (BY MR. BANKSTON)  Okay.  Can you tell me how
3  many years experience you have in working with video
4  production and video technology?
5         MR. ENOCH:  Objection to form.
6    A.  I have 17 years in video technology, and I
7  have over 20 years -- over 20 years in media technology
8  in general.
9    Q    (BY MR. BANKSTON)  You understand the
10  difference between a layman and a technical person?  Do
11  you understand those terms?
12   A.  Yes, sir.
13        MR. ENOCH:  Objection to form.
14   A.  Yes, sir.
15   Q    (BY MR. BANKSTON)  When it comes to video
16  production and video technology, do you consider
17  yourself a layman; or do you consider yourself as
18  someone who has technical expertise?
19        MR. ENOCH:  Objection to form.
20   A.  I consider myself as somebody who has
21  technical expertise.
22   Q    (BY MR. BANKSTON)  Okay.  Do you still have an
23  opinion as to whether or not alternative media can be a
24  force for good if done correctly?
25        MR. ENOCH:  Objection to form.

71

1    A.  I feel that alternative media -- I think the
2  subject is much bigger than that.  I think that media in
3  itself or journalism is when you cross the ethical
4  boundary, then it will be a force for good; but if
5  people are independent and refuse to abide by standards
6  that are journalist standards that have been established
7  for decades already and followed, or maybe even
8  centuries by some standards, you know, if they refuse to
9  do that, then no, it won't be a force for good.  It will
10  be a force for people to be confused and tear each other
11  down.  If they can figure that out, hey, who's going to
12  be the standard of that.  So I do think that there will
13  always be a professional standard of journalism, and
14  independent journalism should be put in its place.
15        MR. ENOCH:  Objection, nonresponsive.
16   Q.  (BY MR. BANKSTON)  When it comes to
17  professionalism in journalism, do you have an opinion --
18  or let me scratch that.
19        When it comes to professionalism in
20  journalism, have you been exposed to events, perceived
21  things with your own eyes and ears, that gives you an
22  opinion on whether it went right or whether it went
23  wrong as it regards Sandy Hook?
24        MR. ENOCH:  Objection, form.
25   A.  I don't really have a comment on that.  I'm

72

1  not really sure.
2    Q    (BY MR. BANKSTON)  Okay.  Do you today have
3  any sense of guilt about the coverage about Sandy Hook
4  that came out of InfoWars?
5         MR. ENOCH:  Objection to form, leading.
6    A.  Yes.  As I mentioned in my statements
7  previously, the reason why I'm here is because of a
8  tremendous amount of guilt that I didn't act faster.
9  Maybe I should have quit.  Maybe I could have caught the
10  story faster or been better at explaining; but, yes, I
11  do.
12        MR. ENOCH:  Objection, nonresponsive.
13   Q.  (BY MR. BANKSTON)  Are you still on friendly
14  terms with InfoWars?
15   A.  No.
16   Q.  Were you terminated?
17   A.  Yes.
18   Q.  Have you filed a complaint with the EEOC?
19   A.  Yes.
20   Q.  And just for the record, I want to make it
21  clear because I've used an abbreviation.  You filed a
22  complaint with the Equal Opportunity Employment
23  Commission?
24   A.  Yes, sir.
25   Q.  Tell me why you filed a complaint.

73

1    A.  Alex's abusive behavior and the unethical and
2  racist behavior of his staff and the environment that's
3  racist and abusive in general at InfoWars.
4         MR. ENOCH:  Objection, nonresponsive.
5  Move to strike.
6    A.  There was evidence against me that I submitted
7  to the EEOC of myself being Photoshopped onto a Rabbi's
8  face and passed around the office.  There was Owen
9  Schroeder sitting on the air calling me the resident
10  Jew, as well as Rob Dew.  There was a culture of
11  anti-Semitism inside InfoWars.  And so I went to the
12  EEOC with that and a culture of abuse propagated mostly
13  by Alex Jones himself.
14        MR. ENOCH:  Objection, nonresponsive.
15   Q    (BY MR. BANKSTON)  Do you know, sitting here
16  today, if you're the only person who's brought such a
17  complaint or if there's anybody else who's brought
18  similar complaints?
19        MR. ENOCH:  Objection to form.
20   A.  I know of several people who have brought
21  exactly the same complaint or similar, very similar
22  complaints about Alex Jones and the office of InfoWars,
23  many of which are public.
24   Q    (BY MR. BANKSTON)  Do you feel that people
25  might look at your EEOC claim and think you're biased?

---

74

1    A.  I feel, yes, people will look at my EEOC
2  complaint and claim that I'm biased.  Should I continue?
3    Q.  No.  I have a question for you.
4    A.  Okay.
5    Q.  If you've got an EEOC claim and you've got bad
6  blood with InfoWars, why should people believe you?
7    A.  Because people should understand just because
8  Alex -- I have a complaint with Alex doesn't make Alex
9  an angel.  Myself and others have all witnessed it.  I
10  am doing my due diligence in bringing forth abuse that
11  Alex had against me as others have brought forth Alex --
12  abuse that Alex has against them as well as the fact
13  that does not negate the fact that this stuff about
14  Sandy Hook didn't happen, either.  What happened to me
15  is real.  What Alex did to the Sandy Hook parents is
16  also real at the same time.  Just because one is true
17  doesn't make the other untrue.  They're both true at the
18  same time.
19        Alex is an abusive man.  Alex -- and
20  every testimony that you see in public, whether it is,
21  you know, on the record -- you know, we have videos and
22  specials all over the place, news articles written about
23  this.  It's no secret of Alex's behavior.  It's no
24  secret.
25        Therefore, you know, just because I

---

75

1  mounted a complaint because of Alex's bad behavior
2  doesn't mean he behaved badly for Sandy Hook.  People
3  should understand just because one is true, the other --
4  it doesn't mean the other's automatically untrue.
5        MR. ENOCH:  Objection --
6    A.  Are they going to feel that I'm biased?  Yes,
7  but that doesn't mean -- you know, everything is true
8  that I am saying.  And again...
9        MR. ENOCH:  Objection, nonresponsive.
10    Q   (BY MR. BANKSTON)  If the Sandy Hook parents
11  who brought these suits were awarded money from Alex
12  Jones, would it benefit you in any way?
13    A.  No.
14    Q.  If the Sandy Hook parents who brought these
15  suits are awarded money from Mr. Jones, let's say, a
16  significant amount of money, do you know of any way that
17  could be a detriment to you?
18    A.  The one way is if the EEOC rules in my favor,
19  it might jeopardized a potential compensation for myself
20  farther down the line.
21    Q.  So you -- do you feel that if the Sandy Hook
22  parents are ultimately compensated by Mr. Jones, do you
23  have any opinion about whether that could potentially
24  threaten your ability to get compensation for your
25  injuries?

---

76

1    A.  I'm not doing any of this for compensation.
2  I'm doing this because Alex is disgracing himself so
3  badly in the way he has made the parents suffer, as well
4  as myself.  He's still on the air to this day saying
5  things that are arguably true or arguably not true; we
6  don't know.  But we do know that he affects his audience
7  in a way that angers and mobilizes them; and it's
8  unclear if anything he's saying is fact or fiction,
9  opinion or speculation.  But what he does do is mobilize
10  a large amount of people in irrational thinking because
11  there's no way to tell whether what Alex is saying on
12  the air is news or not, true or false, speculation, or
13  opinion, jokes or not; but he advertises it all as news.
14  He is the InfoWars.
15        MR. ENOCH:  Objection, nonresponsive.
16    Q   (BY MR. BANKSTON)  Mr. Jacobson, have -- all
17  of your answers today, have they been based on your
18  personal knowledge?
19        MR. ENOCH:  Objection to form.
20    A.  As far as I know.
21    Q   (BY MR. BANKSTON)  Okay.  Mr. Jacobson, that's
22  all I believe I have for you at this time.
23        MR. ENOCH:  Go ahead.  I'm sorry.  I
24  didn't mean to interrupt you.
25        MR. BANKSTON:  Sure.

---

77

1        That's all I have for you in terms of
2  questions.  I have a few things I need to put on the
3  record.
4        MR. OGDEN:  Mark, can you check your
5  e-mail?
6        MR. BANKSTON:  Yeah, sure.
7        They don't need to concern you.  If you
8  would like to be excused while I put this on the record,
9  I can do that.
10        MR. ENOCH:  And I would like to ask
11  questions.  Are you going to prevent me from doing that,
12  Mark?
13        MR. BANKSTON:  We're going to talk about
14  that on the record in just a minute.
15        MR. ENOCH:  Well, that's what I'm asking
16  you.
17        MR. BANKSTON:  Yeah, so we're going to
18  let Mr. Jacobson go because we're not going to have this
19  discussion in front of a witness.
20        MR. ENOCH:  No, sir, we're not gonna --
21        MR. BANKSTON:  We're not going to let
22  him leave the building, Mark.  We're going to let
23  Mr. Jacobson go to the bathroom, and then I'm going to
24  put something on the record.  And if you have some
25  things to say about it, you can say whatever you want on

---

78

1 the record. And then Mr. Jacobson will be in the
2 building.
3        MR. ENOCH: Are you going to permit me to
4 ask questions, yes or no?
5        MR. BANKSTON: I don't think I can stop
6 you. I literally don't think I can. I think I would
7 have to, like, go over there and physically restrain you
8 because you won't abide by rules; but Mr. Jacobson is
9 just going to go to the bathroom.
10        Now, he's going to come back; and he's
11 going to sit down in that chair. And whether he wants
12 to sit around and listen to anything you say is not my
13 choice, but I'm not releasing him from the building
14 right now.
15        Mr. Jacobson, would you like to step out
16 of the room, maybe, for a moment? You can use the
17 restroom if you need to; otherwise, just wait in the
18 front room for us.
19        (Witness leaves the conference room.)
20        MR. ENOCH: What is it you would like to
21 say outside of his presence?
22        MR. BANKSTON: Okay. I have a few things
23 I need to put on the record.
24        First of all, just to read it really
25 quick, there is an order entered in this case concerning

79

1 this deposition. In Paragraph 3 of the Judge's
2 Discovery Order, it allows that Plaintiff's Motion is
3 granted and that Plaintiff may take the deposition of
4 Robert Jacobson. It does not say that the parties may
5 take the deposition of Robert Jacobson. It says the
6 Plaintiff may take the deposition of Robert Jacobson.
7        The Civil Remedies Code provides that
8 limited discovery will be allowed if the party shows
9 good cause for that discovery and gets an order from the
10 Court on that limited discovery. Plaintiff has gotten
11 an order from the Court showing good cause. Defendants
12 have never attempted to show good cause and, in fact,
13 under the case law is extremely questionable and I see
14 no authority for an idea that a defendant would ever be
15 granted discovery on its own motion. The discovery is
16 granted for the Plaintiff to meet the burdens, the
17 onerous burdens caused by the TCPA.
18        Nonetheless, Mr. Enoch has attempted
19 right from the start to interrupt and hijack my
20 deposition, which I have properly noticed, and start
21 asking the witness questions, questions which the
22 witness was visibly uncomfortable with. This witness
23 agreed to appear voluntarily at this deposition with the
24 understanding that he would be questioned by the
25 Plaintiff's counsel. He has appeared without his own

80

1 personal counsel and was suddenly ambushed by a barrage
2 of questions from his former employer, questions he was
3 not expecting.
4        I need to put this on the record for we
5 are now on our the third deposition of this case; and in
6 the first deposition of Mr. Jones, which Mr. Enoch was
7 not defending but was merely an observer, his name
8 appeared in all caps where's he's speaking and
9 interjecting into the record 28 times during the
10 testimony of Mr. Jones; and that's taking out the times
11 that it appeared for housekeeping matters, like getting
12 the witness water or talking about the PO at the end of
13 the deposition.
14        And I don't want to be tag-teamed and it
15 was ridiculous and improper but I normally wouldn't
16 call it out on the record but I reviewed the
17 transcript -- and I've done this to confirm this -- that
18 there were questions on the floor about what a certain
19 building was and whether it was the school or not. And
20 as part of his interruption, Mr. Enoch blurted out to
21 the witness that it's the firehouse in the video, a word
22 that had not previously appeared in the deposition. So,
23 of course, right after that, Mr. Jones says, quote, "And
24 I later corrected, you know, that was one of the things
25 that had been said that wasn't true was that they were

81

1 at the firehouse. There was other footage from the
2 school."
3        At best, this was highly improper
4 conduct, and it's exactly why we don't allow speaking
5 objections in Texas. At worst, it was an attempt to
6 communicate an idea to the witness, conduct which is
7 absolutely repellant to the idea of justice.
8        Yet, on the following day, the problems
9 continued. I only have a video, not a transcript; but,
10 once again, Mr. Enoch repeatedly interrupted a
11 deposition he was not defending, in which he was simply
12 an observer. And, again, I've watched the video to
13 confirm; and so has my cocounsel, to confirm both of our
14 memories, that Mr. Dew, the corporate representative,
15 visibly reacted to a gesture from Mr. Enoch during a
16 difficult question. And Mr. Ogden had to call him out
17 on it; and you can see Mr. Dew's reaction, how narrow
18 his eyes are in the deposition. During both depositions
19 Mr. Enoch was repeatedly asked to leave the deposition
20 if he refused to stay quiet. He stayed but continued to
21 interrupt.
22        I am putting this all on the record right
23 now because this deposition began rather contentiously;
24 and my reaction to it was one of significant
25 disturbance. I am now in a position where I have a

82

1  witness who is not represented by counsel.  I am facing
2  a counsel who at the very beginning of this deposition
3  threw all sense of propriety out the window and began
4  questioning the witness on multiple issues.  Though he's
5  not the one who noticed this deposition, had no ability
6  to question that witness first, and almost certainly had
7  no ability to question him at all.  It has caused the
8  witness to become very agitated.
9       I do not feel I'm equipped to defend this
10  witness' rights.  I don't represent him.  What is
11  happening is totally inconsistent with the Court's
12  order.  We have attempted to contact the Court because I
13  believe the Court would be wanting to have some sort of
14  input on, when an order like this only gives me the
15  right to question, whether Mr. Enoch should be allowed
16  to question this witness who does not currently have
17  counsel.  I'm very disturbed by this turn of events.  I
18  want this all on the record in case these matters need
19  to be brought to the Court in any kind of connection
20  with sanctions.
21       Right now I'm going to finish, and I'm
22  going to ask Mr. Jacobson to return to the room.  I'm
23  going to tell Mr. Jacobson that I've concluded with my
24  deposition, the deposition that was ordered in the
25  Court's order, and that I have no further need of him to

83

1  be here.  I do not know what Mr. Enoch's going to do at
2  that point.  I do not know if Mr. Enoch's going to
3  attempt to try to keep the witness here.  I don't know
4  what's going to happen.
5       I do know that I am extremely concerned
6  about a witness who -- I mean, about a lawyer who has
7  already exhibited an incredible pattern of astonishing
8  bad conduct in deposition to now take this very
9  unorthodox turn.
10       That being said, those are my comments on
11  the record.  I will allow Mr. Jacobson to return to the
12  room and allow him to make the decision in his own best
13  interest.
14       MR. ENOCH:  And I do not intend to
15  respond tit for tat to what I think is self-serving
16  diatribe, and I will respond appropriately when
17  appropriate.
18       Let's have the witness come back in.
19       (Mr. Bankston briefly left the room and
20  returned with the witness.)
21       MR. BANKSTON:  All right, Joe.  Let's get
22  back on the record.
23       THE VIDEOGRAPHER:  We're still on.
24       MR. BANKSTON:  Mr. Jacobson, that's all I
25  have for you today.  Thank you for your time.

84

1       MR. ENOCH:  Mr. Bankston, if I ask
2  questions, are you going to seek sanctions against --
3       (Indistinguishable simultaneous
4  speakers.)
5       MR. ENOCH:  Mr. Jacobson, are you
6  leaving?
7       (Witness leaves the conference room.)
8       MR. BANKSTON:  He's leaving, apparently.
9  He doesn't want to talk to you, I guess.
10       MR. ENOCH:  Okay.  And my understanding
11  is that you threatened me with sanctions earlier if I
12  asked questions.  Is my understanding correct, sir?
13       MR. BANKSTON:  Yeah, if you were to go
14  ahead and ask him questions, I would probably bring a
15  motion against you.  It would also be for your other
16  conduct in the previous two depositions; but, yeah, if
17  you did that.  And, again, let me just make that clear.
18  You didn't ask him any questions.  I still, depending on
19  what we need to do, might be bringing sanctions against
20  you.
21       MR. ENOCH:  I just -- you don't need to
22  give me a speech.  My question was a simple one:  Did
23  you say you would threaten me with sanctions if I asked
24  questions?  Your answer was in the affirmative.  That's
25  all I need.  Thank you very much.

85

1       MR. BANKSTON:  Yeah, if you're going to
2  engage in improper conduct, I will always put the
3  possibility of sanctions on the table.
4       MR. ENOCH:  I disagree.
5       MR. BANKSTON:  And I think you know that
6  about me by now.
7       MR. ENOCH:  Mr. Bankston, we don't have
8  to have an argument over it.  The question was a simple
9  one.  Thank you for answering.
10       MR. BANKSTON:  Are we off the record?
11       THE VIDEOGRAPHER:  We're off the record
12  at 1:55 p.m.
13       (Deposition concluded at 1:55 p.m.)
14       (Signature of the witness was waived.)
15
16
17
18
19
20
21
22
23
24
25

86

1        CAUSE NO. D-1-GN-18-006623

2  SCARLETT LEWIS     * IN THE DISTRICT COURT OF

      Plaintiff      *

3                *

                *

4  VS.        * TRAVIS COUNTY, TEXAS

5  ALEX E. JONES, INFOWARS, *

    LLC, AND FREE SPEECH    *

6  SYSTEMS, LLC,      *

    Defendants    * 53RD JUDICIAL DISTRICT

7

8      REPORTER'S CERTIFICATION

9      ORAL/VIDEOTAPED DEPOSITION

            OF

10      ROBERT JACOBSON,

11     Taken on March 20, 2019

12    I, Debbie D. Cunningham, a Certified

13  Shorthand Reporter in and for the State of Texas, hereby

14  certify to the following:

15      That the witness, ROBERT JACOBSON, was

16  duly sworn by me, and that the transcript of the oral

17  deposition is a true record of the testimony given by

18  the witness;

19      That examination and signature of the

20  witness to the deposition transcript was waived by the

21  witness and agreement of the parties at the time of the

22  deposition;

23      That the original deposition transcript

24  was delivered to MR. BANKSTON, Esq.;

25      That the amount of examination time used

87

1  by each party at the deposition is as follows:

2     BY MR. BANKSTON:

3     BY MR. ENOCH:

4     BY MR. OGDEN:

5     That $_____ is the deposition

6  officer's charges to the Plaintiff for preparing the

7  original deposition transcript and copies of exhibits,

8  if any;

9     That pursuant to information given to the

10  deposition officer at the time said testimony was taken,

11  the following includes counsel for all parties of

12  record:

13  COUNSEL FOR PLAINTIFF:

14     KASTER LYNCH FARRAR & BALL, LLP

       1010 Lamar, Suite 1600

15     Houston, Texas

       (T) 713.221.8300

16     By: Mark D. Bankston, Esq.

       mark@fbtrial.com

17         AND

       William Ogden, Esq. (VIA PHONE)

18

19  COUNSEL FOR DEFENDANTS:

20     GLAST, PHILLIPS & MURRAY, P.C.

       14801 Quorom Drive, Suite 500

21     Dallas, Texas

       (T) 972.419.8300

22     By: Mark Enoch, Esq.

       mkenoch@gpm-law.com

23

24     That a copy of this certificate was served

25  on all parties shown herein on _____,

88

1  and filed with the Clerk pursuant to Rule 203.3.

2     I further certify that I am neither

3  counsel for, related to, nor employed by any of the

4  parties or attorneys in the action in which this

5  proceeding was taken, and further that I am not

6  financially or otherwise interested in the outcome of

7  the action.

8     Certified to by me this day, April 8,

9  2019.

10

11

12

13     _____

     Debbie D. Cunningham, CSR

14     CSR 2065

     Expiration: June 30, 2021

15     INTEGRITY LEGAL SUPPORT SOLUTIONS

     3100 West Slaughter Lane, Suite A-101

16     Austin, Texas 78748

     www.integrity-texas.com

17     512-320-8690; FIRM # 528

18

19

20

21

22

23

24

25

**From:** Adan S <adan@infowars.com>
**To:** "Louis S." <louis@infowars.com>
**Subject:** Fwd: Sandy Hook Lingerie Party Massacre 2000
**Date:** 2012-12-21 19:30:32 +0000

---

----- Forwarded Message -----
From: "luisito"
To: "Adan S"
Sent: Friday, December 21, 2012 11:24:08 AM
Subject: Re: Sandy Hook Lingerie Party Massacre 2000

You are seriously ill to send me something like that - Don't contact me any more or I will report you for harrassment you bunch of weirdos


Dnia 21 grudnia 2012 19:30 Adan S napisał(a):

> Hello Mr. Gonzalez,
>
> There is a vicious rumor that the date you posted your review of the "Sandy Hook Lingerie Party Massacre" on your site aslashabove.com shows foreknowledge or prior planning, of the events that have taken place as of late.
>
> http://www.godlikeproductions.com/forum1/message2087015/pg1
>
> http://aslashabove.com/2012/07/20/sandy-hook-lingerie-party-massacre-2000-review/
>
> At first, we thought this was surely ridiculous, however, we're (Infowars.com) going to point it out in an article anyway and would like to give you the opportunity to provide a comment.
>
> Thank you.
>

**#1707.1**

FSSTX-077825

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## <u>DECLARATION OF MARK BANKSTON</u>

STATE OF TEXAS  §
  §
HARRIS COUNTY  §

I, Mark Bankston, declare under penalty of perjury that the statements herein are true and correct:

1.  My name is Mark Bankston. My date of birth is 10-10-1978. I am competent to make this declaration.

2.  I am an attorney at the law firm Kaster Lynch Farrar & Ball, LLP, 1117 Herkimer, Houston, TX, 77008. I serve as lead counsel for the Plaintiff.

3.  As a civil litigator, I have ten years of experience in complex tort lawsuits. I have tried over a dozen injury lawsuits to a jury, and I have represented scores of clients in over twenty different states in connection with various product liability, civil rights, employment, and negligence cases in state and federal court.

4.  I currently serve on the Plaintiffs' Steering Committee in Multi-District Litigation for MDL-2666, *In re Bair Hugger Products Liability Litigation,* pending in U.S. District Court for the District of Minnesota. I am also the Plaintiffs' Briefing Chair for that consolidated proceeding. My billing in that lawsuit is submitted to the Plaintiffs' Steering Committee at a rate of $550 per hour.

5.  While this lawsuit is not as complex as a medical device mass tort, it nonetheless presented complicated legal and evidentiary issues which required an attorney of a high level of competence. Given the work itemized and described in this affidavit, I would value my time for the purposes of this affidavit at a rate of $450 per hour.

6.   I am personally familiar with the rates charged by other attorneys of my experience
and professional background in this locality, and my rates are reasonable for the
locality.

7.   In connection with the Defendants' TCPA Motion, I rendered the following legal
services in the trial court:

| Date | Task | Time |
|---|---|---|
| 07-14-2018 – 07-15-2018 | Drafting Plaintiff's Mt for Expedited Discovery and proposed discovery requests | 13.0 |
| 07-14-2018 | Consultation with expert re: discovery | 2.0 |
| 07-15-2018 – 07-17-2018 | Drafting Plaintiff's Mt for Spoliation Sanctions | 10.0 |
| 07-20-2018 – 07-26-2018 | Review and notes on Defendants' 686-page TCPA motion to dismiss and exhibits | 26.0 |
| 07-18-2018 – 07-21-2018 | Legal research on authorities cited in TCPA motion | 20.0 |
| 07-24-2018 | Consultation with expert re: TCPA response | 4.5 |
| 07-27-2018 | Consultation with client re: TCPA response | 5.0 |
| 07-30-2018 | Research InfoWars, LLC website statements for affidavit | 2.0 |
| 08-01-2018 – 08-06-2018 | Legal research on issues raised in TCPA Motion | 28.0 |
| 08-05-2018 | Consultation with expert re: TCPA issue | 2.5 |
| 08-07-2018 – 08-26-2018 | Drafting Plaintiff's response to TCPA motion | 58.0 |
| 08-30-2018 | Oral hearing on TCPA motion and motion for expedited discovery | 2.5 |
| 09-15-2018 – 09-18-2018 | Deposition preparation – Alex Jones | 18.0 |
| 09-19-2018 – 09-22-2018 | Deposition preparation – Owen Shroyer | 8.0 |
| 09-25-2018 – 09-26-2018 | Deposition preparation – Free Speech Systems, LLC and InfoWars, LLC | 10.0 |
| 10-01-2018 | Drafting Plaintiff's Motion for Contempt | 4.0 |
|  |  |  |
|  | TOTAL | 213.5 |

8.      Accordingly, for 213.5 hours of services at $450/hour, I would place the reasonable value of attorney's fees incurred in the trial court at $96,075.

9.      All the work described was reasonable and necessary to respond to Defendants' TCPA motion.

10.     I have also rendered the following legal services in connection with InfoWars' erroneous appeal:

| Date | Task | Time |
|------|------|------|
| 12-06-2018 – 12-10-2018 | Review and notes on Appellants' brief and appendix | 18.0 |
| 12-10-2018 – 12-14-2018 | Legal research on authorities in cited Appellants' brief | 20.0 |
| 12-16-2018 – 12-17-2018 | Research of the record on appeal re: issues in Appellants' brief | 12.0 |
| 12-18-2018 – 12-26-2018 | Drafting of Appellees' brief | 50.0 |
|  |  |  |
|  | TOTAL | 100.0 |

11.     Accordingly, for 100 hours of services at $450/hour, I would place the reasonable value of attorney's fees for the appeal at $45,000.

Executed in Harris County, State of Texas on September 29, 2019.

_____

Mark Bankston

3

10/1/2019 2:23 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Kyla Crumley

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA.

### NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN** | § | **IN THE DISTRICT COURT** |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | **TRAVIS COUNTY, TEXAS** |
| **ALEX E. JONES, INFOWARS, LLC,** | § | |
| **FREE SPEECH SYSTEMS, LLC, and** | § | |
| **OWEN SHROYER** | § | |
| *Defendants* | § | **261st JUDICIAL DISTRICT** |

### DEFENDANTS' STIPULATION AND RESPONSE TO
### PLAINTIFF'S THIRD AMENDED PETITION

This *Stipulation and Response to Plaintiff's Third Amended Petition* is brought by Alex

E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and Owen Shroyer (Defendants), and in

support would respectfully show the Court the following:

### I. Stipulation

Defendants agree to narrow the issues argued in the *Motion to Dismiss Under the Texas*

*Citizens Participation Act* by assuming for purposes of the motion only that the well-pleaded

factual allegations in the Petition are true. As a result, discovery is unnecessary.

### II. Response to Plaintiff's Third Amended Petition

A. *Introduction*

Plaintiff, Neil Heslin, alleged causes of action against each Defendant when the *Motion*

*to Dismiss* was filed were as follows:

| Defendant | Defamation | Defamation Per Se | Respondeat Superior | Conspiracy | Total Causes of Action |
|---|---|---|---|---|---|
| Alex Jones | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | | (2) June 26 and July 20, 2017 | 6 |
| INFOWARS, LLC | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | 8 |
| FREE SPEECH SYSTEMS, | (2) June 26 and July 20, | (2) June 26 and July 20, | (2) June 26 and July 20, | (2) June 26 and July 20, | 8 |

| LLC | 2017 | 2017 | 2017 | 2017 | |
|---|---|---|---|---|---|
| Owen Schroyer | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | | (2) June 26 and July 20, 2017 | 6 |
| **Total Causes of Action Against Defendants** | **28** | | | | |

On August 8, 2019, Plaintiff filed *Plaintiff's Third Amended Petition*, nonsuiting all causes of action against all Defendants for conspiracy and respondeat superior. In total, Plaintiff nonsuited twelve causes of action. With the new amended pleading, only the following causes of action for defamation and defamation *per se* remain:

| **Defendant** | **Defamation** | **Defamation *Per Se*** | **Total Causes of Action** |
|---|---|---|---|
| Alex Jones | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | 4 |
| INFOWARS, LLC | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | 4 |
| FREE SPEECH SYSTEMS, LLC | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | 4 |
| Owen Schroyer | (2) June 26 and July 20, 2017 | (2) June 26 and July 20, 2017 | 4 |
| **Total Causes of Action Against Defendants** | **16** | | |

Plaintiff nonsuited the twelve causes of action after the Defendants filed their *Motion to Dismiss*. Therefore, Defendants pending claims for affirmative relief under the TCPA, including dismissal with prejudice, attorney's fees, and sanctions against Plaintiff for these causes of action, survive the nonsuit.

B. *Argument and Authorities*

Under Texas law, parties have an inherent right to nonsuit their claims for relief at any time until they have introduced all evidence, other than rebuttal evidence, at trial. However, a party's decision to nonsuit does not control the fate of a nonmoving party's independent claims for affirmative relief. TEX. R. CIV. P. 162. A motion to dismiss that may afford more relief than a nonsuit affords constitutes a claim for affirmative relief that survives a nonsuit. *Rauhauser v. McGibney*, 508 S.W.3d 377, 381 (Tex. App.—Fort Worth 2014, no pet.) (citing to *CTL/Thompson Tex., LLC v. Starwood Homeowner's Ass'n, Inc.*, 390 S.W.3d 299, 300–01 (Tex. 2013)); *Villafani v. Trejo*, 251 S.W.3d 466, 468–69 (Tex.2008); *Klein v. Dooley*, 949 S.W.2d 307, 308 (Tex.1997). The TCPA mandates that if the court orders dismissal of a legal action, the court shall award the moving party: (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require; and (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter. TEX. CIV. PRAC. & REM. CODE §27.008(a)(1-2). Thus, a motion to dismiss under the TCPA may afford more relief than a nonsuit provides and constitutes affirmative relief that can be pursued and granted even after the claims have been withdrawn or nonsuited. *See e.g. Rauhauser v. McGibney*, 508 S.W.3d 377; *Walker v. Hartman*, 19-16-00299-CV, 2017 WL 1173827 (Tex. App.—Beaumont Mar. 30, 2017, no. pet. h.); *Souza v. Tessmer,* No. 04-15-00153-CV, 2015 Tex. App. LEXIS 8686, at *9 (Tex. App.—San Antonio 2015, no pet. h.); *James v. Calkins*, 446 S.W.3d 135, 146 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

In *Rauhauser*, the plaintiffs nonsuited all of their claims after the defendant filed a TCPA motion to dismiss. *Rauhauser*, 508 S.W.3d at 382. The *Rauhauser* Court held the defendant was

still entitled to a hearing on his motion to dismiss, seeking dismissal with prejudice, attorney's fees and sanctions. *Id*. The court further held that because the appellant met his burden to show by a preponderance of the evidence that the legal action against him was based on, related to, or in response to his exercise of free speech, and because the Plaintiffs nonsuited their claims and thus did not attempt to establish by clear and specific evidence each essential element of their claims, the motion to dismiss should have been granted. *Id*. The court remanded the case to the trial court to decide defendant's request for dismissal with prejudice, attorney's fees, and sanctions. *Id*.

As the *Rauhauser* court noted, "[a]lthough a plaintiff decides which of its own claims to pursue or to abandon, that decision does not control the fate of a nonmoving party's independent claims for affirmative relief." *Rauhauser,* 508 S.W.3d at 382. Like in *Rauhauser,* Defendants have met their burden to show by a preponderance of the evidence that the legal action against them was based on, related to, or in response to their exercise of the right of free speech, right to petition, and right of association. Plaintiff elected to nonsuit his causes of action pertaining to conspiracy and respondeat superior, rather than attempt to establish by clear and specific evidence a prima facie case for each essential element of his claims against Defendants. Therefore, this Court should grant Defendants' *Motion to Dismiss* as to the recently nonsuited twelve causes of action.

## PRAYER

For the reasons set forth above, this Court should grant Defendants' *Motion to Dismiss* as to the recently nonsuited twelve causes of action.

Respectfully submitted,

BURNETTTURNER
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
Tel: (512) 472-5060
Fax: (512) 472-5427

Michael Burnett
State Bar No. 00790399
mburnett@BurnettTurner.com
Scott Nyitray
State Bar No. 24094876
snyitray@BurnettTurner.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that pursuant to Rule 21 of the TEXAS RULES OF CIVIL PROCEDURE, a true and correct copy of foregoing document was served on the following attorney or party on October 1, 2019, as follows:

*Via E-Service: mark@fbtrial.com*
Mark D. Bankston
KASTER LYNCH FARRAR & BALL, LLP
117 Herkimer Street
Houston, Texas 77008

Michael Burnett

OCT 18 2019 RT

At _____ 4 : 16 P. M.

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## ORDER ON PLAINTIFF'S MOTION FOR CONTEMPT UNDER RULE 215 AND DEFENDANTS' MOTION TO DISMISS UNDER THE TCPA

On October 3rd, 2019, the Court heard Plaintiff's Motion for Contempt Under Rule 215 and Defendants' Motion to Dismiss under the Texas Citizens Participation Act (TCPA Motion). After hearing the arguments of counsel and considering the record, the Court finds that the Motion for Contempt should be granted and the TCPA Motion should be denied.

It is hereby ORDERED that pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burdens in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion.

It is further ORDERED that pursuant to Rule 215.2(b)(8), the Court must require Defendants to pay the reasonable expenses, including attorney fees, caused by the failure to obey the August 31, 2018 order because the Court does not find that the failure was substantially justified or that other circumstances make an award of

1

expenses unjust. The Court orders costs and expenses of $25,875 to be paid by Defendants, to be taxed as costs of court.

It is further ORDERED that Defendants' TCPA Motion is in all respects DENIED.

It is further ORDERED that even without taking Plaintiff's burdens in responding to Defendants' TCPA Motion to be established in favor of Plaintiff pursuant to TRCP 215.2(b)(3), Defendants' TCPA Motion must nevertheless be, and is, DENIED.

So ORDERED October ___, 2019.

Scott Jenkins
Travis County District Judge

2

NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA.

**11/4/2019 4:16 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

## NO. <u>D-1-GN-18-001835</u>

| | | |
|---|---|---|
| **NEIL HESLIN** | § | **IN THE DISTRICT COURT** |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | **TRAVIS COUNTY, TEXAS** |
| **ALEX E. JONES, INFOWARS, LLC,** | § | |
| **FREE SPEECH SYSTEMS, LLC, and** | § | |
| **OWEN SHROYER** | § | |
| *Defendants* | § | **261st JUDICIAL DISTRICT** |

### MOTION FOR SUBSTITUTION OF COUNSEL

This *Motion for Substitution of Counsel* is brought by Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and Owen Shroyer (Defendants), who request the Court to grant permission to substitute Michael Burnett, BURNETTTURNER as attorney of record in this case.

Michael Burnett; BURNETTTURNER; 6034 W. Courtyard Drive, Suite 140, Austin, Texas 78730; Telephone: (512) 472-5060; Facsimile: (512) 472-5427; Email: mburnett@BurnettTurner.com; and State Bar No. 00790399, has been employed to represent Defendants as evidenced by their signature on this motion. Defendants approve this substitution. This substitution is not sought for delay only.

Defendants prays that the Court enter an order substituting Michael Burnett, BURNETTTURNER and discharging Mark C. Enoch, MARK C. ENOCH, P.C. and Glast, Phillips and Murray, PC as attorney of record for Defendants.

Respectfully submitted,

BURNETTTURNER
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
(512) 472-5060
(512) 472-5427 Fax

Michael Burnett
State Bar No. 00790399
mburnett@BurnettTurner.com
Scott A. Nyitray
State Bar No. 24094876
snyitray@BurnettTurner.com

SUBSTITUTING ATTORNEY FOR
DEFENDANTS

**AGREED TO AND APPROVED:**

Alex E. Jones INFOWARS, LLC,
FREE SPEECH SYSTEMS, LLC, and
Owen Shroyer, Defendants

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that pursuant to Rule 21 of the TEXAS RULES OF CIVIL PROCEDURE, a true and correct copy of foregoing document was served on each below-named attorney of record or party on the 4th day of November 2019, as follows:

*Via E-Service: mark@fbtrial.com*
Mark D. Bankston
Kyle W. Farrar
William R. Ogden
KASTER LYNCH FARRAR & BALL, L.L.P
1117 Herkimer Street
Houston, Texas 77008
ATTORNEYS FOR PLAINTIFF

*Via E-Service: fly63rc@verizon.new*
Mark C. Enoch
MARK C. ENOCH, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254
CURRENT ATTORNEY FOR DEFENDANTS

Michael Burnett

**11/6/2019 2:41 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Irene Silva**

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN THE DISTRICT COURT |
| **Plaintiff** | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |
| **Defendants** | § | 261st JUDICIAL DISTRICT |

## NOTICE OF APPEARANCE OF COUNSEL

T. Wade Jefferies, Attorney, files this Notice of Appearance of Counsel on behalf of Alex E. Jones, INFORWARS, LLC, FREE SPEECH SYSTEMS, LLC, and Owen Shroyer, Defendants herein, as an attorney of record in accordance with the Texas Rules of Civil Procedure. All communications from the court or other counsel with respect to this suit shall be sent to the undersigned.

Respectfully submitted,

The Law Firm of T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701

/s/ T. Wade Jefferies
T. Wade Jefferies
Attorney for: Defendants
Bar no: 00790962
Phone: (512) 201-2727
Fax: (512) 687-3499
Email: twadejefferies@twj-law.com

**Certificate of Service**

I certify that a true copy of this document was served in accordance with Rule 21a of the Texas Rules of Civil Procedure to all attorneys of record by electronic filing manager on November 7, 2019.

/s/ T. Wade Jefferies
T. Wade Jefferies
Attorney for: Defendants

11/7/2019 2:54 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
|     Plaintiff | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, | § | |
| LLC, FREE SPEECH SYSTEMS, | § | |
| LLC and OWEN SHROYER, | § | |
|     Defendants | § | 53rd DISTRICT COURT |

## DEFENDANTS' NOTICE OF INTERLOCUTORY APPEAL

To the Honorable Scott H. Jenkins:

On October 18, 2019, the Court signed an order denying *Defendants' Motion to Dismiss under the Texas Citizens' Participation Act*, which all Defendants in this case hereby appeal. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer give notice of an interlocutory appeal to the Third District Court of Appeals pursuant to TEX. CIV. PRAC. & REM. CODE §51.014(a)(12). The appeal shall be expedited as provided by TEX. CIV. PRAC. & REM. CODE §27.008(b). All other proceedings in the trial court are stayed pending resolution of the appeal. TEX. CIV. PRAC. & REM. CODE §51.014(b).

Dated: November 7, 2019.

Respectfully submitted,

The Law Firm of T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701

/s/ T. Wade Jefferies
T. Wade Jefferies
Attorney for: Alex E. Jones, INFOWARS,
LLC, FREE SPEECH SYSTEMS, LLC and
Owen Shroyer
Bar no: 00790962
Phone: (512) 201-2727
Fax: (512) 687-3499
Email: twadejefferies@twj-law.com

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that pursuant to Rule 21 of the Texas Rules of Civil Procedure, a true and correct copy of the foregoing document was served on the following attorney via E-Service on November 7, 2019:

Mark D. Bankston
KASTER LYNCH FARRAR & BALL, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
mark@fbtrial.com
Attorney for: Neil Heslin

/s/ T. Wade Jefferies
T. Wade Jefferies

**11/7/2019 2:56 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, | § | |
| LLC, FREE SPEECH SYSTEMS, | § | |
| LLC and OWEN SHROYER, | § | |
| Defendants | § | 53rd DISTRICT COURT |

---

**DESIGNATION OF COURT REPORTER'S RECORD**

---

TO THE CLERK OF THE COURT:

Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and Owen Shroyer, Defendants, filed a Notice of Appeal in this case on November 7, 2019.  Defendants Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and Owen Shroyer request the court reporter to prepare a transcript with exhibits of the October 3, 2019 hearing conducted before Judge Jenkins for inclusion in the appellate record.

Dated: November 7, 2019.

Respectfully submitted,

The Law Firm of T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701

/s/ T. Wade Jefferies
T. Wade Jefferies
Attorney for:  Defendants
Bar no: 00790962
Phone: (512) 201-2727
Fax: (512) 687-3499
Email: twadejefferies@twj-law.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that pursuant to Rule 21 of the Texas Rules of Civil Procedure, a true and correct copy of the foregoing document was served via electronic filing manager on all attorneys of record on November 7, 2019:

<u>/s/ T. Wade Jefferies</u>
T. Wade Jefferies

11/7/2019 3:12 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, | § | |
| LLC, FREE SPEECH SYSTEMS, | § | |
| LLC and OWEN SHROYER, | § | |
| Defendants | § | 53rd DISTRICT COURT |

## DESIGNATION OF FILINGS FOR CLERK'S RECORD

TO THE CLERK OF THE COURT:

Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and Owen Shroyer, Defendants, filed a Notice of Appeal in this case on November 7, 2019. In accordance with APPELLATE RULE 34.5(a) and (b), Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and Owen Shroyer, Defendants, request the clerk to prepare a clerk's record of the proceeding in this case for inclusion in the appellate record. This list includes those items required by Texas Rules of Appellate Procedure Rule 34.5(a).

Dated: November 7, 2019.

1. The Clerk's Docket Sheet for this case.

2. Plaintiff's Original Petition and Request for Disclosure (filed April 16, 2018)

3. Defendants' Original Answer (filed June 18, 2018)

4. Defendants' First Amended Answer (filed July 13, 2018)

5. Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed July 13, 2018)

6. Defendants' Notice of Hearing on Motion to Dismiss (filed July 19, 2018)

7.      Defendants' Letter to Clerk with thumb drive containing video exhibits (filed July 23, 2018) Thumb drive to be included in Clerk's Record.

8.      Plaintiff's Motion for Sanctions for Intentional Destruction of Evidence (filed August 17, 2018)

9.      Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion (filed August 17, 2018)

10.     Defendants' Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery (filed August 23, 2018)

11.     Plaintiff's Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

12.     Supplemental Affidavit in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 27, 2018)

13.     Defendants' First Amended Response to Plaintiff's Motion for Sanctions and Motion for Expedited Discovery and Defendants Motion for Sanctions (filed August 27, 2018)

14.     Supplemental Affidavits in Support of Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 28, 2018)

15.     Supplemental Affidavit in Support of Defendants' First Amended Response to Plaintiff's Motion for Expedited Discovery and Motion for Sanctions (filed August 28, 2018)

16.     Defendants' Objections to Plaintiff's Evidence Submitted in Response to Defendants' Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

17.     Defendants' First Supplemental Motion to Dismiss Under the Texas Citizens Participation Act (filed August 29, 2018)

18.     Supplemental Affidavit in Support of Defendants' First Amended Response to
Plaintiff's Motion for Expedited Discovery and Motion for Sanctions (filed August 29, 2018)

19.     Defendants' Second Amended Answer (filed August 29, 2018)

20.     Defendants' Second Supplemental Motion to Dismiss Under the Texas Citizens
Participation Act (filed August 30, 2018)

21.     Supplemental Affidavit in Support of Defendants' First Amended Response to
Plaintiff's Motion for Expedited Discovery and Motion for Sanctions (filed August 30, 2018)

22.     Letter to Clerk including a thumb drive containing Exhibit 3 to Defendants'
Second Supplemental Motion to Dismiss Under the Texas Citizens Participation Act (filed
August 30, 2018) Thumb drive to be included in Clerk's Record.

23.     Letter to Clerk including a flash drive containing Exhibits B1 and B2 to Plaintiff's
Response to Defendants' Motion to Dismiss (filed August 30, 2018) Flash drive to be included in
Clerk's Record.

24.     Order on Plaintiffs' Motion for Expedited Discovery and in Aid of Plaintiff's
Response to Defendants' TCPA Motion (filed August 31, 2018)

25.     Defendants' Request for Rulings on Timely Filed Objections to Plaintiff's
Evidence (filed September 11, 2018)

26.     Defendants' Second Request for Rulings on Timely Filed Objections to Plaintiff's
Evidence (filed September 25, 2018)

27.     Plaintiff's Motion for Contempt Under Rule 215 (filed October 1, 2018)

28.     Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and Owen
Shroyer's Notice of Interlocutory Appeal (filed October 2, 2018)

29.     Plaintiff's First Amended Petition (filed on June 26, 2019)

30.     Plaintiff's Third Amended Petition (filed on August 8, 2019)

31.     Plaintiff's Supplemental Response to Defendants' Motion to Dismiss Under the

Texas Citizens Participation Act (filed September 30, 2019)

32.     Defendants' Stipulation and Response to Plaintiff's Third Amended Petition (filed

October 1, 2019)

33.     Order on Plaintiff's Motion for Contempt Under Rule 215 and Defendants'

Motion to Dismiss Under the TCPA (filed October 18, 2019)

34.     Defendants' Notice of Interlocutory Appeal (filed November 7, 2019)

35.     Designation of Court Reporter's Record (filed November 7, 2019)

36.     Designation of Filings for Clerk's Record (filed November 7, 2019)

      Respectfully submitted,

The Law Firm of T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701

/s/ T. Wade Jefferies
T. Wade Jefferies
Attorney for:  Defendants
Bar no: 00790962
Phone: (512) 201-2727
Fax: (512) 687-3499
Email: twadejefferies@twj-law.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that pursuant to Rule 21 of the Texas Rules of Civil Procedure, a true and correct copy of the foregoing document was served via electronic filing manager on all attorneys of record on November 7, 2019:

      /s/ T. Wade Jefferies
      T. Wade Jefferies

# Velva L. Price
## District Clerk, Travis County
**P. O. Box 679003**
**Austin, TX 78767**

## BILL OF COST FOR CLERK'S RECORD

November 08, 2019

T. WADE JEFFERIES
401 CONGRESS AVENUE, SUITE 1540
AUSTIN, TX 78701

AUSTIN, TX 78730-5064

**CASE NUMBER:** D-1-GN-18-001835

NEIL HESLIN

VS

ALEX E. JONES, INFOWARS, LLC., FREE SPEECH SYSTEMS, LLC, AND OWEN
SHROYER

BALANCE DUE FOR CLERK'S RECORD OBO DF-1: **$3303.00**
**\*\*\*You can now pay your bill ONLINE\*\*\***
**Visit https://www.traviscountytx.gov/district-clerk** and click on **Online Payment**

THE RECORD WAS REQUESTED BY: T. WADE JEFFERIES
Please direct your payment to the attention of the undersigned, "**Court Costs, Fines, or Fees are
due to the Travis County District Clerk no later than 10 business days from the date of this
"Bill of Costs".**

If you have any questions, or need further assistance, please contact the District Clerk's office.

Thank You,

*Selina Hamilton*

HAMILTON LYNDA SELINA

Type/Form Number: B03 - 000002966

| Administrative Offices | Civil and Family Division | Criminal Division | Jury Office |
|---|---|---|---|
| (512) 854-9737 | (512) 854-9457 | (512) 854-9420 | (512) 854-4295 |
| Fax: 854-4744 | Fax: 854-6610 | Fax: 854-4566 | Fax: 854-4457 |

FILE COPY



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

Filed in The District Court
of Travis County, Texas

NOV 1 2 2019

At _____6:03_____ P. M.

Velva L. Price, District Clerk



JEFF L. ROSE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

November 12, 2019

Mr. T. Wade Jefferies
The Law Firm of T. Wade Jefferies
401 Congress Avenue  Suite 1540
Austin, TX 78701
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
* DELIVERED VIA E-MAIL *

RE:   Court of Appeals Number:   03-19-00811-CV
      Trial Court Case Number:   D-1-GN-18-001835

Style:   Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
         v. Neil Heslin

Dear Counsel:

The Court has been advised that appellant has given notice of appeal. The cause in this Court will bear the number and style shown above. Cases in the Third Court of Appeals are governed by the Texas Rules of Appellate Procedure (Tex. R. App. P.) which may be accessed on the Court's website at http://www.txcourts.gov/rules-forms/rules-standards/. The Court provides all notices, orders, or other communications about a case by email. All documents filed with this Court must include the filer's email address in addition to any other information required by the Texas Rules of Appellate Procedure. It is the filer's responsibility to update the Court with any changes to their email address. In addition, at or before the time of a document's filing, the filing party must serve a copy of the document(s) on all parties to the proceeding. *See* Tex. R. App. P. 9.5.

Appellant is requested to forward the following items to this Court on or before **November 18, 2019**:

- **Docketing Statement** – *See* Tex. R. App. P. 32. Until the clerk's record is filed, the docketing statement is the primary source of important information about an appeal, including contact information for the parties and information about the order being appealed. A copy of the docketing statement is available on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/forms/.

- **Challenge to Constitutionality of a State Statute -** Pursuant to Section 402.010 (a-1) of the Texas Government Code, any party challenging the constitutionality of a Texas Statute must file a "Challenge to the Constitutionality of a State Statute" form with the court in which the challenge is pending. This form can be accessed on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/forms/. **Parties**

FILE COPY

**who are not challenging the constitutionality of a state statute need not file this form.**

Unless an appellant is exempt by law or is presumed unable to afford payment of court costs, the trial-court clerk and court reporter are not required to file the clerk's and reporter's records until appellant has paid the required fees, or has made satisfactory arrangements to pay the fees. *See* Tex. R. App. P. 35.3(a)(2), (b)(3). If appellant has not already done so, written requests and arrangements for payment of the following records must be made on or before **November 18, 2019**.

- **Clerk's Record** - The Court may dismiss an appeal for want of prosecution if the clerk's record is not filed and it is appellant's fault. See Tex. R. App. P. 37.3(b); 42.3. Appellant should make arrangements for the clerk's record with the trial-court clerk and may file a written designation specifying additional items to be included in the clerk's record. *See* Tex. R. App. 34.5(b)(2).

- **Reporter's Record** - If appellant decides to include a reporter's record as part of the appellate record, a request in writing to the court reporter must be made. *See* Tex. R. App. P. 34.6(b). The request to the court reporter must designate the portions of the proceedings to be included in the record including any exhibits. Appellant must also file a copy of the request with the trial-court clerk. *See* Tex. R. App. P.34.6. If a reporter's record is not filed, the Court may decide the appeal on those issues or points that do not require a reporter's record for a decision. *See* Tex. R. App. P. 37.3(c).

More information about the courts practices are available on the Court's website at http://www.txcourts.gov/3rdcoa/practice-before-the-court/. Please note, Tex. R. App. P. 9.6 requires that parties and counsel communicate with the appellate court about a case only through the clerk of the court.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Courtland Crocker*

Courtland Crocker, Deputy Clerk

cc:    The Honorable Velva L. Price

**11/13/2019 9:12 AM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**



THE LAW FIRM OF
# T. WADE JEFFERIES

**401 Congress Ave., Suite 1540**
**Austin, TX 78701**

**twadejefferies@twj-law.com**

**Office: (512) 201-2727**
**Cell: (512) 751-6027**
**Fax: (512) 687-3499**

**www.twj-law.com**

November 12, 2019

Chavela V. Crain                                  Sent via USPS Priority Mail
Official Court Reporter
53rd District Court, Travis County
1000 Guadalupe, Room 327
Austin, Texas 78721

     RE:  Job Number 1962-1; Cause No. D-1-GN-18-001835, Neil Heslin v. Alex E. Jones, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and Owen Shroyer, 53rd District Court, Travis County, Texas.

Ms. Crain,

     Attached is a check made payable to Chavela V. Crain in the amount of $402.00 for the preparation of the court transcript for appeal on the October 3, 2019 Hearing on Defendants' Motion to Dismiss.

     Please mail or email me a receipt at your convenience.

Thank you,

*T. Wade Jefferies*

T. Wade Jefferies



**Chavela V. Crain**
Official Court Reporter
53rd District Court, Travis County
1000 Guadalupe, Room 327
Austin, Texas  78701
Phone:  (512) 854-9322
Fax: (512) 854-0234
Chavela.Crain@traviscountytx.gov

---

## BILL OF COSTS

Invoice Date:  November 8, 2019

Job Number:  1962-1

Bill to: T. Wade Jefferies
    The Law Firm of T. Wade Jefferies
    401 Congress Avenue, Suite 1540
    Austin, Texas  78701
    (512) 201-2727

Cause No. D-1-GN-18-001835,
Neil Heslin v. Alex E. Jones,
InfoWars, LLC, Free Speech
Systems, LLC, and Owen Shroyer,
53rd District Court, Travis County

| DATE TAKEN | DESCRIPTION | AMOUNT |
|---|---|---|
| | Preparation of court transcript for appeal: | |
| 10-03-19 | Hearing on Motion to Dismiss | |
| | TOTAL | $402.00 |

Please make check payable to:
Chavela V. Crain

# Velva L. Price
**Travis County District Clerk**
**Travis County Courthouse Complex**
**P.O. Box 679003**
**Austin, Texas 78767-9003**



November 18, 2019

A Disk containing a complete copy of the clerk's record in cause number D-1-GN-18-001835 // 03-19-00811-CV, styled NEIL HESLIN vs. ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC AND OWEN SHROYER., was hand delivered by Selina Hamilton to the Third Court of Appeals clerk on November 18, 2019. The cost of the clerk's record was $3303.00, and it was paid for on November 12, 2019.

_____
3rd Court of Appeals Clerk

_____
Selina Hamilton
Court Clerk II
Travis County District Clerk's Office
Civil Division

Administrative Offices
(512) 854-9457
fax: 854-4744

Civil and Family Division
(512) 854-9457
fax: 854-9549

Criminal Division
(512) 854-9420
fax: 854-4566

Jury Office
(512) 854-9669
fax: 854-4457

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| | § | |
| *Defendants* | § | 261st JUDICIAL DISTRICT |

## **ORDER ON MOTION FOR SUBSTITUTION OF COUNSEL**

On this date came on for consideration the Motion for Substitution of Counsel for Defendants Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer.  Noting that defendants consent to this motion and substitution of counsel, the Court finds that it should be GRANTED.

Therefore it is ORDERED that Michael Burnett of Burnett Turner (6034 W. Courtyard Drive, Suite 140, Austin, Texas 78730) shall be substituted as counsel for Defendants and Defendants' counsel, Mark C. Enoch of Glast, Phillips & Murray, P.C., be permitted to withdraw as their counsel of record.

SIGNED this _____ day of _____, 2019.


_____
JUDGE PRESIDING



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

**Filed in The District Court
of Travis County, Texas**

**NOV 19 2019**

At_____6:02_____P.M.

**Velva L. Price, District Clerk**

November 19, 2019

Mr. T. Wade Jefferies
The Law Firm of T. Wade Jefferies
401 Congress Avenue  Suite 1540
Austin, TX 78701
\* DELIVERED VIA E-MAIL \*

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
\* DELIVERED VIA E-MAIL \*

RE:   Court of Appeals Number:   03-19-00811-CV
      Trial Court Case Number:    D-1-GN-18-001835

Style:   Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
         v. Neil Heslin

Dear Counsel:

On November 18, 2019, the one-volume clerk's record was filed in this Court.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: _Courtland Crocker_

Courtland Crocker, Deputy Clerk

cc:   Ms. Chavela Crain
      The Honorable Velva L. Price



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

JEFF L. ROSE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

December 4, 2019

**Filed in The District Court
of Travis County, Texas**

**DEC 0 4 2019**

At _____6:01_____ P.M.

**Velva L. Price, District Clerk**

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

RE:  Court of Appeals Number:  03-18-00650-CV
     Trial Court Case Number:   D-1-GN-18-001835

Style:  Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
        v. Neil Heslin

Dear Ms. Price:

Enclosed, with reference to the above cause, is the mandate of this Court. Please file and execute in the usual manner. Your cooperation in this regard is appreciated.

In addition, as required by Texas Government Code, Sec. 51.204(d), the trial court clerk is notified that we will destroy all records filed in respect to this case with the exception of indexes, original opinions, minutes and general court dockets no earlier than six (6) years from the date final mandate is issued.

Very truly yours,

JEFFREY D. KYLE, CLERK

By: Courtland Crocker, Deputy Clerk

cc: Mr. Mark Bankston                    Mr. Michael Burnett

# **M A N D A T E**

THE STATE OF TEXAS

TO THE 261ST DISTRICT COURT OF TRAVIS COUNTY, GREETINGS:

Trial Court Cause No. D-1-GN-18-001835

      Before our Court of Appeals for the Third District of Texas on August 30, 2019, the cause on appeal to revise or reverse your judgment between

                    Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

No. 03-18-00650-CV      v.

                    Neil Heslin

Was determined, and therein our Court of Appeals made its order in these words

Having reviewed the record, it appears that the Court lacks jurisdiction over this appeal. Therefore, the Court dismisses the appeal for want of jurisdiction. Appellant shall pay all costs relating to this appeal, both in this Court and in the court below.

Wherefore, we command you to observe the order of our Court of Appeals in this behalf and in all things have the order duly recognized, obeyed, and executed.



Witness the Honorable Jeff L. Rose, Chief Justice of the Court of Appeals for the Third District of Texas, with the seal of the Court affixed in the City of Austin on December 04, 2019.

_____

JEFFREY D. KYLE, CLERK

By:  Courtland Crocker, Deputy Clerk

# BILL OF COSTS

## TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

No. 03-18-00650-CV

### Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

v.

### Neil Heslin
(No. D-1-GN-18-001835 IN 261ST DISTRICT COURT OF TRAVIS COUNTY)

| Type of Fee | Charges | Paid | By |
|---|---|---|---|
| FILING | $10.00 | E-PAID | JILL BAUERLEIN |
| FILING | $10.00 | E-PAID | JILL BAUERLEIN |
| FILING | $10.00 | E-PAID | DAVID GUILLEN |
| SUPPLEMENTAL CLERK'S RECORD | $11.00 | UNKNOWN | UNKNOWN |
| FILING | $10.00 | E-PAID | MELANIE ILLIG |
| FILING | $10.00 | E-PAID | MELANIE ILLIG |
| FILING | $10.00 | E-PAID | MELANIE ILLIG |
| REPORTER'S RECORD | $1,086.00 | UNKNOWN | UNKNOWN |
| CLERK'S RECORD | $3,192.00 | UNKNOWN | UNKNOWN |
| INDIGENT | $25.00 | E-PAID | MELANIE ILLIG |
| FILING | $100.00 | E-PAID | MELANIE ILLIG |
| SUPREME COURT CHAPTER 51 FEE | $50.00 | E-PAID | MELANIE ILLIG |
| STATEWIDE EFILING FEE | $30.00 | E-PAID | MELANIE ILLIG |

**Balance of costs owing to the Third Court of Appeals, Austin, Texas:  0.00**

*Court costs in this cause shall be paid as per the Judgment issued by this Court.*

I, **JEFFREY D. KYLE, CLERK** OF THE THIRD COURT OF APPEALS OF THE STATE OF TEXAS, do hereby certify that the above and foregoing is a true and correct copy of the cost bill of THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS, showing the charges and payments, in the above numbered and styled cause, as the same appears of record in this office.



**IN TESTIMONY WHEREOF,** witness my hand and the Seal of the **COURT OF APPEALS** for the Third District of Texas on December 4, 2019.

**JEFFREY D. KYLE, CLERK**

By: Courtland Crocker, Deputy Clerk

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

Filed in The District Court
of Travis County, Texas

MAR 2 5 2020

At_____6:04 P. M.

Velva L. Price, District Clerk

NO.  03-19-00811-CV

**Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer, Appellants**

v.

**Neil Heslin, Appellee**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-001835, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellants Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer appeal from the district court's order denying their motion to dismiss under section 27.003 of the Texas Citizens Participation Act (TCPA). *See* Tex. Civ. Prac. & Rem. Code § 27.003.[1] We will affirm the district court's denial of Appellants' motion to dismiss.

### BACKGROUND

Neil Heslin's son, Jesse, was killed in the Sandy Hook Elementary School shooting in December 2012. In June 2017, Heslin participated in a television interview during which he responded to claims by Jones that the shooting at Sandy Hook was "a giant hoax."

---

[1] The TCPA was amended in the 2019 legislative session, but those amendments do not apply to this lawsuit, which was filed before the amendments' effective date. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11, 12, 2019 Tex. Gen. Laws 684, 687 (amendments to TCPA apply "only to an action filed on or after" September 1, 2019).

Shortly thereafter, Appellants aired broadcasts disputing Heslin's account of how he lost his son. In response, Heslin sued Appellants for defamation and defamation per se related to Appellants' statements disputing Heslin's claim that he held his deceased son in his arms. On July 13, 2018, Appellants filed a motion to dismiss Heslin's claims under the TCPA. In August 2018, Heslin filed a motion for expedited discovery. Heslin also responded to the motion to dismiss. On August 30, 2018, the district court held a hearing to consider the pending motions. At that hearing, the court determined that it would grant limited discovery relevant to the motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code § 27.006(b). Because Appellants did not respond to any discovery requests, Heslin filed a motion for contempt, seeking sanctions under Rule 215. *See* Tex. R. Civ. P. 215. The day Heslin filed his contempt motion, Appellants filed a notice of appeal, asserting that their TCPA motion had been dismissed by operation of law. *See* Tex. Civ. Prac. & Rem. Code § 27.008(a) (providing for denial by operation of law if a trial court does not rule within the time limits prescribed by the TCPA). This Court dismissed that premature appeal for want of jurisdiction because the district court had not yet ruled on the motion at issue. *Jones v. Heslin*, 587 S.W.3d 134, 136-37 (Tex. App.—Austin 2019, no pet.).

The district court then held a hearing on Appellants' still-pending TCPA motion to dismiss and Heslin's motion for sanctions. At the hearing, Appellants acknowledged that they never responded to discovery and confirmed their agreement to stipulate, for purposes of the TCPA motion, that all of the factual allegations in Heslin's pleadings are true. Appellants' counsel further explained that "it really comes down to whether or not the Court finds that what the defendants are alleged to have done is protected expressions of opinion or alleged statements of fact." The district court granted Heslin's motion for sanctions and ordered that "pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's

2

burdens in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion." That is, under the district court's order, Heslin has met his burden to establish a prima facie case for defamation under the TCPA. In the same order, the district court denied the TCPA motion, specifying that the motion would have been denied even without taking the Rule 215.2(b)(3) sanctions into account. Appellants assert on appeal that the district court erred in denying their motion to dismiss. However, Appellants do not complain on appeal about the sanctions order. In fact, neither their brief nor their reply mention their stipulation to the facts alleged in Heslin's pleadings nor the sanctions awarded by the district court. Heslin responded, arguing that (1) this appeal is rendered frivolous by the unchallenged contempt sanctions establishing all the matters contained in Heslin's court approved written discovery (the subject of the August 31, 2018 order) and (2) even in the absence of the sanctions, Heslin met his burdens under the TCPA to survive dismissal. Heslin has also moved for sanctions in this Court under Texas Rule of Appellate Procedure 45, arguing that Appellants' appeal is frivolous "for several reasons," including the fact that Appellants' brief ignores the existence of the Rule 215 sanctions establishing discovery responses in Heslin's favor.

## ANALYSIS

Generally, "[r]eviewing a TCPA motion to dismiss requires a three-step analysis." *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018). As a threshold matter, the moving party must show by a preponderance of the evidence that the TCPA properly applies to the legal action against it. Tex. Civ. Prac. & Rem. Code § 27.005(b). If the moving party meets that burden, the nonmoving party must establish "by clear and specific evidence a prima facie case for each

3

essential element of the claim in question." *Id.* § 27.005(c). If the nonmoving party satisfies that requirement, the burden shifts back to the moving party to prove each essential element of any valid defense by a preponderance of the evidence. *Id.* § 27.005(d).

"In determining whether a legal action should be dismissed under [the TCPA], the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). We review de novo whether each party carried its assigned burden. *Long Canyon Phase II & III Homeowners Ass'n v. Cashion*, 517 S.W.3d 212, 217 (Tex. App.—Austin 2017, no pet.).

Although in their initial brief Appellants argue extensively that the TCPA applies, Heslin does not dispute the applicability of the TCPA. Appellants' brief also argues at length that Heslin has not established a prima facie case for defamation or defamation per se. However, Appellants' reply brief acknowledges that the Rule 215 discovery sanction "relieves [Heslin] of the burden . . . under Tex. Civ. Prac. & Rem. Code §27.005(c)." In other words, Appellants concede that the effect of the district court's unchallenged sanctions order is that Heslin has met his burden to establish a prima facie case for each essential element of defamation and defamation per se. Therefore, Appellants are proceeding solely "under Tex. Civ. Prac. & Rem. Code §27.005(d)," to determine whether they established a valid defense to Heslin's claims. We therefore assume the TCPA applies and consider, in light of Appellants' stipulation to the truth of all facts asserted in Heslin's pleadings and the sanctions imposed by the district court, whether Appellants proved each essential element of a valid defense by a preponderance of the evidence.

**Statute of Limitations**

Appellants first assert the one-year statute of limitations as a defense "to the extent that Heslin's claims are based on any alleged 'long history' of defamatory statements." Although Heslin's pleadings and brief contain Appellants' "history" of statements regarding the death of Heslin's son as background and to show knowledge of falsity or Appellants' intent, the statements that serve as the basis for the current suit were made in two broadcasts: one in June 2017 and the other in July 2017. Heslin filed suit in April 2018, and Appellants seem to acknowledge that the broadcasts made in summer of 2017, if they are defamatory "in and of themselves," may serve as the basis of a timely filed claim for defamation. Having conceded that, for the purposes of the TCPA motion, Heslin established a prima facie case for defamation as to the statements made in the summer of 2017, Appellants are not entitled to dismissal based on the statute of limitations.

**Timely Requesting a Correction**

In their second alleged defense on appeal, Appellants argue that Heslin was required to seek a correction "not later than the 90th day after receiving knowledge of the publication" in order to recover exemplary damages. Appellants do not present any argument or evidence regarding when Heslin learned of the broadcasts, though they state that he requested a correction on April 11, 2018. Relying on an affidavit attached to his petition, Heslin argues that he learned of the broadcast during the first week of April 2018, shortly before requesting a correction. Because Appellants identify no evidence as a basis for their argument that Heslin failed to timely request a correction, they have not met their burden under the TCPA to prove each element of this defense by a preponderance of the evidence, and are therefore not entitled to dismissal.

5

**Protected Statements of Opinion**

   Appellants' third defense is that their statements were opinions.  By agreeing that Heslin established his prima facie case for defamation, as discussed above, which includes the element of publishing a "false statement of fact," Appellants seem to have already acknowledged they made at least one false statement of fact.  *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019) (listing elements of defamation).  However, without addressing any particular statements alleged as the basis of Heslin's claims, Appellants argue, generally, that their statements are constitutionally protected expressions of opinion, rather than statements of fact.  "Whether a statement is an opinion is a question of law." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018).  "And, like the determination whether a publication is false and defamatory, the determination whether a publication is an actionable statement of fact or a protected expression of opinion depends upon a reasonable person's perception of the entirety of the publication." *Vice v. Kasprzak*, 318 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2002)).  To distinguish between fact and opinion, the Texas Supreme Court has determined that we are to use *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), as our guide.  *Bentley*, 94 S.W.3d at 579. The *Milkovich* court declined to develop an unnecessary and artificial distinction between opinion and factual assertions.  *Id.* at 579-80; *see Milkovich*, 497 U.S. at 19.  The Texas Supreme Court extrapolated from *Milkovich* the following principles that apply in determining whether a statement is one of opinion or fact: (1) the statement must be provable as false, at least "where public-official or public-figure plaintiffs [are] involved"; (2) constitutional protection is afforded to "statements that cannot 'reasonably be interpreted as stating actual facts'" in order to assure "that public debate will not suffer for lack of 'imaginative expression' or . . . 'rhetorical

6

hyperbole'"; (3) "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth"; or if the statement involves a private figure on a matter of public concern, the "plaintiff must show that the false connotations were made with some level of fault"; and (4) the statements must be given "enhanced appellate review" to assure that these determinations are made in a manner that does not "constitute a forbidden intrusion" into free speech. *Bentley*, 94 S.W.3d at 580.

We note that in Appellants' brief and reply brief, they rely on the Texas Supreme Court's opinion in *Carr v. Brasher*, 776 S.W.2d 567 (Tex. 1989), to argue that their statements constitute opinions rather than facts. However, as the Texas Supreme Court observed in *Bentley*, *Carr* was decided without the benefit of guidance from the United States Supreme Court's decision in *Milkovich*. *Bentley*, 94 S.W.3d at 579 n.36. Both *Bentley* and *Milkovich* are cited in Appellant's brief for other propositions, but these precedents are absent from Appellants' arguments regarding whether Appellants' statements are actionable. *Carr* differed from *Milkovich* in that *Carr* stated that "all assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution," 776 S.W.2d at 570, while *Milkovich* refused to make that bright-line distinction on the ground that such an interpretation would "ignore the fact that expressions of 'opinion' may often imply an assertion of objective fact," *Milkovich*, 497 U.S. at 19. Even under *Carr*, false statements of fact (that are otherwise defamatory, as has already been established for purposes of this TCPA motion) would be actionable. *See Carr*, 776 S.W.2d at 570.

7

To determine whether the two broadcasts at issue contained solely protected statements of opinion, we briefly review some of the statements made in each broadcast. The June broadcast featured Shroyer, an Infowars reporter, commenting on Heslin's statement about holding his deceased son:

> Neil Heslin, a father of one of the victims, during the interview described what happened the day of the shooting and basically what he said, the statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible.

Shroyer further comments: "You would remember if you held your dead kid in, in your hands with a bullet hole. That's not something that you would just misspeak on. So let's roll the clip first, Neil Heslin telling Megyn Kelly of his experience with his, with, uh, with his kid." The broadcast then shows a clip of Heslin telling Megyn Kelly about how his son was murdered at Sandy Hook Elementary and that he held Jesse "with a bullet hole though his head." Following that clip, Shroyer stated that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child. Now here is an account from the coroner that does not cooperate with that narrative." At that point, the broadcast shows a clip of a person stating

> We did not bring the bodies and the families into contact. We took pictures of them, of their facial features. It's easier on the families when you do that. There is a time and a place for up close and personal in the grieving process, but to accomplish this, we felt it would be best to do it this way. You can control the situation depending on your photographer, and I have very good photographers.

8

In the July broadcast, Alex Jones states that he will play a video that "pointed out an anomaly" "concerning Sandy Hook."  Before playing that video, Jones questioned the honesty of the media, then asked, regarding the events and reporting on Sandy Hook:

> Is there a blue screen where Anderson Cooper's face disappearing?  Are there kids going in circles in the video shots?  Did they hold back the helicopters?  Did they have port-a-potties there in an hour and a half?  Did they run it like a big PR operation?  Do they get all these conflicting stories in the media? Absolutely. . . . I'm questioning known liars in the media.

He then introduces the clip of Shroyer from the June broadcast where Shroyer plays the clip of Heslin followed by what Shroyer identifies as a clip of the coroner, commenting that Heslin "needs to clarify" the "anomaly."  Following the Shroyer clip, Jones stated:

> you've got CNN and MSNBC both with different groups of parents and the coroner saying we weren't allowed to see our kids basically ever, what they sound like they're saying, but we see a father, a grieving father saying that he dropped him off with a book bag, got him back in a body bag. . . . we need to get clarification on what went on, and I couldn't ever find out.  The stuff I found was they never let them see their bodies.

In context, at least some of Shroyer's statements in the June broadcast, including the statement "according to a timeline of events and a coroner's testimony, [Heslin having held his son's body] is not possible," are verifiable statements of fact challenging the veracity of Heslin's statement that he held his son's body.  Likewise, at least some of Jones's comments, including the series of questions about the circumstances surrounding the events and reporting on Sandy Hook and his statement that "they never let them see the bodies," are statements of fact that could be proven false and that challenge Heslin's account of events.  Thus, Appellants have not established by a

9

preponderance of the evidence a defense that their statements were constitutionally protected opinions, and they are not entitled to dismissal based on this defense.

**Substantial Truth Doctrine**

Appellants assert a statutory substantial truth doctrine as their fourth defense. "[M]edia outlets that accurately report allegations made by a third party about matters of public concern can assert the truth as a defense." *Hall*, 579 S.W.3d at 380 (citing Tex. Civ. Prac. & Rem. Code § 73.005(b)). Appellants assert that the June broadcast reported and commented on third-party allegations, and they argue that faithfully reiterating third-party allegations renders Appellants' statements "substantially true," regardless of the actual facts surrounding Sandy Hook. However, in context, some of the comments made by Shroyer and Jones were independent statements of fact that disputed Heslin's account of the events at Sandy Hook and whether he held his son's body. In addition, by stipulating to the truth of the facts asserted in Heslin's pleading, Appellants have stipulated that Shroyer's report was "manifestly false" and that Jones was "lying." In other words, they have stipulated that they made false statements. They have also acknowledged that Heslin has established his prima facie case for defamation, which included a showing that Appellants' statements were false. *See Hall*, 579 S.W.3d at 377 (listing elements of defamation). Moreover, the unchallenged discovery sanctions relieved Heslin of his burden under the TCPA motion with regard to matters discussed at the August 31, 2018 order, which included discovery regarding Appellants' "factual assertions," and a request for admission to Shroyer asking that he admit he "had no legitimate basis to claim it was impossible for Neil Heslin to have held his dead son and saw a bullet wound to his forehead."

10

Under the circumstances, Appellants are not entitled to dismissal based on the defense of substantial truth in reporting third-party allegations.

**Fair Comment Privilege**

Appellants' fifth defense is the fair comment privilege. "The fair comment privilege is an affirmative defense to a defamation action extending to publications that are 'reasonable and fair comment on or criticism[s] of . . . matter[s] of public concern published for general information.'" *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) (quoting Tex. Civ. Prac. & Rem. Code § 73.002(a), (b)(2)). "'[I]f a comment is based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege.'" *Id.* (quoting *Neely v. Wilson*, 418 S.W.3d 52, 70 (Tex. 2013)). In light of our holdings above and conclusion that Appellants have stipulated that their statements were false, Appellants are not entitled to dismissal based upon the fair comment privilege.

**Liability of Infowars, LLC**

As a final defense, Appellants urge that Infowars, LLC, is not liable for the defamation "based on undisputed facts" because it "does not own or operate the domain name or website located at https://www.infowars.com, where the publications originated"; it has never employed Jones or Shroyer; and it never had authority or control over the content of the broadcasts. In response, Heslin asserts that this Court has previously determined that Infowars, LLC, is a proper party based on evidence that is identical to the evidence in this record. *See Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 Tex. App. LEXIS 9303, 2019 WL 5444400, at *4-8 (Tex. App.—Austin Oct. 24, 2019, pet. filed) (mem. op.) (determining, based

11

on the same evidence submitted in this case, that appellee "has established by clear and specific evidence the minimum quantum of evidence necessary to support a rational inference that Infowars, LLC is a proper defendant"). The record in *Fontaine*, as here, contains a document entitled "INFOWARS LLC, TERMS OF USE & PRIVACY POLICY" (Terms of Use), which contains Infowars.com's terms of service.[2] We conclude, as we did in *Fontaine*, that the Terms of Use show that users of Infowars.com initiated a relationship with Infowars, LLC, and that Infowars, LLC, was involved in the website's operation. *See id.* at *7-8. As a result, we conclude that Heslin has established by clear and specific evidence the minimum quantum of evidence necessary to support a rational inference that Infowars, LLC, is a proper defendant. However, even without considering the Terms of Use, we would nonetheless reach the same conclusion based on the unchallenged discovery sanctions. Heslin submitted a request for admission that as of the date of the June broadcast "InfoWars, LLC had the right to direct or control" Shroyer's work. He also submitted a request for admission to Infowars, LLC, asking it to admit that (1) it "was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the" June broadcast; (2) it "possesses intellectual property rights and copyright over any part of the" June broadcast; and (3) it "has the authority to remove content from InfoWars.com if InfoWars, LLC determines that the content violates the rights of others or is not appropriate for the website." Under the sanctions imposed by the district court, these requests are admitted for purposes of the TCPA motion. These admissions contradict Appellants' argument that Infowars, LLC, lacked control or authority over at least the June broadcast. We conclude that Infowars, LLC, is not entitled to dismissal for not being liable

---

[2] Appellants assert that they objected to the Terms of Use as irrelevant because the Terms of Use do not bear on whether Appellants' statements are defamatory. The district court has not ruled on this objection.

"based on undisputed facts." Having overruled Appellants' issues relating to their defenses, we
next address Heslin's motion for sanctions.

**Sanctions**

Heslin contends this appeal is frivolous and seeks $22,250 for the amount of
attorney's fees incurred in defending against the appeal and moving for sanctions. "If the court
of appeals determines that an appeal is frivolous, it may—on motion of any party or on its own
initiative, after notice and a reasonable opportunity for response—award each prevailing party
just damages." Tex. R. App. P. 45; *see Caldwell v. Zimmerman*, No. 03-17-00273-CV, 2017
Tex. App. LEXIS 10010, *8 (Tex. App.—Austin Oct. 26, 2017, pet. denied) (mem. op.) ("The
decision to grant appellate sanctions is a matter of discretion that an appellate court exercises
with prudence and caution and only after careful deliberation."). "To determine whether an
appeal is frivolous, we apply an objective test." *Hunt v. CIT Grp./Consumer Fin., Inc.*, No. 03-
09-00046-CV, 2010 Tex. App. LEXIS 2767, at *27 (Tex. App.—Austin Apr. 15, 2010, pet.
denied) (mem. op.) (citing *Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.]
2001, pet. denied. We review the record from the advocate's viewpoint and decide whether he
had reasonable grounds to believe the judgment could be reversed. *Id.* Although bad faith is not
dispositive in deciding whether an appeal is frivolous, the presence of bad faith may be relevant
to determining the amount of the sanction. *Id.*

In addition to arguing that Appellants' brief makes a host of factual
misrepresentations, Heslin asserts that Appellants' omission of the "critical" fact of the existence
of unchallenged discovery sanctions in the district court warrants sanctions here because the
district court sanctions had a "dispositive effect." He further observes in his reply brief that

13

Appellants' brief "addresses every element of Heslin's burdens as if the discovery misconduct never happened."  Rather than mentioning only the issues before this Court, Appellants' brief seeks to relitigate issues resolved by the district court that remain unchallenged on appeal, such as Heslin's burden to establish a prima facie case for defamation.  We agree with Heslin that this appeal was frivolous.  Our reasons include that Appellants stipulated to the truth of the facts contained in Heslin's pleadings, Appellants incurred a discovery sanction ordering Heslin's burdens in responding to Defendants' TCPA Motion established in Heslin's favor for the purposes of the TCPA Motion, and Appellants presented arguments that lacked legal merit, including those based on caselaw that had been identified as outdated in another case they cited.  Accordingly, we conclude Appellants lacked reasonable grounds to believe the judgment could be reversed.  Although not dispositive, we note that most of Appellants' brief addresses issues outside the scope of the appeal, Appellants' brief does not completely address the issues before the Court, and Appellant's brief fails to mention the discovery sanctions.  These factors favor awarding Heslin the fees he has requested.

### CONCLUSION

We affirm the district court's dismissal of Appellants' motion to dismiss, and we grant Heslin's motion for sanctions and award him $22,250 for attorney's fees.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:  March 25, 2020

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## JUDGMENT RENDERED MARCH 25, 2020

### NO. 03-19-00811-CV

**Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer, Appellants**

v.

**Neil Heslin, Appellee**

## APPEAL FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
## BEFORE CHIEF JUSTICE ROSE, JUSTICES BAKER AND TRIANA
## AFFIRMED -- OPINION BY JUSTICE TRIANA

This is an appeal from the interlocutory order signed by the trial court on October 18, 2019. Having reviewed the record and the parties' arguments, the Court holds that there was no reversible error in the trial court's order. Therefore, the Court affirms the trial court's order. The Court grants Heslin's motion for sanctions and awards him $22,250 for attorney's fees. Appellant shall pay all costs relating to this appeal, both in this Court and in the court below.

**COURT OF APPEALS**
**FOR THE**
**THIRD DISTRICT OF TEXAS**
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
(512) 463-1733

Date:          March 25, 2020

Appeal No.:    03-19-00811-CV
Trial Court No.: D-1-GN-18-001835

Style:         Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
               v. Neil Heslin

Please be advised that Appellee's Motion for Sanctions was granted on the date noted above.
Also, the enclosed opinion and judgment were sent this date to the following persons:

Mr. David J. Sacks
Sacks Law Firm
2323 S. Shepherd Dr., Suite 825
Houston, TX 77019-7028
* DELIVERED VIA E-MAIL *

Mr. T. Wade Jefferies
The Law Firm of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, TX 78701
* DELIVERED VIA E-MAIL *

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

The Honorable Scott H. Jenkins
Judge, 53rd District Court
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

The Honorable Billy Ray Stubblefield
Administrative Judge
Williamson County Courthouse
405 Martin Luther King, Box 2
Georgetown, TX 78626
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX 77008
* DELIVERED VIA E-MAIL *

Filed in The District Court
of Travis County, Texas

JUN 2 6 2020 DS

At_____6:03____P_M.
Velva L. Price, District Clerk

FILE COPY

```
     RE: Case No. 20-0347          DATE: 6/25/2020
     COA #: 03-19-00811-CV         TC#: D-1-GN-18-001835
STYLE: JONES v. HESLIN
     A petition for review was filed today in the above-
styled case.  Respondent may file either a response, or a
waiver of response.  If you file a waiver, the Court will
not grant the petition without first requesting a response.
(TEX. R. APP. P. 53.3)  There is no fee for a response or a
waiver.


               DISTRICT CLERK  TRAVIS COUNTY
               TRAVIS COUNTY COURT
               P. O. BOX 679003
               AUSTIN, TX  78767
               * DELIVERED VIA E-MAIL *
```

FILE COPY

RE: Case No. 20-0347
COA #: 03-19-00811-CV
STYLE: JONES v. HESLIN

DATE: 6/5/2020
TC#: D-1-GN-18-001835

Today the Supreme Court of Texas received and filed a second motion for extension of time to file petition for review pursuant to Rule 53.7(f) in the above numbered and styled case.

DISTRICT CLERK  TRAVIS COUNTY
TRAVIS COUNTY COURT
P. O. BOX 679003
AUSTIN, TX 78767
* DELIVERED VIA E-MAIL *

Filed in The District Court
of Travis County, Texas

JUL 06 2020 DS

At_____8_____A.M.
Velva L. Price, District Clerk

Filed in The District Court
of Travis County, Texas

JAN 2 2 2021 DS

At_____6:13_____P.M.

Velva L. Price, District Clerk

FILE COPY

RE: Case No. 20-0347                           DATE: 1/22/2021
COA #: 03-19-00811-CV              TC#: D-1-GN-18-001835
STYLE: JONES v. HESLIN

    Today the Supreme Court of Texas denied the petition
for review in the above-referenced case.

DISTRICT CLERK  TRAVIS COUNTY
TRAVIS COUNTY COURT
P. O. BOX 679003
AUSTIN, TX  78767
* DELIVERED VIA E-MAIL *

FILE COPY

DATE: 2/19/2021
TC#: D-1-GN-18-001835

RE: Case No. 20-0347
COA #: 03-19-00811-CV
STYLE: JONES v. HESLIN

Today the Supreme Court of Texas granted the motion for extension of time to file motion for rehearing in the above-referenced case. The motion for rehearing is due to be filed in this office on or before **Wednesday, March 10, 2021.** **FURTHER REQUESTS FOR EXTENSIONS OF TIME FOR THIS FILING WILL NOT BE CONSIDERED.**

DISTRICT CLERK TRAVIS COUNTY
TRAVIS COUNTY COURT
P. O. BOX 679003
AUSTIN, TX 78767
* DELIVERED VIA E-MAIL *

Filed in the District Court
Of Travis County, Texas
FEBRUARY 19, 2021 6PM
At
Velva L. Price, District Clerk

FILE COPY

```
        RE: Case No. 20-0347              DATE: 2/23/2021
        COA #: 03-19-00811-CV             TC#: D-1-GN-18-001835
STYLE: JONES v. HESLIN
```

    Today the Supreme Court of Texas denied the Motion for
Extension of Time to file Response to Pro Hac Vice Motions
in the above-referenced case.

```
                          DISTRICT CLERK  TRAVIS COUNTY
                          TRAVIS COUNTY COURT
Filed in the District Clerk    P. O. BOX 679003
Of Travis County, Texas        AUSTIN, TX  78767
                          * DELIVERED VIA E-MAIL *

At FEBRUARY 23, 2021 6:03 PM
Velva L. Price, District Clerk
```



# THE SUPREME COURT OF TEXAS

**Post Office Box 12248**
**Austin, Texas 78711**

**(512) 463-1312**

FILE COPY

Filed in the District Clerk
Of Travis County, Texas

FEBRUARY 24, 2021 6:02 PM
At_____
Velva L. Price, District Clerk

Wednesday, February 24, 2021

Mr. Thomas W. Jefferies
The Law Firm of T. Wade Jefferies
401 Congress Ave., Suite 1540
Austin, TX 78701
\* DELIVERED VIA E-MAIL \*

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, L.L.P.
1117 Herkimer St
Houston, TX 77008-6745
\* DELIVERED VIA E-MAIL \*

Mr. Marc J. Randazza
Randazza Legal Group, PLLC
2764 Lake Sahara Drive
Suite 109
Las Vegas, TX 89117
\* DELIVERED VIA E-MAIL \*

Mr. David J. Sacks
Sacks Law Firm
2323 S. Shepherd Drive, Suite 825
Houston, TX 77019
\* DELIVERED VIA E-MAIL \*

Mr. Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande St, Ste 203
Austin, TX 78701
\* DELIVERED VIA E-MAIL \*

Mr. William Ogden
Kaster Lynch Farrar & Ball LLP
1117 Herkimer St
Houston, TX 77008-6745
\* DELIVERED VIA E-MAIL \*

RE:  Case Number:  20-0347
     Court of Appeals Number:  03-19-00811-CV
     Trial Court Number:  D-1-GN-18-001835

Style:  ALEX E. JONES; INFOWARS, LLC; FREE SPEECH SYSTEMS, LLC; AND OWEN
        SHROYER
        v.
        NEIL HESLIN

Dear Counsel:

Today the Supreme Court of Texas granted the Motions for Pro Hac Vice of Marc J.
Randazza in the above-referenced case.

Sincerely,

*Blake A. Hawthorne*

Blake A. Hawthorne, Clerk

by Haley Marlow, Deputy Clerk



**THE SUPREME COURT OF TEXAS**
Post Office Box 12248
Austin, Texas 78711

(512) 463-1312

FILE COPY

cc:  Mr. Jeffrey D. Kyle (DELIVERED VIA E-MAIL)
District Clerk Travis County (DELIVERED VIA E-MAIL)

3/9/2021 4:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Sandra Santos

**LORA J. LIVINGSTON**
**Local Administrative Judge**

**DISTRICT COURTS**

Travis County Courthouse
P. O. Box 1748
Austin, TX 78767

(512) 854-9309
FAX (512) 854-9332

March 9, 2021

Mark C. Enoch
Mark C. Enoch. PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email:* *fly63rc@verizon.net*

Robert E. Barnes
Barnes Law
601 S. Figueroa Street, Suite 4050
Los Angeles, CA 90017
*Via email:* *robertbarnes@barneslawllp.com*

Michael Burnett
Scott Nyitray
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
*Via email:* *mburnertt@burnettturner.com*
*Via email:* *snyitray@burnettturner.com*

Mark D. Bankston
Kyle W. Farrar
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
*Via email:* *mark@fbtrial.com*
*Via email:* *kyle@fbtrial.com*

T. Wade Jeffries
The Law Office of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701
*Via email:* *twadejefferies@twj-law.com*

Eric J. Taube
Kevin W. Brown
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
*Via email:* *eric.taube@wallerlaw.com*
*Via email:* *kevin.brown@wallerlaw.com*

**Re: Cause No. D-1-GN-18-001605;** *Marcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFORWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFORWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-006623**; *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-19-004651**; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

D-1-GN-18-001605, D-1-GN-18-001835
D-1-GN-18-001842, D-1-GN-18-006623
& D-1-GN-19-004651
Page 2 of 2

Dear Counsel:

      In accordance with Chapter 2.6, the above cases have been **reassigned from JUDGE SCOTT JENKINS to JUDGE MAYA GUERRA GAMBLE** for the handling of all pre-trial, trial and post-judgment proceedings.

      Thank you.

                    Sincerely,

                    LORA J. LIVINGSTON
                    Local Administrative Judge
                    Travis County, Texas

LJL/lme/arb
xc: Velva L. Price, District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 51310287
Status as of 3/10/2021 2:17 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 3/9/2021 4:15:17 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark C.Enoch | | fly63rc@verizon.net | 3/9/2021 4:15:17 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/9/2021 4:15:17 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark C.Enoch | | fly63rc@verizon.net | 3/9/2021 4:15:17 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/9/2021 4:15:17 PM | SENT |

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark C.Enoch | | fly63rc@verizon.net | 3/9/2021 4:15:17 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/9/2021 4:15:17 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 51310287
Status as of 3/10/2021 2:17 PM CST

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark C.Enoch | | fly63rc@verizon.net | 3/9/2021 4:15:17 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/9/2021 4:15:17 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 3/9/2021 4:15:17 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 3/9/2021 4:15:17 PM | SENT |

3/10/2021 11:40 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Gilberto Rios**

**LORA J. LIVINGSTON**
Local Administrative Judge

Travis County Courthouse
P. O. Box 1748
Austin, TX 78767

DISTRICT COURTS

(512) 854-9309
FAX (512) 854-9332

March 9, 2021

Mark C. Enoch
Mark C. Enoch. PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email:* fly63rc@verizon.net

Robert E. Barnes
Barnes Law
601 S. Figueroa Street, Suite 4050
Los Angeles, CA 90017
*Via email:* robertbarnes@barneslawllp.com

Michael Burnett
Scott Nyitray
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
*Via email:* mburnertt@burnettturner.com
*Via email:* snyitray@burnettturner.com

Mark D. Bankston
Kyle W. Farrar
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
*Via email:* mark@fbtrial.com
*Via email:* kyle@fbtrial.com

T. Wade Jeffries
The Law Office of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701
*Via email:* twadejefferies@twj-law.com

Eric J. Taube
Kevin W. Brown
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
*Via email:* eric.taube@wallerlaw.com
*Via email:* kevin.brown@wallerlaw.com

**Re: Cause No. D-1-GN-18-001605;** *Marcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFORWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFORWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-006623**; *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-19-004651**; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

D-1-GN-18-001605, D-1-GN-18-001835
D-1-GN-18-001842, D-1-GN-18-006623
& D-1-GN-19-004651
Page 2 of 2

Dear Counsel:

       In accordance with Chapter 2.6, the above cases have been **reassigned from JUDGE SCOTT JENKINS to JUDGE MAYA GUERRA GAMBLE** for the handling of all pre-trial, trial and post-judgment proceedings.

       Thank you.

                     Sincerely,

                     LORA J. LIVINGSTON
                     Local Administrative Judge
                     Travis County, Texas

LJL/lme/arb
xc: Velva L. Price, District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 51335071
Status as of 3/10/2021 3:02 PM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark C.Enoch | | fly63rc@verizon.net | 3/10/2021 11:40:29 AM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/10/2021 11:40:29 AM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/10/2021 11:40:29 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/10/2021 11:40:29 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 3/10/2021 11:40:29 AM | SENT |

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 3/10/2021 11:40:29 AM | SENT |

FILE COPY

RE: Case No. 20-0347                    DATE: 3/10/2021
COA #: 03-19-00811-CV          TC#: D-1-GN-18-001835
STYLE: JONES v. HESLIN
    Petitioner's motion for rehearing was this day filed in
the above styled and numbered case.

Filed in the District Clerk
Of Travis County, Texas

At_____
MARCH 11, 2021 11:03 PM

Velva L. Price, District Clerk

DISTRICT CLERK  TRAVIS COUNTY
TRAVIS COUNTY COURT
P. O. BOX 679003
AUSTIN, TX  78767
* DELIVERED VIA E-MAIL *

**3/11/2021 5:21 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Heman Marion Sweatt Travis County Courthouse**
**P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

March 11, 2021

Mark C. Enoch
Mark C. Enoch. PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email:* fly63rc@verizon.net

Robert E. Barnes
Barnes Law
601 S. Figueroa Street, Suite 4050
Los Angeles, CA 90017
*Via email:* robertbarnes@barneslawllp.com

Michael Burnett
Scott Nyitray
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
*Via email:* mburnertt@burnettturner.com
*Via email:* snyitray@burnettturner.com

Mark D. Bankston
Kyle W. Farrar
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
*Via email:* mark@fbtrial.com
*Via email:* kyle@fbtrial.com

T. Wade Jeffries
The Law Office of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701
*Via email:* twadejefferies@twj-law.com

Eric J. Taube
Kevin W. Brown
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
*Via email:* eric.taube@wallerlaw.com
*Via email:* kevin.brown@wallerlaw.com

**Re:  Cause No. D-1- GN-18-001605;** M*arcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

Page 2 of 2

**Re: Cause No. D-1-GN-18-006623;** *Scarlett Lewis vs. Alex E. Jones, INFOWARS, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-19-004651;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

Dear Counsel:

These cases have been assigned to the 459th District Court pursuant to Travis County Local Rule 2.6. You must present all motions and orders, **including agreed motions and orders**, to this court only. Please note that simply filing a motion with the District Clerk does not bring it to the court's attention as I do not receive these documents automatically. You must file pleadings with the District Clerk and then deliver them directly to the 459th District Court. You may deliver documents to the 459th District Court by emailing them to 459.submission@traviscountytx.gov. We will also create a Box drive folder for you to upload relevant documents in advance of any virtual hearings. However, any documents which exceed 20 pages in length must be provided in paper form.

My Judicial Executive Assistant is the primary point of contact for this Court. You may call her at (512) 854-9384 or you may email the Court at 459.submission@traviscountytx.gov. Specifically, please coordinate with my Judicial Executive Assistant for dates and times of any hearings that you may need to set.

For any setting, you must announce in compliance with Chapter 3 of the Local Rules of the District Courts of Travis County and the most recent Travis County Civil and Family Courts Emergency Order. I look forward to working with you on this case.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc:     Ms. Velva L. Price, Travis County District Clerk

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Larissa Walton on behalf of Samuel Denton
Bar No. 24064378
larissa.walton@traviscountytx.gov
Envelope ID: 51404358
Status as of 3/14/2021 2:03 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 3/11/2021 5:21:25 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/11/2021 5:21:25 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/11/2021 5:21:25 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 3/11/2021 5:21:25 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |

Associated Case Party: Free Speech, LLC

| Name |
|------|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Larissa Walton on behalf of Samuel Denton
Bar No. 24064378
larissa.walton@traviscountytx.gov
Envelope ID: 51404358
Status as of 3/14/2021 2:03 PM CST

Associated Case Party: Free Speech, LLC

| | | | | |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/11/2021 5:21:25 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 3/11/2021 5:21:25 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/11/2021 5:21:25 PM | SENT |

FILE COPY

```
          RE: Case No. 20-0347                    DATE: 4/16/2021
          COA #: 03-19-00811-CV              TC#: D-1-GN-18-001835
     STYLE: JONES v. HESLIN

         Today the Supreme Court of Texas denied the motion for
     rehearing of the above-referenced petition for review.
```

Filed in the District Clerk
Of Travis County, Texas

APRIL 16, 2021 6:03 PM
At_____
Velva L. Price, District Clerk

```
                              DISTRICT CLERK  TRAVIS COUNTY
                              TRAVIS COUNTY COURT
                              P. O. BOX 679003
                              AUSTIN, TX  78767
                              * DELIVERED VIA E-MAIL *
```

**4/20/2021 4:11 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Heman Marion Sweatt Travis County Courthouse P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

4/20/2021

Marguerite Guadin
Amos Pictures
9 Perseverance Works
Kingsland Road
London, GB
*Via email:* marguerite@amospictures.co.uk

**Re:  Media Coverage Request for Alex Jones-Related Cases**

**Cause No. D-1- GN-18-001605;** M*arcel Fontaine vs. Alex E. Jones, InfoWars, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, InfoWars, LLC, et al; in the 261st Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFORWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-006623;** *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-19-004651;** *Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

Ms. Guadin:

I understand that you are interested in providing media coverage of upcoming trials that will take place in my Courtroom. For guidance on media request procedures and required conduct during hearings, please review Texas Rule of Civil Procedure 18c and Travis County Local Rules of Civil Procedure and Rules of Decorum (Local Rules) Chapter16.

In Travis County, media coverage is permitted only on written order of the Court. A person wishing to broadcast, televise, record or photograph a court proceeding must file a request to cover the proceeding with the District Clerk and deliver copies of the request to the Court, Court Administrator, all counsel of record and all parties not represented by attorneys. This must occur well in advance of the hearing or trial in order to allow the parties time to object and the Court to hear and consider argument. Again, details on the process and

requirements are located in Chapter 16 of the Local Rules. The link to the Local Rules can be found at: https://www.traviscountytx.gov/courts/files/civil-district.

Please direct all communications with this Court to 459.submission@traviscountytx.gov. Thank you.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc:     Ms. Velva L. Price, Travis County District Clerk
        Mark C. Enoch, fly63rc@verizon.net
        Mark D. Bankston, mark@fbtrial.com
        Kyle W. Farrar, kyle@fbtrial.com
        Robert E. Barnes, robertbarnes@barneslawllp.com
        T. Wade Jeffries, twadejefferies@twj-law.com
        Michael Burnett, mburnertt@burnettturner.com
        Scott Nyitray, snyitray@burnettturner.com
        Eric J. Taube, eric.taube@wallerlaw.com
        Kevin W. Brown, kevin.brown@wallerlaw.com

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Larissa Walton on behalf of Samuel Denton
Bar No. 24064378
larissa.walton@traviscountytx.gov
Envelope ID: 52652938
Status as of 4/23/2021 12:25 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 4/20/2021 4:11:44 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/20/2021 4:11:44 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/20/2021 4:11:44 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 4/20/2021 4:11:44 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |

Associated Case Party: Free Speech, LLC

| Name |
|------|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Larissa Walton on behalf of Samuel Denton
Bar No. 24064378
larissa.walton@traviscountytx.gov
Envelope ID: 52652938
Status as of 4/23/2021 12:25 PM CST

Associated Case Party: Free Speech, LLC

| Scott Nyitray | | snyitray@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
|---|---|---|---|---|
| Michael Burnett | | mburnett@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/20/2021 4:11:44 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/20/2021 4:11:44 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/20/2021 4:11:44 PM | SENT |

**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | | |

## **NOTICE OF APPEARANCE ON BEHALF OF DEFENDANTS**

COME NOW, Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively "Defendants"), and file this Notice of Appearance of Counsel, hereby providing notice to the Court and to Plaintiff, Neil Heslin, that the following attorney and law firm is now counsel of record for Defendants, and thus copies of all pleadings and notices should be served upon the following attorney:

> Bradley J. Reeves
> REEVES LAW, P.C.
> 702 Rio Grande St., Suite 203
> Austin, TX 78701
> brad@brtx.law
> Telephone: (512) 827-2246
> Facsimile: (512) 318-2484

Dated: April 27, 2021.

Respectfully submitted,

By:   */s/ Bradley J. Reeves*
    Bradley J. Reeves
    Texas Bar No. 24068266
    brad@brtx.law
    **REEVES LAW, PLLC**
    702 Rio Grande St., Suite 203
    Austin, TX 78701
    Telephone: (512) 827-2246
    Facsimile: (512) 318-2484

    **ATTORNEY FOR DEFENDANTS, ALEX E. JONES,
    INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC,
    AND OWEN SHROYER**

## CERTIFICATE OF SERVICE

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on April 27, 2021.

T. Wade Jefferies             *via* email
The Law Firm of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701

Robert Barnes               *via* email
BARNES LAW, LLP
601 South Figueroa St., Suite 4050
Los Angeles, CA 90017

Mark Bankston              *via* email
William Ogden
Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

    */s/ Bradley J. Reeves*
    Bradley J. Reeves

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 52876899
Status as of 4/28/2021 11:59 AM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 4/27/2021 3:43:37 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: Free Speech, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 52876899
Status as of 4/28/2021 11:59 AM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

4/27/2021 3:43 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | | |

## DEFENDANTS' UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL

Defendants, Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively "Defendants") file this Unopposed Motion for Substitution of Counsel and Withdrawal of Counsel and would show unto the Court as follows:

Defendants desire to substitute the following as counsel of record in place of T. Wade Jefferies and the Law Firm of T. Wade Jefferies and Michael Burnett and Scott Nyitray of the law firm of BurnettTurner:

Bradley J. Reeves
Texas State Bar No. 24068266
REEVES LAW, PLLC
702 Rio Grande Street, Suite 203
Austin, Texas 78701
Tel: (512) 827-2246
Fax: (512) 318-2484
Email: brad@brtx.law

Defendants desire that T. Wade Jefferies of the Law Firm of T. Wade Jefferies and Michael Burnett and Scott Nyitray of the law firm of BurnettTurner be permitted to withdraw as attorneys of record for Defendants.

This motion is made with the approval and desire of Defendants.

Pursuant to Local Rule 6.2(a), counsel for Plaintiff consents to the withdrawal as indicated by his electronic signature below.

The motion is not made for any purpose of delay in this case.

WHEREFORE, Defendants, Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer request that Bradley J. Reeves of REEVES LAW, PLLC be substituted as their attorney of record in place of T. Wade Jefferies of the Law Firm of T. Wade Jefferies and Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; that T. Wade Jefferies of the Law Firm of T. Wade Jefferies and Michael Burnett and Scott Nitray of the law firm of BurnettTurner be permitted to withdraw as attorneys of record for the aforementioned Defendants; and for such other and further relief, both general and special, at law or in equity, to which Defendants may be justly entitled.

Dated: April 27, 2021.

Respectfully submitted,

By:   */s/ Bradley J. Reeves*
     Bradley J. Reeves
     Texas Bar No. 24068266
     brad@brtx.law
     **REEVES LAW, PLLC**
     702 Rio Grande St., Suite 203
     Austin, TX 78701
     Telephone: (512) 827-2246
     Facsimile: (512) 318-2484

     **SUBSTITUTED ATTORNEYS FOR DEFENDANTS,
     ALEX E. JONES, INFOWARS, LLC, FREE
     SPEECH SYSTEMS, LLC, AND OWEN SHROYER**

By:   */s/ T. Wade Jefferies*
T. Wade Jefferies
Texas Bar No. 00790962
The Law Firm of T. Wade Jefferies
401 Congress Ave., Ste. 1540
Austin, TX 78701
twadejefferies@twj-law.com
Telephone: (512) 201-2727
Facsimile: (512) 687-3499

By:   */s/ Michael Burnett*
Michael Burnett
Texas Bar No. 00790399
mburnett@burnettturner.com
Scott Nyitray
Texas Bar No. 24094876
snyitray@burnettturner.com
BURNETTTURNER
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730
Telephone: (512) 472-5060
Facsimile: (512) 472-5427

**WITHDRAWING ATTORNEYS FOR DEFENDANTS**

CONSENT TO WITHDRAWAL:

FARRAR & BALL, LLP

By:   */s/ William R. Ogden*
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:   (713) 221-7008
Fax:   (713) 221-8301

**ATTORNEYS FOR PLAINTIFF, NEIL HESLIN**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on April 27, 2021.

T. Wade Jefferies       *via* email
The Law Firm of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701

Michael Burnett        *via email*
Scott Nyitray
BURNETTTURNER
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730

Mark Bankston        *via* email
William Ogden
Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

         ___*/s/ Bradley J. Reeves*_____
         Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 52876899
Status as of 4/28/2021 11:59 AM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 4/27/2021 3:43:37 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: Free Speech, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 52876899
Status as of 4/28/2021 11:59 AM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 4/27/2021 3:43:37 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 4/27/2021 3:43:37 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | | |

## ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL

CAME ON for consideration the Motion for Substitution of Counsel and Withdrawal of Counsel filed by Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer (collectively "Defendants"), and the Court, after considering the motion, is of the opinion that the motion should be GRANTED. It is therefore,

ORDERED that Bradley J. Reeves and the law firm of REEVES LAW, PLLC is substituted as attorney of record for Defendants, Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer in place of T. Wade Jefferies and the Law Firm of T. Wade Jefferies and Michael Burnett and Scott Nyitray of the law firm of BurnettTurner. It is further

ORDERED that that T. Wade Jefferies and the Law Firm of T. Wade and Michael Burnett and Scott Nyitray of the law firm of BurnettTurner are permitted to withdraw as attorneys of record for Defendants.

SIGNED ON _____, 2021.


_____
HONORABLE JUDGE PRESIDING

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**SUBSTITUTED ATTORNEY FOR DEFENDANTS**

By: ___/s/ T. Wade Jefferies_____
T. Wade Jefferies
Texas Bar No. 00790962
The Law Firm of T. Wade Jefferies
401 Congress Ave., Ste. 1540
Austin, TX 78701
twadejefferies@twj-law.com
Telephone: (512) 201-2727
Facsimile: (512) 687-3499

By: ___/s/ Michael Burnett_____
Michael Burnett
Texas Bar No. 00790399
mburnett@burnettturner.com
Scott Nyitray
Texas Bar No. 24094876
snyitray@burnettturner.com
BURNETTTURNER
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730
Telephone: (512) 472-5060
Facsimile: (512) 472-5427

**WITHDRAWING ATTORNEYS FOR DEFENDANTS**

By:     */s/ William R. Ogden*
Mark D. Bankston
Texas Bar No. 24071066
[mark@fbtrial.com](mailto:mark@fbtrial.com)
William R. Ogden
Texas Bar No. 24073531
[bill@fbtrial.com](mailto:bill@fbtrial.com)
1117 Herkimer Street
Houston, TX 77008
Tel:    (713) 221-7008
Fax:    (713) 221-8301

**ATTORNEYS FOR PLAINTIFF,
NEIL HESLIN**

5/14/2021 12:29 PM



AMOS Pictures

**MAYA GUERRA GAMBLE**
Judge, 459th District Court
Heman Marion Sweatt Travis County Courthouse P.O. Box 1748
Austin, Texas 78767
512-854-9384

Your Honor,

Please consider giving Amos Pictures, an independent television documentary production company based in London, England, permission to film court proceedings, for an HBO television documentary, in the following cases:

Cause No. D-1-GN-18-001835; Neil Heslin vs. Alex E. Jones,InfoWars, LLC, et al;
Cause No. D-1-GN-18-001842; Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al;
Cause No. D-1-GN-18-006623; Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free SpeechSystems, LLC;
Cause No. D-1-GN-19-004651; Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free SpeechSystems, LLC;

We note that no hearings are currently scheduled, however we seek permission to film all court proceedings from this date forward.

In view of the immense public interest and cultural significance of these cases Amos Pictures has been commissioned by HBO Documentaries to create a 90-minute documentary following the legal battle between Alex Jones et al and several parents whose children perished in the Sandy Hook school shooting. The program will be broadcast worldwide after the conclusion of legal proceedings in Texas.

The program, which will be strictly non-political and non-partisan, will seek to closely involve its audience in the complexities and the dramatic unfolding of the judicial process.

For the avoidance of doubt, no material filmed in court will be released or shared in any way before legal proceedings in each case listed above have come to an end.

We have reviewed the Texas Rule of Civil Procedure 18c and Travis County Local Rules of Civil Procedure and Rules of Decorum (Local Rules) Chapter 16.

We will operate at all times with great care and in close consultation with the court and its officers and will submit to the authority of the Court in all matters pertaining to the enforcement of the rules around filming..

Company Registration No. 3511357
Registered Address: 9 Perseverance Works, London, E2 8DD



AMOS Pictures



Amos Pictures has significant prior experience of filming court proceedings in the United States and will ensure that the business of the court is not impeded and that the judge's instructions are scrupulously complied with.

We would like to be able to film the speech of participants in the courtroom so that audiences can see and engage with the person/s speaking. Equipment will be unobtrusive and consist of one digital cinema camera on a tripod, which can be operated from a seated position; and a number of remotely-operated wireless microphones.

Amos Pictures is a multi-award-winning production house whose recent successes have included the Primetime Emmy-winning documentary "Leaving Neverland" (2019) which became HBO's most-watched ever documentary.

Dan Reed the director of this documentary has three decades of experience in the documentary field and is one of its leading practitioners, with dozens of awards and nominations for his exacting, diligent journalism and cinematic storytelling.

This request is copied to all counsel of record in the case as instructed.

We look forward to providing further details if the Court should require these.

Best regards,

Dan Reed

Company Registration No. 3511357
Registered Address: 9 Perseverance Works, London, E2 8DD

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 53453830
Status as of 5/14/2021 1:11 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 5/14/2021 12:29:00 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/14/2021 12:29:00 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/14/2021 12:29:00 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 5/14/2021 12:29:00 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 5/14/2021 12:29:00 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 5/14/2021 12:29:00 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 5/14/2021 12:29:00 PM | SENT |

Associated Case Party: Free Speech, LLC

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 53453830
Status as of 5/14/2021 1:11 PM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/14/2021 12:29:00 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 5/14/2021 12:29:00 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 5/14/2021 12:29:00 PM | SENT |

Filed in the District Court
Of Travis County, Texas

June 02, 2021, 01:29:30

At _____
Velva L. Price, District Clerk

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Heman Marion Sweatt Travis County Courthouse**
**P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

June 2, 2021

Mark C. Enoch
Mark C. Enoch. PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email: fly63rc@verizon.net*

Robert E. Barnes
Barnes Law
601 S. Figueroa Street, Suite 4050
Los Angeles, CA 90017
*Via email: robertbarnes@barneslawllp.com*

Michael Burnett
Scott Nyitray
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
*Via email: mburnett@burnettturner.com*
*Via email: snyitray@burnettturner.com*

Bradley Reeves
Reeves Law, PLLC
702 Rio Grande St, STE 306
Austin, TX 78701
Via email: brad@brtx.law

Mark D. Bankston
Kyle W. Farrar
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
*Via email: mark@fbtrial.com*
*Via email: kyle@fbtrial.com*

T. Wade Jeffries
The Law Office of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701
*Via email: twadejefferies@twj-law.com*

Eric J. Taube
Kevin W. Brown
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
*Via email: eric.taube@wallerlaw.com*
*Via email: kevin.brown@wallerlaw.com*

**Re: Cause No. D-1- GN-18-001605;** M*arcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

Page 2 of 2

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-006623;** *Scarlett Lewis vs. Alex E. Jones, INFOWARS, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-19-004651;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

Dear Counsel:

It is the Court's understanding that all appellate procedures have concluded. If this is incorrect, please inform the Court and provide a summary of the current situation and, to the extent possible, an anticipated timeline.

The Court would like to set an initial hearing so that the parties may orient the Court to these cases and dispose of any initial issues. The Court's upcoming available dates are July 9 at 9am or July 23rd at 9am or 2pm. Please confer and provide the Court with the date and time most agreeable to the parties.

Prior to this initial hearing, Counsel must agree on and file a proposed docket control order for each case. These docket control orders should comport with the Texas Rules of Civil Procedure and the "Standing Pretrial Scheduling Order for Civil and Family Jury Trials in the Travis County District Courts," located at https://www.traviscountytx.gov/images/courts/Docs/standing-pretrial-scheduling-order-for-civil-and-family-jury-trials.pdf. Further, the proposed order must provide that all substantive motions be heard no later than thirty days before trial. If the parties cannot agree to the schedule, please provide briefing on the issues by filing with the District Clerk and submitting a courtesy copy to 459.submission@traviscountytx.gov. As with any written communication to the Court, please ensure you "cc" all parties.

For any setting, you must announce in compliance with Chapter 3 of the Local Rules of the District Courts of Travis County and the most recent Travis County Civil and Family Courts Emergency Order. As always, I look forward to working with you on this case.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc:     Ms. Velva L. Price, Travis County District Clerk



Filed in The District Court
of Travis County, Texas

JUN 03 2021

At _____4:24_____ P.M. P.DS

Velva L. Price, District Clerk

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Heman Marion Sweatt Travis County Courthouse**
**P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

June 2, 2021

Mark C. Enoch
Mark C. Enoch. PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email: fly63rc@verizon.net*

Robert E. Barnes
Barnes Law
601 S. Figueroa Street, Suite 4050
Los Angeles, CA 90017
*Via email: robertbarnes@barneslawllp.com*

Michael Burnett
Scott Nyitray
Burnett Turner
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730
*Via email: mburnertt@burnettturner.com*
*Via email: snyitray@burnettturner.com*

Bradley Reeves
Reeves Law, PLLC
702 Rio Grande St, STE 306
Austin, TX 78701
Via email: brad@brtx.law

Mark D. Bankston
Kyle W. Farrar
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, Texas 77008
*Via email: mark@fbtrial.com*
*Via email: kyle@fbtrial.com*

T. Wade Jeffries
The Law Office of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701
*Via email: twadejefferies@twj-law.com*

Eric J. Taube
Kevin W. Brown
Waller Lansden Dortch & Davis LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
*Via email: eric.taube@wallerlaw.com*
*Via email: kevin.brown@wallerlaw.com*

**Re: Cause No. D-1- GN-18-001605;** M*arcel Fontaine vs. Alex E. Jones, INFOWARS, LLC, et al; in the 459th Judicial District, Travis County, Texas*

**Re: Cause No. D-1-GN-18-001835;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC, et al; in the 261st Judicial District, Travis County, Texas*

D-1- GN-18-001605, D-1-GN-18-001835, D-1-GN-18-001842, D-1-GN-18-006623,
D-1-GN-19-004651

Page 2 of 2

> **Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al; in the 345th Judicial District, Travis County, Texas*
>
> **Re: Cause No. D-1-GN-18-006623;** *Scarlett Lewis vs. Alex E. Jones, INFOWARS, LLC, and Free Speech Systems, LLC; in the 98th Judicial District, Travis County, Texas*
>
> **Re: Cause No. D-1-GN-19-004651;** *Neil Heslin vs. Alex E. Jones, INFOWARS, LLC and Free Speech Systems, LLC; in the 261st Judicial District, Travis County, Texas*

Dear Counsel:

It is the Court's understanding that all appellate procedures have concluded. If this is incorrect, please inform the Court and provide a summary of the current situation and, to the extent possible, an anticipated timeline.

The Court would like to set an initial hearing so that the parties may orient the Court to these cases and dispose of any initial issues. The Court's upcoming available dates are July 9 at 9am or July 23rd at 9am or 2pm. Please confer and provide the Court with the date and time most agreeable to the parties.

Prior to this initial hearing, Counsel must agree on and file a proposed docket control order for each case. These docket control orders should comport with the Texas Rules of Civil Procedure and the "Standing Pretrial Scheduling Order for Civil and Family Jury Trials in the Travis County District Courts," located at https://www.traviscountytx.gov/images/courts/Docs/standing-pretrial-scheduling-order-for-civil-and-family-jury-trials.pdf. Further, the proposed order must provide that all substantive motions be heard no later than thirty days before trial. If the parties cannot agree to the schedule, please provide briefing on the issues by filing with the District Clerk and submitting a courtesy copy to 459.submission@traviscountytx.gov. As with any written communication to the Court, please ensure you "cc" all parties.

For any setting, you must announce in compliance with Chapter 3 of the Local Rules of the District Courts of Travis County and the most recent Travis County Civil and Family Courts Emergency Order. As always, I look forward to working with you on this case.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc:     Ms. Velva L. Price, Travis County District Clerk



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

DARLENE BYRNE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed in the District Clerk
Of Travis County, Texas

June 4, 2021

At _JUNE 4, 2021 6:02 PM_
Velva L. Price, District Clerk

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

RE:   Court of Appeals Number:   03-19-00811-CV
        Trial Court Case Number:   D-1-GN-18-001835

Style:   Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer
          v. Neil Heslin

Dear Mr. Price:

Enclosed, with reference to the above cause, is the mandate of this Court. Please file and execute in the usual manner.  Your cooperation in this regard is appreciated.

In addition, as required by Texas Government Code, Sec. 51.204(d), the trial court clerk is notified that we will destroy all records filed in respect to this case with the exception of indexes, original opinions, minutes and general court dockets no earlier than six (6) years from the date final mandate is issued.

Very truly yours,

JEFFREY D. KYLE, CLERK

By: Courtland Crocker, Deputy Clerk

cc:   Mr. David J. Sacks            Mr. Bradley J. Reeves
       Mr. T. Wade Jefferies         Mr. Mark Bankston

FILE COPY

# M A N D A T E

THE STATE OF TEXAS

TO THE 53RD DISTRICT COURT OF TRAVIS COUNTY, GREETINGS:

Trial Court Cause No. D-1-GN-18-001835

Before our Court of Appeals for the Third District of Texas on March 25, 2020, the cause on appeal to revise or reverse your judgment between

Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

No. 03-19-00811-CV          v.

Neil Heslin

Was determined, and therein our Court of Appeals made its order in these words

This is an appeal from the interlocutory order signed by the trial court on October 18, 2019. Having reviewed the record and the parties' arguments, the Court holds that there was no reversible error in the trial court's order.  Therefore, the Court affirms the trial court's order.  The Court grants Heslin's motion for sanctions and awards him $22,250 for attorney's fees. Appellant shall pay all costs relating to this appeal, both in this Court and in the court below.

Wherefore, we command you to observe the order of our Court of Appeals in this behalf and in all things have the order duly recognized, obeyed, and executed.

Witness the Honorable Darlene Byrne, Chief Justice of the Court of Appeals for the Third District of Texas, with the seal of the Court affixed in the City of Austin on Friday, June 4, 2021.

JEFFREY D. KYLE, CLERK

By:  Courtland Crocker, Deputy Clerk

# BILL OF COSTS

## TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

No. 03-19-00811-CV

**Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer**

v.

**Neil Heslin**
(No. D-1-GN-18-001835 IN 53RD DISTRICT COURT OF TRAVIS COUNTY)

| Type of Fee | Charges | Paid | By |
|---|---|---|---|
| FILING | $10.00 | E-PAID | CARMEN M SCOTT |
| FILING | $10.00 | E-PAID | BRADLEY REEVES |
| FILING | $10.00 | E-PAID | DAVID J SACKS |
| FILING | $10.00 | E-PAID | CARMEN M SCOTT |
| FILING | $10.00 | E-PAID | DAVID J SACKS |
| FILING | $10.00 | E-PAID | DAVID J SACKS |
| REPORTER'S RECORD | $402.00 | UNKNOWN | UNKNOWN |
| CLERK'S RECORD | $3,303.00 | UNKNOWN | UNKNOWN |
| STATEWIDE EFILING FEE | $30.00 | E-PAID | T. WADE JEFFERIES |
| FILING | $100.00 | E-PAID | T. WADE JEFFERIES |
| SUPREME COURT CHAPTER 51 FEE | $50.00 | E-PAID | T. WADE JEFFERIES |
| INDIGENT | $25.00 | E-PAID | T. WADE JEFFERIES |

**Balance of costs owing to the Third Court of Appeals, Austin, Texas:   0.00**

*Court costs in this cause shall be paid as per the Judgment issued by this Court.*

I, **JEFFREY D. KYLE, CLERK** OF THE THIRD COURT OF APPEALS OF THE STATE OF TEXAS, do hereby certify that the above and foregoing is a true and correct copy of the cost bill of THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS, showing the charges and payments, in the above numbered and styled cause, as the same appears of record in this office.



**IN TESTIMONY WHEREOF,** witness my hand and the Seal of the **COURT OF APPEALS** for the Third District of Texas on June 4, 2021.

**JEFFREY D. KYLE, CLERK**

By: Courtland Crocker, Deputy Clerk

6/15/2021 6:07 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Gilberto Rios**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | | |

## DEFENDANTS' AMENDED UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants") file this Amended Unopposed Motion for Substitution of Counsel and

Withdrawal of Counsel and would show unto the Court as follows:

Defendants desire to substitute the following as counsel of record in place of T. Wade

Jefferies and the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm

of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C.:

Bradley J. Reeves
Texas State Bar No. 24068266
REEVES LAW, PLLC
702 Rio Grande Street, Suite 203
Austin, Texas 78701
Tel: (512) 827-2246
Fax: (512) 318-2484
Email: brad@brtx.law

Defendants desire that T. Wade Jefferies of the Law Firm of T. Wade Jefferies; Michael

Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, &

Murray, P.C. be permitted to withdraw as attorneys of record for Defendants.

This motion is made with the approval and desire of Defendants.

Pursuant to Local Rule 6.2(a), counsel for Plaintiff consents to the withdrawal as indicated by his electronic signature below.

The motion is not made for any purpose of delay in this case.

WHEREFORE, Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer request that Bradley J. Reeves of REEVES LAW, PLLC be substituted as their attorney of record in place of T. Wade Jefferies of the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C.; that T. Wade Jefferies of the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C. be permitted to withdraw as attorneys of record for the aforementioned Defendants; and for such other and further relief, both general and special, at law or in equity, to which Defendants may be justly entitled.

Dated: June 15, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____
    Bradley J. Reeves
    Texas Bar No. 24068266
    brad@brtx.law
    **REEVES LAW, PLLC**
    702 Rio Grande St., Suite 203
    Austin, TX 78701
    Telephone: (512) 827-2246
    Facsimile: (512) 318-2484

    **SUBSTITUTED ATTORNEY FOR DEFENDANTS,**
    **ALEX E. JONES; INFOWARS, LLC; FREE SPEECH**
    **SYSTEMS, LLC; AND OWEN SHROYER**

By:   /s/ T. Wade Jefferies
    T. Wade Jefferies
    Texas Bar No. 00790962
    The Law Firm of T. Wade Jefferies
    401 Congress Ave., Ste. 1540
    Austin, TX 78701
    twadejefferies@twj-law.com
    Telephone: (512) 201-2727
    Facsimile: (512) 687-3499

By:   /s/ Michael Burnett
    Michael Burnett
    Texas Bar No. 00790399
    mburnett@burnettturner.com
    Scott Nyitray
    Texas Bar No. 24094876
    snyitray@burnettturner.com
    BURNETTTURNER
    6034 W. Courtyard Dr., Suite 140
    Austin, TX 78730
    Telephone: (512) 472-5060
    Facsimile: (512) 472-5427

By:   /s/ Mark C. Enoch
    Mark C. Enoch
    Texas Bar No. 06630360
    fly63rc@verizon.net
    GLAST, PHILLIPS, & MURRAY, P.C.
    14801 Quorum Drive, Suite 500
    Dallas, TX 75254
    Telephone: (972) 419-8366
    Facsimile: (972) 419-8329

**WITHDRAWING ATTORNEYS FOR DEFENDANTS, ALEX E. JONES; INFOWARS, LLC; FREE SPEECH SYSTEMS, LLC; AND OWEN SHROYER**

CONSENT TO WITHDRAWAL:

FARRAR & BALL, LLP

By:_____/s/ William R. Ogden_____
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:    (713) 221-7008
Fax:    (713) 221-8301

**ATTORNEYS FOR PLAINTIFF, NEIL HESLIN**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on June 15, 2021.

T. Wade Jefferies                                 *via* email
The Law Firm of T. Wade Jefferies
401 Congress Avenue, Suite 1540
Austin, Texas 78701

Michael Burnett                                   *via email*
Scott Nyitray
BURNETTTURNER
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730

Mark Enoch                                        *via* email
GLAST, PHILLIPS, & MURRAY, P.C.
14801 Quorum Driive, Suite 500
Dallas, TX 75254

Mark Bankston                                     *via* email
William Ogden
Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

                              ___*/s/ Bradley J. Reeves*_____
                              Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Case Contacts

| Name |
|------|
| Warren Lloyd Vavra |
| Velva Lasha Price |
| William Ogden |
| Jill Bauerlein |
| Bradley Reeves |
| Judge Maya Guerra Gamble |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Case Contacts

| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 6/15/2021 6:07:03 PM | SENT |
|---|---|---|---|---|

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER, | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

**ORDER GRANTING DEFENDANTS' AMENDED UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL**

CAME ON for consideration the Amended Unopposed Motion for Substitution of Counsel and Withdrawal of Counsel filed by Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer (collectively "Defendants"), and the Court, after considering the motion, is of the opinion that the motion should be GRANTED. It is therefore,

ORDERED that Bradley J. Reeves and the law firm of REEVES LAW, PLLC is substituted as attorney of record for Defendants in place of T. Wade Jefferies and the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C. It is further

ORDERED that that T. Wade Jefferies and the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C. are permitted to withdraw as attorneys of record for Defendants.

SIGNED ON _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**SUBSTITUTED ATTORNEY FOR DEFENDANTS**

By: ___/s/ T. Wade Jefferies_____
T. Wade Jefferies
Texas Bar No. 00790962
The Law Firm of T. Wade Jefferies
401 Congress Ave., Ste. 1540
Austin, TX 78701
twadejefferies@twj-law.com
Telephone: (512) 201-2727
Facsimile: (512) 687-3499

By: ___/s/ Michael Burnett_____
Michael Burnett
Texas Bar No. 00790399
mburnett@burnettturner.com
Scott Nyitray
Texas Bar No. 24094876
snyitray@burnettturner.com
BURNETTTURNER
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730
Telephone: (512) 472-5060
Facsimile: (512) 472-5427

By: ___/s/ Mark C. Enoch_____
Mark C. Enoch
Texas Bar No. 06630360
fly63rc@verizon.net
GLAST, PHILLIPS, & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Telephone: (972) 419-8366
Facsimile:  (972) 419-8329

**WITHDRAWING ATTORNEYS FOR DEFENDANTS**


By:_____/s/ William R. Ogden_____
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:     (713) 221-7008
Fax:     (713) 221-8301

**ATTORNEYS FOR PLAINTIFF, NEIL HESLIN**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Case Contacts

| Name |
|------|
| Warren Lloyd Vavra |
| Velva Lasha Price |
| William Ogden |
| Jill Bauerlein |
| Bradley Reeves |
| Judge Maya Guerra Gamble |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Case Contacts

| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 6/15/2021 6:07:03 PM | SENT |
|---|---|---|---|---|

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |