## EXHIBIT B  (contd.)

**Copy of All Filings with State Court**

Filed in the District Court of Travis County, Texas

June 21, 2021, 05:10:02

At _____
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER, | § | |
| | § | 261st JUDICIAL DISTRICT |
| Defendants, | § | |

## ORDER GRANTING DEFENDANTS' AMENDED UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL

CAME ON for consideration the Amended Unopposed Motion for Substitution of Counsel and Withdrawal of Counsel filed by Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer (collectively "Defendants"), and the Court, after considering the motion, is of the opinion that the motion should be GRANTED. It is therefore,

ORDERED that Bradley J. Reeves and the law firm of REEVES LAW, PLLC is substituted as attorney of record for Defendants in place of T. Wade Jefferies and the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C. It is further

ORDERED that that T. Wade Jefferies and the Law Firm of T. Wade Jefferies; Michael Burnett and Scott Nyitray of the law firm of BurnettTurner; and Mark Enoch of Glast, Phillips, & Murray, P.C. are permitted to withdraw as attorneys of record for Defendants.

SIGNED ON ___June 21_____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM**
**AND ENTRY REQUESTED:**

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**SUBSTITUTED ATTORNEY FOR DEFENDANTS**

By: ___/s/ T. Wade Jefferies_____
T. Wade Jefferies
Texas Bar No. 00790962
The Law Firm of T. Wade Jefferies
401 Congress Ave., Ste. 1540
Austin, TX 78701
twadejefferies@twj-law.com
Telephone: (512) 201-2727
Facsimile: (512) 687-3499

By: ___/s/ Michael Burnett_____
Michael Burnett
Texas Bar No. 00790399
mburnett@burnettturner.com
Scott Nyitray
Texas Bar No. 24094876
snyitray@burnettturner.com
**BURNETTTURNER**
6034 W. Courtyard Dr., Suite 140
Austin, TX 78730
Telephone: (512) 472-5060
Facsimile: (512) 472-5427

By: ___/s/ *Mark C. Enoch*_____
Mark C. Enoch
Texas Bar No. 06630360
fly63rc@verizon.net
GLAST, PHILLIPS, & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Telephone: (972) 419-8366
Facsimile:  (972) 419-8329

**WITHDRAWING ATTORNEYS FOR DEFENDANTS**


By:_____/s/ *William R. Ogden*_____
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:    (713) 221-7008
Fax:    (713) 221-8301

**ATTORNEYS FOR PLAINTIFF, NEIL HESLIN**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark D.Bankston | | mark@fbtrial.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Case Contacts

| Name |
|---|
| Warren Lloyd Vavra |
| Velva Lasha Price |
| William Ogden |
| Jill Bauerlein |
| Bradley Reeves |
| Judge Maya Guerra Gamble |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 54451681
Status as of 6/16/2021 2:27 PM CST

Case Contacts

| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 6/15/2021 6:07:03 PM | SENT |
|---|---|---|---|---|

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 6/15/2021 6:07:03 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 6/15/2021 6:07:03 PM | SENT |

7/6/2021 9:12 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Chloe Jimenez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| *Defendants,* | § | |

## **AGREED MOTION TO ENTER LEVEL 3 SCHEDULING ORDER**

Plaintiff, Neil Heslin ("Plaintiff"), and Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer ("Defendants"), file this agreed motion and move the Court to enter a Level 3 Scheduling Order pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, and would show unto the Court as follows:

### **MOTION**

This case is a defamation and defamation *per se* case filed by Plaintiff against Defendants in response to certain broadcasts by Defendants pertaining to the December 2012 shooting at Sandy Hook Elementary School. After Plaintiff filed this lawsuit in April 2018, Defendants filed a motion to dismiss under the Texas Citizens Participation Act ("TCPA"). The Court ordered discovery related to Defendants' TCPA motion to dismiss, but Defendants did not respond. Defendants subsequently appealed to the Third of Court of Appeals. That appeal was dismissed for want of jurisdiction. Upon remand, a hearing was held by the trial court wherein the court denied Defendants' TCPA motion and held Defendants in contempt on October 18, 2019. Defendants subsequently appealed the denial of their TCPA motion, first to the Third Court of

Appeals and subsequently to the Supreme Court of Texas. The trial court's denial of Defendants' TCPA motion to dismiss were ultimately affirmed, and mandate was issued June 4, 2021 sending this case back to the trial court.

Pursuant to this Court's instructions, the parties have conferred regarding a proposed scheduling order in this matter. As such, the parties have agreed upon certain dates for a scheduling order, and thus jointly request the Court enter the proposed Agreed Level 3 Scheduling Order attached hereto as "Exhibit 1."

Under Rule 190.4(a) of the Texas Rules of Civil Procedure, the Court "must, on a party's motion, and may, on its own initiative, order that discovery be conducted with a discovery control plan tailored to the circumstances of the specific suit." TEX. R. CIV. P. 190.4(a). The Court "should act on a party's motion . . . under this subdivision as promptly as reasonably possible." The Rules require that the discovery plan must include: (1) a date for trial; (2) a discovery period during which either all discovery must be conducted or all discovery requests must be sent; (3) appropriate limits on the amount of discovery; and (4) deadlines for joining additional parties, amending or supplementing pleadings, and designating expert witnesses. *Id.* at 190.4(b).

Attached to this motion is the parties' agreed proposed Level 3 discovery control plan. The parties' attached scheduling order proposes a close of discovery on January 1, 2022, followed by a trial in March or April, but the proposal leaves blank the actual scheduled trial date, since such a date is dependent upon the Court's availability for trial. Otherwise the proposed order sets a discovery period during which all discovery must be conducted, sets appropriate limits on the amount of discovery, and establishes deadlines for joining additional parties, amending and supplementing pleadings, and designating expert witnesses. *Id.* As such, the proposed discovery plan meets the requirements of Rule 190.4(b) and should be entered by this Court.

<u>**PRAYER**</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff and Defendants request the Court enter the attached proposed docket control order in this matter pursuant to the Texas Rules of Civil Procedure, along with such other and further relief to which Plaintiffs may be justly entitled.

Dated: July 6, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____ _
    Bradley J. Reeves
    Texas Bar No. 24068266
    brad@brtx.law
    **REEVES LAW, PLLC**
    702 Rio Grande St., Suite 203
    Austin, TX 78701
    Telephone: (512) 827-2246
    Facsimile: (512) 318-2484

    **ATTORNEY FOR DEFENDANTS**


By:_____*/s/ Mark Bankston*_____
    Mark D. Bankston
    Texas Bar No. 24071066
    mark@fbtrial.com
    William R. Ogden
    Texas Bar No. 24073531
    bill@fbtrial.com
    1117 Herkimer Street
    Houston, TX 77008
    Telephone: (713) 221-7008
    Facsimile:  (713) 221-8301

    **ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF CONFERENCE**

The undersigned counsel for Defendants hereby certifies that counsel for Plaintiff and counsel for Defendants have conferred regarding this motion and the proposed Level 3 discovery control plan and scheduling order, and that the parties agree on this motion and the proposed Level 3 discovery control plan and scheduling order.

　　　*/s/ Bradley J. Reeves*　　　　　
Bradley J. Reeves


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on July 6, 2021.

Mark Bankston　　　　　　　　　　　　*via email*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

　　　*/s/ Bradley J. Reeves*　　　　　
Bradley J. Reeves

4

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55091232
Status as of 7/7/2021 9:14 AM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/6/2021 9:12:46 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 9:12:46 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 9:12:46 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 9:12:46 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/6/2021 9:12:46 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/6/2021 9:12:46 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/6/2021 9:12:46 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/6/2021 9:12:46 PM | SENT |

# Exhibit 1

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

**LEVEL 3 SCHEDULING ORDER**

Pursuant to TEX. R. CIV. P. 190.4, the Court enters the following Agreed Level 3 Scheduling Order. If no date is given below, the item is governed by the Texas Rules of Civil Procedure or the Local Rules of this Court.

1.  **08/15/2021**  **JOINDER.** All parties must be added and served, whether by amendment or third-party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE.

2.  **EXPERT WITNESS DESIGNATION.** Expert witness designations are required and must be served by the following dates. The designation must include the information listed in Rule 194.2 (f). Failure to timely respond will be governed by Rule 193.6.

    **09/15/2021**  Experts for parties seeking affirmative relief.
    **10/30/2021**  Rebuttal experts.

3.  **01/01/2022**  **DISCOVERY PERIOD ENDS.** All discoveries must be conducted before the end of the discovery period. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period that the deadline for responding will be within the discovery period.

4.  **02/01/2022**  **DISPOSITIVE MOTIONS AND PLEAS.** Must be filed by this date.

5.  <u>**01/01/2022**</u>  **CHALLENGES TO EXPERT TESTIMONY.**  All motions to exclude expert testimony and evidentiary challenges to expert testimony must be filed by this date, unless extended by leave of court.

6.  <u>**09/15/2021**</u>  **PLEADINGS.**  Amendments and supplements may be filed by this date without leave of court.  This order does not preclude prompt filing of pleadings directly responsive to any timely filed pleadings.  Amendment and supplements filed after this date are permitted only upon leave of court for good cause shown.

7.  <u>**March/April 2022**</u>  **TRIAL.** This case is set for a jury trial during the week of_____.

The time periods and terms of this Scheduling Order may be modified by the Parties by Rule 11 Agreement or upon order of the Court for good cause shown.

**CERTIFICATE OF COMPLIANCE WITH STANDING PRETRIAL SCHEDULING ORDER** (Effective January 1, 2020). None of these deadlines are shorter than those contained in the Standing Pretrial Scheduling Order, and none of the deadlines contained in the Standing Pretrial Scheduling Order shall be shortened without leave of court.

**ENTERED:**

_____
Date

_____
HON. MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

By:   */s/ Bradley J. Reeves*
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**


By:    */s/ Mark Bankston*
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:     (713) 221-7008
Fax:     (713) 221-8301

**ATTORNEYS FOR PLAINTIFF**

7/6/2021 11:12 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## OPPOSED MOTION FOR *PRO HAC VICE* ADMISSION OF MARC J. RANDAZZA

Movant, Marc J. Randazza, moves this Court grant admission to this body *pro hac vice* pursuant to Texas Government Code Section 82.001, *et seq.*, and Rule XIX of the Rules Governing Admission to the Bar of Texas to represent Defendants in this case, and would respectfully show the Court and declares such under penalty of perjury under the laws of the State of Texas as follows:

(1)     Movant is an attorney and member of the law firm Randazza Legal Group, PLLC, with offices at:

| | |
|---|---|
| Mailing address: | 2764 Lake Sahara Drive, Suite 109 Las Vegas, Nevada 89117 |
| Telephone: | 702-420-2001 |
| Facsimile: | 702-297-6584 |
| Email: | mjr@randazza.com |

(2)     Movant will be associated in this proceeding with attorney Bradley Jordan Reeves, whose State Bar card number is 24068266, an attorney licensed in Texas, with offices at:

| | |
|---|---|
| Mailing address: | Reeves Law, PLLC, 702 Rio Grande St., Ste. 203 Austin, TX 78701 |
| Telephone: | 512-827-2246 |
| Facsimile: | 512-318-2484 |
| Email: | brad@brtx.law |

(3)     Movant has appeared or has sought leave to appear or participate in the past two years in the following cases and causes in Texas courts:[1]

| Cause Number | Caption |
| --- | --- |
| 19-1102 | *Pozner, et al. v. Jones, et al.*, Supreme Court of Texas (admission *pro hac vice* granted on February 24, 2021) |
| 19-1050 | *Lewis v. Jones, et al.*, Supreme Court of Texas (admission *pro hac vice* granted on February 24, 2021) |
| 20-0347 | *Heslin v. Jones, et al.*, Supreme Court of Texas (admission *pro hac vice* granted on February 24, 2021) |
| 20-0835 | *Heslin v. Jones, et al.*, Supreme Court of Texas (admission *pro hac vice* granted on February 24, 2021) |

(4)     Movant is licensed in the following jurisdictions, including federal courts and is an active member in good standing in each of those jurisdictions as follows:

*SEE* ATTACHED LIST, **Exhibit 1**.

(5)     Movant has been the subject of disciplinary action by the Bar or courts of certain jurisdictions in which Movant is licensed within the preceding five years, and Movant describes such actions as follows:

a.      The last court to enter reciprocal discipline was the State Bar of Florida, which instead of merely adopting the underlying Nevada discipline, engaged in its own full fact finding and issued a full independent opinion after offering Movant due process. The Florida Bar Referee's decision is attached as **Exhibit 2**. The factfinder determined that Movant did not do anything "actually adverse" to his clients. *See id.* at 6. And there were no "factors in aggravation warranting any discipline in excess of that imposed by Nevada." *Id.* at 8.

---

[1]     To the extent applicable, Movant has appeared in the following cases in the Federal courts in Texas within the past two years: *Corsi, et al., v. Infowars, LLC, et al.,* Case No. 1:20-CV-00298-LY (W.D. Tex. Apr. 7, 2020); *Farrington v. Infowars, LLC,* Case No. 1:20-cv-00332-LY (W.D. Tex. May 26, 2020); *Mustard v. Infowars, LLC,* Case No. 1:20-cv-00485-RP (W.D. Tex. May 26, 2020). Movant has also recently been admitted in the Western District of Texas.

b.      On October 10, 2018, Movant was disciplined by the Supreme Court of Nevada for conduct that occurred in 2012.  *See* **Exhibit 3**, *In re Marc J. Randazza*, Bar No. 12265, No. 76543 (Nev. Oct. 10, 2018) (Order Approving Conditional Guilty Plea) and **Exhibit 4** (Conditional Guilty Plea).  The stipulated and implemented discipline was a twelve-month suspension, stayed for eighteen months, with certain other conditions. *See* **Exhibits 3 & 4**.

c.      The Nevada discipline arises from a negotiated agreement between Movant and the Southern Nevada Disciplinary Board.  The stipulated facts forming the basis of the discipline are as set forth in the enclosed Conditional Guilty Plea.

d.      As set forth in the Conditional Guilty Plea, the discipline arose from a specific circumstance where Movant represented a company as in-house counsel, along with its sister entity.  Those circumstances will not repeat themselves as Movant is not in-house counsel for any clients and Movant now recognizes where he misunderstood his ethical obligations.

e.      Movant fully complied with the State of Nevada discipline and completed his Nevada probation.  *See* **Exhibit 5**, Letter from State Bar of Nevada.

f.      Reciprocal discipline in the nature of a probation or stayed suspension was imposed by the State of Arizona, the State of Florida, the Commonwealth of Massachusetts, and the State of California.  *See* **Exhibits 6, 2, 7 and 8**.  Movant fully completed the terms of discipline in Arizona, California, and Massachusetts and no suspensions were imposed.  *See* **Exhibits 9 and 10**.[2]  Among its requirements, California required Movant to retake the MPRE, wherein he scored a 119.  *See* **Exhibit 11**.  California requires a score of 86 and Texas requires a score of 85.

---

[2]    The California Supreme Court does not entertain motions to declare that a probation has been successfully completed.  Thus, there is no exhibit closing the matter akin to ones issued by Arizona and Massachusetts.

g.     Reciprocal discipline of probation or a stayed suspension was imposed by the U.S. District Courts for the District of Massachusetts and for the Southern District of Florida (which probation expired before the discipline issued), and by the U.S. Patent & Trademark Office.  *See* **Exhibits 12, 13, and 14**.  The District of Massachusetts terminated proceedings on June 23, 2020, without imposing a suspension.  *See* **Exhibit 15**.  The discipline imposed by the PTO expired on January 23, 2021.[3]

h.     Reciprocal discipline in the nature of an active suspension was imposed by the U.S. District Court for the District of Nevada, which expired on April 10, 2020.  *See* **Exhibit 16**.  Movant was reinstated on June 9, 2020.  *See* **Exhibit 17**.

i.     The U.S. Court of Appeals for the Federal Circuit stayed all proceedings pending the completion of the Nevada discipline and terminated proceedings on May 28, 2020 without imposing discipline.  *See* **Exhibit 18**.

j.     Every other state court, Federal court, or Federal agency to issue a determination in response to the Nevada state discipline has either declined to take action, stayed all proceedings, or issued a stayed suspension or probation, or has readmitted Movant.

k.     Movant is aware of no other disciplinary actions.[4]

(6)     Movant has not been denied admission to the courts of any State or to any federal court during the preceding five years, except that Movant was denied admission *pro hac vice* by the Superior Court of the State of Connecticut on January 30, 2019 and again on July 7, 2020, in the matter if *Lafferty, et al. v. Jones, et al.*, Case No. UWY-CV18-6046436-S, in both instances the same judge denying such "in light of the applicant's recent disciplinary history."  *See* **Exhibits 19 and 20**.  Movant further states that, notwithstanding that same disciplinary history, he was readmitted to practice by the U.S. District Court for the District

---

[3]     As with California, the US PTO has not issued any document that the probationary period was successfully completed, but neither has an actual suspension been imposed.

[4]     To the extent they qualify as disciplinary actions, Movant discloses that he has been the subject of complaints by non-clients to one or more state bars, which, following investigation, declined to prosecute.

of Nevada, his admission was renewed by the U.S. Court of Appeals for the Eleventh Circuit, and he was admitted to practice *pro hac vice* by the U.S. District Court for the District of Columbia, by the U.S. District Court for the Western District of Texas, and by the Superior Court of Rhode Island.

(7)     Movant states that he is familiar with the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Professional Conduct governing the conduct of members of the State Bar of Texas, and Movant will at all times abide by and comply with the same so long as this proceeding is pending and Movant has not withdrawn as counsel therein.

(8)     Pursuant to Rule XIX(c) of the Rules Governing Admission to the Bar of Texas, proof of payment of the non-resident attorney fee to the Board of Law Examiners is attached hereto as **Exhibit 21**.

(9)     Pursuant to Rule XIX(b) of the Rules Governing Admission to the Bar of Texas, the motion of the resident practicing Texas attorney with whom Movant will be associated in the proceeding of this cause accompanies this motion. The motion of the resident attorney states that the resident attorney finds the Movant to be a reputable attorney and recommends that Movant be granted permission to participate in this proceeding before the Court.

WHEREFORE, Movant respectfully requests that this Motion be granted and grant such other and further relief as is just and appropriate under the circumstances.

Dated:  July 6, 2021

Respectfully submitted,

Marc J. Randazza
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Tel: (702) 420-2001
Fax: (702) 297-6584
ecf@randazza.com

State of MASSachusetts  )
County of essex          )

SWORN to and SUBSCRIBED before me, the undersigned authority, on the 12th day of June , 2021, by Marc J. Randazza.

_____
Notary Public

My Commission Expires: May 27, 2027

Cassidy S. Curran
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
May 27, 2027

[seal]

**CERTIFICATE OF CONFERENCE**

The undersigned counsel for Defendants conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via the court's electronic filing system on July 6, 2021.

Mark Bankston
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

*/s/ Bradley J. Reeves*
Bradley J. Reeves

---

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55091814
Status as of 7/7/2021 9:19 AM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 11:12:10 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/6/2021 11:12:10 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/6/2021 11:12:10 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/6/2021 11:12:10 PM | SENT |

# <u>Exhibit 1</u>

Marc J. Randazza Admissions List

# Marc J. Randazza, Esq.

### State Bar Admissions

| State | Date of Admission | Bar No. | Good Standing |
|---|---|---|---|
| Commonwealth of Massachusetts | 01/24/2002 | 651477 | Yes |
| State of Florida | 03/25/2003 | 625566 | Yes |
| State of California | 05/20/2010 | 269535 | Yes |
| State of Arizona | 08/26/2010 | 027861 | Yes |
| State of Nevada | 01/06/2012 | 12265 | Yes |

### Federal Court Admissions

| Title of Court | Date of Admission | Good Standing |
|---|---|---|
| Supreme Court of the United States | 02/28/2005 | Yes |
| U.S. Court of Appeals for the First Circuit | 05/08/2003 | Yes |
| U.S. Court of Appeals for the Second Circuit | 08/14/2018 | Yes |
| U.S. Court of Appeals for the Fourth Circuit | 11/06/2015 | Yes |
| U.S. Court of Appeals for the Sixth Circuit | 07/30/2013 | Yes |
| U.S. Court of Appeals for the Seventh Circuit | 11/06/2009 | Yes |
| U.S. Court of Appeals for the Ninth Circuit | 09/04/2009 | Yes |
| U.S. Court of Appeals for the Tenth Circuit | 11/03/2011 | Yes |
| U.S. Court of Appeals for the Eleventh Circuit | 06/20/2003 | Yes |
| U.S. Court of Appeals for the Federal Circuit | 09/01/2006 | Yes |
| U.S. District Court for the District of Massachusetts | 06/12/2002 | Yes |
| U.S. District Court for the Northern District of Florida | 05/17/2005 | Yes |
| U.S. District Court for the Middle District of Florida | 06/09/2003 | Yes |
| U.S. District Court for the Southern District of Florida | 08/04/2006 | Yes |
| U.S. District Court for the Northern District of Texas | 11/12/2009 | Yes |
| U.S. District Court for the Eastern District of California | 06/08/2010 | Yes |
| U.S. District Court for the Southern District of California | 06/08/2010 | Yes |
| U.S. District Court for the Central District of California | 06/08/2010 | Yes |
| U.S. District Court for the Northern District of California | 06/22/2010 | Yes |
| U.S. District Court for the District of Arizona | 10/19/2010 | Yes |
| U.S. District Court for the District of Colorado | 03/28/2011 | Yes |
| U.S. District Court for the District of Nevada | 02/01/2012 | Yes |
| U.S. District Court for the Eastern District of Wisconsin | 06/18/2010 | Yes |
| U.S. District Court for the Northern District of Ohio | 02/13/2012 | Yes |
| U.S. District Court for the Eastern District of Michigan | 06/30/2009 | Yes |

# **Exhibit 2**

The Florida Bar Referee's Report and Supreme Court Order

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

    Complainant,

v.

MARC JOHN RANDAZZA,

    Respondent.

Supreme Court Case
No. SC19-188

The Florida Bar File
No. 2020-00,216(2B) NFC

_____/

### REPORT OF REFEREE

I. SUMMARY OF PROCEEDINGS

    Pursuant to the undersigned being duly appointed as referee to conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of Discipline, the following proceedings occurred:

    This is a reciprocal discipline case. The Respondent filed The Notice of Discipline by a Foreign Jurisdiction (Nevada) in the Florida Supreme Court and had as attachments the Nevada Order Approving a Conditional Guilty Plea and the underlying Conditional Guilty Plea. Respondent's Exhibit 3; Tr. Vol. II, page 235, lines 8-10. On January 6, 2019, The Florida Bar filed its Formal Complaint against Respondent. On February 19, 2019, The Florida Bar noticed respondent that a case Management Conference would be conducted by the referee on March 8, 2019. On May 3, 2019, the referee commenced the Final Hearing in this matter.

Mr. Fisher, counsel for The Florida Bar, Mr. Weiss, counsel for the Respondent and the Respondent, Mr. Randazza, were present. Needing additional time to conclude the Final Hearing, the parties rescheduled the second day. Due to events beyond everyone's control, the Final Hearing was rescheduled again. The second day of the Final Hearing convened on January 8, 2020. All items properly filed including pleadings and exhibits in evidence and the report of referee constitute the record in this case and are forwarded to the Supreme Court of Florida.

## II. FINDINGS OF FACT

Jurisdictional Statement. Respondent is, and at all times mentioned during this investigation was a member of The Florida Bar subject to the jurisdiction and Disciplinary Rules of the Supreme Court of Florida.

Narrative Summary Of Case.

Because this is a reciprocal discipline action, it is based on the Findings of Fact, Conclusions of Law and Recommendation of the Southern Nevada Disciplinary Board of the State Bar of Nevada dated July 10, 2018 and Order Approving Conditional Guilty Plea Agreement of the Supreme Court of the State of Nevada, dated October 10, 2018. The Supreme Court of the State of Nevada imposed a 12 month suspension, stayed for 18 months of probation subject to conditions. Those findings of fact and Order are attached to The Florida Bar's Formal Complaint.

2

In or about June 2009, the Respondent drafted and signed a Legal Services Agreement with Excelsior Media Corp. (Excelsior) which provided that the Respondent would become "in-house" general counsel. The Agreement did not prohibit the Respondent from maintaining ad private practice or providing legal services to other clients so long as there was no conflict of interest with Excelsior. Excelsior had a subsidiary or affiliate company, Liberty Media Holdings, LLC (Liberty), which engaged in the production and distribution of pornography. The Respondent provided legal services to both entities, but did not have a separate agreement with Liberty.

In February 2011, Excelsior relocated its corporate offices to Las Vegas, Nevada. The Respondent followed in June 2011 and was admitted to the Nevada Bar in January 2012. Until his admission, the Respondent did not engage in the practice of law in the State of Nevada, except as a member of the bar of the U.S. District Court for the District of Nevada.

On or about June 20, 2012, the Respondent filed a lawsuit against FF Magnat Limited d/b/a Oron.com (Oron) for alleged violations of Liberty's intellectual property. On or about June 21, 2012, the Respondent obtained and injunction against Oron freezing certain accounts and funds of Oron. On July 1, 2012, the Respondent and attorneys for Oron signed a Settlement Letter with regard to the Oron litigation and a similar case between the two parties in Hong

Kong.  The parties agreed that Oron would pay Liberty $550,000 payable to the Respondent's trust account.  A dispute arose after the Settlement Letter was signed.  Liberty filed a Motion to Enforce the settlement letter which the United States District Court granted on August 7, 2012.  Liberty obtained a Judgment against Oron for $550,000.  As part of the Post-Judgment settlement negotiations, Oron  informed the Respondent that it wanted to enter into an agreement to retainthe Respondent for bona fide legal services.  Specifically, Oron wanted the Respondent to advise it how to avoid this type of litigation in the future and how to restructure the company so as to not be subject to jurisdiction in the United States. Tr. II, page 215, lines 2-25, 216, lines 1-14. Subject to the agreement of Liberty and its execution of a Post-Judgment agreement, the Respondent negotiated a separate agreement with Oron whereby he would receive $75,000 of Oron's frozen funds. On August 6, 2012, while still in litigation representing Excelsior against Oron, the Respondent executed a $75,000 non-refundable,  "earned upon receipt retainer" to represent  FF Magnat, the parent company of Oron. Tr. II, page 254, lines 17-28 and page 258, lines 8-14, The retainer agreement clearly stated that it could not take effect unless and until Liberty's dispute with Oron was fully resolved. See Transcript, Vol. Il, at 215:20-216:1 & 239:25-240:7. The Respondent presented and subsequently discussed the Post-Judgment Agreement, which included payment of the $550,000 and the $75,000  retainer for future

4

services with Oron, with the CEO of Liberty, Mr. Gibson. The agreement was never consummated because Mr. Gibson disapproved it. Tr. II, page 214-216, line 14; 217, lines 3-7. The Respondent did not receive the retainer fee of $75,000.

On August 21, 2012, the Court ordered Pay Pal, Inc. to transfer $550,000 of Oron funds to the Randazza Legal Group trust account. A full and proper accounting occurred with Liberty receiving its share.

Concurrent with the United States litigation between Liberty and Oron, the Respondent and Mr. Gibson also discussed pursuing litigation against Oron and/or its affiliates in Hong Kong. The Respondent estimated those costs, excluding attorney's fees, to be approximately $50,000. Mr. Gibson said Liberty to advance $25,000 if the Respondent would personally advance $25,000. The Respondent agreed and requested and Liberty executed a promissory note to him for $25,000. The Respondent did not advise Liberty, in writing, to seek the advice of independent counsel regarding the promissory note. The Respondent and Excelsior parted ways on or about August 29, 2012. They dispute whether he resigned or was terminated.

Following his departure from Excelsior, the Respondent engaged in litigation against Excelsior, Liberty and Jason Gibson, individually over among other things money he alleged was owed to him by his former employers. The parties submitted the matter to arbitration. After a five day trial, the Arbitrator

5

issued an Interim Arbitration award (IAA) in favor of the employers and against the Respondent. The Florida Bar's Exhibit 1. The Referee does not give any weight to the IAA for several reasons. First, the IAA was vacated in its entirety, after a court refused to confirm it, by voluntary agreement and by order of a court of competent jurisdiction. Respondent's Exhibit 12; Tr. Vol. II, page 196, lines 18-23. Second, the burden of proof for the IAA is a preponderance of the evidence, not the clear and convincing standard as required by these proceedings. Third, the Arbitrator's findings that the Respondent engaged in unethical conduct based on testimony and evidence that occurred over a five day trial and that has not been presented or observed by this Referee are of little weight. The IAA was not a basis for any discipline by the State Bar of Nevada. While the Referee may be sympathetic to the amount of time, energy and money that the Respondent's employers spent to litigate the IAA issues, sympathy should play no part in the Referee's recommendation.

The Florida Bar argued and presented evidence of other alleged conflicts of interest engaged in by the Respondent when he represented other clients whose interests were allegedly adverse to Excelsior or Liberty. There is no clear and convincing evidence to suggest that anything the Respondent may have done on behalf of his other clients was actually adverse to Excelsior or Liberty. The Respondent testified it was not. Tr. II, page 203, line 1-204, line 24 and 246, line

6

4-248, line 7. The Respondent was authorized under his employment agreement to do so. Tr. Vol. II, page 198: 23-25. The Florida Bar's witness, Mr. Dunlap, offered no examples of a single matter where such representation was adverse. Tr. Vol. II, page 281, line 23-284, line 23. The only instance in which there was a conceivable conflict was with respect to the representation of XVideos, but as soon as a potential conflict arose, Respondent acted to withdraw and the conflict never ripened. Tr. Vol. II, page 248, lines1-7. Mr. Dunlap's testimony regarding 10 Group fails to show that the Respondent represented 10 Group in that transaction. There was no conflict of interest where he briefly represented 10 Group regarding an unrelated litigation matter. The Nevada bar investigated these conflicts and no such conflicts were found. Tr. Vol. II, page 265, lines 3-11.

Since the imposition of the Nevada Order, every other state in which Respondent is admitted has issued reciprocal discipline tracking the Nevada Order. Specifically:

1. Arizona: The Presiding Disciplinary Judge issued a Final Judgment and Order of Reprimand and Probation placing Mr. Randazza on 18 months of probation, concurrent with the Nevada discipline. Respondent's Exhibit 4; Tr. Vol. II, page 189, line 11-13.

2. California: The Supreme Court of California issued a one-year suspension, stayed for one year, to be terminated upon satisfying the terms of the stay, which includes quarterly reporting and passing the MPRE. Respondent's Exhibit 9; Tr.Vol. II, page 188, lines 15-24

3. Massachusetts: The Supreme Judicial Court issued an Order of Term Suspension/Stayed, suspending Mr. Randazza for 12 months, stayed for 18

months, retroactive to the date of the Nevada discipline, with the suspension to be lifted upon compliance with the Nevada Order. Respondent's Exhibit 10; Tr. Vol. II, page 189, lines5-10.

None of these jurisdictions found any factors in aggravation warranting any discipline in excess of that imposed by Nevada. Tr.Vol. II, page 224, line22-225,, line 11. To date, Respondent's right to practice law has not been suspended.

Additionally, proceeding in the Federal Appellate Courts (10th, 11th and Federal Circuit) all deferred to the Nevada Order. Respondent's Exhibit 4. The Supreme Court of the United States and the U.S. Courts of Appeals for the 1st, 2nd, 4th, 6th, 7th and 9th Circuits to date, have not taken any action despite timely notice. Tr. Vol. II, page 241, lines 2-9.

Despite being put on notice of the Nevada Order, the U.S. District Courts for the Northern & Middle Districts of Florida, the Northern District of Texas, the Northern, Central, Eastern, & Southern Districts of California, the Eastern District of Wisconsin, the Eastern District of Michigan, the Northern District of Ohio, and the District of Montana (admitted pro hac vice) have taken no action toward reciprocal discipline. Tr. Vol. II, page 241, lines 2-9. The matter was referred to an investigatory subcommittee of the Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance of the U.S. District Court for the Southern District of Florida following Respondent's response to a show cause order. Since the Final Hearing, on May 8, 2020, the U.S. District Court for the Southern District

8

of Florida adopted the disciplinary measures imposed by Nevada.  See In re: Marc John Randazza, Case No. 18 MC 25230  (S.D. Fla. Feb. 6, 2019).  This document is of record pursuant to the granting of the Respondent's Motion to Supplement the Record. The U.S. District Court for the District of Massachusetts, upon the consent of Respondent, imposed reciprocal discipline in the nature of a 12-month suspension, stayed for 18 months, retroactive to October 10, 2018, conditioned upon compliance with the Nevada Order. See Respondent's Exhibit 4, In re: Marc. J Randazza, Misc. Bus. Dict. No. 18-mc-81490-FDS (D. Mass. sept. 26, 2019).

Only the U.S. District Court for the District of Nevada, which did not act on the prompt notice of the Nevada Order until September 2019, issued an order placing the Respondent on active suspension until the expiration of the Nevada state probation, subject to reinstatement upon discharging all conditions. See In re: Marc J. Randazza, Case No. 2: 19-cv-01765-MMD (D. Nev. Oct. 22, 2019). The reason given was that the court had "neither the obligation, resources, nor inclination to monitor Mr. Randazza's compliance with the probationary conditions the [Nevada Supreme Court] imposed on him." Id. at 1; Tr. Vol. II, page 241, lines 10-14.

Finally, the Referee does not find persuasive the numerous character letters submitted by the Respondent nor the testimony of his character witnesses, who were unfamiliar with the facts surrounding his discipline. Like the IAA award, the

9

Referee does not give any weight to these letters whether sent directly to the Referee's chambers or filed as an exhibit.

III.  RECOMMENDATIONS AS TO GUILT.

I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar: 4-1.8(a) and Rule 4-5.6(b).

STANDARDS FOR IMPOSING LAWYER SANCTIONS

I considered the following Standards prior to recommending discipline: 3.0, 4.3, 9.1, 9.2 and 9.3.


IV.  RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BEAPPLIED

I recommend that Respondent be found guilty of misconduct justifying disciplinary measures, and that he be disciplined by:

A.  One year of probation with a public reprimand and that the Respondent successfully complete the thirty hours of Florida continuing legal education ethics hours, and

B.  Payment of The Florida Bar's costs in these proceedings.

V.  PERSONAL HISTORY, PAST DISCIPLINARY RECORD

Prior to recommending discipline pursuant to Rule 3-7.6(m)(1)(D), I considered the following:

Age: 50 Years of Age.

10

Date of Bar Admission: March 3, 2003

Prior Discipline:    None

Aggravating Factors:  Standard 9.2

> (d)    multiple offenses; and
> (i)    substantial experience in the practice of law.

Mitigating Factors:

> (a)    absence of a prior disciplinary record.

## VI.    STATEMENT OF COSTS AND MANNER IN WHICH COSTS SHOULD BE TAXED

I find the following costs were reasonably incurred by The Florida Bar:

| | |
|---|---|
| Investigative Costs | $105.25 |
| Administrative Costs | $1250.00 |
| Court Reporter's Fees | $1532.00 |
| Total | $2887.25 |

It is recommended that such costs be charged to Respondent and that interest at the statutory rate shall accrue and be deemed delinquent 30 days after the judgment in this case becomes final unless paid in full or otherwise deferred by the Board of Governors of The Florida Bar.

Dated this 7th day of July 2020.

/S/ Dawn Caloca Johnson
Dawn Caloca-Johnson, Referee
301 South Monroe Street
Tallahassee, FL 32301-1861

11

Originals To:

Clerk of the Supreme Court of Florida; Supreme Court Building; 500 South Duval Street, Tallahassee, Florida, 32399-1927

Conformed Copies to:

James Keith Fisher, Bar Counsel, at jfisher@floridabar.org, and

John A. Weiss, Counsel for Respondent, at jweiss@rumberger.com

# Supreme Court of Florida

## THURSDAY, SEPTEMBER 3, 2020

**CASE NO.: SC19-188**
Lower Tribunal No(s).:
2015-00,718(2B)

THE FLORIDA BAR      vs.     MARC JOHN RANDAZZA

| Complainant(s) | Respondent(s) |
|---|---|

The Court approves the uncontested referee's report and reprimands respondent.

Respondent is further placed on probation for one year under the terms and conditions set forth in the report.  Respondent shall comply with all other terms and conditions in the report.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Marc John Randazza in the amount of $2,887.25, for which sum let execution issue.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, and COURIEL, JJ., concur.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

ca
Served:
LESLIE LAGOMASINO BAUM      JAMES KEITH FISHER
HON. DAWN CALOCA-JOHNSON, JUDGE      JOHN A. WEISS
PATRICIA ANN TORO SAVITZ

# **Exhibit 3**

Order Approving Conditional Guilty Plea, *In re Marc J. Randazza*, Bar No. 12265, No. 76543
(Nev. Oct. 10, 2018)

## IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF DISCIPLINE OF
MARC J. RANDAZZA, BAR NO. 12265.

No. 76453

**FILED**

OCT 10 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

### *ORDER APPROVING CONDITIONAL GUILTY PLEA AGREEMENT*

This is an automatic review of a Southern Nevada Disciplinary Board hearing panel's recommendation that this court approve, pursuant to SCR 113, a conditional guilty plea agreement in exchange for a stated form of discipline for attorney Marc J. Randazza. Under the agreement, Randazza admitted to violating RPC 1.8(a) (conflict of interest: current clients: specific rules) and RPC 5.6 (restrictions on right to practice) in exchange for a 12-month suspension, stayed for a period of 18 months subject to conditions.

Randazza has admitted to the facts and the violations alleged in two counts set forth in the amended complaint.[1] The record therefore establishes that Randazza violated the above-listed rules by loaning money to his client without informing the client in writing of the desirability of obtaining independent counsel, and by negotiating with opposing counsel to receive, as part of a settlement, a retainer for future legal services.

As Randazza admitted to the violations as part of the plea agreement, the issue for this court is whether the agreed-upon discipline

---

[1]In exchange for Randazza's guilty plea, the State Bar agreed to dismiss the remaining seven counts in the amended complaint.

18-39837

sufficiently protects the public, the courts, and the legal profession. *State Bar of Nev. v. Claiborne*, 104 Nev. 115, 213, 756 P.2d 464, 527-28 (1988) (explaining purpose of attorney discipline). In determining the appropriate discipline, we weigh four factors: "the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating and mitigating factors." *In re Discipline of Lerner*, 124 Nev. 1232, 1246, 197 P.3d 1067, 1077 (2008).

Randazza has admitted to violating duties owed to his client (conflict of interest) and the legal profession (restrictions on right to practice), and the admitted facts reflect that the misconduct was knowing. His conduct may have caused a delay in the disbursement of settlement funds to his client. The baseline sanction for both rule violations, before considering aggravating and mitigating circumstances, is suspension. Standards for Imposing Lawyer Sanctions, *Compendium of Professional Responsibility Rules and Standards*, Standard 4.32 (Am. Bar Ass'n 2017) (providing that suspension is appropriate when a lawyer "knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client"); *id.* Standard 7.2 (providing that suspension is appropriate when a lawyer "knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system"). The record supports one aggravating circumstance (substantial experience in the practice of law) and three mitigating circumstances (absence of prior disciplinary record, full and free disclosure to disciplinary authority or cooperative attitude toward proceeding, and delay in disciplinary proceedings). Considering all the factors, we conclude that the agreed-upon discipline is appropriate.

SUPREME COURT
OF
NEVADA

(O) 1947A

2

Accordingly, we hereby suspend Marc J. Randazza for 12 months, stayed for 18 months commencing on the date of this order, subject to the following conditions: (1) Randazza shall "stay out of trouble" during the probationary period, "meaning that he will have no new grievance arising out of conduct post-dating the date of the plea which results in the imposition of actual discipline (a Letter of Reprimand or above, SCR 102) against him"; (2) he shall successfully complete 20 hours of CLE in ethics in addition to his normal CLE requirements during the probationary period; (3) he shall seek the advice and approval of an independent and unaffiliated ethics attorney in the relevant jurisdiction before obtaining any conflicts of interest waivers during the probationary period; and (4) he shall pay the actual costs of the disciplinary proceeding, including $2,500 under SCR 120, within 30 days of this court's order, if he has not done so already. The State Bar shall comply with SCR 121.1

It is so ORDERED.

_____, C.J.
Douglas

_____, J.         _____, J.
Cherry                                 Gibbons

_____, J.         _____, J.
Pickering                              Hardesty

_____, J.         _____, J.
Parraguirre                            Stiglich

cc:    Chair, Southern Nevada Disciplinary Panel
        Gentile, Cristalli, Miller, Armeni & Savarese, PLLC
        Bar Counsel, State Bar of Nevada
        Kimberly K. Farmer, Executive Director, State Bar of Nevada
        Perry Thompson, Admissions Office, U.S. Supreme Court

# **Exhibit 4**

Conditional Guilty Plea, *In re Marc J. Randazza*, Bar No. 12265, No. 76543
(Nev. June 5, 2018)

**FILED**

**JUN 0 5 2018**

STATE BAR OF NEVADA
BY: _____
OFFICE OF BAR COUNSEL

Case No.: OBC15-0747

STATE BAR OF NEVADA

SOUTHERN NEVADA DISCIPLINARY BOARD

STATE BAR OF NEVADA,

    Complainant,

vs.

MARC J. RANDAZZA, ESQ.,

    Nevada Bar No. 012265,
    Respondent.

)
)
)
)
)
)
)
)
)
)
)

**CONDITIONAL GUILTY PLEA
IN EXCHANGE FOR A STATED
FORM OF DISCIPLINE**

    Marc J. Randazza ("Respondent"), Bar No. 012265 hereby tenders to Assistant Bar Counsel for the State Bar of Nevada a Conditional Guilty Plea ("Plea") pursuant to Supreme Court Rule ("SCR") 113(1) and agrees to the imposition of the following Stated Form of Discipline in the above-captioned cases.

I.
**CONDITIONAL GUILTY PLEA**

    Through the instant Plea, Respondent agrees and admits as follows:

    1.    Respondent is now and at all times since January 6, 2012 was a licensed attorney in the State of Nevada.

    2.    The State Bar filed a Formal Complaint on the above referenced case on January 25, 2016. Thereafter, the State Bar filed an Amended Complaint on December 16, 2016. Respondent filed various Motions to Dismiss the Amended Complaint and then ultimately filed a Verified Response to the Amended Complaint on October 23, 2017.

    3.    In accordance with the Stipulation of Facts herein, Respondent pleads guilty and admits that he violated Rules of Professional Conduct ("RPC") as follows:

**SBN EXH 1, PG.0001**

## II.
## STIPULATION OF FACTS

The facts stipulated to and agreed upon between Respondent and the State Bar of Nevada in support of this conditional plea are as follows:

1.      Respondent is now a licensed attorney in the states of Nevada, California, Florida, Arizona, and Massachusetts.  Respondent became licensed in the State of Nevada on or about January 6, 2012 and has been assigned Bar No. 12265.

2.      In or about June 2009, Respondent entered into an agreement with Excelsior Media Corp ("Excelsior") which provided, among other things, that Respondent would become in-house general corporate counsel for Excelsior ("Legal Services Agreement").  The Legal Services Agreement did not prohibit Respondent from also maintaining a private legal practice to provide legal services to clients other than Excelsior.

3.      At the time the Legal Services Agreement was entered into, Excelsior was headquartered in California and Respondent was licensed to practice law in the State of Florida.  For a period of time following execution of the Legal Services Agreement, Respondent relocated to California, obtained admission to the State Bar of California, and maintained his primary office to perform legal work for Excelsior in California.

4.      At the time the Legal Services Agreement was entered into, Excelsior had a subsidiary or affiliate called Liberty Media Holdings, LLC ("Liberty").  Liberty was engaged in the business of production and distribution of pornography.  After entering into the Legal Services Agreement, Respondent provided legal services to both Excelsior and Liberty, although no separate agreement was entered into by and between Liberty and Respondent.

5.      In or about February 2011, Excelsior relocated its corporate headquarters to Las Vegas, Nevada.  In or about June 2011, Respondent relocated to Las Vegas, Nevada and continued working as general corporate counsel for Excelsior.  Prior to June 2011, Respondent was not

**SBN EXH 1, PG.0002**

engaged in the practice of law in the State of Nevada in any capacity, except to the extent such was in his capacity as a member of the bar of the U.S. District Court for the District of Nevada.

6.      At the direction of Excelsior, Respondent pursued violations of Liberty's intellectual property rights by third parties through his separate law firm.

7.      On or about June 20, 2012, Respondent, on behalf of Liberty, filed a lawsuit in US District Court, District of Nevada against FF Magnat Limited d/b/a Oron.com ("Oron") for alleged violations of Liberty's intellectual property. See Case No. 2:12-cv-01057-GMN-RJJ (hereinafter "Oron Litigation").

8.      On or about June 21, 2012, Respondent obtained an injunction in the Oron Litigation freezing certain accounts and funds belonging to Oron.

9.      On July 1, 2012, Respondent and attorneys for Oron signed a letter memorializing settlement terms in regards to the Oron Litigation and a similar case between the two parties in Hong Kong (hereinafter "Settlement Letter"). An essential part of the Settlement Letter was that Oron would pay Liberty the sum of $550,000 with said sum payable to Respondent's Attorney-Client Trust Account.

10.     A dispute arose after the Settlement Letter was signed.  On behalf of Liberty, Respondent filed a Motion to Enforce Settlement.

11.     By Order dated August 7, 2012, the United States District Court found that the Settlement Letter constituted an enforceable contract as there was a "meeting of the minds as to all material terms on July 5, 2012." A Judgment was entered in the docket of the above-entitled Court in favor of Liberty as Judgment Creditor and against Oron as Judgment Debtor for $550,000.00.

12.     By Order dated August 21, 2012, the United States District Court ordered PayPal, Inc., to transfer funds belonging to Oron to satisfy the Judgment by paying $550,000.00 to the trust account of Randazza Legal Group.

13.     Between August 7, 2012 and August 13, 2012, Respondent and Oron continued discussions regarding reducing the terms of the Settlement Letter and the Judgment into a more definitive written agreement although the District Court had already enforced the settlement and reduced the $550,000.00 settlement amount ("Settlement Amount") to judgment ("Post-Judgment Discussions").

14.     During the Post-Judgment Discussions, Oron informed Respondent that it wanted to enter into an agreement to retain Respondent for bona fide legal services, which would have the practical effect of potentially conflicting off Respondent from ever representing a client in litigation against Oron in the future.

15.     Subject to the agreement of Liberty and Liberty's execution of a written agreement, Respondent negotiated a separate agreement with Oron whereby $75,000 of Oron's frozen funds would be released to Oron's counsel with the understanding, but no guarantee, that such funds would be used to retain Respondent as counsel for Oron for the payment of $75,000, which would have the practical effect of potentially conflicting Respondent off any future litigation against Oron ("Post-Judgment Agreement").

16.     On or about August 13, 2012, Respondent informed Liberty of the proposed Post-Judgment Agreement by presenting a copy thereof to Liberty's CEO Jason Gibson for his review, approval and signature.  The Post-Judgment Agreement encompassed the payment of the $550,000 Settlement Amount and Judgment by Oron to Liberty as well as the release of $75,000 of Oron's frozen funds to Oron's counsel.

17.     On or about August 13, 2012, Respondent and Jason Gibson discussed the proposed unfreezing of $75,000 of Oron's funds. Jason Gibson expressed concerns to Respondent about the disposition of that $75,000 and did not consent to such unfreezing.

18.     As a result of the August 13, 2012 discussion between Jason Gibson and Respondent, the Post-Judgment Agreement was not executed.  Oron's frozen funds were not

released, Respondent did not receive a $75,000 payment, and Respondent did not become counsel for Oron which might have conflicted him off from opposing Oron in future litigation.

19.    In response to the District Court's Order dated August 21, 2012, PayPal transferred $550,000 of Oron's funds to pay the $550,000 Settlement Amount and Judgment in favor of Liberty. A full and proper accounting of those funds has occurred with Liberty receiving its appropriate share.

20.    During August of 2012, Respondent and Jason Gibson also discussed pursuing further litigation on behalf of Liberty against Oron and/or its affiliates or related parties in overseas jurisdictions. Respondent estimated additional litigation costs and expenses (not to include attorney's fees) in an amount approximating $50,000. Mr. Gibson informed Respondent that Liberty was prepared to advance $25,000 for additional costs and expenses if Respondent would advance the other half. Respondent informed Mr. Gibson that he would personally advance the additional required $25,000. To memorialize the $25,000 as an advancement of costs and expenses, Respondent requested Liberty execute a promissory note to that effect.

21.    On or about August 21, 2012, pursuant to Respondent's advancement to Liberty of the $25,000, Mr. Gibson signed a promissory note on Liberty's behalf noting the terms of repayment.

22.    Respondent did not advise Liberty, in writing, of its right to seek the advice of independent counsel with regards to the promissory note.

23.    Respondent's employment by Excelsior ceased on or about August 29, 2012 after he indicated a likely need to withdraw from representing Liberty. Respondent and Excelsior dispute whether Respondent resigned or was terminated by Excelsior.

24.    RPC 5.6 reads, in part, that "[a] lawyer shall not participate in offering or making ... [a]n agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy." As part of the negotiations culminating in the drafting of the proposed

Post-Judgment Agreement to which Liberty was a proposed party and signatory, Respondent offered to enter into an agreement which would have the likely effect of restricting Respondent's right to practice law.

25.     RPC 1.8(a) mandates that "a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory security or other pecuniary interest adverse to a client  unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client, and(b) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction." Respondent did not advise Liberty, in writing, of the desirability or advisability of seeking the advice of independent legal counsel on the fairness of the $25,000 advance or give Liberty the reasonable opportunity to seek the advice of independent counsel before accepting the advance and signing the promissory note.

## AGGRAVATION / MITIGATION

1.     Pursuant to SCR 102.5(1) (Aggravation and mitigation), the Parties considered the following *aggravating* factors in considering the discipline to be imposed:

(i)     Substantial experience in the practice of law.

2.     Pursuant to SCR 102.5(2) (Aggravation and mitigation), the Parties considered the following *mitigating* factors in considering the discipline to be imposed:

(a) Absence of prior disciplinary record;

(e) Full and free disclosure to disciplinary authority or cooperative attitude toward proceeding including Respondent's self-reporting of the results of an arbitration proceeding which reopened this matter after the initial complaint had been closed;

(j)     Delay in disciplinary proceedings recognizing that all allegations relate to alleged conduct occurring almost 6 and 7 years prior to this Conditional Guilty Plea with no further complaints filed with the bar subsequent to that time.

## III.
## STATED FORM OF DISCIPLINE

Based upon the above and foregoing, the Parties agree to recommend attorney discipline subject to the following conditions:

1.     The Respondent agrees to accept a term of suspension of 12 months, with the suspension stayed; said suspension is to begin on the date of the Nevada Supreme Court's Order approving the conditional guilty plea in this matter.

2.     The Respondent will be placed on an eighteen-month term of probation, said probation to begin on the date of the Nevada Supreme Court's order approving the conditional guilty plea in this matter.

3.     The Respondent will "stay out of trouble" during his term of probation, meaning that he will have no new grievance arising out of conduct post-dating the date of this Conditional Guilty Plea resulting in the imposition of actual discipline (a Letter of Reprimand or above- SCR 102) against him during his term of probation.

4.     The Respondent will successfully complete twenty hours of Continuing Legal Education ("CLE"), in addition to his normal CLE requirements, during his term of probation. The twenty CLE hours will all be ethics credits, cannot be used as credit against any other CLE requirements, and will be reported to the State Bar of Nevada.

5.     The Respondent will seek the advice and approval of an independent and unaffiliated ethics attorney in the relevant jurisdiction before obtaining any conflicts of interest waivers during the probationary period.

6.    The Respondent agrees to pay SCR 120(1) fees in the amount of $2,500.00, and to pay the actual costs of the disciplinary proceeding.  That amount is to be paid in full within thirty days of receipt of a billing from the State Bar.

7.    If any of these terms is violated by the Respondent, it will be grounds for the State Bar to seek to impose the stayed portion of the suspension.

## IV.
## CONDITIONAL AGREEMENT BY THE STATE BAR

Conditional to approval by the Nevada Supreme Court of the instant Plea, the State Bar agrees to:

1.    Dismiss all remaining allegations of violations of Rules, with prejudice.

## V.
## APPROVAL OF RESPONDENT

Having read the Plea and being satisfied with it, the same is hereby approved by Respondent.

Respondent acknowledges that he has had the opportunity to discuss this Plea with counsel of his choosing.  Respondent fully understands the terms and conditions set forth herein and enters into this Plea freely and voluntarily.

DATED this ___ day of May, 2018.

Marc J. Randazza, Esq.
Nevada Bar No. 012265
c/o Dominic Gentile. Esq.
410 South Rampart Boulevard, Suite 420
Las Vegas, NV 89145

V.
## APPROVAL OF BAR COUNSEL

Having read the Plea tendered by Respondent and being satisfied with the contents therein,

I hereby approve and recommend the Plea for approval by the Formal Hearing Panel.

DATED this ___4___ day of ~~May,~~ 2018.
June

                                STATE BAR OF NEVADA
                                Janeen V. Isaacson, Acting Bar Counsel

By: _____
                                Matthew Carlyon
                                Assistant Bar Counsel
                                Nevada Bar No. 12712
                                3100 W. Charleston Blvd., Suite 100
                                Las Vegas, Nevada, 89102

# **<u>Exhibit 5</u>**

Letter from State Bar of Nevada
(April 13, 2020)

# STATE BAR OF NEVADA



April 13, 2020

**Via email only to mjr@randazza.com**

Marc Randazza, Esq.
2764 Lake Sahara Dr.
Suite 109
Las Vegas, NV 89117

3100 W. Charleston Blvd.
Suite 100
Las Vegas, NV 89102
phone 702.382.2200
toll free 800.254.2797
fax 702.385.2878

9456 Double R Blvd., Ste. B
Reno, NV 89521-5977
phone 775.329.4100
fax 775.329.0522

*www.nvbar.org*

Re:  Compliance with Nevada Supreme Court Order filed October 10, 2018

Dear Mr. Randazza:

Our records reflect that you have successfully completed the conditions of your stayed suspension as set forth in the Nevada Supreme Court's Order filed October 10, 2018, in Case No. 76453, and no actual suspension will be imposed.

Congratulations on your successful completion of probation.  Our file in the matter is now closed.

Please do not hesitate to contact our office if you have any questions.

Sincerely,

Daniel Hooge (Apr 13, 2020)

Daniel M. Hooge
Bar Counsel

/lw

# 2020.04.13_Randazza letter

Final Audit Report                                           2020-04-13

| | |
|---|---|
| Created: | 2020-04-13 |
| By: | Belinda Felix (belindaf@nvbar.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAUrl0u3COu_Dl8BmR1itrFUKf5kVWRMfB |

## "2020.04.13_Randazza letter" History

Document created by Belinda Felix (belindaf@nvbar.org)
2020-04-13 - 5:04:06 PM GMT- IP address: 68.224.102.64

Document emailed to Daniel Hooge (danh@nvbar.org) for signature
2020-04-13 - 5:04:32 PM GMT

Email viewed by Daniel Hooge (danh@nvbar.org)
2020-04-13 - 5:33:42 PM GMT- IP address: 98.167.70.177

Document e-signed by Daniel Hooge (danh@nvbar.org)
Signature Date: 2020-04-13 - 5:33:48 PM GMT - Time Source: server- IP address: 98.167.70.177

Signed document emailed to Daniel Hooge (danh@nvbar.org) and Belinda Felix (belindaf@nvbar.org)
2020-04-13 - 5:33:48 PM GMT

Adobe Sign

# **Exhibit 6**

Final Judgement and Order of Reprimand and Probation, State of Arizona
(January 14, 2019)

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | **PDJ-2018-9110** |
| **MARC J. RANDAZZA,** Bar No. 027861 | **FINAL JUDGMENT AND ORDER OF REPRIMAND AND PROBATION** |
| Respondent. | [State Bar No. 18-3420-RC] |
| | **FILED JANUARY 14, 2019** |

Under Rules 54(h) and 57(b), *Reciprocal Discipline*, Ariz. R. Sup. Ct.,[1] a certified copy of the Supreme Court of Nevada's Order Approving Conditional Guilty Plea Agreement was received by the Presiding Disciplinary Judge (PDJ).

The Order imposed a 12-month suspension, which was stayed for 18 months subject to conditions. The conditions include the following terms: Respondent shall have no new grievances out of conduct post-dating the date of the plea which results in the imposition of discipline; 2) successfully complete during the period of probation 20 hours of continuing legal education (CLE) in ethics in addition to any yearly CLE requirements; 3) seek the advice and approval of an independent and unaffiliated ethics attorney in the relevant jurisdiction before obtaining any conflict of interest waivers during the period of probation; 4) pay actual costs of disciplinary

---

[1] Unless otherwise stated, all rule references are to the Ariz. R. Sup. Ct.

proceeding including $2,500.00 under SCR 120. The suspension was for Mr. Randazza's failure to avoid conflict of interests with clients and failure to advise the client of their right to seek the advice of independent counsel regarding a promissory note.

Notice of the filing of that Order was issued to the parties on November 11, 2018, in compliance with Rule 57(b)(2). Under Rule 57(b)(3), the PDJ "shall impose the identical or substantially similar discipline" unless Bar Counsel or Respondent establishes by preponderance of the evidence one of the four elements listed under that rule. Both the State Bar and Mr. Randazza filed responses. The State Bar asserts under Rule 57(b)(3), no factors are applicable, and a sanction of reprimand and probation are appropriate under the facts of this matter. Mr. Randazza asserts suspension in this matter is not warranted and would in fact be punitive. He states the appropriate resolution in this matter is to stay these proceedings until successful completion his term of probation in Nevada and to then dismiss this matter.  In the alternative, Mr. Randazza requests a reprimand, or at most, be placed on probation with no additional terms.

Arizona does not recognize a stayed suspension subject to conditions. Rule 60, Ariz. R. Sup. Ct. Therefore, the imposition of an identical sanction is not appropriate and a suspension in Arizona may not be stayed in favor of probation.

We are reminded that the objective of lawyer discipline proceedings is to protect the public, the profession, and the administration of justice, and not to punish the lawyer. *In re Neville,* 147 Ariz. 106, 708 P.2d 1297. Imposing a reprimand and probation serves to advise the Bar and the public that Mr. Randazza engaged in conduct that violated the Rules of Professional Conduct. It serves the purpose of protecting the public, the integrity of the profession, educating other lawyers, and instilling confidence in the integrity of the disciplinary process. A reprimand and eighteen (18) months of probation is substantially similar discipline

Now Therefore,

**IT IS ORDERED** imposing reciprocal discipline of reprimand and eighteen (18) months of probation upon Respondent, **MARC J. RANDAZZA, Bar No. 027861,** effective immediately.

**IT IS FURTHER ORDERED** Mr. Randazza shall be placed on probation for eighteen (18) months to run concurrently with the terms and conditions as set forth in the Nevada Order Approving Guilty Plea Agreement dated October 10, 2018.

**IT IS FURTHER ORDERED** Mr. Randazza shall be responsible for the costs associated with this matter in the amount of $1,200.00.

**DATED** this 14th day of January 2019.

*William J. O'Neil*

**William J. O'Neil, Presiding Disciplinary Judge**

Copy of the foregoing e-mailed/mailed
this 14th day of January 2019, to:

Jon Weiss
Lewis Roca Rothgerber Christie LLP
201 E. Washington Street, Suite 1200
Phoenix, AZ  85004-2595
Email: jweiss@lrrc.com
Respondent's Counsel

Maret Vessella
Chief Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, AZ 85016-6288
Email: LRO@staff.azbar.org

by: AMcQueen

# **Exhibit 7**

Order of Term Suspension/Stayed, Commonwealth of Massachusetts
(May 14, 2019)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
NO:  BD-2018-110

IN RE: MARC JOHN RANDAZZA

### ORDER OF TERM SUSPENSION/STAYED

This matter came before the Court, Gaziano, J., on a Petition for Reciprocal Discipline pursuant to S.J.C. Rule 4:01, § 16, and the Order entered in the Supreme Court of the State of Nevada filed by the Office of Bar Counsel on December 11, 2018.

On December 12, 2018, an Order of Notice issued and was served on the lawyer in the manner specified in S.J.C. Rule 4:01, § 21, directing him to inform the Court within thirty (30) days why the imposition of the identical discipline would be unwarranted in the Commonwealth of Massachusetts. On January 15, 2019, the lawyer filed his response to the petition and a hearing was scheduled for March 26, 2019. On March 19, 2019, counsel for the lawyer filed a motion to continue the hearing, which was allowed by this Court and the hearing was rescheduled for May 2, 2019.  Bar Counsel's reply to the lawyer's response was filed by Acting Bar Counsel on April 2, 2019, and the lawyer then filed his memorandum in response to Acting Bar Counsel's reply on April 26, 2019.

RECEIVED
5/14/2019 2:54 PM
MAURA S. DOYLE, CLERK
SUPREME JUDICIAL COURT
THE COUNTY OF SUFFOLK

Upon consideration thereof, and after a hearing attended by acting bar counsel, the lawyer and his counsel;

It is ORDERED that:

Marc John Randazza is hereby suspended from the practice of law in the Commonwealth of Massachusetts for a period of twelve (12) months, with the execution of the suspension stayed for a period of eighteen (18) months, retroactive to October 10, 2018, conditioned upon the lawyer's compliance with the Order entered in the Supreme Court of Nevada, attached hereto and incorporated herein.

After eighteen (18) months from October 10, 2018, the lawyer may file an affidavit of compliance with the Office of Bar Counsel and the Clerk of the Supreme Judicial Court for the County of Suffolk, that he has complied with this Order. Upon receipt, and with the assent of the Office of Bar Counsel, the lawyer may then request that this court issue an order that he is no longer subject to the twelve (12) month suspension for the misconduct that gave rise to the instant petition for discipline.

By the Court, (Gaziano, J.)

Assistant Clerk

Entered: May 14, 2019



**EXHIBIT**

**A**

## IN THE SUPREME COURT OF THE STATE OF NEVADA

IN THE MATTER OF DISCIPLINE OF
MARC J. RANDAZZA, BAR NO. 12265.

No. 76453

# FILED

**OCT 10 2018**

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

## *ORDER APPROVING CONDITIONAL GUILTY PLEA AGREEMENT*

This is an automatic review of a Southern Nevada Disciplinary Board hearing panel's recommendation that this court approve, pursuant to SCR 113, a conditional guilty plea agreement in exchange for a stated form of discipline for attorney Marc J. Randazza. Under the agreement, Randazza admitted to violating RPC 1.8(a) (conflict of interest: current clients: specific rules) and RPC 5.6 (restrictions on right to practice) in exchange for a 12-month suspension, stayed for a period of 18 months subject to conditions.

Randazza has admitted to the facts and the violations alleged in two counts set forth in the amended complaint.[1] The record therefore establishes that Randazza violated the above-listed rules by loaning money to his client without informing the client in writing of the desirability of obtaining independent counsel, and by negotiating with opposing counsel to receive, as part of a settlement, a retainer for future legal services.

As Randazza admitted to the violations as part of the plea agreement, the issue for this court is whether the agreed-upon discipline

---

[1]In exchange for Randazza's guilty plea, the State Bar agreed to dismiss the remaining seven counts in the amended complaint.



18-39837

sufficiently protects the public, the courts, and the legal profession. *State Bar of Nev. v. Claiborne*, 104 Nev. 115, 213, 756 P.2d 464, 527-28 (1988) (explaining purpose of attorney discipline). In determining the appropriate discipline, we weigh four factors: "the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating and mitigating factors." *In re Discipline of Lerner*, 124 Nev. 1232, 1246, 197 P.3d 1067, 1077 (2008).

Randazza has admitted to violating duties owed to his client (conflict of interest) and the legal profession (restrictions on right to practice), and the admitted facts reflect that the misconduct was knowing. His conduct may have caused a delay in the disbursement of settlement funds to his client. The baseline sanction for both rule violations, before considering aggravating and mitigating circumstances, is suspension. Standards for Imposing Lawyer Sanctions, *Compendium of Professional Responsibility Rules and Standards*, Standard 4.32 (Am. Bar Ass'n 2017) (providing that suspension is appropriate when a lawyer "knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client"); *id.* Standard 7.2 (providing that suspension is appropriate when a lawyer "knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system"). The record supports one aggravating circumstance (substantial experience in the practice of law) and three mitigating circumstances (absence of prior disciplinary record, full and free disclosure to disciplinary authority or cooperative attitude toward proceeding, and delay in disciplinary proceedings). Considering all the factors, we conclude that the agreed-upon discipline is appropriate.

Accordingly, we hereby suspend Marc J. Randazza for 12 months, stayed for 18 months commencing on the date of this order, subject to the following conditions: (1) Randazza shall "stay out of trouble" during the probationary period, "meaning that he will have no new grievance arising out of conduct post-dating the date of the plea which results in the imposition of actual discipline (a Letter of Reprimand or above, SCR 102) against him"; (2) he shall successfully complete 20 hours of CLE in ethics in addition to his normal CLE requirements during the probationary period; (3) he shall seek the advice and approval of an independent and unaffiliated ethics attorney in the relevant jurisdiction before obtaining any conflicts of interest waivers during the probationary period; and (4) he shall pay the actual costs of the disciplinary proceeding, including $2,500 under SCR 120, within 30 days of this court's order, if he has not done so already.  The State Bar shall comply with SCR 121.1

It is so ORDERED.

_____, C.J.
Douglas

_____, J.            _____, J.
Cherry                           Gibbons

_____, J.            _____, J.
Pickering                        Hardesty

_____, J.            _____, J.
Parraguirre                      Stiglich

cc:     Chair, Southern Nevada Disciplinary Panel
          Gentile, Cristalli, Miller, Armeni & Savarese, PLLC
          Bar Counsel, State Bar of Nevada
          Kimberly K. Farmer, Executive Director, State Bar of Nevada
          Perry Thompson, Admissions Office, U.S. Supreme Court

# **Exhibit 8**

Order on Discipline, *In re Marc J. Randazza,* No. S258331
(CA. Dec. 11, 2019)

SUPREME COURT
**FILED**

DEC 1 1 2019

Jorge Navarrete Clerk

(State Bar Court No. SBC-19-J-30338)

Deputy

**S258331**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re MARC JOHN RANDAZZA on Discipline

The court orders that Marc John Randazza (Respondent), State Bar Number 269535, is suspended from the practice of law in California for one year, execution of that period of suspension is stayed, and Respondent is placed on probation for one year subject to the following conditions:

1. Respondent must comply with the conditions of probation recommended by the Hearing Department of the State Bar Court in its Order Approving Stipulation filed on August 13, 2019; and

2. At the expiration of the period of probation, if Respondent has complied with the terms of probation, the period of stayed suspension will be satisfied and that suspension will be terminated.

Respondent must provide to the State Bar's Office of Probation proof of taking and passing the Multistate Professional Responsibility Examination as recommended by the Hearing Department in its Order Approving Stipulation filed on August 13, 2019. Failure to do so may result in suspension. (Cal. Rules of Court, rule 9.10(b).)

Costs are awarded to the State Bar in accordance with Business and Professions Code section 6086.10 and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.

**CANTIL-SAKAUYE**

*Chief Justice*

# **Exhibit 9**

Arizona State Bar's Notice of Successful Completion of Probation
(April 16, 2020)

FILED
4/16/2020
/s/ BRANDI ENSIGN

Maret Vessella, Bar No. 019350
Chief Bar Counsel
State Bar of Arizona
4201 N. 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Telephone (602)340-7272
Email: LRO@staff.azbar.org

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA, | PDJ 2018-9110 |
| | **NOTICE OF SUCCESSFUL COMPLETION OF PROBATION** |
| **MARC J. RANDAZZA** **Bar No. 027861** | |
| | File No. **18-3420-RC** |
| Respondent. | |

Pursuant to Rule 60(a)(5)(C), Ariz. R. Sup. Ct., the State Bar, through undersigned bar counsel, hereby notifies the Presiding Disciplinary Judge of the Supreme Court of Arizona that Respondent has successfully complied with the terms of probation, and the probation is therefore completed.

DATED this 16th day of April, 2020.


_/s/Maret Vessella_____
Maret Vessella
Chief Bar Counsel


Original electronically filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this 16th day of April, 2020.

1

Copy of the foregoing emailed
this 16th day of April, 2020, to:

Jon D. Weiss
Lewis Roca Rothgerber Christie LLP
201 E. Washington St, Ste 1200
Phoenix, AZ  85004-2595
Email: jweiss@lrrc.com
Respondent's Counsel

Lawyer Regulation Records Manager
State Bar of Arizona
4201 N. 24th St., Suite 100
Phoenix, Arizona 85016-6266

Compliance Monitor
State Bar of Arizona
4201 N. 24th St., Suite 100
Phoenix, Arizona 85016-6266


by: _/s/Jackie Brokaw_____

# **Exhibit 10**

Discharge of Suspension, Commonwealth of Massachusetts
(April 27, 2020)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No:  BD-2018-110

IN RE: MARC JOHN RANDAZZA

<u>ORDER</u>

This matter came before the Court, Gaziano, on the motion for an order to enter that the lawyer is no longer subject to the twelve month suspension imposed by this Court's May 14, 2018 Order of Term Suspension/Stayed, the execution of which was stayed for eighteen (18) months retroactive to October 10, 2018, and conditioned upon the lawyer's compliance with the Order entered in the Supreme Court of Nevada.  With the Office of Bar Counsel assenting to the motion and the fact that execution of the suspension was stayed, the lawyer was never in fact suspended from the practice of law, therefore no formal order of reinstatement is required.

Upon consideration thereof, it is ORDERED that Marc John Randazza shall no longer be subject to the twelve (12) month

term suspension for the misconduct that gave rise to the petition for discipline.

By the Court, (Gaziano, J.)

Assistant Clerk

Entered: 4/27/2020

# **Exhibit 11**

Marc J. Randazza MPRE Score

# MPRE Score

Name: MARC RANDAZZA
NCBE Number: N10473643
Date of Birth: 11/26/1969

Your score on the Multistate Professional Responsibility Examination (MPRE) administered on 03/13/2020 is as follows:

Scaled Score: 119

The score shown above has been reported to CALIFORNIA as you requested when you registered for the MPRE.

**Your MPRE score will be available on your NCBE account only until the next MPRE test date. If you want to obtain your score after that, you will need to request a score transcript, and pay the required fee. Therefore, we recommend that you save this page and/or print it for your records.**

Each jurisdiction determines its own passing score on the MPRE. You may find a jurisdiction's passing score, as well as contact information for its bar admission agency, by selecting the jurisdiction from the interactive map. Any questions about admission requirements pertaining to MPRE scores should be directed to the bar admission agency in the jurisdiction to which you are applying.

The MPRE scaled score is a standard score. Standard scaled scores range from 50 (low) to 150 (high).

**MPRE Score Services: All MPRE score services listed below must be requested under the Score Services tab or from the File Cabinet of your NCBE account.**

- MPRE Score Report: If you would like to have your MPRE score sent to another jurisdiction, you must submit a request to NCBE for a score report. Score reports are sent to jurisdictions by secure transfer.
- MPRE Score Verification: If you would like to have the scoring of your MPRE answer sheet rechecked by hand, you must request a score verification. **Score verification requests must be submitted to NCBE within two months of the original test date.**
  Note: See link in File Cabinet to request a MPRE Score Verification. This link is only visible when the service is available.
- MPRE Unofficial Score Transcript: If you would like a replacement copy of your MPRE score after it is no longer available on this page, you must submit a request to NCBE for an MPRE Unofficial Score Transcript. The transcript will include all the MPRE scores you earned from 1999 to the present. All scores on the MPRE Unofficial Score Transcript are duplicative of score information provided following the exam. MPRE Unofficial Score Transcripts will be available in the File Cabinet of your NCBE account, and are not sent by mail.

# **Exhibit 12**

Order of Term Suspension/Stayed, U.S. District Court for the District of Massachusetts
(Sept. 26, 2019)

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 81 of 689

Case 1:18-mc-91490-FDS  Document 16  Filed 09/26/19  Page 1 of 1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| IN RE:  **MARC J. RANDAZZA** | ) | MISC. BUSINESS DOCKET |
|  | ) | No.: 18-mc-91490-FDS |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## ORDER OF TERM SUSPENSION/STAYED

WHEREAS, on March 28, 2019, the United States Patent and Trademark Office has cause to file with this Court a certified copy of an Order of Term Suspension/Stayed with respect to Attorney **MARC J. RANDAZZA**;

1.  WHEREAS, pursuant to Local Rule 83.6.9(b), on September 4, 2019, "Notice of Filing of Disciplinary Action" and "Order to Show Cause" were filed in this Court and copies sent (along with a copy of the Local Rule) via certified mail to **MARC J. RANDAZZA**;

2.  WHEREAS, on September 19, 2019, Attorney James S. Bolan on behalf of **MARC J. RANDAZZA** filed a Response to Order to Show Cause consenting to reciprocal discipline.

WHEREFORE, pursuant to Local Rule 83.6.9(c), this Court hereby imposes the identical discipline, and **MARC J. RANDAZZA** is hereby suspended from this Court for a period of twelve (12) months, with the execution of the suspension stayed for a period of eighteen (18) months, retroactive to October 10, 2018, conditioned upon the lawyer's successful compliance with the Order entered in the Supreme Court of Nevada.

Sept. 26, 2019
_____
Date

_____
F. Dennis Saylor, District Judge

# __Exhibit 13__

Order Adopting Second Amended and Final Report and Recommendation,
U.S. District Court for the Southern District of Florida
(May 8, 2020)

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 83 of 689

Case 1:18-mc-25320 Document 21 Entered on FLSD Docket 05/08/2020 Page 1 of 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**ADMINISTRATIVE ORDER 2020-29**
**CASE # 18-MC-25320**

In re:  **MARC JOHN RANDAZZA**
      **FLORIDA BAR # 625566**

_____/

FILED BY    CW    D.C.

May 8, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. • MIA

## ORDER ADOPTING SECOND AMENDED AND FINAL REPORT AND RECOMMENDATION

On February 6, 2019, this Court asked the Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance (the "Committee") to conduct disciplinary proceedings or to make recommendations to the Court for appropriate action in light of attorney Marc John Randazza's discipline by the Supreme Court of Nevada. (ECF No. 8). Randazza was suspended from the practice of law by the Supreme Court of Nevada on October 10, 2018, "for 12 months, stayed for 18 months." *See In the Matter of Discipline of Randazza,* 428 P.3d 260 (2018) ("Nevada Order") (ECF No. 2). This matter initially came to the attention of this Court by letters from Randazza on three separate occasions, informing the Court of the Nevada Order. (ECF Nos. 3-5). Prior to the referral to the Committee, this Court issued an Order to Show Cause for Randazza to respond to the Nevada Order. (ECF No. 6). Randazza responded that any "disciplinary action should be deferred until the successful completion of the period of probation" imposed by the Nevada Order. (ECF No. 7). In a Supplement to his Response, Randazza informed the Court and Committee that he completed the CLE requirement imposed by the Nevada Order and that the United States Court of Appeals for the Eleventh Circuit renewed his admission to the bar of that Court despite the Nevada Order. (ECF No. 9).

On April 1, 2020, after reviewing the record provided by Randazza and having confirmed with him that "he is currently in compliance with the requirements of his probation and is unaware of the existence of any further disciplinary matters brought against him," the Committee issued its

Report and Recommendation, recommending that this Court adopt the same disciplinary measures imposed in the Nevada Order in addition to requiring that Randazza confirm in writing that he has not been subject to any disciplinary matters since his probation began.   (ECF No. 12).   After the Report and Recommendation was issued, Randazza sent an email to the Committee explaining that while he has not been subject to any new discipline and believed that the Report and Recommendation was limited to only new discipline, he wanted to update the Committee of other reciprocal orders of discipline already imposed upon him from the Bar of Massachusetts, the Bar of California, the U.S. District Court for the District of Massachusetts, the U.S. District Court for the District of Nevada, and the U.S. Patent and Trademark Office.   (ECF Nos. 18, 13-17).

On April 21, 2020, the Committee issued an Amended Report and Recommendation, in which it responded to Randazza's disclosure of reciprocal discipline orders from other courts. (ECF No. 19).   The Committee found that "[u]nder the applicable rules of this Court, all of these suspensions should have been reported as they occurred" pursuant to Rule 8(a) of the Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys ("Attorney Rules"), Local Rules of the United States District Court for the Southern District of Florida.   *Id*.   As a consequence, the Committee recommended that this Court "continue Mr. Randazza's probation for an additional year, until April 10, 2021," that Randazza immediately report any changes to the reciprocal discipline orders or new discipline imposed from other courts, and provide the Court with periodic status reports.   *Id*.   Randazza responded with a request that the Committee withdraw its Amended Report and Recommendation and maintain its initial Report and Recommendation or issue a revised Report and Recommendation that does not characterize his conduct as knowingly violating Rule 8(a).   ("Response to Amended Report and Recommendation") (ECF No. 20).

On April 28, 2020, the Committee issued a Second Amended and Final Report and Recommendation, acknowledging receipt and consideration of Randazza's Response to Amended

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 85 of 689

Case 1:18-mc-25320  Document 21  Entered on FLSD Docket 05/08/2020  Page 3 of 5

Report and Recommendation but only modifying its recommendations to the extent of eliminating the additional year of probation.  (ECF No. 10).  Randazza filed a Response to Second Amended and Final Report and Recommendation in which he "consents to the discipline and requirements recommended by the Committee and respectfully requests that this Court enter an order adopting the recommendations."  (ECF No. 11).

This Court is in agreement with the Committee's finding that "[u]nder the applicable rules of this Court, all of these suspensions should have been reported as they occurred" and that "Mr. Randazza should have been aware of his obligation to report these orders when they were issued." (ECF No. 10).  Randazza raised the argument that Rule 8(a) only applies to reporting the original discipline and that if he had to report all reciprocal discipline in other jurisdictions, "it would mean that . . . [he] could be potentially reporting dozens of orders to this Court."  (ECF No. 20).  These arguments lack merit.  Rule 8(a)[1], which is the first procedure where discipline is imposed by other courts, unequivocally directs members of this Bar to report, without modifier, "discipline," a catch-all to the more specific forms of reprimand, suspension, or disbarment.  To infer a limitation on "discipline" to only original and not reciprocal discipline would imply an inherent exception that is not there.  Reciprocal discipline is still discipline.  Furthermore, the argument about having to "potentially" report "dozens of orders to this Court" is exactly the purpose Rule 8(a) is intended to serve.  While it may be "potentially" burdensome, it is an obligation as a member of this Court's Bar to inform this Court of discipline imposed by other courts so this Court is adequately informed of the activities of its members.

Given this background, in accordance with Rule 8(d) and the Court's inherent power to regulate membership in its bar for the protection of the public interest, *see Chambers v. NASCO,*

---

1 Rule 8(a) in its entirety states:  "An attorney admitted to practice before this Court shall, upon being subjected to reprimand, discipline, suspension, or disbarment by a court of any state, territory, commonwealth, or possession of the United States, or by any other court of the United States or the District of Columbia, shall promptly inform the Clerk of the Court of such action."

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 86 of 689

Case 1:18-mc-25320  Document 21  Entered on FLSD Docket 05/08/2020  Page 4 of 5

*Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it."), having reviewed the file, considered the Committee's Second Amended and Final Report and Recommendation, it is hereby

ORDERED AND ADJUDGED that the Committee's Second Amended and Final Report and Recommendation is ADOPTED and the matter is CLOSED.

IT IS FURTHER ORDERED as follows:

1.  This Court ADOPTS the disciplinary measures imposed in the Nevada Order with the same probationary requirements set to expire on April 10, 2020;

2.  Randazza is to *immediately* file notice with this Court under the above case number of any changes to his status in Massachusetts, California, Nevada, or any U.S. District or Circuit Courts or the U.S. Patent Office;

3.  Randazza is to *immediately* file notice with this Court under the above case number of any discipline recommended in Florida, Arizona, or any other jurisdiction filed by the complainant there;

4.  Randazza is to *immediately* file notice with this Court under the above case number of any other matters as required by Rules 8 through 10 of the Attorney Rules; and

5.  Randazza is to provide this Court a status report under the above case number of any pending disciplinary charges, reviews or proceedings occurring anywhere on the 90th, 180th and 270th day from the entry of this Order, with a final status report due on April 10, 2021.

DONE and ORDERED in Chambers at Miami, Miami-Dade County, Florida, this 8th day of May, 2020.

K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

Copies furnished as follows:   See attached

c:    All South Florida Eleventh Circuit Court of Appeals Judges
All Southern District Judges
All Southern District Bankruptcy Judges
All Southern District Magistrate Judges
United States Attorney
Circuit Executive
Federal Public Defender
Clerks of Court – District, Bankruptcy and 11th Circuit
Florida Bar and National Lawyer Regulatory Data Bank
Library
Clinton Payne, Chair, Ad Hoc Committee on Attorney Admissions, Peer Review and
      Attorney Grievance
Marc John Randazza

# **Exhibit 14**

U.S. Patent & Trademark Office Final Order
(July 23, 2019)



## UNITED STATES PATENT AND TRADEMARK OFFICE

OFFICE OF THE GENERAL COUNSEL

July 23, 2019

Mr. Marc J. Randazza
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117

CERTIFIED MAIL  *7017 2620 0000 C105 7585*
RETURN RECEIPT REQUESTED

<u>PERSONAL AND CONFIDENTIAL</u>
Re: File No. D2019-25

FINAL ORDER PURSUANT TO 37 C.F.R. § 11.24

Dear Mr. Randazza:

Enclosed please find a service copy of a Final Order signed on behalf of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The Final Order will be published on the USPTO FOIA web page (https://foiadocuments.uspto.gov/oed/) and the Notice of Stayed Suspension will be published in the Official Gazette.

If you require any additional information or records, you may contact the Office of Enrollment and Discipline at 571-272-4097, or by writing to Mail Stop OED, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Sincerely,

Tricia Choe
Associate Counsel
Office of General Law

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

In the Matter of:           )
                             )
Marc J. Randazza,          )         Proceeding No. D2019-25
                             )
     Respondent        )
_____)

## FINAL ORDER PURSUANT TO 37 C.F.R. § 11.24

Pursuant to 37 C.F.R. § 11.24(b), Marc J. Randazza ("Respondent") is hereby suspended from the practice of trademark and other non-patent law before the United States Patent and Trademark Office ("USPTO" or "Office") for one year, stayed for eighteen months subject to conditions, for violation of 37 C.F.R. § 11.804(h).

### Background

By Order dated October 10, 2018, the Supreme Court of the State of Nevada in its order in *In the Matter of Discipline of Marc J. Randazza, Esq., Bar No. 12265*, Case No. 76453, suspended Respondent for one year, stayed for eighteen months subject to conditions, from the practice of law in that jurisdiction.

On June 11, 2019, a "Notice and Order Pursuant to 37 C.F.R. § 11.24" ("Notice and Order"), was sent by certified mail (receipt no. 70172620000001058230) notifying Respondent that the Director of the Office of Enrollment and Discipline ("OED Director") had filed a "Complaint for Reciprocal Discipline Pursuant to 37 C.F.R. § 11.24" ("Complaint") requesting that the Director of the USPTO impose reciprocal discipline upon Respondent identical to the discipline imposed by the Supreme Court of the State of Nevada on October 10, 2018 in *In the Matter of Discipline of Marc J. Randazza, Esq., Bar No. 12265*, Case No. 76453. The Notice and Order was delivered to Respondent on June 14, 2019.

The Notice and Order provided Respondent an opportunity to file, within forty (40) days,

a response opposing the imposition of reciprocal discipline identical to that imposed by the State

of Nevada, based on one or more of the reasons provided in 37 C.F.R. § 11.24(d)(1).

Respondent filed a timely letter dated July 15, 2019 responding to the Notice and Order.

### Analysis

In his response, Respondent indicates that he is "amenable to the imposition of discipline

identical to that imposed by the Supreme Court of the State of Nevada in *In the Matter of*

*Discipline of Marc J. Randazza, Esq., Bar No. 12265*, Case No. 76453." (Ex. 1). He further

states that he "[does] not believe there is any genuine issue of material fact that the imposition of

identical discipline would be unwarranted." *Id.*

Given that Respondent believes that it is appropriate for the USPTO to impose reciprocal

discipline on the same terms and conditions as those set forth in the October 10, 2018 Order of

the Supreme Court of the State of Nevada in *In the Matter of Discipline of Marc J. Randazza,*

*Esq., Bar No. 12265*, Case No. 76453, it is hereby determined that there is no genuine issue of

material fact under 37 C.F.R. § 11.24(d), and that it is the appropriate discipline to suspend

Respondent from the practice of trademark and other non-patent law before the USPTO for one

year, stayed for eighteen months, subject to Respondent's successful compliance with conditions

during the eighteen-month stay, as set by the Supreme Court of the State of Nevada.

ACCORDINGLY, it is hereby ORDERED that:

1.      Respondent be, and hereby is, suspended from the practice of trademark and other

non-patent law before the USPTO for one year, stayed for eighteen months, subject to

Respondent's successful compliance with conditions during the eighteen-month stay, as set by

the Supreme Court of the State of Nevada, effective the date of this Final Order;

2.      The OED Director publish a notice in the Official Gazette that is materially

consistent with the following:

## <u>Notice of Stayed Suspension</u>

This notice concerns Marc J. Randazza of Las Vegas, Nevada, who is authorized to practice before the Office in trademark and non-patent matters.  In a reciprocal disciplinary proceeding, the Director of the United States Patent and Trademark Office ("USPTO") has ordered that Mr. Randazza be suspended from practice before the USPTO in trademark and other non-patent matters for one year, stayed for eighteen months subject to conditions, for violating 37 C.F.R. § 11.804(h), predicated upon being suspended (stayed) from the practice of law by a duly constituted authority of a State.  Mr. Randazza is not authorized to practice before the Office in patent matters.

Mr. Randazza was suspended for one year, stayed for eighteen months subject to conditions set by the Supreme Court of the State of Nevada, for knowingly violating duties owed to his client (conflict of interest) and the legal profession (restrictions on the right to practice) arising out of a matter in which Mr. Randazza loaned money to his client without informing the client in writing of the desirability of obtaining independent counsel, and by negotiating with opposing counsel to receive, as part of a settlement, a retainer for future legal services.

This action is taken pursuant to the provisions of 35 U.S.C. § 32 and 37 C.F.R. § 11.24.  Disciplinary decisions are available for public review at the Office of Enrollment and Discipline's FOIA Reading Room, located at: https://foiadocuments.uspto.gov/oed/;

and

3.      The OED Director give notice pursuant to 37 C.F.R. § 11.59 of the public

discipline and the reasons for the discipline to disciplinary enforcement agencies in the state(s)

where Respondent is admitted to practice, to courts where Respondent is known to be admitted,

and to the public.


23 July 2019
_____
Date

_____
David Shewchuk
Deputy General Counsel for General Law
United States Patent and Trademark Office

on delegated authority by

Andrei Iancu
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

cc:

OED Director

Mr. Marc J. Randazza
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Final Order Pursuant to 37 C.F.R. § 11.24 was mailed by first-class certified mail, return receipt requested, on this day to the Respondent at the address listed by the Nevada State Bar for Respondent and to where the OED Director reasonably believes Respondent receives mail::

Mr. Marc J. Randazza
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117

7/23/2019
_____
Date

United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

5

## Notice of Stayed Suspension

This notice concerns Marc J. Randazza of Las Vegas, Nevada, who is authorized to practice before the Office in trademark and non-patent matters. In a reciprocal disciplinary proceeding, the Director of the United States Patent and Trademark Office ("USPTO") has ordered that Mr. Randazza be suspended from practice before the USPTO in trademark and other non-patent matters for one year, stayed for eighteen months subject to conditions, for violating 37 C.F.R. § 11.804(h), predicated upon being suspended (stayed) from the practice of law by a duly constituted authority of a State. Mr. Randazza is not authorized to practice before the Office in patent matters.

Mr. Randazza was suspended for one year, stayed for eighteen months subject to conditions set by the Supreme Court of the State of Nevada, for knowingly violating duties owed to his client (conflict of interest) and the legal profession (restrictions on the right to practice) arising out of a matter in which Mr. Randazza loaned money to his client without informing the client in writing of the desirability of obtaining independent counsel, and by negotiating with opposing counsel to receive, as part of a settlement, a retainer for future legal services.

This action is taken pursuant to the provisions of 35 U.S.C. § 32 and 37 C.F.R. § 11.24. Disciplinary decisions are available for public review at the Office of Enrollment and Discipline's FOIA Reading Room, located at: https://foiadocuments.uspto.gov/oed/.

23 July 2019
_____
Date

David Shewchuk
Deputy General Counsel for General Law
United States Patent and Trademark Office

on delegated authority by

Andrei Iancu
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

# **<u>Exhibit 15</u>**

Order Discharging Suspension, U.S. District Court for the District of Massachusetts
(June 23, 2020)

22-01023-tmd Doc#1-1 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 97
Case 1:18-mc-91490-FDS Document 19 Filed 06/23/20 Page 1 of 1
of 689

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|                                   |   |                         |
|-----------------------------------|---|-------------------------|
|                                   | ) |                         |
|                                   | ) |                         |
|                                   | ) |                         |
| IN RE:   **MARC J. RANDAZZA**     | ) | MISC. BUSINESS DOCKET   |
|                                   | ) | No.: 18-mc-91490-FDS    |
|                                   | ) |                         |
|                                   | ) |                         |
|                                   | ) |                         |

## ORDER

1. WHEREAS, on September 3, 2019, the U.S. Patent and Trademark Office caused o be filed with this Court a Final Order suspending Mr. Randazza for one (1) year, stayed for eighteen (18) months subject to conditions with respect to **MARC J. RANDAZZA**;

2. WHEREAS, on September 26, 2019, pursuant to Local Rule 83.6.9(b), a reciprocal Order of Term Suspension/Stayed was issued by Chief Judge Saylor IV;

3. WHEREAS, on April 30, 2020, Attorney Sara Holden representing **MARC J. RANDAZZA** filed an Order notifying the Court that Mr. Randazza has successfully completed the conditions of his stayed suspension as set forth in the Nevada Supreme Court's Order retroactive to October 10, 2018;

WHEREFORE, it is hereby ORDERED that **MARC J. RANDAZZA** shall no longer be subject to the twelve (12) month term suspension for the misconduct that gave rise to the petition for discipline.


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: June 23, 2020

# **Exhibit 16**

Order of Suspension, U.S. District Court for the District of Nevada
(Oct. 22, 2019)

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 99 of 689

Case 2:19-cv-01765-MMD   Document 5   Filed 10/22/19   Page 1 of 3

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

In re: Marc J. Randazza,
Attorney at Law, Bar No. 12265

Case No. 2:19-cv-01765-MMD

ORDER OF SUSPENSION

## I.    SUMMARY

This is an attorney discipline matter. Before the Court is Marc J. Randazza's response to the Court's Order to Show Cause ("OSC") why he should not be suspended from practice before this Court following the Order Approving Conditional Guilty Plea Agreement filed by the Nevada Supreme Court ("NSC") on October 10, 2018. (ECF Nos. 1 (OSC), 3 (the "Response").) As further explained below, the Court will suspend Mr. Randazza from practice before this Court because this Court has neither the obligation, resources, nor inclination to monitor Mr. Randazza's compliance with the probationary conditions the NSC imposed on him. However, Mr. Randazza may file a petition for reinstatement once he has fully discharged those conditions and can produce a certificate of good standing from the NSC reflecting the same.

## II.    BACKGROUND

Mr. Randazza was suspended by the NSC following his conditional guilty plea to a charge that he violated "RPC 1.8(a) (conflict of interest: current clients: specific rules) and RPC 5.6 (restrictions on right to practice)." (ECF No. 3 at 15.) While Mr. Randazza's suspension was stayed, he is currently subject to several probationary conditions imposed by the NSC. (*Id.* at 17.) Until at least April 10, 2020, Mr. Randazza must: (1) "stay out of trouble;" (2) successfully complete 20 hours of ethics CLE in addition to his normal CLE requirements; and (3) seek the advice of an independent and unaffiliated

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
100 of 689
Case 2:19-cv-01765-MMD  Document 5  Filed 10/22/19  Page 2 of 3

1  ethics attorney in each relevant jurisdiction before obtaining any conflicts of interest

2  waivers. (*Id.* at 3, 15, 17.)

3      This Court issued the OSC as to why Mr. Randazza should not be suspended from

4  practice in this Court on September 6, 2019. (ECF No. 1.) Mr. Randazza timely filed his

5  Response on October 3, 2019. (ECF No. 3.) In his Response, he argues that this Court

6  should allow him to continue practicing before it because he is still allowed to practice law

7  before the Nevada state courts, and he is currently complying with the probationary

8  conditions the NSC imposed on him. (*Id.* at 3-5.) He also argues that his suspension from

9  practice by this Court would either be gravely unjust, or his misconduct does not justify

10  suspension by this Court. (*Id.* at 3.) He further notes that other federal court have

11  continued to allow him to practice while he is subject to the NSC's probationary conditions.

12  (*Id.* at 5-6.)

13  **III.    DISCUSSION**

14      This Court imposes reciprocal discipline on a member of its bar when that person

15  is suspended or otherwise disciplined by a state court unless it determines that the state's

16  disciplinary adjudication was improper. *See In re Kramer*, 282 F.3d 721, 724 (9th Cir.

17  2002). Specifically, the Court will only decline to impose reciprocal discipline if the

18  attorney subject to discipline presents clear and convincing evidence that:

19  (A) the procedure in the other jurisdiction was so lacking in notice or opportunity to
20  be heard as to constitute a deprivation of due process; (B) there was such an
    infirmity of proof establishing the misconduct as to give rise to a clear conviction
21  that the court should not accept as final the other jurisdiction's conclusion(s) on
    that subject; (C) imposition of like discipline would result in a grave injustice; or (D)
22  other substantial reasons justify not accepting the other jurisdiction's
    conclusion(s).

23  LR IA 11-7(e)(3); *see also In re Kramer*, 282 F.3d at 724-25 (stating that the attorney

24  bears the burden by clear and convincing evidence).

25      The Court will suspend Mr. Randazza from practice before this Court because the

26  NSC's disciplinary adjudication regarding Mr. Randazza following his conditional guilty

27  plea appears to have been proper, and he presents no clear and convincing evidence to

28  the contrary. Procedurally, Mr. Randazza did not submit a certified copy of the entire

2

1    record from the NSC or present any argument as to why less than the entire record will

2    suffice. *See* LR IA 11-7(e)(3). Substantively, while Mr. Randazza does appear to be

3    allowed to practice in the Nevada state courts, he is also subject to probationary

4    conditions that this Court has neither the obligation, resources, nor inclination to monitor.

5    (ECF No. 3 at 17.) And the Court sees no substantial reasons not to suspend Mr.

6    Randazza based on its review of the record. *See* LR IA 11-7(e)(3). The Court will therefore

7    suspend Mr. Randazza.

8          That said, Mr. Randazza is free to petition the Court for reinstatement under LR IA

9    11-7(i) assuming he is able to successfully complete his term of probation with the NSC.

10   Any petition for reinstatement should not be filed until Mr. Randazza has successfully

11   discharged each and every probationary condition imposed on him by the NSC, and he

12   is able to present both a certificate of good standing from the NSC and evidence sufficient

13   to establish that his practice in the Nevada state courts is fully unencumbered by any

14   probationary or other conditions stemming from his conditional guilty plea or any other

15   discipline imposed on him by the NSC.

16   **IV.    CONCLUSION**

17         It is therefore ordered that Marc J. Randazza, Bar No. 12265, is hereby suspended

18   from practice in the United States District Court for the District of Nevada.

19         DATED THIS 22nd day of October 2019.

20

21         _____

22         MIRANDA M. DU
           CHIEF UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

3

# **Exhibit 17**

Order of Reinstatement, U.S. District Court for the District of Nevada
(June 9, 2020)

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
103 of 689
Case 2:19-cv-01765-MMD *SEALED* Document 18  Filed 06/09/20  Page 1 of 3

1

2

3                    UNITED STATES DISTRICT COURT

4                        DISTRICT OF NEVADA

5                              * * *

6  In re: Marc J. Randazza,              Case No. 2:19-cv-01765-MMD
   Attorney at Law, Bar No. 12265
7                                                ORDER

8

9

10  **I.    SUMMARY**

11         This is an attorney discipline matter. Before the Court is Marc Randazza's petition

12  for reinstatement (the "Petition").[1] (ECF No. 14.) As further explained below, the Court

13  will grant Mr. Randazza's Petition.

14  **II.   BACKGROUND**

15         Mr. Randazza was suspended by the Nevada Supreme Court ("NSC") following

16  his conditional guilty plea to a charge that he violated "RPC 1.8(a) (conflict of interest:

17  current clients: specific rules) and RPC 5.6 (restrictions on right to practice)." (ECF No. 3

18  at 15.)

19         Upon receiving notice of his suspension by the NSC, the Court issued an order to

20  show cause why Mr. Randazza should not also be suspended by this Court. (ECF No. 1

21  ("OSC").) Mr. Randazza filed a response to the OSC, arguing he should not be suspended

22  by this Court. (ECF No. 3.) The Court nonetheless suspended him because he remained

23  subject to probationary conditions imposed by the NSC. (ECF No. 5 (the "Suspension

24  Order").) Mr. Randazza then filed an emergency motion to alter or amend the Suspension

25  Order (ECF No. 8), which the Court denied (ECF No. 12).[2]

26  _____

27         [1]Mr. Randazza also filed an emergency motion for a hearing on his Petition. (ECF
    No. 17.) Because the Court will grant the Petition, the Court will deny the emergency
28  motion for a hearing as moot.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 104 of 689

Case 2:19-cv-01765-MMD *SEALED* Document 18 Filed 06/09/20 Page 2 of 3

1        The Petition followed.[3] (ECF No. 14.) In his Petition, Mr. Randazza asks to be

2    reinstated primarily because he has successfully discharged the NSC's probationary

3    conditions. (*Id*. at 2.) In most pertinent part, he attached a letter from the State Bar of

4    Nevada confirming that he has successfully discharged the probationary conditions the

5    NSC imposed on him. (*Id*. at 16.) Mr. Randazza also submitted a declaration explaining

6    he has clients with cases in this district who would like him to represent them (*id.* at 11-

7    14), and some declarations from some of his clients explaining they would like Mr.

8    Randazza to represent them (*id.* at 19-26). Mr. Randazza previously submitted a current

9    certificate of good standing from the State Bar of Nevada. (ECF No. 10-3.)

10   **III.   DISCUSSION**

11        Local Rule IA 11-7(i) states that an attorney who is the subject of an order of

12    suspension "may petition for reinstatement to practice before this court or for modification

13    of the order as may be supported by good cause and the interests of justice." LR IA 11-

14    7(i). The Rule further provides: "if the attorney was readmitted by the supervising court or

15    the discipline imposed by the supervising court was modified or satisfied, the petition must

16    explain the situation with specificity, including a description of any restrictions or

17    conditions imposed on readmission by the supervising court." *Id.* However, the decision

18    as to whether and under what circumstances the attorney will be reinstated to practice

19    before this Court is left to the discretion of the Chief Judge, or other reviewing Judge if

20    the Chief Judge refers the matter to another judge. *See id.*; *see also* LR IA 11-7(a).

21        The Court will grant the Petition because Mr. Randazza has sufficiently

22    demonstrated he successfully discharged the NSC's probationary conditions and is an

23    attorney in good standing with the State Bar of Nevada. (ECF Nos. 10-3, 14 at 16.)

24

25        [2]The Court issued this order on November 27, 2019, and received a certified mail
receipt indicating it was mailed to Mr. Randazza's counsel that same day. (ECF No. 13.)

26   However, both Mr. Randazza and his counsel claim they never received that order. (ECF
Nos. 15 (minute order explaining in response to a letter from Mr. Randazza's counsel

27   inquiring about a ruling on the emergency motion to alter or amend judgment that the
Court had already issued an order denying it on November 27, 2019), 17 at 4, 17-1 at 3.)

28

        [3]Mr. Randazza followed up with a letter as well. (ECF No. 16.)

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 105 of 689

Case 2:19-cv-01765-MMD *SEALED* Document 18 Filed 06/09/20 Page 3 of 3

1    Moreover, Mr. Randazza's Petition demonstrates understanding of the Court's prior

2    Suspension Order granting him leave to petition this Court for reinstatement once he

3    could show that he is able to practice in Nevada state courts unencumbered by any

4    probationary conditions. (ECF No. 5 at 3.) The Court thus finds that Mr. Randazza has

5    shown cause to be readmitted to the bar of this Court.

6    **IV.    CONCLUSION**

7    It is therefore ordered that Mr. Randazza's renewed petition for reinstatement (ECF

8    No. 14) is granted.

9    It is further ordered that Mr. Randazza's emergency motion for a hearing (ECF No.

10    17) is denied as moot.

11    DATED THIS 9th day of June 2020.

12

13    _____

14    MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE

3

# **Exhibit 18**

Order of Termination of Proceedings, U.S. Court of Appeals for the Federal Circuit
(May 28, 2020)

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAY 28 2020

PETER R. MARKSTEINER
CLERK

NOTE: This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**IN RE MARC J. RANDAZZA,**
*Respondent.*

---

2018-MA014

---

## ORDER

In light of the court's January 3, 2020 order and Marc J. Randazza's submission received May 26, 2020,

IT IS ORDERED THAT:

These proceedings are terminated.

FOR THE COURT

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

# <u>Exhibit 19</u>

Order Denying Admission Pro Hac Vice of Marc J. Randazza
*Lafferty, et al. v. Jones, et al.*
(January 30, 2019)

ORDER   421277

DOCKET NO: FBTCV186075078S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF FAIRFIELD
  AT BRIDGEPORT

1/30/2019

ORDER

ORDER REGARDING:
01/22/2019 154.00 MOTION FOR PERMISSION TO APPEAR PRO HAC VICE PB 2-16

The foregoing, having been considered by the Court, is hereby:

ORDER: DENIED

The applicant, Attorney Marc Randazza, is currently on a disciplinary probation in the State of Nevada through April of 2020, for serious misconduct. He has been suspended from the practice of law in the State of Nevada for a period of one year, with conditions, and the suspension has been stayed for eighteen months. The State of Arizona entered reciprocal disciplinary orders imposing a concurrent probation and a reprimand. Permission to appear pro hac vice is a privilege, not a right. In light of the applicant's recent disciplinary history, the court declines to extend the privilege of pro hac admission to Attorney Randazza.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

# Exhibit 20

Order Denying Admission Pro Hac Vice of Marc J. Randazza
*Lafferty, et al. v. Jones, et al.*
(July 7, 2020)

ORDER    421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
    V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
    AT WATERBURY

7/7/2020

ORDER

ORDER REGARDING:
07/07/2020 286.00 MOTION FOR PERMISSION TO APPEAR PRO HAC VICE PB 2-16

The foregoing, having been considered by the Court, is hereby:

ORDER:

This court denied Attorney Randazza's application to appear pro hac vice on January 30,2020. As the court indicated on that date, appearing pro hac vice is a privilege, not a right. In light of the applicant's recent, serious disciplinary history, the court, even having considered the current circumstances as set forth in the new application and affidavits, declines to extend the privilege of pro hac admission to Attorney Randazza. While the court did not grant argument on the application, if there are additional facts and circumstances which were not set forth in the new application or affidavits, please file a new request for adjudication, and the court will schedule argument and reconsider the application.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# **Exhibit 21**

Payment Confirmation Pages
Texas Board of Law Examinors

# NRA Submission Record

Your NRA form is SUBMITTED.

| | |
|---|---|
| Name: | **Marc J Randazza** |
| Payment Method: | **Credit** |
| Total Fee: | **$255.88** |
| Transaction Date: | **Jun 12 2021 12:13** |
| Approval Code: | **291010** |
| Transaction Id: | **15116** |

Continue to Home Page

7/6/2021 11:12 PM

**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Chloe Jimenez**

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

---

## OPPOSED MOTION FOR *PRO HAC VICE* ADMISSION OF MARC J. RANDAZZA BY RESIDENT ATTORNEY

---

Movant, Bradley Jordan Reeves, moves this Court grant admission to this body *pro hac vice* for non-resident attorney Marc J. Randazza to represent Defendants in this case.

Movant states that he finds Applicant Marc J. Randazza to be a reputable attorney and recommends that Mr. Randazza be granted permission to participate in this proceeding before the Court.

Dated July 6, 2021.              Respectfully submitted,

REEVES LAW, PLLC

*/s/ Bradley J. Reeves*
Bradley J. Reeves
State Bar No. 24068266
702 Rio Grande Street, Suite 203
Austin, Texas 78701
Tel: (512) 827-2246
Fax: (512) 318-2484
Email: brad@brtx.law

ATTORNEY FOR DEFENDANTS

**CERTIFICATE OF CONFERENCE**

The undersigned counsel for Defendants conferred with counsel for Plaintiff regarding this

Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.


*/s/ Bradley J. Reeves*
Bradley J. Reeves


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served

upon the parties listed below via the court's electronic filing system on July 6, 2021.

Mark Bankston
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008


*/s/ Bradley J. Reeves*
Bradley J. Reeves


Opposed Motion for Pro Hac Vice Admission of Marc J. Randazza by Resident Attorney

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55091814
Status as of 7/7/2021 9:19 AM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 11:12:10 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/6/2021 11:12:10 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/6/2021 11:12:10 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/6/2021 11:12:10 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |
| | § | |

---

### ORDER GRANTING MOTION FOR *PRO HAC VICE* ADMISSION OF MARC J. RANDAZZA

---

The Court, having reviewed the Opposed Motion for *Pro Hac Vice* Admission of Marc J. Randazza and the Opposed Motion for *Pro Hac Vice* Admission of Marc J. Randazza by Resident Attorney, finds that the Motions should be GRANTED and thus GRANTS Marc J. Randazza *pro hac vice* admission to this Court.

IT IS SO ORDERED.

SIGNED on this the _____ day of _____, 2021.

_____
HONORABLE MAYA GUERRA GAMBLE

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55091814
Status as of 7/7/2021 9:19 AM CST

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 11:12:10 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 11:12:10 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/6/2021 11:12:10 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/6/2021 11:12:10 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/6/2021 11:12:10 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/6/2021 11:12:10 PM | SENT |

7/6/2021 7:53 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

### PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215

---

Comes now, Plaintiff Neil Heslin, and files this Second Motion for Contempt Under Rule 215 showing the Court that Defendants continue to openly defy the Court's discovery order after remand despite a prior contempt sanction.

## BACKGROUND

### I.    Mr. Heslin's Defamation Lawsuit.

On April 16, 2018, Neil Heslin sued Alex Jones, Mr. Jones' companies, and one of his co-anchors, Owen Shroyer. The Court of Appeals summarized Mr. Heslin's defamation claim:

> Neil Heslin's son, Jesse, was killed in the Sandy Hook Elementary School shooting in December 2012. In June 2017, Heslin participated in a television interview during which he responded to claims by Jones that the shooting at Sandy Hook was "a giant hoax." Shortly thereafter, Appellants aired broadcasts disputing Heslin's account of how he lost his son. In response, Heslin sued Appellants for defamation and defamation per se related to Appellants' statements disputing Heslin's claim that he held his deceased son in his arms.

1

*Jones v. Heslin,* 03-19-00811-CV, 2020 WL 1452025, at *1 (Tex. App.-Austin, 2020, pet.
denied).

## II.     Judge Jenkins' 2018 Discovery Order.

Shortly after being sued, InfoWars filed a TCPA motion. Judge Jenkins decided
to "grant limited discovery relevant to the motion to dismiss." *Id.* at *1. On August 31,
2018, InfoWars was ordered to respond to court-approved discovery requests and
appear for depositions.[1] However, InfoWars refused to respond. "Because [InfoWars]
did not respond to any discovery requests, Heslin filed a motion for contempt, seeking
sanctions under Rule 215." *Id.* "The day Heslin filed his contempt motion, [InfoWars]
filed a notice of appeal, asserting that their TCPA motion had been dismissed by
operation of law." *Id.*

## III.    The 2019 Appeal and Remand of Mr. Heslin's Defamation Claim.

During the time Mr. Heslin's defamation claim was on appeal through most of
2019, InfoWars violated similar discovery orders in the *Lewis* case in this Court and
the *Lafferty* case pending in Connecticut. *See Jones v. Lewis,* 03-19-00423-CV, 2019
WL 5090500, at *1 (Tex. App.—Austin Oct. 11, 2019, pet. denied); *Lafferty v. Jones*,
336 Conn. 332, 338 (2020), cert. denied, 2021 WL 1240941 (U.S. Apr. 5, 2021).
Shortly after InfoWars' discovery obstruction in those cases, Mr. Heslin's defamation
claim returned from the Third Court of Appeals, who had "dismissed that premature

---

[1] Exhibit 1, August 31, 2018 Discovery Order.

appeal for want of jurisdiction." *Jones v. Heslin,* 2020 WL 1452025 at *1. As noted above, InfoWars' appeal had been filed following a motion for contempt. For nearly after month after remand in September 2019, InfoWars remained in violation of the Court's discovery order and did not respond.

## IV.    The 2019 Hearing on Motion for Contempt.

In an oral hearing in October 2019, Judge Jenkins questioned Defendants' counsel about their refusal to comply:

| | |
|---|---|
| THE COURT: | But the record on the motion for contempt filed October 1st of last year was that I signed the order on August 31st -- |
| MR. BURNETT: | That's correct. |
| THE COURT: | -- ordering discovery. |
| MR. BURNETT: | Right. |
| THE COURT: | And the defendant simply -- |
| MR. BURNETT: | Objected. |
| THE COURT: | -- wouldn't provide the discovery -- |
| MR. BURNETT: | Because they were -- |
| THE COURT: | -- and as of October 1st still hadn't provided the discovery and that that resistance -- and it's reargued now, as though we were arguing it November 1st of last year, or whenever it would have been, you know, sometime after the |

October 1st filing, and the discovery is still
not provided.[2]

Judge Jenkins lamented that "we got the discovery ordered, you wouldn't give the discovery, and now we're down here on contempt at the last minute."[3] In response, InfoWars' counsel tried to blame the lack of compliance on the appeal:

| MR. BURNETT: | Let me explain. Of course there's not going to be any discovery while the case is on appeal. Mr. Enoch had to file the notice of appeal. It stays – |
| --- | --- |
| THE COURT: | I'm not talking about appeal. |
| MR. BURNETT: | Okay. |
| THE COURT: | I'm talking about for more than a month before Mr. Enoch appealed it and once it was remanded. |
| MR. BURNETT: | Okay. |
| THE COURT: | And to this day, instead of providing any discovery, you just basically fell on your sword...[4] |

InfoWars' counsel in the 2019 *Heslin* hearing next tried to excuse his clients' failure to respond by arguing that after the appeal was remanded, Plaintiff never re-requested that discovery be provided:

| MR. BURNETT: | There was no communication like, hey, you're not doing the discovery we need, whatever. And, of course, when you do the notice of appeal, it stops everything. And then in the last 30 something days, I've |
| --- | --- |

---

[2] Exhibit 2, October 3, 2019 Transcript in *Heslin*, p. 52-53.
[3] *Id.,* p. 53.
[4] *Id,* p. 53-54.

> had zero communication from counsel on
> the other side about wanting depositions,
> answers to discovery, nothing at all.[5]

In response, Judge Jenkins stated, "[t]hat's okay," because the court's order "was in effect and came back to life as soon as the Court of Appeals sent this case back to us."[6] For that reason, Judge Jenkins noted it was InfoWars' responsibility "to go ahead and give discovery," not the plaintiff to remind them.[7] When Judge Jenkins asked what InfoWars had done to comply, InfoWars' counsel responded:

MR. BURNETT:     Candidly, nothing, because I didn't know they were waiting on any discovery in that matter. And if you look at the --

THE COURT:     Written discovery? The requests for production? Interrogatories? Any of that? You didn't think they were waiting for that?

MR. BURNETT:     I honestly didn't, Judge.[8]

InfoWars' counsel claimed, "I had no idea this discovery was outstanding."[9] Counsel argued that "if they needed it, why have they not done anything in the last 30 something days?"[10] None of those excuses mattered. In the 2019 *Heslin* hearing, Judge Jenkins granted the motion for contempt and assessed sanctions of $25,875, while also finding that Plaintiff's burdens under the TCPA would be taken as established.[11]

---

[5] *Id.,* p. 54-55.
[6] *Id.,* p. 55.
[7] *Id.*
[8] *Id.*
[9] *Id.,* p. 55-56.
[10] *Id.,* p. 58.
[11] Exhibit 3, October 18, 2019 Order in *Heslin,* p. 2.

## V.    InfoWars' Second Appeal in 2020.

At the start of 2020, InfoWars initiated a second appeal based on the Court's

denial of its TCPA motion. InfoWars did not challenge the Court's August 31, 2018

discovery order, nor did it challenge the Court's October 18, 2019 contempt order.

Instead, as the Court of Appeals noted when issuing sanctions, InfoWars filed a brief

"address[ing] every element of Heslin's burdens as if the discovery misconduct never

happened." *Heslin*, 2020 WL 1452025 at *6. The Court noted that "Appellants' brief

seeks to relitigate issues resolved by the district court that remain unchallenged on

appeal, such as Heslin's burden to establish a prima facie case for defamation." *Id.* In

addition, InfoWars failed to disclose that "Appellants stipulated to the truth of the

facts contained in Heslin's pleadings," nor did it disclose that "Appellants incurred a

discovery sanction ordering Heslin's burdens in responding to Defendants' TCPA

Motion established in Heslin's favor." *Id.* The Court also found that InfoWars

"presented arguments that lacked legal merit, including those based on caselaw that

had been identified as outdated in another case they cited," and that InfoWars "lacked

reasonable grounds to believe the judgment could be reversed." *Id.* The Court of

Appeals assessed $22,250 in sanctions against InfoWars for its frivolous appeal.

## VI.    Failure to Respond Since 2021 Remand.

Following an unsuccessful petition to the Texas Supreme Court, the judgment

of the Court of Appeals became final by a mandate issued on June 4, 2021. Since that

time, Defendants have not taken any steps to comply with the Court's August 31, 2018

discovery order. Just as they did when they were first held in contempt in 2019, Defendants have returned from appeal and ignored the discovery order for over a month.

## ARGUMENT

### I.    This Court Should Assess Sanctions for Contempt.

"An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Lafferty v. Jones,* 336 Conn. 332, 381, 246 A.3d 429, 461 (2020), cert. denied, 20-1135, 2021 WL 1240941 (U.S. Apr. 5, 2021), quoting *Fox* v. *First Bank*, 198 Conn. 34, 40 n.3, 501 A.2d 747 (1985). This principle is crucial to control over court proceedings. Indeed, "a party has a duty to obey a court order even if the order is later held to have been unwarranted." *Id.,* quoting *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 658 n.20, 646 A.2d 133 (1994). As shown below, the record is clear that Defendants were fully aware of their obligation to comply with the discovery order.

### II.    Defendants Understood the Obligation to Comply with the Court's Discovery Orders.

Defendants' counsel previously assured Judge Jenkins that Defendants understood their obligation to comply with his discovery orders independent of the TCPA ruling. In a hearing on December 18, 2019 denying Defendants' TCPA motion in Mr. Heslin's IIED claim, Defendants' counsel promised he would be "providing additional videos, documents, and information they're seeking" and that he "fully

intend[ed] to do so."[12] Defendants' counsel agreed that his clients needed "to continue to comply with the order."[13] Defendants' counsel stated, "I am certainly going to comply with that 100 percent, stay or no stay, moving forward, absolutely."[14] Judge Jenkins held off ruling on default sanctions during that hearing so that "the trial judge who's going to try the case" can determine "just how quickly [Defendants] do that and how compliant [they] are with the order before we make potentially outcome determinative decisions."[15] Though Defendants promised to respond – even during the stay – Defendants did nothing to comply with the Court's order in the IIED case or any other case.

A few weeks prior to remand in this case on June 4, 2021, Defendants were also reminded by the Connecticut *Lafferty* court that "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the defendants have been precluded from pursuing special motions to dismiss."[16] The *Lafferty* court also reminded Defendants that emails from their own counsel acknowledged their obligation to comply with the court's expedited discovery order despite the resolution of their anti-SLAPP motion.[17] In short, Defendants have no excuse for continuing to ignore this Court's discovery order upon remand in this case. Yet that is exactly what happened.

---

[12] Exhibit 7, December 18, 2019 Transcript in *Heslin,* p. 80-81.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] Exhibit 4, May 14, 2021 Order in *Lafferty,* p. 1.
[17] Exhibit 5, June 2, 2021 Order in Lafferty, p. 1.

### III.    Defendants Ignored the Discovery Order Upon Remand.

Following remand, a month passed in which nothing occurred. Just as they did following the 2019 remand, Defendants took no steps to comply with the August 31, 2018 order. Finally, on July 2, 2021, Plaintiffs' counsel wrote to Defendants' counsel expressing Plaintiffs' intention to seek contempt sanctions for Defendants' continued failure to comply with the Court's discovery orders in *Heslin* and *Lewis*. Defendants' counsel responded by stating that he needed Plaintiff's counsel to send him the discovery requests in *Heslin* and *Lewis* because "one of the things I am indeed trying to get a hold of is where discovery stands."[18] In other words, even though a month had passed since remand while Defendants remained in contempt, their attorney did not even know what discovery was due. Ironically, the discovery requests are contained in this Court's discovery orders in *Heslin* and *Lewis.* This means that Defendants' counsel had not even reviewed the Court's orders.

Defendants' current counsel has been in the case for six months and also represented Defendants during their appeal at the Texas Supreme Court. Nonetheless, he claimed ignorance and said he was "playing major catch-up."[19] Counsel's failure to understand the discovery situation, or to even recognize what discovery is overdue or what the Court's orders contain, is further evidence of Defendants' conscious disregard. The fact that Defendant's counsel has been in these

---

[18] Exhibit 10, July 2, 2021 Email from Defendants' counsel.
[19] *Id.*

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
128 of 689

cases for six months and took no affirmative steps to address (or even understand) the discovery situation demonstrates Defendants' callous indifference to these proceedings and a failure to understand the gravity of the Court's repeated sanctions.

Defendants' counsel admitted he had not undertaken efforts to address the discovery situation, stating that "discovery is one of the things I have to tackle and get taken care of one way or the other."[20] Counsel also acknowledged that his clients were required to comply with the Court's discovery orders. Cryptically, he stated, "I intend on doing whatever I can to ensure compliance with discovery orders and requests *to the extent I am able to do so*."[21] In any case, Defendants have entirely ignored the Court's discovery order to date.

## IV.  While Ignoring his Discovery Obligations, Mr. Jones' Obsession with the Idea of Democratic Party "Show Trials" Continues.

Although Defendants have not taken any actions in this Court since remand or responded to their discovery obligations, they have been occupied by other gambits. For example, on July 1, 2021, Defendants filed a motion in Connecticut "compelling the testimony and production of documents from Hillary Clinton."[22]

Defendants' motion asserts that "this suit was filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by Hillary Clinton as part of a vendetta to silence Alex Jones after Ms. Clinton

---

[20] *Id.*
[21] *Id.* (emphasis added).
[22] Exhibit 8, *Lafferty* Motion for Commission to Out of State Deposition of Hillary Clinton, p. 1.

lost the presidential race to Donald J. Trump."[23] In short, Mr. Jones' litigation conduct remains as ludicrously detached from reality as his internet show. Given that the Texas lawsuits were filed first, InfoWars' latest motion means InfoWars also contends that Hillary Clinton is orchestrating and directing Plaintiff's counsel in this case.

As noted in Mr. Heslin's Supplemental Brief in Support of his Motion for Default Sanctions, part of the reason Mr. Jones has continually defied judicial authority is that he has become obsessed with the idea that these lawsuits are a conspiracy by the Democratic Party, and that the lawsuits are actually "show trials." For example, in an InfoWars episode entitled "Alex Jones and Lawyer Respond to Sandy Hook Show Trials," Mr. Jones appeared with his lawyer to discuss how the lawsuits were controlled by a shadowy group of Democratic officials.



Mr. Heslin's supplemental brief discussed Mr. Jones' description of Judge Jenkins as a "hoodwinked" "mainline liberal" who was being "manipulated" in a situation that was "villainous and transparent."[24] Mr. Jones told his audience these

---

[23] *Id.,* p. 2.
[24] *See* Heslin Supplemental Brief in Support of Default Sanctions, p. 52-53.

lawsuits are "the Democratic party versus Alex Jones. Versus America."[25] Similarly, during Mr. Jones' 20-minute tirade following the discovery of child pornography in his discovery files, Mr. Jones railed against an alleged Democratic Party conspiracy using typically unhinged PizzaGate / QAnon allegations. *See, e.g., Lafferty*, 336 Conn. at 342-46 ("What a nice group of Democrats. How surprising. What nice people ... I'm done. Total war. You want it? You got it. I'm not into kids like your Democratic party, you cocksuckers ... They literally went right in there and found this hidden stuff...I am sure that [the United States] attorneys appointed by Obama are sweet little cupcakes. Come on...I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does."). At the conclusion of his November 2019 deposition, just prior to being sanctioned a fourth time, Mr. Jones closed by glibly exclaiming: "Let's just say time is running out for the establishment. Epstein didn't kill himself."[26] Now, despite all the events of the past three years, and despite all the court sanctions, Mr. Jones is still more interested in his own paranoid fantasies than he is in complying with this Court's orders.

## CONCLUSION

Mr. Jones' conscious indifference to his obligations in this case continue unabated. Plaintiff again moves the Court to enter sanctions for contempt.

---

[25] *Id.*
[26] Exhibit 9, November 26, 2019 Deposition of Alex Jones, p. 154.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

_____

MARK D. BANKSTON

## **CERTIFICATE OF SERVICE**

     I hereby certify that on July 6, 2021, the forgoing document was served upon all counsel of record via electronic service.


_____

MARK D. BANKSTON

# EXHIBIT "1"

CAUSE NO. D-1-GN-18-001835

Filed in The District Court
of Travis County, Texas

AUG 3 1 2018  JC
At_____2:58___P. M.
Velva L. Price, District Clerk

| | | |
|---|---|---|
| NEIL HESLIN<br>    *Plaintiff* | §<br>§<br>§ | IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER,<br>    *Defendants* | §<br>§<br>§<br>§ | 53rd DISTRICT COURT |

---

**ORDER ON PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY IN AID OF
PLAINTIFF'S RESPONSE TO DEFENDANTS' TCPA MOTION**

---

Having considered Plaintiff's Motion for Expedited Discovery, the Court finds that there is good cause to grant the Motion, and hereby ORDERS that:

1.      Plaintiff's Motion is GRANTED. After considering the pleadings and arguments of counsel, the Court rules that Plaintiff may serve the written discovery attached as Exhibit 1 to this Order, and that Plaintiff may take the following depositions: Alex Jones, InfoWars LLC, Free Speech Systems LLC, and Owen Shroyer.

2.      Defendants shall respond to written discovery within 30 days of service.

3.      Depositions shall be completed no later than October 22, 2018. Each deposition shall last no more than 2.5 hours.

4.      As authorized by Tex. Civ. Prac. & Rem. Code Sec. 27.004, the court will "extend the hearing date to allow discovery." Oral hearing on Defendants' Motion to Dismiss under the Texas Citizen's Participation Act is recessed and extended until November 1, 2018, which is less than 120 days after the service of the motion under Tex. Civ. Prac. & Rem. Code Sec. 27.003.

So ORDERED this 31st day of _August_, 2018.

Scott Jenkins
Travis County District Judge

Respectfully submitted and entry requested,

**FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

# EXHIBIT 1

# Court Approved
# Written Discovery

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN<br>*Plaintiff* | §<br>§<br>§ | IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER,<br>*Defendants* | §<br>§<br>§<br>§<br>§ | 261st DISTRICT COURT |

---

**PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, ALEX E. JONES**

---

TO:     Defendant, Alex E. Jones, by and through his attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Alex E. Jones, under the Texas Rules of Civil Procedure.  Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN

State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 31st day of August,  2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.


*Via E-Sevice: fly63rc@verizon.net*

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254


MARK D. BANKSTON

## DEFINITIONS

As used herein, the words defined below shall be deemed to have the following meanings:

1.  "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession.

2.  "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession.

3.  "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.  "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5.  "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
### TO DEFENDANT ALEX E. JONES

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that as of June 26, 2017, you had the right to direct or control the work performed by employees of Free Speech Systems, LLC and InfoWars, LLC.

**RESPONSE:**

**PLAINTIFF'S FIRST SET OF INTERROGATORIES
TO DEFENDANT ALEX E. JONES**

**INTERROGATORY NO. 1:** Describe your job duties, responsibilities, and authority with Free Speech Systems, LLC as of June 26, 2017.

**ANSWER:**

**INTERROGATORY NO. 2:** Describe your job duties, responsibilities, and authority with InfoWars, LLC as of June 26, 2017.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe your education and training in journalism.

**ANSWER:**

**INTERROGATORY NO. 4:** Describe your process for ensuring that factual assertions made in InfoWars programming are vetted for accuracy as of June 26, 2017.

**ANSWER:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
## TO DEFENDANT ALEX E. JONES

**REQUEST FOR PRODUCTION NO. 1:** All communications, including letters, memoranda, emails, text messages, instant messenger logs, or other electronic communications in which the follow topics are referenced:

      a) Neil Heslin or his son
      b) Dr. Wayne Carver
      c) Zero Hedge
      d) Jim Fetzer

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications between you and Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding policies and procedures for the factual vetting for reporting on InfoWars programming.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All communications between you and Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding Megyn Kelly.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All contracts between you, Owen Shroyer, InfoWars, LLC, or Free Speech Systems, LLC.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF** _____ | § |

  **BEFORE ME**, the undersigned notary public, on this day personally appeared ALEX E. JONES, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.


_____
ALEX E. JONES


**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.


_____
Notary Public in and for the State of Texas


My Commission Expires:


_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, OWEN SHROYER

---

TO:  Defendant, Owen Shroyer, by and through his attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Owen Shroyer, under the Texas Rules of Civil Procedure. Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066

mark@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 31st day of August, 2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.

**_Via E-Sevice: fly63rc@verizon.net_**

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

MARK D. BANKSTON

## **DEFINITIONS**

As used herein, the words defined below shall be deemed to have the following meanings:

1. "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession.

2. "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession.

3. "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4. "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5. "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT OWEN SHROYER

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that on June 25-26, 2017, you knew it was possible that Neil Heslin held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that on June 25-26, 2017, you had no legitimate basis to claim it was impossible for Neil Heslin to have held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that as of June 26, 2017, you were employed by Free Speech Systems, LLC.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 5:** Admit that as of June 26, 2017, Alex Jones had the right to direct or control the work you perform.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:** Admit that as of June 26, 2017, agent(s) of InfoWars, LLC had the right to direct or control the work you perform.

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT OWEN SHROYER

**INTERROGATORY NO. 1:** Identify every step you took in assessing the credibility of Jim Fetzer.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify every step you took in assessing the credibility of Zero Hedge.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe your education and training in journalism.

**ANSWER:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
## TO DEFENDANT OWEN SHROYER

**REQUEST FOR PRODUCTION NO. 1:** All communications, including letters, memoranda, emails, text messages, instant messenger logs, or other electronic communications in which the follow topics are referenced:

      a) Neil Heslin or his son
      b) Dr. Wayne Carver
      c) Zero Hedge
      d) Jim Fetzer

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All communications between you and Alex Jones, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding policies and procedures for the factual vetting for reporting on InfoWars programming.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All communications between you and Alex Jones, InfoWars, LLC, or Free Speech Systems, LLC, or anyone acting on their behalf, regarding Megyn Kelly.

**RESPONSE:**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

**STATE OF TEXAS**     §
                       §
**COUNTY OF** _____   §

**BEFORE ME**, the undersigned notary public, on this day personally appeared OWEN SHROYER, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.

_____
OWEN SHROYER

**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, FREE SPEECH SYSTEMS, LLC

TO:    Defendant, Free Speech Systems, LLC, by and through its attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, Free Speech Systems, LLC, under the Texas Rules of Civil Procedure. Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com

KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 31st day of August, 2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.

*Via E-Sevice: fly63rc@verizon.net*

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

_____
MARK D. BANKSTON

## DEFINITIONS

As used herein, the words defined below shall be deemed to have the following meanings:

1. "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession, including communications in the custody of any employee or agent of Free Speech Systems LLC.

2. "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession, including documents in the custody of any employee or agent of Free Speech Systems LLC.

3. "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4. "Instant messenger logs" means any written or electronic records reflecting the content of any online chat that offers real-time text transmission over the Internet.

5. "Organizational chart" means a diagram that shows the structure of an organization and the relationships and relative ranks of its parts and positions/jobs.

6. "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that prior to responding to these discovery requests, you searched all documents in your possession or control that may contain responsive information.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that on June 26, 2017, Free Speech Systems, LLC knew it was possible that Neil Heslin held his dead son and saw a bullet wound to his forehead.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that Free Speech Systems, LLC was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:** Admit that Free Speech Systems, LLC possesses intellectual property rights and copyright over the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these discovery requests and identify their job duties at Free Speech Systems, LLC.

**ANSWER:**

**INTERROGATORY NO. 2:** Identify every employee or agent of Free Speech Systems, LLC who was involved in the creation, research, editing, marketing, funding, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," and describe their specific role.

**ANSWER:**

**INTERROGATORY NO. 3:** For each person who had ownership interest in Free Speech Systems, LLC on June 26, 2017, state:

a)    their full name
b)    the date(s) upon which the person acquired their ownership interest.
c)    the kind of consideration paid or promised for the ownership interest and the date(s) on which it was paid or promised.
d)    the percentage of that individual's ownership interest.
e)    whether the person is related by blood or marriage to any other person who is or has been a shareholder, officer, or director of Free Speech Systems, LLC, and, if so, the identity of the other person and the nature of the relationship.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify each person who has served as an officer, director, or management-level employee of Free Speech Systems, LLC at any time during the past five years.

**ANSWER:**

## PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
## TO DEFENDANT FREE SPEECH SYSTEMS, LLC

**REQUEST FOR PRODUCTION NO. 1:** A copy of all documents relating to Sandy Hook which have been deleted or removed from public availability since the inception of this lawsuit.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All documents or communications which reference the following topics:

|     |                        |
|-----|------------------------|
| a)  | Neil Heslin or his son |
| b)  | Dr. Wayne Carver       |
| c)  | Zero Hedge             |
| d)  | ZeroPointNow           |
| e)  | iBankCoin.com          |
| f)  | Jim Fetzer             |

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** Transcripts of all InfoWars videos in which the Plaintiff is discussed.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** A copy of all articles featuring Sandy Hook posted on a website operated under the brand name "InfoWars" from December 14, 2012 to June 25, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All documents or communications relating to the June 26, 2017 YouTube video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece" or the episode of InfoWars programming it originated from.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:** All documents or communications relating to the July 20, 2017 video in which the June 26 video featuring Mr. Shroyer was re-published.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on June 18, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:** All documents or communications relating to Neil Heslin's interview with Megyn Kelly on April 19, 2018.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:** All documents relating to disciplinary or corrective actions taken against any employee or agent of InfoWars due to the publication of false or incorrect information during the past ten years.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:** All documents used to train or instruct InfoWars' employees of the vetting of factual information for publication, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** All documents reflecting policies for the factual vetting of information published by InfoWars, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** All documents setting forth InfoWars' editorial standards or guidelines, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:** All documents setting forth InfoWars' prior or superseded editorial standards or guidelines, as in effect between December 14, 2012 and June 25, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** All documents setting forth InfoWars' disciplinary rules or code of conduct for reporters and editorial staff, as in effect on June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** All documents setting forth InfoWars' prior or superseded disciplinary rules or code of conduct for reporters and editorial staff, as in effect between December 14, 2012 and June 25, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:** Owen Shroyer's employment agreement.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:** An organizational chart for Free Speech Systems, LLC as of June 26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:** All documents or communications reflecting the ownership of The Alex Jones Show, InfoWars.com, the InfoWars' brand, and its related intellectual property from 2017 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:** All contracts in effect between Free Speech Systems, LLC and InfoWars, LLC.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:** All incorporating documents for Free Speech Systems, LLC, including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

RESPONSE:

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

STATE OF TEXAS      §
                    §
COUNTY OF _____  §

**BEFORE ME**, the undersigned notary public, on this day personally appeared _____, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.

_____
AFFIANT

**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.

_____
Notary Public in and for the State of Texas

My Commission Expires:

_____

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN<br>    *Plaintiff* | §<br>§<br>§ | IN DISTRICT COURT OF |
| VS. | §<br>§ | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER,<br>    *Defendants* | §<br>§<br>§<br>§<br>§ | 261st DISTRICT COURT |

**PLAINTIFF'S REQUESTS FOR ADMISSIONS, REQUESTS FOR INTERROGATORIES AND REQUESTS FOR PRODUCTION TO DEFENDANT, INFOWARS, LLC**

TO:    Defendant, InfoWars, LLC, by and through its attorney of record, Marc C. Enoch, Glast, Phillips & Murray, P.C., 14801 Quorom Drive, Ste.500, Dallas, Texas 75254.

COMES NOW, Neil Heslin, Plaintiff, in the above-styled and numbered cause, and serves the following Requests for Admissions, Requests for Interrogatories and Requests for Production to Defendant, InfoWars, LLC, under the Texas Rules of Civil Procedure. Plaintiff hereby requests that answers and responses to the same be answered in writing under oath, within the time and manner prescribed by the applicable rules. Plaintiff further requests that Defendant produce the following documents, or things, within thirty (30) days of service of this request by either producing the original of such documents for examination and copying or delivering legible and accurate copies thereof to the office of the undersigned during usual business hours.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
mark@fbtrial.com

KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of record in compliance with the Texas Rules of Civil Procedure on this 31st day of August,   2018 by facsimile, US Postal Mail, hand-delivery, and/or e-mail.

*Via E-Sevice: fly63rc@verizon.net*

Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

MARK D. BANKSTON

## DEFINITIONS

As used herein, the words defined below shall be deemed to have the following meanings:

1.   "Communication" as used in these requests means the conveying or sharing of information, ideas, or feelings, by whatever medium, be it oral, written, electronic, or otherwise. These requests seek all communications in your custody or constructive possession, including communications in the custody of any employee or agent of InfoWars LLC.

2.   "Document" as used in these requests means all handwritten, typed, audio recorded, video recorded, or electronic representation of any kind, including legal instruments, agreements, letters, e-mails, text messages, notices, specifications, instructions, literature, books, magazines, newspapers, booklets, notes, notebooks, log books, diaries, memoranda, manuscripts, manifestos, data compilations, reports, studies, analyses, surveys, calculations, videos, sound files, photographs, image macros, memes, blog posts, internet articles, social media posts, internet comments, screenshots, blockchains, illustrations, diagrams, symbols, bulletins, circulars, telegrams, telexes, or any other reasonably similar representational thing, as well as any deleted copies of the aforesaid or drafts upon which have been placed any additional marks or notations. These requests seek all documents in your custody or constructive possession, including documents in the custody of any employee or agent of InfoWars LLC.

3.   "InfoWars," generically, means the brand name of the media organization founded by Alex Jones, whether operating as InfoWars LLC, Free Speech Systems LLC, or any other corporate name.

4.   "Organizational chart" means a diagram that shows the structure of an organization and the relationships and relative ranks of its parts and positions/jobs.

5.   "Video" as used in these requests means any discrete and identifiable piece of InfoWars video content.

## PLAINTIFF'S FIRST SET OF ADMISSIONS
## TO DEFENDANT INFOWARS, LLC

**REQUEST FOR ADMISSION NO. 1:** Admit that InfoWars, LLC was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 2:** Admit that InfoWars, LLC possesses intellectual property rights and copyright over any part of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece."

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:** Admit that InfoWars, LLC has the authority to remove content from InfoWars.com if InfoWars, LLC determines that the content violates the rights of others or is not appropriate for the website.

**RESPONSE:**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES
## TO DEFENDANT INFOWARS, LLC

**INTERROGATORY NO. 1:** Identify all persons answering or supplying information used in answering these discovery requests and identify their job duties at InfoWars, LLC.

**ANSWER:**

**INTERROGATORY NO. 2:** Describe the business purpose of InfoWars, LLC.

**ANSWER:**

**INTERROGATORY NO. 3:** Describe all the ways in which InfoWars, LLC generates revenue.

**ANSWER:**

**INTERROGATORY NO. 4:** Identify every employee or agent of InfoWars, LLC who was involved in the creation, research, editing, marketing, funding, staffing, distribution, or publication of the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," and describe their specific role.

**ANSWER:**

**INTERROGATORY NO. 5:** Does InfoWars, LLC share office space with any other named party?

**ANSWER:**

**INTERROGATORY NO. 6:** Does InfoWars, LLC share common employees with any other named party?

**ANSWER:**

**INTERROGATORY NO. 7:** Has an employee or agent of InfoWars, LLC ever rendered services on behalf on any named other party, or has an employee or agent of any named party ever rendered services on behalf on InfoWars, LLC? Describe.

**ANSWER:**

**INTERROGATORY NO. 8:** Has InfoWars, LLC ever made an undocumented transfer of funds to any named party, or has any named party ever made an undocumented transfer of funds to InfoWars, LLC? Describe.

**ANSWER:**

**INTERROGATORY NO. 9:** For each person who had ownership interest in InfoWars, LLC on June 26, 2017, state:

      a)      their full name.

      b)      the date(s) upon which the person acquired their ownership interest.

      c)      the kind of consideration paid or promised for the ownership interest and the date(s) on which it was paid or promised.

      d)      the nature of percentage of that individual's ownership interest.

      e)      whether the person is related by blood or marriage to any other person who is or has been a shareholder, officer, or director of InfoWars, LLC, and, if so, the identity of the other person and the nature of the relationship.

**ANSWER:**

**INTERROGATORY NO. 10:** Identify each person who has served as an officer, director, management-level employee of InfoWars, LLC at any time during the past five years.
or

**ANSWER:**

**PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
TO DEFENDANT INFOWARS, LLC**

**REQUEST FOR PRODUCTION NO. 1:** An organizational chart for InfoWars, LLC as of June
26, 2017.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:** All contracts in effect between InfoWars, LLC and any

other party.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:** All documents in the possession of InfoWars, LLC
regarding the ownership, management, or administration of the InfoWars.com website.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:** All incorporating documents for InfoWars, LLC,
including article of incorporation, bylaws, certificate of incorporation, and notice of incorporation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:** All documents or communications reflecting the ownership
of The Alex Jones Show, InfoWars.com, the InfoWars brand, and its related intellectual property from
2017 to the present.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 6**: All contracts in effect between Free Speech Systems, LLC
and InfoWars, LLC.

**RESPONSE**:

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261st DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## VERIFICATION

STATE OF TEXAS     §
                   §
COUNTY OF _____     §

**BEFORE ME**, the undersigned notary public, on this day personally appeared
_____, known to me to be the person whose signature is affixed hereto, and swore and acknowledged to me that the answers to the above and foregoing answers to Interrogatories are true and correct to the best of his/her personal knowledge and belief.


_____
AFFIANT


**SUBSCRIBED AND SWORN TO BEFORE ME**, this the _____ day of _____, 2018.


_____
Notary Public in and for the State of Texas


My Commission Expires:


_____

# EXHIBIT "2"

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 174 of 689

1

# 03-19-00811-CV

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GN-18-001835
COURT OF APPEALS NO. 03-19-00811-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/24/2019 12:40:45 PM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| NEIL HESLIN, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| ALEX E. JONES, INFOWARS, | ) | |
| LLC, FREE SPEECH SYSTEMS, | ) | |
| LLC, and OWEN SHROYER, | ) | |
| | ) | |
| Defendants | ) | 261ST JUDICIAL DISTRICT |

-----------------------------------------------

HEARING ON MOTION TO DISMISS AND MOTION FOR CONTEMPT

-----------------------------------------------

On the 3rd day of October, 2019, the following
proceedings came on to be heard in the above-entitled
and numbered cause before the Honorable Scott H.
Jenkins, Judge presiding, held in Austin, Travis County,
Texas;

Proceedings reported by machine shorthand.

2

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

     MARK D. BANKSTON
     SBOT NO. 24071066
     WILLIAM OGDEN
     SBOT NO. 24073531
     KASTER, LYNCH, FARRAR & BALL
     1010 Lamar, Suite 1600
     Houston, Texas  77002
     (713) 221-8300


FOR THE DEFENDANTS:

     MICHAEL BURNETT
     SBOT NO. 00790399
     SCOTT NYITRAY
     SBOT NO. 24094876
     BURNETT TURNER
     6034 W. Courtyard Dr., Suite 140
     Austin, Texas  78730
     (512) 472-5060

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 176 of 689

3

**I N D E X**

**VOLUME 1**

**HEARING ON MOTION TO DISMISS AND MOTION FOR CONTEMPT**

**OCTOBER 3, 2019**

|  | Page | Vol. |
|---|---|---|
| Announcements......................... | 4 | 1 |
| Argument by Mr. Burnett................ | 5 | 1 |
| Argument by Mr. Bankston............... | 22 | 1 |
| Further Argument by Mr. Burnett........ | 51 | 1 |
| Court Takes Matters Under Advisement... | 61 | 1 |
| Adjournment............................ | 62 | 1 |
| Court Reporter's Certificate........... | 63 | 1 |

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
177 of 689

4

1                      **PROCEEDINGS**

2                THE COURT:  We're on the record in

3    Cause No. GN-18-1835, Neil Heslin vs. Alex E. Jones,

4    et al.  Would you announce your presence beginning with

5    counsel for plaintiff.

6                MR. BANKSTON:  Mark Bankston on behalf of

7    plaintiff, Neil Heslin.

8                MR. OGDEN:  Big Ogden on behalf of Neil

9    Heslin.

10               THE COURT:  Who will be the -- will there

11   just be one lawyer arguing?

12               MR. BANKSTON:  Yes, Your Honor.  It'll

13   be -- Mr. Bankston will be arguing.

14               THE COURT:  Okay.  For defendants.

15               MR. BURNETT:  Yes.  Good afternoon, Judge.

16   My name is Michael Burnett representing the defendants

17   along with my associate Scott Nyitray.  And I'll be

18   handling the arguments today.

19               THE COURT:  All right, Counsel.  We just

20   had a conversation before going on the record about what

21   it is we're here to do today.  What we're here to do

22   today is to argue -- for you to argue defendants' motion

23   to dismiss filed last year, summer of last year, and for

24   plaintiff to argue a motion for contempt that was filed

25   on October 1st of last year, correct?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
178 of 689

5

```
 1                    MR. BURNETT:  Correct, Your Honor.

 2                    MR. BANKSTON:  Yes, that's correct,

 3  Your Honor.

 4                    THE COURT:  And you've agreed that you

 5  will argue both of these motions in no more than

 6  20 minutes a side.  You've agreed that the plaintiff --

 7  I'm sorry -- that the defendants will start first.  And

 8  they will get the last word since they have the burden

 9  of persuasion on what I call the -- well, the most

10  consequential motion, or at least the overarching

11  motion, the motion to dismiss.  And you've agreed that

12  plaintiff will get 20 minutes to respond.  And then

13  defendants will get no more than five minutes to get the

14  last word.  So you can use more than 15 minutes, but if

15  you use less than 15 minutes, you don't build on your

16  five-minute closing.  And I'll let you know when you've

17  used 15 so that you can save that last five minutes or

18  as much of it as you want.  You can also use it and not

19  have the last word.  Everybody agree that's the order of

20  argument?

21                    MR. BURNETT:  Yes, Your Honor.

22                    MR. BANKSTON:  Agreed, Your Honor.

23                    THE COURT:  All right.  With that, you get

24  to go first.  You may proceed.

25                    MR. BURNETT:  Thank you, Judge.  You know,
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
179 of 689

6

1   as you know, I just recently became involved in these

2   so-called Sandy Hook Alex Jones cases.  There's a lot in

3   the file.  There's cases on appeal.  There's a long

4   transcript.  I wasn't a part of any of that prior

5   litigation, but I've briefed myself, and I am familiar

6   with the procedural background of this and the other

7   cases.

8           And I'll just tell you that I took this

9   case not because I believe in Alex Jones or what he says

10  on the air.  Candidly, I've never watched his show.  I

11  don't listen to it.  It's not something that I'm even

12  familiar with.  Pretty much everything I know about Alex

13  Jones I've learned as being a lawyer for him in this

14  litigation.

15          But I took the case because I strongly

16  believe in the First Amendment.  And I'm not going to

17  lecture the Court on the importance of the First

18  Amendment because I know from the Court's background

19  that the Court itself strongly believes in the First

20  Amendment and agrees that the First Amendment is even

21  more important when we're dealing with unpopular figures

22  like Alex Jones and arguably unpopular speech that goes

23  on his airwaves.

24          But, you know, what we're here today is on

25  his motion to dismiss under the anti-SLAPP statute.  And

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
180 of 689

7

1  the Court is well aware -- and I told you I'm not going

2  to go through the background on that, but the statute

3  does, quoting, protect citizens who speak on matters of

4  public concern from retaliatory lawsuits that seek to

5  intimidate or silence them.

6          And I believe that's exactly what we have

7  going on here.  I don't think there's any dispute that

8  the statute applies to this case.  And under the case

9  law and the statute that once there's a showing that it

10  applies to this case, then the burden shifts to the

11  plaintiff to show by clear and specific evidence that

12  they do have a cause of action to assert against the

13  defendant.  And here -- the defendants.

14          And here they have sued him for

15  defamation, which we all know from being back in

16  law school you have a right to your opinions in this

17  country.  I mean, every time I turn on the news I hear

18  someone expressing some opinion that I disagree with,

19  okay?  But that's what makes this country great.  You

20  can have opinions and your opinions can be wrong.  What

21  you can't do is make false statements of fact against

22  somebody else because that's defamation.  But you can

23  have false or wrong opinions about somebody else, and

24  that's not actionable in this country, and we all know

25  that, but that's exactly what I think we have presented

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
181 of 689

8

1 in this particular case.

2 If you look at their third amended

3 petition -- does the Court have a copy of the third

4 amended petition?

5 THE COURT:  I do, and the first amended.

6 MR. BURNETT:  Right.

7 THE COURT:  There was no second amended,

8 interestingly.

9 MR. BURNETT:  I don't know if that was

10 something that was to trip me up or not, but I looked a

11 long time for the second one and I couldn't find it

12 either.  You're right; there is just a third one.

13 But if you look at their third amended

14 petition -- and the factual allegations are on Pages 3

15 through 6.  And I think it's important to actually look

16 at what they -- not what they -- what Mr. Heslin alleges

17 factually happened.

18 And I will represent to the Court -- and

19 this is going to be relevant when we get into the

20 discovery abuse allegation -- that the defense will

21 stipulate that these factual allegations are true for

22 the purposes of this motion only, all right?  And so

23 assuming these are true, if you go through the factual

24 allegations that Mr. Heslin alleges in this case, there

25 are no statements of fact made by the defendants that

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
182 of 689

9

1   are actionable.

2               Starting on Page 3 -- and I normally don't

3   read from pleadings, but this actually I think is

4   important to look at since we're stipulating that these

5   factual allegations are true for the purposes of this

6   motion only.  And these factual allegations have to rise

7   to a level that, if true, are a cause of action.  And if

8   you look on Page -- I mean, Page 3, Paragraph 13,

9   Mr. Heslin --

10              THE COURT:  Well, you're skipping some

11  paragraphs.

12              MR. BURNETT:  Well, the first is --

13              THE COURT:  Is there no statement of fact

14  alleged in Paragraph 2?  They're saying that --

15              MR. BURNETT:  In Paragraph --

16              THE COURT:  I'm sorry.  Paragraph 12.

17  They're saying --

18              MR. BURNETT:  Well, Paragraph 12 is

19  just -- is a background that led to the interview that

20  Mr. Heslin was on national TV for.  The prelude for the

21  interview that he was on national TV for was the

22  allegation that Mr. Jones has said that the Sandy Hook

23  massacre was a hoax.

24              THE COURT:  Right, which is a statement of

25  fact.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
183 of 689

10

 1            MR. BURNETT:  That's a statement of fact,

 2  but the defendants in this case are not alleged of

 3  saying that about Mr. Heslin in this case.  I mean, what

 4  they're being sued for is what they said in response to

 5  his interview on national TV.  And what Mr. Heslin said

 6  in his interview on national TV was, quote, "I lost my

 7  son.  I buried my son.  I held my son with a bullet hole

 8  through his head."  Okay?

 9            Then there's two statements -- or

10  publications that the plaintiff alleges give rise to the

11  cause of action; one, what happened on June 26 of 2017,

12  and then the second one was on July 20th of 2017.  And

13  so in response to that, there was a segment on

14  InfoWars -- which Mr. Jones wasn't even on that segment

15  at all.  I don't know how Mr. Jones could be sued for

16  that particular segment because he was not on the air.

17  There was a different host, a gentleman by the name of

18  Owen Shroyer.  And in that segment, according to the

19  plaintiff, the InfoWars broadcast featured a segment

20  hosted by reporter Owen Shroyer in which Shroyer claimed

21  to have reviewed evidence showing it was impossible for

22  plaintiff to have held his son and see his injury.

23            Going to the next page in Paragraph 15 --

24            THE COURT:  Excuse me.  You're saying

25  these are not statements of fact.  Isn't that a

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
184 of 689

11

1  statement of fact?

2          MR. BURNETT:  No, no.  They said that he

3  claimed to have reviewed evidence showing it was

4  impossible.  They're not alleging that he did or didn't

5  say that -- I mean, review evidence.  They don't know if

6  he reviewed that evidence or not.

7          But if you look on the next page, what he

8  says is he played a video clip from the coroner.  And

9  the coroner said -- the local medical examiner informed

10 reporters that the slain students were initially

11 identified using photographs rather than in person.  So

12 Mr. --

13         THE COURT:  What paragraph are you

14 referencing now?

15         MR. BURNETT:  Paragraph 16.

16         THE COURT:  Okay.  All right.

17         MR. BURNETT:  And so what Mr. Shroyer --

18 if you look at the allegations, what you have here is

19 Mr. Heslin gets on national TV and says I held my son --

20 I held my son with a bullet hole through his head.  And

21 Mr. Shroyer goes on the air -- not Mr. Jones, but

22 Mr. Shroyer goes on the air on June 26 and plays a video

23 clip of the local medical examiner after everything has

24 happened saying that the students were identified by

25 photographs.  And so Mr. Shroyer says essentially I

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 185 of 689

12

1  don't know how he could have held his son with a bullet

2  hole through his head when he was -- when the coroner --

3  when the local medical examiner said that the slain

4  students were identified by photographs.

5              THE COURT:  Well, isn't he then making a

6  factual statement I'm telling you as a reporter I've

7  looked at what the medical examiner says and factually,

8  as a reporter, it's impossible for plaintiff to have

9  held his son?

10             MR. BURNETT:  Right.

11             THE COURT:  Isn't that what the reporter

12  is saying?

13             MR. BURNETT:  Right.

14             THE COURT:  Well, isn't that a statement

15  of fact that if they have evidence that it's just

16  demonstrably false and he knew it was false when he said

17  it is --

18             MR. BURNETT:  Well, they haven't shown

19  that he did hold his head.  All he did is say that the

20  guy says he held his head with a bullet hole through his

21  head -- held his son with a bullet hole through his

22  head, and the reporter says essentially I don't know how

23  that could be true because you have the local medical

24  examiner saying that they were identified by

25  photographs.  That's his opinion saying I don't know how

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
186 of 689

13

1  that could be true when you've got the local medical

2  examiner saying this.  And he didn't -- and he didn't go

3  on the air and just say the local medical examiner says

4  X.  He played the video footage from the local medical

5  examiner on the air and saying, okay, you have

6  Mr. Heslin saying this and you have the local medical

7  examiner saying this over here; I don't know how he

8  could be telling the truth in light of what he is saying

9  there.  That's a statement of his opinion.  I believe

10  that's a statement of opinion.

11          You have two conflicting evidence, him

12  saying A and the medical examiner saying what he says.

13  "How can that possibly be true?" is what he's asking.

14  And that's all Mr. Shroyer.  I mean, Mr. Jones is not

15  even on the air.  You know, all he's doing as a reporter

16  is taking two bits of information that he didn't come up

17  with on his own.  I mean, Mr. -- none of the defendants

18  created any of that information.  He's taking what

19  Mr. Heslin says and he's taking what the local examiner

20  is saying and saying I don't know how you can say that

21  that -- how they match up.  That's an opinion.  You're

22  asking a question.  That's what we want the press to do,

23  is ask questions like that.  And I believe it's a

24  statement of opinion that is protected by the First

25  Amendment.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 187 of 689

14

1      Now -- and again, I've said now three or
2 four times that Mr. Jones, who's the target defendant
3 for them, wasn't even on the air.  I don't know how they
4 could possibly have a claim against him on that.
5      THE COURT:  Well, we don't get to him
6 until Paragraph 23 when apparently he rebroadcast the
7 very same thing you just referenced and then commented
8 on it as though -- basically, it appears, from the way I
9 read Paragraph 23, Jones put his imprimatur on what his
10 reporter was saying.  I'm rebroadcasting this and
11 demanding that the plaintiff, Mr. Heslin, clarify this.
12      MR. BURNETT:  Right, right.  And the
13 reason why I make a distinction between the two
14 publications is because they have separate causes of
15 action for defamation on each publication.  And so even
16 if the Court finds that there is a statement of fact on
17 the reporting, whatever, Mr. Jones can only be liable,
18 if at all, based on the July publication in which he is
19 actually doing something, not separately for the June
20 publication.
21      THE COURT:  Well, that's why I asked the
22 question.  Isn't this alleging that he's basically by
23 rebroadcasting it putting his imprimatur on it basically
24 saying what Shroyer said I'm saying again right now and
25 asking Mr. Heslin to clarify this.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 188 of 689

15

1          MR. BURNETT:  Right, exactly.

2          THE COURT:  Is that right?

3          MR. BURNETT:  That is exactly right.

4   Exactly right.

5          THE COURT:  Well, isn't that basically

6   restating -- assuming it's defamatory, restating the

7   defamatory factual statement?

8          MR. BURNETT:  Yes, for July.

9          THE COURT:  Yes.

10         MR. BURNETT:  And so if you do -- if the

11  Court does find that the case should not be dismissed

12  because there's statements of alleged facts, not

13  protected opinions, I think at the very least the Court

14  has to dismiss the claim against Mr. Jones for the June

15  publication, because he didn't make the publication in

16  June, and then the Court would have to dismiss against

17  Mr. Shroyer the July publication because he wasn't

18  involved in a republication of what was said in July.

19  It is a fine distinction, but I think it's required

20  under the law because they're making different -- I

21  mean, causes of action based on those two different

22  publications.

23         THE COURT:  Well, I'm not -- where later

24  in the pleadings does he say I'm suing Jones

25  individually for what I said in Paragraph 14 about

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
189 of 689

16

1  Shroyer and I'm suing Shroyer individually for what I

2  said in Paragraph 23 about Jones?  I mean, I understand

3  what you're saying.  It sounds like kind of

4  microsurgery.

5              MR. BURNETT:  It is.

6              THE COURT:  Not to be disparaging at all.

7  But where does that nail down that I'm suing both of you

8  for both of these paragraphs?  Or is it just a little

9  more -- I mean, you could have filed special exceptions

10  to say which of these factual allegations are you suing

11  us for?  But maybe it's clear.

12              MR. BURNETT:  I believe if you look later

13  in the pleading on Paragraph --

14              THE COURT:  What page?  What page do I

15  need to look at?

16              MR. BURNETT:  Page 14 on Paragraph 55

17  and Paragraph 57.

18              THE COURT:  I'm sorry.  Page 14 on

19  Paragraph 57?

20              MR. BURNETT:  Right.  55 and 57 talk about

21  the two different broadcasts.  See how they allege it

22  against the defendants plural separately for each of

23  those causes of action?

24              THE COURT:  Well, I take your point.

25              MR. BURNETT:  But that's not --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
190 of 689

17

```
 1              THE COURT:  I guess they could have parsed
 2  it out saying, you know, as to -- Shroyer as to June and
 3  Jones as to July, but...
 4              MR. BURNETT:  But that's not the crux of
 5  my argument.
 6              THE COURT:  I wouldn't think it would be.
 7              MR. BURNETT:  The crux of the argument is
 8  that the First Amendment does protect a reporter from
 9  looking at someone's interview on national TV saying
10  that I held my son with a bullet hole through his head,
11  and you have the local medical examiner previously who
12  went on TV and said that all the slain students were
13  identified by photographs, and then it raised the
14  question:  How could you hold your son with a bullet
15  hole through his head when the local medical examiner
16  said that they were identified by photographs?
17              THE COURT:  Well, I can't remember exactly
18  what this medical examiner said or where it is in this
19  fairly voluminous file now, if it exists, as an
20  attachment to what's been filed.  Does it exist in this
21  file, what the medical examiner said?
22              MR. BURNETT:  Not that I'm aware of.
23              THE COURT:  Okay.  So what --
24              MR. BURNETT:  But for purposes of today's
25  motion --
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 191 of 689

18

1      THE COURT:  So what does this mean in

2  Paragraph 16?  What is it -- what is it that your people

3  said the local medical examiner said that makes it

4  arguably factually impossible for Mr. Heslin to have

5  experienced what he says he experienced?

6      MR. BURNETT:  For purpose of today's

7  motion --

8      THE COURT:  Yes.

9      MR. BURNETT:  -- exactly what the

10 plaintiff alleges in this case in Paragraph 16.  They

11 said that Shroyer played a video footage where the local

12 medical examiner informed reporters that the slain

13 students were initially identified using photographs

14 rather than in person.

15     THE COURT:  Well, initially identified by

16 whom?  By the medical examiner?  By whom?

17     MR. BURNETT:  For today I'm just taking

18 their pleadings that they have right here.  The burden

19 shifts to them, by the way, to show that that was a

20 false statement.  All the -- but if you just look at

21 what they allege, which is all I have to do for today's

22 purposes, is what they allege is that their client gets

23 on TV and says he held their son, and then what we did

24 in response is play the local medical examiner's footage

25 where he says they were identified by photographs and

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
192 of 689

19

then the defendant saying, well, how could you hold your

son's head with a bullet hole when the local medical

examiner says they were identified by photographs?

There's no false statement of fact.

THE COURT:  And by the way, you've just

hit 15 minutes, which you said you wanted me to warn you

at 15 minutes, and you've hit it now.

MR. BURNETT:  I think you understand my

argument.

THE COURT:  But I guess the reason I'm

asking you this question is this is the way you framed

it in this argument; Judge, this was a rational question

to ask given what the medical examiner was saying.  And

to this point, I still don't understand your point about

why this was a rational question to ask in light of what

the medical examiner was saying.  So since you're trying

to explain what your client put on the air and explain

it as sort of a rational question of fact, I'm still not

understanding what they had from the medical examiner

that would have caused them to ask a rational question

of fact about what Mr. Heslin was saying about his son

and his experience of his son post death holding him was

false.

MR. BURNETT:  Okay.  Well, let me see if I

can --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
193 of 689

20

1           THE COURT:  So just answer that question,
2  and I won't count this time against you.
3           MR. BURNETT:  Because the medical examiner
4  said that they were identified by photographs from the
5  morgue.  That's where the medical examiner is at.  They
6  were identified by photographs.
7           THE COURT:  How does that preclude --
8  initially identified.  How does -- initially identified.
9  How does that preclude the possibility and allow your
10 client to raise the question that this is just
11 unanswerable how Heslin could say he held his son?
12          MR. BURNETT:  Okay.  But that's an
13 opinion.  See, that proves the point.  Him asking the
14 question how can you hold your son when the medical
15 examiner said they're identified by photographs is a
16 protected question that you're allowed to ask as a
17 reporter.  Now, the response may be -- if Mr. Heslin had
18 a response to that in response to this publication, it
19 could be, well, I went down there to the morgue and the
20 medical examiner let me in and I went into the room
21 where the bodies are and I held his head.  He could have
22 said that.  But in this country you're allowed to ask
23 that question.
24          Now, the defendants are not alleged to
25 have said there's no way he went down there, held his

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
194 of 689

21

1  son's head, he's lying, he's making it up, he wants it

2  for gun control purposes or anything like that.  They're

3  not alleged to have said that.  They just asked a

4  question, which you're allowed to do as the press.  Then

5  the person who's the subject of the question can say

6  this is what happened; you owe me an apology.  But they

7  don't get to sue you for defamation under the

8  First Amendment for doing that.

9            THE COURT:  Okay.

10            MR. BURNETT:  And that's what this

11  First Amendment protects.

12            THE COURT:  Now we're morphing into

13  argument.  I just didn't understand your clients' -- I

14  didn't understand the logic of using the medical

15  examiner to suggest that we don't know how he could have

16  held his son if they were initially identified by

17  photographs.  I didn't understand the logic of that.

18  You answered my question, which is all I wanted you to

19  do.

20            MR. BURNETT:  All right.  Thank you,

21  Your Honor.  I'll save the rest of my time for rebuttal.

22            THE COURT:  All right.  I guess you'd

23  better just address the arguments that he made here.

24  You may want to talk a little bit about your contempt in

25  discovery.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
195 of 689

22

1          MR. BANKSTON:  Okay.  Let's start there,

2  actually.  Let's start with the contempt.  And you've

3  read the Court of Appeals opinion that they were wrong

4  to do what they did.  They took a gamble to disobey you

5  and they were wrong.  They served discovery responses

6  saying you don't have authority.  The next day,

7  you know, I filed a contempt motion, then they appealed.

8          When they came back on appeal they've done

9  nothing.  They've continued to ignore the order.

10  Every day they're in violation.  They know it.  Then

11  they asked for this hearing right -- you know, as a

12  last-minute thing without ever paying attention to the

13  discovery.  They think they can stipulate their way out

14  of contempt, is what they think.

15          THE COURT:  I don't have anything in the

16  file whatsoever about the discovery from you since

17  October 1st.

18          MR. BANKSTON:  Correct.

19          THE COURT:  There's no augmentation of

20  that motion to explain the chronology after remand on

21  August 30th of this year what has been done to obtain

22  that discovery or what has been done to resist the

23  discovery.

24          MR. BANKSTON:  Sure.

25          THE COURT:  Nothing.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 196 of 689

23

```
 1              MR. BANKSTON:  Sure.

 2              THE COURT:  And so it makes me wonder --

 3  because when I saw the case was remanded, I would have

 4  assumed you would have been conferring about getting

 5  discovery and I would have a record about what, if

 6  anything, was done about that, but there's nothing.  And

 7  for the purposes of this hearing, you know, we can't --

 8  we can't inject it now since there's no supplemental

 9  motion.

10              MR. BANKSTON:  Sure.

11              THE COURT:  Do you see what I mean?

12              MR. BANKSTON:  Exactly.  And I don't think

13  I need to file a second contempt motion.

14              THE COURT:  Well, but if you want to say

15  that they have basically resisted discovery for the last

16  30 plus days since August 30th of this year, that needs

17  to be in a motion that explicates the chronology of what

18  you did post-remand to get the discovery that I ordered

19  last year.

20              MR. BANKSTON:  Let me try to offer it this

21  way.  Assuming there had been no appeal, right, and I

22  had filed a motion for contempt and they had not

23  provided the discovery, and then 30 more days passed

24  until we had the hearing, I would not need to file

25  something in advance of that hearing to tell you what
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
197 of 689

24

1  had transpired in those 30 days where they still didn't

2  answer the discovery.

3              THE COURT:  No, I know.

4              MR. BANKSTON:  That's all that's happened

5  here.

6              THE COURT:  What I'm saying is I have

7  nothing to consider about any events this year.

8              MR. BANKSTON:  Correct, just as you

9  wouldn't in that case as well.

10              THE COURT:  So I'm looking at this as

11  motion for contempt, October 1st, appeal arguing that I

12  couldn't recess the hearing on August 30th.  That was

13  wrong.  I could and explained why I did.  And the Court

14  of Appeals said I could and didn't lose jurisdiction.

15              So what I'm looking at now is their

16  failure to produce discovery in fall of last year when I

17  ordered the expedited discovery the end of August and

18  they didn't produce it in September and instead did the

19  appeal in early October.  I'm just looking at that

20  action --

21              MR. BANKSTON:  I'm --

22              THE COURT:  -- and then the erroneous

23  appeal.

24              MR. BANKSTON:  What I'm --

25              THE COURT:  And then I'm looking at the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
198 of 689

25

1 fact that today -- or actually, yesterday, I guess,

2 they've conceded everything, just like Mr. Barnes did, I

3 guess, in the -- what case was that?  That was the --

4             MR. BANKSTON:  In *Lewis*.

5             THE COURT:  In the *Lewis* case.

6             MR. BANKSTON:  Right.  And we talk about

7 that as well.

8             THE COURT:  At the very end he conceded

9 we'll just assume everything in their pleadings is true;

10 therefore, we don't need any more discovery.

11            MR. BANKSTON:  Okay.  A couple of things.

12            THE COURT:  So that's where we are.

13            MR. BANKSTON:  A couple of things on that.

14 First of all, the appeal is as though it never happened.

15 There was no jurisdiction, never happened.  So if we

16 were to pretend a situation where the appeal didn't

17 happen and just bring us back to October 1st, what would

18 have happened absent an appeal is more time would have

19 passed and then there would have been a hearing, exactly

20 like what's happening here.  Thirty days have passed.

21            THE COURT:  And at the hearing,

22 presumably, if counsel had been there then, they would

23 have filed the same thing, you know what, we will just

24 concede --

25            MR. BANKSTON:  Exactly.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
199 of 689

26

1                THE COURT:  -- and admit everything in the

2  pleadings are true.

3                MR. BANKSTON:  Exactly.

4                THE COURT:  Okay.

5                MR. BANKSTON:  So let's just for this

6  conversation pretend the appeal didn't happen, because

7  it didn't.

8                THE COURT:  Okay.

9                MR. BANKSTON:  There was no jurisdiction.

10                THE COURT:  We're on the same page.

11                MR. BANKSTON:  So if I was at October 1st,

12  and then let's just pretend this hearing happened

13  November 1st, okay?  And if that was the situation, I

14  wouldn't have filed anything between October 1st and

15  November 1st with the court.  I had a motion for

16  sanctions on file.  I had two letters out to them saying

17  give me my discovery; give me my dates.  None of that

18  happened.  Same thing here.  Nothing has happened.  They

19  before the appeal refused to answer the discovery.

20  Thirty more days have passed.  Nothing has happened.  So

21  there's nothing else that I need to put on file with the

22  court for you except the one thing I did, which is my

23  attorney's fees, so I've put that on there.

24                THE COURT:  Well, the attorney's fees,

25  though, is for the whole case.  It's not just for

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
200 of 689

27

1  discovery.

2          MR. BANKSTON:  Exactly.  I gave you --

3  because you'll need that for the TCPA motion too.

4          THE COURT:  If I find that it's frivolous.

5          MR. BANKSTON:  Exactly.  So that's why I

6  had to give you all of it in one affidavit.

7          THE COURT:  All right.

8          MR. BANKSTON:  So anyway, so the problem

9  with the stipulation is this.  When I first filed this

10 case, I filed it under Texas fair notice standards.  I

11 filed what I knew.  They filed a TCPA motion which

12 increases my burdens.  The TCPA motion gives me the

13 discovery to fully explore my facts and amend my

14 petition if necessary, because there's a good chance

15 when I do this TCPA discovery I'm going to learn

16 additional facts, and those facts might be much worse

17 than what Mr. Heslin initially understood, and those

18 facts may also add further content to the allegations in

19 this petition.  And he can amend his petition upon the

20 completion of that discovery before the TCPA hearing.

21         THE COURT:  But you got that discovery in

22 the *Lewis* case, and it's the mother of the same child.

23 And the question -- frankly, the reason I allowed

24 expedited discovery is what did Jones and everybody else

25 over there know and when did they know it when they were

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
201 of 689

28

1  making statements that were --

2              MR. BANKSTON:  Two things, Your Honor.

3              THE COURT:  -- from your perspective

4  palpably erroneous?

5              MR. BANKSTON:  Two things on that.  *Lewis*

6  is an intentional infliction case, about five years of

7  statements in the past.  And it was not about the

8  statement about Mr. Heslin in 2017.  There is no

9  discovery in that case.  And in fact, you denied certain

10 discovery that related specifically to Mr. Heslin in the

11 *Lewis* matter.  And the Heslin discovery that you see

12 attached to your order is markedly different than what

13 the *Lewis* discovery is.  It's about this 2016 statement.

14 It's about Owen Shroyer.  I haven't gotten anything from

15 Owen Shroyer.

16             THE COURT:  I understand.

17             MR. BANKSTON:  All right.  It's a

18 completely different set of discovery.  Second, the

19 *Lewis* discovery was incomplete.  That's why I had a

20 motion for sanctions, and they had to throw up their

21 hands and say, well, never mind and do a stipulation,

22 because that discovery wasn't good enough.  So even if

23 you want to say, well, you have the *Lewis* discovery,

24 that discovery is not good.  That discovery is being

25 contested.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
202 of 689

29

1           THE COURT:  So your point is that it's not

2   good enough for them to concede on October 1st of this

3   year, just two days ago, assume everything in the

4   pleadings are true.

5           MR. BANKSTON:  Correct.

6           THE COURT:  Your argument is if I had

7   gotten the discovery, which I should have gotten a year

8   ago, I might well have been able to amend these

9   pleadings, adding more precision and making it even more

10  clear that I can show a *prima facie* case and survive the

11  dismissal?

12          MR. BANKSTON:  Absolutely.  And I'll go

13  you one better.

14          THE COURT:  And therefore, under 215,

15  Rule 215, on your motion for contempt, I can -- well,

16  you asked me to strike the motion to dismiss, which is

17  the most draconian remedy, but there are other remedies

18  under 215.2, right --

19          MR. BANKSTON:  Sure.

20          THE COURT:  -- less than that that

21  accomplish the same thing.

22          MR. BANKSTON:  They're a different way to

23  skin the cat with an additional procedural step, right?

24  So if you took all things as established as true that

25  the discovery could prove, then you'd have to look at

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
203 of 689

30

1  the motion and say:  Is there anything in the motion

2  that discovery wouldn't help them on?  And the answer in

3  this case is no.  We'll go through that in a second.

4  But it basically would just be one more step.  You find

5  that those matters are established and then you deny the

6  motion based on those things that were established.

7          THE COURT:  Well, let's walk through that

8  then.  Assume I'm not going to use the most draconian

9  remedy under 215 and simply strike the motion to

10 dismiss.  Assume it's something less than that, which is

11 a presumption, right?

12         MR. BANKSTON:  Then let's talk about what

13 we would need to presume, right, if we go through what

14 their motion argues and what of it relates to discovery

15 and what of it that I could prove if I had the

16 discovery, right?  And so I'm just going to give you a

17 quick rundown of what their motion is.

18         The first 44 is facts and whether TCPA

19 applies.  Their argument, though, starts on 44.  It's

20 that there's no evidence of a false statement.

21 Obviously, discovery can help me prove it's a false

22 statement.  There's no evidence of a defamatory

23 statement.  Discovery can also help me there because

24 we're not limited to the four corners of the text.

25 Extrinsic circumstances can be used as evidence of a

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
204 of 689

31

1  defamatory meaning.

2           THE COURT:  Now, they're focusing on two

3  statements, the June statement and July republished

4  statement.

5           MR. BANKSTON:  Correct.

6           THE COURT:  Are you focused on those too?

7           MR. BANKSTON:  Yes.  Those are the two

8  that are actionable under Mr. Heslin's defamation case.

9           THE COURT:  Tell me how the discovery

10  would have augmented your pleading on that.

11           MR. BANKSTON:  Okay.  First from the false

12  standpoint, I can get evidence that they have in their

13  possession that they knew it was false and proves it was

14  false.  They might have evidence internally that shows

15  that, right?  So there's falsity.

16           On defamatory meaning, I can choose -- I

17  can have other statements InfoWars made at other times

18  that based on the meanings communicated there can give

19  me meaning about what my statement means.  The classic

20  hornbook example is InfoWars uses a combination of words

21  in my broadcast and they use that same combination of

22  words in a different broadcast and give explicit meaning

23  to what that means, then that can add meaning to my

24  broadcast.  So discovery can help me prove a defamatory

25  meaning.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
205 of 689

32

1         The third argument they make is that the

2   video was not of or concerning Mr. Heslin, which

3   shouldn't be disputed.  But obviously if I get discovery

4   where they've had people contact them who say that video

5   about Mr. Heslin was really bad and we're complaining

6   about it, then it would show that they -- an outside

7   viewer understood it was of or concerning Mr. Heslin.

8   Discovery could help me there.

9         In terms of actual --

10        THE COURT:  Well, the paragraphs he

11  argued, he's not even disputing it's about Mr. Heslin.

12        MR. BANKSTON:  The motion is.

13        THE COURT:  Ah.

14        MR. BANKSTON:  I don't know what they're

15  disputing today --

16        THE COURT:  I see.

17        MR. BANKSTON:  -- but their motion is.

18  And the motion -- regardless of what they're arguing

19  today, I have to prove all my *prima facie* elements.

20  Their only thing is they just have to prove it applies.

21  Then they argue actual malice.  Discovery obviously

22  helps me there.

23        Public figure, which is to determine

24  actual malice, that also helps me because I could find

25  out if they made the statement germane to Mr. Heslin's

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
206 of 689

33

1  gun activism.  They could say internally this has

2  nothing to do with Mr. Heslin's gun activism.

3         And then the last thing they have in their

4  motion is their defenses of substantial truth, which

5  obviously discovery can help me there.  They've got a

6  fair comment privilege, which I can explore there.

7         And the only one that couldn't be, maybe,

8  is the statute of limitations defense, which, I mean,

9  really doesn't matter, because we all know that these

10 statements were inside the statute.  What that argument

11 is is that you can't use the old statements as

12 defamatory actionable statements, which they're not.

13 They're just evidence of actual malice.

14         So there's nothing in the motion that

15 couldn't -- that doesn't hinge on discovery.  You'll

16 notice Mr. Burnett stood up and said the bulk of my

17 argument -- my real argument today is that the

18 First Amendment protects Mr. Jones.  That's not in the

19 TCPA motion.  There is no constitutional argument in the

20 TCPA motion.  This is not Mr. Barnes' case.  This was

21 Mr. Enoch's case.  And the motion he brought was purely

22 that we cannot meet our *prima facie* evidence burdens.

23         So every single part of this motion hinges

24 on discovery.  And so, therefore, if they stipulate that

25 all of the discovery is unnecessary and you can simply

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
207 of 689

34

1  assume -- and this isn't exactly what they're saying,

2  but I think they're trying to get at you can assume that

3  discovery is unnecessary because it won't help the

4  plaintiff because everything you can assume in discovery

5  is true.

6             THE COURT:  Well, no, what they said --

7             MR. BANKSTON:  And that's --

8             THE COURT:  This is word for word what

9  they filed on October 1st.  Assuming for the purposes of

10  the motion, meaning the motion to dismiss, that the

11  well-pleaded, whatever they mean by that, factual

12  allegations in the petition are true.  In other words,

13  everything you're alleging is true is the way I read

14  their stipulation.

15             MR. BANKSTON:  And you just --

16             THE COURT:  Ergo, you need no more

17  discovery because we're conceding.  This was what

18  Mr. Barnes did at the last minute, somewhat to my

19  surprise, after we'd spent a lot of time arguing about

20  it before that, that we could assume the allegations

21  were true in the -- *Scarlet Lewis* case?

22             MR. BANKSTON:  Correct.

23             THE COURT:  Yes.  And so basically they're

24  taking a page out of what Mr. Barnes did in that case

25  and doing it here --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
208 of 689

35

```
 1              MR. BANKSTON:  Yes.

 2              THE COURT:  -- so we quit fighting about

 3   discovery, so they say.

 4              MR. BANKSTON:  A couple problems with

 5   that.

 6              THE COURT:  All right.

 7              MR. BANKSTON:  And you hit on one right

 8   off the bat.  What does well-pleaded mean?  And they

 9   argue that on appeal.  For instance, I argue in my

10   petition that Jones acted with actual malice,

11   substantially disregarded the truth.  They say that's

12   not a well-pleaded allegation.  They say that's a legal

13   conclusion, so you have to prove that on appeal.

14              So I got up to the appellate court with

15   Scarlett Lewis, and they just completely repudiated the

16   statements they made in court and said, no, you have to

17   prove your prima facie claim because we weren't bound by

18   a Rule 11 agreement; what we said to Judge Jenkins in

19   court doesn't matter; only what we put on a Rule 11

20   agreement matters.

21              So even if you go with the stipulation

22   now, I'm going to have to be arguing over what does a

23   well-pled allegation mean?  I'm going to have to go up

24   there and argue about what was really taken as

25   established.  And they're going to say, no, these things
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
209 of 689

36

```
 1  weren't.  And if I had that discovery, I'd be able to

 2  prove these things.

 3              THE COURT:  But you're not arguing for the

 4  discovery now, even though there might be a few days

 5  left in my 120 days.

 6              MR. BANKSTON:  Agreed.

 7              THE COURT:  That's not what you want now.

 8              MR. BANKSTON:  Agreed.

 9              THE COURT:  What you want now is deny this

10  motion to dismiss; and by the way, one of the bases for

11  denying it is to put some language in the order on the

12  motion for contempt, which sort of provides an

13  additional basis for denying it.

14              MR. BANKSTON:  Correct.

15              THE COURT:  I'm looking at your proposed

16  order on contempt, so let's walk through that briefly.

17              MR. BANKSTON:  Okay.

18              THE COURT:  Do you have it in front of

19  you?

20              MR. BANKSTON:  I sure do.  I can pull it

21  right up, Your Honor.

22              THE COURT:  But what specifically -- I

23  guess the first paragraph, matters regarding the order

24  shall be taken as established for the purposes of the

25  action, right?  That's the first paragraph.
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
210 of 689

37

1              MR. BANKSTON:  Yes, Your Honor.

2              THE COURT:  The second paragraph is --

3     basically strikes their motion.

4              MR. BANKSTON:  Right.  That's the higher

5     sanction that we maybe don't want to explore and that's

6     fine.

7              THE COURT:  Well, you can tell I'm a

8     little concerned about making the motion -- the contempt

9     outcome determinative on the motion to dismiss.  So you

10    strike the second paragraph.  You just want the first

11    paragraph and your attorney's fees.

12             MR. BANKSTON:  Correct.  Correct.

13             THE COURT:  Right?

14             MR. BANKSTON:  Correct.

15             THE COURT:  All right.  I understand your

16    position.

17             MR. BANKSTON:  Okay.

18             THE COURT:  Now, what else do you need to

19    say today about the motion to dismiss?

20             MR. BANKSTON:  Okay.  Just one last thing

21    on the motion for contempt is what the attorney's fees

22    are.

23             THE COURT:  We can walk through that too.

24             MR. BANKSTON:  You'll remember in the

25    *Lewis* case we had to have attorney's fees for the same

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
211 of 689

38

1   reason.  But one of the things --

2               THE COURT:  Actually, I don't remember,

3   honestly.

4               MR. BANKSTON:  It has been a long time,

5   you're right.

6               THE COURT:  It's been too long and I've

7   had too many other cases.

8               MR. BANKSTON:  Yeah, it has been a long

9   time actually now that I'm thinking about it.  One of

10  the things that you brought up there, and it was a

11  really good point in *Lewis*, was that in *Lewis* I actually

12  got some of the discovery.  I was able to take a couple

13  depositions, and I ended up getting some documents.  And

14  your point on this, which I thought was well taken is,

15  well, that discovery inured some benefit to you.

16              THE COURT:  Well, it did.  You're using it

17  in your supplement now.

18              MR. BANKSTON:  Yes.  Some of it I'm able

19  to use today, exactly.  And so I wasn't given attorney's

20  fees for all of the conduct of discovery in that case.

21  I was only given it for the actual motion, right, not

22  the expenses of discovery as would normally be done.  In

23  this case, that's not the case.  In this case I got no

24  benefit for any of these.

25              THE COURT:  I awarded you attorney's fees

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
212 of 689

39

1 on your expedited discovery motion?

2           MR. BANKSTON:  Actually, what it ended up

3 was that Mr. Barnes volunteered to pay them without you

4 having to do an order.

5           THE COURT:  I do remember that now.

6           MR. BANKSTON:  Yeah, he stood up and said

7 I'll pay it out of my own pocket.

8           THE COURT:  I was surprised by that too.

9           MR. BANKSTON:  It was surprising.  He

10 ended up paying that, but that again was just for that

11 limited amount.  Here we have wasted a year of our time.

12 I have brought a lot of pleadings relating to discovery.

13 I have done a lot of work described in that affidavit

14 relating to the discovery and dealing with what this

15 motion alleges I need to prove through discovery.  And I

16 submit that I need all those fees, that that's

17 mandatory, that the Court does not have discretion about

18 whether to give me those fees caused by that failure

19 because here I got no benefit out of it.

20           THE COURT:  What fees?  The discovery

21 fees?

22           MR. BANKSTON:  Correct.  And if you want

23 to look through the affidavit, we can do that too.

24           THE COURT:  I already made notes on it

25 just looking at it.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
213 of 689

40

1          MR. BANKSTON:  All right.  Let me pull

2  that up for you too if you have any questions there.

3          Okay.  I have my affidavit open.  And

4  you'll see on second page is my fees in the trial court

5  and the third page is my fees --

6          THE COURT:  And it was attached to what

7  you filed with the clerk, so they have it.  It was

8  served on them --

9          MR. BANKSTON:  Correct.

10          THE COURT:  -- as an attachment to your --

11          MR. BANKSTON:  It's Exhibit 5 to my

12  supplemental response to the TCPA motion.

13          THE COURT:  Right.  Well, the first two

14  items I see, drafting the motion, 13 hours.

15          MR. BANKSTON:  And the discovery request,

16  Your Honor.

17          THE COURT:  And the discovery -- oh, yes,

18  of course.  And then consultation with expert.  You had

19  some expert reports or affidavits.

20          MR. BANKSTON:  This was actually the

21  declaration that went with the motion for expedited

22  discovery.

23          THE COURT:  The next one I don't

24  understand -- or I don't know why you would get it.  It

25  was the motion for spoliation.  That motion was filed on

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
214 of 689

41

1 August 17th.  You did not get a spoliation finding from

2 me that I recall.

3          MR. BANKSTON:  You ordered discovery on

4 spoliation.

5          THE COURT:  Exactly.  But I don't know

6 that you'd -- you're saying I get another ten hours even

7 though the motion for spoliation -- that was just -- to

8 me that was part of the expedited discovery.

9          MR. BANKSTON:  It's up to you.  I believe

10 it's related to discovery.

11          THE COURT:  All right.

12          MR. BANKSTON:  I think it's part of your

13 order.

14          THE COURT:  What next on this first page,

15 which was actually numbered Page 2 in your affidavit?

16          MR. BANKSTON:  I mean, I believe that the

17 review of their motion was necessary as was the legal

18 research to determine what discovery I'm doing.

19          THE COURT:  Well, you -- okay.

20          MR. BANKSTON:  And again, Your Honor, I'm

21 not going to make long involved arguments on here.  You

22 can pick and choose what you want to grant.  I'm not --

23          THE COURT:  Well, I'm just looking at

24 this.  You've got 13 hours of deciding what discovery to

25 do and drafting the discovery requests and filing the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
215 of 689

42

1  motion.  That seems to cover discovery, plus the two

2  hours consulting with your expert.  That's 15 hours

3  total.

4              MR. BANKSTON:  I also --

5              THE COURT:  But I'm going to keep going

6  down the column here.  Anything else referencing

7  discovery?

8              MR. BANKSTON:  Yeah.  In terms of that

9  would be the -- and I'll just give you the ones I know

10 you're going to think are on point, which is the hearing

11 time for the motion on expedited discovery, 8-30-2018,

12 and then every entry below that.

13             THE COURT:  Well, the deposition

14 preparation, that's the deposition of Alex Jones, but

15 you got that deposition.  You're saying I prepared for

16 18 hours for a deposition of Alex Jones in this case,

17 which I'm calling *Heslin 1* --

18             MR. BANKSTON:  Correct.

19             THE COURT:  -- because you filed another

20 case -- I'm going to ask you about that in just a

21 moment --

22             MR. BANKSTON:  Okay.

23             THE COURT:  -- which I'm calling *Heslin 2*,

24 and we're set for a hearing on that in two weeks.

25             MR. BANKSTON:  Correct.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
216 of 689

43

1            THE COURT:  Yes.  And so -- with a new
2  cause of action or new theory that you want to pursue
3  cause of action, right?
4            MR. BANKSTON:  Correct.
5            THE COURT:  On the same facts, basically.
6            MR. BANKSTON:  The same facts as *Lewis*.
7  The intentional infliction claim I'm adding has not the
8  same facts as this case, no, Your Honor.
9            THE COURT:  Okay.  All right.  So the
10 preparation for the Alex Jones deposition is 18 hours
11 for his deposition you planned to take in this case but
12 never did?
13           MR. BANKSTON:  Correct.
14           THE COURT:  It doesn't count any time you
15 prepared for and took the deposition of Alex Jones in
16 the *Lewis* case?
17           MR. BANKSTON:  No, that's a different
18 deposition that I was going in a different direction.
19           THE COURT:  But if they never gave you the
20 deposition dates and you're basically saying they kind
21 of just dragged their feet and you never got them and
22 you had to file a motion for contempt on October 1st,
23 why were 18 hours spent preparing for a deposition that
24 was never scheduled?
25           MR. BANKSTON:  That was before the

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
217 of 689

44

1  contempt happened.  We knew the deposition was ordered

2  to happen before November 22nd.

3               THE COURT:  So you started preparing even

4  without a date?

5               MR. BANKSTON:  We had a date certain by

6  which it had to happen.

7               THE COURT:  Okay.

8               MR. BANKSTON:  We had your discovery

9  order.  And once that discovery order was entered, I

10 started preparing for the deposition.

11              THE COURT:  Okay.  Same thing with Owen

12 Shroyer, a deposition which never occurred in any case.

13              MR. BANKSTON:  Correct.  That was for just

14 this case.

15              THE COURT:  I understand.  Okay.  I see.

16 And the appellate fees are all about the motion to

17 dismiss.  They're not about discovery.

18              MR. BANKSTON:  Well, the appeal was --

19              THE COURT:  You asked for $45,000 in

20 appellate fees for 100 hours at 450 an hour to fight off

21 their appeal on the argument that I could not recess the

22 hearing and that -- because I started the hearing.  It

23 was overruled by operation of law.  And they were wrong

24 about that.

25              MR. BANKSTON:  Correct.  And this is --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
218 of 689

45

```
 1              THE COURT:  But you're not asking for
 2  those attorney's fees in the discovery.
 3              MR. BANKSTON:  From the discovery context,
 4  I think the amount in the appeal would be minimal in
 5  terms of -- I mean, we did argue the discovery in the
 6  appeal.  But in terms of what it was mostly about was
 7  whether -- was the merits and whether you could extend
 8  the hearing.  So I'll go and make it easy for you.  I
 9  won't claim the appellate fees for the discovery motion.
10              THE COURT:  Okay.  That's the short answer
11  that I understand.  Okay.  You're down -- you actually
12  have just finished your --
13              MR. BANKSTON:  Yeah, I just --
14              THE COURT:  You just finished your
15  20 minutes.  Does that wrap up all your arguments?
16              MR. BANKSTON:  Yes, Your Honor.  I think
17  everything has been briefed for you on the motion to
18  dismiss itself, so I think all of those merits arguments
19  are there for you to consider on paper.
20              THE COURT:  Okay.
21              MR. BANKSTON:  What I say here doesn't
22  really matter anyway.
23              THE COURT:  Okay.  Then I'll ask this one
24  last question that you may not have anticipated, and you
25  can decide how much you can answer, because some of it
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
219 of 689

46

1 may just be strategy and you don't want to reveal

2 everything.  And I won't count this time against you,

3 just like I asked Mr. Burnett a question.  He morphed

4 back into argument and I stopped him, but I'm not going

5 to count that against him.

6          You filed a first amended petition in June

7 while this case was still on appeal, right?

8          MR. BANKSTON:  Correct.

9          THE COURT:  In that pleading you added

10 intentional infliction of emotional distress on this

11 case, which I'm calling *Heslin 1*, right?

12          MR. BANKSTON:  Correct.

13          THE COURT:  I forget the cause number in

14 Heslin 2, but it's -- just for the record here, *Heslin 2*

15 is Cause No. GN-19-4651, a new case you filed this year

16 for the same client we're talking about today,

17 Mr. Heslin, and in that new case you pled it as an

18 intentional infliction case.

19          MR. BANKSTON:  Correct.

20          THE COURT:  All right.  But in this case

21 we're here on today, *Heslin 1*, you filed an amended

22 pleading in June of this year while the case was still

23 up before the Court of Appeals adding intentional

24 infliction, right?

25          MR. BANKSTON:  Correct.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
220 of 689

47

1          THE COURT:  You did not file a second
2   amended petition.  I couldn't find it.  Opposing counsel
3   couldn't find it.
4          MR. BANKSTON:  It's a scrivener's error.
5   It should have been the second.
6          THE COURT:  That's okay.  And so you filed
7   a third amended petition, which should have been called
8   second, but it's called third, in August, August 8th, I
9   believe, thereabouts.
10          MR. BANKSTON:  Correct.
11          THE COURT:  And then you drop the
12   intentional infliction.
13          MR. BANKSTON:  Correct.
14          THE COURT:  Then you filed a new lawsuit
15   for the same client.  And you say it's different facts,
16   but you had the same facts in this lawsuit when you
17   added intentional infliction in June and then you
18   dropped it and now we have a new lawsuit.  So I don't
19   know how else to ask it other than what are you doing?
20          MR. BANKSTON:  What happened?  Exactly.
21   Okay.  So you'll remember in the *Pozner* case -- we got
22   these lawsuits on file very quickly.  We were up against
23   a statute issue on defamation.  We added right before
24   your hearing in *Pozner* the intentional infliction case.
25   And then what happened is InfoWars argued on appeal,

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
221 of 689

48

1 well, now that cause of action is subject to dismissal;

2 even though you got to do more discovery on it, we're

3 arguing that's going to get dismissed.

4           So in *Heslin* we were -- we said, well,

5 let's not add the intentional infliction before the

6 hearing.  Let's let the appeal run its course and then

7 we'll add it when it comes back, because it's an

8 expedited appeal.  We thought it would be pretty quick.

9           THE COURT:  And they get 30 days to file a

10 motion to dismiss after you add a new cause of action.

11           MR. BANKSTON:  Exactly, right.  And so we

12 figured let's just let that -- we'll let that happen

13 after appeal instead of having it go up on appeal and

14 possibly lose it with no evidence.

15           The problem was *Heslin* took forever.  It

16 took a year to get that opinion.  And as we were getting

17 close to that year coming up, we were going to run into

18 a statute issue on the intentional infliction.  So the

19 first thing we did was we added it in this case.  And

20 then we got a letter from the other side and a motion to

21 the Court of Appeals saying we want a stay on all of our

22 deadlines and everything.  In other words, you can't

23 really do this because the case is still on appeal,

24 right?  And my response to them is --

25           THE COURT:  They're telling you you can't

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
222 of 689

49

1   really amend pleadings because the case is on appeal?

2           MR. BANKSTON:  Right, or at least that

3   amendment will have no effect until the case is back

4   from appeal, right?

5           THE COURT:  Well, that's an interesting

6   question, because you filed the third amended before the

7   case was back on appeal.

8           MR. BANKSTON:  Exactly.

9           THE COURT:  So that sort of begs the

10  second question.  What is your live pleading in this

11  case?

12          MR. BANKSTON:  Right now it's the third

13  amended petition.

14          THE COURT:  Because once it was remanded,

15  that suddenly comes to life.

16          MR. BANKSTON:  Exactly.

17          THE COURT:  All right.

18          MR. BANKSTON:  Or at least that's when it

19  starts triggering the deadlines and all those sorts of

20  things.

21          THE COURT:  Okay.

22          MR. BANKSTON:  For instance, if I had

23  added a new cause of action in the third amended, their

24  deadlines for the TCPA wouldn't have started when I did

25  it while it was on appeal; it would have started when it

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
223 of 689

50

1    got back here.

2                    THE COURT:  Okay.

3                    MR. BANKSTON:  So we didn't know the Court

4    of Appeals was just about to decide *Heslin*, and so they

5    ended up coming back coincidentally at the same time.

6    Basically Mr. Heslin at that point was like I'm done

7    waiting; can we just get this case started because we

8    know it's going to get appealed too?  So I said to them,

9    fine, I'll revert it back to the original defamation;

10   you don't have to get any relief from the Court of

11   Appeals, and we'll just file a new lawsuit in your

12   court.  Once the TCPA process is done on both, they're

13   obviously going to be consolidated together, and that's

14   where we're headed right now.

15                   THE COURT:  All right.  What did you say

16   at the very end?  They're obviously going to be

17   consolidated --

18                   MR. BANKSTON:  Yeah, these two cases.

19                   THE COURT:  -- at some point.

20                   MR. BANKSTON:  At some point that has to

21   happen.

22                   THE COURT:  In fact, even -- you could ask

23   for them to be consolidated on appeal, I think.

24                   MR. BANKSTON:  I think that's possible.

25                   THE COURT:  No matter what I do in two

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
224 of 689

51

1 weeks, you could ask for the Court of Appeals to just

2 mesh these together and have one argument for the entire

3 thing.

4          MR. BANKSTON:  Assuming, which I think is

5 a safe assumption, that they're going to appeal whatever

6 your ruling is on the next *Heslin* case.

7          THE COURT:  I think it's a safe assumption

8 that both of you are going to appeal whatever I do.

9          MR. BANKSTON:  I think that's true,

10 exactly.

11          THE COURT:  All right.

12          MR. BANKSTON:  And so, yes, once the next

13 *Heslin* case gets appealed, very likely they could be

14 consolidated at the Court of Appeals or we could do it

15 when we come back here.

16          THE COURT:  Okay.

17          MR. BURNETT:  I have five minutes left?

18          THE COURT:  You do.

19          MR. BURNETT:  Judge, I was not involved in

20 the cases last year when this alleged discovery abuse

21 took place, but I have looked at everything, and I don't

22 see how there was discovery abuse to warrant sanctions.

23 If you look at the timeline, Mr. Enoch, who was very

24 able counsel for the defendants at that time, had sort

25 of a Hobson's choice.  There are some cases out there

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
225 of 689

52

1  where it could be argued that he had to file the notice

2  of appeal when he did or he would have waived his right

3  to appeal, all right?  And the Court decided that, no,

4  he didn't have to file it then.  But if he was wrong, he

5  would have waived his entire right to appeal at that

6  time, and he briefed the Court on that issue.  And

7  again, there are cases that justify his -- I don't want

8  to say paranoia, but concern about whether or not he was

9  going to miss an appellate deadline if he waited until

10  November when you had recessed the hearing.

11           THE COURT:  But the record on the motion

12  for contempt filed October 1st of last year was that I

13  signed the order on August 31st --

14           MR. BURNETT:  That's correct.

15           THE COURT:  -- ordering discovery.

16           MR. BURNETT:  Right.

17           THE COURT:  And the defendant simply --

18           MR. BURNETT:  Objected.

19           THE COURT:  -- wouldn't provide the

20  discovery --

21           MR. BURNETT:  Because they were --

22           THE COURT:  -- and as of October 1st still

23  hadn't provided the discovery and that that

24  resistance -- and it's reargued now, as though we were

25  arguing it November 1st of last year, or whenever it

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
226 of 689

53

1 would have been, you know, sometime after the

2 October 1st filing, and the discovery is still not

3 provided; instead, the defendants are at the last minute

4 conceding let's just assume all their allegations are

5 true.

6 So doesn't that mean they won on the

7 motion for contempt?  That is to say, we got the

8 discovery ordered, you wouldn't give the discovery, and

9 now we're down here on contempt at the last minute.

10 You're conceding everything on the pleadings so that we

11 don't have to get discovery.  That means we got, we

12 should have, all the benefit that that discovery could

13 have provided to us and still could provide to us were

14 it provided under Rule 215.  I mean, aren't they right

15 about that?

16 MR. BURNETT:  No.  No.

17 THE COURT:  Why not?

18 MR. BURNETT:  Let me explain.  Of course

19 there's not going to be any discovery while the case is

20 on appeal.  Mr. Enoch had to file the notice of appeal.

21 It stays --

22 THE COURT:  I'm not talking about appeal.

23 MR. BURNETT:  Okay.

24 THE COURT:  I'm talking about for more

25 than a month before Mr. Enoch appealed it and once it

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
227 of 689

54

1  was remanded.

2                    MR. BURNETT:  Okay.

3                    THE COURT:  And to this day, instead of

4  providing any discovery, you just basically fell on your

5  sword at the end like Mr. Barnes and said we don't need

6  discovery, just assume everything is true.

7                    MR. BURNETT:  All right.  Let me respond

8  to that.  Two things real quickly.

9                    THE COURT:  It seems to me they get the

10  benefit of the argument that they were entitled to

11  expedited discovery.  They won on that.  They got

12  expedited discovery that was fought strenuously by

13  defendants.  And then after it wasn't provided, they get

14  a concession, a stipulation that everything in the

15  pleadings is true.

16                    MR. BURNETT:  Okay.

17                    THE COURT:  That to me means you've

18  conceded all the points that they were trying to reach

19  for their discovery.

20                    MR. BURNETT:  I don't think so, but let

21  me --

22                    THE COURT:  Why not?

23                    MR. BURNETT:  Let me respond quickly with

24  my time.  A year ago they didn't notice any of the

25  depositions during that 30-day time period.  There was

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
228 of 689

55

1  no communication like, hey, you're not doing the

2  discovery we need, whatever.  And, of course, when you

3  do the notice of appeal, it stops everything.  And then

4  in the last 30 something days, I've had zero

5  communication from counsel on the other side about

6  wanting depositions, answers to discovery, nothing at

7  all.

8                    THE COURT:  That's okay.

9                    MR. BURNETT:  I don't get anything until

10  right now.

11                    THE COURT:  You had an expedited order

12  that was in effect and came back to life as soon as the

13  Court of Appeals sent this case back to us.  What did

14  you do to go ahead and give discovery that I ordered in

15  August of 2018, from August 30th of this year to the

16  point at which you stipulated?

17                    MR. BURNETT:  Candidly, nothing, because I

18  didn't know they were waiting on any discovery in that

19  matter.  And if you look at the --

20                    THE COURT:  Written discovery?  The

21  requests for production?  Interrogatories?  Any of that?

22  You didn't think they were waiting for that?

23                    MR. BURNETT:  I honestly didn't, Judge.  I

24  mean, I don't play discovery games.  You know I've been

25  down here for over 20 years.  I had no idea this

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
229 of 689

56

1  discovery was outstanding.  I've been trying to get up

2  to speed in all these cases.  I've had many discussions

3  with Mr. Bankston on the telephone about this and the

4  other cases, and there's never been a single mention,

5  hey, by the way, Michael, you owe me discovery on the

6  *Heslin* case or when can I take these depositions or

7  anything like that, nothing at all.  And the reason

8  why -- the reason why, I believe, they don't need

9  discovery.  If you look at the allegations that they're

10  making, there's no discovery that they need to be able

11  to show their allegation because it really comes down to

12  whether or not the Court finds that what the defendants

13  are alleged to have done is protected expressions of

14  opinion or alleged statements of fact.  I mean, the two

15  things are their client's interview that can't -- I

16  mean, there's no discovery from us on what that was when

17  he was on national TV.  And then the local medical

18  examiner, I mean, there was no discovery they need from

19  us on him saying it.  I mean, they don't allege that he

20  didn't say it.  They don't allege that we somehow messed

21  with the tape or altered the videotape or put someone

22  else up there that wasn't him or anything like that.

23  Those are the two pieces of information, and you don't

24  need any discovery to decide opinions or statements of

25  fact.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
230 of 689

57

1          And moreover, Judge, if you are going to

2     award fees, I think their fees request is excessive in

3     there.  And I'd like you to consider in assessing fees

4     any other sanctions against the defendants in this case

5     that they've done nothing in the last 30 something days

6     to try to get the discovery.

7          THE COURT:  No, it's just the affidavit

8     that he filed looking at whether he should be awarded --

9     plaintiff should be awarded some of these fees that are

10    highlighted here that are attributable to discovery

11    efforts that never occurred.

12          MR. BURNETT:  Right.

13          THE COURT:  That's his only argument.

14          MR. BURNETT:  Right, right.  And they sent

15    written request for discovery and that's it.

16          THE COURT:  No, no.  This is back what he

17    did in 2018.  I'm sure you've looked at the affidavit.

18    That's all he's asking for now, not asking for any

19    attorney's fees for this year, just what he did last

20    year to pursue the discovery he never got.

21          MR. BURNETT:  In the file I have, I don't

22    have a copy of that affidavit.  I'm sure it was filed.

23    I just don't have it.

24          THE COURT:  That's okay.  It's in the

25    clerk's file because that's where we printed it.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
231 of 689

58

1          MR. BURNETT:  And I don't doubt it.  And

2     there was also -- and I did read the transcript from

3     that hearing a year ago.  There was also a motion for

4     sanctions against him.  There seems to be a lot of going

5     back and forth on discovery abuse or whatever.  That's

6     not the way I operate.  That's not the way I practice.

7     I think the Court knows that.  I mean, you never see me

8     down here on a discovery abuse motion --

9          THE COURT:  You've gone beyond your five

10     minutes.  And I didn't mean to suggest earlier that you

11     personally have done anything wrong in the last 30 days.

12     But there are consequences to the way in which it has

13     been litigated up until now and where we are now versus

14     where we were a year ago.

15          MR. BURNETT:  And when you decide those --

16     and I believe you, and I agree with you.  But when you

17     decide what the consequences should be, I think you

18     should consider what discovery do they really need

19     that's germane to this motion and why -- if they needed

20     it, why have they not done anything in the last 30

21     something days to get ready for this hearing that they

22     know the statute better than I do has strict deadlines.

23     I think they were assuming I was going to blow right by

24     it.  I'm out of time.  Thank you, Judge.

25          THE COURT:  You really are.  All right.  I

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
232 of 689

59

1   need proposed orders.  I will consider granting the

2   motion for contempt under Rule 215.  You could call it a

3   motion for contempt or sanctions.  I guess you phrased

4   it actually in the file as a motion for contempt.  I

5   don't like that word.  It's such a -- such an incendiary

6   word.  Sanctions seems a little softer, but it is a

7   motion for contempt.  I'm considering granting it as

8   discussed with counsel, not to strike the motion to

9   dismiss, but simply to presume -- to make presumptions

10  that I'm allowed to make under Rule 215 about factual

11  allegations, which I think is sort of a belt and

12  suspenders approach to -- there's some benefit to that

13  for the plaintiff probably over and above the

14  stipulation about well-pleaded allegations, well-pleaded

15  factual allegations.

16            So I think -- I'm inclined to do that, and

17  then I need a blank for attorney's fees.  I will go back

18  and examine the affidavit and decide.  There will be

19  some attorney's fees because I think plaintiff fought

20  for discovery, won the right to get discovery, and never

21  got the discovery.  And probably a good idea to kind of

22  cut off the costs on that.  I'm not blaming you for

23  doing what you did, for doing the stipulation.  In fact,

24  that certainly simplified the case and that's good.  But

25  what I said earlier I think is true.  The plaintiff had

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
233 of 689

60

1 to expend a lot of effort and attorney's fees to get to

2 the point we're at now where we're simply ruling on the

3 motion to dismiss without the discovery.

4 MR. BURNETT:  Are you talking about a year

5 ago?

6 THE COURT:  Yes, that's right.  I'm

7 talking about the attorney's fees expended in the year

8 2018.  I will be awarding some of those fees.  So I need

9 an order sent to us at the court and also sent to

10 opposing counsel simultaneously.  Don't even need it

11 approved as to form.  I'll just decide whether I like it

12 or not.  And if I need to change it I will.  Send it in

13 a form that I can change it.  As you know, I've done

14 that before in other cases.  And it'll be signed.

15 I need orders on the motion to dismiss.

16 The plaintiff wants me to find that it was filed

17 frivolously and award all of the attorney's fees for

18 that.  That's probably not going to happen in light of

19 the procedural history for more than a year.  It's going

20 to be a grant or denial and not a denial and a finding

21 that it was frivolous.

22 If I -- so it's a simple order denying it.

23 It should be very simple.  Do I already have one of

24 those orders?

25 MR. BANKSTON:  You do, Your Honor, yes.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
234 of 689

61

1                  THE COURT:  Great.

2                  MR. BANKSTON:  With respect to the other

3    order, do you want me to submit another proposed copy of

4    the contempt taking out that higher sanction we talked

5    about?

6                  THE COURT:  Yes.  For one thing, take out

7    proposed order.

8                  MR. BANKSTON:  Yeah, okay, sure.

9                  THE COURT:  Write it as an order I can

10   sign --

11                 MR. BANKSTON:  Okay.

12                 THE COURT:  -- so that I can mess with it

13   to the extent necessary and sign it and be done with it.

14   And it would probably only have something along the

15   lines of Paragraph 1.

16                 MR. BANKSTON:  Okay.

17                 THE COURT:  Does that make sense?

18                 MR. BANKSTON:  It does.

19                 THE COURT:  Okay.  And the attorney's fees

20   blank.  And then I need -- I don't know that we need all

21   this on the record.  Do you need any more discussions on

22   the record about orders --

23                 MR. BANKSTON:  No, Your Honor.

24                 THE COURT:  -- or can we give the court

25   reporter a break?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
235 of 689

62

1                    MR. BURNETT:  I don't need anything on the

2    record.

3                    MR. BANKSTON:  I'm fine going off the

4    record.

5                    *(Discussion off the record, then*

6                    *court adjourned)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
236 of 689

63

1                    **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS  )

3  COUNTY OF TRAVIS    )

4                    I, Chavela V. Crain, Official Court

5  Reporter in and for the 53rd District Court of Travis

6  County, State of Texas, do hereby certify that the above

7  and foregoing contains a true and correct transcription

8  of all portions of evidence and other proceedings

9  requested in writing by counsel for the parties to be

10  included in this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13    I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, offered in evidence by the respective

16  parties.  I further certify that the total cost for the

17  preparation of this Reporter's Record is $402.00 and was

18  paid by counsel for defendants.

19    WITNESS MY OFFICIAL HAND this the 24th day of

20  November, 2019.

21
                        _/s/ Chavela V. Crain_____
22                      Chavela V. Crain, CSR, RDR, RMR, CRR
                        Texas CSR 3064
23                      Expiration Date:  12/31/2019
                        Official Court Reporter
24                      53rd District Court
                        Travis County, Texas
25                      P.O. Box 1748, Austin, Texas 78767
                        (512) 854-9322                    *

# EXHIBIT "3"

Filed in The District Court
of Travis County, Texas

OCT 18 2019 RT

At _____4:16 P. M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## ORDER ON PLAINTIFF'S MOTION FOR CONTEMPT UNDER RULE 215 AND DEFENDANTS' MOTION TO DISMISS UNDER THE TCPA

---

On October 3rd, 2019, the Court heard Plaintiff's Motion for Contempt Under Rule 215 and Defendants' Motion to Dismiss under the Texas Citizens Participation Act (TCPA Motion). After hearing the arguments of counsel and considering the record, the Court finds that the Motion for Contempt should be granted and the TCPA Motion should be denied.

It is hereby ORDERED that pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burdens in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion.

It is further ORDERED that pursuant to Rule 215.2(b)(8), the Court must require Defendants to pay the reasonable expenses, including attorney fees, caused by the failure to obey the August 31, 2018 order because the Court does not find that the failure was substantially justified or that other circumstances make an award of

expenses unjust. The Court orders costs and expenses of $25,875 to be paid by Defendants, to be taxed as costs of court.

It is further ORDERED that Defendants' TCPA Motion is in all respects DENIED.

It is further ORDERED that even without taking Plaintiff's burdens in responding to Defendants' TCPA Motion to be established in favor of Plaintiff pursuant to TRCP 215.2(b)(3), Defendants' TCPA Motion must nevertheless be, and is, DENIED.

So ORDERED October __18__, 2019.


Scott Jenkins
Travis County District Judge

# EXHIBIT "4"

ORDER    421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

5/14/2021

## ORDER

ORDER REGARDING:
11/12/2020 309.00 MOTION FOR ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

The obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the defendants have been precluded from pursuing special motions to dismiss.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# EXHIBIT "5"

ORDER    421277

DOCKET NO: UWYCV186046436S

SUPERIOR COURT

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

6/2/2021

<u>ORDER</u>

ORDER REGARDING:
06/01/2021 348.00 MOTION FOR PROTECTIVE ORDER PB 13-5

The foregoing, having been considered by the Court, is hereby:

ORDER:

The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due over two years ago. At no point in time following the decision of the Connecticut Supreme Court on July 23, 2020 did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs in their supplemental objection, the Jones defendants, in February and March of 2020, while their case was pending before the Connecticut Supreme Court and a court ordered stay of discovery was in effect, asked plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020 and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021 confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that this motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# EXHIBIT "6"

| NO.   X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
|---|---|---|
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | JUNE 2, 2021 |

_____

| NO.   X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | JUNE 2, 2021 |

_____

| NO.   X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | JUNE 2, 2021 |

## SUPPLEMENT TO OBJECTION TO EMERGENCY MOTION FOR PROTECTIVE ORDER

The plaintiffs file this Supplement in support of their Objection to the Jones Defendants' Emergency Motion for Protective Order.

In their Emergency Motion for Protective Order, the Jones defendants represent that "[d]efendants had interpreted the termination of the anti-SLAPP motion to have necessarily terminated the 'limited discovery' served in connection with that motion; *i.e.* it was a mooted request." DN 348, Def. Mot. at 2. That representation is not accurate.

Well after the Court struck their anti-SLAPP motion, the Jones defendants understood their obligation to comply with the limited discovery that was pending. In February 2020, ten months after the Court struck the Jones defendants' anti-SLAPP motion, the Jones defendants'

1

counsel contacted the plaintiffs' counsel concerning compliance with that discovery. On

February 13 and 21, 2020, Jones defendants' counsel Chris LaTronica contacted the plaintiffs'

counsel, indicated that the Jones defendants had identified an e-discovery provider to work with,

and asked that the plaintiffs' counsel confer with him concerning what specific formats would be

acceptable for production. See Ex. A, February 2020 LaTronica-Sterling Email Chain (2/13/20 at

5:21 PM; 2/21/20 at 3:37 PM; 2/22/20 at 6:03 PM). On March 10, Attorney LaTronica contacted

plaintiffs' counsel again and asked if counsel would provide him with "a complete set of

discovery requests up to this point?" Ex. B, March 2020 LaTronica-Mattei email chain (3/10/20

at 12:12 PM). He continued, "We are trying to recalibrate and clean up the file. I want to make

sure we have a productive conversation and are working off the same documents. Once I have

those, I will check them against the responses I have in the file, and be ready to discuss." *Id.*

Attorney Mattei responded, forwarding the Court's orders, and referring the Jones defendants'

counsel to the transcripts as well. *Id.*, 3/12/20 at 10:03 AM. Attorney LaTronica concluded the

exchange by stating: "As soon as I have a chance to summarize where we think we are with this

discovery, I will reach out to see if we concur." *Id.,* 3/12/20 at 11:37 AM.

In short, in February-March 2020, the Jones defendants perfectly understood their

obligation to respond to the plaintiffs' First Interrogatories and Requests for Production and

appeared to be working toward compliance. The Jones defendants' contention that they

"interpreted the termination of the anti-SLAPP motion to have necessarily terminated the

'limited discovery' served in connection with that motion," DN 348, Def. Mot. at 2, is not

accurate and should not be credited.

**THE PLAINTIFFS,**

By:     */s/ Alinor C. Sterling*
ALINOR C. STERLING
CHRISTOPHER M. MATTEI
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
Telephone:     (203) 336-4421
JURIS #32250

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

**For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:**
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
Phone: (702) 420-2001

**For Genesis Communications Network, Inc.:**
Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
mcerame@brignole.com
Phone: (860) 527-9973

*/s/ Alinor C. Sterling*
ALINOR C. STERLING
CHRISTOPHER M. MATTEI
MATTHEW S. BLUMENTHAL

# EXHIBIT A

On Sat, Feb 22, 2020 at 6:03 PM Alinor C. Sterling <ASterling@koskoff.com> wrote:

Hi Chris,

It's good news that the Jones Defendants have identified an ediscovery provider to work with.

We're happy to have any further conversation concerning discovery after you enter an appearance on behalf of the Jones defendants. Please be in touch once that is in place.

Sincerely,

Alinor

**Alinor Sterling** | Attorney at Law
**KOSKOFF KOSKOFF & BIEDER PC**
350 Fairfield Ave., Bridgeport, CT 06604
203.336.4421 | 203.368.3244 (fax)
www.koskoff.com

**From:** Chris La Tronica <cmlatronica.law@gmail.com>

**Date:** Friday, February 21, 2020 at 3:37 PM
**To:** Alinor Sterling <ASterling@koskoff.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Re: Sherlach/Lafferty V Jones

Alinor,

Good afternoon.  I hope all is well.  I have not heard back from you on this yet.  Please call me at 203-824-2574 if you did email me so I can double check my email spam filter.

I believe that we have identified a firm that we may be working with going forward to assist with discovery.  This firm indicates that they can work directly with whatever data firm your offices are using to get you any responsive files in the format you require.  In the alternative, if you want them to work directly with your office, can you let me know a point person for this?  Once they are engaged and have the data preliminary processed, they will not be able to move forward without know the specific format you are wanting any responsive data in (native, database, etc.)

Best

Chris

Chris M. La Tronica
Law Offices of Chris La Tronica
O: (203) 699-6684
C: (203) 824-2574
E: cmlatronica.law@gmail.com

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

On Thu, Feb 13, 2020 at 5:21 PM Chris La Tronica <cmlatronica.law@gmail.com> wrote:

> Alinor,
>
> Good afternoon.  I hope all is well.  I called your office, but reception said you had left for the day.  You probably don't remember me, I briefly introduced myself after the Supreme Court argument.  I am working with Norm to get discovery sorted in this case.  I cc'd him on this email just to put you at ease that I am working in that capacity.
>
> We here in the Jones camp are trying to use this time to make sure discovery is ready to go and in the format you require.  To that end, I am requesting information regarding the firm you

employed to process the emails we provided you earlier.

My purpose in asking for this information is so we can either 1) engage the firm for the
remainder of the discovery process (they know exactly what format you are looking for) OR 2)
have a separate firm we select contact them to make sure we get you exactly what you are
looking for.

My direct number is (203) 824-2574.  Feel free to call anytime so I can get this process started.
The goal is to avoid the quagmire we found ourselves in earlier.  Thanks.

Best

Chris

Chris M. La Tronica
Law Offices of Chris La Tronica
C: (203) 824-2574
E: cmlatronica.law@gmail.com

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and
confidential information intended only for the use of the individual(s) or entity named on
the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or
agent responsible for delivering it to the intended recipient, you are hereby notified that
reading it is strictly prohibited. If you have received this e-mail in error, please
immediately return it to the sender and delete it from your system. Thank you.

.

# EXHIBIT B

**From:** Chris La Tronica <cmlatronica.law@gmail.com>
**Date:** Thursday, March 12, 2020 at 11:37 AM
**To:** Christopher Mattei <CMattei@koskoff.com>
**Cc:** Alinor C. Sterling <ASterling@koskoff.com>, Matthew Blumenthal <mblumenthal@koskoff.com>, Meghan McGloin <MMcGloin@koskoff.com>, Kristin Percival <KPercival@Koskoff.com>, Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Re: FW: Sherlach/Lafferty V Jones

Chris,

No worries.  With the duplication of cases and number of filings in each, case details page can be difficult to navigate.  That's why I thought the most efficient thing to do was ask you to send a complete set of discovery requests, instead of assuming I would pick the most up to date version off that page.

As soon as I have a chance to summarize where we think we are with this discovery, I will reach out to see if we concur.

Best

Chris

Chris M. La Tronica
Law Offices of Chris La Tronica
O/C: (347) 973 2992

E: cmlatronica.law@gmail.com
W: cml.law

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

On Thu, Mar 12, 2020 at 11:31 AM Christopher Mattei <CMattei@koskoff.com> wrote:

My apologies. I didn't realize you had filed.

Chris



**Christopher M. Mattei** |Attorney at Law
KOSKOFF KOSKOFF & BIEDER PC
350 Fairfield Ave. Bridgeport, CT 06604
203.336.4421 | 203.368.3244 (fax)
**www.koskoff.com**

THIS MESSAGE IS ONLY FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION. Any dissemination, distribution or copying of this communication other than by the intended recipient(s) is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (collect), and destroy all copies of this communication. Thank you.

**From:** Chris La Tronica <cmlatronica.law@gmail.com>
**Sent:** Thursday, March 12, 2020 11:30 AM
**To:** Christopher Mattei <CMattei@koskoff.com>
**Cc:** Alinor C. Sterling <ASterling@koskoff.com>; Matthew Blumenthal <mblumenthal@koskoff.com>; Meghan McGloin <MMcGloin@koskoff.com>; Kristin Percival <KPercival@Koskoff.com>; Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Re: FW: Sherlach/Lafferty V Jones

Chris,

Not in addition to the one I already entered.

Chris M. La Tronica
Law Offices of Chris La Tronica
O/C: (347) 973 2992

E: cmlatronica.law@gmail.com
W: cml.law

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

On Thu, Mar 12, 2020 at 11:20 AM Christopher Mattei <CMattei@koskoff.com> wrote:

Chris,

Do you intend to enter an appearance?

Chris



**Christopher M. Mattei** |Attorney at Law
KOSKOFF KOSKOFF & BIEDER PC
350 Fairfield Ave. Bridgeport, CT 06604
203.336.4421 | 203.368.3244 (fax)
**www.koskoff.com**

THIS MESSAGE IS ONLY FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION. Any dissemination, distribution or copying of this communication other than by the intended recipient(s) is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (collect), and destroy all copies of this communication. Thank you.

**From:** Chris La Tronica <cmlatronica.law@gmail.com>
**Sent:** Thursday, March 12, 2020 10:27 AM
**To:** Christopher Mattei <CMattei@koskoff.com>
**Cc:** Alinor C. Sterling <ASterling@koskoff.com>; Matthew Blumenthal <mblumenthal@koskoff.com>; Meghan McGloin <MMcGloin@koskoff.com>; Kristin Percival <KPercival@Koskoff.com>; Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Re: FW: Sherlach/Lafferty V Jones

Chris,

Thanks for this.  It will help to make sure we are all on the same page.

For the sake of clarity, I am not an associate at Pattis & Smith.  I am a solo practitioner based out of Brooklyn.  In order to keep everyone on the same page, please make sure you include Norm on any emails, recalled or otherwise.

Best

Chris

Chris M. La Tronica
Law Offices of Chris La Tronica
O/C: (347) 973 2992
E: cmlatronica.law@gmail.com
W: cml.law

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.


On Thu, Mar 12, 2020 at 10:03 AM Christopher Mattei <CMattei@koskoff.com> wrote:

> Chris,
>
> I'm attaching the discovery requests approved by Judge Bellis. However, you should review the transcripts and most recent pleadings for further guidance.
>
> Chris
>
> 
>
> **Christopher M. Mattei** |Attorney at Law
> KOSKOFF KOSKOFF & BIEDER PC
> 350 Fairfield Ave. Bridgeport, CT 06604
> 203.336.4421 | 203.368.3244 (fax)
> **www.koskoff.com**
>
> THIS MESSAGE IS ONLY FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION. Any dissemination, distribution or copying of this communication other than by the intended recipient(s) is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (collect), and destroy all copies of this communication. Thank you.

**From:** Chris La Tronica <cmlatronica.law@gmail.com>
**Sent:** Tuesday, March 10, 2020 12:12 PM
**To:** Christopher Mattei <CMattei@koskoff.com>
**Cc:** Norm Pattis <NPattis@pattisandsmith.com>
**Subject:** Re: Sherlach/Lafferty V Jones

Chris,

Good morning.  Can you please resend me a complete set of discovery requests up to this point?
We are trying to recalibrate and clean up the file.  I want to make sure we have a productive
conversation and are working off the same documents.  Once I have those, I will check them
against the responses I have in the file, and be ready to discuss.

Best

Chris

Chris M. La Tronica
Law Offices of Chris La Tronica
O/C: (347) 973 2992
E: cmlatronica.law@gmail.com
W: cml.law

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and
confidential information intended only for the use of the individual(s) or entity named on
the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent
responsible for delivering it to the intended recipient, you are hereby notified that reading it
is strictly prohibited. If you have received this e-mail in error, please immediately return it

to the sender and delete it from your system. Thank you.

On Mon, Mar 9, 2020 at 2:29 PM Christopher Mattei <CMattei@koskoff.com> wrote:

Chris,

I haven't heard back from you on this. Can we schedule a time to discuss
outstanding discovery items?

Thanks.

Chris



**Christopher M. Mattei** |Attorney at Law
KOSKOFF KOSKOFF & BIEDER PC
350 Fairfield Ave. Bridgeport, CT 06604
203.336.4421 | 203.368.3244 (fax)
**www.koskoff.com**

THIS MESSAGE IS ONLY FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN CONFIDENTIAL
AND PRIVILEGED INFORMATION. Any dissemination, distribution or copying of this communication other
than by the intended recipient(s) is strictly prohibited. If you have received this communication in error,
please notify us immediately by telephone (collect), and destroy all copies of this communication. Thank you.

# EXHIBIT "7"

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
260 of 689

1

# 03-20-00008-CV
REPORTER'S RECORD
VOLUME 3 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-19-004651
COURT OF APPEALS NO. 03-20-00008-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/21/2020 3:48:25 PM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| NEIL HESLIN, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | |
| | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| ALEX E. JONES, INFOWARS, | ) | |
| LLC, and FREE SPEECH | ) | |
| SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants | ) | 261ST JUDICIAL DISTRICT |

-------------------------------------------------

HEARING ON MOTION TO DISMISS AND

MOTION FOR SANCTIONS

-------------------------------------------------

On the 18th day of December, 2019, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

Proceedings reported by machine shorthand.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
261 of 689

2

1                **A P P E A R A N C E S**

2

   FOR THE PLAINTIFF:
3

          MARK D. BANKSTON
4         SBOT NO. 24071066
          WILLIAM OGDEN
5         SBOT NO. 24073531
          KASTER, LYNCH, FARRAR & BALL
6         1010 Lamar, Suite 1600
          Houston, Texas  77002
7         (713) 221-8300

8

9  FOR THE DEFENDANTS:

10         T. WADE JEFFERIES
           SBOT NO. 00790962
11         LAW FIRM OF T. WADE JEFFERIES
           401 Congress Avenue, Suite 1540
12         Austin, Texas  78701
           (512) 201-2727
13
           MICHAEL BURNETT
14         SBOT NO. 00790399
           BURNETT TURNER
15         6034 W. Courtyard Dr., Suite 140
           Austin, Texas  78730
16         (512) 472-5060

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
262 of 689

3

# I N D E X

## VOLUME 3

### HEARING ON MOTION TO DISMISS AND
### MOTION FOR SANCTIONS

### DECEMBER 18, 2019

|  | Page | Vol. |
|---|---|---|
| Announcements......................... | 4 | 3 |
| Argument by Mr. Jefferies.............. | 9 | 3 |
| Argument by Mr. Bankston............... | 25 | 3 |
| Further Argument by Mr. Jefferies...... | 77 | 3 |

**DEFENDANTS' WITNESSES**

|  | Direct | Cross | Vol. |
|---|---|---|---|
| WADE JEFFERIES | | | |
| By Mr. Burnett | 82 | | 3 |
| By Mr. Ogden | | 85 | 3 |
| MICHAEL BURNETT | | | |
| By Mr. Burnett | 90 | | 3 |
| By Mr. Ogden | | 101 | 3 |

|  | Page | Vol. |
|---|---|---|
| Closing Argument by Mr. Bankston....... | 110 | 3 |
| Closing Argument by Mr. Jefferies...... | 118 | 3 |
| Court Takes Matters Under Advisement... | 121 | 3 |
| Adjournment........................... | 122 | 3 |
| Court Reporter's Certificate.......... | 123 | 3 |

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
263 of 689

4

**EXHIBIT INDEX**

**DEFENDANTS'**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 1 | Declaration of Mark Bankston | 92 | 92 | 3 |

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
264 of 689

5

1                        **PROCEEDINGS**

2              THE COURT:  We are on the record in

3    Cause No. GN-19-4651 styled Neil Heslin vs. Alex E.

4    Jones, InfoWars, LLC, and Free Speech Systems, LLC.

5    Would you announce your presence for the record

6    beginning with counsel for plaintiff.

7              MR. BANKSTON:  Mark Bankston on behalf of

8    the plaintiff.

9              MR. OGDEN:  And Bill Ogden on behalf of

10   the plaintiff.

11             MR. JEFFERIES:  Wade Jeffries and Michael

12   Burnett on behalf of the defendants.

13             THE COURT:  All right.  Thank you,

14   Counsel.  We just had a very collegial discussion before

15   going on the record to confirm our order of business in

16   this hearing.  This is a resumption of the hearing that

17   was initiated or started in October on defendants'

18   motion to dismiss.  It's the motion that was filed on

19   September 6th.  Plaintiff filed a response on

20   September 30th.  We had a hearing in October, following

21   which -- we also had a hearing on defendants' Rule 91a

22   motion to dismiss.  We all agree that is under

23   advisement.  There will be no additional argument on the

24   91a motion today.  We're here exclusively following the

25   order which I issued that was filed on October 18th,

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
265 of 689

6

1  order on plaintiff's motion for expedited discovery,

2  et cetera.

3          You've gone forth to do some discovery.

4  You're now back to resume argument on the motion to

5  dismiss.  And in addition, there is a new motion filed,

6  which is plaintiff's motion for sanctions and motion for

7  default judgment, all one motion, filed a week ago

8  Monday to which defendants filed a response late last

9  night and again early this morning both of which I've

10  read.  I've read both responses.  Of course, I read the

11  motion for sanctions.  I won't say I read every one of

12  the 600 and some-odd pages attached to the motion for

13  sanctions, but I read salient portions, particularly,

14  for example, Exhibit 24 was referenced by one of you

15  about the do not destroy letter that was actually sent

16  in another case, not in this case.  But I went and

17  looked at that because I thought you'd want me to be

18  prepared for that.  In addition, of course, I read the

19  *Brookshire* opinion which you both discuss in your

20  motions for sanctions.

21          So I've read this.  And now you wish to

22  make some brief argument.  You've agreed that you don't

23  need a lot of time for argument, but you do want to put

24  on three witnesses.  I was told by counsel for

25  defendants you want to put on basically just three

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 266 of 689

7

```
 1   lawyer witnesses.  You, right, Mr. Jeffries?

 2              MR. JEFFERIES:  Correct.

 3              THE COURT:  And also Mr. Burnett and

 4   counsel for plaintiff.

 5              MR. JEFFERIES:  Correct.

 6              THE COURT:  Just those three witnesses.

 7              MR. JEFFERIES:  Correct, Judge.

 8              THE COURT:  You wish to make a brief

 9   argument on those motions.  We've agreed that because

10   the defendants have the burden of persuasion on the

11   motion to dismiss, which is the main motion, and because

12   the motion for sanctions is inextricably intertwined

13   with that, that the defendants will get the last word.

14              And I understand plaintiffs filed

15   supplemental exhibits at 10:00 a.m. this morning.

16   You'll have to walk me through that because I had two

17   different family law cases this morning, so I've read

18   all of this in my spare time last night and on breaks

19   today.

20              So with that, that's what we have before

21   us.  And I think I told you at the beginning because

22   these cases have been extensively argued -- the *Scarlett*

23   *Lewis* case was an IIED case also.  And I also have

24   *Heslin 1.*  And no one for a minute could think that if

25   this case is ever tried it's not going to be a single
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
267 of 689

8

1 case, Heslin against the defendants.  We discussed that

2 at the prior hearing too.  And because I've heard

3 extensive arguments on all these different claims,

4 *Heslin 1* being a defamation case, *Heslin 2,* the case

5 today, being an IIED case similar to *Scarlett Lewis*, I'm

6 going to be uncharacteristically quiet.  But I must say

7 many of the questions I posed and observations made in

8 these other cases are pertinent now and I don't -- I

9 just don't think I need to repeat them.

10          So that's what I plan to do.  With that,

11 I'm going to turn it over to you.  And you've agreed

12 that with your witnesses and argument and everything you

13 will confine every bit of time you're going to use today

14 in an hour and 20 minutes for the defendants and an hour

15 and 20 minutes for the plaintiff.  Is that correct?

16          MR. JEFFERIES:  That's correct, Judge.

17          MR. BANKSTON:  Yes, Judge.

18          THE COURT:  I will keep track of your

19 time.  I'm not going to micromanage how you use it.  But

20 we all agree that the defendants, getting the last word,

21 the final few minutes of this case this afternoon, you

22 will not get more than just a few minutes to get the

23 final word, five, ten at most.  Agreed?

24          MR. JEFFERIES:  Agreed, Judge.

25          THE COURT:  All right.  With that, I'm

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 268 of 689

9

1  going to keep track of the clock now, and you may

2  proceed.

3            MR. JEFFERIES:  Okay.  Judge, just

4  briefly, may it please the Court.  Again, Wade

5  Jefferies.  As you know, I'm relatively new to this

6  case.  Anyway, I read the transcript of the prior

7  hearing on motion to dismiss and the TCPA motion that

8  was back in October.  That was continued when the judge

9  ordered discovery under the TCPA motion.  So again, very

10  brief argument on that issue.  I did want to point the

11  Court and I provided your staff attorney with a copy of

12  a case.  I didn't see it cited in any of the pleadings,

13  but I do think it's relevant to our TCPA motion.  That's

14  the *Creditwatch, Inc. v. Jackson* case, Supreme Court of

15  Texas, decided February 25th, 2005.

16            THE COURT:  I believe that case has been

17  cited among all of the Sandy Hook cases.  It was cited

18  somewhere because I remember it.

19            MR. JEFFERIES:  Okay.  And, Judge, bear in

20  mind, I'm still playing catch-up on all four of these,

21  so I apologize if it's already been cited.

22            So again, the reason I wanted to bring

23  that up is when I read the transcript of the prior

24  motion that Mr. Burnett was arguing, you know, one of

25  his big pushes for the motion is, Judge, IIED is a gap

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
269 of 689

10

1  filler and isn't appropriate for Mr. Heslin because he

2  already has a defamation case on file in '18.

3              THE COURT:  For some conduct, but not for

4  some of the conduct alleged in *Heslin 2*.

5              MR. JEFFERIES:  That's correct.  However,

6  my reading of *Creditwatch*, et cetera was that's

7  irrelevant.  He has got a claim on file.  And according

8  to *Creditwatch*, again, you know -- basically *Creditwatch*

9  is a sexual harassment claim.  She tried to bring

10  various actions under the Human Rights Act Commission --

11              THE COURT:  But wasn't it the same conduct

12  for which they were being sued?

13              MR. JEFFERIES:  It was the same conduct.

14              THE COURT:  And isn't that distinction in

15  this case?  I told you I wasn't going to ask questions,

16  but here I am doing it anyway.  I guess I just can't

17  help myself.  You see my question.

18              MR. JEFFERIES:  I see your question, and

19  let me try to answer it to the best of my ability.

20              THE COURT:  And I think we discussed this

21  in October too.

22              MR. JEFFERIES:  Okay.  Yes.  And, Judge,

23  the reason I think there is a distinction is because

24  when she filed -- or excuse me -- when he filed his case

25  in '18, he knew of the conduct now complained of, okay?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
270 of 689

11

1  So again, just because he had ability, regardless if

2  it's barred by the statute of limitations, he waited to

3  file, et cetera, if he had an alternate route that he

4  could have filed a lawsuit on, and even if he didn't do

5  so -- let's assume he didn't even file *Heslin* in '18,

6  okay?  Since clearly he's got a defamation cause of

7  action according to him that he's pled and he's argued,

8  whether or not he wins, loses, is barred by the statute

9  of limitations, at the end of the day it doesn't matter.

10 According to *Creditwatch*, just because other avenues may

11 be barred, that doesn't give him a right to file an IIED

12 claim.

13        THE COURT:  Well, let's assume it's all

14 one case because we all know if this case is ever tried

15 it will not be -- there will not be a *Heslin 1* trial and

16 then a *Heslin 2* trial.  There will be one *Heslin* trial.

17        MR. JEFFERIES:  It will be consolidated.

18        THE COURT:  Exactly.  I think we all know

19 eventually it will be consolidated.  I'm even getting

20 some affirmation signs from the plaintiff's side as I

21 say this.  So let's assume it's all one pleading.  Your

22 argument is because there are different discrete conduct

23 by the defendants, some of which cannot give rise to a

24 defamation case, even -- because there are some --

25 there's some conduct that does give rise to a defamation

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 271 of 689

12

1  case, no one can ever sue for IIED for separate and

2  discrete conduct, separate and discrete acts that are

3  not defamatory acts but instead could arguably be an

4  IIED claim.

5          MR. JEFFERIES:  Your Honor, I would

6  disagree that in this particular case they couldn't sue

7  under those things for defamation.  That being said, my

8  argument would be -- my follow-up argument would be the

9  acts they allege of in their petition as a matter of law

10 don't rise to the level of outrageousness.

11         THE COURT:  That's a different argument.

12         MR. JEFFERIES:  No, it is a different

13 argument.

14         THE COURT:  All right.

15         MR. JEFFERIES:  But again, sort of

16 addressing both, you're required to have an IIED case.

17 And specifically, again, in *Creditwatch* the Court states

18 we certainly understand judicial reticence to dismiss

19 claims like this one stemming from heinous acts, but

20 except in circumstances bordering on serious criminal

21 acts, we repeat that such acts will rarely have merit as

22 intentional infliction claims.

23         So, yeah, that's my only argument,

24 Your Honor.  I wanted to bring the cases.  It sounds

25 like the judge has already read it and is familiar with

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 272 of 689

13

1　it.  But yes, my argument would be under either

2　scenario, *Heslin 2* as a matter of law is not proper to

3　go forward and should be dismissed.  Okay.

4　　　　　　　　THE COURT:  Anything else on the motion

5　for sanctions you wish to say before we get --

6　　　　　　　　MR. JEFFERIES:  Oh, I --

7　　　　　　　　THE COURT:  -- before we go to evidence?

8　　　　　　　　MR. JEFFERIES:  Absolutely, Judge, just

9　briefly.

10　　　　　　　　THE COURT:  Go ahead.

11　　　　　　　　MR. JEFFERIES:  Particularly, the first

12　part of the motion for sanctions is basically that my

13　clients spoliated evidence, okay?  And I understand the

14　Court's read the file, et cetera, 615 some pages of

15　exhibits, but a couple of small things I do want to

16　point out to the Court that I think is very important.

17　One is I think that they seriously misrepresent

18　Mr. Zimmerman, who is the IT professional who testified.

19　　　　　　　　THE COURT:  I read your response that

20　there are all these backups --

21　　　　　　　　MR. JEFFERIES:  Correct.  Correct.

22　　　　　　　　THE COURT:  -- and the data is still

23　there.

24　　　　　　　　MR. JEFFERIES:  Correct.  And in fact, the

25　issue I've got and what I want to point out to the Court

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
273 of 689

14

 1  is, you know, they basically quoted a very -- they

 2  misquoted him in their motion for sanctions and I take

 3  issue with that.  And they basically misquoted him

 4  saying they took no efforts to secure their server prior

 5  to April of this year when he made a -- when he did a

 6  full backup of the email server.  It starts on Page 34

 7  of the motion, Judge, for sanctions.  Here we go.  I'm

 8  sorry.  It's on Page 31.

 9          On Page 31 at the bottom about ten lines

10  out they state IT director Michael Zimmerman testified

11  that the first time Free Speech Systems, LLC took any

12  effort to preserve its email server was at the beginning

13  of this year during discovery in *Lewis* almost a year

14  after it's been sued, and then they cite to his

15  deposition.

16          That is just a false misrepresentation to

17  the Court.  His deposition testimony, which is in the

18  618 pages, but if you look starting on Page 39, the

19  question asked is, Question by Mr. Ogden:  Earlier you

20  testified that the email backup was done in January of

21  2019, correct?

22          Answer:  January, February, sometime

23  earlier this year.

24          Question:  At no point between April of

25  2018 and that time were steps taken to preserve any

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
274 of 689

15

1  evidence?

2          His answer:  Periodic backups of the email

3  system were done frequently.

4          Okay.  Why then would you need to build a

5  backup other than the periodic backups?

6          His answer:  Searching on the server

7  itself is very time intensive.  With 9.6 million emails

8  or 9.3, somewhere in that range, it is a lot more

9  effective to pull that over to a different system than

10 to perform the searches on the system.

11         Question:  So the backup that was done

12 earlier this year, that was just for the availability to

13 help you search all these --

14         Effectively, yeah.

15         Okay.

16         So, again, it's clear from the transcript

17 what he did was he created a copy of their email backup

18 in order to more efficiently try to find these emails.

19         THE COURT:  It's easier to search.  I

20 understood.

21         MR. JEFFERIES:  Okay.  Yes, they're

22 representing in their motion that he spoliated the

23 evidence, so I think that's an important point to make.

24         They then go -- they also indicate in

25 their motion, and I'm sure you've read it in

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
275 of 689

16

1 Mr. Zimmerman's affidavit, that from time to time
2 computers need to be repurposed.  And Mr. Zimmerman even
3 testified that when that happened he would in fact
4 reload a new operating system and new program files onto
5 those new computers, okay?  Well, obviously the
6 follow-up question was asked, and that's addressed in
7 Mr. Zimmerman's affidavit, that the employees at Free
8 Speech Systems, which is the parent company that owns
9 InfoWars, so whether you call it Free Speech or
10 InfoWars -- the employees all have portable hard drives
11 where the data is kept.  So the mere fact that you'd go
12 when you've got an aging computer or a hard drive or
13 something that happens to that computer and you
14 repurpose that computer or even replace that computer,
15 there's no evidence there whatsoever of any data loss or
16 spoliation.  Based on Mr. Zimmerman's affidavit, it's
17 clear they use external hard drives that still exist.
18 Again, no evidence of spoliation.  I think that's
19 critical.
20          They then talk about that we deleted
21 various data from internal chat systems that the
22 employees used to communicate.  There are two that are
23 referenced in this case, Your Honor.  The first one is
24 called Slack messaging system.  And again, that's the
25 interim.  And the second one is Rocket.Chat.  Okay.  And

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
276 of 689

17

 1  again, Mr. Zimmerman's affidavit makes clear after his

 2  deposition, after I was involved in the case and I met

 3  with him, he's still able to access the Slack data.  So

 4  none of that's been destroyed.  That is still available

 5  and recoverable, so we don't have a spoliation issue

 6  there.  Likewise on RocketChat, same thing, all the data

 7  has been preserved.

 8          So, again, on the spoliation claims,

 9  Your Honor, I just want to address there is no proper

10  evidence before the Court that in fact any spoliation

11  has occurred.  The last issue on that is they argue that

12  because the YouTube video archive has been deleted -- or

13  is no longer available to my client, that that somehow

14  constitutes spoliation.  Again, it's my understanding --

15  and, in fact, Mr. Zimmerman's affidavit states clearly

16  that everything that was uploaded to YouTube, Free

17  Speech Systems or InfoWars still has on their servers,

18  so that data is still available.

19          Furthermore, regarding their argument

20  regarding spoliation that we were somehow negligent or

21  intentionally allowed data to be destroyed when we

22  didn't do a backup of Facebook and some of the other

23  third-party accounts before this new platform, again,

24  *Brookshire* is clear.  For spoliation to occur, one of

25  the things the Court should look at is to determine

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 277 of 689

18

1 whether or not that evidence is available from the

2 third-party source. So we've got the YouTube. That's

3 clear from Mr. Zimmerman's affidavit. As far as

4 Facebook, Twitter, et cetera, my guess is once an

5 issue -- a subpoena is issued to those third companies,

6 that that is going to be there.

7 As the Court knows, in 2019, once data has

8 sort of been uploaded onto the Internet, it rarely goes

9 away for good. So I'm confident that it's going to be

10 found; and therefore, spoliation shouldn't apply. So

11 briefly I just wanted to address all the issues, Judge.

12 I will now call Mr. Burnett to the stand.

13 THE COURT: Well, before you do that, you

14 might want to address -- and they get to argue first

15 before you start calling witnesses.

16 MR. JEFFERIES: Okay. Fair enough.

17 THE COURT: So I'll let them do that.

18 MR. JEFFERIES: Okay.

19 THE COURT: But you addressed the

20 spoliation. What you didn't address that was

21 disconcerting to me is the -- my order says that Free

22 Speech Systems must produce a corporate

23 representative -- this is on October 18th, the order --

24 who is prepared to testify about the following topics.

25 And the first one is the sourcing and research for the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 278 of 689

19

1  videos described in plaintiff's petition.  And my

2  reading of this indicates that corporate rep wasn't

3  prepared to discuss any of that, was just completely --

4  and I'm sorry to pick on your co-counsel at the table,

5  but some of the questions suggested I didn't understand

6  I was supposed to do this.  And that is a --

7                    MR. JEFFERIES:  Yeah, and --

8                    THE COURT:  That to me struck me as a

9  massive failure to communicate.  I don't know why it

10  happened, but I found it very disconcerting since the

11  order was so specific about that.

12                    MR. JEFFERIES:  Understood.

13                    THE COURT:  And that isn't spoliation;

14  that's just declining to follow a court order and

15  produce the discovery that's ordered.

16                    MR. JEFFERIES:  I understand.

17                    THE COURT:  Do you see what I mean?

18                    MR. JEFFERIES:  I understand completely,

19  Judge.

20                    THE COURT:  All right.

21                    MR. JEFFERIES:  And let me respond to

22  that.  First of all, Mr. Burnett had nothing to do with

23  that.  I said first of all -- first of all, I'm sure the

24  Court has read in their motion for sanctions and for

25  default judgment that Mr. Barnes was terminated the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
279 of 689

20

1  night before those depositions.  Robert Barnes.

2                    THE COURT:  Yes.

3                    MR. JEFFERIES:  Okay, okay.

4                    THE COURT:  But Mr. Burnett was at the

5  hearing in October --

6                    MR. JEFFERIES:  He was at the hearing, but

7  Mr. --

8                    THE COURT:  -- and when I issued this

9  discovery order, right?

10                    MR. JEFFERIES:  That's correct,

11  Your Honor.

12                    THE COURT:  I just don't think the

13  discovery order could be any more clear.  It's at the

14  bottom of Page 1.  It's just like clear as can be what

15  you're supposed to do.

16                    MR. JEFFERIES:  Correct.

17                    THE COURT:  So why wasn't it done, is my

18  question?

19                    MR. JEFFERIES:  I can't answer that.  It

20  should have been done.  I don't think any fault goes on

21  Mr. Burnett.  Again --

22                    THE COURT:  Well, it's somebody's fault.

23  I think we can agree it's somebody's fault and that part

24  of the order was not complied with.

25                    MR. JEFFERIES:  I agree, Judge.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg
280 of 689

21

```
 1                    THE COURT:  Do you agree?

 2                    MR. JEFFERIES:  I agree.

 3                    THE COURT:  I appreciate that.

 4                    MR. JEFFERIES:  I agree with that, Judge.

 5   There's no way to argue around that.  If I could I

 6   would.  I may could give it a best shot, but you're

 7   right.  I mean, the reality is he was unable to answer

 8   the questions at the deposition.  The transcript is

 9   clear on that point.

10                    THE COURT:  Well, good lawyers fall on

11   their swords --

12                    MR. JEFFERIES:  Okay.

13                    THE COURT:  -- or have their clients fall

14   on their sword.  So the order was not complied with.

15   Now the question is:  What is the remedy for that?

16                    MR. JEFFERIES:  Sure.

17                    THE COURT:  And their motion for

18   sanctions, even if I don't go with them on spoliation,

19   you basically just conceded, well, the plaintiff is

20   right, they didn't comply with the court order under

21   4(a), for example --

22                    MR. JEFFERIES:  Correct.

23                    THE COURT:  -- and so a sanction must flow

24   from that, right?  What should it be?

25                    MR. JEFFERIES:  Sure.  Well, first of all,
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
281 of 689

22

1  it definitely should not be the death penalty sanction.

2  I do want to point out this is the first motion for

3  sanctions in this case.

4  THE COURT:  I understand.

5  MR. JEFFERIES:  I know there were some

6  others in --

7  THE COURT:  And I read *Transamerica* many

8  years ago and I went back -- thank you for making me do

9  it -- and reread *Brookshire* last night at home.

10  MR. JEFFERIES:  Okay.  Okay.

11  THE COURT:  It was very interesting.  It's

12  a long opinion.

13  MR. JEFFERIES:  Yes.

14  THE COURT:  So I read that and I

15  understand.  You know, the end sanction, that there's a

16  continuum and courts should really consider -- if

17  there's something less draconian on the continuum that

18  will accomplish the same purpose, I'm supposed to do

19  that.

20  MR. JEFFERIES:  Right.

21  THE COURT:  I'll pick on the other side

22  about that.  So it's not default.  What is it?

23  MR. JEFFERIES:  I would argue, Your Honor,

24  that the appropriate sanctions would be a ruling that as

25  a result of that they meet their *prima facie* burden

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
282 of 689

23

 1  under the TCPA.

 2          THE COURT:  Well, wouldn't that mean you

 3  wouldn't have any basis to appeal it then?  In other

 4  words, if I deny the motion -- so that means I should

 5  deny the motion to dismiss.  If they had met their

 6  *prima facie* burden, the motion should be denied.

 7          MR. JEFFERIES:  Well, Your Honor, we still

 8  have under the TCPA motion -- if your decision regarding

 9  sanctions is a result of the corporate rep not being

10  prepared, under the TCPA rules, even if you say because

11  of that they've met their *prima facie*, I've got the

12  right to argue affirmative defenses.

13          THE COURT:  I get that.  And that gets

14  back to your legal arguments --

15          MR. JEFFERIES:  Bingo, correct.

16          THE COURT:  -- that you believe are

17  dispositive.

18          MR. JEFFERIES:  Correct.

19          THE COURT:  I understand your position.

20          MR. JEFFERIES:  Okay.  Thank you.

21          THE COURT:  And I appreciate that.

22          MR. JEFFERIES:  Okay.  Sure.  Thank you.

23          THE COURT:  So really I could do much of

24  what -- like what was done in *Heslin 1* --

25          MR. JEFFERIES:  Correct.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 283 of 689

24

1          THE COURT:  -- because under Rule 215 one

2  can presume that had that discovery been complied with,

3  had -- I guess it was Rob Dew who didn't have a clue how

4  to answer the questions, and so that corporate rep

5  couldn't answer the questions and therefore you did not

6  comply -- the defendants did not comply with 4(a) of my

7  order, I -- that would lead to an order much like I did

8  in *Heslin 1*, which is -- under Rule 215, you can presume

9  that they met their burdens.  Exactly what you just

10  said --

11          MR. JEFFERIES:  Right.

12          THE COURT:  -- can go in the order.

13          MR. JEFFERIES:  The Court clearly has the

14  authority to do that, correct, Judge.

15          THE COURT:  Okay.  Thank you.

16          MR. JEFFERIES:  And again, you know, my

17  argument is -- and just to follow up and then I'll be

18  done with my argument.  It should be the last prong of

19  their motion.  You know, what do you do?  They attempt,

20  I think extremely inappropriately, to bootstrap in other

21  cases into this case.  I think under the *Brookshire*

22  opinion it's clear that it's the Court's responsibility

23  to look at the conduct of this case, certainly not the

24  conduct that occurs out in the Connecticut lawsuit, but

25  in this case and this case alone.  As you know,

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 284 of 689

25

1  you know, in *Brookshire* and it's Texas policy that

2  absent, you know, lesser sanctions moving forward, you

3  want to try the case on its merits, not by default.

4             So now I understand that they get to

5  argue, and then I'll put on my evidence?  That's the way

6  we're going to proceed?

7             THE COURT:  Yes.

8             MR. JEFFERIES:  Okay.  Nothing further at

9  this point, Judge.

10             THE COURT:  Thank you.  Do you wish to

11  make an opening argument?

12             MR. BANKSTON:  Yes, Your Honor.  As part

13  of the first part of it I'm going to present some slides

14  to you to sort of get us up to speed.

15             THE COURT:  Just argument slides?

16             MR. BANKSTON:  Yes, exactly.  PowerPoint,

17  I think, yes.

18             THE COURT:  Are these things that were

19  attached to the motion or referenced in the motion?

20             MR. BANKSTON:  These are visual aids of

21  the exhibits that I filed this morning.

22             THE COURT:  Ah, the ones you filed at

23  10:00 a.m. this morning.

24             MR. BANKSTON:  Correct.

25             THE COURT:  Okay.  That's probably a good

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
285 of 689

26

1  thing to walk me through since it came in so recently.

2              MR. BANKSTON:  Exactly.  Exactly.

3              THE COURT:  All right.

4              MR. BANKSTON:  So I'm going to have

5  Mr. Ogden bring up the PowerPoint.  I'm hoping that's

6  going to be up on your screen.

7              THE COURT:  Yes, and it should be on the

8  screen on counsel table too for their convenience.

9              MR. BANKSTON:  Your Honor, may it please

10  the Court.  The elephant in the room is Robert Barnes.

11  We heard from counsel -- it was asked, why didn't this

12  get done?  Why weren't they prepared?  And the obvious

13  answer to that is because Robert Barnes was totally

14  responsible for that.  The lawyers who were signed as

15  attorney of record in this case did not have

16  responsibility for that.  They didn't do that.

17              THE COURT:  Which lawyer appeared with the

18  corporate rep for Free Speech Systems?

19              MR. BANKSTON:  That would be

20  Mr. Jefferies.  Mr. Jefferies --

21              MR. JEFFERIES:  *(Stood up)*.

22              THE COURT:  It's not your turn.  You'll

23  get to speak again when it is your turn, but they're

24  burning their time now.  Go ahead.

25              MR. BANKSTON:  That night before the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
286 of 689

27

1   deposition, I got an email from Mr. Jeffries saying that

2   he would be appearing and not Mr. Barnes and that he was

3   then taking over control of the case.  So from that

4   night apparently when Mr. Jeffries had discovered that

5   Mr. Barnes had completely botched discovery is when

6   Mr. Barnes was officially terminated, or so we're led to

7   believe, and Mr. Jefferies --

8           THE COURT:  So what you're saying is I can

9   infer that Mr. Barnes is the one who did not adequately

10  prepare a corporate rep.

11          MR. BANKSTON:  I believe that's true.  I

12  don't think there's any way you can infer anything else.

13  I don't believe that you're going to have testimony from

14  either of these counsels that they spent time with any

15  of the deponents or did anything in terms of discovery.

16          What we had here is you remember we had

17  Mr. Barnes back in *Lewis* who was *pro hac*.  He didn't

18  come do *pro hac* in this case because of what happened in

19  our case, plus things that continued to happen over that

20  summer.  He didn't want to come back in front of this

21  Court.  So instead he found some local counsel who would

22  just put the names on his discovery and that's what

23  happened.

24          So I want to walk you through the history

25  of how this came to happen and how it's been so harmful

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
287 of 689

28

1  to the plaintiffs to have an attorney who is not an

2  attorney of record, is actually the person who's doing

3  everything and is now beyond this Court's reach, because

4  one of the important things about this motion,

5  Your Honor, is you can't sanction Bob Barnes because

6  he's not here.  He's never been before the Court in this

7  case.  Let's go to the first slide.

8          THE COURT:  And the other thing is courts

9  are supposed to determine whether it's the client or the

10  lawyer who is to be sanctioned.

11          MR. BANKSTON:  Exactly.  And I think

12  that's going to raise a very interesting question on

13  just who was Robert Barnes in this case, right?  We're

14  going -- the first thing I want to show you is an

15  affidavit from March 22nd.

16          THE COURT:  I also saw the most recent

17  affidavit filed this morning by opposing counsel, at

18  7:30 this morning, an affidavit from Alex Jones saying

19  Barnes was never an employee.  He was an independent

20  lawyer who appeared *pro hac*, as you say, and he's no

21  longer in that role.

22          MR. BANKSTON:  He's never appeared *pro hac*

23  in this case, though.

24          THE COURT:  Well, I know.  No, but he did

25  previously.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
288 of 689

29

1           MR. BANKSTON:  In a different case, sure.

2           THE COURT:  What I'm saying is I read that

3   affidavit, and he was just a lawyer appearing in court.

4           MR. BANKSTON:  He was a -- they don't --

5   they've called him plenty of times on the record general

6   counsel before.  They no longer want to call him general

7   counsel.  The reason they don't want to call him general

8   counsel is because they're afraid that's going to get a

9   sanction of the party.  Their hope is that they can get

10  a sanction against Robert Barnes.

11          THE COURT:  Well, whoever said that

12  besides Robert Barnes himself?

13          MR. BANKSTON:  Mr. Jones has said that

14  multiple times.

15          THE COURT:  Oh, in deposition.

16          MR. BANKSTON:  Yeah, in both deposition

17  and in the real world too has said that multiple times.

18          THE COURT:  And of course, we'd have to

19  understand when he said it he knew what that meant and

20  that that somehow meant that whenever he said something

21  he was speaking for the company as opposed to an

22  independent counsel.

23          MR. BANKSTON:  Sure.  My only point on

24  this, though, Your Honor, is that a party cannot escape

25  sanctions by saying, oh, the actual responsible party is

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
289 of 689

30

 1 | this lawyer who never appeared in the case and was never
 2 | before the Court and you should sanction that person and
 3 | not the client or the current attorneys of record.
 4 |         THE COURT:  Well, but they've never made
 5 | that argument.  And in fact, opposing counsel just
 6 | graciously conceded we didn't comply with your order,
 7 | let me just fall on that sword right at the beginning;
 8 | we did not; and therefore, some sanction can be levied
 9 | for discovery, but it shouldn't be dispositive; it
10 | should be something along the lines of what I did in
11 | *Heslin 1*, which is actually, I thought, a fairly
12 | gracious admission.  Why wouldn't that be enough?
13 |         MR. BANKSTON:  Well, let's -- kind of
14 | going back to -- we're getting to the end of my
15 | presentation now.
16 |         THE COURT:  I have a way of doing that.
17 |         MR. BANKSTON:  I'll jump there for you,
18 | which is to say that if a party continually has orders
19 | from the Court to do something and it continually does
20 | the same thing over and over again, if you're just going
21 | to use the same sanction again, if you're not going to
22 | elevate your sanction, there's no deterrent effect
23 | whatsoever.
24 |         THE COURT:  So what your argument is I've
25 | already sanctioned him in *Heslin 1;* I need to do

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 290 of 689

31

1  something more in *Heslin 2* because *Heslin 1* wasn't

2  enough.

3          MR. BANKSTON:  Especially considering what

4  happened in *Lewis* and what happened in *Lafferty.*  Yes,

5  the Court can consider that conduct, and we'll get into

6  that as well.  That's a whole different legal thing

7  we'll unravel.  But to kind of -- like I said, to get to

8  the end of what I'm saying is that the prejudice that's

9  happened to plaintiffs is you'll remember that the first

10 time the plaintiffs were able to have an opportunity to

11 discover facts about their case, because the TCPA puts

12 everything on hold, was in *Heslin 1* about a year ago.

13 We missed that opportunity because they did this

14 erroneous appeal.  We tried again in *Lewis* to get facts

15 about the case, couldn't do it there.

16          THE COURT:  Well, you did get them in

17 *Lewis.*  In fact, you got a deposition in *Lewis*.

18          MR. BANKSTON:  I got a deposition.  But

19 one of the things you'll remember is you never ruled on

20 that motion for sanctions because they took it out from

21 under you because they were in a bad spot.  And had that

22 hearing gone to conclusion, I think you would have

23 agreed with me that that discovery is absolutely

24 worthless, which is something you're also going to

25 conclude with me as I go through my presentation today

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
291 of 689

32

1    about what was given to me in this case, because what

2    was given to me in this case in terms of documentary

3    evidence is exactly what was given to me in *Lewis*.

4                    THE COURT:  Is there a case in Texas where

5    a previous order for sanctions on another completely

6    separate case -- it is separate; these are different

7    cases; you're the one who filed two different Heslin

8    cases -- can be used to walk up the ladder of sanctions

9    in *Transamerica* and do something more draconian because

10   something in another case didn't work?

11                   MR. BANKSTON:  Yes.  Again, skipping to

12   the end, we're going to -- I'm going to get to two cases

13   for you.  And what those two cases are, they're

14   actually -- if you think about it, they're cases you see

15   all the time, and you see them especially common in

16   federal court where you have very vexatious litigants,

17   which as the Court says that is presented with evidence

18   that a certain plaintiff has attempted a certain

19   fraudulent act, a fraudulent type of -- and in the case

20   that we're going to talk about it's about obtaining

21   fraudulent temporary restraining orders and the

22   plaintiff had a pattern of doing that through these

23   courts, and in several prior cases they had done bad

24   conduct, and that was presented to the Court.

25                   THE COURT:  But that wasn't a discovery

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
292 of 689

33

1 sanction.

2          MR. BANKSTON:  No, that actually wasn't a

3 215 sanction, right.  Right.

4          THE COURT:  Exactly.  I'm talking about is

5 there law in Texas about basically the *Transamerica*

6 analysis under 215, how you're supposed to pick a

7 sanction that is appropriate to put the plaintiff -- put

8 the discovering party in the position they would be in

9 had the discovery been provided, which is what I think I

10 did in *Heslin 1* and would accomplish the same thing in

11 *Heslin 2*.  Is there a case in Texas where you would go

12 to a more draconian sanction in discovery under Rule 215

13 because of another order in another case that wasn't

14 enough to get the party providing discovery to comply?

15          MR. BANKSTON:  That is my belief,

16 Your Honor.  Yes, that's how I read that case.

17          THE COURT:  What's the case?

18          MR. BANKSTON:  Well, first of all -- I

19 don't have the -- I'm going to get to it in the

20 presentation.  I have a case name.  I don't have it

21 memorized off the top of my head.

22          THE COURT:  It's the federal court case

23 about the vexatious litigant.

24          MR. BANKSTON:  No.  I have a Texas case

25 about that as well.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
293 of 689

34

1              THE COURT:  Oh.

2              MR. BANKSTON:  I do have a Northern

3    District of Texas case, but I have a Texas case that's

4    another one of these that is basically -- and again, not

5    looking at it right now, I'm not totally positive it's

6    215, so I may need to look closer at that.

7              THE COURT:  Okay.

8              MR. BANKSTON:  But in terms of the test

9    that you're given under *Cummings* and *Transamerica* and

10   all this, it's not that you actually have to test a

11   lesser sanction, but you must consider whether a lesser

12   sanction would be effective.  And in considering whether

13   that lesser sanction would be effective, you can

14   consider whether that party has had sanctions against

15   them in the past in front of the court that we're

16   talking about that has failed to make them act

17   appropriately.

18             THE COURT:  But, Counsel, we're not even

19   yet on the merits of the case.  We're simply at the

20   threshold motion to dismiss stage.

21             MR. BANKSTON:  Yeah.

22             THE COURT:  And the only reason for the

23   specified and limited discovery was so that you could

24   make your *prima facie* showing.

25             MR. BANKSTON:  You're absolutely right.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
294 of 689

35

```
 1              THE COURT:  If by failure to produce the
 2   discovery, counsel's concession here today, that meets
 3   that burden, that gives you everything.  In other words,
 4   you didn't even need this discovery.  If they would have
 5   just stood up in October and said we will agree that
 6   every bit of this discovery will meet the burden that
 7   the plaintiff has to make a prima facie showing, we
 8   wouldn't have even needed discovery.
 9              MR. BANKSTON:  I see what you're saying,
10   but I powerfully disagree with that.
11              THE COURT:  Why?
12              MR. BANKSTON:  Okay.  Because the
13   discovery that I was granted, right, isn't -- I haven't
14   learned anything about my case yet that is in their
15   possession, anything of real substance, and I'm entitled
16   to that right.  And now for two years is basically how
17   long it's going to take me to even begin that, because
18   they're going to walk away from here not giving me
19   discovery.
20              THE COURT:  It will be when we come back
21   from the appellate courts and we're back to move toward
22   a trial.
23              MR. BANKSTON:  And everybody's memory is
24   faded, all the qualities of the evidence has been
25   degraded.  They have used the TCPA as a sword to
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
295 of 689

36

1 successfully defeat my ability to discover my facts

2 about my case for more than two years, which I have a

3 strong belief are way worse than what I have in the

4 petition that's before you.  But that's the petition I

5 have to go up on now.  I have to go up on appeal on that

6 petition.  And I don't have what I was entitled to from

7 discovery.

8              THE COURT:  But one of the other --

9              MR. BANKSTON:  And worse off, I'm

10 prejudiced for the entire future of this case.

11              THE COURT:  Then one of the other --

12              MR. BANKSTON:  And counsel --

13              THE COURT:  Excuse me.  Let me get a

14 question out if you don't mind.  Then one of the other

15 sanctions could be they are prohibited from presenting

16 any evidence about sources, for example.  If they don't

17 show it to you now and they don't give it to you until

18 two years from now, this case -- this motion could be

19 held under advisement for the time when it comes back on

20 the TCPA decision -- assuming you prevail on the TCPA

21 decision and it comes back for trial, this court or the

22 trial court could then decide, you know, we're going to

23 issue more sanctions; you are prohibited, defendants,

24 from offering any evidence about sources because, for

25 whatever reason, you didn't give it to them in response

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
296 of 689

37

1 to a clear order telling you to do so.  Why wouldn't

2 that be a sanction that would work for you for trying

3 your case?

4            MR. BANKSTON:  I think that's very worth

5 your considering.  I'm not going to tell you that that's

6 not a good sanction or that that's not somewhere you

7 should end up.  I think, again, the very -- one of

8 the -- the very last slide you're going to see from me

9 today is 215(b)(2) and all the list of the things you

10 can do, and that is one of them.  I think another one

11 that's interesting to look at is having now completely

12 spiked the discovery process for me, you can limit their

13 ability to do discovery in the future, and that's

14 another thing you can do that isn't merits based and

15 isn't a default.

16            THE COURT:  But it doesn't have to be done

17 now, does it?

18            MR. BANKSTON:  No, not all of your order

19 needs to take effect right now.

20            THE COURT:  In fact, the only part that

21 really must occur now is the part which affects the

22 decision on the motion to dismiss.

23            MR. BANKSTON:  I would say that the other

24 purpose of your order needs to punish the offender and

25 deter similar conduct from other litigants; and

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
297 of 689

38

1 therefore, there must be a punitive effect that takes

2 effect.

3          THE COURT:  Well, you can have attorney's

4 fees for wasted time preparing for depositions that were

5 useless.

6          MR. BANKSTON:  And this last one in

7 *Heslin,* that wasn't -- the way it was done in *Heslin*

8 wasn't enough of a deterrent because that was put to the

9 end of the case.

10          THE COURT:  But my point is that all --

11          MR. BANKSTON:  They didn't care.

12          THE COURT:  My point is that this ratchet

13 of sanctions can be imposed by the trial judge when and

14 if this case comes back.  Because you're right on the

15 motion to dismiss; if it's determined ultimately you're

16 right and it comes back for trial, this whole list of

17 sanctions can be given based on the very argument you're

18 making now.  Now we're two years down the road.  Now I

19 can't get the discovery that should have been provided

20 in response to the order from October, and now I'm

21 prejudiced by getting it two years late.  I want an

22 order that prevents the defendants from offering any

23 evidence about sources.

24          MR. BANKSTON:  I think that's true.

25          THE COURT:  Okay.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
298 of 689

39

1          MR. BANKSTON:  Here's a couple of hang-ups

2 I have about that.  One is that it's going to be way

3 easier for me to get that order from you now than it is

4 coming back here six, eight, more than a year later --

5          THE COURT:  But the --

6          MR. BANKSTON:  -- and have you try to

7 understand what happened and the same effect.

8          THE COURT:  The posture is the same.  The

9 order is just -- it's only a two-page order.

10          MR. BANKSTON:  No, I understand the

11 posture is the same.  I'm saying that if I come back in

12 here, I'm not going to have a judge in front of me who

13 is as familiar with -- that's going to be year-old facts

14 to you, and I'm going to basically have to reargue the

15 motion again and going to have to go through the entire

16 steps.  I just think from a judicial economy standpoint

17 it would be nice to get one order now that also lets the

18 parties know what's going to happen in the case.

19          THE COURT:  Well, maybe, but you need to

20 understand that trial judges like the judge who's going

21 to try the case to be able to put their imprimatur on

22 things because it determines how they're able to try the

23 case.

24          MR. BANKSTON:  Right.

25          THE COURT:  So one thing I don't like to

1 do is hamstring a colleague who's going to have to

2 conduct this jury trial with rulings -- by embedding

3 rulings that constrain the trial judge.  For example,

4 you want a default on *Heslin 2*, which is only as to IIED

5 claims.  So if it goes up and comes back, the Court of

6 Appeals is not going to rule on the default.  We know

7 that, right?

8 MR. BANKSTON:  Yes.

9 THE COURT:  You do know that.

10 MR. BANKSTON:  Yes, they're not going

11 to -- right.  I wouldn't figure so.  That wouldn't be

12 how the procedure would work out.  Right.

13 THE COURT:  Right, because it's not a

14 final appealable because it's only as to liability is

15 what you're asking for, right?

16 MR. BANKSTON:  Exactly.

17 THE COURT:  So we'd have this

18 interlocutory order embedded in there with a default on

19 liability only.  The Court of Appeals is not even going

20 to look at it.  They're only going to look at the motion

21 to dismiss ruling.  Then it comes back, and we've

22 embedded -- so we don't get any advice from the Court of

23 Appeals whatsoever.  And it comes back to a trial judge

24 who's got a liability finding on part of the case but

25 not on the other, not on the first part, not on any of

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 300 of 689

41

1 the defamation allegations.

2         MR. BANKSTON: Except I will move for that

3 upon return, though, obviously.

4         THE COURT: Well, but then you could move

5 for that upon return along with considering a ruling on

6 this motion for liability on the IIED.

7         MR. BANKSTON: No, I take your -- I take

8 your meaning. I do.

9         THE COURT: I'm just trying to think about

10 this in part practically.

11         MR. BANKSTON: I mean, that's where I'm

12 kind of worried too, is that I know based on -- I mean,

13 based on what their strategy has been in this case is to

14 make sure you're not the trial judge, and I know that

15 there's a substantial chance you won't be.

16         THE COURT: There's a good chance there

17 will be a better one than me.

18         MR. BANKSTON: Maybe so, right? But I'm

19 going to have to have some judge try to make sense out

20 of what your proceedings were here, and that's why I'd

21 like to get to as final or as close to done as I can. I

22 do -- I understand exactly what you're saying, though.

23         THE COURT: Well, that's why this

24 transcript maybe could be helpful to somebody who's

25 trying to glean what it is I was thinking to navigate

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
301 of 689

42

1   this.  And, you know, the pathway is how do we get to a

2   jury verdict and how do we get to a final judgment one

3   way or the other.

4              MR. BANKSTON:  The only thing I would say

5   about that is if you are thinking like I'm hoping you

6   will after I'm done with my presentation that there is a

7   possibility that you might default these defendants is

8   that you come to the conclusion that there is no reason

9   to force us to spend more legal fees on this.  There's

10  no reason for us to go up on a year or more appeals on

11  both parties if this case needs to be defaulted.

12             Now, I do take your meaning that if you're

13  looking at a lesser sanction than default, there might

14  be benefit from you from your standpoint of saying I'm

15  going to grant certain things as to the TCPA motion and

16  attorneys' fees, but I'm going to wait upon remand to

17  handle the rest of the motion.  I can understand that.

18             THE COURT:  But you kind of framed an

19  argument for them at the beginning when you're

20  suggesting it's really Mr. Barnes who's responsible for

21  this train wreck, and then why should I default his

22  client on liability because a lawyer -- you're arguing a

23  lawyer malfeasance -- or a lawyer colossal mistake.  Let

24  me say it that way.

25             MR. BANKSTON:  You couldn't have given me

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
302 of 689

43

1  a better opportunity to start my presentation.

2            THE COURT:  Okay.

3            MR. BANKSTON:  All right.  So here we go.

4  So now I'm going to actually dive into it.  The first

5  thing I want to show you is a March 22nd, 2019 affidavit

6  from Alex Jones.  You notice that there was an affidavit

7  today sort of pushing him -- distancing himself from

8  Robert Barnes.

9            THE COURT:  I read that.

10           MR. BANKSTON:  They've already tried this.

11  They've already thrown Mr. Barnes under the bus.  Right

12  around the time just a -- just probably about a week

13  before Mr. Barnes showed up into this court for the

14  first time they filed this affidavit in *Lafferty*.  And

15  the thing was that *Lafferty* and *Lewis* were running about

16  neck and neck, but Connecticut's anti-SLAPP is a little

17  more generous in timelines, so it was slightly behind

18  *Lewis*.

19           THE COURT:  Was a deposition taken of

20  Alex --

21           MR. BANKSTON:  No, no deposition taken.

22           THE COURT:  You've got to let me get my

23  questions out.  The court reporter is going to be so

24  frustrated with us.

25           MR. BANKSTON:  Sure.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
303 of 689

44

```
 1              THE COURT:  When I ask a question, please
 2   let me finish it before you answer.  I guess you
 3   answered it.  No deposition has been taken of Alex Jones
 4   in any case other than the Scarlett Lewis case and
 5   Heslin 2.
 6              MR. BANKSTON:  With regard to cases filed
 7   about the Sandy Hook litigation, yes, Your Honor.
 8              THE COURT:  Thank you for that.
 9              MR. BANKSTON:  This affidavit was put at
10   the same point that we were at with Lewis where they had
11   not met deadlines to produce documents, all right?  So
12   at the same point as basically the eve of the Lewis
13   hearing, this affidavit is put forward, which basically
14   says from Mr. Jones I instructed Mr. Barnes to do these
15   things; I instructed him to comply; I thought that he
16   had complied; I had no idea; I've instructed this other
17   attorney, Norman Pattis up in Connecticut, to take over
18   and take care of everything in the case.
19              THE COURT:  And this affidavit is part of
20   your 600 and some-odd pages attached to this motion?
21              MR. BANKSTON:  No.  It's actually one of
22   the supplemental exhibits filed this morning.
23              THE COURT:  Filed this morning.  Thank
24   you.
25              MR. BANKSTON:  Okay.  In that hearing that
```

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
304 of 689

45

1    followed that affidavit -- that's the other exhibit

2    that's in my supplemental exhibits.  Mr. Norman Pattis

3    got up in front of the Court and said these things.  He

4    said I was in an unstainable position where I was being

5    given direction by Mr. Barnes to do things that I

6    thought were unsupportable and the client needed to know

7    that.  The client has taken those steps.

8                    All right.  The client is aware of

9    Mr. Barnes' behavior and what's going on and is actively

10   throwing him under the bus in Connecticut in order to

11   avoid a sanctions ruling.

12                   He says:  I'll be candid.  I consulted my

13   lawyer, who's Willie Dow, and I described the situation

14   to try to find out what my ethical obligations were, and

15   he basically told me I was in a very precarious

16   situation.  So I took the steps that I needed to take to

17   protect myself, and the result is that Mr. Barnes is no

18   longer in the picture and I am it.

19                   Next slide.  He said he's no longer

20   corporate counsel and no longer has any role in

21   directing this litigation because my view and my

22   representation to the client was, based on what I saw in

23   this case, if they continued to follow Barnes' advice,

24   they'd suffer adverse consequences.

25                   Next slide.  You'll also remember around

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
305 of 689

46

1   this time is when Mr. Enoch stopped showing up to oral

2   hearing in our cases and then he started to withdraw.

3   Mr. Pattis was candid with the Court about why that was.

4   He said that Enoch is local counsel in Texas to the

5   Jones defendants and Mr. Barnes is *pro hac vice* counsel

6   and there's been a struggle there.  Candidly, Judge,

7   what blew this into crisis mode for me and led me to

8   consider withdrawing is I received a phone call and had

9   my first communication with Texas counsel on Monday.

10               Next slide.

11               THE COURT:  And you're reading from Norm

12  Pattis again?

13               MR. BANKSTON:  Yes, exactly.

14               THE COURT:  In the Connecticut case.

15               MR. BANKSTON:  In the Connecticut *Lafferty*

16  case.  And so as you'll remember, Mr. Enoch left the

17  case and then there was just Mr. Barnes here in Texas.

18               THE COURT:  I do remember.  Let me tell

19  both sides now you've each used 20 minutes, so you're

20  each now down to one hour per side for every question of

21  every witness and every argument you're going to make.

22               MR. BANKSTON:  Thank you, Your Honor.

23               THE COURT:  Go ahead.

24               MR. BANKSTON:  The last thing that

25  Mr. Pattis said to assure the Court is Mr. Barnes has

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
306 of 689

47

1 been eased out of the picture and will no longer be

2 involved in the case.  Of course, Mr. Barnes didn't

3 mention any of this to us when he showed up to our

4 hearings in Texas.

5                    And if you could go to the next slide.

6                    And what Mr. Pattis said was obviously not

7 true.  And this, as you see, is of the videos that they

8 produced to me.  All since the time of that affidavit

9 Mr. Barnes has been appearing on InfoWars as general

10 counsel discussing with Mr. Jones, threatening me,

11 making a big scene, basically acting like this is all a

12 circus and not taking it seriously.  There's an episode

13 saying that we're going to respond to the Sandy Hook

14 show trials.  This is all a period where they're not

15 taking anything seriously.

16                    They were able to get the extension in

17 *Lafferty*, though.  So they were able to have until June

18 in *Lafferty* to be able to comply with the discovery

19 orders.  Mr. Barnes then is still now running everything

20 even though the client's already thrown him under the

21 bus.  And Mr. Barnes at that point produces to the

22 plaintiff's counsel, which I'm also in the sharing

23 agreement on, a bunch of new documents.  And at this

24 point they'll have produced a total in *Lafferty* of

25 53,000 documents, all right?  But *Lafferty* has a much

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
307 of 689

48

1  wider discovery scope than we did.  They're getting

2  these things called Google Analytics and marketing

3  data --

4              THE COURT:  Are they --

5              MR. BANKSTON:  -- and all sorts of stuff.

6              THE COURT:  I'm sorry.  I interrupted you

7  that time.  Are they in a motion to dismiss stage or are

8  they doing final trial discovery?

9              MR. BANKSTON:  No, I'm getting that right

10 now.  They're actually still technically procedurally

11 dealing with the anti-SLAPP.  It's on appeal right now.

12             THE COURT:  They still get discovery while

13 it's on appeal?

14             MR. BANKSTON:  Well, no.  You'll see in a

15 minute as I get through these slides, okay?

16             THE COURT:  Okay.

17             MR. BANKSTON:  This is right now about May

18 to June.  They're still waiting to answer their

19 discovery, okay, in *Lafferty*.  They've been given one

20 extension past *Lewis*.  So they actually do.  They end up

21 producing some documents.  The anti-SLAPP at this point

22 is still waiting to get ruled on.  All right.  They

23 produce the documents, these 53,000 total at this point.

24 What I'm sure you've read in the motion is at that point

25 plaintiff's counsel up in Connecticut discovered that

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
308 of 689

49

1    what we've been given had child pornography in it.

2    Okay.  At this point Mr. Barnes is still managing

3    things.

4              So right after this one before the

5    *Lafferty* hearing, I want to show you the other final

6    supplemental exhibit I filed, which is a short video.

7    And this is three minutes that I'm going to show you

8    from a video that was published by Mr. Jones directly

9    after this.  And it's in the PowerPoint.

10             Yes, next slide.  This was a video

11   Mr. Jones published directly after the production of the

12   meeting, basically a call where plaintiff's counsel

13   called up Mr. Jones and said we found this, let's set up

14   a meeting with the U.S. Attorney's Office and we'll get

15   this figured out.

16             Mr. Jones did not react well to this.  I'm

17   going to show you this video, and I'm going to warn you

18   this video is incredibly profane.  And it's

19   performatively so.  And what I think you're going to see

20   about this video is at this point in the proceedings

21   Mr. Jones is not taking these proceedings seriously.  He

22   is using them as a world wrestling entertainment type

23   event and is placing everybody at risk for it and is at

24   this point even obviously still not taking discovery

25   seriously.  So let me show you this video and we'll talk

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
309 of 689

50

1    about what happened afterwards.

2                    *(The video was played)*

3                    THE COURT:  Who is that?

4                    MR. BANKSTON:  The gentleman laughing at

5    the end is Mr. Jones' attorney in Connecticut.  That's

6    Norman Pattis who, just like Mr. Barnes, started to make

7    appearances on InfoWars with Mr. Jones.

8                    THE COURT:  He's the one who made the

9    statement that Barnes had put him in a compromised

10   position?

11                   MR. BANKSTON:  Exactly.  Exactly.  And in

12   fact, what you'll also learn is that none of those

13   statements that he was making to the Court appeared to

14   be true because Mr. Barnes was still completely involved

15   and did all the discovery.

16                   In fact, if you go to the next slide, the

17   very next thing that happens is on June 19th, 2019,

18   Judge Bellis in Connecticut strikes their motion to

19   dismiss.  And that discussion was about how Mr. Barnes

20   had botched that discovery.

21                   THE COURT:  I'm sorry.  That discussion

22   was -- say it slower.

23                   MR. BANKSTON:  That discussion was about

24   how Mr. Barnes had botched discovery.

25                   THE COURT:  Okay.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 310 of 689

51

1          MR. BANKSTON:  In that hearing -- you'll

2    see some of it quoted in our motion and there's a

3    transcript for it.  Judge Bellis says, look, even if you

4    disregard that video we just saw, even if you disregard

5    that child pornography that was produced in discovery,

6    even if you disregard that there was an affidavit from

7    Mr. Jones submitted that wasn't actually signed by

8    Mr. Jones in that case, that even if all of that is

9    disregarded, they had fundamentally and egregiously

10   violated the discovery orders with total disrespect.

11   And the Court said I'm striking everything and got

12   really close -- considered doing a default and said I'm

13   not going to do a default now, but I can't make this any

14   more clear; if you keep this up, you're done; you are

15   not taking this lawsuit seriously.

16          Next slide.  The next thing that happens

17   is we get the discovery -- the discovery -- the case

18   comes back in *Heslin 1.*  And that's the case where they

19   had done no discovery at the time and then did no

20   discovery before.  So here you end up granting our

21   motion and ended up giving the findings that you did and

22   giving $25,000 in attorneys' fees.

23          THE COURT:  Well, you didn't make a move

24   after it came back on remand to have that order for

25   discovery enforced in any other way, as I recall, in

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
311 of 689

52

1  *Heslin 1.*

2           MR. BANKSTON:  Yeah, we had a discussion

3  about that in the court about how if the appeal had

4  never happened, which fundamentally it didn't because

5  there was no jurisdiction, upon filing the motion for

6  sanctions and then to the point of the hearing, I

7  wouldn't have filed anything else, so there was nothing

8  intermittent in there, but we had a pending motion for

9  sanctions.  But one of the things you did in that case

10  was say, all right, we're only going to do attorneys'

11  fees for the attorneys' fees that were spent in *Heslin 1*

12  in 2018 during that period, so you kind of limited it

13  there.

14           But essentially we got an order there that

15  had the two basic -- the first most basic elements of

16  215.  And we had the award of attorneys' fees, which

17  were mandatory.  And then we had an evidentiary finding,

18  which is not exactly what 215 contemplates, because 215

19  actually contemplates an evidentiary finding for the

20  purposes of the action.  Now, your order did it for the

21  purposes of the motion, which I think -- I don't have

22  any authority for it but I think is still fine.  I think

23  you're totally empowered to do that.  Because I think

24  215 kind of gives you a catch-all, you can do whatever

25  is just.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 312 of 689

53

1          THE COURT:  Well, obviously I decided that

2  I was empowered to do it --

3          MR. BANKSTON:  To do it, sure.

4          THE COURT:  -- because I did it.

5          MR. BANKSTON:  Because you did it,

6  exactly.

7          THE COURT:  And I haven't changed my mind

8  since then.

9          MR. BANKSTON:  And I feel like we're going

10 to be fine at the Court of Appeals on that too.  So in

11 other words, those are remedies I think you can take

12 today without hesitation.  But again, to me, that's the

13 floor.  If you have a defendant who's acting this way,

14 who is not responding to any forms of deterrence

15 whatsoever in the case, has now seriously compromised

16 the state of the evidence, there must be some sort of

17 elevated sanction here.  So I'd like to walk through a

18 little bit --

19          THE COURT:  Which can occur now or on

20 remand to prepare for trial.

21          MR. BANKSTON:  Either way, yes.  And we'll

22 get to how that plays out at the very end here.  I do

23 want to go through the allegations of what discovery

24 abuse was committed in this case because not much of it

25 has been talked about.  So the first -- the first point

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
313 of 689

54

1 here is the corporate representative.  And you're on

2 that.  I don't think I need to say another word about

3 that.  The thing that's egregious to me is that he's the

4 same one who wasn't prepared last time --

5             THE REPORTER:  Can you slow down?  It's

6 getting really hard.

7             MR. BANKSTON:  I'm very sorry.

8             THE COURT:  Yeah, you really can't get a

9 record the way you're going.

10             MR. BANKSTON:  Yeah, I understand.  We

11 know that last time Mr. Dew wasn't prepared, and he

12 wasn't prepared this time, and it was by the same group

13 of counsel.  They absolutely knew what their duties

14 were.  This is an intentional act of discovery abuse.

15 But the one that didn't -- that wasn't addressed in

16 their response.  They didn't even answer it.

17             The next one is that Mr. Jones didn't

18 respond to written discovery in good faith.  If you look

19 at the actual written discovery responses that are given

20 in this case, they're absurd.  They say we can't

21 identify any of the employees who worked on this, we

22 don't know any of our sources, we can't -- we don't

23 basically know anything.

24             THE COURT:  But can't you just hamstring

25 them at trial, and wouldn't that be your dynamite at

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
314 of 689

55

1 trial?  They can't even defend themselves on sources.

2 They can't even tell the jury there are sources if they

3 don't produce them in discovery.  That could be one of

4 the remedies.

5              MR. BANKSTON:  I think -- I think it helps

6 to have -- the problem is I've been on these cases long

7 enough and they're going to go forward and they're going

8 to have a new answer.  And yeah, I'm going to be able to

9 impeach them at trial, but I'll have been denied

10 discovery on it the entire time, and they're going to

11 have a new answer and somebody's going to let them

12 testify to it.

13              THE COURT:  Well, even when they come up

14 with the source, does anybody seriously think the source

15 is going to explain, you know, the basis for saying that

16 children weren't killed?

17              MR. BANKSTON:  Oh, I think it's much more

18 than that actually, Your Honor.  I think not only can

19 you use who their sources were and what it was to prove

20 that they acted recklessly false, but I think once I

21 start discovering who those sources are and what they

22 did together, I'm going to discover other things that

23 they did to these parents.

24              THE COURT:  Well, and that's the point.

25 If you finally get -- when you finally get the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
315 of 689

56

1  discovery, your point is it's going to be an even better

2  trial for me, even if I get it late, because I'm going

3  to be able to use those sources to show the absurdity of

4  their statements is what you're saying.

5          MR. BANKSTON:  I don't see why you at this

6  point would have any faith that I'm getting any

7  discovery on this point ever.  They don't have it, and

8  they will not give it.  And no matter what this Court

9  does they don't give it.

10          THE COURT:  Well, and then you get back to

11  the point that you can't give it to the jury then.  If

12  you don't give it during discovery and if you don't give

13  it when it's reasonably available to you, which is

14  really now, right now, you can't -- and you can't

15  explain why you waited so long to give it, you can't use

16  it at trial.

17          MR. BANKSTON:  I think that's a good

18  order.  I think that's good.

19          THE COURT:  Okay.

20          MR. BANKSTON:  I think that needs to be

21  firm.  You know, it needs to be not that I'm suddenly

22  ambushed at trial by new explanations of what these

23  things are when, when the discovery was fresh and

24  available, they didn't make the efforts to go do it.

25          THE COURT:  Okay.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
316 of 689

57

1            MR. BANKSTON:  And now they've had four

2   times to do it.

3            Move to the next one.

4            The next one is they broke their own

5   Rule 11 agreement.  Never mentioned it.  They just

6   didn't respond to that.  They made a Rule 11 agreement

7   about the discovery and about the production of *Lewis*

8   documents.  They just simply ignored it.  Mr. Burnett

9   made that agreement and then Mr. Barnes apparently did

10  not follow through on it.

11           Next one.  They relied on the deficient

12  *Lewis* production for the request for production.  So in

13  the request for production in this case I got 600 new

14  documents, but they were all duplicated ten times or

15  more.  So basically I got about 50 new emails that had

16  never been produced in *Lewis* for some reason.  But for

17  everything else, they just said go look at *Lewis;* it's

18  in there somewhere.  And that production, as explained

19  through our motion, is entirely deficient in ways that

20  can be proven.

21           THE COURT:  The *Lewis* production.

22           MR. BANKSTON:  Exactly, right.  And not

23  only was it obviously not complying at the time it was

24  given, deposition testimony in this case has revealed

25  some more bad things about it, particularly the next

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
317 of 689

58

1  one.

2          Defendants can't account for tens of

3  thousands of missing emails.  They have no response to

4  this in their motion.  There is an affidavit up in

5  *Lafferty* given around the same time as that other stuff

6  saying that there's 80,000 emails with Sandy Hook in the

7  title.  In our case we didn't get as much discovery as

8  *Lafferty* because it was broader.  So we got somewhere in

9  the neighborhood of 15,000 to 25,000 emails or total

10  documents.  Given the way they produced it, it's a

11  little hard to give you a total number, but it's right

12  around that neighborhood.  *Lafferty* got about double.

13  But there's about 80,000 emails that we know have Sandy

14  Hook in the title.  And we know they don't collate out

15  the duplicates because Mr. Zimmerman testified in both

16  cases they give out duplicates.  Mr. Zimmerman testified

17  there's 80,000 emails with Sandy Hook on them somewhere,

18  and nobody knows what the story is.  And there are these

19  tens of thousands of missing emails now that have no

20  explanation from anybody on the record.

21          Next one.  They didn't issue a litigation

22  hold.  There's zero.  That did not happen.  And in fact,

23  you would know if it did happen.  If there was a written

24  letter that has a litigation hold for Sandy Hook related

25  materials, we'd have it because it would be

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
318 of 689

59

1  non-privileged and it would have the words Sandy Hook in

2  it.  That never got produced.  In fact, what they

3  testified happened was that around the time of the *Lewis*

4  discovery they sent out an email to the company that

5  said, hey, everybody, look for documents.  They never

6  did a litigation hold.

7          We talked about them preserving their

8  email servers.  And Mr. Zimmerman testified exactly like

9  what we said.  The first time a mirror image of the

10  server was created was in January of 2019.  Before that

11  the server was periodically overriding itself, so it was

12  periodic backups.  So take, for instance -- let's say it

13  does it once every month.  There's emails on the server

14  at the time this lawsuit started and for months and

15  months afterward.  But say an employee decides he wants

16  to take those emails off and delete those emails.  The

17  moment that the server backs itself up the next time

18  that email is lost forever.  There was never any attempt

19  to make a solid preservation of the documents that the

20  defendants had in their possession.  So none of the

21  defendants' servers were imaged.  There was no

22  litigation hold sent throughout the entire company.

23  This is grossly negligent behavior.

24          THE COURT:  So you would argue under the

25  *Brookshire* case a spoliation instruction that those

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
319 of 689

60

1  emails would be damaging to the defendants' defense.

2         MR. BANKSTON:  Yes.  And I would also

3  argue by extension I would get a finding, and I'm not

4  sure exactly how you'd want to word it, but that would

5  accomplish the same thing for the purposes of this

6  motion saying that had that discovery been produced it

7  would have been favorable to the plaintiff for the

8  purposes of this motion, this motion to dismiss.

9         Next one.  The erasure of computers.  This

10  is interesting because --

11         THE COURT:  And you agree we have to have

12  an evidentiary hearing.  Looking at *Brookshire*, a judge

13  has to decide as a matter of fact whether it was

14  intentional, whether they intentionally spoliated.

15  That's what --

16         MR. BANKSTON:  Yes.

17         THE COURT:  That's what the majority

18  opinion talks about.  There are some exceptional

19  circumstances for negligent destruction, but it has to

20  be when it's out -- essentially outcome determinative

21  information.

22         MR. BANKSTON:  Exactly.

23         THE COURT:  Otherwise, it has to be

24  intentional destruction.

25         MR. BANKSTON:  Right.  And that's --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
320 of 689

61

 1          THE COURT:  And you believe this record

 2  before me now proves intentional destruction of these

 3  emails; ergo, I should rule now that they get a

 4  spoliation instruction when this case is ultimately

 5  tried to a jury?

 6          MR. BANKSTON:  Yes, I believe that.  And I

 7  think it's well beyond the emails.  So I think the

 8  emails is actually maybe the smallest component of that.

 9  And I do think intentional as used in *Brookshire*

10  *Brothers* is a bit of a term of art because it also

11  encompasses a reckless disregard of such severity that

12  you showed absolutely no care about trying to preserve

13  anything.  I think that can do it too.  But I don't

14  think you have to worry about that because there's

15  plenty of intentional here.

16          First let's talk about the computers,

17  all right?  These were definitely erased.  There's no

18  question about that.  What is being said now that was

19  never said before is there exists apparently these

20  portable hard drives, all right?  There's apparently a

21  set of portable hard drives that contain information

22  that was at one time on these computers, maybe put on

23  new computers.

24          We asked for all sources of information.

25  We questioned the witnesses about exactly what was

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 321 of 689

62

1  searched.  This is brand new.  I can guarantee you

2  there's no testimony about them searching portable hard

3  drives or anything like that.  This just seems to be an

4  invention out of thin air.

5            And if you look at how they left the

6  employees, if you can go to the next one -- oh, let's

7  talk about Slack real quick too.  Okay.  So here's

8  another thing where there was some obvious destruction

9  going on here.  First of all, you have people testifying

10 that nobody at the company has access to Slack anymore.

11 Slack was a messaging service used before RocketChat.

12           THE COURT:  Slow that down.  It was used

13 before -- because the court reporter is hearing these

14 terms for the first time.  I've read them.  Slack was

15 the service used before --

16           MR. BANKSTON:  RocketChat.  When the

17 testimony was made, it was -- the implication was given

18 that Slack and RocketChat are successive to each other;

19 in other words, the moment Slack ended they started

20 using RocketChat.  Apparently from the affidavits today

21 there is a third instant messaging system that was never

22 identified in interrogatories because there were

23 specific questions about that, never testified about.

24 And now there's this third messaging system that's still

25 unidentified and we don't know anything about it,

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
322 of 689

63

1  whatever was in use between April 2016 and August 2018,

2  right, which means that it was in use at the time the

3  lawsuit was filed and for many months afterwards.  And

4  we have no information about what it is, and certainly

5  nothing was ever done to search it.

6           More importantly, the Slack system, they

7  now say in an affidavit that all the data to it is

8  preserved.  Well, if that's true, we have an email

9  notification showing there were Sandy Hook Slack

10 messages.  Why don't we have those Slack messages,

11 right?

12          There's nothing that they're saying about

13 this that makes any sense.  It does not add up.  And

14 it's our belief that they don't have anything in Slack

15 that is going to be responsive to anything.  They don't

16 have the ability to search it.  Zimmerman also told us

17 they don't have the ability to search RocketChat.  They

18 said that they had to leave employees to do that for

19 themselves.  According to Zimmerman in testimony, that

20 was the only thing that still existed.  Now apparently

21 there's an entire preservation of Slack somewhere that

22 should contain responsive messages that wasn't searched

23 and wasn't turned over and a whole new messaging system.

24 And none of these were effectively managed or even cared

25 about by counsel.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
323 of 689

64

1          The next is where the defendants allowed

2   individual employees to search their own files and

3   devices.  And here to allow the very people who are

4   potentially implicated by the conduct to manage the

5   discovery is clearly not sufficient.  So there's just

6   more on top of their total disregard for care.

7          Keep going.  The social media accounts.

8   This is interesting to me.  Imagine you were an

9   insurance company defending a case for something

10  involving an auto accident and there was a vehicle that

11  was in a storage facility that was set to be destroyed,

12  or say you were paying to have a vehicle stored

13  somewhere and you decided to stop paying your bill and

14  the company gave you a warning that said, hey, if you

15  don't pay your bill, if you don't follow our rules,

16  we're going to destroy the car.

17          THE COURT:  I should let you know you've

18  now used 40 minutes.

19          MR. BANKSTON:  Okay.

20          THE COURT:  Go ahead.

21          MR. BANKSTON:  They say we're going to

22  destroy the car.  If that defendant does nothing, they

23  have intentionally spoliated that evidence, and that is

24  exactly what happened here with social media accounts.

25  And again, these accounts, when you talk about evidence

1  that underlies the claim, this is huge because this is

2  how they communicate as an online media empire.  And the

3  argument that I hear is, well, maybe it's not lost.  I

4  mean, possibly these companies backed it up and they

5  still have it a year now later; they still saved all of

6  our data.  No evidence of that and no attempts by

7  defendants to even try to locate any of it.  What we

8  know is that those accounts were terminated and they do

9  not exist anymore.  That information is not available.

10           The last one.  The videos.  And this I

11  just don't understand, Your Honor.  We had unequivocal

12  testimony, and you can see it from two different

13  witnesses, from Jones and Dew, saying the videos are

14  destroyed, not even God knows what all the videos are,

15  we don't have them, YouTube destroyed them and we lost

16  them.  Now Michael Zimmerman is saying, no, everything

17  we've ever uploaded to YouTube we actually have.

18           THE COURT:  They say they backed up every

19  one of the videos.

20           MR. BANKSTON:  Every one.  Well, if that's

21  true, then all of my meet and confer letters when I

22  said, hey, what about this video, this video, this

23  video, and this video, where I have the specific titles

24  and I know they have Sandy Hook in them, why don't I

25  have those videos, right?  There's something very

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
325 of 689

66

1  confusing about the video situation.

2            THE COURT:  But you're suing over certain

3  videos, aren't you?

4            MR. BANKSTON:  I am.

5            THE COURT:  Aren't you talking about the

6  very same videos that you already know exist and in fact

7  you've even seen?

8            MR. BANKSTON:  Oh, and I know there's way

9  more.  My client has seen way more in the past.

10           THE COURT:  I see.  So you're looking for

11 more and you might even augment your pleadings with --

12           MR. BANKSTON:  Oh, absolutely.

13           THE COURT:  -- additional videos for

14 different dates falling within the statute of

15 limitations and you believe they're out there.

16           MR. BANKSTON:  Two things on that.  One is

17 that additional videos could also bolster the continuing

18 course of conduct sort of thing.  But yes, it's our --

19 from what we were able to tell from how InfoWars has

20 been written about over these years and from my client's

21 own memory, we know that this video list is not even

22 close to complete.  And therefore, the very evidence on

23 which plaintiff is suing on the very conduct which we

24 need to prove to a jury is gone and I don't have it.

25 And that is very, very serious too.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
326 of 689

67

1          Okay.  So I'm going to talk to you a

2    little bit about the law first, when we talked about

3    considering, not testing, lesser sanctions.  I'll move

4    real quickly through this.

5          Go to the next slide.  I'm sure you know

6    the *Cummings* case.  And about -- my point is that you

7    don't actually have to test them.  You just have to

8    consider if they would be effective.  And in this case,

9    I don't think there's any reason to believe -- after

10   *Heslin 1* where you gave a sanction and then on that very

11   same day told them now you need to answer discovery in

12   *Heslin 2*, it didn't affect their conduct, didn't have

13   any ability to affect their conduct.  So my argument

14   would be there has to be something stronger than

15   *Heslin 1*.

16         If you can go to another slide.

17         I want to talk about what *Cummings* was

18   about because that case was a default, was entered when

19   a party intentionally destroyed audiotapes that related

20   to the claim.  Basically in that situation it was

21   recordings that they had made with the other party at

22   some point, so it was extremely relevant to the case.

23   And after being ordered to produce them, the plaintiff

24   ended up destroying them.  In that case they were

25   defaulted.  You have a similar situation here, but it's

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
327 of 689

68

1    actually much worse.

2              So first is you didn't have broad

3    discovery obstruction in *Cummings*.  You just had that

4    one event.  Here you have an entire tableau of them not

5    taking this case seriously.

6              Go to the next one.

7              In *Cummings* you didn't have the

8    destruction of the evidence upon which the claim was

9    based, right?  They didn't lose that.  They still had

10   what they were actually suing on.  My client's been

11   denied that.

12             The other problem is that in *Cummings* one

13   of the things they talk about in what kind of sanctions

14   you could consider, including whether you should default

15   someone, is whether there's the availability of

16   alternative evidence.  And in this case, most of that

17   alternative evidence has also been compromised through

18   various forms of loss and failure to preserve, so we

19   don't even have that.

20             And our last one.  In *Cummings* there

21   wasn't a prior pattern of discovery abuse by the same

22   party in a string of related cases in front of that same

23   Court, and that is something that this Court can

24   consider.

25             Let me show you a couple of these cases.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
328 of 689

69

1   This first one I want to show you is a San Antonio case.

2   This is the one about the restraining orders.  And I

3   understand this is not a discovery sanction case.  What

4   it's talking about is a pattern of misconduct in prior

5   cases.  And so you had this -- you presented the trial

6   court with several other cases where bad conduct --

7   sanctionable conduct happened.  And the trial court

8   said, based on what's happening, I need to make sure

9   it's a substantial sanction so it doesn't happen again.

10  And here I think you are faced with the same thing, that

11  these defendants need some sort of sign to take this

12  lawsuit seriously, and they don't have one yet, and

13  that's what this Court needs to do.

14          Another one I wanted to point out to you,

15  this is a Northern District of Texas case.  And this was

16  about you had a plaintiff who across the board just

17  repeatedly failed to obey the Court rules and procedures

18  in other cases, and so now they show up in another case

19  and they still are not obeying the rules and procedures,

20  and the Court says it's absolutely fine to consider

21  their conduct in my prior cases when I'm trying to

22  decide if they should have a dismissal.  I believe you

23  can do the same thing here.

24          These are what we can do, right?  I think

25  215.2 probably gives you some creativity on top of this,

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
329 of 689

70

1  but any time you do that you're going out in uncharted

2  territory, right?  So I think and my opinion is we need

3  to kind of stick to these types of remedies.  And so

4  you've tried some of them.  Basically you've tried two

5  and three on here.  You've tried the expenses of

6  discovery and the taxable court costs and you've made an

7  order about designated facts being established, not for

8  the purposes of the action like No. 3 says, but for the

9  purposes of the motion.

10            So here I think I have somewhat of a sense

11  of what's going on in this courtroom, that you may be

12  quite rightly hesitant to consider a default.  I

13  understand that.  I think there are a lot of other

14  things in 215 that can actually have an effect in this

15  case that can actually act as a deterrent and can maybe

16  change this defendant's behavior.  Because out of all of

17  this, I think that's the most important.  I don't think

18  there's a lot you can really do to remedy me on the

19  discovery side.  I think if the goal of your action is

20  to try to put me back in the place where I would be if I

21  had gotten discovery, I don't think we can ever do that.

22            So what I think really has to -- the other

23  two goals of this order under the case law was to punish

24  the violator and to deter future conduct.  And I don't

25  know another way to say it, Judge, except that if a

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
330 of 689

71

1  defendant is allowed to come into this courtroom and

2  make excuses after excuses and then is able to

3  completely ignore discovery in the last case and that

4  they know that they're really not going to face any --

5  look, they don't care if the motion's denied.  They

6  don't.  They don't care.  That's not part of the

7  strategy.  The strategy is not to win the motion.  They

8  don't care about that.  The strategy is to delay.  The

9  strategy is to use this TCPA as a weapon to keep me as

10  far away from a courtroom as possible.

11              THE COURT:  Well, you have two depositions

12  of Alex Jones, who is apparently the very heart of this

13  entire operation.

14              MR. BANKSTON:  And it wasn't -- I don't

15  know if you've seen those transcripts.

16              THE COURT:  And you wouldn't have had

17  those if I hadn't ordered the discovery.

18              MR. BANKSTON:  I agree.

19              THE COURT:  And you got fairly extensive

20  depositions.

21              MR. BANKSTON:  I'm not sure if you've read

22  those depositions or not, Your Honor, so I don't --

23              THE COURT:  I've read portions.

24              MR. BANKSTON:  Okay.  And particularly in

25  this last one, something that was very revealing -- and

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
331 of 689

72

1  you're right; he is the center of all this.  He should

2  know everything.  He doesn't know anything.

3              THE COURT:  Well, but isn't that

4  incredibly helpful to you?  I mean, when you play that

5  to a fact-finder, "This, this is your answer for what is

6  your basis for saying these things?  This is your

7  answer?"  I mean --

8              MR. BANKSTON:  I get what you're saying.

9  I do.  I understand what you're saying, that Jones --

10 but Jones has to make a choice here, and I think they've

11 made the choice.  They can either participate in

12 discovery with good faith, and if they do, that's not

13 going to be good for them.

14             THE COURT:  Or you can hoist them on the

15 petard he's created for himself, which is I can't tell

16 you one thing I used as a source.

17             MR. BANKSTON:  For them, that is way

18 preferable to actually disclosing what the truth is.

19             THE COURT:  Well, that's interesting.

20             MR. BANKSTON:  Right?  Because --

21             THE COURT:  It doesn't seem like it looks

22 good to me.

23             MR. BANKSTON:  It's not good.  They don't

24 have a good choice.  They have a Rosemary's -- or a

25 Sophie's choice, right?  They can either take the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
332 of 689

73

1  sanction on the hit, pay the money at the end of the

2  case, which they may or may not do because some --

3  there's a good idea that this probably ends up with

4  Jones running from every judgment ever, but they can

5  just delay everything to the end of the case, they can

6  take the hit, which is to say now we're going to have

7  these evidentiary findings against us, but nobody ever

8  has to find out the deep dark truth of what happened

9  here.  That's what these defendants are doing right now.

10 So they don't want me anywhere close to the truth of

11 what happened here because what happened here was

12 horrifying.

13              THE COURT:  But a default doesn't get you

14 any closer to that either.  A default on liability means

15 that liability is over, all we're going to move to

16 now -- be careful what you ask for -- is how did this

17 personally affect me as opposed to how was I affected by

18 the death of my son to begin with.

19              MR. BANKSTON:  Exactly.

20              THE COURT:  And that's a limited offer of

21 proof.  You wouldn't go into all the liability facts,

22 which seems to me, as a former plaintiff's lawyer

23 myself, you might want to do.  I don't know.

24              MR. BANKSTON:  I think that's --

25              THE COURT:  I'm not understanding how a

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
333 of 689

74

1  default gets you what you just said you want.

2                MR. BANKSTON:  Ah, okay.

3                THE COURT:  In fact, it kind of cuts it

4  off.

5                MR. BANKSTON:  You're right.

6                THE COURT:  No more discovery of facts.

7  We're done.  Right?

8                MR. BANKSTON:  Yes, absolutely.

9                THE COURT:  Okay.

10                MR. BANKSTON:  No, no, and I see what

11  you -- I kind of see what your point is there of

12  wouldn't I want to keep doing litigation to try to get

13  facts or something like that.

14                THE COURT:  I'm always wondering why trial

15  lawyers are doing what they're doing.  I can't help

16  myself, having been one myself.

17                MR. BANKSTON:  I have got no indication

18  that any of the money I've spent and any of the time

19  I've spent is getting me anywhere closer to that goal,

20  nowhere closer to it.  For two years I've been trying

21  after that goal and I'm nowhere closer to it.  I don't

22  believe that these defendants will ever take this

23  lawsuit seriously in any way, shape or form.  And I do

24  believe that instead of relying on whatever I just

25  happen to have to have, whatever findings I can get out

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
334 of 689

75

1  of the court or whatever I have now in my petition, I

2  don't want to roll the dice with a liability claim and

3  then have my client wonder, would that jury have found

4  liability if we had actually gotten the discovery?  No,

5  I'd just rather have the default.  Again --

6             THE COURT:  So you're thinking if he can't

7  even put on any evidence about any sources, that you run

8  the risk of a non-liability finding and then the client

9  could be upset about that when you could have gotten a

10  default from a discovery failure.

11             MR. BANKSTON:  I think there are some

12  other things in the discovery too that satisfy that too.

13  I mean, we're kind of focusing in on this source issue,

14  but, you know, I think they brought up this point of the

15  *prima facie* elements could be met and they'd still have

16  a way to prevail on the motion through like their

17  affirmative defenses and all of that.

18             And as I think we talked about at the

19  hearing last time, my discovery is relevant to a lot of

20  those issues that that they're raising.  You know, they

21  have this constitutional argument that kind of hangs

22  over the case that has a lot to do with what their

23  motivations were and how they treated my client

24  specifically and what their thinking was about my client

25  specifically, not just about the malice issue.  But they

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
335 of 689

76

1   seem to want to believe that they need -- that I would

2   need to prove that Mr. Jones intended to cause my client

3   harm, things like that.

4              There's a lot of different peripheral

5   issues that are still addressed by discovery.  And so I

6   actually think in terms of how you handle the motion

7   from an evidentiary standpoint, how you handled it in

8   *Heslin 1* is logically correct, because instead of doing

9   something like -- I mean, I don't want to bad mouth the

10  Connecticut court, but instead of just striking the

11  motion to dismiss, I think it's proper to make a finding

12  that then affects your denial of it.  And so I think

13  that needs to happen here.

14             But what I'm really arguing with you today

15  is that that's exactly what you gave for me last time,

16  and there needs to be an escalation of how this Court

17  responds to what is just egregious behavior by a party

18  that knew that it was conducting this egregious

19  behavior.  We talked a little bit about Barnes because

20  they knew who Barnes was and what he was doing.  They

21  had thrown him under the bus before.  They stuck with

22  him.  And they stuck with him in this case.

23             And so here when we sanction, there's a

24  sanction that flows from any of this, and there has to

25  be -- there has to be mandatory attorneys' fees.  You

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
336 of 689

77

1  can't let the client slip out from under that by saying,

2  oh, it was this lawyer who's now lost to the wind to us.

3  And you can't let the attorneys say, no, you can't get

4  us either so nobody gets sanctioned, right?  The client

5  knew what they were doing.  It was a very intentional

6  act.  And I think you can see from how that client was

7  acting it was an intentional act.

8               So we have fees before you.  I'm not going

9  to go into those because I have the anticipation I'm

10  about to be put on the witness stand to talk about them,

11  so I'm not going to talk to you much about that.

12               THE COURT:  Also, you're running out of

13  time.

14               MR. BANKSTON:  I should be running out of

15  time, exactly.  And, of course, on the merits, I think

16  you don't need to hear anything from me.  So with that,

17  let's go ahead and get to the evidence and we'll finish

18  up.

19               THE COURT:  Okay.  Let me log your time

20  here.  Back to you for any more argument or we can go

21  straight to evidence.

22               MR. JEFFERIES:  Sure.  I'd like to briefly

23  before I go to evidence respond to some of that in their

24  argument.

25               THE COURT:  All right.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
337 of 689

78

1          MR. JEFFERIES:  Again, Judge, I just want

2    to reiterate again this is the first motion for

3    sanctions in this case.  The two cases he put up there

4    are totally inapplicable to Rule 215, *Transamerica*,

5    et cetera.

6          As far as spoliation, I don't think they

7    met their burden in their evidence attached to their

8    motion that spoliation occurred.  Again, we talked about

9    the misleading representation, and I read to you

10   out loud Mr. Zimmerman's deposition testimony.  There is

11   no evidence that those emails -- any email has been

12   lost.  There is no evidence that any video has been

13   lost.  There is no evidence that, you know, any

14   information on Facebook or Twitter isn't available --

15   they're the ones who host the site -- that isn't

16   available through a subpoena to them.

17          And again, I want to focus the judge on --

18   and the judge made a very good point earlier.  You know,

19   we're here today in connection with the TCPA dismissal

20   claim.  The judge granted in my opinion pretty broad

21   discovery to them.

22          THE COURT:  Meaning me?

23          MR. JEFFERIES:  Yes.  Yes, I mean, they

24   got to take Alex -- Mr. Jones' deposition.  They got to

25   take Mr. Zimmerman's deposition.  They got a certain

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
338 of 689

79

1  amount of documents.  Again, I'm not defending what

2  happened with Mr. Dew, the corporate rep, but they got

3  Mr. Jones' deposition.  They don't like the answers

4  primarily, but, you know, that's part of a deposition.

5           That being said, as far as their concern

6  or their request that because Mr. Dew was not prepared

7  to talk about sources, that they should get some order

8  precluding the defendants from putting on evidence in

9  the future regarding sources I think would be wholly

10 inappropriate for a couple of reasons.  One is there's

11 no, again, evidence that's going anywhere.

12           There's nothing to preclude, meaning

13 again -- you know, there's a new quarterback now.

14 Barnes is gone.  They've complained about Barnes all

15 throughout their motion, in their presentation,

16 et cetera.  He's gone, okay?  He is off the case.  I

17 know already I cannot tell you -- yeah, all cases, I

18 mean, any representation.  He was never general counsel.

19 He had a retention agreement.  Yes, he was represented

20 as general counsel.  Mr. Jones -- you know, that's a

21 generic term.  But he had a retention agreement.  He was

22 never an employee of either FSS or InfoWars.  So,

23 you know, how he was referred to, he was an attorney.

24 He's been dismissed from all facets of any

25 representation of Mr. Jones, you know, as of the night

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
339 of 689

80

1 before the depositions, okay?

2          I can assure this Court I've spent

3 significant time finding out what's available, what if

4 anything is no longer available, hence Mr. Zimmerman's

5 affidavit.  And I will represent to this Court that,

6 you know, regardless if this goes on appeal, that

7 doesn't preclude me from -- it precludes -- it stays the

8 Court as far as filing motions, et cetera.  It certainly

9 doesn't preclude me from providing additional videos,

10 documents, and information they're seeking during that

11 period of time, and I fully intend to do so.  I've

12 already started that process.  So again, they're asking

13 now for basically an instruction that, you know --

14          THE COURT:  So what you're saying is

15 you're going to continue to comply with the order --

16          MR. JEFFERIES:  I --

17          THE COURT:  -- excuse me -- that includes

18 written discovery, which is the exhibit to my order,

19 ordering you to produce those things.

20          MR. JEFFERIES:  Absolutely, Judge.  I'm

21 representing to the Court that I have spent countless

22 hours understanding infrastructure, what exists,

23 et cetera, et cetera, and I am certainly going to comply

24 with that 100 percent, stay or no stay, moving forward,

25 absolutely.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
340 of 689

81

1          THE COURT:  So your point is let it come

2   back to the trial judge who's going to try the case and

3   see just how quickly you do that --

4          MR. JEFFERIES:  Exactly.

5          THE COURT:  -- and how compliant you are

6   with the order before we make potentially outcome

7   determinative decisions --

8          MR. JEFFERIES:  Exactly right.

9          THE COURT:  -- or preclude evidence from

10  being offered, et cetera.

11         MR. JEFFERIES:  Exactly right.  Exactly

12  right.

13         THE COURT:  All right.

14         MR. JEFFERIES:  And again, I do want to

15  reiterate one last time that the video that was shown,

16  et cetera, et cetera, these are in other cases.

17         So that's all the argument I have.  I'll

18  call myself as the first witness.

19         THE COURT:  Let me make sure they don't

20  have any more argument.  They've already used

21  53 minutes.  I would think they wouldn't.

22         You don't want to burn more time, do you?

23         MR. BANKSTON:  I wasn't aware that I even

24  had the option.  I do not plan on it.

25         THE COURT:  I was just going to go back

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 341 of 689

82

1 and forth until you're ready for witnesses.  All right.

2 You may call your first witness.

3              MR. JEFFERIES:  It will be myself, and

4 Mr. Burnett will ask questions.

5              THE COURT:  Please step forward in front

6 of me and raise your right hand.  Oh, yeah, maybe we

7 should take a break.  Hang on just one second.  Let me

8 log your time.  We'll take a break now for 10 or 15

9 minutes.  I'll see you back then.

10              *(Recess taken)*

11              THE COURT:  You may call your first

12 witness.

13              MR. JEFFERIES:  I call myself, Your Honor.

14              THE COURT:  All right.  Please step

15 forward in front of me and raise your right hand.

16              *(The witness was sworn)*

17                    **WADE JEFFERIES**,

18 having been first duly sworn, testified as follows:

19                    **DIRECT EXAMINATION**

20 BY MR. BURNETT:

21    Q.   Good afternoon.  Will you tell us your name for

22 the record.

23    A.   Wade Jefferies.

24    Q.   Are you a licensed lawyer in the state of

25 Texas?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
342 of 689

83

1      A.    I am.

2      Q.    Are you the lead counsel for the defendants in

3   this case?

4      A.    I am now.

5      Q.    And when did you become lead counsel for the

6   defendants?

7      A.    November 26th, the night before the depositions

8   in this -- the case we're here for today.

9      Q.    And the depositions you're referring to are the

10   ones that Judge Jenkins ordered in October, correct?

11      A.    That's correct.

12      Q.    Okay.  And when you became involved in this

13   case as lead counsel for the defendants, what did -- who

14   do you understand was in charge of responding to the

15   discovery request as ordered by Judge Jenkins?

16      A.    Robert Barnes.

17      Q.    And was he doing so as sort of outside general

18   counsel for the defendants?

19      A.    Yes, he was -- correct, outside is fair.

20      Q.    Was it your understanding that I, Michael

21   Burnett, had no involvement, participation, or

22   responsibility for responding to that discovery as

23   ordered by Judge Jenkins?

24      A.    That's correct.

25      Q.    And then did you represent the defendants at

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
343 of 689

84

1 the depositions?

2    A.   I did.  I defended their depositions.

3    Q.   And did it become clear to you during the

4 corporate representative's deposition that the corporate

5 representative that was identified by Mr. Barnes to

6 appear on behalf of the corporation was unable to answer

7 all of the questions along the topics as ordered by

8 Judge Jenkins?

9    A.   Yes.  I did two things the night before.  One,

10 I realized that Mr. Dew, who was chosen by Mr. Barnes to

11 be the corporate rep on all issues, that he couldn't

12 testify at all regarding IT issues.  So I immediately

13 called Mr. Bankston and said we're going to have two

14 corporate reps as opposed to one.  But then during the

15 deposition the following day I realized Mr. Dew was

16 unable to answer the questions posed to him.

17    Q.   Okay.  And what efforts, if any, did you make

18 after that deposition to cure this situation and

19 hopefully avoid a hearing like we're in today?

20    A.   Sure.  I reached out to plaintiff's counsel,

21 Mr. Bankston.  I told him that, you know, I understood

22 that Mr. Dew was unable to answer the questions posed,

23 offered to bring a new corporate rep to Houston so he

24 could take that deposition again and to pay for,

25 you know, the delta in additional cost as a result of

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
344 of 689

85

1  having to retake that deposition.

2      Q.   And you made that offer to Mr. Bankston?

3      A.   Absolutely.

4      Q.   Okay.  And what was Mr. Bankston's response to

5  that offer?

6      A.   He declined.

7      Q.   All right.  Do you know why he declined?  Or

8  excuse me.  Did he tell you why he was declining your

9  offer?

10     A.   He stated that it wasn't about money; it was

11  about time.

12             MR. BANKSTON:  Pass the witness.

13             THE COURT:  Use your microphone if you're

14  going to ask any questions.

15             MR. OGDEN:  I have questions, Your Honor.

16                   **CROSS-EXAMINATION**

17  BY MR. OGDEN:

18     Q.   Mr. Jefferies, you testified a second ago that

19  on November 26 was when you became lead counsel and your

20  understanding was Robert Barnes was lead counsel prior

21  to you, correct?

22     A.   Correct.

23     Q.   So as general counsel for InfoWars, Robert

24  Barnes was actually in the process of litigating the

25  case as well?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
345 of 689

86

1      A.   He was -- I wouldn't say he was responsible for

2  litigating the case.  He was responsible for interfacing

3  with the clients, getting the interrogatory responses

4  from the clients, interfacing with the clients in

5  obtaining the documents that were ultimately produced to

6  you and Mr. Bankston.

7      Q.   Who was in charge of litigating the case prior

8  to you?  Excuse me.  Immediately prior to you.

9      A.   Immediately prior to me?  In this case, I don't

10 know.

11     Q.   Are you familiar with the motion to substitute

12 counsel that was filed that introduced you into the case

13 somewhere in September of 2019?

14     A.   No, there's never been a motion to substitute

15 on my behalf.  I filed notices of appearances in all

16 four of the Austin cases.

17     Q.   Okay.  Are there any motions to withdraw as

18 counsel filed on behalf of the defendants you represent

19 currently?

20     A.   Not in this case, no.  I believe in the

21 *Scarlett Lewis* case that Mark Enoch has a pending motion

22 to withdraw.

23     Q.   Earlier you said outside general counsel,

24 correct?

25     A.   Correct.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
346 of 689

87

1    Q.   What is that?

2    A.   Outside general counsel as I would define it

3 would mean it's somebody generally representing a client

4 on various matters.  However, he or she is not employed

5 by the entity he is acting -- he or she is acting as

6 outside general counsel for.

7    Q.   So from the time that you filed an appearance

8 in this case to sitting here today, you aren't sure who

9 was litigating this case prior to you; is that your

10 testimony?

11   A.   No, it's not my testimony.  As far as what

12 Austin attorney prior to November 26?  Is that your

13 question?

14   Q.   It can be Austin.  It can -- I'm just trying to

15 figure out which attorney was in charge of litigating

16 this case.

17   A.   I guess I'm struggling with your term

18 litigating.  Prior to November 26, I filed my notice of

19 appearance I believe on November the 7th, maybe November

20 the 6th.  And Michael Burnett is also an attorney of

21 record in this case.

22   Q.   Are there any other attorneys of record in this

23 case besides Mr. Burnett and yourself?

24   A.   Not to my knowledge.

25   Q.   Have there ever been to your knowledge?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
347 of 689

88

1       A.    Not to my knowledge in this case.

2       Q.    So it will be -- and Mr. Burnett was lead

3  counsel -- was counsel of record in this case prior to

4  you joining, correct?

5       A.    That's correct.

6       Q.    So would it be your understanding that

7  Mr. Burnett was lead counsel in this case prior to

8  November 26, 2019?

9       A.    It would be my understanding that Mr. Burnett

10  was Austin litigation counsel for this case, that's

11  correct.

12       Q.    What's the difference between Austin litigation

13  counsel and lead counsel?

14       A.    Sure.  The distinction in my mind is imagine --

15  the distinction in my mind is Mr. Barnes in his capacity

16  as outside general counsel was directing, you know,

17  discovery efforts, et cetera, et cetera, as opposed to

18  Mr. Burnett.  Mr. Burnett's responsibility would have

19  been showing up, as he is today, arguing at various

20  hearings.

21       Q.    You would agree with me that when an attorney

22  files something with his name at the bottom, he's

23  responsible for that filing, correct?

24       A.    I'd agree with that.

25       Q.    Do you know whose name is on the discovery

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 348 of 689

89

1  responses in this case?

2      A.   My name is on several of them.

3      Q.   Do you know who else's name is on them?

4      A.   I don't believe there was any discovery.  I

5  think it's only my name.

6      Q.   My last question is -- or the last area,

7  depending on your answer to the last question.

8      A.   Sure, fair enough.

9      Q.   You didn't prep Mr. Dew on any of the other

10  topics other than IT and learned for the first time

11  during his deposition that he was not prepared on any of

12  the other corporate topics?

13      A.   Let me -- I think that's -- let me try to

14  answer that question.  I learned the night before the

15  depositions that Mr. Dew was not prepared to answer

16  anything regarding IT.  I also learned the night before

17  that he had -- was not as prepared as I had hoped he

18  would be regarding the other matters.

19      Q.   And from the time you filed your notice of

20  appearance in early November to the time Mr. Dew was

21  deposed, did you spend all of that time trying to read

22  the file and catch up with what was going on?

23      A.   Oh, I spent the majority of time reviewing all

24  four case files, obviously catching up on two years'

25  worth of documents, et cetera, et cetera.  That's where

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 349 of 689

90

1  I spent the majority of my time.

2               MR. OGDEN:  That's all I have.

3               MR. BURNETT:  No questions.

4               THE COURT:  All right.  You may step down.

5               MR. JEFFERIES:  Thank you, Judge.

6               THE COURT:  You may call your next

7  witness.

8               MR. JEFFERIES:  Michael Burnett.

9               THE COURT:  Step forward in front of me

10  and raise your right hand.

11               *(The witness was sworn)*

12               MR. JEFFERIES:  Your Honor, may I approach

13  to have two exhibits marked?

14               THE COURT:  Yes, you can approach the

15  court reporter to mark exhibits.

16               *(The witness was sworn)*

17                    **MICHAEL BURNETT**,

18  having been first duly sworn, testified as follows:

19                    **DIRECT EXAMINATION**

20  BY MR. JEFFERIES:

21      Q.    Can you state your name for the record?

22      A.    Michael Burnett.

23      Q.    And Michael Burnett, are you an attorney?

24      A.    Yes, I am.

25      Q.    And how long have you been practicing?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
350 of 689

91

1    A.    I've been practicing in Austin for -- I guess
2  I've been licensed for 25 years.  I worked for a federal
3  judge for a year, and then for the last 24 years I've
4  been here in Austin.
5    Q.    Okay.  Are you familiar with the rates charged
6  by other attorneys here in Travis County --
7    A.    Yes, I am.
8    Q.    -- for cases --
9         THE COURT:  Excuse me.  Wait until he gets
10  his entire question out.  The court reporter can't
11  record it otherwise.
12         THE REPORTER:  I didn't get the last few
13  words.
14         THE COURT:  She didn't get it.
15         MR. JEFFERIES:  Sure.
16    Q.    (BY MR. JEFFERIES)  Are you familiar with the
17  rates customarily charged by attorneys here in Travis
18  County for cases such as this?
19    A.    Yes, I am.  I am primarily a family lawyer now,
20  board certified in family law, and my practice is -- if
21  it's not 100 percent, 99 percent in the family law area.
22  But prior to that, for at least 15 years I practiced
23  extensively in commercial litigation, and I still
24  occasionally will have a commercial litigation case that
25  I'll handle.  So yes, I'm familiar with the rates in the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 351 of 689

92

1  commercial litigation area as well as the family law

2  area.

3      Q.   Okay.  And can you identify what's been marked

4  as Exhibit 1?

5      A.   Yes.  Exhibit No. 1 is the declaration of Mark

6  Bankston that he's offered to support his attorneys'

7  fees claim in this case.

8      Q.   Okay.  And that's a true and correct copy?

9      A.   Yes, it is.

10          MR. JEFFERIES:  I move that Exhibit 1 be

11  admitted, Judge.

12          MR. BANKSTON:  No objection, Your Honor.

13          THE COURT:  Thank you, Counsel.

14  Defendants' 1 is admitted.

15          *(Defendants' Exhibit 1 admitted)*

16      Q.   (BY MR. JEFFERIES)  Have you had a chance to

17  look over Exhibit No. 1?

18      A.   I have.

19      Q.   Okay.  And what conclusions -- well, have you

20  had a chance to run any calculations or analysis of

21  Exhibit No. 1?

22      A.   I have.

23      Q.   Okay.  And as a result of that analysis, what

24  conclusions, if any, did you reach?

25      A.   A few conclusions that I have.  And let me

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 352 of 689

93

1  preface my comments that with the exception that I don't

2  like the way plaintiff's counsel is litigating this case

3  in the press, I have no questions about their integrity,

4  their professionalism.  We've gotten along well.  I

5  don't want any of my testimony to be construed as

6  damaging or impugning their character or the work that

7  they're doing in this case because I do think they are

8  fine lawyers.  However, they are from Houston, and I

9  first and foremost believe that the rates that they are

10  charging are not reasonable rates for the Austin market.

11  I have done litigation in Houston myself, and I know the

12  rates in Houston are higher than the Austin market.

13           But here Mr. Bankston has been licensed to

14  practice law for ten years.  He's claiming a rate of

15  $450 per hour.  And in the Austin market, for someone

16  with his level of experience and being a very fine

17  lawyer, I think a reasonable rate for his level of

18  experience would be $350 an hour, not $450 an hour.

19           Similarly for Mr. Ogden, who's also a fine

20  lawyer, he's been practicing law for six years.  It

21  appears that he's been practicing longer -- I'll give

22  him credit for that -- by the job he's doing in this

23  case.  But the rate that he's claiming here is $400 an

24  hour, and a reasonable rate for someone even as good as

25  he is in Austin as a six-year lawyer would be around

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
353 of 689

94

1   $275 per hour.

2       Q.   Okay.  In addition to your analysis and

3   opinions on their rates and whether they're reasonable

4   or not for the Austin market, have you had a chance to

5   look at the time entries -- the time charged for various

6   services provided or documents drafted?

7       A.   Yes, I have.  If you look at Exhibit No. 1,

8   there's no breakdown by day, by specific date, what was

9   done, but there's a general description.  And it goes

10  through from the beginning of drafting the written

11  discovery request that is the subject of the motion,

12  drafting the motion to compel that the Court granted --

13  or the motion for discovery that the Court granted, and

14  then actually then reviewing the discovery and taking

15  the discovery and drafting today's -- the motion that's

16  the subject of today's hearing.  They're down in those

17  different categories.  If you take the claimed amount of

18  time that they did to draft the written discovery

19  request, he's claiming 3.5 hours.  If you look at

20  written discovery request, I don't think it would be

21  more than an hour and a half to draft that discovery.

22      Q.   Okay.  Let me stop you right there.  Look at

23  Exhibit No. 2.

24      A.   Yes.

25      Q.   And can you identify what's been marked as

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
354 of 689

95

1  Exhibit No. 2?

2      A.    Yes.   Exhibit No. 2 are the written discovery

3  requests that Judge Jenkins ordered that the defendants

4  answered.

5      Q.    Okay.   And how many -- for Free Speech Systems,

6  how many discovery requests were sent to Free Speech

7  Systems?

8      A.    Well, if you look at them, there's one request

9  for admission, four interrogatories, and three requests

10 for documents.

11     Q.    Okay.   And do you know if Mr. Bankston drafted

12 discovery requests for Free Speech Systems in the

13 *Scarlett Lewis* matter?

14     A.    Yes.

15     Q.    So all in all, looking at the discovery

16 contained in Exhibit No. 2, how long do you think it

17 should have taken to draft these particular motions --

18 or these discovery requests?   Excuse me.

19     A.    In many law firms this discovery would have

20 been drafted by a paralegal or an associate, not the

21 lead counsel for the client.   But regardless of who was

22 doing it, especially someone of Mr. Bankston's level and

23 experience and skill, an hour and a half at the most.

24     Q.    Okay.   Let me draw your attention down to the

25 drafting of the motion for sanctions for discovery

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
355 of 689

96

1 abuse.

2     A.   Yes.

3     Q.   It says 36 hours, correct?

4     A.   Right.

5     Q.   And it's got a date range from November 27th,

6 '19 through 12-10-19, correct?

7     A.   Right.

8     Q.   So it's nowhere broken down by how much hours

9 spent per day or anything like that, correct?

10     A.   No.  No.  It is bold billing -- or actually, I

11 think we refer to that as block billing.  He claims that

12 he spent 36 hours drafting the motion for sanctions and

13 that Mr. Ogden says that he worked on it for 18 hours.

14 That's a total of 54 hours to draft a 47-page motion

15 that included a lot of quotes from other cases and

16 discovery in there.  And if you break it down per page,

17 that means they would have spent almost 69 minutes, over

18 an hour, drafting each page of that motion, which in my

19 opinion is excessive and not reasonable.

20     Q.   Okay.  And going back to -- you said citations.

21 You reviewed their motion for sanctions, true?

22     A.   Yes.

23     Q.   Okay.  And would you agree that a large portion

24 of their 46-page -- not the exhibits but the actual

25 motion for sanctions is copy and pasted deposition

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 356 of 689

97

1  testimony for depositions in this case?

2      A.    Yeah.  Well, in this case and then also

3  information that they've had in other cases that I

4  believe would have been reviewed before the drafting of

5  this motion because it's been referred to by plaintiff's

6  counsel in other contexts.

7      Q.    And when you've got a 46-page motion that

8  includes a lot of those cut and paste kind of jobs, as I

9  call them, in your experience and expertise typically

10  does it take less to draft such a motion as opposed to,

11  you know, a court appellate brief or a motion for

12  summary judgment brief?

13      A.    Of course.

14      Q.    Okay.

15      A.    And then --

16      Q.    Go ahead.

17      A.    Did you want to ask me about some of the other

18  entries?

19      Q.    Oh, yeah.  Let me ask you a couple other

20  questions.  One, let me point to deposition preparation

21  for Alex Jones, 20 hours.  Do you see that?

22      A.    Right.  I don't think it's reasonable to spend

23  20 hours preparing to take a three-hour deposition when

24  counsel's already taken the deposition of Mr. Jones

25  before.  He obviously was prepared about the facts of

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
357 of 689

98

1   the case because we had a previous hearing on a motion

2   to dismiss where he went into a lot of the allegations.

3   I don't believe it should have taken him more than five

4   hours to prepare to depose Mr. Jones.

5       Q.   And do you have an opinion on whether or not

6   that deposition preparation is going to --

7               THE COURT:  I'm sorry.  What did you say

8   instead of the 36 hours for drafting the motion?  Did

9   you ever answer a question about how long you think it

10  should have taken?

11              THE WITNESS:  Five hours, Your Honor.

12              THE COURT:  Instead of 36 hours.

13              THE WITNESS:  Yes, Your Honor.

14      Q.   (BY MR. JEFFERIES)  Well, and for

15  clarification, it was 36 by Mr. Bankston and 18 hours by

16  Mr. Ogden, correct?

17      A.   That's correct.

18      Q.   Okay.  So that's a total of 54 hours they

19  charged, correct?

20      A.   That's correct.

21      Q.   Okay.  Now, going back to the preparation for

22  the deposition, do you have an opinion whether or not

23  that preparation is going to carry over once we start

24  getting into discovery in the case-in-chief?

25      A.   Yes, I do.  I think all that information -- I

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
358 of 689

99

1  mean, or time that he spent preparing for Mr. Jones'

2  deposition and also the time he spent preparing for

3  Mr. Watson's deposition can be used in the

4  case-in-chief, I'll call it.

5          When you look at the deposition

6  preparation for Paul Watson, Mr. Bankston avers that he

7  spent 14 hours preparing for that deposition.  I don't

8  think it should have taken him more than five hours to

9  prepare for that deposition.

10          Mr. Bankston also says that he spent 18

11  hours reviewing documents.  Similar to the deposition

12  prep, that's not wasted time on the discovery -- or,

13  you know, that's not lost time for the corporate rep not

14  being able to testify about all the matters because

15  those documents would have had to have been reviewed as

16  part of the case-in-chief anyway, so that information

17  can be used --

18      Q.  Okay.  Going back --

19      A.    -- you know, after the hearing.

20          THE COURT:  Excuse me.  He didn't finish

21  his answer and now you're speaking.

22          MR. JEFFERIES:  I apologize, Judge.

23          THE COURT:  The court reporter just can't

24  do that.  Do you want to finish your answer?

25          THE WITNESS:  Yeah.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
359 of 689

100

1      A.    That time that Mr. Bankston and Mr. Ogden both

2   spent preparing for these depositions can be used in the

3   case-in-chief and also the time they spent reviewing the

4   documents.  I do believe that, you know -- I've gone

5   through and calculated if you want me to answer what I

6   do think would be an appropriate amount of time that

7   they have spent that could be argued by counsel as being

8   wasted because they were unable to get all of the

9   discovery ordered by Judge Jenkins.

10      Q.    (BY MR. JEFFERIES)  And what is that amount?

11      A.    Well, I would say -- if you look at the time

12   that they have on Exhibit No. 1, preparing -- for

13   Mr. Bankston's time, five hours to prepare for

14   Mr. Jones' deposition would be a reasonable amount of

15   time.  Five hours for preparing for Mr. Watson's

16   deposition.  I think he should get the full credit for

17   the four hours he actually took Mr. Jones' deposition,

18   the two hours to take the deposition of Mr. Watson, and

19   then five hours for drafting the motion.  That would be

20   21 hours that I think can be argued was, quote, unquote,

21   wasted on that discovery that he didn't obtain that was

22   ordered by Judge Jenkins.

23              And then if you look at Mr. Ogden's time,

24   I think five hours preparing for the deposition of Free

25   Speech Systems, LLC and four hours to actually take that

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
360 of 689

101

1  deposition for a total of nine hours it could be argued

2  as wasted on the discovery that they weren't able to

3  get.

4             If you add those hours together, if you

5  just -- you know, if the Court orders that the rates

6  claimed by or charged by plaintiff's counsel is a

7  reasonable rate for Austin, using those rates then the

8  total amount of fees would be $13,050.  If the Court

9  were going to go with the lower rates that I testified

10 that I think are reasonable for the Austin market, then

11 the fees would be $9,825.

12             MR. JEFFERIES:  I'll pass the witness.

13             MR. OGDEN:  Cross, Your Honor.

14             THE COURT:  Use your microphone, please.

15             MR. OGDEN:  Yes, Your Honor.

16                    **CROSS-EXAMINATION**

17 BY MR. OGDEN:

18    Q.   Mr. Burnett, earlier you said -- or you used

19 the term the Austin market, correct?

20    A.   Yes.

21    Q.   What did you do to prepare for your testimony

22 today to determine reasonable rates for the Austin

23 market?

24    A.   Well, one, I'm familiar with the rates because

25 I practice here in Austin and so I have personal

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
361 of 689

102

1  knowledge what the rates are.  In addition, prior to my

2  testimony today, I called Mark Hawkins, who's a licensed

3  lawyer here in town who does commercial litigation.

4  He's been practicing law in Austin since I think 1995.

5  He's a partner at Armbrust & Brown.  I've got a lot of

6  respect for him.  He's got a great reputation.  In

7  addition to being a commercial litigator himself,

8  Mr. Hawkins is a mediator for commercial litigation

9  cases.  And in his role as a mediator, he encounters

10  a lot of other lawyers and is familiar with the rates

11  charged by other lawyers doing commercial litigation.

12  And I asked him what he thought was a reasonable rate,

13  and the answers he gave me coincidentally were the same

14  rates that I had come up with on my own and that I

15  testified to earlier today.

16          THE COURT:  I should let the plaintiffs

17  now know you've crossed the hour point.  You're down to

18  under 20 minutes for everything you're going to say and

19  every question you're going to ask.

20          MR. OGDEN:  Yes, Your Honor.

21  Q.   (BY MR. OGDEN)  During your questioning, you

22  mentioned your experience and said -- you listed a lot

23  of areas that you practice, family law and commercial

24  litigation.  You did not mention that you practiced any

25  personal injury, correct?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
362 of 689

103

1     A.   No, I'm not a personal injury lawyer.  I have

2  handled defamation cases for the plaintiff and the

3  defendant, but in my mind personal injury like car

4  wrecks, medical malpractice, those kind of cases, I've

5  never handled those in my practice.

6     Q.   What do you charge by the hour?

7     A.   I charge $575 an hour.

8     Q.   How many defamation cases have you done?

9     A.   Three that I can think of right now, including

10  one trial I had against 60 Minutes in El Paso.

11     Q.   How much do you believe is a reasonable rate

12  for Mr. Bankston to charge for this case?

13     A.   $350 per hour.

14     Q.   How did you get to that number?

15     A.   Based on his years of practicing law, someone

16  at the top level of that.  I think that's what the

17  market here in Austin is, based on my experience and

18  conversations with Mr. Hawkins.

19     Q.   So the accepted principles and methods that you

20  used to apply to the facts of this case to come to your

21  expert opinion are based solely on an attorney's

22  experience and numbers of years, correct?

23     A.   No.  No.  No, it's not based solely on the

24  number of years.  In Austin if you're -- he's a very

25  accomplished and talented lawyer, but he's a ten-year

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 363 of 689

104

1  lawyer.  I don't believe he's board certified.  And

2  ten-year lawyers -- I don't know what you guys do down

3  there.  In Austin they don't charge $450 per hour, and

4  that's based on my own personal experience in dealing

5  with other lawyers and also my conversation with

6  Mr. Hawkins.  It doesn't mean he's a bad lawyer or he's

7  not doing a good job.  I'm just saying someone at that

8  level, you have to be in your -- for most people in the

9  20 years of practice to be able to charge a rate that

10  high.

11      Q.    What about $400 an hour?  How long do you need

12  to practice to charge $400 an hour?

13      A.    I think around probably in Austin in this kind

14  of case closer to 15 years.

15      Q.    Are you aware that Mr. Enoch who represents

16  your clients charged his son, who has less experience

17  than I do, $400 an hour and sought over $130,000 against

18  my client for a TCPA motion in *Heslin 1*?  Did you know

19  that?

20      A.    No, I didn't know that.  But Mr. Enoch is a

21  Dallas lawyer where the rates are higher up in Dallas

22  than they are in Austin.  And I'm also familiar with the

23  case law, and I assume you are as well, that the

24  reasonableness of your rates have nothing to do with the

25  rate or hours that the opposing side charges.  That's

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
364 of 689

105

1   not the standard.  So that's my answer on that.

2      Q.   Are you aware that Mr. -- is it your

3   understanding Mr. Bankston only practices in Houston?

4      A.   No, I never said that.

5      Q.   Are you aware that Mr. Bankston practices in

6   Austin?

7      A.   I don't know one way or the other, but that

8   doesn't change my testimony on what his rate should be.

9   I mean, the fact of whether --

10         THE COURT:  Just answer the question and

11   wait for the next question.

12         THE WITNESS:  Right.

13      Q.   (BY MR. OGDEN)  Your answer is no, you don't

14   know where Mr. Bankston practices?

15      A.   No.  I just know he has these four cases in

16   Austin, but I don't know the extent of his docket.

17      Q.   Are you aware that Mr. -- did you do anything

18   to prepare yourself to learn Mr. Bankston's experience

19   over the last ten years?

20      A.   Yes.  I looked at his website, and I looked him

21   up on the state bar website to find out when he was

22   licensed to practice law, and I tried to find out

23   whether or not he was board certified in any practice

24   area.

25      Q.   Are you aware that Mr. Bankston is undefeated

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
365 of 689

106

1 at three state supreme courts outside of Texas and

2 currently has a brief pending in front of the United

3 States Supreme Court all involving complex products

4 liability cases?

5     A.   No.  That doesn't make a difference to me, no.

6     Q.   So it doesn't matter to you what a lawyer does

7 once he's licensed; you just count the years?

8     A.   No, no.  No, it does matter what he did.  I

9 gave him the benefit of the doubt of being a very

10 excellent lawyer in coming up with the rate.  I think he

11 at 350 an hour for a ten-year lawyer in Austin is on the

12 very high end.  There's a lot of lawyers that have been

13 practicing ten years that I would say based on their

14 experience and level of competency should be around 200

15 or 225 per hour.  I do think he's a fine lawyer.  And

16 that's great to hear he's undefeated, but...

17     Q.   You understand that you're -- that you've been

18 called as an expert in this case as you sit here,

19 correct?

20     A.   Yes.

21     Q.   Do you believe you adequately prepared yourself

22 to give expert testimony within a reasonable degree of

23 professional certainty as to Mr. Bankston's experience?

24     A.   Yes, and also for your experience as well, I

25 do.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
366 of 689

107

1      Q.    You said that the 36 hours Mr. Bankston spent

2  on the briefing shouldn't have been more than five

3  hours, correct?

4      A.    That's my opinion, yes.

5      Q.    How many documents were attached to the motion?

6      A.    Many, many pages.

7      Q.    You don't know?

8      A.    No, no, I didn't count the pages, but I know --

9  I think it's a 600-something-page document, and many of

10  the pages are transcripts that are attached that

11  Mr. Bankston has been referencing in other cases, and

12  he's also been sending this information -- many of

13  this -- much of this information to the press.  And so I

14  don't think it's reasonable to attribute all the time

15  that he's done looking at this information and gathering

16  it for this motion to be reasonable.  I don't.

17      Q.    There are three new depositions that were

18  involved in this motion, correct?

19      A.    The three new depositions?

20      Q.    Yes.

21      A.    Yeah, those are the corporate represent -- the

22  corporate representative depositions and Mr. Jones'

23  depositions that Mr. Bankston attended.

24      Q.    How many pages were there?

25      A.    I didn't count the pages.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
367 of 689

108

1    Q.    Did you read them?

2    A.    The depositions?

3    Q.    Yes.

4    A.    No.  I wasn't there and I have not read the

5    transcripts.

6    Q.    So you don't know how many pages were involved

7    in the motion, attached to the motion as attachments --

8    you don't know how many pages each deposition was that

9    was cited in the motion, yet you're giving an opinion to

10   a reasonable degree of professional certainty on how

11   many hours it should have taken to draft the motion,

12   correct?

13   A.    That is correct.  He was at the deposition --

14            MR. BURNETT:  That's all I have,

15   Your Honor.

16            MR. JEFFERIES:  No further questions,

17   Your Honor.  Pass the witness.

18            THE COURT:  You may step down.

19            MR. JEFFERIES:  I have no further

20   witnesses, Judge.

21            THE COURT:  Oh, I thought you were calling

22   another one.

23            Okay.  The hearing turns to you to call

24   any witnesses you wish to call.  Any witnesses you wish

25   to call?

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
368 of 689

109

1        MR. BANKSTON:  Excuse me, Your Honor.  No,
2   we -- no need to call any witnesses.
3        THE COURT:  Okay.  You have an unequal
4   consumption of time.  How much time do you want to --
5   you made extensive arguments at the beginning.  I'm sure
6   you don't want to make those arguments again.  How long
7   do you wish to argue now?
8        MR. JEFFERIES:  I mean, Your Honor, I just
9   need a short closing statement.
10       THE COURT:  Do you want them to close
11  first and then you --
12       MR. JEFFERIES:  Yes.
13       THE COURT:  -- so that you can have the
14  last word?
15       MR. JEFFERIES:  Yes, Your Honor.
16       THE COURT:  Can we simply say ten minutes
17  a side for a final closing argument?
18       MR. JEFFERIES:  Certainly.
19       THE COURT:  Or do you need -- is that
20  ample?
21       MR. BANKSTON:  That's ample for me,
22  Your Honor.
23       MR. JEFFERIES:  Likewise, Judge.
24       THE COURT:  Great.  Then you get to go
25  first because I said they would get the last word since

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
369 of 689

110

1   they have the burden of persuasion.

2            MR. BANKSTON:  Your Honor, if it please

3   the Court, I don't think I need to talk about obviously

4   the merits of the motion to dismiss or even really the

5   sanctions motion.  I think you've heard quite a bit

6   about it and the papers are really exhaustive.  I just

7   wanted to spend a little time here at the end addressing

8   my fees and Mr. Ogden's fees and some of the testimony

9   that was given about that.

10           First of all, as you can tell from my

11  affidavit, I am an unusually accomplished lawyer for my

12  age.  I understand that.  I have reduced what my

13  standard billing is.  I bill at the same level

14  Mr. Burnett bills at.  I submit those bills in

15  consolidated litigation.  I've been paid in many, many

16  cases at the rate of $550 an hour.  You know, I've

17  talked about some of those experiences.

18           Mr. Ogden likewise is sort of a rising

19  star here in Texas and is at the center of some of the

20  most complicated mass torts in south Texas, and he bills

21  at a high rate too.

22           We've both reduced our fees for this case,

23  and I've tried to explain why that is.  And it is a

24  lower rate than Mr. Burnett.  It's a lower rate than

25  Mr. Enoch's 535.  And so we've brought that rate down,

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
370 of 689

111

1   and I do believe it's appropriate.  I belong to a

2   law firm that is very accomplished and is one of the --

3   is in the running for the top three products liability

4   firms in the country this year.  We do fantastic work.

5   And I take any umbrage at the idea that the billing that

6   I testified to is not worth for what it is in this case.

7   This case is a very unusual case.  It is a case that has

8   incredible national focus on it.  And I think it's right

9   for these clients to have hired a lawyer of my type.

10              In terms of the time on some of these, you

11  heard a little bit of Mr. Ogden talking about

12  Mr. Burnett making these opinions without knowing the

13  actual specifics of how much some of this should have

14  taken.  And I want to point to an example of that.  For

15  instance, take the interrogatories, for example.  I had

16  to draft discovery in this case.  And Mr. Burnett says,

17  no, there's no way it should have taken you long to

18  draft that discovery.

19              THE COURT:  Is that the category drafting

20  proposed written discovery?

21              MR. BANKSTON:  That's correct, Your Honor.

22  Okay.  And Mr. Burnett says, oh, you should have only

23  taken about an hour, an hour and a half to do that.  And

24  if you look at that discovery, let's just take one of

25  the interrogatories, which is one of the interrogatories

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
371 of 689

112

1   to Mr. Jones.  And that interrogatory has 18 separate

2   subparts that reference 18 specific contentions that

3   were advanced in 18 separate videos, all right?  The

4   amount of time it took to organize those videos, pull

5   the quotes, arrange all of that into that one

6   interrogatory took me an hour and a half, much less the

7   entire remainder of the discovery.

8              This case is incredibly detailed oriented,

9   and it has an ever exponentially growing record as I

10  keep discovery more in the public domain.  It has taken

11  an immense amount of time.

12             None of the testimony that was given to

13  you about the fees was really done to a reasonable

14  degree of certainty.  It was just sort of another

15  lawyer's opinion.  And in case after case after case

16  that I've been involved in which I'm doing high-level

17  briefing -- and in this case, this motion for sanctions

18  is a highly technical motion and, as you saw, with

19  nearly 30 exhibits that had to be all coordinated and

20  done.  I typically average about an hour a page to get a

21  motion like that done.  And that's what's happened on

22  this case and it's happened in all of what you see in

23  front of you.

24             The hours that we have claimed are

25  substantially less than what defendants have routinely

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
372 of 689

113

1  claimed over and over in this case.  And there is some

2  element of fairness to be considered there.  But what I

3  really want --

4              THE COURT:  What you're saying is to draft

5  this motion was a total of 46 hours of attorney time; is

6  that right?

7              MR. BANKSTON:  Yes, Your Honor.

8              THE COURT:  No, I'm sorry.  54 hours of

9  attorney time.

10              MR. BANKSTON:  Yes, 54 hours of attorney

11  time to draft the 50-page motion and do the exhibits and

12  have it all done.  Basically me and Mr. Ogden took

13  sections of that.  He took a smaller portion of the

14  motion than I did and we worked on it side by side.

15              I also want to point out that we have been

16  and always are conscientious of this Court to be

17  conservative in our fees.  Not everything that we have

18  done in this case quite clearly is charged on those.

19  One of the things that we have done, for instance, just

20  because -- I think maybe we're entitled to it, but I

21  haven't done it.  You aren't going to see charges up

22  there for me and Mr. Ogden's travel.  You're not going

23  to see us for the time that we literally have to spend

24  here away from other work.  None of that is in there.

25  We've tried -- both Mr. Ogden and I showed up to all

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
373 of 689

114

1  three depositions.  We're only charging one lawyer.

2            THE COURT:  How are you getting here, now

3  that I'm curious?

4            MR. BANKSTON:  Actually, I've actually

5  discovered a service called Vonlane, which is a bus

6  service that comes up here.

7            THE COURT:  Yes, I've heard about it.

8            MR. BANKSTON:  And it's really great for

9  attorneys because they'll set you up a desk too while

10  you're working.  Maybe that's another reason I don't

11  need to claim the time that I'm on the bus, because I

12  can actually make something of it, but I am

13  conscientious about those things.

14            This attorneys' fees is consistent with

15  every other affidavit we've ever submitted in the case.

16  If you go back and you look at our expedited discovery

17  or any of the other affidavits that I've submitted,

18  you're going to see the amounts of times to do these

19  tasks is directly on target.

20            THE COURT:  Well, since you bring that up,

21  have you compared this to your affidavit that you

22  submitted for your 91a claim for fees?

23            MR. BANKSTON:  Yes.  For the work that was

24  done in *Heslin 1*, correct, Your Honor.  Yes, I've taken

25  a look at that.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
374 of 689

115

1              THE COURT:  Well, the 91a is -- there's

2    the 91a motion to dismiss in *Heslin 2*.  Do you remember?

3    We had a hearing --

4              MR. BANKSTON:  Oh, yes.  Yes.  I'm sorry,

5    Your Honor.  Yes.

6              THE COURT:  Have you looked at that

7    affidavit to compare it to the affidavit that you

8    submitted for the motion for sanctions?

9              MR. BANKSTON:  I have done that at one

10   point, not recently enough to talk to you about it in

11   great detail without me pulling it up.

12             THE COURT:  You would agree, though, you

13   were telling me I really have to award all the fees in

14   the 91a motion if I deny it.

15             MR. BANKSTON:  Right.  That was my

16   argument, yes.

17             THE COURT:  Yes.  And there are several

18   entries on that affidavit that match up the entries on

19   this affidavit.  I should not order them twice, right?

20             MR. BANKSTON:  Oh, I agree with that, yes.

21             THE COURT:  And I found -- and I'm sorry

22   to tell you this -- but some disconcerting

23   inconsistencies on three entries on the affidavit.  I

24   did look at them.  For example, on the 91a affidavit, it

25   says -- let's see.  Drafting proposed discovery, two

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
375 of 689

116

1  hours.  But on this affidavit it's drafting proposed

2  written discovery, three and a half hours.  Of course,

3  if I had already awarded drafting discovery in the 91a

4  motion, I shouldn't award it here, but it's a different

5  number of hours.  And then drafting the motion for

6  expedited discovery in the 91a motion, six hours.  In

7  this motion today, nine hours.  And then finally,

8  consultation with expert regarding discovery.  And I

9  will say you put three different dates, 9-5 to 9-8, on

10  this new affidavit, but on the affidavit you submitted

11  in October all of your -- and you said this was all the

12  work you've done on the case and I should award all of

13  it.

14           MR. BANKSTON:  Right.

15           THE COURT:  That was the argument.  I

16  remember.

17           MR. BANKSTON:  Okay.

18           THE COURT:  Not just discovery, but all of

19  it.  Consultation with discovery -- with expert for

20  discovery was two hours, but now on this new affidavit,

21  consultation with expert on declaration for discovery

22  motion is four hours.  So those are some

23  inconsistencies.

24           MR. BANKSTON:  So -- okay.  So some of

25  that I need to -- in creating the affidavit for this

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
376 of 689

117

1  case went back and looked at what I did with my expert

2  and in combination with the expedited discovery motion,

3  and I think I have divided that time up differently than

4  the first affidavit that I did in the second affidavit.

5  So I believe, one, I was pretty conservative about it in

6  my first affidavit.  But in the second affidavit I

7  believe I have some of my expert time actually with what

8  we did on the motion.

9          THE COURT:  But you understand all I have

10  is affidavits, no additional testimony, and I found

11  those --

12          MR. BANKSTON:  No, I understand.

13          THE COURT:  -- three inconsistencies.  So

14  I just have to do the best I can divining what that

15  means.

16          MR. BANKSTON:  Look, I'll make that part

17  of it easy for you.  If you have any conflicts with my

18  affidavit, I play it like the lower number that I have

19  is -- you can take that number.

20          THE COURT:  Good answer.  Thank you.

21          MR. BANKSTON:  So I think there might be a

22  couple like that on there that are like those because,

23  again, we had some tasks that were all in one ball of

24  wax.  So please do just take the lower number on those.

25  But with respect mainly to --

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
377 of 689

118

1          THE COURT:  And you're down to the last

2    couple of minutes.

3          MR. BANKSTON:  Sure.  And what I'll just

4    say to conclude is that you see the quality of the

5    motion and what we had to do to do it and you see

6    everything that went into it beforehand.  And there's

7    this allegation that maybe I shouldn't have spent so

8    much time preparing for a deposition of Alex Jones,

9    which as I think you've seen from both transcripts are

10   two qualitatively different depositions.

11         I believe that all the time that we spent

12   was necessary and reasonable in this case, particularly

13   because of the nature of the case and how heavily it's

14   being litigated.  So I believe in comparison to all the

15   other affidavits in the case, this one is right in line

16   with everything else from both sides.  That's why we'd

17   urge those attorneys' fees.  Thank you, Your Honor.

18         THE COURT:  Thank you.  It's your turn.

19         MR. JEFFERIES:  Yes, Your Honor.  We're

20   going to respond on attorneys' fees, specifically

21   regarding the drafting of the motion for discovery

22   abuse, the 54 cumulative motions by both attorneys -- or

23   54, yeah, total hours for both attorneys.  And again,

24   Judge, I would argue, you know, to refer to the quality

25   of the motion.  Again, I don't think they pointed to one

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
378 of 689

119

1   Rule 215 case that says you can bring in and incorporate

2   into a 46-page motion with -- you know, 600 total with

3   exhibits and that's proper under a 215 motion talking

4   about other cases other than this one, much less a

5   Connecticut case.  And a majority of a portion of their

6   brief deals with those types of issues.  So I would

7   request that the Court take that into consideration when

8   looking at that number.  I just think that is

9   unnecessary.  There's no basis in Texas law in my

10  opinion for the Court to look at conduct outside of the

11  conduct in this case under Rule 215, which is --

12              THE COURT:  Can't you, though, look for a

13  pattern and practice?  And maybe you can't do sanctions

14  for what happened in another case, but this is not an

15  accident; this is a habit.  It's almost like habit

16  evidence, that you can't use evidence of what people did

17  under other circumstances to prove they did it in this

18  case.  But on the other hand, if someone is habitually

19  doing these things, it's something courts can consider.

20  And when I think about the inability of Alex Jones to

21  answer any questions about sources but saying, oh, I can

22  find -- I didn't know I had to look for that, but I can

23  go find that, and then you admit, and I appreciate it,

24  the deposition of the corporate rep, Rob Dew, was

25  completely useless, and it has been before.  I mean, the

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
379 of 689

120

1  discovery before in other cases has been not

2  forthcoming, even cases I've handled.  So I don't know

3  why I can't consider those things as part of the

4  pattern.

5          MR. JEFFERIES:  Fair enough, Judge.  Part

6  of the pattern, again under the *Brookshire* case,

7  you know, one of the points it makes is that the

8  plaintiff in this case shouldn't get the fruits of

9  alleged improprieties in other cases, meaning they can't

10 argue because of that alleged discovery abuse in other

11 cases that Mr. Heslin in this *Heslin 2* case should get

12 the benefit of that.  And that's what they're asking for

13 both under monetary sanctions and other sanctions from

14 the Court.  So anyway -- so again, I think that's,

15 you know, Texas Supreme case law.  You need to look

16 at --

17         THE COURT:  But I'm required to order

18 attorneys' fees for anything that was incurred,

19 including, of course, drafting the motion for sanctions,

20 unless it's substantially justified, unless the

21 resistance to this motion is substantially justified.  I

22 believe that's something along the lines of what the

23 rule says.  Am I right?

24         MR. JEFFERIES:  Agreed.  And I'm not

25 questioning the Court's ability or authority to award

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 380 of 689

121

1  attorneys' fees.  I'm questioning what's fair and

2  reasonable given the *Brookshire* case, et cetera, that

3  the plaintiff in this case shouldn't benefit from

4  alleged bad acts in another case.  The purpose of

5  Rule 215 is to get corrective conduct in this case.

6            Again, the last thing would be going back

7  to Mr. Bankston's, I guess, request to somehow have an

8  order entered which would preclude my clients from

9  putting on any source evidence they have in the future.

10 Again, I made a representation to the Court.  I'm

11 actively going on that.  I'm getting a handle on this.

12 There's been an active flow of information.  Again, this

13 has been transcribed.  There's a record here for the

14 judge.  But to do it now I would think is inappropriate,

15 Your Honor, and I request that that order not be

16 entered.  Thank you, Judge.

17            THE COURT:  All right.  That concludes our

18 record.  I'm required to rule on this quickly.  So by

19 the middle of January I have to rule or it's overruled

20 by operation of law, I believe, the motion to dismiss.

21 So you'll get a ruling from me, and you'll get a ruling

22 from me on the motion for sanctions.  It will be in a

23 single order.  You can already tell some of the things

24 I'm thinking about in light of what I did in *Heslin 1*.

25 But I'll ruminate on that some more and decide how to

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
381 of 689

122

1  deal with all of the arguments you've made and what

2  should be done at this juncture in the case.

3            Thank you again for your arguments and

4  your briefing.  That concludes our record.

5                    *(Court adjourned)*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
382 of 689

123

1                    **REPORTER'S CERTIFICATE**

2

3  THE STATE OF TEXAS   )

4  COUNTY OF TRAVIS     )

5              I, Chavela V. Crain, Official Court

6  Reporter in and for the 53rd District Court of Travis

7  County, State of Texas, do hereby certify that the above

8  and foregoing contains a true and correct transcription

9  of all portions of evidence and other proceedings

10  requested in writing by counsel for the parties to be

11  included in this volume of the Reporter's Record, in the

12  above-styled and numbered cause, all of which occurred

13  in open court or in chambers and were reported by me.

14     I further certify that this Reporter's Record of

15  the proceedings truly and correctly reflects the

16  exhibits, if any, offered in evidence by the respective

17  parties.

18     WITNESS MY OFFICIAL HAND this the 21st day of

19  January, 2020.

20
                            _/s/ Chavela V. Crain_____
21                          Chavela V. Crain, CSR, RDR, RMR, CRR
                            Texas CSR 3064
22                          Expiration Date:  12/31/2019
                            Official Court Reporter
23                          53rd District Court
                            Travis County, Texas
24                          P.O. Box 1748
                            Austin, Texas 78767
25                          (512) 854-9322
    *

# EXHIBIT "8"

| NO.    X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
|---|---|---|
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| NO.    X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| NO.    X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

### MOTION FOR COMMISSION TO TAKE OUT OF STATE DEPOSITIONS

Pursuant to Conn. Gen. Stat. §52-148c(b) and Connecticut Practice Book §13-28(a), the plaintiffs in the above-captioned consolidated matters respectfully request that this Court grant a Commission to a competent authority, in the form attached hereto as Exhibit A., to issue or cause to issue Subpoena *Duces Tecum,* compelling the testimony and production of documents from Hillary Clinton, 15 Old House Lane, Chappaqua, New York.

## <u>THE WITNESS</u>

Hillary Clinton is a former public official and a former presidential candidate. She has been the target of vitriolic criticism by Alex Jones.

Although Mr. Jones made certain statements about Sandy Hook as early 2012, and largely stopped making claims about Sandy Hook in the years thereafter, the plaintiffs in this action waited until 2018 to bring the instant action. They are all represented by the same firm, Koskoff, Koskoff and Bieder. On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid.

It is clear as a matter of public record, that Erica Lafferty, the lead plaintiff in this case, was invited to speak at the Democratic National Convention in 2016. Ms. Lafferty was also praised thereafter by Hillary Clinton.

The defendants in this case believe that this suit was filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by Hillary Clinton as part of a vendetta to silence Alex Jones after Ms. Clinton lost the presidential race to Donald J. Trump. The litigation is brought and pursued in bad faith as part of a partisan effort to silence Mr. Jones for reasons wholly independent of the merits of the plaintiffs' claims.

Someone directed all of the plaintiffs to the same firm many years after the shooting. The defendants are entitled to know who and why. The defendants intend to ask Ms. Clinton about her endorsement of Ms. Lafferty in 2016, the factors that led Ms. Lafferty to be invited to speak at the Democratic National Convention, and what role, if

any, Ms. Clinton or those working under her direction had in directing the plaintiffs to the same firm in this case. Ms. Lafferty is clearly a public figure in this case, and has inserted herself on to a public stage in order to advance her vision of what "gun safety" requires. The defendants seek to depose Ms. Clinton to gather further information about how it is that so many plaintiffs found themselves represented by the same firm so long after the events giving rise to the complaint, but shortly after Ms. Clinton suffered a deeply humiliating defeat in her run for the presidency in 2016.

THE DEFENDANTS
FREE SPEECH SYTSEMS, LLC
INFORWARS HEALTH LLC
PRISON PLANET TV LLC

BY: /s/ NORMAN A. PATTIS /s/
PATTIS & SMITH, LLC
Juris NO. 423934
383 Orange Street, First Floor
New Haven, CT 06511
V: 203-393-3017
F: 203-393-9745
npattis@pattisandsmith.com

## CERTIFICATION

This is to certify and a copy of the foregoing has been emailed and/or mailed, this 1st day of July 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT  06103
jmw@randazza.com

Brignole & Bush, LLC
73 Wadsworth Street
Hartford, CT  06106
Genesis Communications Network, Inc.
 Fax: 860-527-5929

Koskoff Koskoff & Bieder, PC
330 Fairfield Ave.
Bridgeport, CT  06604
asterling@koskoff.com
cmattei@koskoff.com

/s/Norman A. Pattis /s/

# EXHIBIT A

| | | |
|---|---|---|
| NO.    X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.    X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.    X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

## <u>ORDER OF COMMISSION</u>

The matter comes before the Court on the motion of the defendants in the above-captioned consolidated matters for leave or judicial authority and an issuance of an Order for Commission pursuant to the Connecticut Practice Book §13-28(a) for the taking of the deposition of Wolfgang Halbig.

IT IS HEREBY ORDERED, that the motion for issuance of an Order for Commission be allowed and is hereby granted: and, it is further ordered that any appropriate authority in the State of New York is authorized to issue a subpoena required to compel the attendance of the witness for the taking of said deposition and to produce requested documents:

Dated: this ___ day of July, 2021, at Waterbury, Connecticut


_____
Hon. Barbara N. Bellis
Connecticut Superior Court

# EXHIBIT "9"

CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN | * | IN THE  DISTRICT  COURT |
| | * | |
| VS. | * | |
| | * | OF TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, | * | |
| LLC, and FREE SPEECH | * | |
| SYSTEMS, LLC | * | 261ST JUDICIAL DISTRICT |

**********************************

VIDEOTAPED ORAL DEPOSITION OF

ALEX E. JONES

November 26, 2019

**********************************

        VIDEOTAPED ORAL DEPOSITION OF ALEX E. JONES,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on the 26th of November, 2019, from

9:17 a.m. to 12:54 p.m., before Micheal A. Johnson, RDR,

CRR, CSR, Certified Shorthand Reporter in and for the

State of Texas, reported by machine shorthand, at the

law offices of Burnett Turner, 6034 West Courtyard

Drive, Suite 140, Austin, Texas pursuant to the Texas

Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

## 2

1       APPEARANCES
2   ON BEHALF OF THE PLAINTIFF
    NEIL HESLIN:
3
    Mark D. Bankston
4   Bill Ogden
    FARRAR & BALL, LLP
5   1117 Herkimer Street
    Houston, Texas 77008
6   (713) 221-8300
    mark@fbtrial.com
7   bill@fbtrial.com
8
    ON BEHALF OF THE DEFENDANTS
9   ALEX E. JONES, INFOWARS, LLC
    AND FREE SPEECH SYSTEMS, LLC:
10
    T. Wade Jefferies
11  THE LAW FIRM OF T. WADE JEFFERIES
    401 Congress Avenue, Suite 1540
12  Austin, Texas 78701
    (512) 201-2727
13  twadejefferies@twj-law.com
14
    VIDEOGRAPHER:
15
    Robie Rowley
16
17  ALSO PRESENT:
18  Brooke Binkowski
19
20
21
22
23
24
25

## 3

1           INDEX
          ALEX E. JONES
2       November 26, 2019
3
    APPEARANCES                    2
4
    PROCEEDINGS                    6
5
6
    EXAMINATION OF ALEX E. JONES:
7
    BY MR. BANKSTON                6
8
9
    CHANGES AND SIGNATURE         155
10
    REPORTER'S CERTIFICATION      157
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 4

1       DEPOSITION EXHIBITS
          ALEX E. JONES
2       November 26, 2019
3
    NUMBER        DESCRIPTION        MARKED
4
    Exhibit 1    Defendant Free Speech      7
5            Systems, LLC's Second
            Amended Objections and
6            Responses to Plaintiff's
            Requests for Admissions,
7            Interrogatories and
            Requests for Production
8
    Exhibit 2    Defendant Free Speech      33
9            Systems, LLC's Amended
            Objections and Responses to
10           Plaintiff's Requests for
            Admissions, Interrogatories
11           and Requests for Production
12  Exhibit 3    Photograph         56
13  Exhibit 4    Screenshot from        57
            tv.infowars.com, May 9,
14           2014
15  Exhibit 5    09/21/2019 Article from     59
            infowars.com
16
    Exhibit 6    USB Drive of Videos     60
17
    Exhibit 7    Denounce Sandy Hook Denier    65
18           Alex Jones, My Open Letter
            to President-Elect Trump,
19           Erica Lafferty, Nov 16,
            2016
20
    Exhibit 8    Screenshot from Video,     67
21           Final Statement on Sandy
            Hook on November 18th, 2016
22
    Exhibit 9    Screenshot from Video,     77
23           Final Statement on Sandy
            Hook on November 18th, 2016
24
25

## 5

1       DEPOSITION EXHIBITS
          ALEX E. JONES
2       November 26, 2019
3
    NUMBER        DESCRIPTION        MARKED
4
    Exhibit 10   Higher Resolution      78
5            Screenshot from Video,
            Final Statement on Sandy
6            Hook on November 18th, 2016
7   Exhibit 11   Screenshot from CNN, Arias    79
            Jury Deliberates: Day 3
8
    Exhibit 12   Screenshot from Video, What    96
9            Alex Jones Really Believes
            about Sand Hook - 06-13-17
10
    Exhibit 13   01/29/2013 E-mail Chain    111
11           FSSTX-072489
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

```
1              PROCEEDINGS
2         THE VIDEOGRAPHER:  We are on the record.
3   This is the videotaped deposition of Alex Jones.
4   Today's date is November 26th, 2019, and the time is
5   9:17 a.m.
6         Would the court reporter please swear in the
7   witness.
8              ALEX E. JONES
9   having been first duly sworn, testified as follows:
10             EXAMINATION
11  BY MR. BANKSTON:
12    Q.  Mr. Jones.  Are we doing that thing where you
13  don't respond?
14         MR. JEFFERIES:  Objection.  You just said,
15  "Mr. Jones."
16         MR. BANKSTON:  I was trying to see if the
17  witness would acknowledge, like, hey, good morning.  How
18  you doing.  Anyway, whatever.
19    Q.  (BY MR. BANKSTON)  Mr. Jones, you signed an
20  affidavit verifying the discovery responses of Free
21  Speech Systems, right?
22    A.  Yes.
23    Q.  Okay.
24         MR. BANKSTON:  Let's go ahead and mark that
25  as Exhibit 1.
```

7

```
1         (Deposition Exhibit 1 marked for
2         identification.)
3    Q.  (BY MR. BANKSTON)  Mr. Jones, I'm handing you
4   what I've marked as Exhibit 1.  That's Defendant Free
5   Speech Systems' Second Amended Objections and Responses
6   to Plaintiff's Request for Admissions, Interrogatories
7   and Requests for Production.  This is the discovery
8   responses that you verified?
9    A.  I believe so.
10    Q.  And you understand that by verifying a
11  discovery response, you signed an affidavit in which you
12  subscribed and sworn that these discovery responses are
13  true and correct?
14    A.  Yes.
15    Q.  Okay.  Would you do me a favor and flip to
16  page 3 for me.  You see where it says, "Interrogatory
17  No. 2"?
18    A.  Yes.
19    Q.  Okay.  And that states, "Identify by date and
20  title every article or video discussing the Sandy Hook
21  Elementary School shooting created or published by Free
22  Speech Systems, LLC which is not already listed in the
23  declaration of Brooke Binkowski."
24         Did I read that correctly?
25    A.  Yes.
```

8

```
1    Q.  I want to talk to you about videos first.  It's
2   true that on November 7th, your company produced to me
3   42 videos with Sandy Hook in the title; is that correct?
4    A.  Is there somewhere I read that?
5    Q.  No.  I'm just asking you.
6    A.  I don't know.
7    Q.  At some point when those videos were produced,
8   you were the one who verified these -- that the last
9   sentence here, "the InfoWars Videos produced on
10  November 7, 2019," correct?
11    A.  But I know they got videos together and gave
12  them to you, I believe, yeah.
13    Q.  Okay.  Well, when you certified this as
14  correct, were you certifying that was the production of
15  all videos in InfoWars' possession that discussed or
16  relate to Sandy Hook?
17    A.  I believe so.
18    Q.  Okay.  It's true that after I sent a letter
19  saying that that's not true, that those weren't all the
20  videos, that on November 14th, you produced an
21  additional 12 videos to me; isn't that correct?
22    A.  I don't remember.
23    Q.  When you signed these interrogatory
24  requests, again, the last sentence there says, and
25  videos produced on November 14, 2019, you were involved
```

9

```
1   in that process or you weren't involved in that process?
2    A.  I mean, I just said, give them all the videos.
3    Q.  You did nothing to verify that those were
4   actually all the videos?
5    A.  I mean, I -- I mean, I -- I didn't really know
6   how to pull those videos up.  I don't understand all
7   those computers, that type of stuff.
8    Q.  Well, what I'm saying, Mr. Jones, is you signed
9   an affidavit verifying these answers and that these were
10  the responses of Free Speech Systems.  Are you telling
11  me you didn't have anything to do with that?
12    A.  I relied on my attorneys and my crew.  I said,
13  give them all the videos.
14    Q.  Okay.  Who did you say that to?
15         MR. JEFFERIES:  Objection, don't relay any
16  conversations you had with counsel.
17         THE WITNESS:  Okay.
18    A.  I can't relay that.
19    Q.  (BY MR. BANKSTON)  Okay.  Did you give any
20  instructions to any members of your staff?
21    A.  Just to comply with the -- give you all the
22  videos.
23    Q.  Okay.  So you did talk to your staff about the
24  production of videos?
25    A.  I guess in the previous three lawsuits by you,
```

10

1 but I just -- I just say comply with it. I'm not --
2 that's not -- I'm not doing that.
3    Q.  Well, what I'm asking you is when you got these
4 discovery responses in this case and when you executed
5 an affidavit on September 24th of this year, who did you
6 talk to in terms of your staff?
7    A.  I don't think I even needed -- I mean, they
8 were given the information; I believe they had turned it
9 over. I don't remember who I talked to. I don't
10 think -- I may not have even talked to any of the staff.
11 I just obviously complied with the discovery.
12    Q.  Okay. Well, when those 54 videos were provided
13 to me, that's not all the videos where InfoWars
14 discussed Sandy Hook, is it?
15    A.  I don't know.
16    Q.  What did you do to try to find out?
17    A.  Well, I -- I mean, I did go and -- I guess just
18 last night and said, you know, in the computer, are
19 there any other videos; and they did some searches, Rob
20 Dew did, and was able to find stuff that wasn't under
21 the name Sandy Hook, and we -- and I -- and he was there
22 and we put them on a --
23        MR. JEFFERIES:  USB drive.
24    A.  -- USB drive.
25    Q.  (BY MR. BANKSTON)  Okay. And when you say he

11

1 is there and you're pointing off camera, you're talking
2 about your attorney?
3    A.  Wade Jefferies, yes.
4    Q.  So in other words, first of all, in response to
5 my question, those 54 videos that were produced on
6 November 7th and November 14th, those were not all the
7 videos that discuss or relate to Sandy Hook?
8    A.  Yes.
9    Q.  That's true, that's not all the videos?
10    A.  We discovered, I guess.
11    Q.  Okay. And when you produced today, as I walked
12 into this deposition room, a USB drive, how many videos
13 are on that USB drive?
14    A.  I don't know.
15    Q.  Okay. Is it your opinion that between those
16 54 videos previously produced and that USB drive you
17 gave me today, that you have produced all videos in
18 which InfoWars has discussed Sandy Hook?
19    A.  That was what I said last night. I said, find
20 anything and give it to them.
21    Q.  You didn't say that back when you were
22 answering the discovery back in September?
23    A.  I mean, obviously, I said just -- we're not
24 hiding anything. I said, give them all the videos.
25    Q.  We didn't get all the videos, though, did we?

12

1    A.  I didn't know that until last night.
2    Q.  Okay. And so right now you can't say to me,
3 that I currently have produced from you all the videos
4 from InfoWars that talk about Sandy Hook; you can't say
5 that, can you?
6    A.  I mean, actually, I can because I -- that
7 wasn't my job and I told people to do it. So I'd be
8 happy to look some more.
9    Q.  When you say that wasn't your job, you're the
10 person who signed a sworn affidavit saying that this had
11 been done?
12    A.  Yes. I relied on my counsel and my crew.
13    Q.  So in other words, this affidavit here -- can
14 you flip to the last page with me, page 5. Do you see
15 at the very end, the very last two lines says, "The
16 answers are true and correct based upon his own personal
17 knowledge and belief"?
18        These answers are not based upon your personal
19 knowledge; you relied on somebody else.
20    A.  My personal knowledge of the lawyer and my crew
21 doing it, and before we came here, we discovered this
22 and had told you and produced it. Supplemented it.
23    Q.  Right. What I'm saying is here right now, you
24 don't have personal knowledge to say whether these
25 responses are full and complete and correct?

13

1    A.  I mean, if you want to get technical, it's
2 possible there could be something somewhere, I mean.
3 But, I mean, to the best of my knowledge, we have -- we
4 have given you what you requested.
5    Q.  Let's not be technical about it. Let's be
6 really accurate about it. Which is to say, if you
7 wanted to find out if there were videos talking about
8 Sandy Hook, how would you do that?
9    A.  We would have to do what we did and search for
10 things that don't have any of those names in it.
11 Because I started digging deeper into it and I said, I
12 remember a video or two, and so we took hours digging
13 around and then found it under another name and then
14 produced it to you.
15    Q.  Digging around in what?
16    A.  I don't understand -- searching in the
17 computer.
18    Q.  What are you searching on the computer? Video
19 files?
20    A.  Yes.
21    Q.  Are you searching transcripts?
22    A.  Everything, trying to -- trying to find stuff.
23    Q.  Do you have transcripts of your InfoWars
24 videos?
25    A.  No.

Alex Jones - 11/26/2019

14

1  Q. Okay. So you're not searching transcripts;
2  you're searching videos, right?
3  A. Well, you search words too, because that's what
4  the names are, but yeah.
5  Q. Okay. And so are you searching the titles?
6  A. Yes.
7  Q. Okay. Are you searching anything else?
8  A. No, it goes on titles.
9  Q. Okay. So if Sandy Hook isn't in the title,
10 it's not in there?
11 A. No. That's how we were able to find it. It
12 didn't have anything really related to that. But I said
13 I remember -- I remember this video, and so we were --
14 and so we went and dug through again and were able to --
15 I forget the exact search term, but it was different.
16 Q. Okay. So there is a video that doesn't have
17 Sandy Hook in the title that you asked to be produced?
18 A. It was late last night; it was a couple of
19 them. I think -- I believe, what we produced then.
20 Q. You don't know what you did last night; how
21 many videos there were?
22 A. I don't remember the exact number. I think it
23 was a couple.
24 Q. It was a couple.
25 A. I think it was -- it was multiple versions of

15

1  the same one and I -- and we just said, so what, just
2  put all the copies of it.
3  Q. And you're saying we've discovered this because
4  you remembered a video that didn't have Sandy Hook in
5  the title, but that was talking about Sandy Hook?
6  A. Yes. I remembered a title when I was going
7  back over the paperwork, just double-checking it, and so
8  we went and called Rob Dew up to the office and went in
9  there and searched the computer.
10 Q. When you do an InfoWars show, there's some sort
11 of written record of that show, what the outline of the
12 show is, what you're going to talk about. That exists,
13 right?
14 A. No.
15 Q. So what's a daily show log? What is that?
16 A. Sometimes someone writes notes about topics
17 that were covered, guests that were on so that somebody
18 can grab clips out of that and make a boiled down
19 derivative of it.
20 Q. Right. So a daily show log is an outline of
21 that day's show, a list of what happens the first hour,
22 what happens the second hour, what happens the third
23 hour, what happens the fourth, what segments, what
24 topics are going to be discussed, correct?
25 A. I would think of an outline is what somebody

16

1  does before a show. So no, I would call it more of a
2  primitive -- maybe a log.
3  Q. Wait. So you're saying a daily show log
4  doesn't occur before the show; it occurs after the show?
5  A. It occurs during the show.
6  Q. Somebody is -- as the show is being recorded is
7  writing down and creating an outline?
8  A. It's live.
9  Q. Okay. So as the show -- well, are all InfoWars
10 videos live or are some recorded?
11 A. Well, you were saying the show, the daily show
12 is live.
13 Q. Okay.
14 A. I mean, I guess every once in a while parts of
15 it are recorded.
16 Q. Okay. So when is the daily show log created?
17 A. As it's being -- as the show is being made.
18 Q. Who creates it?
19 A. Just one of the people that's in there during a
20 live show, usually a producer or just someone that makes
21 notes.
22 Q. Okay. So first of all, your testimony is that
23 a show log is not distributed to employees in advance of
24 the show?
25 A. No.

17

1  Q. Okay. Second is, if you were to search those
2  show logs, you could discover all the videos that talked
3  about Sandy Hook, couldn't you?
4  A. No.
5  Q. Well, they certainly mention the topics you're
6  going to talk about on the show, right?
7  A. No.
8  Q. So in your testimony, if we were to go look in
9  InfoWars production, the documents that you produced, we
10 wouldn't find daily show logs which list that Sandy Hook
11 is being discussed that day?
12 A. The log is made -- it's not even really a log.
13 It's just to mark interesting things that went on during
14 the show or like an interesting caller or things like
15 that. It's -- I mean, that's basically -- it's just
16 something to make a -- make, boil down, like best of
17 things out of. So that's what I'm trying to explain, is
18 that we only started doing it a couple years ago.
19 That's another thing.
20 Q. Well -- Okay. When you say "a couple years
21 ago," so would there be daily show logs in 2015?
22 A. No.
23 Q. So those don't exist?
24 A. I don't believe so. No. I think we started
25 like in 2016.

18

1    Q. Okay. If you had daily show logs that
2  mentioned that Sandy Hook was discussed on the show, you
3  should be able to produce those videos, correct?
4    A. It depends. A lot of the live show was only
5  archived on YouTube, and so then that was taken down.
6    Q. Okay. And between April 4th, when you were
7  given first notice that these lawsuits might be filed
8  and when your YouTube account was taken down later that
9  summer, you took no efforts to save all those videos?
10   A. There was over 30,000 videos. No, we didn't
11  save those videos, most of them.
12   Q. Okay. So most of those videos you allowed to
13  be lost when that happened?
14         MR. JEFFERIES: Objection, form.
15   A. No, I didn't take the YouTube channel down.
16   Q. (BY MR. BANKSTON) Right. I know. I
17  understand that. But before your YouTube channel was
18  taken down but after you were sued, you took no steps to
19  preserve any of those videos?
20   A. We did -- we did save the videos that we had on
21  our servers.
22   Q. That's not what I'm asking you, though, is it?
23  When you talk about the videos that were lost that you
24  don't have because the YouTube channel was taken down
25  and the only place you had them saved was natively on

19

1  YouTube, you don't have those videos. And so by
2  extension, I don't have those videos, correct?
3    A. A lot -- no, those videos were duplicated on
4  other people's channels. I've seen what you guys have.
5  You have basically everything we ever talked about,
6  about that.
7    Q. Am I asking if we have basically everything or
8  am I asking you if we have everything?
9    A. I don't know if you have everything.
10   Q. Okay. You don't know if I have everything,
11  correct?
12   A. I don't.
13   Q. Let's talk about articles. Do you know how
14  many articles you produced to me that InfoWars did about
15  Sandy Hook?
16   A. I don't know.
17   Q. Do you know it was about several -- several
18  hundred pages, though, right?
19   A. I don't remember.
20   Q. Why don't you take a look at page 3, what you
21  swore to. Do you see in response to Interrogatory
22  No. 2, and you can tell me that there are hundreds of
23  pages of news articles about Sandy Hook, correct?
24   A. I'm not sure what these numbers mean, but I
25  guess that means 327?

20

1    Q. It's your answer, Mr. Jones. Why don't you
2  tell me what it means.
3    A. I guess that means 327.
4    Q. You guess that it means that. You swore to it,
5  but you guess that that's what that is?
6    A. Well, I'm not a lawyer, so I -- I went off what
7  I believe was best through my counsel.
8    Q. Again, that answer is not based on your
9  personal knowledge; you're just trusting other people?
10   A. Well, I mean, you have to trust your lawyers.
11  I don't have a law degree.
12   Q. Do you need a law degree to figure out how many
13  pages of InfoWars articles you produced to me?
14   A. I mean, I believe that means 327. It just has
15  zeros in front of it.
16   Q. Have you ever looked at that before you --
17   A. I read this.
18   Q. Hold on. Before you signed this affidavit
19  swearing that this answer was correct, did you look at
20  page 1 through 327?
21   A. I remember it was there, yeah. Yes.
22   Q. Okay. So when you -- when you swore to this
23  answer, you understood that 1 through 327 was InfoWars
24  articles you were producing?
25   A. To the best of my knowledge, yes.

21

1    Q. All right. When you were searching for
2  articles, did you search for articles on the website as
3  it exists now, or did you search for deleted articles as
4  well?
5    A. I don't -- we don't -- I don't really
6  understand that question.
7    Q. Well, you understand that InfoWars has deleted
8  articles from its website relating to Sandy Hook,
9  correct?
10   A. I don't know that.
11   Q. Okay. Did you -- so do you know if the search
12  was done on the website as it exists now, or was it a
13  backup of the website, as it always existed?
14   A. I don't know. I don't understand.
15   Q. You understand that there's a website on the
16  Internet, InfoWars.com?
17   A. Yes.
18   Q. It's published live; anybody can go there and
19  look at it?
20   A. Yes.
21   Q. Okay. There -- I assume that the total content
22  of everything that was ever on the website, whether it's
23  there now or not, is saved somewhere, right?
24   A. I believe so.
25   Q. Okay. Was that searched?

22

1     A.  I don't remember.
2     Q.  Did the company search prisonplanet.com?
3     A.  I believe so.
4     Q.  Well, it's strange, because I don't have any
5  prisonplanet.com articles, and you would agree with me
6  that there's been Sandy Hook articles published on
7  prisonplanet.com, right?
8     A.  But it's a mirror, so it's the same database.
9     Q.  Okay.  So you're saying that every article
10 that's ever been published on prisonplanet.com relating
11 to Sandy Hook was also published identically on
12 InfoWars.com?
13    A.  It's a mirror site, I believe so.
14    Q.  Okay.  Can you look on page 3 again for me at
15 Interrogatory No. 4.  That interrogatory, do you see it?
16    A.  Yes.
17    Q.  Okay.  That interrogatory reads, "Identify
18 every method by which employees or agents of Free Speech
19 Systems, LLC have communicated messages to other
20 employees, agents or sources concerning the subject
21 matter of this lawsuit, including the name of any
22 electronic application, program or service used in such
23 communications."
24        I read that correctly?
25    A.  Yes.

23

1     Q.  All right.  If you flip the page on to page 4,
2  you'll see at the end of this answer after all the legal
3  objections that it states, "The methods by which
4  employees or agents of Free Speech Systems, LLC have
5  communicated messages is via e-mail, telephone or
6  verbally."
7        I read that correctly?
8     A.  Yes.
9     Q.  That answer's not true, is it?  That's false
10 testimony, right?
11    A.  Where is it?  Which one?
12    Q.  I'm talking about on page 4, your answer at the
13 very top of page 4.  That answer is not accurate; that
14 is false testimony.
15        MR. JEFFERIES:  Objection, form.
16    A.  That's how we communicate.
17    Q.  (BY MR. BANKSTON)  You're saying -- you're
18 going to testify here under oath you've never received a
19 text message relating to Sandy Hook?
20    A.  No, I searched my phone.  There was nothing in
21 it.  I remember that.  Yeah, there's -- no.
22    Q.  Wait.  Let's back up and make sure we
23 understand this correctly.  First you're testifying that
24 what you're saying right now is you searched your phone?
25    A.  Yeah.  There was nothing in there.  I remember

24

1  doing it, yeah.
2     Q.  Okay.  First let's go back to the original
3  question.  Regardless of what's in your phone right now,
4  are you saying you've never received text messages
5  relating to Sandy Hook?
6     A.  No, not that I remember.
7     Q.  Okay.  What did you do to try to verify that?
8  Was it just looking at your phone?
9     A.  Yeah.  I mean you can search at the top.  I
10 never talked about it.
11    Q.  Okay.  I've seen in court filings that you
12 frequently destroy your cell phone; is that true?
13    A.  No.  I've gotten new cell phones.
14    Q.  Okay.  So if it was said in a court filing, you
15 destroyed -- you frequently destroy your cell phones,
16 that's not accurate; that wasn't true?
17    A.  Well, if by "destroy," you mean like it gets in
18 a lake or whatever; I've lost them.
19    Q.  No, I mean like intentionally destroy.  You
20 haven't ever done that?
21    A.  I guess I did get mad a couple years ago and
22 throw one or something up against the wall.  So I guess
23 that is true, I have destroyed a cell phone before.
24    Q.  Okay.  When was the last time that you either
25 destroyed or replaced a cell phone?

25

1     A.  I don't know.  Three or four months ago, I got
2  a new cell phone.
3     Q.  Three or four months ago?
4     A.  Uh-huh.  But it has the same SIM card, so it's
5  the same deal.
6     Q.  So you have -- how far back do you have text
7  messages?
8     A.  I don't know.
9        MR. JEFFERIES:  Objection, form.
10    A.  I don't know.
11    Q.  (BY MR. BANKSTON)  So you're saying you never
12 received text messages relating to Sandy Hook.  Is your
13 testimony the same, that you've never sent a text
14 message relating to Sandy Hook?
15    A.  I mean, I've sent to like -- talked to a
16 lawyer, like meeting about it or something.  But, no, I
17 don't sit there and talk about Sandy Hook.  It's not my
18 identity.  I very rarely talk about Sandy Hook, period.
19    Q.  Okay.  So your testimony is you've never sent a
20 text message relating to Sandy Hook to a fellow employee
21 or a source or somebody outside the company?
22    A.  No.  Other than -- I mean, I think I've talked
23 about meetings with lawyers about it and that's it.
24    Q.  Okay.  You're also saying you've never sent
25 messages over any kind of internal messaging application

26

1  to a member of your staff about Sandy Hook?
2      A. Internal messaging system?
3      Q. Uh-huh.
4      A. I don't -- I don't know of any other systems.
5      Q. You mean you don't -- are you saying you don't
6  know what an internal messaging system is or InfoWars
7  doesn't have any?
8      A. I don't know of any internal messaging systems,
9  other than like a calendar.
10     Q. Do you know what Yahoo! Instant Messenger is?
11     A. Yes, I have -- I haven't used that in over
12  ten years.
13     Q. Do you know what Slack is?
14     A. I've heard of it.
15     Q. Okay. Both of those are things used inside of
16  InfoWars, right?
17     A. No. I haven't used -- I mean, it's probably
18  longer than ten years since Yahoo! Messenger. We used
19  to use that a long time ago, more than ten years ago.
20     Q. What do your staff use to send messages to each
21  other in terms of internal applications? Do they use
22  Slack?
23     A. I don't know. I've heard of that name.
24     Q. Wait. Let's back up here. When you say you
25  don't know if they use Slack, when you had to answer

27

1  this question about what methods of communication were
2  used by members of your staff among each other and which
3  sources, what exactly did you do to find that out?
4      A. I mean, the only communications with Sandy Hook
5  are like e-mail and verbal and some guests on the show.
6      Q. That's not what I asked you, Mr. Jones. What
7  did you do to find out what methods of communication
8  your staff used?
9      A. I talked to the staff and I had the lawyer ask
10  the staff.
11     Q. What members of staff did you talk to?
12     A. Well, I talked to like Rob Dew and I talked to
13  Zimmermann.
14     Q. All right. Let's talk about Rob Dew first.
15  You asked Rob Dew, hey, how do InfoWars employees
16  communicate with each other? What did he say?
17         MR. JEFFERIES: Objection, form.
18     A. It was just like, hey, give them all the Sandy
19  Hook stuff.
20     Q. (BY MR. BANKSTON) That's what you said to Rob
21  Dew?
22     A. Yeah. Just like any type of communications on
23  this, just, you know, give it to the lawyer.
24     Q. How did that help you answer this question?
25  This question is, what methods of communication were

28

1  used; how did you answer that question?
2      A. I asked -- I mean, I -- I know the memo is a
3  communication like they talked or e-mail or in person
4  and over the phone, stuff like that.
5      Q. You just told me you don't know if they used
6  Slack or not, right?
7      A. Well, when you said the word "Slack," I've
8  heard of that before.
9      Q. Okay. Why is that not in your interrogatory
10  response?
11     A. Because I'd never -- I never thought of that.
12  I don't even know they use that. I just -- I've heard
13  of a bunch of other names too.
14     Q. Let's just make sure we have this really clear.
15  When that question asks you to identify all methods of
16  communication, including any applications, messaging
17  programs, et cetera, you didn't make any steps to find
18  out if there were messaging programs. You didn't do
19  that.
20     A. I've not seen anybody -- I've not used Slack or
21  seen anybody use it.
22     Q. Again, that's not what I'm asking you. I'm
23  asking you for the purpose of answering these questions,
24  you didn't do anything?
25         MR. JEFFERIES: Objection, form.

29

1      A. I mean, I did say provide anything about Sandy
2  Hook.
3      Q. (BY MR. BANKSTON) Right. So for instance,
4  there's some requests for production. Do you see that,
5  the next one is No. 1, Request for Production?
6      A. Yes.
7      Q. And it says, "All documents created, edited or
8  replied to by any named Defendant," relating to Sandy
9  Hook and some other topics.
10     A. Uh-huh.
11     Q. You see that? So you told your employees to
12  comply with that question, right?
13     A. Yes.
14     Q. But when it comes to the previous question,
15  when it comes to what methods of communication, you
16  don't do anything to identify those?
17     A. I did. I told, I believe, counsel and the
18  crew, we're doing that.
19     Q. Okay. So again, your answers that you swore to
20  are not based on your personal knowledge; you just
21  trusted that the counsel and the crew were correct that
22  it was only e-mail, telephone and verbally?
23     A. Well, personal knowledge is, is I believe that
24  that's what they done.
25     Q. Okay. That's not true, though, is it? This

30

1  answer's just not true?
2      A.  I don't know that's the case.
3      Q.  Okay.  So you don't know whether your
4  communications have ever been by Slack or text messages
5  among your employees; you have no idea?
6      A.  No, we checked the text messages.  There's no
7  Sandy Hook.
8      Q.  Whose messages did you check?
9      A.  I remember giving my phone to Zimmermann and to
10  the other people and them going around checking.
11      Q.  That means you, you checked your text messages,
12  correct?
13      A.  Yeah, I checked it myself, and then Zimmermann
14  did some type of more intense thing.
15      Q.  Did more intense thing with what?
16      A.  With my telephone.
17      Q.  With you, with your text messages, correct?
18      A.  Yes.
19      Q.  Okay.  What about your employees?
20      A.  I told them to go through it and that's what
21  they said they did.
22      Q.  Okay.  So your -- in terms of trying to find
23  out if there were responsive text messages from your
24  employees to each other, you left it entirely up to your
25  staff to go find those and know if there were any that

31

1  existed?
2      A.  Yes, I told them to do that.
3      Q.  Okay.  And so potentially the employees who
4  were implicated in some of the conduct that's alleged in
5  this petition, they were the ones who were responsible
6  for finding out if there were any text messages?
7      A.  No.  It was the -- the IT guy went and did it.
8      Q.  Wait.  So your IT person went and searched all
9  your employees' text messages?
10      A.  They followed -- they talked to the lawyer and
11  then followed -- followed this.
12      Q.  That's not what I'm asking you, Mr. Jones.  I'm
13  asking you, did your IT person search your employees'
14  text messages, or did your employees search their own
15  text messages?
16      A.  I know Zimmermann searched mine.  I don't know.
17      Q.  Okay.  So when you answered this question about
18  what methods have they communicated, you don't know if
19  your employees have texted each other about Sandy Hook;
20  you have no idea?
21      A.  No, I was told there was nothing there.
22      Q.  Mr. Zimmermann told you that?
23      A.  Yes.
24      Q.  Okay.  So are you saying now that
25  Mr. Zimmermann is able to represent whether there were

32

1  text messages on all of your employees' phones relating
2  to Sandy Hook?
3      A.  I don't know about all my employees' phones.
4      Q.  Okay.
5      A.  I don't know that was what was even asked.
6      Q.  Well, let's look at what's asked.  It's right
7  in front of you.  Let's look at Interrogatory No. 4.
8  Turn back one page, to page 3, you'll see the question.
9  It says, "Identify every method by which employees or
10  agents of Free Speech Systems have communicated."
11      So it is asking for every employee or agent, is
12  it not, Mr. Jones?
13      A.  Uh-huh.
14      Q.  And that was not done, right?
15      A.  No, I remember them checking -- they said
16  there's no text messages.
17      Q.  Okay.  Let's make sure we have this clear on
18  the record because you've given a couple different
19  answers.  You were saying that all of your employees'
20  text messages have been checked for Sandy Hook material?
21      A.  I believe that that was being handled by the
22  lawyer and by Zimmermann and I -- and I believe whatever
23  was found was turned over, if anything.  I don't know.
24      Q.  Okay.  Was anything turned over?
25      A.  I don't know.

33

1      Q.  All right.  Let's talk about Request for
2  Production No. 3 on page 4.  This request sought, "All
3  documents reflecting disciplinary action taken against
4  any employee of Free Speech Systems, LLC for publication
5  of false information or for breach of journalistic
6  ethics between December 14th, 2012, and April 18th,
7  2018."
8      Your response is "none," correct?
9      A.  Yes.
10      Q.  Okay.  Now, Mr. Jones, if you look on page 2,
11  do you see where it says, "Certificate of Service"?
12      A.  Yes.
13      Q.  And the last line says, "November 20th, 2019"?
14      A.  Yes.
15      Q.  Okay.  You remember you actually verified a
16  previous set of interrogatory responses about a week
17  earlier; do you remember that?
18      A.  Yes.
19      Q.  Okay.
20      MR. BANKSTON:  Let's mark that as 2.
21      (Deposition Exhibit 2 marked for
22      identification.)
23      Q.  (BY MR. BANKSTON)  Okay.  Mr. Jones, I'm
24  handing you what I've marked as Exhibit 2, which is the
25  previous set of interrogatory responses.  And what I'm

34

1  interested in is, if you go to page 4 and it bleeds on
2  to page 5 is the answer that I'm interested in.  I
3  noticed that you had a different answer before that you
4  changed to say "none."  And I want to ask what the
5  difference between these two answers are.  So I'm going
6  to read for you, if you see at the bottom of page 4, do
7  you see that same question, "All documents reflecting
8  disciplinary action, "in Request for Production No. 3?
9      A.  Yes.
10     Q.  Okay.  And if you turn the page, you'll see
11  your answer is on the back there on page 5.  And do you
12  see the highlighted portion that states, "Free Speech
13  has never knowingly published false information in
14  breach of journalistic ethics and thus never had any
15  reason to take disciplinary action against any
16  employee"?
17         Do you see where it says that?
18     A.  Uh-huh.
19     Q.  And then you changed your answer in amended
20  response to just say "none," correct?
21     A.  I need to -- is this the amended one?
22     Q.  That's the amended one, yes.
23     A.  Yes.
24     Q.  Okay.  This statement in the first response,
25  that Free Speech has never knowingly published false

35

1  information, is that statement still true, or are you
2  trying to say by changing it that that statement is not
3  true?
4      A.  No.  We're just making it simpler here.
5      Q.  Okay.  So this statement here you still stand
6  by, Free Speech has never knowingly published false
7  information in breach of journalistic ethics?
8      A.  Absolutely.
9      Q.  Okay.  And thus you've never had any reason to
10  take disciplinary action.  You agree that that's true
11  under your testimony?
12     A.  Yeah, not for someone lying.
13     Q.  Okay.  So you admit Free Speech has published
14  false information before; it just hasn't done that
15  knowingly?
16         MR. JEFFERIES:  Objection, form.
17         Go ahead.
18     A.  We've made mistakes before.
19     Q.  (BY MR. BANKSTON)  Okay.  And it would be
20  different if somebody did it knowingly?
21     A.  Yes.
22     Q.  Okay.  And the only reason you'd take
23  disciplinary action is if someone knowingly published
24  false information?
25     A.  No.  I mean, if somebody was messing up a lot

36

1  as well, they -- I would have issues.
2      Q.  All right.  So there would be other reasons you
3  might take disciplinary action in addition to it being
4  knowingly published, right?
5      A.  Sure.  Like people getting lazy or -- there's a
6  lot of things.
7      Q.  Sure.  So people have been careless in the past
8  and let false information get to air before, haven't
9  they?
10     A.  I don't think that's a fair statement.
11     Q.  You don't think somebody's made a mistake at
12  InfoWars before?
13     A.  I think people have made mistakes.  I don't
14  think people have been careless.
15     Q.  You don't take disciplinary action, though, for
16  mistakes, correct?
17     A.  We've taken corrective measures, talked to
18  people.
19     Q.  Okay.  So when it says here, you've never had
20  any reason to take disciplinary action against any
21  employee, that's not true?
22         MR. JEFFERIES:  Objection, form.
23     A.  Not for journalistic reasons.
24     Q.  (BY MR. BANKSTON)  Not for journalistic
25  reasons, did you say?

37

1      A.  Uh-huh.
2      Q.  So you've taken discipline with people that had
3  nothing to go with their reporting of the news?
4      A.  Yes.
5      Q.  But in terms of things that have happened at
6  InfoWars with reporting of the news, nobody's ever been
7  disciplined for anything that's happened at InfoWars?
8      A.  Not for knowingly putting out false
9  information.
10     Q.  That's not what I'm asking, Mr. Jones.  We had
11  just talked, that there are other situations besides
12  putting out knowingly false information, when people are
13  reckless, careless, they make a mistake they shouldn't
14  have made, they're incompetent, they're lazy, and as a
15  result false information gets published.  Has somebody
16  ever been disciplined for that?
17         MR. JEFFERIES:  Objection, form.
18     A.  Is that a question?
19     Q.  (BY MR. BANKSTON)  Yeah, absolutely.
20     A.  I don't understand the question.
21     Q.  Okay.  Besides putting out knowingly false
22  information, if somebody was reckless, careless, they
23  made a mistake, they were lazy, they were incompetent
24  and one of those things caused false information to be
25  published, there's no discipline taken for that.

38

1        MR. JEFFERIES:  Objection, form.
2     A.  There's been discipline when people have done
3  things that are wrong; it's just not -- we've never had
4  anybody we know knowingly lied.  So I think that's
5  the -- that's what we're saying, no one's ever been
6  disciplined for -- when someone knowingly lied about
7  something.
8     Q.  (BY MR. BANKSTON)  Okay.  Well, what I'm asking
9  is, if somebody was reckless, careless, incompetent,
10  lazy, did a bad job and it caused false information to
11  be published, not knowingly, just reckless, has there
12  ever been discipline taken for that?
13     A.  I don't think --
14        MR. JEFFERIES:  Objection, form.
15     A.  Not under your definition of "reckless."
16     Q.  (BY MR. BANKSTON)  What's your definition of
17  "reckless"?
18     A.  Not what we're doing.
19     Q.  I'm not sure what that means.  What do you
20  mean?  What is your -- what does "reckless" mean to you?
21     A.  I mean, reckless would just be with no regard.
22     Q.  Okay.  What if somebody is careless?  Is that
23  different than reckless to you, or is that the same
24  thing?
25     A.  No, I mean, I think careless is a form of

39

1  recklessness.
2     Q.  Okay.  Somebody does that at InfoWars, do they
3  get punished?
4     A.  Yes.
5     Q.  Okay.  Has that ever happened?
6     A.  I'd have to refresh my memory.
7     Q.  Well, when these -- these questions asked you
8  to do that, didn't they?  These questions asked you, has
9  anybody ever been disciplined for the publication of
10  false information.  Has that ever happened, or did you
11  not refresh your memory when you were answering these
12  sworn questions?
13     A.  Hold on.  Let me read it again.
14     Q.  Sure.
15     A.  Where was that?
16     Q.  Request for Production No. 3 at the bottom of
17  page 4.
18        (Witness reviews document.)
19     A.  I don't know about between those dates.  It
20  just all kind of blurs together.  I couldn't give you an
21  accurate answer.
22     Q.  (BY MR. BANKSTON)  Did you go and try to find
23  out?
24     A.  Yes.  And we did not find anything in writing
25  about that.

40

1     Q.  Okay.  So between those dates, 2012 to 2018,
2  the last six years of your business, you were unable to
3  locate any examples of you taking disciplinary action
4  against an employee related to the publication of false
5  information?
6     A.  Nothing verifiably false, no.
7     Q.  Was there disciplinary action taken for
8  something that was probably false that you couldn't
9  verify?
10     A.  I'd have to consult my files.  I'd have to look
11  into that more.  I don't know about -- that's a
12  different question.
13     Q.  Okay.  You say nobody at InfoWars has ever
14  breached journalistic ethics, correct?
15     A.  We're mainly punditry and opinion.  Journalism
16  is a very small part of what we do.
17     Q.  Okay.  This answer here disclaims that false
18  information has ever been published in breach of
19  journalistic ethics.  Do you stand by that answer or do
20  you not stand by that answer?
21     A.  I stand by that answer.
22     Q.  So nobody at InfoWars has breached
23  journalistic ethics causing false information to be
24  published?
25     A.  Not knowingly.

41

1     Q.  Okay.  So people have unknowingly breached
2  journalistic ethics?
3     A.  Well, that would be according to whose point of
4  view you're looking at.
5     Q.  I'm asking your point of view.  Has anybody at
6  InfoWars ever breached journalistic ethics?
7     A.  Not that I have in front of me.
8     Q.  Okay.  What if someone at Free Speech Systems
9  wanted to say on air, Sandy Hook Elementary School had
10  actually been shut down and wasn't an operating school,
11  what has to happen in order for that to be said on air?
12     A.  Well, generally, that would be someone talking
13  about what other people were saying and why people were
14  asking questions and some of the claims that were out
15  there.
16     Q.  Okay.  Let's say they wanted to make that claim
17  factually; they just wanted to say that sentence.  What
18  has to happen?
19     A.  It would just depend on the context of where --
20  of how it was said and what was said around it.
21     Q.  All right.  Well, let's just assume nothing was
22  said around it, that's all they wanted to say.  You have
23  a reporter and that's the thing that they wanted to say
24  during a broadcast that you're doing.
25     A.  I can't respond to hypotheticals.

42

1    Q.  Okay.  So if somebody was to come to you before
2  a show and say, Mr. Jones, I want to say this on today's
3  show, you can go, well, that's a hypothetical, I can't
4  tell you whether you can or cannot say that?
5    A.  That's a hypothetical as well.
6        MR. JEFFERIES:  Objection, form.
7    Q.  (BY MR. BANKSTON)  Okay.  So basically anybody
8  can say anything they want to on your show; they don't
9  need to get prior permission from you?
10       MR. JEFFERIES:  Objection, form.
11   A.  It is a call-in show.  There is no prior
12 constraint on the callers and on many of the guests.
13   Q.  (BY MR. BANKSTON)  Let's talk about employees.
14 Do you have any kind of prior restraint on anything
15 employees say on your show?
16   A.  Yes.  I mean, I -- I mean, I don't want people
17 to say things that they think are false.  I wouldn't
18 have anybody working for me that's like that.
19   Q.  All right.  Well, let's say you have a factual
20 claim an employee wants to make on the air and that you
21 want to make on the air; what has to happen before you
22 make a factual claim on InfoWars?
23   A.  Well, if we publish an article saying it's
24 definitive that X, Y and Z happened, then we want to
25 have proof there so that the viewers and listeners can

44

1  audience with proof of that because everybody knows what
2  happens in that case, right?
3    A.  Yes.
4    Q.  Okay.  But there might be some claims that you
5  make, things like Sandy Hook Elementary School wasn't an
6  operating school, if somebody wanted to say that, what
7  kind of proof would you need before you could say that
8  on InfoWars?
9        MR. JEFFERIES:  Objection, form.
10   A.  Again, if I'm covering what other people are
11 saying, saying that Google showed that it wasn't an
12 operating school, that nothing was being delivered
13 there, then that would be why we were covering people
14 believed that.
15   Q.  (BY MR. BANKSTON)  Okay.  So your opinion is,
16 is that if you're repeating a factual claim made by
17 somebody else, you don't really have to fact check that?
18   A.  I'm not even calling it a factual claim.
19   Q.  Okay.  What -- you think Sandy Hook is not an
20 operating school; you think that's an opinion?
21   A.  I don't know the context you're speaking about
22 it in.
23   Q.  I'm just saying right now.  If I told you -- if
24 I said to you, Mr. Jones, Sandy Hook wasn't an operating
25 school.

43

1  see that for themselves; but generally we're talking
2  about events and what other people are saying and we're
3  just covering news events that aren't even being
4  contested or we're covering, you know, what -- generally
5  what -- what the public thinks, like a Jeffrey Epstein
6  thing; like people don't believe that he killed himself
7  and would people be sued for that.  The government says
8  that he did kill himself.  Most people don't believe
9  that's true.  And so nowadays the establishment doesn't
10 want you to be able to say that.  They want to be able
11 to sue you to make you believe the official story and
12 not question it.
13   Q.  Okay.
14   A.  It's not working.
15   Q.  Let's put a pin in Epstein.  We'll definitely
16 come back to Epstein.  Definitely want to talk about
17 that today.  But I want to talk about when a factual
18 claim is made on InfoWars and you say, we'd like to
19 present proof so the viewer can have it, you obviously
20 don't present proof of every factual claim made on
21 InfoWars, right?
22   A.  Most of what we do is not factual claims.
23   Q.  Well, for instance, if you were to get on the
24 air and say something like, Roger Stone lost his
25 criminal trial, you wouldn't need to present your

45

1    A.  I believe it was torn down.
2    Q.  That's not what I'm asking.
3    A.  Oh, I'm confused.
4    Q.  I see that.  I'm asking you, if I said to
5  you -- right now, I'm going to say it to you right now;
6  Mr. Jones, Sandy Hook wasn't an operating school, did I
7  just make a statement or did I just make an opinion?
8    A.  I think that's your opinion.
9    Q.  Okay.  So those sorts of statements can be said
10 on InfoWars without fact checking?
11       MR. JEFFERIES:  Objection, form.
12   A.  I don't know the context.
13   Q.  (BY MR. BANKSTON)  Let's say an editor at
14 InfoWars publishes a false accusation that a private
15 individual is a criminal and publishes that accusation
16 based on anonymous sources whose identity cannot be
17 verified, is that okay at InfoWars?
18   A.  Can you say that again?
19   Q.  Sure.  Let's say an editor publishes a false
20 accusation that a private individual is a criminal and
21 publishes that accusation based on anonymous sources
22 whose identity cannot be verified, is that okay at
23 InfoWars?
24   A.  It would depend on the context and who the
25 source is.

46

1    Q.  Well, I just told you, the source cannot be
2  verified; is that okay?
3    A.  Well, that's what so-called journalists do all
4  the time.
5    Q.  Do they?
6    A.  Yeah, the New York Times, everybody.  They say
7  that they've got the proof that Trump's a Russian agent,
8  but it never was there.
9    Q.  Okay.  That's not good, is it?
10    A.  No, it's not.
11    Q.  No, it's not.  So relying on an unnamed,
12  unverified, can't even figure out who they are source,
13  that's not okay?
14    A.  Well, Daniel Ellsberg was an unnamed source for
15  years.  No, if you know who the source is and you know
16  they're a good source, then you have to protect that
17  source.
18    Q.  That's totally different, right?  Let's say the
19  reporter knows the identity of the source but the public
20  doesn't.
21    A.  Oh, sure.
22    Q.  Okay.  So let's back up --
23    A.  See, I don't understand your question.
24    Q.  So let's back up again and let's try it again.
25  Let's say an editor publishes a false accusation that a

47

1  private individual is a criminal and publishes that
2  accusation based on anonymous sources whose identity the
3  reporter cannot verify; is that okay or is that not?
4    A.  No, I mean, that's quite a mouthful, but I
5  think what you're saying is, they know it's not true.
6  That would not be good.
7    Q.  No, I'm just saying they don't know who the
8  source is.
9    A.  You just said it up front, it wasn't -- say
10  that again.
11    Q.  Sure.  An editor publishes a false accusation,
12  is just wrong, just publishes somebody else's accusation
13  that somebody is a criminal and that person they're
14  relying on for that accusation, they have no idea who
15  that person's identity is.
16    A.  Well, I wouldn't do that if I knew it was
17  false.  So you're putting that up front.  So I would not
18  go with something if I knew that it was false.
19    Q.  Let's try it one more time.  I'll reword this
20  question for you.  Okay.
21        Let's say an editor publishes an accusation
22  that somebody is a criminal and in doing so they relied
23  on a source whose identity they cannot verify, they have
24  no idea who it is, it's a totally anonymous message they
25  got and then it turns out that that reporting was false;

48

1  is that okay?
2    A.  No, it's not.
3    Q.  Okay.  You would take disciplinary action if
4  that happened?
5    A.  Yes.
6    Q.  Now, what kind of disciplinary action would you
7  take?
8    A.  I would generally just -- if it was something
9  like that, I would probably let them go.
10    Q.  Okay.  Now, when Kit Daniels ran an article
11  accusing an innocent young man of being the Parkland
12  mass murderer based on anonymous sources which he could
13  not verify, you didn't fire him, did you?
14    A.  That individual's name was not put out and it
15  was from another site and it was pulled down and then
16  the individual reported themselves and their name into
17  the record, but Kit did not do that on purpose.  And it
18  was all -- it was on thousands of publications.
19    Q.  He intentionally on purpose reported an
20  accusation of a crime based on an anonymous source whose
21  identity he could not verify, correct?
22    A.  No.  It was -- it was a -- it appeared to match
23  the information that was also on other sites, but it was
24  incorrect and that's why we took it down.
25    Q.  What sites are you talking?

49

1    A.  It was a long list of sites.  It was all over
2  the Internet.
3    Q.  Before Kit Daniels published it?
4    A.  Uh-huh.  Yes.
5    Q.  That's your belief?
6    A.  That's what I remember.  That's the best of my
7  knowledge.
8    Q.  Kit Daniels testified that he just found it on
9  4chan and saw it in a tweet by an anonymous Twitter
10  account.
11    A.  I don't recall that.
12    Q.  Okay.  If that was true, though, if he just
13  relied on two anonymous sources whose identity he could
14  not verify, that's a fireable offense, isn't it?
15    A.  I'm not -- yes.  Yes.  I believe there was
16  more, but, yes, that's not good.
17    Q.  You didn't take disciplinary action against any
18  employee involved in the false reporting on the Chobani
19  yogurt company that you publicly apologized for,
20  correct?
21    A.  That was a publicity stunt by Chobani yogurt
22  and there was no money.  It was all -- there were
23  migrant workers being brought in, there were rapes in
24  the area, but technically the company itself wasn't
25  doing it.  It was the owner and the fellow reserve board

50

1    member.
2       Q.  Didn't David Knight tell you explicitly that
3    there were no rapes, that that was false?
4       A.  I don't remember what you're talking about.
5       Q.  Okay.  You didn't take any disciplinary action
6    against any employee involved in the false reporting on
7    Pizzagate that you publicly apologized for?
8          MR. JEFFERIES:  Objection, form.
9       A.  No, the Jeffrey Epstein blackmail rings are
10   real.
11      Q.  (BY MR. BANKSTON)  When your reporter Owen
12   Shroyer tried to falsely connect the Austin pizza
13   restaurant East Side Pies to a pedophile ring, you
14   didn't take any disciplinary action, correct?
15         MR. JEFFERIES:  Objection, form.
16      A.  I don't know what -- I'm not familiar with the
17   specifics of what you're talking about.
18      Q.  (BY MR. BANKSTON)  You've never taken any
19   disciplinary action against any employee for any of the
20   false things said about Sandy Hook on InfoWars, correct?
21         MR. JEFFERIES:  Objection, form.
22      A.  I don't understand -- I'm not sure what you're
23   getting at.
24      Q.  (BY MR. BANKSTON)  Really?  You don't -- is it
25   the question or is it the subject matter of Sandy Hook?

51

1    Is that too broad, or what do I need to clear up for you
2    here?
3       A.  I mean, I just don't understand the question.
4       Q.  Sure.  So you understand what disciplinary
5    action is, right?
6       A.  Yes.
7       Q.  You understand what Sandy Hook's -- the
8    coverage of Sandy Hook by InfoWars; you understand what
9    that is, right?
10      A.  Uh-huh.
11      Q.  So you've never taken disciplinary action
12   against any employee for any of the false things that
13   have been said on InfoWars about Sandy Hook, correct?
14         MR. JEFFERIES:  Objection, form.
15      A.  We have -- we have questioned public events,
16   like any American has a right to do, of the First
17   Amendment.
18      Q.  (BY MR. BANKSTON)  Are you saying you haven't
19   said false things about Sandy Hook on InfoWars?
20      A.  I have covered the Internet and others
21   questioning the anomalies surrounding it.
22      Q.  And you've told me in testimony back in March,
23   you've said there are things that you said that were not
24   true, were inaccurate, you were wrong about?
25      A.  I discovered later things that people were

52

1    saying, anomalies have been cleared up, yes.
2       Q.  So the things you said were false, right?
3       A.  Not the things I said.  The things I covered
4    that other people were saying, the questions.
5       Q.  Let's put it this way.  The things that you
6    repeated, from people like Wolfgang Halbig, were false?
7       A.  I would have to go through the specifics.  Can
8    we go through the specifics?
9       Q.  We will.  But I'm asking you right now
10   generally.  There have been things Wolfgang Halbig have
11   said that you repeated that were false?
12      A.  I'd have to see the specifics.
13      Q.  So you can't just admit that generally right
14   now?
15      A.  I'd have to see the specifics.
16      Q.  Okay.  Let's talk with you about -- I have some
17   questions about a couple of your employees.  And the
18   first one is a gentleman named Buckley Hamman, Hamman.
19   How do I say that?
20      A.  Hamman.
21      Q.  Okay.  Buckley Hamman, that's your cousin,
22   right?
23      A.  Uh-huh.
24      Q.  Okay.  What's his job at InfoWars?
25      A.  He doesn't work at InfoWars.

53

1       Q.  Okay.  Has he ever worked at InfoWars?
2       A.  Yes.
3       Q.  Okay.  What was his job at InfoWars?
4       A.  It was IT infrastructure.
5       Q.  Okay.  What dates did he work at InfoWars?
6       A.  I don't remember the exact dates.
7       Q.  Okay.  When did he -- I mean, I imagine he very
8    recently stopped working for InfoWars.
9       A.  It was a couple years ago.
10      Q.  Do you know what his opinion was of your Sandy
11   Hook coverage?
12      A.  I don't know.
13      Q.  Let's talk about Jerome Corsi.  In 2017, you
14   hired Dr. Corsi as your Washington bureau chief?
15      A.  Yes.
16      Q.  That didn't last very long, though, did it?
17      A.  No.
18      Q.  You two had a falling out?
19      A.  Yes.
20      Q.  Dr. Corsi, that's someone who has told you
21   their opinions about you bringing up Sandy Hook over and
22   over, right?
23      A.  I don't remember.
24      Q.  Okay.  So you don't recall any conversations
25   you might have had with Dr. Corsi in which he talked to

54

1  you about you repeatedly bringing up Sandy Hook?
2      A.  I don't ever remember that, no.
3      Q.  Okay.  Daria Karpova, who is that?
4      A.  That's a radio producer.
5      Q.  Produces -- so you have a -- your show goes out
6  on syndicated radio, correct?
7      A.  Yes.
8      Q.  Okay.  So she does a job that is tailored
9  towards having that show brought to radio; is that
10  right?
11      A.  No.
12      Q.  Okay.  Describe her job functions for me.
13      A.  Producers in TV are the people that pay for and
14  run the production.  In radio it just means the person
15  that like answers phones and sets guests up and like --
16  and like does that -- like the technicals of the show.
17      Q.  Okay.  So when she sets guests up, she does
18  that for radio but not for the web broadcast?
19      A.  It's simulcast of radio and TV, but it's really
20  a radio show.  So what it is, is a technical director.
21  In radio it's called producer, so that can be confusing.
22      Q.  Gotcha.  Okay.  Now, Daria Karpova, that's the
23  same person as Daria Russkaya?
24      A.  I don't know.
25      Q.  Okay.  When did Ms. Karpova start working for

55

1  you?
2      A.  I think about four years ago.
3      Q.  Still working for you now?
4      A.  Uh-huh.
5      Q.  What about Roger Stone?  Is he an employee of
6  yours?
7      A.  No.
8      Q.  Has he ever been an employee of yours?
9      A.  Yes.
10      Q.  Okay.  When did he stop being an employee?
11      A.  Or, no, he's a contractor.
12      Q.  Okay.  So he's a paid contributor in some way?
13      A.  Yes.
14      Q.  Okay.  And just -- let me give you a little
15  instruction to caution you, because I know we have a
16  court reporter here who is having to write everything
17  down.  And if you jump on my question, it makes it
18  really difficult for him --
19      A.  Got it.
20      Q.  -- to write that down.
21          THE WITNESS:  Can we take a break?
22          MR. JEFFERIES:  Yeah.
23          MR. BANKSTON:  Yeah, we can take a break.
24          THE VIDEOGRAPHER:  Going off the record at
25  10:12 a.m.

56

1          (Recess taken from 10:12 a.m. to 10:27 a.m.)
2          THE VIDEOGRAPHER:  We are back on the
3  record at 10:27 a.m.
4      Q.  (BY MR. BANKSTON)  Mr. Jones, we were talking
5  about employees and agents of InfoWars and I want to ask
6  you about a gentleman who I'm going to show you in
7  Exhibit 3.
8          (Deposition Exhibit 3 marked for
9          identification.)
10      Q.  (BY MR. BANKSTON)  Do you recognize that
11  gentleman?
12      A.  Dan Bidondi.
13      Q.  Can you hold that up for the camera for us?
14      A.  (Witness complies.)
15      Q.  Can you hold that a little higher so we can
16  zoom in on that?
17      A.  (Witness complies.)
18      Q.  That's Mr. Bidondi?
19      A.  Yes.
20      Q.  All right.  Thank you, Mr. Jones.  That's the
21  man that InfoWars sent to Newtown to report on Sandy
22  Hook in 2014, correct?
23      A.  Well, he lived up there.  He went and covered
24  it.
25      Q.  He lives in the Boston area, correct?

57

1      A.  Yes.
2      Q.  Okay.  So InfoWars sent him to Sandy Hook to
3  cover it in 2014, right?
4      A.  Not exactly.  He had his own separate radio
5  show from us.
6      Q.  Okay.  But he did reporting for InfoWars in
7  2014 in Sandy Hook?
8      A.  We had him on as a guest, but he wasn't working
9  for us then.
10      Q.  Okay.  He wasn't your reporter?
11      A.  Not technically.
12      Q.  You described him as your reporter, right?
13      A.  I don't remember that.  I may have.
14      Q.  Okay.  And you sent him to go cover Wolfgang
15  Halbig, correct?
16      A.  I don't remember that.
17          MR. BANKSTON:  Go ahead and give me Tab 4.
18  Mark that for me.
19          (Deposition Exhibit 4 marked for
20          identification.)
21      Q.  (BY MR. BANKSTON)  Mr. Jones, I've handed you
22  what I've marked as Exhibit 4.  This is from
23  TV.InfoWars.com.  Do you recognize this format?
24      A.  Yes.
25      Q.  Okay.  And this is from your video archives,

58

1 and you see on the right-hand corner, May 9th, 2014,
2 correct?
3    A. Yes.
4    Q. The video is an InfoWars video entitled School
5 Safety Expert Seeks The Truth In Sandy Hook School
6 Shooting, right?
7    A. Yes.
8    Q. Okay. And that's Mr. Bidondi interviewing
9 Mr. Halbig, correct?
10    A. Yes.
11    Q. And this was an InfoWars episode?
12    A. Yes.
13    Q. Okay. Wolfgang Halbig, the man he's
14 interviewing, that's a retired school safety officer who
15 sort of got obsessed with Sandy Hook, correct?
16    A. Yes.
17    Q. Okay. What did you think of Mr. Bidondi's work
18 in Newtown in 2014?
19    A. I did not follow a lot of it.
20    Q. Okay. When you did find out about it, what was
21 your reaction? What did you do?
22       MR. JEFFERIES: Objection, form.
23    A. I don't remember the specifics.
24    Q. (BY MR. BANKSTON) Okay. When you testified
25 back in March, didn't you say that you had seen what he

59

1 did and had a reaction to it?
2    A. Are you talking about this report? I don't
3 remember this report.
4    Q. I'm just talking about his work in Newtown.
5 What did you think about his work in Newtown in 2014?
6    A. I don't remember the exact year, but I remember
7 telling him do not -- you're not reporting for us and I
8 stop using the mic flag and I told him to stop -- don't
9 come on the show -- I mean, I don't like your demeanor
10 and you don't represent us. I do remember that. I'm
11 not sure of the year.
12       MR. BANKSTON: Can we mark that.
13       (Deposition Exhibit 5 marked for
14       identification.)
15    Q. (BY MR. BANKSTON) Okay. Mr. Jones, you sent
16 Dan Bidondi back to Newtown in 2015, didn't you?
17    A. I don't remember.
18    Q. Okay. Let me show you what I've marked as
19 Exhibit 5. Flip the page and you'll see a highlighted
20 portion. Do you see where it says, "In an interview
21 with InfoWars Reporter Dan Bidondi following the
22 hearing"?
23    A. Yes.
24    Q. And you'll see that this story, if you look
25 back at the front, says July 7th, 2015, correct?

60

1    A. Yes.
2    Q. Okay. So Mr. Bidondi was back in Newtown in
3 2015, correct?
4    A. Yes.
5    Q. Back during your prior testimony in March, we
6 watched a video of Bidondi in Newtown following people
7 on the street accusing them of being liars and
8 criminals; do you remember that?
9    A. Yes.
10    Q. Okay. I want to show you right now another
11 video of Dan Bidondi and Wolfgang Halbig in the
12 Connecticut courthouse and a confrontation that occurred
13 and ask you some questions about it.
14       MR. BANKSTON: Can we play -- we're going
15 to go ahead and offer -- are we on 6? We're going to
16 offer as Exhibit 6 the entire USB drive of videos and
17 we'll be doing them as 6A, 6B, 6C, et cetera.
18       MR. JEFFERIES: Got it.
19       (Deposition Exhibit 6 marked for
20       identification.)
21       MR. BANKSTON: So right now we're going to
22 offer video 6A of the Halbig confrontation on May 28th,
23 2015.
24       Can you play that for me?
25       (Video played.)

61

1    Q. (BY MR. BANKSTON) Mr. Jones, when Mr. Halbig
2 was yelling that he is going to find Avielle Richman and
3 find Mr. Urbina, do you remember his accusations about
4 Avielle Richman?
5    A. No, I don't.
6    Q. All right. Mr. Halbig told you that Avielle
7 Richman wasn't dead; do you remember that?
8    A. No.
9    Q. Okay. Mr. Halbig claimed there was another
10 little girl in the town that was actually Avielle
11 Richman and that he was stalking that girl's parent, the
12 Urbinas. What do you think about that?
13    A. I don't know that's true.
14    Q. Okay. If Mr. Halbig is going around right here
15 where you can see, shouting about Avielle Richman and
16 he's going to find Avielle Richman, the little girl who
17 died at Sandy Hook, what do you think about that?
18    A. I don't think that that's good.
19    Q. Okay. You claim that you saw what Bidondi was
20 doing and you fired him because of it, right?
21    A. Well, I'd have to go back and look at all the
22 times, but he was not working for us then and he kept
23 doing reports and then he popped up a few times on the
24 nightly news; and I remember yelling at Dew and other
25 people and saying, you know, tell him to stop doing that

62

1 and don't have him -- and don't cover it. I distinctly
2 remember that. I don't remember the year or whatever,
3 but it was -- I never even seen this.
4 Q. Okay. And you've said that Bidondi was not
5 working for you when he went to Sandy Hook, right?
6 You've testified to that before?
7 A. Well, it depends which -- again, it's long time
8 ago. So I really -- I can't speak to it. I just
9 remember telling -- you know, telling Dan that he was
10 not doing that in my name.
11 Q. Okay. In addition to Wolfgang Halbig, one of
12 your other sources for your Sandy Hook reporting was Jim
13 Fetzer, right?
14 A. Not one of mine, but I remember -- it was a
15 long time ago.
16 Q. Really? You didn't testify to that in March,
17 that Mr. Fetzer was --
18 A. He was one of the people questioning it.
19 Q. And one of your sources for Sandy Hook
20 coverage, correct?
21 A. I don't remember what I -- I mean, I
22 remember -- I don't think he was on my show.
23 Q. Didn't you testify that Mr. Watson was telling
24 you that Mr. Fetzer was bad and you shouldn't be relying
25 on him?

63

1 A. I remember Paul saying he didn't like Fetzer.
2 I do remember that.
3 Q. Okay. Mr. Fetzer is a retired professor and a
4 rabid anti-Semite, right?
5 A. I don't know that.
6 Q. You didn't know Mr. Fetzer was a rabid
7 anti-Semite?
8 A. No, I don't know that.
9 Q. You didn't know that Mr. Fetzer thinks the Jews
10 did Sandy Hook?
11 A. No, I don't know that.
12 Q. Just like he thinks the Jews did 9/11?
13 A. No.
14 Q. Okay. After some time, you say you realized
15 that Halbig and Fetzer were not credible and the
16 anomalies they raised weren't accurate, correct?
17 A. Some of them, yes. Talking about Halbig mainly
18 there. I didn't know Fetzer was saying all that. I
19 didn't agree with a lot of things Fetzer said over the
20 years.
21 Q. Sure. But you kept repeating those anomalies
22 as fact right up until you got sued, right?
23 MR. JEFFERIES: Objection, form.
24 A. No.
25 Q. (BY MR. BANKSTON) Okay. You remember at the

64

1 end of the 2016 election, there was some media coverage
2 about how you had said on your show that Trump had
3 called you to thank you for your help in the election?
4 A. Uh-huh.
5 Q. And some of those mainstream media sources
6 were, you know, kind of trying to pile on you about
7 that; do you remember that?
8 A. Yes.
9 Q. Okay. Two days after that happened, a woman
10 named Erica Lafferty -- first, let's back up. Do you
11 know who Erica Lafferty is?
12 A. No.
13 Q. Okay. She's the daughter of Dawn Hochsprung;
14 she's currently suing you. You don't know who she is?
15 A. I've never talked about her.
16 Q. Okay. She's been talked about on InfoWars,
17 though. You didn't know that?
18 A. I don't know.
19 Q. Okay. And you didn't know that she currently
20 is the named plaintiff in a suit against you in
21 Connecticut, called Lafferty versus Jones? You didn't
22 know that?
23 A. Oh, I've seen that name, yes.
24 Q. Well, two days later, Erica Lafferty wrote an
25 open letter to Trump about you; do you remember that?

65

1 A. No.
2 Q. You don't remember a letter in which
3 Ms. Lafferty wrote on behalf of the victims, saying to
4 Trump, please disavow Alex Jones, don't associate
5 yourself with Alex Jones; you don't remember that?
6 A. I do remember a letter about that.
7 Q. Okay.
8 MR. BANKSTON: Do you see Tab 7? Can we
9 mark that?
10 (Deposition Exhibit 7 marked for
11 identification.)
12 Q. (BY MR. BANKSTON) Mr. Jones, I'm going to show
13 you Exhibit 7 just so you can see the letter and what
14 date it was. Do you see the date on that?
15 A. Yes.
16 Q. Okay. And that is November 16, 2016, correct?
17 A. Yes.
18 Q. Okay. Again, just another caution to wait
19 until I finish my question before you answer it because
20 he has difficulty writing that down. Can we agree to
21 that, Mr. Jones?
22 A. Uh-huh.
23 Q. Okay. Two days after this letter, do you
24 remember publishing a video which you called your final
25 statement on Sandy Hook?

66

1     A.  Say that again.
2     Q.  Do you remember two days after this letter,
3  publishing a video which you titled your final statement
4  on Sandy Hook?
5     A.  I remember making a video.
6     Q.  Okay.  And that was a video that you recorded
7  to especially address this controversy, correct?
8     A.  Yes.
9     Q.  Okay.  I want to play you a copy of that video
10  that is going to be Exhibit 6B.  That video is entitled
11  Final Statement on Sandy Hook on November 18th, 2016.
12  And this is going to be a little bit of a long clip.  So
13  I want you to pay close attention because we're going to
14  talk about every part of it.  I know you don't like it
15  when videos are cut short, so we're going to watch a
16  long piece of this.  So again, I caution you to pay
17  attention here --
18     A.  Thank you.
19     Q.  -- because we're going to be watching this
20  video.
21        MR. BANKSTON:  So let's go ahead and play
22  that video.
23        (Video played.)
24     Q.  (BY MR. BANKSTON)  All right.  Mr. Jones --
25        MR. BANKSTON:  Can we mark that?

67

1        (Deposition Exhibit 8 marked for
2        identification.)
3     Q.  (BY MR. BANKSTON)  Mr. Jones, I'm handing you
4  what I've marked as Exhibit 8.  It's a screenshot from
5  the video.  Could you hold that up for the camera real
6  quick?
7     A.  (Witness complies.)
8        THE VIDEOGRAPHER:  I didn't get it.
9     Q.  (BY MR. BANKSTON)  Can you hold that up again?
10        THE VIDEOGRAPHER:  Okay.
11     Q.  (BY MR. BANKSTON)  All right.  Thank you.  This
12  is part of the video that dealt with the Wayback
13  Machine, correct?
14     A.  Yes.
15     Q.  Okay.  You said, it's the biggest piece of
16  evidence, the smoking gun.  Explain to me what you meant
17  by that?
18     A.  Specifically?
19     Q.  Sure.  What did you mean by that?
20     A.  Well, there's a whole group of research around,
21  not just this but other algorithm sites and meters not
22  showing any traffic to the school website or food
23  deliveries, things like that, for those years.
24     Q.  Okay.  So you've said in the video, "We see
25  Sandy Hook's website having zero traffic."

68

1     A.  According to this.
2     Q.  All right.  Do you -- so the Internet Wayback
3  Machine, do you believe that that shows Internet
4  traffic?  Is that what you believe?
5     A.  What it shows is what's being archived there
6  and there's also -- it's a group of not just this but --
7  I'd have to go back to it because that was years ago.
8     Q.  Okay.  Internet Wayback Machine does not show
9  Internet traffic at a school, correct?
10     A.  It shows new material and traffic on a website
11  that's posted.
12     Q.  Okay.  You're going to stick by you think it
13  shows traffic, Internet traffic; that's what it's
14  measuring?
15     A.  I guess the technical term would be -- you
16  know, traffic and posting and activity.
17     Q.  Have you ever read the Wayback Machine FAQ,
18  frequently asked questions, ever figured out what it is?
19     A.  It archives web pages.
20     Q.  Right.  So there's little crawling robots, web
21  robots that crawl different websites, and if it hits it,
22  it preserves it in the Wayback Machine, correct?
23     A.  Yes.
24     Q.  Has nothing to do with how much web traffic was
25  coming to a particular site, correct?

69

1     A.  How much updating of the site's there, that's
2  the traffic, that's a form of traffic.
3     Q.  Okay.  Those little bars there, that isn't a
4  measurement of how many people are accessing the website
5  or how much traffic is coming over the website, is it?
6     A.  A better word would be "activity" on the site
7  by people that are posting.
8     Q.  So you're saying that the little bars there
9  reflect something other than the Internet Wayback
10  Machine's own web crawling robots and whether or not
11  they connected with the page?
12     A.  I'd have to go back and look at what I was
13  covering at the time.
14     Q.  Have you ever Googled why a page might be
15  excluded from the Wayback Machine for a certain period?
16     A.  There's things like if they blocked a robot
17  with the spider.
18     Q.  Yeah.  And so have you checked to see if that
19  was done?
20     A.  This was years ago and I was also speaking in
21  general about, not just the Wayback Machine but the
22  updating of the site, the traffic to the site and food
23  deliveries to the site.  It was a whole group of things.
24  This could have been better said.
25     Q.  Okay.  But you said that's the smoking gun,

70

1  right, the Wayback Machine and the traffic to the
2  Internet?  That's what you said?
3      A.  Well, not just this.  That whole group of
4  things.
5      Q.  Okay.  So let's talk about the other things.
6  You said --
7      A.  That was an oversimplification.
8      Q.  You say there's things showing there's no
9  traffic coming to the school.  What are you talking
10  about?
11      A.  I would have to pull that up.  This was years
12  ago.
13      Q.  Well, I think you could pull it up pretty
14  easily because it comes from Jim Fetzer's book, right?
15  You could just open up Jim Fetzer's book and --
16      A.  I've never read Jim Fetzer's book --
17          (Simultaneous discussion interrupted by
18           reporter.)
19      Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
20  caution you again.  Please wait till I answer [sic] a
21  question because, as you can see, it's very frustrating
22  for this man.  And he's not here affiliated with any
23  party.  He's a private person.  He's paid to provide a
24  service.  He's come in here to try to write all this
25  down so we have a good record.  So let's try to behave

71

1  in the deposition.  Finish -- and let me finish my
2  questions.
3          You didn't check any other Connecticut school
4  district websites, did you?  Because they all look this,
5  don't they?
6      A.  I don't remember.
7      Q.  Well, let's say hypothetically, if you had gone
8  and you had seen every other Connecticut school district
9  website looks just like this, be pretty irresponsible to
10  go on the Internet -- I mean, go on your web show, call
11  this the smoking gun, wouldn't it?
12      A.  I was predominantly talking about the other
13  information, but I would have to go back and get that.
14      Q.  Okay.  Have you seen Ms. Binkowski's
15  declaration in this case discussing all this?  Have you
16  looked at that?
17      A.  I've read over a lot of papers.  I can't keep
18  track of it all.
19      Q.  Okay.  Have you read anything about this, about
20  the Wayback Machine?
21      A.  I was speaking of a whole grouping of things,
22  not just this.
23      Q.  That's not what I'm asking you.  I'm asking you
24  if you've ever read any documents in this case about the
25  Wayback Machine?

72

1      A.  I don't remember.
2      Q.  Okay.  What you said right after that is, the
3  school was shut down for those years, that's what the
4  records show.  Correct?
5      A.  I was --
6      Q.  Correct?
7      A.  I'm sorry, is he done?
8      Q.  You can answer as long as I'm not talking,
9  Mr. Jones.
10      A.  Okay.  What was the question?
11      Q.  The question is, you said right after that, the
12  Wayback Machine discussion, you said, the word is that
13  school was shut down for those years, that's what the
14  records show; that was your argument, correct?
15      A.  I was specifically talking about the other
16  articles I was talking about, yes.
17      Q.  That's what I'm asking you about right now.
18  Those records, what are you talking about?
19      A.  I would have to go pull them up.
20      Q.  And you haven't done that?
21      A.  No, not -- no, not recently.
22      Q.  You've been under lawsuit now for over a year
23  on Sandy Hook-related cases, multiple cases, and you
24  haven't done anything to go try to find what your
25  sources for these claims are, have you?

73

1      A.  I've done a lot of work.
2      Q.  Well, you were asked in interrogatories,
3  weren't you, to identify your sources for all your Sandy
4  Hook claims, including this one?  You were asked that,
5  right?
6      A.  I don't remember.
7      Q.  Okay.  You don't remember saying you couldn't
8  figure out what your sources were; is that what you're
9  saying?
10      A.  I don't understand.
11      Q.  Let's just ask you right now.  Are you able to
12  figure out what your sources are?
13      A.  Yes, I could specifically -- now that I
14  understand what you're asking, I could go find that.
15      Q.  So if I wanted to know when you say the records
16  show that the school was closed down, you could produce
17  those records?
18      A.  I could show what I was talking about at that
19  point.
20      Q.  Or you could produce whatever you were relying
21  on as your source, right?
22      A.  Now that you've specified.
23      Q.  You haven't done that, though, have you?
24      A.  I don't have a law degree.
25      Q.  Okay.  When you -- if you were asked the

74

1  question, produce to me your source or records or
2  information that you relied on to say the school was
3  closed, that's something you could do?
4      A.  Yes.  I don't know that it would be what you're
5  looking for.
6      Q.  I mean, look, if you had records or some sort
7  of information, some sort of source showing the school
8  in America's most horrifying school shooting was
9  actually closed, you'd probably save that somewhere,
10  right?
11      A.  Well, I specifically mentioned -- I remember
12  what people were pointing out, what was going on.
13      Q.  I'm asking you if you would have saved that
14  stuff.
15      A.  I mean, I don't have the specifics here in
16  front of me.
17      Q.  I'm not asking what you have in front of you.
18  I'm asking you when you had information that the school
19  shooting, that is the most famous in American history,
20  actually occurred in a school that was closed down and
21  wasn't an operating school, did you save that
22  information?
23      A.  You know, I don't remember.  It was a long time
24  ago, almost seven years ago.
25      Q.  Okay.  You remember we saw in that video a

75

1  piece of video footage of what you claimed at the time
2  was kids going in circles, correct?
3      A.  Yes.
4      Q.  Okay.  That's not accurate, right?
5      A.  Well, they are going in circles.
6      Q.  There's not kids, are they?
7      A.  I believe they were kids.
8      Q.  Didn't we look at that in your last deposition
9  and you agreed with me those are not school-aged kids
10  nor is that the school?
11      A.  I believe later there was also some stuff with
12  the fire department.
13      Q.  I have no idea what you mean.  What I'm asking
14  you, Mr. Jones, is, didn't you agree with me that that
15  video does not feature school-aged children nor does it
16  feature Sandy Hook Elementary School?
17      A.  I don't remember that.
18      Q.  In fact, in March, didn't you tell me, well,
19  that was the wrong video; we do a live show and people
20  just put up videos sometimes?
21      A.  I remember something about a fire department,
22  yeah.  I don't remember it not being the kids.  I'm
23  confused.  This was adults?
24      Q.  Yeah.  We saw a video of adults walking in and
25  out of that building, which wasn't even the school.  And

76

1  didn't you tell me that you wrongly said that that was
2  children and you came to understand that that was false?
3      A.  I remember that conversation.
4      Q.  It was one of the reasons you changed your mind
5  about a lot of things; isn't that what you said?
6      A.  Can you refresh and show me the video again?
7      Q.  I don't have the video with me right now.  I'm
8  just asking you a question.
9      A.  I'm just trying to accurately answer this.
10      Q.  Sure.  Well, we saw the video right there,
11  right?  We saw the video of them going in and out of
12  circles out of the school.
13      A.  It was a -- pretty far away.  I think that's
14  the same video.
15      Q.  Right.  And you told your audience that was the
16  school, and that was not true.
17      A.  I don't remember the specifics.  But I do
18  remember I think that was -- something in there was
19  wrong.
20      Q.  And that's another thing that you got from Jim
21  Fetzer and Wolfgang Halbig, correct?
22      A.  I didn't really get anything I remember from
23  Fetzer.
24      Q.  Okay.  When you talked about emergency
25  helicopters weren't called, again, you've testified you

77

1  were relying on Halbig and Mr. Fetzer, right?
2      A.  And I -- I remember there was some research in
3  the news and that was pointed out.  I would have to pull
4  that up, though.
5      Q.  Okay.  The truth is you had no idea where
6  emergency helicopters would be coming from and you had
7  no idea if they could have gotten there faster or gotten
8  a patient to the hospital faster than an ambulance,
9  right?
10      A.  I was relying on the fact that Halbig was a
11  recognized expert on national television at that time,
12  at the beginning and that he was credible.
13      Q.  Right.  You did nothing to corroborate that;
14  you just relied on Mr. Halbig?
15      A.  I don't remember back at the time.
16      MR. BANKSTON:  Can you give me Tab 12.  Can
17  you mark that?
18      (Deposition Exhibit 9 marked for
19      identification.)
20      Q.  (BY MR. BANKSTON)  Mr. Jones, I've just handed
21  you Exhibit 9, which is a screenshot from your video.
22  And you remember this bit about Nancy Grace and Ashleigh
23  Banfield doing a split screen interview?
24      A.  I do.
25      MR. BANKSTON:  Mark that.

78

```
 1        (Deposition Exhibit 10 marked for
 2        identification.)
 3    Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to hand
 4  you Exhibit 10, which is a little bit of a higher
 5  resolution picture of that from an Atlantic article,
 6  just to help you refresh your memory.  Do you remember
 7  that bus going behind there?
 8    A.  I remember the story.  They were at the same
 9  location.
10    Q.  Yeah.  Explain what you think is going on here.
11    A.  Well, I'm not saying they're staging Sandy
12  Hook.  I'm saying just they were staging -- that they
13  were at different locations.
14    Q.  Were they staging that they were in different
15  locations?
16    A.  That's what I believe the report was.
17    Q.  Do you see how at the top of the picture here
18  you have little boxes that say where they are?  Are they
19  in different places, or do they both say "Phoenix"?
20    A.  Well, sure, but that could be in a different
21  remote location.
22    Q.  Sure.  But they're only 40 yards away from each
23  other, right?
24    A.  I don't know.
25        MR. JEFFERIES:  Objection, form.
```

79

```
 1    Q.  (BY MR. BANKSTON)  You don't remember what
 2  they're covering here?
 3    A.  No.
 4    Q.  So first of all, we know it's not Sandy Hook,
 5  right?  They're not covering Sandy Hook?
 6    A.  Looks like this says something different, about
 7  captives and brothers held.
 8    Q.  Yeah, you're just going over some news
 9  headlines in a moment.  But you don't know where they
10  are in Phoenix; why they're in Phoenix?
11    A.  I don't remember.  It's a long time ago.
12        MR. BANKSTON:  Let's mark that.
13        (Deposition Exhibit 11 marked for
14        identification.)
15    Q.  (BY MR. BANKSTON)  I'm going to show you
16  Exhibit 11 a little bit later in the day.  You see the
17  title on the bottom?
18    A.  About jury deliberations?
19    Q.  Yes.  You remember the Jody Arias murder trial?
20  You remember that happening?
21    A.  No.
22    Q.  You ever seen coverage of different crimes and
23  trials where they're all waiting out in the parking lot
24  for a jury to deliberate just talking on cable news?
25    A.  Yes.
```

80

```
 1    Q.  Okay.  And that's what's going on here, right?
 2  You have a bunch of cable news vultures sitting out in a
 3  parking lot waiting for a jury verdict to report on a
 4  crime, right?
 5        MR. JEFFERIES:  Objection, form.
 6    A.  I don't know.
 7    Q.  (BY MR. BANKSTON)  Have you ever seen that sort
 8  of stuff, like what Nancy Grace does?
 9    A.  Yes.
10    Q.  Okay.  Is it -- does it -- is it surprising to
11  you that three of those people have the same building
12  behind them, that courthouse?  Is that surprising to
13  you?
14    A.  I can't tell what that is.
15    Q.  If all those people are sitting in the same
16  parking lot waiting for that jury verdict, is that, to
17  you, evidence that there's some sort of conspiracy
18  behind Sandy Hook?
19    A.  No.
20    Q.  Okay.  You've seen tabloid-style coverage of
21  crimes on these cable news networks, right?  You're
22  familiar with what Nancy Grace does?
23    A.  Yes.
24    Q.  We can both agree, Nancy Grace has reported
25  false things on CNN about tragic murders, hasn't she?
```

81

```
 1    A.  I haven't really -- I don't know that.
 2    Q.  You haven't made your -- you've had some
 3  criticisms of Nancy Grace, about her false reporting,
 4  haven't you?
 5    A.  I don't really remember.
 6    Q.  Okay.  Did you know she's been sued multiple
 7  times for false reporting?
 8    A.  I don't know that.
 9    Q.  Do you think people are justified in suing
10  someone like Nancy Grace when she does false reportings
11  on crimes involving their loved ones?
12        MR. JEFFERIES:  Objection, form.
13    A.  I don't know the specifics.  I don't really
14  follow Nancy Grace.
15    Q.  (BY MR. BANKSTON)  I'm just asking you if you
16  think people would be justified suing her if she said
17  false things about crimes involving their loved ones?
18    A.  I'm not judging her.  I don't know.  I really
19  haven't followed her.
20    Q.  Okay.  You wouldn't agree with me, then, that
21  you and Nancy Grace are basically two peas in a pod; you
22  do basically the same thing?
23    A.  I don't follow Nancy Grace enough to know what
24  your definition of her or I are.
25    Q.  Well, I mean, I'll just tell you Nancy Grace
```

82

1    does really, really reckless tragedy porn and you do the
2    same thing with a conspiracy twist, don't you?
3        A. No. I question a system known for continually
4    lying, that says that babies were thrown out of
5    incubators that never existed in the DU, and there's
6    WMDs in Iraq when there's not, and then all these -- and
7    the Benghazi stand-downs. We've been lied to so much,
8    just like most Americans, I question the official
9    stories. It's not illegal.
10       Q. What question did you ask in that video that we
11   just watched? What was the question you asked?
12       A. I was talking about some of the questions
13   people have.
14       Q. I'm not -- I don't -- what was the question?
15   What question? I heard a lot of statements. Can you
16   tell me what the question was?
17       A. I was putting out some of the, you know,
18   reasons people question things.
19       Q. You were putting out assertions that were false
20   that you were using to justify your skepticism of Sandy
21   Hook, correct?
22       A. I've been skeptical of all events, like Jussie
23   Smollett, the Covington kids; and so many times it turns
24   us out what we're being told isn't true. And I've been
25   wrong about things I've questioned before and I've

83

1    admitted that, but I've not consciously tried to go out
2    and do that. In fact, you get a lot of -- you get
3    attacked for questioning things and -- but, you know,
4    it's something that, you know, I think is important to
5    do because we've been lied to so much and it's really
6    the system's fault for lying so much, that people have
7    lost confidence in it.
8        Q. Literally every single assertion you made in
9    that video is false, correct? Not one thing you said in
10   it is true?
11       A. I don't -- I'm not -- no.
12       Q. I'm not understanding your answer. Are you
13   claiming there are things you said in that video that
14   are true?
15       A. I would have to watch the video again. There's
16   also a full video. That's only an excerpt.
17       Q. Well, first of all, I asked you to watch it
18   closely because you knew I was going to ask you
19   questions about it. And I want you to know, all those
20   assertions you made, which ones are true?
21       A. Well, I mean, that looks like green screen to
22   me when his face turns and the nose disappears.
23       Q. You work in Internet video, right?
24       A. Internet video?
25       Q. Yeah. That's part of your job.

84

1        A. I don't know what "Internet video" means.
2        Q. You publish videos to the Internet, correct?
3        A. Yes.
4        Q. Okay. You run an Internet-based media company,
5    correct?
6        A. No.
7        Q. Okay. You've seen a lot of Internet videos?
8        A. Yes.
9        Q. You knew that wasn't blue screen. Are you
10   really going to tell me you thought that was blue
11   screen?
12       A. That's exactly what it looks like.
13       Q. Okay. What efforts did you make to find out?
14       A. I've seen -- that's the most classic thing, is
15   on the line, if the colors are close to each other, it
16   will disappear. I know you asked if it was video
17   artifacts and stuff. Those are usually boxes and --
18   where stuff blurs out over large areas. It doesn't just
19   do it on the nose or on the line or on the shoulders.
20   With blue screen or chroma key, it's along the outlines.
21       Q. So the answer to the question is nothing; you
22   made no actual efforts to find out if that was blue
23   screen. You just looked at it and said, looks like blue
24   screen.
25       A. It's -- that's exactly when you -- I mean --

85

1    and I'm not saying that means Anderson Cooper's involved
2    in Sandy Hook or something. It's just saying that CNN
3    is famous for faking locations.
4        Q. Again, you made no efforts to find out. That's
5    all I'm asking.
6        A. I don't remember. Back at the time, I mean,
7    the Internet was -- a lot of folks -- people that are
8    familiar with blue screen thought it looked like that,
9    green screen, blue screen.
10       Q. I did not ask you what other people on the
11   Internet were thinking at the time. I asked you, what
12   did you do? What efforts did you make to determine if
13   it was blue screen? And the answer is none, correct?
14       A. We did. We went to the original CNN site. I
15   remember we found the clip from them and it was like
16   that. It wasn't the version of the video we had.
17       Q. Let's talk about that Bloomberg e-mail that
18   comes up, this idea that there was an e-mail sent the
19   day before Sandy Hook, saying, get ready, next 24 hours
20   there's going to be a big event. That e-mail -- you've
21   been asked for that e-mail and you say you don't have
22   it, right?
23       A. We were covering reports of the e-mail that was
24   sent out to the activist groups that had been in the
25   news.

22-01023-tmd  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B_contd. Pg
414 of 689

Alex Jones - 11/26/2019

86

1    Q. Where were you covering it?  What do you mean,
2  you were covering it?
3    A. We were covering the reports of them activating
4  their antigun rights organization.
5    Q. Okay.  Well, see, here's the thing, Mr. Jones.
6  First, I thought there must be some e-mail
7  coincidentally sent on the day before Sandy Hook that
8  Bloomberg or his people sent that you must be willfully
9  misinterpreting or something like that, but the problem
10  is, nobody who's looked at this has been able to find
11  any evidence that such an e-mail has ever existed, and I
12  want to know if you can explain that.
13    A. Well, I'm just not taking your assertion.
14  That's the case.
15    Q. That's why I've asked you questions in
16  discovery and you haven't been able to produce that
17  e-mail to me, have you?
18    A. You guys are asking if we have an e-mail in our
19  e-mails.  I was reporting on other news reports about an
20  alert they put out to their group.
21    Q. All right.  Could you find those reports if you
22  needed to?  Could you identify your source?
23    A. Well, I mean, A, you can hold back a source if
24  you want to, but I remember it being online.  I can try
25  to go find that again.

87

1    Q. What do you mean, you can hold back a source if
2  you want to?  What does that mean?
3    A. I mean, if I have a confidential source on
4  something, I want to be able to hold back the
5  confidential source for their protection, but that's not
6  what's happening in this case.  I remember the news
7  articles about it that we reported on.
8    Q. So you could find those, right?
9    A. I should be able to.
10    Q. Okay.  This bit about Robbie Parker, the whole
11  fake crying bit, the hoo-hoo-hoo-hoo, that bit, I'm
12  curious, do you feel any shame about that or are you
13  totally fine with seeing video of yourself do that?
14    A. I don't think I did it quite the way you did.
15    Q. Do you feel any shame about it, or are you fine
16  seeing video of yourself doing that?
17    A. I did not kill those children.  I know the
18  media and everybody wants to make it that way and I have
19  a right to question things, and the Internet saw him
20  laughing and then turning and
21  hyperventilating and started crying, and that's why
22  people who have been lied to so much from the media
23  began to ask questions, is that real, because it's also
24  so traumatic that the public didn't want to believe that
25  terrible things like this could happen.  And so I don't

88

1  wish any harm against Mr. Parker.  I believe he lost his
2  son and -- but I did not kill his son.
3    Q. I'm not -- let's back away from what you think
4  you have a right or not right to do on television.
5  Let's just back away from that for a moment.  I'm just
6  talking as a human being.  Does seeing you do that on
7  video, does that make you feel ashamed?
8    A. I mean, that's what he did on video.  So that's
9  what happened.
10    Q. So the answer's no?
11    A. I've been asked a lot about that.  The
12  Internet -- by the time I saw that video of Mr. Parker,
13  who had millions of views, I didn't kill his son and I
14  didn't -- I didn't laugh like he did.  And I understand
15  when people are going through grief, they do
16  inappropriate things and later I understood that and
17  I've said that.
18    Q. In April of the following year, so just a
19  couple months later after this video, do you remember
20  there being video coverage about how Trump hadn't
21  responded to that letter asking him to disavow you?
22    A. I do remember the letter now by the parents.  I
23  didn't remember the specific name of the lady.
24    Q. Okay.  And you remember a few months later some
25  of those outlets, like Daily Beast and Guardian and all

89

1  of those, were waving their hands in the air, saying
2  Trump hasn't responded to the letter and won't disavow
3  Alex Jones; do you remember that?
4    A. I remember that.
5    Q. Okay.  And do you remember just a couple days
6  after that you did a video that you published called
7  Sandy Hook Vampires Exposed?  Remember that?
8    A. Yes.
9    Q. Okay.  And that was in April of 2017, right?
10    A. Yes.
11    Q. Okay.  And that's another video where you kept
12  repeating the things Halbig was saying, right?
13    A. That's a video where I called the media and the
14  lawyers that live off Sandy Hook, vampires.
15    Q. Did you repeat the things Halbig was saying?
16    A. I don't remember the specifics of the whole
17  video.
18    Q. Okay.  Let's watch it.
19        MR. BANKSTON:  I would like to offer now
20  Exhibit 6C.  This is entitled Sandy Hook Vampires
21  Exposed.  It was published on April 22nd, 2017.
22        Can you play us that clip?
23        (Video played.)
24    Q. (BY MR. BANKSTON)  I want to ask you about the
25  things that you and Mr. Dew said in that video.  And we

90

1   can agree there was a list of factual claims made in
2   that video, correct?
3       A. No, I was giving my opinion.
4       Q. When you say porta potties were delivered an
5   hour after it happened, that's not a factual assertion
6   to you?
7       A. I believe they were delivered soon thereafter.
8       Q. That's not what I'm asking you, Mr. Jones.  I'm
9   asking is that a factual assertion?
10      A. I think it's my opinion.
11      Q. So if you have an opinion, I think a certain
12  person is pretty, to you that's the same kind of
13  statement as there were porta potties there an hour and
14  a half later?
15          MR. JEFFERIES:  Objection, form.
16      Q. (BY MR. BANKSTON)  Those are both opinions?
17      A. Can you play it again?
18      Q. I don't think we need to play it again,
19  Mr. Jones, just to burn the time.  I'm just asking
20  you --
21      A. I'm not trying to burn the time; I'm just
22  like --
23      Q. Saying a porta potty being there an hour after
24  Sandy Hook, that's a fact?
25      A. I mean, they do admit the chemical attacks were

91

1   fake.  That's been confirmed now.
2       Q. Okay.  Mr. Jones, let's start with each one.
3   Let's go through each one.  Started the video talking
4   about the wrong name was being given; Mr. Dew said that
5   they gave the wrong name of the shooter; do you remember
6   that?
7       A. That's what he said, yeah.
8       Q. Right.  So Lanza had his older brother's ID on
9   him.  Why does that support a conspiracy with Sandy
10  Hook?  Why is that weird?
11      A. I think Rob was explaining why people had
12  questions.  There was a lot of anomalies.
13      Q. That's what I'm asking.  Why is it weird?  Why
14  does that make you question Sandy Hook, that Adam Lanza
15  had his brother's ID on him?
16      A. That was Rob Dew saying that.
17      Q. Okay.  Why is that -- you're sitting there
18  agreeing with it, right?  Why are y'all questioning it?
19      A. We were pointing out why people questioned it.
20      Q. Okay.  When they said, Rob said they're pulling
21  guns out of cars.  Lanza had a shotgun in his trunk.
22  Why does that support a question about whether Sandy
23  Hook happened?
24      A. Because they had also said -- as memory serves,
25  it was a long time ago, like they said the AR-15 was in

92

1   the car too.  So how was that inside if it was inside
2   the Bushmaster?
3       Q. Okay.  And you understand the AR-15 was not in
4   the car?
5       A. I -- like I said, this is almost seven years
6   ago.
7       Q. Actually, this wasn't seven years ago,
8   Mr. Jones.  This is April 2017.
9       A. No, I know.  I'm just saying going back in
10  time, it all gets...
11      Q. Okay.  You don't use a Teleprompter on your
12  show?
13      A. No.
14      Q. In all these videos, you just rattle them off,
15  right?  You say porta potties, Bloomberg e-mail, green
16  screen, helicopters in the woods, school was closed,
17  video showing it was falling and rotting apart, SWAT
18  team.  You just rattle them off without a Teleprompter,
19  correct?
20      A. I remember a video of the rotting school, I
21  remember the helicopter video, and I remember -- I
22  remember the chemical attack in Syria being staged.
23  That's now public.
24      Q. And you were able to do that without a
25  Teleprompter.  But today sitting in deposition ever

93

1   since you got sued, all of a sudden you can't remember
2   anything, right?
3       A. No, I remember seeing the -- I just -- I
4   remember like the photos and video of the rotting school
5   and the mold and the stains on all the floor and all
6   that stuff.  I just can't -- but specifically in a
7   deposition, then you'll say where is that and then
8   trying to actually pull that very thing up in my head
9   right here, I mean, I don't have a photographic memory
10  of the exact thing.
11      Q. Yeah.  But I've been asking for a year, haven't
12  I?  Still don't have it, do I?  Correct?
13      A. I just want to be able to answer all this just
14  exactly right and that's why I can't answer a lot of it
15  because I want to be accurate as much as possible.
16      Q. Okay.  When it says in that video, the school
17  was closed until that year, that's false.  That's not
18  true.  You were wrong.  That was a false statement.
19          MR. JEFFERIES:  Objection, form.
20      A. I don't understand the -- how am I supposed to
21  answer that?
22      Q. (BY MR. BANKSTON)  I'm trying to tell you right
23  now, are you going to make this claim in this deposition
24  that Sandy Hook was a closed school, that it wasn't
25  really open?

94

1 A. I was going off the reports. It certainly was
2 a horrible dump, shouldn't have been opened. I know
3 that. Didn't look like an open school.
4 Q. Mr. Jones, you know that's not my question.
5 You're just wasting time.
6 A. No, I'm not.
7 Q. I'm asking you, are you saying right now that
8 that school was closed, or are you going to admit that
9 you said something false?
10 A. I was going off other people's reports that
11 looked credible to me, of the school that was so
12 dilapidated that it didn't look like it was open to me.
13 I guess I could go find that stuff somewhere and dig it
14 up.
15 Q. And you were wrong, that is false, correct?
16 A. I may have been covering somebody that put
17 something out that was false.
18 Q. Same deal with kids going around in circles
19 with their hands up around the school, that is false,
20 that is not the truth?
21 A. I would have to review it again.
22 Q. All these things you were saying as fact, you
23 were saying them just a couple months before you were
24 sued, right?
25 MR. JEFFERIES: Objection, form.

95

1 A. I believe I said in the tape I believe Sandy
2 Hook happened. That's what people questioned, is what
3 I'm saying.
4 Q. (BY MR. BANKSTON) Right. And all these
5 things, this entire list, comes from Fetzer and Halbig,
6 doesn't it?
7 A. I don't know about Fetzer. This came from
8 people questioning.
9 MR. BANKSTON: Can you tell me the time?
10 THE VIDEOGRAPHER: 1:43.
11 MR. BANKSTON: Can we take a little break
12 real quick? Let's go off the record real quick.
13 THE VIDEOGRAPHER: Going off the record at
14 11:14 a.m.
15 (Recess taken from 11:14 a.m. to 11:26 a.m.)
16 THE VIDEOGRAPHER: We are back on the
17 record at 11:26 a.m.
18 Q. (BY MR. BANKSTON) Mr. Jones, do you remember
19 in the summer of 2017, you appeared for an interview
20 with Megyn Kelly?
21 A. I do.
22 Q. Okay. Shortly before that aired, you published
23 a video where you asked her not to air it, correct?
24 A. Yes.
25 Q. Okay. I want to play a little bit of that

96

1 video from you in June of 2017.
2 MR. BANKSTON: Going to offer Exhibit 6D,
3 What Alex Jones Really Believes about Sandy Hook,
4 published on June 13th, 2017.
5 Can you go ahead and play that?
6 (Video played.)
7 (Deposition Exhibit 12 marked for
8 identification.)
9 Q. (BY MR. BANKSTON) All right. Mr. Jones, I'm
10 going to hand you what I've marked as Exhibit 12. This
11 is a screenshot from the video we just watched. And I
12 want to talk to you about these -- the little bullet
13 point list here that was shown during the video that you
14 talked about. The first one talking about Sandy Hook
15 school website having zero traffic for four years.
16 We've talked about that already, correct? That's
17 something we've talked about?
18 A. This is Zero Hedge. This is different.
19 Q. When it says, "Among his questions," who does
20 "his" refer to, Mr. Jones?
21 A. Me.
22 Q. Right. These are your questions, right?
23 Correct?
24 A. They're questions -- no, as I said there, these
25 are questions the Internet is bringing forward.

97

1 Q. In other words, these are things you said on
2 your show, and then Zero Hedge reported on that you said
3 them and then now you're reporting on it again, correct?
4 A. I'm pointing out what the Internet is asking,
5 what people are questioning, as I said in the video.
6 Q. Sure. These are things you've said on your
7 show?
8 A. These are things that I have questioned on my
9 show.
10 Q. Okay.
11 A. Opinions.
12 Q. Let's talk about them again. The first one,
13 the Sandy Hook Elementary School website having zero
14 traffic, we've talked about that already today; we've
15 talked about the Wayback Machine, right?
16 A. As I told you, that was one part of saying
17 that.
18 Q. All I was asking --
19 A. I need to clarify something. When you keep
20 asking me about documents, I don't have any other
21 sources on Sandy Hook. And when I'm talking about
22 research or talking about sources of info, that's where
23 I would have to go out online and look at again and find
24 again. That's not things that I've not produced or
25 given to you.

98

1    Q.  Okay.  Let's try that question again.  We've
2  talked about the Wayback Machine in this deposition,
3  right?
4    A.  Yes.
5    Q.  Okay.  Second one is discussions about shooters
6  dressed in camouflage, other shooters dressed in
7  camouflage.  Do you remember making that statement?
8    A.  Yes.
9    Q.  Okay.  There were no shooters dressed in
10  camouflage, correct?
11    A.  The police had reported what they thought was
12  other shooters in the woods and other people taken into
13  custody who had firearms.
14    Q.  There were people taken into custody that had
15  firearms.
16    A.  That was reported that day, yes.
17    Q.  Okay.
18    A.  People were taken into custody that they
19  believed had been armed, yes.
20    Q.  Okay.  The next one that says, "Why were
21  port-o-potties, sandwiches, fruit, drinks and chips
22  brought and set up for people at the crime scene to eat
23  inside the school?"  That's another thing you got from
24  Halbig, right?
25    A.  I believe so.

99

1    Q.  Okay.  Do you want to take a wild guess right
2  now whether that's true or not?
3    A.  I remember the local -- I remember seeing news
4  of stuff set up.
5    Q.  You think people ate food inside the school at
6  the crime scene?  That's what you think?
7    A.  I don't know about that specific.  I thought
8  you meant about the porta potties and food.  I don't
9  know about inside the school.
10    Q.  Okay.  So that's another thing that you just
11  relied on from Halbig and just put on your show without
12  checking?
13    A.  You're saying it's from Halbig.  I'm not --
14    Q.  I thought you just agreed it was from Halbig?
15    A.  Well, I mean, I'm thinking Halbig did say some
16  of those things.
17    Q.  Okay.  The next one that says, "Sandy Hook
18  father Robbie Parker 'getting into character.'"  You
19  stopped yourself from reading this one.
20    A.  Because that's not what I'm saying.  Those
21  aren't my words.
22    Q.  Yeah.  You knew this would be a terrible thing
23  to say.
24    A.  No, that's not what I said.  So they got
25  that --

100

1    Q.  You're going to tell me that you've never on
2  your show accused Robbie Parker of getting into
3  character?
4    A.  Well, that's not my word for it.  The Internet
5  saw that clip and millions of people watched it and
6  basically said that, and that isn't an accurate
7  representation of what I was saying there, so I didn't
8  read that.
9    Q.  Didn't you turn --
10    A.  I didn't write that.
11    Q.  Didn't you turn to Rob Dew multiple times on
12  your show and say, Rob, you have a degree in theater,
13  don't you; that's getting into character, isn't it?
14    A.  I may have said that.
15    Q.  So you've said multiple times, Robbie Parker
16  was getting into character?
17    A.  I said it looked like that, previously.
18    Q.  And you --
19    A.  And I have a right to say it looks like
20  somebody is getting into character.
21    Q.  Well, I'm saying, you didn't say it this time,
22  right before Father's Day when Megyn Kelly's interview
23  was coming up, because you knew it would look really bad
24  if you said that; you stopped yourself from saying it,
25  correct?

101

1        MR. JEFFERIES:  Objection, form.
2    A.  I don't know.
3    Q.  (BY MR. BANKSTON)  Your next argument about a
4  crime stat which shows no murders in Newtown in 2012,
5  that's not true, is it?
6    A.  The FBI did report that, and then later said it
7  was in error.
8    Q.  That's not true, either is, is it?  What you're
9  saying right now is not true, correct?
10    A.  I remember it being on the FBI website.
11    Q.  Yeah.  Have you read Ms. Binkowski's
12  declaration about this, about the FBI stats?  Have you
13  seen what the truth is?
14    A.  Your truth?  I mean, I haven't -- I haven't --
15    Q.  No, there's no your truth and my truth,
16  Mr. Jones, there's a truth and I'm wondering if you know
17  it.  Do you know about those FBI crime stats?  Did you
18  read Ms. Binkowski's declaration?
19    A.  I don't remember.  I really don't.  Can you
20  refresh my memory?
21    Q.  I just wanted to know if you read it,
22  Mr. Jones.  That part about why didn't they let
23  paramedics and EMTs into the building after 27 children
24  were declared dead, that's not true either, is it?
25  That's false?

102

1    A. I remember it being reported that it was a long
2  wait.
3    Q. I'm asking you if it's true or not, Mr. Jones.
4    A. I don't have the specifics in front of me.
5    Q. You did in March, right?  You read two
6  different EMTs who went into the building, performed
7  services in the building, you read those reports,
8  correct?
9    A. Well, you have to remember they kept a lot of
10  that secret for years.  It was the longest time anything
11  was ever kept secret, and that was also what contributed
12  to a lot of the questions in the community and around
13  the country, was the level of secrecy.  There were a lot
14  of lawsuits -- I don't remember all the specifics, but
15  there was a lot of stuff kept secret for years and
16  years.  Didn't put out official crime report for a very
17  long time, years and years.  I don't remember all the
18  specifics, but there was a lot of that.  I would have to
19  go back online and refresh my memory to get it exactly
20  right.
21    Q. Let's unpack all of that because, first of all,
22  when you read those reports in your deposition, you
23  acknowledge that paramedics went into the building,
24  correct?  Start there.
25    A. You showed me documents that have recently come

103

1  out showing that.
2    Q. Recently come out.  When do you think those
3  documents came out?
4    A. I just know there was a big controversy about
5  most of the case being kept secret.
6    Q. Didn't we cover, in your testimony last time,
7  that those documents were out in 2013, right after the
8  incident?  Isn't that something we covered?
9    A. I don't remember specifically.
10    Q. Okay.  If those documents were out in 2013 and
11  here you are in 2017 talking about there being no
12  paramedics in the building, that's a pretty bad error,
13  isn't it, Mr. Jones?
14      MR. JEFFERIES:  Objection, form.
15    A. I mean, if that is the case, the New York Times
16  knowingly lied about WMDs in Iraq that killed millions
17  after the sanctions.  I would never do that on purpose.
18    Q. (BY MR. BANKSTON)  Absolutely.  The New York
19  Times messed up bad.  Some people needed to get fired,
20  didn't they?
21    A. No, a lot of people at New York Times get
22  promoted for lying.
23    Q. Yeah, that's bad, isn't it?
24    A. Yeah, it's bad that Carlos Slim, the big
25  corrupt kingpin, pumped all that money into them.

104

1    Q. Look, we can agree, mainstream media messes up
2  all the time and they do it pretty badly, right?
3    A. ABC put out fake footage from Knob Creek and
4  said it was the Kurds being blown up.  I would never do
5  that.  I wouldn't put out fake video of something.  So
6  you guys -- the whole thing is just about that, about
7  finding alternative media and trying to make it the bad
8  guy instead of the corporate media and the
9  establishment.
10    Q. When you say "you guys," you think I'm
11  connected with mainstream media?  You think I wouldn't
12  sue mainstream media at the drop of a hat?  Is that what
13  you think?
14    A. All I know is, is that you basically live and
15  breathe Sandy Hook and it was something I barely covered
16  that I got sucked into.  And I read the articles and see
17  the things where people are constantly saying that I --
18  that I won't stop talking about Sandy Hook and that I
19  want to hurt people in Sandy Hook and that is not the
20  case.  And I've been tired of Sandy Hook since it
21  happened.  I think it's terrible.
22    Q. I keep hearing you say you don't want to be
23  known as Sandy Hook man and you barely covered Sandy
24  Hook, but it's true that you produced to me 54 videos of
25  you discussing Sandy Hook, and that's not even all of

105

1  them, correct?
2    A. I don't know.  I believe I tried to get
3  everything I could.  Again, I have -- it's a tar baby,
4  I've been sucked back into it and I don't want to be
5  involved with Sandy Hook.
6    Q. I don't care what you want to be involved with,
7  Mr. Jones.  I care if you can answer the question, you
8  have covered Sandy Hook in at least 54 videos and
9  hundreds of pages of articles, correct?
10    A. I mean, I think that's what's in the filing,
11  yeah.
12    Q. And there's actually more than that.  You
13  didn't give us everything.  So there's more than that,
14  right?  Do you think that's barely covering Sandy
15  Hook?
16    A. I think we did find some more videos last night
17  we produced to you.
18    Q. Absolutely.  That's what I'm saying.
19    A. We've done our best to give you everything
20  that's there.
21    Q. It just keeps coming, doesn't it?  Just keeps
22  coming, correct?
23    A. We did find the footage of the people in the
24  woods, yeah.
25    Q. So you -- you're still -- you would admit with

106

1   me, you didn't barely cover Sandy Hook; you covered it
2   over and over and over and over?
3       A.  Well, especially since we've been drug into it,
4   I've had to respond to it.
5       Q.  A few days after this video we just watched,
6   Megyn Kelly's profile of you aired on NBC, right?
7       A.  Yes.
8       Q.  You watched it?
9       A.  Yes.
10      Q.  So you saw her interview of Neil Heslin?
11      A.  Yes.
12      Q.  And Mr. Heslin had some things to say about you
13  and what you had been doing for the past several years,
14  right?
15      A.  Yes.
16      Q.  What did you think about what Mr. Heslin had to
17  say about you?
18      A.  I thought it was very, very sad and I thought
19  he was projecting the grief over his losing a son to
20  Adam Lanza, you know, onto me and I thought that the
21  media and others had, you know, basically glommed onto
22  him and were using him for an antigun message and, you
23  know, I thought it was Hollywoodesque to say I dropped
24  my son off with a book bag and picked him up in a body
25  bag.  And I thought it was sad to see him being

107

1   exploited like that.
2       Q.  Mr. Heslin directly asked you in that video to
3   stop saying false things about Sandy Hook, right?
4       A.  I believe so.
5       Q.  Yeah.  He wanted you to stop.  You didn't stop,
6   though, did you?
7       A.  Well, Megyn Kelly edited that video.  I said I
8   believed Sandy Hook happened in the video, and she kept
9   trying to -- because she's a lawyer -- bringing up,
10  well, what are the anomalies to me.  Just so they could
11  then edit it to make -- everybody saw the jump cuts.
12  And I was actually saying that I believe it happened.
13      Q.  Yeah, I know you believe children died.  I
14  understand that.
15      A.  Yeah.  But then it got edited into something
16  completely different, exactly what I'm talking about.
17      Q.  But you don't believe the official story of
18  Sandy Hook.  We've already covered that?
19      A.  No, I do -- I do believe -- I mean, I think
20  there might have been another shooter and, I mean,
21  that's my right to think that, and I legitimately really
22  believe the things I said.
23      Q.  Okay.  During that interview, Mr. Heslin said,
24  I buried my son, I held my son with a bullet hole
25  through his head.  Do you remember him saying that?

108

1       A.  Uh-huh.
2       Q.  Okay.  Now, you'll agree with me that a week
3   later, InfoWars publishes a video that says he's lying
4   about that?
5           MR. JEFFERIES:  Objection, form.
6       A.  No, that's not what we said.
7       Q.  (BY MR. BANKSTON)  Said it was impossible,
8   right?
9       A.  No.  We said that the coroner must -- has to be
10  lying, because he said none of the parents were able to
11  be with their children.
12      Q.  I mean, that's just not true, Mr. Jones.  You
13  said that Mr. Shroyer got on that video, said Mr. Heslin
14  was not misspeaking and that what he said was
15  impossible.  That's what he said, right?
16      A.  That's not what I remember.  Do you have the
17  clip?
18      Q.  No, we can play that with Mr. Shroyer.  I'm
19  wondering what you know about it.  In that video, are
20  you denying that InfoWars called Mr. Heslin a liar?
21      A.  No, I don't remember that.
22      Q.  Okay.
23      A.  I believe -- I believe I remember from memory,
24  though, is we were saying that the coroner is saying
25  that that didn't happen.  So I believe what Owen said is

109

1   somebody is not telling the truth.  And I said -- I
2   remember on the video, I said I think it's the coroner.
3   I'm going from memory, though, so I don't want to --
4       Q.  Okay.  Yeah, because that didn't actually
5   happen.  What I want to ask you about is what you did
6   two weeks later.  You rebroadcast it, didn't you?
7       A.  I -- we rebroadcast what?
8       Q.  Mr. Shroyer's report.  Well, let's -- actually,
9   let's back up.  Mr. Shroyer's initial video segment
10  about Mr. Heslin, you weren't on that video, right?
11      A.  I'm going from memory, but I think so.
12      Q.  Just Mr. Shroyer doing his show at that time,
13  you weren't featured in the video, correct?
14      A.  I don't remember.
15      Q.  Well, two weeks later, you did play it again,
16  right?  Do you remember that?
17      A.  The video of Owen or the video of Megyn Kelly?
18      Q.  The video of Owen.
19      A.  Do you have the clip?
20      Q.  No.  I'm just asking you what you remember,
21  Mr. Jones.  You're here to testify.  I want your
22  testimony.
23      A.  You know, this all just blurs together.  I
24  mean, I -- I mean, I remember what he said, I think it
25  was like a Zero Hedge article or something again.

110

1     Q. Yeah, it was Mr. Fetzer again.
2     A. Fetzer wrote the article there?
3     Q. It was in the Zero Hedge article, yes, sir.  Do
4  you remember Mr. Fetzer bringing all this up about how
5  Neil Heslin is a liar?
6     A. Fetzer wrote the article?
7     Q. Yeah.  You don't remember that, that Mr. Fetzer
8  wrote that Mr. Heslin's a liar?
9     A. No, I don't.  No.
10    Q. Okay.  You had said that the stuff you found
11 was that they never let the parents see the body.  What
12 are you talking about when you said that?
13         MR. JEFFERIES:  Objection, form.
14    A. I believe -- I'm trying to go back to the --
15 the coroner had said that no one was allowed to see the
16 kids that day, and so he didn't pick him up that day
17 with a bullet in his head.  And I said, no, they
18 probably -- I remember saying, that's why people have
19 questions because they're saying two different things.
20    Q. (BY MR. BANKSTON) Okay.  Mr. Heslin was a
21 parent who asked you specifically to leave him alone,
22 stop doing this, correct?
23    A. I think -- I think that's what you said.
24    Q. Yeah.  And so we know that you didn't at least
25 with Mr. Heslin, leave him alone, you did more videos

111

1  about him, right, after the Megyn Kelly piece?
2     A. There was a big national controversy and I
3  think Owen was responding to say, this is why people ask
4  questions, see this news article about the coroner says
5  one thing, he says another.  That's why people have
6  questions.
7     Q. Well, from the very beginning, Sandy Hook
8  parents had been asking you to leave them alone, right?
9     A. I don't remember that from the very beginning,
10 no.
11    Q. Okay.
12         MR. BANKSTON:  Let's mark this.
13         (Deposition Exhibit 13 marked for
14           identification.)
15    Q. (BY MR. BANKSTON)  I'm going to show you
16 Exhibit 13.  Mr. Jones, this is an e-mail that you
17 received, correct?
18         (Witness reviews document.)
19    A. Uh-huh.
20    Q. (BY MR. BANKSTON)  Okay.  Is that a yes,
21 Mr. Jones?
22    A. Say that again, I'm sorry.
23    Q. This is an e-mail you received?
24    A. Yes.
25    Q. This e-mail comes from Len Pozner, correct?

112

1     A. Uh-huh.
2     Q. Mr. Pozner is a Sandy Hook parent.  You know
3  that, right?
4     A. Uh-huh.
5     Q. Right.  He says to you in an e-mail on
6  January 29th, 2013, over six years ago, he says, "Alex,
7  I am very disappointed to see how many people are
8  directing more anger at families that lost their
9  children in Newtown.  Accusing us of being actors.....
10 Haven't we had our share of pain and suffering?  All
11 these accusations of government involvement, false flag
12 terror, new world order, et cetera.  I used to enjoy
13 listening to your shows prior to 12-14-12.  Now I feel
14 that your type of show has created these hateful people
15 and they need to be reeled in!  Lenny Pozner."
16         That's what he wrote to you, right?
17    A. Yes.
18    Q. Okay.  And then you and Mr. Watson together
19 composed a response, correct?
20    A. I don't remember that.
21    Q. Okay.  You don't remember saying that you and
22 Mr. Watson were -- did this together?
23    A. I remember talking to Watson about it and I
24 remember inviting the guy on the show too.  I think
25 there's some e-mail on it.

113

1     Q. In the response e-mail, you and Mr. Watson
2  write back to Mr. Pozner and say, "Sir, We have not
3  promoted the 'actors' thing.  In fact, we have actively
4  distanced ourselves from it."
5         Right?
6     A. Uh-huh.
7         MR. JEFFERIES:  Objection, form.
8         MR. BANKSTON:  Did I read that wrong, Wade?
9         MR. JEFFERIES:  No.  You said that he and
10 Mr. Watson wrote back.
11         MR. BANKSTON:  Gotcha.  Okay.
12    Q. (BY MR. BANKSTON)  So let's do this again
13 because you're unsure whether you wrote -- had any role
14 in writing this e-mail, right?
15    A. I don't think I had a role in writing this.  I
16 remember I was talking to -- somebody else got e-mails
17 too.  I can't remember.
18    Q. Okay.  Mr. Watson writes back, "Sir, We have
19 not promoted the 'actors' thing.  In fact, we have
20 actively distanced ourselves from it."
21         Over the next six years, that's not true, is
22 it?  You didn't distance yourself from the "actors"
23 thing, you actively embraced the "actors" thing?
24    A. I think that's Paul saying this.  And no, I
25 didn't get -- I didn't do -- I didn't get into the actor

114

1  stuff.  The people brought it up and I said that's why
2  people had questions.
3      Q.  You produced a video to me entitled Crisis
4  Actors Used at Sandy Hook, and it has an exclamation
5  point, not a question mark.  With that video, you'll
6  admit to me you endorsed this crisis actors thing,
7  didn't you?
8      A.  A lot of the videos that we gave you were
9  videos that we were in but that we did not produce.  I'd
10  have to see the specifics.
11      Q.  Okay.  So if InfoWars produced a video and
12  uploaded it to YouTube and it was titled Crisis Actors
13  Used at Sandy Hook, and it would contradict what Mr.
14  Jones -- I mean, what Mr. Watson is saying?
15      A.  Yes.  I mean, I need to see that, but yeah.
16      Q.  Okay.  And we can agree that by this time,
17  2013, six years ago, InfoWars knew parents were getting
18  harassed by people who were believing what you were
19  saying about Sandy Hook?
20      A.  I remember Watson, you know -- because we were
21  all debating it, saying he thought it happened.
22      Q.  Let me make sure I get a clean answer here.
23  You knew InfoWars had knowledge in 2013 that parents
24  were being harassed.
25      A.  No.  He's -- no, I do not know that.

115

1      Q.  Remember in your last deposition, we watched a
2  video of Mr. Watson saying exactly that in 2013?  Do you
3  remember that?
4      A.  Was it 2013?
5      Q.  When we watched -- we watched a video in March,
6  of Mr. Watson saying in 2013, parents are being
7  harassed; do you remember that?
8      A.  I remember a video.  I don't remember if it was
9  from them.
10      Q.  I think it's fair to say in terms of trying to
11  count on what happened or what the truth is in relying
12  on your memory, your memory's not very good.  Would you
13  agree with me with that?
14      A.  You played a lot of videos and a lot of short
15  and a lot of edited ones, so it is a blur.
16      Q.  Yeah, and you took that video and you ended up
17  playing it on your show, right?  You had a lot to say
18  about it, right?
19      A.  Which video?
20      Q.  The video of you giving your deposition in
21  March of this year.
22      A.  I don't think I aired the whole video.
23      Q.  Okay.  There were times when Sandy Hook parents
24  had been successful in getting YouTube to remove videos
25  about their children, correct?

116

1      A.  I believe so.
2      Q.  You didn't like that, correct?
3      A.  I didn't like some of the videos getting taken
4  down that we had produced and then things being said
5  about what was in the videos that wasn't accurate,
6  because then you couldn't show what was actually in the
7  video.
8      Q.  You didn't like this foundation Mr. Pozner was
9  running; you didn't like that, correct?
10      A.  I don't know the specifics of that.
11      Q.  You said on your show you didn't like it,
12  right?
13      A.  What did I specifically say?
14      Q.  You called them bullies; do you remember that?
15      A.  I don't remember that specifically.
16      Q.  You said you were going to fight back.  Do you
17  remember that?
18      A.  Well, I remember, I don't know if it was those
19  guys, but some of them like saying, I said nobody died
20  in Parkland in Florida and saying, Jones is saying no
21  one died again, and then getting media platform, we were
22  able to show the videos are on platform and YouTube put
23  us back up and took the strikes off because I didn't say
24  nobody died at Parkland.
25      Q.  You said the Sandy Hook parents were stirring

117

1  up a hornet's nest, right, by coming after you?
2      A.  I don't remember the specifics of that or what
3  specifically was happening, but --
4      Q.  You told the Sandy Hook parents you're not a
5  guy to mess with, didn't you?
6      A.  I don't remember those specifics.
7      Q.  On your show you showed maps and addresses used
8  by a parent who complained, because in your mind he was
9  running an anti-free speech foundation, right?
10      A.  I did not show that footage.
11      Q.  What do you mean you didn't show it?  Aren't
12  you the -- you run InfoWars, right?
13      A.  We showed like a U-Haul empty parking lot to
14  debunk a thing that the guy was using a false address
15  and we said that's normal to use an address when you're
16  a public figure.  I remember like -- when you said that,
17  I remember going and trying to find it and we found,
18  like, this is us saying this is a parking lot at a
19  U-Haul; we're not showing where this guy's house is.
20      Q.  Yeah, that's where he picks up his mail.  It's
21  a U-Haul store.  You can get a post office box there,
22  right?
23      A.  But you said we were sending people to their
24  houses and stuff.  That wasn't true.
25      Q.  I'm not -- I've certainly never said that.

118

1  A. That's what they were saying. That's what the
2  media was saying.
3  Q. All I'm asking you --
4  A. Never sent anybody to their houses. Never done
5  that. Never said people need to harass them. That's
6  not true.
7  Q. (BY MR. BANKSTON) All I'm asking you --
8      THE REPORTER: Hold on. I need you to slow
9  down.
10  Q. (BY MR. BANKSTON) All I'm asking you,
11  Mr. Jones, is you showed maps and addresses used by a
12  parent who complained against you. That's what you did,
13  right?
14  A. No, that was not the intent of that.
15  Q. I'm not asking what your intent was. I'm
16  asking, it happened. You showed maps and addresses used
17  by a Sandy Hook parent who complained against you. That
18  happened.
19  A. Showed maps and addresses. No, we showed where
20  his foundation was supposedly -- the people were saying
21  it was fake, and we said that's not proving something is
22  fake.
23  Q. Okay. I want to show you a video of you and a
24  Sandy Hook denier talking about YouTube complaints,
25  about videos involving Sandy Hook children.

119

1      MR. BANKSTON: We're going to offer right
2  now, video Exhibit 6E. This video does not have a title
3  known to us because you didn't upload it to YouTube and
4  it doesn't exist online, but its date is February 12th,
5  2015. We have titled it for the purposes of this
6  deposition, InfoWars Video Relating to HONR Copyright
7  Claim.
8      Can you play that video? And that is video 6E.
9      (Video played.)
10  Q. (BY MR. BANKSTON) Considering how the past
11  year has gone, still think it was a major mistake for
12  these families to involve you?
13  A. I don't have any opinion on that.
14  Q. Okay. Right after this video is when you sent
15  Dan Bidondi to Newtown to start doing some reporting,
16  correct?
17  A. I don't know. No.
18  Q. Okay. Because according to you, you didn't
19  know anything about Dan Bidondi going to Newtown; he
20  wasn't going there as an InfoWars reporter, right?
21  A. I'd have to look at the timelines and all that.
22  I told you that I didn't like the job he was doing, told
23  him to stop doing it in our name.
24  Q. Okay.
25      MR. BANKSTON: Can you tell me how much

120

1  time we have?
2      THE VIDEOGRAPHER: You're at 2:14 right
3  now.
4  Q. (BY MR. BANKSTON) I would like to show you a
5  video that we're offering as Exhibit 6F. This is
6  entitled Retired FBI Agent Investigates Sandy Hook Mega
7  Massive Cover Up. This was aired on July 7th, 2015.
8  Mr. Jones, this is a long video. So again, I'm going to
9  caution you to pay close attention because this video is
10  over five minutes long. We're going to watch a very
11  long clip.
12      MR. BANKSTON: All right. Can we play this
13  video, Exhibit 6F?
14      (Video played.)
15  Q. (BY MR. BANKSTON) Okay. Mr. Jones, one thing
16  I noticed you said in that video about two minutes in is
17  that I knew we sent our reporter Dan Bidondi there for
18  days to cover it. That's what you said in this video?
19  A. I told you I'm trying to get the dates
20  straight, yeah.
21  Q. Okay. So if you've testified in the past that
22  Bidondi was not working for InfoWars when he went to
23  Sandy Hook, that's not accurate?
24  A. No, that is accurate. I told you I don't
25  remember the dates. Some he was, some later he wasn't

121

1  and sometimes he was doing it on his own. I told him to
2  stop.
3  Q. That was the last time he ever went to Sandy
4  Hook. He never went to Sandy Hook after --
5  A. What was the date of this?
6  Q. In the summer of 2015.
7  A. I don't remember that. I remember -- I
8  remember saying, tell him that he doesn't report for us.
9  Q. Yeah, he did that a year later when he went to
10  a Trump rally and caused some problems in Rhode Island.
11  Had nothing to do with Sandy Hook, did it?
12  A. That's not what I remember, but...
13  Q. Well, it's strange to me because didn't you
14  have your staff go and find the exact invoices and
15  e-mails to Dan Bidondi?
16  A. I told them to try to go found out what had
17  happened. I could refresh my -- I mean, I...
18  Q. Yeah, and didn't they find out that we have a
19  guy -- you employ a guy named Darrin, right?
20  A. Darrin McBreen, yeah.
21  Q. Darrin McBreen. Yeah, he sent messages to Dan
22  Bidondi. You asked your staff to go get him, right?
23  A. I remember saying, go look and find him. If I
24  remember correctly -- all the dates bleed together.
25  Q. I mean, the truth is, you didn't have any

122

1  problem with what he was doing at Sandy Hook.  You said
2  he did a good job.
3      A.  Well, I had only seen this report.  As you see
4  in the report, I didn't even know he was out there doing
5  that.  I'm like, wow, what's this?  Because I saw the
6  thing with his brother -- his uncle that was good.  The
7  other stuff I saw, I guess later, I didn't like them,
8  from putting it together watching all this.
9      Q.  Well, you didn't fire him for it.  You kept him
10 around for another year, didn't you?
11     A.  No, he wasn't -- I don't think he was being
12 paid then, no.
13     Q.  Well, the truth of the matter is you didn't
14 have a problem with Sandy Hook; you had a problem with
15 him embarrassing you at a Trump rally.
16     A.  One thing you're right about is I do need to, I
17 guess, spend time and burrow into this more.  It's --
18 because it's like -- I remember a lot of it.  I remember
19 what happened.  And I think if I go dig even deeper, I
20 can get specifics, but I remember telling them, trying
21 to find out the specifics.
22     Q.  You've now -- this is your second deposition in
23 a Sandy Hook case.  You've got more going up in
24 Connecticut, you've had discovery in Connecticut, you've
25 had discovery three times in Texas, and you're telling

123

1  me you think you need to go burrow in and figure out
2  what happened?
3      A.  Well, no, now that I get these kind of
4  questions -- I don't think you were asking me these
5  exact questions last time.
6      Q.  I was very much asking you about Mr. Bidondi
7  and when he was terminated in the last deposition,
8  wasn't I, Mr. Jones?
9      A.  I don't remember this video.  Did you show me
10 this last time?
11     Q.  I did not show you this video.  That's not what
12 I asked, is it?  I asked you --
13     A.  I went and I guess tried to get invoices or
14 something, I guess you're saying.
15     Q.  Actually, Mr. Jones, your document production
16 in this case shows you did that in May 2018, right after
17 you were sued.  The truth of the matter, Mr. Jones, is
18 you knew immediately after being sued that Dan Bidondi
19 was going to be a liability for you, didn't you?
20     A.  No.
21     Q.  When you say at the beginning of this video,
22 "Retired state police officers have been threatened,"
23 who are you talking about?
24     A.  I forget the -- Halbig was one of them and
25 there was another state police guy that went up there.

124

1      Q.  When you say --
2      A.  Can we take a quick break?  I've drank so much
3  water.
4      Q.  Yeah, we can take a break, Mr. Jones.
5          THE VIDEOGRAPHER:  Going off the record at
6  12:06 p.m.
7          (Recess taken from 12:06 p.m. to 12:14 p.m.)
8          THE VIDEOGRAPHER:  We are back on the
9  record at 12:15 p.m.
10     Q.  (BY MR. BANKSTON)  Mr. Jones, before we broke,
11 I asked you about your statement about what state police
12 officers were threatened, and you told me Mr. Halbig and
13 maybe somebody else, correct?
14     A.  Uh-huh.
15     Q.  Okay.  Then you said that school investigation
16 experts were threatened.  Who was that?
17     A.  It wasn't just Halbig.  I remember there were
18 some other groups and people asking questions and some
19 other professors, other than Fetzer.  I was really going
20 off of what Fetzer said.
21     Q.  Okay.  Then you said that in addition to those
22 two groups, that some school safety experts had been
23 threatened.  Who was that?
24     A.  I think it was talking about Halbig.
25     Q.  Right.  I mean, all of these are talking about

125

1  Halbig, right?
2      A.  No.
3      Q.  Okay.  You said in that video, ambulances came
4  an hour and a half later.  That's not true, right?
5      A.  I don't have the timeline in front of me.
6      Q.  Are you going to claim in this lawsuit that
7  those ambulances came an hour and a half later?
8      A.  I'm going to have to check that.
9      Q.  Well, I asked you to check it.  Did you?  I
10 asked you in discovery to check it.  Did you?
11     A.  I'm going from memory.  I believe there's some
12 conflicting reports.
13     Q.  I'm not asking what your memory was.  I'm
14 asking if you checked it.
15     A.  I think I did check it.  I don't --
16     Q.  What were the results of you checking it?
17     A.  I don't have that in front of me.
18     Q.  And whatever it was, you didn't give it to me
19 either, right, in discovery?  Correct?
20     A.  Oh, I thought that was rhetorical.
21     Q.  I don't ask rhetorical questions, Mr. Jones.  I
22 want testimony.
23     A.  Oh, I don't have that in front of me.  I can't
24 speak accurately to that.
25     Q.  You said in that video that DHS -- which I

126

1  imagine means the Department of Homeland Security,
2  correct?  Is that what you meant by DHS?
3      A.  I don't know the specifics.
4      Q.  So you don't know what you meant by DHS?
5      A.  You said DHS?
6      Q.  Yeah.  I'm just asking you what those initials
7  mean to you?
8      A.  Department of Homeland Security, I believe.
9      Q.  Okay.  So you said that Department of Homeland
10 Security an hour and a half later put up an electronic
11 sign saying check in here, correct?  Remember that?
12     A.  Did I say that?
13     Q.  Yes.  You don't remember seeing that on the
14 video?
15     A.  I said put up a sign here?
16     Q.  Put up a sign saying, check in here.
17     A.  I don't -- that was on that video?
18     Q.  Yes.  I guess that -- that means you can't
19 meaningfully testify about it, right?
20     A.  I'll take your word on it.  I didn't remember
21 that.
22     Q.  Okay.  Do you remember again saying about
23 Mr. Bloomberg sending an e-mail the day before saying
24 get ready to roll?
25     A.  Yes.

127

1      Q.  Okay.  And we've already talked about that,
2  right?
3      A.  Earlier.
4      Q.  Yes.  Okay.  You said there were e-mails
5  between city council and the school talking about it
6  being shut down a year before.  Where did you see those
7  e-mails?
8      A.  I'd have to go check from memory.
9      Q.  And again, during discovery you were asked,
10 what is your source on saying that there are e-mails
11 between the city council and the school.  And those
12 e-mail -- your sources haven't been produced, correct?
13     A.  Do you have the discovery?
14     Q.  Yeah, I do.  But I'm kind of curious that you
15 signed it like days ago and you don't know what's in it?
16     A.  Well, we were reading back over it and we --
17 like the helicopter stuff, like I said I know I've seen that
18 footage so we were able to find it.
19     Q.  Yeah, I know you found this helicopter stuff
20 well after the deadline.  I'm asking you when you did
21 your discovery, did you go and look for e-mails between
22 the city council and the school saying it was shut down?
23     A.  I don't have it in front of me.
24     Q.  Okay.  We saw here you talking about multiple
25 videos of parents crying, what you called pure acting

128

1  method.  What parents are you talking about?
2      A.  Well, I think you know that -- some people
3  thought it looked like, acting method with Mr. Parker.
4      Q.  Right.  I know you've talked about Mr. Parker.
5  Who else?
6      A.  I would have to go back to the time.  That was
7  like four years ago, I think you said the video is from.
8      Q.  You stand by that, the idea that there are
9  multiple videos of parents crying that are pure acting
10 method?
11     A.  I'm saying that's what they appeared like.  And
12 my point is, is -- and you'll release this video and say
13 that I did it again for publicity, and that's not a very
14 nice thing to do.
15     Q.  I'm sorry, I don't mean to be not nice.  I
16 just --
17     A.  But you'll say, Jones has done it again, and
18 release the video.  I know.
19     Q.  I won't say that again.  Let's make an
20 agreement between you and me right now.  I won't say
21 that.  How about that?  Does that sound okay?
22     A.  Your surrogates will when you release this
23 video.
24     Q.  Yeah, I think people are going to be interested
25 in talking about this video.

129

1      A.  No, no, that's fine, yeah.  I'm just saying,
2  it's you that keeps bringing it up and releasing it and
3  doing that.
4      Q.  Yeah.  I mean, we're seeing you were doing the
5  same thing right up until you were sued, right?
6      A.  When people brought it up, my listeners do not
7  like hearing about Sandy Hook.
8      Q.  All right.  In that video you talked about
9  Mr. Halbig, you said he ran the most successful school
10 security company in the country and that he was making
11 millions of dollars a year in school security.
12     A.  That's what they said on the news.  They said
13 he was very successful and one of the biggest ones in
14 the country back at the time.
15     Q.  You really thought Wolfgang Halbig was making
16 millions of dollars a year?
17     A.  That's what he represented.
18     Q.  You've done Skype calls with him on your show,
19 right?
20     A.  I'm not -- I think so.
21     Q.  Yeah, you've seen the inside of Wolfgang
22 Halbig's house from one of those Skypes, right?
23     A.  I don't really remember the details.
24     Q.  Okay.  In other words, if you wanted to try to
25 figure out for yourself just off of basic knowing about

130

1  who Mr. Halbig is, what his living conditions is, it's
2  pretty clear he's not a multimillionaire, isn't it?
3        MR. JEFFERIES: Objection, form.
4     A. There's no way to answer that. I don't
5  remember what his house -- I've never been in his house.
6     Q. (BY MR. BANKSTON) I'm also curious, why are
7  you so hellbent on sort of boosting his credentials?
8  That seems to be something you do a lot. I mean, are
9  you in a position where you still feel like you need to
10  defend Mr. Halbig?
11        MR. JEFFERIES: Objection, form.
12     A. No. Halbig, years ago, said I was covering up
13  Sandy Hook, even -- like four or five years ago because
14  I was saying it probably happened, on air.
15     Q. (BY MR. BANKSTON) Let me show you a video from
16  this same episode. I'd like to show you what we're
17  going to offer as video Exhibit 6G. It is titled
18  Government is Manufacturing Crises and it was published
19  on July 7th, 2015.
20        MR. BANKSTON: Go ahead and play that video
21  for me.
22        (Video played.)
23     Q. (BY MR. BANKSTON) Okay. Mr. Jones, I want to
24  ask you about this statement. "If they did kill kids,
25  they knew it was coming and stocked the school with kids

131

1  and had the media there and that probably didn't even
2  happen."
3        And my question is, you basically have two
4  versions of the Sandy Hook conspiracy; one where kids
5  are killed and it's a government conspiracy and one
6  where the kids are fake. But in either case it's phony;
7  is that correct?
8     A. Like the declassified Operation Northwoods
9  plan, where they would either kill people for real
10  including children, or they would stage the airplane and
11  say it -- and attack theaters and shopping malls to
12  blame it on the Russians and the Cubans. Or the babies
13  in the incubators that weren't thrown out and had their
14  brains bashed out, that launched a major war that killed
15  millions. Or the fake chemical attacks they now admit
16  didn't happen in Syria that were blamed and the kids --
17  and actually the kids in the fake attack have testified.
18        So yeah, that's why people start questioning
19  those type of deals. Or Jussie Smollett or the -- said
20  the Covington kids attacked people when they didn't.
21  And the Gulf of Tonkin to get us into the Vietnam War
22  was a staged attack on a ship. So yeah, that's why
23  people question.
24        MR. BANKSTON: Objection, nonresponsive.
25     Q. (BY MR. BANKSTON) Today, which version of that

132

1  conspiracy do you hold, that the kids were killed or the
2  kids were fake?
3     A. That was basically almost five years ago. I
4  have -- I believe that the children died there and I
5  believe that a lot of the anomalies that were brought up
6  have been disproven and I believed that before I ever
7  got sued.
8     Q. And they were disproven a long time before
9  these 2015, 2016, 2017 videos; would you agree with
10  that?
11     A. No. Because a lot of the police reports and
12  final reports and things didn't come out till just a few
13  years ago.
14     Q. Okay.
15     A. In fact, I think --
16     Q. So your answer sort of depends on the fact that
17  you believe the final reports of Sandy Hook didn't come
18  out till recently?
19     A. I don't remember all the specifics of the
20  reporting. I just remember it was like early 2018 when
21  the reports came out, the big one. I had to pull that
22  up. I don't have it in front of me.
23     Q. Yeah, the reason you don't have it in front of
24  you is because there wasn't a final report in 2018;
25  isn't that correct? Would you disagree with that?

133

1     A. I don't know if that's correct. That's why I
2  said I'd have to look it up.
3     Q. Let me show you another little video from a
4  little bit earlier that year.
5        MR. BANKSTON: We're going to offer
6  Exhibit 6K. It's a video entitled Why We Accept
7  Government Lies. This is January 13th, 2015.
8  Can you play that video?
9        (Video played.)
10     Q. (BY MR. BANKSTON) All right. Mr. Jones,
11  you're not questioning anything here; you're saying they
12  clearly used actors, right?
13     A. I'd have to see the full context of that video.
14  I've tried to find the full context. Maybe you have it.
15  Do you have the full context of the video?
16     Q. Yeah. You gave it to me.
17     A. That's the clips that are online. I'm trying
18  to find the full clip.
19     Q. Yeah, you gave me that video.
20     A. I know. That's the one -- that's the clip
21  that's online that's been used on the news.
22     Q. But you have it?
23     A. Well, you asked for all the Sandy Hook videos
24  we could find. A lot of that stuff is online. So we
25  even gave you stuff that was online. I'm trying to -- I

Alex Jones - 11/26/2019

134

1    mean, I'm not denying that I thought things were staged
2    because so many things are staged.
3        Q.  Right.  So what I'm saying --
4        A.  Like America thinks that Epstein did not kill
5    himself.  Are you going to sue all them?
6        Q.  We'll get to that.  I promise.
7        A.  We'll get to Epstein.
8        Q.  I promised you we will.  I absolutely promise
9    you.
10       A.  Okay.
11       Q.  But my question before we do that is you're not
12   questioning anything here.  You're saying they clearly
13   used actors.  That's all I'm saying.  You're not asking
14   a question.
15       A.  No, my opinion in that vein is that I could
16   start thinking that it was all staged because I'm like
17   trying to suss out.  That's what I'm saying there.
18       Q.  Look, it's false.  What you said there is
19   false.  The kids -- there are real kids who died.
20       A.  I believe now that kids died there, but my
21   opinions have gone back and forth.
22       Q.  And when you screw up and report false facts
23   about the death of my client's son over and over and
24   over again, you're responsible for that, aren't you?
25       A.  I'm not responsible --

135

1            MR. JEFFERIES:  Objection, form.
2        A.  I'm not responsible for his son dying and I'm
3    not responsible for them suing the dead teacher or the
4    school or Remington or anything else.  And I
5    legitimately think a lot of events are staged and a lot
6    of events are staged.  That's my First Amendment right.
7        Q.  (BY MR. BANKSTON)  That's not what I'm asking,
8    Mr. Jones.  And I don't know why you don't want to
9    answer my questions today.  All I'm asking you is when
10   you screw up and you report false facts about my
11   client's son's death, you are responsible for that.
12       A.  I'm not saying your client's name or son's name
13   on that video.  I'm saying that I believe a lot of
14   events are staged, and I've gone back and forth on that
15   because so many of them are.  Like babies in incubators
16   having their brains bashed out and an actress telling
17   Congress she saw it and then millions died, millions I
18   didn't kill.  I did not kill those children in Iraq.
19       Q.  My client's son died at Sandy Hook, didn't he?
20       A.  Yes, he did.
21       Q.  Okay.  And you just said on that video kids
22   didn't die at Sandy Hook, didn't you?
23       A.  I said -- I'm actually talking about it there,
24   that I've gone back and forth.  And I'm talking about
25   that vein.  It's my right to say it.  I did not say your

136

1    client's name, you did.
2        Q.  Right.  But my client's kid died at Sandy Hook.
3    So when you say no kids died at Sandy Hook, that means
4    Jesse Lewis didn't die at Sandy Hook, doesn't it,
5    Mr. Jones?
6        A.  Well, that is my opinion at the time that I was
7    saying how my mind felt.  I'm even saying in the video,
8    I've gone back and forth.
9        Q.  So when you --
10       A.  And there's a move to make it -- not
11   questioning the received knowledge, whether you're right
12   or wrong, is what the country is fundamentally founded
13   on and there's an assault on that now.
14       Q.  Look, all I'm saying is when you screw up in
15   your reporting and you report false facts, do you stand
16   by that or do just think you're not responsible for it?
17       A.  That's me as a talk show host talking to a
18   caller.
19       Q.  Yeah, it is, you're right.
20       A.  And giving my opinion.  And if I said the moon
21   was made out of cheese, as an opinion, whether I'm on a
22   radio show or on a street corner, I'm allowed to.  And I
23   legitimately, looking at all that stuff, have gone back
24   and forth on all of this.
25       Q.  Yeah.  You said false things and then you said

137

1    things that were true, right?
2        A.  No, I have had opinions and I've had different
3    views on things.
4        Q.  Okay.  Let's just go ahead and use your word
5    "opinion," even though we all know that's not an
6    opinion.  Your opinion is false.
7            MR. JEFFERIES:  Objection, form.
8        Q.  (BY MR. BANKSTON)  Kids died at Sandy Hook,
9    right?
10       A.  And I didn't kill them.
11       Q.  Do you see me anywhere in this deposition
12   saying you killed children, Mr. Jones?
13       A.  Remington didn't kill them, that teacher didn't
14   kill them.
15       Q.  Do you think you're here because you killed
16   children, that's the accusation?
17       A.  No, but it is like I'm Adam Lanza or something,
18   and it's all just --
19       Q.  I'm just asking -- you're a journalist.  Do you
20   feel you're responsible for the things you report?
21       A.  If I put out a journalistic report and said
22   this is fact, then that would be that.  But when I'm on
23   a show talking about how I feel, I'm allowed to have my
24   feelings and to say at that point -- I even say, I've
25   gone all over the map.  I'm there talking about my

138

1  emotions.
2      Q. This isn't journalism?
3      A. Absolutely not. It's -- no. It's me talking
4  about my feelings.
5      Q. And you're totally immune for any
6  responsibility for that? You don't feel any sense of
7  responsibility for this kind of awful, vile stuff?
8      A. I'm not saying anybody is immune from anything.
9  I mean, I'm here right now with you because people don't
10  like things I've said in the free speech and the -- and
11  misrepresenting what I've said about Sandy Hook and
12  using it as been used against the First Amendment in
13  general and I'm very, very sorry for that and I,
14  obviously, you know, have gotten a larger perspective on
15  things.
16      Q. Let's talk about Epstein for a minute. Been
17  wanting to talk about that.
18          I think maybe, and I'm going to take a guess
19  here, but I think one of the things that you and I agree
20  on is that large segments of the ruling class of this
21  country and indeed the world are psychopaths and
22  criminals.
23      A. Yes, I agree with that.
24      Q. Okay. And, in fact, because of that, when
25  these really, really strange happenings with Epstein

139

1  happened, when Epstein killed himself in his cell,
2  allegedly, when he was supposed to be under watch by
3  federal officials, that looks suspicious to say the
4  least, correct?
5      A. Yes, sir.
6      Q. In fact, I think a lot of people in this
7  country think it's most likely true that there was foul
8  play, that Epstein was killed. A lot of people think
9  that, right?
10      A. Yes.
11      Q. And now Epstein is a massive public figure.
12  He's been in the news a ton, right?
13      A. Yes.
14      Q. Partially because of something called the
15  Lolita Express, right?
16      A. Yes.
17      Q. And we in this country get to talk about public
18  figures, wouldn't you agree?
19      A. Yes.
20      Q. So like -- let's take George Bush, for example.
21  I think it's fine if you want to get on TV and say
22  George Bush did 9/11. That's something you're allowed
23  to do, right?
24      A. Well, I said that 9 -- they definitely covered
25  it up.

140

1      Q. Yeah. Right. And like let's just say -- let's
2  just say for a moment that you were right, George Bush
3  did 9/11, or maybe you were wrong and George Bush didn't
4  have anything to do with covering up 9/11. Either way,
5  it's not illegal for you to say that, right?
6      A. Well, I believe that it's been sussed out and
7  proven that they had prior knowledge and stood down and
8  they did it -- they wrote in PNAC they did it so they
9  could invade the Middle East. I think that's wrong.
10      Q. Well, let's talk about Epstein for a minute.
11  It's not -- there's nothing illegal for you saying I
12  think Epstein probably killed himself or I think --
13  excuse me. Let me do that again. There's nothing
14  illegal about you saying, I don't think Epstein killed
15  himself?
16      A. I mean, I believe -- if I believe he -- there
17  was foul play probably and the evidence points towards
18  that. That's why I talk about it. I could be wrong.
19  It could come out he did kill himself.
20      Q. If you did, that's okay too, right? Because
21  he's a public figure. We're allowed to talk about him,
22  right?
23      A. Yes. And Sandy Hook was a big public event
24  that was then projected onto American gun owners, so
25  they didn't like being blamed for something they didn't

141

1  do.
2      Q. All right. Well, let's talk about -- let me
3  give you an example. Let's say that there is a security
4  guard at that federal penitentiary and his name is Bob
5  Smith. If you wanted to get on TV and say Bob Smith
6  killed Jeff Epstein and you were wrong, should you be
7  held responsible for that? A private citizen like Bob
8  Smith had no involvement in trying to get on the news.
9  Is it okay?
10      A. I mean, if there were issues and anomalies and
11  I questioned whether it was -- whether Bob was involved
12  or not, then, no, because --
13      Q. No, I'm -- and what I'm asking, Mr. Jones, is
14  you just flat out say Bob Smith killed Jeff Epstein. Is
15  that okay if you're wrong, or does Bob Smith -- do you
16  have some responsibility to Bob Smith to make that
17  right?
18      A. Not if I did it out of, you know, believing it
19  was true.
20      Q. So as long as you believed it was true, you can
21  say anything you want?
22      A. Well, I mean, I'm not trying to hurt people's
23  feelings and do mean things for the fun of it. I mean,
24  it's dangerous to question official orthodoxy. And I
25  think sometimes in my life, I did basically see almost

142

1 everything as staged because so many things were staged.
2 And I've gotten more sophisticated about that and I've
3 admitted that.
4     But I legitimately looked at these things and
5 saw what was going on and thought it was probably staged
6 and went back and forth the whole time looking at both
7 sides.  And that's from a real place the first thing I
8 have said, I bet this Covington kid thing was staged and
9 it turned out it was.  I think the Smollett thing -- I
10 was the first one.  I said Smollett was staged.  It was
11 staged.  I mean, my God, almost all of it was staged.
12 I've learned some stuff is real, even if it's
13 unbelievable that somebody would go kill all those kids.
14 That's just unbelievable.  But it really happened.  And
15 so I would not ever do that, no one I know would do
16 that.  So it's hard to believe that.  So people get in
17 denial, that's well known and that happens.
18     Q.  Do you know what question you were answering?
19     A.  You were wanting me to elaborate.  I mean, you
20 were asking me a large question about -- that's a big
21 question and that's what the whole thing is about and
22 that's what -- that's what it comes down to with New
23 York Times versus Sullivan and the whole nine yards, and
24 I have never intentionally gone out and tried to hurt
25 people by questioning big public events, but we need to

143

1 question public events.  That's what it is to be an
2 American and if we don't, we're in North Korea.
3     Q.  I asked you, sir, would you be responsible for
4 Bob Smith?
5     A.  And I told you that it would be the specifics,
6 that if there was reporting and information and it --
7 there were questions about it and Bob's the only one
8 that could have had access and then I questioned it and
9 it turned out Bob was innocent, if I wasn't doing it
10 intentionally to go hurt Bob, no.  I mean, Bob was
11 there, he's working there, someone's died.  And so
12 around any crime or event people are going to always
13 look -- just like a clue or a who done it, there's five
14 people at the dinner party or seven people and the
15 lights go off and somebody's got a steak knife in them,
16 everybody is implicated and looked at.
17     Q.  Do you know who Richard Jewell is?  Have you
18 ever heard that name?
19     A.  Yes.
20     Q.  Okay.  And you're familiar about accusations
21 made against him in the 1996 Olympic bombing, correct?
22     A.  There's a big movie coming out about it.  Clint
23 Eastwood is making it.
24     Q.  Yeah, Client Eastwood is making it.  I saw
25 that.  It's unfair what happened to Richard Jewell.  You

144

1 agree with me?
2     A.  Yes.
3     Q.  He was innocent, right?
4     A.  I think that's been proven.
5     Q.  And a lot of people in media said he wasn't
6 innocent, said he committed the bombing, right?
7     A.  And they're -- because a lot of the evidence
8 looked like that and that's what the FBI thought, but I
9 don't think the media lied and said they thought he was
10 guilty on purpose.
11     Q.  You don't think the media was careless in that
12 case?
13     A.  No, I think they went with the authority of the
14 FBI and others in the way it looked, that a lot of times
15 somebody that finds a bomb before it goes off, generally
16 in the criminology has -- a lot of times has staged it.
17 So I think that, you know, that's the thing about
18 justice is that it's not always perfect.  Humans aren't
19 perfect.
20     Q.  So the media has no responsibility to Richard
21 Jewell?
22     A.  I'm not going -- I'm not saying the specifics
23 of it and quite frankly I saw the trailer for the movie
24 the other day and I have to refresh my memory to it.
25     Q.  Sure.  Okay.  But what I'm trying to get to

145

1 you, Mr. Jones, is do you agree that there's a
2 difference between an internationally recognized famous
3 person and a person who spent millions, if not billions,
4 trying to influence our country, like Jeff Epstein, and
5 a private citizen just minding their own business?
6 There's a difference between those two people, right?
7     A.  There is a difference.
8     Q.  There is a difference in journalistic ethics in
9 how you have to treat those two people, isn't there?
10     A.  I think there is.
11     Q.  And at the end of the day with a private
12 person, you'd agree with me that InfoWars needs to take
13 appropriate steps to make sure it isn't reporting false
14 things about private people?
15     A.  Most of what we do is punditry and opinion, and
16 when parents and others become public figures and go out
17 with a political mission to restrict gun ownership, then
18 they have stepped into the arena of politics.
19     Q.  You know courts disagree with you on that,
20 though, right?
21     A.  I don't know your interpretation of the courts.
22     Q.  Well, you are involved in a lawsuit with
23 Leonard Pozner and Veronique De La Rosa.  Are you
24 familiar with that lawsuit?
25     A.  I know about it.

146

1    Q.  Yeah.  You know the Texas Court of Appeals came
2  back and told you they're not public figures, correct?
3    A.  I know that that's a Democratic court.
4    Q.  I'm sure they'll be delighted to hear that.
5    A.  I mean, the Supreme Court is reversing the 9th
6  Circuit on a lot of that stuff.  That's what goes on.
7         MR. BANKSTON:  Mr. Jones, I've got about
8  ten minutes left.  Let me take a quick break and confer
9  with co-counsel.  I might be done with questions for
10  you, but I might just have a couple more to finish up.
11        THE VIDEOGRAPHER:  Going off the record at
12  12:40 p.m.
13        (Recess taken from 12:40 p.m. to 12:46 p.m.)
14        THE VIDEOGRAPHER:  We are back on the
15  record at 12:46 p.m.
16    Q.  (BY MR. BANKSTON)  Mr. Jones -- did you have a
17  question?
18    A.  Sorry to speak up.  I'm willing to clarify
19  something because I don't think you understood it when I
20  said it earlier because I probably mumbled through it.
21    Q.  Okay.
22    A.  I need to clarify my earlier testimony.  You
23  kept asking about sources and where these sources are.
24  When we have articles and things, most of it is links.
25  And so when -- I've given you, to my knowledge,

147

1  everything we've got.  We'll do another search.  But
2  90 percent of the things is links to other sources that
3  are online and then over time those links die and it's
4  very hard to find that stuff.
5         So anything that we haven't given you is
6  outside of my office and not in my office, when you say
7  a source, that would just be newspapers and archives and
8  TV reports that are outside of my office on the
9  Internet, sources for things that I'm thinking about
10  from memory that I need to go out and find.  So I must
11  have misunderstood what you meant by sources.
12    Q.  Sure.  Okay.  You'd agree it's not general
13  practice, it's not part of your operating protocols, to
14  save corroborating information underlying InfoWars' news
15  broadcasts?
16    A.  We save some of it, but then over time it
17  just -- it gets -- over time we just -- like piles of
18  articles, news folders with information, yeah, it tends
19  to get thrown away.
20    Q.  Okay.
21    A.  But most of what we have is articles with links
22  and then that's where people can go look at what we're
23  talking about.  And the links go to outside websites and
24  outside TV stations and networks and things.  And so
25  when I talk about -- you keep asking about sources of

148

1  info, where I got something, where I found something.  I
2  need to go back to those original articles that you've
3  been given, but then follow the links through that are
4  on there.
5    Q.  I understand Mr. Barnes, Robert Barnes, is no
6  longer representing you?
7    A.  No.
8    Q.  Is he still employed by the company?
9    A.  No.
10    Q.  So he's not general counsel in any way?
11    A.  No.
12    Q.  Okay.  While he was there, did he have any
13  managerial responsibilities?
14    A.  No.
15    Q.  Okay.  Did he have any director positions at
16  the company?
17    A.  No.
18    Q.  Did he at one point serve as general counsel?
19    A.  That's the name you call it.  He was trying to
20  manage some things.
21    Q.  What does that mean, "he was trying to manage
22  some things"?
23    A.  He was trying to get the cases organized.
24    Q.  Okay.  So he's practicing law?
25    A.  Yes.

149

1    Q.  Okay.  Thank you.  If -- let's say after this
2  deposition I go to the media and I tell them you're Bill
3  Hicks, you faked your death and you're a liar; is that
4  my opinion or have I defamed you?
5    A.  That's your opinion.
6    Q.  Okay.  So people are allowed to do that, in
7  your mind?
8    A.  I mean, I -- I think they -- I think they are.
9  But I'm not -- I don't sit there and knowingly get
10  things wrong.
11    Q.  Okay.  I guess what I'm asking you, Mr. Jones,
12  if I -- if I accuse you of being an imposter, if I say
13  that you're a liar and that you're not really who you
14  say you are, have I damaged you in some way?
15    A.  I haven't sued anybody that calls me Bill
16  Hicks.
17    Q.  So the media can report that and that's totally
18  fine, in your mind?
19    A.  That's the -- no, citizens have a right and
20  pundits have a right, people have a right to an opinion.
21  I mean --
22    Q.  What if I said that this court reporter is Bill
23  Hicks and that he's lying and he faked his death?
24    A.  No, I'm not saying that.
25    Q.  I'm saying it, Mr. Jones.  I'm saying it.  Have

150

1  I done anything wrong if I get on TV and say that?
2      A. That's up to him, his view.
3      Q. No, I'm asking you.
4      A. I'm not a court reporter.
5      Q. I'm not asking you if you're a court reporter.
6  I'm asking you, have I done anything wrong?
7      A. That's a moral judgment and I'm not speaking
8  for the court reporter.
9      Q. I'm asking you to make a moral judgment for
10  yourself. Is it wrong?
11     A. I've not said he's somebody else.
12     Q. I did. I did right now; I just said that. Is
13  it wrong?
14     A. If you believe that, then you might be -- you
15  know, just have a mental problem or something. If you
16  did it to hurt him, then that would be different.
17     Q. So it doesn't matter how incompetent I am when
18  I make that accusation, as long as I believe it, no
19  matter how wrong I am, how bad I am at my job --
20     A. No, when you have a giant train of media staged
21  events, ABC News saying here's footage of a Turkish town
22  being blown up of Kurds and they know it's fake, the
23  public gets to the point where you can't believe
24  anything basically anymore and that's totally natural
25  and normal. We've all reached that point. And lawsuits

151

1  like this by the establishment don't stop the public
2  from questioning the system.
3      Q. Let me get this straight.
4      A. So you --
5      Q. It would be natural and normal for me to accuse
6  this court reporter of being Bill Hicks and having faked
7  his death?
8      A. No. No. But it would be normal when you see
9  ABC News saying, here's Trump allowing a city to be
10  blown up, to go that's probably not true, this probably
11  isn't. I know you guys probably don't know about that,
12  but that's -- you didn't hear about ABC News and the
13  fake city being blown up?
14     Q. When you say we're the establishment, what do
15  you mean by that?
16     A. Just people that buy the party line, just
17  believe whatever they're told.
18     Q. That's what we are, me and Mr. Ogden?
19     A. I mean, I'm -- it's okay if I have my opinion,
20  right?
21     Q. Sure.
22     A. Okay.
23     Q. That's your opinion, though?
24     A. I mean --
25     Q. This is just a witch hunt by the establishment?

152

1      A. Oh, the establishment isn't all behind you,
2  isn't backing you?
3      Q. Oh, I know the establishment doesn't like you,
4  Mr. Jones. I understand that very well.
5      A. Okay.
6      Q. I understand that very well. I'm asking you do
7  you believe this lawsuit, us here, that we're involved
8  in some sort of conspiracy against you, or do you think
9  I just found a good case?
10     A. Well, two people agreeing on something is a
11  conspiracy. So I don't know -- when you say that --
12     Q. Sure. Am I in a conspiracy with the
13  establishment? Is that what you think?
14     A. Well, I think you like publicity and stuff like
15  that and, you know, you're casting yourself as the good
16  guy or whatever. That's fine. That's your -- that's
17  what you're doing.
18     Q. When you say I like publicity, have you ever --
19  have you seen me on TV?
20     A. Yeah, with Megyn Kelly and all that.
21     Q. Yeah, about a year ago, maybe a year and a half
22  ago. Ever see me on TV again?
23     A. I've seen you talk to the press and try to get
24  on television.
25     Q. I don't think I've been on television,

153

1  Mr. Jones. Maybe that's not important.
2      A. Okay.
3      Q. Let me ask you this. I had asked you earlier
4  in this deposition, it seemed like you didn't feel any
5  shame about the things you were saying. But I want to
6  ask you now looking back on this, are you sorry?
7      A. You know, I did all this from a good place in
8  my heart and I really sad the establishment has lied
9  so much and done so much that the public doesn't believe
10  what they're told anymore. There's been a real loss of
11  confidence in the system and I -- everything I've done
12  has been from a place of really trying to get people to
13  think and try to find out the truth and I've certainly
14  been wrong about things and, you know, I've -- but it
15  came from a place of really trying to do my best job.
16  So I'm real proud of getting the public to be skeptical
17  and getting people to think for themselves and --
18     Q. Let me get this straight. These videos we just
19  watched today, you're proud of those videos?
20     A. I'm proud of the compendium of my work, not
21  small clips taken out of context. And I'm a good
22  person. And I pioneered exposing Epstein 13 years ago,
23  said they'd fly around on aircraft with the Clintons and
24  kidnap children and it's been proven right. Everybody
25  comes up and shakes my hand, apologizes in Austin now,

**154**

1  the liberals do.  They go, oh, we're sorry and we were
2  wrong about you, and a bunch of other stuff.
3      Q.  So in some ways you're a victim?
4      A.  Let's just say time is running out for the
5  establishment.  Epstein didn't kill himself.
6          MR. BANKSTON:  All right.  Mr. Jones, thank
7  you for your time today.  Until next time.
8          MR. JEFFERIES:  We reserve.
9          THE VIDEOGRAPHER:  This concludes the depo
10  at 12:54 p.m.  We are off the record.
11          (Deposition concluded at 12:54 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**156**

1          I, ALEX E. JONES, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted herein.
4
5          _____
6          ALEX E. JONES
7
8  STATE OF _____  )
9  COUNTY OF _____  )
10
11          Before me, _____, on this day
12  personally appeared ALEX E. JONES known to me (or proved
13  to me under oath through _____
14  (description of identity card or other document) to be
15  the person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they executed the
17  same for the purposes and consideration therein
18  expressed.
19          Given under my hand and seal of office this
20  _____ day of _____, 2019.
21
22          _____
23          NOTARY PUBLIC IN AND FOR
24          THE STATE OF_____
25  My Commission Expires:  _____

**155**

1          CHANGES AND SIGNATURE
2  WITNESS: ALEX E. JONES   DATE OF DEPOSITION: 11/26/2019
3  PAGE/LINE      CORRECTION      REASON FOR CHANGE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

**157**

1          CAUSE NO. D-1-GN-19-004651
2  NEIL HESLIN        *  IN THE  DISTRICT  COURT
3  VS.                *
                       *  OF TRAVIS COUNTY, TEXAS
4  ALEX E. JONES, INFOWARS,  *
   LLC, and FREE SPEECH    *
5  SYSTEMS, LLC          *  261ST JUDICIAL DISTRICT
6
7          REPORTER'S CERTIFICATION
           DEPOSITION OF ALEX E. JONES
8          November 26, 2019
9
10          I, Micheal A. Johnson, Certified Shorthand
11  Reporter in and for the State of Texas, do hereby
12  certify to the following:
13          That the witness, ALEX E. JONES, was duly
14  sworn by the officer and that the transcript of the oral
15  deposition is a true record of the testimony given by
16  the witness;
17          That the deposition transcript was submitted
18  on _____, to the witness or to the attorney
19  for the witness for examination, signature and return to
20  me by _____;
21          That the amount of time used by each party at
22  the deposition is as follows:
23      Mr. Mark D. Bankston - 02:56:53
        Mr. T. Wade Jefferies - 00:00:00
24
25          That pursuant to information given to the

158

1  deposition officer at the time said testimony was taken,
2  the following includes counsel for all parties of
3  record:
4       Mr. Mark D. Bankston, Attorney for Plaintiff
        Mr. Bill Ogden, Attorney for Plaintiff
5       Mr. T. Wade Jefferies, Attorney for Defendants
6       I further certify that I am neither counsel
7  for, related to, nor employed by any of the parties or
8  attorneys in the action in which this proceeding was
9  taken, and further that I am not financially or
10 otherwise interested in the outcome of the action.
11      Further certification requirements pursuant to
12 Rule 203 of TRCP will be certified to after they have
13 occurred.
14      Certified to by me this 1st day of
15 December, 2019.
16
17
18      _____
        Micheal A. Johnson, CSR, RDR, CRR
19      Texas Certification No. 5891
        Expiration Date:  01/31/2021
20      Firm Registration No. 528
        Integrity Legal Support Solutions
21      PO Box 245
        Manchaca, Texas 78652
22      (512) 320-8690
        (512) 320-8692
23
24
25

159

1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition was/was not returned
3  to the deposition officer on _____;
4       If returned, the attached Changes and
5  Signature page contains any changes and the reasons
6  therefor;
7       If returned, the original deposition was
8  delivered to Mark D. Bankston, Custodial Attorney;
9       That $_____ is the deposition officer's
10 charges to the Plaintiff for preparing the original
11 deposition transcript and any copies of exhibits;
12      That the deposition was delivered in
13 accordance with Rule 203.3, and that a copy of this
14 certificate was served on all parties shown herein and
15 filed with the Clerk.
16      Certified to by me this _____ day of
17 _____, 2019.
18
19      _____
        Micheal A. Johnson, CSR, RDR, CRR
20      Texas Certification No. 5891
        Expiration Date:  01/31/2021
21      Firm Registration No. 528
        Integrity Legal Support Solutions
22      PO Box 245
        Manchaca, Texas 78652
23      (512) 320-8690
        (512) 320-8692
24
25

| Numbers | |
|---|---|
| **155** | 3:10 |
| **157** | 3:11 |

# EXHIBIT "10"

| From: | Bradley Reeves |
|---|---|
| To: | Mark Bankston |
| Cc: | Bill Ogden; Marc Randazza |
| Subject: | RE: Discovery Matters |
| Date: | Friday, July 2, 2021 6:54:56 PM |

Mark:

There is a lot to unpack in your email. Just FYI, I have nothing to do with the *Lafferty* case and frankly do not see how it has anything to do with these cases (nor do I see how an order in that matter has any implications on these cases), but make whatever assumptions and incorrect conclusions you want.

Regarding discovery issues, one of the things I am indeed trying to get a hold of is where discovery stands with everything. Something that would be extremely helpful would be if you would do me the favor of sending me courtesy copies of the discovery requests you say have not been responded to. Obviously I am playing major catch-up and going through voluminous case files in these matters, and I recognize that discovery is one of the things I have to tackle and get taken care of one way or the other. In the meantime, know that I have already been working with my clients to try and get things to you. From my standpoint, I fully intend on doing whatever I can to ensure compliance with discovery orders and requests to the extent I am able to do so.

I will forward your email to my clients so they understand the positions you are taking. Other than the *Pozner* motion to compel, you have provided no timeline of when you intend to file these other motions. Can you give me an idea of that? Also, please know that from a personal standpoint, I am starting a 2-week in-person jury trial here in Travis County on July 12th, so it may be difficult for me to meet any expedited timeline, but I will certainly do my best.

Let me know. Have a wonderful July 4th holiday.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Friday, July 2, 2021 6:39 PM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Bill Ogden <bill@fbtrial.com>
**Subject:** Discovery Matters

Given yesterday's filing in *Lafferty,* we know you are probably working hard helping to prepare for the Hillary Clinton deposition your client will soon be taking, but there are some issues we need to bring to your attention.

As we're sure you surmised from our recent filing in *Heslin,* No. D-1-GN-19-004651, we consider your clients in flagrant contempt of court. As we are re-urging a default, we will not be making any further efforts attempting to secure your compliance. However, we do need to confer with you regarding motions which appear necessary in other Sandy Hook discovery matters.

Regarding *Pozner,* No. D-1-GN-18-001842, your clients have not responded to Plaintiff's initial discovery requests. Those responses were due on September 1, 2018. When the appeal was initiated, the responses were almost two weeks overdue. Upon remand, you have made no efforts

to respond. Now, the requests are nearly a month and a half overdue. If you do not agree to provide responses without objections within 14 days, we will be moving to compel and seeking sanctions.

Regarding *Heslin,* No. D-1-GN-18-001835, on August 21, 2018, your clients were ordered to respond to Mr. Heslin's written discovery in thirty days and produce all defendants for deposition. Your clients chose not to provide responses. On October 1st, 2018, Mr. Heslin filed a Motion for Contempt. Your clients then filed a Notice of Appeal.

Upon remand of that appeal in the fall of 2019, another month passed in which your clients again chose not to comply with the Court's order. On October 18, 2019, the Court granted a Motion for Contempt against your clients, including a sanction of $25,875. Following the court's contempt order, your clients initiated another appeal, during which they were again sanctioned, this time by the Court of Appeals.

Now after the second remand, thirty more days have passed and your client has again chosen not to comply with the court's three-year-old discovery order, willfully continuing the contempt of court. Additionally, your clients' counsel made statements both in this case and in the *Lafferty* case acknowledging their continuing obligations to comply with discovery orders despite the resolution of the anti-SLAPP motion. Likewise, several weeks prior to the recent second remand in this case, the *Lafferty* court reminded your clients that the resolution of the anti-SLAPP motion does not extinguish their obligation to comply with a court order regarding discovery. Yet you have taken no action whatsoever to comply with Judge Jenkin's August 21, 2018 order. We obviously intend to file another motion for contempt. We assume you will be opposed.

Finally, in *Lewis,* No. D-1-GN-18-006623, the Court issued discovery orders on January 25, 2019 and March 8, 2019. Your clients failed to comply with these orders in numerous respects, both as it concerns document production, written discovery answers, and the corporate deposition. Your clients made stipulations to the trial court to avoid being held in contempt in May 2019, but since that time they have made no efforts to remedy these issues or comply with the discovery order. Again, your clients understood that the resolution of the anti-SLAPP motion did not vacate the prior discovery order. As such, we will also be filing a motion for contempt in the *Lewis* case. Again, we assume you will opposed.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 55050860
Status as of 7/7/2021 9:41 AM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/6/2021 7:53:51 AM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 7:53:51 AM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 7:53:51 AM | SENT |

Case Contacts

| Name |
|------|
| Mark Charles Enoch |
| Warren Lloyd Vavra |
| Velva Lasha Price |
| William Ogden |
| Jill Bauerlein |
| Bradley Reeves |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 55050860
Status as of 7/7/2021 9:41 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 7/6/2021 7:53:51 AM | SENT |

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 7:53:51 AM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/6/2021 7:53:51 AM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/6/2021 7:53:51 AM | SENT |

7/7/2021 2:11 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, INFOWARS, LLC,** | § | |
| *et al.,* | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## NON-PARTY AMOS PICTURES, LTD.'S REQUEST FOR ORDER TO ALLOW RECORDING AND BROADCASTING OF COURT PROCEEDINGS

Non-Party Amos Pictures, Ltd. ("Amos Pictures") files this Request for Recording and Broadcasting of Court Proceedings pursuant to TEX. R. CIV. P. 18c and Travis County Local Rule 16, and in support thereof shows the Court the following:

### I.
### SUMMARY

Amos Pictures is an award-winning production company responsible for documentaries such as "Leaving Neverland," which won the Primetime Emmy in 2019. Amos Pictures is producing a documentary for broadcast on HBO that examines the claims against Alex Jones and InfoWars asserted by parents of children killed at Sandy Hook in December 2012. By this request, Amos Pictures seeks to record the proceedings in this lawsuit and broadcast portions of the proceedings in the documentary. These recordings will not harm or disadvantage any party or potential witness, but will instead promote public access and exposure to the court system, in general, and the issues in this lawsuit, in particular.

Amos Pictures has previously recorded court proceedings in another United States trial court and will accommodate any necessary restrictions on recording imposed by the Court

and be as unobtrusive as possible in its operations.  Amos Pictures respectfully requests the

Court exercise its discretion and allow the recording and broadcasting of these important

proceedings.

## II.
## STATEMENT OF CONSENT

Plaintiff consents to Amos Pictures' request to record all proceedings in this lawsuit,

and has already delivered a letter to the Court outlining his support.  *See* Exhibit 1.  As of the

date of filing this request, Defendants have not voiced any opposition to Amos Pictures'

request.

## III.
## PROCEDURAL BACKGROUND

This lawsuit is part of the following set of cases brought against Alex Jones, InfoWars,

LLC, and Free Speech Systems, LLC ("Defendants"):

- Cause No. D-1-GN-18-001835; *Neil Heslin v. Alex E. Jones, InfoWars, LLC, et al.*; in the 261st Judicial District, Travis County, Texas;

- Cause No. D-1-GN-18-001842; *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, InfoWars, LLC, et al.*; in the 345th Judicial District, Travis County, Texas;

- Cause No. D-1-GN-18-006623; *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 98th Judicial District, Travis County, Texas; and

- Cause No. D-1-GN-19-004651; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 261st Judicial District, Travis County, Texas.

(the "Lawsuits").  According to the allegations, the Lawsuits arise from:

> [T]he intentional infliction of emotional distress committed
> against Plaintiff for the past five years through InfoWars'
> recklessly false statements concerning the circumstances of the
> death of his child, as well as InfoWars' coordination and
> encouragement of a fringe community of dangerous fanatics who
> have stalked and endangered the Sandy Hook parents.

Orig. Pet., Cause No. D-1-GN-19-004651.[1]

On March 9, 2021, the Lawsuits were specially assigned to the Honorable Judge Maya Guerra Gamble. *See* March 9, 2021 Letter from the Honorable Judge Lora J. Livingston. On March 23, Amos Pictures contacted the Court to request information on recording proceedings in the Lawsuit. Exhibit 2. In response, Judge Maya Guerra Gamble issued a letter directing Amos Pictures to file a request to cover the proceeding. *See* April 20, 2021 Letter to M. Gaudin. Dan Reed, the director of the planned documentary, submitted a letter to the Court to request such recording. Exhibit 3. On June 15, the Court confirmed that a hearing on Amos Pictures' request would occur on July 9, 2021.

## IV.
### ARGUMENTS & AUTHORITIES

Trial courts in the United States have long recognized a presumption of openness in their proceedings grounded in the public's right to know ensured by the First and Sixth Amendments to the United States Constitution as well as Article 1, Sections 8 and 10 of the Texas Constitution.[2] Both the Sixth Amendment right to a public trial and the free speech and press clause affirmatively mandate access for cameras in the courtroom. In addition, the policies underlying these amendments favor media coverage of court proceedings as a means of advancing the public's understanding of the way in which the government, and specifically

---

[1] There is one additional lawsuit against the Defendants (Cause No. D-1-GN-18-001605; *Marcel Fontaine v. Alex E. Jones, InfoWars, LLC, et al.*; in the 459th Judicial District, Travis County, Texas) that is unrelated to the Sandy Hook-related allegations. Amos Pictures does not seek to record or broadcast proceedings from this lawsuit.

[2] Article I, Section 8 is the free speech provision to the Texas Constitution. Article I, Section 10 is the public trial provision to the Texas Constitution.

the judicial system, works.  The Texas Constitution's free speech amendment provides in

pertinent part:

> Every person shall be at liberty to speak, write or publish his
> opinions on any subject . . . and no law shall ever be passed
> curtailing the liberty of speech or of the press.

Amos Pictures requests permission to serve the constitutional mandates established by

the United States and Texas Constitutions (and further enacted within the Travis County Local

Rules) and record the proceedings in the Lawsuits.

## A.  The United States and Texas Constitutions Provide the Right of the Press and the Public to Attend Trials.

The U.S. Supreme Court has long recognized that the Constitution requires both the

press and the public be permitted to attend and observe judicial proceedings absent the most

compelling circumstances.  *See, e.g., Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986).

There are no compelling circumstances in this case to warrant otherwise.  This is particularly

true given the global pandemic, where the public now must rely even more heavily on the

press to cover relevant court proceedings.

According to the U.S. Supreme Court, the essential factors to consider when

determining whether access attaches to a particular proceeding are: (1) whether the place and

process in question historically have been open to the press and the public in general, and (2)

whether public access plays a significant positive role in the functioning of the particular

process in question.[3]  *Id.* at 8-9.  Courts in the Fifth Circuit have applied these factors in

determining access to civil proceedings in state courts, including those in Texas.  *See Doe v.*

---

[3]     These factors will be discussed *infra* Section IV.B.3.

*Santa Fe Indep. Sch. Dist.*, 933 F. Supp. 647, 650 (S.D. Tex. 1996) (citing *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3rd Cir. 1984)); *see also Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981). Finally, the Texas Supreme Court demonstrated its belief that both of these factors were met by lifting the ban on cameras in the courtroom, effective September 1, 1990. The Texas Supreme Court deleted Canon 3(a)(10) of the Code of Judicial Conduct and amended Rule 18c of the Texas Rules of Civil Procedure to establish guidelines for the use of cameras in civil trial courts.

Texas Rule of Civil Procedure 18c provides that a trial court "may permit broadcasting, televising, recording, or photographing of proceedings" in three distinct circumstances. Subparagraph (b) contains a requirement for consent by the parties. At the time of filing, Defendants have not indicated any opposition to this request, so recording and broadcasting is appropriate under Rule 18c(b). To the extent Defendants do not consent, recording and broadcasting is still proper under Rule 18c(a). Consent of the parties is ***not*** required under Rule 18c(a) where the media coverage is sought under guidelines promulgated by the Supreme Court. Accordingly, as set forth below, Amos Pictures' media coverage of this hearing pursuant to TEX. R. CIV. P. 18c(a), in accordance with the Local Rules adopted by the Supreme Court, is a proper circumstance under which the Court may permit the videotaping and broadcasting of these proceedings without regard to consent of the parties.

**B.      Recording and Broadcasting of the Lawsuits Should be Permitted Under Travis County Local Rules.**

In accordance with the Texas Supreme Court's guidance, many local jurisdictions—including Travis County—have adopted their own rules and procedures regarding cameras in the courtroom. The Rules Governing the Recording and Broadcasting of Court Proceedings in the Civil District Courts of Travis County (the "Local Rules") were approved by order of

the Texas Supreme Court on April 14, 2014.  Under the Local Rules, "the decision to allow

[media] coverage is discretionary and will be made by the Court on a case-by-case basis."  Local

Rule 16.3.4.  "In determining an application for coverage, the Court shall consider all relevant

factors, including but not limited to:

>    (a)    the type of case involved;
>
>    (b)    whether the coverage would cause harm to any
>           participants;
>
>    (c)    whether the coverage would interfere with the fair
>           administration of justice, advancement of a fair trial, or
>           the rights of the parties;
>
>    (d)    whether the coverage would interfere with any law
>           enforcement activity;
>
>    (e)    the objections of any of the parties, prospective witnesses,
>           victims, or other participants in the proceeding for which
>           coverage is sought;  the physical structure of the
>           courtroom and the likelihood that and equipment
>           required to conduct coverage of proceedings can be
>           installed and operated without disturbance to those
>           proceedings or any other proceedings in the Courthouse;
>
>    (g)    the extent to which the coverage would be barred by law
>           in the judicial proceeding of which coverage is sought; and
>
>    (h)    the fact that any party, prospective witness, victim, or
>           other participant in the proceeding is a child, to which fact
>           the Court shall give great weight."

*Id.*  Here, as discussed below, these factors weigh heavily in favor of allowing Amos Pictures

to record and broadcast the proceedings.

## 1.    The type of case involved.

At their core, the Lawsuits involve issues related to media rights, defamation, and

freedom of speech.  The plaintiffs in these Lawsuits allege that the Defendants published false

and defamatory statements in videos and articles with the intent to cause emotional distress, harassment, and ridicule to the plaintiffs. In response, the Defendants claim the following:

> [T]his lawsuit is also a strategic device used by Plaintiff and her attorneys, in conjunction with at least other two lawsuits filed by her attorneys on behalf of others with whom Plaintiff is acting, to silence Defendants' free speech and an attempt to hold Defendants liable for simply expressing their opinions about **matters of public concern**. The goal of Plaintiff and her attorneys in this lawsuit as well as the goal of others who have similarly sued, is to silence Defendants from expressing what she and they consider to be inappropriate speech about Sandy Hook and other **matters of public concern**.

*See* Defendants' Motion to Dismiss under the Texas Citizens Participation Act, Cause No. D-1-GN-18-006623 (emphasis added). Amos Pictures believes the public has great interest in not only the subject matter of these Lawsuits, but also in how the judicial system will resolve these contentious claims.

### 2. Whether the coverage would cause harm to any participants.

Plaintiff—who arguably could suffer the most harm from having these proceedings broadcast—has consented to their recording. Defendants have not expressed any opposition to this request, nor have they offered any specific objections or demonstrable injury that might result from the recording. Indeed, it would seem that the Defendants, who operate in the media space, should embrace open access to these proceedings. Mr. Jones's website, InfoWars.com, has reached more than 1 million page visits per day and, as of 2018, averaged more than 25 million page views per month.[4] It would be incongruous to allow the Defendants to broadcast the very statements, articles, interviews, and videos at issue in these

---

[4] https://www.statesman.com/business/20180813/bans-dont-seem-to-be-lessening-reach-of-alex-jones-infowars

Lawsuits while, at the same time, disallowing the public from viewing proceedings that attempt to hold Defendants liable for those publications.

### 3.      Whether the coverage would interfere with the fair administration of justice, advancement of a fair trial, or the rights of the parties.

Trials have traditionally been open for public scrutiny.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980);[5] *Gannett Co. v. DePasquale*, 443 U.S. 368, 386, n. 15 (1979).  This is, in part, because the public and the press have a First Amendment right to attend trials.  "[T]he First Amendment can be read as protecting the right of everyone to attend trials . . . ."  *Richmond Newspapers*, 448 U.S. at 573-575.  Indeed, openness "has long been recognized as an indispensable attribute of an Anglo-American trial."  *Id.* at 569; *accord Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event.  What transpires in the courtroom is public property.").  As Justice Brennan explained:  "Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."  *Globe Newspapers v. Superior Court*, 457 U.S. 596,  606-07 (1982).

The core purpose of this right of access is to enable the public, through the press, to monitor judicial proceedings.[6]  *See Richmond*, 448 U.S. at 555.  This purpose is clearly met in

---

[5]      In *Richmond Newspapers*, the Supreme Court addressed squarely for the first time whether a criminal trial could be closed to the public on the request of a defendant without a demonstration that closure is required to protect the defendant's right to a fair trial, or that some other overriding consideration requires closure.  The Supreme Court held that it could not.  Long ago, Texas reached the same conclusion.  *See Ex parte Foster*, 44 Tex. Crim. 423, 71 S.W. 593 (1903); *Ex parte McCormick*, 129 Tex. Crim. 457, 88 S.W.2d 104 (1935).  While *Richmond Newspapers* addressed the closure of a criminal trial, its reasoning is generally applicable to civil trials.  Indeed, the court noted that historically both civil and criminal trials have been presumptively open.  *Richmond Newspapers*, 448 U.S. at 575.

[6]      Paul, Angelique M., *Turning the Camera on Court TV: Does Televising Trials Teach us Anything About the Real Law?*, 58 OHIO ST. L. J. 655, 691, at n. 3 (1997)("For any democracy to survive and flourish, the citizens

this case. The First Amendment right to attend trials serves to reinforce public acceptance of "both the process and its results." *Id.* at 571. In his concurring opinion, Justice Brennan referred to this as the presses' broader "structural" role of ensuring full and informed participation in the democratic process. *Id.* at 587-88.[7] In a later case, the Supreme Court reiterated that "[p]ublic access to civil proceedings plays a significant role in the proper functioning of the judicial process and the government as a whole." *Globe Newspapers*, 457 U.S. at 606.

The U.S. Supreme Court has repeatedly made it clear that press and public rights to attend both civil and criminal trials serve not only to educate the public about how the justice systems works, but also to secure confidence in that system. *Richmond Newspapers*, 448 U.S. at 572; *Globe Newspapers Co.*, 457 U.S. at 605-06. The Court's justification for allowing filming applies equally to civil proceedings.[8]

During the current global pandemic where in-person attendance is not feasible, the right to attend trial is vindicated through the press' ability to cover trial proceedings. Here, Amos Pictures' coverage will enhance the dignity of the proceedings and the public's perception of them. The coverage of the actual proceedings, with a dignified judge presiding

---

of that democracy must know what their public servants are doing and how well they are performing the jobs with which they have been entrusted.").

[7]      Justice Brennan also noted that "public access to trials displays their fairness, prevents public resentment, dissuades judges from excess, and calls the attention of important, but unknown witnesses." *Richmond Newspapers*, 448 U.S. at 595-97.

[8]      Cameras have also traditionally been allowed in a variety of civil proceedings. *See Deatherage v. Examining Bd. of Psychology*, 932 P.2d 1267 (Wash. App. 1996) (cameras allowed in an administrative disciplinary hearing of a Washington psychologist); *New York v. Haygood*, 23 Med. L. Rptr. 1636 (N.Y. Sup. Ct. 1995)(camera allowed in civil trial of podiatrist accused of billing fraud); *Sprecher v. Sprecher*, 15 Med. L. Rptr. 1773 (N.Y. Sup. Ct. 1988) (camera allowed in child custody proceeding); *Lang v. Tampa Television, Inc.*, 11 Med. L. Rptr. 1150 (Fla. 4th Cir. Ct. 1984) (television station granted permission to broadcast proceedings in civil action by rape victim).

over a respectful and attentive courtroom, will contrast with the typically skewed or sensationalized events, such as "spin control" conducted by parties and television dramatizations of courtroom proceedings, that may transpire **outside** the courtroom. The camera inside the courtroom, unobtrusively and accurately recording the dignified proceedings, will enable the public to see what actually occurred and create an historical record.

4.      **Whether the coverage would interfere with any law enforcement activity.**

Amos Pictures is not aware of any law enforcement activity related to the subject matter of the Lawsuits.  Even so, allowing Amos Pictures access to these proceedings would not interference with any law enforcement activity.

5.      **The objections of any of the parties, prospective witnesses, victims, or other participants in the proceeding for which coverage is sought; the physical structure of the courtroom and the likelihood that any equipment required to conduct coverage of proceedings can be installed and operated without disturbance to those proceedings or any other proceedings in the Courthouse.**

No party, prospective witnesses, victims, or other participants in the Lawsuits has voiced any objection to Amos Pictures being allowed to record and broadcast the proceedings.

If the proceedings in the Lawsuits are conducted virtually via Zoom, then there will be very little, if any, obstruction.  If the proceedings are conducted at the courthouse, Amos Pictures will operate at all times with great care and in close consultation with the Court and its staff, and will submit to the Court in all matters related to any restrictions on recording. Amos Pictures has significant prior experience filming court proceedings in the United States and will ensure that the business of the court is not impeded and the Judge's instructions are followed.  Equipment will be unobtrusive and consist of one digital cinema camera on a tripod,

which can be operated from a seated position, as well as a number of remotely operated wireless microphones.

Given the parameters of Amos Pictures' request and the breadth of experience Amos Pictures has in filming in an unobtrusive manner in the courtroom, the Court can comfortably set conditions on Amos Pictures that will eliminate any concerns of interference in the proceedings.

**6.    The extent to which the coverage would be barred by law in the judicial proceeding of which coverage is sought**

Amos Pictures is not aware of any law that would prevent or prohibit the recording and broadcast of the proceedings in this Lawsuit.  Instead, as set forth above, the law strongly supports Amos Pictures' proposed filming of the proceedings.

**7.    The fact that any party, prospective witness, victim, or other participant in the proceeding is a child, to which fact the Court shall give great weight.**

The Sandy Hook school shooting involved the tragic loss of the lives of multiple children.  But in this Lawsuit, there are no minor plaintiffs.  Additionally, the attorneys for the plaintiffs have indicated that there are no minor witnesses.  Exhibit 1.  As a result, this factor weighs in favor of recording and broadcasting.

In the unexpected event that a minor does testify in the proceedings, Amos pictures will comply with any restrictions on recording the Court deems necessary.  In this regard, the opinion in *Doe v. Santa Fe Independent School District*, 933 F. Supp. 647, 650 (S.D. Tex. 1996) is instructive.  In *Doe*, the court considered access to a civil trial involving adult and minor plaintiffs over violations of the First Amendment establishment clause.  *Id.*  The court held that the trial would be closed only to the extent necessary to protect the minor plaintiffs, but

would not be closed to protect the adult plaintiffs. *Id.* at 651. The court held that the trial should remain open to the public unless "denial [of the constitutional right of access] is necessitated by a compelling governmental interest and is narrowly tailored to serve that interest." *Id.* at 650 (*quoting Globe Newspaper*, 457 U.S. at 607). Ultimately, the court found the adult plaintiffs' right of privacy was insufficient to deny the public's First Amendment right of access. *Id.* at 652. Accordingly, to the extent the Court requires restrictions related to minor victims or minor witnesses, the Court should grant open access to the remaining proceedings that do not involve minors.

## C.     Amos Pictures Will Comply with Travis County Local Rules.

Amos Pictures and its personnel understand and agree that:

1.     All media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and the Local Rules.

2.     If the Court requires, there will be no audio or visual coverage of the testimony of any witness unless consent of that witness has been obtained in the manner required by the Court and filed with the District Clerk, with a copy delivered to the trial court.

3.     Permission may be withdrawn by the Court at any time pursuant to the Local Rules, at which time media coverage will immediately cease.

4.     This request has been filed with the District Clerk, with a copy delivered to the trial court and the Court Administrator.

## V.
### CONCLUSION

The factors set forth by the Travis County Local Rules applied to the circumstances of the Lawsuits favor open access to—and recording and broadcasting of—all proceedings in the Lawsuits. Accordingly, Amos Pictures respectfully requests an order allowing it to record and broadcast all proceedings in the Lawsuits pursuant to Local Rule 16.

Respectfully submitted,

**JACKSON WALKER L.L.P.**

By:  */s/ Charles L. Babcock*
     Charles L. Babcock
     cbabcock@jw.com
     State Bar No. 01479500
     1401 McKinney St., Suite 1900
     Houston, Texas 77010
     (713) 752-4200

     Joshua A. Romero
     jromero@jw.com
     State Bar No. 24046754
     Scott Weatherford
     State Bar No. 24079554
     sweatherford@jw.com
     100 Congress, Suite 1100
     Austin, Texas 78701
     (512) 236-2000
     (512) 236-2002 - Fax

     **ATTORNEYS FOR**
     **AMOS PICTURES**

## CERTIFICATE OF SERVICE

This is to certify that on the 7th day of July 2021, a true and correct copy of the foregoing has been served via electronic service on all counsel of record:

     */s/ Scott W. Weatherford*
     Scott W. Weatherford

# EXHIBIT 1



TEXAS | FLORIDA

May 18, 2021

The Honorable Maya Guerra Gamble
459th District Court
Heman Marion Sweatt Travis County Courthouse
P.O. Box 1748
Austin, Texas 78767
*Via Email*: 459.submission@travdscountvtx.gov

Re:     Media Request
        D-1-GN-18-001835; *Neil Heslin vs. Alex Jones, et al*
        D-1-GN-18-001842; *Leonard Pozner and Veronique De La Rosa vs. Alex Jones, et al*
        D-1-GN-18-006623; *Scarlett Lewis vs. Alex Jones, et al*
        D-1-GN-19-004651; *Neil Heslin vs. Alex Jones, et al*

Dear Judge Gamble,

        I write on behalf of the Plaintiffs in the above-styled cases concerning the May 14, 2021 letter submitted to the Court by Amos Pictures. Plaintiffs do not object to media coverage and recording of these proceedings. Indeed, they welcome it. Having lived the past eight years of their lives stalked and threatened due to misinformation, these families firmly believe that greater transparency and public information about these proceedings is beneficial for their safety and long-term well-being, regardless of the outcome of the trial.

        Plaintiffs would also note that allowing media coverage of a trial "over the defendant's objection is not inherently a denial of due process." *Wright v. State,* 374 S.W.3d 564, 572 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Instead, the U.S. Supreme Court unanimously held in *Chandler* that allowing media coverage was proper even over the defendant's objection unless there was a showing of constitutional prejudice. A defendant can show constitutional prejudice when "the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Chandler v. Florida,* 449 U.S. 560, 575 (1981). Plaintiffs see no such threat here.

        Finally, concerning Rule 3.5(h) of the Rules for Recording and Broadcasting Court Proceedings in Certain Civil Courts of Travis County, no prospective witness or other participant in the proceeding is a child.

                                        Sincerely,

                                        Mark D. Bankston

# EXHIBIT 2

# RE: [CAUTION EXTERNAL] Re: Media request - HBO / AMOS Pictures

---

From: **Marguerite Gaudin** | marguerite@amospictures.co.uk   Wednesday 21 Apr, 22:06

To: **Larissa Walton** | Larissa.Walton@traviscountytx.gov

Understood, thanks for letting me know and for sharing Mr. Denton's address.

Best Regards

Marguerite Gaudin

Producer

+44 7768 150 354
+1 (202) 977 6812

---

From: **Larissa Walton** | Larissa.Walton@traviscountytx.gov   Wednesday 21 Apr, 20:56

There currently is no hearing set. You may follow up with our staff attorney, Samuel Denton after April 30, 2021.

I will no longer be working for the Court. His email is Samuel.Denton@traviscountytx.gov

Thank you,



Larissa Walton

Judicial Executive Assistant

459th Judicial District

The Honorable Judge Maya Guerra Gamble

✉ *P.O. Box 1748, Austin, TX 78767*

☎ *(512) 854-9384*

🌐 *Larissa.Walton@traviscountytx.gov*

---

From: **Marguerite Gaudin** | marguerite@amospictures.co.uk

To: **Larissa Walton** | Larissa.Walton@traviscountytx.gov

Wednesday 21 Apr, 14:55

Thank you so much, that is really helpful. We'll be sending the request asap.

The next hearing date had not been set last time we spoke, has anything changed since then?

Best Regards

Marguerite

Marguerite Gaudin

Producer

+44 7768 150 354
+1 (202) 977 6812

---

**From: Larissa Walton** | Larissa.Walton@traviscountytx.gov          Tuesday 20 Apr, 22:18

Ms. Guadin,

Apologies for the delay, please see the letter that is attached from Judge Guerra Gamble. It is filed with the District Clerk's office.

Thank you,



Larissa Walton
Judicial Executive Assistant
459th Judicial District
The Honorable Judge Maya Guerra Gamble
✉ *P.O. Box 1748, Austin, TX 78767*
☎ *(512) 854-9384*
🌐 *Larissa.Walton@traviscountytx.gov*

---

**From: Marguerite Gaudin** |          **To: Larissa Walton** |          Tuesday 30 Mar,
marguerite@amospictures.co.uk          Larissa.Walton@traviscountytx.gov          10:56

CAUTION: This email is from OUTSIDE Travis County. Links or attachments may be dangerous. Click the Phish Alert button above if you think this email is malicious.

Hello Larissa

I hope you don't mind me following up on this. I was wondering if you had any updates on the below.

Many thanks for your help

Best

Marguerite

---

From: **Marguerite Gaudin** | marguerite@amospictures.co.uk                    Tuesday 23 Mar, 21:56

Hello Larissa

Thanks very much for taking the time to chat yesterday.

As discussed, it would be great to understand how to apply to film in court. You mentioned that court proceedings are held on Zoom at the moment and if it is still the case when the hearing takes place it would be great to know if it might be possible to apply to film the Youtube retransmission.

Just to give you a little bit of background, I am a producer at Amos Pictures, an award-winning production company based in London. Our last production, *Leaving Neverland,* is HBO's most-watched ever documentary.

We are currently working on a new documentary for HBO, which will follow the legal battle between the Sandy Hook parents, who lost children during the 2012 school shooting, and Alex Jones. We are in contact with both the Plaintiffs and their legal team, as well as the Defendant. We believe this case is an important one which will illuminate the complexities of the pursuit of justice through the courts.

While we already have considerable experience filming in a US civil court in CA, I appreciate that things in Texas may work differently. We will of course diligently comply with all conditions imposed by the court, while making our presence unobtrusive.

Please do let me know if there is any other information I can provide.

Best Regards

Marguerite

Marguerite Gaudin

Producer
+447768150354

# EXHIBIT 3

AMOS Pictures



MAYA GUERRA GAMBLE
Judge, 459th District Court
Heman Marion Sweatt Travis County Courthouse P.O. Box 1748
Austin, Texas 78767
512-854-9384

Your Honor,

Please consider giving Amos Pictures, an independent television documentary production company based in London, England, permission to film court proceedings, for an HBO television documentary, in the following cases:

Cause No. D-1-GN-18-001835; Neil Heslin vs. Alex E. Jones,InfoWars, LLC, et al;
Cause No. D-1-GN-18-001842; Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al;
Cause No. D-1-GN-18-006623; Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free SpeechSystems, LLC;
Cause No. D-1-GN-19-004651; Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free SpeechSystems, LLC;

We note that no hearings are currently scheduled, however we seek permission to film all court proceedings from this date forward.

In view of the immense public interest and cultural significance of these cases Amos Pictures has been commissioned by HBO Documentaries to create a 90-minute documentary following the legal battle between Alex Jones et al and several parents whose children perished in the Sandy Hook school shooting. The program will be broadcast worldwide after the conclusion of legal proceedings in Texas.

The program, which will be strictly non-political and non-partisan, will seek to closely involve its audience in the complexities and the dramatic unfolding of the judicial process.

For the avoidance of doubt, no material filmed in court will be released or shared in any way before legal proceedings in each case listed above have come to an end.

We have reviewed the Texas Rule of Civil Procedure 18c and Travis County Local Rules of Civil Procedure and Rules of Decorum (Local Rules) Chapter 16.

We will operate at all times with great care and in close consultation with the court and its officers and will submit to the authority of the Court in all matters pertaining to the enforcement of the rules around filming..

10 Orange Street, London, WC2H 7DQ        www.amospictures.co.uk        marguerite@amospictures.co.uk

Company Registration No. 3511357
Registered Address: 9 Perseverance Works, London, E2 8DD

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aisha Milburn on behalf of Charles Babcock
Bar No. 1479500
amilburn@jw.com
Envelope ID: 55117881
Status as of 7/8/2021 2:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 7/7/2021 2:11:18 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/7/2021 2:11:18 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/7/2021 2:11:18 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/7/2021 2:11:18 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/7/2021 2:11:18 PM | SENT |
| Jill Bauerlein | | jbauerlein@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/7/2021 2:11:18 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 7/7/2021 2:11:18 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 7/7/2021 2:11:18 PM | SENT |
| Scott Weatherford | | sweatherford@jw.com | 7/7/2021 2:11:18 PM | SENT |

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/7/2021 2:11:18 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michael Burnett | | mburnett@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/7/2021 2:11:18 PM | SENT |

Associated Case Party: InfoWars, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Aisha Milburn on behalf of Charles Babcock
Bar No. 1479500
amilburn@jw.com
Envelope ID: 55117881
Status as of 7/8/2021 2:40 PM CST

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/7/2021 2:11:18 PM | SENT |
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/7/2021 2:11:18 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Nyitray | | snyitray@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/7/2021 2:11:18 PM | SENT |
| Michael Burnett | | mburnett@BurnettTurner.com | 7/7/2021 2:11:18 PM | SENT |

Filed in The District Court
of Travis County, Texas

AR    JUL 12 2021
At_____4:00____PM.
Velva L. Price, District Clerk

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
|   *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| and OWEN SHROYER, | § | |
|   *Defendants* | § | 261st DISTRICT COURT |

and

D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
|   *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, | § | |
| LLC,, | § | |
|   *Defendants* | § | 261st DISTRICT COURT |

## ORDER OF CONSOLIDATION

On this day, the Court considered Defendants' Motion to Consolidate. The Court finds that the motion should be granted.

It is accordingly ORDERED that Defendants' Motion to Consolidate is GRANTED. The Cause No. D-1-GN-19-004651 is consolidated into the action styled,

Cause No. D-1-GN-18-001835, *Neil Heslin v. Alex Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, In the District Court of Travis County, Texas, 261st Judicial District.

Dated July 12, 2021.

Hon. Maya Guerra Gamble

7/12/2021 3:47 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## LEVEL 3 SCHEDULING ORDER

Pursuant to TEX. R. CIV. P. 190.4, the Court enters the following Agreed Level 3 Scheduling Order. If no date is given below, the item is governed by the Texas Rules of Civil Procedure or the Local Rules of this Court.

1. **08/15/2021**   **JOINDER.**   All parties must be added and served, whether by amendment or third-party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE.

2.   **EXPERT WITNESS DESIGNATION.** Expert witness designations are required and must be served by the following dates.  The designation must include the information listed in Rule 194.2 (f). Failure to timely respond will be governed by Rule 193.6.

   **09/15/2021**   Experts for parties seeking affirmative relief.
   **10/30/2021**   Rebuttal experts.

3. **01/01/2022**   **DISCOVERY PERIOD ENDS.**  All discoveries must be conducted before the end of the discovery period. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period that the deadline for responding will be within the discovery period.

4. **02/01/2022**   **DISPOSITIVE MOTIONS AND PLEAS.**  Must be filed by this date.

5.   **01/01/2022**   **CHALLENGES TO EXPERT TESTIMONY.**   All motions to exclude expert testimony and evidentiary challenges to expert testimony must be filed by this date, unless extended by leave of court.

6.   **09/15/2021**   **PLEADINGS.**  Amendments and supplements may be filed by this date without leave of court.  This order does not preclude prompt filing of pleadings directly responsive to any timely filed pleadings. Amendment and supplements filed after this date are permitted only upon leave of court for good cause shown.

7.   **March/April 2022**   **TRIAL.** This case is set for a jury trial during the week of_March 28, 2022_____.

The time periods and terms of this Scheduling Order may be modified by the Parties by Rule 11 Agreement or upon order of the Court for good cause shown.

**CERTIFICATE OF COMPLIANCE WITH STANDING PRETRIAL SCHEDULING ORDER** (Effective January 1, 2020). None of these deadlines are shorter than those contained in the Standing Pretrial Scheduling Order, and none of the deadlines contained in the Standing Pretrial Scheduling Order shall be shortened without leave of court.

**ENTERED:**

July 9, 2021
Date

HON. MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

By:_____/s/ Mark Bankston_____
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:    (713) 221-7008
Fax:    (713) 221-8301

**ATTORNEYS FOR PLAINTIFF**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55300333
Status as of 7/14/2021 9:32 AM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/13/2021 1:49:45 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/13/2021 1:49:45 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 7/13/2021 1:49:45 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 7/13/2021 1:49:45 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 7/13/2021 1:49:45 PM | SENT |
| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 7/13/2021 1:49:45 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/13/2021 1:49:45 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/13/2021 1:49:45 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/13/2021 1:49:45 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/13/2021 1:49:45 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/13/2021 1:49:45 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/13/2021 1:49:45 PM | SENT |

Associated Case Party: Free Speech, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55300333
Status as of 7/14/2021 9:32 AM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/13/2021 1:49:45 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/13/2021 1:49:45 PM | SENT |

7/19/2021 4:33 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Jessica A. Limon

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et al.** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| **SCARLETT LEWIS,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| **NEIL HESLIN,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| **LEONARD POZNER** et al. | § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs,* | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **345th JUDICIAL DISTRICT** |

## ORDER ALLOWING RECORDING AND
## BROADCASTING OF COURT PROCEEDINGS

On this day, the Court considered Non-Party Amos Pictures, Ltd.'s ("Amos Pictures")

Request for Recording and Broadcasting of Court Proceedings pursuant to Tex. R. Civ. P.

18c and Travis County Local Rule 16 ("Request").  After considering the Request, the relevant factors, as well as the consent of the parties, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Amos Pictures' Request for Recording and Broadcasting of Court Proceedings pursuant to TEX. R. CIV. P. 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Amos Pictures is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual coverage[1] and audio coverage.[2]  Amos Pictures shall be entitled to install equipment in the courtroom for the purpose of such coverage.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and the Travis County Local Rules.

IT IS SO ORDERED.

Signed on this __16th__ day of July 2021.

HONORABLE JUDGE MAYA GUERRA GAMBLE

---

[1]     Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image, and includes still and moving picture photographic equipment and video equipment.

[2]     Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape and cassette sound recorders, and radio and video equipment.

**<u>AGREED AS TO FORM AND SUBSTANCE:</u>**

*<u>/s/ Mark Bankston (w/ permission JAR)</u>*
Mark Bankston
*Counsel for Plaintiffs*

*<u>/s/ Brad Reeves (w/ permission JAR)</u>*
Brad Reeves
*Counsel for Defendants*

*<u>/s/ Joshua A. Romero</u>*
Joshua A. Romero
*Counsel for Amos Pictures*

29530896v.2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55490948
Status as of 7/19/2021 10:00 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/19/2021 4:33:06 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 7/19/2021 4:33:06 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/19/2021 4:33:06 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/19/2021 4:33:06 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/19/2021 4:33:06 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/19/2021 4:33:06 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/19/2021 4:33:06 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 7/19/2021 4:33:06 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55490948
Status as of 7/19/2021 10:00 PM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

7/23/2021 2:02 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Chloe Jimenez**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO MOTION FOR PRO HAC VICE ADMISSION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

LEGAL STANDARD ..............................................................................................................3

    I.     There is a Lower Standard for Application than for Revocation.............3

    II.    Trial Courts have Wide Discretion to Assess Reputability and
          Unlawyerlike Conduct....................................................................................3

PROCEDURAL BACKGROUND ...........................................................................................4

    I.     Mr. Randazza's Applications in *Lafferty* in 2019 and 2020 ......................4

    II.    Mr. Randazza's Application to the Texas Supreme Court in 2021.........6

HISTORY OF MR. RANDAZZA'S MISCONDUCT ...........................................................8

    I.     Mr. Randazza's Solicitation of Bribes and Destruction of Evidence
          was Revealed in a California Arbitration Proceeding ................................8

          A.    The Arbitrator found Mr. Randazza repeatedly solicited
                 bribes..........................................................................................................9

          B.    The Arbitrator found Mr. Randazza destroyed evidence..........9

          C.    The Arbitrator found numerous other ethical violations ......10

          D.    Part of these events also led to State Bar discipline.................11

    II.    Mr. Randazza Offered a Bounty on his Law Licenses to a
          Complaining Witness in a Bar Proceeding ......................................................13

    III.   Mr. Randazza has Trafficked in Wrongfully Obtained Information
          from Litigation Adversaries......................................................................15

    IV.   Mr. Randazza was Lambasted by a Federal Court for
          Misrepresenting Facts...............................................................................16

V.      Mr. Randazza Intimidated an Opponent with Profane Taunts, Violent Threats, and Disturbing Anti-Semitic Harassment ................... 18

VI.     Mr. Randazza Expressed Ethnic Distaste for a Russian Litigation Opponent ..................................................................................................... 20

VII.    Mr. Randazza Made Frivolous Claims of Sexual Harassment Against his own Client ........................................................................... 21

VIII.   Mr. Randazza has Continued his Profane and Abusive Conduct in 2021 Related to this Case ................................................................. 23

        A.      Mr. Randazza casually referenced anal rape in his opening letter to Plaintiffs' counsel ................................................ 23

        B.      Mr. Randazza verbally abused a non-party with vulgar sexist slurs ..................................................................................... 24

        C.      Mr. Randazza's sexist denigration of his opponents is not an isolated occurrence .................................................... 26

IX.     Mr. Randazza's Recent Pro Hac Vice Admissions in Texas are not Compelling ................................................................................ 29

X.      These Lawsuits are Especially Sensitive to Further Misconduct ......... 31

XI.     Comity with the *Lafferty* Court Weighs in Favor of Denial .................... 33

CONCLUSION ......................................................................................................... 34

CERTIFICATE OF SERVICE ...................................................................................... 36

# INTRODUCTION

Plaintiffs Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa are parents of children murdered at Sandy Hook Elementary School. In 2018, each of them filed suit in Texas against Alex Jones and his media organization InfoWars, alleging defamation and intentional infliction of emotional distress relating to InfoWars' five-year campaign to profit from lies told about the circumstances of their children's deaths. A different set of Sandy Hook parents brought a similar lawsuit shortly thereafter which has been simultaneously occurring in a Connecticut case styled *Lafferty v. Jones*.

For over three years, Mr. Jones has made a mockery of this litigation while exercising his right to choose his counsel in the Texas lawsuits on no less than seven occasions. Mr. Jones was initially represented by Austin attorney Randall Wilhite. Mr. Jones was next represented by Dallas attorney Mark Enoch. This was followed by Austin attorneys Michael Burnett and Scott Nytiray. Mr. Jones also received permission for California attorney Robert Barnes to appear pro hac vice. Mr. Barnes was then replaced by Austin attorney T. Wade Jefferies. Mr. Jefferies was then replaced by Austin attorney Brad Reeves. Now, after seven attorneys have appeared in a set of cases riddled with sanctions and bizarre misconduct[1], Mr. Jones seeks to add an explosively controversial Las Vegas attorney named Marc Randazza.

---

[1] InfoWars has been repeatedly sanctioned by the trial court and ordered to pay attorneys' fees totaling $133,000. InfoWars was also separately fined for contempt of court. InfoWars was also sanctioned by the Court of Appeals and ordered to pay $22,250.

Mr. Randazza has already twice applied to appear pro hac vice in the related *Lafferty* case in Connecticut, first in January 2019 and again in July 2020, but he was denied both times due to his recent serious misconduct and state bar disciplinary sanctions. Those decisions in *Lafferty* were correct, and the Court here should rule likewise. This brief sets forth evidence that Mr. Randazza has:

- Solicited bribes from his client's adversaries during litigation.

- Deliberately destroyed evidence.

- Attempted to bribe a witness in a disciplinary proceeding.

- Solicited wrongfully obtained confidential information of litigation adversaries.

- Admitted under oath that he routinely lies to opposing counsel.

- Mismanaged settlement funds under his control.

- Has been chastised by a federal court for misrepresenting facts.

- Screamed violent anti-Semitic threats at a party after a mediation, followed by continuing anti-Semitic harassment online.

- Expressed ethnic distaste for a Russian litigation opponent.

- Made frivolous claims of sexual harassment against his own client.

- Sent a letter to Plaintiff's counsel in this case comparing their actions to anal rape.

- Verbally abused female opponents with vulgar sexist slurs, including a non-party connected to this case.

Appearing pro hac vice is a privilege vested in the broad discretion of the court, and it should be denied where a court has reason to believe an applicant may be

2

detrimental to the fair or efficient administration of justice. Here, Mr. Randazza's alarming history puts the Plaintiffs at risk of further sanctionable misconduct, especially when combined with Defendants' existing history of misconduct in this Court. For all of the reasons discussed below, Plaintiff prays the Court denies Mr. Randazza's application.

## LEGAL STANDARD

### I.  There is a Lower Standard for Application than for Revocation.

There are two important standards relating to pro hac vice admission. Once an attorney is admitted pro hac vice for a particular court, the standard for revocation is high. Revocation requires finding "the non-resident attorney engage[d] in professional misconduct as that term is defined by the State Bar Act." *In re Golden Peanut Company, LLC*, 2018 WL 6616894, at *2 (Tex.App.-Dallas, 2018), quoting Tex. R. Governing Admission to the Bar XIX(e). But where an application is first submitted to a court, the standard is much lower. Not only can the court deny the application if it believes "the non-resident attorney is not a reputable attorney who will observe the ethical standards required of Texas attorneys," but it can also deny the application if "other good cause exists to deny the motion." *Id.*, quoting Tex. R. Governing Admission to the Bar XIX(d).

### II.  Trial Courts have Wide Discretion to Assess Reputability and Unlawyerlike Conduct.

When ruling on a pro hac vice application, the reputability of a non-resident attorneys is addressed to the discretion of the trial court. *See State Bar v. Belli*, 382

S.W.2d 475, 476 (Tex. 1964) (noting "the matter of [applicant's] qualification as 'A reputable nonresident attorney' under Rule X(i) will be addressed to the discretion of the court in which the case is pending."). In denying pro hac vice applications, courts consider a lawyer's past ethical violations, including State Bar actions. Courts also consider conduct which may not rise to the level of revocation, including "unlawyerlike conduct" or "past inappropriate and unprofessional behavior by counsel in other matters." *Kampitch v. Lach*, 405 F.Supp.2d 210, 215-16 (D.R.I. 2005); *see also Panzardi-Alvarez v. U.S.*, 879 F.2d 975, 980 (1st Cir. 1989) ("It is also appropriate, however, for the court to consider the effect of the attorney's past actions (especially past ethical violations)"). Courts should also consider if a lawyer's past behavior has been "uncivilized, and at times unprofessional." *Kohlmayer v. National R.R. Passenger Corp.*, 124 F.Supp.2d 877, 878 (D.N.J. 2000) (Denying application due to "uncivilized behavior in past actions," as well as "belligerent conduct toward opposing counsel."). In this case, Mr. Randazza's background not only includes numerous ethical violations, but also numerous examples of unlawyerlike conduct and abusive behavior.

## PROCEDURAL BACKGROUND

### I.    Mr. Randazza's Applications in *Lafferty* in 2019 and 2020.

When these cases had their initial hearings in 2018, InfoWars was represented by Dallas attorney Mark Enoch. Around that time, Mr. Randazza, a longtime InfoWars commentator, began acting as corporate counsel for InfoWars. Mr. Randazza did not

try to appear in any of the lawsuits, though he occasionally acted as Mr. Jones'
spokesperson. Plaintiffs' counsel met Mr. Randazza on one occasion in the gallery
during the first hearing in the *Pozner* case, and he was polite and friendly. Mr.
Randazza told Plaintiffs' counsel that Mr. Jones would be waiving any claim of fees
against the Sandy Hook parents, which Plaintiffs' counsel took as an honorable
gesture. Plaintiffs' counsel never had any inkling of Mr. Randazza's problematic
history.

However, Mr. Randazza's presence in the Sandy Hook litigation quickly came
to an end when he applied for pro hac vice admission in *Lafferty* but was denied on
January 30, 2019. Judge Barbara Bellis of the Connecticut Superior Court denied his
application "in light of [Randazza's] recent disciplinary history" and "serious
misconduct."[2] That misconduct, described more fully below, involved shocking acts
of bribery, evidence tampering, and false statements. Yet at that time, Plaintiffs'
counsel herein remained unaware of the extent of the controversy surrounding Mr.
Randazza, who had seemed eccentric but harmless compared to InfoWars' other
attorneys. Plaintiffs' counsel never looked into Mr. Randazza since he had never tried
to appear in the Texas cases, and he was soon out of the picture completely.

Surprisingly, a year and a half later, in July 2020, Mr. Randazza again applied
for pro hac vice admission in the *Lafferty* case in Connecticut, arguing that his
disciplinary probation had ended. Judge Bellis again denied his motion, stating:

---

[2] Exhibit 1, January 30, 2019 Order Denying Pro Hac Vice in *Lafferty v. Jones.*

> This court denied Attorney Randazza's application to
> appear pro hac vice on January 30, [2019]. As the court
> indicated on that date, appearing pro hac vice is a privilege,
> not a right. In light of the applicant's recent, serious
> disciplinary history, the court, even having considered the
> current circumstances as set forth in the new application
> and affidavits, declines to extend the privilege of pro hac
> admission to Attorney Randazza.[3]

Following the second denial of his application in *Lafferty,* InfoWars removed

the case to federal court, where Mr. Randazza again applied for pro hac vice

admission, despite Judge Bellis' two rulings.[4] However, the federal court found the

removal was defective, and it granted remand while denying the pro hac vice motion

as moot.[5] InfoWars filed a motion for reconsideration which the court denied.[6]

## II.   Mr. Randazza's Application to the Texas Supreme Court in 2021.

Mr. Randazza's next strategy for inserting himself into the Sandy Hook

litigation occurred took place the following year in March 2021 with a sudden and

unexpected application at the Texas Supreme Court. The Sandy Hook appeals in Texas

had been pending since 2019, long before Mr. Randazza's second attempt to join the

Connecticut case in 2020 or his subsequent third attempt to apply in federal court.

Nonetheless, Mr. Randazza waited to apply for pro hac vice admission in Texas until

a matter of days before InfoWars was due to file a Motion for Rehearing of the Texas

Supreme Court's denial of its appeal. Blindsided, the Plaintiffs requested an extension

---

[3] Exhibit 2, July 7, 2020 Order Denying Pro Hac Vice in *Lafferty v. Jones.*
[4] *See Lafferty v. Jones,* United States District Court for Connecticut, 3:20-cv-01723-JCH, Doc. 34.
[5] *Id.,* Doc. 44.
[6] *Id.,* Doc. 45, Doc. 48.

of time to respond, but given the imminent deadline, the extension was denied and a response remained due in 48 hours. Because the Plaintiffs were unable to meaningfully investigate Mr. Randazza's history and respond, they chose not to oppose pro hac vice admission for the purposes of a motion for rehearing, telling the Supreme Court:

> Without waiving future objections to motions to appear in other courts, and given the limited functional role played by counsel in the context of a rehearing and potential oral argument, as well as the Court's limited time-frame, Respondents will trust in the Court's ability to regulate the counsel before it.[7]

Plaintiffs further stated their reasons for their lack of any objection at that time:

> Respondents have only in the past few days begun to learn about many of the issues surrounding Mr. Randazza's professional history…

> The underlying record and evidence relating to these events is exhaustive, and Respondents do not intend to suggest to any other courts that their lack of opposition here is an endorsement of those events, or that Respondents have fully explored those events.

> It is merely Respondents' belief that the limited activity during a Supreme Court rehearing poses a lowered risk of interference with the administration of justice. Because the parties are not engaged in discovery or other meaningful litigation activities, the Respondents feel less exposed to potential litigation misconduct. The magnitude of the Supreme Court's authority also provides reassurance in this regard.[8]

---

[7] Exhibit 3, February 24, 2021 *Heslin* Response to Pro Hac Vice Motion.
[8] *Id.*

Plaintiffs have now had the opportunity to research the evidence relating to Mr. Randazza's professional history and personal temperament, and it is clear he should not be trusted with the privilege of pro hac vice admission to handle these cases. The facts set forth below make clear that Mr. Randazza is not a reputable attorney, nor will this Court have any assurance he will observe ethical standards. His history of unethical, abusive, anti-Semitic, and sexist conduct shows that granting Mr. Randazza the privilege of pro hac vice admission "may be detrimental to the prompt, fair and efficient administration of justice" and "to the legitimate interests of parties other than the client(s) the lawyer proposes to represent." *See* ABA Model Rule on Pro Hac Vice Admission.[9]

## HISTORY OF MR. RANDAZZA'S MISCONDUCT

## I. Mr. Randazza's Solicitation of Bribes and Destruction of Evidence was Revealed in a California Arbitration Proceeding.

Disturbing revelations about Mr. Randazza's unethical conduct came to light in a California arbitration trial. The underlying misconduct arose when Mr. Randazza was employed as General Counsel for a pornographic film company named Excelsior / Liberty (E/L). The Arbitrator found that while employed by E/L, Mr. Randazza solicited bribes from E/L's litigation adversaries and later destroyed evidence in the ensuing litigation.

---

[9]

https://www.americanbar.org/groups/professional_responsibility/committees_commissions/commission_on_multijurisditional_practice/mjp_comm_iadc3/

## A.   The Arbitrator found Mr. Randazza repeatedly solicited bribes.

A trial was held before Arbitrator Stephen E. Haberfeld, former California federal judge. After hearing from days of witnesses as well as reviewing hundreds of documents and internal emails, the Arbitrator first ruled that Mr. Randazza was guilty of "engaging in negotiations for monetary bribes to be paid to him--- including the 'Oron $75,000' which [his client] noticed without Mr. Randazza's affirmative disclosure of it."[10] The Arbitrator "determined, based on the evidence, that Mr. Randazza solicited the bribe in the first instance, [and] attempted to negotiate with Oron's counsel ways and means whereby it would be concealed from and not become known by E/L."[11] The Arbitrator also found that "he repeatedly engaged in these 'bribe' negotiations."[12] In one such email proposing a payoff from an infringer on his client's pornographic films, Mr. Randazza stated, "If you client wants to keep me personally out of the TNA game, then I think that there needs to be a little gravy for me."[13] Mr. Randazza said "I'm gonna want at least used BMW money."[14]

## B.   The Arbitrator found Mr. Randazza destroyed evidence.

Next, the Arbitrator found that Mr. Randazza was guilty of "ordering and causing the deliberate 'wiping' of his and legal assistant's corporate laptops."[15]

---

[10] Exhibit 4, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.,* p. 14.
[11] *Id.,* p. 7.
[12] *Id.,* p. 14.
[13] Exhibit 5, Email from Marc Randazza to opposing counsel Val Gurvitz, filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, p. 23.
[14] *Id.*
[15] Exhibit 4, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.,* p. 14.

Indeed, Mr. Randazza "admitted deletion of files and other legal information via multiple wipings of company-owned computers."[16] As such, the Arbitrator found that "Mr. Randazza committed spoliation of evidence."[17] Even worse, the evidence spoiliated by Mr. Randazza was owned by his adversary.

## C.  The Arbitrator found numerous other ethical violations.

The Arbitrator also found an ethical violation in "Mr. Randazza's continuing and undisclosed (and thus unconsented-to) legal work for clients (*e.g.,* Bang Bros., XVideos, XNXX, Porn Garian, Titan Media, Kink), whose interests were actually and potentially adverse to E/L's interests."[18] In other words, while Mr. Randazza was working for E/L supposedly pursuing infringers of E/L's pornographic films, Mr. Randazza was accepting money from those very infringers.

For example, XVideos was a company that operated a "tube site" allowing visitors to watch pornographic videos at no cost. Infringement of E/L's films was common on these websites. E/L executives sent an email to Mr. Randazza directing him to infringing links hosted on XVideos.com, asking Randazza, "Can we go after them?"[19] Instead, Randazza talked his employers out of suing "this *particular* tube site," telling them XVideos was "actually the poster child for tube sites that behave."[20] However, Mr. Randazza failed to tell his employers he was accepting money to

---

[16] *Id.,* p. 15.
[17] *Id.,* p. 17.
[18] *Id.*
[19] Exhibit 6, Randazza Email regarding XVideos, filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10.
[20] *Id.*

represent XVideos, which they only discovered two years later.[21] Upon discovering the cover-up, an E/L executive wryly noted, "Oh, and it is also an ethical problem because Marc is the attorney for this *particular* tube site?"[22]

Furthermore, the Arbitrator found "Mr. Randazza was unjustly enriched in the amount of $60,000...in connection with Mr. Randazza's ostensibly pro bono representation in connection with the so-called *Righthaven* cases."[23] Mr. Randazza concealed his payments on these cases from E/L. The Arbitrator also found Mr. Randazza was guilty of "taking control for his personal benefit of, and refusing to relinquish control over, Oron settlement funds --- all of which ought to have been for the benefit and under the direction and control of his principals/clients E/L, before and after the end of his employment and representations on behalf of E/L."[24] Finally, Mr. Randazza testified during the arbitration that he "routinely lied" to opposing counsel.[25]

### D. Part of these events also led to State Bar discipline.

Prior to the arbitration trial, a complaint made by E/L relating to some of the events above was submitted to the State Bar of Nevada, beginning a disciplinary proceeding that ultimately resulted in the severe sanctions disclosed in Mr. Randazza's application. This was followed by bar actions in other jurisdictions. Yet as

---

[21] *Id.*
[22] *Id.*
[23] Exhibit 4, Interim Arbitration Award in *Randazza v. Exclesior Media Corp., et al.,* p. 18.
[24] *Id.,* p. 14.
[25] *Id.,* p. 7.

shown in the Arbitrator's ruling, the situation was even worse than a review of the state bar actions would initially suggest.

As noted in the later Arbitration trial, "the [Nevada] State Bar did not reach the merits of E/L's grievance."[26] The sanction was the result of a negotiated plea. Furthermore, the state bar did not explore the matters being litigated in the arbitration. The Arbitrator noted that "the Nevada State Bar closed its file with an express statement that it has 'no authority to take any action which could affect the outcome of any civil disputes or litigation.'"[27] Moreover, the Arbitrator noted "many of the issues and much of the evidence presented in this arbitration (identities of represented entities, retainer and billing records, emails, etc.) was not available to be presented by E/L in support of its grievance."[28] The Arbitrator also found that "Mr. Randazza's credibility was also undermined by the variance between his testimony…and his written Nevada State Bar Submission."[29]

Mr. Randazza was later subject to another bar proceeding in Florida which found multiple violations of Florida Bar Rules, but the discipline would have likely been even more severe had the Florida Referee been able to rely on the arbitration proceeding. However, like the Nevada Bar action, evidence from the arbitration was not presented to the Florida Referee.[30] In addition, the Florida Referee noted he while

---

[26] *Id.*, p. 17.
[27] *Id.,* p. 18.
[28] *Id.*
[29] *Id.,* p. 6.
[30] *See* Randazza Pro Hac Vice Motion, Exhibit 2, p. 5.

he was "sympathetic to the amount of time, energy and money that Respondent's employers spent to litigate the IAA issues," he could not rely directly on the arbitration ruling itself because "the burden of proof for the IAA is a preponderance of the evidence, not the clear and convincing standard as required by these proceedings."[31] Yet here, in a pro hac vice admission, the standard is much lower, since the Court has wide discretion when assessing reputability and granting that privilege. *See State Bar v. Belli*, 382 S.W.2d 475, 476 (Tex. 1964) (whether an applicant is "reputable" is "addressed to the discretion of the court."). The events set forth in the Arbitration decision provide good cause for the Court to deny admission.

In his application to this Court, Mr. Randazza claims that "Movant now recognizes where he misunderstood his ethical obligations,"[32] as if he failed to understand his ethical obligations at the time. Yet given the evidence in this motion, it would be impossible for an attorney to not understand that their conduct exceeded ethical bounds.

## II. Mr. Randazza Offered a Bounty on his Law Licenses to a Complaining Witness in a Bar Proceeding.

After the Arbitration was completed, news website *Ars Technica* later published an email showing that Mr. Randazza authorized a highly unethical offer to Excelsior/Liberty when bar proceedings appeared imminent. The email shows that as part of a settlement offer with E/L, Mr. Randazza offered to pay $20,000 for each

---

[31] *Id.*
[32] *See* Randazza's Motion for Pro Hac Vice Admission, p. 3.

of his bar licenses that wasn't suspended or revoked. In other words, Randazza was extending a bribe in which E/L would be financially motivated not to cooperate with the state bar associations. Mr. Randazza's counsel relayed the offer as follows: "Upon the conclusion of disciplinary proceedings (if any) or within one (1) year, Marc [Randazza] would pay an additional $20,000.00 for each license kept wherein he wasn't suspended or disbarred."[33]

It seems this offer was rejected. Yet the parties did later agree to request a vacatur of the arbitration award upon payment of a cash settlement. But as the Arbitrator noted, these troubling events can never be wiped clean:

> The requested vacatur of the Interim Arbitration Award on the merits sought by the settling parties in the joint request appears to be based solely on vacatur being a condition of settlement, and further appears to bear the earmarks of an attempted erasure of carefully and soundly arrived-at arbitral determinations, proven by [E/L] on matters infused with the public interest — including strong public policy to protect the public and respect for the legal profession.[34]

In his order, the Arbitrator noted there was no way "to render 'null, void and of no legal effect' serious misconduct by Mr. Randazza, in violation of his professional ethical duties."[35] The Arbitrator noted that any other result would "vitiate and

---

[33] Exhibit 7, Randazza settlement offer email published in the February 12, 2016 article in *Ars Technica* entitled "Embattled Copyright Lawyer Uses DMCA to Remove Article About Himself." The article is available at: https://arstechnica.com/tech-policy/2016/02/embattled-copyright-lawyer-uses-dmca-to-remove-article-about-himself

[34] Exhibit 8, Arbitrator's Order to Show Cause, p. 2, filed in *In re Marc John Randazza,* U.S. Bankruptcy Court for the District of Nevada, No. 15-14956-ABL, Doc. 246.

[35] *Id.*

suppress both truth and protection of future victims and the public."[36] Mr. Randazza's

pro hac vice application in this case is precisely the kind of event contemplated by the

Arbitrator when emphasizing the future importance of those findings.

## III.    Mr. Randazza has Trafficked in Wrongfully Obtained Information from Litigation Adversaries.

Mr. Randazza has also shown he is willing to cross ethical lines in obtaining

confidential information from his opponents. One such episode occurred when Mr.

Randazza was pursuing a file-sharing company. During that lawsuit, Mr. Randazza

acquired pilfered confidential information about his opponent's business from a

photographer named James Grady who assisted in Randazza's case against the file-

sharing company.

In an email, Grady told Randazza that he "pay[s] a guy – call him a forensic

investigator" who was able to gain access to confidential information from the target

company, including "corporate papers" and "emails."[37] Grady made it clear the

information was not legitimately obtained, telling Randazza that his source "didn't get

the info at Walmart in the course of normal commerce."[38] In a later email, Randazza

asked Grady to testify, but told him, "I need you to consider what happens if the judge

wants to know where you got your information."[39] While Randazza wanted Grady to

have an answer ready for the judge, Randazza didn't care if the information was

---

[36] *Id.*

[37] Exhibit 9, Emails between Randazza and James Grady filed in in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, p. 1.

[38] *Id.*

[39] *Id*, p. 3.

obtained in violation of ethical rules. Randazza told Grady that if the information came from a "disgruntled Oron employee" or a "jilted lover" with access to the company's confidential documents, he felt that was "great."[40]

Likewise, the findings from the Arbitration confirm Mr. Randazza trafficking in pilfered information. During the Excelsior/Liberty trial, the Arbitrator found evidence of "Mr. Randazza's assisting Datatech, including via forwarding fruits of a disclosed (unnamed) computer hacker."[41] In doing so, Mr. Randazza was "[k]nowingly forwarding illegally 'hacked' computer data to counsel for another company."[42] These events provide good cause to deny the application.

## IV. Mr. Randazza was Lambasted by a Utah Federal Court for Misrepresenting Facts.

Frustration with Mr. Randazza became apparent in *Purple Innovation, LLC v. Honest Reviews, LLC.* In that case, Ryan Monahan ran a website called Honest Mattress Reviews on which he claimed that mattresses made by Purple Innovation contained a cancer-causing powder. Purple Innovation sued Monahan, and it accused him of working for Purple's competitor. Mr. Randazza defended Monahan before a Utah federal court. The court described Mr. Randazza's representations about the case as follows:

> Mr. Randazza repeatedly referred to Monahan as a "consumer journalist" and "consumer reporter", even asserting that the court did not have authority to find

---

[40] *Id.*

[41] Exhibit 4, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.*, p. 18.

[42] *Id.*, p. 8.

> otherwise. He referred to the HMR site as a "consumer
> journalist publication just like Consumer Reports." With
> respect to the allegation that Monahan was, in fact, closely
> affiliated with [the competitor], Mr. Randazza stated: "if we
> believe this entire conspiracy that this whole thing was
> cooked up back in October to be a shadow marketing
> campaign for [the competitor], that would require a degree
> of creativity and just a degree of plotting that even
> Alexander Dumas could not have imagined when he wrote
> *The Count of Monte Cristo*" and stated that "these fantasies
> are probably best used in fiction."

*Purple Innovation, LLC v. Honest Reviews, LLC*, 2018 WL 840035, at *3 (D.Utah, 2018).

However, testimony from a witness appeared to confirm Monahan was being paid by

the competitor. In response, Mr. Randazza claimed he would prove the witness was

lying, stating, "I realize if you look at Ms. Anderson's declaration, boy, that looks really

compelling. It is lies. I am going to prove it is lies. I hope that there will be sanctions

when it shows that it is lies. I hope she'll be charged with perjury when I can show

she has lied." *Id.* at *4.

The court held a hearing, but it noted that "Mr. Randazza did not attend the

hearing to cross-examine Ms. Anderson, despite his confident assertions that he

would expose Ms. Anderson as a liar." *Id.* at *5. Instead, facts arose in the hearing

which made it obvious that Mr. Randazza and his clients had misled the court. As such,

the court found Mr. Randazza and his clients had interfered with the judicial process,

and that their interference was not inadvertent:

> The court also finds that the degree of interference with the
> judicial process here was substantial. Defendants and their
> counsel adamantly defended misleading representations that
> Monahan and [the competitor] had no meaningful association

> and that Monahan was a consumer journalist entitled to the
> fullest possible protection of the First Amendment. They
> vigorously asserted those misrepresentations even after the
> court received Ms. Anderson's declaration...[T]he court does
> not agree that these material misrepresentations were merely
> inadvertent missteps. Monahan, Werner, and counsel for each
> were given numerous opportunities in several hearings prior
> to the September 16 Evidentiary Hearing to correct and clarify
> their previous, misleading testimony.

*Id.* at *6. The court's opinion chastised this conduct, noting "[i]t is expected and

presumed that parties and their counsel will not knowingly misrepresent material

facts to the court." *Id.*

## V.     Mr. Randazza Intimidated an Opponent with Profane Taunts, Violent Threats, and Disturbing Anti-Semitic Harassment.

In another "online review" case, Mr. Randazza came to represent an

anonymous operator of a social media account who was publishing allegedly

defamatory statements about Roca Labs, a food additives company. Mr. Randazza's

harassment began with profane taunts, such as the tweet below.[43]



---

[43] Exhibit 10, Complaint in *Roca Labs v. Randazza*, p. 8.

Yet Mr. Randazza's harassment soon intensified. Mr. Randazza's opposing counsel gave a sworn declaration about violent anti-Semitic threats witnessed by the client and a mediator, as well as Randazza's continuing anti-Semitic harassment online:

> After the conclusion of mediation outside the building Mr. Randazza became enraged at Don Juravin and myself. Mr. Randazza screamed, threatened, and berated the undersigned and my client without provocation. He screamed at both of us and threatened violence against both Mr. Juravin and myself. He threatened to beat me up and send Mr. Juravin to the Gaza Strip. Mr. Juravin is Jewish and his family lives in Israel. After screaming and berating Mr. Juarvin and myself for several minutes Mr. Randazza walked to his vehicle and proceeded as if he was leaving (screaming curses at us as he left).

> Rather than driving away, he stopped his vehicle, got out of the car and began to scream at Mr. Juravin and myself and made more threats of violence against us. He stated that he would ruin Mr. Juravin and sue him for millions of dollars. He then drove off in his car. The mediator, Mr. Michael Kahn, Esq., a Member of the Florida Bar (482 N. Harbor City Blvd., Melborne, FL 32935 Tel. 321-242-2564) witnessed the entire event.

> Mr. Randazza posted a blog on his website with the Hebrew phrase מעבדות רוקה נפגעות מאוד (translation: "Roca Labs is very hurt"). The message was directed specifically at Mr. Juravin and was more hate speech. A brief search of Mr. Randazza's hundreds of blog posts failed to find any other titles written in Hebrew.

> During a conference call Mr. Randazza repeatedly berated the undersigned, calling me an idiot, stupid and a "sorority girl."[44]

---

[44] Exhibit 11, Declaration from Roca Labs counsel, p. 7.

## VI.  Mr. Randazza Expressed Ethnic Distaste for his Russian Adversary.

The Roca Labs suit was not the only time that Mr. Randazza's ethnic distaste

for his adversary has been documented. Emails filed during bankruptcy litigation

showed Mr. Randazza's hostility toward his Russian opponents in a file-sharing

lawsuit. In one email, Randazza stated:

> I asked that mother fucker point blank today to assure
> me that the delays would not be used to move
> anything. Fuck him and his shit bag russian asshole
> clients.[45]

Mr. Randazza's anti-Semitic and anti-Russian sentiments are especially

worrisome in these lawsuits because Sandy Hook parents Leonard Pozner and

Veronique De La Rosa are both Jews, and Mr. Pozner is a first-generation Russian-

American, born in Latvia. Both are extremely disturbed at the prospect of Mr.

Randazza's participation in this litigation. Ms. De La Rosa has submitted a declaration

explaining her feelings:

> I was highly alarmed to learn that an attorney who
> engaged in anti-Semitic harassment might be given
> the right to appear in our case. I am very worried by
> the idea that an attorney who used the Hebrew
> language to publicly harass a Jewish opponent might
> be in control of my personal information, or that I
> might have to face him while answering his questions
> in a deposition. Also, after reading about the violent
> anti-Semitic threats I saw described in a statement by
> a Florida lawyer, I have a great deal of anxiety about
> having to encounter this man. Much of the harassment
> my ex-husband and I have faced in the years following

---

[45] Exhibit 12, Email regarding Russian opponents filed in in *Randazza v Excelsior*, U.S. Bankruptcy
Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10.

> Sandy Hook has been anti-Semitic in nature, and I do
> not relish the idea of having to face it in this lawsuit. I
> also do not trust this man will treat us fairly.[46]

These concerns are shared by Mr. Pozner, Mr. Heslin and Ms. Lewis, all of whom

are extremely disturbed at the possibility of Mr. Randazza's involvement.

## VII. Mr. Randazza Made Frivolous Claims of Sexual Harassment Against his own Client.

During the E/L litigation, Mr. Randazza retaliated against his client by making

frivolous claims that he was sexually harassed. The Arbitrator noted that "since the

outset of the arbitration, Mr. Randazza made highly-charged, sexually-based 'core

allegations' and his claimed strong reactions to them," but their frivolous nature

"undermined and impaired Mr. Randazza's credibility concerning all of his testimony

and his claims and related contentions."[47]

Mr. Randazza first made a harassment claim "concerning the pornographic

filming in his offices."[48] However, it turned out there was evidence that Mr. Randazza

"had advance notice of the filming of a pornographic video in his office."[49] Evidence

revealed a "playful exchange of texts between Messrs. Randazza and Gideon

concerning the intended shoot,"[50] in which the Arbitrator noted that "Mr. Randazza

texted, in a crude possible sexual/legal double entendre, 'Don't jizz on my briefs.'"[51]

---

[46] Exhibit 20, Declaration of Veronique De La Rosa.
[47] Exhibit 4, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.,* p. 6.
[48] *Id.,* p. 10.
[49] *Id.*
[50] *Id.,* p. 11.
[51] *Id.,* p. 10, n. 7.

When the director told Mr. Randazza that a female performer "squirted all over your desk & floor," Mr. Randazza perversely retorted, "I don't want it cleaned up."[52] Yet Mr. Randazza initially claimed the film shoot was actionable sexual harassment.

Mr. Randazza also falsely claimed that his employers harassed him by exposing him to homosexual acts, including witnessing "a homosexual oral copulation allegedly performed by [two E/L executives] in the backseat of Mr. Randazza's car, which allegedly greatly upset Mr. Randazza."[53] Again, this event, "which the evidence shows did not occur as alleged, was not strongly or even negatively reacted to by Mr. Randazza as initially alleged."[54] The Arbitrator found evidence showing that Mr. Randazza was not "offended by any of the sexually related conduct of which he has complained" and that he "was not in any way uncomfortable" with the sexual activities of his employer.[55] The ruling notes there was "frequent seasoning of business and socially related conversation and written communications with crude gay and other sexual terms," and that "Mr. Randazza was not embarrassed to be seen or filmed in full undress at a poolside business-social event at [the CEO's] home."[56] The evidence showed Mr. Randazza's false harassment claim "was made primarily for tactical reasons."[57] Mr. Randazza's tactical accusations, which cheapened and

---

[52] Exhibit 16, Randazza texts from Arbitration Proceedings, filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-9.
[53] Exhibit 4, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.,* p. 5.
[54] *Id.*
[55] *Id.*, p. 9.
[56] *Id.*, p. 10.
[57] *Id.,* p. 11.

demeaned the very concept of sexual harassment, further undermine Mr. Randazza's reputability.

## VIII.  Mr. Randazza has Continued his Profane and Abusive Conduct in 2021 Related to this Case.

Mr. Randazza's profane and abusive conduct is not limited to his past. That same conduct has already revealed itself since he suddenly arrived[58] in the Texas cases in 2021.

### A.  Mr. Randazza casually referenced anal rape in his opening letter to Plaintiffs' counsel.

In Mr. Randazza's initial letter in 2021, he criticized a pleading filed by Plaintiff's counsel by using a metaphor comparing the pleading to anal rape. Mr. Randazza told Plaintiff's counsel Mark Bankston and Bill Ogden that their pleading was "like if you asked a date for consent to fuck her, and then you went right for anal."[59] There is nothing in Mr. Randazza and Mr. Bankston's limited history that would suggest a sexual assault metaphor would be warmly received, and Mr. Randazza has never even spoken to Mr. Ogden. It is worth noting that Mr. Randazza's casual reference to anal rape was made in the context of an email in which he was trying to be nice.

---

[58] Over the past months, Defendants have conferred several times stating they were filing a pro hac vice motion for Randazza, but each time they did not file the motion. Instead, InfoWars' counsel stated, "[Randazza] will soon be admitted PHV. *I have simply held off on filing the motions because it irks you so much*." *See* Exhibit 17, June 24, 2021 Email re: application.

[59] Exhibit 13, February 24, 2021 email from Marc Randazza.

## B.     Mr. Randazza verbally abused a non-party with vulgar sexist slurs.

When Mr. Randazza isn't trying to be nice, he can be extremely abusive. On March 17, 2021, Mr. Randazza maliciously harassed a non-party who is connected to these cases, calling her "a fucking cunt," "a fucking liar," and "fucking bitch liar" during a phone conference.[60] The phone conference also included a plaintiff in an unrelated case who confirms Mr. Randazza's attacks. The situation arose as follows.

Alexandrea Merrell is the President on Orndee Public Relations based in New York.[61] In her work, Mr. Merrell often assists people struggling with online defamation.[62] One such individual she is assisting is Mike Postle, a professional poker player accused of cheating.[63] For several weeks, Ms. Merrell had been "contacting attorneys to see if they are interested in bringing a defamation case based on that smear campaign."[64] In early March 2021, Ms. Merrell called Mark Bankston, plaintiffs' counsel in this case, who she met after Mr. Bankston came to represent Sandy Hook parents. "Because of [Ms. Merrell's] work with some of the Sandy Hook families in fighting online abuse, [she] knew Mr. Bankston handled these kind of defamation cases."[65] Ms. Merrell and Mr. Bankston discussed the poker case, but Ms. Merrell "did not disclose Mr. Postle's name."[66] Ms. Merrell was told by Mr. Bankston "he was

---

[60] Exhibit 14, Declaration of Alexandrea Merrill, para. 13.
[61] *Id.,* para. 2.
[62] *Id.,* para. 3.
[63] *Id.,* para. 5.
[64] *Id.,* para. 7.
[65] *Id.,* para. 8.
[66] *Id.,* para. 9.

interested in the facts and that once he had researched some legal issues he would like to talk to the client."[67]

By happenstance, "Marc Randazza represents one of the individuals who is alleged to have defamed Mr. Postle."[68] Mr. Postle remained unrepresented. On March 17, 2021, Mr. Postle and Ms. Merrell had a phone conversation with Mr. Randazza. Ms. Merrell told Mr. Randazza that they "had approached Mr. Bankston and that he would hopefully be appearing in the near future."[69] Minutes later, Mr. Randazza called Ms. Merrell and Mr. Postle back, stating that "he had called Mr. Bankston and that Mr. Bankston denied any intention to make an appearance for Mr. Postle."[70]

Ms. Merrell states in her Declaration that "Mr. Randazza was astonishingly abusive and profane during this call."[71] During the call, Mr. Randazza called her "a fucking cunt," "a fucking liar," and "fucking bitch liar."[72] He told Ms. Merrell to "shut the fuck up and let the big boys talk."[73] Mr. Postle confirms these statements by Mr. Randazza in his Declaration as well.[74] Mr. Randazza's statement about his call with Mr. Bankston was true, as Mr. Bankston never knew Mike Postle's name and believed Mr. Randazza was referring to a different matter. Mr. Bankston ultimately chose not to represent Mr. Postle, but he had not yet reached that decision at the time of these

---

[67] *Id.*
[68] *Id.,* para. 6.
[69] *Id.,* para. 10.
[70] *Id.,* para. 11.
[71] *Id.*, para. 12.
[72] *Id.,* para. 13.
[73] *Id.,* para. 14.
[74] Exhibit 15, Declaration of Mike Postle, para. 4-6.

events. It short, Mr. Randazza profanely berated Ms. Merrell over a simple misunderstanding.

Ms. Merrell stated that she is used to dealing with lawyers and law enforcement, and that she is "no stranger to colorful language, crude humor, and the occasional aggressive confrontation. But what Mr. Randazza did was truly upsetting."[75] Ms. Merrell also stated that she was "also extremely disturbed that his abuse and his insult of 'fucking cunt' was meant to demean and disgrace [her] as a woman."[76] At the time of the events, Mr. Randazza knew that Ms. Merrill also does work for HONR Network, the non-profit organization founded by Sandy Hook parent Leonard Pozner, plaintiff in these cases.[77]

### C.  Mr. Randazza's sexist denigration of his opponents is not an isolated occurrence.

Mr. Randazza's use of sexist insults for his litigation adversaries was also confirmed when Mr. Randazza casually used the same sexist slur to insult another opponent in front of a Buzzfeed interviewer. As described in the Buzzfeed interview:

> While we were sitting in his office last month, Randazza received a call from Dennis Hof, the Nevada pimp who is the Republican candidate for state legislature in his district. Nye County had just revoked Hof's brothel license, which Randazza said was an act of political retribution. On the call, Randazza referred repeatedly to a county employee as a "cunt," as the men plotted how to take revenge. "I'm going

---

[75] *Id.,* para. 15.

[76] *Id.,* para. 16.

[77] Mr. Randazza gave a statement to a poker website acknowledging Ms. Merrill's work at HONR. *See* https://www.pokertube.com/article/mike-postle-case-update-veronica-brill-defense-attorney-marc-randazza-provides-statement-on-honr-network-involvement

to bring the fist of fury and I'm not going to cover it in the
most comfortable lubricant, Dennis," Randazza said.[78]

In a 2016 interview, Randazza bragged about an incident in law school in which
his crude campaign posters for Student Bar Association, which discussed hitting a
"penis with a sledgehammer," upset members of the Women's Legal Alliance (WLA).[79]
In his interview, Randazza bragged that following a WLA complaint to the dean, "the
WLA cow had to apologize to *me*."[80]

Mr. Randazza has often invoked Lenny Bruce in saying that he champions the
right to use the word "fuck" because otherwise you cannot say "fuck the
government."[81]  Plaintiffs' attorneys share this view. But the same cannot be said of
sexist slurs, which are only deployed to shame and humiliate women, not institutions.
There is no bravery in calling a woman a cow, or in using a craven slur, and certainly
no professional honor. While lay individuals are free to use whatever language they
please, the malicious use of foul sexist slurs to denigrate opponents is unlawyerlike
conduct.

---

[78] Exhibit 18, Joseph Bernstein. "Meet The Lawyer Fighting To Keep Nazis And Trolls On Twitter."
*Buzzfeed News*, September 21, 2018. Also available at:
https://www.buzzfeednews.com/article/josephbernstein/meet-the-free-speech-lawyer-fighting-to-keep-nazis-and

Mr. Randazza has proudly promoted the Buzzfeed interview:
https://randazza.wordpress.com/2018/11/01/buzzfeed-news-profiles-marc-randazza-and-explores-his-high-profile-controversial-cases/

[79] Exhibit 19, February 17, 2016 Interview with Marc Randazza. Also available at:
https://blog.simplejustice.us/2016/02/17/cross-marc-randazza-first-amendment-badass/

[80] *Id.* (emphasis in original).
[81] *Id.*

These events provide good cause to "find that the admission of an out of state attorney pro hac vice is fraught with potential abusive misconduct." *Collins v. Collins,* 2020 OK CIV APP 65, ¶ 32, 481 P.3d 270, 277. As noted in *Kohlmayer*, "[g]eneral uncivilized or 'unlawyerlylike' conduct may not constitute a technical violation of the ethical rules, but such conduct is a stain on the legal profession and often delays the judicial process." *Kohlmayer*, 124 F.Supp.2d at 879. Courts "can, and must, consider the character of an applicant and his or her record of civility when determining whether to grant pro hac vice status." *Id.* at 882-83. "Where a court is made aware of a pattern of ... behavior by an attorney, bordering on the unethical, which has resulted in the waste of judicial time in the past, it must have discretion to deny the otherwise leniently granted pro hac vice applications in the interest of judicial economy." *Id.* Here, not only has Mr. Randazza committed numerous ethical violations, but his unlawyerlike conduct also weighs heavily against admission.

Denial of the application in such circumstances is especially appropriate when the party has shown the ability to secure other representation. *See, e.g., Meschi v. Iverson*, 805 N.E.2d 72, 75, 60 Mass.App.Ct. 678, 682 (2004) (Application properly denied where out-of-state counsel's past conduct had "skated perilously close to the line" of violating an ethical rule, and where in-state counsel had already appeared); *Mike Woods v. On Baldwin Pond, LLC*, 2014 WL 12625077, at *2 (M.D.Fla. 2014) (Noting that although "the Court [did] not find that the conduct here amounts to an ethical violation," it was nonetheless proper to deny the application, especially "in

view of the appearance of existing counsel."); *PCG Trading, LLC v. Seyfarth Shaw*, LLP, 460 Mass. 265, 276, 951 N.E.2d 315, 322 (2011) (Finding that "adequate representation by existing counsel, when combined with the already extended procedural history of this case, may have reasonably prompted the judge to deny the motion."). Here, Defendants are represented by in-state counsel, and they already exercised the opportunity to chose their counsel on seven prior occasions.

## IX. Mr. Randazza's Unopposed Pro Hac Vice Admissions are not Compelling.

Mr. Randazza is likely to trumpet the recent cases where has been admitted in the Western District of Texas, but these admissions are not compelling, as none of the motions were opposed or involved the facts now before this Court. "Although discretion in the matter of pro hac vice admission is formally vested in the trial judge, in practice admission becomes an issue primarily because the opposing party makes it one." GDMULTILIT § 4:6, Guide to Multistate Litigation, *Denial of pro hac vice admission*. Where the opposing party does not oppose the request, such motions are liberally granted.

For example, on April 5, 2019, Mr. Randazza applied for pro hac vice admission in the Western District of Texas in *Corsi v. InfoWars*,[82] and on May 21, 2020, he applied for admission in a pair of copyright claims, *Farrington v. Infowars*[83] and *Mustard v.*

---

[82] 1:20-CV-00298.
[83] 1:20-CV-00332.

*InfoWars.*[84] In those cases, his admission was not opposed. In *Corsi,* Mr. Randazza's opposing counsel was Larry Klayman. Mr. Klayman is a notorious vexatious litigator known for filing a frivolous petition to have President Barack Obama deported.[85] Mr. Klayman's outrageous conduct frequently leads to sanctions, including a ban from appearing in two courtrooms as well as two suspensions of his law license.[86] Mr. Klayman, a pot, was likely hesitant to call the kettle black. Nor was there any opposition filed in the *Farrington/Mustard* copyright litigation, where the parties were either unaware of the extent of Mr. Randazza's misconduct or predisposed to ignore it.

Finally, Mr. Randazza's eleventh-hour appearance at the Texas Supreme Court in this case and Plaintiffs' lack of opposition holds no weight either, as Mr. Randazza's sudden arrival left the Plaintiffs with no time to research his history and respond. Plaintiffs never had any reason to investigate Mr. Randazza's background until his sudden application caused a response to be due in days. Without the ability to meaningfully respond, Plaintiffs chose not to oppose the application since a Motion for Rehearing did not present any meaningful risk of litigation misconduct. The Rehearing would not involve contact with the Plaintiffs, and there would be no

---

[84] 1:20-CV-00485.

[85] *See* https://en.wikipedia.org/wiki/Larry_Klayman

[86] *See* Nelson, Steven. "Lawyer Who Beat the NSA Files Obama 'Deportation Petition'". *U.S. News & World Report*; *see also* Weisberg, Jacob (June 6, 1998). "Nut Watch: First Larry Klayman sued Hillary Clinton. Now he's suing his mom". *Slate*; Garcia-Roberts, Gus (November 1, 2011). "Riptide: Larry Klayman, Conservative Wingnut Lawyer, Gets Reprimanded By Florida Bar, Is Broke". *Miami New Times*; *In re Bundy*, 840 F.3d 1034, 1046 (9th Cir. 2016) (sanctioning Klayman); *In re Larry Klayman,* No. 18-BG-0100, District of Columbia Court of Appeals (suspending Klayman).

opportunity to commit discovery abuse or substantially damage the proceedings. As such, the application was not opposed, and the Texas Supreme Court never reviewed the facts in this Motion, which Plaintiffs were only beginning to investigate.

One can only speculate how the Texas Supreme Court may have ruled had it reviewed the arbitration findings, the bribes, the destruction of evidence, the pilfered confidential data, the bounty on his law licenses, the frustration of the Utah federal court, the violent threats, the anti-Semitic harassment, the sexist attacks on his opponents, and the history of unlawyerlike conduct. Ultimately, the answer does not matter, since every court has independent authority to regulate admission to the proceedings before it based on the nature and circumstances of that proceeding. The Texas Supreme Court does not and cannot dictate which attorneys must be given the privilege of pro hac vice admission for proceedings in this Court, and a ruling denying Mr. Randazza's admission in this Court does not damage comity with the Texas Supreme Court, which has no interest in this Court's decision.

## X.    These Lawsuits are Especially Sensitive to Further Misconduct.

For over three years, the Sandy Hook lawsuits have been a circus. Mr. Jones has consistently defied the orders of this Court and the Connecticut Superior Court, refusing to participate in these lawsuits in good faith, all while incurring over $150,000 in cumulative sanctions. During that time, Mr. Jones refused to comply with discovery orders on five successive occasions, produced child pornography in discovery, threatened the lives of plaintiffs' counsel, provided false and evasive

discovery responses, submitted a fraudulent affidavit when seeking to avoid

sanctions, and has continuously introduced chaos and insolence into the proceedings,

both in Texas and Connecticut.

The Connecticut Supreme Court has already noted that Mr. Jones "created a

hostile atmosphere that could discourage individuals from participating in the

litigation." *Lafferty v. Jones,* 20327, 2020 WL 4248476, at *13 (Conn. July 23, 2020). In

addition to Mr. Jones' outrageous actions, the Sandy Hook litigation has been plagued

by death threats, including a death threat against the Connecticut judge. As the

Connecticut Supreme Court noted:

> In an order dated June 21, 2019, Judge Barbara Bellis
> stated: "In the interest of full disclosure to all parties, the
> court was contacted by the Connecticut State Police, [which
> was] reportedly contacted by the FBI regarding threats
> against the undersigned [judge] made by individuals on the
> ... Infowars website." In addition, the plaintiffs' counsel also
> represented to the trial court that, as a result of the
> broadcast, they had "since received threats from the
> outside" and even obtained police protection when
> attending the court hearing after the broadcast.

*Id.* at *15. Similarly, undersigned Plaintiffs' counsel has also received death threats in

this case, including a threat against him received by his wife on her cell phone. This

harassment intensified when Mr. Jones's previous pro hac vice attorney made

outrageous statements about Plaintiffs' counsel on Mr. Jones' show. Given the unruly

history of these lawsuits, as well as Mr. Jones' extensive exercise of his right to

counsel, this Court should be especially wary of granting another pro hac vice

admission, especially to an abusive, sexist attorney with an unsavory professional history who has shown ethnic distaste for Plaintiffs' religion and national origin.

## XI.  Comity with the *Lafferty* Court Weighs in Favor of Denial.

The principle of comity is one of cooperation among tribunals of overlapping jurisdiction.[87] Comity favors consideration of the rulings of a fellow tribunal, "not as a rule of law, but rather out of deference or respect." *Guimaraes v. Brann,* 562 S.W.3d 521, 536 (Tex. App.—Houston [1st Dist.] July 24, 2018, pet. denied). "[C]omity is grounded in cooperation and mutuality." *K.D.F. v. Rex,* 878 S.W.2d 589, 594 (Tex. 1994).

In Connecticut, Judge Bellis has twice denied Mr. Randazza's pro hac vice applications, and those rulings were made as part of her efforts to preserve the integrity of the proceedings. Due to the connections between the Texas and Connecticut lawsuits, Mr. Randazza's admission in this Court would undermine Judge Bellis' efforts, harming comity with the *Lafferty* court. Any misconduct in connection with the Texas litigation has a substantial likelihood of prejudicing the *Lafferty* proceedings as well. For this reason, the admission of Mr. Randazza poses potential harm not only to the Texas plaintiffs and this Court, but also the parties and court in Connecticut.

---

[87] Both this Court and the *Lafferty* court have exercised enforcement power over a discovery process that is shared between the lawsuits. Because the suits concern similar subject matter and are occurring on a similar procedural timeline, they are inexorably linked.

## CONCLUSION

Given the troubling and bizarre history up to this point, these cases need a Texas lawyer invested in practicing in this state, or at the very least, an out of state lawyer without a severely blemished ethical record and history of abusive conduct. Here, there is good cause to deny the application when there is evidence that the applying attorney:

- Solicited bribes from his client's adversaries.

- Deliberately destroyed evidence.

- Attempted to bribe a witness in a disciplinary proceeding.

- Solicited wrongfully obtained confidential information of litigation adversaries.

- Admitted under oath he routinely lies to opposing counsel.

- Mismanaged settlement funds under his control.

- Has been chastised by a federal court for knowingly misrepresenting facts.

- Screamed violent anti-Semitic threats at a party after a mediation, followed by continuing anti-Semitic harassment online.

- Expressed ethnic distaste for a Russian litigation opponent.

- Made frivolous claims of sexual harassment against his client.

- Sent a letter to Plaintiff's counsel in this case comparing their actions to anal rape.

- Has a pattern of verbally abusing opponents with vulgar sexist slurs, including a non-party connected to this case.

- Has been twice denied pro hac vice admission in parallel
  Sandy Hook litigation.

The evidence relating to Mr. Randazza's professional history weighs heavily

against admission. A contrary ruling in this case would risk substantial prejudice to

Plaintiffs and undermine the *Lafferty* court. For these reasons, Plaintiffs pray that this

Court denies pro hac vice admission.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

## DECLARATION OF MARK BANKSTON

STATE OF TEXAS    §
                         §
HARRIS COUNTY    §

I, Mark Bankston, declare under penalty of perjury that the following declaration is true and correct and based upon my personal knowledge:

1. My name is Mark Bankston. I am over the age of 18 and competent to make this declaration.

2. I am a partner at the law firm Kaster Lynch Farrar & Ball, LLP, 1117 Herkimer, Houston, Texas 77008. I serve as counsel for the Plaintiffs in the InfoWars defamation cases pending in Travis County.

3. Attached to the foregoing Motion are the following exhibits.

4. Exhibit 1 is a true and correct copy of the January 30, 2019 Order Denying Pro Hac Vice in *Lafferty v. Jones,* Docket No. FBTCV186075078S, Connecticut Superior Court, Judicial District of Fairfield.

5. Exhibit 2 is a true and correct copy of the July 7, 2020 Order Denying Pro Hac Vice in *Lafferty v. Jones,* Docket No. FBTCV186075078S, Connecticut Superior Court, Judicial District of Fairfield.

6. Exhibit 3 is the February 24, 2021 *Heslin* Response to Pro Hac Vice Motion which I drafted and filed in the Texas Supreme Court.

7. Exhibit 4 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 104-1, consisting of the Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.,* JAMS No. 1260002283.

8. Exhibit 5 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, consisting of an email discussion between Marc Randazza and his opposing counsel Val Gurvitz.

9. Exhibit 6 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, consisting of an email discussion between Marc Randazza and his client regarding XVideos.

10.     Exhibit 7 is a copy of an email which was published in the February 12, 2016 article in *Ars Technica* entitled "Embattled Copyright Lawyer Uses DMCA to Remove Article About Himself." The article is available at: https://arstechnica.com/tech-policy/2016/02/embattled-copyright-lawyer-uses-dmca-to-remove-article-about-himself

The email was directly downloaded from: https://cdn.arstechnica.net/wp-content/uploads/2016/02/SettlementOffer.randazza.pdf

11.     Exhibit 8 is a true and correct copy of the Arbitrator's Order to Show Cause from *Randazza v. Exclesior Media Corp., et al*, filed in *In re Marc John Randazza,* U.S. Bankruptcy Court for the District of Nevada, No. 15-14956-ABL, Doc. 246.

12.     Exhibit 9 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, consisting of emails between Marc Randazza and James Grady.

13.     Exhibit 10 is a true and correct copy of an exhibit filed in *Opinion Corp. v. Roca Labs, Inc*., No. 1:14-CV-06396-LGS, in the United States District Court for the Southern District of New York, consisting of the Complaint and Verified Motion for Temporary Injunction filed in *Roca Labs, Inc. v. Marc Randazza,* in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough, Florida.

14.     Exhibit 11 is a true and correct copy of an exhibit filed in *Roca Labs, Inc. v. Consumer Opinion Corp.,* No. 8:14-cv-02096-VMC-EAJ, in the United States District Court for the Middle District of Florida, consisting of a sworn complaint to the Florida Bar filed by attorney Paul Berger.

15.     Exhibit 12 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, consisting of an email from Marc Randazza regarding Russian opponents.

16.     Exhibit 13 is a true and correct copy of a February 24, 2021 email that I was sent by Marc Randazza in this case.

17.     Exhibit 14 is a true and correct copy of a Declaration provided to me by Alexandrea Merrill.

18.     Exhibit 15 is a true and correct copy of a Declaration provided to me by Mike Postle.

19.     Exhibit 16 is a true and correct copy of an exhibit filed in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-9, consisting of Mr. Randazza's texts produced in the Arbitration proceedings.

20.     Exhibit 17 is a true and correct copy of a June 24, 2021 email that I was sent by Defendants' counsel Bradley Reeves.

21.     Exhibit 18 is a true and correct copy of the September 21, 2018 *Buzzfeed News* article entitled "Meet The Lawyer Fighting To Keep Nazis And Trolls On Twitter," which was retrieved from: https://www.buzzfeednews.com/article/josephbernstein/meet-the-free-speech-lawyer-fighting-to-keep-nazis-and

22.     Exhibit 19 is a true and correct copy of a February 17, 2016 Interview with Marc Randazza at the blog *Simple Justice*, which was retrieved from: https://blog.simplejustice.us/2016/02/17/cross-marc-randazza-first-amendment-badass/

23.     Exhibit 20 is a true and correct copy of a Declaration from my client Veronique De La Rosa.


Executed on July 23, 2021 in Harris County, Texas.




_____
MARK D. BANKSTON

# EXHIBIT "1"

ORDER   421277

DOCKET NO: FBTCV186075078S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF FAIRFIELD
    AT BRIDGEPORT

1/30/2019

ORDER

ORDER REGARDING:
01/22/2019 154.00 MOTION FOR PERMISSION TO APPEAR PRO HAC VICE PB 2-16

The foregoing, having been considered by the Court, is hereby:

ORDER: DENIED

The applicant, Attorney Marc Randazza, is currently on a disciplinary probation in the State of Nevada through April of 2020, for serious misconduct. He has been suspended from the practice of law in the State of Nevada for a period of one year, with conditions, and the suspension has been stayed for eighteen months. The State of Arizona entered reciprocal disciplinary orders imposing a concurrent probation and a reprimand. Permission to appear pro hac vice is a privilege, not a right. In light of the applicant's recent disciplinary history, the court declines to extend the privilege of pro hac admission to Attorney Randazza.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

# EXHIBIT "2"

ORDER    421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

7/7/2020

## ORDER

ORDER REGARDING:
07/07/2020 286.00 MOTION FOR PERMISSION TO APPEAR PRO HAC VICE PB 2-16

The foregoing, having been considered by the Court, is hereby:

ORDER:

This court denied Attorney Randazza's application to appear pro hac vice on January 30,2020. As the court indicated on that date, appearing pro hac vice is a privilege, not a right. In light of the applicant's recent, serious disciplinary history, the court, even having considered the current circumstances as set forth in the new application and affidavits, declines to extend the privilege of pro hac admission to Attorney Randazza. While the court did not grant argument on the application, if there are additional facts and circumstances which were not set forth in the new application or affidavits, please file a new request for adjudication, and the court will schedule argument and reconsider the application.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

# EXHIBIT "3"

FILED
20-0835
2/24/2021 1:40 PM
tex-50871517
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# NO. 20-0835

## IN THE SUPREME COURT OF TEXAS

---

ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC,
*Petitioners*

v.

NEIL HESLIN
*Respondent*

---

On Petition for Review from the
Third Court of Appeals at Austin, Texas
No. 03-20-00008-CV

---

## RESPONDENT'S RESPONSE TO *PRO HAC VICE* MOTIONS

---

Mark D. Bankston
State Bar No. 24071066
William R. Ogden
State Bar No. 24073531
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax
mark@fbtrial.com
bill@fbtrial.com

Without waiving future objections to motions to appear in other courts, and given the limited functional role played by counsel in the context of a rehearing and potential oral argument, as well as the Court's limited time-frame, Respondents will trust in the Court's ability to regulate the counsel before it, and they take no position on the motion.

However, for the purposes of the record, Respondents must clarify the following:

1.     This lack of opposition is not intended as taking any position on the merits of the on-going dispute over Mr. Randazza's admission occurring in the Connecticut lawsuit styled *Lafferty v. Jones.*

2.     Respondents have only in the past few days begun to learn about many of the issues surrounding Mr. Randazza's professional history. The issues which have been raised about Mr. Randazza's history include events which later resulted in state bar action as well as events which were beyond the scope of those inquiries.

3.     The underlying record and evidence relating to these events is exhaustive, and Respondents do not intend to suggest to any other courts that their lack of opposition here is an endorsement of those events, or that Respondents have fully explored those events.

4.     It is merely Respondents' belief that the limited activity during a
Supreme Court rehearing poses a lowered risk of interference with the
administration of justice. Because the parties are not engaged in discovery or
other meaningful litigation activities, the Respondents feel less exposed to
potential litigation misconduct. The magnitude of the Supreme Court's
authority also provides reassurance in this regard. Thus, Respondents have
concluded that burdening the Court with additional facts is not proportional to
the immediate needs of this particular proceeding.

5.     As Respondents have stated, they are averse to raising debates
about attorney fitness or entangling the Court in this on-going dispute. Under
the present circumstances, Respondents have decided to forego an opposition,
and they are confident the Supreme Court will safeguard their rights in these
limited proceedings as it best sees fit.

Respectfully submitted,

_____
Mark D. Bankston
State Bar No. 24071066
William R. Ogden
State Bar No. 24073531
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX 77008
713.221.8300 Telephone

713.221.8301 Fax

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24th, 2021 the forgoing document was served upon all counsel of record via electronic service, as follows:

Brad Reeves
Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, TX 78701
Email: brad@brtx.law

T. Wade Jefferies
THE LAW FIRM OF T.WADE JEFFERIES
401 Congress Ave., Suite 1540
Austin, TX 78701
Email: twadejefferies@twj-law.com

David J. Sacks
SACKS LAW FIRM
2323 S. Shepherd, Suite 825
Houston, TX 77019
Email: david@sackslawfirm.com

_____
MARK D. BANKSTON

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below:

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 50871517
Status as of 2/24/2021 1:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/24/2021 1:40:15 PM | SENT |
| Thomas Jefferies | 790962 | twadejefferies@twj-law.com | 2/24/2021 1:40:15 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/24/2021 1:40:15 PM | SENT |
| David JSacks | | david@sackslawfirm.com | 2/24/2021 1:40:15 PM | SENT |
| Shannon Francis | | shannon@twj-law.com | 2/24/2021 1:40:15 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 2/24/2021 1:40:15 PM | SENT |
| Carmen Scott | | camen@fbtrial.com | 2/24/2021 1:40:15 PM | SENT |

# EXHIBIT "4"

Hon. Stephen E. Haberfeld
JAMS
555 W. 5th St. , 32nd Fl.
Los Angeles, CA 90013
Tel: 213-253-9704
Fax: 213-620-0100

Arbitrator

JAMS

| | |
|---|---|
| MARC J. RANDAZZA, | ) JAMS No. 1260002283 |
| Claimant, | ) INTERIM ARBITRATION AWARD |
| v. | ) |
| EXCELSIOR MEDIA CORP., a Nevada Corp.; LIBERTY MEDIA HOLDINGS, LLC, a California limited liability company; and JASON GIBSON, individually | ) |
| Respondents. | ) |

I, THE UNDERSIGNED ARBITRATOR --- in accordance with the arbitration provision in Section 8 of the Contract For Employment Agreement As General Counsel Between Marc J. Randazza and Excelsior Media Corp., dated June 6/10, 2009 ("employment agreement"), and based upon careful consideration of the evidence, the parties' written submissions and applicable law, and good cause appearing --- make the following findings, conclusions, determinations ("determinations") and this Interim Arbitration Award, as follows:

## DETERMINATIONS

1.     The determinations in this Interim Arbitration Award include factual determinations by the Arbitrator, which the Arbitrator has determined to be true and necessary to this award. To the extent that the Arbitrator's determinations differ from any party's positions, that is the result of determinations as to relevance, burden of proof considerations, and the weighing of the evidence.

2.     The Arbitrator has jurisdiction over the subject matter and over the parties to the arbitration which are as follows: Claimant and Counter-Respondent Marc J. Randazza ("Mr. Randazza"), Respondents and Counterclaimants Excelsior Media Corp. ("Excelsior"), Liberty Media Holdings, LLC ("Liberty"), and Respondent Jason Gibson. [1]

3.     On February 9, 10, 11, 12 and 13, 2015, the Arbitrator held in-person evidentiary sessions on the merits of the parties' respective claims, counterclaims and contentions. All witnesses who testified did so under oath and subject to cross-examination. All offered exhibits were received in evidence.

4.     This Interim Arbitration Award is timely rendered. See Order of June 1, 2015.

5.     The following is a summary of the Arbitrator's principal merits determinations:

---

[1] Except as otherwise stated or indicated by context, "E/L" shall be used to reference Excelsior and Liberty, collectively and interchangeably for convenience in this Interim Arbitration Award, only. Nothing should be inferred or implied that there is any determination, or basis for any determination, that either or both of those entities are "alter egos" of Jason Gibson or of any person or entity. Mr. Randazza failed to sustain his burden of proof that either Excelsior or Liberty were or are "alter egos" of Respondent Jason Gideon or of any person or entity. Mr. Gideon will be dismissed as a party in this arbitration. See Interim Arbitration Award, Par. 9, at p. 29, infra.

A.    Mr. Randazza voluntarily ended his employment by Excelsior and Liberty.

B.    Mr. Randazza's employment by Excelsior and Liberty was not involuntarily terminated by Excelsior, Liberty or at all.[2]

C.    Whether or not Mr. Randazza's employment by E/L was terminated voluntarily by Mr. Randazza or involuntarily by E/L, the principal proximate cause for the ending of Mr. Randazza's employment was Mr. Randazza's breaches of fiduciary duty and the covenant of good faith and fair dealing, implied in his employment agreement, as an employee, executive and general counsel of E/L. The precipitating events which led to the end of Mr. Randazza's employment was Mr. Gideon's having first learned on August 13, 2012 that Mr. Randazza had been involved in and successfully concluded negotiations for a bribe in the amount of $75,000, to be paid to Mr. Randazza by the other side in connection with resolution of high-importance litigation, commonly referred to as the "Oron litigation," which had been initiated and pursued on behalf of E/L by Mr. Randazza, as E/L's counsel of record.    The first indication of that was Mr. Gideon's noticing a provision included in an execution copy of an Oron settlement agreement, presented to him for signature by Mr. Randazza on that date, and Mr. Gideon's inquiring of Mr. Randazza about that provision.

After initial contacts with Mr. Randazza concerning what Mr. Gideon discovered in the Oron settlement agreement, communications and relations between Messrs. Gideon and Randazza noticeably chilled during Mr. Randazza's remaining employment, which ended on August 29, 2012.

---

[2] While not accepting Mr. Randazza's "core contentions" concerning the end of his employment by E/L, the Arbitrator agrees with Mr. Randazza's assertion that "The nature of Mr. Randazza's departure from Excelsior is central to several of his causes of action, and crucial to the defenses Respondents raise" — including whether there was a breach of contract, wrongful termination, constructive termination and/or retaliatory termination. Reply at p. 7:12-15. As also stated elsewhere herein, none of those claims were proven.

The chilled relations, including greatly reduced
communication, was in stark contrast with the custom and practice of Messrs.
Gibson and Randazza, practically right up to August 13, 2012, being in regular,
frequent, cordial and occasionally sexually-peppered communication with each
other by face-to-face meetings, texting and emails.

  That Mr. Gideon's reaction was not feigned or a pretext for
anything asserted by Mr. Randazza in his competing narrative are shown by the
following:

  1. A sudden and significant reduction of those
previously primarily electronic (i.e., email and text) communications ---
beginning only after Mr. Gideon learned of the $75,000 bribe --- with
Mr. Randazza sending Mr. Gideon unresponded-to emails attempting to
attempting to salvage and revive his communications and relationship
with Mr. Gideon.

  2. Mr. Randazza beat a hasty retreat, in an attempt to
salvage the situation by offering to pay the bribe money over to E/L, when
initially confronted by Mr. Gideon concerning the "bribe" provision in the <u>Oron</u>
settlement agreement, presented for Mr. Gideon's signature.

  3. Mr. Gideon did not timely sign the execution copy of
the <u>Oron</u> settlement agreement, as negotiated and presented to him by
Mr. Randazza.

  D. The ending of Mr. Randazza's employment E/L was not ---
as contended by Mr. Randazza --- (1) constructive discharge, proximately caused
by Mr. Gibson becoming distant and out-of-communication with Mr. Randazza,
which made it difficult or impossible for Mr. Randazza to get needed
instructions or direction in his employment by E/L as their general counsel,
leading to Mr. Randazza's August 29, 2012 email of resignation from
employment, or (2) retaliatory termination, which was caused by Mr. Randazza's
having "expressed his feelings" of having been "upset, betrayed, offended, and

stressed" anything of a sexual nature whatsoever --- including, as highlighted
during hearing, a pornographic video shot in Mr. Randazza's office in April,
2012 or a homosexual oral copulation allegedly performed by Mr. Gideon and
another E/L executive in the backseat of Mr. Randazza's car, which allegedly
greatly upset Mr. Randazza while he was driving his passengers back from a
party aboard Mr. Gideon's boat on August 9, 2012.

     E.    The immediately foregoing Determination's repeated use of the
word "allegedly" is because it is not necessary to resolve a conflict of evidence as
to whether the alleged sexual act in Mr. Randazza's car actually occurred or the
degree of upset it caused Mr. Randazza, if it actually occurred. That is because
the Arbitrator has determined that --- contrary to Mr. Randazza's central
contentions in this arbitration --- the factual and legal cause of the end of Mr.
Randazza's employment had nothing whatsoever to do with anything having to
do with alleged sexual activity in Mr. Randazza's car --- alone or taken together
with a pornographic shoot which, without dispute, occurred in his office,
without prior notice to Mr. Randazza, but which the evidence shows did not
occur as alleged, was not strongly or even negatively reacted to by Mr. Randazza
as initially alleged and did not, as shot or shown, include a photograph of
Mr. Randazza's family, as initially presented by Mr. Randazza.

      The foregoing determination includes that anything relating to sex
--- including in connection with a filmed video in Mr. Randazza's E/L office or
in the back seat of his car --- had nothing whatsoever to do with any decision ---
which the Arbitrator has determined was neither made or considered ---
to terminate Mr. Randazza's E/L employment. 2012. There was no E/L
contrived pretext or any retaliation by E/L in connection with the cessation of
Mr. Randazza's E/L employment, which was entirely voluntary on

/////
/////

5

Mr. Randazza's part.[3]  For those reasons, the Arbitrator has determined that Mr.
Randazza failed to sustain his burden of proof required to establish his claims of
and relating to anything having to do with sex — e.g., sexual harassment, hostile
work environment, constructive termination, retaliatory termination, etc.

     F.    As stated above — and as picked up and amplified later in the
Determinations portion of this Award — since the outset of the arbitration, Mr.
Randazza made highly-charged, sexually-based "core allegations" and his
claimed strong reactions to them in support of his statutory and contractual
claims, which were in the main disproved or not proved.  That failure of proof
undermined and impaired Mr. Randazza's credibility concerning all of his

/////

/////

/////

testimony and his claims and related contentions.[4]  The evidence established at
hearing was that Mr. Randazza intended that his allegations would induce

---

[3] The same is true with respect to Mr. Randazza's contention(s) that Mr. Gideon's
discovery of Mr. Randazza having been involved with and negotiating a $75,000 "bribe"
in connection with a settlement of the Oron litigation was a pretext for an earlier-formed
intention by Mr. Gideon to end Mr. Randazza's E/L employment.
[4] Mr. Randazza's credibility was also undermined by the variance between his testimony
and positions at hearing and his written Nevada State Bar submission concerning the
Oron litigation $75,000 bribe — including what, if anything, Mr. Gideon knew about it
and when, and who solicited the bribe in the first instance.
   Mr. Randazza's credibility was also undermined by the variance between his
testimony and his EEOC submission.  At hearing, Mr. Randazza admitted that the EEOC
complaint contained errors, but tried to explain them away by saying that he did not
prepare it. That is not a sufficient excuse or explanation, in the circumstances.
   Resolving a credibility-related issue presented in the post-hearing briefs concerning
asserted testimonial evasiveness implied by Mr. Randazza's body positioning and
whether he had eye contact with the Arbitrator (as asserted by Mr. Randazza in his
Reply), throughout his extensive testimony at hearing and primarily on cross-
examination, the Arbitrator observed that Mr. Randazza sat sideways in his chair,
relative to Claimant's counsel's table — with his back to (i.e., 180 degrees away from) his
own counsel and 90 degrees away from Respondent's counsel — albeit with his seated
body positioned toward the part of the wall behind and to Mr. Randazza's left from

Mr. Gideon to authorize a settlement financially favorable to Mr. Randazza,

based on Mr. Randazza's belief at the time --- and ultimately proven incorrect ---

that Mr. Gideon would so settle, rather than have to litigate true or false

allegations relating to his own sexuality, sexual activity, and the pornographic

nature of E/L's business. Mr. Randazza's miscalculation, as aforesaid, led to an

---

where the Arbitrator was seated. Mr. Randazza almost always listened to questions and answered in that position — leaning well forward and looking down or straight ahead into "middle distance" in the direction of the wall behind where the Arbitrator was seated. Mr. Randazza rarely answered a question on cross-examination with sustained eye contact with either the questioning attorney or the Arbitrator.

The Arbitrator has determined, based on the evidence, that Mr. Randazza solicited the bribe in the first instance, attempted to negotiate with Oron's counsel ways and means whereby it would be concealed from and not become known by E/L, and disclosed it to E/L, per Mr. Gideon, for the first time only on August 13, 2012, when the settlement documentation prepared and presented for Mr. Gideon's signature on behalf of E/L by Oron's counsel surfaced a $75,000 retainer payment to Mr. Randazza.

The Arbitrator has further determined that E/L never gave Mr. Randazza permission or consent to solicit, negotiate or accept the $75,000 bribe,* or any bribe or any other payment other than payment of all proceeds being solely for the benefit of and deposited to the account of his clients/principals, E/L.

[*On August 13, 2013, Mr. Gideon handwrote an arrow and "Who gets this" next to the $75,000 payment provision in the copy of the execution copy of the Oron settlement agreement presented to him by Mr. Randazza. The Arbitrator credits that notation as being first notice to and genuine surprise expressed by Mr. Gideon about any Oron settlement payment not being made directly to E/L.

[That notation also was the genesis of a rapid unraveling of the theretofore close professional and personal relationship, symbolized by Mr. Gideon's sharply reducing communications with Mr. Randazza and Mr. Randazza's repeated and ultimately unsuccessful efforts to salvage his situation, by attempting to re-establish direct contact with Mr. Gideon. As previously stated, the Arbitrator has not accepted Mr. Randazza's central contention and narrative that this state of affairs, triggered on August 13, 2012, was manufactured by Mr. Gideon and served as a convenient or other pretext for an earlier-decided termination of Mr. Randazza's employment.]

The Arbitrator has not accepted that E/L's knowledge of or informed consent to any such situation can be implied by non-objection and silence in response to an unspecific, Delphic allusion in one of Mr. Randazza's emails prior to August 13, 2012 or to Mr. Randazza's after-the-fact, self-serving reference to alleged earlier communications, wherein Mr. Randazza claimed in the later email to have "fully disclosed...overtures about that."

In addition, except for admissions, anything which Mr. Randazza and his opposing counsel in the <u>Oron</u> litigation, Val Gurvitz, communicated to each other lacked credibility, because Mr. Randazza testified that he and Mr. Gurvitz routinely lied to each other in their settlement communications.

ultimately successful counterattack by E/L, via counterclaims in this arbitration, centering on ethical and legal challenges to Mr. Randazza's conduct as E/L's general counsel and litigation counsel during his employment by E/L. Mr. Randazza's alleged misconduct consisted of engaging in ethically-prohibited negotiations with adverse parties, including concerning monetary "bribes" to "conflict (Mr. Randazza) out" from future litigation, further damaging E/L's recovery in the <u>Oron</u> litigation by knowingly forwarding illegally "hacked" computer data to counsel for another company, without authorization and in contravention of an E/L settlement agreement, engaging in other prohibited conflicts of interest, including representing competitors of E/L, not disclosing and not obtaining informed written client consents from E/L where actual or potential conflicts of interest arose, working and not disclosing that he was working as a practicing lawyer on non-E/L matters during his employment significantly in excess of what was contractually permitted, spoliation of evidence to cover up the foregoing and his undisclosed intention to resign from E/L's employment, including via planning and causing the deletion of legal files and other relevant data from E/L-owned computers, taking control of client funds, in form of <u>Oron</u> litigation settlement proceeds, and refusing to unconditionally release the same to E/L.

      G.    As stated above, Mr. Randazza voluntarily ended his employment by E/L. The principal evidence of that consisted of (1) Mr. Randazza's August 29, 2012 email to Mr. Gideon, (2) days before sending Mr. Gideon his August 29 email, Mr. Randazza cleaned out his personal belongings from his office, (3) shortly after Noon on August 28 --- and more than 24 hours before sending his August 29 email to Mr. Gideon --- Mr. Randazza had his corporate laptop computer "wiped" the first of four times during his last week of employment, and (4) before that, Mr. Randazza was overheard to say "Fuck this shit, I quit," following a company "happy hour" event.

H.    In his August 29, 2012 email to Mr. Gideon, Mr. Randazza stated that he could no longer represent the Company, i.e., E/L.[5]  In the circumstances then known, Mr. Gideon and other E/L executives with whom he consulted reasonably, and not hastily,[6] concluded from their review of Mr. Randazza's August 29, 2012 email that Mr. Randazza had resigned from his employment. Their conclusion was proven accurate by facts which became known after Mr. Randazza's departure.  Any actions taken by them based on that reasonable belief did not result in any involuntary termination of Mr. Randazza's E/L employment.

I.    The lack of absolute, unquestionable, pristine clarity in     Mr. Randazza's August 29, 2012 carefully worded and crafted email that he    was resigning his employment was deliberate.

J.    In addition to Mr. Randazza's disputed, disproved and unproved allegations of sexual conduct engaged in or authorized by is important evidence which established that Mr. Randazza was not either (1) a target of any discriminatory or conduct which created a hostile work environment, because of his being a heterosexual or "straight" male, or (2) offended by any of the sexually-related conduct of which he has complained.

K.    Prior to and subsequent to agreeing to go "in house" as E/L's general counsel, Mr. Randazza was outside counsel to several companies engaged in Internet pornography, including videos and stills available on openly homosexual websites.  Since at least the date of the commencement of his employment as E/L's inside general counsel through his last day of E/L employment, Mr. Randazza knew of and was not in any way uncomfortable with Mr. Gideon's gay sexual orientation — which was also that of most, but not all,

---

[5] Mr. Randazza also said he could "potentially" work to wind up his E/L pending matters.  The Arbitrator interprets the inclusion of that to be part of Mr. Randazza's crafted effort to both resign and leave open his attempt to engage Mr. Gideon directly.
[6] The Arbitrator has not accepted Mr. Randazza's assertion that "Respondents hastily decided to call that [August 29, 2012 email] a resignation." Mr. Randazza's Reply at p. 7:20-21.

9

of E/L's other executives — and the frequent seasoning of business and socially-related conversation and written communications with crude gay and other sexual terms, references and allusions, which Mr. Randazza also used.[7] Mr. Randazza was not embarrassed to be seen or filmed in full undress at a poolside business-social event at Mr. Gideon's home. Mr. Randazza permitted and encouraged his children to have warm personal relationships with Mr. Gideon, who they called "Uncle."

      L.    The evidence was that the only complaints which       Mr. Randazza had concerning the pornographic filming in his offices in April 2012 — four months before the end of his employment — were that (1) he was not given the courtesy of advance notice of the shoot and (2) after the shoot was completed, Mr. Randazza's office was not restored to just the way it had been before the office was prepped for filming.

      The preponderance of disputed evidence was not that Mr. Randazza complained to Mr. Gideon centering on or in any way reasonably relating to sexual discrimination or harassment or a hostile work environment based on sex, including "male-on-male" sex, which has been recognized as a basis for a legal claim. Accordingly, allegedly involuntary termination of Mr. Randazza's employment, based on Mr. Randazza's April 2012 complaint about the filming of pornography in his office — which did not constitute statutorily "protected activity" — is not includible as a component for a statutory claim that he had been fired in retaliation for making that complaint. Mr. Randazza's complaint about the allegedly personally offensive oral copulation of Mr. Gideon

---

[7] For example, Mr. Randazza admitted that he used the term "butthurt" — which he alleged that Mr. Gideon used to demean his expression of feelings about the pornographic filming in his office. In a series of texts about the shoot, Mr. Randazza texted, in a crude possible sexual/legal "double entendre," "Don't jizz on my briefs." Mr. Randazza has admitted that "The Arbitrator has seen many texts and emails from Mr. Randazza with informal, rough, vulgar content." Reply at p. 10:9-10. In making a different point, Mr. Randazza concedes by assertion that "Respondents [have] conceded that jokes and banter were common in the office."

in the back seat of his car on August 9, 2012 was not genuinely or deeply felt and was made primarily for tactical reasons. Therefore, the end of Mr. Randazza's employment was not and was not the product of anything retaliatory, in violation of public policy (e.g., engaging in protected activity), as a matter of law.

Moreover, the preponderance of the evidence is that Mr. Randazza had advance notice of the filming of a pornographic video in his office and that he did not either object or indicate that the noticed shoot was in any way objectionable or offensive to him. That evidence is the playful exchange of texts between Messrs. Randazza and Gideon concerning the intended shoot and the testimony of the director of the shoot, Chaz Vorrias, who testified that he advised Mr. Randazza of the shoot in advance and received no objection from Mr. Randazza.[8]

M.    Contrary to the strong impression created by Mr. Randazza's pre-Arbitration Hearing narrative of allegations, there was no evidence that any photograph(s) of his wife or children or anything personal of or concerning Mr. Randazza or any member of his family, or in any way reasonably violative of their respective personal privacy, were used or visible in the video. The (possible) visibility of a painting on the wall of Mr. Randazza's office, which was painted by Mr. Randazza's wife, is not to the contrary.

In the circumstances, there was no action taken which was either statutorily offensive or hostile.

N.    Mr. Randazza's California Labor Code-based claims --- for Excelsior's failure to (1) pay him his final wages in August 2012 (2nd Claim) or (2) reimburse and indemnify his for business expenses incurred by him in during 2012 (1st Claim) --- fail as a matter of law. The same is true for Mr. Randazza's

---

[8] Mr. Vorrias testimony was not unfair surprise, Mr. Vorrias's admitted deletion of his emails with Mr. Randazza was done without knowledge of their significance in connection with the dispute underlying this arbitration and, in the event, is not attributable to either Excelsior or Liberty, because he was not a managing agent of either entity.

claim for payment of all of his wage-related claims --- including payment of
raises, bonuses and repayment of his $25,000 loan. That is because --- at all times
relevant to those California Labor Code claims, since June 2011, Mr. Randazza
worked and lived in Nevada, to which Mr. Randazza relocated, as did E/L, in
order to continue as E/L's general counsel.  As stated or indicated in a pretrial
ruling bearing on the same issue, (1) the California Labor Code, presumptively,
does not apply extraterritorially,[9] and does not apply to the facts and
circumstances of this case, and relatedly, (2) that determination, concerning Mr.
Randazza's non-contractual claims, is unaffected by the California-as-governing-
substantive-law provision of Mr. Randazza's employment agreement with
Excelsior, which applies and controls only as to breach-of-contract claims and
not, as in this instance, Mr. Randazza's statutory claims.[10]

In the event, Mr. Randazza was properly compensated for all
services as to which he has asserted statutory and contractual claims.[11]

O.      Mr. Randazza's claim for unpaid wages and penalties under
Nevada NRS Sec.608.050 (3rd Claim) fails as a matter of law, because there is no
private right of action for enforcement of that statute.  It is therefore not
necessary to decide whether the a claim has been stated under that statute.

P.      As to Mr. Randazza's contractual claims --- which are governed by
the Employment Agreement, including the provision that California law governs
its interpretation and enforcement, etc. --- (1) Mr. Randazza is not entitled to a
contractual severance payment, because he voluntarily resigned his

---

[9] Sullivan v. Oracle Corp. , 51 Cal.4th 1191, 12016 (2011); Wright v. Adventures Rolling
Cross Country, Inc., 2012 U.S. Dist. LEXIS 104378 (N.D. Cal. 2012) (presumption against
extraterritorial application of state law applies to unpaid wage claims under California
Labor Code, plus "situs of the work" is the most important factor in determining
extraterritoriality, trumping residency and where wages are paid).
[10] See, e.g., Narayan v. EGL, Inc. , 616 F.3d 895, 899 (9th Cir. 2010).
[11] For example, Mr. Randazza's bonuses were to be based on net and gross amounts
(which he acknowledged prior to the end of his employment), claimed compensation
raises were discretionary. Whatever Mr. Randazza was paid as compensation and
bonuses is subject to the remedy of disgorgement.

employment,[12] (2) Mr. Randazza is not entitled to any payment for expenses in connection with the annual International Trademark Association Conference, which he did not attend, and (3) Mr. Randazza's bonuses were to be paid on "net" amount, not "gross" amounts, as contended by Mr. Randazza. In the event, E/L has been legally excused from any obligation to make any further contractual payment, by reason of Mr. Randazza's material breaches of contract with respect to the his obligations under the same contract, Mr. Randazza's employment agreement. That is so under contract law principles --- separate and apart from equitable principles, which are also applicable to contract claims, including the equitable doctrine of unclean hands, which is applicable to Mr. Randazza's contract claims.

    Q.   Turning to E/L's counterclaims, Mr. Randazza owed fiduciary duties to E/L, because he was their in-house general counsel and their attorney of record in judicial civil actions, and an E/L executive and employee. As such, Mr. Randazza owed E/L, as his clients, employers and principals, the highest duty of loyalty and honesty in the performance of his professional and executive obligations. That duty --- among other things --- included legal and ethical duties of acting honestly and solely for the benefit of his clients/employers/principals, avoiding acting inconsistently with those duties, and where actual or potential conflicts of interests existed to make full written disclosure of the same and to obtain informed written consents from his clients/principals as to each and every such conflict of interest. Each and all of Mr. Randazza's ethical duties owed to his principals/clients was a legal fiduciary duty owed to them. Mr. Randazza violated those fiduciary duties owed by him to E/L, as his principals/clients/employers --- including by the following:

---

[12] See Pars. 5(A), (B) and (G), supra, concerning Mr. Randazza's having voluntarily ended his E/L employment, including via and as evidenced by written and verbal and non-verbal conduct. Mr. Randazza was contractually entitled to payment equivalent to 12-week severance only if his employment was involuntarily terminated.

(1) engaging in negotiations for monetary bribes to be paid to him — including the "Oron $75,000" which Mr. Gideon noticed, without Mr. Randazza's affirmative disclosure of it ——— which would result in his being "conflicted out" of future litigation or any disputes with parties then and/or in the future with

/////
/////
/////

interests adverse to E/L's interests (e.g., Oron, TNA),[13] (2) taking control for his personal benefit of, and refusing to relinquish control over, Oron settlement funds — all of which ought to have been for the benefit and under the direction and control of his principals/clients E/L, before and after the end of his employment and representations on behalf of E/L --- (3) Mr. Randazza's ordering and causing the deliberate "wiping" of his and legal assistant's corporate laptops, as an integral part of his planned resignation as E/L's General

---

[13] It is irrelevant that none of Mr. Randazza's negotiations concerning bribes — including the Oron bribe — resulted in an actual bribe payment. See Mr. Randazza's Reply at pp.4:24–5:1: "Yet despite years of discovery in this matter, Respondents have not been able to point to a single 'bribe' paid to Mr. Randazza, or a single consummated deal between him and the opposing party."* The Arbitrator has accepted, as an admission by Mr. Randazza that "he repeatedly engaged in these 'bribe' negotiations," but the Arbitrator has not accepted Mr. Randazza's testimony and further contention that he did so "because they were par for the course in dealing with counsel for infringers and because engaging in them was the best way to soften up the other side and get more money for respondents." Id., at p. 5:2–5.
In this arbitration, Mr. Randazza has established a virtually unbroken pattern of asserting a legal/fiduciary variant of the sports cliché, "No harm, no foul." The Arbitrator has not accepted those assertions — including, for example, a professional or fiduciary duty has been violated, whether spoliation has been committed, etc.

Counsel and outside counsel of record, and (4) Mr. Randazza's continuing and
undisclosed (and thus unconsented-to) legal work for clients (e.g., Bang Bros.,
XVideos, XNXX, Porn Garian, Titan Media, Kink), whose interests were actually
and potentially adverse to E/L's interests.[14]

R.    The Arbitrator respectfully disagrees with Mr. Randazza's expert
witnesses, who respectively testified that, under both Nevada and California
rules of ethics and/or professional responsibility, there were no violations of
fiduciary duty, if and because they concluded that there was no resulting harm.

The "fact of damage" or proximate cause is not an essential element
of either "duty" or "breach of duty" --- but rather a separate element of a claim or
cause of The Arbitrator's disagreement with Mr. Randazza's expert witnesses
centers

Whether or not Mr. Randazza's breaches of fiduciary duty
proximately resulted in damages sustained by Excelsior, Liberty or both of them
--- as a matter of sound public policy --- Mr. Randazza should not be allowed to
retain any pecuniary or legal benefit resulting from or closely connected to those
breaches.

For example, Mr. Randazza has included in his defense of his
admitted deletion of files and other legal information via multiple wipings of
company-owned computers the assertion that Respondents have not been able to
show any damage resulting from those multiple wipings.   This is another of Mr.
Randazza's assertions in this arbitration of "No harm, no foul" --- which the
Arbitrator has not accepted, primarily because of the violations of duties
constituting and/or including fiduciary duties.  Ethical and other violations of

_____

[14] Mr. Randazza's legal work for non-E/L clients --- independent of the violations of Mr.
Randazza's ethical and fiduciary duties --- were significantly beyond the contractually-
permitted scope under his employment agreement.  The Arbitrator may award the
equivalent to amounts of funds ordered to be immediately turned over by Mr. Randazza
to E/L.  See Interim Arbitration Award, Par.

fiduciary duties do not require "fact of harm" to be shown by a preponderance of the evidence or otherwise.

Moreover, in the circumstances of (1) multiple ethical violations having been shown to have been committed by Mr. Randazza — including negotiating for and in the instance of the <u>Oron</u> settlement agreeing to a "bribe" to be conflicted out of future litigation with adverse settling parties and other conflicts of interest — and (2) Mr. Randazza's ethical challenges shown in this arbitration, there should be a presumption of "fact of harm" caused to E/L by Mr. Randazza's conduct and, additionally, a presumption of Mr. Randazza's intention to harm his clients by wiping everything off of his and his legal assistant's company-owned computers.

As E/L's inside general counsel and employee, Mr. Randazza had a legal and fiduciary duty — no later than when his employment ceased, regardless of whether or not with or without cause and/or by whom ended — to deliver every file and other piece of data and/or information — complete, intact and undeleted, unmodified and immediately accessible and usable by E/L. That included all files and data stored on the computers entrusted to Mr. Randazza and his legal assistant Erika Dillon for their use by and on behalf of E/L. Because of his noncompliance, indeed resistance to compliance with those duties, they continued and continue to the day of the rendering of this award — including beyond Mr. Randazza's belated and resisted turnover of one of the laptop computers — because another laptop entrusted to Mr. Randazza remains unreturned. Those continuing fiduciary duties owed by him to E/L exist, including by reason of his exclusive control over the computers and thus superior knowledge of what was on each computer's hard drive before and after he had everything on the returned laptops completely and multiply deleted — including prior and in contemplation of his planned resignation on August 29, 2012.

16

In the circumstances, Mr. Randazza's generalized and unspecified claims of privacy — in attempted justification of his ordered complete and multiple wipings of company-owned computers — cannot be accorded weight or credibility. By the same token, that ordered conduct raises an inference that whatever was deleted was known and intended by Mr. Randazza to be harmful to him and any claims and contentions which he might make in any dispute with E/L — i.e., deliberate spoliation, in addition to conversion.

Mr. Randazza cannot escape liability for spoliation or conversion — or, additionally, violation of his fiduciary duties as an employee, executive and general counsel of E/L, by reason of the same conduct — by claiming, as he has, that Respondents have not shown any specific or tangible injury by reason of his conduct in causing company-owned computers to be completely wiped of all data prior to their resisted and belated return. In the circumstances — and paraphrasing former Defense Secretary Donald Rumsfeld — neither Respondent should bear any burden or responsibility to come forward with any evidence of damage, when they do not know what they do not know. As stated above — with his actual exclusive knowledge of what was on the computers' hard drives, before and because he ordered them to be completely wiped and, in the instance of his returned laptop, multiply wiped before ultimate return — Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L.

S.    The closure of the Nevada State Bar's file on the grievance filed by E/L has not been given any weight in this arbitration. The reasons for that are manifold, several of the most significant of which include the following: (1) the State Bar did not reach the merits of E/L's grievance, (2) even if it would have, the standard of evaluation would have been "clear and convincing evidence," rather than the standard applicable in this arbitration of "preponderance of the evidence," (3) Mr. Randazza's response to E/L's grievance contained at least one

17

material misrepresentation acknowledged during an evidentiary session in this arbitration (that he stopped representing XVideos in 2009), (4) the Nevada State Bar closed its file with an express statement that it has "no authority to take any action which could affect the outcome of any civil disputes or litigation, (5) many of the issues and much of the evidence presented in this arbitration (identities of represented entities, retainer and billing records, emails, etc.) was not available to be presented by E/L in support of its grievance (e.g., Mr. Randazza's assisting Datatech, including via forwarding fruits of a disclosed (unnamed) computer "hacker").

T.     E/L was damaged in at least the amount of $275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in the future.

U.     Mr. Randazza was unjustly enriched in the amount of $60,000. Of that amount, $55,000 was paid to and received by Mr. Randazza's law firm, rather than E/L, in connection with (1) Mr. Randazza's ostensibly pro bono representation in connection with the so-called "Righthaven cases," of which E/L was generally aware and consented to (A) with the understanding and on the condition that Mr. Randazza was acting as a faithful, compensated E/L employee, including in compliance with his employment agreement, with costs of the representation advanced by E/L, including compensation as employees of Mr. Randazza and his legal assistant Erika Dillon, and (2) unaware that compensation was to be or actually paid to Mr. Randazza, via his law firm, until after the fact, indeed after Mr. Randazza's resignation from E/L employment.[15] Mr. Randazza also received $5,000 from James Grady, in connection with E/L's Oron litigation.  Although Mr. Randazza testified, without corroboration, that

---

[15] Of the $60,000 paid and received, (A) $55,000 was court-awarded attorneys' fees, which were paid to Mr. Randazza's law firm, and (B) $5,000 was paid by James Grady.

Mr. Grady's payment was used for <u>Oron</u> litigation expenses, Mr. Randazza did
not disclose the receipt of the Grady $5,000 payment to E/L. In the
circumstances, and under principles of unjust enrichment, all compensation paid
to or for the benefit of Mr. Randazza should have been paid directly to E/L or
turned over to E/L by Mr. Randazza — neither of which was done, immediately
or ever.

     V.    Mr. Randazza materially breached his employment agreement with
Excelsior by (1) acting as an attorney in connection with the TNAFlix litigation
and the MegaUpload case, his concurrent representation of XVideos and/or
XNXX during his employment by Excelsior and (2) spending significantly
excessive time on non-Excelsior/Liberty matters beyond contractually-permitted
time under his employment agreement with Excelsior and by failing to wind
down his non-Excelsior/Liberty legal activities, as also provided in Mr.
Randazza's employment agreement.[16]

     The extent of Mr. Randazza's contractual material breaches made
them also breaches of fiduciary duty — regardless of whether or not those
breaches of fiduciary duty were conflicts of interests, as some were.

     W.    Disgorgement of compensation paid by E/L to Mr. Randazza is an
available remedy, which is appropriate in the circumstances of Mr. Randazza's
clear and serious violations of fiduciary duty owed to E/L, and within the
Arbitrator's discretion, based on the evidence in this arbitration.[17]

---

[16] Mr. Randazza materially breached his employment agreement with Excelsior by
maintaining a private law practice, with billed hours shown to be in excess of that
permitted by that agreement, performing non-E/L legal services during the time he
could and should have been performing services as E/L's General Counsel, and by
failing or refusing, consistent with ethical duties and requirements, to reduce and taper
off to zero his professional services for clients other than his employer, E/L.

    The extent of Mr. Randazza's contractual material breaches made them also breaches
of fiduciary duty — regardless of whether or not those breaches of fiduciary duty were
conflicts of interests, as some were.

[17] See <u>Burrow v. Arce</u>, 997 S.W.2d 229 (Tex. 1999) ("<u>Burrow</u>")(remedy of
forfeiture/disgorgement upheld, including court discretion to determine whether some
or all compensation paid to attorney who breached fiduciary duty of loyalty owed to

///// 
///// 
///// 

There is no requirement that causation or "fact of damage" be shown.[18] There is no valid reason to distinguish between an executive who is "in house" general

_____

client to be forfeited or disgorged, where clear and serious violation(s) of fiduciary duty shown).

[18] That is because, among other reasons, one of the primary purposes of a remedy like forfeiture/disgorgement for breaches of fiduciary duty is to deter, not reward and to remove incentives of fiduciary disloyalty — including by denying the benefits of disloyalty, regardless of provable or even actual harm to the principal, including after payment of compensation. As the Texas Supreme Court pertinently stated in Burrow in connection with the remedy of forfeiture/disgorgement as a deterrent and disincentive for an attorney or other agent to breach of fiduciary duty:

"Pragmatically, the possibility of forfeiture of compensation discourages an agent from taking personal advantage of his position of trust in every situation, no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence of amount of damages."

The California cases cited by Claimant are distinguishable. Frye v. Tenderloin Housing Clinic, Inc., 38 Cal.4th 23 (2006)("Frye"), Slovensky v. Friedman, 142 Cal.App. 4th 1518 (2006) ("Slovensky"). The appellate court's conclusion in Slovensky was based on its misreading and/or misstatement of the Supreme Court's holding and the basis and reasoning for its holding in Frye — which was, in effect, a "one-off" opinion strongly driven by the facts and public policy considerations articulated and emphasized by the Supreme Court in the opinion. The Slovensky court's mistake is highlighted by its reliance on what it called the "Frye rule" — which was no such thing, or at least not as stated and relied on by the court in Slovensky.

There would be little or no reason for the remedy of disgorgement, if there was a so-called "Frye rule" as misstated by the Slovensky court and urged by Mr. Randazza. If fact of damage and extent of damages must be proven by a preponderance of the evidence, in order to obtain disgorgement, that remedy would be rendered duplicative of the remedy of compensatory damages, except in name only. Moreover, the strong public policy to deter and remove any incentive for clear and serious violations of fiduciary duty - where injury to the client or other principal might be difficult or impossible to prove, as a matter of compensable damages - would be severely undermined.

In Frye, the California Supreme Court appears to have been offended by the plaintiff/client's overreach in the circumstances. The Court determined not that the remedy of disgorgement was legally unavailable but, rather, that its application — in the

counsel and other corporate executives with respect to the availability of the remedy of forfeiture/disgorgement of compensation for breaches of fiduciary duty.[19]  While it might be less easy to determine the appropriate amount of disgorgement --- because, for example, the compensation paid is not a fixed percentage, as in an all-or-nothing legal or brokerage contingency fee arrangement, contractual hourly arrangements, etc. --- that is not a disqualifying factor or consideration.   Considerations of proportionality and non-overlap with an award under other remedies are applicable.

Disgorgement will be applied to E/L-paid compensation received by Mr. Randazza in connection with litigation and other engagements on behalf of non-E/L clients --- in material breach of contract, while employed by E/L and beyond the significantly limited scope of his employment agreement (in terms of subject matter and time) and/or, in all events, in violation of his professional and fiduciary duties owed to his principal/client/employer, E/L. See Par. 1(V), above.

None of the expert witnesses who testified concerning breaches of legal ethics and fiduciary duties by attorneys and remedies for such breaches opined that disgorgement is unavailable in all instances.  The Arbitrator had the

---

special context of a technical failure to properly register for the practice of law by a public interest non-profit organization, engaged in what the Court considered to be important, worthy public interest work, expressly supported by the Court (including by affirming very substantial statutory attorneys' fees awards, as stated in that opinion) --- was "grossly disproportionate to the wrongdoings" of the defendant there and therefore "would constitute a totally unwarranted windfall" to the plaintiff there. 38 Cal.4th, at p. 50. Frye, therefore, is distinguishable from the facts of this case.
  Because the basis for its opinion was wrong, Slovensky is distinguishable or, more aptly, inapplicable to Mr. Randazza's proven clear and serious ethical and fiduciary breaches in this case.
[19] See Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 385-386 (Mo. Ct. App. 2000) (executive's breaches of fiduciary duty resulted affirmed forfeiture of his right to "all compensation, including bonuses and severance pay to which he may have been entitled"); Riggs Investment Management Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1266-1267 (DDC 1997) (former chairman and CEO of corporation forfeited all salary, bonuses and other compensation paid from the time disloyal action began, as determined by the appellate court, to date of end of employment six months later).

21

sense, however, that Mr. Joseph Garin came close to opining that causation and/or "fact of damage" caused by an assumed breach of an ethical/fiduciary duty is or should be a prerequisite to the imposition of disgorgement, with which opinion the Arbitrator respectfully disagrees (if that is Mr. Garin's opinion).[20]  In so opining, Mr. Garin (as did Mr. Randazza's California expert witness, Ms. Ellen Peck) testified that --- based on information provided by Mr. Randazza --- there was not a single instance of an ethical violation, with which the Arbitrator also respectfully agrees, based on all of the evidence adduced at hearing.

See Burrow v. Arce, 997 S.W.2d 229 (Tex. 1999) and Restatement of Agency 3d, Sec. 8.01 comment d(2).

X.     While Mr. Randazza's obtaining Mr. Gideon's signature on the promissory note for Mr. Randazza's $25,000 loan to E/L for Hong Kong legal fees was rife with ethical infirmities, in the exercise of the Arbitrator's discretion, the Arbitrator will not void the underlying loan.  However --- again in the exercise of the Arbitrator's discretion --- the Arbitrator will limit the benefit of that decision to allowing Mr. Randazza to assert an offset, under this paragraph, to any and all amounts awarded on E/L's counterclaims, up to a maximum amount of $25,000 (i.e., no interest) — which right of offset shall be conditional upon Claimant's transfer to Respondent Liberty of all Oron settlement-related and other E/L funds held in Claimant's attorney trust account,[21] plus interest at the legal rate of ten percent (10%) per annum from August 29, 2012.

Y.     E/L are the prevailing parties in this arbitration.  As such one or both of Respondents is or may be entitled to contractual attorneys fees under the employment agreement.[22]

---

[20] Mr. Garin conceded, on cross-examination, that Section 37 of the Restatement 3rd of The Law Governing Lawyers does not say that a showing of actual monetary loss is required for disgorgement of attorney compensation.
[21] See Interim Arbitration Award, Pars. 4 & 5, at p. 28, infra.
[22] See Interim Arbitration Award, Pars. 8 at pp. 28-29, infra.

## INTERIM ARBITRATION AWARD

Based upon careful consideration of the evidence, the applicable law, the parties' written submissions, the Determinations hereinabove set forth, and good cause appearing, the Interim Arbitration Award in this arbitration is as follows:

1.　　　Claimant and Counter-Respondent Marc J. Randazza ("Claimant") shall take nothing by any of his claims set forth in his Amended Arbitration Demand.

2.　　　Claimant shall pay Respondent(s) the following sums and amounts, as and for monetary damages in connection with Respondents' counterclaims.   Said amounts are exclusive and non-duplicative of any amount separately and additionally awarded to Respondents as part of the remedy of disgorgement.  See below.

Said amount includes the amount of $275,000, plus pre-award interest from August 13, 2012, at the legal rate of ten percent (10%) per annum, as and for monetary damages in connection with the resettlement of the Oron litigation, as a direct and proximate result of Claimant's violations of fiduciary duty in connection with his negotiating for a $75,000 "bribe" (to conflict him out of future representation against Oron) as part of the resolution of the Oron litigation.

Said amount will include the amount of $60,000, by which amount Claimant was unjustly enriched --- in that Claimant (via his law firm), rather than either Respondent received (A) $60,000 in connection with Claimant's ostensibly pro bono representation in connection with the Righthaven cases, while compensated for Claimant's time spent on the representation as employee, in the course of his employment, as to which representation the costs were advanced by Claimant's employer, and (B) received from James Grady in connection with the Oron litigation.

Said amount will include the amount of $3,215.98 --- as and for Respondents' expenses reasonably incurred in connection with QUIVX forensic

23

examination and attempted restoration of data on employer-owned laptop computers and an iPhone used and returned, as applicable, by Claimant and Erika Dillon. In addition, an amount yet to be determined, in the exercise of the Arbitrator's discretion, will be awarded for Claimant's spoliation and conversion of Excelsior's and Liberty's files and other data contained on employer-owned laptop computers entrusted to Claimant and Erika Dillon during their employment by Respondents or either of them. The additional amount awarded will be set forth in a further and/or amended interim arbitration award and/or in the final arbitration award.

3.      Claimant shall pay Respondent Excelsior the amount of $197,000.00 --- as and for disgorgement of an appropriate amount of Claimant's employment compensation (including salary and bonuses) paid under his employment agreement).

The awarded amount under this paragraph is non-duplicative of and does not overlap with any amount award as monetary damages under any other paragraph of this Interim Award.

The amount awarded under this paragraph does not include disgorgement based on Claimant's post-employment violations of fiduciary duty. That is because it appears to the Arbitrator that they are instances of Respondents having rights without a remedy --- as the limits of case law on disgorgement do not extend to post-employment violations of fiduciary duty.

Disgorgement shall be based on Claimant's violations of fiduciary duty ---including as acting as an attorney in connection with the TNAFlix litigation and the MegaUpload case, Claimant's concurrent representation of XVideos and/or XNXX during his employment by Excelsior and spending excessive, undisclosed, time on non-Excelsior/Liberty matters far beyond contractually-permitted time under his employment agreement.

4.      Claimant is hereby ordered forthwith (i.e., within ten (10) days of the date of the issuance of this Interim Arbitration Award) to turn over to

Respondents all <u>Oron</u>-related funds and, further, an additional $30,000 of non-<u>Oron</u>-related client funds of Respondents --- which funds have been held in Claimant's attorney trust account --- plus pre-award interest at the legal rate of ten percent (10%) per annum from August 29, 2012.

5.     An accounting of Claimant's attorney trust account is hereby ordered --- including to ensure compliance with Paragraph 4 hereof.  The accounting shall be performed by a qualified third-party accountant and/or accounting firm appointed and/or approved by the Arbitrator.  The cost and expense of which shall be borne solely by Claimant --- although Respondents may advance the funds necessary for the accounting, subject to ordered reimbursement by Claimant.   Claimant is hereby ordered to cooperate fully with the ordered accounting.

6.     Claimant is hereby ordered to return the as-yet-unreturned company-owned laptop to Respondents' counsel forthwith --- and in no event later than ten (10) days from the date of the issuance of this Interim Arbitration Award.

7.     Respondent shall be awarded as damages or costs reasonably incurred with this litigation, expenses reasonably incurred by QVIX or similarly qualified expert vendor --- up to a maximum of $3,500 --- in connection with the vendor's performance of successful and/or attempted retrieval of data a report to the Arbitrator of what, if anything was deleted from the computer and when.

8.     Respondents and Counterclaimants Excelsior Media Corp. and Liberty Media Holdings, LLC shall be afforded the right in this arbitration to establish their rights --- if any, and according to proof --- to contractual attorney's fees and costs.

Counsel for the parties are ordered to immediately commence and diligently conduct and conclude meet-and-confer communications and to submit to the Arbitrator within ten (10) days of the issuance of this Interim Arbitration

Award an emailed proposed briefing and hearing schedule for any application
for contractual attorney's fees and costs.

  9.  Respondent Jason Gideon will be dismissed as a party to this
arbitration.

  Subject to further order and/or a further and/or amended interim
arbitration award, and the Final Arbitration Award, this Interim Arbitration
Award, including the Determinations hereinabove set forth, is intended to be in
full settlement of all claims, issues, allegations and contentions, on the merits,
submitted by any party against any adverse party in this arbitration. Subject to
the immediately preceding sentence, claims and requests for relief not expressly
granted in this Interim Arbitration Award are hereby denied.

Dated: June 3, 2015

            STEPHEN E. HABERFELD
              Arbitrator

# EXHIBIT "5"

Print | Close Window

Subject: Re: A strange development
   From: "Marc John Randazza" <mjr@randazza.com>
   Date: Tue, Jan 11, 2011 8:08 pm
     To: Val Gurvits <vgurvits@bostonlawgroup.com>
     Cc: "evan@fray-witzer.com" <evan@fray-witzer.com>

The number was transmitted on the condition that it was done before a certain date. That date passed.

Also, while at the Adult Entertainment Expo, I heard a rumor that TNAflix is installing Vobile.

1) You confirm the rumor,
2) TNA pays $50K,
3) TNA agrees that we get the IPs for each infringement we DMCA,
4) Any work product produced for corbin fisher in this litigation remains confidential, and will not be shared with other companies.

Keeping me completely out of the TNA game is a little more complicated.

If your client wants to keep me personally out of the TNA game, then I think that there needs to be a little gravy for me. And it has to be more than the $5K you were talking about before. I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week. I'm gonna want at least used BMW money.

In order to conflict me out of future matters, I suggest this:

Your firm retains me as "of counsel" to you. I'd get $5K per month (for six months) paid to me, from you (TNA will reimburse you, I presume). I will render advice on TNA and TNA only, and I'll be chinese walled from your other clients so that other conflicts are not created.

If TNA is sold, and we're the brokers, the payments stop.

Also, I get a conflict waiver so that I can represent the buyer in the sale, and I'm not conflicted out of it.

That way, I'm adequately compensated for my loss of major potential work, and I'm conflicted out of acting adversely to TNA.


On Jan 11, 2011, at 7:29 PM, Val Gurvits wrote:

> I don't want to muddy the waters with the possible sale. If the case can be settled, we should settle it without reference to the sale.
>
> Marc, we are not going above $50K. If that number was ok before xmas and is not ok now, so be it. I am not going to play that game. In fact, the more time a bill to TNA on this, the less will be left for Liberty. I am sure we can agree to share IP addresses of Liberty infringers (I need to confirm with TNA, but I like your idea - it makes sense). And finally we need to make sure you don't assist anyone else against TNA.
>
> Val Gurvits
> Boston Law Group, LLP
> 825 Beacon Street, Suite 20
> Newton Centre, MA 02459
> (617) 928-1804 direct
> (617) 928-1800 main
> (617) 928-1802 fax
> vgurvits@bostonlawgroup.com
>
> ------------------------------------------------
>
> The contents of this message and any attachments are confidential and intended only for the addressee(s). This message may also be subject to attorney-client privilege. If you received this message in error, please notify Boston Law Group, LLP immediately and destroy the original message.
> Boston Law Group, LLP
>

DEFENDANT'S EXHIBIT 356

EMC001360002047

> tel: 617/928-1800
> e-mail: info@bostonlawgroup.com
>
> -----Original Message-----
> From: Marc John Randazza [mailto:mjr@randazza.com]
> Sent: Tuesday, January 11, 2011 10:23 PM
> To: Val Gurvits
> Cc: evan@fray-witzer.com
> Subject: Re: A strange development
>
> Of course it is! And I presume that your client doesn't mind paying out 15% to us to put the deal together.
>
> And, to make the deal go smoothly - we are going to need to kill off the case. If we put together a $2mil to $5 mil deal, or even a $1 mil deal, the money we are talking is on the toilet seat, and we shouldn't let that queer that deal. And, the non-monetary conditions would be the buyer's problem.
>
> How about we agree to this:
>
> TNA puts $100k in your trust account for settlement. If a sale goes through, Corbin Fisher gets it all. If the sale does not go through, CF gets $65K.
>
>
> On Jan 11, 2011, at 7:13 PM, Val Gurvits wrote:
>
>> ok. I will ask TNA. I am sure they will want to start high (doesn't everyone?)
>>
>> Will let you know. 7.5% of anything in that ballpark is just fine with me.
>>
>> Val Gurvits
>> Boston Law Group, LLP
>> 825 Beacon Street, Suite 20
>> Newton Centre, MA 02459
>> (617) 928-1804 direct
>> (617) 928-1800 main
>> (617) 928-1802 fax
>> vgurvits@bostonlawgroup.com
>>
>> _____
>>
>> The contents of this message and any attachments are confidential and intended only for the addressee(s). This message may also be subject to attorney-client privilege. If you received this message in error, please notify Boston Law Group, LLP immediately and destroy the original message.
>> Boston Law Group, LLP
>>
>> tel: 617/928-1800
>> e-mail: info@bostonlawgroup.com
>>
>> -----Original Message-----
>> From: mjr@randazza.com [mailto:mjr@randazza.com]
>> Sent: Tuesday, January 11, 2011 10:12 PM
>> To: Val Gurvits
>> Cc: evan@fray-witzer.com
>> Subject: Re: A strange development
>>
>> I can ask, if that's a real number. If I ask the seller and tna comes back saying 6 mil, the buyer will tell me to screw off.
>> Sent via BlackBerry by AT&T
>>
>> -----Original Message-----
>> From: Val Gurvits <vgurvits@bostonlawgroup.com>
>> Date: Tue, 11 Jan 2011 22:10:24
>> To: mjr@randazza.com<mjr@randazza.com>
>> Cc: evan@fray-witzer.com<evan@fray-witzer.com>
>> Subject: RE: A strange development
>>
>> I will ask, but without having some indication of what the buyer is thinking I suspect the asking price will be a gazillion dollars.

EMC001361002048

You mentioned mid 7 digits. Do you think the buyer will pay $5MM?
>>
>> Val Gurvits
>> Boston Law Group, LLP
>> 825 Beacon Street, Suite 20
>> Newton Centre, MA 02459
>> (617) 928-1804 direct
>> (617) 928-1800 main
>> (617) 928-1802 fax
>> vgurvits@bostonlawgroup.com
>>
>> ————————————————————————
>>
>> The contents of this message and any attachments are confidential and intended only for the addressee(s). This message may also be subject to attorney-client privilege. If you received this message in error, please notify Boston Law Group, LLP immediately and destroy the original message.
>> Boston Law Group, LLP
>>
>> tel: 617/928-1800
>> e-mail: info@bostonlawgroup.com
>>
>> ——Original Message——
>> From: mjr@randazza.com [mailto:mjr@randazza.com]
>> Sent: Tuesday, January 11, 2011 10:08 PM
>> To: Val Gurvits
>> Subject: Re: A strange development
>>
>> Name price. Lawyers split a 15 percent broker fee. Ill call potential buyer.
>> Sent via BlackBerry by AT&T
>>
>> ——Original Message——
>> From: Val Gurvits <vgurvits@bostonlawgroup.com>
>> Date: Tue, 11 Jan 2011 22:06:12
>> To: Marc John Randazza<mjr@randazza.com>
>> Subject: RE: A strange development
>>
>> By the way, there seems to be a lot of interest on my client's side to sell. How do we explore this possibility?
>>
>> Val Gurvits
>> Boston Law Group, LLP
>> 825 Beacon Street, Suite 20
>> Newton Centre, MA 02459
>> (617) 928-1804 direct
>> (617) 928-1800 main
>> (617) 928-1802 fax
>> vgurvits@bostonlawgroup.com
>>
>> ————————————————————————
>>
>> The contents of this message and any attachments are confidential and intended only for the addressee(s). This message may also be subject to attorney-client privilege. If you received this message in error, please notify Boston Law Group, LLP immediately and destroy the original message.
>> Boston Law Group, LLP
>>
>> tel: 617/928-1800
>> e-mail: info@bostonlawgroup.com
>> ——Original Message——
>> From: Marc John Randazza [mailto:mjr@randazza.com]
>> Sent: Thursday, December 30, 2010 12:56 PM
>> To: Val Gurvits
>> Subject: Re: A strange development
>>
>> Bizarre to say the least. Happy new year to you too!
>>
>> Here's how I think we could do it -- and I think that I have more ethical pitfalls than you. I'd have to reveal to Liberty that this

was going on, and I think that a settlement with CF would have to be part of the deal. But, I think that we could do it so that the settlement would be paid only after the sale - so that there was no suspicion on youngtek's part that this was any sleight of hand on my part to just get Liberty a settlement.
>>
>>
>>
>>
>> On Dec 30, 2010, at 9:49 AM, Val Gurvits wrote:
>>
>>> That is an interesting development. I will email my client.
>>>
>>> Happy New Year to you and yours.
>>>
>>> Val Gurvits
>>> Boston Law Group, LLP
>>> 825 Beacon Street, Suite 20
>>> Newton Centre, MA 02459
>>> (617) 928-1804 direct
>>> (617) 928-1800 main
>>> (617) 928-1802 fax
>>> vgurvits@bostonlawgroup.com
>>>
>>> —————————————————————————
>>> The contents of this message and any attachments are confidential and intended only for the addressee(s). This message may also be subject to attorney-client privilege. If you received this message in error, please notify Boston Law Group, LLP immediately and destroy the original message.
>>>
>>> Boston Law Group, LLP
>>> tel: 617/928-1800
>>> e-mail: info@bostonlawgroup.com
>>>
>>> -----Original Message-----
>>> From: Marc John Randazza [mailto:mjr@randazza.com]
>>> Sent: Thursday, December 30, 2010 11:36 AM
>>> To: Val Gurvits
>>> Subject: A strange development
>>>
>>> Val,
>>>
>>> I have a strange development in the TNA matter. It is actually tangential to it. Another client of mine asked me if I knew anyone at TNA, because they want to purchase the site. I think they are talking about mid seven figures.
>>>
>>> This puts me in a weird position, I think. But, I believe that if TNA is interested in such discussions, that I can orchestrate an ethical way for us to manage that. May as well ask them if they would have any interest. If so, you and I can figure out how to ethically work on such a transaction. I'd imagine that you personally could earn a shitload more money for a broker fee than you'd earn litigating this case (and me as well).
>>>
>>>
>>
>

Copyright © 2003-2013. All rights reserved.

# EXHIBIT "6"

Print | Close Window

Subject: [FWD: Re: xvideos.com]
From: "Jason Gibson" <jason@excelsiormedia.com>
Date: Tue, Feb 26, 2013 3:24 pm
To: "Wendy Krincek" <wkrincek@littler.com>
Cc: "Brian Dunlap" <bdunlap@excelsiormedia.com>, "Henry Leonard" <henry@excelsiormedia.com>

Oh, and it is also an ethical problem because Marc is the attorney for this *particular* tube site

-------- Original Message --------
Subject: Re: xvideos.com
From: General Counsel <marc@corbinfisher.com>
Date: Mon, January 17, 2011 8:05 pm
To: Andrew Rasmus <andrew@excelsiormedia.com>

Plus, there's a complication. As an alternative avenue of trying to get tube sites to behave themselves (as opposed to suing every one of them), Jessica Christensen and I personally shoved Vobile down their throat for the Free Speech Coalition. Thus, making it an ethical problem if we sue this *particular* tube site.

If we hope to make a dent in the tube site scourge, Vobile has to succeed. Thus, they've been actually the poster child for tube sites that behave.

Naturally, there is this particular fuck up on their part. But, lets set the ethical issue aside -- the fact that they have installed Vobile creates a strong defense on their part.

http://info.xvideos.com/content/contact/?title=Fingerprinting%20Protection%20Request

If you put links in that box, they actually *do* get effectively fingerprinted.

On Jan 17, 2011, at 5:09 PM, Andrew Rasmus wrote:

http://www.xvideos.com  --  Does not have a registered DMCA agent

http://www.xvideos.com/video781063/dawson_fucks_preston

Can we go after them?



# EXHIBIT "7"

**From:** Zach Larson [mailto:Zach@lzlawnv.com]
**Sent:** Tuesday, June 16, 2015 9:31 AM
**To:** WKrincek@littler.com; Langberg, Mitchell; Matt Zirzow; Marc John Randazza
**Subject:** Marc Randazza / Settlement Proposal / Excelsior / Liberty
**Importance:** High

**CONFIDENTIAL SETTLEMENT COMMUNICATION**

Hi All:  Here is a rough proposal to settle this matter.  Obviously, if it is in the ballpark we can nail down the details.  If not, we tried.

With that said, here is what Marc could do within 10 days:

1.  $50,000.00 from my IOLTA account (my bankruptcy retainer);
2.  $100,000.00 from friends / family;
3.  Carrier has to date agreed to pay $50,000.00 (We think the carrier will cough up more, but this is the authority we have been given to date and we would assign all rights to the policy claim to your client);
4.  Marc after the Interim Arbitration self-reported to the State Bars of Nevada, California, Massachusetts, Arizona and Florida.  Upon the conclusion of disciplinary proceedings (if any) or within one (1) year, Marc would pay an additional $20,000.00 for each license kept wherein he wasn't suspended or disbarred.  Candidly, we only think Florida will suspend and/or disbar.  Obviously we don't know, but that is our best guess at this time. So this is likely another $80,000.00.

We can provide draft bankruptcy schedules and statements later this week for your review.  Obviously, if a settlement is had, full releases would be required.

Let me know your thoughts or if you want to discuss.  Z.

 LARSON & ZIRZOW

Zachariah Larson, Esq.
LARSON & ZIRZOW, LLC
810 S. Casino Center Blvd., Suite 101
Las Vegas, Nevada 89101
Telephone:  (702) 382-1170
Facsimile:  (702) 382-1169
www.lzlawnv.com

Pursuant to IRS Circular 230, any tax information or written tax advice contained herein (including any attachments) is not intended to be and can neither be used by any person for the purpose of avoiding tax penalties nor used to promote, recommend or market any tax-related matter addressed herein.

DO NOT read, copy or disseminate this communication unless you are the intended addressee.  This e-mail communication contains confidential and/or priveled information intended only for the addressee.  If you have received this communication in error, please call us (collect) immediately at (702) 382-1170 and ask to speak to the sender of the communication.  Also please e-mail the sender and notify the sender immediately that you have received the communication in error.  Thank you.  Larson & Zirzow, LLC – Attorneys at Law

STATEMENT OF CONFIDENTIALITY & DISCLAIMER: The information contained in this email message is attorney privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this email is strictly prohibited. If you have received this email in error, please notify us immediately by calling (303)-223-1300 and delete the message. Thank you.

# EXHIBIT "8"

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
564 of 689
Case 15-12956-abl Doc 246 Entered 04/18/17 15:07:53 Page 91 of 98

Hon. Stephen E. Haberfeld (Ret.)
JAMS
555 W. 5th St., 32nd Fl.
Los Angeles, CA 90013
Tel: (213) 253-9704

Arbitrator


## JAMS


| | |
|---|---|
| MARC J. RANDAZZA, | ) JAMS No. 1260002283 |
| Claimant, | ) |
| | ) ORDER TO SHOW CAUSE WHETHER |
| vs. | ) OR NOT INTERIM ARBITRATION |
| EXCELSIOR MEDIA CORP., etc., et al., | ) AWARD SHOULD BE SUBJECT TO |
| | ) VACATUR, WITH PREJUDICE, AS |
| | ) REQUESTED BY SETTLING PARTIES |
| Respondents. | ) |
| | ) |
| _____ | ) |
| | ) |
| And Related Counterclaims. | ) |
| | ) |
| _____ | ) |

On May 29, 2018, JAMS forwarded to the Arbitrator a stipulation signed by
counsel for all parties to the arbitration. The stipulation included a request and
proposed "decision" for vacatur of the Arbitrator's June 3, 2015 Interim Arbitration
Award on the merits in this matter, with prejudice --- which the settling parties would
have rendered "null, void and of no legal effect" --- as well as a request to dismiss the
arbitration, with prejudice.

Except for the requested dismissal of the arbitration, including all claims and
counterclaims, with prejudice --- which is not inconsistent with JAMS Employment

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
Case 15-24956-abl Doc 248 Entered 04/18/22 15:07 Page 91 of 98
565 of 689

Arbitration Rule 13(a), which governs this arbitration --- it is not appropriate for the Arbitrator to approve or accept the settling parties' stipulation or to sign the requested decision or order on the current record.[1] California Code of Civil Procedure 128(a)(8);

---

[1] The purpose and function of rules of professional ethical conduct for lawyers is "to protect the public and to promote respect and confidence in the legal profession." See e.g., California Rules of Professional Conduct Rule 1-100 (promulgated by the State Bar of California and approved by the California Supreme Court).

The requested vacatur of the Interim Arbitration Award on the merits sought by the settling parties in their joint request appears to be based solely on vacatur being a condition of settlement, and further appears to bear the earmarks of an attempted erasure of carefully and soundly arrived-at arbitral determinations, proven by Excelsior on matters infused with the public interest --- including strong public policy to protect the public and respect for the legal profession.

In the circumstances, the question must be asked, whether it is permissible and appropriate for the Arbitrator and the JAMS arbitral process to be made complicit in implementing an apparent "it's as if it never happened" condition of settlement, via vacatur of a merits award, to render "null, void and of no legal effect" serious misconduct by Mr. Randazza, in violation of his professional ethical duties, which are infused with public interest --- and thereby vitiate and suppress both truth and protection of future victims and the public.

The essence of the Interim Arbitration Award of June 3, 2015 --- the determinations of which have remained correct, just and arrived at with considerable care, based on the evidence adduced during multi-day evidentiary sessions of the Merits Hearing in this matter --- remains as follows:

Mr. Rendazza --- as in-house general counsel and chief trial counsel of his employer/client Excelsior Media Corp. --- engaged in serious ethical conflicts of interest for undisclosed pecuniary gain, via solicited bribes - against the financial and legal interests of his client/employer --- to the undisclosed prospective advantage of Excelsior's litigation-settling competitors in the internet pornography industry, by "conflicting himself" out of representation of his employer/client in its anticipated future litigation against those settling Excelsior competitors. See IAA, Par. 5Q. In addition, to his greatly undermined credibility (duty of candor), preparatory to his departure from employment by and representation of Excelsior, Mr. Randazza engaged in spoliation of evidence, via deliberately having his and his legal assistant's corporate laptops "wiped" clean of data. See IAA, Par. 5Q & n. 4.

The proven serious ethical violations by Mr. Randazza were the bedrock on which Excelsior's state-based counterclaims for Mr. Randazza's violations of fiduciary duty and other serious claims of attorney misconduct were built and successfully maintained --- notwithstanding Mr. Randazza's proven express threat to his client/employer and its principal to assert and press false and true sexual allegations of the principal's sexual orientation and conduct, via this arbitration, unless Mr. Randazza extracted a financial settlement very favorable to him, collateral to the merits of any employment-related claim which he asserted, but which he failed to prove at trial.

2

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
566 of 689
Case 15-24956-abl Doc 246 Entered 04/18/22 15:07:53 Page 95 of 98

<u>Hardisty v. Hinton & Alfert</u> , 124 Cal.App.4th 999 (2004) ("<u>Hardisty</u>")("[Under CCP
128(a)(8), as amended in 1999] [t]he parties must now submit memoranda of points and
authorities and declarations and other documentary evidence persuasively
demonstrating that reversal of the judgment in question will not adversely affect
nonparties or the public, erode public trust, or reduce the incentive for pretrial
settlement, and the courts must now fully consider and weigh these factors on a case-
by-case basis.") ; <u>U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership</u>, 513 U.S. 18
(1994) (exceptional circumstances must be shown to justify vacatur, mootness by reason
of settlement, alone, not sufficient to warrant such an unusual action as vacatur); <u>Izumi
Seimitsu Kogyo Kabushiki Kaisah v. U.S. Phillips Corp.</u>, 510 U.S. 27 (1993) (Stevens, J.,
dissenting).

The Arbitrator hereby issues this Order to Show Cause why requested vacatur in
the parties' stipulation should or should not be granted ("OSC") and sets July 24, 2018,
9:00 a.m. (PT), JAMS' Los Angeles Resolution Center, 555 W. 5th St., 32nd Fl.,  Los
Angeles, CA 90013, as the date, time and place for an in-person evidentiary hearing on
this OSC.

Pre-hearing declarations and other documents and memoranda, meeting the
requirements of Local Rule 8, referenced in <u>Hardisty</u> --- plus true and correct copies of
(A) the Settlement Agreement referenced in the settling parties' stipulation and
the U.S. Bankruptcy Court's February 14, 2018 order approving that agreement and
(B) the Bankruptcy Court's findings and conclusions stated at hearing on
Mr. Randazza's apparently unopposed motion for approval of the settlement, which the
Bankruptcy Court generally incorporated by reference in its February 14,  2018 written
order --- shall be received by the Arbitrator by June 28, 2018, 4:00 p.m. (PT).

If the Arbitrator does not timely receive the declarations, memoranda and other
documentation required under the immediately preceding paragraph of this OSC,
the Arbitrator will treat this OSC as an order to show cause whether all claims and
counterclaims brought by all parties should simply be dismissed with prejudice ---
without inclusion of the requested decision or order re requested vacatur of the Interim

3

OSC RE JOINTLY REQUESTED VACATUR OF INTERIM ARBITRATION AWARD

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 567 of 689

Case 15-24956-abl Doc 245 Entered 04/18/17 15:07:53 Page 94 of 96

Arbitration Award --- which OSC will be decided without hearing, unless requested in writing received by the Arbitrator by July 3, 2018, 4:00 p.m. (PT). In the latter event, the in-person hearing noticed above will be held on the date and at the time and place hereinabove set forth.

It is hereby also ordered that --- if any future filing is made with the U.S. Bankruptcy Court concerning or germane to the Interim Arbitration Award by or on behalf of any of the settling parties --- accompanying and/or concurrently with any such filing, the settling parties are hereby ordered (A) to also file with that court a Request for Notice re this OSC --- referencing this OSC and attaching thereto as a referenced exhibit a true and correct copy of this OSC --- accompanied by a proof of service, showing service of the Request for Notice on JAMS and the Arbitrator and, further, (B) to file with JAMS in this arbitration a proof of service of the immediately foregoing Bankruptcy Court filings.

**IT IS SO ORDERED**.

Dated: June 11, 2018

_____
STEPHEN E. HABERFELD
Arbitrator

4

OSC RE JOINTLY REQUESTED VACATUR OF INTERIM ARBITRATION AWARD

# EXHIBIT "9"

**From:** James Grady Photo
**To:** mjr@randazza.com
**Subject:** Re: Oron
**Date:** Wednesday, June 06, 2012 4:56:01 PM

Marc,

I am in Virgin Islands shooting until the 16th.

Oron is not a huge problem for me but I can toss in $5000. Not much, but its a start.

I pay a guy - call him a forensic investigator - to dig past Domains by Proxy and things like that. He called me today while I was sitting in FT Lauderdale airport with the info. Haven't seen it myself yet but the guy has never been wrong.

I didn't have great connection.... but basic are

Russian, living in FL 10 years.

Married.

My guy has seen corporate papers.

My guys says he has seen emails from guy upset about Forumophelia domain name being on hold after complaint about false whois data. Dated May 2012.

Its legit. We have the guy.

But, my guy didn't get the info at Walmart in the course of normal commerce.

I'll be in touch with him now that I have better reception and hope to update you soon. Please understand I am on a photo shoot trip, Villa full of models, so can't dedicate many minutes until home on 16th.

On 6/6/2012 10:14 AM, mjr@randazza.com wrote:
> I have a complaint drafted and delivered to them.
>
> They are jerking me around.
>
> Corbin Fisher is ready to go. I need some more participants to help fund
> the thing. Do you have anyone who is ready to shit or get off the pot? I
> have a few parties who keep saying yes, but they haven't committed.
>
> How certain are you of the owner's identity and location? Their lawyer
> is telling me that they are in Hong Kong. Of course, I don't buy it, but
> what's your back up for that information?
>
>
> -------- Original Message --------
> Subject: Oron
> From: GroupFivePhotosports <jamesgradyphoto@gmail.com
> <mailto:jamesgradyphoto@gmail.com>>


DEFENDANT'S
EXHIBIT
396

> Date: Wed, June 06, 2012 8:08 am
> To: mjr@randazza.com <mailto:mjr@randazza.com>
>
> Trying to get a group together to go after Oron.
>
> Know anybody that wants in?
>
> By the way... The REAL owner of Oron, PornBB and Forumophilia is a
> Russian living in Jacksonville, FL. Been there 10 years, recently
> married, etc.
>
> Jimmy

MJR 013220

| | |
|---|---|
| **From:** | James Grady Photo |
| **To:** | mjr@randazza.com |
| **Subject:** | Re: Witness in case |
| **Date:** | Monday, June 25, 2012 6:33:36 PM |

OK, I shall work all that out. Be there whatever day you wish.

On 6/25/2012 7:31 PM, mjr@randazza.com wrote:
> Ok, I need:
>
> 1)  You to develop a report, everything you know about Oron.
> 2)  You to consider what happens if the judge wants to know where you
> got your information.  As far as I know, it was lawfully obtained.  You
> certainly got it lawfully.  If the source is a disgruntled Oron
> employee, great.  Jilted lover, great.  Hacker, problematic.
> 3)  Need you here on July 3.  Probably a day or two before.
>
>
>     -------- Original Message --------
>     Subject: Re: Witness in case
>     From: James Grady Photo <jamesgradyphoto@gmail.com
>     <mailto:jamesgradyphoto@gmail.com>>
>     Date: Mon, June 25, 2012 6:30 pm
>     To: mjr@randazza.com <mailto:mjr@randazza.com>
>
>
>     Sure -- whatever you need.
>
>     On 6/25/2012 7:21 PM, mjr@randazza.com <mailto:mjr@randazza.com> wrote:
>     > you interested in coming down to Vegas for the hearing on July 3
>     > (probably beforehand to prepare) to be a star witness in this case?
>     >   >
>     >   >
>     >



DEFENDANT'S
EXHIBIT
399

MJR 013367
002229

# EXHIBIT "10"

Case 1:24-cv-06996-ECS  Document 28-2  Filed 11/17/24  Page 2 of 32

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH, FLORIDA

ROCA LABS, INC.,                                      CASE NO:

      Plaintiff,

vs.

MARC RANDAZZA,

      Defendant.

_____/

## **COMPLAINT AND VERIFIED MOTION FOR TEMPORARY INJUNCTION**

Plaintiff, **ROCA LABS, INC. ("ROCA")**, a Florida Corporation, by and through the undersigned counsel, files this Complaint, Verified Motion for Temporary Injunction and Declaratory Action against Defendant, **MARC RANDAZZA**, and states as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1. This is an action for injunctive relief, declaratory relief, and for breach of contract involving damages in excess of $15,000, exclusive of interest, costs and attorneys' fees.

2. Venue is proper in this Honorable Court as this is an action for Tortious Interference and Defamation *Per Se* and seeks an award of money damages, including actual damages, punitive damages and reasonable attorneys' fees and costs; an award of compensatory damages under common law claim of tortious interference with a contractual relationship; an award of compensatory damages under common law claim of tortious interference with a prospective relationship, an award of compensatory damages under common law claim of defamation and injunctive and declaratory relief all stemming from conduct that occurred in Florida.

1

3. Plaintiff **ROCA** is a Florida for-profit corporation with its principal place of business at 7261A Tamiami Trail S, Sarasota, FL 34231.

4. **RANDAZZA** is an individual residing in Nevada and practicing law in Florida.

5. Pursuant to Florida Statutes Section 48.193(2), **RANDAZZA** is subject to personal jurisdiction in Florida because he committed a tortious acts within the State of Florida.

6. Pursuant to Florida Statutes Section 48.193(1)(a), **RANDAZZA** is subject to personal jurisdiction in Florida because he practices law within the State of Florida and maintains a law office within the State of Florida.

7. **ROCA** retained the undersigned counsel and agreed to pay a reasonable fee for its services.

8. All conditions precedent to the filing of this Complaint, if any, have been satisfied, performed, or waived.

### **GENERAL ALLEGATIONS**

### *A.  PLAINTIFF ROCA*

9. **ROCA** is a Florida for-profit corporation that was formed in 2006 as Appealing Ventures, Inc.  It changed its name to Roca Labs, Inc. in 2009.

10. **ROCA** manufactures food additives (sometimes referred to a nutraceuticals) and is the inventor of the proprietary Gastric Bypass Alternative® that is an effective weight loss option for people who are trying to lose in excess of 50 pounds.

11. **ROCA**'s products have been purchased and used by thousands of people as a surgery-free alternative to gastric bypass.

12. **ROCA**'s products are safe and effective when used as directed.  Thousands of individuals have used **ROCA** products to lose weight.

Case 1:14-cv-06396-ECS Document 289 Filed 11/17/04 Page 4 of 32

13. **ROCA**'s products are a natural alternative to surgery and to the best of its knowledge, no one has required medical treatment or hospitalization from the proper use of **ROCA**'s products.

14. **ROCA** made significant investments in product development and in its intellectual property rights.

15. **ROCA** owns numerous registered trademarks including: **ROCA** Labs®, Gastric Bypass Alternative®, Gastric Bypass Surgery Alternative®, Gastric Bypass Effect®, Gastric Bypass Results®, Natural Gastric Bypass®, Gastric Bypass No Surgery® and Anti Cravings®. **ROCA**'s trademarks are inherently distinctive.

16. **ROCA** invests heavily in an online marketing and advertising program that has run in Florida and across the United States.

17. **ROCA** markets and sells its products through its website, "www.rocalabs.com," where information on its products is available and consumers can purchase the product directly.

18. **ROCA** relies upon its reputation, internet reviews, and the weight loss success stories of its customers to generate new business and attract new customers.

19. **ROCA** relies upon its reputation and the weight loss success of its customers to generate new business and attract new customers.

20. Indeed, **ROCA** has a unique Money Back Reward program, where **ROCA** pays individuals a monetary sum for sharing their weight loss success stories.

21. A recent search for **ROCA** Labs on "YouTube" pulled up more than six-thousand (6,000) results, the majority of which are personal weight loss videos shared by individuals.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 576 of 689

Case 1:24-cv-08396-LGS Document 289 Filed 21:47:04 Page 9 of 32

22. Unfortunately, due to the unencumbered nature of the internet, anyone with a keyboard can voluntarily and intentionally detract from the thousands of positive stories with just one harmful article, interview, tweet, blog, or posting.

23. For instance, Consumer Opinion Corp. and Opinion Corp. own and operate pissedconsumer.com (hereinafter collectively "Pissed Consumer"), an internet haven for consumers, competitors or even Pissed Consumer itself to denigrate, disparage, and defame thousands of small businesses, regardless of the truth or veracity of the posting.

24. Based on the website's name alone, Pissed Consumer invites inherently negative commentary to be disseminated on their website. In other words, a happy or satisfied consumer would not seek out *Pissed* Consumer to communicate a positive story to the world.

25. **ROCA**'s business relationships were and are interfered with by Pissed Consumer. As a result, **ROCA** continues to suffer irreparable harm at the hands of Pissed Consumer.

26. Pissed Consumer defamed and continues to defame **ROCA**. As a result, **ROCA** continues to suffer irreparable harm at the hands of Pissed Consumer.

27. **ROCA** took legal action to protect its rights and reputation in the State of Florida and sued Pissed Consumer (*Roca Labs v. Consumer Opinion Corp.* and *Opinion Corp.* Case No 8:14-cv-2096-T-33EAJ Middle District of Florida) for issues concerning, among other things, Pissed Consumer's violations of Florida's Deceptive and Unfair Trade Practice Act, Tortious Interference, and Defamation. **RANDAZZA** is legal counsel for Pissed Consumer in the foregoing matter.

**B. *DEFENDANT RANDAZZA***

28. **RANDAZZA** is an individual residing Nevada.

4

Case 1:24-cv-06896-ECS Document 29-2 Filed 11/17/24 Page 6 of 32

29. **RANDAZZA** is an attorney and is licensed to practice law in the State of Florida and **RANDAZZA** maintains a law office in Florida.

30. **RANDAZZA** gained notoriety for providing legal services to the pornography and adult entertainment fields. He has represented a number of adult entertainment companies, including Kink.com, BangBus.com, and MilfHunter.com.[1]

31. **RANDAZZA** has been an outspoken advocate for Phillip Greaves, the author of "*The Pedophiles Guide to Love and Pleasure.*" Mr, Greaves pled no contest to criminal charges in Florida because of his distribution of the book in Florida.

32. **RANDAZZA** adopted the use of the Latin term "*murum aries attigit*" to describe his approach to litigation. The foregoing phrase translates to "the ram has touched the wall," and refers to the ancient Romans' strategy of not allowing mercy and slaughtering everyone in a city if they did not surrender before the Roman battering ram touched the city's walls. **RANDAZZA** adopted this term for his approach to the legal profession, and consequently, behaves as if litigation is his own war.[2]

33. Despite being an Officer of the Court and a practicing member of the Florida Bar, **RANDAZZA** has waged his war against **ROCA** by intentionally and maliciously publishing many false and defamatory statements in his pleadings, with the intent to share them to his contacts in the media, and indeed by directly speaking to the media about **ROCA** with the intent to have them publish false, misleading and defamatory articles about **ROCA**, and by

---

[1] *See* Wikipedia (http://en.wikipedia.org/wiki/Marc_Randazza)
[2] *Id*.

5

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 578 of 689

Case 1:14-cv-06896-ECS Document 289 Filed 11/17/04 Page 7 of 32

harassing and making derogatory statements about **ROCA** via his personal social media sites including his Twitter account.

34. **RANDAZZA** announced his war against **ROCA** via a simple email to Paul Berger, counsel for **ROCA**, that simply read *murum aries attigit.* (*See below*, Exhibit 1 email from **RANDAZZA** to Paul Berger).



35. Fortunately, we are not the ancient Romans and do not live in fear of attacks from battering rams. However, **RANDAZZA** waged modern day warfare by attacking and bullying his perceived enemy **ROCA** in the media for the sole purpose of harming **ROCA** and crippling it financially by battering away its customers.

36. Indeed, the Institute for Defense and Government Advancement has said the following: "harnessing and controlling messages distributed via the internet and social media will be a next big battleground to win the heart and minds of the world's masses regardless of who is the enemy of the day. The question of which nations will control and push out the message most effectively will become increasingly important. One thing is clear; whoever controls the message controls the masses. And whoever controls the masses will have the ability to win future wars."[3]

37. Through his own words, **RANDAZZA** is admittedly waging a modern war in the online media against **ROCA**.

---

[3] *Psychological Warfare in the Social Media Era: Winning Hearts and Minds through Facebook and Twitter?*, Nick Younker, Institute for Defense and Government Advancement, September 7, 2010.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 579 of 689

Case 1:14-cv-06896-LGS Document 289 Filed 11/17/04 Page 6 of 32

38. **RANDAZZA** uses whatever opportunity his has to fight his war against **ROCA**. For example, just recently **RANDAZZA** used the children's holiday of Halloween in an attempt to humiliate **ROCA** and malign the company in public by making the intentionally false and malicious statement "Some fucker put Roca Labs' shit in my kids candy bag!" (*See* Tweet below). The Tweet came from his personal Twitter account "@marcorandazza," and has been retweeted to more than 5,000 people as of the date of this filing.



39. The foregoing defamation is not the first perpetration by **RANDAZZA**; rather, he routinely issues statements about **ROCA** on Twitter. The statements are not related to litigation between **ROCA** and Opinion Corp., but are made with malice and with the purpose to mock, ridicule, humiliate, harm, and continue his war against **ROCA**.

40. As a Member of the Florida Bar and an Officer of the Court, **RANDAZZA's** statements are more likely to be viewed as true and correct by the general public. When **RANDAZZA**

7

makes the statement "Some fucker put Roca Labs' shit in my kids candy bag!" because of his respected position an ordinary individual may believe it to be true.

41. According to the *Creed of Professionalism* for trial lawyers established by the Florida Bar;

> (1) A lawyer is both an officer of the court and an advocate. As such, the lawyer always should strive to uphold the honor and dignity of the profession, avoid disorder and disruption in the courtroom, and maintain a respectful attitude toward the court; (4) A lawyer should be courteous and civil in all professional dealings with other persons. Lawyers should act in a civil manner regardless of the ill feelings that their clients may have toward others. Lawyers can disagree without being disagreeable. Effective and zealous representation does not require antagonistic or acrimonious behavior. Whether orally or in writing, lawyers should avoid vulgar language, disparaging personal remarks, or acrimony toward other counsel, parties, or witnesses; and (7) A lawyer must not use any aspect of the litigation process, including discovery and motion practice, as a means of harassment.

42. **RANDAZZA**'s actions show his disdain for the Court system, the rules that govern the Florida Bar, and our legal system. To **RANDAZZA**, winning the war and harming his opponents is what is most important. There is no room for civility, truth, or justice.

### *C. THE DEFAMATORY STATEMENTS*

#### 1) Original Dissemination to the Media Prior to Court Pleadings

43. **RANDAZZA** made defamatory statements *first* to the media, then repeated them in *subsequent* Court filings.

44. Beginning on or about September 8, 2014, and continuing to present date, **RANDAZZA** went to his friends in the online media and caused select webzines / online media sites to encourage the publishing of false and defamatory articles about ROCA (*See* Exhibit 2 September 8 & 9, 2014 articles).

45. **RANDAZZA** went to the media before he made any responsive pleadings in the *Roca Labs v. Opinion Corp.* case.

8

Case 1:14-cv-04390-LGS  Document 65-0  Filed 11/17/16  Page 10 of 92

46. **RANDAZZA** is referenced in the articles contained within Exhibit 2, and the articles reference information that **RANDAZZA** provided to the media outlets.

47. **RANDAZZA** encouraged the media for the sole purpose of harassing, defaming, and injuring **ROCA** as part of his war against **ROCA**.

48. **RANDAZZA**'s war against **ROCA** began with him telling the media that **ROCA** was snake oil salesman, **ROCA's** products did not work, made people sick, were a health hazard, and that the government was going to close **ROCA** down.

49. On September 8, 2014, TechDirt, an online magazine (or webzine), which claims 1.2 million unique visitors a month, published the first of what would be a long series of negative articles about **ROCA** from the "good thing we never bought anything from Roca Labs dept." at TechDirt (*See* Exhibit 2).

50. The September 8, 2014 article states that **ROCA** is the "manufacturer of 'dietary supplements' some of which they label with highly questionable claims that I imagine would not be supported by anything the FDA would consider to be credible evidence."

51. The article *foreshadows* the later defenses **RANDAZZA** would put forth on behalf of Opinion Corp. and references ROCA's Complaint stating, "Almost everything there is ridiculous. Presenting a platform for people to express their own opinions is not encouraging them to break any contract (which, again, is of dubious legality in the first place). Second, the site is not authoring or co-authoring the posts. Third, there's no evidence that anything being posted is 'false.' Fourth, what does Twitter's total user base have to do with anything?"

52. **RANDAZZA** caused these articles to be published, and, based on his past dealings with TechDirt, knew the articles would be disseminated all throughout the internet.

53. Interestingly, without ever reading the Complaint, TechDirt was familiar with the arguments against Pissed Consumer and its future defenses.

54. Further, on September 9, 2014, BoingBoing.net wrote "Roca Labs sells dubious snake-oil like a 'Gastric Bypass Alternative.'"  Once again these words would *foreshadow* the words used by **RANDAZZA** in the pleadings.

55. As a result of **RANDAZZA's** communications with the media, and his own voluntary actions of dissemination, the Defamatory Statements about **ROCA** were thereby purposefully and resolutely published and disseminated to numerous third-parties in online magazines, websites, and blogs.

56. **RANDAZZA** unequivocally acted with intent and malice in making and distributing the Defamatory Statements.

## 2)  The Subsequent Dissemination in Court Pleadings

57. On or about *September 18, 2014*, **RANDAZZA** filed Pissed Consumer's *Opposition to Plaintiff's Motion for Entry of a Temporary Injunction* (attached as Exhibit 3), which ironically includes the same false, malicious and defamatory statements he previously made to the media a little more than a week earlier.  These statements include, but are not limited to:

    a.  **ROCA** shows little concern for what happens to its users;

    b.  [**ROCA** sounds] like a disreputable company, producing tubs of snake oil (or snake oil goop, as it were);

22-01023-smd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 583 of 689

Case 1:14-cv-04396-LGS Document 65-4 Filed 11/17/14 Page 12 of 92

    c. **ROCA** Labs is desperately trying to force a cone of silence over each and every customer that discovers that **ROCA** Labs' product is not only a specious remedy for weight issues, but a potential cause of additional health problems;

    d. Plaintiff [**ROCA**], desperate to sell as many tubs of goo to the public as it can before regulatory agencies come knocking; and

    e. [**ROCA** Products may cause] a possible health crisis.

58. Additionally, in Pissed Consumer's *Emergency Motion for a Temporary Restraining Order* (attached as Exhibit 4), filed on or about ***September 22, 2014***, **RANDAZZA** repeated his false, malicious and defamatory statements he previously made to the media including, but not limited to:

    a. **ROCA**'s product threatens the health and welfare of at least a portion (if not all) of its users; and

    b. **ROCA** has threatened them [its customers].

(These statements along with the statements referenced in the paragraphs, *supra*, are hereinafter collectively referred to as "Defamatory Statements.")

59. The Defamatory Statements were first made as factual allegations in the media, and cannot be claimed to be his personal opinion, puffery, or supposition.

60. Therefore, chronologically speaking, **RANDAZZA** made his Defamatory Statements *first* to the media on *September 8, 2014*, and then approximately ten days later memorialized the exact same statements in Court pleadings on *September 18 and 22, 2014*, respectively.

61. Not Surprisingly, in Pissed Consumer's Answer to Roca Labs's Complaint, which was filed with the Middle District Court on September 11, 2014 and submitted by **RANDAZZA**,

Pissed Consumer claims little or no knowledge about **ROCA**. Again, chronologically speaking, there was a claim of no knowledge about **ROCA** after **RANDAZZA** had been defaming **ROCA** to the media.

62. These statements were repeated by TechDirt, BoingBoing, ArsTechnica, and other media outlets (*See* Composite Exhibit 5). For example on September 22, 2014, TechDirt published an article that contained the following:

> As the filing questions, all of these should raise red flags about the company and its products:
>
> Does that sound like an upstanding company that stands behind its safe and reliable product? Or does that sound like a disreputable company, producing tubs of snake oil (or snake goop, as it were), and which knows that too much truth will hurt its fly-by-night bottom line? Roca Labs is desperately trying to force a cone of silence over each and every customer that discovers that Roca Labs' product is not only a specious remedy for their weight issues, but a potential cause of additional health problems. Plaintiff, desperate to sell as many of its tubs of goo to the public as it can before regulatory agencies come knocking does its best to bully its former customers into silence.

63. **RANDAZZA** promoted the article at TechDirt that repeated his Defamatory Statements about **ROCA** on his Twitter account.



22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 585 of 689

Case 1:14-cv-03396-LGS Document 25-2 Filed 11/17/16 Page 14 of 92



64. **RANDAZZA** also had Tracy Coenen, an accountant and colleague, publish an article entitled "Roca Labs Weight Loss Scam" that repeats the defamatory statements (*See* Exhibit 6). Mrs. Coenen has a long standing relationship with **RANDAZZA**, and on February 2, 2013 wrote on her Facebook page "First Amendment lawyer Marc Randazza is amazing." There would be no other reason for an Illinois accountant to publish on her blog an article about Roca Labs other than her relationship with **RANDAZZA** and to assist her friend with his war against **ROCA**. Mrs. Coenen also Tweeted about her article, calling Roca Labs a "scam":

![Tracy Coenen @sequenceinc · Sep 22 — Roca Labs Weight Loss Scam: Roca Labs sells a weight loss product that may be viewed as a scam by ... bit.ly/1siJZ9c #fraudfiles]

65. Essentially, **RANDAZZA** restated his previously made Defamatory Statements in his subsequent Court pleadings in hopes of shielding himself from liability under judicial litigation privilege. In all events, it is abundantly clear that **RANDAZZA**, a seasoned litigator specializing in First Amendment and Defamation practices, should know that the judicial litigation privilege cannot be used as a sword and a shield.

13

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 586 of 689

Case 1:14-cv-04396-LGS Document 25-2 Filed 11/17/16 Page 15 of 92

## D.  RANDAZZA CAUSED AND CONTINUES TO CAUSE INJURY TO ROCA

66. The publications of Defamatory Statements by **RANDAZZA** brought disgrace, humiliation, injury, and loss to **ROCA**'s business relationships, reputation, and goodwill in the community.

67. These publications, and ensuing purposeful dissemination, regarding **ROCA** hurt **ROCA**'s business**,** drove away customers, and interfered with **ROCA**'s ability to sell its products.

68. **RANDAZZA** made the Defamatory Statements in the media *first*, and then *subsequently* in Court pleadings at a later date.

69. At the time **RANDAZZA** voluntarily made the Defamatory Statements, he did not have any genuine knowledge or regard for the truth and veracity of the Defamatory Statements regarding **ROCA**'s customer care.

70. At the time **RANDAZZA** voluntarily made the Defamatory Statements, he did not have any genuine knowledge or regard for the truth and veracity of the Defamatory Statements regarding any health risks associated with **ROCA** products, which have safely been used by more than 10,000 people.

71. At the time **RANDAZZA** voluntarily made the Defamatory Statements, he did not have any genuine knowledge or regard for the truth and veracity of the Defamatory Statements regarding any alleged (solely by **RANDAZZA**) government actions against **ROCA**.[4]

---

[4] **ROCA** is unaware of any pending investigation or inquiry into its company as alleged by **RANDAZZA**.  Indeed, if *assuming arguendo*, there were an ongoing investigation, it would be hard to believe that any U.S. Government Regulation Agency, including the Food and Drug Administration, would share such confidential information with a private citizen.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
587 of 689
Case 1:14-cv-04596-LGS Document 63 Filed 11/17/15 Page 19 of 92

72. At the time **RANDAZZA** voluntarily made the Defamatory Statements, he did not have any genuine knowledge or regard for the truth and veracity of the Defamatory Statements regarding **ROCA**'s internal business policies and programs.

73. In truth, **RANDAZZA** knew when he made his Defamatory Statements that they lacked merit, lacked truth, were unsubstantiated, and were injurious to **ROCA**.

74. The Defamatory Statements caused and continue to cause injury, harm, and damage to **ROCA**, including but not limited to irreparable harm, public humiliation, and unwarranted ill-repute in the community, which in this case extends to the internet.

75. The Defamatory Statements were disseminated by **RANDAZZA** to numerous third-parties, with the full knowledge that those third-parties would further disseminate his Defamatory Statements.

76. Based on the foregoing, **RANDAZZA** engaged in conduct which was intentional, fraudulent, malicious, oppressive, and/or he engaged in conduct with such gross negligence as to indicate a wanton disregard for the rights of **ROCA**.

77. **RANDAZZA** was politely asked to stop speaking to the media by Paul Berger, counsel for Roca Labs. On September 26, 2014, Mr. Berger sent **RANDAZZA** an email respectfully requesting that he stop speaking to the media, informing him of his limited immunity and providing him with notice to retract his statements in accordance with Florida law. (*See* Exhibit 7).

78. **RANDAZZA'S** response to the email by Mr. Berger, was to immediately distribute the email to the media and to Tweet about it.

15

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
588 of 689
Case 1:14-cv-04396-LGS Document 25-2 Filed 11/11/15 Page 1 of 92



79. TechDirt published the following:

Roca Labs' lawyer, Paul Berger, also sent threatening emails to Randazza himself, suggesting that Randazza had been "making defamatory comments" to the media. The email exchange, which Randazza filed as an exhibit with his filing, shows Randazza responding to Berger asking what specific defamatory quote he's talking about. Berger instead quotes PissedConsumer's legal filing (about calling Roca Labs' product "snake oil"), which we (and, I believe) other news publications, quoted. Randazza pointed out to Berger that it was not a quote from him but rather in his pleadings, and then asked (one assumes, sarcastically) if Berger is truly asking Randazza to retract a statement from his motion for preliminary injunction. I would assume that Berger is aware of the concept of litigation privilege, so either he didn't fully read Randazza's earlier filings, he forgot about litigation privilege, or he's just blustering for the sake of blustering. Randazza's latest filing suggests the latter may be the case:

The desperation continued with Roca threatening personal claims against the Defendants' attorney for statements made in the course of litigation.

80. In addition, two days after the email **RANDAZZA** once again took to Twitter, but this time to mock **ROCA's** legal team.



22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 589 of 689

Case 1:14-cv-03396-LGS Document 65-2 Filed 11/17/16 Page 18 of 82

81. It is clear that **RANDAZZA** believes that litigation is war, and that pleadings are a miraculous battle shield that permits lawyers to make intentionally false, misleading and defamatory statements for the sole purpose of inflicting as much injury on an adversary as possible. **RANDAZZA's** strategy is to beat up **ROCA** in the court of public opinion, to drive away its customers, and hope that **ROCA** will "cry uncle" and give up its day in Court.

### COUNT I
### TORTIOUS INTERFERENCE WITH ROCA's
### PROSPECTIVE ECONOMIC RELATIONSHIPS

82. The allegations set in forth in paragraphs 1 through 81 are incorporated by reference as if fully repeated herein.

83. **ROCA** derives it revenues through online sales of its product to consumers seeking to lose weight.

84. **ROCA** has an actual prospective economic relationship with internet users that search for **ROCA** and its products on search engines.

85. **RANDAZZA** is aware of the existence of **ROCA**'s prospective economic relationship with internet users who desire to purchase **ROCA**'s weight loss products.

86. **RANDAZZA** made and disseminated Defamatory Statements with the knowledge that they would reach **ROCA**'s potential consumers and cause them to view false, negative and misleading information when they search the internet using search engines.

87. **RANDAZZA** knowingly and intentionally warned (essentially counseled) internet users against the purchase of **ROCA** products.

22-01023-smd Doc#11-1 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 590 of 689

Case 1:14-cv-06396-LGS Document 25-4 Filed 11/17/16 Page 19 of 92

88. The conduct of **RANDAZZA** tainted the actual prospective economic relationship with numerous consumers and these customers were lost because of the malicious and intentional conduct of **RANDAZZA**.

89. Indeed, customers have refused to order and reorder from **ROCA** as a direct and proximate result of **RANDAZZA'**s intentional interference with said relationships.

90. But for the intentional interference, **ROCA** would have sold products to the internet users.

91. As a direct and proximate cause of **RANDAZZA'S** conduct, consumers have not purchased **ROCA** products.

92. Thus, as a direct and proximate cause of the **RANDAZZA'S** intentional and unjustified tortious interference, **ROCA** has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff, **ROCA LABS, INC.,** respectfully requests that this Honorable Court declare that Defendant, **MARC RANDAZZA**, has intentionally disrupted and interfered with **ROCA'**s prospective economic relationships, and further, that this Honorable Court grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## COUNT II
## DEFAMATION *PER SE*

93. The allegations set in forth in paragraphs 1 through 92 are incorporated by reference as if fully repeated herein.

94. **RANDAZZA** is representing Pissed Consumer in a case justifiably brought against those Defendants by **ROCA** in the State of Florida.

95. **RANDAZZA** authored and filed several pleadings in that action, including Exhibits 3 and 4.

18

22-01023-smb Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 591 of 689

Case 1:14-cv-03396-LGS Document 25-2 Filed 11/17/15 Page 20 of 92

96. However, *prior to filing* the foregoing Court pleadings, **RANDAZZA** made and disseminated false, malicious and Defamatory Statements to the media.

97. **RANDAZZA** authored and published the Defamatory Statements to the media and disseminated the content via social media websites.

98. *After the foregoing mass dissemination* of the Defamatory Statements *to the media* perpetrated by **RANDAZZA**, he *subsequently* repeated his Defamatory Statements over a week later in Court filings.

99. It is unequivocal that **RANDAZZA** made and disseminated his Defamatory Statements *first* to the media *on September 8*, *and then ten days later* in Court pleadings.

100. In truth, **RANDAZZA** knew when he made his Defamatory Statements that they lacked merit, lacked truth, were unsubstantiated, and were injurious to **ROCA**. The Defamatory Statements were made only for his own war against **ROCA** and for **RANDAZZA's** own public relations efforts.

101. **RANDAZZA**'s Defamatory Statements caused and continue to cause injury, harm, and damage to **ROCA**, including, but not limited to irreparable harm, public humiliation, and unwarranted ill-repute in the community, which in this case extends to the internet.

102. **RANDAZZA**'s Defamatory Statements were made and disseminated by **RANDAZZA** to numerous third-parties, with the full knowledge that those third-parties would in fact further disseminate his Defamatory Statements.

103. As a direct and proximate result of **RANDAZZA**'s reckless, wrongful and malicious statements, **ROCA** has suffered significant loss of reputation as well as business opportunities.

19

22-01023-tmd Doc#:1-11 Filed:04/18/22 Entered:04/18/22 14:16:53 Exhibit B contd. Pg 592 of 689

Case 1:14-cv-06396-LGS Document 25-2 Filed 11/17/16 Page 21 of 92

104.    **ROCA**'s losses include, but are not limited to, the failure of **ROCA** to sell its product to identifiable potential customers as well as significant lost revenues from other potential customers.

105.    Based on the foregoing, **RANDAZZA** engaged in conduct which was intentional, fraudulent, malicious, oppressive, and/or he engaged in conduct with such gross negligence as to indicate a wanton disregard for the rights of **ROCA**.

106.    The Defamatory Statements made by **RANDAZZA** against **ROCA** constitute defamation *per se* under the law.

107.    **RANDAZZA** was provided with notice as required by Chapter 770, *Florida Statute*.  A true a correct copy of the email notice is attached hereto as Exhibit 7.

108.    **RANDAZZA** confirmed his receipt of the foregoing notice when he referenced the notice in a Court filing, shared the communication with the media, disseminated the notice on the internet, and used the notice to further harass and harm **ROCA**.  *See* Exhibit 8.

WHEREFORE, Plaintiff, **ROCA LABS, INC.,** respectfully requests that this Honorable Court declare that Defendant, **MARC RANDAZZA**, has defamed **ROCA** *per se*, and further grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT III
## DECLARATORY RELIEF AGAINST RANDAZZA

109.    The allegations set in forth in paragraphs 1 through 108 are incorporated by reference as if fully repeated herein.

110.    This is an action for declaratory relief pursuant to Section 86.011, *Florida Statute*.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 593 of 689

Case 1:14-cv-03396-LGS Document 50 Filed 11/17/16 Page 22 of 92

111. There is a bona fide, actual, present practical need for declaratory relief in this matter.

112. A present controversy with ascertainable facts exists between the parties in this matter.

113. **RANDAZZA** has intentionally interfered with **ROCA**'s economic relationship with potential customers when he made his Defamatory Statements to the media, and then later memorialized the exact statements in Court pleadings.

114. **RANDAZZA**'s conduct directly and proximately caused **ROCA** to monetary damages that continue to accrue, as well as irreparable harm to **ROCA**'s reputation.

115. **ROCA** is in doubt as to their rights under Florida law and is in need of a present declaration whether the conduct of **RANDAZZA**, *i.e.*, the Defamatory Statements, tortiously interfered with **ROCA**'s prospective economic relationship with potential customers.

116. **ROCA** is in doubt as to their rights under Florida law and is in need of a present declaration whether the conduct of **RANDAZZA**, *i.e.*, the Defamatory Statements, defamed **ROCA** *per se*.

117. There is a bona fide, actual dispute between the parties based on the refusal of **RANDAZZA** to cease and desist its conduct after **ROCA** has requested same. *See* Exhibits 7 and 8.

118. **ROCA** seeks relief in order to enforce contractual and legal rights, and does not merely seek legal advice from this Honorable Court.

119. **ROCA**'s right to recovery is dependent upon the Court's finding of facts and/or application of same to Florida law.

120. The parties' interests in this declaration of rights are actual, present, adverse and antagonistic of fact and/or law.

21

WHEREFORE, Plaintiff, **ROCA LABS, INC.,** requests the Court to:

a.       Take jurisdiction of the subject matter and parties hereto;

b.       Determine applicable law, including the provision(s) of *Florida Statute* that apply to the parties;

c.       Declare that **RANDAZZA** has intentionally, tortiously interfered with **ROCA**'s economic relationship with consumers;

e.       Declare that **RANDAZZA** has defamed **ROCA** *per se*;

g.       Declare that **ROCA** has suffered economic damages as proximate result of Defendant's conduct;

h.       Declare that **ROCA** is entitled to attorneys' fees and costs against **RANDAZZA** and determine the amounts thereof;

i.       Declare that **ROCA** is entitled to award of monetary damages against **RANDAZZA** and determine the amounts thereof;

j.       Declare that **RANDAZZA** cease and desist his defamatory conduct;

k.       Award damages, interest, and taxable costs against **RANDAZZA**; and

m.       Award any other relief this Court deems just and proper against **RANDAZZA.**

WHEREFORE, Plaintiff, **ROCA LABS, INC.,** respectfully requests that this Honorable Court enter judgment against Defendant, **MARC RANDAZZA**, for all damages, attorneys' fees, and costs.

22-01023-smd Doc#:11-1 Filed:04/18/22 Entered:04/18/22 14:16:53 Exhibit B contd. Pg 595 of 689

Case 1:14-cv-04390-LGS Document 55 Filed 11/17/15 Page 24 of 92

## VERIFIED MOTION FOR ENTRY OF A TEMPORARY INJUNCTION

Plaintiff, **ROCA LABS, INC.,** by and through its undersigned counsel and pursuant to Rule 1.610 of the Florida Rules of Civil Procedure and Section 688.003, *Florida Statute*, hereby moves this Court to enter a temporary/preliminary injunction forcing Defendant, **MARC RANDAZZA**, to (a) cease and desist intentionally and tortiously interfering with the business relationships of **ROCA**, (b) formally retract, in writing, any and all previously made and/or disseminated Defamatory Statements of or about **ROCA**, and (c) remove any and all previously made Defamatory Statements of or about **ROCA** from media outlets in which **RANDAZZA** has an interest in, controls, or otherwise has authority over its content. In support hereof, **ROCA** states as follows:

## INTRODUCTION

This motion is supported by the verified factual allegations in the *Complaint* filed contemporaneously herewith, and said allegations are incorporated by reference and will not be reiterated verbatim herein. As stated above, **RANDAZZA** made Defamatory Statements about **ROCA** *first* to the media, and then repeated them verbatim in *subsequent* Court filings. The publications of the Defamatory Statements brought disgrace, humiliation, injury, and loss to **ROCA**'s business relationships, reputation, and goodwill in the community. These publications about **ROCA** hurt **ROCA**'s business**,** drove away customers, and interfered with **ROCA**'s ability to sell its products. The foregoing conduct tortiously interfered with the business practices and relationships of **ROCA**.

The verified allegations conclusively demonstrate that (a) there is a substantial likelihood that **ROCA** will prevail on the merits of this case and (b) in the absence of injunctive relief to

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
Case 1:14-cv-04395-LGS Document 252 Filed 11/17/16 Page 23 of 92
596 of 689

maintain the status quo pending the outcome of the case, **ROCA** will suffer immediate and irreparable injury.

## MEMORANDUM OF LAW

### A.  STANDARD FOR INJUNCTIVE RELIEF

Under Florida law, there are four prerequisites to the granting of preliminary injunctive relief: (1) the plaintiff will suffer irreparable harm; (2) the plaintiff has no adequate remedy at law; (3) there is substantial likelihood that the plaintiff will prevail on the merits; and (4) a temporary injunction will serve the public interests.  *Provident Mgt. Corp. v. City of Treasure Island*, 796 So.2d 481, 485 n. 9 (Fla. 2001); *Naegel Outdoor Advertising Co., Inc. v. City of Jacksonville*, 659 So.2d 1046, 1047 (Fla. 1995).

### B.  INJUNCTIVE RELIEF IS APPROPRIATE

As a general rule, a trial court has sound discretion to grant injunctions. *Precision Tune Auto Case, Inc. v. Radcliff*, 731 So.2d 744, 745 (Fla. 4th DCA 1999).  Further, the purpose of a preliminary injunction is to prevent future harm.  *Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc.,* 870 So. 2d 111, 116 (DCA Fla. 2004)("By its nature, an injunction restrains commission of a future injury; a court cannot prevent what has already occurred.")  Thus, it is not necessary for a party seeking a preliminary injunction to wait until harm has occurred; such a delay would defeat the purpose of injunctive relief.  The facts of this case demonstrate that all of the elements are easily satisfied, and the requested injunction should be issued by this honorable Court.

### 1)   <u>*In the Absence of Injunctive Relief, ROCA Will Suffer Irreparable Harm*</u>

Irreparable injury is an injury which is of a peculiar nature, so that compensation in money cannot atone for it.  *Mullinix v. Mullinix*, 182 So. 2d 268 (Fla. 4th DCA 1966); *First Nat. Bank n St. Petersburg v. Ferris*, 156 So. 2d 421 (Fla. 2nd DCA 1963).   Due to the nature of the internet (which is the arena for the majority of the events that gave rise to this cause), defamatory postings can cause great harm with very little effort.

The actions taken by **RANDAZZA** created an immediate and viable state of emergency for **ROCA**, which has already caused **ROCA** to incur substantial damages and which threaten further immediate and irreparable harm, *to wit*: (a) **ROCA** has lost daily sales of thousands of dollars through the date of this filing, and those sales will continue to be lost until the actions of **RANDAZZA** are prohibited or cured and (b) the conduct of **RANDAZZA** tainted the actual prospective economic relationship with numerous consumers and these customers were lost because of the malicious, intentional conduct of **RANDAZZA**.   Indeed, the actions taken by **RANDAZZA** threaten to destroy **ROCA**'s business.  There is likely potential irreparable harm that is reasonably likely to result in the absence of an injunction.

### 2)   <u>*Plaintiffs Do Not Have An Adequate Remedy at Law*</u>

**ROCA** does not have an adequate remedy law because an injunction is the only means available to stop **RANDAZZA** from tortiously interfering with the business practices and relationships of **ROCA**.   If an injunction is not issued, **ROCA** will likely continue to lose business relationships that can never be reestablished.  Further, monetary damages that would arise from **RANDAZZA**'s continued misconduct are not readily ascertainable and, in all events, would be insufficient to compensate **ROCA** for the wrongs committed by **RANDAZZA**.  Given

22-01023-smb Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
598 of 689
Case 1:14-cv-03396-LGS Document 52 Filed 11/14/16 Page 27 of 92

the vagaries associated with calculating lost business, lost customers, and lost goodwill in the community, no legal remedy can adequately compensate **ROCA** for **RANDAZZA**'s actions.

### 3) *Plaintiffs Are Substantially Likely To Prevail On The Merits*

**ROCA** is substantially likely to prevail on the merits in this matter, particularly with respect to the issues raised by this Motion. **ROCA** does not request that the Court pre-judge all of the issues raised by its Complaint; rather, the relief requested herein is narrowly limited to ensuring that **RANDAZZA** (a) cease and desist intentionally and tortiously interfering with the business relationships of **ROCA**, (b) formally retract, in writing, any and all previously made and/or disseminated Defamatory Statements of or about **ROCA**, and (c) remove any and all previously made Defamatory Statements of or about **ROCA** from the media outlets in which **RANDAZZA** has an interest in, controls, or otherwise has authority over its content.

**RANDAZZA** made Defamatory Statements about **ROCA** *first* to the media, and then repeated them verbatim in *subsequent* Court filings. The parties are unequivocally aware of the certain Defamatory Statements at issue. Further, as shown in the *Verified Complaint for Damages and Injunctive Relief*, the defenses **RANDAZZA** will undoubtedly attempt to raise are inapplicable as a matter of fact and law. The publications of the Defamatory Statements brought disgrace, humiliation, injury, and loss to **ROCA**'s business relationships, reputation, and goodwill in the community. These publications about **ROCA** hurt **ROCA**'s business**,** drove away customers, and interfered with **ROCA**'s ability to sell its products. The foregoing conduct tortiously interfered with the business practices and relationships of **ROCA**. Thus, the *Verified*

22-01023-smb  Doc#1-11  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd.  Pg 599 of 689

Case 1:14-cv-03396-LGS  Document 55-2  Filed 11/17/15  Page 28 of 92

*Complaint for Damages and Injunctive Relief* does in fact and law demonstrate that **ROCA** is likely to prevail on the merits.

### 4)  *An Injunction is in the Public Interest*

**ROCA** seeks an injunction in order to prevent further monetary damages and other irreparable harm from lost business, lost customers, and lost goodwill that is reasonably likely to occur if **RANDAZZA** continues to defame **ROCA** and tortiously interfere with the business practices and relationships of **ROCA**.  Under these circumstances, an injunction is in the public's interest.  *See Pino v. Spanish Broad. Corp.*, 564 So.2d 186, 189 (Fla. 3d DCA 1990)(holding that the public is entitled to rely on certainty in contracting and the protection of property rights; indeed, commercial development depends on the ability of a company to protect its legitimate business interests); *see also Silvers v. Dis-Com Sec., Inc.*, 403 So.2d 1133, 1137 (Fla. 4th DCA 1981) ("[i]f contracts are to have any viability at all, there must be some means of meaningful enforcement available for the courts….").

### C.  BOND

In cases in which a Temporary Injunction is issued, a bond is required to be posted by the movant; the amount of the bond is completely within the Court's discretion.  *See* Fla.R.Civ.P. 1.610(b); *Montville v. Mobile Medical Industries, Inc.*, 855 So.2d 212, 215 (Fla 4th DCA 2003) (holding that "the trial court is generally afforded discretion in setting the amount of a bond for a temporary injunction entered pursuant to Rule 1.610(b)").  Generally, the amount of the bond should reflect the damages that are reasonably foreseeable if the injunction is found to have

wrongfully issued.  In this case, a bond of no more than $1,000.00 is appropriate because of the (a) narrow injunctive relief sought and (b) lack of monetary damage suffered by **RANDAZZA**.

## CONCLUSION

WHEREFORE, Plaintiff, **ROCA LABS, INC.,** by and through undersigned counsel, moves this Court to enter a temporary/preliminary injunction forcing Defendant, **MARC RANDAZZA**, to (a) cease and desist intentionally and tortiously interfering with the business relationships of **ROCA**, (b) formally retract, in writing, any and all previously made and/or disseminated Defamatory Statements of or about **ROCA**, and (c) remove any and all previously made Defamatory Statements of or about **ROCA** from the media outlets in which **RANDAZZA** has an interest in, controls, or otherwise has authority over its content.

## REQUEST FOR ATTORNEY'S FEES

Plaintiff, **ROCA LABS, INC.,** requests an award of attorney's fees, costs, and such other relief that the Court finds to be appropriate.

## DEMAND FOR JURY TRIAL ON COMPLAINT

Plaintiff, **ROCA LABS, INC.,** hereby demands trial by jury as to all issues so triable as to the Complaint.

22-01023-tmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 601 of 689

Case 1:14-cv-06336-LGS Document 65-9 Filed 11/17/16 Page 30 of 92

Respectfully submitted on this 6th day of November, 2014.

_/s/ John DeGirolamo_

JOHNNY G. DEGIROLAMO, ESQ.

FLORIDA BAR NO: 0089792

_The Law Offices of John DeGirolamo, Esq._

6000 South Florida Avenue,

P.O. Box 7122, Lakeland, FL 33807

_Attorney for Plaintiff, Roca Labs, Inc._

Phone: (863) 603-3461

Email: JohnD@inlawwetrust.com

22-01023-lmd Doc#1-11 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
602 of 689
Case 1:12-cv-06393-LGS Document 25-2 Filed 11/17/14 Page 31 of 32

## VERIFICATION BY DON KARL JURAVIN

BEFORE ME, the undersigned authority, personally appeared Don Juravin, upon being duly sworn, deposes and states:

Under penalties of perjury, I, Don Juravin, am Vice President of Roca Labs, Inc. declare and affirm on this 25 day of October, 2014, under oath, pursuant to § 92.525, Florida Statutes, that I have read the foregoing *Complaint and Motion*, and declare that the facts stated in it are true to the best of my knowledge and belief and irreparable harm and damage will result if the relief is not granted.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Don Karl Juravin

_____
NOTARY PUBLIC, State of Florida

My Commission Expires



ANTONIO GONZALEZ
Notary Public, State of Florida
Commission# EE 185555
My comm. expires Apr. 1, 2016

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been e-filed via the Florida State E-Portal on this 6th day of November, 2014.

*/s/ John DeGirolamo*

JOHNNY G. DEGIROLAMO, ESQ.

# EXHIBIT "11"

# The Florida Bar
## Inquiry/Complaint Form

**PART ONE  (See Page 1, PART ONE – Complainant Information.):**

Your Name:  Paul Berger

Organization:

Address:  1015 Spanish River Road, Apt. 408

City, State, Zip Code: Boca Raton, FL 33432

Telephone:  561-414-4570

E-mail:  paul@hurricanelawgroup.com

ACAP Reference No.:

Have you ever filed a complaint against a member of The Florida Bar:  Yes ☐   No ☒

If yes, how many complaints have you filed? _____

Does this complaint pertain to a matter currently in litigation? Yes ☒   No ☐

**PART TWO  (See Page 1, PART TWO – Attorney Information.):**

Attorney's Name:  Marc Randazza

Address:  3625 S Town Center Dr.

City, State, Zip Code: Las Vegas, NV 89135

Telephone:  702-420-2001

**PART THREE  (See Page 1, PART THREE – Facts/Allegations.):  The specific thing or things I am complaining about are: (attach additional sheets as necessary)**

See Part Three Attached

**PART FOUR  (See Page 1, PART FOUR – Witnesses.):  The witnesses in support of my allegations are: [see attached sheet].**

**PART FIVE  (See Page 1, PART FIVE – Signature.):  Under penalties of perjury, I declare that the foregoing facts are true, correct and complete.**

Paul Berger
_____
Print Name

_____
Signature

6/8/1025
_____
Date

# PART THREE  Facts/Allegations

As described below, I, Paul Berger, allege that Marc Randazza has violated rules of the Florida Bar governing attorney ethics and conduct in Florida. The facts that support these allegations are as follows:

I am an attorney representing a corporate client, Roca Labs, Inc. ("Roca"). Attorney Marc Randazza represents Opinion Corp and Consumer Opinion Corp. These entities operate a website pissedconsumer.com  Mr. Randazza's clients are collectively referred to as Pissed Consumer. Roca is involved in litigation with  Pissed Consumer. I provided legal services to assist Roca in dealing with false, malicious and defamatory information placed about Roca on pissedconsumer.com.

On **August 12, 2104,** Pissed Consumer filed suit against Roca in the U.S. District Court in the Southern District of New York. At the time the lawsuit was filed attorney Marc Randazza of the Randazza Legal Group was representing Pissed Consumer (Mr. Randazza was not counsel in New York, attorney Ron Coleman represented Pissed Consumer).  I am not licensed to practice law in New York and did not file an appearance in this matter.  This case was voluntarily dismissed.

On **August 20, 2014,** Roca filed suit against Pissed Consumer in Twelfth Judicial Circuit in and for Sarasota County, Florida.  I was an attorney of record on the suit. The matter was then removed to the U.S. District Court for the Middle District of Florida where it is presently ongoing. Mr. Randazza is the lead attorney for Pissed Consumer. I am lead counsel on the case.

On **September 15, 2014,** Mr. Randazza emailed Michael Masnick, the founder of TechDirt about Roca in an effort to find a class representative "to serve Roca right" (see below). Mr. Randazza was asking Mr. Masnick to solicit clients for him and for other law firms to serve as a plaintiff against Roca (In Mr. Juravin's Bar Complaint against Mr. Randazza, he asserts that essentially Mr. Masnick was providing free advertising for Mr. Randazza). TechDirt is a technology website that claims 1.5 million monthly viewers.  Mr. Randazza and Mike Masnick are friends and Mr. Masnick has published numerous negative articles about Roca Labs and myself.  There is no reason for a technology magazine to publish anything about the

undersigned.  The only reason is the request from Mr. Randazza.

### Roca Labs
1 message

**Marc Randazza** <mjr@randazza.com>                                      Mon, Sep 15, 2014 at 8:12 PM
To: Michael Masnick ████████████

Mike,

Is it something you'd do, ask anyone reading your post if they've been threatened by Roca Labs?

I'm defending Pissed Consumer.  I'd really like some threatened parties as witnesses.

Further, i think there's a hell of a class action here - and finding the right class rep would be a good way to serve
Roca right.

--

**Marc John Randazza, JD, MAMC, LLM·** | Randazza Legal Group
3625 South Town Center Drive | Las Vegas, NV 89135
Tel : 702-420-2001 | Fax : 305-437-7662
Email: mjr@randazza.com | Website: www.randazza.com

     Since the email, TechDirt published a series of articles deriding Roca and portraying Mr.
Randazza as a legal champion (articles available upon request). Mr. Randazza augmented by
artificial stimulus the publicity normally resulting from his law practice, seeing to it that his
successes are broadcast and magnified. At the same time he took to the media to smear my
reputation.  A search on TechDirt shows dozens of articles linked to my name or about me
(articles available upon request).  These articles were published because of Mr. Randazza.

     On **September 19, 2014,** Mr. Randazza sent me an email that consisted only of the Latin
phrase *murum aries attigit* (Email attached as **Exhibit 1**). Mr. Randazza has written a blog about
the use of this phrase (Attached as **Exhibit 2**). I interpreted this cryptic email as a threat against
myself and Roca by Mr. Randazza[1]. I felt it was Mr. Randazza's announcement that he was
going to war with me and that he would show me no mercy. I also interpreted it as a command
that I surrender immediately.  I sincerely believe that Mr. Randazza's goal is to put both myself
and my client out of business.

     On **September 28, 2014,** Mr. Randazza issued a Tweet comparing me to Joe Rakofsky
and Charles Carreon. Mr. Rakofsky was an attorney who had one of his cases declared a mistrial

---

[1] *Murum Aries Attigit* was a warfare policy attributed to Mark Antony advocating "no mercy" toward Pompey and the
Optimates.  The policy was said to act as a deterrent against resistance to those about to be besieged. It was an incentive
for anyone who was not absolutely sure that they could withstand the assault to surrender immediately, rather than face
the possibility of total destruction.

by the Judge because of his apparent lack of courtroom knowledge (his first trial was a murder case). Mr. Carreon was an attorney who sued an Internet publisher and lost trying to protect his reputation online and who has a history of bar complaints. I have no relationship with either attorney and was not aware of either attorney until the Tweet by Mr. Randazza.



On **January 24, 2015**, Mr. Randazza publically called myself and every other attorney providing legal services to Roca Labs "idiots." Mr. Randazza has repeatedly called me an idiot, stupid and other derogatory and unprofessional terms.



Mr. Randazza uses social media websites such as Twitter and his friends at media outlets such as TechDirt to promote himself, smear my reputation and hurt my legal practice. Mr. Randazza's countless number of social media activities about myself ranges from stating that Roca Lab's legal team (including myself) would be a good fit for radical terrorists to stating that "Some Fucker put Roca Labs Shit in my kid's candy bag!" (social media activity upon request).

On **May 6, 2015,** mandatory mediation took place between Roca and Pissed Consumer in a different matter (*Roca Labs, Inc. v. Opinion Corp et. al.* Case No: 8:14-cv-2096-T-33EAJ). After the conclusion of mediation outside the building Mr. Randazza became enraged at Don Juravin and myself. Mr. Randazza screamed, threatened, and berated the undersigned and my client without provocation. He screamed at both of us and threatened violence against both Mr. Juravin and myself. He threatened to beat me up and send Mr. Juravin to the Gaza Strip. Mr. Juravin is Jewish and his family lives in Israel. After screaming and berating Mr. Juarvin and myself for several minutes Mr. Randazza walked to his vehicle and proceeded as if he was leaving (screaming curses at us as he left).

Rather than driving away, he stopped his vehicle, got out of the car and began to scream at Mr. Juravin and myself and made more threats of violence against us. He stated that he would ruin Mr. Juravin and sue him for millions of dollars. He then drove off in his car. The mediator, Mr. Michael Kahn, Esq., a Member of the Florida Bar (482 N. Harbor City Blvd., Melborne, FL 32935 Tel. 321-242-2564) witnessed the entire event.

On **May 8, 2015**, Mr. Randazza posted a blog on his website with the Hebrew phrase רוקה הוא מאוד נפגע מאוד (translation: "Roca Labs is very hurt"). The message was directed specifically at Mr. Juravin and was more hate speech. A brief search of Mr. Randazza's hundreds of blog posts failed to find any other titles written in Hebrew.

On **June 3, 2015,** during a conference call Mr. Randazza repeatedly berated the undersigned, calling me an idiot, stupid and a "sorority girl". After the call I sent an email to Mr. Randazza notifying him that I would not have any telephone calls that were not recorded to ensure professional behavior (email available upon request).

I am requesting the Committee investigate the above allegations against Marc Randazza to determine whether his conduct violates the Rules of the Florida Bar.

# EXHIBIT "12"

**From:** James Grady Photo
**To:** mjr@randazza.com
**Subject:** Re: Donation for PG
**Date:** Wednesday, June 20, 2012 6:33:17 PM

Summary of on topic emails today.

Steve L, with Oron help, contacts two German law firms to ask about a preemptive style suit that would prevent legal action in the USA.

One firm states they not interested IF reasoning is just to delay legal action in USA.

Second firm loosely mentions some options but insists on seeing not only the draft you sent but the exhibits - which Steve doesn't have. Later the German lawyer, Sven Podworny, says he could start something .vs Liberty but can't guarantee would solve issue or be binding in USA, and would be costly.

Further discussions involve terms of service changes for Oron.com

Then, they pull D&B on AVN to discuss suing for the posts on GFY and XBiz that are started / created by the Siep Kuppens guy from ACIUF.org, and they further discuss going directly after him in EU for reporting their stuff to Paypal, CCBill, etc. Sven Podworny tells them that its a Dutch firm, could be sued for contacting Mastercard, but not sure of benefits (damages awarded or what could be collected)

Take Note that they are upset at him (Siep) for stating that they host CP, beastiality, etc. They argue HE posts it, then reports it.

But, funny thing is - we can see Oron people using various screennames on GFY to make the same exact statements about OTHER file hosts.

Fuckers.

No discussions about money movements except that Paypal released money that had been on hold 5 months and it was sent to the HK bank (HSBC)

On 6/20/2012 6:51 PM, mjr@randazza.com wrote:
> I asked that mother fucker point blank today to assure me that the
> delays would not be used to move anything. fuck him and his shit bag
> russian asshole clients.
>
>
>    -------- Original Message --------
>    Subject: Re: Donation for PG
>    From: James Grady Photo <jamesgradyphoto@gmail.com
>    <mailto:jamesgradyphoto@gmail.com>>
>    Date: Wed, June 20, 2012 5:50 pm
>    To: mjr@randazza.com <mailto:mjr@randazza.com>
>
>    I will know in a few minutes. Source is checking


**DEFENDANT'S EXHIBIT**
397

# EXHIBIT "13"

| From: | Marc Randazza |
|---|---|
| To: | Bradley Reeves |
| Cc: | Mark Bankston: Bill Ogden |
| Subject: | Re: Extension |
| Date: | Wednesday, February 24, 2021 7:50:15 AM |

Bankston, et. al, (using last names so we don't get confused about Marc v. Mark)

My .02 -

I get that there is a history in this case, and that history is negative between counsel.  I think
that Bankston and I are probably close in how we feel about some of our predecessors.
Nevertheless, if someone else peed in the pool, and we get in the pool, that doesn't clean out
the pee, right?

In other words, I recognize that even though we didn't cause the prior acrimony, we do inherit
it.  However, having inherited it, I am trying to do my best to put it aside.  I do not want to
simply step in, I want to step in and change how things have been done.  We can disagree
without being disagreeable.  Also, many of my friends in this profession are my former
opposing counsels -- I like to enter each case with the hope to replicate that experience.  I'd
say it happens most of the time.

Bankston, in hindsight, I hope you can look at what you filed and have the humility to say
"yeah, I kinda see where you're coming from."  When you ask for an extension of time, I
presume I'm going to see "we would like more time" and that's it.  Even "We would like more
time, because if you're not going to hear the petition anyway, what's the point of the
admission?"  But, this is sorta like if you asked a date for consent to fuck her, and then you
went right for anal.  Your date might be rightly nonplussed, even if the act fit the text of the
consent.

In most things, including this, I subscribe to the view "*do not blame evil for acts that might
have been committed by misunderstanding.*"  I get that your alliance with your CT
counterparts requires you to act in certain ways that are different from how you would act
independently.  I get that you may be forced to oppose my PHV because of that political
situation.  I was under the impression that CT wanted you to be an asshole, you don't want to
be an asshole, but the cards are what they are.

I understood the request for extension as a nice way to take you out of that situation - and to at
least defer the "being a dick" part until you had to.

I know that you'll need to be a dick here and there in this case.  Me too.  I did understand that
we would endeavor to limit that.

From our perspective, this motion was a dick move.  **However, I do see your perspective on
it too.**  I think that communication about how we might see things differently is helpful -
because both of our sets of clients benefit if we are able to rise above acrimony, and keeping a
lid on it only makes it boil.

So, Bankston, all I ask of you is for you to try and see this from our perspective, see how what
you did wasn't **wrong** but might have been **unnecessary** and could also make it a little harder
to trust you.  I want us to be able to trust one another without reservation.  So, lets give that the

best possible chance.  In the future, if you ask if we wanna fuck, don't presume that we mean that we're consenting to anal, ok?

On Tue, Feb 23, 2021 at 11:01 PM Bradley Reeves <brad@brtx.law> wrote:
Who said I was ignorant about things related to these files? And what baseless accusations did I make? Stop being so dramatic; you're not impressing anyone.

What I said is that whatever made you hate prior counsel has nothing to do with me as a lawyer. If you can't see the distinction, then that's your problem.

Best regards,

Brad Reeves

Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, TX 78701
T: (512) 827-2246
F: (512) 318-2484
E: brad@brtx.law
www.brtx.law

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Tuesday, February 23, 2021 9:41 PM
**To:** Bradley Reeves
**Cc:** Marc Randazza; Bill Ogden
**Subject:** RE: Extension

Given that you're firmly proclaiming your preferred state of ignorance about the file after having made completely baseless accusations about my history in these cases because you got all riled up over nothing, I can't really say I'm looking forward to working with you, but I do pledge to try my absolute best.

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Tuesday, February 23, 2021 9:34 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Cc:** Marc Randazza <mjr@randazza.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** Re: Extension

Mark:

Way to blow the situation out of proportion. An objective review of your extension motions
doesn't jive with how you say they were written, but I'm over it. It appears you have
harbored a good amount resentment about these cases for some time, so I'm glad you got all
that off your chest. But to be clear, no I don't care why you have such distaste for the prior
lawyers; that has nothing to do with me.

I look forward to working with you on these cases. Have a good night.

Best regards,

Brad Reeves

Reeves Law, PLLC

702 Rio Grande St., Suite 203

Austin, TX 78701

T: (512) 827-2246

F: (512) 318-2484

E: brad@brtx.law

www.brtx.law

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Tuesday, February 23, 2021 9:22:05 PM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Marc Randazza <mjr@randazza.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Extension

Frankly, I find this email bizarre. I went out of my way to ensure I did not mention any
substance of the underlying dispute or make any commentary about it, going so far as to
emphasize that it was focused in the parallel lawsuit. I confined my description to procedural

facts, i.e., the pro hac has been denied twice in Connecticut and there is a pro hac currently pending in federal court. Marc's own application discloses those same facts.

I intentionally made no remarks about the details of underlying debate. Instead, I indicated to the court that any pro hac debate is unpleasant and that this debate would be time consuming given the long duration of the dispute and these cases. I did mention the court would need to review Marc's professional history, but that is obvious from the face of the application. It's not a surprise that an application disclosing numerous state bar actions for ethical issues will involve a lawyer's professional history. Indeed, Marc's application enclosed lengthy rulings on these matters, which is exactly the kind of thing the court would need to review which would make the inquiry time consuming. I discussed none of it. I gave no preview of any response. There wasn't even any indication of what the issues might be, even though those issues were discussed at length in the application.

There were no potshots taken. When I take a potshot at you, I guarantee you will know it. Your many predecessor attorneys who racked up sanctions can attest to this. And for you to blithely insinuate that somehow I am the cause of the problem when your client owes $150,000 in sanctions or that I invited the disgusting misconduct your predecessors have carried out has certainly affected my impression of you going forward.

Next time, before firing off an email accusing me of being the cause of acrimony in these cases, I would advise you to get up to speed on the file, and perhaps learn how my wife received death threats on her phone after one your predecessors went on a tirade on Infowars urging Mr. Jones' fans to stop me. You could learn how one of your predecessors provided us with child pornography. You can learn how we were accused of planting that child pornography by your client with one of your predecessors sitting right next to him, as he offered a million dollar bounty for a head on a pike, which your predecessors then defended and accused us of overreacting. You can learn how one of your predecessors tried to force my clients to publicize their home addresses despite no requirement under Texas law to do so. You can learn how one of your predecessors submitted a fraudulent fake affidavit, or how he publicly accused me of taking money from George Soros to perpetrate a fraud on the court. You can learn how each of your predecessors has consistently lied and cheated in their attempts to slide out from responsibility or engineer some absurd farce.

You say you "do not care to know" why we have no love lost for your predecessors. Maybe you should. Maybe you should read your file and learn about the revolting and ridiculous things that have occurred before having the cavalier gall to accuse me of anything, simply because you didn't like the phrasing in a benign and incredibly restrained pleading.

Despite your email, and out of respect for the situation, I am still going to try and approach this issue in a way that limits unnecessary conflict.

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Tuesday, February 23, 2021 6:47 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Cc:** Marc Randazza <mjr@randazza.com>
**Subject:** RE: Extension

Mark:

I have had a chance to review the extension requests you filed, and I must say that I am surprised at the tone and combative nature of your filings. Although I indicated we were not opposed to your extension request, that did not mean you then had free reign to give a preview of your responses to the PHV requests and essentially bad mouth Mr. Randazza in the midst your extension requests. That is not how I practice law, and I am disappointed you made the decisions you did with the various unnecessary statements in your extension requests.

Obviously, in hindsight, had we known you were going to throw these potshots into your extension requests, we would not have consented. While I hope we are not going to need to be so exacting or probing with these matters when such courtesies are discussed in the future, know that these filings by you—and how they are far beyond the simple extension requests we discussed—will make it much more difficult for us to consent to any other motions by you in the future.

I know you and I have not worked together in the past, but I do not play games like this. I understand you may have had negative relationships with prior counsel on these matters, and while I do not know or care to know the reasons for that, perhaps stuff like this was part of the problem. I am a direct, straight-forward individual both professionally and personally, and I do not take kindly to people trying to pull fast ones like you have attempted to do with these filings. But, I am hopeful that with this email laying it all out for you that we can avoid situations like this in the future.

Have a good evening.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Monday, February 22, 2021 11:49 AM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Marc Randazza <mjr@randazza.com>
**Subject:** RE: Extension

As we discussed, I'm going to ask the court for an extension to respond to the pro hac vice motion. To make things easiest, I'm going to ask for an extension until the court decides whether to take up rehearing. I assume you'll have no problem with that.

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Friday, February 19, 2021 9:40 AM
**To:** Mark Bankston <mark@fbtrial.com>
**Subject:** Re: Extension

Mark:

Can you give me a quick call re: these PHV motions? I know you've spoken to Randazza about them, but the filings were returned to me today bc of a lack of a certificate of conference, so I need to make sure I'm on the same page with you so I can re-file them today. I also called and left a voice mail on your cell phone (I think).

Give me a call at 281-813-4150 when you have a quick minute. Thanks.

Best regards,

Brad Reeves

Reeves Law, PLLC

702 Rio Grande St., Suite 203

Austin, TX 78701

T: (512) 827-2246

F: (512) 318-2484

E: brad@brtx.law

www.brtx.law

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, February 18, 2021 5:30:06 PM
**To:** Bradley Reeves <brad@brtx.law>
**Subject:** Extension


I've got no problem with your extension for the motions for rehearing.


Mark Bankston

Farrar & Ball, LLP


--

_____

**Marc John Randazza, JD, MAMC, LLM\* | Randazza Legal Group**
2764 Lake Sahara Drive, Suite 109| Las Vegas, NV 89117
Tel: 702-420-2001 | Email: mjr@randazza.com
Firm Offices - Las Vegas | Miami | New England
_____

\* Licensed to practice law in Arizona, California, Florida, Massachusetts, and Nevada.

# EXHIBIT "14"

## DECLARATION OF ALEXANDREA MERRELL

STATE OF NEW YORK   §
                             §
NEW YORK COUNTY   §

I, Alexandrea Merrell, declare under penalty of perjury that the following declaration is true

and correct and based upon my personal knowledge:

1. My name is Alexandrea Merrell. I am over the age of 18 and competent to make this declaration.

2. I am the President of Orndee Public Relations based in New York. My firm specializes in crisis reputation response and communication strategy. I have also come to be heavily involved in the growing national struggle with online harassment and defamation.

3. Over the past several years, I have assisted numerous individuals who have been harassed online, both in my business and through *pro bono* endeavors.

4. On some occasions, I assist these individuals in trying to locate law enforcement who are willing to pursue their harassers, or in trying to locate and convince attorneys to pursue legal cases on their behalf.

5. One such individual I have been assisting is Mike Postle, a poker prodigy whose professional career was cut short by a false smear campaign that he was a cheater.

6. Marc Randazza represents one of the individuals who is alleged to have defamed Mr. Postle. At present, Mr. Postle remains unrepresented.

7. Over the past few weeks, I have been contacting attorneys to see if they are interested in bringing a defamation case based on that smear campaign.

8. In early March 2021, I called attorney Mark Bankston to discuss the case. Because of my work with some of the Sandy Hook families in fighting online abuse, I knew Mr. Bankston handled these kind of defamation cases.

9. I described to Mr. Bankston the basic facts of the case, but I did not disclose Mr. Postle's name. Mr. Bankston told me he was interested in the facts and that once he had researched some legal issues he would like to talk to the client.

10. On March 17, 2021, Mr. Postle and I had a phone conversation with Mr. Randazza. During that conversation, I told Mr. Randazza that we had approached Mr. Bankston

and that he would hopefully be appearing in the near future. Mr. Randazza then said that he had to take a call and hung up.

11.   A few minutes later, Mr. Randazza called us back. He told us that he had called Mr. Bankston and that Mr. Bankston denied any intention to make an appearance for Mr. Postle.

12.   Mr. Randazza was astonishingly abusive and profane during this call.

13.   During the call, Mr. Randazza called me "a fucking cunt," "a fucking liar," and "fucking bitch liar."

14.   He then told me to "shut the fuck up and let the big boys talk."

15.   My career has often brought me into contact with lawyers and law enforcement, and thus I am no stranger to colorful language, crude humor, and the occasional aggressive confrontation. But what Mr. Randazza did was truly upsetting

16.   I am also extremely disturbed that his abuse and his insult of "fucking cunt" was meant to demean and disgrace me as a woman.

Alexandrea Merrell

Dated: March 18th, 2021

# EXHIBIT "15"

## DECLARATION OF MIKE POSTLE

STATE OF CALIFORNIA     §
                                 §
SACRAMENTO COUNTY    §

I, Mike Postle, declare under penalty of perjury that the following declaration is true and

correct and based upon my personal knowledge:

1. My name is Mike Postle. I am over the age of 18 and competent to make this declaration.

2. I am a resident of Sacramento, California. I am a professional poker player. I am currently pursuing a defamation lawsuit based on false allegations that I cheated at a series of live-stream poker events.

3. Attorney Marc Randazza represents one of the individuals who defamed me.

4. On March 17*, 2021, I had a phone conversation with Alexandrea Merrell and Mr. Randazza in which Mr. Randazza acted in an outrageously unprofessional manner.

5. During this phone call, Mr. Randazza made abusive statements, including calling Ms. Merrell "a fucking cunt."

6. Mr. Randazza also said, "I don't know who the fuck you are" and "shut up and let the boys talk," he continued to berate her and call her a "fucking liar" and a "fucking bitch" so we hung up on the call.


Mike Postle

Dated: March 18*, 2021

# EXHIBIT "16"

# Arbitration Exhibit

# 330

001986

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| | Media | | | | |
|---|---|---|---|---|---|
| 23419 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-20 12:43:30 | good. Utah was supposed to be the quickest. | out |
| 23420 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-20 12:48:02 | Wednesday, May 16 | in |
| 23421 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-20 12:55:36 | I can reserve it for you and put in for reimbursement, or you can reserve directly at 702-386-4867 | in |
| 23422 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-20 12:56:13 | ok thx | out |
| 23441 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-20 21:24:06 | Celebrating 420? | in |
| 23443 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-20 21:24:46 | lol it's a CF school night! | out |
| 23590 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-22 00:04:20 | happy earth day | out |
| 23604 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-22 08:00:11 | Celebrating by hiking grand canyon | in |
| 23605 | Marc Randazza, Esq. | (702) 539-2411 | 2012-04-22 08:10:33 | I'm shooting gay porn on your office desk & couch. | out |

9/14/12 10:18 AM



EMC000459

001987

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| | | | | | |
|---|---|---|---|---|---|
| | Excelsior Media | | | | |
| 23622 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-22 09:44:48 | Don't get jizz on my briefs | in |
| 23661 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-22 18:50:04 | Olivia squirted all over your desk & floor. Sharon won't have time to clean til end of next week... | out |
| 23662 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-22 19:01:58 | I don't want it cleaned up | in |
| 23663 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-22 19:03:40 | Jennifer's bush is gonna be very famous | out |
| 23744 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:07:17 | will a dwi within the last 3 years prohibit someone from getting a concealed carry permit? | out |
| 23745 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:08:05 | in Nevada? | in |
| 23746 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:08:24 | yes and Utah and Florida | out |
| 23747 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:09:35 | David had a dwi in July 2010 in Arkansas. | out |

9/14/12 10:18 AM

CONFIDENTIAL

001988
EMC000460

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| 23748 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:14:40 | misdemeanor or felonyt? | | in |
| 23749 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:16:05 | David A McCoigDOB | | out |
| 23750 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:17:37 | plz look him up and send me his printout. He believes it was a misdemeanor. No jail time. No probation. Lost his license for a year. | | out |
| 23751 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:18:37 | In Nevada, it is not an automatic disqual if he has a DUI. But, the sherrif must deny the permit if hee has "habitually used intoxicating liquor to the extent that his normal faculties are impaired" | | in |
| 23752 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:19:36 | he says the dwi is his only alcohol related offense. | | out |
| 23753 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:20:38 | Utah, on the other hand, I think he is hosed. | | in |
| 23754 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:21:34 | utah law provides that the state shall issue a permit, if the state establishes that he has not been convicted of "any offense" involving the use of alcohol | | in |
| 23755 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:22:15 | kk. Florida? | | out |
| 23756 | Marc Randazza, Esq. Excelsior | 7025392411 | 2012-04-23 12:22:51 | Working on it... | | in |

9/14/12 10:18 AM

CONFIDENTIAL

001989
EMC000461

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| | | Media | | | | |
|---|---|---|---|---|---|---|
| 23757 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:23:11 | Florida presumptively denies if you have 2 or more DUIs. | | in |
| 23758 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:24:12 | ok | | out |
| 23759 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:26:11 | So, I think he's a presumptive grant in NV and FL, and a presumptive denial in UT. But, he still might get through UT. | | in |
| 23760 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:26:46 | plz pull his record | | out |
| 23761 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:27:38 | If I were him, I would apply in NV (laxest laws) and wait til I got approved. Then, try UT and FL. | | in |
| 23762 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:27:48 | But I would rather not have to report that I had an application denied. | | in |
| 23763 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 12:27:50 | Pulled, on its way to you. His DUI is not coming up on it. | | in |
| 23764 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 12:28:04 | ok | | out |
| 23770 | Marc Randazza, Esq. | 7025392411 | 2012-04-23 14:04:12 | I thought you were joking about shooting in here. | | in |

9/14/12 10:18 AM

CONFIDENTIAL

001990

EMC000462

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| | Excelsior Media | | | | |
|---|---|---|---|---|---|
| 23771 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-23 14:04:34 | not at all. | out |
| 23772 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:05:04 | is that going to be a regular thing? | in |
| 23773 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:05:26 | it can be if you like? | out |
| 23774 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:08:33 | I'm glad to help out if we need a place to shoot. I'd just ask that I get some notice so I can prep the place for it next time. | in |
| 23775 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:11:01 | I gave you notice! | out |
| 23776 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:15:43 | and I was the person who cleared off your "briefs" so no one else saw anything confidential. | out |
| 23777 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:16:12 | wait a minute, were you joking about hiking the grand canyon? | out |
| 23778 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:16:20 | That's helpful. I was concerned about that. | in |

9/14/12 10:18 AM

CONFIDENTIAL

001991
EMC000463

file:///Users/Jason Gibson/Desktop/Marc SMS.Html

| 23779 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:17:16 | no. I was there. | in |
|---|---|---|---|---|---|
| 23780 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:17:41 | I can get Sharon back in there to clean up Olivia's juice, she apparently squirted everywhere. | out |
| 23781 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:18:16 | and Jennifer's bush artwork was in a bunch of the shots... | out |
| 23782 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:27:00 | That's sort of cool. And I am sure that she'll be just fine with that, if not honored. But, can you understand how I might not be all that happy? | in |
| 23783 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:28:01 | I guess the only thing that made me sad was finding my pictures of my kids and my dead best friend on the floor this morning. | in |
| 23784 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:28:44 | I wasn't joking when I texted you first thing in the morning. You had about a 5 hour window to raise concerns. | out |
| 23785 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:31:57 | I'm not going to apologize for shooting in your office when I told you before doing so and you raised no objections - even encouraged it. Personal photos would have been moved off camera as a matter of protocol. | out |
| 23786 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:35:01 | Its your building. Its your desk. You can do with it as you please. | in |
| 23787 | Marc Randazza, Esq. Excelsior | 7025392411 | 2012-04-23 14:40:11 | don't be butt hurt. this is the guy that jokes with our female paralegal about needing a handjob in front of the CEO, right? No disrespect was meant, (but you know that already) and that text | out |

9/14/12 10:18 AM

CONFIDENTIAL

001992
EMC000464

| | Media | | | was sent 5 hours before we shot in your office. You are prob the only First Amendment attorney in the biz to have a hot scene filmed in his office. | |
|---|---|---|---|---|---|
| 23788 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 14:44:45 | I'd rather talk to you in person about this, because I think that texts are creating more misunderstanding. | in |
| 23789 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 15:03:57 | We can have a 5:30p meeting. Would you like Kirk there? | out |
| 23790 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 15:04:38 | no, dont be silly. its not a huge deal. | in |
| 23791 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 15:05:44 | we can talk about it the next time you happen to be walking by my office. | in |
| 23792 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-23 15:06:05 | and in 60 seconds or less, I would expect it to be a non issue. | in |
| 23926 | Marc Randazza, Esq. Excelsior Media | 7025392411 | 2012-04-24 08:22:23 | hee hee... I should send that to her unemployment office. | in |
| 23937 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-24 09:03:18 | Gouda morning | out |
| 23944 | Marc Randazza, Esq. Excelsior Media | (702) 539-2411 | 2012-04-24 11:06:01 | did Chuck confirm for Monday May 7? | out |

9/14/12 10:18 AM

CONFIDENTIAL

001993
EMC000465

# EXHIBIT "17"

| From: | Bradley Reeves |
|---|---|
| To: | Mark Bankston; Bill Ogden |
| Cc: | Marc Randazza |
| Subject: | RE: Docket Control Order |
| Date: | Thursday, June 24, 2021 12:39:21 AM |

Mark:

I am going to keep including Randazza whether you like it or not, since he will soon be admitted PHV. I have simply held off on filing the motions because it irks you so much. But otherwise, thank you again for correcting me; I am getting lost in the verbose emails you insist on writing. I only wish I had the wordsmithing ability that you seem to have.

Regarding your proposed DCO dates, I believe it is unreasonable of you to think any trials will be occurring in February, 2022, particularly since we have been assigned to Judge Gamble's court only and it is highly unlikely she has the docket availability to do that given her other commitments to the central docket. I am also unclear as to how level 2 deadlines would be wasteful beyond you wanting to try and ramrod these cases through without adequate discovery into your clients' claims and damages. Regardless, I do agree that since a certain amount of discovery has occurred, it is somewhat reasonable to truncate the standard Level 2 deadlines, but your proposed dates simply do not allow enough time for each of these matters to be addressed. So, I propose the following dates for a DCO:

8/15/2021 – Joinder

9/15/2021 – Expert designations for parties seeking affirmative relief, with reports

9/15/2021 – Pleadings deadline

10/15/2021 – Rebuttal experts, with reports

1/1/2022 – Discovery period ends

1/1/2022 – Challenges to expert testimony

2/1/2022 – Dispositive motions and pleas deadline – filing deadline, not hearing deadline

March/April 2022 – Trials

If these dates are agreeable to you, I will send over the proposed DCOs for your approval. Let me know.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, June 24, 2021 12:11 AM
**To:** Bradley Reeves <brad@brtx.law>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Swing and a miss Brad, your first email to me was in February and the guy you keep copying who isn't an attorney in this case was referring to you as local counsel even before you emailed me. I'd say February to June is "nearly half a year." Looks like you just read my email wrong, in addition to getting your appearance date wrong. But yes, February, March, April, May, and June is sufficient time to know what motions are pending and read the appellate opinion in the appeal you were handling.

Regarding the DCO, we do not agree to the same schedule as Fontaine. I'll quote your client's other attorney in this very email thread, in which he proposed a different schedule for Fontaine because that case should not "be conducted lock step with the other 4 matters" and noting "there was no discovery conducted in this matter during the MTD stage." We agreed for that reason. In the Sandy Hook matters, as also discussed below, substantial resources have already been devoted to the litigation during the TCPA process, making standard level 2 deadlines wasteful. We will be proposing the schedule we provided below.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Wednesday, June 23, 2021 11:50 PM
**To:** Mark Bankston <mark@fbtrial.com>; Bill Ogden <bill@fbtrial.com>
**Cc:** Marc Randazza <mjr@randazza.com>
**Subject:** RE: Docket Control Order

I have only been retained in these cases since March, 2021, so I have no idea where you are getting your year and a half from. So forgive me for not knowing the files backwards and forwards in 3 months' time when, believe it or not, I have other cases going on as well.

As far as the DCOs are concerned, we are agreeable to the same DCO in each case as the one agreed to in the *Fontaine* matter. I presume that is agreeable for you as well.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Wednesday, June 23, 2021 11:23 PM
**To:** Bradley Reeves <brad@brtx.law>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Brad, you have been representing Mr. Jones for nearly half a year and you are "still working to catch-up?" Can you really not understand how that is frustrating from our perspective? And this isn't about "catching up." Even if you never reviewed the filings, and even if you never reviewed the docket sheet or tried to find out what was pending, and even if you never reviewed the Heslin transcripts or read the Reporter's Record while representing Mr. Jones in that appeal, one would expect you'd at least be familiar with the appellate opinion discussing these issues in the very appeal you were handling.

How do you expect me to feel about someone who has not done those things now attempting to negotiate a DCO in these cases? This is a serious question. Am I supposed to pretend it's good faith for you to be months deep into a case with a seriously troubled history and attempting to negotiate discovery deadlines and trial dates while "still working to catch-up?" I don't even know how it's

possible to negotiate a DCO without a firm understanding of what was pending in each case and what has already transpired. You have neither.

The reality is that I am going to be irritated whenever you ask me questions that are answered by a pile of different sources you should already know about. And this is not the first time I have asked you to get up to speed on your file before attempting to negotiate things with us. If I found myself in your current position, and I had caused my opponent to devote unnecessary time and effort to setting me straight on matters that I should have known had I exercised basic diligence, I would be pretty apologetic about that, and I'd probably have a lot of patience for any frustration directed my way. I certainly wouldn't be accusing my frustrated opponent of a lack of professionalism, because I would understand the irony of that.

But please know that I don't have animus towards you. I have animus towards some of the things you do (or chose not to). Hopefully this is a wake-up call to get up to speed on your file, and we won't be devoting unnecessary time to these kinds of gaffes in the future. But don't expect me to be chipper when we do. Nor do I feel any obligation to mask my irritation at this sort of thing. You're a grown man, and I'm being perfectly civil.

In the meantime, we provided you a DCO back at the start of the month, and we have been awaiting your response, which you said would finally be given yesterday. We have no intention of swamping the Court with an eleventh-hour briefing fight.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Wednesday, June 23, 2021 3:33 PM
**To:** Mark Bankston <mark@fbtrial.com>; Bill Ogden <bill@fbtrial.com>
**Cc:** Marc Randazza <mjr@randazza.com>
**Subject:** RE: Docket Control Order

Mark:

It would be great if you acted like a professional and avoided being as patronizing as possible in every one of your emails. I have been through many of the filings but frankly am still working to catch-up, so I appreciate you making sure I am aware of the motion to consolidate. And as you stated, I don't need you doing my job, but since you are more intimately familiar with these cases given your extended involvement, it certainly wouldn't hurt for you to be cordial and professional about things when you are responding to questions I have (or maybe that is simply too much to ask from you).

I will discuss with my clients about whether they will agree to consolidate the Lewis/Heslin matters. Thanks for brightening my day with your continued unnecessary animus towards me.

Best regards,

Brad Reeves

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Wednesday, June 23, 2021 11:33 AM
**To:** Bradley Reeves <brad@brtx.law>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Brad, before you ask me any more of these kind of questions, would you please get up to speed on your file? At least enough to know that your own client has a pending motion for consolidation? I am baffled that someone who is the seventh attorney dropping into a case upon remand is not operating with an awareness of what motions are currently pending.

But even if you hadn't bothered finding out what motions your client has pending, I would have assumed you had at least read the hearing transcripts in the *Heslin* IIED case, during which your client's motion to consolidate and my agreement to the same were repeatedly discussed by the Court. *See Heslin II,* RR Vol. II, p. 25-27 ("I don't want to make you argue the consolidation today, as I said earlier, but for the life of me I cannot imagine, and I suspect you cannot imagine either, having two trials."); *see also* RR Vol. III, p. 11 ("I think we all know eventually it will be consolidated. I'm even getting some affirmation signs from the plaintiff's side as I say this.").

I would have also assumed you had read the transcript in the *Heslin* defamation case, during which this issue was also discussed. *See Heslin I,* RR Vol. I, p. 50-51 ("And so, yes, once the next *Heslin* case gets appealed, very likely they could be consolidated at the Court of Appeals or we could do it when we come back here.").

But even if you hadn't bothered finding out what motions are pending, and even if you had never read any of the hearing transcripts, I would have assumed you were at least familiar with the opinion in *Heslin II* from the Court of Appeals, considering you represented InfoWars for the final stage of that appeal. That opinion likewise discusses your client's motion to consolidate and my agreement to the same. *See Jones v. Heslin,* 03-20-00008-CV, 2020 WL 4742834, at *2 (Tex. App.—Austin Aug. 14, 2020, pet. denied) ("Appellants filed a motion to consolidate the defamation suit and the IIED suits. However, rather than setting that motion for a hearing, Appellants instead set a hearing on their motions to dismiss."); *see also id.* ("[T]hey're *obviously* going to be consolidated together, and that's where we're headed now.") (emphasis added).

This is basic tie-your-shoes law, and I don't want to have to be the one taking time out of my day to do your job.

As it respects *Lewis,* we did not represent Ms. Lewis at the time Mr. Heslin's lawsuit was filed, and by the time Ms. Lewis' suit was filed, Mr. Heslin's lawsuit was already on appeal. Ever since, Mr. Heslin and Ms. Lewis' lawsuits have never been before the Trial Court at the same time, so a consolidation motion has not yet arisen. It has always been your predecessors' intention to seek to join her case to Mr. Heslin's case, which we indicated we would not oppose since her damages for IIED are inexorably linked to the videos defaming Mr. Heslin in June-July 2017 regarding Jesse's body. Her claim would have been filed with Mr. Heslin's claim had we represented them both in April 2018, just as we did with Mr. Pozner and Ms. De La Rosa. Having a separate trial for Ms. Lewis is plainly inefficient, and we won't be pursuing it.

Mark Bankston

Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Tuesday, June 22, 2021 6:22 PM
**To:** Mark Bankston <mark@fbtrial.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Mark:

Can you help me understand why it seems you have lumped the Heslin and Lewis matters together, particularly in light of the fact that there are 2 separate Heslin cases?

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Wednesday, June 16, 2021 1:01 PM
**To:** Bradley Reeves <brad@brtx.law>; Kevin Brown <Kevin.Brown@wallerlaw.com>; Eric Taube <Eric.Taube@wallerlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

I would estimate 5 days for the Pozner/De La Rosa trial and another 5 days for the Heslin/Lewis trial.

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Monday, June 14, 2021 12:47 PM
**To:** Mark Bankston <mark@fbtrial.com>; Kevin Brown <Kevin.Brown@wallerlaw.com>; Eric Taube <Eric.Taube@wallerlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Mark:

I recognize that each of these cases are different from each other to a certain extent, but what is your estimate for how long a trial will last in each of the Heslin matters, the Pozner matter, and the Lewis matter? I am working with my clients to determine what their schedules look like in 2022 for trial purposes.

I will also get back to you later today with my comments on a proposed DCO.

Thanks.

Best regards,

Brad Reeves

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Monday, June 14, 2021 12:35 PM
**To:** Kevin Brown <Kevin.Brown@wallerlaw.com>; Bradley Reeves <brad@brtx.law>; Eric Taube <Eric.Taube@wallerlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Regarding the time estimate, I think Brad was right in his discussion with me and Eric when he said 1.5 hours should be sufficient for all the cases. I already agreed to that a week ago. Whichever way you want to split up your 45 minutes is fine with me.

Regarding the DCO, it looks like our proposals only differ by two months, so fortunately there isn't too much daylight between the parties. But just to confirm what I'm pretty sure is a typo in your email, you do *not* believe it is reasonable or necessary to truncate the normal discovery period, correct? In other words, your proposal for Fontaine is a Level 2 order, along with the standing pretrial order?

If I've understood you right, Bill and I will confer and see if we can reach an agreement as it concerns Fontaine.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

**From:** Kevin Brown <Kevin.Brown@wallerlaw.com>
**Sent:** Friday, June 11, 2021 2:54 PM
**To:** Mark Bankston <mark@fbtrial.com>; brad@brtx.law; Eric Taube <Eric.Taube@wallerlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Docket Control Order

Mark:

Getting back to you on (1) the time estimate for the July 9th hearing – given the Court's notification about the scope of the issues to be discussed, and (2) the proposed DCO deadlines.

First, on the time estimate, we believe that 30 minutes for our side in the Fontaine case will be sufficient. Note that this estimate does not include your side's time estimate for the Fontaine case or the other matters.

Second, we do believe it is reasonable or necessary to truncate the normal discovery period under a traditional Level 2 discovery control plan in the Fontaine matter (nor that this case should be conducted lock step with the other 4 matters – given the unrelated issues). As you will note, there was no discovery conducted in this matter during the MTD stage, there has been no discovery concerning your client's claims (including those related to alleged mental anguish damages) until after

the mandate, and expert discovery will be necessary (given those Mr. Fontaine disclosed and utilized during the MTD process).

With that in mind, we propose a close of discovery on February 4, 2022 (which you acknowledge is eight months after the Court of Appeals' mandate), a dispositive motions deadline of March 4, 2022 (filed and heard by), and trial during an available and mutually agreeable jury week in April or May 2022.  Pretrial deadlines to be governed by the standing pretrial scheduling order for civil cases.

Let us know.

Kevin


**Kevin Brown**
Partner
o: (512) 685-6405
Bio

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Monday, June 7, 2021 12:36 PM
**To:** brad@brtx.law; Eric Taube <Eric.Taube@wallerlaw.com>; Kevin Brown <Kevin.Brown@wallerlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** Docket Control Order


🟥 **External Message**

Given that all the InfoWars mass shooting lawsuits have been remanded at the same time in the same procedural posture, we intend to ask the Court for a single docket control order governing pretrial deadlines in all the cases.

Under Rule 190.3, the close of discovery in a Level 2 case is nine months after the first initial disclosures are due. That due date was 50 days after the petitions were served. Your clients filed their TCPA motions on the 49th day, creating a stay until the motion was denied. Each appeal also created a stay. As a result, only one month of non-stayed court time has elapsed in each of the cases prior to mandate (the month between denial of the TCPA motions and the notices of appeal). Thus, under a traditional Level 2 discovery plan, the discovery period would end on February 4, 2022, which is eight months after the Court of Appeals' mandate.

However, in these lawsuits, the parties and the court have already devoted significant time and resources towards discovery during the TCPA process. Therefore, we think it's appropriate to ask for a custom plan under Level 3 tailored to these circumstances. We believe it's wasteful and unnecessary to keep discovery open in these cases until February. We plan to ask the Court to close discovery in December, with the first trial beginning in February, using the following docket control plan:

**September 1, 2021**
Expert witness designations

**December 1, 2022**
Discovery period ends
Dispositive motions and challenges to experts filed

**January 1, 2022**
Dispositive motions and challenges to experts heard

**January 20, 2022**
Witness and exhibit lists exchanged
Deposition designations for case in chief

**January 22, 2022**
Motions in limine filed

**January 26, 2022**
Deposition cross-designations
Objections to designations
Proposed jury charge

**January 28, 2022**
Objections to cross-designations

**January 29, 2022**
Counsel conference

**February 1, 2022**
Trial

Hopefully we'll be able to secure your assent to this schedule. We believe it provides a just and expedient resolution to these long-pending lawsuits. Please let us know as soon as possible if you can agree. If not, please let us know why you feel entitled to additional time in spite of the history of these cases.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message.

# EXHIBIT "18"



REPORTING TO YOU



*Illustrations by Claire McCracken; Photo by Simon Simard for BuzzFeed News*

TECH

## Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis And Trolls On Twitter

The new speech wars are a push and pull between individuals, governments, and platforms. At the center of this is attorney Marc Randazza, fighting for Nazis, satanists, and unapologetic trolls. Here's why.

**By Joseph Bernstein**
Last updated on September 21, 2018, at 1:20 p.m. ET
Posted on September 21, 2018, at 8:28 a.m. ET

Shortly after the attorney Marc Randazza moved into a new office

that there was nothing on the walls. Randazza's recent, high-profile clients include neo-Nazis and white supremacists, whom most of his colleagues won't get anywhere near. He's not the kind of lawyer who needs to buy fancy art. So he told his daughter to draw him something, anything, with one condition: It had to be about the First Amendment.

Today, Randazza's small space in Gloucester, Massachusetts, is still mostly bare. But across from his desk hangs a crayon rendering of an American flag overlaid with determined elementary school handwriting.

"FREEDOM," it reads in between the stars. And in the topmost stripe: "Of SPeech."



Artwork in Marc Randazza's office by his young daughter.
*Simon Simard for BuzzFeed News*

That's fitting, because Marc Randazza has what his critics would call a childish First Amendment devotion to the First Amendment. It's his labor.

his love, and, as you might expect of someone Mike Cernovich calls "the Clarence Darrow of the free speech movement," his brand. He embraces the devout and slightly overdramatic spirit of the famous Evelyn Beatrice Hall quote: "I disapprove of what you say, but I will defend to the death your right to say it." By this well-polished nugget of Enlightenment logic, the more society hates what someone has to say, the higher the calling to represent them. Historically in the US, that has meant socialists, pornographers, artists, and Nazis.

# The advent of the internet ignited a big bang of speech, the consequences of which America hasn't yet reckoned with.

For a long time, that calling led Randazza to represent some of the biggest names in porn: Kink.com, Bang Bros, Corbin Fisher. But more recently, he's become better known as a free speech advocate for a who's who of internet-famous right-wingers, people who run the gamut from trollish to hateful to worse. They include the Infowars goblin Alex Jones; the neo-Nazi Andrew Anglin; Gawker bête noire Chuck Johnson; the white supremacist writer Jared Taylor; the white supremacist politician Paul Nehlen; an anonymous planner of the deadly 2017 Charlottesville "Unite the Right" rally; and the Twitter activist Cernovich, who is Randazza's friend. In so doing, he's become the legal face of the burning conservative conviction, fanned vigorously by President Trump, that the real victims of speech suppression today are on the right.

The advent of the internet ignited a big bang of speech, the consequences of which America hasn't yet reckoned with. False speech, and speech many of us find hateful, proliferates in a way that would be unimaginable to those who waged the foundational First Amendment fights of the 20th century. And most of that chaotic.

speech — yours, mine, everyone's — is now happening in private spaces ruled by massive, unaccountable technology companies. At the moment, the people who claim to be most threatened by those companies' actions are on the right. But regardless of politics, the rules around speech have changed in a real and tangible way, and have done so largely beyond the bounds of democratic government. This vexes Randazza to the point that he's willing to argue a position that liberals see as a naked attempt by the far right to preserve its ability to publish dangerous ideas and cynical falsehoods on platforms that aren't obligated to host them.

"There is a war on right-wing speech," Randazza, whose own politics are a mishmash (he favors widespread economic redistribution and universal health care but voted for Gary Johnson in 2016), told me. "If you can't win in the marketplace of ideas, you try to change the marketplace."

The marketplace has indeed changed, but not really in the Overton window way Randazza means. In the great free speech cases of the 20th century, the government tried to limit the speech of publicly despised groups. Those fights took place in court. Today, the flashy speech fights take place on college campuses or, more often and more significantly, on the social networks that have largely privatized and monetized public discourse.

Whatever you think of the supposed war on right-wing speech, it so far has not been fought principally in the courtroom but on the servers of profit-motivated corporations more concerned with monthly active users than democratic principles. This battle has different rules — most importantly, that tech platforms can legally censor basically anything their users post for basically whatever reason, or even for no reason at all. So while a lawyer protecting a neo-Nazi's right to express himself would once have battled a state or local government and cited First Amendment precedent, today that lawyer takes on the Silicon Valley megacorporations on whose

products *no one* has any legally protected free speech rights at all, be they neo-Nazis or nuns.

Given the settled law that gives social networks such latitude to moderate speech, it's worth wondering why a First Amendment lawyer would pick this fight at all, unless to seek publicity.

But Randazza, even critical colleagues acknowledge, is much more than a troll with a law degree. At a high level, he's doing all this because, he argues, Twitter and YouTube and Facebook are de facto public spaces with capricious private overlords, and there are legal reasons that they should be more tolerant of extreme speech. To that end, he sued Twitter on behalf of Taylor, who was booted last December for violating the company's "hateful and abusive content" policy. He filed a complaint with the Federal Election Commission against Twitter for banning Paul Nehlen for a racist tweet in February, in what the complaint claims is effectively a contribution to Nehlen's political opponents in a Wisconsin congressional race. He's arguing that an anti-Semitic social media troll storm initiated by Andrew Anglin against a Montana woman did not constitute an actionable threat. And he doesn't only fight on behalf of the right; he currently — controversially — represents the Satanic Temple in a religious discrimination lawsuit against Twitter. He's consistent, or opportunistic, depending on your perspective.

But the deeper story is more complicated, and it has as much to do with the place of free speech in American culture as it does American jurisprudence.

## The backlash is a virtuous feedback loop, a sign of doing something right.

Even in less polarized times, lawyers who defend the speech of others and advocates spread. Randazza was

himself as the heir to that tradition, and all of the scorn that comes along with it — the kind of scorn one gets while defending Alex Jones' tall tales about the Sandy Hook shootings in a lawsuit filed by the grieving parents of murdered children. At 48, with a Masshole caw, a boxer's mug, and an attraction to television cameras, Randazza seems indeed to relish the blowback: from other lawyers, from anonymous emailers sending death threats, and even from a member of his immediate family who did not want to be interviewed for this story. To a lawyer of Randazza's ilk, as to a right-wing troll, the backlash is a virtuous feedback loop, a sign of doing something right.

Yet in 2018, due largely to a resurgence of white nationalism, those who have traditionally been most comfortable with defending uncomfortable ideas are reconsidering what's acceptable. In June, a leaked internal American Civil Liberties Union memo revealed that the organization had issued new case selection guidelines to help balance its mission to protect free speech with its mission to safeguard civil rights. "The potential conflict between advocacy for free speech and for equal justice in the fight against white supremacy is especially salient," the document stated. Though the ACLU played the memo down, it can easily be read as a repudiation of its famous work defending the First Amendment rights of neo-Nazis in the late 1970s — and a sign that it might not use its resources and credibility to go to bat for neo-Nazis in the future. To Randazza, this was "a betrayal," proof that even the staunchest institutional guardian of free speech was wilting in the heat of 2018's brutal partisan politics.

The memo pulls into question what Yale law professor Owen Fiss calls, ambivalently, the "firstness of the First Amendment": a dogma that the guarantee of free speech is more important than any other right. It's a powerful idea that usually goes untested. It bleeds easily into a popular belief that freedom of expression should be of paramount importance even in nonpublic domains of American life — like, say, social networks. And on the big tech platforms that control the future

of speech, this belief is very much at stake. Which is why, with or without the ACLU, Marc Randazza is determined to plead his case.



Free speech attorney Marc Randazza at his office in Gloucester, Massachusetts.
*Simon Simard for BuzzFeed News*

**In August**, I visited Randazza at his seaside office in Gloucester, the small, working-class Massachusetts port city where he was raised. Born in 1969, Randazza grew up in a tight-knit Italian American community in which everyone was assumed to be, and perhaps was, a cousin.

(While I waited in line with Randazza to buy his morning coffee at Gloucester's tiny Caffe Sicilia, he was stopped by a smiling old man with several teeth, who began speaking to him in Italian. After a few minutes, Randazza explained that the old man had known his grandfather. Randazza had never met the old man before, but, he said, "He recognized me by my face.")

Randazza was a self-described "problem child" who never skipped school. "Why would I?" he asked. "That's where the weed was." He listened to Dead Kennedys and Black Flag, and on weekends he stomped into rock clubs in Boston in combat boots. He internalized punk's DIY libertarian streak and he got off on starting trouble, physical, verbal, intellectual, whatever. It was post-Vietnam America, and authority was bullshit.

Eventually, his antiauthoritarian temperament found a principle to attach to. A far-left high school teacher told Randazza the school couldn't compel him to pledge allegiance to the American flag, as it would violate his First Amendment rights. It made an impression, all the more so when another teacher encouraged Randazza's classmates to rough him up unless he said the words.

"Every First Amendment lawyer has a 'Quit hassling me, man' moment," he said. "That was mine."

Randazza had what he called "punk rock communist politics" when he entered the University of Massachusetts, Amherst, where he "majored in female anatomy and recreational horticulture." (He really majored in journalism.) After college he tried driving a taxi, joining the Army ("because I'm a fucking idiot" — he left after six months on an entry-level separation), working as a journalist in Italy, partying in New York, and laboring on tugboats in Miami. A girlfriend in Florida told him he was smart, as had a professor in a journalism and law course in college. He started Georgetown Law School in 1997. He had just seen *The People vs. Larry Flynt,* Miloš Forman's dramatization of *Hustler Magazine, Inc. v. Falwell*, in which the Supreme Court held that Jerry Falwell could not recover damages from Hustler for a satirical interview in which Falwell discusses losing his virginity to his mother. Here was the First Amendment Randazza — and other liberals — wanted to protect: a law that safeguarded subversive speech from powerful moralistic assholes.

# "Once John Ashcroft got into his job, I started driving Porsches."

But law school was a drag. It was full of snobs, and worse, Randazza found, moralistic assholes. As a first-year law student, he ran afoul of the Women's Legal Alliance with some off-color posters in a successful bid for the student bar association. The dean of students told him to apologize. Randazza threatened to tell CNN that the law school was censoring political speech, and the dean backed down. It set a pattern of doubling down against political correctness for Randazza, who years later is still stunningly vindictive and sexist about the incident.

"The WLA cow had to apologize to *me*," he recalled in a 2016 interview.

Randazza was less successful in class. His grades weren't good enough to get a job with the ACLU, where he dreamed of working, or at a white-shoe firm, where much of his class went. Instead, after graduating from Georgetown in 2000, he bounced around. First there was a fellowship, then there was a stint doing condo law, and, finally, he landed at a small First Amendment practice in Orlando. Given that it was Florida, he represented mostly porn clients, as the Justice Department under the new George W. Bush administration had ramped up obscenity prosecutions.

"I didn't vote for the guy and I can't stand him. And he should be in jail for war crimes," Randazza said of the former president. "But once John Ashcroft got into his job, I started driving Porsches."

eep Nazis



A sign made by Randazza's daughter hangs in his office.

*Simon Simard for BuzzFeed News*

**The contemporary fight** over free speech beliefs occurs in a dense fog created by the constant conflation of federal speech laws and private speech rules.

The First Amendment guarantees freedom from government intervention into speech except in cases that create a small number of special problems, among them incitement, obscenity, and defamation. They're all intentionally hard to prove.

The private rules that govern the websites on which much of this fight takes place, Twitter, Facebook, and YouTube, guarantee no such thing. These social networks enjoy almost complete discretion to moderate content posted to their platforms how they see fit. They can take down whatever they want without meeting any kind of standard or fulfilling any kind of test at all. That's thanks to <u>Section 230 of the Communications Decency Act</u>.

Section 230 immunizes internet service providers from liability due to user-created content. At the outset of the consumer internet, they did not have this protection. In the early 1990s, a series of court rulings had suggested internet companies would be liable for content posted to their sites if they moderated that content whatsoever. That created a problem. If internet service providers were afraid to moderate for

legal reasons, they might not take down truly heinous content like
child pornography.

# Facebook, Twitter, and YouTube grew into mind-bogglingly huge companies precisely because they didn't have to worry about the ways they police speech.

Signed into law in 1996, Section 230 was originally written as a way to
allay those fears and encourage internet companies to take down the
worst kinds of stuff. A <u>subsequent federal decision</u> interpreted 230 to
mean that *any* potential liability over objectionable user content
might cause these networks to censor too broadly, and chill the
obvious speech potential of the internet. Section 230 emerged from
this ruling, *Zeran v. America Online, Inc.*, as a powerful statute that
allowed tech platforms almost complete, legally protected control over
their users' content. Facebook, Twitter, and YouTube grew into mind-
bogglingly huge companies precisely because they didn't have to
worry about the ways they police speech. Section 230 has made their
very existence possible; it is their oxygen. It is why we have the
internet we have today.

But for Randazza's clients, 230 is more like a ball gag than an oxygen
mask. Legal arguments that the big social networks are public spaces
in which it should be unconstitutional to censor speech have been met
by the judiciary with deaf ears. Jared Taylor's lawsuit against Twitter
<u>recently lost</u> in a California appellate court, which ruled that "any
activity that can be boiled down to deciding whether to exclude
material that third parties seek to post online is perforce immune
under Section 230." According to Randazza, Taylor is currently
deciding whether to appeal.

**BuzzFeed·News**   Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

It's not that 230 can't be weakened. SESTA and FOSTA, bills with bipartisan support that President Trump signed into law in April, do carve out a narrow exception to 230 immunity for state and federal sex trafficking laws. In recent testimony before the Senate Intelligence Community, both Twitter CEO Jack Dorsey and Facebook COO Sheryl Sandberg said they could be open to changes to 230. And President Trump has lobbed the occasional Twitter grenade accusing the tech industry of viewpoint suppression. But such a broad exception around political speech seems extraordinarily unlikely, even in a restive legislative environment — such regulation is much more likely to center on privacy or election interference. A source familiar with the Trump administration's thinking told me the White House sees the speech regulatory path as "extraordinarily difficult," particularly in the event of a split Congress after November.

Next week, Attorney General Jeff Sessions will meet with state attorneys general to discuss what the Department of Justice characterized in a press release as tech companies "intentionally stifling the free exchange of ideas on their platform," though two sources familiar with the initiative told me its unlikely to target 230 as a means of weakening the platforms.

"Social platforms are just allowed to viewpoint discriminate," said Kate Klonick, a law professor at St. John's University who writes about freedom of expression and social media speech rules. "They just are. There's no question whatsoever."

Klonick and the Yale law professor Jack Balkin have argued that speech regulation no longer forms a simple two-party relationship in which state power threatens individual expression. The modern model is a triangle between states, tech companies, and individual users. The state still has the limited power to regulate individuals' speech. But so too can the state pressure or mandate social platforms to limit what they publish (as it did in FOSTA/SESTA, which forced websites like Backpage to stop hosting ads for sex work, resulting in conditions that

**BuzzFeed News** Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

sex workers say have endangered them), and so too do social platforms govern the speech of their users.



A visualization of the new model of free speech adapted from "Free Speech in the Algorithmic Society: Big Data, Private Governance, and New School Speech Regulation," by Jack M. Balkin.

*BuzzFeed News*

The First Amendment, in this model, is of diminished importance; its protections simply don't apply to most speech on the internet. And in the absence of politics, the push to apply only a First Amendment standard to private speech online might be seen as a sympathetic attempt to simplify this profusion of new rules and relationships.

But, 2018. Some of Randazza's clients, most notably Alex Jones, have been challenged on two sides of this new, triangular model. Jones has been sued for defamation by parents of victims of the 2012 massacre at Sandy Hook Elementary School, which is a matter for the courts, and has been suspended and banned by various speech platforms, which is not. The conservative media has eagerly used the confusion between these two speech domains to suggest — falsely — that social platforms violate civil liberties when they moderate content. So have conservative politicians. In July, shortly after Facebook temporarily banned Jones' Infowars account, Sen. Ted Cruz tweeted:

"Am no fan of Jones ...but who the hell made Facebook the arbiter of political speech? Free speech includes views you disagree with. #1A." That tweet, of course, conflates two very different things: platform policies, which exist to protect businesses, and the First Amendment, which exists to protect speech.

Infowars host Alex Jones arrives at the Travis County Courthouse in Austin, Texas, April 17, 2017.

*Tamir Kalifa | AP*


**BuzzFeed News**   Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

“Either he's an idiot or a maniacal asshole and doesn't care.” Klonick
22-01023-tmd   Doc#1-11   Filed 04/18/22   Entered 04/18/22 14:16:53   Exhibit B contd: Pg
659 of 689
said of Cruz (who was an editor on the Harvard Law Review).

The big social networks have done much to contribute to this confusion. They enforce their rules inconsistently and hold different users to different standards. Twitter, for example, routinely <u>dismisses harassment reports</u> against neo-Nazi accounts yet <u>suspended a prominent</u> #MeToo activist for tweeting a phone number. Meanwhile, liberals have hammered these networks for not using that power more — particularly against hate speech and fake news. It's a sign of how confusing the debate over online speech is, and how it scrambles political categories, that some conservatives want government regulation of internet speech platforms, while many liberals and members of the press have called for more unilateral censorship by the very same companies.

## "Either he's an idiot or a maniacal asshole and doesn't care."

Beyond the way politicians like Cruz drag the First Amendment into the debate over online speech, the First Amendment still does influence these platforms. The American lawyers who wrote the speech rules that govern these sites grounded them in the American legal tradition. Free speech is central to the identity of at least one of these platforms, Twitter, which was famously described by executives as "the free speech wing of the free speech party." (Of course, venerating free speech principles allowed these platforms for many years to avoid the <u>incredibly difficult task of content moderation</u>.) And users across platforms have what Klonick calls "free speech expectations": Norms around free expression, which, if violated egregiously enough in either direction, could lead them to abandon a platform.

**BuzzFeed.News**   **Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis**

These norms might be shaped by the First Amendment but they aren't bound by them. That means the fight happening on social media around the First Amendment has less to do with the Constitution than it does with the values of its users and their feelings about free speech — and how likely enforcement actions are to cause them to remain on or leave a service. Do most users actually want virtual speech limited only by exceptions to the First Amendment? Do enough users care about the principle of a law that visibly protects Alex Jones and Andrew Anglin that they would abandon the platforms that censor them? Well, no. There was no exodus from Facebook after it banned Jones.

That is, most social media users probably have no special belief in the firstness of the First Amendment. As for those who profess to, well, take a look at Gab to get a sense of what a social network governed only by First Amendment exceptions looks like in practice. That free-speech-*ü*ber-alles Twitter alternative served me the following "popular posts" on a recent afternoon: a photograph of German children in traditional dress dancing a jig, an oil painting of Adolf Hitler, and a post about "#LIBERALHEADEXPLOSIONS" promising that Supreme Court nominee Brett "#KAVANAUGH IS GONNA BE #EPIC." And more to the point, from a business standpoint, very, very few people use it.

As chaotic as the big platforms are right now, in other words, users' expectations are not the thing that's preventing them from moderating — censoring — more speech. "There is no guarantee that social media platforms will continue to be so free-speech friendly in the future," Balkin, the Yale law professor, wrote in a recent paper. "Platform policies are the result of a tug of war between the demands of the company owners and shareholders, end-users and nation states. The direction of this tug of war is unpredictable."

That's frightening to Randazza, and to the cottage industry of middle-aged intellectuals issuing alarmist messages about the coddled

American mind and safe spaces. To them, a world where the discourse happens in a private digital space designed above all to prevent losing users marks a major shift in American culture. It's a move away from a time-tested speech principle and toward a trendy profusion of speech rules — rules that they say are bound to boomerang on young liberals who don't remember past speech wars.

More than that, it's a future in which the invocation of free speech loses its talismanic cultural power to connote neutrality, fairness, and democracy. But then again, it's worth wondering how and for whom it acquired that power to begin with.



Simon Simard for BuzzFeed News

**Randazza may have** gotten his Porsches from porn, but he got his passion from politics, and developed an eye for media-savvy trolls long before the rise of the alt-right. In 2009, a Florida computer science student registered a domain, "GlennBeckRapedAndMurdered-AYoungGirlIn1990.com," as, he said, a parody of Beck's questioning

filed a defamation suit against him with the World Intellectual Property Organization. Randazza took the case and successfully argued that the site was a political statement. Afterward, having proved the point and drawn an enormous amount of attention to the site, Randazza suggested that they give the domain to Beck.

"It was fun shoving his bullshit right up his ass," Randazza said.

Mostly, though, Randazza was good at keeping porn clients on the right side of the law. In 2009 he got hired as general counsel for Liberty Media, the gay porn giant. That job went sour. In 2012, Randazza quit amid mutual recriminations; Liberty claimed that Randazza had been ripping them off with outside work, and Randazza claimed that he had been ripped off, harassed, and wrongly fired. In 2015, Randazza lost at arbitration — in which he was represented by Ken White, of Popehat.com — and was ordered to pay Liberty $600,000. (Earlier this year, a federal bankruptcy judge vacated the award.)

# "It was fun shoving his bullshit right up his ass."

It was a dark year. Randazza's marriage began to fall apart at the same time. One of the people who got him through was Mike Cernovich. The two had known each other by reputation since the mid-2000s, when they both had active legal blogs. (Cernovich started Crime & Federalism in 2004, years before his turn to men's self-help and anti-feminism on his better-known blog, Danger & Play.) They got to know each other better when Randazza represented dozens of legal bloggers and other publishers, including Cernovich and Ken White, who were sued for defamation by a lawyer, Joseph Rakofsky, for reporting that he had been laughed out of court for poor performance by a judge. (The suit did not go well for Rakofsky.)



Years later, Cernovich reached out to his old attorney when he learned that Randazza was struggling.

"Mike was there for me when things started to go bad," Randazza said. "A lot of my personal life started to fall apart. A lot of people who were swinging from my nuts started to let go."

The two became close friends, and Randazza began to represent Cernovich in intellectual property and open records cases. That's how he became the house free speech lawyer for the right-wing internet.

"People who were politically aligned with him saw that I did good work for him," Randazza said. "They trusted me despite me not being a political ally. I believed in their rights."



Conservative media personality Mike Cernovich speaks during a tour stop with Kelli Ward, Republican US Senate candidate from Arizona, in Phoenix, Aug. 24.

*Caitlin O'Hara | Bloomberg via Getty Images*

But Randazza does more than simply believe in and protect the rights of his new clients. One of the open records cases he's litigated for

Cernovich involves Jeffrey Epstein, the disgraced financier who pleaded guilty in 2008 to soliciting prostitution and procuring a person under 18 for prostitution. Epstein's alleged sexual abuse of minors has been for years extrapolated into a wide-ranging conspiracy theory on the right regarding a child sex ring that involves the Clintons, Hollywood executives, and the financial elite. Cernovich, who promoted the Pizzagate conspiracy, has consistently pushed pedophilia conspiracies. In pursuing open records cases for him, Randazza appears to be furnishing Cernovich with fresh ammunition. (Both men point out that the Reporters Committee for Freedom of the Press filed an amicus brief, signaling their support, in the matter.)

Beyond providing his noxious clients material aid and comfort in the disinformation wars, Randazza's critics say, he's failed to maintain a barrier of professionalism between himself and their rhetoric. Unlike the stoic ACLU lawyers who argued for the First Amendment liberties of neo-Nazis in the 70s in Skokie, for someone doing a supposedly solemn duty, Randazza sure seems to be having a blast. He attended the January internet-right party "A Night for Freedom" in DC. He regularly appears on Infowars to discuss First Amendment law. He's made the bizarre, seemingly tongue-in-cheek argument that his client Andrew Anglin shouldn't be responsible for coordinating the harassment of a Jewish real estate agent because he doesn't believe the Holocaust happened. Whether or not it's part of a vigorous representation, Randazza appears to have bought into some of his clients' bullshit. In a July column titled "Just Because You're Defending Nazis Doesn't Mean You Have to Be a Prick About It," Above the Law editor Elie Mystal lambasted Randazza, with whom he is friendly, for publicly stating that Alex Jones has compassion for the Sandy Hook parents:

"If you are going to make your career along the lawyerly duty to give the most disgusting among us a competent legal defense, then *stick to the law*. If you have a First Amendment argument, MAKE IT, and leave the rehabilitation of Alex Jones's character to Donald Trump. A Court

is the place where we have stylized arguments about the technical legality of proposed atrocities," wrote Mystal.

Indeed, in the anti-snowflake right, Randazza seems to have met his rhetorical tribe, a group of offense-giving white guys who relish backlash. Recently, the subject of North Korea's large untapped gold deposits came up on a conference call between Randazza, Anglin, and Randazza's partner, Jay Wolman, who is Jewish. Randazza impersonated Eric Cartman from *South Park* and repeated that character's joke about Jews knowing where gold is hidden. Anglin asked Randazza if he was red-pilled. Randazza laughed and said of course not.

"I have an affinity for people who stir shit," Randazza said. "I've been stirring shit since I learned how to stir shit."

# "I'm going to bring the fist of fury and I'm not going to cover it in the most comfortable lubricant."

People who stir shit: While we were sitting in his office last month, Randazza received a call from Dennis Hof, the Nevada pimp who is the Republican candidate for state legislature in his district. Nye County had just revoked Hof's brothel license, which Randazza said was an act of political retribution. (Randazza also has an office in Las Vegas, and he represented Hof in a successful First Amendment case against the county, which took down some of his campaign signs.) On the call, Randazza referred repeatedly to a county employee as a "cunt," as the men plotted how to take revenge.

"I'm going to bring the fist of fury and I'm not going to cover it in the most comfortable lubricant, Dennis," Randazza said.

 **BuzzFeed News**  **Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis**

Like his clients, Randazza relishes shocking speech. No matter how much his political views diverge, he shares with them a tone, which in 2018 has become a form of politics all its own. And judging by his tweets bemoaning outrage culture and wokeness, he sees threats to that tone as a threat to American free expression, even if those threats have nothing to do with the First Amendment.

"Absolutists to their discredit mow the lines between these two," Mystal told me. "Most of the First Amendment absolutists think political correctness has been a scourge on America. It crosses the line from defending a principle to defending the idea that anybody can say anything to anyone else with no repercussions."

The problem with this kind of conflation, Mystal said, is that it reorients the threat to liberty from the government to the threat to liberty posed by callout culture. It's a misdirection of the "don't tread on me" impulse focused on cultural authority instead of government authority — hence the concept of cultural libertarianism. That's how President Trump, the most powerful man in the world, can present himself as the target of a powerful conspiracy to his base.

"If you're going to put your whole flag on the First Amendment," Mystal said, "That flag needs to be firmly planted against the government." Randazza's defenses of Jones and Anglin don't involve government action; they're lawsuits filed by private citizens whose lives have been irrevocably altered by speech.

Mystal's point echoes one long popular among liberal First Amendment thinkers. In his famous survey of freedom of speech in America, *A Worthy Tradition*, Harry Kalven arrived at one central meaning of the law: that "seditious libel cannot be made the subject of government sanction."



**BuzzFeed News**    Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

# "A case against an asshole does not have an impact limited to assholes."

Neither the Trump administration nor state governments are censoring conservatives, who hardly pose a seditious threat to the government. Indeed, it's hard to say that there's a proper First Amendment threat to conservative speech at all. In fact, it's probably easier to make the opposite case. Unlimited corporate money has been protected as political speech under the First Amendment since *Citizens United v. FEC*. The Supreme Court, underline moving ever rightward, recently ruled that labor unions cannot compel nonmember workers who benefit from union protections to pay dues, on the grounds that doing so violates their free speech rights. In her dissent in the case, *Janus v. AFSCME*, Justice Elena Kagan accused her conservative colleagues of "weaponizing the First Amendment."

Still, Randazza and other First Amendment advocates argue that it's impossible to separate the cases against Jones and Anglin from other future censorship that could result from judgments against them — a precedent that could eventually be aimed at more vulnerable political groups.

"That's fencing off in an unrealistic way the impact of cases involving Nazis," Ken White told me. "A case against an asshole does not have an impact limited to assholes."

It's a tough message to deliver in a time when it seems like the assholes are winning. Do they really need the help? Ask Randazza why he's defending people whose entire raison d'être is triggering the libs, and he throws up his hands. The principle is the thing that has got us this far, he says, and it's the thing that he'll continue to fight for.

"It's like evolution. I'm not smart enough to say where's it going. I'm not smart enough to tell you where the marketplace of ideas will lead.

us. Maybe the apex animal is the cockroach or the rat. Maybe that's where the marketplace leads us.



*Simon Simard for BuzzFeed News*

**Judging by the** current state of Twitter, Facebook, and YouTube, not to mention the national discourse, the marketplace of ideas may have already crowned the cockroach. And yet these networks, under political and cultural pressure to fight the spread of disinformation and harassment, have in Section 230 a very powerful can of Raid. That is, near-absolute authority to moderate their platforms, over and above cries of chilled speech from the right.

However prominent those cries, they may well be met with popular indifference. Just as Marc Randazza formed his beliefs around free speech in a liberal culture that lionized the First Amendment for protecting Vietnam protesters and Larry Flynt, young people in 2018 are forming their opinion of free speech in a moment when those most loudly claiming its virtues are conspiratorial grifters like Alex



**BuzzFeed News**    Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

Jones and racists like Andrew Anglin and Richard Spencer. It's not clear that they like what they see.

Even as Randazza argues his clients' cases on First Amendment grounds, he may well be harming the popular sentiment around free speech that is one of the only bulwarks against platforms unilaterally censoring all they want. He may be defending the neutral principle of free speech in the courts while helping to damage it in the speech arenas of the present and future.

Those close to him seem to have some understanding of that potential damage. Recently, Ronald Green, Randazza's partner, called to say he had serious misgivings about taking on a very high-profile prospective client. (Randazza and Green told me this anecdote on the condition that I not name the client.) Green thought that this person was motivated to speak so he could make money, regardless of the truth. It might set a bad example, he reasoned, to argue that this speech, which was full of conspiracies and inflammations, should be protected under the First Amendment.

"Sometimes we have to take people on who we find unsavory, but that's what a commitment to the First Amendment means," Randazza told Green. Discussion over. They took the client — consequences be damned.

In the wake of the recent campus free speech debates, polling around millennial and Generation Z support for free speech principles has become the subject of fierce debate. Those on the right and the center claim the data show a drop in tolerance for dissenting viewpoints, and those on the left say the data show that these groups are only against certain *kinds* of dissenting viewpoints (namely, racist speech). Even assuming no change in popular support for free speech principles and absent regulation, there's very little, besides their own squeamishness,

to stop social platforms from developing their own speech codes to a

act genuinely afraid of the conservative response to accusations of censorship. Still, it's hard to imagine, if the platforms move gradually enough, that conservatives can stop the move to speech rules that seek to guarantee what Kate Klonick calls "the fair opportunity to participate."

Of course, even well-intentioned speech rules are incredibly difficult to design; they can chill wanted speech, and they can backfire. In 1987, the University of Michigan enacted anti–racial harassment speech codes in response to a series of racist incidents on campus. In the 18 months the code was enforced, before being struck down in federal court, 20 black students were charged by white students with using speech such as "white trash."

Some version of this, the dreaded false equivalence, already exists on the internet. Right-wingers on Twitter, including Cernovich, have turned the tactic of reporting offensive past tweets into a poisonous campaign against liberals — winning temporary suspensions. (BuzzFeed News staffers, including me, were caught up in the most recent round of this.) More ominously from a legal standpoint, a judge in California recently overruled a motion to quash a subpoena that now has the potential to unmask Randazza's anonymous Charlottesville client. It's easy to imagine how a different kind of judge might look to such a ruling to justify unmasking, say, far-left protesters. And First Amendment advocates like Randazza will be the first to say "I told you so."

# Marc Randazza may be helping to hurry the process by which young Americans come to see a guiding cultural principle as a cynical tool.

**BuzzFeed News**  Devils' Advocate: Meet The Lawyer Fighting To Keep Nazis

That's why Marc Randazza fights for a neutral principle that protects everyone's right to express their views. He argues it's the best way to structure public discourse. His clients have included not just bombastic right-wingers but the American Muslim Women Political Action Committee, the political activist Vermin Supreme, the Satanic Temple, a woman blogger whose coverage of the Steubenville High School rape case turned it into a national story, and the controversial civil rights attorney Lisa Bloom. He lives his ideals.

But the First Amendment in the United States isn't in danger. When white supremacists wanted to rally in Washington in August, they received a police escort and their own subway car. What's in danger is the status of near-total free speech as an unalloyed cultural virtue in the eyes of an American public who has seen unfettered free speech on the internet help flay the country apart. What's in danger is a thousand virtual Skokie marches a day hindering the still real democratic potential of social platforms. And in not just representing, but rhetorically casting in with the loudest, least sympathetic, and least sincere people to claim the firstness of the First Amendment — people whose speech is totally unthreatened by the current federal government — Marc Randazza may be helping to hurry the process by which young Americans come to see a guiding cultural principle as a cynical tool.

Which would be a shame. Because there are urgent free speech cases out there. In August, federal agents arrested a 33-year-old Boston man who tweeted that he would give $500 to anyone who killed an ICE agent. It's a despicable sentiment — one that should have gotten the man kicked off of Twitter. But this man has been charged with "using interstate commerce to transmit a threat to injure another." His speech clearly falls short of the famous *Brandenburg v. Ohio* test for incitement, which allows for punishment only of speech that is calculated to produce "imminent lawless action" and is likely to actually produce that action. And given the number of death threats

lodged every day on social media, the prosecution seems selective, to say the least.

Back at Randazza's office in Gloucester, I asked him why he does what he does. He pointed out the window at the old town. "People came here in 1623," he said. "I don't buy the mythology that they came here for freedom. They came here to be zealots. This country has been the shit stirrer since the day it was founded." He paused. "I am having fun, but I'm tired too. I love doing this because I sincerely love this country. I believe what I do is the only way that I know how to pay this country back." He began to cry. ●

## CORRECTION

September 26, 2018, at 11:08 a.m.

The ACLU has not taken the case of Brandon Ziobrowski, a Massachusetts man arrested for offering a reward to anyone who would kill an ICE agent. An earlier version of this story claimed the organization was representing him.

**TOPICS IN THIS ARTICLE**

Facebook  Twitter



Joe Bernstein is a senior technology reporter for BuzzFeed News and is based in New York.

Contact Joseph Bernstein at joe.bernstein@buzzfeed.com.

Got a confidential tip? Submit it here.

## FINCEN FILES

# THE INVESTIGATION THAT CHANGED THE BANKING INDUSTRY

A BuzzFeed News investigation, in partnership with the International Consortium of Investigative Journalists, based on thousands of documents the government didn't want you to see.

eep Nazis

# EXHIBIT "19"

# Cross: Marc Randazza, First Amendment Badass

Feb. 17, 2016 (Mimesis Law) — *Ed. Note:  Scott Greenfield crosses Marc Randazza, practicing nationwide out of Las Vegas, Nevada, and writing for Popehat and the Legal Satyricon.*

Q. Before you decided to wreak havoc upon the law, you were a journalist coming out of college. What made you turn to journalism? How did that work out for you?  What about your journalism career made you say to yourself, "for a journalist, I'd make a damn good lawyer"?

A. In high school, I only had one teacher that I really got along with – my writing teacher. So that gave me an instant interest in journalism.  I thought that Hunter S. Thompson and Ernest Hemingway were great role models.  So, I majored in journalism because I thought it would be a good major for someone who liked to write and drink gin.

There was one problem, though. There was a mandatory class in J-school that met on Friday mornings at 9 AM. That was incompatible with my lifestyle, which commanded that weekends began on Thursday and ended on Tuesday – and no classes before noon.  So, I took a detour, changing my major multiple times.  At one point, I majored in "Social Thought and Political Economy."  This was a major that only existed at UMass.  Today, you'd call it, "SJW studies." As much as I liked the revolutionary aspect of it, even back then, I started to realize that these people were fucking nuts.

I didn't really learn much in the first few years of college. I was there to drink, do drugs, and chase girls. Despite my requests, UMass wouldn't give me college credit for that though, so I flunked out.

When I managed to come back, they got rid of that 9 AM course in the J-School, so I went back to journalism. Then, I took a course, Journalism and Law.  That was the first time I was academically exposed to the First Amendment.  And, that was the first time that a professor showed any interest in me, or told me that I had any promise.  Karen List.  She saved my life. From there, I thought "I want to be a First Amendment lawyer." I buckled down, and was an A student from then on.

Once I graduated, life took me on a few detours. I decided to work in journalism a bit, writing for Italian newspapers, doing some correspondent work in Rome and Palermo.  I couldn't really make much of a living at that though, and started writing and working on fishing boats, merchant marine ships, all over the world.  I actually started mailing out applications when I would hit port calls.

So, it was more that I considered journalism to be my pre-law experience than I was a journalist who decided to become a lawyer.

Q. One of your inspirations for going to Georgetown Law was the movie, *The People vs. Larry Flynt*, which explains far more about you than anyone likely cares to know. What is it about *Larry Flynt* that caught your attention? Would you rather be the Hustler or repesent him?  Did you have a particular

interest in obscenity law?  And with that in mind, a Jesuit school?  Was Georgetown amenable to someone with your interest in the First Amendment?

A. Remember in undergrad that I spent some time in that "SJW studies" major? As a college left-wing radical, we all knew that the Right wanted to take away our free speech rights.

But, around that time, I learned how vicious anti-free-speech feminists and the left could be. I learned that I believed in the First Amendment as a value in itself, untethered from any political polarity.

I saw how the lawyers who represented Flynt, and Flynt himself, stood up for freedom of ex-pression against the left and the right. I also noticed through law school that the cases that were the most constitutionally interesting happened to be ones dealing with erotic expression.

Georgetown was *not* a place I would call friendly toward the First Amendment. However, that had nothing to do with the Jesuits. In fact, the Jesuits were great – I became quite good friends with those that I spent any time with. The real problem at Georgetown was that it had "social justice warrior" mentality as well. The prevailing view there was that if it was speech that made someone upset, it should not necessarily be protected.

For example, I was drinking in a bar one night with some classmates, and one of them sug-gested that I run for the Student Bar Association. I had zero interest in the SBA, but he pulled out a copy of the Washington City Paper, and there was an article about penile implants. There was a picture of a guy with a quote that said, "you could hit my penis with a sledgeham-mer, and I wouldn't even feel it. – Fred C., unsatisfied penile implant customer." My buddy tore that page out, slapped it on a sheet of paper, and underneath wrote "Vote for Marco, 100% real, No insensitive dick."   He said, "there's your campaign poster."

I agreed. We put the posters up everywhere on campus, and the Women's Legal Alliance went around and tore them down, because they were "offensive to women." Then I got called down to some dean's office, where I got scolded for being "offensive." And, in my mind I was think-ing, "you were lucky to get in here, just go along to get along… say you're sorry, and move on…" But, what came out of my mouth was "are you fucking shitting me? This is the eve be-fore an election, and because these harpies are pissed off at their fathers, *my* political speech is being censored, and you want an apology from ME?" I was asked to leave the room, and I heard the sounds of a pretty heated argument inside, and then the WLA cow had to apologize to *me*. And, I got my posters put back up.

That's when I started to realize that I really did want to be a First Amendment lawyer… and that I was likely to have clashes with the left-leaning anti-speech forces as much as I might have to confront the "religious right" as portrayed in the *People v. Larry Flynt*.

Q. After you got your law degree, you chose to head down to Florida for a masters in mass commu-nications. Were you having second thoughts about law? You wrote your thesis on "vote pairing," which turned out to be enormously timely in the 2004 elections. What did that do for you? Was it worth the time after law school to get a masters degree?  Has it helped you as a lawyer?

A. Actually, I decided to do the masters there because I wanted to do more academic work in media law – and UF had a great program for that. My undergraduate mentor suggested that I might enjoy working with Bill Chamberlin, a great communications law scholar who was there

at the time.   I got offered a fellowship, and thought it would be a lot of fun – and it was. While I
was there, I joined the bike racing team. I also got a big grant from the student government to
revive the UF skydiving team, so I spent a lot of time jumping out of airplanes, reading First
Amendment law, and riding bikes. Who the fuck wouldn't want to do that for a few years?

I did find that UF was a lot more tolerant than Georgetown. I took a few classes in the law
school there, and I was struck by how much better the classes were – professors who actually
wanted to know you, and professors who wanted to teach you. The contrast was day and
night.

The success of my thesis was shit luck. I started writing my thesis on how evil the RIAA was
for trying to enforce copyright law. But, as I did my research and writing, my position on that
changed 100%. As I kept looking at the problem, I realized that my view boiled down to what a
lot of people think — "*boo hoo, people don't want me to steal*." Once I realized how full of shit I
was on that, I lost my passion for the project after a year of working on it.

At about the same time, the "Vote Swapping" thing popped up. I thought it was interesting as
hell. It was political speech and coalition building online. It had everything except porn, as far
as a fun First Amendment topic. So, I called my thesis advisor and told him that I wanted to
change my topic, after a year of work, and three weeks before a major draft was due. He was
pretty exasperated with me, for good reason, but told me he would bless the change.

So I hunkered down for three weeks in the J-school computer lab, and ate every meal from the
vending machines there. I did not sleep much, nor even see the outside world, but I got a
really good draft done. Then, it was perfect timing, because I figured that the 2000 election
results would mean that I could just slap on one of two pre-written conclusions.

And then we sat there all night long waiting for the election to be called.

And then the legal challenges started. I was just in the right place, at the right time. All the
usual suspects who were going to write about the election ran like moths to the flame on the
core issues, leaving a big issue like this as unoccupied territory – allowing a new scholar like
me to write and publish on it. I got my thesis published.

Then, in 2004, it looked like this would be an issue again. I updated the thesis for 2004, and
got another publication out of it.

The publications I got from that got me on Fox News. And one thing led to another, and the at-
tention from being the "Liberal foil" on Fox plus the publications (one of which got cited by the
9th Circuit) led to me establishing an early name for myself in First Amendment law.

So yeah, I would say it was worth it. The Masters was worth it for a few reasons. Mostly, I
learned more about writing and First Amendment law in that program than I did in law school.
Bill Chamberlin really took me under his wing, and taught me more about scholarship than I
ever thought I could know. I made great friends and connections there. I thought the legal edu-
cation at Georgetown was mediocre. But, the UF faculty, both in the J-School and the law
school, was much more focused on developing us as students, and creating community. I
wouldn't have given that experience up for anything.

And, funny enough, as much as I shit on law professors without legal experience, the best law
professor I ever had was Bill – who didn't even have a JD. But, he is really the one who taught

me legal writing, and he was the one who inspired me to publish scholarship for the sheer love of it, and who gave me the skills to keep doing so.

Q. You were an adjunct professor at Barry School of Law for a while, teaching First Amendment, Copyright and Trademark law. How did you like teaching? Did you consider going the tenure route? What was your sense of others in the legal academy?  You've been critical of academics for keeping to themselves and engaging in a "circle jerk," refusing to engage with people outside their clique. What is your problem with scholars?  Are they as smart as they think they are? Are they in touch with reality?  Do they use their scholarly credentials to serve less than savory purposes with their social and political agendas?  And how did they react to your challenges?

A. I loved teaching. But, I knew that teaching at Barry, I was looking at a class full of students who were not going to be treated kindly by the shrinking job market. So, I did everything I could to give them practical training – I wanted them to have an edge. I remembered the contrast between my professors at Georgetown, who seemed to only teach so that they could promote their publications, and my professors at UF who seemed to really want to be "teachers."

I tried my best to emulate the latter. And, I tried my best to help my students not only learn the theory, but to learn the practice. For example, I made them all bill for their time on their papers, so they could learn how to actually *practice* law.

Another thing I enjoyed was actually fostering debate and challenging ideas there. I taught a seminar on the Free Exercise clause, and I had a student in there who was an Evangelical Christian – I made no secret of the fact that I am a militant Atheist. When that kid booked the class, he came to me and said he was shocked – that he was hoping for, at best, a B-, because I never agreed with anything he said. I explained to him that he wasn't graded on how much he agreed with me – but by how well he articulated his own position and how well he knew the material.

I did consider going the tenure route. In fact, I went through the interview process for a few rounds, until I finally decided it wasn't for me. Two things made me change my mind: First, one of the professors on the committee told me that using current events and a sense of humor in teaching was a bad idea, because I might "trigger" someone. The example she used was how she knew someone who had used the O.J. Simpson trial as an exam question, and a woman in her class who had been abused by her husband ran out of the room in tears – so you never know when you might "trigger" someone.

My response to that was, "give me a break." Yes, you should care about your students' experiences and value them. You don't make rape jokes or jokes about the Holocaust, but that's because that's just douchey. But, there is a point where we can't just say "never include current events" and "never make a joke" because everything will flip someone out.

With a media event that is on every network, every radio station, every website, for all that time – and you can't handle an exam question that mentions O.J. Simpson? That says something about your mental health. If we are going to temper our sense of humor to that low of a risk tolerance, we might as well hang up any hope of trying to communicate at all. Maybe we should be more careful about who we let in to law school, if someone is going to run out of an exam hyperventilating if we mention O.J. Simpson on an exam.

Second, they told me that they didn't like how much practical experience I had, and they wanted me to cease practicing if I was going to teach. I said "what sense does that make?" They explained that the preference was for professors who had not been "tainted" by more than three years of practical experience – and I was already past that. I told them that there was no way I was going to cease practicing, because that was the greatest source of teaching material you could ever have. That did not go over well with all of the committee.

I found my colleagues at Barry to be pretty cool, but in general, I think only about a quarter of full time academics have any business teaching law students anything. The whole academy is built on bullshit. When you have law professors who never took the bar exam, and the average actual experience practicing law is less than three years, what is this entire institution based upon?

Q. You are renowned for your cautious use of delicate language, particularly the word "fuck" wherever possible. Some have called you vulgar, but others say that you're making a point, that words are just words, and you're doing what Lenny Bruce tried to do in the '60s, to inure people to words they find offensive rather than to censor words. Which is it? Are you a foul-mouthed cretin, or is there method to your madness?  Is it helping, or are things getting worse with the efforts to silence "hate speech," micro-aggressions and offensive language?

A. Lenny Bruce said "**Take away the right to say 'fuck' and you take away the right to say 'fuck the government.'**" I love that.

And, I know that I am often using "salty" language. I did not grow up "upper class." I grew up in a fishing town, the son of a guy who fixed air conditioners, the grandson of fishermen, in a very working class town. "Fuck" is punctuation for us. I love how these soft-handed academic pussies have a big problem with me speaking in my home vernacular, but they'd call anyone racist who complained about someone from a black neighborhood throwing in a little bit of their vernacular. Or if someone shit on someone for tossing in a little bit of Yiddish into their speech. You say "shmuck," I say "fuckhead."

I wish I could say that I'm half the fucking visionary that Lenny Bruce was, but I just speak from the heart, and sometimes that heart says "fuck you." I spent a few years trying to be someone I'm not. I tried using soft academic language. I tried "code switching." I didn't like it. I'm a working class Sicilian from a fishing town in New England, suck my salty cock if you want me to talk like some fucking pussy from wherever the fuck land.

Does it help? It helps in some ways. For example, I have never met anyone who said, "I'm ambivalent about Randazza." Yes, it turns some people off. Well, I think those people would be turned off by me after they got to know me better even if I toned it down. I know it turns some people off, but I'm pretty sure that there's nobody in the world who dislikes me who would like me if I'd just stop using indelicate language. I don't know anyone who is ambivalent about me.

At the same time, I get mail from people who appreciate that I bring the law down to a more proletarian level. You know, there was a time when they burned people at the stake for translating the Bible into English, because "the people" shouldn't be reading the word of god – it should be given to them by the priests.

So, I understand that the academics think that maybe only their over-privileged pussy students should learn the law from *their* over privileged namby pamby mouths. But, "*sir, I am incredu-*

*lous as to your disingenuous notion*" is how they say it. "You're full of shit" makes a lot more sense, and gets right to the point.

Q. As a lawyer, you've been on both sides of the copyright debate, going after copyright trolls like Righthaven, but also seeking to enforce copyright on behalf of your clients, most notably in the porn industry. Is this just a lawyer doing his job, or is there a principle at stake here? Which side do you back, the enforcers of copyright or those victimized by the trolls?

A. I don't think that copyright is a "you're with us or you're against us" formula. I realize that there are a lot of fucking idiots out there who are religious zealots when it comes to copyright. Remember my original thesis? I thought, "copyright bad." Why? Because I loved downloading gigabytes worth of "free" music from Napster, and I was pissed when it had to shut down.

And so as I attacked that issue, I realized that the "freetards" are really full of shit. Yeah, copyright maximalism sucks. I hate the fact that copyright terms are so long – I think they should be subject to a 25 year term and a 25 year renewal term, which can't be bought or sold until after the renewal. I think Fair Use should be beefed up to a real goddamned right. I think that orphaned works should automatically drop into the public domain.

At the same time, I think that rampant piracy sucks. It hasn't just hurt the big companies, who I give no fucks about. Its hardest impact has been on small producers. Ultimately, it means less small producers, less small productions, less diversity of thought. So, every time some fucking asshole steals and redistributes a small-batch film, its not like they're stealing a hamburger from McDonalds, its like they're stealing an artisanal dry aged Elk steak from some one-location restaurant. You shouldn't do either, but if the food industry had a 20% chew-and-screw rate, do you think we would have anything but chain restaurants?

That's going to be the ultimate result from unchecked piracy. Big companies will still be able to extract money from their businesses – but new entrants and diverse entrants will be locked out.

When it comes to copyright, I refuse to take a "side" on the enforcement vs. defense divide. I see no "divide" there. The law is the law. I think that some aspects of the law should be changed, but I'm not the legislature. I enforce the law on my clients' part when I am called upon to do so, and I defend my clients when called upon to do that.

In *Righthaven*, I thought what they were doing was wrong, and a perversion of copyright, so I greatly enjoyed defending that set of cases. On the other hand, I understood that the news business is tanking because it can't monetize the way it could before.

I've encountered plenty of crybabies who cheered when I defended *Righthaven* victims, but got very bent out of shape when I enforced copyrights on behalf of porn companies. What they didn't see is that I actually defended a number of "torrent" cases too – when I thought there was an important principle in play, or just when a client called upon me to.

For example, in one case, a defendant called me because he knew that I did a lot of these cases for the plaintiffs. He presumed that since I did the plaintiff side a lot, I'd know the playbook well. He was right, and I defended him quite well. I can't discuss the actual settlement, but lets just say that he was quite grateful. In another case, I took on a client pro bono because I thought that he had a very interesting argument. The defense lawyers all thought that dividing defendants on improper joinder arguments was the best strategy – I thought that

keeping defendants together allows them to join forces. That worked well in that case as well, as it wound up getting my client out for nothing.

On the other hand, I brought lots of torrent cases on behalf of a client because, as I said in the press at the time, that client was losing money left and right because of widespread piracy. The company demanded that I put an end to it. I did my duty, and did it damn well, and it laughed all the way to the bank. They've subsequently said that they didn't want to do those cases, and that it was all my doing – now that this narrative suits them. But, I'll say here and now that this is total bullshit. In fact, I'm the one that shut them down, when I felt thought it was a bad idea.

Q. You were general counsel to a gay porn filmmaker for quite a while, until the relationship went south when you complained about their shooting a movie in your law office. Any qualms about your choice of client? In dealing with First Amendment law, there is certainly a concern in assuring that broadest possible use of free speech and expression be maintained, but that doesn't mean you have to get too cozy with the porn industry. In retrospect, would you do it again? Is there anything you would do differently?  You got very close, some would say too close, to your client. Have you learned from that?

A. Yes, I was. I have no qualms about having chosen to represent a porn company. That company in particular? Yes. I recall wanting to fire them as a client before being their GC, but before I did so, they made me a very lucrative offer to come in as GC. I was a new dad, and the offer was too good to turn down.

Then, I actually got to be very good friends with the CEO, which put me in a bad spot. I tend to have personal friendships with my clients, and that led me, at least then, to not do "cover my ass" letters on every conversation. When you eat 5-6 meals a week with someone, you tend not to then run back to your desk and write a letter confirming the conversation. It just comes off as you're spending more time covering your ass than actually doing work.

Of course, sometimes you have friends who you see acting like complete douchebags, and you think, "I'm different, I'm his friend." That's delusional. If they act like douchebags to everyone else, it will eventually be your turn.

Since that experience, it doesn't matter to me if I'm representing a family member – they get CYA letters. Also, I've decided that the moment I realize that a client is trouble, I get rid of them. And when I have friends who act like douchebags toward other people, I get rid of them – because I don't want to wait for it to be my turn again.

Q. You've handled some very well-known internet cases, including one in which I was a defendant, Rakofsky v. Internet. But that has also put you in touch with some of the internet's craziest denizens. Were the cases interesting? Was it cool to become an internet legend as a First Amendment Badass? What about the crazies? Did you realize just how many crazies would go gunning for you, and to what extremes they would go? And not just you, but your family. Are the crazies on the internet out of control?

A. The cases were really interesting. I loved the *Rakofsky* case, not so much because I liked what was happening, but it allowed me to represent a bunch of people who I really respected. When the "gang of 15" or however many of you hired me, most of that group of defendants were people I looked up to, mentors of mine. When people who you admire say, "I want you to

be my lawyer," it really gives you a lot of confidence. But, it also kicked me in the ass to be a lot better. I didn't have the luxury of not being on my A++ game every day in that case.

The other high profile cases I've done have really been enjoyable, not because of the attention, but because I get calls from young lawyers who say, "can you spend some time teaching me?"

Being an "internet legend?" I don't even know what that means. Sure, I think it is funny when I do something like the Glenn Beck case or the Julien Blanc takedown or sticking up for Amy Alkon against the TSA. But, remember that for every bit of attention you get, you get negative attention too. So, yeah, being well known means being well known by everyone – not just people you like.

Along the way, I picked up stalkers, one of whom famously tried to extort me, and that lunatic is still in my life. I've got a few others who are obsessed with me. Eventually, you just let it roll off your back. It does suck when desperate lowlives target your family, and I realize that I'll have people like that around for a long time. It isn't just the well known ones either. When you work as a high profile lawyer, there are a lot of desperate losers out there who would suck poison from Hitler's dick to be in my position, and they get jealous and bitter when they see you successful. Then they start attacking you.

I won't say it didn't bother me at first, but eventually it sorta just becomes background noise. In fact, sometimes it even helps your career. For example, recently someone wrote a hit piece on me, hoping to hurt me. Then, I got hired by a really great client. I asked them what made them call me, and they told me, "I read this really stupid article about you, where the author clearly had sand in his pussy about you, so it made me do more research, and I decided that we wanted you on our side." So, sometimes I have to thank the douchebags in my life.

Q. You were involved early in the move to end revenge porn, by going after Craig Brittain and Chance Trahan, who ran the notorious website, IsAnybodyDown. Since then, a cottage industry has arisen, led by a couple of law professors, together with a small organization called the Cyber Civil Rights Initiative. As someone who started the fight, where do you stand on their goal of criminalizing revenge porn? They also argue that male bullying and harassment silences women's voices, so it too must be stopped. How does that square with your view of free speech?  They've also called for the elimination of Section 230 of the Communications Act, the "safe harbor" for websites, so that they can penalize websites for content posted by others. Do you agree that it's time to end the safe harbor?

A. Regarding revenge porn, I took down three of the biggest purveyors of that shit. I made nothing on the cases, and never expected to. I have given hundreds of hours of pro bono time to the victims, and I'm really proud of that. I really don't think that the "Cyber Civil Rights" crowd has their heads on right. They do have some brilliant women in that group, some of whom I call friends. I really admire Erica Johnstone, for example. But, I think collectively, that group is awful. It is more of a group devoted to hating on men than solving problems. For example, one truth they refuse to acknowledge is that most revenge porn gets posted by women. Most online harassment comes *from women*. But, they have a few dipshit academics who taught them to just re-define words to mean what you want them to mean, and then an email that says "hi" turns into "harassment."

As far as bullying silencing women's voices? I'm not entirely at odds with that notion – but what I disagree with is the lie that this is a male vs. female thing. Come on, the biggest fucking

lunatics on the web are women. Men get bored really fast. Women will focus on a target for years. I'll say this, I haven't had a straight male stalker. It isn't men who attacked my wife and my three year old daughter. And it sure as shit wasn't any "cyber civil rights" harpy that spoke up and said it was wrong when it happened. Not one of them. So, while I do like a few of its members, I think that organization has no credibility, and no honor.

That all said, I do think that Section 230 goes too far. I defend the living shit out of my clients who depend on it, but before I take a 230 client, I have a talk with them – I make sure that I am convinced that they don't just say, "fuck you, Section 230," when they're confronted with real abuse. Unfortunately, a lot of the Silicon Valley companies refuse to have that principled of a position. And, when they just didn't give a shit, it was bad enough. But, they've lately started taking the Cyber Civil Rights position – meaning, if it is a woman complaining, they'll shut it down.   But, when it's a woman or a minority doing the harassing, that's just "redistributive justice." So, now 230 went from a shield for companies that didn't give a shit, to an actual political tool. That's not a good thing.

Q. Your litigation approach comes from Caesar's maxim, *murum aries attigit*, "the ram has touched the wall."  One might call that a scorched earth approach, that once someone has pushed the button, there is no backing off and you go for broke. Where did that come from? It's a bit of an inflexible approach to litigation, but one that could well scare the crap out of your adversaries if you've got the chops to pull it off. Has it helped or hurt you? Do you sometimes wish you had taken a softer, more flexible approach to litigation? Has your "tough guy" approach to litigation ever turned around on you and bitten you in the butt?  Do you have any regrets for going out on a limb to be that First Amendment Badass that the internet loves (or hates)?

A. *Murum Aries Attigit*. That phrase gets batted around a lot with my name attached to it. But, what does it really mean?

Caesar described the concept in Commentarii de Bello Gallico. It literally translates to "the ram has touched the wall." The "ram" meaning a battering ram, and "the wall" meaning a besieged city's outer defenses. Under Roman Law, a general had the right to offer any terms to a besieged city. As long as the city submitted, the terms could be quite favorable. The Romans were quite civilized in this regard, and dispensing quite favorable, even beneficial, terms was not uncommon. Why destroy a city if you can turn it into an ally?

Of course, these terms were not available indefinitely. Diplomacy ended once the first battering ram touched the city's walls. Then, the general was legally prohibited from offering any terms except complete destruction.

It is well known that this is my personal motto in litigation. I announced it in *Righthaven*, for example. And, the rest is history as the company now no longer exists.  I announced it in the Roca Labs case.  It didn't work out well for them.

If only they had accepted the really reasonable terms they were offered before the ram touched the wall.

But my most proud achievements while employing *Murum Aries Attigit* are those that nobody will ever hear about. They are cases where my clients authorized me to offer ludicrously generous terms, the other side accepted, and no metaphoric blood was shed. I wish I could talk about those, but usually they come along with confidentiality agreements. Suffice to say that I

love those. Client gets a four figure bill instead of a six figure one. About half the time, the opposing party winds up calling me to represent them within a year or two.

As an example, I once represented a party that got a *ridiculous* defamation demand. My personal desire was to utterly destroy the other party — and I had all the tools with which to do so. The allegedly defamatory statements were quite problematic for the plaintiff, but I had a full report from an official source proving each of them exactly true. The report was a public record but not one that the plaintiff thought we could find. We found it. Nevertheless, I am proud to say that we ultimately settled the matter, with my client even writing a check to the plaintiff. Why? It was smart. The client paid less than the cost of a motion to dismiss, or even a small discovery skirmish. The plaintiff's lawyer could not believe his good luck in not getting dashed against the rocks. Client thanked me.

Of course, there is always the fool who thinks that favorable terms are a sign of weakness, or that some terms are not favorable enough. "Just walk away" is often something that gets put on the table. But, we always have a *Stercus Caput* who will think that *Murum Aries Attigit* means *blind aggression*, or even that it contains a component of anger. Nothing could be further from the truth

*Murum Aries Attigit* is an excuse **for** diplomacy and mercy, not a philosophy of "take no prisoners." Anyone who sees it that way is an idiot.

As far as going out on a limb… I have mixed feelings. The moment I became a somewhat public figure, I realized that it would be hard to go back. Back in 2013, I moved to Italy for a while. All of a sudden, nobody knew who the fuck I was, nobody was impressed by me. I was anonymous again. And, I sort of liked it. But, I look at what I do as a calling, and I don't get to choose whether I'm in that gladiatorial sand or not. This is the path that fate put me on, and I'm not likely to get off it any time soon. Do some people hate me? Sure, so what? Fuck them. You think I give a fuck about some cowardly little shit who hides behind a VPN to say snarky shit about me?

You know what I like about my life? There's not a motherfucker in this world who ever says, "I'm ambivalent about Marc Randazza." That is what scares me… people being ambivalent about me.

Has it bitten me in the ass? Sure. You can't win every case.

The first time I had a big loss, a friend sent me this quote by Theodore Roosevelt:

> It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doer of deeds could have done them better. The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.

That really resonated with me. Even when I've taken a beating, I remember that and I know that I'm not ever going to be the sorry sonofabitch who knows neither victory nor defeat, and I

won't ever be called "timid."

---

**Share this:**

| 🖨 Print | Tweet | **Share** 0 | ✉ Email | ⌃ ⌄ | 🟢 WhatsApp |

---

This entry was posted in Cross, Uncategorized and tagged Cross, Marc Randazza on February 17, 2016 [https://blog.simplejustice.us/2016/02/17/cross-marc-randazza-first-amendment-badass/] by SHG.

---

## 9 thoughts on "Cross: Marc Randazza, First Amendment Badass"

### CLS
February 17, 2016 at 1:59 pm

I honestly want my next tattoo to read "Murum Aries Attigit"after reading this.

Question to Marc: When you write your response letters to the idiots you've had to deal with, they've always been entertaining to read but eventually reach a very salient point that needs discussing within the context of the letter.

How long did it take you to mix your personal blend of humor, legal analysis, and artful use of profanity to get to this point?

---

**shg** `Post author`
February 17, 2016 at 2:13 pm

Your "next" tattoo?

---

**CLS**
February 17, 2016 at 2:30 pm

Yessir.

---

**shg** `Post author`
February 17, 2016 at 4:05 pm

Ah. Found a pic of you. Got it.



**Wrongway**

February 18, 2016 at 5:07 am

Is that the Cross between Ted & Madeline You were talking about ??

Marc Randazza

February 17, 2016 at 2:21 pm

CLS,

*How long did it take you to mix your personal blend of humor, legal analysis, and artful use of profanity to get to this point?*

Thank you for the question, but I think it presupposes that I'm "doing it right." Some might say, with a very valid point, that I am not.

Also, you're talking about the response letters you've seen. Think about the hundreds I write where that is not appropriate, for whatever reason. I can do "quiet mode." Sometimes, those are the best ones — the ones where the matter ends because I get the parties together.

So, bottom line is, don't be so impressed by the crazy fun ones.

But, the answer is, "my whole life so far."

Scott Jacobs

February 17, 2016 at 11:12 pm

"If you don't have to go to trial, never go to trial. If you have to go to trial, go to win."

---

Pingback: Hate Is Not An Excuse For RooshV False Rape Claim | Simple Justice

## Cornflake S. Pecially
February 19, 2016 at 9:46 am

Did you have a chance to ask that Greenfield guy why he doesn't groom his upper lip, and you seem pretty young to have been overwhelmed by John Lyndon during your formative years. What gives?

---

Comments are closed.

# EXHIBIT "20"

## DECLARATION OF VERONIQUE DE LA ROSA

STATE OF FLORIDA         §
                            §

ORANGE COUNTY       §

I, Veronique De La Rosa, declare under penalty of perjury that the following declaration is true and correct and based upon my personal knowledge:

1.  My name is Veronique De La Rosa, formerly Veronique Pozner. I am over the age of 18, and I am competent to make this declaration. My ex-husband and I are the plaintiffs in *Pozner v. Jones, et al*.

2.  I was highly alarmed to learn that an attorney who engaged in anti-Semitic harassment might be given the right to appear in our case. I am very worried by the idea that an attorney who used the Hebrew language to publicly harass a Jewish opponent might be in control of my personal information, or that I might have to face him while answering his questions in a deposition. Also, after reading about the violent anti-Semitic threats I saw described in a statement by a Florida lawyer, I have a great deal of anxiety about having to encounter this man. Much of the harassment my ex-husband and I have faced in the years following Sandy Hook has been anti-Semitic in nature, and I do not relish the idea of having to face it in this lawsuit. I also do not trust this man will treat us fairly.

Executed on July 23, 2021 in Orange County, Florida.

/s/Veronique De La Rosa_____

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 55651762
Status as of 7/23/2021 2:30 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/23/2021 2:02:54 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Marc Randazza | | ecf@randazza.com | 7/23/2021 2:02:54 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/23/2021 2:02:54 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 7/23/2021 2:02:54 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/23/2021 2:02:54 PM | SENT |