**EXHIBIT B  (contd.)**

**Copy of All Filings with State Court**

7/30/2021 4:10 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Alexus Rodriguez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

## REPLY IN SUPPORT OF MOTION FOR *PRO HAC VICE* ADMISSION OF MARC J. RANDAZZA

Plaintiffs' response to the Motion for *pro hac vice admission* is an unprofessional screed that relies primarily on a legal nullity, a vacated interim arbitration order[1], outright lies, and half truths.

Plaintiffs' counsel have known for years that Randazza and his firm are representing Defendants in litigation involving the Sandy Hook shooting, and in fact invited his participation. (*See* Declaration of Marc J. Randazza ["Randazza Decl."], attached as **Exhibit 1**; *see also* August 12, 2020 email from Mark Bankston to Randazza, attached as **Exhibit 2;** *and see* August 26, 2019 letter from Bankston to Scott Nyitray and Michael Burnett, attached as **Exhibit 3**.)

Yet now, for dramatic effect, they act surprised that he has sought *pro hac vice* admission here. This is a tactical opposition that is not made in good faith. Plaintiffs argue that Randazza should be denied admission based on his use of colorful language in out-of-court statements, but such a standard (if applied evenly), would disqualify Plaintiffs' lead counsel, Mark Bankston, and would also potentially subject him to discipline by the State Bar. Plaintiffs' opposition is no more than a strategic attempt to deny Defendants their counsel of choice.

The competing values in this dispute are a defendant's right to counsel of his choice, counsel who has been with him for years, and who he is comfortable with. Notably, Attorney Bankston himself wrote that Randazza has approached this litigation in a "*very tasteful and principled*" manner. *See* **Exhibit 3**. Mr. Bankston wrote "*His [Randazza's] presence in these lawsuits as InfoWars' corporate counsel is sorely missed*." *Id.* Bankston even provided a sworn declaration that "*my experience with Mr. Randazza in that case* [referring to the instant case] *was that he*

---

[1] It was vacated after a court refused to confirm it. Should the Court wish, Defendants would be happy to share the briefing on why, as a matter of law, it was unreliable and biased, with statements that flew in the face of undisputed fact and governing law. However, Defendants will generally refrain from unnecessarily relitigating issues relating to that discarded arbitration.

*always acted properly and above reproach in all respects.*" See **Exhibit 4**, Declaration of Mark. Bankston.)

On the other side of the dispute is the plaintiffs who speculate (if they are credited with being honest, and this "speculation" is not mere cynical tactical maneuvering) that Mr. Randazza *may* do something that they *may* find troubling, but against the backdrop of their clear interest in depriving the Defense of one of the top First Amendment lawyers in the nation, who has been involved in coordinating aspects of this litigation for years.[2]

The Defendant's right to counsel of his choice outweighs any speculation on the Plaintiff's part.  If the court denies the motion, then the Defendants are permanently denied their right to counsel of their choice.  If the Court grants the motion, there is no permanency - the court retains the right, at any time, without notice, to revoke the *pro hac vice* admission.  If Mr. Randazza is admitted *pro hac vice*, he will have a very strong incentive to comport himself in a manner that will be far afield from the image that Mr. Bankston is trying to paint.

The Court should grant the instant Motion and admit Randazza *pro hac vice*.

## 1.0    LEGAL STANDARD

### 1.1    Applicable Law

Texas courts long ago also settled that a litigant's right to be represented by the attorney of his choice is a significant one, and the unwarranted denial of a defendant's right to select counsel constitutes fundamental error. See *Keller Industries, Inc. v. Blanton*, 804 S.W.3d 182, 185 (Tex. App.—Houston [14th Dist.] 1991, orig. proceeding); *Ayres v. Canales*, 790 S.W.2d 554, 557–58 (Tex.1990); *Farmers' Gas Co. v. Calame*, 262 S.W. 546, 548 (Tex. Civ. App.—Waco 1924, no writ). *See also*, *Swartz v. Swartz*, 76 S.W.2d 1071, 1072 (Tex. Civ. App.—Dallas 1934, no writ)

---

[2] Randazza was absent for a number of months, predicating Bankston's comment that he was not still involved.

(unwarranted denial of counsel of choice constitutes reversible error). Absent a compelling reason, courts should not deprive litigants of that right because such deprivation can result in immediate and palpable harm. *Hoggard v. Snodgrass*, 770 S.W.2d 577, 581 (Tex. App. — Dallas 1989, orig. proceeding).

This right is not unfettered of course. The attorney must be legally qualified, which Mr. Randazza clearly is. In the case of a non-resident attorney, the Court must approve the attorney in accordance with standards promulgated by the Supreme Court at the time. There is no dispute that Mr. Randazza has meet these promulgated statutory requirements.[3] In Texas, courts are clear that once a Texas defendant complies with the rules and regulations that defendant should not be denied his or her choice of counsel by a Court except for **compelling reasons**. *Blanton*, 804 S.W.3d at 185. "*Unsupported speculation as to possible, future misbehavior on their part should not preclude non-resident attorneys from representing clients in Texas courts.*" *Id*. Although *Ayres* specifically dealt with the advocate-witness rule, the Supreme Court there stated, "*the rule should not be used as a tactical weapon to deprive the opposing party of a right to be represented by the lawyer of his or her choice because reducing the rule to such a use would subvert its purpose.*" *Id*.

Most certainly, the Plaintiffs are seeking to use this process as just such a tactical weapon for the precise purpose of trying to deprive the Defendants of their right to be represented by a lawyer of their choice. This Court is begged to not subvert the rule for this purpose.

### 1.2    Plaintiffs try to mislead the court with their citations

It is telling that the case law on which Plaintiffs rely to argue for a much different standard comes from foreign jurisdictions.[4] Further, while Bankston has

---

[3] In fact, Mr. Randazza has been admitted to the bar of the Western District of Texas and the 5th Circuit Court of Appeals recently. *See* **Exhibit 6** and **Exhibit 7**.

[4] For example, he relies on a District of Rhode Island case. Randazza was admitted *pro hac vice* in

carefully cherry picked quotes from those cases to try to make it appear that they support his position, an examination of the facts in those cases shows that he seems to be trying to mislead the court as to how applicable they are.

In *Kampitch v. Lach*, 405 F. Supp. 2d 210, 211 (D.R.I. 2005), the petitioning attorney expressly failed to disclose three incidents of sanctions and two prior pro hac vice applications. In sharp contrast, Mr. Randazza has withheld nothing. Notably, the U.S. District Court for the District of Rhode Island admitted Mr. Randazza *pro hac vice* only a few weeks ago, with the same fulsome disclosures made in this matter. Moreover, the misconduct in *Kampitch* was recent in time; Mr. Randazza's discipline arose from events in 2012.

In *Panzardi-Alvarez v. United States*, 879 F.2d 975, 978 (1st Cir. 1989), the petitioning attorney harassed the judge and failed to disclose an improper payment scheme; Mr. Randazza has done nothing of the sort.

*Kohlmayer v. AMTRAK*, 124 F. Supp. 2d 877, 880 (D.N.J. 2000) involved an attorney who "left a trail of mistrials in his wake" and engaged in improper in court conduct; such is not the case with Mr. Randazza. In fact, in a different Rhode Island case, the presiding state court judge specifically noted that none of Randazza's prior incidents involved litigation misconduct. *See* **Exhibit 7**.

In *Collins v. Collins*, 2020 OK CIV APP 65, ¶ 34, 481 P.3d 270, 278, there was a "potential for abusive misconduct" where the attorney withheld information from the court; Mr. Randazza has made no such withholding.

---

both the District of Rhode Island and in Rhode Island state court, after a full examination of his history. *See* **Exhibit 7**. He relies on a Massachusetts case, when Mr. Randazza clearly meets the standard to practice in Massachusetts, as he is a member in good standing of the Massachusetts bar. He relies on a 1st Cir. Case, a Middle District of Florida case, as well – bars where he is admitted, and bars where prior litigation adversaries have sought to use this very same information against him.

*Meschi v. Iverson*, 60 Mass. App. Ct. 678, 681-82, 805 N.E.2d 72, 74-75 (2004) directly involved skirting professional ethics to the potential detriment of an opposing party; such has never occurred as to Mr. Randazza.

The attorney in *Mike Woods v. On Baldwin Pond, LLC* , No. 6:13-cv-726-Orl-41DAB, 2014 WL 12625077 (M.D. Fla. Nov. 26, 2014) displayed a "consistent lack of knowledge" of the local rules; Mr. Randazza has never been so accused.

Plaintiffs also cite their cases without the full context, as the Massachusetts court reversing denial of pro hac vice expressly found "the existence of adequate local representation cannot constitute, by itself, an independent ground to uphold the denial." *PCG Trading, LLC v. Seyfarth Shaw, LLP*, 460 Mass. 265, 276, 951 N.E.2d 315, 322 (2011).

### 1.3 The decision is subject to change

A defendant's fundamental right to choose counsel weighs heavily in favor of a Court granting the pro hac vice motion because as Texas courts universally recognize, the court and opposing party possesses ample protection after admission should Mr. Randazza actually misbehave. Rule 19(e) sets out the clear parameters for revoking an order granting a non-resident attorney permission to appear pro hac vice.

> *If, after being granted permission to participate in the proceedings of any particular cause in Texas, the non-resident attorney engages in professional misconduct as that term is defined by the State Bar Act, the State Bar Rules, or the Texas Disciplinary Rules of Professional Conduct, the court may revoke the non-resident attorney's permission to participate in the Texas proceedings and may cite the non-resident attorney for contempt. In addition, the court may refer the matter to the Grievance Committee of the Bar District in which the court is located.*

Accordingly, what is the worst that could happen if this Court admits Randazza *pro hac vice* and he gets out of line, at all? This court could, without delay, simply

take away his *pro hac vice* admission. So why commit reversible error by denying it prospectively?

## 2.0 FACTUAL ISSUES IN THE OPPOSITION

Randazza has not attempted to hide anything about his history or his litigation conduct. The *pro hac vice* motion contains an excessively fulsome disclosure and includes all credible allegations against Randazza. Everything else in Plaintiffs' response consists of unsubstantiated or irrelevant allegations meant to muddy the waters. Randazza is forced to respond to Plaintiffs' allegations, but the Court should not pay attention to them, as they have no bearing on whether Randazza should be admitted *pro hac vice*.

Just as Bankston tries to mislead the court with selective quotes from cases that do not really support his position, he further undermines his credibility by a combination of providing "facts" to the court that are either not facts at all or when they are, misleadingly presenting them. This is beyond mere zealous advocacy, and rises to dishonorable conduct.

### 2.1 The Oron Litigation

Although Defendants do not believe it is appropriate to relitigate matters in which Randazza has already prevailed, Plaintiffs' knowing and material misrepresentations must be addressed. Plaintiffs' characterization of Randazza's attorney misconduct is wildly misleading and relies on representing unsubstantiated allegations as proven facts. In reality, the only misconduct Randazza was found to have committed was failing to advise his client in the *Oron* litigation as to seeking separate counsel prior to signing a promissory note for the purpose of reimbursing litigation costs, and entertaining settlement discussions that could have *potentially* involved representing the opposing party in the future. Neither act was harmful to the legal process, nor did any of Randazza's conduct harm his client, Excelsior/Liberty ("E/L"), or the opposing party. In any event, this conduct happened nine years ago

7

and Randazza has learned his lesson. There is no prospect of such conduct happening again here, and Plaintiffs cannot provide any evidence suggesting such a possibility.

Randazza never solicited a bribe. All he did was *entertain* a settlement term that *could have* led to a restriction on his right to practice (*i.e.* he might have a conflict of interest should someone wish to hire him against Oron). There was no Nevada case at the time establishing that such conduct violated Nevada Rule of Professional Conduct 5.6, and so Randazza reasonably believed this conduct was ethically permitted. He was mistaken, and he completed his additional ethics credits to ensure that this error would not happen again.

Randazza did not destroy evidence. Rather, he maintained all materials relevant to his dispute. A single computer was wiped to preserve the attorney/client privilege as to Randazza's other clients, which the Rules of Professional Conduct required him to do. Moving evidence from one place to another, and protecting client confidences is hardly "destroying" evidence.

There was no conflict of interest presented by Randazza representing adult entertainment companies other than E/L. In fact, when raised in Randazza's Florida disciplinary proceeding (which was disclosed in Randazza's *pro hac vice* motion), an actual judge found there was no conflict caused by representing other clients in the adult entertainment industry. (Report of Referee in *The Florida Bar v. Randazza*, Case No. SC19-188 (Fla. July 7, 2020), attached as **Exhibit 8**, at 6-7.)[5] Randazza representing other companies created no more a conflict than Attorney Bankston representing multiple plaintiffs against Defendants.[6]

---

[5] The Court should note that the Florida Bar proceeding is the only one in which Randazza was afforded a full evidentiary hearing. The Florida Bar's recitation of facts in this case is accurate. Bankston's is knowingly false. *See* **Exhibit 8**.

[6] If anything, Bankston has a greater likelihood of a conflict of interest here because, if Plaintiffs receive a judgement or reach a settlement with monetary terms, they will have to divide any assets among themselves and will become adverse to one another.

Regarding XVideos, there was similarly no conflict. Once Randazza identified a possible conflict, he made sure not to counsel either party. He also did not conceal any payments specifically approved by a court in public proceedings.

Plaintiffs' argument to the contrary relies entirely on an unconfirmed arbitration award that was vacated by the U.S. Bankruptcy Court for the District of Nevada. (*See* order vacating IAA in *In re marc John Randazza*, Case No. BK-S-15-14956-ABL, ECF No. 261 (D. Nev. Bankr. Aug. 2, 2018), attached as **Exhibit 9**.) The award is thus of no effect and must be disregarded. If the Court wishes to consider the findings of the arbitrator despite this vacatur, it should also consider the numerous examples of the arbitrator's bias, clear errors of fact and law, and unreliable credibility findings that Randazza identified in the proceedings leading up to the award's vacatur. (*See* Opposition to Motion for Order Confirming IAA in *Excelsior Media Corp. v. Randazza*, Adv. No. 15-01193-abl, Adv. ECF No. 137-5 (D. Nev. Bankr. Mar. 16, 2017), attached as **Exhibit 10**, at 53-58.)[7]

Plaintiffs try to ignore that the arbitration award means nothing by noting that the arbitrator, who was clearly and manifestly biased, made comments criticizing the settlement of Excelsior/Liberty's claims against Randazza. But again, without an order confirming an arbitration award, the arbitration award is a legal nullity and even if admissible, due zero weight. A biased and disgruntled arbitrator shouting into the wind does not change this, and this Court is in no position to relitigate such matters when no other court has credited the majority of Excelsior/Liberty's allegations. In fact, the Arbitrator needed to be threatened with sanctions by the bankruptcy court because he refused to honor the bankruptcy court's order approving a settlement that included vacatur of the arbitration award. (*See* Order to Show Cause regarding failure

---

[7] Most galling was the arbitrator finding Randazza's testimony not credible based on where Randazza sat and his posture during the arbitration hearing, despite specifically commanding him to sit in such a manner. (*Id.* At 53-54)

to vacate arbitration award, Case No. 15-14956-abl, ECF No. 238 (D. Nev. Bankr. June 26, 2018), attached as **Exhibit 11**.) Further, Bankston falsely claims that he is a "former California federal judge," Haberfeld was, in truth, merely a magistrate for four years, decades prior.  Mr. Haberfeld, who was pursuing his own interest rather than following the law, should not be trusted, in the least, as an arbitrator or a witness.

Apart from the vacated interim arbitration award, Plaintiffs knowingly lie that Randazza offered a bribe to Excelsior/Liberty in the form of a bounty on his law licenses. Randazza was trying to settle a putative malpractice claim where his client was not injured, but instead was seeking essentially to penalize Randazza due to a personal dispute with Randazza. And, so, Randazza speculated as to a possible way to reduce Excelsior/Liberty's desired penalty to a dollar value based in part on Randazza's ability to pay such a settlement.  The source of his income is his bar licenses.  Even Mr. Haberfeld, who had a personal axe to grind, does not appear to complain about this.

Randazza also did not traffic in wrongfully obtained information related to the *Oron* litigation. He used information he properly obtained as part of his duty to represent his clients and committed no misconduct. Plaintiffs again improperly rely on the meaningless arbitration award for this claim, and it should be ignored. But, even looking at the evidence Plaintiffs provide in support of their claim, it is obvious they are lying. James Grady, the person who told Randazza about this information, mentioned that he obtained it from a third party. (Response at *Exhibit 9*.) Grady did not disclose or suggest there was anything improper in how they were obtained. Randazza then told Grady there would not be an issue using this information if it had been legitimately obtained,  but that, there would be issues if, for example, a hacker obtained it. (*Id*.) It is important to keep in mind that this was in an email thread where Randazza planned on sittting Grady as a witness in this litigation regarding this information.  Grady was to be a witness and was expected to testify as to his source

of this information. (*Id.*)  It would be a very poor maneuver for Randazza to voluntarily place a witness on the stand if he truly had any concern that the material in question was illegally obtained.

Randazza admitted to violation of two of Nevada's Rules of Professional Conduct. He was disciplined for this conduct, and other jurisdictions in which he is admitted engaged in reciprocal disciplinary proceedings regarding this conduct, and only this conduct. No state imposed any discipline more severe than a stayed suspension premised on compliance with certain probation conditions. Randazza has consistently been complying with probation conditions stemming from his discipline without incident since October 2018. He has not tried to hide this information, even publishing the Florida Bar findings on his own website for all to view.[8]  He has taught Ethics CLE courses, where he has pointed to his discipline to caution fellow attorneys. *See* **Exhibit 12**.

His disciplinary history does not even suggest he is not a reputable attorney who cannot be trusted to observe the ethical standards required of Texas attorneys, and does not constitute good cause to deny his admission *pro hac vice* in this case. In fact, as noted, the Western District of Texas made a thorough inquiry into his admission – not just *pro hac vice*, but as a full member of its bar.

### 2.2    Randazza Did Not Bring Frivolous Sexual Harassment Claims

Plaintiffs, again relying on the unconfirmed, vacated arbitration award, claim that Randazza should not be admitted *pro hac vice* here because he brought "frivolous claims that he was sexually harassed." (Response at 21.) Though Randazza did not ultimately prevail in sexual harassment claim, he believed he had been harassed. He did not believe a pornographic film would be filmed in his office without his consent, and he did not consent to his employer performing fellatio on a drunken co-worker

---

[8]    https://randazza.com/wp-content/uploads/Annotated-Florida-Bar-v.-Randazza.Supreme-Court-Case-No.-SC-19-188.Report-of-Referee-copy.pdf

in the back seat of a vehicle Randazza was driving. Though the party to this act denied doing so, that is what Randazza stated under oath that he saw in the rearview mirror, and he maintains that story under penalty of perjury.

Representing the interests of adult entertainers professionally is very different from being forced to watch a sex act performed in your own car. The arbitrator who chose not to credit Randazza's testimony regarding these events made other inexplicable and unreliable credibility determinations. (**Exhibit 10** at 53-54.)

The sole basis for Plaintiffs' argument as to the frivolity of Randazza's sexual harassment claim is a meaningless, conclusory piece of paper. The Court should ignore this argument in its entirety.

### 2.3    Randazza Was Not "Lambasted" by a Utah Federal Court

Plaintiffs lie about the proceedings in *Purple Innovation, LLC v. Honest Reviews, LLC,* 2018 U.S. Dist. LEXIS 23150 (D. Utah Feb. 9, 2018) to imply that a federal court found Randazza had misrepresented facts. This is false. Randazza was not "lambasted" for making any kind of knowing misrepresentation. Rather, Randazza made representations to the court based on information he had obtained from his client, believing his client to be telling him the truth. Randazza never made any knowing misrepresentations, and the Court never made any such findings. The court did not impose sanctions against Randazza or his firm, instead only sanctioning Randazza's *client* for misrepresentations. *Id.* at *21-22.

### 2.4    Randazza Did Not Make Anti-Semitic or Ethnic Slurs

Plaintiffs rely on statements from Don Juravin, the founder of Roca Labs, Inc., and several related companies, to claim that Randazza has a history of anti-Semitic statements and intimidation of litigation opponents.

As an initial matter, Juravin is a known fraudster. He and his companies defrauded thousands of consumers about the efficacy of a dangerous "weight loss" nutraceutical and then intimidated these customers into silence by threatening to sue

them if they said anything bad about this sham product. Randazza helped put an end to Juravin's grift – including providing a brief to the Federal Trade Commission, which then prosecuted Juravin and imposed a $25 million fine. This is the source that Bankston wants this court to find to be unbiased and credible.

Unlike the unconfirmed allegations in the IAA, all of Juravin's misdeeds are all proven matters of public record. The Federal Trade Commission successfully filed suit against Juravin and his companies, resulting in a $25 million dollar judgment against them. *FTC v. Roca Labs, Inc.*, 2019 U.S. Dist. LEXIS 46419, *23-24 (M.D. Fla. Jan. 4, 2019). Plaintiffs are free to consider Juravin a credible source of information, but that says more about them than it does about Randazza.

For example, Plaintiffs Randazza engaged in "harassment" by posting, on his own Twitter account and outside the context of any litigation, a joke on Halloween, stating "Some fucker put Roca Labs' shit in my kids' candy bag!" (Response at 18.) As to how this could possibly be harassment when it does not identify any individual and does not even claim anyone affiliated with Roca Labs did anything is anyone's guess. But, as a further example of how Juravin consistently acted in bad faith, he sued Randazza over this statement only to later voluntarily dismiss it. This is the kind of thing that Bankston expects this court to call "misconduct?"

Plaintiffs then cite a declaration from Juravin's counsel regarding statements made after the conclusion of a mediation, *i.e.,* conduct outside the context of litigation. Randazza denies these statements – made by an attorney who himself advised his client to file bar complaints as a litigation strategy – because Randazza was effective in the Roca Labs litigation. Juravin submitted this declaration to the court in the *Roca Labs* case. The court did not find it credible and took no action against Randazza based on it. He also complained to the Florida Bar, which took no action. Again, an uncorroborated statement ignored by a court and a state bar is not a reason to deny Randazza admission *pro hac vice*.

Just like Plaintiffs' counsel, Juravin thought it would be tactically advisable to try and eliminate Randazza from representing his client. Juravin thus filed civil claims and multiple bar complaints against Randazza. In fact, he does so on a somewhat regular basis.  None have ever been found to have any merit by anyone – except Plaintiffs' counsel, who has knowingly and willfully lied to this court about them. It is ironic that, as proof of Randazza's allegedly unprofessional conduct, Plaintiffs cite allegations in a frivolous SLAPP suit and bar complaint filed for the purpose of retaliating against Randazza for representing a party Juravin was suing, *while that litigation was pending*.

Plaintiffs then use this flimsy evidence to make the outrageous claim that Randazza is anti-Semitic because he wrote, in Hebrew, "*Roca Labs is very hurt*." (Response at 19.) What is anti-Semitic about that?

One of RLG's attorneys, who happens to be heading up Defendants' defense in the Connecticut Sandy Hook cases, is an observant Jew who has known Randazza for over 20 years and has not observed any anti-Semitic conduct from him. (Declaration of Jay M. Wolman ["Wolman Decl."], attached as **Exhibit 13**, at ¶ 6-7.) Randazza also sent his two children to a Jewish pre-school. (Randazza Decl. at ¶ 23.) If Randazza, who voluntarily sent his children to a Jewish preschool, and who attends synogogue is an anti-Semite, he is the worst one ever.

Finally, Plaintiffs cite an email from Randazza in a bankruptcy case in which Randazza happens to reference the nationality of his adversaries. Randazza tends to use colorful language, but the reference to someone's nationality is a far cry from proof of ethnic hatred. If Randazza had been dealing with New York adversaries, he may have referred to them as "shit bag New Yorker clients." An incidental reference to the geographic location of an adversary does not hate speech make. If Plaintiffs genuinely fear for their safety based on these unsubstantiated allegations and Randazza's conduct that fails to show any bias, then they are jumping at shadows.

Their feigned paranoia is not a reason to deprive Defendants of their counsel of choice.

## 2.5 Randazza's Other Out-of-Court Statements Do Not Provide a Basis to Deny His Admission *Pro Hac Vice*

Plaintiffs complain about other statements Randazza has made in the past, none of which are alleged to have actually harmed anyone or to be even remotely related to an ethics violation. Randazza made a hyperbolic argument, comparing Bankston's actions to what had been consented to. The hyperbole compared the limits of sexual consent to what is actually consented to, and demonstrated that consent to one thing did not mean carte blanche to consent to everything remotely related. This hyperbole is fairly tame in comparison to Attorney Bankston's own statements, discussed infra at sect. 2.6.

But, in addition to a letter Randazza sent to Bankston years after they had been acquainted, Plaintiffs also refer to perjurious allegations made by a *pro se* plaintiff and a third party who was committing the unlicensed practice of law by acting as legal counsel for Mike Postle in *Postle v. Brill*, Case No. 34-2020-00286265 (Sacramento Cty. CA Sup. Ct.). Alexandrea Merrell of the HONR Network was lying, as Randazza did not call her a sexist slur during a call with Postle in which Merrell was impermissibly acting as legal counsel despite not having a law license. (*See* Declaration of Cassidy S. Curran in *Postle v. Brill* ["Curran Brill Decl."], attached as **Exhibit 14**.) In that case, a disgruntled litigant was facing a large attorneys' fees award because of Randazza's effective advocacy. In order to try and discredit his fee application, Merrell and Postle lied to the court about Randazza's statements. They, however, did not consider the fact that Randazza works in an open office, and his assistant always listens to his end of conversations, and takes contemporaneous notes. It is also worth noting that Merrell works for one of the Plaintiffs in this case. She committed the unlicensed practice of law, to interfere in a

case that Randazza was working on, and then commited perjury – this is Bankston's source.

Randazza does confess to calling Merrell a "fucking liar." It is interesting that Bankston does not address what the lie is. In the *Postle* case, Ms. Merrell claimed that Bankston, himself, was about to file an appearance in that case. *See* Randazza Decl. at ¶ 28. Randazza called Bankston to confirm this. Randazza Decl. at ¶ 29. Bankston told Randazza that any such statement was a lie. Randazza Decl. at ¶ 29. *See also* Curran  Brill Decl. at ¶ 13. Randazza thanked him, and then got on a call with Mr. Postle and Ms. Merrell. Randazza Decl. at ¶ 30. When she reiterated the lie, yes, Randazza did use an expletive and called her a liar. Randazza Decl. at ¶ 31-32. It is telling that  Bankston does not inform the court of his own part in that non-event.

Just as with *Oron* and *Roca Labs*, the court in the *Brill* case did not credit these allegations and took no action against Randazza in response to them.[9]

In an attempt to bolster this claim of sexist behavior, Plaintiffs also identify an unsubstantiated claim by a Buzzfeed reporter that Randazza, *while speaking to a client*, called a third-party an expletive. Aside from there being no admissible evidence that Randazza made this statement, the Court would be entering dangerous territory by making determinations as to attorney fitness based on the content of communications with clients. Finally, Plaintiffs note that Randazza, while in law school, ran a student political campaign with a poster discussing hitting a "penis with a sledgehammer." (Response at 27.) Plaintiffs are truly desperate if they are complaining about Randazza's political speech from decades ago before he became an attorney. And, referring to someone as a "cow" when recounting criticism during

---

[9] Coincidentally, Postle also tried to introduce Randazza's disciplinary history and the *Oron* litigation to oppose the defendant's motion for attorneys' fees against him. The court did not credit these arguments and did what this court should do, ignore them.

that election, which Randazza won, cannot possibly constitute good cause to deny admission *pro hac vice*.

### 2.6    By Plaintiffs' Own Logic, Their Counsel Should Be Disciplined

Plaintiffs argue that Randazza's alleged off-color statements are disqualifying, but this is bizarre given that Attorney Bankston has made statements just as "offensive," if not more so, than anything cited in Plaintiffs' Response. Bankston writes on Twitter using the handle @RespectableLaw. (Wolman Decl. at ¶ 11.) Using this account, he has made numerous offensive, violent, and sexual statements using foul language, while holding himself out as an attorney. Below is a non-exhaustive list of such statements:[10]

•      In response to a third party stating they had respect for the Secret Service, Bankston wrote: "I have zero respect for the Secret Service. Fuck every single one of those guys. If you think there are good Secret Service agents, sorry, you are wrong." (Declaration of Cassidy S. Curran ["Curran Decl."], attached as **Exhibit 15**, at ¶ 4 and *Exhibit A*.)

•      In response to a third party asking why someone would make obscene gestures to an elderly couple simply because the couple attended a speech given by former President Donald J. Trump, Bankston wrote: "*Because fuck them, that's why*." (Curran Decl. at ¶ 5 and *Exhibit B*.)

•      In November 2017, Bankston said to a third party "Hello Mr. Alaska, I am with the Federalist and I wanted to know if we could use your tweet for an upcoming story on brain parasites" and then, after the third party responded "no u

---

[10] Randazza would not normally bring these kinds of statements to a court's attention because it is his position that such statements are irrelevant to one's fitness to be an attorney or their ability to comply with ethics rules. However, by claiming Randazza's out-of-court statements are related to whether he should be admitted *pro hac vice*, Bankston has opened the door to scrutiny of his own statements.

may not," Bankston wrote "Gonna do it anyway. Try and stop me cuck."[11] Later, he reposted this exchange and wrote "Fuck me, that was two years ago. Feels like yesterday we had that guy to kick around." (Curran Decl. at ¶ 6 and *Exhibit C*.)

• Bankston wrote "*Stop being such a jew about it*." (Curran Decl. at ¶ 7 and *Exhibit D*.) And yet Mr. Bankston has had the audacity to accuse Randazza of being anti-Semitic. "Jew" should never be used as an epithet, and the fact that Mr. Bankston uses that term as an epithet should be of great concern to his clients, if they are being truthful about being concerned about anti-semitism.

• Without any provocation, Bankston wrote several tweets to former United States Representative Steve King urging King to impregnate Bankston's wife to "preserve the white race." (Curran Decl. at ¶ 8 and *Exhibit E*.)

• Bankston wrote "*I could tell you that Kanye [West] made a hologram of Bob Kardashian and he made it tell Kim that his spirit is always around whenever her pussy farts and that he is so proud she married the greatest genius in the world but you wouldn't believe any of that*." (Curran Decl. at ¶ 9 and *Exhibit F*.)

• Making light of child rape, Bankston wrote "Because I am kind to everybody, and that's true whether you brush your hair differently than me, or if you like pineapple on pizza, or if you rape children." (Curran Decl. at ¶ 10 and *Exhibit G*.) Bankston jokes about raping children, yet feigns offense at Randazza using occasionally colorful language?

• In joking about rape, Bankston wrote "There won't be a massive monetary settlement for rape after we drink together if that's what you're getting at." (Curran Decl. at ¶ 11 and *Exhibit H*.) Same.

---

[11] "Cuck" is a truncated form of "cuckold," a word used to describe a man whose wife is having sexual affairs with one or more other men. In modern vernacular, "cuck" has become a general term used to insult men for being weak or ineffectual, and thus may constitute hate speech against a certain class of men.

•     In joking about anal sex, Bankston wrote "Well, let's assume for a moment that Brett [Kavanaugh] had some bromantic experimentation in those days. I really don't think they're going to be writing yearbook notes to each other about the secret anal sex they had. After all, it was Brett [Kavanaugh] who 'got boofed.'" (Curran Decl. at ¶ 12 and *Exhibit I*.) He followed up this tweet by stating "So unless these guys plugging heroin up their butts, the phrase 'have you boffed yet?' means anal sex." (Curran Decl. at ¶ 13 and *Exhibit J*.) Meanwhile, Bankston tries to feign shock at Randazza using similar language in speaking to Bankston.

•     In threatening frivolous litigation, Bankston wrote "Hey man I gave $7000 to your GoFundMe and you showed up to court in a cheap suit and sneakers. This is torturous interference and likely also conspiracy. I will be filing suit against you as soon as I can figure out how to fake a signature on an affidavit." (Curran Decl. at ¶ 14 and *Exhibit K*.)

•     In making light of minors engaging in alcohol abuse and sex and mentioning a comedian whose sexual misconduct had recently been exposed, Bankston wrote "Really think it's myopic of Louis CK to think youngsters can't subvert dominant paradigms while also doing jello shots and finger banging." (Curran Decl. at ¶ 15 and *Exhibit L*.)

•     Days ago, in joking about a seriously ill minor physically assaulting a celebrity, Bankston wrote to Kevin Sorbo "Kevin my six year old son is dying from a type of tuberculosis cancer (or possibly COVID-19, not sure) and his last wish is to do a series of Brazilian jujitsu strikes on your nutsack, who do I need to call to make this happen?" (Curran Decl. at ¶ 16 and *Exhibit M*.)

While Plaintiffs do not identify any objectionable statements Randazza has made about them, Bankston has made similarly offensive and insulting tweets specifically regarding Defendants in this matter, including but not limited to the following:

- "I'm just going to take a pill from InfoWars that makes me calm." (Curran Decl. at ¶ 17 and *Exhibit N*.)

- "I take InfoWars pills which make me calm." (Curran Decl. at ¶ 18 and *Exhibit O*.)

- "Here's the thing about the stuff you hear on InfoWars: it's not real. That's not reality. That's some weird fantasy. It's made up." (Curran Decl. at ¶ 19 and *Exhibit P*.)

- "If you're asking for better outlets than InfoWars, the answer is LITERALLY ANY OTHER OUTLET. I'd line my chicken coop with the Daily Caller but it's basically Edward Murrow compared to Infowars, you freak. Also FYI Molyneaux and Pettibone are objectively, proudly, racist." (Curran Decl. at ¶ 20 and *Exhibit Q*.)

- In addressing Chris Cilizza of CNN, Bankston wrote "If you want to know why Alex Jones was able to thrive, look in the mirror you goofy parasite." (Curran Decl. at ¶ 21 and *Exhibit R*.)

- In addressing multiple politicians, Bankston wrote "Posting these fake quotes is just as bad as Alex Jones." (Curran Decl. at ¶ 22 and *Exhibit S*.)

Randazza making a joke, using profanity in a conversation with a client, and referring to someone in a dispute from 23 years ago as a "cow" is positively tame in comparison to Bankston's racist, sexist, and anti-Semitic statements. Plaintiffs and Bankston do not actually care about Randazza's tenor or whether he can be trusted to follow the rules governing Texas attorneys.[12] Bankston is crying foul over isolated

---

[12] Plaintiffs claim this litigation is "especially sensitive to further misconduct," citing numerous alleged abuses of discovery or other misconduct related to litigation here or in the Connecticut litigation. (Response at 31-33.) But, Plaintiffs fail to explain how this alleged misconduct, committed by *other attorneys,* could possibly be predictive of Randazza's conduct. Considering the storied history of such alleged misconduct by other attorneys, one would think Plaintiffs would be excited by the prospect of an experienced First Amendment attorney who has not engaged in such conduct managing the case.

conduct over a span of decades that is less objectionable than what he does every day. The Court should not be fooled by this performative, bad-faith taking of offense and should recognize that Plaintiffs and their counsel are engaged in a cynical attempt to deprive Defendants of their counsel of choice.

### 2.7    Admission in Other Cases and Courts

Plaintiffs argue this Court should not admit Randazza *pro hac vice* because a Connecticut court denied his applications to be admitted there. This ignores the procedural history of Randazza's disciplinary proceedings, however. Randazza was disciplined in October 2018, and sought admission in Connecticut in January 2019 and, again, in July 2020. The Connecticut court's initial decision to deny Randazza admission *pro hac vice* was understandable considering the Nevada Supreme Court's order imposing discipline was still fresh and it was an open question as to whether other jurisdictions might impose harsher discipline. Randazza was still in the process of defending reciprocal discipline when he applied for *pro hac vice* admission again in 2020. Things have changed now.[13]   Randazza complied with disciplinary conditions for nearly 3 years without incident, and there has been no other conduct rising to any concern since 2012. This Court can be confident that there will be no further actions or proceedings related to this discipline. There is no reason to think he will engage in unethical conduct. In fact, Attorney Bankston himself has committed positive observations about his character and conduct. (**Exhibits 2 & 3**.)

Randazza has also been admitted *pro hac vice* in other courts in this state and in other states since the initiation of Randazza's discipline. The Supreme Court of

---

[13] For these reasons, comity with the Connecticut court does not weigh in favor of denying Randazza admission here. The factual situation is different now and there are entirely different courts. In fact, if anything, interested of comity would counsel in favor of admitting Randazza here; his firm is representing Defendants in the Connecticut litigation and is already familiar with discovery issues in this case and the factual underpinnings of the cases.

Texas found that Randazza is worthy of admission *pro hac vice in this very case*.[14] If the Supreme Court of Texas found that Randazza was ethical enough to practice in these cases, before the highest court in the State, this Court should take the Supreme Court of Texas's lead in admitting him. Further, the U.S. District Court for the Western District of Texas and the 5th Circuit admitted Randazza to practice as well.

Mr. Bankston, in his desperate attempt to smear opposing counsel, claims that Mr. Randazza's *pro hac vice* admissions in the Western District of Texas should not be considered. He very carefully avoids noting that Mr. Randazza was not just admitted pro hac vice, and not only was there no incident in any of those cases, but Mr. Randazza was admitted *as a full member of the bar of the Western District of Texas*, after the District's character and fitness committee convened an inquiry and investigated Randazza's character. (Admission certificate for the United States District Court for the Western District of Texas, attached as **Exhibit 5**.) The Fifth Circuit Court of Appeals also recently admitted him (albeit without an investigation that Randazza is aware of), which admission came after a full disclosure of all relevant facts. (Admission certificate for the Fifth Circuit Court of Appeals, attached as **Exhibit 6**.)

And, while Plaintiffs wish to ignore other Texas matters where Randazza was admitted *pro hac vice* without incident, they should review the transcript of Randazza's *pro hac vice* hearing in the Rhode Island matter of *St. Angelo v. Kearney*,

---

[14] Plaintiffs acknowledge this but claim it is unimportant because they were "blindsided" by Randazza's request for admission *pro hac vice* and did not have adequate time to research his background. (Response at 6-7.) This is nonsense. Plaintiffs' counsel knew that Randazza is involved in Sandy Hook litigation since July 2018. Plaintiffs had plenty of time and opportunity to research Randazza and object to his admission in those matters but chose not to do so. In fact, Bankston told Randazza that he has "always found [Randazza's] actions above reproach." (**Exhibit 2**.) Changing their tune now is rank opportunism. Even if this claim were true, essentially all of the alleged misconduct cited in Plaintiffs' Response was publicly available, Plaintiffs' request for an extension of time to respond and their response alluded to this conduct, and the Supreme Court of Texas easily could have fully considered it. A court does not abdicate its duty to judge an attorney's fitness for admission simply because a *pro hac vice* motion is unopposed.

where the court considered Randazza's disciplinary history and found that, upon closer inspection, it did not merit concern for Randazza's ability to practice in that court. (Transcript of hearing on *pro hac vice* motion in *St. Angelo v. Kearney*, attached as **Exhibit 7**, at 6:4-22.)

### 3.0    CONCLUSION

For the foregoing reasons, the Court should admit Attorney Marc J. Randazza *pro hac vice* in this matter. The feigned indignation of Plaintiffs and their counsel to Randazza's alleged conduct is not genuine. If the Court requires further examples of this, it should know that in February 2021, years after knowing Randazza was involved in the Sandy Hook litigation, Bankston called Randazza and informed him that he had no concerns about Randazza being admitted *pro hac vice* in the Supreme Court of Texas matters, but that he could not consent to Randazza's admission because Plaintiffs' Connecticut attorneys would not allow him to, due to Bankston having previously said positive things about Randazza's character. (Randazza Decl. at ¶ 7-19.)  The opposition amounts to "the Plaintiffs do not wish to face effective and competent counsel who is most familiar with the Defendant and the case."  This is an unethical use of the pro hac vice process, and it should not be given this court's imprimatur.

There is no reason for the Court to entertain this charade. It should admit Randazza *pro hac vice*.

Dated: July 30, 2021

> Respectfully Submitted,
> By: ___/s/ Bradley J. Reeves__
> Bradley J. Reeves
> Texas Bar No. 24068266
> brad@brtx.law
> **REEVES LAW, PLLC**
> 702 Rio Grande St., Suite 203
> Austin, TX 78701
> Telephone: (512) 827-2246
> Facsimile: (512) 318-2484

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2021 the forgoing document was served upon all counsel of record via electronic service.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

# EXHIBIT 1

Declaration of Marc J. Randazza

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

# DECLARATION OF MARC J. RANDAZZA

I, MARC J. RANDAZZA, hereby declare as follows:

1.    I am over the age of 18 years and have never been convicted of a crime involving fraud or dishonesty.

2.    The facts set forth in this declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.    I am the principal of Randazza Legal Group, PLLC ("RLG").

4.    Plaintiffs' counsel in this matter, Mark Bankston, has known since July 2018 that I am serving as counsel for Defendants, and I have represented the Defendants in multiple matters, and have provided assistance in both this matter and related litigation regarding the Sandy Hook shooting in Connecticut.

5.    On August 12, 2020, Bankston sent me an email stating that he respected my character and considered my actions to be "above reproach." A true and correct copy of this email is attached to the reply in support of my motion for admission *pro hac vice* (the "Reply") as **Exhibit 2**.

6.    Attached to this August 12 email was a letter Bankston sent to Defendants' then-counsel on August 26, 2019, praising my character and stating, *inter alia*, that I was approaching the Sandy Hook cases in a "very tasteful and principled matter," that I was "a reasonable and honorable opponent," and that my "presence in these lawsuits as InfoWars' corporate counsel is sorely missed." A true and correct copy of this letter is attached to the Reply as **Exhibit 3**.

2

7.      I did not reciprocate his compliments, as Mr. Bankston has largely tried this matter in the press, and has comported himself in a shockingly unprofessional manner in most all communications he has had with opposing counsel in this matter. Nevertheless, when I have been copied on these communications, I have done my best to try and influence him to be more professional and to discourage my colleagues to "take the bait" that he lays down when acting in an unprofessional manner. When I sought *pro hac vice* admission with the Supreme Court of Texas matters related to this litigation, I spoke with Mark Bankston on the telephone in February 2021.

8.      I did not record this call (as doing so without announcing it is unlawful in most states where I am licensed, including California, Nevada, Florida, and Massachusetts).  In fact, in California, the other party to a recorded call can recover civil damages of $5,000 or three times the actual damages, whichever is greater. Cal. Penal Code § 637.2. The court may also impose injunctions preventing the use of illegally obtained information. Cal. Penal Code § 637.2(b). Further, I did not take contemporaneous notes, as I did not anticipate needing to discuss the matter further. However, I can provide a summary of the issues on that call to the best of my memory. Some matters did, indeed, stand out and I do recall them. The reports in this Declaration are in line with my best recollection.

9.      In that call, Bankston told me that he apologized for having to oppose my *pro hac vice* motion. In fact, he said that he did not wish to oppose it, but he was

3

compelled to do so by attorneys handling a related case in Connecticut.

10.    Bankston said that he wanted an extension of time in which to file his opposition because he wanted to avoid having to file one in the first place. He believed that events in Connecticut could unfold in a manner that would leave him able to make an independent judgment about declining to oppose it in Texas. At the time we had this call, the related Connecticut litigation had been removed to and was pending in federal court and I had a *pro hac vice* application pending in the U.S. District Court for the District of Connecticut.

11.    During this call, we discussed my District of Connecticut application. I presumed, and Bankston told me he agreed, that I would be admitted in that case, and Bankston told me (and I agreed) there was a strong likelihood that the case would not be remanded to state court.

12.    In fact, Bankston expressed the opinion that the Connecticut law firm litigating against Mr. Jones, Koskoff Koskoff & Bieder (the "Koskoff Firm"), had expressed fear that the case would be transferred from the U.S. District Court for the District of Connecticut to the U.S. District Court for the Western District of Texas.

13.    During this call, Bankston said that if the Connecticut matter was transferred to the Western District of Texas, and/or if the motion for remand was denied and the matter remained in federal court, or even if my *pro hac vice* application were granted in the District of Connecticut, he would not oppose my *pro hac vice*

4

motion in the Supreme Court of Texas per instructions he received from the attorneys at the Koskoff Firm representing Plaintiffs in the Connecticut litigation.

14.    Bankston expressed that the attorneys at the Koskoff Firm "did not want to face" me in court. He, however, expressed confidence, in a polite manner, that he had no such fears.

15.    During this call, Bankston said he wanted to be very sure to communicate to me that it was not his usual practice to oppose a *pro hac vice* motion, and it bothered him to do so, but that he was compelled to do so here at the direction of the attorneys at the Koskoff Firm.

16.    In response, I expressed concern that Bankston was allowing out-of-state attorneys in another case to dictate his movements in this case, but that I empathized with his problem.

17.    He explained that there was an agreement of cooperation between Bankston and the Koskoff Firm and he could not jeopardize that relationship by not resisting my *pro hac vice* application.

18.    During this call, Bankston told me he had already been scolded by the Connecticut attorneys for sending me the August 12, 2020 email and attached documents attesting to my character.  In fact, he said they were "fucking pissed."

19.    During this call, Bankston also expressed that he did not have much respect for the Connecticut attorneys, but that he had been forced into an unwilling alliance

5

with them.

20.    I find it ridiculous and offensive that I have to defend myself against allegations of anti-Semitism based on the uncritical repetition of allegations made by Don Juravin, a con man with a personal vendetta against me. But, I will do so for the sake of completeness.

21.    The supposed "anti-Semitic" comment was "Roca Labs is very hurt" written in Hebrew.  I cannot think of a single word in that statement that is remotely anti-Semitic. In fact, the only thing that is "Semitic" in nature about it is the use of Hebrew. I am unaware of how using the Hebrew language makes one an anti-Semite. In fact, it would be a rare species of Anti-Semite who would take the time to learn some rudimentary Hebrew, without any compulsion to do so.

22.    I would say that my Hebrew is quite rudimentary. I can recite some Jewish prayers and exchange a few pleasantries in the language, but I would not say that I "speak" Hebrew. Accordingly, if the translation of what I wrote in Hebrew is not properly translated, that was inadvertent. I would suggest that if the Court is at all interested, that it have someone with greater knowledge review this phrase, in Hebrew, for confirmation that there is no Anti-Semitic implication. "מעבדות

רוקה נפגעות מאוד".

23.    I sent my two children to a Jewish pre-school, which is where I learned how to recite Hebrew prayers. At no point did I feel there was any issue with the

6

school's religious, ethnic, or cultural grounding or the backgrounds of its faculty or student body. In fact, I have attended Temple far more in the past 10 years than I have attended Catholic services. I have been to Catholic services exactly once in that time frame that I can recall, aside from a funeral service and weddings. I have absolutely no idea how many times I have attended Temple.

24.     I suppose that one can still be an anti-Semite and voluntarily have one's children educated in the Jewish tradition, maintain dozens of friendships with Jews of the secular, orthodox, reform, and conservative persuasions, have one's own custom-made Italian flag kippah, and learn rudimentary Hebrew. But, I would question how committed one could be to the cause of anti-Semitism with all of that going on.

25.     I am aware of Mr. Bankston's twitter account and the vulgarity he uses on it on a regular basis. I do not criticize him for it, but rather I am compelled to address it as Mr. Bankston's arguments about my own language are not in good faith. On the basis of his vulgarity and the vulgarity that he uses regularly when on the phone, I have never considered Mr. Bankston to be someone who needed to be spoken to delicately. Rather, his protests about vulgarity are the lawyer's equivalent of a soccer or basketball player throwing himself to the ground at the slightest contact, so as to hope to draw a penalty from an unwitting and unobservant referee.

26.     I am under no impression that the Court is either unwitting or unobservant.

27.     In a separate matter, *Postle v. Brill,* Case No. 34-2020-00286265 (Sacramento Cty. CA Sup. Ct.), I spoke on the phone with Mr. Postle and Alexandrea Merrell of the HONR Network on March 17, 2021.

28.     Ms. Merrell, a third party who was acting as legal counsel for Postle without being licensed to do so, claimed that Mark Bankston would be filing an appearance in the case on behalf of Mr. Postle.

29.     I called Mr. Bankston to confirm that this was true. Mr. Bankston then informed me that he had never heard the name Mike Postle and that he had never heard of the case.

30.     I thanked Mr. Bankston for this information and proceeded to again speak with Ms. Merrell and Mr. Postle.

31.     Ms. Merrell then reiterated the lie of Mr. Bankston planning to file an appearance.

32.     At that point in the conversation, I called Ms. Merrell a "fucking liar" and informed them that I had just spoken to Mr. Bankston.

/

/

/

/

/

8

My name is Marc John Randazza, my date of birth is November 26, 1969, and my business address is 30 Western Avenue, Gloucester, Massachusetts 01930, United States. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Essex County, Massachusetts, on this 20 day of July, 2021.

Marc J. Randazza

9

# EXHIBIT 2

August 12, 2020 Email from Mark Bankston



Ale  Shepard  a s  randazza.com

## Fwd: Question about Media Statements

**Marc Randazza**  mjr@randazza.com                                    Tue,  ul 27, 2021 at 9:  6 AM
To: Ale  Shepard  ajs@randazza.com

---------- Forwarded message ---------
From: **Mark Bankston**  mark@f  trial.com
Date: Wed, Aug 12, 2020 at 11:30   M
Su  ject:   E:   uestion a  out Media Statements
To:  andazza Marc  ohn  mjr@randazza.com

Looking at the motion,   can definitely say those sentences were not near as clear as they should have  een. My intent was to communicate two ideas:

1. There had  een numerous discussions with  ones and  oth of his attorneys since the inception of the case, which is fine.

2. But many of those discussions went over the line  due to comments  y  ones, and later, Barnes .

What  didn t make clear, and should have made clear, is that the discussions in which you were involved did not go over the line due to anything *you* said,  ut rather things  ones said, which o  viously you cannot control in a live-streamed  roadcast.  ou are correct in your email  elow.  have always found your actions a  ove reproach.

 ust in case anyone in the future should try to use this pleading against you,   have attached a declaration from me stating clearly that the statements in the motion do not refer to you and that your actions in this case were always proper.

 have also attached a letter   sent to  nfoWars  new counsel a few months after the filing of that motion, in which   descri  e your tenure in the case as follows:

When Mr.   andazza came to Te  as for the hearings last year, the two of us had a pleasant discussion.  thanked him for the way he was approaching the cases, which  felt had  een very tasteful and principled.  also told him  felt agreeing to forego fees against the Sandy  ook parents was not only a sound strategy  ut a commenda  le gesture as well.  e said he wouldn t have it any other way. We shook hands, and for the ne  t si  months, not a single unkind word passed  etween us. Mr.   andazza was a reasona  le and honora  le opponent.  is presence in these lawsuits as  nfoWars  corporate counsel is sorely missed.

My apologies for the confusion.  t would have  een interesting to see how these cases would have developed with you on the other side instead of the a  solute mess they  ecame after your departure.

Mark Bankston

Kaster Lynch Farrar   Ball, LL

---

**From:**  andazza Marc  ohn  mjr@randazza.com
**Sent:** Wednesday, August 12, 2020 1:4   M
 **o:** Mark Bankston  mark@f  trial.com
**Sub ect:**   uestion a  out Media Statements

Mark,

 recently read this paragraph in a motion you filed.  Sorry for not addressing it contemporaneously with its filing,   ut  have not  een involved in the Te  as cases, e  cept o  serving in court.

do recall that when we met, you shook my hand and said that you and your clients appreciated the way   had treated them in the press.

But then   read this, and   ask if there s something we haven t discussed.

 f you   elieve that   went over the   ounds of allowa  le e  trajudicial statements,    would like to know what you are referring to.   f   owe someone an apology,   am   ig enough to give it.

Can you refer me to any statement   made that you   elieve is  over the   ounds

-Marc

Mr. Jones' conduct. Plaintiff's counsel have periodically given statements to news outlets regarding the progress of the lawsuits, and they've never had any objections to InfoWars attorneys discussing the merits or giving their opinion on the case. Indeed, Plaintiff's counsel has been extremely tolerant of the constant discussion of the lawsuits on InfoWars, whether from Mr. Jones, his former counsel Mr. Randazza, or current counsel Mr. Barnes. Many of these discussions stepped well over the bounds of allowable extrajudicial statements, but Plaintiff's counsel were

---

[34] *Id.*
[35] *Id.*

8

not unsympathetic to the fact Mr. Jones has been the subject of massive negative media coverage. Out of fairness, Plaintiff's counsel felt Jones was owed a little latitude.

---

**Marc John Randazza, JD, MAMC, LLM**· | **Randazza Legal Group**
2764 Lake Sahara Drive, Suite 109| Las Vegas, NV 89117
Tel: 702-420-2001 | Email: mjr@randazza.com

Firm Offices - Las Vegas | Miami | New England

_____

\* Licensed to practice law in Arizona, California, Florida, Massachusetts, and Nevada.

--

_____

**Marc John Randazza, JD, MAMC, LLM\* | Randazza Legal Group**
2764 Lake Sahara Drive, Suite 109, Las Vegas, NV 89117
30 Western Avenue, Gloucester, MA 01930
2 S Biscayne Boulevard, Suite 2680, Miami, FL 33131
Tel: 702-420-2001 | Email: mjr@randazza.com
Firm Offices - Las Vegas | Miami | New England

_____

\* Licensed to practice law in Arizona, California, Florida, Massachusetts, and Nevada.

---

**2 attachments**

**2020-08-12 Declaration of Mark Bankston.pdf**
167K

**2019-08026 MDB to Nyitray fwd Corresp.pdf**
1139K

# EXHIBIT 3

Letter from Mark Bankston to Michael Burnett
August 26, 2019



KASTER LYNCH
FARRAR&BALL LLP

TEXAS | FLORIDA

MARK D. BANKSTON | ATTORNEY
mark@fbtrial.com

August 26, 2019

**VIA EMAIL: snyitray@BurnettTurner.com**
**VIA EMAIL: mburnett@BurnettTurner.com**
Scott Nyitray
Michael Burnett
BURNETTTURNER
6034 W. Courtyard Drive, Suite 140
Austin, Texas 78730

Re: *Heslin v. Jones et al*., No. 03-18-00650-CV

Dear Counsel:

I write to follow up on your proposed brief. Since I know you are new to these lawsuits as local counsel, I need to bring you up to speed on the lengthy history of your client's representations not to seek fees against parents of Sandy Hook victims. On August 2, 2018, InfoWars published an article with the headline "Media Caught in Huge Sandy Hook Trial Lie: Falsely claims Jones making Sandy Hook parents pay his legal fees, when the opposite is true."[1] The article states it is a lie "that Alex Jones was forcing *the Sandy Hook parents* to pay his legal fees." The article quotes from an episode of Mr. Jones' show in which he described his concession as "something no one ever does, super high road." The article quotes Jones as saying, "We waived the attorney's fees and the media turned that into I'm seeking expenses from *the families* – that is fraud."

In another InfoWars episode last year, Mr. Jones disclaimed that he was seeking attorney's fees from Sandy Hook parents, saying "You know I didn't sue *the families*. And you know I waived attorney's fees that no one has ever done."[2]

Also last year, former InfoWars corporate counsel Marc Randazza appeared on yet another episode of Mr. Jones' show to discuss the lawsuits.[3] During one exchange, they said:

> JONES: Let's be clear, no one waives that. We did --
>
> RANDAZZA: I have never seen before in the history of an anti-slapp case where a defendant invoked the anti-slapp law, but then specifically waived their right to fees. Now you've done it here in

---

[1] https://www.infowars.com/exposed-media-caught-in-huge-sandy-hook-trial-lie/
[2] https://www.mediamatters.org/alex-jones/alex-jones-threatens-sandy-hook-parents-cease-and-desist-letters-if-they-keep-talking
[3] https://www.youtube.com/watch?v=bsQiHnEHK1I

Texas. You did openly yesterday and also in the Connecticut case that I'm handling for you.[4]

In response, Mr. Jones said, "And you'd think that be news! No, instead, I'm suing the Sandy Hook parents."[5] Discussing the decision not to seek fees against any of the parents, Mr. Randazza said, "And I think that was a good idea. *Because nobody wants to -- These people lost their kids*."[6]

One of the statements to which Mr. Randazza refers is found on page one of your client's motion to dismiss in *Lafferty v. Jones,* which states "Defendants, however, waive any fees over and above the sum of $1. *They have no desire to collect money from the parents of Sandy Hook victims*."[7] Consistent with that representation, former local counsel Mark Enoch noted a few months later during the *Pozner* motion to dismiss hearing that no fees above $1 were being sought.

When Mr. Randazza came to Texas for the hearings last year, the two of us had a pleasant discussion. I thanked him for the way he was approaching the cases, which I felt had been very tasteful and principled. I also told him I felt agreeing to forego fees against the Sandy Hook parents was not only a sound strategy but a commendable gesture as well. He said he wouldn't have it any other way. We shook hands, and for the next six months, not a single unkind word passed between us. Mr. Randazza was a reasonable and honorable opponent. His presence in these lawsuits as InfoWars' corporate counsel is sorely missed.

During the *Heslin* hearing a few weeks later, in which the Court also considered a motion for discovery and a motion for sanctions, it became quite clear the Court would not be considering the motion to dismiss and would instead be ordering discovery. It seems local counsel Mr. Enoch never got around to putting InfoWars' concession not to seek TCPA fees on the record as he did in *Pozner* because he found himself too busy answering questions from Judge Jenkins about what the scope of that discovery would be. That doesn't mean the concession not to seek fees from Sandy Hook parents didn't exist, as shown above.

Indeed, your client's new corporate counsel Robert Barnes touted your client's concession not to seek fees from Sandy Hook parents when he began making a series of appearances on InfoWars and other media outlets upon taking over the defense this spring, well after the *Heslin* hearing. A few months later, Mr. Barnes repeated the concession during the motion to dismiss hearing in the *Lewis* case this summer.

As I indicated on Friday, your stated position makes no sense. Why would your clients have waived anti-slapp fees for every single Sandy Hook parent in Connecticut and Texas with the sole exception of Mr. Heslin? Taking this position would be especially strange considering the fees incurred in *Heslin* are far lower than the *Lafferty* matter or the *Lewis* matter, both of which featured discovery. This position -- which I am sure did not originate with either of you gentlemen at Burnett Turner -- appears to be an attempt by your client's new corporate counsel to take

---

[4] *Id.* at 3:35.

[5] *Id.* at 4:00.

[6] *Id.* at 4:50.

[7] *Lafferty v. Jones,* No. 3:18-cv-01156-JCH, Doc. 22.

advantage of Mr. Enoch's omission while disclaiming the reliability of your client's public representations and his counsel's assurances both in and out of court.

Your client gained benefit from his gracious concession not to seek fees against Sandy Hook parents by promoting it in his own programing while also securing rare positive coverage in the typically hostile media, not to mention gaining goodwill with the trial courts in Texas and Connecticut. I suppose in the absence of a signed Rule 11 agreement specifically for the *Heslin* matter, you could attempt to repudiate what was the obvious understanding of the parties and the repeated public representations by your client and his attorneys. But we both know that would be weird and dare I say slimy, so I'm hoping you don't sign off on that path.

In any case, Mr. Heslin has made it clear to me he would oppose the proposed brief given your client's many public representations and the assurance of counsel both in and out of court regarding the waiver of TCPA fees against the Sandy Hook parents as a whole.

Sincerely,

*/s/ Mark D. Bankston*

Mark D. Bankston

MDB:cs

# EXHIBIT 4

Declaration of Mark Bankston

## DECLARATION OF MARK BANKSTON

STATE OF TEXAS   §
        §
HARRIS COUNTY  §

I, Mark Bankston, declare under penalty of perjury that the following declaration is true

and correct and based upon my personal knowledge:

1. My name is Mark Bankston. I am over the age of 18 and competent to make this declaration. I am an attorney at the law firm Kaster Lynch Farrar & Ball, LLP in Houston, Texas.

2. In 2019, I filed a motion in *Lewis v. Jones* seeking the revoke the *pro hac vice* status of attorney Robert Barnes.

3. The motion discusses improper extrajudicial statements by Mr. Barnes and his client Alex Jones.

4. The motion mentions that Mr. Jones discussed the details of the case in episodes of his show featuring both Mr. Barnes as well as his former attorney Marc Randazza.

5. In no way did I mean to imply that Mr. Randazza ever made improper extrajudicial statements. Furthermore, my experience with Mr. Randazza in that case was that he always acted properly and above reproach in all respects.

Executed on August 12, 2020 in Harris County, Texas.

_____
MARK D. BANKSTON

1

# EXHIBIT 5

Western District of Texas
Admittance Certificate



# <u>EXHIBIT 6</u>

Fifth Circuit Court of Appeals
Admittance Certificate



THE UNITED STATES OF AMERICA

**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

I, Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, do hereby certify that Marc Randazza of Las Vegas, NV, being duly qualified was admitted as an Attorney and Counselor of the United States Court of Appeals for the Fifth Circuit on the 23rd day of June, A.D. 2021.

In Testimony Whereof, I hereunto subscribe my name and affix the seal of the United States Court of Appeals for the Fifth Circuit at my office in New Orleans, Louisiana on the 23rd day of June, A.D. 2021.

Lyle W. Cayce

Clerk

# EXHIBIT 7

Transcript of Hearing on Motion for Admission pro hac vice in St. Angelo v. Kearney

1              STATE OF RHODE ISLAND

2     PROVIDENCE, SC.                        SUPERIOR COURT

3

4

5

6     ASHLEY ST. ANGELO PPA            )
      ANTHONY ST. ANGELO              )
7                                     )
       vs.                           )      PC-2021-00224
8                                     )
      AIDAN KEARNEY, JULIANNE KEARNEY  )

9

10

11

12                     **HEARD BEFORE**

13     **THE HONORABLE JUSTICE MELISSA A. DARIGAN**

14            **ON THURSDAY, JUNE 3, 2021**

15                    **VIA WEBEX**

16

17

18

19     **APPEARANCES:**

20     FOR THE PLAINTIFFS........EDWARD P. MANNING, JR., ESQUIRE

21     FOR THE DEFENDANTS........SEAN M. MCATEER, ESQUIRE
                            MARC J. RANDAZZA, ESQUIRE
22

23

24                     **PAULA CAMPAGNA**
25                 **OFFICIAL COURT REPORTER**

1    actions that were addressed in multiple states, it's primarily

2    reciprocal discipline relating to one situation.  So I read

3    everything that was presented in Mr. Randazza's application from

4    all of the courts.  And again, I was actually happy to see that

5    the issue that sparked the disciplinary proceedings in Nevada

6    which then traveled around the country was not related to an

7    issue of candor to the court or attorney misconduct as it

8    relates to activities before any court, and instead appear all

9    to be related to, you know, conflicts of interest involving one

10   particular client and it's related entities.  And it goes back a

11   number of years.

12        So the fact that the primary instances of discipline again

13   in multiple states all stem from an activity that does not go to

14   candor to the court or conduct through the Court, or even, you

15   know, mistreatment of a client, although I suppose you could

16   argue that the conflict of interest issues was a mistake, not

17   exactly mistreatment of a client.  It was a conflict of interest

18   that wasn't appropriately addressed or perceived and dealt with

19   at the time.  So despite initially being sort of taken aback by

20   the application, I have concluded that the discipline against

21   Mr. Randazza does not rise to the level where I would be

22   uncomfortable admitting him to practice in this case.  Again,

23   conduct doesn't relate to candor to the tribunal, it doesn't

24   relate to conduct before the Court and doesn't relate to an

25   actual mistreatment of a client.  So my concerns upon initially

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 54 of 210

7

1    seeing the application were alleviated once I understood what

2    was going on in Mr. Randazza's professional life.  The 2013

3    deposition issue also doesn't cause me any concern.  Things

4    happen.  The record on that case is not as detailed as the

5    record on the Nevada and related disciplinary actions, but it

6    does appear that whatever happened at that deposition back in

7    2013 was appropriately addressed and was addressed with the

8    consent of Mr. Randazza according to the order that I read in

9    the package.  So subject to the filing of the client

10   certification, the motion for admission of Mr. Randazza pro hac

11   vice is granted.

12        MR. MCATEER:  Thank you, Your Honor.  We'll file that

13   certification forthwith.

14        THE COURT:  You can file that certification and you can

15   also file the order, Mr. McAteer.

16        MR. MCATEER:  Yes, Your Honor.

17        MR. RANDAZZA:  Thank you, Your Honor.

18        THE COURT:  You're welcome.  All right.  So I have a live

19   hearing in the courtroom that I need to attend to, but I would

20   like to take 10 minutes with counsel off the record to talk

21   about where we're going in this case.  All right.  So I'm going

22   to excuse our court reporter and our clerk.  I'm going to go off

23   of the streaming record, and we'll just chat for a few minutes

24   about what we're doing here.

25                    **( A D J O U R N E D )**

# EXHIBIT 8

Florida Report of Referee

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

    Complainant,

v.

MARC JOHN RANDAZZA,

    Respondent.

_____/

Supreme Court Case
No. SC19-188

The Florida Bar File
No. 2020-00,216(2B) NFC

## REPORT OF REFEREE

## I.  SUMMARY OF PROCEEDINGS

Pursuant to the undersigned being duly appointed as referee to conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of Discipline, the following proceedings occurred:

This is a reciprocal discipline case. The Respondent filed The Notice of Discipline by a Foreign Jurisdiction (Nevada) in the Florida Supreme Court and had as attachments the Nevada Order Approving a Conditional Guilty Plea and the underlying Conditional Guilty Plea. Respondent's Exhibit 3; Tr. Vol. II, page 235, lines 8-10. On January 6, 2019, The Florida Bar filed its Formal Complaint against Respondent. On February 19, 2019, The Florida Bar noticed respondent that a case Management Conference would be conducted by the referee on March 8, 2019. On May 3, 2019, the referee commenced the Final Hearing in this matter.

Mr. Fisher, counsel for The Florida Bar, Mr. Weiss, counsel for the Respondent

and the Respondent, Mr. Randazza, were present.   Needing additional time to

conclude the Final Hearing, the parties rescheduled the second day.  Due to events

beyond everyone's control, the Final Hearing was rescheduled again.  The second

day of the Final Hearing convened on January 8, 2020.  All items properly filed

including pleadings and exhibits in evidence and the report of referee constitute the

record in this case and are forwarded to the Supreme Court of Florida.

## II. FINDINGS OF FACT

Jurisdictional Statement.  Respondent is, and at all times mentioned during

this investigation was a member of The Florida Bar subject to the jurisdiction and

Disciplinary Rules of the Supreme Court of Florida.

Narrative Summary Of Case.

Because this is a reciprocal discipline action, it is based on the Findings of

Fact, Conclusions of Law and Recommendation of the Southern Nevada

Disciplinary Board of the State Bar of Nevada dated July 10, 2018 and Order

Approving Conditional Guilty Plea Agreement of the Supreme Court of the State

of Nevada, dated October 10, 2018.  The Supreme Court of the State of Nevada

imposed a 12 month suspension, stayed for 18 months of probation subject to

conditions.  Those findings of fact and Order are attached to The Florida Bar's

Formal Complaint.

2

In or about June 2009, the Respondent drafted and signed a Legal Services Agreement with Excelsior Media Corp. (Excelsior) which provided that the Respondent would become "in-house" general counsel. The Agreement did not prohibit the Respondent from maintaining ad private practice or providing legal services to other clients so long as there was no conflict of interest with Excelsior. Excelsior had a subsidiary or affiliate company, Liberty Media Holdings, LLC (Liberty), which engaged in the production and distribution of pornography. The Respondent provided legal services to both entities, but did not have a separate agreement with Liberty.

In February 2011, Excelsior relocated its corporate offices to Las Vegas, Nevada. The Respondent followed in June 2011 and was admitted to the Nevada Bar in January 2012. Until his admission, the Respondent did not engage in the practice of law in the State of Nevada, except as a member of the bar of the U.S. District Court for the District of Nevada.

On or about June 20, 2012, the Respondent filed a lawsuit against FF Magnat Limited d/b/a Oron.com (Oron) for alleged violations of Liberty's intellectual property. On or about June 21, 2012, the Respondent obtained and injunction against Oron freezing certain accounts and funds of Oron. On July 1, 2012, the Respondent and attorneys for Oron signed a Settlement Letter with regard to the Oron litigation and a similar case between the two parties in Hong

3

Kong. The parties agreed that Oron would pay Liberty $550,000 payable to the

Respondent's trust account. A dispute arose after the Settlement Letter was

signed. Liberty filed a Motion to Enforce the settlement letter which the United

States District Court granted on August 7, 2012. Liberty obtained a Judgment

against Oron for $550,000. As part of the Post-Judgment settlement negotiations,

Oron informed the Respondent that it wanted to enter into an agreement to

retainthe Respondent for bona fide legal services. Specifically, Oron wanted the

Respondent to advise it how to avoid this type of litigation in the future and how to

restructure the company so as to not be subject to jurisdiction in the United States.

Tr. II, page 215, lines 2-25, 216, lines 1-14. Subject to the agreement of Liberty

and its execution of a Post-Judgment agreement, the Respondent negotiated a

separate agreement with Oron whereby he would receive $75,000 of Oron's frozen

funds. On August 6, 2012, while still in litigation representing Excelsior against

Oron, the Respondent executed a $75,000 non-refundable, "earned upon receipt

retainer" to represent FF Magnat, the parent company of Oron. Tr. II, page 254,

lines 17-28 and page 258, lines 8-14, The retainer agreement clearly stated that it

could not take effect unless and until Liberty's dispute with Oron was fully

resolved. See Transcript, Vol. II, at 215:20-216:1 & 239:25-240:7. The

Respondent presented and subsequently discussed the Post-Judgment Agreement,

which included payment of the $550,000 and the $75,000 retainer for future

4

services with Oron, with the CEO of Liberty, Mr. Gibson. The agreement was never consummated because Mr. Gibson disapproved it. Tr. II, page 214-216, line 14; 217, lines 3-7. The Respondent did not receive the retainer fee of $75,000.

On August 21, 2012, the Court ordered Pay Pal, Inc. to transfer $550,000 of Oron funds to the Randazza Legal Group trust account. A full and proper accounting occurred with Liberty receiving its share.

Concurrent with the United States litigation between Liberty and Oron, the Respondent and Mr. Gibson also discussed pursuing litigation against Oron and/or its affiliates in Hong Kong. The Respondent estimated those costs, excluding attorney's fees, to be approximately $50,000. Mr. Gibson said Liberty to advance $25,000 if the Respondent would personally advance $25,000. The Respondent agreed and requested and Liberty executed a promissory note to him for $25,000. The Respondent did not advise Liberty, in writing, to seek the advice of independent counsel regarding the promissory note. The Respondent and Excelsior parted ways on or about August 29, 2012. They dispute whether he resigned or was terminated.

Following his departure from Excelsior, the Respondent engaged in litigation against Excelsior, Liberty and Jason Gibson, individually over among other things money he alleged was owed to him by his former employers. The parties submitted the matter to arbitration. After a five day trial, the Arbitrator

5

issued an Interim Arbitration award (IAA) in favor of the employers and against

the Respondent. The Florida Bar's Exhibit 1. The Referee does not give any

weight to the IAA for several reasons. First, the IAA was vacated in its entirety,

after a court refused to confirm it, by voluntary agreement and by order of a court

of competent jurisdiction. Respondent's Exhibit 12; Tr. Vol. II, page 196, lines 18-

23. Second, the burden of proof for the IAA is a preponderance of the evidence,

not the clear and convincing standard as required by these proceedings. Third, the

Arbitrator's findings that the Respondent engaged in unethical conduct based on

testimony and evidence that occurred over a five day trial and that has not been

presented or observed by this Referee are of little weight. The IAA was not a basis

for any discipline by the State Bar of Nevada. While the Referee may be

sympathetic to the amount of time, energy and money that the Respondent's

employers spent to litigate the IAA issues, sympathy should play no part in the

Referee's recommendation.

The Florida Bar argued and presented evidence of other alleged conflicts of

interest engaged in by the Respondent when he represented other clients whose

interests were allegedly adverse to Excelsior or Liberty. There is no clear and

convincing evidence to suggest that anything the Respondent may have done on

behalf of his other clients was actually adverse to Excelsior or Liberty. The

Respondent testified it was not. Tr. II, page 203, line 1-204, line 24 and 246, line

6

4-248, line 7. The Respondent was authorized under his employment agreement to

do so. Tr. Vol. II, page 198: 23-25. The Florida Bar's witness, Mr. Dunlap,

offered no examples of a single matter where such representation was adverse. Tr.

Vol. II, page 281, line 23-284, line 23. The only instance in which there was a

conceivable conflict was with respect to the representation of XVideos, but as soon

as a potential conflict arose, Respondent acted to withdraw and the conflict never

ripened. Tr. Vol. II, page 248, lines1-7. Mr. Dunlap's testimony regarding 10

Group fails to show that the Respondent represented 10 Group in that transaction.

There was no conflict of interest where he briefly represented 10 Group regarding

an unrelated litigation matter. The Nevada bar investigated these conflicts and no

such conflicts were found. Tr. Vol. II, page 265, lines 3-11.

Since the imposition of the Nevada Order, every other state in which

Respondent is admitted has issued reciprocal discipline tracking the Nevada Order.

Specifically:

1.   Arizona: The Presiding Disciplinary Judge issued a Final Judgment and Order of Reprimand and Probation placing Mr. Randazza on 18 months of probation, concurrent with the Nevada discipline. Respondent's Exhibit 4; Tr. Vol. II, page 189, line 11-13.

2.   California: The Supreme Court of California issued a one-year suspension, stayed for one year, to be terminated upon satisfying the terms of the stay, which includes quarterly reporting and passing the MPRE. Respondent's Exhibit 9; Tr.Vol. II, page 188, lines 15-24

3.   Massachusetts: The Supreme Judicial Court issued an Order of Term Suspension/Stayed, suspending Mr. Randazza for 12 months, stayed for 18

7

months, retroactive to the date of the Nevada discipline, with the suspension to be lifted upon compliance with the Nevada Order. Respondent's Exhibit 10; Tr. Vol. II, page 189, lines5-10.

None of these jurisdictions found any factors in aggravation warranting any discipline in excess of that imposed by Nevada. Tr.Vol. II, page 224, line22-225,, line 11. To date, Respondent's right to practice law has not been suspended.

Additionally, proceeding in the Federal Appellate Courts (10th, 11th and Federal Circuit) all deferred to the Nevada Order. Respondent's Exhibit 4. The Supreme Court of the United States and the U.S. Courts of Appeals for the 1st, 2nd, 4th, 6th, 7th and 9th Circuits to date, have not taken any action despite timely notice. Tr. Vol. II, page 241, lines 2-9.

Despite being put on notice of the Nevada Order, the U.S. District Courts for the Northern & Middle Districts of Florida, the Northern District of Texas, the Northern, Central, Eastern, & Southern Districts of California, the Eastern District of Wisconsin, the Eastern District of Michigan, the Northern District of Ohio, and the District of Montana (admitted pro hac vice) have taken no action toward reciprocal discipline. Tr. Vol. II, page 241, lines 2-9. The matter was referred to an investigatory subcommittee of the Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance of the U.S. District Court for the Southern District of Florida following Respondent's response to a show cause order. Since the Final Hearing, on May 8, 2020, the U.S. District Court for the Southern District

8

of Florida adopted the disciplinary measures imposed by Nevada. See In re: Marc

John Randazza, Case No. 18 MC 25230 (S.D. Fla. Feb. 6, 2019). This document

is of record pursuant to the granting of the Respondent's Motion to Supplement the

Record. The U.S. District Court for the District of Massachusetts, upon the consent

of Respondent, imposed reciprocal discipline in the nature of a 12-month

suspension, stayed for 18 months, retroactive to October 10, 2018, conditioned

upon compliance with the Nevada Order. See Respondent's Exhibit 4, In re: Marc.

J Randazza, Misc. Bus. Dict. No. 18-mc-81490-FDS (D. Mass. sept. 26, 2019).

Only the U.S. District Court for the District of Nevada, which did not act on

the prompt notice of the Nevada Order until September 2019, issued an order

placing the Respondent on active suspension until the expiration of the Nevada

state probation, subject to reinstatement upon discharging all conditions. See In re:

Marc J. Randazza, Case No. 2: 19-cv-01765-MMD (D. Nev. Oct. 22, 2019). The

reason given was that the court had "neither the obligation, resources, nor

inclination to monitor Mr. Randazza's compliance with the probationary conditions

the [Nevada Supreme Court] imposed on him." Id. at 1; Tr. Vol. II, page 241, lines

10-14.

Finally, the Referee does not find persuasive the numerous character letters

submitted by the Respondent nor the testimony of his character witnesses, who

were unfamiliar with the facts surrounding his discipline. Like the IAA award, the

9

Referee does not give any weight to these letters whether sent directly to the Referee's chambers or filed as an exhibit.

III.    RECOMMENDATIONS AS TO GUILT.

I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar: 4-1.8(a) and Rule 4-5.6(b).

STANDARDS FOR IMPOSING LAWYER SANCTIONS

I considered the following Standards prior to recommending discipline: 3.0, 4.3, 9.1, 9.2 and 9.3.

IV.    RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BE APPLIED

I recommend that Respondent be found guilty of misconduct justifying disciplinary measures, and that he be disciplined by:

A.    One year of probation with a public reprimand and that the Respondent successfully complete the thirty hours of Florida continuing legal education ethics hours, and

B.    Payment of The Florida Bar's costs in these proceedings.

V.    PERSONAL HISTORY, PAST DISCIPLINARY RECORD

Prior to recommending discipline pursuant to Rule 3-7.6(m)(1)(D), I considered the following:

Age: 50 Years of Age.

10

Date of Bar Admission: March 3, 2003

Prior Discipline:    None

Aggravating Factors:  Standard 9.2

   (d) multiple offenses; and
   (i) substantial experience in the practice of law.

Mitigating Factors:

   (a) absence of a prior disciplinary record.


VI. STATEMENT OF COSTS AND MANNER IN WHICH COSTS SHOULD BE TAXED

I find the following costs were reasonably incurred by The Florida Bar:

| | |
|---|---|
| Investigative Costs | $105.25 |
| Administrative Costs | $1250.00 |
| Court Reporter's Fees | $1532.00 |
| Total | $2887.25 |

It is recommended that such costs be charged to Respondent and that interest at the statutory rate shall accrue and be deemed delinquent 30 days after the judgment in this case becomes final unless paid in full or otherwise deferred by the Board of Governors of The Florida Bar.

Dated this 7th day of July 2020.


/S/ *Dawn Caloca Johnson*
Dawn Caloca-Johnson, Referee
301 South Monroe Street
Tallahassee, FL 32301-1861

11

Originals To:

Clerk of the Supreme Court of Florida; Supreme Court Building; 500 South Duval Street, Tallahassee, Florida, 32399-1927

Conformed Copies to:

James Keith Fisher, Bar Counsel, at jfisher@floridabar.org, and

John A. Weiss, Counsel for Respondent, at jweiss@rumberger.com

# Supreme Court of Florida

### THURSDAY, SEPTEMBER 3, 2020

**CASE NO.: SC19-188**
Lower Tribunal No(s).:
2015-00,718(2B)

THE FLORIDA BAR      vs.    MARC JOHN RANDAZZA

Complainant(s)                               Respondent(s)

The Court approves the uncontested referee's report and reprimands respondent.

Respondent is further placed on probation for one year under the terms and conditions set forth in the report.  Respondent shall comply with all other terms and conditions in the report.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Marc John Randazza in the amount of $2,887.25, for which sum let execution issue.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, and COURIEL, JJ., concur.

A True Copy
Test:

John A. Tomasino
Clerk, Supreme Court

ca
Served:
LESLIE LAGOMASINO BAUM              JAMES KEITH FISHER
HON. DAWN CALOCA-JOHNSON, JUDGE    JOHN A. WEISS
PATRICIA ANN TORO SAVITZ

# EXHIBIT 9

Docket 261 Order Vacating

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 70 of 210

Case 15-14956-abl    Doc 261    Entered 08/02/18 16:34:49    Page 1 of 3

_____
Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
August 02, 2018

6  Jessica R. MacGregor, Esq., Ca Bar No. 168777          Lawrence A. Jacobson, Esq., Ca Bar No. 057393
   *(Pro Hac Vice)*                                        *(Pro Hac Vice)*
7  Long & Levit LLP                                        Cohen and Jacobson, LLP
8  465 California Street, 5th Floor                        66 Bovet Road, Suite 285
   San Francisco, CA  94104                                San Mateo, CA  94402
9  Telephone:  415-397-2222                                Telephone:  650-261-6280
   Facsimile:  415-397-6392                                Facsimile:  650-368-6221
10 Email:  jmacgregor@longlevit.com                        Email:  laj@cohenandjacobson.com

11 *Attorneys for JAMS, Inc. and Stephen Haberfeld*

12 Jeanette E. McPherson, Esq., NV Bar No. 5423
   Schwartzer & McPherson Law Firm
13 2850 South Jones Boulevard, Suite 1
   Las Vegas, Nevada 89146-5308
14 Telephone: 702-228-7590
   Facsimile: 702-892-0122
15 E-Mail:  bkfilings@s-mlaw.com

16

17 *Local Counsel for JAMS, Inc. and Stephen Haberfeld*

18                       **UNITED STATES BANKRUPTCY COURT**

19                            **DISTRICT OF NEVADA**

20 In re:                                    Case No. BK-S-15-14956-ABL

21 MARC JOHN RANDAZZA,                        Chapter 11

22                          Debtor.           **ORDER REGARDING ORDER TO SHOW
                                              CAUSE WHY STEPHEN HABERFELD AND
23                                            JAMS, INC. SHOULD NOT BE COMPELLED
                                              TO COMPLY WITH THE ORDER
24                                            APPROVING SETTLEMENT AGREEMENT
                                              AND/OR HELD IN CONTEMPT AND
25                                            SANCTIONED FOR WILLFUL VIOLATIONS
                                              OF THE AUTOMATIC STAY
26

27                                            Hearing Date:   July 31, 2018
                                              Hearing Time:  1:30 p.m.
28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Order re OSC                                  1

1    The Order To Show Cause Why Stephen Haberfeld And Jams, Inc. Should Not Be

2    Compelled To Comply With The Order Approving Settlement Agreement And/Or Held In

3    Contempt And Sanctioned For Willful Violations Of The Automatic Stay ("OSC") having come

4    before this Court on July 31, 2018; Marc John Randazza (the "Debtor") appearing by and through

5    his counsel, Matthew Zirzow, Esq. of Larson Zirzow & Kaplan, LLC, JAMS, Inc. ("JAMS") and

6    Hon. Stephen E. Haberfeld (Ret.) ("Judge Haberfeld") (JAMS and Haberfeld collectively referred

7    to herein as the "JAMS Parties") appearing by and through their counsel Jessica MacGregor, Esq.

8    of Long & Levit, Lawrence Jacobson, Esq. of Cohen and Jacobson, LLP, and Jeanette E.

9    McPherson, Esq. of Schwartzer & McPherson Law Firm; the Court having reviewed the pleadings

10    on file and having heard the argument and proposals of the Debtor and the JAMS Parties; and in

11    full resolution of the OSC and for good cause shown, it is hereby

12    ORDERED that to effectuate the Court's order approving the settlement between the

13    Debtor and the Excelsior Parties, the Court further orders that the Interim Arbitration Award

14    issued in the Arbitration is hereby deemed vacated and dismissed; and

15    ORDERED that the automatic stay be and is hereby modified to authorize and allow

16    JAMS and Stephen Haberfeld to terminate the arbitration proceeding and close its file with no

17    other action to be taken; and

18    ORDERED that the parties to the OSC, the Debtor and the JAMS Parties, shall bear their

19    own attorneys' fees and costs; and

20    ORDERED that nothing in this order shall be deemed a finding of contempt; and

21    ORDERED that the court reserves jurisdiction over the interpretation and enforcement of

22    this order; and

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Order re OSC

2

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 72 of 210

Case 15-14956-abl    Doc 261    Entered 08/02/18 16:34:49    Page 3 of 3

1    ORDERED that upon entry of this Order, the hearing scheduled for September 4, 2018 at

2  9:30 a.m. regarding the OSC shall be vacated.

3  Submitted by:

4  /s/ Jessica R. MacGregor
   Jessica R. MacGregor, Esq.
5  Long & Levit LLP

6       -and-

7  Lawrence A. Jacobson, Esq.
   Cohen and Jacobson, LLP

8  *Attorneys for JAMS, Inc. and Stephen Haberfeld*

9       -and-

10 Jeanette E. McPherson, Esq.
   Schwartzer & McPherson Law Firm

11 *Local Counsel for JAMS, Inc. and Stephen Haberfeld*

12 **Approved**/Disapproved:

13 /s/  Matthew Zirzow
   Matthew Zirzow, Esq.
14 Larson Zirzow & Kaplan, LLC

15 *Attorneys for Debtor*

16        **LR 9021 CERTIFICATION**

17 In accordance with LR 9021, counsel submitting this document certifies that the order accurately
   reflects the court's ruling and that (check one):

18

19   ☐   The court waived the requirement of approval under LR 9021(b)(1).

20   ☐   No party appeared at the hearing or filed an objection to the motion.

21   ☒   I have delivered a copy of this proposed order to all counsel who appeared
22       at the hearing, and any unrepresented parties who appeared at the hearing, and each
         has approved or disapproved the order, or failed to respond, as indicated above.

23   ☐   I certify that this is a case under Chapter 7 or 13, that I have served a copy
24       of this order with the motion pursuant to LR 9014(g), and that no party has
         objection to the form or content of the order.

25

26 /s/ Jeanette E. McPherson
   Jeanette E. McPherson, Esq.
27 Schwartzer & McPherson Law Firm

28        # # #

3

Order re OSC

# EXHIBIT 10

Opposition to Motion to Confirm Arbitration

Electronically Filed
08/07/2015 02:45:21 PM

**CLERK OF THE COURT**

1  **OPPS & CTM**
2  Mark A. Hutchison (4639)
   Michael K. Wall (2098)
3  Timothy R. Koval (12014)
   HUTCHISON & STEFFEN, LLC
4  Peccole Professional Park
   10080 West Alta Drive, Suite 200
5  Las Vegas, NV 89145
6  Telephone: 702-385-2500
   Facsimile: 702-385-2086
7  mhutchison@hutchlegal.com
   mwall@hutchlegal.com
8  tkoval@hutchlegal.com
9
   *Attorneys for Defendant*
10 *Marc J. Randazza*

11                    **DISTRICT COURT**

12              **CLARK COUNTY, NEVADA**

13

14 EXCELSIOR MEDIA CORP., a Nevada Corp.;      Case No. A-15-719901-C
   LIBERTY MEDIA HOLDINGS, LLC, a
15 California limited liability company; and     Dept. No. XXIV
   JASON GIBSON, individually,
16                                               **DEFENDANT'S OPPOSITION TO**
17              Plaintiffs,                      **PLAINTIFFS' MOTION TO CONFIRM**
                                                 **ARBITRATION AWARD AND**
18 vs.                                           **COUNTER-MOTION TO VACATE**
                                                 **AND/OR MODIFY**
19 MARC J. RANDAZZA, individually,

20              Defendant.

21

22         Defendant Marc J. Randazza ("Defendant" or "Randazza") opposes Plaintiffs' Motion to

23 Confirm Arbitration Award. As a threshold matter, the Interim Arbitration Award cannot be

24 confirmed because it is a non-final award. Further, Plaintiffs have violated the arbitration clause

25 of the employment agreement between Randazza and his ex-employer Excelsior Media Corp.

26 ("Excelsior") by bringing this confirmation action in Nevada. The employment agreement

27

                                      - 1 -

requires the parties to bring any action to confirm, modify, or vacate an arbitration award concerning Randazza's employment in San Diego, California. Specifically, the agreement states that "any controversy, dispute or claim arising out of this Agreement or relating to Randazza's employment with Excelsior" must proceed through alternative dispute resolution, culminating in arbitration if necessary. Further, the agreement states, "[j]udgment on any Award made by the arbitrator may be entered in any court having jurisdiction." Contract of Employment for Corporate General Counsel By and Between Excelsior Media Corp. and Marc J. Randazza at § 8, attached as Exhibit A.[1] The agreement then clarifies that "[a]ny action to enforce an arbitrator's award will be venued [sic] in San Diego County, California, unless otherwise agreed to by the parties." *Id.* at § 9(f). Randazza is in the process of initiating an action to vacate and/or modify Plaintiffs' arbitration award in San Diego, California, the correct forum.

However, should the Court find that it is authorized to consider Plaintiffs' request, this Opposition should also be deemed a counter-motion to vacate pursuant to common law and NRS 38.241 or, in the alternative, to modify or correct the award pursuant to NRS 38.242. The award cannot be confirmed because it manifestly disregards the law by applying Nevada law instead of California law as required by Randazza's employment agreement, which states, "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of laws." Exhibit A at § 9(f). The Arbitrator's failure to apply California law demonstrated his evident bias against Randazza. The Arbitrator likewise

---

[1] Please see the declarations of Randazza and Ken White – who was Randazza's attorney in the underlying arbitration – for authentication of the exhibits to this brief. The declarations are attached as Exhibit B and Exhibit C, respectively. The exhibits that were entered in the arbitration contain arbitration exhibit numbers in the bottom right-hand portions of the documents.

failed in his duties to evaluate the record, and he exceeded his power.  Defendant respectfully

requests that this Court deny Plaintiffs' motion to confirm the arbitration award *in toto* and, to

the extent applicable, vacate and/or modify the award.

      Randazza's opposition to the motion to confirm the arbitration award and counter-motion

to vacate and/or modify are based on EDCR 2.20, the following points and authorities, the

attached exhibits, and any oral argument entertained by the Court.

      DATED this 7th day of August, 2015.

                              HUTCHISON & STEFFEN, LLC

                              Mark A. Hutchison (4639)
                              Michael K. Wall (2098)
                              Timothy R. Koval (12014)

                              *Attorneys for Defendant*
                              *Marc J. Randazza*

1

2

## **TABLE OF CONTENTS**

Table of Authorities ...............................................................................6

Points and Authorities

    I.      Introduction.............................................................................8

    II.     Factual Background ...............................................................10

    III.    Standard of Review................................................................14

    IV.    Analysis.................................................................................17

        A.  Plaintiffs Have Violated The Employment Agreement
            By Bringing The Enforcement Action In Nevada ..................17

        B.  The Interim Arbitration Award Is Not Final, Thus
            Plaintiffs' Motion to Confirm The Award Should Be Denied.................18

        C.  The Arbitrator Made Gross Factual and Legal Errors ...........................19
            1. The Arbitrator Made Improper Factual Findings....................19
               a.  Randazza Did Not Resign ...............................................19
               b.  There Was No "Bribe" .....................................................21
            2. The Arbitrator Made Improper Legal Determinations...............22
               a.  Randazza Should Have Prevailed on His Claims ...........23
                   i.    Randazza Is Entitled To Reimbursement
                        Under California Law .....................................23
                   ii.   Randazza Is Owed Unpaid Wages Under
                        California Law ...............................................26
                   iii.  Randazza Is Owed Unpaid Wages Under
                        Nevada Law ...................................................28
                   iv.  Randazza Is Entitled To Unpaid Severance
                        And Bonuses ..................................................30
                   v.   Randazza Was Wrongfully Terminated...............32
                   vi.  Randazza Was Subject To A Hostile
                        Work Environment.........................................33
                   vii. Randazza Was Retaliated Against ......................34
                b.  The Interim Arbitration Award to Plaintiffs
                 Is Improper.....................................................................34
                   i.    Randazza Did Not Breach Fiduciary Duties........35
                   ii.   Randazza Was Not Unjustly Enriched.................39
                   iii.  Damages For Spoliation Or Conversion
                        Are Not Warranted.........................................41

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 78 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 6 of 433

   iv. Disgorgement Of Wages Earned Is Impermissible ........................................................43

   v. Remittance of Trust Funds Is Improper ...............49

   vi. No Audit Of Randazza Legal Group's Trust Account Is Permissible ...............................50

   vii. Randazza Cannot Return a Non-Existent Laptop ..................................................................51

   viii. Gibson Is A Proper Party ....................................52

 **D. Interim Awards Are Not Otherwise Subject To Confirmation** .........53

  1. The Interim Award Was Replete With Bias .................................53

   *a. Physical Position Is Not An Indicium Of Credibility When The Arbitrator Directed Such Position* ..................53

   *b. The Arbitrator Expressly Bifurcated The Question Of Alter-Ego Liability But Disregarded His Own Order.* 54

   *c. Errors Of Counsel Were Misattributed To Defendant* .....57

   *d. The Arbitrator Cannot Make An Adverse Finding Based On An Issue He Opted Not To Decide* .................57

V. Conclusion ..............................................................................................58

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 79 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 7 of 433

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Baldonado v. Wynn Las Vegas, LLC*, 124 Nev. 951, 194 P.3d 96 (Nev. 2008).
*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999).
*Cal. Satellite Sys. v. Nichols*, 170 Cal. App. 3d 56 (Cal. App. 3d Dist. 1985).
*Carlton v. Quint*, 77 Cal. App. 4th 690 (Cal. App. 2d Dist. 2000).
*Cedars-Sinai Med. Ctr. v. Superior Ct.*, 18 Cal.4th 1, 954 P.2d 511 (1998).
*Clark Cnty. Educ. Ass'n v. Clark Cnty. Sch. Dist.*, 122 Nev. 337, 131 P.3d 5 (2006).
*Complainant v. Foxx*, EEOC Appeal No. 2012-24738–FAA-03 (July 15, 2015).
*Fetrow-Fix v. Harrah's Entm't, Inc.*, 2010 U.S. Dist. LEXIS 125625 (D. Nev. Nov. 16, 2010).
*General Dynamics Corp. v. Superior Court (Rose)*, 7 Cal 4th 1164, 876 P.2d 487 (1994).
*Ghirardo v. Antonioli*, 14 Cal. 4th 39, 924 P.2d 996 (Cal. 1996).
*Graber v. Comstock Bank*, 111 Nev. 1421, 905 P.2d 1112 (Nev. 1995).
*Jackson v. Johnson*, 5 Cal. App. 4th 1350, 7 Cal.Rptr.2d 482 (Cal. App. 2d Dist. 1992).
*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (U.S. 1951).
*Kane v. Sklar*, 122 Cal. App. 2d 480, 265 P.2d 29 (Cal. 1954).
*Liberty Media Holdings, LLC v. FF Magnat Limited*, C.A. No. 2:12-cv-01057 (D,Nev. Aug. 7, 2012).
*Lopez v. Corral*, 2010 Nev. LEXIS 69 (Nev. Dec. 20, 2010).
*McDonagh v. Harrah's Las Vegas, Inc.*, 2014 U.S. Dist. LEXIS 82290, 2014 WL 2742874 (D. Nev. June 17, 2014).
*Morelite Constr. Corp. v New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79 (2d Cir. 1984).
*Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010).
*Nat'l Post Office Mailhandlers v United States Postal Serv.*, 751 F.2d 834 (6th Cir. 1985).
*Northland Truss Sys., Inc. v Henning Constr. Co., LLC*, 808 F. Supp. 2d 1119 (S.D. Iowa 2011).
Orion Shipping & Trading Co. v Eastern States Petroleum Corp., 312 F.2d 299 (2d Cir. 1963).
*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019 (9th Cir. 1991).
*Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 108 Cal. Rptr. 3d 455 (Cal. App. 4th Dist. 2010).
*Righthaven LLC v. Hoehn*, 716 F.3d 1166 (9th Cir. 2013).
*Righthaven, LLC, v. Hoehn*, C.A. No. 2:11-cv-00050 (D.Nev. Jun. 6, 2013).
*Rodriguez v. Disner*, 688 F.3d 645 (9th Cir. 2012).
*Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013).
*Selcke v. New England Ins. Co.*, 995 F.2d 688 (7th Cir. 1993).
*Sherman v. Board of Trustees*, 9 Cal. App. 2d 262, 49 P.2d 350, 1935 Cal. App. LEXIS 1299 (Cal. App. 1935).
*Shopoff & Cavallo LLP v. Hyon*, 167 Cal. App.4th 1489 (Cal. App. 1st Dist. 2008).
*Simon v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 63480, 2010 WL 2609436 (D. Nev. June 23, 2010).
*Small v. Univ. Med. Ctr. of S. Nev.*, 2014 U.S. Dist. LEXIS 114406 (D. Nev. Aug. 18, 2014).
*Stanley v. Richmond*, 35 Cal. App. 4th 1070, 41 Cal. Rptr. 2d 768 (Cal. App. 1st Dist. 1995).
*Sullivan v. Oracle Corp.*, 51 Cal 4th 1191 (2011).

**TABLE OF AUTHORITIES**

Cases Cont'd.

*Tandy Computer Leasing, Div. of Tandy Elecs. v. Terina's Pizza*, 105 Nev. 841, 784 P.2d 7 (Nev. 1989).

*Tuxedo Int'l Inc. v. Rosenberg*, 127 Nev.   , 251 P.3d 690 (Nev. 2011).

*Williams v. Cigna Financial Advisors Inc.*, 197 F.3d 752 (5th Cir. 1995).

*Wright v. Adventures Rolling Cross Country, Inc.*, 2012 U.S. Dist. LEXIS 104378 (N.D. Cal. 2012).

Statutes And Other Authorities

Cal. Civ. Code, Section 3294.
Cal. Gov. Code, Section 12940(a) & (h).
Cal. Labor Code, Sections 200-203.
Cal. Labor Code, Section 206.
Cal. Labor Code, Section 221.
Cal. Labor Code, Section 2802.
Cal. Labor Code, Section 2750.
Cal. R. Prof. Conduct 3-100.
NRS 17.130.
NRS 38.222.
NRS 38.236.
NRS 38.239.
NRS 38.241.
NRS 38.242.
NRS 38.330.
NRS 99.040.
NRS 108.221-.246
NRS 608.050.
NRS 608.160.
Nev. R. Prof. Conduct 1.6.
Nev. R. Prof. Conduct 3.4.
Nev. R. Prof. Conduct 5.6.
9 U.S.C. 10.
9 U.S.C. 11

## POINTS AND AUTHORITIES

### I.    Introduction

As noted by Plaintiffs in their motion to confirm the arbitration award, Arbitrator Haberfeld issued his self-titled Interim Arbitration Award. Exhibit D. By its own terms, it is not final; it contemplates a forthcoming accounting of a trust account managed by a non-party law firm, amounts to be determined for alleged spoliation, as well as the briefing and award of attorneys' fees to Plaintiffs. Once the award is finalized, the employment agreement between Randazza and Excelsior requires: "Any action to enforce an arbitrator's award will be venued [sic] in San Diego County, California, unless otherwise agreed to by the parties." Exhibit A at § 9(f). In other words, Plaintiffs are precluded from filing a motion to confirm the award in Clark County, Nevada, as they have done.

If, nevertheless, the Court were to entertain Plaintiffs' motion on the merits, the Interim Arbitration Award incorrectly fails to apply California law in several instances as required by the employment agreement. *Id.* (stating, "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to conflict of laws.") Further, it incorrectly requires Defendant to pay all three Plaintiffs, jointly, $275,000, plus interest, for an alleged breach of fiduciary duty. *Id.* at 23. It requires Defendant to remit to all three Plaintiffs, jointly, $60,000 that was paid to a non-party law firm. *Id.* It requires Defendant to pay $3,215.98 for expert costs, plus an unspecified amount for spoliation and conversion, notwithstanding lack of evidence of the value of the allegedly spoliated data[2] and the absence of

---

[2] Despite a five day hearing, preceded by extensive discovery practice, during which time Plaintiffs had the opportunity to have the alleged laptop that is the subject of the spoliation issue

1   a tort cause of action in California for spoliation, *Cedars-Sinai Med. Ctr. v. Superior Ct.*, 18

2   Cal.4th 1, 17, 954 P.2d 511 (1998).  To their credit, Plaintiffs did not plead spoliation, but the

3   Arbitrator nonetheless appears prepared to create such a claim.  *Id.* at 23-24.  The Interim

4   Arbitration Award also requires an accounting of the non-party law firm's trust account, despite

5   a complete lack of jurisdiction over that non-party.[3]  *Id.* at 25.

6        And the Interim Arbitration Award requires Defendant to disgorge to Excelsior, his

7   employer, the salary he earned in the amount of $197,000.00, for allegedly breaching a fiduciary

8   duty and for spending excessive time on other matters.  *Id.* at 24.  There was no showing that

9   Defendant did not perform the work and earn his salary, and the award is in violation of

10  California Labor Code, Section 221, which states that "[i]t shall be unlawful for any employer to

11  collect or receive from an employee any part of wages theretofore paid by said employer to said

12  employee."[4]  This is in addition to the improper denial of Defendant's claims.  Consequently,

13  Plaintiffs' action to confirm the Interim Arbitration Award in Clark County, Nevada, cannot be

14  confirmed and the ultimate final award, assuming it retains these improper awards, would be

15  subject to vacatur.

16  / / /

_____

22  produced for inspection, the Arbitrator is requesting that Plaintiffs' expert newly determine what
    data may have been deleted.  Exhibit A at 24.

24  [3] Similarly, Plaintiffs could have sought to inspect the trust account pre-hearing.

25  [4] The interim award also requires Defendant to return a laptop.  Defendant has already done so,
    rendering the issue moot.  It also dismisses Plaintiff Jason Gibson as a party, which Defendant
    does not oppose.  But this dismissal as a party would seem to preclude the issuance of a
    monetary award to him.

- 9 -

## II.      Factual Background

Marc J. Randazza is a noted and respected First Amendment and Intellectual Property attorney with a nationwide focus.  Excelsior, a Nevada corporation whose President and owner is Jason Gibson, is a producer and internet distributor of pornographic films under the brand name "Corbin Fisher."  Excelsior frequently found itself requiring the services of an attorney with experience in those areas of law.

In July of 2009, Excelsior Media Corporation hired Randazza as its in-house general counsel.  Exhibit A.  While serving as general counsel, Randazza was also permitted to practice law on behalf of other clients through his outside law firm, Marc J. Randazza P.A. d/b/a Randazza Legal Group.  *Id.* at § 6(c) (stating in part, "[i]nsofar as such activities do not violate any professional ethical standard or the Confidentiality and inventions Assignment Agreement . . . , Excelsior agrees that Randazza may, without breaching such duties and agreements, provide professional services to a limited number of outside clients on an ongoing basis as long as such services are rendered without legal or professional conflict with Excelsior . . . .).

This outside law practice worked to create a symbiotic relationship for Excelsior.  Liberty Media Holdings, LLC ("Liberty"), is a California limited liability company whose managing member is the same Jason Gibson.  As a general practice, Liberty was assigned all rights in the Corbin Fisher films produced by Excelsior.  As general counsel, Randazza was tasked by Gibson, on behalf of Excelsior, to enforce Liberty's copyrights.  Liberty, with the approval of Gibson, enforced the copyrights in these films through Marc J. Randazza PA, which did business as Randazza Legal Group.

In any niche area of practice, the same attorneys frequently encounter each other.  Such is especially true in the world of those representing creators of online pornographic content and

those who represent the people who steal those works. One such attorney Randazza encountered on multiple occasions was Valentine Gurvits. In one matter, a company called TNAFlix was accused of infringing Liberty's copyrights. Gurvits and Randazza engaged in a bluff negotiation, with Gibson's full knowledge, that would result in the retention of Randazza as an attorney for TNAFlix following settlement, in order to effectuate a conflict of interest that would preclude Randazza from representing others against TNAFlix. This portion of the negotiation was intended to increase the overall settlement fund for Excelsior and Liberty. Although incorrectly referred to as a "bribe," no actual bribery ever occurred. Following settlement, Randazza kept up the pretense of pursuing the conflict of interest in order to maintain credibility in future dealings with Gurvits.

Randazza's strategy of post-settlement pretense with Gurvits proved prescient. In July of 2012, Randazza, for Liberty, came to settlement terms in an infringement action against FF Magnat Limited d/b/a Oron.com ("Oron"). Oron subsequently repudiated the agreement, but Randazza successfully obtained an order enforcing it. *Liberty Media Holdings, LLC v. FF Magnat Limited*, C.A. No. 2:12-cv-01057 (D,Nev. Aug. 7, 2012) (order granting Liberty's motion to enforce settlement against Oron), attached as Exhibit E.

Subsequent to this order, while Liberty was pursuing an order of attorneys' fees and freezing Oron's assets globally, Gurvits appeared for Oron and, not unexpected, Randazza again found himself negotiating a "bribe" that would create a conflict of interest for future claims against Oron. On August 13, 2012, Randazza disclosed this putative $75,000 "bribe" to Gibson as part of a settlement offer. Gibson soured at the mechanism in the agreement, because there was no express method to ensure that Liberty (rather than Randazza) would receive the $75,000.

- 11 -

1    August of 2012 was a trying time for Excelsior.  On August 7, 2012, Gibson reported that

2    two significant employees would be terminated, one specifically for economic reasons.  *See* E-

3    mail correspondence between Randazza and Gibson dated August 7, 2012, attached as Exhibit F.

4    Benefits, including 401k matching and dependent coverage, were eliminated.  *Id.*  Sales were

5    declining and the ownership was dipping into personal assets to cover business expenses.  *Id.*  On

6    or about August 21, 2012, Randazza was required, for the first time, to lend Plaintiffs $25,000 to

7    cover a portion of litigation expenses.  Arbitration Transcript at 832:25-833:15, attached as

8    Exhibit G.

9

10    In addition to corporate financial strain, Randazza became subject to personal disrespect.

11    In April of 2012, without prior notice to Randazza's or consent, a pornographic film was made in

12    Randazza's office, which included a woman urinating on his desk.  The video is available for the

13    Court's review upon request.  Filming in employee offices was not to be anticipated prior to that

14    date; at that time, Randazza had no choice but to attempt to take it in stride.  In that same filming

15    session, male-on-male homosexual pornography was photographed in Randazza's office. The

16    photographs are available for the Court's review upon request.  Gibson explicitly highlighted to

17    Randazza that he was "shooting gay porn on [Randazza's] office desk & couch."  *See*

18    Communications between Randazza and Gibson dated April 20, 2012 to April 24, 2012, attached

19    as Exhibit H.  Then, on August 9, 2012, Gibson performed fellatio on another employee in the

20    back seat of Randazza's vehicle, adjusting Randazza's rear view mirror in an attempt to compel

21    him to watch.

22

23    In light of the personal harassment and the financial pressures, Randazza anticipated his

24    termination was imminent.  For the protection of his clients, including Liberty, pursuant to

25    California Rule of Professional Conduct 3-100 and Nevada Rule of Professional Conduct 1.6,

26

27

- 12 -

Randazza caused client (and personal) files stored on Excelsior's computers to be transferred to his firm's cloud storage system, wiping the computers to protect their confidentiality should Randazza be terminated by Excelsior.

On or about August 29, 2012, $550,000 was received from Oron. Gibson wanted all of the funds transferred to Liberty's account, without regard for proper disbursements. *See* E-mail communications among Randazza, Gibson, and Excelsior's outside counsel dated August 29, 2012, attached as Exhibit I. Later that day, Randazza wrote to Gibson that, "[g]iven our now openly adversarial relationship, it seems appropriate that I withdraw from representing Liberty in any further matters. There might be a way I can continue to wind down existing matters, but it's going to require a call to discuss it. When are you free?" *See* E-mail correspondence between Randazza and Gibson dated August 29, 2012, attached as Exhibit J. Notwithstanding Randazza's narrow statement that it seemed appropriate for him to withdraw from representing Liberty only, Gibson seized the opportunity to cast this statement as a resignation from Excelsior. *Id.* Gibson disingenuously stated to Randazza, "[w]e construe your email as a resignation of your employment and accept your resignation effective immediately." *Id.* Within an hour of receiving that e-mail, Randazza disputed that mischaracterization, stating to Excelsior's outside counsel, "that was not a resignation, as much as Mr. Gibson would like it to be so that he can try and evade payment of my severance," and correctly noting that they were terminating him. *Id.*

Following the termination of the employment relationship, Randazza commenced an arbitration claim against Excelsior relative to monies owed him and for sexual harassment, as

- 13 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 87 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 15 of 433

well as against Liberty and Gibson on an alter-ego theory.  Excelsior made a counterclaim.

Unfortunately, the Arbitrator failed at his task, issuing the misguided interim arbitration award.[5]

### III.    Standard of Review

Plaintiffs have sought confirmation of the arbitration award under both federal and Nevada law.  Nevada recognizes nonexclusive common law grounds and statutory authority under which a court may review an arbitration award.  *Graber v. Comstock Bank*, 111 Nev. 1421, 1426, 905 P.2d 1112, 1115 (1995).  The common law grounds are "(1) whether the award is arbitrary, capricious, or unsupported by the agreement; and (2) whether the arbitrator manifestly disregarded the law."  *Clark Cnty. Educ. Ass'n v. Clark Cnty. Sch. Dist.,* 122 Nev. 337, 341, 131 P.3d 5, 8 (2006).  The Nevada Supreme Court has defined the "manifest disregard of the law" standard as error that is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator."  *Graber*, 111 Nev. at 1426, 905 P.2d at 1115 (quoting *Williams v. Cigna Financial Advisors Inc.*, 197 F.3d 752, 762 n.2 (5th Cir. 1995) (citation omitted).  Under Nevada statutory law, NRS 38.241, the award *shall* be set aside if:

    (a)  The award was procured by corruption, fraud or other undue means;

    (b)  There was:

        (1)  Evident partiality by an arbitrator appointed as a neutral arbitrator;

        (2)  Corruption by an arbitrator; or

        (3)  Misconduct by an arbitrator prejudicing the rights of a party to the arbitral proceeding;

---

[5] Separately, the non-party law firm made claims against Liberty in the Clark County District Court relating to fees owed in the Oron litigation.  That action remains pending.  *Marc J. Randazza, P.A. v. Liberty Media Holdings, LLC,* Case No. A-12-673275-C (hereinafter "the State Court Action").

(c) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to NRS 38.231, so as to prejudice substantially the rights of a party to the arbitral proceeding;

(d) An arbitrator exceeded his or her powers . . . .

As set forth herein, evident partiality, misconduct, and exceeding of powers warrant setting aside the award under Nevada law.

Similarly, under federal law, an arbitration order is subject to being vacated under 9 U.S.C. 10:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Because the federal statute closely matches the Nevada statute, federal authorities construing the federal statute are persuasive for the construction of the state statute. The award must be final; review is not permissible of interim orders. *See, e.g., Northland Truss Sys., Inc. v Henning Constr. Co., LLC*, 808 F. Supp. 2d 1119, 1123 (S.D. Iowa 2011). Where a reasonable person would conclude that the arbitrator was partial to one party to the arbitration, "evident partiality" within the meaning of section 10 will be found. *Morelite Constr. Corp. v New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984). An arbitrator will be deemed to have exceeded his powers or imperfectly executed them where the record before him demonstrates unambiguous and undisputed mistakes of fact and the arbitrator relied on those

- 15 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 89 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 17 of 433

mistakes in making his award. *Nat'l Post Office Mailhandlers v United States Postal Serv.,* 751 F.2d 834, 843 (6th Cir. 1985). The arbitrator's partiality, misconduct, and exceeding of his powers, warrants vacatur of the arbitration award under federal law.

Further, under both NRS 38.241 and the Federal Arbitration Act, 9 U.S.C. 11, an arbitral award is subject to modification. NRS 38.242(1) sets the standard for modification if:

(a) There was an evident mathematical miscalculation or an evident mistake in the description of a person, thing or property referred to in the award;

(b) The arbitrator has made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted; or

(c) The award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

Under the Federal Arbitration Act, an award is also subject to modification:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. 11 (2015). Should the Court opt not to vacate the award, it may modify and correct the award so as to effect the intent thereof and promote justice between the parties.

In performing its review function, this Court is required to review the necessary transcript and exhibits. *Graber v. Comstock Bank,* 111 Nev. at 1429, 905 P.2d at 1117. Plaintiffs did not submit such to the Court and, for that reason alone, the motion should be denied. Notwithstanding that failure, the motion should be denied on the merits as the interim arbitration award is not subject to confirmation.

## IV.    Analysis

Plaintiffs' motion fails both procedurally and substantively.  Plaintiffs chose the wrong court and improperly submitted an interim, rather than final, award.  Substantively, the Interim Arbitration Award is so manifestly and thoroughly rife with errors, omissions, disregard of applicable California law, and evident bias that it would be a miscarriage of justice to enforce it.  Rather, to the extent applicable, the Court should deny the motion and/or vacate it in its entirety or remand it for rehearing before a new arbitration panel.

### A.  Plaintiffs have Violated the Employment Agreement by Bringing the Enforcement Action in Nevada

At the outset, it bears mention that the arbitration arose under the employment agreement between Randazza and Excelsior.  Exhibit A at §§ 8 & 9.  The arbitration was permitted to be conducted in Las Vegas, Nevada, by Section 8(F) of the employment agreement.  However, an entirely separate section of the employment agreement controls construction thereof and enforcement (confirmation) of an arbitration award.  Specifically, Section 9(E) states, in relevant part:  "Any action to enforce an arbitrator's award will be venued [sic] in San Diego County, California, unless otherwise agreed to by the parties."  Defendant has not consented to venue in Clark County, Nevada, nor has he otherwise waived the requirements of Section 9(E).  A freely negotiated forum selection clause is enforceable where it is just and reasonable.  *Tandy Computer Leasing, Div. of Tandy Elecs. v. Terina's Pizza*, 105 Nev. 841, 844, 784 P.2d 7, 8 (1989).  A party seeking to set aside a forum selection clause must make a "strong showing" that the relief is warranted.  *Tuxedo Int'l Inc. v. Rosenberg*, 127 Nev. ___, 251 P.3d 690, 699 (2011) (quoting *Tandy* at 844).  Plaintiffs have failed to make any showing, let alone a strong showing.  It is undisputed that the employment agreement was fully and freely negotiated, and given the geographic fluidity of the parties, it remains just and reasonable to enforce the agreement

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 91 of 210

Case 15-01193-abl   Doc 137-5   Entered 03/16/17 18:14:49   Page 19 of 433

requiring venue in San Diego.  Without waiver of the argument that it is premature to litigate this matter, Randazza is in the process of filing an action in San Diego to vacate the interim arbitration award.  Thus, Plaintiffs' motion to confirm the arbitration award must be denied.  However, assuming, *arguendo,* that this is a proper jurisdiction, confirmation is not warranted and the interim awards are subject to vacatur.

**B. The Interim Arbitration Award Is Not Final, Thus Plaintiffs' Motion to Confirm the Award Should Be Denied**

Notwithstanding the improper venue, Plaintiffs state, without support, that the Interim Arbitration Award qualifies as an arbitral award subject to confirmation under NRS 38.236, NRS 38.239 and Section 9 of the Federal Arbitration Act, 9 U.S.C. 9.[6]  Pursuant to NRS 38.222(2)(a), an "arbitrator may issue . . . orders for provisional remedies including interim awards, as the arbitrator finds necessary to protect the effectiveness of the arbitral proceeding and to promote the fair and expeditious resolution of the controversy, to the same extent and under the same conditions as if the controversy were the subject of a civil action . . . ."  By definition, a provisional "interim award" is not a final award.  Pursuant to NRS 38.330(4), an "award" must be made within 30 days after the conclusion of arbitration, demonstrating that the term, "award" as presented in NRS chapter 38 refers to a final arbitration award following the arbitration – as opposed to a provisional "interim award" pending the final resolution of the arbitration.

---

[6] Obviously, both Nevada and Federal law cannot apply to this action.  If the federal statute applies, it would preempt the state statute.  *See Southland Corp. Keating*, 465 U.S. 1 (1984).  The federal statute applies only to "maritime transaction or a contract evidencing a transaction involving commerce."  9 U.S.C. § 2 (1976).  This is obviously not a maritime transaction, so unless it is "a contract evidencing a transaction involving commerce," the federal statute has no direct application here.  We have cited to federal law as persuasive, not controlling.

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 92 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 20 of 433

NRS 38.239 only permits a party to seek confirmation of a final "award" after the party "receives notice of an award." This language indicates that the Nevada Legislature intended that an award must be final before a party seeks to confirm it with the district court. Thus, Plaintiffs' motion to confirm the Interim Arbitration Award is premature and should be denied. Similarly, the Interim Arbitration Award would not be subject to confirmation under the Federal Arbitration Act, because it does not dispose of a self-contained issue, such as temporary equitable relief. *Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir. 1991). Absent finality, Plaintiffs' motion must be denied.

**C. The Arbitrator Made Gross Factual and Legal Errors**

The Arbitrator made numerous findings and determinations that are factually and legally misplaced, so much so that he failed to execute his duties in manifest disregard of the facts and the law, exceeding his powers.

1. The Arbitrator Made Improper Factual Findings

Throughout the Interim Arbitration Award, the Arbitrator made numerous findings of fact. Many of these findings are wholly separated from the evidence and demonstrate the Arbitrator's failure to perform. Two of them are of particular note: deeming Randazza to have resigned and determining that Randazza was seeking personal remuneration in a settlement negotiation.

*a. Randazza Did Not Resign*

The Arbitrator erroneously found that Randazza's August 29, 2012, e-mail constituted a resignation. Exhibit J. As set forth above, on August 29, 2012, Randazza stated to Gibson that it seemed appropriate that Randazza withdraw as Liberty's counsel. *Id.* Although there is no language about separation of employment with Excelsior, Excelsior treated it as a letter of

1  resignation. As documented in Exhibit J, immediately upon learning that Plaintiffs construed the

2  e-mail as a resignation, Randazza disputed that characterization. *Id.*; Exhibit G at 206-207.

3  "A resignation is in the nature of a notice of the termination of a contract of employment

4  and is contractual in its nature. It is ineffectual without the intent of the incumbent to sever the

5  relationship of employer and employee." *Sherman v. Board of Trustees*, 9 Cal. App. 2d 262,

6  266, 49 P.2d 350, 352, 1935 Cal. App. LEXIS 1299, *6 (Cal. App. 1935). There is no evidence

7  that Randazza had the intent to sever the employment relationship. Several reasons demonstrate

8  it was not a resignation. First, and most telling, if Randazza intended to resign, he would not

9  have disputed that characterization of his e-mail immediately. Instead, it is clear that it was

10

11  disingenuously interpreted as a resignation, with Excelsior having already retained its

12  employment counsel at Littler. Excelsior intended to terminate Randazza and seized upon the e-

13  mail in order to pretextually treat it as a resignation.[7] Upon learning of their incorrect

14  interpretation of the e-mail, a rational employer would have required Randazza to work.

15  Excelsior took no steps to enable Randazza to perform his work on August 30, 2012, the next

16  day. It treated him as separated, not properly pursuant to a voluntary resignation. Such

17

18  constitutes an involuntary termination.

19  Second, as set forth above, on August 21, 2012, Randazza loaned Liberty $25,000 of his

20  own funds at the behest of his employer, Excelsior. Exhibit G at 832:25-833:15; Exhibit Y.

21  Plaintiffs attempted to suggest that Randazza intended to quit in the weeks leading up to August

22  29. A quitting employee would not lightly part with such a sum.

23

24

25

26  [7] As general counsel, Randazza would have been involved in the hiring process for outside counsel, were Littler on a standard retainer. Instead, it appears Littler was specifically hired relative to the termination of Randazza.

27

- 20 -

Third, the Arbitrator improperly considered that the transfer of client files to his firm's cloud storage, and then erasing those on Excelsior's hardware, evidenced an intent to resign. Instead, Randazza had prudently hoped for the best, but planned for the worst. The Arbitrator misconstrued the protective measures of wiping personal and Randazza Legal Group privileged information as an intent to quit; to the contrary, Randazza expected to be fired and was required to ensure that the law firm's files remained confidential, and he would not have been able to do so after termination. It is a miscarriage of justice to penalize Randazza for following his ethical duties.

### b.  There Was No "Bribe"

The arbitrator grounded his conclusions that Randazza breached fiduciary duties and committed malpractice on Randazza's alleged negotiation for a $75,000 "bribe." As set forth above, in prior dealings with an opposing attorney, Valentin Gurvits, Randazza had been presented with offers that, following the settlement, he would be retained by the opposing side. This would create a conflict of interest for Randazza should another party seek to engage him to pursue a similar claim against Gurvits' client. Randazza testified that he participated in these conversations as a bluff, to increase available settlement funds. Exhibit G at 242:16-243:2. Randazza testified that he never intended to individually profit. *Id.* at 173:1-22. No evidence was presented to the contrary.[8] Neither was there any evidence that Randazza ultimately

---

[8] Randazza did express a concern that delivering the earmarked $75,000 to Liberty might constitute improper fee sharing under Nevada Rule of Professional Conduct 5.4, and he intended to adjust his employment bonus and firm's bill commensurately to avoid impropriety. Exhibit G at 421:1-15. Typically, an attorney's fee is the property of the client. *Evans v. Jeff D.,* 475 U.S. 717, 731 (1986). Here, however, it was to be characterized as a legal fee to Randazza Legal Group for the representation of Oron, not attorneys' fee award. However, Randazza ultimately agreed that he would figure out a way to ensure the earmark would be remitted to Liberty as part of the global settlement fund. *See* E-mail from Randazza to Gibson dated August 16, 2012, attached as Exhibit Z.

- 21 -

intended to consummate such a negotiation.[9]  Randazza had never previously consummated such a deal, despite it then being part of the negotiations as well.  Exhibit G at 397:7-10

Prior practice bears this out.  Following a settlement between Liberty and TNAFlix, an infringer represented by Attorney Gurvits, Randazza continued the pretense of negotiating to represent TNAFlix.  *Id.* at 377:20-25.  Having kept up the pretense, Randazza was all the more credible in his negotiations with Attorney Gurvits in the Oron matter.  The Arbitrator effectively agreed that Randazza never intended to obtain the actual $75,000 for himself against the interests of Liberty.  He concluded, correctly, that Randazza and Gurvits were lying to each other.  Exhibit D at 7, n. 4.  Yet, the Arbitrator did not even consider how these tactics benefitted Plaintiffs.  Instead, as will be discussed below, he found that the "bribe" caused $275,000 in damages after Oron.com made post-termination claims for breach of the settlement agreement, none of which claims involved the alleged bribe.  The contradictory findings that Randazza both was and was not negotiating for a $75,000 bribe demonstrates the lack of any factual foundation for the Arbitrator's interim award.

As Randazza neither resigned nor acted against Plaintiffs' interests, each of the portions of the interim award are not only legally wrong, but factually misplaced.  Thus, the award cannot be confirmed.

### 2. The Arbitrator Made Improper Legal Determinations

In the Interim Arbitration Award, the Arbitrator applied the incorrect law in several instances and made numerous improper legal conclusions, violating his duties as arbitrator and

---

[9] The only expert as to California professional responsibility, Attorney Ellen Peck, testified that this was not improper.  *See* Expert rebuttal report of Ellen Peck at 4-10, attached as Exhibit AA; Exhibit G at 1244:9-1245:6.  This was also not improper in Nevada.  *See* Expert rebuttal report of Joseph Garin at 17, attached as Exhibit BB.

rendering the arbitration award unenforceable.  With few exceptions, the legal conclusions as to both Randazza's claim and Plaintiffs' counterclaims are erroneous and violate public policy in manifest disregard of the law.  For general background of the legal issues presented in the arbitration, Defendant attaches his Opening Post-Hearing Brief, at Exhibit K.  The Arbitrator improperly ruled against Randazza on his claims against Plaintiffs as well as on their claims against him.

> a.  *Randazza Should Have Prevailed On His Claims*

Randazza brought eight claims against Plaintiffs:  1) reimbursement of expenses under Cal. Labor Code, sec. 2802; 2) unpaid wages and vacation time under Cal. Labor Code, sec. 201-203; 3) unpaid wages, expenses, and vacation time under NRS 608.050; 4) breach of contract; 5) wrongful termination in violation of public policy; 6) hostile work environment; 7) retaliation; and 8) declaration of alter ego.  In the Interim Arbitration Award, the Arbitrator ruled that Randazza "shall take nothing by any of his claims."  Exhibit D at 23.  This ruling cannot be confirmed.

> i.  Randazza Is Entitled To Reimbursement Under California Law

As to claim 1, Randazza sought reimbursement of the $25,000 in litigation expenses he advanced in the Oron.com matter pursuant to Cal. Labor Code, Section 2802. *See* Amended Arbitration Claims of Marc J. Randazza at 16-17, attached as Exhibit L.  This Section states, "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ." Cal. Labor Code § 2802(a) (2015).  The Arbitrator denied the claim, stating that the statute a) did not apply in Nevada, and b) was not incorporated into the contract.  Exhibit D at 11-12.  Although the Arbitrator denied this claim, he

- 23 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 97
of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 25 of 433

also permitted Randazza to offset the $25,000 against monies awarded. *Id.* at 22. The Arbitrator

provided no justification for permitting this offset, which could only be within his power if

Randazza actually prevailed on this claim or, perhaps, claim 3 for unpaid expenses.[10] Thus, at a

minimum, the award must be modified to find Randazza a prevailing party, who may seek

attorney fees.

In making his erroneous legal conclusion, the Arbitrator ignored the employment

agreement and his duties to interpret that agreement. The Arbitrator found that Cal. Labor Code,

Section 2802 does not apply extraterritorially, citing *Sullivan v. Oracle Corp.*, 51 Cal 4th 1191

(2011), and *Wright v. Adventures Rolling Cross Country, Inc.*, 2012 U.S. Dist. LEXIS 104378

(N.D. Cal. 2012). Exhibit D at 12, n. 9. First, the California Supreme Court in *Sullivan*

expressly noted that it was not addressing the question of whether such law applied

extraterritorially. 51 Cal. 4th at 1201. The *Wright* Court noted a presumption against

extraterritoriality, finding the labor code did not apply where there was no choice of law

provision. Here, there was a choice of law provision and it explicitly chose California law, with

one key exception: it is "without regard to conflict of laws." Exhibit A at § 9(E).[11] The

Arbitrator misread both cases and the employment agreement. Notwithstanding any presumption

against extraterritoriality, the parties here agreed California law should apply extraterritorially.

---

[10] None of Randazza's December 16, 2013, affirmative defenses raised the entitlement to an offset, so it cannot be argued that the Arbitrator permitted the offset on that basis. *See* Marc J. Randazza's Affirmative Defenses to Counterclaims of Excelsior Media Corporation, attached as Exhibit K. In addition, the $25,000 was loaned to Liberty, yet the offset was awarded relative to Excelsior's counterclaims, further indicating that the Arbitrator deemed them alter egos of each other.

[11] This standard language means that California law regarding conflicts of laws would not be used to apply some other state's law on a theory that the other state had a superior interest in the controversy, emphasizing that only California law would apply.

- 24 -

1  Compounding his error, the Arbitrator stated that the choice of law provision only

2  governed contract claims, not statutory claims, citing *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th

3  Cir. 2010). Exhibit D-12 and n. 10. The Arbitrator misread *Narayan*. More accurately, the

4  Ninth Circuit stated, "While the contracts will likely be used as evidence to prove or disprove the

5  statutory claims, the claims do not arise out of the contract, involve the interpretation of any

6  contract terms, or otherwise require there to be a contract." *Narayan v. EGL, Inc.*, 616 F.3d at

7  899. What *Narayan* does not say is that parties are precluded from ensuring that all of the

8  benefits of California statutory law could not be incorporated into a contract. *See Selcke v. New*

9  *England Ins. Co.*, 995 F.2d 688, 690 (7th Cir. 1993) ("The law could require contracting parties

10  to specify every right and duty that they wanted to make legally enforceable, but then contracts

11  would be very long. An economizing measure is for the law to create, whether by statute or

12  common law, standard, 'off the rack' terms that parties can vary if they want but that govern

13  otherwise, eliminating the need for parties to negotiate them expressly in every contract."). That

14  is, though a Section 2802 claim does not rest on contractual provisions, parties are free to

15  incorporate the law into their agreements. Here, the parties to the employment agreement

16  incorporated the entire corpus of California labor law into the contract.

17

18  It is further notable that Section 2802 falls under Division 3, Chapter 2 of the California

19  Labor Code, which, at Section 2750, begins by setting forth the identity of employer and

20  employee as being those who are parties to a contract of employment. Thus, by definition,

21  Section 2802, which must be read into all California contracts of employment, governs the

22  instant contract where the parties chose California law to apply. The Arbitrator having wholly

23  misapprehended the law, the Interim Arbitration Award must be vacated. Randazza is expressly

24  entitled to reimbursement of the $25,000 and is a prevailing party.

25

26

27

- 25 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 99 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 27 of 433

ii.      <u>Randazza Is Owed Unpaid Wages Under California Law</u>

In Count II of his Amended Arbitration Claim, Randazza sought unpaid wages and

bonuses under California Labor Code, Sections 201-203. Exhibit L at 18-21. These Sections

require a discharging employer to pay the wages earned and unpaid of a discharged employee

immediately at the time of discharge. Cal. Labor Code §§ 201-203 (2015). Here, Randazza

sought a day's pay of $1,014.20, as he was only paid for four days from his final week, and an

additional $2,281.95, representing an unpaid 5% wage increase from July 1 to August 30, 2012,

required by the contract. *Id.*; Exhibit A at §§ 3(A)-(B). Randazza also sought certain non-

discretionary bonuses, namely 25% of each of five settlements, in the amount of at least

$190,779.35. Exhibit L at 19-21; Exhibit A at § 3(C).[12] Additionally, Randazza sought the

penalty of his daily wage ($1,014) per day per Cal. Labor Code. sec. 2013, for the first thirty

days during which Excelsior failed to pay his final wages per California Labor Code Section 203,

which states that if an employedr fails to pay wages of a discharged employee, "the wages of the

employee shall continue as a penalty from the due date thereof at the same rate until paid or until

an action therefor is commenced; but the wages shall not continue for more than 30 days."

Finally, treble damages of at least $564,130 were sought per Cal. Labor Code sec. 206(b).

Exhibit L at 21.

---

[12] It is further notable that there was no dispute that Randazza was generally entitled to these 25% bonuses for settlements. Yet, in practice, the settlements were on behalf of Liberty, not Excelsior, though the contract itself only speaks to settlements paid to Excelsior. This further evidences that Liberty and Excelsior are alter egos of each other.

Once more, the Arbitrator incorrectly found that California law did not apply.  Exhibit D at 11-12.  For the same mistaken reasons as with the first claim, the Arbitrator failed to appreciate that California law is made part of the contract.[13]

Further, the Arbitrator otherwise erroneously found that Randazza was properly compensated.  *Id.* at 12 ("In the event [sic], Mr. Randazza was properly compensated for all services as to which he has asserted statutory and contractual claims").  In Footnote 11, the Arbitrator stated that "claimed compensation raises were discretionary."  *Id.* at n. 12.  However, the Arbitrator undertook no examination of Excelsior's failure to abide the procedure by which it could avoid the raise.  The explicit terms of the employment agreement make the raise mandatory unless there is an executed memorandum of understanding.  Exhibit A at § 3(B).  The parties never executed a memorandum of understanding and Plaintiffs failed to present any evidence to the contrary.  Thus, the Arbitrator had no basis to deny Randazza his raise.

In a similar failure, the Arbitrator undertook no examination of what bonuses were owed for what settlements and whether they were paid.  In fact, he did not even deign to decide how bonuses were to be calculated, as the parties disputed whether they were to be paid on net or gross settlements.  Exhibit D at 12, n. 11 ("Mr. Randazza's bonuses were to be based on **net** and **gross** amounts") (emphasis added); Exhibit G at 31:24-34:9.  Randazza claimed 25% of settlements and fee awards with Oron, Excubitor USA, and other amounts procured by Plaintiffs while Randazza was employed.  Exhibit L at 19-20; Exhibit A at § 3(C).  The employment agreement entitled Randazza to these fees and the Arbitrator had no option but to award them once it was established that the settlement funds existed.  Instead, in dismissive fashion, the

---

[13] With respect to these claims, California Labor Code, Section 200(b) governs all work subject to an agreement between employers and employers.

1  Arbitrator states they were otherwise subject to disgorgement.  Exhibit D at 12, n. 11.  Yet, even

2  in his disgorgement order, the Arbitrator paid no attention to any of these particular bonuses or

3  unpaid salary claims. *Id.* at 24.[14]  Moreover, as more fully set forth below, disgorgement of

4  earned wages is improper.  And, as Randazza did not resign, he is otherwise owed, under statute,

5  the full week's salary and statutory penalties.

6              iii.        Randazza Is Owed Unpaid Wages Under Nevada Law

7          In Count III of his Amended Arbitration Claim, Randazza sought to enforce his rights to

8  the unpaid day, his 5% raise, and the nondiscretionary bonuses[15], pursuant to NRS 608.050, plus

9  statutory penalties.  Exhibit L at 21-23.  The Arbitrator gave short shrift to this claim, stating that

10  it "fails as a matter of law, because there is no private right of action for enforcement of that

11  statute.  It is therefore not necessary to decide whether the [sic] a claim has been stated under

12  that statute."  Exhibit D at 12.  The Arbitrator made a fundamental error of law in this finding,

13  without having provided any basis in law.  The Arbitrator undertook no analysis of the private

14  right of action.  No Nevada state court has found a private right of action wanting.  Presumably,

15

16

17

18  _____

19  [14] In the disgorgement order, the Arbitrator states "Claimant shall pay Respondent Excelsior the amount of $197,000.00—as and for disgorgement of an appropriate amount of Claimant's

20  employment compensation (including salary and bonuses) paid under his employment agreement." *Id.* at 24.  The disgorgement figure lacks any form of calculation, yet appears

21  curiously akin to Randazza's claim for unpaid bonuses, with one number transposed (the "7" in the hundreds column moved to the thousands).  Assuming that the Arbitrator's reference in

22  Footnote 11 to disgorgement correlates with Section 3 of the award, it appears that the Arbitrator is not requiring Randazza to write a check for $197,000, but rather that his claim for unpaid

23  salary and bonuses of approximately that amount is forfeit.  This may be the likely interpretation, as it is the only portion of the monetary award to not include interest.

24  [15] Excelsior argued at the Arbitration that the bonuses are not wages within the meaning of NRS

25  608.050, citing to NRS 608.012.  However, NRS 608.012 distinguishes commissions from other forms of bonuses and deems them as part of the wage.  Randazza's bonus was akin to a

26  commission, selling a release of claims to an infringer for value, and thus is cognizable under the statute.

27

the Arbitrator relied upon Plaintiffs' citation to *McDonagh v. Harrah's Las Vegas, Inc.*, 2014

U.S. Dist. LEXIS 82290, *9, 2014 WL 2742874 (D. Nev. June 17, 2014), in its post-arbitration

brief.  However, such citation was misplaced; the Ninth Circuit found such a claim cognizable

less than one year prior.  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 901 (9th Cir. 2013);

*Fetrow-Fix v. Harrah's Entm't, Inc.*, 2010 U.S. Dist. LEXIS 125625, *5 (D. Nev. Nov. 16, 2010)

(finding that the plaintiffs stated a valid claim under NRS 608.050).

      The *McDonagh* judge did not perform a private right of action analysis.  Instead, tracing

through the cited case law, the *McDonagh* decision ultimately rests on the analysis in *Baldonado*

*v. Wynn Las Vegas, LLC*, 124 Nev. 951, 960, 194 P.3d 96, 102 (2008), relative to NRS 608.160.

In *Baldonado*, the Nevada Supreme Court found no private right of action where "the statutory

scheme require[ed] the Labor Commissioner to enforce the labor statutes and" there was "the

availability of an adequate administrative remedy for those statutes' violations."  124 Nev. at

960.  The *Baldonado_* court reached this stage of the analysis after first determining that there

was no express private right of action and the legislative history was silent as to the intent to

create a private remedy.  *Id.* at 958-960.  Although NRS 608.160 is silent as to enforcement,

NRS 608.050 is not, and the *Baldonado* analysis is misplaced.  Specifically, NRS 608.050(2)

explicitly grants an employee the right to record a lien against the employer's property and

foreclose thereon, in accordance with the provisions of NRS 108.221 to 108.246.  Of note, NRS

108.238, incorporated by reference into NRS 608.050(2), specifically permits a civil action to

recover the debt made subject of the lien, *i.e.* a private right of action.  Similarly, NRS 108.239

entitles the claimant to, in a private civil action, enforce and foreclose the lien granted by NRS

608.050.  Thus, unlike other claims in Chapter 608, claims under NRS 608.050 contain an

express right of action and it is otherwise unreasonable to find no private right where the

- 29 -

1  statutory scheme permits the recording of and foreclosure on a lien for the debt created under
2  that statute.  Randazza is entitled, as argued at arbitration, to a day's pay, vested bonuses, the 5%
3  raise, and statutory penalties.  Thus, the Interim Arbitration Award should be vacated and
4  remanded to a new arbitrator.

5       iv.  Randazza Is Entitled To Unpaid Severance And Bonuses

6     In his fourth claim, Randazza made claim for breach of contract relative to the
7  aforementioned bonuses as well as for unpaid severance.  Exhibit L at 23-24.  Pursuant to
8  Section 7(B) of the employment agreement, Randazza was entitled to twelve weeks of salary as a
9  severance if terminated during his fourth year of employment.  Exhibit A.  This severance, in the
10  amount of $60,852, was not paid.  There is no dispute he was not paid this amount nor the
11  claimed bonuses.

12     First, the Arbitrator erroneously found that Randazza resigned, disqualifying him from
13  the severance payment.  As set forth in detail above, the facts demonstrate that Randazza did not
14  resign nor did he have any intent to resign.  Excelsior's choice to deem the withdrawal of
15  representing Liberty as a resignation had no basis in fact and to the contrary was a bad faith
16  action in an effort to avoid paying Randazza the twelve weeks of severance it owed him.  It is
17  nonsensical for the Arbitrator to simultaneously determine that Randazza was so greedy as to
18  divert $75,000 to himself while he was also readily willing to forego over $60,000 in severance.

19     The Arbitrator also found that Randazza was miscalculating the amount of his claimed
20  bonus, that it should have been based on Liberty's net recovery, subtracting litigation costs,
21  rather than gross settlement.  In correspondence between Excelsior and Randazza, it was
22  determined that Excelsior would "pay all expenses/assume all risks."  *See* E-mail correspondence
23  between Jason Gibson and Marc Randazza dated February 9, 2010, to February 15, 2010,

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 104 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 32 of 433

1 attached as Exhibit M. Were the bonus from net, Randazza would have been subsidizing
2 expenses by 25% and assuming part of the risk. Only by ignoring the record before him could
3 the Arbitrator have found otherwise.

4     The Arbitrator further exceeded his authority when he also determined that Excelsior did
5 not have to make "any further contractual payment" based on Randazza's alleged own material
6 breach and the doctrine of unclean hands. Exhibit D at 13. As to Randazza's own alleged
7 breach, none occurred as discussed below.[16] Similarly, the doctrine of unclean hands "applies
8 only if the inequitable conduct occurred in a transaction directly related to the matter before the
9 court and affects the equitable relationship between the litigants." *Cal. Satellite Sys. v. Nichols*,
10 170 Cal. App. 3d 56, 70 (Cal. App. 3d Dist. 1985). Here, unclean hands cannot apply where
11 Randazza was deprived of his severance solely because Excelsior spuriously chose to deem the
12 separation a resignation, despite Randazza's contemporaneous disclaimer.

13     Similarly, the Arbitrator undertook no analysis of what alleged misconduct should
14 deprive him of what particular bonus due. For example, Randazza earned his bonus on the Oron
15 matter in July 2012 at the time of settlement; yet, the Arbitrator made no finding that Randazza
16 committed any breach or malpractice at that time causing injury to Plaintiffs. Instead, the only
17 finding of breach or malpractice occurred a month later, after the court enforced the Oron
18 settlement and the bonus was earned. Thus, the Interim Arbitration Award should be vacated and
19 remanded to a new arbitrator.

/ / /

---

[16] By the same token, however, Randazza should not be compelled to perform any post-termination requirements based on Plaintiffs' material breach.

- 31 -

v.     Randazza Was Wrongfully Terminated

In his fifth claim, Randazza claimed wrongful termination based upon his sexual orientation and retaliation for a harassment complaint and for violating public policy, seeking to force Randazza to ignore his duties as an attorney.  Exhibit L at 25-27.  The Arbitrator gave no meaningful analysis to this claim, having erroneously determined Randazza voluntarily resigned. Exhibit D at 5-6, 8-11.

Randazza initially complained directly to Gibson about sexual harassment following the pornography filmed in his office in April 2012.  Exhibit G at 618:2-18; Exhibit H at 6 (admonishing Randazza not to be "butt hurt" about the incident and refusing to apologize). Following Gibson performing fellatio in Randazza's vehicle, no complaint was made due to the chilling effect following the original complaint.  *Id.*  These events targeted Randazza on the basis of his sexual orientation and protected activities.  Cal. Gov. Code § 12940(a) & (h) (2015) (precluding discrimination on the basis of sexual orientation and precluding retaliation); *Complainant  v. Foxx*, EEOC Appeal No. 2012-24738–FAA-03 (July 15, 2015) (finding discrimination on the basis of sexual orientation to constitute discrimination on the basis of sex under Title VII).  Excelsior's termination of Randazza may properly have been deemed wrongful termination on the basis of sexual orientation and complaints of harassment.

Subsequently, as noted above, due to the financial hardships of Excelsior, demands were put upon Randazza to distribute the Oron settlement funds.  Exhibit I.  As Randazza indicated, there were predicate acts he was required to undertake prior to distribution.  *Id.*  Such was consistent with his responsibilities under Nev.R.Prof. Conduct 3.4(c).  When Excelsior terminated him, it acted with the retaliatory motive noted above as well as with the intent to punish Randazza for obeying his ethical duties.  Because the employment agreement is to be

- 32 -

1    interpreted under California law, Randazza properly had a claim for wrongful termination.  *See*

2    *General Dynamics Corp. v. Superior Court (Rose)*, 7 Cal 4th 1164, 1191, 876 P.2d 487, 504

3    (1994) (an in-house attorney discharged for violating the ethics code can make a claim for

4    wrongful discharge).  Thus, the matter needs to be vacated and remanded to a new arbitrator.

5                          vi.      Randazza Was Subjected To A Hostile Work Environment

6            In the sixth claim, Randazza made a direct claim for sexual harassment and the creation

7    of a hostile work environment.  Exhibit L at 28-31.  As noted above, such claims are actionable

8    under California law and, most recently, Title VII of the federal Civil Rights Act.  Excelsior

9    specifically targeted Randazza with gay pornography filmed on his desk and attempting to

10   compel him to watch male-on-male fellatio performed in his vehicle.  Although Randazza

11   generally accepted such acts as part of the public-facing business of Excelsior, those incidents

12   were attacks upon Randazza directly, with the express, and successful, intent of creating a hostile

13
14   work environment.

15           The Arbitrator found count 6 was not proved.  Exhibit D at 6.  In so ruling, the Arbitrator

16   contradicted his own finding that he would not resolve the conflicting evidence of whether the

17   sexual acts occurred (gay and straight pornography filmed in his office, which included urination

18   on his desk, and fellatio occurring in the back seat of his car while driving) or whether Randazza

19   was bothered by these events.  *Compare* Exhibit D at 5 *with* Exhibit D at 9.  The Arbitrator had

20   the evidence before him that these acts occurred and that they caused Randazza emotional

21   distress.  However, it appears he could not bring himself to afford any satisfaction to Randazza,

22
23   further evidencing his unmistakable bias.  Such an award cannot be confirmed.

24   / / /

25
26
27

- 33 -

vii.    Randazza Was Retaliated Against

In Claim 7 of his Amended Arbitration Claim, Randazza asserted that he was wrongfully retaliated against for his complaints of sexual harassment, as set forth above.  Exhibit L at 32-34. As noted above, Randazza complained of the harassment to Gibson on April 23, 2012, who refused to apologize and told him not to be "butt hurt."  Subsequently, Gibson targeted Randazza with the vehicular fellatio incident, ultimately culminating in Gibson seizing upon the August 29 email to pretend Randazza resigned, effectively terminating him.  Such action is unlawful, as noted, under California and federal law.  Randazza suffered the loss of salary resulting from his retaliatory termination and suffered emotional distress.  The Arbitrator gave no consideration to this claim, making the patently erroneous finding that Randazza resigned.  The Interim Arbitration Award must, therefore, be vacated.

viii.    Plaintiffs are Alter Egos of Each Other

In the eighth count, Randazza sought a declaration that the Plaintiffs are alter egos of each other.  Exhibit L at 34-38.  Should the matter be vacated, Randazza is entitled to put forth evidence, which opportunity he was denied, to show that Gibson ignored corporate formalities and treated Excelsior and Liberty as his own alter egos and as alter egos of each other.  A declaration is warranted to find them jointly and severally liable for the damages they caused Randazza.

b.    *The Interim Arbitration Award To Plaintiffs Is Improper*

Excelsior brought seven (7) counterclaims against Randazza:  1) breach of fiduciary duty; 2) conversion; 3) intentional interference with contractual relations; 4) tortious breach of duty of good faith and fair dealing; 5) legal malpractice; 6) unjust enrichment; and 7) breach of contract. The Interim Arbitration Award portion explicitly only addresses counterclaims 1, 2, 6 & 7.

- 34 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 108 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 36 of 433

Exhibit D at 23-25.  However, the Arbitrator, in his analysis, found that Randazza violated "fiduciary duty and other duties", implicating counts 4 & 5.  *Id.* at 18.  The Arbitrator did not address the third claim.[17]

At the outset, in varying portions of the Interim Arbitration Award, the Arbitrator gave monetary relief in some instances to "Respondent(s)" and in others to "Respondent Excelsior." Compare *Id.* at 23 ("Respondent(s)") with *id.* at 24 ("Respondent Excelsior"), 25 ("Respondents," "Respondent," and "Respondents and Counterclaimants Excelsior Media Corp. and Liberty Media Holdings, LLC").  The only respondent to have asserted counterclaims was Excelsior.  To the extent monies are awarded to any other respondent, including attorneys' fees,[18] such exceeded the Arbitrator's authority as claims by them were not put before him. Excelsior is not entitled, by any reasonable estimate, to any portion of the Interim Arbitration Award as the Arbitrator manifestly disregarded the record and the law.

i.    Randazza Did Not Breach Fiduciary Duties

The Arbitrator awarded Plaintiff(s) $275,000, plus prejudgment interest at 10%, for the alleged breach of fiduciary duty arising from Randazza's negotiation for the additional $75,000 payment.  *Id.* at 23.  As discussed above, Randazza had obtained judicial enforcement of the $550,000 July 2012 settlement with Oron, and he was pursuing attorneys' fees and securing overseas assets of Oron.  As part of an effort to resolve these outstanding issues, Gurvits appeared for Oron and began negotiating a separate fee for Randazza to ensure that others might not enjoy the fruits of Randazza's skill.  Customarily, Randazza played along in order to expand

---

[17] The third counterclaim alleged Randazza caused other lawyers to cease working for Plaintiffs.

[18] It should be noted that if Liberty or Gibson could assert a claim for attorneys' fees, such would contradict the Arbitrator's alter-ego analysis, since by that finding only Excelsior would have a contract right to such fees.

the settlement fund.  The Arbitrator agreed that Randazza and Gurvits were bluffing.  Exhibit D

at 7 n.4 (stating that "except for admissions, anything which Mr. Randazza and his opposing

counsel in the Oron litigation, Val Gurvitz, communicated to each other lacked credibility . . .

.").

There is no basis for this interim award.  Excelsior alleges that, following its termination

of Randazza, Oron brought claims against Liberty and a settlement was reached in that matter.

The $275,000 figure represents the approximate reduction in the ultimate agreement between

Oron and Liberty, from the original $550,000 paid.  First, as Liberty asserted no counterclaims

and was adjudged not to be the alter ego of Excelsior, Excelsior lacked standing to make this

claim.  Second, there is no causal connection, legal or factual, between the so-called "bribe" and

Liberty's decision to return $275,000 to Oron.  Second, at no point in the Oron Arbitration

Demand did it make mention of the negotiation over the $75,000 payment.  Exhibit N.  The

Arbitrator completely neglected a legal causation analysis required for any claim of breach of

fiduciary duty, breach of duty of good faith and fair dealing, breach of contract, or legal

malpractice.  *See Shopoff & Cavallo LLP v. Hyon*, 167 Cal. App. 4th 1489, 1508-09 (Cal. App.

1st Dist. 2008) (discussing elements of claims); *Kane v. Sklar*, 122 Cal. App. 2d 480, 482-483,

265 P.2d 29, 31 (Cal. App. 1954); *Carlton v. Quint*, 77 Cal. App. 4th 690, 699 (Cal. App. 2d

Dist. 2000).  The Arbitrator recognized that "proximate cause" and "fact of damage" is a

separate element of the claims.  Exhibit D at 15.  Less than one page later, in contravention of the

causation element of any of these claims and in manifest disregard of the law, the Arbitrator

expressly ruled that "violations of fiduciary duties do not require 'fact of harm' to be shown by a

preponderance of the evidence or otherwise." *Id.* at 15-16.  As no reasonable construction of the

evidence could tie the $75,000 negotiation to the reduced settlement, there was no harm to

1   Excelsior and no proximate causation.  This is in addition to the absence of a breach where the

2   Arbitrator acknowledged that, as a bluffer, Randazza was not intending to consummate the so-

3   called "bribe."  Absent breach, causation, and harm, no award is justified.  The Arbitrator failed

4   to perform his duties and this award must be vacated.

5           The record is devoid of corroboration that Liberty paid Oron $275,000, further

6   undermining the claim of damages.  In fact, Plaintiffs' failure to corroborate is in violation of the

7   Arbitrator's own order.  On August 15, 2013, Randazza requested production of "all

8   communications related to the settlement of the Oron Litigation."  Following Plaintiffs' refusal

9   to produce the communications evidencing the alleged revised settlement between Liberty and

10  Oron.com, Randazza moved to compel.  The Arbitrator granted the motion subject to

11  confidentiality considerations on March 31, 2014.  Exhibit O at 3-4.  The Arbitrator confirmed

12  Plaintiffs' obligation to produce them again on August 28, 2014.  See, Exhibit P at 1-

13  2.  Plaintiffs stipulated to an order on November 3, 2014, that they would produce them.  Exhibit

14  Q at 2.  The Arbitrator again ordered production on January 16, 2015, of all e-mails from Oron's

15  counsel.  Exhibit R at 1-2.  Despite these multiple orders, Plaintiffs never produced any such

16  corroborating evidence of a finalized agreement with Oron.com to resettle the case at $275,000,

17  the very measure of damages found by the Arbitrator.  Such likely would have shown the true

18  cause for such reduction, if any, and that would certainly implicate whether Randazza's alleged

19  errors or omissions contributed to it in any meaningful way.   Additionally, no corroborating

20  evidence of any funds delivered to Oron or any meaningful compliance with the alleged

21  agreement was introduced.

22          Even the Plaintiffs never argued that the $75,000 negotiation was the reason they

23  allegedly forfeited half of the $550,000 original settlement with Oron, tendering back $275,000.

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
111 of 210

Case 15-01193-abl  Doc 137-5  Entered 03/16/17 18:14:49  Page 39 of 433

Instead, they claimed that Randazza provided material assistance to a third party (Datatech Enterprises, LLC) bringing a separate claim against Oron, in violation of paragraph 10 of the original settlement agreement.[19]  This is exceptionally ironic.  Throughout the litigation, Plaintiffs, through their expert Dennis Kennedy, contended that the negotiation of this so-called bribe violated Nevada Rule of Professional Conduct 5.6(b).  Rule 5.6(b) prohibits an attorney from negotiating a settlement that restricts his right to practice.  Yet, the very settlement provision in paragraph 10, to the extent it precluded Randazza individually from facilitating the representation of others, would have violated Rule 5.6(b) and would have been unenforceable as against public policy.  Oron could not have legitimately claimed that Randazza was precluded from assisting Datatech Enterprises and, thus, no malpractice or other breach could have been committed by Randazza by virtue of this assistance.  Assuming, *arguendo*, that Liberty paid Oron the $275,000,[20] such was due to the malpractice of successor counsel in failing to contest Oron's claim pursuant to the interpretation of an unlawful contract term as applied.  Randazza is not liable for the errors of his successors.

In addition, although Defendant contends that California law is generally applicable, the Oron litigation occurred in Nevada and thus, to the extent Plaintiffs suffered harm, it was occasioned by the resolution of a Nevada matter.  The 10% interest rate awarded grossly exceeds the rates permitted by NRS 99.040(1) or NRS 17.130(2).  Thus, the Interim Arbitration Award cannot be confirmed.

/ / /

---

[19] Paragraph 10 stated "Liberty will agree to dissuade others from bringing suit against Oron."
[20] As argued below, the payment lacks corroboration.

ii.     Randazza Was Not Unjustly Enriched

The Arbitrator orders payment to Respondents based on an unjust enrichment theory. Exhibit D at 23. It is ordered for two instances: (1) legal fees of $55,000 paid to Marc J. Randazza, P.A. d/b/a Randazza Legal Group as a result of the representation of an unrelated individual, Wayne Hoehn, and (2) monies received by Marc J. Randazza, P.A., in the amount of $5,000, from James Grady, relative to expenses in the Oron litigation.[21] First, as noted by the Arbitrator, these amounts were not paid to Randazza personally, but rather to his non-party law firm. That alone renders the award improper, and subject to vacatur, as exceeding his powers. *See Orion Shipping & Trading Co. v Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir. 1963) ("an action for confirmation is not the proper time for a District Court to 'pierce the corporate veil.'"), *cert den'd* 373 U.S. 949, 83 S Ct 1679 (1963).

Second, in order to establish a cause of action for unjust enrichment, Plaintiffs were required to establish: (1) that the defendant received money that was intended to be used for the benefit of the plaintiff, (2) that the money was not used for the benefit of the plaintiff, and (3) defendant has not given money to the plaintiff. *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51, 924 P.2d 996, 998 (Cal. 1996). Pursuant to his contract, Randazza was permitted to represent third-parties through his non-party law firm. Exhibit A at § 6(C).

Randazza successfully represented an individual named Wayne Hoehn against a company called Righthaven, arising from Mr. Hoehn's fair use of an article in the Las Vegas Review-Journal; Righthaven was found to lack standing. *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1168 (9th Cir. 2013). Subsequently, on June 6, 2013, Randazza Legal Group was awarded

---

[21] The Arbitrator erroneously states the $60,000 figure is for the Hoehn representation, but then only awarded $60,000 for both instances. The Arbitrator earlier correctly identified the Hoehn amount as $55,000. Exhibit D at 18.

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
113 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 41 of 433

$55,000 "for its administrative expenses." *Righthaven, LLC, v. Hoehn,* C.A. No. 2:11-cv-00050

(D.Nev. Jun. 6, 2013).  The Arbitrator made no evaluation of the basis on which that fee was

awarded, neither was any record made.  The public record, however, shows that of $34,045.50

awarded for the Hoehn matter alone.  Randazza's time represented but 15.02 hours over a six

month period, totaling $6,773.50.  *See Righthaven v. Hoehn,* C.A. No. 2:11-cv-00050, Document

32-3 (D.Nev. Jul. 5, 2011) (timesheet).  The Hoehn distribution also included $3,815 earned by

Randazza Legal Group in the companion matter of *Righthaven v. Leon,* C.A. No. 2:10-cv-01627

(D.Nev. Jul. 5, 2011), none of which was based on Randazza's time (per ECF 42-3 May 3, 2011

in that matter).  Finally, it included the $29,848.35 incurred in *Righthaven v. Wolf,* C.a. No. 1:11-

cv-00830 (D.Colo.) of which Randazza's time was but 9.5 hours over a five month period (per

ECF No. 59-3, Oct. 14, 2011).  Thus, Randazza Legal Group received $55,000 for nearly

$65,000 in bills, where Randazza spent less than 24 hours of his own time working on the matter,

between January and October 2011.  There was no evidence that Randazza, in working on

average less than three hours per month in his personal time, did any of the work on the

Righthaven matters during time when he should have been working for Excelsior.  He did not

receive funds for the time intended for the benefit of Excelsior.

Moreover, the legal fees earned in the Hoehn matter were not for the benefit of Excelsior,

nor could they be.  Were Randazza, through Marc J. Randazza, P.A., to deliver the legal fees to

Excelsior, they would be in violation of California Rule of Professional Conduct 1-320 and

Nevada Rule of Professional Conduct 5.4(a), prohibiting lawyers and firms from sharing fees

with non-lawyers.  Excelsior, as a for-profit corporation, does not meet the exception of Nevada

Rule 5.4(a)(4).  As a matter of fact and a matter of law, both of which were misapprehended by

the Arbitrator, Excelsior is not entitled to the Hoehn fees.  Thus, the Court cannot confirm the

1     award of $55,000 as unjust enrichment.

2         The Arbitrator also awarded as unjust enrichment $5,000 received by Randazza Legal

3     Group from a Mr. James Grady. Exhibit D at 23. As found by the Arbitrator, Grady funded the

4     Oron litigation in the amount of $5,000. *Id.* at 18. Plaintiffs offered no evidence, and thus the

5     Arbitrator cannot have found, that those funds were not used for Excelsior's benefit. Instead, the

6     Arbitrator merely asserted that Randazza's statement lacked corroboration. Exhibit D at 19.

7     Yet, as set forth above, at no time did the Arbitrator require Plaintiffs to corroborate that Oron

8     was paid $275,000. Such a double standard cannot be condoned.

9         Further, if Plaintiffs, over Defendant's objection, are permitted to introduce new evidence

10     relating to the trust account and computer, Randazza should be permitted to supplement the

11     record with documentation corroborating his disbursement of the $5,000 for the benefit of

12     Liberty. Thus, there is no basis to confirm this portion of the award.

### iii.    Damages For Spoliation Or Conversion Are Not Warranted

        The Arbitrator awarded Plaintiff(s) $3,215.98 in expert fees incurred, and he reserved his

decision on damages for spoliation and/or conversion pending further evidence of data

destruction. Exhibit D at 23-24. As noted above, this demonstrates the non-finality of the entire

award, precluding confirmation. Notwithstanding the foregoing, there is no evidence of

spoliation or conversion and the Arbitrator manifestly disregarded the law. In a conversion

claim, a plaintiff must show (1) that the plaintiff owned and/or had a right to possess an item of

personal property, (2) the defendant intentionally interfered with the plaintiff's right to

possession, including by destroying or refusing to return the property, (3) the plaintiff did not

consent, (4) the plaintiff was harmed, and 5) the defendant's conduct was a substantial factor in

causing the harm. *Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 50, 108 Cal. Rptr. 3d

455, 464-465 (Cal. App. 4th Dist. 2010) (conversion requires an "act of dominion" over personal property).[22]  Here, there is no dispute that Randazza, in his final days as an employee, removed non-Excelsior materials and then securely erased data from his work-issued laptop.  Having had the benefit of over 100,000 documents produced and the delivery of all of its files from Randazza, Plaintiffs identified not a single missing document or category of documents belonging to them.  Their own experts even recovered 19,000 files transferred to the cloud storage system.  Exhibit G at 987:7-15.  They only speculate, and the Arbitrator adopts, that documents might have been taken.  Exhibit D at 17.  The Arbitrator knew that the identification of potentially missing documents was crucial to this claim, yet he ignored his own prior ruling on the subject.  Exhibit P at 1.  Absent an evidentiary foundation, the Arbitrator failed to perform his duties.  Plaintiffs' expert fee was unnecessary, as their expert merely confirmed what everyone knew:  Randazza securely wiped the data and there was nothing he needed to retrieve that was not otherwise given by Randazza to them freely.  Further, as Randazza acknowledged, keeping non-Excelsior materials on the laptop and iPhone, delivery of that data to Excelsior could have violated Nevada Rule of Professional Conduct 1.6, as it could have resulted in the revelation of confidential non-party client information.  To condemn Randazza for abiding the rules of professional conduct is manifest disregard of the law.  Finally, the record is closed as to all issues but attorneys' fees; no further examination or evidence is permissible under the Arbitrator's scope.

---

[22] Neither Nevada nor California recognize a cause of action for spoliation and Excelsior did not make such a claim. *Timber Tech Engineered Bldg. Prods. v. Home Ins. Co.*, 118 Nev. 630, 633, 55 P.3d 952, 954 (2002).  To the extent the expense constitutes a sanction under JAMS Employment Arbitration Rule 29, Randazza could not fairly have been said to not have complied with his obligations under the Rules or the Arbitrator's order where arbitration had not yet been initiated.  *See* JAMS Employment Arbitration Rule 17(a) (duty to exchange information only accrues "after commencement of the Arbitration").

Moreover, the Arbitrator's ruling evidences a double-standard.  In Footnote 8 of the Interim Arbitration Award, the Arbitrator set forth that he excused the deletion of certain text messages (the award erroneously calls them e-mails) by a Chaz Vorias.  Exhibit D at 11, n. 8.  These text messages allegedly showed Randazza's assent to the April 2012 pornographic filming in his office.  Exhibit G at 958:11-22.  At no time, not after the April 23, 2012 complaint to Gibson or in August 2012 at the direction of counsel at Littler, did Excelsior cause Vorias to preserve those text messages.  *Id.* at 963:16-965:10.  The Arbitrator excused Excelsior's failure to ensure its agent preserved the alleged text message by shifting the blame to Vorias.  The failure of a company to preserve employee text messages constitutes spoliation.  *Small v. Univ. Med. Ctr. of S. Nev.*, 2014 U.S. Dist. LEXIS 114406, *128 (D. Nev. Aug. 18, 2014).  The irony is that, unlike Vorias's destruction of text messages, Excelsior offered no evidence to suggest that Randazza destroyed documents, only, as he conceded, that he moved them to his firm's cloud storage.  The Arbitrator's double standard cannot be condoned.  Thus, there is no justifiable basis to confirm this portion of the interim award.

iv.     <u>Disgorgement Of Wages Earned Is Impermissible</u>

The Arbitrator orders Randazza to disgorge $197,000.00 of his earnings from his employment with Excelsior.  Exhibit D at 24.  The Arbitrator states that it was for violations of fiduciary duty in his capacity as an attorney regarding his performance in the TNAFlix and MegaUpload litigation, representation of XVideos and/or XNXX, and "excessive, undisclosed, time" on other matters.  *Id.*  The disgorgement order is impermissible as a matter of law.

Rather than consider California law, the Arbitrator decided to adopt the rationale of a Texas Supreme Court case, *Burrow v. Arce*, 997 S.W.2d 229, 237-238 (Tex. 1999).  The *Burrow* court relied on Proposed Restatement 3d of the Law Governing Lawyers, § 49 (Proposed Final

- 43 -

1   Draft No. 1, 1996), which stated "A lawyer engaging in clear and serious violation of duty to a
2   client may be required to forfeit some or all of the lawyer's compensation for the matter." The
3   actual adopted Restatement provision appears at section 37. Reporter's Comment E to
4   Restatement 3d of the Law Governing Lawyers, § 37, specifically distinguishes in-house
5   counsel, noting "[o]n nonforfeiture of the salary of a lawyer employee, see [cases cited]."
6   Randazza was an employee, not outside counsel, rendering sec. 37 and *Burrow* entirely
7   inapplicable. Such is consistent with the laws of California precluding disgorgement of wages,
8   discussed below.
9
10       Additionally, in *Burrow*, the Texas Supreme Court determined that fee forfeiture may be
11  appropriate where a lawyer is engaged in "clear and serious violation of duty." 997 S.W. 2d at
12  241. The Arbitrator made no determination that Randazza's alleged violations were either clear
13  or serious; even assuming a violation, the Arbitrator could not have found it clear or serious
14  where undisputedly qualified experts disagreed that a violation even occurred under California or
15  Nevada law. First, with respect to spending time on non-Excelsior or Liberty matters, the
16  Arbitrator did not ground such in fiduciary duties, but rather attended to the contractual provision
17  regarding outside work. Exhibit D at 24. Specifically, the contractual provision, Section 6(C),
18  required that Randazza's first duty of "temporal loyalty" lie with Excelsior. Exhibit A at § 6(C).
19  In Footnote 16, the Arbitrator stated that "billed hours shown to be in excess of that permitted by
20  that agreement." Exhibit D at 19. As to his "excessive, undisclosed, time", it appears that the
21  Arbitrator made no findings as to how much time, if any, was taken away from Randazza's
22  responsibilities to Excelsior. Nothing in the record showed a failure of Randazza to meet
23  deadlines or any pre-termination concerns regarding time spent. The contract required Randazza
24  to use non-working hours, vacation days, and unpaid leave time to work on outside projects. The
25
26
27

- 44 -

1 Arbitrator made no finding that Randazza did not perform third-party work under these

2 parameters. Although evidence was introduced of Randazza's non-Excelsior/Liberty time,

3 Randazza testified that he worked long hours. Exhibit G at 632:16-633:7. At no point was he

4 critiqued or disciplined for not spending enough time on Excelsior matters. *Id.* at 675:21-676:15.

5 Thus, the Arbitrator lacked evidentiary foundation to suggest Randazza's time on outside

6 projects was excessive, requiring disgorgement.

7 Second, with respect to concurrent representation of XVideos and/or XNXX, no evidence

8 was introduced of breach of fiduciary duty or that Excelsior suffered any harm. While working

9 for Excelsior, Randazza's third-party clients included XVideos and XNXX, sites that might

10 facilitate the streaming of online videos. The evidence at the hearing indicated, at most, that

11 Randazza determined that they were not appropriate litigation targets. *See* Exhibit G at 734:10-

12 737:11; e-mail communication from Randazza dated September 6, 2011, attached as Exhibit S.

13 At no point was any evidence introduced that Randazza's opinion was erroneous and, moreover,

14 subsequent to Randazza's departure, Plaintiffs have not brought suit against them. Exhibit G at

15 821:12-17. The policies and choice Randazza instituted relative to XVideos and DMCA notices

16 have not changed, with new counsel implicitly ratifying them. *Id.* at 837:15-838:21. Instead, it

17 appears that the relationship was mutually beneficial, with Liberty's content having priority for

18 DMCA takedowns. *Id.* at 628:20-629:6. With respect to the representation of XVideos and/or

19 XNXX,[23] the Arbitrator omitted any analysis of legal causation. Similar to his analysis of post-

20 termination breach of fiduciary duty, in which the Arbitrator found Excelsior had a right without

21 a remedy, the absence of legal causation bars a remedy. Thus, there is no factual basis for the

22

23

24

25 _____

26 [23] As the Arbitrator did not actually make a finding as to whether Randazza represented XVideos, XNXX, or both, it is unknown how he determined that Randazza's representation of one or both of them at a particular time was adverse to Excelsior and a breach of fiduciary duty.

27

arbitrator to have concluded that the representation of XVideos and XNXX violated any of Randazza's fiduciary duties in any way that would warrant disgorgement.

Third, the Arbitrator found that Randazza's representation of Liberty on matters involving TNAFlix and MegaUpload breached fiduciary duties. Exhibit D at 24. In negotiating settlements with TNAFlix and MegaUpload, Randazza was offered so-called "bribes" to be conflicted out of future third-party representation, none of which was consummated. Randazza settled both of those matters for $50,000 and $600,000 respectively. Exhibit G at 731:17-732:3. In the MegaUpload matter, Randazza was offered a $5,000 "bribe." *Id.* at 749:17-750:6. In the TNAFlix matter, negotiating with Attorney Gurvits, Randazza was offered $5,000 and made a bluff demand of $30,000. E-mail from Randazza to Gurvits dated December 22, 2010, attached as Exhibit T; e-mail correspondence between Randazza and Gurvits dated December 30, 2011 to January 11, 2011, attached as Exhibit U. None of these negotiations bore fruit. Plaintiffs' expert claimed that these negotiations violated the Nevada and California rules of professional conduct precluding restrictions on the right to practice. These rules address an attorney's obligations to society at large, not a particular client, in order that any person can hire the services of any attorney of their choosing. Excelsior is only permitted to recover on a claim for breach of fiduciary duty where the fiduciary duty was owed specifically to Excelsior arising out of the attorney-client relationship. *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086-1087, 41 Cal. Rptr. 2d 768, 776 (Cal. App. 1st Dist. 1995). No evidence of harm resulting from either negotiation was introduced, and Liberty benefitted from the TNAFlix negotiation where Randazza subsequently appeared credible to Gurvits in the Oron litigation. Even absent harm, there is no evidence that Randazza breached his fiduciary duties to Excelsior or Liberty. Thus, absent an actual breach of duty, causation, or harm, the Arbitrator had no basis in fact or law to

order disgorgement.

Not only is Randazza not subject to penalty as he did not violate any fiduciary duties, the supposed remedies of forfeiture and disgorgement violate California law. Both Section 37 of the Restatement and *Burrow* speak to forfeiture of the right to collect fees, rather than disgorgement of fees collected. No case law has been provided where the attorney was required to disgorge; the only precedent is a statement in dicta that disgorgement may be appropriate. *See Rodriguez v. Disner*, 688 F.3d 645, 653 (9th Cir. 2012). Even in *Burrow*, no individual attorney was required to return his or her salary.

Moreover, the Ninth Circuit did not analyze California wage law on the question. None of the cases address the salary of in-house counsel as a fee to be disgorged. None properly could. California Labor Code, Section 221, states that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Thus, even if outside counsel might be subject to a disgorgement order, in-house counsel, as an employee protected by the wage laws, is not. Randazza is entitled to retain his salary and bonuses previously paid under California law, and the Arbitrator's Interim Arbitration Award is in manifest disregard of the law. For Excelsior to seek enforcement thereof would constitute a new violation of those laws. Thus, the Interim Arbitration Award cannot be confirmed.

Finally, the Arbitrator did not consider any of the specific factors to determine the extent of forfeiture. With the exception of the few matters at issue in the arbitration, Defendant's service to Excelsior has not been questioned. The Arbitrator gives no indication at how he arrived at the $197,000.00 figure and it does not appear to correlate with any of Plaintiffs' specific requests for disgorgement. Such analysis is required by *Burrow*:

> It would be inequitable for an agent who had performed extensive services faithfully to be denied all compensation for some slight, inadvertent misconduct that left the principal unharmed, and the threat of so drastic a result would unnecessarily and perhaps detrimentally burden the agent's exercise of judgment in conducting the principal's affairs . . . . In determining whether and to what extent forfeiture is appropriate, relevant considerations include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.

*Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999).  For that reason alone, the Interim Arbitration

Award cannot be confirmed.

The Arbitrator impermissibly instituted punitive damages, even in the absence of

liability.  The Arbitrator specifically ordered disgorgement to act "as a deterrent and disincentive

for an attorney or other agent to breach of fiduciary duty."  Exhibit D at 20, n. 18.  The

disgorgement was thus not compensatory.  Absent a showing of actual harm, there is no tort, thus

punitive damages cannot be awarded.  *Jackson v. Johnson*, 5 Cal. App. 4th 1350, 1354-55, 7

Cal.Rptr.2d 482 (Cal. App. 2d Dist. 1992).  Moreover, to the extent the duties arose

independently of the contract, Plaintiffs were required to show, by clear and convincing

evidence, oppression, fraud or malice.  Cal. Civ. Code § 3294(a) (2015).  The Arbitrator made no

such findings.  California does not permit the disgorgement order where (a) there was no

precedent for attorney fee disgorgement; (b) there was no breach of fiduciary duty, causation, or

harm; (c) wage laws prohibit in-house counsel from disgorging earnings; and (d) there was no

actual harm or oppression, fraud, or malice warranting such punitive damages.  In sum, the

disgorgement order was issued in manifest disregard of the facts and the law, in violation of the

Arbitrator's duties.

/ / /

v.    Remittance Of Trust Funds Is Improper

As previously discussed, a non-party law firm, Marc J. Randazza P.A. d/b/a Randazza Legal Group represented Liberty in litigation.  Funds were placed in the law firm's client funds trust account relative to expenses and recoveries in litigation.  The Arbitrator orders Randazza to deliver to Plaintiffs certain funds held in this trust account and pay 10% interest thereon, specifically, "all Oron related funds[24] and, further, an additional $30,000 of non-Oron-related client funds."  Exhibit D at 24-25.  Such is improper for several reasons, in disregard of the law, and in excess of the Arbitrator's authority.

As set forth in the disbursement breakdown, of the original $550,000.00 Oron settlement received, Randazza was owed his 25% commission of $137,500.00, plus an additional $25,000.00 for the loan.  Exhibit I.  As counsel, Randazza Legal Group was also required to disburse $31,800.00 in litigation costs to third parties.  *Id.*  Additionally, Liberty owed Randazza Legal Group $21,279.50 for the services of professionals other than Randazza in the Oron litigation.[25]  *Id.*  Finally, Liberty owed Randazza Legal Group $2,601.00 for non-Oron matters.  Remittance of these funds is impermissible.

First, to the extent such funds represent wages owed to Randazza, as set forth above, tender would be impermissible.  Disgorgement of wages earned is impermissible under the law.  Second, also as noted, the funds are not in a personal trust account, but rather with the non-party law firm; the Arbitrator lacks the authority to issue such an order as there has been no proper

---

[24] Plaintiffs claim that it was $275,000.

[25] Judge Navarro determined that the actual value of Randazza Legal Group's services, including Randazza's, was $131,797.50.  *Liberty Media Holdings, LLC v. FF Magnat Ltd.*, Case No. 2:12-cv-01057 (D.Nev. Sept. 4, 2012).  Subtracting out Randazza's labors, for which compensation is due under the employment contract, Randazza Legal Group is actually entitled to $81,433.98.

- 49 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
123 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 51 of 433

finding that the firm is Randazza's alter ego.  Instead, these funds are subject to pending

litigation in the State Court Action, *Marc J. Randazza, P.A. v. Liberty Media Holdings, LLC,*

Case No. A-12-673275-C.  Thus, the trust account was never properly before the arbitrator.

Third, the 10% interest is excessive under Nevada law, as previously noted.  Moreover,

the Arbitrator's requirement of interest conflicts with Nevada Rule of Professional Conduct 1.15,

which does not require that funds held in trust be placed in an interest bearing account.  The

Arbitrator manifestly disregarded this rule, resulting in an improper penalty to Randazza for his

firm's compliance with the rule.  Certainly, if there was interest earned and the principal was

owed Plaintiffs, then they would be entitled to the interest earned, but an award of prejudgment

interest on disputed funds places a burden on law firms and lawyers that the rules of conduct do

not require.  *See Lopez v. Corral*, 2010 Nev. LEXIS 69, *17-18 (Nev. Dec. 20, 2010) ("an

attorney who holds disputed funds in his trust account pending resolution of the dispute does not

convert those funds as a matter of law").  Thus, there is no basis at law for the award of interest.

Fourth, there is no basis in fact for the claim for an additional $30,000.  Although

Plaintiffs claim it, there is no evidentiary basis.  Instead, the only record was testimony from

Gibson that Randazza Legal Group may have received some settlement funds, which he admitted

was without any actual knowledge of such on his part.  Exhibit G at 773:9-774:3.  The Arbitrator

had no facts in evidence that would permit such an award.

> vi.  No Audit Of Randazza Legal Group's Trust Account Is
> Permissible

Continuing his impermissible actions relative to the non-party law firm's client funds

trust account, the Arbitrator orders an accounting of that trust account.  Exhibit D at 25.  This

cannot be subject to confirmation.  First, as previously noted, the record is closed.  Plaintiffs did

not seek to keep the record open and this was a matter that could have been resolved during the

- 50 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
124 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 52 of 433

1  discovery phase. Second, the Arbitrator gives no purpose to such accounting as relates to the

2  rights of Plaintiffs. In fact, Excelsior never requested an accounting as part of its counterclaim.

3  Excelsior's Answer and Counterclaim, attached as Exhibit V. Thus, it exceeds the Arbitrator's

4  powers to order an accounting. Third, again exceeding the Arbitrator's authority, it interposes an

5  obligation on one or both non-party law firms, which are not parties to the arbitration, and thus

6  beyond the Arbitrator's powers. And fourth, an audit of the account would necessarily reveal the

7  identities of other clients of the non-party law firms, revealing the fact of representation, which

8  may be confidential, and disclosing monies that may be subject to confidentiality agreements or

9  otherwise reveal client financial arrangements. Such would result in a gross violation of

10  California Rule of Professional Conduct 3-100 and Nevada Rule of Professional Conduct 1.6.

11  Finally, a "claim for accounting must be tethered to relevant actionable claims." *Simon v. Bank*

12  *of Am., N.A.*, 2010 U.S. Dist. LEXIS 63480, *30, 2010 WL 2609436, at *11 (D. Nev. June 23,

13  2010) (internal citation omitted). As there is no other actionable claim, no accounting is

14  warranted. As a result, given the Arbitrator's manifest disregard of facts and law, in excess of

15  his authority, no accounting is warranted and the Interim Arbitration Award cannot be

16  confirmed.

17

18

19                  vii.        Randazza Cannot Return A Non-Existent Laptop

20        As previously argued in his Opposition to Plaintiffs' Request for an Order Shortening Time

21  and Motion for Continuance, incorporated herein by reference, Section 6 of the Interim

22  Arbitration Award is meaningless. Exhibit D at 25. It requires Randazza to return an

23  unidentified laptop computer that likely does not exist. There is no manufacturer, model, serial

24  number, or MAC address entered into evidence or referenced by the Arbitrator that would permit

25  Randazza to identify the computer and comply. Plaintiffs presented no evidence in the record

26

27

that would identify such computer, when they simply could have testified to issuing computers X &Y and only receiving back computer X. The only mention in the record is where Gibson states that he is seeking the return of a "second company laptop that Mr. Randazza testified he had, and has not returned to the company." Exhibit G at 772:16-19. Nothing in Randazza's testimony mentioned simultaneously having two company issued laptops, only that over the course of his employment, two had been issued; at the time of termination, there was only the MacBook Air. *Id.* at 197: 15-22. Moreover, Plaintiffs did not even make a claim for the return of a computer in their counterclaim. Exhibit V. Absent any claim, let alone evidence, the Interim Arbitration Award is unreasonable and unenforceable. It exceeded the Arbitrator's authority and is in manifest disregard of the facts. The issue of an alleged second laptop should have been addressed in discovery; the record is closed and there is no meaningful purpose to this section of the award. There is no cause for any further inspection of the non-existent, unidentified computer, as required by Section 7 of the Interim Arbitration Award. Thus, the Interim Arbitration Award must be vacated.

### viii.    Gibson Is A Proper Party

Finally,[26] Gibson should not be dismissed, per Section 9 of the Interim Arbitration Award. Exhibit D at 26. First, as discussed above, the Arbitrator failed to perform a meaningful alter ego analysis and expressly and unfairly deprived Defendant of the opportunity to present evidence on this question. His own prior order deferred the question and evidence thereon, and the ruling is therefore capricious and contradictory. Second, and related thereto, upon vacatur

---

[26] Defendant takes no issue with the order in Section 8 that the parties are free to each apply for attorneys' fees and costs, reserving the right to challenge any such application by Plaintiffs.

- 52 -

1   and remand to a different arbitrator, it is expected the evidence will show Gibson liable as an

2   alter ego of Excelsior.  Thus, the Interim Arbitration Award cannot be confirmed.

3   **D.  Interim Awards are Not Otherwise Subject to Confirmation**

4   1.  <u>The Interim Award Was Replete With Bias</u>

5       It is evident throughout the Interim Arbitration Award that the Arbitrator disfavored

6   Defendant and resolved all factual and credibility disputes, as well as conflicting expert opinions,

7   against him.  In doing so, the Arbitrator demonstrated his bias, failing to draw logical

8   conclusions and placing Randazza in catch-22 situations.  There are several instances that

9   highlight these problems.

10

11  *a.  Physical Position Is Not An Indicium Of Credibility When The Arbitrator Directed Such
     Position*

12

13      Relegating the credibility determination to Footnote 4 of the Interim Arbitration Award,

14  the Arbitrator determined Randazza lacked credibility based upon his physical position.  Exhibit

15  D at 6-7, n. 4.  Randazza was the only witness who was told prior to his testimony where to face,

16  for no other reason than to ensure the court reporter and the Arbitrator properly heard him.

17  Exhibit G at 10:16-11:22.  At the hearing, the Arbitrator instructed Randazza as follows:

18      ARBITRATOR HABERFELD: I would just ask, Mr. Randazza, if you could, as much
19      as you can, although the questions will be coming from Mr. White, who is to your right,
        and I am to your left, and the court reporter is across from you, to please try to be as
20      much giving your testimony to me and to the court reporter, rather than looking to Mr.
        White, which would be making it difficult to read your lips and to hear you better.
21

22  *Id.* at 11:10-19.  Yet, in the Interim Arbitration Award, the Arbitrator commented negatively on

23  this middle-distance position, for Randazza's near perfect obedience "leaning well forward and

24  looking down or straight ahead into 'middle distance' in the direction of the wall behind where

25  the Arbitrator was seated."  Exhibit D at 6-7, n. 4.  He further criticized Randazza for not

26  maintaining "eye contact with either the questioning attorney or the Arbitrator" even though the

27

1  Arbitrator had instructed him not to even make eye contact with his own counsel and to face the

2  middle distance between the court reporter and the Arbitrator.  *Id.*

3      There was no similar colloquy before any other witness testified.  *See, e.g.*, Exhibit G at

4  658-659 (testimony of Jason Gibson).  The record does not indicate anywhere that Randazza

5  deviated from the physical position the Arbitrator required; the Arbitrator's findings do not even

6  indicate that his position during cross-examination differed from that during direct examination.

7  Exhibit D at 6-7, n. 4; Exhibit C.  It is patently unfair of the Arbitrator to make a credibility

8  assessment adverse to Randazza based on him having followed the Arbitrator's explicit

9  instruction.[27]  And, it appears that the positioning colored the Arbitrator's entire decision,

10  requiring vacatur and remand for a new hearing before a different Arbitrator.

11

12      b.  *The Arbitrator Expressly Bifurcated The Question Of Alter-Ego Liability But*
        *Disregarded His Own Order*

13

14      The Arbitrator, again by footnote, dismissed Gibson as a party, finding that Defendant

15  had failed to show Gibson was an alter ego of either Excelsior or Liberty, and determined that

16  neither Excelsior nor Liberty were alter egos of anybody or entity.  Exhibit D at 2, n. 1.

17  Randazza had specifically sought declaratory relief in Count 8 of his Amended Arbitration claim

18  that Excelsior, Liberty, and Gibson were alter egos of each other, to be held jointly and severally

19  liable.  Exhibit L at 34-37.  Presumably, the footnote ruling suggests that they were not found to

20  be alter egos of each other, denying Claim 8.  The Arbitrator omits from this footnote and the

21

22  remainder of the Interim Arbitration Award any reference to his earlier ruling of January 8, 2014.

23

24

25  [27] Moreover, in raising the position of Randazza in their post-hearing brief, Plaintiffs improperly dropped a footnote relaying a supposed incident where chewing gum may have appeared on the car of Plaintiffs' counsel, without any actual evidence that Randazza was actually the cause and without relevance to the proceedings themselves.  This may have prejudiced the entire decision making process, warranting vacatur.

26

27

1   In that ruling, the Arbitrator states that Randazza's "'alter ego' contentions will be segmented

2   from [his] claims for liability and damages and will be deferred to a later phase of the arbitration

3   or will become moot." Exhibit W at 1.  This order precluded even the taking of discovery from

4   Gibson and the entities that would tend to have shown alter-ego status.  Without notice to

5   Defendant, the Arbitrator disregarded this order, effectively pretending it did not exist.

6   Defendant lacked opportunity to take discovery or present evidence on the question of alter ego.

7   This issue was adjudicated adversely to Defendant even where the remainder of the decision

8   rendered the question moot.  The issue was not bifurcated, per the Arbitrator's own order.  And

9   the Arbitrator failed to undertake any actual analysis or application of the facts to the law.

10

11          Curiously, despite this ruling, the Arbitrator treats Plaintiffs as alter egos of each other.

12   In that very same footnote, and throughout the interim award, the Arbitrator opts to treat

13   Excelsior and Liberty interchangeably.  In fact, at p. 23, paragraph 2, the Arbitrator issues a

14   monetary award to all Plaintiffs, including Gibson,[28] jointly.  Exhibit D.  If they are not alter

15   egos and proper parties, then the only party entitled to any award would be Excelsior, being the

16   only party to assert a counterclaim.  In fact, if they are not alter egos, the other Plaintiffs could

17   not have asserted counterclaims as they were then not parties to the arbitration agreement.

18

19   Similarly, since of the three Plaintiffs only Liberty was the client in the Oron litigation, and since

20   Liberty was the only of the three Plaintiffs to allegedly disgorge the $275,000, only Liberty has

21   standing to assert these alleged damages.

22          Further, there was no evidence to suggest that Excelsior had standing to bring a claim for

23   malpractice on behalf of Liberty.  Similarly, the Arbitrator requires disgorgement of disputed

24

25

26   [28] Gibson cannot be entitled to enforce a monetary award in his favor where he was dismissed as
27   a "party," not merely as Respondent, depriving him of standing.

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 129 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 57 of 433

funds relative to the representation of Liberty held in trust, otherwise the subject of the State Court Action.  Plaintiffs cannot have it both ways—they are either alter egos or the award is void; and the Arbitrator acted with manifest disregard of the law and facts to let Plaintiffs have it both ways.

Further, without even being presented the issue for adjudication, the Arbitrator in his interim award, at paragraphs 2, 4, & 5, implicitly treated non-parties Marc J. Randazza, P.A. d/b/a Randazza Legal Group and Randazza Legal Group, PLLC, as Randazza's alter egos.  As noted above, Marc J. Randazza, P.A. d/b/a Randazza Legal Group, a Florida entity, was the outside law firm representing Liberty and other clients.  Randazza Legal Group, PLLC, did not begin operations until after Randazza's termination.  The cited paragraphs of the Interim Arbitration Award appear to require one or both of these non-party law firms to disgorge legal fees for work performed in part by other lawyers, disgorge funds held in trust and certain disputed funds to Plaintiffs, and require one or both of their trust accounts to be audited.  The Arbitrator manifestly disregarded the portions of the record indicating that all litigation was conducted through the non-party law firm, Marc J. Randazza, P.A.  Exhibit G at 55:11-24.  At no time was evidence, let alone the question, presented to the Arbitrator as to whether the law firms were Defendant's alter ego and the Arbitrator performed no analysis of the matter.  Thus, not only did the Arbitrator blatantly disregard his prior ruling relative to the alter ego status of Plaintiffs, he opted to doubly surprise Defendant by *sua sponte* determining Defendant and his law firms were alter egos in the Interim Arbitration Award.  This further evidences the Arbitrator's determination to construct an award adverse to Randazza, in an arbitrary fashion, without regard for facts or law.

///

    *c.   Errors Of Counsel Were Misattributed To Defendant*

       In retaliation for Randazza having filed his arbitration claims, Gibson filed bar complaints against him in each of the five jurisdictions in which he was admitted. To properly preserve his sexual harassment claim, Randazza filed a complaint with the Nevada Equal Rights Commission & Equal Employment Opportunities Commission. Exhibit X. Randazza had different attorneys in these differing proceedings. The Arbitrator noted that Randazza's varying counsel made factual errors, where one or more attorneys appear to have not yet located or overlooked evidence. Exhibit D at 6, n. 4, 17-18. This matter included over 100,000 documents exchanged as part of discovery. Exhibit G at 801:14-18.[29] Given the volume of pleadings and documents at issue, mistakes of counsel are bound to happen. However, for unknown reasons, the Arbitrator attributed these errors to Randazza personally, and then he drew adverse credibility findings against Randazza for the errors of counsel. Exhibit D at 6, n. 4, 17-18. Such constitutes guilt by association, "one of the most odious institutions of history." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 178 (U.S. 1951). And yet, this guilt by association was a significant factor in the credibility determination and must not be condoned.

    *d.   The Arbitrator Cannot Make An Adverse Credibility Finding Based On An Issue He Opted Not To Decide*

       As noted above, due to the office-desk pornography and back-seat fellatio incidents in which Randazza was targeted, separate and apart from the explicit nature of the industry, a sexual harassment and retaliatory termination claim was filed with the Nevada Equal Rights Commission and EEOC and made part of Randazza's arbitration claims. Exhibit X. Plaintiffs

---

[29] There has been no finding that the documents produced were not properly responsive to the Plaintiffs' discovery requests or otherwise excessive. Plaintiffs' overbroad discovery requests necessitated Defendant's comprehensive response.

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
131 of 210

Case 15-01193-abl   Doc 137-5   Entered 03/16/17 18:14:49   Page 59 of 433

denied the occurrence of the fellatio incident and denied that these events actually upset

Randazza.  The Arbitrator found, ultimately (and erroneously), that Randazza resigned, thus he

explicitly held that he was not resolving a conflict of evidence as to how or whether the incidents

occurred and their effect on Randazza.  Exhibit D at 5.  Even though the Arbitrator expressly

stated that the sexual incidents were not being decided, he somehow held this against Randazza.

At page 6, paragraph F, the Arbitrator states that the failure of Randazza to prove his sexually-

based allegations and reactions to them undermined his credibility.  *Id.*  However, it was not the

case that Randazza did not prove them; instead, the Arbitrator decided that no proof was

required.  To summarize the Arbitrator's circular reasoning: he chose not to make a credibility

determination, because he credited Plaintiffs' theory as to cause of separation, resulting in

Randazza not being credible, which is why he found Plaintiffs' theory credible.   Such

demonstrates clear bias and the absolute failure of the Arbitrator to execute his duties.

### V.  Conclusion

The motion to confirm Plaintiffs' arbitration award is not properly before the Court as it

is in the wrong jurisdiction and venue.  Further, in light of the foregoing, given the evident bias,

manifest disregard for the facts and the law, and exceeding his contractual powers, the

Arbitrator's Interim Arbitration Award cannot be confirmed.  To the contrary, it must be vacated

and remanded to a different arbitrator.

DATED this 7th day of August, 2015.

HUTCHISON & STEFFEN, LLC

Mark A. Hutchison (4639)
Michael K. Wall (2098)
Timothy R. Koval (12014)

*Attorneys for Defendant*
*Marc J. Randazza*

- 58 -

22-01023-tmd  Doc#1-12  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 132 of 210

Case 15-01193-abl    Doc 137-5    Entered 03/16/17 18:14:49    Page 60 of 433

**CERTIFICATE OF SERVICE**

      Pursuant to NRCP 5(b), I certify that I am an employee of HUTCHISON & STEFFEN, LLC and that on this 7th day of August, 2015, I caused the above and foregoing document entitled **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO CONFIRM ARBITRATION AWARD AND COUNTER-MOTION TO VACATE AND/OR MODIFY** to be served as follows:

☐        by placing same to be deposited for mailing in the United States Mail, in a sealed envelope upon which first class postage was prepaid in Las Vegas, Nevada;

☐        pursuant to EDCR 7.26, to be sent via facsimile;

☒        pursuant to EDCR 8.05(a) and 8.05(f), to be electronically served through the Eighth Judicial District Court's electronic filing system, with the date and time of the electronic service substituted for the date and place of deposit in the mail; and/or

☐        to be hand-delivered;

to the attorneys and/or parties listed below at the address and/or facsimile number indicated below:

Wendy Medura Krincek, Esq.
Ethan D. Thomas, Esq.
LITTLER MENDELSON, P.C.
3960 Howard Hughes Parkway, Ste. 300
Las Vegas, NV 89169-5937
702-862-8800 (Tel)
702-862-8811 (Fax)

*Attorneys for Plaintiffs*

_____
An Employee of Hutchison & Steffen, LLC

- 59 -

# EXHIBIT 11

Order to Show Cause

_____
Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
June 26, 2018

LARSON ZIRZOW & KAPLAN, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzklegal.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzklegal.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel:  (702) 382-1170
Fax:  (702) 382-1169

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: BK-S-15-14956-abl |
| | Chapter 11 |
| MARC JOHN RANDAZZA, | |
| Debtor. | Date: July 31, 2018 |
| | Time: 1:30 P.M. |

**ORDER TO SHOW CAUSE WHY STEPHEN HABERFELD AND JAMS, INC. SHOULD**
**NOT BE COMPELLED TO COMPLY WITH THE ORDER APPROVING**
**SETTLEMENT AGREEMENT AND/OR HELD IN CONTEMPT AND SANCTIONED**
**FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY**

The Court having reviewed and considered the *Motion for Order to Show Cause Why
Stephen Haberfeld and JAMS, Inc. Should not be Compelled to Comply With the Order Approving
Settlement Agreement and/or Held in Contempt and Sanctioned for Willful Violations of the*

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

22-01023-tmd Doc#1-12 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 135 of 210

Case 15-14956-abl Doc 238 Entered 06/26/18 15:37:31 Page 2 of 3

1  *Automatic Stay* the <u>Motion</u> [1] filed by    r   oh                       <u>Mr. Randazza</u>   as debtor and

2  debtor in possession, and, without making any final determination regarding the Motion and the

3  requests for relief set forth therein; and good cause appearing;

4       **IT IS HEREBY ORDERED:**

5       1.    Ar  tr tor  te he      er e                       o e t  e    the  <u>JAMS Parties</u>

6  shall show cause why they allegedly have failed or refused to   o        th the ter  s o th s Court's

7  *Order Granting Debtor's Motion to Approve Settlement Agreement and Release With Excelsior*

8  *Media Corp., Liberty Media Holdings, LLC and Jason Gibson Per Fed. R. Bankr. P. 9019* (the

9  <u>Settlement Order</u>    [ECF No. 219], and in particular why they allegedly have failed or refused to

10 enter the Arbitration Dismissal Stipulation attached to the Settlement Agreement and Release (the

11 <u>Settlement Agreement</u>   as Exhibit 1, and in the form as presented to them, without change,

12 further briefing, or hearing on the matter in the Arbitration, JAMS No. 1260002283 (the

13 <u>Arbitration</u>  , including the vacatur of the Interim Arbitration Award as set forth in that

14 Stipulation.

15      2.    The JAMS Parties shall further show cause why they allegedly have not committed

16 various intentional and willful violations of the automatic stay pursuant to 11 U.S.C. § 362 by

17 entering the *Order to Show Cause Whether or Not Interim Arbitration Award Should be Subject*

18 *to Vacatur, With Prejudice, as Requested by Settling Parties* the  <u>Arbitration OSC</u>    the

19 Arbitration on or about June 11, 2018, and by undertaking any further proceedings in the

20 Arbitration pursuant to the Arbitration OSC or otherwise except as consistent with this Court's

21 Settlement Order, the Settlement Agreement and the Arbitration Dismissal Stipulation attached to

22 the Settlement Agreement as Exhibit 1.

23      3.    The JAMS Parties shall further show cause why they should not be held in contempt

24 of court and sanctioned for their alleged failures or refusals to abide by the Settlement Order and

25 their intentional and willful violations of the automatic stay as set forth herein, including in

26 particular why   r       shou    ot re  o er h s re so     e  ttor e  s' ees and costs in having

27 _____

28 [1] Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Motion.

LARSON ZIRZOW & KAPLAN, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

to file and prosecute the Motion, pursuant to 11 U.S.C. §§ 105(a) and/or 362(k), and/or the Court's

inherent power to enforce its orders, to the extent applicable.

4.      The JAMS Parties shall respond to this Order to Show Cause by

July 12, 2018, Mr. Randazza shall file any reply to such response by

July 26, 2018, and the Court shall hold a hearing on the Motion on July 31, 2018 at 1:30 p.m..

**IT IS SO ORDERED.**

PREPARED AND SUBMITTED:

By:    /s/ Matthew C. Zirzow
LARSON ZIRZOW & KAPLAN, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
850 E. Bonneville Ave.

Attorneys for Debtor

# # #

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LARSON ZIRZOW & KAPLAN, LLC**
**850 E. Bonneville Ave.**
**Las Vegas, Nevada 89101**
**Tel: (702) 382-1170  Fax: (702) 382-1169**

3

# EXHIBIT 12

Randazza CLE Presentation

# Ethical Considerations

You might be surprised at what violates Rule 1.8



RANDAZZA
LEGAL GROUP

# EXHIBIT 13

Declaration of Jay M. Wolman

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

---

## DECLARATION OF JAY M. WOLMAN

I, Jay M. Wolman, hereby declare as follows:

1.     I am over the age of 18 years and have never been convicted of a crime involving fraud or dishonesty.

2.     The facts set forth in this declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.     I am an attorney with Randazza Legal Group, PLLC ("RLG"), and I am admitted to, and in good standing with, the bars of the State of New York, the District of Columbia, the Commonwealth of Massachusetts, and the State of Connecticut, as well as numerous federal district and appellate courts.

4.     I represent Defendants in related litigation brought by other Sandy Hook families and one FBI agent in the State of Connecticut.

5.     I am a religiously observant Jew, and I regularly observe Jewish religious traditions and holidays.

6.     I have known Attorney Marc J. Randazza for over 20 years. We went to law school together, and we have worked at the same firm for over 6 years.

7.     At no point have I known Mr. Randazza to make any statement or engage in any conduct that I could characterize as anti-Semitic. I cannot see how anyone could reasonably believe in good faith that any of his statements or conduct could even potentially be anti-Semitic.

8.     I am fully aware of Mr. Randazza's litigation history with Roca Labs and its principal, Don Juravin, and I have worked with Mr. Randazza in multiple cases against them. At no time have I observed Mr. Randazza to have engaged in unethical behavior, though Juravin has repeatedly made spurious accusations against Mr. Randazza in an attempt to gain a litigation advantage.

9.     Like many attorneys, I use the Twitter social media platform, and I

2

routinely interact with other attorneys across the country on that platform.

10.  In May 2017, I became acquainted with the Twitter account "@RespectableLaw." Upon information and belief, that is the same month the account was created.

11.  On or about September 24, 2017, after reviewing information he published to his followers, I observed that Mark Bankston (who is now Plaintiffs' counsel), was the operator of the said Twitter account "@RespectableLaw." Mr. Bankston confirmed his status as the operator.  On or about April 18, 2018, he extended an invitation to me to get together when he would be in Newtown, Connecticut, to visit one of his clients.

12.  I virtually met and engaged with Mr. Bankston on Twitter before I was hired by Defendants and before this litigation or the related Connecticut litigation was filed.

13.  Mr. Randazza and RLG have always accommodated my religious observance, including my Sabbath and holiday observances where I do not work.

My name is Jay Marshall Wolman, my date of birth is February 2, 1976, and my business address is 100 Pearl Street, 14th Floor, Hartford, Connecticut, 06103, United States. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford County, State of Connecticut, on this 29ᵗʰ day of July, 2021.

Jay M. Wolman

3

# EXHIBIT 14

Declaration of Cassidy S. Curran
*Postle v. Brill*

Marc J. Randazza, SBN 269535
Alex J. Shepard, SBN 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive Suite 109
Las Vegas, NV 89117
Telephone: (702) 420-2001
Email: ecf@randazza.com

*Attorneys for Defendant,*
*Veronica Brill*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| **Michael Postle,** an individual;<br><br>Plaintiff,<br><br>vs.<br><br>**Veronica Bill,** an individual; **ESPN, Inc.,** a Delaware Corporation; **Joey Ingram**, an individual; **Haralabos Voulgaris**, an individual; **Daniel Negreanu**, an individual; **Upswing Poker, Inc.,** a Nevada Corporation; **iBus Media Limited d/b/a "PokerNews"**, and Isle of Man, United Kingdom Private Limited Liability Company Parent; **Jonathan Little Holdings LLC, d/b/a "Poker Coaching"**, a Nevada Limited Liability Company; **Solve For Why Academy LLC**, a Nevada Limited Liability Company; **Todd Witteles**, an individual; **Run It Once, Inc.,** a Nevada Corporation; and **DOES 1** through **1,000**, inclusive;<br><br>Defendants. | Case No. 34-2020-00286265<br><br>**DECLARATION OF CASSIDY S. CURRAN**<br><br>Action Filed: 10/01/2020<br>Trial Date:    Not Yet Set |

I, Cassidy S. Curran, declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty.

---

- 1 -
Declaration of Cassidy S. Curran

2.      The facts set forth in this Declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.      I am a Legal Assistant and Paralegal employed at Randazza Legal Group, PLLC ("RLG").

4.      On March 17, 2021, I was located in the same office as Attorney Randazza.

5.      Attorney Randazza, in preparing for his call with Mr. Postle, asked me to carefully listen to his portion of their phone conversation, as Mr. Postle was not represented by counsel, and Attorney Randazza wanted to be extremely careful in his discussion.

6.      This is our common practice unless I am asked to leave the room for a confidential conversation, as Attorney Randazza and I share an office, divided only by cubicle walls, and I actively listen to his phone conversations when deadlines and next steps of a case will be discussed to ensure we do not overlook a deadline or task and to ensure a level of familiarity with his work and projects.

7.      I could not hear Mr. Postle's portion of the phone conversation.

8.      It appeared that Attorney Randazza was speaking to two people, but I was not aware that Alexandrea Merrell was the third party present on the call until Attorney Randazza stated such afterwards.

9.      I am aware that Mr. Postle and Attorney Randazza spoke regarding the continuance of the Anti-SLAPP hearings, and Attorney Randazza agreed to 60 days.

10.     At no time during this call did I hear Attorney Randazza state "you're a fucking cunt" or "you fucking bitch."  Had I overheard the use of the word "cunt" I would have taken note of this or shared my discomfort and concern with Attorney Randazza or our Human Resources department.

11.     I did hear Attorney Randazza tell someone to "shut the fuck up" and he also called someone "a fucking liar."

12.     It was not until after the call that Attorney Randazza stated that he made those comments due to the phone parties speaking over each other, and Ms. Merrell constantly interrupting the ongoing conversation, and trying to take control of the conversation.

13.    He explained that he called Ms. Merrell a "fucking liar" because she had previously claimed that Attorney Mark Bankston would be participating in the case, but he had made a call to Mr. Bankston, who said that this was not true and he did not know who Mike Postle was.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: June 14, 2021.

*Cassidy Curran*

_____

Cassidy S. Curran

# EXHIBIT 15

Declaration of Cassidy S. Curran
Authenticating Exhibits

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |
| | § | 459th  DISTRICT COURT |
| | § | |

# DECLARATION OF CASSIDY S. CURRAN

I, Cassidy S. Curran, hereby declare as follows:

1.      I am over the age of 18 years and have never been convicted of a crime involving fraud or dishonesty.

2.      The facts set forth in this declaration are within my personal knowledge and are true and correct to the best of my knowledge and belief.

3.      I am a paralegal with Randazza Legal Group, PLLC ("RLG").

4.      On July 29, 2021 at approximately 5:10 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an October 4, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1312927581260394496>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit A.

5.      On July 29, 2021 at approximately 5:16 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an August 28, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1299466941061632000>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit B.

6.      On July 29, 2021 at approximately 5:17 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a November 10, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1193779142510157824>. Immediately

after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit C.

7.      On July 29, 2021 at approximately 5:18 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an August 4, 2018 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1025810554399727616>.  Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit D.

8.      On July 29, 2021 at approximately 5:19 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a January 10, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1083449803936329728>.  Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit E.

9.      On July 29, 2021 at approximately 5:20 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an October 29, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1321981292683104258>.  Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit F.

3

10.    On July 29, 2021 at approximately 5:20 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an October 8, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1181467917138976768>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit G.

11.    On July 29, 2021 at approximately 5:21 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a January 26, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1221600377994448900>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit H.

12.    On July 29, 2021 at approximately 5:22 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a September 28, 2018 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1045887134505336832>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit I.

13.    On July 29, 2021 at approximately 5:23 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a

4

September 29, 2018 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1045936859535364096>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit J.

14. On July 29, 2021 at approximately 5:24 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a September 6, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1170056549357817862>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit K.

15. On July 29, 2021 at approximately 5:24 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a December 31, 2018 tweet by @RespectableLaw located at the url < https://twitter.com/RespectableLaw/status/1079858807193391105>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit L.

16. On July 29, 2021 at approximately 5:25 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a July 20, 2021 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1417655473885614085>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to

PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit M.

17. On July 29, 2021 at approximately 5:26 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an October 4, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1180230065877073920>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit N.

18. On July 29, 2021 at approximately 5:27 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a June 13, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1271977717978804224>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit O.

19. On July 29, 2021 at approximately 5:28 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an April 15, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1117899754149597186>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit P.

6

20.    On July 29, 2021 at approximately 5:28 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a March 17, 2019 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1107457979366981633>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit Q.

21.    On July 29, 2021 at approximately 5:29 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to an August 13, 2018 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1029128026813067264>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit R.

22.    On July 29, 2021 at approximately 5:30 p.m. EDT, while at the Massachusetts office of RLG and using a Macbook Air laptop and the Google Chrome internet browser, I visited the website <twitter.com> and navigated to a January 21, 2020 tweet by @RespectableLaw located at the url <https://twitter.com/RespectableLaw/status/1219721879939960832>. Immediately after viewing this tweet, I took a screen capture of it using Google Chrome's print to PDF function. A true and correct copy of this screen capture is attached to this Declaration as Exhibit S.

My name is Cassidy Sarah Curran, my date of birth is March 7, 1996, and my business address is 30 Western Avenue, Gloucester, Massachusetts 01930, United States. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Essex County State of Massachusetts, on this 29th day of July, 2021.

_____

Cassidy S. Curran

8

# EXHIBIT A

October 4, 2020, tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "I have zero respect for the Secret Service. Fuck every single one of those guys. If you think there are good Secret Ser…

Twitter

# Explore

⚙ Settings

← **Thread**

**Respectable Lawyer**
@RespectableLaw

I have zero respect for the Secret Service. Fuck every single one of those guys. If you think there are good Secret Service agents, sorry, you are wrong.

> 🔵 **Bakari Sellers** @Bakari_Sellers · 4 Oct 2020
> I have so much respect for the Secret Service, bc I would've just tossed Trump the keys and showed him where I parked.

9:28 pm · 4 Oct 2020 · Twitter Web App

**125** Retweets    **6** Quote Tweets    **2,106** Likes

💬          ↻          ♡          ⬆

**Respectable Lawyer** @RespectableLaw · 4 Oct 2020
Replying to @RespectableLaw
The career path, disposition, and ideology required to be offered a job protecting the president means every last one of them is a deranged mutant freak.

💬 24          ↻ 39          ♡ 1.2K          ⬆

**st. vincent-st. marys grad** @StVincentGrad23 · 4 Oct 2020
Replying to @RespectableLaw
What about the guys who just hunt down counterfeit money

💬 1          ↻          ♡ 2          ⬆

**Matt Clark** @MrGoldendeal1 · 4 Oct 2020
Replying to @RespectableLaw
Secret Service were some of the ones beating the shit out of protestors

💬          ↻          ♡ 64          ⬆

**Jack Liu** @baconradar · 4 Oct 2020
Replying to @RespectableLaw
ACAB, but especially the potus goon squad.

💬          ↻          ♡ 59          ⬆

🔥🔥 **Even more Premium Rankings** 🔥🔥 @VicNobu · 4 Oct 2020
Replying to @RespectableLaw
If it was such a secret how come we always know who they are? They're not even good at their jobs

💬 1          ↻          ♡ 36          ⬆

Show replies

**That Tweet that I Himbroned** @CharlieWBrennan · 4 Oct 2020
Replying to @RespectableLaw
Jar-head robots whose icy dads beat them.

💬          ↻          ♡ 4          ⬆

This Tweet is from a suspended account. Learn more

**riley bunchofnumbers** @ryaitch · 5 Oct 2020

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own per

Sign up

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Bakari Sellers** ✓
@Bakari_Sellers
Former SC House o
@CNN @StromLaw
Bestseller "My Vani
stores now.

**What's happening**

COVID-19 · LIVE
**People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say**

Television · LIVE
**BBNaija: All the action from house** 🟢🟢
Trending with Maria, Beatrice

Celebrities · Trending
**Jared Leto**
A first look at Jared Leto's tr his role in the upcoming film has sparked conversation
19.3K Tweets

Ⓥ Variety ✓ · 2 hours ago
**Scarlett Johansson sues D over 'Black Widow' stream release**
Trending with Scarlett Johanss ScarJo

COVID-19 · LIVE
**COVID-19: News and upda for Massachusetts**

Show more

Terms of Service  Privacy Polic
Ads info  More ···  © 2021 Twi

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

Explore

Settings

Search Twitter

**Anarcho-Feudalist** @jermergerg · 4 Oct 2020
Replying to @RespectableLaw
The secret service agents who Trump exchanged covid particles with in that cramped car during his vanity ride almost certainly voted for him so it's very very funny that he's giving them covid in return.

56

**blank** @Hail_the_Fist · 4 Oct 2020
Replying to @RespectableLaw
literally the praetorian guard of the american empire

1          7

This Tweet was deleted by the Tweet author. Learn more

**Reign** @Reignstradamus · 4 Oct 2020
When we say ACAB we mean it.

4

**hexhunter** ✝🏴 @hexhunter · 4 Oct 2020
Replying to @RespectableLaw
Secret Service, covering up their latest incident:

> **wint** @dril · 9 May 2014
> drunk driving may kill a lot of people, but it also helps a lot of people get to work on time, so, it;s impossible to say if its bad or not,

4

**Aranock, 4 of Ravens** @Aranock1 · 4 Oct 2020
Replying to @RespectableLaw
Also they did this:

> **Josh Stewart** @JoshDStewart · 23 Aug 2017
> The U.S. Secret Service is advertising on Breitbart. Is this a thing?

5

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# EXHIBIT B

August 28, 2020,  tweet by Mark Bankston

29/07/2021                         Respectable Lawyer on Twitter: "Because fuck them, that's why." / Twitter



Respectable Lawyer on Twitter: "Because fuck them, that's why." / Twitter

# Explore

⚙ Settings

🔍 Search Twitter



💬    ⟲ 1    ♡ 177    ⬆

**The Wizard of Whoopie** @TJEBergen · 28 Aug 2020    ⋯
Replying to @RespectableLaw
"won't anyone think of the complacent olds???"

💬    ⟲    ♡ 60    ⬆

**Rohan** @Fine_Feels · 28 Aug 2020    ⋯
Replying to @RespectableLaw
Don't base your political action around what simply feels good and cathartic.

💬 2    ⟲    ♡ 1    ⬆

**Christine VH** @CVHarrold · 28 Aug 2020    ⋯
Replying to @RespectableLaw
The Covington kid got in an old Veterans face. That's ok though.

💬 1    ⟲ 2    ♡ 70    ⬆

**Snapchat me says ''yello''** @th_hplss_rollr · 29 Aug 2020    ⋯
I mean pretty sure it was the other way round

💬 1    ⟲    ♡ 1    ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

[ Log in ]    S

# EXHIBIT C

November 10, 2019,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@KrangTNelson Fuck me, that was two years ago. Feels like yesterday we had that guy to kick around. https://t.co/m...





# <u>EXHIBIT D</u>

August 4, 2018,  tweet by Mark Bankston

29/07/2021    Respectable Lawyer on Twitter: "@spencer12281 @RealCandaceO @nytimes @sarahjeong "Stop being such a jew about it" https://t.co/rVMVo95BX…



29/07/2021          Respectable Lawyer on Twitter: "@spencer12281 @RealCandaceO @nytimes @sarahjeong "Stop being such a jew about it" https://t.co/rVMVo95BX…



Show replies

FIREBEARD🧔🖐 @fesso667 · 4 Aug 2018

Replying to @RespectableLaw @spencer12281 and 3 others

When I read the words  Rick Nayman the voice in my head sounds like Matt Damon in Team America.

GIF

Matt Damon!

💬 1          🔁          ♡ 2          ↗

Show replies

This Tweet was deleted by the Tweet author. Learn more

Show replies

Show more replies

Search Twitter

ScarJo

Entertainment · Trending
**Hawkeye**
66.5K Tweets

Sports · Trending
**Westbrook to the Lakers**
4,485 Tweets

COVID-19 · LIVE
**COVID-19: News and upda**
**for Massachusetts**

Show more

Terms of Service   Privacy Polic
Ads info   More ···   © 2021 Twi

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# EXHIBIT E

January 10, 2019,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "Steve King is back in the news, so here is a ‡ashback to my dogged attempts to have the noble congressman impregn…



29/07/2021          Respectable Lawyer on Twitter: "Steve King is back in the news, so here is a ‡ashback to my dogged attempts to have the noble congressman impregn…



Explore

Settings

**Respectable Lawyer** 🔒 @RespectableLaw · 24 Nov 2017
Maybe you or your staff missed my request, which I politely raised in one of your recent tweets:

**Respectable Lawyer** 🔒 @RespectableLaw
Representative King, my wife and I live in Iowa's 4th District and we are unable to have children.

💬 2          ⟲ 11          ♡ 218          ⬆

**Respectable Lawyer** @RespectableLaw · 10 Jan 2019          •••

💬 3     ⟲ 9     ♡ 191

**Respectable Lawyer** 🔒 @RespectableLaw
Replying to @RespectableLaw @SteveKingIA

Please have someone on your staff DM me, and God protect you and your family's shopping on this blessed Black Friday.

3:20 PM · 24 Nov 2017

6 Retweets  159 Likes

💬 3          ⟲ 8          ♡ 212          ⬆

**Respectable Lawyer** @RespectableLaw · 10 Jan 2019          •••

**Respectable Lawyer** 🔒 @RespectableLaw
Replying to @SteveKingIA

Representative King, as a proud resident of Iowa's 4th District, I could not agree with you more, and it is for this reason that I am again compelled to ask for your assistance in impregnating my sweet Caucasian wife.

9:10 PM · 26 Nov 2017

44 Retweets  395 Likes

💬 1          ⟲ 5          ♡ 192          ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

https://twitter.com/RespectableLaw/status/1083449803936329728                    2/4

Respectable Lawyer on Twitter: "Steve King is back in the news, so here is a ‡ashback to my dogged attempts to have the noble congressman impregn…

Explore

Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

Explore

Settings

Search Twitter

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# EXHIBIT F

October 29, 2020  tweet by Mark Bankston

29/07/2021                    Respectable Lawyer on Twitter: "@Cryptoterra I could tell you that Kanye made a hologram of Bob Kardashian and he made it tell Kim that his spirit …

# Explore

⚙ Settings

🔍 Search Twitter

**Respectable Lawyer** @RespectableLaw · 29 Oct 2020 ···
For my birthday, Kanye got me the most thoughtful gift of a lifetime. A special surprise from heaven. A hologram of my dad. It is so lifelike! We watched it over and over, filled with emotion.



💬 12        🔁 58        ♡ 1.3K        ⬆

**Bris Angel** @Cryptoterra · 29 Oct 2020

← **Tweet**

**Respectable Lawyer** ···
@RespectableLaw

Replying to @Cryptoterra

I could tell you that Kanye made a hologram of Bob Kardashian and he made it tell Kim that his spirit is always around whenever her pussy farts and that he is so proud she married the greatest genius in the world but you wouldn't believe any of that.

9:04 pm · 29 Oct 2020 · Twitter for iPhone

**2 Retweets  1 Quote Tweet  31 Likes**

💬        🔁        ♡        ⬆

**Bris Angel** @Cryptoterra · 29 Oct 2020        ···
Replying to @RespectableLaw
anything I see like 10 people tweet verbatim is real and I will not investigate further

💬        🔁        ♡ 5        ⬆

**Spooky & Sexy** @LestradeMorgan · 29 Oct 2020        ···
Replying to @RespectableLaw and @Cryptoterra
unfortunately I would believe all of that because we live in a hell world

💬        🔁        ♡ 2        ⬆

**Bby⁷** @Exluansis · 29 Oct 2020        ···
Replying to @RespectableLaw
I need a fucking drink.

💬        🔁        ♡        ⬆

**Hayden Gordon** @HaydenRGordon · 30 Oct 2020        ···

**New to Twitter?**
Sign up now to get your own per

**Sign up**

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Bris Angel**
@Cryptoterra
microphone check

**What's happening**

COVID-19 · LIVE
People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say

⊘ Variety ✓ · 2 hours ago
Scarlett Johansson sues D over 'Black Widow' stream release

Trending with Scarlett Johansso Scar Jo

**Don't miss what's happening**
People on Twitter are the first to know.

Log in      S

https://twitter.com/RespectableLaw/status/1321981292683104258                                     1/2

**Explore**

**Settings**

Search Twitter

Trending in United States
**#BeforeJulyIsOver**

COVID-19 · LIVE
**COVID-19: News and upda for Massachusetts**

Show more

Terms of Service   Privacy Polic
Ads info   More ···   © 2021 Twit

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# EXHIBIT G

October 8, 2019,   tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "Because I am kind to everybody, and that's true whether you brush your hair differently than me, or if you like pineap…

# Explore

⚙ Settings

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
Some of you may have seen video of me at the Cowboys game sitting
next to Jared Fogle, the guy from the Subway ads who molested children.
Here's the whole story.

💬 66          🔁 1.8K          ♡ 10.1K          ⬆

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
First, I want to emphasize that the tickets were given to me by a friend
who is very rich, and that the seats were very fancy. It's very important
you keep that in mind.

💬 1          🔁 70          ♡ 2.5K          ⬆

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
Second, I was there primarily to visit I with my very rich friend, not Jared
Fogle.

💬 2          🔁 42          ♡ 2K          ⬆

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
Yes, I did take a cutesy cell phone video with Jared Fogle, and yes, I
shared a few laughs with the famous pedophile, BUT, and here is the
important part:

← **Thread**

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
It's only because I am better than you and more morally praiseworthy, and
being nice to Jared Fogle proves that.

💬 3          🔁 70          ♡ 2.4K          ⬆

**Respectable Lawyer**
@RespectableLaw                          ···

Replying to @RespectableLaw

## Because I am kind to everybody, and that's true whether you brush your hair differently than me, or if you like pineapple on pizza, or if you rape children.

3:14 am · 8 Oct 2019 · Twitter for iPhone

**77** Retweets    **4** Quote Tweets    **2,455** Likes

💬          🔁          ♡          ⬆ Share

**Respectable Lawyer** @RespectableLaw · 8 Oct 2019  ···
Replying to @RespectableLaw
In short, I sat in a private luxury box with Jared Fogle for the good of the
country, as opposed to your ugly, divisive, divide and conquer, win at any
cost brand of politics.

💬 38          🔁 131          ♡ 3K          ⬆

**Derek Ahlswede** @derekahlswede · 8 Oct 2019  ···
Replying to @RespectableLaw
This is the best thread ever

💬          🔁          ♡ 1          ⬆

**Steve** @graymagiker · 9 Oct 2019  ···
Replying to @RespectableLaw
But are you a packers or cowboys fan?

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own per

**Sign up**

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**What's happening**

COVID-19 · LIVE
People should still get
vaccinated even if they've
already had COVID-19, hea
agencies and medical expe
say

Variety ✓ · 2 hours ago
Scarlett Johansson sues D
over 'Black Widow' stream
release
Trending with Scarlett Johanss

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

29/07/2021   Respectable Lawyer on Twitter: "Because I am kind to everybody, and that's true whether you brush your hair differently than me, or if you like pineap…



Replying to @RespectableLaw
Unroll please @threadreaderapp

1

**Thread Reader App** @threadreaderapp · 9 Oct 2019
Hallo there is your unroll: Thread by @RespectableLaw: "Some of you may have seen video of me at the Cowboys game sitting next to Jared Fogle, the guy from the Subway ads who m [...]"
threadreaderapp.com/thread/1181467…
Share this if you think it's interesting. 🤖

| |
| --- |
| 📰 Thread by @RespectableLaw: "Some of you may … Thread by @RespectableLaw: "Some of you may have seen video of me at the Cowboys game … 🔗 threadreaderapp.com |

Show more replies

Search Twitter

Instagram Story
25.2K Tweets

COVID-19 · Last night
**Health experts discuss the CDC's updated mask guida…**
Trending with  Marco

COVID-19 · LIVE
**COVID-19: News and upda…**
**for Massachusetts**

Show more

Terms of Service   Privacy Polic…
Ads info   More ···   © 2021 Twit…

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   S…

# EXHIBIT H

January 26, 2020  tweet by Mark Bankston



# EXHIBIT I

September 28, 2018,  tweet by Mark Bankston

29/07/2021                    Respectable Lawyer on Twitter: "@Kennyright2 @AtticusGF Well, let's assume for a moment that Brett had some bromantic experimentation in those …

Explore

Settings

Search Twitter

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
In short, the American people are entitled to know **beyond all reasonable doubt** that a lifetime appointee to the highest instrument of law is not a liar with a history of being a disgusting sex pest.

💬 8          🔁 179          ♡ 1.2K          ⬆️

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
And so I'm not saying every allegation is disqualifying, but if a substantial number of fair-minded people have doubts about the appointee's integrity, they should be withdrawn.

💬 8          🔁 72          ♡ 798          ⬆️

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
There are literally thousands of people who could competently fill the role and who are also free from significant public doubt about their integrity.

💬 9          🔁 92          ♡ 911          ⬆️

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
At this point, to support Kavanaugh is to support the idea that it's fine and healthy for a substantial portion of America to have reasonable doubts about the fitness and honesty of a Supreme Court Justice.

💬 6          🔁 213          ♡ 1.1K          ⬆️

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
And you may disagree the standard should be quite that high. Maybe you want something higher, like "probable cause." And I think that's fair. But the idea that Kavanaugh must be proven guilty, or even beyond a preponderance of the evidence, is just insane.

💬 8          🔁 55          ♡ 810          ⬆️

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018          ···
But in the end, this "burden of proof" stuff should be academic lawyer talk. Because that guy lied to our faces.

Devil's Triangle is not a drinking game.
Boofed is not farting.

He lied. I know it. You know it. They know it. Dogs know it.

💬 49          🔁 402          ♡ 2.2K          ⬆️

This Tweet was deleted by the Tweet author. Learn more

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          

https://twitter.com/RespectableLaw/status/1045887134505336832                    1/3



# Explore

⚙ Settings

intoxicated."

Weirdly enough, among junkie subculture, "to boof" means to take drugs anally. But the past tense usage would be an active verb vs. passive, e.g., "I just boofed some dope" vs. "I got boofed."

🔁 1          ♡ 3

This Tweet was deleted by the Tweet author. Learn more

**Respectable Lawyer** @RespectableLaw · 28 Sep 2018
Check the whole entry as there as more than one definition. And as I mentioned, it can also mean shoving something into your butt. But in the context of Brett talking about hanging out with his male friends, I reallllly doubt it's anal sex.

> **Urban Dictionary: Boofed**
> https://www.urbandictionary.com/define.php?term=Boofed ▾
> extremely drunk, derived from the boof box of beer from milwaukee, which was a ton of beer at an insanely low price. usually coincides with stumbling and …

🔁          ♡ 2

← **Tweet**

**Respectable Lawyer** @RespectableLaw

Well, let's assume for a moment that Brett had some bromantic experimentation in those days. I really don't think they're going to be writing yearbook notes to each other about the secret anal sex they had. After all, it was Brett who "got boffed."

12:04 am · 29 Sep 2018 · Twitter Web Client

**3** Likes

This Tweet was deleted by the Tweet author. Learn more

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018
It would be cool if it was tho

🔁          ♡ 2

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own per

**Sign up**

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Atticus Goldfinch**
@AtticusGF
communications st
you idiots. bully wit

**What's happening**

COVID-19 · LIVE
People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say

Ⓥ **Variety** ✓ · 2 hours ago
Scarlett Johansson sues D over 'Black Widow' stream release
Trending with Scarlett Johanss

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

# <u>EXHIBIT J</u>

September 29, 2018,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@DRomATX @urbandictionary So unless these guys plugging heroin up their butts, the phrase "have you boffed yet…

**Explore**

**Settings**

🔍 Search Twitter



**Daniel Romero** @DRomATX · 29 Sep 2018          ···
Both? Don't be dense.

💬 1          ↻          ♡          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ···
Well, I guess because "I'm dense", I'll have to plow through both terms and every definition listed in urban dictionary. Ok Daniel. Let's do this but I'm sending you an invoice at the end, ok?

💬 2          ↻          ♡ 24          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ···
The term "Devil's Triangle" has seven listed definitions on urban dictionary. The first, added ten years ago and with more than 1800 upvotes, is "a threesome with 1 woman and 2 men."

💬 1          ↻ 2          ♡ 13          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ···
The second, third, fourth, and fifth definitions are all variations of jokes about Kavanaugh, making fun of his lame excuse. All were added on September 27, 2018.

💬 1          ↻          ♡ 17          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ···
The sixth definition, added February 2011, claims it is "NOT A THREESUM WITH TWO GUYS," but instead using rough language to say it means penetration of all three major orifices. It was heavily downvoted.

💬 1          ↻          ♡ 9          ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

29/07/2021          Respectable Lawyer on Twitter: "@DRomATX @urbandictionary So unless these guys plugging heroin up their butts, the phrase "have you boffed yet…

Explore

Settings

which is true. It's a Latin American usage and typically in Spanish, though not always. Not exactly relevant for our purposes, though.

💬 1          🔁          ♡ 10          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
So, I'm not sure what you're getting at or what you're even asking when it comes to this term, but that must be because I am dense. I don't even know which of those definitions you're citing. But those are the definitions.

💬 1          🔁          ♡ 16          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
So yeah, it means a MMF threesome. Moving on to "boofed"…

💬 2          🔁 1          ♡ 19          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
The first definition was added in 2004, and it means to have anal sex. It was upvoted over 1400 times.

💬 2          🔁          ♡ 9          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
The second definition, added in February 2018, says the term is also short for "buttf**ked", and that it relates to consuming alcohol or drugs through the anus.

💬 1          🔁          ♡ 6          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
The third definition, added in November 2009, means "totally spun out of your mind" or "high on meth." It got about 50 upvotes and 50 downvotes.

💬 1          🔁          ♡ 6          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
The fourth definition, added in July 2005, means "extremely drunk, derived from the boof box of beer from Milwaukee." It has about 60 upvotes and 60 downvotes. Likely a regional thing but who knows?

💬 1          🔁          ♡ 7          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
The fifth definition means "high from smoking weed". The sixth is "to…

← **Tweet**

💬 1          🔁          ♡ 5          ⬆

**Respectable Lawyer**          ⋯
@RespectableLaw

Replying to @RespectableLaw, @DRomATX and @urbandictionary

So unless these guys plugging heroin up their butts, the phrase "have you boffed yet?" means anal sex.

3:22 am · 29 Sep 2018 · Twitter Web Client

**1** Retweet   **7** Likes

💬          🔁          ♡          ⬆

**Respectable Lawyer** @RespectableLaw · 29 Sep 2018          ⋯
Replying to @RespectableLaw, @DRomATX and @urbandictionary
So, is there any particular point or question you had about any of these fourteen various definitions that I was supposed to mind-read, or did I just completely waste my time? Because I'm pretty sure I just wasted my time

🔍 Search Twitter

**New to Twitter?**

Sign up now to get your own per

[Sign up]

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Daniel Romero**
@DRomATX
Nobody #Crypto ne

**Don't miss what's happening**
People on Twitter are the first to know.

[Log in]   [S

29/07/2021          Respectable Lawyer on Twitter: "@DRomATX @urbandictionary So unless these guys plugging heroin up their butts, the phrase "have you boffed yet…

**Daniel Romero** @DRomATX · 29 Sep 2018          ···

The point is the definition to these was more succinctly defined by urban dictionary...which probably had more credence than wiki-fucking-pedia than any other source.

Anyone wishing to obfuscate the true definition of these terms didn't cover their bases at all. I'm with U 1/1

Search Twitter

bot will tweet you th
Dictionary definitio

**What's happening**

COVID-19 · LIVE
**People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say**

**Variety** · 2 hours ago
**Scarlett Johansson sues D over 'Black Widow' strea release**
Trending with  Scarlett Johanss
ScarJo

Sports · Trending
**Rob Pelinka**

Celebrities · Trending
**Jared Leto**
A first look at Jared Leto's tr
his role in the upcoming film
has sparked conversation
19.6K Tweets

COVID-19 · LIVE
**COVID-19: News and upda for Massachusetts**

Show more

Explore

Settings

Terms of Service   Privacy Polic
Ads info   More ···   © 2021 Twit

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

# EXHIBIT K

September 6, 2019,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@NickRekieta Hey man I gave $7000 to your GoFundMe and you showed up to court in a cheap suit and sneakers. T…



# EXHIBIT L

December 31, 2018, tweet by Mark Bankston



🐦

\# **Explore**

⚙ **Settings**

🔍 Search Twitter

💬 1          ⟲          ♡ 35          ⬆

**Chrisi, Livable Climate Enthusiast** @chrisiousity · 31 Dec 2018          ···
As a parent, I only wish I believed that all the youth did today was politics and pronouns.

💬          ⟲          ♡ 7          ⬆

**they call me bruce** @ringtrick · 31 Dec 2018          ···
Replying to @RespectableLaw
And yet



These individuals were grouped into cohorts by the decade in which they were born.

Opinion: Millennials are having less sex than any generation in 60 ye…
I spent most of yesterday morning mulling over Tara Bahrampour's article in the Washington Post headline "'There isn't really anything…
🔗 latimes.com

💬 1          ⟲          ♡          ⬆

Show replies

**John Clavis** @johnclavis · 31 Dec 2018          ···
Replying to @RespectableLaw
It'd be hard for him to more explicitly articulate an out-of-touch "I don't understand kids today" attitude than he already has.

💬          ⟲          ♡ 12          ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

# <u>EXHIBIT M</u>

July 20, 2021,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@ksorbs Kevin my six year old son is dying from a type of tuberculosis cancer (or possibly COVID-19, not sure) and…

𝕏 Twitter

# Explore

⚙ Settings

**Kevin Sorbo** ✔ @ksorbs · 20 Jul                                    ···
i'm not proud of this but i just made a scene in public for the first time in
my life. I walked into Starbucks and they asked me to put a mask on.  I
yelled this is BS. I turned around and walked out. I know what you're
thinking - My first mistake was walking into a Starbucks!

← **Tweet**

**Respectable Lawyer**                                               ···
@RespectableLaw

Replying to @ksorbs

Kevin my six year old son is dying from a type of
tuberculosis cancer (or possibly COVID-19, not sure) and
his last wish is to do a series of Brazillian jujitsu strikes on
your nutsack, who do I need to call to make this happen?

9:19 pm · 20 Jul 2021 · Twitter Web App

**157** Retweets   **14** Quote Tweets   **5,858** Likes

💬          🔁          ♡          ⬆

♦ **C O N S U M E** ♦ @OminousBeeping · 20 Jul                        ···
Replying to @RespectableLaw and @ksorbs
BJJ doesn't have striking 😂😂😂
💬 7          🔁          ♡ 25          ⬆

**Respectable Lawyer** @RespectableLaw · 20 Jul                      ···
That's the kind of hilarious thing losers like you say right before my
beautiful dying six year old son Gordon wails on their nutsack using
precision timed Brazillian jujitsu strikes.
💬 6          🔁 8          ♡ 572          ⬆

Show replies

**Mary Sloan** @trueheart39 · 21 Jul                                 ···
Replying to @RespectableLaw and @ksorbs
'Respectable Lawyer' there is no way he knew about your child and the
CDC stated that it isn't mask mandatory to wear them inside. Prayers for
healing for your son and at 6 yo, they don't have any idea what Brazilian
Jujitsu is). Don't teach him hate.
💬 36          🔁 3          ♡ 58          ⬆

**Respectable Lawyer** @RespectableLaw · 21 Jul                      ···
You know Mary, I think it's really SHAMEFUL how you would deny the
dying wish of my beautiful son Gordon who KNOWS AT LEAST SIX
different types of Brazilian jujitsu strikes.
💬 4          🔁 2          ♡ 283          ⬆

Show replies

**molly conger** @socialistdogmom · 21 Jul                          ···
Replying to @RespectableLaw and @ksorbs
this is a beautiful wish and i hope kevin can help gordon find some peace
in his final days. surely hercules is as brave and generous as this cop?

🔍 Search Twitter

**New to Twitter?**

Sign up now to get your own per

**Sign up**

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Kevin Sorbo** ✔
@ksorbs
Actor, director, see
Click the link to see

**What's happening**

COVID-19 · LIVE
**People should still get
vaccinated even if they've
already had COVID-19, hea
agencies and medical expe
say**

ⓥ Variety ✔ · 2 hours ago
**Scarlett Johansson sues D
over 'Black Widow' stream
release**
Trending with Scarlett Johanss
ScarJo

Trending in United States
**AMZN**
135K Tweets

Music · Trending
**Chris Brown**
Chris Brown appears to add
controversy surrounding Da
Instagram Story
25.5K Tweets

COVID-19 · LIVE
**COVID-19: News and upda
for Massachusetts**

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

29/07/2021        Respectable Lawyer on Twitter: "@ksorbs Kevin my six year old son is dying from a type of tuberculosis cancer (or possibly COVID-19, not sure) and…



🐦

\#  **Explore**

⚙  **Settings**

🔍 Search Twitter

Watch a Teen Fulfill Her Dying Wish to Tase a Police Officer
These police officers came through.
🔗 teenvogue.com

💬 11          ↻ 40          ♡ 833          ⬆

⋮          **Show replies**

**CherylMMMM** @Cherylmmmm · 22 Jul
Replying to @RespectableLaw and @ksorbs
Prayers for your child, kind Sir🙏

💬          ↻          ♡          ⬆

**GACFamilyRocks!** @sam696979 · 22 Jul
Replying to @RespectableLaw and @ksorbs
My husband said call Zena warrior princess! Lol.

💬          ↻          ♡          ⬆

**LSD** @Lucie31424715 · 23 Jul
Replying to @RespectableLaw and @ksorbs
LMFAO!! Your kid rocks!

💬          ↻          ♡          ⬆

**Jennifer** @jholbert123 · 23 Jul
Replying to @RespectableLaw and @ksorbs
Is there a go fund me started to make this happen?

💬          ↻          ♡          ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

# EXHIBIT N

October 4, 2019,  tweet by Mark Bankston

29/07/2021  Respectable Lawyer on Twitter: "@Tolerance_haver @Emc2_Ted I'm just going to take a pill from InfoWars that makes me calm." / Twitter



# Explore

# Settings

**Respectable Lawyer** @RespectableLaw · 4 Oct 2019
AOC not arguing with the crazy lady saying we should eat babies means AOC is cool with eating babies.
103    165    3.4K

**Ted Haulley** @Emc2_Ted · 4 Oct 2019
You realize Candace Owens pretty much said that.
4    1    86

## ← Tweet

**Respectable Lawyer**
@RespectableLaw

Replying to @Tolerance_haver and @Emc2_Ted

I'm just going to take a pill from InfoWars that makes me calm.

5:15 pm · 4 Oct 2019 · Twitter Web App

**119** Likes

**Dave** @Tzelph · 4 Oct 2019
Replying to @RespectableLaw, @Tolerance_haver and @Emc2_Ted
They sure seem to make Alex Jones chill out.
17

This Tweet is from a suspended account. Learn more

🌶 **Saffi** 🟣 @SaffiEriksdottr · 4 Oct 2019
This is a fun read for people who hate David Brooks:
phillymag.com/news/2004/04/0...
2    1

Show replies

Search Twitter

### New to Twitter?
Sign up now to get your own per

Sign up

### Relevant people

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Ted Haulley**
@Emc2_Ted
Navy Reservist, his
fan and proud fathe

### What's happening

COVID-19 · LIVE
**People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say**

⓿ Variety ✓ · 2 hours ago
**Scarlett Johansson sues D over 'Black Widow' stream release**
Trending with Scarlett Johanss ScarJo

Music · Trending
**Chris Brown**
Chris Brown appears to add controversy surrounding Da Instagram Story
25.5K Tweets

Sports · Trending
**Beal**
8,430 Tweets

**Don't miss what's happening**
People on Twitter are the first to know.
Log in

# <u>EXHIBIT O</u>

June 13, 2020,  tweet by Mark Bankston

29/07/2021

Respectable Lawyer on Twitter: "@dan_flc I take InfoWars pills which make me calm." / Twitter



https://twitter.com/RespectableLaw/status/1271977717978804224

# EXHIBIT P

April 15, 2019,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@JA_Burton @G_eppler @MattWalshBlog Here's the thing about the stuff you hear on InfoWars: it's not real. That'...

Explore

Settings

**Matt Walsh** ✔ @MattWalshBlog · 15 Apr 2019
I don't understand how a fire of this magnitude could happen accidentally

💬 4.3K          ⟲ 2.1K          ♡ 8K

**Respectable Lawyer** @RespectableLaw · 15 Apr 2019
Normally I'd say that's because you're incredibly dumb, but in this case it's clear you're just being a disingenuous goon in the hopes of spreading a ridiculous conspiracy narrative to help feed the idiotic kayfabe of your manufactured culture war.

💬 98          ⟲ 232          ♡ 6.2K

This Tweet was deleted by the Tweet author. Learn more

**Respectable Lawyer** @RespectableLaw · 15 Apr 2019
You mean the Newsweek article from last month that discussed a single fire in a single church that all you paranoid chuds are freaking out about to support your weird rants? The explanation is that you're a twitchy freak.

💬 82          ⟲ 58          ♡ 3.8K

← **Tweet**

**Respectable Lawyer**
@RespectableLaw

Replying to @JA_Burton and @MattWalshBlog

Here's the thing about the stuff you hear on InfoWars: it's not real. That's not reality. That's some weird fantasy. It's made up.

5:17 pm · 15 Apr 2019 · Twitter for iPhone

29 Likes

**New to Twitter?**
Sign up now to get your own per

Sign up

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Matt Walsh** ✔
@MattWalshBlog
theocratic fascist, p
beekeeping influen

**What's happening**

COVID-19 · LIVE
**People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say**

Variety ✔ · 2 hours ago
Scarlett Johansson sues D over 'Black Widow' stream release

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

# <u>EXHIBIT Q</u>

March 17, 2019,  tweet by Mark Bankston





Andrew Bolt, who has himself peddled racist and xenophobic crap on his show, considered Southern and Molyneux to be too extreme and racist when he interviewed them.

💬 1          ⟲          ♡ 5          ⬆

This Tweet was deleted by the Tweet author. Learn more

**Respectable Lawyer** @RespectableLaw · 17 Mar 2019     •••
Honestly you little weirdo, it's not so much your affinity for wretched racists with brains full of rancid dishwater, it's the fact you said "InfoWars is alright," which is one of the most horrifyingly dumb things you could have ever said to me.

💬          ⟲          ♡ 3          ⬆

← **Tweet**

**Respectable Lawyer**     •••
@RespectableLaw

If you're asking for better outlets than InfoWars, the answer is LITERALLY ANY OTHER OUTLET. I'd line my chicken coop with the Daily Caller but it's basically Edward Murrow compared to InfoWars, you freak.

Also FYI Molyneaux and Pettibone are objectively, proudly, racist.

9:45 pm · 17 Mar 2019 · Twitter Web Client

**1** Retweet     **8** Likes

💬          ⟲          ♡          ⬆

This Tweet was deleted by the Tweet author. Learn more

⋮     Show replies

Search Twitter

**New to Twitter?**
Sign up now to get your own per

Sign up

**Relevant people**

**Respectable Lawy**
@RespectableLaw
Exclusively practici
redistribution of co
into the hands of w
exploiting rules the
for itself.

**Queranus** 🧟‍♂️🏴‍☠️🌹
@Queranus77
Your local GodEmp
INFJ. Pro-miscegen
Progressive. Nietzs
leftie. he/him. pans
#blacklivesmatter ✊

**Quatre-Vingt Dix**
@Jewthulhu
Lord Fem-Bitch | th
pronouns: not picky
If I block you I win a

**What's happening**

COVID-19 · LIVE
**People should still get vaccinated even if they've already had COVID-19, hea agencies and medical expe say**

💿 Variety ✓ · 2 hours ago
**Scarlett Johansson sues D over 'Black Widow' stream release**
Trending with Scarlett Johanss

**Don't miss what's happening**
People on Twitter are the first to know.

Log in     S

# EXHIBIT R

August 13, 2018,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@CillizzaCNN If you want to know why Alex Jones was able to thrive, look in the mirror you goofy parasite." / Twitter



# <u>EXHIBIT S</u>

January 21, 2020,  tweet by Mark Bankston

29/07/2021          Respectable Lawyer on Twitter: "@ShawnRobb3 @TomSteyer @BernieSanders Posting these fake quotes is just as bad as Alex Jones." / Twitter



## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55881084
Status as of 8/2/2021 4:28 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/30/2021 4:10:37 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/30/2021 4:10:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 7/30/2021 4:10:37 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 7/30/2021 4:10:37 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 7/30/2021 4:10:37 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 7/30/2021 4:10:37 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 7/30/2021 4:10:37 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/30/2021 4:10:37 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/30/2021 4:10:37 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/30/2021 4:10:37 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 7/30/2021 4:10:37 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/30/2021 4:10:37 PM | SENT |

Associated Case Party: Free Speech, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 55881084
Status as of 8/2/2021 4:28 PM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/30/2021 4:10:37 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/30/2021 4:10:37 PM | SENT |