**<u>EXHIBIT B  (contd.)</u>**

**Copy of All Filings with State Court**

9/15/2021 8:16 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Lisa Guerrero**

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

## PLAINTIFFS' MOTION FOR LEAVE TO SERVE NET WORTH DISCOVERY

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................... ii

LEGAL STANDARDS ......................................................................................... 1

    I.     Legal Standard for Net Worth Discovery .......................................... 1

    II.    Legal Standard for Punitive Damages in Defamation and IIED ............... 1

SUMMARY OF PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES ...................... 2

    I.     The *Pozner* Defamation Claim ....................................................... 3

    II.    The *Heslin* Defamation Claim ........................................................ 4

    III.   The *Pozner*, *Heslin*, and *Lewis* IIED Claims ................................ 5

ARGUMENT ..................................................................................................... 6

    I.     InfoWars Relied on Inherently Improbable Assertions ...................... 7

    II.    The Affidavits of Fred Zipp Support Reckless Disregard ..................... 8

          A.   Mr. Zipp's analysis of InfoWars' false claims about a blue-screen interview supports reckless disregard .............................. 9

          B.   Mr. Zipp's analysis shows how InfoWars' false claims about Neil Heslin were made with reckless disregard ........... 11

    III.   Alex Jones' Testimony Shows Reckless Disregard .......................... 13

    IV.   Paul Watson's Testimony Shows Reckless Disregard. ....................... 17

    V.    Robert Jacobson's Testimony Shows Reckless Disregard ................... 22

    VI.   InfoWars Intentionally Harmed the Plaintiffs ............................... 26

    VII.  InfoWars Used Dubious Third Party Sources ................................ 33

          A.   Relying on Jim Fetzer shows reckless disregard ............. 33

B.  Relying on Wolfgang Halbig Fetzer shows reckless disregard ............................................................................... 35

VIII.  The Long Duration of the Offending Conduct Shows Reckless Disregard ....................................................................................... 37

IX.  InfoWars Drives Profits by Recklessly Stating that National Tragedies are Fake .................................................................. 41

CONCLUSION ............................................................................................................. 43

CERTIFICATE OF CONFERENCE ........................................................................ 44

CERTIFICATE OF SERVICE .................................................................................... 44

Plaintiffs bring this Motion for Leave to Serve Net Worth Discovery. Net worth discovery is available to any plaintiff who shows a substantial likelihood of success on a claim for punitive damages. Plaintiff can make such a showing here. In fact, it is difficult to conceive of a defamation case involving a major national media organization more deserving of punitive damages than this one.

## LEGAL STANDARDS

### I.    Legal Standard for Net Worth Discovery

"On the motion of a party and after notice and a hearing, a trial court may authorize discovery of evidence of a defendant's net worth if the court finds in a written order that the claimant has demonstrated a substantial likelihood of success on the merits of a claim for exemplary damages." Tex. Civ. Prac. & Rem. Code § 41.0115. "Evidence submitted by a party to the court in support of or in opposition to a motion made under this subsection may be in the form of an affidavit or a response to discovery." *Id.* "Accordingly, the statute's plain language makes clear that the movant seeking net worth discovery need only show a substantial likelihood of success on the merits, not clear and convincing evidence, to be entitled to net worth discovery." *In re Bella Corp.*, 12-21-00090-CV, 2021 WL 3671334, at *2 (Tex. App.— Tyler Aug. 18, 2021, no pet. h.).

### II.   Legal Standard for Punitive Damages in Defamation and IIED.

When a private plaintiff's defamation action against a media defendant arises out of a matter of public concern, the plaintiff must establish actual malice to recover

punitive damages. *Klentzman v. Brady,* 456 S.W.3d 239, 264 (Tex. App.—Houston [1st Dist.] 2014), aff'd, 515 S.W.3d 878 (Tex. 2017). An IIED plaintiff must meet this same constitutional hurdle of proving malice to recover punitive damages when the IIED lawsuit alleges damage from speech on a matter of public concern.

Malice exists when a publisher shows a "reckless disregard for the falsity of a statement." *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). A showing of actual malice can be satisfied when there is *prima facie* circumstantial evidence that a defendant would have "entertained serious doubts as to the truth of his publication." *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 805 (Tex. App.—Austin 2017), aff'd, 611 S.W.3d 1 (Tex. 2020). A plaintiff may offer circumstantial evidence suggesting that a defendant made statements which he "knew or strongly suspected could present, as a whole, a false and defamatory impression of events." *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 120-121 (Tex. 2000).

## SUMMARY OF PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

As this Court is well-aware, InfoWars creator Alex Jones waged a non-stop obsessive campaign from 2013 to 2018 to convince his viewers that the Sandy Hook school shooting was "a giant hoax," "synthetic," and "completely fake with actors." Two families in particular – the parents of Noah Pozner and Jesse Lewis – found themselves as special targets for Mr. Jones' cruel attacks.

## I.     The *Pozner* Defamation Claim

Leonard Pozner and Veronique De La Rosa are the parents of Noah Pozner. In their lawsuit, the plaintiffs allege that a 2017 video published by InfoWars, entitled "Sandy Hook Vampires Exposed," defamed them. In the video, Mr. Jones discusses an interview Ms. De La Rosa gave to Anderson Cooper in front of the Edmond Town Hall in Newtown, Connecticut. Mr. Jones asserted that the interview was faked on a green-screen and was not actually conducted in Newtown.[1] Jones alleged the interview was staged by "known liars" that "have blood on their hands."[2] Mr. Jones mocked those who believe the shooting was real, stating, "How could you believe any of it if you have a memory?"[3] Mr. Jones also asserted that "the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it."[4] Mr. Jones claimed there was video in which "the kids are going in circles, in and out of the building with their hands up."[5] He next claimed "they had Port-A-Potties being delivered an hour after it happened, for the big media event."[6] He also claimed that law enforcement authorities were "finding people in the back woods who are dressed up in SWAT gear."[7] Plaintiffs allege that Mr. Jones made these statements knowing they were false or with reckless disregard for the truth. Plaintiffs allege that the

---

[1] Exhibit 1, Fred Zipp Affidavit in *Pozner*, p. 3.
[2] *Id.*
[3] *Id.*
[4] *Id.,* p. 4.
[5] *Id.,* p. 7.
[6] *Id,* p. 9.
[7] *Id.,* p. 11.

logical implication of Mr. Jones' statements is that Ms. De La Rosa and Mr. Pozner are not real parents, but instead participants in a massive crime.

## II. The *Heslin* Defamation Claim

As far back as 2013, Neil Heslin had been alarmed over InfoWars and its maniacal fabrications about Sandy Hook, but he was determined not to dignify the allegations by acknowledging their existence.[8] But as Mr. Jones' inflammatory statements reached a wider audience, they were met by a growing tide of public indignation, and in June 2017, Megyn Kelly produced a feature story on the fallout from InfoWars' various accusations. Ms. Kelly convinced Mr. Heslin to appear for an interview to discuss the pain caused by InfoWars' lies about the death of his son, Jesse Lewis.[9] During the interview, Mr. Heslin stated, "I lost my son. I buried my son. I held my son with a bullet hole through his head."[10]

One week later, InfoWars retaliated with a cruel and false accusation against Mr. Heslin, delivered by InfoWars host Owen Shroyer. The premise of Mr. Shroyer's video was that Mr. Heslin was lying about having held his son's body and having seen his injury. Mr. Shroyer stated:

> He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible.[11]

---

[8] Exhibit 3, Affidavit of Neil Heslin, para 4.
[9] *Id.,* para 12.
[10] *Id.,* para 25.
[11] Exhibit 2, Fred Zipp Affidavit in *Heslin,* Attached Transcript (Ex. A-1).

During the video, Mr. Shroyer showed a portion of an interview with medical examiner Dr. Wayne Carver describing the initial identification of the victims, which was performed by photograph.[12] Mr. Shroyer misrepresented this portion of Dr. Carver's interview, along with a deceptively edited clip of Sandy Hook parent Lynn McDonnel, to falsely claim that the victims' parents were not allowed access to their children's bodies before burial.[13] With arrogant mockery, Mr. Shroyer stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on."[14] When Mr. Heslin learned about these statements, he brought his lawsuit.

### III.    The *Pozner, Heslin,* and *Lewis* IIED Claims

All of the above Plaintiffs, in addition to Plaintiff Scarlett Lewis, have brought claims against Mr. Jones and his companies for intentional infliction of emotional distress (IIED). As stated in their petitions, the IIED claims arise from "InfoWars' recklessly false statements concerning the circumstances of the death of [their] child[ren], as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents."[15] Plaintiffs allege that Defendants committed "a continuous pattern of five years of intentional and reckless harassment accomplished through dozens of disturbing videos, a relentless stream of recklessly false articles published on

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Exhibit 4, *Lewis* First Amended Petition, para 10.

InfoWars.com, harassing social media content, as well as the encouragement, aid, and financial support to third-parties in furthering this harassment."[16] InfoWars maliciously coordinated and supported this community of unhinged "hoaxers" to inflame the situation, all to profit from building a reprehensible five-year sideshow around the children's death. Most of this conduct was not defamatory to the Plaintiffs. Indeed, not all of it was even speech. What happened here was unique, and IIED exists for this situation. As a gap-filler tort, IIED can encompass the appalling acts of harassment, the malicious support of dangerous third parties, the outrageously cruel mockery, the intentional false statements about the tragedy, and the endless national shaming that put these families' lives in danger.

## ARGUMENT

Throughout its Sandy Hook coverage and its attacks on these Plaintiffs, InfoWars acted with reckless disregard. Defendants either knew that they were publishing false claims or purposefully hid themselves from the obvious falsity of the claims. Defendants also knew their actions would cause emotional distress to the Plaintiffs, and Defendants intended that result due to their animosity against these parents. The facts below show a substantial likelihood of success on Plaintiffs' claims for punitive damages.

---

[16] *Id.,* para 87.

## I.    InfoWars Relied on Inherently Improbable Assertions.

As a starting point, malice is shown when the circumstances of the publication were "so improbable that only a reckless publisher would have made the mistake." *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 855 (Tex. 2005). "Inherently improbable assertions and statements made on information that is obviously dubious may show actual malice." *See* 50 Tex. Jur. 3d Libel and Slander § 133. In this case, InfoWars' allegations were wildly outlandish. From 2013 to 2018, InfoWars made the following improbable assertions about the Sandy Hook shooting:

- Mr. Heslin lied about holding his son's body.[17]

- Anderson Cooper faked a blue-screen interview with Ms. De La Rosa.[18]

- The Internet Wayback Machine proves there was a cover-up.[19]

- Michael Bloomberg sent an email with foreknowledge of the attack.[20]

- The FBI accidentally admitted no one was killed at Sandy Hook.[21]

- Paramedics were not allowed inside the building.[22]

- Ambulances came an hour and a half later, or not at all.[23]

- The death certificates are sealed under felony penalty.[24]

---

[17] Exhibit 2, Fred Zipp Affidavit in *Heslin,* Attached Transcript (Ex. A1)
[18] Exhibit 1, Fred Zipp Affidavit in *Pozner*, Attached Transcripts (Ex. A4, A6, A7, A9, A11, A12, A22, A24, A26, A30).
[19] *Id.* (Ex. A24 and A28)
[20] *Id.* (Ex. A12, A22, A24)
[21] *Id.* (Ex. A28)
[22] *Id.*
[23] *Id.* (Ex. A21, A22)
[24] *Id.* (Ex. A17, A24)

- Sandy Hook Elementary had been closed for years.[25]

- There is a video of children with their hands up being led in circles.[26]

- There were mystery men detained in the woods in SWAT gear.[27]

- Port-a-Potties were placed at Sandy Hook within an hour.[28]

- The same actors were caught playing the parts of different people.[29]

- There are photos of alleged victims that are still alive.[30]

The sheer volume of these false allegations shows InfoWars took no steps to verify its information, and their ceaseless repetition over the years was especially egregious. It one thing to make a false assertion on a single occasion. It is quite another to make a dozen false assertions. But it is simply outrageous to make the same dozen false assertions on a continuous basis for over five years in the face of massive public controversy. It is clear InfoWars "ignored elementary precautions." *Warner Bros.*, 538 S.W.3d at 806.

## II.    The Affidavits of Fred Zipp Support Reckless Disregard.

Evidence of actual malice is found in the affidavits of Fred Zipp. Now a journalism professor at the University of Texas, Mr. Zipp is the former editor of the *Austin American Statesman* with 39 years of expertise in the responsible delivery of news to a mass media audience. Mr. Zipp wrote affidavits in the *Pozner* and *Heslin*

---

[25] *Id.* (Ex. A11, A12, A21, A22, A24, A27)
[26] *Id.* (Ex. A7, A9, A12, A24, A27, A29)
[27] *Id.* (Ex. A3, A6, A9, A22, A24, A27, A28)
[28] *Id.* (Ex. A 22, A27, A28).
[29] Exhibit 5, March 4, 2019 Deposition of Alex Jones, p. 77.
[30] *Id.,* p. 65-66.

cases in 2018 during the TCPA proceedings.[31] Those affidavits are attached are "Exhibit 1" and "Exhibit 2." In those affidavits, Mr. Zipp meticulously debunked InfoWars outrageous assertions. Mr. Zipp's exhaustive affidavits detail the reckless nature of InfoWars' 2017 statements, as well as the history of InfoWars' false statements about Sandy Hook. Mr. Zipp's affidavits also include partial transcripts of relevant InfoWars videos.

### A. Mr. Zipp's analysis of InfoWars' false claims about a blue-screen interview supports reckless disregard.

In his *Pozner* affidavit, Mr. Zipp notes that during InfoWars' five years of false Sandy Hook coverage, "the accusation that Ms. De La Rosa's interview was conducted in front of a blue-screen became a central element of InfoWars' claim that the official story of Sandy Hook was a lie."[32] To evaluate this claim, Mr. Zipp first reviewed an affidavit from FBI forensic video analyst Grant Fredericks. Mr. Fredericks examined the video and concluded that "to a reasonable degree of engineering certainty, the visual anomaly in the video was caused by post-production compression."[33] Mr. Fredericks stated that "it does not require a high level of technical expertise to understand that Mrs. De La Rosa's interview was not conducted in front of a blue-screen."[34] The compression artifact in the video "is a basic concept in the field of TV

---

[31] Exhibit 1, Fred Zipp Affidavit in *Pozner;* Exhibit 2, Fred Zipp Affidavit in *Heslin*.
[32] Exhibit 1, Affidavit of Fred Zipp in *Pozner,* p. 23.
[33] Exhibit 6, Affidavit of Grant Fredericks, p. 8.
[34] *Id.*

production and web-based video broadcasting."[35] Mr. Fredericks explained that InfoWars would have known their allegation was false:

> Anyone with experience in analog or digital video production, or in web-based broadcasting, should have arrived at the same conclusions. No credible video professional, editor, or web-content specialist would conclude that the visual anomaly is evidence of a chroma key process, such as a blue-screen or green-screen.[36]

As a result of these circumstances and the evidence he reviewed, Mr. Fredericks concluded that "InfoWars either had knowledge of the falsity of its statements, or made those statements while having serious doubts about the truth of those statements."[37] Mr. Zipp noted that in addition to Mr. Frederick's analysis, the assertion made by InfoWars was obviously implausible:

> Mr. Jones' assertion about the blue-screen was farfetched to the say the least. It required an extraordinary level of verification before being repeatedly stated as fact. Yet it is clear that InfoWars performed no verification because any genuine inquiry would have shown the accusation was bogus...Mr. Jones ignored basic precautions taken by journalists. Rather than meaningfully investigate his claim or produce corroborating evidence, Mr. Jones made these statements with reckless disregard for whether they were true or not.[38]

As Mr. Zipp noted, a major problem with Mr. Jones' allegation "is that it makes no sense to use a blue-screen to simulate an interview in a location that is a short

---

[35] *Id.*
[36] *Id.*
[37] *Id.* at p. 9.
[38] Exhibit 1, Fred Zipp Affidavit in *Pozner,* at p. 22-23.

drive from Anderson Cooper's office in New York City."[39] Mr. Zipp's affidavit also

discusses the fact that "there is copious third-party evidence that Mr. Cooper was in

Newtown."[40] Mr. Zipp concluded that "there was no reasonable basis to believe that

Veronique De La Rosa participated in a faked interview, and any publisher would

entertain serious doubts about the truth of such a claim."[41] The allegations made in

the broadcast, including the allegation about the blue-screen interview, were "so

improbable that only a reckless publisher would have made the mistake." *Freedom

Newspapers of Tex.,* 168 S.W.3d at 855.

## B. Mr. Zipp's analysis shows how InfoWars' false claims about Neil Heslin were made with reckless disregard.

In his *Heslin* affidavit, Mr. Zipp evaluated the June 26, 2017 video in which

InfoWars' anchor Owen Shroyer alleged that Mr. Heslin was lying about having held

his child's body. Mr. Zipp explained how "InfoWars used a deceptively edited clip of

Lynn McDonnel to convince its viewers that she was not allowed to see her child's

body."[42] InfoWars "also used an out-of-context clip of [coroner] Dr. Carver to convince

viewers that parents were only allowed to see photographs of their dead children."[43]

Mr. Zipp concluded that "[t]hese actions were aimed at manufacturing a controversy

where none existed."[44] As Mr. Zipp explained:

---

[39] *Id.* at p. 22.
[40] *Id.*
[41] *Id.* at p. 4.
[42] Exhibit 2, Fred Zipp Affidavit in *Pozner,* p. 14
[43] *Id.*
[44] *Id.*

> Dr. Carver clearly stated that at the time of his interview, the bodies had been released to private funeral homes on behalf of the families. Mr. Shroyer used the same dishonest tactic to edit a portion of an interview with Sandy Hook parents Chris and Lynn McDonnel. Mr. Shroyer cut off the end of Ms. McDonnel's answer to make it appear that she was not allowed to see her daughter's body. A full copy of the transcript shows that Ms. McDonnel had the opportunity to see her daughter's body.[45]

Mr. Zipp concluded that "Mr. Shroyer used sham evidence," and that InfoWars "ignore[d] basic precautions taken by journalists" and "intentionally distorted the evidence in a malicious way to attack and retaliate against Mr. Heslin."[46] These deceptive claims were used to support Mr. Jones' continuing crusade to demonize the Plaintiffs for participating in an allegedly staged event. When Mr. Heslin had the courage to defend himself and his community against these lies, InfoWars maliciously targeted him with a cruel and dishonest accusation, all to promote their insane fantasy.

For Mr. Zipp, demonstrating the falsity of InfoWars' absurd claims was not a difficult enterprise, as he stated in his affidavit:

> It was not necessary to obtain a subpoena to secure the materials needed to fact-check these claims. All these materials exist in the public domain, and they have been discussed by Sandy Hook researchers online. A variety of individuals have debunked these claims over the years while providing verifiable information from the public record. Any responsible publisher would have known Mr. Jones' claims were false, or otherwise entertained serious doubts about their accuracy.[47]

---

[45] *Id.,* p. 15-16.
[46] *Id.,* p. 16.
[47] Exhibit 1, Fred Zipp Affidavit in *Pozner,* at p. 13.

When assessing actual malice, the court should "begin by noting the gravity of the accusations made against [plaintiff]." *Warner Bros. Entm't, Inc.,* 538 S.W.3d at 806. Here, Mr. Zipp noted that "Mr. Jones' accusation proves the adage that serious claims require serious evidence."[48] The Austin Court of Appeals recently echoed that sentiment in a case involving allegations that professional athlete hired a hitman, noting "[c]harges as serious as the ones leveled against [plaintiff] in this article deserve a correspondingly high standard of investigation." *Id.* at 806. Yet like the defendant in *Warner Bros.*, InfoWars "ignored elementary precautions." *Id.*

## III.   Alex Jones' Testimony Shows Reckless Disregard.

Evidence of reckless conduct is also shown in Mr. Jones' deposition testimony in the *Lewis* case, which was a three-hour admission of actual malice. During his deposition, Mr. Jones candidly admitted he performed no corroboration of the conspiracy claims being given to InfoWars by self-styled investigators Wolfgang Halbig and Jim Fetzer. Mr. Jones claimed he relied on "other people that were investigating."[49] Mr. Jones admitted, "We did not ourselves investigate Sandy Hook."[50] These actions show actual malice because InfoWars "failed to meaningfully seek corroboration ... from any other sources." *Warner Bros. Entm't, Inc.,* 538 S.W.3d at 808. In one exchange concerning Wolfgang Halbig, Mr. Jones testified about his reliance on this dubious source:

---

[48] *Id.* at p. 22.
[49] Exhibit 5, March 4, 2019 Deposition of Alex Jones, at 58:25.
[50] *Id.* at 58:25-59:1.

Q.     You didn't know one way or the other, right, whether the school was open? You had some doubts. You didn't know one way or another; you couldn't confirm it one way or another?

A.     I know that some investigators who were accreditated school safety folks who thought were credible experts were the ones -- professors and others that were in good standing -- were the ones that were really doing these investigations; and that I was in some cases taking what they said incorrectly. And I've admitted to that.

Q.     And with no corroboration? You just take what they said, and you trusted these guys, right?

A.     I mean, I'd seen one of the guys, like, on national television before on the Columbine stuff as a national safety expert; and he sounded pretty credible.

Q.     Mr. Halbig, right?

A.     Yes.

Q.     And he had sent you something in the neighborhood of 4,000 e-mails?

A.     It's a lot, yeah.

Q.     And looking at those e-mails, taking a look at them, you wouldn't agree with me that that man is a raving lunatic?

A.     He seemed very credible and put together earlier on, but -- I can't remember the exact number -- he seemed to get agitated about four years ago, three years ago.[51]

---

[51] *Id.* at 42:17 to 43:19.

Though Mr. Jones claimed Mr. Halbig became "agitated" in 2015 or 2016, Mr. Jones was still repeating Mr. Halbig's claims until he was sued in 2018. When discussing one of those claims -- the "Port-a-Potty" allegation -- Mr. Jones claimed "I was going off what Halbig was saying."[52] Mr. Jones then admitted InfoWars did not perform any confirmation, even though the dashcam video necessary to fact-check the claim was publicly available and had been discussed on Mr. Jones' show:

> Q.    You did no confirmation whatsoever of Mr. Halbig's statements about the Port-A-Potties, did you?
>
> A.    I don't believe these videos were released for a long time.
>
> Q.    If they were, if those videos were released in 2013, it certainly would have been reckless to say the Port-A-Potties arrived in an hour in 2017, wouldn't it, Mr. Jones?
>
> A.    I just don't know how to respond to the fact that -- that how do we know more weren't arriving later and that there's other Port-A-Potties or whatever? I'm not saying that's what happened. You just showed me one still off something and tell me to answer questions.
>
> Q.    Yeah. So one thing you could do is go back into the dashcam video and scroll through and find out if something did arrive earlier? That's something you could do, right? It's not hidden information, right? Correct?
>
> A.    I guess correct.[53]

---

[52] *Id.* at 62:2.
[53] *Id.* at 62:3-63:3.

Similarly, when discussing his claim that paramedics were not allowed inside of Sandy Hook, Mr. Jones confirmed that he merely repeated dubious information with no fact checking:

> Q.    You've said repeatedly on your web show paramedics weren't allowed inside of Sandy Hook? You've said that; you're not going to deny that?
>
> A.    I've read other people's reports saying.
>
> Q.    Okay. And you did nothing to confirm those reports, literally nothing?
>
> A.    I went out and I covered news that was being covered.[54]

Mr. Jones also admitted InfoWars had been provided information from various people who had been debunking the claims made on Mr. Jones' show. In particular, InfoWars News Director Rob Dew had been receiving information with the correct facts regarding Mr. Jones' claims:

> Q.    Mr. Dew, in addition to those debates, has been provided written information from a lot of these debunking people seeking to stop the allegation that it's a hoax. You would agree with that?
>
> A.    Yes. There was a big Internet fight going on, and we were showing both sides.[55]

In truth, Mr. Jones had not been "showing both sides." Instead, his videos uncritically repeated the absurd claims of Wolfgang Halbig and Jim Fetzer. Mr. Jones

---

[54] *Id.* at 54:2 to 54:16.
[55] *Id.* at 146:14 to 146:19.

admitted that he accepted Halbig and Fetzer's conspiracy claims at face value because he had a form of psychosis:

> And I, myself, have almost had like a form of psychosis back in the past where I basically thought everything was staged, even though I'm now learning a lot of times things aren't staged.[56]

Mr. Jones said, "I would kind of get into that mass group-think of the communities that were out there saying that."[57] This mass group-think caused Mr. Jones to act recklessly when covering Sandy Hook, publishing the most absurd and easily debunked allegations. During his deposition, Mr. Jones was repeatedly confronted with video clips of the bizarre claims he made on his show, and he was completely unable to provide a coherent explanation as to how those allegations ever made it to air.  In sum, Mr. Jones admitted he published inherently improbable and dubious claims with no corroboration.

## IV.    Paul Watson's Testimony Shows Reckless Disregard.

Paul Watson has served as InfoWars' Chief Reporter since 2014.[58] From the beginning, Mr. Watson had expressed strong reservations about the accuracy of InfoWars' coverage of Sandy Hook. Mr. Jones admitted that Mr. Watson frequently warned him about InfoWars' coverage of Sandy Hook:

> Q.    And he frequently warned you about what you were saying about Sandy Hook?

---

[56] *Id.* at 184:9-12.
[57] *Id.* at 185:10 to 185:12.
[58] *Id.* at 72:17.

A.      Well, I mean, we had discussions about it, yes.  We're not running a cult. We have different views.[59]

Mr. Jones testified that Paul Watson "was saying that some of the people that were out there putting stuff out, like Fetzer and others in that, were not good."[60] This is quite an understatement. On December 17, 2015, Paul Watson wrote to two of his co-workers to let them know he had sent Alex Jones the following message:

> This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show. Plus the event happened 3 years ago, why even risk our reputation for it?[61]

Despite Mr. Watson's warning in 2015 that the conspiracy theorists InfoWars was relying on were "batshit crazy," Mr. Jones continued to spread their absurd claims until he was sued in 2018. It is a rare and outrageous case where a media outlet's Chief Reporter acknowledges their sources are mentally disturbed. Mr. Watson also testified that by 2013, he was "aware at this time that the parents were being harassed by believers in a Sandy Hook hoax conspiracy."[62] Mr. Watson knew the harassment against the parents went on for years:

Q.      You knew and understood that that harassment went on for years, correct?

---

[59] *Id.* at 71:2 to 71:6.
[60] *Id.* at 77:19-21.
[61] Exhibit 7, December 17, 2015 email - FSSTX-027752
[62] Exhibit 8, Deposition of Paul Watson, at 11:15-17.

A.    That it went on for years afterwards, I don't know an exact time period as to when it went on, but I do know that it occurred, yes.[63]

Mr. Watson testified that InfoWars willfully disregarded the sensitivity of the victims during its reporting for five years:

Q.    When we talk about maintaining that respect, that dignity, that sensitivity for the victims that you mentioned in that video in 2013, for the next five years, Infowars frequently did not do that, not saying you, but other people at InfoWars.  You'd agree with that?

A.    I would say generally speaking, that's probably correct in terms of the trajectory of how InfoWars covered these events...[64]

Mr. Watson testified that he thought it looked "really bad to align with people who harass the parents of dead children."[65] He testified that he found InfoWars' coverage indecent and wrong:

Q.    In terms of what you think is decent and right, in terms of covering this story, do you think Infowars always adhered to what is decent and right in covering this story?

A.    Well, it's a subjective term, but, from my –

Q.    In your opinion, Mr. Watson.

A.    From my personal perspective, decent and right, I would not have covered it in that way, no.[66]

---

[63] *Id.* at 22:5-9.
[64] *Id.* at 20:4-14.
[65] *Id.* at 29:15-23.
[66] *Id.* at 17:16-22.

Mr. Watson strongly disagreed with assertions made on InfoWars that Sandy Hook was staged or that "crisis actors" were used. Mr. Watson testified he disagreed with these assertions because "[he] saw at the time the people who were pushing that narrative were not credible people."[67]

As noted above, Mr. Watson was the author of an email informing two InfoWars colleagues that he warned Mr. Jones in writing about InfoWars' Sandy Hook coverage. In his warning, Mr. Watson told Mr. Jones the sources he was relying on were "bat shit crazy." Mr. Watson testified he also had similar personal conversations with Jones.[68] When Mr. Watson was asked why the sources were "bat shit crazy," he admitted the same characteristics applied to Mr. Jones:

> Q.    Tell me how you came to the conclusion that these two gentlemen that InfoWars was relying on were bat shit crazy?
>
> A.    Because they were pushing the notion that nobody died at Sandy Hook, which I thought was not credible and was supported by no evidence, so therefore, was a crazy conclusion to make.
>
> Q.    So by that same logic, Alex Jones, equally, bat shit crazy?
>
> A.    I wouldn't describe him as bat shit crazy.
>
> Q.    What kind of crazy?
>
> A.    I would describe it as him commenting on the controversy of the conspiracy theories that were swirling about Sandy Hook at the time.

---

[67] *Id.* at 12:22-13:2.
[68] *Id.* at 40:8-14.

Q.  Okay. So if Jeff Rense or Jim Fetzer starts pushing allegations that the children aren't real and that the parents are fake and that the crying is all fake and it's all an act, they're bat shit crazy. But if Jones says literally the exact same words on his web broadcast, he's just doing a good job as a journalist?

A.  Well, to kind of combine this with your previous question, I would say the description of them as "bat shit crazy" would also involve things that they've said in the past unrelated to Sandy Hook, maybe about UFOs or alien abduction or holograms on 911, which I think was Fetzer's big thing for a while. So, you know, they had -- they has a previous of engaging in very obscure conspiracy theories, which would contribute to that description of bat shit crazy.

Q.  Do you think that their history of doing that is any different than Alex Jones?

A.  No. But again, they have the right to engage in that speech under the First Amendment.[69]

Mr. Watson defended InfoWars by claiming it had no duty to report events accurately. As editor, Mr. Watson believes "a commentary opinion outlet, one that may be partisan in nature," ultimately "has no obligation to ensure that the things that it's saying are accurate or true."[70] Mr. Watson flatly admitted InfoWars does not believe it has any duty to abide by journalistic ethics, and it therefore does not abide by those ethics:

Q.  If you have somebody with a track regard of being bat shit crazy and unreliable, it would violate the

---

[69] *Id.* at 26:24-28:9.
[70] *Id.* at 50:24-51:12.

> sense of journalistic integrity to promote what they are saying as fact, correct?

A.  Yes. If you were a journalistic, middle-of-the-road, nonpartisan, non-commentary outlet –

Q.  So Alex Jones is allowed to do that? Other people who claim to be journalists can't, but Alex Jones can do that? That's fine?

A.  Under their -- under their own journalistic ethics, they wouldn't. Alex Jones would because he's an opinion commentator.

Q.  And he has no journalistic ethics, correct?

A.  He's not a journalist. So no, he's not. He doesn't abide by those ethics because he's not a journalist.[71]

Mr. Watson testified InfoWars believes it "should be held to a lower standard than perhaps other media organizations."[72] Mr. Watson's deposition shows the organization operates with a willful disregard for journalistic ethics. Moreover, Texas courts have noted that "rarely will a defendant admit knowing of a substantial certainty that emotional harm would befall the victim." *Clayton v. Wisener,* 190 S.W.3d 685, 695 (Tex. App.—Tyler 2005, pet. denied). Yet Mr. Watson made such admissions here.

## V.  Robert Jacobson's Testimony Shows Reckless Disregard.

Robert Jacobson worked at InfoWars writing and producing videos for thirteen years, from 2004 to 2017.[73] Mr. Jacobson contacted Plaintiff's counsel because he

---

[71] *Id.* at 52:7-52:24.
[72] *Id.* at 56:5-6.
[73] Exhibit 9, Deposition of Robert Jacobson, at 22:4-16

"was concerned" and "felt terrible about what happened," and he "[felt he had] to right a wrong that [he] was involved in."[74] Mr. Jacobson was deposed in the *Lewis* case, and he testified about his interactions with InfoWars writers on the subject of Sandy Hook. Mr. Jacobson testified he was bothered by the flagrant violations of ethics:

> Q.     What did you hear that bothered you?
>
> A.     I heard them making accusations based on extremely narrow cross-sections of information, that I did my best to make the writers and the staff aware that what they were doing was speculation based on not enough information. It bothered me. That bothered me that I felt they had no concept of journalist ethics.
>
> Q.     Did you tell anyone at InfoWars your feelings about the Sandy Hook coverage?
>
> A.     I attempted to make it as clear as possible to the writers that there is something called journalist ethics and how what they were doing was in a direct violation of that anytime I caught wind of the Sandy Hook story on InfoWars.[75]

Mr. Jacobson testified about his repeated visits to the writers' room in which he explained the ethical problem and the consequences of those actions:

> I would make it my business to go into the writers and explain to them as clearly as possible that there is journalist ethics; and I tried to demonstrate what those ethics are and why they are violating them and what the damage could possibly be. In fact, I remember -- I must have been in that room four to five times, at least, and only to be received with laughter and jokes.[76]

---

[74] *Id.* at 32:16-22.

[75] *Id.* at 33:13-34:1

[76] *Id.* at 34:6-12

Mr. Jacobson testified that InfoWars News Director Rob Dew was acting recklessly, stating that "Mr. Dew was overzealous to receive any type of hint that perhaps this might have been a phony act, a staged act. Any type of whisper that came through to him, he would celebrate."[77] Whenever he raised the issue, Mr. Jacobson testified that the writers "mocked [his] concerns about Sandy Hook coverage."[78]

Mr. Jacobson also testified about Adan Salazar, one of the writers working on Sandy Hook. Mr. Salazar showed a willingness to publish any allegation, no matter how absurd. For example, Mr. Salazar wrote to the author of the horror movie website "A Slash Above" because in the months before the Newtown shooting, the website author had written a review of the 2000 slasher film "Sandy Hook Lingerie Party Massacre." Mr. Salazar sought comment on a rumor that "your review of 'Sandy Hook Lingerie Party Massacre on your site aslashabove.com shows foreknowledge or prior planning of the events that have taken place as of late."[79] Mr. Salazar stated, "we thought this was surely ridiculous, however, we're (Infowars.com) going to point it out in an article anyway."[80] In other words, Mr. Salazar was admitting that InfoWars intended on publishing information it knew was ridiculous. The author of the blog replied, "You are seriously ill to send me something like that – Don't contact me anymore or I will report you for harassment you bunch of weirdos."[81]

---

[77] *Id.* at 36:13-16
[78] *Id.* at 38:5
[79] Exhibit 10, December 21, 2012 Email by Adan Salazar, FSSTX-077825.
[80] *Id.*
[81] *Id.*

In addition to Mr. Salazar, Mr. Jacobson further testified regarding his concerns with Wolfgang Halbig's reliability and mental state:

> And every time I saw [Halbig], I saw somebody that if he was amongst a group, a large group of people, okay; but a one and only person, I felt that this person may have mental problems. This person may have a lot of emotional problems. He could be a lonely man. He could be somebody looking for attention. There could be a lot of questions to be asked before we present forward as a news organization such a heavy accusation as accusing the parents of slaughtered children of being liars.[82]

Mr. Jacobson testified that the reliance on Wolfgang Halbig was caused by a total lack of journalistic ethics at InfoWars:

> I think that perhaps we should have asked the question "what is Wolfgang Halbig's story" before we put this story to the public. This story should never have been put forward to the public at all without -- and if they knew ethics in journalism, they would have known that immediately; but they have absolutely no ethics experience, in my opinion. Therefore, the story went forward; and the damage was caused.[83]

Mr. Jacobson also testified about InfoWars' allegation that there exist photographs of Sandy Hook children who are actually still alive:

> Q.  Have you ever heard the allegation that there are photographs of children who are supposedly dead who are actually alive?
>
> A.  Yes, I've heard that allegation.

---

[82] Exhibit 9, Deposition of Rob Jacobson, at 38:23-39:6.
[83] *Id.* at 39:7-14

Q.   From what you have seen inside of InfoWars, have you seen anything that has caused you to form an opinion about that allegation?

A.   I mean, you know, my opinion is it's so distasteful -- and it happened a while ago, that – you know, it happened a while ago. So it was just all these things seem to -- all of the little allegations that Halbig and all these other people set forward, I sort of see it as individual cross-sections of information that each one was improperly handled.[84]

Mr. Jacobson testified that he was shocked at the lack of fact-checking considering the serious nature of the allegations being made:

The weight of the accusation in this particular case, it was shocking that they didn't do more research. They didn't go further into it. They didn't -- I mean, what I constantly tried to clarify is a story of this level should not be brought forward unless they are -- I tried to make it clear that they need as much evidence in this story as if they were going to court to prove their case; and if they didn't have that, they didn't have a story.[85]

The InfoWars writers for Sandy Hook ignored the warnings of Robert Jacobson, just as Mr. Jones had ignored the warnings of Paul Watson. This testimony provides clear and specific *prima facie* evidence that InfoWars recklessly published false facts.

## VI.   InfoWars Intentionally Harmed the Plaintiffs.

InfoWars' conduct is especially outrageous because Mr. Jones understood and intended the suffering he was causing to the Sandy Hook parents – especially these particular plaintiffs – and he responded with increasing hostility. InfoWars knew as

---

[84] *Id.* at 42:8-22
[85] *Id.* at 52:9-17

early as 2013 that the Sandy Hook parents were being harassed by Sandy Hook deniers. In the month after the shooting, InfoWars had already received a direct complaint from Plaintiff Leonard Pozner. In a January 29, 2013 email to InfoWars, Plaintiff Leonard Pozner wrote:

> I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown. Accusing us of being actors.......
>
> Haven't we had our share of pain and suffering? All these accusations of government involvement, false flag terror, new world order etc..
>
> I used to enjoy listening to your shows prior to 12-14-12.
>
> Now I feel that your type of show created these hateful people and they need to be reeled in!
>
> Lenny Pozner[86]

Mr. Watson responded to Mr. Pozner by writing:

> Sir,
>
> We have not promoted the "actors" thing. In fact, we have actively distanced ourselves from it.
>
> We have said on numerous occasions that it was a very real tragedy with very real victims.
>
> I hope we can continue to count you as a listener, and I am deeply sorry for your loss.
>
> Best Regards, Paul Joseph Watson[87]

---

[86] Exhibit 11, January 29, 2013 Email between Pozner and Infowars - FSSTX-072489
[87] *Id.*

Despite Mr. Pozner's email, InfoWars showed a complete lack of caution and a total indifference to the suffering of the Sandy Hook parents. Mr. Jones promoted "the actors thing" and repeatedly made false claims in support of his allegation that the event was staged. In 2015, Mr. Pozner started a parent support organization called HONR Network to help remove harassment from YouTube, Facebook, and other major platforms. Mr. Jones reacted with open hostility. In a February 2015 episode of InfoWars, Mr. Jones was particularly upset when one of his videos containing a photo of Noah Pozner was removed. Discussing Mr. Pozner's support group "HONR Network," Mr. Jones said:

> We just are saying something is going on here. And we're sorry that, you know, the First Amendment is so upsetting, but we're going to be investigating this. We're going to be looking into this. We're going to be countering this, and we're going to be dealing with this.[88]

Referencing the distressed parents, Mr. Jones also stated, "we need to stop cowing down to these people and let them know we're not putting up with their bullying anymore."[89] In his affidavit, Mr. Zipp noted that:

> Mr. Jones later took a live phone call from a fellow Sandy Hook denier who was also upset with Mr. Pozner. The caller stated, "Lenny, if you're listening, your day is coming, my friend. It is coming." Mr. Jones responded, "This sounds like a war is going on. I think they made a major mistake involving us." The caller then stated, "Oh, I totally agree. They don't know what they bit off. Go after them, Alex. Crush them." Mr. Jones responded, "I'm not somebody to mess with."[90]

---

[88] Exhibit 1, Fred Zipp Affidavit in *Pozner,* p. 96 (Ex. A-14).
[89] *Id.,* p. 100 (Ex. A-15).
[90] *Id.*, p. 25-26.

Mr. Zipp noted that in the same episode, "InfoWars reporter Rob Dew showed personal addresses of Mr. Pozner and displayed maps of these locations. Mr. Jones stated that, 'I guess I'm going to have to probably go on up to Newtown. I'm going to have to probably go investigate Florida as well.'"[91]

Mr. Jones testified he was aware of the harassment he was causing. For example, Mr. Jones testified he was aware of the 2013 arrest of Jonathan Reich, one of the conspiracy fanatics being accompanied by an InfoWars reporter in Newtown, Connecticut.[92] Mr. Reich was arrested for harassing a Sandy Hook parent.[93] Mr. Jones testified he was also aware of an incident in Newtown in 2015 in which the same InfoWars reporter, Dan Bidondi, followed and verbally abused people who were involved in Sandy Hook. [94] Mr. Jones also testified he understood the allegations on his show were distressing to the parents.[95]

Despite this knowledge, Mr. Jones continued his reckless obsession with Sandy Hook. On November 16, 2016, Erica Lafferty wrote an open letter on behalf of the victims' families to President Trump, asking him to disavow Mr. Jones. Ms. Lafferty's letter received extensive media coverage, and two days later, on November 18, 2016, Mr. Jones published another video defending his false claims about Sandy Hook. During this response video, Mr. Jones specifically discussed the negative reaction of

---

[91] *Id.,* p. 26.
[92] Exhibit 5, March 4, 2019 Deposition of Alex Jones, at 160:13 to 160:17.
[93] *Id.*
[94] *Id.* at 84:3-22; 89:23 ("I saw that stuff; and I was like -- I remember seeing it in the paper.")
[95] *Id.* at 55:17 to 55:22.

the families, claiming they had something to hide. Mr. Jones directly addressed the

Sandy Hook families in his cruel message:

> MR. JONES: And why should anybody fear an investigation if they have nothing to hide. In fact, isn't that in Shakespeare's Hamlet, "me thinks you protest too much."…
>
> But this particular case, they are so scared of an investigation. So everything they do basically ends up blowing up in their face. So you guys are going to get what you want now. I'm going to start reinvestigating Sandy Hook and everything else that happened with it…
>
> And so if children were lost in Sandy Hook, my heart goes out to each and every one of those parents and the people that say they're parents that I see on the news. The only problem is I've watched a lot of soap operas, and I've seen actors before. And I know when I'm watching a movie and when I'm watching something real.[96]

Soon thereafter, in February 2017, the Newtown Board of Education wrote a

letter to President Trump asking him to speak out against Alex Jones. On April 18,

2017, news stories about the letter and Trump's silence appeared in major national

media.[97] In response, on April 22, 2017, Mr. Jones published a response video entitled

"Sandy Hook Vampires Exposed," again defending his false allegations about Sandy

Hook. This video is the subject of the *Pozner* defamation claim.

On June 18, 2017, Megyn Kelly's profile and interview of Mr. Jones aired on

NBC. During that profile, Mr. Jones again showed his indifference to the distress of the

parents. The following exchange took place:

---

[96] Exhibit 1, Fred Zipp Affidavit in *Pozner,* p. 158-159 (Ex. A-25 to the affidavit).
[97] https://www.cbsnews.com/news/newtown-leaders-call-on-trump-to-denounce-sandy-hook-conspiracies/

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied --
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.[98]

Mr. Jones and Ms. Kelly also had the following exchange:

> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.[99]

During Ms. Kelly's profile of Mr. Jones, Plaintiff Neil Heslin was interviewed about the distress caused by InfoWars' false statements about his son's death. An obviously distraught Mr. Heslin asked Mr. Jones to stop his lies about his son's death. Yet Mr. Heslin's public plea did nothing to help the situation. Instead, InfoWars retaliated against him by defaming him. In response to Mr. Heslin's interview, InfoWars published the June 26, 2017 video "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece," during which InfoWars host Owen Shroyer accused Mr. Heslin of lying about holding his dead son's body. On July 20, 2017, Mr. Jones repeated these accusations. Those two videos are the subject of Mr. Heslin's defamation claim.

Well after Mr. Heslin made his public plea for Mr. Jones to stop, InfoWars continued to spread false Sandy Hook conspiracy stories. On October 26, 2017, Mr.

---

[98] Exhibit 12, Megyn Kelly Interview Transcript, June 18, 2017.
[99] *Id.*

Jones published a video in which he discussed an InfoWars article promoting new theories about a cover-up of Sandy Hook, and he again told his audience "it's as phony as a $3 bill, with CNN doing fake newscasts, with blue screens."[100] In sum, Mr. Jones has known about the distress he was causing the Sandy Hook parents for years, and he responded to that distress with increasing animosity, especially towards these Plaintiffs. During Robert Jacobson's deposition, when asked to assess the level of outrageousness he saw, he described the InfoWars writing staff laughing about the pain they were causing to the Sandy Hook parents:

> Q.     Can you describe to me on a scale of one, being not outrageous at all, and ten, being extremely outrageous, on that one-to-ten scale, what is the level of outrageousness of this conduct that you were trying to impart?

> A.     It was a ten.

> Q.     Tell me why you thought that.

> A.     I mean, it's one thing to make a mistake. It's another thing to have somebody come in – and I don't even – I'm not aware if I was the only person or not, but I know I was doing it – to come in and say, "Hey, this is wrong. You're making a mistake." It's one thing, you know, to actually have a mistake and something else to have it pointed out to you, not just once but over and over and over again, and to not only hear the damage that you're doing to people outside of your zone but to actually laugh about it, I thought that's a ten.[101]

---

[100] Exhibit 1, Affidavit of Fred Zipp, p. 186 (Ex. A-30 to the affidavit)
[101] Exhibit 9, Deposition of Robert Jacobson, at p. 65:24-66:19.

## VII.    InfoWars Used Dubious Third Party Sources.

In a case involving allegations originating with a third-party source, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Warner Bros.,* 538 S.W.3d at 806, *citing Harte-Hanks*, 491 U.S. at 688. Here, both sources routinely relied on by InfoWars are extraordinarily unreliable.

### A.    Relying on Jim Fetzer shows reckless disregard.

InfoWars frequently relied on the outrageous claims by conspiracy fanatic Jim Fetzer. As noted above, Chief Editor Paul Watson warned Mr. Jones that Jim Fetzer was "batshit crazy." Jim Fetzer was the person cited in the anonymous blog post featured in Mr. Shroyer's video defaming Mr. Heslin. Mr. Fetzer is also the source for many of the claims in the "Sandy Hook Vampires Exposed" video. Mr. Zipp's affidavit provides context on Mr. Fetzer's background:

> In its Motion to Dismiss, InfoWars described Mr. Fetzer with an air of respectability, referring to him as "Professor Emeritus of the University of Minnesota." In truth, the retired professor has long been understood to be an unhinged crank. I do not use these terms lightly. Mr. Fetzer, author of the disturbingly titled self-published book "Nobody Died at Sandy Hook" has spent years spreading ridiculous and bizarre claims about the event. For example, Mr. Fetzer is convinced that Sandy Hook parent Leonard Pozner is actually a different man named Reuben Vabner…Mr. Fetzer's bizarre writings feature notably anti-Semitic rants about Mr. Pozner, who he insists is part of some international Jewish conspiracy…Mr. Fetzer is obsessed with the notion of faked identifies, and he makes similar accusations about the shooting victims, posting

photo comparisons which he claims prove that the photos of children are actually adults.[102]

Mr. Zipp notes that Mr. Fetzer even told his readers "that he has located a photograph containing the female shooting victims, who are now allegedly adolescents." Shown below is Mr. Fetzer's purported photo of the "crisis actors" reunion:



According to Mr. Zipp, "Mr. Fetzer has claimed, with no evidence, that the death certificates for shooting victims have been faked and that a shooting victim's gravestone was actually a computer-generated graphic."[103] In short, Mr. Fetzer is well known for being an outrageous grifter, selling books and collecting donations from confused outcasts, all of which he has based on either malicious lies or his own

---

[102] Exhibit 2, Fred Zipp Affidavit in *Heslin*, p. 16-17.
[103] *Id.* at p. 19.

preposterous delusions. Mr. Zipp concluded that "no rational journalist would ever rely on Mr. Fetzer as a source for anything, especially an allegation as improbable and serious as accusing a parent of lying about holding their dead child. InfoWars' uncritical endorsement of accusations being promoted by Mr. Fetzer demonstrates its reckless and deceptive conduct."[104]

## B.    Relying on Wolfgang Halbig shows reckless disregard.

Wolfgang Halbig is a self-styled "school safety expert" that Mr. Jones frequently featured as a guest on his show. As discussed above, Mr. Jones testified that he did nothing to corroborate the wild tales told to him by Mr. Halbig. Mr. Jones also testified that signs of Halbig's mental distress were apparent by at least 2016.

Likewise, former video editor Rob Jacobson testified about InfoWars' reckless reliance on Mr. Halbig. Mr. Jacobson testified that he attempted to explain the problems with relying on Mr. Halbig, but he was met with derision:

> What I've pointed out to [writer] Adan [Salazar] specifically is that you're taking the word of one witness primarily and a couple of speculative other facts and calling it the truth without actually going down and investigating it ourselves or actually going with our own reporters and corroborating what these people are saying. I made it aware to Adan that Wolfgang Halbig could have a lot of issues that we're not considering, that by taking the word of this one man so heavily with such a great accusation that he's accusing people of is so irresponsible, so damaging. I asked him to consider the size of the audience. And Adan Salazar responded with – and I'm going to quote him because he said it to me many times – "I want to print up a

---

[104] *Id.*

> T-shirt that says, 'Halbig was right.' I want bumper stickers that say, 'Halbig was right,'" to a laughing room.[105]

Keith Johnson, a freelance journalist and former contributor to InfoWars, wrote to news director Rob Dew warning about Mr. Halbig in 2014:

> You are promoting Wolfgang Halbig, a man with less than a year of law enforcement as a ticket-writing Florida highway patrolman in 1974 and a 3.3 hour online certificate with NIMS. He claims to have been a homicide detective and a consultant on Columbine. Both claims are false and I can prove it. I have documented multiple lies this man told. In addition, I have exposed the intentional manufacturing of evidence by Sandy Hook conspiracy theorists and have indisputable and documented proof of their frauds.[106]

Mr. Johnson noted that Mr. Halbig was basically a "child predator," and he warned Mr. Dew not to rely on a person "seeking to hunt down children who sang at the 2013 Super Bowl and stalks children at playgrounds in Newtown and plots ways to exhume the bodies of dead children."[107]

On June 23, 2017, three days before InfoWars defamed Mr. Heslin, Wolfgang Halbig sent one of his hundreds of harassing emails to Leonard Pozner, copying a variety of media organizations including InfoWars. Online debunker C.W. Wade responded to Mr. Halbig and Mr. Dew, stating:

> In all seriousness Wolfgang, it is the targeting of these little children that should cause you to be arrested. The 4th grade choir is not the murdered children, you filthy creature. Why does Rob Dew, Nico and Alex Jones of Infowars love this stuff? Wolfgang, your right hand man,

---

[105] Exhibit 9, Deposition of Rob Jacobson, 37:9-25.
[106] Exhibit 13, Keith Johnson email on December 14, 2014 (FSSTX-037204).
[107] *Id.*

> Jonathan, went to jail and was convicted because you convinced him of this nonsense stuff and he harassed the family of a Super Bowl singer. You ruined your friend's life over this lie of yours.[108]

Despite Mr. Halbig's deranged behavior, and despite warnings from people inside and outside InfoWars, Mr. Jones continued to publish the outrageous lies given to him by this obsessed, delusional crank.

## VIII.  The Long Duration of the Offending Conduct Shows Reckless Disregard.

Defendants' five-year campaign of lies and harassment against these Plaintiffs supports a finding of actual malice because "evidence of extraneous conduct is admissible, as prior bad act evidence, to show malice, in a defamation suit." *See* 1 Tex. Prac. Guide Civil Trial § 6:131, Character evidence—Evidence of other wrongs or acts—Intent/Malice. "[A]ctual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication." *Warner Bros.,* 538 S.W.3d at 805, *citing Dolcefino v. Turner*, 987 S.W.2d 100, 111-12 (Tex. App.—Houston [14th Dist.] 1998), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). Here, Mr. Jones' five-year campaign of lies against the Sandy Hook families in the face of irrefutable affirmative evidence is relevant to establishing the malicious nature of his 2017 defamatory statements. *See, e.g.,*

---

[108] Exhibit 14, C.W. Wade email on June 23, 2017 (FSSTX-052975).

*Beaumont v. Basham*, 205 S.W.3d 608, 624 (Tex.App. Waco. 2006) (Finding prior statements are "admissible under Rule 404(b) to show malice in a defamation suit.").

For Mr. Jones, carrying on his reckless obsession year after year was extreme, outrageous, and malicious. In the IIED claims, "it is the cumulative effect of the conduct that, inflicted over a sufficiently lengthy period of time, caused injury over a period of years." *Moyer v. Moyer,* 03-03-00751-CV, 2005 WL 2043823, at *6 (Tex. App.—Austin Aug. 26, 2005, no pet.). Mr. Zipp's affidavit provides a lengthy yet only partial history of InfoWars' constant harassment of these parents.[109] As Mr. Zipp noted, "InfoWars has made wild claims about the Sandy Hook massacre from the beginning," and it has "continually repeated these falsehoods over the course of five years."[110] Mr. Zipp explained how the five-year history demonstrates malice:

> InfoWars had ample opportunity to investigate the accuracy of its assertions. It has devoted an enormous amount of airtime to the tragedy, with broadcasts making extreme assertions years after the event. Given the enormous public attention and outcry over Jones' allegations, I find it unlikely that InfoWars researchers could have avoided the widespread debunking efforts unless they were doing so intentionally. It is my opinion that any reasonable journalist who continued to publish these claims in 2017 would entertain serious doubts about the truth of their statements, and that they would be acting with a desire to mislead their audience.[111]

In *Carr,* it weighed towards outrageousness when a publisher made no "reasonable effort to ascertain the truth of the report before the [second] broadcast."

---

[109] Exhibit 1, Affidavit of Fred Zipp in *Pozner*, p. 7-13.

[110] *Id.*, p. 19.

[111] *Id.*

*Carr v. Mobile Video Tapes, Inc.,* 893 S.W.2d 613, 621 (Tex. App.—Corpus Christi 1994, no writ). The *Carr* court noted:

> Although we do not consider the initial error outrageous, we cannot say that all reasonable persons would necessarily agree that rebroadcast of the same erroneous statement is equally tolerable. Because of this uncertainty, the jury must determine whether KRGV–TV5 acted outrageously in failing to correct the inaccuracy in the report before rebroadcasting the story over one month later.

*Id.* InfoWars' years of false claims are even more outrageous because Mr. Jones' assertions had long been known to be ridiculously bogus. According to Mr. Zipp, "[c]ountless individuals and media organizations have thoroughly debunked each of InfoWars' claims over the years. Nonetheless, InfoWars has persisted in this malicious campaign."[112] Not only were InfoWars' claims debunked by sources which are readily available and dominate the relevant Google searches, but many of these debunkers contacted InfoWars directly.

One of these explicit warnings came from former InfoWars contributor Keith Johnson, who did not mince words in a 2014 email:

> I know Lenny Pozner personally. Mr. Pozner's son was brutally murdered on 12/14/2012. I have met with this man and have seen and verified documents that are indisputable proof that his son was murdered. I have also seen the email exchanges between himself and your staff. You told Mr. Pozner that Alex Jones acknowledged that children died and dismissed the idea of a hoax.

---

[112] *Id.*

Now you are promoting the hoax mythology and entertaining individuals I can prove are frauds and child predators. I must warn you that you are travelling down a road that will ultimately lead to serious lawful consequences. Those you have placed your faith in are providing you with information that is verifiably false and your ignorance to this fact is no excuse against your complicity. Think about what you are doing. You are willing participating and facilitating in the defamation and libel of a man whose young child was brutally murdered and doing so at a time when we are approaching the 2nd anniversary of this horrendous act.[113]

Despite Mr. Johnson's warning, Mr. Jones persisted in his conduct for another four years. Here, the cruelty of the campaign of lies waged by Mr. Jones is beyond measure. In making these groundless claims for years, Mr. Jones did not care about the truth. He wanted to deliver a sensational and paranoid spectacle to his audience so that he could sell them various products tailored towards the apocalyptic fears he fosters. As shown below, it is the very nature of his business model.

## IX. InfoWars Drives Profits by Recklessly Stating that National Tragedies are Fake.

In his affidavit, Mr. Zipp points out that InfoWars has built a strong brand identity around news stories claiming that national tragedies are actually "false flags" conducted by a shadowy cabal for sinister political purposes. Mr. Zipp notes that "Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government," and "[h]is current promotional materials boast that 'Alex Jones is considered by many to be the grandfather of what has come to be

---

[113] Exhibit 13, Keith Johnson email on December 14, 2014 (FSSTX-037204).

known as the 9/11 Truth Movement.'"[114] Mr. Zipp described InfoWars' reckless history of telling its audience that national tragedies are fake:

> Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100% false flag." Jones claimed that Columbine "had globalist operations written all over it." Regarding the Oklahoma City bombing, Jones said the bombing was a "false flag" and that "we've never had one so open and shut." He added that convicted bomber Timothy McVeigh "was a patsy, that was a staged event."
>
> Mere hours after James Holmes killed twelve people in a movie theater in Aurora, CO, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind-control event." After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven." Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."
>
> An April 18, 2013 headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up." A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now." Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies." Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA.
>
> Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90% probability that it was a false flag.[115]

---

[114] Exhibit 1, Fred Zipp Affidavit in *Pozner*, p. 19.
[115] *Id.* at p. 20

Mr. Zipp concluded that "a major element of the InfoWars brand is built on his allegations that major national tragedies are actually the result of orchestrated government actions."[116] In his deposition, InfoWars' Chief Editor Paul Watson testified that Mr. Jones only stopped calling these events fake in the year after he was sued:

> Q. Can you give me an example of a US mass casualty event, like a mass shooting, a bombing, or the like that Mr. Jones didn't say was a false flag?
>
> A. I would say that the most recent ones post-Las Vegas massacre, maybe the debates in Ohio shooting, the El Paso shooting. Again, I don't know for sure, but I think after the Las Vegas one, he was more reticent to call them false flags.
>
> Q. After I sued him, right?
>
> A. I don't know when you sued him.
>
> Q. April of 2018. So in the past year, Mr. Jones has stopped saying some of these things, correct?
>
> A. I wouldn't say he's stopped saying them. I would say that there's a tendency to not directly say that after the event.
>
> Q. Because in the past, he would say it within hours of an event, correct, that it was a false flag?
>
> A. Well, yeah. That happened, yeah.[117]

---

[116] *Id.* at p. 21.
[117] Exhibit 8, Deposition of Paul Watson, p. 60.

In light of this history, Mr. Zipp found "that InfoWars' pattern of predictably asserting that events are 'false flags,' sometimes within hours of the event, is circumstantial evidence that InfoWars recklessly disregarded whether his broadcast was true in this case."[118]

## CONCLUSION

"A movant seeking net worth discovery need only show a substantial likelihood of success on the merits, not clear and convincing evidence, to be entitled to net worth discovery." *In re Bella Corp.*, 2021 WL 3671334 at *2. Because that standard is met by the facts set forth above, Plaintiffs prays this Court grants their Motion for Leave to Serve Net Worth Discovery.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

---

[118] Exhibit 1, Fred Zipp Affidavit in *Pozner*, p. 21.

## CERTIFICATE OF CONFERENCE

I hereby certify that I have twice conferred with opposing counsel about this Motion, but they have not indicated if they are opposed.

_____

MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2021, the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

---

## ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO SERVE NET WORTH DISCOVERY

---

1

On this day, the Court considered Plaintiffs' Motion for Leave to Serve Net Worth Discovery. The Court finds there is good cause to grant the Motion because Plaintiffs have a substantial likelihood of success on the merits of each of their claims for exemplary damages.

It is hereby ORDERED that Alex Jones, Owen Shroyer, Free Speech Systems, LLC, and InfoWars, LLC are all ordered to answer the following discovery requests:

Interrogatory No. 1: Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

a.      All income and assets of whatsoever kind and nature and wherever situated.

b.      A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

Request for Production No. 1: Produce any balance sheets or financial statements reflecting your net worth since April 16, 2018.

Request for Production No. 2: Produce any account statements for 2021 for any bank accounts or brokerage accounts you own.

Request for Production No. 3: Produce any Federal or State income tax returns with W-2 statement(s) you have filed in the past five years.

Furthermore, it is hereby ORDERED that Plaintiffs are permitted to inquire about Defendants' net worth at any future depositions.

Dated _____, 2021.

_____
Hon. Maya Guerra Gamble

## AFFIDAVIT OF FRED ZIPP

STATE OF TEXAS  §
                §
TRAVIS COUNTY  §

Before me, the undersigned notary, on this day personally appeared FRED ZIPP, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

### PERSONAL BACKGROUND

I have spent 39 years in daily newspaper journalism and journalism education.

From 1979 to 1984, I was a reporter and assistant city editor at the Beaumont Enterprise in Beaumont, Texas. From 1984 to 1987, I was a sports copy editor, assistant sports editor and assistant city editor at the Austin American-Statesman in Austin, Texas. From 1987 to 1998, I was assistant metro editor, deputy metro editor, news editor and metro editor the Palm Beach Post in West Palm Beach, Florida. In 1998, I returned to the American-Statesman as assistant managing editor, managing editor, and retired as editor. Over the course of my career, I gained extensive experience and expertise in the responsible delivery of news content to a mass media audience.

In 2012, I began teaching at the University of Texas at Austin. At the University of Texas, I supervise a digital media initiative known as *Reporting Texas* which functions similarly to a newsroom; students are the reporters, and I am their editor. I help them conceive, report and write stories that are posted on the reportingtexas.com website.

I have been a director and officer of the Freedom of Information Foundation of Texas and the Headliners Foundation of Texas, an organization that promotes journalism excellence in the state.

### SCOPE OF REVIEW

In arriving at my opinions in this case, I have used the same principles and analysis as I have used throughout my journalism career to determine whether particular assertions could be responsibly published. This review included an examination of the disputed statements as well as a variety of relevant background materials. I have reviewed numerous background items, including:

- Public domain materials relating to the Sandy Hook shooting.

- Materials from the final report published by the Connecticut Department of Emergency Services and Public Protection, available at: http://cspsandyhookreport.ct.gov/

- Various articles and social media content from InfoWars.

- Various articles and reference materials concerning InfoWars

- My own personal reference materials and texts.

- Video clips containing statements by InfoWars about Sandy Hook, along with transcripts of those video clips created by a court reporter. Those transcripts are attached to my affidavit.

It is my belief that discovery will likely to produce further relevant evidence, but I am confident that enough material exists in the public domain to reach reliable opinions for the purposes of these initial findings.

## BACKGROUND KNOWLEDGE OF INFOWARS

Having been involved in media in Austin for 23 years, I am aware of Alex Jones and InfoWars, although I felt no need to pay close attention to either one before agreeing to review the materials in this lawsuit. Nonetheless, I was aware of InfoWars' extremely poor reputation in the media industry with respect to the reliability of the information it publishes, and I also knew Mr. Jones had alleged the Sandy Hook Elementary School shooting was a government hoax involving actors.

After I asked to review the events of this lawsuit, I have spent a significant amount of time reading articles on InfoWars.com and reviewing audio and video recordings posted to the website. While the site purports to be a news and information operation, it is clear that it is actually a propaganda outlet for Mr. Jones' theories about a global conspiracy to control and enslave the world's population.

Alex Jones and InfoWars generally have a signature style: rapid-fire assertion of various data points with little or, more often, no attribution. The assertions are presented to the viewer as facts. Underlying the presentation is the premise that Jones is at war with "the globalists" and that he wins the war by marshaling his assertions more effectively than they do. In traditional journalism, by contrast, attributing assertions to sources is an essential element of the work, and the attribution becomes more important in proportion to the seriousness of the facts asserted.

According to the American Press Institute, "Journalism is the activity of gathering, assessing, creating, and presenting news and information. It is also the product of these activities...These elements not only separate journalism from other forms of communication, they are what make it indispensable to democratic societies."[1] The process of journalism is dependent on responsible verification in which information is gathered and its accuracy is evaluated. In

---

[1] https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/

coming to my opinions, I have analyzed InfoWars' conduct against the well-established standards of the journalism profession.

## INFOWARS' 2017 BROADCASTS

1.    **InfoWars' April 22, 2017 broadcast falsely stated that Plaintiff Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper to cover up the truth about Sandy Hook.**

A central element of Mr. Jones' years of allegations that Sandy Hook was staged fake focuses an interview between Sandy Hook parent Veronique De La Rosa and Anderson Cooper. Mr. Jones insists this interview was fake, and that it was conducted in front of blue-screen. On the April 22, 2017 InfoWar's broadcast entitled "Sandy Hook Vampires Exposed," Alex Jones made the following statements:

> So here are these holier than thou people, when we question CNN, who is supposedly at the site of Sandy Hook, and they got in one shot leaves blowing, and the flowers that are around it, and you see the leaves blowing, and they go [gestures]. They glitch. They're recycling a green-screen behind them...

> [Shows video footage of interview between Veronique De La Rosa and Anderson Cooper]

> And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists (sic), if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists (sic) attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, *how could you believe any of it if you have a memory?* If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that.[2]

My review suggests this statement is false, both in their explicit text and in their implications. The available public evidence suggests that Anderson Cooper interviewed Veronique

---

[2] Ex. A26 - 2017-04-22 - Sandy Hook Vampires Exposed (Clip at 29m)

De La Rosa in Newtown. An expert review by video analyst Grant Fredericks concluded that there is no reasonable basis to believe the interview used a blue-screen and that the compression artifact would be understand by anyone with a basic understanding of digital video.[3] For this reason and other discussed more fully below, is clear to me that any broadcaster would have serious doubts about stating a blue-screen was used. In sum, there was no reasonable basis to believe that Veronique De La Rosa participated in a faked interview, and any publisher would entertain serious doubts about the truth of such a claim.

**2.      InfoWars' April 22, 2017 broadcast made additional false statements about the Sandy Hook shooting and investigation meant to imply that Mrs. De La Rosa's interview is covering up a terrible secret truth.**

In order to justify the implication that the Sandy Hook shooting was a hoax, Mr. Jones has repeatedly provided his viewers with false assertions which he claims are evidence of a cover-up. In the April 22, 2017 broadcast, Mr. Jones followed this pattern by making several statements of fact which are contradicted by the publicly available evidence. These statements have been made by Mr. Jones on numerous prior occasions, and they are used as part of his efforts to convince his audience that a terrible secret truth about Sandy Hook is being covered up by the Plaintiffs and many others.

**A.      In the April 22, 2017 broadcast, InfoWars falsely asserted that "the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it."**

In the April 22, 2017 broadcast, Mr. Jones asserted that Sandy Hook Elementary School had not been open for years, and the incident was staged in a decaying school which had not been in operation. Mr. Jones has repeated this argument many times over the years.

I have reviewed the affidavit Dr. H. Wayne Carver, the chief medical examiner who attended to the dead at Sandy Hook. Dr. Carver stated that the school was operational and not rotting or falling apart. I have also viewed publicly available photos of the school's interior taken by law enforcement, as well as video taken by law enforcement, both of which were included in the official Sandy Hook report. The school appears perfectly normal, bearing all the signs of an operational school. The school is not rotting or falling apart, just as Dr. Carver stated.

In order to believe Mr. Jones' statements, one must believe that all photos taken inside Sandy Hook are actually older photos, since Jones alleged that the school was shut down for several years. However, the most well-known and widely publicized photo of Sandy Hook victim N.P. was taken inside Sandy Hook Elementary School. N.P. is wearing a t-shirt made to promote the movie The Amazing Spiderman, which he is also seen wearing other photos.[4]

---

[3] Affidavit of Grant Fredericks
[4] Photos provided and used with permission of the Pozner family.

 

Given the production date of the film, the t-shirt worn by N.P. establishes that the photos could not have been taken before 2012, indicating that the school was open and in operation during that year.

 

Similarly, there is a photograph of N.P. taken on the same day in which he is holding a copy of a LEGO Star Wars book entitled "Anakin to the Rescue." The book was published on September 1, 2012.

 

Finally, N.P. and his sisters are present in a photo taken inside Sandy Hook Elementary School for a Veteran's Day celebration, which matches footage recorded in the school on the day of the shooting.

 

Researchers have catalogued at least 180 news articles appearing in the Newtown Bee, the Danbury Newstimes, and the Newtown Patch between 2008-2012 which discuss activities at Sandy Hook Elementary.[5] The Newtown Bee hosts a photo archive which contains pictures from stories on Sandy Hook, along with viewable metadata. For example, a photo taken in 2011 shows choir practice in Sandy Hook.[6]

---

[5] http://www.crisisactorsguild.com/2016/08/25/sandy-hook-elementary-was-open-part-eleven-180-articles-referencing-sandy-hook-school-written-between-2008-2012/

[6] https://photos.newtownbee.com/Journalism/Photos-from-the-issue-59/i-p8G52Rv



There are countless examples of the school's operation between 2008-2012 in the form of social media posts, photographs, and school publications. The evidence I have reviewed shows that the school was not shut down in the years leading up to the shooting. Rather, all evidence indicates that N.P. was a student attending Sandy Hook Elementary School and that it was operational through 2012.

**B.     In the April 22, 2017 broadcast, InfoWars falsely asserted that "the kids are going in circles, in and out of the building with their hands up."**

In the April 22, 2017 broadcast, Mr. Jones repeated a false statement he has made many times about kids walking in circles back into Sandy Hook Elementary School with their hands up. In an earlier broadcast on November 18, 2016, Mr. Jones discussed this claim, stating "We watched footage of kids going in circles, in and out of the building. You'd be running them away from the building."[7] Mr. Jones showed news helicopter footage taken on the afternoon of the incident showing a line of people exiting the rear of a building and walking in a line to the building's front entrance.

---

[7] Ex. A24 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)



Mr. Jones lead his audience to believe this building is Sandy Hook Elementary School. The building is actually a Newtown fire station. The fire station was used as a staging location near the school. This fact is obvious from the same news helicopter footage.



As can be seen in the footage, the shooting has long since ended, and there was no danger to any of the individuals in the staging area. Moreover, none of these individuals walking in line are elementary-aged children. Rather, they are adults with some late adolescent children. None of the individuals have their hands up.



The footage shows people were calmly walking to the front of the firehouse. The reasonable inference is that this group of parents had been ordered by authorities to walk to the front of the building, and they could not travel through the building without disrupting official operations occurring inside.[8] Whatever the reason for these individuals walking in a line to the front of the building, it did not involve kids with their hands up, nor did it reasonably suggest any cover-up or manipulation. In short, there is no truth to the claim on the April 22, 2017 broadcast that "the kids are going in circles, in and out of the building with their hands up." Furthermore, any reasonable publisher would have known the claim was not true.

**C.    In the April 22, 2017 broadcast, InfoWars asserted that "they had Port-A-Potties being delivered an hour after it happened, for the big media event."**

To reinforce the idea that the event was staged, Mr. Jones claimed that port-a-potties were delivered to Sandy Hook Elementary School within an hour. However, the arrival of port-a-potties was recorded by an officer's dashboard camera, which was part of the publicly available report. The dashboard camera shows the port-a-potties arrived around 1:30 p.m., nearly four hours after the shooting.

---

[8] Sandy Hook Official Report - Book 6, Document 40345.



**D.  In the April 22, 2017 broadcast, InfoWars asserted that law enforcement was "pulling guns out of cars."**

During the April 22, 2017 broadcast, InfoWars reporter Rob Dew alleged that authorities found multiple guns in Adam Lanza's car. On prior occasions, Mr. Jones has stated that the shooter's semi-automatic rifle was found inside his car. On January 4, 2013, Mr. Jones stated: "They said he had an AR-15...M4 inside, and it was in the car."[9] The implication is that Lanza could not have used his semi-automatic rifle to commit the crime because he did not take it into the building.

However, there was only one weapon found in Lanza's vehicle. That weapon was a shotgun, not his semi-automatic rifle. Lanza took his rifle and pistols into the building. Newtown Police Officer Leonard Pena found a shotgun in Lanza's vehicle and secured it in the trunk in the early moments of the response.[10] A police photo[11] shows the Saiga 12 shotgun in the truck of Lanza's car.

---

[9] Ex. A2 - 2013-01-04 - Callers React to Foreign Media Pushing Total Gun Confiscation (Clip at 20m25s)
[10] Sandy Hook Official Report - Book 6 Doc 258036
[11] Sandy Hook Official Report - Meehan Parking Lot Photo 37



There is no evidence that police found any other weapon in Lanza's vehicle. Likewise, there is no evidence that police were "pulling guns out of cars." The statements in the April 22, 2017 broadcast were false.

### E. In the April 22, 2017 broadcast, InfoWars asserted that law enforcement authorities were "finding people in the back woods who are dressed up in SWAT gear."

In the April 22, 2017 broadcast, InfoWars reporter Rob Dew claimed that men wearing SWAT gear were detained in the woods behind Sandy Hook Elementary School. Mr. Jones responded: "And that's on helicopter footage, and then they say it never existed, and later admit it does."

The helicopter footage referenced by Mr. Jones depicts police detaining two reporters who were walking through the woods carrying cameras. The helicopter footage of this encounter has been available online through the Associated Press' YouTube channel since the day of the shooting.[12] Multiple police reports also described this encounter and identified the individuals as reporters. Newtown Police Officer Jason Flynn discussed the encounter in his post-incident interview.[13] He described running into the woods and detaining the reporters with fellow officers:

> I then remained outside and assisted Officers with securing the scene. I was near Ofc. Hull near the dumpsters when we heard some Officers in the woods yelling "show me your hands". Ofc. Hull and I then ran into the woods with our sidearm drawn, where several Connecticut Environmental Conservation Officers had two males at gunpoint. As I approached the males I observed they had several straps around their bodies with cameras

---

[12] https://www.youtube.com/watch?v=-uor8MnOTM8
[13] Sandy Hook Official Report - Book 6, Document 28227



Newtown Police Officer Liam Seabrook also discussed the encounter with the reporters in his post-incident interview.[14]

> While at the front of the school, Newtown Police Officer Hull, who was standing on the front right corner of the school, yelled that he heard people shouting "put your hands up". I then ran over to the location to where Ofc. Hull indicated he heard the shouts. I observed three DEP police officers, with their weapons pointed at two male individuals that were in the woods on the right side of the school. I then ran up the hill, in the woods, to the

> three DEP police officers. As I approached the three DEP officers, I also pointed my rifle at the two males standing with their hands in the air. I approached the male on the right and handcuffed him. I then searched the male for weapons with negative results. Newtown Police Ofc. Flynn then ran both parties over the radio. One of the DEP officers recorded the two males information. The two males were then identified as reporters for newspapers. It was then determined that the two reporters were going to be set free for the time being. The two reporters were then told to immediately leave the area. I then returned to the front of the school.

Two other individuals were known to be detained in the aftermath of the shooting, but neither were in the woods wearing SWAT gear. First, a parent of a child attending Sandy Hook, Chris Manfredoni, was briefly detained. His detention was described in contemporary press accounts.[15] His detention was also discussed in a post-incident report.[16] This parent was not in the woods, and he was certainly not in SWAT gear. Second, an unarmed man was detained for getting too close to the school. Police reports indicate he had an app on his phone that alerted him to police emergencies.[17] There was also a news interview with a witness who saw this man detained.[18] Finally, there was a report in the Newtown Bee that a man in civilian clothes seen by residents in the woods with a gun was an off-duty police officer responding to the emergency.[19] There were no reports of anybody wearing SWAT gear, and there is no report that this off-duty officer was detained. In sum, there is no reasonable basis for an assertion that police found men in the woods wearing SWAT gear.

It was not necessary to obtain a subpoena to secure the materials needed to fact-check these claims. All these materials exist in the public domain, and they have been discussed by Sandy

---

[14] Sandy Hook Official Report - Book 6, Document 29085

[15] http://articles.latimes.com/2012/dec/14/nation/la-na-1215-newtown-school-shooting-20121215

[16] Sandy Hook Official Report - Book 5, Document 14498

[17] Sandy Hook Official Report - Book 6, Document 2060; Book 6, Document 40345

[18] https://www.youtube.com/watch?v=PqY9Xvr0Ts8  [19]https://www.snopes.com/fact-check/sandy-hook-exposed/ ;
https://www.salon.com/2013/01/18/your_comprehensive_answer_to_every_sandy_hook_conspiracy_theory/ ;
https://www.huffingtonpost.com/2013/02/11/sandy-hook-hoax-theories-explained-debunking-newtown-truther_n_2627233.html

Hook researchers online. A variety of individuals have debunked these claims over the years while providing verifiable information from the public record. Any responsible publisher would have known Mr. Jones' claims were false, or otherwise entertained serious doubts about their accuracy.

## OPINIONS

### 1.    InfoWars' False Statements in 2017 Impugned the Reputation of the Plaintiffs.

It is my opinion that the statements made in the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed" were capable of defaming Veronique De La Rosa and Leonard Pozner by impugning their reputation with false information about their honesty or integrity.

### A.    Background

InfoWars' April 22, 2017 statements were not made in isolation. The 2017 statements repeated and elaborated on allegations that InfoWars had been making for over four years. Mr. Jones used these false statements as evidence for his contention that the Sandy Hook shooting was faked or staged, and that the participants are engaged in a sinister cover-up.

In a January 27, 2013 broadcast entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones first alleged that Veronique De La Rosa's interview was evidence of a cover-up:

> In the last month and a half, I have not come out and said that this was clearly a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction...Something serious is going on here, and CNN over and over again is at the heart of the fishy things that are happening...
>
> We've got Anderson Cooper supposedly at Sandy Hook, and it's clearly blue screen. I've worked with blue screen for 17 years. We've got it right in there. We know what it looks like. We know what the anomalies look like, and we know what happens when you don't tune it properly. It's clearly blue screen, and you can draw from that what you want...[20]
>
> Now, ladies and gentlemen, the finale. I saw this footage where Anderson Cooper turns. He's supposedly there at Sandy Hook in front of the memorial, and his whole forehead and nose blurs out. I've been working with blue screen, again, for 17 years. I know what it looks like. It's clearly blue screen, clearly.[21]

In an April 16, 2013 broadcast entitled "Shadow Govt Strikes Again," Mr. Jones was discussing was various plots behind various national tragedies. During his remarks, he stated:

---

[20] Ex. A3 - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 1m12s)
[21] Ex. A4 - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 12m58)

"They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."[22]

In a March 14, 2014 broadcast entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones again repeated his false claim about Mrs. De La Rosa's interview with Anderson Cooper, along with several other irresponsible claims. Mr. Jones then asserted that the event was pre-planned and featured actors as a part of a cover-up:

> Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it.[23]

In a May 13, 2014 broadcast entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Mr. Jones again repeated his false statements,

> They don't even hide this stuff, ladies and gentlemen. Anderson Cooper, CIA, up there, who cares if it's blue screen. Just like CNN - - I'm going back to our guest -- Just like CNN back there in the first Gulf War was at the broadcast center in Atlanta on top of a roof with a blue screen behind them saying they were in Riyadh, Saudi Arabia, and Israel different days being hit by nerve gas. And then they went on air for parts of it with the blue screen not even turned on with blue behind them...
>
> You're looking at how they don't any of the standard stuff, the paperwork, the police reports, no helicopter sent, no rescue, kids going in circles totally staged, men with guns in the woods getting grabbed, no names released. They deny it went on. Later have to admit it went on but say we're not answering questions. I mean, clearly it's a drill, just like the Boston bombing. I don't know exactly what's going on, but it just -- the official story isn't true.[24]

In a September 25, 2014 broadcast entitled "Connecticut PD Has FBI Falsify Crime Statistics," Mr. Jones stated

---

[22] Ex. A5 - 2013-04-16 - Shadow Govt Strikes Again (Clip at 13m20s)
[23] Ex. A6 - 2014-03-14 - Sandy Hook, False Narratives Vs. The Reality (Clip at 26s)
[24] Ex. A7 - 2014-05-13 - Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert (Clip at 17m)

This is not a game. They are hopping mad we're covering this. CNN admits they did fake scud attacks on themselves back in 1991, 1990. Would they stage this? I don't know. Do penguins live in Antarctica? Wolfgang W. Halbig's our guest, former state police officer, then worked for the customs department, and then over the last decade's created one of the biggest, most successful school safety training grips. And he just has gone and investigated, and it's just phony as a three-dollar bill...[25]

If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.[26]

In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones stated:

All I know is I saw Cooper with blue screen out there, green screen. I know I saw the kids doing fake, you know, rotations in and out of the building. They tore it down, all the unprecedented gag orders, you know, the police in anti-terror outfits in the woods. Then they denied that, that had been in the news. I mean, something is being hidden there... [27]

I said they may have killed real kids, but they're practicing how to propagandize, and how to control the press, and how to put out a product that's a fraud when I just saw the heavy, heavy, heavy scripting. That was what was so clear. And then the parents laughing and then one second later doing the actor breathing to cry. I mean, it just -- it's just over the top. Over the top sick. [28]

In a December 29, 2014 broadcast entitled "America the False Democracy," Mr. Jones continued to insist that Sandy Hook was fake:

---

[25] Ex. A8 - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[26] Ex. A8 - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[27] Ex. A9 - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 3m08s)
[28] Ex. A10 - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 4m34s)

I've had investigators on. I've had the state police have gone public, you name it. The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? I mean it's just -- how do you even convince the public something is a total hoax?

The general public doesn't know the school was actually closed the year before. They don't know. They've shielded it all, demolished the building. They don't know that they had their kids going in circles in and out of the building as a photo op. Blue screen, green screens, they got caught using. I mean the whole thing.

But remember, this is the same White House that's been caught running the fake Bin Laden raid that's come out and been faked. It's the same White House that got caught running all these other fake events over and over again, and it's the same White House that says I never said that you could keep your doctor when he did say you could keep doctor. People just instinctively know that there's a lot of fraud going on, but it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up, but then I did deep research; and my gosh, it just pretty much didn't happen. [29]

In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook, including his allegation about Mrs. De La Rosa's interview, as well allegations about her son. He asserted that the event was "completely fake" and "manufactured":

You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting.

Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit.[30]

---

[29] Ex. A11 - 2014-12-29 - America the False Democracy (Clip at 11m53s)
[30] Ex. A12 - 2015-01-13 - Why We Accept Gov't Lies (Clip at 10m36s)

In a February 12, 2015 broadcast with an unknown title, Mr. Jones continued to repeat his false claims. Mr. Jones stated, "I know they're using blue screens...There are literally hundreds of smoking guns here that this thing doesn't add up."[31]

In a March 4, 2015 broadcast entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones stated, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake. How fake we don't know. It's sick."[32]

In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.[33]

In a July 7, 2015 broadcast entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his prior false claims about Sandy Hook:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.
>
> Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.
>
> We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method...
>
> But I mean, this is just so big. And the more we look at Sandy Hook, I don't want to believe it's a false flag. I don't know if kids really got killed. But you got green screen with Anderson Cooper where I was watching the video and the flowers and plants are blowing in some

---

[31] Ex. A13 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 0m26s)
[32] Ex. A20 - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 32m30s)
[33] Ex. A21 - 2015-07-07 - Government Is Manufacturing Crises (Clip at 32m)

of them, and then they blow again the same way. It's looped, and then his nose disappears. I mean, it's fake.

The whole thing is just -- I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House, you know. I don't know how they do it, but it's not real. When you take your kids to see, you know, the Haunted House and ghosts are flying around, they're not real, folks. It's staged.[34]

Mr. Jones also stated, "It's 101, they're covering up...This is mega-massive cover-up. My God." Mr. Jones stated that the tragedy was "totally made up with green screens, everything. And we've got them on green screens." Mr. Jones stated, "That's how evil these people are is that they can have CNN involved, all these people."[35]

In a November 18, 2016 broadcast entitled "Alex Jones Final Statement on Sandy Hook," Mr. Jones directly addressed the growing public controversy caused by his statements. In doing so, he began by repeating the numerous false claims he has made over the years.

Number one, the day before this tragic event happened an email was sent out by Bloomberg's anti-gun group saying prepare for a big event. But the biggest piece of evidence, the smoking gun, if you would, of a cover-up, of whatever really happened is the Wayback Machine, the internet archive. We see Sandy Hook's Newtown website K through 12 having zero traffic 2008, '09, '10, '11, '12, and then all of a sudden it just explodes. It's impossible to have zero traffic to a K through 12 entire school system. And the word is that school system was shut down for those years. That's what the records show. They tell us it was open...

And early on, that day we watched footage of kids going in circles in and out of the building. You'd be running them away from the building. Emergency helicopters weren't called. Instead port-potties were prepared for the press within hours of the event. I saw the helicopters that did respond, the police helicopters saying that there were men or a man in the woods in camouflage...

And then I saw Anderson Cooper -- I've been in TV for 20-something years; I know a blue screen or a green screen -- turn, and his nose disappears. Then I saw clearly that they were using footage on the green screen looped because it would show flowers and other things during other broadcasts that were moving and then basically cutting to the same piece of footage...

---

[34] Ex. A22 - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 0-5m)
[35] Ex. A23 - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip at 9m40s)

Then we see footage of one of the reported fathers of the victims, Robby Parker, doing classic acting training where he's laughing and joking. And they say, hey, we're live, and he goes, oh. And maybe that's real. I'm sure it is.

But you add it to all the other things that were happening and all the other fake news the media has been caught in, and CNN back in 1991 openly faking scud missile attacks on Saudi Arabia and Israel when they were back in Atlanta; and the satellite feeds caught them admitting that it was all fake. We'd be crazy not to question this because bare minimum they were faking some of the shots and some of the coverage.

So to be clear, we point out clear chroma key, also known as blue screen or green screen being used, and we're demonized. We point out they're clearly doing fake interviews.[36]

In other words, Mr. Jones used Mrs. De La Rosa's "fake" interview as proof that the truth about Sandy Hook was being artificially manipulated. In a chilling finale, Mr. Jones told his audience that the parents were actors:

And why should anybody fear an investigation if they have nothing to hide. In fact, isn't that in Shakespeare's Hamlet, "me thinks you protest too much."

But this particular case they are so scared of an investigation. So everything they do basically ends up blowing up in their face. So you guys are going to get what you want now. I'm going to start reinvestigating Sandy Hook and everything else that happened with it...

And so if children were lost in Sandy Hook, my heart goes out to each and every one of those parents and the people that say they're parents that I see on the news. The only problem is I've watched a lot of soap operas, and I've seen actors before. And I know when I'm watching a movie and when I'm watching something real.[37]

On April 22, 2017, InfoWars aired the "Sandy Hook Vampires Exposed" broadcast. During that broadcast, InfoWars once again made the false accusation that Ms. De La Rosa conducted a fake interview with Anderson Cooper as evidence of a conspiracy to cover up the truth about Sandy Hook. This broadcast was not an isolated statement, and it was clearly meant to reinforce years of claims about Sandy Hook. InfoWars should have known these claims were not true.

---

[36] Ex. A24 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)
[37] Ex. A25 - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 15m22s)

The statements made in the April 22, 2017 broadcast were further reinforced by comments Mr. Jones and InfoWars made later in 2017. On June 13, 2017, Mr. Jones stated in a Facebook video that "there's been a cover-up, and Anderson Cooper got caught faking where his location was with blue screen."[38] On June 19, 2017, Mr. Jones appeared for an interview with Megyn Kelly. During this interview, Mr. Jones continued to insist there had been a cover-up. While he waffled on whether he now believed children were killed, he did not abandon his accusations about a cover-up. Mr. Jones claimed it was suspicious that the children's autopsy records were not released to the public, and he again claimed to see video of kids going in circles in and out of Sandy Hook elementary. Mr. Jones stated, "I do think there's some cover-up and some manipulation."[39]

In an October 26, 2017 broadcast entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones again returned to the subject of Sandy Hook. In this broadcast, he repeated his accusation that "it's as phony as a three-dollar bill with CNN doing fake newscasts, with blue screens."[40]

### B.       The reasonable meaning of InfoWars' 2017 broadcasts

Before publishing, journalists must evaluate how their story will be received by the public. The editorial process includes an analysis of how ordinary readers of average intelligence will understand and interpret the story. During my years in newspaper journalism, I gained extensive expertise in assessing the reasonable meanings of a text. As editor, I routinely applied this expertise in order to avoid creating a misimpression among our readership. In this case, I likewise analyzed the publication to determine what meaning could be reasonably understood by a person of average intelligence.

It is my opinion that a person of ordinary intelligence could reasonably understand InfoWars' 2017 statements to accuse Ms. De La Rosa in colluding in an act of technical trickery to simulate her presence in Newtown when she was not actually there. A person of ordinary intelligence could reasonably understand that Mr. Jones was claiming this trickery was consistent with a series of deceptions perpetrated by CNN to facilitate violence and abuses of power. Unquestionably, the gist of the broadcast is that Ms. De La Rosa's fake interview is evidence of an evil conspiracy underlying Sandy Hook. Given the circumstances, it is my opinion that a person of ordinary intelligence could reasonably draw the implication that InfoWars was alleging Mrs. De La Rosa's interview is evidence that Sandy Hook was staged and that the alleged parents are participating in a cover-up. A person of ordinary intelligence could also reasonably draw the implication that InfoWars was alleging that Ms. De La Rosa is not a parent, but rather an actor participating in CNN's insidious scheme.

While the statements do not feature him specifically, a person of ordinary intelligence acquainted with Leonard Pozner, who was Ms. De La Rosa's husband, could reasonably have understood that the allegations also implicated him. Given the nature of the allegations about Ms. De La Rosa's conduct, and given the allegations that Sandy Hook was a staged event, a person of

---

[38] Ex. A28 - 2017-06-13 - What Alex Jones Really Believes About Sandy Hook (Clip at 14m)
[39] Ex. A29 - 2017-06-19 - Megyn Kelly Profile (Clip at 7m55s)
[40] Ex. A30 - 2017-10-26 - JFK Assassination Documents To DROP Tonight (Clip at 1h13m30s)

ordinary intelligence could reasonably draw the implication that Leonard Pozner must also have been participating in a cover-up of the event.

Not only is it my opinion that these statements could be understood in this manner, but there is ample evidence that Mr. Jones' statements were indeed understood in this manner by the public at large. The nature of Mr. Jones' statements about Sandy Hook have been widely reported in the media. The national outrage created by the unmistakable meaning of Mr. Jones' statements about Sandy Hook is well documented. In an April 19, 2018 editorial entitled "Thank You for Suing Alex Jones," the Hartford Courant editorial board wrote:

> Alex Jones and his website Infowars offer the worst kind of free speech — incendiary malice, based in falsehood, with no social value...They claim the Sandy Hook parents are actors. They claim the children never existed. They weave wild conspiracies from thin air. They have no regard for human suffering.[41]

The New York Daily News Editorial Board wrote about Jones' statements in an editorial on April 17, 2018 entitled "Defamed by the devil: Sandy Hook parents take on Alex Jones' lies." The Board wrote:

> All decent people should cheer on Leonard Pozner, Veronique De La Rosa and Neil Heslin...for filing a defamation lawsuit in Texas court against Alex Jones. As a radio show host and the grand poobah of Infowars.com, Jones has peddled wretched whole-cloth lies about the 2012 Newtown massacre: that it was all a hoax, that the victims and their mourning mothers and fathers are actors.[42]

In short, nobody who has been paying attention to Mr. Jones has any ambiguity about the meaning of his claims. His statements about Mrs. De La Rosa's interview form a central part of his years-long campaign to convince his viewers that the events of Sandy Hook should not be believed. Given the persistence of the Sandy Hook hoax conspiracy online, it is clear that many of Mr. Jones' followers have accepted his allegations as true. A 2016 poll conducted by Fairleigh Dickinson University found that 24% of Americans believe Sandy Hook was either "definitely" or "possibly" faked.[43]

Additionally, it is clear from my review that Mr. Jones' statements would be reasonably understood as assertions of fact, not opinions. Mr. Jones did not equivocate in his statements about a blue-screen or his other false statements about Sandy Hook. Mr. Jones has frequently claimed special expertise and assured his audience that the interview "clearly" used a blue screen. In the April 22, 2017 broadcast, Mr. Jones confidently stated that "the green-screen isn't set right."[44]

---

[41] http://www.courant.com/g00/opinion/editorials/hc-ed-alex-jones-sandy-hook-hoax-lawsuit-20180417-story.html?i10c.encReferrer=&i10c.ua=1&i10c.dv=14
[42] http://www.nydailynews.com/opinion/defamed-devil-sandy-hook-parents-alex-jones-lies-article-1.3939094
[43] https://view2.fdu.edu/publicmind/2016/161011/
[44] Ex. A26 - 2017-04-22 - Sandy Hook Vampires Exposed (Clip at 29m)

It is my opinion that that InfoWars' 2017 statements would tend to injure a person's reputation and impeach their honesty and integrity. It is also clear these statements could expose a person to contempt or ridicule.

**2.      InfoWars' accusations about Sandy Hook and Ms. De La Rosa's interview were made with reckless disregard for truth.**

I have reviewed materials which lead me to believe that InfoWars demonstrated a reckless disregard for truth. It is my opinion that InfoWars had serious doubts about the truth of their 2017 broadcasts and were motivated by a desire to mislead.

### A.      InfoWars's accusations were inherently improbable.

Mr. Jones' assertion about the blue-screen was farfetched to the say the least. It required an extraordinary level of verification before being repeatedly stated as fact. Yet it is clear that InfoWars performed no verification because any genuine inquiry would have shown the accusation was bogus. As demonstrated by video analyst Grant Fredericks, any minimal competent video professional would have understood that the blue-screen was not used.

Another problem with InfoWars' allegation is that it makes no sense to use a blue screen to simulate an interview in a location that is a short drive from Anderson Cooper's office in New York City. In addition, there is copious third-party evidence that Mr. Cooper was in Newtown. For example, on December 15, 2012, an Anderson Cooper fan blog, "All Things Anderson," posted photographs of Mr. Cooper in Newtown.[45]

 

Mr. Jones' accusation proves the adage that serious claims require serious evidence. Yet it does not appear that Mr. Jones had any evidence to make his assertions, relying instead on his own self-professed expertise in video technology. As such, Mr. Jones ignored basic precautions taken

---

[45] http://www.allthingsandersoncooper.com/2012/12/anderson-cooper-live-in-newtown-ct.html

by journalists. Rather than meaningfully investigate his claim or produce corroborating evidence, Mr. Jones made these statements with reckless disregard for whether they were true or not.

**B.      InfoWars has a long history of making false statements about Sandy Hook.**

InfoWars has made wild claims about the Sandy Hook massacre from the beginning. Mr. Jones suggested the event was a "false flag" on the day on the shooting[46], and InfoWars explicitly made that claim over the next five years. The accusation that Ms. De La Rosa's interview was conducted in front of a blue-screen became a central element of InfoWars' claim that the official story of Sandy Hook was a lie. In a 2013 broadcast entitled "Why People Think Sandy Hook is Hoax," Mr. Jones called Ms. De La Rosa's interview footage "the finale" in his parade of evidence that the event was staged. He continued to repeat this falsehood on numerous broadcasts over the new five years, along with other false assertions about Sandy Hook.

As part of my evaluation in this case, I reviewed video clips from over twenty InfoWars' broadcasts between 2013-2016, all of which discuss the alleged conspiracy behind Sandy Hook. In the videos I reviewed, InfoWars made a variety of factual allegations which are readily disproved by basic journalistic efforts. The various claims made by Jones have been debunked from numerous groups and individuals using a wide variety of sources in the public record.

InfoWars had ample opportunity to investigate the accuracy of its assertions. It has devoted an enormous amount of airtime to the tragedy, with broadcasts making extreme assertions years after the event. Given the enormous public attention and outcry over Jones' allegations, I find it unlikely that InfoWars researchers could have avoided the widespread debunking efforts unless they were doing so intentionally. It is my opinion that any reasonable journalist who continued to publish these claims in 2017 would entertain serious doubts about the truth of their statements, and that they would be acting with a desire to mislead their audience.

**C.      InfoWars has a long history of recklessly claiming that national tragedies were staged by the government.**

Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government. His current promotional materials boast that "Alex Jones is considered by many to be the grandfather of what has come to be known as the 9/11 Truth Movement."[47] Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100% false flag."[48] Jones claimed that Columbine "had globalist operations written all over it."[49] Regarding the Oklahoma City bombing, Jones said

---

[46] Ex. A1 - 2012-12-14 - Connecticut School Massacre Looks Like False Flag Says Witnesses (Clip at 9m30)
[47] Free Speech Systems, LLC Media Kit, p. 1.
[48] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51244/gcn-alexjones-20120720-columbinefalseflag
[49] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51241/gcn-alexjones-20120720-columbine

the bombing was a "false flag" and that "we've never had one so open and shut." He added that convicted bomber Timothy McVeigh "was a patsy, that was a staged event."[50]

Mere hours after James Holmes killed twelve people in a movie theater in Aurora, CO, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind control event."[51]

After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven."[52] Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."

An April 18, 2013 headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up."[53] A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now."[54] Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies."[55] Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA. [56]

Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90% probability that it was a false flag:

[50] The Alex Jones Show, April 19, 2015, video available at:
https://www.mediamatters.org/embed/clips/2016/11/21/51199/youtube-jones-20150419-okc
[51] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51243/gcn-alexjones-20120720-100
[52] Interview with Rolling Stone, March 2, 2011, available at:
http://www.rollingstone.com/politics/news/talk-radios-alex-jones-the-most-paranoid-man-in-america-20110302
[53] http://www.infowars.com/proof-boston-marathon-bombing-is-staged-terror-attack/
[54] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51269/youtube-alexjones-20130426-staged
[55] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51271/youtube-alexjones-20130426-boston
[56] The Alex Jones Show, April 8, 2015. Available at:
http://mediamatters.org/video/2015/04/08/rand-pauls-ally-alex-jones-boston-marathon-bomb/203215



In short, a major element of Mr. Jones' brand is built on his allegations that major national tragedies are actually the result of orchestrated government actions. Given this background, I find that Mr. Jones' pattern of predictably asserting that events are "false flags," sometimes within hours of the event, is circumstantial evidence that Mr. Jones recklessly disregarded whether his broadcast was true in this case.

### D.    There is evidence of personal animus to the Pozner family.

According to his affidavit, Plaintiff Leonard Pozner has spent significant effort online attempting to stop the spread of Mr. Jones' hoax fantasies. Mr. Pozner started a non-profit known as the HONR Network that seeks to have false statements about victims of mass shooting events removed from the internet.

In 2015, HONR lodged a complaint with YouTube over an InfoWars video that featured photographs of Mr. Pozner's son. When these complaints caused the video to be deleted, a visibly angry Jones discussed the issue on his February 12, 2015 broadcast. Mr. Jones stated, "We're going to be countering this, and we're going to be dealing with this."[57] Mr. Jones then stated, "We need to stop cowing down to these people, and let them know we're not putting up with their bullying anymore."[58]

Mr. Jones later took a live phone call from a fellow Sandy Hook denier who was also upset with Mr. Pozner. The caller stated, "Lenny, if you're listening, your day is coming, my friend. It is coming." Mr. Jones responded, "This sounds like a war is going on. I think they made a major mistake involving us." The caller then stated, "Oh, I totally agree. They don't know what they bit off. Go after them, Alex. Crush them." Mr. Jones responded, "I'm not somebody to mess with."[59]

---

[57] Ex. A14 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 23m34s)
[58] Ex. A15 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 31m14s)
[59] Ex. A16 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 34m10s)

Following this call, InfoWars reporter Rob Dew showed personal addresses of Mr. Pozner and displayed maps of these locations.[61] Mr. Jones stated that, "I guess I'm going to have to probably go on up to Newtown. I'm going to have to probably go investigate Florida as well."[62]

A few weeks after the broadcast discussing Mr. Pozner, InfoWars featured another broadcast about Sandy Hook on March 4, 2015 entitled "New Bombshell Sandy Hook Information In-Bound." Over the course of the one-hour broadcast, Mr. Jones made repeated reference to Mrs. De La Rosa's interview, such as:

> If we've seen false flags over and over again and then you've got all these anomalies and clear loop tapes and clear blue screen/green screens -- I mean, they really screwed up. CNN screwed up during the Gulf War with fake green screen stuff. It was blue screen in that case, chroma key…And you know, fake scud attacks that are admitted. So I just -- it had all the signs too. How they were so ready that day, how they capitalized them, how they rolled out all these groups.[63]

Mr. Jones and InfoWars continued to make false statements over the next year, culminating the statements in the April 22, 2017 broadcast entitled "Sandy Hook Vampires Exposed." I find there is circumstantial evidence that InfoWars' continuing allegations were motivated in part by personal malice towards Leonard Pozner.

## CONCLUSION

Based on the evidence I have reviewed at this early stage, it is my opinion that the Defendants failed to use reasonable care to ascertain the accuracy of their statements. Moreover, it is my opinion that the Defendants entertained serious doubts about the truth of their statements regarding the Plaintiffs. Given the evidence I have reviewed, I conclude that the statements were published with reckless disregard for falsity. It is also my opinion that the statements by InfoWars were harmful to the Plaintiff, and could subject them to public contempt, hate, or ridicule.

ERIC TELLEZ
Notary Public State of Texas
My Commission# 124709495
My Comm. Exp. Apr. 06, 2021

Fred Zipp

Eric Teller

My commission expires 4-6-21

---

[60] Ex. A17 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 38m59s)
[61] Ex. A18 - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 42m23s)
[62] Ex. A19 - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 16m53s)

# Exhibit A1

2012-12-14 - Connecticut School Massacre Looks Like False Flag Says Witnesses (Clip at 9m30)

Discovery Resource
713-223-3300

1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9 LOOKS LIKE FALSE FLAG SAYS WITNESSES

10            DECEMBER 14, 2012

11             CLIP AT 9M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **MR. JONES:**  ... with all sorts of information on

2 this subject.  But get ahold of your cousin when she settles

3 down and get her to talk to us for any other information.  We

4 need to know: were there any drills that day or the day

5 before?  Does she have anything about other shooters, or was

6 it that she never saw the shooters?

7      **UNIDENTIFIED CALLER:**  Well, I had asked them if it

8 was supposedly too -- because they have a lot of security at

9 that school.  You have to ring a doorbell in order to get

10 into the school.

11      **MR. JONES:**  Yeah, of course.  Which is another side

12 of that.  Yeah.  It's one of these federal model schools.

13      **UNIDENTIFIED CALLER:**  The thing that just scared

14 the daylights out of me -- I had to call right away -- is I

15 asked them, "Did they ever train for this?"  And my uncle

16 said, "Yes."  Within this school year, since September, they

17 have trained for incidents like this.

18      **MR. JONES:**  Well, that in and of itself isn't proof

19 of it, but they could use a drill to then bring in a patsy.

20 It could just be a Prozac head.  We'll find out.  God bless

21 you, sir.  I appreciate your call.  Stay in contact.

22      We're going to go to Rob who says email --

23      (END OF AUDIO FILE)

24

25

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A2

2013-01-04 - Callers React to Foreign Media Pushing Total Gun Confiscation. January 04, 2013.
Clip at 20m 25s

1

2

3

4                    CONNECTICUT MASSACRE SHOOTING

5

6

7

8                 TRANSCRIPT OF INFOWARS BROADCAST

9  CALLERS REACT TO FOREIGN MEDIA PUSHING TOTAL GUN CONFISCATION

10                        JANUARY 04, 2013

11                       CLIP AT 20M 25S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  ...but right on time Sandy Hook

2 happened.  And I saw some more of the foreign media going

3 conspiracy theorists say that, you know, there were multiple

4 shooters.  Well, the media always reports multiple shooters

5 because little kids were seeing, you know, people and making

6 the reports.

7          No.  We've aired the newscast.  It was helicopters

8 and footage and surveillance cameras of multiple guys in camo

9 arrested out in the woods.  It wasn't little kids filing

10 these reports.  There's video of it, and they said he had an

11 AR-15 M4 inside.  It was in the car.

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1               CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5      I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11                      _____

12                  Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A3

2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 1m12s)

Discovery Resource
713-223-3300

1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9 WHY PEOPLE THINK SANDY HOOK IS A HOAX

10              JANUARY 27, 2013

11               CLIP AT 1M 12S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1     **MR. JONES:** Now again, in the last month and a half

2 I have not come out and said that this was clearly a staged

3 event.  Unfortunately, evidence is beginning to come out that

4 points more and more in that direction, and we're going to

5 show you that information in a moment.

6        Now, a lot of the tens of millions of video views

7 on YouTube concerning the Sandy Hook hoax surrounds CNN and

8 what appears to be people who have been coached, people who

9 have been given cue cards, people who are behaving like

10 actors.  And we see CNN criticizing all the witnesses from

11 the helicopter, and the news crews, and witnesses, adults,

12 that saw multiple people being detained who were in camo.

13 We're told, oh, those are five-year-olds saying that.  It's a

14 conspiracy theory, when it's not five-year-olds saying that.

15 It's adults.  It's police admitting that "police officers"

16 were arrested from other jurisdictions creeping around in the

17 woods.

18        Something serious is going on here, and CNN over

19 and over again is at the heart of the fishy things that are

20 happening.

21        Now, remember, in 1990-1991 when the Gulf War

22 started, CNN would send out their raw feeds to their news

23 affiliates, and on it there was clear blue screens on top of

24 the roof of CNN Center in Atlanta with their top reporters

25 claiming they were in Israel under sarin nerve gas attack

Discovery Resource
713-223-3300

3

1 from scuds.  And later they had to admit, quietly -- this is

2 on record; we're going to show you some clips -- that indeed

3 they were in Atlanta, Georgia, and that they were not being

4 attacked by scud missiles with sarin gas.

5          CBS News got caught scripting videos as well, and

6 there's a lot of examples of this.

7          (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A4

2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 12m58)

Discovery Resource
713-223-3300

1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9 WHY PEOPLE THINK SANDY HOOK IS A HOAX

10              JANUARY 27, 2013

11              CLIP AT 12M 58S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1      **MR. JONES:**  ...that their people were supposedly

2 under with a blue screen.  Now, ladies and gentlemen, the

3 finale.  I saw this footage where Anderson Cooper turns.

4 He's supposedly there at Sandy Hook in front of the memorial,

5 and his whole forehead and nose blurs out.

6         I've been working with blue screen, again, for 17

7 years.  I know what it looks like.  It's clearly blue screen,

8 clearly.  And I thought that's got to be somebody's doctored

9 YouTube.  There's no way.

10         We went to CNN, found a link where the whole

11 interview had been posted.  It's been removed.  Oh, by the

12 way, just like some of the earlier clips, like Robby Parker,

13 have been removed.  I forgot that.

14         So I'm thinking, okay, they took it down.  Let me

15 go to Archive.org, which is, you know, respected, you know,

16 puts the archives up, and I found it all unedited right

17 there, exact same footage in high def.  And we're going to

18 show you a clip of that right now, full size, and then we'll

19 enhance it and blow it up.

20         (Video played - not transcribed)

21         And Anderson Cooper has got some explaining to do

22 because I know blue screen when I see it.

23         I believe children died at Sandy Hook, and there

24 are a lot of parents going through serious grief.  So that

25 can account for some of the strange behavior.  Nothing can

3

1 account for what happens to his nose, and this is CNN,

2 admittedly run by the Pentagon and psyops, Washington Post.

3 WorldNetDaily.

4          This needs to be investigated.  They're clearly

5 using this to go after our guns.  The government knows

6 overall violent crime is down 49 percent.

7          (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1               CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12             Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A5

2013-04-16 - Shadow Govt Strikes Again (Clip at 13m20s)

1

2

3

4    CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9   SHADOW GOVERNMENT STRIKES AGAIN

10          APRIL 16, 2013

11          CLIP AT 13M 20S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1        **MR. JONES:** Let's -- and again, there's maybe a 5

2 percent chance out of 100 that this could be real Muslim

3 terrorists, or I guess there could be some domestic group

4 freaked out that would go stage this.

5        To be clear, I've never seen an Easter Bunny, but

6 some say it's real.  To be clear, I've never seen Santa

7 Claus.  Some say it's real.  Never seen a unicorn.  Some say

8 it's real.  Now, I don't think it exists, but it may.

9        Same thing with domestic terror groups.  I mean,

10 I've interviewed the cops and the people that saw the feds

11 plant the bombs in Oklahoma City.  You saw them stage Fast

12 and Furious.  Folks, they staged Aurora.  They staged Sandy

13 Hook.  The evidence is just overwhelming, and that's why I'm

14 so desperate and freaked out.  This is not fun, you know,

15 getting up here telling you this.  Somebody has got to tell

16 you the truth.  Somebody has got to stand against these

17 people.  Somebody has got to do it.

18        And I just hope everybody that is watching out

19 there that serves the system, who thinks they're going to get

20 away with all this, I hope you understand that you're not

21 going to get away with this.  You get rid of our checks and

22 balances, our protections, you're going to lose yours as

23 well.

24        And you want to throw your children out in the

25 cold.  You think you're cold-blooded.  You think you're a

1  winner doing stuff like this.  You're not.

2         (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A6

2014-03-14 - Sandy Hook, False Narratives Vs. The Reality (Clip at 26s)

Discovery Resource
713-223-3300

1

2

3

4       CONNECTICUT MASSACRE SHOOTING

5

6

7

8       TRANSCRIPT OF INFOWARS BROADCAST

9 SANDY HOOK, FALSE NARRATIVES VERSUS THE REALITY

10           MARCH 14, 2014

11            CLIP AT 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  ...major universities he's consulted

2 for.  I mean, he's a top consultant, long career as a state

3 police officer in Miami, Florida.  If you're just joining us,

4 he's been in customs, and then he got into being an educator

5 and then security.  And he's looking at it and dissecting it

6 like everybody else did.

7          I mean, folks, we've got video of Anderson Cooper

8 with clear blue screen out there.  He's not there in the town

9 square.  We've got people clearly coming up and laughing and

10 then doing the fake crying.  We've clearly got people where

11 it's actors playing different parts of different people, the

12 building bulldozed, covering up everything.  Adam Lanza

13 trying to get guns five times we're told.  The witnesses, you

14 know, not saying it was him.  People out in the woods.

15          But we've got the investigator here, Wolfgang W.

16 Halbig.  I'm going to give you the floor, sir.  Go over your

17 16 points, the problems, the issues, and break down what you

18 believe is a total hoax.

19          I've looked at it, and undoubtedly there's a cover-

20 up.  There's actors.  They're manipulating.  They've been

21 caught lying, and they were preplanning before it and rolled

22 out with it.  So clearly I agree with you that something is

23 rotten under the floorboard.  But is it a possum, or is it a

24 human?

25          Well, regardless, they're not letting a good crisis

Discovery Resource
713-223-3300

3

1  go to waste.  But you're the expert.  Break it down for us.

2              (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1               CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A7

2014-05-13 - Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert
(Clip at 17m)

1

2

3

4             CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9    BOMBSHELL SANDY HOOK MASSACRE WAS A DHS ILLUSION

10             SAYS SCHOOL SAFETY EXPERT

11                  MAY 13, 2014

12                  CLIP AT 17M

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
108 of 1271

2

 1          MR. JONES:  They don't even hide this stuff,

 2    ladies and gentlemen.  Anderson Cooper, CIA, up there, who

 3    cares if it's blue screen.  Just like CNN -- I'm going back

 4    to our guest. Just like CNN back there in the first Gulf

 5    War was at the broadcast center in Atlanta on top of a roof

 6    with a blue screen behind them saying they were in Riyadh,

 7    Saudi Arabia, and Israel different days being hit by nerve

 8    gas.  And then they went on air for parts of it with the

 9    blue screen not even turned on with blue behind them.

10          And then there were live feeds back in that day.

11    Remember the whole thing where David Letterman was getting

12    mad that people could tape his show as it was being taped

13    and sent over, same thing with Jay Leno.  Same thing was

14    happening with Johnny Carson before he retired because they

15    would tape it during the day and then beam it back to New

16    York to be edited.  Well, it's the same deal.

17          CNN was sending that raw feed out all over the

18    world, and people knew how to descramble them and get them.

19    And it's on record that CNN did fake scud missile attack

20    videos.  So they've done it over and over again.

21          We've got Wolfgang here with us.  Sir, I'm going

22    to give you about three minutes to make any other points

23    that you didn't make to the school board.  Then we're going

24    to play a special report that aired actually last Friday of

25    you in there talking to them.  I didn't know the video was

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
109 of 1271

3

1   actually out or had been on the nightly news.  I missed

2   Friday's show.  I usually watch it almost every night, but

3   I missed that one.  I was with family.

4          But, look, let's say you got three minutes in a

5   nutshell of what's going on here to the layperson out there

6   as a school safety expert, renowned nationally, Mr. Halbig,

7   of what really happened here.  And then what you would say

8   to that school board?

9          MR. HALBIG:  Well, the first thing I got to say

10  before I get into that is that thank God I've had 67 great

11  years of great life.  I got a beautiful family.  You know,

12  I mean, I'm getting threats all the time.  I got some crazy

13  people out there, you know.  They're attacking my wife.

14  They're attacking me and everything else.

15         But you know what, all they have to do is answer

16  16 simple questions.  You and I wouldn't even be talking

17  today.  It's just -- it's unheard of, okay.  And I think

18  the school board members and the superintendent, they have

19  a responsibility of telling the truth.

20         Alex, there's no -- I cannot believe that a

21  public school system -- and you know, when you look at the

22  school itself, when you look at Sandy Hook, it is a filthy

23  school.  That's what I wanted to talk to the school board

24  members about.  It is a toxic waste dump.  When you look at

25  the data -- and here's what they didn't realize.  They put

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
110 of 1271

4

1   it in their own newspaper before they demolished it.  Sandy

2   Hook had the highest level of lead paint throughout the

3   entire school.  Sandy Hook had the highest level of

4   asbestos in the ceiling tiles and the ceiling floors.  It

5   had the highest level of PCP, and the ground water is

6   contaminated.

7         Now, here's the question: Connecticut law

8   requires that every parent must be notified of those

9   hazardous chemicals because they have serious health

10   effects on children which may not be seen until five years

11   later.  Now, why would any parent -- why would those 18 of

12   the 20 parents that moved into Newtown in 2009 enroll their

13   child in a school with all those hazardous chemicals?

14   Parents just don't that.  They don't expose their little

15   children to chemical hazards.

16         MR. JONES:  Well, let me just stop you.  As an

17   investigator, kind of like they got Al Capone for tax

18   evasion, not for all the murders or money laundering.

19   You're looking at how they don't any of the standard stuff,

20   the paperwork, the police reports, no helicopter sent, no

21   rescue, kids going in circles totally staged, men with guns

22   in the woods getting grabbed, no names released.  They deny

23   it went on.  Later have to admit it went on but say we're

24   not answering questions.  I mean, clearly it's a drill,

25   just like the Boston bombing.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
111 of 1271

5

1        I don't know exactly what's going on, but it just

2   -- the official story isn't true.  And again, I've read a

3   lot of criminology.  I'm not -- you know, I'm not a cop,

4   but I've studied a lot of it.  And just from a lay media

5   investigative journalist perspective, something is rotten

6   here, and then you see it duplicated over and over again.

7        What's your bottom line?  What do you think

8   really happened at Sandy Hook?  People could see your 16

9   questions at Sandyhookjustice.com.  And we just salute your

10  will to go up there and have eight police car blocks you at

11  the United Way and have them shut you down at the school

12  board, at the commission.  But bottom line, what do you, as

13  an almost 40-year, you know, investigator, police officer,

14  you name it -- what do you think is happening here?

15       MR. HALBIG:  Well, until they answer those

16  questions, I can tell you children did not die.  Teachers

17  did not die on December 14, 2012.  It just could not have

18  happened, and it's in their words.  It's not what Wolfgang

19  thinks, or it's just my opinion.  It's what they say.

20       I mean, their own words actually show that it

21  could not have happened.  Who declares 27 people legally

22  dead within 8 minutes?  Nobody does that.  Who has a 99.9

23  percent kill rate shooting children in a school within 8

24  minutes?  There isn't an FBI agent, there isn't a Navy Seal

25  that's, that good of a shot within eight minutes and then

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
112 of 1271

6

1   kill himself.  I mean, that's reasonable doubt.  I mean,

2   that in itself is reasonable doubt to show that --

3          MR. JONES:  That's right.

4          MR. HALBIG:  -- Adam Lanza could not have done

5   that.  I mean, he's an autistic child.  He's got

6   Asperger's.  Alex, nobody has a 99.9 percent kill rate, not

7   even the New York Police Department.

8          MR. JONES:  But he's a perfect cutout.  And for

9   those that don't know, the reason that is, even if you're

10  shooting people point blank in the head, the bullets change

11  direction.  They go different directions, and I mean, a lot

12  of times I've shot a wild hog, a deer, you name it, and the

13  bullet deflects off, even if you hit them broad side.

14  Sometimes it just deflects through.  You don't get 99.99

15  kill rates.  It's just incredibly hard to do.

16         MR. HALBIG:  It is.  And you know -- and the

17  thing that -- people, they haven't had time to read that

18  7000 page report that was put out by Steven Sedensky, who

19  is the state attorney in Danbury, Connecticut.

20         Even the Governor's own commission -- Alex, the

21  Governor's own handpicked Sandy Hook Advisory Commission

22  calls this 7000-page report the biggest data dump that

23  they've ever seen.  Now, this is his handpicked commission,

24  and it's redacted.  This is a commission who is supposed to

25  read it, study it, and come up with recommendations, and

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
113 of 1271

7

 1  they get a redacted report.  Now, what does that tell us?

 2          MR. JONES:  Well, everybody's compartmentalized,

 3  and everybody is just playing along with the peer pressure.

 4          MR. HALBIG:  Yes, there are.

 5          MR. JONES:  Just like the police officers on

 6  9/11, you know, were told get back.  They're going to blow

 7  up building 7.

 8          MR. HALBIG:  Yeah.

 9          MR. JONES:  It's on video.  I heard it on CNN.

10  Heard it on CBS News.  Have the video.  The cops saying,

11  "Get back; they're blowing it up."

12          I'm not saying the cops blew it up.  I've

13  interviewed the police officers on this show that are on

14  CNN saying, "Get back.  They're going to blow it up."  And

15  they said, "No.  We were told on the radio they're going to

16  blow up Building 7.  Get back."

17          And there was a countdown on the Red Cross radio.

18  They were running it, and again, they used United Way Red

19  Cross as the CIA cutouts.  If you look that up, that's

20  mainstream news.  And they were there telling the cops what

21  to do that afternoon.  Incredible.  And they're there,

22  hearing the countdown.

23          I've interviewed not one but two.  One of them

24  was an EMT, the other a cop.  And, boy, did they get

25  threatened over it.  They wouldn't even do more interviews

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
114 of 1271

8

1  after it.  And they go, "No.  We heard the countdown."  And

2  the Red Cross guy said, "You know, morally I got to just

3  tell all you cops, get back.  They're going to blow it up

4  in a couple of minutes."  He goes, I'm not supposed to tell

5  you this, and then the countdown.  And the cops were like,

6  "Countdown."  So the cops are like, "Get back, get back."

7         And then the media spins it.  You're saying the

8  cops blew up the World Trade Centers.  All I know is it's

9  on CNN, cops going, "Get back.  They're going to blow that

10  building up."  They weren't even brought in on it.  They

11  got told by people warning them who were compartmentalized,

12  and it's just so incredible.  I don't mean to get off in

13  another subject, Wolfgang.  It's just that I've seen this

14  over and over again how the compartmentalization works.

15         MR. HALBIG:  I agree, but I think the same --

16  Alex, we've never had a time in our history where Sandy

17  Hook, a school massacre, the biggest illusion ever

18  portrayed by Homeland Security and FEMA.  It can bring down

19  the house.  I think America -- I cannot tell America.  This

20  is probably our only chance to unite and come together and

21  look for the truth, and this house needs to fall because

22  Sandy Hook is taking away our guns across the country.

23  Sandy Hook is messing with our freedom of speech.  That's

24  not the America that we -- you and I know, Alex.

25         MR. JONES:  And they raised hundreds of millions

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
115 of 1271

9

1   of dollars, billions in the case of 9/11, collecting money

2   off of people's goodwill and then giving it to anti-gun

3   groups.   The United Way is an anti-gun cesspit.

4            MR. HALBIG:   It is, and I hope nobody ever

5   donates another dime to United Way until they answer every

6   question.

7            (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 116 of 1271

10

CERTIFICATE OF TRANSCRIPTIONIST

1

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A8

Ex. A8 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)

1
2
3
4                 CONNECTICUT MASSACRE SHOOTING
5
6
7
8               TRANSCRIPT OF INFOWARS BROADCAST
9         CONNECTICUT PD HAS FBI FALSIFY CRIME STATISTICS
10                   SEPTEMBER 25, 2014
11                     CLIP AT 22M
12
13
14
15
16
17
18
19
20
21
22
23
24
25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
119 of 1271

2

1           MR. JONES:  We're fearless, folks.  Support us.

2    Support Wolfgang.  This is not a game.  They are hopping mad

3    we're covering this.  CNN admits they did fake scud attacks

4    on themselves back in 1991, 1990.  Would they stage this?  I

5    don't know.  Do penguins live in Antarctica?  Wolfgang W.

6    Halbig's our guest, former state police officer, then worked

7    for the customs department, and then over the last decade's

8    created one of the biggest, most successful school safety

9    training grips.  And he just has gone and investigated, and

10   it's just phony as a $3 bill.  And they've been --

11          But man, Wolfgang, you dropped a bombshell of yours

12   scores of points, your 16 questions.  If you've got a school

13   of 100 kids and then nobody can find them, and you've got

14   parents laughing going ha, ha, ha; and then they walk over to

15   the camera and go (crying), and I mean, not just one, but a

16   bunch of parents doing this and then photos of kids that are

17   still alive they said die.  I mean, they think we're so dumb

18   that it's really hidden in plain view, and so the

19   preponderance -- I mean, I thought they had some scripting

20   early on to exacerbate and milk the crisis as Rahm Emmanuel

21   said, but when you really look at it, where are the lawsuits?

22   There would be incredible lawsuits and payouts, but there

23   haven't been any filed, nothing.  I've never seen this.  This

24   is incredible.

25          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 120 of 1271

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                                  _____

12                                      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A9

2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 3m08s)

Discovery Resource
713-223-3300

1

2

3

4          CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9 LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10                DECEMBER 27, 2014

11                 CLIP AT 3M 8S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  What do you guys think of Halbig?  I

2  mean, he was a big, you know, successful, famous school

3  safety guy, wrote the book on a lot of it.

4          All I know is I saw Cooper with blue screen out

5  there, green screen.  I know I saw the kids doing fake, you

6  know, rotations in and out of the building.  They tore it

7  down, all the unprecedented gag orders, you know, the police

8  in anti-terror outfits in the woods.  Then they denied that,

9  that had been in the news.  I mean, something is being hidden

10  there.  You guys are on the East Coast.  You have a lot of

11  sources.  What do you really think happened?

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

3

1           CERTIFICATE OF TRANSCRIPTIONIST

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5     I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11                _____

12            Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A10

2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 4m34s)

1

2

3

4              CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9  LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10                  DECEMBER 27, 2014

11                   CLIP AT 4M 34S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A10

2

1          **MR. JONES:**  Very astute.  That's what I said a few

2  weeks into it.  I said they may have killed real kids, but

3  they're practicing how to propagandize, and how to control

4  the press, and how to put out a product that's a fraud when I

5  just saw the heavy, heavy, heavy scripting.  That was what

6  was so clear.  And then the parents laughing and then one

7  second later doing the actor breathing to cry.  I mean, it

8  just -- it's just over the top.

9          **UNIDENTIFIED MALE:**  Agreed, yep.

10          **MR. JONES:**  Over the top sick.  And we know they've

11  staged other stuff before.

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1            CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A11

2014-12-29 - America the False Democracy (Clip at 11m53s)

1
2
3
4          CONNECTICUT MASSACRE SHOOTING
5
6
7
8          TRANSCRIPT OF INFOWARS BROADCAST
9          AMERICA THE FALSE DEMOCRACY
10          DECEMBER 29, 2014
11          CLIP AT 11M 53S
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ex. A11

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
131 of 1271

2

 1          MR. JONES:  Let's talk to, Kevin.  Kevin, go ahead.

 2    You're on the air.

 3          KEVIN:  Hi, Alex.  Calling about Sandy Hook.

 4    Basically my take on it is I live about 50 miles from

 5    Newtown, and the whole thing is pretty much the next step in

 6    reality TV because with other false flags like 9/11, or

 7    Oklahoma City, or the Boston bombing, at least something

 8    happened.  With Sandy Hook, there's no there, there.  You've

 9    got a bunch of people walking around a parking lot is pretty

10    much what it comes down to and none of the --

11          MR. JONES:  No, no.  I've had investigators on.

12    I've had the state police have gone public, you name it.  The

13    whole thing is a giant hoax.  And the problem is how do you

14    deal with a total hoax?  I mean it's just -- how do you even

15    convince the public something is a total hoax?

16          KEVIN:  Very hard because, you know, anytime I talk

17    about this issue with people, you know, they -- you get

18    criticized, black balled, ridiculed, called every name in the

19    book, or they respond with the magic words they were saying

20    on TV.  There's no statement more proof positive of somebody

21    that's been brainwashed by that stuff, mainstream media, than

22    those words.  They were saying it on TV.

23          Well, I always tell people the same thing.  Go out

24    and prove the official story.  And there's been -- I knew the

25    millisecond this happened with that now fake picture of the

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 132 of 1271

3

1   kids being lead out of the school that this -- there's

2   nothing that's going to sell this agenda like dead elementary

3   school kids. Nothing --

4           MR. JONES: Well, that's right. The general public

5   doesn't know the school was actually closed the year before.

6   They don't know. They've shielded it all, demolished the

7   building. They don't know that they had their kids going in

8   circles in and out of the building as a photo op. Blue

9   screen, green screens, they got caught using. I mean the

10   whole thing.

11           But remember, this is the same White House that's

12   been caught running the fake Bin Laden raid that's come out

13   and been faked. It's the same White House that got caught

14   running all these other fake events over and over again, and

15   it's the same White House that says I never said that you

16   could keep your doctor when he did say you could keep doctor.

17   People just instinctively know that there's a lot of fraud

18   going on, but it took me about a year with Sandy Hook to come

19   to grips with the fact that the whole thing was fake. I

20   mean, even I couldn't believe it. I knew they jumped on it,

21   used the crisis, hyped it up, but then I did deep research;

22   and my gosh, it just pretty much didn't happen.

23           UNIDENTIFIED MALE: Everything we said came true.

24   Everything we've done been's --

25           (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 133 of 1271

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                          _____

12                          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A12

2015-01-13 - Why We Accept Gov't Lies (Clip at 10m36s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

TRANSCRIPT OF INFOWARS BROADCAST

WHY WE ACCEPT GOVERNMENT LIES

JANUARY 13, 2015

CLIP AT 10M 36S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 136 of 1271

2

1    MR. JONES:  Yeah.  When you're trying to, I mean,

2  decipher cloak and dagger, dirty tricks, it's pretty hard to

3  do.  It's just that when you -- then you learn that they were

4  funded by western funding.  Then you learn that it was the

5  same Amerall-Locky (phonetic) connection underwear bomber.

6  Then those are big red flags that they were patchy

7  provocateurs.  The classic MO has been followed.

8    And then, yeah, it kind of becomes a red herring,

9  you know, to say the whole thing was staged because they have

10  staged events before, but then you learn the school had been

11  closed and reopened.  And you got video of the kids going in

12  circles in and out of the building, and they don't call the

13  rescue choppers for two hours.  Then they tear the building

14  down and seal it.  And they get caught using blue screens,

15  and an email by Bloomberg comes out in the lawsuit where he's

16  telling people get ready in the next 24 hours to capitalize

17  on a shooting.

18    Yeah.  So Sandy Hook is a synthetic, completely

19  fake with actors, in my view, manufactured.  I couldn't

20  believe it at first.  I knew they had actors there clearly,

21  but I thought they killed some real kids; and it just shows

22  how bold they are that they clearly used actors.  I mean,

23  they even ended up using photos of kids killed in mass

24  shootings here in a fake mass shooting in Turkey.  So, yeah -

25  - or Pakistan.  The sky is now the limit.  I appreciate your

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
137 of 1271

3

1  call.

2          Shirley in Louisiana.  You're on the air, welcome.

3          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
138 of 1271

4

1          CERTIFICATE OF TRANSCRIPTIONIST

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A13

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 0m26s)

1

2

3

4                      CONNECTICUT MASSACRE SHOOTING

5

6

7

8                  TRANSCRIPT OF INFOWARS BROADCAST

9          INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10                        FEBRUARY 12, 2015

11                        CLIP AT 0M 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
141 of 1271

2

1        MR. JONES:  And again, if they can do this to us,

2   they can do it to anybody.  And we're going to give you the

3   name of the video as well that they are trying to sensor.

4   Mystery Sandy Hook victim dies again in Pakistan, and I'm

5   going to show you some of these photos from the BBC of people

6   in Pakistan holding up photos of children they say were

7   killed by terrorists; and it is one of the Sandy Hook

8   victims.  So we just said, man, what's going on in Pakistan?

9   What are they faking?

10        Well, the answer to that was the HONR or HONR

11   network, Lenny Pozner reportedly lost his son there came in

12   and filed a copyright claim on us showing a BBC news article.

13   You can't do that.  For those that don't know how copyright

14   works, I could show a clip off the news if I was analyzing it

15   in commentary, but I could certainly show newspapers all day

16   long.

17        I've been doing this for 20 years.  I took RTF.

18   That was the first thing they taught us.  I've had to sit in

19   on lawyer meetings.  I've been involved in lawsuits that

20   we've won dealing with this, and I've countersued people.

21   It's all on record.  I know what I'm talking about.  I know

22   what I'm talking about on defamation.  Knock on wood, we've

23   never had that problem.  Other people have and have settled

24   with us out of court twice.  So I know of what I speak.

25        And you can't go to somebody's YouTube channel and

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
142 of 1271

3

1   say they showed a news article from the BBC, and then say

2   that you can't show that because someone in Pakistan was

3   holding up a photo of your son, who reportedly died at Sandy

4   Hook, and they're saying the same person died in a terror

5   attack in Pakistan.  Obviously, we've got to investigate

6   this, just like we investigated Brian Williams and his

7   claims.

8           So, you know, we're sorry for everybody's losses,

9   whatever.  We're investigating this though because we live in

10  a system where the media exploits things and twists things.

11          Paul Watson thinks the official story of Sandy Hook

12  is true.  He's my chief reporter, and we get major heat from

13  the folks that think Sandy Hook was totally staged, saying

14  why aren't you on the same page.  Because we're

15  investigating.

16          I think there's some cover-ups there.  I know

17  they're using blue screens.  I've seen the footage of people

18  going in and out in circles in the building.  It doesn't look

19  right.  It doesn't pass the smell test.  There are literally

20  hundreds of smoking guns here that this thing doesn't add up.

21          (END OF AUDIO FILE)

22

23

24

25

4

CERTIFICATE OF TRANSCRIPTIONIST

1

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A14

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 23m34s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

8                    TRANSCRIPT OF INFOWARS BROADCAST

9         INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10                       FEBRUARY 12, 2015

11                       CLIP AT 23M 34S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
146 of 1271

2

1        MR. JONES:  And these families that have been used

2   to push gun control, you name it, is now not just going after

3   the Second Amendment, they're now going after the First

4   Amendment.  What do you make of that?

5        I mean, I guess -- should I just shut up forever

6   and never -- just quit my show?  I mean, is that what you're

7   saying?  Or if I want to do a report on Wells Fargo Bank

8   laundering drug money -- that was in Bloomberg.  If I go

9   stand across the street from Wells Fargo, will they claim

10  it's -- oh, I had the Federal Reserve of San Antonio three

11  years ago when we had an End the Fed rally out in front of

12  it.  I forgot.  I had them claim a copyright claiming that

13  their building was their copyrighted material, and I couldn't

14  show it.  Of course that was overturned.  You people are out

15  of your minds.

16       If you go to this HONR Network that reportedly has

17  filed this claim trying to take down our YouTube channel, and

18  they have taken down the video and suspended some of our

19  rights while we're "under investigation," they say on their

20  website they will use every means necessary to shut down, to

21  bring awareness to hoaxers activity and to criminally and/or

22  civilly prosecute those who willingly and publicly defame,

23  harass, and emotionally abuse the victims of high profile

24  tragedies.  That means questioning any tragedy is abuse, and

25  that's what they're pushing in the EU.  You can't criticize

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 147 of 1271

3

1  anything, no more free speech.  Of high profile tragedies

2  and/or family members.  "We intend to hold such abusers

3  personally accountable for their actions in whatever capacity

4  the law allows."

5          Well, you better look into what happened to Rite

6  Haven and other groups that have gone down this road.  I

7  mean, I'm sorry that you don't want us to show BBC showing

8  your son at rallies of dead children in Pakistan.  We just

9  are saying something is going on here.

10          And we're sorry that, you know, the First Amendment

11  is so upsetting, but we're going to be investigating this.

12  We're going to be looking into this.  We're going to be

13  countering this, and we're going to be dealing with this.

14          (END OF AUDIO FILE)

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 148 of 1271

4

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate

transcript of the digital recording provided to me in this

matter.

    I do further certify that I am neither a relative, nor

employee, nor attorney of any of the parties to this

action, and that I am not financially interested in the

action.

    Julie Thompson, CET-1036

# Exhibit A15

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 31m14s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

TRANSCRIPT OF INFOWARS BROADCAST

INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

FEBRUARY 12, 2015

CLIP AT 31M 14S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
151 of 1271

2

1          MR. JONES:  And I've been massively criticized for,

2   you know, not going with the whole thing being staged the

3   first year or so.  Wolfgang Halbig, former state police

4   officer, former customs officer, he then over the next 20

5   years became the biggest school safety trainer in the county

6   to major colleges, you name it.  I mean, he's the guy.  And

7   he just said, "Where are the helicopters being launched for

8   the kids?  Where is the ambulances?"  The whole thing was

9   disregarded, and then they wouldn't let him in to anything

10  and acted very suspicious.  Then they came to his house and

11  threatened him.

12         You know, the answer to the censorship is we're

13  just going to redouble our efforts investigating Sandy Hook.

14  We need to stop cowling down to these people, and let them

15  know we're not putting up with their bullying anymore.  And

16  this is part of the attack on free speech worldwide, ladies

17  and gentlemen.

18         We're taking your phone calls on this subject.

19  I'll shift gears into some others coming up after we talk to

20  more of the callers and have some of the folks in here, David

21  Knight and, of course, Rob Dew of InfoWars Nightly News, who

22  have hosted Sandy Hook debates with so called debunkers of

23  the official story and debunkers of the debunkers.  So for

24  holding a debate in America and showing both sides, we now

25  need to be taken off the air for the children.  Isn't that

3

1   just precious?   This is how totalitarianism comes, always

2   packaged for the children.

3           Brian in Alabama, you're on the air.   Go ahead.

4           (END OF AUDIO FILE)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 153 of 1271

4

1          CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                          _____

12                          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A16

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 34m10s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

TRANSCRIPT OF INFOWARS BROADCAST

INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

FEBRUARY 12, 2015

CLIP AT 34M 10S

Ex. A16

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
156 of 1271

2

1          MR. JONES:  Before we could even investigate it,

2    there were videos with tens of millions of views bringing up

3    the anomalies.  There's been a real move to shut those folks

4    down.  What do you think of us being censored?  What's been

5    happening to you?

6          UNIDENTIFIED MALE:  I can tell you lots about

7    Lenny.  This man is something that you've never seen before.

8    He's got a group of trolls, and if you don't mind, I'll just

9    go ahead and call them out.  These people would be Keith --

10         MR. JONES:  Well, listen, hold on.  I don't want to

11   give these people any attention.  I'm going to have to get

12   with lawyers on this and deal with this.  But I understand

13   that -- I mean, if they're trying to shut us down when we're

14   just investigating it and looking at all sides, it must be

15   horrible for folks out there that vehemently think this is

16   staged.  So just specifically, what have you gone through?

17         UNIDENTIFIED MALE:  I can't even put up a video

18   showing that he has put up a copyright strike against me

19   without him copyrighting striking that.  They have taken my

20   information, and they had -- they gave it to one of his

21   trolls in his network.  And they went and they looked up all

22   my information and put up a whole blog post about me and my

23   daughter is what this troll network has done.  These people

24   are vial.  And, Lenny, if you're listening, your day is

25   coming, my friend.  It is coming.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
157 of 1271

3

1          MR. JONES:  Wow.  I mean, this sounds like a war is

2    going on.  I think they made a major mistake involving us

3    because we were basically showing both sides and getting

4    criticized by both groups for it.

5          UNIDENTIFIED MALE:  Oh, I totally agree.  They

6    don't know what they bit off.  Go after them, Alex.  Crush

7    them.

8          MR. JONES:  Well, I mean, I just want them to leave

9    the First Amendment alone.  But I mean, it does show that --

10   how would they claim it's a Fox News copyright violation.

11   There's no Fox News on there.  It's a news article.  I mean,

12   how do you do that?  It's just -- it's amazing.

13         UNIDENTIFIED MALE:  They have two different email

14   addresses they use.  I noticed you said that for this claim

15   they used the HONR@gmail.  The other one that they use -- I

16   won't say it, but I'll tell you off air if you want to know

17   what that is off air.

18         MR. JONES:  Well, I just -- I'm not somebody to

19   mess with, and I understand that they can, you know, use

20   children or whatever and then say, you know, the First

21   Amendment is bad.  But I mean, I got to defend the First

22   Amendment, and it's just wild to get into this subject when

23   you got all this stuff happening worldwide, all these moves

24   against the First Amendment going on.  It's pretty hardcore.

25         So we're going to have our news director in here

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
158 of 1271

4

1    with our news anchor and talk about this because they're

2    trying to shut us down.

3              (END OF AUDIO FILE)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 159 of 1271

5

1                    CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A17

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 38m59s)

1

2

3

4                    CONNECTICUT MASSACRE SHOOTING

5

6

7

8              TRANSCRIPT OF INFOWARS BROADCAST

9      INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10                    FEBRUARY 12, 2015

11                    CLIP AT 38M 59S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
162 of 1271

2

 1              MR. DEW:  And so --

 2              MR. JONES:  So, see, we're not even supposed to

 3      have a debate --

 4              MR. DEW:  Right.

 5              MR. JONES:  -- in America.

 6              MR. DEW:  You're not even allowed to talk about it.

 7              MR. KNIGHT:  And if you look at that debate, the

 8      guy who was opposing Halbig never offered any -- never

 9      responded to anything that --

10              MR. DEW:  He just attacked Halbig.

11              MR. KNIGHT:  Halbig had some very specific

12      questions, and the guy always just attacked him.

13              MR. JONES:  Why didn't they call rescue

14      helicopters?

15              MR. KNIGHT:  Exactly, yeah.

16              MR. JONES:  On and on and on.

17              MR. DEW:  Why were the ambulances not even at the

18      school?  They were stuck at the firehouse.

19              MR. KNIGHT:  Why did they destroy -- why did they

20      classify the investigation?  They've never done that with any

21      previous shootings.

22              MR. DEW:  Right.

23              MR. KNIGHT:  Why did they knock down the school and

24      destroy it?

25              MR. JONES:  Why did Mayor Bloomberg alert his

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
163 of 1271

3

1  people to get ready the day before for a big push?

2       MR. KNIGHT:  Yeah.

3       MR. DEW:  They made it a felony to release a birth

4  certificates or death certificate information.  What kind of

5  country is that where you can't release birth certificate and

6  death certificate information?  I mean, if there's, you know

7  -- what have you got to hide, as they like to say to us?  You

8  know, why are you so concerned about privacy?  What have you

9  got to hide?  But it's only if you're going after one of

10  their -- I think it looks like an operation.  It looks like

11  something went on there, and it stinks to high heaven.

12       MR. JONES:  A drill.

13       MR. DEW:  Stinks to high heaven.  You got the actor

14  father who comes out, gets into character.  I was a theater

15  major.  I worked with actors.  I used to watch them get ready

16  before they would go out and cry like that.  I remember --

17       MR. JONES:  You have a degree in theater.

18       MR. DEW:  I was in the play Our Town, and I'm

19  sitting there watching these other people about to go out and

20  do the funeral scene; and they're pumping themselves up,

21  doing exactly what he did (breathing).

22       MR. JONES:  First he's laughing and smiling, and

23  then --

24       MR. DEW:  And then he walks out, and then he's

25  totally sad, crying.  He was cracking jokes right before.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
164 of 1271

4

1  That's an actor.  That's an actor.  I'm sorry.

2          MR. JONES:  You're not allowed to say that.  I

3  mean, Brian Williams was shot down in that helicopter.

4          MR. DEW:  There it is right there.  He's smiling.

5  I mean, he's just --

6          MR. JONES:  Then he huffs and puffs and gets --

7          MR. DEW:  Yeah.  And that's what -- that is a tale-

8  tale sign of somebody acting right there.  Now, I don't know

9  for a fact that this guy is an actor.  That looks like acting

10  all the way.  It's just amazing that they continue to really

11  go after people.  I've got an article here from a guy, I

12  think was our last caller, Michael.  He's been -- he's been

13  getting all kinds of grief from Mr. Pozner, anything that

14  comes out.  Social media shut down due to Sandy Hook false

15  copyrights.

16          What's interesting is they list the address for the

17  HONR Network in Boca Raton, Florida.  You look up the address

18  on that, which says 908 North Dixie Highway.  It is the

19  address for a women's clothing store and a UPS -- U-Haul

20  rental place, U-Haul Neighborhood Dealer.  So here's the 908

21  North Dixie Highway.  There is no suite, but it's got two

22  different buildings listed at that address.  One is JJ Shop

23  women's clothing store, and you go to the other one, same

24  address, U-Haul Neighborhood Dealer.

25          Now, you go to their About HONR Network -- I'll go

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
165 of 1271

5

1  to this one right here, guys.  You can leave the camera right

2  there, HONR Network right there.  It lists their --

3        MR. JONES:  They say they're in Connecticut.

4        MR. DEW:  It says they're in Newtown, Connecticut.

5  But you go to that address, it's a U-Haul UPS -- I'm sorry.

6  It's a UPS store, same address, Main Street, Newtown,

7  Connecticut.  It's a UPS store.

8        (END OF AUDIO FILE)

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 166 of 1271

6

1                CERTIFICATE OF TRANSCRIPTIONIST

2 I certify that the foregoing is a true and accurate

3 transcript of the digital recording provided to me in this

4 matter.

5     I do further certify that I am neither a relative, nor

6 employee, nor attorney of any of the parties to this

7 action, and that I am not financially interested in the

8 action.

9

10

11                     _____

12                 Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A18

2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 42m23s)

1

2

3

4              CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9    INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10              FEBRUARY 12, 2015

11               CLIP AT 42M 23S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
169 of 1271

2

1          MR. DEW:  You'd think, you know, if they had this

2    organization, they would have some sort of headquarters where

3    they would be setting up a memorial.

4          MR. JONES:  Well, we'll just start investigating

5    that, and I guess I'm going to have to probably go on up to

6    Newtown.  I'm going to have to probably go investigate

7    Florida as well.

8               (END OF AUDIO FILE)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
170 of 1271

3

1                  CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                        _____

12                        Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A19

2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 16m53s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

8                    TRANSCRIPT OF INFOWARS BROADCAST

9         NEW BOMBSHELL SANDY HOOK INFORMATION IN-BOUND

10                       MARCH 04, 2015

11                      CLIP AT 16M 53S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
173 of 1271

2

1    MR. JONES:  I've seen this over and over again.

2  False flags don't just happen at the start of The Running Man

3  in fiction movies.  They are the bread and butter of

4  totalitarian elements within governments, and who can deny

5  we're going in a totalitarian direction that ends up hurting

6  all Americans but a tiny group.  It hurts them as well in the

7  end, but they are of their -- their feather.  Birds of a

8  feather flock together, of their father the devil I guess you

9  could say.

10    Before we go back to Wolfgang W. Halbig, I want to

11  open the phones up specifically for your questions or

12  comments.  We don't have time for diatribes or not a bunch of

13  name-calling against people that say Sandy Hook happened or

14  people that say it didn't, serious questions.  I'd love to

15  hear from you.  I'm not admonishing the general audience, but

16  you know, some of the trolls out there.  I don't want to

17  attack some of the supposed parents of the victims because

18  that opens some dangerous doors.

19    I don't want to attack Halbig, but you can bring up

20  any questions or comments.  You can disagree with him, or

21  agree with him, or add points.

22    Here's the toll-free number - (800) 259-9231, (800)

23  259-9231.

24    If we've seen false flags over and over again and

25  then you've got all these anomalies and clear loop tapes and

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
174 of 1271

3

1  clear blue screen/green screens -- I mean, they really

2  screwed up.  CNN screwed up during the Gulf War with fake

3  green screen stuff.  It was blue screen in that case, chroma

4  key.  You can have pink screen if you wanted to.  It's just

5  the color is going to be blue and mint green.  And you know,

6  fake scud attacks that are admitted.

7          So I just -- it had all the signs too.  How they

8  were so ready that day, how they capitalized them, how they

9  rolled out all these groups.

10          (END OF AUDIO FILE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg
175 of 1271

4

## CERTIFICATE OF TRANSCRIPTIONIST

1

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                      _____

12                      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A20

2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 32m30s)

1
2
3
4                CONNECTICUT MASSACRE SHOOTING
5
6
7

8          TRANSCRIPT OF INFOWARS BROADCAST
9    NEW BOMBSHELL SANDY HOOK INFORMATION IN-BOUND
10              MARCH 04, 2015
11              CLIP AT 32M 30S
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ex. A20

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
178 of 1271

2

1            MR. JONES:  Wolfgang --

2            MR. HALBIG:  You know, I agree with you.  And I'll

3    say this to you:  I'm begging that I'm wrong.  And if they

4    answer my questions to my satisfaction and to Alex's

5    satisfaction, if they answer it to the people of America to

6    their satisfaction, I will run to the nearest mental health

7    facility -- and I've said it before -- I'll voluntarily

8    enroll myself because if I dare upset these parents or

9    children or school, I need mental health.

10            But I tell you what, I have spent my life doing

11    this, and when people refuse to answer simple, logical

12    questions, it raises the red flag.  And I am telling you I'm

13    not going to stop until we get the answers.

14            MR. JONES:  We know it stinks.  I mean, it's phony.

15    The question is what is going on.  We don't know.  We just

16    know it's fake.  How fake we don't know.  It's sick.

17            Thank you, John.

18            Kyle, Jay, Jimmy, Erik, your calls are straight

19    ahead.

20            (END OF AUDIO FILE)

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 179 of 1271

3

CERTIFICATE OF TRANSCRIPTIONIST

1  
2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12  Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A21

2015-07-07 - Govt Is Manufacturing Crises (Clip at 32m)

1

2

3

4                  CONNECTICUT MASSACRE SHOOTING

5

6

7

8                 TRANSCRIPT OF INFOWARS BROADCAST

9              GOVERNMENT IS MANUFACTURING CRISES

10                    JULY 7, 2015

11                     CLIP AT 32M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
182 of 1271

2

1        MR. JONES:  I didn't watch the nightly news one

2   night last week.  I tend to watch it in the morning on my

3   iPad while I get on the elliptical, and I've got, you know,

4   televisions in there that I monitor as well in the gym, in

5   the public gym I go to.

6        And I heard them back there talking yesterday

7   afternoon about a show they did last week, and I knew that we

8   had sent our East Coast reporter, Dan Bidondi, up there to

9   cover it.  And I heard Dew talking about his uncle, who I

10  know was a Navy Seal and a decorated FBI agent, who retired a

11  few years ago, and is part of a big security firm.

12        And I heard Dew talking, and I was like, "Are you

13  kidding me?"  His uncle talking to other FBI people, who I

14  guess are still in, was told, "You ought to go check out

15  Sandy Hook.  We're not allowed to.  It doesn't add up."  And

16  his uncle went to the hearings, and I didn't even realize, we

17  have video of him at the hearings and Bidondi interviewing

18  him and what he said on air, and what he said off air.  And

19  he told Dew, "Yeah.  You can repeat what I said."

20        He's been in the John Gotti trial.  He's a well-

21  known FBI agent.  He's been in a whole bunch of stuff, a

22  bunch of big cases.  And he told Dew, "I have never seen

23  people acting so weird and so suspicious and saying no one

24  knows anything and no paperwork on anything."  He's a former

25  Navy Seal, retired FBI agent, and I'm --

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
183 of 1271

3

1        And I know what will happen.  These guys are

2  compartmentalized.  They're like Mr. America most of them.

3  They really think they're the good guys, and overall they are

4  good guys.  But they're compartmentalized.  Right next to

5  them is the devil and above them people like Eric Holder, as

6  bad as it gets.

7        They'll go investigate something, find out it's

8  true, and then be shut down.  And I would imagine after we

9  talk about this, he's going to -- he's going to get a visit

10  because he's now investigating Sandy Hook.  Rob Dew's uncle

11  is now investigating Sandy Hook, former FBI agent, retired.

12  That's got to really freak them out.  And I'm not going to

13  put words in his mouth, but he said he's never seen something

14  that looks this fake.  It's because it is, folks.

15        I don't know if they really killed kids.  I don't

16  know, but they -- we got emails and memos that school was

17  shut down a year before.  They tore it down.  They covered it

18  up.  No rescue helicopters, no ambulances.  Within an hour

19  and a half they had a sign saying, "Check in here."  It was a

20  media event.

21        If they did kill kids, they knew it was coming,

22  stocked the school with kids, killed them, and then had the

23  media there, and that probably didn't even happen.  I mean,

24  no wonder we get so many death threats and so much heat and

25  so much other stuff I'm not going to get into, behinds the

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 184 of 1271

4

1  scenes, when we touch Sandy Hook because, folks, it's as

2  phony as a $3 bill.

3          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
185 of 1271

5

CERTIFICATE OF TRANSCRIPTIONIST

1

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                   Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A22

2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 0-5m)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9       RETIRED FBI AGENT INVESTIGATES SANDY HOOK

10              MEGA MASSIVE COVER-UP

11               JULY 07, 2015

12               CLIP AT 0-5M

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A22

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
188 of 1271

2

1           MR. JONES:  We have been warned.  We have been

2  warned.  We have been threatened.  We have been told through

3  official channels, unofficial channels, threats, you name it,

4  stop investigating Sandy Hook.

5           Now, when this first happened a few years ago, I

6  didn't come out of the gate saying it was a false flag, and I

7  got criticized by a lot of our listeners who were smart folks

8  and who went and really investigated that, hey, Alex, you

9  need to look at this again.

10           All I know is that the official story doesn't add

11  up, and that when retired state police officers, and school

12  investigation experts, and school safety experts, and others

13  began to investigate it, they were threatened.

14           No emergency helicopters were sent.  The ambulances

15  came an hour and a half later and parked down the road.  DHS

16  an hour and a half later with the time stamp put up signs

17  saying sign in here.  They had porta-potties being delivered

18  within an hour and a half.  It looked like a carnival.  It

19  looked like a big PR stunt.

20           Came out that Bloomberg a day before sent an email

21  out to his gun control groups in all 50 states saying,

22  "Prepare to roll, maybe operation coming up."  That came out

23  in the news.

24           We have the emails from city council back and forth

25  and the school talking about it being down a year before.  We

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
189 of 1271

3

1  have the school then being demolished, and the records being
2  sealed.

3      We have videos that look just incredibly suspicious
4  where people are laughing and everything, and then they start
5  huffing and puffing and start crying on TV, which is pure
6  acting method.  You've got a degree, Rob, in theater.  I
7  mean, this is -- this is something that even laypeople
8  notice.  So I began to investigate.

9      They had a weird anti-terrorism unit from the state
10  nearby with men in the woods, which were on video from
11  helicopter.  Then they said that didn't exist.  And so we'll
12  recap some of the history of this.

13      But now, your uncle, John Dew, Navy Seal, retired
14  FBI agent, works for a successful security company, I had
15  missed this episode of the nightly news back on June 4th and
16  then again last week when you did an update.  And then I
17  heard you talking about it yesterday.  I knew that we'd sent
18  our reporter down, Dan Bidondi, there for days to cover the
19  city council hearings about it and the fact that they're
20  sealing everything.

21      And then you just said, "Oh, yes, and that's why
22  I'm trying to get my uncle to tell me more."  Because he's
23  been in John Gotti hearings and been involved in huge cases,
24  pretty prominent FBI agent before he retired, and in his
25  words he said he seen the most secretive mafia stuff ever,

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 190 of 1271

4

1  and he's never seen people more closed-lipped.  He's never

2  seen something where it basically stinks.  And we'll use his

3  words, but the headline here is retired FBI agent

4  investigating Sandy Hook.  I mean, that was just amazing to

5  me that so much goes on around here that I miss some of

6  what's happening.

7       Next time a former Navy Seal FBI agent -- I don't

8  care if it's your uncle --

9       MR. DEW:  Yeah.

10      MR. JONES:  -- you know, is investigating something

11  like this, we want to hear about it.  I want to try to get

12  him on.  I know he's going to get heat probably, and they'll

13  probably try to threaten him.  But really kudos to him.

14       I mean, you told me that he went and investigated

15  it because other insiders said you need to go look at this.

16  I guess people currently in the FBI aren't allowed to, but,

17  man, the fix is in.

18       So, Rob Dew, tell us about your uncle, tell us

19  about all this.  I wish we would have gotten more than a two-

20  minute interview with him with Bidondi.  Bidondi did a great

21  job.  I just wish I would have known about this.  I would

22  have gone up there.  Halbig tried to get me to go.  I just am

23  trying to launch the TV network, and the new website, and

24  everything else.

25       But I mean, this is just so big.  And the more we

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
191 of 1271

5

1   look at Sandy Hook, I don't want to believe it's a false

2   flag.  I don't know if kids really got killed.  But you got

3   green screen with Anderson Cooper where I was watching the

4   video and the flowers and plants are blowing in some of them,

5   and then they blow again the same way.  It's looped, and then

6   his nose disappears.

7          MR. DEW:  Uh-huh (affirmative).

8          MR. JONES:  I mean, it's fake.  The whole thing is

9   just -- I don't know what happened.  It's kind of like if you

10  see a hologram at Disney World in the Haunted House, you

11  know.  I don't know how they do it, but it's not real.  When

12  you take your kids to see, you know, the Haunted House and

13  ghosts are flying around, they're not real, folks.  It's

14  staged.  I mean, a magician grabs a rabbit out of his hat.  I

15  know he's got a box under the table that he reaches in and

16  gets the rabbit.

17         I don't know what the trick is here.  I got a good

18  suspicion, but when you've got Wolfgang Halbig, who was the

19  top -- I mean, 20/20, CNN, I mean, ran the most successful

20  school safety course in the country, got the contracts at

21  Columbine, making millions of dollars a year, he believed it

22  was real.  People called him.  He went and investigated.  No

23  paperwork, no nothing.  It's bull.  And now an FBI retired

24  agent who retired, you know, with decorations --

25         I mean, Dew, this is just unprecedented.  I can't

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
192 of 1271

6

1  believe I missed this.  Recap what happened, and then we've

2  got some of the questions from Bidondi.  He told you a lot

3  more.  Well, just tell us what he said.

4              (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 193 of 1271

7

1          CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A23

2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 9M40S)

1

2

3

4           CONNECTICUT MASSACRE SHOOTING

5

6

7

8         TRANSCRIPT OF INFOWARS BROADCAST

9      RETIRED FBI AGENT INVESTIGATES SANDY HOOK

10            MEGA MASSIVE COVER-UP

11             JULY 07, 2015

12            CLIP AT 9M 40S

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A23

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
196 of 1271

2

1          MR. DEW:  So they were already on the scene right
2    after it happened.  That using u
3          MR. JONES:  Let's remember, they ran fast and
4    furious killing thousands of Mexicans, hundreds of Americans,
5    including six law enforcement to blame the Second Amendment.
6    CBS News got the memo.
7          MR. DEW:  Yeah.
8          MR. JONES:  That was a false flag killing thousands
9    to blame the Second Amendment and martyr Mexicans and say
10   you're racist if you don't turn your guns in.  So they've
11   done it before, and, my gosh, they've done it again.
12         MR. DEW:  Yeah.
13         MR. JONES:  Keep going.
14         MR. DEW:  Well, guys, actually, let's play the clip
15   from my uncle.  It's actually clip number two.  We'll play
16   that one first.  It's really short.
17         MR. JONES:  I want to play it, but tell us more of
18   what he said because you told me more than that.
19         MR. DEW:  Okay.  Well, he was concerned that there
20   -- because he had believed in the initial story, the official
21   story.  He said, well, now this doesn't add up.  If you have
22   all these people, they should just be giving the paperwork
23   and going on with their lives, if they don't want, you know
24   -- because right now it's all being --
25         MR. JONES:  It's 101 they're covering up.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
197 of 1271

3

1          MR. DEW:  He goes nobody acts like that if they're

2  on the up and up.

3          MR. JONES:  It's like if a cop pulls you over and

4  you're busy cramming stuff under the -- under the seat.

5          MR. DEW:  Right.  Saying, don't worry.  Hold on.

6  I'm looking for my license or whatever.

7          MR. JONES:  Yeah.

8          MR. DEW:  You know, nobody has the proper

9  paperwork.  Nobody can deliver it.  They deliver videos

10  without time stamps from police squad cars.  There's videos

11  without time stamps that they give to them and say these are

12  the copies from the squad car.  Yet you go online and you

13  could see squad car video from the same squad car, and it's

14  got time code on it.  So how did they give him video without

15  time code, and he's viewing it at the police station?

16          MR. JONES:  This is mega-massive cover-up.

17          MR. DEW:  It's crazy.  So you know --

18          MR. JONES:  My God.

19          MR. DEW:  -- he just basically -- my uncle doesn't

20  say much.  He's the kind of guy that doesn't say a lot.  He

21  just -- he kind of, you know -- so Dan -- I don't know how

22  Dan figured out he was my uncle.  But he went over and talked

23  to --

24          MR. JONES:  Oh, your uncle is not telling you he's

25  up there?

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
198 of 1271

4

1          MR. DEW:  No, no, no.  He never told me he was

2    going up there.  I got the text from Dan.  That's how I found

3    out he was there, and then I texted him; and the I called him

4    the next day because he couldn't talk at the time.  It was

5    probably 11:30 at night that night.  It was June --

6          MR. JONES:  Well, I suggest you call him and see

7    what he thinks now, see if he's been threatened or anything.

8    But please continue with what else he told you.  So former

9    Navy Seal, retired FBI agent.  Sandy Hook doesn't add up.  He

10   said -- that's the quote, "Doesn't add up"?

11         MR. DEW:  Well, we can take the quote from him.  He

12   said he's never seen anything like this before.

13         MR. JONES:  But to you what did he say?

14         MR. DEW:  That -- and then that's what -- to me

15   what he's saying is that from all of his experience in the

16   years that he has worked as an FBI agent.  He's retired.  He

17   went into the FBI pretty much out of -- out of the Navy.  He

18   was a -- he went to the Naval Academy.  He was a Navy Seal.

19   This guy is on the up and up.  I've known him all my life,

20   you know.  Very --

21         He doesn't tell you what he does in terms of -- you

22   know, we used to go up there and visit him when he was

23   working, and he would just leave and come back.  And you

24   know, he was doing his -- doing casework or whatever.

25         But from what he told me, he said that this thing

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
199 of 1271

5

1  doesn't add up, and it's the weirdest court proceeding he's

2  ever been in, in his entire life.  And he's been in a lot of

3  court proceedings.  He was in New York City, stationed in New

4  York City.

5          MR. JONES:  Well, let me tell you, we get more

6  threats over this than anything.  I mean, they --

7          MR. DEW:  Yeah.

8          MR. JONES:  They're hiding something.

9          MR. DEW:  They definitely are.

10         MR. JONES:  Let's ask your opinion, your gut level,

11  without getting into the personalities involved.  You can

12  clearly see they're scared.  The wagons are circled.  They

13  could just release all this.  There is no paperwork.

14         MR. DEW:  Oh, there is none.

15         MR. JONES:  I mean, that's what they -- it's all --

16  so, I mean, I guess totally made up with green screens,

17  everything.  And we've got them on green screens.

18         MR. DEW:  Yeah.

19         MR. JONES:  I mean, what is going on here?

20         MR. DEW:  On top of that --

21         MR. JONES:  That's how evil these people are is

22  that they can have CNN involved, all these people.  It's like

23  a Manhattan project of the gun grabbers.

24              (END OF AUDIO FILE)

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 200 of 1271

6

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12                Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A24

2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

8                    TRANSCRIPT OF INFOWARS BROADCAST

9          ALEX JONES FINAL STATEMENT ON SANDY HOOK

10                        NOVEMBER 18, 2016

11                        CLIP AT 4M 59S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
203 of 1271

2

1          MR. JONES:  Number one, the day before this tragic

2    event happened an email was sent out by Bloomberg's anti-gun

3    group saying prepare for a big event.  But the biggest piece

4    of evidence, the smoking gun, if you would, of a cover-up, of

5    whatever really happened is the Wayback Machine, the internet

6    archive.  We see Sandy Hook's Newtown website K through 12

7    having zero traffic 2008, '09, '10, '11, '12, and then all of

8    a sudden it just explodes.  It's impossible to have zero

9    traffic to a K through 12 entire school system.  And the word

10   is that school system was shut down for those years.  That's

11   what the records show.  They tell us it was open.

12          I don't know if the moon landings were faked, but I

13   don't put anything past these anti-gunners.  And early on,

14   that day we watched footage of kids going in circles in and

15   out of the building.  You'd be running them away from the

16   building.  Emergency helicopters weren't called.  Instead

17   port-potties were prepared for the press within hours of the

18   event.

19          I saw the helicopters that did respond, the police

20   helicopters saying that there were men or a man in the woods

21   in camouflage.  The media later said that was a conspiracy

22   theory.  So early on I'm like, well, I saw local news of the

23   guy in the woods, and they took him in custody.  Now they're

24   saying it never happened.  So that shows there some kind of

25   cover-up happening.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
204 of 1271

3

1        And then I saw Anderson Cooper -- I've been in TV

2   for 20-something years; I know a blue screen or a green

3   screen -- turn, and his nose disappear.  Then I saw clearly

4   that they were using footage on the green screen looped

5   because it would show flowers and other things during other

6   broadcasts that were moving and then basically cutting to the

7   same piece of footage.

8        Then I saw CNN do faked satellite interviews with

9   reporters clearly with the same traffic and the same cars

10  right behind them conducting the interview face to face.

11       Then we see footage of one of the reported fathers

12  of the victims, Robby Parker, doing classic acting training

13  where he's laughing and joking.  And they say, hey, we're

14  live, and he goes, oh.  And maybe that's real.  I'm sure it

15  is.

16       (Video played - not transcribed)

17       But you add it to all the other things that were

18  happening and all the other fake news the media has been

19  caught in, and CNN back in 1991 openly faking scud missile

20  attacks on Saudi Arabia and Israel when they were back in

21  Atlanta; and the satellite feeds caught them admitting that

22  it was all fake.  We'd be crazy not to question this because

23  bare minimum they were faking some of the shots and some of

24  the coverage.

25       (Video played - not transcribed)So to be clear, we

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
205 of 1271

4

1   point out clear chroma key, also known as blue screen or

2   green screen being used, and we're demonized.  We point out

3   they're clearly doing fake interviews.  We point out that

4   normal emergency procedures weren't followed, and their

5   answer is to say that we said nothing died.

6            (END OF AUDIO FILE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate transcript of the digital recording provided to me in this matter.

I do further certify that I am neither a relative, nor employee, nor attorney of any of the parties to this action, and that I am not financially interested in the action.

Julie Thompson, CET-1036

# Exhibit A25

2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 15m22s)

1

2

3

4
CONNECTICUT MASSACRE SHOOTING

5

6

7

8
TRANSCRIPT OF INFOWARS BROADCAST

9
ALEX JONES FINAL STATEMENT ON SANDY HOOK

10
NOVEMBER 18, 2016

11
CLIP AT 15M 22S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
209 of 1271

2

1        MR. JONES:  And why should anybody fear an

2   investigation if they have nothing to hide.  In fact, isn't

3   that in Shakespeare's Hamlet, me thinks you protest too

4   much."

5        So here is my statement for the media when they

6   call up saying where do you stand on this: where I've always

7   stood.  When there were other mass shootings, I would simply

8   point out that they're very rare statically, and why should

9   we all give up our rights because some other bad person does

10  something.  A guy with a car runs over 50 people.  Do we ban

11  driving cars?  It's the same thing.

12       And there have been other instances of shootings

13  that are very suspicious.  Aurora is one, just look into

14  that.

15       But this particular case they are so scared of an

16  investigation.  So everything they do basically ends up

17  blowing up in their face.  So you guys are going to get what

18  you want now.  I'm going to start reinvestigating Sandy Hook

19  and everything else that happened with it.

20       I'm Alex Jones signing off for InfoWars.com.  If

21  you're watching this transmission, think for yourself.  I

22  know it's a thought a crime (sic).  And then ask yourself:

23  what is so strange about Sandy Hook and that tragedy?

24       But I will say this finally.  My heart does goes

25  out to all parents that lose children, whether it's to

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
210 of 1271

3

1  stabbings, or whether it's to car wrecks, or whether it's to

2  stranglings, or whether it's to blunt force trauma, or

3  murder, firearms, whatever the case is.  I'm a parent, and my

4  heart goes out to all parents that have lost children in

5  these tragic events.

6           And so if children were lost in Sandy Hook, my

7  heart goes out to each and every one of those parents and the

8  people that say they're parents that I see on the news.  The

9  only problem is I've watched a lot of soap operas, and I've

10  seen actors before.  And I know when I'm watching a movie and

11  when I'm watching something real.  Let's look into Sandy

12  Hook.

13           (END OF AUDIO FILE)

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 211 of 1271

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                              _____

12                              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A26

2017-04-22 - Sandy Hook Vampires Exposed (Clip at 29m)

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9            SANDY HOOK VAMPIRES EXPOSED

10                 APRIL 22, 2017

11                  CLIP AT 29M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A26

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
214 of 1271

2

1  MR. JONES:  So here are these holier than though

2  people.  When we questioned CNN, who supposedly is at the

3  sight of Sandy Hook, and they've got in one shot leaves

4  blowing and flowers that are out.  And you see the leaves

5  blowing, and they go -- they glitch.  They're recycling a

6  green screen behind them.  You've got -- who's the female

7  lawyer who used to be on CNN, fake southern accent, whatever?

8  She's on there with cars driving in a cul-de-sac in circles,

9  and you see it's the same cars going in circles.  And then

10 we've got Anderson Cooper famously, not just with the flowers

11 blowing in a fake, but when he turns, his nose disappears

12 repeatedly because the green screen isn't set right.

13  And they don't like to do live feeds because

14 somebody might run up.  CNN did that in the Gulf War and

15 admitted it.  They just got caught two weeks ago doing it in

16 supposedly Syria.  Then the green screen cuts out, and they

17 got, you know, phones ringing.  And all we're saying is if

18 these are known liars that lied about WMDs, and lied to get

19 us into all these wars, and back the Arab spring, and Libya,

20 and Syria, and Egypt, and everywhere else to overthrow

21 governments and put in radical Islamicists.

22  If they do that and have blood on their hands and

23 lied about the Iraq war, and were for the sanctions that

24 killed a half million kids, and let the Islamicists attack

25 Serbia, and lied about Serbia launching the attack when it

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
215 of 1271

3

1  all came out later that Serbia didn't do it, how could you

2  believe any of it, if you have a memory and you're not Dory

3  from Finding Dory, you know, the Disney movie?  Thank God

4  you're so stupid.  Thank God you have no memory.  It all goes

5  back to that.

6         Now, I could go on and on about the wars, the lies,

7  the racial attacks they cover up that are on white people.

8  And I'm not black/white, but just this weekend they have

9  Science is Real marches everywhere.  And here in Austin they

10  have signs officially saying white men run science; that's

11  why they don't believe in global warming.  No.

12         (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
216 of 1271

4

CERTIFICATE OF TRANSCRIPTIONIST

1

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A27

2017-04-22 - Sandy Hook Vampires Exposed (Clip at 59m)

1

2

3

4                     CONNECTICUT MASSACRE SHOOTING

5

6

7

8                 TRANSCRIPT OF INFOWARS BROADCAST

9                  SANDY HOOK VAMPIRES EXPOSED

10                        APRIL 22, 2017

11                        CLIP AT 59M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 219 of 1271

2

1          MR. DEW:  Yeah.  Hey, Alex, the whole Sandy Hook

2    think is a quagmire because of the way the media and the

3    officials up there were so secret about everything, and

4    that's where people started questioning.  That's the big

5    thing.  They were saying anybody who says anything on the

6    internet and gets caught with it, we're going to go after

7    them.

8          They come out, first day, they have the wrong name

9    of the supposed shooter.  They have his older brother.  And

10   they have guns that they're calling out.  Then they're

11   pulling guns out of cars.  They're finding people in the back

12   woods that are dressed up in SWAT gear.

13         MR. JONES:  And that's on helicopter footage, and

14   they say it never existed; and then they later admit it does.

15   And then the school was closed until that year, and in the

16   videos it's all rotting and falling apart.  And nobody is

17   even in it, and the kids are going in circles in and out of

18   the buildings with their hands up.  And then they never

19   called rescue choppers.  I mean, exactly.

20         MR. DEW:  Yeah.  There's a lot of weirdness.

21   There's some supposed dash-camera footage where the people

22   are smiling and getting their lunches ready, the police

23   officers.  You think you're going to have smiling police

24   officers at a time when, you know, they're supposedly

25   bringing out 20 dead kids, and they're smiling and getting

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
220 of 1271

3

1  their lunches ready on top of a police car.

2          MR. JONES:  And they had porta-potties being

3  delivered an hour after it happened for the big media event.

4          MR. DEW:  Yeah.  Yeah.  It's -- I'm amazed that --

5  and then, you know, we've never seen -- there's never been

6  any even blurred photos of any bodies or anything.  We've

7  seen every other incident where there's dead bodies.

8          MR. JONES:  They sure showed us the nerve-gassed

9  kids in Syria, didn't they?

10          MR. DEW:  Yeah.  Oh, yeah.  Well, we didn't even

11  get blurred images with the dead kids in Syria.  We got -- we

12  got crisp photos.  We got --

13          MR. JONES:  Video.

14          MR. DEW:  -- you know, UN photos being held up.

15          (END OF AUDIO FILE)

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 221 of 1271

4

CERTIFICATE OF TRANSCRIPTIONIST

1

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A28

2017-06-13 - What Alex Jones Really Believes About Sandy Hook (Clip at 14m)

1

2

3

4　　　　　　　　　CONNECTICUT MASSACRE SHOOTING

5

6

7

8　　　　　　　TRANSCRIPT OF INFOWARS BROADCAST

9　　　WHAT ALEX JONES REALLY BELIEVES ABOUT SANDY HOOK

10　　　　　　　　　　JUNE 13, 2017

11　　　　　　　　　　CLIP AT 14M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
224 of 1271

2

1          MR. JONES:  And how they're all colluding and the

2     fake polls.  You guys are the globalists.  You're the

3     enemies.  You're the people that have hijacked America.

4     You're the threat to our children.  You're the people that

5     are cold and heartless and don't care, not us.

6          But again, I want to encourage people to read the

7     Zero Hedge article that breaks it all down because they

8     absolutely are on target with this report where they ask the

9     questions that the media seems so scared that I might even

10    actually talk about if the Megyn Kelly interview aired.

11         Why does the Sandy Hook Elementary School website

12    have zero traffic for four years before the event and show it

13    was closed?

14         Why were there several reports of other shooters

15    dressed in camouflage in the woods that fled, whom the police

16    allegedly detained?

17         Why were porta-potties, sandwiches, and fruit

18    drinks, and chips brought up and set up for the crime scene

19    in just an hour or so?

20         Sandy Hook -- it just goes on and one.  An FBI

21    crime stat which shows no murders occurred in Newtown in

22    2012.

23         Why didn't they let paramedics and EMTs in the

24    building if 27 children were declared dead in 8 minutes?

25         Why was Adam Lanza's home burned to the ground by

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
225 of 1271

3

1  the bank?

2        Why have they declared all the records totally

3  secret?

4        These are questions the public has.  They're the

5  ones asking it.  They're the ones demanding it.  I've said I

6  believe children did die there, but PR firms were involved,

7  admittedly, hyping it up as much as possible.  But there's

8  been a cover-up, and Anderson Cooper got caught faking where

9  his location was with blue screen.

10        I mean, it's all there.  We don't know what

11  happened.  I believe kids died.  But the same media that's

12  faking a bunch of other stuff and faking war propaganda is

13  saying that I have said things that I never said that have

14  been taken out of context, and now won't report when I'm

15  saying don't air the interview on Father's Day to hurt

16  fathers, and demonize men, and that you edited me out of

17  context; and that I don't want it aired.  Why won't they

18  actually report on what I'm saying?

19        I'm Alex Jones.  This is the InfoWars.  Coming up,

20  Owen Shroyer in the studio for the next 30 minutes.  Then

21  I'll be back in the studio coming up live.  Please spread the

22  word because the truth lives at InfoWars.com.

23        (Cut to different clip)

24        MR. JONES:  Let's go to Devin in Florida.  Devin in

25  Florida, you're on the air.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
226 of 1271

4

1               UNIDENTIFIED MALE:  Great.  Hey, thank you so much.

2    Listen, I --

3               (END OF AUDIO FILE)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 227 of 1271

5

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12                  Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A29

2017-06-19 - Megyn Kelly Profile (Clip at 7m55s)

```
 1

 2

 3

 4              CONNECTICUT MASSACRE SHOOTING

 5

 6

 7

 8

 9              MEGYN KELLY PROFILE

10                JUNE 19, 2017

11               CLIP AT 7M 55S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
230 of 1271

2

1          MS. KELLY:  At the top of that list is Jones'

2   outrageous statement that the slaughter of innocent children

3   and teachers at Sandy Hook Elementary School, one of the

4   darkest chapters in American history, was a hoax.

5          MR. HESLIN:  I watched my son.  I buried my son.  I

6   held my son with a bullet hole through his head.

7          MS. KELLY:  Neil Heslin's son Jessie, just six

8   years old, was murdered along with 19 of this classmates and

9   6 adults on December 14, 2012, in Newtown, Connecticut.

10         MR. HESLIN:  I dropped him off at 9:04.  That's

11  when we dropped him off at school with his book bag.  Hours

12  later I was picking him up in a body bag.

13         MS. KELLY:  Alex Jones repeatedly claimed that the

14  shooting never happened.  Here he is on InfoWars in December

15  2014.

16         MR. JONES:  But it took me about a year with Sandy

17  Hook to come to grips with the fact that the whole thing was

18  fake.

19         MS. KELLY:  You said the whole thing is a giant

20  hoax.  How do you deal with a total hoax?  It took me about a

21  year with Sandy Hook to come to grips with the fact that the

22  whole thing was fake.  I did deep research, and, my gosh, it

23  just pretty much didn't happen.

24         MR. JONES:  At that point -- and I do show think there's

25  some cover-up and some manipulation -- that is pretty much

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
231 of 1271

3

1   what I believed.  But then I was also going in devil's

2   advocate.  But then we know there's mass shootings and these

3   things happen.  So again --

4        MS. KELLY:  You're trying to have it all ways,

5   right?

6        MR. JONES:  No, I'm not.

7        MS. KELLY:  If you wrongly went out there and said

8   it was a hoax, that's wrong.

9        MR. JONES:  But what I already answered your

10   question was listeners and other people are covering this.  I

11   didn't create that story.

12        MS. KELLY:  But, Alex, the parents, one after the

13   other, devastated, the dead bodies that the coroner

14   autopsied.

15        MR. JONES:  And they blocked all that, and they

16   won't release any of it.  That's unprecedented, even --

17        MS. KELLY:  All of the parents --

18        MR. JONES:  -- the reports.

19        MS. KELLY:  -- decided to come out and lie about

20   their dead children.

21        MR. JONES:  I didn't say that.

22        MS. KELLY:  What happened to the children?

23        MR. JONES:  I will sit there on the air and look at

24   every position and play devil's advocate.

25        MS. KELLY:  Was that devil's advocate; the whole

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
232 of 1271

4

1  thing is a giant hoax; the whole thing was fake?

2       MR. JONES:  Yes.  Because I remember in -- even

3  that day I go back from memory, them saying but then some of

4  it looks like it's real.  But then what do you do when

5  they've got the kids going in circles in and out of the

6  building with their hands up?  I've watched the footage, and

7  it looks like a drill.

8       MS. KELLY:  When you say parents faked their

9  children's death, people get very angry.

10       MR. JONES:  Yeah.  Well, let's -- oh, I know.  But

11  they don't get angry about the half million dead Iraqis from

12  the sanctions, or they don't get angry about --

13       MS. KELLY:  That's a dodge.

14       MR. JONES:  No, no.  It's not a dodge.  The media

15  never covers all the evil wars it has promoted, all the big

16  things.

17       MS. KELLY:  That doesn't excuse what you did and

18  said about Newtown.  You know it.

19       MR. JONES:  But I -- here's the difference.  Here's

20  the difference.  I looked at all the angles of Newtown, and I

21  made my statements long before the media even picked up on

22  it.

23       MS. KELLY:  In our interview we asked Jones

24  numerous times what he now believes, and he never completely

25  disavowed his previous statements.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
233 of 1271

5

1             MR. JONES:  I tend to believe that children

2     probably did die there, but then you look at all the other

3     evidence on the other side.  I can see how other people

4     believe that nobody died there.

5             MS. KELLY:  Of course, there --

6             (END OF AUDIO FILE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 234 of 1271

6

CERTIFICATE OF TRANSCRIPTIONIST

1

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A30

2017-10-26 - JFK Assassination Documents To DROP Tonight (Clip at 1h13m30s)

1

2

3

4                    CONNECTICUT MASSACRE SHOOTING

5

6

7

8                 TRANSCRIPT OF INFOWARS BROADCAST

9          JFK ASSASSINATION DOCUMENTS TO DROP TONIGHT

10                        OCTOBER 26, 2017

11                      CLIP AT 1HR 13M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A30

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
237 of 1271

2

1          MR. JONES:  ...top trend forecaster.  But look at

2   this article that was on Infowars.com a few days ago that I

3   read.  I meant to cover, and then I heard Lee Ann McAdoo

4   during the break.  A lot of our radio ads aren't radio ads.

5   They're just one minute little information news pieces,

6   something we do.  We just change things up.  And I'd

7   forgotten in the documents the CIA visited Lanza and

8   reportedly recruited him about a year before the shooting.  I

9   mean, they bulldozed the house to get rid of it.

10          I don't know what really happened with Sandy Hook,

11  folks.  We've looked at all sides.  We played devil's

12  advocate from both sides, but I mean, it's as phony as a $3

13  bill with CNN doing fake newscasts, with blue screens.  I

14  mean, Nancy Grace got caught doing it, Anderson Cooper.  I

15  mean, that is just a crazy -- that's the kind of stuff that I

16  read on InfoWars.com that I don't even get to.

17          Speaking of that --

18          (END OF AUDIO FILE)

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 238 of 1271

3

```
 1              CERTIFICATE OF TRANSCRIPTIONIST
 2   I certify that the foregoing is a true and accurate
 3   transcript of the digital recording provided to me in this
 4   matter.
 5        I do further certify that I am neither a relative, nor
 6   employee, nor attorney of any of the parties to this
 7   action, and that I am not financially interested in the
 8   action.
 9
10
11                          _____
12                          Julie Thompson, CET-1036
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# Exhibit A31

2017-03-08 - Hunt For Wikileaks Source Begins (Clip at 1h11m)

1

2

3

4                     CONNECTICUT MASSACRE SHOOTING

5

6

7

8              TRANSCRIPT OF INFOWARS BROADCAST

9            HUNT FOR WIKILEAKS SOURCE BEGINS

10                    MARCH 08, 2017

11                 CLIP AT 1HR 1H 11M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. A31

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
241 of 1271

2

1          UNIDENTIFIED MALE:  Now, Dr. Steve Pieczenik,
2  totally legit, right?

3          MR. JONES:  Oh, yeah.

4          UNIDENTIFIED MALE:  High level?

5          MR. JONES:  I mean, when he comes on the show, it's
6  in like Italian newspapers, and then they send like, you
7  know, FBI to his house; and he's called before federal
8  courts.  When he releases stuff, they threaten him with him
9  national security arrest.

10          UNIDENTIFIED MALE:  Doctor --

11          MR. JONES:  That's how real he is.

12          UNIDENTIFIED MALE:  Dr. Steve Pieczenik, and you
13  got some heat for this.  This is kind of changing the subject
14  a little.  Dr. Steve Pieczenik on your show said that no kids
15  died at Sandy Hook.  That it was a Homeland Security drill
16  that they passed off as a real event.

17          MR. JONES:  He says that.

18          UNIDENTIFIED MALE:  That's what he says.

19          MR. JONES:  And I've been hit really hard with it.
20  I can't prove it one way or the other.  I know Anderson
21  Cooper is standing up there and turns, and his whole nose
22  disappears.  I work in TV.  I know what a blue screen is,
23  bro.

24          UNIDENTIFIED MALE:  Yeah.  And I have one question
25  about Sandy Hook, the one question, the Tower 7 question is:

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 242 of 1271

3

1   why weren't the medivac helicopters called?

2           MR. JONES:  Pieczenik ran the operation to

3   overthrow at least seven countries.

4           UNIDENTIFIED MALE:  Yeah.

5           MR. JONES:  I mean, that's on record.

6           UNIDENTIFIED MALE:  Yeah.

7           MR. JONES:  He co-wrote Tom Clancy's books.  He's

8   the Jack Ryan character.

9           UNIDENTIFIED MALE:  Yeah.

10          MR. JONES:  That's because he used to be in covert

11  action himself.

12          UNIDENTIFIED MALE:  Uh-huh (affirmative).

13          MR. JONES:  That's how he got into the CIA was --

14  here's a big secret about the CIA.  Like they've got hit men

15  that are like former Special Forces and stuff that are Army,

16  Navy, Marine Corps, you know, because you like graduate out

17  of the Seals and out of things into squads that are put in

18  strategic locations around the country, sleeper cells.

19          And so that's basically what goes on, but who they

20  really have for assassins are doctors and psychiatrists.  And

21  so a lot of these people you see that are doctors and

22  psychiatrists and things that head up things that, oh, were

23  in the Navy or in the Army, they were all put through secret

24  programs and a bunch of other stuff, and they're the real hit

25  men.  And there's some weird thing in the government where

1  it's a medical procedure we're doing, like torture is all a

2  medical procedure.

3          UNIDENTIFIED MALE:  Yeah.

4          MR. JONES:  It's this thing with doctors.  So if

5  they send real hit men after you, it's guys with medical

6  degrees.  Isn't that crazy?

7          UNIDENTIFIED MALE:  Uh-huh (affirmative).  Anderson

8  --

9          MR. JONES:  It's all very professional done though,

10  you understand.

11          UNIDENTIFIED MALE:  You mentioned Anderson Cooper.

12  What -- people think he's -- he was in the CIA, right?

13          MR. JONES:  Yes.

14          (END OF AUDIO FILE)

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 244 of 1271

5

1               CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5      I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11                      _____

12                      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit A32

2017-04-28 - Alex Jones Austin Press Conference (Clip at 30m29s)

1
2
3

CONNECTICUT MASSACRE SHOOTING

5
6
7

TRANSCRIPT OF INFOWARS BROADCAST

ALEX JONES AUSTIN PRESS CONFERENCE

APRIL 28, 2017

CLIP AT 30M 29S

12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ex. A32

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 247 of 1271

2

```
 1            MR. JONES:  That's a joke too.  You what?
 2            UNIDENTIFIED MALE:  You seriously believe Sandy
 3   Hook is a false flagstone?
 4            MR. JONES:  I think -- I think we should
 5   investigate everything because the government staged so much
 6   stuff.  Then they lie and say that I said the whole thing was
 7   totally fake when I was playing devil's advocate in debate.
 8   I said, "Maybe the whole thing is real.  Maybe the whole
 9   thing is fake."  They were using blue screens out there.
10            UNIDENTIFIED MALE:  So you're serious?
11            MR. JONES:  Why won't the media -- I know that's
12   the anointed thing your editors tell you to go out --
13            UNIDENTIFIED MALE:  I'm not the media.
14            MR. JONES:  -- and like -- well, that's what the
15   media talks about.  Screw this.  You're just regurgitating
16   that.  They ask about -- they ask about Sandy Hook.  They ask
17   about Sandy Hook, and I say, yes, government stage things.
18            UNIDENTIFIED MALE:  Yeah.
19            MR. JONES:  So it's not bad to question them.
20   Anyways, you guys have fun.
21            UNIDENTIFIED MALE:  Thanks.
22            UNIDENTIFIED MALE:  Why don't you just make your
23   apology?
24            (END OF AUDIO FILE)
25
```

1      CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12            Julie Thompson, CET-1036

# EXHIBIT A

# Affidavit of Fred Zipp

## AFFIDAVIT OF FRED ZIPP

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared FRED ZIPP, a person whose identity has been established to me. Upon being duly sworn, Affiant states:

## PERSONAL BACKGROUND

I have spent 39 years in daily newspaper journalism and journalism education.

From 1979 to 1984, I was a reporter and assistant city editor at the Beaumont Enterprise in Beaumont, Texas. From 1984 to 1987, I was a sports copy editor, assistant sports editor and assistant city editor at the Austin American-Statesman in Austin, Texas. From 1987 to 1998, I was assistant metro editor, deputy metro editor, news editor and metro editor the Palm Beach Post in West Palm Beach, Florida. In 1998, I returned to the American-Statesman as assistant managing editor, managing editor, and editor. Over the course of my career, I gained extensive experience and expertise in the responsible delivery of news content to a mass media audience.

In 2012, I began teaching at the University of Texas at Austin. At the University of Texas, I supervise a digital media initiative known as *Reporting Texas* which functions similarly to a newsroom; students are the reporters, and I am their editor. I help them conceive, report and write stories that are posted on the reportingtexas.com website.

I have been a director and officer of the Freedom of Information Foundation of Texas and the Headliners Foundation of Texas, an organization that promotes journalism excellence in the state.

## SCOPE OF REVIEW

In arriving at my opinions in this case, I have used the same principles and analysis as I have used throughout my journalism career to determine whether particular assertions could be responsibly published. This review included an examination of the disputed statements as well as a variety of relevant background materials. I have reviewed numerous background items, including:

- Public domain materials relating to the Sandy Hook shooting.

- Materials from the final report published by the Connecticut Department of Emergency Services and Public Protection, available at: http://cspsandyhookreport.ct.gov/

- Various articles and social media content from InfoWars.

- Various articles and reference materials concerning InfoWars

- My own personal reference materials and texts.

- Video clips containing statements by InfoWars about Sandy Hook, along with transcripts of those video clips created by a court reporter. Those transcripts are attached to my affidavit.

- A July 26, 2017, YouTube video from InfoWars entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece." A digital copy is attached to this affidavit.

- A July 20, 2017, segment of the Alex Jones show in which the July 26, 2017, video was republished.

It is my belief that discovery will likely produce further relevant evidence, but I am confident that enough material exists in the public domain to reach reliable opinions for the purposes of these initial findings.

## BACKGROUND KNOWLEDGE OF INFOWARS

Having been involved in media in Austin for 23 years, I was aware of Alex Jones and InfoWars but felt no need to pay close attention to either one before agreeing to review the materials in this lawsuit. Nonetheless, I was aware of InfoWars' extremely poor reputation in the media industry with respect to the reliability of the information it publishes, and I also knew Mr. Jones had alleged the Sandy Hook Elementary School shooting was a government hoax involving actors.

After I asked to review the events of this lawsuit, I have spent a significant amount of time reading articles on InfoWars.com and reviewing audio and video recordings posted to the website. While the site purports to be a news and information operation, it is clear that it is actually a propaganda outlet for Mr. Jones' theories about a global conspiracy to control and enslave the world's population.

Alex Jones and InfoWars generally have a signature style: rapid-fire assertion of various data points with little or, more often, no attribution. The assertions are presented to the viewer as facts. Underlying the presentation is the premise that Jones is at war with "the globalists" – or their various stand-ins, including the Illuminati, Jews and Communists -- and that he wins the war by marshaling his assertions more effectively than they do. In traditional journalism, by contrast, attributing assertions to sources is an essential element of the work, and the attribution becomes more important in proportion to the seriousness of the facts asserted.

2

According to the American Press Institute, "Journalism is the activity of gathering, assessing, creating, and presenting news and information. It is also the product of these activities…These elements not only separate journalism from other forms of communication, they are what make it indispensable to democratic societies."[1] The process of journalism is dependent on responsible verification in which information is gathered and its accuracy is evaluated. In coming to my opinions, I have analyzed InfoWars' conduct against the well-established standards of the journalism profession.

## INFOWARS' 2017 BROADCASTS

1.     **InfoWars' June 26 and July 20 Videos.**

After Mr. Heslin condemned InfoWars' false statements about Sandy Hook during an interview with Megyn Kelly on NBC TV, InfoWars produced a video in which it claimed that Mr. Heslin's statements about his last moments with his child were a lie. InfoWars host Owen Shroyer began the video by citing an article from an anonymous blog called "Zero Hedge." The video shows that the anonymous blog post had been "shared" only three times before it was featured on InfoWars' video. InfoWars took this obscure blog post that almost nobody in the world had seen and used it to smear Mr. Heslin.

In the interview, Mr. Heslin told Ms. Kelly that he buried his son, held his body, and saw his fatal injury. Concerning Mr. Heslin's claim, Mr. Shroyer stated the following:

> The statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible. And so one must look at Megyn Kelly and say, Megyn, I think it's time for you to explain this contradiction in the narrative because this is only going to fuel the conspiracy theory that you're trying to put out, in fact.
>
> So -- and here's the thing too, you would remember -- let me see how long these clips are. You would remember if you held your dead kid in your hands with a bullet hole. That's not something that you would just misspeak on. So let's role the clip first, Neil Heslin telling Megyn Kelly of his experience with his kid.[2]

Mr. Shroyer then played a clip from the interview in which Mr. Heslin stated, "I lost my son. I buried my son. I held my son with a bullet hole through his head." After playing the clip, Mr. Shroyer stated:

---

[1] https://www.americanpressinstitute.org/journalism-essentials/what-is-journalism/
[2] Exhibit A-1, 2017-06-26 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)

So making a pretty extreme claim that would be a very thing, vivid in your memory, holding his dead child. Now, here is an account from the coroner that does not corroborate with that narrative.[3]

Mr. Shroyer then played a short clip from a news conference with Dr. Wayne Carver, the medical examiner at Sandy Hook. In the clip, Dr. Carver stated that "we did not bring the bodies and the families into contact. We took pictures of them." Dr. Carver stated in the clip that "we felt it would be best to do it this way." Mr. Shroyer also showed an edited clip of an interview with Chris and Lynn McConnel in which Anderson Cooper states, "It's got to be hard not to have been able to actually see her."

At the end of the video, Mr. Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[4]

On July 20, 2017, during an episode of The Alex Jones Show, Mr. Jones republished the entire segment with Mr. Shroyer.

My review shows that the InfoWars video creates a false impression, both in its explicit text and in its implications. The video creates the false impression by incorporating, contrary to widely accepted journalistic standards,[5] an edited, incomplete account of Dr. Carver's and an edited, incomplete account of the McDonnel interview. It is clear to me that any publisher would have serious doubt about stating that Mr. Heslin could not have held his child nor seen his wound and that any publisher would entertain serious doubt about the truth of such a claim. In fact, the evidence I reviewed makes it clear that InfoWars was being purposely deceptive in an act of retaliation.

## OPINIONS

## 1.    InfoWars' False Statements in 2017 Impugned the Reputation of the Plaintiffs.

It is my opinion that the Shroyer video defamed Neil Heslin by impugning his reputation with false statements about his honesty or integrity. Mr. Shroyer arranged edited footage in a misleading and dishonest way to attack Mr. Heslin. At best, the InfoWars video is a mishmash of out-of-context statements that creates a dishonest portrait of Mr. Heslin, his statements and the events of Sandy Hook. At worst, it was a calculated and unconscionably cruel hit-job intended to smear and injure a parent who had the courage to speak up about InfoWars' falsehoods. In either case, InfoWars recklessly disregarded journalistic standards in approaching this story because disregarding those standards was necessary to carry out its distortion of events.

---

[3] *Id.*

[4] *Id.*

[5] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Provide context…" and "Never deliberately distort…"

Mr. Shroyer attributes the defamatory statements about Mr. Heslin to the anonymous Zero Hedge website. Republishing material by an anonymous author as if it were fact is inconsistent with journalistic standards.[6] Clearly, the point of Mr. Shroyer's video was that the allegations are true. It was not a neutral report about the Zero Hedge allegation. Rather, InfoWars adopted the allegations and attempted to persuade its audience that Mr. Heslin's description of his actions was not possible. Mr. Shroyer's callous statements about the "dead kid" throughout the video are intended to support and bolster an allegation that Mr. Heslin is lying. Mr. Shroyer also made it clear that he was not accusing Mr. Heslin of an innocent mistake. Mr. Shroyer asserts the event is "not something that you would just misspeak on" because "you would remember if you held your dead kid in your hands with a bullet hole."[7]

After the accusations appeared on InfoWars, Mr. Heslin was featured on numerous conspiracy websites and social media networks as internet users made wild speculations about him. Mr. Heslin had now become fodder for the Sandy Hook conspiracy fanatics. For example, he appeared in an internet meme accusing him of being an actor who also "played" a fireman killed on 9/11:



[8]

---

[6] Id., esp., "Identify sources clearly…"
[7] Exhibit A-1, 2017-06-26 - Zero Hedge Discovers Anomaly In Alex Jones Hit Piece (Full Segment)
[8] https://busy.org/@barrysoetoro/neil-heslin-is-dead-9-11-fireman

Once a person's name enters conspiracy culture, there is no limit for how bizarre the accusations can become. One conspiracy website alleged that Mr. Heslin's name was actually an anagram hiding his secret purpose with the Illuminati:



9

Anti-Semitism appears to be common among conspiracy fanatics, who believe the "Globalists" are controlled by Jewish interests. In the weeks after the InfoWars video appeared, Mr. Heslin became the target of these bigots:



10

---

9 http://theconspiracyzone.podcastpeople.com/posts/68433
10 https://www.johndenugent.com/how-the-whole-anti-confederate-hysteria-began-the-fake-charleston-church-shooting-using-crisis-actor-john-graas/

The InfoWars video was not only false and disparaging, but also influential; after it appeared, a group of irrational and dangerous conspiracy fanatics turned their attention to Mr. Heslin. The InfoWars video exposes Mr. Heslin to ridicule and contempt, and it is reasonable to believe that it could encourage bad actors who could become a threat to his safety.

### A.    Background Context of the 2017 Statements.

InfoWars' 2017 statements were not made in isolation. The 2017 statements were the latest allegation in a series of reckless falsehoods InfoWars has been making about Sandy Hook for five years. Mr. Jones used these false statements as evidence for his contention that the Sandy Hook shooting was faked or staged, and that the participants are engaged in a sinister cover-up.

In a January 27, 2013, broadcast entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones first alleged that the event had been faked:

> In the last month and a half, I have not come out and said that this was clearly a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction…Something serious is going on here, and CNN over and over again is at the heart of the fishy things that are happening…
>
> Now, ladies and gentlemen, the finale. I saw this footage where Anderson Cooper turns. He's supposedly there at Sandy Hook in front of the memorial, and his whole forehead and nose blurs out. I've been working with blue screen, again, for 17 years. I know what it looks like. It's clearly blue screen, clearly.[11]

In an April 16, 2013, broadcast entitled "Shadow Govt Strikes Again," Mr. Jones was discussing was various plots behind various national tragedies. During his remarks, he stated: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."[12]

In a March 14, 2014, broadcast entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones again repeated numerous false and irresponsible claims. Mr. Jones then asserted that the event was pre-planned and featured actors as a part of a cover-up:

> Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him…I've looked at it and undoubtedly, there's a cover-up, there's actors, they're

---

[11] Exhibit A3 - Transcript - 2013-01-27 - Why People Think Sandy Hook is a Hoax (Clip at 12m58)
[12] Exhibit A4 - Transcript - 2013-04-16 - Shadow Govt Strikes Again (Clip at 13m20s)

manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it.[13]

In a May 13, 2014, broadcast entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Mr. Jones again repeated his false statements:

> They don't even hide this stuff, ladies and gentlemen. Anderson Cooper, CIA, up there, who cares if it's blue screen…You're looking at how they don't any of the standard stuff, the paperwork, the police reports, no helicopter sent, no rescue, kids going in circles totally staged, men with guns in the woods getting grabbed, no names released. They deny it went on. Later have to admit it went on but say we're not answering questions. I mean, clearly it's a drill, just like the Boston bombing. I don't know exactly what's going on, but it just -- the official story isn't true.[14]

In a September 25, 2014, broadcast entitled "Connecticut PD Has FBI Falsify Crime Statistics," Mr. Jones stated:

> This is not a game. They are hopping mad we're covering this. CNN admits they did fake scud attacks on themselves back in 1991, 1990. Would they stage this? I don't know. Do penguins live in Antarctica? Wolfgang W. Halbig's our guest, former state police officer, then worked for the customs department, and then over the last decade's created one of the biggest, most successful school safety training grips. And he just has gone and investigated, and it's just phony as a three-dollar bill…[15]

> If you've got a school of 100 kids and then nobody can find them, and you've got parents laughing going "Ha, Ha, Ha," and then they walk over to the camera and go (crying), and I mean, not just one, but a bunch of parents doing this and then photos of kids that are still alive they said die. I mean, they think we're so dumb that it's really hidden in plain view, and so the preponderance -- I mean, I thought they had some scripting early on to exacerbate and milk the crisis as Rahm Emmanuel said, but when you really look at it, where are the lawsuits? There would be incredible lawsuits and payouts, but there haven't been any filed, nothing. I've never seen this. This is incredible.[16]

---

[13] Exhibit A5 - Transcript - 2014-03-14 - Sandy Hook, False Narratives Vs. The Reality (Clip at 26s)
[14] Exhibit A6 - Transcript - 2014-05-13 - Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert (Clip at 17m)
[15] Exhibit A7 - Transcript - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)
[16] Exhibit A8 - Transcript - 2014-09-25 - Connecticut PD Has FBI Falsify Crime Statistics (Clip at 22m)

In a December 27, 2014, broadcast entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," Mr. Jones stated:

> All I know is I saw Cooper with blue screen out there, green screen. I know I saw the kids doing fake, you know, rotations in and out of the building. They tore it down, all the unprecedented gag orders, you know, the police in anti-terror outfits in the woods. Then they denied that, that had been in the news. I mean, something is being hidden there…[17]
>
> I said they may have killed real kids, but they're practicing how to propagandize, and how to control the press, and how to put out a product that's a fraud when I just saw the heavy, heavy, heavy scripting. That was what was so clear. And then the parents laughing and then one second later doing the actor breathing to cry. I mean, it just -- it's just over the top. Over the top sick.[18]

In a December 29, 2014, broadcast entitled "America the False Democracy," Mr. Jones continued to insist that Sandy Hook was fake:

> I've had investigators on. I've had the state police have gone public, you name it. The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? I mean it's just -- how do you even convince the public something is a total hoax?
>
> The general public doesn't know the school was actually closed the year before. They don't know. They've shielded it all, demolished the building. They don't know that they had their kids going in circles in and out of the building as a photo op. Blue screen, green screens, they got caught using. I mean the whole thing.
>
> But remember, this is the same White House that's been caught running the fake Bin Laden raid that's come out and been faked. It's the same White House that got caught running all these other fake events over and over again, and it's the same White House that says I never said that you could keep your doctor when he did say you could keep doctor. People just instinctively know that there's a lot of fraud going on, but it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up, but then I did deep research; and my gosh, it just pretty much didn't happen.[19]

---

[17] Exhibit A9 - Transcript - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 3m08s)
[18] Exhibit A10 - Transcript - 2014-12-27 - Lawsuit Could Reveal Truth About Sandy Hook Massacre (Clip at 4m34s)
[19] Exhibit A11 - Transcript - 2014-12-29 - America the False Democracy (Clip at 11m53s)

In a January 13, 2015, broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook. He asserted that the event was "completely fake" and "manufactured":

> You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting.

> Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit.[20]

In a February 12, 2015, broadcast with an unknown title, Mr. Jones continued to repeat his false claims. Mr. Jones stated, "I know they're using blue screens…There are literally hundreds of smoking guns here that this thing doesn't add up."[21]

In a March 4, 2015, broadcast entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones stated, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake. How fake we don't know. It's sick."[22]

In a July 7, 2015, broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behind the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.[23]

In a July 7, 2015, broadcast entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his prior false claims about Sandy Hook:

---

[20] Exhibit A12 - Transcript - 2015-01-13 - Why We Accept Gov't Lies (Clip at 10m36s)
[21] Exhibit A13 - Transcript - 2015-02-12 - InfoWars broadcast relating to HONR copyright claim (Clip at 0m26s)
[22] Exhibit A14 - Transcript - 2015-03-04 - New Bombshell Sandy Hook Information In-Bound (Clip at 32m30s)
[23] Exhibit A15 - Transcript - 2015-07-07 - Government Is Manufacturing Crises (Clip at 32m)

No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.

Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.

We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method…

But I mean, this is just so big. And the more we look at Sandy Hook, I don't want to believe it's a false flag. I don't know if kids really got killed. But you got green screen with Anderson Cooper where I was watching the video and the flowers and plants are blowing in some of them, and then they blow again the same way. It's looped, and then his nose disappears. I mean, it's fake.

The whole thing is just -- I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House, you know. I don't know how they do it, but it's not real. When you take your kids to see, you know, the Haunted House and ghosts are flying around, they're not real, folks. It's staged.[24]

Mr. Jones also stated, "It's 101, they're covering up…This is mega-massive cover-up. My God." Mr. Jones stated that the tragedy was "totally made up with green screens, everything. And we've got them on green screens." Mr. Jones stated, "That's how evil these people are is that they can have CNN involved, all these people."[25]

In a November 18, 2016, broadcast entitled "Alex Jones Final Statement on Sandy Hook," Mr. Jones directly addressed the growing public controversy caused by his statements. In doing so, he began by repeating the numerous false claims he has made over the years.

Number one, the day before this tragic event happened an email was sent out by Bloomberg's anti-gun group saying prepare for a big

---

[24] Exhibit A16 - Transcript - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip 0-5m)
[25] Exhibit A17 - Transcript - 2015-07-07 - Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up (Clip at 9m40s)

event. But the biggest piece of evidence, the smoking gun, if you
would, of a cover-up, of whatever really happened is the Wayback
Machine, the internet archive. We see Sandy Hook's Newtown
website K through 12 having zero traffic 2008, '09, '10, '11, '12, and
then all of a sudden it just explodes. It's impossible to have zero
traffic to a K through 12 entire school system. And the word is that
school system was shut down for those years. That's what the
records show. They tell us it was open…

And early on, that day we watched footage of kids going in circles
in and out of the building. You'd be running them away from the
building. Emergency helicopters weren't called. Instead port-potties
were prepared for the press within hours of the event. I saw the
helicopters that did respond, the police helicopters saying that there
were men or a man in the woods in camouflage…

And then I saw Anderson Cooper -- I've been in TV for 20-
something years; I know a blue screen or a green screen -- turn, and
his nose disappears. Then I saw clearly that they were using footage
on the green screen looped because it would show flowers and other
things during other broadcasts that were moving and then basically
cutting to the same piece of footage…

Then we see footage of one of the reported fathers of the victims,
Robby Parker, doing classic acting training where he's laughing and
joking. And they say, hey, we're live, and he goes, oh. [Jones mock
cries]. And maybe that's real. I'm sure it is.

But you add it to all the other things that were happening and all the
other fake news the media has been caught in, and CNN back in
1991 openly faking scud missile attacks on Saudi Arabia and Israel
when they were back in Atlanta; and the satellite feeds caught them
admitting that it was all fake. We'd be crazy not to question this
because bare minimum they were faking some of the shots and some
of the coverage.

So to be clear, we point out clear chroma key, also known as blue
screen or green screen being used, and we're demonized. We point
out they're clearly doing fake interviews.[26]

In other words, Mr. Jones used his false claims as proof that the truth about Sandy Hook
was being artificially manipulated. In a chilling finale, Mr. Jones told his audience that the parents
were actors:

---

[26] Exhibit A18 - Transcript - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 4m59s)

And why should anybody fear an investigation if they have nothing to hide. In fact, isn't that in Shakespeare's Hamlet, "me thinks you protest too much."

But this particular case they are so scared of an investigation. So everything they do basically ends up blowing up in their face. So you guys are going to get what you want now. I'm going to start reinvestigating Sandy Hook and everything else that happened with it…

And so if children were lost in Sandy Hook, my heart goes out to each and every one of those parents and the people that say they're parents that I see on the news. The only problem is I've watched a lot of soap operas, and I've seen actors before. And I know when I'm watching a movie and when I'm watching something real.[27]

On April 22, 2017, InfoWars aired the "Sandy Hook Vampires Exposed" broadcast, which is the subject of a separate lawsuit brought by Leonard Pozner and Veronique De La Rosa. During that video, InfoWars once again made the false accusation that Ms. De La Rosa conducted a fake interview with Anderson Cooper as evidence of a conspiracy to cover up the truth about Sandy Hook.

On June 13, 2017, Mr. Jones stated in a Facebook video that "there's been a cover-up, and Anderson Cooper got caught faking where his location was with blue screen."[28] On June 19, 2017, Mr. Jones appeared for an interview with Megyn Kelly. During this interview, Mr. Jones continued to insist there had been a cover-up. While he waffled on whether he now believed children were killed, he did not abandon his accusations about a cover-up. Mr. Jones claimed it was suspicious that the children's autopsy records were not released to the public, and he again claimed to have seen video of kids going in circles in and out of Sandy Hook Elementary. Mr. Jones stated, "I do think there's some cover-up and some manipulation."[29]

In an October 26, 2017, broadcast entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones again returned to the subject of Sandy Hook. In this broadcast, he repeated his accusation that "it's as phony as a three-dollar bill with CNN doing fake newscasts, with blue screens."[30]

### B.    The reasonable meaning of InfoWars' June 26, 2017 Video.

Before publishing, journalists must evaluate how their story will be received by the public. The editorial process includes an analysis of how ordinary readers of average intelligence will understand and interpret the story. During my years in newspaper journalism, I gained extensive

---

[27] Exhibit A19 - Transcript - 2016-11-18 - Alex Jones Final Statement on Sandy Hook (Clip at 15m22s)
[28] Exhibit A20 - Transcript - 2017-06-13 - Media Refuses To Report Alex Jones' Real Statements On Sandy Hook (Clip at 14m)
[29] Exhibit A21 - Transcript - 2017-06-19 - Megyn Kelly Profile (Clip at 7m55s)
[30] Exhibit A22 - Transcript - 2017-10-26 - JFK Assassination Documents To DROP Tonight (Clip at 1h13m30s)

expertise in assessing the reasonable meanings of a text. As editor, I routinely applied this expertise
in an effort to avoid creating a misimpression among our readership. In this case, I likewise
analyzed the publication to determine what meaning could be reasonably understood by a person
of average intelligence.

It is my opinion that a person of ordinary intelligence would understand the June 26, 2017,
video as an accusation that Mr. Heslin was lying about the circumstances of his son's death.
Unquestionably, the gist of the video is that Mr. Heslin's claim of holding his son was not possible.
InfoWars used a deceptively edited clip of Lynn McDonnel to convince it viewers that she was
not allowed to see her child's body. It also used an out-of-context clip of Dr. Carver to convince
viewers that parents were only allowed to see photographs of their dead children. These actions
were aimed at manufacturing a controversy where none existed.

Moreover, the allegation against Mr. Heslin was merely the latest part of a calculated five-
year campaign to convince InfoWars' viewers that the Sandy Hook massacre was staged and that
the parents were actors in a "false flag" event. In the context of this five-year course of harassment
and deception, it is clear that a reasonable person could understand InfoWars to be implying that
Mr. Heslin's "impossible" claim about holding his alleged son is evidence that he was an actor in
the "false flag" and not a real parent. As such, a reasonable viewer could understand that the video
ultimately accuses Mr. Heslin of criminal conduct, such as falsifying a police report or fraud.

Not only is it my opinion that these statements could be understood in this manner, but
there is ample evidence that these statements were indeed understood in this manner by the public
at large. The nature of InfoWars' statements about Sandy Hook have been widely reported in the
media. The national outrage created by the unmistakable meaning of Mr. Jones' statements about
Sandy Hook is well documented. In an April 19, 2018, editorial entitled "Thank You for Suing
Alex Jones," the Hartford Courant editorial board wrote:

> Alex Jones and his website Infowars offer the worst kind of free
> speech — incendiary malice, based in falsehood, with no social
> value…They claim the Sandy Hook parents are actors. They claim
> the children never existed. They weave wild conspiracies from thin
> air. They have no regard for human suffering.[31]

The New York Daily News Editorial Board wrote about Jones' statements in an editorial
on April 17, 2018, entitled "Defamed by the devil: Sandy Hook parents take on Alex Jones' lies."
The Board wrote:

> All decent people should cheer on Leonard Pozner, Veronique De
> La Rosa and Neil Heslin…for filing a defamation lawsuit in Texas
> court against Alex Jones. As a radio show host and the grand poobah
> of Infowars.com, Jones has peddled wretched whole-cloth lies about

---

[31] http://www.courant.com/g00/opinion/editorials/hc-ed-alex-jones-sandy-hook-hoax-lawsuit-20180417-
story.html?i10c.encReferrer=&i10c.ua=1&i10c.dv=14

the 2012 Newtown massacre: that it was all a hoax, that the victims
and their mourning mothers and fathers are actors.[32]

In short, nobody who has been paying attention to InfoWars has any doubt about the
meaning of its claims. InfoWars' statements about Mr. Heslin are the latest part of its years-long
campaign to convince Mr. Jones' viewers that the events of Sandy Hook should not be believed.
Given the persistence of the Sandy Hook hoax conspiracy online, it is clear that many of Mr. Jones'
followers have accepted his allegations as true. A 2016 poll conducted by Fairleigh Dickinson
University found that 24 percent of Americans believe Sandy Hook was either "definitely" or
"possibly" faked.[33]

Additionally, it is clear from my review that InfoWars' statements would be reasonably
understood as assertions of fact, not opinions. Mr. Shroyer did not equivocate in his statements
about Mr. Heslin. Mr. Shroyer claimed Mr. Heslin's statement about holding his son was "not
possible." He also referenced the involvement of unspecified "fact-checkers," which obviously
signals an assertion of fact, not an opinion.  It is my conclusion that that InfoWars' 2017 statements
about Mr. Heslin would tend to injure his reputation, impeach his honesty and integrity and expose
him to contempt or ridicule.

**2.    InfoWars' accusations about Mr. Heslin were made with reckless disregard for truth.**

I have reviewed materials which lead me to believe that InfoWars demonstrated a reckless
disregard for truth. It is my opinion that InfoWars not only had serious doubts about the truth of
their 2017 statements about Mr. Heslin, but that they were motivated by a desire to mislead and
deceive.

**A.    InfoWars' accusations were inherently improbable and manufactured using
edited out-of-context footage.**

Mr. Shroyer's statements about Mr. Heslin were farfetched and shocking on their face. It
required an extraordinary level of verification before being repeatedly stated as fact. Yet it is clear
that InfoWars not only performed no verification, but also used edited source material in a
misleading way. Both are serious departures from standard journalism practice.[34] For example,
there is a full copy of Dr. Carver's interview posted on YouTube,[35] and portions of the interview
show that Mr. Shroyer has edited out a small part to create the impression that the parents were
not allowed access to their children. Dr. Carver clearly stated that at the time of his interview, the
bodies had been released to private funeral homes on behalf of the families. Mr. Shroyer used the
same dishonest tactic to edit a portion of an interview with Sandy Hook parents Chris and Lynn
McDonnel. Mr. Shroyer cut off the end of Ms. McDonnel's answer to make it appear that she was
not allowed to see her daughter's body. A full copy of the transcript shows that Ms. McDonnel

---

[32] http://www.nydailynews.com/opinion/defamed-devil-sandy-hook-parents-alex-jones-lies-article-1.3939094
[33] https://view2.fdu.edu/publicmind/2016/161011/
[34] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Take
responsibility…", Provide context…" and "Never deliberately distort…"
[35] https://www.youtube.com/watch?v=k3NS1lLo6As

had the opportunity to see her daughter's body.[36] Mr. Shroyer was only able to support his bogus
accusations by using deceptively edited footage.

Serious claims require serious evidence. Here, Mr. Shroyer used sham evidence. Not only
did InfoWars ignore basic precautions taken by journalists, but it intentionally distorted the
evidence in a malicious way to attack and retaliate against Mr. Heslin.

### B.    InfoWars relied upon dubious and unhinged sources.

As noted above, Mr. Shroyer began the video by referencing a post on an anonymous blog
known as "Zero Hedge." It appears that Mr. Shroyer aired his segment within hours of seeing the
Zero Hedge blog post. It does not appear that Mr. Shroyer did anything to investigate the author
behind the anonymous post. Given the seriousness of the accusations, Mr. Shroyer acted recklessly
and in a manner contrary to standard journalism practice[37] by hastily endorsing the accusations of
this anonymous author.

In addition, the Zero Hedge article cites accusations made by an individual named Jim
Fetzer. In its Motion to Dismiss, InfoWars described Mr. Fetzer with an air of respectability,
referring to him as "Professor Emeritus of the University of Minnesota." In truth, the retired
professor has long been understood to be an unhinged crank. I do not use these terms lightly. Mr.
Fetzer, author of the disturbingly titled self-published book "Nobody Died at Sandy Hook"[38] has
spent years spreading ridiculous and bizarre claims about the event. For example, Mr. Fetzer is
convinced that Sandy Hook parent Leonard Pozner is actually a different man named Reuben
Vabner. Mr. Fetzer wrote:

> Do not let the difference in Reuben and Lenny's ears fool you: they
> are still lopsided in the same direction even though the tops are
> bigger on Lenny, which we take to be one of the means they faked
> to deny they are the same. Fotoforensics demonstrates to anyone
> interested that Lenny's ears were extended at the tips. His chin was
> fattened up as well, which you can also see in photo forensics. Take
> away the ear tips and the double chin and you have Reuben
> Vabner.[39]

Mr. Fetzer also posts his purported "photo forensics" which he claims prove that Mr.
Pozner is actually Mr. Vabner:

---

[36] http://transcripts.cnn.com/TRANSCRIPTS/1212/18/acd.02.html
[37] *See* Society of Professional Journalists Code of Ethics, at https://www.spj.org/ethicscode.asp; esp. "Take
responsibility…." and "Identify sources…"
[38] https://books.google.com/books/about/Nobody_Died_at_Sandy_Hook.html?id=DH8cjwEACAAJ&source=kp_bo
ok_description
[39] http://jamesfetzer.blogspot.com/2018/06/philip-kraske-sandy-hook-alex-jones.html



Reuben Vabner                    Leonard Pozner

40

Mr. Fetzer's bizarre writings feature notably anti-Semitic rants about Mr. Pozner, who he insists is part of some international Jewish conspiracy:

> Pozner is the true picture of a traitor that has sold out his fellow man. He is a banker/financial consultant and an NWO shill that seems to have no remorse for lying and stealing everyone's donations. Not to mention the trauma our people in the U.S. have endured since 9/11.
>
> Oh I know it's nothing like the Zionists say they went through during their years in the wilderness. Especially, since they are so much better than us and why Leonard Pozner thinks this is all ok to do.[41]

Mr. Fetzer is obsessed with the notion of faked identifies, and he makes similar accusations about the shooting victims, posting photo comparisons which he claims prove that the photos of children are actually adults:

---

[40] *Id.*
[41] *Id.*



Jim Fetzer asked Larry Rivera to perform a superposition to test the hypothesis that they are indeed one and the same, which produced the following confirmation We have established far beyond a reasonable doubt that ███ and "Michael" are the same person since this proof demonstrates that no alternative hypothesis is reasonable

[42]

Mr. Fetzer tells his readers that he has located a photograph containing the female shooting victims, who are now allegedly adolescents:



[43]

---

[42] *Id.*
[43] *Id.*

Mr. Fetzer has claimed, with no evidence, that the death certificates for shooting victims have been faked and that a shooting victim's gravestone was actually a computer-generated graphic.[44] In short, no rational journalist would ever rely on Mr. Fetzer as a source for anything, especially an allegation as improbable and serious as accusing a parent of lying about holding their dead child. InfoWars' uncritical endorsement of accusations being promoted by Mr. Fetzer demonstrates its reckless and deceptive conduct.

### C.    InfoWars has a long history of making false statements about Sandy Hook.

InfoWars has made wild claims about the Sandy Hook massacre from the beginning. InfoWars suggested the event was a "false flag" on the day on the shooting[45], and InfoWars explicitly made that claim over the next five years. The accusation about Mr. Heslin is simply the latest element of InfoWars' claim that the official story of Sandy Hook was a lie. He has continually repeated these falsehoods over the course of five years. Countless individuals and media organizations have thoroughly debunked each of InfoWars' claims over the years. Nonetheless, InfoWars has persisted in this malicious campaign.

As part of my evaluation in this case, I reviewed video clips from over twenty InfoWars' broadcasts between 2013-2016, all of which discuss the alleged conspiracy behind Sandy Hook. In the videos I reviewed, InfoWars made a variety of factual allegations which are readily disproved by basic journalistic efforts. The various claims made by Jones have been debunked from numerous groups and individuals using a wide variety of sources in the public record.

InfoWars had ample opportunity to investigate the accuracy of its assertions. It has devoted an enormous amount of airtime to the tragedy, with videos and articles making extreme assertions years after the event. Given the enormous public attention and outcry over InfoWars' allegations, I find it unlikely that InfoWars researchers could have avoided the widespread debunking efforts unless they were doing so intentionally. It is my opinion that any reasonable journalist who continued to publish these claims in 2017 would entertain serious doubts about the truth of their statements and that they would be acting with a desire to mislead their audience.

### D.    InfoWars has a long history of recklessly claiming that national tragedies were staged by the government.

Mr. Jones' rise to notoriety coincided with his assertions that the 9/11 terror attacks were orchestrated by the U.S. government. InfoWars' current promotional materials boast that "Alex Jones is considered by many to be the grandfather of what has come to be known as the 9/11 Truth Movement."[46] Regarding the shooting at Columbine High School, Jones told his audience, "Columbine, we know was a false flag. I'd say 100 percent false flag."[47] Jones claimed that

---

[44] Id.
[45] Exhibit A23 - Transcript - 2012-12-14 - Connecticut School Massacre Looks Like False Flag Says Witnesses (Clip at 9m30)
[46] Free Speech Systems, LLC Media Kit, p. 1.
[47] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51244/gcn-alexjones-20120720-columbinefalseflag

Columbine "had globalist operations written all over it."[48] Regarding the Oklahoma City bombing, Jones said the bombing was a "false flag" and that "we've never had one so open and shut." He added that convicted bomber Timothy McVeigh "was a patsy, that was a staged event."[49]

Mere hours after James Holmes killed twelve people in a movie theater in Aurora, Colorado, Jones told his audience that there was a "100 percent chance" the shooting was a "false flag, mind control event."[50]

After the shooting of Rep. Gabrielle Giffords, Jones stated: "The whole thing stinks to high heaven."[51] Mr. Jones asserted that the Giffords shooting was "a staged mind-control operation."

An April 18, 2013, headline on the InfoWars website read "Proof Boston Marathon Bombing Is False Flag Cover-Up."[52] A week later, Mr. Jones stated on his broadcast, "I have never seen a false flag, provocateured, staged event by a government come apart faster than it is right now."[53] Jones said that "patsies were set up" after being recruited by "globalist intelligence agencies."[54] Jones claimed that Dzhokhar Tsarnaev, who was convicted of the Boston Marathon bombing, "was totally set up, ladies and gentlemen, to sell the police state," and that his brother worked for the CIA.[55]

Mr. Jones made similar accusations about the Douglas High School shooting in Parkland, Florida, claiming a 90 percent probability that it was a false flag:

---

[48] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51241/gcn-alexjones-20120720-columbine
[49] The Alex Jones Show, April 19, 2015, video available at:
https://www.mediamatters.org/embed/clips/2016/11/21/51199/youtube-jones-20150419-okc
[50] The Alex Jones Show, July 20, 2012, video available at:
https://www.mediamatters.org/embed/clips/2016/11/23/51243/gcn-alexjones-20120720-100
[51] Interview with Rolling Stone, March 2, 2011, available at:
http://www.rollingstone.com/politics/news/talk-radios-alex-jones-the-most-paranoid-man-in-america-20110302
[52] http://www.infowars.com/proof-boston-marathon-bombing-is-staged-terror-attack/
[53] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51269/youtube-alexjones-20130426-staged
[54] The Alex Jones Show, April 26, 2013, available at:
https://www.mediamatters.org/embed/clips/2016/11/29/51271/youtube-alexjones-20130426-boston
[55] The Alex Jones Show, April 8, 2015. Available at:
http://mediamatters.org/video/2015/04/08/rand-pauls-ally-alex-jones-boston-marathon-bomb/203215



In short, a major element of the InfoWars brand is built on allegations that major national tragedies are actually the result of orchestrated government actions. Given this background, I find that InfoWars' pattern of predictably asserting that events are "false flags," sometimes within hours of the event, is circumstantial evidence that InfoWars recklessly disregarded whether Jones' broadcast was true in this case.

## CONCLUSION

Based on the evidence I have reviewed at this early stage, it is my opinion that the Defendants failed to use reasonable care to ascertain the accuracy of their statements. Moreover, it is my opinion that the Defendants not only entertained serious doubts about the truth of their statements regarding the Plaintiffs, but that they were acting with the intent to deceive. Given the evidence I have reviewed, I conclude that the statements were published with reckless disregard for falsity. It is also my opinion that the statements by InfoWars were harmful to the Plaintiff, and could subject him to public contempt, hate or ridicule.


FURTHER YOUR AFFIANT SAYETH NOT


Fred Zipp

21

THE STATE OF TEXAS    §
                  §
COUNTY OF HARRIS    §

     SWORN to and SUBSCRIBED before, the undersigned authority, on the 21st day of August, 2018, by Mr. Fred Zipp.



ERIC TELLEZ
Notary Public State of Texas
My Commission# 124709495
My Comm. Exp. Apr. 06, 2021

_____
Notary Public, State of Texas

My commission expires: _____4-6-21_____

22

# EXHIBIT A-1

1

2

3

4                CONNECTICUT MASSACRE SHOOTING

5

6

7

8             TRANSCRIPT OF INFOWARS BROADCAST

9    ZERO HEDGE DISCOVERS ANOMALY IN ALEX JONES HIT PIECE

10                  JUNE 26, 2017

11                   FULL SEGMENT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
273 of 1271

2

1          MR. SHROYER:  So, folks, now here's another story.

2    You know, I don't even know if Alex knows about this, to be

3    honest with you.  Alex if you're listening and you want to --

4    or if you just want to know what's going on, Zero Hedge has

5    just published a story, "Megyn Kelly fails to fact-check

6    Sandy Hook's -- Sandy Hook father's contradictory claim in

7    Alex Jones Hit Piece."

8          Now, again, this broke -- I think it broke today.

9    I don't know what time.  But featured in Megyn Kelly's

10   expose, Neil Heslin, a father of one of the victims, during

11   the interview described what happened the day of the

12   shooting, and basically what he said -- the statement he

13   made, fact checkers on this have said cannot be accurate.

14   He's claiming that he held his son and saw the bullet hole in

15   his head.  That is his claim.

16         Now, according to a timeline of events and a

17   coroner's testimony, that is not possible.  And so one must

18   look at Megyn Kelly and say, Megyn, I think it's time for you

19   to explain this contradiction in the narrative because this

20   is only going to fuel the conspiracy theory that you're

21   trying to put out, in fact.

22         So -- and here's the thing too, you would remember

23   -- let me see how long these clips are.  You would remember

24   if you held your dead kid in your hands with a bullet hole.

25   That's not something that you would just misspeak on.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
274 of 1271

3

1            So let's role the clip first, Neil Heslin telling

2    Megyn Kelly of his experience with his kid.

3            (Video played - not transcribed)

4            Okay.  So making a pretty extreme claim that would

5    be a very thing, vivid in your memory, holding his dead

6    child.

7            Now, here is an account from the coroner that does

8    not corroborate with that narrative.

9            (Video played - not transcribed)

10           Okay.  So just another question that people are now

11   going to be asking about Sandy Hook.  The conspiracy

12   theorists on the internet out there that have a lot of

13   questions that are yet to get answered.  I mean, you can say

14   whatever you want about the event.  That's just a fact.  So

15   there's another one.  Will there be a clarification from

16   Heslin or Megyn Kelly?  I wouldn't hold your breath.  So now

17   they're fueling the conspiracy theory claims.  Unbelievable.

18           We'll be back with more.

19           (Segment ended)

20           (Commercial - not transcribed)

21           (END OF AUDIO FILE)

22

23

24

25

4

CERTIFICATE OF TRANSCRIPTIONIST

1    

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                    Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-2

```
1

2

3

4      CONNECTICUT MASSACRE SHOOTING

5

6

7

8    TRANSCRIPT OF INFOWARS BROADCAST

9  LOOKS LIKE FALSE FLAG SAYS WITNESSES

10            DECEMBER 14, 2012

11             CLIP AT 9M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1          **MR. JONES:** ... with all sorts of information on

2  this subject.  But get ahold of your cousin when she settles

3  down and get her to talk to us for any other information.  We

4  need to know: were there any drills that day or the day

5  before?  Does she have anything about other shooters, or was

6  it that she never saw the shooters?

7          **UNIDENTIFIED CALLER:**  Well, I had asked them if it

8  was supposedly too -- because they have a lot of security at

9  that school.  You have to ring a doorbell in order to get

10 into the school.

11         **MR. JONES:**  Yeah, of course.  Which is another side

12 of that.  Yeah.  It's one of these federal model schools.

13         **UNIDENTIFIED CALLER:**  The thing that just scared

14 the daylights out of me -- I had to call right away -- is I

15 asked them, "Did they ever train for this?"  And my uncle

16 said, "Yes."  Within this school year, since September, they

17 have trained for incidents like this.

18         **MR. JONES:**  Well, that in and of itself isn't proof

19 of it, but they could use a drill to then bring in a patsy.

20 It could just be a Prozac head.  We'll find out.  God bless

21 you, sir.  I appreciate your call.  Stay in contact.

22         We're going to go to Rob who says email --

23         (END OF AUDIO FILE)

24

25

3

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-3

1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9 WHY PEOPLE THINK SANDY HOOK IS A HOAX

10            JANUARY 27, 2013

11             CLIP AT 1M 12S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1      **MR. JONES:**  Now again, in the last month and a half

2 I have not come out and said that this was clearly a staged

3 event.  Unfortunately, evidence is beginning to come out that

4 points more and more in that direction, and we're going to

5 show you that information in a moment.

6           Now, a lot of the tens of millions of video views

7 on YouTube concerning the Sandy Hook hoax surrounds CNN and

8 what appears to be people who have been coached, people who

9 have been given cue cards, people who are behaving like

10 actors.  And we see CNN criticizing all the witnesses from

11 the helicopter, and the news crews, and witnesses, adults,

12 that saw multiple people being detained who were in camo.

13 We're told, oh, those are five-year-olds saying that.  It's a

14 conspiracy theory, when it's not five-year-olds saying that.

15 It's adults.  It's police admitting that "police officers"

16 were arrested from other jurisdictions creeping around in the

17 woods.

18           Something serious is going on here, and CNN over

19 and over again is at the heart of the fishy things that are

20 happening.

21           Now, remember, in 1990-1991 when the Gulf War

22 started, CNN would send out their raw feeds to their news

23 affiliates, and on it there was clear blue screens on top of

24 the roof of CNN Center in Atlanta with their top reporters

25 claiming they were in Israel under sarin nerve gas attack

3

1 from scuds.  And later they had to admit, quietly -- this is

2 on record; we're going to show you some clips -- that indeed

3 they were in Atlanta, Georgia, and that they were not being

4 attacked by scud missiles with sarin gas.

5          CBS News got caught scripting videos as well, and

6 there's a lot of examples of this.

7          (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11       _____

12            Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-4

1

2

3

4    CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9   SHADOW GOVERNMENT STRIKES AGAIN

10            APRIL 16, 2013

11            CLIP AT 13M 20S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1          **MR. JONES:** Let's -- and again, there's maybe a 5

2 percent chance out of 100 that this could be real Muslim

3 terrorists, or I guess there could be some domestic group

4 freaked out that would go stage this.

5          To be clear, I've never seen an Easter Bunny, but

6 some say it's real.  To be clear, I've never seen Santa

7 Claus.  Some say it's real.  Never seen a unicorn.  Some say

8 it's real.  Now, I don't think it exists, but it may.

9          Same thing with domestic terror groups.  I mean,

10 I've interviewed the cops and the people that saw the feds

11 plant the bombs in Oklahoma City.  You saw them stage Fast

12 and Furious.  Folks, they staged Aurora.  They staged Sandy

13 Hook.  The evidence is just overwhelming, and that's why I'm

14 so desperate and freaked out.  This is not fun, you know,

15 getting up here telling you this.  Somebody has got to tell

16 you the truth.  Somebody has got to stand against these

17 people.  Somebody has got to do it.

18          And I just hope everybody that is watching out

19 there that serves the system, who thinks they're going to get

20 away with all this, I hope you understand that you're not

21 going to get away with this.  You get rid of our checks and

22 balances, our protections, you're going to lose yours as

23 well.

24          And you want to throw your children out in the

25 cold.  You think you're cold-blooded.  You think you're a

Discovery Resource
713-223-3300

3

1   winner doing stuff like this.  You're not.

2          (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-5

```
1

2

3

4            CONNECTICUT MASSACRE SHOOTING

5

6

7

8        TRANSCRIPT OF INFOWARS BROADCAST

9  SANDY HOOK, FALSE NARRATIVES VERSUS THE REALITY

10                  MARCH 14, 2014

11                    CLIP AT 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

1          **MR. JONES:** ...major universities he's consulted

2 for.  I mean, he's a top consultant, long career as a state

3 police officer in Miami, Florida.  If you're just joining us,

4 he's been in customs, and then he got into being an educator

5 and then security.  And he's looking at it and dissecting it

6 like everybody else did.

7          I mean, folks, we've got video of Anderson Cooper

8 with clear blue screen out there.  He's not there in the town

9 square.  We've got people clearly coming up and laughing and

10 then doing the fake crying.  We've clearly got people where

11 it's actors playing different parts of different people, the

12 building bulldozed, covering up everything.  Adam Lanza

13 trying to get guns five times we're told.  The witnesses, you

14 know, not saying it was him.  People out in the woods.

15          But we've got the investigator here, Wolfgang W.

16 Halbig.  I'm going to give you the floor, sir.  Go over your

17 16 points, the problems, the issues, and break down what you

18 believe is a total hoax.

19          I've looked at it, and undoubtedly there's a cover-

20 up.  There's actors.  They're manipulating.  They've been

21 caught lying, and they were preplanning before it and rolled

22 out with it.  So clearly I agree with you that something is

23 rotten under the floorboard.  But is it a possum, or is it a

24 human?

25          Well, regardless, they're not letting a good crisis

3

1  go to waste.  But you're the expert.  Break it down for us.

2                 (END OF AUDIO FILE)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-6

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

BOMBSHELL SANDY HOOK MASSACRE WAS A DHS ILLUSION

SAYS SCHOOL SAFETY EXPERT

MAY 13, 2014

CLIP AT 17M

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 292 of 1271

2

1    MR. JONES:  They don't even hide this stuff,

2  ladies and gentlemen.  Anderson Cooper, CIA, up there, who

3  cares if it's blue screen.  Just like CNN -- I'm going back

4  to our guest. Just like CNN back there in the first Gulf

5  War was at the broadcast center in Atlanta on top of a roof

6  with a blue screen behind them saying they were in Riyadh,

7  Saudi Arabia, and Israel different days being hit by nerve

8  gas.  And then they went on air for parts of it with the

9  blue screen not even turned on with blue behind them.

10    And then there were live feeds back in that day.

11  Remember the whole thing where David Letterman was getting

12  mad that people could tape his show as it was being taped

13  and sent over, same thing with Jay Leno.  Same thing was

14  happening with Johnny Carson before he retired because they

15  would tape it during the day and then beam it back to New

16  York to be edited.  Well, it's the same deal.

17    CNN was sending that raw feed out all over the

18  world, and people knew how to descramble them and get them.

19  And it's on record that CNN did fake scud missile attack

20  videos.  So they've done it over and over again.

21    We've got Wolfgang here with us.  Sir, I'm going

22  to give you about three minutes to make any other points

23  that you didn't make to the school board.  Then we're going

24  to play a special report that aired actually last Friday of

25  you in there talking to them.  I didn't know the video was

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
293 of 1271

3

1  actually out or had been on the nightly news.  I missed

2  Friday's show.  I usually watch it almost every night, but

3  I missed that one.  I was with family.

4         But, look, let's say you got three minutes in a

5  nutshell of what's going on here to the layperson out there

6  as a school safety expert, renowned nationally, Mr. Halbig,

7  of what really happened here.  And then what you would say

8  to that school board?

9         MR. HALBIG:  Well, the first thing I got to say

10  before I get into that is that thank God I've had 67 great

11  years of great life.  I got a beautiful family.  You know,

12  I mean, I'm getting threats all the time.  I got some crazy

13  people out there, you know.  They're attacking my wife.

14  They're attacking me and everything else.

15         But you know what, all they have to do is answer

16  16 simple questions.  You and I wouldn't even be talking

17  today.  It's just -- it's unheard of, okay.  And I think

18  the school board members and the superintendent, they have

19  a responsibility of telling the truth.

20         Alex, there's no -- I cannot believe that a

21  public school system -- and you know, when you look at the

22  school itself, when you look at Sandy Hook, it is a filthy

23  school.  That's what I wanted to talk to the school board

24  members about.  It is a toxic waste dump.  When you look at

25  the data -- and here's what they didn't realize.  They put

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 294 of 1271

4

1  it in their own newspaper before they demolished it.  Sandy

2  Hook had the highest level of lead paint throughout the

3  entire school.  Sandy Hook had the highest level of

4  asbestos in the ceiling tiles and the ceiling floors.  It

5  had the highest level of PCP, and the ground water is

6  contaminated.

7        Now, here's the question: Connecticut law

8  requires that every parent must be notified of those

9  hazardous chemicals because they have serious health

10  effects on children which may not be seen until five years

11  later.  Now, why would any parent -- why would those 18 of

12  the 20 parents that moved into Newtown in 2009 enroll their

13  child in a school with all those hazardous chemicals?

14  Parents just don't that.  They don't expose their little

15  children to chemical hazards.

16        MR. JONES:  Well, let me just stop you.  As an

17  investigator, kind of like they got Al Capone for tax

18  evasion, not for all the murders or money laundering.

19  You're looking at how they don't any of the standard stuff,

20  the paperwork, the police reports, no helicopter sent, no

21  rescue, kids going in circles totally staged, men with guns

22  in the woods getting grabbed, no names released.  They deny

23  it went on.  Later have to admit it went on but say we're

24  not answering questions.  I mean, clearly it's a drill,

25  just like the Boston bombing.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
295 of 1271

5

1          I don't know exactly what's going on, but it just

2     -- the official story isn't true.  And again, I've read a

3     lot of criminology.  I'm not -- you know, I'm not a cop,

4     but I've studied a lot of it.  And just from a lay media

5     investigative journalist perspective, something is rotten

6     here, and then you see it duplicated over and over again.

7          What's your bottom line?  What do you think

8     really happened at Sandy Hook?  People could see your 16

9     questions at Sandyhookjustice.com.  And we just salute your

10    will to go up there and have eight police car blocks you at

11    the United Way and have them shut you down at the school

12    board, at the commission.  But bottom line, what do you, as

13    an almost 40-year, you know, investigator, police officer,

14    you name it -- what do you think is happening here?

15         MR. HALBIG:  Well, until they answer those

16    questions, I can tell you children did not die.  Teachers

17    did not die on December 14, 2012.  It just could not have

18    happened, and it's in their words.  It's not what Wolfgang

19    thinks, or it's just my opinion.  It's what they say.

20         I mean, their own words actually show that it

21    could not have happened.  Who declares 27 people legally

22    dead within 8 minutes?  Nobody does that.  Who has a 99.9

23    percent kill rate shooting children in a school within 8

24    minutes?  There isn't an FBI agent, there isn't a Navy Seal

25    that's, that good of a shot within eight minutes and then

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
296 of 1271

6

1   kill himself.  I mean, that's reasonable doubt.  I mean,

2   that in itself is reasonable doubt to show that --

3           MR. JONES:  That's right.

4           MR. HALBIG:  -- Adam Lanza could not have done

5   that.  I mean, he's an autistic child.  He's got

6   Asperger's.  Alex, nobody has a 99.9 percent kill rate, not

7   even the New York Police Department.

8           MR. JONES:  But he's a perfect cutout.  And for

9   those that don't know, the reason that is, even if you're

10  shooting people point blank in the head, the bullets change

11  direction.  They go different directions, and I mean, a lot

12  of times I've shot a wild hog, a deer, you name it, and the

13  bullet deflects off, even if you hit them broad side.

14  Sometimes it just deflects through.  You don't get 99.99

15  kill rates.  It's just incredibly hard to do.

16          MR. HALBIG:  It is.  And you know -- and the

17  thing that -- people, they haven't had time to read that

18  7000 page report that was put out by Steven Sedensky, who

19  is the state attorney in Danbury, Connecticut.

20          Even the Governor's own commission -- Alex, the

21  Governor's own handpicked Sandy Hook Advisory Commission

22  calls this 7000-page report the biggest data dump that

23  they've ever seen.  Now, this is his handpicked commission,

24  and it's redacted.  This is a commission who is supposed to

25  read it, study it, and come up with recommendations, and

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
297 of 1271

7

1 | they get a redacted report.  Now, what does that tell us?

2 |        MR. JONES:  Well, everybody's compartmentalized,

3 | and everybody is just playing along with the peer pressure.

4 |        MR. HALBIG:  Yes, there are.

5 |        MR. JONES:  Just like the police officers on

6 | 9/11, you know, were told get back.  They're going to blow

7 | up building 7.

8 |        MR. HALBIG:  Yeah.

9 |        MR. JONES:  It's on video.  I heard it on CNN.

10 | Heard it on CBS News.  Have the video.  The cops saying,

11 | "Get back; they're blowing it up."

12 |        I'm not saying the cops blew it up.  I've

13 | interviewed the police officers on this show that are on

14 | CNN saying, "Get back.  They're going to blow it up."  And

15 | they said, "No.  We were told on the radio they're going to

16 | blow up Building 7.  Get back."

17 |        And there was a countdown on the Red Cross radio.

18 | They were running it, and again, they used United Way Red

19 | Cross as the CIA cutouts.  If you look that up, that's

20 | mainstream news.  And they were there telling the cops what

21 | to do that afternoon.  Incredible.  And they're there,

22 | hearing the countdown.

23 |        I've interviewed not one but two.  One of them

24 | was an EMT, the other a cop.  And, boy, did they get

25 | threatened over it.  They wouldn't even do more interviews

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 298 of 1271

8

1  after it.  And they go, "No.  We heard the countdown."  And

2  the Red Cross guy said, "You know, morally I got to just

3  tell all you cops, get back.  They're going to blow it up

4  in a couple of minutes."  He goes, I'm not supposed to tell

5  you this, and then the countdown.  And the cops were like,

6  "Countdown."  So the cops are like, "Get back, get back."

7          And then the media spins it.  You're saying the

8  cops blew up the World Trade Centers.  All I know is it's

9  on CNN, cops going, "Get back.  They're going to blow that

10  building up."  They weren't even brought in on it.  They

11  got told by people warning them who were compartmentalized,

12  and it's just so incredible.  I don't mean to get off in

13  another subject, Wolfgang.  It's just that I've seen this

14  over and over again how the compartmentalization works.

15          MR. HALBIG:  I agree, but I think the same --

16  Alex, we've never had a time in our history where Sandy

17  Hook, a school massacre, the biggest illusion ever

18  portrayed by Homeland Security and FEMA.  It can bring down

19  the house.  I think America -- I cannot tell America.  This

20  is probably our only chance to unite and come together and

21  look for the truth, and this house needs to fall because

22  Sandy Hook is taking away our guns across the country.

23  Sandy Hook is messing with our freedom of speech.  That's

24  not the America that we -- you and I know, Alex.

25          MR. JONES:  And they raised hundreds of millions

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 299 of 1271

9

1  of dollars, billions in the case of 9/11, collecting money

2  off of people's goodwill and then giving it to anti-gun

3  groups.  The United Way is an anti-gun cesspit.

4          MR. HALBIG:  It is, and I hope nobody ever

5  donates another dime to United Way until they answer every

6  question.

7          (END OF AUDIO FILE)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 300 of 1271

10

1                      CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                              _____

12                              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-7

1

2

3

4          CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9     CONNECTICUT PD HAS FBI FALSIFY CRIME STATISTICS

10              SEPTEMBER 25, 2014

11               CLIP AT 22M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
302 of 1271

2

1          MR. JONES:  We're fearless, folks.  Support us.

2   Support Wolfgang.  This is not a game.  They are hopping mad

3   we're covering this.  CNN admits they did fake scud attacks

4   on themselves back in 1991, 1990.  Would they stage this?  I

5   don't know.  Do penguins live in Antarctica?  Wolfgang W.

6   Halbig's our guest, former state police officer, then worked

7   for the customs department, and then over the last decade's

8   created one of the biggest, most successful school safety

9   training grips.  And he just has gone and investigated, and

10  it's just phony as a $3 bill.  And they've been --

11          But man, Wolfgang, you dropped a bombshell of yours

12  scores of points, your 16 questions.  If you've got a school

13  of 100 kids and then nobody can find them, and you've got

14  parents laughing going ha, ha, ha; and then they walk over to

15  the camera and go (crying), and I mean, not just one, but a

16  bunch of parents doing this and then photos of kids that are

17  still alive they said die.  I mean, they think we're so dumb

18  that it's really hidden in plain view, and so the

19  preponderance -- I mean, I thought they had some scripting

20  early on to exacerbate and milk the crisis as Rahm Emmanuel

21  said, but when you really look at it, where are the lawsuits?

22  There would be incredible lawsuits and payouts, but there

23  haven't been any filed, nothing.  I've never seen this.  This

24  is incredible.

25          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 303 of 1271

3

                    CERTIFICATE OF TRANSCRIPTIONIST

1

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12                        Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-8

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

CONNECTICUT PD HAS FBI FALSIFY CRIME STATISTICS

SEPTEMBER 25, 2014

CLIP AT 22M

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
305 of 1271

2

1          MR. JONES:  We're fearless, folks.  Support us.

2  Support Wolfgang.  This is not a game.  They are hopping mad

3  we're covering this.  CNN admits they did fake scud attacks

4  on themselves back in 1991, 1990.  Would they stage this?  I

5  don't know.  Do penguins live in Antarctica?  Wolfgang W.

6  Halbig's our guest, former state police officer, then worked

7  for the customs department, and then over the last decade's

8  created one of the biggest, most successful school safety

9  training grips.  And he just has gone and investigated, and

10 it's just phony as a $3 bill.  And they've been --

11         But man, Wolfgang, you dropped a bombshell of yours

12 scores of points, your 16 questions.  If you've got a school

13 of 100 kids and then nobody can find them, and you've got

14 parents laughing going ha, ha, ha; and then they walk over to

15 the camera and go (crying), and I mean, not just one, but a

16 bunch of parents doing this and then photos of kids that are

17 still alive they said die.  I mean, they think we're so dumb

18 that it's really hidden in plain view, and so the

19 preponderance -- I mean, I thought they had some scripting

20 early on to exacerbate and milk the crisis as Rahm Emmanuel

21 said, but when you really look at it, where are the lawsuits?

22 There would be incredible lawsuits and payouts, but there

23 haven't been any filed, nothing.  I've never seen this.  This

24 is incredible.

25         (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
306 of 1271

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                              _____

12                              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-9

1

2

3

4           CONNECTICUT MASSACRE SHOOTING

5

6

7

8        TRANSCRIPT OF INFOWARS BROADCAST

9 LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10               DECEMBER 27, 2014

11                  CLIP AT 3M 8S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Discovery Resource
713-223-3300

2

1          **MR. JONES:**  What do you guys think of Halbig?  I

2  mean, he was a big, you know, successful, famous school

3  safety guy, wrote the book on a lot of it.

4          All I know is I saw Cooper with blue screen out

5  there, green screen.  I know I saw the kids doing fake, you

6  know, rotations in and out of the building.  They tore it

7  down, all the unprecedented gag orders, you know, the police

8  in anti-terror outfits in the woods.  Then they denied that,

9  that had been in the news.  I mean, something is being hidden

10  there.  You guys are on the East Coast.  You have a lot of

11  sources.  What do you really think happened?

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-10

1

2

3

4              CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9  LAWSUIT COULD REVEAL TRUTH ABOUT SANDY HOOK MASSACRE

10                  DECEMBER 27, 2014

11                   CLIP AT 4M 34S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          **MR. JONES:**  Very astute.  That's what I said a few

2  weeks into it.  I said they may have killed real kids, but

3  they're practicing how to propagandize, and how to control

4  the press, and how to put out a product that's a fraud when I

5  just saw the heavy, heavy, heavy scripting.  That was what

6  was so clear.  And then the parents laughing and then one

7  second later doing the actor breathing to cry.  I mean, it

8  just -- it's just over the top.

9          **UNIDENTIFIED MALE:**  Agreed, yep.

10          **MR. JONES:**  Over the top sick.  And we know they've

11  staged other stuff before.

12          (END OF AUDIO FILE)

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12        Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-11

1

2

3

4                 CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9            AMERICA THE FALSE DEMOCRACY

10               DECEMBER 29, 2014

11               CLIP AT 11M 53S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
314 of 1271

2

1        MR. JONES:  Let's talk to, Kevin.  Kevin, go ahead.

2   You're on the air.

3        KEVIN:  Hi, Alex.  Calling about Sandy Hook.

4   Basically my take on it is I live about 50 miles from

5   Newtown, and the whole thing is pretty much the next step in

6   reality TV because with other false flags like 9/11, or

7   Oklahoma City, or the Boston bombing, at least something

8   happened.  With Sandy Hook, there's no there, there.  You've

9   got a bunch of people walking around a parking lot is pretty

10  much what it comes down to and none of the --

11       MR. JONES:  No, no.  I've had investigators on.

12  I've had the state police have gone public, you name it.  The

13  whole thing is a giant hoax.  And the problem is how do you

14  deal with a total hoax?  I mean it's just -- how do you even

15  convince the public something is a total hoax?

16       KEVIN:  Very hard because, you know, anytime I talk

17  about this issue with people, you know, they -- you get

18  criticized, black balled, ridiculed, called every name in the

19  book, or they respond with the magic words they were saying

20  on TV.  There's no statement more proof positive of somebody

21  that's been brainwashed by that stuff, mainstream media, than

22  those words.  They were saying it on TV.

23       Well, I always tell people the same thing.  Go out

24  and prove the official story.  And there's been -- I knew the

25  millisecond this happened with that now fake picture of the

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
315 of 1271

3

1  kids being lead out of the school that this -- there's

2  nothing that's going to sell this agenda like dead elementary

3  school kids.  Nothing --

4          MR. JONES:  Well, that's right.  The general public

5  doesn't know the school was actually closed the year before.

6  They don't know.  They've shielded it all, demolished the

7  building.  They don't know that they had their kids going in

8  circles in and out of the building as a photo op.  Blue

9  screen, green screens, they got caught using.  I mean the

10  whole thing.

11          But remember, this is the same White House that's

12  been caught running the fake Bin Laden raid that's come out

13  and been faked.  It's the same White House that got caught

14  running all these other fake events over and over again, and

15  it's the same White House that says I never said that you

16  could keep your doctor when he did say you could keep doctor.

17  People just instinctively know that there's a lot of fraud

18  going on, but it took me about a year with Sandy Hook to come

19  to grips with the fact that the whole thing was fake.  I

20  mean, even I couldn't believe it.  I knew they jumped on it,

21  used the crisis, hyped it up, but then I did deep research;

22  and my gosh, it just pretty much didn't happen.

23          UNIDENTIFIED MALE:  Everything we said came true.

24  Everything we've done been's --

25          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
316 of 1271

4

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12                  Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-12

1

2

3

4  CONNECTICUT MASSACRE SHOOTING

5

6

7

8  TRANSCRIPT OF INFOWARS BROADCAST

9  WHY WE ACCEPT GOVERNMENT LIES

10  JANUARY 13, 2015

11  CLIP AT 10M 36S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
318 of 1271

2

1          MR. JONES:  Yeah.  When you're trying to, I mean,

2    decipher cloak and dagger, dirty tricks, it's pretty hard to

3    do.  It's just that when you -- then you learn that they were

4    funded by western funding.  Then you learn that it was the

5    same Amerall-Locky (phonetic) connection underwear bomber.

6    Then those are big red flags that they were patchy

7    provocateurs.  The classic MO has been followed.

8          And then, yeah, it kind of becomes a red herring,

9    you know, to say the whole thing was staged because they have

10   staged events before, but then you learn the school had been

11   closed and reopened.  And you got video of the kids going in

12   circles in and out of the building, and they don't call the

13   rescue choppers for two hours.  Then they tear the building

14   down and seal it.  And they get caught using blue screens,

15   and an email by Bloomberg comes out in the lawsuit where he's

16   telling people get ready in the next 24 hours to capitalize

17   on a shooting.

18          Yeah.  So Sandy Hook is a synthetic, completely

19   fake with actors, in my view, manufactured.  I couldn't

20   believe it at first.  I knew they had actors there clearly,

21   but I thought they killed some real kids; and it just shows

22   how bold they are that they clearly used actors.  I mean,

23   they even ended up using photos of kids killed in mass

24   shootings here in a fake mass shooting in Turkey.  So, yeah -

25   - or Pakistan.  The sky is now the limit.  I appreciate your

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
319 of 1271

3

1    call.

2              Shirley in Louisiana.  You're on the air, welcome.

3              (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 320 of 1271

4

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate transcript of the digital recording provided to me in this matter.

I do further certify that I am neither a relative, nor employee, nor attorney of any of the parties to this action, and that I am not financially interested in the action.

_____

Julie Thompson, CET-1036

EXHIBIT A-13

1

2

3

4                CONNECTICUT MASSACRE SHOOTING

5

6

7

8              TRANSCRIPT OF INFOWARS BROADCAST

9     INFOWARS BROADCAST RELATING TO HONR COPYRIGHT CLAIM

10               FEBRUARY 12, 2015

11                CLIP AT 0M 26S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 322 of 1271

2

1      MR. JONES:  And again, if they can do this to us,
2  they can do it to anybody.  And we're going to give you the
3  name of the video as well that they are trying to sensor.
4  Mystery Sandy Hook victim dies again in Pakistan, and I'm
5  going to show you some of these photos from the BBC of people
6  in Pakistan holding up photos of children they say were
7  killed by terrorists; and it is one of the Sandy Hook
8  victims.  So we just said, man, what's going on in Pakistan?
9  What are they faking?

10     Well, the answer to that was the HONR or HONR
11  network, Lenny Pozner reportedly lost his son there came in
12  and filed a copyright claim on us showing a BBC news article.
13  You can't do that.  For those that don't know how copyright
14  works, I could show a clip off the news if I was analyzing it
15  in commentary, but I could certainly show newspapers all day
16  long.

17     I've been doing this for 20 years.  I took RTF.
18  That was the first thing they taught us.  I've had to sit in
19  on lawyer meetings.  I've been involved in lawsuits that
20  we've won dealing with this, and I've countersued people.
21  It's all on record.  I know what I'm talking about.  I know
22  what I'm talking about on defamation.  Knock on wood, we've
23  never had that problem.  Other people have and have settled
24  with us out of court twice.  So I know of what I speak.

25     And you can't go to somebody's YouTube channel and

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
323 of 1271

3

1  say they showed a news article from the BBC, and then say

2  that you can't show that because someone in Pakistan was

3  holding up a photo of your son, who reportedly died at Sandy

4  Hook, and they're saying the same person died in a terror

5  attack in Pakistan.  Obviously, we've got to investigate

6  this, just like we investigated Brian Williams and his

7  claims.

8        So, you know, we're sorry for everybody's losses,

9  whatever.  We're investigating this though because we live in

10 a system where the media exploits things and twists things.

11       Paul Watson thinks the official story of Sandy Hook

12 is true.  He's my chief reporter, and we get major heat from

13 the folks that think Sandy Hook was totally staged, saying

14 why aren't you on the same page.  Because we're

15 investigating.

16       I think there's some cover-ups there.  I know

17 they're using blue screens.  I've seen the footage of people

18 going in and out in circles in the building.  It doesn't look

19 right.  It doesn't pass the smell test.  There are literally

20 hundreds of smoking guns here that this thing doesn't add up.

21       (END OF AUDIO FILE)

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 324 of 1271

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                          _____

12                          Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-14

1

2

3

4            CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9      NEW BOMBSHELL SANDY HOOK INFORMATION IN-BOUND

10              MARCH 04, 2015

11              CLIP AT 32M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 326 of 1271

2

1          MR. JONES:  Wolfgang --

2          MR. HALBIG:  You know, I agree with you.  And I'll

3  say this to you:  I'm begging that I'm wrong.  And if they

4  answer my questions to my satisfaction and to Alex's

5  satisfaction, if they answer it to the people of America to

6  their satisfaction, I will run to the nearest mental health

7  facility -- and I've said it before -- I'll voluntarily

8  enroll myself because if I dare upset these parents or

9  children or school, I need mental health.

10          But I tell you what, I have spent my life doing

11  this, and when people refuse to answer simple, logical

12  questions, it raises the red flag.  And I am telling you I'm

13  not going to stop until we get the answers.

14          MR. JONES:  We know it stinks.  I mean, it's phony.

15  The question is what is going on.  We don't know.  We just

16  know it's fake.  How fake we don't know.  It's sick.

17          Thank you, John.

18          Kyle, Jay, Jimmy, Erik, your calls are straight

19  ahead.

20          (END OF AUDIO FILE)

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 327 of 1271

3

CERTIFICATE OF TRANSCRIPTIONIST

1. I certify that the foregoing is a true and accurate
2. transcript of the digital recording provided to me in this
3. matter.
4.     I do further certify that I am neither a relative, nor
5. employee, nor attorney of any of the parties to this
6. action, and that I am not financially interested in the
7. action.

_____

Julie Thompson, CET-1036

EXHIBIT A-15

1

2

3

4            CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9         GOVERNMENT IS MANUFACTURING CRISES

10                  JULY 7, 2015

11                  CLIP AT 32M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
329 of 1271

2

1        MR. JONES:  I didn't watch the nightly news one

2   night last week.  I tend to watch it in the morning on my

3   iPad while I get on the elliptical, and I've got, you know,

4   televisions in there that I monitor as well in the gym, in

5   the public gym I go to.

6        And I heard them back there talking yesterday

7   afternoon about a show they did last week, and I knew that we

8   had sent our East Coast reporter, Dan Bidondi, up there to

9   cover it.  And I heard Dew talking about his uncle, who I

10  know was a Navy Seal and a decorated FBI agent, who retired a

11  few years ago, and is part of a big security firm.

12       And I heard Dew talking, and I was like, "Are you

13  kidding me?"  His uncle talking to other FBI people, who I

14  guess are still in, was told, "You ought to go check out

15  Sandy Hook.  We're not allowed to.  It doesn't add up."  And

16  his uncle went to the hearings, and I didn't even realize, we

17  have video of him at the hearings and Bidondi interviewing

18  him and what he said on air, and what he said off air.  And

19  he told Dew, "Yeah.  You can repeat what I said."

20       He's been in the John Gotti trial.  He's a well-

21  known FBI agent.  He's been in a whole bunch of stuff, a

22  bunch of big cases.  And he told Dew, "I have never seen

23  people acting so weird and so suspicious and saying no one

24  knows anything and no paperwork on anything."  He's a former

25  Navy Seal, retired FBI agent, and I'm --

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
330 of 1271

3

1          And I know what will happen.  These guys are

2    compartmentalized.  They're like Mr. America most of them.

3    They really think they're the good guys, and overall they are

4    good guys.  But they're compartmentalized.  Right next to

5    them is the devil and above them people like Eric Holder, as

6    bad as it gets.

7          They'll go investigate something, find out it's

8    true, and then be shut down.  And I would imagine after we

9    talk about this, he's going to -- he's going to get a visit

10   because he's now investigating Sandy Hook.  Rob Dew's uncle

11   is now investigating Sandy Hook, former FBI agent, retired.

12   That's got to really freak them out.  And I'm not going to

13   put words in his mouth, but he said he's never seen something

14   that looks this fake.  It's because it is, folks.

15         I don't know if they really killed kids.  I don't

16   know, but they -- we got emails and memos that school was

17   shut down a year before.  They tore it down.  They covered it

18   up.  No rescue helicopters, no ambulances.  Within an hour

19   and a half they had a sign saying, "Check in here."  It was a

20   media event.

21         If they did kill kids, they knew it was coming,

22   stocked the school with kids, killed them, and then had the

23   media there, and that probably didn't even happen.  I mean,

24   no wonder we get so many death threats and so much heat and

25   so much other stuff I'm not going to get into, behinds the

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 331 of 1271

4

1    scenes, when we touch Sandy Hook because, folks, it's as

2    phony as a $3 bill.

3              (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 332 of 1271

5

1                    CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11                              _____

12                              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-16

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

RETIRED FBI AGENT INVESTIGATES SANDY HOOK

MEGA MASSIVE COVER-UP

JULY 07, 2015

CLIP AT 0-5M

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
334 of 1271

2

1      MR. JONES:  We have been warned.  We have been

2  warned.  We have been threatened.  We have been told through

3  official channels, unofficial channels, threats, you name it,

4  stop investigating Sandy Hook.

5      Now, when this first happened a few years ago, I

6  didn't come out of the gate saying it was a false flag, and I

7  got criticized by a lot of our listeners who were smart folks

8  and who went and really investigated that, hey, Alex, you

9  need to look at this again.

10      All I know is that the official story doesn't add

11  up, and that when retired state police officers, and school

12  investigation experts, and school safety experts, and others

13  began to investigate it, they were threatened.

14      No emergency helicopters were sent.  The ambulances

15  came an hour and a half later and parked down the road.  DHS

16  an hour and a half later with the time stamp put up signs

17  saying sign in here.  They had porta-potties being delivered

18  within an hour and a half.  It looked like a carnival.  It

19  looked like a big PR stunt.

20      Came out that Bloomberg a day before sent an email

21  out to his gun control groups in all 50 states saying,

22  "Prepare to roll, maybe operation coming up."  That came out

23  in the news.

24      We have the emails from city council back and forth

25  and the school talking about it being down a year before.  We

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
335 of 1271

3

1  have the school then being demolished, and the records being

2  sealed.

3          We have videos that look just incredibly suspicious

4  where people are laughing and everything, and then they start

5  huffing and puffing and start crying on TV, which is pure

6  acting method.  You've got a degree, Rob, in theater.  I

7  mean, this is -- this is something that even laypeople

8  notice.  So I began to investigate.

9          They had a weird anti-terrorism unit from the state

10  nearby with men in the woods, which were on video from

11  helicopter.  Then they said that didn't exist.  And so we'll

12  recap some of the history of this.

13          But now, your uncle, John Dew, Navy Seal, retired

14  FBI agent, works for a successful security company, I had

15  missed this episode of the nightly news back on June 4th and

16  then again last week when you did an update.  And then I

17  heard you talking about it yesterday.  I knew that we'd sent

18  our reporter down, Dan Bidondi, there for days to cover the

19  city council hearings about it and the fact that they're

20  sealing everything.

21          And then you just said, "Oh, yes, and that's why

22  I'm trying to get my uncle to tell me more."  Because he's

23  been in John Gotti hearings and been involved in huge cases,

24  pretty prominent FBI agent before he retired, and in his

25  words he said he seen the most secretive mafia stuff ever,

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
336 of 1271

4

1   and he's never seen people more closed-lipped.  He's never

2   seen something where it basically stinks.  And we'll use his

3   words, but the headline here is retired FBI agent

4   investigating Sandy Hook.  I mean, that was just amazing to

5   me that so much goes on around here that I miss some of

6   what's happening.

7          Next time a former Navy Seal FBI agent -- I don't

8   care if it's your uncle --

9          MR. DEW:  Yeah.

10         MR. JONES:  -- you know, is investigating something

11  like this, we want to hear about it.  I want to try to get

12  him on.  I know he's going to get heat probably, and they'll

13  probably try to threaten him.  But really kudos to him.

14         I mean, you told me that he went and investigated

15  it because other insiders said you need to go look at this.

16  I guess people currently in the FBI aren't allowed to, but,

17  man, the fix is in.

18         So, Rob Dew, tell us about your uncle, tell us

19  about all this.  I wish we would have gotten more than a two-

20  minute interview with him with Bidondi.  Bidondi did a great

21  job.  I just wish I would have known about this.  I would

22  have gone up there.  Halbig tried to get me to go.  I just am

23  trying to launch the TV network, and the new website, and

24  everything else.

25         But I mean, this is just so big.  And the more we

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
337 of 1271

5

1  look at Sandy Hook, I don't want to believe it's a false

2  flag.  I don't know if kids really got killed.  But you got

3  green screen with Anderson Cooper where I was watching the

4  video and the flowers and plants are blowing in some of them,

5  and then they blow again the same way.  It's looped, and then

6  his nose disappears.

7          MR. DEW:  Uh-huh (affirmative).

8          MR. JONES:  I mean, it's fake.  The whole thing is

9  just -- I don't know what happened.  It's kind of like if you

10  see a hologram at Disney World in the Haunted House, you

11  know.  I don't know how they do it, but it's not real.  When

12  you take your kids to see, you know, the Haunted House and

13  ghosts are flying around, they're not real, folks.  It's

14  staged.  I mean, a magician grabs a rabbit out of his hat.  I

15  know he's got a box under the table that he reaches in and

16  gets the rabbit.

17          I don't know what the trick is here.  I got a good

18  suspicion, but when you've got Wolfgang Halbig, who was the

19  top -- I mean, 20/20, CNN, I mean, ran the most successful

20  school safety course in the country, got the contracts at

21  Columbine, making millions of dollars a year, he believed it

22  was real.  People called him.  He went and investigated.  No

23  paperwork, no nothing.  It's bull.  And now an FBI retired

24  agent who retired, you know, with decorations --

25          I mean, Dew, this is just unprecedented.  I can't

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 338 of 1271

6

1  believe I missed this.  Recap what happened, and then we've

2  got some of the questions from Bidondi.  He told you a lot

3  more.  Well, just tell us what he said.

4          (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 339 of 1271

7

CERTIFICATE OF TRANSCRIPTIONIST

1

2  I certify that the foregoing is a true and accurate

3  transcript of the digital recording provided to me in this

4  matter.

5      I do further certify that I am neither a relative, nor

6  employee, nor attorney of any of the parties to this

7  action, and that I am not financially interested in the

8  action.

9

10

11  _____

12      Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A-17

1

2

3

4              CONNECTICUT MASSACRE SHOOTING

5

6

7

8          TRANSCRIPT OF INFOWARS BROADCAST

9      RETIRED FBI AGENT INVESTIGATES SANDY HOOK

10              MEGA MASSIVE COVER-UP

11                 JULY 07, 2015

12                CLIP AT 9M 40S

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
341 of 1271

2

1          MR. DEW:  So they were already on the scene right

2    after it happened.  That using u

3          MR. JONES:  Let's remember, they ran fast and

4    furious killing thousands of Mexicans, hundreds of Americans,

5    including six law enforcement to blame the Second Amendment.

6    CBS News got the memo.

7          MR. DEW:  Yeah.

8          MR. JONES:  That was a false flag killing thousands

9    to blame the Second Amendment and martyr Mexicans and say

10   you're racist if you don't turn your guns in.  So they've

11   done it before, and, my gosh, they've done it again.

12         MR. DEW:  Yeah.

13         MR. JONES:  Keep going.

14         MR. DEW:  Well, guys, actually, let's play the clip

15   from my uncle.  It's actually clip number two.  We'll play

16   that one first.  It's really short.

17         MR. JONES:  I want to play it, but tell us more of

18   what he said because you told me more than that.

19         MR. DEW:  Okay.  Well, he was concerned that there

20   -- because he had believed in the initial story, the official

21   story.  He said, well, now this doesn't add up.  If you have

22   all these people, they should just be giving the paperwork

23   and going on with their lives, if they don't want, you know

24   -- because right now it's all being --

25         MR. JONES:  It's 101 they're covering up.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
342 of 1271

3

1          MR. DEW:  He goes nobody acts like that if they're

2     on the up and up.

3          MR. JONES:  It's like if a cop pulls you over and

4     you're busy cramming stuff under the -- under the seat.

5          MR. DEW:  Right.  Saying, don't worry.  Hold on.

6     I'm looking for my license or whatever.

7          MR. JONES:  Yeah.

8          MR. DEW:  You know, nobody has the proper

9     paperwork.  Nobody can deliver it.  They deliver videos

10    without time stamps from police squad cars.  There's videos

11    without time stamps that they give to them and say these are

12    the copies from the squad car.  Yet you go online and you

13    could see squad car video from the same squad car, and it's

14    got time code on it.  So how did they give him video without

15    time code, and he's viewing it at the police station?

16         MR. JONES:  This is mega-massive cover-up.

17         MR. DEW:  It's crazy.  So you know --

18         MR. JONES:  My God.

19         MR. DEW:  -- he just basically -- my uncle doesn't

20    say much.  He's the kind of guy that doesn't say a lot.  He

21    just -- he kind of, you know -- so Dan -- I don't know how

22    Dan figured out he was my uncle.  But he went over and talked

23    to --

24         MR. JONES:  Oh, your uncle is not telling you he's

25    up there?

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
343 of 1271

4

1          MR. DEW:  No, no, no.  He never told me he was

2   going up there.  I got the text from Dan.  That's how I found

3   out he was there, and then I texted him; and the I called him

4   the next day because he couldn't talk at the time.  It was

5   probably 11:30 at night that night.  It was June --

6          MR. JONES:  Well, I suggest you call him and see

7   what he thinks now, see if he's been threatened or anything.

8   But please continue with what else he told you.  So former

9   Navy Seal, retired FBI agent.  Sandy Hook doesn't add up.  He

10  said -- that's the quote, "Doesn't add up"?

11         MR. DEW:  Well, we can take the quote from him.  He

12  said he's never seen anything like this before.

13         MR. JONES:  But to you what did he say?

14         MR. DEW:  That -- and then that's what -- to me

15  what he's saying is that from all of his experience in the

16  years that he has worked as an FBI agent.  He's retired.  He

17  went into the FBI pretty much out of -- out of the Navy.  He

18  was a -- he went to the Naval Academy.  He was a Navy Seal.

19  This guy is on the up and up.  I've known him all my life,

20  you know.  Very --

21         He doesn't tell you what he does in terms of -- you

22  know, we used to go up there and visit him when he was

23  working, and he would just leave and come back.  And you

24  know, he was doing his -- doing casework or whatever.

25         But from what he told me, he said that this thing

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 344 of 1271

5

1 doesn't add up, and it's the weirdest court proceeding he's

2 ever been in, in his entire life. And he's been in a lot of

3 court proceedings. He was in New York City, stationed in New

4 York City.

5        MR. JONES: Well, let me tell you, we get more

6 threats over this than anything. I mean, they --

7        MR. DEW: Yeah.

8        MR. JONES: They're hiding something.

9        MR. DEW: They definitely are.

10        MR. JONES: Let's ask your opinion, your gut level,

11 without getting into the personalities involved. You can

12 clearly see they're scared. The wagons are circled. They

13 could just release all this. There is no paperwork.

14        MR. DEW: Oh, there is none.

15        MR. JONES: I mean, that's what they -- it's all --

16 so, I mean, I guess totally made up with green screens,

17 everything. And we've got them on green screens.

18        MR. DEW: Yeah.

19        MR. JONES: I mean, what is going on here?

20        MR. DEW: On top of that --

21        MR. JONES: That's how evil these people are is

22 that they can have CNN involved, all these people. It's like

23 a Manhattan project of the gun grabbers.

24        (END OF AUDIO FILE)

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 345 of 1271

6

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate transcript of the digital recording provided to me in this matter.

    I do further certify that I am neither a relative, nor employee, nor attorney of any of the parties to this action, and that I am not financially interested in the action.

Julie Thompson, CET-1036

# EXHIBIT A-18

1

2

3

CONNECTICUT MASSACRE SHOOTING

5

6

7

TRANSCRIPT OF INFOWARS BROADCAST

ALEX JONES FINAL STATEMENT ON SANDY HOOK

NOVEMBER 18, 2016

CLIP AT 4M 59S

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 347 of 1271

2

1          MR. JONES:  Number one, the day before this tragic

2    event happened an email was sent out by Bloomberg's anti-gun

3    group saying prepare for a big event.  But the biggest piece

4    of evidence, the smoking gun, if you would, of a cover-up, of

5    whatever really happened is the Wayback Machine, the internet

6    archive.  We see Sandy Hook's Newtown website K through 12

7    having zero traffic 2008, '09, '10, '11, '12, and then all of

8    a sudden it just explodes.  It's impossible to have zero

9    traffic to a K through 12 entire school system.  And the word

10   is that school system was shut down for those years.  That's

11   what the records show.  They tell us it was open.

12          I don't know if the moon landings were faked, but I

13   don't put anything past these anti-gunners.  And early on,

14   that day we watched footage of kids going in circles in and

15   out of the building.  You'd be running them away from the

16   building.  Emergency helicopters weren't called.  Instead

17   port-potties were prepared for the press within hours of the

18   event.

19          I saw the helicopters that did respond, the police

20   helicopters saying that there were men or a man in the woods

21   in camouflage.  The media later said that was a conspiracy

22   theory.  So early on I'm like, well, I saw local news of the

23   guy in the woods, and they took him in custody.  Now they're

24   saying it never happened.  So that shows there some kind of

25   cover-up happening.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 348 of 1271

3

 1          And then I saw Anderson Cooper -- I've been in TV
 2   for 20-something years; I know a blue screen or a green
 3   screen -- turn, and his nose disappear.  Then I saw clearly
 4   that they were using footage on the green screen looped
 5   because it would show flowers and other things during other
 6   broadcasts that were moving and then basically cutting to the
 7   same piece of footage.
 8          Then I saw CNN do faked satellite interviews with
 9   reporters clearly with the same traffic and the same cars
10   right behind them conducting the interview face to face.
11          Then we see footage of one of the reported fathers
12   of the victims, Robby Parker, doing classic acting training
13   where he's laughing and joking.  And they say, hey, we're
14   live, and he goes, oh.  And maybe that's real.  I'm sure it
15   is.
16          (Video played - not transcribed)
17          But you add it to all the other things that were
18   happening and all the other fake news the media has been
19   caught in, and CNN back in 1991 openly faking scud missile
20   attacks on Saudi Arabia and Israel when they were back in
21   Atlanta; and the satellite feeds caught them admitting that
22   it was all fake.  We'd be crazy not to question this because
23   bare minimum they were faking some of the shots and some of
24   the coverage.
25          (Video played - not transcribed)So to be clear, we

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
349 of 1271

4

1    point out clear chroma key, also known as blue screen or

2    green screen being used, and we're demonized.  We point out

3    they're clearly doing fake interviews.  We point out that

4    normal emergency procedures weren't followed, and their

5    answer is to say that we said nothing died.

6                    (END OF AUDIO FILE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 350 of 1271

5

1                    CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5        I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11                           _____

12                           Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-19

1

2

3

4        CONNECTICUT MASSACRE SHOOTING

5

6

7

8        TRANSCRIPT OF INFOWARS BROADCAST

9     ALEX JONES FINAL STATEMENT ON SANDY HOOK

10              NOVEMBER 18, 2016

11              CLIP AT 15M 22S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 352 of 1271

2

1    MR. JONES:  And why should anybody fear an
2  investigation if they have nothing to hide.  In fact, isn't
3  that in Shakespeare's Hamlet, me thinks you protest too
4  much."
5        So here is my statement for the media when they
6  call up saying where do you stand on this: where I've always
7  stood.  When there were other mass shootings, I would simply
8  point out that they're very rare statically, and why should
9  we all give up our rights because some other bad person does
10  something.  A guy with a car runs over 50 people.  Do we ban
11  driving cars?  It's the same thing.
12        And there have been other instances of shootings
13  that are very suspicious.  Aurora is one, just look into
14  that.
15        But this particular case they are so scared of an
16  investigation.  So everything they do basically ends up
17  blowing up in their face.  So you guys are going to get what
18  you want now.  I'm going to start reinvestigating Sandy Hook
19  and everything else that happened with it.
20        I'm Alex Jones signing off for InfoWars.com.  If
21  you're watching this transmission, think for yourself.  I
22  know it's a thought a crime (sic).  And then ask yourself:
23  what is so strange about Sandy Hook and that tragedy?
24        But I will say this finally.  My heart does goes
25  out to all parents that lose children, whether it's to

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 353 of 1271

3

1  stabbings, or whether it's to car wrecks, or whether it's to

2  stranglings, or whether it's to blunt force trauma, or

3  murder, firearms, whatever the case is.  I'm a parent, and my

4  heart goes out to all parents that have lost children in

5  these tragic events.

6           And so if children were lost in Sandy Hook, my

7  heart goes out to each and every one of those parents and the

8  people that say they're parents that I see on the news.  The

9  only problem is I've watched a lot of soap operas, and I've

10  seen actors before.  And I know when I'm watching a movie and

11  when I'm watching something real.  Let's look into Sandy

12  Hook.

13           (END OF AUDIO FILE)

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 354 of 1271

4

1                    CERTIFICATE OF TRANSCRIPTIONIST

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5        I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                         Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-20

1

2

3

4       CONNECTICUT MASSACRE SHOOTING

5

6

7

8       TRANSCRIPT OF INFOWARS BROADCAST

9   WHAT ALEX JONES REALLY BELIEVES ABOUT SANDY HOOK

10              JUNE 13, 2017

11              CLIP AT 14M

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 356 of 1271

2

1          MR. JONES:  And how they're all colluding and the

2    fake polls.  You guys are the globalists.  You're the

3    enemies.  You're the people that have hijacked America.

4    You're the threat to our children.  You're the people that

5    are cold and heartless and don't care, not us.

6          But again, I want to encourage people to read the

7    Zero Hedge article that breaks it all down because they

8    absolutely are on target with this report where they ask the

9    questions that the media seems so scared that I might even

10   actually talk about if the Megyn Kelly interview aired.

11         Why does the Sandy Hook Elementary School website

12   have zero traffic for four years before the event and show it

13   was closed?

14         Why were there several reports of other shooters

15   dressed in camouflage in the woods that fled, whom the police

16   allegedly detained?

17         Why were porta-potties, sandwiches, and fruit

18   drinks, and chips brought up and set up for the crime scene

19   in just an hour or so?

20         Sandy Hook -- it just goes on and one.  An FBI

21   crime stat which shows no murders occurred in Newtown in

22   2012.

23         Why didn't they let paramedics and EMTs in the

24   building if 27 children were declared dead in 8 minutes?

25         Why was Adam Lanza's home burned to the ground by

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
357 of 1271

3

1    the bank?

2              Why have they declared all the records totally

3    secret?

4              These are questions the public has.  They're the

5    ones asking it.  They're the ones demanding it.  I've said I

6    believe children did die there, but PR firms were involved,

7    admittedly, hyping it up as much as possible.  But there's

8    been a cover-up, and Anderson Cooper got caught faking where

9    his location was with blue screen.

10             I mean, it's all there.  We don't know what

11   happened.  I believe kids died.  But the same media that's

12   faking a bunch of other stuff and faking war propaganda is

13   saying that I have said things that I never said that have

14   been taken out of context, and now won't report when I'm

15   saying don't air the interview on Father's Day to hurt

16   fathers, and demonize men, and that you edited me out of

17   context; and that I don't want it aired.  Why won't they

18   actually report on what I'm saying?

19             I'm Alex Jones.  This is the InfoWars.  Coming up,

20   Owen Shroyer in the studio for the next 30 minutes.  Then

21   I'll be back in the studio coming up live.  Please spread the

22   word because the truth lives at InfoWars.com.

23             (Cut to different clip)

24             MR. JONES:  Let's go to Devin in Florida.  Devin in

25   Florida, you're on the air.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
358 of 1271

4

1              UNIDENTIFIED MALE:  Great.  Hey, thank you so much.

2    Listen, I --

3              (END OF AUDIO FILE)

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 359 of 1271

5

CERTIFICATE OF TRANSCRIPTIONIST

1

2 I certify that the foregoing is a true and accurate

3 transcript of the digital recording provided to me in this

4 matter.

5     I do further certify that I am neither a relative, nor

6 employee, nor attorney of any of the parties to this

7 action, and that I am not financially interested in the

8 action.

9

10

11 _____

12                     Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A-21

1
2
3
4          CONNECTICUT MASSACRE SHOOTING
5
6
7
8
9            MEGYN KELLY PROFILE
10
            JUNE 19, 2017
11
            CLIP AT 7M 55S
12
13
14
15
16
17
18
19
20
21
22
23
24
25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
361 of 1271

2

1          MS. KELLY:  At the top of that list is Jones'

2    outrageous statement that the slaughter of innocent children

3    and teachers at Sandy Hook Elementary School, one of the

4    darkest chapters in American history, was a hoax.

5          MR. HESLIN:  I watched my son.  I buried my son.  I

6    held my son with a bullet hole through his head.

7          MS. KELLY:  Neil Heslin's son Jessie, just six

8    years old, was murdered along with 19 of this classmates and

9    6 adults on December 14, 2012, in Newtown, Connecticut.

10         MR. HESLIN:  I dropped him off at 9:04.  That's

11   when we dropped him off at school with his book bag.  Hours

12   later I was picking him up in a body bag.

13         MS. KELLY:  Alex Jones repeatedly claimed that the

14   shooting never happened.  Here he is on InfoWars in December

15   2014.

16         MR. JONES:  But it took me about a year with Sandy

17   Hook to come to grips with the fact that the whole thing was

18   fake.

19         MS. KELLY:  You said the whole thing is a giant

20   hoax.  How do you deal with a total hoax?  It took me about a

21   year with Sandy Hook to come to grips with the fact that the

22   whole thing was fake.  I did deep research, and, my gosh, it

23   just pretty much didn't happen.

24         MR. JONES:  At that point -- and I do think there's

25   some cover-up and some manipulation -- that is pretty much

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 362 of 1271

3

 1  what I believed.  But then I was also going in devil's

 2  advocate.  But then we know there's mass shootings and these

 3  things happen.  So again --

 4          MS. KELLY:  You're trying to have it all ways,

 5  right?

 6          MR. JONES:  No, I'm not.

 7          MS. KELLY:  If you wrongly went out there and said

 8  it was a hoax, that's wrong.

 9          MR. JONES:  But what I already answered your

10  question was listeners and other people are covering this.  I

11  didn't create that story.

12          MS. KELLY:  But, Alex, the parents, one after the

13  other, devastated, the dead bodies that the coroner

14  autopsied.

15          MR. JONES:  And they blocked all that, and they

16  won't release any of it.  That's unprecedented, even --

17          MS. KELLY:  All of the parents --

18          MR. JONES:  -- the reports.

19          MS. KELLY:  -- decided to come out and lie about

20  their dead children.

21          MR. JONES:  I didn't say that.

22          MS. KELLY:  What happened to the children?

23          MR. JONES:  I will sit there on the air and look at

24  every position and play devil's advocate.

25          MS. KELLY:  Was that devil's advocate; the whole

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 363 of 1271

4

1  thing is a giant hoax; the whole thing was fake?

2          MR. JONES:  Yes.  Because I remember in -- even

3  that day I go back from memory, them saying but then some of

4  it looks like it's real.  But then what do you do when

5  they've got the kids going in circles in and out of the

6  building with their hands up?  I've watched the footage, and

7  it looks like a drill.

8          MS. KELLY:  When you say parents faked their

9  children's death, people get very angry.

10          MR. JONES:  Yeah.  Well, let's -- oh, I know.  But

11  they don't get angry about the half million dead Iraqis from

12  the sanctions, or they don't get angry about --

13          MS. KELLY:  That's a dodge.

14          MR. JONES:  No, no.  It's not a dodge.  The media

15  never covers all the evil wars it has promoted, all the big

16  things.

17          MS. KELLY:  That doesn't excuse what you did and

18  said about Newtown.  You know it.

19          MR. JONES:  But I -- here's the difference.  Here's

20  the difference.  I looked at all the angles of Newtown, and I

21  made my statements long before the media even picked up on

22  it.

23          MS. KELLY:  In our interview we asked Jones

24  numerous times what he now believes, and he never completely

25  disavowed his previous statements.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
364 of 1271

5

1              MR. JONES:  I tend to believe that children

2    probably did die there, but then you look at all the other

3    evidence on the other side.  I can see how other people

4    believe that nobody died there.

5              MS. KELLY:  Of course, there --

6              (END OF AUDIO FILE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
365 of 1271

6

CERTIFICATE OF TRANSCRIPTIONIST

1

2   I certify that the foregoing is a true and accurate

3   transcript of the digital recording provided to me in this

4   matter.

5       I do further certify that I am neither a relative, nor

6   employee, nor attorney of any of the parties to this

7   action, and that I am not financially interested in the

8   action.

9

10

11   _____

12                   Julie Thompson, CET-1036

# EXHIBIT A-22

CONNECTICUT MASSACRE SHOOTING

TRANSCRIPT OF INFOWARS BROADCAST

JFK ASSASSINATION DOCUMENTS TO DROP TONIGHT

OCTOBER 26, 2017

CLIP AT 1HR 13M 30S

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
367 of 1271

2

1          MR. JONES:  ...top trend forecaster.  But look at

2   this article that was on Infowars.com a few days ago that I

3   read.  I meant to cover, and then I heard Lee Ann McAdoo

4   during the break.  A lot of our radio ads aren't radio ads.

5   They're just one minute little information news pieces,

6   something we do.  We just change things up.  And I'd

7   forgotten in the documents the CIA visited Lanza and

8   reportedly recruited him about a year before the shooting.  I

9   mean, they bulldozed the house to get rid of it.

10          I don't know what really happened with Sandy Hook,

11  folks.  We've looked at all sides.  We played devil's

12  advocate from both sides, but I mean, it's as phony as a $3

13  bill with CNN doing fake newscasts, with blue screens.  I

14  mean, Nancy Grace got caught doing it, Anderson Cooper.  I

15  mean, that is just a crazy -- that's the kind of stuff that I

16  read on InfoWars.com that I don't even get to.

17          Speaking of that --

18          (END OF AUDIO FILE)

19

20

21

22

23

24

25

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 368 of 1271

3

CERTIFICATE OF TRANSCRIPTIONIST

I certify that the foregoing is a true and accurate

transcript of the digital recording provided to me in this

matter.

    I do further certify that I am neither a relative, nor

employee, nor attorney of any of the parties to this

action, and that I am not financially interested in the

action.

_____

       Julie Thompson, CET-1036

EXHIBIT A-23

1

2

3

4     CONNECTICUT MASSACRE SHOOTING

5

6

7

8   TRANSCRIPT OF INFOWARS BROADCAST

9 LOOKS LIKE FALSE FLAG SAYS WITNESSES

10          DECEMBER 14, 2012

11            CLIP AT 9M 30S

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          **MR. JONES:**  ... with all sorts of information on

2 this subject.  But get ahold of your cousin when she settles

3 down and get her to talk to us for any other information.  We

4 need to know: were there any drills that day or the day

5 before?  Does she have anything about other shooters, or was

6 it that she never saw the shooters?

7          **UNIDENTIFIED CALLER:**  Well, I had asked them if it

8 was supposedly too -- because they have a lot of security at

9 that school.  You have to ring a doorbell in order to get

10 into the school.

11          **MR. JONES:**  Yeah, of course.  Which is another side

12 of that.  Yeah.  It's one of these federal model schools.

13          **UNIDENTIFIED CALLER:**  The thing that just scared

14 the daylights out of me -- I had to call right away -- is I

15 asked them, "Did they ever train for this?"  And my uncle

16 said, "Yes."  Within this school year, since September, they

17 have trained for incidents like this.

18          **MR. JONES:**  Well, that in and of itself isn't proof

19 of it, but they could use a drill to then bring in a patsy.

20 It could just be a Prozac head.  We'll find out.  God bless

21 you, sir.  I appreciate your call.  Stay in contact.

22          We're going to go to Rob who says email --

23          (END OF AUDIO FILE)

24

25

3

1           CERTIFICATE OF TRANSCRIPTIONIST

2    I certify that the foregoing is a true and accurate

3    transcript of the digital recording provided to me in this

4    matter.

5         I do further certify that I am neither a relative, nor

6    employee, nor attorney of any of the parties to this

7    action, and that I am not financially interested in the

8    action.

9

10

11    _____

12              Julie Thompson, CET-1036

13

14

15

16

17

18

19

20

21

22

23

24

25

## AFFIDAVIT OF NEIL HESLIN

| | |
|---|---|
| STATE OF CONNECTICUT | § |
| | § Shelton |
| FAIRFIELD COUNTY | § |

      Before me, the undersigned notary, on this day personally appeared NEIL HESLIN, a person whose identity is known to me. Upon being duly sworn, Affiant states:

1.     My name is Neil Heslin. I am over the age of 21 and competent to make this affidavit.

2.     Mr. Jones and InfoWars began spreading lies about Sandy Hook and the death of my son within the first month following the tragedy.

3.     I have seen Mr. Jones claim on numerous occasions that the Sandy Hook shooting was fake, phony, and synthetic.

4.     For many years, I made a conscious effort not to get drawn into the hoax "controversy" caused by Mr. Jones' statements. I had no interest in dignifying Mr. Jones by participating in the discussion.

5.     Before this tragedy, I had no contact with the media. In the aftermath of the shooting, I granted some of the interview requests to media outlets who wanted to speak to me about my experience.

6.     Following the tragedy, I was asked to appear before the U.S. Senate and Connecticut legislators to give testimony about my experience and my opinion on school safety.

7.     I never sought to be any kind of public figure. I merely recognized that I was involved in a matter that had attracted public attention. It was not my intention to give up my privacy or surrender my interest in the protection of my own name in all aspects of my life.

8.     I had some tangential involvement in speaking out on sensible gun regulations, but I do not consider myself an activist. I have not been a vigorous participant or a noteworthy part of that on-going debate.

9.     Contrary to the claims in InfoWars' Motion to Dismiss, I do not seek to destroy the Second Amendment, and this lawsuit has nothing to do with the Second Amendment or political purposes. I am an NRA member and registered Republican. I have no desire to limit Mr. Jones' rights under the First Amendment or prevent his ability to speak about his personal opinions, however bizarre. I object to his malicious pattern of lies, especially about Sandy Hook and my son.

10.     I never sought to participate in any public debate over whether the events at Sandy Hook were staged. Nor did I seek to participate in any public debate over whether my son died.

Exhibit C

11. Over the years, I remained silent as Mr. Jones continued to make disgusting false claims about Sandy Hook, telling his viewers that the children were fake and that the parents were liars and evil conspirators.

12. In 2017, Megyn Kelly was in the process of producing a profile on Mr. Jones when she asked me for an interview. Though I was very conflicted as to whether to grant an interview, I agreed to speak on camera only to help set the record straight about the lies told by Mr. Jones about Sandy Hook, specifically that the event was staged and involved actors.

13. I gave comments to Ms. Kelly stating the reality: The shooting happened. I stated that I buried my son, that I held my son's body, and that I saw a bullet hole through his head.

14. I made these statements not to invite debate, but to clear my name and protect the memory of my son.

15. On Ms. Kelly's show, Mr. Jones did not apologize for his comments. He also said he there was a cover-up, and that he wasn't sure kids actually died.

16. After my interview with Ms. Kelly, I tried my best to avoid any coverage of Mr. Jones. Yet almost a year later, I was alarmed that people seemed to still be talking online about Sandy Hook being a hoax.

17. During the first week of April 2018, I became aware that InfoWars had made numerous videos over the past year trying to convince its viewers that Sandy Hook was a hoax, including a segment on June 26, 2017, featuring reporter Owen Shroyer which focused on me.

18. The June 26, 2017 video directly addressed the comments I made to Megyn Kelly. Mr. Shroyer claimed in the video that my statements about holding my son and seeing a bullet wound are not possible.

19. Mr. Shroyer further stated in the video that statements made by the authorities do not corroborate with my statement.

20. Mr. Shroyer then accused me of lying, saying "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."

21. The June 26, 2017 video is false. I buried my son. I held his body. I saw a bullet hole through his head.

22. Mr. Jones' prior videos had deeply disturbed me, but this 2017 InfoWars video was far worse.

2

23.    This broadcast was the first time that InfoWars had featured me by name. In the past,
       when InfoWars discussed other specific parents, they had become subject to terrible
       harassment. For example, I was aware of the case of Lucy Richards, an InfoWars fan who
       was arrested and sentenced to federal prison for death threats against Sandy Hook parent
       Leonard Pozner. I was also aware of threats and harassment being directed at other
       parents.

24.    I was also aware that some conspiracy fanatics online had become convinced I was a
       "crisis actor." There is even an insane theory that I am a fireman who supposedly died on
       9/11. Upon seeing Mr. Shroyer's video, I became intensely alarmed that his lie would
       embolden these dangerous people.

25.    When I learned about Mr. Shroyer's video and InfoWars' other 2017 statements, I knew
       that my safety and the safety of my family had been placed at risk. This fear dominated
       my thoughts.

26.    I have suffered a high degree of psychological stress and mental pain due to InfoWars
       using me and my child to revive the Sandy Hook hoax conspiracy in 2017. I had hoped
       that this ugly lie would go away, but now Mr. Jones had singled me out in his campaign
       of harassment, along with the memory of my son. This realization has caused a severe
       disruption to my daily life.

27.    I find that I can think of little else. I have experienced terrible bouts of insomnia, and
       periods in which I am filled with nothing but outrage, and I find that I am unable to do
       anything productive. Other times, I am filled with grief knowing that InfoWars has
       ensured that its sick lie continues, and I am dismayed that my last moments with my son
       have become a part of that. I decided to return to grief counselling to help address these
       issues, but I feel that I have been changed in a way that can never be fixed.

28.    Since learning of Mr. Shroyer's video, I have incurred counselling expenses of $875.
       This counselling has been aimed at helping me cope with becoming a featured part of the
       Sandy Hook hoax claims.

29.    Since learning of Mr. Shroyer's video, I purchased a one-year, two-person plan for the
       DeleteMe Privacy Protection service, which provides online monitoring and removal of
       your personal information. Given that I had specifically targeted by InfoWars, I wanted
       to take action to prevent an InfoWars follower from discovering my family's personal
       details and location. A year of this service cost me $229.

30.    For the same reasons, I also purchased a year's plan for the LifeLock service, which
       guards against the unauthorized use of personal information and identity theft attacks. I
       was concerned that conspiracy fanatics may use identify theft techniques to gain access to
       my personal details. This service cost me $360.

31.    Since learning of Mr. Shroyer's video, I have incurred expenses of $598 in purchases for
       home security. I strongly prefer not to disclose the exact nature of the security items in a

3

public document, but suffice to say they consist of consumer products for my home and my ex-wife's home to detect, monitor, record, and alert of potential intruders. I purchased these items due to the fear that InfoWars' false statements would cause individuals to confront my family. I felt these items were necessary to help address my mental stress.

FURTHER YOUR AFFIANT SAYETH NOT

Neil Heslin

Subscribed and sworn to before me, this 22nd day of August, 2018 by **Neil Heslin**.

Caroline Allegretta
Notary Public
My Commission Expires: 07/31/2020

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN DISTRICT COURT OF |
|    *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, | § | <u>53rd</u> DISTRICT COURT |
|    *Defendants* | § | |
| | § | |

---

## PLAINTIFF'S FIRST AMENDED PETITION

---

Plaintiff SCARLETT LEWIS files this First Amended Petition against Defendants, ALEX JONES, INFOWARS, LLC, and FREE SPEECH SYSTEMS, LLC, and alleges as follows:

### DISCOVERY CONTROL PLAN

1.      Plaintiff intends to seek a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2.      Plaintiff Scarlett Lewis is an individual residing in the State of Connecticut.

3.      Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com. Mr. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

4.      Defendant InfoWars, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its attorney, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

5.      Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

6.      At all times relevant to this Petition, Defendants Alex Jones, InfoWars, LLC, and Free Speech Systems, LLC operated as a joint-venture, joint-enterprise, single business enterprise, or alter ego.

## JURISDICTION & VENUE

7.      The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

8.      Venue is proper in Travis County under Tex. Civ. Prac. & Rem. Code §15.002 because it is the county of Defendants' residence at the time the cause of action accrued.

## FACTUAL BACKGROUND

9.      Plaintiff Scarlett Lewis is the parent of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School shooting.

10.      This case arises out of the intentional infliction of emotional distress committed against Plaintiff for the past five years through InfoWars' recklessly false statements concerning the circumstances of the death of her child, as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents.

11.      In addition, InfoWars has repeatedly promoted a dreadful and despicable false narrative about Sandy Hook in which it mocks the families as liars and accuses them of a sinister conspiracy. Plaintiff's family has been specifically targeted in this campaign of harassment.

12.     In addition to the mockery of the families, InfoWars has spent years advancing a vast collection of grotesque and outrageous falsehoods about the circumstances of the shooting and the subsequent law enforcement investigation and media coverage.

13.     All of these baseless and vile accusations, which have been pushed by InfoWars and Mr. Jones on a continuous basis since the shooting, advance the idea that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using carefully placed actors, or that the families of the victims are also participants in a horrifying cover-up. InfoWars knew its assertions were false or made these statements with reckless and outrageous disregard for their truth.

**A PARTIAL HISTORY OF INFOWARS' COVERAGE OF SANDY HOOK**

14.     Beginning in the month of the shooting, in December 2012, InfoWars published multiple videos with false information while claiming the incident was a "false flag" or otherwise staged.

15.     InfoWars continued with a video on January 27, 2013 entitled "Why People Think Sandy Hook is a Hoax," Mr. Jones introduced a variety of completely baseless claims which he would continually repeat with malicious obsession for the next five years.

16.     On March 28, 2013, InfoWars published an article advancing its hoax claim, entitled "Cover-Up of Adam Lanza Link to Psychotropic Drugs."

17.     In an April 9, 2013 video entitled "Obama Gun Grabbing Psyop Speech of Evil," Mr. Jones warned his viewers that recent mass shootings were actually "a government operation," and that Sandy Hook was an "inside job."

18.     In an April 16, 2013 video entitled "Shadow Govt Strikes Again," Mr. Jones discussed his allegation that the government was staging various national tragedies. He told his

audience: "They staged Sandy Hook. The evidence is just overwhelming, and that's why I'm so desperate and freaked out."

19.     On January 27, 2014, InfoWars published an article advancing its hoax claim, entitled "Exposed: Sandy Hook Shooter's Biggest Threat Still Lives."

20.     On February 18, 2014, InfoWars published an article advancing its hoax claim, entitled "School Shooting Expert Threatened Over Sandy Hook Investigation."

21.     In a March 14, 2014 video entitled "Sandy Hook, False Narratives Vs. The Reality," Mr. Jones said, "Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him…I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

22.     On May 9, 2014, InfoWars published an article advancing its hoax claim, entitled "Revealed: Sandy Hook Truth Exposed."

23.     On May 13, 2014, InfoWars published an article advancing its hoax claim, entitled "Connecticut Tries to Hide Sandy Hook Truth."

24.     On May 13, 2014, InfoWars published a video entitled "Bombshell Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert." Mr. Jones hosted a notorious crank, Wolfgang Halbig, who solicits donations to support his "investigation" into Sandy Hook. Mr. Halbig maintains that the event was staged and that the parents are actors. Mr. Jones agreed with Mr. Halbig during the video, and he asked his viewers to support Halbig. Over the coming years,

Mr. Halbig was a frequent guest, and InfoWars continued to provide support and encouragement

to Mr. Halbig to carry out his campaign of harassment against the Sandy Hook parents.

25.     On September 24, 2014, InfoWars published an article advancing its hoax claim,

titled: "FBI Says No One Killed At Sandy Hook."

26.     InfoWars also published a video on September 25, 2014 entitled "Connecticut PD

Has FBI Falsify Crime Statistics." Mr. Jones again hosted Mr. Halbig for a lengthy discussion in

which they accused Plaintiff and other parents of lying about the tragedy for a nefarious purpose.

Mr. Jones stated:

> This is not a game…If you've got a school of 100 kids and then
> nobody can find them, and you've got parents laughing going "Ha,
> Ha, Ha," and then they walk over to the camera and go (crying), and
> I mean, not just one, but a bunch of parents doing this and then
> photos of kids that are still alive they said die. I mean, they think
> we're so dumb that it's really hidden in plain view, and so the
> preponderance -- I mean, I thought they had some scripting early on
> to exacerbate and milk the crisis as Rahm Emmanuel said, but when
> you really look at it, where are the lawsuits? There would be
> incredible lawsuits and payouts, but there haven't been any filed,
> nothing. I've never seen this. This is incredible.

27.     On September 26, 2014, InfoWars published an article advancing its hoax claim,

entitled: "Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime Statistics."

28.     On December 2, 2014, InfoWars published an article promoting the hoax video

entitled "We Need to Talk About Sandy Hook."

29.     On December 9, 2014 published an article advancing its hoax claim, entitled:

"Internet Censors Viral Sandy Hook Truth Documentary."

30.     In a December 27, 2014 broadcast entitled "Lawsuit Could Reveal Truth About

Sandy Hook Massacre," Mr. Jones made numerous false claims about Sandy Hook, including his

false allegations about "rotations in and out of the building," "blue-screen," "police in anti-terror

outfits in the woods," and many others. Mr. Jones described the alleged "acting" by the parents as "just over the top, over the top sick." The video also featured claims that the event was undertaken as a Satanic ritual by global elites.

31.     In a December 29, 2014 broadcast entitled "America the False Democracy," Jones again discussed Sandy Hook, telling his audience, "The whole thing is a giant hoax. And the problem is how do you deal with a total hoax? How do you even convince the public something is a total hoax?" Mr. Jones stated, "It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."

32.     In the same December 2014 broadcast, Jones continued with more false assertions: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

33.     On January 2, 2015, InfoWars published an article advancing its hoax claim, entitled "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

34.     In a January 13, 2015 broadcast entitled "Why We Accept Gov't Lies," Mr. Jones continued his allegations about Sandy Hook. During his discussion, he stated:

> You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."

35.     Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones helped spread involving a Sandy Hook victim whose photograph appeared at vigil for children slain a school attack in Peshawar. InfoWars' story was meant to reinforce Mr. Jones' persistent lie that the victims of the shooting, such as Plaintiff's deceased son J.L., are not real, or that some sinister conspiracy murdered her child.

36.     In a February 12, 2015 video with an unknown title, Mr. Jones continued to repeat his false claims. During his discussion, Mr. Jones stated, "I know they're using blue screens…There are literally hundreds of smoking guns here that this thing doesn't add up."

37.     In a March 4, 2015 video entitled "New Bombshell Sandy Hook Information In-Bound," Mr. Jones continued to promote Mr. Halbig, hosting him for a wide-ranging discussion accusing the parents of evil acts. Mr. Jones told Mr. Halbig, "We know it stinks. I mean, it's phony. The question is what is going on. We don't know. We just know it's fake."

38.     In June of 2015, InfoWars sent its reporter Dan Bidondi to Newtown, Connecticut to accompany Mr. Halbig. While in Newtown, Bidondi and Halbig confronted Newtown residents and civil servants. Mr. Bidondi, a former cage-fighter, aggressively berated several individuals with profanity, false claims, and outrageous threats to publicize their crimes. Their activities created a climate of fear in the community.

39.     In a July 7, 2015 broadcast entitled "Government Is Manufacturing Crises," Mr. Jones again asserted that Sandy Hook was staged:

> If they did kill kids, they knew it was coming, stocked the school with kids, killed them, and then had the media there, and that probably didn't even happen. I mean, no wonder we get so many death threats and so much heat and so much other stuff I'm not going to get into, behinds the scenes, when we touch Sandy Hook because, folks, it's as phony as a three-dollar bill.

7

40.    In a July 7, 2015 video entitled "Retired FBI Agent Investigates Sandy Hook Mega Massive Cover Up," Mr. Jones repeated a large selection of his false claims about Sandy Hook. During his discussion, Mr. Jones stated:

> No emergency helicopters were sent. The ambulances came an hour and a half later and parked down the road. DHS an hour and a half later with the time stamp put up signs saying sign in here. They had porta-potties being delivered within an hour and a half. It looked like a carnival. It looked like a big PR stunt.

> Came out that Bloomberg a day before sent an email out to his gun control groups in all 50 states saying, "Prepare to roll, maybe operation coming up." That came out in the news.

> We have the emails from city council back and forth and the school talking about it being down a year before. We have the school then being demolished, and the records being sealed. We have videos that look just incredibly suspicious where people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method…

> You've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is…I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick is here. I've got a good suspicion. But when you've got Wolfgang Halbig…He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull. And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented.

41.    On July 10, 2015, InfoWars published an article advancing its hoax claim, entitled "Sandy Hook FOIA Killed by Commission."

42.     On January 5, 2016, InfoWars published an article advancing its hoax claim, entitled "Obama's Crying Fuels Speculation It Was Faked."

43.     In January of 2016, InfoWars follower Lucy Richards began stalking and making death threats to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Scarlett Lewis. The threats included messages stating: "Death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."[1] When Richards was later sentenced, Senior U.S. District Judge James Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'…Your words were cruel and insensitive. This is reality and there is no fiction. There are no alternative facts."[2] As part of her sentence, Ms. Richards will not be permitted to access a list of conspiracy-based websites upon her release, including InfoWars.[3] Ms. Richard's arrest and sentencing are an ominous reminder to the Plaintiff of the danger posed by InfoWars' continuing lies about Sandy Hook.

44.     Mr. Jones and InfoWars were well-aware of the unhinged community of "Sandy Hook Investigators" they had fostered. Mr. Jones knew that a large collection of Sandy Hook deniers were coordinating their harassment. Plaintiff and her family have suffered harassment and threats from this community. Mr. Jones and InfoWars have frequently communicated with the hoax community and have interviewed or promoted members of this dangerous community on their programming. During a February 2015 video, one prominent member of the Sandy Hook denier community issued a threat to a Sandy Hook parent on the air. During the same video, Mr. Jones showed maps and addresses used by the parent. This parent was the leader of a Sandy Hook

---

[1] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[2] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754
[3] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a

non-profit who had complained to YouTube about the emotional distress caused by Jones. Since

that time, Mr. Jones' open animosity towards the Sandy Hook parents has been on full display.

45.     By November 2016, a growing tide of public outrage caused Mr. Jones to appear

on InfoWars and rant about his false Sandy Hook claims for twenty minutes in what he called his

"Final Statement on Sandy Hook," published on November 18, 2016.

46.     During the outrageous video, Mr. Jones directly addressed the public outcry over

his statements by doubling down on his accusations. For example, Mr. Jones stated: "That shows

some kind of cover-up happening. And then I saw Anderson Cooper -- I've been in TV for twenty-

something years, I know a blue-screen or a green-screen -- turn and his nose disappeared. Then I

saw clearly that they were using footage on the green-screen looped, because it would show

flowers and other things during other broadcasts that were moving, and then basically cutting to

the same piece of footage…Then we see footage of one of the reported fathers of the victims,

Robbie Parker, doing classic acting training."

47.     The gist of these statements was that the Sandy Hook parents, including Plaintiff

Scarlett Lewis, are participating in a sinister manipulation plan to fool the public, or that a shadowy

cabal of elites pre-planned the murder of their children and controlled the coverage of the event

through the media manipulation.

48.     During the November 2016 broadcast, Mr. Jones played video footage of Anderson

Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We

point out clear chromakey, also known as blue-screen or greenscreen being used, and we're

demonized. We point out that they're clearly doing fake interviews…and their answer is to say

that we said nobody died." In other words, Mr. Jones admitted that Plaintiff's son actually died

and that Plaintiff may not be lying, but Jones still maintained the event was a pre-planned government operation. Mr. Jones' statements in support of this conclusion were recklessly false.

49.     Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't that in Shakespeare's Hamlet? Methinks you protest too much…This particular case, they are so scared of investigation."

50.     Mr. Jones concluded the video by accusing certain parents seen on television of being actors. Mr. Jones stated, "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."

51.     The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless torment of the Sandy Hook parents as well as his assertions that they were liars and actors engaged in a fraud on the American people.

52.     As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave some hope to Plaintiff that Mr. Jones' harassment might be coming to an end after four long years.

53.     Those hopes were soon dashed. Instead, InfoWars continued its cruel campaign in 2017.

54.     In a March 8, 2017 video, Mr. Jones praised the credibility of Steve Pieczenik, who had previously claimed on InfoWars programming that Sandy Hook was "a Homeland Security drill that they passed off as a real event." Mr. Jones admitted that despite his years of prior statements, "I can't prove it one way or the other." Nonetheless, Mr. Jones

repeated his accusation that Veronique De La Rosa's interview with Anderson Cooper was faked in front of a blue-screen. He also told his audience that Anderson Cooper was in the CIA, hoping to convince them that the agency was part of the plot.

55.     On April 22, 2017, InfoWars published a video entitled "Sandy Hook Vampires Exposed." This video again repeated the large collection of false accusations which Mr. Jones had been using for years to support his ceaseless attacks on the Sandy Hook families, including the false claims that Sandy Hook parent Veronique De La Rosa participated in a fake blue-screen interview with Anderson Cooper, that the school was closed until that year and was rotting and falling apart in videos, that the children were "going in circles, in and out of the building with their hands up," that port-a-potties had been delivered "an hour after it happened, for the big media event," and that police were "pulling guns out of cars" and "finding people in the back woods who are dressed up in SWAT gear." Not only did this video continue to advance these hideous and reckless lies about the tragedy, but Mr. Jones and his employee Rob Dew mocked the families as actors and discussed their desire to see photographs of the children's dead bodies.

56.     On June 13, 2017, in a video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook," Mr. Jones addressed what he knew would be a highly embarrassing interview with Megyn Kelly that was scheduled to air several days later. During this video, Mr. Jones pointed his viewers to a list of questions published by Zero Hedge, a notorious anonymous website that spreads misinformation. These questions were all based on Mr. Jones' baseless lies, including his allegation that school's website received no internet traffic in the years before the attack, that there had been reports of other shooters in the woods who fled, that port-a-potties had been delivered within an hour, that FBI crime statistics show no murders in Newtown in 2012, that

EMTs were not allowed in the building, and that Mrs. De La Rosa's interview was faked using a blue-screen.

57.     On June 18, 2017, NBC aired Ms. Kelly's profile of Jones. During his interview, Mr. Jones stated that there had been a "cover-up" and "manipulation." He also falsely claimed that children were filmed going in circles in and out of the school.

58.     The following exchange took place:

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied…
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.

59.     Mr. Jones and Ms. Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.

60.     During her profile of Mr. Jones, Ms. Kelly interviewed Neil Heslin about the claims made by Mr. Jones. Mr. Heslin is the father of Plaintiff's deceased son J.L. Addressing Mr. Jones' hateful lies, Mr. Heslin told Ms. Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

61.     On June 25-26, 2017, InfoWars published a video segment hosted by reporter Owen Shroyer in which Mr. Shroyer claimed to have reviewed evidence -- again, from notorious website Zero Hedge -- showing it was impossible for Mr. Heslin to have held his son and see his injury.

62.     During the broadcast, Shroyer said, "The statement [Mr. Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

63.     As support for these malicious statements, Mr. Shroyer played deceptively edited video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. Mr. Shroyer also used a video clip of Sandy Hook parent Lynn McDonnel which had been deceptively edited to suggest that she was never allowed access to her child's body. In truth, Mrs. McDonnel stated in her interview that she was in possession of her child's body.

64.     Mr. Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."

65.     Mr. Shroyer continued by stating that Mr. Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

66.     Mr. Shroyer also stated, "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."

67.     At the conclusion of his report, Mr. Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

68.     Mr. Shroyer's report was recklessly false and outrageous. A minimal amount of research would have caused any competent journalist not to publish the defamatory accusation. According to contemporary news accounts, the bodies of the victims were released from the

medical examiner into the custody of the families.[4] Funerals where the children's bodies were in
the custody of their parents were widely reported on by the press.[5] More importantly, the full
versions of the deceptively edited interviews used by Mr. Shroyer explicitly contradict his
allegations.

69.     On July 20, 2017, InfoWars programming featured a segment hosted by Mr. Jones
in which Mr. Shroyer's report was re-broadcast in full. When introducing the segment, Mr. Jones
demanded that Mr. Heslin "clarify" what actually happened.

70.     Mr. Jones said he told Mr. Shroyer, "I could never find out. The stuff I found was
they never let them see their bodies. That's kind of what's weird about this." Dripping with
sarcasm, Mr. Jones stated, "But maybe they did. So I'm sure it's all real. But for some reason they
don't want you to see [Shroyer's segment]."

71.     After five years of torment by Mr. Jones, the harassment had become directly and
aggressively focused on Plaintiff's family. Mr. Jones had cast the attention of his dangerous
followers specifically towards J.L.'s' death and Plaintiff's family.

72.     Even to this day, Mr. Jones continues to gaslight the Lewis family and other victims
by insisting that he admitted for years that Sandy Hook was real. He even claims to have
apologized in a video released on the day of Megyn Kelly profile, on June 18, 2017. Yet his video
did not actually contain any apology, and soon thereafter, Mr. Jones continued to tell his viewers
that the shooting was staged. Ultimately Jones waffles and back forth on whether Ms. Lewis' son
and the other children actually died, but he consistently maintains the event is "phony," and repeats
his dozens of recklessly false assertions to support his conclusion.

---

[4] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[5] http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101;
https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-
begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100

73.     For example, in an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones claimed that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

74.     Despite his well-documented conduct, Mr. Jones decided to cast the families as dishonest not only about Sandy Hook, but about their own torment at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Mr. Jones once again proved himself to be an emotionally manipulative liar while mocking the parents with a cruel and juvenile imitation:

> I think they almost do this to mess with us or something. I'm serious, man…They go, "Oh, my gosh, why are you doing that? You hurt me." And we're like, "No, no. We're sorry." "You've hurt me." And like five years later, "You hurt me. Stop hurting me." And we're like, "But we're not bringing you up."

75.     In truth, Mr. Jones has continuously leveled his accusations against the parents, repeated a collection of false claims about the shooting, and even claimed the incident was phony a few months before the first lawsuits were filed against him.

76.     In the same video on April 20, 2018, Mr. Jones continued to accuse the parents of lying about his conduct, and he falsely claimed that he had not discussed Sandy Hook in many years. In a mocking imitation, he stated, "'Oh, my gosh. Alex has no heart. He is -- nothing is sacred. He brought it up again.' No. You did and lied about it."

77.     In the April 20, 2018 video, Mr. Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents…Who in the hell would try to go after people's parents who have dead children?"

16

78.     In the April 20, 2018 video, Mr. Jones also continued to make recklessly false claims about Sandy Hook. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the video, he repeated his claim that there was a police "stand down" at Sandy Hook.

79.     In the April 20, 2018 video, Mr. Jones also continued his bizarre allegations about Veronique De La Rosa's interview with Anderson Cooper, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chroma key." Mr. Jones also repeated his claim that Anderson Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

80.     Finally, it must be noted that the above descriptions of InfoWars' conduct are not exhaustive. InfoWars has published an enormous amount of video and written content regarding its Sandy Hook hoax claim. Much of that material has been removed from the public domain over the last few months and cannot be identified by date and title. It is impossible for the Plaintiff to present the full scope of InfoWars' actions over the past five years without testimony and documents from the participants.

81.     Nonetheless, it is clear that InfoWars did not merely "cover" the Sandy Hook conspiracy. Instead, its malicious allegations about Sandy Hook quickly become a core element of its programming and soon turned into an outrageous five-year obsession.

## CAUSE OF ACTION

### I.     Intentional Infliction of Emotional Distress.

82.     All previous allegations are incorporated by reference.

17

83.     Defendants knew or should have known that their videos on November 18, 2016, March 8, 2017, April 22, 2017, June 13, 2017, June 19, 2017, June 26, 2017, July 20, 2017, October 26, 2017, and April 20, 2018 would cause Plaintiff severe emotional distress and cause her family to be the subject of harassment, ridicule, and threats to their safety.

84.     Defendants made the statements in these videos in bad faith and with malicious motives, knowing the statements were false or in reckless disregard for the truth, and knowing they would cause severe emotional distress.

85.     Defendants consistently published false assertions about the circumstances of the death of Plaintiff's child in scores of videos and articles for years, long after it should have known its allegations were false and causing emotional distress and danger.

86.     In addition, Defendants have been acting in a continuing course of conduct against Plaintiff since at least January 27, 2013, when Mr. Jones first made his outrageous and false Sandy Hook hoax allegation. Since that time, Defendants have been engaged in a continuous campaign of cruel and dishonest harassment.

87.     Defendants' latest malicious statements in 2017 were part of a continuous pattern of five years of intentional and reckless harassment accomplished through dozens of disturbing videos, a relentless stream of recklessly false articles published on InfoWars.com, harassing social media content, as well as the encouragement, aid, and financial support to third-parties in furthering this harassment. The cumulative quality and quantity of the harassment has been extreme and has shocked the nation.

88.     Defendants recognized the existence and distress of the Sandy Hook parents and often addressed the parents directly in their outrageous videos.

89.     In light of their prior experience with these kind of reckless statements, Defendants knew or should have known that their conduct could cause Plaintiff and her family to suffer harassment and violence. Defendants knew or should have known their reckless conduct was likely to prompt its audience to contact or communicate with Sandy Hook victims in a hostile or harassing manner.

90.     Severe emotional distress was the primary risk created by Defendants' reckless conduct.

91.     Defendants' conduct, as a whole, was outrageous and intolerable, going beyond all possible bounds of decency.

92.     Defendants' five-year campaign of willful lies and malicious harassment was utterly intolerable in a civilized community.

93.     No reasonable person could be expected to endure the emotional distress inflicted upon Plaintiff.

94.     Plaintiff is a private individual and is neither a public official nor a public figure.

95.     Defendants' actions were not conducted in a public space. Rather, Defendants' actions were conducted on its own private property for the purpose of profit.

## DAMAGES

96.     Defendants' actions have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, Plaintiff has suffered and continue to suffer substantial damages in an amount to be proven at trial.

97.     Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which disrupted her daily routine and caused a high degree of psychological pain.

98.     Plaintiff is also entitled to exemplary damages because the Defendants acted with gross negligence, ill-will, and malice.

99.     Plaintiff is entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

100.    Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking an amount in relief which exceeds $1,000,000.

## JURY DEMAND

101.    Plaintiff demands a jury trial and tendered the appropriate fee with her Original Petition.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Scarlett Lewis ask that the Court issue citation for each Defendant to appear and answer, and that Plaintiff be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiff is justly entitled.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | * | IN THE DISTRICT COURT OF |
|    Plaintiff | * | |
| | * | |
| | * | |
| VS. | * | TRAVIS COUNTY, TEXAS |
| | * | |
| ALEX E. JONES, INFOWARS, | * | |
| LLC, AND FREE SPEECH | * | |
| SYSTEMS, LLC, | * | |
|    Defendants | * | 53RD JUDICIAL DISTRICT |

ORAL/VIDEOTAPED DEPOSITION

OF

ALEX E. JONES

Thursday, March 14, 2019

     ORAL/VIDEOTAPED DEPOSITION OF ALEX E. JONES, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on Thursday, March 14, 2019, from 12:02 p.m. to 4:33 p.m., before Debbie D. Cunningham, CSR, reported via Machine Shorthand at the offices of Waller Lansden Dortch & Davis, LLP, 100 Congress Avenue, Suite 1800, Austin, Texas, pursuant to the Texas Rules of Civil Procedure and/or any provisions stated on the record or attached hereto.

**2**

1        APPEARANCES

2

3  COUNSEL FOR PLAINTIFF:

4     KASTER LYNCH FARRAR & BALL, LLP

       1010 Lamar, Suite 1600

5     Houston, Texas

       (T) 713.221.8300

6       By:  Mark D. Bankston, Esq.

         mark@fbtrial.com

7        AND

       William Ogden, Esq.

8

9  COUNSEL FOR DEFENDANTS:

10    GLAST, PHILLIPS & MURRAY, P.C.

      14801 Quorom Drive, Suite 500

11    Dallas, Texas

      (T) 972.419.8300

12     By:  Mark Enoch, Esq.

        mkenoch@gpm-law.com

13

       AND

14

15    BARNES LAW, LLP     (PRO HAC VICE)

      601 South Figueroa St., Suite 4050

16    Los Angeles, California

      (T) 213.294.3006

      By:  Robert E. Barnes, Esq.

17       barneslaw@barneslawllp

18

19

   VIDEOGRAPHER:

20    Joe Bazan

21

   ALSO PRESENT:

22    Fred Zipp

      Rob Dew

23

24

25

**4**

1        EXHIBIT INDEX

2  Exhibit Number   Description      Page

3  Exhibit 1   7/27/18 First Supplemental   8

        Affidavit of Alex E. Jones

4

5  Exhibit 2   Trooper Jeremy Combes State of  47

        Connecticut Department of Public

6       Safety Investigation Report

7  Exhibit 3   Sgt. William F. Cario State of  51

        Connecticut Department of Public

        Safety Investigation Report

8

9  Exhibit 4   Photograph date and time stamped  60

        12-14-12 13:28:11

10  Exhibit 5   Photograph of man wearing     83

        INFOWARS.COM T-shirt, with

11       background caption of:

        TRUTHRADIOSHOW.COM Declaring War

12       on the -New World Order-

13  Exhibit 6   Affidavit of Fred Zipp      110

14  Exhibit 7   Affidavit of Alex E. Jones   118

15  Exhibit 8   Photograph of two men with the  125

        caption of Carl Rochelle, Saudi

16       Arabia, CNN Live, with a

        background caption of InfoWars

17       Nightly News with Alex Jones and

        a caption under the photo of

18       INFOWARS.com

19  Exhibit 9   Photograph of two men dressed in  127

        military type desert camouflage

20       clothing standing in front of a

        white building with palm trees

21

   Exhibit 10  Photograph of a man in a green  127

22       fatigue jacket standing front of

        palm trees, with the caption of

23       Forrest Sawyer ABC News

24

25

**3**

1          INDEX

2  APPEARANCES             2

3

4  EXAMINATION OF ALEX E. JONES:

5   BY MR. BANKSTON        7

6

7

8  CHANGES AND SIGNATURE     189

9  REPORTER'S CERTIFICATION   191

10  FURTHER CERTIFICATION    194

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**5**

1  Exhibit 11   Photograph of satellite     128

        communication dishes and other

2       equipment next to a blue and

        white building

3

   Exhibit 12   Flash drive        188

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**6**

1      (Thursday, March 14, 2019, 12:02 p.m.)
2          P R O C E E D I N G S
3          THE VIDEOGRAPHER: We're on the record for
4 the videotaped deposition of Alex Jones, taken on
5 Thursday, March 14, 2019. The time is approximately
6 12:02 p.m.
7          Will the court reporter please swear in
8 the witness.
9          ALEX E. JONES,
10 having taken an oath to tell the truth, the whole truth,
11 and nothing but the truth, was examined and testified as
12 follows:
13          EXAMINATION
14 BY MR. BANKSTON:
15    Q.   Mr. Jones --
16          MR. BARNES: When do you want me to go on
17 the record?
18          MR. BANKSTON: Oh, yeah, let's do that
19 now, actually, Mr. Barnes. Why don't you do that for
20 me?
21          MR. BARNES: Thank you.
22          This is Robert Barnes. I'm General
23 Counsel for InfoWars and Mr. Jones and in this context
24 Free Speech Systems, LLC, here representing him. I have
25 a motion for pro hac pending; and the agreement is I can

**7**

1 represent the Defendant, Mr. Jones, here with the
2 acknowledgment that I am bound by the Texas Rules of
3 Civil Procedure, the Texas Ethical and Professional
4 Rules, and the Texas Sanctions Rules and will be bound
5 by them accordingly.
6          MR. BANKSTON: Thank you, Mr. Barnes.
7          MR. BARNES: Oh, you do want the mic on?
8 No problem.
9          EXAMINATION
10 BY MR. BANKSTON:
11    Q.   Mr. Jones?
12    A.   (No audible response.)
13    Q.   Mr. Jones?
14    A.   Uh-huh.
15    Q.   I want to go back to when this all started.
16 And in fairness to you, one of the things that you've
17 tried to make clear is that you're not the one who
18 started the theory that Sandy Hook was a false flag,
19 correct?
20    A.   Yes, sir.
21    Q.   And that's something that was borne out by
22 InfoWars archives and that you've been able to rely on
23 in court, correct?
24    A.   I don't exactly understand what you're saying.
25    Q.   Okay. Let me help you with that.

**8**

1          (Exhibit 1 marked.)
2    Q.   (BY MR. BANKSTON) I'm going to be showing you
3 what I'm now marking as Exhibit 1. It's a double-sided
4 document. Mr. Jones, that is a July 27th, 2018
5 Affidavit which you executed, correct?
6    A.   Yes, sir.
7    Q.   I want to go through this affidavit with you
8 and the highlighted part sentence by sentence. Do you
9 see the pale orange part which I'm now going to read to
10 you? "Plaintiffs claim that I started the controversy
11 and/or conspiracy about Sandy Hook being a hoax. This
12 is not true." I read that correctly?
13    A.   I need to read the full page.
14    Q.   Please take a moment to read it.
15    A.   (Witness silently reading document.)
16          It's just the orange part you want me to
17 read?
18    Q.   I actually just read it to you and wanted to
19 know if I had read it correctly. Allow me to read it
20 for you again, Mr. Jones. "Plaintiffs claim that I
21 started the controversy and/or conspiracy theory about
22 Sandy Hook being a hoax. This is not true." I read
23 that correctly?
24    A.   Yes, uh-huh.
25    Q.   Okay. The next sentence says, "Before I ever

**9**

1 publicly commented on any issues relating to Sandy Hook,
2 I learned that others with whom I have no affiliation or
3 relationship had already posted articles" -- excuse me,
4 Mr. Jones, if you would like to flip the page --
5 "relationship had already posted articles online making
6 this claim and questioning the events as reported." I
7 read that sentence correctly?
8    A.   Yes, sir.
9    Q.   So there were a variety of articles and
10 YouTube videos questioning the events that started
11 getting popular in the time period after the shooting.
12 I assume you saw some of those?
13    A.   Yes, sir.
14    Q.   How long is this are we talking? Are we
15 talking days, weeks, months?
16    A.   I don't know. I don't want to answer
17 incorrectly. I don't remember the exact times. So I
18 really can't state that time, but I think a month or
19 longer.
20    Q.   Sure. Okay. I remember there was -- about a
21 month after the shooting, there was a relatively popular
22 YouTube video that went viral. Do you recall this
23 video?
24    A.   There were a lot of -- 2 million, 10 million.
25 It was a bunch of videos. It was a firestorm of -- on

10

1  the Internet about it.
2      Q.  Okay.  And it was then, when you saw that,
3  that you started covering it and started commenting on
4  Sandy Hook?
5          MR. BARNES:  Objection as to define Sandy
6  Hook.  Object as to form.
7      Q.  (BY MR. BANKSTON)  You can go ahead and
8  answer, Mr. Jones.
9      A.  No, I started commenting on Sandy Hook that
10  they would use it to go after our guns and that the
11  media always hyped up school shootings and was causing
12  copycat events, that the mainstream media were basically
13  psychic vampires promoting mass shootings so they could
14  blame gun owners and try to take the Second Amendment
15  away, which they pushed to repeal the Second Amendment.
16      So for the first month or so -- and,
17  again, this was almost seven years ago -- but we've gone
18  back and looked at some of it in trying to find -- at
19  least three weeks, four weeks or so.  And then it was
20  such a firestorm on the Internet, it's like, no, this
21  isn't Prozac; this isn't video games, like I was saying,
22  I thought, like other shootings that happened.  This
23  was, you know, some type of staged event or multiple
24  shooters or people in the woods, things like that.  It
25  was a whole range of theories in a big Internet debate

11

1  going on that I then reported on and gave analysis to my
2  opinions.
3      Q.  Correct.  Okay.
4      A.  And I think that's what was weeks after.  I
5  can't remember the exact number.  I immediately when it
6  happened, you know, said, "Oh, look another person in a
7  black trench coat, you know, a loner on psychotropics
8  that came out, shoot-'em-up video games."  And I
9  remember being criticized by the video game industry
10  saying, "Don't you blame video games."
11      Q.  What I'm curious about, Mr. Jones, can you
12  flip the page back over again and look at the beginning
13  of the yellow sentence?  So when you say, "Before I ever
14  publicly commented on any issues relating to Sandy
15  Hook," you saw other stuff going on, right, you mean
16  whether it was staged or not?  In other words, you made
17  some comments about Sandy Hook when it first happened;
18  but in terms about it being a false flag or staged or
19  some sort of hoaxed event, right, that came later?
20  You're not the one who started that?
21          MR. BARNES:  Objection as to form.
22      A.  I know that I didn't start it.  And I think
23  it's a boilerplate.  Anytime there's a big public event,
24  like Jussie Smollett or babies in incubators in Iraq, a
25  lot of people question, you know, whether it's real.

12

1  President Trump questioned right after he got elected
2  and was first in office whether the attacks on the
3  Jewish cemeteries were being staged, and it turned out
4  they were.
5      So, I mean, again, going from memory, I
6  remember looking at it as your standard horrible tragedy
7  of psychotropic drugs, a kid in a cult, you know, type
8  stuff, like Columbine, shoot-'em-up video games.  I
9  remember that's where I was going because that's where
10  all the other shootings basically came from.
11      Q.  Sure.
12      A.  And so I can't specifically -- I mean, I'm
13  going from the best of my memory.
14      Q.  Okay.  Well, Mr. Jones, I want to show you
15  some video clips of some things you were saying as the
16  news broke of Sandy Hook and in a video that day that
17  you titled Connecticut School Massacre Looks Like False
18  Flag, Says Witnesses.
19          MR. BANKSTON:  Can you play the clip Day
20  of Sandy Hook?
21          (Video playing.)
22      Q  (BY MR. BANKSTON)  Mr. Jones, this is a video
23  where you made comments on issues relating to Sandy Hook
24  and you put forward a theory that it could be staged by
25  the Government to take away our guns, correct?

13

1          MR. BARNES:  Objection.  It seems like
2  this is a video, from watching it, that's different
3  pieces put together.
4          MR. BANKSTON:  Correct.
5          MR. BARNES:  Okay.  So it's not from --
6  so different things are out of context.  Is there any
7  way to get, like, the whole --
8          MR. BANKSTON:  You own the whole video,
9  and it's been produced with Mr. Zipp's affidavit.
10          MR. BARNES:  But for his purposes --
11          MR. BANKSTON:  If he wants to go watch an
12  entire four-hour video, I'm not going to have time --
13          MR. ENOCH:  Mark, it has not been
14  produced with Zipp's --
15          MR. BANKSTON:  Actually, Connecticut
16  False Claim full video has been produced; and it's been
17  in a court.  If you want to argue about that and object,
18  you can object at that time when it's offered.  That
19  objection's preserved.  You don't have to object to form
20  on that one.
21      Q.  (BY MR. BANKSTON)  Mr. Jones, that was a video
22  in which you made statements about Sandy Hook in which
23  you said -- put forth the theory it could be staged to
24  take away our guns?
25      A.  That's a Media Matters edited -- that's Media

14

1   Matters edited derivative.
2       Q.   Is that you on that tape?
3       A.   It's edited.
4       Q.   And that's you talking about: Don't think
5   this couldn't be staged. Our Government kills little
6   kids all the time. That's you saying those words?
7       A.   With SMART moms and things, yeah. It's edited
8   out of context.
9       Q.   The truth is, Mr. Jones, you were the first
10  person in the world to make the false flag theory about
11  Sandy Hook and you did it before the bodies were even
12  cold; that's the truth?
13          MR. BARNES:  Objection as to form and to
14  the defin- -- are we going to have, like, set
15  definitions of the words, like --
16          MR. BANKSTON:  No, you can object to
17  form. Yeah, that's Rule 199. Just object to form.
18          MR. BARNES:  That's fine.
19      Q.   (BY MR. BANKSTON) Mr. Jones, you said in your
20  affidavit that before you commented on any issues
21  relating to Sandy Hook, you saw other things that other
22  people were doing. That affidavit has false statements,
23  doesn't it?
24      A.   No.
25      Q.   So we didn't just see you commenting on issues

15

1   relating to Sandy Hook?
2       A.   That was callers calling up.
3       Q.   You're going to tell me you watched that video
4   and you weren't commenting on Sandy Hook?
5       A.   I told you five minutes ago before you played
6   it that as a boilerplate of any big public event,
7   whether it's Jussie Smollett or whether it's babies
8   having their brains bashed out in incubators or WMDs,
9   that I upfront questioned it because of things from
10  Operation Northwoods and hundreds of declassified real
11  staged events where our Government admits that it staged
12  events. Now, I always boilerplate say that we need to
13  investigate the news reportage of this and see what's
14  true. There's such a long history of governments and
15  corporations and legal groups engaging in fraud. And I
16  said that before you played the clip.
17          MR. BANKSTON:  Objection, nonresponsive.
18      Q.   (BY MR. BANKSTON) Mr. Jones, I have a very
19  simple question for you: That video you just saw of you
20  talking, were you talking about Sandy Hook?
21      A.   The edited pieces were.
22      Q.   The pieces that I edited and put together of
23  you speaking, I edited them. When I edited those pieces
24  together and put them in front of you, was that you on
25  the camera?

16

1       A.   I saw a Media Matters video of that before.
2   You're saying you edited that?
3       Q.   It's not an important deal.
4       A.   But you did edit it?
5       Q.   I did, yes. I'm not here to answer questions.
6       A.   Three-second clips together.
7       Q.   Those clips were edited together by me two
8   weeks ago.
9       A.   Why didn't you just play them unedited?
10      Q.   That's -- Mr. Jones, I'm not here to answer
11  your questions. You understand you're here because
12  people have sued you and you have four hours in which
13  they're to ask you questions. Are you going to do that
14  for me today?
15      A.   Yes, I'm answering your questions.
16      Q.   So in that video, "yes" or "no," you were
17  commenting about Sandy Hook?
18      A.   In the edited video I was commenting on Sandy
19  Hook.
20      Q.   You'll agree over the years you've seen
21  various anomalies relating to Sandy Hook?
22      A.   I've seen reported anomalies.
23      Q.   A lot of those anomalies are in videos, things
24  like the helicopter video of people being detained in
25  the woods. Do you know what I'm talking about?

17

1       A.   Yes.
2       Q.   Okay. There's the Anderson Cooper interview
3   with Ms. De La Rosa. Do you know what I'm talking about
4   there?
5       A.   I know who Anderson Cooper is.
6       Q.   You know what the blue screen video is --
7       A.   Yes.
8       Q.   -- where his nose disappears?
9       A.   Yes.
10      Q.   Okay. You know that there's some videos of
11  some interviews that were just kind of strange, right?
12  Those are something you've seen?
13      A.   Yes.
14      Q.   There's been discussion on InfoWars about the
15  interior videos taken of the school itself, right?
16      A.   Yes.
17      Q.   There's been discussion on InfoWars about dash
18  cam video footage at Sandy Hook? Remember Mr. Dew
19  talking about videos of the officers eating their
20  lunches on top of their cars?
21      A.   I don't remember that.
22      Q.   Okay. But if there was -- if Mr. Dew talks
23  about dash cam footage, you have no reason to believe
24  he's lying, do you?
25      A.   I'm still not familiar with what you're

18

1  talking about.
2      Q.  Okay.  And InfoWars has also discussed
3  questioning the official story from time to time,
4  correct?
5      A.  Uh-huh.
6      Q.  Including the official report about Sandy Hook
7  that was released?  There's some weird things in there
8  that have been questioned on InfoWars?
9      A.  The one that came out, like, five or six years
10  later.
11      Q.  I think in December of 2013, so about a year
12  later.
13      A.  The state police report?
14      Q.  The state police report.  Are you familiar
15  with what I'm talking?
16      A.  That's so long ago, six years ago, I just...
17      Q.  Well, I mean, there's anomalies all over the
18  place is what I'm saying.  You've seen --
19      A.  There have been a lot of people asking a lot
20  of questions that isn't legal yet in this country.
21      Q.  Right.  Recently your lawyer said in a legal
22  document, "There is no dispute that the Sandy Hook
23  tragedy was real with tragic loss of life."  Do you
24  stand by that?
25      A.  I'm sorry.  You're talking so fast.

19

1      Q.  Sure, sure.  Let me slow down a little bit for
2  you, Mr. Jones.  Recently your lawyer said in a legal
3  document, "There is no dispute that the Sandy Hook
4  tragedy was real with tragic loss of life."  You stand
5  by that; that's what you admit is true now?
6      A.  Yes.
7      Q.  Okay.  But in the past -- before you had all
8  the information, in the past, you didn't know exactly
9  what happened at Sandy Hook?  You've questioned it?
10      A.  Oh, certainly in the past.  You mean in the
11  last seven years?
12      Q.  Sure.
13      A.  Yes.
14      Q.  And, in fact, over the course of covering
15  Sandy Hook over the past six or so years, you've always
16  entertained serious doubts about what really happened
17  that day?
18      A.  I'm sorry.  I don't understand.
19      Q.  Sure.  Over the course of Sandy Hook, you've
20  questioned the official story.  You've had serious
21  doubts that the official story was true?
22      A.  I've always, from the beginning, had questions
23  about any big public event that's hyped up because so
24  many times parts of it are being covered up or things
25  are being staged or they're not letting a new crisis go

20

1  to waste.  Sometimes things are completely made up, like
2  the babies in the incubators, which is admitted.  You
3  know, they've got the PR firm that said the babies
4  brains were all bashed out and we lost all those wars.
5      Q.  I've heard you say that.
6      A.  And so it's just been -- and the WMDs.  The
7  WMDs were a lie, too, and then watched -- that have
8  killed millions of people.
9          MR. BANKSTON:  Objection, nonresponsive.
10      A.  Well, I'm trying to answer the question.
11      Q.  (BY MR. BANKSTON)  Oh, do you know what
12  question you're answering?
13      A.  Well, you were asking a question of, like --
14  I'm not sure.  You said you've always questioned; and
15  I'm saying, no, I questioned it up front.  The public
16  questioned it.  And then, as I had time to go over it, a
17  lot of the anomalies turned out to not be accurate; and
18  I believe school shootings happen.
19      Q.  All right.  So I think a shorter way is you
20  had doubts; you had questions until you didn't.  At some
21  point -- I mean, things change; I understand that.  But
22  there have been points in which you've questioned the
23  official narrative.  You've had serious doubts about
24  some of these things?
25      A.  Yes.

21

1      Q.  And these anomalies that have come up, these
2  things have raised serious doubts.  You've had serious
3  doubts about the anomalies, too?
4      A.  Yes.
5      Q.  Okay.  By the spring of 2013 or so, let's say
6  just a few months after the shooting, by that point, you
7  had gone from theory to just straight up telling your
8  audience, "Sandy Hook was staged, and the evidence is
9  overwhelming"?
10          MR. BARNES:  Objection as to form.
11      Q.  (BY MR. BANKSTON) Correct?
12      A.  Well, what does "staged" mean?
13      Q.  I'm just asking what you were telling your
14  audience.
15      A.  No, no --
16      Q.  I'm not answering your questions, Mr. Jones.
17  You're going to tell me what "staged" means when you
18  said it.  So what I'm asking you is:  A few months after
19  the shooting, you had gone from theory to straight up
20  telling your audience, "Sandy Hook was staged, and the
21  evidence was overwhelming."  True or false?
22      A.  But I'm asking you to define what you mean by
23  "staged."
24      Q.  I'm not asking -- I'm not asking for a
25  definition of "staged."  I don't care what "staged"

22

1  means. I'm asking: Did you say it?
2      A.  I don't have it in front of me; but, I mean, I
3  did say that I saw a lot of anomalies that I thought
4  that certainly large parts of the way it was being
5  handled, you know, the Supreme Court came out saying
6  they covered up some of the reports on what happened
7  with the incident. I think a lot of that's been borne
8  out that when you see a cover-up going on, you're not
9  sure what's happening inside of it.
10         And later we just learned it was a
11  cover-up of, I think, some of the negligence there in
12  the town and with the school. I don't know the teacher
13  that tried to save the kids was negligent -- that
14  person's a hero -- and sadly got sued. But I do, you
15  know, clearly think there was some cover-up, but it
16  wasn't in that it was all, the whole thing, staged, but
17  that the way the media handled it was synthetic. They
18  way it was used against gun owners was synthetic.
19         MR. BANKSTON:  All right, Mr. Jones.
20  Objection, nonresponsive.
21         Can you play the clip Overwhelming for
22  me, please?
23     Q.  (BY MR. BANKSTON)  Mr. Jones, I want to show
24  you clip from April 16th, 2013.
25         (Video playing.)

23

1      Q.  (BY MR. BANKSTON)  That's you on the video,
2  right?
3      A.  Yes, that's me on the short video.
4      Q.  Yeah, it's a short video. I understand.
5         By the end of 2014 you had personally
6  done intensive research, and you concluded Sandy Hook
7  was all fake?
8         MR. BARNES:  Objection as to form. And
9  are you asking him to repeat a quote?
10         MR. BANKSTON:  No. I'm asking him --
11     Q.  (BY MR. BANKSTON)  By the end of 2014 you had
12  personally done intensive research; and you concluded it
13  was all fake, correct?
14         MR. BARNES:  Still objection as to form.
15     A.  The specific areas I was talking about being
16  fact, not in a totality.
17         MR. BANKSTON:  Okay. Can you play the
18  clip for me?
19     Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
20  play you a clip from December 29th, 2014.
21         MR. BANKSTON:  Go ahead and play that for
22  me, please.
23         (Video playing.)
24     Q.  (BY MR. BANKSTON)  That's you saying you did
25  deep research, correct?

24

1         MR. BARNES:  The same objection as to
2  form and that these are highly edited excerpts from --
3         (Simultaneous speakers.)
4         MR. BANKSTON:  Can you stop with speaking
5  objections.
6         MR. BARNES:  Obviously --
7         MR. BANKSTON:  Yeah, I know exactly what
8  you're doing; and you need to say: Objection, form;
9  objection, leading; assert a privilege or stay quiet.
10  You do not need to be making suggestive objections about
11  the content of the evidence and what its form is. You
12  don't need to be doing that, Mr. Barnes.
13         MR. BARNES:  I'm not trying to do that.
14  I'm just saying that these are videos that are highly --
15         MR. BANKSTON:  That's a great opinion. I
16  don't understand why your opinion is relevant to these
17  questions right now. You wouldn't be doing this in a
18  courtroom. Don't do it in my deposition right now.
19         MR. BARNES:  Oh, yeah, in a courtroom it
20  wouldn't come in because it wouldn't be admissible
21  because of the rule of completeness.
22         MR. BANKSTON:  Mr. Barnes, that's why
23  your objection's preserved as to the form of that
24  evidence. You don't have to raise an objection. The
25  only reason you would be doing it is to possibly

25

1  influence the witness.
2         MR. BARNES:  So can we have a standing
3  stipulation that when I object to form, that includes an
4  objection to the rule of completeness?
5         MR. BANKSTON:  Absolutely.
6         MR. BARNES:  Thank you. Then we're good.
7         MR. BARNES:  And for the record every
8  objection to every piece of evidence is preserved under
9  the Texas Rules, which --
10         MR. BARNES:  I was objecting in a way
11  that --
12         MR. BANKSTON:  Mr. Barnes --
13         (Simultaneous speakers.)
14         THE REPORTER:  Excuse me, Counsel. You
15  are speaking over one another. You're making the record
16  very muddled.
17         MR. BARNES:  I'm sorry.
18         So we have a standing stipulation that
19  when I object to form, that includes an objection on
20  rule of completeness grounds to any evidence that -- or
21  a document or exhibit would otherwise include other
22  excerpts.
23         MR. BANKSTON:  Thank you, Mr. Barnes.
24         MR. BARNES:  Perfect.
25     Q  (BY MR. BANKSTON)  Over the next few years,

26

1  Mr. Jones, you did dozens and dozens of videos with that
2  same message about Sandy Hook being staged, correct?
3       MR. BARNES: Objection as to form.
4  A.  No.
5  Q.  (BY MR. BANKSTON) Okay. Well, I want to talk
6  about some of the claims you've made over the years.
7  The first thing I want to talk to you about is circles
8  and I want to show you a video clip of something you
9  said on November 18, 2016; April 22nd, 2017; and
10  June 13, 2017.
11       MR. BANKSTON: Can you play me the video
12  clip Going in Circles?
13       (Video playing.)
14       MR. BANKSTON: Can you give me the last
15  frame, please?
16  Q.  (BY MR. BANKSTON) Mr. Jones, when you said
17  you'd be running them away from the building, what did
18  you mean by that?
19  A.  The police should be getting the children away
20  from the building.
21  Q.  Right. Okay. So the police should be --
22  scratch that.
23       No doubt there's a dangerous situation, a
24  shooter on campus? Is it dangerous when there's
25  somebody shooting up a school?

27

1  A.  Yes.
2  Q.  Okay. And so you would think if proper
3  procedures were being followed in keeping them safe,
4  this looks pretty weird, doesn't it, if they're not
5  being run away from the building, right?
6  A.  Yes.
7  Q.  But, Mr. Jones, when you said this to your
8  audience, you knew that wasn't the school. You knew
9  that, right?
10       MR. ENOCH: Are you saying that's part of
11  his broadcast?
12       MR. BANKSTON: Yes. It says InfoWars
13  right there on the bottom.
14       MR. ENOCH: Is that part of the same
15  broadcast?
16       MR. BANKSTON: Yes. Do you see where it
17  says InfoWars?
18       MR. ENOCH: As long as you're
19  representing that the video that you're showing him now
20  with the people walking across was part of the same
21  broadcast --
22       MR. BANKSTON: Okay. First of all --
23       MR. ENOCH: -- statements.
24       MR. BANKSTON: First of all, there's
25  only going to be one lawyer defending this deposition,

28

1  Mr. Enoch; and one was already chosen. And, no,
2  Mr. Enoch, there will be one lawyer speaking on the
3  record. There is one lawyer defending the deposition.
4  I am not being tag-teamed by the two of you. And so I
5  would appreciate it if you kept your mouth shut for this
6  deposition and let Mr. Barnes defend the deposition.
7       For the record in the bottom corner of
8  this screen is a large InfoWars logo. This was
9  broadcast on InfoWars.
10  Q.  (BY MR. BANKSTON) So, Mr. Jones, my question
11  to you is: When you broadcast this to your audience and
12  told them this, you knew that wasn't the school,
13  correct?
14       MR. ENOCH: Mark, would you please answer
15  my question? And it's a simple question: If you
16  represent that the video of the school that you're
17  showing, the firehouse, was part of the same broadcast
18  in which he made his statements --
19       MR. BANKSTON: Yes. Mr. Enoch, we just
20  watched it. Do you really think I edited his words over
21  a different video?
22       MR. ENOCH: Well, what I think doesn't
23  matter. Thank you for answering the question.
24       MR. BANKSTON: Mr. Enoch, I would
25  appreciate it if you kept quiet the remainder of this

29

1  deposition and let Mr. Barnes defend the deposition.
2  Q.  (BY MR. BANKSTON) Mr. Jones, you knew that
3  wasn't the school?
4       MR. BARNES: Object to the form.
5  Q.  (BY MR. BANKSTON) Correct?
6  A.  I did not know that. This is so edited it
7  looks like two different shows together. Can you play
8  it again? It's so edited. I've never...
9       MR. BANKSTON: Can you play at least the
10  last part there where he's doing the video?
11       THE WITNESS: Just play the whole thing.
12       MR. BANKSTON: Play the whole video again
13  for him.
14  Q.  (BY MR. BANKSTON) These are three different
15  clips. And I'll remind you, Mr. Jones, these are from
16  November 18, 2016; April 22nd, 2017; and June 13, 2017.
17  A.  You just told him it was the same broadcast.
18  Q.  And this one right here is the same broadcast,
19  Mr. Jones.
20       MR. ENOCH: Is this the --
21       MR. BANKSTON: This is November 18th,
22  2016.
23       (Video playing.)
24  Q.  (BY MR. BANKSTON) Let's see if we can help
25  you understand this. Hold on, Mr. Jones. Let's see if

30

1  we can help you understand this. You understand this
2  first video where it says Sandy Hook Vampires Exposed,
3  you see that?
4     A.  Yes. That's about the media.
5     Q.  Correct. That's April 22nd, 2017. That's an
6  InfoWars video.
7     A.  It's blurred. I can't see that.
8     Q.  In other words, you know that there was an
9  InfoWars video with that title, correct?
10    A.  I believe so.
11    Q.  Okay. And then we saw a second clip from your
12  Megyn Kelly interview, right?
13    A.  Which was highly edited.
14    Q.  Sure. And I edited a piece of it in here,
15  correct? That was from the Megyn Kelly --
16       MR. ENOCH: Wait. Time out. Time out.
17  We need to take a break. You just told me that
18  everything you showed him was from one video.
19       MR. BANKSTON: No, Mr. Enoch. I told you
20  what was on the screen and the audio were from the same
21  video.
22       MR. ENOCH: If you want to take a fair
23  deposition, you're entitled to do that. You are not
24  entitled to misrepresent to the witness three different
25  dates in deposition and say -- three different dates of

31

1  video and say this was the same video. Were these, all
2  the clips that you showed him the same video, "yes" or
3  "no"?
4        MR. BANKSTON: No. And we've said that
5  repeatedly from the moment I asked him. They were three
6  different dates. I read the three different dates to
7  you, Mr. Enoch. So your indignation can calm down, and
8  I'd like you to be quiet in this deposition.
9        MR. ENOCH: In what video --
10       MR. BANKSTON: Mr. Barnes, can you please
11  instruct your counsel to be quiet? You are defending
12  this deposition.
13       MR. ENOCH: Let's take a break.
14       MR. BANKSTON: Actually, I've got a
15  question on the floor. We're not taking a break.
16       MR. BARNES: You're entitled to do
17  depositions the way you want, but I'm just saying it's
18  creating a lot of unnecessary confusion.
19       MR. BANKSTON: And, hey, I'm walking
20  through it with him right now.
21       MR. BARNES: Okay.
22       MR. BANKSTON: We're going to clear up
23  all that confusion. All right? That's what we're going
24  to do. Okay?
25    Q.  (BY MR. BANKSTON) Mr. Jones, we've talked

32

1  about this one. This is the Sandy Hook Vampires
2  Exposed. And we've talked about the second clip being
3  from the Megyn Kelly interview, right? Correct?
4     A.  Yes.
5     Q.  Okay. Now then, the third clip that starts at
6  the end where it shows the video that we were talking
7  about and you remember there was something you did
8  called Final Statement on Sandy Hook in November of
9  2016?
10       MR. ENOCH: Mark --
11       MR. BANKSTON: Mr. Enoch --
12       MR. ENOCH: -- you are -- maybe you don't
13  intend to do it, Mark; but you're stating something
14  that's not correct. You just said one is from the Megyn
15  Kelly interview and you gave us three dates and none of
16  them are the Megyn Kelly date.
17       MR. BANKSTON: I'm sorry if I've given
18  you a wrong date. It was June 13th, 2017.
19       MR. ENOCH: That is not the Megyn Kelly
20  broadcast.
21       MR. BANKSTON: Okay. If I've misstated
22  the date, that's my -- and you can object to that or you
23  can do whatever you want.
24    Q.  (BY MR. BANKSTON) Do you agree that's the
25  Megyn Kelly broadcast we were watching? That interview

33

1  in the middle was from the Megyn Kelly interview?
2     A.  I saw part of that. I mean, it was so fast,
3  I...
4     Q.  We'll keep it slow. We'll keep going --
5     A.  I watch Court TV and stuff. Nobody plays
6  edited tapes.
7     Q.  Okay. This video here that we're looking at
8  is something from Final Statement on Sandy Hook. Do you
9  remember doing a video from Final Statement on Sandy
10  Hook?
11    A.  I do remember that.
12    Q.  Okay. And this video here is where you showed
13  this footage, and you made some comments about kids
14  going in circles, right?
15       MR. BARNES: Objection as to form.
16    A.  If that's from it, I remember making comments.
17    Q.  (BY MR. BANKSTON) Okay. Mr. Jones, do you
18  see that ambulance right there?
19    A.  Yes.
20    Q.  Okay. I want to play you a couple of clips.
21       MR. BANKSTON: Can you play me --
22    Q.  (BY MR. BANKSTON) I want to play you
23  something from July 5th, 2015.
24       MR. BANKSTON: Can you play me the clip
25  called Ambulance?

---

**34**

1    Q.  (BY MR. BANKSTON)  These are two things that
2  you and Mr. Dew --
3            (Video playing.)
4    Q.  (BY MR. BANKSTON)  Mr. Jones, if you saw
5  ambulances parked next to that building, you knew it
6  wasn't the school, didn't you?
7            MR. BARNES:  Objection as to form.
8    A.  No, I didn't.  And later I corrected, before I
9  was ever sued that that was one of the things that had
10  been said that wasn't true was that they were at the
11  firehouse.  There was other footage, too, from the
12  school.  So it's all edited.  So it's hard to respond to
13  this.  I want to respond to your questions.  It's so
14  edited, like, two- or three-second clips sandwiched in
15  with others.  It looks like more than three broadcasts.
16    Q.  (BY MR. BANKSTON)  Well, let's look right
17  there.  That was just two things, something you said,
18  something Mr. Dew said.
19    A.  Yeah, I --
20    Q.  Hold on.  Ambulances are parked down the road;
21  they didn't even go to the school.  Then a year later,
22  you showed your audience a video of a building with an
23  ambulance to it; and you told them it was the school?
24    A.  I talk four hours a day, and I can't remember
25  what I talked about sometimes a week ago.  Sandy Hook

---

**35**

1  has been, in the aggregate, less than one-tenth of
2  1 percent of what I cover.  And I understand that you've
3  been living this and pouring over it constantly.  I have
4  done almost no preparation for this.  It's very -- it
5  gives me a headache, and I just -- you're just showing
6  me a bunch of edited tapes.
7    Q.  What question are you answering?
8    A.  You're asking me about a bunch of edited --
9  how does someone answer...
10    Q.  Mr. Jones, what question were you answering?
11    A.  If you put a bunch of pages in a blender with
12  writing on it and blended it all up and you asked me
13  what's in the blender, I can't answer you a question
14  with a bunch of blended words.
15    Q.  Mr. Jones, I'm asking you:  If there's
16  ambulances next to the building, you know it's not the
17  school?
18            MR. BARNES:  Objection as to form.
19    Q.  (BY MR. BANKSTON)  Correct?
20    A.  No, that's not what I meant.
21    Q.  Okay.  I want to play you a piece of video
22  footage from the helicopter footage.  Let's take a look
23  at that really quick.
24            MR. BANKSTON:  Can you play the
25  December 14th, 2012 Helicopter Firehouse Footage?

---

**36**

1            (Video playing.)
2    Q.  (BY MR. BANKSTON)  Mr. Jones, there are no
3  elementary aged children in this line of people walking,
4  is there?
5    A.  No.  It's another clip we're talking about.
6    Q.  Yeah.  Do you see here is where they're
7  walking in the circles?  None of those people have their
8  hands up, do they?
9    A.  But here is footage I've seen that shows
10  that.  So you're conflating two different things.
11    Q.  Really?  Because you were talking about the
12  footage on your show.  You're saying there's actually a
13  different piece of video footage with children with
14  their hands up being led in circles in and out of --
15    A.  From my memory it's a live show, so the people
16  in there was throwing stuff up.  Many times it's not
17  accurate, sure.
18    Q.  So the video clip you were showing wasn't even
19  of the school?
20            MR. BARNES:  Objection as to form.
21    Q.  (BY MR. BANKSTON)  Correct?
22    A.  I'm not sure about what video this is it's so
23  edited, but I wrongly have said in the past, off of news
24  reports that I was relying on, that the children were
25  going around with their hands up at the school when it

---

**37**

1  was the firehouse.  And that's one of the main anomalies
2  that ended up to not be true and the reason I changed my
3  mind about a lot of things.
4    Q.  Sure.  After 2017, right?
5    A.  Well, I've gone back when I've been asked
6  about anomalies and I've repeated those anomalies and
7  those tapes have been edited and that's why I do not do
8  interviews now and talk about the anomalies, because
9  those are edited.
10    Q.  Right.  Let's talk about the school itself.  I
11  want to show you two comments that you made on July 7th,
12  2015 and April 22nd, 2017.
13            MR. BANKSTON:  Can you play The School
14  was Closed?
15            (Video playing.)
16    Q  (BY MR. BANKSTON)  The first thing, you admit
17  now there are no e-mails between City Council and the
18  School in which Sandy Hook was being shut down; that's
19  not a real thing?
20            MR. BARNES:  Objection as to form.
21    A.  This is almost seven years old, but I do
22  believe that we wouldn't -- I mean, sometimes we're
23  wrong about things; but there's always some news we're
24  covering or a witness or something.  So I can't answer
25  that because of just memory.

---

Alex Jones - 3/14/2019

---

38

1    Q.   (BY MR. BANKSTON)  Mr. Jones, you said it was
2  seven years ago?
3    A.   Six years ago, whatever it was.
4    Q.   You just -- that stuff we just played you was
5  April 22nd, 2017.  That was a year before you were sued,
6  right?
7    A.   It was 3 seconds long.
8    Q.   Right.  But it's not seven years ago, is it,
9  Mr. Jones?  You were saying that a year before you were
10  sued.
11       MR. BARNES:  Objection as to form.
12    A.   I can't answer.  It's out of context.  I don't
13  know what you're showing me.
14       MR. BANKSTON:  Of course.  Objection,
15  nonresponsive.
16    Q.   (BY MR. BANKSTON)  When you said in the video
17  it's all rotting and falling apart, we'd talked earlier,
18  you'd seen the interior video of Sandy Hook; that's
19  something you'd seen before?
20    A.   The photos of the mold and the rotting doors.
21    Q.   And you said on the video it was falling
22  apart.  You just said that on the video?
23       MR. BARNES:  Objection as to form.
24    Q.   (BY MR. BANKSTON)  Right?
25    A.   I saw the edited video.  I don't know where

---

39

1  it's from.  I don't know the context.
2    Q.   Sure.  But you said in this video, in the
3  video, the school's rotting and all falling apart and
4  nobody's even in it.
5       MR. BARNES:  Objection --
6    Q.   (BY MR. BANKSTON)  Right?  That's what you
7  said?
8       MR. BARNES:  Objection as to form.
9    A.   I have no idea what the context of this is.
10    Q   (BY MR. BANKSTON)  So wait.  There's a context
11  in which saying in the video that the school was all
12  rotting and falling apart and nobody's even in it --
13    A.   Why are these videos all 3 seconds long?
14    Q.   Because I'm focusing in on specific issues,
15  Mr. Jones.  And I want to know:  This claim you made
16  that there is a video of the school where's it's
17  rotting and falling apart -- that's all I care about
18  right now -- you saw such a video?
19       MR. BARNES:  Objection as to form.
20    A.   I have seen, from memory, news reports showing
21  photos and images.  And my memory fails, but I do
22  remember seeing photos put to video of the school being
23  in disrepair in the reports.
24    Q.   (BY MR. BANKSTON)  Let's play for you really
25  quick -- I want to show you this video, the interior

---

40

1  video of Sandy Hook that was taken that day.  I want to
2  show you a clip from that, and I want to note that
3  every time they're going to go -- there's a couple of
4  times they're going to go in the hallway; and there's
5  part of the hallway they go in that has to be redacted
6  because that's where Ms. Hochsprung and Ms. Sherlach's
7  blood is all over that hallway.  But I want you to take
8  a look at the hallways and the classrooms for me as you
9  watch this video.
10       MR. BANKSTON:  Can you play Interior of
11  Sandy Hook?
12       (Video playing.)
13    Q   (BY MR. BANKSTON)  Mr. Jones, that school is
14  not rotting, falling apart, or abandoned, is it?
15       MR. BARNES:  Objection as to form.  I
16  assume that includes any authentication disputes that I
17  have about whether something is --
18       MR. BANKSTON:  Under the Texas Rules
19  every bit of evidence that is offered in deposition is
20  not -- there's no waiver of any objections.
21    Q.   (BY MR. BANKSTON)  That video's not rotting --
22  that school's not rotting and falling apart and it's not
23  abandoned, is it, Mr. Jones?
24    A.   I've never seen that video.
25    Q.   I'm perfectly confident you haven't.

---

41

1  Absolutely, I know that.  But what I'm asking you --
2    A.   I don't even know --
3    Q.   -- is seeing it right now, what I just showed
4  you, regardless of what school it was or if I just went
5  and took it over at Eastside Elementary, that school
6  that you just saw on the screen is not rotting, is not
7  falling apart, and does not look to be abandoned, does
8  it?
9    A.   It looks dilapidated.
10    Q.   Okay, Mr. Jones.  You've seen Mr. Zipp's
11  affidavit, correct?
12    Mr. Zipp?
13    Q.   Mr. Zipp, Fred Zipp, Plaintiff's expert who's
14  sitting with us in the room today, you've seen his
15  affidavit in this case?
16    A.   No.
17    Q.   Okay.  So you didn't know that there were 180
18  news articles from 2009 to 2011 about the Sandy Hook
19  school with photos of the children doing things from
20  multiple sources; that's not something you've ever
21  known?
22    A.   I didn't know that number.  I mean, I've seen
23  photos and things showing mold and the place dirty and
24  messed up if that's what you're talking about.
25    Q.   No.  I asking you that the school was open

---

42

1 during those years, right?  During 2009 to 2011 there's
2 plenty of evidence the school was open, right?
3     A.  There's been controversy, like, on Google,
4 showing their deliveries and things like that.  I mean,
5 that was controversy we covered.
6     Q.  Okay.  So based on what you knew at the time,
7 you entertained serious doubts about whether the school
8 was open?
9         MR. BARNES:  Objection as to form.
10     Q.  (BY MR. BANKSTON)  In other words -- let me
11 pull that back, Mr. Jones.
12     A.  I had said stuff about Jussie Smollett.
13     Q.  Sure.  Okay.
14     A.  I was the first person to question it.
15     Q.  Sure.  And I'm not going to try to pin you
16 down on here.  Let's just be straight up and upfront
17 about it.  You didn't know one way or the other, right,
18 whether the school was open?  You had some doubts.  You
19 didn't know one way or another; you couldn't confirm it
20 one way or another?
21     A.  I know that some investigators who were
22 accreditated school safety folks who thought were
23 credible experts were the ones -- professors and others
24 that were in good standing -- were the ones that were
25 really doing these investigations; and that I was in

43

1 some cases taking what they said incorrectly.  And I've
2 admitted to that.
3     Q.  And with no corroboration?  You just take what
4 they said and you trusted these guys, right?
5     A.  I mean, I'd seen one of the guys, like, on
6 national television before on the Columbine stuff as a
7 national safety expert; and he sounded pretty credible.
8     Q.  Mr. Halbig, right?
9     A.  Yes.
10     Q.  And he had sent you something in the
11 neighborhood of -- ten fours -- 4,000 e-mails?
12     A.  It's a lot, yeah.
13     Q.  And looking at those e-mails, taking a look at
14 them, you wouldn't agree with me that that man is a
15 raving lunatic?
16     A.  He seemed very credible and put together
17 earlier on, but -- I can't remember the exact number --
18 he seemed to get agitated about four years ago, three
19 years ago.
20     Q.  Let's talk a little bit about EMTs, emergency
21 medical technicians; and I want to show you a clip of
22 something that you said.  And this, to address
23 Mr. Enoch, is I think where this got messed up.  There's
24 a clip, again, on June 13, '27 [sic.] right before the
25 Megyn Kelly interview.  In other words, the Megyn Kelly

44

1 interview's coming up; and let's just be upfront about
2 it.  It was edited, and you didn't think that was fair,
3 right?  I mean, it was pretty heavily edited?
4     A.  I think they call it deceptively jump titles.
5 I mean, your videos are worse; but sure.  Sure.
6     Q.  Yeah, I get that.  I get that.
7         Let's take a look at something you said
8 right before the Megyn Kelly interview.  Okay?  And this
9 is on June 13th, 2017.
10         MR. BANKSTON:  Will you play the clip
11 called EMTs?
12         (Video playing.)
13     Q.  (BY MR. BANKSTON)  How did you determine that?
14         MR. BARNES:  Objection as to form.
15     A.  I was reading someone else's report.
16         MR. BANKSTON:  Okay.  Hold on.
17         Bring up the last frame again.
18     Q.  (BY MR. BANKSTON)  Mr. Jones, I'm going to
19 lean up here so I can kind of point a little bit.  Do
20 you see here where it says, "What Alex Jones really
21 believes about Sandy Hook?"
22     A.  Yes, I do.
23     Q.  Do you see where it says, "Among his
24 questions?"  Do you see that?
25     A.  Yes.

45

1     Q.  Do you see it says, "In closing Jones
2 says..."?
3     A.  I believe that's where I'm saying I think
4 Sandy Hook happened.
5     Q.  Right.  What I'm asking you is:  When it's
6 talking "his questions," that's Zero Hedge reporting on
7 your questions.  And when it says, "In closing Jones
8 says," that's Zero Hedge reporting on what you said.
9         And now, in some sort of inception, this
10 is you reporting on Zero Hedge reporting on what you
11 said?
12     A.  Can you make it bigger?  I can't read that.
13     Q.  I cannot make that bigger, Mr. Jones; but I'm
14 asking --
15         THE WITNESS:  May I approach it, your
16 Honor?
17         MR. BANKSTON:  You may approach it.
18 Yeah, go ahead.
19         THE WITNESS:  I can't even see it.  My
20 god.  There's no way to blow it up maybe?
21         MR. BANKSTON:  I don't think I can blow
22 that up.
23     A.  "My heart goes out to the" -- I can't read it.
24 "My heart goes out to the parents of lost children."
25     Q.  (BY MR. BANKSTON)  Okay.  That's great.  What

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 408 of 1271

Alex Jones - 3/14/2019

46

1 I'm asking you, Mr. Jones, is: Do you see the word
2 "his"?
3     A. Yes.
4     Q. Who does "his" refer to?
5     A. I believe it refers to me.
6     Q. Okay.
7         MR. BANKSTON: You can take a seat,
8 Mr. Jones.
9     Q. (BY MR. BANKSTON) So how did you come to the
10 conclusion that they never let paramedics or EMTs in the
11 building?
12        MR. BARNES: Objection as to form.
13     A. I went off of the professors and all the
14 so-called experts.
15     Q. (BY MR. BANKSTON) Okay.
16     A. And they wouldn't release a bunch of the
17 reports. There were a bunch of lawsuits about the
18 secrecy, which added to all of the -- and as more of the
19 stuff got released, then it proved the official story.
20     Q. When do you think that the police reports on
21 Sandy Hook were released? When do you think that
22 happened?
23     A. I know there was one report -- you know, I
24 don't know the date, so I don't want to be inaccurate.
25     Q. Okay.

47

1     A. I believe one took over five years.
2     Q. Okay. Well, let me show you one that didn't
3 take five years. Okay? We're going to talk about one
4 of those, and I'm going to mark it for you right now as
5 Exhibit 2.
6         MR. BANKSTON: We're actually going to
7 the videos after the sequence. I think that's going to
8 be lot easier.
9         (Exhibit 2 marked.)
10     Q. (BY MR. BANKSTON) Mr. Jones, I have handed
11 you a State of Connecticut Department of Public Safety
12 Investigation Report. Do you see that at the top?
13     A. Uh-huh.
14     Q. Okay. And you see kind of in the middle
15 there, "Place of Interview: Newtown Police Department,"
16 right in the middle of the interview report?
17     A. I need to read this.
18     Q. In fact, you know what, just to be fair to you
19 about this, it's a long report, right? I mean, it's
20 five, six pages? Let's let you read the whole thing.
21 Don't you think that'd be fair?
22     A. Sure.
23         MR. BANKSTON: In fact, let's go off the
24 record. We'll take a little break.
25         THE WITNESS: Well, I mean --

48

1         MR. BANKSTON: You can sit there and read
2 that. Does that sound good?
3         THE WITNESS: Well, I may need to -- if
4 we're taking a break, I'm going to go to the bathroom
5 and stuff.
6         MR. BANKSTON: Sure, you can go to the
7 bathroom. I'm not going to stop you from that,
8 Mr. Jones. I'm not -- your bodily functions are your
9 own.
10        Let's go ahead and go off the record.
11        THE VIDEOGRAPHER: We're off the record
12 at 12:44 p.m.
13        (Off the record from 12:44 to 12:58 p.m.)
14        THE VIDEOGRAPHER: We are back on the
15 record at 12:58 p.m.
16     Q. (BY MR. BANKSTON) Mr. Jones, before we went
17 on a break we were talking about the issue of whether
18 there were EMTs allowed into the building, and I
19 provided you with a couple of findings of some police
20 reports. I have put in front of you Exhibit 2, the
21 statement of Lieutenant Vanghele, correct? You've had a
22 chance to read that?
23     A. Vanghele. I did read most of it, but I didn't
24 get to the second one.
25     Q. Oh, okay. Well, let's look at Exhibit 2. You

49

1 have Exhibit 2 in your hand?
2     A. I'm on 2.
3     Q. Let's go to page 5. Do you see the
4 highlighted portion?
5     A. Yes.
6     Q. I'm going to read that, and you're going to
7 follow along with me. Okay? "I then walked into a room
8 with Sergeant Carrio. At first glance it did not appear
9 there were any casualties. To the left of the room as
10 you walk in, there was a bathroom in the corner. There
11 was a massive pileup of bodies in this room. At this
12 time I did not know it was a bathroom and I wondered how
13 the suspect had the time to kill that many people and
14 stack them in the corner of the room. Sergeant Carrio
15 stated he was an EMT or maybe a paramedic and that he
16 had to check to see if anyone in the pile might have
17 survived -- may have survived. I agreed as the bodies
18 were stacked two and three high and that some of the
19 children at the bottom, who were able to cram in first,
20 may have escaped bullets.
21        "He began to check for life signs,
22 wounds, and attempts to find a pulse. The victims on
23 the top of the pile" -- redacted -- "and many of the
24 bodies had injuries that were obviously fatal. It
25 appeared as if the teachers in the room immediately upon

---

50

1 hearing gunshots began to pack children into the
2 bathroom. The children that were sitting on the floor
3 of the bathroom were packed in like sardines. One
4 little girl was sitting, crouched in between the toilet
5 seat and the back corner of the room. I thought that
6 she might have the best chance for survival. As
7 Sergeant Carrio got to the last bodies, it was clear
8 that no one had survived."
9         You've never heard of Sergeant Carrio,
10 have you?
11     A. I haven't.
12     Q. And you didn't know what he did in the
13 building that day?
14         MR. BARNES: Objection as to form for the
15 time.
16     Q. (BY MR. BANKSTON) You can answer. You didn't
17 know what he did in the building?
18     A. (No audible response.)
19     Q. Correct, Mr. Jones?
20     A. It's, again, over seven years. I don't
21 remember a lot of this stuff.
22     Q. Okay. So either you didn't know what he did
23 in the building, or you did know what he did in the
24 building. One of those two things has to be true,
25 right?

---

51

1     A. I think I do know now.
2     Q. Sure.
3     A. It's just there's so much. It all becomes a
4 big paste.
5     Q. So we can agree that in 2017, when you raised
6 the question, "Why were no paramedics let in the
7 building," you either did know what Sergeant Carrio did
8 or you didn't know what Sergeant Carrio did. One of
9 those two things has to be true, obviously, right?
10         MR. BARNES: Objection as to form.
11     A. The tape was so edited, I don't remember.
12         (Exhibit 3 marked.)
13     Q (BY MR. BANKSTON) Okay. Let's look at
14 Exhibit 3. Do you want to pull Exhibit 3 for me? Can
15 you go to the final page, just flip it on its back, onto
16 the back. Do you see at the very bottom of the page,
17 the very bottom of the left corner it says
18 Sergeant William F. Carrio?
19     A. Yes.
20     Q. Okay. I'm going to read the highlighted part
21 to you. "Paramedic Matt Cassavechia approached me. I
22 had known Cassavechia for many years and recognized him
23 as the head of EMS for Danbury Hospital. Cassavechia
24 asked how long it would be until he could get into the
25 building. I told him the building was not yet secured,

---

52

1 that all the injured were out, and that numerous dead
2 persons remained in the school. Cassavechia said, 'You
3 know I've got to get into that building.' I realized at
4 some point those victims presumed dead would have to be
5 officially pronounced dead. We also needed to impact
6 the fewest number of EMS personnel that we needed
7 preserve the integrity of the scene. Looking around I
8 recognized two other senior paramedics that I believed
9 had the experience and training to handle the situation
10 tactically. I told Cassavechia I would bring myself
11 [sic], Paramedic Bernie Meehan, and Paramedic John Reed
12 into the front of the school, which was secured by that
13 point. They were told to bring minimal equipment. As
14 we walked to the school, I tried to prepare them for
15 what they were about to see. I told them the number of
16 the victims and the nature of the wounds. I told
17 Cassavechia, 'This will be the worst day of your life?'"
18         You have never heard of Matt Cassavechia,
19 Bernie Meehan, or John Reed, have you, Mr. Jones?
20     A. I mean, I just read their names.
21     Q. Prior to me putting that sheet of paper in
22 front of you, you've never heard of those gentlemen,
23 have you?
24     A. I can't say that. It's too much -- too much
25 information.

---

53

1     Q. In fact, it's possible when you said that
2 paramedics weren't let into the building, you knew those
3 three gentlemen and you knew they had been in the
4 building; that's possible, true?
5     A. I wouldn't consciously do that.
6     Q. If -- those reports sitting right there, if
7 those reports were available and online and had been
8 discussed by InfoWars as early as 2013, if that's
9 something that was public, you would agree with me that
10 saying no paramedics went into the building is reckless,
11 correct?
12         MR. BARNES: Objection as to form.
13     A. I just don't know what you're talking about
14 off a 3-second video and this.
15     Q. (BY MR. BANKSTON) You're not going to dispute
16 with me that you've repeatedly said on your television
17 show -- or your web broadcast that paramedics weren't
18 allowed in the building; you've said that over and over
19 and over, right, Mr. Jones?
20         MR. BARNES: Objection as to the form.
21     Q. (BY MR. BANKSTON) Right?
22     A. It's edited the way you -- what you've shown
23 me, so I can't comment.
24     Q. I'm not talking about what I -- what was on
25 the video. I'm not talking about that. Ignore what you

---

54

1  just saw on the video.  I'm asking you -- me and you
2  right now -- you've said repeatedly on your web show
3  paramedics weren't allowed inside of Sandy Hook?  You've
4  said that; you're not going to deny that?
5      A.  I've read other people's reports saying.
6      Q.  Okay.  And you did nothing to confirm those
7  reports, literally nothing?
8      A.  I went out and I covered news that was being
9  covered.
10      Q.  How did you confirm the reports that you were
11  given that paramedics weren't allowed in the building?
12  How did you confirm --
13      A.  We generally go through the reports, and then
14  we look at what they link to.  And I don't have all the
15  dates, but one report took over five years; another,
16  three years; another, a year.  And so it's all -- I
17  mean, again, this has not been a large part of what I've
18  covered.  Sandy Hook has been a very -- not even one-
19  tenth of 1 percent of what we cover and I know that you
20  think that that's the case, but that's not the case.
21          MR. BANKSTON:  Objection to the
22  nonresponsive portion.
23      Q.  (BY MR. BANKSTON)  Hearing that your murdered
24  child received no medical attention, that's obviously
25  distressing?

55

1          MR. BARNES:  Objection as to the form.
2      Q.  (BY MR. BANKSTON)  Right, Mr. Jones?
3      A.  (No audible response.)
4      Q.  Can you -- let's do it this way --
5          Withdraw the question.
6          Can you imagine a universe where hearing
7  that your murdered child received no medical attention
8  is not distressing?
9          MR. BARNES:  Objection as to the form.
10      A.  I think there were even lawsuits by the
11  parents saying things weren't done right sometimes, and
12  that's a terrible thing.
13      Q.  (BY MR. BANKSTON)  That's not my question,
14  though, is it, Mr. Jones?
15      A.  Oh.
16      Q.  Is it?  That's not my question.
17          So my question is:  If you heard your
18  murdered child received no medical care, that's
19  distressing?
20          MR. BARNES:  Objection as to form.
21      A.  It is distressing.  That's why I was
22  distressed just in general hearing those reports.
23      Q.  (BY MR. BANKSTON)  Wait.  When you say you
24  were distressed hearing those reports, what reports are
25  you talking about?  What reports?

56

1      A.  Those -- I mean, this is over -- that was
2  seven years ago.
3      Q.  You know this is the one day you were to come
4  down here and testify about Sandy Hook, and are you
5  going to tell me you haven't done anything to try to
6  figure out what happened in those seven years?
7          MR. BARNES:  Objection as to form.
8      Q.  (BY MR. BANKSTON)  Is that what you're saying,
9  you walked in here totally unprepared, just winging it
10  today?
11          MR. BARNES:  Objection as to form.
12      A.  I don't know how to respond to that.
13      Q.  (BY MR. BANKSTON)  Do you have the respect
14  enough for these parents in this lawsuit to actually go
15  back and try to find out what happened?  Did you do
16  that?
17          MR. BARNES:  Objection as to form.
18      A.  I covered it when it first happened.  And you
19  can look at six shows a week, three to four hours a day
20  and find spots and edit them and things.  It's the
21  media's claim that my life is about Sandy Hook, and it's
22  not even one of the major issues I've ever covered.  And
23  so you're asking me to do the impossible, to go back
24  through a whole compendium and then give some
25  quantifiable statement to you off 3-second edited

57

1  videos.  It's like -- it's square pegs in round holes.
2          MR. BANKSTON:  Objection to the
3  nonresponsive portion.
4      Q.  (BY MR. BANKSTON)  I want to talk to you about
5  death certificates.  I want to play you a clip of
6  something you and Mr. Dew said February 12th, 2015 and
7  November 18, 2016.
8          MR. BANKSTON:  Can you play School and
9  Death Certificates for me?
10          (Video playing.)
11      Q.  (BY MR. BANKSTON)  What did you do to confirm
12  that?
13          MR. BARNES:  Objection as to form.
14      A.  Again, these are highly edited, spliced tapes.
15  The audio's been altered.  I don't even know what
16  context this is in.
17      Q.  (BY MR. BANKSTON)  Sir, the context is Sandy
18  Hook death certificates are sealed; and you said that.
19  What did you do to confirm it, Mr. Jones?
20          MR. BARNES:  Objection as to form.  It
21  misstates the evidence.
22          MR. BANKSTON:  You don't have to do
23  speaking objections, Mr. Barnes.
24          MR. BARNES:  This is one of the worst
25  depositions I've ever witnessed.

58

1     MR. BANKSTON: That's fine. You can make
2  your objections. Go make all the objections you want,
3  but make them in accordance with the Texas Rules which
4  you agreed to be bound with before you --
5     MR. BARNES: I am. Okay. Fine, fine.
6  Q.  (BY MR. BANKSTON) Mr. Jones, sealing the
7  death certificates, the fact that they were sealed,
8  something you and Mr. Dew both said, how did you confirm
9  that?
10     MR. BARNES: Objection as to form.
11  A.  I don't want to answer these things
12  incorrectly. So my memory is -- I remember that this
13  thing was the most sealed case ever and that it was in
14  the news, that there were all these lawsuits about
15  unsealing things and that the records and the redacted
16  police reports -- like what you gave me is almost all
17  blacked out -- this is what people were talking about.
18  And so I can't accurately answer off of edited tapes.
19  I've never seen anything like that. So I'm trying to
20  answer your questions.
21  Q.  You never -- have you ever tried to order a
22  death certificate? They're $20. Anybody can get any
23  one of them. Did you ever try?
24  A.  As I told you, we went off news reports and
25  other people that were investigating. We did not

59

1  ourselves investigate Sandy Hook.
2  Q.  Thank you, Mr. Jones.
3     I want to talk to you about something you
4  said about Port-A-Potties. You know what I'm talking
5  about when I talk about Port-A-Potties, right?
6  Port-A-Potties showed up to Sandy Hook?
7  A.  Port-A-Potties?
8  Q.  Yeah. Do you know what I'm talking about when
9  I say that allegation, when you talked about on your
10  show Port-A-Potties showing up to Sandy Hook? Do you
11  remember talking about Port-A-Potties?
12  A.  I do remember talking about them.
13  Q.  Okay. And you remember how your point was
14  they showed up within an hour for a big media event,
15  showed that it was clearly -- something's going on
16  because they showed up way too quick?
17     MR. BARNES: Objection as to form.
18  Q.  (BY MR. BANKSTON) Correct?
19  A.  I was reporting on what other people had
20  reported.
21  Q.  Okay. Let me play you a clip of something
22  that you said on July 7th, 2015 and April 22nd, 2017.
23     MR. BANKSTON: Could you play
24  Port-A-Potties for me?
25     (Video playing.)

60

1  Q.  (BY MR. BANKSTON) That's consistent with what
2  we were just talking about, right --
3     MR. BARNES: Objection --
4  Q.  -- Port-A-Potties showing up an hour before a
5  big media event?
6     MR. BARNES: Objection as to form.
7  Q.  (BY MR. BANKSTON) Correct, Mr. Jones?
8  A.  Yes. I mean, I did talk about that on some of
9  your edited tape. I don't know the context.
10  Q.  Sure.
11     (Exhibit 4 marked.)
12  Q.  (BY MR. BANKSTON) Mr. Jones, I'm going to
13  hand you a copy of what I have marked as Exhibit 4.
14  Have you ever seen that before?
15  A.  I don't remember.
16  Q.  You're not sure if you've seen this before?
17  A.  No.
18  Q.  Okay. You'll see at the top it has a time
19  stamp 12-14-12?
20  A.  Yes.
21  Q.  You know that's the date of Sandy Hook, right?
22  A.  I don't know.
23  Q.  You don't know that?
24  A.  Was that the day?
25  Q.  It is.

61

1  A.  Okay.
2  Q.  It is, Mr. Jones.
3     We had talked earlier about the dash cam
4  videos and the official report and if there's police
5  cars sitting out in front of Sandy Hook with their dash
6  cams on, it would be a pretty simple matter of just
7  going to video and scrolling through to see when various
8  stuff arrives. That's something you can do, right?
9  A.  I would imagine, yeah.
10  Q.  Yeah. InfoWars didn't do that, did they?
11  A.  I can't say that. I don't know what we did.
12  Q.  Okay. Well, if InfoWars did do that, they
13  would have come across this picture of Port-A-Potties
14  showing up at 1:30 p.m., right? That's what that time
15  is right there? Are you familiar with military time?
16  A.  Uh-huh.
17  Q.  Okay. And that's 1:30, right?
18  A.  Uh-huh.
19  Q.  Right. So that's not an hour after the
20  shooting, is it, Mr. Jones? Correct?
21  A.  It's pretty darn soon after.
22  Q.  Is it? Is it maybe more like four hours
23  after?
24  A.  Again, I was going off of what I believed to
25  be -- and he was -- an accreditated national school

Alex Jones - 3/14/2019

62

1  safety person who'd been on national television programs
2  as an expert. I was going off what Halbig was saying.
3      Q.  You did no confirmation whatsoever of
4  Mr. Halbig's statements about the Port-A-Potties, did
5  you?
6      A.  I don't believe these videos --
7          MR. BARNES:  Objection as to form.
8      A.  -- were released for a long time.
9      Q.  (BY MR. BANKSTON)  If they were, if those
10  videos were released in 2013, it certainly would have
11  been reckless to say the Port-A-Potties arrived in an
12  hour in 2017, wouldn't it, Mr. Jones?
13          MR. BARNES:  Objection as to form.
14      A.  I just don't know how to respond to the fact
15  that -- that how do we know more weren't arriving later
16  and that there's other Port-A-Potties or whatever?  I'm
17  not saying that's what happened.  You just showed me one
18  still off something and tell me to answer questions.
19      Q.  (BY MR. BANKSTON)  Yeah.  So one thing you
20  could do is go back into the dash cam video and scroll
21  through and find out if something did arrive earlier?
22  That's something you could do, right?
23          MR. BARNES:  Objection as to form.
24      Q.  (BY MR. BANKSTON)  It's not hidden
25  information, right?

63

1          MR. BARNES:  Objection as to form.
2      Q.  (BY MR. BANKSTON)  Correct?
3      A.  I guess correct.
4      Q.  Okay.  Thank you, Mr. Jones.
5          Mr. Jones, I've noticed on a lot of these
6  answers you've said, "Well, I'm just going off what
7  Mr. Halbig said."  So what I want to know is:  When you
8  talked earlier about you did deep research, what was
9  that?  What deep research did you do?
10      A.  Well, I mean, I did look at the news articles
11  saying they were being very secretive about the case,
12  that a lot of things were sealed, which is unusual.
13  There were lawsuits involved with that, and I did do
14  research on Bloomberg putting out an e-mail the day
15  before saying, "Get ready.  There's going to be a big
16  event," you know, just straight up, people waiting
17  around for mass shootings or whatever.  And just the way
18  the media made a spectacle out of it right away is what
19  really made me question.  That scene like with the WMDs
20  or babies in the incubators, I just saw the media so on
21  it, so ready; and I thought that added credibility to
22  it.
23      Q.  Okay.  I mean, I'm glad you brought up the
24  Bloomberg thing.  I remember there was a couple of
25  episodes where you talked about this Bloomberg e-mail

64

1  and you said to your audience that there was an e-mail
2  that came out in the lawsuit where Bloomberg told his
3  people:  Get ready in the next 24 hours to capitalize on
4  a mass shooting.
5          That didn't happen; that's not a real
6  e-mail, is it?
7          MR. BARNES:  Objection as to form.
8      A.  I mean, I don't think it's exactly that; but
9  there's one similar to that.
10      Q.  (BY MR. BANKSTON)  Yeah.  I mean, what you
11  said is not real?
12          MR. BARNES:  Objection as to form.
13      Q.  (BY MR. BANKSTON)  Bloomberg never told his
14  people:  Get ready in the next 24 hours to capitalize on
15  a mass shooting; that did not happen?
16      A.  What does his gun organization do?
17          MR. BANKSTON:  Okay, Mr. Jones.
18          THE REPORTER:  I'm sorry.  Could you
19  repeat the answer?
20          THE WITNESS:  I believe his anti-gun
21  organization said:  Get ready.  Get ready to move quick,
22  you know.  I don't have it in front of me.  It's from
23  years ago.
24      Q.  (BY MR. BANKSTON)  Let's -- I want to ask you

65

1  about photos of the children, so I'm going to play you a
2  video clip of something you said about the photos of the
3  children.  This is something you said on September 25th,
4  2014.
5          MR. BANKSTON:  Can you play Photos of
6  Children?
7          (Video playing.)
8      Q.  (BY MR. BANKSTON)  Mr. Jones, you can admit
9  that that statement was absolutely nonsense; there are
10  not photos of children who died who are actually still
11  alive?
12      A.  That is and out-of-context clip.  I can't even
13  respond to something like that.
14      Q.  You said it, though, didn't you?
15      A.  I don't know what it's in context with.
16      Q.  Is there a good context to that, Mr. Jones,
17  that people's children who are dead, there's actually
18  photos of them still alive?  Can you give me the good
19  context?
20      A.  There is no way --
21          MR. BARNES:  Objection as to form.
22      A.  There's no way to respond to -- I mean, I
23  don't know what it is.
24      Q.  (BY MR. BANKSTON)  I know what it is.  It's a
25  video of you saying that there are photos of children

66

1   who died who are still alive.  And I'm asking you:
2   That's absolute nonsense, isn't it, Mr. Jones?
3           MR. BARNES:  Objection as to form.
4       A.  No, it's -- no, it's not.  I don't know the
5   context of that video.
6       Q.  (BY MR. BANKSTON)  Okay.
7       A.  Okay?  There have been cases where the
8   Associated Press major groups ran pictures of Sandy
9   Hook children in Pakistan after a mass bombing; and in
10  the lineup of dead kids -- or parents about their dead
11  kids -- because I believe a bombing happened in
12  Pakistan -- bizarrely, they've got a Sandy Hook kid in
13  there, admitted.  And then we've seen other cases.  It's
14  very bizarre and that's where people call in and ask and
15  then I respond to it.  And I don't know if that's even
16  that clip because it's a couple of seconds long.
17      Q.  Yeah, well, clearly, it's not the kid in
18  Pakistan because that's not a kid who's still alive,
19  right?  When Noah Pozner's picture appeared in Pakistan,
20  that's not Noah Pozner's still alive, right?
21          MR. BARNES:  Objection as to form.
22      Q.  (BY MR. BANKSTON)  Correct?
23      A.  I wasn't saying Noah Pozner's still alive.
24      Q.  Okay.  It was widely reported during your
25  divorce that your attorney said to the judge that you're

67

1   playing a character, that you're a performance artist.
2   So I want to ask you -- I want to know:  When you were
3   making these claims about Sandy Hook, were you being a
4   journalist; or was this all performance art?
5           MR. BARNES:  Objection as to form.
6       A.  When I say things on air, I believe it.  I
7   had -- when I made a radio talk show host.  That was my
8   ex-wife trying to enter into evidence, like ten years
9   ago, me in a Joker outfit doing a satire piece about
10  chemicals in the water; and she was trying to say that I
11  was crazy and was really the Joker.
12          And we said, "No.  When Jack Nicholson
13  plays the Joker, your Honor, he's not really the Joker.
14  He's playing a part."
15          And then the media ran with it, saying
16  that I said that what I regularly do on air is
17  entertainment.
18          So it's very clear when I'm being serious
19  on air; and it's very clear if I'm wearing a Gorn mask,
20  you know, and reenacting Star Trek as a joke, that I'm
21  not literally believing that the Gorn's a real lizard
22  creature.  I was making fun of the media in that case
23  for saying that -- you know, saying that I believe the
24  Government's talking about lizards.  That's on me.
25      Q.  Sure.

68

1       A.  And so I wore a lizard mask.  They also tried
2   to introduce that.  And we explained that, "No, your
3   Honor" -- the judge agreed, yes, we understand satire
4   versus reality.
5           So, no, I was -- I believe what I say on
6   air.  Now, when I cover what somebody else is covering
7   or I have a war game, I look on both sides of something,
8   that doesn't mean that I believe in both sides of what
9   I'm covering.  It means I'm looking at the different
10  angles, and then that's taken out of context.
11      Q.  Well, what I'm getting at is:  This stuff
12  we're looking at today, kids going in circles, the
13  school was closed, e-mails, EMTs not in the building,
14  Port-A-Potties, these aren't comedy skits; this is
15  journalism?
16      A.  Yes -- well, this is punditry because I wear a
17  journalist hat, a punditry hat, satire hat, you know,
18  just reading news.  I mean, just being a news reader, I
19  mean, I do that as well.  So I do a lot of things; but
20  when I was covering Sandy Hook, I was genuinely trying
21  to get to the truth of it.
22      Q.  Okay.  At InfoWars it was known from the very
23  start that parents were being harassed by believers in
24  the Sandy Hook Conspiracy?  You would agree to that,
25  right?

69

1       A.  No.
2           MR. BARNES:  Objection as to form.
3       Q.  (BY MR. BANKSTON)  Well, you would also at
4   least agree that -- because of the potential for that
5   harassment, you would agree with me that InfoWars needed
6   to treat Sandy Hook allegations with extreme caution,
7   given it was a traumatic event; you'd agree with that?
8           MR. BARNES:  Objection as to form.
9       A.  I mean, I think it's the American birthright
10  and it's important when you have big events, whether
11  they're wars or WMDs or mass shootings, that -- I mean,
12  I think the right to question is an absolute right.
13          Just like the Jussie Smollett situation,
14  I took a risk saying I thought that was fake and I was
15  the first person to question it and I was proven right.
16  So I just really -- I questioned Jussie Smollett from a
17  position of looking at the facts; and if I had been
18  proven wrong, then I would have, you know, apologized
19  for it.  I mean, that's what I do.
20      Q.  (BY MR. BANKSTON)  Okay.  But with Sandy Hook,
21  not with Jussie Smollett, with Sandy Hook, you would
22  agree with me you were under an obligation, InfoWars,
23  you needed to treat this with extreme caution --
24          MR. BARNES:  Objection --
25      Q.  (BY MR. BANKSTON)  -- agreed or not agreed?

Alex Jones - 3/14/2019

---

70

1    MR. BARNES: Objection as to form.
2    A. Well, I mean, we always covered things from
3 the perspective of caution. We were covering other
4 people's reports and also questioning the historical
5 fact that, you know, things like Operation Northwoods,
6 the Government planned to stage mass shootings in the
7 U.S.; but Kennedy said no to the plan. But the Chairman
8 of the Joint Chiefs had green-lighted it. And so
9 because of things like that, we are forced to then
10 question these events. And I think that's -- you know,
11 it's just part of the process in this country.
12   Q. (BY MR. BANKSTON) Okay. So that's part of
13 the process; and to be fair to you, InfoWars didn't know
14 from the very start that Sandy Hook parents were being
15 harassed?
16   A. No, we didn't know, not from the very start.
17   MR. BANKSTON: Can you --
18   Q. (BY MR. BANKSTON) I want to play something --
19 I want to play a clip from the InfoWars episode on
20 January 18, 2013. Okay?
21   MR. BANKSTON: Can you play the clip
22 Extreme Caution?
23   (Video playing.)
24   Q (BY MR. BANKSTON) That clip is Mr. Paul
25 Watson, who is your chief reporter at InfoWars, right?

---

71

1    A. He is now.
2    Q. And he frequently warned you about what you
3 were saying about Sandy Hook?
4    A. Well, I mean, we had discussions about it,
5 yes. We're not running a cult. We have different
6 views.
7    Q. Right. For instance, one of the gentlemen in
8 the room with us right now, Rob Dew, Mr. Watson
9 disagreed with Mr. Dew and said, "Mr. Dew's wrong, and
10 you need to stop this, Mr. Jones"? That's what
11 Mr. Watson told you?
12   MR. BARNES: Objection as to form.
13   Q. (BY MR. BANKSTON) Correct?
14   A. That there were external and internal debates,
15 as you just saw. We've looked it up. It's 90-something
16 percent of my reporting saying that it happened, even
17 going back with -- I don't do this anymore because
18 people can edit stuff -- but we would go on air and say:
19 Real shootings happen, you know, the black trench coat,
20 on the drugs, all the regular things we see in mass
21 shootings. And then we would have the other side of
22 that because the Internet didn't believe it happened.
23   Q. Let me put it this way: Mr. Watson was right;
24 Mr. Dew was wrong, correct?
25   MR. BARNES: Objection as to form.

---

72

1    A. It's not in context. I can't answer that.
2    Q. (BY MR. BANKSTON) Okay. I want to play you
3 some comments you made about Mr. Watson. I want to
4 show you something you said about Mr. Watson on
5 February 12th, 2015 and on April 20th, 2018, the day
6 after you were sued.
7    MR. BANKSTON: Can you play the clip for
8 me Jones Comments on Mr. Watson?
9    (Video playing.)
10   Q. (BY MR. BANKSTON) So your chief reporter was
11 right when he was warning you not to say it was phony or
12 there were crisis actors?
13   MR. BARNES: Objection as to form.
14   A. He was not the chief reporter then.
15   Q. (BY MR. BANKSTON) When did he become chief
16 reporter?
17   A. About five years ago -- well, about six --
18 well, about five years ago.
19   Q. Five years ago, 2014?
20   A. I'd have to look it up.
21   Q. Okay. So at the time you were saying that
22 clip in 2015, when you said, "He's my chief reporter,"
23 that's when he became your chief reporter?
24   A. And I said his instincts are right. So you
25 played, finally, one clip where I'm saying it happened

---

73

1 instead of editing clips.
2    Q. Well, no, I was actually talking about the one
3 before, on February 12th, 2015, you called him your
4 chief reporter.
5    A. I think I said by then he was.
6    Q. Okay. Over the years there's been some
7 tension between you and the parents after they started
8 complaining about what you were doing, correct?
9    MR. BARNES: Objection as to form.
10   MR. BANKSTON: What's your basis on that
11 one?
12   MR. BARNES: It's --
13   MR. BANKSTON: A legal objection, not a
14 speaking objection, a legal. What's your legal basis
15 for that one?
16   MR. BARNES: Okay. Well, explain the
17 legal -- it's time, date, context, definitions.
18   MR. BANKSTON: Those aren't legal
19 objections, Mr. Barnes.
20   MR. BARNES: Yes, they are because if the
21 form of the objection [sic] is misleading or leading in
22 the nature in which it --
23   MR. BANKSTON: I'm allowed to lead the
24 witness; he's adverse to me.
25   MR. BARNES: You are; but if I say -- if

---

Integrity Legal Support Solutions
www.integrity-texas.com

74

1  I don't give you context of time and date...
2       MR. BANKSTON:  No, that's fine.  It's not
3  an objection.  It's baseless.
4       MR. BARNES:  Oh, yes, it is.  It's a
5  basic objection.  It's Lawyering 101 on how to ask
6  questions.  I mean, come on.
7       MR. BANKSTON:  Okay.
8       MR. BARNES:  It would be easier for you
9  and for everybody if it was --
10      MR. BANKSTON:  Have you got a rule of
11 evidence for me, maybe?
12      MR. BARNES:  Oh, sure.  It gives
13 specificity as to both date and time so that the person
14 can answer the question meaningfully.  When you say --
15      MR. BANKSTON:  So is that 403?
16      MR. BARNES:  That could be.
17      MR. BANKSTON:  That's not to form.
18 That's not -- you don't have to object to that.  It's
19 preserved, Mr. Barnes.
20    Q    (BY MR. BANKSTON)  Let's talk about this
21 question:  Over the years there started to develop
22 tension between you and the Sandy Hook parents after
23 they started complaining about what you were doing,
24 correct?
25    A    No.

75

1     Q    Okay.  No tension.
2          You will admit, I mean, you've done
3  mocking imitations of Sandy Hook parents crying,
4  correct?
5     A    No.
6     Q    I want to play you a video clip -- two, from
7  September 24th, 2014 and November 11th, 2016.
8          MR. BANKSTON:  Will you play the video
9  clip called Crying?
10         (Video playing.)
11    Q    (BY MR. BANKSTON)  You realize now you were
12 mocking the difficult emotional reactions of people who
13 provably lost their children?
14    A    No, I was not mocking.  I was showing what
15 people were questioning.  It was not to mock the
16 parents.  It was showing why people were questioning.
17 It's you that is projecting mocking onto it.  I was
18 showing what he did.
19    Q    When you did this stuff about the crying and
20 your imitations, this was all in service of an argument
21 that some of these parents were actors, right?
22         MR. BARNES:  Objection as to form.
23    A    No.
24         MR. BANKSTON:  Can you play me --
25    Q    (BY MR. BANKSTON)  I want to play you a clip

76

1  from March 14th, 2014.
2       MR. BANKSTON:  Can you play me the clip
3  called Actors?
4       (Video playing.)
5     Q    (BY MR. BANKSTON)  Who were the actors playing
6  the different -- what are the different people where the
7  same actor was playing different parts?
8     A    I'd have to see the context.
9     Q    But that was something you believed that was
10 true?
11    A    From an edited tape I don't know what the
12 context is.
13    Q    Well, I mean, look, Mr. Jones, you can see
14 you say "actors" enough times that you and I can both
15 admit -- you can just admit right now there have been
16 multiple, repeated times where you have accused some of
17 the parents of being actors?
18         MR. BARNES:  Objection as to form.
19    Q    (BY MR. BANKSTON)  Right?
20    A    No, I never -- I covered the Internet, talking
21 about how people looked like actors.  This is edited.  I
22 can't comment on it.
23    Q    Okay.  So let me understand this, Mr. Jones:
24 Unless we play you a full four-hour InfoWars clip, you
25 just can't answer questions today, can you?

77

1     A    It's not a four-hour clip.  It's that these
2  were maybe a-minute-long clips, not -- five seconds, two
3  seconds.
4     Q    Well, you're telling your audience there:
5  We've clearly got people where it's actors playing
6  different parts of different people.  So you were pretty
7  certain, weren't you?
8     A    I have -- because of all the strange things
9  we've seen, there have been points in my mind where I've
10 gone back and forth in the earlier years, you know,
11 really thinking maybe the whole thing has been staged;
12 and then later, I realized it was just mainly media
13 hyping it and then trying to choreograph, you know,
14 turning it into a political situation after the case.
15    Q    Okay.  Well, regardless of whatever that was,
16 this thing we just saw you say about actors, the mocking
17 imitations of crying, this is exactly the stuff that
18 Paul Joseph Watson was warning you about, correct?
19    A    No.  He was saying that some of the people
20 that were out there putting stuff out, like Fetzer and
21 others in that, were not good.
22    Q    Yeah.  He was really opposed to the crisis
23 actor angle, correct?
24         MR. BARNES:  Objection as to form.
25    Q    (BY MR. BANKSTON)  And If I get -- Mr. Jones,

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 416 of 1271

Alex Jones - 3/14/2019

78

1 if I get Paul Watson here to testify, he's going to tell
2 me he never believed in the crisis actor thing and
3 thought it was a bad idea to talk about crisis actors.
4 That's what he's going, isn't he?
5        MR. BARNES: Objection as to form.
6      A. Yeah, because, I mean, he legitimately is his
7 own person; and we don't tell people what to say or what
8 to do. I respect him, and we have different points of
9 view. We've had debates about Sandy Hook on air.
10     Q. (BY MR. BANKSTON) You have different views
11 about journalistic ethics, too?
12     A. Well, I mean, when there's a big Internet
13 debate that's going on and we cover that debate, I give
14 my opinion on it. That's what happens.
15     Q. Okay. As time went on, starting into 2015,
16 you learned that a Sandy Hook parent named Leonard
17 Pozner was behind a group called HONR Network, correct,
18 that was fighting online abuse of Sandy Hook victims?
19     A. I did, I think.
20     Q. And when you learned that and when HONR
21 complained to YouTube in 2015, you told your viewers
22 that HONR was run by Mr. Pozner. You showed addresses
23 being used by Mr. Pozner; and you said he needed to be
24 investigated, in Florida. Didn't you say that?
25        MR. BARNES: Objection as to form.

79

1      A. No.
2      Q. (BY MR. BANKSTON) Okay. Let's play a clip
3 here. I'm going to show you something that you and
4 Mr. Dew were talking about on February 12th, 2015.
5        MR. BANKSTON: Can you play Addresses for
6 me?
7          (Video playing.)
8      Q. (BY MR. BANKSTON) If a person were to stake
9 out those addresses, they could wait for Mr. Pozner to
10 come pick up his mail, couldn't they?
11        MR. BARNES: Objection as to form.
12     Q. (BY MR. BANKSTON) True?
13     A. I mean, the guy's running an anti-free speech
14 foundation.
15     Q. And you're the one who outed him as doing
16 that, right? There's nothing on the HONR Network
17 website that said Mr. Pozner was running it; you outed
18 him.
19        MR. BARNES: Objection as to form.
20     A. I believe he was public on that.
21     Q. (BY MR. BANKSTON) Do you? You don't think
22 that InfoWars was the first one to break that in an
23 article? You don't think that?
24     A. That he was running a site, trying to get
25 people's websites and things taken down?

80

1      Q. Correct, that Mr. Pozner was running, as an
2 anonymous front, the HONR Network to help make
3 complaints against various sites so that individual
4 parents wouldn't be the subject of retribution. Yeah,
5 that's what I'm asking you if you knew.
6      A. No, I was not aware of that. We were -- I
7 believe, from memory, Dew was covering a news article
8 about how the -- but then that's been conflated by you
9 guys, sneaking into people's houses or putting out their
10 addresses to go after them; and we never did that.
11     Q. So InfoWars -- well, if it happened that
12 InfoWars went and searched and dug through records for
13 private business filings and used DMCA reports that it
14 had gotten to suss out that Mr. Pozner was the head of
15 HONR and then reported it to its audience, that wouldn't
16 be a good thing if that happened, right?
17        MR. BARNES: Objection as to form.
18     A. Well, I don't have any knowledge of what
19 you're talking about there.
20     Q. (BY MR. BANKSTON) I'm just saying: If it
21 happened hypothetically -- if, hypothetically, InfoWars
22 went to some lengths to unmask a person who was running
23 a charity that was trying to stop people from being
24 abused and then disclosed that to its audience with
25 maps, that wouldn't be a good thing?

81

1      A. That's, from my memory, not what happened. I
2 can't comment on hypotheticals.
3      Q. So if I was to say to you if somebody was to
4 come along and strike your hand with a hammer, would it
5 hurt, you can't answer that question?
6        MR. BARNES: Objection as to --
7      A. I'm not striking anybody with hammers.
8      Q. (BY MR. BANKSTON) If I asked you: If I gave
9 you a big bowl of chili, might it affect your memory,
10 you can't answer that; that's hypothetical? Correct?
11 You're just not going to answer those kind of questions?
12     A. (No audible response.)
13     Q. I'll take it that's a no. Let's move on.
14        MR. BARNES: I'll take it that was a
15 question? Is that a question? That's a comment; that's
16 not a question. This is becoming one of the most
17 harassing -- this is for TV and for PR, not for a
18 legitimate suit. That's what this is. That's what this
19 is. You want to put it on TV. That's all -- and this
20 is just a show, and it's a bad show at that. It's a
21 show of how-not-to-be-a-lawyer-in-deposition-of-a-case
22 show.
23        I mean, if you want to be fair and you
24 want to ask real questions, go ahead; but don't make
25 comments and then try to reinterpret those comments as a

82

1   question and then try to put words in the mouth of the
2   witness. I mean, a first year law student should know
3   that.
4           MR. BANKSTON: What was your objection?
5           MR. BARNES: The objection was to your
6   comment saying that there was an answer; and my point
7   was you didn't ask a question so there couldn't have
8   been an answer. And I was objecting for the record
9   purposes that no answer had been given to a question
10  that had not been asked.
11          MR. BANKSTON: Do you maybe want to take
12  a break so we can have a few breaths?
13          MR. BARNES: Yes.
14          MR. BANKSTON: Yeah, you might need to do
15  that.
16          MR. BARNES: Yeah, absolutely. And maybe
17  you can go back and read how to ask people questions.
18          MR. BANKSTON: We're off the record.
19          THE VIDEOGRAPHER: Off the record
20  1:34 p.m.
21          (Off the record from 1:34 to 1:48 p.m.)
22          THE VIDEOGRAPHER: We are back on the
23  record at 1:48 p.m.
24      Q   (BY MR. BANKSTON) Mr. Jones, I want to talk a
25  little bit more about that episode on February 12, 2015,

83

1   the one we had looked at with the maps; and I want to
2   show you a clip of your message to the parents that were
3   complaining and ask you some questions. This clip,
4   again, is from February 12th, 2015.
5           MR. BANKSTON: Can you play Hornets?
6           (Video playing.)
7       Q   (BY MR. BANKSTON) So for complaining, you
8   were going to bring InfoWars to their hometown?
9           MR. BARNES: Objection as to form.
10      A   I have no idea what that 3-second clip was.
11      Q   (BY MR. BANKSTON) Well, forget the 3-second
12  clip. For complaining, you were going to bring InfoWars
13  to their hometown?
14      A   That is not what I said.
15      Q   Okay. Well, a couple months later -- hang on,
16  Mr. Jones. I'm going to hand you what I am now marking
17  as Exhibit 5.
18          (Exhibit 5 marked.)
19      Q   (BY MR. BANKSTON) A couple of months later,
20  in the spring of 2015, you sent this man, a cage
21  fighter, to go badger and yell obscenities at Sandy Hook
22  residents, right?
23      A   No.
24      Q   No? You know who that is, right?
25      A   Yes.

84

1       Q   Okay. That's Mr. Bidondi?
2       A   Yes.
3       Q   I want to play you a clip of Mr. Bidondi in
4   Newtown. This is from June 8th, 2015.
5           MR. BANKSTON: Can you play the clip of
6   Bidondi?
7           (Video playing.)
8       Q   (BY MR. BANKSTON) And, Mr. Jones, those are
9   hardly the only people that Mr. Bidondi harassed on his
10  multiple trips to Newtown, correct?
11          MR. BARNES: Objection as to form.
12      Q   (BY MR. BANKSTON) Correct?
13      A   I mean, almost everything you said is not
14  true. So there's no way to respond to it. No, not
15  correct.
16      Q   Okay. That was Mr. Bidondi calling people who
17  were involved in Sandy Hook crooked, corrupt, piece-
18  of-shit motherfuckers, right? That's what we just saw?
19          MR. BARNES: Objection as to form.
20      Q   (BY MR. BANKSTON) That's what we saw on the
21  video, Mr. Jones, correct?
22      A   I didn't quite hear all of it.
23      Q   Okay. I want to show you something you said
24  after Mr. Bidondi went to Sandy Hook about the school
25  itself; and I'm going to show you a clip from July 7th,

85

1   2015.
2           MR. BANKSTON: Can you play Stocked the
3   School?
4           (Video playing.)
5       Q   (BY MR. BANKSTON) First, Mr. Jones, you see
6   the headline at the top of that screen, "The FBI says no
7   one killed at Sandy Hook"?
8       A   Yes.
9       Q   You're familiar that's an article that
10  InfoWars published at one time?
11      A   Yes, the FBI said no deaths that year in Sandy
12  Hook on their website.
13      Q   Is that what they say?
14      A   I'm going from memory. You can pull it up.
15      Q   So you say that headline's true?
16      A   The FBI later amended it and said that it was
17  an error.
18      Q   Oh, they amended it? That happened?
19      A   Uh-huh.
20      Q   Okay. Let's move on to 2016. And in the 2016
21  election you found yourself having to discuss Sandy Hook
22  because Hillary Clinton actually brought you up
23  specifically in a campaign speech, didn't she?
24      A   Yes.
25      Q   And that she -- she wanted to put light on

86

1 you, in other words? That was part of her campaign
2 strategy?
3    A. Yes.
4    Q. Now, after the campaign was over, in November
5 2016, you directly addressed the parents in a video
6 called your final statement and accused some of them
7 being actors, right?
8    A. No.
9    Q. Okay. I'm going to show you the very end of
10 your clip, your message to the parents on November 11th,
11 2016 in the final statement on Sandy Hook.
12        MR. BANKSTON: Can you play the video
13 clip titled Soap Opera?
14        (Video playing.)
15    Q. (BY MR. BANKSTON) That was not the extreme
16 caution that your chief reporter, Mr. Watson, had been
17 urging, correct?
18        MR. BARNES: Objection as to form.
19    Q. (BY MR. BANKSTON) Correct?
20    A. I mean, if people had been coached about
21 certain political anti-gun statements, I have a right to
22 say that they're putting out political talking points.
23    Q. "I know when I'm watching a movie, and I know
24 when I'm watching something real. We have seen soap
25 operas before." I mean, this is an accusation about

87

1 actors, correct?
2    A. No, not specifically about that. I was saying
3 politically it turned into something synthetic to go
4 after guns, and I think that's why you don't play the
5 whole clip.
6    Q. And then at the end of the clip, you point
7 into the camera and say, "Let's look into Sandy Hook."
8 And then there's a title card that says, "InfoWars you
9 are the resistance." The "you" in the "You are the
10 resistance," that's your audience, correct?
11    A. That's a tagline on everything, so it wasn't a
12 specific Sandy Hook message.
13    Q. But I'm asking you the meaning of that
14 tagline, "You are the resistance." "You" means your
15 audience?
16    A. It means -- yes, uh-huh, or it means -- it
17 just means the American people.
18    Q. Am I part of the resistance?
19    A. Well, all the Democrats.
20    Q. I'm sorry? Did I...
21    A. Well, that's a Democratic tagline that they
22 took from me: You are the resistance.
23    Q. Okay.
24    A. You're not a Democrat?
25    Q. I don't know why you -- where you're getting

88

1 that from.
2    A. All I'm saying it's a -- Democrats use that.
3    Q. Okay. Mr. Jones, we've talked a little bit
4 about the Sandy Hook investigators, one of them,
5 Mr. Halbig and one of them, like, Mr. Fetzer. These are
6 people who have been investigating Sandy Hook.
7 Mr. Halbig's been a considerable source of information
8 for you. You will admit that, correct?
9    A. Yes.
10    Q. Now, these Sandy Hook investigators, these
11 people were so crazy that you had to realize at some
12 point that what they're saying isn't true and that Sandy
13 Hook wasn't a fake, right?
14        MR. BARNES: Objection as to form.
15    A. I found out some of what they were saying was
16 not accurate.
17    Q. (BY MR. BANKSTON) Okay. Let me play a clip
18 for you that's something you said just a little while
19 ago, on January 19th, 2019.
20        MR. BANKSTON: Can you play Kooky?
21        (Video playing.)
22    Q. (BY MR. BANKSTON) When did you finally
23 realize that these crazy people were crazy?
24        MR. BARNES: Objection as to form.
25    A. I can't answer exactly because it's so many

89

1 years; but about three years ago, I found that some of
2 what they said was inaccurate.
3    Q. (BY MR. BANKSTON) Okay. So, essentially,
4 then, I think what you're getting at is you haven't been
5 saying Sandy Hook is fake for years?
6    A. I have been more on the side, going back about
7 three or four years ago, that it did happen and then
8 started talking about some of the anomalies that were
9 not anomalies; and then that triggered more of the ire
10 of those folks as they got more, I think, extreme.
11 That's what I'm saying: This is all cherry-picked here.
12    Q. Well, I'm just trying to understand,
13 Mr. Jones. At some point you learned that those people
14 were crazy; you couldn't believe what they were saying.
15 You couldn't say it was synthetic or completely fake
16 anymore. When did you stop saying it was --
17    A. I don't know. It was probably four years ago
18 I told Bidondi not to say he worked with the InfoWars,
19 because he didn't. And he's a professional wrestler,
20 not a cage fighter. I mean, I remember that. That's a
21 date we could find when we sent him e-mails and said,
22 "You don't work here. Stop saying our name. Don't do
23 that in our name," because I saw that stuff; and I was
24 like -- I remember seeing it in the paper. And I was
25 like, "Bidondi doesn't work here." I mean, he did stuff

90

1    for us years before that, you know.
2         MR. BANKSTON: Objection, nonresponsive.
3    A.   I mean, I'm really answering your question.
4    Q.   (BY MR. BANKSTON) No, Mr. Jones. I'm asking
5    you about Mr. Halbig, the sources that you had, not your
6    employees.
7    A.   He's not my employee.
8    Q.   I'm talking about these investigators, right?
9    These investigators, at some point -- we just saw a
10   clip -- you realized they were kooky, couldn't say it
11   was synthetic anymore. When do you think is the last
12   time you -- like, that ended? When did you stop calling
13   it fake?
14        MR. BARNES: Objection as to form.
15   A.   I mean, I can't accurately say that.
16   Q.   (BY MR. BANKSTON) Okay. Let's try to -- hold
17   on for a second. Let me take you back to April 20th,
18   2018. I want to play you a clip on April 20th, 2018. I
19   believe it was a day or two after you were first sued.
20        MR. BANKSTON: Can you play the clip Not
21   Doing It?
22        (Video playing.)
23   Q    (BY MR. BANKSTON) When you say you're not
24   doing it, is this meaning that you haven't been saying
25   Sandy Hook was fake for several years?

91

1    A.   No. What it means is the media currently and
2    then says, "Jones is saying it. Jones is sending
3    people."
4         And then never showing me saying, "Don't
5    go investigate it. I believe mass shootings have
6    happened. And I'm sorry and some of the anomalies we
7    were told were wrong." And I've said it -- I've
8    probably been saying that for four years.
9    Q.   Okay.
10   A.   And then the media, the corporate media, wants
11   to use it to, I guess, to bring back gun control or
12   anti-free speech stuff, whatever it is; and so it
13   continues to do that over and over again.
14   Q.   Right. You kind of -- you end up in the
15   crosshairs because they want to generate clips, right?
16   A.   Well, I'm not sure how all that works; but I
17   can tell you: Sandy Hook is not my identity. I covered
18   it less than one-tenth of 1 percent until Hillary gave
19   her All Right Speech; and then there were thousands of
20   articles, you know, saying, "Jones is doing this. Jones
21   is sending people there." And it kind of restarted. A
22   big resurgence happened on the street saying, "How dare
23   you not -- you not say it happened; you don't think it
24   happened?" It's a big thing. It was, like, spray
25   painted on the walls here in Austin on the side of the

92

1    highway that, you know, Sandy Hook was staged. That's a
2    big thing on the Internet.
3         And so the media made -- Hillary made it
4    this huge thing on which she said Pepe the Frog was a
5    white supremacist; and made the frog a white
6    supremacist. She had a lot of power at that point in
7    the news.
8         And so I've been trying to say,
9    particularly, you know, "Hey, it's not my identity. And
10   I believe it happened and I'm sorry for your -- you
11   know, any pain you've had." But I'm not going to be
12   Sandy Hook man and then take what everybody else did as
13   if what people have said and done is all me and then I'm
14   kind of like the sin eater and it's all put on me when
15   that's not my identity.
16        I mean, this idea -- I know they have
17   shows, like Homeland, and things where there's
18   supposedly Alex Jones and he does all these things.
19   That's not a real person. That's an actor. And then
20   kind of the media fantasizes that they're fighting, you
21   know, this big boogyman that's on Homeland; and that's
22   not who I am.
23   Q.   Do you remember what my question was? What
24   was my question?
25   A.   But I just answered your question. I mean,

93

1    ask your question again. There's no yes-or-no answer to
2    something like that.
3    Q.   Well, I mean, you don't even know what the
4    question was because you were just talking. You were
5    just ranting, like you do on your show, right?
6    A.   No, I was being honest with you about the
7    situation.
8    Q.   All right. Well, let's walk through it,
9    Mr. Jones. We know you started making videos calling it
10   fake in 2013, right? No doubt there?
11        MR. BARNES: Objection as to form.
12   Q.   (BY MR. BANKSTON) Right?
13        MR. BARNES: Objection as to form.
14   A.   I can't comment on edited videos you've got
15   here.
16   Q.   (BY MR. BANKSTON) I'm not asking you about
17   edited video, Mr. Jones. I'm asking you: In 2013 you
18   made videos calling it fake, correct?
19        MR. BARNES: Objection as to form.
20   A.   I think I was asking if it was fake, yes.
21   Q.   (BY MR. BANKSTON) Admittedly, you weren't
22   asking; you were saying it was fake, and the evidence is
23   overwhelming, right?
24   A.   I mean, we have a right in this country to
25   question things.

Alex Jones - 3/14/2019

94

1    Q. I'm not saying what you did and didn't have a
2 right to do. I'm just asking you what you did. You
3 made videos in 2013 saying it was fake, right?
4    A. I think saying -- I remember making statements
5 that it looks fake to me, but we're not a hundred
6 percent.
7    Q. Okay. And then in 2014 and 2015 you were
8 making videos, calling it synthetic, completely fake,
9 manufactured, phony as a three-dollar bill. That was
10 happening all through 2014 and 2015, right?
11       MR. BARNES: Objection as to form.
12    Q. (BY MR. BANKSTON) And there's transcripts of
13 that, right?
14    A. I'm not denying that I've questioned Sandy
15 Hook.
16    Q. Okay. That's all I'm asking.
17       Then in 2016 we know it became an issue
18 because of the campaign. We saw a video called your
19 final statement. We've looked at that. And we've seen
20 you saying really false things about Sandy Hook all
21 through 2017 in these videos, too, right?
22       MR. BARNES: Objection as to form.
23    A. Edited videos. I can't respond to it.
24    Q. (BY MR. BANKSTON) Okay. If you just say --
25 for instance, if you say that there are Port-A-Potties

95

1 showing up within an hour in 2017, that's not true,
2 right?
3    A. We don't know that.
4    Q. Exactly, right? You don't know that, but you
5 said they did?
6    A. That's what the reports were from people we
7 believed were credible.
8    Q. Okay. But in 2017 you're still calling it
9 fake?
10       MR. BARNES: Objection as to form.
11    A. No. I was -- the media would get me to
12 respond and say, "Well, what were the anomalies?" And
13 then I would -- like Megyn Kelly, I said, "I believe it
14 happened."
15       She goes, "But what are the anomalies?"
16    Q. (BY MR. BANKSTON) Okay.
17    A. And then they edited it together to have me
18 saying it didn't happen. That's just incredibly
19 deceptive.
20    Q. Okay. I want to show you something you said
21 on October 26th, 2017; and this is a video called $3
22 Bill.
23       MR. BANKSTON: Can you play that?
24       (Video playing.)
25    Q. (BY MR. BANKSTON) That video, that was made

96

1 October 26th, 2017. That's just a couple of months
2 before you were sued, wasn't it?
3    A. I would guess if the date's right.
4    Q. And that was almost five years after the
5 parents had told you how distressing what you were doing
6 was to them, right?
7    A. I say right there I don't know what happened
8 at Sandy Hook.
9    Q. It says it's as phony as a 3-dollar bill.
10       MR. BARNES: Objection as to form.
11    A. Talking about Nancy Grace where she says she's
12 on location and they've got trucks and you see the same
13 trucks driving behind her and the guest, that's what I
14 mean. It's the media creating a synthetic thing around
15 it to script the outcome of what they want. You're
16 taking it out of context.
17    Q. (BY MR. BANKSTON) Oh, really? That's what
18 "phony as a 3-dollar bill" means? That's how you've
19 used that term over the years?
20    A. Talking about Nancy. That clip is long enough
21 where I can tell what I'm talking about. I mean,
22 Nancy's sitting there, where she's sitting there in a
23 roundabout; and she says the other person is...
24    Q. I'm familiar, Mr. Jones. Ashleigh Banfield
25 sitting in a chair. They're both in the same parking

97

1 lot. As a result of the satellite feed, you see the
2 same cars going behind them; and it shows they're
3 actually in the same location, even though they're
4 trying to do it like a satellite feed, right?
5    A. Yeah.
6    Q. Right. And then, obviously, they didn't have
7 a guest to put on. They put those two people together.
8 To you, that's an anomaly, right? That's one of the
9 anomalies that caused you to have doubts?
10    A. They lied and said they were on location.
11    Q. Yeah, sure, they lied. Yeah, they said, "Hey,
12 she's over here; and I'm over here." And they're
13 actually in the same place?
14    A. Yeah.
15    Q. They were pulling a -- they pulled a trick?
16    A. She said she had just got a text from The
17 Atlanta --
18    Q. We'll talk about that.
19    A. -- rooftop.
20    Q. Put a pin in that, Mr. Jones. We'll talk
21 about that. I definitely want to get back and talk
22 about that; but in terms of what you were saying in that
23 video, you said, "We've looked at both sides. We've
24 tried coming at it from all angles; but, folks, it's as
25 phony as a 3-dollar bill." That's what you said?

98

1    A.   Talking about the media coverage, yes, in
2  context.
3    Q.   Oh, in that you were talking about the media
4  coverage?
5    A.   Yeah, that's what I'm talking about.  That's
6  what I'm talking about, Nancy Grace.
7    Q.   And Anderson Cooper, right?
8    A.   Yes.
9    Q.   The blue screen, you said:  It's fake, wasn't
10 there.  It didn't happen.  They weren't on location.
11     That's what you said?
12     MR. BARNES:  Objection as to form.
13   A.   Now, generally when someone is on location, it
14 doesn't mean that the person being interviewed is even
15 part of it.  It means that they'll say, "Hey, you're
16 going to be standing here, talking to Anderson Cooper."
17 And they're not talking.  At that level of television
18 they routinely do that.
19     CNN is famous for it.  They'll even run
20 audio in the back of the video and, like, you'll hear
21 is -- another that happened a few months ago is CNN, you
22 hear a bunch of crickets and the cars.  All of sudden
23 the tape stops and they have to start it back up, and
24 they're supposedly on location in Gaza.
25   Q.   (BY MR. BANKSTON)  I have no idea what you're

99

1  talking about, but it's not important.  What I'm asking
2  you is --
3    A.   Oh, okay.  Okay.
4    Q.   -- in terms of Anderson Cooper, you said that
5  Anderson Cooper wasn't at Sandy Hook; he was not there?
6      MR. BARNES:  Objection as to form.
7    Q.   (BY MR. BANKSTON)  Right, you said that?
8      MR. BARNES:  Objection as to form.
9    A.   I don't know how to respond to that.  Yes, I
10 believe that he used -- that he faked being on location
11 once.  That doesn't mean that the people involved aren't
12 the parents or that it didn't happen.  It means CNN's
13 famous for faking locations.
14   Q.   (BY MR. BANKSTON)  Okay.  I want to show you a
15 clip of something you said in 2015, and this is a clip
16 that's become kind of famous.  And so I want to get your
17 input on something you said in 2015 on January 13th.
18 And let me show you a clip called Hoax.
19     (Video playing.)
20   Q.   (BY MR. BANKSTON)  Mr. Jones, can you now
21 admit that these statements were reckless?
22   A.   No.  I think at that point in my life, in
23 whatever the context was that I was saying I think
24 basically the whole thing was fake, I mean, that's my
25 right to do that.  I legitimately had believed that

100

1  Sandy Hook was probably completely staged at different
2  periods of my life.  Like, I believed Jussie Smollett
3  was staged or the WMDs were staged.  And I'm on record
4  on hundreds of these events when I think they're staged.
5  I've learned sometimes I'm wrong.
6      And so, no, I stand by the fact that I
7  genuinely believed that.  And one of my best reporters,
8  Paul, thought that was wrong; and so that shows that we
9  have real debates, real discussions.  And what people
10 believe, as long as I think they really believe it, it's
11 what we debate and discuss.  And that's like most any
12 talk radio show there is.
13   Q.   Everything -- every last word of factual claim
14 in those statements are things that you repeated with no
15 confirmation from people you now admit are crazy, right?
16   A.   Well, I don't want to call people crazy and
17 get sued by somebody else.  I have found that some of
18 what they said and then the reports they put out were
19 not accurate.
20   Q.   Well, you certainly have no problem calling
21 them kooky, right?  You've said it on the air to, like,
22 millions of people?
23   A.   Yeah.  I mean, yeah, I mean, I think it's --
24   Q.   These people are kooky, and everything you
25 said in that was based on what they told you and with no

101

1  confirmation?
2    A.   I wouldn't say everything.  There was a lot of
3  different sources, a lot of different things; and then
4  there was a cover-up on the files and the reports and
5  Lanza and his background.  And so you've got a cover-up,
6  and you're not sure exactly what's going on and the
7  extent of it.
8    Q.   Let me make sure I have this really clear.
9    A.   Uh-huh.
10   Q.   You don't believe the official story of Sandy
11 Hook.  You think there was a cover-up.  You think there
12 was manipulation.  You think there was some sinister
13 thing going on.
14   A.   I still -- yes, I still think -- I think
15 children died.  I believe mass shootings happen.  They
16 just had one in Brazil, a tragedy.  And I believe it's a
17 crisis.  And I go back to the point of all gun owners
18 being collectively blamed.  Then it's traumatic and so
19 people go and they find anomalies.  And then I've kind
20 of retrospectively gone back and seen how I did believe
21 that stuff.
22     And then I go back and I'm now, studying
23 more, actually, the real anomalies; and it's just the
24 School System and Government trying to covering its rear
25 end from liability.  And so there definitely has been a

Alex Jones - 3/14/2019

102

1  cover-up of the events.
2       And I think there's a lot of evidence
3  showing there could have been a second shooter.  There
4  is the helicopter footage of the man in woods.
5       I still have questions about Sandy Hook,
6  but I know people that know some of the Sandy Hook
7  families.  They say, "No, it's real," people I think are
8  credible.  And so over the years, I've -- you know,
9  especially as it's become a huge issue, had time to
10  really retrospectively think about it.  And as the whole
11  thing matured, I've had a chance to believe that
12  children died and it's a tragedy; but there are still
13  real anomalies in the attempt to basically keep it
14  blacked out that generally, when you see that in
15  government, something's being covered up.
16       Q.  And after you were sued, you said there was a
17  police stand down in Sandy Hook, right?  You said that?
18       A.  I said that about Parkland, too.  I think
19  there was a very slow response on both.
20       Q.  Now, you're a parent.  Just imagine with me
21  for a moment that you lost one of your children.  One of
22  your children was murdered and you think you know who
23  did it and there's been a justice system that worked
24  that said this is who did it.  And then someone who
25  thinks that they have information comes to you and says,

103

1  "Mr. Jones, the person who killed your son, information
2  about him is being covered up.  There's a government
3  conspiracy.  They're manipulating.  There's a police
4  stand down."  Those things would be upsetting to you,
5  wouldn't they?
6       MR. BARNES:  Objection as to form.
7       A.  I think the whole thing's upsetting, and
8  everybody's upset by it.  And people see anomalies, and
9  citizens have rights to ask questions.
10       Q.  (BY MR. BANKSTON)  Right.  So if there was a
11  police stand down, that'd be upsetting, right?  I mean,
12  come on, if the police chose not to react, that's
13  upsetting, isn't it?
14       A.  Well, there was -- in Columbine, there was --
15  at Parkland that -- they've ruled in Florida there was a
16  police stand down.  I was the first to report that
17  because we had students call in.
18       Q.  I'm not asking --
19       A.  And CNN said they were actors.
20       Q.  I'm not asking if there was a police stand
21  down in Parkland.  I'm not asking if one happened at
22  Sandy Hook.  I'm saying that if children are being
23  attacked and the police anywhere stand down, that's
24  upsetting?
25       A.  Yes.

104

1       Q.  Now, by the same token, if the police didn't
2  stand down but somebody was told -- a parent, a victim,
3  was told that the police did stand down, falsely, that's
4  also upsetting?
5       A.  I believe there's been lawsuits by the
6  families about a lack of response.
7       Q.  Was that my question?  Is that in any way my
8  question, Mr. Jones?
9       A.  Well, I don't understand your question.
10       Q.  My question is:  If somebody was to lie to
11  you -- your children were killed and then somebody came
12  to you and lied to you and said the police stood down,
13  that'd be distressing?
14       MR. BARNES:  Objection as to form.
15       A.  I don't know of anyone -- if people believed
16  there was a stand down, then it's not a lie.
17       Q.  (BY MR. BANKSTON)  If somebody came to you
18  about your murdered child and said, "Your murdered child
19  wasn't actually murdered; he was stolen by aliens" and
20  lied to you about that, that's upsetting, right?
21       A.  Yeah, uh-huh.
22       Q.  Can you now admit that you've done an
23  outrageous wrong to these parents?  Can you admit that?
24       A.  You know, the mainstream media is who always
25  takes it and makes it a huge issue and then says that

105

1  I'm saying it and gets me to respond.  And it's lawyers
2  like you and people that glom onto this for fame that
3  then try to get the fame and then say that I'm the
4  person that's promoting it.  And it's obscene, in my
5  view.
6       Q.  So that's "no"?
7       A.  No.  I genuinely questioned it.  You know, I
8  think the Government and the media that's been caught
9  lying so much has created an atmosphere where people
10  don't know what's true.
11       Q.  So you do not believe that you've done an
12  outrageous wrong to these parents?
13       A.  No, I've not done an outrageous wrong to the
14  parents.
15       Q.  Okay.  In that clip you said the state police
16  have gone public.  Have you ever argued anything about
17  the state police?
18       A.  Like I told you, most of this stuff I can't
19  even remember.
20       Q.  Do you, sitting here today, remember anything
21  about the state police going public?  Is there anything
22  that occurs to you today?
23       A.  I can't remember.
24       Q.  Okay.  I want to talk to you about rescue
25  helicopters.  You mentioned rescue helicopters a lot.

106

1 It was puzzling to you that rescue helicopters weren't
2 called, correct?
3    A. Yes.
4    Q. Okay. I take it you don't know how long it
5 takes for a LifeStar crew from Hartford Hospital to be
6 dispatched, travel to Sandy Hook, and for the engine to
7 calm down to safely approach the vehicle? From
8 Hartford, you don't know how long that takes?
9    A. No, I don't.
10   Q. And, by the same token, you don't know how
11 long it takes for an ambulance crew to be dispatched to
12 loading of the patient from Danbury Hospital, 9 miles
13 down I-84? You don't know that?
14   A. No, I was going off Halbig's and others, that
15 professor's analysis of it.
16   Q. Okay. I think we've agreed before that Sandy
17 Hook was real. It was not staged. It was not phony.
18 You were wrong about that and --
19   A. Well, I want to be clear: I believe children
20 died. I believe there was a mass shooting. I still
21 think that there was a man in the woods in camo. There
22 were other reports. I saw the video. And I believe
23 that, you know, normally after every person -- remember,
24 it's happened before -- every person in a shooting died;
25 and just a lot of experts I've talked to, including

107

1 retired FBI agents and other people and people high up
2 in the Central Intelligence Agency, have told me that
3 there is a cover-up in Sandy Hook.
4    Q. Okay. Have there ever been any InfoWars
5 employees who have been terminated or formally
6 disciplined for allowing false Sandy Hook information to
7 reach the air?
8       MR. BARNES: Objection on two grounds:
9 One is to form; and secondly, Mr. Jones is only here in
10 his personal capacity. He's not here as a
11 representative of Free Speech.
12      MR. BANKSTON: I'm not asking to bind
13 him. If he has personal knowledge, he can tell me.
14   A. Bidondi was not working for us when he went to
15 Sandy Hook. I told him not to. And then I told him to
16 stop using InfoWars, over and over, repeatedly, until I
17 had to tell him that I'm going to go public on air and
18 say that he's a bad person if he didn't stop using my
19 name.
20   Q. (BY MR. BANKSTON) So you're going to tell me
21 that after that episode in Newtown happened, Mr. Dew
22 didn't communicate with Mr. Bidondi and ask him to cover
23 Sandy Hook some more?
24   A. I haven't reviewed all the things that went on
25 with the other reporters and people. I know I said to

108

1 him, "Stop doing it." Even the year before that I said,
2 "Don't go in our capacity to any of these places." And
3 I'm just going off memory about that because we told him
4 we did not want him covering Sandy Hook, and the last
5 thing he covered for us was the Boston bombing.
6    Q. Who is "we" when you say, "We told him not to
7 cover Sandy Hook"?
8    A. I mean, I told him.
9    Q. Okay.
10   A. He lives up there.
11   Q. How did you tell him?
12   A. Over the telephone, and I believe in e-mails.
13   Q. Okay. You use e-mails to communicate with
14 employees and people like Mr. Bidondi?
15   A. I remember saying in a meeting around eight
16 years ago -- I said, "Listen, it's funny. He's a
17 professional wrestler. He likes to clown around. I
18 don't want to be a bunch of clowns. We're not the
19 Howard Stern Show. So tell him to stop doing stuff in
20 our name." And, basically, he just wouldn't stop.
21   Q. You've repeatedly said the 9/11 Attacks were
22 orchestrated by the Government, right?
23   A. Well, I believe criminal elements of our
24 Government were involved in 9/11.
25   Q. Regarding Columbine, you said, "Columbine we

109

1 know was a false flag; I'd say 100 percent false flag, a
2 globalist operation."
3    A. By "false flag," they knew it was coming; and
4 they let it happen.
5    Q. Okay. The Oklahoma City bombing you said was
6 a false flag, "We've never had one so open and shut."
7    A. A hundred percent. I can name the names.
8    Q. And that Tim McVeigh was an innocent patsy?
9    A. He was set up, yeah.
10   Q. Okay. Hours after James Holmes shot up the
11 Aurora movie theater, you said that was 100 percent a
12 false flag, mind-control event?
13   A. He told the jailers that he was in a mind
14 control program, like Theodore Kaczynski, the Unabomber.
15   Q. Okay. The shooting of Gabrielle Giffords you
16 called a staged mind-control operation?
17   A. Say that again.
18   Q. The shooting of Gabrielle Giffords you called,
19 quote, "a staged mind-control operation"?
20   A. I believe we looked at those possibilities.
21   Q. The Douglas High School shooting in Parkland,
22 Florida, you told your audience you were nearly certain
23 it was a false flag to start a civil war, right?
24   A. That's out of context. What I said was I
25 believe the shooting happened, but that the way it was

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 424 of 1271

Alex Jones - 3/14/2019

110

1  being hyped, that the police stood down. We talked to
2  the students, and it was later confirmed.
3       (Exhibit 6 marked.)
4       Q. (BY MR. BANKSTON) I want to show you the
5  context so we can make sure we're not taking it out of
6  context. I'm going to hand you the Affidavit of Fred
7  Zipp. I would like you to turn the document onto its
8  back and flip one page to page 25. Do you see that
9  tweet right there? There's a tweet at the top of the
10  page, right?
11      A. Uh-huh.
12      Q. A tweet is a message distributed to InfoWars'
13  thousands -- hundreds of thousands of Twitter followers,
14  correct?
15      A. Yes.
16      Q. That tweet reads, "Probability Florida Attack
17  False Flag For Civil War 90 percent," correct?
18      A. Yes.
19      Q. The remainder of that tweet says, "Alex Jones
20  calculates the probability of the Florida school
21  shooting being a false flag of the Deep State to create
22  resentment towards conservatives, gun owners, and sew
23  the seeds of civil war," correct?
24      A. That's a tweet.
25      Q. That's the context of that message, correct?

111

1       A. I didn't put this out, but they took a
2  derivative of what I said on air and put it out.
3       Q. InfoWars published that?
4       A. Well, the video that it links to is in the
5  context.
6       Q. I'm asking you: That tweet --
7       A. Yes.
8       Q. -- InfoWars published that tweet?
9       A. I believe so.
10      Q. Thank you, Mr. Jones.
11          The November 2017 church shooting in
12  Sutherland Springs, Texas, you put forth the theory that
13  it was, quote, "Part of the Antifa Revolution against
14  Christians and conservatives or an ISIS op," correct?
15      A. Well, I that's out of -- I was giving, like,
16  possible things; and then it turned out -- it turned out
17  that he -- you know.
18      Q. In November 2017, the same month, there was a
19  horrific mass shooting at the Las Vegas music festival.
20  You remember that, correct?
21      A. Uh-huh.
22      Q. And you said, quote, "Vegas is as phony as a
23  three-dollar bill or as Obama's birth certificate,"
24  correct?
25      A. Yes.

112

1       Q. Okay. So it really wasn't a surprise that you
2  said the exact same thing about Sandy Hook that you've
3  said about all of these other shootings, correct?
4       A. Yeah, well, I talked to the FBI hostage rescue
5  team on the thing in Las Vegas.
6       Q. Okay. Let's talk a little bit about
7  Pizzagate. You told your audience -- first, let's start
8  off, Pizzagate is the allegation that there was a
9  pedophile sex dungeon in a Washington D.C. pizzeria with
10  connections to Hillary Clinton and the DNC, right?
11          MR. BARNES: Objection --
12      Q. (BY MR. BANKSTON) That's what Pizzagate is?
13          MR. BARNES: Objection as to form.
14      A. Does that mean to ask it again?
15      Q. (BY MR. BANKSTON) No, you can answer,
16  Mr. Jones.
17      A. Say it again.
18      Q. Pizzagate is the allegation that there was a
19  pedophile sex dungeon being operated out of the basement
20  of a pizzeria in Washington, D.C., with connection to
21  Hillary Clinton and the DNC?
22      A. No.
23      Q. Okay. Tell me what Pizzagate was.
24      A. Pizzagate came out of the John Podesta
25  e-mails, head of Hillary's campaign. I'm talking about

113

1  Aleister Crowley rituals. And then the media diverted
2  onto 4chan and covered a pizza place that the DNC went
3  to and that was going on and created the dis-info about
4  these dungeons and basements and everything to then
5  distract onto that away from the serious stuff in the
6  FBI manual that they use things, you know, things like
7  cheese pizza means, you know, child pornography; and
8  those are code words used for pedophilia. And so that
9  was basically a diversion story, kind of a Karl Rove
10  type trick, where we have a big story and they slip this
11  info into it so that everybody then covers that.
12      Q. You told your audience, "Something's going on
13  in that pizzeria," right?
14          MR. BARNES: Objection as to form.
15      A. I mean, I did point out there was a lot of
16  really bizarre art and that Tony Podesta did not hide
17  the fact in the Washington Post 2007, a big write-up
18  about his deviant art, that he likes art that most
19  people would be arrested for, yeah.
20      Q. (BY MR. BANKSTON) You said, "Something's
21  being covered up in that restaurant," right?
22      A. I don't remember saying that specifically.
23      Q. You said, "You have to go investigate it for
24  yourself." Didn't you say that?
25      A. I don't know if that's the exact quote.

114

1    Q.   So if Mr. Zipp reported that in that affidavit
2  in front of you, he would be wrong?
3    A.   I don't know Zipp.  I mean, I don't know
4  Mr. Zipp, so.
5    Q.   Well, Mr. Zipp who's sitting with us, who's
6  the former editor of the Austin-Statesman, he's a UT
7  Journalism Professor.  He prepared that affidavit.  If
8  he messed up and misquoted you, that's a problem, isn't
9  it?
10   A.   Where is it?  I mean, I haven't had a chance
11  to read this.
12   Q.   Well, I'm just asking you --
13   A.   Well, let me read it.  Let me read it then.
14        MR. BARNES:  Which page are we supposed
15  to be at, by the way?
16        MR. BANKSTON:  I'm not actually referring
17  him to a specific page number, but I can.  Let's do
18  that.
19        MR. BARNES:  That would be helpful.
20   Q.   (BY MR. BANKSTON)  I believe that's going to
21  be in the Heslin affidavit.
22        Let's talk about the Plaintiff's Petition
23  then.  Have you seen these statements in the Plaintiff's
24  Petition about Pizzagate?
25   A.   I'm confused.

115

1    Q.   I'm telling you right now that there's a
2  different affidavit that I'm not going to ask you about,
3  about Pizzagate; but I want to ask you about
4  Plaintiff's Petition, the lawsuit that was served on
5  you.
6    A.   Okay.  Can I see it?
7    Q.   I'm not even interested in reading it right
8  now.  I'm just wanting to know:  Do you remember
9  Pizzagate being a subject that came up?  Is that
10  something you've looked into in the past couple of
11  months?
12   A.   I have been very clear the last two years that
13  I believe that there was no illegal activity going on at
14  that pizza place, and I've told people that on record.
15  So I don't know if you're looking for clips to put on
16  the news of me saying something about that, but...
17   Q.   Well, what I'm really getting at, Mr. Jones,
18  is that after you told people to go and investigate it,
19  somebody did and then opened fire there, right?  That
20  happened?
21   A.   No, there's evidence that person did that from
22  any directions I gave him.
23   Q.   Okay.  You made similar allegations on
24  InfoWars.  There are videos about an Austin pizza place,
25  East Side Pies, similar allegations made on InfoWars,

116

1  right?
2    A.   I don't know if I've made those allegations.
3    Q.   You apologized for them, though, didn't you?
4    A.   I think a reporter went and pointed out the
5  same symbol or something.
6    Q.   Did you apologize?
7    A.   I don't remember.
8        MR. BARNES:  Objection as to form.
9    Q.   (BY MR. BANKSTON)  You apologized to Chobani,
10  though, right for publishing stories that they were
11  caught importing migrant rapists, right?
12   A.   That was a technical thing versus there were
13  rapes in the town, but it wasn't the company themselves
14  that brought the rapists in.  It was the policies of the
15  Federal Reserve Board member who owns Chobani.
16   Q.   You apologized?
17   A.   I did.
18   Q.   You also just recently apologized for false
19  reporting on the murder of DNC Staffer Seth Rich?
20        MR. BARNES:  Objection as to form.
21   A.   That was on reporting of another reporter.
22   Q.   (BY MR. BANKSTON)  And last year InfoWars had
23  to apologize for misidentifying an innocent young man as
24  the Parkland High School shooter?
25   A.   I think we did.

117

1        MR. BANKSTON:  I'll tell you what,
2  Mr. Jones, let's take a little break.
3        THE VIDEOGRAPHER:  Off the record
4  2:28 p.m.
5        (Off the record from 2:28 to 2:51 p.m.)
6        THE VIDEOGRAPHER:  We are back on the
7  record at 2:51 p.m.
8    Q    (BY MR. BANKSTON)  Mr. Jones, some of your
9  Sandy Hook reporting -- hold on.  Excuse me, Mr. Jones.
10  I need to grab a file.
11        Mr. Jones, some of your reporting on
12  Sandy Hook involved an anonymous website known as Zero
13  Hedge.  Do you know what Zero Hedge is?
14   A.   Yes.
15   Q.   Okay.  You'll remember that there was an
16  affidavit submitted by one of the Plaintiff's experts
17  that said InfoWars and Zero Hedge promoted and endorsed
18  each other's content.  Do you remember that affidavit?
19   A.   No.
20   Q.   Okay.  You've taken issue with that statement,
21  though?  You don't believe -- that statements not true?
22   A.   I don't know who runs Zero Hedge.  I wouldn't
23  say we have a relationship with them.
24   Q.   Okay.  I want to show you what I'm now marking
25  as Exhibit 7.

Alex Jones - 3/14/2019

118

1        (Exhibit 7 marked.)

2    Q.  (BY MR. BANKSTON)  If you want to take a

3 minute to read this, Mr. Jones, what I have handed you

4 is the August 28th affidavit that you executed in the

5 Heslin case.  Do you want a minute to read that?

6    A.  Sure.  Thank you.

7        (Witness silently reading document.)

8        I'm finished.

9    Q.  Okay.  Mr. Jones, I'd like to direct your

10 attention there at the end of page 1 and spilling onto

11 page 2.  I'm going to read a sentence there for you

12 that's highlighted.  It states, "None of the defendants

13 ever cooperated in any way with Zero Hedge nor have

14 defendants and Zero Hedge ever promoted or endorsed each

15 other's content."  Did I read that correctly?

16    A.  Yes.

17    Q.  Okay.  Now, the next sentence there -- there's

18 been times where Zero Hedge has been cited?

19    A.  Yes.

20    Q.  And commented about?

21    A.  Yes.

22    Q.  Right.  But to talk about you engage in the

23 promotion or endorsement of Zero Hedge content, that was

24 wrong; that's what this document states?

25    A.  Yes, that's wrong.  I mean, I don't know who

119

1 Zero Hedge is.  I've reached out to them before and

2 said, "Hey, who are you?  I would like to you to come on."

3 And there's been no response back.

4        I've said, "Wow, this is a good article

5 from Zero Hedge," like I've said The New York Times has

6 a good story; but I don't have any relationship with

7 them.

8    Q.  Right.  Okay.  Well, I want to show you a

9 video of you talking about Zero Hedge that was taken on

10 June 13, 2017.  This clip, unfortunately, is not

11 available online anymore.  What you're about to see has

12 been downloaded from a website called

13 sandyhookfacts.com.  So I want to show you that video,

14 which is just a recording of yours.

15        MR. BANKSTON:  Can you play the clip

16 called Zero Hedge?

17        (Video playing.)

18    Q  (BY MR. BANKSTON)  When you said in your

19 affidavit that InfoWars and you have never promoted or

20 endorsed Zero Hedge's content, that was a false

21 statement?

22        MR. BARNES:  Objection as to form.

23    A.  I just said before you played the clip that

24 I've said they've done good reporting.

25    Q.  (BY MR. BANKSTON)  Sure.  But, Mr. Jones --

120

1    A.  That's not an endorsement.  I don't know who

2 they are.

3    Q.  You're going to tell us that that clip we just

4 saw was not you promoting and endorsing Zero Hedge's

5 content?

6        MR. BARNES:  Objection as to form.

7    A.  I just told you I said I think they do good

8 reporting.

9    Q.  (BY MR. BANKSTON)  You think that the

10 statements that you've made in that affidavit were

11 honest, forthright, and complete?

12    A.  Yes.

13    Q.  Okay.  Mr. Jones, you've said in testimony in

14 this case that you've used blue screens before, you have

15 experience with blue screens, and that there can be

16 anomalies if the blue screen is not properly aligned,

17 correct?

18    A.  Yes.

19    Q.  Tell me how to align a blue screen.

20    A.  It depends if it's an older Chromakey model or

21 it depends if it's dozens and dozens of different

22 digital units; but if the lighting isn't correctly

23 displayed against the green screen or blue screen --

24 it's whatever color you really dial it to.  TVs use blue

25 screens; a lot of entertainment stuff, green.  But it

121

1 doesn't matter.  It can be any color that's not really

2 common that's not going to be on your shirt or on your

3 tie because it will make that disappear as well.

4        And, also, if there's kind of a blue hue

5 to your nose or in the event of a rising point, noses

6 turning is generally the Number 1 thing that disappears;

7 or any hairs that are amiss can create a blue shimmer

8 off of television lights and you'll see areas that

9 disappear.  And so that's a telltale sign not of digital

10 breakup, but it's squares.

11    Q.  How do you align it?  What does that mean,

12 aligning the blue screen?

13    A.  I mean, that's not even really a technical

14 term.  You have to turn the lights on, put people in a

15 chair, and make sure the lights are properly set up to

16 then work in the blue screen system.

17    Q.  Can you pull up Exhibit 1?

18    A.  This is 7.

19    Q.  And can you look at Paragraph 3 of Exhibit 1?

20 This not technical term, "aligned," that's your term,

21 right?  You used it in this sworn affidavit, correct?

22    A.  Well, yeah.  I mean, I would call -- when you

23 dial just like two different dials, lights, and a thing

24 to make them work together, I'd call that aligned.  I

25 mean, that's a pretty good word.  I guess you could call

122

1    it "sync" or --
2       Q.   So the lights -- you're talking about the
3    lights need to be aligned, not a blue screen?  You've
4    got to dial something on a light?
5       A.   Well, no, the lights and the computer program
6    have to be aligned.  You have to look at a color scope.
7    You have to make sure the colors are all lined up or it
8    won't work.  You have to be perfectly aligned.  And
9    that's either on an old spectrum system or you align
10   them on a digital system.  That's called -- that's
11   aligning on that.  It's on the scope.  And now those
12   scopes are digital.  So you align the scope,
13   technically.  After you align the scope, then you have
14   to align the lights with the scope so that it hits the
15   settings of the Chromakey system.
16      Q.   You would be able to, I think, through your
17   years of experience and exposure to these kinds of
18   videos -- you've seen them before, the most common type
19   of nose disappearing stuff -- you would be able to
20   produce to us examples of blue screen videos with noses
21   disappearing, just like Anderson Cooper's, right?
22      A.   I think I could probably find those.
23      Q.   Yeah, that's something that you could produce?
24      A.   I can't guarantee it, but that's pretty --
25   like, have you ever seen, like, the weather person and

123

1    they're, like, wearing the wrong colored tie and it does
2    that?  I mean...
3       Q.   Absolutely.  And so if they're wearing a blue
4    shirt, all of a sudden it looks like their shirt's
5    invisible, right, because it's the same color as the
6    blue screen, right?
7       A.   Or it might be set to green and then somebody
8    sets it blue and, you know -- or somebody hits it; and
9    it goes to brown and all of a sudden the rest of their
10   clothes disappear.
11      Q.   And the whole shirt disappears?
12      A.   There is a dial.  You can dial it to any color
13   you want.
14      Q.   Okay.
15      A.   At least on those units, older units.
16      Q.   Okay.  What kind do you have at InfoWars?  You
17   said you have one in the back?
18      A.   Oh, we have quite -- most of them that we
19   have -- we probably have about ten of them.
20      Q.   Okay.
21      A.   The average news computer system has them.
22      Q.   You still have them, all ten of them?
23      A.   That's not an accurate statement.  We probably
24   have 50.
25      Q.   You have 50 blue screen mechanical devices?

124

1       A.   No, I said I have blue screens still.  They're
2    on all your major video editing software now.
3       Q.   Okay.
4       A.   And then we have -- somewhere we might
5    actually have an old-fashioned tube-based one.  And I
6    say 50.  Do we have 50 computers?  I mean, we probably
7    have 50 computers, old and new.
8       Q.   Now, those blue screens -- in other words,
9    what InfoWars uses to create blue screens, that still
10   exists, is available for inspection, correct?
11      A.   Well, it's standard on Final Cut Pro.  It's
12   standard on all those editing systems.  Just you can go
13   to the store and buy them.
14      Q.   Okay.  So whatever InfoWars has that it's
15   claiming gives it knowledge of how blue screens work,
16   that still exists; you haven't gotten rid of that stuff,
17   right?
18      A.   No.  We've got a couple of green screens up on
19   the walls.
20      Q.   Perfect.  Okay.  One of the things that you
21   talked about -- remember we said we were going to put a
22   pin in it, about blue screens is one of the reasons that
23   you were suspicious about this interview and blue
24   screens is because CNN's got caught using blue screens
25   before, right?

125

1       A.   Uh-huh.
2       Q.   And, in fact, one of the things you brought up
3    was about CNN getting caught using blue screens in the
4    Gulf War?
5       A.   Uh-huh.
6       Q.   On the satellite feeds, right?
7       A.   Yes.
8       Q.   Okay.  I want to play you a video really quick
9    from something you said on May 13th, 2014 about these
10   blue screens.
11           MR. BANKSTON:  Can you play CNN Blue
12   Screen for me?
13           (Video playing.)
14      Q    (BY MR. BANKSTON)  Now, Mr. Jones, you've seen
15   there was actually a satellite feed leak -- a leak of
16   this that you've seen, right?
17      A.   Uh-huh.
18      Q.   Okay.  Is that a "yes"?
19      A.   Yes.
20      Q.   Okay.
21           (Exhibit 8 marked.)
22      Q.   (BY MR. BANKSTON)  Mr. Jones, I'm going to
23   hand to you what I've marked as Exhibit 8.  You
24   recognize this leak from the Charles Jaco CNN broadcast
25   where he's got the blue screen behind him?  You

126

1  recognize that?
2      A.  Yes.
3      Q.  Okay.  And this was something that some people
4  recorded off of a satellite leak?
5      A.  I believe so, a long time ago.
6      Q.  Okay.  And you've done some reporting about
7  this on InfoWars.  You've shown this video and what
8  happened that day?
9      A.  Yes.
10     Q.  Okay.  And as we see from here, you can see
11  kind of on the left-hand side and on the right-hand
12  of the screen, there's this big blue screen up behind them,
13  right?
14     A.  Uh-huh.
15     Q.  Right?  Because they left it on.  I mean, they
16  didn't put anything on it because they were on a
17  satellite kind of practice feed, I think, right?
18     A.  I don't remember all the particulars, but they
19  admitted they weren't on location.
20     Q.  Okay.
21     A.  And then, again, it's not like the background
22  turns on.  It's that the computer overlays it.
23     Q.  Right.  It's not like actually on the --
24  there's something up on the screen.  The computer takes
25  care of that in postproduction?

127

1      A.  Or does it live.
2      Q.  Or does it live, right.  Okay.
3          But that CNN studio, that setup -- what
4  I'm going to hand you now is what's been marked as
5  Exhibit 10.
6          (Exhibit 10 marked.)
7      Q.  (BY MR. BANKSTON)  Do you think ABC News and
8  Forrest Sawyer was given access to Ted Turner's secret
9  studio?
10         MR. BARNES:  Objection as to form.
11     A.  I don't even know anything about this.  I
12  mean, I know they were...
13     Q.  (BY MR. BANKSTON)  You've never seen that
14  picture?
15     A.  No.  I believe that CNN and others, especially
16  CBS partners with other groups routinely; but that's
17  conjecture.  I don't know.
18     Q.  Okay.  So I take it you've never done any sort
19  of research as to where these interviews were allegedly
20  done or CNN says they were done?
21     A.  You know, this was so long ago.  I remember
22  seeing PBS documentaries about this.
23     Q.  Let me show you an exhibit about that.
24         (Exhibit 9 marked.)
25     Q.  (BY MR. BANKSTON)  I'm going to hand you now

128

1  what I've marked as Exhibit 9.  You've never seen the
2  International Hotel in Riyadh, Saudi Arabia, have you?
3      A.  No.  I know that's where they said they were
4  broadcasting from.
5      Q.  I'm going to show you what I'm marking as
6  Exhibit Number 11.
7          (Exhibit 11 marked.)
8      Q.  (BY MR. BANKSTON)  You've never seen the
9  photographs for the satellite setups for the major
10  networks at the International Hotel in Riyadh, Saudi
11  Arabia, have you?
12     A.  Nope.  I just know Jaco says that they staged
13  a chemical attack that didn't happen.
14     Q.  You know that Jaco admits is what you're
15  saying?  You've seen clips of Charles Jaco saying it
16  was --
17     A.  Yeah, it came out later that there wasn't
18  nerve gas in the air and all that and that they staged
19  some of the shots on blue screen.
20     Q.  So you're maintaining that that thing behind
21  them in that shot is a blue screen used for compositing
22  and not just the walls of the International Hotel in
23  Riyadh that was on every broadcast during that time?
24         MR. BARNES:  Objection --
25     Q.  (BY MR. BANKSTON)  That's what you're saying?

129

1          MR. BARNES:  Objection as to form.
2      A.  Well, no.  They were saying they were there.
3  They weren't saying they were projecting that behind
4  them.  I get your confusion about the blue thing or my
5  confusion.  This was a long time ago.  It's not debated
6  that CNN staged location shots.
7      Q.  (BY MR. BANKSTON)  They didn't stage that
8  shot, did they?  That shot was in front of the
9  International Hotel in Riyadh.  That was not a staged
10  shot.
11     A.  Yeah, they put the gas masks on through the
12  whole thing and then they stopped during the breaks and
13  it's all a big joke.
14     Q.  I'm not really concerned with what they did on
15  the broadcast.  You said that they were in a secret
16  broadcast center in Atlanta when they said they were in
17  Riyadh.  You were wrong.  That was false.  They were
18  actually in Riyadh.  You can admit that?
19     A.  I can't say that.
20     Q.  In fact, you don't know.  When you were saying
21  that they were not in Riyadh, you had no idea?
22     A.  I think you're mixing things together.
23     Q.  Okay, Mr. Jones.
24     A.  You're right.  Colin Powell, the anthrax was
25  real.  You're right.  Nothing sticks.

130

1    Q.   There was a lot of reporting during the Gulf
2    War, a lot of people doing really hard work to uncover
3    the fact that those aluminum tubes were total bunk.
4    That wasn't WMDs, right?
5    A.   Were they wrong to question that.
6    Q.   Absolutely.   There was a lot of people
7    questioning that.   They did some really good reporting.
8    They found out, for instance, that some of the
9    allegations of torture in Kuwait were total bunk; it was
10   total propaganda.   Some good journalists found that --
11   A.   The babies in the incubators?
12   Q.   I think that's some of it, isn't it?   Not just
13   the babies in the incubators, though.   There was a lot
14   of false things being told to the American public to get
15   them to go to war, wasn't there?
16   A.   Yeah.
17   Q.   And a lot of reporters did really good work
18   doing it and finding out what those things were.   There
19   were some really good reports, right, an incubator
20   report, for instance?
21   A.   Yeah.   Yeah.   I was pretty young then, but
22   yeah.
23   Q.   So those good journalists did good work
24   uncovering those facts; but your work on the blue screen
25   allegation in the Gulf War, that wasn't good journalism,

131

1    was it, Mr. Jones?
2    A.   No.   They admitted they did blue screen shots
3    from Atlanta and a whole bunch of places.
4    Q.   That's where you're doubling down; you're
5    saying that that's a fact?
6    A.   I'm saying you're mixing things together, so I
7    can't say anything further.
8    Q.   Okay.   I want to talk a little bit --
9    actually, I want to go back to something you said
10   earlier, which is that you have CIA sources who told you
11   that something's up in Vegas --
12   A.   Yep.
13   Q.   -- something funny's going on in Vegas.   Who?
14        MR. BARNES:   Objection, and we'll
15   instruct the witness not to answer on journalistic
16   privilege.
17        MR. BANKSTON:   Gotcha.
18   Q.   (BY MR. BANKSTON)   Well, what did you hear?
19   What did this person tell you?
20        MR. BARNES:   The same instruction not to
21   answer if it in any way will disclose their identity.
22        MR. BANKSTON:   Yeah, I'm not asking for
23   their identity.
24        THE WITNESS:   Go ahead.
25   Q.   (BY MR. BANKSTON)   What did they tell you?

132

1    A.   I got contacted in the morning with -- I got
2    contacted by an individuals assigned to the SERF Teams
3    CIA Assassination squads who had people inside the
4    hostage rescue team in Vegas and they said that he was
5    selling weapons to the Gihadies and that they had
6    paraphernalia for the Gihadies in the Middle East, that
7    he was an arms dealer.   I mean, the Saudis were having a
8    civil war.
9         They were having an event with the Saudi
10   military, over 10,000 of them in Las Vegas that weekend
11   as part of a larger event, and that as basically inside
12   the Saudi Arabia civil war that they used the arms deal
13   to get weapons inside of the United States and that they
14   then killed the patsy and then carried out the operation
15   and that the whole thing was basically a Saudi civil
16   war.   And a lot of that later came out.
17   Q.   Came out where?
18   A.   It came out in the news that he went to the
19   Middle East.   It came out that he had been involved in
20   arms dealing.   And I also had to sign nondisclosures
21   that I can't get into subsequently with other
22   information.
23   Q.   You've signed nondisclosures?
24   A.   Uh-huh.
25   Q.   With whom?

133

1    A.   I can't talk about it.
2    Q.   Okay.   Well, what about:   What's the general
3    topic that you can't disclose?
4    A.   I can't talk about it.
5    Q.   Okay.   So apparently there's some
6    nondisclosure agreement that you've signed with some
7    unnamed person that is relevant to the allegations that
8    you were making about Las Vegas?
9    A.   Yes.
10   Q.   Okay.   And you can't -- for reasons of that
11   nondisclosure, you can't disclose anything about that
12   today?
13   A.   No, I can't.
14   Q.   Was that a government person that you did the
15   nondisclosure with?
16        MR. BARNES:   Objection, and we'll
17   instruct the witness not to answer to the degree it
18   could disclose his identity, which that question
19   basically would.
20   Q.   (BY MR. BANKSTON)   Was it a corporate entity?
21        MR. BARNES:   The same instruction not to
22   answer on the grounds of the journalistic privilege
23   shield as something that may identify or lead to the
24   identification of the individual person.
25   Q.   (BY MR. BANKSTON)   Was it a real person or an

Alex Jones - 3/14/2019

---

**134**

1 imaginary person?

2     A.  Oh, it's real.

3     Q.  It's a real person.  So there is a contract.

4 If we needed it, we could get it?  It exists?  Do you --

5     A.  I already told you it exists.

6     Q.  Do you own a copy?

7         THE WITNESS:  We have a copy of that,

8 don't we?

9         MR. BARNES:  Well, he's just asking

10 whether you --

11     A.  Yes, we have a copy.

12     Q.  (BY MR. BANKSTON)  Okay.  Thank you,

13 Mr. Jones.

14         Let's talk a little bit about sources.

15 What is InfoWars' policy on using unnamed sources?

16     A.  If they've been credible in the past and have

17 been good sources, then we report from an unnamed

18 source.

19     Q.  Who is in charge or makes the decision on if

20 the source is credible?

21     A.  Paul Watson, myself, Rob Dew.

22     Q.  Okay.  You talked a lot about covering

23 Internet --

24     A.  Let me be clear:  Paul does his own thing.  So

25 he does his reporting and then helps us out with other

---

**135**

1 stuff.

2     Q.  Okay.  So it's you and Rob who assign

3 credibility to sources?

4     A.  Yes.

5     Q.  Okay.  You talked a bit about covering the

6 Internet and what's being said on the Internet.  On when

7 you cover the Internet and the stuff that's being said

8 there, are there particular places that you consider

9 important places to look on the Internet for what's

10 really being said and what's happening?

11     A.  Yes.

12     Q.  What are some of your primary sources on the

13 Internet to get Internet chatter?

14     A.  I mean, everything from the Intercept to the

15 New York Times to Drudge Report to CNN -- I mean, we

16 just look at everything -- to the Congressional Record.

17     Q.  Well, I mean, I understand you look at media,

18 mass media and government reports; but I'm talking about

19 Internet chatter, what the people are talking about

20 online.  How do you get a pulse of that?

21     A.  It's not even getting a pulse.  In the past we

22 would cover whatever the big chatter was if I thought it

23 was interesting and the crew did.  We basically try not

24 to even do that anymore because it always gets assigned

25 on us when we cover even big stories because if, like,

---

**136**

1 CNN takes the angle on Pizzagate and makes it huge --

2 Washington Post, New York Times, CNN -- they make

3 whatever they're reporting on the huge thing; and then

4 we go report on this huge thing that the media, the

5 corporate media, actually went, like, a honey pot and

6 set up.  So more and more I try to not even report on

7 whatever the big thing on 4chan or, you know, any of

8 these sites are talking about.  I directly stay away

9 from them now.

10     Q.  Okay.  4chan, let's just pick that one up

11 first.

12     A.  Yes.

13     Q.  That's an anonymous image board, right?

14     A.  Yes.

15     Q.  The posters there are assigned a random

16 number, right?

17     A.  Yes.

18     Q.  InfoWars has frequently used 4chan as a

19 source?

20     A.  We've reported on things being reported at

21 4chan.

22     Q.  As a source, right?  That's what a source is,

23 isn't it?

24     A.  Yes.

25     Q.  Okay.

---

**137**

1     A.  I mean, if somebody was e-mailing you, you

2 could say technically it was a source --

3     Q.  Sure.

4     A.  -- even if you never even open it.

5     Q.  Any piece of information that you're going to

6 report secondhand is a source, right?

7     A.  Yeah.

8     Q.  It was the source of that information?

9     A.  Yeah.  Like, if somebody draws on a bathroom

10 wall, it could be a source.

11     Q.  Now, for instance, one of the things we've

12 talked about is misidentifying the Parkland shooter.  We

13 talked earlier about misidentifying the Parkland shooter

14 last year.  InfoWars' source was 4chan, right?

15     A.  I don't remember that, but we corrected it

16 within a day.

17     Q.  Well, I mean, I didn't ask you anything about

18 correction, right?  What I'm asking is:  Do you or do

19 you not know if 4chan was your source?

20     A.  I believe it was one of the places that put it

21 up.

22     Q.  Okay.

23     A.  That's why I told --

24     Q.  So that's what I was kind of asking when I

25 say:  Where do you get your chatter?  4chan is one.  Do

---

138

1  you have any others for us?
2      A.  Yeah, e-mail, what people are talking about on
3  the street.
4      Q.  Well, I mean, specifically we're talking about
5  honing in on this idea that there were people on the
6  Internet chattering about Sandy Hook.  The Internet was
7  talking about it.  You know --
8      A.  I would say YouTube.  The videos within the
9  first two weeks with, like, 5 million, 10 million views,
10  plus; and they were showing a lot of things that when
11  you looked at it, looked pretty compelling.
12      Q.  Okay.  So there were people making videos on
13  YouTube.  You had some of those people on your show,
14  right?
15      A.  I'm not -- I can't remember.
16      Q.  Okay.  You know who Q.K. Ultra is?  Have you
17  heard that name?
18      A.  (No audible response.)
19      Q.  Do you know who the Independent Media
20  Solidarity Group is?  Have you ever heard that name?
21      A.  No.
22      Q.  Do you know Peter Klein and his film, Let's
23  Talk About Sandy Hook?
24      A.  No.
25      Q.  Do you know the book Nobody Died at Sandy

139

1  Hook?
2      A.  I've not read it.
3      Q.  Okay.  All of these things have been sources
4  for you, though, right?
5      A.  No, I don't think Fetzer, by the time he wrote
6  that book, was a source.
7      Q.  There was a broadcast with Mr. -- discussing
8  Mr. Heslin in 2017 about his statements on the Megyn
9  Kelly show.  Do you know what I'm talking about?
10      A.  Can you give me specifics?
11      Q.  Yeah, you were sued over it by Mr. Heslin.  Do
12  you know what broadcast I'm talking about now?
13      A.  Well, I mean, what specifically?
14      Q.  Mr. Jones, do you understand that Neil Heslin
15  sued you?  Do you understand that?
16      A.  Well, you're asking me about a specific
17  broadcast; and I'm saying:  What broadcast?
18      Q.  Right.  First, I'm asking you:  Do you
19  understand Neil Heslin sued you?
20      A.  Yes.
21      Q.  Okay.  Are you telling me that you don't know,
22  sitting right now, what broadcast he sued you for?
23      A.  I mean, I'm asking you to give me the
24  specifics, like, so you can get me to comment.
25      Q.  No, I'm asking you right now.  That's what I

140

1  want to know a question to.  Do you even know what
2  Mr. Heslin sued you for?
3          MR. BARNES:  Objection as to this being
4  outside of the scope.
5          MR. BANKSTON:  He's an individual.
6          THE WITNESS:  This is Scarlett Lewis,
7  right?
8          MR. BANKSTON:  Right.  There's no
9  30(b)(6) Notice here.  He don't have a scope.
10          MR. BARNES:  Sure there is.
11          MR. BANKSTON:  If he has personal
12  knowledge, he can answer it.  Are you instructing him
13  not to answer?
14          MR. BARNES:  It's an objection.
15      Q.  (BY MR. BANKSTON)  Okay.  Then you can go
16  ahead and answer, Mr. --
17          MR. ENOCH:  Well, don't tell him there's
18  no scope, Mark.
19          MR. BANKSTON:  I have no idea, Mr. Enoch,
20  what you mean.  Is there something in the Order that you
21  think there's a scope?  I don't see a scope.
22          MR. ENOCH:  The Court said you were
23  allowed to ask things consistent with your RFPs.
24          MR. BANKSTON:  Yeah, whether Mr. Heslin
25  was defamed is relevant to my case.  You know that.  The

141

1  document request was all about Mr. Heslin.
2          MR. ENOCH:  I --
3          MR. BANKSTON:  Don't even start this with
4  me.
5          MR. ENOCH:  Let me finish, please.
6          MR. BANKSTON:  I would rather you not
7  because you're not defending this deposition, Mr. Enoch.
8  I've had an extraordinary amount of patience with you
9  speaking during this deposition, but we're not going to
10  do this to you when we defend depositions.
11          MR. ENOCH:  Do not misrepresent to this
12  lawyer that the Judge did not restrict the scope to the
13  limit -- limited to the RFPs.  Do you agree that he
14  limited it to that?
15          MR. BANKSTON:  No, I don't think so --
16          MR. ENOCH:  Okay.
17          MR. BANKSTON:  -- not to an RFP, no, I
18  don't think so.
19          MR. ENOCH:  You don't think so?
20          MR. BANKSTON:  No, Mr. Enoch, I don't
21  think the scope of written discovery on a Request For
22  Production was identical to the scope of deposition.
23  And many, many times, Mr. Enoch, the Judge said, "No,
24  you can't ask that question for a Request For
25  Production; but you can just ask it in deposition."  So,

Alex Jones - 3/14/2019

---

142

1  no, I don't agree with you at all; and I would
2  appreciate it if kept quiet for the remainder of the
3  deposition. You are not defending this deposition.
4        MR. ENOCH: Mr. Bankston, I will speak if
5  it's appropriate for to speak.
6        MR. BANKSTON: It is not appropriate for
7  you to speak.
8        MR. ENOCH: Please don't interrupt me,
9  sir. That's not courteous.
10        MR. BANKSTON: Sir, I'm going to ask you
11  to leave my deposition.
12        Go off the record for a second.
13        MR. ENOCH: No, I do not agree to go off
14  the record.
15        MR. BANKSTON: All right. Don't go off
16  the record.
17        Mr. Enoch, I'm asking you to leave my
18  deposition. You are being obstructive. You are
19  talking. You are not appearing at this deposition. You
20  are not defending it. If you do not agree to be quiet,
21  I'm asking you to leave the deposition. Are you going
22  to stay and be quiet, or am I going to have to ask you
23  to leave?
24        MR. ENOCH: Mr. Bankston, I am not
25  leaving the deposition.

---

143

1        MR. BANKSTON: Then you're going to stay
2  quiet.
3        MR. ENOCH: Would you like to continue
4  your deposition?
5        MR. BANKSTON: I am. And if you leave
6  again -- if you keep speaking, I guarantee you I will
7  seek sanctions against you, Mr. Enoch.
8    Q   (BY MR. BANKSTON) Mr. Jones, does --
9  interactions with readers and viewers, that tends to
10  help drive what you do on the show, right?
11    A   Somewhat.
12    Q   I mean, if viewers want you to cover
13  something, that's a motivator for you to cover it?
14    A   Sometimes. Not so much.
15    Q   And, in fact, you've said about Sandy Hook,
16  "This is what our viewers wanted us to cover. That's
17  why we were covering it."
18    A   Yes, it was an Internet sen -- a big deal
19  early on.
20    Q   And, in fact, when you weren't covering it so
21  much, whenever you stopped covering it for a little bit,
22  your viewers would get upset. And they'd be like, "Why
23  aren't you covering Sandy Hook; it's a hoax"?
24    A   Yes, people, the public -- the public in
25  general had major questions. I mean, even the Hartford

---

144

1  Current did. They said that they'd never seen stuff
2  covered up like this.
3    Q   Right.
4    A   I mean, I knew FBI agents and people that
5  said there was something weird going on with it.
6    Q   One of them was his uncle, right?
7    A   Yes, Rob Dew's uncle, right.
8    Q   Yeah. He was up there with Mr. Halbig and
9  Mr. Bidondi and Mr. Reich.
10    A   We didn't even know he was going.
11    Q   Right. I'm not saying you did. I'm saying he
12  was up there?
13    A   Yep.
14    Q   Yeah.
15    A   Career, retired FBI, yep.
16    Q   Right. With Mr. Halbig and Mrs. Kay Wilson,
17  Mr. Bidondi --
18    A   There was a big City Council meeting there.
19    Q   Yeah. Mr. Reich was there?
20    A   I don't know who those folks are.
21    Q   Okay. Now, Mr. Dew, he has been frequently
22  sent as the news director of InfoWars -- hold on. Let
23  me back that up because I'm making an assumption.
24        Mr. Dew's the news director of InfoWars?
25    A   For some of the programs. We don't do the

---

145

1  nightly news anymore; but he was directing those shows,
2  yes.
3    Q   Okay. So Mr. Dew had been, over the years,
4  sent e-mails and communications and tweets from Sandy
5  Hook debunkers. Do you know what I mean when I say
6  that?
7    A   Yes.
8    Q   Okay. And Mr. Dew had been told by these
9  people, "What you're saying is wrong. You need to stop
10  saying it. Here's the real truth"? You understand --
11    A   Oh, I thought you meant debunkers debunking
12  the official story.
13    Q   No, I mean those who were debunking what he
14  were saying about Sandy Hook.
15    A   Yes, and then we would offer for them to come
16  on air and cover what they said.
17    Q   And, in fact, you had been given information
18  by them; they had given you information?
19    A   And we put it on air.
20    Q   And you had a debate with a guy named Keith
21  Johnson, right?
22    A   I don't think I did.
23    Q   Well, okay. So there was a debate hosted on
24  InfoWars between Keith Johnson and Mr. Halbig?
25    A   Was that the -- I forget the name of the

---

146

1  newspaper guy.  I can't remember the name.
2      Q.  Well, Keith Johnson, he's a former InfoWars
3  contributor, right?
4      A.  Well, there's a lot of articles that people
5  contribute, whether a letter to the editor or --
6      Q.  That's not what I'm not talking about,
7  Mr. Jones.  Keith Johnson was a paid contributor to
8  InfoWars?
9      A.  Not to my memory.
10     Q.  Okay.  So there was this debate that Mr. Dew
11 hosted, and would you agree with me that was sometime
12 around 2015?
13     A.  I don't remember.
14     Q.  Okay.  Mr. Dew, in addition to those debates,
15 has been provided written information from a lot of
16 these debunking people seeking to stop the allegation
17 that it's a hoax.  You would agree with that?
18     A.  Yes.  There was a big Internet fight going on,
19 and we were showing both sides.
20     Q.  Right.  And so in terms of information about
21 these anomalies, some of the things that I've been
22 showing you today were in Mr. Dew's possession, correct?
23         MR. BARNES:  Objection as to form.
24     A.  I don't understand.  There's been an ongoing
25 debate back and forth on these issues.

147

1      Q.  (BY MR. BANKSTON)  Okay.  Do you know who a
2  person named C.W. Wade is?
3      A.  No.
4      Q.  Okay.  You've never heard of that person's
5  debunking efforts about what you've been saying?
6      A.  I've told you like, I don't live, eat,
7  breathe, sleep, this stuff.
8      Q.  I get you.  I'm just asking questions.
9      A.  I'm just really -- if I had it all over to do,
10 I'd do a better job; but I didn't do it on purpose to
11 malicious.  And everybody wanted to have debates about
12 it; and I said years ago -- probably, like, five years
13 ago I said, "No more of this.  I'm sick of it.  It's a
14 tar baby.  I think it probably happened."
15         But then we'd see stuff in the cover-up
16 and them never releasing documents and the Hartford
17 Current saying, "It looks like a cover-up's going on.
18 We don't think it's a hoax; but, you know..."
19         And so it's just a tar baby.  I'm sick of
20 it.  And so that's why there's so many apologies and
21 statements that I'm sorry, you know, that I was even
22 ever covering it because I don't want it to be my
23 identity.  I'm tired of it.
24     Q.  What question are you answering?
25     A.  I mean, I'm answering your question about, you

148

1  know, these debates in this; and I'm trying to state --
2  what I'm saying is we invited everybody on.  We had
3  debates.  And if I remember that debate correctly, isn't
4  that when Halbig really got mad was because we pretty
5  much, you know, disagreed with him?
6          MR. BANKSTON:  Can you scroll up?
7          (The reporter complies.)
8          THE WITNESS:  I mean, I'm really trying
9  to be helpful.
10     Q.  (BY MR. BANKSTON)  Mr. Jones, I asked you:  Do
11 you know C.W. Wade?
12     A.  I don't know him, no.
13     Q.  Thank you, sir.
14         I want to talk a little bit about
15 InfoWars, LLC.  Have you ever taken money from InfoWars,
16 LLC?
17         MR. BARNES:  Objection.  And my
18 instruction is to privacy.  Unless it's Sandy Hook
19 specific or relevant, I'll instruct the witness not to
20 answer consistent with the constitutional right to
21 privacy protected under both the Texas Constitution and
22 the United States Constitution.
23         MR. BANKSTON:  Wow.  Okay.  We'll take
24 that up another day, I guess.  Wow.
25         MR. BARNES:  I mean, I can go to other

149

1  cases if you want me to.
2          MR. BANKSTON:  I mean, I don't at all,
3  Mr. Barnes.
4      Q.  (BY MR. BANKSTON)  InfoWars, LLC, has it ever
5  had any money?
6          MR. BARNES:  Objection, same instruction
7  to the witness not to answer on the grounds of privacy.
8      Q.  (BY MR. BANKSTON)  What is InfoWars, LLC?
9      A.  I don't believe it's even an operating
10 company.
11     Q.  So it's your allegation it's not an active
12 corporation by the Secretary of State?
13     A.  You know, I'm not the expert on this.  So I
14 probably shouldn't answer it because I don't want to
15 state it wrong, but I...
16     Q.  Okay.  You made InfoWars, LLC; you created it?
17     A.  You know, I'm not one of the lawyers.  So I
18 don't want to answer it wrong.
19     Q.  Nobody else is involved.  It's nobody else's
20 company, right?
21         MR. BARNES:  Objection and instruct the
22 witness not to answer on the grounds of privacy that
23 could also invade the privacy of third parties.
24         MR. BANKSTON:  Okay.
25     Q.  (BY MR. BANKSTON)  InfoWars, LLC, what does it

Alex Jones - 3/14/2019

150

1  do?  What has it ever done as a business?
2      A.  I don't know.
3      Q.  Okay.  Do you have any job duties at InfoWars,
4  LLC?
5      A.  I mean, as you heard, I'm not going to get
6  into structure of things.  Plus, I'm not a CPA or a
7  lawyer.  I don't want to say it wrong.
8      Q.  Okay.  Have you ever had job duties at
9  InfoWars, LLC in the past?
10     A.  I don't want to say -- I mean, I think I'm the
11  only -- it's -- I'm the sole person.
12     Q.  Has InfoWars, LLC ever had an office?
13     A.  I really don't understand.  I don't know what
14  you're getting at.
15     Q.  Do you know what an office is?
16     A.  No, I don't understand.  Like, you're asking
17  me whether a corporation has an office.
18     Q.  Uh-huh.
19     A.  The company has offices at Free Speech
20  Systems.
21     Q.  Well, so if I was to ask you:  Does Free
22  Speech Systems have an office, the answer's "yes"?
23     A.  I think, yeah, it's on the letterhead, yeah,
24  that's what...
25     Q.  Okay.  Let's try InfoWars.  Does InfoWars, LLC

151

1  have an office?
2      A.  You know, I don't want to inaccurately answer
3  that, so I can't.
4      Q.  Okay.  Who would be the person at InfoWars,
5  LLC who could answer that?
6      A.  You know, the corporation got set up a long
7  time ago; and I'm not sure who you'd ask those
8  questions.
9      Q.  Okay.  Now, when it comes to Free Speech
10  Systems, LLC, you're the boss?
11     A.  Uh-huh.
12     Q.  There's nobody with more power at Free Speech
13  Systems, LLC than you?
14     A.  I make all the major decisions.  I'm the --
15  the buck stops with me.
16     Q.  You make final call on anything that goes to
17  air?
18     A.  I mean, I don't sit there and watch over
19  everything.  I try to have good people that are smart
20  and are trying to tell the truth.
21     Q.  But, I mean, you have the authority.  If
22  something's going to air and you find out and you don't
23  want it on air, you can stop it?
24     A.  Yes.  I told you:  The buck stops with me.
25     Q.  Okay.

152

1          THE WITNESS:  Can I have a water, please?
2  Thanks.
3          MR. ENOCH:  Sure.  There's not an extra
4  cup.
5          THE WITNESS:  It's fine.
6          MR. ENOCH:  I'll just give you a coffee
7  cup.
8          THE WITNESS:  Thank you.
9          Is it okay to break for ten minutes and
10  eat?
11         MR. BANKSTON:  Yeah.  You know what, this
12  is not a bad spot.  We're at 3:30 right now.
13         THE WITNESS:  Thanks.  All I need is ten
14  minutes.
15         MR. BANKSTON:  Ten or fifteen is fine.  I
16  mean, if we can come back here by 3:50, I can get us out
17  of here before 5:00.
18         THE VIDEOGRAPHER:  Off the record at
19  3:29 p.m.
20         (Off the record from 3:29 to 3:42 p.m.)
21         THE VIDEOGRAPHER:  We're back on the
22  record at 3:42 p.m.
23     Q   (BY MR. BANKSTON)  When was the last time you
24  did anything for InfoWars, LLC?
25     A.  I'm sorry.  I can't accurately answer that.

153

1      Q.  Was InfoWars, LLC in the news business?
2      A.  I don't think I can accurately answer that.
3      Q.  We've talked a lot about Free Speech Systems
4  employees today, like Mr. Dew.  Did Mr. Dew ever do
5  anything for InfoWars, LLC?
6      A.  InfoWars, LLC's a real corporation.  It's
7  inactive.  And it was set up to deal with something like
8  intellectual properties or something, like, ten years
9  ago; and that was just kind of like a basic corporate
10  structure.  It's pretty standard, I'm told; but I'm not
11  a lawyer.  And so -- but, I mean, it's filed with the
12  State.  It's up to date.  It's just not -- I think the
13  things we were going to do with it we never did fully.
14  I think that's -- but I'm not a lawyer, but that's the
15  best of my understanding of that.
16         MR. BANKSTON:  Object as nonresponsive.
17     Q.  (BY MR. BANKSTON)  I asked you if Mr. Dew had
18  ever done anything for InfoWars, LLC.  Is that "yes" or
19  "no"?
20     A.  I don't believe so.
21     Q.  Okay.  What about -- help me with this name --
22  Tim Fruge?
23     A.  "Fruge."
24     Q.  "Fruge."  Did Tim Fruge do anything for
25  InfoWars, LLC?

154

1   A.  No.
2   Q.  Does InfoWars, LLC have anything to do with
3  the InfoWars, LLC website?
4   A.  I don't want to state it wrong, but I think
5  so.  Yeah, I think that's the whole point is that
6  different things had a different company.
7   Q.  Okay.  Regarding sourcing, would you put
8  information on the air from a source if nobody at
9  InfoWars knew their identity?
10   A.  No, not generally.
11   Q.  Okay.  And that's because if you can't verify
12  their identity of who's telling you the information, you
13  can't assess its credibility, can you?
14   A.  Well, if we got an anonymous call that there
15  had been a gas explosion in South Austin, we'd go see if
16  that was the case or if we looked up and saw smoke, not
17  that I'd normally cover something like that; but we've
18  actually got calls like that before.
19       Like, the morning of 9/11 I got a call,
20  "Hey, have you seen that something flew into The World
21  Trade Center?"
22   Q.  Sure.
23   A.  I mean, it was just -- so it's not -- I'm
24  trying to answer the question simply.  But if somebody
25  calls up and say somebody's a bank robber and there's no

155

1  evidence of that, we don't cover it.  99 percent of the
2  time we report on what is already in the news or
3  something that's said in Congress or something that is
4  already out there and we just give our comment on it.
5   Q.  Let me go back to your example.  Say you got
6  an anonymous call that in South Austin there'd been an
7  explosion, right?  You would take steps to confirm that
8  that explosion had occurred?  Send somebody over there?
9   A.  Yes.
10   Q.  And in corroborating, once you were -- felt
11  confident that there was an explosion, then at that
12  point you should notify the public because that could
13  save lives, couldn't it?
14   A.  Sure, yes.
15   Q.  Okay.  Now, if an anonymous person called you
16  and told you that there was an explosion and you didn't
17  send anybody out to go confirm the explosion, reporting
18  the explosion on the air could cause problems, correct?
19   A.  Yes.
20   Q.  Okay.  Let me just ask you really quick going
21  back to this nondisclosure agreement that we discussed
22  earlier that you can't tell me about the identity or the
23  subject matter.  Okay?  I do want to know:  What did you
24  agree to do?
25   A.  I can't get into the specifics of the

156

1  nondisclosure agreement.  You were asking sources on
2  Vegas, and we have particularly good ones on that.
3   Q.  Okay.
4   A.  And then...
5   Q.  But in terms of your legal obligations, that's
6  also something you're not prepared to talk about today?
7   A.  Yes.  I had to sign a nondisclosure agreement
8  before I was allowed to see something.
9   Q.  Okay.  I want to ask you a little bit more
10  about Wolfgang Halbig.  Now, Wolfgang Halbig was a
11  former security officer at a school, correct?
12   A.  Yes.
13   Q.  He has sold security plans and security
14  consulting services across the nation, correct?
15   A.  Yes.
16   Q.  He was one of the -- you would agree with me
17  he was one of the most aggressive people in trying to
18  publicize the idea that Sandy Hook was a fake?
19   A.  Yes.
20   Q.  How did you meet?
21   A.  I never met him -- well, no.  I don't know if
22  he's ever been in the studio.  I've never met him.  It
23  all blurs, with Skype or audio; but I don't remember.
24   Q.  So your conversations with him generally
25  aren't face to face?

157

1   A.  They were on air.
2   Q.  On your radio or web show, you mean?  Those
3  are the places you would typically talk to Wolfgang?
4   A.  Yes, uh-huh.
5   Q.  Did you ever communicate in any other ways?
6   A.  I vaguely remember talking to him on the phone
7  a couple of times.
8   Q.  Okay.  Do you think you've ever e-mailed
9  Wolfgang Halbig?
10   A.  I think we've responded back to his e-mails,
11  yes.
12   Q.  Okay.  And he's e-mailed people on your staff?
13   A.  A lot.
14   Q.  A lot.  What did you do to vet him?  How did
15  you assess his credibility?
16   A.  We looked him up and he'd been on national
17  television as an expert and he'd been with the state
18  police and then he'd been a security -- head of security
19  at a school.  And at first a lot of what he said
20  sounded -- he was more credible, and I think he
21  genuinely believed what he was saying.  And then he had
22  that professor coming out from Florida -- I forget his
23  name -- and just a bunch of other people.  It was just a
24  big firestorm on the Internet and we covered that
25  firestorm and I gave my opinions on it.

Alex Jones - 3/14/2019

158

1    Q.   So what I think I'm hearing from you is he's
2  been on TV?  He was --
3    A.   Well, no.  I mean, he was a state police
4  officer and then he was the head of school security at a
5  school and then he was a nationally recognized -- as
6  least according to the big national shows I saw, I guess
7  that were mainstream; they must have vetted it -- that
8  he was this really big credible guy.
9    Q.   So are you saying that he had a resume of such
10 that you did not feel the need to fact-check or
11 corroborate his allegations?
12         MR. BARNES:  Objection as to form.
13   A.   We did try to fact-check it; but because there
14 was such a wall of secrecy up around it, around Sandy
15 Hook, that the Hartford Current and others noted,
16 unprecedented, that allowed that darkness for, you know,
17 things not to be checked out.
18   Q.   (BY MR. BANKSTON)  Well, let's take them one
19 by one.  Mr. Halbig said the thing about the
20 Port-A-Potties, right?  Do you know what I'm talking
21 about, the Port-A-Potties?
22   A.   Yes.
23   Q.   Okay.  That wasn't hidden behind a cloak of
24 secrecy.  That's in a video that's been public for six,
25 seven years, right?

159

1    A.   Well, I don't think that that piece of
2  information has been proven one way or the other.  I
3  think they did deliver Port-A-Potties pretty quick.
4    Q.   EMTs were in the building, right?  And that's
5  been public for six or seven years.
6    A.   Most of those reports were blacked out.
7    Q.   You know EMTs were in the building?  That's
8  borne out in multiple reports.
9    A.   In the report itself, the police officer said
10 it didn't look normal; things didn't look right.  That
11 was the kind of thing we were reading.
12   Q.   Okay, Mr. Jones.  You know about what
13 Mr. Halbig did up in Newtown, right?  You know about his
14 activities there?
15   A.   Earlier you played the Bidondi tape.  That was
16 Bidondi saying those things, you notice.  So I'm not
17 sure what you're going to ascribe to me that I'm not
18 involved in.  I don't know what Bidondi did in Newtown
19 after a certain -- after about a year or so.
20   Q.   You know he almost got arrested at the United
21 Way.  You know about that, right?
22   A.   No.
23   Q.   You've talked about that on your show.
24   A.   I don't remember.
25   Q.   You don't remember what happened at the United

160

1  Way with Mr. Halbig?
2    A.   I don't remember some things I talked about
3  two weeks ago on my show.
4    Q.   Definitely you don't remember him almost
5  getting in a brawl with a fireman at a firehouse in
6  Newtown?
7    A.   No.
8    Q.   You certainly knew he was harassing parents up
9  there?
10   A.   No.  I remember hearing that there were some
11 fracases going on; and that's when I said, "I don't want
12 to have him on the show anymore."
13   Q.   And then e-mailed about his associate,
14 Jonathan Reich, who was up there with Mr. Bidondi and
15 Mr. Halbig, getting arrested for harassing a Sandy Hook
16 parent?  You knew about that?
17   A.   Vaguely aback at the time.
18   Q.   Yeah, you know who Jonathan Reich is, don't
19 you?  That's been told to you plenty of times.
20 Mr. Halbig tried to get you to support his case, right?
21   A.   He sent thousands of e-mails.  I haven't read
22 any of them, really.
23   Q.   You know who Lucy Richards is, don't you?
24   A.   No.
25   Q.   Even today, you don't -- sitting here today,

161

1  you don't know who Lucy Richards is?
2    A.   I don't.
3    Q.   Okay.  You don't know that there was a woman,
4  an InfoWars follower, who went to Federal prison for
5  stalking and threatening to kill Sandy Hook parents and
6  that she's now barred from ever seeing InfoWars again by
7  court order?
8    A.   I read about a woman and the media alleging
9  that.
10   Q.   And you know that happened in central Florida
11 very shortly after you disclosed Mr. Pozner's personal
12 e-mail address and maps to where he picks up his mail;
13 you know that, right?
14   A.   No, I do not.
15   Q.   Okay.  You didn't know where that occurred?
16   A.   No, I did not do what you said I did.
17   Q.   Okay.  One of the things that you told me,
18 Mr. Jones, is that Sandy Hook has been one-tenth of
19 1 percent of what InfoWars covered, correct?
20   A.   Yes.
21   Q.   How did you determine that?
22   A.   It's a dead reckoning.  I mean, if you look at
23 four hours on average a day, five days a week, a couple
24 of hours on the weekend or more, probably three or four
25 every weekend, you add -- I mean, I've sat there and

162

1 added it up and talked to everybody around the office,
2 it's like we covered it. You know, somewhere it
3 happened and we're into it and then it was just all over
4 the Internet with debates back and we looked it up and
5 went over the videos and maybe there were part of maybe
6 20 shows or so. And then you look at some were, like,
7 usually 30 minutes to an hour; some were a little
8 longer. And then you add that to just the 300 and
9 something days a year we're on air -- 340 or so, I'd
10 say -- and you look at all that and you add it into all
11 the shows and everything and it's just, like, tiny.
12       And then once Hillary announces that it's
13 my identity, then the media kind of just took who I was
14 at InfoWars and applied it to everybody else; and then
15 just the whole thing became this big tornado. And, I
16 mean, I -- so in this instance it's been somewhat more
17 of me responding to it and things.
18       And then when the media was editing what
19 I was saying to make it look like I was, you know,
20 making statements that they wanted to be hearing so it
21 could be an ongoing thing.
22       And I really woke up when Parkland
23 happened and they said that I was saying nobody died and
24 they were all actors. I was like, "Whoa," because I was
25 dead clear on that when that happened. I just said they

163

1 picked the kids from the drama club that they
2 interviewed, saying, "We're in the drama club, and we're
3 anti-guns." And I said that they picked good-looking,
4 well-spoken people out of 3,000 who wanted to be the
5 spokespersons against guns. That didn't mean that the
6 event didn't happen.
7       And I did -- we did break that the police
8 stood down, and that's now come out. I don't know why
9 they stood down. We did point that out.
10       So I really was like: Whoa. You're not
11 going to say every mass shooting that happens that I'm
12 saying it didn't happen.
13       MR. BANKSTON: Can you scroll back to my
14 question?
15       (Reporter complies.)
16       THE WITNESS: That was the scary point
17 when every mainstream media was like -- I was like:
18 Wow, these people really are crooks.
19       MR. BANKSTON: Thank you.
20       Q. (BY MR. BANKSTON) Here's my question,
21 Mr. Jones: How in the world would you know how much
22 you've covered Sandy Hook, one-tenth of 1 or -- 10
23 percent [sic] when we, the Plaintiffs, have asked you to
24 produce us every video that has Sandy Hook in the title;
25 and you can't even do that? You haven't produced those

164

1 to us.
2       A. Videos from where?
3       Q. From you.
4       A. No, from after -- after you and other law
5 firms lobbied to have us taken off the Internet, which
6 had the index of it on YouTube and other platforms, like
7 Roku, "Oh, he's doing it right now. Get it off right
8 now. He's coming after the kids right now," knowing
9 full well that's not going on.
10       You're lobbying against the First
11 Amendment and you are then at the same time trying to
12 take down all of what I really said and then edit things
13 together and that's the only record. And we went and
14 looked. There's maybe 20 shows, maybe another probably
15 50 times callers calling up. That's what we know of.
16 I'm sure there's more we don't know about. And we added
17 all that together with a calculator and we looked at the
18 number and it's literally not even one -- maybe
19 one-tenth of 1 percent of all the air time we've done is
20 Sandy Hook.
21       Q. So you found some shows, 20 something shows
22 with Sandy Hook in it?
23       A. That's a dead reckoning, but yes.
24       Q. Why haven't you given them to me, Mr. Jones?
25       MR. BARNES: Objection and, in fact --

165

1       A. We have given you everything we could find.
2       Q. (BY MR. BANKSTON) Because the truth is you
3 can't even search by title, can you? You don't have an
4 index. You have no idea, correct? You can't search by
5 title?
6       A. No, but we have -- we -- well, actually, we do
7 have it. It's Prism planted on tv, and we can search.
8 And we searched all the names they had in the title, but
9 that doesn't mean that a caller didn't call in and it
10 didn't get said somewhere, but we've done the best we
11 can to go through all that stuff.
12       Q. Really? If you go to tvinfowars.com and you
13 search Sandy Hook Vampires Exposed, that'll come up?
14       A. tv.infowars.com is a defunct URL that pointed
15 at Prism planted, not tv.
16       Q. Okay.
17       A. So -- and you know that. We've put -- there
18 was a big deal about that.
19       Q. Yeah, I just got sent a link that said --
20       A. Okay. Well, let me -- listen. We've never --
21 we don't take our stuff down unless Twitter -- because
22 the lawyers on your side complain and say, "He's doing
23 this. Take it down." And then Twitter doesn't take
24 your stuff down; they order you to.
25       Q. Uh-huh.

Alex Jones - 3/14/2019

166

1    A.   Okay?  But that's the same thing as taking it
2  down.
3    Q.   And when that happened, Mr. Dew, when he tried
4  to preserve that, when he deleted that stuff --
5    A.   No, we had it preserved when we did it.
6    Q.   Yeah, but he said in his affidavit he lost
7  user comments, didn't he?
8    A.   Those are us.  Twitter's us, not user
9  comments.
10    Q.   No, I know.  There's user comments on your
11  Twitter threads, and they were lost when you deleted
12  them, weren't they?
13    A.   You guys were the ones lobbying to have me
14  taken off the Internet.
15    Q.   I'm not --- I don't care about any of that.
16  I'm just asking you:  Were those deleted?
17    A.   (No audible response.)
18    Q.   Those comments are lost and will never be
19  recovered and Mr. Dew admits it.
20    A.   Sandy Hook lobbied to have my Twitter taken
21  down.  The whole thing was taken down.
22    Q.   I know.  And you didn't do anything to
23  preserve it before that happened, did you?
24    A.   Oh, so you get it taken down; and then it's my
25  fault?

167

1    Q.   No.  I'm asking you:  When did -- you
2  reasonably anticipated litigation the moment you were
3  sued, right?  When you were sued on April of 2018, you
4  knew that all that information was relevant, right?
5        MR. BARNES:  Objection, calls -- as to
6  form.  Also objection to the degree any of the questions
7  are asking about attorney-client communications, then
8  you're instructed not to answer to disclose any
9  information that comes from attorney-client
10  communications.
11    Q.   (BY MR. BANKSTON)  Let me ask it a different
12  way, Mr. Jones --
13    A.   We sent letters to Twitter and to Google
14  requesting that they not take us down and that they save
15  it.  When they did, we said, "Please turn it back on or
16  give us the full records."
17    Q.   Let me make it very clear.  After you were
18  sued, the information existed; it was available to you.
19  And then, later, it was deleted; and those comments are
20  gone.  That's true?
21        MR. BARNES:  Objection as to form.
22    A.   By Twitter.  Twitter took the account down.
23    Q.   (BY MR. BANKSTON)  Right.  I understand that.
24  So before Twitter took that account down, you took no
25  efforts to preserve any of that information?

168

1    A.   Yes, we did.  It's all -- I think that stuff's
2  saved on their site.  The full service is to copy it.
3  What you're saying's not true.
4    Q.   And Mr. Dew admits that in his affidavit, that
5  InfoWars didn't save that in its local capture, it
6  didn't, right?
7        MR. BARNES:  Objection, calls -- as to
8  form.
9    A.   I'm not an IT person.  I can't accurately
10  answer all that.
11    Q.   (BY MR. BANKSTON)  Okay.  So in terms of
12  whether InfoWars failed to preserve evidence that might
13  be relevant to this claim, you're not the right person
14  to ask?
15        MR. BARNES:  Objection as to form.
16    A.   I mean, I think despite the -- according to
17  effort by the media and universally establishment to
18  take all our content offline, we've done a pretty good
19  job of saving almost all of it at infowars.com and at
20  prismplay.com.  So that's really not an accurate
21  statement.
22    Q.   (BY MR. BANKSTON)  But you can't even search
23  it by title?  You have no idea how many videos have
24  Sandy Hook in the title?
25        MR. BARNES:  Objection as to form.

169

1    Q.   (BY MR. BANKSTON)  We know there's videos of
2  Sandy Hook in the title that don't show up on these
3  planetinfowars searches, right?  We know that.
4        MR. BARNES:  Objection as to form.
5    A.   There's no planetinfowars.
6    Q.   (BY MR. BANKSTON)  Whatever you want to call
7  it, Mr. Jones, you have a video archive that's up right
8  now, right?  You have a video archive that's searchable
9  online.  Do you agree or disagree?
10        MR. BARNES:  Objection as to form.
11    A.   Yes.
12    Q.   (BY MR. BANKSTON)  Okay.  On that archive
13  there are videos that have been produced in this lawsuit
14  with Sandy Hook in the title that are not in that
15  archive?
16    A.   Well, that's because you're getting other
17  people's videos offline.  Like, you get them from Media
18  Matters and then you say that's our video and then you
19  want us to produce someone's edited video.
20    Q.   Sorry, Mr. Jones.  When you upload a video to
21  YouTube, you choose the title, don't you; or does
22  YouTube give you the title?
23    A.   I don't think you understand.
24    Q.   No.  So let's take an example of a video.
25  Sandy Hook Narratives, False Narratives Versus the

170

1  Realty, a video that has that title should be showing up
2  in your archives, right?  That's what you're saying?
3      A.  The vast majority of videos of us are not us.
4  Other people get our videos and then put them together
5  with other things.  You understand that.
6      Q.  No, no, Mr. Jones, that's not what I'm saying.
7          Do you have Mr. Zipp's affidavit in front
8  of you?  Hold on.  No, in fact, Mr. Jones, I don't need
9  to make you run back through that.  Let's not even worry
10 about it.
11          I've just got a couple more questions for
12 you, Mr. Jones.  The year before you were sued, you said
13 that, "Everything I've heard is that the parents weren't
14 allowed to touch the children."  Who did you hear it
15 from, and what did they say?
16         MR. BARNES:  Objection as to form.
17     A.  I don't know the specifics of what you're
18 talking about, so I don't want to state something
19 incorrectly.
20     Q.  (BY MR. BANKSTON)  Okay.  So this statement,
21 everything you've heard is that the parents weren't
22 allowed to touch the children, you can't comment on that
23 today?
24         MR. BARNES:  Objection as to the form.
25     A.  I don't want to state it exactly -- I want it

171

1  to be exactly right or I don't want to state it.  So
2  that's -- I mean, you say everything I've heard.  I
3  don't know the specifics, but I remember complaints and
4  things that the parents couldn't get to their kids until
5  they'd been taken later to the morgue and things like
6  that.
7      Q.  (BY MR. BANKSTON)  Can you show me any one
8  human being in the world who told you the parents
9  weren't allowed to touch the children?
10     A.  I believe that was in the newspapers.
11     Q.  Okay.  What about, "They're finding people in
12 the back woods that are dressed up in SWAT gear"?
13 That's not true, is it?
14     A.  I saw it on the national news.
15     Q.  You saw somebody in SWAT gear in the woods?
16     A.  Yeah, black and camouflage.  The police
17 arrested him and there was a SWAT drill in the area.
18     Q.  No, Mr. Jones.  I'm asking you:  Did you see a
19 video of a man in SWAT gear being arrested?
20     A.  I saw them -- the helicopter talking about
21 him, and they said they later arrested a man.
22     Q.  So when you told your audience he was dressed
23 up in SWAT gear, that's just something you made up,
24 isn't it?  There's nobody dressed up in SWAT gear?
25     A.  I do remember that being on the news.

172

1      Q.  What being on the news?
2      A.  The helicopter and the man behind the school
3  and the report of the guy in the SWAT gear and the
4  police saying they arrested him, and later they said
5  they didn't.
6      Q.  Yeah, two reporters with cameras made reports
7  about that.  There's no man in SWAT gear in that video,
8  is there?  That's just something you made up.
9      A.  Nope, I didn't make it up.
10     Q.  So you think you can produce to me a video of
11 a man in SWAT gear in the woods?
12     A.  I remember that's what was being reported on
13 the news.
14     Q.  Okay.  So now it's not you saw it in a video.
15 Now, it's somebody else saying it?
16     A.  But I remember seeing a guy and it looked like
17 in the video that he was in camo and black.
18     Q.  Okay.  First of all, camo and black, what does
19 that mean?  He had camo pants on?
20     A.  I mean, I would tend to think that means kind
21 of a paramilitary outfit.
22     Q.  Okay.  So anybody you see who has camo pants
23 on when you're walking down the street, you're like:
24 That guy's paramilitary?
25         MR. BARNES:  Objection --

173

1      Q.  (BY MR. BANKSTON)  Is that your belief?
2          MR. BARNES:  Objection as to the form.
3      A.  I really -- I told you what my memory is.
4      Q.  (BY MR. BANKSTON)  Is it fair to describe any
5  gentleman wearing camo pants as being dressed in SWAT
6  gear?  Do you think that's an honest and accurate way to
7  describe that?
8          MR. BARNES:  Objection as to the form.
9      A.  Yeah, I think that's a fair way to describe
10 it.
11     Q.  (BY MR. BANKSTON)  Oh, so you -- what I'm
12 trying to get at, Mr. Jones, is:  You don't think saying
13 that a man who is dressed up in SWAT gear found behind
14 the school when he's not actually wearing any SWAT gear
15 is in any way alarmist or dangerous to say?
16         MR. BARNES:  Objection as to the form.
17     Q.  (BY MR. BANKSTON)  Oh, you can answer,
18 Mr. Jones.
19     A.  I mean, this is like seven years ago, so I'm
20 trying to remember.  I mean, I remember seeing the guy
21 in looked like what I'd call police gear, kind of
22 paramilitary gear.  I remember, like, camo and black or
23 something.  I'm not -- again, I'm not living this every
24 day.  I'm not -- and I -- and I'm very sad for folks,
25 you know, who have had to go through it and I'm sorry

---

174

1 for tragedies. And I kind of feel sorry for you having
2 to live through it all the time and knowing every detail
3 and every angle and everything else, but I just...
4    Q. It's hard.
5         Mr. Jones, what we were just talking
6 about, men being arrested in SWAT gear in the woods --
7    A. I don't think I said "men." If I said that, I
8 misspoke.
9    Q. Okay. Well, even if you said "man" in SWAT
10 gear in the woods, you said that just a year before you
11 were sued. That's not seven years ago, is it?
12    A. I was going over why people had -- the
13 anomalies -- some accurate, some not accurate -- why
14 people had questions.
15    Q. Yeah, but it's real recent, Mr. Jones. This
16 thing about, "Oh, it was seven years ago, I can't" --
17 that was just three --
18    A. I questioned Jussie Smollett just the day it
19 happened.
20    Q. And now --
21    A. That was just like a month ago.
22    Q. Exactly. And you know about that. You have
23 no memory problems there.
24    A. I'm proud of it.
25    Q. You just have memory problems when it comes to

---

175

1 Sandy Hook?
2    A. Well, seven years from now the specifics of,
3 like, if I've done 20 broadcasts on it --
4    Q. Mr. Jones, this isn't seven years ago. I'm
5 asking you about 2017.
6    A. I know; but is it okay to question Jussie
7 Smollett, or was that act evil?
8    Q. Mr. Jones, I'm asking you about 2017. Was
9 2017 so long ago it's hard for you to remember?
10         MR. BARNES: Objection as to the form.
11    A. I have gone over the anomalies, and I remember
12 seeing that footage and I -- that's why people
13 questioned.
14    Q. (BY MR. BANKSTON) Who was involved in fact-
15 checking those anomalies? Tell me all the employees who
16 would be involved in that.
17    A. All right. I think myself and Rob Dew and a
18 few others. Like I said, normally, we're just reporting
19 on news that's already out there. I'd say 98, 99
20 percent, it's just going: Hey, look this just happened.
21 Trump just said this. Hillary just said that. What do
22 you think?
23    Q. Okay, Mr. Jones. You will admit to me that of
24 all these things that you have said, all the factual
25 claims you've made about Sandy Hook over the years, that

---

176

1 if you were wrong about them, that it would be
2 reasonable to understand that the parents would be very
3 upset?
4         MR. BARNES: Objection as to the form.
5    A. I am not the only person who questioned Sandy
6 Hook, and I legitimately asked those questions because I
7 had concerns. And I resent the fact that the media and
8 the corporate lawyers and the establishment, the
9 Democratic party, who are trying to make this my
10 identity, brought it up, constantly repeated it, tricked
11 me into debating it with them so that they could say
12 that I was injuring people. And I see the parties that
13 continually bring this up and drag these families
14 through the mud as the real villains, the conscious
15 villains attempting to shore up the First Amendment in
16 the process. I do not consider myself to be that
17 villain.
18         I could have done a better job, in
19 hindsight, and I've apologized for that; but I've seen
20 the very same corporate media and lawyers continue to
21 say that I'm saying all these things and exaggerating
22 and using it against the First Amendment and I think
23 that's very dangerous and despicable.
24    Q. Mr. Jones, do you think I'm a corporate
25 lawyer?

---

177

1    A. Well, I know full well that when Hillary
2 Clinton lost the election is when all this started. And
3 I'm like, "Hey, I think Sandy Hook happened." And you
4 and others continually are in the news; and I remember
5 first in this lawsuit you were like, "All Jones needs to
6 do is say he's sorry to some parents." I'm like: I am
7 sorry that this has all been out of context and that
8 your kids died, and that was all ignored. So I've seen
9 the real disingenuousness and the fact that this is all
10 just a cold-blooded, you know, fit because Hillary lost
11 the election.
12    Q. So do you think I work for Hillary Clinton or
13 something or George Soros gives me money or something
14 like that?
15    A. Well, I mean, I know this: When Hillary lost,
16 the light switch went on. I'd never been sued, and I
17 got sued a bunch.
18         And then you've got all the corporate
19 media --
20    Q. Wait, wait, wait.
21    A. -- working in tandem. And I know you're
22 working with a Connecticut case and doing all that and
23 triangulating all that stuff. So let's not -- let's
24 not -- and there's going to be some other things coming
25 down the road where all that will come out.

178

1   Q.  When were you sued?

2   A.  I think it was early last year.

3   Q.  Yeah, like a year and a half after Hillary

4  Clinton lost, right?

5   A.  But they hadn't -- but they hadn't ever put

6  the final report out.  You needed the report because

7  they never would put the report out.

8   Q.  What report?

9   A.  The report came out a month before you sued

10  me.

11   Q.  Okay, Mr. Jones.  Wait.  What report, who --

12  what --

13   A.  The official Sandy Hook report.

14   Q.  What entity issued this report?

15   A.  It was put out by the local, state, and

16  federal government.

17   Q.  So you are going to sit here today and deny

18  that there has been an official Sandy Hook report, books

19  of it, online since December of 2013?

20   A.  Oh, there have been some redacted reports put

21  out; but it was a big deal in -- it went up to the

22  Connecticut Supreme Court.  It's a hugely litigated

23  situation of this thing being so suppressed.

24   Q.  Okay.  So you and your attorney have appeared

25  on your show to talk about this entire lawsuit being a

179

1  conspiracy against you to take you down?

2        MR. BARNES:  Objection as to form.

3   Q.  (BY MR. BANKSTON)  Correct?

4   A.  It's a conspiracy, as Clarence Thomas admits,

5  to get rid of New York Times versus Sullivan.

6   Q.  And you've called me and members of my law

7  firm devil people, correct?

8   A.  Not specifically, no.

9   Q.  Okay.  You've made money from every single one

10  of these broadcasts we saw today, right?

11   A.  No.  We actually lose money on really

12  controversial stuff.  We can actually see it.

13   Q.  Oh, so you can produce that to me?  You have

14  data on that?

15   A.  Absolutely.  We'd love to.

16   Q.  Okay.  And you have supplements you sell, too,

17  with these videos, correct?

18   A.  No, no.  The advertisement's separate from the

19  news.

20   Q.  Well, I mean, in these news broadcasts, you

21  advertise the sale of supplements, right?

22   A.  The two don't go together.

23   Q.  How do you mean they don't go together?

24  You're talking about the news and you put the news down

25  and all of a sudden you're talking Bone Broth and male

180

1  vitality and fluoride-free toothpaste and everything

2  else.

3   A.  Well, if we're talking about WMDs --

4   Q.  Hold on, Mr. Jones.  And then you put that

5  back down and you pick up the news and you start talking

6  about it in the same video, correct?

7        MR. BARNES:  Objection as to form.

8   A.  Well, it's like saying the Super Bowl goes

9  to -- and then the Super Bowl has Budweiser ads on the

10  walls.

11   Q.  (BY MR. BANKSTON)  Yeah, NBC makes money off

12  of its broadcasting, doesn't it?

13   A.  But, technically, that's not how -- our

14  advertising is separate from what is going on during the

15  program.  We don't do product placement.  And so, no,

16  the answer is:  Sandy Hook, before I was ever sued, lost

17  money.

18        9/11 Truth lost me almost all my radio

19  stations and lost money.

20        Those type of really controversial

21  stands, people don't like them; and they have crippled

22  us before these lawsuits.  And, I mean, in fact, we look

23  back and you can see where we're talking about Sandy

24  Hook and the listeners and everything goes down.

25   Q.  I mean, and really, if we look at this at the

181

1  end of the day, I mean, really you're the victim, aren't

2  you?

3   A.  No, but I've certainly learned a lot in the

4  process.

5   Q.  You've learned how not to be a reckless

6  journalist, right?

7        MR. BARNES:  Objection as to form.

8   A.  Well, I think certainly I have experienced

9  real fake news, watching the corporate media lie in my

10  name and put things out that I never did, in a concerted

11  effort.  So I've learned what I -- certainly the polar

12  opposite of what I want to be because I've never

13  consciously tried to lie or hurt people.

14        And I did not make money off saying 9/11

15  was an event where we allowed Saudis to attack us.

16  That's now come out.  I lost 127 something stations.  I

17  went down to about 30.

18        A lot of stations dumped us when we were

19  talking about Sandy Hook.  So if the statement is I say

20  these things and do these things to make money, that is

21  not what we are doing.  Money coming in is to fund the

22  operation, to promote really questioning things, and to

23  build an alternative system.  And it doesn't mean then

24  when you're being an alternative system that you're

25  perfect, but that's basically where I stand on that.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 442 of 1271

Alex Jones - 3/14/2019

---

182

1    Q.   Okay.  I just do want to make sure.  It's not
2  a nonprofit situation; you're not doing this for the
3  charity of your own heart?
4    A.   No, I'm not like the nonprofits, the whole
5  conspiracy where they're buying the college admissions
6  and they call that a charity or Hillary's foundation,
7  no, I'm not running anything like that.
8    Q.   I have no idea what you're talking about,
9  Mr. Jones.
10   A.   Where these people make millions of dollars on
11 their tax-free charities, I don't do that.
12   Q.   Okay.  So --
13   A.   You were asking me if I was running a
14 nonprofit scam; and the answer is "no."  What I do is I
15 pay taxes.
16        MR. BANKSTON:  Mr. Jones, I think we're
17 about wrapped up today if you could give me just a small
18 break to make sure that we're all wrapped up, I think
19 we've got about 45 minutes left in the day; but I'm not
20 going to use it for you.  I'm going to let you get out
21 of here.
22        THE WITNESS:  I'm happy to.
23        MR. BANKSTON:  I mean, hey, if you want
24 to stick around and talk, we can talk; but we might need
25 to do that off the record.  We might not need to put

---

183

1  that on the testimony, but I'm happy to do that.  But
2  let's take just a quick break, and why don't ya'll give
3  us about five minutes?
4        MR. BARNES:  Okay.
5        THE VIDEOGRAPHER:  We're off the record,
6  4:14 p.m.
7        (Off the record from 4:14 to 4:28 p.m.)
8        THE VIDEOGRAPHER:  We're back on the
9  record at 4:28 p.m.
10   Q.   (BY MR. BANKSTON)  There's a couple of things
11 I was curious about, Mr. Jones.  Do you think that
12 there's a question that I should have asked you today in
13 deposition that I didn't?
14   A.   That's a good question.  What question you
15 should have asked me.  I can't think of any.
16   Q.   Okay, Mr. Jones.  You would agree with me that
17 when some damage happens, when you break something, when
18 you cause something to be lost, when you hurt somebody,
19 whether it's intentional or whether it's a mistake,
20 there's consequences for that, right?  People should be
21 accountable for the people they hurt?
22        MR. BARNES:  Objection as to form.
23   A.   Well, sometimes people claim they've been hurt
24 when they haven't been.  So you have to look at the
25 agenda behind things.  You have to balance things about

---

184

1  why has the mainstream media lied so much, why our
2  Government's lied so much, the fact that the public
3  doesn't believe what they're told anymore, and are we
4  going to criminalize questioning Jussie Smollett or WMDs
5  or babies in incubators.  And it really is the fact that
6  we've allowed the Government and institutions to become
7  so corrupt that people have lost any compass of what's
8  real.
9        And I, myself, have almost had like a
10 form of psychosis back in the past where I basically
11 thought everything was staged, even though I'm now
12 learning a lot of times things aren't staged.  So I
13 think as a pundit, someone giving an opinion, that, you
14 know, my opinions have been wrong; but they were never
15 wrong consciously to hurt people.
16        And so I think it's part of that process
17 of me growing up in Rockwall, Texas and watching the
18 police deal drugs and then conduct anti-drug programs in
19 the school, I think that shook my opinion of police in
20 general.  And I was very anti-law enforcement until I
21 grew up and learned more things, and now I'm pretty much
22 pro police.  So it's been a process.
23   Q.   (BY MR. BANKSTON)  You said false things about
24 Sandy Hook because it was psychosis?
25   A.   I --

---

185

1        MR. BARNES:  Objection as to the form.
2    Q.   (BY MR. BANKSTON)  Correct?
3    A.   Well, I'm just saying that the trauma of the
4  media and the corporations lying so much, then
5  everything begins -- you don't trust anything anymore,
6  kind of like a child whose parents lie to them over and
7  over again, well, pretty soon they don't know what
8  reality is.
9        So long before these lawsuits I said that
10 in the past I thought everything was a conspiracy and I
11 would kind of get into that mass group think of the
12 communities that were out there saying that.  And so now
13 I see that it's more in the middle.  All right?  So
14 that's where I stand.
15   Q.   (BY MR. BANKSTON)  And I'm little concerned
16 about something I heard in your answer, that it seemed
17 to be you suggesting that you weren't sure if these
18 parents have suffered pain from what you did.
19   A.   Well, I was stating that I was reporting on
20 the general questioning when others were questioning.
21 And, you know, it's painful that we have to question big
22 public events.  I think that's an essential part of the
23 First Amendment in America.  And I do not take
24 responsibility for the entire train of things that
25 lawyers and the media have said I've done.  So I do not

---

186

1 take the responsibility. I do not take your indictment
2 or your presumed conviction of me as the villain or the
3 star of Homeland because that's not who I am. And so I
4 reject it.
5    Q. Saying, "The school is closed and was closed
6 for years," that's not questioning. That's a statement
7 of fact, Mr. Jones, isn't it?
8       MR. BARNES: Objection as to the form.
9    A. I was going off what other people were saying
10 and the fact that the records were not forthcoming and
11 the Hartford Current headlined: Why is There a
12 Cover-up? Why Aren't There Documents Being Released?
13 Why is it Taking so Long?
14    Q. (BY MR. BANKSTON) "The EMTs weren't allowed
15 in the building," that's not a question, Mr. Jones.
16 That's a statement, correct?
17       MR. BARNES: Objection as to the form.
18    A. Again, that was my going off what someone else
19 who I believed to be a credible expert was saying.
20    Q. (BY MR. BANKSTON) Mr. Jones, are you finally
21 prepared to admit that you have, indeed, caused these
22 families a substantial amount of pain? Are you prepared
23 to admit that?
24    A. I am not prepared to sign on to whatever you
25 and the mainstream media make up about me.

187

1       MR. BANKSTON: All right, Mr. Jones.
2 That will have to be it. I will see you next time.
3       MR. BARNES: One thing I was going to do
4 is just put this on record, just to make it -- the
5 confidentiality part. Is that okay?
6       MR. BANKSTON: Oh, yeah, that's stating
7 you're designating on the trial court?
8       MR. BARNES: Yes.
9       MR. BANKSTON: Please go ahead.
10       MR. BARNES: So what we have is a
11 Protective Order for the 30 days following any
12 deposition, that the parties must treat all of the
13 deposition testimony and the exhibits and other
14 documents produced at any deposition as attorneys' eyes
15 only and so they're marked confidential until that time.
16 Thank you.
17       MR. ENOCH: So no designation of
18 confidentiality is being made today. We'll look at it.
19       MR. BANKSTON: Absolutely. The whole
20 thing's confidential right now.
21       MR. ENOCH: That is the order, and we
22 have 30 days to designate confidential thereafter.
23       MR. BANKSTON: Absolutely.
24       MR. ENOCH: Very well.
25       MR. BANKSTON: Okay. I think we're done.

188

1       THE VIDEOGRAPHER: We're off the record
2 at 4:33 p.m.
3       (Exhibit 12 marked.)
4       (Deposition adjourned at 4:33 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

189

1             CHANGES AND SIGNATURE
2 WITNESS NAME:          DATE OF DEPOSITION:
3 ALEX E. JONES          March 14, 2019
4 PAGE/LINE   CHANGE               REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

190

1  _____
2  _____
3      I, ALEX E. JONES, have read the foregoing
4  deposition and hereby affix my signature that same is
5  true and correct, except as noted herein.
6
7            _____
              ALEX E. JONES
8
9
10  THE STATE OF _____ )
11      BEFORE ME, _____, on
12  this day personally appeared ALEX E. JONES, known to me
13  (or proved to me under oath or through _____)
14  (description of identity card or other document) to be
15  the person whose name is subscribed to the foregoing
16  instrument and acknowledged to me that they executed
17  same for the purposes and consideration therein
18  expressed.
19      Given under my hand and seal of office on
20  this, the _____ day of _____, _____.
21
22
23            _____
              NOTARY PUBLIC IN AND FOR
24            THE STATE OF _____
              My Commission Expires:_____
25

191

1              CAUSE NO. D-1-GN-18-006623
2  SCARLETT LEWIS      * IN THE DISTRICT COURT OF
      Plaintiff        *
3                      *
                       *
4  VS.                 * TRAVIS COUNTY, TEXAS
                       *
5  ALEX E. JONES, INFOWARS, *
   LLC, AND FREE SPEECH    *
6  SYSTEMS, LLC,        *
      Defendants       * 53RD JUDICIAL DISTRICT
7
8
              REPORTER'S CERTIFICATION
9
              ORAL/VIDEOTAPED DEPOSITION
10                    OF
                 ALEX E. JONES,
11
              Taken on March 14, 2019
12
13      I, Debbie D. Cunningham, Certified
14  Shorthand Reporter in and for the State of Texas, hereby
15  certify to the following:
16      That the witness, ALEX E. JONES, was duly
17  sworn by me, and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20      That the deposition transcript was
21  submitted on _____ to the witness
22  or to the attorney for the witness for examination,
23  signature, and return to me by _____;
24      That the amount of examination time used
25  by each party at the deposition is as follows:

192

1  BY MR. BANKSTON:
2  BY MR. ENOCH:
3  BY MR. OGDEN:
4  BY MR. BARNES:
5      That pursuant to information given to the
6  deposition officer at the time said testimony was taken,
7  the following includes counsel for all parties of
8  record:
9  COUNSEL FOR PLAINTIFF:
10      KASTER LYNCH FARRAR & BALL, LLP
        1010 Lamar, Suite 1600
11      Houston, Texas
        (T) 713.221.8300
12      By: Mark D. Bankston, Esq.
        mark@fbtrial.com
13            AND
        William Ogden, Esq.
14
15  COUNSEL FOR DEFENDANTS:
16      GLAST, PHILLIPS & MURRAY, P.C.
        14801 Quorom Drive, Suite 500
17      Dallas, Texas
        (T) 972.419.8300
18      By: Mark Enoch, Esq.
        mkenoch@gpm-law.com
19
              AND
20
        BARNES LAW, LLP        (PRO HAC VICE)
21      601 South Figueroa St., Suite 4050
        Los Angeles, California
22      (T) 213.294.3006
        By: Robert E. Barnes, Esq.
23        barneslaw@barneslawllp
24      I further certify that I am neither
25  counsel for, related to, nor employed by any of the

193

1  parties or attorneys in the action in which this
2  proceeding was taken, and further that I am not
3  financially or otherwise interested in the outcome of
4  the action.
5      Further certification requirements
6  pursuant to Rule 203 of TRCP will be certified to after
7  they have occurred.
8      Certified to by me this day, March 25,
9  2019.
10
11
              _____
12      Debbie D. Cunningham, CSR
        Texas CSR 2065
13      Expiration: June 30, 2021
        INTEGRITY LEGAL SUPPORT SOLUTIONS
14      3100 West Slaughter Lane, Suite A-101
        Austin, Texas 78748
15      www.integrity-texas.com
        512-320-8690; FIRM # 528
16
17
18
19
20
21
22
23
24
25

194

1    FURTHER CERTIFICATION UNDER RULE 203, TRCP

2    The original deposition/errata sheet was / was not

3    returned to the deposition officer on _____;

4    If returned, the attached Changes and Signature

5    page contains any changes and the reasons therefor;

6    If returned, the original deposition was delivered

7    to MR. BANKSTON, Esq., Custodial Attorney;

8    That $_____ is the deposition officer's

9    charges to the Plaintiff for preparing the original

10   deposition transcript and copies of exhibits, if any;

11   That the deposition was delivered in accordance

12   with Rule 203.3, and that a copy of this certificate was

13   served on all parties shown herein on _____

14   and filed with the Clerk.

15   Certified to by me on _____.

16

17

18

      _____

19   Debbie D. Cunningham, CSR
      Texas CSR 2065

20   Expiration:  June 30, 2021
      INTEGRITY LEGAL SUPPORT SOLUTIONS

21   3100 West Slaughter Lane, Suite A-101
      Austin, Texas 78748

22   www.integrity-texas.com
      512-320-8690; FIRM # 528

23

24

25

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND VERONIQUE DE LA ROSA | § § § | IN DISTRICT COURT OF |
| *Plaintiffs* | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § § | |
| ALEX E. JONES, INFOWARS, LLC, AND FREE SPEECH SYSTEMS, LLC, | § § § | 345th DISTRICT COURT |
| *Defendants* | § | |

## AFFIDAVIT OF GRANT FREDERICKS

STATE OF WASHINGTON          )
                                                   )     ss.
COUNTY OF SPOKANE          )

Before me, the undersigned notary, on this day personally appeared Grant Fredericks, a person whose identity has been established to me.

Upon being duly sworn, Affiant states:

My name is Grant Fredericks. I am over the age of 21 and competent to make this affidavit. I have been asked to provide opinions in the field of forensic video analysis.

I am a Certified Forensic Video Analyst with extensive experience in the recovery, scientific examination, and evaluation of recorded video and audio information involving criminal and

AFFIDAVIT OF GRANT FREDERICKS                    1                    Kaster Lynch Farrar & Ball, LLP
                                                                                          1010 Lamar, Suite 1600
                                                                                          Houston, TX 77002
                                                                                                              Ex. C

1   civil investigations in the United States (US), Canada, the United Kingdom (UK), and

2   elsewhere. I have been continuously active in this science since 1984.

3

4   I attained an undergraduate degree in Television Broadcast Communications, with an emphasis

5   on television engineering in 1982.

6

7   Between 1982 and 1987, I was a television news reporter and producer, working extensively

8   with composited video, commonly referred to as 'green-screen' technology; also known as

9   'blue-screen' and 'chroma-key' production.

10

11   As a Forensic Video Analyst, I have processed thousands of videotapes and computer discs

12   containing digital multimedia evidence for both criminal and civil cases. I have been providing

13   expert testimony as a Forensic Video Analyst since the early 1990's. In the past ten (10) years I

14   have provided expert testimony in the field of Forensic Video Analysis more than one hundred

15   and fifty (150) times in US and Canadian courts at all levels. I have testified as an expert in

16   Forensic Video Analysis in Washington State, Oregon, Idaho, California, Nevada, North

17   Dakota, Colorado, Arizona, Iowa, Missouri, Massachusetts, Pennsylvania, Connecticut,

18   Michigan, Maine, New York, Texas, Florida, British Columbia, Alberta, Manitoba, Ontario,

19   New Brunswick, in the Yukon Territories, London, England, Auckland, New Zealand, in the

20   Cayman Islands, and elsewhere.

21

22   From 1999 until December of 2012, I was the Principal Instructor for a series of Forensic

23   Video Analysis courses offered by the Law Enforcement & Emergency Services Video

24   Association (LEVA), a non-profit organization that has trained more than 3,000 law

25   enforcement video analysts from throughout the world.

26

1  From 2006 until December of 2012, I was the Team Leader for LEVA's Forensic Video

2  Analysis Certification Program.

3

4  From 1998 until 2013, I was the Team Leader of LEVA's Curriculum Development

5  Committee, and I continue as an active member of the Committee.

6

7  For the last sixteen (16) years, I have been a contract instructor of Forensic Video Analysis and

8  Digital Multimedia Evidence Processing for the Federal Bureau of Investigation (FBI)

9  National Academy in Quantico, VA.

10

11  From 2006 until 2014, I was the Digital Video Advisor to the International Association of

12  Chiefs of Police (IACP) for its In-Car Video project and for its Digital Interview Room

13  Standards project, which are funded by the US Department of Justice (DOJ). These programs

14  are focused specifically on the development of compression standards for improved

15  performance of digital video systems to ensure accurate presentation in court. I am a co-author

16  of the national standards for mobile video recording systems for law enforcement.

17

18  From 2007 to 2014, I was an instructor of Forensic Video Analysis at the University of

19  Indianapolis, IN. I have provided more than 2,900 hours of classroom instruction to video

20  analysts from throughout the world who have attended the university's Digital Multimedia

21  Evidence Processing Lab. Students served as video analysts, primarily from law enforcement

22  agencies in the US, Canada, the UK, Australia, and Asia. Each of the courses focused on

23  digital video and analog video engineering principles, and on the application of proper

24  scientific methodologies for processing digital multimedia evidence, including scientific

25  techniques used to determine image timing intervals in order to accurately convert time-lapsed

26  video into real-time video for synchronization of separately recorded video sources.

AFFIDAVIT OF GRANT FREDERICKS                    3                Kaster Lynch Farrar & Ball, LLP
                                                                  1010 Lamar, Suite 1600
                                                                  Houston, TX 77002

1    One of the courses that I taught at the University of Indianapolis was entitled

2    Photographic/Video Comparisons, which focused on the identification of vehicles, clothing,

3    and weapons captured to digital and analog video recording sources. Vehicle identification

4    examines class and unique characteristics of Questioned Vehicle, and often included headlight

5    spread pattern analysis. I have taught this course in Canada at the British Columbia Institute of

6    Technology, in the UK, and in Indianapolis for each of the last twenty (20) years.

7

8    A significant element of the Photographic/Video Comparison course material, and of the other

9    courses that I teach, involves the science of Reverse Projection. Reverse Projection is the

10    scientific process of obtaining accurate measurements and making accurate observations from

11    photographic and video images. Reverse Projection has been used among imaging scientists,

12    investigators, and in US courts regularly for more than forty (40) years as a tool to reproduce

13    crime and accident scenes, in order to conduct measurements and to make other accurate

14    observations.

15

16    I currently teach a hands-on course called Video Examinations for the Police Investigator. This

17    course focuses on reflection of light, pixel tracking, digital compression technology,

18    macroblock analysis, motion vector analysis, color measurement/analysis, speed estimation,

19    and on digital and analog artifact (error) identification for the sole purpose of ensuring accurate

20    interpretation of video evidence. Since each of the signal and digital components could impact

21    the meaning of images, the majority of testimony that I have provided includes a narrative

22    explanation of the events captured to the video recording system.

23

24    I am a former Police Officer with the City of Vancouver Police Department in Canada where I

25    was assigned to the Criminal Investigation Division as the head of the department's Forensic

26    Video Unit.

1 | **Work Request**

2

3 | At the request of Mark Bankston, attorney, I have performed an initial reviewed and analysis

4 | of the following four video clips:

5

6 | 1. Pozner Cooper Interview (360p).mp4

7 |    a. (File Hash: 9c29e026d1a3a5ef48903cd19f230df9)

8 | 2. Pozner Cooper Interview (720p).mp4

9 |    a. (Files Hash: 4145adc0fe52d263954c3df9a3ee396a)

10 | 3. Pozner Cooper Interview (InfoWars 2013).mp4

11 |    a. (File Hash: 12b370c3e58745f491b9cc0c0b7ff13d

12 | 4. Pozner Cooper Interview (InfoWars 2017).mp4

13 |    a. (File Hash: eba535d93fcc15c1419c1446937291e8)

14 | .

15 | Clip #1 is a publicly available copy of a video interview between Plaintiff Veronique De La

16 | Rosa and Anderson COOPER which originally aired on CNN following the Sandy Hook

17 | school shooting. This clip has been transcoded from a higher quality version of the depicted

18 | events.

19

20 | Clip #2 is a publicly available copy of a video interview between Plaintiff Veronique De La

21 | Rosa and Anderson COOPER which originally aired on CNN following the Sandy Hook

22 | school shooting. This clip is a higher quality version of Clip #1.

23

24 | Clip #3 is purported to be a video segment from a January 27, 2013 broadcast from InfoWars.

25

26 | Clip #4 is purported to be a video segment from an April 22, 2017 broadcast from InfoWars.

1    In InfoWars' Clips #3 and #4, Mr. Alex JONES discussed video footage of the CNN interview

2    with the Plaintiff in which JONES describes that the tip of Anderson COOPER'S nose

3    disappears as he is turning his head. Mr. JONES claimed the footage proves that the interview

4    was filmed using a blue-screen.

5

6    A blue-screen, or green-screen, is used in chroma key compositing to insert a pre-recorded or

7    remote background behind a live subject.

8

9    There was no reasonable basis to conclude that the production used a chroma key process. The

10    errors described by Mr. JONES are caused by digital video compression, not compositing

11    (layering scenes or images).

12

13

14    Each of the provided video files employ H.264 (MPEG4) compression, which is the most

15    common method of digital video compression.

16

17    H.264 is a lossy compression method. The term lossy refers to video where information is

18    removed from an original recording and errors are created.

19

20    Each of the provided video clips have different levels of H.264 compression.

21    To a reasonable degree of engineering certainty, the visual anomaly in the video was caused by

22

23    post-production compression. Post-production compression refers to the process of

24    'transcoding'. 'Transcoding' describes the process of converting a video file from one format

25    into another format.

26

A 'transcoded' digital video file that uses lossy-compression will add compression errors that cannot be reversed.

Lossy compression is destructive and irreversible. In other words, when *Video A* is transcoded into a lossy format, creating *Video B*, *Video B* cannot be transcoded back to the same quality of the original *Video A*. Each time a video file is transcoded, image quality is reduced.

Video Clip #2 is a much higher quality video than Video Clips #3 or #4.

Video Clip #2 represents a far less lossy copy of the video that is the subject of Mr. JONES' claims, as described in Clips #3 and #4.

Video Clip #2 does not have the errors that are the subject of Mr. JONES' comments.

Since Video Clip #2 has higher image resolution, with fewer compression errors, and is void of the specific error described by Mr. JONES (COOPER'S nose does not disappear), Video Clips #3 and #4 were created using destructive methods, post CNN Broadcast.

I have located a higher quality version of the interview which has been publicly available on YouTube since April 24, 2013.[1] The anomaly described by JONES does not appear in this video. This is significant because the publicly available source of the video used by Mr. JONES shows no evidence of chroma-key compositing.

---

[1] https://www.youtube.com/watch?v=kFw20eLL0w0

It does not require a high level of technical expertise to understand that Mrs. De La Rosa's interview was not conducted in front of a blue-screen. Compression is a basic concept in the field of TV Production and web-based video broadcasting. Anyone with experience in analog or digital video production, or in web-based broadcasting, should have arrived at the same conclusions. No credible video professional, editor, or web-content specialist would conclude that the visual anomaly is evidence of a chroma key process, such as a blue-screen or green-screen.

It is my opinion that InfoWars either had knowledge of the falsity of its statements, or made those statements while having serious doubts about the truth of those statements.

Further, your affiant sayeth naught.

_____
Grant Fredericks

Subscribed and sworn to before me this 3rd day of July, 2018.

_____
Notary Public

J D WALSH
Notary Public
State of Washington
My Appointment Expires
Jul 18, 2021

Kaster Lynch Farrar & Ball, LLP
1010 Lamar, Suite 1600
Houston, TX 77002

**From:** Paul Joseph Watson <watson-paul3@sky.com>
**To:** Buckley <buckley@infowars.com>, "anthony@infowars.com" <anthony@infowars.com>
**Subject:** Sandy Hook
**Date:** 2015-12-17 21:15:38 +0000

---

Sent this to Alex.

This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids. It's gonna hurt us with Drudge and bringing bigger names into the show. Plus the event happened 3 years ago, why even risk our reputation for it?

Sent from my iPhone

FSSTX-027752

Transcript of the Testimony of

# Paul Watson

## Date:

November 27, 2019

## Case:

NEIL HESLIN vs ALEX E. JONES

Paul Watson                                                    November 27, 2019

```
 1                   CAUSE NO. D-1-GN-19-004651

 2   NEIL HESLIN,                    ) IN THE DISTRICT COURT OF
                                     )
 3            Plaintiff,             )
                                     ) TRAVIS COUNTY, TEXAS
 4   VS.                             )
                                     )
 5   ALEX E. JONES, INFOWARS,        )
     LLC, and FREE SPEECH            ) 261ST JUDICIAL DISTRICT
 6   SYSTEMS, LLC,                   )
                                     )
 7            Defendants             )

 8

 9        ORAL AND VIDEOTAPED DEPOSITION OF PAUL WATSON
                      NOVEMBER 27, 2019
10                     VOLUME 1 OF 1

11

12            ORAL AND VIDEOTAPED DEPOSITION OF PAUL WATSON,

13   produced as a witness at the instance of the Plaintiff and

14   duly sworn, was taken in the above styled and numbered

15   cause on Thursday, November 27, 2019, from 9:00 a.m. to

16   11:06 a.m., before JANALYN ELKINS, CSR in and for the

17   State of Texas, reported by computerized stenotype

18   machine, at the offices of Kim Tindall & Associates, 2550

19   S. IH-35, Suite 110, Austin, Texas, pursuant to the Texas

20   Rules of Civil Procedure and the provisions stated on the

21   record herein.

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2
    FOR THE PLAINTIFF:
 3       MARK D. BANKSTON
         BILL OGDEN
 4       KASTER LYNCH FARRAR & BALL
         1117 Herkimer Street
 5       Houston, Texas   77008
         (713) 221-8300
 6       Mark@fbtrial.com

 7
    FOR THE DEFENDANT:
 8       T. WADE JEFFERIES
         THE LAW OFFICE OF T. WADE JEFFERIES
 9       1012 Rio Grande Street
         Austin, Texas   78701
10       (512) 201-2727
         Twadejefferies@gmail.com
11

12
    Also Present:
13       MR. LOUIS SOUCIE (videographer)
         MS. ASHLEY CASON (student reporter)
14       MS. BROOKE BINKOWSKI

15

16

17

18

19

20

21

22

23

24

25
```

Paul Watson                                                    November 27, 2019
                                                                        Page 3

```
 1                           I N D E X

 2
                                                       PAGE
 3

 4    Appearances ...................................    2

 5    Stipulations ..................................    4

 6  PAUL WATSON
      Examination by Mr. Bankson ...................    4
 7
      Signature and Changes........................   66
 8
      Reporter's Certificate.......................   68
 9

10
                          E X H I B I T S
11
      NO.              DESCRIPTION                    PAGE
12    Exhibit 1        Video                            8
      Exhibit 2        E-Mail                          13
13    Exhibit 3        Video                           18
      Exhibit 4        E-Mail                          24
14    Exhibit 5        E-Mail                          32

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. JEFFERIES:  We've agreed to swear in
 2   the witness from Austin, not London, correct?
 3              MR. BANKSTON:  Correct.  Plaintiffs have no
 4   objection to him being sworn in remotely.  Neither do
 5   defendants.
 6                   PAUL WATSON,
 7   having been duly sworn, testified as follows:
 8                   EXAMINATION
 9      Q.  (BY MR. BANKSTON)  Good morning, Mr. Watson.
10   My name is Mark Bankston.  I'm a plaintiff for the --
11   excuse me.  I'm counsel for the plaintiff in this case.
12   I'm going to be asking you some questions this morning.
13      A.  Okay.
14      Q.  I am currently sitting in Austin, Texas.  Where
15   are you today?
16      A.  I'm in London, England.
17      Q.  Okay.  You are Infowars chief reporter; is that
18   correct?
19      A.  I've never been designated that title so --
20      Q.  Okay.
21      A.  -- I wouldn't describe myself as that, no.
22      Q.  Okay.  You are Infowars editor at large,
23   correct?
24      A.  That was a title I adopted in 2016.  So, yeah,
25   that would be correct.
```

Paul Watson                                      November 27, 2019
                                                          Page 5

1       Q.  Okay.  You have also been the editor of the

2    Infowars.com website from 2012 to the present, correct?

3       A.  One of the editors, yes, correct.

4       Q.  Okay.  Would you describe yourself as the chief

5    editor of the Infowars website?

6       A.  No.

7       Q.  Who would you describe as the chief editor of

8    the Infowars website?

9       A.  Alex Jones.

10      Q.  Does Alex Jones day to day manage the website

11   in any way?

12      A.  When it comes to the content that's posted on

13   it and decisions based upon that content, I would say he

14   is the -- the highest authority.

15      Q.  Okay.  So when it -- when it comes down to,

16   say, articles that are being posted on the Infowars

17   website, do you have editorial control independent of

18   Alex Jones, or does he have to approve everything that

19   goes on the website?

20      A.  No.  I have independent control.

21      Q.  Okay.  Can you tell me -- well, first of all,

22   when did you -- when did you start working with Alex

23   Jones?

24      A.  I started working with him in Spring, 2003.

25      Q.  Okay.  From that period in 2003 to the present,

Paul Watson

1  can you list for me every job position you have held

2  with Alex Jones, Infowars, or Free Speech Systems, LLC?

3       A.  I'm -- I'm not an employee and have never been

4  an employee, so I haven't had an official job position.

5       Q.  How would you describe your employment

6  relationship or your working relationship with

7  Mr. Jones?

8       A.  Contractor.

9       Q.  Okay.  You do -- you do the vast majority,

10 overwhelming majority of your work for Infowars located

11 in England --

12      A.  Correct.

13      Q.  -- not in Texas, correct?

14      A.  Correct.

15      Q.  You've been to Texas on a few occasions, I

16 assume, correct?

17      A.  Yes, correct.

18      Q.  But mostly, you work across the pond and do

19 your work remotely, correct?

20      A.  Yes.

21      Q.  Okay.  When you appear on Infowars, you

22 frequently appear like you're appearing right now in

23 front of a Skype camera with -- with headphones in,

24 correct?

25      A.  Correct.

Paul Watson

1      Q.  Okay.  I want to take you back -- I want to

2  take you back to 2013, and specifically, I want to draw

3  your attention to the beginning of that year, which was

4  about a month after the Sandy Hook tragedy happened.  Do

5  you remember this time period?

6      A.  Not in any specific detail, no.

7      Q.  Okay.  Let's see -- let's -- I want to talk

8  about a couple of events you might remember from that

9  time period.

10          Do you remember an interview that you did

11  with a professor named James Tracy in Florida?

12      A.  Yes.

13      Q.  Okay.  You and I both know that Mr. Tracy is an

14  advocate of the assertion that there were crisis actors

15  used in the Sandy Hook massacre.  Do you understand

16  that?

17      A.  Yes.

18      Q.  You'd agree with me that's his assertion?

19      A.  Yes.

20      Q.  That's not an assertion you agree with,

21  correct?

22      A.  No.

23      Q.  Okay.  You would agree with me that when it

24  came to Sandy Hook and covering Sandy Hook, Infowars

25  needed to treat it with extreme caution?

 1       A.   In my own personal view, yes.

 2       Q.   Okay.  Mr. Watson, I'd like to show you right

 3  now a video clip which we will offer as Exhibit 1.

 4                 (Exhibit No. 1 was marked.)

 5       Q.   (BY MR. BANKSTON)  This is going to be a video

 6  clip from your interview with Professor Tracy on

 7  January 18, 2013.  I'm going to have the technology

 8  people here bring up the clip, Watson clip 1.

 9                 (Video playing.)

10                 "Obviously -- "

11                 VIDEOGRAPHER:  Give me a moment.  I need to

12  share screens with him.

13                 MR. BANKSTON:  Sure.

14                 (Video playing.)

15                 "Obviously, I believe that this was a

16  horrible tragedy for all the parents involved, and I

17  believe that some of the people who are asking questions

18  about this, not the professor, but a lot of people on

19  Youtube have handled it in a rather insensitive way.  Of

20  course, we've had reports about them harassing some of

21  the people who were involved.  And, basically, it

22  doesn't do us any favors.  So we need to treat it,

23  obviously, with extreme caution because it was a very

24  traumatic event.  And I think one of the aspects of

25  this, which a lot of people have claimed, Professor, is

 1  this whole idea that there were, quote, 'crisis actors'

 2  who were working with the -- "

 3                 THE WITNESS:  Is this a clip playing?  I'm

 4  not getting anything.

 5                 (Video playing.)

 6                 " -- and this is where we probably differ,

 7  but -- "

 8                 MR. BANKSTON:  Give us one second,

 9  Mr. Watson.  We're going to try to resolve that

10  technical issue.

11                 THE WITNESS:  Okay.

12                 MR. BANKSTON:  Am I just going to need to

13  play it in front of the camera or?

14                 VIDEOGRAPHER:  That's probably the quickest

15  way to do it.

16                 MR. BANKSTON:  Yeah, I think it probably

17  is.

18      Q.  (BY MR. BANKSTON)  All right.  Mr. Watson, are

19  you still with us?

20      A.  Yeah.

21      Q.  Okay.  What we're going to try to do,

22  unfortunately, is we're going to use a laptop -- sure --

23  we're going to use a laptop and put it directly in front

24  of your camera so you can see the video and then have

25  the audio that you're hearing me over, just hear the --

 1 | the audio from the video, so we're hoping that's going

 2 | to work.

 3 |

 4 |     A.  Good.

 5 |     Q.  All right.  So let's figure out a way we can do

 6 | this.  Let's see if we can get that position.  That's

 7 | not bad.

 8 |             Mr. Watson, can you see that video screen?

 9 |     A.  I'm just seeing my own video at the moment.

10 | Hang on a sec.  Let me try and get this.  Yeah, I can

11 | see that.  Yeah.

12 |     Q.  Okay.  Mr. Watson, I'm going to play, again,

13 | Exhibit 1 from your interview of Dr. -- with Professor

14 | Tracy.

15 |     A.  Okay.

16 |             (Video playing.)

17 |             "Obviously, I believe that this was a

18 | horrible tragedy for all the parents involved, and I

19 | believe that some of the people who were asking

20 | questions about this, not the professor, but a lot of

21 | people on Youtube have handled it in a rather

22 | insensitive way.  Of course, we've had reports about

23 | them harassing some of the people who were involved.

24 | And, basically, it doesn't do us any favors.  So we need

25 | to treat it, obviously, with extreme caution because

Paul Watson

November 27, 2019
Page 11

1  it's a very traumatic event.  And I think one of the

2  aspects of this, which a lot of people have claimed,

3  Professor, is this whole idea that there were, quote,

4  'crisis actors' who were working with the media to

5  create a fake narrative surrounding this event.  And

6  this is where we probably differ but just give us your

7  take on the whole 'crisis actors' angle, explain what

8  that is."

9       Q.  (BY MR. BANKSTON)  All right, Mr. Watson, give

10  me just one second so we can get set up and ask you some

11  questions about that.

12       A.  Okay.

13       Q.  Okay.  There's basically three things I want to

14  ask you about this video.  The first is that this being

15  a month after Sandy Hook, you were aware at this time

16  that the parents were being harassed by believers in a

17  Sandy Hook hoax conspiracy, correct?

18       A.  Correct.

19       Q.  Okay.  Second, as we talked about before, you

20  would agree with me that Infowars needed to treat it

21  with extreme caution, correct?

22       A.  Correct.

23       Q.  Okay.  What does that mean to you?

24       A.  To me, it means being able to analyze and

25  discuss the tragedy but not engaging in any activity

Paul Watson

1  which would cause discomfort or harassment to the

2  victims of the tragedy.

3      Q.  Okay.  Third, regarding crisis actors, you said

4  to Professor Tracy "this is where we differ."  Can you,

5  first of all, describe what a crisis actor is and why

6  you don't agree with that?

7      A.  From my understanding, it's somebody who was

8  involved in the event but was playing the role whereby

9  they -- they may be on the scene of the event but not --

10 not actually engaged or responsible for perpetrating the

11 event.  That's my understanding of a crisis actor.

12     Q.  Okay.  In terms of the Sandy Hook tragedy and

13 the statements being made by certain people about crisis

14 actors, can you tell me why you disagreed and thought

15 that was not a thing that should be said?

16     A.  I know -- I just have to go back.  Yes, crisis

17 actor means somebody who is apparently according to

18 reports and statements involved as a victim of the

19 tragedy but actually is not involved in the tragedy and

20 is acting.  So can you repeat the question you just

21 asked again?

22     Q.  Sure.  Why in the context of the Sandy Hook

23 tragedy and of the people who were using the crisis

24 actors allegation, why did you disagree with that and

25 think it was a bad thing to say?

Paul Watson                                    November 27, 2019
                                                      Page 13

```
 1      A.  Because I saw at the time the people who were

 2  pushing that narrative were not credible people.

 3      Q.  Thank you, Mr. Watson.

 4              In January of 2013, another thing that I

 5  wanted to know if you remembered was when you had an

 6  e-mail exchange with a Sandy Hook parent.  Do you

 7  remember that?

 8      A.  I don't recall that, no.

 9      Q.  Okay.  I want to show you right now what we're

10  going to be marking as Exhibit 2.  And we're going to

11  show it to you remotely using the computer.

12      A.  Okay.

13      Q.  And that is going to be under Tab 1.  Are you

14  able to see a document in front of you right now?

15      A.  Yes.

16              (Exhibit No. 2 was marked.)

17      Q.  (BY MR. BANKSTON)  Okay.  So what I would like

18  our technology person to do here is scroll down to the

19  bottom of the e-mail because we'll read it from the top

20  to the bottom.  And so let's start with the first

21  e-mail.  And do you see here an e-mail from a gentleman

22  named Len Pozner.

23      A.  Yeah.

24      Q.  Are you familiar with who that is?

25      A.  He's one of the Sandy Hook parents as far as I
```

 1  know.

 2      Q.  Okay.  Mr. Watson, I'm just going to read this

 3  e-mail for the record and you can read along with me and

 4  then we'll talk a little bit about it.  And Mr. Pozner's

 5  e-mail states:  "I am very disappointed to see how many

 6  people are directing more anger at families that lost

 7  their children in Newtown accusing us of being actors.

 8  Haven't we had our share of pain and suffering?  All

 9  these acquisitions of government involvement, false flag

10  terror, new world order, et cetera, I used to enjoy

11  listening to your prior -- your shows prior to 12-14-12.

12  Now I feel like -- now I feel that your type of show

13  created these hateful people, and they need to be reeled

14  in.  Lenny Pozner."

15              Did I read that correctly?

16      A.  Yes.

17      Q.  Okay.  And now, let's scroll up to your

18  response.  Do you -- do you remember writing this

19  response?  Does this bring back that memory?

20      A.  Now that it's presented to me, yes.  I didn't

21  recall it --

22      Q.  Okay.

23      A.  -- when you initially brought it up.  But yes.

24      Q.  Sure.  Now, do you know -- did you do this on

25  your own, or was this a collaborative effort among other

 1  people at Infowars?  Do you remember that?

 2       A.  No.  This would have been me, personally.

 3       Q.  Okay.  So I want to read what you personally

 4  said to Mr. Pozner.  And what you had written was:

 5  "Sir, we have not promoted the, quote, 'actors',

 6  unquote, thing.  In fact, we have actively distanced

 7  ourselves from it.  We have said on numerous occasions

 8  that it was a very real tragedy with very real victims.

 9  I hope we can continue to count on you as a listener,

10  and I am deeply sorry for your loss."

11            That's what you wrote to Mr. Pozner?

12       A.  Correct.

13       Q.  Now, it's -- it's true that you, being Paul

14  Watson, have over the course of the past several years

15  actively distanced yourself from the actors thing,

16  correct?

17       A.  I would say almost immediately, correct, yeah.

18       Q.  In other words, the opinions that you were

19  holding in January 2013 concerning crisis actors are

20  still the same opinions that you hold today and have

21  held continuously since, correct?

22       A.  Correct.  I would say yes.

23       Q.  Okay.  When you talk about "not promoting the

24  actors thing," over the next several years, that's

25  exactly what happened at Infowars, though, correct, that

1  Alex -- Alex Jones and Rob Dew promoted the actors thing

2  over and over?

3      A.  I would say that that happened, but I would say

4  that the majority of coverage on Infowars.com was

5  related to the fact that the tragedy happened and people

6  died.

7      Q.  Have you -- did you happen to watch Mr. Jones's

8  March deposition that was taken in the Luis case?

9      A.  I didn't watch the whole thing.  I did see

10  clips.  Not the whole thing, but clips.

11      Q.  Okay.  And we can both agree that in that

12  deposition there are multiple times when Mr. Jones says

13  that children did not die, that there were clearly

14  actors, and that there were different parents who were

15  faking their reactions and things like that.  Do you

16  recall seeing that?

17      A.  I don't recall the specific content of the

18  clip, but, generally, in that context, yes.

19      Q.  Okay.  Do you -- did you have anything to do

20  with the production of videos in this lawsuit, in other

21  words, the collection and identification of different in

22  videos which were then turned over to the plaintiff?

23      A.  No.

24      Q.  Okay.  Did you know that there is an Infowars

25  video that is titled "Crisis Actors Used At Sandy Hook!"

1  with an exclamation point?  Did you know that?

2      A.  I didn't -- I didn't know specifically, but I

3  accept that, you know, that's -- that's a possibility,

4  yes.

5      Q.  Okay.  You would agree with me that people like

6  Mr. Jones, Mr. Dew, Mr. Shroyer, and others did not

7  treat this issue with extreme caution?

8              MR. JEFFERIES:  Objection, form.  You can

9  answer.

10      Q.  (BY MR. BANKSTON)  You can answer, Mr. Watson.

11      A.  Okay.  I would -- I would say, no, they didn't

12  treat it with extreme caution but such statements would

13  be protected under the First Amendment.

14      Q.  Okay.  We'll talk about the First Amendment

15  later.  But in terms of what you think is decent and

16  right, in terms of covering this story, do you think

17  Infowars always adhered to what is decent and right in

18  covering this story?

19      A.  Well, it's a subjective term, but, from my --

20      Q.  In your opinion, Mr. Watson.

21      A.  From my personal perspective, decent and right,

22  I would not have covered it in that way, no.

23      Q.  Okay.  Mr. Watson, we're going to show you one

24  more video clip.  This is also from Professor Tracy's

25  interview --

Paul Watson

```
1        A.  Okay.

2        Q.  -- and I'm going to set this up for you using

3   the camera again.  This is going to be offered as

4   Exhibit 3.

5              (Exhibit No. 3 was marked.)

6        Q.  (BY MR. BANKSTON)  And this is Watson Clip 2 on

7   January 18, 2013, and I'm going to show you that video.

8              All right.  There we go.  That should be

9   good.  All right.  Mr. Watson, we're going to watch

10  this, and I'll ask you some questions.

11       A.  Okay.

12              (Video playing.)

13              "So asking questions about an event that is

14  been the fulcrum of the Obama Administration's agenda on

15  gun control, it's only sensible while, of course,

16  maintaining that respect, that dignity, that sensitivity

17  for the victims."

18       Q.  (BY MR. BANKSTON)  All right.  Mr. Watson,

19  while you were at Infowars and covering -- let me

20  start -- let me step back.

21              Over the past, say, ten years at Infowars,

22  there have been a large amount of mass casualty events

23  both in the United States and abroad that have been

24  covered in Infowars programming, correct?

25       A.  Correct.
```

Paul Watson

1     Q.   Okay.  When you've been at Infowars for the

2  past, you know, ten years or so, would you say that in

3  covering those mass casualty events, you have tried to

4  maintain that respect, that dignity, that sensitivity

5  for the victims that you were discussing in that video?

6     A.   I would say after Sandy Hook, yes, I would say

7  I tried to maintain that.

8     Q.   Okay.

9     A.   Whether I had beliefs before that that I now

10  completely disavow, that's possibly the case.  But I

11  would say certainly after 2014, I -- as far as I recall,

12  that would be the case.

13     Q.   Okay.  And you talked in that video about how

14  it's important to be able to ask questions about major

15  events.  You'd agree with that today?

16     A.   Yeah.

17     Q.   Okay.  And in your career, you've often asked

18  questions about events that look suspicious to you,

19  correct?

20     A.   Correct.

21     Q.   Okay.  On the other hand, if you weren't

22  questioning, if you were making certain factual claims,

23  for instance, that a parent wasn't real or that a

24  certain parent's crying wasn't -- was fake, those sorts

25  of things, do you consider that still questioning, or

1  are those making assertions of fact to you?

2      A.  I would consider it offensive.  But I would

3  also consider it still questioning of events or facts.

4      Q.  When we talk about maintaining that respect,

5  that dignity, that sensitivity for the victims that you

6  mentioned in that video in 2013, for the next five

7  years, Infowars frequently did not do that, not saying

8  you, but other people at Infowars.  You'd agree with

9  that?

10          MR. JEFFERIES:  Objection, form.  You can

11  answer.

12          THE WITNESS:  I would say generally

13  speaking, that's probably correct in terms of the

14  trajectory of how Infowars covered these events.  I

15  would say we moved away from that kind of response

16  after, you know, 2014.

17      Q.  (BY MR. BANKSTON)  And when you say "that kind

18  of response," are you referring things like mocking the

19  parents crying or accusing them of being fake?  Is that

20  what you're talking about?

21      A.  No.  I'm talking about the nature of the event

22  and the immediate assumption that the official story of

23  everything that happened was completely true.

24      Q.  When do you think, in your mind, that Infowars

25  stopped calling Sandy Hook phony?

Paul Watson                                        November 27, 2019
                                                            Page 21

```
 1        A.  I don't recall any specific time when that

 2   stopped.

 3        Q.  Okay.

 4        A.  And if -- if I was pinned down on it, I would

 5   probably say the Megyn Kelly interview, which I don't

 6   recall when that was, but I believe it was a couple

 7   years ago, so I would probably say that.

 8        Q.  Okay.  That Megyn Kelly interview -- I'll give

 9   you -- I'll kind of bring you up to speed.  That was in

10   June of 2017.

11        A.  Okay.

12        Q.  And do you know when Infowars was first sued

13   over Sandy Hook?

14        A.  No.

15        Q.  Okay.  That took place in April of 2018, less

16   than a year later.  Do you have any knowledge sitting

17   here today about what Infowars was saying about Sandy

18   Hook between the Megyn Kelly interview in 2017 and when

19   Alex Jones was sued in 2018?

20        A.  I don't have any specific recollection, no.

21        Q.  Okay.  If Mr. Jones -- if I was to tell you

22   that Mr. Jones in October of 2017 was calling Sandy Hook

23   phony as a three dollar bill, you wouldn't have any

24   reason to dispute that?

25        A.  I don't specifically recall him saying that,
```

1  but I wouldn't dispute that it happened.

2       Q.   Okay.  I want to talk a little bit more about

3  harassment and as we discussed that victims were being

4  harassed and that you knew that as early as January in

5  this video.  Did you -- you knew and understood that

6  that harassment went on for years, correct?

7       A.   That it went on for years afterwards, I don't

8  know an exact time period as to when it went on, but I

9  do know that it occurred, yes.

10      Q.   Okay.  You know who Wolfgang Halbig is, right?

11      A.   Vaguely.  He worked in school security.  That's

12  all I know about him.  And that, obviously, he appeared

13  on Infowars.

14      Q.   Okay.  And do you know about his trips to

15  Newtown with a gentleman named Dan Bedani?

16      A.   Not specifically, no.

17      Q.   Okay.  Have you ever seen footage of what Dan

18  Bedani did in Newtown to the Newtown residents?

19      A.   Not that I recall, no.

20      Q.   Okay.  You know who Jim Fetzer is, right?

21      A.   Yes.

22      Q.   Okay.  Do you know who Jonathan Reich is?

23      A.   No.

24      Q.   Okay.  You would know anything about

25  Mr. Reich's arrest for harassing the Sandy Hook parents?

Paul Watson

November 27, 2019
Page 23

```
1        A.   I'm aware that somebody was arrested for that,
2   did not recall his name.  But, yes, I'm aware that
3   somebody was arrested.
4        Q.   Okay.  Do you know who Lucy Richards is?
5        A.   Doesn't ring a bell, no.
6        Q.   Okay.  Let me see if it refreshes, did you know
7   that in 2016 a woman was sentenced to federal prison for
8   threatening to kill some Sandy Hook parents?
9        A.   I don't recollect that.  I recollect -- I
10  recollect the guy arrested for harassment but not this
11  individual.
12       Q.   Okay.  When it came to people who were
13  harassing these parents who had lost children that went
14  on, Infowars was aligning with these people, correct?
15                 MR. JEFFERIES:  Objection, form.  You can
16  answer.
17                 THE WITNESS:  I saw no evidence that we
18  were directly aligning with these people, no.
19       Q.   (BY MR. BANKSTON)  Okay.  Mr. Watson, I would
20  like to show you another document now.  And I would like
21  to show you an e-mail that you sent in 2015 on
22  December 17th.
23       A.   Okay.
24       Q.   This is Tab 2.  Do you see this e-mail in front
25  of you?
```

Paul Watson

November 27, 2019
Page 24

1      A.   Yeah.

2      Q.   We're going to be offering this as Exhibit 4.

3             (Exhibit No. 4 was marked.)

4      Q.   (BY MR. BANKSTON)  I'm going to read this

5  e-mail that you -- well, actually, first, let's start at

6  the top of the e-mail.  You have sent this to two

7  different people, one of whom is named Buckley, correct?

8      A.   Correct.

9      Q.   Okay.  Buckley Hamman, is that his last name?

10     A.   Correct.

11     Q.   Okay.  Buckley Hamman is Alex Jones' cousin,

12  right?

13     A.   Right.  Yes.

14     Q.   Okay.  And then another Infowars personnel that

15  you sent this to is Anthony.  Who is Anthony?

16     A.   That's Anthony Gucciardi.

17     Q.   Okay.  What is his -- what is his job role at

18  Infowars?

19     A.   He's one of the managers at Infowars and I

20  believe still is.  But I'm not sure if he's still there,

21  but he was at the time.

22     Q.   When you say "manager," what does he manage?

23     A.   I don't -- I don't have any detailed

24  information.  Buckley was the manager.  Anthony was the

25  manager.  Basically, they would be, you know, in a

1 position which was above the writers and the

2 contributors.  As to their exact roles, I was not in the

3 office anywhere near enough to know specifically, but I

4 would describe them as managers.

5     Q.  Okay.  That's -- what I guess I'm trying to get

6 at is:  These are people who manage the writing -- in

7 other words, these are people who have management

8 related to Infowars editorial output, not people who,

9 say, manage the sales of the supplements and brain pills

10 and that kind of thing?

11    A.  With Gucciardi, he was mainly involved in the

12 supplements and the sale and logistics of that.  In

13 terms of directly -- I mean, they would give the writers

14 advice, I guess, but they would not be -- that wouldn't

15 be their sole job description.

16    Q.  Okay.

17    A.  So I would say it was a general manager role.

18    Q.  Let's take a look at this e-mail that you sent

19 on December 17th, 2015.  And at the top it says:  "Sent

20 this to Alex."  I'm going to make the assumption, you

21 can tell me if I'm wrong, when you say sent this to

22 Alex, that means you sent it in a text message?

23    A.  I would assume so because I didn't communicate

24 with Alex via e-mail, so I would assume either it would

25 be a direct phone conversation or a text message.

```
 1        Q.   Okay.   And I want to read what you sent to
 2   Alex.
 3                "This Sandy Hook stuff is killing us.  It's
 4   promoted by the most bat shit crazy people like Rense
 5   and Fetzer who all hate us anyway.  Plus it makes us
 6   look really bad to align with people who harass the
 7   parents of dead kids.  It's going to hurt us with Drudge
 8   and bringing bigger names into the show.  Plus the event
 9   happened three years ago.  Why even risk our reputation
10   for it?"
11                My first question is -- let's first talk
12   about who Jeff Rense is.  You know who he is?
13        A.   Yes.
14        Q.   Okay.  Jeff Rense is a notoriously unreliable
15   conspiracy theorist and rabid anti-Semite, correct?
16        A.   I would -- I don't know enough about him to
17   call him a rabid anti-Semite, but I would say he was a
18   conspiracy theorist, yeah.
19        Q.   Okay.  Same question for Mr. Fetzer.
20        A.   Again, the anti-Semitism stuff, I don't -- I
21   don't recall anything related to that, but if you want
22   to say he engages in conspiracy theories, that would be
23   accurate.
24        Q.   All right.  Tell me what you mean -- well,
25   actually, tell me how you came to the conclusion that
```

1  these two gentlemen that Infowars was relying on were

2  bat shit crazy?

3       A.  Because they were pushing the notion that

4  nobody died at Sandy Hook, which I thought was not

5  credible and was supported by no evidence, so therefore,

6  was a crazy conclusion to make.

7       Q.  So by that same logic, Alex Jones, equally, bat

8  shit crazy?

9       A.  I wouldn't describe him as bat shit crazy.

10      Q.  What kind of crazy?

11           MR. JEFFERIES:  Objection, form.

12           THE WITNESS:  I would describe it as him

13  commenting on the controversy of the conspiracy theories

14  that were swirling about Sandy Hook at the time.

15      Q.  (BY MR. BANKSTON)  Okay.  So if Jeff Rense or

16  Jim Fetzer starts pushing allegations that the children

17  aren't real and that the parents are fake and that the

18  crying is all fake and it's all an act, they're bat shit

19  crazy.  But if Jones says literally the exact same words

20  on his telephone -- his web broadcast, he's just doing a

21  good job as a journalist?

22      A.  Well, to kind of combine this with your

23  previous question, I would say the description of them

24  as "bat shit crazy" would also involve things that

25  they've said in the past unrelated to Sandy Hook, maybe

Paul Watson

1  about UFOs or alien abduction or holograms on 911, which

2  I think was Fetz's [sic] big thing for a while.  So, you

3  know, they had -- they has a previous of engaging in

4  very obscure conspiracy theories, which would contribute

5  to that description of bat shit crazy.

6      Q.  Do you think that their history of doing that

7  is any different than Alex Jones?

8      A.  No.  But again, they have the right to engage

9  in that speech under the First Amendment.

10     Q.  I'm not -- look, Mr. Watson, at this point I'm

11 not asking you who had the right to do what.  We'll all

12 figure that out.  What I'm asking you is:  Alex Jones

13 and his crazy conspiracies about Shadow inter

14 dimensional governments and alien/fish hybrids, things

15 like this, that's no different than Fetzer and Rense.

16 There's qualitatively no difference in how they covered

17 conspiracy theories, correct?

18             MR. JEFFERIES:  Objection, form.  You can

19 answer.

20             THE WITNESS:  Well, that's -- that's your

21 view.  I -- I wouldn't necessarily agree with it.

22     Q.  (BY MR. BANKSTON)  All right.  So in your view,

23 people like Rense and Fetzer are bad but Mr. Jones not

24 in the same way?

25     A.  I would say not in the same way because I would

1  say Alex was covering the controversy of Sandy Hook

2  which is circulating before he engaged in the same kind

3  of conspiracy theories.  In terms of Fetzer, as is shown

4  in the e-mail, he's -- he was antagonistic towards me,

5  personally, so I had a bias against him, which is a

6  factor in -- in that e-mail.

7      Q.  Tell me about the conflict you and Mr. Fetzer

8  had.

9      A.  I don't remember very specific details about

10  it, but it was -- it was a long time ago, and it was

11  something to do with me not agreeing with a conspiracy

12  that he had postulated, and he responded by attacking my

13  character.  I think that's what it was related to, but

14  it was a very long time ago.

15      Q.  Okay.  In this e-mail, you say, "It makes us

16  look really bad to align with people who harass the

17  parents of dead children."

18              Can you explain to me what you mean by

19  that?

20      A.  To share their narrative of what happened,

21  given that I did not think they were credible

22  individuals that would harm us, that's what I meant by

23  that.

24      Q.  Okay.  When you talk about Drudge in this

25  e-mail, "it's going to hurt us with Drudge," that's Matt

Paul Watson

November 27, 2019
Page 30

1  Drudge you're talking about, correct?

2      A.  Correct.

3      Q.  Matt Drudge runs an internet website where he

4  collects links from news around the web and collects it

5  for people, correct?

6      A.  Correct.

7      Q.  Okay.  And it was Infowars' desire at this time

8  to be featured on Drudge and to have some of the traffic

9  that Drudge would create, correct?

10     A.  Partly, but partly also, Drudge is seen in

11 conservative new circles as a credible new source.  So

12 to be on Drudge was to give you an element of

13 credibility.

14     Q.  And it's true that if Alex Jones kept going on

15 Infowars and saying things like "the parents are fake"

16 and "the school was actually closed," things like that,

17 it was -- it was going to be difficult for people like

18 Drudge to promote him, correct?

19     A.  Well, you'd have to ask Matt Drudge on that

20 question.  I don't know what he would think.

21     Q.  Well, you say -- you say, "it's going to hurt

22 us with Drudge."  What did you mean by that?

23     A.  That being seen to associate with people who I

24 thought were pushing beliefs and viewpoints that were

25 not credible would have a backlash of making us less

Paul Watson

1  credible amongst more credible new sources like Drudge.

2       Q.  And that's exactly what happened, isn't it?

3  There has been a considerable amount of backlash over

4  Sandy Hook?

5       A.  I wouldn't say with Drudge because he didn't

6  stop linking to our articles on his website.

7       Q.  Okay.  But in general, there have -- Infowars

8  has faced significant backlash over its coverage of

9  Sandy Hook?

10      A.  As a result of the lawsuit and the Megyn Kelly

11  interview, yes.

12      Q.  You don't think people were upset about this

13  before that?

14      A.  Not to the same degree.

15      Q.  Okay.  Now, it has bothered you, personally, to

16  be associated with the kind of tasteless things being

17  said about the parents on Infowars, correct?

18           MR. JEFFERIES:  Objection, form.  You can

19  answer.

20           THE WITNESS:  Well, it obviously bothered

21  me at the time because of the content of that e-mail.

22      Q.  (BY MR. BANKSTON)  Correct.  And it continued

23  to bother you, right?

24      A.  So long as the same narrative was being pushed,

25  yes.

1      Q.   Okay.  Because Mr. -- let's be honest about

2  this e-mail in 2015.  Mr. Jones didn't listen to you,

3  correct, on this topic?

4      A.   Whether he toned it down, I couldn't say, but,

5  I mean, if you want to say he didn't -- he didn't listen

6  to me in that instance, you could convey that argument,

7  yes.

8      Q.   In fact, looking back retrospectively,

9  Mr. Jones has said that you're right.  Did you know

10  that?

11      A.   I'm aware of his deposition where he brought up

12  the fact that we had disagreements about it, yeah.

13      Q.   Okay.  Mr. Jones, [sic] I want to show you

14  another document at this point.  I want to show you a

15  document from an e-mail exchange that you had on

16  November 18, 2016.  This is going to be Tab 3, and I

17  will be offering it as Exhibit 5.

18                (Exhibit No. 5 was marked.)

19                MR. BANKSTON:  Can we scroll to the very

20  bottom of that e-mail exchange?  That will do right

21  there at that paragraph.  Fantastic.  All right.  That's

22  great.

23      Q.   (BY MR. BANKSTON)  Mr. Watson, you see here

24  that there is a -- a e-mail from the communications

25  manager at a -- at a place called Quantcast.  Do you

 1  know what Quantcast is?

 2      A.  Yeah.

 3      Q.  Okay.  Am I correct that Quantcast can

 4  basically place rankings on websites on how much traffic

 5  they received?

 6      A.  Yes.

 7      Q.  Okay.  And this e-mail here is telling you that

 8  there was a traffic surge at Infowars and so as for a

 9  routine measure, they're just going to place a temporary

10  hold on the ranking system.  Have you ever seen an

11  e-mail like this before?

12      A.  I mean, it's -- it's possible that I saw it at

13  the time.  I don't recall it specifically.

14      Q.  Okay.  If we can scroll up to the next couple

15  of sets of e-mails here, right there is fine.  And

16  you'll see the e-mail was sent to you and you said,

17  "Thanks, I will pass this on."  And sent it -- as we

18  scroll up -- keep scrolling up -- to a person that we

19  talked about before, Buckley.  Go ahead and scroll to

20  the top of this e-mail that we can see.

21              All right.  Do you see here where it has

22  your e-mail address to Buckley@Infowars.com?

23      A.  Yeah.

24              MR. BANKSTON:  Let's scroll onto the -- off

25  the header so we can actually see the full e-mail to

 1  right about there is fine for right now.

 2      Q.  (BY MR. BANKSTON)  When you sent this e-mail,

 3  Buckley made a joke, and I want to read it to you.

 4  Okay?  Said, "But no, surely it's a conspiracy theory

 5  that they are trying to suppress our popularity so that

 6  the lizard people can return to the ascension pad at

 7  Sandy Hook and feast on sacrificed crisis actors."

 8          Buckley here is making a joke about the

 9  craziness of those theories, isn't he?

10          MR. JEFFERIES:  Objection, form.

11          THE WITNESS:  You would have to -- you

12  would have to ask Buckley.  I don't want to speak for

13  him.

14      Q.  (BY MR. BANKSTON)  Well, when you get an e-mail

15  in your day-to-day business that's talking about lizard

16  people going to the ascension pad at Sandy Hook and

17  feasting on sacrificed crisis actors, what did you take

18  that to mean?

19      A.  Obviously, I would assume that it's dark humor.

20      Q.  Dark humor about what?  What he's joking about?

21      A.  About the notion that at the time we were being

22  widely suppressed in terms of censorship or blocking our

23  traffic, I guess.

24      Q.  Well, what's this stuff about lizard people?

25  What is that about?

1      A.  Well, I mean, lizard people is a David Icke

2   conspiracy theory that the rule is that the world is

3   actually shape-shifting lizards is the way I understand

4   it.

5      Q.  Okay.  What is an ascension pad?

6      A.  I don't know what an ascension pad is.  I guess

7   it's like a Star Trek beam-me-up kind of thing.  I don't

8   know.

9      Q.  Okay.  And sacrificed crisis actors, have you

10  ever heard of any -- I mean, we talked about crisis

11  actors.  Do you know anything about the sacrifice of

12  crisis actor?

13     A.  No.

14     Q.  Okay.  Below his e-mail is a little caricature

15  of a man who's wearing an undershirt and missing a lot

16  of teeth.  Do you have any idea what that's about?

17     A.  I have no idea what the -- what the image is

18  about, no.  I have some idea about the hand sign but not

19  the overall image.

20     Q.  All right.  Tell me what that hand sign is.

21     A.  During the 2016 presidential campaign, Donald

22  Trump would make the same hand sign while making a

23  point, so it became a thing amongst his supporters to do

24  the same hand sign.

25     Q.  See, I thought -- and maybe I'm wrong about

Paul Watson                                         November 27, 2019
                                                           Page 36

1  this.  You might be able to clear this up.  I thought

2  there was some sort of thing going on 4chan where a

3  bunch of weird neo-Nazis were saying, Hey, we can do the

4  okay sign since it kind of has a plausibly benign

5  explanation, you can use it as a crypto-fascist symbol

6  for white supremacy.  Have you ever heard of that?

7       A.  So currently, I've heard of that, but I would

8  say that whole thing happened after 2016.  I think that

9  started in 2017 when they began that meme.

10      Q.  Were you aware that this -- this caricature

11 here of this man that that's a popular meme on 4chan?

12      A.  I -- I have no recollection of this being a

13 meme at the time, no.

14      Q.  Right.

15      A.  I have a recollection of the hand sign being a

16 meme in 2017 but not this particular cartoon.

17      Q.  Okay.  Do you remember right around after the

18 time of the election there was -- there were some

19 articles about how Alex Jones had said on his show that

20 Trump had called him after the election to thank him?

21 Do you remember that?

22      A.  I remember him making such statements, yeah.

23      Q.  Okay.  And then do you remember a few days

24 after that a woman named Erica Lafferty writing an open

25 letter to the President asking him to disavow Trump -- I

Paul Watson

1    mean asking him to disavow Mr. Jones?

2         A.  I don't remember that, no.

3         Q.  Okay.  Do you remember on the day of this

4    e-mail that we just looked at, November 18, 2016, do you

5    remember Alex Jones publishing a video that he recorded

6    called "Alex Jones's Final Statement on Sandy Hook"?

7         A.  Well, what -- what was the date of the e-mail?

8         Q.  November 18, 2016.

9         A.  I thought it was November 8.  Is it 18?

10        Q.  It's 18, yes, sir.

11        A.  Can you repeat the question?

12        Q.  Sure.  Do you remember on that date Mr. Jones

13   publishing a video, are you familiar with the video

14   "Alex Jones Final Statement on Sandy Hook"?

15        A.  I'm aware of the title of the video not the

16   content.  But the title, yes.

17        Q.  Do you remember during Mr. Jones's deposition a

18   clip being played from that broadcast in which Mr. Jones

19   said, "I've seen soap operas before and I've seen actors

20   and I know when I'm watching a soap opera and when I'm

21   watching something real."  Do you remember that

22   quotation?

23        A.  I don't remember the specific quotation.

24        Q.  Do you remember Mr. Jones doing a mocking

25   imitation of Robby Parker crying?

Paul Watson

November 27, 2019
Page 38

```
 1            MR. JEFFERIES:  Objection, form.

 2            THE WITNESS:  I remember questions about

 3  whether his crying was genuine from Alex Jones.  I don't

 4  remember specifically an impersonation.

 5       Q.  (BY MR. BANKSTON)  Okay.  During that final

 6  statement on Sandy Hook -- let me scratch that and go

 7  back.

 8            At the very time that you were writing

 9  these e-mails with Buckley on November 18, 2016 joking

10  about crisis actors, were you aware that Mr. Jones just

11  a few hours earlier had been on Infowars accusing the

12  parents of being actors?

13       A.  I don't think I joked about crisis actors in my

14  e-mail.  Wasn't that Buckley that used the term "crisis

15  actors"?

16       Q.  Okay.  Let's rephrase the question.

17            Were you aware that in that e-mail exchange

18  you were having with Buckley where he joked to you about

19  crisis actors and the outlandish nature of crisis actors

20  that at that same time a few hours earlier, Mr. Jones

21  was on his show accusing the parents of being actors?

22  Were you aware of that?

23       A.  No --

24       Q.  How do you feel --

25       A.  -- I have no recollection of that.
```

Paul Watson

1    Q.  How do you feel about that, Mr. Watson?

2    A.  I feel that he was completely inaccurate in

3  making that claim.

4    Q.  Okay.  Not something you're proud of at

5  Infowars, correct?

6    A.  Well, it's not something that I said so...

7    Q.  Well, it's something you're associated with,

8  right?  I mean, I understand you're a media person who

9  has seen a meteoric rise in the last years and you have

10 a brand.  Doesn't it bother you on some level that this

11 ridiculous behavior of Jones and others at Infowars has

12 somewhat tarnished your brand and made it more difficult

13 for you?

14          MR. JEFFERIES:  Objection, form.

15          THE WITNESS:  I would say that I had my

16 grievances at the time, and I think the whole culture of

17 the organization slowly started to change afterwards, so

18 I did what I could at the time.

19   Q.  (BY MR. BANKSTON)  Okay.  It wasn't enough,

20 though, right?  Mr. Jones didn't listen to you?

21   A.  Well, I think that he -- he listens more now.

22   Q.  You threatened to quit over Sandy Hook,

23 correct?

24   A.  I don't recall any specific conversation

25 threatening to quit.  I mean, it's possible, but I don't

1   recall it.

2       Q.  Okay.  The reason I asked is Mr. Jones said you

3   threatened to quit.  And I was wondering if you had any

4   reason to dispute that.

5       A.  Maybe in the -- in the heat of a private

6   conversation.  But I don't specifically recall the exact

7   details of the conversation.

8       Q.  So you've had private conversations with

9   Mr. Jones about Sandy Hook?

10      A.  Yes.

11      Q.  Okay.  So in addition to the written messages

12  you've sent him warning him of his conduct, you've had

13  private verbal conversations as well?

14      A.  At the time, yes.

15      Q.  Okay.  When you say "At the time," what do you

16  mean?

17      A.  For the period 2013 to 2014.

18      Q.  And then we saw a 2015 e-mail.  Do you believe

19  you were still talking to him about it in 2016, 2017?

20      A.  I have no recollection of talking to him about

21  it in those years.  It's possible, but I felt the

22  subject had died down by that point.

23      Q.  Do you recall having any conversations with him

24  about his Megyn Kelly interview in 2017?

25      A.  Yeah.

1      Q.  Okay.  Do you remember his Megyn Kelly

2  interview?  Do you remember the things he said?

3      A.  I remember that he was grilled by her.  I don't

4  remember his specific response.

5      Q.  Okay.  Would you have -- would you have any

6  reason to disagree with me that during that interview,

7  Mr. Jones, again, repeated several false claims about

8  Sandy Hook?

9      A.  I don't recall the specifics of the interview

10  so I couldn't say.

11     Q.  Okay.  Let's go back -- you know, we had talked

12  about the First Amendment for a second so let's put a

13  pin in it.  And we had talked about things like decency

14  and sensitivity.  And -- but I believe one of your

15  answers was no matter how indecent, no matter how

16  upsetting that this is all conduct protected by the

17  First Amendment, correct?

18     A.  Correct.

19     Q.  Okay.  And you've -- you've -- okay, you're a

20  foreign journalist, but you're involved in an American

21  media company, correct?

22     A.  I wouldn't consider myself a journalist.

23     Q.  You don't think you do any journalism?

24     A.  I have done journalism.  But the vast majority

25  of what it do I wouldn't consider journalism.

Paul Watson

1     Q.  Can you tell me what -- what is journalism to

2  you, what does that mean?

3     A.  To me, it would be going out on the streets

4  from a first-person perspective and either talking to

5  people involved in news events or being on the scene of

6  news events, I would consider that journalism --

7     Q.  Okay.

8     A.  -- which I have done -- which I have done.  But

9  the vast majority of what I do is not that.

10     Q.  Okay.  As a person who has worked with an

11  American media company, even though you're foreign, you

12  have familiar -- you have familiarity with the First

13  Amendment, freedom of speech, those sorts of concepts?

14     A.  Yeah.

15     Q.  Okay.  You would agree with me the First

16  Amendment doesn't cover falsely accusing someone of a

17  crime that could severely damage their reputation; you

18  would agree with that?

19     A.  Well, I -- that would -- that would be a -- a

20  lawsuit process.  It depends -- it depends on the nature

21  of the accusation.  I don't -- I don't --

22     Q.  Well, I'm telling you the nature of the

23  accusation.

24     A.  That's why we have defamation and libel laws

25  for that to be pursued after the fact.

Paul Watson                                           November 27, 2019
                                                              Page 43

1      Q.  Correct.  So in other words, it may not be

2   covered by the First Amendment if you falsely accuse

3   someone of a crime that could severely damage their

4   reputation?

5      A.  Under my understanding, if that was the case,

6   then, no, it wouldn't be covered under the First

7   Amendment.

8      Q.  Okay.  So if you accuse parents of being fake,

9   if you say they're not real, they're crisis actors, that

10  means they're giving false statements to police.  It

11  means everything they're doing is a lie, a giant fraud,

12  maybe one of the massive -- most massive crimes

13  conceivable in American history, you would agree that

14  those people have suffered damage, they have been

15  falsely accused of something?

16                  MR. JEFFERIES:  Objection, form.

17                  THE WITNESS:  I'm not -- I'm not aware that

18  Alex Jones directly accused a parent of not existing.  I

19  will not say it's not possible, but I'm not aware that

20  that happened.

21      Q.  (BY MR. BANKSTON)  So let's go ahead and make

22  an assumption for me, just for the purposes of this

23  question, that if Alex Jones said something like, "At

24  first, I thought they killed real children, but they

25  didn't kill any children, and everybody's clearly an

1  actor," if he said that, he crossed the line, didn't he,

2  Mr. Watson?

3          MR. JEFFERIES:  Objection, form.

4          THE WITNESS:  I would -- I would compare it

5  to other news organizations who have made claims about

6  events such as the Iraq War where CNN and others

7  reported that babies were being thrown out of incubators

8  by Saddam Hussein's military and people questioned.

9  That would be seen as being very offensive to claim that

10  babies were thrown out of incubators, but that was later

11  proven to not have happened.  So I mean, it's extremely

12  important to question the nature of major news events no

13  matter how offensive that may be.

14      Q.  (BY MR. BANKSTON)  Okay.  So let's go to this

15  babies and incubators thing.  This is an Infowars thing

16  I hear a lot.  Who -- if -- if there was a lie -- so my

17  understanding of this is there was a lie made by the

18  media -- certain parties of the media that babies were

19  being thrown out of incubators in Kuwaiti hospitals; is

20  that correct?

21      A.  As far as I understand it, yeah.

22      Q.  Okay.  Who is being accused of doing that?  Who

23  was being accused of throwing the babies out of the

24  incubators?

25      A.  As far as I know, it was Saddam Hussein's

```
 1  military.
 2      Q.  Okay.  So I guess in that case, if individual
 3  military members who were assigned to that hospital
 4  wanted to sue those American media companies for
 5  defamation, that's something they could do, right?
 6              MR. JEFFERIES:  Objection, form.
 7              THE WITNESS:  Well, from your question, my
 8  understanding is that would it be covered under the
 9  First Amendment to question whether that event was
10  happening.  I would say it was covered because it was a
11  major news event.  No matter how offensive that may be
12  to question such as horrible tragedy, I believe that in
13  some cases it's viable to do so because of the wider
14  tragedy that could evolve from that is far greater.  As
15  to whether Iraqi military soldiers could sue
16  individuals, I don't know the law on that so I couldn't
17  say.
18      Q.  (BY MR. BANKSTON)  Okay.  Well, what about, for
19  instance -- you know who Tom Arnold is, right?
20      A.  The actor.
21      Q.  Yeah.  Tom Arnold.
22      A.  Yeah.
23      Q.  Yeah.  And you know who Jack Posobiec is?
24      A.  Yeah.
25      Q.  Okay.  You remember not too long ago Tom Arnold
```

Paul Watson

1  made some comment once Twitter basically implying that

2  Jack Posobiec was -- had some sexual proclivities that

3  involved children?

4      A.  Yeah.

5      Q.  Okay.  And at that time you wrote that Jack

6  Posobiec was perfectly entitled to sue Tom Arnold and

7  that Tom Arnold is subject to a lawsuit because the

8  First Amendment doesn't cover falsely accusing someone

9  of a crime that could severely damage their reputation.

10  Do you agree with that?

11      A.  In that case, yes.

12      Q.  Okay.  And Mr. Arnold, he's a public figure,

13  right?

14      A.  Yeah.

15      Q.  People know who he is, right?

16      A.  Yeah.

17      Q.  In fact, you understand the distinction in

18  America that when you have a public figure, the media

19  might be more entitled to talk about that person or

20  speculate on that person than if they were a private

21  individual.  Are you familiar with that concept?

22      A.  Well, yes, you would hope.  It's not how the

23  media behaves now, but yes, in -- in principle, yes.

24      Q.  Okay.  So if Tom Arnold, a public figure, and

25  Jack Posobiec, another public figure, if there can be a

Paul Watson                                                    November 27, 2019
                                                                   Page 47

```
 1  defamation suit there, then surely if a media

 2  organization accuses a parent of being fake in the

 3  context of the death of their child, that is equally

 4  actionable; wouldn't you agree?

 5            MR. JEFFERIES:  Objection, form.

 6            THE WITNESS:  As far as I understand it,

 7  the Sandy Hook parent were public figures given that

 8  they had given interviews and statements to the media.

 9  On whether they wanted to become public figures or not

10  is a different matter, but I would consider them public

11  figures.

12     Q.  (BY MR. BANKSTON)  Okay.  Well, let's -- let's

13  leave that for the Courts, and which I'm not sure if

14  you're familiar with any of that and whether that's

15  happened.  But assume for me more the moment that that

16  Sandy Hook parents are private individuals.  Do you

17  believe Infowars needed to exercise a certain level of

18  care to make sure that they weren't making false

19  acquisitions against them?

20     A.  Yes.  But I'm not aware of any direct, false

21  acquisitions that were made against any individual

22  person, not to say it's not possible, but I don't

23  recollect any.

24            THE WITNESS:  Can we have a bathroom break?

25            MR. BANKSTON:  We absolutely can,
```

Paul Watson

 1  Mr. Watson.

 2              THE WITNESS:  Five, minutes?

 3              MR. JEFFERIES:  Sure.

 4              THE WITNESS:  Five minutes, okay.

 5              (Brief recess.)

 6      Q.  (BY MR. BANKSTON)  Mr. Watson, can you tell me

 7  what you did to prepare for your deposition today?

 8      A.  I spoke to Robert Bonds and Wade Jefferies.

 9      Q.  Okay.  Did you review any documents?

10      A.  No.

11      Q.  When did you speak with your counsel?

12              MR. JEFFERIES:  Objection, form.

13              THE WITNESS:  Sunday evening my time and

14  this afternoon, today.

15      Q.  (BY MR. BANKSTON)  Okay.  How long did you

16  spend talking with counsel?

17      A.  Let's say total, both conversations, probably,

18  like, 30 to 40 minutes.

19      Q.  Okay.  When it comes to the Sandy Hook tragedy,

20  how did you determine it was a real event and not phony?

21      A.  I just didn't believe the notion that it was a

22  wider conspiracy.

23      Q.  Why is that?

24      A.  Personally because the -- the explanation that

25  it was a conspiracy to push for the gun control didn't

1  make sense to me because after the event, further gun

2  control did not really happen under the Obama

3  Administration from my perspective so I could not see a

4  motive.

5       Q.  Okay.  So you know -- you came to that

6  realization during the Obama years that it was a real

7  event?

8       A.  Yeah, I would say so, yeah.

9       Q.  Okay.  Let me ask you about the First Amendment

10  again.  One of the things that you have testified to is

11  whether certain things are or are not allowed under the

12  First Amendment.  First of all, can you tell me -- can

13  you first tell me what your educational background is?

14       A.  I -- I went to school, I went to college, and I

15  don't have a higher education degree, so that's my

16  background.

17       Q.  Okay.  So when you -- you went -- you attended

18  a college but have no degree?

19       A.  No.  In college -- in the UK, college is

20  different.  It means the period after high school.  So

21  it's A-level.  So I attended college to get A-levels,

22  and then I went to a university afterwards for a year,

23  and then dropped out.

24       Q.  Okay.  Do you have any education in journalism?

25       A.  No.

Paul Watson

1      Q.   Do you have any education in United States law?

2      A.   No.

3      Q.   Okay.  When it comes to what is or is not

4   allowed under the First Amendment, you really don't have

5   any qualifications to say, do you?

6      A.   No.  But a lot of what I do is related to free

7   speech.  So although I don't have any academic

8   qualifications, I would like to consider I have a

9   reasonably good grasp of it.

10     Q.   Let's talk a little bit about journalism.  Have

11  you ever heard the phrase "journalistic integrity"?

12     A.   Yeah.

13     Q.   What does that phrase mean to you?

14     A.   It means reporting the facts as you see it in a

15  nonpartisan, neutral way.

16     Q.   Okay.  Do you think that a news organization, a

17  media organization owes any obligations to exercise any

18  measure of effort to ensure that its statements about

19  people are factual and true?

20     A.   I would say that's very much dependent on

21  whether the organization presents itself as a

22  middle-of-the-road, nonpartisan, journalistic outlet and

23  not a commentary, slash, opinion outlet.

24     Q.   So a commentary opinion outlet, one that may be

25  partisan in nature, you feel has no obligation --

1     A.   Correct.

2     Q.   -- to ensure that the things that it's saying

3  are accurate or true?

4     A.   No.  Because it will always be skewed by a bias

5  to one side or the other.  If you present yourself as a

6  CNN or an ABC, I believe you have the duty to, you know,

7  play it straight down the line and be -- be nonpartisan,

8  not that that happens, I believe, in today's society.

9  But in terms of wearing your bias on your sleeve, I

10 think people understand that an outlet that doesn't

11 present itself as being nonpartisan is always going to

12 be bias in one direction or another.

13    Q.   Okay.  Well, let's take a claim such as -- I'll

14 give you an example -- a claim being made that no

15 paramedics were allowed inside Sandy Hook Elementary

16 School.  Can you tell me how partisanship or commentary

17 would allow you to say that without regard to its

18 accuracy, but a journalist, a nonpartisan organization

19 has a different obligation?  Can you explain that to me?

20         MR. JEFFERIES:  Objection, form.

21         THE WITNESS:  I don't know.  If -- I would

22 say if you believe -- if you've seen information to

23 suggest that was the case and that's what you believe,

24 then you will present that as your opinion.  I'm not

25 sure as to the exact nature of where that came from

Paul Watson

1  but...

2      Q.  (BY MR. BANKSTON)  Well, what if it came from

3  one of those bat shit crazy people like Fetzer or Rense?

4      A.  Well, personally, I wouldn't amplify what they

5  were saying.

6      Q.  One of the reasons you wouldn't amplify what

7  they're saying is because if you have somebody with a

8  track regard of being bat shit crazy and unreliable, it

9  would violate the sense of journalistic integrity to

10  promote what they are saying as fact, correct?

11      A.  Yes.  If you were a journalistic,

12  middle-of-the-road, nonpartisan, non-commentary

13  outlet --

14      Q.  But Alex Jones -- so Alex Jones is allowed to

15  do that.  Other people who claim to be journalists

16  can't, but Alex Jones can do that.  That's fine.

17      A.  Under their -- under their own journalistic

18  ethics, they wouldn't.  Alex Jones would because he's an

19  opinion commentator.

20      Q.  And he has no journalistic ethics, correct?

21          MR. JEFFERIES:  Objection.

22          THE WITNESS:  He's not a journalist.  So

23  no, he's not.  He doesn't abide by those ethics because

24  he's not a journalist.

25      Q.  (BY MR. BANKSTON)  Thank you, Mr. Watson.

Paul Watson                                    November 27, 2019
                                                    Page 53

```
 1              Do you know who Rob Dew is?

 2       A.   Yeah.

 3       Q.   He's been for many years producing the Infowars

 4  Nightly News, correct?

 5       A.   When -- when that was a show, yeah.

 6       Q.   He -- he has been sort of described -- I don't

 7  know if this is formal or informal, but he's been

 8  described as Infowars news director; were you aware of

 9  that?

10       A.   Yeah.

11       Q.   Did you know that Mr. Dew testified that the

12  majority of what Infowars does is journalism?

13       A.   No.  I haven't seen his testimony so I was not

14  aware of that.

15       Q.   Do you disagree with that assertion?

16       A.   In terms of on-the-ground reporting, there is a

17  journalistic aspect to it, yes.  I wouldn't -- I

18  wouldn't say what Alex Jones does is journalism, but we

19  do have people who do what you would call "reporting,"

20  yes.

21       Q.   Are you familiar with journalists like, say,

22  Chris Wallace on Fox News?

23       A.   Yeah.

24       Q.   Okay.  He doesn't go out in the street, does

25  he?
```

```
 1        A.  I don't know.

 2        Q.  Right.  I mean, he sits behind an anchor desk.

 3        A.  Sorry?

 4        Q.  He sits behind an anchor desk just like Alex

 5   Jones, right?

 6        A.  Mainly, yeah.

 7        Q.  So if you don't have to go out in the street,

 8   if you're sitting behind an anchor desk reporting facts,

 9   you're doing journalism, aren't you?

10             MR. JEFFERIES:  Objection, form.

11             THE WITNESS:  No.  I would say people like

12   him and Sean Hannity on Fox are opinion commentators not

13   journalists.

14        Q.  (BY MR. BANKSTON)  Okay.  Can you tell me in

15   your mind -- because we've been talking today a little

16   bit about Infowars having opinions versus assertions of

17   fact.  What's the difference between a fact and an

18   opinion?

19        A.  An opinion is your viewpoint.  We live in a

20   world where facts are very subjective, unfortunately,

21   and one side has a set of facts which they agree on, and

22   the other side has its set of facts which they agree on.

23   So it's a very vague concept in 2019.  I mean, you --

24   you can have an opinion on fact that skews one way or

25   the other.  So it's a very difficult territory.  So
```

Paul Watson

1  that's all I would say on that.

2      Q.  Well, you'd would agree there's certain things,

3  like, if I was to say this person is beautiful, right,

4  that's subjective.  It can't be proven ascertainably

5  true or false.  It's totally subjective.  You'd agree

6  with that?

7      A.  Yeah.

8      Q.  Okay.  But something like the Sandy Hook school

9  was not an operating school, that can be proven true or

10  false, correct?

11      A.  Well, it could be proven, but it's then based

12  on whether you believe the proof that's presented.  I

13  mean, I believe that it was an operating school, but

14  it's based on the proof that's presented whether it was

15  or not.

16      Q.  Correct.  And there's -- you can find out.  If

17  you have the right evidence, you can find out, correct?

18            MR. JEFFERIES:  Objection, form.

19            THE WITNESS:  I mean, you could make a

20  judgment based on the evidence, yeah.

21      Q.  (BY MR. BANKSTON)  When Infowars does something

22  like that, takes evidence and makes a judgment, does it

23  have any responsibility to be accurate?

24      A.  In the context of opinion commentary, I mean,

25  you can say there's a -- you know, you should strive be

1   accurate.  But in terms of journalistic ethics, I think

2   it's a different ball game in terms of the level at

3   which people are held based on whether they are

4   opinioned commentary or down-the-line journalism.

5        Q.  Okay.  So you should be held to a lower

6   standard than perhaps other media organizations; is that

7   true?

8        A.  Yeah.

9        Q.  I want to go back to your e-mail with -- with

10  Buckley and Anthony.

11       A.  Okay.

12       Q.  Do you know how -- do you know how Buckley felt

13  about the Sandy Hook coverage?

14       A.  I don't have any recollection of any

15  conversation with Buckley besides, you know, from the

16  content of our e-mail which you showed me.

17       Q.  Was --

18       A.  I have no direct recollection of conversations

19  with Buckley about Sandy Hook.

20       Q.  Was there any particular reason you chose those

21  two people to send this message to as opposed to any of

22  the other employees at Infowars?

23       A.  Yes.  Because I had saw those two as the most

24  senior managers at Infowars.

25       Q.  Okay.  Do you know what Anthony thought about

1  the Sandy Hook coverage?

2      A.  Not specifically, but I presume they each had

3  the same feelings as I did.

4      Q.  Can you identify for me everyone at Infowars

5  who had the same feelings you did about the Sandy Hook

6  coverage?

7      A.  I can't identify everybody, no, because I

8  didn't speak to everybody about it.

9      Q.  Can you identify anybody at Infowars who had

10  the same views as you?

11     A.  I would presume Anthony and Buckley from the

12  content of that e-mail and my recollection of Anthony's

13  viewpoints.

14     Q.  Do you recall ever having any discussions of

15  anybody, say, in the past two years at Infowars where

16  you discussed with a fellow employee your opinions on

17  the Sandy Hook coverage?

18     A.  I don't have any recollections.  It's possible,

19  but I don't recollect any direct conversations.

20     Q.  Okay.  When you got that e-mail from Lenny

21  Pozner back in 2013, did you let Alex know that

22  happened?

23     A.  From what I recall, no.  It's possible that I

24  told him, but I don't recall a conversation where I told

25  him.

Paul Watson

1     Q.  Well, what I'm trying to figure out is if you

2   got a communication from a Sandy Hook parent letting you

3   know they were very distressed about what was going on,

4   would you have passed that on to the owner of the

5   company?

6     A.  Not necessarily, no.

7     Q.  All right.

8     A.  I mean, we had conversations about it and

9   whether it was a part of those conversations, it's

10   possible, but I don't recall exactly if it was.

11     Q.  Okay.  I have heard you say in the past before,

12   and I don't know if you still believe this, but I'm

13   wondering if you believe the idea that libertarians who

14   claim false flags never happen are almost as stupid as

15   conspiracy theorists who claim every event is a false

16   flag.

17          Is that something you still believe today?

18     A.  Yeah.  I would agree that there are some

19   conspiracies that do happen, but that doesn't mean

20   everything is a conspiracy, so yes.

21     Q.  Okay.  I want to talk a little bit about Alex

22   Jones and what he thinks is a false flag.  So you're

23   aware Alex Jones has said 911 is a false flag, right?

24     A.  I'm aware that he said that, yes.

25     Q.  You're aware that he said Columbine was a false

Paul Watson                                                    November 27, 2019
                                                                      Page 59

```
 1  flag?

 2       A.   Yeah.

 3       Q.   You're aware that he said Oklahoma City was a

 4  false flag?

 5       A.   Yeah.

 6       Q.   You're aware he said the Aurora shooting was a

 7  false flag.

 8       A.   Yeah.

 9       Q.   You're aware that he said the shooting of

10  Gabrielle Giffords was a staged, mind-control operation,

11  correct?

12       A.   Yeah.

13       Q.   He said the Boston bombing was a false flag.

14       A.   Correct.

15       Q.   He said there were -- there were tweets on --

16  from Infowars on Twitter saying that the Douglas High

17  School shooting in Parkland, Florida was a false flag,

18  correct?

19       A.   I don't know about the specific term, but yes.

20  Generally speaking, yes.

21       Q.   The November 2017 church shooting in Sutherland

22  Springs, Texas, Mr. Jones said that was a false flag.

23       A.   I don't recall him saying that, but I presume

24  it's possible, yes.

25       Q.   The Las Vegas mass shooting, Mr. Jones said was
```

1   a false flag.

2        A.   Yes.

3        Q.   Can you give me an example of a US mass

4   casualty event, like a mass shooting, a bombing, or the

5   like that Mr. Jones didn't say was a false flag?

6        A.   I would say that the most recent ones post Las

7   Vegas massacre, maybe the debates in Ohio shooting, the

8   El Paso shooting.  Again, I don't know for sure, but I

9   think after the Las Vegas one, he was more reticent to

10  call them false flags.

11       Q.   After I sued him, right?

12       A.   I don't know when you sued him.

13       Q.   April of 2018.  So in the past year, Mr. Jones

14  has stopped saying some of these things, correct?

15       A.   I wouldn't say he's stopped saying them.  I

16  would say that there's a tendency to not directly say

17  that after the event.

18       Q.   Because in the past, he would say it within

19  hours of an event, correct, that it was a false flag?

20       A.   Well, yeah.  That happened, yeah.

21       Q.   You know who a Don Salazar is, right?

22       A.   Yeah.

23       Q.   Okay.  He wrote articles claiming that Leonard

24  Pozner's son didn't die, right?

25       A.   I don't recall the specific article.

1    Q.  You certainly recall, though, that a Don
2  Salazar was heavily in that camp of pushing Sandy Hook
3  conspiracy theories on Infowars, correct?
4    A.  I'm aware that he wrote articles to that
5  effect, yes.
6    Q.  Okay.  You know who Owen Shroyer is, right?
7    A.  Yeah.
8    Q.  Do you know about Owen Shroyer's video in 2017
9  which he claimed on what Neil Heslin said on Megyn Kelly
10  was impossible?
11    A.  I don't recall that exact video, no.
12    Q.  Okay.  Are you proud of Infowars' coverage of
13  Sandy Hook?
14    A.  No.  I disagreed with it from the start so I
15  can't say I'm proud of it, no.
16    Q.  You didn't stop it, though, did you,
17  Mr. Watson?
18    A.  Well, I aired my grievances, but I don't
19  control Infowars, so...
20    Q.  Correct.  You aired your grievances in an
21  e-mail that we see, but then after that e-mail in 2015,
22  you just kept working for the company that was doing
23  this, didn't you?
24    A.  Correct.
25    Q.  You had no objection to taking a paycheck from

Paul Watson

1  the man who was leading a five-year harassment campaign

2  against these Sandy Hook parents; isn't that true?

3            MR. JEFFERIES:  Objection, form.

4            THE WITNESS:  I don't believe that he led a

5  harassment campaign against Sandy Hook parents.

6       Q.  (BY MR. BANKSTON)  Really.  That's not

7  something you believe today?

8       A.  No.

9       Q.  Tell me what steps you took to stop it.

10  Because what I want to get at is that I see an e-mail, I

11  see one e-mail that was produced to us when we asked for

12  all documents relating to Sandy Hook, and I've got one

13  e-mail from you raising your complaints.  And you say

14  you've had -- you remember a personal conversation with

15  Mr. Jones.

16       A.  I don't remember --

17       Q.  What else --

18       A.  -- the details.  I remember some conversations,

19  yeah.

20       Q.  What else did you do to try to put a stop to

21  this?

22       A.  Nothing.  I just aired my grievances, and I

23  thought we shouldn't be covering it from that angle and

24  said my peace and that was it.

25       Q.  Mr. Watson, do you have any remorse over what

1  Infowars did to these parents?

2          MR. JEFFERIES:  Objection, form.

3          THE WITNESS:  I don't believe Infowars

4  directly did anything to these parents.  I believe that

5  the people responsible for that harassment, which was

6  vile, were not influenced by Infowars because it was

7  already happening before we heavily covered the subject.

8  So I don't think that Infowars was responsible for

9  telling anybody or instructing anybody to harass Sandy

10 Hook parents.

11     Q.  (BY MR. BANKSTON)  Well, Infowars published a

12 map to where Lenny Pozner picked up his mail, said he

13 was trying to destroy the First Amendment and that we

14 needed to fight back.

15          You understand that?

16     A.  I don't recall that, but, I mean, it's possible

17 that it happened, yes.

18     Q.  That's not good, is it, Mr. Watson?

19     A.  It's not good, no.

20     Q.  And when Infowars found out that Mr. Pozner was

21 running a group, a charity, to try to help these Sandy

22 Hook parents get content removed from Youtube, Infowars

23 reacted by leading a campaign against these complaining

24 parents, correct?

25     A.  I don't recall that.

Paul Watson

1      Q.   Okay.

2      A.   I have no knowledge of that.

3      Q.   You know Mr. Pozner has had to move seven

4   times.  Do you know that?

5      A.   I'm aware that he had to move, yeah.

6      Q.   Yeah.  You know that some of these parents

7   can't even go to the graves of their children anymore.

8   Do you understand?

9      A.   I understand that and that's horrible.

10      Q.   Do you understand that Infowars played a role

11   in that?

12              MR. JEFFERIES:  Objection, form.

13              THE WITNESS:  I don't -- I haven't seen any

14   evidence that Infowars played a role in that from my

15   recollection.

16      Q.   (BY MR. BANKSTON)  Okay.  So -- so sitting here

17   in 2019, looking back at the past seven years of what

18   Infowars has done, your testimony here today is you

19   don't have any remorse or feel bad about that?

20      A.   I think it was the wrong approach to take.  I

21   think it was very offensive and wrong to do so, and I

22   aired my grievances at the time.

23      Q.   Do you think Mr. Jones --

24      A.   That's all I could do.

25      Q.   Do you think Mr. Jones has any responsibility

```
 1   to these parents now?  Do you think he should stand

 2   behind what he said and be held responsible to them?

 3        A.  I think he's retracted what he said and

 4   apologized and that's -- that's -- that was the right

 5   thing to do that's what he did.

 6        Q.  So you think that's all he has to do is --

 7   that's just --

 8        A.  Yes.

 9        Q.  -- an apology now, seven years later, is all he

10   owes these parents?

11        A.  Yes.

12             MR. BANKSTON:  Okay, Mr. Watson.  Thank you

13   for your time.

14             THE WITNESS:  Thank you.

15             MR. JEFFERIES:  We reserve.  Thank you.

16             (Proceedings concluded at 2:52 a.m.)

17

18

19

20

21

22

23

24

25
```

Paul Watson

November 27, 2019
Page 66

```
 1                        CORRECTION PAGE

 2   WITNESS NAME:  PAUL WATSON          DATE:  08/21/2003

 3   PAGE   LINE   CHANGE                REASON

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

```
1                         SIGNATURE PAGE

2

3       I, PAUL WATSON, have read the foregoing deposition
   and hereby affix my signature that same is true and
   correct, except as noted on the correction page.

4

5
                        _____

6                       PAUL WATSON

7

8

9  THE STATE OF TEXAS       )
   COUNTY OF _____ )

10

11      Before me _____ on this day personally
   appeared _____ known to me [or proved to
12 me on the oath of _____ or through
   _____ (description of identity card or
13 other document)] to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
14 he/she executed the same for the purposes and
   consideration therein expressed.
15      Given under my hand and seal of office this _____
   day of _____, 2019.

16

17
                        _____

18                      NOTARY PUBLIC IN AND FOR
                        THE STATE OF T E X A S

19

20 My Commission Expires:
   _____

21

22

23

24

25
```

```
 1              CAUSE NO. D-1-GN-19-004651

 2  NEIL HESLIN,                    ) IN THE DISTRICT COURT OF
                                    )
 3           Plaintiff             )
                                    )
 4  VS.                             ) TRAVIS COUNTY, TEXAS
                                    )
 5  ALEX E. JONES, INFOWARS,       )
    LLC, and FREE SPEECH           )
 6  SYSTEMS, LLC                    ) 261ST JUDICIAL DISTRICT
                                    )
 7           Defendants            )

 8                  REPORTER'S CERTIFICATION
                    DEPOSITION OF PAUL WATSON
 9                  TAKEN NOVEMBER 27, 2019

10      I, JANALYN ELKINS, Certified Shorthand Reporter in

11  and for the State of Texas, hereby certify to the

12  following:

13      That the witness, PAUL WATSON, was duly sworn by the

14  officer and that the transcript of the oral deposition is

15  a true record of the testimony given by the witness;

16      That the deposition transcript was submitted on

17  _____ to the witness or to the attorney for

18  the witness for examination, signature and return to KIM

19  TINDALL & ASSOCIATES, by _____;

20      That the amount of time used by each party at the

21  deposition is as follows:

22      MARK D. BANKSTON - 1 hour 31 minutes

23      That pursuant to information given to the deposition

24  officer at the time said testimony was taken, the

25  following includes counsel for all parties of record:
```

Paul Watson                                          November 27, 2019
                                                         Page 69

1

2       MARK D. BANKSTON - ATTORNEY FOR PLAINTIFF

3       T. WADE JEFFERIES - ATTORNEY FOR DEFENDANT

4       I further certify that I am neither counsel for,

5  related to, nor employed by any of the parties in the

6  action in which this proceeding was taken, and further

7  that I am not financially or otherwise interested in the

8  outcome of the action.

9       Further certification requirements pursuant to Rule

10 203 of TRCP will be certified to after they have occurred.

11      Certified to by me this 3rd day of December 2019.

12

13

14      _____

15      JANALYN ELKINS, CSR NO. 3631;
        Expiration Date: 1-31-2021
16      16414 San Pedro, Suite 900
        San Antonio, Texas  78232
17      PH:  866-672-7880
        Firm Registration 631
18

19

20

21

22

23

24

25

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | * | IN THE DISTRICT COURT OF |
| Plaintiff | * | |
| | * | |
| | * | |
| VS. | * | TRAVIS COUNTY, TEXAS |
| | * | |
| ALEX E. JONES, INFOWARS, | * | |
| LLC, AND FREE SPEECH | * | |
| SYSTEMS, LLC, | * | |
| Defendants | * | 53RD JUDICIAL DISTRICT |

ORAL/VIDEOTAPED DEPOSITION

OF

ROBERT JACOBSON

Wednesday, March 20, 2019

ORAL/VIDEOTAPED DEPOSITION OF ROBERT JACOBSON, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on Wednesday, March 20, 2019, from 12:01 p.m. to 1:55 p.m., before Debbie D. Cunningham, CSR, reported via Machine Shorthand at the offices of Kirker Davis, LLP, 8310-1 N. Capital of Texas Highway, #350, Austin, Texas 78731, pursuant to the Texas Rules of Civil Procedure and/or any provisions stated on the record or attached hereto.

Page 2

```
1           APPEARANCES
2
3  COUNSEL FOR PLAINTIFF:
4     KASTER LYNCH FARRAR & BALL, LLP
          1010 Lamar, Suite 1600
5      Houston, Texas
          (T) 713.221.8300
6        By:  Mark D. Bankston, Esq.
            mark@fbtrial.com
7               AND
            William Ogden, Esq. (VIA PHONE)
8
9  COUNSEL FOR DEFENDANTS:
10     GLAST, PHILLIPS & MURRAY, P.C.
          14801 Quorom Drive, Suite 500
11     Dallas, Texas
          (T) 972.419.8300
12        By:  Mark Enoch, Esq.
            mkenoch@gpm-law.com
13
14
15  VIDEOGRAPHER:
          Joe Bazan
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              INDEX
2
3  APPEARANCES                    2
4
5  EXAMINATION OF ROBERT JACOBSON:
6   BY MR. BANKSTON              4
7
8
9  REPORTER'S CERTIFICATE        86
10
11
12
13          EXHIBIT INDEX
14  Exhibit Number   Description        Page
15  Exhibit 1   Non-Disclosure Agreement    10
16  Exhibit 2   12/17/18 Mark Enoch letter to   23
              Robert Jacobson
17
    Exhibit 3   Video clip          55
18
19
20
21
22
23
24
25
```

Page 4

```
1      (Wednesday, March 20, 2019, 12:01 p.m.)
2           P R O C E E D I N G S
3         THE VIDEOGRAPHER:  We are on the record
4   for the videotaped deposition of Robert Jacobson taken
5   on Wednesday, March 20th, 2019.  The time is
6   approximately 12:01 p.m.
7         Will the court reporter please swear in
8   the witness?
9              ROBERT JACOBSON,
10    having been duly sworn, testified as follows:
11            EXAMINATION
12  BY MR. BANKSTON:
13    Q.  Good afternoon, Mr. Jacobson.  Can you
14  introduce yourself for our record?
15    A.  I am Robert Jacobson.
16    Q.  Okay.
17         MR. ENOCH:  Mark, I'd like to ask a
18  couple of questions and make a comment real quickly.
19         MR. BANKSTON:  I don't think you've been
20  given any orders from the Court to do any discovery.
21  So, no, Mr. Enoch, you're not asking this witness any
22  questions.
23         MR. ENOCH:  Mr. Jacobson --
24         MR. BANKSTON:  Mr. Enoch --
25         MR. ENOCH:  -- were you served with a
```

Page 5

```
1   subpoena?
2         MR. BANKSTON:  Mr. Enoch, please point me
3   to the order in which you've been allowed to do any
4   discovery or take any questions of any witness.  Point
5   me to it, Mr. Enoch.
6         MR. ENOCH:  Please do not --
7         MR. BANKSTON:  Right now, point me to it.
8         MR. ENOCH:  Please do not interrupt.
9         MR. BANKSTON:  Then you're going to --
10  Mr. Enoch, stop talking to the witness.
11         MR. ENOCH:  Mr. Jacobson --
12         MR. BANKSTON:  Mr. Enoch, this deposition
13  will be suspended; and I will seek sanctions if you
14  speak one more time to this witness.
15         MR. ENOCH:  Mr. Jacobson, have you been
16  served with a deposition subpoena?
17         MR. BANKSTON:  Mr. Enoch, we're going off
18  the record.  We're done.  The deposition's done.
19         MR. ENOCH:  We are not going off the
20  record.
21         MR. BANKSTON:  The deposition is
22  suspended.
23         MR. ENOCH:  We are not going off the
24  record.
25         MR. BANKSTON:  You have no ability to
```

Robert Jacobson - 3/20/2019

**6**

1  take any testimony, Mr. Enoch. None. Zero.
2  MR. ENOCH: Mr. Bankston, I suggest
3  instead of getting emotional about it, if you'd let me
4  ask this question --
5  MR. BANKSTON: No, we're not going to
6  allow you any questions, Mr. Enoch.
7  MR. ENOCH: Please don't interrupt me
8  again.
9  MR. BANKSTON: Mr. Enoch, you have no
10  right to ask your questions. Before you ask that
11  question -- a single question to that witness again,
12  direct me to what authority you think you have to --
13  MR. ENOCH: Did you serve a subpoena on
14  this witness?
15  MR. BANKSTON: I don't -- I served a
16  Notice of Deposition on this witness.
17  MR. ENOCH: Sir, if you didn't serve a
18  subpoena, he's under an NDA and a confidentiality
19  agreement. He is not excused from that. You did not
20  provide him with an order from this Court. He cannot
21  testify today. You should have served him with a
22  subpoena, and you did not.
23  MR. BANKSTON: Do you want to take this
24  up with the judge --
25  MR. ENOCH: No, sir.

**7**

1  MR. BANKSTON: -- or are you going to let
2  him testify today?
3  MR. ENOCH: That's what I want to talk
4  with this witness about.
5  MR. BANKSTON: You're not going to talk
6  to him about it.
7  MR. ENOCH: Well --
8  MR. BANKSTON: You don't have the ability
9  to do discovery. I'm going to ask this witness
10  questions. If you --
11  MR. ENOCH: Mr. Bankston --
12  MR. BANKSTON: If you instruct him not to
13  answer and try to prevent this deposition from
14  happening, I will take it up to the Court.
15  MR. ENOCH: Mr. Bankston, you are the one
16  preventing me from asking any questions.
17  MR. BANKSTON: I am.
18  MR. ENOCH: Then do what you need to do,
19  sir.
20  MR. BANKSTON: That's what we're gonna
21  do.
22  MR. ENOCH: I'm going to make sure this
23  witness knows of his obligations under the
24  non-disclosure agreement and confidentiality agreement
25  that he signed. Are you going to --

**8**

1  MR. BANKSTON: You sent him a letter
2  telling him what his confidentiality agreements are,
3  telling him to observe them. You have already had these
4  communications with this witness. You have no reason to
5  ask this witness any questions today. The Court has not
6  granted your client any discovery whatsoever, and you
7  will stop interfering with this deposition. You have no
8  reason to be asking this client about confidentiality
9  when you have already informed him of his obligations.
10  MR. ENOCH: Mr. Bankston, I'm going to
11  ask the question; and if you instruct him not to
12  answer --
13  MR. BANKSTON: I don't represent this
14  witness.
15  MR. ENOCH: Mr. Jacobson, did you receive
16  a letter from me in December or so advising of my
17  client's insistence that you maintain confidentiality
18  under your agreement which you reached with Alex Jones
19  and with Free Speech?
20  THE WITNESS: I don't recall.
21  MR. ENOCH: Okay. Do you still have
22  those confidentiality and non-disclosure agreements?
23  THE WITNESS: I don't recall. I don't --
24  I have -- since traumatic -- since whatever happened to
25  me at work, my files have been scattered around. I'd

**9**

1  also like to add that that non -- that NDA was forced
2  upon me after employment with Alex for over eight
3  years --
4  MR. ENOCH: Sir --
5  THE WITNESS: -- on the record.
6  MR. ENOCH: Sir, you can -- I'm not
7  arguing with you.
8  MR. BANKSTON: Mr. Enoch, you --
9  objection.
10  You've already done what you said you
11  were going to do. Don't start have conversations with
12  the witness. Don't do it. Don't influence his
13  testimony, Mr. Enoch.
14  MR. ENOCH: Mr. Bankston, please stop
15  interrupting me.
16  MR. BANKSTON: Well, then I will put --
17  first, before you ask your question --
18  MR. ENOCH: Rule 99 --
19  MR. BANKSTON: I object to the record --
20  I object; and my objection is to the form of your
21  question.
22  MR. ENOCH: Very well.
23  Mr. Jacobson, are you familiar with the
24  requirements in the documents that you signed that you
25  maintain confidentiality unless you are subpoenaed or

10

1  ordered by the Court?
2      THE WITNESS:  I'm familiar with the
3  action that was forced upon me after being employed by
4  him, with language in that NDA which includes things
5  like "the known universe" and stuff.  It's garbage, and
6  I --
7      MR. ENOCH:  So you're not --
8      THE WITNESS:  No, no, I am not aware
9  of -- I know that it was forced upon me.  I was employed
10  by Alex for over eight years, and they forced it upon
11  me.  I was a -- so I don't know where it is.  I don't
12  know what the language is, and I don't recall anything.
13      MR. ENOCH:  I'd like to mark as an
14  exhibit, please, madam --
15      (Exhibit 1 marked.)
16      MR. BANKSTON:  Object to any exhibits
17  being offered by you.
18      Mr. Enoch, what are you doing?  Let's
19  just talk.  What do you think you're doing?
20      MR. ENOCH:  I want to make sure --
21      MR. BANKSTON:  You're not questioning
22  this witness anymore.
23      MR. ENOCH:  Mr. Bankston --
24      MR. BANKSTON:  This is not your
25  deposition.  You have no ability to do discovery.  I've

11

1  had extraordinary patience with allowing you to ask
2  questions of the witness to ascertain whether he knows
3  there's a confidentiality agreement.  I will also be
4  asking him about that same confidentiality agreement.
5      Now that that's been done, you have no
6  reason to be questioning him.  The only reason you're
7  doing it is to influence this witness.  That's literally
8  the only reason you're doing it.  I consider what you're
9  doing highly improper; and I am asking you once again:
10  Knock this off, Mr. Enoch.  What are you do?
11      MR. ENOCH:  Mr. Jacobson, do you
12  recognize Exhibit Number 1?
13      THE WITNESS:  I don't have any recall of
14  this exhibit.
15      MR. ENOCH:  Would you look at your
16  signature on the last page and please identify that?
17      MR. BANKSTON:  We need to go off the
18  record and call the Court right now, Mr. Enoch --
19      MR. ENOCH:  Do you recognize your
20  signature?
21      MR. BANKSTON:  -- and Mr. Jacobson.
22      THE WITNESS:  I -- I want you to notice
23  the date.
24      MR. ENOCH:  Did you --
25      THE WITNESS:  When was my employment

12

1  started, sir?  Sir, I don't have any representation
2  here.  When was my employment started?  When was the
3  first day I started working?
4      MR. BANKSTON:  Mr. Jacobson, let's stop
5  for a second.
6      (Simultaneous speakers.)
7      MR. BANKSTON:  Mr. Enoch, stop.  We're
8  going off the record right now.  We're calling the
9  Court.
10      MR. ENOCH:  Very well.
11      THE VIDEOGRAPHER:  Off the record at
12  12:07 p.m.
13      (Off the record from 12:07´ to 12:08´ p.m.)
14      (The following is only on the
15  stenographic record:
16      THE REPORTER:  Do you want the telephone
17  conversation on the record?
18      MR. BANKSTON:  No, ma'am, you can go off
19  the record.
20      MR. ENOCH:  No, I do not agree to go off
21  the record.
22      MR. BANKSTON:  Apparently they're
23  transcribing this phone call.
24      MR. OGDEN:  The court administrator?
25      MR. BANKSTON:  Excuse me.  If that's to

13

1  the court administrator, yeah, can you give me Elissa or
2  Tiffany's number?
3      MR. OGDEN:  Sure.  Elissa is 512.854 --
4      MR. BANKSTON:  No, keep the video on and
5  put it on Mr. Enoch.
6      854 --
7      MR. OGDEN:  9366.
8      MR. BANKSTON:  -- 66.  Thank you.)
9      THE VIDEOGRAPHER:  On the record at
10  12:08 p.m.
11      (Phone ringing followed by a recording
12  stating:  Please leave a message for Elissa Hogan.
13  After the tone, please record your message.)
14      MR. BANKSTON:  Have you got a separate
15  number for Tiffany?
16      MR. OGDEN:  Yes.  512.854.7278.
17      (Phone ringing followed by a recording
18  stating:  Please leave a message for Tiffaney Gould.)
19      MR. BANKSTON:  All right.  For the
20  record's purposes, I have attempted to --
21      MR. OGDEN:  Mark -- sorry -- try the
22  court administration.
23      MR. BANKSTON:  All right.  Well, no.
24  That's a totally different office, Bill.  That's Judge
25  Livingston's court administration office.

**14**

1   MR. OGDEN: Well, right now --
2   MR. BANKSTON: Okay. Go back on mute.
3   For the record, I have attempted to call
4   the Court on an emergency basis. I have been unable to
5   get ahold of Staff Attorney Elissa Hogan or Court
6   Coordinator Tiffany Gould.
7   I have properly Noticed this deposition.
8   I am entitled to question the witness first. I'm
9   entitled to question the witness about the topics that
10  the Court ordered that I am allowed to question him on.
11  Mr. Enoch did not Notice this deposition.
12  He is not entitled to question the witness first. While
13  I attempted to stop him from this highly improper
14  conduct, he completely ignored me and continued to
15  question the witness, agitating the witness, who is not
16  represented by counsel.
17  This witness has agreed to appear
18  voluntarily with the understanding that Plaintiff was
19  conducting discovery today, has never made any agreement
20  to appear unrepresented to be inquizited [sic] by
21  his former employee's [sic] counsel. He never made that
22  agreement.
23  Mr. Enoch knows it is highly improper to
24  interrupt my questioning, prevent me from questioning
25  the witness first, and just start his own examination.

**15**

1   That would be true under even normal deposition
2   circumstances; but today we are here on expedited
3   discovery under the Texas Civil Participation Act, which
4   grants my client the right to discovery, to respond to a
5   Special Motion to Dismiss brought my Enoch's client. It
6   gives him absolutely no right to conduct any discovery.
7   This deposition has been highly improper,
8   and so this is the agreement I'm going to make: I have
9   not been able to contact the Court. I've not been able
10  to do that. Mr. Enoch insists on questioning. He won't
11  let me question and just ignores what I'm doing. Under
12  those circumstances and given the level of agitation by
13  Mr. Jacobson, who is here today without counsel, I am
14  suspending the deposition unless Mr. Enoch agrees to
15  cease his improper efforts to question this witness and
16  continues to act appropriately in just defending the
17  deposition.
18  Mr. Enoch, if you cannot agree to do
19  that, this deposition is suspended; and it will be added
20  to my Motion for Sanctions being filed with the Court
21  today. What would you like to do?
22  MR. ENOCH: Well, I don't agree with
23  anything you just said. It was all self-serving. It
24  doesn't accurately reflect what was happening.
25  The only reason I asked him a question

**16**

1   about this document is to show his signature. Now that
2   I've shown it to him, you may go ahead and question him.
3   Under Rule 199 I don't know of anything that prevents me
4   from asking questions out of order, sir. Are you aware
5   of anything?
6   MR. BANKSTON: Yeah, I am, actually.
7   MR. ENOCH: The parties may attend and
8   ask questions.
9   MR. BANKSTON: I actually agreed -- I
10  actually am aware of it under Chapter 26 of the Remedy
11  Code. You have no right to conduct the deposition; only
12  I do.
13  MR. ENOCH: I disagree with that; and
14  rather than talk about it now --
15  MR. BANKSTON: We'll take it up with the
16  Court. I agree.
17  MR. ENOCH: I think that would be an
18  appropriate --
19  MR. BANKSTON: I agree. So, Mr. Enoch --
20  MR. ENOCH: Please continue your
21  deposition.
22  MR. BANKSTON: Well, Mr. Enoch, before I
23  stopped my deposition and you said that you were going
24  to ask him one thing about one document and whether it
25  was his signature; and now you say you're done, when I

**17**

1   asked --
2   MR. ENOCH: And he refused to answer the
3   question.
4   MR. BANKSTON: He sure did.
5   And when I asked you, "Okay. You've
6   asked him. Are you done," you completely ignored me,
7   continued to berate this client -- I mean, this person;
8   and he expressed to you that he was very --
9   MR. ENOCH: Mr. --
10  MR. BANKSTON: Hold on, Mr. Enoch. He
11  expressed to you that he was agitated. Are you now
12  saying you have asked the totality of the questions you
13  intend to ask this witness?
14  MR. ENOCH: Of course not.
15  MR. BANKSTON: Then we are suspending
16  this deposition.
17  MR. ENOCH: I don't know what I'm going
18  to ask or if I'm going to ask anything until you're done
19  with your examination, Mr. Bankston.
20  MR. BANKSTON: Well, apparently you did
21  because you started asking questions before I even
22  started my examination, Mr. Enoch; and you know that's
23  highly improper.
24  I'm asking you right now: Do you intend
25  to question this witness today?

18

1      MR. ENOCH:  Mr. Bankston, I am alarmed
2  that this witness is not represented by counsel.  I am
3  concerned that he is not aware of his rights and
4  obligations under legally binding contracts with my
5  client.  I want to make sure he is aware of those to
6  protect himself or to get counsel of his own choosing.
7      MR. BANKSTON:  You've been able to do
8  that --
9      MR. ENOCH:  Excuse me.  Do not interrupt
10  me, again.  I did not interrupt you.
11      It appears that you have not counseled
12  him one bit about this.  You're interested in getting
13  him to voluntarily disclose information that he's
14  obligated not to do without court order.  You did not
15  serve a subpoena.  You did not tell him of the effect of
16  that under his agreement.  He now knows it.  You may
17  continue your deposition.
18      MR. BANKSTON:  Mr. Enoch, let's make this
19  clear for the record:  I do not have his agreement.
20  When you sent this letter that informed him of that
21  agreement --
22      MR. ENOCH:  You do now.
23      MR. BANKSTON:  -- I asked you at the
24  time -- didn't I, Mr. Enoch -- I sent you a letter and
25  said, "Your letter's very unclear.  It could, in fact,

19

1  cause this witness to think he's not supposed to testify
2  today.  Wouldn't it be best if you disclosed to
3  everybody what that agreement is?"  You didn't do that.
4  You waited until we walked into this room to put it down
5  on the table.
6      You say you have every right to inform
7  this client -- or this person of his obligations and you
8  were worried that he doesn't understand what those were.
9  I understand that, which is why you sent that letter,
10  which I think is a perfectly reasonable thing to do; and
11  if you wanted to call this witness, talk to him, or
12  contact him, that's perfectly appropriate.  To ambush
13  him at the moment of his testimony is not appropriate,
14  and it is not appropriate to start asking questions
15  before I even ask questions.
16      MR. ENOCH:  Mr. --
17      MR. BANKSTON:  If you intend to ask more
18  questions today, let me know because we will suspend the
19  deposition so that Mr. Jacobson can get counsel and so
20  that we can take it up with the Court to see if your
21  actions today were proper.  Do you want to ask questions
22  today or not, Mr. Enoch?
23      MR. ENOCH:  Mr. Bankston, I did not know
24  until my first question of this witness that you had not
25  served him with a subpoena, as I think you were

20

1  obligated to do to obtain his testimony.  Therefore, I
2  wanted to make sure he was aware of Exhibit 1.  It does
3  not allow his voluntarily participation in your
4  discovery without a court order or subpoena.
5      Now, with respect to questions of this
6  witness, I can't answer that now because I haven't heard
7  your questions.  I think I'm entitled to ask questions
8  under the Rules; you think I'm not.  So go ahead and ask
9  your questions.  Let's see if I have questions.  If I
10  do, the Rules allow me to make my record.  You can
11  object as you wish, and then we can take it up with the
12  judge.  We've spent a lot of time haggling right now.
13  We've taken the witness' time.  Ask your questions.
14      MR. BANKSTON:  You've taken the witness'
15  time.
16      MR. ENOCH:  Ask your questions.
17      MR. BANKSTON:  You've taken my time,
18  Mr. Enoch.  That's what you've done.
19      MR. ENOCH:  Ask your questions.
20      MR. BANKSTON:  And I can tell you this:
21  I don't represent this witness; and when I'm done asking
22  my questions, if he wants to get up and walk out of this
23  room without saying another word to you, I'm not
24  stopping him.
25      MR. ENOCH:  On what basis?

21

1      MR. BANKSTON:  I'm not stopping him.  I
2  have no control over this man, Mr. Enoch.  I have none.
3  I don't represent him.
4      MR. ENOCH:  Well, you understand that
5  your Notice says we're here from day to day; and you
6  understand cross-examination is allowed.
7      MR. BANKSTON:  Yeah.  And what do you
8  want me to do to stop him?  What do you want me to do --
9      MR. ENOCH:  Why don't you just ask your
10  questions?
11      MR. BANKSTON:  Should I chain him to the
12  chair, Mr. Enoch?
13      MR. ENOCH:  Mark, please start asking
14  your questions.  Let's get on with the deposition.  Will
15  you do that, please?
16      MR. BANKSTON:  Yeah, now we'll do that,
17  Mr. Enoch.  We sure will.
18      MR. ENOCH:  Do.
19      Q.  (BY MR. BANKSTON)  Mr. Jacobson, I'm really
20  sorry about all that.
21      A.  Yes, sir.
22      Q.  I believe the only -- I'm not sure if we got
23  this question out.  Did you introduce yourself for the
24  record?
25      A.  Yes, sir.  I am Robert Jacobson.

22

1    Q.   Okay.  Did you used to work at InfoWars?
2    A.   Yes, sir.
3    Q.   When were you hired by InfoWars?
4    A.   I was hired in 2004 by Alex Jones.
5    Q.   Do you know what corporate entity you were
6 hired by?
7    A.   At the time I felt I was hired by Alex Jones,
8 and he was an independent proprietor.
9         MR. ENOCH:  Objection, nonresponsive.
10   Q.   (BY MR. BANKSTON)  Do you know today what
11 entity your former employer claims you worked for?
12   A.   Yes.
13   Q.   What entity is that?
14   A.   Free Speech Systems, LLC.
15   Q.   Okay.  When did your employment end?
16   A.   My employment ended on May 1st of 2017 -- or
17 April 30th.
18   Q.   So am I right that that's over a decade that
19 you were at InfoWars?
20   A.   I was there for around 13 years,
21 approximately.
22   Q.   As an employee, did you have a confidentiality
23 agreement of any kind?
24   A.   Not for the first six years or so.
25   Q.   Okay.  So does that mean around 2010 or so the

23

1 idea of confidentiality came up?
2    A.   Confidentiality was passed around the office
3 but was never given to me until years after; and it was
4 more of a -- you know, sort of an ultimatum, sort of
5 suggested, putting my livelihood at risk.
6    Q.   Apparently -- I wanted to show you something I
7 wanted to mark as Exhibit 1, but I believe Mr. Enoch has
8 already highjacked that exhibit.  So I am going to mark
9 this as Exhibit 2.
10        MR. ENOCH:  Object to the sidebar.  Move
11 to strike.
12        (Exhibit 2 marked.)
13   Q.   (BY MR. BANKSTON)  Mr. Jacobson, I've handed
14 you what's been marked as Exhibit 2.  Have you ever seen
15 a copy of that before, or do you remember seeing that?
16   A.   Yes.
17   Q.   I want to direct you to the second page.  I'm
18 going to read the paragraph that appears on this page 2.
19 "You are reminded that you have important continuing
20 obligations under your confidentiality non-disclosure
21 agreements with my client.  You are expected to strictly
22 observe those duties and obligations."  Do you feel like
23 you understand what obligations are being referred to
24 here?
25   A.   I do.

24

1    Q.   Have you abided by those obligations?
2    A.   Yes, sir.  In fact, may I add something?  My
3 understanding of the non-disclosure is not to reveal any
4 company secrets.  I don't think abuse or abusive
5 behavior inside the company constitutes company secrets.
6 I don't think misbehavior inside the company by an adult
7 who runs the business constitutes company secrets.  In
8 fact, I'm here to try to bring light to the truth of
9 abusive behavior inside the walls of InfoWars; and I
10 don't think anything I say today violates the NDA, which
11 would be constituting of company secrets, their formulas
12 in how they produce the news.  Nothing like that is
13 going to be revealed today.  What will be revealed is
14 abusive behavior and the behavior of Mr. Jones and his
15 staff.
16        MR. ENOCH:  Objection, nonresponsive.
17   Q    (BY MR. BANKSTON)  Did you understand that
18 there was a judge here in Travis County who issued an
19 order concerning this deposition today going forward?
20   A.   No -- not sure, actually.
21   Q.   Okay.
22   A.   Fuzzy.
23   Q.   Sitting here today, do you recall seeing a
24 court order concerning your deposition?
25   A.   Yes.

25

1    Q.   Okay.  Did you feel comfortable appearing for
2 deposition without a court order?
3        MR. ENOCH:  Objection to form.  Assumes
4 facts not in evidence.  Leading.
5        You can go ahead and answer subject to
6 those objections.
7    A.   Again, I'm not sure of that.  I mean, with or
8 without a court order, I just feel it's the right thing
9 to do.
10   Q    (BY MR. BANKSTON)  When you first joined
11 InfoWars, did you believe in its mission?
12   A.   For the most part, yes.
13   Q.   Tell me about the kinds of stories or things
14 that you wanted to be working on when you first came to
15 InfoWars.
16   A.   When I first --
17        MR. ENOCH:  Objection, form.
18   A.   When I first arrived at InfoWars, my
19 understanding of InfoWars and Alex's subject matter was
20 the occult, esoteric politics, let's say, what's going
21 on behind the curtain, things that politicians don't
22 tell us in expos", in that fashion.  Fringe media, off
23 the mainstream, but still honest was my impression.
24   Q.   (BY MR. BANKSTON)  Were you passionate about
25 journalism at that time?

26

1          MR. ENOCH:  Objection to form.
2      A.  I was passionate about filmmaking, and I
3  wanted to be a documentary filmmaker.  So in that
4  aspect, yes, that does, I believe, fall under a broader
5  umbrella of journalism.  So when it comes to documentary
6  films, I was on board.
7          MR. ENOCH:  Objection, nonresponsive.
8      Q.  (BY MR. BANKSTON)  Did you want to do good
9  journalism?
10     A.  I did.
11         MR. ENOCH:  Objection, form.
12         MR. BANKSTON:  What's the form?
13         MR. ENOCH:  Well, under the Rules, I'm
14  not sure it's -- I think you're leading the witness; and
15  I think -- I'm not sure if I'm supposed to say
16  objection, leading or form.  I think I'm supposed to say
17  both.  So that's my objection.  You're leading the
18  witness.
19         MR. BANKSTON:  Okay.
20         Can you scroll up to my last question?
21         (Reporter complies.)
22     Q.  (BY MR. BANKSTON)  Mr. Jacobson, what does
23  good journalism mean to you?
24     A.  Good journalism means an objective reporting
25  of facts.  Somebody who can -- or if the journalist can

27

1  remove his emotion and theory as much as possible from
2  reporting what he sees or she sees with their own eyes
3  and ears, empirical evidence reported to the public with
4  very little bias.
5      Q.  In your mind, what is the relationship between
6  good journalism and corroboration of facts?
7      A.  I think good journalism, if you're going to
8  have a corroboration of facts, I believe the more
9  witnesses and points of view of the same action or
10  activity that is being reported on, the better.  And,
11  for example, just theoretically thinking, one person
12  can't see both sides of the cup at once.  So when two
13  people are observing it at the same time, you get a
14  better description of the object in question.  And so
15  the more witnesses that have viewed it, the more
16  impressions we can get after the fact of what has
17  actually happened with the object that we're observing.
18     Q.  In your first few years at InfoWars were you
19  comfortable with the style of journalism and the stories
20  you were working on?
21         MR. ENOCH:  Objection, form and leading.
22         Anytime I make an objection like that,
23  sir, you can go ahead and answer.
24         THE WITNESS:  Okay.
25         MR. ENOCH:  Let me say one thing.  I may

28

1  ask you not to answer based on a privilege.  That's your
2  choice.  That's my client trying to protect a privilege;
3  but when I object, say "Objection, form or leading," you
4  can go ahead and answer.
5          THE WITNESS:  Okay.
6      Q.  (BY MR. BANKSTON)  Would you like me to ask
7  that question again?
8      A.  Yes, please.
9      Q.  In those first few years at InfoWars, were you
10  comfortable with the style of journalism and the stories
11  you were working on?
12         MR. ENOCH:  Same objections.
13     A.  I was comfortable with the films I was
14  producing and helping Alex produce.  I found them
15  interesting; and I found that Alex did present enough
16  expert testimony that it held water, in my mind.
17     Q.  (BY MR. BANKSTON)  All right, Mr. Jacobson.
18  You understand this lawsuit has to do with Sandy Hook?
19     A.  Yes, sir.
20     Q.  I want to direct your attention then to that
21  event, which is end of 2012, very beginning of 2013.
22     A.  Okay.
23     Q.  For that time period, the start of 2013, by
24  that time, had the company changed, in your mind?
25     A.  Absolutely.

29

1          MR. ENOCH:  Objection, form.  Leading.
2      A.  Absolutely.
3      Q.  (BY MR. BANKSTON)  Okay.  Mr. Jacobson, I have
4  a feeling that Mr. Enoch is going to object to just
5  about every question I ask.
6      A.  Okay.
7      Q.  So what I would like you to do to accommodate
8  this, because otherwise it's going to be super-
9  disruptive on the deposition, take a couple-of-second
10  pause before you answer my questions because he's going
11  to step on your answers.  Okay?
12     A.  Okay.
13     Q.  If you can, just take a second pause.  And
14  what I'm going to do is ask you that question again
15  because it got kind of disrupted, and I think
16  Mr. Enoch's going to object again.
17     A.  Okay.
18     Q.  And just for reminders, we may in typical
19  conversations tend to try to finish each other sentences
20  or talk over each other, not to interrupt each other,
21  but to help us get to the point faster.  It makes it
22  very difficult on her.
23     A.  Right.
24     Q.  She has trouble writing down when two people
25  are speaking at the same time.  So this is why, if you

30

1   can, if you can take a pause -- you might even want to
2   check and look over to your former employer's counsel to
3   see if there is going to be an objection -- that way we
4   can keep the record clear.)
5       A.   (Witness nods head.)
6       Q.   At the start of 2013, around that time period,
7   in your mind, had the company changed?
8           MR. ENOCH:  Objection to form, leading.
9       A.   Yes.
10      Q.   (BY MR. BANKSTON)  Tell me about that.
11      A.   When I first started working for InfoWars, it
12  was an operation with just a handful of employees as far
13  as I know, possibly five or less; maybe a few more than
14  I'm aware of.  But I was working out of my own private
15  office.  Alex had a tiny office in the far south of
16  Austin.  He had one employee that I knew of, Ryan
17  Schlickeisen; another employee who I'm not sure of her
18  name.  I can't really recall.  But she was a woman who
19  tended his warehouse, which was in the far south side of
20  Austin.  And I'm not even sure where Alex was
21  broadcasting out of.
22          In 2010 he had a full-size facility.  He
23  had, as far as I know, over 60 people on his staff, if
24  not more; and he had a full-blown studio.  So it wasn't
25  just different.  It was dramatically different in every

31

1   way, shape, and form.
2       Q.   One of the aspects I want to direct your
3   attention to is whether you, in your mind, felt that
4   anything had changed in the company with regards to how
5   it performed journalism.
6       A.   I do.
7       Q.   What are your thoughts about that?
8       A.   I --
9           MR. ENOCH:  Objection, form and -- yeah,
10  objection, form.
11          Excuse me.  Go ahead.
12      A.   I feel that Alex's formula definitely changed.
13  He changed his formula from a complement of the website
14  and films to no films anymore and more or less the
15  radio -- the website, radio show, and films was the
16  original form.  He took the film part out, which I
17  felt -- I felt the films were part of his kind of thing;
18  and he went more radio show.  And that's it -- website,
19  as far as I know.  So in that form of media, I kind of
20  just felt like he just ditched an important part of his
21  media.  That's all.
22          THE VIDEOGRAPHER:  Would you mind
23  clipping it just a little bit higher?
24          Thank you.
25      Q.   (BY MR. BANKSTON)  Mr. Jacobson, in terms of

32

1   InfoWars' consistency or process for corroborating
2   facts, in your mind, had that changed between the start
3   of your employment and the end of your employment?
4           MR. ENOCH:  Objection to form and --
5   object to form.
6       A.   I feel that from the beginning, when I first
7   started working there, the fact collection was mostly
8   Alex and -- mostly himself was the researcher.  By the
9   end, Alex let a lot of others do research for him; and I
10  don't know if these people were specifically qualified
11  or experienced enough to do that kind of work.
12      Q.   (BY MR. BANKSTON)  A few months back do you
13  remember calling me about this case?
14      A.   Yes, sir.
15      Q.   Why'd you do that?
16      A.   I was concerned.  I wanted to make sure -- I
17  felt I was part of something, just being in that
18  building, when all this was going down.  I felt terrible
19  what happened, even though I, myself, know I wasn't
20  directly involved in, you know, putting this out there
21  directly, just being in the building, I feel complicit.
22  I feel I have to right a wrong that I was involved in.
23  Even though I was part of that wrong, I want to at least
24  stack a couple of correct decisions up with some of the
25  mistakes that I have made in the past.

33

1       Q.   When you say that you weren't directly
2   involved in putting this out there, what is "this"?
3       A.   "This" would be Sandy Hook.  Anything that
4   InfoWars put out concerning Sandy Hook, I had absolutely
5   no involvement in.
6       Q.   During your employment, were you exposed to
7   InfoWars' coverage of Sandy Hook?
8       A.   During my employment, I had other assignments
9   to do; and I wouldn't much pay attention to the show.
10  However, when I did and I heard about Sandy Hook, it
11  actually bothered me.
12      Q.   Tell me what you mean by that.  What did you
13  hear that bothered you?
14      A.   I heard them making accusations based on
15  extremely narrow cross-sections of information, that I
16  did my best to make the writers and the staff aware that
17  what they were doing was speculation based on not enough
18  information.  It bothered me.  That bothered me that I
19  felt they had no concept of journalist ethics.
20      Q.   Did you tell anyone at InfoWars your feelings
21  about the Sandy Hook coverage?
22      A.   I attempted to make it as clear as possible to
23  the writers that there is something called journalist
24  ethics and how what they were doing was in a direct
25  violation of that anytime I caught wind of the Sandy

34

1   Hook story on InfoWars.
2          Now, mind you, I would like to add that
3   it's not something I was thinking about all the time,
4   considering I had other things to do.  I'd be working on
5   other projects.  But when it would come on the screen, I
6   would make it my business to go in to the writers and
7   explain to them as clearly as possible that there is
8   journalist ethics; and I tried to demonstrate what those
9   ethics are and why they are violating them and what the
10  damage could possibly be.  In fact, I remember -- I must
11  have been in that room four to five times, at least, and
12  only to be received with laughter and jokes.
13         MR. ENOCH:  Objection, nonresponsive.
14  Q     (BY MR. BANKSTON)  When you say "the room," is
15  there a specific room you're talking about?
16  A     The room I'm talking about is the room in
17  which the writers worked.
18  Q     About how many writers are we talking about
19  involved in working on Sandy Hook?
20         MR. ENOCH:  Objection to form.
21  A     I believe that there were two -- one primary
22  writer and perhaps one other that were definitely
23  involved in Sandy Hook.
24         MR. BANKSTON:  Just so I can possibly
25  clear up that objection, what is the objection to how

35

1   many writers worked on Sandy Hook?
2          MR. ENOCH:  You haven't established he
3   has personal knowledge, sir.
4          MR. BANKSTON:  Okay.
5   Q     (BY MR. BANKSTON)  Just to help clear up this
6   issue -- and I believe this has been asked if; so you
7   have to answer it again, I'm sorry -- but you were
8   exposed to InfoWars' coverage of Sandy Hook?
9   A     Yes.
10  Q     You would know how many people are working on
11  Sandy Hook --
12         MR. ENOCH:  Objection --
13  Q     -- inside InfoWars?
14         MR. ENOCH:  Objection to form and
15  leading.
16  A     I'm aware of every staff member that worked at
17  InfoWars as of up to May of 2017.
18  Q     (BY MR. BANKSTON)  When it came to coverage of
19  Sandy Hook and the work that was being done by the
20  writers, did you see things that you would consider
21  reckless?
22  A     Yes.
23  Q     Can you tell me, are there any individual
24  employees that you believed engaged in reckless conduct
25  regarding Sandy Hook?

36

1   A     Yes.
2          MR. ENOCH:  Objection to form and
3   leading.
4   A     Yes, I do.
5   Q     (BY MR. BANKSTON)  Okay.  Tell me who the
6   employees are that you developed opinions about their
7   work on Sandy Hook.
8   A     First and foremost would be Rob Dew.
9   Q     Okay.  Let's start with Mr. Dew.  What is your
10  observations about Mr. Dew's journalistic integrity as
11  it respects Sandy Hook allegations?
12         MR. ENOCH:  Objection to form.
13  A     I feel that Mr. Dew was overzealous to receive
14  any type of hint that perhaps this might have been a
15  phony act, a staged act.  Any type of whisper that came
16  through to him, he would celebrate.
17         MR. ENOCH:  Objection, nonresponsive.
18  Q     (BY MR. BANKSTON)  Do you know Adan Salazar?
19  A     Yes, sir.
20  Q     Have you seen or did you ever observe any work
21  being done by Adan Salazar on Sandy Hook?
22  A     Yes.
23  Q     Do you have an opinion as to whether that work
24  was done responsibly by Mr. Salazar?
25         MR. ENOCH:  Objection to form.

37

1   A     I do have an opinion of that.
2   Q     (BY MR. BANKSTON)  Can you tell me what facts
3   and observations you may have seen that would inform
4   that opinion of Mr. Salazar?
5          MR. ENOCH:  Objection to form.
6   A     Like I've stated already, whenever the subject
7   came up, I would immediately clarify to the writers that
8   there is a journalistic ethics that they're violating;
9   and what I've pointed out to Adan specifically is that
10  you're taking the word of one witness primarily and a
11  couple of speculative other facts and calling it the
12  truth without actually going down and investigating it
13  ourselves or actually going with our own reporters and
14  corroborating what these people are saying.
15         I made it aware to Adan that Wolfgang
16  Halbig could have a lot of issues that we're not
17  considering, that by taking the word of this one man so
18  heavily with such a great accusation that he's accusing
19  people of is so irresponsible, so damaging.  I asked him
20  to consider the size of the audience.
21         And Adan Salazar responded with -- and
22  I'm going to quote him because he said it to me many
23  times -- "I want to print up a T-shirt that says,
24  'Halbig was right.'  I want bumper stickers that say,
25  'Halbig was right,'" to a laughing room.

38

1       MR. ENOCH: Objection, nonresponsive.
2    Q. (BY MR. BANKSTON) Do you feel that
3  Mr. Salazar ever mocked your concerns about Sandy Hook
4  coverage?
5    A. Absolutely.
6       MR. ENOCH: Objection to form.
7    A. Absolutely.
8    Q. (BY MR. BANKSTON) Let's talk about -- you
9  mentioned the name Mr. Halbig, correct?
10   A. Yes, sir.
11   Q. Can you briefly describe who Mr. Wolfgang
12 Halbig is?
13   A. As far as I can recall, whenever Sandy Hook
14 was on the air or Alex or whoever was hosting was
15 covering Sandy Hook, it was always accompanied by
16 Mr. Halbig. And when I took a look at Mr. Halbig and
17 considering he was the one and only person and the
18 claims -- or as far as I know, he was the one and only
19 person because whenever I would tune in, he was always
20 on.
21      So based on that impression, I would say
22 he was the one and only person. And every time I saw
23 him, I saw somebody that if he was amongst a group, a
24 large group of people, okay; but a one and only person,
25 I felt that this person may have mental problems. This

39

1  person may have a lot of emotional problems. He could
2  be a lonely man. He could be somebody looking for
3  attention. There could be a lot of questions to be
4  asked before we present forward as a news organization
5  such a heavy accusation as accusing the parents of
6  slaughtered children of being liars.
7       I think that perhaps we should have asked
8  the question "what is Wolfgang Halbig's story" before we
9  put this story to the public. This story should never
10 have been put forward to the public at all without --
11 and if they knew ethics in journalism, they would have
12 known that immediately; but they have absolutely no
13 ethics experience, in my opinion. Therefore, the story
14 went forward; and the damage was caused.
15      MR. ENOCH: Objection, nonresponsive.
16   Q. (BY MR. BANKSTON) Mr. Jacobson, I think it's
17 fair to say you have strong opinions about Mr. Halbig?
18   A. I do. I have strong opinions about his
19 validity as a sole witness.
20   Q. Okay.
21      MR. ENOCH: Objection to form -- same
22 objection, nonresponsive.
23   Q. (BY MR. BANKSTON) Who is Halbig's points of
24 contact at InfoWars? Who did he talk to?
25      MR. ENOCH: Object to form.

40

1    A. I don't know. As far as I know, it's the
2  people handling who were handling the Sandy Hook story.
3       MR. ENOCH: Objection, nonresponsive.
4       MR. BANKSTON: What's the form to asking
5  him who Halbig's point of contact is?
6       MR. ENOCH: Speculation, sir.
7       Mr. Bankston, when I -- when you ask me a
8  question, the Rules require that I respond to you
9  clearly. I did so.
10      MR. BANKSTON: You did.
11      MR. ENOCH: No reason to chuckle, sir.
12      MR. BANKSTON: It's funny, Mr. Enoch.
13 I'm sorry if the things that happen in this deposition
14 are funny.
15      MR. ENOCH: I think it's unprofessional,
16 sir.
17      MR. BANKSTON: I think it's
18 unprofessional for a witness to talk about having
19 information from CIA kill teams about Las Vegas, and
20 that's why I chuckle at it.
21      I think it's unprofessional for you to
22 make constant objections even when they have no legal
23 basis. That's why occasionally, yes, you will see the
24 corners of my mouth turn and smile.
25      I'm obviously asking about his personal

41

1  knowledge. That's what I'm asking him about. So that
2  is why I smile.
3    Q. (BY MR. BANKSTON) Are you familiar with the
4  types of claims made by Mr. Halbig?
5    A. Some of them.
6    Q. I want to ask you about some claims and if you
7  know what they are. Have you ever heard the claim from
8  Mr. Halbig or repeated from Mr. Halbig by somebody else
9  that the school was actually closed before the shooting?
10      MR. ENOCH: Objection to form.
11   A. I have heard, yes.
12   Q. (BY MR. BANKSTON) Did you see anything in
13 your time at InfoWars that would make you think that
14 people were acting irresponsibly as it concerns that
15 particular claim?
16      MR. ENOCH: Objection to form.
17      You may answer.
18   A. Yes.
19   Q. (BY MR. BANKSTON) What kinds of things did
20 you see -- excuse me. Scratch that.
21      Who did you see acting irresponsibly with
22 respect to that claim?
23      MR. ENOCH: Objection to form.
24   A. Mr. Robert Dew and Mr. Adan Salazar.
25   Q. (BY MR. BANKSTON) Are you familiar with the

42

1 claim that no paramedics were allowed inside of the
2 building?
3    A. I mean, I've heard it.
4    Q. Okay. It's not something you had direct
5 exposure to?
6    A. No, outside of me just briefly watching it on
7 a video as if I was audience.
8    Q. Have you ever heard the allegation that there
9 are photographs of children who are supposedly dead who
10 are actually alive?
11    A. Yes, I've heard that allegation.
12    Q. Do you -- from what you have seen inside of
13 InfoWars, have you seen anything that has caused you to
14 form an opinion about that allegation?
15       MR. ENOCH: Objection to form.
16    A. I mean, you know, my opinion is it's so
17 distasteful -- and it happened a while ago, that -- you
18 know, it happened a while ago. So it was just all these
19 things seem to -- all of the little allegations that
20 Halbig and all these other people set forward, I sort of
21 see it as individual cross-sections of information that
22 each one was improperly handled.
23       MR. ENOCH: Objection, nonresponsive.
24    Q. (BY MR. BANKSTON) Did you ever voice any
25 criticism of Mr. Halbig specifically while you were at

43

1 InfoWars?
2    A. Yes, I did.
3    Q. Who did you voice that criticism to?
4    A. Adan Salazar.
5    Q. Are you familiar with the Sandy Hook parent
6 Leonard Pozner? Have you heard that name?
7    A. I have heard the name.
8    Q. Okay. Have you ever seen written
9 communications, like e-mails, from Mr. Halbig? Have you
10 seen what his e-mails look like?
11    A. No, I haven't.
12    Q. Okay. Do you know if Mr. Halbig ever came to
13 InfoWars? Did he ever came to the Austin location?
14    A. I'm not aware of that.
15    Q. Okay. Do you happen to know whether anybody
16 ever from InfoWars went to visit Mr. Halbig in Florida?
17    A. Again, I'm not sure.
18    Q. Okay. Do you know anything about InfoWars
19 helping raise money for Mr. Halbig?
20       MR. ENOCH: Objection to form.
21    A. I'm unaware of anything like that.
22    Q. (BY MR. BANKSTON) Okay. Are you aware of
23 Mr. Halbig ever engaging in any sort of harassing
24 behavior towards people involved in Sandy Hook?
25    A. I've never heard of Halbig himself engaging in

44

1 that kind of behavior.
2    Q. Okay. Do you know who Dan Bidondi is?
3    A. Yes, sir.
4    Q. Can you describe what Mr. Bidondi has ever
5 done for InfoWars?
6    A. Mr. Bidondi worked for InfoWars briefly, for
7 about a year or so; and he served as an on-air reporter
8 and journalist.
9    Q. Okay. Are you aware if Mr. Bidondi ever went
10 to Newtown to cover Sandy Hook?
11    A. I'm not sure. I don't know.
12    Q. Have you ever met Mr. Bidondi?
13    A. Yes, sir.
14    Q. Okay. If you were going to pick someone to
15 treat this story with respect and sensitivity, would you
16 pick Mr. Bidondi?
17    A. No, sir.
18       MR. ENOCH: Objection to form and
19 leading.
20    A. No, I wouldn't.
21    Q. (BY MR. BANKSTON) Can you explain why not?
22       MR. ENOCH: Same objections.
23    A. Because Mr. Bidondi is very emotional and
24 when -- and he's also very belief based and I always
25 viewed him as more of somebody who could be a character

45

1 than more of a journalist. And to send somebody like
2 that with such a serious accusation to cover that,
3 especially to talk and conversate with Mr. Halbig,
4 knowing Bidondi, how impassioned he gets over these
5 things and how impressionable he is with these kinds of
6 scenarios, especially with conspiracy kinds of
7 situations -- Mr. Bidondi gloms onto conspiracy kind of
8 situations; he really magnates towards them -- no, I
9 wouldn't because he would, I think, bias the situation
10 and not fairly report it and be over-emotional.
11       MR. ENOCH: Objection, nonresponsive.
12    Q. (BY MR. BANKSTON) When you say that
13 Mr. Bidondi tends to glom onto conspiracy scenarios, can
14 you tell me what you mean by that?
15       MR. ENOCH: Objection to form.
16    A. I mean that he really -- you know, a lot of
17 his programming when he was working at InfoWars had to
18 do with the occult and all this stuff; but a lot of it
19 also has to do with, for example, a big claim to fame
20 for Dan Bidondi would be the Boston -- his appearance as
21 a reporter for the Boston bombing. He made a national
22 spectacle of himself and in an unprofessional way,
23 which, of course, made him a celebrity at InfoWars.
24       MR. ENOCH: Objection, nonresponsive.
25    Q. (BY MR. BANKSTON) When you say that him

Robert Jacobson - 3/20/2019

46

1 making a spectacle made him a celebrity at InfoWars, can
2 you tell me what you mean by that?
3        MR. ENOCH: Objection to form, leading.
4     A. He basically accused -- instead of asking a
5 question at the Boston bombing situation, he made an
6 accusation in which case he was escorted out of the
7 building in typical, you know, journalist activist
8 style, which has been popularized by InfoWars; and
9 because he did that, he was much celebrated by the
10 people at InfoWars. And for a moment there, you know,
11 he was on the top of his game, I suppose, inside that
12 office.
13        MR. ENOCH: Objection, nonresponsive.
14     Q. (BY MR. BANKSTON) When you were at InfoWars,
15 in general, if a person did something in public that was
16 agitating, was that good for their career at InfoWars or
17 bad for their career at InfoWars?
18     A. It was --
19        MR. ENOCH: Objection to form.
20     A. It was excellent for their career. I can
21 point to several examples where it's not reporting at
22 all; it's pure agitation by many members of the staff.
23 And I have also been very critical of that. It's been
24 pure -- in fact, some of it is so agitating it's almost
25 to the level of public disruption, so -- including --

47

1 can I go on?
2     Q. (BY MR. BANKSTON) Please.
3        MR. ENOCH: Objection, nonresponsive so
4 far.
5     Q. (BY MR. BANKSTON) Let me ask you another
6 question. Can you give me an example of some of the
7 things you're talking about when you say "agitation"?
8     A. Yes. Ms. Millie Weaver last year or the year
9 before that -- I'm not sure when; but it was in the
10 last, perhaps, twelve months, I believe, because it was
11 after I left -- she showed up at a Hillary Clinton book
12 signing event that was at BookPeople. These people were
13 not there to protest. These people were not there
14 to...Hillary. This was far after the election. Nobody
15 was campaigning. But Ms. Millie Weaver decided to show
16 up with a lot of Trump gear, which obviously is going to
17 be -- as we follow the news, we know it's agitating
18 towards -- in a very political way, you know.
19        And so, in my opinion, just by looking at
20 that, I noticed that reporters don't show up sponsoring
21 politicians. So for her to go there and say -- and, in
22 fact, the name of this video on YouTube is called
23 Journalists Harassed or something. She identifies
24 herself as a journalist while she shows up wearing
25 political gear directly aiming at the opposite end of

48

1 the spectrum, asking abrasive questions about Hillary
2 Clinton. Now, that's not journalism. That's agitation;
3 and that is a clear-cut case of them swapping
4 out the words "agitation" for "journalism" and vice
5 versa.
6        MR. ENOCH: Objection, nonresponsive.
7     Q. (BY MR. BANKSTON) Have you ever seen anyone
8 at InfoWars engaged in conduct that you believed was
9 designed to elicit a negative emotional reaction from
10 the subject being interviewed?
11        MR. ENOCH: Objection to form and
12 leading.
13     A. I've never been involved in, let's say, people
14 planning such things. However, I've never worked with
15 Millie Weaver closely or Owen Schroeder closely. These
16 guys show up -- both of them show up --
17        Owen, I don't find to be -- I think he's
18 very -- in my opinion, he's a very smart guy. So he
19 must know what he's doing by showing up at these
20 political events wearing Trump hats and whatnot. He
21 must know the difference between a journalist and an
22 agitator, how a journalist has to appear neutral in his
23 stance and how an agitator appears politically motivated
24 on one side or the another at the moment, present in the
25 spot. So I don't know about Millie, but I do know that

49

1 Owen Schroeder should definitely know the difference.
2        So that being said, I mean, I've never
3 been involved in, let's say, let's go down there and
4 cause a fight kind of discussion; but I do know that
5 they should know better, showing up at these places with
6 these kinds of -- you know, this kind of gear that will
7 affect people's emotions is pretty obvious.
8        MR. ENOCH: Object, nonresponsive.
9     Q. (BY MR. BANKSTON) While you were at InfoWars,
10 did you ever hear anybody inside the organization
11 express negative feelings about the Sandy Hook parents?
12        MR. ENOCH: Objection to form.
13     A. No, except for what Alex said live on the air.
14     Q. (BY MR. BANKSTON) Were you uncomfortable with
15 the things that Mr. Jones said on the air?
16     A. Yes, I was.
17        MR. ENOCH: Objection to form and
18 leading.
19        I'm sorry. Would you just hesitate,
20 please, before you give your answer?
21        THE WITNESS: Yes, sir.
22        MR. ENOCH: Thank you.
23     Q. (BY MR. BANKSTON) Specifically as it regards
24 to comments about the Sandy Hook parents, were you ever
25 disturbed by anything you saw at the set on InfoWars?

50

1     MR. ENOCH:  Objection to form.
2     A.  I was disturbed by the way they said
3  Mr. Pozner changed; he went from a laughing stance to a
4  serious stance when the camera was on him briefly before
5  he was asked to call.  I wanted to -- you know, again,
6  this is another thing I attempted to clarify with
7  Mr. Salazar and others that when you go through an
8  extreme tragedy, your emotions are all over the place.
9  And this is a known fact.
10     Just because somebody laughs at a joke
11  somebody tries to -- you know, you're not immune to
12  humor even if you went through a massive tragedy.  For a
13  brief moment somebody could say something; and it's,
14  "Oh, ha, ha."  You know, you don't have any really
15  control over if somebody makes you laugh.  You don't
16  have that control.  And I tried -- just because somebody
17  went through a massive tragedy doesn't mean that you
18  have to jump on the guy for smiling right before the
19  camera was on him.
20     In fact, a lot of people who experience
21  this level -- well, I don't know about this level -- but
22  tragedy in their life, they don't begin to even mourn
23  until days after.  They go through shock.  So I was
24  disgusted and I did attempt to clarify to everybody that
25  people go through a range of emotions after a traumatic

51

1  event.
2     MR. ENOCH:  Objection, nonresponsive.
3     Q.  (BY MR. BANKSTON)  Have you ever while working
4  at InfoWars heard the term "crisis actors"?
5     A.  Yes.
6     Q.  What do you understand that term to mean?
7     A.  I believe it means that there are people from
8  Special Forces, let's -- per se, or something like that.
9  They are people from a nefarious group run through the
10  government or outside for special -- special interest
11  money, let's say, who will then attempt to cause a phony
12  event to -- like, for example, crisis actors faking
13  their death or things like that to change a shift in
14  policy or things like that.  That's what I understand a
15  crisis actor to be.
16     Q.  Have you ever heard while at InfoWars the term
17  crisis actors or a similar allegation being attached to
18  the Sandy Hook event?
19     MR. ENOCH:  Objection to form.
20     A.  Yes, I have.
21     Q.  (BY MR. BANKSTON)  While you were at InfoWars
22  did you feel that you would ever see evidence which you
23  would consider sufficient to responsibly make that
24  allegation on the air?
25     MR. ENOCH:  Objection to form.

52

1     A.  No.
2     Q.  (BY MR. BANKSTON)  What is your personal
3  feeling, sitting here today, about an allegation that
4  there were crisis actors in use at Sandy Hook?
5     MR. ENOCH:  Objection to form.
6     A.  I mean, my opinion is -- my personal feeling
7  is it was shocking to hear -- well, it wasn't shocking
8  that they went down that line because they went down
9  that line of thought before; but the weight of the
10  accusation in this particular case, it was shocking that
11  they didn't do more research.  They didn't go further
12  into it.  They didn't -- I mean, what I constantly tried
13  to clarify is a story of this level should not be
14  brought forward unless they are -- I tried to make it
15  clear that they need as much evidence in this story as
16  if they were going to court to prove their case; and if
17  they didn't have that, they didn't have a story.
18     MR. ENOCH:  Objection, nonresponsive.
19     Q.  (BY MR. BANKSTON)  Can you tell us who Paul
20  Watson is?
21     A.  Paul Watson is sort of Alex's alternate host.
22  He's basically like Alex's sidekick.
23     Q.  Okay.  Have you ever been aware of
24  Mr. Watson's opinions about the Sandy Hook hoax
25  allegations?

53

1     A.  No.
2     Q.  Do you know of anyone else at InfoWars who
3  ever voiced an objection regarding any element of the
4  Sandy Hook coverage or the coverage as a whole?
5     A.  I don't know if -- I mean, did it
6  independently on my own; and then I would have talk to
7  others about it.
8     MR. ENOCH:  Objection, nonresponsive.
9     Q.  (BY MR. BANKSTON)  Have you ever had any
10  private conversations with any of your coworkers at
11  InfoWars about negative reservations about the Sandy
12  Hook coverage?
13     MR. ENOCH:  Objection to form.
14     A.  Yes.
15     Q.  (BY MR. BANKSTON)  And what coworkers would
16  that be?
17     A.  I spoke with Ashley Beckford.  I spoke with...
18  I spoke with Adan Salazar.  I spoke with Kit Daniels.  I
19  spoke with...  I must have spoken -- and others I don't
20  recall.  I have spoken quite a bit.
21     Q.  Can you tell us:  Who is Kit Daniels?
22     A.  Kit Daniels is a writer at InfoWars.
23     Q.  Was Kit Daniels ever involved in any of the
24  Sandy Hook coverage?
25     A.  I'm unsure.

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 539 of 1271

Robert Jacobson - 3/20/2019

54

1    Q.  Okay.  Are you familiar with an allegation
2  concerning an alleged blue screen video interview with
3  Anderson Cooper?
4    A.  I am.
5    Q.  When you were at InfoWars, did you ever work
6  in video technology?
7    A.  Yes, I did.
8    Q.  Okay.  Can you explain to us kind of your
9  background and your training and experience in video
10  technology?
11    A.  My background began in New York City.  I was
12  working for several audio recording studios, including
13  The Hit Factory in New York City, which is a legendary
14  studio.  I moved to Austin shortly after that.  I worked
15  for the Austin Music Network -- before that I worked for
16  a music studio here, in Austin, Texas.  Then I worked
17  for the Austin Music Network for about three and a half
18  years, where I got even better.  Then I moved from there
19  and I worked for Alex for 13 years producing roughly ten
20  of his feature-length documentaries.
21        MR. ENOCH:  Objection to form --
22  objection, nonresponsive.
23    Q.  (BY MR. BANKSTON) Can you explain to us:
24  What is blue screen compositing?
25    A.  Blue screen compositing is when you can stand

55

1  in front of a blue screen and you can add any background
2  you'd like behind you, so.
3    Q.  Okay.  Mr. Jacobson, I am going to play you a
4  video clip that is going to be Exhibit 2 to this
5  deposition.
6        MR. ENOCH:  I think it's Exhibit 3.
7        MR. BANKSTON:  Oh, it will be, yeah.
8  Change that number.
9        (Exhibit 3 marked.)
10        MR. BANKSTON:  Let me ask that question
11  again, Mr. Jacobson.
12    Q.  (BY MR. BANKSTON)  Mr. Jacobson, I'm going to
13  show you a video clip that is going to be Exhibit 3 to
14  this deposition.  That is a video clip from a part of an
15  InfoWars episode.  So I'd like you to watch it, and I'm
16  going to ask you some questions about it.  Okay?
17    A.  Okay.
18        (Video playing.)
19    Q  (BY MR. BANKSTON)  First, Mr. Jacobson, based
20  on your training and experience in video technology, was
21  what we just saw clearly blue screen?
22    A.  It was --
23        MR. ENOCH:  Objection to form.
24    A.  It was not clearly blue screen.
25    Q.  (BY MR. BANKSTON)  Okay.  Would anybody with

56

1  competent video experience think this was blue screen?
2        MR. ENOCH:  Objection to form.
3    A.  Not at first view.
4    Q.  (BY MR. BANKSTON)  Would anybody with
5  competent video experience have serious doubts about
6  saying this was blue screen?
7        MR. ENOCH:  Objection to form.
8    A.  I feel they would.  They would be on the
9  fence.  If they saw this video, they would have
10  questions.
11    Q  (BY MR. BANKSTON)  Okay.
12    A.  Can I go further and explain that?
13    Q.  Actually, let me ask you a question on that.
14  Okay?
15    A.  Okay.
16    Q.  Your opinion about whether or not it could be
17  fairly asserted that this is clearly blue screen, in
18  forming your opinion on whether that could be asserted,
19  can you tell me about any of the things you see in this
20  video or any of your experience that would inform that
21  opinion?
22    A.  There's nothing --
23        MR. ENOCH:  Objection -- I'm sorry.
24  Objection to form.
25        Please continue.

57

1    A.  There's nothing in that video that will
2  clearly indicate to me that that was a blue screen
3  event.
4    Q  (BY MR. BANKSTON)  Okay.  And so if a
5  witness -- if anyone was to say, "I can look at that
6  video.  I work with blue screen.  It's got all the
7  telltale signs.  That's clearly blue screen," in your
8  opinion, is that person acting responsibly?
9        MR. ENOCH:  Objection to form.
10    A.  No, I don't.  I think that, based on what we
11  see on that screen, that could be -- that error in the
12  nose would have been caused by a number of different
13  reasons; and none of them are clear from what we see
14  there without knowing what happened behind the scenes
15  with the operating room controllers, so on and so forth.
16  That could have been a natural glitch that happens all
17  the time on YouTube.  We see it all the time where
18  pixels smudge.  There is no secret about that.  There
19  must be a million videos or more where pixels smudge all
20  the time.
21        In order for that -- should I continue?
22    Q.  If you do have more facts that you are basing
23  your opinion on.
24    A.  The only thing I can tell you about that is
25  the only way that that is possibly green screen is if

---

58

1  Anderson Cooper is not standing next to that woman.
2      MR. ENOCH:  Objection, nonresponsive to
3  the entire answer, including after the continuation of
4  the question "if you have more facts."
5      Q   (BY MR. BANKSTON)  When you say, "That means
6  Anderson Cooper wasn't standing next to that woman," are
7  you making an opinion about whether the woman in the
8  video was actually on location?
9      MR. ENOCH:  Objection to form, leading.
10     A.  I'm not making opinion on anything.  What I'm
11  saying is:  If his nose was cutting off, that means he
12  stepped out of the green screen or the blue screen
13  bounds; and his nose was cut off, which would suggest
14  she was somewhere else.  He was standing in one room,
15  she's standing somewhere else.  That's what it would
16  mean.
17      If he stepped outside the -- and she's
18  not outside the green screen bounds, how could he have
19  stepped outside the green screen bounds if she is -- she
20  would be disappeared.  She wouldn't even be on the
21  screen.  We would see -- if that was green screen, we
22  would see -- she would either -- it would be a cut-out.
23      See, what they're suggesting is Anderson
24  Cooper, okay, would be in this screen.  Everything else
25  would be green.  He would be -- they would composite

---

59

1  behind him the town hall scene that you see behind him.
2  He would step outside, and his nose would get cut off.
3  She would also be outside that box.  If the box is only
4  this big and he steps outside, she would also be outside
5  that box, part of the composite, which would mean that
6  she would have to be on location while he was somewhere
7  else.
8      MR. ENOCH:  Objection, nonresponsive.
9      Q   (BY MR. BANKSTON)  Would it be accurate to say
10  if this theory of how -- if the setup that you're
11  describing is true, would it be accurate to say then
12  that the woman in the interview would not be actually
13  looking at Anderson Cooper?
14      A.  That's what it would mean.
15      MR. ENOCH:  Objection to form and
16  leading.
17      A.  It would mean that what you see in there is
18  two people who are acting remarkably responsive to each
19  other on a super-human level, in my opinion, because,
20  you know, they wouldn't be looking at each other.  She
21  would be in one location.  He would potentially be,
22  according to this theory, in a CNN studio around the
23  corner, down the block, miles away, if not on the other
24  side of the globe.  So they would not be in the same
25  place at the same time to have that interaction if he

---

60

1  stepped outside the bounds of the green screen and his
2  nose got cut off.
3      MR. ENOCH:  Objection, nonresponsive.
4      Q   (BY MR. BANKSTON)  Now, if somebody is wearing
5  glasses in a green screen shot --
6      A.  Uh-huh.
7      Q.  -- will the green screen background that's
8  being composited, will that show up in the reflection of
9  their glasses?
10     MR. ENOCH:  Objection to form.
11     A.  Sometimes.
12     Q.  (BY MR. BANKSTON)  If there's a projection
13  being used?
14     MR. ENOCH:  Objection to form.
15     A.  Depending how the lights are.  If the lights
16  are blasting against that green screen, yes.  If the
17  lighting guy takes that into accounts, they can -- you
18  know, depending on the lights.  If the lights are bright
19  and blasting at them, yes, you would see green screen.
20  Also depending on his proximity to the screen.
21     Q.  (BY MR. BANKSTON)  Okay.  Maybe -- I think
22  maybe I didn't ask -- the question was a little inartful
23  there.  Let's come back up here.  If there's lights
24  being shined on the green screen --
25     A.  Uh-huh.

---

61

1      Q.  -- then it might be possible to see green in
2  some glasses?
3      A.  Yes.
4      MR. ENOCH:  Objection to form.
5      Q.  (BY MR. BANKSTON)  My question is:  If there's
6  a background being put on that green screen, does it
7  show up live there on the green screen; or is that just
8  in the computer?
9      MR. ENOCH:  Objection to form.
10     A.  It's just in the computer.
11     Q.  (BY MR. BANKSTON)  If a person's wearing
12  glasses and they're being filmed against a green screen,
13  will the projected image that's in the computer of the
14  town hall, or whatever, appear in their glasses?
15     MR. ENOCH:  Objection to form.
16     A.  Absolutely not.
17     Q.  (BY MR. BANKSTON)  Okay.  Did you -- as a part
18  of your discussions with people at InfoWars about Sandy
19  Hook, have you raised complaints about this video
20  allegation?
21     MR. ENOCH:  Objection to form, leading.
22     A.  Not -- no.  I mean, it was one of those
23  things.  I just kind of mixed it in with all the rest of
24  it.  It wasn't -- it was just one of those points that
25  was just so silly.  It's just I can't -- I couldn't

---

62

1  believe that Alex was jumping all over that when he
2  knows perfectly well YouTube pixels smudge.
3          MR. ENOCH:  Objection, nonresponsive.
4      Q.  (BY MR. BANKSTON)  Was any -- were you -- at
5  any time during your time at InfoWars past 2013, were
6  you aware that parents had been complaining about this
7  coverage?
8      A.  No, not immediately.  I really became aware of
9  it sometime afterwards when I saw, actually, I think, a
10  PBS special on what was going on; and it really hit home
11  at that point.  I was like, this is...
12      Q.  Well, you understand -- what is your
13  understanding -- scratch that.
14          Was the InfoWars staff aware of the
15  public controversy they were causing with Sandy Hook
16  allegations?
17          MR. ENOCH:  Object to form.
18      A.  I believe they were.
19      Q   (BY MR. BANKSTON)  Was the staff aware of the
20  public opinion about their Sandy Hook coverage?
21          MR. ENOCH:  Object to form.
22      A.  I believe they were.  I believe that they were
23  aware of a dual opinion at the same time, and they got a
24  rush out of it.
25          MR. ENOCH:  Objection, nonresponsive.

63

1      Q.  (BY MR. BANKSTON)  Were you still employed at
2  InfoWars at the time that Mr. Jones was interviewed by
3  Megyn Kelly?
4      A.  No.
5      Q.  Did you ever become aware that parents were
6  being harassed by believers in the Sandy Hook hoax
7  conspiracy theory?
8      A.  Yes, I became aware of that.
9      Q.  When do you think you became aware of that?
10      A.  Somewhere around 2014, 2015.  Maybe 2015.
11  Like I said, when I saw that PBS documentary.
12      Q.  So the PBS documentary you saw, that was when
13  you were employed at InfoWars?
14      A.  I was still employed there.
15      Q.  In light of the harassment that you became
16  aware of, did it cause you to form any opinions about
17  the level of caution that would be required in covering
18  Sandy Hook from then on out?
19          MR. ENOCH:  Objection to form, leading.
20      A.  Absolutely.  Like I've already stated, I
21  marched into the writers' room several times and
22  attempted to point out that they have an ethical
23  responsibility to abide by.
24          MR. ENOCH:  Objection, nonresponsive.
25      Q.  (BY MR. BANKSTON)  Do you feel, based on your

64

1  personal knowledge inside the company, that InfoWars was
2  responsive to those criticisms and began to act
3  appropriately?
4          MR. ENOCH:  Objection to form.
5      A.  No, I don't.
6      Q   (BY MR. BANKSTON)  Okay, Mr. Jacobson.  We are
7  about an hour in.
8      A.  Uh-huh.
9      Q.  As you know, your deposition was ordered for,
10  I believe it was two or two and a half hours today.
11      A.  Uh-huh.
12      Q.  I'm not going to keep you that long, but I am
13  going to take a short break.
14      A.  Uh-huh.
15      Q.  And we do have some more to cover.
16      A.  Okay.
17      Q.  We might get near two hours -- I don't know --
18  but I'm going to try to get you out as soon as I can
19  today.  But why don't we for the moment -- we'll take a
20  15-minute break.
21      A.  Uh-huh.
22      Q.  And then we'll come back and resume after our
23  break.  Thank you.
24          MR. OGDEN:  Hey, Mark.  Will you call my
25  cell phone?

65

1          MR. BANKSTON:  Absolutely.
2          THE VIDEOGRAPHER:  We are off the record
3  at 1:12 p.m.
4          (Off the record from 1:12 to 1:30 p.m.)
5          THE VIDEOGRAPHER:  We're back on the
6  record at 1:30 p.m.
7      Q.  (BY MR. BANKSTON)  Mr. Jacobson, earlier we
8  had talked about a writing room; and I want to ask you
9  questions about that room itself.  That room was the
10  center of the writing process at InfoWars; is that
11  right?
12      A.  Yes, up until the last three years that I
13  worked there.
14      Q.  Okay.  From your personal knowledge and
15  observations of the writers, can you tell me, as it
16  concerns the writing process for coverage of Sandy Hook,
17  what, if anything, concerned you about that process?
18          MR. ENOCH:  Objection to form.
19      A.  The fact that they took Halbig's word for it,
20  and that was the article.  The article was:  Whatever
21  came out of Halbig's mouth was news.
22      Q.  (BY MR. BANKSTON)  When you were, as you
23  mentioned earlier, communicating your thoughts to people
24  at InfoWars about the Sandy Hook coverage, can you
25  describe to me on a scale of one, being not outrageous

66

1  at all and ten, being extremely outrageous, on that
2  one-to-ten scale, what is the level of outrageousness of
3  this conduct that you were trying to impart?
4       MR. ENOCH: Objection, leading and form.
5    A.  It was a ten.
6    Q.  (BY MR. BANKSTON) Tell me why you thought
7  that.
8       MR. ENOCH: Same objections.
9    A.  I mean, it's one thing to make a mistake.
10  It's another thing to have somebody come in -- and I
11  don't even -- I'm not aware if I was the only person or
12  not, but I know I was doing it -- to come in and say,
13  "Hey, this is wrong. You're making a mistake." It's
14  one thing, you know, to actually have a mistake and
15  something else to have it pointed out to you, not just
16  once but over and over and over again, and to not only
17  hear the damage that you're doing to people outside of
18  your zone but to actually laugh about it, I thought
19  that's a ten.
20       MR. ENOCH: Objection, nonresponsive.
21    Q.  (BY MR. BANKSTON) How long have you known
22  Mr. Jones?
23    A.  I've known Mr. Jones since he employed me in
24  2004.
25    Q.  In your 15 years of knowing Mr. Jones, have

67

1  you arrived at any kind of opinion about whether
2  Mr. Jones is capable of rational action or whether he is
3  too mentally unwell to even be capable of rational
4  action?
5       MR. ENOCH: Objection to form and
6  leading.
7    A.  In my 15 years of knowing Alex, I feel he is
8  very capable of rational actions, and I think the growth
9  of his business is evidence of that. Like, while his
10  opinions may be tasteless, he definitely made conscious
11  decisions to run a business. He flipped the switches
12  himself. In fact, he micromanages that place; and,
13  obviously, some of the decisions he made were
14  successful. He took a business from a few handful of
15  people to what it is today. So based on that evidence,
16  I do feel that he's more than rational in his decisions.
17       MR. ENOCH: Objection, nonresponsive.
18    Q.  (BY MR. BANKSTON) Based on your conversations
19  and years with Mr. Jones, do you have an opinion on
20  whether or not Mr. Jones can understand right from
21  wrong?
22       MR. ENOCH: Objection to form.
23    A.  Yes.
24    Q.  (BY MR. BANKSTON) Okay. What is your
25  opinion?

68

1    A.  I think he --
2       MR. ENOCH: Objection to form.
3    A.  I think he knows right from wrong, and he can
4  definitely distinguish it. And, again, it's not just my
5  opinion on this. He goes on the air and proselytizes
6  morality all the time, which, clearly, he knows what's
7  going on; and he's making a conscious decision. If he
8  can proselytize it and verbalize it and actually
9  articulate it that well to everybody, then, he's
10  definitely thinking about it; and he's aware of what's
11  going on.
12       MR. ENOCH: Objection, nonresponsive.
13    Q.  (BY MR. BANKSTON) With respect to your
14  background, have you -- what is your level of experience
15  and exposure to compositing live shots onto backgrounds?
16    A.  I mean, in my experience, I've been asked to
17  do it; and I've done it.
18    Q.  Okay.
19    A.  I've produced those videos.
20    Q.  The films and things that you would make for
21  InfoWars, did you perform any graphics work or
22  compositing work while working on those videos?
23    A.  Mostly graphics works. I mean, aside from my
24  video editing, I would do graphics much more than video
25  compositing for the films.

69

1    Q.  Does InfoWars in it's studio -- during the
2  years you were there, did it perform any green screen or
3  blue green compositing there at the facility?
4    A.  Yes.
5    Q.  When it comes to video technology, does that
6  remain your profession today?
7    A.  Yes.
8       MR. ENOCH: Objection to form.
9    A.  Yes.
10       MR. BANKSTON: What's the basis on that?
11       MR. ENOCH: I don't know what you mean by
12  "video technology." It's vague and ambiguous.
13    Q.  (BY MR. BANKSTON) Do you know what video
14  technology is?
15    A.  Yes, sir.
16    Q.  When I ask you the question, you work in video
17  technology, can you tell me what you mean by video
18  technology?
19    A.  I take technology designed to work on video as
20  my tools and create a product for my clients.
21    Q.  When it comes to video technology, are you
22  someone who considers himself to have specialized
23  knowledge or skill in that technical field?
24       MR. ENOCH: Object to form. Speculating,
25  form, and leading.

70

1    A.  Yes.
2    Q    (BY MR. BANKSTON)  Okay.  Can you tell me how
3  many years experience you have in working with video
4  production and video technology?
5         MR. ENOCH:  Objection to form.
6    A.  I have 17 years in video technology, and I
7  have over 20 years -- over 20 years in media technology
8  in general.
9    Q    (BY MR. BANKSTON)  You understand the
10  difference between a layman and a technical person?  Do
11  you understand those terms?
12    A.  Yes, sir.
13         MR. ENOCH:  Objection to form.
14    A.  Yes, sir.
15    Q    (BY MR. BANKSTON)  When it comes to video
16  production and video technology, do you consider
17  yourself a layman; or do you consider yourself as
18  someone who has technical expertise?
19         MR. ENOCH:  Objection to form.
20    A.  I consider myself as somebody who has
21  technical expertise.
22    Q    (BY MR. BANKSTON)  Okay.  Do you still have an
23  opinion as to whether or not alternative media can be a
24  force for good if done correctly?
25         MR. ENOCH:  Objection to form.

71

1    A.  I feel that alternative media -- I think the
2  subject is much bigger than that.  I think that media in
3  itself or journalism is when you cross the ethical
4  boundary, then it will be a force for good; but if
5  people are independent and refuse to abide by standards
6  that are journalist standards that have been established
7  for decades already and followed, or maybe even
8  centuries by some standards, you know, if they refuse to
9  do that, then no, it won't be a force for good.  It will
10  be a force for people to be confused and tear each other
11  down.  If they can figure that out, hey, who's going to
12  be the standard of that.  So I do think that there will
13  always be a professional standard of journalism, and
14  independent journalism should be put in its place.
15         MR. ENOCH:  Objection, nonresponsive.
16    Q.    (BY MR. BANKSTON)  When it comes to
17  professionalism in journalism, do you have an opinion --
18  or let me scratch that.
19         When it comes to professionalism in
20  journalism, have you been exposed to events, perceived
21  things with your own eyes and ears, that gives you an
22  opinion on whether it went right or whether it went
23  wrong as it regards Sandy Hook?
24         MR. ENOCH:  Objection, form.
25    A.  I don't really have a comment on that.  I'm

72

1  not really sure.
2    Q    (BY MR. BANKSTON)  Okay.  Do you today have
3  any sense of guilt about the coverage about Sandy Hook
4  that came out of InfoWars?
5         MR. ENOCH:  Objection to form, leading.
6    A.  Yes.  As I mentioned in my statements
7  previously, the reason why I'm here is because of a
8  tremendous amount of guilt that I didn't act faster.
9  Maybe I should have quit.  Maybe I could have caught the
10  story faster or been better at explaining; but, yes, I
11  do.
12         MR. ENOCH:  Objection, nonresponsive.
13    Q.  (BY MR. BANKSTON)  Are you still on friendly
14  terms with InfoWars?
15    A.  No.
16    Q.  Were you terminated?
17    A.  Yes.
18    Q.  Have you filed a complaint with the EEOC?
19    A.  Yes.
20    Q.  And just for the record, I want to make it
21  clear because I've used an abbreviation.  You filed a
22  complaint with the Equal Opportunity Employment
23  Commission?
24    A.  Yes, sir.
25    Q.  Tell me why you filed a complaint.

73

1    A.  Alex's abusive behavior and the unethical and
2  racist behavior of his staff and the environment that's
3  racist and abusive in general at InfoWars.
4         MR. ENOCH:  Objection, nonresponsive.
5  Move to strike.
6    A.  There was evidence against me that I submitted
7  to the EEOC of myself being Photoshopped onto a Rabbi's
8  face and passed around the office.  There was Owen
9  Schroeder sitting on the air calling me the resident
10  Jew, as well as Rob Dew.  There was a culture of
11  anti-Semitism inside InfoWars.  And so I went to the
12  EEOC with that and a culture of abuse propagated mostly
13  by Alex Jones himself.
14         MR. ENOCH:  Objection, nonresponsive.
15    Q.    (BY MR. BANKSTON)  Do you know, sitting here
16  today, if you're the only person who's brought such a
17  complaint or if there's anybody else who's brought
18  similar complaints?
19         MR. ENOCH:  Objection to form.
20    A.  I know of several people who have brought
21  exactly the same complaint or similar, very similar
22  complaints about Alex Jones and the office of InfoWars,
23  many of which are public.
24    Q    (BY MR. BANKSTON)  Do you feel that people
25  might look at your EEOC claim and think you're biased?

74

1    A.  I feel, yes, people will look at my EEOC
2  complaint and claim that I'm biased.  Should I continue?
3    Q.  No.  I have a question for you.
4    A.  Okay.
5    Q.  If you've got an EEOC claim and you've got bad
6  blood with InfoWars, why should people believe you?
7    A.  Because people should understand just because
8  Alex -- I have a complaint with Alex doesn't make Alex
9  an angel.  Myself and others have all witnessed it.  I
10  am doing my due diligence in bringing forth abuse that
11  Alex had against me as others have brought forth Alex --
12  abuse that Alex has against them as well as the fact
13  that does not negate the fact that this stuff about
14  Sandy Hook didn't happen, either.  What happened to me
15  is real.  What Alex did to the Sandy Hook parents is
16  also real at the same time.  Just because one is true
17  doesn't make the other untrue.  They're both true at the
18  same time.
19         Alex is an abusive man.  Alex -- and
20  every testimony that you see in public, whether it is,
21  you know, on the record -- you know, we have videos and
22  specials all over the place, news articles written about
23  this.  It's no secret of Alex's behavior.  It's no
24  secret.
25         Therefore, you know, just because I

75

1  mounted a complaint because of Alex's bad behavior
2  doesn't mean he behaved badly for Sandy Hook.  People
3  should understand just because one is true, the other --
4  it doesn't mean the other's automatically untrue.
5         MR. ENOCH:  Objection --
6    A.  Are they going to feel that I'm biased?  Yes,
7  but that doesn't mean -- you know, everything is true
8  that I am saying.  And again...
9         MR. ENOCH:  Objection, nonresponsive.
10    Q.  (BY MR. BANKSTON)  If the Sandy Hook parents
11  who brought these suits were awarded money from Alex
12  Jones, would it benefit you in any way?
13    A.  No.
14    Q.  If the Sandy Hook parents who brought these
15  suits are awarded money from Mr. Jones, let's say, a
16  significant amount of money, do you know of any way that
17  could be a detriment to you?
18    A.  The one way is if the EEOC rules in my favor,
19  it might jeopardized a potential compensation for myself
20  farther down the line.
21    Q.  So you -- do you feel that if the Sandy Hook
22  parents are ultimately compensated by Mr. Jones, do you
23  have any opinion about whether that could potentially
24  threaten your ability to get compensation for your
25  injuries?

76

1    A.  I'm not doing any of this for compensation.
2  I'm doing this because Alex is disgracing himself so
3  badly in the way he has made the parents suffer, as well
4  as myself.  He's still on the air to this day saying
5  things that are arguably true or arguably not true; we
6  don't know.  But we do know that he affects his audience
7  in a way that angers and mobilizes them; and it's
8  unclear if anything he's saying is fact or fiction,
9  opinion or speculation.  But what he does do is mobilize
10  a large amount of people in irrational thinking because
11  there's no way to tell whether what Alex is saying on
12  the air is news or not, true or false, speculation, or
13  opinion, jokes or not; but he advertises it all as news.
14  He is the InfoWars.
15         MR. ENOCH:  Objection, nonresponsive.
16    Q   (BY MR. BANKSTON)  Mr. Jacobson, have -- all
17  of your answers today, have they been based on your
18  personal knowledge?
19         MR. ENOCH:  Objection to form.
20    A.  As far as I know.
21    Q   (BY MR. BANKSTON)  Okay.  Mr. Jacobson, that's
22  all I believe I have for you at this time.
23         MR. ENOCH:  Go ahead.  I'm sorry.  I
24  didn't mean to interrupt you.
25         MR. BANKSTON:  Sure.

77

1         That's all I have for you in terms of
2  questions.  I have a few things I need to put on the
3  record.
4         MR. OGDEN:  Mark, can you check your
5  e-mail?
6         MR. BANKSTON:  Yeah, sure.
7         They don't need to concern you.  If you
8  would like to be excused while I put this on the record,
9  I can do that.
10         MR. ENOCH:  And I would like to ask
11  questions.  Are you going to prevent me from doing that,
12  Mark?
13         MR. BANKSTON:  We're going to talk about
14  that on the record in just a minute.
15         MR. ENOCH:  Well, that's what I'm asking
16  you.
17         MR. BANKSTON:  Yeah, so we're going to
18  let Mr. Jacobson go because we're not going to have this
19  discussion in front of a witness.
20         MR. ENOCH:  No, sir, we're not gonna --
21         MR. BANKSTON:  We're not going to let
22  him leave the building, Mark.  We're going to let
23  Mr. Jacobson go to the bathroom, and then I'm going to
24  put something on the record.  And if you have some
25  things to say about it, you can say whatever you want on

78

1 the record.  And then Mr. Jacobson will be in the
2 building.
3        MR. ENOCH:  Are you going to permit me to
4 ask questions, yes or no?
5        MR. BANKSTON:  I don't think I can stop
6 you.  I literally don't think I can.  I think I would
7 have to, like, go over there and physically restrain you
8 because you won't abide by rules; but Mr. Jacobson is
9 just going to go to the bathroom.
10        Now, he's going to come back; and he's
11 going to sit down in that chair.  And whether he wants
12 to sit around and listen to anything you say is not my
13 choice, but I'm not releasing him from the building
14 right now.
15        Mr. Jacobson, would you like to step out
16 of the room, maybe, for a moment?  You can use the
17 restroom if you need to; otherwise, just wait in the
18 front room for us.
19        (Witness leaves the conference room.)
20        MR. ENOCH:  What is it you would like to
21 say outside of his presence?
22        MR. BANKSTON:  Okay.  I have a few things
23 I need to put on the record.
24        First of all, just to read it really
25 quick, there is an order entered in this case concerning

79

1 this deposition.  In Paragraph 3 of the Judge's
2 Discovery Order, it allows that Plaintiff's Motion is
3 granted and that Plaintiff may take the deposition of
4 Robert Jacobson.  It does not say that the parties may
5 take the deposition of Robert Jacobson.  It says the
6 Plaintiff may take the deposition of Robert Jacobson.
7        The Civil Remedies Code provides that
8 limited discovery will be allowed if the party shows
9 good cause for that discovery and gets an order from the
10 Court on that limited discovery.  Plaintiff has gotten
11 an order from the Court showing good cause.  Defendants
12 have never attempted to show good cause and, in fact,
13 under the case law is extremely questionable and I see
14 no authority for an idea that a defendant would ever be
15 granted discovery on its own motion.  The discovery is
16 granted for the Plaintiff to meet the burdens, the
17 onerous burdens caused by the TCPA.
18        Nonetheless, Mr. Enoch has attempted
19 right from the start to interrupt and hijack my
20 deposition, which I have properly noticed, and start
21 asking the witness questions, questions which the
22 witness was visibly uncomfortable with.  This witness
23 agreed to appear voluntarily at this deposition with the
24 understanding that he would be questioned by the
25 Plaintiff's counsel.  He has appeared without his own

80

1 personal counsel and was suddenly ambushed by a barrage
2 of questions from his former employer, questions he was
3 not expecting.
4        I need to put this on the record for we
5 are now on our the third deposition of this case; and in
6 the first deposition of Mr. Jones, which Mr. Enoch was
7 not defending but was merely an observer, his name
8 appeared in all caps where's he's speaking and
9 interjecting into the record 28 times during the
10 testimony of Mr. Jones; and that's taking out the times
11 that it appeared for housekeeping matters, like getting
12 the witness water or talking about the PO at the end of
13 the deposition.
14        And I don't want to be tag-teamed and it
15 was ridiculous and improper but I normally wouldn't
16 call it out on the record but I reviewed the
17 transcript -- and I've done this to confirm this -- that
18 there were questions on the floor about what a certain
19 building was and whether it was the school or not.  And
20 as part of his interruption, Mr. Enoch blurted out to
21 the witness that it's the firehouse in the video, a word
22 that had not previously appeared in the deposition.  So,
23 of course, right after that, Mr. Jones says, quote, "And
24 I later corrected, you know, that was one of the things
25 that had been said that wasn't true was that they were

81

1 at the firehouse.  There was other footage from the
2 school."
3        At best, this was highly improper
4 conduct, and it's exactly why we don't allow speaking
5 objections in Texas.  At worst, it was an attempt to
6 communicate an idea to the witness, conduct which is
7 absolutely repellant to the idea of justice.
8        Yet, on the following day, the problems
9 continued.  I only have a video, not a transcript; but,
10 once again, Mr. Enoch repeatedly interrupted a
11 deposition he was not defending, in which he was simply
12 an observer.  And, again, I've watched the video to
13 confirm; and so has my cocounsel, to confirm both of our
14 memories, that Mr. Dew, the corporate representative,
15 visibly reacted to a gesture from Mr. Enoch during a
16 difficult question.  And Mr. Ogden had to call him out
17 on it; and you can see Mr. Dew's reaction, how narrow
18 his eyes are in the deposition.  During both depositions
19 Mr. Enoch was repeatedly asked to leave the deposition
20 if he refused to stay quiet.  He stayed but continued to
21 interrupt.
22        I am putting this all on the record right
23 now because this deposition began rather contentiously;
24 and my reaction to it was one of significant
25 disturbance.  I am now in a position where I have a

82

1  witness who is not represented by counsel.  I am facing
2  a counsel who at the very beginning of this deposition
3  threw all sense of propriety out the window and began
4  questioning the witness on multiple issues.  Though he's
5  not the one who noticed this deposition, had no ability
6  to question that witness first, and almost certainly had
7  no ability to question him at all.  It has caused the
8  witness to become very agitated.
9      I do not feel I'm equipped to defend this
10  witness' rights.  I don't represent him.  What is
11  happening is totally inconsistent with the Court's
12  order.  We have attempted to contact the Court because I
13  believe the Court would be wanting to have some sort of
14  input on, when an order like this only gives me the
15  right to question, whether Mr. Enoch should be allowed
16  to question this witness who does not currently have
17  counsel.  I'm very disturbed by this turn of events.  I
18  want this all on the record in case these matters need
19  to be brought to the Court in any kind of connection
20  with sanctions.
21      Right now I'm going to finish, and I'm
22  going to ask Mr. Jacobson to return to the room.  I'm
23  going to tell Mr. Jacobson that I've concluded with my
24  deposition, the deposition that was ordered in the
25  Court's order, and that I have no further need of him to

83

1  be here.  I do not know what Mr. Enoch's going to do at
2  that point.  I do not know if Mr. Enoch's going to
3  attempt to try to keep the witness here.  I don't know
4  what's going to happen.
5      I do know that I am extremely concerned
6  about a witness who -- I mean, about a lawyer who has
7  already exhibited an incredible pattern of astonishing
8  bad conduct in deposition to now take this very
9  unorthodox turn.
10      That being said, those are my comments on
11  the record.  I will allow Mr. Jacobson to return to the
12  room and allow him to make the decision in his own best
13  interest.
14      MR. ENOCH:  And I do not intend to
15  respond tit for tat to what I think is self-serving
16  diatribe, and I will respond appropriately when
17  appropriate.
18      Let's have the witness come back in.
19      (Mr. Bankston briefly left the room and
20  returned with the witness.)
21      MR. BANKSTON:  All right, Joe.  Let's get
22  back on the record.
23      THE VIDEOGRAPHER:  We're still on.
24      MR. BANKSTON:  Mr. Jacobson, that's all I
25  have for you today.  Thank you for your time.

84

1      MR. ENOCH:  Mr. Bankston, if I ask
2  questions, are you going to seek sanctions against --
3      (Indistinguishable simultaneous
4  speakers.)
5      MR. ENOCH:  Mr. Jacobson, are you
6  leaving?
7      (Witness leaves the conference room.)
8      MR. BANKSTON:  He's leaving, apparently.
9  He doesn't want to talk to you, I guess.
10      MR. ENOCH:  Okay.  And my understanding
11  is that you threatened me with sanctions earlier if I
12  asked questions.  Is my understanding correct, sir?
13      MR. BANKSTON:  Yeah, if you were to go
14  ahead and ask him questions, I would probably bring a
15  motion against you.  It would also be for your other
16  conduct in the previous two depositions; but, yeah, if
17  you did that.  And, again, let me just make that clear.
18  You didn't ask him any questions.  I still, depending on
19  what we need to do, might be bringing sanctions against
20  you.
21      MR. ENOCH:  I just -- you don't need to
22  give me a speech.  My question was a simple one:  Did
23  you say you would threaten me with sanctions if I asked
24  questions?  Your answer was in the affirmative.  That's
25  all I need.  Thank you very much.

85

1      MR. BANKSTON:  Yeah, if you're going to
2  engage in improper conduct, I will always put the
3  possibility of sanctions on the table.
4      MR. ENOCH:  I disagree.
5      MR. BANKSTON:  And I think you know that
6  about me by now.
7      MR. ENOCH:  Mr. Bankston, we don't have
8  to have an argument over it.  The question was a simple
9  one.  Thank you for answering.
10      MR. BANKSTON:  Are we off the record?
11      THE VIDEOGRAPHER:  We're off the record
12  at 1:55 p.m.
13      (Deposition concluded at 1:55 p.m.)
14      (Signature of the witness was waived.)
15
16
17
18
19
20
21
22
23
24
25

86

```
1          CAUSE NO. D-1-GN-18-006623
2   SCARLETT LEWIS      * IN THE DISTRICT COURT OF
        Plaintiff        *
3                        *
                         *
4   VS.                  * TRAVIS COUNTY, TEXAS
                         *
5   ALEX E. JONES, INFOWARS, *
    LLC, AND FREE SPEECH   *
6   SYSTEMS, LLC,          *
        Defendants      * 53RD JUDICIAL DISTRICT
7
8          REPORTER'S CERTIFICATION
9          ORAL/VIDEOTAPED DEPOSITION
               OF
10         ROBERT JACOBSON,
11         Taken on March 20, 2019
12         I, Debbie D. Cunningham, a Certified
13  Shorthand Reporter in and for the State of Texas, hereby
14  certify to the following:
15         That the witness, ROBERT JACOBSON, was
16  duly sworn by me, and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19         That examination and signature of the
20  witness to the deposition transcript was waived by the
21  witness and agreement of the parties at the time of the
22  deposition;
23         That the original deposition transcript
24  was delivered to MR. BANKSTON, Esq.;
25         That the amount of examination time used
```

87

```
1   by each party at the deposition is as follows:
2       BY MR. BANKSTON:
3       BY MR. ENOCH:
4       BY MR. OGDEN:
5          That $_____ is the deposition
6   officer's charges to the Plaintiff for preparing the
7   original deposition transcript and copies of exhibits,
8   if any;
9          That pursuant to information given to the
10  deposition officer at the time said testimony was taken,
11  the following includes counsel for all parties of
12  record:
13  COUNSEL FOR PLAINTIFF:
14      KASTER LYNCH FARRAR & BALL, LLP
           1010 Lamar, Suite 1600
15         Houston, Texas
           (T) 713.221.8300
16      By:  Mark D. Bankston, Esq.
           mark@fbtrial.com
17              AND
           William Ogden, Esq. (VIA PHONE)
18
19  COUNSEL FOR DEFENDANTS:
20      GLAST, PHILLIPS & MURRAY, P.C.
           14801 Quorom Drive, Suite 500
21         Dallas, Texas
           (T) 972.419.8300
22      By:  Mark Enoch, Esq.
           mkenoch@gpm-law.com
23
24         That a copy of this certificate was served
25  on all parties shown herein on _____,
```

88

```
1   and filed with the Clerk pursuant to Rule 203.3.
2          I further certify that I am neither
3   counsel for, related to, nor employed by any of the
4   parties or attorneys in the action in which this
5   proceeding was taken, and further that I am not
6   financially or otherwise interested in the outcome of
7   the action.
8          Certified to by me this day, April 8,
9   2019.
10
11
12
13      _____
        Debbie D. Cunningham, CSR
14      CSR 2065
        Expiration:  June 30, 2021
15      INTEGRITY LEGAL SUPPORT SOLUTIONS
        3100 West Slaughter Lane, Suite A-101
16      Austin, Texas 78748
        www.integrity-texas.com
17      512-320-8690; FIRM # 528
18
19
20
21
22
23
24
25
```

**From:** Adan S <adan@infowars.com>
**To:** "Louis S." <louis@infowars.com>
**Subject:** Fwd: Sandy Hook Lingerie Party Massacre 2000
**Date:** 2012-12-21 19:30:32 +0000

---

----- Forwarded Message -----
From: "luisito"
To: "Adan S"
Sent: Friday, December 21, 2012 11:24:08 AM
Subject: Re: Sandy Hook Lingerie Party Massacre 2000

You are seriously ill to send me something like that - Don't contact me any more or I will report you for harrassment you bunch of weirdos

Dnia 21 grudnia 2012 19:30 Adan S napisał(a):

> Hello Mr. Gonzalez,
>
> There is a vicious rumor that the date you posted your review of the "Sandy Hook Lingerie Party Massacre" on your site aslashabove.com shows foreknowledge or prior planning, of the events that have taken place as of late.
>
> http://www.godlikeproductions.com/forum1/message2087015/pg1
>
> http://aslashabove.com/2012/07/20/sandy-hook-lingerie-party-massacre-2000-review/
>
> At first, we thought this was surely ridiculous, however, we're (Infowars.com) going to point it out in an article anyway and would like to give you the opportunity to provide a comment.
>
> Thank you.
>

**#1707.1**

FSSTX-077825

**From:** Paul Watson <watson@prisonplanet.com>
**To:** Len Pozner <lpozner@gmail.com>
**Subject:** Re: Newtown
**Date:** 2013-01-29 22:02:09 +0000

Sir,

We have not promoted the "actors" thing. In fact, we have actively distanced ourselves from it.

We have said on numerous occasions that it was a very real tragedy with very real victims.

I hope we can continue to count you as a listener, and I am deeply sorry for your loss.

Best Regards, Paul Joseph Watson.

----- Original Message -----
From: "Len Pozner"
To: writers@infowars.com
Sent: Tuesday, January 29, 2013 9:55:38 PM
Subject: Newtown

Alex,

I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown. Accusing us of being actors.......

Haven't we had our share of pain and suffering? All these accusations of government involvement, false flag terror, new world order etc..

I used to enjoy listening to your shows prior to 12-14-12.

Now I feel that your type of show created these hateful people and they need to be reeled in!


Lenny Pozner


--
Sent from my Android phone with K-9 Mail. Please excuse my brevity.



# Full Video: Megyn Kelly Interviews Alex Jones

  

Posted By Ian Schwartz
On Date June 18, 2017

Megyn Kelly grilled *Info Wars* founder and host Alex Jones on his political leanings, connection to then-candidate and now President Donald Trump, conspiracy theories about the Sandy Hook massacre and Chobani, and much more on this week's broadcast of *Sunday Night with Megyn Kelly*. **Transcript of the interview below**.

Alex Jones, joined by Mike Cernovich, held a live stream to respond to the Kelly

interview as it was broadcasted on NBC News:



Jones called the Kelly interview a "deep state production."

Kelly's interview received high marks from media pundits. NBC colleague Andrea Mitchell called it "solid journalism" and founder of the blog Mediaite Dan Abrams said it was "important journalism"

#Megyn Kelly did more to expose the real Alex Jones and than anyone else on TV. Solid journalism.

— Andrea Mitchell (@mitchellreports) June 18, 2017

Tonight definitely gives Alex Jones more ammunition for his anti-media war https://t.co/gmMVVSLZ2g

— Brian Stelter (@brianstelter) June 18, 2017

Watching @megynkelly interview with Alex Jones, I'm even more convinced that her piece wasn't just ok to do, but important journalism.

— Dan Abrams (@danabrams) June 18, 2017

Transcript, via NBC News' *Sunday Night with Megyn Kelly*:

**MEGYN KELLY: First tonight, our report on the incendiary radio host, Alex Jones. For years, Jones has been spreading conspiracy theories, claiming, for instance, that elements of the U.S. government allowed the 9/11 attacks to happen and that the horrific Sandy Hook massacre was a hoax. Some thought we shouldn't broadcast this interview because his baseless allegations aren't just offensive, they're dangerous. But here's the thing: Alex Jones isn't going away. Over the years, his YouTube channel has racked up 1.3 billion views. He has millions of listeners and the ear of our current president. We begin our report with his reaction to the recent terrorist attack in Manchester, England.**

*KELLY: ALEX JONES WAS NEARLY 5,000 MILES AWAY FROM MANCHESTER, ENGLAND WHEN A SUICIDE BOMBER KILLED 22*

*PEOPLE AT A CONCERT LESS THAN FOUR WEEKS AGO. DESPITE THE DISTANCE, AND WITH FEW FACTS KNOWN, JONES DID WHAT HE OFTEN DOES: JUMPED MOUTH-FIRST INTO CONTROVERSY.*

ALEX JONES (May 22, 2017 YouTube video): A big bomb goes off at a pop star's rock concert bombing a bunch of liberal trendies.

MEGYN KELLY: You said, "It was a bunch of liberal trendies who were killed, the same people who are promoting open borders, bringing Islamists in.

ALEX JONES: Yes.

MEGYN KELLY: In response to which, many people looked at the victims, many of whom were 15, 14. There was a little eight ...

ALEX JONES: No. I'm sorry I didn't blow 'em up. I know. But I did something bad, though?

MEGYN KELLY: No, that - that you ...

ALEX JONES: Oh, no, no, no, no ...

MEGYN KELLY: ... would suggest that ...

ALEX JONES: 'cause ...

MEGYN KELLY: ... that an eight - that an eight-year-old, right? There

was Saffie Rose Roussos, eight years old, that she was a liberal trendy, right? 'Cause that's what you said about the victims is what has people upset ...

ALEX JONES: No, that's - yeah, no, no. The media misrepresenting and clipping that the way you did. I got home at, like, 6:00, heard about it. The ages of the victims weren't even known. But they were saying it was jihadi. And I said, "How crazy is it that liberal trendies are now the victims?" And then I start going and looking. Of course, if there's kids being killed by Muslims, I'm not saying that it's their fault.

*MEGYN KELLY: THAT PATTERN: RECKLESS ACCUSATION, FOLLOWED BY EQUIVACATIONS AND EXCUSES IS CLASSIC ALEX JONES.*

ALEX JONES CLIP: They can just carte blanche go anywhere ...

*MEGYN KELLY: HE HAS SPENT NEARLY TWO DECADES ON THE FRINGE, SHOUTING HIS CONSPIRACY THEORIES INTO ANY MICROPHONE HE COULD GET IN FRONT OF. HERE HE IS ON AUSTIN COMMUNITY TELEVISION IN 2001.*

ALEX JONES CLIP: Tyranny is enveloping the globe.

*MEGYN KELLY: HE AND HIS COMPANY, INFOWARS, HAVE BEEN STEADILY GAINING FOLLOWERS FOR YEARS, PRODUCING RADIO SHOWS AND WEBCASTS, WHICH REACH MILLIONS A MONTH. BUT JONES' INFLUENCE HIT NEW HEIGHTS WHEN HE*

*ATTRACTED A VERY FAMOUS FAN: THEN PRESIDENTIAL CANDIDATE DONALD TRUMP.*

DONALD TRUMP (On Alex Jones' show December 2, 2015): I just want to finish by saying your reputation is amazing.

*MEGYN KELLY: IN DECEMBER, 2015, MR. TRUMP APPEARED ON JONES' RADIO PROGRAM, OFFERING PRAISE AND PROMISES.*

DONALD TRUMP (On Alex Jones' show December 2, 2015): I will not let you down. You will be very, very impressed I hope and I think we'll be speaking a lot.

*MEGYN KELLY: SEPARATELY, BOTH MEN HAD SUPPORTED THE FALSE STATEMENT THAT BARACK OBAMA WAS NOT A NATURAL-BORN CITIZEN. AND THEY'VE HAD MORE IN COMMON SINCE.*

ALEX JONES (February 24, 2017): I agree with Trump on that. He agrees with me. And then we got articles, "he's following Alex on coal." "He's following Alex on guns." "He's following Alex on borders."

*MEGYN KELLY: THE 2016 CAMPAIGN WAS GOOD FOR INFOWARS. ITS YOU TUBE MONTHLY VIEWS REACHED 83 MILLION IN NOVEMBER 2016, MORE THAN FIVE TIMES HIGHER THAN THE PREVIOUS NOVEMBER. AND WHEN MR. TRUMP WON, ALEX JONES FOUND HIMSELF WITH ACCESS TO THE SEAT OF POWER. INFOWARS GOT A TEMPORARY WHITE HOUSE*

*PRESS PASS FOR THE FIRST TIME, AND JONES SAYS MR. TRUMP CALLED HIM AFTER THE ELECTION TO THANK HIM FOR HIS HELP.*

MEGYN KELLY: You have said that it's surreal to say something on Infowars and then hear it come out of the President of the United States' mouth a couple days later.

ALEX JONES: I mean, that has happened. But, I mean ...

MEGYN KELLY: Do you think he's watching?

ALEX JONES: I mean, I know Trump watches and sees the clips and things.

*MEGYN KELLY: WE DID FIND INDICATIONS OF THAT. ON JULY 22, 2015, INFOWARS PUT UP THIS VIDEO, CLAIMING IT SHOWED DRUG TRAFFICKING ALONG THE US-MEXICO BORDER. ALTHOUGH WE DON'T KNOW WHAT IT ACTUALLY SHOWS.*

INFOWARS REPORTER: We actually witnessed a drug smuggling operation from Mexico into the U.S. ...

*MEGYN KELLY: THREE DAYS LATER, MR. TRUMP GAVE THIS SPEECH IN IOWA.*

DONALD TRUMP: Big story, it's all over the place now - guys swimming across, and big bags of stuff, it's drugs, swimming across the river.

*MEGYN KELLY: THIS WAS INFOWARS PREVIEWING THE FIRST PRESIDENTIAL DEBATE BETWEEN DONALD TRUMP AND HILLARY CLINTON.*

ALEX JONES (September 25, 2016): I think she's going to show up - on drugs though - she's going to be whacked out.

*MEGYN KELLY: AND MR. TRUMP'S TAKE NOT LONG AFTER:*

*DONALD TRUMP (October 15, 2016): We should take a drug test prior, because I don't know what's going on with her.*

*MEGYN KELLY: DONALD TRUMP ALLY AND FREQUENT INFOWARS GUEST ROGER STONE UNDERSCORED THE CONNECTION BETWEEN JONES AND THE TRUMP CAMPAIGN IN A TWEET LAST SPRING. IT READ: "MSM ELITES DON'T SEE THAT @REALALEXJONES AND @INFOWARS REACH MILLIONS OF @REALDONALDTRUMP SUPPORTERS AND HELPED MAKE THE TRUMP REVOLUTION."*

*ALEX JONES (February 22, 2017): Donald Trump calls me. The secretary says, "Donald Trump would like to talk to you, Mr. Jones, would you like to talk to him? Yes, boom."*

*MEGYN KELLY: WHILE JONES HAS BOASTED OF HIS CONTACT WITH THE PRESIDENT ON HIS RADIO SHOW, HE DOWNPLAYED IT IN HIS INTERVIEW WITH US, CLAIMING THE MAINSTREAM MEDIA, OR MSM, HAS EXAGGERATED THEIR CONNECTION.*

ALEX JONES: I think my influence on Trump is way, way lower than what MSM has said.

MEGYN KELLY: Well, what kind of access do you have?

ALEX JONES: He's just called sometimes and, you know, talked about politics or thanked me, stuff like that. That's it.

MEGYN KELLY: Would you describe yourself as friends?

ALEX JONES: No.

MEGYN KELLY: Friendly?

ALEX JONES: Sure.

MEGYN KELLY: And how many times has he called you?

ALEX JONES: I don't want to get into all that.

MEGYN KELLY: What is it, do you think, about Alex Jones that President Trump finds so amazing?

CHARLIE SYKES: That's a scary question.

*MEGYN KELLY: CHARLIE SYKES IS A CONSERVATIVE WRITER AND CONTRIBUTOR TO NBC NEWS. HE'S BEEN CRITICAL OF PRESIDENT TRUMP.*

CHARLIE SYKES: Obviously, there's a conspiratorial turn in the president's thinking and in his imagination. And those darker impulses are fed into by Alex Jones.

MEGYN KELLY: JONES SPEAKS TO HIS LISTENERS FOR HOURS A DAY, SIX DAYS A WEEK. HIS RANTS CAN BE VULGAR AND HATE FILLED LIKE THIS ONE DIRECTED AT A MEMBER OF CONGRESS.

ALEX JONES (March 2017): Schiff looks like the arch - archetypal c***sucker. And there's something about this fairy hopping around, trying to intimidate people like me and you. I want to tell Congressman Schiff and all the rest of them, "You want to sit here and say that I'm a goddamn, f**king Russian. You get in my face with that I'll beat your goddamn ass, you son of a bitch."

MEGYN KELLY: JONES BEGAN DEVELOPING HIS CONSPIRACY THEORIES AS A TEENAGER. HE GREW UP THE OLDEST CHILD OF A DENTIST AND A HOMEMAKER, AND WENT TO HIGH SCHOOL IN AUSTIN, TEXAS.

ALEX JONES: I read a lot of history books when I was a kid. And I also had family that was educated, so, I mean, I just knew how things actually worked, versus what the news was saying sometimes.

MEGYN KELLY: AFTER A BRIEF STINT IN COMMUNITY COLLEGE, JONES FOUND HIS CALLING AT PUBLIC ACCESS TV IN AUSTIN. HE WENT INTO BUSINESS FOR HIMSELF, FOUNDING INFOWARS

*IN 1999. MANY DOUBTED HIS PROSPECTS, BUT HE'S NOW WORTH MILLIONS. INFOWARS MAKES MOST OF ITS MONEY BY SELLING PRODUCTS LIKE MALE SUPPLEMENTS. THE MAIN PITCHMAN: JONES HIMSELF.*

ALEX JONES: I mean, it costs $45, $50 million a year to run this.

MEGYN KELLY: And how much money's being made?

ALEX JONES: Well, the money that's made is pretty much put back into things.

*MEGYN KELLY: JONES USES THAT MONEY TO SPREAD HIS MESSAGE, A MESSAGE THAT HAS CAUSED ENORMOUS PAIN.*

CHARLIE SYKES: What he has done is he has injected this sort of toxic paranoia into the mainstream of conservative thought in a way that would have been inconceivable a couple of decades ago. We're talking about somebody who traffics in some of the sickest, most offensive types of theories.

*MEGYN KELLY: AT THE TOP OF THAT LIST IS JONES' OUTRAGEOUS STATEMENT THAT THE SLAUGHTER OF INNOCENT CHILDREN AND TEACHERS AT SANDY HOOK ELEMENTARY SCHOOL, ONE OF THE DARKEST CHAPTERS IN AMERICAN HISTORY, WAS A HOAX.*

NEIL HESLIN: I lost my son. I buried my son. I held my son with a bullet hole through his head.

*MEGYN KELLY: NEIL HESLIN'S SON JESSE, JUST 6-YEARS-OLD, WAS MURDERED, ALONG WITH 19 OF HIS CLASSMATES AND SIX ADULTS ON DECEMBER 14, 2012 IN NEWTOWN, CONNECTICUT.*

NEIL HESLIN I dropped him off at 9:04. That's when we dropped him off at school with his book bag. Hours later I was picking' him up in a body bag.

*MEGYN KELLY: ALEX JONES REPEATEDLY CLAIMED THAT THE SHOOTING NEVER HAPPENED. HERE HE IS ON INFOWARS IN DECEMBER 2014.*

ALEX JONES (on his show): It took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake.

MEGYN KELLY: you said, "The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research. And my gosh, it just pretty much didn't happen."

ALEX JONES: At that point, and I do think there's some cover-up and some manipulation, that is pretty much what I believed. But then I was also going into devil's advocate. But then we know there's mass shootings, and these things happen. So again ...

MEGYN KELLY: But you're trying to have it all ways, right?

ALEX JONES: No, I'm not.

MEGYN KELLY: If you wrongly went out there and said it was a hoax, that's wrong.

ALEX JONES: But what I already answered your question was, listeners and other people are covering this. I didn't create that story.

MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied ...

ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented. Even ...

MEGYN KELLY: All of the parents ...

ALEX JONES: ... even the reports.

MEGYN KELLY: ... decided to come out and lie about their dead children?

ALEX JONES: I didn't say that ...

MEGYN KELLY: What happened to the children?

ALEX JONES: I will sit there on the air and look at every position and play devil's advocate.

MEGYN KELLY: Was that devil's advocate? "The whole thing is a

giant hoax. The whole thing was fake."

ALEX JONES: Yes. Because I remember, even that day, to go back from memory, then saying, "But then, some of it looks like it's real." But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.

MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.

ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in ...

MEGYN KELLY: That's a dodge.

ALEX JONES: No, no. It's not a dodge. The media never covers all the evil wars it's promoted and all the big things ...

MEGYN KELLY: That doesn't excuse what you did and said about Newtown, and you know it ...

ALEX JONES: Oh, but I - here's the difference. Here's the difference. I looked at all the angles of Newtown. And I made my statements long before the media even picked up on it.

*MEGYN KELLY: IN OUR INTERVIEW, WE ASKED JONES NUMEROUS TIMES WHAT HE NOW BELIEVES. AND HE NEVER*

*COMPLETELY DISAVOWED HIS PREVIOUS STATEMENTS.*

ALEX JONES: I tend to believe that children probably did die there. But then you look at all the other evidence on the other side. I can see how other people believe that nobody died there.

*MEGYN KELLY: OF COURSE, THERE IS NO "EVIDENCE ON THE OTHER SIDE." AFTER PRESIDENT TRUMP TOOK OFFICE, THE NEWTOWN BOARD OF EDUCATION WROTE TO HIM, IMPLORING THE PRESIDENT TO TRY TO STOP JONES AND OTHER HOAXERS LIKE HIM, SAYING JONES CONTINUES TO SPREAD HATE AND LIES TOWARDS OUR TOWN. ALMOST FOUR MONTHS LATER, ACCORDING TO THE BOARD CHAIRMAN, THE PRESIDENT HAS YET TO RESPOND. THE LIES ABOUT SANDY HOOK HAVE HAD REAL WORLD CONSEQUENCES. JUST THIS MONTH, A FLORIDA WOMAN WAS SENTENCED TO FIVE MONTHS IN PRISON FOR SENDING DEATH THREATS TO A SANDY HOOK PARENT. HER DEFENSE ATTORNEY SAYS SHE WAS PRIMARILY MOTIVATED BY INFOWARS.OTHER VICTIMS' FAMILY MEMBERS HAVE BEEN HARASSED OR THREATENED, TOO. THE FAMILIES SAY THAT JONES' WORDS HAVE CAUSED LASTING PAIN, AND THEY FEAR THE HARASSMENT WILL CONTINUE.*

NEIL HESLIN: You know, it's disrespectful to me where in fact I did lose my son. And the 26 other families lost somebody. And I take that very personal.

MEGYN KELLY: You know this piece is going to air on Father's Day.

NEIL HESLIN: Correct.

MEGYN KELLY: what is your message to him?

NEIL HESLIN: I think he's blessed to have his children to spend the day with, to speak to. I don't have that.

*MEGYN KELLY: THE CONSEQUENCES OF JONES' ACTIONS ARE NOT LIMITED TO SANDY HOOK. IN 2016, JONES PROMOTED A CONSPIRACY THEORY KNOWN AS "PIZZAGATE." INFOWARS CLAIMED A CHILD SEX RING WAS BEING RUN BY DEMOCRATS OUT OF A NUMBER OF BUSINESSES, AND SPECIFICALLY POINTED TO A WASHINGTON D.C. PIZZERIA.*

*ALEX JONES (on his radio show): You got to go to Infowars.com and actually see the photos and videos inside these places.*

###

*MEGYN KELLY: JONES ENCOURAGED HIS LISTENERS TO INVESTIGATE THE CASE THEMSELVES, AND ONE DID, BRINGING A SEMI-AUTOMATIC RIFLE TO THE SHOP AND FIRING SEVERAL ROUNDS. NO ONE WAS HURT AND THE SHOOTER WAS ARRESTED. THE PIZZA SHOP OWNER WROTE A LETTER ASKING JONES TO APOLOGIZE. FACING THE POSSIBILITY OF A LAWSUIT, HE DID. ANOTHER APOLOGY CAME JUST THIS SPRING. CHOBANI YOGURT SUED JONES AFTER INFOWARS FANNED THE LIE THAT CHOBANI EMPLOYEES COMMITTED A SEXUAL ASSAULT IN IDAHO.*

*ALES JONES (May 17, 2017): On behalf of Infowars, I regret that we mischaracterized Chobani.*

MEGYN KELLY: You misstated facts about Chobani and its owner, which you could've found out, if you just had a reporter do a little shoe-leather reporting, pick up the phone, call, check out the facts. You never would've had to retract that or apologize.

ALEX JONES: This is my statement on that. We know that that was, basically, a PR event. And what happens is you've got a year of reporting on the reported sexual assault.

MEGYN KELLY: All of which has nothing to do with Chobani.

ALEX JONES: Yeah. I know you're not going to let me get it out, are you?

MEGYN KELLY: I'm going to let you get it out. I just want to make sure the record's straight. 'Cause I don't want to smear the man. You are the one who said that you were wrong about Chobani. You said that.

ALEX JONES: Well, that's because they chose to go after me. And so I simply pointed out that we were reporting on other people's reports that were not entirely accurate. And for that, we were sorry. 'Cause it was true.

MEGYN KELLY: You don't sound very sorry.

ALEX JONES: I'm - well, the media said stuff about the settlement that wasn't true.

MEGYN KELLY: But you said things about Chobani and its owner that were not true. Are you sorry?

ALEX JONES: I'm going to tell you again. There - the media really was upset that they said that it was a hoax ...

MEGYN KELLY: It's not the media ...

ALEX JONES: And so what they did ...

MEGYN KELLY: You ...

ALEX JONES: And so what they did ...

MEGYN KELLY: Are you sorry ...

ALEX JONES: And so what they did - so what the media did, and we know it was the media, and we have the PIs and the law firms. And we're working on it right now. Let's just say Chobani was real happy to get out of that lawsuit.

*MEGYN KELLY: BUT THE LAWSUIT MAKES CLEAR INFOWARS WAS THE ONLY MEDIA OUTLET TO REPORT THE LIE THAT FORCED JONES TO APOLOGIZE. AND WITH THAT APOLOGY CHOBANI CONSIDERS THE MATTER CLOSED.*

MEGYN KELLY: Do you think of yourself as a journalist?

ALEX JONES: I have some journalists that work for me. And I do journalistic work. And I've broken a lot of big stories. And I understand the basics of it.

*MEGYN KELLY: IN THE INFOWARS STUDIO, THERE'S NO SCRIPT. INSTEAD IT'S A FREEWHEELING SPIN THROUGH PILES OF ARTICLES STRAIGHT OFF THE INTERNET.*

ALEX JONES: 95% of what we cover is looking at a news article and then, you know, discussing it.

MEGYN KELLY: Well, but you know, if you just look at an article and discuss it, it's garbage in, garbage out, right? If you haven't ascertained the veracity of that article, and it's all BS, and then you spend two hours talking about it, then you've put out a bunch of misinformation. I'm just trying to figure out what the vetting process is.

ALEX JONES: I mean, we all get Hillary was 15 points ahead, okay? And I mean, we all get mainstream media has got a big problem.

*MEGYN KELLY: THE INFOWAR STAFFERS WE MET HAVE FREE REIGN TO COVER WHATEVER THEY LIKE WITH VIRTUALLY NO OVERSIGHT. WE SPOKE WITH SOME OF JONES' EMPLOYEES, INCLUDING OWEN SHROYER.*

MEGYN KELLY: How do you, on a day to day basis, figure out what you're going to do?

OWEN SHROYER: I wake up. I look at the news. I pray. I rarely get directed from Alex or my boss. They pretty much just leave it up to me.

MEGYN KELLY: Is that what you consider yourself to be? A journalist?

OWEN SHROYER: You know, I don't like calling it that. I'm just a human. I'm just a human that's looking for truth. I'm trying to reach out and be what the people want.

MEGYN KELLY: When you say "people," who do you mean?

OWEN SHROYER: The deplorables. The fly-over country. The forgotten Americans.

DONALD TRUMP (Election Night 2016): We're going to get to work immediately for the American people.

MEGYN KELLY: WITH THE ELECTION OF DONALD TRUMP, ALEX JONES HAS PLANS TO EXPAND INFOWARS. MORE STUDIOS, MORE SHOWS, MORE EMPLOYEES, MORE INFLUENCE.

ALEX JONES: I said, the night he won, I said, "The war has just begun." So this is - we've just got a beachhead. And so that's just the start of the war for me.

*MEGYN KELLY: AND ALEX JONES GOES INTO BATTLE WITH A POWERFUL ALLY. JUST TWO WEEKS AGO, THE TRUMP-PENCE CAMPAIGN EMAILED THIS MESSAGE TO SUPPORTERS. NOTICE, AT THE BOTTOM, IT'S A LINK TO INFOWARS.*

## Related Videos



🎥 **Trump Lawyer Jay Sekulow Takes On Chuck Todd, Jake Tapper, Chris Wallace, John Dickerson In One Day**

Member of President Trump's legal team and former Fox News contributor Jay Sekulow did three morning talk shows on Sunday, defending the president over and over. First,

**From:** Keith Johnson <revoltoftheplebs@yahoo.com>
**To:** Rob Dew <robd@infowars.com>
**Subject:** Re: Whistleblower Contact
**Date:** 2014-12-12 21:05:30 +0000
**Attachments:** keithjohnson1.jpg

---

Bio: Keith Johnson a reporter for American Free Press has for 17 years worked as a private investigator and polygraph examiner for several Fortune 500 companies and prominent law firms.

Photo Attached

---

**From:** Rob Dew <robd@infowars.com>
**To:** Keith Johnson <revoltoftheplebs@yahoo.com>
**Sent:** Friday, December 12, 2014 11:52 AM
**Subject:** Re: Whistleblower Contact

Hi Keith,

I am sorry you will be unable to attend, I was going to get you on with Halbig at the same time for you guys to hash this out.

I'm interested in the truth getting out -- People will be searching this subject over the weekend so if you want to get the info today is the day.

Ping me back if you change your mind.

Thanks
Rob

----- Original Message -----
From: "Keith Johnson" <revoltoftheplebs@yahoo.com>
To: "Rob Dew" <robd@infowars.com>
Sent: Friday, December 12, 2014 5:22:25 AM
Subject: Re: Whistleblower Contact

Rob,
In my last email, I expressed that I would love to be on your show Friday.
However, when I made the announcement, I was met with criticism by people I respect dearly, some who are from Newtown.
They made a very good point that participating in a show like this is very bad timing and not in good taste considering that we are only 2 days away from the two year mark of this tragic massacre.
I had also planned to appear on the Deanna Spingola show on 12-14-14. I will cancel that as well.
I've made the decision to stay away from this subject until after the first of the year.
Please allow me to come on your show at any time after 12-31-2014. I will be more than happy to appear alone or debate anyone who does not share my perspective.
In the meantime, if you have any questions about my point of view, please feel free to ask me any questions and I will reply as soon as possible.
Sincerely,
Keith Johnson

From: Keith Johnson <revoltoftheplebs@yahoo.com>
To: Rob Dew <robd@infowars.com>
Sent: Thursday, December 11, 2014 10:43 PM
Subject: Re: Whistleblower Contact

Rob,

Rob,

Thank you for your reply.

I would love to be on the show Friday night but I cannot use have Skype. I live in rural area on TN and must rely on HughesNet satellite, which causes a delay. If calling in by phone is not acceptable, I can try and make arrangements with a friend to use their Skype.

Now, concerning some of your points raised:

For one thing, the security system was not upgraded in 2012. It was upgraded earlier than that and I have proof. The letter referring to the upgrade was on the school website but originally written in 2010. The video camera in use at the time had no recording feature.

Adam Lanza was more than capable of carrying out the attacks and I can explain why on your show. I also wrote an article recently of my interview with a prominent clinical psychologist on Asperger's and what impact it would have on Lanza's ability to carry out the attacks.

Frauds? You are promoting Wolfgang Halbig, a man with less than a year of law enforcement as a ticket-writing Florida highway patrolman in 1974 and a 3.3 hour online certificate with NIMS. He claims to have been a homicide detective and a consultant on Columbine. Both claims are false and I can prove it. I have documented multiple lies this man told. In addition, I have exposed the intentional manufacturing of evidence by Sandy Hook conspiracy theorists and have indisputable and documented proof of their frauds. Child predators? The dictionary definition of a predator: "a person or group that ruthlessly exploits others." What else would you call those seeking to hunt down children who sang at the 2013 Super Bowl and stalks children at playgrounds in Newtown and plots ways to exhume the bodies of dead children. I have other information on that I can also share.

Let's talk about censorship. Censorship is a function of government, not private industry. The videos taken down were done so after complaints of copyright holders of photos and music were filed.

As far as questions not being answered? Those questions have been answered, especially Wolfcnag Halbig's notorious "16 question." Myself and Sandy Hook researcher CW Wade have both answered those questions.

I will follow this email up with more information in the next few hours but I wanted to get something out before the night expired. I have a few chores to attend to in the meantime.

Thanks for your timely reply. Talk soon.

Sincerely,

Keith Johnson

From: Rob Dew <robd@infowars.com>
To: revoltoftheplebs@yahoo.com
Sent: Thursday, December 11, 2014 3:14 PM
Subject: Re: Whistleblower Contact


Keith,

Can you be more specific of who you are referring to being frauds and child predators?

You are warning us about talking about something and you work for the American FREE Press?

Are we only allowed to talk about topics you approve?

If you undisputed proof about Sandy Hook I would love to put it out on our show.
Threatening our organization to appear on the show is not the way to do it.

Censorship is news, people and organizations in Newtown have singled out a single video when there are millions of videos about the Sandy Hook Incident.

I never discount our government on their ability to murder, but when the act is pinned on a feeble kid carrying pounds of ammunition, firearms and there is not one shred of video evidence that this person was inside or in front of the school which has just upgraded it's video surveillance system, then it is our duty to ask questions.

When those who ask questions are attacked and their questions ignored that only increases the likely hood of a coverup.

Why is Sandy Hook the only event we are not allowed to question?

We can have you on Friday for the Nightly News, we shoot the interviews via video Skype.

Thanks
Rob Dew



----- Original Message -----
From: "Infowars Whistleblowers" < revoltoftheplebs@yahoo.com >
To: whistleblowers@infowars.com
Sent: Thursday, December 11, 2014 8:43:27 AM
Subject: Whistleblower Contact

From:< revoltoftheplebs@yahoo.com >
Subject: Whistleblower Contact

Message Body:
To: Whom it May Concern
I'm a writer whose articles have been featured on your website, infowars.com. I now primarily write for American Free Press. However, what I am writing to you now is not on their behalf.
I know Lenny Pozner personally. Mr. Pozner's son was brutally murdered on 12/14/2012. I have met with this man and have seen and verified documents that are indisputable proof that his son was murdered. I have also seen the email exchanges between himself and your staff. You told Mr. Pozner that Alex Jones acknowledged that children died and dismissed the idea of a hoax.
Now you are promoting the hoax mythology and entertaining individuals I can prove are frauds and child predators. I must warn you that you are travelling down a road that will ultimately lead to serious lawful consequences. Those you have placed your faith in are providing you with information that is verifiably false and your ignorance to this fact is no excuse against your complicity.
Think about what you are doing. You are willing participating and facilitating in the defamation and libel of a man whose young child was brutally murdered and doing so at a time when we are approaching the 2nd anniversary of this horrendous act.
Think about that for a moment.
I will do all in my power to assist Mr. Pozner and other victims of these deranged individuals whom they have fallen prey to.
To that end, I would ask that I be allowed to appear on your program and set the record straight on so much disinformation that is being spread about the SHES massacre.
Please make the wise decision.

#2572.3
FSSTX-037206

I look forward to your reply.
Sincerely,
Keith Johnson

Telephone:


--
This e-mail was sent from a contact form on Dev on NFOCOM-01 ( http://devtest.infowars.com )

**From:** Wades Vids <wadesvideo@gmail.com>
**To:** robd@infowars.com, Nico <nico@infowars.com>, wolfgang halbig <wolfgang.halbig@comcast.net>
**Subject:** Fwd: Help me found the 26 children that sang at the Feb 3, 2013 Super Bowl in New Orleans please.
**Date:** 2017-06-23 16:23:22 +0000
**Attachments:** Screen_Shot_2015-07-02_at_4.05.01_PM.png; Screen_Shot_2016-12-26_at_12.41.29_PM.png

---

In all seriousness Wolfgang, it is the targeting of these little children that should cause you to be arrested.   The 4th grade choir is not the murdered children, you filthy creature.

Why does Rob Dew, Nico and Alex Jones of Infowars love this stuff?

Wolfgang, your right hand man, Jonathan, went to jail and was convicted because you convinced him of this nonsense stuff and he harassed the family of a Super Bowl singer. You ruined your friend's life over this lie of yours. YOU.

Why do you lie and say there is a Gag order when that is stupid, ridiculous, and most importantly false?  Do you think everyone is as dumb as Rob Dew and just believes everything you say without evidence?  Where is this gag order, you liar. Show it to me.

Why must your investigation target small little children? It's very sick.

Wolfgang, leave these little kids alone! Seriously, stop being filthy.

I hope one day soon, a government official makes the bold move of arresting Wolfgang for going after these kids before Wolfgang and/or more of his followers target more of these little children or their families.

Are you going to the hearing where Kay Wilson is finally dumping?

CW


---------- Forwarded message ----------
From: **Wolfgang Halbig** <wolfgang.halbig@comcast.net>
Date: Fri, Jun 23, 2017 at 9:22 AM
Subject: Help me found the 26 children that sang at the Feb 3, 2013 Super Bowl in New Orleans please.
To: newsteam@fox61.com, Lenny Pozner <lpozner@gmail.com>, info@part.twopictures.com
Cc: Sam Judah <Sam.Judah@bbc.co.uk>, ken@schoolsecurity.org, j.fox@northeastern.edu, robd@infowars.com, Nico <nico@infowars.com>, "Ronald D. Stephens" <ronaldstephens@schoolsafety.us>, admin@schoolsafety911.org


Newsteam:

If you care about children then please help me find them?

On Feb 3, 2013 26 4th grade children from the Sandy Hook Elementary School Choir sang before 110 million people worldwide and with 88,000 fans in the stands at the Super Bowl in New Orleans.

3500 Sports reporters from all across the world covered that game.

Not one interview on TV or in the newspapers or magazines.

This is now going on 4 years.

They are under a GAG order from the NFL and CBS Sportsbecause you and I know that you cannot silence a 4th grader from telling their friends about the greatest day in their lives with BEYONCE, JZ, Alsiha Keysetc.

Or are they dead?

They are minor children and being exploited for financial gain by many as I have had the records.

Why have they never ever performed again?

How did they silence 26 minor children and parents for four years?

As a former school administrator for 32 years I have learned that children must always be able to express their emotions and feelings and if you deny them that you can cause them serious long term Mental Health issues such as depression, anxiety, thoughts of suicide since they are not worth being able to share their great experiences with their friends.

What kind of adult would ever do that to an innocent minor 4th grader after this unbelievable Super Bowl event?

The Newtown, CT School Board Attorney Monte Frank denies that they ever attended that function when the video is crystal clear and the announcer for CBS sports talk about how brave they were when they were inside that school during the shooting.

Are they dead?

Are they being sexually abused?

Are they sending these children overseas for sexual exploits?

Where are the parents of these children why have they haven't conducted one interview?

On the day of the Sandy Hook Shooting all of the National News Media interviewed so many children and their parents about the school shooting, which was horrific and now they those 26 children are helping to heal the community and they are SILENCED with a GAG ORDER and for how long?

Please help this old school administrator find those 26 children and their parents in making sure that they are saved.

It is bad enough that 20 children died and six school staff, but to have 26 minor children given a GAG ORDER to SILENCE them is very cruel and causes long term Mental Health consequences.

wolfgang W Halbig

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57252956
Status as of 9/17/2021 2:45 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 9/15/2021 8:16:44 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 9/15/2021 8:16:44 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 8:16:44 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 8:16:44 AM | SENT |

9/15/2021 8:34 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Jonathan Sanders**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

---

## PLAINTIFFS' NOTICE REGARDING STATUS OF DISCOVERY

---

1

Come now Plaintiffs, and file this Notice to update the Court regarding the status of discovery and Defendants' conscious indifference:

1.      In oral hearing on August 31st, Defendants' counsel promised the Court that discovery responses in the *Pozner* case would be served within 14 days. That did not occur as promised. In addition, prior to the hearing Defendants were ignorant of their lack of responses to discovery required by the 2018 order in *Heslin*. To date, no responses have been made, even though Defendants were again reminded at the hearing that they had previously been held in contempt for failing to answer.

2.      On September 2nd, counsel for the parties met and conferred by Zoom. Defendants' counsel agreed that he would respond the following week with dates for the depositions required by the 2018 *Heslin* discovery order, and that those depositions would occur before the end of the month. Defendants failed to respond the following week with dates, nor have Defendants offered dates as of today.

3.      Defendants have not responded to Requests for Disclosure in *Lewis* and *Heslin*. Nor have Defendants supplemented any existing discovery responses. Basic information continues to be withheld. Individuals with knowledge of relevant facts remain unidentified, making discovery impossible.

4.      Today, pursuant to the Discovery Control Plan agreed to by Defendants months ago, Plaintiffs designated their experts with all these issues unresolved.

5.      Also today, two additional Motions to Compel were filed in *Heslin* and *Lewis* concerning failure to comply with post-remand discovery requests.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57253538
Status as of 9/18/2021 2:58 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 9/15/2021 8:34:57 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 9/15/2021 8:34:57 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 8:34:57 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 8:34:57 AM | SENT |

9/15/2021 9:10 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Norma Ybarra**

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## PLAINTIFF'S DESIGNATION OF EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Neil Heslin, Plaintiff and files this his Designation of Expert Witnesses, Supplementation of Interrogatories, Request for Production and Request for Disclosures and in supplementation of all prior discovery requests requesting identification of fact and expert witnesses, as follows:

I.

### Plaintiff's Non-Retained Medical Experts

Contemporary Care Psychiatric Centers of Excellence
And Custodians of Medical and Billing Records
84 Hospital Ave.
Danbury, CT 06810
(203) 769-1312

F. Carl Mueller, MD, MPH, M.S., F.A.P.A.
And Custodians of Medical and Billing Records
999 Summer St., Ste. 200
Stamford, CT 06905
(203) 357-7773

W. Michael Crouch, LCSW
And Custodians of Medical and Billing Records
999 Summer Street, Ste. 200
Stamford, CT 06905
(203) 961-1152

All medical care providers listed above may testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests done, reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiff's pain, mental anguish, medical care, medical expenses, limitations, physical impairment, or any other medical issue in this case. The Custodians of Records will authenticate the records.

Plaintiff is unaware of the general substance of these experts' mental impressions and opinions, as they are treating physicians and custodians of records. However, presumably the general substance of these experts' impressions and opinions would be as contained in their respective records.

### Plaintiff's Retained Experts

Fred Zipp
University of Texas School of Journalism
300 W Dean Keeton St
Austin, TX 78712
(512) 471-1845

Mr. Zipp is a former newspaper editor and journalism professor. He will offer his expertise concerning the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. Mr. Zipp will opine that Defendants ignored elementary precautions in journalism. Mr. Zipp will also opine that Defendants entertained serious doubts about the accuracy of their statements. Mr. Zipp will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff. Materials reviewed by Mr. Zipp are being produced as SANDY HOOK-000001-000642. Mr. Zipp has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Free Speech Systems, and the November 27, 2019 deposition of Paul Watson. Mr. Zipp has also reviewed the YouTube video clips described in his affidavits submitted in response to Defendants' TCPA Motions. Mr. Zipp has also reviewed Plaintiff's petition. Mr. Zipp's curriculum vitae is attached hereto as Exhibit "1."

Becca Lewis
Stanford University, Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford, CA 94305
(650) 723-1941

Ms. Lewis is an academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation. Ms. Lewis will offer her expertise on digital political subcultures, internet celebrity, and online news platforms. Ms. Lewis will testify about InfoWars' cultural footprint and role in the online media ecosystem. Ms. Lewis will opine that Defendants' actions were a substantial factor in the spread of false facts about the Sandy Hook shooting. Materials reviewed by Ms. Lewis are being produced as SANDY HOOK-000643-002142. Ms. Lewis has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, and the November 27, 2019 deposition of Paul Watson. Ms. Lewis has also reviewed the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece" and the April 22, 2017 video entitled "Sandy Hook Vampires Exposed." Ms. Lewis has also reviewed Plaintiff's petition. Ms. Lewis' cirruculum vitae is attached as Exhibit "2."

Dr. Roy Lubit
165 West End Ave #3k
New York, NY 10023
(917) 846-7829

Dr. Lubit is a forensic psychiatrist with expertise in the impact of stress and emotional trauma. Dr. Lubit will testify about Plaintiff's mental injury and the psychological stresses involved from Defendants' false statements and denial of Plaintiff's trauma. Dr. Lubit will opine that Defendants' actions were a substantial factor in Plaintiff's severe mental anguish and continuing grief. Dr. Lubit will testify about his evaluation of Plaintiff. Dr. Lubit will also review any medical records produced in this suit. Dr. Lubit's curriculum vitae is attached as Exhibit "3."

## II.

Plaintiff reserves the right to supplement this designation with additional designations of experts within the time limits imposed by the Court or any alterations of same by subsequent Court Order or agreement of the parties, or pursuant to the Texas Rules of Civil Procedure and/or the Texas Rules of Civil Evidence.

## III.

Plaintiff reserves the right to elicit, by way of cross-examination, opinion testimony from experts designated and called by other parties to the suit.  Plaintiff express his intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

IV.

Plaintiff reserves the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiff.

V.

Plaintiff reserves the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

VI.

Plaintiff reserves the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

VII.

Plaintiff hereby designates, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial.  In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiff reserves the right to designate and/or call any such party or any such experts previously designated by any party.

VIII.

Plaintiff reserves whatever additional rights they might have with regard to experts, pursuant to the Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on 15th day of September, the forgoing document was served upon all counsel of record via electronic service.

Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, Texas 78701
Email:  brad@brtx.law

_____

MARK D. BANKSTON

# EXHIBIT "1"

# Fred  Zipp

2219 Holly St.
Austin TX 78702
fred.zipp@yahoo.com
512.589.4593

## Experience

Editor in residence, University of Texas          2012-2021
Department of Journalism

Austin American-Statesman                         1998-2011
Editor (2009-2011), managing editor (2000-2009), assistant managing editor (1998-2000)

The Palm Beach Post                               1987-1998
Metro editor (1992-1997), news editor (1991-1992), deputy metro editor (1990-1991),
assistant metro editor (1987-1990)

Austin American-Statesman                         1984-1987
City editor (1986-1987), sports editor (1985-86), sports copy editor (1984-1985)

Beaumont Enterprise                               1979-1984
Assistant city editor (1982-1984), various reporting positions (1979-1982)

## Education

New York University                               1978-1979
    Masters degree program, Department of French and Italian

University of Paris IV                             1977-1978
    Film analysis and semiotics

Duke University                                   1973-1978
    A.B., history and French
    Graduated magna cum laude

## Professional development and affiliations

Headliners Foundation of Texas                    2013-present
    Governor; chair, professional excellence committee

American Society of News Editors                  2000-2011

Served on First Amendment Committee; assisted in the organization of the first Sunshine Week promoting open, transparent government throughout the United States

Freedom of Information Foundation of Texas          2000-2011
    Director and officer
    Edited revised edition of the Freedom of Information Handbook

Completed numerous professional development programs in leadership, management and craft skills through the Poynter Institute, American Press Institute, Cox Enterprises

# EXHIBIT "2"

# REBECCA C. LEWIS

Department of Communication - Stanford University
Stanford, CA 94305-2050
beccalewis@protonmail.com

## EDUCATION

**Stanford University,** Department of Communication
    PhD Candidate in Communication Theory and Research, September 2018 – present
    Advisor: Fred Turner

**University of Oxford,** Oxford Internet Institute
    MSc in the Social Science of the Internet, graduated November 2016
    Thesis: *"Candidates of Instagram: Social Media Imagery in the 2016 U.S. Presidential Primaries"*

**Columbia University,** Columbia College
    BA in Film Studies, graduated May 2011
    Thesis: *"Going Viral: The Role of YouTube Sensations in a Culture of Memes"*

## FELLOWSHIPS AND AFFILIATIONS

**Stanford University,** Stanford Graduate Fellowship
    Gerhard Casper Fellow, September 2018 – present

**University of North Carolina at Chapel Hill,** Center for Information, Technology, & Public Life
    Graduate Affiliate, September 2020 – present

**Data & Society Research Institute**
    Research Affiliate, September 2018 – present

**Lightspark Foundation,** Impact Guild
    Impact Guild Fellow for Social Good, 2020

## REFEREED JOURNAL PUBLICATIONS

2021. Lewis, Rebecca and Angèle Christin. "Platform Drama: 'Cancel Culture,' Celebrity, and the Struggle for Accountability on YouTube." Accepted with revisions at *New Media & Society*.

2021. Christin, Angèle and Rebecca Lewis. "The Drama of Metrics: Status and Hierarchies Among YouTube Drama Creators." *Social Media + Society*. https://doi.org/10.1177/2056305121999660

2021, February 3. Lewis, Rebecca, Alice Marwick, and William Parton. "'We Dissect Stupidity and Respond to It': Response Videos and Networked Harassment on YouTube." *American Behavioral Scientist*. https://doi-org.stanford.idm.oclc.org/10.1177/0002764221989781

2019, October 17. Lewis, Rebecca. "'This is what the news won't show you': YouTube creators and the reactionary politics of micro-celebrity." *Television and New Media*. https://doi.org/10.1177/1527476419879919

1

## WHITE PAPERS AND PUBLIC POLICY REPORTS

2018. Lewis, Rebecca. *Alternative Influence: Broadcasting the Reactionary Right on YouTube.* New York: Data & Society Research Institute. https://datasociety.net/library/alternative-influence/
Covered by *The New York Times, The Guardian, Columbia Journalism Review,* and on *NPR Weekend Edition*

2017. Marwick, Alice and Lewis, Rebecca. *Media Manipulation and Disinformation Online.* New York: Data & Society Research Institute. https://datasociety.net/library/media-manipulation-and-disinfo-online/
Covered by *The New York Times, The Guardian, CNN, The Today Show,* and *Business Insider*

## BOOK CHAPTERS

2019. Donovan, Joan, Becca Lewis, and Brian Friedberg. "Parallel Ports: Sociotechnical Change from the Alt-Right to Alt-Tech." In *Post-Digital Cultures of the Far Right: Online Actions and Offline Consequences in Europe and the US* (Maik Fielitz and Nick Thurston, eds.). Verlag, Bielefeld: Transcript Press.

2017, December 15. Lewis, Rebecca and Alice Marwick. "Taking the red pill: Ideological motivations for spreading online disinformation." *Understanding and addressing the disinformation ecosystem.* Philadelphia, PA: First Draft News. https://firstdraftnews.org/wp-content/uploads/2018/03/The-Disinformation-Ecosystem-20180207-v2.pdf

## REFEREED PRESENTATIONS

2021, August 5. Lewis, Rebecca and Angèle Christin. "Platform Drama: 'Cancel Culture,' Celebrity, and the Struggle for Accountability on YouTube." *American Sociology Association Media Preconference*, held remotely.

2020, May 21. Lewis, Rebecca, Alice Marwick, and William Partin. "'We Dissect Stupidity and Respond to It: Response Videos and Networked Harassment." *International Communication Association Annual Meeting*, held remotely.

2019, October 3. Lewis, Rebecca and Leon Yin. "Far-Right YouTube and Search Engine Optimization: Manipulations in 'Ranking Cultures.'" *Association of Internet Researchers*, Brisbane, Australia.

2019, September 7. Lewis, Rebecca. "Performed Persona Scams: Deceptive Personal Branding and Shifting Concepts of Fraud on Social Media Platforms." *Meeting of the Society for the Social Studies of Science*, New Orleans, LA.

2019, August 13. Friedberg, Brian and Rebecca Lewis. "Parallel Ports: Sociotechnical Change from the 'Alt-Right' to Alt-tech." *American Sociology Association*. New York City, NY.

2019, May 28. Davison, Patrick, Rebecca Lewis, and Alice Marwick. "'You Are the Meme Militia': How Alt-Right Digital Media Perpetuates White Supremacy." *International Communication Association Annual Meeting*, Washington, DC.

2

2019, March 15. Lewis, Rebecca. "Celebrity, Fandom, and the Source Credibility of Political Influencers." *Eastern Sociological Society Annual Meeting*, Boston, Massachusetts.

2018, August 10. Lewis, Rebecca. "Candidates of Instagram: Political Image-Building and the Co-optation of Micro-Celebrity Online." *American Sociology Association Media Preconference*, Philadelphia, Pennsylvania.

## INVITED PRESENTATIONS

2021, August 20. "Researching far-right movements online: an introduction to methods." Presentation at the Institute for Research on Male Supremacism's Summer Institute on Contesting Supremacism, held remotely.

2021, July 17. "Authoritarian cults, media indoctrination, and shared psychosis." Panel presentation at the World Mental Health Coalition Project for National Healing Series, held remotely.

2021, June 23. "Radicalization: From conspiracy theories to violent extremism." Panel discussion at the Atlantic Council's 360/Open Summit, held remotely. https://www.youtube.com/watch?v=_tThGy3FH-8

2021, June 11. "Racism and Radicalization in the Digital Age: A Robust Response." Keynote speech at the National Council of Urban Education Associates 2021 Virtual Summer Meeting, held remotely.

2021, January 26. "How did we get here? Where do we go next? Information, media & U.S. democracy." Panel discussion at the University of North Carolina Chapel Hill's CITAP Center, held remotely.

2020, December 11. "Hate Not Found: The Politics of De-platforming the Far Right." Panel presentation at public conference in Berlin, Germany, joined remotely.

2020, November 16. "Internet hate speech: What can we do?" Panel presentation at Middlebury College, held remotely.

2019, October 13. "Alternative Influence: Broadcasting the Reactionary Right on YouTube." Presentation at Cultural Formations of the 'Alt-Right' Symposium, University of Michigan, Ann Arbor, MI.

2019, April 17. "The Fake News Cycle: Searching for Truth in the Digital Age." Panel presentation at Washington University, St. Louis, MO.

2018, October 12. "What is the FATE of Platforms? Fairness, Accountability, Transparency and Ethics Under Review." Panel presentation at Concordia University, Montreal, Quebec.

2018, April 13. "Media Manipulation and the Online Far-Right." Annual Faculty Symposium: Techno Cultures in the 21st Century. Borough of Manhattan Community College, New York, NY.

3

2018, March 8. "Looking past the facts: a sociotechnical approach to fake news, media manipulation, and the far-right alternative press." Presented with Alice Marwick at University of North Carolina at Chapel Hill.

2017, December 15 – 16. Lewis, Rebecca and Marwick, Alice. "Taking the Red Pill: Ideological Motivations for Spreading Online        Disinformation." Understanding and Addressing the Disinformation Ecosystem, University of Pennsylvania Annenberg School for Communication, Philadelphia, PA.

2017, December 4. "Media Manipulation and Disinformation." Nouvelles Pratiques du Journalisme 2017. Sciences Po École de Journalisme**,** Paris, France.

2017, September 25. "Comparative Lessons from Violent Extremism and Far-Right Subcultures." Perspectives on Why Audiences Are Susceptible to Disinformation. National Endowment for Democracy**,** Washington, D.C.

## **RESEARCH & PROFESSIONAL POSITIONS**

**Data & Society,** New York, New York
Affiliated Researcher, September 2018 – present
Full-time Researcher, February 2017 – August 2018
*Media Manipulation Project*
- Lead Researchers: danah boyd, Founder and President of Data & Society; Alice Marwick, Associate Professor of Communication at UNC Chapel Hill; and Joan Donovan, Research Director of the Shorenstein Center on Media, Politics, and Public Policy
- Project explored the manipulation of public discourse by state and non-state actors on social media platforms, with particular focus on the media manipulation tactics of online far-right extremists in the United States

**University of Oxford,** Reuters Institute for the Study of Journalism
Research Assistant, October 2015 – January 2016
*Online News and Digital Intermediaries Project*
- Lead Researchers: Rasmus Kleis Nielsen, Director of Research and Sarah Anne Gantner, Research Fellow
- Project focused on the effects of digital intermediaries (such as Google, Facebook, and Twitter) on traditional news media organizations and government policies

**Crimson Hexagon**, Boston, MA; October 2011 – August 2015
Crimson Hexagon delivers social media data analytics for corporations and research institutions. It is powered by technology developed by Professor Gary King at the Harvard Institute for Quantitative Social Science.

*Director of Social Impact, August 2014 – August 2015*
- Founded and led the company's Social Impact Program, which provided academic, not-for-profit researchers with grants in the form of access to the ForSight social media analytics platform
*Client Services Manager, August 2011 – August 2014*
- Established social media research methodologies with clients and taught them social media analysis techniques

## EDITORIALS AND POPULAR PRESS

2021, August 2. "Space-Cowboys: What Internet history tells us about the inevitable shortcomings of a tech-bro led Space Race." *Tech Policy Press*. https://techpolicy.press/space-cowboys-what-internet-history-tells-us-about-the-inevitable-shortcomings-of-a-tech-bro-led-space-race/

2021, January 17. "The Trump ban across social media wasn't censorship – it was a series of editorial decisions by media companies that call themselves social platforms." *Business Insider*. https://www.businessinsider.com/trump-ban-wasnt-censorship-it-was-an-editorial-decision-2021-1

2020, December 11. "I warned in 2018 YouTube was fueling far-right extremism. Here's what the platform should be doing." *The Guardian*. https://www.theguardian.com/technology/2020/dec/11/youtube-islamophobia-christchurch-shooter-hate-speech

2020, January 7. "All of YouTube, Not Just the Algorithm, is a Far-Right Propaganda Machine." *Medium FFWD*. https://ffwd.medium.com/all-of-youtube-not-just-the-algorithm-is-a-far-right-propaganda-machine-29b07b12430

2019, October 9. "It's Easy to Despair and Do Nothing After the Halle Synagogue Shooting. But We Shouldn't." *Medium FFWD*. https://ffwd.medium.com/its-easy-to-despair-and-do-nothing-after-the-halle-synagogue-shooting-but-we-shouldn-t-34faf86ff48d

2019, June 9. "YouTube's Bungled PR Announcements Made Carlos Maza's Harassment Worse." *VICE Motherboard*. https://www.vice.com/en/article/evyqnz/youtubes-bungled-pr-announcements-made-carlos-mazas-harassment-worse-steven-crowder

2018, November 20. "Why Influence Matters in the Spread of Misinformation." *Data & Society: Points*. https://points.datasociety.net/why-influence-matters-in-the-spread-of-misinformation-fc99ee69040e

2018, October 4. "Forget Facebook, YouTube videos are quietly radicalizing large numbers of people – and the company is profiting." *NBC News THINK*. https://www.nbcnews.com/think/opinion/forget-facebook-youtube-videos-are-radicalizing-millions-young-people-company-ncna916341

2018, March 22. "Black Panther and the Far-Right." *Data & Society Media Manipulation: Dispatches from the Field*. https://medium.com/@MediaManipulation/black-panther-and-the-far-right-e83facb735bb

2017, June 13. "Megyn Kelly Fiasco is one more instance of far-right outmaneuvering media." *Columbia Journalism Review*. https://www.cjr.org/tow_center/megyn-kelly-alex-jones.php

2017, May 18. "The Online Radicalization We're Not Talking About." *New York Magazine: Select All*. https://nymag.com/intelligencer/2017/05/the-online-radicalization-were-not-talking-about.html

## SELECTED MEDIA APPEARANCES

2021, July 6. "Episode 3: Talking About Garbage." *Does Not Compute Podcast* at University of North Carolina's Center for Information, Technology, and Public Life. https://citap.unc.edu/does-not-compute/episode-3/

2021, March 2. "Planet YouTube." *In Land of the Giants: The Google Empire.* https://www.vox.com/land-of-the-giants-podcast

2021, January 21. "How YouTube Normalizes Right-Wing Extremism w/Becca Lewis." *Tech Won't Save Us with Paris Marx.* https://podcasts.apple.com/us/podcast/how-youtube-normalizes-right-wing-extremism-w-becca-lewis/id1507621076?i=1000506047370

2020, September 18. "The Alternative Influence Network, with Rebecca Lewis." *I Don't Speak German Podcast.* https://idontspeakgerman.libsyn.com/65-the-alternative-influence-network-with-rebecca-lewis

2020, June 4. "Social media unites and divides us. How should we respond?" *NPR Marketplace Tech.* https://www.marketplace.org/shows/marketplace-tech/social-media-george-floyd-protests-misinformation-community/

2019, August. "Infinite Evil: The Incubators of Online Hate." *Stuff NZ: Circuit.* https://interactives.stuff.co.nz/2019/circuit/infinite-evil-documentary/

2019, March 22. "How far-right influencers thrive on YouTube." *Front Burner CBC.* https://www.cbc.ca/radio/frontburner/how-far-right-influencers-thrive-on-youtube-1.5066532

2019, March 19. "More extremists are getting radicalized online. Whose responsibility is that?" *NPR Marketplace Tech.* https://www.marketplace.org/2019/03/19/extremists-are-being-radicalized-online-whose-responsibility-is-it/

2019, March 18. "Salvaging ourselves." *Sh!tpost Podcast.* https://soundcloud.com/shtpostpodcast/salvaging-ourselves-31819-ft-becca-lewis

2019, January 9. "Is YouTube radicalizing its users?" *NPR WHYY Radio Times.* https://whyy.org/segments/is-youtube-radicalizing-its-users/

2018, November 27. "Critics Say YouTube Hasn't Done Enough to Crack Down on Extremist Content." *NPR All Things Considered.* https://www.npr.org/2018/11/27/671285261/critics-say-youtube-hasnt-done-enough-to-crack-down-on-extremist-content

2018, September 23. "Alternative Influence: Broadcasting the Reactionary Right on YouTube." *NPR Morning Edition.* https://www.npr.org/2018/09/23/650861652/alternative-influence-broadcasting-the-reactionary-right-on-youtube

2017, November 10. "Popping the Red Pill: Inside a digital alternate reality." *CNN Business.* https://money.cnn.com/2017/11/10/technology/culture/divided-we-code-red-pill/index.html

## SELECTED PRESS COVERAGE

2021, August 3. Tiffany, Kaitlyn. "Left-Wing Activists Are Bringing Back MAGA Twitter." *The Atlantic*. https://www.theatlantic.com/technology/archive/2021/08/patriottakes-and-future-resistance-twitter/619645/

2021, July 7. Hayden, Michael Edison. "'We Make Mistakes': Twitter's Embrace of the Extreme Far Right." *Southern Poverty Law Center Hatewatch*. https://www.splcenter.org/hatewatch/2021/07/07/we-make-mistakes-twitters-embrace-extreme-far-right

2021, June 30. Wong, Julia Carrie. "From viral videos to Fox News: how rightwing media fueled the critical race theory panic." *The Guardian*. https://www.theguardian.com/education/2021/jun/30/critical-race-theory-rightwing-social-media-viral-video

2020, August 18. Tiffany, Kaitlin. "How Instagram Aesthetics Repackage Qanon." *The Atlantic*. https://www.theatlantic.com/technology/archive/2020/08/how-instagram-aesthetics-repackage-qanon/615364/

2020, July 11. Herrman, John. "Who Gets the Banhammer Now?" *The New York Times*. https://www.nytimes.com/2020/07/11/style/online-communities-social-media-bans-reddit-youtube-twitch-facebook.html?referringSource=articleShare

2019, July 25. Sankin, Aaron. "YouTube said it was getting serious about hate speech. Why is it still full of extremists?" *Gizmodo*. https://gizmodo.com/youtube-said-it-was-getting-serious-about-hate-speech-1836596239

2019, June 8. Roose, Kevin. "The Making of a YouTube Radical." *The New York Times*. https://www.nytimes.com/interactive/2019/06/08/technology/youtube-radical.html

2019, June 5. Roose, Kevin and Kate Conger. "YouTube to Remove Thousands of Videos Pushing Extreme Views." *The New York Times*. https://www.nytimes.com/2019/06/05/business/youtube-remove-extremist-videos.html

2019, January. Turner, Fred. "Machine Politics: The rise of the internet and a new age of authoritarianism." *Harper's Magazine*. https://harpers.org/archive/2019/01/machine-politics-facebook-political-polarization/

2018, November 24. Editorial Board. "The New Radicalization of the Internet." *The New York Times*. https://www.nytimes.com/2018/11/24/opinion/sunday/facebook-twitter-terrorism-extremism.html

2018, September 24. Klein, Ezra. "The rise of YouTube's reactionary right." *Vox*. https://www.vox.com/policy-and-politics/2018/9/24/17883330/dave-rubin-ben-shapiro-youtube-reactionary-right-peterson

2018, September 19. Ingram, Matthew. "YouTube's secret life as an engine for right-wing radicalization." *Columbia Journalism Review*. https://www.cjr.org/the_media_today/youtube-conspiracy-radicalization.php

2018, September 18. Solon, Olivia. "YouTube's 'alternative influence network' breeds rightwing radicalization, report finds." *The Guardian*. https://www.theguardian.com/media/2018/sep/18/report-youtubes-alternative-influence-network-breeds-rightwing-radicalisation

## TEACHING EXPERIENCE

Teaching Assistant, Stanford University
COMM 1B: Media, Culture, and Society (Professor Fred Turner) – Winter 2020
COMM 154-254: The Politics of Algorithms (Professor Angèle Christin) – Fall 2019
COMM 124-224: Lies, Trust, and Technology (Professor Jeffrey Hancock) – Winter 2019

Published syllabi
2017. Media Manipulation and Disinformation Online Syllabus. Data & Society. https://datasociety.net/pubs/oh/DataAndSociety_Syllabus-MediaManipulationAndDisinformationOnline.pdf

# EXHIBIT "3"

## **CURRICULUM VITAE**

Roy H. Lubit MD, Ph.D.
165 West End Ave.  Suite 3K
New York, NY 10023
917-846-7829
roylubit@rcn.com

## UNDERGRADUATE EDUCATION

JUNE 1975     BA, Cornell University, Ithaca, NY.
              Academics: double major in history and chemistry.

## MEDICAL EDUCATION

June 1979     MD, New York University School of Medicine, New York, NY.

## POSTDOCTORAL TRAINING IN PSYCHIATRY

6/79-6/83     Psychiatry Residency, Yale University School of Medicine, New Haven, CT.

7/83-6/85     Child Psychiatry Residency, The Children's Hospital, Boston, MA.

7/85-6/87     Advanced Psychotherapy Fellowship, Adams House, Boston, MA.

7/01-6/02     Forensic Psychiatry Fellowship, St. Vincent's Hospital, New York, NY.

## INTERNATIONAL RELATIONS

1997          Ph.D. in Political Science, GSAS, Harvard University, Cambridge.
              Dissertation explored impact of organizational learning on international conflict.

## CERTIFICATIONS

Diplomate, American Board of Psychiatry and Neurology, 1984.
Diplomate, American Board of Child and Adolescent Psychiatry, 2003.
Diplomate, American Board of Forensic Psychiatry, 2003.
New York State Medical License 205720-1.
National Board of Medical Examiners, 1980.

*Roy Lubit CV page 2*

FORENSIC QUALIFICATIONS

Special expertise in evaluating emotional trauma, civil rights (section 1983 actions), child custody evaluations, brain injury, psychological/psychiatric malpractice and critiquing forensic evaluations

Board Certifications
- Psychiatry and Neurology
- Child Psychiatry
- Forensic Psychiatry

Declared an Expert in Psychiatry and/or child psychiatry in:
- Bronx Family Court             Bronx Supreme Court
- Brooklyn Family Court                   Brooklyn Supreme Court
- Manhattan Family Court                  Manhattan Supreme Court
- Queens Family Court           Queens Supreme Court
- Richmond County Supreme Court        Suffolk County Supreme Court
- Westchester County Court               Norfolk County Superior Court in  Massachusetts
- Butler County Virginia Court   Manhattan Criminal Court
- Federal court, NY Eastern District

Organizational Affiliations:
- Consultant to Children and Law Committee of Association of the Bar of the City of NY

Publications

- Ethics in Psychiatry in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 9th edition. Phil: Lippincott, Williams & Wilkins. (in press.)

- Ethics in Psychiatry (with Eth S. and Ladds B.) in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. (2004)
- Forensic Psychiatric/Psychological Assessments  (in preparation).
- Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG,  Eth S. in *Child and Adolescent Psychiatric Clinics of North America*. 2002 Oct; 11(4):823-57.
- Juvenile Delinquency, (with Billick) in Rosner (ed.) Principles and Practice of Forensic Psychiatry (2003).
- Child Custody Evaluations in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).
- Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Presentations

- Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2009
- Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008
- "Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008
-  "Child Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008
- "Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.
- Evaluation of Psychiatric Trauma: International Congress on Law and Psychiatry, 7/7/05, Paris
- Evaluation of Sexual Abuse Allegations: International Congress on Law and Psychiatry, 7/7/05, Paris
- Problems in Child Custody Evaluations Dateline NBC April 15, 2005
- "Evaluating Child Custody Evaluations: Contested Allegations of Domestic Violence, Child Abuse, Superior Parenting Skills" Women's Bar Association of State of New York; June 8, 2004; Brooklyn, NY.
- "Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003; Mystic, CT.
- "Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003; Mystic, CT.

3

<u>CLINICAL EXPERIENCE</u>

| | |
|---|---|
| 1984-present | Private practice (child, adult and forensic psychiatry). |
| 2006-2008 | Clinical Faculty NYU School of Medicine, Dept of Child Psychiatry and Mt Sinai School of Medicine |
| 2003-2004 | Assistant Professor of Psychiatry, Mt. Sinai School of Medicine, Dept of Child Psychiatry |
| 2002-2003 | National Child Traumatic Stress Network, funded by SAMHSA and Assistant Professor of Psychiatry, Saint Vincents Hospital, NY Medical College, Dept of Child Psychiatry |

   •   Consortium for Effective Trauma Treatment, funded by NY Times Foundation
.

| | |
|---|---|
| 2001-2002 | Forensic Psychiatry Fellow, Saint Vincents Hospital, New York Medical College |
| 2001 | ADD and Behavioral Disorders Clinic: Child and Adult Psychiatry. |
| 1999-2001 | Sabbatical from psychiatry to work as a management consultant for PricewaterhouseCoopers. |
| 1998-1999 | Psychiatrist, Jewish Board of Family and Children's Services. |
| 1997-1998 | On-call work for On-Site Psychiatric Services at various hospitals including Metro-West Medical Center and Faulkner Hospital. |
| 1996-1997 | Vinfen Corporation-Child and adult psychiatry at Fall River State Hospital and Beverly Hospital. |
| 1993-1996 | Psychiatrist, on-call and locum tenens ward coverage Charles River Hospital, Solomon Carter Fuller and Corrigan Mental Health:. Different summers I went wherever there was the greatest need.  During the academic year I returned to my research and teaching. |
| 1987-1992 | Psychiatrist for Scoville and Schwager which placed me at various state hospitals they staffed including Danvers State, Northhampton State, Cape and the Islands, Solomon Carter Fuller.  I served as Acting Medical Director at Danver's State and at Cape and the Islands.  As noted above, I went wherever there was the greatest need, and during the academic year I returned to research and teaching. |

4

PUBLICATIONS

Book Chapters

Psychotropic medications and crime: The seasoning of the Prozac defense. With Michael Welner and Jada Stewart (in press) In Mozayani, A & Raymon, L. (Eds.) Handbook of Drug Interactions: A Clinical and Forensic Guide. Humana Press: New York, NY.

Ethics in Psychiatry in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 9th edition. Phil: Lippincott, Williams & Wilkins 2009.

Assessing and Treating Traumatized Children in Hosen, Responding to Traumatized Children. Palgrave 2006.

Cognitive Therapy of Children with PTSD, IBID

Child Custody Evaluations in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Using Emotional Intelligence To Deal With Difficult People and Organizations in Osland S. et al (eds) The Organizational Behavior Reader (7th ed) Saddle River: Prentiss Hall.

Children, Disasters, and the September 11th World Trade Center Attack (with Eth S.) in Norwood A and Ursano B (eds. *Trauma and Disaster Response and Management*. Wash DC: APA Annual Review of Psychiatry, Volume 22, 2003.

Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG, Eth S. in *Child and Adolescent Psychiatric Clinics of North America*. 2002 Oct; 11(4):823-57.

Ethics in Psychiatry (with Eth S. and Ladds B.) in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. (2004)

Office Politics (with Gordon R) in Kahn J. (ed.) *Mental Health and Productivity in the Workplace.* 2002.

Adolescent Moral Development (with Billick S.) in Rosner R. (ed.) Textbook of Adolescent Psychiatry (2003).

Juvenile Delinquency, (with Billick S.) in Rosner S. (ed.) Principles and Practice of Forensic Psychiatry (2003).

Child Custody Evaluations in Forensic Psychiatric/Psychological Assessments (in prep.)


Articles

Post Traumatic Stress Disorder in Children in eMedicine World Medical Library, 2010.

Acute Treatment of Disaster Survivors in eMedicine World Medical Library, 2010.

Post Concussive Syndrome. eMedicine World Medical Library, 2010.

Borderline Personality Disorder. eMedicine World Medical Library, 2010.

Sleep Disorders. eMedicine World Medical Library, 2009

Child Abuse and Neglect: Reactive Attachment Disorder. eMedicine World Medical Library, 2009.

5

Review of Anxiety Disorders in eMedicine's Depression & Anxiety Feature Series, July 2006.

Impact of Trauma on Children (with Rovine D, DeFrancisci Land Eth S.) *Journal of Psychiatric Practice* v9 #2 128-138 (March 2003).

Helping Disaster Survivors.  E-Medicine World Medical Library, 2001.

PTSD in Children.  E-Medicine World Medical Library, 2001.

Preserving Children's Protection While Enhancing Justice for Parents in Abuse and Neglect Evaluations by Lubit R., Billick S. & Pizarro R. *APPL Journal* V 30 No 2 (July 2002) pp287-290.

The Long Term Organizational Effects of Narcissistic Managers and Executives.  *Academy of Management Executive*, Spring 2002.

Tacit Knowledge and Knowledge Management: The Keys to Competitive Advantage. *Organizational Dynamics, winter 2001*.

The Crimean Imbroglio. *East European Review*, August 1995.

The Effects of Drugs on Decision-Making (with Bruce Russett). *Journal of Conflict Resolution*, March 1984.


Books

Forensic Psychiatric/Psychological Assessments with Len Goodstein Ph.D. (in preparation).

Coping with Toxic Managers and Subordinates: Using Emotional Intelligence to Survive and Prosper (2003) Prentiss-Hall.

Developing Emotional Intelligence (in preparation)


Other Publications

"Using Emotional Intelligence to Deal with Difficult Client Personnel (and Colleagues)"Consulting to Management in press June 2004 v15 #2

"The tyranny of toxic managers: An emotional intelligence approach to dealing with difficult personalities" Ivey Business Journal, spring 2004

"Curbing the Tide of Islamic Radicalism in Europe" White Paper requested by CIA 1/1/04.

Psychiatrist's Role in Involuntary Hospitalization. Commentary 2.  Available at: http://www.virtualmentor.org or http://www.ama-assn.org/ama/pub/category/11103.html

Book Review (with Billick S.) of *Handbook of Neurodevelopmental and Genetic Disorders in Children*, edited by Sam Goldstein Ph.D. and Cecil Reynolds Ph.D. (New York: The Guildford Press, 1999) for *The Journal of Psychiatry & Law*.

Book Review (with Eth S.) of *Children's Interests/Mother's Rights: The Shaping of America's Child Care Policy*, by Michel S (New Haven: Yale University: 1999) for *Psychiatry* .

Book Review of *The Big Five* by Alexander Saveliev. *MeiMO* (Journal of the Institute for International Economics and International Relations), winter 1996.

Book Review of *Hidden Illness in the White House* by Kenneth Crispell and Carlos Gomez. *Politics and the Life Sciences,* February 1991.

Seven Easy Peaces (with Catherine Perlmutter). *Children Magazine*, Rodale Press, September 1988.

7

<u>PRESENTATIONS</u>

Assessing Forensic Evaluations, CME talk to Nassau County Bar Association December 15, 2010
Interview on Parental Alienation by Sarah Wallace of ABC Television November 30, 2010
Canadian Broadcasting Company, interviewed on television concerning Chilean Mining Disaster: August 24, 2010
Canadian Broadcasting Company, interviewed by 8 of their radio stations concerning Chilean Mining Disaster: August 24, 2010

Quoted in The McChrystal Effect: Mouthing Off To Your Boss Can Get You Fired: on ABCnews.com June 24, 2010 http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2

Interviewed by Dow Jones concerning authoritarian managers. April 7, 2010

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2010

Lectures on Psychiatry for Navy Physicians (ADHD, PTSD, Forensic Psychiatry, Ethics in Psychiatry, Clinical Assessment of Children, Severe Personality Disorders), Columbia, Missouri October 11 and 12, 2009.

Use of Narratives and Storytelling in Treating PTSD, Trauma Psychiatry & Psychology, International Center For Psychosocial Trauma, Columbia, Missouri September 30, 2009

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2009

Impact of the Lehman Crisis on People, Fox Business News, September 15, 2008

Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008

Developing Emotional Intelligence Rose Seminar Minneapolis September 11, 2008

"Assessing and Dealing With Corporate Threats" at ATAP North East Chapter, June 23, 2008.

"Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008

"Sex Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008

"Experiencing the Trauma of 9/11 and Understanding the Recovery" University of Missouri-Columbia International Center for Psychosocial Trauma" St Louis June 29, 2006.

"Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Doing Forensic Evaluations" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Assessing and Treating Emotional Trauma" at International Academy of Law and Mental Health; Paris July 2005.

8

"Assessing Sexual Abuse Allegations" at International Academy of Law and Mental Health; Paris July 2005.

"New Thoughts on Leadership Development" at Society of Human Resource Management annual national meeting; San Diego June 20, 2005

"Dealing w. Toxic Managers" at NJ OD Network; Sharing Day; May 9, 2005

Problems in the Child Custody System on Dateline NBC April 15, 2005

"Group Dynamics and Decision Disasters" at annual meeting of In2In Thinking Network: Los Angeles, April 9, 2005

"Assessment of Dangerousness" Hudson River Psychiatric Hospital February 2, 2005

"Improving the Quality of Evaluations for Sexual Abuse" Queens ACS lawyers; January 10, 2005.

"Improving the Quality of Child Custody Decisions " The Second National Battered Mother's Custody Conference; Albany; January 8, 2005.

"Evaluating Forensic Child Custody Evaluations" to Women's Bar Association of the State of New York; June 8, 2003; Brooklyn, NY.

"Assessing Dangerousness" Grand Rounds at Hudson River Psychiatric Center 4/7/04.

"Radical Islam in Europe: Ideological, Psychological and Political Foundations and Potential Responses" invited presentation to Workshop on Radical Islam in Europe sponsored by CIA Office of Russian and European Analysis; McLean, VA Dec 12, 2003.

"Rethinking the Role of Psychology in Understanding Terrorism" invited presentation to Psychology of Terrorism Workshop sponsored by CIA Counterterrorism Center, Office of Terrorism Analysis; McLean, VA Nov 21, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds MSSM Pediatrics Nov 20, 2003

"Phenomenology, Psychopathology and Treatment of Emotional Trauma" Grand Rounds Walter Reed Army Hospital, Nov 19, 2003

"Assessment and Treatment of Traumatized Children" Grand Rounds Pediatrics Elmhurst Hospital Nov 17, 2003

With John Kastan "Organization of Disaster Mental Health Services in Post 9/11 New York City" Annual Meeting of APHA, San Francisco, November 15-19, 2003

"Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003.

"Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003.

"Wide Ranging Impact of Emotional Trauma on Children"; William Allanson White Psychoanalytic Institute Sept 25, 2003

"Violence in the Workplace" UPN 9, 7/25/03.

"Terrorism" Chair of Panel, International Society of Political Psychology; Boston July 8, 2003.

"Mind of the Modern Day Terrorist" Paper Panel on Understanding Terrorism at the International Society of Political Psychology; Boston July 8, 2003.

"Limiting the Trauma of Terrorism" Paper Panel on Political Violence and Trauma at the International Society of Political Psychology Boston; July 8, 2003

"Children and Disasters" American Psychiatric Association, San Francisco, May 20, 2003.

"Treatment of Trauma" Grand Rounds, Hudson River Psychiatric Institute, April 23, 2003

"Evaluation and Treatment of Children After Disasters" at Families, Trauma and Forensic Psychiatry Symposium at Walter Reed Army Hospital, April 16, 2003

"Children and Disasters" Maryland APA, April 9, 2003.

"Ethics in Psychiatry" Grand Rounds, Hudson River Psychiatric Institute, February 26, 2003

Chair of panel on "Biological and Chemical Terrorism" at John Jay College's symposium on Homeland Security After 9/11.  January 23, 2003.

"Assessment and Treatment of Traumatized Children", Children's National Medical Center, Dec 11, 2002.

"Children's Needs and Obstacles to Meeting Them After Disasters", LA Child Development Center. November 23, 2002

"School Based Mental Health Screening" International Society of Traumatic Stress Studies November 10, 2002

"Assessment of Traumatized Children and Adolescents" International Society of Traumatic Stress Studies November 7, 2002

"Suicide and Suicide Prevention in Children and Adolescents" Safehorizon. Nov 5, 2002

"Fundamentalism and Terrorism" Group for the Advancement of Psychiatry November 1, 2002

Bereavement and Trauma: Assisting Adolescents After Loss, Covenant House, NYC October 25, 2002

"Living With Uncertainty and Violence: Helping Youth Cope With Trauma" JBFCS Symposium. Oct 7, 2002.

"Treatment of Emotional Trauma" Beth Israel Hospital, 3 half-day sessions in Sept. and Oct. 2002.

"Impact of 9/11" BBC Sept 12, 2002

"Long term impact of 9/11", NPR Sept 8, 2002

"Recognizing Troubled Children" Private Schools (HALB and HAFTR) September 3, 2002.

"Recognizing Troubled Children" NYC School Nurses, August 27, 2002

"Coping with Stress in the Modern World" NY Life Insurance, August 22, 2002

"Ethics and Leadership" Brookings Institution, Washington DC July 30, 2002.

"Treatment of Children Who Lose Parents" Easthampton Camp. July 10, 2002

"Assessing the Impact Of 9/11 On Children in Schools" Meeting of NYC school psychiatrists and supervising nurses. June 28, 2002

"Impact of WTC Disaster on Firefighters" CBS Evening News May 26, 2002

"Psychological Impact of Trauma" for Montclair NJ School District. May 16, 2002

"Origins of Delinquent Behavior" at Update on Juvenile Delinquency for Society for Adolescent Psychiatry.  May 11, 2002

"Impact of Violence On Child Development and Remedial Strategies" at Conference on "Responding to the crisis…Partnering for Violence Prevention" Summit Country Children Services. April 16, 2002

"Terrorism, Trauma and Treatment Options" for the S. Michigan branch of the International Society for the Study of Dissociation Annual Conference Livonia Michigan. April 12, 2002.

Public Radio WNYC: 20 minute interview on psychiatric impact of WTC Disaster, 1/18/02.

"Healing a Traumatized City", invited speaker at the symposium on "The Trauma of Terror in Children", Dec 1, 2001 sponsored by the Southern California Society of Child and Adolescent Psychiatry and the Southern California Psychiatric Society.

NY1 Television: 1 hour interview program on psychiatric impact of WTC Disaster, 12/19/01.

Disaster Recovery: Worked with CEOs and HR to help companies recover from Sept 11, 2001 disaster.  Also gave presentations to groups of 5 to 170 workers: First American Title, NYC, Sept. 14; Costa Kondylis, NYC, Sept 14; Credit Lyonnais, NYC Sept 21; Financial Models, NYC, Sept 21; Coalition for the Homeless. Oct 3; Sadlier Publishing Oct 4; Queller, Fisher, Dienst Oct 10; Village Voice, Oct 17; May Davis Investment Bank, Nov. 5; NY Life Nov 12; Jacqueline Onassis H.S., Oct 19; PS 89, Nov 6; H.S. of Economics and Finance Nov 14, 2001.

"Juvenile Delinquency" invited speaker, Tri-State Forensic Psychiatry Review Course, 3/2/01.

Chairman of panel on "Political Psychology and War", annual meeting of the International Society of Political Psychology, Washington, DC  6/21/85.

"Altered Metabolic States and Decision-Making", annual meeting of the International Society of Political Psychology, Toronto  6/25/84.

Discussant on papers on the "Effects of Alcohol and Drugs on Leadership Behavior", annual meeting of the International Society of Political Psychology, Toronto  6/27/84.

11

## ORGANIZATIONAL AFFILIATIONS

| | |
|---|---|
| 2004-present | Consultant to Association of the Bar of the City of NY Children and Law Committee |
| 2007-present | Consultant to Accountability Review Panel of NYC Administration for Children's Services |
| 2008-present | Member of the Forensic Panel (forensic psychiatrists who peer review their cases) |
| 2007-present | Giveanhour-offering services to war veterans needing PTSD treatment |
| 2005-2006 | Disaster and Trauma Issues Committee of Am Acad of Child and Adolescent Psych |
| 2006-present | Dept of Child Psychiatry, NYU School of Medicine |
| 2004-present | Dept of Psychiatry, Mt Sinai School of Medicine |
| 2004-2006 | American Academy of Child and Adolescent Psychiatry |
| 2004-2005 | NY State Interdisciplinary Forum on Mental Health and Family Law |
| 2004-present | Consultation Cadre of the School Mental Health Project of UCLA |
| 2003-present | Consortium for Research on Emotional Intelligence in Organizations |
| 2002-2004 | Senior Consultant on Psychoeducation and Program Development, Center for Social and Emotional Education (www.csee.net) |
| 2002-2003 | Senior Researcher, Center on Terrorism and Public Safety. John Jay College, CUNY |
| 2003-2005 | Consultant to International Relations and Terrorism Committees of the Group for the Advancement of Psychiatry |
| 2002-2004 | Manhattan Task Force to End Child Abuse and Domestic Violence |
| 2001-2003 | National Child Traumatic Stress Network |
| 2001-2003 | New York Times Consortium for Effective Trauma Treatment |
| 1985-1991 | Institute of Social and Behavioral Pathology, fellow. |
| 1981-1988 | American Psychiatric Association, member. |
| 1983-1987 | International Society of Political Psychology, member. |
| 1982- present | Yale Edward Zigler Center in Child Development and Social Policy |

## AWARDS

| | |
|---|---|
| 1990-1991 | Harvard-MacArthur Scholar in International Security. |

12

ORGANIZATIONAL DEVELOPMENT EXPERIENCE

| | |
|---|---|
| 1999-2001 | Consulted to: Mitsubishi, Delta Airlines, PricewaterhouseCoopers, Morgan Stanley, Sadlier Publishing, First American Title, Costa Kondylis, Credit Lyonnais, Financial Models, Coalition for the Homeless. |
| 1999-2001 | Management consultant in PricewaterhouseCoopers' Strategic and Organizational Change practice. |
| 1997-1998 | Visiting Scholar at Columbia Business School, New York, NY. |
| 1997 | Ph.D. in Political Science, GSAS, Harvard University, Cambridge. Ph.D. dissertation on the role of learning and politics in organizational change. |

TEACHING EXPERIENCE

| | |
|---|---|
| 2005- | Supervisor for residents in child psychiatry, NYU School of Medicine Department of Psychiatry |
| 2003-2004 | Supervisor for residents in child psychiatry and medical students at Mount Sinai School of Medicine |
| 2001-2003 | Supervisor for residents in psychiatry at St. Vincent's Hospital. |
| 2001 | Adjunct Assistant Professor, Zicklin School of Business, New York, NY. Taught course on Managerial and Leadership Skills in the MBA program. |
| 1990-1996 | Teaching fellow at Harvard University, for International Conflicts in the Modern World, Ethics and International Relations, Europe After 1945, and The Stalin Era. |
| 1998 | Teaching assistant at Columbia Business School, for Organizational Behavior and Building the Learning Organization. |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57255287
Status as of 9/18/2021 3:21 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 9/15/2021 9:10:10 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 9/15/2021 9:10:10 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 9:10:10 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 9:10:10 AM | SENT |

Filed in The District Court
of Travis County, Texas

AR  SEP 27 2021
At_____3:30_____P.M.
**Velva L. Price, District Clerk**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |
| *Defendants* | § | 459th DISTRICT COURT |

---

## ORDER ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

---

On this day, the Court considered Neil Heslin's Motion for Default Judgment.
The Court finds that the Motion should be granted.

### BACKGROUND

On October 18, 2019, this Court ordered expedited discovery in Mr. Heslin's
IIED claim, including written discovery and depositions. Defendants failed to comply
with the order in numerous respects. On December 20, 2019, the Court assessed
sanctions and held the Defendants in contempt for intentionally disobeying the order.
At that time, the Court took under advisement all additional remedies based on
representations by Defendants that discovery would be promptly supplemented
during the appellate stay. As the Court stated in its prior order, the amount of
supplemental discovery would be a factor when revisiting sanctions upon remand.
Despite their promises, Defendants failed to supplement any discovery following the

2019 hearing and prior to remand. Defendants also failed to supplement any discovery for nearly three months following remand in June 2021.

On August 26, 2021, a few days before the hearing on this matter, Defendants provided some additional documents to Mr. Heslin, but it is clear these documents do not satisfy Defendants' outstanding obligations. In addition, Defendants did not provide any supplemental discovery responses, nor did Defendants make efforts for a corporate representative deposition to cure their non-appearance. Nor have the Defendants fully and fairly responded to the discovery requests at issue.

### FINDINGS

The Court now finds that a default judgment on liability should be granted. The Court finds that Defendants' discovery conduct in this case has shown flagrant bad faith and callous disregard for the responsibilities of discovery under the rules. The Court finds Defendants' conduct is greatly aggravated by the consistent pattern of discovery abuse throughout the other Sandy Hook cases pending before this Court. Prior to the discovery abuse in this case, Defendants also violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623) and *Heslin v. Jones, et al.* (D-1-GN-18-001835). After next violating the October 18, 2019 discovery order in this case, Defendants also failed to timely answer discovery in *Pozner v. Jones, et al.* (D-1-GN-18-001842), another Sandy Hook lawsuit, as well as *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that

Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. In sum, Defendants have been engaged in pervasive and persistent obstruction of the discovery process in general. The Court is also faced with Defendants' refusal to produce critical evidence. Defendants have shown a deliberate, contumacious, and unwarranted disregard for this Court's authority. Based on the record before it, this Court finds that Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit.

In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense and determined they would be inadequate in light of the history of Defendants conduct in this court. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

It is accordingly ORDERED that a default judgment be entered against Defendants with respect to liability in this lawsuit.

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion. Plaintiffs shall submit evidence regarding the reasonable value of the time expended by their attorneys related to their Motion for Default Judgment subsequent to the December 2019 hearing in this matter.

Dated *September 27,* 2021.

Hon. Maya Guerra Gamble

Hearing/Trial Date(s): 8/31/2021

Received into TCDC: _____

Cause Number D-1-GN-18-001835, et al

| HESLIN | X | In the District Court of |
| | X | |
| V | X | Travis County, Texas |
| | X | |
| ALEX JONES | X | 459TH Judicial District |

### Receipt of Exhibits

I, <u>Alicia A. DuBois</u>, Court Reporter for the 459th District Court, do hereby tender for filing to Velva L. Price, District Clerk, Travis County, Texas, the following exhibits in the above numbered and styled cause:

| # | Plaintiff's Exhibits |
|---|---|
| 1 | Video Clip |
| 2 | Video Deposition |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| # | Defendant's Exhibits |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Court Reporter**

I, Velva L. Price, District Clerk, do hereby acknowledge receipt of the above listed exhibits in the above numbered and styled cause.

Dated this_____ 7TH _____ day of ___OCTOBER_____, 20_21_____

(FILE STAMP)

Filed in the District Court
Of Travis County, Texas

AT 10/7/2021 2:25PM
Velva L. Price, District Clerk

**Velva L. Price**
**District Clerk, Travis County, Texas**

_____
DEPUTY

10/11/2021 12:00 AM

No.  D-1-GN-18-001835

**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton**

| | | |
|---|---|---|
| NEIL HESLIN | : | IN THE DISTRICT COURT OF |
| | : | |
| | : | |
| **vs.** | : | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, | : | |
| INFOWARS, LLC, FREE SPEECH | : | |
| SYSTEMS, LLC, AND OWEN SHROYER | : | 459TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE:  **Contemporary Care Psychiatric Centers of Excellence (Medical/Psychiatric)**

I,   Cris Garza   , Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil
Procedure,

1.  That this Deposition by Written Questions of **Christine Lent**, the Custodian of Records for the above named is a true and
exact duplicate of the records pertaining to **Neil Heslin**, given by the witness named herein, after said witness was duly sworn
by   **Denise V. Toomey**   ;

2.  That the transcript is a true record of the testimony given by the witness;

3.  That $ **139.80** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits,
charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4.  **That the deposition transcript was submitted on  08/27/2021 9:00AM.** to the witness for examination, signature and return
to the officer by a specified date;

5.  That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6.  That the witness returned the transcript;

7.  That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to
**Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first
questions for safekeeping and use at trial;

8.  That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties
of record:
**Bradley Reeves (Reeves Law, PLLC) 512-318-2484
Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9.  A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  09/21/2021 .

**Discovery Resource
1511 West 34th Street
Houston, TX 77018
713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

93489.001

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 58046080
Status as of 10/22/2021 1:36 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/10/2021 5:36:27 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/10/2021 5:36:27 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/10/2021 5:36:27 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/10/2021 5:36:27 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 58046080
Status as of 10/22/2021 1:36 PM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

**10/11/2021 12:00 AM**

No.  D-1-GN-18-001835

**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001835**
**Selina Hamilton**

| | | |
|---|---|---|
| NEIL HESLIN | : | IN THE DISTRICT COURT OF |
| | : | |
| | : | |
| vs. | : | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, | : | |
| INFOWARS, LLC, FREE SPEECH | : | |
| SYSTEMS, LLC, AND OWEN SHROYER | : | 459TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE:  **Contemporary Care Psychiatric Centers of Excellence (Medical/Psychiatric)**

I,  ___Cris Garza___ , Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1.  That this Deposition by Written Questions of **Christine Lent**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Neil Heslin**, given by the witness named herein, after said witness was duly sworn by___ **Denise  V.  Toomey** ___;

2.  That the transcript is a true record of the testimony given by the witness;

3.  That $ 139.80 is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff**, Mark D. Bankston, TBA # 24001430;

4.  **That the deposition transcript was submitted on  08/27/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5.  That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6.  That the witness returned the transcript;

7.  That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8.  That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
    **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
    **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9.  A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  09/21/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

**CRIS GARZA**
**MY COMMISSION EXPIRES**
**JUNE 23, 2025**
**NOTARY ID: 126941309**

93489.001

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 58046080
Status as of 10/22/2021 1:36 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 10/10/2021 5:36:27 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/10/2021 5:36:27 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/10/2021 5:36:27 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/10/2021 5:36:27 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/10/2021 5:36:27 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 58046080
Status as of 10/22/2021 1:36 PM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 10/10/2021 5:36:27 PM | SENT |

10/22/2021 12:02 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL RESPONSES TO SECOND SET OF DISCOVERY REQUESTS AND MOTION FOR SANCTIONS

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer (collectively "Defendants"), file this response to Plaintiff's Motion to Compel Responses to Second Set of Discovery Requests and Motion for Sanctions, and would show unto the Court as follows:

### SUMMARY OF RESPONSE

Plaintiff's motion to compel and motion for sanctions should be denied. Defendants have fully supplemented their discovery responses to address most, if not all, of Plaintiff's concerns. To the extent Defendants have stood on their original objections, the Court should sustain Defendants' objections and deny Plaintiff's motion.

Unsurprisingly, Plaintiff's motion is loose with the facts, particularly where it comes to claiming Defendants would supplement their production in response to Plaintiff's original discovery requests within fourteen (14) days of the August 31, 2021 hearing in this case. Defendants made no such promises; what was promised was that the undersigned would review additional documents to determine if further supplementation was necessary. Counsel did review

additional documents and determined that all documents responsive to Plaintiff's initial production

requests had already been produced. Yet that had nothing to do with Plaintiff's second set of

discovery requests, most of which sought wholly irrelevant documents and information simply for

the purposes of harassing Defendants. Regardless, as demonstrated below, Defendants have fully

complied with their discovery responsibilities by supplementing their discovery responses to

ensure the issues raised by Plaintiff in his motion have been addressed. *See* Ex. 1;[1] Ex. 2;[2] Ex. 3;[3]

Ex. 4;[4] and Ex. 5.[5] Consequently, Plaintiff's motion should be denied.

### RESPONSE TO MOTION TO COMPEL AND MOTION FOR SANCTIONS

1)     **Defendant, Alex Jones, has fully complied with his discovery obligations pertaining to Plaintiff's Second Set of Interrogatories; Defendant's objections to Plaintiff's discovery requests should be sustained; and Plaintiff's motion should be denied.**

Plaintiff first complains about Defendant, Alex Jones's, responses to Plaintiff's second set

of discovery requests. Plaintiff first seeks to compel Defendant to provide different responses to

certain interrogatories, as follows:

A.     *Interrogatory No. 1*

**Interrogatory No. 1**

Identify by name and last known contact information of any individual who
you chose to employ at Free Speech Systems between December 14, 2012
and July 1, 2021 with duties that involved writing, researching, editing,
filming, hosting, or producing InfoWars media content and who is no longer
employed by the company.

---

[1] Defendant, Alex Jones's, Supplemental Objections and Answers to Plaintiff's Second Set of Interrogatories.

[2] Defendant, Free Speech Systems, LLC's, Supplemental Objections and Answers to Plaintiff's Second Set of Interrogatories.

[3] Defendant, Free Speech Systems, LLC's, Supplemental Objections and Responses to Plaintiff's Second Requests for Production.

[4] Defendant, Owen Shroyer's, Supplemental Objections and Answers to Plaintiff's Second Set of Interrogatories.

[5] Defendant, Owen Shroyer's, Supplemental Objections and Responses to Plaintiff's Second Requests for Production.

In his initial and supplemental answer to this interrogatory, Mr. Jones asserted the

following objections:

**<u>OBJECTIONS:</u>**

> Defendant objects to this interrogatory as overly broad, unduly burdensome,
> and a fishing expedition, as Plaintiff has not identified any relevancy
> between his claims in this lawsuit and the information requested in this
> interrogatory. Defendant further objects to the harassing and burdensome
> nature of this interrogatory as it would encompass essentially every former
> employee of Free Speech Systems during that entire time period, very few
> of which would have any relevancy or connection to the claims at issue in
> this lawsuit. Defendant further objects to this interrogatory as it is not
> reasonably calculated to lead to the discovery of admissible evidence.
> Defendant also objects to this interrogatory as it assumes facts not in
> evidence with whether Defendant "chose to employ" any individual(s) at
> Free Speech Systems.

*See* Ex. 2 to Plaintiff's motion; *see also* Ex. 1. In his supplemental objections and answers,

Defendant reiterated he does not have the requisite knowledge or information to adequately

respond to this interrogatory, stating:

**<u>ANSWER:</u>**

> Subject and without waiving the foregoing objections, Defendant does not
> have the requisite information and knowledge to respond to this
> interrogatory.

*Id*. Yet, Plaintiff still wishes to have the Court compel Defendant to answer an interrogatory with

information that he has no knowledge of, particularly in his individual capacity. But Defendant

cannot be compelled to provide an answer for which he has no personal knowledge regarding

former employees of a separate and distinct entity—Free Speech Systems, LLC[6]—which is also a

defendant in this lawsuit.

Plaintiff's motion fails to meaningfully address the objections raised by Defendant;

Plaintiff simply makes his own unsubstantiated conclusion that the objections are somehow

---

[6] Hereinafter referred to as "Free Speech Systems."

"frivolous." While it is not clear when Plaintiff or his counsel became the judge in this case, Plaintiff's failure to discuss Defendant's objections to these discovery requests in its motion deems, in and of itself, that the Court should sustain Defendants' objections and deny Plaintiff's motion.

Notably, Plaintiff's motion does not assert that Defendant's objections were improper (other than to claim they are frivolous), nor does Plaintiff provide any analysis that would otherwise support its contention that Defendants' objections are frivolous. *See Morris v. Greater McAllen Star Properties,* No. 13–11–00316–CV, 2012 WL 3043106, at *15-16 (Tex. App.—Corpus Christi July 26, 2012, no pet.). Therefore, Plaintiff has not shown that the Court should overrule each of Defendant's objections and compel discovery. *Id.* (citing *In re Hernandez,* No. 14-11-00408-CV, 2011 WL 4600706, at *2 (Tex. App.—Houston [14th Dist.] Oct. 6, 2011, orig. proceeding) (mem. op.); *see also In re Citizens Supporting Metro Solutions, Inc.,* No. 14-07-00190-CV, 2007 WL 4277850, at *3 (Tex. App.—Houston [14th Dist.] Oct. 18, 2007, orig. proceeding) (mem. op.).

The Court should also deny Plaintiff's motion because Plaintiff's interrogatory no. 1 is a pure fishing expedition and seeks information that has little to no relevance to the claims at issue in this lawsuit. The period covered by Plaintiff's interrogatory no. 1 is far too broad for the circumstances of this case, particularly since Plaintiff's claims, at the earliest, only stem from alleged statements made in 2017 and 2018. Plaintiff has no rational explanation as to why information from prior to 2017 and 2018 is relevant to his asserted causes of action, especially information on former employees going all the way back in 2012. Parties are not entitled to unlimited discovery, and it is incumbent upon the Court to impose reasonable discovery limits. *In re Sun Coast Res., Inc.,* 562 S.W.3d 138, (Tex. App.—Houston [14th Dist.] 2018, orig.

proceeding). A party's discovery requests must show a reasonable expectation of obtaining information that will aid in the resolution of the dispute. *In re CSX Corp.,* 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) (per curiam). Plaintiff's interrogatory no. 1 is not reasonably limited or sufficiently tailored to a relevant scope of time that would aid in resolution of the dispute. The Court should sustain Defendant's objections to this interrogatory and deny Plaintiff's motion.[7]

Plaintiff's motion also makes extremely presumptuous statements as to what information Defendant should be able to obtain in his individual capacity, as opposed to information that is possessed, owned, and/or controlled by the entity-defendant, Free Speech Systems. First, Plaintiff's interrogatory requests identifying information for anyone Mr. Jones *personally* "chose to employ." Yet as Mr. Jones stated in his objections to this interrogatory, there is no evidence he ever made personal decisions as to whom Free Speech Systems should employ. Plaintiff's motion also claims, without any proof, that Mr. Jones in his individual capacity "should be able to identify employees" of Free Speech Systems. *See* Mtn. at 3. Yet again, Plaintiff's motion misses the mark, and Plaintiff's unsubstantiated presumptions fail to demonstrate any support for the contentions in his motion.

Plaintiff's motion also misleads the Court as to the extreme breadth of the information he is seeking. Based on the phrasing in the motion, one would think that Plaintiff's interrogatory no. 1 only seeks information on former employees "in production roles who have been terminated or resigned"—albeit without any information to fully understand what Plaintiff means by "production roles." *See* Mtn. at 3. But a review of the interrogatory shows the request itself is much broader and more burdensome than that. Tellingly, Plaintiff's motion fails to discuss how his interrogatory

---

[7] As an aside, it is also particularly concerning that Plaintiff's interrogatory seeks information only as to *former* employees, and not any current employees. Presumably, Plaintiff and/or his counsel are attempting to usurp Defendants' rights to have former employees represented by counsel regarding events that occurred while still employed. The Court should not allow this to occur.

seeks identifying information of any and all former employees of Defendant, Free Speech Systems, LLC (and not employees of Mr. Jones, to whom the interrogatory was propounded) who was involved in any way in: (1) writing; (2) researching; (3) editing; (4) filming; (5) hosting; or (6) producing InfoWars media content. *See* Mtn. at 2. This interrogatory essentially encompasses *every* former employee of Free Speech Systems and as such is unduly burdensome and overly broad on its face. More to the point, Plaintiff's interrogatory does not limit itself to seeking the identification of former employees who may have had a role in any Sandy Hook-related broadcasts. Instead, Plaintiff is seeking to have any former employees who did any of the tasks/roles listed above for any broadcasts on any subject. Thus, it is clear Plaintiff's interrogatory no. 1 is not "reasonably tailored to include only relevant matters." *In re Alford Chevrolet-Geo,* 997 S.W.2d 173, 180 n. 1 (Tex. 1999) (orig. proceeding).

Finally, as referenced above, the information sought in response to this interrogatory pertains to former employees of Free Speech Systems, and not those of Mr. Jones. Plaintiff is not entitled to compel information from Mr. Jones in his personal capacity when the information he desires pertains to former employees of an independent entity, Free Speech Systems. A person sued in his individual capacity is not required or expected to provide information and discovery that are within the corporation/limited liability company's possession and knowledge. *See In re Kuntz,* 124 S.W.3d 179, 183-84 (Tex. 2003).

The Court should sustain Defendant's objections to Plaintiff's interrogatory no. 1 and deny Plaintiff's motion to compel (and motion for sanctions) as to his interrogatory no. 1.

B.    *Interrogatory No. 2*

**Interrogatory No. 2**

Identify by name and any known contact information of any individual not
employed by Free Speech Systems, LLC with whom you have
communicated about this lawsuit or the allegations in this lawsuit since
April 16, 2018.

In his initial and supplemental answer to this interrogatory, Mr. Jones asserted the

following objections:

**OBJECTIONS:**

Defendant objects to this interrogatory as harassing and not reasonably
calculated to lead to the discovery of admissible evidence. Defendant
further objects to the extent this interrogatory violates the attorney-client,
work-product, and/or reporter's privilege. Defendant further objects to this
interrogatory as unduly burdensome and seeking information not relevant
to Plaintiff's claims in this lawsuit.

*See* Ex. 2 to Plaintiff's motion; *see also* Ex. 1.

In his supplemental objections and answers, Mr. Jones emphasized that he does not have

the requisite knowledge or information to specifically identify any persons in response to this

interrogatory beyond knowing he has indeed spoken to his attorneys about this lawsuit. To wit,

Mr. Jones responded to this interrogatory with:

**ANSWER:**

Subject to and without waiving the foregoing objections, while Defendant
does not deny he has likely discussed the lawsuit and/or the allegations in
this lawsuit since April 16, 2018 with individual(s) not employed by Free
Speech Systems, Defendant does not currently have the requisite
information and knowledge to identify any specific person(s) with whom
he has had those discussions beyond Defendant discussing the lawsuit with
his attorneys.

*See* Ex. 1.

Again, Plaintiff's motion does nothing to address Defendant's objections other than to call

them "frivolous." *See* Mtn. at 3. This likewise dooms Plaintiff's complaints and compels the Court

to sustain Defendant's objections and deny Plaintiff's motion as to interrogatory no. 2.

Regardless, Plaintiff is not entitled to an order compelling an answer to a question to which Mr. Jones lacks the requisite knowledge to provide an answer. While Plaintiff's counsel baselessly contends Mr. Jones "should know the people outside the company with whom he discussed this case," the fact of the matter is that Mr. Jones does not know specific individuals with whom he has discussed anything relevant to this lawsuit other than his lawyers. Discovery is not a memory contest, and simply because Plaintiff is unhappy that Mr. Jones cannot identify individuals with whom he has discussed this lawsuit over an almost 4-year period of time—beyond his attorneys— does not mean Plaintiff is entitled to an order compelling an answer and sanctions. Thus, the Court should likewise sustain Defendant's objections and deny Plaintiff's motion to compel as to interrogatory no. 2.

**C.**     *Interrogatory No. 3*

**Interrogatory No. 3**

Identify the date and description of the circumstances for any occasions in which you have made public oral or written statements that were not published by Free Speech Systems, LLC concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits.

In his initial and supplemental answer to this interrogatory, Mr. Jones asserted the following objections:

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, not narrowly tailored in scope of subject or time, and unduly burdensome. Defendant further objects to this interrogatory as an improper compound interrogatory in violation of the Texas Rules. Defendant also objects to the extent this interrogatory seeks information in violation of the attorney-client and/or work-product privileges. Defendant further objects to the extent this interrogatory seeks an impermissible narrative that cannot be adequately confined as an answer to an interrogatory. Defendant further objects to this

interrogatory as vague in its reference to "not published by Free Speech Systems, LLC."

Plaintiff contends Mr. Jones merely stated his "standard objections," clearly failing to realize that while some of the objections to these interrogatories are the same, many also point to unique aspects of the respective interrogatories which are objectionable—these are not just boilerplate objections Plaintiff can somehow ignore and not address.

Regardless of the merits of Defendant's objections—which should be sustained by the Court, especially since Plaintiff does nothing to address them—Mr. Jones has already further supplemented his answer to this interrogatory, obviating any need to compel any further response or otherwise warranting any sanctions from the Court. *See* Ex. 1. As such, the Court should deny Plaintiff's motion as to his interrogatory no. 3 to Mr. Jones.

**2) Defendant, Free Speech Systems, has likewise fully complied with its discovery obligations pertaining to Plaintiff's Second Set of Interrogatories and Second Requests for Production; Defendant's objections to Plaintiff's discovery requests should be sustained; and Plaintiff's motion should be denied.**

Plaintiff then turns his meritless complaints to Free Speech Systems and its responses to Plaintiff's second set of discovery requests. Plaintiff first seeks to compel Free Speech Systems to provide different responses to certain interrogatories, as follows:

**A.** *Interrogatory No. 1*

**Interrogatory No. 1**

State the total number of viewers and/or listeners for the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," the June 25, 2017 episode of The Alex Jones Show from which the June 26th video was taken, and the July 20, 2017 episode of The Alex Jones Show in which the June 26th video was featured.

In its initial answer to this interrogatory, Free Speech Systems explained that it was unable to answer this interrogatory because it had no access to any of that data or information for any

viewers and/or listeners that may have viewed these videos/broadcasts on third-party platforms since those platforms have removed those videos. Somehow, this answer is "insufficient" for Plaintiff. Plaintiff's only argument that this is not sufficient is the completely erroneous assumption that "the number of views occurring on InfoWars.com for these videos is obviously within InfoWars' possession." *See* Mtn. at 5. While Plaintiff and/or his counsel are apparently very confident that they know everything about how Free Speech Systems and/or InfoWars works and what data is captured as to viewers to be able to make such a statement in his motion, they are, in fact, completely wrong. As explained in Defendant's supplemental answer to this interrogatory,

> **<u>ANSWER:</u>**
>
> Subject and without waiving the foregoing objections, Defendant has no information responsive to this interrogatory as to total viewers and/or listeners who may have seen or heard the video(s) on third-party platforms. In addition, Defendant supplements its answer as follows:
>
> At the time of the video/show(s) in question, Defendant was only utilizing a continuous running live stream on its website and did not (and does not) capture or save data on number of viewers/listeners for a particular show or segment of the live stream. The only site analytics Defendant has access to, at least to some extent, is analytics as to the number of page views for the page that had the live stream player. But since this does not capture data pertaining to number of viewers/listeners for a particular video or episode of The Alex Jones Show, Defendant does not have the information necessary to respond to Plaintiff's interrogatory.

*See* Ex. 2. Clearly, despite Plaintiff's unsubstantiated claims to the contrary, Free Speech Systems does not actually have the information or data responsive to this interrogatory as it pertains to the InfoWars.com website. Plaintiff cannot compel Free Speech Systems to provide information it does not have and has never had.

Plaintiff also makes the outlandish comment that regarding "evidence InfoWars distributed on third party video platforms such as YouTube, it is now clear that evidence has been spoliated." *See* Mtn. at 5. Plaintiff and his counsel again make this baseless statement without any legal or

factual support. Plaintiff does not even know whether this data regarding viewership numbers is or is not available from these third-party platforms. The only thing that is known is that Defendants has been removed from these platforms and does not have any access to this information or data. But whether those third-party platforms have this information is something Plaintiff has not even attempted to obtain; his counsel instead chooses to file motion upon motion without any meaningful attempt at conferring with Defendant's counsel, wasting this Court's time and resources with specious arguments.

There is also no basis for claiming evidence has been spoliated. Information from third-party platforms is not owned or controlled by Free Speech Systems. Free Speech Systems also had nothing to do with those platforms' decisions to remove Defendants' and Defendants' content that was on those platforms. Plaintiff likewise had equal access to the content on these platforms while this suit was pending before these third-party platforms unilaterally and without warning decided to remove Defendants' and their content and ban them from any further use of these platforms. So, Plaintiff's contention that evidence has been spoliated is entirely offbase and has no merit.

Since Free Speech Systems does not have and has never had the information Plaintiff is seeking by way of his interrogatory no. 1 to Free Speech Systems, the Court should deny Plaintiff's motion to compel and motion for sanctions.

**B.**    ***Interrogatory No. 2***

**Interrogatory No. 2**

Identify every way in which the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," the June 25, 2017 episode of The Alex Jones Show, the July 20, 2017 episode of The Alex Jones Show, or any portions of the foregoing, were disseminated to the public, whether by radio, television, internet video, or any other publication or broadcast, whether by Free Speech Systems or by any other authorized entity or person.

In its initial and supplemental answer to this interrogatory, Free Speech Systems asserted the following objections:

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, unduly burdensome, and a fishing expedition, particularly in light of the fact that its broadcasting, at least as of the dates referenced in Plaintiff's interrogatory, occurred simultaneously across several platforms. Defendant also objects to this interrogatory as vague in its use of the terms "any other authorized entity or person."

*See* Ex. 3 to Plaintiff's motion. Just like the other complaints raised by Plaintiff in his motion, Plaintiff makes no attempt to refute Defendant's objections, deeming that the Court should sustain Defendant's objections as a matter of law and deny Plaintiff's motion.

Defendant's objections notwithstanding, Defendant's initial answer to this interrogatory stated:

**ANSWER:**

Subject to and without waiving the foregoing objections, at the time referenced in Plaintiff's interrogatory, InfoWars-related broadcasts, posts, videos, etc., and in particular The Alex Jones Show, were simulcast across multiple platforms, including Twitter, Facebook, YouTube, and others, most of which are no longer available to FSS. As such, Defendant is currently unable to determine which of these platforms were actually utilized to simulcast the particular broadcasts referenced in Plaintiff's interrogatory.

*Id.* Free Speech Systems subsequently supplemented its answer to this interrogatory, further stating:

**ANSWER:**

. . . In addition, Defendant supplements its answer as follows: Defendant has no radio distribution agreements or television/broadcasting agreements by which Defendant's content was distributed. Rather, Defendant has (and had) a blanket free-to-rebroadcast policy.

*See* Ex. 2.

Thus, Plaintiff's contention that Free Speech Systems "failed to identify all web-based methods of disseminating InfoWars videos" is simply false and intentionally misleads the Court as to the extent of the information Free Speech Systems provided in response to this interrogatory. One can plainly see that even in its initial answers that Free Speech Systems provided Plaintiff with a list of platforms that had previously been utilized to distribute content. Defendant's supplemental answers provide further clarity to Plaintiff and his misperception that radio distribution agreements and/or television/cable agreements exist when in fact they do not. As such, there is simply nothing Free Speech Systems can add to this answer, even if the Court were to erroneously compel Defendant to somehow provide additional information responsive to this interrogatory. The Court should deny Plaintiff's motion as to interrogatory no. 2 propounded on Free Speech Systems.

**C.**     *Interrogatory No. 3*

**Interrogatory No. 3**

Identify every individual at Free Speech Systems, LLC who was aware of the Zero Hedge blog post "Megyn Kelly Fails to Fact Check Sandy Hook Father's Contradictory Claim in the Alex Jones Hit Piece" prior to Owen Shroyer discussing that blog post on The Alex Jones Show.

Free Speech Systems asserted the following objections—none of which are addressed in Plaintiff's motion:

**OBJECTIONS:**

Defendant objects to this interrogatory as vague in its use of the term "aware." Defendant further objects to this interrogatory as unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

*See* Ex. 3 to Plaintiff's motion. In its initial and supplemental responses, Free Speech Systems stated it had no information responsive to this interrogatory. Plaintiff tries to twist and manipulate this answer into an argument that Free Speech Systems has somehow failed to "secure evidence

and identify persons with knowledge of relevant facts at the outset of this case." *See* Mtn. at 6. That argument is nothing but Plaintiff and his counsel trying to create a controversy where none exists. It is impossible for Free Speech Systems to know who was merely "aware" of the blog post referenced in Plaintiff's interrogatory.

Seemingly recognizing the vague nature of his interrogatory, Plaintiff attempts to rewrite the interrogatory in his motion to compel, now claiming that he is only seeking "to identify the employees involved in creating the Challenged Video." *See* Mtn. at 6. That is a far cry from Plaintiff's initial ask as to who may have been "aware" of the blog post. But given that Free Speech Systems can only respond to the interrogatory actually propounded upon it—and as it has no information as to who may have been "aware: of the blog post—Free Speech Systems cannot provide any information to answer this interrogatory. Because Plaintiff has failed to analyze or refute Defendant's objections to this interrogatory, and because Free Speech Systems has no information responsive to this interrogatory as written, there is nothing for the Court to compel. The Court should therefore deny Plaintiff's motion as to interrogatory no. 3 to Free Speech Systems.

D.      *Request for Production No. 3*

**Request for Production No. 3**

All master-level or overview reports created to summarize product sales performance from December 14, 2012 to the present day.

Free Speech Systems responded to this request as follows:

**OBJECTIONS:**

Defendant objects to this request as overly broad and unduly burdensome. Defendant further objects to this request as it is not narrowly tailored to the underlying facts of this case and is merely a fishing expedition. Defendant also objects to this request to the extent it seeks documents regarding Defendant's net worth in violation of § 41.005 of the TEX. CIV. PRAC. &

Rᴇᴍ. Cᴏᴅᴇ. Defendant further objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to the extent this request seeks documents in violation of the accountant-client privilege. Defendant also objects to this request as vague in its use of the terms "master-level," "overview reports," and "product sales performance." Defendant further objects to the extent this request seeks documents pertaining to protected confidential trade secrets and financial information to which Plaintiff is not entitled absent a court order.

**RESPONSE:**

Defendant believes such documents are not relevant to Plaintiff's claims and this request violates § 41.005 of the Texas Civil Practices and Remedies Code regarding net worth discovery, along with this request impermissibly seeking protected trade secrets and financial information of Defendant. Defendant will further supplement this response as necessary if the necessary Court order is entered regarding the production of such documents and if a mutually agreeable protective and confidentiality order is also entered by the Court.

*See* Ex. 4 to Plaintiff's motion.

Regarding this request, Plaintiff for once does discuss at least a portion of Defendant's objections. First, Plaintiff contends these documents have nothing to do with Defendant's net worth. However, sales data and sales revenues certainly do go towards determining Defendant's net worth and valuation. More to the point, Plaintiff has utterly failed to demonstrate how such documents are in any way relevant to his underlying claims that center on videos and broadcasts from only 2017 and 2018. Plaintiff's motion does not discuss how sales data and documents from prior to the 2017 videos/broadcasts are in any way relevant to the actual claims in this lawsuit.

In addition, Plaintiff challenges Defendant's objections to the terms "master-level," "overview reports," and "product sales performance" as vague when those terms had agreed definitions in the Connecticut lawsuits. But Plaintiff seems to forget that we are in Texas, not Connecticut, and without Plaintiff identifying and defining those terms, Free Speech Systems is not at liberty to guess as to what Plaintiff meant by those terms simply to appease Plaintiff.

Regardless, Free Speech Systems did indeed produce documents responsive to this request with its initial responses—something Plaintiff conveniently omits from its motion. Free Speech Systems has also provided additional documents responsive to this request by way of its supplemental production. *See* Ex. 3. Therefore, Free Speech Systems has fully complied with its obligations to produce documents responsive to this request, and Plaintiff's motion to compel and motion for sanctions should be denied.

E.     *Request for Production No. 4*

**Request for Production No. 4**

All documents you relied on in answering Plaintiff's Second Set of Interrogatories.

Plaintiff's argument regarding this request is a giant "nothing burger." Free Speech Systems has already produced all documents used in answering Plaintiff's Second Set of Interrogatories, and Defendant informed Plaintiff of same in its initial and supplemental responses to Plaintiff's second requests for production. *See* Ex. 3. The Court should thus also deny Plaintiff's motion to compel and motion for sanctions as to this request for production.

**3)**     **Defendant, Owen Shroyer, has fully complied with its discovery obligations pertaining to Plaintiff's Second Set of Interrogatories and Second Requests for Production; Defendant's objections to Plaintiff's discovery requests should be sustained; and Plaintiff's motion should be denied.**

A.     *Interrogatory No. 1*

**Interrogatory No. 1**

Identify by name and address every employer you have had since June 26, 2012 and every job title you have held during that period.

In his initial objections and answers, Mr. Shroyer stated as follows:

**<u>OBJECTIONS:</u>**

Defendant objects to this interrogatory as overly broad, unduly burdensome,

16

and a fishing expedition, as Defendant's employment history has no bearing on the issues in this lawsuit. Defendant further objects to this interrogatory as not seeking information relevant to this lawsuit or Plaintiff's claims in any way.

**ANSWER:**

Subject and without waiving the foregoing objections, Defendant has been a free-lance reporter, podcaster, political activist, and commentator for a number of years. Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

*See* Ex. 5 to Plaintiff's motion.

Once again, Plaintiff makes no mention of Defendant's objections, thereby deeming as a matter of law that the Court should sustain these objections. In particular, Plaintiff makes no effort to demonstrate how Defendant's employment history from five (5) years prior to the video which serves as the basis of Plaintiff's claims has any relevance to the underlying claims in this lawsuit. That notwithstanding, Mr. Shroyer has since supplemented his answers and provided the requisite identification information as to his current and former employers over the requested time-period. *See* Ex. 4. Thus, Mr. Shroyer has fully complied with his discovery obligations, and the Court should deny Plaintiff's motion to compel and motion for sanctions.

**B.**     *Interrogatory No. 4*

**Interrogatory No. 4**

Identify by date any occasions in which you have made public oral or written statements concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits. If those statements were orally made on an InfoWars show, state the show and the episode title. If those statements were made on the InfoWars website, identify the title of the webpage and URL. If those statements were made elsewhere, describe the circumstances of the statements.

17

In his initial objections and answers, Mr. Shroyer stated as follows:

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, not narrowly tailored in scope of subject or time, and unduly burdensome. Defendant further objects to this interrogatory as an improper compound interrogatory in violation of the Texas Rules. Defendant also objects to the extent this interrogatory seeks information in violation of the attorney-client and/or work-product privileges. Defendant further objects to the extent this interrogatory seeks an impermissible narrative that cannot be adequately confined as an answer to an interrogatory.

**ANSWER:**

Subject to and without waiving the foregoing objections, Plaintiff is seeking to have Defendant go through years of his comments, appearances, political activism, posts, and the like for at last the last almost nine (9) years—which occur on a regular and almost daily basis—from the time when the Sandy Hook shooting occurred (December 14, 2012) to the present—when Defendant is a reporter, host, and activist who makes a living off of providing news-worthy content to the public. Defendant is simply unable to state with any specificity the "occasions" on which Defendant has made any comments or statements of any sort which Plaintiff would somehow deem responsive to this interrogatory. As such, Defendant at this time does not have the requisite information to respond to this interrogatory as currently phrased by Plaintiff and it would force Defendant an undue hardship and burden to have to do so without further clarification and appropriate boundaries on this interrogatory from Plaintiff.

*See* Ex. 5 to Plaintiff's motion.

Mr. Shroyer then supplemented his answer to provide more information—to the extent possible—to ensure full compliance with his discovery obligations, maintaining his original objections and answer, while supplementing as follows:

**ANSWER:**

. . .

In addition, Defendant supplements his answer as follows:

To the best of Defendant's recollection, he does not believe he has made any public oral or written statements concerning the Sandy Hook tragedy, relatives of the victims, the lawsuits brought by the victims, or the

allegations in those lawsuits, beyond the singular discussion/commentary provided by Defendant on or about June 25, 2017 disputing the mainstream media's coverage of Plaintiff's account of the Sandy Hook incident. The events at issue occurred long before Defendant became a reporter broadcasting with Infowars, and beyond the aforementioned commentary, Defendant does not believe he has provided any other coverage or commentary regarding any aspect of Sandy Hook.

*See* Ex. 4. Plaintiff's only argument is his baseless contention that it "does not appear that Mr. Shroyer has done anything to exercise diligence in answering this request." *See* Mtn. at 8. Similar to the other meritless complaints raised by Plaintiff, this contention completely lacks any factual basis. Plaintiff simply is not content or satisfied with any answer that Mr. Shroyer does not have the necessary information to respond to an interrogatory. But Mr. Shroyer cannot be compelled to provide an answer for which he has no information. However, as demonstrated above, Mr. Shroyer has indeed exercised diligence in attempting to answer this interrogatory as fully and completely as he can, hence why he provided a supplemental answer to this interrogatory. Plaintiff's hollow assertion that Mr. Shroyer did not exercise diligence is in no way grounds for the Court to grant a motion compelling Mr. Shroyer to provide further responsive information, particularly where there is no other responsive information Defendant could provide regarding this interrogatory. Thus, the Court should deny Plaintiff's motion to compel and motion for sanctions.

## C.     *Request for Production No. 1*

### Request for Production No. 1

All communications you sent or received concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits since the start of your employment at Free Speech Systems, LLC.

In his initial response to this request, Mr. Shroyer stated as follows:

**OBJECTIONS:**

Defendant objects to this request as overly broad on its face because it is not sufficiently narrowed in scope of time. Defendant also objects to this request to the extent it seeks documents that are protected by the work-product and/or attorney-client privileges. Defendant further objects to this request as vague in its use of the broad term "concerning." Defendant also objects to this request as it assumes facts not in evidence as to whether Defendant was employed by Free Speech Systems, LLC. Defendant further objects to the extent this request seeks to have Defendant prematurely marshal all evidence and documents in his defense in this case. Subject to and without waiving the foregoing objections,

**RESPONSE:**

Subject to and without waiving the foregoing objections, Defendant is not currently in possession, custody, or control of documents responsive to this request beyond those which may be in the possession, custody, or control of Free Speech Systems, LLC. Defendant is continuing to diligently search to determine if any documents responsive to this request are indeed in his care, possession, custody, or control, and will further supplement his production with the same as necessary in accordance with the Texas Rules of Civil Procedure, expect to the extent such documents are protected from production by the applicable privileges cited above.

*See* Ex. 6 to Plaintiff's motion. Mr. Shroyer then further supplemented this response, stating the same objections, but revising its response to:

**RESPONSE:**

None.

*See* Ex. 5. However, consistent with his approach on the other discovery requests referenced in the instant motion to compel, Plaintiff does not even mention Mr. Shroyer's objections to this request, much less try to refute them. As such, the Court should sustain these objections and in turn deny Plaintiff's motion.

That notwithstanding, Plaintiff's only "argument" in his motion is that because Defendants (collectively) have purportedly not produced any documents responsive to this request, the Court should somehow compel Mr. Shroyer to produce documents he does not possess, own, or

otherwise control. Plaintiff unsurprisingly provides no legitimate argument or reasoning as to how the idea that other Defendants have not produced responsive documents somehow equates to Plaintiff having a legitimate basis to seek to compel Mr. Shroyer to produce documents he does not have (to the extent any documents responsive to this request even exist). And based on the documents reviewed and produced by Defendants to date, there indeed appears to be no documents responsive to this request propounded on Mr. Shroyer. Plaintiff simply assumes such documents exist, but we all know what assuming does. The fact of the matter is that Mr. Shroyer does not have any documents responsive to this request, and therefore there is nothing for the Court to compel him to respond to regarding this document request. So, the Court should likewise deny Plaintiff's motion to compel and motion for sanctions as to this request for production to Mr. Shroyer.

## CONCLUSION AND PRAYER

The Court should deny Plaintiff's motion to compel and motion for sanctions in its entirety. Defendants have fully complied with their discovery obligations, including timely and promptly supplementing their discovery responses to ensure that most, if not all, of the issues raised by Plaintiff are addressed to the extent it is possible to do so—including supplementing their production with almost 1,000 additional documents containing very confidential market analytics and sales figures. However, in the context of this motion to compel, the fact that Plaintiff has essentially ignored or otherwise not refuted Defendants' objections to these various requests deems as a matter of law that the Court should sustain Defendants' objections and deny Plaintiff's motion.

Despite Plaintiff's contentions to the contrary, Defendants are in no way obstructing discovery. Rather, they are making every effort possible to fully comply with their discovery obligations, as shown by their supplemental discovery responses and production discussed herein.

21

Simply because Plaintiff is apparently unhappy with the responses does not mean Plaintiff has any meritorious grounds to compel Defendants to respond any further or that Plaintiff has any basis for seeking sanctions.

The Court should thus sustain Defendants' objections to the discovery requests at issue, deny Plaintiff's motion to compel, and deny Plaintiff's motion for sanctions, along with such other and further relief to which Defendants are justly entitled.

Dated: October 22, 2021.

Respectfully submitted,

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on September 22, 2021.

Mark Bankston                                             *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

<u>      /s/ Bradley J. Reeves                    </u>
Bradley J. Reeves

# Ex. 1

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFEENDANT, ALEX JONES'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Pursuant to the Texas Rules of Civil Procedure, Defendant, Alex Jones ("Defendant"), hereby provides his supplemental objections and answers to the Second Set of Interrogatories propounded by Plaintiff, Neil Heslin ("Plaintiff"). Defendant reserves the right to supplement these objections and responses as necessary in accordance with the Texas Rules of Civil Procedure

Dated: October 21, 2021.

Respectfully submitted,

By: ___ */s/ Bradley J. Reeves* _____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 21, 2021.

Mark Bankston                                   *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                                    */s/ Bradley J. Reeves*
                                    Bradley J. Reeves

2

### DEFENDANT, ALEX JONES'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify by name and last known contact information of any individual who you chose to employ at Free Speech Systems between December 14, 2012 and July 1, 2021 with duties that involved writing, researching, editing, filming, hosting, or producing InfoWars media content and who is no longer employed by the company.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, unduly burdensome, and a fishing expedition, as Plaintiff has not identified any relevancy between his claims in this lawsuit and the information requested in this interrogatory. Defendant further objects to the harassing and burdensome nature of this interrogatory as it would encompass essentially every former employee of Free Speech Systems during that entire time period, very few of which would have any relevancy or connection to the claims at issue in this lawsuit. Defendant further objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this interrogatory as it assumes facts not in evidence with whether Defendant "chose to employ" any individual(s) at Free Speech Systems.

**ANSWER:**

Subject and without waiving the foregoing objections, Defendant does not have the requisite information and knowledge to respond to this interrogatory.

**INTERROGATORY NO. 2:** Identify by name and any known contact information of any individual not employed by Free Speech Systems, LLC with whom you have communicated about this lawsuit or the allegations in this lawsuit since April 16, 2018.

**OBJECTIONS:**

Defendant objects to this interrogatory as harassing and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent this interrogatory violates the attorney-client, work-product, and/or reporter's privilege. Defendant further objects to this interrogatory as unduly burdensome and seeking information not relevant to Plaintiff's claims in this lawsuit.

**RESPONSE:**

Subject to and without waiving the foregoing objections, while Defendant does not deny he has likely discussed the lawsuit and/or the allegations in this lawsuit since April 16, 2018 with individual(s) not employed by Free Speech Systems, Defendant does not currently have the requisite information and knowledge to identify any specific person(s) with whom he has had those discussions beyond Defendant discussing the lawsuit with his attorneys.

3

**INTERROGATORY NO. 3:** Identify the date and description of the circumstances for any occasions in which you have made public oral or written statements that were not published by Free Speech Systems, LLC concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, not narrowly tailored in scope of subject or time, and unduly burdensome. Defendant further objects to this interrogatory as an improper compound interrogatory in violation of the Texas Rules. Defendant also objects to the extent this interrogatory seeks information in violation of the attorney-client and/or work-product privileges. Defendant further objects to the extent this interrogatory seeks an impermissible narrative that cannot be adequately confined as an answer to an interrogatory. Defendant further objects to this interrogatory as vague in its reference to "not published by Free Speech Systems, LLC."

**ANSWER:**

Subject to and without waiving the foregoing objections, Defendant is unable to adequately respond to this interrogatory as phrased by Plaintiff and what Plaintiff means by statements "not published by Free Speech Systems, LLC" as opposed to Defendant's individual right to protected free speech. In addition, Defendant supplements his answer as follows:

Defendant was interviewed by Megyn Kelly to discuss Sandy Hook on or about June 16, 2017. Defendant also participated in an October 27, 2020 podcast with Joe Rogan on "The Joe Rogan Experience" where Sandy Hook was briefly mentioned by Mr. Rogan, but Defendant did not make any oral statements regarding the Sandy Hook tragedy in that podcast (rather, it was mentioned by Mr. Rogan). Defendant does not believe he has made any other public oral or written statements regarding Sandy Hook that occurred outside of his broadcasting with Infowars.

4

# Ex. 2

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFEENDANT, FREE SPEECH SYSTEMS, LLC'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Pursuant to the Texas Rules of Civil Procedure, Defendant, Free Speech Systems, LLC ("Defendant"), hereby provides its supplemental objections and answers to the Second Set of Interrogatories propounded by Plaintiff, Neil Heslin ("Plaintiff"). Defendant reserves the right to supplement these objections and responses as necessary in accordance with the Texas Rules of Civil Procedure

Dated: October 21, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 21, 2021.

Mark Bankston                                          *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                                        */s/ Bradley J. Reeves*
                                        Bradley J. Reeves

## DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** State the total number of viewers and/or listeners for the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," the June 25, 2017 episode of The Alex Jones Show from which the June 26th video was taken, and the July 20, 2017 episode of The Alex Jones Show in which the June 26th video was featured.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, unduly burdensome, and a fishing expedition, as Plaintiff has not identified any relevancy between his claims in this lawsuit and the listed video. Defendant also objects to this interrogatory as not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**

Subject and without waiving the foregoing objections, Defendant has no information responsive to this interrogatory as to total viewers and/or listeners who may have seen or heard the video(s) on third-party platforms. In addition, Defendant supplements its answer as follows:

At the time of the video/show(s) in question, Defendant was only utilizing a continuous running live stream on its website and did not (and does not) capture or save data on number of viewers/listeners for a particular show or segment of the live stream. The only site analytics Defendant has access to, at least to some extent, is analytics as to the number of page views for the page that had the live stream player. But since this does not capture data pertaining to number of viewers/listeners for a particular video or episode of The Alex Jones Show, Defendant does not have the information necessary to respond to Plaintiff's interrogatory.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

**INTERROGATORY NO. 2:** Identify every way in which the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly in Alex Jones Hit Piece," the June 25, 2017 episode of The Alex Jones Show, the July 20, 2017 episode of The Alex Jones Show, or any portions of the foregoing, were disseminated to the public, whether by radio, television, internet video, or any other publication or broadcast, whether by Free Speech Systems or by any other authorized entity or person.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, unduly burdensome, and a fishing expedition, particularly in light of the fact that its broadcasting, at least as of the dates referenced in Plaintiff's interrogatory, occurred simultaneously across several platforms. Defendant also objects to this interrogatory as vague in its use of the terms "any other authorized entity or person."

**ANSWER:**

Subject to and without waiving the foregoing objections, at the time referenced in Plaintiff's interrogatory, InfoWars-related broadcasts, posts, videos, etc., and in particular The Alex Jones Show, were simulcast across multiple platforms, including Twitter, Facebook, YouTube, and others, most of which are no longer available to FSS. As such, Defendant is currently unable to determine which of these platforms were actually utilized to simulcast the particular broadcasts referenced in Plaintiff's interrogatory. In addition, Defendant supplements its answer as follows:

Defendant has no radio distribution agreements or television/broadcasting agreements by which Defendant's content was distributed. Rather, Defendant has (and had) a blanket free-to-rebroadcast policy.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

**INTERROGATORY NO. 3:** Identify every individual at Free Speech Systems, LLC who was aware of the Zero Hedge blog post "Megyn Kelly Fails to Fact Check Sandy Hook Father's Contradictory Claim in the Alex Jones Hit Piece" prior to Owen Shroyer discussing that blog post on the Alex Jones Show.

**OBJECTIONS:**

Defendant objects to this interrogatory as vague in its use of the term "aware." Defendant further objects to this interrogatory as unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**

Subject to and without waiving the foregoing objections, Defendant has no information responsive to this interrogatory.

# Ex. 3

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFEENDANT, FREE SPEECH SYSTEMS, LLC'S, SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUESTS FOR PRODUCTION

Pursuant to the Texas Rules of Civil Procedure, Defendant, Free Speech Systems, LLC ("Defendant"), hereby provides its supplemental objections and responses to the Second Requests for Production propounded by Plaintiff, Neil Heslin ("Plaintiff"). Defendant reserves the right to supplement these objections and responses as necessary in accordance with the Texas Rules of Civil Procedure

Dated: October 21, 2021.

Respectfully submitted,

By:   */s/ Bradley J. Reeves*
     Bradley J. Reeves
     Texas Bar No. 24068266
     brad@brtx.law
     **REEVES LAW, PLLC**
     702 Rio Grande St., Suite 203
     Austin, TX 78701
     Telephone: (512) 827-2246
     Facsimile: (512) 318-2484

     **ATTORNEY FOR DEFENDANTS**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 21, 2021.

Mark Bankston                                    *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

*/s/ Bradley J. Reeves*
Bradley J. Reeves

2

**D**EFENDANT, **F**REE **S**PEECH **S**YSTEMS, LLC'**S**, **S**UPPLEMENTAL **O**BJECTIONS AND **R**ESPONSES
TO **P**LAINTIFF'**S** **S**ECOND **R**EQUESTS FOR **P**RODUCTION

**REQUEST FOR PRODUCTION NO. 1:**   All documents concerning Neil Heslin.

**OBJECTIONS:**

Defendant objects to this request as overly broad on its face because it is not sufficiently narrowed
in scope of time. Defendant also objects to this request to the extent it seeks documents that are
protected by the work-product and/or attorney-client privileges. Defendant further objects to this
request as vague in its use of the broad term "concerning." Subject to and without waiving the
foregoing objections,

**RESPONSE:**

Responsive documents have previously been produced to the extent such documents are in the
possession, custody, or control of Defendant. Defendant will further supplement its production, if
necessary, in accordance with the Texas Rules of Civil Procedure, expect to the extent such
documents are protected from production by the applicable privileges cited above.

**REQUEST FOR PRODUCTION NO. 2:**  All   financial   statements   between   2012-2018,
including but not limited to, profit and loss statements, general ledger, trial balance statements,
cash flow statements, and equity draws.

**OBJECTIONS:**

Defendant objects to this request as overly broad and unduly burdensome. Defendant further
objects to this request as it is not narrowly tailored to the underlying facts of this case and is merely
a fishing expedition. Defendant also objects to this request to the extent it seeks documents
regarding Defendant's net worth in violation of § 41.005 of the TEX. CIV. PRAC. & REM. CODE.
Defendant further objects to this request as not reasonably calculated to lead to the discovery of
admissible evidence. Defendant also objects to the extent this request seeks documents in violation
of the accountant-client privilege. Defendant also objects to this request as vague in its use of the
terms "financial statements."

**RESPONSE:**

Defendant believes such documents are not relevant to Plaintiff's claims and this request violates
§ 41.005 of the Texas Civil Practices and Remedies Code regarding net worth discovery.
Defendant will further supplement this response as necessary if the requisite Court order is entered
regarding the production of such documents and if a mutually agreeable protective and
confidentiality order is also entered by the Court.

**REQUEST FOR PRODUCTION NO. 3**: All master-level or overview reports created to summarize product sales performance from December 14, 2012 to the present day.

**OBJECTIONS:**

Defendant objects to this request as overly broad and unduly burdensome. Defendant further objects to this request as it is not narrowly tailored to the underlying facts of this case and is merely a fishing expedition. Defendant also objects to this request to the extent it seeks documents regarding Defendant's net worth in violation of § 41.005 of the TEX. CIV. PRAC. & REM. CODE. Defendant further objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to the extent this request seeks documents in violation of the accountant-client privilege. Defendant also objects to this request as vague in its use of the terms "master-level," "overview reports," and "product sales performance." Defendant further objects to the extent this request seeks documents pertaining to protected confidential trade secrets and financial information to which Plaintiff is not entitled absent a court order.

**RESPONSE:**

Defendant believes such documents are not relevant to Plaintiff's claims and this request violates § 41.005 of the Texas Civil Practices and Remedies Code regarding net worth discovery, along with this request impermissibly seeking protected trade secrets and financial information of Defendant. Defendant will further supplement this response as necessary if the requisite Court order is entered regarding the production of such documents and if a mutually agreeable protective and confidentiality order is also entered by the Court.

**REQUESTS FOR PRODUCTION NO. 4:** All documents you relied on in answering Plaintiff's Second Set of Interrogatories.

**OBJECTIONS:**

Defendant objects to this request as overly broad and unduly burdensome. Defendant further objects to this request as it is not narrowly tailored to the underlying facts of this case and is merely a fishing expedition. Defendant also objects to this request to the extent it seeks documents regarding Defendant's net worth in violation of § 41.005 of the TEX. CIV. PRAC. & REM. CODE. Defendant further objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this request as vague in its broad reference to the "videos in Plaintiffs' petition" without further specifying same in Plaintiff's request.

**RESPONSE:**

Subject to and without waiving the foregoing objections, responsive documents have been produced. Defendant will further supplement its production, if necessary, in accordance with the Texas Rules of Civil Procedure, expect to the extent such documents are protected from production by the applicable privileges cited above.

# Ex. 4

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFENDANT, OWEN SHROYER'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Pursuant to the Texas Rules of Civil Procedure, Defendant, Owen Shroyer ("Defendant"), hereby provides his supplemental objections and answers to the Second Set of Interrogatories propounded by Plaintiff, Neil Heslin ("Plaintiff"). Defendant reserves the right to further supplement these objections and responses as necessary in accordance with the Texas Rules of Civil Procedure

Dated: October 21, 2021.

Respectfully submitted,

By: ___ */s/ Bradley J. Reeves* _____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 21, 2021.

Mark Bankston                                    *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                              */s/ Bradley J. Reeves*
                              Bradley J. Reeves

### DEFENDANT, OWEN SHROYER'S, SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify by name and address every employer you have had since June 26, 2012 and every job title you have held during that period.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, unduly burdensome, and a fishing expedition, as Defendant's employment history has no bearing on the issues in this lawsuit. Defendant further objects to this interrogatory as not seeking information relevant to this lawsuit or Plaintiff's claims in any way.

**ANSWER:**

Subject and without waiving the foregoing objections, Defendant has been a free-lance reporter, podcaster, political activist, and commentator for a number of years. In addition, Defendant supplements his answer as follows:

- Writer and Sports Editor for University of Missouri St. Louis "The Current" from 2011 to 2012
- Producer, Editor, and Consultant for EG Radio Marketing from 2013 to 2015
- DJ and Emcee with Complete Weddings and Events from 2015 to the Present
- Youth Development counselor at YMCA St. Louis – Mid-County/Downtown from 2013 to the Present
- Public Address Announcer for Lindenwood University, Maryville University, and University of Missouri St. Louis from 2014 to 2015
- NHL Visiting Broadcast Engineer in St. Louis from 2015 to the Present
- CBS Sports Operations Runner with CBS Network Television from 2013 to the Present
- Play-by-Play Announcer, Host, and Producer with Prepcasts.com from 2012 to the Present
- Executive Producer, Producer, Host, Stand-In Host, Sports Correspondent, and Field Reporter with KFNS, KXFN, and St. Louis Sports Magazine from 2011 to the Present
- Reporter/Producer/Host/Stand-In Host/Correspondent/Field Reporter – Free Speech Systems, LLC d/b/a InfoWars from June 2016 to the Present

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

3

**INTERROGATORY NO. 2:** Identify every individual you communicated with on June 25, 2017 between the time you first saw the Zero Hedge blog post "Megyn Kelly Fails to Fact Check Sandy Hook Father's Contradictory Claim in Alex Jones Hit Piece" and the time you discussed that blog post on the Alex Jones Show.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad and unduly burdensome and not reasonable calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent this interrogatory seeks information that is private and otherwise has nothing to do with Plaintiff's claims in his lawsuit. Defendant further objects to this interrogatory as vague in it fails to specify any real period of time but only states "when you first saw" the blog post.

**ANSWER:**

Subject to and without waiving the foregoing objections, Defendant is unable to answer this interrogatory because Defendant cannot remember that time period with enough specificity to remember and list all individuals he may have communicated with during that vague period of time referenced in Plaintiff's interrogatory from when Defendant "first saw" the blog post and when it was discussed on the Alex Jones Show. Defendant otherwise has no recollection of any specific individual with whom he may have communicated regarding the blog post referenced in Plaintiff's interrogatory. Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure if and when additional information responsive to this interrogatory is learned/determined by Defendant.

**INTERROGATORY NO. 3:** Describe how and at what time you became aware of the Zero Hedge blog post "Megyn Kelly Fails to Fact Check Sandy Hook Father's Contradictory Claim in Alex Jones Hit Piece" on June 25, 2017.

**OBJECTIONS:**

Defendant objects to this interrogatory as vague in its use of the term "you became aware" without further explaining what level of "aware" Defendant would be required to have to actually know of the blog post's existence and contents of that blog post.

**ANSWER:**

Subject to and without waiving the foregoing objections, Defendant is unable to respond to this interrogatory and provide a specific time as to when Defendant "became aware" of this blog post.

In addition, Defendant supplements his answer as follows:

Defendant believes the blog post referenced by Plaintiff was provided to him by someone on the Free Speech Systems crew, but he has no specific memory of that occurring. Free Speech Systems has a "team" that is constantly printing news stories while Defendant (and others) are broadcasting

4

live as news is breaking. Defendant does remember that around the time referenced in Plaintiff's interrogatory, that Megyn Kelly had just came into town and visited the studio, so at that time, she was a topical subject to cover. But that is the best of Defendant's recollection, as he reviews hundreds of news stories a day, and thus it is difficult to remember any further specifics regarding the subject of this interrogatory.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure if and when more information responsive to this interrogatory becomes available to Defendant.

**INTERROGATORY NO. 4:** Identify by date any occasions in which you have made public oral or written statements concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits. If those statements were orally made on an InfoWars show, state the show and the episode title. If those statements were made on the InfoWars website, identify the title of the webpage and URL. If those statements were made elsewhere, describe the circumstances of the statements.

**OBJECTIONS:**

Defendant objects to this interrogatory as overly broad, not narrowly tailored in scope of subject or time, and unduly burdensome. Defendant further objects to this interrogatory as an improper compound interrogatory in violation of the Texas Rules. Defendant also objects to the extent this interrogatory seeks information in violation of the attorney-client and/or work-product privileges. Defendant further objects to the extent this interrogatory seeks an impermissible narrative that cannot be adequately confined as an answer to an interrogatory.

**ANSWER:**

Subject to and without waiving the foregoing objections, Plaintiff is seeking to have Defendant go through years of his comments, appearances, political activism, posts, and the like for at last the last almost nine (9) years—which occur on a regular and almost daily basis—from the time when the Sandy Hook shooting occurred (December 14, 2012) to the present—when Defendant is a reporter, host, and activist who makes a living off of providing news-worthy content to the public. Defendant is simply unable to state with any specificity the "occasions" on which Defendant has made any comments or statements of any sort which Plaintiff would somehow deem responsive to this interrogatory. As such, Defendant at this time does not have the requisite information to respond to this interrogatory as currently phrased by Plaintiff and it would force Defendant an undue hardship and burden to have to do so without further clarification and appropriate boundaries on this interrogatory from Plaintiff.

In addition, Defendant supplements his answer as follows:

To the best of Defendant's recollection, he does not believe he has made any public oral or written statements concerning the Sandy Hook tragedy, relatives of the victims, the lawsuits brought by the victims, or the allegations in those lawsuits, beyond the singular discussion/commentary

provided by Defendant on or about June 25, 2017 disputing the mainstream media's coverage of Plaintiff's account of the Sandy Hook incident. The events at issue occurred long before Defendant became a reporter broadcasting with Infowars, and beyond the aforementioned commentary, Defendant does not believe he has provided any other coverage or commentary regarding any aspect of Sandy Hook.

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## **VERIFICATION**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this day, Owen Shroyer, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he has read Defendant, Owen Shroyer's, Supplemental Objections and Answers to Plaintiff's Second Set of Interrogatories, and that the Answers are within his personal knowledge and are true and correct to the best of his knowledge.

By: _____
Owen Shroyer

SUBSCRIBED AND SWORN TO BEFORE ME on this the 21st day of October, 2021.

_____
NOTARY PUBLIC, STATE OF TEXAS

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

# Ex. 5

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## DEFENDANT, OWEN SHROYER'S, SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUESTS FOR PRODUCTION

Pursuant to the Texas Rules of Civil Procedure, Defendant, Owen Shroyer ("Defendant"), hereby provides his supplemental objections and responses to the Second Requests for Production propounded by Plaintiff, Neil Heslin ("Plaintiff"). Defendant reserves the right to supplement these objections and responses as necessary in accordance with the Texas Rules of Civil Procedure

Dated: October 21, 2021.

Respectfully submitted,

By: ___ */s/ Bradley J. Reeves* ___
      Bradley J. Reeves
      Texas Bar No. 24068266
      brad@brtx.law
      **REEVES LAW, PLLC**
      702 Rio Grande St., Suite 203
      Austin, TX 78701
      Telephone: (512) 827-2246
      Facsimile: (512) 318-2484

      **ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 21, 2021.

Mark Bankston                                     *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

        */s/ Bradley J. Reeves*
        Bradley J. Reeves

**D**EFENDANT, **O**WEN **S**HROYER'S, **S**UPPLEMENTAL **O**BJECTIONS AND **R**ESPONSES TO
**P**LAINTIFF'S **S**ECOND **R**EQUESTS FOR **P**RODUCTION

**REQUEST FOR PRODUCTION NO. 1:**  All communications you sent or received concerning the Sandy Hook shooting, any relatives of the victims, any lawsuits brought by relatives of the victims, or the allegations in those lawsuits since the start of your employment at Free Speech Systems, LLC.

**OBJECTIONS:**

Defendant objects to this request as overly broad on its face because it is not sufficiently narrowed in scope of time. Defendant also objects to this request to the extent it seeks documents that are protected by the work-product and/or attorney-client privileges. Defendant further objects to this request as vague in its use of the broad term "concerning." Defendant also objects to this request as it assumes facts not in evidence as to whether Defendant was or has ever been employed by Free Speech Systems, LLC. Defendant further objects to the extent this request seeks to have Defendant prematurely marshal all evidence and documents in his defense in this case. Subject to and without waiving the foregoing objections,

**RESPONSE:**

None.

**REQUEST FOR PRODUCTION NO. 2:**  All communications you sent or received concerning a "false flag" since the start of your employment at Free Speech Systems, LLC.

**OBJECTIONS:**

Defendant objects to this request as overly broad and unduly burdensome. Defendant further objects to this request as it is not narrowly tailored to the underlying facts of this case and is merely a fishing expedition. Defendant further objects to this request as not sufficiently tailored in scope of time or subject matter in that it seeks documents that have nothing to do with the underlying Sandy Hook tragedy at issue in this case. Defendant also objects to this request as it assumes facts not in evidence as to whether Defendant was or has ever been employed by Free Speech Systems, LLC. Defendant further objects to this request to the extent it seeks documents in violation of the attorney-client and/or work-product privileges. Subject to and without waiving the foregoing objections,

**RESPONSE:**

None.

3

# Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58451427
Status as of 10/26/2021 5:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/22/2021 12:02:50 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/22/2021 12:02:50 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/22/2021 12:02:50 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 12:02:50 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | 261st JUDICIAL DISTRICT |
| *Defendants,* | § | |

## [PROPOSED] ORDER ON PLAINTIFF'S
## MOTION FOR TO COMPEL RESPONSES TO SECOND SET OF DISCOVERY
## REQUESTS AND MOTION FOR SANCTIONS

On the 25th day of October, 2021, came to be heard Plaintiff's Motion to Compel Responses to Second Set of Discovery and Motion for Sanctions. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that Defendants' objections to the discovery requests at issue should be SUSTAINED and further DENIES Plaintiff's motion to compel and motion for sanctions in its entirety. It is therefore:

ORDERED that Defendants' objections to Interrogatory No. 1 to Alex Jones; Interrogatory No. 2 to Alex Jones; Interrogatory No. 3 to Alex Jones; Interrogatory No. 1 to Free Speech Systems, LLC; Interrogatory No. 2 to Free Speech Systems, LLC; Interrogatory No. 3 to Free Speech Systems, LLC; Request for Production No. 3 to Free Speech Systems, LLC; Request for Production No. 4 to Free Speech Systems, LLC; Interrogatory No. 1 to Owen Shroyer; Interrogatory No. 4 to Owen Shroyer; and Request for Production No.1 to Owen Shroyer of Plaintiff's Second Set of Discovery Requests to Defendants are hereby SUSTAINED. It is further:

ORDERED that Plaintiff's motion to compel and motion for sanctions is hereby DENIED

in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ____*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:       (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58451427
Status as of 10/26/2021 5:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/22/2021 12:02:50 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/22/2021 12:02:50 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/22/2021 12:02:50 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 12:02:50 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/22/2021 12:02:50 PM | SENT |

10/22/2021 3:40 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Jessica A. Limon

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO CONSOLIDATE**

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants"), file this response to Plaintiffs' Motion to Consolidate, and would show unto the Court as follows:

**SUMMARY OF RESPONSE**

The Court should deny Plaintiffs' motion to consolidate these cases. The Court should decline to consolidate these matters, because doing so would undoubtedly compromise Defendants' rights to a fair trial, cause extreme prejudice to Defendants, and almost certainly create a significant risk that an unfair outcome against Defendants would occur because of prejudice. *See In re Gulf Coast Bus. Dev. Corp.,* 247 S.W.3d 787, 794-95 (Tex. App.—Dallas 2008, orig. proceeding); *see also* TEX. R. CIV. P. 174. Plaintiff's motion to consolidate basically confirms that such prejudice is inevitable. Despite Plaintiffs' asserting claims with either 1 or 2-year statutes of limitations (defamation versus intentional infliction of emotional distress), Plaintiffs' motion telegraphs that they believe they are entitled to parade "the entire five years of InfoWars' recklessly false statements" in front of a single jury, pulling at heartstrings in the hopes of landing a massive exemplary-damages verdict. *See* Mtn. at 2.

The intense nature of the Plaintiffs' claims against Defendants clearly demonstrate that consolidation would result in a manifest injustice against Defendants and violate their right to a fair trial. Moreover, certain Plaintiffs' claims, particularly the IIED claims, require proof of specific intent to inflict emotional distress on a particular Plaintiff, not general claims that statements were made regarding a group that constitute IIED as to individuals in that group. Even if commonality of certain facts in these various cases points to consolidation being convenient, those convenience factors are substantially outweighed by the risk of an unfair outcome against Defendants because of the extreme prejudice Defendants would face, particularly in the context of the claims in this lawsuit. Thus, the Court should decline to consolidate these cases and deny

2

Plaintiff's motion to consolidate.

## LEGAL STANDARD

Consolidation of cases is governed by Rule 174 of the Texas Rules of Civil Procedure, which provides:

> (a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

TEX. R. CIV. P. 174(a). Although TEX. R. CIV. P. 174 gives the trial court broad discretion to consolidate cases, the trial court's discretion is not unlimited. *In re Shell Oil Co.,* 202 S.W.3d 286, 290 (Tex. App.—Beaumont 2006, no pet.) (orig. proceeding) (citing *Womack v. Berry,* 291 S.W.2d 677, 683 (Tex. 1956)). As stated by the Texas Supreme Court in *Womack:*

> The express purpose of the rule is to further convenience and avoid prejudice, and thus promote the ends of justice. When all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, and there is no fact or circumstances supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby, there is no room for the exercise of discretion.

*Womack,* 291 S.W.2d at 683. Courts must balance the judicial economy and convenience that may be gained by consolidation against the possibility that consolidation may cause delay, prejudice, or jury confusion. *In re Shell Oil Co.,* 202 S.W.3d at 290 (citing *Dai-Briar Corp. v. Baskette,* 833 S.WW.2d 612, 615 (Tex. App.—El Paso 1992, no writ)). "If the convenience factors are substantially outweighed by the risk of an unfair outcome because of prejudice or confusion, then the trial court abuses its discretion in granting consolidation." *Id.* at 616. The dominant consideration is whether the trial will be fair and impartial to all parties. *In re Ethyl Corp.,* 975 S.W.2d 600, 614-15 (Tex. 1998). If consolidation will prejudice the complaining party, the trial

court should not consolidate. *Gulf Coast,* 247 S.W.3d at 794-95. These lawsuits are the precise
type of "extraordinary" cases that should preclude consolidation due to the extreme risk of
prejudice to Defendants. Moreover, these cases do not truly involve the same "transactions" and
consolidation would also lead to juror confusion as it pertains to damages of these individual
plaintiffs. As such, the Court should deny Plaintiffs' motion to consolidate.

## ARGUMENT AND AUTHORITIES

### 1)      The Claims Do Not Relate to the Same Transaction.

Plaintiff's motion fails to provide any actual evidence to support its conclusory contention
that the Plaintiffs' claims relate to the same transaction. The only "support" for this argument is
Plaintiffs' bald assertion that "the five years of InfoWars' conduct is admissible in each case for
the purposes of assessing punitive damages" and the unsupported contention that "the expert
testimony offered for each claim will be largely duplicative." *See* Mtn. at 3. It should be noted that
Plaintiffs incorrectly presume they are entitled to seek and obtain exemplary damages due to the
current liability default-judgment orders from the Court. Yet, Plaintiffs are not actually entitled to
seek exemplary damages, even with the Court's default judgment rulings. While Plaintiffs have
asserted defamation and IIED claims, the *gravamen* of their claims is for defamation—meaning
the IIED claims should be dismissed because IIED is merely a "gap filler" when no other remedy
is available. *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005) (Holding that
"intentional infliction of emotional distress is a 'gap filler' tort never meant to supplant or duplicate
existing statutory or common-law remedies.").

Plaintiffs' pleadings clearly demonstrate that the IIED claims are dependent upon the
allegedly defamatory statements and conduct of Defendants. In other words, the "extreme and
outrageous conduct [Defendants] are alleged to have engaged in is making allegedly defamatory

4

statements about Plaintiffs. *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex.

App.—Houston [14th Dist.] May 5, 2020, no pet.). Here, because Plaintiffs' IIED claims depend

on the allegedly defamatory statements of Defendants, Plaintiffs have another remedy, and thus

the IIED claims are not available to them. This is important because since the only real claims

Plaintiffs have are for defamation, whether they are entitled to seek exemplary damages is

governed by the Texas Defamation Mitigation Act ("TDMA"). *See* TEX. CIV. PRAC. & REM. CODE

§73.051. Under the TDMA, if a person asserting a claim for defamation does not submit a request

to the Defendant(s) for a correction, clarification, or retraction within ninety (90) days of the

publication of the alleged defamatory statements, then the person "may not recover exemplary

damages." *Id.* at § 73.055(c).

In this case, none of these Plaintiffs ever issued a request to any of the Defendants for a

correction, clarification, or retraction within the requisite time period provided under the law. As

a result, Plaintiffs are not entitled to seek exemplary damages, and thus there is no commonality

of damages between the Plaintiffs, since they must each prove their own individual, unique actual

damages. Therefore, consolidation of these cases into a singular trial should not occur because

each Plaintiff's alleged damages and the source of those alleged damages is distinct from the other

Plaintiffs. In fact, the only commonality pointed to by Plaintiffs as a basis for consolidation is that

the alleged "five years of Infowars' conduct is admissible in each case for the purpose of assessing

punitive damages,"[1] so absent any ability to recover exemplary damages (due to preclusion under

the TDMA), there is insufficient commonality as to each Plaintiff's alleged damages to support

consolidation.

---

[1] It should be noted that Plaintiffs are in no way entitled to present evidence of alleged conduct that occurred outside of the applicable limitations periods—1 year for defamation, and 2 years for IIED. But what is clear is that Plaintiffs and their counsel fully intend on doing so purely for the purpose of inflaming a jury and prejudicing Defendants to such an extent that Defendants would not receive a fair trial.

As the movants seeking consolidation, Plaintiffs have the evidentiary burden to establish commonality of law or facts sufficient to support consolidation. Yet Plaintiffs have provided no actual evidence of commonality beyond mere conclusory statements in their motion which certainly does not constitute evidence under Texas law. Because there is insufficient commonality between the Plaintiff's claims, and more specifically commonality as to the actual damages allegedly incurred by each Plaintiff, consolidation is simply not supported such that the Court should deny Plaintiffs' motion.

2)      **Defendants would and will suffer extreme prejudice and manifest injustice to such an extent that Defendants would not receive a fair trial if these matters are consolidated.**

While it may be more convenient to try these cases together, the extreme risk of prejudice to Defendants should preclude the Court consolidating these matters for trial. "In deciding whether to consolidate, the trial court must balance the judicial economy and convenience that may be gained by consolidation against the risk of an unfair outcome because of prejudice or jury confusion." *Owens-Corning Fiberglas Corp. v. Martin,* 942 S.W.2d 712, 716 (Tex. App.—Dallas 1997, no writ). Plaintiffs laughably contend that there is only a "trivial risk of prejudice" to Defendants if consolidation were to occur, when Plaintiffs and their counsel know all too well that the chances of Plaintiffs obtaining a significant damages verdict would be significantly increased if these matters were consolidated, since it would not force the Plaintiffs to approach their claims and damages individually, but rather would allow them to paint with broad strokes and blend the experiences of each Plaintiff together to inflame and anger the jury to the extreme prejudice of Defendants.

Here, any convenience factors for consolidation are substantially outweighed by the risk of an unfair outcome because of prejudice or confusion. *In re Levi Strauss Co.,* 959 S.W.3d 700, 702 (Tex. App.—El Paso 1998, no writ). Consolidation of these matters would be improper

because the individual Plaintiffs each allege they were harmed by different acts of Defendants—they do not all allege to have been injured by a single act of the Defendants. *Id.* at 703. In addition, because of the varying claims between the Plaintiffs and their distinct alleged damages, prejudice in the form of potential jury confusion is also extremely likely. *Id.; see also Dal-Briar,* 833 S.W.2d 612.

More importantly, if the Court allows consolidation of these cases, that will allow the jury to "impermissibly 'bootstrap' the evidence from one case into the other, thereby causing confusion and prejudice to [Defendants]." *Id.* Thus, this Court should find that the potential benefits of consolidation do not outweigh the potential prejudice to Defendants, and therefore deny Plaintiffs' motion to consolidate.

Finally, the fact that the undersigned suggested consolidation for discovery purposes in no way equates to consolidation for trial being the appropriate course of action. Time and time again throughout this case, Plaintiffs' counsel has consistently used totally unrelated comments by counsel to mislead the Court and to justify whatever goal Plaintiffs' counsel has at that time. A review of the email attached as an exhibit to Plaintiffs' motion—the only "evidence" provided by Plaintiffs in support of their motion to consolidate—clearly shows that only discovery inefficiencies were being discussed. There is not one mention of the cases being consolidated for all purposes, including trial. And the logic and benefits that would have been gained has Plaintiffs agreed to consolidate discovery are obvious. But the Court should not allow Plaintiffs—who were opposed to consolidation of discovery and used that to their advantage to obtain default-judgment rulings—to now completely reverse their position to consolidate these matters for trial.

All in all, the tremendous risk of prejudice and manifest injustice to Defendants, and the high likelihood that Defendants would not receive a fair trial in violation of their rights. If this

Court were to consolidate these matters, Defendants would face an imminent loss of substantial rights that could not be cured by ordinary appellate remedies. Instead, the jury will simply return a verdict upon each claim, and whether jurors reached any individual verdict because of evidence admitted as relevant to another case; or whether jurors believed that because four plaintiffs alleged the same wrongs, there must be some misdeeds by Defendants based upon sheer numbers; or whether the jury simply hesitated to return a verdict for one plaintiff without finding for all four, will never be ascertainable. Thus, the possibility of obtaining meaningful appellate review on the propriety of consolidation would be negligible and almost uncurable. *See* Dal-Briar, 833 S.W.2d at 617.

An unbiased review of the balance of judicial economy and convenience gained by consolidation against the possibility of delay, prejudice, or jury confusion caused by consolidation in this situation unequivocally demonstrates that the convenience factors are substantially outweighed by the risk of an unfair outcome because of prejudice or confusion. *Id.* at 616. Consolidation would almost certainly lead to the trial being patently unfair to Defendants and entirely partial to Plaintiffs. Because the consideration of whether the resultant trial will be fair and impartial to all parties is the "dominant consideration in consolidation, the only appropriate outcome of this motion is for the Court to deny Plaintiffs' motion to consolidate. *In re Ethyl Corp.,* 975 S.W.2d at 614-15.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to conduct the appropriate balancing analysis and recognize that there is truly no discretion here—the Court must deny Plaintiffs' motion to consolidate these three (3) separate lawsuits to avoid the substantial prejudice and manifest injustice Defendants will face if consolidation is granted. As such,

Defendants pray the Court deny Plaintiffs' motion to consolidate these cases for trial, along with
such other and further relief to which Defendants may be justly entitled.

Dated: October 22, 2021.

Respectfully submitted,

By:    */s/ Bradley J. Reeves*              _
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 22, 2021.

Mark Bankston                                      *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

　　　　　　　　　　　　　　　　　*/s/ Bradley J. Reeves*
　　　　　　　　　　　　　　　　　Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58466743
Status as of 10/26/2021 8:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/22/2021 3:40:38 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/22/2021 3:40:38 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/22/2021 3:40:38 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 3:40:38 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants*, | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

## **[PROPOSED] ORDER ON PLAINTIFFS' MOTION TO CONSOLIDATE**

On the 25th day of October, 2021, came to be heard Plaintiffs' Motion to Consolidate. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that the risk of an unfair outcome because of prejudice or confusion substantially outweighs the convenience factors of consolidating these cases. As such, the Court hereby DENIES Plaintiffs' Motion to Consolidate. It is therefore:

ORDERED that Plaintiffs' Motion to Consolidate is hereby DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.


_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:       (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58466743
Status as of 10/26/2021 8:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/22/2021 3:40:38 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/22/2021 3:40:38 PM | SENT |
| William Ogden | | bill@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/22/2021 3:40:38 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 3:40:38 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/22/2021 3:40:38 PM | SENT |

10/25/2021 9:22 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO CONDUCT NET WORTH DISCOVERY**

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants"), file this response to Plaintiffs' Motion for Leave to Conduct Net Worth Discovery, and would show unto the Court as follows:

R<span style="font-variant:small-caps">ESPONSE</span>

Plaintiffs' motion for net-worth discovery should be denied as they have not shown themselves to be entitled to exemplary damages as required by Texas law. For a party to be entitled to net-worth discovery, they must demonstrate a substantial likelihood of success on the merits of a claim for exemplary damages. *See* T<span style="font-variant:small-caps">EX. CIV. PRAC. & REM. CODE</span> §41.0115. Despite Plaintiffs' contentions to the contrary, the fundamental legal issue of whether Plaintiffs' claims for intentional infliction of emotional distress ("IIED") are viable in the face of their defamation claims for the same alleged actions should preclude this Court from ordering net-worth discovery. The *gravamen* of Plaintiffs' claims is indeed for defamation, meaning that their IIED claims should be dismissed because IIED is merely a "gap filler" when no other remedy is available. *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005). Plaintiffs' pleadings clearly demonstrate that the IIED claims are dependent upon allegedly defamatory statements and conduct of Defendants. In other words, the "extreme and outrageous conduct [Defendants] are alleged to have engaged in is making allegedly defamatory statements about Plaintiffs." *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.).

Here, because Plaintiffs' IIED claims depend on the allegedly defamatory statements of Defendants, Plaintiffs have another remedy, and thus these IIED claims should not be available to them. This is important, particularly in the context of the instant motion, because since the only truly viable claims are for defamation, whether Plaintiffs are entitled to seek exemplary damages is governed by the Texas Defense Mitigation Act ("TDMA"). *See* T<span style="font-variant:small-caps">EX. CIV. PRAC. & REM. CODE</span> §73.051. Under the TDMA, if a person asserting a claim for defamation does not submit a request

2

to the Defendant(s) for a correction, clarification, or retraction within ninety (90) days of the publication of the alleged defamatory statements, then the person "may not recover exemplary damages." *Id.* at §73.055(c). In these cases, none of the Plaintiffs ever issued a request to any of the Defendants for a correction, clarification, or retraction within the requisite time period provided under the law. As such, Plaintiffs are not entitled to seek exemplary damages pursuant to the TDMA, and consequently are not entitled to conduct net-worth discovery.

Alternatively, even if the Court does find that Plaintiffs have met their burden of demonstrating a "substantial likelihood" of success on their claim for exemplary damages, the scope of the discovery Plaintiffs have requested is far too broad. For example, Plaintiffs have requested the Court order discovery for: (1) a list of all assets transferred in any manner since April 16, 2018; (2) any balance sheets or financial statements reflecting [Defendants'] net worth since April 16, 2018; (3) production of any federal or state tax returns with W-2 statements in the last five years; and (4) the vague permission for Plaintiffs "to inquire about Defendants' net worth at any future depositions." for protection is possibly one of the most bizarre motions the undersigned has seen in his legal career. All of these requests go far beyond what is allowable under Texas law. Under Texas law, with respect to net-worth discovery, generally only "financial documents pertaining to current net worth are relevant." *In re Jacobs,* 300 S.W.3d 35, 44-45 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding) (concluding trial court abused its discretion by ordering relators to produce two years of net-worth information beyond relators' current net worth); *see also In re House of Yahweh,* 266 S.W.3d 688, 673 (Tex. App.—Eastland 2008, orig. proceeding) (holding trial court erred in failing to limit discovery to relators' current balance sheets because earlier balance sheets would not be relevant to relators' current net worth). More to the point, a court "should not allow discovery of tax returns" if there are other adequate methods to

3

ascertain net worth. *In re Brewer Leasing, Inc.,* 255 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding); *see also In re Garth,* 214 S.W.3d 190, 194 (Tex. App.—Beaumont 2007, orig. proceeding) (trial court abuses its discretion by requiring production of tax returns when trial court's order also requires production of financial statements regarding net worth of party because tax returns are typically of little value in showing net worth since they only show assets); *see also Marcesca v. Marks,* 362 S.W.2d 299, 301 (Tex. 1962) (orig. proceeding) ("It is self-evident that the maximum protection of privacy is unattainable if trial courts [do] not exercise their discretion to safeguard from discovery those portions of income tax returns which are irrelevant and immaterial, and it is our view that failure to exercise such discretion is arbitrary action.").

A court must "scrupulously examine discovery requests for income tax returns to balance privacy rights and the pursuit of justice." *In re Vaughan,* No 13-18-00541-CV, 2019 WL 962381, at *7 (Tex. App.—Corpus Christi Feb. 27, 2019, orig. proceeding). "[T]rial courts should not allow discovery of private financial records, such as tax returns, when there are other adequate methods to ascertain" the information sought from those returns." *In re Vaughan,* 2019 WL 962381 at *5. As a result, the party seeking tax returns must show that the information "cannot be discovered through other, less-intrusive means than the income tax returns." *Id.* (citing *In re Beeson,* 378 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding)). This is because "[f]ederal income tax returns are not material if the same information can be obtained from another source." *In re Sullivan,* 214 S.W.3d 622, 624-25 (Tex. App.—Austin 2006, orig. proceeding).

Here, Plaintiffs' requests for net-worth discovery go well beyond that allowed by law. They do not seek information for Defendants' current net worth, but also seek financial information and tax returns dating back to as far as 2016. Plaintiffs are simply not entitled to this overly broad

scope of net-worth discovery, particularly regarding Defendants' tax returns. There are certainly

ample ways for Plaintiffs to obtain this same information as to Defendants' current net worth

without the need for these private tax returns being produced in discovery, and Plaintiffs have

failed to carry their extreme burden demonstrating their entitlement to these tax returns.

**P<span>RAYER</span>**

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to deny Plaintiffs'

motion for leave to conduct net-worth discovery, or in the alternative to significantly limit the

scope of such net-worth discovery, along with such other and further relief to which Defendants

may be justly entitled.

Dated: October 25, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____ _
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**R<span>EEVES</span> L<span>AW</span>, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**A<span>TTORNEY FOR</span> D<span>EFENDANTS</span>**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 25, 2021.

Mark Bankston                                              *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

    */s/ Bradley J. Reeves*
    Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485385
Status as of 10/27/2021 2:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:22:17 AM | SENT |
| William Ogden | | bill@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:22:17 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants*, | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON PLAINTIFF'S
MOTION FOR LEAVE TO CONDUCT NET-WORTH DISCOVERY**

On the 25th day of October, 2021, came to be heard Plaintiff's Motion for Leave to conduct

Net-Worth Discovery. The Court, having considered the Motion, Defendants' response thereto,

along with the arguments of counsel, finds that Plaintiffs have not carried their burden and as such

DENY Plaintiffs' motion. It is therefore:

ORDERED that Plaintiffs' Motion for Leave to Conduct Net Worth Discovery is hereby

DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:      (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485385
Status as of 10/27/2021 2:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:22:17 AM | SENT |
| William Ogden | | bill@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:22:17 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

10/25/2021 9:22 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFFS'
## MOTION FOR PROTECTION REGARDING MARC RANDAZZA

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants"), file this response to Plaintiffs' Motion for Protection Regarding Marc
Randazza, and would show unto the Court as follows:

## RESPONSE

Plaintiffs' motion for protection is possibly one of the most bizarre motions the
undersigned has seen in his legal career. Despite there being absolutely no reason for this motion
to have been filed, Plaintiffs' counsel felt compelled to do so in furtherance of his bizarre vendetta
against Mr. Randazza. For the (brief) reasons set forth herein, the Court should deny Plaintiffs'
motion for protection, and Defendants request the Court strongly consider whether Plaintiffs'
counsel should be sanctioned for this frivolous, intentionally misleading, motion that serves no
legitimate purpose and is simply a waste of the Court's time.

Plaintiffs' motion is nonsensical and intentionally makes statements Plaintiffs' counsel
knows are false. This is just another in a series of pot-shots Plaintiffs' counsel has taken at Mr.
Randazza. It is bad enough that the Court denied Mr. Randazza's *pro hac vice* admission in these
cases based on some of these same dishonest accusations set forth in Plaintiffs' instant motion.
Now, without any objective threat of any conduct warranting their request, Plaintiffs and their
counsel want to essentially wall off Mr. Randazza from any involvement in these cases, even in a
consulting-type capacity, even though there is truly no legitimate basis for Plaintiffs to have any
concerns. The Court should deny Plaintiffs' motion.

First, Mr. Randazza did not violate any court orders in the *Lafferty* matter regarding
confidential settlement documents. As Plaintiffs' own exhibits to their motion demonstrate, Mr.
Randazza was sent a copy of certain settlement documents by an outside party completely
unsolicited. Mr. Randazza then hired ethics counsel to ensure that no ethical violations occurred,
and even when that counsel determined disclosure was not necessary—since the documents would

not be used in the case based on that court's prior order—Mr. Randazza still made the decision to inform the Court of what had occurred in the interest of full disclosure and to ensure his actions were completely above board. In fact, a federal court considering these very same allegations found that these settlement documents were received "unsolicited" and that "the Connecticut Superior did not sanction either Mr. Randazza or his firm in response to this disclosure." *See* Ex. 1, Order in *Logan Cheng v. Wengui Guo*, 20 Civ. 5678, in the United States District Court for the Southern District of New York, dated October 5, 2021. Of course, Plaintiffs' motion does not reference or include any order from the *Lafferty* court finding any violation of court orders in that case. Plaintiffs' sensationalist language implying anything to the contrary is nothing more than a misleading attempt to further bias and prejudice the Court against Defendants and their counsel.

Plaintiffs' accusation that Mr. Randazza or anyone in his office violated a protective order in *Lafferty* is equally erroneous. Plaintiffs' motion claims that Jay Wolman, an attorney with Mr. Randazza's office who is one of the counsel involved in the *Lafferty* matters, violated a protective order by filing a motion referencing deposition testimony that had just been designated as "Confidential-Attorneys Eyes Only." Yet, that is completely incorrect. Mr. Wolman, nor anyone else in Mr. Randazza's office, had anything to do with the filing of the motion complained of by Plaintiffs. That motion was filed by local counsel without the knowledge of Mr. Wolman or Mr. Randazza. Plaintiffs' claim that Mr. Randazza's office had anything to do with this alleged violation of a protective order is simply false, and regardless, this shows no meritorious basis for Plaintiffs in this case to need any sort of protection from Mr. Randazza personally.

Plaintiffs also intentionally mislead the Court in their claim that Mr. Randazza has "previously trafficked in wrongfully obtained confidential information." Just as they falsely claimed in response to Mr. Randazza's *pro hac vice* motion that was incorrectly denied by this

3

Court, Plaintiffs rely solely upon an arbitration award that has never been confirmed and is a legal nullity that should be given no weight by this Court. It should be noted that this same arbitration that Plaintiffs rely upon was vacated by a federal court. Moreover, Plaintiffs' own exhibits demonstrate Mr. Randazza used information he properly obtained as part of his duty to represent his clients and that he committed no misconduct. The information Plaintiffs' point to was obtained from a third party by James Grady, the person who told Mr. Randazza about this information. Grady did not disclose or suggest there was anything improper about how the information was obtained. The emails also clearly demonstrate that Mr. Randazza told Grady there would be no issues in using this information so long as it had been obtained legitimately, but that there would be problems if, for example, a hacker had obtained it. One must keep in mind that this was an email thread where Mr. Randazza planned on presenting Grady as a witness in that litigation regarding this information, where Grady was expected to testify as to his source of this information. It would have been an extremely poor maneuver for Mr. Randazza to voluntarily place a witness on the stand if he truly had any concern that the material in question was illegally obtained.

Finally, Plaintiffs again put forth falsehoods with their claim that Mr. Randazza has "already intimidated a witness in this case." Plaintiffs refer to perjurious allegations made by a pro se plaintiff and a third party who was committing the unlicensed practice of law by acting as legal counsel for Mike Postle—an accused card cheat being sued for millions for improperly obtained gambling winnings through his cheating— in *Postle v. Brill*, Case No. 34-2020-00286265 (Sacramento Cty. CA Sup. Ct.). Alexandrea Merrell of the HONR Network was lying, as Mr. Randazza did not call her a sexist slur during a call with Postle in which Merrell was impermissibly acting as legal counsel despite not having a law license. *See* Declaration of Cassidy S. Curran in

4

Postle v. Brill ["Curran Brill Decl."], attached as Exhibit 14 to the Reply to Response to Mr.
Randazza's *Pro Hac Vice* motion. In that case, a disgruntled litigant was facing a large attorneys'
fees award because of Randazza's effective advocacy. To try and discredit his fee application,
Merrell and Postle lied to the court about Mr. Randazza's statements. It is also worth noting that
Merrell works for one of the Plaintiffs in this case—Leonard Pozner. She committed the unlicensed
practice of law, to interfere in a case that Mr. Randazza was working on, and then committed
perjury—this is Plaintiffs' counsel's "source" to support their meritless motion.

Importantly, this precise situation and the allegations at issue in Plaintiffs' motion have
already been reviewed by certain federal courts and ultimately been rejected. Soon after this Court
denied Mr. Randazza's *pro hac vice* admission without reason, Plaintiffs' counsel—either on his
own violition or at the behest of at least one of his clients, Mr. Pozner—began parading around
the country and inserting themselves into any other case where Mr. Randazza had been granted
admission *pro hac vice*. They succeeded in convincing certain opposing parties to move to revoke
Mr. Randazza's *pro hac vice* admission based on the same lies they have stated in the instant
motion. Yet, thankfully, the federal court in those matters saw through the façade of these
allegations, and while the Court admonished Mr. Randazza's tone and language in some of his
correspondence, the Court correctly found that the "unadjudicated charge of witness intimidation
[is not] a basis for sanctioning Mr. Randazza," and it reached the "same conclusion with respect
to other allegations levied against Mr. Randazza in the Texas proceeding." *See* Ex. 1.

Plaintiffs' motion should be denied. The Court has already relied upon these same
allegations and lies to deny Mr. Randazza's *pro hac vice* admission in these cases. But it should
not allow Plaintiffs to pre-emptively wall off Mr. Randazza—who is indeed counsel for the
Defendants regardless of whether he is admitted *pro hac vice* in this Court—on the basis of pure

speculation and conjecture. There is simply no good cause for the relief Plaintiffs have requested.

<u>**PRAYER**</u>

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to deny Plaintiffs'

motion for protection regarding Marc Randazza, along with such other and further relief to which

Defendants may be justly entitled.

Dated: October 25, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 25, 2021.

Mark Bankston                                        *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

    */s/ Bradley J. Reeves*
Bradley J. Reeves

**Ex. 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOGAN CHENG, | |
| Plaintiff, | 20 Civ. 5678 (KPF) |
| -v.- | **ORDER** |
| WENGUI GUO, | |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

The Court is in receipt of the parties' submissions regarding Mr. Randazza's *pro hac vice* admission for this case. (Dkt. #66-71). Defendant Wengui Guo now requests that the Court revoke Mr. Randazza's admission. (*See* Dkt. #68, 70). This Court received a similar application in another matter in which Mr. Randazza was admitted *pro hac vice*, wherein it concluded that Mr. Randazza had not been unforthcoming with his disclosures in his application for *pro hac vice* admission and that the additional context provided by the moving party's submissions did not warrant reconsideration of Mr. Randazza's admission for that case. *See Maron* v. *The Legal Aid Society*, No. 21 Civ. 5960 (KPF), Dkt. #41 (S.D.N.Y. Oct. 4, 2021). For substantially similar reasons, the Court declines to revoke Mr. Randazza's admission *pro hac vice* for this case. Nonetheless, as in its decision in *Maron*, the Court again wishes to express its concern regarding certain of Mr. Randazza's actions, including certain allegations against him that were detailed in Defendant's submissions. For good measure, the Court will address Defendant's arguments below.

*First*, Defendant observes that while Mr. Randazza disclosed that he was denied *pro hac vice* admission in a case pending before the Connecticut Superior Court, he failed to disclose that he was also denied *pro hac vice* admission in a parallel case pending in Texas state court. (Dkt. #68 at 1). The Court cautions Mr. Randazza to be more comprehensive in his *pro hac vice* applications going forward, but does not find that this omission warrants revocation of his admission in this matter.

*Second*, Defendant asserts that Mr. Randazza has been accused of threatening a witness in the Texas state-court proceeding. (Dkt. #68 at 2). Following the Court's review of the record in that case, it finds that Mr. Randazza's communications may be understood as expressing a concern over a potential violation of California's two-party consent law. (*See* Dkt. #68-3 at 9-10). To be sure, the Court finds Mr. Randazza's tone and language in certain of his correspondence to be wholly unbecoming of an officer of the court. Regardless, the Court does not perceive unadjudicated charges of witness intimidation to be a basis for sanctioning Mr. Randazza in the instant proceeding at this time. It reaches the same conclusion with respect to the other allegations levied against Mr. Randazza in the Texas proceeding. (*See generally* Dkt. #68-3).

*Third*, Defendant urges the Court to consider other conduct engaged in by Mr. Randazza and his law firm in the Connecticut state-court case. In particular, Defendant notes that Mr. Wolman filed a notice in the Connecticut proceeding reporting that Mr. Randazza's law firm had obtained documents

2

relating to a settlement entered into by the Connecticut plaintiffs and a former defendant in the case, after the Connecticut Superior Court issued several orders prohibiting Mr. Randazza's clients from requesting documents related to this settlement. (Dkt. #68 at 2). The Court has reviewed the notice, which represents that these settlement documents were "unsolicited." (Dkt. #68-3 at 21-22). Moreover, it appears that the Connecticut Superior Court did not sanction either Mr. Randazza or his firm in response to this disclosure. The Court will not do so here.

*Lastly*, Defendant refers the Court to the submission of a defendant in *Maron* v. *The Legal Aid Society*, discussing the disciplinary proceedings that resulted in Mr. Randazza's twelve-month suspension by the Supreme Court of the State of Nevada in 2018. (Dkt. #68 at 3 (referencing No. 21 Civ. 5960, Dkt. #28)). As in *Maron*, Defendant asks the Court to consider in its entirety the amended complaint that precipitated the Nevada disciplinary proceedings. (*Id.*). That amended complaint asserted a total of nine ethical violations against Mr. Randazza, and the matter was resolved when Mr. Randazza admitted to two of these ethical violations. (*Id.*). While the Court finds all of the alleged breaches of Mr. Randazza's ethical and professional obligations concerning, it declines to reconsider his *pro hac vice* admission based on unadjudicated and disputed allegations. Mr. Randazza has already faced sanctions in multiple jurisdictions for the ethical violations to which he pleaded guilty, and the seven additional counts in the amended complaint are merely allegations to which Mr. Randazza has not admitted. The Court does not consider the additional

3

context provided by the defendant in *Maron* to justify its revocation of Mr. Randazza's *pro hac vice* admission.

For the foregoing reasons, the Court DENIES Defendant's request for a pre-motion conference regarding his anticipated motion to revoke Mr. Randazza's *pro hac vice* admission. However, the Court should in no way be understood as condoning or trivializing any of the serious allegations contained in Mr. Randazza's disciplinary record. Mr. Randazza appears to have repeatedly toed ethical lines, and the Court remains concerned about the recency of certain allegations against Mr. Randazza. The Court reserves the right to revisit this decision if additional developments in this or other cases render it appropriate for the Court to do so.

SO ORDERED.

Dated: October 5, 2021
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485385
Status as of 10/27/2021 2:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:22:17 AM | SENT |
| William Ogden | | bill@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:22:17 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## [PROPOSED] ORDER ON PLAINTIFF'S
## MOTION FOR PROTECTION REGARDING MARC RANDAZZA

On the 25th day of October, 2021, came to be heard Plaintiff's Motion for Protection

Regarding Marc Randazza. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that Plaintiffs' motion should be in all things DENIED. It is therefore:

ORDERED that Plaintiffs' Motion for Protection Regarding Marc Randazza is hereby DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.


_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:     (512) 827-2246
Facsimile:      (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485385
Status as of 10/27/2021 2:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 10/25/2021 9:22:17 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:22:17 AM | SENT |
| William Ogden | | bill@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:22:17 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 10/25/2021 9:22:17 AM | SENT |



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS
P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

DARLENE BYRNE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed in the District Court
Of Travis County, Texas
NOVEMBER 10, 2021
At 6:01 PM
Velva L. Price, District Clerk

November 10, 2021

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX 77008
\* DELIVERED VIA E-MAIL \*

Mr. Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande Street, Suite 306
Austin, TX 78701
\* DELIVERED VIA E-MAIL \*

RE:    Court of Appeals Number:    03-21-00570-CV
       Trial Court Case Number:    D-1-GN-18-001835; D-1-GN-18-006623; D-1-GN-18-001842

Style:    In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer


Dear Counsel:

Relator's petition for writ of mandamus was filed in this Court on the date noted above.


Very truly yours,

JEFFREY D. KYLE, CLERK


BY: _Jackalyn Berron_
Jackalyn Berron, Deputy Clerk


cc:    The Honorable Velva L. Price
       The Honorable Maya Guerra Gamble
       Mr. William R. Ogden

FILE COPY

# COURT OF APPEALS

## FOR THE

# THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS  78711-2547
(512) 463-1733

Filed in the District Court
Of Travis County, Texas
NOVEMBER 17, 2021
At 6:01 PM
Velva L. Price, District Clerk

Date:            November 17, 2021

Appeal No.:   03-21-00570-CV
Trial Court No.: D-1-GN-18-001835; D-1-GN-18-006623; D-1-GN-18-001842

Style:          In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and
                Owen Shroyer

---

The enclosed opinion was sent this date to the following persons:

The Honorable Billy Ray Stubblefield
Administrative Judge
Williamson County Courthouse
405 Martin Luther King, Box 2
Georgetown, TX  78626
* DELIVERED VIA E-MAIL *

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX  78767
* DELIVERED VIA E-MAIL *

Mr. William R. Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer St
Houston, TX  77008
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX  77008
* DELIVERED VIA E-MAIL *

The Honorable Maya Guerra Gamble
459th District Court
P. O. Box 1748
Austin, TX  78767
* DELIVERED VIA E-MAIL *

Mr. Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande Street, Suite 306
Austin, TX  78701
* DELIVERED VIA E-MAIL *

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.  03-21-00570-CV

Filed in the District Court
Of Travis County, Texas
NOVEMBER 17, 2021
At  6:01 PM
Velva L. Price, District Clerk

### In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

## ORIGINAL PROCEEDING FROM TRAVIS COUNTY

## M E M O R A N D U M   O P I N I O N

The petition for writ of mandamus is denied.  *See* Tex. R. App. P. 52.8(a).

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Filed:   November 17, 2021

11/30/2021 10:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

No. **D-1-GN-18-001835**

| | | |
|---|---|---|
| **NEIL HESLIN** | : | **IN THE DISTRICT COURT OF** |
| | : | |
| | : | |
| **vs.** | : | **TRAVIS COUNTY, TEXAS** |
| **ALEX E. JONES,** | : | |
| **INFOWARS, LLC, FREE SPEECH** | : | |
| **SYSTEMS, LLC, AND OWEN SHROYER** | : | **459TH JUDICIAL DISTRICT** |

# NOTICE OF DELIVERY

RE:  **Mueller, Carl, F., M.D., MPH, M.S., F.A.P.A. (Medical/Psychiatric)**

I,  ___Cris Garza___ , Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1.  That this Deposition by Written Questions of **Jennifer Boccarossa**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Neil Heslin**, given by the witness named herein, after said witness was duly sworn by ___Joann Strazza___ ;

2.  That the transcript is a true record of the testimony given by the witness;

3.  That $ **150.60** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4.  **That the deposition transcript was submitted on  09/16/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5.  That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6.  That the witness returned the transcript;

7.  That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8.  That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
    **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
    **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9.  A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  10/13/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**

Notary Public in and for the State of Texas

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

93489.003

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 11/30/2021 10:21:36 PM | SENT |
| William Ogden | | bill@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 11/30/2021 10:21:36 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

No.  **D-1-GN-18-001835**

11/30/2021 10:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

| NEIL HESLIN | : | IN THE DISTRICT COURT OF |
| | : | |
| | : | |
| **vs.** | : | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, | : | |
| INFOWARS, LLC, FREE SPEECH | : | |
| SYSTEMS, LLC, AND OWEN SHROYER | : | 459TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE:  **Mueller, Carl, F., M.D., MPH, M.S., F.A.P.A. (Billing)**

I, ___Cris Garza___, Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1. That this Deposition by Written Questions of **Jennifer Boccarossa**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Neil Heslin**, given by the witness named herein, after said witness was duly sworn by___Joann Strazza___;

2. That the transcript is a true record of the testimony given by the witness;

3. That $ **132.25** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4. **That the deposition transcript was submitted on  09/16/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5. That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6. That the witness returned the transcript;

7. That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8. That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
**Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
**Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9. A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  10/13/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

93489.004

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 11/30/2021 10:21:36 PM | SENT |
| William Ogden | | bill@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 11/30/2021 10:21:36 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

11/30/2021 10:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

No. **D-1-GN-18-001835**

| | | |
|---|---|---|
| **NEIL HESLIN** | : | **IN THE DISTRICT COURT OF** |
| | : | |
| | : | |
| **vs.** | : | **TRAVIS COUNTY, TEXAS** |
| **ALEX E. JONES,** | : | |
| **INFOWARS, LLC, FREE SPEECH** | : | |
| **SYSTEMS, LLC, AND OWEN SHROYER** | : | **459TH JUDICIAL DISTRICT** |

## NOTICE OF DELIVERY

RE: **Crouch, Michael, W., LCSW (Medical/Psychiatric)**

I, ___**Cris Garza**___ , Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1. That this Deposition by Written Questions of **William Michael Crouch**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Neil Heslin**, given by the witness named herein, after said witness was duly sworn by **Chistopher Perrett**;

2. That the transcript is a true record of the testimony given by the witness;

3. That $ **281.00** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4. **That the deposition transcript was submitted on 09/20/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5. That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6. That the witness returned the transcript;

7. That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8. That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
   **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
   **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9. A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON 10/13/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



_____
Notary Public in and for the State of Texas

93489.005

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941308

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 11/30/2021 10:21:36 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 11/30/2021 10:21:36 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 11/30/2021 10:21:36 PM | SENT |
| William Ogden | | bill@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 11/30/2021 10:21:36 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 11/30/2021 10:21:36 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 59578322
Status as of 12/2/2021 9:21 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 11/30/2021 10:21:36 PM | SENT |

12/27/2021 3:22 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Alyssa Butler

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

**PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................................1

ARGUMENT ........................................................................................................................1

I.     InfoWars has Repeatedly Refused to Present a Corporate
       Representative............................................................................................................1

II.    InfoWars Failed to Present a Corporate Representative for a Fourth
       Time............................................................................................................................8

       A.     The materials provided to Ms. Karpova and her lack of
              preparation time were a farce ....................................................................8

       B.     Ms. Karpova was not prepared to testify about sourcing and
              research for the videos described in Plaintiffs' petitions................11

       C.     Ms. Karpova was not prepared to testify about individuals
              involved in the production of the videos described in
              Plaintiffs' petitions ...................................................................................23

       D.     Ms. Karpova was not prepared to testify about internal
              editorial discussions regarding InfoWars' coverage of the
              Sandy Hook Elementary School shooting...............................................24

       E.     Ms. Karpova was not prepared to testify about the company's
              knowledge of the Plaintiffs.......................................................................26

       F.     Ms. Karpova was not prepared to testify about the documents
              produced by the company in response to Plaintiffs' discovery
              requests .......................................................................................................31

       G.     Ms. Karpova was not prepared to testify about efforts made by
              the company to preserve potential evidence........................................32

       H.     Ms. Karpova was not prepared to testify about the audience
              reach of the videos described in Plaintiffs' petitions.........................34

       I.     Ms. Karpova was not prepared to testify about the company's
              business structure and relationship with other parties..................36

III.   Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith............37

IV.    InfoWars has the Resources to Properly Prepare its Corporate Designee .. 38

V.    This Court Should Enter All Remedies at its Disposal ......................................... 40

    A.    Preclude further discovery under Rule 215(b)(1) ............................ 40

    B.    Award all litigation costs under Rule 215(b)(2) ................................ 40

    C.    Enter evidentiary findings under Rule 215(b)(3)............................. 41

    D.    Assess punitive monetary sanctions for outrageous discovery abuse .......................................................................................................... 41

CONCLUSION ........................................................................................................................... 42

CERTIFICATE OF SERVICE ............................................................................................... 43

CERTIFICATE OF SERVICE ............................................................................................... 43

# INTRODUCTION

Following the default judgment entered by this Court, Plaintiffs sought discovery on the remaining issues to be decided by the jury concerning punitive and compensatory damages. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs sought depositions of the Defendants, including a corporate representative of Free Speech Systems, LLC. On December 3rd, the company produced Daria Karpova as its corporate representative to testify about eight topics. Ms. Karpova was completely unprepared to testify about the designated topics, ultimately making a mockery of the deposition.

While sanctionable in isolation, this conduct is truly egregious given that Defendants have repeatedly refused to produce a prepared corporate designee on three prior occasions. For these non-appearances, Defendants incurred sanctions, a contempt finding, and ultimately a default judgment. Throughout this case, Defendants' open disrespect for the judicial process has been on full display, and they have now made the conscious decision to sabotage the remainder of the proceedings. Every sanction ever entered by this Court has been completely ineffective at altering Defendants' conduct. As such, Plaintiffs asks the Court to take forceful measures to balance the playing field for their upcoming damages trial, including an award of all litigation costs, preclusion of further discovery, evidentiary findings relating to the corporate deposition topics, and punitive monetary sanctions.

# ARGUMENT

## I.      InfoWars has Repeatedly Refused to Present a Corporate Representative.

Throughout these lawsuits, InfoWars has consistently evaded its obligation to provide corporate testimony. First, on August 31, 2018, this Court ordered a corporate

deposition in Mr. Heslin's defamation case, but InfoWars refused to comply with the order, and the Court ultimately assessed sanctions the following year for the non-appearance.[1]

On January 25, 2019, the Court again ordered discovery in the *Lewis* case, but that process turned into a complete farce. Ms. Lewis was forced to take depositions without any document production. Even worse, when InfoWars produced Rob Dew as a corporate representative, InfoWars failed to prepare him to give any testimony whatsoever on behalf of the company. In oral hearing, Judge Jenkins chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition."[2]

On October 18, 2019, this Court ordered Defendant to produce a corporate representative for a third time in Mr. Heslin's IIED case. In response, InfoWars again chose Rob Dew to testify about two topics: 1) "Sourcing and research for the videos described in Plaintiff's petition," and 2) "Internal editorial discussions regarding Free Speech Systems' coverage of the Sandy Hook Elementary School shooting."[3] Once again, Mr. Dew was completely unprepared to discuss either topic. For example, Mr. Dew gave the following testimony about a March 2014 video from Plaintiff's petition:

> Q.   Who did the research for that one?
> A.   I don't know.
> Q.   What steps did you take to find out?
> A.   Since we don't have that video, I don't know what -- I'd
>       have to see the video to jog my memory of what's in it.
> ...
> Q.   You don't have this video is your testimony, and by you,
>       you mean Free Speech Systems?
> A.   I didn't have it in any of the searches that I made.

---

[1] *See* October 18, 2019 *Heslin* Order on Plaintiff's Motion for Contempt Under Rule 215 (assessing sanctions of $25,875).
[2] Exhibit 1, April 3, 2019 Transcript in *Lewis*, p. 30; p. 34.
[3] Exhibit 2, November 26, 2019 Deposition of Rob Dew, 3:16-20.

> Q.    How long did you spend looking for the sources or the video or the researcher for "Sandy Hook: False Narratives Versus the Reality?"
> A.    For that particular video, maybe 15 minutes.
> Q.    Are you aware that in this case you produced this video to me?
> A.    Okay.
> ...
> Q.    So you have it in your possession, correct?
> A.    I don't know if I have it in my possession.[4]

When Mr. Dew testified regarding a May 13, 2014 from Plaintiff's petition, he speculated on its content without knowing what was in the video:

> Q.    Who did the research for this video?
> A.    I would imagine Wolfgang Halbig did the research for that.
> Q.    Again, I'm not asking you to imagine.
> A.    Okay. I'll say Wolfgang Halbig, school safety expert, that was Wolfgang Halbig.
> Q.    How do you know he did the research – excuse me. Did anyone else research any of the information that went into this episode?
> A.    That is most likely an interview between Wolfgang Halbig and Alex Jones.
> Q.    You don't even know what's in this video, do you?
> A.    No.[5]

Mr. Dew testified in the same way about a December 27, 2014 video from Plaintiff's petition:

> Q.    What was the source of the information in this one?
> A.    I don't know.
> Q.    Do you know what information is in this video?
> A.    No.
> Q.    Are you prepared to discuss the research that was in the video which you don't know what it's about?
> A.    No.[6]

---

[4] *Id.* at 52:3-53:15.
[5] *Id.* at 54:3-18.
[6] *Id.* at 56:6-13.

Mr. Dew gave the same testimony regarding a December 29, 2014 video from Plaintiff's petition:

> Q.   Have you ever seen this one?
> A.   I'd probably know it if I saw it.
> Q.   Sitting here -- have you seen it in the last year?
> A.   No.
> Q.   Did you do anything to prepare where the information came from in this video that you don't know what it's about?
> A.   No.
> Q.   You have no -- is it fair to say you don't know who the source of the information is that's in this video?
> A.   That would be fair.[7]

Mr. Dew gave the same testimony regarding a January 13, 2015 video from Plaintiff's petition:

> Q.   Have you seen this video in the last year?
> A.   I have not seen it in the last year.
> Q.   Are you prepared to discuss the research that went into the information that was put in this video?
> A.   No.
> Q.   Are you prepared to tell us the source of information for this video?
> A.   No.[8]

This testimony continued for video after video through 2015, 2016, and 2017. For each of the additional videos, Mr. Dew admitted he was not prepared, even including the crucial 2017 "Sandy Hook Vampires Exposed" video:

> Q.   Who researched the information for that video?
> A.   I would say myself and Alex did.
> Q.   What were your sources?
> A.   I believe a Megyn Kelly interview.[9]
> ...
> Q.   Are you aware that on April 22nd, 2017, that the Megyn Kelly interview hadn't even happened yet?

---

[7] *Id.* at 56:15-57:3.
[8] *Id.* at 57:5-13.
[9] *Id.* at 72:17-20.

4

> A.    Oh, it hadn't happened yet? Okay.
> Q.    Fair to say you're not prepared to discuss this video?
> A.    I'm -- must be confused with another Sandy Hook vampire video.
> Q.    Fair to say you're not prepared to discuss the one from April 22nd, 2017? Yes?
> A.    Correct.[10]

Mr. Dew was likewise unprepared to testify regarding the employees who were involved in Sandy Hook research. For each employee inquired about, Mr. Dew testified that he was not "prepared to testify as to [the employee's] involvement with sourcing and researching for the videos in plaintiff's petition."[11] Mr. Dew further testified that he was unprepared to discuss InfoWars' editorial discussions about Sandy Hook:

> Q.    We know that from your answers related to the videos and not knowing the sources of the information or any of the researchers, that any discussion that would have involved that -- those people that did that, you're not prepared to discuss that, correct?
> A.    That's correct.[12]
> Q.    Did you take any steps to prepare yourself to discuss whether or not there are any editorial discussions that were had between anyone at Free Speech Systems outside your purview?
> A.    No.[13]

Moreover, Mr. Dew acknowledged that editorial discussions could be contained within documents, but he admitted he did not use any documents to help prepare for the deposition:

> Q.    If there are discussions out there within Free Speech Systems' documents that were produced in this case that have editorial discussions in there, that's something you should know about, correct?

---

[10] *Id.* at 72:24-73:9.
[11] *Id.* at 15:6-8; *see also* p. 15-26.
[12] *Id.* at 77:6-11.
[13] *Id.* at 78:8-15.

A.  If you're saying I reviewed every e-mail that was sent around the office during those time periods, I didn't do that.

Q.  You didn't review any e-mails preparing for today?

A.  That's correct.

Q.  Do you think you should have?

A.  I was relying on the advice of my attorney.[14]

Mr. Dew's testimony showed that Defendants intentionally failed to prepare him to offer testimony. Given their prior experience failing to prepare Mr. Dew in the *Lewis* case, Defendants understood their obligation to prepare their corporate designee. On December 20, 2019, this Court assessed sanctions and held Defendants in contempt for their third non-appearance.[15] In a set of companion orders, the Court assessed $100,000 in monetary sanctions.[16] The Court noted:

> Defendants' failure to produce a corporate representative who was prepared to testify about a) sourcing and research for the videos described in Plaintiff's petition and b) internal editorial discussions regarding Free Speech System, LLC's coverage of the Sandy Hook Elementary School shooting should be treated as contempt of court. Defendants have been continuously represented in this case by competent Texas counsel. The same counsel who represented Defendants at the October 17 hearing…are representing Defendants now, with one additional attorney recently appearing. Surely this Court can assume that Defendants' counsel fulfilled their professional obligation to insure that Defendants understood this Court's October 18 order. And the order itself is clear and unmistakable, easily understood by any competent reader. On the record presented, the Court concludes that Defendants intentionally disregarded the October 18 order. The Court notes that a client's refusal to cooperate with an attorney may rise to good cause for the attorney's withdrawal under Texas Disciplinary Rule of Professional Conduct 1.15(b).[17]

---

[14] *Id.* at 80:16-81:7.

[15] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions (awarding sanctions of $65,825).

[16] *See* December 20, 2019 Order on Defendants' Rule 91(a) Motion (awarding additional $34,323.80).

[17] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions, p. 2.

During the 2019 hearing, Defendants' counsel promised to address the discovery situation despite the pending appeal. Yet even upon remand in 2021, Defendants spent the entire summer ignoring the situation, eventually resulting in the Court entering the default judgment which it had held under advisement since 2019.

During the default judgment hearing on August 31, 2021, this Court inquired about the necessity of further discovery, noting that "[m]y concern is you need this discovery even for a damages trial."[18] The Court also noted that "if [plaintiffs] are trying to get punitive damages, [they] probably do need more discovery."[19] Plaintiffs' counsel responded that "after this hearing and I have more of an understanding of what the scope of discovery is like going forward, then we'll serve new discovery requests and depositions that we may need."[20]

## II.     InfoWars Failed to Present a Corporate Representative for a Fourth Time.

Following the default judgment, Plaintiffs sought discovery for the remaining issues to be decided by the jury. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs also sought the deposition of Free Speech Systems, LLC, which was cross-noticed in all three cases. The company was instructed to designate a witness to testify about the following topics:

- Sourcing and research for the videos described in Plaintiffs' petitions.

- Individuals involved in the production of the videos described in Plaintiffs' petitions.

- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.

- The company's knowledge of the Plaintiffs.

---

[18] Exhibit 3, August 31, 2021 hearing transcript, p. 73.
[19] *Id.,* p. 74.
[20] *Id.,* p. 75.

- The audience reach of the videos described in Plaintiffs' petitions.

- The documents produced by the company in response to Plaintiffs' discovery requests.

- Efforts made by the company to preserve potential evidence.

- The company's business structure and relationship with other parties.

These topics included not only the topics about which Mr. Dew had failed to testify before, but additional topics relating to punitive and compensatory damages. No objections were made to any topic. The deposition was originally set for November 4, 2021. However, due to a medical emergency in the family of Defendants' counsel, the deposition was postponed to December 3, 2021. At deposition, the company produced Daria Karpova as its corporate representative. Ms. Karpova, an InfoWars producer and manager, was completely unprepared to testify on any of the eight topics.

### A.   The materials provided to Ms. Karpova and her lack of preparation time were a farce.

Ms. Karpova testified that her preparation for the deposition consisted of the following:

- "Maybe an hour" on December 1st with Bradley Reeves.[21]
- "A couple of hours" on December 2nd with Marc Randazza.[22]
- One hour preparing by herself.[23]

---

[21] Exhibit 4, November 3, 2021 Deposition of Free Speech Systems, LLC, at 5:8.

[22] *Id.* at 4:1. Mr. Randazza's conduct in preparing the corporate designee and appearing at Mr. Jones' deposition creates tension with Texas statutes regarding the unauthorized practice of law by performing these services in Texas for a particular proceeding in a Texas case. The Government Code defines the "practice of law" to include not only court appearances, but also a "service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge." Tex. Govt. Code 81.101. "The statutory definition is not exclusive. Courts inherently have the power to determine what is the practice of law on a case-by-case basis. The practice of law embraces, in general, all advice to clients and all action taken for them in matters connected with the law." *Green v. Unauthorized Practice of Law Comm.,* 883 S.W.2d 293, 297–98 (Tex. App.—Dallas 1994, no writ) (internal citations omitted).

[23] *Id.* at 11:8.

Ms. Karpova brought a small file folder to the deposition containing the "documents that [Ms. Karpova] reviewed prior to this deposition."[24] Those documents "represent the total universe of documents that [Ms. Karpova] had prepared for before the deposition."[25] The folder contained the following:

- Wikipedia articles for "False flag,"[26] "The Reichstag Fire,"[27] and "Pearl Harbor advance-knowledge conspiracy theory."[28]

- A post from "HistoryToday.com" summarizing the sinking of the USS Maine in 1895.[29]

- An anonymous blog post from "DC Clothesline" which purported to contain biographical information about Wolfgang Halbig, an InfoWars source.[30]

- A bio of Dr. Steve Pieczenik, an InfoWars guest, from "StevePieczenik.com."[31]

- An article from "LoveTheTruth.com" entitled "I Think Sandy Hook Was a Massive Elaborate Hoax."[32]

- Two news articles with "interesting information regarding the victim's mother and her request to have an open casket,"[33] which Ms. Karpova felt was relevant because it was "unconscionable" and "horrific."[34]

---

[24] *Id.* at 9:20.
[25] *Id.* at 10:19-21.
[26] *Id.* at 19:9.
[27] *Id.* at 21:17.
[28] *Id.* at 27:8.
[29] *Id.* at 25:24.
[30] *Id.* at 27:23.
[31] *Id.* at 29:17.
[32] *Id.* at 28:11.
[33] *Id.* at 30:18.
[34] *Id.* at 32:22; 33:4.

Mr. Karpova also testified that she met briefly with the other prior corporate representatives designated by InfoWars, but she did not acquire any relevant information from those discussions:

> Q. You met with Mr. Dew and talked to him about the topics you'd be speaking about today?
> A. Briefly.
> Q. What's briefly? What does that mean?
> A. I basically sort of ran through the topics and asked him if I was going to say anything, if he had any information for me and he said no.[35]
> ...
> Q. Okay. Who's the other corporate rep you know?
> A. Michael Zimmerman.
> Q. Okay. Did you get any information from Mr. Zimmerman?
> A. No.[36]

In sum, Ms. Karpova's preparation was completely lacking. She only had short meetings with counsel, did not meet any employees who gave her information, and the materials she did review were frivolous, unreliable, and largely irrelevant. Later in the deposition, after prompting from her counsel, Ms. Kaprova claimed she reviewed additional documents, but she testified that those documents were not relevant to the deposition topics:

> Q. There are documents that you have reviewed prior to this deposition that you did not bring to this deposition?
> A. I did not think they were relevant to the specific points.[37]

As shown below, Ms. Karpova was unable to testify about *any* of the topics for the deposition. The lack of preparation she was given demonstrates InfoWars' continuing disrespect for the legal process, causing irreparable prejudice to the upcoming trial.

---

[35] *Id.* at 7:16-22.
[36] *Id.* at 8:6-10.
[37] *Id.* at 40:16-20.

## B. Ms. Karpova was not prepared to testify about sourcing and research for the videos described in Plaintiffs' petitions.

Ms. Karpova had not been prepared to testify about the videos in Plaintiffs' petitions.

Prior to the deposition, Ms. Karpova did not review any of the videos:

> Q. Topic number one is the sourcing and research for the videos described in plaintiffs' petitions. When was the last time you watched those videos? Back up. I made an assumption there. Have you watched the videos in plaintiffs' petition ever in your history at InfoWars?
>
> A. I've watched some of them.
>
> Q. Okay. So one thing we can say is that in preparation for this deposition you didn't watch those videos, correct?
>
> A. (No response.)
>
> Q. I'm sorry, Ms. Karpova, is that a difficult question for you to answer?
>
> A. Well, I've already answered some of the videos.
>
> Q. Right. No. I understand that you have in your history at InfoWars since 2015, you've probably on occasion seen some of these videos. I understand that. What I'm asking you is since the date you were told you were giving this deposition in November and you were preparing for this deposition, you haven't watched any of these videos, right?
>
> A. I have not.[38]

Ms. Karpova did not even know if she had reviewed the Plaintiffs' Petitions which describe the videos:

> Q. When that topic number one says sourcing and research for the videos described in Plaintiffs' Petitions, have you seen the Plaintiffs' Petitions?
>
> A. Briefly.
>
> Q. Okay. They're not in this folder, are they?
>
> A. No.[39]
>
> ...
>
> Q. But in terms of Plaintiffs' Petitions, is that something you looked at before this deposition?
>
> A. I honestly can't recall.[40]

---

[38] *Id.* at 35:22-36:16.
[39] *Id.* at 22:5-11.
[40] *Id.* at 22:18-20.

When faced with basic questions about the videos in Plaintiffs' Petition, it immediately became apparent that Ms. Karpova could not testify:

> Q. Do you see that paragraph 14 identifies the January 27, 2013 video entitled, "Why People Think Sandy Hook is a Hoax"?
> A. Yes.
> Q. Okay. You're familiar with the claims made in that video, right?
> MR. REEVES:  Objection; form.
> A. I don't recall the exact video.
> Q. And so sitting here today, you're not familiar with the claims made in that video.
> A. No.[41]
> ...
> Q. And do you see in paragraph 25 it discussing a September 25, 2014 video entitled "Connecticut PD Has FBI Falsify Crime Statistics," correct?
> A. Yes.
> Q. Okay. First of all, are you familiar with the claim that InfoWars has made that the FBI either falsified crime statistics or admitted that nobody died at Sandy Hook?  Are you familiar with those claims?
> A. As far as it's quoted here in this paragraph, the company believes that to be the case.
> Q. No. What I'm asking, Ms. Karpova, is based on the title and this talking about FBI falsified crime statistics. Are you personally right now familiar with that claim made by InfoWars?
> A. Personally I'm not.
> Q. Okay. Did you talk to anybody about that claim?
> A. No.
> Q. Okay. So this video and its title, you don't really understand where that comes from, right?
> A. No.[42]
> ...
> Q. Does paragraph 29 contain a video that you're supposed to talk about under topic number one?
> A. Yes.
> Q. The video is December 27, 2014, entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," correct?
> A. Yes.
> Q. What lawsuit is being talked about?
> A. I don't know for sure.

---

[41] *Id.* at 47:21-6.
[42] *Id.* at 77:1-15.

Q.   Well, at least this one we're lucky because I do. Do you know Wolfgang [Halbig] sued Leonard Pozner, that they were in a lawsuit together?

A.   Yes.[43]

...

Q.   Well, first of all, we know that you didn't know that this video referred to that lawsuit. You didn't know what lawsuit it was. So you also, I would take it, you haven't done any research to determine what that lawsuit is or anything about it, right?

A.   I haven't reviewed that lawsuit, no.

Q.   Or anything that has to do with what this video said about the lawsuit, right?

A.   I mean, if you ask me specifically? Because you're saying anything. If you ask me a specific point, then I may or may not recall.

Q.   Sure. What truth about the Sandy Hook massacre could this lawsuit reveal? What did the video have to say about that?

A.   Well, based on the quotes here in this paragraph, you know, the truth would be -- I mean something to do with it not being the way the mainstream news reported.

Q.   Okay. Help me understand. The lawsuit could reveal something that's different than the mainstream media. That's your answer? Is that -- am I understanding --

A.   Different than what the mainstream media finally reported about the incident. I believe it took a year for the State of Connecticut to release the final report on the event.

Q.   What does that have to do with the lawsuit? I'm confused. What -- what's the lawsuit having to do --

A.   Are you asking me what it could've --

Q.   Well, let's --

A.   So that truth might have been something that contradicted the report that the State of Connecticut had issued.

Q.   You have no idea, do you? You say "might." You don't have any idea.

A.   Yeah, we don't have a record of that.

Q.   Yeah. And you -- when you got this petition and you read it and you saw there was a video entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," you did nothing to figure out what that lawsuit was or what it could reveal, did you?

A.   Huh-uh. No. Not specifically.[44]

...

Q.   You see here this talks about a March 4, 24 2015 video entitled "New Bombshell Sandy Hook Information Inbound"?

A.   Yes.

Q.   What was the bombshell information?

---

[43] *Id.* at 94:25-95:14
[44] *Id.* at 96:13-98:8.

A.   The bombshell information was the new statement -- information Mr. Halbig had brought on that show is what I can infer.

Q.   Which is what? What's the bombshell?

A.   I wouldn't know the details of it.

Q.   So when you had this video to try to figure out what was the sourcing and the research that went into it, you don't even know what the bombshell information was that is described in the title of the video, correct?

A.   Well, any new information would be bombshell. So just because it says bombshell, there -- there might have been a lot of information in that video which there's no way I can remember what was in that video exactly.

Q.   Well, I mean, it's not a matter of you not remembering. You never watched it, right?

A.   Not recently.

Q.   Right. And so -- and you didn't do anything to try to get prepared on it for this deposition, right?

MR. REEVES:  Objection; form.

A.   No.

Q.   You haven't read any documents about this video.

A.   No.

Q.   And you haven't talked to any employees about this video.

A.   No.

Q.   Have you tried to talk to Mr. Halbig about this video?

A.   No.[45]

When it became clear Ms. Karpova could not testify about research and sourcing for these claims, Plaintiffs' counsel confirmed that she was unprepared to testify about _any_ of the videos in Plaintiffs' Petitions:

Q.   I want to cover some of the things we talked about in this first video to see if they apply for every video because I think we might be able to save some time. Alright? And you can tell me if we can or we can't. But from what I understand about that first video is, A, you didn't watch it and, B, you didn't talk to any of the employees involved in making it. That's correct, right?

A.   Yes.

Q.   Okay. Is that true for all the videos?

A.   Yes.

Q.   Okay. And in terms of understanding what claims were made in the videos, is that the same that you don't know what claims were made in the videos for all the videos?

---

[45] _Id._ at 113:23-115:8.

A.  Correct.[46]

Despite having no preparation, Ms. Karpova frequently speculated about the source

for the videos, but she admitted she was making guesses, not giving testimony from

knowledge or preparation. Indeed, Plaintiffs' counsel frequently had to correct Ms. Karpova

when her guesses were not true:

> Q.  So sitting here today, you couldn't tell me who the sources were for
> the claims that you don't know, correct?
> A.  From -- I would assume they were either Mr. Halbig or Pieczenik,
> because these were the two sources that were -- that had pertained
> to the videos.[47]
> ...
> Q.  Okay. And you are telling me you're making this assumption that this
> must have something to do with Wolfgang Halbig or Dr. Steve
> Pieczenik. But do you know if either of those individuals had ever
> been on InfoWars by 2013?  Do you know?
> A.  Not for a fact I do not know. I could find that information if that was
> a question that I knew I had to prepare for.[48]
> ...
> Q.  But for these videos, where Wolfgang Halbig or Dr. Steve Pieczenik
> had never said anything about Sandy Hook until at least 2014, you
> don't know what the sources for these videos are, do you?
> A.  I would say no.[49]

Yet throughout the deposition, Ms. Karpova continued to speculate with no actual

knowledge behind her answers:

> Q.  Ma'am, I just want you to understand, before we answer any more
> questions, that Wolfgang Halbig didn't even start investigating
> Sandy Hook until 2014. So when I have you here under oath saying
> that this must come from Wolfgang Halbig, I'm a little concerned. So
> I just want to stop and make sure we're not making assumptions,
> that we're answering the questions based on the knowledge that we
> have. Okay? And the reality is that when it comes to whether "the
> evidence was overwhelming," one, you don't know what evidence is
> even being talked about in that statement, do you?

---

[46] *Id.* at 54:9-25.
[47] *Id.* at 48:7-12.
[48] *Id.* at 49:5-12.
[49] *Id.* at 51:13-17.

A. I don't.
Q. Okay. Two, you don't know where any of that alleged evidence came from, do you?
A. No. It's been a long time, though. Correct.
Q. That's why I'm taking this deposition. And sitting here today, you can't do it, can you? You cannot tell me what evidence is being talked about in paragraph 17?
A. No.[50]

Continually through the deposition, Ms. Karpova seemed eager to speculate that

Wolfgang Halbig was the source for particular claims made by InfoWars, but her testimony

was not correct:

Q. Do you see where it says they had kids going around in circles in and out of the building as a photo op?
A. Yes.
Q. Do you know the company source on that?
A. I believe it should be -- the company believes it to be Wolfgang Halbig.
Q. Well, it's interesting, you know, because -- have you watched Alex Jones' deposition the first time I took it?
A. Parts of it.
Q. Okay. Did you watch the part about the kids allegedly going in circles around the video with the building? Have you seen that?
A. I don't remember that specifically.
Q. Okay. Because here's the thing. And I'm -- just again, to try to make sure that you're answering questions that you know the answer to, we already know where that one came from. We had a deposition, and we put the video up. And there's kind of an infamous YouTube video made by just some random YouTuber, some conspiracy person, and it's called the "Going in Circles" video. And it has -- it's actually not Sandy Hook Elementary at all. It's a firehouse down the street. It's not kids going in and out of the building, but it's actually adults and young teenagers. But there's this video of this circle of people going from the front to the back. And we talked about all this in deposition. It comes from a YouTube video. It doesn't come from Mr. Halbig. It doesn't come from Mr. Fetzer. It doesn't come from any of these people. But when you sit here and you say, well, I can infer it can came from Mr. Halbig, you can allow for me the possibility that those answers aren't correct, right?

---

[50] *Id.* at 60:25-61:21.

A. Well, you can also infer that the source for the video was either Mr. Halbig or Fetzer, as you just mentioned. You don't know where the video came from.

Q. You don't know, do you?

A. No, you don't know.

Q. You don't know, right?

A. Just as you don't know.

Q. Right. So we're just all speculating here today, right? We have no idea what's going on.

A. You're speculating yourself.[51]

Ms. Karpova could not even give any testimony on the specific claims quoted verbatim in Plaintiffs' Petitions:

Q. When it comes to trying to figure out who [Mr. Jones is] even talking about here in terms of "actors playing different parts of different people," you didn't do anything to figure that out, correct?

A. Correct.

Q. You didn't ask Alex about this statement or this video, correct?

A. Correct.[52]

...

Q. So do you see in that paragraph it's talking about "photos of kids that are alive that they say died?"

A. Yes, I see that paragraph.

Q. Do you know what photo they're talking about?

A. From what I can infer, it was probably a photo that -- or photos that were going around that people were talking about online.

Q. Sure. You have no idea what they are. I mean, you're guessing, right? Right?

A. To the best of my knowledge. There's no way to tell what they were.

Q. You have no personal knowledge about this, correct?

A. Well, there's no way to go back to that video because we don't keep those kinds of records of every show. Of any show.

Q. You didn't talk to any of the employees, did you?

A. It's hard to tell who worked on that day.[53]

...

Q. Do you see where it says "DHS an hour and a half later with a time stamp put up signs saying 'sign in here?'"

A. Yes.

Q. Do you know where that came from?

---

[51] *Id.* at 101:13-103:8.

[52] *Id.* at 73:5-12.

[53] *Id.* at 79:5-22. This answer contradicts Ms. Karpova's other testimony, in which she testified "I have a list of people who were working on that day." *See* 52:20.

A.   No.

Q.   Okay. They had a statement that said, "They had Porta Potties being
     delivered within an hour and a half." Do you see where it says that?
     It's also in that first paragraph.

A.   Yes.

Q.   Do you know where that came from?

A.   No.

Q.   In the third paragraph, the first sentence, do you see where it says
     "We have the emails from the city council back and forth and the
     school talking about it being shut down a year before?" Do you see
     that?

A.   Yes.

Q.   ...Does the company know if those emails actually exist?

A.   No, it doesn't.

Q.   Do you know what the company source for saying that was?

A.   No.[54]

When confronted with her lack of preparation, Ms. Karpova asked if she could review

each video at the deposition before answering:

A.   Can we review the video right now?

Q.   No. I'm not going to play a 2-hour video for you right now, no.

A.   But you expect me to know what's going on in every video?

Q.   Uh-huh. I do. I do, Ms. Karpova. And I expected Rob Dew to do the
     same thing when he showed up to the deposition to talk about
     sourcing and research and he didn't do that twice.

MR. REEVES:  Object to the sidebar.

Q.   So I do -- I want to make sure this witness understands what she's
     here to do today and my questions, what they are. I do expect you to
     have done your homework and know what was in those videos, yes,
     ma'am, I do. So for instance in this video, there's a claim made about
     Charles Jaco. Do you know who he is?

A.   No.

Q.   Okay. So you wouldn't be able to talk to me in any way about the
     claims made about Charles Jaco in the January 27, 2013 video?

A.   No.[55]

During a break in the deposition, Defendants' counsel requested extra time for the

break because Ms. Karpova is a nursing mother and needed time to pump, which Plaintiffs

---

[54] *Id.* at 120:19-121:19.
[55] *Id.* at 51:20-52:17.

were happy to oblige. However, Defendants also used this extra time to attempt to show Ms.

Karpova the remaining videos during the break. Yet even after this mid-deposition crash

course screening, Ms. Karpova could not meaningfully answer questions about the videos:

> Q.  Do you see there it's talking about an April 22, 2017 video called "Sandy Hook Vampires Exposed"?
> A.  Yes.
> ...
> Q.  Okay. Did you watch that video? I mean, unless you've watched it in the last couple of hours, you haven't watched it, right, for this deposition?
> A.  I'm familiar with the video.
> Q.  Did you watch it in preparing for this deposition, though?
> A.  Yes, I believe so.
> Q.  Okay. When did you watch it?
> A.  Earlier today.
> Q.  Earlier today when?
> A.  During the break.
> Q.  Oh. So during the break when it became apparent that you hadn't watched these videos, you went and tried to watch this video?
> A.  Yes.
> Q.  You didn't watch the whole thing, though, did you?
> A.  No.
> Q.  Because it's a 45-minute video, right?
> A.  It's a lengthy video.
> Q.  Yeah. So you didn't watch this video.
> MR. REEVES:  Objection; form.
> Q.  You watched pieces of this video, correct?
> A.  Correct.
> Q.  How many pieces did you watch? How many minutes total did you watch of this video?
> A.  I did not count.
> Q.  So you have no idea, sitting here today, how long it was, when it was just a couple of minutes ago?
> A.  I did not count the amount of minutes I watched.
> Q.  Okay. Was it more than 5 minutes?
> A.  I'm not sure.
> Q.  Okay. So you just watched the video within the last 20 minutes; and you're not sure if you watched more than 5 minutes of it, correct?
> MR. REEVES:  Objection; form.
> Q.  Is that correct?
> A.  I didn't time the amount of minutes I watched.[56]

---

[56] *Id.* at 122:21-124:23.

...
Q. Do you see it talks about a June 13, 2017 video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook"?

A. Yes.

Q. Is that another one you were just shown during the break?

A. Yes.

Q. Okay. Is it fair to say that what happened is that every video past this in the petition, that you went and tried to watch a little piece of it before you came back into this room?

MR. REEVES:  Objection; form.

A. This video I watched in its entirety.

Q. Okay. So when did you watch that?

A. During the break.[57]

...
Q. Where does this come from, this picture? Where does it come from?

A. This is a still from the show.

Q. Do you know what show?

A. Not specifically. It doesn't have the date year.

Q. Okay. It's the one you just apparently watched a couple of minutes ago. You don't remember seeing this?

A. Not this part specifically.

Q. Okay. So you maybe didn't even watch this part of the video?

A. I watched the video.

Q. Okay.

A. I don't remember this specific --

Q. Okay. A large portion of that video is Mr. Jones going over these questions. Do you remember that from the video you just watched?

A. Yes.[58]

...
Q. This talks about an October 26, 2017 video called "JFK Assassination Documents to Drop Tonight." Is that another one that you just looked at at the break?

A. Yes.

Q. Okay. How much of that one did you watch?

A. That's a long video. I watched parts of it.

Q. You understand that doesn't help me, right? That that's not helping me understand what you've watched. You understand that?

A. I understand that.

Q. Okay. So when I'm asking you the question, this is a -- it's an hour long video, isn't it? It might be a full 4-hour episode. Do you know?

A. I don't know the exact timestamp on that, but I know it's a long video.

Q. How did you decide what part of it to watch?

---

[57] *Id.* at 126:8-23.

[58] *Id.* at 127:14-128:7.

A.   I skimmed through it.[59]

...

Q.   Do you see the part about the CIA visiting Lanza for recruiting? Not on the petition. In the video you watched?

A.   No.

Q.   It's in the petition. I'm asking if you saw it in the video.

A.   Yes.

Q.   You did see that part?

A.   Yes.

Q.   What was the company source for that?

A.   Again, that was based on previously sourced information Alex -- from his guests, as well as other reports.

Q.   Ms. Karpova, no, it was not. And I -- please, can you stop guessing? Because I need you to understand if you watched that video, you'd understand that this video was done because a new set of documents was declassified by the FBI on that date, and Lee Ann McAdoo did a report on InfoWars talking about those documents. It didn't come from Mr. Halbig. The testimony you gave is just not correct, is it?

MR. REEVES:  Objection; form. She didn't say anything about Mr. Halbig.

Q.   Alright. Let me adjust to your objection. This didn't come from prior videos, did it, Ms. Karpova? Or do you know?

A.   The company believe it did come from previously sourced material.

Q.   Okay. So when I talk about Lee Ann McAdoo doing this report on the documents that were declassified on that day, on October 26, 2017, do you have any idea what I'm talking about? Is that new information to you, or do you know what I'm talking about?

A.   I -- I have some information about it.[60]

...

Q.   Well, I'm asking you about the statement that the CIA recruited Lanza which you said came from prior videos. But that's not true, because that piece of information was in that released report that day, correct? Or do you know?

A.   I do not know.[61]

Ms. Kaprova could not even answer basic questions about the sourcing of the most recent video in Plaintiffs' Petition:

Q.   In 2017 did the company believe that Jim Fetzer was a reliable source of information?

A.   At that time there was controversy regarding that individual.

---

[59] *Id.* at 132:25-133:17.
[60] *Id.* at 134:2-135:12.
[61] *Id.* at 137:3-8.

Q.   In 2017 InfoWars published a video that relied on Mr. Fetzer,
     correct?

MR. REEVES:  Objection; form.

A.   Okay.

Q.   That's true?

A.   You're telling me that? I --

Q.   I'm actually -- no.  You need to tell me, Ms. Karpova, because you're
     here to talk to me about the sourcing and researching in plaintiffs'
     petition of those videos. Is that one of the videos you watched when
     y'all took the break?

A.   The Owen Shroyer video?

Q.   Yeah.

A.   Yes, I've seen that video before.

Q.   Of course. Yeah. You knew you were going to testify about it.

A.   What is the --

Q.   My question is, that was in 2017?

A.   Uh-huh.

Q.   It relied on Jim Fetzer. It had material from Jim Fetzer, correct?

A.   I don't know where Owen got that material.[62]

Ms. Karpova also testified that despite her lack of preparation, the company did not

feel it needed to do anything else to prepare her for the deposition:

Q.   When the company knew that it had to produce testimony about
     these videos in the plaintiffs' petition, the company did not feel it
     was worthwhile to have employees review, watch, catalog and figure
     out what was said and make that available to you, correct?

A.   The company believes that I have sufficient knowledge to testify
     regarding these matters.[63]

Ms. Karpova's testimony was even worse than the unprepared testimony previously

given by Rob Dew. Indeed, many of the questions on this topic were the exact same questions

from the prior depositions. Despite understanding not only the topic, but the specific

questions being asked, the company did not prepare Ms. Karpova. To excuse her lack of

preparation, Ms. Karpova claimed the topic was impossible to answer:

Q.   Ms. Karpova, did you just assert for me that that topic was too broad
     to be answered correctly? Is that what you told me?

---

[62] *Id.* at 256:2-257:3.
[63] *Id.* at 118:19-119:1.

A.  When it comes to -- yes, for -- for all intents and purposes, yes.

Q.  So when I ask you I want to know the sourcing for a video at InfoWars, you can't figure that out? That's too broad?

A.  Sourcing can mean a lot of different things. It can -- can you be more specifically what you mean by sources?

Q.  I think you know what it means, don't you? Right? What a source is? What do you think a source is?

A.  Where you get a particular information.[64]

In sum, the deposition resulted in no actual information regarding the videos or the sources and research for the claims made by the company.

### C.    Ms. Karpova was not prepared to testify about individuals involved in the production of the videos described in Plaintiffs' petitions.

On the second topic, Ms. Karpova had not been prepared and could not give testimony about which employees were involved in the creation of the videos or what roles they played. Even worse, Ms. Karpova testified that she possessed a list of which employees were working at specific times, but she did not bring the document to the deposition, so she could not answer specific questions:

Q.  Can you tell me what employees were involved in researching that video? Who came up with those claims in that video?

A.  I have a list of people who were working on that day. From that list I could tell you who might have been in production for that day.

Q.  So the best we can tell you is -- the best we can figure out is who might have been working in the production side at that date, correct?

A.  Yes.

Q.  Okay. Have you talked to any of those people before your deposition today?

A.  No.[65]

InfoWars employs a sizeable writing, editing, and production staff, many of whom contributed to the company's coverage of Sandy Hook. Unlike Ms. Karpova, those employees

---

[64] *Id.* at 50:11-25.
[65] *Id.* at 52:18-53:5.

possess first-hand knowledge of the research and sourcing for the videos. Ms. Karpova
admitted that she had every opportunity to speak to those employees, but she chose not to
do so.

> Q.  But for any of the videos that we're going to talk about today, for any
>      of the videos in Plaintiffs' Petitions, you had a list of who was
>      working at InfoWars at that time, correct?
> A.  Yes.
> Q.  And you could have interviewed those employees, correct?
> A.  I could have.
> Q.  And you didn't, correct?
> A.  Correct.[66]

As a result of her lack of preparation, Ms. Karpova continuously disclaimed any
knowledge of what employees were involved in researching InfoWars' claims:

> Q.  And again, just like our prior answers, you don't know what
>      employee researched the information to create the claims in this
>      video, correct?
> A.  Correct.[67]

In sum, Ms. Kaprova was completely unprepared to offer any testimony about the role
played by InfoWars' employees in this case.

> **D.  Ms. Karpova was not prepared to testify about internal editorial
>       discussions regarding InfoWars' coverage of the Sandy Hook Elementary
>       School shooting.**

Ms. Karpova was required to prepare to testify about InfoWars' editorial discussions
about its Sandy Hook coverage, but Ms. Karpova made no such preparations. In fact, she did
not prepare because Ms. Karpova testified that "we did not – we do not have editorial
discussions regarding Sandy Hook."[68] This statement is so wildly false that Plaintiffs' counsel
made sure to confirm her testimony:

---

[66] *Id.* at 52:22-54:6.
[67] *Id.* at 58:9-12.
[68] *Id.* at 87:7-8.

> Q. Did I hear you say InfoWars never had editorial discussions on
> Sandy Hook?
> A. Correct.
> Q. Okay. That's not true, though, right? People inside InfoWars have
> talked about Sandy Hook from an editorial standpoint a lot, correct?
> MR. REEVES: Objection; form.
> A. Negative.[69]

Ms. Karpova also confirmed that she understood the topic. She testified that "an
editorial discussion would be an internal conversation about what type of information,
angles to go with live on air or website or anywhere else."[70] After confirming Ms. Kaprova
understood the topic, Plaintiffs' counsel again confirmed her testimony:

> A. You asked me about the editorial discussions --
> Q. Right.
> A. -- of Sandy Hook.
> Q. And there's never been any -- was that your testimony?
> A. Yes.[71]

Plaintiffs' counsel further confirmed that if any editorial discussions *did* exist, Ms.
Karpova was unprepared to talk about those discussions:

> Q. If there were conversations between editors having editorial
> discussions about whether the sources they were using for Sandy
> Hook were reliable or not, are those discussions you're prepared to
> talk about today?
> A. I have no knowledge of those discussions.[72]
> ...
> Q. So I take it by that same token, you have never seen any documents
> in which one editor or high person in InfoWars, a writer, editor --
> let's say editor or producer is talking to another management-level
> employee and saying I'm really worried about our Sandy Hook
> sources, you've never seen any documents like that?
> A. Not specifically like that, no.[73]

---

[69] *Id.* at 104:9.
[70] *Id.* at 105:1-3.
[71] *Id.* at 106:8-13.
[72] *Id.* at 109:15-19.
[73] *Id.* at 109:20-110:2.

InfoWars' editorial discussions about Sandy Hook have been a central focus of the evidence offered by Plaintiffs throughout this case. In fact, Plaintiffs' recent Motion for Leave to Serve Net Worth Discovery contained a 50+ page recitation of evidence relating to internal editorial discussions. Indeed, one of the most oft-cited documents in this lawsuit, having been featured in every deposition and numerous briefs, is an email from InfoWars' chief editor telling another editor that he warned Ms. Jones that his sources on Sandy Hook were "batshit crazy."[74] The depositions and briefing in these cases have featured dozens of documents containing editorial discussions of Sandy Hook. Ms. Karpova was not prepared to address any of these discussions, denying that they even existed.

### D. Ms. Karpova was not prepared to testify about the company's knowledge of the Plaintiffs.

Ms. Karpova could not testify about the company's knowledge of the Plaintiffs or the documents produced concerning the Plaintiffs. For example, Defendants provided a set of electronic documents a few days before this Court's October 25, 2021 sanctions hearing. Included in those documents were folders containing documents specific to the four plaintiffs. The folder for Mr. Pozner contained a single document: a 187-page comprehensive background report on Mr. Pozner and dozens of his relatives. When asked about this document, Ms. Karpova could not provide any testimony:

> Q. Have you ever seen that? Have you seen that before today?
> A. No, I have not.
> Q. So in terms of the document, a single document that was recently produced to me about Leonard Pozner, you've never seen.
> A. If this is the single document you're talking about.
> Q. That's it. Uh-huh.
> A. No.
> Q. Okay. Do you see where it says FSSTX dash 8085544?
> A. Yes.

---

[74] *Id.* at 252:14.

Q.   Okay. You don't know what this is, do you? If I wanted to ask you what is this, you couldn't tell me.

A.   It looks like a background information.

Q.   Right. I mean, I can figure that out, right? Like, we can look at the top at the table of contents right here, and it says "For Licensed Investigator Purposes Only." Do you see where it says that?

A.   Yes.

Q.   And then do you see where it says "Leonard Pozner Comprehensive Report?

A.   Yes.

Q.   Do you see where it has all these entries about all this information about Leonard Pozner?

A.   Yes.

Q.   This is a lot of knowledge that the company has in its possession concerning Leonard Pozner. You'd agree with that?

A.   Yes.[75]

...

Q.   Do you see where it says page 66 for possible relatives? Can you flip to page 66 in that document for me?

A.   (Witness complies.)

Q.   This is a bunch of people's personal information, isn't it?

A.   Yes.

Q.   And you can't tell me why the company has this, can you?

A.   I don't know.

Q.   So when it comes to testifying about the company's knowledge of Leonard Pozner, which you can now see, it is extremely extensive, you're not prepared to testify about that today, right?

MR. REEVES:  Objection; form.

A.   Well, the company was asked for the knowledge of the plaintiffs.

Q.   Uh-huh. Lenny Pozner is a plaintiff, right?

A.   This is what they produced about the knowledge of the plaintiff.

Q.   Right. I understand that. I asked for a request for production of documents. Then I asked for your testimony. Part of the reason I asked for your testimony and the knowledge of the plaintiffs is because you produced to me -- your company produced to me -- a 187 page comprehensive background report on Leonard Pozner, and I wanted to know why. And I wanted to ask questions about that document. I wanted to know what was inside of it. I wanted to know the information that the company had and what they did with it. You can't answer any of that, can you?

A.    Well, this is -- just looks like a typical, like, investigation report done on a person.

Q.   You have no idea where it comes from, do you, Ms. Karpova? None, right?

---

[75] *Id.* at 219:19-220:24.

A. This is a document that you were provided by the company.
Q. Yeah. Where did the company get it? Do you know?
A. (No response.)
Q. So you don't know, correct?
A. Are you talking about specific people? No.
Q. You have no -- let's make this really clear. You have zero knowledge about this document, none whatsoever, correct?
A. Not other than it being an investigation report on Leonard Pozner.
Q. Which you have seen now –
A. Back -- background -- background information.
Q. Which you have now seen for the very first time, correct?
A. Yes.[76]

Ms. Karpova was also unable to give testimony concerning the videos made by the

company about Mr. Pozner:

Q. You know Mr. Jones did a video in February 15, 2015 about Mr. Pozner. You know that, right?
A. I don't have the video in front of me.[77]
...
Q. You understand InfoWars took Mr. Pozner's address and put it on air to its viewers. You know that, right?
MR. REEVES:  Objection; form.
Q. Or do you not know that?
A. I do not have the record of it right now.[78]

Ms. Karpova was also unable to give any testimony about the correspondence the

company has had with Mr. Pozner:

Q. Have you seen the email Leonard Pozner wrote to the company weeks after the shooting? Have you seen it?
A. I don't have the recollection of it.
Q. So in terms of trying to get up to speed on the company's knowledge of the Plaintiffs in terms of complaints that Leonard Pozner may have made to InfoWars, you haven't seen those, have you?
A. I haven't seen the email you're talking about.
Q. Right. Yeah. You know that both Paul Watson and Alex Jones, like, worked on responses to send to Leonard Pozner? Have you seen those?
A. I've seen, like I said, a lot of documents.

---

[76] *Id.* at 221:9-223:2-11.
[77] *Id.* at 145:8-11.
[78] *Id.* at 145:24-146:4.

Q.  I'm not asking you --
A.  (Cross-talk.)
Q.  So that's what I'm asking you. When you got prepared to talk to me
    about the company's knowledge of the Plaintiffs, you haven't even
    seen the correspondence that InfoWars has had with that Plaintiff,
    right?
A.  I have not.
Q.  You don't deny Mr. Pozner complained to InfoWars about its
    coverage within weeks of the shooting, right? You do acknowledge
    that. The company acknowledges that. The company has that
    knowledge. Or do you not know if the company has that knowledge?
A.  I don't have specific dates of his complaints.[79]

Ms. Karpova admitted that when it comes to the company's knowledge of the

Plaintiffs and the "documents [Defendants] produced as it relates specifically to those four

clients," she has only "[c]ursory knowledge of Leonard Pozner and no knowledge of the other

people."[80] In fact, Ms. Karpova admitted she was not prepared to testify about the company's

knowledge of any other Plaintiff:

Q.  What about Scarlett Lewis, do you know what the company has in
    terms of information about Scarlett Lewis?
A.  No.
Q.  Do you know what information the company has about Neil Heslin?
A.  No.
Q.  Do you know what information it has about Veronique De La Rosa?
A.  No.[81]

Defendants have twice produced a small collection of documents regarding Ms. De La

Rosa, Ms. Lewis, and Mr. Heslin -- first in 2019 and again in 2021 -- but Ms. Karpova was

unaware of these documents. Ms. Karpova also denied InfoWars had gathered information

on Mr. Heslin:

Q.  Are you sitting here and telling me today the company hasn't
    produced documents on those folks?
A.  No, the company has no knowledge.

---

[79] *Id.* at 217:2-218:3.
[80] *Id.* at 219:1-7.
[81] *Id.* at 223:12-21.

> Q.  Really? Okay. So InfoWars' employees weren't researching materials
> about Mr. Heslin?
> A.  There are -- there's no records of any employees researching things
> like that that --
> Q.  Yeah, there are. Unfortunately for you, Ms. Karpova, there definitely
> are.[82]

Ms. Karpova's testimony is contradicted by Defendants' document production. Among the few documents produced by InfoWars discussing Mr. Heslin are multiple emails showing that InfoWars anchor David Knight was researching hit-pieces about Neil Heslin's past immediately after Mr. Heslin's appearance on Megyn Kelly in 2017. These documents were later discussed in Mr. Jones' deposition.[83] Defendants also produced documents about the other Plaintiffs, but Ms. Karpova had no awareness of those documents.

Finally, Ms. Kaprova admitted that the only materials she reviewed in preparing to testify about the company's knowledge of the Plaintiffs were two articles about Noah Pozner having an open casket at his viewing service:

> Q.  The only two pieces of documentation that you have reviewed for
> this deposition about the Plaintiffs are two articles, both of which
> discuss in the article Noah Pozner's open-casket funeral, correct?
> A.  Yes.[84]
> ...
> Q.  Okay. So when it comes down to the documents that you reviewed
> for this deposition about the Plaintiffs, the only information that
> you're really gleaning from this that's useful to this deposition
> concerns Noah Pozner's open casket and the appearance of his body,
> correct?
> A.  It was useful to some of the points.
> Q.  I'm not asking what it's useful for. I'm asking you that of all the
> documents that you reviewed about the plaintiffs, the only piece of
> information that you have had gleaned from those documents that
> is relevant to this deposition concerns Noah Pozner's open-casket
> funeral and the appearance of his body, correct?
> A.  These are the articles that I had chosen to bring.

---

[82] *Id.* at 224:16-25.
[83] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 71:8-73:24.
[84] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 34:8-12.

Q.   So that is correct, right?

A.   (No response.)

Q.   Let's try it this way. You can't give me another piece of information out of either of those two articles that you believe is relevant to this deposition, right, other than Noah Pozner's open-casket funeral and the appearance of his body?

A.   Correct. Those are the articles for it, yes.

Q.   And those are the only articles that you've reviewed about the plaintiffs in preparation for this deposition, correct?

A.   Yes.[85]

With a trial on damages approaching, one of the chief purposes of this deposition was to discover what knowledge and information Defendants possessed about the Plaintiffs. Due to Ms. Karpova's lack of preparation, those discussions were impossible, irreparably prejudicing Plaintiffs' trial.

### E.   Ms. Karpova was not prepared to testify about the documents produced by the company in response to Plaintiffs' discovery requests.

Throughout the deposition, Ms. Karpova showed she was unfamiliar with Defendants' document production. As shown above, she totally uninformed as it concerned documents about the Plaintiffs. She was also unprepared to testify about numerous documents which have featured prominently in the case. Even worse, she testified that she did not review any documents produced in the case. After prompting from her counsel, Ms. Karpova later claimed that she *did* review documents relating to this topic, but she could not identify those documents, nor did she bring them to the deposition. Ms. Karpova testified as follows:

Q.   You thought it was important to bring articles about Noah Pozner's open-casket funeral, but did not think you should bring documents that you reviewed relevant to topic number four, correct?

A.   Correct.[86]

...

Q.   Would the documents fit in this folder (indicating)? Would they all fit in here do you think?

---

[85] *Id.* at 34:19-35:21.

[86] *Id.* at 41:16-21.

A.    I think so.
Q.    Okay. So you wouldn't need, say, like this to hold all them all. You
        could hold them all -- not in a banker's box like this, but in a manila
        folder like this, correct? Is that accurate?
A.    Yes.
Q.    Now, surely you remember some of those documents, right?
A.    I'm not sure.[87]
...
Q.    So sitting here today you can't identify any of the documents you
        reviewed. So you're not going – none of your testimony today is
        going to be based on those documents, correct?
A.    Not -- not off the top of my head.[88]

Ms. Karpova was also unprepared to speak to any specifics regarding the document

production, nor could she address which requests InfoWars' produced documents.[89] Due to

her lack of preparation, Plaintiffs was unable to secure testimony on this topic.

### F.    Ms. Karpova was not prepared to testify about efforts made by the company to preserve potential evidence.

Ms. Karpova could not answer questions about Defendants' document preservation

efforts. Ms. Karpova did not know when a letter went out through the company issuing a

litigation hold.[90] Ms. Karpova also had no knowledge of document preservation requests

from the Plaintiffs or the company's actions in response to those requests:

Q.    Let me ask you this. Has the company ever received any
        correspondence from the plaintiffs saying please preserve evidence?
        Do you know?
A.    I don't have any documents on that that I understand.
Q.    Okay. So in terms of getting ready to testify about efforts made to
        preserve documents, you have not seen any correspondence from
        the plaintiffs or their counsel asking to preserve documents?
A.    I have not. Point number five has anything to do with efforts made
        by the company to preserve potential evidence.
Q.    Right. And here's what I'm getting at, Ms. Karpova, is that I want to
        know when the plaintiffs served a request to preserve documents

---

[87] *Id.* at 44:6-19.
[88] *Id.* at 46:1-5.
[89] *See, e.g., id.* at 229-233.
[90] *Id.* at 242:11.

    back in April of 2018, one, if you have seen it, and two, if the company actually did anything. And from what I understand, you didn't ever see that correspondence, right?

A.   I haven't.[91]

In addition, Ms. Karpova knew nothing about efforts made to preserve InfoWars' various internal communication systems.

Q.   You know who Rocket.Chat is, right?

A.   Yes.

Q.   Okay. Is the company still using that?

A.   Yes.

Q.   Do you know when Rocket.Chat was searched?

A.   No.

Q.   Okay. Do you know when it was preserved?

A.   No.

Q.   Okay. What about Yahoo Messenger, do you know when that was used? Was that used during the events of this lawsuit?

A.   No, don't know.

Q.   Okay. What about Slack, was Slack used during the events of this lawsuit, since 2013?

A.   I'm not sure.

Q.   Okay. Was any efforts made to preserve any messaging systems like Slack?

A.   I don't know for sure.

Q.   Okay. What about things like Basecamp? Do you know what Basecamp is?

A.   Yes.

Q.   Okay. Was anything done to preserve Basecamp?

A.   I don't know any Basecamp associations with InfoWars.

Q.   Okay. Let me ask you this. Does InfoWars -- have they used Basecamp? Have employees used that to communicate with each other?

A.   No, not that I know of.

Q.   Okay. Not that you know of, right?

A.   I've never heard of Basecamp being a communication platform for InfoWars employees.

Q.   I hadn't either. And it was strange because we requested -- obviously we requested and asked for it, what are your communication platforms. Whatever, that's a whole other story. But I recently got produced a document from Paul Watson that talks about his Basecamp communications with another employee. And I'm just

---

[91] *Id.* at 243:8-244:1.

wondering when was Basecamp used.  But you aren't familiar with
Basecamp?

A.  No.

Q.  Okay. So by the same token if were there any efforts made to
preserve Basecamp messages, you don't know what those steps
were?

A.  No.[92]

Each of these issues has come up in prior corporate depositions and in the parties'

briefing. Nonetheless, Ms. Karpova had not been prepared to give any testimony on this topic.

### G.  Ms. Karpova was not prepared to testify about the audience reach of the videos described in Plaintiffs' petitions.

Ms. Karpova made no efforts to learn any information relevant to the audience reach

of the videos in Plaintiffs' petitions. Ms. Karpova could not identify everywhere the videos

appeared or were disseminated by InfoWars, and she made no attempts to secure audience

size information for any of the different mediums:

Q.  InfoWars is currently broadcast on over 200 radio stations, correct?

A.  Around there.

Q.  Okay. What did you do to go find out their viewership and audience
for those dates?

A.  There would be no information.

Q.  How do you know that? Who did you ask? Have you gone to -- let me
back this up. How many of those radio stations did you make
requests to?

A.  I didn't.

Q.  Okay. Did you do anything to figure out what those radio stations
audienceship was at the time those videos were broadcast?

A.  No.

Q.  Okay. At the time of the videos described in the plaintiffs' lawsuit,
how many over-the-air television stations from 2013 to 2018?

A.  I don't have the exact number.

Q.  So if I wanted to establish what the audience reach was of over-the-
air television broadcast of InfoWars, you can't help me with that
because you don't even know how many there are in terms of over-
the-air television, right?

A.  Well, the topics asked for specific videos and the reach of those
videos.

---

[92] *Id.* at 245:14-247:8.

Q.   Uh-huh. And those videos were broadcast on over-the-air television,
     right?

A.   I would say during -- well, not necessarily. Some of the videos could
     have been posted as standalone videos.

Q.   A lot of "coulds" in this room. We don't know, do we? Right? So we
     know -- one thing we do know is at least some of them were
     broadcast over-the-air television, right?

A.   Yes.[93]

...

Q.   How many cable packages was InfoWars carried on between 2013
     to 2019?

A.   That wasn't part of the questions. I could have found that
     information for you from an Affiliate Relations person.

Q.   Part of InfoWars' audience reach is the people that it reaches over
     cable packages, right?

MR. REEVES:  Objection; form.

Q.   Isn't that true?

A.   That is a very specific question pertaining to a department, a
     particular department that would need to be --

Q.   And you didn't go do that?

A.   No. That wasn't in the scope of the questions.

Q.   So in terms of the audience reach of these videos that was reached
     on any cable packages, you don't have any information on that for
     me today?

A.   No.

Q.   Okay. How many OTT services -- well, first of all, do you know what
     an OTT service is?

A.   What is it?

Q.   Over-the-top.

A.   Okay.

Q.   Over-the-top box systems.

A.   Okay.

Q.   Like, I think one example might be, like, Roku.

A.   Okay.

Q.   That would be an example of an OTT system. InfoWars has
     frequently promoted that it's on multiple OTT systems, right?

A.   But the company would have no -- the company would keep no track
     of those kinds of views.

Q.   But you don't know if that information is accessible, do you?

A.   There's no information for me that.

Q.   Well, let's fist figure out the first thing that I might need if I'm going
     to try to figure out the audience reach was, which is how many OTT
     packages is InfoWars included on?

A.   I would have to go back and check on that.

---

[93] *Id.* at 225:16-227:3.

> Q.  So in terms of the reach -- the audience reach of the audience that
> was reached through those OTT packages, InfoWars has no
> information to offer today.
>
> A.  Correct.[94]

In order to answer questions about the audience reach and various mediums of
distribution, Ms. Karpova claimed she would have to talk to employees in InfoWars' Affiliate
Relations department. This answer by Ms. Karpova was especially surprising since InfoWars'
Affiliate Relations department was discussed at length in connection with Plaintiffs' pending
sanction motion regarding post-remand written discovery. In that briefing, Plaintiffs showed
how InfoWars' evasive answers about its audience reach and channels of distribution were
not made in good faith given the existence of InfoWars' Affiliate Relations department.
Plaintiffs' briefing even included public statements made by the manager of InfoWars'
Affiliate Relations department. These matters were also discussed at oral hearing, where
Plaintiffs' counsel again raised the problems with InfoWars' written discovery on this topic.
Nonetheless, Ms. Karpova was unprepared to address these issues and had not spoken with
Affiliate Relations about where InfoWars videos were distributed and what audiences they
reached.

**H.     Ms. Karpova was not prepared to testify about the company's business
structure and relationship with other parties.**

As this Court may recall from both the Sandy Hook lawsuits and the *Fontaine* case,
Plaintiffs have faced immense difficulty in securing information about the business of
structure of Mr. Jones' companies. Plaintiffs had no better success in Ms. Karpova's
deposition. Ms. Karpova was unprepared to testify regarding the basic facts about InfoWars,

---

[94] *Id.* at 227:10-229:3.

LLC. For example, Ms. Karpova did not know if InfoWars, LLC was a holding company.[95]
However, Defendants admitted in the *Furie* copyright litigation that InfoWars, LLC "is an
intellectual property holding company." *Furie v. Infowars, LLC,* 401 F. Supp. 3d 952, 970 (C.D.
Cal. 2019). Likewise, Ms. Karpova denied that InfoWars, LLC was a subsidiary of Free Speech
Systems.[96] Yet more than two years ago, Defendants' counsel stated InfoWars, LLC would be
considered as "a subsidiary of Free Speech Systems" for the purposes of this litigation.[97]
Because Ms. Karpova did not even understand InfoWars, LLC or its purpose as a holding
company, it was clear she was unprepared to testify about the company.

### III.    Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith.

Mr. Jones appeared for deposition the day after Ms. Karpova. During his belligerent
testimony, the first words out of Mr. Jones' mouth again made clear his utter contempt for
these proceedings:

> I know that my seventh amendment rights were violated by a political
> show trial. Yes, I do know that.[98]

Mr. Jones later testified that:

> The death penalty sanction with all the stuff we produced I believe was
> a fraud. And it's because they're scared of the real evidence coming out
> and want to be able to tell a jury that this man is guilty, now you decide
> how guilty.[99]
> ...
> I know I didn't get a jury trial. I know a judge said I was guilty. I don't
> believe that I live in the Soviet Union.[100]

---

[95] *Id.* at 244:16-24.
[96] *Id.* at 244:2-4.
[97] Exhibit 1, April 3, 2019 Hearing Transcript in *Lewis,* p. 33.
[98] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 1:23-25.
[99] *Id.* at 11:17-22.
[100] *Id.* at 13:22.

Mr. Jones testified that if this Court's conduct "isn't fraud, then nothing is."[101] Mr.

Jones also blew off his obligations by claiming that he did not spend much time thinking

about the discovery requests served by Plaintiffs' counsel:

> Q. You remember we talked in that last deposition about the
> Bloomberg email where Bloomberg sent an email out to his people,
> said get ready in the next 24 hours, there's going to be a big event?
> You remember that?
> A. That was a news story, yeah.[102]
> …
> Q. And then you remember you told me you could find it for me. Right?
> A. Yeah, I believe I said that.
> Q. And then you never gave it to me, did you?
> A. To be honest with you, Bankston, you don't really inhabit much in
> my mind.
> Q. I know, yeah. You don't have much respect for any of this process,
> do you? None of it?
> A. I don't think you have respect for America or anything.[103]

It is abundantly clear from Mr. Jones' own statements that he has no respect for this

process and does not intend on complying with his obligations as it concerns these lawsuits.

Despite all of this Court's prior interventions (and indeed because of them), Mr. Jones intends

to proceed in bad faith through the remainder of this case, asserting that these cases are a

political show trial after having sabotaged the proceedings.

## IV. InfoWars has the Resources to Properly Prepare its Corporate Designee.

Given the resources at its disposal, InfoWars had no excuse for its failure to prepare

its deponent. During the deposition, Ms. Karpova was questioned about a document

reflecting revenue to the InfoWars.com online store between 2016 and 2018.[104] Ms. Karpova

testified that the sales revenue reflected in the document during that period was in excess of

---

[101] *Id.* at 12:22.
[102] *Id.* at 22:5-10.
[103] *Id.* at 22:17-23:1.
[104] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 239:17.

$165 million.[105] The document shows that InfoWars' revenue figures rose even after its social media "deplatforming" in August of 2018.[106] Yet even assuming no growth in revenue in 2019-2021, it would appear InfoWars has generated another quarter billion dollars in revenue during the three years of this lawsuit solely from online sales in the InfoWars.com store. This does not even account for InfoWars' numerous other revenue streams, which has included advertisers, click-through promotion revenue, Amazon.com sales, Ebay.com sales, YouTube monetization, donation drives, and others. According to its net worth interrogatory answer, Free Speech Systems, LLC appears to possess in excess of $50 million in capital, which it claims it owe in its entirely to "PQPR Holdings, Inc.," another shell company registered by attorney Eric Taube which is owned and controlled by Alex Jones.[107] In his own net worth interrogatory answer, Mr. Jones' noted significant assets, including equity interest in excess of $50 million, an interest note in excess of $25 million, and over $6 million in various other assets, cash, and cryptocurrency.[108] Given the history of this suit and Mr. Jones' lack of candor, Plaintiffs also expect that he has additional assets squirreled away, likely in some other shell company as yet undisclosed.

In short, Mr. Jones' operation is not a small business or a "mom and pop" company. Instead, it is one of the most lucrative media enterprises on the planet, acting as a full-time informercial for massive sales of dietary and herbal supplements. InfoWars has the resources to properly participate in corporate discovery and take the steps necessary to prepare its designee or multiple designees.

---

[105] *Id.* at 240:3.
[106] Exhibit 6, Revenue Spreadsheet, FSSTX-086589.
[107] Exhibit 7, Free Speech Systems, LLC Answer to Net Worth Interrogatory;
*see also* https://opencorporates.com/companies/us_tx/0801863807
[108] Exhibit 8, Alex Jones' Answer to Net Worth Interrogatory.

**V.     This Court Should Enter All Remedies at its Disposal.**

Little more can be said about Defendants' ceaseless pattern of discovery abuse that has not already been said. Defendants have sabotaged Plaintiffs' case at every step of the proceedings, undeterred by repeated sanctions and contempt findings. Even after the severe sanction of a liability default, Defendants' bad faith obstruction continues, now sabotaging the remaining issues in the case. Obviously, Plaintiffs ask the Court to grant this motion and award reasonable expenses caused by Defendants' conduct. In addition, Plaintiffs request the following remedies:

**A.     Preclude further discovery.**

Rule 215(b)(1) authorizes this Court to enter "an order disallowing any further discovery of any kind or of a particular kind by the disobedient party." In this case, where Defendants have flagrantly sabotaged Plaintiffs' discovery at every step, Defendants should not reap the reward of any further discovery from the Plaintiffs. To preserve fairness, this Court should address Defendants' ceaseless contempt by terminating discovery.

**B.     Award all litigation costs under Rule 215(b)(2).**

Plaintiffs have expended extraordinary effort pursing discovery for years, only to be met by consistent obstruction and bad faith. Plaintiffs should not be forced to absorb those expenses. This Court has already awarded some of the attorney's fees related to discovery, but Plaintiffs have incurred numerous other expenses and court costs over the course of the litigation. This Court is empowered under Rule 215(b)(2) to address this inequity by entering "an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him." Such an award is appropriate given Defendants' ceaseless obstruction.

771 of 1271

## C.      Enter evidentiary findings under Rule 215(b)(3).

These depositions have been sought since they were ordered by the Court in August

2018 yet ignored by Defendants. In particular, the corporate deposition was the last

available avenue to secure necessary information relating to Plaintiffs' claims for punitive

and compensatory damages. By repeatedly sabotaging this process, Defendants have

prejudiced Plaintiffs' ability to introduce evidence on the topics of the corporate deposition.

It should be remembered that Plaintiffs' ability to take a meaningful corporate deposition

had already been severely hamstrung due to Defendants' false and evasive answers to post-

remand written discovery. Under Rule 215(b)(3), this Court is authorized to order that

"designated facts shall be taken to be established for the purposes of the action." Here, the

Court should enter an order instructing the jury that relevant facts relating to the eight

corporate deposition topics should be taken as established in favor of the Plaintiffs.

## D.      Assess punitive monetary sanctions for outrageous discovery abuse.

In addition to awards of attorney's fees, the Court can award punitive monetary

sanctions. "Trial courts have discretion to impose monetary sanctions within limits" so long

as those sanctions are "directed toward remedying prejudice caused to the innocent party."

*CHRISTUS Health Gulf Coast v. Carswell,* 505 S.W.3d 528, 541 (Tex. 2016). In awarding a

punitive monetary sanction, a trial court must "explain its rationale behind the amount

imposed as monetary sanctions or the relationship between the sanctions and particular

conduct." *Id.* At 540. In *RH White Oak,* the Court of Appeals upheld the following justification

for awarding punitive monetary sanctions in addition to attorney's fees:

> The egregiousness and repetitiveness of Defendants' egregious
> perjury and misconduct exhibits Defendants' total disregard for
> and disrespect of the integrity of this Court and our judicial
> system. The Court finds that Defendants can pay monetary

sanctions, if ordered by the Court. Again, Defendants' perjury and misconduct go to the heart of this case, is egregious, exceptional and exemplifies a pattern of misconduct and disregard for truth which is not to be tolerated. Additional monetary sanctions are just, appropriate and there is a direct relationship between the egregiousness and repetitiveness of Defendants', their perjury and misconduct and this sanction because this is an exceptional case of perjury and misconduct, not about failing to produce one document or one lie, but a mountain of evasiveness, lack of candor, concealment, numerous outright lies, and total disregard for truth, which is the foundation of our judicial system based on truth, rules and litigants' compliance with those rules. Accordingly, additional monetary sanctions are appropriate, just and not excessive.

*RH White Oak, L.L.C. v. Lone Star Bank,* 14-16-00840-CV, 2018 WL 4925118, at *6 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018) (remanded by agreement, Feb. 8, 2019). In this case, every corrective step taken by the Court and other courts have been ineffective at altering or deterring Mr. Jones' contempt for these lawsuits. As such, a severe monetary penalty is now justified to address Mr. Jones' determined efforts to sabotage this process.

## CONCLUSION

For all of the reasons above, Plaintiffs ask this Court to grant their motion and enter all appropriate remedies, as reflected in Plaintiffs' Proposed Order.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

_____
MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2021, the forgoing document was served upon the Court and all counsel of record via e-mail. The document was not filed on that date, pursuant to Protective Order, pending potential action on a Motion to Seal. No action having been taken, the document has now been filed on December 27, 2021.

_____
MARK D. BANKSTON

# Plaintiffs' Proposed Order

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

# D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

## ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS
## REGARDING CORPORATE DEPOSTION

On this day, the Court considered Plaintiffs' Motion for Sanctions Regarding Corporate Deposition. For the reasons below, the Court finds that the Motion should be granted.

# BACKGROUND

Defendants' pattern egregious discovery abuse is well-detailed in the many prior orders of this Court,[1] but a brief history of Plaintiffs' attempts to take a corporate deposition is as follows:

On August 31, 2018, the Court ordered Defendants to appear for depositions in Mr. Heslin's defamation claim (D-1-GN-18-001835). Defendants refused to appear for the depositions or respond to written discovery. After Plaintiff filed a Motion for Sanctions, Defendants initiated an appeal.

On January 25, 2019, this Court ordered Defendants to respond to court-approved discovery requests and appear for depositions in Ms. Lewis' IIED case (D-1-GN-18-006623). Defendants presented Rob Dew as a corporate designee, who was unable to give any testimony. The Court chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition." Defendants agreed to stipulate to Plaintiff's petition

---

[1] In addition to discovery abuse in these cases, the Court has considered Defendants' consistent pattern of bad faith litigation tactics and discovery abuse in other cases and courts. First, as described in this Court's prior orders, InfoWars has also committed discovery abuse in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a defamation lawsuit relating to the Stoneman Douglass High School shooting. In that case, InfoWars failed to timely answer written discovery. After InfoWars provided untimely and evasive responses, Mr. Fontaine was forced to bring a motion to compel InfoWars' compliance, for which this Court awarded sanctions and attorney's fees on September 15, 2021. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar lawsuit brought after the instant cases by a different set of Sandy Hook parents in the Superior Court of Connecticut, ultimately resulting in a default judgment on liability several weeks after this Court's entry of default judgment. The Court further notes that Defendants have been sanctioned by the Texas Court of Appeals for bringing a frivolous appeal in Mr. Heslin's case. Finally, as noted in the Court's default judgment order, Mr. Jones has publicly declared that he considers these lawsuits to be a "show trial," showing clear signs that Defendants' discovery violations are the result of bad faith. Mr. Jones' recent deposition confirmed these signs, during which Mr. Jones testified about his indifference to his discovery obligations.

for the purposes of the TCPA motion and voluntary pay $8,100 in attorney's fees to avoid sanctions at that time.

Following the events in *Lewis,* the premature appeal in Mr. Heslin's defamation case was dismissed for lack of jurisdiction. Upon remand to this Court in the fall of 2019, InfoWars again refused to respond or appear for deposition. On October 18, 2019, this Court assessed sanctions of $25,875, while also ruling that Plaintiff's burdens were taken as established for the purposes of the TCPA motion.

On October 18, 2019, this Court ordered Defendants to appear for deposition in Mr. Heslin's IIED case (D-1-GN-18-004651).[2] Again, Rob Dew was produced as the corporate designee. Again, Mr. Dew had not been prepared and was unable to offer any meaningful testimony. On December 20, 2019, the Court assessed sanctions totaling $100,000 and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court held a default judgment under advisement based on representations by Defendants that discovery would be promptly supplemented during the appellate stay.

All of the cases were remanded in June 2021. Defendants had not taken any steps to address the discovery situation during the appeal, and for the next three months following remand, Defendants ignored Plaintiffs' demands for compliance. On September 27, 2019, this Court issued a default judgment on liability and awarded attorney's fees of $45,925.

### THE DECEMBER 3, 2021 CORPORATE DEPOSITION

Following the default judgment, Plaintiffs again sought the Defendants' depositions to secure testimony relevant to the trial on compensatory and punitive damages. Defendants produced Daria Karpova for the deposition. The transcript of Ms. Karpova's deposition

---

[2] Subsequently consolidated with D-1-GN-18-001835.

shows that she was not prepared to discuss any of the eight topics for which she had been designated. Her testimony as a whole demonstrated profound disrespect for the discovery process. Ms. Karpova's lack of preparation was flagrant and egregious, especially given the repeated refusal to prepare a designee. Plaintiffs have now faced four non-appearances at corporate depositions on the issues at the heart of their claims despite every remedial action taken the Court, including the severe sanction of default and over $165,000 in cumulative attorney's fees.

### FINDINGS

. The Court finds that, once again, Defendants have intentionally thwarted the legitimate discovery process in these cases. There is no other way to interpret the refusal to prepare Ms. Karpova as anything but obstruction of the highest order. The egregiousness and repetitiveness of Defendants' obstruction exhibits a total disregard for and disrespect of the integrity of this Court and our judicial system. Plaintiffs' discovery of facts necessary to properly present their claim for damages has been irreparably prejudiced in virtually all respects. Absent severe action from this Court, Defendants will ultimately profit from their sabotage of the discovery process.

The Court therefore ORDERS that:

1.      Pursuant to Rule 215(b)(1), the Court disallows any further discovery by Defendants. Any obligation of the Plaintiffs to respond to any pending discovery is terminated.

2.      Pursuant to Rule 215(b)(2), the Court orders that Defendants shall pay all of the expenses of discovery and taxable court costs in these lawsuits. Within 30 days of this Order, Plaintiffs shall submit evidence setting forth any court costs or attorney's fees relating

to discovery or discovery motions, excepting those costs or attorney's fees which were already awarded in any prior order of the Court.

3.     Pursuant to Rule 215(b)(3), the Court orders that designated facts shall be taken to be established for the purposes of the action. Specifically, the jury will be instructed that any factual dispute between the parties relating to the following corporate deposition topics shall be taken as established in favor the Plaintiffs:

- Sourcing and research for the videos described in Plaintiffs' petitions.
- Individuals involved in the production of the videos described in Plaintiffs' petitions.
- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.
- The company's knowledge of the Plaintiffs.
- The audience reach of the videos described in Plaintiffs' petitions.
- The documents produced by the company in response to Plaintiffs' discovery requests.
- Efforts made by the company to preserve potential evidence.
- The company's business structure and relationship with other parties.

4.     The Court orders that Defendants shall pay additional punitive monetary sanctions in the amount of $_____. The Court finds that there is a direct relationship between additional monetary sanctions and the egregiousness and repetitiveness of Defendants' obstruction. Defendants' pattern of discovery abuse is a truly exceptional case and exemplifies a course of misconduct which must be deterred lest future litigants pursue the same path. Given the outrageous nature of the misconduct, the total failure of prior sanctions, and the massive prejudice to Plaintiffs' claims, the Court finds that additional monetary sanctions are appropriate, just, and not excessive. Defendant shall pay this sanction within 30 days of this Order.

Dated _____, 2021.

_____
Hon. Maya Guerra Gamble

# Exhibit 1

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
782 of 1271

1

<pre>
 1                  REPORTER'S RECORD
                 VOLUME 1 OF 1 VOLUME
 2         TRIAL COURT CAUSE NO. D-1-GN-18-006623

 3
    SCARLETT LEWIS              )  IN THE DISTRICT COURT
 4                              )
          Plaintiff             )
 5                              )
                                )
 6  VS.                         )
                                )  TRAVIS COUNTY, TEXAS
 7                              )
    ALEX E. JONES, INFOWARS,    )
 8  LLC, AND FREE SPEECH        )
    SYSTEMS, LLC                )
 9                              )
          Defendants            )  53RD JUDICIAL DISTRICT
10

11

12      --------------------------------------------------

13

14       EXCERPT FROM HEARING ON MOTION FOR SANCTIONS

15

16      --------------------------------------------------

17

18      On the 3rd day of April, 2019, the following

19  proceedings came on to be heard in the above-entitled

20  and numbered cause before the Honorable Scott H.

21  Jenkins, Judge presiding, held in Austin, Travis County,

22  Texas;

23      Proceedings reported by machine shorthand.

24

25
</pre>

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
783 of 1271

2

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

    MARK D. BANKSTON
    SBOT NO. 24071066
    WILLIAM OGDEN
    SBOT NO. 24073531
    KASTER, LYNCH, FARRAR & BALL
    1010 Lamar, Suite 1600
    Houston, Texas  77002
    (713) 221-8300


FOR THE DEFENDANTS:

    ROBERT BARNES *(Admitted Pro Hac Vice)*
    BARNES LAW
    601 South Figueroa Stree, Suite 4050
    Los Angels, California  90017
    (213) 330-3341

    RICHARD E. YOUNG
    SBOT NO. 22204800
    GLAST, PHILLIPS & MURRAY
    14801 Quorum Drive, Suite 500
    Dallas, Texas  75254
    (972) 419-8300

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
784 of 1271

3

**I N D E X**

**VOLUME 1**

**EXCERPT FROM HEARING ON MOTION FOR SANCTIONS**

**APRIL 3, 2019**

|                                          | <u>Page</u> | <u>Vol.</u> |
|------------------------------------------|-------------|-------------|
| Argument by Mr. Barnes...............    | 4           | 1           |
| Further Argument by Mr. Bankston.....    | 39          | 1           |
| Rule 11 Agreement....................    | 53          | 1           |
| Adjournment..........................    | 54          | 1           |
| Court Reporter's Certificate.........    | 55          | 1           |

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 785 of 1271

30

1  allegation made by the plaintiffs is true, they cannot

2  bring this claim as a matter of law as an intentional

3  infliction of emotional distress claim.  I'm sure the

4  answer to this is going to be yes.  That would mean if

5  that's -- that's true as to all defendants.  So they

6  don't need to worry anymore either about the failure of

7  the defendants to present an InfoWars corporate

8  representative who has a clue about InfoWars as a

9  corporation.

10              MR. BARNES:  That's correct, Your Honor.

11              THE COURT:  Because you heard me say,

12  golly, if they prevail as to the other defendants, you

13  shouldn't be able to kick out InfoWars because they

14  haven't been able to get information about InfoWars.

15              MR. BARNES:  That's correct, Your Honor.

16              THE COURT:  But that's taken care of

17  because it's subsumed within the concession, the broad

18  concession you made earlier.

19              MR. BARNES:  Yes, Your Honor.

20              THE COURT:  Okay.

21              MR. BARNES:  And one additional component

22  of that, I had offered the plaintiffs Mr. Jones to be

23  the InfoWars guy.

24              THE COURT:  Say that once again.  I'm

25  sorry.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
786 of 1271

31

```
 1              MR. BARNES:  I'm sorry, Your Honor.

 2              THE COURT:  No, it's me.  It's me.

 3              MR. BARNES:  I'm sorry.  Oh, I had offered

 4   the plaintiffs prior to the deposition -- what happened

 5   is on March the 11th, that Monday, the person who had

 6   signed the interrogatories for InfoWars, LLC had -- I

 7   can't disclose -- had a medical emergency that he

 8   actually was hospitalized for.

 9              THE COURT:  One of the exhibits was some

10   really generic statement by a doctor, but I saw that.

11              MR. BARNES:  I was trying to avoid --

12   there's strict HIPAA limitations on what I can say.

13              THE COURT:  I understand.

14              MR. BARNES:  But it was a serious

15   emergency.  So then I realized we needed to sub them

16   out.  So one thing that I offered plaintiff's counsel

17   was I said Alex Jones will be available on the 20th when

18   they were -- to be the InfoWars representative when they

19   were also doing other depositions.  They declined.

20              THE COURT:  They declined to have Alex

21   Jones be the corporate rep for InfoWars?

22              MR. BARNES:  For the -- on the -- yes,

23   Your Honor, on the 20th.  They said they wanted to go

24   forward on the 15th.  So I assumed, to be honest with

25   you, that they --
```

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
787 of 1271

32

 1                    THE COURT:  Let me make sure I understand

 2     it, not that this matters anymore in light of your

 3     global concession you've made in this hearing.  You

 4     offered when to make Alex Jones the corporate rep for

 5     InfoWars and they declined?

 6                    MR. BARNES:  I believe on -- I believe it

 7     was March the 12th, Your Honor.

 8                    THE COURT:  And why did they not want Alex

 9     Jones to be the corporate rep for InfoWars?  He would be

10     the person most knowledgeable about InfoWars.

11                    MR. BARNES:  That he would be available

12     for that on the 20th, and they wanted the corporate rep

13     to be deposed on the 15th.

14                    THE COURT:  Which was the schedule.

15                    MR. BARNES:  Absolutely.

16                    THE COURT:  I see.  So you weren't

17     offering to make Alex Jones the corporate rep on the

18     date that had already been ordered for the corporate rep

19     deposition.  You wanted to postpone it and make him the

20     corporate rep on a later date.

21                    MR. BARNES:  That's correct, Your Honor.

22                    THE COURT:  So it was really the timing, I

23     guess I'll hear, to the extent it matters anymore on

24     that.

25                    MR. BARNES:  Yes, Your Honor.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
788 of 1271

33

```
 1              THE COURT:  Okay.
 2              MR. BARNES:  And the way I interpreted it
 3 is -- Rob Dew is the director of production for Free
 4 Speech Systems.  He handles all the -- getting the
 5 broadcasts together.  So I -- and he was already going
 6 to be the person for Free Speech Systems.  So I thought,
 7 oh, really what they want to get into is how did the
 8 broadcast happen, what information was relied on.  So
 9 that's why I had him designated as InfoWars.  And I was
10 the one that confirmed that it's only a paper entity.
11 It was formed many years ago originally with the
12 intentions of putting the website into InfoWars.  That
13 never functionally happened.  Then the divorce
14 proceeding started, so he's advised just to freeze
15 everything.
16              I think to the degree it makes it easier,
17 we'll probably just make InfoWars, LLC -- rather than
18 dissolve it, just make it a subsidiary of Free Speech
19 Systems.  That simplifies it across the board.  But
20 there was no goal or objective of trying to not have
21 someone available.  I thought they were looking at just
22 the production side, this is the same guy that knows the
23 production side, so I'll produce him.  And because he
24 was relying upon me for his information about InfoWars,
25 that was where he didn't go into detail on that aspect.
```

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
789 of 1271

34

1 But there was no goal whatsoever to have someone

2 unavailable for those purposes.  It's just an entity

3 that only exists on paper, and all Alex Jones could say

4 is the exact same thing.  It exists on paper.  The

5 lawyers did it.

6          THE COURT:  Well, he'd say more than that

7 witness.  I mean, the part of the transcript I read, he

8 was clueless about InfoWars.

9          MR. BARNES:  Yeah, I mean, he has very

10 limited --

11          THE COURT:  The deponent just knew nothing

12 about InfoWars, so it was a pretty meaningless

13 deposition in terms of explicating InfoWars as an

14 entity.

15          MR. BARNES:  It only exists on paper, so

16 there's not -- like I didn't know what else --

17          THE COURT:  I understand, but he didn't

18 even really explain that, but okay.

19          MR. BARNES:  Oh, yeah.  That's because I

20 thought they were really having him there for the other

21 purposes.

22          THE COURT:  Okay.

23          MR. BARNES:  There was, again, no goal or

24 objective to in any way withhold information or anything

25 else.  So, again, we'll accommodate the plaintiffs

# Exhibit 2

CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN | * | IN THE  DISTRICT  COURT |
| | * | |
| VS. | * | |
| | * | OF TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, | * | |
| LLC, and FREE SPEECH | * | |
| SYSTEMS, LLC | * | 261ST JUDICIAL DISTRICT |

*********************************

VIDEOTAPED ORAL DEPOSITION OF

ROB DEW

November 26, 2019

*********************************

VIDEOTAPED ORAL DEPOSITION OF ROB DEW, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th of November, 2019, from 1:27 p.m. to 3:22 p.m., before Micheal A. Johnson, RDR, CRR, CSR, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the law offices of Burnett Turner, 6034 West Courtyard Drive, Suite 140, Austin, Texas pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

---

**2**

1          APPEARANCES
2  ON BEHALF OF THE PLAINTIFF
   NEIL HESLIN:
3
   Bill Ogden
4  Mark D. Bankston
   FARRAR & BALL, LLP
5  1117 Herikimer Street
   Houston, Texas 77008
6  (713) 221-8300
   bill@fbtrial.com
7  mark@fbtrial.com
8
   ON BEHALF OF THE DEFENDANTS
9  ALEX E. JONES, INFOWARS, LLC
   AND FREE SPEECH SYSTEMS, LLC:
10
   T. Wade Jefferies
11 THE LAW FIRM OF T. WADE JEFFERIES
   401 Congress Avenue, Suite 1540
12 Austin, Texas 78701
   (512) 201-2727
13 twadejefferies@twj-law.com
14
   VIDEOGRAPHER:
15
   Robie Rowley
16
17 ALSO PRESENT:
18 Brooke Binkowski
19
20
21
22
23
24
25

---

**4**

1          DEPOSITION EXHIBITS
              ROB DEW
2         November 26, 2019
3

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|

4

5  Exhibit 1   Order on Plaintiffs' Motion        6
              for Expedited Discovery in
5              Aid of Plaintiff's Response
              to Defendants' TCPA Motion
6
7  Exhibit 2   04/24/2018 E-mail, Rob Dew       67
              to Melinda Flores, et al.
8              Heslin (19-4651) - 000627
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1              INDEX
              ROB DEW
2         November 26, 2019
3

APPEARANCES                    2
4

PROCEEDINGS                    5
5
6

EXAMINATION OF ROB DEW:
7
   BY MR. OGDEN                 5
8
9
CHANGES AND SIGNATURE          92
10
   REPORTER'S CERTIFICATION     94
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**5**

1              PROCEEDINGS
2          THE VIDEOGRAPHER:  We are on the record.
3  This is the videotaped deposition of Rob Dew.  Today's
4  date is November 26, 2019, and the time is 1:27 p.m.
5          Would you please swear in the witness.
6              ROB DEW
7  having been first duly sworn, testified as follows:
8              EXAMINATION
9  BY MR. OGDEN:
10     Q.  Please state your name.
11     A.  Rob Dew.
12     Q.  Mr. Dew, what -- why are you here today?
13     A.  You guys have questions for me.
14     Q.  Do you have -- can you tell us what your
15 understanding is about what those questions are going to
16 be about?
17     A.  They have to do with the Sandy Hook lawsuit.
18     Q.  Okay.  You're here as a corporate
19 representative.  You understand that?
20     A.  Yes.
21     Q.  And you've testified on behalf of -- as a
22 corporate representative before, correct?
23     A.  Correct.
24     Q.  As you sit here right now, who are you a
25 corporate representative for?

6

1      A.  Free Speech Systems.
2          (Deposition Exhibit 1 marked for
3          identification.)
4      Q.  (BY MR. OGDEN)  I'm going to hand you
5   Exhibit 1.
6      A.  Okay.
7      Q.  Have you seen Exhibit 1 before?
8      A.  I've seen a lot of these.  Let me just look
9   through it real quick.
10     Q.  And to shortcut this, I can tell you it's at
11  the bottom of page 1, top of page 2.
12     A.  Bottom of page 1, top of page 2, yes.
13     Q.  Those are the topics.  It's double-sided.
14     A.  Okay.  Right.  Okay.
15     Q.  Which of the four topics listed at the bottom
16  of page 1 and top of page 2 of Exhibit 1 are you
17  prepared to discuss today?
18     A.  I am prepared to discuss a), Sourcing and
19  research for the videos described in Plaintiff's
20  petition, and b), Internal editorial discussions
21  regarding Free Speech Systems's coverage of Sandy Hook
22  Elementary School shooting.
23     Q.  What did you do to prepare for your deposition
24  testimony today regarding sourcing and research for the
25  videos described in plaintiff's petition?

7

1      A.  Not much, other than speak with my attorney.
2      Q.  Did you look at any documents?
3      A.  I looked at this document, and that's it in
4   terms of preparing for this.
5      Q.  Did you talk to any fellow employees?
6      A.  Other than Alex Jones, I think, no.
7      Q.  You would agree with me there are a number of
8   employees that were researchers or were involved in the
9   sourcing process of getting Sandy Hook information,
10  correct?
11     A.  There was -- yeah, I would agree there's more
12  than one employee doing that.
13     Q.  Why didn't you talk to any of them?
14         MR. JEFFERIES:  Objection, form.
15         Go ahead.
16     A.  Talk to any of the employees?  I would say most
17  of the employees that were there back then are not there
18  now.
19     Q.  (BY MR. OGDEN)  Okay.  Is Buckley Hamman still
20  there?
21     A.  No.
22     Q.  Is Nico?
23     A.  No.
24     Q.  Is Darrin McBreen?
25     A.  He is still there.

8

1      Q.  Did you talk to him?
2      A.  We share an office, but we don't -- so I have
3   talked to Darrin McBreen.  I don't -- it wasn't about
4   preparing for this -- for this at all.
5      Q.  Are you prepared to testify as to the
6   discussions Darrin McBreen has had with individuals at
7   Free Speech Systems regarding the sourcing and research
8   for videos described in plaintiff's petition?
9      A.  Am I -- repeat that again.  Am I prepared to --
10     Q.  You understand Topic a) in Exhibit 1?
11     A.  Right.
12     Q.  Are you prepared to give testimony today
13  regarding Darrin McBreen as it applies to Topic a)?
14     A.  That depends on what your question would be.
15  I'm not sure if I have the answer to any questions about
16  Darrin McBreen.
17     Q.  What type of information and research -- excuse
18  me.  What type of research did Darrin McBreen do
19  regard -- involving the videos in plaintiff's petition?
20     A.  I wouldn't consider him a researcher.
21     Q.  Has he ever done research?
22     A.  He has done research, but I --
23     Q.  Has he done Sandy Hook research?
24     A.  Not that I know of.  He does -- he makes
25  graphics and makes things look good on video.

9

1      Q.  He also does research, though?
2      A.  He does when he does his own stuff, his own
3   reporting.
4      Q.  Did you ask him if he's done research for Sandy
5   Hook?
6      A.  No, I didn't ask him that.
7      Q.  So you don't know whether or not he's done
8   research for Sandy Hook?
9      A.  I can't remember any videos he was involved
10  with making.
11     Q.  Right.  That wasn't my question, though.
12  Because I'm not asking you personally.  I'm asking you
13  as the corporate representative, and you were tasked
14  with preparing yourself to discuss Topic a) as it
15  applies to the entire company.
16         So my question is, are you prepared to discuss
17  the research that Darrin McBreen was involved with
18  regarding Sandy Hook?
19     A.  I would say no.
20     Q.  Okay.  Josh O, does that ring a bell?
21     A.  Josh O.  In what context?
22     Q.  In -- as an employee for InfoWars.
23     A.  As an employee.  There was a Josh that used to
24  work there.
25     Q.  Doesn't work there anymore?

10

1    A.  No.
2    Q.  Okay.  Jakari Jackson?
3    A.  He does not work there.
4    Q.  Melissa Melton?
5    A.  Does not work there.
6    Q.  Marcos Morales?
7    A.  He does still work there.
8    Q.  Did you speak with Marcos Morales about
9  sourcing and research that he did for videos described
10  in plaintiff's petition?
11    A.  No, I did not speak with him.
12    Q.  So you would agree you're not prepared to
13  discuss the research that Marcos Morales has done for
14  the videos described in plaintiff's petition?
15        MR. JEFFERIES:  Objection, form.
16        THE WITNESS:  Answer?
17        MR. JEFFERIES:  Yeah.
18    A.  To my knowledge, Marcos Morales did not do any
19  research with regards to Sandy Hook.
20    Q.  (BY MR. OGDEN)  Right.  But I'm not asking you
21  about your knowledge.  I'm asking you what you did --
22  whether or not you prepared yourself to give me an
23  answer on behalf of the company today.
24    A.  Sure.  And what I'm saying is, if I know they
25  didn't do anything, I didn't go ask them if they did

11

1  anything.
2    Q.  Has Marcos Morales ever done any research for
3  Sandy Hook?
4    A.  Not to my knowledge.
5    Q.  So is that a yes or a no?
6    A.  That's a not to my knowledge that he's done it.
7    Q.  So you don't know, correct?
8    A.  I don't know that he -- I do know that he
9  hasn't made any videos.  He may have been in on a live
10  presentation, but like maybe cut switching the cameras,
11  but he's not a -- he's not a -- someone we would rely on
12  for research.  He's someone that is more of a technical
13  operator.
14    Q.  Okay.
15    A.  So that's why I would never have asked him
16  anything about it.
17    Q.  Has Marcos Morales ever done any research
18  regarding Sandy Hook?
19    A.  Not that I know of.
20    Q.  Did you ask him?
21    A.  I did not ask him.
22    Q.  So you don't know?
23    A.  I think I explained my position on that.
24    Q.  Do you know or not?  Let me clear it up.
25    A.  Okay.

12

1    Q.  Does Free Speech Systems know whether or not
2  Marcos Morales has done research on Sandy Hook regarding
3  the videos in plaintiff's petition?
4    A.  I don't think he's been involved in any of
5  that.
6    Q.  I didn't ask whether or not you thought.  I
7  asked whether or not Free Speech Systems knows whether
8  or not Marcos Morales has done any research for the --
9  pertaining to the videos in plaintiff's petition?
10    A.  I can't answer that.
11    Q.  And that's because you don't know on behalf of
12  the company?
13    A.  Well, going back to the best of my knowledge, I
14  do not know.
15    Q.  You understand that when you were tasked as the
16  corporate representative on that topic, that you had a
17  duty to prepare yourself to discuss that topic?  Do you
18  know that?
19    A.  I didn't understand that.
20    Q.  Okay.  Nobody has explained that to you --
21    A.  No.
22    Q.  -- prior to right now?
23    A.  Prior to right now.
24    Q.  You were under the impression you were to come
25  in here, sit down and testify as to what you know

13

1  personally and that's it?
2    A.  No, that's not what I understood.  I understood
3  that I was the corporate representative.  But I did not
4  know I was supposed to go talk to Marcos Morales.
5    Q.  What did you think you were supposed to do?
6    A.  Well, Marcos Morales didn't have anything to do
7  with any of the production work.  So I don't know how
8  that -- it's like asking the janitor, you know, if they
9  did any research.
10    Q.  When it comes to sourcing, InfoWars has an
11  e-mail address that it puts out where tips can be sent,
12  correct?
13    A.  We used to, yes.
14    Q.  You understand that there's a lot of documents
15  that were produced in the Lewis case, correct?
16    A.  Uh-huh.
17    Q.  Is Marcos -- did Marcos ever answer any of
18  those e-mails?
19    A.  I don't know.  I didn't look at all the
20  e-mails.
21    Q.  Did he ever open them and forward them to other
22  employees of InfoWars or Free Speech Systems?
23    A.  Okay.  I see what you're getting at.  At the
24  end of a show, there are titles and descriptions that go
25  out and those might have been sent to Marcos at some

14

1   time.
2       Q. My question was a little different.
3       A. But it's not having to do with research.  It's
4   about a show, how you put a show out on the Internet.
5       Q. My question was a little different.  Did Marcos
6   ever answer -- ever open e-mails that came in on the
7   information -- you know, we'll call it the hotline, the
8   e-mail address that was out that people could send in
9   tips, did Marcos ever open those and then forward them
10  to people based on what was in there?
11      A. That is possible, that he might have done that.
12  If I forwarded something for the show people to, say,
13  hey, check this out for the show, if I forwarded it to
14  like a host, then he might have been in on there because
15  he is the director of the show.
16      Q. I asked you whether or not he personally
17  forwarded it to other employees.
18      A. That, I don't know.
19      Q. So you don't know whether or not he was
20  involved with any sourcing of the video -- regarding the
21  videos in plaintiff's petition?  And I'm not trying to
22  trip you up.  I just want a yes or no.
23      A. I don't know.
24      Q. David Ortiz?
25      A. What about him?

15

1       Q. Does he still work at Free Speech Systems?
2       A. No.
3       Q. Kristi, K-r-i-s-t-i, no last name?
4       A. No.
5       Q. Lydia, L-y-d-i-a, no last name?
6       A. No.
7       Q. Do you recognize the name?
8       A. I do recognize the name.
9       Q. But she does not work there anymore?
10      A. No.
11      Q. Travis Knight?
12      A. He does still work there.
13      Q. Okay.  And Travis Knight was involved at least
14  in part with some of the Sandy Hook videos, correct?
15      A. I think when he first came in, he would have
16  been at that time editing the shows and so there may
17  have been e-mails sent to him that had Sandy Hook in the
18  title.  He may have got -- I don't know if he got -- if
19  he was getting tips.  I don't think he was getting any
20  tips through our tip system because that only went to a
21  few people, mainly the writers.  But, no, I don't -- I
22  don't think he would have been involved.
23      Q. You don't think or he was -- he was or he
24  wasn't?
25      A. On an administrative level, he might have had

16

1   something pass through.
2       Q. Again, I'm not asking whether he might have.
3   Does Free Speech Systems know whether or not Travis
4   Knight was involved in research or sourcing of the
5   videos in plaintiff's petition?
6       A. No.
7       Q. Did you ask -- did you talk to Travis Knight in
8   preparing for today?
9       A. I did not.
10      Q. Alejandra Gutierrez?
11      A. Are you asking if she still works there?
12      Q. Yes.
13      A. She still works there.
14      Q. She's a lead producer, correct?
15      A. She might have been before.  I don't think
16  she's a lead producer now.
17      Q. Okay.  What's her position now?
18      A. She does graphics and edits stuff for social
19  media.
20      Q. Did you speak with her about whether or not she
21  had any -- she was involved with any sourcing or
22  research regarding the videos pertain -- contained in
23  plaintiff's petition?
24      A. No, definitely not.
25      Q. Was Alejandra Gutierrez involved with the

17

1   sourcing or research in plaintiff's petition?
2       A. Not to my knowledge.
3       Q. Does Free Speech Systems know whether or not
4   Alejandra Gutierrez had any involvement with any
5   sourcing or any research with regards to the videos
6   contained in plaintiff's petition?
7       A. I don't believe she was hired -- I don't think
8   she was around for most of that, but I couldn't tell
9   you.
10      Q. So the answer's you don't know?
11      A. That's the answer.
12      Q. Richard Gaines?
13      A. Richard Gaines.  He does not work there.
14      Q. Wilson Bondesen?
15      A. He does still work.
16      Q. He does?  And we know at this point that Wilson
17  was involved with tips coming in and sources giving
18  information.  Did you speak with Wilson prior to today
19  about your testimony?
20      A. No.
21      Q. Are you prepared to testify as to Wilson
22  Bondesen, B-o-n-d-e-s-e-n's involvement with sourcing
23  and researching for the videos in plaintiff's petition?
24      A. No, I'm not.  If you could show me something, I
25  can look at it and tell you if it was germane or not.

18

1    Q.  Jerome Corsi?
2    A.  He was a guest for -- I don't know if he -- he
3  was hired briefly for -- during the election.
4    Q.  Did he have any involvement with any research
5  or sourcing of the video -- for the videos contained in
6  plaintiff's petition?
7    A.  Not -- I don't think when he was an employee.
8    Q.  When he wasn't an employee, did he have any?
9    A.  He might have.  I don't know.  I'm sure he's on
10  a Wolfgang Halbig e-mail.
11   Q.  And I'm asking these as these are all prior
12  employees, but the topic is not only as to employees.
13  You understand that, correct?  It's any researching or
14  sourcing for the videos described in the petition.
15   A.  I misunderstood with Corsi.  I thought you were
16  talking about when he was an employee.
17   Q.  Are you prepared -- is Free Speech Systems
18  prepared to give testimony today as to Jerome Corsi's
19  involvement with sourcing and research for the videos
20  described in plaintiff's petition?
21   A.  I guess it would depend on what question you
22  asked.
23   Q.  All right.  I'll give you an example.  Was
24  Mr. Corsi involved with any sourcing or research for the
25  videos contained in plaintiff's petition?

19

1    A.  I think that's still a broad, generalized
2  question.
3    Q.  Right.
4    A.  Do you have anything more detailed?
5    Q.  You can give me any answer if he was involved
6  in any way, if you know.
7    A.  I don't know.
8    Q.  Okay.  And you didn't prepare yourself in any
9  way to discuss whether or not --
10   A.  Mr. Corsi.
11   Q.  -- whether or not Mr. Corsi was involved in
12  sourcing or researching these videos in plaintiff's
13  petition?
14   A.  That's correct.
15   Q.  Daria Karpova or Daria?
16   A.  She still works there.
17   Q.  Is it Daria or Daria?
18   A.  It's Daria.
19   Q.  Daria.  Is she still the technical director?
20   A.  No.  She's probably moved up to lead producer
21  of the show, of Alex's show.
22   Q.  Was -- did you speak with her about your
23  testimony today?
24   A.  No.
25   Q.  Are you prepared -- is Free Speech Systems

20

1  prepared to discuss Daria Karpova's involvement with
2  sourcing and research for the videos described in
3  plaintiff's petition?
4    A.  You could ask me questions.  I'll tell you what
5  I know.
6    Q.  Was Daria Karpova involved with researching or
7  sourcing any of the videos contained in plaintiff's
8  petition?
9    A.  Not to my knowledge.  Other than booking guests
10  or something like that.
11   Q.  And again, you answered with not to my
12  knowledge, but I'm asking is Free Speech Systems
13  prepared to discuss whether or not she was involved with
14  sourcing or researching the videos contained in
15  plaintiff's petition?
16   A.  Whether she was involved.  I don't think she
17  was involved.
18   Q.  And again, I'm not asking whether or not you
19  think she was.  I'm asking Free Speech Systems whether
20  or not she was.  It's a yes, no or I don't know.
21   A.  I don't know.
22   Q.  Moving on.  Zach Drucker, is he still employed?
23   A.  No.
24   Q.  Did Zach Drucker have any involvement with any
25  sourcing or research for the videos described in

21

1  plaintiff's petition?
2    A.  I don't know.
3    Q.  Did you take any steps to find out one way or
4  the other whether or not he did?
5    A.  No.  He wouldn't have been on my radar to do
6  that.
7    Q.  Why is that?
8    A.  Because he was more of a technical person.
9    Q.  I understand that.  However, it seems like
10  there were a couple of technical people that we've
11  discussed so far that might have, you just don't know.
12   A.  Well, they've had -- a lot of these -- I think
13  when Zach came in, Sandy Hook was not really being
14  reported on.
15   Q.  What year was that?
16   A.  I think 2014 or sometime.  We stopped -- maybe
17  2015.  I don't have an exact date.
18   Q.  You don't have the year; you just know that
19  that's when Zach was around?
20   A.  No, I know when Zach was around, he wouldn't
21  have been involved in getting tip -- he wouldn't have
22  been on a tip line or anything like that.
23   Q.  Did he get any sources or do any research
24  regarding Sandy Hook and the videos contained in
25  plaintiff's petition?

22

1    A. Are you considering receiving an e-mail on a
2  giant e-mail blast, garnering tips or research?  Is that
3  what you're referring to?
4    Q. If in any way they relate to the videos
5  contained --
6    A. Because that -- what I feel is going on, you're
7  going to ask me --
8    Q. Let's stop here.
9    A. Okay.
10   Q. He's going to throw stuff at both of us if we
11  talk over each other because he's trying to write down
12  every word.
13   A. Sure.
14   Q. If you'll let me finish my question, I'll let
15  you finish your answer.
16   A. Sure.
17   Q. That way we can give him a break on that.
18      So yes, I am asking you whether -- yes, that --
19  my question includes whether or not he received an
20  e-mail that had information that inevitably went into
21  one of the videos contained in plaintiff's petition.
22   A. I don't know.
23   Q. Did you take any steps to figure out whether or
24  not he was involved?
25   A. No, I did not.

23

1    Q. Sam Montoya, is that person still employed?
2    A. Uh-huh.
3    Q. What does Sam Montoya do?
4    A. He edits videos and he was -- he's a production
5  assistant on some of the live shows.
6    Q. Has Sam Montoya done any research for Sandy
7  Hook that is contained in the videos in plaintiff's
8  petition?
9    A. I don't know.
10   Q. Did you take any steps to find out?
11   A. No.
12   Q. Harrison Smith?
13   A. He still works there.
14   Q. What does Harrison do?
15   A. He is a fill-in host and he does reports.
16   Q. Was he involved -- was he involved in sourcing
17  or research for the videos described in plaintiff's
18  petition?
19   A. Do you have the list around real quick?
20   Q. What list?
21   A. The list in the plaintiff's petition.  I can
22  just look at the dates real quick on them.  It's
23  possible he was.
24   Q. Okay.  When you say "it's possible," that's
25  just -- that's -- again, Free Speech Systems does not

24

1  know one way or the other whether or not Harrison Smith
2  was involved with sourcing or research for the videos
3  described in plaintiff's petition?
4    A. That's correct.
5    Q. Okay.  Andrew Thompson, still employed with
6  Free Speech Systems?
7    A. Yes, he still works there.
8    Q. What does he do?
9    A. He's a video editor.
10   Q. Okay.  Did he --
11   A. And a cameraman.
12   Q. Was he in any way involved with sourcing and
13  research for the videos described in plaintiff's
14  petition?
15   A. I can guarantee you he was not.
16   Q. Okay.  And how do you come to that guarantee?
17   A. Because he's only been there for a year.  Maybe
18  a year and a half.
19   Q. Okay.  My next question is, we just went
20  through a list of names of -- one, two, three, four,
21  five, six, seven -- looks like ten people that -- at
22  least ten people that Free Speech Systems is not aware
23  one way or the other whether they were involved with
24  resource -- researching or sourcing the videos in
25  plaintiff's petition.  So the follow-up to that is, who

25

1  was involved in sourcing and researching the information
2  that is contained in the videos described in plaintiff's
3  petition?
4    A. That works at Free Speech Systems?
5    Q. Anyone.
6    A. I would go back to --
7    Q. Let's start with you.
8    A. Okay.
9    Q. You were involved?
10   A. I was involved.
11   Q. How about Alex?
12   A. Alex.
13   Q. Alex was involved.  And that's Alex Jones?
14   A. Correct.
15   Q. All right.  Owen Shroyer?
16   A. Yeah.  I mean, he did that one video, but he
17  didn't come around until after the election -- or right
18  before the election.
19   Q. Your uncle?
20   A. He went to a meeting well after everything
21  occurred.
22   Q. There's a --
23   A. I did interview him.
24   Q. There's a video that references your uncle's
25  beliefs and opinions regarding Sandy Hook, correct?

26

1      A.  No, I think his opinions and beliefs are
2   regarding the meeting that was taking place there and he
3   was told by a lot of his neighbors that he should go up
4   there to that meeting.  That had nothing to do with us.
5      Q.  So when Alex Jones went on the air and said,
6   we've talked to a former FBI agent retired and he says
7   all of this is fake, that's not your uncle being
8   involved in sourcing information for these videos?
9      A.  No.  That might have been Alex's interpretation
10  of what I told him.  What my uncle specifically said was
11  that I've never been to a meeting with government people
12  where nobody knows nothing.  That's what he said.
13     Q.  Okay.  And Alex just took that and kind of ran
14  with it in his own words?
15     A.  You'd have to ask him what he did with that.
16  But that's -- I wrote -- you know, I wrote down -- I
17  mean, I don't know where the notes are, but I wrote
18  down -- because I talked to him in front of a dry
19  cleaner.
20     Q.  So the video we're talking about involving the
21  information that Alex claims is from your uncle, that's
22  in plaintiff's petition, correct?
23     A.  I believe so.
24     Q.  And your uncle, at least in part, was the
25  source of some of that information, correct?

27

1      A.  He was the source of him going to the meeting
2   and his impressions of the meeting.
3      Q.  He didn't stop there.  He then relayed those
4   impressions to you, who relayed them to Alex, correct?
5      A.  I actually called my uncle.
6      Q.  Right.  He relayed those impressions to you and
7   you relayed them to Alex, who put them on the air,
8   correct?
9      A.  Yes.
10     Q.  In your -- is it your understanding that that
11  is his involvement in the sourcing of the information in
12  these videos?
13     A.  I don't think I was questioning whether he was
14  a source or not.  I was questioning whether -- we'd have
15  to go back and -- whatever you said didn't sit right
16  with reality.
17     Q.  Okay.  Let me ask you a question.  What does
18  the word "sourcing" mean to you?
19     A.  I guess -- well, there's many ways to get --
20  there's many ways that you would get a source.  You can
21  get it from a piece of video, an article, an e-mail tip,
22  eyewitness testimony, security camera footage, receipts,
23  interviews.
24     Q.  Instead of giving examples, let me just ask you
25  this.  Is your understanding of sourcing, sourcing is

28

1   where the information comes from; is that fair?
2      A.  That's fair to say.
3      Q.  Okay.  Who -- earlier you mentioned writers,
4   correct?
5      A.  Uh-huh.
6      Q.  And you said that those were mainly the
7   individuals who would come into possession of tips on
8   the information e-mail address, correct?
9      A.  Uh-huh.
10     Q.  Who were the writers that worked on Sandy Hook?
11     A.  Adon Salazar, Paul Watson, Aaron Dykes.
12     Q.  Is that E-r or A-a-r?
13     A.  A-a-r.
14     Q.  Got Adon, Paul and Aaron.  Anyone else?
15     A.  Those are ones that I know that definitely
16  wrote articles about Sandy Hook.
17     Q.  How about David Knight?
18     A.  I wouldn't consider him a writer, but he's --
19  he's probably done something.
20     Q.  What about Nico?
21     A.  No, he was just a producer.  I mean, he would
22  have --
23     Q.  Jonathan Rappaport?
24     A.  Rappaport didn't work for us.  He was a
25  contributor, I guess you could say.  We've probably

29

1   published -- republished his articles.
2      Q.  Okay.  So he would be considered a writer for
3   Sandy Hook information that he published?
4      A.  Uh-huh.
5      Q.  Kurt Nimmo?
6      A.  Yes, but he doesn't -- so he doesn't work
7   there, yeah.  That would be another one.
8      Q.  He does not work there anymore?
9      A.  Correct.
10     Q.  What was his position with InfoWars -- excuse
11  me, with Free Speech Systems?
12     A.  He was a writer, and at one point he was the
13  webmaster.
14     Q.  The webmaster?
15     A.  Yeah.  At one point, but I don't know how -- I
16  don't know when that was.  It was probably even before I
17  got there.
18     Q.  Why doesn't he work there anymore?
19     A.  It's kind of personal.  I think he just wanted
20  to move out of the state of Texas.
21     Q.  Okay.
22     A.  Because that's what he did.  I don't know.
23     Q.  Dan Bidondi?
24     A.  Is it whether he still -- he does not work for
25  us anymore.

Rob Dew - 11/26/2019

30

1    Q. Correct. My question is, was Dan Bidondi's
2  writing ever published by InfoWars or by Free Speech
3  Systems?
4    A. It's possible we put an article which had
5  contained a video under his byline, but that would be --
6  I don't know if he actually wrote an article.
7    Q. Today you're tasked with having sourcing and
8  research for all the videos described in plaintiff's
9  petition.
10    A. Uh-huh.
11    Q. How many videos are there?
12    A. I would say upwards of 30.
13    Q. What are they?
14    A. I couldn't name them all right now.
15    Q. Are you prepared to discuss each one and how
16  they were sourced and researched?
17    A. If you could give me the name, I could then
18  tell you about it. The one I have the most familiarity
19  with is why people don't believe Sandy Hook is a hoax.
20    Q. Okay. Let's start there, Why People Think
21  Sandy Hook is a Hoax. What steps did you take to
22  prepare yourself right now to speak on behalf of Free
23  Speech Systems about the sourcing and research involved
24  for this video?
25    A. I scanned through the final video because

31

1  that's what we have.
2    Q. Okay. Who was in charge -- who was tasked with
3  researching this video?
4    A. It was Alex and myself.
5    Q. No one else?
6    A. If anybody was ancillary involved, it was me
7  and Alex who put the project together.
8    Q. And I'm not asking who put the project
9  together. I'm asking who researched the story and
10  gave -- and brought information in that was ultimately
11  used in the project?
12    A. Right. And unfortunately I couldn't go back
13  and tell you who might have handed Alex an article or
14  who might have brought him a video in terms of that
15  detail, but it was -- the stuff me and Alex sat down and
16  went through and looked at the different pieces, then we
17  laid out how we were going to make that video.
18    Q. Okay. The source of the information, who was
19  in charge of sourcing that?
20    A. Like I said, that would have been Alex and
21  myself. Alex would have had ultimate editorial control.
22    Q. Who -- was it you or Alex who originally found
23  the video and noticed what was later claimed by
24  Mr. Jones to be blue screen?
25    A. From what I remember, somebody sent that in to

32

1  us that -- either that morning or the day before.
2    Q. And somebody had just e-mailed it in?
3    A. They e-mailed it in and said look, it looks
4  like it's blue screen, and they sent a horrible video
5  that was blown up on YouTube. And I do specifically
6  remember looking for the original -- finding the best
7  source we could find on that, because CNN did not have
8  the video on their website and it was -- I do remember
9  it was a different website that wasn't CNN that had the
10  video and it was the best-looking quality. And so --
11    Q. What website was that?
12    A. I couldn't tell you.
13    Q. Did you --
14    A. Couldn't tell you to this day. But it was a
15  website that was grabbing news feeds. They were like an
16  aggregator. I don't remember the name and it was -- you
17  know, I grabbed the video and then we had the video.
18    Q. Who sent in the original source?
19    A. I'm sure it's in one of those e-mails. I don't
20  know. I don't remember. But it would have been an
21  e-mail that I clicked on that came through, I don't
22  know, the tip system. I don't know if it was -- I don't
23  remember if it was directly addressed to me or if it was
24  through the tip system.
25    Q. What steps did you take to prepare yourself

33

1  today to speak on behalf of Free Speech Systems as to
2  who was the source of the video from Sandy Hook -- from
3  Why People Think Sandy Hook is a Hoax?
4    A. I told you, I scanned through the video and
5  looked at it.
6    Q. So you just watched the video?
7    A. Uh-huh. And a lot of it brought back the
8  memories of what I remember of putting it together.
9    Q. Right. And again, you're here on behalf of
10  Free Speech Systems, and you had a responsibility today
11  to be prepared to discuss the source of the information
12  in that video, correct?
13    A. Sure. I think I'm telling you everything that
14  I know and that what happened.
15    Q. It's not everything you know, Mr. Dew. It's
16  everything Free Speech Systems knows. So if there is an
17  e-mail out there that you claim has been produced to us,
18  who is it from, what date, what's it say?
19    A. I don't know.
20    Q. Did you look for it in preparing for today?
21    A. No, I did not.
22    Q. Why?
23    A. I don't know if our system goes back that far.
24  That would have been sometime in January, maybe, of
25  2013.

34

1    Q. So if I just looked at an e-mail from
2  January 27th, 2013, the system definitely goes back that
3  far, right?
4    A. I don't know if I have access to all my e-mails
5  back that far.
6    Q. So you're only checking your e-mails when you
7  were preparing for today; you weren't checking the
8  e-mails that are in the possession of Free Speech
9  Systems who you're currently sitting here as?
10   A. That's correct.
11   Q. Okay. Do you believe, sitting here right now,
12 that you're prepared to discuss the sourcing and
13 research that went into Why People Think Sandy Hook is a
14 Hoax?
15   A. Yes, I do because I edited the video.
16   Q. Okay. Who was the source?
17   A. I don't know. It's probably an anonymous
18 person.
19   Q. Who did that --
20   A. I can tell you this. The video they sent me is
21 not the video we used.
22   Q. I didn't ask that. I asked who your source of
23 the information was and you don't know who that was,
24 correct?
25   A. Well, I could say I'm the source because I went

35

1  and found the original video.
2    Q. Okay. From where?
3    A. I don't remember the name of the site.
4    Q. So you don't remember the name of the source?
5    A. That had the video? They probably don't exist
6  anymore.
7    Q. Probably or they don't?
8    A. I don't know.
9    Q. Right. And what I'm saying is, you're not
10 prepared to discuss whether or not they are?
11   A. When you grab -- I mean, I can see why it makes
12 a difference in your case, but when we were making the
13 video, it did not matter where the source came from
14 because we had the actual video and it was Anderson
15 Cooper and I believe Neil -- not Neil Heslin. The
16 Pozner -- Mr. Pozner's ex-wife at the time.
17   Q. You don't even -- you don't know her name?
18   A. Veronica or Veronique, something like that.
19   Q. Okay. And I'm aware that at the time you were
20 getting this information, no one at InfoWars cared where
21 it came from; but you were tasked with finding out where
22 it came from and you aren't prepared for that, correct?
23   A. I don't think you could find out.
24   Q. Why?
25   A. I'm sure the source doesn't exist anymore.

36

1    Q. You're sure?
2    A. I myself am sure. For Free Speech, no, I don't
3  know.
4    Q. Okay. What type of research did you and/or
5  Alex do to determine whether or not there was a blue
6  screen behind Anderson Cooper?
7    A. What type of research? I think looking at
8  whether something is a blue screen or not comes from
9  years of doing blue screen work, and Alex -- I'm not
10 speaking for Alex, but I was in the room when he looked
11 at it and he said that's blue screen.
12   Q. Have you ever seen Alex work with a blue
13 screen?
14   A. Uh-huh.
15   Q. You have a blue screen at the studio?
16   A. We have a blue screen at the studio. But he's
17 worked with blue screen at Access Television.
18   Q. How do you know?
19   A. Because I've seen him there and he told me he
20 did and I've seen his shows, many years working at
21 Access.
22   Q. Have you seen his nose disappear?
23   A. Alex's nose?
24   Q. Yeah.
25   A. I don't think I've ever seen his nose

37

1  disappear.
2    Q. Okay. So it was Alex's expertise on the blue
3  screen, not yours?
4    A. Correct.
5    Q. So all the research would have been done by
6  him?
7    A. Uh-huh.
8    Q. And he didn't really do any research. He just
9  looked at it and said, well, I've never seen that
10 before, so it must be a blue screen?
11   A. You'd have to ask him on that, but yes. I
12 mean, I was there when he said it and he said that's
13 blue screen.
14   Q. I'm asking you because you're sitting here
15 today on behalf of the company and it's your job to know
16 what research he did.
17   A. And then later he said he's looked at
18 thousands -- or he's done -- maybe he said hundreds of
19 hours of blue screen video at Access Television.
20   Q. I don't know what that means.
21   A. Well, when you've got the blue screen behind
22 you and --
23   Q. Oh, no, I know what you meant. I don't know
24 how in any way that was responsive.
25   A. I guess from his experience, he was drawing out

38

1 that he could -- he determined that that was blue
2 screen.
3    Q. And I'm not -- again, I'm not asking you to
4 guess. You said, I guess that was his. I'm asking --
5 you were tasked with knowing.
6    A. Right. And that's what he said later, that he
7 had done hours in Access Television in front of a blue
8 screen and he knows what it looks like.
9    Q. But that was after the video went up?
10   A. Yeah, that was probably after the video. Yes.
11 I would say it's after the video.
12   Q. Okay. Before the video went up and you put
13 this out there as fact?
14   A. He looked at it and said that was blue screen.
15   Q. That was enough for you?
16   A. That was enough for me.
17   Q. And that was enough for Free Speech Systems?
18   A. The reason there is a Free Speech Systems is
19 because of Alex Jones.
20   Q. That wasn't my -- you didn't answer my
21 question. My question was, Free Speech Systems is okay
22 with Alex Jones looking at something, saying it to be
23 the gospel and then putting it up on the Internet for
24 millions to see?
25   A. It was his -- I think it's his free speech

39

1 right to say that that's what he thinks it is.
2    Q. And my question was Free Speech Systems is okay
3 with that?
4    A. Correct.
5    Q. Do you have any journalistic principles in
6 writing, for everybody to review and adhere to before
7 they put content up for millions to see?
8    A. I think with Alex, it's -- he puts up what he
9 feels he wants to put up, and I'm not sure -- it depends
10 on when he's got the journalistic hat on or when he's
11 got his -- when he's got his -- he's a commentator,
12 where he's being a pundit. There's different hats he
13 wears and I think he changes them out frequently.
14   Q. Okay. Do you remember when I deposed you a few
15 months ago?
16   A. Uh-huh.
17   Q. We had a conversation about Free Speech Systems
18 and what their roles are generally.
19   A. Uh-huh.
20   Q. You remember that?
21   A. Yeah.
22   Q. And I asked you whether or not -- what portion
23 of Free Speech Systems was journalism and what portion
24 was not, and you said the majority of what we do is
25 journalism. You remember that?

40

1    A. Yeah, because we're presenting the news of
2 what -- of what is going on in the world and we're
3 either showing videos or reading other people's articles
4 or...
5    Q. And you -- when you're presenting the news,
6 there's principle -- there's a responsibility that a
7 company has for that, right?
8    A. Yeah.
9    Q. What responsibility is that?
10   A. To get the truth as best you can.
11   Q. As the best you can. Are there steps in place
12 to ensure that you do get the truth out there, that you
13 don't make a mistake?
14   A. Well, I don't think anybody's infallible of
15 making -- not making a mistake. I mean, mistakes have
16 been made in the past and we've owned up when we've made
17 mistakes.
18   Q. Which mistake is that? I'll give you some
19 examples.
20   A. Okay. Give me some examples.
21   Q. Mistake or not mistake: Anderson Cooper was in
22 front of a blue screen?
23   A. The only reason I would say it's not
24 100 percent is because somebody asked him if he was
25 there and he denied being at the funeral.

41

1    Q. You know that's not true.
2    A. No, there's video of it. There's video of a
3 guy asking him during a taping of a show; he said, hey,
4 were you at the funeral and he goes, no, I wasn't.
5    Q. Right. He wasn't at -- inside the funeral.
6 You understand that -- you've been a corporate
7 representative for Free Speech Systems in other lawsuits
8 in Texas, correct?
9    A. Uh-huh.
10   Q. And I'm involved with those, correct?
11   A. I'm sure you are.
12   Q. You understand that an expert who has decades
13 of service in the FBI in video forensics determined that
14 that was not a blue screen but was simply video
15 compression. Did you know that?
16   A. I've heard people say stuff. You know, the FBI
17 also said they put photos of two guys who supposedly
18 bombed the Boston marathon and said they didn't know who
19 they were when they'd interviewed them. So the FBI lies
20 a lot, yeah.
21   Q. So you don't trust the FBI?
22   A. I don't really trust much in the government.
23   Q. Okay.
24   A. That comes out of the government.
25   Q. Do you trust anonymous sources on 4chan?

42

1   A.  I don't know if I've ever used an anonymous
2   source on 4chan.
3   Q.  Do you know that's where the picture of Marcel
4   Fontaine was found and used?
5   A.  Are you talking -- who's Marcel Fontaine?
6   Q.  You don't know who Marcel Fontaine is?  He's
7   the poor individual that lives in Massachusetts that
8   InfoWars randomly put up his picture saying he was
9   responsible for the Florida Parkland mass shooting.
10      THE WITNESS:  So we're talking about a
11  different case now?
12  Q.  (BY MR. OGDEN)  Absolutely.
13  A.  Oh, we are.  Okay.  Well, I didn't put that up,
14  but from my understanding --
15  Q.  I'm not asking you whether you put it up.  I'm
16  asking if Free Speech Systems is okay trusting an
17  anonymous source that is completely unverifiable and
18  using that information, but not trusting the FBI?  Is
19  that what you're testifying to?
20  A.  What I'm testifying to is that it's been our
21  experience that the FBI has lied many times to cover
22  up -- cover their own ass, essentially.
23  Q.  Did you tell your uncle that?
24  A.  Yeah, I've told him that.  I told him I don't
25  like how they go find poor guys and set them up and,

43

1   like, hey, we're going to -- do you want to go bomb
2   something, here's a bomb, let's go to do this.  I
3   don't agree with that.  I think that's -- that's not the
4   way to have a world that works.
5   Q.  Okay.  You -- earlier you mentioned that you
6   broadcast information as it comes in, right?
7   A.  Sometimes, yes.
8   Q.  What --
9   A.  Sometimes it's live.
10  Q.  What are the sources that you do trust for
11  information that you put out to the public?
12  A.  Well, I mean, like I say, sometimes we've used
13  CNN, but we also think CNN lies.  But we've taken CNN
14  and we've looked at their videos.  And early on, when --
15  say there's an article on some site, you go to the link,
16  you click to the source and you go down and find it.
17  Q.  Okay.  Dan Bidondi's articles that were
18  republished, you trusted those, right?
19  A.  It depends on what you're --
20  Q.  I'm talking about every article related to
21  Sandy Hook that Dan Bidondi submitted that InfoWars
22  republished.  You trusted all of those as reliable
23  sources, correct?
24  A.  I think we republished videos.  I'm not sure
25  that Dan Bidondi wrote actual articles, although he may

44

1   have had a name on the byline.
2   Q.  Okay.  You trusted all the videos that he made,
3   which are just videos of him talking.  That was a
4   reliable source to Free Speech Systems, but the FBI is
5   not.  True?
6   A.  No, I'm not going to say the FBI is wrong in
7   all cases.  I think there's lot of good people in the
8   FBI.  But we've also seen that they like to cover their
9   own ass.
10  Q.  Who at Free Speech Systems is in any way
11  qualified to break down an FBI investigation and
12  determine whether or not it's true?
13  A.  What, do you have to have a degree to break
14  down an FBI investigation?
15  Q.  No, I'm just asking who's qualified to do all
16  this.  Because to be in the FBI, yes, you do have to
17  have a degree.
18  A.  I don't think I understand your question.
19  Q.  Yeah.  Name someone at Free Speech Systems
20  that's qualified to break down an FBI investigation and
21  determine that it's wrong.  You can start with just one
22  name.  This is getting slightly uncomfortable.
23  A.  Is it?
24  Q.  Start with one name and then we'll go to see if
25  you have two.

45

1   A.  Okay.  Well, I think Alex Jones could break
2   down an FBI investigation and look at it and figure out
3   whether it's true or false, and I think he's done that
4   in the past.
5   Q.  Has he ever gotten it wrong?
6   A.  About anything?
7   Q.  About -- about an FBI investigation that he
8   says was not true that turned out it was.
9   A.  Well, sometimes it takes a while for these
10  things to come out.  But I think we just heard that the
11  gas attack on the Syrian Kurds, that I don't know if --
12  whether the FBI had anything to do with it, but that it
13  was done and we had to go invade Syria and then it came
14  out, no, somebody made it up; that there was no chlorine
15  gas found at all.  So these things do happen.  And so
16  when we see them, we don't always take everything at
17  face value for what comes out.
18  Q.  Sure.  But I wasn't asking about that.  I was
19  asking about the FBI.
20  A.  I know.  But we went to the Parkland shooting
21  too for a second.  So I mean, seems like we're going all
22  over the place.
23  Q.  Right.  But the FBI is the Federal Bureau of
24  Investigation and they only have jurisdiction here.
25  A.  Right.  And, you know, so Sandy Hook happened

Rob Dew - 11/26/2019

46

1  in 2012. 2013 we had the Boston bombing, just a few
2  months later. And they showed pictures up on the TV and
3  said, we don't know who these guys are; you need to help
4  us find them. And one of the guys was someone they had
5  interviewed twice and they had interviewed his mother.
6  And the Russians had even contacted the FBI saying, hey,
7  this guy is traveling to Turkmenistan or something and
8  getting training under an assumed name. And so for the
9  FBI to get up there and say, we don't know who these
10 guys are, when they do, is dishonest and they put a
11 whole city in a panic to do that.
12    Q. You took the report from the Boston bombing
13 that the FBI did and you broke it down and determined
14 what? What are you saying?
15    A. I'm saying when they showed the pictures of the
16 two boys that they had on camera and they're saying they
17 didn't know who they were, they were lying. They did
18 know who they were.
19    Q. Okay.
20    A. That's what I'm saying.
21    Q. And you understand at times matters of national
22 security can allow --
23    A. Oh, that's right. There's always that, yes. I
24 understand.
25    Q. Okay. I'm just making sure --

47

1     A. There's always national security. I know.
2     Q. Just making sure we are on the same page.
3        April 9, 2013, video, Obama Gun Grabbing Psyop
4  Speech of Evil. Does that ring a bell?
5     A. Can you describe what the video looks like?
6  Some of these we don't have anymore because they --
7  they've been taken off YouTube.
8     Q. Sure. The video had to do with an employee of
9  Free Speech Systems warning the viewers that recent mass
10 shootings were actually a government operation and Sandy
11 Hook was an inside job. Who did the research for that
12 information?
13    A. Who -- do you know who the -- do you have the
14 video? Is there somebody talking on it?
15    Q. Yes. His name is Alex Jones.
16    A. Okay. So then it was his -- it's what he
17 determined.
18    Q. Where did he get that information?
19    A. From -- I think from years of looking at
20 government operations. At the time that's what he felt.
21    Q. What I'm asking is, what are the sources of
22 information that he relied on to come to that
23 conclusion?
24    A. I think he relied on articles that they were
25 going to use -- when he saw the script of, hey, now we

48

1  have to start going after the guns, we have to start
2  going after the guns, which happens pretty much like
3  every shooting, there's a call to take and disarm
4  American citizens. And so as stewards of the Second
5  Amendment, we feel it is our duty to stand up against
6  those and Obama did want to go after guns.
7     Q. You're a steward of the Second Amendment?
8     A. And while he says that, while he's sitting
9  there crying over those kids, he's also bombing children
10 in other countries with drones. So we were just
11 pointing that out.
12    Q. You used that information to say that Sandy
13 Hook was an inside job? Based on what?
14    A. I think at the time they were being -- I don't
15 know how old you are, but when this stuff was coming
16 out, there wasn't as many sources on the Internet to --
17 Twitter wasn't very big. They weren't putting out a lot
18 of information. And the state government of Connecticut
19 was not putting out a lot of information and they were
20 going after people -- or they were saying at least -- I
21 don't know if they were going after people. They were
22 saying, if anybody puts out wrong information, we're
23 coming after you and to us, that was a red flag.
24    Q. Isn't that a good policy?
25    A. It depends on what's --

49

1     Q. Can you give me --
2     A. That would be a good policy if that was their
3  real intent. I'm not sure -- I think their real intent
4  was covering up something that they felt went wrong and
5  they didn't want anybody to know about.
6     Q. Okay. Sitting here today, we have all the
7  reports and you've had plenty of time to go through it.
8  What was it? What did they get wrong or what were they
9  hiding? Or are you going to sit here like Mr. Jones has
10 said and say, yeah, we got this one wrong?
11    A. See, we're going back and forth. In the
12 present day, I believe kids were shot and killed.
13    Q. Which part of the story --
14    A. And I believe kids were shot and killed in the
15 beginning. Okay. And if you look at our articles, we
16 always talked about the victims. We were never
17 disparaging towards the parents.
18    Q. Do you -- you've seen the video of Mr. Jones
19 mocking Robbie Parker's father by mocking him crying as
20 a grieving father. Surely --
21    A. Robbie Parker's father? I don't know if I've
22 ever seen a video of Robbie Parker's father.
23    Q. I mean, Robbie Parker. Excuse me. You've seen
24 the video of Mr. Jones mocking Robbie Parker about
25 crying over his dead son, right?

50

1    A. I don't know if I've seen that video.
2    Q. So you're not prepared to talk about that video
3  that's listed in plaintiff's petition that you had a
4  duty to prepare for today?
5    A. I am not prepared to talk about that video of
6  Robbie Parker crying over his son.
7    Q. Oh, no, of Mr. Jones mocking Robbie Parker
8  crying over his son.
9    A. I'm not.
10   Q. Okay. What about the video that you and
11 Mr. Jones are in where you throw up maps related to
12 where Lenny Pozner lives? You don't think --
13   A. I don't think -- I don't think he lives in a
14 U-Haul storage facility. I think that's what that --
15 that's like a mailbox place.
16   Q. Right. You put up a photograph and map to all
17 your viewers of where Mr. Pozner picks up his mail.
18   A. I don't even know if he picks up his mail
19 there. That's something you're saying.
20   Q. If you weren't targeting Mr. Pozner by doing
21 that, why else would you put it up?
22   A. At the time I believe -- this is what I
23 believe. Mr. Pozner was getting videos pulled off
24 YouTube, for whatever reason, you'd have to ask him what
25 his reasons were, and then I think it listed the HONR

51

1  Network and we were showing where the HONR Network is
2  located.
3    Q. Why?
4    A. That it wasn't a building; it was a PO box
5  place.
6    Q. And on that show you told your audience that
7  you knew the leader of the HONR Network is Mr. Pozner,
8  correct?
9    A. Because we got a -- I think we even got a
10 YouTube takedown notice and it had his name on there.
11   Q. Any of the YouTube videos that were taken down,
12 were any of them true?
13   A. I'd have to look at the video, but I believe
14 the information we were putting out was accurate at the
15 time.
16   Q. I'm not asking you if it was accurate at the
17 time. I'm asking you if the -- actually, we'll back up.
18 The videos that the HONR Network had taken down, were
19 those true, sitting here today?
20   A. I'd have to see the video to know whether --
21 sitting here today, whether I think it was true. I
22 think a lot of it he pulled down just because they were
23 giving him carte blanche to pull down whatever he
24 wanted.
25   Q. And you're just making that up. You have no

52

1  evidence of that, correct?
2    A. I have no evidence.
3    Q. Okay. And I just wanted to make sure. Again,
4  we're sitting here as you make up information and spread
5  it.
6    A. As I make up information and spread it. Okay.
7    Q. April 16, 2013, Shadow Government Strikes
8  Again. What was -- who did the research for that video?
9    A. I believe Alex Jones did.
10   Q. Why do you believe that?
11   A. Can you describe what was in the video?
12   Q. No, it was your job to be prepared to discuss
13 it.
14   A. Okay.
15   Q. Who did the research -- excuse me, why do you
16 believe Alex Jones did the research?
17   A. Because it sounds like a video that he would
18 have titled.
19   Q. What was the source of the information?
20   A. Probably hundreds of articles.
21   Q. I'm not asking you probably. As Free Speech
22 Systems, what specific sources were relied upon to make
23 that video?
24   A. I don't know if we have that video in our
25 possession anymore.

53

1    Q. Not an answer to my question. Yes, no or I
2  don't know.
3    A. Okay.
4    Q. The sources used to make that video, Shadow
5  Government Strikes Again?
6    A. I don't know.
7    Q. March 14, 2014, Sandy Hook, False Narrative
8  Versus the Reality. Who did the research for that one?
9    A. I don't know.
10   Q. What steps did you take to find out?
11   A. Since we don't have that video, I don't know
12 what -- I'd have to see the video to jog my memory of
13 what's in it.
14   Q. Okay. What was the source of the information
15 in that video?
16   A. Like I -- I'll refer to my previous answer.
17   Q. You don't have this video as your testimony,
18 and by "you," you mean Free Speech Systems?
19   A. I didn't have it in any of the searches that I
20 made.
21   Q. Okay. Where did you search?
22   A. Actually, some of these I actually went on the
23 Internet to see if people had reposted them and I didn't
24 find anything at the time because that's usually how we
25 find stuff that got erased, people repost our stuff.

Rob Dew - 11/26/2019

54

1    Q. How long did you spend looking for the sources
2  or the video or the researcher for Sandy Hook, False
3  Narratives Versus the Reality?
4    A. For that particular video, maybe 15 minutes.
5    Q. Are you aware that in this case, you produced
6  this video to me?
7    A. Okay.
8    Q. Yet you're not prepared to discuss it?
9    A. The problem is, and I think I discussed this in
10 the last deposition, we don't have video -- the titles
11 that you're using -- you're referring to YouTube titles,
12 and those aren't always what the video file is named
13 when it gets uploaded.
14   Q. Mr. Dew, you gave me this video.  Free Speech
15 Systems produced this to me, not YouTube.
16   A. I understand that.
17   Q. So you have it in your possession, correct?
18   A. I don't know if I have it in my possession.
19   Q. How on earth could Free Speech Systems produce
20 a video to me and it not be in your possession?  One,
21 you had it and then you spoliated it, which is the
22 destruction of evidence --
23   A. No.
24   Q. -- or, two, you never had it yet somehow
25 magically produced it to me.  Which one of those is

55

1  probably more accurate?  Or three, you're just not
2  prepared to discuss it?
3    A. I'm not prepared to discuss it.
4       MR. JEFFERIES:  Objection, form.
5    Q. (BY MR. OGDEN)  May 13th, 2014, "'Bombshell,
6  Sandy Hook massacre was a DHS illusion,' says school
7  safety expert."
8       Who did the research for this video?
9    A. I would imagine Wolfgang Halbig did the
10 research for that.
11   Q. Again, I'm not asking you to imagine.
12   A. Okay.  I'll say Wolfgang Halbig; school safety
13 expert, that was Wolfgang Halbig.
14   Q. How do you know he did the research -- excuse
15 me.  Did anyone else research any of the information
16 that went into this episode?
17   A. That is most likely an interview between
18 Wolfgang Halbig and Alex Jones.
19   Q. You don't even know what's in this video, do
20 you?
21   A. No.
22   Q. Okay.  We'll just skip to the next one, then.
23   A. Okay.
24   Q. September 25th, 2014, Connecticut PD has FBI
25 Falsely -- Falsify Crime Statistics.  Who did the

56

1  research for this video -- actually, strike that.
2       What's this video about?  Without guessing.
3  Without guessing.
4    A. Without guessing.  That video is -- that video
5  is about the FBI not including the murders in Newtown --
6    Q. Okay.
7    A. -- in their crime statistics.
8    Q. Who appears in this video?
9    A. Alex Jones.
10   Q. Anyone else?
11   A. I couldn't tell you.
12   Q. Were any of the writers involved in any of this
13 information?
14   A. I think one of the writers probably brought
15 that information to Alex.
16   Q. Again, I'm not asking probably.  I'm asking
17 what Free Speech Systems knows or doesn't know.  And if
18 so, which writer?
19   A. I don't know which writer, but that's how Alex
20 would have gotten that information for that particular
21 video.
22   Q. Okay.
23   A. Because I believe there's an article based on
24 that too.
25   Q. So you don't know anybody else that would have

57

1  appeared in this video?
2    A. No.
3    Q. In the last year, have you seen this video?
4    A. No.
5    Q. Okay.  December 27, 2014, Lawsuit Could Reveal
6  Truth about Sandy Hook Massacre.  It's kind of an ironic
7  title, right?  Who gave the research -- excuse me.  What
8  was the source of the information in this one?
9    A. I don't know.
10   Q. Do you know what information is in this video?
11   A. No.
12   Q. Are you prepared to discuss the research that
13 was in the video, which you don't know what it's about?
14   A. No.
15   Q. Okay.  December 29th, 2014, America, The False
16 Democracy.  Have you ever seen this one?
17   A. I'd probably know it if I saw it.
18   Q. Sitting here -- have you seen it in the last
19 year?
20   A. No.
21   Q. All right.  Did you do anything to prepare
22 where the information came from in this video that you
23 don't know what it's about?
24   A. No.
25   Q. You have no -- is it fair to say you don't know

58

1  who the source of the information is that's in this
2  video?
3      A.  That would be fair.
4      Q.  Okay.  January 13, 2015, Why We Accept Gov't
5  Lies -- "government" spelled gov't.  Do you know -- have
6  you seen this video in the last year?
7      A.  I have not seen it in the last year.
8      Q.  Are you prepared to discuss the research that
9  went into the information that was put in this video?
10     A.  No.
11     Q.  Are you prepared to tell us the source of
12 information for this video?
13     A.  No.
14     Q.  March 4th, 2015, New Bombshell, Sandy Hook
15 Information Inbound.  What's this video about?
16     A.  What was the date again, March 14th --
17     Q.  March 4th, 2015.
18     A.  That probably has to do with --
19     Q.  Again, not probably.
20     A.  Oh, I'm sorry.  I'm not prepared to talk about
21 it.
22     Q.  You can't tell us, sitting here today, what
23 that new bombshell was?
24     A.  It was probably information that came out of
25 one of those meetings.

59

1      Q.  Again, not probably.  I want to know what it
2  was, what it was not or you don't know.
3      A.  I don't know.
4      Q.  Okay.  July 7th, 2015, Government is
5  Manufacturing Crises.  Do you know what this video is
6  about?
7      A.  From its title, I would suggest -- it would
8  suggest that the government is manufacturing a crisis.
9      Q.  And again --
10     A.  It's about the Hegelian dialectic.
11     Q.  Okay.  When is the last time you saw this
12 video?
13     A.  Probably when I made it.
14     Q.  And I'm not asking probably.  I'm asking when.
15 Did you -- did you review it preparing for your
16 testimony today?
17     A.  No.
18     Q.  And you -- when you were preparing for your
19 testimony, you knew that you would be responsible for
20 discussing the sourcing and research that went into the
21 videos described in plaintiff's petition, such as this
22 one, correct?
23     A.  I'm not sure if I ever had a meeting on that,
24 no.
25     Q.  I'm not asking you if you had a meeting.  I'm

60

1  asking if you did anything at all to prepare yourself to
2  discuss this video and the source and research that went
3  into it?
4      A.  That video, no.
5      Q.  Okay.  July 7th, 2015, Retired FBI Agent
6  Investigates Sandy Hook Mega Massive Cover Up.  Do you
7  know what the source of all the information is -- was
8  that went into this video?
9      A.  I couldn't tell you everything, but I would say
10 the primary source is -- was the interview I did with my
11 uncle.
12     Q.  Okay.  What information -- when was the last
13 time you saw this video?
14     A.  Probably when it was made.
15     Q.  Are you prepared to discuss the sourcing and
16 research that went into it?
17     A.  Parts of it, I can discuss.
18     Q.  Okay.  What all is in this video?  Well,
19 actually back up.  I can break this down into better --
20 easier questions for you.
21         The ambulance came -- "Ambulances came an hour
22 and a half later."  What's the source of that
23 information?
24     A.  That might have been Wolfgang Halbig.
25     Q.  Again, not asking might.  I want definitive

61

1  answers.  One, I know; two, I don't know.  Do you know?
2      A.  I don't know.
3      Q.  Okay.  Speaking of Wolfgang Halbig, you and I
4  can agree, probably not the best source of information,
5  right?
6      A.  At the time, I don't think we made -- we looked
7  at his past and determined that he was credible.
8      Q.  Right.  But hindsight is 50/50.
9      A.  Sure.  Hindsight is 50/50, hindsight is 20/20,
10 whatever you want to say.  But what -- I think what
11 gave -- what garnered Wolfgang credibility is when the
12 Florida State Police went to his house and told him to
13 stop asking questions, and that to us is a red flag.
14     Q.  Right.  Because when the police department goes
15 to somebody and says, stop harassing these people,
16 that's a red flag?
17     A.  At the time I don't know if he was harassing
18 people.  I think he just had his 13 questions or
19 whatever he had.  Which I don't think it had anything to
20 do with the families.
21     Q.  Again, with regards to Wolfgang Halbig and his
22 involvement with the families, we spoke in depth at our
23 last deposition together, about Jonathan Reich?
24     A.  I don't remember speaking in depth about
25 Jonathan Reich.

Rob Dew - 11/26/2019

---

**62**

1  Q. All right. Let's do it now.
2  A. But I remember you asking about him and I
3  didn't know who he was.
4  Q. Do you know who he is now?
5  A. No.
6  Q. Have you done any research to find out all of
7  the people that were harassed by Free Speech Systems and
8  their affiliates?
9  A. All the people that were harassed?
10  MR. JEFFERIES: Objection, form.
11  A. No, I didn't do any research in to -- because
12  we were never advocating harassment of anybody.
13  Q. (BY MR. OGDEN) Really?
14  A. I don't think --
15  Q. In your last deposition --
16  A. I don't think I ever said harass anybody.
17  Q. In your last deposition, you told me that
18  Wolfgang Halbig -- excuse me, that Dan Bidondi, another
19  affiliate, was fired because of what he did at Sandy
20  Hook, right? You remember that?
21  A. He was -- I think he was fired before Sandy
22  Hook.
23  Q. Before Sandy Hook happened?
24  A. I know he was gone before -- he was gone -- I
25  would have to look at his employment records, but the

---

**63**

1  Boston bomb- -- he was gone for a while, and then when
2  he was in Delaware during the Boston bombing, someone
3  mentioned that he was close by so Alex had him go report
4  on what was going on.
5  Q. And then quickly after you saw what he did to
6  those people, it was uploaded to the Internet and it had
7  an InfoWars tag on it, surely after you saw that, that's
8  when you think, Bidondi needs to be disassociated from us
9  completely, right?
10  MR. JEFFERIES: Objection, form.
11  A. When he came -- I think when he went to those
12  meetings and then was going to the people outside of the
13  meeting -- anything we told him to do was never to go
14  harass people; it was to cover what was going on in the
15  meeting.
16  Q. (BY MR. OGDEN) Right. But you could see in
17  the videos that he was giving you that he was harassing
18  people and, in fact, was doing very little investigative
19  journalism.
20  MR. JEFFERIES: Objection, form.
21  A. The only video I saw him harassing was a
22  lawyer.
23  Q. (BY MR. OGDEN) You understand that Mr. Bidondi
24  is also a semi-professional wrestler, correct?
25  A. A professional wrestler was the governor of

---

**64**

1  Minnesota. Okay. What does that have to do with it?
2  Q. Just asking whether or not you were aware that
3  Mr. Bidondi was a semi-professional wrestler?
4  A. Okay. So does that disqualify him from asking
5  questions?
6  Q. No, not at all. In fact, it gets me to my next
7  question. When you saw the video of him harassing that
8  lawyer, did you think he was being more of a journalist
9  or more of a semi-professional wrestler?
10  A. I would say more of a semi-professional
11  wrestler. I mean, he was asking him questions.
12  Q. Shortly after that video, he was fired because
13  of what he was doing to those people?
14  A. He wasn't -- he was doing contract work for us.
15  We would either accept or not accept his reports.
16  Q. And after that, you stopped accepting all
17  reports and stopped responding to him, according to your
18  deposition testimony last time we spoke?
19  A. I would have to look at the dates of
20  everything, but, yes, that sounds right.
21  Q. Okay. So it's weird that we were produced in
22  this case for the first time, an e-mail that you're
23  involved with that has Dan Bidondi being fired for how
24  he was acting at a Donald Trump rally in 2016. Fun
25  fact, right?

---

**65**

1  A. That is a fun fact.
2  Q. All right. Let's get back to this list of
3  videos that we're not going to be able to discuss.
4  November 18th, 2016, Final Statement on Sandy Hook. You
5  remember this one?
6  A. That was after Hillary Clinton brought it back
7  up into the purview, that Alex Jones was running around
8  talking about Sandy Hook all the time.
9  Q. Right. Now, you understand that prior to this,
10  Alex Jones had been speaking about this -- he had spoken
11  about this five months before that and prior to that
12  38 separate times and that's just the ones we know of.
13  A. Uh-huh. In how many years? It was six years
14  at the time.
15  MR. JEFFERIES: Just answer the question.
16  Q. (BY MR. OGDEN) I'm going to tell you that it
17  was almost four years.
18  A. Okay.
19  MR. BANKSTON: Almost three. It was
20  December -- gotcha.
21  MR. OGDEN: Almost four years.
22  Q. (BY MR. OGDEN) Who did the research on that
23  video?
24  A. What was the video again?
25  Q. Final Statement on Sandy Hook.

---

66

1    A.  That was something that me and Alex put
2  together.  So we did the research on it.
3    Q.  What were the sources that y'all used?
4    A.  News articles and video.
5    Q.  From where?
6    A.  Probably from previous videos that we had done.
7    Q.  Again, not probably.  I'm asking for specifics
8  because you have a duty, sitting here today, to be very
9  specific with me on what Free Speech Systems knows.
10  Okay?  What news articles did you rely on?
11    A.  I don't know.
12    Q.  What news articles do you read that you find
13  reliable, if you don't trust the FBI's reports?
14    A.  So you're saying the FBI has never lied to us
15  before?
16    Q.  Not at all.
17        MR. JEFFERIES:  Just answer the question.
18    Q.  (BY MR. OGDEN)  What I'm asking you is, where
19  do you even start looking for reports if they're not
20  videos that you can see and dissect; but if it's just a
21  written report, what do you trust?
22    A.  Who do I trust?
23    Q.  And that's Free Speech Systems, I'm asking.
24    A.  I think we have pointed out that some -- some
25  outlets are reliable at certain times and they're not.

67

1  Even the FBI can be reliable.
2    Q.  Okay.  Who gets to cherry-pick when an outlet
3  is reliable --
4    A.  I think --
5    Q.  -- you or Alex?
6    A.  Alex Jones makes that editorial decision.
7    Q.  Okay.  Do you ever question him?
8    A.  I think I've questioned him a couple times.
9    Q.  How did that go for you?
10    A.  I'm still working.
11        MR. OGDEN:  All right.  I think this is a
12  good time to take a break.  His hands have got to be
13  tired.  Off the record.
14        THE VIDEOGRAPHER:  Going off the record at
15  2:41 p.m.
16        (Recess taken from 2:41 p.m. to 2:53 p.m.)
17        THE VIDEOGRAPHER:  We are back on the
18  record at 2:53 p.m.
19        (Deposition Exhibit 2 marked for
20        identification.)
21    Q.  (BY MR. OGDEN)  I'm going to hand you
22  Exhibit 2.  Exhibit 2 is an e-mail from you to Tim
23  Flores.
24    A.  Looks like it says Melinda Flores.
25    Q.  Melinda Flores and Tim, correct?

68

1    A.  Yeah.
2    Q.  And that deals with Free Speech Systems
3  informing Dan Bidondi to stop representing himself as a
4  reporter, after an incident at a Trump rally in Rhode
5  Island, correct?
6    A.  Yeah.  Yeah, that's what it says.
7    Q.  And that was not in 2013 or '14, that was
8  actually halfway through 2016.
9    A.  Yeah.
10    Q.  In your last deposition that you had with me,
11  you were tasked with talking about the employment of
12  Mr. Bidondi and you told us under oath, swearing to God,
13  that he was fired because of his actions and conduct
14  related to videos of him related to the Sandy Hook and
15  Newtown, Connecticut.
16    A.  Right.
17    Q.  But when I read this e-mail, it seems that you
18  actually fired him well after that date for something
19  related to Donald Trump and his campaign.  Fair?
20    A.  Well, there's several people at InfoWars who
21  have been fired and hired at different times, and I
22  don't think we ever considered him fully an onboard
23  employee.  He was more of a contractor, because we were
24  paying invoices to a contractor.
25    Q.  Right.  And we talked about that at your last

69

1  deposition and that's exactly what you said, except you
2  told me that he had been fired immediately after that
3  video of him harassing those people and the lawyers at
4  the courthouse in Newtown.  Remember that?
5    A.  Uh-huh.
6    Q.  Okay.  That wasn't exactly true, was it?
7    A.  Well, and then he came back after -- I think
8  what happened is, he got some congressman to tell him
9  to -- I don't know if he told him to shut the F up, or
10  something like that, and he had video of it.  And it was
11  during a gun -- Second Amendment legislation going
12  through Delaware.  And so I think he got brought back on
13  in that capacity to be -- allow for him to produce
14  reports for us again.
15    Q.  Okay.
16    A.  But he was never hired back in terms of -- he
17  was never hired back in terms of full-time employment.
18    Q.  Right.  But you contracted with him, after you
19  told me that you cut ties with him completely within a
20  text message, that's what you testified to under oath
21  swearing to God --
22    A.  Right.  And at the time we had cut ties
23  completely with him.
24    Q.  Yeah, but at the time I asked you that
25  question, you had also recontracted with him all the way

22-01023-tmd Doc#1-14 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 809 of 1271

Rob Dew - 11/26/2019

70

1  up until December of 2015 and paid him in January and
2  then also sent him messages all the way up through June
3  of 2016 regarding his -- him being a contractor for Free
4  Speech Systems. But none of that was in your answer,
5  right?
6      A. I'm not sure if you -- what the answer -- or
7  what the question was at the time, but what -- from what
8  I remember, is that Dan Bidondi would go in and out of
9  the good graces, because I don't think he was even
10 hired -- he wasn't even there at the time of Sandy Hook.
11 And then he came back and then he was gone again. And
12 that's all with Alex's purview.
13     Q. What do you mean, the time of Sandy Hook?
14     A. Well, there's this massive time since 2012
15 where --
16     Q. Through when?
17     A. I would say maybe 2015. I mean, I'm not saying
18 we didn't do any videos after that. I'm saying somebody
19 might have called and done it; and then when Hillary
20 Clinton brought it back up on the campaign trail, I
21 think Alex saw the lawsuit attacks that were being set
22 up.
23     Q. Okay. Let's break down that answer.
24     A. Okay.
25     Q. Earlier this year you told me that you

71

1  terminated him completely and disassociated yourself
2  when he harassed the lawyers at the courthouse in
3  Newtown, Connecticut. However, today you told me that
4  he was -- that was disgusting and we disassociated
5  ourselves at the time, but then he came into our good
6  graces because he got a congressman in Delaware to curse
7  at him. That's the credentials that allows you to get
8  back into the good graces of InfoWars?
9      A. Well, it depends on what the context is, but
10 that could be politics.
11     Q. And this context was the Second Amendment,
12 right?
13     A. Uh-huh.
14     Q. And you said earlier that you considered
15 yourself a Second Amendment steward?
16     A. Uh-huh.
17     Q. Are you in a well-regulated militia?
18     A. I don't think you have to be in a
19 well-regulated militia to be a Second Amendment steward.
20     Q. Right. I was just asking which part of the
21 Second Amendment you were a steward of?
22     A. That the right to bear arms shall not be
23 infringed.
24     Q. And "bear" arms is not the animal, but it's
25 actually the ability to bear arms to protect yourself

72

1  against tyranny.
2      A. What do you mean the animal?
3      Q. Have you ever heard of bears?
4      A. Yeah, I've heard of bears.
5      Q. Okay. I just wanted to make sure that you
6  weren't confused, because we've had a lot of confusion
7  in this room today on the questions.
8          MR. JEFFERIES: Objection.
9      Q. (BY MR. OGDEN) With the -- we'll get back to
10 the topics that you were prepared for -- or were
11 supposed to be prepared for today. July 7 -- excuse me.
12 November 18th, 2016, Final Statement on Sandy Hook. You
13 remember that one?
14     A. (Nods head.)
15     Q. And that video was a compilation of a number of
16 videos we've already gone through, correct?
17     A. Correct.
18     Q. So it's safe to say you have no idea who
19 researched or sourced that information?
20     A. Well, Alex and I researched and sourced the
21 information.
22     Q. From prior videos, correct?
23     A. Uh-huh.
24     Q. We just went through all those prior videos and
25 you don't know who researched or sourced those, so the

73

1  information may have been compiled by you to make this,
2  but the source of that information is unknown to Free
3  Speech Systems, as we sit here today, correct?
4      A. Correct.
5      Q. Now, fast-forward four months, April 22nd,
6  2017, after the final statement, that was our last
7  video, is Sandy Hook Vampires Exposed. Do you remember
8  that video?
9      A. I do remember that video.
10     Q. Who researched the information for that video?
11     A. I would say myself and Alex did.
12     Q. What were your sources?
13     A. I believe a Megyn Kelly interview.
14     Q. Any others?
15     A. And then I believe previous videos that we
16 produced.
17     Q. Are you aware that on April 22nd, 2017, that
18 the Megyn Kelly interview hadn't even happened yet?
19     A. Oh, it hadn't happened yet? Okay.
20     Q. Fair to say you're not prepared to discuss this
21 video?
22     A. I'm -- must be confused with another Sandy Hook
23 vampire video.
24     Q. Okay. Fair to say you're not prepared to
25 discuss the one from April 22nd, 2017? Yes?

74

1    A.  Correct.
2    Q.  Okay.  Let's go to June 13th, 2017.  It's the
3  55th video.  Media Refuses to Report Alex Jones' Real
4  Statements on Sandy Hook.  Who researched the
5  information on this video?
6    A.  Alex.
7    Q.  How do you know that?
8    A.  Because I think by that time, Alex had
9  apologized several times to the families and -- and what
10  was the date on that again?  I don't know if that was
11  right around -- we did a video right around Father's
12  Day.
13    Q.  June 13th, 2017.
14    A.  So I'm not sure if that was Father's Day or
15  not, but he did put out a special Father's Day message
16  around that time to the families --
17    Q.  And no one --
18    A.  -- apologizing for whatever -- I don't know
19  how -- however many times it was, he apologized again.
20    Q.  Who else from Free Speech Systems researched
21  for that video?
22    A.  It would have just been me and Alex.
23    Q.  Earlier you said it was only Alex.  Now it was
24  you and Alex?
25    A.  Well, I put the stuff together.  So I would

75

1  consider -- I would consider what I would -- what I'm
2  doing, sourcing the other videos.
3    Q.  Okay.  And were those other videos the ones
4  that I've described already?
5    A.  Probably -- yes.  Some of them were.  I'm sure
6  some of them might have been from a different name or
7  something.
8    Q.  Okay.  Have you produced the ones with
9  different names?
10    A.  What do you mean?
11    Q.  Well, you said some of them would be.  I
12  listened --
13    A.  I'm sure some of those would have been on the
14  list that we talked about.  I'm sure there's others on
15  the list that we didn't talk about that are in your
16  possession, that we might have pulled video from.
17    Q.  Okay.  And you're sure they're in my
18  possession?
19    A.  You know, most of our video library got wiped
20  out with YouTube, and so whatever is left is still
21  around and whatever's not is not.
22    Q.  Okay.  However, the June 13, 2017, you said
23  that you compiled and sourced -- or sourced this video
24  from other videos.  At least the videos we've gone
25  through today that were involved in that, you don't know

76

1  the source of that information, correct?
2    A.  Correct.
3    Q.  And October 26, 2017, JFK Assassination
4  Documents to Drop Tonight.
5    A.  Okay.
6    Q.  Do you remember that video?
7    A.  No, I don't remember that video.
8    Q.  It's fair to say that then you were -- you're
9  not prepared to discuss the source of the information
10  related to Sandy Hook in that video?
11    A.  Correct.
12    Q.  It's fair to say that you're also not prepared
13  to discuss the research that went into the information
14  in that video relating to Sandy Hook?
15    A.  That's correct.
16    Q.  All right.  Let's move to the second topic that
17  you were tasked with being prepared to discuss.  Topic 2
18  is, "Internal editorial discussions regarding Free
19  Speech Systems LLC's coverage of the Sandy Hook
20  Elementary School shooting."
21    A.  Uh-huh.
22    Q.  What did you do to prepare yourself?
23    A.  Spoke with my attorney.
24    Q.  Anything else?  And let me cut you off there.
25  If there's any information that -- in your answer that

77

1  regards a conversation you've had with your attorney, I
2  don't want you to disclose that to me.
3    A.  Okay.  Then that is all.
4    Q.  Did you review any documents?
5    A.  Just a couple of -- I believe the one I looked
6  at earlier.  I don't know if this is the one.
7    Q.  Did you review any e-mails?
8    A.  No.
9    Q.  Did you review any text messages?
10    A.  No.
11    Q.  Did you review any memorandums?
12    A.  I don't think we have anything from that.
13    Q.  Did you speak with any of the employees that
14  are still at InfoWars that may have been related to
15  Sandy Hook in any way?
16    A.  No.
17      MR. JEFFERIES:  Objection, form.
18    Q.  (BY MR. OGDEN)  Did you speak to Paul Watson?
19    A.  No.
20    Q.  We know that from your answers related to the
21  videos and not knowing the sources of the information or
22  any of the researchers, that any discussion that would
23  have involved that -- those people that did that, you're
24  not prepared to discuss that, correct?
25    A.  That is correct.

Rob Dew - 11/26/2019

78

1    Q. Okay. Outside of that, what does the term
2  "editorial discussion" mean to you?
3    A. Well, an editor is someone who determines
4  what's going up on a website, either fixing -- either
5  verifying a fact or fixing the context of something or
6  making sure it's grammatically correct.
7    Q. Okay. And I apologize, my question was a
8  little -- probably confusing. But I didn't ask what an
9  editor was. I asked what an editorial discussion was.
10    A. Well, those are discussions that people who are
11  making editorial decisions, those are the discussions
12  they would have.
13    Q. What's an editorial decision?
14    A. Saying -- looking at -- so the essence of an
15  editorial decision would be -- and we can go back to the
16  green screen thing. Looking at it and going, I believe
17  that's green screen; we're going to do a video on this
18  saying that's green screen. So at that time, Alex made
19  an editorial decision to create that video.
20    Q. Other than that editorial discussion that you
21  were involved with, are you prepared to discuss any
22  editorial discussions that you were not involved in?
23    A. Not that I was not involved in.
24    Q. Did you take any steps to prepare yourself to
25  discuss whether or not there are any editorial

79

1  discussions that were had between anyone at Free Speech
2  Systems outside your purview?
3    A. No.
4    Q. Okay. With regard to an editorial discussion
5  that leads to an editorial decision, if someone at Free
6  Speech Systems comes and says, I want to go on air and
7  say Sandy Hook Elementary School was actually shut down
8  and wasn't an operating school at the time of the
9  shooting, what discussion would have to happen -- excuse
10  me. What -- how would that person then be able to
11  actually put that on air? What has to happen?
12    A. I think what you're referring to is Wolfgang
13  Halbig and I'm -- Alex doesn't do preinterviews with
14  people. So if somebody comes on and says they have a
15  bombshell to drop or whatever, I mean, a lot -- so a lot
16  of the headlines are written after the interview is
17  done. So we don't go in and say, oh, we've got
18  Wolfgang, he's going to present this information. So
19  I'm not sure how -- in terms of that, that sounds like
20  that came from Wolfgang Halbig.
21    Q. Okay. Do you believe that Wolfgang Halbig is a
22  good source of information?
23    A. Well, at the time I think we did believe he was
24  a good source of information.
25    Q. What time was that?

80

1    A. I think the Sandy Hook period, from the time of
2  the incident to -- till we stopped having him on, which
3  I don't know the exact date.
4    Q. So 2013, '14 and some of '15 --
5    A. Yeah.
6    Q. -- you thought Wolfgang Halbig was a good
7  source of information?
8    A. Uh-huh.
9    Q. Did anybody at Free Speech Systems voice
10  concerns about Wolfgang Halbig being crazy?
11    A. Not that I -- not to my knowledge.
12    Q. Would that have been an editorial discussion?
13    A. Yeah, I think that would have been an editorial
14  discussion.
15    Q. What about Mr. Fetzer, Jim Fetzer?
16    A. Yeah, I don't know if we ever had Jim Fetzer on
17  the show.
18    Q. You definitely relied on his information,
19  correct, a multitude of times?
20    A. I don't know. Fetzer didn't like Alex, as far
21  as I know.
22    Q. It's fair to say that there were definitely
23  editorial discussions that were had about Fetzer's
24  reliability as a source, correct?
25    A. I don't know if Fetzer ever came into the

81

1  picture at that time.
2    Q. If there are discussions out there within Free
3  Speech Systems' documents that were produced in this
4  case that deal -- that have evidence -- excuse me,
5  editorial discussions in there, that's something that
6  you should know about, correct?
7    A. If you're saying I reviewed every e-mail that
8  was sent around the office during those time periods,
9  no, I didn't do that.
10    Q. You didn't review any e-mails preparing for
11  today?
12    A. That's correct.
13    Q. All right. Do you think you should have?
14    A. I was relying on the advice of my attorney.
15    Q. With how this deposition has gone so far, do
16  you think you've prepared enough?
17    A. I'm not going to answer that.
18    Q. Okay. I want to ask you, with your testimony
19  that you gave me earlier this year versus -- it was in
20  March -- versus the testimony that you have given me
21  today, does it all coincide with each other?
22    A. I think maybe, except for some of the
23  miscommunications on what we consider employment status
24  with Dan Bidondi.
25    Q. So if we go back and read that transcript where

82

1  the nice court reporter in March was writing down every
2  word and it was clear that we were talking about
3  contractor work with him, can you -- do you still stand
4  by the statements you gave to me in March?
5      A.  Well, it's possible that they were -- I didn't
6  have all the information in front of me at the time.
7      Q.  Do you understand that back in March, as well
8  as today, you have a legal duty to be prepared to
9  discuss the topics that I give you?  Do you know that?
10     A.  Sure.  But I don't know if that means -- I
11 don't know every question you're going to ask me.
12     Q.  Right.  But you know the topics.  One of --
13     A.  I don't know if Dan Bidondi was a topic in
14 the -- in any of the documents that I saw.
15     Q.  You know that Dan Bidondi was a source of
16 information regarding Sandy Hook, at least to some
17 extent, correct?
18     A.  In terms of after going up there and reporting
19 on those --
20     Q.  In terms of that --
21     A.  -- those meetings, yeah.
22     Q.  -- in terms of sending e-mails in, in terms of
23 having back-and-forth discussions with people from Free
24 Speech Systems, you understand that Dan Bidondi was a
25 source of information and specifically that -- was a

83

1  source of information that you and Mr. Jones used to
2  make videos and spread that information to millions of
3  people?
4      A.  In some small part, he had a -- I wouldn't
5  consider him a major investigator into Sandy Hook.
6      Q.  Sitting here today, does Free Speech Systems
7  acknowledge that it spread a multitude of mistruths to
8  millions of people regarding the families and children
9  at Sandy Hook Elementary School in December of 2012?
10         MR. JEFFERIES:  Objection, form.
11     A.  I think we made some mistakes and I think we've
12 acknowledged those mistakes and -- but we never told
13 anybody to go after anybody's families, we never wanted
14 to -- we never wanted to hurt the families.  We see
15 events like these, and they're current -- it happens
16 even today, when these events happen, the next thing
17 that comes out of a politician's mouth is, we've got to
18 start grabbing people's guns.
19     Q.  (BY MR. OGDEN)  As a journalist, don't you have
20 the duty to be right and not first?
21     A.  Well, we're not always wearing journalistic
22 hats.  Sometimes we're commenting on something.
23     Q.  So when you're commenting on something, you can
24 just make it up and it doesn't matter?
25     A.  No, you can say your opinion.

84

1      Q.  In any way is that differentiated on air?  Does
2  Mr. Jones say, here, I'm just going to make stuff up;
3  here, you should trust me because we're truth in
4  journalism?
5          MR. JEFFERIES:  Objection, form.
6      Q.  (BY MR. OGDEN)  Does he do that?
7      A.  I think he doesn't play devil's advocate as
8  much anymore because of instances like these, where
9  we're at today.
10     Q.  Did you know that a woman in Florida was
11 inspired by InfoWars to harass one of my clients to the
12 point she went to federal prison?
13     A.  I mean, somebody was inspired by Bernie Sanders
14 to go shoot a bunch of congressmen.
15     Q.  Did you know that?
16     A.  No, I've heard of the case.  Yeah.  I don't
17 remember her name, but --
18     Q.  Do you take any responsibility for that?
19     A.  No, I'm not responsible for what someone else
20 does.
21     Q.  If someone relies on the misinformation that
22 you have spread over the course of six years, to the
23 point where they believe you because you keep telling
24 them over and over again that you are the truth in
25 journalism and they take what you have as the truth and

85

1  they act upon it, you don't have any responsibility for
2  that?
3          MR. JEFFERIES:  Objection, form.
4      A.  I don't think we were covering Sandy Hook as
5  much as you'd like to think we were.
6      Q.  (BY MR. OGDEN)  I just ripped off 61 videos
7  spanning from 21 minutes to over three hours long.
8      A.  Okay.  And I bet that three-hour long video,
9  we're not talking about Sandy Hook the entire time.  We
10 also do three hours a day every day and two hours on
11 Sunday, plus we're doing an hour live every night and
12 then there's the multitude of other live videos that are
13 going on.  There's a lot of video content that's being
14 produced, and you're looking at a very small percentage
15 of it.
16     Q.  Right.  I don't even know if these are all your
17 Sandy Hook videos.  These are just the ones that I could
18 find.
19     A.  You can thank YouTube for that.  You can thank
20 YouTube and Facebook and everybody else.
21         MR. JEFFERIES:  Answer the question.
22     Q.  (BY MR. OGDEN)  You don't even know if we're --
23 if I'm talking about all the videos, do you?
24     A.  I don't think anybody knows.
25     Q.  The three-hour video --

Rob Dew - 11/26/2019

---

86

1    A. I don't even think God knows all the videos
2  because they're gone.  They don't exist anymore.
3    Q. The three-hour video that you just mentioned,
4  we probably weren't talking about Sandy Hook the whole
5  time, you don't know because you didn't review it to
6  prepare for today, did you?
7    A. No, I did not.
8    Q. So you don't know.  That's just you making
9  something up and spreading it to people?
10   A. No, that's not what I'm doing.
11   Q. Then what are you doing?
12   A. The same thing you're doing.
13   Q. I'm asking questions.
14   A. Oh.
15   Q. What are you doing?
16   A. Okay.
17   Q. When you say something and you're not sure if
18  it's true but you sit here under the penalty of perjury
19  and swear to God that it is the truth, what is that
20  other than lying?
21   A. I'm not lying.
22   Q. Then what is it called when you make up
23  something that you aren't sure of when you've sworn to
24  tell the truth and the complete truth?  What is that
25  called, in your mind?

---

87

1    A. I am not lying.  We're having -- you're asking
2  me questions, but we're also having back and forth on a
3  multitude of topics.
4    Q. We are having back and forth on a multitude of
5  topics.  I'm just asking you questions and expecting you
6  to answer them truthfully.  And like I said at the
7  beginning and like I said at the beginning of the last
8  time you and I spoke on the record, don't guess.
9  Because, one, it's not fair to anybody in this room;
10  and, two, it's -- there's no journalistic integrity in
11  doing it.  Okay?
12   A. Is that a question?
13   Q. My last question is, sitting here today on
14  behalf of the company, are you proud of the work that
15  you did -- that Free Speech Systems did on Sandy Hook
16  Elementary School and the shooting that happened in
17  December 2012?
18   A. I think our reporting stopped what was going to
19  be a lot of antigun legislation coming down.
20   Q. You didn't answer my question.
21   A. So I am proud of it.
22   Q. My question was: Are you proud of the
23  information that you spread about Sandy Hook from 2012
24  to 2017 as a company?  Is that what you want to be
25  remembered for?

---

88

1    A. I don't think we're going to be remembered for
2  Sandy Hook.
3    Q. What do you think you're going to be remembered
4  for?
5    A. I don't know.  That's what you want.  I know
6  that.
7    Q. Simple question.  I can repeat it if you'd
8  like.  What do you think InfoWars and Free Speech
9  Systems is going to be remembered for, other than the
10  Sandy Hook misinformation that was spread over the
11  course of over half a decade?
12   A. I think we'll be remembered about a lot more
13  than that.  And other than a few -- having a few people
14  on that said it didn't happen, I mean, I don't think I
15  ever questioned that kids died at that location.
16   Q. I know that you said you're proud of stopping
17  some legislation that was never put in place, but are
18  you ashamed of the wrongs that you guys spread?
19   A. Well, I mean --
20       MR. JEFFERIES:  Objection, form.
21   A. -- we didn't -- we didn't kill those kids.  We
22  didn't cause the situation to happen.  We were just
23  actively looking at it and looking at a bunch of
24  different angles and some of those angles were wrong.
25  And I'm not going to sit here and say that we're bad

---

89

1  people, because we didn't make this thing happen.  We
2  didn't cause it to happen.  We didn't give the kid the
3  drugs, we didn't give the kid the access to all the
4  stuff.  We didn't have -- you know, I think a lot of
5  this would have been solved had they put out security
6  footage showing the guy entering the building.  They
7  never did that.  Then they go, well, we didn't have it.
8  We saw it in Columbine.  So when you see red flags like
9  that, you start asking questions and I'm not ashamed of
10  asking questions and I don't think anybody should be
11  ashamed of asking questions, even yourself.
12   Q. (BY MR. OGDEN)  If any of my clients were in
13  the room right now, would you apologize to them?
14   A. I would apologize for the loss of their kids,
15  yes, I would.
16   Q. You wouldn't apologize for spreading a bunch of
17  information that was wrong about the circumstances of
18  their kids' death, to millions of people for years, to
19  the point where some of them had to move?  You wouldn't
20  apologize to them?
21   A. Well, we didn't turn it into a media spectacle.
22  It was already turned into a media spectacle.  We were
23  just talking about it.  Are you going to ask these
24  people who were -- you know, the cameras that were --
25  people that were sticking cameras in their faces every

---

90

1 time they turned around and sneezed and all the
2 interviews they with doing?  They made themselves
3 politic -- public figures.  That's what they did.
4     Q.  Absolutely.  If I get the opportunity, I'm
5 absolutely going to ask those people if they're sorry.
6 But I'm asking you right now.  Are you?
7     A.  I'm sorry for the loss of their kids,
8 definitely am.  I would never want that to happen to
9 anybody.
10     Q.  And again, are you sorry for spreading a bunch
11 of lies and impacting their life over a decade after
12 they had to experience the one thing no parent should
13 ever have to do?
14         MR. JEFFERIES:  Objection, form.
15     A.  At the time I think what we were putting out we
16 thought was correct information at the time.
17     Q.  (BY MR. OGDEN)  And you were wrong, correct?
18     A.  On some instances, we were wrong.
19     Q.  And are you sorry for that?
20     A.  Am I sorry for being wrong?  No.  People get
21 wrong -- get things wrong all the time.
22         MR. OGDEN:  Okay.  I appreciate your time.
23         THE WITNESS:  Thanks.
24         THE VIDEOGRAPHER:  This concludes the
25 deposition at 3:22 p.m.  We are off the record.

91

1 (Deposition concluded at 3:22 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

92

1         CHANGES AND SIGNATURE
2 WITNESS: ROB DEW   DATE OF DEPOSITION: 11/26/2019
3 PAGE/LINE      CORRECTION      REASON FOR CHANGE
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

93

1         I, ROB DEW, have read the foregoing deposition
2 and hereby affix my signature that same is true and
3 correct, except as noted herein.
4
5
6         _____
7                 ROB DEW
8 STATE OF _____ )
9 COUNTY OF _____ )
10
11         Before me, _____, on this day
12 personally appeared ROB DEW known to me (or proved to me
13 under oath through _____
14 (description of identity card or other document) to be
15 the person whose name is subscribed to the foregoing
16 instrument and acknowledged to me that they executed the
17 same for the purposes and consideration therein
18 expressed.
19         Given under my hand and seal of office this
20 _____ day of _____, 2019.
21
22         _____
23                 NOTARY PUBLIC IN AND FOR
               THE STATE OF_____
24
25 My Commission Expires:  _____

94

1    CAUSE NO. D-1-GN-19-004651
2  NEIL HESLIN          *  IN THE  DISTRICT  COURT
                        *
3  VS.                  *
                        *  OF TRAVIS COUNTY, TEXAS
4  ALEX E. JONES, INFOWARS,  *
   LLC, and FREE SPEECH   *
5  SYSTEMS, LLC          *  261ST JUDICIAL DISTRICT
6
7      REPORTER'S CERTIFICATION
           DEPOSITION OF ROB DEW
8          November 26, 2019
9
10     I, Micheal A. Johnson, Certified Shorthand
11  Reporter in and for the State of Texas, do hereby
12  certify to the following:
13     That the witness, ROB DEW, was duly sworn by
14  the officer and that the transcript of the oral
15  deposition is a true record of the testimony given by
16  the witness;
17     That the deposition transcript was submitted
18  on _____, to the witness or to the attorney
19  for the witness for examination, signature and return to
20  me by _____;
21     That the amount of time used by each party at
22  the deposition is as follows:
23     Mr. Bill Ogden - 01:42:43
       Mr. T. Wade Jefferies - 00:00:00
24
25     That pursuant to information given to the

95

1  deposition officer at the time said testimony was taken,
2  the following includes counsel for all parties of
3  record:
4     Mr. Bill Ogden, Attorney for Plaintiff
      Mr. Mark D. Bankston, Attorney for Plaintiff
5     Mr. T. Wade Jefferies, Attorney for Defendants
6     I further certify that I am neither counsel
7  for, related to, nor employed by any of the parties or
8  attorneys in the action in which this proceeding was
9  taken, and further that I am not financially or
10  otherwise interested in the outcome of the action.
11     Further certification requirements pursuant to
12  Rule 203 of TRCP will be certified to after they have
13  occurred.
14     Certified to me this 1st day of
15  December, 2019.
16
17
18     _____
           Micheal A. Johnson, CSR, RDR, CRR
19     Texas Certification No. 5891
           Expiration Date: 01/31/2021
20     Firm Registration No. 528
           Integrity Legal Support Solutions
21     PO Box 245
           Manchaca, Texas 78652
22     (512) 320-8690
           (512) 320-8692
23
24
25

96

1  FURTHER CERTIFICATION UNDER RULE 203 TRCP
2     The original deposition was/was not returned
3  to the deposition officer on _____;
4     If returned, the attached Changes and
5  Signature page contains any changes and the reasons
6  therefor;
7     If returned, the original deposition was
8  delivered to Bill Ogden, Custodial Attorney;
9     That $_____ is the deposition officer's
10  charges to the Plaintiff for preparing the original
11  deposition transcript and any copies of exhibits;
12     That the deposition was delivered in
13  accordance with Rule 203.3, and that a copy of this
14  certificate was served on all parties shown herein and
15  filed with the Clerk.
16     Certified to by me this _____ day of
17  _____, 2019.
18
19     _____
           Micheal A. Johnson, CSR, RDR, CRR
20     Texas Certification No. 5891
           Expiration Date: 01/31/2021
21     Firm Registration No. 528
           Integrity Legal Support Solutions
22     PO Box 245
           Manchaca, Texas 78652
23     (512) 320-8690
           (512) 320-8692
24
25

# Exhibit 3

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
817 of 1271

1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME

| NEIL HESLIN, | ) | IN THE DISTRICT COURT |
| --- | --- | --- |
| | ) | |
| Plaintiff | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| VS. | ) | 459TH JUDICIAL DISTRICT |
| | ) | |
| ALEX E. JONES, INFOWARS, | ) | |
| LLC, ET AL., | ) | TRIAL COURT CAUSE NO. |
| | ) | D-1-GN-18-001835 AND |
| Defendant | ) | D-1-GN-19-004651 |

| LEONARD POZNER AND | ) | IN THE DISTRICT COURT |
| --- | --- | --- |
| VERONIQUE DE LA ROSA, | ) | |
| | ) | TRAVIS COUNTY, TEXAS |
| Plaintiff | ) | |
| | ) | 459TH JUDICIAL DISTRICT |
| VS. | ) | |
| | ) | |
| ALEX E. JONES, INFOWARS, | ) | TRIAL COURT CAUSE NOS. |
| LLC, ET AL., | ) | D-1-GN-18-001842 |
| | ) | |
| DEFENDANTS | ) | |

| SCARLETT LEWIS, | ) | IN THE DISTRICT COURT |
| --- | --- | --- |
| | ) | |
| Plaintiff | ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| VS. | ) | 459TH JUDICIAL DISTRICT |
| | ) | |
| ALEX E. JONES, INFOWARS, | ) | |
| LLC, ET AL., | ) | TRIAL COURT CAUSE NO. |
| | ) | D-1-GN-18-006623 |
| DEFENDANTS | ) | |

-----------------------------------------------------------

MOTION TO COMPEL; MOTION FOR SANCTIONS

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
818 of 1271

73

1    non-appearing attorney, who's acting as corporate

2    counsel.  He's general counsel.  He's essentially the

3    party.  He is their corporate lawyer.

4         And you have these attorneys who come in who

5    are put in these awkward positions, like you can see

6    Mr. Pattis really found himself in an awkward position

7    there.  And each of these attorneys will then come and

8    the next local counsel will blame it on the local

9    counsel before.  And so here we have Mr. Reeves again,

10   who is the latest series in that, and I'm expecting,

11   just like Mr. Jefferies, he will blame the one before

12   him.  But what you'll see is the consistent behavior of

13   party itself.  And that is the reason why we think

14   anything more at this point just becomes ridiculous.

15        So what we're asking is the default judgment

16   and to let a trial proceed forward just on whether

17   Jones' conduct merits punitive damages; what the

18   compensatory damages are; and, if there is a punitive

19   damages finding, what the punitive damages should be.

20   And that's what we're asking for today, Your Honor.

21        THE COURT:  So, I printed out your proposed

22   orders.  I haven't read them yet because I didn't know

23   they were there until this morning.

24        My concern is you need this discovery even

25   for a damages trial.  So, are you asking me to default

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 819 of 1271

74

1   liability and order the discovery still be responded to
2   again?
3           MR. BANKSTON:  It's interesting.  I do think
4   you're right, that there will need to be some damages
5   discovery from therein that's directed towards them.  I
6   don't honestly think it's ever -- I'm going to get
7   much.  And I don't -- let me put it this way, I don't
8   think the discovery that was, um, issued under the
9   court's prior discovery orders, which was TCPA-directed
10  discovery, all that goes to my burdens.  So I don't
11  think we've served any discovery yet that would be
12  subject to these orders that would be damage related.
13          Certainly if we go forward and there's
14  something going on with damages that we need to bring
15  to the court, you know, for -- we could have that.  But
16  I'm just kind of hoping that we can go forward and at
17  least put on a damages trial, even if they don't
18  produce us anything.
19          THE COURT:  Right.  I mean you can, but my
20  question is just, if you're trying to get punitive
21  damages, you probably do need more discovery.
22          MR. BANKSTON:  I think that's true.
23          Well, I'm going to tell you, Your Honor, I
24  think I have enough to prove punitive damages right
25  now.  I do.

22-01023-tmd  Doc#1-14  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
820 of 1271

75

1          THE COURT:  Okay.  You might want more, let's

2     put it that way.

3          MR. BANKSTON:  I do.  Exactly.  Correct, Your

4     Honor.

5          THE COURT:  Okay.  But your position is

6     you'll file that later.

7          MR. BANKSTON:  Right.

8          Right, if we need -- if, for instance, after

9     this hearing and I have more of an understanding of

10    what the scope of discovery is like going forward, then

11    we'll serve new discovery requests and depositions that

12    we may need.  I think that would be very limited.

13         THE COURT:  Okay.  All right.  Thank you.

14         Mr. Reeves.

15         MR. REEVES:  Okay.  Thank you, Your Honor.

16         You know, Mr. Bankston, he kind of merged

17    everything together and I feel like, for at least my

18    purposes, the best way to approach this is individually

19    with each motion so that we can make sure that we have,

20    you know, a clear understanding of each particular

21    motion, what is requested here.

22         The first thing I want to say is that, you

23    know, the statement at the very end where he pulled out

24    where I asked you to give me basically a chance to deal

25    with the discovery issue is from a brief in Pozner,

# Exhibit 4

1          ROUGH DRAFT

2     The stenographic notes taken in the within

3  proceeding have been translated instantaneously into

4  their English equivalents through a computerized process

5  called realtime translation.  A rough draft, in ASCII

6  format, is available to all counsel.  The text as seen

7  herein of these proceedings is unedited and uncertified

8  and may contain untranslated stenotype, misspelled

9  proper names and technical words, occasional reporter's

10  notes, and/or nonsensical English word combinations.

11  These will be corrected on the final certified

12  transcript upon its delivery to you in accordance with

13  our standard delivery terms, or on an expedited basis,

14  as requested.

15     The rough draft is intended only for the purpose of

16  augmenting counsel's notes and is not intended to be

17  used or cited in any court proceeding as representing a

18  final edited and proofread transcript.

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  This is the deposition

2  of Daria Karpova, the date is December 3, 2021.  The

3  time is 10:53 a.m.

4          You may swear in the witness.

5          (Oath administered remotely by the reporter

6  located in San Antonio, Texas, to the witness located in

7  Austin, Texas)

8          MR. BANKSTON:  Do you want us to announce

9  appearances?

10          THE REPORTER:  That would be great.

11          MR. BANKSTON:  Yeah.  Okay.  Mark Bankston

12  questioning for the plaintiffs.

13          MR. REEVES:  Brad Reeves for the

14  defendants.

15          Before we begin, Mark, I'd like to go ahead

16  and see if we have the same stipulations yesterday

17  morning that this is subject to the already entered

18  protective order in the Louis case and the pending ones

19  in the Heslin and Pozner and De La Rosa matters.

20          MR. BANKSTON:  So agreed.

21          MR. REEVES:  Alright.

22          DARIA KARPOVA,

23  having been duly affirmed, was examined and testified as

24  follows:

25          EXAMINATION

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          3

1  BY MR. BANKSTON:

2      Q. Ma'am, could you tell the jury your name and

3  what you do for a living?

4      A. Daria Karpova.  I'm a producer for InfoWars.

5      Q. When were you first told you'd be giving this

6  deposition?

7      A. I don't recall the exact date, but I believe it

8  was a few weeks ago.

9      Q. Sometime in November you think.

10      A. Yes.

11      Q. Okay.  Do you know what you're here to testify

12  about?

13      A. It is my understanding I'm here on behalf of

14  Free Speech Systems.

15      Q. Have you been provided with topics you're going

16  to testify about?

17      A. Yes.

18      Q. Okay.  Did you meet with your attorney before

19  this deposition?

20      A. Yes.

21      Q. When did you do that?

22      A. Yesterday.

23      Q. Was that the first time you met this attorney?

24      A. Yes.

25      Q. How long did you spend with him?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        4


1      A. A couple of hours.

2      Q. And when I say when you met with your attorney,

3  I'm speaking about Bradley Reeves seated across from me.

4  Have you met with any other attorneys?

5      A.  Yes.

6      Q.  What other attorneys have you met with?

7  Well -- actually, hold on.  Because -- let me back up

8  here.

9          Have you met with any other attorneys regarding

10  your preparation for your testimony here today?

11      A.  Yes.

12      Q.  Okay.  What attorneys are that?

13      A.  Isn't it privileged?

14          MR. REEVES:  Excuse me?  You can talk about

15  whom -- the attorneys you met with.  Do not speak about

16  the discussions you had.

17      A.  Okay.  Mr. Randazza.

18      Q.  (By Mr. Bankston)  Okay.  You met with

19  Mr. Randazza.  When did you do that?

20      A.  That was yesterday.

21      Q.  Is he in the room with Mr. Reeves?

22      A.  No.  That was the day before.

23      Q.  Okay.  I thought you met with Mr. Reeves

24  yesterday.

25      A.  You asked me about the attorney.  That's what I

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          5

1  thought you meant.  So I was referring to Mr. Randazza.

2      Q.  Have you ever meet with Mr. Reeves?

3      A.  The day before.

4      Q.  Okay.  Okay.  So actually the day before

5  yesterday you actually met with Mr. Reeves.

6      A.  Correct.

7      Q.  Okay.  How long did you meet with Mr. Reeves?

8      A.  Maybe an hour.

9      Q.  Okay.  Mr. Randazza, did you meet with him in

10  Austin or was that over some sort of technology

11  situation?

12      A.  In person.

13      Q.  Okay.  That was in Austin, though?

14      A.  Yes.

15      Q.  Okay.  So let me make sure I have it straight

16  now.

17          Yesterday you met with Mr. Randazza for a

18  couple of hours.  And the day before you met with

19  Mr. Reeves for a couple of hours.

20      A.  And I didn't time the meetings, but that's what

21  I approximate, yes.

22      Q.  Sure, sure.  Okay.  So let me just make sure I

23  understand.

24          And -- and as -- let me also just as a warning,

25  sort of a caution.  We're going to have conversation

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          6

1  today that is not exactly natural or normal.  If we were

2  talking to each other, say, outside of this room, just

3  in a room together, there's a good chance that we'd be

4  able to anticipate each other's questions and answers,

5  finish each other's sentences, be able to jump in and

6   start answering before I was done with my question

7   because you'd know what I was saying.  We do this all

8   the time in -- in normal conversation.  It's not rude or

9   anything.  I'm not saying you're interrupting me or

10  anything.  But in a deposition, she's go to write

11  everything down.  And it makes it real -- it makes it

12  super difficult for her if we're ever talking at the

13  same time.  And so we kind of have to do this unnatural

14  thing where you have to, like, wait a second until I'm

15  done with question and then answer.  So it kind of seems

16  unnatural, but I'll try to remind you if we're talking

17  over each other.  I'm sure if we do it really bad, she's

18  going to remind us.  Remember, that she's -- she's not

19  paid by any -- she's not part of the case.  She's not

20  associated with the parties.  She has no interest in

21  this.  So she's just trying to do her job.  So I'm going

22  to make sure we try to do that for her.

23      A.  Thank you.

24      Q.  With -- I want to make sure I have it down

25  correctly, that in terms of you meeting with lawyers to

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          7


1   prepare for this deposition, that consists of

2   Mr. Randazza yesterday for what you think is a couple

3   of hours and Mr. Reeves the day before for what you

4   think is a couple of hours.

5      A.  Correct.

6      Q.  Okay.  Tell me anybody else that you have

7   spoken to about what you plan to testify about here

8  today.

9      A.  I've consulted with two former corporate reps

10  in regards to whether I was missing any information.

11  They said that I wasn't.  I've also consulted with HR

12  regarding some of the topics for the information that I

13  was going to need for this.  And that's it.

14      Q.  Who was the first corporate rep?

15      A.  Rob Dew.

16      Q.  Okay.  You met with Mr. Dew and talked to him

17  about the topics you'd be speaking about today?

18      A.  Briefly.

19      Q.  What's briefly?  What does that mean?

20      A.  I basically sort of ran through the topics and

21  asked him if I was going to say anything, if he had any

22  information for me and he said no.

23      Q.  How long did you talk to him?

24      A.  I'd say 15, 20 minutes.

25      Q.  Okay.  And Mr. Dew didn't have any other

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        8


1  information for you?

2      A.  No.

3      Q.  So nothing here that you say today is going to

4  be coming from Mr. Dew?

5      A.  No.

6      Q.  Okay.  Who's the other corporate rep you know?

7      A.  Michael Zimmerman.

8      Q.  Okay.  What -- did you have -- did you get any

9   information from Mr. Zimmerman?

10      A.  No.

11      Q.  How long did you talk -- excuse me.  I'm sorry.

12      A.  Yeah, he was pretty much the same type of

13  meeting.

14      Q.  Okay.  So -- and I take it by when you say

15  "same type of meeting," you asked him if there was any

16  information that you needed to know about any of these

17  topics and he said, no, I don't have anything?

18      A.  Correct.  Yes.

19      Q.  Again, I'm going to caution you.

20      A.  I'm sorry.

21      Q.  Yeah, it's -- we'll get used to it.  I promise.

22  It's going to be a long day.  So we'll get used to it.

23  But let me ask that question again.

24          What I'm taking you're saying is that you met

25  with Mr. Zimmerman for a brief period of time, asked him

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        9


1  if he had any information about these topics and he told

2  you he did not have any information about these topics

3  to give you.

4      A.  He told me that I already had the information.

5  He didn't have anything new to add.

6      Q.  So how did Mr. Zimmerman know what information

7  you had?

8      A.  I believe I had read the topics that are on

9  that sheet of paper in front of --

10      Q.  Okay.  So in other words, after reading those

11  topics to Mr. Zimmerman and wanting to know if he had

12  any additional information he could give to you, he

13  said, no, you should have everything?  Is that the basic

14  sum of it?

15      A.  Yes.

16      Q.  Okay.  Now, I understand -- I've been given a

17  folder.  Do -- do you recognize this folder that I'm

18  holding right here?

19      A.  Yes.

20      Q.  Okay.  I've been told that these are documents

21  that you reviewed prior to this deposition.

22      A.  Yes.

23      Q.  Okay.  So you have taken the documents that

24  you've prepared yourself for today and put them in this

25  folder?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        10


1      A.  Correct.

2      Q.  Okay.  I want to right now -- no, let's do them

3  individually.

4          (Discussion off the record)

5          (Exhibit 1 introduced)

6      Q.  (By Mr. Bankston)  Okay.  So, ma'am, what I'm

7  going to do is I'm going to put a sticker on this folder

8  itself, and we're going to mark that as Exhibit 1.

9  Okay.  And I want to talk to you about some of the

10  documents in here.

11          Let me -- let me ask you this too.  So these

12  documents that you prepared and the conversations that

13  you've had with counsel and the conversations you've had

14  with your corporate representative, the two corporate

15  representatives, excuse me, that would be the total

16  universe of people that you've spoken to about the

17  deposition.  Is that right?

18      A.  Yes.

19      Q.  Okay.  And these documents here represent the

20  total universe of documents that you had prepared for

21  before the deposition.  Is that correct?

22      A.  Yes.

23      Q.  Okay.  Can you tell me the amount of time that

24  you have spent on -- let me back it up this way.

25          I -- I would assume -- or maybe I'm not

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        11


1  correct, so let me know.  But I would assume that in

2  addition to meeting with the attorneys and speaking to

3  the corporate representatives, you also spent time, say,

4  reviewing these documents, right?

5      A.  Some time, yes.

6      Q.  How much time do you think you spent reviewing

7  these documents?

8      A.  I'd say an hour.

9      Q.  Okay.  So the -- the things that we see here in

10  Exhibit 1, these are things that you personally, outside

11  of the company of lawyers and outside the company of

12  corporate representatives prior, you spent about an hour

13  reviewing this material?

14     A.  Correct.

15     Q.  Okay.  And is there anything else that I'm not

16  talking about yet that you have done to prepare or

17  gather information for this deposition?

18     A.  Can you repeat the question?

19     Q.  Yeah.  Sure.  Let me try to rephrase it.

20         We have talked about reviewing documents.

21  We've talked about talking to people.  There's --

22  there's no other people or documents, other than the

23  people we've already talked about?

24     A.  (No response.)

25     Q.  Is that correct?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        12


1      A.  The -- yeah.  One of the topics for this

2  meeting today that I prepared included personnel for

3  particular dates of the videos, which I had inquired

4  from HR about.  She had provided me with some personnel,

5  which I thought I had printed out, but they're still in

6  my email.  Which when I looked through the folder, it

7  wasn't there.  So they're still in my folder.  I mean in

8  my email.  So if you need that, I could potentially

9  print that out.

10     Q.  Those documents are things that you used to

11  determine who was working at the company --

12     A.  Correct.

13     Q.  -- at what -- again --

14     A.  I'm sorry.  I'm sorry.

15    Q.  And I know -- again, I know you're not doing it

16  on purpose.  And because -- I have the feeling you try

17  to be an efficient person and you know exactly what I'm

18  asking.  So you wanted to be compliant.

19    A.  I apologize.

20    Q.  No, you're -- you're fine.  Trust me.  But I

21  will -- I will stop you and remind you when that happens

22  just because I'm trying to make sure this record is

23  good.  I'm glad you brought that up because I did forget

24  about the HR person.

25        And can you tell me that person's name?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        13

1    A.  Melinda.

2    Q.  Is it maybe Flores?

3    A.  Yes.

4    Q.  Okay.  So Melinda Flores is the HR person you

5  talked about.  And you were -- did you feel like you

6  were able to get information about who was working at

7  different times?

8    A.  Yes.

9    Q.  Okay.  Okay.  Before we dive into those

10  documents, I want to talk just a little bit more about

11  you.

12        Can you first -- first, can you tell me a

13  little bit about your educational background, what that

14  looks like?

15    A.  I have a bachelor's degree in applied

16  engineering.

17     Q.  Where's your degree from?

18     A.  Expression College for Digital Arts.

19     Q.  Excuse me.  I'm sorry.  I didn't catch that.

20     A.  Expression College for Digital Arts.

21     Q.  Gotcha.  Okay.

22          And is that your only secondary education?

23     A.  Yes.

24     Q.  Okay.  Can you -- is InfoWars -- let me back

25  that up.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        14


1          When did you start working with -- with Free --

2  oh.  I'm making assumptions.

3          Is your employer Free Speech Systems, LLC?

4     A.  Yes.

5     Q.  Okay.  When did you start working for them?

6     A.  I believe October 2015.

7     Q.  Okay.  Between your secondary education and

8  InfoWars, did you have other jobs?

9     A.  Here and there.

10     Q.  Can you walk me through those, through your

11  resume?

12     A.  Due to the nature of my education, what it

13  required, I would have regular gigs here and there.  So

14  it wasn't a -- one single employer.  At times I would

15  have several employers during the course of, say, a

16  couple of months.  Then I would just take regular gigs.

17  What I'm talking about is sound engineering, light,

18 sound, different production roles, different gigs for

19 music composition. So things like that.

20    Q. Okay. So these jobs were not permanent

21 employment, but you had contract work, in other words,

22 between different people?

23    A. Yes. That's right.

24    Q. Okay. And when you say audio production, are

25 we talking music production? Are we talking for

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        15


1 entertainment, video, news? What -- what kind of things

2 are we talking about?

3    A. Conferences. Anything that had to do with

4 audio. Again -- conferences, concerts, music concerts.

5 Again, anything that had to do with audio, I would be

6 engineering that.

7    Q. Okay. When you were first hired by Free Speech

8 Systems, what was your job title?

9    A. I believe it was assistant producer, which is a

10 title that is given to everybody on production. And my

11 specific role was the sound -- sound board because that

12 was my background and I was put in that position.

13    Q. Now -- and today your job title would just be

14 producer?

15    A. Yes.

16    Q. Okay. Have you had any other job titles at

17 InfoWars?

18    A. No.

19    Q. How much does InfoWars pay you a year? Or

20  actually, let me -- I'm sorry.  Let me back that up for

21  a second.

22      Are you paid as a salaried employee or hourly

23  employee?

24      A.  Salary.

25      Q.  Okay.  Then the same question.  What do you

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      16


1  make yearly for InfoWars?

2      A.  About 125,000.

3      Q.  Okay.  I have in -- in looking into InfoWars

4  itself, I have occasionally seen reference, usually

5  outside the company, of you being referred to as

6  Mr. Jones' executive assistant.  Is that a role you

7  play, or is that -- have they got that wrong?

8      A.  I wouldn't know where that's coming from.

9      Q.  Okay.  That's what -- again, it's outside the

10  company.  And I think a lot of people say a lot of

11  things about InfoWars without really knowing what it is.

12  And so sometimes I may think that I know something about

13  what's going on with InfoWars.  Please feel free to

14  correct me.

15      You would con -- I take it as a producer,

16  your -- the main functions of your job is to ensure or

17  to facilitate the creation of the video and audio

18  broadcast that InfoWars creates.  Is that right?

19      A.  No.  I would say it is my job to facilitate the

20  live broadcast.

21    Q.  Okay.

22    A.  And production thereof.  Preproduction as well.

23    Q.  Okay.  So things like -- let's try to separate

24  this out.

25        InfoWars does a live show pretty much every

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        17

1  day?

2    A.  Correct.

3    Q.  Okay.  And then that -- that live show is

4  sometimes distributed through other channels like the

5  internet, correct?

6    A.  Yes.

7    Q.  For instance, you know Banned.Video.

8    A.  Yes.

9    Q.  You -- you understand what that is.

10        Do you have any involvement in running that

11  website?

12    A.  No.

13    Q.  Okay.  So in other words, the live production

14  side and the internet side, those are -- would you

15  describe those as two different parts of the business?

16    A.  I'm not sure how to answer that.

17    Q.  Well, what I'm interested in is the amount of

18  overlap between the people who are working with you to

19  create the live show every day and the people who are

20  running the website and putting articles and videos on

21  the website and Banned.Video.  Is there overlap --

22  significant overlap between those two groups?

23     A.  I would say no.

24     Q.  Okay.  And do you have -- as a producer, I -- I

25  take it you have managerial authority over different

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          18


1  employees.  Is that right?

2     A.  Yes.

3     Q.  Okay.  If there's somebody doing something

4  involved in the live show and they're doing it

5  incorrectly, you have the power to tell them to do it

6  differently, correct?

7     A.  Correct.

8         MR. REEVES:  Mark, one sec.  I just want to

9  stipulate -- note for the record that I don't believe

10  this covered by any of the topics in your deposition

11  notice for the corporate representative.  Just for

12  purposes of the record to denote that.  I'm not

13  otherwise going to stop you from asking them.  But I

14  just wanted to note that.

15         MR. BANKSTON:  Right, right.

16     Q.  (By Mr. Bankston)  Do you have managerial

17  authority or -- I guess maybe managerial isn't even the

18  right word.

19         Do you have power and authority to tell the

20  people who are running the website what to do?

21     A.  No.

22     Q.  Okay.  Okay.  I want to talk to you now about

23  some things in Exhibit 1.

24          (Discussion off the record)

25          (Exhibit 1A introduced)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          19

1     Q.  (By Mr. Bankston)  Okay.  I've marked this as

2  1A.  You recognize that, correct?

3     A.  Yes.

4     Q.  That's a document that you reviewed prior to

5  this deposition, right?

6     A.  Correct.

7     Q.  That is the Wikipedia entry for false flag,

8  correct?

9     A.  Yes.

10     Q.  Okay.  Can you tell me why you looked at this

11  document?

12     A.  I thought it would be a good idea to bring it

13  as a reference to some of the points for topic number

14  one.

15          If I could have the list of topics, that would

16  help me to identify the exhibits.

17     Q.  I understand what you're saying.  In fact,

18  let's do that.  I'm going to mark this as 1B.

19          (Exhibit 1B introduced)

20     Q.  (By Mr. Bankston)  And what I'm handing you

21  right now is titled Plaintiff's Third Amended Notice of

22  Taking the Oral and Video Deposition of the Corporate

23  Representative of Free Speech Systems, LLC.  And I'll go

24  ahead and just give you the paper with the topics on it

25  so you can see.

1    A.  Thank you.

2    Q.  Now, hopefully you can refer to that.

3        And when you were referring to topic one, you

4  were talking about the sourcing and research for the

5  videos described in plaintiffs' petition?

6    A.  May I just take a minute?

7    Q.  Sure.

8    A.  Yes.  Correct.

9        (Exhibit 1C introduced)

10   Q.  (By Mr. Bankston)  I've handed you 1B [sic].

11  Do you recognize that?

12   A.  Yes.

13   Q.  That is the Wikipedia entry for the Reichstag

14  Fire, correct?

15   A.  Yes.

16   Q.  Again -- yeah, I know.  I'm going to have to

17  keep reminding you, but it's okay.

18       MR. REEVES:  Didn't you mark the depo

19  notice as 1B?

20       MR. BANKSTON:  You are absolutely right,

21  Brad.  You sure are.

22       MR. REEVES:  Do you want to just make this

23  2?

24       MR. BANKSTON:  Yeah.  No.  I can --

25       MR. REEVES:  And you can keep -- and you

1  keep the article --

2          MR. BANKSTON:  Yeah, that'll work.  This

3  was in the folder is the only reason I was --

4          MR. REEVES:  Oh.  Whatever you want to do,

5  man.

6          MR. BANKSTON:  Yeah, I just wanted to have

7  everything in 1 be the documents that she reviewed.

8          MR. REEVES:  Yeah, that's fine.

9          MR. BANKSTON:  So what I am going to do

10  since that was 1B, what we're going to do is I'm

11  actually going to make this 1C.  So now I have handed

12  you what I've marked as 1C, which you recognize,

13  correct?

14     A.  Correct.

15     Q.  And that is the Wikipedia entry for the

16  Reichstag Fire, correct?

17     A.  Yes.

18     Q.  Okay.  The Reichstag Fire was a Nazi party

19  arson attack, correct?

20     A.  Correct.

21     Q.  Okay.  Can you tell me why this is relevant to

22  the case?

23     A.  The same answer as for the previous exhibit.  I

24  thought it would be a document pertaining to some of the

25  points in topic number one as an example of false flags.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        22

1     Q.  So in other words -- let's try to put it this

2  way.  In some of the videos in plaintiffs' petition,

3  there are statements made about false flags, correct?

4      A.  Which petition are you referring to?

5      Q.  I'm -- well -- okay.  When -- when that topic

6  number one says sourcing and research for the videos

7  described in plaintiffs' petitions, have you seen the

8  plaintiffs' petitions?

9      A.  Briefly.

10     Q.  Okay.  They're not in this folder, are they?

11     A.  No.

12     Q.  Okay.  So this folder actually doesn't

13  represent everything that you've reviewed for this

14  deposition, right?

15     A.  These are just appointed documents that I

16  thought would be good to have for me personally to refer

17  to some of the topics here.

18     Q.  Okay.  But in terms of plaintiffs' petitions,

19  is that something you looked at before this deposition?

20     A.  I honestly can't recall.

21     Q.  You can't recall if you've seen the plaintiffs'

22  petitions?

23     A.  I've seen a lot -- a lot of documents.

24     Q.  Have you --

25     A.  I'm not -- since I don't have a legal

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      23

1  background, it's -- I'd have a hard time recalling right

2  now exactly which one was which.

3    Q.  Which document was which document you mean?

4    A.  Yes.

5    Q.  Okay.

6         MR. REEVES:  Mark, without waiving

7  attorney-client privilege, I'll stipulate that she has

8  seen the petitions.

9         MR. BANKSTON:  I don't need you to do that.

10  I don't need you to testify for her, Brad.

11         MR. REEVES:  I'm not testifying.

12         MR. BANKSTON:  Please don't do that again.

13         MR. REEVES:  Okay.

14         MR. BANKSTON:  I need to question her about

15  what she prepared for.

16         MR. REEVES:  That's fine.  That's fine.

17         MR. BANKSTON:  Alright.

18         MR. REEVES:  I'm not trying to testify for

19  her.

20         MR. BANKSTON:  But you absolutely are,

21  Brad.  And please don't do that again.

22         MR. REEVES:  Mark, I'm not.  I'm -- you can

23  think what you want, but I'm --

24         MR. BANKSTON:  I'm going to make it for the

25  record right now.  I'm questioning this witness about

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        24


1  what she has reviewed for the deposition under her

2  duties to prepare for this deposition and counsel has

3  just answered for her.

4         MR. REEVES:  I have not.

5          MR. BANKSTON:  And I -- and I object to

6   that.  And I don't like it and I don't want it to

7   continue.

8          MR. REEVES:  Alright.

9      Q.  (By Mr. Bankston)  We can then say that there

10   are other documents besides what's in this folder that

11   you've reviewed that I don't have in front of me,

12   correct?

13      A.  Well, can I add something to the previous

14   point?

15      Q.  Sure.  I'm not sure what you mean.

16      A.  You were asking me specifically a reference to

17   false flag from a petition that I've seen.  When I was

18   trying to recall that, I do not recall in the petition

19   that specific reference.  It might have been there, but

20   I don't recall from all the documents that I've seen.

21          Now, the reason I brought these again is to

22   help me present some of the points when answering these

23   topics in this petition

24      Q.  Sure.  No, I understand that.

25      A.  Yeah.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      25


1      Q.  What I'm -- what I'm trying -- you know, first

2   of all, I -- before we get back to my question.  Now

3   that I know that in addition to these documents -- your

4   counsel tells me that you've reviewed the petitions,

5   right?  Are there anything else that I need to know

6  about?

7    A.  I don't believe so.

8    Q.  Okay.  In terms of my question was for the

9  videos described in plaintiffs' petition, do they

10  reference false flags?

11    A.  Repeat that again, please.

12    Q.  The videos described in plaintiffs' petitions,

13  do they reference false flags?

14    A.  I'm not sure of that exact wording.

15        (Exhibit 1D introduced)

16    Q.  (By Mr. Bankston)  Okay.  I'm putting to you

17  1D.  Do you recognize that?

18    A.  Yes.

19    Q.  Where does -- can you read the website at the

20  bottom?  What website does that come from?

21    A.  historytoday.com.

22    Q.  Okay.  So this is a HistoryToday article about

23  the sinking of the Maine, correct?

24    A.  Correct.

25    Q.  Okay.  The USS Maine was a 19th century

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        26


1  warship, correct?

2    A.  Correct.

3    Q.  Okay.  And that warship exploded in Havana

4  Harbor, correct?

5    A.  Correct.  Sorry.

6    Q.  No problem.  Let me ask that again.

7        That warship exploded in Havana Harbor,

8    correct?

9    A.  Correct.

10    Q.  There is significant historical evidence to

11    suggest that that ship was intentionally exploded by the

12    United States Government.  That's correct?

13    A.  There is a controversy about it I would say.

14    Q.  In other words, what I'm -- what I'm wondering

15    is from reading that article, did you come away with the

16    idea that there is substantial evidence; in other words,

17    non-trivial evidence which people could use to support

18    the idea that the USS Maine was intentionally destroyed

19    by the United States Government?

20    A.  I would say one could infer that.

21    Q.  Okay.  Can you tell me why that particular

22    article is relevant to your testimony today?

23    A.  It could be viewed as an example of false

24    flags.

25    Q.  Okay.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        27


1    A.  Throughout history.

2    Q.  I'm going to put in front of you 1E.

3        (Exhibit 1E introduced)

4    Q.  (By Mr. Bankston)  You recognize that, correct?

5    A.  Yes.

6    Q.  A Wikipedia entry for the Pearl Harbor

7    advance-knowledge conspiracy theory, correct?

8    A.  Correct.

9      Q.  Is this the same answer as the other documents?

10     A.  Yes.

11     Q.  Okay.  So this is another example of

12  potentially -- well, let me ask you -- back up.

13          Would you call this is a false flag, for

14  instance, if -- let me rephrase that question.

15          If the allegations about this conspiracy theory

16  are true, would you consider that a false flag?

17     A.  I would say so, yes.

18          (Exhibit 1F introduced)

19     Q.  (By Mr. Bankston)  Okay.  Alright.  I'm going

20  to put in front of you 1F.  Do you recognize that?

21     A.  Yes.

22     Q.  Can you explain what that is?

23     A.  Yes.  It is an article that was archived from

24  the website D.C. Clothesline which includes Mr. Halbig's

25  biography, which I wanted to have on hand.

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        28


1      Q.  Okay.  So this is just biographical information

2  about one of InfoWars's sources?

3      A.  Correct.

4          (Exhibit 1G introduced)

5      Q.  (By Mr. Bankston)  Okay.  Now, I'll put in

6  front of you what I've marked as 1G.  Do you recognize

7  that?

8      A.  Yes.

9      Q.  Okay.  Can you explain what that is?

10     A.  One second.

11        So this is another article that contains

12  information regarding the questions that Mr. Halbig had

13  regarding Sandy Hook.

14      Q.  Okay.  There's also some information about

15  Mr. Jones in there too, correct?

16      A.  There might be.  I didn't read the entire

17  article.

18      Q.  Okay.  So you didn't actually review this

19  entire document?

20      A.  Not in its entirety.

21      Q.  Did you go find this document?

22      A.  Yes.

23      Q.  Okay.  And so how did you come across this

24  document?  How did you find it?

25      A.  I was looking for Mr. Halbig's questions

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        29


1  regarding Sandy Hook.

2      Q.  Okay.  Do you feel like you have an

3  understanding now of Mr. Halbig's questions regarding

4  Sandy Hook?

5      A.  Yes.

6      Q.  Okay.

7          (Discussion off the record)

8          (Exhibit 1H introduced)

9      Q.  (By Mr. Bankston)  Alright.  I'm going to show

10  you what I've marked as 1H.  Do you recognize that?

11      A.  Yes.

12    Q.  That's from Dr. Steve Pieczenick's website,

13  isn't it?

14    A.  Yes.

15    Q.  Okay.  And that's basically a biography of

16  Dr. Steve Pieczenick?

17    A.  Correct.

18    Q.  Okay.  You wanted to have that because Steve

19  Pieczenick is somebody who has appeared on InfoWars at

20  one point to talk about Sandy Hook?

21    A.  Correct.

22        (Exhibit 1I introduced)

23    Q.  (By Mr. Bankston)  Okay.  Okay.  I'm going to

24  show you now what I've marked as 1I.  Do you recognize

25  that?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        30


1    A.  Yes.

2    Q.  That's a Guardian article, right?

3    A.  Correct.

4    Q.  Guardian's a newspaper in Britain.  Am I right

5  about that?

6    A.  Yes.

7    Q.  Okay.  This article says -- its headline says:

8  Sandy Hook father, Leonard Pozner, on death threats:  I

9  never imagine having to fight for my child's legacy,

10  correct?

11    A.  Correct.

12    Q.  What did you need this article for in your

13  testimony today?  Or let me -- that's not a good

14  question.

15     Why did you feel you wanted to review this

16  article for your testimony today?

17     A.  One second, please.

18     The reason I wanted to have this article is

19  that I thought one of the victim's mother -- there was

20  interesting information regarding the victim's mother

21  and her request to have an open casket for the funeral.

22     Q.  Why is that interesting to you?

23     A.  It seems to me that the motivation for doing so

24  would be to exploit a child's death for a political

25  agenda.

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        31


1     Q.  Might another reason for it is because a bunch

2  of people are saying that child is fake?  Couldn't that

3  be a reason for it?

4     A.  I don't know.

5     Q.  Sitting here right know, if your child -- let's

6  back up.

7     You -- you just had a baby, right?

8     A.  Yes.

9     Q.  Okay.  Let's say 6 years from now your child

10  walks into an elementary school and is massacred in a

11  gun violence incident and some news organizations are

12  saying that your child is fake, can you see that a

13  possible way to combat that would be to have an

14  open-casket funeral for your child?

15    A.  No.

16    Q.  That's not something you would ever consider?

17    A.  No.

18    Q.  Could you imagine how somebody else could

19 consider that?

20    A.  Not if they have a heart and know political

21 agenda.

22    Q.  Okay.  So you think that this Jewish family's

23 choice to have an open-casket funeral for their child

24 was politically motivated.

25         MR. REEVES:  I'm going to object as being

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       32


1 outside of scope for corporate representative testimony.

2         MR. BANKSTON:  That's fine.

3         THE REPORTER:  Sir, could you please speak

4 up.

5         MR. REEVES:  I'm sorry.  This is Brad

6 Reeves.  I objected to this as being outside the scope

7 of the corporate representative testimony.

8         But you can go ahead -- otherwise go ahead

9 and answer.

10         (Discussion off the record)

11    Q.  (By Mr. Bankston)  Yeah.  You have a question.

12 I don't know if you answered it or not.

13    A.  What was the question?

14         MR. BANKSTON:  Madam Court Reporter, can

15 you read back my last question?

16         (Court reporter read requested portion)

17      A.  What does being Jewish have anything to do with

18  this?

19      Q.  (By Mr. Bankston)  I'm not here to answer your

20  questions, ma'am.

21      A.  I don't know.  My answer is -- my personal

22  opinion, I find it unconscionable.  That's something

23  that I would never bring myself to doing.

24      Q.  People have open-casket funerals every day,

25  don't they?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        33


1      A.  Yes.

2          However, considering the circumstances and how

3  the child was disfigured, based on these articles, I

4  find that just horrific.

5          (Exhibit 1J introduced)

6      Q.  (By Mr. Bankston)  Okay.  Here's another

7  article about that, right, Exhibit 1J?

8      A.  Yes.

9      Q.  So you actually pulled two separate articles

10  about Noah Pozner's funeral having an open coffin,

11  correct?

12      A.  I pulled this one article because it was linked

13  in the Guardian, and I wanted to make sure I have the

14  sources for where I got the articles from.

15      Q.  Okay.  And so of all the documents that you

16  reviewed regarding the plaintiffs, the only ones you've

17  reviewed that you chose to go review were two articles

18  about Ms. Pozner choosing to have an open casket for her

19  son, correct?

20      A.  That wasn't the reason why I reviewed the

21  article.

22      Q.  That's not what I'm asking you, Ms. Karpova.

23          I'm asking you of all the documents you

24  reviewed about the plaintiffs before this deposition,

25  the only two that you did review are articles that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      34


1  discuss Noah Pozner's funeral having an open casket,

2  correct?

3      A.  They happened to mention that.  But that's the

4  only -- that's not the only thing they discussed.

5      Q.  I'm not saying that.  I'm not -- I understand

6  what you're saying.  Let's make it even broader then for

7  you.

8          The only two pieces of documentation that you

9  have reviewed for this deposition about the plaintiffs

10  are two articles, both of which discuss in the article

11  Noah Pozner's open-casket funeral, correct?

12      A.  Yes.

13      Q.  Okay.  Tell me any other information from those

14  articles that you believe is relevant to this deposition

15  today.

16      A.  I've already mentioned that -- the state of the

17  physical body that the child had for the -- for the

18  open-casket ceremony describes that.

19      Q.  Okay.  So when it comes down to the documents

20  that you reviewed for this deposition about the

21  plaintiffs, the only information that you're really

22  gleaning from this that's useful to this deposition has

23  to con -- concerns Noah Pozner's open casket and the

24  appearance of his body, correct?

25      A.  It was useful to some of the points.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      35


1       Q.  I'm not asking what it's useful for.  I'm

2   asking you that of all the documents that you reviewed

3   about the plaintiffs, the only piece of information that

4   you have had gleaned from those documents that is

5   relevant to this deposition concerns Noah Pozner's

6   open-casket funeral and the appearance of his body,

7   correct?

8       A.  These are the articles that I had chosen to

9   bring.

10      Q.  So that is correct, right?

11      A.  (No response.)

12      Q.  Let's try it this way.  You can't give me

13  another piece of information out of either of those two

14  articles that you believe is relevant to this

15  deposition, right, other than Noah Pozner's open-casket

16  funeral and the appearance of his body.

17      A.  Correct.  Those are the articles for it, yes.

18      Q.  And those are the only articles that you've

19  reviewed about the plaintiffs in preparation for this

20  deposition, correct?

21    A.  Yes.

22    Q.  Okay.  Topic number one is the sourcing and

23  research for the videos described in plaintiffs'

24  petitions.  When was the last time you watched those

25  videos?  Back up.  I made an assumption there.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        36


1        Have you watched the videos in plaintiffs'

2  petition ever in your history at InfoWars?

3    A.  I've watched some of them.

4    Q.  Okay.  So one thing we can say is that in

5  preparation for this deposition you didn't watch those

6  videos, correct?

7    A.  (No response.)

8    Q.  I'm sorry.  Ms. Karpova, is that a difficult

9  question for you to answer?

10    A.  Well, I've already answered some of the videos.

11    Q.  Right.  No.  I understand that you have in your

12  history at InfoWars since 2015, you've probably on

13  occasion seen some of these videos.  I understand that.

14  What I'm asking you is since the date you were told you

15  were giving this deposition in November and you were

16  preparing for this deposition, you haven't watched any

17  of these videos, right?

18    A.  I have not.

19        (Discussion off the record)

20    Q.  (By Mr. Bankston)  Okay.  Alright.  In

21  preparing for -- to talk about the videos in plaintiffs'

22  petition, do you have an idea sitting here right now how

23  many there are?

24    A.  Roughly.

25    Q.  How many are there?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        37


1    A.  A couple of dozen maybe.

2    Q.  Okay.  And did you ever compile a list of those

3  for any reason?

4    A.  Not personally.

5    Q.  Okay.  No outside of the petition in other

6  words, right?  What I'm asking you is did you sit down

7  and ever write them down or type them all out?

8    A.  No.

9    Q.  Okay.  When you say "not personally," did

10  somebody give you a list of the videos?

11        MR. REEVES:  Objection.

12        I'm going to -- to the extent you received any

13  information in discussions with your attorneys, that is

14  privileged.  So -- if there is information that

15  you -- that that occurred outside of your attorneys, you

16  may answer that question; otherwise, that information is

17  privileged and I instruct you not to answer on that.

18    Q.  (By Mr. Bankston)  Is there any information

19  that you can disclose to me that is outside of your

20  attorney's instruction?

21    A.  No.

22        (Exhibit 2 introduced)

23    Q.  (By Mr. Bankston)  Okay.  Let me give you what

24  I've marked as Exhibit 2.  You recognize that, right?

25      A.  May I review it?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       38

1          THE REPORTER:  Could you repeat that?

2      A.  May I have a second to review it?

3      Q.  (By Mr. Bankston)  Yes, you may.

4          (Discussion off the record)

5      A.  Yes.

6      Q.  (By Mr. Bankston)  You do recognize this

7  document?

8      A.  I believe I've seen this before.

9      Q.  You believe you've seen it before.

10      A.  I've seen a lot of documents.

11      Q.  I understand that.

12          Well, I mean, we know how many documents you've

13  seen.  They were in this folder, right?  Correct?

14      A.  Yes.

15      Q.  Okay.  So when you say a lot of documents, you

16  mean Exhibits 1A through 1I, right?

17      A.  (No response.)

18      Q.  Correct?

19      A.  I've seen some exhibits from my attorney, which

20  is privileged.

21      Q.  Okay.  Okay.  Ms. Karpova, at one point I asked

22  you if these were the documents you reviewed for this

23  deposition.  You testified yes to me.  And then we found

24  out you reviewed the plaintiffs' petitions or at least

25  your attorney said you reviewed the plaintiffs'

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          39

1  petitions.  So I asked you at that point are there any

2  other documents that I need to know about and you told

3  me no.  Are you now changing that testimony?

4      A.  I didn't understand your question because the

5  topic for -- one of the topics for this deposition today

6  includes the question about the documents produced by

7  the company.

8      Q.  Okay.  So have you reviewed documents relating

9  to your deposition today for that topic?

10      A.  That would be between my attorney.

11      Q.  If your attorney wants to instruct you that you

12  are not going to tell me about the documents you

13  reviewed before this deposition, he can do that.

14          MR. REEVES:  If you have -- that's -- you

15  are not to discuss any conversations that you've had

16  with attorneys.  That is privileged information.

17  Documents that you have reviewed in preparation for

18  this, is not.  Unless they're provided directly to you

19  from your attorneys as far as -- you know,

20  correspondence.  But if it's documents that were

21  produced or anything like that that you reviewed, that

22  is information he can -- you should tell him.

23      Q.  (By Mr. Bankston)  So let's try this one more

24  time.

25          Can you tell me in addition to the plaintiffs'

1  petition and Exhibit 1A through 1I or 1J, can you tell

2  me what documents you reviewed to prepare for your

3  deposition today?

4      A.  I don't recall -- I don't have a list of all

5  the documents that I looked at.

6      Q.  That's not great.

7          MR. REEVES:  Objection to the sidebar.

8      Q.  (By Mr. Bankston)  So in other words there are

9  more documents than this, but these are just the ones

10  that you decided to bring, correct?

11         MR. REEVES:  Objection; form.

12     A.  I've already answered that question.

13     Q.  (By Mr. Bankston)  I don't think you have,

14  ma'am.

15         And what I -- what I'm specifically asking you

16  about, there are documents that you have reviewed prior

17  to this deposition that you did not bring to this

18  deposition.

19     A.  I did not think they were relevant to the

20  specific points.

21     Q.  Okay.  So now let's get back to this.

22         I thought you had just told me that there was a

23  topic on here, a specific point on here about the

24  documents that have been produced in discovery, that you

25  reviewed documents that were relevant to that topic.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        41


1  Are you saying now that the documents you reviewed

2  aren't relevant to that topic, or they are relevant to

3  that topic?

4      A.  I did not think they were relevant to -- to

5  bring to this deposition.

6      Q.  You thought it was relevant to bring an article

7  about Noah Pozner's open-casket funeral, but you didn't

8  think it was relevant to bring the very documents you

9  reviewed to prepare for topic number six?  Is that

10  correct?

11      A.  I would say topic number four is what I'm

12  referring to.

13      Q.  Okay.  Topic number four is the one about the

14  company's documents?

15      A.  Yes.

16      Q.  Okay.  So let me ask that question again.

17          You thought it was important to bring articles

18  about Noah Pozner's open-casket funeral, but did not

19  think you should bring documents that you reviewed

20  relevant to topic number four, correct?

21      A.  Correct.

22      Q.  Okay.  And so sitting here today, taking your

23  deposition, there's no way for me to know if you

24  reviewed regarding topic number four, is there?

25      A.  (No response.)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      42

1      Q.  Right?

2      A.  (No response.)

3      Q.  Do you understand my question?

4      A.  Yes, I understand your question.  I would say

5  the documents that I reviewed were sent to me by my

6  attorney.

7      Q.  Okay.  I mean, how does that tell me whether I

8  can or cannot know what they are.  That doesn't help me

9  answer that question, right?  The question is, sitting

10  here right now in this deposition room where I'm here to

11  ask you questions for the company, there's no way for me

12  to know what those documents are --

13      A.  Well, I would assume that you guys would have

14  those documents.

15      Q.  Okay.  Again, I'm going to caution you not to

16  answer over me.  Okay?

17          If you thought we had these documents, why did

18  you bring those?

19      A.  Because these are the documents that I know you

20  don't have.

21      Q.  How do you know I don't have those?

22      A.  Because these are supplementary articles that I

23  thought would be helpful for me in answering some of the

24  points personally.

25      Q.  Okay.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      43

1      A.  These are not the documents that have to do

2  with any official legal documents.

3      Q.  Okay.  So -- in terms of -- let's just make

4  sure we understand.

5          We now know that there are documents that you

6   have reviewed that are not here today that I don't know

7   what they are regarding topic number four.  Are there

8   any other topics where there are documents that you

9   reviewed that I don't have here today?

10      A.  No.

11      Q.  Okay.  Regarding the documents that you

12  reviewed on topic number four, was that during your hour

13  that you prepared for the deposition on your own or did

14  you review those documents during your meeting with

15  counsel?

16      A.  No.

17      Q.  Okay.  So in other words we had your couple of

18  hours with Mr. Reeves the day before yesterday, your

19  couple of hours with Mr. Randazza yesterday and then

20  about your hour on your own.  And during all -- during

21  all those times are the times in which you reviewed

22  documents that were relevant to topic number four.

23      A.  Yes.

24      Q.  Okay.  How many documents?

25      A.  I don't have the count, the exact count.  I

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          44


1   didn't count them.

2       Q.  Okay.  You can understand how that's not

3   helpful to me, right?  I don't have any idea of the

4   universe or size of documents that you've reviewed.  So

5   would you be able to --

6      How about let's do it this way? Would the

7  documents fit in this folder (indicating)?

8          MR. REEVES:  Objection; form.

9      Q.  (By Mr. Bankston)  Would they all fit in here

10  do you think?

11      A.  I think so.

12      Q.  Okay.  So you wouldn't need, say, like this to

13  hold all them all.  You could hold them all -- not in a

14  Banker's box like this, but in a manila folder like

15  this, correct?  Is that accurate?

16      A.  Yes.

17      Q.  Now, surely you remember some of those

18  documents, right?

19      A.  I'm not sure.

20      Q.  You -- okay.  So the documents you reviewed

21  for -- for topic number four, sitting here today you

22  can't identify any of them for me.

23      A.  I don't want to make a mistake.  Not off the

24  top of my head.

25      Q.  Okay.  So in other words, whatever's in those

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        45


1  documents -- because you can't even identify them --

2  whatever's in them is not going to be relevant to your

3  testimony here today.  You're not going to be giving me

4  information from those documents I take it.

5          MR. REEVES:  Objection; form.

6      Q.  (By Mr. Bankston)  Correct?

7      A.  Well, the information -- the relevant

8  information would be pertaining to question -- to topic

9  number four.

10    Q.  Right.

11        But if you can't even remember what the

12  documents are, you're not going to be able to tell me

13  what's in them, right?

14        MR. REEVES:  Objection; form.

15    Q.  (By Mr. Bankston)  Ms. Karpova, is there

16  something difficult to understand about that?

17        MR. REEVES:  Objection; form.  Let her

18  answer the question.

19    A.  The documents are pertaining to the discovery

20  requests that you guys have requested, right?  So you

21  should know what's in them.

22    Q.  (By Mr. Bankston)  I know what's in them.  I

23  know.  Trust me, I do.

24    A.  Right.

25    Q.  Right.  I want to know if you do.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        46


1        So sitting here today you can't identify any of

2  the documents you reviewed.  So you're not going -- none

3  of your testimony today is going to be based on those

4  documents, correct?

5    A.  Not -- not off the top of my head.

6    Q.  Okay.  So that's what I'm saying.

7        Right now you're giving testimony.  You

8  understand that?

9      A.  Yes.

10      Q.  It's coming off the top of your head, right?

11  You understand that?

12      A.  Yes.

13      Q.  There's not somebody with a teleprompter back

14  there, right?

15      A.  Correct.

16      Q.  Okay.  Everything that's coming right now is

17  coming right out of your brain.

18      A.  Yes.

19      Q.  Right?

20         And since you cannot tell me what those

21  documents are and what they say off the top of your

22  head, that's not going to be part of your testimony

23  today, correct?

24         MR. REEVES:  Objection; form.

25      A.  I would say not specifically what's in those

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        47


1  documents because there's no way I can remember the

2  amount of documents and what's in them.

3      Q.  (By Mr. Bankston)  Right.

4         And they're not here today, right?

5      A.  I did not print them up, no.

6      Q.  Right.

7         So they're not going to be part of your

8  testimony, right?

9         MR. REEVES:  Objection; form.

10      A.  (No response.)

11    Q.  (By Mr. Bankston)  Correct?

12        I'm sorry.  Like -- we're going to be here a

13  long day today.

14        MR. BANKSTON:  No.  I need to go a little

15  bit longer.

16    Q.  (By Mr. Bankston)  I think I got what I needed

17  from that.  I don't need you to answer that question.

18        Okay.  Can you look at Exhibit 2 for me and can

19  you go to paragraph 14?

20    A.  (Witness complies.)

21    Q.  Do you see that paragraph 14 identifies the

22  January 27, 2013 video entitled, "Why People Think

23  Sandy Hook is a Hoax"?

24    A.  Yes.

25    Q.  Okay.  You're familiar with the claims made in

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        48


1  that video, right?

2        MR. REEVES:  Objection; form.

3    A.  I don't recall the exact video.

4    Q.  (By Mr. Bankston)  And so sitting here today,

5  you're not familiar with the claims made in that video.

6    A.  No.

7    Q.  Okay.  So sitting here today, you couldn't tell

8  me who the sources were for the claims that you don't

9  know, correct?

10    A.  From -- I would assume they were either

11  Mr. Halbig or Pieczenik, because these were the two

12  sources that were -- that had pertained to the videos.

13      Q.  Okay.  First of all I'm going to tell you,

14  Ms. Karpova, do not make assumptions for me.  I -- so

15  here's the thing that I need you to understand.  You're

16  here to testify for the corporation, right?  You

17  understand that?  You're not -- there's sometimes

18  questions I'm going to ask you personally, what you

19  personally think or know.  When I ask you questions

20  about the corporation when you're here testifying,

21  there's basically three answers you can have, which is I

22  know and here's the answer, the corporation knows this;

23  the corporation does not know this; or I, Daria Karpova,

24  do not know if the corporation knows or does not know.

25  Do you understand those three types of answers?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      49

1      A.  Yes.

2      Q.  Okay.  So in this particular situation, you

3  don't know what claims are made in that video, correct?

4      A.  I don't.

5      Q.  Okay.  And you are telling me you're making

6  this assumption that this must have something to do with

7  Wolfgang Halbig or Dr. Steve Pieczenik.  But do you know

8  if either of those individuals had ever been on InfoWars

9  by 2013?  Do you know?

10      A.  Not for a fact I do not know.  I could find

11  that information if that was a question that I knew I

12  had to prepare for.

13      Q.  Well, we asked you for the sourcing -- I mean,

14  look at topic number one.  Do you see what topic number

15  one says?

16      A.  Right.  This question is very broad and hard to

17  understand what is even wanted.  So I did my best

18  preparing -- in good faith preparing to answer these

19  topics.

20      Q.  Well, it sounds like your attorney should have

21  objected to it if it was overbroad and in bad faith.  I

22  get that.

23          MR. REEVES:  Do you realize that you cannot

24  object like that, Mark.  So if you wouldn't -- you don't

25  need to tell her what her attorney should or shouldn't

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       50


1  have done.  Why don't you just go ahead and answer your

2  question.

3          MR. BANKSTON:  Well, if she wants to have

4  legal arguments with me today, we're going to discuss

5  what those legal --

6          MR. REEVES:  She's not having legal

7  arguments with you.  Just ask you question.

8          MR. BANKSTON:  She -- Brad, Brad.  Don't

9  interrupt my testimony.

10          MR. REEVES:  Don't harass the witness.

11      Q.  (By Mr. Bankston)  Ms. Karpova, did you

12  just -- did you just assert for me that that topic was

13  too broad to be answered correctly?  Is that what you

14  told me?

15    A.  When it comes to -- yes, for -- for all intents

16 and purposes, yes.

17    Q.  So when I ask you I want to know the sourcing

18 for a video at InfoWars, you can't figure that out?

19 That's too broad?

20    A.  Sourcing can mean a lot of different things.

21 It can -- can you be more specifically what you mean by

22 sources?

23    Q.  I think you know what it means, don't you,

24 right, what a source is?  What do you think a source is?

25    A.  Where you get a particular information.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       51


1    Q.  Right.

2        And you understand that claims were made in

3 these videos, right --

4    A.  Uh-huh.

5    Q.  -- about Sandy Hook?  And they came from

6 somewhere, right?

7    A.  They came from Alex Jones.

8    Q.  So Alex Jones is the source for the information

9 in these videos.

10    A.  It -- it depends.

11    Q.  It does.  And that's why I brought you here

12 today, right?

13        But for these videos, where Wolfgang Halbig or

14 Dr. Steve Pieczenik had never said anything about

15 Sandy Hook until at least 2014, you don't know what the

16 sources for these videos are, do you?

17     A.  I would say no.

18     Q.  Okay.  There's a claim made in this video -- I

19 don't know how -- let me put it this way.

20     A.  Can we review the video right now?

21     Q.  No.  I'm not going to play a 2-hour video for

22 you right now, no.

23     A.  But you expect me to know what's going on in

24 every video?

25     Q.  Uh-huh.  I do.  I do, Ms. Karpova.  And I

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       52


1 expected Rob Dew to do the same thing when he showed up

2 to the deposition to talk about sourcing and research

3 and he didn't do that twice.

4          MR. REEVES:  Object to the sidebar.

5          MR. BANKSTON:  So I do -- I want to make

6 sure this witness understands what she's here to do

7 today and my questions, what they are.

8     Q.  (By Mr. Bankston)  I do expect you to have done

9 your home work and know what was in those videos, yes,

10 ma'am, I do.

11        So for instance in this video, there's a claim

12 made about Charles Jacob.  Do you know who he is?

13     A.  No.

14     Q.  Okay.  So you wouldn't be able to talk to me in

15 any way about the claims made about Charles Jacob in the

16 January 27, 2013 video?

17     A.  No.

18    Q. Okay. Can you tell me what employees were

19 involved in researching that video? Who came up with

20 those claims in that video?

21    A. I have a list of people who were working on

22 that day. From that list I could tell you who might

23 have been in production for that day.

24    Q. So the best we can tell you is -- the best we

25 can figure out is who might have been working in the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        53


1 production side at that date, correct?

2    A. Yes.

3    Q. Okay. Have you talked to any of those people

4 before your deposition today?

5    A. No.

6    Q. Okay. So in other words, if you had a list of

7 people who were working that day and you could, it would

8 be within your power to do so, to walk down to wherever

9 they work in your building and say, hey, this video

10 right here from January 27, 2013, when you were working

11 that day, did you have anything to do with any of these

12 claims made in that video? You could do that, couldn't

13 you?

14    A. Some of those people on the list do not work

15 for the company anymore.

16    Q. Okay. But some of them do, don't they?

17    A. Some do.

18    Q. Yeah. And you could do that, couldn't you?

19    A. It depends on the video. I'm not sure about

20  this video, who specifically worked that day.

21      Q.  Sure.

22          But for any of the videos that we're going to

23  talk about today, for any of the videos in plaintiffs'

24  petition, you had a list of who was working at InfoWars

25  at that time, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      54


1      A.  Yes.

2      Q.  And you could have interviewed those employees,

3  correct?

4      A.  I could have.

5      Q.  And you didn't, correct?

6      A.  Correct.

7      Q.  Okay.  Can you go to paragraph 16 for me?

8  Actually, hold on.  Before we go on to this next video.

9          One of the things that you -- I want to cover

10  some of the things we talked about in this first video

11  to see if they apply for every video because I think we

12  might be able to save some time.  Alright?  And you can

13  tell me if we can or we can't.

14          But from what I understand about that first

15  video is, A, you didn't watch it and, B, you didn't talk

16  to any of the employees involved in making it.  That's

17  correct, right?

18      A.  Yes.

19      Q.  Okay.  Is that true for all the videos?

20      A.  Yes.

21    Q.  Okay.  And in terms of understanding what

22  claims were made in the videos, is that the same that

23  you don't know what claims were made in the videos for

24  all the videos?

25    A.  Correct.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        55

1    Q.  Okay.  So look at paragraph 16 for me.  And

2  that one talks about an April 9, 2013 video called

3  "Obama Gun Grabbing Psyop Speech of Evil," correct?

4    A.  Correct.

5    Q.  Okay.  So in this video -- for instance, that

6  petition in front of you says -- alleges -- let me back

7  up.

8        When I say that the plaintiff alleges something

9  in a petition, you understand that that is my client's

10  saying that this happened.  That's -- and so part of the

11  whole court process is to figure out whether any of that

12  is true, right?  Do you get that?

13    A.  Uh-huh.

14    Q.  Okay.  So when I say that they're alleging

15  this, I'm not going to tell you that what is being said

16  here is fact.  You know, that may be for you to decide,

17  right?  But when I'm talking about allegations, I just

18  wanted you to understand what I meant by that.

19        But here in paragraph 16 talking about that

20  video, this plaintiff, this petition alleges that

21  Mr. Jones said that those recent mass shootings were a

22  government operation and that Sandy Hook was an inside

23  job.  You see where it alleges that, correct?

24     A.  Uh-huh.

25     Q.  Sitting here today can you tell me whether

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     56


1  that's true or not?

2          MR. REEVES:  Objection; form.  Can you

3  rephrase that, please, Mark?  I'm not sure what

4  you're --

5          MR. BANKSTON:  Yeah.

6     Q.  (By Mr. Bankston)  So the plaintiffs allege

7  that Mr. Jones in that video told his viewers that the

8  recent mass shootings were a government operation and

9  that Sandy Hook was an inside job.  That's what the

10  plaintiffs allege happened.  Is that true?  Is that what

11  he said in that video?  Or can you tell?

12     A.  If I had the video in front of me, I would be

13  able to tell you.

14     Q.  Or if you had watched the video prior to this

15  deposition and looked into the research and sourcing of

16  it you could tell me, correct?  Is that correct?

17     A.  If that was something that's among the topics,

18  yes, I would have.

19     Q.  Sure.

20          So --

21     A.  But because the topic was so broad, there was

22  no way I could have known that I had to go point by

23  point in this original petition.

24     Q.  Did you raise that -- did you raise that issue

25  with your attorneys?  Did you bring to them -- to the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        57


1  attention I can't do this?

2           MR. REEVES:  Objection.

3           Don't talk to -- anything about you talked

4  to your attorneys about.

5     Q.  (By Mr. Bankston)  Okay.  Did you express to

6  anybody at the company I can't do this?

7     A.  I can't do what?

8     Q.  Answer topic number one.

9     A.  I'm answering it to the best of my ability.

10    Q.  Okay.  But you've told me it can't be answered,

11  correct?  It's too broad.  There's no way you could do

12  this, right?  Is that correct or not correct?

13    A.  Well, if we are going point by point, as you

14  are right now, then, correct.

15    Q.  Yeah.

16          So, I mean, in your mind when the plaintiffs

17  requested a representative of the company to talk about

18  the sourcing and the research of the videos that made

19  claims in plaintiffs' petition, did you think they'd be

20  uninterested in the claims made in the videos?

21    A.  It would -- it would -- it's -- it's pretty

22  much impossible to figure out on that particular day of

23  the -- what was the sourcing.  We don't have that kind

24  of documentation for every show or every video.

25    Q.  But you didn't go ask any of the employees

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          58

1  involved, did you?  Correct?

2      A.  Correct.

3      Q.  Okay.  Go to paragraph 17 for me.

4      A.  (Witness complies.)

5      Q.  Do you see where there it talks about the

6  April 16, 2013 video entitled "Shadow Government Strikes

7  Again," correct?

8      A.  Yes.

9      Q.  Okay.  And again, just like our prior answers,

10  you don't know what employee researched the information

11  to create the claims in this video, correct?

12      A.  Correct.

13      Q.  Okay.  There's a quote there in the petition

14  that's being alleged.  It says:  They state Sandy Hook.

15  The evidence is just overwhelming, and that's why I'm so

16  desperate and freaked out.

17          Do you know if that's an accurate quote from

18  Mr. Jones?

19      A.  I don't know for a fact, no.

20      Q.  Okay.  So it's fair to say when you reviewed

21  the petitions for these plaintiffs' videos and they had

22  quotations from Mr. Jones, you didn't do anything to try

23  to verify those quotations, correct?

24      A.  Correct.

25      Q.  Okay.  The company now admits -- actually, let

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          59

1  me go back for a second.

2       When we have a statement like this from

3  Mr. Jones, did you ask Mr. Jones about any of these

4  statements?

5    A.  No.

6    Q.  And prior to taking this deposition from the

7  time you learned in November that you were going to be

8  giving this deposition to the present day, have you

9  talked to Mr. Jones about what your testimony's going to

10  be in this room?

11    A.  No.

12    Q.  Okay.  The company now admits -- okay.  Let me

13  go back to the statement you were just looking at,

14  right?  Do you see that, the evidence is just

15  overwhelming?

16    A.  Yes.

17    Q.  The company now admits there was not

18  overwhelming evidence in April 2013 that

19  Sandy Hook -- that the government staged Sandy Hook.

20       MR. REEVES:  Objection; form.

21    Q.  (By Mr. Bankston)  The company admits that now?

22       MR. REEVES:  Objection; form.

23    A.  To the best of our knowledge.

24    Q.  (By Mr. Bankston)  To the best of your

25  knowledge today, sitting here today --

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       60


1    A.  Yes.

2      Q. -- the company to the best of its knowledge

3  admits there was not overwhelming evidence in 2013?

4          MR. REEVES:  Objection; form.

5      Q. (By Mr. Bankston)  Correct?

6      A. To the best of our knowledge at that time, we

7  thought that there was overwhelming evidence based on

8  the expert witnesses that we were interviewing.

9      Q. Okay.  Who was -- who are those?

10     A. Mr. Halbig and Mr. Pieczenik.

11     Q. Ma'am, neither of them had been on the show by

12  2013.  So can you tell me who the experts actually were

13  for this video?

14     A. If it wasn't a direct interview, it must have

15  been information coming from them.

16     Q.  It must have been.

17         You're certain that the information in this

18  video came from -- you're testifying under oath that the

19  information in this video came from Steve Pieczenik or

20  Wolfgang Halbig?

21     A.  I wouldn't be able to say for sure, but I know

22  they were the two expert witnesses that were the key

23  people where Alex had concluded -- you know, made his

24  conclusions from.

25     Q.  Okay.  Ma'am, I just want you to understand,

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      61


1  before we answer any more questions, that Wolfgang

2  Halbig didn't even start investigating Sandy Hook till

3  2014.

4       So when I have you here under oath saying that

5  this must come from Wolfgang Halbig, I'm a little

6  concerned.  So I just want to stop and make sure we're

7  not making assumptions, that we're answering the

8  questions based on the knowledge that we have.  Okay?

9       And the reality is that when it comes to

10  whether the evidence was overwhelming, one, you don't

11  know what evidence is even being talked about in that

12  statement, do you?

13   A. I don't.

14   Q. Okay.  Two, you don't know where any of that

15  alleged evidence came from, do you?

16   A. No.  It's been a long time, though.  Correct.

17   Q. That's why I'm taking this deposition.

18       And sitting here today, you can't do it, can

19  you?  You cannot tell me what evidence is being talked

20  about in paragraph 17.

21   A. No.

22   Q. Okay.

23       MR. REEVES:  Mark, let's go ahead and take

24  a break.  We've been going for a little --

25       MR. BANKSTON:  I've got one more question

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      62


1  on this video.

2       MR. REEVES:  Alright.

3   Q. (By Mr. Bankston)  Regardless of what the

4  company thought in 2013, sitting here today the company

5  will now admit there was not overwhelming evidence in

6  2013 that Sandy Hook was staged, correct?

7      MR. REEVES:  Objection; form.

8      A.  I think I already answered that question.

9      Q.  (By Mr. Bankston)  I think what you had told

10  me -- and let me make sure I understand your answer --

11  was that at the time you believed there was evidence.

12      A.  At the time the company believed there was

13  evidence.

14      Q.  Correct.

15      Today, though, today sitting here right now

16  with the benefit of everything that's happened, with the

17  benefit of everything that's happened in this suit, will

18  the company now admit today there was not overwhelming

19  evidence that the government staged Sandy Hook in 2013?

20      A.  The company believed that at that time there

21  was.  Now the company does not believe --

22      Q.  Right.  So now the company --

23      A.  -- that there is.

24      Q.  I'm sorry.  Go ahead and finish your answer.

25      A.  Sorry.  Yeah.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      63


1      Q.  Okay.  But now -- I'm just trying to confirm

2  because I think I understand what your answer was.  But

3  now today the company admits there was not overwhelming

4  evidence?

5      A.  Correct.

6          MR. BANKSTON:  Okay.  Alright.  We can take

7   a break.

8          THE VIDEOGRAPHER:  The time is 12:03 p.m.

9   We are off the record.

10          (Recess from 12:03 p.m. to 12:28 p.m.)

11          THE VIDEOGRAPHER:  The time is 12:28 p.m.

12   we are on.

13          MR. BANKSTON:  Alright.  I have -- I just

14   wanted to let you know I had taken Exhibits 1A through

15   1J, they're back in this folder.  If you need them at

16   any time, please feel free to pull them out.

17          I want to show you right now what I'm going

18   to mark as Exhibit 3.

19          (Exhibit 3 introduced)

20    Q.  (By Mr. Bankston)  Have you seen this document

21   before?

22    A.  I do not remember seeing that.

23    Q.  Okay.  This was produced to us without a Bates

24   number on it.  Back up.

25          I didn't -- you were -- you understand -- okay.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          64

1   I'm sorry.

2          One of the topics you were supposed to prepare

3   for was documents produced by the company, correct?

4    A.  Yes.

5    Q.  So you understand that the company has produced

6   documents at several different points over the past

7   3 years?

8     A. Correct.

9     Q. Okay. You understand that the first time that

10 the company produced documents back in 2018, they didn't

11 have any numbers on the bottom here. Did you know that?

12    A. I didn't.

13    Q. Okay. Have you ever seen documents reviewed in

14 this case that say FSSTX and a long number at the end of

15 them at the bottom?

16    A. Yes.

17    Q. Okay. This document doesn't have anything like

18 that, okay, because that's the way it was produced.

19         Can you look at this and tell me whether this

20 is an email that came from your files? Is there any way

21 for you to do that?

22    A. Can you specify from my files?

23    Q. I'm sorry. What I mean to say your files, I

24 mean the company's. Is this -- is this a Free Speech

25 Systems' email?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      65


1     A. It appears so.

2     Q. Okay. So Nico, that's a Free Speech Systems'

3 employee?

4     A. Yes.

5     Q. He -- he was a frequently liaison of

6 Mr. Halbig, correct?

7     A. Yes, that's my understanding.

8     Q. Okay. This email is dated February 25, 2014,

9  correct?

10     A.  Yes.

11     Q.  And this is Mr. Halbig sending his resume and

12  bio to InfoWars?

13     A.  It appears so, yes.

14     Q.  Okay.  And Mr. Halbig says:  Nico, here is some

15  information on me that you guys can check out, Wolfgang,

16  and he gives his phone number, correct?

17     A.  Yes.

18     Q.  Okay.  Do you have any reason to believe that

19  InfoWars had any dealings with Mr. Halbig before this

20  date?

21     A.  I don't know for sure.

22     Q.  Okay.  So let me make sure I ask this in a

23  couple of ways.  Okay?

24        First of all, when you give that answer, when

25  you say I don't know for sure, that's based on your

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        66


1  personal knowledge, Daria Karpova, correct?  That's what

2  you're saying?

3     A.  I'm saying that --

4     Q.  I think maybe --

5     A.  I'm saying -- sorry.

6     Q.  Let me try to help clarify because I think it

7  may be helpful to your answer.

8        What I'm trying to say is when you give the

9  answer of I don't have any reason to believe that we've

10  had -- I don't have any basis to say that InfoWars had

11  contact with Mr. Halbig before that date, is that based

12  on just your own personal knowledge or is that based on

13  information somebody else has given you?

14      MR. REEVES:  Objection; form.  That wasn't

15  testimony given, but --

16    A.  As far as -- as far as the company knows,

17  we -- if there wasn't a record produced before this

18  date, then we don't know if there was communication with

19  Halbig before this date or not.

20    Q.  (By Mr. Bankston)  Okay.  I want to also just

21  before we move on to something else, I want to clear

22  up -- I made a representation to you, and I don't think

23  it was quite accurate.  Okay?  We had talked about

24  Wolfgang Halbig and when he appeared on the show, and I

25  made a representation about that, okay, and about him

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      67


1  being on in 2014.  But I also made a representation

2  about Dr. Steve Pieczenik, that at the time I was

3  speaking of, he hadn't been on the show until 2014.  We

4  did a little checking, and it appears from what we can

5  figure out that Dr. Steve did something on Sandy Hook on

6  InfoWars in March of 2013.  We don't have that video.

7  But I just want to represent to you that that -- what I

8  represented to you before probably isn't accurate

9  because it looks like now there's a video out there that

10  we don't know about that was in March of 2013.  But in

11  terms of -- and we were talking about in January of

12  2013.

13      But just for going forward, I want you to

14  understand that -- that we -- I don't want to represent

15  to you that he wasn't there before March 2013.  Do you

16  understand what I'm saying?

17      A.  I understand.

18      Q.  Okay.  Alright.

19      A.  Thank you.

20      Q.  Okay.  Can you go to paragraph 20 for me in

21  Exhibit 2?  Okay.  And Exhibit 2 being Mr. Heslin's

22  petition.  And paragraph 20 talks about a March 14, 2014

23  video entitled "Sandy Hook, False Narratives vs. The

24  Reality."  Do you see where it talks about that?

25      A.  Yes.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      68


1      Q.  Okay.  First let's -- I want to go through some

2  of these videos.  We had talked about -- one thing -- is

3  it true that one thing you can't do here for me today is

4  for each of these videos in this petition -- actually,

5  no.  Let's just go through them a little bit this way.

6      For instance, in this video, March 14, 2014,

7  you would not be able to tell me the specific claims

8  that were made in that video, right?

9      A.  As far as the quotes specifically written here

10  or anything else?

11      Q.  No.  Anything that was claimed about

12  Sandy Hook.  Do you know anything, what was claimed

13  about Sandy Hook in that video?

14      A.  Well, to the company's understanding, the

15  quotes that are presented in this petition appear to be

16  accurate.

17      Q.  Okay.  Beyond what's quoted in this petition,

18  sitting here today, you can't tell me about anything

19  else that was claimed in that video.

20      A.  No.

21      Q.  Okay.  Well, let's talk about what we do at

22  least know.

23          You see a quote there that says we've clearly

24  got people where it's actors playing different parts of

25  difficulty people?  Do you see where it says that?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        69


1      A.  Yes.

2      Q.  Okay.  The company, sitting here today, agrees

3  that was a ridiculous thing to say.

4          MR. REEVES:  Objection; form.

5      Q.  (By Mr. Bankston)  Correct?

6      A.  At the time of the event, with all the

7  information that was coming in, as well as Alex's

8  previous research, as he is a history buff of the false

9  flags that we discussed earlier, it is the company's

10  understanding that he was entitled to his commentary and

11  opinions in this matter.

12      Q.  Okay.  So in other words, the company does not

13  agree it was ridiculous to say we've clearly got people

14  where it's actors playing different parts of different

15  people, correct?

16      MR. REEVES:  Objection; form.

17      A.  Again, this was Alex's commentary.  I'm not

18  sure if the company can agree or not.  It's not a

19  person.  It's not a human being that can agree or not.

20  So as far as this quote from Alex Jones at the time, I

21  already answered that question.

22      Q.  (By Mr. Bankston)  Okay.  Well, you're here as

23  the corporate representative today, correct?

24      A.  Uh-huh.

25      Q.  Correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        70

1       A.  Correct.

2       Q.  Okay.  And you've been asked to give testimony

3   in response to my questions today, correct?

4       A.  Correct.

5       Q.  Speaking from what the company knows or does

6   not know.

7       A.  Correct.

8       Q.  Okay.  The company has opinions on the people

9   who works for it, correct?

10      MR. REEVES:  Objection; form.  Can you

11  please point out to where that's a topic in your

12  deposition notice?

13      MR. BANKSTON:  That's not a topic of my

14  deposition notice, no.

15      MR. REEVES:  Okay.  Well, then she's not

16  here to test -- she's here testifying as a corporate

17 representative on the noticed topics.  If you're asking

18 questions outside of that, she can certainly answer.

19 But that is not on behalf of the company.

20          MR. BANKSTON:  I can give you a running

21 objection to the entire --

22          MR. REEVES:  If you'd like to do that,

23 that's great.

24          MR. BANKSTON:  Yeah.  For every question

25 that I ask, you don't have to stop anymore to do that.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          71


1          MR. REEVES:  Okay.  I'm not trying to

2 interrupt.

3          MR. BANKSTON:  No, I understand.  I

4 understand you're trying to preserve your record.  But I

5 know we're going to be here forever if we don't do stuff

6 like --

7          MR. REEVES:  Okay.  No -- that's fine.

8    Q.  (By Mr. Bankston)  Alright.  So does --

9 let's -- actually, let's -- let me -- let withdraw that

10 question and I'll ask it this way.

11          Do you have any information for me here sitting

12 today what the source of the information it was that

13 allowed Mr. Jones to conclude that we've clearly got

14 people playing -- excuse me -- where he was able to

15 conclude we've clearly got people where it's actors

16 playing different parts of different people?

17    A.  A lot of the information that Alex had

18  commentary upon came from meshoo (phonetic) media,

19  videos, articles.  There's no way to have access to

20  that -- to every single piece of that information at

21  this point.  It would be hard, even the day before, to

22  have access to whatever the sourcing was for Alex at

23  that particular time.

24      Q.  It's true that you didn't do anything to try to

25  figure out that, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        72


1      A.  Based on my knowledge of the work flow,

2  day-to-day work flow that we've had for years and years,

3  I can make an educated guess because I've been in this

4  position and I can tell you of the typical sourcing that

5  is done for each show --

6      Q.  Okay.

7      A.  -- and Alex's commentary on it.

8      Q.  Okay.  So in answer to my question, you

9  didn't -- in preparation for this deposition, you didn't

10  do anything to try to figure that out in terms of what

11  the source was for that statement.  That's correct.

12      A.  Not for this specific quote.  I can tell you

13  the general sourcing that we have, that we utilized in

14  preparation for the shows, as well as during the shows.

15  That's my expertise as a day-to-day person who's

16  involved in production.

17      Q.  Okay.  You can't tell me -- can you tell me

18  what actors -- can you tell me what people were being

19  alleged to be actors?

20    A.  Based on this quote, there's no way to tell.

21    Q.  And based on what you -- and you have done

22  nothing in preparation for this deposition to determine

23  that, correct?

24    A.  That wasn't part of the questions that I was

25  asked --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       73


1    Q.  I'm not --

2    A.  -- to prepare for --

3    Q.  Ma'am, I'm not asking what you were or were not

4  asked to do.  We'll figure that out.  I want to know

5  factually.  You -- when it comes to trying to figure out

6  who he's even talking about here in terms of actors

7  playing different parts of different people, you didn't

8  do anything to figure that out, correct?

9    A.  Correct.

10    Q.  You didn't ask Alex about this statement or

11  this video, correct?

12    A.  Correct.

13    Q.  You don't know any of the employees who may

14  have researched and come up with this idea that there

15  was actors playing different parts of different people,

16  do you?

17    A.  This -- to me this doesn't appear as a research

18  that's coming from a particular employee that's feeding

19  Alex any information.  This appears to me as Alex's

20  opinions and commentary on the situation that he

21  is -- has in front of him that he's watching based on

22  the main street news reporting, other sources that he

23  might have had at that time.

24      Q.  Okay.  But you're guessing.

25      A.  Educated guess, yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        74


1      Q.  Right.

2          So there's two situations that could happen

3  when Alex Jones is going to say something like this on

4  air.  Situation one is that some employee has found

5  something online, some video, some articles, something

6  that he thinks shows that there's actors playing

7  different parts of different people and he takes that to

8  Alex and Alex goes and puts that on the air.

9          And situation two is Alex Jones himself saw

10  something that made him arrive at this conclusion.

11          One of those two things is most certainly what

12  happened, correct?

13      A.  Not necessarily.  It could be that one of those

14  things happened.  But number one that you mentioned is

15  unlikely in my opinion, just from working for years in

16  the same environment and knowing the work flow.  Again,

17  Alex's commentary could have been -- I'm not sure what

18  his commentary was based on.  It's just hard to -- it's

19  hard to say in this particular case.

20      Q.  Okay.  Do you know who was working on this day

21  in the production department?

22      A.  I have a list of people who were working on

23　that day, and I can refer potentially who were working

24　in production.  Even that is not for sure because at any

25　time a person could have or could have not been there.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT　　　75

1　　Q.  Okay.  If you needed to -- if I asked you right

2　now who was there, would you need to look at a document

3　to do that, to figure out who was there?

4　　A.  If the document is in my email, yes.

5　　Q.  Okay.  And that's not here on this table, is

6　it?

7　　A.  No.

8　　Q.  Okay.  You can go to paragraph 23 for me.

9　　A.  (Witness complies.)

10　　Q.  Do you see where it talks about a May 20 -- a

11　May 13, 2014 video entitled "Bombshell Sandy Hook

12　Massacre Was a DHS Illusion Says School Safety Expert"?

13　　A.  Yes.

14　　Q.  That school safety expert, that's Wolfgang

15　Halbig, correct?

16　　A.  Yes.

17　　Q.  He's the source for this video?

18　　A.  It appears so.

19　　Q.  Okay.  Do you -- are you -- are you familiar

20　with claims made in this video about CNN and a

21　(indiscernible) broadcast involving (indiscernible)?

22　　A.  Say it again, please.

23　　Q.  Are you aware of claims made in this video

24  about CNN and the first Gulf War and a blue screen?

25      A.  Yes, I recall -- I recall that incident.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      76

1      Q.  Okay.  And you -- tell me what you

2  understand that allegation about CNN and the first Gulf

3  War and the blue screen could be?

4      A.  The allegation is that Anderson Cooper used a

5  green screen to report.

6      Q.  Okay.  Do -- do you think that Anderson Cooper

7  was at the first Gulf War?

8      A.  No.

9      Q.  Okay.  So that's probably not what that is,

10  right?

11      A.  That's the only thing that I can recall having

12  to do with CNN and a reporter.

13      Q.  Okay.  So any discussion about what CNN was

14  doing during the Gulf War in Iraq in terms of a blue

15  screen in that video is something that you do not

16  understand the researching or sourcing for, correct?

17      A.  I do not recall.

18      Q.  Okay.  Can you go to paragraph 25?  And do you

19  see in paragraph 25 it discussing a September 25, 2014

20  video entitled "Connecticut PD Has FBI Falsify Crime

21  Statistics," correct?

22      A.  Yes.

23      Q.  Okay.  First of all, are you familiar with the

24  claim that InfoWars has made that the FBI either

25  falsified crime statistics or admitted that nobody died

1  at Sandy Hook?  Are you familiar with those claims?

2      A.  As far as it's quoted here in this paragraph,

3  the company believes that to be the case.

4      Q.  No.

5          What I'm asking, Ms. Karpova, is based on the

6  title and this talking about FBI falsified crime

7  statistics.  Are you personally right now familiar with

8  that claim made by InfoWars?

9      A.  Personally I'm not.

10     Q.  Okay.  Did you talk to anybody about that

11  claim?

12     A.  No.

13     Q.  Okay.  So this video and its title, you don't

14  really understand where that comes from, right?

15     A.  No.

16     Q.  Okay.  So you wouldn't know what employee came

17  up with this idea that the FBI falsified crime

18  statistics.

19     A.  There wouldn't be an employee that came up with

20  that specific idea.  That's a show title.  That's based

21  on the information that's discussed in the video.

22  That's how we title the videos.

23     Q.  Do you think this allegation -- I mean, you

24  don't know if this allegation came from inside or

25  outside the company, do you?

1     A.  It came from either that interview with

2  Mr. Halbig that was included in this video or a source

3  that Alex Jones had.

4     Q.  Have you ever seen the article about this,

5  about FBI says nobody killed at Sandy Hook?

6     A.  I might have.  I don't remember now.

7     Q.  Okay.  It's an InfoWars' article?

8     A.  I don't remember.

9     Q.  Did you know it was the third most popular

10  InfoWars' article ever?

11     A.  No.

12     Q.  Okay.  And that's not -- none of those claims

13  are something that you can testify about today.

14          MR. REEVES:  Objection; form.  The -- I

15  know we have a running objection, but again that's not

16  part of the notice of deposition.

17     A.  Which claims specifically?

18          MR. BANKSTON:  I'm sorry.  Are you

19  objecting that her testifying about not being able to

20  talk about the claim made in this video is not part

21  of --

22          MR. REEVES:  No.

23          MR. BANKSTON:  Okay.  I'm confused on

24  what --

25          MR. REEVES:  I'm talking about the article,

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        79


1  about the article.

2          MR. BANKSTON:  Okay.  We'll get to that

3 later.

4          MR. REEVES:  Okay.

5     Q.  (By Mr. Bankston)  So do you see in that

6 paragraph it's talking about photos of kids that are

7 alive that they say died?

8     A.  Yes, I see that paragraph.

9     Q.  Do you know what photo they're talking about?

10    A.  From what I can infer, it was probably a photo

11 that -- or photos that were going around that people

12 were talking about online.

13    Q.  Sure.

14        You have no idea what they are.  I mean, you're

15 guessing, right?  Right?

16    A.  To the best of my knowledge.  There's no way to

17 tell what they were.

18    Q.  You have no personal knowledge about this,

19 correct?

20    A.  Well, there's no way to go back to that video

21 because we don't keep those kinds of records of every

22 show.  Of any show.

23    Q.  You didn't talk to any of the employees, did

24 you?

25    A.  It's hard to tell who worked on that day.  We

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       80


1 don't have record of that either.

2     Q.  You know who wrote the article that went along

3  with this video, don't you?

4      A.  No, no idea.

5      Q.  You'd be able to figure that out if you wanted

6  to, though, couldn't you?

7      A.  If that article had a name on -- of the author,

8  it would be there, yes.

9      Q.  Okay.  So we don't know what employee was

10  responsible for bringing this information to the

11  company's attention, whether it was Alex Jones or

12  another employee, correct?

13      A.  Correct.

14      Q.  Okay.  Do you know if this has to do with the

15  Super Bowl picture?  Do you know what I mean when I say

16  "Super Bowl picture"?

17      A.  I think -- can you be more specific?

18      Q.  Yeah.

19          Do you know about Wolfgang Halbig sending the

20  company a Super Bowl picture?

21      A.  I do not know that.

22      Q.  Okay.  Let me attach No. 4.

23          (Discussion off the record)

24          (Exhibit 4 introduced)

25      Q.  (By Mr. Bankston)  And while he's looking -- I

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        81


1  may have already asked you this.  But on September 25,

2  2014, for that video on that day, you don't know what

3  employees were working that day to be involved in making

4  that video?

5     A.  I can be -- I can potentially infer who were

6  active during the production of this video based on a

7  record of employed personnel on that day.  But I

8  couldn't tell you specifically if they were in the room

9  at that specific moment because we don't keep records of

10  things like that.

11     Q.  Can you tell -- can you tell me who was working

12  that day?

13     A.  If I can have access to my email.

14     Q.  Never mind.

15        Okay.  So let me just make sure for the record.

16  There's nothing on the table right now that's going to

17  be able to help you answer the question of who was in

18  that room that day making that video?

19     A.  Because we don't keep track of that

20  information, correct.

21     Q.  Wait.  No.

22        From what I understand, you do keep track of

23  that information; and if you had access to it, you could

24  answer it.  But you don't have access to it as you sit

25  in that chair?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        82


1     A.  No.  I said I can infer from a list of

2  employees who might have been there at that particular

3  time.

4     Q.  Okay.  And then from that list you could

5  perhaps go interview those employees, correct?

6    A. Yes.

7    Q. Okay.  And you didn't do that, correct?

8    A. (No response.)

9        (Discussion off the record)

10       (Exhibit 4 introduced)

11    Q. (By Mr. Bankston)  I'm going to show you what

12 I've marked as Exhibit 4.  Can you take a quick look at

13 that real quick and then let me know if you've seen it

14 before?

15    A. Yes.

16    Q. You have seen this document before?

17    A. I have not seen -- I don't recall seeing that

18 specifically.  Like I said, I've reviewed a lot of

19 documents.

20    Q. Alright.  I'm just trying to make sure -- have

21 you or have you ever seen this document?

22    A. I don't recall reading this particular exchange

23 with Mr. Halbig and Nico.

24    Q. Okay.  I'm going to start at the bottom here.

25 And this is -- this document that I'm reading from you

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        83


1 is marked FSS Texas, FSSTX, dash 039429.  And you will

2 see at the bottom email Mr. Halbig writes to Nico.  Do

3 you know who Nathaniel Folks is, the person he copies?

4    A. No.

5    Q. Okay.  Nico, though, is an InfoWars' employee.

6    A. Yes.

7    Q. What's his job title at this time?

8      A.  He's not employed by Free Speech Systems.

9      Q.  At this time.

10     A.  Oh.  At this time?  He would be the head

11   producer.

12     Q.  Nico's no longer employed by InfoWars?

13     A.  Correct.

14     Q.  Does InfoWars possess his last known contact

15   information?

16     A.  Yes.

17     Q.  Okay.  Mr. Halbig in this email states:  Nico,

18   the picture of the Sandy Hook Elementary School choir is

19   one of the keys.  Other pictures are great for

20   discussion.  These are the CT CRIME pictures.  Wolf.

21        Have I read that correctly?

22     A.  Yes.

23     Q.  Okay.  Nico responds and says:  Got the Super

24   Bowl picture.  Thank you for sending.  We will be

25   having -- we will be calling you on Skype at 1:00 p.m.

          UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        84


1   Eastern Time.  How long will you be available for the

2   interview today?  Thanks, Nico.

3        Have I read that correctly?

4      A.  Yes.

5      Q.  Okay.  And then the final email says:  As long

6   as you and Alex can put up with me.  Wolfgang.

7        I read that correctly?

8      A.  Yes.

9      Q.  Okay.  Does this help you refresh your memory

10  about what the Super Bowl picture is?

11      A.  Are you asking me personally right now?

12      Q.  If you can answer either on behalf of the

13  company or you can answer on behalf of yourself, let me

14  know either way.

15      A.  If the Super Bowl picture wasn't produced by

16  the company, then we don't have a record of that -- of

17  the picture.  Personally I -- over the years I've

18  seen -- I might have seen the Super Bowl picture.

19      Q.  Okay.  Let's find out.

20          (Discussion off the record)

21          (Exhibit 5 introduced)

22      Q.  (By Mr. Bankston)  Alright.  I'm going to show

23  you what I've marked as Exhibit 5.  Can you take a look

24  at that picture for me?

25      A.  (Witness complies.)

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          85


1      Q.  Do you see at the bottom corner where it says

2  FSSTX.0446 -- 476?

3      A.  Yes.

4      Q.  Okay.  Have you seen this picture before?

5      A.  Personally I have not.

6      Q.  Okay.  This was a document though you can tell

7  from the number at the bottom that was produced by the

8  company, correct?

9      A.  Yes.

10      Q.  Okay.  Can you read what it says at the very

11  top of the picture, the white text?

12      A.  "10 Sandy Hook Children found alive and well."

13      Q.  Okay.  This -- does the company now admit that

14  this picture is outrageous?

15          MR. REEVES:  Objection; form.

16      A.  This picture was produced by a guest we've had

17  on the show who thought it was relevant material.

18      Q.  (By Mr. Bankston)  Okay.

19      A.  We don't -- we don't tell our guests what to

20  say or what not to say.

21      Q.  Now, this is something that Nico thanked

22  Mr. Halbig for, correct?

23      A.  Sure.  It appears so.

24      Q.  Does the company -- and when the company in its

25  editorial discussions is discussing things like this,

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        86


1  right, when you have employees of the company discussing

2  a picture of a Super Bowl choir which is being contended

3  to be the pictures of dead children who are actually

4  alive, does the company have an opinion sitting here

5  today about whether those editorial discussions were

6  responsible or not?

7          MR. REEVES:  Objection; form.

8      A.  The expert guest that we had on the show,

9  Wolfgang Halbig, thought that it was an appropriate

10  supplementary material to bring to the interview.  With

11  all the information that we had on Wolfgang Halbig

12  regarding his extensive bio and knowledge in the subject

13  matter that he was going to be discussing, we had no

14  reason to believe that this would be an inappropriate

15  picture if -- we -- if that's something he wanted to

16  bring to the interview and talk about, he's allowed to

17  do that.  We -- we allow that with the guests.

18      Q.  When InfoWars has a source like Mr. Halbig,

19  he's going to bring him on and Alex Jones is going to

20  repeat the things he says.  Let me back up.

21      You'll agree with me, Alex Jones has frequently

22  repeated the things Mr. Halbig has claimed without

23  Mr. Halbig even being on the show, right?

24      A.  Mr. Halbig was a subject matter expert, so Alex

25  would defer to his opinion.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      87


1      Q.  Sure.

2      And one thing that you'll agree with me that

3  the company would have in its editorial discussions on

4  Sandy Hook needs to do is continually assess and

5  reassess the credibility of the experts it's relying on,

6  correct?

7      A.  We did not -- we do not have editorial

8  discussions regarding Sandy Hook, nor did we ever have

9  them.  And to the best of our knowledge, this was the

10  foremost expert on the matter of school shootings,

11  school safety at the time.  And we did our best to bring

12  the top person in the business to state his opinion on

13  the subject matter.

14      Q.  Who vetted Wolfgang Halbig's bio, bio and

15  background?  Who did that?

16      A.  This is -- specifically vetted?  I'm not sure

17  who vetted.

18      Q.  Okay.

19      A.  It -- since Nico was the producer, he probably

20  was the person who vetted.

21      Q.  Alright.  So when InfoWars was assessing

22  Wolfgang Halbig's credibility and whether he should be

23  somebody who should be relied on as to an expert, one of

24  the pieces of information that they had in order to make

25  that credibility assessment was this picture of a Super

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        88


1  Bowl choir that Wolfgang Halbig was contending was

2  actually secretly the murdered children of Sandy Hook

3  who are actually killed.  That's one of the things that

4  InfoWars had in its possession to assess his

5  credibility, correct?

6      A.  I wouldn't say so.  This -- from -- from this

7  exchange, it appears that this is a supplementary

8  material that Wolfgang wanted to have for the interview.

9  His bio, his credentials is an entirely different thing

10  from the materials that he wants to bring to talk about.

11      Q.  Well, what I'm saying is if there's an expert

12  and you've been relying on them, the guy's supposed to

13  be a school safety shooting expert, whatever it is,

14  alright, you're relying on him and then just

15  hypothetically that person starts saying absolutely

16  crazy things and it's pretty clear they're going off

17  their rocker, maybe they were even credible at one time,

18  but suddenly they start saying a bunch of crazy things,

19  to the company, when it's deciding whether to put stuff

20  on about Sandy Hook, it needs to -- it -- it should

21  consider whether what the things its expert is saying

22  are crazy, correct?

23      A.  Well, if he's the expert on the subject matter

24  and -- who knows a lot more on the subject than any of

25  us working at Free Speech Systems, it would be

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          89


1  reasonable to believe that we would want to listen

2  what -- what -- or consider the information that he is

3  bringing.

4      Q.  What exactly in Wolfgang Halbig's history and

5  expertise makes him an expert that you should defer to

6  on whether this picture of the Super Bowl choir is

7  actually pictures of children who were murdered?

8      A.  Well, that's a good question.  That's why I

9  brought his bio, which I would like to read.

10      Q.  You'd just like to read it into the record, or

11  what?

12      A.  Yes.

13          And the reason that we brought him on the show

14  is for his long credential of being an expert on school

15  shootings, on school safety.

16      Q.  Does he have credentials in the photographic

17  forensic analysis of potential murdered children who are

18  actually being used as crisis actors?

19     A.  I don't know that specific credential.

20     Q.  Yeah.  Okay.

21        Do you personally sitting here, you looking at

22  this, it's crazy, right?

23     A.  I'm not here to talk about my personally

24  opinions.

25     Q.  I'm asking you, though.  Yeah, you are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        90


1        MR. REEVES:  Objection; form.

2     Q.  (By Mr. Bankston)  Yeah, is -- this is crazy,

3  right?

4        MR. REEVES:  Objection; form.  Don't answer

5  that question.

6        MR. BANKSTON:  Yeah.  Are you instructing

7  asking her not to answer --

8        MR. REEVES:  I'm instructing her not to --

9        MR. BANKSTON:  -- whether this was produced

10  by a rationale, sane, human being?

11        MR. REEVES:  That's what you asked her the

12  first time.

13        MR. BANKSTON:  Then let me do that

14  question.

15     Q.  (By Mr. Bankston)  Will you admit sitting here

16  right now, this was not created by a rationale, sane

17  human being, or are you going to tell this jury that

18  this is created by a rationale, sane human being?

19     A.  I don't have an opinion -- a personal opinion

20  on it.

21     Q.  So you see this picture and in trying to

22  determine whether it was created by a sane, rationale

23  human being, you look at it and go I have no strong

24  feelings either way, correct?

25     A.  I'm not a psychiatric medical expert to

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      91


1  determine who is sane and who isn't.

2     Q.  Is this the kind of picture that if somebody

3  gave you that you would say this is a person that I

4  think is trustworthy and credible?  Is that something

5  you would say?

6     A.  It depends where I'm at, what information I

7  have.  We're talking -- we're talking the date 2015

8  where Wolfgang Halbig came on the show.  I -- judging

9  from this conversation, I don't know what Nico looked at

10  or knew about what Wolfgang was going to talk about or

11  bring on the show.  So if -- from -- from the workload

12  that we have, if a guest sends me material that they

13  want to discuss and this guest has long credentials in

14  the subject matter that they want to talk about, then I

15  would thank them for sending me the information just

16  like Nico did.  I don't see anything wrong with that.

17     Q.  You would -- if somebody sent you this while

18  you were doing reporting, you would thank them for it?

19     A.  I don't know.  It depends on the circumstances.

20    Q.  Okay.  Well, the circumstances --

21    A.  I wasn't there when Nico was having this

22 exchange, what information he had at the time.

23    Q.  Well, I'm asking you what if you had this

24 information, a picture that says at the top,

25 "10 Sandy Hook Children found alive and well" and

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       92


1 they're the Super Bowl choir in front of millions of

2 people?  Would you look at that and go, man, I'm glad

3 I -- they sent me that?

4    A.  Personally I would rather think that those kids

5 were alive than -- than having -- because the tragedy of

6 kids being murdered for no reason, the innocence of

7 those children who didn't deserve what -- that -- that

8 kind of fate, I would hold out hope to the last bit of

9 my soul hoping and praying that that picture was -- that

10 was something that would possible, for those kids to be

11 alive.

12    Q.  So if you think about it, from your point of

13 view --

14    A.  Yeah.

15    Q.  -- if you think about it, if the parents, if my

16 clients saw this picture, it should give them a lot of

17 hope, right?  They should -- they should react really

18 positively to this with a lot of hope inside, right?

19         MR. REEVES:  Objection; form.

20    Q.  (By Mr. Bankston)  Is that what you're saying?

21    A.  I'm not those parents.  I'm looking at it as an

22  outsider.  And I would much rather -- and I don't know a

23  person with a heart who'd rather think -- who'd rather

24  believe that the kids are dead versus that the kids

25  might be alive.  I would say it's reasonable for a

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        93


1  person with a heart to have that sort of optimism as I'm

2  sure Alex wanted to believe, that those kids -- if there

3  was any possibility that the kids were not dead, that he

4  was going to grab on to it because that's a much better

5  proposition to have in your heart and mind than to -- to

6  realize that they weren't.

7    Q.  So Alex Jones, according to how the company

8  view things in terms of your Sandy Hook coverage,

9  Alex Jones said the kids didn't really die and they were

10  really alive in part because he has such a big heart and

11  a lot of hope and optimism, correct?

12        MR. REEVES:  Objection; form.

13    A.  Yes.

14    Q.  (By Mr. Bankston)  Okay.  There was nothing in

15  your mind, in the company's mind, nasty, vindictive,

16  negative about any of these statements, about the kids

17  still being alive, right?

18        MR. REEVES:  Objection; form.

19    A.  Absolutely not.

20    Q.  (By Mr. Bankston)  Okay.  Was it -- would it be

21  responsible journalism to show this picture to millions

22  of people?

23          MR. REEVES:  Objection; form.

24      A.  It's possible journalism is the ability to dig

25  for information and present it in a truthful way to the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          94


1  audience and let them be the judge of that information.

2  As long as the information is truthful, to the best of

3  our knowledge, that's what responsible journalism is and

4  that's what we did.

5      Q.  (By Mr. Bankston)  So if you were to show this

6  picture to millions of people, the picture that says

7  10 Sandy Hook Children found alive and well and has a

8  bunch of names superimposed on them, that would be good

9  journalism, right?

10          MR. REEVES:  Objection; form.

11      A.  Again, I already answered that this was the

12  supplementary material that the expert guest wanted to

13  show, send us and it was appropriate for us to -- I'm

14  not sure if it was shown on the screen or not, but -- as

15  a company we didn't -- I don't believe we censored

16  anything that Wolfgang wanted to say.

17      Q.  (By Mr. Bankston)  Let me go back to our

18  petition there, Exhibit 1.  Or is that -- is that

19  Exhibit 1?  I'm sorry.  I didn't -- it might be 2?

20  Yeah -- okay.  Can you look at Exhibit 2 for me?  And go

21  to paragraph 29.

22          Paragraph 29 talks about one of the videos

23  discussed in topic number one, correct?

24 A. (No response.)

25 Q. Ms. -- Ms. Karpova, I'm just asking you. Does

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT 95

1 paragraph 29 contain a video that you're supposed to

2 talk about under topic number one?

3 A. Yes.

4 Q. Okay. The video is December 27, 2014, entitled

5 "Lawsuit Could Reveal Truth About Sandy Hook Massacre,"

6 correct?

7 A. Yes.

8 Q. What lawsuit is being talked about?

9 A. I don't know for sure.

10 Q. Well, at least this one we're lucky because I

11 do.

12 Do you know Wolfgang sued Leonard Pozner, that

13 they were in a lawsuit together?

14 A. Yes.

15 Q. Okay. You understand the company was helping

16 Wolfgang Halbig raise money to use in court against

17 Mr. Pozner. Do you know that?

18 A. I'm not sure of the details of -- of the

19 raising of the money for Mr. Halbig's lawsuit.

20 Q. Can you read that for me? I'm sorry. The

21 reasoning, is that what you said?

22 A. What was your question?

23 Q. My question is, the company was helping

24 Wolfgang Halbig raise money to use in court against

25 Mr. Pozner, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          96

1     A.  Yeah.  The company doesn't have details in

2  terms of the said money being raised for -- for court.

3     Q.  I think -- wouldn't the more accurate be --

4  answer be you, Daria Karpova, does not know if the

5  company has information relating to whether they were

6  raising money for Wolfgang Halbig's lawsuit?

7     A.  If the documents regarding that weren't

8  produced by the company, then the company does not know

9  because it didn't keep the record.

10     Q.  Do you know if any such records exist?

11     A.  I might have -- it might have been part of the

12  reviewed documents that I've looked at.  I'm not sure.

13     Q.  Well, first of all, we know that you didn't

14  know that this video referred to that lawsuit.  You

15  didn't know what lawsuit it was.  So you also, I would

16  take it, know you haven't done any research to determine

17  what that lawsuit is or anything about it, right?

18     A.  I haven't reviewed that lawsuit, no.

19     Q.  Or anything that has to do with what this video

20  said about the lawsuit, right?

21     A.  I mean, if you ask me specifically?  Because

22  you're saying anything.  If you ask me a specific point,

23  then I may or may not recall.

24     Q.  Sure.

25         What truth about the Sandy Hook massacre could

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          97

1  this lawsuit reveal?  What did the video have to say

2  about that?

3     A.  Well, based on the quotes here in this

4  paragraph, you know, the truth would be -- I mean

5  something to do with it not being the way the main

6  stream news reported.

7     Q.  Okay.  Help me understand.

8        The lawsuit could reveal something that's

9  different than the mainstream media.  That's your

10  answer?  Is that -- am I understanding --

11     A.  Different than what the mainstream media

12  finally reported about the incident.

13        I believe it took a year for Connecticut -- the

14  State of Connecticut to release the final report on the

15  event.

16     Q.  What does that have to do with the lawsuit?

17  I'm confused.  What -- what's the lawsuit having to

18  do --

19     A.  Are you asking me what it could've --

20     Q.  Well, let's --

21     A.  So that truth might have been something that

22  contradicted the report that the State of Connecticut

23  had issued.

24     Q.  You have no idea, do you?  You say "might."

25  You don't have any idea.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        98


1     A.  Yeah, we don't have a record of that.

2    Q.  Yeah.

3        And you -- when you got this petition and you

4  read it and you saw there was a video entitled lawsuit

5  could reveal truth about Sandy Hook massacre, you did

6  nothing to figure out what that lawsuit was or what it

7  could reveal, did you?

8    A.  Huh-uh.  No.  Not specifically.

9    Q.  Okay.  That video also you'll see in the last

10  line, the plaintiff's alleged that the video says that

11  the event was undertaken as a satanic ritual by global

12  elites.  Do you know if that's accurate?  Not that -- do

13  you know if the claim -- in other words, do you know if

14  it's accurate that that was said in the video?

15    A.  I have no reason -- the company has no reason

16  to believe that that wasn't said.  And on that point I

17  would say that that's -- that is a commentary opinion of

18  Alex Jones at that time.

19    Q.  Wait, wait, wait.  Hold on.

20        How do you know Alex Jones said that?  I mean,

21  you don't -- you didn't watch the video, right?

22    A.  Not recently, no.

23    Q.  Okay.  And it says the video also featured

24  claims.  It doesn't say Mr. Jones said that, does it?

25    A.  It does not.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        99


1    Q.  And you're not going to be able to offer me any

2  helpful testimony about that, are you?  You don't know

3  who said it or who researched it, right?

4      A.  Sorry.

5          Judging from the paragraphs it mentions,

6  Mr. Jones is the only one who's mentioned in this

7  paragraph regarding the video.  It doesn't mention any

8  other guests.  So -- which is why I would infer that the

9  claims that are made in the video are made by Mr. Jones.

10     Q.  Which is to say you don't have knowledge,

11  you're making a guess?

12     A.  Not specifically, correct.

13     Q.  Okay.  Thank you.

14         Can you go to paragraph 30 for me?

15     A.  (Witness complies.)

16     Q.  You see that talks about a December 29, 2014

17  video entitled "America the False Democracy," correct?

18     A.  Yes.

19     Q.  Okay.  Do you see where it says Mr. Jones

20  stated that he did deep research?

21     A.  Yes.

22     Q.  Did Mr. Jones do deep research, or was that

23  false?

24     A.  If he said that he did deep research, then he

25  must have done deep research.

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     100


1      Q.  Because everything Alex Jones says is true.  He

2  does not lie on air, correct?

3      A.  He believes everything he says.

4      Q.  Okay.  That's --

5          MR. BANKSTON:  No, I'm okay.

6      Q.  (By Mr. Bankston)  Do you see where it says the

7  general public doesn't know the school was actually

8  closed the year before?

9      A.  Yes.

10     Q.  You can't tell me the company source on that,

11  can you?

12     A.  I could -- I know that those are one of the

13  claims made by Mr. Halbig, so I can make an educated

14  guess and say those -- that knowledge Alex got from

15  Mr. Halbig.

16     Q.  Okay.  Do you know what employee researched or

17  vetted that claim?

18     A.  I wouldn't know at this point, no.

19     Q.  Okay.  Can you -- can you even affirm for me

20  that that claim was vetted in any way before it hit

21  InfoWars' public broadcast?

22     A.  We relied on the expert guests to provide that.

23     Q.  Right.

24         And you've already testified you don't know who

25  vetted Wolfgang Halbig, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        101


1      A.  I don't know for sure, but I already said that

2  as producer Nico must have done that.

3      Q.  And you don't know what Nico did to vet him,

4  correct?

5      A.  No.

6    Q. You have not spoken with Nico?

7    A. No.

8    Q. You can -- you know how to get in touch with

9 him, correct?

10    A. I have last known contact information.

11    Q. Did you try it?

12    A. No.

13    Q. Okay.  Do you see where it says they had kids

14 going around in circles in and out of the building as a

15 photo op?

16    A. Yes.

17    Q. Yeah.

18        Do you know the company source on that?

19    A. I believe it should be -- the company believes

20 it to be Wolfgang Halbig.

21    Q. Well, it's interesting, you know,

22 because -- have you watched Alex Jones' deposition the

23 first time I took it?

24    A. Parts of it.

25    Q. Okay.  Did you watch the part about the kids

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        102


1 allegedly going in circles around the video with the

2 building?  Have you seen that?

3    A. I don't remember that specifically.

4    Q. Okay.  Because here's the thing.  And I'm --

5 just again, to try to make sure that you're answering

6 questions that you know the answer to, we already know

7 where that one came from.  We had a deposition, and we

8  put the video up.  And there's kind of an infamous

9  YouTube video made by just some random YouTuber, some

10  conspiracy person and it's called the going in circles

11  video.  And it has -- it's actually not Sandy Hook

12  Elementary at all.  It's a firehouse down the street.

13  It's not kids going in and out of the building, but it's

14  actually adults and young teenagers.  But there's this

15  video of this circle of people going from the front to

16  the back.  And we talked about all this in deposition.

17  It comes from a YouTube video.  It doesn't come from

18  Mr. Halbig.  It doesn't come from Mr. Fetzer.  It

19  doesn't come from any of these people.  But when you sit

20  here and you say, well, I can infer it can came from

21  Mr. Halbig, you can allow for me the possibility that

22  those answers aren't correct, right?

23      A.  Well, you can also infer that the source for

24  the video was either Mr. Halbig or Fetzer, as you just

25  mentioned.  You don't know where the video came from.

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      103


1    Q.  You don't know, do you?

2    A.  No, you don't know.

3    Q.  You don't know, right?

4    A.  Just at you don't know.

5    Q.  Right.

6        So we're just all speculating here today,

7  right?  We have no idea what's going on.

8    A.  You're speculating yourself.

9      Q.  Yeah, it does appear so.

10          MR. REEVES:  Objection to sidebar.

11          MR. BANKSTON:  I'm not going to try to get

12  sidebars admitted, Brad.  You know that.  If you

13  think --

14          MR. REEVES:  I don't care.

15          MR. BANKSTON:  Let me tell you --

16          MR. REEVES:  Stop abusing the witness.

17          MR. BANKSTON:  If you think I'm harassing

18  this witness too much considering the quality of

19  testimony and the respect we've been given, then you can

20  call the court or stop this deposition right know;

21  otherwise, I don't need these -- the interruption of the

22  flow of the deposition.

23      Q.  (By Mr. Bankston)  During this time, this time

24  being 2014, right, December 2014 -- so even in 2015 --

25  during this time -- hold on.  Let me back up because I

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      104


1  do need to address something you said earlier.

2          Did I hear you say InfoWars never had editorial

3  discussions on Sandy Hook?

4      A.  Correct.

5      Q.  Okay.  That's not true, though, right?  People

6  inside InfoWars have talked about Sandy Hook from an

7  editorial standpoint a lot, correct?

8          MR. REEVES:  Objection; form.

9      A.  Negative.

10      Q.  (By Mr. Bankston)  Okay.  During this time

11   people inside of InfoWars were using the term crisis

12   actor to describe the events of Sandy Hook, correct?

13        A.  I don't have any record of that as a company.

14        Q.  You've never seen a document in the case where

15   people inside of InfoWars were using the term crisis

16   actor, correct?

17        A.  As it pertained to Sandy Hook?

18        Q.  Sure.

19        A.  Editorial discussions?

20        Q.  Uh-huh.

21        A.  I don't recall right now.

22        Q.  So, for instance, one thing -- okay.  First --

23   yeah, let's go back for a second.

24           What's an editorial discussion?

25        A.  An editorial discussion would be an internal

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        105


1   conversation about what type information -- of

2   information, angles to go with live on air or website or

3   anywhere else.

4        Q.  In 5 years of covering Sandy Hook, nobody at

5   InfoWars ever had any conversation like that, correct?

6   That's what you're saying?

7        A.  Wait.  Repeat that question, please.

8        Q.  In the 5 years that InfoWars covered

9   Sandy Hook, nobody had a conversation like that ever.

10   Is that what you're testifying to?

11        A.  In terms of editorial discussion with the

12 staff, the company doesn't have record on that that I

13 can recall.  In 2015, at some point before these

14 lawsuits were brought on, Alex had told the staff to

15 halt the potential discussion about Sandy Hook on air,

16 granted Sandy Hook was a tiny, tiny, tiny, tiny, tiny

17 percentage of the information, news, commentary,

18 opinions that's covered on the show.  I mean, a tiny

19 percentage.  Because what you -- what these -- you --

20 you guys are trying to make it sound like that's all

21 that InfoWars had been talking about for 5 years, and

22 that's not the case at all.  Sandy Hook, again, takes a

23 fraction of a percent of the information that we had

24 covered.  And at some point in 2015, Alex decided that

25 it wasn't a good idea because of all the controversy

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        106

1 that's going on.  I don't know what his -- I don't know

2 where he was basing his opinions on, but at some point

3 he decided that it wasn't a good direction to continue

4 to comment on Sandy Hook.  And that was before you guys

5 even brought any of the lawsuits.

6     Q.  Okay.  Do you know what question you're

7 answering?

8     A.  You asked me about the editorial discussions --

9     Q.  Right.

10     A.  -- of Sandy Hook.

11     Q.  And there's never been any and -- was that your

12 testimony?

13     A.  Yes.

14    Q.  So -- and my -- it's your understanding that,

15  no, there has been?

16    A.  No, I just clarified on what I said by there

17  not being any and what happened, the specific

18  point -- what specific -- Alex Jones saying that he does

19  not want to see any reporters discussing Hook anymore.

20    Q.  Okay.  So let's -- let's unpack all of that.

21      First of all, Mr. Jones putting a ban on future

22  Sandy Hook materials going on there, when did that

23  happen?

24    A.  Sometime in 2015.

25    Q.  So it wasn't actually a real ban, was it?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      107


1  Because there's a lot of InfoWars stuff about Info --

2  about Sandy Hook after 2015, isn't there?

3      MR. REEVES:  Objection; form.

4    Q.  (By Mr. Bankston)  Right?

5    A.  Not a lot, no.  As I -- as I just said,

6  Sandy Hook takes a fraction of the information that we

7  cover.

8    Q.  Okay.  So, yeah, let's go to that one.

9      What did you look at to come to that

10  conclusion?

11    A.  My experience at the company, the daily show.

12    Q.  How many videos do you think InfoWars made

13  about Sandy Hook?

14    A.  A fraction of all the videos that we produced.

15    Q.  How many?

16         MR. REEVES:  Objection; form.

17    A.  I don't know the exact number.

18    Q.  (By Mr. Bankston)  What fraction?  Do you know?

19  I mean, I don't -- I'm trying to understand -- if you

20  understand that it's a tiny fraction, right, what --

21  what number would -- would constitute a tiny fraction?

22  Like, what ballpark are we talking about?  How many

23  videos --

24    A.  Well, you have to separate the videos and the

25  broadcasts.  During the 4-hour broadcast, Alex may

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      108


1  mention -- might have mentioned Sandy Hook for a

2  few minutes during the 4-hour period of the show.  When

3  you're talking about the videos that get posted to the

4  website from that particular show, I don't know how many

5  videos could have be produced from that.  It depends on

6  the show.

7    Q.  I've been trying to find out for 3 years.

8  Today you can't help me with that, can you?

9    A.  Well, I believe the videos have been -- the

10  Connecticut case and other functions.

11    Q.  Why -- so you -- no, I know why you believe.

12  (Indiscernible) ask about that.  Never mind.  Don't

13  worry about it.

14         MR. BANKSTON:  Can you give me Tab 38?

15    Q.  (By Mr. Bankston)  Oh.  Ms. Karpova, talking

16  about editorial discussions.  Let me give you a

17  hypothetical.  Okay?  Let's say you got an InfoWars'

18  producer, editor, somebody in that kind of a role and

19  he's talking to another producer, an editor in that kind

20  of a role, right?  And he says to him hypothetically,

21  hey, look, these people we're relying on for Sandy Hook

22  coverage, god, they're not good, these people are not

23  reliable, man, I think we've got a big problem, that's

24  an editorial discussion.  That would be if that

25  happened, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        109


1        MR. REEVES:  Objection; form.

2      A.  If it's a conversation between two employees,

3  I'm not sure how to classify that.

4      Q.  (By Mr. Bankston)  I mean, two editors having a

5  discussion about the material they're covering and the

6  reliability of their source, that's almost the

7  definition of an editorial discussion, isn't it?

8        MR. REEVES:  Objection; form.

9      A.  Well, a company-level editorial discussion or

10  department level would infer that the particular

11  decisions that come out of the discussion are

12  implemented as policy on something.

13      Q.  (By Mr. Bankston)  Let me just ask you this.

14      A.  Yeah.

15      Q.  If there were conversations between editors

16  having editorial discussions about whether the sources

17  they were using for Sandy Hook were reliable or not, are

18   those discussions you're prepared to talk about today?

19      A.  I have no knowledge of those discussions.

20      Q.  You -- so I take it by that same token, you

21   have never seen any documents in which one editor or

22   high person in InfoWars, a writer, editor -- let's say

23   editor or producer is talking to another

24   management-level employee and saying I'm really worried

25   about our Sandy Hook sources, you've never seen any

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        110

1   documents like that?

2      A.  Not specifically like that, no.

3      Q.  Okay.

4           (Discussion off the record)

5           (Exhibit 6 introduced)

6      Q.  (By Mr. Bankston)  I'm going to show you what

7   I've marked as Exhibit 6.  You'll see down at the bottom

8   right-hand corner there's a label on it that says

9   FSSTX 075327?

10      A.  Yes.

11      Q.  Do you see that?  Okay.

12           Up at the top do you see that this is an email

13   from Nico to Rob Dew?

14      A.  Yes.

15      Q.  Okay.  Do you see what the subject is?

16      A.  Yes.

17      Q.  Can you read it for me?

18      A.  Ebola, Sandy Hook crisis actor clips attached.

19      Q.  As of this date, 2014/10/19.  That's the date

20  of the email?

21      A.  Yes.

22      Q.  As of this date, employees inside of, InfoWars

23  such as Nico, were engaged in discussions of another

24  employee, like Rob Dew, using the term crisis actor in

25  relation to Sandy Hook, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      111


1      A.  I don't see any discussion being held here.

2      Q.  I mean, he wrote the words Ebola, Sandy Hook

3  crisis actor clips attached.  That's a statement, right?

4      A.  That is a statement that could have been the

5  names of the clips.

6      Q.  No.  The attachment's have the names of the

7  clips, don't they?  It's got a PDF and it's got a name,

8  doesn't it?

9      A.  Yes.  But one has nothing to do with the other.

10      Q.  Alright.  Who knows, right?  We've never looked

11  at the attachment, have we?

12      A.  Well, here's -- here's what I can tell this is.

13      Q.  Uh-huh.

14      A.  This subject matter has to do with the clips,

15  with earlier clips that must have been attached for the

16  names of the clips.  The attachment here, the way the

17  email system works is that you -- if you, like, reply to

18  an email, it will keep the same subject, but you can

19  reply with another attachment or an entirely other

20  conversation and it will still keep that subject if you

21  don't start a new email thread.  So if you just reply to

22  a subject of an email as a thread, even if your

23  attachments have nothing to do with the subject matter,

24  that's -- that's a possibility here.

25      Q.  The subject will say re, R-E, with a colon

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        112

1  after it, right, if it's a reply?  Right?

2      A.  Sometimes.

3      Q.  Okay.  So would it be your contention that,

4  look, despite there being the word crisis actor in the

5  scene, that's not, like, something InfoWars' employees

6  would joke about with each other, right?

7      A.  No.

8      Q.  That would be extremely inappropriate to make

9  jokes about Sandy Hook crisis actors, like, laugh it up

10  about that?

11          MR. REEVES:  Objection; form.

12      Q.  (By Mr. Bankston)  That would be inappropriate,

13  right?

14      A.  In what context?

15      Q.  For your employees -- let's say -- you have

16  managerial responsibilities, right?

17      A.  Yes.

18      Q.  Let's say you found out that two of your

19  subordinate employees were trading emails back and forth

20  joking about sacrificing Sandy Hook crisis actors, would

21  you find that inappropriate?

22          MR. REEVES:  Objection; form.

23    Q.  (By Mr. Bankston)  Or are you okay with that?

24        MR. REEVES:  Objection; form.

25    A.  It's a hypothetical situation.  It would have

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        113

1  to be -- I would have to be there, look at the

2  conversation, look at the circumstances.  I can't just,

3  like, give you a blanket statement.

4    Q.  (By Mr. Bankston)  Right.  So if I was -- if I

5  was one of your subordinates and I came to you and I

6  said, hey, look, Ms. Karpova, I don't want to be a

7  tattletale, but I overheard some employees and they were

8  making jokes about sacrificing Sandy Hook crisis actors

9  and I think that's messed up and can you do something

10  about that, or would you say, I'm sorry, I don't have

11  enough information or would you do something?

12        MR. REEVES:  Objection; form.

13    A.  I would probably do something if that was

14  brought to my attention in this direct kind of way.

15    Q.  (By Mr. Bankston)  Okay.  Would it make a

16  difference whether that person was related to

17  Alex Jones?

18    A.  No.

19    Q.  Okay.  Can you go to paragraph 36 of Exhibit 1?

20  I'm sorry.  Excuse me.  I keep doing that.  Can you go

21  to paragraph 36 of Exhibit 2?

22    A.  (Witness complies.)

23    Q.  Okay.  You see here this talks about a March 4,

24  2015 video entitled "New Bombshell Sandy Hook

25  Information Inbound"?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          114

1     A.  Yes.

2     Q.  What was the bombshell information?

3     A.  The bombshell information was they knew

4  statement -- information Mr. Halbig had brought on that

5  show is what I can infer.

6     Q.  Which is what?  What's the bombshell?

7     A.  I wouldn't know the details of it.

8     Q.  So when you had this video to try to figure out

9  what was the sourcing and the research that went into

10  it, you don't even know what the bombshell information

11  was that is described in the title of the video,

12  correct?

13     A.  Well, any new information would be bombshell.

14  So just because it says bombshell, there -- there might

15  have been a lot of information in that video which

16  there's no way I can remember what was in that video

17  exactly.

18     Q.  Well, I mean, it's not a matter of you not

19  remembering.  You never watched it, right?

20     A.  Not recently.

21     Q.  Right.  And so -- and you didn't do anything to

22  try to get prepared on it for this deposition, right?

23          MR. REEVES:  Objection; form.

24     A.  No.

25     Q.  (By Mr. Bankston)  You haven't read any

1  documents about this video.

2      A.  No.

3      Q.  And you haven't talked to any employees about

4  this video.

5      A.  No.

6      Q.  Have you tried to talk to Mr. Halbig about this

7  video?

8      A.  No.

9      Q.  Okay.  Will you go to paragraph 38?

10      A.  (Witness complies.)

11      Q.  Do you see where it says a July 7, 2015 video

12  entitled "Government is Manufacturing Crises"?

13      A.  Yes.

14      Q.  Okay.  Do you see where there's a quote there

15  that says if they did kill kids, they knew it was

16  coming, stocked the school with kids, killed them and

17  then had the media there and that probably didn't even

18  happen.  Do you see that quote?

19      A.  Yes.

20      Q.  What does stocked the school with kids mean?

21  Do you know what that means?

22      A.  Well, just judging on common sense here from

23  the sentence, that would probably mean the kids were in

24  the school.  They were put in the school.

25      Q.  By who?  Do you know?

1    A.  Whoever was involved in the operation.

2    Q.  What do you mean by operation?  What is that?

3    A.  Well, Mr. Jones is talking about Sandy Hook was

4  staged.  So the staged operation would make sense.  The

5  staged operation of Sandy Hook, that's what I mean.

6    Q.  So the idea here is there was -- there was a

7  school and it was empty, it didn't have students going

8  to it, and then it was -- some nefarious actors arranged

9  for children to be put into the school for the purposes

10  of killing them?  Am I understanding this correct?

11    A.  From -- from what I can tell here, it is either

12  they were -- the kids were put in an empty school or the

13  school was filled with more kids than there normally are

14  in school.

15    Q.  And you don't know which one, right?

16    A.  No.  Again, this looks like Alex Jones'

17  opinion, commentary.

18    Q.  And you don't know what it was based on, right?

19    A.  (No response.)

20    Q.  Right.

21    A.  Not in details.  But most likely based on all

22  the information that he had acquired and reviewed at

23  that point.  That was his honest opinion.

24    Q.  Again, you're guessing, aren't you?  There

25  could have been, before he made this statement, a very

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      117

1  specific video he's referring to or a very specific

2  piece of evidence.  And you don't know that, do you?

3      A.  The company doesn't have a record of that

4  because we don't keep such records.

5      Q.  Wait a second.

6          The company has the video, doesn't it?

7      A.  (No response.)

8      Q.  Right?

9      A.  Yes.

10     Q.  So you could have watched the video and

11  determined if he was referring to something specific,

12  couldn't you?

13     A.  Well, you -- this quote from Alex to me sounds

14  like an opinion.

15     Q.  But again, that's your guess, right?

16     A.  Yes.

17     Q.  Okay.  If there was an employee who had

18  researched some material who had brought it to Mr. Jones

19  for this video, you wouldn't know that, would you?  You

20  would have no ability to tell me that.

21     A.  Based on my educated guess, this wouldn't be

22  the case in a statement like this.

23     Q.  Again, you're just guessing, right.  There is

24  no -- it is possible, right, that -- that somebody could

25  have brought Alex Jones some material that caused him to

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      118


1  say this thing, right?  That's possible.

2      A.  Very unlikely in this particular video.

3    Q.  Right.

4         But I'm -- I'm asking you to testify what you

5    know is true.  And you don't know, do you?

6    A.  I'm testifying to what is -- I -- I think I

7    know to the best of my ability in good faith.

8    Q.  Well, right.  I know you're guessing because

9    you want to give me an answer, and I appreciate you

10   trying to give me an answer.  But I want to make clear

11   that you had information you could have looked at and

12   you did not look at, correct?  Some of the -- some of

13   the gaps -- in other words, the video, you could have

14   looked at the video and you did not, right?

15   A.  There were a lot of videos, and there's no way

16   I could remember all these details --

17   Q.  And -- okay.  Let's --

18   A.  -- about the videos.

19   Q.  Let's put it this way.  When the company knew

20   that it had to produce testimony about these videos in

21   the plaintiffs' petition, the company did not feel it

22   was worthwhile to have employees review, watch, catalog

23   and figure out what was said and make that available to

24   you, correct?

25   A.  The company believes that I have sufficient

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       119


1    knowledge to testify regarding these matters.

2    Q.  Okay.

3         MR. REEVES:  Let's go ahead and take a

4    break.

5         MR. BANKSTON:  Okay.

6         THE VIDEOGRAPHER:  The time is 1:38 p.m.

7  We are off.

8         (Recess from 1:38 p.m. to 2:56 p.m.)

9         THE VIDEOGRAPHER:  The time is 2:56 p.m.

10  We are on.

11     Q.  (By Mr. Bankston)  Alright.  Can you pull out

12  Exhibit 2 for me again.  And let's go to paragraph 39.

13     A.  (Witness complies.)

14     Q.  Do you see this is talking about a July 7, 2015

15  video entitled "Retired FBI Agent Investigates

16  Sandy Hook Mega Massive Coverup"?

17     A.  Yes.

18     Q.  Okay.  That retired FBI agent, that's Rob Dew's

19  uncle?

20     A.  Yes.

21     Q.  Do you see in this claim where it says the

22  ambulances came an hour and a half later, that that was

23  claimed in the video?  Do you see where it says that?

24  It's the second sentence.  Do you see that sentence?

25     A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        120


1      Q.  Okay.  What was your source on that?

2      A.  Previous discussions with Halbig and with

3  Pieczenik.

4      Q.  Are you guessing on that, or do you know that

5  for a fact?

6    A.  I don't know for a fact.

7    Q.  Right.

8         You were guessing, because that actually came

9   from Mr. Fetzer.  That's in his book, "Nobody Died at

10  Sandy Hook."  So can I just admonish you one more time?

11  Can we please not guess during this deposition?  It's

12  okay to say I don't know.

13   A.  Okay.

14   Q.  You can say the company knows, here's the

15  answer, the company doesn't know or I don't know if the

16  company doesn't know or doesn't know.  But your guesses

17  are not what we need today.  Okay?

18   A.  Yes.

19   Q.  Okay.  Do you see where it says DHS an hour and

20  a half later with a time stamp put up signs saying sign

21  in here?

22   A.  Yes.

23   Q.  Do you know where that came from?

24   A.  No.

25   Q.  Okay.  They had a statement that said they had

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       121


1  Porta Potties being delivered within an hour and a half.

2  Do you see where it says that?  It's also in that first

3  paragraph.

4    A.  Yes.

5    Q.  Do you know where that came from?

6    A.  No.

7    Q.  In the third paragraph, the first sentence, do

8  you see where it says we have the emails from the city

9  council back and forth and the school talking about it

10  being shut down a year before?  Do you see that?

11     A.  Yes.

12     Q.  Do you know if those emails actually exist?

13  Let me rephrase that.

14        Do you know if the company -- does that company

15  know if those emails actually exist?

16     A.  No, it doesn't.

17     Q.  Do you know what the company source for saying

18  that was?

19     A.  No.

20     Q.  Okay.  Can you move on to paragraph 44 for me?

21  Do you see it talks about a November 26th video,

22  November '18, the 26th, entitled "Final Statement on

23  Sandy Hook," right?

24     A.  Yes.

25     Q.  Do you know the claims that were made during

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       122


1  that video?

2     A.  I'm familiar with the video.

3     Q.  Okay.  In that video -- do you know about the

4  claim made in that video, that the Sandy Hook Elementary

5  School website had no internet traffic for 3 to 4 years

6  before the incident?

7     A.  Yes.

8     Q.  Okay.  Do you know where that came from?

9      A.  Yes.

10     Q.  Where did that come from?

11     A.  The Wayback Machine archive for the website for

12  the school.

13     Q.  Okay.  And where did Mr. Jones get that?

14     A.  The Wayback Machine.

15     Q.  Do you know if he got that from Mr. Fetzer?

16     A.  I don't know.

17     Q.  Do you know if that's in Mr. Fetzer's book?

18     A.  No.

19     Q.  Okay.  Can you go to paragraph 54 for me?

20     A.  (Witness complies.)

21     Q.  Do you see there it's talking about an

22  April 22, 2017 video called "Sandy Hook Vampires

23  Exposed"?

24     A.  Yes.

25     Q.  Do you understand that that is the video that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      123


1  Mr. Pozner and Ms. De La Rosa based their defamation

2  claim on?  Did you know that?

3      A.  Okay.

4      Q.  Did you know that?  When preparing for this

5  depo did you know that?

6      A.  Yes.

7      Q.  Okay.  Did you watch that video?  I mean,

8  unless you've watched it in the last couple of hours,

9  you haven't watched it, right, for this deposition?

10     A.  I'm familiar with the video.

11     Q.  Did you watch it in preparing for this

12  deposition, though?

13     A.  Yes, I believe so.

14     Q.  Okay.  When did you watch it?

15     A.  Earlier today.

16     Q.  Earlier today when?

17     A.  During the break.

18     Q.  Oh.  So during the break when it became

19  apparent that you hadn't watched these videos, you went

20  and tried to watch this video?

21     A.  Yes.

22     Q.  You didn't watch the whole thing, though, did

23  you?

24     A.  No.

25     Q.  Because it's a 45-minute video, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       124


1     A.  It's a lengthy video.

2     Q.  Yeah.

3        So you didn't watch this video.

4           MR. REEVES:  Objection; form.

5     Q.  (By Mr. Bankston)  You watched pieces of this

6  video, correct?

7     A.  Correct.

8     Q.  How many pieces did you watch?  How

9  many minutes total did you watch of this video?

10     A.  I did not count.

11     Q.  So you have no idea, sitting here today, how

12  long ago it was, when it was just a couple of minutes

13  ago?

14      A.  I did not count the amount of minutes I

15  watched.

16      Q.  Okay.  Was it more than 5 minutes?

17      A.  I'm not sure.

18      Q.  Okay.  So you just watched the video within the

19  last 20 minutes; and you're not sure if you watched more

20  than 5 minutes of it, correct?

21          MR. REEVES:  Objection; form.

22      Q.  (By Mr. Bankston)  Is that correct?

23      A.  I didn't time the amount of minutes I watched.

24      Q.  So that is -- I'm not asking you the exact time

25  or if you timed it.  I'm saying do you know if you

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       125

1  watched more or less than 5 minutes.

2      A.  I believe more.

3      Q.  Okay.  Do you think you watched more than

4  10 minutes?

5      A.  I'm not sure.

6      Q.  Okay.  You understand that that video -- did

7  you watch the part in that video where they talked about

8  the police finding people in the back woods dressed up

9  in SWAT gear?

10      A.  I recall seeing that.

11      Q.  20 -- just a few minutes ago?

12      A.  Yes.

13      Q.  Okay.  And do you know where the company got

14  that claim?

15      A.  As far as the company's under -- understanding,

16  it's based on the previous videos that were watched by

17  Alex and statements that were made by Halbig.

18      Q.  So that's talking about -- you're talking about

19  the prior videos we've been talking about today in this

20  petition?

21      A.  Correct.

22      Q.  The ones you don't know the sources for,

23  correct?

24      A.  Correct.

25      Q.  Okay.  You understand that in that video

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      126


1  Mr. Jones claims the school had been closed for years?

2  Did you watch that part?

3      A.  Yes.

4      Q.  Okay.  Where did he get that information?

5      A.  Mr. Halbig.

6      Q.  Okay.  Can you go to paragraph 55 for me?

7      A.  (Witness complies.)

8      Q.  Do you see it talks about a June 13, 2017 video

9  entitled "Media Refuses to Report Alex Jones' Real

10  Statements on Sandy Hook"?

11      A.  Yes.

12      Q.  Is that another one you were just shown during

13  the break?

14      A.  Yes.

15    Q.  Okay.  Is it fair to say that what happened is

16  that every video past this in the petition, that you

17  went and tried to watch a little piece of it before you

18  came back into this room?

19         MR. REEVES:  Objection; form.

20    A.  This video I watched in its entirety.

21    Q.  (By Mr. Bankston)  Okay.  So when did you watch

22  that?

23    A.  During the break.

24    Q.  Okay.  Do you remember how long that video is?

25    A.  Around 20 minutes or so.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      127


1    Q.  Okay.  So you have a copy of it here in the

2  building.

3    A.  Yes.

4    Q.  Correct?  Okay.

5         (Discussion off the record)

6         (Exhibit 7 introduced)

7    Q.  (By Mr. Bankston)  Alright.  Ms. Karpova, I'm

8  showing you what I've marked as Exhibit 7.  You

9  recognize that now I would assume?

10    A.  Yes.

11    Q.  Okay.  What is this?  What are you looking at

12  right now?

13    A.  This is an excerpt from a Zero Hedge article.

14    Q.  No.  Like, where does this come from, this

15  picture?  Where does it come from?

16    A.  This is a still from the show.

17    Q.  Do you know what show?

18    A.  Not specifically.  It doesn't have the date

19  year.

20    Q.  Okay.  It's the one you just apparently watched

21  a couple of minutes ago.  You don't remember seeing

22  this?

23    A.  Not this part specifically.

24    Q.  Okay.  So you maybe didn't even watch this part

25  of the video.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      128

1    A.  I watched the video.

2    Q.  Okay.

3    A.  I don't remember this specific --

4    Q.  Okay.  A large portion of that video is

5  Mr. Jones going over these questions.  Do you remember

6  that from the video you just watched?

7    A.  Yes.

8    Q.  Okay.  Alright.  So you do remember Mr. Jones

9  talking about these questions.

10    A.  Yes.

11    Q.  Alright.  I want to ask you about a couple of

12  them.

13        When it says why does the Sandy Hook Elementary

14  School website have zero traffic for 4 years, that's not

15  true, correct?  The company admits that's not true.

16        MR. REEVES:  Objection; form.

17    Q.  (By Mr. Bankston)  Correct?

18    A.  This is a statement -- this is a question that

19 Alex had at the time.

20    Q.  Right.

21       And he's making a statement, isn't it?  Isn't

22 he.  Alright.  He's saying that the school had no

23 website traffic for 4 years.

24    A.  Correct.

25    Q.  Right.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      129

1       That's not true, correct?  The company admits

2 that's not true.

3       MR. REEVES:  Objection; form.

4    A.  It was true according to the source that he

5 had.

6    Q.  (By Mr. Bankston)  What do you mean it was true

7 according to the source that he had?  What does that

8 mean?

9    A.  He was referring to the Wayback Machine of the

10 traffic recording from the website.

11    Q.  And that's not true, correct?

12    A.  What's not true?

13    Q.  The website -- the school website did not have

14 zero traffic for 4 years, that's not true.  The company

15 admits that's not true, correct?

16    A.  Again, the -- Alex Jones is asking the question

17 based on the source he was showing in the video of the

18 Wayback Machine that lists the traffic being zero for

19 4 years.

20    Q.  Okay.  First of all, his source -- then let's

21  just go at it this way.  His source was wrong, correct?

22  The company admits that.  Mr. Halbig is wrong about

23  that.

24        MR. REEVES:  Objection; form.

25    Q.  (By Mr. Bankston)  Correct?

         UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        130


1        MR. BANKSTON:  Brad, I might --

2    A.  The company admits that Alex Jones believed

3  that there was zero traffic for 4 years, which was a

4  source at the time.

5    Q.  (By Mr. Bankston)  You understand that's not my

6  question, right?  I just want to make sure.  Do you

7  understand the question?

8    A.  Repeat the question again, please.

9    Q.  Sure.

10        Mr. Jones' source, Mr. Halbig, was wrong about

11  there being zero traffic for 4 years to the school

12  website, correct?

13        MR. REEVES:  Objection; form.

14    A.  Yes.

15    Q.  (By Mr. Bankston)  Do you see down in the

16  second to the last bullet point it says why didn't they

17  let paramedics and EMTs into the building after

18  27 children were declared dead in 8 minutes?  Do you see

19  that?

20    A.  Yes.

21    Q.  Literally nothing about that statement is true,

22  correct?

23          MR. REEVES:  Objection; form.

24    A.  That was Alex's understanding at the time based

25  on the claim made by Halbig.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       131


1    Q.  (By Mr. Bankston)  Okay.  And you're positive,

2  you're testifying under oath that Mr. Halbig made this

3  claim and not somebody else?  You know that for a fact?

4    A.  Yes.

5    Q.  Okay.  Mr. Fetzer didn't say that?  That's not

6  a Mr. Fetzer claim?

7    A.  Mr. Fetzer could have said that, but there was

8  also statements made by Halbig.

9    Q.  Okay.  It's true -- the company admits it's

10  true that Mr. Jones under -- you've heard it's

11  Mr. Jones' understanding of what his source said.  You

12  now admit -- the company now admits it's not true,

13  correct?  Paramedics were in that building, right?

14    A.  Correct.

15    Q.  Okay.  It's also true that 27 children didn't

16  die, correct?

17    A.  Correct.

18    Q.  Okay.  And they weren't declared dead in

19  8 minutes, were they?  That's not correct.  The company

20  admits that?

21    A.  Correct.

22    Q.  Okay.

23          (Discussion off the record)

24     Q.  (By Mr. Bankston)  Can you go to paragraph 61

25  for me?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          132


1     A.  Let me add to the previous statement.

2         These questions here are questions, they're not

3  statements.

4     Q.  Alright.  So let me ask you this, Ms. Karpova.

5     A.  Right.

6     Q.  If I say you beat your newborn baby, why --

7  that's a statement, right?  And that would be, like, a

8  false statement, right?

9     A.  Right.

10     Q.  If I say to you, Ms. Karpova, why do you beat

11  your newborn baby, have I made a statement?

12     A.  Well, you're asking -- well, I mean, it could

13  be -- in this case, yes.

14     Q.  Right.

15        So when Mr. Jones asks why were no paramedics

16  allowed in the building, he's saying no paramedics were

17  allowed in the building, correct?

18     A.  Correct.  And he's basing that on reports that

19  he's read and seen.

20     Q.  Right, that are wrong.  The company now admits

21  are wrong, right?

22     A.  Correct.

23     Q.  Okay.  You can go to paragraph 61 for me now.

24     A.  (Witness complies.)

25     Q.  This talks about an October 26, 2017 video

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       133

1  called "JFK Assassination Documents to Drop Tonight."

2  Is that another one that you just looked at at the

3  break?

4      A.  Yes.

5      Q.  Okay.  How much of that one did you watch?

6      A.  That's a long video.  I watched parts of it.

7      Q.  You understand that that doesn't help me,

8  right?  That that's not helping me understand what

9  you've watched.  You understand that?

10     A.  I understand that.

11     Q.  Okay.  So when I'm asking you the question,

12  this is a -- it's an hour long video, isn't it?  It

13  might be a full 4-hour episode.  Do you know?

14     A.  I don't know the exact timestamp on that, but I

15  know it's a long video.

16     Q.  How did you decide what part of it to watch?

17     A.  I skimmed through it.

18     Q.  So you just randomly picked some places to

19  watch?

20     A.  No, not randomly.

21     Q.  How would you know to -- what parts to got to?

22  How would they not be random?  Do you have a document

23  that tells you what's in the video?

24     A.  I just know based on the time segments where --

25  where to go in the play head.

1    Q.  Okay.  Alright.

2        Do you see the part about the CIA visiting

3   Lanza for recruiting?  Not on the petition.  In the

4   video you watched.

5    A.  No.

6    Q.  It's in the petition.  I'm asking if you saw it

7   in the video.

8    A.  Yes.

9    Q.  You did see that part?

10   A.  Yes.

11   Q.  What was the company source for that?

12   A.  Again, that was based on previously sourced

13  information Alex -- from his guests, as well as other

14  reports.

15   Q.  Ms. Karpova, no, it was not.  And I -- please,

16  can you stop guessing?  Because I need you to understand

17  if you watched that video, you understand that this

18  video was done because a new set of documents was

19  declassified by the FBI on that date and Lee Ann McAdoo

20  did a report on InfoWars talking about those documents.

21  It didn't come from Mr. Halbig.  The testimony you gave

22  is just not correct, is it?

23        MR. REEVES:  Objection; form.  She didn't

24  say anything about Mr. Halbig.

25   Q.  (By Mr. Bankston)  Alright.  Let me adjust to

1  your objection.

2      This didn't come from prior videos, did it,

3  Ms. Karpova?  Or do you know?

4      A.  The company believe it did come from previously

5  sourced material.

6      Q.  Okay.  So when I talk about Lee Ann McAdoo

7  doing this report on the documents that were

8  declassified on that day, on October 26, 2017, do you

9  have any idea what I'm talking about?  Is that new

10  information to you, or do you know what I'm talking

11  about?

12      A.  I -- I have some information about it.

13      Q.  And you understand that from Ms. McAdoo's

14  article, the allegation was made that the CIA tried to

15  recruit Lanza.  Did you know that?

16      A.  I cannot tell for sure.

17      Q.  You cannot tell for sure if you knew, is that

18  what you're telling me?  I mean, you either knew or you

19  didn't, right, Ms. Karpova?  This thing I just told you

20  about Lee Ann McAdoo, did you know it before I told it

21  to you?

22      A.  The specific part about inferring

23  the -- that -- those documents that were dropped that

24  she was talking about, I do not recall the specific part

25  about that CIA visits Adam Lanza and recruited him based

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      136

1  on those documents.

2      Q. How long -- okay.  So you were watching this

3  video, right, in the break?

4      A. Uh-huh.

5      Q. How long was Mr. Jones talking about Sandy Hook

6  in that video?  How much total footage do you think you

7  watched about Sandy Hook in that video?

8      A. I'm not sure.

9      Q. Would you say it's less than 2 minutes?

10      A. No.

11      Q.  You think that Mr. Jones talked about

12  Sandy Hook for more than 2 minutes in that video.

13      A. I'm not sure exactly how long.

14      Q. Okay.  Do you understand it was -- I'm just

15  going to represent to you it was an extremely brief

16  conversation mentioning Ms. McAdoo's article.  And do

17  you remember Mr. Jones saying, well, you know sometimes

18  I don't even see what's out there on infowars.com, I

19  didn't check and somebody had to tell me about this

20  article and it was a total surprise to me.  Do you

21  remember him saying that?

22      A. Yes.

23      Q. Okay.  So we can agree that the source for this

24  video is the article that he's talking about that he

25  just looked at, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       137

1      A. I'm sure that article was a source for him

2  given some of the statements that he made.

3      Q.  Well, I'm asking you about the statement that

4  the CIA recruited Lanza which you said came from prior

5  videos.  But that's not true, because that piece of

6  information was in that released report that day,

7  correct?  Or do you know?

8      A.  I do not know.

9      Q.  Okay.

10            (Discussion off the record)

11            (Exhibit 8 introduced)

12      Q.  (By Mr. Bankston)  I hand you what I've marked

13  as Exhibit 8.  You're going to see that this is a

14  document marked FSSTX-075755.

15      A.  Yes.

16      Q.  This is a November 26, 2013 email.  Do you see

17  that?

18      A.  Yes.

19      Q.  Do you know who changeshorses@aol.com is?

20      A.  I do not.

21      Q.  Okay.  Robd is Rob Dew, right?

22      A.  Yes.

23      Q.  Kurt, who's that?

24      A.  Kurt Nimmo.

25      Q.  Okay.  And what's his position at this time?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      138

1      A.  He was a writer.

2      Q.  Okay.  Do you see where it has a link here?

3  The subject says check out Sandy Hook final report?

4      A.  Yes.

5    Q.  And then there's an underlined hyperlink that

6  says "Sandy Hook Final Report" in the body of the email?

7    A.  Yes.

8    Q.  So the company will admit that it has been

9  provided information of the final report as early as

10  2013, correct?

11    A.  Yes.  So the -- the final report provided

12  from -- from the State of Connecticut, correct.

13    Q.  From the Connecticut State Police, correct?  Do

14  you know that that's who issued it?

15    A.  Yes.

16    Q.  Okay.

17        (Discussion off the record)

18        (Exhibit 9 introduced)

19    Q.  (By Mr. Bankston)  I'm putting this email in

20  front of you now that I've marked as Exhibit 9.  Do you

21  see that?

22    A.  Yes.

23    Q.  Okay.  It is marked FFSTX-075999.  Is that

24  correct?

25    A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        139


1    Q.  Okay.  And from what you can see here, this is

2  another communication with Rob, Kurt and this

3  changeshorses@aol.com person, correct?

4    A.  Yes.

5    Q.  Okay.  And -- and here what is being provided,

6  what Rob is attempting to get is a copy of the

7  Sandy Hook 911 tapes, correct?

8     A.  May I have a second?

9     Q.  Yeah, go ahead and read the email.

10    A.  Okay.

11    Q.  Okay.  So this is an email in which Rob Dew is

12  attempting to get the 911 tapes?

13    A.  Yes.

14    Q.  Okay.  And that was on December 5, 2013?

15    A.  December 4th you mean, it says here?

16    Q.  Okay.  I think there's another, like -- let's

17  see.

18        (Discussion off the record)

19    Q.  (By Mr. Bankston)  Yeah, the email from the

20  changeshorses person is from the 4th and then the email

21  from Mr. Dew is from the 5th, correct?

22    A.  Correct.

23        (Exhibit 10 introduced)

24    Q.  (By Mr. Bankston)  Okay.  Ms. Karpova, I've

25  given you an email which I've marked as Exhibit 10

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        140


1  labeled at the bottom FSSTX-012708.  Is that correct?

2     A.  Correct.

3     Q.  You'll be looking here -- before we get into

4  this email real quick, you would agree with me that the

5  InfoWars website occasionally requires moderation.  Do

6  you understand what I mean by that?

7     A.  Yes.

8     Q.  Okay.  Occasionally in the company's editorial

9  discussions about Sandy Hook, the company would have to

10  decide whether certain material was appropriate to leave

11  on the InfoWars website or take it off the website,

12  correct?

13          MR. REEVES:  Objection; form.

14      A.  The website gets moderated for spam as far as I

15  know in the comments.

16      Q.  (By Mr. Bankston)  Okay.  Well, let's take a

17  look at this email because it's not about spam.  Okay?

18          This email -- the original message is from Matt

19  at InfoWars.  Who is Matt W?

20      A.  Matt Weber (phonetic).

21      Q.  Okay.  What was his job title in 2014?

22      A.  Assistant producer.

23      Q.  What about Louis S, who's that and what's his

24  job title?

25      A.  Writer.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        141


1     Q.  Okay.  So Matt writes to Louis and says:  Hello

2  Louis.  Can you do me a favor?  Just got a phone call

3  from my friend Johnny Walker.  Some people are posting

4  some bullshit about how he was involved in the

5  Sandy Hook shooting last year, including some personal

6  stuff about John.  They did the thing about a year ago.

7  Apparently there are more than one Johnny Walker in the

8  world.  Last time it involved going through his Facebook

9   page and pointing out friends with Jewish names and

10  things like that.  John is a character who was not even

11  in the Sandy Hook time zone.  If you see it, could you

12  take care of it for him?  Thanks, Matt W.

13        That's what the email says?

14  A.  Yes.

15  Q.  Okay.  The reply from Louis says:  The site has

16  been acting weird and not letting me search.  If you can

17  give me an article or user name involved, let me know.

18  Otherwise if I see it, I will get on it, with a winky

19  smiley face, correct?

20  A.  Yes.

21  Q.  This email was sent on May 15th -- the two

22  emails are May 14th to May 15th of 2014, correct?

23  A.  Yes.

24  Q.  Okay.  So the company can admit that a friend

25  of an InfoWars employee named Mr. Walker got tied to a

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        142


1   Sandy Hook allegation according to Matt, correct?

2   A.  Correct.

3   Q.  Okay.  And so Matt and Louis were okay with

4   deleting the stuff about Mr. Walker, correct?

5   A.  As a comment being posted that misidentifies a

6   person, yes.

7   Q.  Right.

8        But since my clients weren't friends with

9   anybody at InfoWars, they couldn't get similar comments

10  removed from the InfoWars forums, could they?

11          MR. REEVES:  Objection; form.

12     A.  What you're referring to is a public case.

13  This is a private person who gets misassociated with the

14  event.  Sandy Hook was a public story.

15     Q.  (By Mr. Bankston)  So you think all the parents

16  are fair game?

17          MR. REEVES:  Objection; form.

18     A.  People asking questions, having discussions,

19  that's what's called free speech in a public case.

20     Q.  (By Mr. Bankston)  You think telling lies about

21  people and saying they're a crisis actor and their kid

22  didn't exist, is that free speech?

23          MR. REEVES:  Objection; form.

24     Q.  (By Mr. Bankston)  If it's false, is that free

25  speech in InfoWars eyes'?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     143


1     A.  If it's something that is knowingly false, we

2  don't -- we don't allow that.  We do, to the best of our

3  ability, allow truthful comments only.

4     Q.  (By Mr. Bankston)  Mr. Pozner asked y'all to

5  stop posting these kind of comments, didn't he?

6          MR. REEVES:  Objection; form.

7     A.  Say that again, please.

8     Q.  (By Mr. Bankston)  Mr. Pozner asked InfoWars to

9  stop posting comments like this on its website about

10  him, right?

11     A.  Are you referring to a specific document

12  Mr. Pozner --

13      Q.  I've got a few in mind, but I was wondering

14  what you knew about if the InfoWars -- one of your --

15  one of your topics is the knowledge of the plaintiffs,

16  right?

17      A.  Correct.  But you've asked me to comment on a

18  specific post regarding Mr. Pozner that he asked to be

19  removed?

20      Q.  No.  I'm asking you in general.  Like, not for

21  anything specific.

22          Do you know sitting here today if Mr. Pozner

23  has asked the company to remove content about him from

24  the InfoWars' website?

25      A.  Yes.  And as far as I know, that's been done.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        144


1      Q.  Wait.  When -- when Mr. Pozner complained, you

2  think InfoWars did something about it?

3      A.  Well, are you referring -- which date are you

4  referring to?

5      Q.  I'm asking any time.

6          What are you referring to?

7      A.  I don't have a record -- I don't have a record

8  of that information.

9      Q.  Well, what were you referring to when you said,

10  yes, we did take care of it?  What are you talking

11  about?

12      A.  I was referring to the previous comment that I

13  made regarding Alex Jones requesting that the on air

14  personalities not make comments regarding Sandy Hook.

15      Q.  Okay.  So from your point of view is what

16  you're telling me is that at some point Mr. Jones put a

17  ban on Sandy Hook materials on air and you believe that

18  was in response to Mr. Pozner asking him to do that?

19      A.  In part.

20      Q.  Okay.  Why do you think that -- what -- what

21  information do you have that made you think that, or are

22  you speculating right now?

23      A.  It was the company's understanding -- it was

24  the company's understanding that there were questions

25  and controversies involved in the case and Mr. Pozner

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        145


1  was unhappy with the coverage.  Alex Jones made the

2  decision to not continue with the coverage.

3      Q.  So his YouTube channel wouldn't get deleted,

4  right?  That's why he did it, right?

5          MR. REEVES:  Objection; form.

6      A.  No.  We had no idea that the channel would be

7  deleted.  That came as a surprise.

8      Q.  (By Mr. Bankston)  You -- you know Mr. Jones

9  did a video in February 15, 2015 about Mr. Pozner.  You

10  know that, right?

11      A.  I don't have the video in front of me.

12      Q.  But, I mean, you know that happened.  You know

13  Mr. Jones went on air, complained about the honor

14  network and the complaints that they made to YouTube,

15 said that they were an anti-free speech system -- an

16 anti-free speech organization --

17    A.  Correct.

18    Q.  -- put Mr. Pozner's address on the air with a

19 map.  You know that happened, right?

20    A.  I don't recall that specific part.

21    Q.  You don't know that part of this lawsuit?

22    A.  You're asking me about the video.

23    Q.  That's what I'm asking you.

24       You understand InfoWars took Mr. Pozner's

25 address and put it on air to its viewers.  You know

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        146


1 that, right?

2        MR. REEVES:  Objection; form.

3    Q.  (By Mr. Bankston)  Or do you not know that?

4    A.  I do not have the record of it right now.

5    Q.  Okay.

6        (Discussion off the record)

7    Q.  (By Mr. Bankston)  You know who Dan Bidondi is,

8 right?

9    A.  Yes.

10    Q.  Okay.  He was a reporter working for InfoWars

11 who was sent to Connecticut multiple times, right?

12    A.  In some capacity.

13    Q.  What capacity?  What do you mean?  What does

14 that mean?

15    A.  A reporter.

16    Q.  He went there as a reporter, right?

17          There's no reason to qualify that.  InfoWars

18   sent him there as a reporter to cover Sandy Hook, right?

19       A.  I don't have a record right now as of S2 how

20   much of his work was done on his own volition as opposed

21   to InfoWars giving him the directions to do that.  I

22   think it was a combination of that.

23       Q.  Weren't you personally involved, right after

24   getting sued, of trying to get all the documents

25   together about Mr. Bidondi, when his invoices were, when

          UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          147


1   he was fired?  Wasn't that you?

2       A.  No.

3       Q.  Okay.  If somebody was to represent that was

4   you, they would not be -- be inaccurate?

5       A.  I'm sorry?

6       Q.  If someone was to represent that you were the

7   person who went and got all Halbig's -- excuse me.

8          If someone was to represent that you were the

9   person who went and gathered up all of Mr. Bidondi's

10   invoices, tried to figure out why he got fired after

11   being sued in 2018, if somebody was to say you were the

12   person who did that, they wouldn't be accurate, they'd

13   be mistaken.

14          MR. REEVES:  Objection; form.

15       A.  Yes.

16       Q.  (By Mr. Bankston)  In editorial discussions

17   about Sandy Hook, how did InfoWars feel about

18  Dan Bidondi's reporting in Newtown?

19      A.  The company doesn't have records of that.

20      Q.  So you didn't go pull any documents.  I

21  understand that.  Right?

22          So is your answer for me I can't tell you, I

23  don't know, I don't know how the company felt about it?

24  Is that your answer?

25      A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       148


1       Q.  Okay.  There were people who were working with

2   Dan Bidondi at that time, correct?

3       A.  (No response.)

4       Q.  I mean -- let's make this easy.  There were

5   people inside of InfoWars who communicated with Dan

6   Bidondi about his assignments, right?

7       A.  Yes.

8       Q.  Okay.  They knew what he was doing in

9   Sandy Hook, right?

10      A.  To some degree, yes.

11      Q.  Okay.  There were people who watched his

12  reports.

13      A.  Yes.

14      Q.  Somebody watched it before you put it on the

15  air, right?

16      A.  Yes.

17      Q.  Okay.  So there are people currently employed

18  by InfoWars who probably have a pretty good

19  understanding of how the company in its editorial

20  discussions felt about Dan Bidondi's reporting.  You'd

21  agree with me about that?

22          MR. REEVES:  Objection; form.

23      A.  I would have to see specific conversations, if

24  there's a record of conversations.

25      Q.  (By Mr. Bankston)  Well, look.  You know that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        149


1  Rob Dew was in touch with Dan Bidondi and sent him down

2  to Connecticut.  You know that, right?

3      A.  I know Rob Dew has had conversations with Mr.

4  Bidondi.

5      Q.  And he didn't give you any information about

6  Mr.  Bidondi before this deposition, did he?

7      A.  He did not.

8      Q.  Okay.  You know Mr. Jones has seen Dan

9  Bidondi's videos from -- from his reporting, right?  He

10  aired them during the episodes he was hosting, right?

11      A.  Yes.

12      Q.  Okay.  Mr. Jones might have some feelings about

13  what Mr. Bidondi did, right?

14      A.  He might.

15      Q.  Yeah.

16          But I -- you aren't going to be able to tell me

17  any of those, are you?

18      A.  I wasn't asked to provide that information.

19      Q.  Okay.  Mr. Bidondi is a person who has

20  definitely come up in editorial discussions about

21  Sandy Hook, correct?

22          MR. REEVES:  Objection; form.

23      A.  Define editorial discussions.  They're -- as

24  far as we -- our understanding from the previous

25  definition of that word, of that concept, no.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        150


1      Q.  (By Mr. Bankston)  Well, I'm -- I'm assuming

2  that you know what editorial discussions mean.  Because

3  nobody asked me if -- that they thought they didn't

4  understand what that meant.

5          And are you telling me right now you're not

6  sure what editorial discussions means?

7      A.  No.  We've already gone through this, and I

8  answered you what an editorial discussion was.

9      Q.  Right.

10          And So we know that when editors and producers

11  were talking about Sandy Hook, they were making

12  decisions about things like whether to send Dan Bidondi

13  there, right?  That's a decision they made, correct?

14      A.  It -- a decision could have been made by one

15  person upon which that was the sole responsibility to

16  make that decision.

17      Q.  We don't know, do we?  We have no idea in that

18  editorial discussion about Dan Bidondi and his coverage.

19  We don't know, do we?

20      A.  That's why I'm talking -- I'm telling you

21  there's no record of it.  If it was a specific person,

22  like you mentioned Rob Dew, that sent him there or there

23  was a combination of people, I -- the company has no

24  record of that.

25      Q.  It has employees who know it, though, doesn't

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      151

1  it?

2      A.  Know what?

3      Q.  Employees who personally dealt with Dan

4  Bidondi.  You're not one of those people, though, right?

5      A.  No.

6      Q.  Okay.  But there are people who personally

7  dealt with Dan Bidondi.

8      A.  Yes.

9      Q.  You didn't talk to them about their editorial

10  discussions about his reporting, did you?

11      A.  No.

12      Q.  Okay.

13          (Discussion off the record)

14          (Exhibit 11 introduced)

15      Q.  (By Mr. Bankston)  I'm going to show you what

16  I've marked as Exhibit 11.  You'll see that this is also

17  a document that was produced without a number at the

18  bottom of the page.  Do you see that?

19      A.  Yes.

20      Q.  Okay.  But what we're looking at here, this

21  appears from the format and even the names involved and

22  everything about it, this appears to be a document that

23  existed in InfoWar's email system that was produced to

24 us in this lawsuit, correct?

25     A. Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     152

1     Q. So what you'll see in the bottom email -- and I

2 want to give you a chance to read it really quick. But

3 this -- when he says hey, Rob, this is Dan Bidondi

4 talking. Hey, Rob, can I do an MOS tomorrow?

5         Before we go into anything else. And MOS, is

6 that man on the street?

7     A. Yes.

8     Q. Okay. And that's a sort of interview where he

9 might just go up and try and talk to random people?

10     A. Yes.

11     Q. Okay. So I want you to just -- because I think

12 you may want to -- just go ahead and read that email

13 real quick. It's not real relevant to what we're going

14 to be talking about. But if you can take a chance to

15 look at it.

16     A. Okay.

17     Q. Okay. So -- and then what we see basically

18 here is some proposed questions that he wants to ask

19 random people on the street, right?

20     A. Yes.

21     Q. And in the follow-up email from Rob Dew, he

22 doesn't want Dan to do that, right?

23     A. Correct.

24     Q. Right.

25         It's going to be old by the time they can air

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    153

1  it, correct?

2    A.  Yes.

3    Q.  Okay.  So he says go to Sandy Hook, we will

4  cover that, correct?

5    A.  Yes.

6    Q.  Okay.  So it was an intentional choice by

7  Mr. Dew to want to get Dan Bidondi to go to Sandy Hook,

8  correct?

9    A.  Yes.  I guess it was in the news.  And the

10  nature of -- on the -- of the beast so to speak on the

11  news, the 24-hour news cycle expires really fast.

12    Q.  How was -- excuse me.  I'm sorry.

13      How was Sandy Hook in the news on 7/7/2015?

14  What had happened that put it in the news?

15    A.  I don't have -- I don't have the record of that

16  right now.

17    Q.  Right.

18      So you don't know that it had anything to

19  do --

20    A.  Sandy Hook has been in the news despite the

21  fact that Alex has not mentioned it in years.  And it

22  keeps being put in the news as if Alex was the one who

23  was the purveyor of the Sandy Hook news, the Sandy Hook

24  and him talking about the parents, yet it's the

25  mainstream media who keeps mentioning the parents and

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    154

1  tormenting the parents with the entire situation.

2      Q.  When you say "purveyor" -- when you say go to

3  Sandy Hook, we will cover that, InfoWars is being the

4  purveyor through almost -- almost 3 years after

5  Sandy Hook is being the purveyor of Sandy Hook coverage,

6  correct?

7      A.  No.

8      Q.  What -- what is that then?  Is he saying that

9  we're going to cover it and not air it?  He intends to

10  put whatever Dan Bidondi does on the air, correct?

11      A.  It depends if the report is good or not.

12      Q.  And then again, in answering this question,

13  you've speculated out of thin air that there was

14  something going on around January 7, 2015 that put this

15  in the news, that made it timely.  But that was pure

16  speculation.  You have no idea what that might be,

17  correct?

18      A.  That's the nature of our news.  That's how we

19  do news.  If there's something in the news, then we'll

20  cover it.

21      Q.  Yeah.  Y'all were going to make news.  Do you

22  understand that?  You were sending Dan Bidondi there to

23  Wolfgang Halbig.  Do you know what they did there?

24      A.  No.

25          (Discussion off the record)

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        155


1          (Exhibit 12 introduced)

2     Q.  (By Mr. Bankston)  Let me show you what I've

3  marked as Exhibit 12.  This is an email you received,

4  correct?

5     A.  Yes.

6     Q.  Okay.  I'm going to go through the email with

7  you really quick.

8          Now, you'll notice at the bottom here we have a

9  Bates number.  It says Heslin 19-4651-000661, correct?

10     A.  Yes.

11     Q.  Now, one of the problems you're going to see in

12  this document is that unfortunately the way your former

13  attorneys decided to produce it it cuts off.  You notice

14  how that line cuts off there at the end?  We can't read

15  what that long line says, right?

16     A.  Right.

17     Q.  Okay.  I'm going to try to do my best, though,

18  okay?

19          And what we have here is that we

20  have -- alright.  What we have here is from

21  truthradio9990@hotmail.com [sic].  And this was

22  something sent to Rob Dew at InfoWars, right?

23     A.  Right.

24     Q.  Okay.  So we have this email here from Dan

25  Bidondi stating someone you may want to get in that

          UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      156


1  documentary on Sandy Hook, and it says forward, Dan.

2  Alex announced that he is going to do a Sandy Hook doc

3  film.  Sheila Matthews, who you met at Hartford at a

4  Halbig hearing, is a friend of mine who lives in the

5  next town.  And I'm going to guess that says over.  And

6  we don't know what it says after that.  Then it says

7  Sheila asked me to provide you with her telephone

8  number.  And it gives a telephone number, right?

9      A.  Right.

10      Q.  Okay.  And then Rob sends it to you.  And this

11  is April 24, 2018, correct?

12      A.  Correct.

13      Q.  And he says if Alex wants to go the Sandy Hook

14  route, he may want to get this lady on, correct?

15      A.  Yes.

16      Q.  Okay.  So this is just shortly after the

17  company was sued, right?

18      A.  Yes.

19      Q.  That's why he wants to make this documentary,

20  right?

21      A.  I'm not sure of the exact reasons for Alex

22  wanting to do a documentary.

23      Q.  What is the Sandy Hook route?  What is that?

24      A.  I'm -- well, the way we do -- since Rob is

25  recommending a guest for the show, that would be Alex's

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        157

1  decision if he wanted to have this guest on or not.

2      Q.  Well, I think you know that the Sandy Hook

3  route is about how he was going to respond to this

4  lawsuit, whether he was going to make this documentary

5  film.  Do you understand that?

6          MR. REEVES:  Objection; form.

7      A.  That's your conjecture.

8      Q.  (By Mr. Bankston)  I'm asking you.  That

9  documentary film that was made in response to this

10  lawsuit, that's what he was planning on doing.

11      A.  I don't have a record of a documentary film on

12  Sandy Hook.

13      Q.  Do you understand that immediately after this

14  lawsuit was filed, that Alex Jones was talking about

15  making a documentary that proved it was all fake?  Did

16  you know that?

17      A.  That's a conjecture too.  We don't know what

18  the documentary film he wanted to do was about.

19      Q.  Well, I'm asking you.  That's what I'm saying.

20  I'm asking you.

21          Wasn't it about Sandy Hook being faked?

22      A.  There were never editorial, quote, discussions

23  about what was going to be in the film.

24      Q.  When -- he sent you a subject line that says

25  Bidondi, Sandy Hook documentary, what did you think that

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       158


1  meant?

2      A.  You were asking me about what was going to be

3  in that Sandy Hook documentary.

4      Q.  Sure.

5      A.  And I answered you that there was no

6  discussions of specific topics of the Sandy Hook

7  documentary.

8      Q.  Right.

9      A.  It could have been about anything that had to

10  do with Sandy Hook, whether Alex was trying to present

11  his case or -- it's just -- again, I don't want to

12  speculate.

13      Q.  I understand.  That's the answer to your last

14  question.

15         My next question is, when Rob Dew sends you an

16  email that says Bidondi, Sandy Hook documentary, what

17  did you think that meant?

18      A.  I don't understand the question.

19      Q.  When you get an email from Rob Dew, it's part

20  of your job duties to understand your employee's

21  communicating with you, correct?

22      A.  Yes.

23      Q.  So when you got this email did you just, like,

24  not pay attention to it, or did you form an opinion

25  about what it's about?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        159


1      A.  No.  I don't think you understand how the

2  production works --

3      Q.  Okay.

4      A.  -- at the company.  So I'm trying to explain to

5  you.

6         This looks as if Rob Dew is suggesting a guest

7  for the show.

8      Q.  But the show is not a documentary, right?  A

9  documentary is something separate from the show.

10      A.  The subject matter is from the previous email,

11  not the email that's -- this is a forwarded email to me

12  with information about the guest that's being discussed

13  in the previous email.

14      Q.  Again, I don't see where there's any talk about

15  a guest.  Can you point me to where there's a guest?

16      A.  Yeah.  Sheila asked me to provide you with her

17  telephone number.

18      Q.  Sure.

19       Is she going to be a guest?  What tells you

20  here she's going to be a guest?

21      A.  It says right there.

22      Q.  Where?  Where does it say guest?

23      A.  Sheila Matthews, who you met in Hartford at

24  Halbig hearing, is a friend of mine who lives in next

25  town over.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      160


1      Q.  Maybe he just wants her to talk to him?  Maybe

2  Sheila Matthews has some information that would be

3  bombshell for the Sandy Hook documentary.

4      A.  Well, what I'm -- what I'm -- so I'm trying to

5  clarify to you, because you don't seem to understand how

6  the operations work, I'm telling you the reason Rob

7  Dew's sending me this email is to consider this guest in

8  case Alex wants to have her on the show.

9     Q.  There's -- there's no talk of the show here.

10  There's talk of a Sandy Hook documentary.  Let's back up

11  for a second.

12          MR. REEVES:  Hold on.  Hold on.  Hold on.

13  Please let him ask you the questions and answer them to

14  the best of your ability, please.

15          MR. BANKSTON:  Okay.

16          MR. REEVES:  Thank you.

17     Q.  (By Mr. Bankston)  When -- when this is talking

18  about -- let's talk about InfoWars and how it works,

19  right?  Because I better get that cleared up because I

20  don't know how it works, right?

21          But there's a show called the Alex Jones show,

22  right?

23     A.  Yes.

24     Q.  There's also a showed called, like, "The War

25  Room" with Owen Shroyer.

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      161


1     A.  Yes.

2     Q.  Right?

3          There was a David Knight show at one point,

4  right?

5     A.  Yes.

6     Q.  There is also, though, an entirely different

7  department of people who work on things like documentary

8  films, somebody like Rob Jacobson, right?

9     A.  That was one of his jobs.

10    Q.  And he doesn't work on the show, right?  He

11 didn't do show work.  He did documentary work, correct?

12     A.  Not on a regular basis I would say.

13     Q.  Okay.  So you understand that there have been

14 documentary films made by Alex Jones.

15     A.  Yes.

16     Q.  They're not a show, are they?

17     A.  No.

18     Q.  Okay.  So when you're telling me in this email

19 that there is talk of a guest on a show, there's no talk

20 in this email from Mr.  Bidondi about a guest or the

21 show, is there?  There's talk about a documentary,

22 right, and somebody he may want to talk to.

23     A.  Yes, he may want to get this lady on.

24     Q.  Now, that's what Rob is saying, right?

25     A.  Right.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    162

1     Q.  Rob is saying he wants to get this lady on.

2 Get her on what?

3     A.  The show.

4     Q.  Where do you get that from?

5     A.  That's how we communicate.

6     Q.  Alright.  Well -- so she's not going to be in

7 the documentary?

8     A.  I have no idea if she was going to be in the

9 documentary.

10     Q.  Wouldn't the fact --

11     A.  They're not talking about the documentary here.

12    Q.  The email subject line is Sandy Hook

13  documentary, ma'am.

14    A.  I've already explained that for you.

15    Q.  Okay.  So despite the fact that it's emailed

16  Sandy Hook documentary, despite the fact that Dan

17  Bidondi said that Alex Jones announced that he is going

18  to do a Sandy Hook documentary film, you insist this

19  email is about the show.

20        MR. REEVES:  Objection; form.

21    Q.  (By Mr. Bankston)  Is that your testimony?

22    A.  The guest that's mentioned in the email with

23  the subject matter Sandy Hook documentary to Rob Dew

24  includes information about a person that has to do in

25  some way with Sandy Hook.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      163

1    Q.  Does the --

2    A.  Rob Dew looks at that email, he forwards me the

3  email with the subject matter.  It's going to be

4  forwarded the way it was sent to him.

5    Q.  Uh-huh.

6    A.  He is sending me this information so that I can

7  take a look at the guest that's being suggested, that I

8  can run this guest by Alex and find out if Alex wants to

9  have this guest on the show or not.

10    Q.  Tell me what you did to figure out who this

11  guest was and how to pitch it to Alex?

12    A.  I have no recollection of this guest whatsoever

13  because I -- from -- from -- you're asking me in my

14  capacity as a producer for this specific email?

15      Q.  I'm asking you about actually editorial

16  discussions of Sandy Hook.  So I'm actually asking you

17  as the company.

18      A.  There was no -- there was no response to this

19  email that I provided.

20      Q.  If Rob Dew was sending to you a source from Dan

21  Bidondi, the Truth Warrior, we can be fairly certain

22  that that guest was going to support the idea that

23  Sandy Hook was fake, right?  That's a fair assumption?

24          MR. REEVES:  Objection; form.

25          Don't answer that question.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      164

1          MR. BANKSTON:  Why not?

2          MR. REEVES:  Because that's extremely

3  misleading.

4          MR. BANKSTON:  That's not a proper basis to

5  object -- to --

6          MR. REEVES:  That is entirely.  Go read the

7  rule.

8          MR. BANKSTON:  Madam Court Reporter, can

9  you read my question back?

10          (Court reporter read requested portion)

11          MR. BANKSTON:  Have her answer the question

12  or I will move for sanctions?  I will -- I will move to

13  compel that answer.  That if you're not having her

14  answer that question, it's very clear what you're trying

15  to hide.  I want her to answer the question.

16        MR. REEVES:  I don't appreciate the

17  threats.

18        MR. BANKSTON:  It's not a threat, Brad.

19        MR. REEVES:  It is a threat, and I don't

20  really appreciate it.  You know what?

21        MR. BANKSTON:  Look at where we are in this

22  case, Brad.

23        MR. REEVES:  Go ahead.  Go ahead.  If you

24  know the answer to the question, proceed with answering

25  the question.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        165


1      A.  I get sent a lot of guests on a daily basis.

2  There's no way for me to know this specific guest would

3  be pro Sandy Hook conspiracy theory or the official

4  version.  Because if you've watched other videos of

5  Alex Jones, he would have people on the show who would

6  disagree that it was staged.  And they -- and he allowed

7  that debate.  Even -- even Wolfgang Halbig was on the

8  show at the same time with a person that disagreed with

9  him and that was a debate.  And Alex allowed both sides

10  to be public with their statements.

11      Q.  (By Mr. Bankston)  Okay.  First, that happened

12  once, correct?  There's never been any other debate or

13  guest who supported the idea that Sandy Hook was real,

14  correct?

15      A.  Alex multiple times has said that he didn't

16  know what exactly happened in Sandy Hook, that he

17  believed many kids died, but that there was a cover-up.

18  He said it multiple times.  And he said it was in the

19  public's best interest and in the best interest of those

20  children to find out the exact truth that happened and

21  how those kids died.

22      Q.  Yeah, that doesn't answer the question of

23  whether more than one debate with guests who supported

24  Sandy Hook being real.  That's a whole bunch of stuff of

25  what Alex Jones said at some point that you think he

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        166


1  said.  I'm asking you --

2      A.  Oh, no.  He said that.

3      Q.  I -- that's not the question, though,

4  Ms. Karpova.

5          The question is, was there more than one debate

6  with a guest who supported the idea that Sandy Hook was

7  real.  Has that ever happened, other than the one time

8  that they brought Keith Johnson on and railroaded him

9  with Wolfgang Halbig?

10          MR. REEVES:  Objection; form.

11      Q.  (By Mr. Bankston)  Ever?

12      A.  From my recollection as a producer, there have

13  been callers calling into the broadcast that were

14  allowed to state their opinions that were disagreeable

15  with Alex Jones.

16      Q.  That's not a guest, though, is it?

17      A.  If a caller is being allowed on the show.

18     Q.  You know what a guest is.  That's not a guest.

19     A.  Well, sure.

20     Q.  That's not somebody who's been booked to come

21  on the show.

22     A.  Sure.

23     Q.  Right.

24         There is never, other than Keith Johnson, when

25  he was brought in with Wolfgang Halbig, there has never

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      167


1  been a person who's been a guest on the show who said

2  that Sandy Hook was real, correct?

3     A.  Yes.

4     Q.  Additionally, when it comes to Dan Bidondi, you

5  may not -- you may not know what other guests may have

6  said, you may not know whatever, but you know Dan

7  Bidondi believes Sandy Hook was fake, correct?  The

8  company knows that.

9     A.  Dan Bidondi had questions about Sandy Hook

10  just -- just like Alex, just like other people.

11     Q.  When you say questions, when Dan Bidondi does

12  stuff like chase people down on the street and yell at

13  them these are the people who covered up Sandy Hook,

14  they're criminals, you're all going to jail, do you

15  think those are questions?  Do you believe that?

16         MR. REEVES:  Objection; form.  On what

17  topic of the depo notice does this cover?

18         MR. BANKSTON:  We're in editorial

19  discussions about Dan Bidondi, which is -- and I'm

20  also -- Brad, she's copied on that email.  This is

21  personally to her.  So if you --

22          MR. REEVES:  I understand that.  I'm asking

23  you --

24          MR. BANKSTON:  You already have a running

25  objection to both, to anything that's outside --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      168


1           MR. REEVES:  You just asked the question

2  about the -- about the company's position on it.  So I'm

3  allowed to reiterate --

4           MR. BANKSTON:  And you have a running

5  objection on every one of those questions.

6           MR. REEVES:  But that is a misleading

7  question that you're going to ask her what the company

8  believes whenever she is over -- when you know that is

9  outside the scope.  And so I'm allowed --

10          MR. BANKSTON:  You can object to it, and

11  you already have.

12          MR. REEVES:  And I just did.

13          MR. BANKSTON:  And it's running.  So

14  please --

15          MR. REEVES:  Great.  Well I objected

16  anyway.  So go for it.  If you have a problem with me

17  reasserting my objection despite having a running one

18  overall --

19          MR. BANKSTON:  I do.

20          MR. REEVES:  I have -- I have a problem

21  with you asking misleading questions, asking for the

22  company's position on a person when that's clearly not

23  covered by the scope of these deposition topics with

24  someone who is here to testify on the topics on behalf

25  of the company.  That is a misleading way to approach

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      169

1  the questions with this witness.

2      Q.  (By Mr. Bankston)  You know what Dan Bidondi

3  believes about Sandy Hook, don't you, you personally,

4  Daria Karpova?

5      A.  I do not.

6      Q.  You don't know?

7      A.  I personally do not.

8      Q.  No.

9          As an InfoWars producer here to testify on

10  behalf of the company, you also didn't do anything to

11  prepare to know what Dan Bidondi did, right?  That's not

12  part of the topics you were asked to talk about today?

13      A.  I know Dan Bidondi had questions and believed

14  that there was a cover-up in the Sandy Hook case, which

15  he did his hardest to try and investigate, as a good

16  reporter would.

17      Q.  You -- you are testifying here right now

18  Dan Bidondi is a good reporter.  Is that what you're

19  testifying to?

20      A.  Insofar as him trying to investigate what

21  happened, to find the truth.  That's what a good

22  reporter's supposed to do.

23    Q.  Have you seen any videos of Dan Bidondi in

24  Connecticut and what he did?  Have you ever watched him?

25    A.  (Indiscernible.)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        170


1    Q.  You might not be the best person qualified to

2  talk about whether Dan Bidondi was a good reporter in

3  Newtown, are you?

4        MR. REEVES:  Objection; form.  That's not

5  what she said.

6        MR. BANKSTON:  That's why I'm asking her a

7  question, Brad.

8    Q.  (By Mr. Bankston)  I'm asking you, you may not

9  be the best qualified person to talk about what

10  Dan Bidondi did in Newtown, correct, you Daria Karpova,

11  InfoWars employee?

12    A.  My definition of a good reporter is somebody

13  who seeks the truth and is going to great lengths in

14  order to find it.

15    Q.  So you don't -- you -- but you can admit to me

16  right now you don't know what Dan Bidondi did in

17  Newtown.

18    A.  His specific actions I don't know.  But you

19  just mentioned what --

20    Q.  Do you know about St. Rose of Lima Catholic

21  School in Newtown, what Dan Bidondi and Wolfgang Halbig

22  did there?

23    A.  Not off the top of my head.

24      Q.  Okay.

25          (Discussion off the record)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        171

1           (Exhibit 13 introduced)

2      Q.  (By Mr. Bankston)  I'm showing you what I've

3  marked as Exhibit 13.  Do you recognize that?

4      A.  I haven't seen this document before.

5      Q.  Okay.  So you understand that -- like we were

6  talking about earlier, the company has produced sets of

7  documents and pieces over the course of 3 years, right?

8      A.  Yes.

9      Q.  Okay.  I'll represent to you that, like, what

10  you're looking at right now, you'll see FSSTX-082669.

11  Okay?

12     A.  Yes.

13     Q.  Which would represent to you this is the 82,669

14  page that InfoWars has produced in this lawsuit.

15         I'll represent to you this was produced to me

16  extremely recently, like, in the last little bit.  And

17  you understand that InfoWars was ordered to produce

18  analytics about their website, right?

19     A.  Yes.

20     Q.  Do -- do you know anything about what was

21  produced?  Do you know what analytics were produced to

22  the claims?

23     A.  Website traffic.

24     Q.  Right.

25         I mean, obviously that's what analytics are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        172

1  Do you know what actual analytics -- where they came

2  from, what was produced, any of that?

3      A.  It came from the IT department with the

4  software they use for analytics.

5      Q.  Right.

6          This isn't an InfoWars document, right?

7  This was not -- this is -- and this document was not

8  generated using InfoWars stuff, InfoWars products or

9  InfoWars --

10      A.  You'd have to talk to IT about that.

11      Q.  So you don't know the origin of this document,

12  right?

13      A.  I do not.

14      Q.  Alright.  I believe -- and I was hoping I could

15  ask you about this, because you're supposed to testify

16  about the documents you produced.  And I know there's

17  been a lot of documents, but I was hoping maybe the ones

18  that were just produced we could talk about.  But I

19  think this is a Google analytics document from Google.

20  Do you know if I'm right or wrong, or do you not know?

21      A.  I don't know.

22      Q.  Okay.  From what it looks like to me -- I

23  can't -- you see there's a date up at the top that says

24  January 1, 2012 to June -- June 16, 2019?

25      A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        173

1    Q.  Okay.  That looks to be a period -- a period of

2  time in which these analytics was collected.  Do you

3  have any reason to dispute that?

4    A.  No.

5    Q.  Okay.  So what we have here is -- you see how

6  we have a column of pages that lists for each of these

7  URLs the total unique page views of that URL?

8    A.  Correct.

9    Q.  Okay.  Now, you'll notice that some of

10  the -- on this list here, it goes through -- this is

11  just the top 20 for the website.  You'll notice that

12  some of them have what I would call landing pages that

13  aren't specific to a certain story.  For instance,

14  infowars.com/category, infowars.com/watchalexjonesshow.

15  Do you know what I mean when I say that?

16    A.  Yes.

17    Q.  Okay.  And so none of those URLs are associated

18  with a specific story, correct?

19    A.  Correct.

20    Q.  The first URL that we would see that's

21  associated with a specific story is a URL titled

22  "Graphic Shocking Complete Video Shock From Virginia

23  Gunman's Point of View," correct?

24    A.  Yes.

25    Q.  Okay.  And the unique page views for that --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       174

1  that article shown on this document is 4,265,000,

2  correct?

3     A.  Correct.

4     Q.  Okay.  If you look at the very next entry, that

5  is a story, right?  That would be No. 13, correct?

6  Because No. 8, 9, 10, 11 and 12 are not stories,

7  correct?

8     A.  Correct.

9     Q.  Okay.  And so No. 13 is "Boston Bombing

10  Culprits Found," correct?

11     A.  Correct.

12     Q.  Okay.  So No. 14 is "FBI Says No One Killed At

13  Sandy Hook," correct?

14     A.  Correct.

15     Q.  And that shows the unique page views of

16  3,301,616 people, right?

17     A.  Yes.

18     Q.  Okay.  So from this analytics chart, we can

19  determine that for that time period of June -- of

20  January 1, 2012 to June 16, 2019, the story, "FBI Says

21  No One Killed At Sandy Hook," was the third most popular

22  site and unique page views on the entire InfoWars

23  website.  The company would agree with that?

24        MR. REEVES:  Objection; form.

25     A.  Which story again?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        175


1     Q.  (By Mr. Bankston)  No. 14 would be the third

2  most popular story in terms of unique page views ever

3  published on the InfoWars website during that period of

4  time.

5      A. According to this graphic, yes.

6      Q. Okay.

7         (Discussion off the record)

8      A. I mean, this -- this -- if we can go back to

9  this previous graphic real quick.

10        It does provide other information like how long

11  people were on that page, the bounce rate.  So I'm not

12  an analytics expert, so -- but I think that information

13  is important as well, other than the unique page views

14  that you tried to bring attention to.

15        MR. BANKSTON:  Object as nonresponsive.

16        (Exhibit 14 introduced)

17      Q. (By Mr. Bankston)  I'm going to show you what

18  I've marked as Exhibit 14.  You'll see this is a similar

19  chart, right, same date range?  January 20 -- January 1,

20  2012 to June 16, 2019?

21      A. Yes.

22      Q. Okay.  Now, this talks about landing pages.  Do

23  you see where it says that in the top left corner under

24  the words analytics?

25      A. Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      176


1      Q. Okay.  Now, here we also have landing pages and

2  numbers of sessions, correct?

3      A. Yes.

4      Q. Okay.  Now, on this one as well, for this type

5  of analytics charts in terms of sessions on InfoWars,

6  No. 8, "FBI Says No One Killed at Sandy Hook," is the

7  third most popular story in terms of sessions on

8  InfoWars, correct?

9      A.  Yes.

10     Q.  Okay.  Now, in terms of session duration -- do

11  you see where it says average session duration?

12     A.  Yes.

13     Q.  Okay.  Now, you see -- where it says "FBI Says

14  No One Killed on Sandy Hook, you have an average

15  duration of just under a minute, right?

16     A.  Yes.

17     Q.  But if you look at No. 11, Saudi Arabia Has

18  100,00 Empty Air-conditioned Tents That Can House

19  3 million People Yet Has Taken Zero Refugees, the

20  average session duration there was 16 seconds, right?

21  Correct?

22     A.  Yes.

23     Q.  And for other landing pages, say No. 9 listed

24  on the internet, you've got an average duration of

25  4 minutes and 28 seconds, right?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        177


1      A.  Yes.

2      Q.  When someone clicks on the listen on the

3  internet link, that typically means they're going to

4  listen to the radio broadcast, right?

5      A.  Yes.

6      Q.  It's kind of expected they might be on there a

7   few more minutes than just reading the story.  That's

8   expected to InfoWars?

9      A.  (No response.)

10          MR. REEVES:  Objection; form.

11          (Discussion off the record)

12     Q.  (By Mr. Bankston)  Correct?

13     A.  What was the question?

14          MR. BANKSTON:  Madam Court Reporter, can

15   you help me out here and read that question back?

16          (Court reporter read requested portion)

17     A.  When people go to a stream to listen to the

18   stream, it's expected that they would be listening to

19   the stream as opposed to reading an article.

20     Q.  (By Mr. Bankston)  Okay.  Has InfoWars, when

21   making its editorial discussions and decisions about the

22   Sandy Hook coverage, has it ever attempted to use its

23   Sandy Hook stories and videos in a strategic way to

24   attract viewers?

25     A.  No.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      178

1      Q.  Okay.  The idea that we would make some video

2   uploads about Sandy Hook as a strategic measure, that's

3   not something that would be a -- would be a part of

4   InfoWars editorial sessions?

5      A.  Never.

6      Q.  Never?

7      A.  Never.

8          (Discussion off the record)

9          (Exhibit 15 introduced)

10     Q.  (By Mr. Bankston)  Let me show you what I've

11  marked as Exhibit 15.  Can you tell me who -- at the top

12  here -- well, actually, let me start at the bottom.  At

13  the bottom corner you see there's a mark that says

14  FSSTX-076069, correct?

15     A.  Yes.

16     Q.  Okay.  Now, can you tell me -- first, let's

17  just look at the top of the email.  Who is Darrin?

18     A.  Darrin McBreen.

19     Q.  And his title in 2015, do you know?

20     A.  Editor.

21     Q.  Okay.  And Rob Dew we've talked about, correct?

22     A.  Yes.

23     Q.  Louis S. we've talked about, right?

24     A.  Yes.

25     Q.  Okay.  The next other person that's on here is

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        179


1  Travis Knight.  Do you know who that person is?

2     A.  Yes.

3     Q.  Okay.  And do you know what their job position

4  is?

5     A.  Editor.

6     Q.  Okay.  And then this email is being sent from

7  Louis S. to Travis Knight, Rob Dew and Darrin.  And the

8  subject is video files for Facebook upload on

9  September 24, 2015.  That's correct?

10     A.  Yes.

11     Q.  Okay.  He asked them can I get these video

12  files for future strategic Facebook uploads, correct?

13     A.  Yes.

14     Q.  And one of the files that he is asking for is

15  "Why People Think Sandy Hook is a Hoax," correct?

16     A.  Yes.

17     Q.  Okay.  So we can tell from this email -- and

18  then Darrin follows up and says any luck finding these,

19  correct?

20     A.  Yes.

21     Q.  We can agree from this email that Editor Darrin

22  and Louis S. were attempting to use a video about

23  Sandy Hook being a hoax as a future strategic Facebook

24  upload, correct?

25     A.  It's one of the video -- one of the videos out

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        180


1  of eight videos that he's requesting.

2     Q.  Sure.

3        So it is one of the videos being used for

4  future strategic Facebook upload, correct?

5           MR. REEVES:  Objection; form.

6     A.  Yes.

7     Q.  (By Mr. Bankston)  Okay.

8        (Discussion off the record)

9           MR. BANKSTON:  Yeah.  Let's go ahead and

10  take a break.

11          MR. REEVES:  Alright.

12          THE VIDEOGRAPHER:  The time is 4:08 p.m.

13  we are off.

14          (Recess from 4:08 p.m. to 4:17 p.m.)

15          THE VIDEOGRAPHER:  The time is 4:17 p.m.

16  We are on.

17          (Exhibit 16 introduced)

18     Q.  (By Mr. Bankston)  Ms. Karpova, I'm handing you

19  what I've marked as Exhibit 16.  Alright.  Down at the

20  bottom it is labeled FSSTX-079546, correct?

21     A.  Yes.

22     Q.  Okay.  And this email was sent on April 16,

23  2015?

24     A.  Yes.

25     Q.  Okay.  We talked about Louis S., right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        181


1     A.  Yes.

2     Q.  And we've talked about Lee Ann before.  She's

3  Lee Ann McAdoo, right?

4     A.  Yes.

5     Q.  Okay.  She's an InfoWars reporter.

6     A.  She was, yes.

7     Q.  She was.

8          Okay.  At the time of this, were they both

9  reporters, editors?  What were they?

10     A.  Both who?

11     Q.  Both individuals on this email.

12    A. Louis I think was a (indiscernible) editor.

13 Lee Ann was a reporter.

14    Q. Okay. This is a subject list called playlist

15 ideas, correct?

16    A. Yes.

17    Q. Importance was labeled high, correct?

18    A. Yes.

19    Q. The playlist ideas that are listed in this

20 video I'm going to read to you. Okay?

21        Vaccines, already up. When it's -- let's stop

22 there. When it says "already up," would it be your

23 assumption from seeing documents at InfoWars, meaning

24 that that playlist has already been created and is

25 currently up on the internet?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        182


1    A. Yes.

2    Q. Okay. And then it says: Police state,

3 InfoWars health, Alex Jones show, Second Amendment,

4 rants, celebrity, border, TSA, geoengineering/chem

5 trails, GMO, resistance, Boston bombing, Sandy Hook,

6 victories, winning, good news, correct?

7    A. Yes.

8    Q. Okay. So from this list of playlist ideas, we

9 know that Sandy Hook was one of the ideas for playlists

10 that was being proposed inside of InfoWars during

11 editorial discussions, correct?

12        MR. REEVES: Objection; form.

13    A. One of many ideas for the YouTube playlist.

14     Q.  (By Mr. Bankston)  No.  I understand -- look, I

15  completely understand that when I ask a question, you

16  want to push back and give information you think is

17  going to be helpful.  I get that.

18         I know that there are other -- we just read

19  them all.  We read all these topics here.  But in a very

20  simple statement, we can understand that Sandy Hook was

21  one of these playlist ideas, correct?

22     A.  Well, I'm just trying to be more accurate

23  because you're trying to present more of a skewed point

24  to mis -- misrepresent how our operations work.  So I'm

25  trying to clarify that among -- Sandy Hook was among the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        183

1  topics for playlists that they were in the process of

2  organizing a YouTube channel for.

3     Q.  Yeah.  And one of the things you wanted to have

4  on that YouTube channel -- or at least one of the things

5  that the company did through its editor Louis here, is

6  they wanted to have a playlist about Sandy Hook, right?

7     A.  Sure.  This is relevant in 2015.

8     Q.  Right.

9         Because according to the company, 2-1/2 years

10  after Sandy Hook it was still a relevant thing to talk

11  about, right?

12     A.  The videos were archived.  They wanted

13  to class -- to categorize them for -- yeah.

14     Q.  Okay.  I didn't ask how the videos were

15 categorized. I didn't ask any of that. What I asked was

16 the company believes when it was doing its discussions

17 on Sandy Hook, that Sandy Hook 2-1/2 years after the

18 shooting was something that needed to be covered in the

19 news.

20     A. What discussions about Sandy Hook?

21     Q. The editorial discussions you've had in the

22 company about Sandy Hook.

23     A. This lists the different topics. There's no

24 discussion of Sandy Hook.

25     Q. I know that. I'm asking you about the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     184

1 editorial discussions in the company. Because your

2 position is, for the company, that in its editorial

3 discussions, that it came to the conclusion that 2-1/2

4 years after the shooting Sandy Hook was a relevant topic

5 to be talking about on InfoWars, correct?

6     A. It is one of the topics for playlists as you

7 know.

8     Q. I'm not asking -- can you take that email --

9 see that stack of exhibits you have right now?

10     A. Yes.

11     Q. Can you put them aside just out of your view

12 for just a second?

13     Okay. Now, editorial discussions inside of

14 InfoWars. InfoWars made the decision that 2-1/2 years

15 after the shooting, that topic was a relevant thing to

16 be talking about on their news broadcast, right?

17    A.  Again, I would have to refer to the YouTube

18  channel with the playlists of Sandy Hook.

19    Q.  I'm not -- Ms. Karpova, I don't know if I can

20  make this any more clear.  I'm not asking about the

21  playlist anymore.

22    A.  Correct.

23    Q.  Alright.  I'm not -- we're done with that

24  document.  We're talking about something totally

25  different.  I don't care what happened in terms of the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      185

1  YouTube playlist.  What I'm asking is when InfoWars was

2  making editorial discussions about Sandy Hook, part of

3  those discussions included the conclusion that

4  2-1/2 years after the shooting, that event was a

5  relevant thing to be talking about on InfoWars, correct?

6        MR. REEVES:  Objection; form.

7    A.  False, because I already answered that

8  question.  We did -- do not -- did not have editorial

9  discussions about Sandy Hook.

10    Q.  (By Mr. Bankston)  Okay.  We've seen a couple

11  of emails here today with people talking about how

12  InfoWars should cover Sandy Hook, right?  Correct?

13    A.  There were a few emails mentioning Sandy Hook.

14    Q.  That's not what I asked you, Ms. Karpova.

15    A.  Can we go back to those emails and I'll --

16    Q.  They're all sitting in -- right in front of

17  you.

18     A.  Okay.

19     Q.  And I'm asking you, in your recollection of

20  what we've spoken about here today, we've had people

21  talking about how InfoWars should cover Sandy Hook.

22         Do you remember that email from Mr. Bidondi

23  that was forwarded to you?

24     A.  Yes.

25     Q.  That was a discussion about how you should

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        186


1  cover Sandy Hook, wasn't it?

2     A.  No.

3     Q.  It wasn't a discussion with Rob -- didn't you

4  tell me that Rob Dew was making a recommendation that

5  this is somebody Alex should have on the show about

6  Sandy Hook?

7     A.  He didn't say he should have it.  It was a

8  proposed guest.

9     Q.  Right.

10        So we're having some discussions about who

11  should be on the show, maybe we should have this lady.

12  That was a discussion that you were actually copied on,

13  correct?

14     A.  Yes.

15     Q.  Okay.  So we can drop this idea, can't we, that

16  there were no editorial discussions because we've seen

17  one that you were included on, right, Ms. Karpova?

18     A.  Now, that I'm looking also at this previous

19  email that we've discussed, it says video files for

20  future strategic Facebook uploads.  I just want to be

21  clear that I think what you're referring to as a

22  strategic upload refers to some kind of marketing scheme

23  for Sandy Hook analytics videos.  What this refers to is

24  a -- almost like an auto post that is scheduled for

25  future uploads.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        187


1          MR. BANKSTON:  Objection; nonresponsive.

2      Q.  (By Mr. Bankston)  Let's go on to talk about

3  Wolfgang Halbig.  Would you mind opening up your blue

4  folder for me?

5      A.  (Witness complies.)

6      Q.  Do you see that article on top?

7      A.  Yes.

8      Q.  That's something you brought today and you were

9  talking about how much -- you were talking about, like,

10  you wanted to read it today, right, to talk about

11  Wolfgang's qualifications?

12      A.  Yes, his bio specifically.

13      Q.  Right, his bio.  Okay.

14      A.  Yes.

15      Q.  So this article that you brought is what you

16  believe is -- you -- let me ask you this.  Is that

17  something that InfoWars had before you went and looked

18  for it for your deposition, or is that something you got

19  for your deposition to help you acquaint yourself?

20      A.  The latter.

21    Q.  Okay.  So before this deposition, InfoWars did

22  not have this document in its corporate files.

23    A.  Correct.  The files that I looked through that

24  I searched for Halbig's bio, I could not find anything.

25  As well as it seems like he's been memory-holed on the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       188

1  internet as well.  So that's the only article that I

2  could actually find in an archive mode where it actually

3  listed his bio.

4    Q.  Did you go try to search Wolfgang Halbig on

5  Google?  Did you do that?

6    A.  Yes.

7    Q.  Okay.  So when you say he's been memory-holed,

8  I take it you're ignoring the dozens of mainstream

9  articles about Wolfgang Halbig, you don't want to use

10  the mainstream articles.

11    A.  No.  I'm talking specifically his bio and his

12  credentials have been memory-holed.

13    Q.  Okay.  There are mainstream articles that talk

14  about Wolfgang's credentials or his alleged credentials,

15  right?  Did you see any of those?

16    A.  I've looked at many of them, and I did not see

17  an actual biography of his accomplishments.

18    Q.  Okay.

19    A.  I've not seen, except for this article, which

20  is why I printed it.

21    Q.  So you brought us instead this Exhibit 1F

22  written by Dr. Eowyn.  Do you know who that is?

23    A.  I do not -- I didn't bring it for the author.

24  I brought it for the bio that is included in this

25  article.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        189


1    Q.  Right.

2         So you've got to -- you've -- one thing you

3  probably need to do when you say as a producer of a

4  journalistic organization, particularly when dealing

5  with a lawsuit like this and coming to testify is you

6  should probably try to figure out the voracity of the

7  bio being provided to you, right?

8         Do you have any faith sitting here today that

9  the information contained in that article is accurate?

10    A.  Yes.  Because even the people who disagree with

11  Wolfgang Halbig admit that he has a lengthy bio that's

12  impressive.

13    Q.  Who said that?

14    A.  I've read it in different articles when I was

15  searching for his bio.

16    Q.  I thought you said his bio's been

17  memory-holed.

18    A.  Well, exactly.  They failed to (indiscernible)

19  his bio, but they do acknowledge that he's got an

20  extensive bio if that bio is covered accurately.  But I

21  could not find the actual bio because the bio was not

22  included, except for this article.

23    Q.  You think it's covered accurately there?

24 That's what you think?

25    A. Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    190

1    Q. Okay. And the person who wrote that,

2 Dr. Eowyn, do you know who that is?

3    A. No.

4    Q. He doesn't have a last name, right?

5    A. I do not believe that's the person who wrote

6 this art --

7    Q. Go back and look at the first page.

8    A. No, no, no. I understand that the article was

9 posted by the said Dr. Eowyn.

10    Q. Uh-huh.

11    A. The bio that's been screen-shotted here -- it's

12 not even typed, it's screen-shotted from somewhere else.

13    Q. From where?

14    A. I do not have the source, the exact source

15 where it was printed from.

16    Q. You have no idea where that came from.

17    A. Well, like I said, people -- people who

18 disagree with Halbig and who criticize him admit that

19 his bio is impressive.

20    Q. I -- I'm still waiting to see that. Do you

21 have any information you can point me to that? Anybody

22 you say who's an opponent of Halbig who admits that he

23 has an impressive bio.

24    A. I would have -- I would have printed those

25 documents if that's what I thought I needed for you.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        191

1 But --

2    Q.  Instead --

3    A.  -- to my satisfaction -- I did the research;

4 and to my satisfaction, this bio checks out.

5    Q.  Let's talk about what satisfied you, which is

6 apparently a screen shot that you cannot identify where

7 it came from, printed an article by Dr. Eowyn who

8 did you -- who -- first of all, that's -- let me pull

9 this question back.

10        Did you know Dr. Eowyn wrote Chapter 2 of Jim

11 Fetzer's book, "Nobody Died at Sandy Hook"?  Did you

12 know that?

13    A.  No.

14    Q.  Okay.  Do you know what Fellowship of the Minds

15 is?

16    A.  No.

17    Q.  Okay.  Go to the last page of your article

18 there.

19    A.  (Witness complies.)

20    Q.  Do you see -- actually, the second to the last

21 page.  You'll see the very end of the article.

22        Do you see where it says who Dr. Eowyn is?

23    A.  Yes.

24    Q.  Who does it identify him as?

25    A.  The editor of Fellowship of the Minds.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        192

1    Q.  Okay.  Do you know about Mr. Fetzer being

2  involved in Fellowship of the Minds?

3    A.  No.  That has no real relevance to why I

4  brought this article.

5    Q.  Right.

6      So in other words, just like in normal InfoWars

7  practice, if you find the information you're looking

8  for, you don't really care where it came from, right?

9      MR. REEVES:  Objection; form.

10    A.  No, that's not true.

11    Q.  (By Mr. Bankston)  So you -- but you don't care

12  who this person -- author is, do you?  You didn't care

13  to find out.

14    A.  I -- the value of this article isn't the

15  opinion of the writer.  The writer has included the bio

16  that was taken from another source.

17    Q.  Which we have no idea what it is.

18      So wouldn't you say --

19    A.  If it's been memory-holed, we can't find it.

20  The official -- official Wolfgang Halbig's website is no

21  longer.  I'm sure it was there.  It was posted there at

22  some point.

23    Q.  Yeah, I'm sure Wolfgang Halbig has said a lot

24  of things about his credentials.  Do you think they're

25  all true?  Do you think Wolfgang Halbig is a reliable

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      193

1  source about his own credentials?

2      A.  I'm not responsible for making sure that the

3  claims for our guests are all accurate.

4      Q.  Thank you.

5      A.  They're responsible for providing their bios.

6      Q.  Thank you.

7          Let's look at --

8              (Discussion off the record)

9      Q.  (By Mr. Bankston)  One thing you can agree is

10  that Free Speech Systems helped Mr. Halbig raise money,

11  correct?

12      A.  I don't have any record of that.

13      Q.  Do you know if there are any documents produced

14  in this case like that?  Have you -- let me pull that

15  back.

16          Have you seen documents in this case relating

17  to whether or not InfoWars helped fund Mr. Halbig?

18      A.  Not that I can recall off the top of my head.

19      Q.  Okay.

20              (Discussion off the record)

21      Q.  (By Mr. Bankston)  At some point there was a

22  discussion inside InfoWars.  I don't know who had it,

23  but I'm going to go ahead and assume there was a

24  discussion inside InfoWars about whether we should be

25  using info -- Wolfgang Halbig as a source.  Do you

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      194


1  acknowledge that?

2              MR. REEVES:  Objection; form.

3     Q.  (By Mr. Bankston)  Or did that discussion never

4  happen?

5     A.  Yes.  Later -- years later there were questions

6  that arose about the cred -- the credibility of Halbig.

7     Q.  When?

8     A.  I don't have the exact date for that.

9     Q.  Well, look.  Here's the thing.

10    A.  Over the years things have come up that.

11    Q.  What kind of things?

12    A.  I don't have the exact things for you.

13    Q.  Okay.  So you're able to -- you brought me from

14  Fellowship of the Minds and the guy who wrote "Nobody

15  Died At Sandy Hook," you brought me a bio.  But in terms

16  of -- in terms of what facts y'all came up with that

17  were bad against topic, you can't point me to any of

18  those, right?

19    A.  At the time we had no reason to believe that

20  Mr. Halbig wasn't who he said he was in his bio.  His

21  bio was not being questioned by anybody out there.

22    Q.  The company -- for instance, let's put it this

23  way, right?  Wolfgang gives you his bio.  It looks

24  pretty good.  You go with it.  But what if somebody --

25  if somebody had come to the company and said, hey, watch

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      195


1  out, y'all really need to look out for Wolfgang Halbig

2  and his credentials, I don't think they are what he says

3  they are, I think you should doubt them, if the company

4  got a message like that, would it have done its due

5  diligence and tried to figure out if Mr. Halbig was

6  really qualified?

7          MR. REEVES:  Objection; form.

8      A.  Hypothetical?

9      Q.  (By Mr. Bankston)  Sure.

10     A.  Yes.

11     Q.  Yes.  Okay.

12         But because that didn't happen, the -- you're

13  testimony is here today the company had no reason to go

14  double-check Wolfgang Halbig's credentials.

15     A.  Well, no.  You're talking about after the fact.

16  When Wolfgang Halbig was a guest on the show, he

17  provided his credentials.

18     Q.  Right.

19     A.  There was nobody at the time who was coming out

20  and saying do not have this guest on.

21     Q.  Right, right.

22         So in other words your testimony is in the

23  absence of anybody doing that, right, InfoWars really

24  didn't have a reason to go double-check his credentials,

25  right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      196


1      A.  The company's general guideline for a producer

2  is to spot-check the biography.

3          (Discussion off the record)

4          MR. BANKSTON:  Brad, just so I don't have

5  to slow down, can I just confer with you on this

6  document?

7           MR. REEVES:  Sure.

8           MR. BANKSTON:  Okay.  So we have a document

9  here, and we don't have the second page.  But that's the

10  second page.  And I can print that little part out or I

11  can just read it to her and we can agree to put that in

12  a second.  I don't know what you want to do.  I can take

13  a break and print it ou.

14           MR. REEVES:  How about if -- will you

15  show --

16           MR. BANKSTON:  Yeah, yeah.  I'm going to

17  show it to her.  I'm just going to give her my computer.

18  Exactly.

19           MR. REEVES:  Read it to her and show her --

20           MR. BANKSTON:  In other words the document

21  that I'm going to show her is just a computer copy.

22           MR. REEVES:  Yeah, that's fine.

23           MR. BANKSTON:  Okay.  Alright.  I'm going

24  to go ahead and mark this?

25           (Discussion off the record)

         UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          197


1     Q.  (By Mr. Bankston)  Okay.  I'm going to give you

2  this for the stack, but I'm actually going to show it to

3  you by PDF.  Okay?  And the reason I'm going to show it

4  to you by PDF is because it cuts off.  Alright?  And it

5  has this little part right here.  So what I'm going to

6  do for you is I'm first just going to bring this up,

7  okay, so you can see the last part.  Okay?

8     A.  Okay.

9          (Exhibit 17 introduced)

10    Q.  (By Mr. Bankston)  Alright.  And that's what's

11  on that page.  Alright?

12         And so I want to read this together, the second

13  page of Exhibit 17 for you.  And you'll notice we'll

14  have to scroll up to see who wrote it, right?

15         You don't know who Robert Heath is, right?

16    A.  Say it again.

17    Q.  You don't know who Robert Heath is I would take

18  it?

19    A.  No.

20    Q.  Okay.  But he's writing to the writers at

21  infowars.com?

22    A.  Yes.

23    Q.  The subject is Wolfgang Halbig?

24    A.  Yes.

25    Q.  The date is March 14, 2014?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      198


1     A.  Yes.

2     Q.  Okay.  Down here at the bottom we see this

3  document is marked FSSTX-040803, correct?

4     A.  Yes.

5     Q.  Okay.  Mr. Heath writes:  Dear Sir or Madam,

6  You would be well advised to check Wolfgang Halbig's

7  credentials.  Best wishes, Robert Heath.

8         I read that correctly?

9      A.  Yes.

10     Q.  Okay.  Now, I'm going to give you this.  This

11  is the remainder of the document.  Okay?

12         The person who replies back is Adan, correct?

13     A.  Yes.

14     Q.  Adan Salazar is a writer at Sandy Hook -- I

15  mean at -- excuse me.  Adan Salazar is a writer at

16  InfoWars, correct?

17     A.  Yes.

18     Q.  Adan Salazar has worked on Sandy Hook coverage

19  for InfoWars, correct?

20     A.  Yes.

21     Q.  Okay.  Adan Salazar writes and says:  Robert,

22  thanks.  But what on Earth do you mean?  The guy

23  seemingly has credentials up the wazoo.  Your email is

24  much to vague to follow up on.  Thanks, Adan.

25         Did I read that correctly?

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       199


1      A.  Yes.

2      Q.  Okay.  I'm going to read this next part of the

3  email.  And it says:  Dear Adnan -- and he's got his

4  name wrong, right?

5      A.  Right.

6      Q.  Okay.  And he says:  Thank you very much for

7  your attention and reply.  Yes, he "seemingly" has many

8  credentials.  But do you know that from any other source

9  than he himself?  I really hope he's genuine and that

10  I'm just being paranoid and wasting your time.  But have

11 you tried looking him up in Google as I have?  I don't

12 know, but doubt whether hat it would make a difference

13 that I'm in the UK.  But I use Google as worldwide.  I

14 find no trace of him except in connection with his

15 current activities on Sandy Hook.  For example, I cannot

16 find him on the list that exists of expert witnesses of

17 which he has categorically stated he was one concerning

18 Columbine.  I cannot find any reference to him prior to

19 2012 as a school safety expert or as a school principal.

20 As a comparison, all the teachers or head teachers and

21 principals that I know can easily find prior to 2012,

22 the same for a sample of the professionals I know.  I

23 tried the same sort of search for random people I do

24 know who have a much lower profile CV than Halbig and

25 get many results for them.  As you know, if one is, for

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        200

1 example, on a committee, no matter how small or local

2 and the meetings of a meet -- and the minutes of

3 a meeting are online, you'll find your name very quickly

4 on a simple name search, especially if it is an

5 uncommon.  I can't find a trace of him.  And he has an

6 unusual name, which should make it easier.  I will look

7 again now and spend more time and try to be more

8 resourceful in finding him in any context prior to 2012.

9 If he was using a pseudonym that could explain it.  But

10 why would someone looking for transparency do that.

11 What if he drags everybody along the line of "no

12   deaths," which Alex rightly didn't commit to?  Would not

13   all the questions and doubts be illustrated to the

14   public as just another crazy conspiracy theory if it was

15   exposed that definitely there were, in fact, deaths and

16   that Halbig was a con man?  Again, sorry to waste your

17   time if I have.  I will look again.  Best wishes,

18   Robert.

19         I've read that correctly?

20      A.  Yes.

21      Q.  Okay.  And from what we can tell here from this

22   email, this appears bio -- you have no reason to dispute

23   that this is a genuine and accurate email that came from

24   InfoWars' files, right?

25      A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      201


1      Q.  Okay.  Do you know if he was an expert of

2   Columbine?  Do you know if that's a lie or not?

3      A.  I don't know.

4      Q.  Okay.

5      A.  Is there a follow-up from Adan?

6      Q.  I don't know.  I don't know.  I will answer

7   you -- I told you I wouldn't answer questions for you

8   today.  I'll answer you that one.  I don't know.  I'd

9   love to know.  Don't know.

10         During the time that InfoWars was relying on

11   Wolfgang Halbig -- that's actually -- let's establish

12   that time period if you wouldn't mind.  We understand

13   that Wolf -- claims made by Wolfgang Halbig were being

14  published on InfoWars in 2014, correct?

15      A.  Yes.

16      Q.  Claims made by Wolfgang Halbig were being

17  published on InfoWars in 2015, correct?

18      A.  Yes.

19      Q.  2016, correct?

20      A.  (No response.)

21      Q.  It's what you told me about that final

22  statement video, right?  Remember we talked about that

23  earlier?

24      A.  Yes.

25      Q.  Okay.  2017, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       202

1       A.  Uh-huh.

2       Q.  "Sandy Hook Vampires Exposed," correct?

3       A.  Yes.

4       Q.  Halbig stuff in there.

5           So during the time 2014 to 2017, when InfoWars

6  was publishing Wolfgang Halbig's claims, InfoWars had

7  received information that Halbig was directly harassing

8  the victims of the tragedy, correct?

9           MR. REEVES:  Objection; form.

10      A.  Is there a document that you're referring to?

11      Q.  (By Mr. Bankston)  I want to know what you know

12  about it.

13          Do you know if the company was aware that

14  Wolfgang Halbig was harassing people -- directly

15  harassing people anywhere between 2014 and 2017?

16     A.  No.

17     Q.  You don't know, right?  Okay.

18           (Exhibit 18 introduced)

19     Q.  (By Mr. Bankston)  I want to show you what I

20  have marked as Exhibit 18.  Do you see at the bottom of

21  that page there is a Bates number that says

22  FSSTX-039550, correct?

23     A.  Yes.

24     Q.  Alright.  Now, we can see this is an email from

25  Wolfgang Halbig, right?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        203


1     A.  Yes.

2     Q.  Okay.  Do you know why InfoWars has this email?

3     A.  May I read the email?

4     Q.  Yeah, go ahead and read the whole email and

5  we'll talk about it.

6     A.  Okay.

7     Q.  Okay.  So first of all, how do you -- how does

8  the company feel about this email?

9           MR. REEVES:  Objection; form.

10          MR. BANKSTON:  What's your objection?

11          MR. REEVES:  Vague.  How does the company

12  feel?  A company has feelings?

13          MR. BANKSTON:  Sure.  How does it feel?  No

14  problem.  That's good.

15     Q.  (By Mr. Bankston)  Yeah, how does the company

16  feel about this email?

17    A.  Mr. Halbig is asking -- it seems to be concern

18  for the well-being of this child.

19    Q.  Thank you, Ms. Karpova.

20       Let me actually -- I want to read this email

21  into the record so we can talk about it.  Okay.

22       Mr. Halbig writes:  Michelle, How could you and

23  your husband as responsible parents even allow your

24  precious child Josephine to attend that filthy and

25  deplorable looking school on December 14, 2012?  The

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      204


1  school, as you must know, is and was a toxic waste dump

2  as reported by the environmental consultants who

3  requested more money from city of Newtown leaders for

4  demolishing the school and transporting all the high

5  levels of lead paint, high levels asbestos and

6  especially the high levels of PCPs and the ground water

7  at Sandy Hook out of state.  Josephine, your child

8  should have expected more from you before that tragic

9  day as a parent.  You were supposed to protect her from

10  serious lifelong health risks when you send her to that

11  school every day.  Why would you as a parent and all

12  those other parents who supposedly lost a child to gun

13  fire allow their children as you did to serious toxic

14  waste.  This all unfolded before the first shot at that

15  school even occurred.  Did you not see the filth and

16  deplorable conditions when you went to that school, or

17  are you blind?  I do not understand unless you explain

18 it to me and the world why you and your husband failed

19 Josephine, who is a nonverbal child as you stated and

20 depended on you for her safety. She needed you to

21 protect her from all the serious health risks that you

22 sentenced her to on a daily basis. Now you talk about

23 school security. You have got to be joking. You have

24 all these experts on your staff who are now part of your

25 conspiracy. They should be ashamed of their actions in

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        205

1 supporting you. A mom puts her own child at risk on a

2 daily basis now the -- is now the expert on school

3 security? I look forward to meeting you one day when I

4 can take your deposition, not about the shooting, but

5 why you and your husband failed Josephine by sending her

6 to the filthy and deplorable school with all that toxic

7 waste. We call this child endangerment when you know of

8 the danger that you expose your child to serious

9 lifelong risks. We must -- you must know -- have known

10 without a doubt because the pictures do not L-I, which I

11 assume is lie. You put her life in serious risk every

12 day knowing how filthy and deplorable that school is. I

13 am enclosing photos that you must recognize since you

14 took your child to school. And having a child in

15 special needs, you would expect a school environment and

16 school climate that allows children to learn and

17 teachers to tech, which I believe is teach, right?

18 Please explain to me, if you can, why a school

19 principal, Don Hochspring [sic], would allow her school

20  to be so filthy and deplorable looking.  There is not

21  one female elementary school principal in the country

22  that would allow her school to be that filthy and

23  deplorable both inside and outside and most of all allow

24  her school to become a toxic waste dump, placing every

25  child and their school staff in serious lifelong health

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        206

1  risk, right?  All the pictures are taken by the major

2  crime squad from the Connecticut State Police.  Please

3  respond since you are now the expert on school security.

4  Wolfgang W. Halbig, www.sandyhookjustice.com.

5        I read that correctly?

6    A.  That's one of the interpretations?  I mean, the

7  inflections that you put on the email could be read in a

8  completely entirely different way.

9    Q.  A lot of different ways, right?

10    A.  Right.

11        (Discussion off the record)

12        (Exhibit 19 introduced)

13    Q.  (By Mr. Bankston)  Ma'am, I've put in front of

14  you what I've marked as Exhibit 19.  We're going to read

15  that together.

16        Do you see at the bottom it says FSXTX [sic]

17  dash 051348?

18    A.  Yes.

19    Q.  Okay.  So I'm going to go from the top here.

20        This is an email from Wolfgang Halbig, correct?

21    A.  Correct.

22    Q.  And it's to a lot of people, right?

23    A.  Yes.

24    Q.  Okay.  Do you see -- and I may have to try to

25   help you point on my document.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      207

1        Do you see about right in here, do you see some

2   InfoWars email addresses?

3    A.  Yes.

4    Q.  Do you see where it says Nico --

5    A.  Yes.

6    Q.  -- and all that?  Yeah.  Okay.

7        Now, I want to go to the date -- well, actually

8   let's talk about the subject line.  It says:  Anyone

9   needing the addresses for a visit to welcome them to

10   Florida, please call.  And this was a great day for me.

11   Who says that you cannot catch a big fish in Florida?

12        I read that correctly?

13    A.  The words are correct.

14    Q.  Okay.  The date is March 21, 2017, correct?

15    A.  Yes.

16    Q.  This is one month before InfoWars aired the

17   April 22, 2017 video "Sandy Hook Vampires Exposed,"

18   correct?

19    A.  Correct.

20    Q.  And that's the video we just talked about that

21   airs claims by Wolfgang Halbig, correct?

22    A.  Yes.

23     Q.  Okay.  So I'm going to read you this email, and

24  we'll read along together.  Let me try to be little more

25  flat in my affect too.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       208

1         Nick and Laura Phelps did a great job acting in

2  Newtown, Connecticut on December 14, 2012.  I visited

3  their home today at 1924 Westover Reserve Boulevard,

4  Windermere, Florida, 34786, thanks to Lieutenant

5  Vangehle telling me during my wellness check of Nick and

6  Laura Phelps, that they no longer live in Newton,

7  Connecticut and they are now Richard and Jennifer

8  Sexton.  Guess what?  He is totally right.  And can you

9  believe it, that my Newton Police Department guided me

10  in the right direction.  They have a beautiful home with

11  a three-car garage.  They were not home today, but the

12  good news was that the three adult females, moms with

13  their children standing outside their homes, observed me

14  and wanted to know what I was doing.  It is spring break

15  for Orange County Florida school children.  I showed

16  them this picture and told them that I did not want to

17  go to the wrong house to surprise Nick and Laura from

18  Newton, Connecticut, a/k/a Richard and Jennifer Sexton,

19  today.  It took a few minutes for them to look at the

20  pictures, and then they asked why I wanted to speak to

21  them.  I told them that I have been in Newton and wanted

22  to surprise them since they now live in Florida.  They

23  asked for my name, which I gave them as Wolfgang W.

24  Halbig.  They told me how I knew them, and I told them

25  that they had been on the national news and so I wanted

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      209

1  to meet them again.  Our conversation was all about

2  Newton, Connecticut.  So she said do you mind if I text

3  her.  I said absolutely not.  I waited about 10 minutes

4  only to learn that they did not know me, which surprised

5  me.  They verified the pictures and why she would text

6  them about Newtown, Connecticut and that someone from

7  there wanted to visit if they were not -- if they

8  were -- if they where not Nick and Laura Phelps, now

9  Richard and Jennifer Sexton.  At first I did not want to

10  enter since it is a gated community, but several people

11  told me just to go on in there, is no security guard at

12  the gates.  If there is CCTV, they will see me being

13  told to go in, and that is the only reason or I would

14  have not entered -- or I would not have entered.  Now

15  who says that law enforcement does not know what they

16  are doing?  Thank you, Connecticut Police Department.

17       Have I read that accurately?

18  A.  The words, yes.

19  Q.  Okay.  Can you -- was that -- can you give me

20  some guidance on how I should do the inflection for the

21  future?

22  A.  Just regular text.  Not pretending to be some

23  kind of movie character or a 13-year-old teenager

24  arguing with his brother.

25  Q.  Okay.  I tried to do it as robotically as

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          210

1  possible.

2      A.  Not robotically, just real (cross-talk)

3  conversation.

4      Q.  Okay.

5      A.  I can read it for you if you want me to.

6      Q.  No, that's okay.  I want you to flip the

7  page over.  Do you see that?

8      A.  Yes.

9      Q.  Read that part for me, the big white part at

10  the top.

11      A.  Sandy Hook hoax actors.

12      Q.  What does it say at the bottom?

13      A.  Playing the part of the grief stricken parents.

14      Q.  How does the company feel about this email?

15      A.  I have no feelings on this email.  Wolfgang

16  Halbig did his own investigation.

17      Q.  That email doesn't creep you out, you

18  personally?

19          MR. REEVES:  Objection; form.

20      A.  It creeps me out the way you're reading it,

21  yes.

22      Q.  (By Mr. Bankston)  It doesn't creep you out to

23  have Wolfgang Halbig showing up at these people's houses

24  and describing their three-car garage and all that

25  stuff, accusing them of being people they're not

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          211

1  actually are?  That doesn't -- that doesn't have any --

2  don't have any strong feelings one way or the other on

3  that?

4          MR. REEVES:  Objection; form.

5      A.  (No response.)

6      Q.  (By Mr. Bankston)  Correct?

7      A.  Are you asking my personal opinion?

8      Q.  Yeah, your personal opinion.

9      A.  It strikes me as an impassioned man who is

10  doing an investigation of something he believes in his

11  own heart and he wants to get to the bottom of.

12      Q.  Thank you, Ms. Karpova.

13          (Discussion off the record)

14          (Exhibit 20 introduced)

15      Q.  (By Mr. Bankston)  I'm going to throw you in

16  front of -- put this document I'm putting in front of

17  you now I'm marking at Exhibit 20.  Let me see if I can

18  read this one any better.  We're looking at Free Speech

19  Systems Texas-053016.  Is that correct?

20      A.  Yes.

21      Q.  It's written by Wolfgang Halbig?

22      A.  Yes.

23      Q.  Okay.  The first person it is to is to Lenny

24  Pozner?

25      A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      212


1      Q.  Okay.  I'm going to read you this email.

2    Actually, let's -- if you'd flip the page for

3 me.

4    A.  (Witness complies.)

5    Q.  And do you see how there's some more from

6 Wolfgang Halbig right there?

7    A.  Yes.

8    Q.  Okay.  So I want you to flip back and you'll

9 see at the bottom email it says from Wolfgang Halbig.

10    A.  Yes.

11    Q.  And again, there's a bunch of other people he's

12 sending this to?

13    A.  Yes.

14    Q.  Okay.  And then if we flip over onto the back,

15 I can read this.  Okay?

16    And the subject says:  Forward, clear no wires

17 helicopter view.

18    A.  Yes.

19    Q.  The email says the shadow shows an 11:45 a.m.

20 time period, just do not know the date, question mark?

21    A.  Yes.

22    Q.  And then it says flag at half mask, who ordered

23 that, question mark?

24    A.  Yes.

25    Q.  Only the governor can do that and he has not

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      213

1 even addressed the national news media, correct?

2    A.  Yes.

3      Q.  Okay.  Turn the email over.

4          Do you see there's another email from Lenny

5  Pozner right after that?

6      A.  Yes.

7      Q.  I'm going to go ahead and do inflection on this

8  because he's my client and I know he said this when he

9  said it.  It says can you please go fishing or play

10  bingo?

11          That's what it says on the page?

12      A.  Yes.

13      Q.  Okay.  And the next email it says:  Pozner, I

14  love this picture, don't you?  This is not December 14,

15  2012.  So what date did they practice for killing 20

16  children and 6 school staff members?  Practice makes

17  perfect they say.  What is the name of the police

18  officer who shot all those people inside the school on

19  December 14, 2012?  Dr. Wayne Carver has already been

20  onsite, so was Manfradonia, who was arrested that day

21  and let go.  No yellow warning tape on that huge

22  sinkhole.  And when Rosen gets interviewed on that

23  December 14, 2012, there is a yellow emergency tape

24  around the sink hole.  Only television magic can make

25  that happen.  Wolfgang.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      214

1          I read that email correctly?

2      A.  Yes.

3      Q.  This is something that InfoWars had in its

4  corporate files, correct?

5    A. Yes.

6    Q. And, in fact, if you look at the last email

7   address at the top of the page, it says

8   robd@infowars.com, correct?

9    A. Yes.

10    Q. One of the other emails you'll see in the last

11   line of the to list is npattis@pattislaw.com, correct?

12   On the to line at the top of the page, the last line of

13   the to line. Do you see npattis@pattislaw.com?

14    A. Yes.

15    Q. That's the company's lawyer, correct?

16    A. Yes.

17    Q. Was that the company's lawyer at the time?

18    A. I don't know.

19    Q. Okay.

20        (Discussion off the record)

21    Q. (By Mr. Bankston) So I'm --

22    A. I can -- I just want to clarify. These kinds

23   of emails that are being sent to people is something

24   that Halbig sends on a regular basis and they are not

25   read by people or staff.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    215


1    Q. Okay. So the source that you were relying on

2   a month later, the emails he's sending to the company,

3   were ignored, correct?

4    A. Well, we have a lot of emails. But in the ones

5   that have this many addresses in the to lines and cc

6  usually go to spam.  So they're not even noticed.

7      Q.  You don't know that that went to spam.  You

8  don't know that, right?

9      A.  I know that these types of emails go to spam.

10  They were -- they weren't addressed to just one specific

11  person.

12      Q.  So if I have an email with all those to's on it

13  and it's replied to by InfoWars people, that would be

14  kind of inconsistent with that, wouldn't it?

15      A.  If they were replied to by an InfoWars person,

16  yes, but this person isn't replied to by an InfoWars

17  person.

18      Q.  Right.

19          But we know they're not going to spam because

20  y'all regularly communicate with Wolfgang Halbig when he

21  does this, right?  Do you agree with it or do you not

22  agree with that?

23      A.  No, because the email that is responded to is

24  addressed to specific people.

25      Q.  I'm not asking about that email.  I'm asking

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        216


1  when InfoWars communicates as regularly communicated

2  with Wolfgang Halbig on emails that copy a ton of people

3  like that.  That's something that's happened quite a bit

4  at InfoWars, correct?

5      A.  I haven't seen that.

6      Q.  Okay.  So in terms of trying to get acquainted

7  with the documents that the company has produced today,

8  you didn't see any of those documents, right?

9    A.  InfoWars personnel -- a specific person from

10  InfoWars is responding to a mass email like this.

11    Q.  Uh-huh.

12    A.  I do not seeing that.

13    Q.  Okay.  Let's talk about really quick -- oh,

14  man, there it is.

15        MR. BANKSTON:  Can you tell me how much

16  time we've used?

17        THE VIDEOGRAPHER:  Yeah, one second.

18        A little over 4 hours.

19        MR. BANKSTON:  Okay.

20    Q.  (By Mr. Bankston)  Okay.  One of the things

21  you're supposed to testify today about is the company's

22  knowledge of the plaintiffs, correct?

23    A.  Yes.

24    Q.  Okay.  The company knew about Leonard Pozner

25  within weeks of the shooting, correct?  Let's go through

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        217

1  it.  Withdraw the question.  Back up.

2        Have you seen the email Leonard Pozner wrote to

3  the company weeks after the shooting?  Have you seen it?

4    A.  I don't have the recollection of it.

5    Q.  So in terms of trying to get up to speed on the

6  company's knowledge of the plaintiffs in terms of

7  complaints that Leonard Pozner may have made to

8  InfoWars, you haven't seen those, have you?

9    A.  I haven't seen the email you're talking about.

10   Q.  Right.  Yeah.

11        You know that both Paul Watson and Alex Jones,

12 like, worked on responses to send to Leonard Pozner?

13 Have you seen those?

14   A.  I've seen, like I said, a lot of documents.

15   Q.  I'm not asking you --

16   A.  (Cross-talk.)

17   Q.  So that what I'm asking you.

18        When you got prepared to talk to me about the

19 company's knowledge of the plaintiffs, you haven't even

20 seen the correspondence that InfoWars has had with that

21 plaintiff, right?

22   A.  I have not.

23   Q.  You don't deny Mr. Pozner complained to

24 InfoWars about its coverage within weeks of the

25 shooting, right?  You do acknowledge that.  The company

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      218

1 acknowledges that.  The company has that knowledge.  Or

2 do you not know if the company has that knowledge?

3    A.  I don't have specific dates of his complaints.

4    Q.  So you can't tell me today if in 2013 the

5 company knew who Leonard Pozner was.  You can't tell me

6 that.

7    A.  The company had knowledge of Lenny Pozner, yes.

8    Q.  I want to show you something.

9        You understand that the company produced

10 documents from its own corporate files, right?

11    A.  Yes.

12    Q.  Okay.  And you understand that some of those

13  document requests asked for documents about my clients,

14  right?

15    A.  Yes.

16    Q.  Do you know who my clients are?  Can you name

17  them?  I have four clients.  Do you know who they are?

18  Yeah, it's on the notice.  I know -- from memory, you

19  don't.  You've got to pull this up, right?

20    A.  Yes.

21    Q.  Okay.  So now you can see it, right?  It's on

22  that.  Okay.

23       So you understand that InfoWars produced

24  documents about each of those four clients.

25    A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       219


1    Q.  Are you generally familiar with what documents

2  they produced as it relates specifically to those four

3  clients or what InfoWars' knowledge is?  It's not a lot.

4    A.  Yes.

5    Q.  Okay.  Do you see --

6    A.  Cursory knowledge of Leonard Pozner and no

7  knowledge of the other people.

8    Q.  Okay.  So you do know that documents were

9  produced that relate to Leonard Pozner.  I was given

10  specific documents that relate specifically to Leonard

11  Pozner.  Do you understand that?

12     A.  I don't have a list of specific documents for

13  you right now, yes.

14     Q.  Okay.  Actually, when I say InfoWars produced

15  documents, that's not accurate.  InfoWars produced a

16  document to me very, very recently --

17     A.  Okay.

18     Q.  -- okay, about Leonard Pozner.

19        Have you ever seen that?  Have you seen that

20  before today?

21     A.  No, I have not.

22     Q.  Okay.  So in terms of the document, a single

23  document that was recently produced to me about Leonard

24  Pozner, you've never seen.

25     A.  If this is the single document you're talking

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      220


1  about.

2     Q.  That's it.  Uh-huh.

3     A.  No.

4     Q.  Okay.  Do you see where it says FSXTX [sic]

5  dash 8085544?

6     A.  Yes.

7     Q.  Okay.  You don't know what this is, do you?  If

8  I wanted to ask you what is this, you couldn't tell me.

9     A.  It looks like a background information.

10     Q.  Right.  I mean, I can figure that out, right?

11  Like, we can look at the top at the table of contents

12  right here, and it says for license investigator

13  purposes only.  Do you see where it says that?

14    A.  Yes.

15    Q.  And then do you see where it says Leonard

16  Pozner comprehensive report?

17    A.  Yes.

18    Q.  Do you see where it has all these entries about

19  all this information about Leonard Pozner?

20    A.  Yes.

21    Q.  This is a lot of knowledge that the company has

22  in its possession concerning Leonard Pozner.  You'd

23  agree with that?

24    A.  Yes.

25    Q.  And some of the information that the company

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        221


1  has about Leonard Pozner in its knowledge include his

2  possible relatives, right?  Do you see that down near

3  the bottom of the list?

4    A.  Yes.

5    Q.  And possible likely associates and possible

6  associates, right?

7    A.  Yes.

8    Q.  Okay.  And, like, for instance, if we go to --

9  do you see where it says page 66 for possible relatives?

10  Can you flip to page 66 in that document for me?

11    A.  (Witness complies.)

12    Q.  This is a bunch of people's personal

13  information, isn't it?

14    A.  Yes.

15    Q.  And you can't tell me why the company has this,

16  can you?

17    A.  I don't know.

18    Q.  So when it comes to testifying about the

19  company's knowledge of Leonard Pozner, which you can now

20  see, it is extremely extensive, you're not prepared to

21  testify about that today, right?

22        MR. REEVES:  Objection; form.

23    A.  Well, the company was asked for the knowledge

24  of the plaintiffs.

25    Q.  (By Mr. Bankston)  Uh-huh.  Lenny Pozner is a

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        222


1  plaintiff, right?

2    A.  This is what they produced about the knowledge

3  of the plaintiff.

4    Q.  Right.  I understand that.  I asked for a

5  request for production of documents.  Then I asked for

6  your testimony.  Part of the reason I asked for your

7  testimony and the knowledge of the plaintiffs is because

8  you produced to me -- your company produced to me

9  187 comprehensive background report on Leonard Pozner

10  and I wanted to know why.  And I wanted to ask questions

11  about that document.  I wanted to know what was inside

12  of it.  I wanted to know the information that the

13  company had and what they did with it.  You can't answer

14  any of that, can you?

15    A.  Well, this is -- just looks like a typical,

16  like, investigation report done on a person.

17    Q.  You have no idea where it comes from, do you,

18  Ms. Karpova?  None, right?

19    A.  This is a document that you were provided by

20  the company.

21    Q.  Yeah.

22      Where did the company get it?  Do you know?

23    A.  (No response.)

24    Q.  So -- so you don't know, correct?

25    A.  Are you talking about specific people?  No.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      223


1  I --

2    Q.  You have no -- let's make this really clear.

3      You have zero knowledge about this document,

4  none whatsoever, correct?

5    A.  Not other than it's being an investigation

6  report on Leonard Pozner.

7    Q.  Which you have seen now --

8    A.  Back -- background -- background information.

9    Q.  Which you have now seen for the very first

10  time, correct?

11    A.  Yes.

12    Q.  Okay.  What about Scarlett Lewis, do you know

13  what the company has in terms of information about

14  Scarlett Lewis?

15    A.  No.

16    Q.  Do you know what information the company has

17  about Neil Heslin?

18    A.  No.

19    Q.  Do you know what information it has about

20  Veronique De La Rosa?

21    A.  No.

22    Q.  Okay.  And let me make sure I'm clear about

23  this.  When you say you, that's you personally, Daria

24  Karpova don't know.  So in other words the answer to the

25  question on the company is you Daria Karpova don't know

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      224

1  what information the company has on any of those people.

2    A.  No, the company doesn't have information on any

3  of those people, other than the documents that have been

4  provided to you.

5    Q.  Okay.  So that's what I'm asking you.  What

6  does the company know?  Do you know what the company

7  knows about Ver --

8    A.  This is the document that was provided for

9  you -- to you.

10    Q.  Okay.  That was provided to me in response to

11  requests for Leonard Pozner.

12    A.  Right.

13    Q.  I'm asking you about Neil Heslin?

14    A.  No other information on other plaintiffs, the

15  company does not have.

16    Q.  Are you sitting here and telling me today the

17  company hasn't produced documents on those folks?

18    A.  No, the company has no knowledge.

19    Q.  Really?  Okay.

20          So InfoWars' employees weren't researching

21  materials about Mr. Heslin?

22      A.  There are -- there's no records of any

23  employees researching things like that that --

24      Q.  Yeah, there are.  Unfortunately for you,

25  Ms. Karpova, there definitely are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       225


1          Let's just -- I'm moving off of this topic

2  because there's -- obviously nothing is going to be

3  accomplished here and we're running out of time.

4          What did you do to determine the total

5  audience reach of the videos in plaintiffs' petition?

6  What did you do?

7      A.  There's -- there's no way of finding out the

8  total reach of the audience because the YouTube channel

9  was deplatformed, as well as other media that the videos

10  could have been posted on.  We have a view count on

11  videos on banned.video.  But that just tells you how

12  many times the vide was watched, how many people watched

13  it.  In terms of videos being shared by other people,

14  there's no -- there's no way of figuring out what the

15  reach for that is.

16      Q.  How many -- InfoWars is currently broadcast on

17  over 200 radio stations, correct?

18      A.  Around there.

19      Q.  Okay.  What did you do to go find out their

20  viewership and audience for those dates?

21    A.  There would be no information.

22    Q.  How do you know that?  Who did you ask?  Have

23  you gone to -- let me back this up.

24        How many of those radio stations did you make

25  requests to?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        226

1    A.  I didn't.

2    Q.  Okay.  Did you do anything to figure out what

3  those radio stations audienceship was at the time those

4  videos were broadcast?

5    A.  No.

6    Q.  Okay.  At the time of the videos described in

7  the plaintiffs' lawsuit, how many over-the-air

8  television stations from 2013 to 2018?

9    A.  I don't have the exact number.

10    Q.  So if I wanted to establish what the audience

11  reach was of over-the-air television broadcast of

12  InfoWars, you can't help me with that because you don't

13  even know how many there are in terms of over-the-air

14  television, right?

15    A.  Well, the topics asked for specific videos and

16  the reach of those videos.

17    Q.  Uh-huh.

18        And those videos were broadcast on over-the-air

19  television, right?

20    A.  I would say during -- well, not necessarily.

21  Some of the videos could have been posted as standalone

22  videos.

23     Q.  A lot of coulds in this room.  We don't know,

24  do we?  Right?

25        So we know -- one thing we do know is at least

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        227

1  some of them were broadcast over-the-air television,

2  right?

3     A.  Yes.

4     Q.  Okay.  You didn't -- there's no way for you to

5  tell me anything about that, is there?

6     A.  No.

7     Q.  You didn't do anything to try to figure that

8  out, did you?

9     A.  I did the best I could.

10     Q.  How many cable packages was InfoWars carried on

11  between 2013 to 2019?

12     A.  That wasn't part of the questions.  I could

13  have found -- found that information for you from an

14  affiliate relation person.

15     Q.  Part of InfoWars audience reach is the people

16  that it reaches over cable packages, right?

17        MR. REEVES:  Objection; form.

18     Q.  (By Mr. Bankston)  Isn't that true?

19     A.  That is a very specific question pertaining to

20  a department, a particular department that would need to

21  be --

22     Q.  And you didn't go do that?

23     A.  No.  That wasn't in the scope of the questions.

24    Q.  So in terms of the audience reach of these

25  videos that was reached on any cable packages, you don't

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        228

1  have any information on that for me today?

2    A.  No.

3    Q.  Okay.  How many OTT service -- well, first of

4  all.  Do you know what an OTT service is?

5    A.  What is it?

6    Q.  Over-the-top.

7    A.  Okay.

8    Q.  Over-the-top box systems.

9    A.  Okay.

10    Q.  Like, I think one example might be, like, Roku.

11    A.  Okay.

12    Q.  That would be an example of an OTT system.

13        InfoWars has frequently promoted that it's on

14  multiple OTT systems, right?

15    A.  But the company would have no -- the company

16  would keep no track of those kinds of views.

17    Q.  But you don't know if that information is

18  accessible, do you?

19    A.  There's no information for me that.

20    Q.  Well, let's fist figure out the first thing

21  that I might need if I'm going to try to figure out the

22  audience reach was, which is how many OTT packages is

23  InfoWars included on?

24    A.  I would have to go back and check on that.

25    Q.  So in terms of the reach -- the audience reach

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          229

1  of the audience that was reached through those OTT

2  packages, InfoWars has no information to offer today.

3      A.  Correct.

4      Q.  Okay.  Zero Hedge is one of the sources for

5  company Sandy Hook information.

6      A.  Yes.

7      Q.  Okay.  You understand that in Neil Heslin's

8  defamation case, this court ordered InfoWars to respond

9  on to discovery about Zero Hedge.  Do you know that?

10      A.  Okay.

11      Q.  Okay.  Do you know that that discovery was

12  never responded to?

13      A.  Okay.

14      Q.  Okay.  So in terms of the documents produced by

15  the company and as far the plaintiffs' discovery

16  request, the company admits that it refused to answer

17  discovery about what -- about Zero Hedge.  That's true?

18      A.  Well, that means we have no documents for that.

19      Q.  I don't think that's what that means.  Alright?

20  And I think -- I think if you want to say that's what

21  that means, it would actually be answering the question

22  and saying we have no documents.

23          But you understand that InfoWars never answered

24  those requests.  Did you know that?

25          MR. REEVES:  Objection; form.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          230

1    Q.  (By Mr. Bankston)  Were you aware of that?

2    A.  The company did the best to provide all the

3  documents requested.  And we have provided hundreds of

4  thousands of pieces of documents.

5    Q.  So the best the company can do is -- you take

6  it that not answering the questions themselves is the

7  best the company can do?

8    A.  The company did their best.

9    Q.  The same deal with ibankcoin.com.  That's a

10  source for InfoWars Sandy Hook video, isn't it?

11    A.  Uh-huh.

12    Q.  Okay.

13    A.  Yes.

14    Q.  No discovery has ever been answered on

15  iBankCoin, right?

16    A.  The company doesn't have any information.

17    Q.  I highly doubt that, Mr. Karpova.

18       MR. REEVES:  Objection; form.

19    Q.  (By Mr. Bankston)  One of the articles that was

20  relied on for Owen Shroyer's video about Mr. Heslin in

21  June of 2017 is an iBankCoin article, right?

22    A.  Alex Jones, as well as Owen, who does multiple

23  articles from websites.

24    Q.  And do you think there's nothing in InfoWars'

25  files relating to ibank.coin [sic]?  Is that your

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        231

1  testimony today?

2     A.  Define InfoWars' files.

3     Q.  Do you know what I mean when I say InfoWars'

4  files?  Do you not know what I mean -- is what --

5  InfoWars maintains files, right?

6     A.  Correct.

7     Q.  Right.  So it has documents.

8     A.  Emails.

9     Q.  Sure.

10    A.  Videos.

11    Q.  All sorts of things.  Pamphlets, star charts,

12  runes, block chains, diagrams, pictures.  All sorts of

13  things are at InfoWars' corporate files.  And there are

14  some in -- on ibankcoin.com in InfoWars' files, or are

15  you saying there's not?

16    A.  That were produced (indiscernible).

17    Q.  Okay.  You know who Dr. Wayne Carver is, right?

18    A.  The name sounds familiar.

19    Q.  Alright.  That's in -- also in Owen Shroyer's

20  video.  Did you watch Owen Shroyer's video about

21  Mr. Heslin?

22    A.  I have, yes.

23    Q.  Okay.  Is that one that you watched in the

24  break or did you watch that before?

25    A.  I've watched it before.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       232


1     Q.  Okay.  And Dr. Wayne Carver's a medical

2  examiner in Sandy Hook.  The company has documents on

3   him, doesn't it?

4      A.  All the documents that we have we have

5   produced.

6      Q.  You know Corey Skalanka is, right?

7      A.  No.

8      Q.  Okay.  Corey Skalanka is an associate of

9   Wolfgang Halbig who is a codefendant with InfoWars in

10   the Lafferty suit.  Does that refresh your memory on who

11   Corey Skalanka is now?

12      A.  No, not really.

13      Q.  Okay.  You would admit being a co-defendant

14   with Corey Skalanka in the Lafferty suit, the company

15   possesses documents about Corey Skalanka, correct?

16         MR. REEVES:  Objection; form.  Nothing to

17   do with the Texas cases here.

18         MR. BANKSTON:  It has to do with the

19   documents produced in response to our discovery request

20   and our discovery request for Corey Skalanka, which you

21   would know if you ever answered me.

22         I mean, Brad, this is the most

23   disrespectful deposition I've ever been in.  We've been

24   in two depositions where you presented the same -- your

25   company presented the same kind of deponent who didn't

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      233

1   know anything about what was being on these topics.  And

2   now for you to come in and to object to topics about I'm

3   asking about documents produced in my discovery request

4   and you tell me Corey Skalanka isn't responsive to this

5  case -- both of y'all need to get up to speed on what

6  this case is about.

7          MR. REEVES:  Excuse me.  First of all.  I

8  am objecting on the basis of you asking about the

9  Connecticut litigation.  I'm not ask -- I'm not saying

10  you have any -- I'm not objecting to you asking any

11  questions about your discovery requests.

12          Second of all, no one is trying to be

13  disrespectful here.  She's doing her best job.  And I

14  don't care whether you think she isn't or not, and I

15  don't really care what your personal opinions are on her

16  or not.  If you have a problem with it, which I'm sure

17  you -- you obviously do, you're going to try to do

18  something about it.

19          MR. BANKSTON:  And you know I'm going to,

20  Brad.

21          MR. REEVES:  And I -- and I want you to

22  maintain for the record that every one here has been

23  working as hard as they can to actually get you answers

24  that you want.  And I'm sorry that out of the hundreds

25  and thousands of pages of documents that you're asking

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       234


1  about specific ones that she doesn't have the exact

2  answer to.

3          MR. BANKSTON:  You haven't produced

4  hundreds of thousands of pages.

5          MR. REEVES:  Okay, man.  You know what?

6        MR. BANKSTON:  You haven't even answered

7    discovery, Brad.  So if you're going to sit here and

8    lecture me --

9        MR. REEVES:  I would like you to show me

10   the ones you're saying have not been responded to.

11       MR. BANKSTON:  What's that?

12       MR. REEVES:  Which ones are you saying have

13   not been responded to?

14       MR. BANKSTON:  You haven't responded to the

15   Pozner discovery in any shape or form.

16       MR. REEVES:  Have I been compelled by a

17   court order to actually respond to those documents?

18   Because I got defaulted, but I haven't actually seen a

19   motion to compel on it.

20       MR. BANKSTON:  Right.  And I'm proving all

21   that up right now.

22       MR. REEVES:  I understand that.  But I'm

23   unclear on if I'm defaulted on it and -- I'm unclear of

24   the obligations to actually supplement it.  But if

25   you -- if you to want to ask me to do that, then I'll do

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      235


1    that for you.

2        MR. BANKSTON:  I'm not asking that at all.

3    I'm asking her directly, that they haven't produced me

4    documents to my discovery request.  And I want them to

5    admit that they refuse to answer them.  And you've just

6    kept interrupting me about it.

7        MR. REEVES:  Okay.  Well, I'm sorry.  I

8  didn't mean to interrupt you. I apologize. That's not

9  my intent. And I will --

10        Go ahead and answer the question to the

11  extent you can, please.

12  Q. (By Mr. Bankston) Alright. The company does

13  possess documents about Corey Skalanka that would have

14  been responsive to plaintiffs' discovery request and

15  they refused to provide them, correct?

16  A. That's not correct. The company has provided

17  all the information they have.

18  Q. That's --

19        MR. BANKSTON: Brad, do you want to warn

20  your witness, or do you need to consult with her

21  outdoor -- outside or something? Because that's --

22  that's not a true -- that's a false answer and I don't

23  want to get into that area. I need an answers to this

24  question, and I -- that's, like, I don't know if you

25  want to go talk to her or something. I'm trying to make

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        236


1  this easy for you.

2        MR. REEVES: Let's take a minute and let me

3  confer with her and then come back to it.

4        MR. BANKSTON: Tell you what. Let's put

5  that question at the pin at the end because I really --

6  I wanted to get out of here at 5:30 for these people.

7  And I -- the latest we can stay is 6:00, and that's till

8  not going to give me enough time. But let me get to the

9    rest of these questions.  And then if you yet I've have

10   you confer with her so I can ask her that question at

11   the end.

12       Q.  (By Mr. Bankston)  You're aware of a film that

13   the company hosted about Mr. Pozner called "We Need to

14   Talk About Sandy Hook"?  Do you know what that film is?

15       A.  No.

16       Q.  Okay.  Do you know who Independent Media

17   Solidarity Group is?

18       A.  No.

19       Q.  Okay.  The company is aware of other parents

20   who lost children at Sandy Hook besides my four clients,

21   correct?

22       A.  I don't have a document listing their names.

23       Q.  Right.

24          But you know there's other parents, right?

25       A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       237


1        Q.  Okay.  The company possesses documents about

2    some of those parents?

3        A.  Again, the answer's the same.  The company did

4    the best -- their best to provide the documents they had

5    in response to discovery.

6        Q.  So in terms of whether InfoWars has been

7    requested to produce documents about other parents than

8    the Pozner case, you wouldn't know whether those

9    documents have been produced or not, right?

10       A.  Again, the answer's the same.

11    Q.  Okay.

12        (Discussion off the record)

13        MR. BANKSTON:  Brad, this is an Excel

14  spreadsheet you produced to me.

15        MR. REEVES:  Okay.

16        MR. BANKSTON:  I printed it as a PDF.

17        MR. REEVES:  Alright.

18        MR. BANKSTON:  I have made two alterations

19  to the document, which I think will be for your benefit,

20  I have confidential attorneys eyes only at the top.

21        MR. REEVES:  Okay.

22        MR. BANKSTON:  I have labeled the Bates

23  number of this spreadsheet.  And I have added a 001

24  through page numbers on it too just to make it easier

25  for us to work with.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      238


1    Q.  (By Mr. Bankston)  Are you familiar with the

2  documents produced by the company in response to the

3  plaintiffs' request regarding revenue data for the

4  company?

5    A.  No.

6    Q.  Okay.  I don't even know why I'm showing you

7  this, but whatever.

8        (Exhibit 21 introduced)

9    Q.  (By Mr. Bankston)  I'm going to show you what

10  I've marked Exhibit 21.  This is marked as FSXTX [sic]

11  dash 086589.  Do you see that?

12    A.  Yes.

13    Q.  Okay.  So you've never seen this document

14  before, right?

15    A.  No.

16    Q.  Okay.  I was produced this?  It's not labeled

17  on anything.  But from what it looks to me, that's what

18  it is.  As you'll see, there is a date column, right?

19    A.  Right.

20    Q.  There's some orders, right?

21    A.  Yes.

22    Q.  Sales items, correct?

23    A.  Yes.

24    Q.  Sales total?

25    A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        239


1    Q.  Invoiced?

2    A.  Yes.

3    Q.  Refunded?

4    A.  Yes.

5    Q.  Sales tax?

6    A.  Yes.

7    Q.  Sales shipping?

8    A.  Yes.

9    Q.  Sales discount?

10    A.  Yes.

11    Q.  Canceled?

12    A.  Yes.

13    Q.  Okay.  My assumption would be that this

14  document is providing sales revenue information,

15  statistics from the infowars.com store.  Do you know if

16  that's accurate?

17      A.  Yes.

18      Q.  Okay.  Can you flip to the last page for me,

19  which actually would be on the back of the last page.

20  You can just turn the document around.

21          Do you see how there's a column that says

22  total?

23      A.  Yes.

24      Q.  Okay.  So this document reflects that during

25  the period of this document, that the total amount of

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      240


1  sales revenue from InfoWars and the infowars.com store

2  is $165,237,014.62, correct?

3      A.  Yes.

4          (Discussion off the record)

5          (Exhibit 22 introduced)

6      Q.  (By Mr. Bankston)  I'm showing you what I've

7  marked as Exhibit 22.  Have you ever seen that document?

8      A.  I have not.

9      Q.  Okay.  It says here amazon services, seller

10  central.  Am I correct that InfoWars sells products on

11  Amazon?

12      A.  Yes.

13      Q.  Can you flip to me to the page labeled -- and

14  its -- look at the Bates number, the red number down

15  here at the bottom.  Can you go to 57574  Alright.  This

16  document which is labeled FSSTX-086575.  Is that

17  correct?

18      A.  Yes.

19      Q.  Okay.  This document appears to me to reflect

20  that InfoWars made $1,355,664.30 in revenue from Amazon

21  and paid $421,973.69 in expenses.  Is that correct?

22      A.  It appears so from this document, yes.

23      Q.  Okay.  Would that be consistent with your

24  understanding, that InfoWars is doing about a million

25  dollars a year in sales every year on Amazon right now?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        241


1       A.  No.  From my understanding, that Amazon

2   account -- I don't have that information.

3       Q.  Okay.  InfoWars sells things on eBay too?

4       A.  I don't know about that.

5       Q.  Okay.  When was the date -- I'm talking about

6   now efforts the company made to preserve evidence in

7   this case.  Do you know when the first litigation hold

8   letter was sent out to InfoWars' employees?

9       A.  There was a letter sent out, yes.

10      Q.  Do you know when the first litigation letter

11  was --

12      A.  I don't have -- oh, the date?

13      Q.  Yeah, when it happened.

14      A.  I don't know.

15      Q.  Do you know who sent it?

16      A.  Tim Fruge.

17      Q.  Okay.  And what did that letter say?  Do you

18  know?

19      A.  It requested the employees to search their

20  archives for anything having to do with Sandy Hook and

21  to preserve all the documents from that point on.

22      Q.  You're aware -- have you read the deposition of

23  Michael Zimmerman?

24      A.  No.

25      Q.  Okay.  Were you aware that during

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      242


1  Mr. Zimmerman's testimony we confirmed that in response

2  to Mr. Fruge's request to all the employees, not a

3  single employee returned a single -- not a single

4  employee returned a single document.  Were you aware of

5  that?

6      A.  I wasn't.

7      Q.  Okay.  If I was to -- it's my understanding

8  that Tim Fruge sent out this letter sometime in 2019.

9  Does that -- does that conflict with what you know, or

10  do you not know?

11      A.  No, I do not know for sure.  But I believe that

12  letter was sent out as soon as the request was made in

13  litigation.

14      Q.  Excuse me.  Say that again.

15      A.  So whenever it was requested for to -- for the

16  discovery, it --

17      Q.  Gotcha.

18        Well, that would make sense because the

19   discovery in this case was put off until spring of 2019.

20   It didn't really start in earnest until then.

21        But you understand the company had been sued

22   back in April of 2018, right?

23   A.  Yes.

24   Q.  So it would be fair to say that for almost a

25   year InfoWars took no action to preserve evidence from

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        243


1   those employees.

2   A.  Well, they weren't requested to.

3   Q.  Really?  Are you sure about that?

4   A.  From my understanding.

5   Q.  Are you sure?

6   A.  Well, the -- as the request for discovery was

7   made.

8   Q.  Let me ask you this.  Has the company ever

9   received any correspondence from the plaintiffs saying

10   please preserve evidence?  Do you know?

11   A.  I don't have any documents on that that I

12   understand.

13   Q.  Okay.  So in terms of getting ready to testify

14   about efforts made to preserve documents, you have not

15   seen any correspondence from the plaintiffs or their

16   counsel asking to preserve documents.

17   A.  I have not.  Point number has -- point number

18   five has anything to do with efforts made by the company

19   to preserve potential evidence.

20    Q.  Right.  And here's what I'm getting at,

21  Ms. Karpova, is that I want to know when the plaintiffs

22  served a request to preserve documents back in April of

23  2018, one, if you have seen it, and two, if the company

24  actually did anything.  And from what I understand, you

25  didn't ever see that correspondence, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        244

1    A.  I haven't.

2    Q.  Okay.  InfoWars LLC, is that a subsidiary of

3  Free Speech Systems?

4    A.  No.

5    Q.  Okay.  Is that something you're stating from

6  something that you know personally or something somebody

7  told you?  You don't have to tell me anybody anything

8  told you, or who told you or what that.  I'm just -- is

9  that your personal knowledge, or is that something you

10  did preparing for the deposition?

11    A.  That's -- both.

12    Q.  Okay.  Okay.  So if somebody was to say that

13  InfoWars LLC is a subsidiary for Free Speech Systems,

14  they would be incorrect.  You're confident of that?

15    A.  Yes.

16    Q.  Okay.  InfoWars LLC is a holding company,

17  correct?

18    A.  InfoWars LLC is -- InfoWars LLC is a

19  single-member company owned.

20    Q.  I'm not asking how many people own it or how

21  many members there are.  I'm asking is it a holding

22  company.  Back up.

23       Do you know what a holding company is?

24  A.  I'm not sure.

25  Q.  Okay.  Alright.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       245

1        MR. REEVES:  Objection; form.  I don't even

2  know anything about a holding company.  So --

3        MR. BANKSTON:  Well, InfoWars sure does.

4        MR. REEVES:  As far as -- I don't know what

5  you're --

6        MR. BANKSTON:  You put it in a pleading,

7  Brad.

8        MR. REEVES:  I'm talking about what

9  you're -- what you mean by that.  I'm asking what you

10  mean by that.

11       MR. BANKSTON:  I want to know what InfoWars

12  means by that.  And I -- I really am kind of shocked

13  because that is in the pleading.  Okay.

14  Q.  (By Mr. Bankston)  Okay.  You know who

15  Rocket.Chat is, right?

16  A.  Yes.

17  Q.  Okay.  Is the company still using that?

18  A.  Yes.

19  Q.  Do you know when Rocket.Chat was searched?

20  A.  No.

21  Q.  Okay.  Do you know when it was preserved?

22  A.  No.

23    Q.  Okay.  What about Yahoo Messenger, do you know

24  when that was used?  Was that used during the events of

25  this lawsuit?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        246

1    A.  No, don't know.

2    Q.  Okay.  What about Slack, was Slack used during

3  the events of this lawsuit, since 2013?

4    A.  I'm not sure.

5    Q.  Okay.  Was any efforts made to preserve any

6  messaging systems like Slack?

7    A.  I don't know for sure.

8    Q.  Okay.  What about things like Basecamp?  Do you

9  know what Basecamp is?

10    A.  Yes.

11    Q.  Okay.  Was anything done to preserve Basecamp?

12    A.  I don't know any Basecamp associations with

13  InfoWars.

14    Q.  Okay.  Let me ask you this.  Does InfoWars --

15  have they used Basecamp?  Have employees used that to

16  communicate with each other?

17    A.  No, not that I know of.

18    Q.  Okay.  Not that you know of, right?

19    A.  I've never heard of Basecamp being a

20  communication platform for InfoWars employees.

21    Q.  I hadn't either.  And it was strange because we

22  requested -- obviously we requested and asked for it,

23  what are your communication platforms.  Whatever --

24  that's a whole other story.  But I recently got produced

25  a document from Paul Watson that talks about his

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        247


1  Basecamp communications with another employee.  And I'm

2  just wondering when was Basecamp used.  But you aren't

3  familiar with Basecamp?

4        A.  No.

5        Q.  Okay.  So by the same token if were there any

6  efforts made to preserve Basecamp messages, you don't

7  know what those steps were?

8        A.  No.

9        Q.  Okay.  When it comes to the videos that

10  were -- okay.  First of all, when the company was first

11  sued in 2018, April 2018, the company possessed copies

12  of every video that it had ever made on Sandy Hook,

13  correct?

14        A.  Yes, efforts were made to archive all the

15  videos requested, yeah.

16        Q.  Currently InfoWars does not have access to all

17  the videos it made about Sandy Hook, correct?

18        A.  The videos which were deleted?

19        Q.  That you've lost.

20        A.  We couldn't locate?  Yes.

21        Q.  Yeah.  Okay.

22            What efforts were made to preserve those videos

23  before they were deleted?

24        A.  The videos that were available were preserved.

25  The videos that were not -- that were not --

1    Q.  I'm talking about when you had them all, back

2  when you still had them all.  From the time you were

3  sued -- let's stop for a second just to make sure you

4  understand this.

5        You understand that at the time the videos were

6  lost, when they were deleted, that was after InfoWars

7  had already been sued.  Do you get that?

8    A.  Okay.

9    Q.  Okay.  So during the period which InfoWars had

10  been sued up and to the point its videos were deleted,

11  what steps did InfoWars take to preserve those videos?

12    A.  We didn't anticipate for the YouTube channel to

13  be taken off -- offline.  And our archiving platform was

14  the YouTube channel.

15    Q.  Okay.  So in terms of what you did to preserve

16  it, the only thing you did to preserve it was just leave

17  it on YouTube, correct?

18    A.  Yes.

19    Q.  Okay.  Alright.  I do want to ask this question

20  and I'll circle back to it.

21        MR. BANKSTON:  And, Brad, if after I ask

22  this you want to take your witness out and talk to her

23  before answering the question, I normally would

24  obviously not be okay with that.  But in this specific

25  situation I would.

1    Q.  (By Mr. Bankston)  Which is there were

2  documents requested from the company relating to Corey

3  Skalanka.  InfoWars refused to provide those documents,

4  correct?

5    A.  I don't know that to be the case.

6    Q.  Okay.  So in other words, let me -- let me put

7  it this way.  You sitting here right now do not know

8  whether InfoWars produced document relating to Corey

9  Skalanka or whether it answered discovery relating to

10  Corey Skalanka, correct?

11    A.  You're saying whether they refused to produce

12  documents.

13    Q.  Correct.

14    A.  The company has not refused to produce any

15  documents that they had.

16    Q.  Okay.  I mean -- you understand that if a court

17  order orders you to order -- answer discovery and it

18  never gets turned in, nobody ever answers it, you

19  understand that I could construe that as refusal, right?

20    A.  It's my understanding the documents were

21  produced.

22    Q.  Okay.  So from your -- let's make that -- that

23  maybe is what we need to get at.

24    From your understanding, Daria Karpova, coming

25  into this deposition today, your understanding is that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      250


1  documents relating to Corey Skalanka have been produced.

2      A.  Again, I already said the documents that the

3  company had in possession were produced for discovery

4  purposes that were requested.

5      Q.  Okay.  So in other words, from what you

6  understand to be the discovery situation, there should

7  not be -- it should not exist that there are documents

8  produced in the Connecticut lawsuit about certain topics

9  that were also requested in Texas but weren't produced

10  in Texas.  That situation should not exist.

11      A.  Okay.  Say it again, please.

12      Q.  Sure.

13          Let's imagine for a second that there were

14  documents produced in Connecticut and those same

15  documents were produced in Texas but not -- were

16  requested in Texas but not produced.  You're saying that

17  situation should not exist because InfoWars has produced

18  everything.

19      A.  I don't know.

20      Q.  Okay.

21          MR. BANKSTON:  Let me take a break real

22  quick, bro.

23          THE VIDEOGRAPHER:  5:36 p.m., off record.

24          (Recess from 5:36 p.m. to 5:41 p.m.)

25          THE VIDEOGRAPHER:  The time is 5:41 p.m.

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      251

1  We are on.

2      Q.  (By Mr. Bankston)  Ms. Karpova, I wanted to go

3  back to one of the things you testified about.  I had

4  asked you if you had ever seen any documents in which

5  InfoWars' editorial staff was making the assertion that

6  the sources that they were relying on for Sandy Hook

7  were unreliable.  And I remember you told me you don't

8  think you've seen any documents like that, right?

9      A.  I'd have to look at the document.

10          (Exhibit 23 introduced)

11     Q.  (By Mr. Bankston)  Yes.  That's what I wanted

12  to see if you had seen.  So I'm going to show you this.

13  I've marked this as Exhibit 23.  At the bottom corner it

14  says FSSTX-027766.  Is that right?

15     A.  Yes.

16     Q.  Okay.  And this is Paul Joseph Watson is who

17  it's from at the top, correct?

18     A.  Yes.

19     Q.  Buckley, that's a relative of Alex Jones,

20  correct?

21     A.  Yes.

22     Q.  Okay.  He worked at the company?

23     A.  Yes.

24     Q.  He had a managerial role?

25     A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        252


1      Q.  Okay.  Paul Watson, at this time was he the

2  head editor of InfoWars in 2015?

3      A.  He was an editor.

4      Q.  Okay.  He was the chief reporter at this point,

5   though, wasn't he?

6      A.  Yes.

7      Q.  Okay.  Subject is re, Sandy Hook.  Do you see

8   that?

9      A.  Yes.

10     Q.  Date is December 19, 2015?

11     A.  Yes.

12     Q.  Okay.  I'm going to read this from the bottom.

13  Okay?

14        At -- on December 17th Paul Joseph Watson

15  wrote:  Sent this to Alex.  This Sandy Hook is killing

16  us.  It's promoted by the most bat shit crazy people

17  like Rense and Fetzer who all hate us anyway.  Plus it

18  makes us look really bad to align with people who harass

19  the parents of dead kids.  It's going to hurt us with

20  Drudge and bringing bigger names to the show.  Plus, the

21  event happened 3 years ago.  Why even risk our

22  reputation for it?

23        Next Buckley responds:  I agree with you

24  100 percent.  We think it hurts our credibility

25  significantly.  I'll do what I can to head it off as

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        253


1   much as we can.  What was the latest incursion?  I

2   missed it.

3        Paul Joseph Watson writes back:  Adam -- and I

4   believe that may be Adan -- it may be a typo.

5      A.  Yes.

6    Q. -- wrote another article implying that the

7  Pozner guy's son didn't die. I think Alex had it out

8  with him and put a ban on future Sandy Hook stuff.

9        Have you ever seen that document before?

10   A. I haven't seen this document, no.

11   Q. Okay. Now, you were aware, I believe -- is

12  this what you were referring to when you said Alex Jones

13  put a ban on Sandy Hook stuff?

14   A. Yes.

15   Q. Okay. And that didn't stick, did it?

16   A. Well, what I can say regarding that is Alex

17  allows different opinions on the platform. Paul had a

18  different opinion. Alex had a different opinion.

19  Everyone was -- that was -- people were still talking

20  about -- there were opinions on both sides. So there

21  wasn't a specific -- you know, just again, free speech.

22   Q. My question isn't about who can say what or any

23  of that kind of stuff. My question is simply this. If

24  Alex Jones put a ban on Sandy Hook in December of 2015,

25  it didn't last. It didn't stick, right? We've talked

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      254


1  about videos, multiple videos after this date about

2  Sandy Hook, correct?

3    A. Well, I believe Alex was the subject matter in

4  those videos. He was the one providing commentary in

5  them.

6    Q. You know -- do you remember watching Owen

7  Shroyer's video about Neil Heslin?

8    A.  Right.  And what was the date on that?

9    Q.  That was 2017.  That didn't stick, did it?

10 Correct?

11    A.  It appears -- it appears that Owen had an

12 opinion about it, yes.

13    Q.  Okay.  Do you think any -- anybody else said

14 anything about Sand -- you've seen Rob Dew say things

15 about Sandy Hook after 2015 on InfoWars, right?

16    A.  (No response.)

17    Q.  You just watched "Sandy Hook Vampires Exposed."

18 He was talking in that, wasn't he?

19    A.  Yes.

20    Q.  Okay.  This email where Paul Watson says:  It's

21 promoted by the most bat shit crazy people like Rense

22 and Fetzer.  Does the company agree with Mr. Watson's

23 position or does it disagree with Mr. Watson's position?

24    A.  That's -- that's Paul's opinion.

25    Q.  That's not -- I know that.  I know that.  Does

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      255

1 the company agree with it or not?

2    A.  At this time it appears that Fetzer and Rense

3 would be a very questionable source of information.

4    Q.  Okay.

5        (Discussion off the record)

6    Q.  (By Mr. Bankston)  Okay.  In fact -- I'm just

7 going to ask you a question about this.  Do you remember

8 right after this suit happened, Nico sent you blog

9   material from Jim Fetzer?  Do you remember that

10  happening?

11     A.  After which?

12     Q.  After this lawsuit, a couple of months after

13  this lawsuit, Nico --

14     A.  From the summer of 2018?

15     Q.  From -- yeah, summer of 2018.

16     A.  Okay.

17     Q.  Do you remember Nico sending you blog material

18  from Jim Fetzer for you to look at?

19     A.  I don't specifically remember an email, but if

20  you want to show it to me.

21     Q.  I'm trying -- we've got to get out of here

22  unfortunately I think.  But I'm just wondering if you

23  had remembered that.

24     A.  But, I mean --

25     Q.  In other words, let me -- let me put the

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        256


1   question this way.  Sure.  Let me put the question this

2   way.  In 2017 did the company believe that Jim Fetzer

3   was a reliable source of information?

4      A.  At that time there was controversy regarding

5   that individual.

6      Q.  In 2017 InfoWars published a video that relied

7   on Mr. Fetzer, correct?

8          MR. REEVES:  Objection; form.

9      A.  Okay.

10     Q.  (By Mr. Bankston)  That's true?

11     A.  You're telling me that?  I --

12     Q.  I'm actually -- no.  You need to tell me,

13  Ms. Karpova, because you're here to talk to me about the

14  sourcing and researching in plaintiffs' petition of

15  those videos.

16         Is that one of the videos you watched when

17  y'all took the break?

18     A.  The Owen Shroyer video?

19     Q.  Yeah.

20     A.  Yes, I've seen that video before.

21     Q.  Of course.  Yeah.  You knew you were going to

22  testify about it.

23     A.  What is the --

24     Q.  My question is, that was in 2017.

25     A.  Uh-huh.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      257


1     Q.  It relied on Jim Fetzer.  It had material from

2  Jim Fetzer, correct?

3     A.  I don't know where Owen got that material.

4     Q.  Okay.  If Owen -- and so given your previous

5  answer, given that there was some -- InfoWars was aware

6  that there was some issues being raised with

7  Mr. Fetzer's credibility, that happened in the exact

8  same year that Owen published his video in 2017, right?

9     A.  Right.

10     Q.  So if Owen relied on -- if it did happen that

11  Owen's video contains material from Mr. Fetzer, it was

12  done so at a time where InfoWars knew there were issues

13  regarding his reliability, correct?

14      A.  Yes.

15          MR. BANKSTON:  Okay.  Thank you,

16  Ms. Karpova.  That's all I have for you today.

17          MR. REEVES:  Are you passing right now?

18          MR. BANKSTON:  Yeah.

19          MR. REEVES:  Alright.  We'll reserve.

20          THE VIDEOGRAPHER:  The time is 5:48 p.m.

21  we are off.

22          (Discussion off the record)

23          THE REPORTER:  Mr. Reeves, do you need to

24  purchase a copy of this deposition, sir?

25          MR. REEVES:  Yes, please.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      258


1          (Deposition completed 5:48 p.m.)

2          (Signature reserved)

3

4

5

6

7

8

9

10

11

12

13

Exhibit 5

1

```
1         THE VIDEOGRAPHER:  We're on the record.
2  Today's date is Saturday, December 4th, 2021, and the
3  time is 10:38 a.m.  This is the videotaped deposition of
4  Alex Jones.  Will the court reporter please swear in the
5  witness.
6         THE REPORTER:  I'm Janet Hoffman, Texas
7  Certified Shorthand Reporter, No. 4208.  I am taking
8  this deposition by machine shorthand, and I am located
9  in Spring, Texas.  The witness is located in Austin,
10  Texas.
11         ALEX JONES,
12  having been first duly sworn, testified as follows:
13         MR. REEVES:  Mark, just for purposes of
14  the record, I would like to again have the same
15  stipulation that this is going to be subject to one
16  protective order that's entered into.  Do we have that
17  same stipulation?
18         MR. BANKSTON:  Plaintiffs will agree.
19              EXAMINATION
20  BY MR. BANKSTON:
21     Q.  All right.  Mr. Jones, you know about back in
22  September a default got granted against you.  Right?
23     A.  I know that -- that my seventh amendment
24  rights were violated by a political show trial.  Yes, I
25  do know that.
```

2

1    Q.   It's funny.  Let me show you what's been

2   marked as Exhibit 1 because you mailed it, man, right

3   off there, seventh amendment and default ruling.  Texas

4   judge tramples it.  Right?

5              (Exhibit 1 marked.)

6    A.   That's right.

7    Q.   Okay.  So in fact, as you see on that printoff

8   there, the way your screen kind of prints, it doesn't

9   print very well, so I'm going to actually show you a

10   full copy of that exhibit on this screen here.  Okay.

11   And now that can help you read it a little better.

12   Right?

13    A.   Yes.  And that's about my first amendment, one

14   of the other things you guys are attacking.  This is my

15   first amendment right to say that.

16    Q.   Oh, yeah, no, absolutely.  Have fun, man,

17   totally.  What I'm actually asking you about is:  In

18   that broadcast -- well, in that one, heck, right after

19   it happened, September 30th, you got on the show and

20   talked about it.  Right?

21    A.   I believe so.

22    Q.   October 1st, October 2nd, October 3rd, October

23   4th you were just talking about the default ruling.

24   Right?

25    A.   I did talk about it on some shows.

                              3


1    Q.   One of the things you kept saying on those

2  shows is "I barely covered Sandy Hook."  Correct?

3     A.   I mean, it's a bit of a very small part of

4  what I've done.  It's not my life, like you.  Yes.

5     Q.   Yeah.  And you said yes, I've done --

6  only covered it a few times.  Right?

7     A.   In the aggregate comparatively, yes.

8     Q.   You see how there's a comment on this article

9  right here that I have showing right now?  And you can

10  probably read it fully right here.

11     A.   What?  Are you BigDoggy?  Is that you?

12     Q.   No.  I have it on the screen.  It's not my

13  comment, no, sir.

14     A.   I don't know whose it is, but okay.

15     Q.   I don't know either.  I don't know who

16  BigDoggy is.

17     A.   I just know you're pretty famous for comments

18  on the internet, so --

19     Q.   I am.

20     A.   -- I was asking:  Are you BigDoggy?

21     Q.   No, I'm not BigDoggy.  Okay.  But again, I

22  don't know who BigDoggy is.  It could be Brad.  It could

23  be Mark.

24     A.   Could be you.

25     Q.   Could be you.  Well, actually --

                                    4


1        MR. REEVES:  Please let him just ask you

2  questions and answer his questions.  I understand y'all

3  have contentious -- against the other. But if you could

4  just let him ask questions and you answer, that would be

5  great.

6          THE WITNESS:  Sure.

7      Q.   I think we have a friendly relationship.

8  Don't you, Mr. Jones?  We've had some fun in these

9  depositions, haven't we?  Yeah.  So here's the thing, is

10  I don't think you're a BigDoggy.  And the reason it is

11  is because isn't BigDoggy saying, look, why does Alex --

12  and I'm going to quote BigDoggy here.  Let's get

13  BigDoggy on the record -- why does Alex say he barely

14  covered Sandy Hook?  We know that isn't true.  Alex

15  should just tell the truth.  He covered this extensively

16  many, many shows dedicated to this story.  BigDoggy is

17  right, isn't he?

18      A.   You should just call BigDoggy as a witness.

19      Q.   Well, I'm basically kind of doing that.

20      A.   I understand.  I don't know anything about

21  BigDoggy, so I can't speak for them.

22      Q.   But he's right?

23      A.   No.  In the aggregate, I barely covered Sandy

24  Hook.

25      Q.   How many videos did you do on Sandy Hook?

                            5


1      A.   I don't have that number in front of me.

2      Q.   Truth is it's probably around 100, isn't it?

3      A.   Well, if you count responding to you guys in

4  your lawsuits, yes.  Since then, I have covered it quite

5   a bit.

6       Q.   No.  I'm talking between the dates before you

7   were sued, from 2012 to 2018, about 100 videos.  Right?

8       A.   That's not the number I have.  I don't have

9   those numbers exactly in front of me, so I don't know.

10      Q.   Well, you only produced 55 of them to me.

11  Correct?  You know how many you produced to me.  Right?

12      A.   Well, we produce about 55 videos a day.

13      Q.   Right.  I'm not talking -- let's make sure

14  that you understand the difference between what you mean

15  by produced in your world, which means the collection of

16  people who get together and create an audio-visual

17  product which you distribute to the world and the

18  definition of produce in my world, which means that you

19  give me things.  And one of the things that you gave me

20  was 55 videos on Sandy Hook.  Okay?

21      A.   Okay.

22      Q.   So you did cover it many, many times.

23  Correct?

24      A.   I have covered it, yes.

25      Q.   All right.  So my question is:  If you're

                                6

1   going to get on your show and say you barely covered

2   Sandy Hook and you only covered it a few times, if

3   you're going to say that untrue stuff, why should this

4   jury believe you about anything?

5           MR. REEVES:  Objection.  Form.

6      Q.   Mr. Jones, you've been in enough depositions

7  now to know that when Mr. Reeves says Objection.  Form.,

8  you can go ahead and answer.  You already know that.  So

9  I'm just going to go ahead and ask you the question

10  again.  If you get on your show and you say "I barely

11  covered Sandy Hook.  I only covered it a few times" and

12  the truth is that you covered it many, many, many times,

13  why should this jury believe you about anything?

14          MR. REEVES:  Objection.  Form.  Go ahead

15  and answer if you can.

16      A.   Again, in my opinion, if you compare it to all

17  the things we've covered and done in the last ten years,

18  it was a very small thing that we covered at limited

19  points.  But I do four hours a day, and so things can be

20  cut up into different pieces.  Many videos have been

21  reedited by others countless times.  And there's really

22  no way for me to know.  I just know that -- that I've

23  covered it a lot more since these lawsuits and I've had

24  to talk about it so I can respond to it than I did

25  previous to that, and that it was -- it's not something

                          7

1  that made my career.  It's not something that made me

2  money.  It's not something that was my bailiwick, as you

3  have said.

4      Q.   Do you know what the most popular news story

5  on your website in page views is?  Do you know what it

6  is?

7      A.   No.

8    Q.   Okay.  I'm going to talk about that later.

9  Let's come back to that.  One of the things you just

10  talked about is that you have since this lawsuit has

11  started you've said some things about Sandy Hook.

12  Correct?

13    A.   I've said things about organizations and

14  groups to want to get rid of the first amendment trying

15  to use me as a case to do it.

16    Q.   Okay.  Well, what I'm really talking about is

17  you've said things about Sandy Hook itself.  Correct?

18    A.   I have -- I have talked about -- I mean, I

19  talked about the coverage surrounding it and the

20  lawsuits and that ongoing process, yes.

21    Q.   Okay.  Well, actually, I want to ask you about

22  a little something else.  Hold on.  Back up for a

23  second.  One thing that you have said a few times is

24  that in terms of when you did say that Sandy Hook was

25  completely take, synthetic, there were actors, et

8

1  cetera, you've said that you've apologized for that.

2  Correct?

3    A.   Well, first off, I said I could see how people

4  see that.  And I also -- when people said please

5  apologize to us and I'd seen some of the anomalies that

6  I think were wrong, that weren't what people were

7  questioning online, then I'm, like, yeah, of course.

8  I'm sorry for questioning Sandy Hook, but it wasn't

9  intended, you know, in a false way.  I mean, I really

10  thought maybe it didn't happen.  And then the attacks

11  intensified and people began falsely saying that I was

12  currently saying those things and then exaggerating what

13  I'd said as a political weapon that Hillary Clinton was

14  using to beat me over the head with it in 2016 on record

15  and run national political ads against me playing edited

16  tapes of me talking about Sandy Hook.

17         MR. BANKSTON:  Okay.  First of all,

18  objection, nonresponsive.

19     Q.   Second of all, you -- Mr. Jones, you

20  understand this jury is going to watch the videos of you

21  saying unequivocally not "I see how people could think

22  this" but unequivocally saying Sandy Hook was

23  completely --

24     A.   Sure.

25     Q.   No, Mr. Jones.

                              9


1          MR. REEVES:  Hold on.  Let him finish.

2     Q.   You don't get to interrupt me.  You understand

3  that, sir?  You're here to answer questions for this

4  jury, and I want to you listen to the questions.  You

5  know this jury is going to watch videos of you saying

6  multiple times over and over again Sandy Hook is

7  completely fake, completely synthetic.  It is not real.

8  Right?  And you're going to sit here in this chair and

9  say, oh, actually what I said, actually what I said is I

10  could see how some other people could think it was fake.

11  You know the jury is going to see those videos, and you

12  know they're going to hear your words.  Do you think

13  that they should take you seriously whatsoever when they

14  can see you saying the things you said you didn't say?

15      A.   I know --

16          MR. REEVES:  Objection.  Form.  Go ahead

17  and answer the question.

18      A.   I know that the jury is going to say I always

19  heard that people are innocent until proven guilty, not

20  guilty until proven how guilty they choose and that the

21  system is actually scared for me to put on evidence.

22  The truth is deep down I still have real questions about

23  Sandy Hook and a lot of the anomolies and the weird

24  stuff that's gone on and the CIA visiting Adam Lanza

25  before it happened and the FBI.  That was in mainstream

10

1  news and just all the bizarreness that went on, the

2  public still has real questions, just like they do about

3  Jussie Smollett or the Roe v. Wade baby that never

4  actually died or WMDs in Iraq or just the Gulf of Tonkin

5  or Operation Northwood or Bubba Wallace or you know so

6  many of these things that have had the most of these

7  hate crimes and type things end up being false flags.

8  So I still, when I look events, question and say could

9  this -- could this be staged.  We look for telltale

10  signs.  And that's because genuinely we've seen a lot of

11  staged things and a lot of fraud.  And so that is

12  something that I question abd something that I continue

13  to do.

14      Q.   Let's -- I want to show you a video.  We are

15  going to -- this is going to be Exhibit 2.

16             (Exhibit 2 marked.)

17      Q.   On -- I'm going to show you a little clip of

18  something you said on October 1st.  (Video playing)  All

19  right.  So now you're back to feeding your audience this

20  lie about Sandy Hook.  Right?

21             MR. REEVES:  Objection.  Form.

22      Q.   Correct?

23      A.   No, that's -- that -- I'm proud of the video

24  and I'm proud of my statement in its context that I'm

25  sure we'll be able to show the jury when we have time

                                11

1  to.  They will see what I had to say and see that I'm

2  speaking up for the American tradition of being able to

3  challenge authority of official stories that almost

4  always turn out to be at least partially wrong.

5      Q.   Please keep that promise in play of that whole

6  October 1st video.  Please keep that promise.

7      A.   Okay.

8      Q.   But second, what has happened here is now that

9  you got beat in court, now that a default has been

10  granted??

11      A.   I didn't get beat in court.  I got beat by an

12  organized crime syndicate.

13      Q.   Now that a default has been granted, you don't

14 have to pretend anymore, do you?  That's what's going

15 on.  Right?

16          MR. REEVES:  Objection.  Form.

17     A.  No, that's not what's happened.  The death

18 penalty sanction with all the stuff we produced I

19 believe was a fraud.  And it's because they're scared of

20 the real evidence coming out and want to be able to tell

21 a jury that this man is guilty, now you decide how

22 guilty.  Now, juries are supposed to decide if someone

23 is guilty or not, period, not how guilty they are.  So

24 you guys can try to do all your anti-free speech stuff.

25 All you're doing is waking up the American people.

                          12


1     Q.  All right.  So let's just be honest about what

2 this is.  You got mad after you got defaulted and you

3 lashed out by saying that Sandy Hook was fake again.

4 That's what happened.  Right?

5     A.  No.  I have privately -- I mean, I told my

6 crew I mean I've always said I really have real

7 questions about this but I can't a hundred percent prove

8 it was totally staged, but the CIA was definitely

9 involved.  And -- and that came out.  And then I was --

10 I was told again by high level folks in the CIA that it

11 was staged back at the time, and so I went with them and

12 also what Wolfgang Halbig said and others.  So I really

13 believed that it should be looked at.

14     Q.  You've repeatedly said that this is court

15 process, this lawsuit, what just happened --

16    A.   Uh-huh.

17    Q.   -- is all a sham because you turned everything

18 over.  And that court still defaulted you anyway.

19 Right?

20    A.   Yes.  Owen Shroyer, you never sent him one

21 deposition, one document request, one thing, and he was

22 defaulted along with me.  And if that isn't fraud, then

23 nothing is.

24    Q.   Okay.  Hold on.  I may have to pull this order

25 for you because I need you to understand this.  Do you

13

1 understand that in Ms. Neilhussen's case there was a

2 court order requiring Owen Shroyer to appear for

3 deposition?  Do you know that?

4    A.   I know he appeared for a deposition.

5    Q.   Yesterday.

6    A.   You asked for it after the default.

7    Q.   Hold on.  No, sir, Mr. Jones.  Do you

8 understand that there was an order on August 31st, 2018

9 asking Mr. -- requiring Owen Shroyer to appear for

10 deposition?  Did you know that?

11    A.   I don't know what you're talking about.

12    Q.   Yeah, you didn't know that.  So you got on

13 your show without even knowing what the discovery was.

14 Did you know in Mr. and Mrs. -- Mr. Pozner's case and

15 Mrs. De La Rosa's case, you understand they're suing

16 you.  Right?

17      A.   I've never said her name.  I'm never going to

18  say it.

19      Q.   I'm not asking you about what you said.  You

20  know they're suing you, don't you?  Correct?  Let's just

21  start there.  You know there's a lawsuit --

22      A.   I know I didn't get a jury trial.  I know a

23  judge said I was guilty.  I don't believe that I live in

24  the Soviet Union.

25      Q.   Mr. Jones, you're not answering questions.

14

1  Let's just admit it right now.  You're not answering

2  questions.  I'm asking you:  Do you know that Leonard

3  Pozner and Veronique de la Rosa sued you?  Do you know

4  that?

5      A.   Yes, yes.

6      Q.   Okay.  Do you know they served you discovery?

7      A.   I believe so, yes.

8      Q.   Yeah.  You know you didn't answer it ever?

9      A.   That's not true.

10      Q.   It is true, Mr. Jones.  And I'll bet when you

11  go back and talk to your lawyers you're going to find

12  out a lot of things you don't know.  I'm going to tell

13  you, Mr. Jones.  Not like you got a bad grade on your

14  homework.  Like you didn't turn it you.  You didn't know

15  that?

16      A.   What were the depositions we had and all the

17  81,000 documents?

18      Q.   That's in Mrs. Lewis' case.  That's when Mr.

19   Barnes came in.  And we'll get to that.  Let's talk

20   about that in a minute.  But first let's take on Mr.

21   Pozner and Mrs. De la Rosa's case.  You don't know that

22   you never answered discovery, do you?  You don't even

23   know that.  Correct?

24      A.   Again, I don't have that stuff in front of me.

25      Q.   Right.  Now let's talk about in Mr. Heslin's

                                15

1   case.  In that same order that required Mr. Shroyer to

2   show up to deposition, did you know it required you to

3   show up to deposition and your company to talk about Mr.

4   Heslin's defamation case?  Did you know that?

5      A.   I mean, I've showed up for these, so I don't

6   know what you're talking.

7      Q.   Yeah, you showed up for Ms. Lewis's case,

8   didn't you?

9      A.   Again, I don't have this in front of me so I'm

10   not sure what you're talking about.

11      Q.   Right.  How many depositions have you done

12   before today with me?

13      A.   Two.

14      Q.   Right.  How many lawsuits -- how many

15   different plaintiffs are suing you in Texas?

16      A.   I don't know.

17      Q.   Can you name the people who are suing you in

18   Texas?

19      A.   No.

20 Q. Not surprising.

21 A. Didn't ever name most of them to begin with.

22 They're the ones attached to me.

23 Q. In Mrs. -- in Mrs. Lewis' case back when you

24 had Mr. Barnes handling discovery, things didn't go so

25 smoothly there, did they, according to an affidavit

16

1 written by you about Mr. Barnes.  Right?

2 A. I don't have that in front of me.

3 Q. Do you remember writing an affidavit up in

4 that Lafferty case basically saying Mr. Barnes messed

5 everything up and I've gotten rid of him?  Do you

6 remember that?

7 A. I'm thinking I remember there was a memo.

8 Q. Yeah.  You remember because you had to get on

9 the phone with somebody in Connecticut.  You didn't

10 actually sign that affidavit.  Somebody signed it with

11 your permission and there was a big hubaloo about it.

12 Do you not remember --

13 A. I do remember something about that.

14 Q. Yeah.  So you wrote an affidavit about Mr.

15 Barnes, how he botched discovery.  Right?  Correct?

16 A. I believe so.

17 Q. Yeah.  Okay.  So now let's go through it here.

18 You've got Mr. Pozner and Ms. De la Rosa's case where

19 you didn't even answer discovery.  You've got

20 Mr. Heslin's defamation case where you didn't show up

21  for defamation -- answer any discovery or show up for

22  deposition.  Neither did Mr. Shroyer, neither did the

23  company.  You've got Mrs. Lewis' case where you wrote an

24  affidavit saying your lawyer screwed it up, and you've

25  got Mr. Heslin's IED case, which you just got sanctioned

                            17


1   because you sent Rob Dew to the deposition and he

2   couldn't answer any questions.  And if all of those

3   things are true, when you get on to your show and you

4   tell your show that this is all just a kangaroo court

5   and you completely complied but got railroaded, that's

6   not true.  None of that's true.

7       A.   No, it is true.  I remember giving you guys

8   all sorts of stuff; then you would say you hadn't been

9   given it or it wasn't given the way you wanted it.

10  Just -- I mean, look, it should be on the issues of what

11  did I say on air.

12      Q.   It should be maybe -- and I asked you those

13  questions and you didn't answer them, Mr. Jones.  And

14  that's not fair, is it?  Mr. De la Rosa -- excuse me --

15  Ms. De la Rosa and Mr. Pozner have the right to ask you

16  questions.  Right?  Do you agree with that, or not?

17      A.   I mean, I've sat for these depositions.

18      Q.   You have not sat for a deposition for Mrs. De

19  la Rosa or Mr. Pozner.  And they have that right, don't

20  they?

21      A.   I don't know.

22      Q.   You don't think they deserve that?

23    A.  I don't -- I don't deserve a jury trial.  I'm

24  found guilty by a judge.

25    Q.  You remember when you told me in your November

18

1  2019 deposition, look, Mr. Bankston, I'm sorry.  I could

2  find those sources you were looking for if I had known

3  to look for them, but I didn't know what you were

4  talking about.  But yes, now that you've told me, I can

5  go find those sources.  Do you remember telling me that?

6    A.  Yes.

7    Q.  Okay.  I imagine you probably watched the

8  August 31st, 2021 default judgment hearing.  I would bet

9  that.  Right?

10    A.  No.

11    Q.  Okay.  So you don't -- everything that you

12  said about the judge and what went on in that hearing is

13  secondhand.  You didn't watch it?

14    A.  I read the newspaper articles.  It's not what

15  I've been doing.

16    Q.  Everything you said about Mr. Reeves, that was

17  secondhand about what he did in that hearing?

18        MR. REEVES:  Objection.  Form.

19    A.  I didn't watch the hearing.

20    Q.  You remember talking on your show about

21  Mr. Reeves.  Right?

22    A.  I mean, I remember talking about the newspaper

23  articles.

24      Q.   No.   You remember talking on your show about

25   the judge won't let you have the lawyer you want, so all

19

1   you have is a bunch of new lawyers who've rolled over

2   and go into court, and you did a mocking voice of Mr.

3   Reeves.  Do you not remember that?

4      A.   Well, I never -- yes.  My point was, is that

5   he didn't know that -- he wasn't ready for the case then

6   because they weren't letting my lawyer in.  And so

7   that's why he wasn't ready.  That's why he was new on

8   the case.

9      Q.   Yeah, new on the case, I understand.  But you

10   were mocking his performance in that courtroom.  Right?

11      A.   I mean, I guess you could say I wasn't happy

12   with what the newspapers' rendition of that performance

13   was.

14      Q.   And I'm going to tell you right there that's a

15   good lawyer.  Right?  That's a good lawyer.  Now, I'm

16   starting to wonder when you don't know that you haven't

17   even answered discovery, I'm kind of wondering what has

18   gone on before that.  I don't know.  Right?

19          MR. REEVES:  Object to this line of

20   questions because the discovery in the Pozner case is

21   the Free Speech Systems, LLC.  It's not Alex Jones.  I'm

22   just telling you --

23          MR. BANKSTON:  You know what the court

24   ruled on that.

25          MR. REEVES:  I understand --

1          MR. BANKSTON:  You don't a hundred --

2    Brad, don't even raise that objection.  That's in bad

3    faith, and you know it.

4          MR. REEVES:  It's not in bad faith.

5          MR. BANKSTON:  The court has said

6    unequivocally on the record Alex Jones, Free Speech

7    Systems, Infowars, LLC, are all -- are all to be

8    considered one entity and all have equal --

9          MR. REEVES:  No.  -- question related to

10   certain information related to employees and things like

11   that because it -- that is not what she said about

12   discovery requests being one for Free Speech Systems

13   being discovered --

14         MR. BANKSTON:  You're sitting here right

15   now knowing about -- because I know now you are

16   brand-new counsel on the Fontaine ^  case.  There is a

17   motion to compel that was granted in that case.  That

18   describes all of this.  That describes all of how

19   Infowars, LLC, cannot get away with saying no, those

20   were requests for Free Speech Systems.  And neither can

21   Mr. Jones.  And if you want to raise that objection and

22   have it ruled on by the court, we'll do that.

23         MR. REEVES:  I'm just saying that the

24   discovery that you are referencing in the Pozner case

25   was discovery issued to Free Speech Systems, LLC, not to

1  Alex Jones, individually.

2          MR. BANKSTON:  All right.  You can say

3  that.  I'm just telling you -- you can put that on the

4  record.

5          MR. REEVES:  I want to make sure that the

6  record --

7          MR. BANKSTON:  Let's -- in fact, let's

8  make it -- let's make the record clear.  Right?

9      Q.   There was discovery served to the company that

10  you were the sole owner and member of -- correct? -- in

11  these cases?  That's happened.  Do you understand what

12  I'm saying?

13      A.   Yes, yes.

14      Q.   Okay.  You have access to every single

15  document Free Speech Systems has.  Correct?  Is there

16  any situation where I would ask you for a document in

17  Free Speech Systems' files and you would walk into the

18  offices of Free Speech Systems and anybody in Free

19  Speech Systems would tell you, no, Mr. Jones, you can't

20  have that document?  Is that something that could ever

21  happen?

22      A.   Any?  I don't understand how to answer that

23  question.

24      Q.   Sure you do.  If I'm telling you right now if

25  you walked into Free Speech Systems is there any

                            22


1  document you couldn't lay your hands on?  Is there

2  anything in the building, period, that you couldn't lay

3  your hands on?

4      A.  No.  I probably find anything I needed to.

5      Q.  Okay.  That's interesting, too, because you

6  remember we talked in that last deposition about the

7  Bloomberg email where Bloomberg sent an email out to his

8  people, said get ready in the next 24 hours, there's

9  going to be a big event?  You remember that?

10     A.  That was a new story, yeah.

11     Q.  Yeah.  And then we talked about it for a while

12  because you had brought that up to me.  You were, like,

13  look, I don't have the email itself.  That was something

14  I was reporting on.  I had -- there was a story about it

15  and I was reporting on it.  You remember that?

16     A.  I do.

17     Q.  And then you remember you told me you could

18  find it for me.  Right?

19     A.  Yeah, I believe I said that.

20     Q.  And then you never gave it to me, did you?

21     A.  To be honest with you, Bankston, you don't

22  really inhabit much in my mind.

23     Q.  I know, yeah.  You don't have much respect for

24  any of this process, do you?  None of it?

25     A.  I don't think you have respect for America or

                           23


1  anything.

2      Q.  You remember when I asked you to produce me

3  records that shows that the school was closed?  Do you

4  remember me asking you about that?

5      A.  I do.

6      Q.  And you remember you telling me you could give

7  it to me?

8      A.  I'm --

9      Q.  Remember that?

10     A.  I mean, I don't remember all the stuff in the

11  deposition.

12     Q.  All right.  You didn't give it to me, though,

13  did you?

14     A.  I don't remember.

15     Q.  Infowars is currently broadcast on over 200

16  radio stations?

17     A.  I don't have the number in front of me right

18  now.

19     Q.  If you had to ballpark it, what would you say?

20     A.  Something like that.

21     Q.  Okay.  How many over-the-air television

22  stations?

23     A.  I don't have a number.

24     Q.  Give me a ballpark on that.

25     A.  We're free to air.  Anybody can pick it up.

                              24


1      Q.  Right.  But over-the-air television stations

2  has -- there has to be an affiliate there who you have a

3  relationship with?

4      A.  No.

5     Q.   You're going to tell me that somebody is

6   broadcasting Infowars' programming over the air without

7   you knowing about it?

8     A.   Absolutely.  That's what free air is.

9     Q.   I don't think that's happening, Mr. Jones.

10   You think there are things going out on FCC airwaves

11   right now that are Infowars' broadcasts that in no way

12   you knew about?  You think that's happening?

13     A.   I just don't think you have the knowledge of

14   what free air means.

15     Q.   Okay.  I understand that, for instance,

16   Infowars is on cable -- certain cable packages.  Right?

17     A.   (Nods head.)

18     Q.   You may not even know about all the cable

19   packages.  Right?

20     A.   I don't --

21     Q.   Because, again, when you say it's free to air,

22   people -- you know what an OTT system is.  Right?

23     A.   I'm not really an engineer, but I just know

24   I'm free to air.

25     Q.   Right.  So OTT, over the top -- like, say, I

                                25


1   know you're not on it anymore, but, say, like a Roku

2   box.  Right?  It's possible that there are OTT systems

3   out there that are playing Infowars and you don't even

4   know about it.  Right?  That's a possibility.  Right?

5     A.   Yes.

6    Q.   But you think the same thing is true over the

7  over-the-air television?

8    A.   Yes.

9    Q.   Okay.  I want to play you a piece of audio

10  from your radio show.  So there's not going to be any

11  video to show you, but this is going to be Exhibit 3.

12          (Exhibit 3 marked.)

13    Q.   Let me play that for you now.  (Audio playing)

14  That's true?

15    A.   That's a guesstimation.

16    Q.   Conservative.  Right?  It's probably a little

17  higher than that.  Right?

18    A.   I don't know.

19    Q.   So --

20    A.   Depends on how you define the audience.  If

21  somebody tuned in once a month, once a year, once a day.

22    Q.   You're the one who said it, Mr. Jones.  You

23  tell me.

24    A.   It's a very short clip.  I need to know the

25  context.

                            26


1    Q.   You don't need to -- there's nothing else said

2  about audience in that entire clip.

3    A.   Okay.  Well, I haven't heard the whole clip.

4    Q.   It's an advertisement for some sort of pill or

5  something.  I'm asking you right now:  Is 10 percent of

6  America an accurate representation of Infowars' listener

7  show?  That's true.  Right?  Major media organization?

8    A.   I mean, I would say a larger percentage than

9  that agree with my world view.  But I mean, yeah, I

10  would say 10 percent of the country has watched

11  something I've done and has agreed with me.

12    Q.   And then globally another 10 percent.  Right?

13  Because you're -- let me put it this way:  Infowars'

14  programming is not bound by U.S. borders.  It's -- the

15  internet is everywhere.  Right?

16    A.   Uh-huh.

17    Q.   And so globally Infowars also has a very large

18  audience.  Right?

19    A.   Uh-huh.

20    Q.   Maybe 10 percent of the globe is listening in

21  to Infowars.  Right?

22    A.   I would imagine 10 percent of the people --

23  that's a -- that's -- that's more hyperbole, but the

24  English-speaking world?  Yeah, I would say so.

25    Q.   Hyperbole is something you're very familiar

27

1  with?

2    A.   Yes.  Talk radio is a big part of that, yeah.

3    Q.   Exactly.  When addressing that audience, your

4  United States in global audience, would you ever

5  intentionally lie to them?

6    A.   No.

7    Q.   Okay.  Let me play you another clip.  This is

8  going to be -- I'm going to play you Exhibit 4, and this

9   is another audit clip from your show.  (Recording

10  playing)

11          (Exhibit 4 marked.)

12  Q.   How many people have you physically killed?

13  A.   None.

14          MR. REEVES:  Objection.  Form.

15  Q.   You knew about Leonard Pozner within weeks of

16  the shooting.  Right?

17  A.   I think I knew of Leonard Pozner.

18  Q.   Right.  He had complained to Infowars about

19  its coverage within weeks of the shooting.  Right?

20  A.   Sometime later I learned of some

21  correspondence between him and I think one of crew

22  members.

23  Q.   So if anybody were to testify that you were

24  involved in responding to Mr. Pozner's correspondence,

25  that wouldn't be true?

28

1   A.   Would you refresh my memory?

2   Q.   I'm just saying if that happens.  I'm just

3   trying to --

4   A.   Say that again.

5   Q.   If somebody were to testify that you were

6   involved in the correspondence of Mr. Pozner in writing

7   the responses to him in the weeks after the shooting,

8   that wouldn't be true?

9   A.   I'd have to go back, but I remember inviting

10  him on the show when -- I think he emailed us -- I'm

11  going from memory on this -- he emailed us and I invited

12  him on the show.  That's what I remember.

13      Q.   Okay.  It's fair to say that Leonard Pozner

14  and Free Speech Systems have had an unfriendly

15  relationship over the years?

16      A.   No, I'm not -- I don't really follow what he

17  does, so...

18      Q.   You've done shows about him, so you do follow

19  him.  Correct?

20      A.   I mean, you'd have to refresh my memory.

21      Q.   So I will refresh your memory about what you

22  know about Mr. Pozner.  I'm going to show you what I've

23  marked as Exhibit 5.

24          (Exhibit 5 marked.)

25      Q.   Have you ever seen that before?

29

1      A.   No, not that I remember.  What is it?

2      Q.   That's the sole document you produced to me

3  just a couple, I guess, month or two ago in regard to

4  discovery requests for any documents you had regarding

5  Mr. Pozner.  That's the sole document that was in that

6  folder labeled Pozner.  That's it.  And that, you will

7  agree with me, appears to be a very large -- looks to be

8  about a 187-page comprehensive background report on Mr.

9  Pozner.  Correct?

10      A.   Well, I never ran a background report on

11  Pozner.  I've never even seen this.

12     Q.   I understand that you probably never even saw

13   that.

14     A.   Would somebody email us this and then we

15   opened --

16     Q.   I don't know, Mr. Jones.  You gave it to me.

17   What am I supposed to tell you about it?  I don't know.

18   You tell me.  That's what I got you --

19     A.   I did not -- I mean, we just go through the

20   email, most of it even unopened, and just send you guys

21   everything.

22     Q.   This isn't an email, is it?

23     A.   I would imagine -- well, I've never run a

24   background thing on Pozner.

25     Q.   All right.  Well, one thing we can agree on

                                    30

1   it, because if you look at the bottom of that document,

2   it says FSSTX.085544.  Correct?

3     A.   Yeah.

4     Q.   That's the Bates numbers y'all use when you

5   give me documents.  Right?

6     A.   Uh-huh.

7     Q.   So this document right here came from

8   Infowars' corporate files?

9     A.   I thought you said we haven't given you any

10   documents.

11     Q.   I've said you --

12     A.   Earlier you said we were defaulting; we gave

13   you nothing; we didn't even respond.

14     Q.   You gave me documents in the Lewis case in

15  response to document --

16     A.   I mean, listen, I'm just telling you I've --

17  I've never looked at this.

18     Q.   That's not what I'm asking you, Mr. Jones.

19     A.   But I remember hearing in the news about

20  something in Florida doing a background thing on him,

21  and so I figure something might have sent us this.  I'm

22  just guessing.  I shouldn't guess.  I don't know.

23     Q.   Yeah.  Do you think you should be guessing in

24  this deposition?

25     A.   No.  I just said -- you're right.  I don't

31

1  know what that is.

2     Q.   So let's not do that anymore.  But the first

3  thing that I'm asking you, the only question that I was

4  actually trying to ask you is:  It has a Bates number on

5  there that is the Bates number you put on your documents

6  that you give to me.  Right?

7     A.   I think, yes.

8          THE WITNESS:  I think this is ours.

9  Right?

10          MR. REEVES:  I can't answer questions.

11     Q.   You answer the question.

12     A.   Yes, this is ours.

13     Q.   Okay.  So one thing we can agree on is that in

14  the files of Free Speech Systems is a 187-page

15   investigator's comprehensive report on Leonard Pozner?

16      A.   According to you.

17      Q.   No, no, no, no, Mr. Jones, no, sir.  According

18   to you.  I want your testimony.

19      A.   I told you I've never seen this before.

20      Q.   I don't care if you've seen it before.

21      A.   Okay.

22      Q.   I'm saying you put -- this is your Bates

23   number on the bottom.  Correct?

24      A.   Yes.

25      Q.   Okay.  This came from Infowars' corporate

32

1   files?

2      A.   Okay.

3      Q.   So the company does follow Mr. Pozner?

4           MR. REEVES:  Objection to form.

5      Q.   Correct?

6      A.   No, I don't -- I don't know the -- I don't

7   know why -- if this out of our email or what.

8      Q.   What is Honor Network.  You know what that is.

9   Right?

10      A.   I think that's a fundraising mechanism that

11   he's involved in.  I have heard of that.

12      Q.   Fundraising mechanism.  How do you -- let's

13   start -- because I know you're not guessing because you

14   just said you weren't going to guess.  So where did you

15   hear that?  Who told you that?

16      A.   I can't remember exactly.  It was either news

17  articles about the tens of millions, hundreds of

18  millions of dollars raised by the Sandy Hook families.

19     Q.   Something like Sandy Hook Promise.  Right?

20     A.   And some controversy about where that money

21  goes.

22     Q.   Yeah.

23     A.   So I have heard about that.

24     Q.   Yeah.  Does Leonard Pozner have anything to do

25  with Sandy Hook Promise?

33

1     A.   Like I told you, I've heard of him and the

2  Honor Network.

3     Q.   Honor Network.

4     A.   I've heard that, and I've heard the other name

5  you said.  I don't know really --

6     Q.   You're just -- I mean, you heard some random

7  stuff and now you're trying to smear Mr. Pozner with it.

8  Right?  He has nothing to do with Sandy Hook Promise,

9  does he?

10        MR. REEVES:  Objection.  Form.

11     A.   You're asking me questions, so I don't know.

12     Q.   Yeah.  And I'm asking you what do you know

13  about Honor Network, and you just started telling me

14  some stuff.  But it's not anything you actually know.

15  Right?  You're just telling me things?

16        MR. REEVES:  Objection.  Form.

17     A.   No.  I told you that I heard that he's

18  involved with that.  I don't know -- I never talked

19  about it.

20      Q.   Let's go back to what you actually know about

21  Honor Network.  What is Honor Network, as far as you

22  know?

23      A.   I've been told it's something associated with

24  Mr. Pozner and charity but I --

25      Q.   Infowars has published articles talking about

34

1  the Honor Network.  Correct?

2      A.   I don't know that.

3      Q.   Infowars what has told its audience that Mr.

4  Pozner was behind Honor.  Correct?

5      A.   There's so much information we've put out, I

6  can't, without in front of me -- do you have it again to

7  refresh my memory?

8      Q.   I'm here asking you questions.

9      A.   I don't know.

10      Q.   Yeah, that's what I need.  I need "I don't

11  know."  That's what I want.  If you have an answer and

12  you either know or you don't know, just tell me.

13      A.   Okay.

14      Q.   That's how it works.

15          MR. BANKSTON:  Well, that ain't going to

16  work because that's how they produced.  Yeah, we'll save

17  that for another day.

18      Q.   Do you remember a video not made by Infowars

19  but one you chose after it got removed from YouTube to

20  put on the Infowars website?  And the video's name is We

21  Need to Talk About Sandy Hook.  Do you remember that

22  video?

23      A.   No.

24      Q.   Okay.  Do you know who Independent Media

25  Solidarity Group is?

35

1      A.   No.

2      Q.   Do you know who Peter Klein is?

3      A.   No.

4      Q.   Okay.  So as far as Infowars' hosting of --

5  let me put it this way:  Do you remember what the first

6  YouTube strike against Infowars over Sandy Hook was?

7      A.   No.

8      Q.   Okay.  I want to talk to you about what you

9  think is okay or not okay to do as it concerns Mr.

10  Pozner.  And so what I want to do is pretend for the

11  moment that I'm going to play the role of Infowars'

12  reporter/editor/writer, something like that.  And I've

13  come to your office and I've said, "Hey, Mr. Jones, I

14  want to publish something on the Infowars website, and

15  what I want to publish is the details of Mr. Pozner's

16  business.  I want to publish his business filings.  I

17  want to publish the address of all that."  Can I do

18  that?  Is that okay with you?

19      A.   I'm not going to answer hypothetical

20  questions.

21    Q.   So in your day-to-day business let me just

22  put it this way:  In your day-to-day business when

23  reporters come to you and ask you if they can do

24  something that they haven't yet done, those are

25  questions you cannot answer today?

36

1         MR. REEVES:  Objection.  Form.

2    A.   No, I can't answer your hypothetical question.

3    Q.   No.  I'm saying if I'm a reporter.  I'm not

4  asking you if my hypothetical -- it's not me asking the

5  question.  I'm saying if the reporter walked into your

6  office and wanted to publish the address details of Mr.

7  Pozner's business, could they do that?  What would you

8  say to them?

9    A.   It would depend on the context of it.

10    Q.   There are situations where that would be okay

11  because it depends on the context.  Correct?

12    A.   Yes.

13    Q.   Okay.  What about his home -- what about an

14  address that is not his business address, just an

15  address like his home address, his mailing address, any

16  of that?  Is that the same answer?

17    A.   It would depend on the actual circumstances.

18    Q.   Okay.  Do you believe that at any point in the

19  past, say, between 2012, 2016, have there been

20  circumstances that have arisen that would put into your

21  mind the feeling that it is justified to publish Mr.

22  Pozner's personal details?

23          MR. REEVES:  Objection.  Form.

24     A.  I'd have to have you give me specifics.

25     Q.  Well, I'm asking you in your memory of these

37

1  entire events.  Do you remember any specific situations

2  that you believe would justify publishing Mr. Pozner's

3  personal information?

4     A.  I never told my crew members or anybody to go

5  to anybody's houses or do any of that.  I remember some

6  controversy on the internet about his -- a U-Haul

7  parking lot where he claimed he lived, and we simply

8  pointed out -- I think Rod Dew did.  I'm going from here

9  here -- something to do with -- no, this report saying

10  this commentary on somebody else's report and then

11  pointing out that it was a U-Haul.  That's what my

12  memory -- that's what I remember.

13     Q.  You know U-Haul has mailboxes on it.  Right?

14  A lot of U-Haul places have PO boxes?  Did you know

15  that?

16     A.  I think so.

17     Q.  Okay.  So that's not weird, is it?  Somebody

18  to have an address at a U-Haul for a PO box, that's not

19  weird, is it?

20     A.  I mean, I answered you as much as I know.

21     Q.  No, that's not what I'm -- I'm not asking

22  about the facts.  I'm just asking right now:  If

23  somebody has a mailing address at a PO Box at a U-Haul,

24  that's not weird?

25    A.  I think we said that, yeah.

38

1    Q.  Okay.  So the point of your broadcast was to

2  say that that's not weird?

3    A.  I'd have to see it again.  I vaguely remember

4  it.

5    Q.  Like, you were trying to defend Mr. Pozner, is

6  what you're saying?

7    A.  I vaguely remember something about it.

8    Q.  Now, Mr. Pozner started in all of this

9  privately complaining to Infowars.  You agree with that.

10  He made a private complaint?

11    A.  I -- yes.

12    Q.  Okay.  And he was very polite about it, wasn't

13  he?

14    A.  It's been a long time since I saw the email,

15  but I think so.

16    Q.  Okay.  And when that didn't work, he

17  complained again but this time to YouTube.  You know

18  about that.  Right?

19    A.  I really don't remember.

20    Q.  You know Mr. Pozner complained to YouTube.

21  Right?

22    A.  No.  I mean, no.  I remember -- I remember

23  people said he was going around getting a lot of stuff

24  taken down all over the place and -- and --

25    Q.  It made you mad, didn't it?

1    A.   No, no.  Actually, I told my crew members

2  Sandy Hook is a tar baby.  Stop covering it.  And then

3  it would just always come back like -- like a disease.

4  And so, I mean, long before you guys ever sued me, I

5  would scream at people if they even talked about it

6  because it's tar baby.  And that's why I've told you

7  I've just had to compartmentalize because it's just like

8  constant on the Sandy Hook, man, I killed the kids.  I

9  had people in Florida just a few months ago tell me you

10  killed those kids.  I went, "No, I didn't," just

11  whatever.  People don't know who Adam Lanza is.  They

12  think I killed the kids, so whatever.  I mean, I just --

13  you guys used it to deplatform me.  People think I

14  killed the kids, all this stuff.  Just do your worst.

15    Q.   What was my question?

16    A.   I've answered your question.

17    Q.   You don't know what it was.  You were just

18  talking.  You were just -- right?

19    A.   No.  I didn't know what your question was.

20    Q.   Right.  And so you just started talking

21  because you didn't even know what the question was

22  because you don't care.  Correct?

23    A.   Because it wasn't a clear question.

24         MR. REEVES:  Objection.  Form.

25    Q.   So here --

1    A.   No, I do care.  I care a lot.

2    Q.   Please let me give you --

3         MR. REEVES:  Hold on.  Stop.  There's a

4  court reporter.  There's no way she can take down what

5  both of y'all are saying.  Everybody take a breath.

6  Please let me him ask you questions.  Then answer his

7  questions.  And let's try to do this in as reasonable

8  method as possible.  And I would appreciate it if you

9  would just answer ask your questions instead of laughing

10  and instilling your own personal thoughts about his

11  testimony.  I would appreciate if you'd just ask your

12  questions so that he can answer them.  You're more than

13  happy -- welcome to disagree with him and point those

14  out, but your personal opinion on his answers is

15  something that is not appropriate.  And so I would just

16  ask if you'd please ask your questions, let him answer

17  them.

18         MR. BANKSTON:  I'm not going to be in

19  this deposition and pretend that what is happening here

20  is normal.  I am not going to guard my reactions to the

21  utter absurdity of what is happening.  That's not going

22  to happen.  All right?  This man is clearly not at all

23  showing any respect to the process of answering these

24  questions.  And I am not in any way -- I'm going to stay

25  civil during this deposition, but I am not going to be

41

1  met with this kind of absurdity and not react to it.

2 That won't happen.

3    Q.   I will give you the instruction, Mr. Jones,

4 that if you don't understand my question, if you think

5 it's not a clear question, don't answer the question.

6 Ask me to clarify the question.  If you answer a

7 question from now on, I'm going to assume that you

8 understood the question.  Do you understand that?

9    A.   Yes, I do.

10    Q.   All right.

11        MR. REEVES:  I'm going to object to all

12 that sidebar.  When you're ready to get down off your

13 soapbox and ask your questions, please proceed.

14        MR. BANKSTON:  Brad, this is not a

15 soapbox.  You understand what's happening in this room.

16 You understand what happened in this room yesterday.

17        MR. REEVES:  I want you to ask your

18 questions so that we can proceed with this deposition.

19 That's what I would like.  I would like you to not get

20 into an argumentative session with my client.  I would

21 like you to ask your questions so that he can answer

22 them.  I would appreciate that.

23        MR. BANKSTON:  All right.  We'll give it

24 another try.

25    Q.   You remember a video entitled Sandy Hook

                                42


1 victim dies again in Pakistan?  You remember that?

2    A.   Yes.

3      Q.   Tell me everything you can remember about what

4   the claims made in that video were.

5      A.   I don't remember enough about it to talk about

6   it.

7      Q.   Mr. Pozner was not happy with that video.  Do

8   you remember that?

9      A.   I don't remember anything with Mr. Pozner.

10      Q.   Okay.  You understand that the Sandy Hook

11   victim who was alleged to have died again in Pakistan is

12   Noah Pozner.  You know that.  Right?

13      A.   I believe the people in Pakistan had a photo

14   of him at the bombing or something, so I'd have to --

15   can you -- I can't answer the question because I don't

16   remember.

17      Q.   Okay.  Now, when it comes to Honor Network

18   attempting to have content removed, complaining to

19   YouTube, things like that, you've talked specifically on

20   your show about how you didn't like that.  Right?

21      A.   Well, this has happened over the last ten

22   years.

23      Q.   Sure.

24      A.   You want vague answers to the best of my

25   memory?

                                43


1      Q.   Yeah, I want -- Mr. Jones, I expected you to

2   somewhat, after now your third deposition, to maybe try

3   to get acquainted with the facts of this case and the

4   claims being made against you so that you could

5   meaningfully testify about them.  That's what I -- I

6   mean, honestly, I didn't actually expect that, but

7   that's what I would normally expect.  But what I'm

8   asking you right now, yes, is based purely on your

9   memory.

10          Do you have any memory that you ever got

11   on your show and said about the people who were having

12   content removed that you didn't like that?

13      A.   I do remember in general talking about that,

14   like, five, six years ago.

15      Q.   Right.  I think it went on a lot longer than

16   that, Mr. Jones, but some of it's in the past.

17      A.   I mena, I'm really against censorship, yes.

18      Q.   Yeah, I get that.  You called them bullies

19   too.  You remember that?

20      A.   I can't specifically remember that.

21      Q.   You remember saying you were going to fight

22   back?

23      A.   I don't specifically remember that, but I do

24   fight back against censorship.

25      Q.   You remember you said they stirred up a

44

1   hornet's nest?

2      A.   I don't remember any of that.

3      Q.   You remember you told them you're not a guy to

4   mess with?

5      A.   Maybe have the clip?  Show it to me.

6      Q.   No.  I'm asking you, Mr. Jones —

7      A.   I don't remember.

8      Q.   Of course I have the clip.  I'm asking you:

9  Do you remember saying that?

10      A.   No.

11      Q.   If you did say that, not a great thing to say

12  to parents who are upset who have lost their children.

13  Right?

14           MR. REEVES:  Objection.  Form.

15      A.   I mean, listen.  The American people are tired

16  of being blamed for shootings and being told that all

17  gun owners are to blame for things.  And so the

18  emotional response of people is to -- is to, basically,

19  be in denial.  And I've explained that psychology to

20  you.  And so I don't remember all that stuff.

21      Q.   Well, I didn't ask you if you remembered it.

22  My last question was:  If you were to tell parents who

23  were complaining because they didn't like seeing

24  pictures of their dead children on your television show,

25  if you were to tell those parents I'm not a person to

                                45


1  mess with, that's not a very good thing to tell them --

2  right? -- if that happened?

3      A.   I don't know the context --

4           MR. REEVES:  Objection.  Form.  Now

5  answer if you know the answer to the question.

6      A.   I mean, I don't know the context of what

7  you're saying.

8      Q.   What do you mean by context?  I don't

9   understand what that means.  Can you help me clarify?

10      A.   All I remember was telling my employees at

11   least five years ago don't talk about Sandy Hook, six

12   years ago.

13      Q.   I'm not -- again, Mr. Jones, I have just told

14   you I'm not asking about the past and what you remember.

15   I'm asking you:  If there were parents and they had lost

16   children and their photos had been on your show, and not

17   even Sandy Hook parents, just any parents, they've been

18   parents, they've lost children, grieving poor parents,

19   and they complained, maybe rightly or wrongly -- right?

20   -- like maybe you should ignore those complaints, maybe

21   you shouldn't, right, whatever it is, if you told them

22   I'm not a guy to mess with, that wouldn't be a good

23   thing.  Correct?

24          MR. REEVES:  Objection.  Form.

25      A.   I would need to know the context.  I don't

46

1   want to speculate, but I remember if they're on TV

2   showing pictures and saying we want to take your guns

3   and then people say we're sick of it, well, then we

4   should be able to talk about people that have made

5   themselves public figures.  But I don't know the

6   hypothetical circumstance.

7      Q.   Exactly.  So then when we're talking, it

8   depends on the context, doesn't it?

9      A.   Yes.

10     Q.   Okay.  So there are situations in which

11  parents who have lost their children who have their

12  pictures of their dead children shown on your show and

13  complained about that, there are contexts in which it

14  would be totally fine with you to say I'm not a person

15  to mess with.  Right?

16          MR. REEVES:  Objection.  Form.

17     A.   No, no.  I don't remember the exact -- I can't

18  answer something I don't know what you're talking about.

19     Q.   I'm asking you:  Is there -- is there possible

20  context where that would be okay or there's never a

21  possible context where that would be okay?

22     A.   I mean, there could -- see, I might have been

23  talking about YouTube itself or something.  I don't

24  know.  That's how -- your interpretation.

25     Q.   I'm not asking you about any specific

47

1  statement you've ever made.  I'm asking you again

2  hypothetically, not even about Sandy Hook parents.

3  Right?  I'm asking you:  Are there situations in context

4  where telling them I'm not a person to mess with is

5  okay, or is there never a context where that's okay?

6      A.   Yeah, I think people have a free speech right

7  to say don't mess with me.

8      Q.   Okay.  I'm going to show you what I've marked

9  as Exhibit 6.  Now, when --

10          (Exhibit 6 marked.)

11     Q.   When you see an email that begins "from

12 Jones," that's your dad.  Right?  You get emails from

13 your dad.  Right?

14     A.   Not very often, but yes.

15     Q.   That's your dad.  Right?

16     A.   I'm not sure.

17     Q.   Okay.  Well, we'll?

18     A.   Yes, it says David Jones right here.

19     Q.   Okay.  We're going to read through the whole

20 thing together.  Okay?  You see at the bottom there's a

21 label that says Heslin 19-4651-000862?  You see that?

22     A.   Yes.

23     Q.   Okay.  This is an email dated September 6,

24 2018.  Right?

25     A.   Yes.

48

1     Q.   That's after your suit.  Right?

2     A.   Yes.

3     Q.   The subject line -- well, let's first, it's

4 from your dad to Rob Dew.  Right?  Correct?

5     A.   Yes.

6     Q.   What does your dad do for you?

7     A.   He doesn't do anything anymore.

8     Q.   What did your dad do for you at the time of

9 this email?

10     A.   He was doing some HR and helping with product

11 development.

12    Q.   How did your dad go from being a dentist to

13  HR?  How did that happen?

14    A.   He'd done HR before for the dental companies.

15    Q.   Okay.  So you decided to bring him on when?

16    A.   Oh, ten years ago.

17    Q.   Okay.  So approximately 2011, that time

18  period, is when your dad joined the company?  Does he

19  have a managerial role at the company?  Can he tell

20  employees what to do?

21         MR. REEVES:  Objection.  Form.  Only

22  reason I -- can you can you please clarify the timeline?

23         MR. BANKSTON:  Yeah.  When he was working

24  there, I mean, you know.

25         MR. REEVES:  That's all I have --

49

1    A.   Yes.

2    Q.   Okay.  In this email to Rob Dew he says -- and

3  read along with me so you can make make sure I'm reading

4  it correctly.  Okay?  Actually, can you go ahead and

5  read this email for him?  I want to make sure that -- I

6  had some complaints about how I read an email yesterday,

7  so I want you to go ahead and read it for me.

8    A.   The Sandy -- okay.  This is from Jones,

9  subject, please help me find and get a copy of the video

10  of the U-Haul store.  We want to let people know where

11  they live.  Date, Thursday, 6 September 2018,

12  11:33:0500, CDT.  The Sandy Hook attorneys are claiming

13  that we tried to expose their addresses.  Evidently

14  there is a video of that claim that shows that was not

15  what we were doing.  Mr. Enoch wants a copy of that

16  since it's no longer available on YouTube.  He thinks it

17  and the apology should be made a part of a what really

18  happened landing spot to be used in public relations

19  reeducation.  David Jones for Alex.

20      Q.   And I believe it says, "Thanks David Jones for

21  Alex"?

22      A.   "Thanks David Jones for Alex."

23      Q.   All right.  So first of all, is there a video

24  that shows that that's not what you were doing?  Do you

25  know if that was ever discovered?

50

1       A.   Yes, I think there's a video of that.

2       Q.   Okay.  So if I wanted to have a video that

3  shows that what you were not trying to expose their

4  addresses, you'd be able to identify that video for me?

5       A.   I mean, I'm not -- I'm trying to guess what

6  this email is about, but yes.

7       Q.   Okay.  In truth, we know now that those

8  addresses were aired.  We can agree at least on that.

9  Right?

10      A.   The U-Haul?  Is that what you're talking

11  about?

12      Q.   Actually, multiple addresses, but yes.

13      A.   I do remember Rob Dew doing a show mentioning

14  some of that.

15    Q.   You were on that show.  You remember that.

16  Right?

17    A.   I haven't watched the video in a while.

18    Q.   Okay.  Do you remember right after Rob Dew

19  showing all that, I guess you don't remember saying that

20  I guess I'm going to have to go investigate them down in

21  Florida?  You don't remember that?

22    A.   I do remember saying that.

23    Q.   Yeah.  Okay.  Down at the bottom -- let's go

24  ahead and get this too.  This has a label that says

25  Heslin (19-4651)-00862.  Is that correct?

                                51


1    A.   Uh-huh.

2    Q.   Okay.  So this came from Free Speech Systems'

3  corporate files?

4    A.   Yes.

5    Q.   Okay.  All right.  When Neil Heslin -- okay.

6  First of all, you know who Neil Heslin is.  Right?

7    A.   Yes.

8    Q.   Okay.  So when Neil Heslin appeared on Megyn

9  Kelly's show in 2017, do you remember that?

10    A.   Yes.

11    Q.   Okay.  When he went on there and said he was

12  upset by the things you were saying about Sandy Hook,

13  did you believe him?

14    A.   I thought it was all done very theatrically in

15  a very canned way, but I do parents have pain about

16  their children.  But it was all done and had an

17  infomercial feel to it.  And that's my view of it.

18      Q.   Look, I don't care really what you think about

19  Megyn Kelly or NBC News run by the largest weapons

20  manufacturer in the world, you know.  Like, yes, they

21  make incredibly edited videos.  They -- it's a

22  complete -- I mean, I'm sure if you've ever seen an NBC

23  production with lights and cameras and staging that they

24  set up scenes, they do all this stuff, I know that.  I

25  know it looks like a video.  I'm not asking about NBC or

52

1  Megyn Kelly.  I just want to know about Neil Heslin.

2  Did you believe him?

3          MR. REEVES:  Objection.  Form.

4      A.   Believe him about what?

5      Q.   When he said he was upset about the things you

6  said about Sandy Hook, did you believe him?

7      A.   Yes, I believe him.

8      Q.   Okay.  You understood that if Infowars were --

9  okay.  So let me go back to the -- let me get you clear

10  on your day.  I want to take you back to the night that

11  you first saw that Megyn Kelly interview, which probably

12  was a surprise for you considering that it was not what

13  she represented it to you to be.  Correct?

14      A.   Yes.

15      Q.   Okay.  And on that night when you saw that

16  video and you saw Mr. Heslin saying those things, I want

17  to take you back to that date.  Okay?  And at that date

18  you understood that if Infowars were to make a video

19  saying Mr. Heslin could not have held his son, that

20  would be very upsetting to Mr. Heslin.  You understood

21  that?

22          MR. REEVES:  Objection.  Form.

23     A.  No, I did not understand that.

24     Q.  Okay.  Who -- do you know, sitting here today,

25  who made the choice for Owen Shroyer to put those claims

53

1  by Jim Fetzer on the air about Neil Heslin after the

2  Megyn Kelly interview?  Do you know who did that?

3     A.  It was a live show.  That's -- it's not a

4  video we made.  It was a live show, and I believe he

5  read a Zero Hedge article.  He just read an article.

6     Q.  About Jim Fetzer stuff.  Right?  You remember

7  that?

8     A.  I believe he was in the article.

9     Q.  Right.  And you understand that a video was

10  made for that and uploaded to YouTube on June 26, 2017?

11  Would you have any reason to dispute that?

12     A.  I'm not sure we would have our YouTube channel

13  then.

14     Q.  But you did.  You lost it in 2018.  You also

15  know that a month after Mr. Shroyer made that video you

16  then took that five-minute video from the live show and

17  played it on your show again.  You understand that?

18  You're being sued for that?

19     A.  I mean, yes, I guess.

20    Q.   Okay.  So whose decision was it, if you know,

21 for him to basically give more air to Mr. Fetzer's

22 claims?  Whose decision was that?

23    A.   It was Owen's decision.

24    Q.   Okay.  So the thing is I talked to him a

25 couple of days ago, and he said no, he didn't read it at

54

1 all or research it.  Somebody put it in front of him and

2 told him to do it.  He doesn't remember who, but he

3 doesn't do that.  I mean, he doesn't research stuff

4 himself.  Somebody puts it in front of him.  So let's

5 try to go at it this way.  If Owen is going to be doing

6 that video that day --

7    A.   I don't agree with that statement.

8    Q.   Okay.  Well, I mean, I'm -- again, talk to

9 Owen because he testified a couple of days ago.  Right?

10 But what I'm trying to figure out is if Owen's in that

11 studio that day because he's guesting for you that day,

12 how many people are in the studio right then to make

13 that show happen?  Like, how many people does it take to

14 get an Infowars episode live and going?

15    A.   Counting the host.

16    Q.   Yeah.  Counting Owen.  Right.  Tell me --

17    A.   About five.

18    Q.   Okay.  So who are the other four people?  Not

19 their names.  Like, what -- what -- what job functions

20 are they fulfilling?

21    A.    Their roles?

22    Q.    Yeah, exactly.

23    A.    You've got a producer and a radio.  That

24  doesn't mean like movies.  They don't pay for it and run

25  it.  Which means they, like, set up guests and make sure

55

1  and then that the show runs but they don't actually tell

2  them generally what to do.  And you'll have a camera

3  operator, you'll have a board operator, and then you'll

4  have one person researching, grabbing clips, news

5  articles, another person running a video switcher.  And

6  sometimes there might be an extra person in there

7  creating a radio log of just basic points that the

8  person was making on air in case they ever want to go

9  back and find any clips from the show.

10    Q.    Gotcha.

11    A.    Like, when we have a guest on, they'd say, oh,

12  that was interesting the guest said that.  Mark that.

13  And then the other day I'll look at the logs sometimes

14  and say, oh, I'm going to -- let's put that video up.

15    Q.    All right.  So let's talk about the people in

16  this room.  The camera person, the camera operator, in

17  general, is not going to have a lot of influence on the

18  content that goes on to the show.  Correct?

19    A.    Yes.

20    Q.    Okay.  Same true for the sound engineer on the

21  sound board?

22    A.    Yes.

23     Q.   Okay.  Same true for the logger.  Right?  For

24  you to make a radio log?

25     A.   Yes.

56

1     Q.   So the only two people in the room who are

2  probably going to have any influence on what goes in

3  front of the anchor to say are the producer and the

4  person who's researching and checking clips, and that

5  sort of thing.  Right?

6     A.   No, no.  The way -- the way it works is the

7  host is telling people what to play and what articles.

8  The host runs the shows.

9     Q.   So Owen should have been the one tho found the

10  Zero Hedge article?  That's what you're thinking?

11  That's how it would normally work?  He would have found

12  that article?

13     A.   Hundreds -- hundreds of articles -- this is

14  way I do it.  Other people don't do it this way.  I'm my

15  own, basically, producer, booker, everything.  So the

16  way I sit there and I print hundreds of articles or I

17  direct people to, and I just say go to these ten sites

18  and print everything on it because I like to have a

19  physical copy.  And then other people there have chosen

20  to do it the same way.  And then just constantly more

21  information is coming out as the day goes on.  And we

22  might -- kind of like a parrot eating.  I might, like,

23  throw away 90 percent of the stuff that's put in front

24  of me and then it just sits there and just, you know,

25  decide once they eat.  But the radio hosts run the show.

57

1  It's a radio show on TV.  It's a radio show.  It's not

2  journalism.  It's not, you know, in the main.  It's just

3  like Howard Stern or it's just like Rush Limbaugh.  And

4  you're playing clips; you're covering articles; you're

5  giving your opinion on things.

6          MR. REEVES:  Mark, can we take a short

7  break?

8          MR. BANKSTON:  Yeah.  Well, let me -- the

9  last line of questioning on that.

10      Q.   So I think a short way to do this, too, is to

11  say:  Of the people in that room who can have control

12  over the content or are likely to have control over the

13  content, it's the host, producer, and researcher.

14  Correct?

15      A.   Researcher?  There's --

16      Q.   Okay.  Maybe I messed up, then.  Let me go

17  back because I said the wrong thing.  Let me back that

18  up.  At one point you told me of the people in the room

19  is producer, camera, sound, a person doing radio log,

20  and then somebody who does -- pulls articles and

21  researches articles and clips and gets the clips ready.

22  Does that person have a name, a job role?  What is that

23  called?

24      A.   I come in -- the host sends to -- generally,

25  to the producer by email, by text, however they want,

1  hey, we're going to play these clips or grab me this

2  clip.

3      Q.   So that person is less likely to have control

4  over the content.  That content is almost certainly

5  being -- usually being sent to them and saying, hey, can

6  you pull this and get it ready for the show.  Is that

7  kind of more --

8      A.   Yes.  The -- the -- the host is the captain of

9  the ship.

10     Q.   Gotcha.

11     A.   Sometimes they pop in and go, hey, there's a

12 standoff at the UN headquarters.  And I go, hey, give me

13 an article on that.  And then we're, like, okay.  NBC is

14 reporting.  Looks like it's a guy that wants to be

15 killed by a cop and we hope everything ends peacefully.

16 30 seconds on it.  The next thing is, oh, look.  A

17 federal court just ruled that they can't enforce

18 inoculations.  Oh, look.  An oil tanker just crashed.  I

19 mean, we're just talking about what's in the news.

20     Q.   Okay.  All right.  He wants to take a break,

21 so let's go ahead and do that.

22         THE VIDEOGRAPHER:  Going off the record.

23 Time is 11:38 a.m.

24         (Short recess.)

25         THE VIDEOGRAPHER:  We're back on the

1  record at 11:56 a.m.

2  Q.  Sitting here today, do you have an opinion, do

3  you have a thought, a conclusion, about whether Mr.

4  Heslin was telling the truth about holding his dead son?

5  A.  Looked convincing to me.

6  Q.  Wasn't as convincing to you, though, in 2017.

7  Right?

8  A.  I'm not sure what your question is, again.

9  Q.  You weren't as sure in 2017 that Mr. Heslin

10  held his child as you are today?

11  A.  You're talking about Owen, not me.  The issue

12  you're talking about with Owen is Owen.

13  Q.  No.  I'm talking about you getting on your

14  show in July 20th, 2017, and saying the stuff I heard

15  was they never let them have their kids.  You thought

16  Mr. Heslin wasn't telling the truth in 2017.  You were

17  not sure of that.  Correct?

18  A.  I was believing that Sandy Hook happened, and

19  then I saw the Megyn Kelly piece.  And everything I said

20  was edited the opposite of, basically, what I intended

21  to say.  And then it looked so scripted.  The way

22  everybody would -- it was, like, just the whole thing

23  looked like a TV production like a -- like a soap opera.

24  And I was, like -- I was, like, this looks so real.

25  It's, like -- but personally, I had questions about

60

1  that.  I mean, I did see that article after Owen covered

2  it.  And it did conflict with what the coroner said.

3  But again, I mean, I want to believe him.  I believe his

4  son died, I believe mass shootings happen, and I also

5  believe we have a right to question events because I

6  know we're lied to about them.  And that's where I

7  stand.  I said that to Megyn Kelly.  I said, I believe

8  that this attack happened and I can understand why it

9  hurt people's feelings.  Then she's, like, well, let's

10  go into the anomolies.  Let's go into why you questioned

11  it so I can be the villain again.  And then you just run

12  into this whole if Sandy Hook itself is not synthetic,

13  then how all the bureaucracy and the media and the

14  system came in and got it and that made it synthetic and

15  so that's why people then -- that's my thinking process

16  really started to think it probably didn't happen.

17          MR. BANKSTON:  Objection.  Nonresponsive.

18      Q.  Back in 2017 you had information, you had seen

19  information that caused you to doubt whether Mr. Heslin

20  really held his kid.  Correct?

21      A.  Yes, I did see an article questioning it.

22      Q.  Yeah.  And that information -- that

23  information was raised by Mr. Fetzer.  Correct?

24          MR. REEVES:  Objection.  Form.

25      A.  I don't -- I don't -- I don't have the article

                                61

1  in front of me.

2      Q.  Okay.  In 2017 Infowars, the company itself,

3  had an understanding that there was issues with

4  Mr. Fetzer's credibility.  Correct?

5          MR. REEVES:  Objection.  Form.

6      A.  I mean, I can't really speak to Mr. Fetzer's

7  credibility.

8      Q.  Okay.  Well, other people in your company have

9  spoken of Mr. Fetzer's credibility to you.  Correct?

10     A.  I don't recall.

11     Q.  You don't recall Paul Watson talking to you

12  about Jim Fetzer?

13     A.  No.

14     Q.  Okay.  If somebody -- if Paul Watson in

15  2015 -- is he your chief reporter by then?  Is he an

16  editor?  What is he?  Do you remember?

17     A.  Yeah, he was the head editor of Infowars, the

18  articles, the site itself.

19     Q.  Okay.  And he also did some hosting duties

20  too.  Right?

21     A.  Yes.

22     Q.  Okay.  If Mr. Watson -- let's just say again

23  that Mr. Watson, somebody whose opinion you respect, I

24  would assume.  Correct?

25     A.  Yes, sir.

                          62


1      Q.  Somebody you will -- if he -- if he brings you

2  something, you'll listen to him.  Right?

3      A.  Yes.

4      Q.  May not always agree with Mr. Watson.  Right?

5      A.   Yes.

6      Q.   But you'll listen to him?

7      A.   Yes.

8      Q.   If Mr. Watson had come to you in 2015 and told

9  you, Alex, Tim Fetzer is bat shit crazy, would you have

10  listened to him?  Would you have taken that into

11  consideration?

12      A.   Yes.

13      Q.   Would you have looked into Mr. Fetzer to make

14  your own determination if he was bat shit crazy before

15  relying on him again?

16      A.   I don't remember the discussion.

17      Q.   Okay.  But being the responsible journalist

18  you are, if you had received information that called

19  into doubt Mr. Fetzer's credibility, you would check in

20  and verify before ever relying on him again.  Correct?

21           MR. REEVES:  Objection.  Form.

22      A.   I can't talk about hypotheticals that you're

23  discussing.  And I already told you that 98 percent of

24  what we do is cover news in the public domain and give

25  our opinion and commentary.  And so I am not a

63

1  journalist with the Wall Street Journal that writes

2  one-year-long investigative, you know, journalist

3  reports.  And so I'm a radio talk show host that puts

4  the show on TV.

5      Q.   No, I understand you don't do year-long

6  reports.  I understand that.  You do five years of

7  coverage on Sandy Hook.  I understand that.  And it's

8  sporadic.  Right?  You're not -- you're not engaged

9  every day going into the office researching Sandy Hook

10  during those years, are you?

11      A.   No.  It's continued to -- to come up in the

12  press and then people would call in about it and things.

13  But I've, for at least five, six years have told the

14  crew I do not want to cover it and that I think Sandy

15  Hook happened.  I still had anomalies.  I have real

16  questions.  I genuinely questioned it, and the

17  statements that I made it up, that is, I would get

18  publicity off of it, are false.  That is false.

19      Q.   Okay.  Have you -- have you -- have you ever

20  had a chance to either read or watch Paul Watson's

21  deposition?

22      A.   No, I've not read it or watched it.

23      Q.   Okay.  There's something he said in that

24  deposition.  I want to run it by you.  Okay?  Which is

25  that Mr. Watson testified that you don't feel bound by

                                64


1  journalistic ethics.  Would you agree with that?

2      A.   No, I don't agree with that term or phrase.  I

3  do have ethics and I want to tell the truth and I try to

4  tell the truth, but I'm definitely wrong sometimes.  But

5  to say that I don't feel bound by journalistic ethics

6  because I am by ethics, that's -- I mean, I disagree

7  with my interpretation of that because I do have ethics.

8      Q.   Your chief -- okay.  So Paul Watson also

9   testified that he did not believe that how you acted

10   regarding Sandy Hook was decent or right.  How would you

11   respond to that?

12      A.   Well, I'm not running a cult.  And so the

13   people that work there, we disagree; we have debates on

14   air.  We -- we had debates about Sandy Hook, and I think

15   we concluded that we thought it probably happened well

16   before I was sued.  And so yeah, we're a radio show just

17   like guys in a barber shop arguing and debating.  That's

18   what it is.  It's like a barber shop on TV.

19      Q.   Well, so I want to ask you now is:  Are you

20   going to tell this jury that the way you acted regarding

21   Sandy Hook was decent and right?

22         MR. REEVES:  Objection.  Form.

23      A.   I mean, I have a first amendment right to

24   question big events.  I did not kill the children at

25   Sandy Hook.  And the families have sued the police and

                                65


1   the teachers and the government and Remington and

2   everybody else.  And we're ten years later, and I'm not

3   the one bringing up Sandy Hook.  I'm not the one living

4   off Sandy Hook.  I'm not the one, you know, who -- who

5   is -- is in the main doing the things people claim I've

6   done or, quote, are continuing to do.  And I've been

7   beaten over the head with it.  It's been used to

8   deplatform me.  It's been used to dehumanize me.  It's

9  been used to try to sue us.  I mean, we know the

10  families have said that we want to destroy Alex Jones,

11  we want him off air, we want him silenced.  And so --

12      Q.   Which one of my clients said that?

13           MR. REEVES:  Objection.  Form.

14      A.   I would have to go pull it back up, but I've

15  seen the quotes in the press.

16      Q.   None of my clients have said that, Mr. Jones.

17  You're just making stuff up right now, and I'd prefer it

18  if you wouldn't just smear my clients in the middle of

19  this deposition.

20           MR. REEVES:  Objection.  Form.  No one

21  said it was your clients.

22           MR. BANKSTON:  Yeah, he's making a very

23  big impression here.

24      Q.   You're being really vague about it.  And so

25  that's why I'm asking you this question.  None of my

                              66


1  clients said that, did they?

2      A.   I can go pull up news articles where -- where

3  some of the Sandy Hook families have been quoted as

4  saying this.

5      Q.   I'm not asking you that, Mr. Jones.  I'm

6  asking a very specific question.  Not some of the Sandy

7  Hook parents.  I'm asking you:  Did any of my clients

8  say that?

9      A.   I wasn't specifically talking about your

10  clients.

11    Q.   Then the answer is no.  Correct?

12    A.   I'll have to go do a search, but it said quite

13 a bit.

14    Q.   But you have no problem just saying it out

15 loud in this deposition.  Right?

16         MR. REEVES:  Objection.  Form.

17    Q.   What I'm trying to get at is you have no

18 basis, sitting there right there in this chair, that my

19 clients said any of those things?

20    A.   Clients said what?

21    Q.   Any of the things you just said.

22    A.   Repeat them back.

23    Q.   That they want to destroy Alex Jones.

24    A.   Take Alex Jones off the air.

25    Q.   Take him off the air.

67

1    A.   Make him pay.

2    Q.   Oh, well, that.  Oh, Mr. Jones, we're here to

3 collect a debt.  A hundred percent we're going to make

4 you pay, but nobody here is talking about destroying you

5 or taking you off the air is the goal of this lawsuit.

6    A.   Oh, really?

7    Q.   Are they?  That's what I'm asking you.  Do you

8 have information, sitting here right now in this chair

9 under oath that that's true, that my clients said that.

10 Do you?

11    A.   I have seen news articles with quotes like

12  that and, if you want, I can later pull the specifics

13  for you.

14     Q.   From my clients.  That's your testimony under

15  oath?

16     A.   No, I didn't say from your clients.

17     Q.   Then that's what I'm asking you, Mr. Jones.

18  In this chair you're sitting right now under oath you

19  have no information that my clients said the kind of

20  comments you just referred to.

21        MR. REEVES:  Objection.  Form.

22     Q.   Correct?

23     A.   What were the comments, again?

24     Q.   I'm done answering your questions, Mr. Jones.

25  I've already given you a lot of latitude by trying to do

                                68


1   that for you.  Can you answer my question or not?  You

2   can say I can't answer that question.

3     A.   Sitting here, I don't have the specifics.

4     Q.   There we go.  Thank you.

5        MR. BANKSTON:  16 and 17.

6     Q.   Who's David Knight?

7     A.   David Knight is a talk show host.

8     Q.   Does he work for you right now?

9     A.   No.

10    Q.   Okay.  He did work for you recently?

11    A.   Yes.

12    Q.   When did he leave the company?

13    A.   If I remember correctly, about a year ago.

14     Q.   And then he's not come back in any way?  Are

15   y'all still doing videos with David Knight?

16     A.   No.

17     Q.   Okay.  David Knight did not  -- there was

18   some -- I don't know how to say this.  There was some

19   tension between David Knight and Dr. Steve Pieczenik.

20   You'd agree with that?

21     A.   I mean, I remember some.

22     Q.   David Knight and Steve Pieczenik did not get

23   along.  Right?

24     A.   I guess.

25     Q.   David Knight was incredibly critical of the

69

1   things Steve Pieczenik was saying about Sandy Hook.

2   Correct?

3     A.   No, I don't remember that.

4     Q.   Okay.  Can you tell me why David Knight isn't

5   with the company anymore?

6     A.   David was saying that he was being censored

7   and no one was censoring him.  And he was just unhappy

8   and so I fired him.

9     Q.   Okay.  I'm going to put in front of you what I

10   marked as Exhibit 7.  Now, one of the things you'll

11   notice about this document as you look down in the

12   bottom corners, there's no numbers, are there?  Bottom

13   corners of the document?

14            (Exhibit 7 marked.)

15    A.   No.

16    Q.   Blank page?  All right.  So this is -- I'm

17   going to represent to you this is a document that was

18   produced to me by your former lawyers that has no Bates

19   number on it.  Okay?  So I don't have an identification

20   number for you.  But looking at this email with David

21   Knight's name to and from, that's one of your employees

22   at that time, 2017?

23    A.   Yes.

24    Q.   Okay.  And I'm going to go ahead and read this

25   for you here.  This is -- the date is June 19th, 2017?

70

1    A.   Uh-huh.

2    Q.   Okay.  You remember that the Megyn Kelly

3   interview was in the summer of 2017.  Right?

4    A.   Yes.

5    Q.   Okay.  And in fact, one of the videos that

6   your company is being sued for is a June 26th video from

7   2017 that Owen Shroyer did; we've just been talking

8   about it.  Right?

9    A.   Yes.

10    Q.   And then in July you also did a video about

11   Mr. Heslin as well.  Correct?  That you're being sued

12   for?

13    A.   Yes.

14    Q.   So you do know you did make that July 20th

15   video about Mr. Heslin.  You know that, sitting here

16   today?

17     A.   Yeah, I did a live radio show, yes, this show.

18  I didn't make a video.

19     Q.   Well, I guess you didn't make the video but

20  somebody did.  Somebody made a video of that and

21  uploaded it to the YouTube channel at Infowars.  Right?

22     A.   Uh-huh.

23     Q.   So I don't -- what I'm trying to get, because

24  you've brought this distinction up a couple of times,

25  that, no, we're just a live radio show, it's not a

                              71


1  video.  But there are videos and they are uploaded to

2  YouTube.  Correct?

3     A.   They were, yes.

4     Q.   And in fact, the listenership for the radio

5  show could be totally different than who's watching the

6  YouTube video.  Correct?

7     A.   They are, yeah.

8     Q.   Yea.  Okay.  So now we have this video -- we

9  have this email from David Knight and it's from David

10  Knight to David Knight.  Right?

11     A.   Uh-huh.

12     Q.   So he's sending himself something.  Correct?

13     A.   I would guess.

14     Q.   Okay.  The subject line is, it says

15  Connecticut carry releases the troubled past of Neil

16  Heslin.  And then do you see that there is a link there

17  from ammoland.com?  Correct?

18      A.   Yes.

19      Q.   Okay.  And then it says sent from my iPad.

20  Right?

21      A.   Yes.

22      Q.   Okay.  And then this email here was sent to

23  himself at 6:12 p.m.  You see that?

24      A.   Yes.

25      Q.   Okay.  Everything I've said about this email

72

1  is accurate?

2      A.   Yes.

3      Q.   Do you have any reason to think that this is

4  not a true and accurate email from Infowars's files?

5      A.   I don't know.

6      Q.   I don't know either.  You gave it to me and it

7  doesn't seen even have a Bates number on it, so that's

8  why I'm asking you.  Do you have any reason to dispute

9  this is a real email --

10      A.   No, I don't have any reason to dispute it.

11      Q.   Okay.  Have you ever been to ammoland.com?

12      A.   I've been there some.

13      Q.   Okay.  So you're familiar with what that site

14  is?

15      A.   Not -- actually, no.

16      Q.   Okay.

17      A.   I've just heard of it.

18      Q.   Let me show you this.  This is a similar email

19  which I've marked as Exhibit 8.

20        (Exhibit 8 marked.)

21    Q.  You see this says 6-18-2017?

22    A.  Yes.

23    Q.  Okay.  Just a couple of days before Owen

24  Shroyer did his video.  Correct?

25    A.  Yes.

73

1    Q.  Okay.  And do you remember that Megyn Kelly's

2  interview with your profile came out in June 19th, 2017?

3    A.  I don't remember.  I don't remember the date.

4    Q.  Okay.  So here we have again David Knight

5  sending an email to himself, David Knight.  Seekthetruth

6  80@yahoo, is that another one of David Knight's email

7  addresses?

8    A.  I don't know.

9    Q.  Okay.  You don't know who that is?

10    A.  No.

11    Q.  Okay.  It says subject, Neil Heslin, father of

12  Sandy Hook victim, faces criminal charges/news/

13  countrytimes.com [sic].  Right?

14    A.  Yes.

15    Q.  And then there's a Country [sic] Times article

16  link?

17    A.  Yes.

18    Q.  Okay.  And then Mr. Knight sent himself this

19  email at 2:56 in the morning?

20    A.  Yes.

21     Q.   Okay.  Do you have any reason to think that

22  this isn't a correct true and copy email that came out

23  of Infowars' files?

24     A.   No, I have no reason.

25     Q.   All right.  You know who Veronique de la Rosa

74

1  is.  Right?

2     A.   Yes.

3     Q.   Okay.  Video of her interview with Anderson

4  Cooper has been shown on Infowars many times.  Correct?

5     A.   Yes.

6     Q.   Okay.  The company believes she was a public

7  figure.  Correct?

8     A.   Yes.

9     Q.   Company believes you should have greater

10  latitude to comment on public figures.  Correct?

11     A.   Yes.

12     Q.   Part of the reason the company believed that

13  her interview was suspicious was because Ms. De la Rosa

14  had made statements in support of gun regulation.

15  Right?

16          MR. REEVES:  Objection.  Form.

17     A.   Yes.

18     Q.   So if the company was commenting on her

19  because of her public advocacy, then the company knew

20  who she was, obviously.  Right?

21          MR. REEVES:  Objection.  Form.

22     A.   I don't understand the specifics of what

23  you're asking.

24     Q.   I'm asking you:  Since you knew she was a

25  public figure, since you knew she had made gun advocacy

75

1  comments and that was part of the reason why it was

2  suspicious, the company knew who she was?

3     A.   Well, she put herself in the arena on

4  television.

5     Q.   Right.  I'm not disputing you on that, Mr.

6  Jones.  I'm not having an argument about that.  Right?

7  All I'm trying to come up with is at the moment that

8  Infowars put that video of her and her interview on the

9  air, Infowars knew who she was and knew she was, in your

10  eyes, a gun advocate -- a gun regulation advocate.

11  Right?

12     A.   You know, I don't remember back ten years ago.

13  I just really don't remember.

14     Q.   Well, I mean, you were totally fine just now

15  testifying to me that you knew she -- and believed she

16  was a public figure, that you knew that she had made

17  comments on gun advocacy.  Right?  You just testified to

18  that.

19     A.   That's what my memory serves a long time ago.

20     Q.   Right, right.  But I mean, again, if you're

21  going to make the argument that she's a public figure

22  and that part of what she was doing was suspicious based

23  on the things she was doing in her public advocacy, that

24 means you would have to know about her public advocacy.

25 Right?

76

1    A.   I don't have the specifics back at the time.

2    Q.   Okay.  Do you remember when talking about that

3 video -- okay.  So you know there's this thing in that

4 video about the -- Anderson Cooper's and the green

5 screen.  Right?  You remember that?

6    A.   Yes, I remember that.

7    Q.   Okay.  Do you remember them talking about

8 whenever you talked about that video too you would talk

9 about how the background behind them was looped and the

10 flowers would move the same way and that you could tell

11 it was looped?  Right?  Do you remember talking about

12 that?

13    A.   Yes.

14    Q.   Okay.  First of all, that's just not true.

15 Right?  There's no looped background?

16    A.   I was talking about several shots and things

17 we'd seen CNN done --

18    Q.   Ms. De la Rosa's interview that you were

19 talking about, there's no looped background.  Correct?

20    A.   That was ten years ago.  If you show me the

21 video and refresh my memory.

22    Q.   I'm asking you here because I brought you to a

23 deposition about the video that you -- we allege you

24 defamed her on.  And I'm wondering right now if you're

25 saying today -- is it going to be your contention to

1  this jury that that video had a looped background and

2  you were right?  Is that your contention or not?

3      A.  The video looked like it had been altered and

4  it did look like other shots CNN has done before where

5  they have the person in the studio and then the person

6  is there and they cut the pieces over each other.

7      Q.  I'm asking about if there's a looped

8  background.  Is there a looped background or not?  Is

9  that going to be a contention in this case or not?

10          MR. REEVES:  Objection.  Form.

11      A.  I'd have to see it again.

12      Q.  Okay.  One thing we do know, though, is you

13  were talking about how the leaves were blowing.  Right?

14  Because they're outside in that video.  You understand

15  what I'm saying?

16      A.  Uh-huh.

17      Q.  Okay.  And how if the leaves were blowing and

18  then suddenly they glitch and they go back to where they

19  were, that would show you there was a loop.  Right?

20  That's how you would know there was a loop.  Correct?

21      A.  Yes.

22      Q.  Okay.  So if there's wind blowing out there --

23  the other thing we know is that there's wind blowing on

24  the people if they were actually on the scene.  Right?

25  If there were people -- if there's wind blowing on the

1  flowers and the people are supposedly actually there,

2  there should be wind blowing on them too.  Right?

3      A.   Yes.

4      Q.   Okay.  So in that interview, Ms. De la Rosa's

5  hair is moving from the wind.  Do you understand that?

6  Do you disagree with that?

7      A.   I'd have to see the video again.

8      Q.   Okay.  So you don't know that.  But if her

9  hair is moving --

10      A.   Well, we're saying Anderson Cooper wasn't

11  there.

12      Q.   Woah.  Okay.  This is new to me.  Are you --

13  are you saying -- are you saying that Veronique de la

14  Rosa was standing in the Newtown square and Anderson

15  Cooper wasn't and they composited Anderson Cooper and

16  Veronique de la Rosa was either talking to nobody or

17  somebody in, like, a blue Jar Jar Binks suit?

18      A.   I believe Jar Jar Binks.

19      Q.   Do you know who that is?

20      A.   No.

21      Q.   Okay.  Don't worry about it.  Do you think

22  Veronique de la Rosa was there?  Back up.  When you made

23  those comments, when you were -- when you were

24  describing this Anderson Cooper blue screen, was it your

25  allegation that they were both on a studio in Atlanta

79

1  behind the blue screen --

2    A.   No, no.

3    Q.   -- or was it that Anderson Cooper wasn't there

4    but Veronique de la Rosa was there?

5    A.   I would have to -- like I told you, it was ten

6    years ago.  I would have to review the videos.

7    Q.   Okay.  So as far as the video you're being --

8    A.   I remember the nose disappearing and people

9    having a lot of questions saying that could be a blue

10   screen and looking at it and then some of the other

11   anomalies.

12   Q.   When was the last time you saw that video?

13   A.   Oh, a long time ago.

14   Q.   So here you are for your third deposition.

15   A.   I didn't know you were going to bring this up.

16   Q.   It really would be surprising for me to bring

17   up the video that you're being sued for defamation --

18   A.   Well, next time you bring it up I'll certainly

19   all done the research.

20   Q.   There isn't going to be a next time, Mr.

21   Jones.  Next time we see each other is going to be a

22   couple of months in a courthouse.

23   A.   Well, next time we see each other you'll be

24   able to bring this up.

25   Q.   No, we're not going to talk about that.

80

1    A.   Oh, okay.

2         MR. REEVES:  Please just let him ask you

3  questions.

4        MR. BANKSTON:  No.  He wants to answer --

5  I mean, he really wants to ask questions.  I'm happy to

6  answer them.

7        MR. REEVES:  Please just let him ask you

8  questions and you answer them so we can move on.

9      Q.  So one of two things has to be true if

10  Anderson Cooper is on a blue screen.  One of two things

11  has to be true.  Either Ms. De la Rosa is also on blue

12  screen or Ms. De la Rosa is in the town square and she's

13  not actually talking to Anderson Cooper.  One of those

14  two things has to be true if there is a blue screen.

15  Correct?

16      A.  How it would work is one person has an ear

17  piece; they're really talking to them.  They just

18  composite the person in so they're essentially together.

19  They generally do that kind of shot and you see how

20  they're far apart.  You can see blue screen sometimes.

21  That happens in a lot of shots.  And we may have been

22  wrong about that.  We weren't the ones that generated it

23  and the first to put it out.  We just simply gave

24  commentary and our views on it.

25      Q.  Okay.  If Ms. De la Rosa wasn't at Newtown --

                              81


1  let's go ahead and pretend for a moment that this was

2  all shot on blue screen, right, that Anderson Cooper is

3  not in the town square.  And let's also pretend that Ms.

4  De la Rosa isn't at the town square.  If that's the

5  case, somebody is going to have to be off screen with a

6  fan blowing her hair.  Right?

7         MR. REEVES:  Objection.  Form.

8     A.  Like I told you, it's hard to comment on

9  something that's not in front of me.

10    Q.  Uh-huh.  Does the company have any reason to

11  contend -- well, first let me ask it this way:  Do you

12  have any reason to contend that any of these parents

13  have been faking their distress over Infowars' actions

14  as it regards Sandy Hook?

15    A.  I did not kill their children and I didn't

16  visit Adam Lanza's house.  CIA did, and all the rest of

17  that.  And no one sued me back at the time when I was

18  actually talking about it.  It was once I became

19  extremely famous and Hillary Clinton made an issue about

20  it in campaign ads.  And then Trump won the election,

21  and then I became this big supercharged political target

22  as low-hanging fruit, and then they go, oh, he's the

23  Sandy Hook man.  And then the anti-gun control groups,

24  the democratic party basically attached themselves to me

25  so that every time I was in the news they could then

82

1  bring back up Sandy Hook for the gun control advocacy

2  that they have.  And that's what this long process

3  has -- has been.

4         MR. BANKSTON:  Okay.  First of all,

5  objection, nonresponsive.

6      Q.   Was any of that -- was any of that meant to be

7   a reason that you contend that thie Sandy Hook families

8   are faking -- or saying my clients are faking their

9   distress over --

10      A.   I do not think they are faking their distress.

11      Q.   Okay.  So their distress over what you said is

12   genuine?  You admit that?

13           MR. REEVES:  Objection.  Form.

14      A.   I mean, I would call it more hatred than

15   distress.

16      Q.   I think -- yeah, I think there's some feelings

17   of hatred.  Yeah, I do.  I think -- I think when -- for

18   instance, you can understand how when Neil Heslin has

19   spent the last moments with his little heroic child who

20   saved some lives that day looking him in the face with a

21   bullet hold in this head --

22      A.   I didn't kill him.

23      Q.   I know you didn't kill him.

24           MR. REEVES:  Please let him just ask

25   you --

                                83

1      Q.   Yeah, let's not interrupt me, Mr. Jones.  I

2   don't you didn't kill him.

3           MR. REEVES:  I've got my client -- I'm

4   handling my client.

5           MR. BANKSTON:  You're not, but I'm --

6   we'll see what we can do.

7      Q.   I'm asking you, Mr. Jones.  I'm not saying you

8   killed these kids.  Nobody is saying that you caused

9   that grief.  Let's make that really clear.  Nobody is

10  saying that.  These parents, though, were grieving over

11  the deaths of their children.  That's a thing that they

12  went through.  Has nothing to do with you.  You get

13  that?  Their grief over the death of their children has

14  nothing to do with you.  You get that?

15      A.   Except then through the gun control movement,

16  it was projected on gun owners blaming us for their

17  deaths, and we don't accept that.

18      Q.   I don't even know what that means, but --

19      A.   You know what it means.  Gun owners have all

20  been blamed.  You asked me to answer your question.  We

21  get blamed every time some crazy person on Prozac goes

22  and kills people that the CIA went and visited on

23  record.  And then -- and then we get blamed, and we're

24  tired of being blamed.  And so -- and so people start

25  really looking at these events and don't trust them.

84

1   And a lot of the times it turns out they are staged.

2   The Roe v. Wade baby never died.  Gulf of Tonkin never

3   happened.  The CIA did plan staged mass shootings and

4   mock funerals to -- at Star War with Russia and Cuba,

5   Operation Northwoods.  These are real things.

6       Q.   Judith Miller at the New York Times

7   collaborated with Ahmed Chalabi and basically invented

8   weapons of mass instruction that resulted in the death

9   of a million Iraqi civilians.  Right?

10      A.   Yes.

11      Q.   And whoever the journalist was who got to the

12   bottom of what Judy Miller and those neocons were doing,

13   that person deserves a Pulitzer and maybe a metal and

14   maybe Judith Miller deserves to be in jail.  Would you

15   agree with that?

16      A.   Yes.

17      Q.   Right?  And so that journalism that resulted

18   in that was really good journalism?

19      A.   Yes.

20      Q.   But there can also be really bad journalism

21   too like what Judith Miller did with the weapons of mass

22   destruction.  Right?

23      A.   The point is they lied on purpose about WMD's.

24   I made my opinion and legitimately thought it might not

25   have happened.

85

1      Q.   Right.

2      A.   Okay?  And I'm being honest with you about

3   that.  So here's the deal:  The court of public opinion

4   knows that people have a right to ask questions.  Now,

5   in hindsight, I saw the families.  It looked pretty

6   legitimate.  Some of the anomolies turned out to not be

7   true, and then I said I was sorry.  And then I got sued.

8   And so let's just not sit here and pretend that Alex

9   Jones is in red pajamas like the devil running around

10   attacking all these people when that's not the case.

11    Q.    Let's see if we can -- okay.  So if Neil

12  Heslin spent these last moments with his son, has this

13  cherished memory putting his hand through his son's

14  hair, and then he sees Mr. Shroyer and then you, right,

15  get on TV and draw serious doubt about whether he even

16  held his son, whether he's telling the truth, and he did

17  that after he had asked you to stop, you can understand

18  why that man might have some negative feelings about

19  you?

20    A.    And you can understand how he's on TV on an

21  actual program attacking us.

22    Q.    Yeah.  You know why he did that?

23    A.    Yeah.

24    Q.    Tell me why.  Why did he do that?

25    A.    Because Megyn Kelly went and organized the

86

1  whole thing for publicity to go after second amendment.

2  They stepped into this, used it for political purposes,

3  went after the American people, and then get surprised

4  when people think it might be staged or it might be

5  synthetic.

6    Q.    You think Neil Heslin went on national

7  television to ask you to stop as part of a plot to,

8  what, destroy the second amendment?

9    A.    No.  There are the interests behind it and the

10  money and the financing.

11    Q.    I don't care about those people.  I don't

12  represent any of these people.  I don't represent Megyn

13  Kelly.  If I had Megyn Kelly in this chair right now,

14  believe me I'd be talking to her about some things.

15      A.  Why don't you subpoena her and get the real

16  thing I said on that interview.

17      Q.  Don't you have it?  You have a full audio of

18  everything that happened when she came into your

19  building.  You never gave it to me, but you have it,

20  don't you?

21      A.  No.

22      Q.  Where's that tape?

23      A.  Well, would you like me to be specific?

24      Q.  Yeah.  Where's the tape?

25      A.  It was not -- that was not taped at the

87

1  office.  That was taped at a house they rented.

2      Q.  Oh, so they rented a house to do your actual

3  interview?

4      A.  Yes.

5      Q.  And then you didn't actually tape any part of

6  that?

7      A.  No.  Well, the crew member did not put their

8  phone on do not disturb, and so about a few minutes into

9  it someone calls and then their recording stops.  Just a

10  total -- the truth is we've got some good employees,

11  we've got some bad employees.  But it is slackerville

12  Austin.  And if anything, we're incompetent sometimes.

13  And so that's my crime, is we got so huge and big and

14  sometimes I'm just a regular guy on the radio and make

15  mistakes.

16      Q.   All right.  But you do have an audio recording

17  of you talking with Megyn Kelly about that interview?

18      A.   No.  Like I told you, it didn't --

19      Q.   No, no.  Before talking about the interview.

20  She came --

21      A.   Oh, yeah, I did record -- yeah.  Well, no.  I

22  interviewed her -- let me slow down here.  She called me

23  one day a few months before -- before she came to Austin

24  and did the interview that aired in the summer.  And

25  she -- she was driving in the car and she's, like, oh,

88

1  I'm such a big fan, oh, you're so wonderful.  And I knew

2  it was a setup and I didn't have a recorder on my phone.

3  So I said let me get back to my office.  So I got to my

4  office.  I had another iPhone, and then those -- that's

5  the thing I interviewed and put out on the internet to

6  show what she'd really said and really done.  That was

7  not a recording of her at the office.  That was a

8  recording of her setting up the interview with me.

9      Q.   Okay.  So you have audio of you and Megyn

10  Kelly?

11      A.   It was uploaded to YouTube and then they took

12  that channel down.  But I'm sure it's somewhere.

13      Q.   Okay.  And they took that channel down after

14  you were sued.  Right?

15     A.   Uh-huh.

16     Q.   Okay.  So at some point between when you were

17  sued and when they took that channel down you had audio

18  of you talking to Megyn Kelly.  Correct?

19     A.   Yes.  And that audio is public.  We put it out

20  unedited.  If you've want it, you've got it.

21     Q.   Where would I find it?

22     A.   I mean, if -- we've used that as the cloud.

23  We used YouTube as the cloud.

24     Q.   I get that.

25     A.   And so I didn't, like, organize stuff.  I'm

89

1  the --

2     Q.   No, no.  I'm not asking you that.

3     A.   I'm super unorganized.

4     Q.   I'm asking where can I find it.

5     A.   I would have to get online and go find Alex

6  Jones.  I forget even the headline of it.  It would take

7  some time, but not that long.

8     Q.   Okay.

9     A.   It would be like -- trying to remember.

10     Q.   Does the company have any reason to -- let me

11  ask you this way.  Let me do it you.  I don't want you

12  to speak for the company if you don't -- you can't speak

13  for everybody in the company.  Right?  Some people in

14  the company have different opinions.  Right?

15     A.   Yes.

16     Q.   Okay.  Do you have any reason to dispute that

17 these parents' grieving process over the past eight

18 years has been impacted by Infowars' actions as it

19 regards Sandy Hook?

20       MR. REEVES:  Objection.  Form.

21    A.   That's a hypothetical question.  I can't speak

22 to their emotions.

23    Q.   There's nothing hypothetical about it, Mr.

24 Jones.

25    A.   I did not kill their children.  They became

90

1 political and used that death to then -- for their

2 advocacy against the right to keep and bear arms.  And

3 so that directly put them in opposition politically with

4 me, and so they stepped into that political arena.

5    Q.   What did Leonard Pozner do politically about

6 guns?  What did he do?  Did he ever say anything about

7 guns publicly?

8    A.   I'm talking about the whole Sandy Hook

9 situation in general and then some of the parents.

10    Q.   Okay.  Did Scarlett Lewis ever say anything

11 about guns?

12    A.   I don't have it all in front of me.  I mean, a

13 lot of these people never even said their names.

14    Q.   Okay.  But again, I want to go back not to,

15 like, what they may have done.  I'm asking you:  Do you

16 have any reason, sitting here today, to think that their

17 grieving process was unaffected by Infowars' actions as

18  it regards Sandy Hook?

19     A.  No.  I think it was affected, and then it gave

20  them someone to hate and to continue on again.  So I

21  wish I never would have gotten in the middle of it.

22     Q.  Right.  So if for five straight years Infowars

23  is telling millions of people that Sandy Hook is fake

24  and that the controversy then stays alive, you

25  understand it might be hard for my clients to have

91

1  disclosure on the death of their children?

2     A.  Five straight years --

3         MR. REEVES:  Objection.  Form.

4     A.  -- is a false statement.

5     Q.  Really?  Okay.  So we know you said false --

6  we know --

7     A.  Straight years means --

8         MR. REEVES:  Hold on.  Hold on, please.

9  Let him ask you the question.

10     Q.  So we know in 2012 right when it happened you

11  got on TV and started talking about it being staged.

12  Right?  We know that?

13     A.  Soon thereafter I had questions.

14     Q.  No, Mr. Jones.  I don't understand this whole

15  thing about questions.  I don't get this.  If you say

16  Sandy Hook is fake, that's not a question.  Right?

17     A.  That was -- that was years later.  There's a

18  quote of me saying I can see how people think it's

19  absolutely fake.

20    Q.    There's no quote of you saying I can see how

21  people -- that doesn't exist.  You keep repeat that.  It

22  doesn't exist.

23    A.    Okay.  Well, that's what I remember.

24    Q.    In our last deposition, I showed you clip

25  after clip of you saying it's totally synthetic,

92

1  completely made up with actors.  At first, I thought

2  they killed real kids, but nope, they didn't.

3    A.    That's -- that's -- that's -- that was my --

4    Q.    That's what you said.

5    A.    Yeah.

6    Q.    Yeah.  And you did that in 2014.  You did it

7  -- you did it in 2013.  You did it in 2014.  You did it

8  in 2015.  You did it in 2016.  You did it in 2017.

9  Correct?

10         MR. REEVES:  Objection.  Form.

11    A.    I'd have to go back and look, but I definitely

12  said that I had serious questions about it and could see

13  how it was staged with all the bizarreness around it,

14  I'll tell you.

15    Q.    No.  Mr. Jones, let me just make something

16  really clear.  If you had gone on and said, man, Sandy

17  Hook looks weird.  There's a bunch of weird stuff going

18  on.  God, it's weird.  Look at this weird thing.  This

19  thing is weird and I don't know what's going on and

20  somebody needs to answer these questions, we wouldn't be

21  here today.  Okay?  The reason -- the statements that I

22  want to talk to you about is you admit that over those

23  five years you repeatedly without equivocation said it

24  was fake, that children didn't die, there were actors

25  playing the different parts of different people.  You

93

1  said those things.  Can you now just admit that for the

2  jury that you said them?  They're going to see the

3  videos.  Can you --

4      A.  Well, sure.  Then they should investigate

5  Sandy Hook themselves.

6          MR. REEVES:  Objection.  Form.

7      A.  They should look into it themselves and see

8  why people ask questions.  You hope they don't.

9      Q.  No.  I really hope they do.

10     A.  Okay.

11     Q.  I really hope they do.  You're aware of

12  Mr. Fetzer's book Nobody Died At Sandy Hook?

13     A.  I've not read it.

14     Q.  Infowars promoted it, though.  Right?

15     A.  I don't remember.

16          MR. BANKSTON:  Give me the tabloid.

17     A.  Can we stop and get a cup of coffee real quick

18  and maybe go to the bathroom?  Just five minutes?

19     Q.  Yeah, if it's five minutes.

20     A.  Okay.  Thanks.

21          THE VIDEOGRAPHER:  Going off the record,

22  12:31 p.m.

23        (Short recess.)

24        THE VIDEOGRAPHER:  We are back on the

25  record at 12:35 p.m.

94

1     Q.   Before we broke, we had talked about whether

2  Infowars had ever promoted or directed people to Jim

3  Fetzer's book, tried to get more viewership for Jim

4  Fetzer's book, and you weren't aware of that.  Right?

5     A.   Not in my memory.

6     Q.   Okay.  I'm going to show you what I've marked

7  as Exhibit 9, and I'm going to go through this whole

8  thing with you to see if it reflects your memory.  Okay?

9  Or if it refreshes your memory.  You'll see at the

10  bottom corner there is a notation that says

11  FSSTX-01923 --

12     A.   I do see that.

13     Q.   I need to finish for the court reporter before

14  you say do you see that.  Do you see a notation that

15  says FSSTX-019237?

16     A.   Yes.

17     Q.   Okay.  Up at the top we see that there's an

18  exchange of emails here.  The -- let's start at the

19  bottom email, and you'll see how the original message is

20  a message from James Fetzer to Allan Powell cc'ing Rob

21  Dew and James Tracy.  Do you see where I'm referring to

22  there?

23     A.   Yes.

24      Q.   Okay.  And then in Mr. Fetzer's email is a

25   copy of an email that he was sent earlier by a name

                               95

1   named Allan Powell down at the bottom.  Right?

2      A.   Uh-huh.

3      Q.   Do you know who Allan Powell is?

4      A.   No.

5      Q.   Okay.  And you know who James Tracy is,

6   though.  Right?  He's one of the professors you said was

7   an expert on Sandy Hook that you relied on?

8      A.   No.  I was talking about -- talking about

9   Wolfgang Halbig and Steve Pieczenik.

10      Q.   Okay.  You don't remember Paul Watson

11   interviewing Michael Tracy about crisis actors?

12      A.   I do remember Paul interviewing a professor.

13      Q.   Yeah, who said that there were crisis actors

14   at Sandy Hook?  Did you not know that was his claim?

15      A.   Oh, I remember that -- him now, yes, yeah.  He

16   was all over the news, yes.

17      Q.   Okay.  I want to start at the bottom with

18   Allan Powell's email.  And he says Rob, Jim Fetzer put

19   together a book on Sandy Hook to which I contributed two

20   chapters.  Amazon have decided they won't handle it.  I

21   think Jim would agree to it being distributed by

22   Infowars free as a PDF.  We were both just on the

23   phone -- we were both just on the Jeff Rense show today,

24   and Jim gave that right of distribution to Jeff.  Would

25   you see if Alex would have Jim and Jim Tracey on to

1  promote the book and talk a bit about the still running

2  sore of Sandy Hook?  I spoke to Jim Fetzer about this

3  today and said he will speak to you.  If you flip over

4  onto the back part of the page, you can see it says

5  Cheers, Allan Powell?

6      A.  Yes.

7      Q.  Okay.  So did I read that email correctly?

8      A.  Yes.

9      Q.  Okay.  The next message is from Jim -- okay.

10  Before we go on to Jim Fetzer's message, do you know who

11  Jeff Rense is?

12      A.  Yes.

13      Q.  Okay.  Do you remember Paul Watson also

14  telling you at the same time that he told you that Jim

15  Fetzer was bat shit crazy that Jeff Rense was bat shit

16  crazy?  Do you remember that?

17      A.  No.

18      Q.  Okay.  Going up to Jim Fetzer's email, or he

19  identifies himself as Jim and James so it's going to be

20  used both in this document, but he says, Rob, we are

21  making the book available to the public for free.  Here

22  is the cover and PDF.  Several sites are now offering

23  it.  I would be glad if Alex were to do the same.  I am

24  sure James would be glad to come on with me if Alex

25  wanted to interview us about this stunning event.  I

1  think the latest case was the Pentagon Papers.  Did I

2  read that correctly?

3      A.  Yes.

4      Q.  Okay.  And then Rob Dew writes back to Jim

5  Fetzer.  Says, Thanks for the heads up.  Sent the links

6  to Adan and he is writing an article about it.  Please

7  let us know if there is a bump in downloads.  Rob.  Did

8  I read that correctly?

9      A.  Yes.

10      Q.  Okay.  And from this Bates label at the bottom

11  that says FSSTX, we know that this is a document that

12  resided in Infowars' corporate files.  Correct?

13      A.  Yes.

14      Q.  Okay.

15          MR. BANKSTON:  Okay.  Can you show me tab

16  4?

17          (Exhibit 10 marked.)

18      Q.  I'm going to show you what I've marked as

19  Exhibit 10.  Do you recognize that?

20      A.  Yes.

21      Q.  Okay.  Can you tell us what this is?

22      A.  Zero Hedge article.

23      Q.  Do you know why it might be relevant to this

24  lawsuit?

25      A.  This is the article Owen was reading that he's

1  been sued for and the coverage I gave of Owen that I was

2  sued for.

3      Q.   Okay.  Can you flip over to the second page

4  for me?  Do you see there's a big blank space in the

5  middle of the page?  Seems to be the way it printed from

6  the internet?

7      A.   Uh-huh.

8      Q.   Below that big blank space, do you see where

9  it says accept this does not comport with the official

10  story?

11      A.   Yes.

12      Q.   Okay.  And then it says Jim Fetzer, professor

13  emeritus at the University of Minnesota who wrote a book

14  claiming Sandy Hook was staged, notes that, based on the

15  facts of the case, Heslin's statement that he held his

16  son with a bullet hole through his head could not have

17  happened.  Have I read that correctly?

18      A.   Yes.

19      Q.   Okay.  Now I want you to flip to the third

20  page.  You see that first sentence, the first paragraph

21  there?  It's just one long sentence.

22      A.   Yes.

23      Q.   Okay.  And how that paragraph begins is by

24  saying it's entirely possible that Mr. Heslin had access

25  to his son after the shooing.  Do you see where it says

99

1  that?

2      A.   Yes.

3    Q.   Okay.  That wasn't said by Infowars, though.

4  Right?

5    A.   I don't have the clip in front of me.

6    Q.   Okay.  When you said on July 20th, 2017 the

7  stuff I found was that they never let the parents see

8  the bodies, that's Jim Fetzer's book Nobody Died At

9  Sandy Hook.  That's what you found.  Right?

10    A.   I remember going off the news reports for

11  that.  I don't know if it was this one.

12    Q.   I mean, that's not -- Mr. Fetzer's book and

13  all that, he's not a news reporter.  You understand

14  that?

15    A.   Yes.  I'm not even sure that I was going off

16  that.

17    Q.   Right.  That's what I'm asking you.  I don't

18  think you were going off that because when you said the

19  stuff that I had found, that had obviously happened

20  before this brouhaha started.  Right?  So I'm saying

21  when you say the stuff I found was that they never let

22  the parents see the bodies, the stuff that you found was

23  Jim Fetzer's book Nobody Died At Sandy Hook?

24         MR. REEVES:  Objection.  Form.

25    A.   I just -- I don't remember the information

                             100


1  enough to be able to comment on it accurately.

2    Q.   Okay.

3         MR. BANKSTON:  Will you get me tab 34?

4  Oh, no.  I'm sorry.  Second folder, tab 34.  Actually,

5  skip that.  Give me 23 out of this book.  I do want to

6  see that.

7      Q.  All right, Mr. Jones.  Just to let you know

8  for your -- FYI, I do think I can get you out of here by

9  2 o'clock.

10      A.  Okay.  Great.

11      Q.  Because we're doing a good job.  Okay.  I've

12  shown you what I've marked as Exhibit 11.

13          (Exhibit 11 marked.)

14      Q.  And I know this hasa real -- like, has a lot

15  of stuff in it, some really tiny print.

16      A.  I may not, yeah --

17      Q.  Yeah.

18      A.  -- be able to read the tiny print.

19      Q.  I know.  Like, yeah, I don't -- the only thing

20  that I'm actually -- I think when we get into this

21  document, we'll quickly discover that it may not be

22  necessary to even read all of this stuff.  But if so, I

23  may need to give you some time to go read it, if you

24  want to do that.  But what I want to ask you about this

25  document is:  Up at the very top you see that this is an

101

1  email on June 29th, 2018?

2      A.  Uh-huh.

3      Q.  Okay.  That's about a month after you were

4  sued.  You understand that?

5      A.  Uh-huh.

6     Q.   Okay.  And it's from Nico.  What was Nico's

7  job title at that time?

8     A.   Radio producer.

9     Q.   Okay.  And then Daria, what's her title?

10    A.   She was sound operator then.

11    Q.   Okay.  And today she's a producer as well.

12  Right?

13    A.   Yes.

14    Q.   Okay.  And so Daria is sending this to Nico,

15  and the subject is forward:  vanishing blog:  Not only

16  is "Noah Pozner" a fiction, but his father, "Lenny," is

17  also a fake.  Have you ever seen this email?

18    A.   No.

19    Q.   Okay.  I don't think I need to ask you

20  anything else about it, then.  If you'd never read this,

21  I don't think we need to talk about it.  My only other

22  question was:  Do you have any idea why Nico would be

23  sending things to Daria from Jim Fetzer right after you

24  were sued?

25    A.   I mean, no, I have no idea.

102

1     Q.   Okay.

2          MR. BANKSTON:  Tab 10.

3     Q.   I'm going to talk a little bit about Wolfgang

4  Halbig.  Do you know what I mean when I talk about the

5  Super Bowl picture?

6     A.   No.

7     Q.   Okay.  Do you know what I mean when I talk

8  about the Super Bowl choir of fourth grades from Sandy

9  Hook?

10    A.   Yes, I've heard of that.

11    Q.   Okay.

12    A.   And that's when I really started thing it

13  probably did happen because that's -- it's crazy.

14    Q.   Just crazy.  Right?

15    A.   Yeah.

16    Q.   Okay.  I've shown you what I've marked as

17  Exhibit 12.

18          (Exhibit 12 marked.)

19    Q.   You'll see again at the bottom there's no

20  Bates number on this one.  Right?

21    A.   No.

22    Q.   Okay.  This one is dated 11-19-2016?

23    A.   Yes.

24    Q.   Towards the end of 2016.  It is from Wolfgang

25  Halbig.  Right?

103

1    A.   Uh-huh.

2    Q.   The "to" line, the main people it's sent to,

3  include Nico.  That's an Infowars employee.  Right?

4    A.   Yes.

5    Q.   Then several -- a couple of addresses to the

6  Trump organization.  Correct?

7    A.   Yes.

8    Q.   Rob Dew, who is also another employee of

9  yours.  Right?

10     A.   Yes.

11     Q.   And then J. Rense.  Do you think it would be a

12  fair assumption to say that's probably Jeff Rense?

13     A.   Yes.

14     Q.   Okay.  And then also copied -- there's a cc

15  line, and there are several other people copied who are

16  either media organizations and there's also some

17  government addresses.  Do you see that?

18     A.   Yes.

19     Q.   Okay.  Now, there are also a bunch of

20  attachments listed.  Do you see that?

21     A.   Yes.

22     Q.   Okay.  And those attachments appear to be png

23  files.  Those are images.  Right?

24     A.   Yes.

25     Q.   Okay.  And then the subject line says trust

104

1  but always verify, please verify with your uncle.

2  Thanks.  Do you see that?

3     A.   Yes.

4     Q.   Okay.  And then I'm going to go ahead and read

5  this email to you.  All right?  It says, Nico and Rob,

6  Rob, Please send this video to your uncle, the former

7  FBI agent who attended my Connecticut Freedom of

8  Information hearings in Hartford, Connecticut.  He told

9  me that I was right about what was happening, which gave

10  me a tat more courage.  He has friends who can verify

11  this video to be accurate and now we know that the

12  children who supposedly died at Sandy Hook are at the

13  Super Bowl on February 3rd, 2013 and that is why we have

14  never ever heard them sing again.

15            Think about it for just a second.  They

16  sing before 110 million people worldwide with Jennifer

17  Hudson.  They have 87,000 people in the stadium with

18  over 3500 news reporters and we never have one interview

19  in the newspaper of on television from them.  Why?

20            Just think about how much money came

21  flowing in after that February 3rd, 2013 Super Bowl

22  performance from across the world.  Why have they never

23  performed again if they were so great to be asked to

24  sing at the February 3rd, 2013 Super Bowl?  Why no

25  appearances on the national early morning television

105

1  shows?  They sing before 110 million people and they

2  simply disappear.  Even Beyonce met them.  Where are

3  they?  Are they all dead?  Are they coerced and

4  threatened by the NFL and CBS Sports and by their own

5  parents never to talk about the greatest day in their

6  lives?  Are they part of child trafficking?  Who would

7  do this to fourth grade children when we all know that

8  children need to express their feelings or emotions or

9  it can have long-term mental health issues.

10            Then below that is a YouTube link.  And

11  then it says, Please have your uncle verify and tell me

12  that I am not crazy because I -- because I have now run

13  out of funds chasing the truth.  Please help if you can

14  afford it.  Wolfgang Halbig.  And then he gives his

15  address and phone number.

16      A.  Uh-huh.

17      Q.  Correct?  I've read all that correctly?

18      A.  Yes.

19      Q.  Okay.  When he asked them to verify that he is

20  not crazy, that's not something that could be done for

21  this email.  This is crazy, isn't it?

22      A.  That is when I really started thinking that it

23  probably did happen, when things took these turns, yes.

24  But then I still saw some anomalies, but I'm not the

25  progenitor of this.  I'm not saying this.

                              106


1      Q.  No.  I understand that.  But once you see

2  this, you have to understand that Wolfgang Halbig isn't

3  reliable anymore.  Right?

4      A.  Yes.  When he first came out, though, I'd see

5  him on national TV as a big top expert in all the

6  things, so that's why I was relying on him.

7      Q.  Yeah.  Okay.  But after this, it's clear you

8  shouldn't be relying on Wolfgang Halbig.  This man is

9  not well?

10      A.  Well, I didn't learn about this till later.

11  But I have -- I don't remember when, but I remember

12  after this -- sometime after this the stuff about, you

13  know, the Sandy Hook kids at the Super Bowl.

14    Q.   It's crazy.  Right?  It's not a thing a

15  rational or sane person would do.  Right?  Claim that

16  the Super Bowl choir was actually the murdered children.

17  Right?

18         MR. REEVES:  Objection.  Form.

19    A.   I never claimed that.

20    Q.   I'm not -- right.  I get that.  I'm saying the

21  person who did, if somebody was to claim that, that's

22  not a thing a rational person would do.  Right?

23    A.   I don't think that's rational.  And around the

24  same time people started thinking I was Beau Bridges and

25  Bill Hicks, so I started experiencing --

107

1    Q.   Right.  And that's unrational.  Like, I've

2  actually heard about that, people think you're Bill

3  Hicks.

4    A.   Yeah.

5    Q.   And that's dumb, isn't it?

6    A.   Yeah.

7    Q.   It's really stupid.  And one thing that I've

8  noticed is that a lot of times people are, like,

9  completely face blind and they, like, look at a picture

10  of you and Bill Hicks and they're, like, that's the same

11  person.  And it's obviously not the same person.  Right?

12    A.   Yes.

13    Q.   Okay.  People who say things like that, like,

14  for instance, if somebody was to say about the people at

15  Sandy Hook, oh, there's actors who were playing the

16  different parts of different people, like, there's a guy

17  who's playing a police officer and he's also a parent

18  and he's also this guy, that's also irrational.  Right?

19      A.   Well, the reason people have those questions

20  is it's called Astro turf.  And you really can hire

21  1000, 5,000, 100 wherever you want people to go be, and

22  governments and others have done that.  That kind of

23  stuff goes on.  And I remember seeing some of those

24  anomalies where they were saying the coroner looked like

25  his guy, and they did look very similar.  But I could

108

1  see why people were thinking that and then the

2  extrapolation goes out to, like, the Super Bowl and the

3  rest of it.  But that's just -- the system has lost so

4  much credibility with the public.  We've been lied to so

5  much that then -- there certainly have been cases where

6  things that are real, the public questions them because

7  they've lost so much confidence and they don't know

8  what's real anymore.

9      Q.   You know, you bring up an interesting point.

10  And I actually think just for -- I've been pretty

11  aggressive with you in this deposition.  I understand

12  that.

13      A.   Uh-huh.

14      Q.   But I think I need to be fair with you for a

15  moment about something that happened in your previous

16  deposition, which is the media ran with something in

17  your deposition, and I think they kind of distorted it

18  and didn't quite say what you really said, which is you

19  remember all those headlines about you saying that you

20  said things about Sandy Hook because of psychosis?

21  Right?

22     A.   Yes.

23     Q.   And that wasn't really accurate, was it?  The

24  way the mainstream media spun that was not really

25  accurate.  You were not literally saying you had a

109

1  mental illness.  Right?

2     A.   No, I was not saying that I was mentally ill.

3     Q.   Right.

4     A.   I was saying it was like a form of.  And

5  that's -- the general public doesn't believe anything

6  they're told anymore because the corporate press lies on

7  purpose, so then you start reflexively not believing

8  anything you're told.  And I'm simply just being honest

9  saying I believe the things I said, I believe the things

10  I did.  And in the aggregate, even at the time I had

11  problems with a lot of my listeners who didn't actually

12  like what I was saying.  But I never said things and did

13  things to just get an audience.  I said it because I was

14  generally questioning.  Like, I had over 130, 40 radio

15  stations on 9-11.  And I would have already been the

16  next Rush Limbaugh, but then I thought there were bombs

17  in the buildings.  It looked like.  They said on the

18  local news that they had blown up building seven.  I had

19  the news cast.  And I went on air and said that I think

20  the government was involved or at least let it happen,

21  and I lost over 100 of my stations in the next month.

22  And I didn't care because I thought I was telling the

23  truth.

24          Now, looking back at 9-11 now and that,

25  even more evidence has come out.  But I didn't go say

                                110

1  9-11 was an inside job for audience.  That took my

2  revenue now massively.  Totally hurt us.  But it was the

3  right thing to do.  And so after 9-11, and if you've

4  seen that, then you start thinking, you know, more stuff

5  is going on.

6      Q.  No.  I get what you're saying there.  In fact,

7  this might surprise you to learn this.  But when I was

8  in college, I watched loose change.  Like, I understood

9  it's important to ask questions.  Right?

10          You would agree with me that in this

11  country today the phenomenon you're talking about where

12  people have a hard time telling what's real, this

13  country has failed in so many ways to its public.  And

14  the media has failed in so many ways to the public that

15  it is genuinely difficult sometimes for members of the

16  public to know what's real anymore.  Right?

17      A.  Yes.

18      Q.  Okay.  Those members of the public, the only

19  way that they can be kept from being lost in the sea of

20  confusion is if there are enough responsible journalists

21  in this country.  That's the only way it's going to

22  happen.  Right?

23      A.  Yes.

24      Q.  Okay.  And right now there's not.  You'd agree

25  with me?  The state of journalism in America is bad?

111

1       A.  Yes.  And I've -- I've tried to get better

2   even before I got sued, and so I've definitely never

3   said I was perfect.  And I see the whole state of the

4   country.  And I have four children.  I'm really worried

5   about them, and that's why I've tried to be more

6   measured and everything, because I've never realized how

7   big my show is.  I mean, I didn't even realize how big

8   my show was ten years ago, five years ago.  I mean, I do

9   now.  And that's -- that's -- but that's also because,

10  you know, I've been contacted by so many prominent

11  people who -- who have lost confidence in the system and

12  now basically listen to me.  And so with that -- that's

13  a lot of power; comes with a lot of responsibility.

14      Q.  Responsibility.  Correct.  And the only way --

15  well, I won't say the only way, but one of the ways that

16  we help or we could help maybe making journalism better

17  in this country is if we ensure that journalists are

18  held accountable when they publish false facts and do so

19  carelessly.  You'd agree with that?

20      A.  Well, that's not what's happening.  The big

21  corporations are lying on purpose more than ever.  I

22  never lied on purpose.  And they are supporting the

23  destruction of independent journalism and small-time

24  journalism and citizen journalists who mean well but

25  make mistakes, whereas, the big corporations are owned

112

1  by trillion-dollar companies and are actively supporting

2  the attempts to silence us and shut us down.  And it's

3  all over the news that they say they hope your lawsuits

4  take us off the air.

5      Q.   Yeah, because they hate you.  Right?

6      A.   Well, the big corporations do.

7      Q.   Yeah.

8      A.   And listen, I mean, I'll just be honest with

9  those big corporations.  It's had the opposite effect.

10  Big media is so hated and so distrusted.  This has been

11  a terrible process for me and my family, and it's been a

12  growing process because I would have grown anyway as you

13  get older.  This -- all this persecution has just -- I

14  mean, has made us bigger.  I mean, it's like -- it's --

15  I mean, so like I told you last time, you guys, I mean,

16  this is all just a process.  And whatever -- whatever it

17  is that big shots think they're doing, it's not going to

18  do what they think they did.

19      Q.   Yeah.  So when the media piles on you, for

20  instance, that actually is counterproductive to what

21  they think their goals are.  Right?  Like, they're

22  actually making you more popular.  Correct?

23     A.   Well, people know that I legitimately question

24   and -- and am not lying to them on purpose.  And I

25   actually admit when I'm wrong on air and -- and am

113

1   trying to be better.  But I've also --

2        Q.   And it's important we try to be better.

3   Right?  You agree that particularly for independent

4   media, if we have any prayer in this country, it's that

5   we get out from the yolk of corporate media.  And the

6   only way we can do that is through independent media.

7   You'd agree with that?

8        A.   But the big corporate media as a default in

9   these cases only puts out what you guys says and hammers

10   it everywhere because they want to silence all the

11   little people.  So whether you like it or not, Mark

12   Bankston, you are on the side of the cutting edge of the

13   establishment.

14        Q.   No.  I'm suing them too.  And I think I just

15   told you right now in this deposition for the record

16   they messed up doing that.  When they come in here and

17   they take your words out of these depositions and they

18   distort them, that isn't good.  I understand that.  What

19   I'm asking you is from the standpoint of the independent

20   media.  It's important, crucially important.  Like,

21   there's a lot of new independent medias that have come

22   out in the past five, six years.  You'd agree with that?

23   We've seen almost a revolution --

24    A.   Yes.  The corporate's attempt the corporate

25  attempt to use Sandy Hook -- I'm not saying you yourself

114

1  are doing this because I can't read your motives -- they

2  are using this and even writing articles about how

3  they're going to try to use it to silence all their

4  opposition.  So that's why -- that's why the

5  establishment supports it.  And that's fine because the

6  establishment is making a real run at censorship,

7  authoritarianism, and control, and thinks it can use a

8  demonized version of Alex Jones as the poster child of

9  the villain.  But when you've got the real system that's

10  the real villain and people know that and they see the

11  big villain coming after Alex Jones, they go he's not a

12  villain.

13            So I mean, I guess you've actually blessed

14  me.  So it's hard, it's rough, but I'm going to go

15  through this and I'm going to grow and be better at the

16  other end.  But I really meant to be good and I really

17  meant to tell the truth.  And so at the end of the day,

18  this is just the way it is.

19    Q.   Villains are going to be villains.  Right?  We

20  know no matter what happens in this lawsuit, corrupt

21  corporate media is going to be corrupt corporate media.

22  There's no stopping them.  Right?  They're going to do

23  what they're going to do?

24            MR. REEVES:  Objection.  Form.

25    Q.   Right?

1    A.   I'm just telling you that -- that the power

2  structure is anti-Alex Jones, and so I've got a lot more

3  serious issues to deal with for my children and the

4  future of the country and everybody than this -- this --

5  this whirlpool that is Sandy Hook.  And so I don't hang

6  my hat on Sandy Hook, and I wish things would have gone

7  better and been different, believe me, in hindsight.

8  But the claim that I got famous off Sandy Hook and I

9  like Sandy Hook and I want Sandy Hook isn't true.  Until

10  they made me the Sandy Hook guy and I'm being attacked

11  for it, that has given -- you know, made me a lot

12  bigger.  But I didn't do that.  The previous Sandy Hook

13  stuff hurt me and made me lose audience, made everybody

14  get mad at me and made my crews -- made one of my crew

15  get mad at me.

16            Once -- once, though, the system took it

17  up and started attacking me with it, now people -- you

18  know, the people see what it is.

19    Q.   Yeah.  And I wish they would -- we'll not go

20  into my feelings about what they're...  But you'd agree

21  with me if we're going to solve what's wrong with

22  information right now, what's being pulled over the

23  public's eyes, we can't rely on corporate media to fix

24  it; it's got to be independent media.  Would you agree

25  with that?

1    A.    Well, Mark, let me just say this since we

2  actually here talking:  In that PBS documentary

3  Frontline you were in, one of the parents says that

4  he -- to paraphrase, he sent his attack dog hinchman at

5  us.  And it's some woman I never even heard of until she

6  got arrested.  And it's on the show everyone consciously

7  up there talking about Alex Jones sent this woman.  It

8  wasn't said, oh, what he said made her do it.  It was --

9  it was Alex Jones sent his attack dog knowing what she

10  would do.  That is fake 100 percent not true.  And if

11  you ever thought about the stuff that my family gets and

12  what happens to my children over stuff like that that is

13  not true.  And so we can all sit here and claim that we

14  want to be these great journalists who want to be

15  perfect and everything, but I wouldn't have said

16  something like that about somebody unless I was sure

17  that indeed they did send that poor schizophrenic woman

18  after them.

19    Q.    And again, because I'm sympathetic for what

20  you're saying right.  If -- was that something that one

21  of my clients said? because I don't think my clients

22  were on that show.  Right?  I'm just trying to check.

23    A.    Here's -- I'm being honest.  Mark, it all

24  just -- it all -- I forget who said it on the show, but

25  I basically word for word -- I mean --

117

1    Q.    What I'm trying to get at, Mr. Jones, is I'm

2  pretty sure I didn't say it.  But if somebody on that

3  show said that, if PBS put somebody on that show to say

4  that, I'm going to demand a retraction.

5      A.   Okay.  Great.

6      Q.   I want to know:  Do you know who said that?

7      A.   I'd have to go review it again.  I'm telling

8  you this is --

9      Q.   I promise you --

10     A.   I don't say this as a victim, but this is

11  traumatic for me.  And I'm tired of hearing about it.

12  And so I'll be honest.  Just like 9-11 became a

13  traumatic thing, I never talk about 9-11 because I got

14  to sick of talking about it and attacked over it.  And

15  now I have, like, a mental wall on Sandy Hook that just

16  goes up because I can't deal with the stress of it.  And

17  so I just put a mental wall up.  You ask me these

18  questions, and it's like I just can't deal with it

19  anymore.

20     Q.   Okay.  Let's not talk about Sandy Hook just

21  for a minute.  Maybe we can bring the temperature down.

22  Which is that you agree with me that independent media,

23  people who do independent media, if they do it poorly,

24  they hurt the cause of independent media.  People like a

25  Jeff Rense or a Fetzer that people were we're

                                118

1  criticizing, that's not good for independent media.

2  Would you --

3     A.   Yes.  And I want to move out of that class

4  that I wasn't completely in into a better class.

5     Q.   I hear you.  I do.

6     A.   But then that doesn't gauge me by the

7  corporate press that is trained to analyze on purpose,

8  whereas I was untrained and went through this whole

9  process.

10     Q.   Look, I'm with you that I want to hold

11  corporate media accountable wherever I can.  But do you

12  also agree that it's good for journalism to hold

13  independent media accountable wherever we can?

14     A.   Yeah.  But independent media is being

15  absolutely censored and attacked and sued with lawfare

16  everywhere.  There's a real system -- systemwide attack

17  on -- and very legitimate stuff like Senator Paul gives

18  a speech about -- about learn ^  Israeli study being 13

19  times better and YouTube censors it saying the WHO

20  doesn't authorize that statement.  The American Heart

21  Association comes out and says on the inserts of the

22  Pfizer shot, it says increase in myocarditis and heart

23  attacks.  They said we don't care.  You're not allowed

24  to scare people, and they block the American Heart

25  Association.  So see, people are pissed about this

119

1  censorship.  And so --

2     Q.   For sure.

3     A.   -- and so they see what's happening to us as

4  that.  And that's why you've got the corporate backing.

5   So you can't -- you can't -- Mark, you can't get out of

6   the fact that you've got the establishment behind you.

7       Q.   Oh, 100 percent I get that.  No.  I know that,

8   in other words, if -- if -- there is a feeling in

9   corporate media that if you are discredited it helps

10  them.  You understand that that exists?

11      A.   Yes.

12      Q.   And then that is something that they want to

13  try to do.

14      A.   And so that's why Tucker Carlson basically

15  endorsed me last week --

16      Q.   I saw that.

17      A.   -- is because they now understand it's the

18  symbol like this to Hitler, like Alex Jones is now the

19  symbol of victory.

20      Q.   It's only because you brought that up and I'm

21  just actually fascinated by this.  Did you -- did you

22  see the story, the thing that broke from -- that Lin

23  Wood put out there about Tucker Carlson getting a

24  recommendation for his kid from Hunter Biden, and all

25  that?

                                120


1       A.   No, I didn't follow --

2       Q.   No.  There's a story, and again, maybe we

3   can't talk --

4       A.   Well, I mean, I'll just say this.  Lin Wood --

5   I'm not going to get onto Lin Wood but Lin Wood is

6  definitely what I don't want to be.

7     Q.   Right.  I'm just saying like sometimes you see

8  some things come out and you realize it's a big club and

9  maybe we're not in it?  Have you ever heard that phrase?

10    A.   Yes, I've been learning that I'm definitely

11 not in the club.

12    Q.   Yeah.

13    A.   Believe me, the problems with this is the

14 least of my problems.

15    Q.   You're referring to January 6?

16    A.   All of that, yeah.

17    Q.   Okay.  I'll do you a favor.  We won't talk

18 about that today.  I want to show you this.  This I've

19 marked as Exhibit 13.

20              (Exhibit 13 marked.)

21    Q.   Okay.  This, as you see at the bottom it, it

22 says FSSTX-039550?

23    A.   Yes.

24    Q.   Okay.  And this is from Wolfgang Halbig.

25 Right?

                              121


1     A.   Yes.

2     Q.   Okay.  And then this is to a couple of email

3  addresses that I bet you don't know who those people

4  are.  Right?

5     A.   No, I don't.

6     Q.   The one safeandsoundschools.org, have you ever

7  heard of an organization called that?

8      A.   Not in my memory.

9      Q.   I don't either.  Okay.  I'm going to assume,

10  though -- you see the address is written to somebody

11  named Michele?

12     A.   Yes.

13     Q.   Okay.  And then the subject line is "I urge

14  Michele to stop using Josephine and making money and

15  appearing on speaking engagements."  You saw that?

16     A.   Yes.

17     Q.   Okay.  The date of this email is December

18  21st, 2014?

19     A.   Yes.

20     Q.   Okay.  And as we see from Free Speech Systems

21  at the bottom, this is a document from Infowars'

22  corporate files.  Right?

23     A.   Yes.

24     Q.   The attachments here, we see a bunch of png's.

25  That's correct?

122

1      A.   Yes.

2      Q.   Okay.  I'm going to go ahead and read the

3  email to you.  All right?  Michele, how could you and

4  your husband as responsible parents even allow your

5  precious child Josephine to attend that filthy and

6  deplorable looking school on December 14th, 2012?  This

7  school has you must have known is and was a toxic waste

8  dump as reported by Environmental Consultants who

9  requested more money from City of Newtown leaders before

10  demolishing the school and transported all of the high

11  levels of lead paint, high levels of asbestos and

12  especially the high levels of PCPs in the groundwater at

13  Sandy Hook out of state.  Josephine your child should

14  have expected more from you before that tragic day as a

15  parent.  You are supposed to protect her from serious

16  lifelong health risks when you send her to that school

17  every day.  Why would you as a parent and all those

18  other parents who supposedly lost a child to gunfire

19  allow their children as you did to serious toxic waste?

20  This all unfolded before the first shot at that school

21  even occurred.  Did you not see the filth and deplorable

22  conditions when you went to that school or are you

23  blind?  I do not understand unless you explain it to me

24  and the world why you and your husband failed Josephine,

25  who is a nonverbal child as you stated and depended on

123

1  for her safety.  She's needed you to protect her from

2  all the serious health risks that you sentenced her to

3  on a daily basis.  Now you talk about school security.

4  You have got to be joking.  You have all these experts

5  on your staff who are now part of your conspiracy.  They

6  should be ashamed of their actions in supporting you.  A

7  mom puts her own child at risk on a daily basis and is

8  now the expert on school security?

9         I look forward meeting you one day when I

10  can take your deposition about not the shoot -- not

11  about the shooting but why you and your husband failed

12  Josephine by sending her to that filthy and deplorable

13  school with all that toxic waste.  We call this child

14  endangerment when you know of the danger that exposes

15  your child to serious lifelong health risks.  You must

16  have known without a doubt because pictures do not --

17  and it says li, but I believe that says -- means lie.

18  You put her life in serious risk every day knowing how

19  filthy and deplorable that school is.  I am enclosing

20  photos that you must recognize since you took your child

21  to school.  And having a child in special needs, you

22  would expect a school environment and school climate

23  that allows children to learn and teachers to teach.

24  Right?  Please explain to me if you can why school

25  principle Dawn Hochsprung would allow her school to be

124

1  so filthy and deplorable looking.  There is not one

2  female elementary school principal in this country who

3  would allow her school to be that filthy and deplorable

4  both inside and outside, and most of all, allow her to

5  become a toxic waste dump, placing every child in her

6  school staff in serious lifelong health risk.  Right?

7  All of the pictures are taken by the major crime squad

8  from the Connecticut state police.  Please respond since

9  you are now the expert on school security.  Wolfgang W.

10  Halbig, www.SandyHookJustice.com.  Have I read that

11  correctly?

12    A.   Yes.

13    Q.   How do you feel about that?

14    A.   It's horrible.  I've never seen this before.

15 I mean, I guess he sent it to us too.

16    Q.   Well, it's in Infowars' corporate files.

17 Right?

18    A.   Yeah.  It's just -- I don't even see Infowars

19 on here.  I'm wondering why we had it.

20    Q.   That was going to be my next question.  Do you

21 know?

22    A.  I don't.

23        MR. BANKSTON:  Okay.  Give me tab 20.

24        (Exhibit 14 marked.)

25    Q.   I'm going to show you what I've marked as

125

1 Exhibit 14.  You see at the top there's another email

2 from Wolfgang Halbig?

3    A.   Yes.

4    Q.   Right?  Okay.  And on this one you see about

5 right here?  See what that blue line is?  I'll show you

6 again.  You see that?  And so you see on your document

7 too you got the --

8    A.   Yes.

9    Q.   -- Infowars' email addresses there?

10    A.   Yes.

11    Q.   Okay.  And that would be Rob Dew and Nico who

12 got this email?

13    A.   Yes.

14    Q.   Okay.  This was March 21st, 2017?

15    A.   Yes.

16    Q.   Okay.  The subject was, Anyone needing the

17   address for a visit to welcome them to Florida please

18   call and this was a great day for me.  Who says that you

19   cannot catch a big fish in Florida?  That's what the

20   subject line says?

21    A.   Yes.

22    Q.   Okay.  And then there's a png attached, an

23   image file.  Is that correct?

24    A.   Yes.

25    Q.   Okay.  And then I'm going to go ahead and read

126

1   this email to you.  It says, Nick and Laura Phelps did a

2   great job acting in Newtown on -- Newtown, Connecticut,

3   on December 14th, 2012.  I visited their home today at

4   1924 Westover Reserve Boulevard, Windmere, Florida

5   34786.  And thanks to Lieutenant Vangehle telling me

6   during my wellness check of Nick and Laura Phelps, that

7   they no longer live in Newtown, Connecticut, and that

8   they are now -- and they are now Richard and Jennifer

9   Sexton.  Guess what.  He is totally right and can you

10   believe it that my Newtown Police Department guided me

11   in the right direction?  They have a beautiful home with

12   a three-car garage.  They were not home today, but the

13   good news was that the three adult female moms with

14   their children standing outside their homes observed me

15 and wanted to know what I was doing. It was spring

16 break -- it is spring break for Orange County, Florida,

17 school children.  I showed them this picture and I told

18 them that I did not want to go to the wrong house to

19 surprise Nick and Laura from Newtown, Connecticut, a/k/a

20 Richard and Jennifer Sexton, today.  It took a few

21 minutes for them to look at the pictures.  And then when

22 they asked why I wanted to speak to them, I told him

23 that I had been in Newtown and wanted to surprise them

24 since they now live in Florida.  They asked for my

25 namne, which I gave as Wolfgang Halbig.  They told me

127

1 how I would know them -- knew them, and I told them they

2 have been on the national news, so I wanted to meet them

3 again.  Our conversation was all about Newtown,

4 Connecticut.  So she said, Do you mind if I text her?  I

5 said absolutely not.  Waited about 10 minutes, only to

6 learn that they did not know me, which surprised me.

7 They verified the pictures, and why should she text them

8 about Newtown, Connecticut, and that someone from there

9 wanted to visit if they were not NIck and Laura Phelps

10 now, Richard and Jennifer Sexton.

11         At first, I did not want to enter since it

12 is a gated community.  But several people told me just

13 go in on in there, there is no security at the gates.

14 If there is CC TV, they will see me being told to go in,

15 and that is the only reason or I would not have entered.

16 Now, who says law enforcement does not know what they

17  are doing?  Thank you, Newtown, Connecticut Police

18  Department.

19          Can you turn the document over?  First of

20  all, have I read that email correctly?

21     A.   Yes.

22     Q.   Okay.  And then on the back you see there's a

23  picture here.  Right?

24     A.   Yes.

25     Q.   And at the top it says Sandy Hook hoax actors.

128

1  Correct?

2     A.   Yes.

3     Q.   And it has arrows pointing to the Phelps.

4  Right?

5     A.   Yes.

6     Q.   And then at the bottom it says playing the

7  part of grief-stricken parents.  Yes?

8     A.   Yes.

9     Q.   This is a horrible email, isn't it?

10     A.   I've never seen this email, and it's --

11          MR. REEVES:  Objection.  Form.  Go ahead.

12     A.   Yes.  I don't like this email.  And again,

13  this is someone else, Wolfgang Halbig, after I'd already

14  clearly knew he cracked up.  And so that's not my work.

15     Q.   The next month you did a video called Sandy

16  Hook Vampires Exposed.  Right?

17     A.   Someone edited the video but then -- I've seen

18  that.

19     Q.   Okay.  And during that video, you repeated all

20  of Wolfgang Halbig's claims.  Right?  His 16 questions

21  thing?

22         MR. REEVES:  Objection.  Form.

23     A.   I don't remember that.  I'd have to see that

24  video, but I believe it was about people using it to

25  continue to try to get gun control and money.  But I'd

129

1  have to watch it, if you've got it.  But I don't

2  remember --

3         MR. BANKSTON:  Tab 15.

4         (Exhibit 15 marked.)

5     Q.   Mr. Jones, I've handed you what I've marked as

6  Exhibit 15.  At the bottom you see it says FSXTX-040027

7  [sic]?

8     A.   Yes.

9     Q.   This is an email from Infowars' corporate

10  files?

11     A.   Yes.

12     Q.   Okay.  At the top it says Wolfgang Halbig.

13  Right?  That's who it's from?

14     A.   Yes.

15     Q.   Okay.  It says to Wildrosefarm1740@gmail.com.

16  Do you know who that is?

17     A.   No.

18     Q.   That's my client, Scarlett Lewis.

19     A.   Okay.

20    Q.   The subject line says, How could you as a

21  mother stop and buy your special brand of coffee on

22  December 14th, 2012, when you heard as a mom that shots

23  had been fired at the Sandy Hook school?  Have I read

24  that correctly?

25    A.   Yes.

130

1    Q.   This is a March 10th, 2015 email.  Correct?

2    A.   Yes.

3    Q.   He says in this email, Scarlet, it is just a

4  matter of time and all that money you have has to be

5  returned.  How could you even stop to buy your coffee

6  and you bought coffee for two other people.  What other

7  mother does that especially when you see on the news

8  tell everyone how you ran across that fire department

9  parking lot.  If you did you would have spilled the

10  coffee.  Do some serious soul searching because the scam

11  is up.  Wolfgang and his phone number.  Have I read that

12  correctly?

13    A.   Yes.

14    Q.   Okay.  So at least Infowars had in its --

15  Infowars had received information that Mr. Halbig was

16  harassing Ms. Lewis.  Correct?

17         MR. REEVES:  Objection.  Form.

18    A.   We had millions of emails.  I've never -- I'd

19  never seen those up until the time of these lawsuits, so

20  I'm not Wolfgang Halbig.

21    Q.   I understand.  All I'm asking is.  Infowars

22 received that?

23    A.   Yes.

24    Q.   Okay.  Infowars -- was Infowars aware that

25 Mr. Halbig -- what he was doing at the Catholic school

131

1 in -- bad question.  You can't answer for all of

2 Infowars.  Do you know what Mr. Halbig was up to at the

3 Catholic school in Newtown?

4    A.   No.  I knew that he was getting mad at us

5 because we wouldn't have him on and because I was saying

6 that, hey, it probably happened.  And so -- and then I

7 was aware over time that, you know, that he'd seemed

8 like he had deteriorated some.  And so that's what I was

9 talking about, you know, where I had questions about the

10 questions.

11    Q.   Did you know what he did at the Catholic

12 school?

13    A.   No.

14    Q.   Okay.

15    A.   I'm trying to search my memory.

16    Q.   I'm going to show you what I've marked as

17 Exhibit 16.

18         (Exhibit 16 marked.)

19    Q.   You see at the bottom this has Bates label

20 that says FSXTX-042477 [sic]?  That's correct?

21    A.   Yes.

22    Q.   This is a June 25th, 2015, letter.  You see

23  it's from the Diocese of Bridgeport?

24      A.  Yes.

25      Q.  Okay.  It's to Mr. Wolfgang Halbig in

132

1  Sorrento, Florida?

2      A.  Yes.

3      Q.  Says, Dear Mr. Halbig, As the chief legal

4  officer of the Diocese of Bridgeport, I write to serve

5  you notice that you are to cease and desist any activity

6  on or in the vicinity of St. Rose of Lima Parish,

7  including the church, rectory, school, and any other

8  ancillary buildings on or near the parish grounds.  Your

9  presence will be considered a trespass and a nuisance.

10          Should there be any violation of this

11  order, the parish reserves the right to seek any and all

12  remedies available to it under the law and will

13  immediately contact law enforcement to remove you and

14  any individuals in your company from the property,

15  forcibly if necessary.

16          This order shall remain in effect from the

17  date of this letter forward.  Very truly yours, Anne O.

18  McCrory, chief legal and real estate officer.  Have I

19  read that correctly?

20      A.  Yes.

21      Q.  So Infowars had received information that

22  Mr. Halbig had been banned from the premises of the

23  local Catholic school?

24          MR. REEVES:  Objection.  Form.

25      Q.  Correct?

133

1       A.  I mean, I guess that's what this shows.  I --

2   I'm not Wolfgang Halbig.

3           MR. BANKSTON:  Can you give me second

4   photo Tab 31?

5           (Exhibit 17 marked.)

6       Q.  Okay.  This is a one-page email.  You see at

7   the bottom this has been marked Exhibit 17?

8       A.  Yes.

9       Q.  At the bottom it's marked FSSTX-053394?

10      A.  Yes.

11      Q.  Okay.  This is a series of emails.  Correct?

12      A.  Yes.

13      Q.  The first email is from Jonathan Reich.  Do

14  you know who that is?

15      A.  No.

16      Q.  Okay.  It's to Wolfgang Halbig.  It was sent

17  on May 16th, 2016.  Correct?

18      A.  Yes.

19      Q.  Okay.  It says Saint Rose security guard video

20  footage, and then it has a link to download for some

21  video footage.  Right?

22      A.  Yes.

23      Q.  Okay.  And then the next email is from

24  Mr. Halbig, right, on May 17th, 2016.  Correct?

25      A.  Yes.

1    Q.   And it says, Arturo, this is the Saint Rose

2  Lima video that we shot accusing us of being a pedophile

3  and was trespassed.  False police reports filed by

4  Monseigneur Weise.  Have I read that correctly?

5    A.   Yes.

6    Q.   Then Arturo Rico responds.  Do you know this

7  associate of Mr. Halbig's?

8    A.   No.

9    Q.   Okay.  He says, Thank you.  And then there's

10  another email from Arturo.  Correct?

11    A.   Yes.

12    Q.   And that's to Wolfgang Halbig on May 17th.

13  Right?

14    A.   Yes.

15    Q.   Okay.  And he says in that email, I saw the

16  video.  I'm so upset.  I'm looking into the face of the,

17  quote, security, unquote.  He is no security.  He is

18  government.  We need to speak.  I will explain

19  everything.  Yes, there is suspicion that the pastor was

20  part of it, but not the church itself.  Wait until I get

21  the official green light.  There are people inside that

22  school.  They knew you were coming.  They followed you.

23  Not the church, but the government.  They got -- I

24  believe it's "the" school on gag order.  I wish I would

25  have been there with you guys.  The, quote, principal,

1  unquote, of Saint Rose of Lima is the same, quote,

2  principal, unquote, that, quote, died, unquote, at Sandy

3  Hook -- Sandy Hook shooting.  But the, quote, principal,

4  unquote, of Saint Rose was always fake.  I know the

5  location of that person.  This is the most serious event

6  the church has and will go through Arturo.  Have I read

7  that correctly?

8      A.  Yes.

9      Q.  And then the next email is from Wolfgang

10 Halbig, and this email is sent to Nico at Infowars.

11 Correct?

12     A.  Yes.

13     Q.  And the other person it's sent to is

14 npattis@pattislaw.com.  Correct?

15     A.  I guess so, yes.

16     Q.  And is that the company's lawyer?

17     A.  That is a lawyer that we work with.

18     Q.  Okay.  At that time was that the company's

19 lawyer?

20     A.  No.

21     Q.  Okay.  And then there are a couple of other

22 people copied on the email too.  Right?  Do you know who

23 Tony Mead is?

24     A.  No.

25     Q.  Do you know who Richard Carlisle is?

136

1      A.  No.

2    Q.   Okay.  The --

3    A.   I mean, I can volunteer that Pattis had

4  run-ins with Halbig and doesn't like him.  So I mean, I

5  jsut -- that's just an added thing.  I don't think

6  they're working together.

7    Q.   Okay.  It says Wolfgang says it's going to

8  fall apart very shortly.  I want my lawsuit to come to

9  closure for my family's sake.  Wolf.  Have I read that

10  correctly?

11    A.   Yes.

12    Q.   Okay.  Now, the idea that the principal of

13  Saint Rose of Liam is the same murdered principal at

14  Sandy Hook, that's -- that's not rational.  Right?

15        MR. REEVES:  Objection.  Form.

16    A.   I've not investigated it; but no, it doesn't

17  look like a pattern of sanity to me.

18    Q.   Okay.

19    A.   But, I mean, like I told you, I've never -- he

20  just forwards everything to us.  I have nothing to do

21  with it.

22    Q.   So a lot of times you just ignore what he

23  says?

24    A.   He seemed very credible early on.  I looked up

25  who he was on TV, the things he was saying, the

137

1  anomalies.  But I think, you know, obviously there seems

2  to be a deterioration here, but I am not Wolfgang Halbig

3  and I've not talked to him in probably five, six years.

4      Q.   You said there's been a deterioration.  We saw

5  emails from, like, 2014 of him harassing parents that's

6  kind of weird --

7      A.   Yeah, I wasn't -- I wasn't aware of that, and

8  it doesn't seem good.

9      Q.   It doesn't.  It seems like maybe you didn't

10  know what was going on with Wolfgang Halbig's mental

11  state?

12      A.   No.

13      Q.   Okay.

14          MR. BANKSTON:  Can you give me 14?

15          (Exhibit 18 marked.)

16      Q.   And if we just power through, I think we can

17  do it and get out of here by 2:00.  We're at 1:20 right

18  now.

19          I'm going to show you what I've marked as

20  Exhibit 18.  You see at the bottom it's FSSTX-039897?

21      A.   Yes.

22      Q.   Okay.  This is a 2015 email sent March 6,

23  2015?

24      A.   Yes.

25      Q.   Okay.  And this is -- the top email is Nico

138

1  forwarding something to Rob Dew.  Correct?

2      A.   Yes.

3      Q.   And it says forward, two cents from a third

4  year law student.  Right?

5      A.   Yes.

6      Q.   And then it says some comments on Halbig's

7  last interview from a law student.  Okay?

8      A.   Uh-huh.

9      Q.   And then I'm going to go ahead and read you

10  this email from a gentleman named R. Darren Brumfield.

11  It was sent to mediacontacts@infowars.com.  He writes:

12  Two cents from a third year law student.  Madam or sir:

13  I am in my final semester of law school.  I listened to

14  the Wolfgang Halbig video and some significant alarm

15  bells went off.  I also wrote on the YouTube page, but I

16  copy and paste here.  Ok.  So I just get this straight.

17  Starting at 31:30, he filed his lawsuit in Seminole

18  County Court in Florida?  Not in federal court in

19  Florida, but in state court?  There is a legal

20  requirement called, quote, standing, unquote.  He does

21  not have standing to sue in Seminole County Court.  He

22  was not a party in the shooting in any fashion.  There

23  is also a concept called, quote, jurisdiction, unquote.

24  Either the man is lying or the judge is insane.  A

25  Florida county level judge would not have jurisdiction

139

1  for any reason other than a contract, tort, or crime

2  issue directly involving Halbig.  Something is

3  completely wrong here.  Had he said, quote, in the

4  federal district of Florida, quote, or whatever district

5  it might be if the state is split, that may at least be

6 plausible. This is completely insane and cannot go

7 anywhere but into the trash can. No standing, no

8 subject matter jurisdiction, no personal jurisdiction,

9 two cents from a third year law student who is legally

10 current in his education. The man seems to be grasping

11 and stretching. No judge in their right mind would do

12 such a thing as he describes. Here's an example.

13 Imagine there is a crime in Las Vegas and the criminal

14 kills himself. There is no law whatsoever that would

15 allow Alex or anyone else to file suit in San Antonio

16 for anything involving the crime in Las Vegas. There is

17 no claim that could be made in Texas for something that

18 happened in Nevada. It is a rule. R. Darren Brumfield.

19 Have I read all that correctly?

20     A.   Yes.

21     Q.   Okay. So here we have that not only did

22 Infowars receive information suggesting that what Halbig

23 was up to was completely insane in Darren Brumfield's

24 words, but actually Nico ended up forwarding that

25 information directly to Rob Dew. Correct?

140

1     A.   Yes.

2     Q.   Okay.

3     A.   Which is good that he found that, because we

4 get about 10,000 emails a day, or at least we did.

5     Q.   It's good that he found that in 2015?

6     A.   Yeah. I mean, it wasn't shown to me, but I

7 mean, it shows -- I guess Rob Dew wanted to know about

8  anything coming in about Sandy Hook because he was

9  interested in it.  And so that's why it was sent to him.

10     Q.  Okay.

11        MR. REEVES:  Which one are you talking

12  about in 2015?

13        MR. BANKSTON:  This email is in 2015?

14        MR. REEVES:  You said it was found in

15  2015.

16        MR. BANKSTON:  Right, that Nico found

17  this in 2015.  He said he's glad he found this, like,

18  this is something that they actually found.  His

19  testimony is about them sending tons of emails that they

20  don't even see or ever recognize.  And he got this one,

21  and this one was found in 2015.  We know it was found in

22  2015 because Nico forwarded it to Rob Dew in 2015.

23     Q.   In fact, let's ask that question.  We know

24  this email was found and actually seen by somebody at

25  Infowars because it was forwarded to Rob Dew in 2015?

141

1   A.  Yes.

2   Q.  Thank you.

3        MR. REEVES:  I just -- I didn't mean

4  to --

5        MR. BANKSTON:  No.  I understand.  I

6  understand.  I clear up your --

7        MR. REEVES:  Thanks.  I appreciate it.

8        MR. BANKSTON:  Can you give me tab 17?

9      Q.   Now, as far back as 2014, you were raising

10  money for Halbig's court actions.  Correct?

11     A.   He'd been a guest a few times, and we let

12  guests -- a lot of guests do stuff like that, but yes.

13     Q.   And you told your audience support Halbig.  Go

14  to sandyhookjustice.com and give them money.  You told

15  your audience that?

16     A.   I don't remember doing that, but that may have

17  happened.

18     Q.  Okay.

19     A.   Because, again, I thought he was -- they had

20  him on actual TV as a top school safety expert.  I

21  thought he was going to find out.  I mean, even Rob

22  Dew's retired FBI agent uncle thought it sounded

23  credible enough to go actually hear what they said at

24  the event.  So...

25          MR. BANKSTON:  Object as nonresponsive.

142

1      Q.   Infowars was aware that Mr. Halbig was

2  harassing Mr. Pozner for years.  Right?

3      A.   No, no.

4      Q.   Okay.  Infowars was following the lawsuit

5  between Mr. Halbig and Mr. Pozner, was keeping up with

6  it?

7      A.   I mean, I think Rob Dew was.  I really wasn't.

8      Q.   Your news -- Rob Dew was news director at that

9  point?

10     A.   Well, news directly on the nightly news.

11    Q.  Okay.

12    A.  Not he director of everything at the office.

13    Q.  Let's talk about Dan Badani (phonetic).

14  Right?  You sent Dan Badani to Newtown multiple times?

15    A.  Dan lived nearby and would go, and then he was

16  on the show some.

17    Q.  Well, I mean, you said on your show, We sent

18  our reporter Dan Badani up to Newtown to cover this?

19  You've said that plenty of times?

20    A.  I think so, yes.

21    Q.  Okay.  He went there to film videos about

22  Wolfgang Halbig.  Correct?

23    A.  I believe so.

24    Q.  Okay.  You understood that Dan Badani was

25  prone to causing trouble.  You knew that?

143

1    A.  Later I figured it out.

2    Q.  When did you think you figured that out?

3    A.  He came down to Austin for a few months and he

4  was a nice fellow but he would not follow direction.  So

5  we sent him back to Connecticut.  He didn't officially

6  work for us.  And then he just would go out and do

7  things, some interesting, some that we didn't agree

8  with.  And then he would still occasionally call on the

9  show or be on the show.

10    Q.  But you would send him out on a mission, you

11  knew he was likely to cause trouble.  You knew that.

12  Right?

13          MR. REEVES:  Objection.  Form.

14    A.  No.

15    Q.  Okay.  I want to play an audio clip from you,

16  and this audit clip will be Exhibit 19.

17          (Exhibit 19 marked.)

18    Q.  I want you -- I'm going to play an audio clip

19  from you, and I want you to tell me is this you talking.

20    A.  Okay.  (Audio playing)

21    Q.  A kraken is a mythological Greek monster.

22  Correct?

23    A.  Yes.

24    Q.   Release the kraken is a rather famous line of

25  dialog from the film Clash of the Titans?

                        144


1    A.  Yes.  A listener sent us a painting saying

2  he's the -- and that was from -- that we're talking

3  about, that was from the Boston bombing.

4    Q.  Okay.

5    A.  That's what we were talking about.

6    Q.  Right.  Because he caused some trouble in the

7  Boston bombing and stuff.  I remember that.

8    A.  I mean, there really were a bomb squad there

9  that looked like they were wearing black water uniforms.

10    Q.   Oh, look, before we dive into the esoterica of

11  whether the Boston bombing happened or not, I'm actually

12  just referring when Dan Badani went to do some coverage

13  in the Boston bombing, there was -- there was some

14  fracus?

15      A.   Well, he asked some questions.

16      Q.   Yeah.  And wasn't it -- didn't somebody try to

17  kick him out of a room or something?  Somebody tried to

18  make --

19      A.   It was a press conference.

20      Q.   Okay.

21      A.   And that's what I was talking about in that

22  clip.  I mean, I remember the clip.

23      Q.   So you had had previous experience with Dan

24  Badandi sending him out?

25      A.   Yes.

145

1       Q.   Okay.  Okay.  Tell you, Mr. Jones:  Let me let

2   you take a short break, and I -- actually, let me ask

3   you about one more thing before we do that.  I've got --

4   I've got a couple more topics to talk about, but I don't

5   think it's going to be too long.  The one I did want to

6   bring up, though, real quick because I think we can

7   cover it real quick, do you know who -- do you know who

8   I'm talking about when I say Darren Howard?

9       A.   No.

10      Q.   Okay.  Do you remember accusing a man of being

11  a Covid crisis actor, being a fake Covid patient, in the

12  United Kingdom?

13      A.   I remember -- I remember covering people

14  saying that, yes.

15    Q.   Okay.  So -- okay.  Who do you think was

16  saying that?  Do you remember?

17    A.   I don't remember the specifics.

18    Q.   Okay.  Can you explain what Darren Howard was

19  being accused of right now?  Do you remember?

20    A.   I don't remember.

21    Q.   Okay.  Do you know if you apologized to him?

22    A.   I do believe so, yes.

23    Q.   Okay.

24    A.   Well, what is that question of that for?

25         MR. REEVES:  Just answer the question.

146

1    Q.   If you apologized to him in writing, do you

2  think you have it?

3    A.   I don't know.

4    Q.   Okay.  Yeah, go ahead and let's take a quick

5  comfort break, and we'll come back on the record in

6  five.

7         THE VIDEOGRAPHER:  Off the record at 1:31

8  p.m.

9         (Short recess.)

10         THE VIDEOGRAPHER:  We're back on the

11  record at 1:41 p.m.

12    Q.   All right, Mr. Jones.  Just a couple of last

13  things.  You would agree with me your company does not

14  have any documents that are used to train Infowars

15  employees in how to verify factual information and

16  Infowars stories.  Those documents, you don't have

17  anything like that?

18      A.  Well, I mean, we've had lots of meetings and

19  things about if we're going to do something original,

20  then we have to prove it and have multiple witnesses.

21  And generally, it's video journalism out in the street

22  like it is what it is.  You see it.  Then on air it's

23  just commentary and opinion and analysis.  So I've

24  always told people, you know, make sure, you know, what

25  you're saying is -- is backed up.  And the areas we've

147

1  gotten in trouble with have been things where it's these

2  big internet hubbub speculation things.  And I really

3  try to steer clear of those now.

4      Q.  Okay.  But my question is:  There are no

5  documents that -- that set forth the policies or

6  procedures for vetting factual information at Infowars.

7  That's not something that exists in a document.

8  Correct?

9      A.  No.

10      Q.  Okay.  Your company has never disciplined

11  anyone due to a false fact about Sandy Hook published on

12  Infowars.  Correct?

13          MR. REEVES:  Objection.  Form.

14      A.  I don't remember.

15      Q.  You think it's possible you may have

16  disciplined somebody for saying something false about

17  Sandy Hook?

18     A.   I wouldn't say false.   I mean, people have

19 gotten in trouble for talking about it.   I've tried to,

20 like, you know, stay out of it and myself get sunk back

21 into it.   I think people testified to that, too.   At

22 least, that's what I was told.

23     Q.   One of the reasons that you in 2015 went to

24 people like Adan Salazar and told them stop printing

25 articles about Sandy Hook is because Leonard Pozner kept

148

1 getting strikes against the company.   Right?

2     A.   I don't remember if it was Leonard Pozner.   I

3 mean, I know I've seen people make a big thing between

4 me and Leonard Pozner.   I barely know who he is and I've

5 seen him in some shows.   But no, I just did not -- yes,

6 I mean, I did not want to -- I had -- I had seen some of

7 the anomalies and things be proven that should not be

8 anomalies.   And so I wasn't sure that it was staged.

9 But then, you know, I go back and forth like anybody on

10 these -- kind of these mysteries.   But -- so that's --

11 that's where I stand on that.

12     Q.   I want to know:  Do you -- so the day after

13 the Connecticut default happened, there was a company

14 registered in Delaware called Restore America Marketing

15 Company.   Is that your company?

16     A.   Restore America Marketing Company?   No, I've

17 never heard of that.

18     Q.   Okay.   The company apparently has something to

19 do with Reset Wars.   Can you tell me what Reset Wars is?

20     A.   Reset Wars is somebody else's company.

21     Q.   Okay.  What is Reset Wars?  Does that have

22  anything -- is that affiliated with Free Speech Systems

23  in any way or you?

24     A.   No.  That is -- that is somebody else's

25  company that -- that is for promotions.

149

1     Q.   Does that have anything to do with Free Speech

2  Systems and Infowars and its business?

3     A.   Well, yes.  I mean, I am working with them.

4  They are producing a six-hour course titled Reset Wars.

5     Q.   A course.  Like a educational course?

6     A.   Yes.

7     Q.   Okay.  And does there plan to be, like,

8  students who sign up for it and watch it online?  Is

9  that the idea?

10     A.   I wouldn't call it students, but it's like a

11  self-help deal.

12     Q.   So it's not -- what I'm trying to distinguish

13  with is it's not an in-person class.  It's an online

14  thing?

15     A.   Yes.

16     Q.   Okay.  I want to show you what I marked as

17  Exhibit 19 [sic].

18          (Exhibit 19 marked.)

19     Q.   At the bottom we see FSSTX-077501?

20     A.   Yes.

21     Q.   Okay.  And this is from somebody named Logan

22  Ponder, and their email is at the topic.  And I take you

23  don't know this person personally?

24     A.   No.

25     Q.   This is to writers at Infowars.com?

150

1     A.   Yes.

2     Q.   And the subject is "I'm with you all."

3  Correct?

4     A.   Yes.

5     Q.   The date is April 17th, 2013.  Correct?

6     A.   Yes.

7     Q.   I'm going to read this email.  My name is

8  Logan Ponder.  I'm 21 years old and what's going on in

9  this world is disgusting.  You guys are always on top of

10  information.  I am so glad I have all of you to refer to

11  because you know what's going on.  The government and

12  all these groups are trying to take over the world and

13  they are clearly succeeding.  What can I do to help stop

14  this madness?  Sandy Hook and now this Boston bombing

15  marathon are clearly inside jobs.  It's obvious.  So

16  what can I do to help?  What can I do to change the

17  expected outcome?  Please tell me.  I want to help.  I

18  live in Lexington, Kentucky.  If there's anything I can

19  do to help your cause, please let me know.  I support

20  you guys all the way.  Sincerely, Logan Ponder.  Sent

21  from my iPad.  Correct?

22     A.   Yes.

23    Q.  Okay.  This is actually somewhat typical, not

24  a -- this is not an unusual email for you.  Right?  You

25  have a lot of fans who are very supportive of you?

151

1    A.  We get millions of emails.  I don't -- you can

2  find, basically, anything you wanted in the emails.

3    Q.  Oh, I've found a lot of things in them, yeah,

4  sure.  There's people sending you just hundreds of pages

5  of crazy numerology.  Have you seen stuff like that?

6  And that's of kind of stuff you can just throw in the

7  trash.  Right?

8    A.  We can't even -- we've thought about getting

9  rid of the email addresses.  You can't look at all of

10  it.

11    Q.  But this email, now that you've seen it today,

12  this is something you're proud of.  Right?

13    A.  I don't know who this person is.

14    Q.  No.  What I mean, just generally, I mean,

15  we're looking at somebody here who is kind of waking up

16  to some of the forces that are involved in this country

17  and they're listening to you and they want to get

18  involved in the fight.  That's kind of the mission

19  statement of your show.  Right?  To get people woken up

20  like this.  Right?

21      MR. REEVES:  Objection.  Form.

22    A.  I mean, yes.  I like people to become aware of

23  the international corporate tyranny that's taking over

24  publicly in front of all of us right now.

25      Q.   And in doing that, I would imagine that you

152

1  feel a sense of responsibility to people like Logan

2  Ponder.  Right?  They're looking for you for

3  information.  You feel a sense of responsibility to him?

4      A.   I mean, this is an email from nine years ago.

5  I don't know what to say.

6      Q.   No.  I mean, let's talk about anybody who you

7  have, unless -- I don't think it would be inappropriate

8  for me to say you have millions of fans.  Right?  Would

9  you agree with that?

10      A.   Sure.

11      Q.   Okay.  And those millions of fans who follow

12  you and are engaged by you, some of them follow you

13  because they're entertained by you and some follow

14  because they like the information.  Right?  There could

15  be different reasons people are a fan of yours.  Right?

16  Some people could be really into your comedy.  Some

17  people could be really into your commentary.  Some

18  people could be really into your website and what you're

19  doing there.  There's lots of different reason people

20  could be a fan of yours.  Right?

21      A.   Yes.

22      Q.   Okay.  But in terms of those millions of

23  people who are your fans, do you feel some sense of

24  responsibility to them?

25          MR. REEVES:  Objection.  Form.

1    A.   I mean, yes.  And it's been a growing,

2   learning process as well.

3         THE VIDEOGRAPHER:  Counsel, I have

4   Exhibit 19 as the audio clip.

5         MR. BANKSTON:  Oh, you're absolutely

6   right.  Let's go ahead and re-mark that for the record.

7   Thank you so much.

8         (Exhibit 19 marked.)

9    Q.   Mr. Jones, I have -- as you see, I've put in

10  front of you an exhibit that's been re-marked as Exhibit

11  20.  You see that?

12        (Exhibit 20 marked.)

13   A.   Yes.

14   Q.   And so this is the Logan Ponder email --

15   A.   Yes.

16   Q.   Let me ask that one more time because she's

17  got to write it down.  This is the Logan Ponder email

18  we've been talking about?

19   A.   Yes.

20   Q.   Okay.  I'm going to show you what I've marked

21  as Exhibit 21.

22        (Exhibit 21 marked.)

23   Q.   Do you see where it says FSSTX-078964?

24   A.   Yes.

25   Q.   Okay.  So this is another email from Infowars'

1 corporate files?

2    A.  Yes.

3    Q.  And it looks like here we have an email from a

4 person named Gabriel Jones, is how they sign it.

5 Correct?

6    A.  Uh-huh.

7    Q.  Okay.  This was an email sent on March 24th,

8 2014?

9    A.  Yes.

10    Q.  Okay.  I'm going to read this email.  Okay?

11 It says, Dear Alex Jones, I'm not sure if this is the

12 way to contact you or not but I hope this is received.

13 My name is Gabriel Jones.  I'm 15 and I now truly

14 realize that nothing is what it seems.  Raised to think

15 this way by my conspiracy theorist father, Evan Jones, I

16 now understand everything from 9-11 and Sandy Hook all

17 the way down to chemtrails in the skies and GMOs in our

18 foods.  My father listens to you all the time and knows

19 all about you.  About one hour ago he just made his

20 first "Elephant in the Room" "Chemtrails Aren't

21 Invisible."  You see, sir, I've been watching this and I

22 finally understand the things my father had been putting

23 into my brain.  We can't trust big brother and something

24 big is going to happen soon.  Anyway...I'm sorry for the

25 long story, but I had a huge question.  You see, my

155

1 father is unemployed and he just wants to live a

2 peaceful life and do what he loves. I want to help in

3 this fight. The, quote, Infowars, unquote, you can say

4 (bad joke, sorry) but you see, I feel as though my

5 father could do so much in this. Just to show people

6 the truth even...But I don't know how to do this for him

7 or help... But anyway, I ask of you...Do you have any

8 ideas? I know you would before anybody. So that is why

9 I ask you. If this gets to you...Thank you so much.

10 Continue the good fight. Thank you. Gabriel Jones.

11          Now, I take it you've never seen this

12 email. Right?

13     A.   No.

14     Q.   But now that it has gotten to you and Gabriel

15 now, seven years after the fact, you've seen Gabriel's

16 thanking you?

17     A.   Very sweet.

18     Q.   You're proud of this email. Right?

19          MR. REEVES:  Objection. Form.

20     A.   I mean, I think it's a sweet person. He

21 sounds sweet, doesn't he?

22     Q.   He does. He sounds like a real sweet kid,

23 doesn't he? Sounds like he's maybe waking up to some

24 things in the world. Right?

25          MR. REEVES:  Objection. Form.

156

1     Q.   Correct?

2     A.   I mean, I think it's good to question.

3      Q.   Yeah.  And you're proud that you're able to do

4   this, that people are going to follow you and you might

5   be making a difference.  Right?

6           MR. REEVES:  Objection to the form.

7      A.   I mean, I've tried to tell the truth and I've

8   been warning people about tyranny and forced

9   inoculations.  And now it's here.

10      Q.   You didn't -- you didn't start Infowars and do

11   what you do every day four hours talking, you didn't do

12   that just to make money.  Right?  You did that to make a

13   difference.  Right?

14      A.   Yes.

15      Q.   Okay.  Mr. Jones, I appreciate your time

16   today.  That's all the questions I've got for you.

17      A.   Thanks.

18           MR. REEVES:  Reserve for time of trial.

19           THE VIDEOGRAPHER:  This concludes the

20   deposition.  We are going off the record at 1:53 p.m.

21

22

23

24

25

# Exhibit 6

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Interval | Orders | Sales Item | Sales Total | Invoiced | Refunded | Sales Tax | Sales Shipping | Sales Discount | Canceled |
|---|---|---|---|---|---|---|---|---|---|
| 18-Sep-15 | 2 | 3 | $15.00 | $0.00 | $0.00 | $0.00 | $15.00 | $0.00 | $0.00 |
| 5-Oct-15 | 1 | 1 | $81.90 | $0.00 | $0.00 | $0.00 | $5.00 | $0.00 | $0.00 |
| 6-Oct-15 | 2 | 4 | $119.01 | $0.00 | $0.00 | $0.00 | $20.00 | $0.00 | $0.00 |
| 8-Oct-15 | 2 | 5 | $320.40 | $0.00 | $0.00 | $0.00 | $25.00 | $0.00 | $0.00 |
| 13-Oct-15 | 1 | 2 | $83.01 | $0.00 | $0.00 | $5.56 | $10.00 | $0.00 | $0.00 |
| 21-Oct-15 | 1 | 1 | $32.50 | $0.00 | $0.00 | $0.00 | $5.00 | $0.00 | $0.00 |
| 27-Oct-15 | 2 | 2 | $91.08 | $0.00 | $0.00 | $6.18 | $10.00 | $0.00 | $0.00 |
| 28-Oct-15 | 6 | 21 | $3,919.11 | $0.00 | $0.00 | $296.01 | $35.17 | $0.00 | $0.00 |
| 3-Nov-15 | 2 | 2 | $33.14 | $33.14 | $0.00 | $0.48 | $26.76 | $0.00 | $0.00 |
| 4-Nov-15 | 2 | 3 | $35.25 | $0.00 | $0.00 | $0.64 | $26.76 | $0.00 | $0.00 |
| 5-Nov-15 | 8 | 38 | $1,085.07 | $1,085.07 | $0.00 | $0.33 | $71.83 | $181.09 | $0.00 |
| 6-Nov-15 | 17 | 75 | $2,170.36 | $1,959.26 | $0.00 | $1.27 | $197.83 | $464.24 | $0.00 |
| 7-Nov-15 | 8 | 43 | $914.22 | $914.22 | $0.00 | $0.00 | $61.55 | $160.00 | $0.00 |
| 13-Nov-15 | 248 | 743 | $25,291.17 | $25,073.60 | $0.00 | $3.48 | $2,362.73 | $1,879.86 | $0.00 |
| 14-Nov-15 | 96 | 311 | $10,479.37 | $10,479.37 | $0.00 | $14.06 | $888.81 | $800.00 | $0.00 |
| 15-Nov-15 | 18 | 72 | $2,213.79 | $2,213.79 | $0.00 | $5.11 | $152.27 | $180.00 | $0.00 |
| 16-Nov-15 | 3 | 4 | $154.70 | $154.70 | $0.00 | $0.00 | $19.95 | $10.00 | $0.00 |
| 17-Nov-15 | 1 | 2 | $48.63 | $48.63 | $0.00 | $0.47 | $5.75 | $2.49 | $0.00 |
| 18-Nov-15 | 2 | 6 | $221.05 | $221.05 | $0.00 | $0.00 | $28.90 | $0.00 | $0.00 |
| 19-Nov-15 | 34 | 111 | $3,566.34 | $3,566.34 | $0.00 | $6.97 | $303.59 | $0.00 | $0.00 |
| 20-Nov-15 | 336 | 1017 | $39,499.13 | $38,591.00 | $0.00 | $36.60 | $3,000.47 | $7.00 | $0.00 |
| 21-Nov-15 | 316 | 878 | $33,321.50 | $32,835.22 | $0.00 | $37.80 | $2,779.96 | $28.80 | $0.00 |
| 22-Nov-15 | 248 | 694 | $31,222.18 | $31,222.18 | $0.00 | $8.80 | $3,027.90 | $28.80 | $0.00 |
| 23-Nov-15 | 270 | 697 | $29,135.08 | $29,053.53 | $0.00 | $27.07 | $1,898.16 | $8.40 | $0.00 |
| 24-Nov-15 | 714 | 2323 | $122,312.21 | $122,081.67 | $0.00 | $42.48 | $1,753.42 | $19.48 | $0.00 |
| 25-Nov-15 | 735 | 2290 | $83,003.11 | $82,626.47 | $0.00 | $22.77 | $1,612.66 | $31.17 | $0.00 |
| 26-Nov-15 | 722 | 2241 | $88,382.29 | $88,254.66 | $0.00 | $57.23 | $1,518.99 | $27.45 | $0.00 |
| 27-Nov-15 | 1816 | 7567 | $172,626.44 | $171,476.45 | $0.00 | $128.31 | $2,827.35 | $34.77 | $0.00 |
| 28-Nov-15 | 2296 | 11091 | $219,515.79 | $219,515.79 | $9.95 | $117.75 | $4,624.00 | $218.74 | $0.00 |
| 29-Nov-15 | 729 | 3499 | $80,053.21 | $80,053.21 | $60.86 | $57.48 | $1,917.36 | $39.73 | $0.00 |
| 30-Nov-15 | 1441 | 6636 | $166,847.10 | $166,405.97 | $283.15 | $174.00 | $2,388.26 | $181.45 | $0.00 |
| 1-Dec-15 | 2051 | 7908 | $223,376.50 | $219,312.02 | $239.25 | $402.71 | $3,470.24 | $313.91 | $0.00 |
| 2-Dec-15 | 664 | 2177 | $68,356.36 | $68,356.36 | $30.91 | $137.51 | $1,114.94 | $359.23 | $0.00 |
| 3-Dec-15 | 1144 | 4132 | $114,573.00 | $114,420.39 | $106.85 | $223.45 | $2,389.06 | $636.90 | $0.00 |

### FSSTX-086589                                    001



## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4-Dec-15 | 861 | 2760 | $76,299.05 | $76,416.83 | $149.25 | $97.47 | $1,599.52 | $322.50 | $117.78 |
| 5-Dec-15 | 838 | 2828 | $75,636.95 | $75,636.95 | $0.00 | $91.84 | $1,351.75 | $169.61 | $0.00 |
| 6-Dec-15 | 415 | 1383 | $55,584.36 | $55,584.36 | $0.00 | $94.95 | $1,153.66 | $248.61 | $0.00 |
| 7-Dec-15 | 517 | 1517 | $62,432.12 | $62,432.12 | $54.90 | $172.70 | $1,031.20 | $130.99 | $0.00 |
| 8-Dec-15 | 339 | 780 | $33,459.64 | $33,459.64 | $0.00 | $105.53 | $1,037.74 | $126.40 | $0.00 |
| 9-Dec-15 | 480 | 1205 | $55,326.92 | $55,326.92 | $0.00 | $86.71 | $1,231.52 | $204.07 | $0.00 |
| 10-Dec-15 | 538 | 1309 | $77,758.12 | $77,758.12 | $0.00 | $304.04 | $1,443.20 | $110.00 | $0.00 |
| 11-Dec-15 | 404 | 942 | $49,684.46 | $49,684.46 | $0.00 | $282.33 | $989.47 | $234.43 | $0.00 |
| 12-Dec-15 | 317 | 747 | $33,811.87 | $33,811.87 | $0.00 | $74.00 | $796.97 | $160.93 | $0.00 |
| 13-Dec-15 | 267 | 689 | $29,982.12 | $29,982.12 | $0.00 | $47.53 | $526.01 | $209.91 | $0.00 |
| 14-Dec-15 | 337 | 882 | $39,710.40 | $39,710.40 | $0.00 | $147.91 | $823.39 | $218.78 | $0.00 |
| 15-Dec-15 | 325 | 814 | $41,130.63 | $41,130.63 | $0.00 | $69.76 | $679.39 | $93.64 | $0.00 |
| 16-Dec-15 | 487 | 1182 | $49,325.96 | $49,325.96 | $0.00 | $83.13 | $1,051.06 | $707.55 | $0.00 |
| 17-Dec-15 | 580 | 1470 | $71,647.39 | $71,647.39 | $0.00 | $93.67 | $1,168.49 | $668.57 | $0.00 |
| 18-Dec-15 | 844 | 2201 | $94,563.20 | $94,563.20 | $319.05 | $380.01 | $989.11 | $2,586.21 | $0.00 |
| 19-Dec-15 | 350 | 897 | $37,073.57 | $37,073.57 | $0.00 | $63.78 | $710.03 | $484.30 | $0.00 |
| 20-Dec-15 | 181 | 442 | $18,901.56 | $18,901.56 | $0.00 | $16.26 | $552.83 | $97.66 | $0.00 |
| 21-Dec-15 | 242 | 642 | $28,461.78 | $28,461.78 | $0.00 | $67.17 | $597.28 | $882.52 | $0.00 |
| 22-Dec-15 | 231 | 635 | $25,031.33 | $25,031.33 | $0.00 | $27.26 | $923.51 | $304.98 | $0.00 |
| 23-Dec-15 | 154 | 452 | $19,152.94 | $19,152.94 | $0.00 | $47.76 | $1,288.18 | $279.96 | $0.00 |
| 24-Dec-15 | 136 | 314 | $18,512.15 | $18,512.15 | $89.95 | $47.10 | $1,276.27 | $263.07 | $0.00 |
| 25-Dec-15 | 119 | 304 | $13,320.76 | $13,320.76 | $0.00 | $25.16 | $1,165.37 | $103.73 | $0.00 |
| 26-Dec-15 | 183 | 464 | $20,098.27 | $20,098.27 | $0.00 | $22.45 | $1,652.82 | $899.79 | $0.00 |
| 27-Dec-15 | 176 | 441 | $19,406.90 | $19,406.90 | $0.00 | $9.16 | $1,852.80 | $999.32 | $0.00 |
| 28-Dec-15 | 197 | 567 | $28,345.74 | $28,345.74 | $0.00 | $302.92 | $1,819.81 | $1,545.12 | $0.00 |
| 29-Dec-15 | 264 | 771 | $36,129.69 | $36,129.69 | $0.00 | $195.68 | $2,539.74 | $1,911.31 | $0.00 |
| 30-Dec-15 | 267 | 754 | $35,297.36 | $35,297.36 | $0.00 | $177.83 | $2,356.76 | $2,786.04 | $0.00 |
| 31-Dec-15 | 289 | 894 | $38,768.47 | $38,768.47 | $0.00 | $104.27 | $3,009.71 | $3,735.52 | $0.00 |
| 1-Jan-16 | 222 | 600 | $24,874.59 | $24,874.59 | $0.00 | $74.44 | $2,030.53 | $1,436.18 | $0.00 |
| 2-Jan-16 | 213 | 511 | $24,425.91 | $24,425.91 | $0.00 | $11.66 | $2,051.85 | $597.26 | $0.00 |
| 3-Jan-16 | 178 | 432 | $22,729.64 | $22,729.64 | $66.39 | $56.87 | $1,913.39 | $698.22 | $0.00 |
| 4-Jan-16 | 223 | 545 | $27,053.24 | $27,053.24 | $0.00 | $46.57 | $2,117.30 | $967.98 | $0.00 |
| 5-Jan-16 | 291 | 726 | $31,124.48 | $31,124.48 | $0.00 | $78.18 | $2,563.21 | $1,282.82 | $0.00 |
| 6-Jan-16 | 273 | 815 | $32,762.14 | $32,762.14 | $0.00 | $107.25 | $2,565.77 | $1,621.62 | $0.00 |
| 7-Jan-16 | 426 | 1243 | $42,823.87 | $42,823.87 | $41.47 | $159.13 | $3,885.21 | $2,619.82 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8-Jan-16 | 453 | 1212 | $52,037.97 | $52,037.97 | $0.00 | $63.71 | $4,349.10 | $3,883.83 | $0.00 |
| 9-Jan-16 | 435 | 1225 | $49,054.38 | $49,054.38 | $0.00 | $103.93 | $4,101.49 | $3,357.78 | $0.00 |
| 10-Jan-16 | 197 | 512 | $20,394.61 | $20,394.61 | $0.00 | $78.83 | $1,733.43 | $848.87 | $0.00 |
| 11-Jan-16 | 321 | 750 | $32,682.36 | $32,682.36 | $0.00 | $48.92 | $2,911.74 | $2,179.52 | $0.00 |
| 12-Jan-16 | 301 | 759 | $32,420.07 | $32,420.07 | $0.00 | $88.30 | $2,968.25 | $1,167.12 | $0.00 |
| 13-Jan-16 | 335 | 895 | $38,755.15 | $38,755.15 | $0.00 | $60.05 | $3,438.30 | $1,732.56 | $0.00 |
| 14-Jan-16 | 297 | 782 | $45,234.74 | $45,234.74 | $0.00 | $70.62 | $2,687.00 | $607.75 | $0.00 |
| 15-Jan-16 | 374 | 953 | $66,383.17 | $66,383.17 | $0.00 | $106.25 | $2,757.65 | $697.69 | $0.00 |
| 16-Jan-16 | 353 | 972 | $82,199.47 | $82,199.47 | $0.00 | $68.48 | $3,711.84 | $2,123.51 | $0.00 |
| 17-Jan-16 | 281 | 495 | $33,556.33 | $33,556.33 | $0.00 | $51.50 | $1,929.88 | $150.68 | $0.00 |
| 18-Jan-16 | 281 | 810 | $41,335.61 | $41,335.61 | $239.85 | $48.00 | $2,528.08 | $631.10 | $0.00 |
| 19-Jan-16 | 337 | 809 | $43,393.16 | $43,393.16 | $0.00 | $155.48 | $2,999.43 | $360.04 | $0.00 |
| 20-Jan-16 | 592 | 1547 | $75,276.72 | $75,276.72 | $0.00 | $251.63 | $5,266.39 | $932.50 | $0.00 |
| 21-Jan-16 | 459 | 1257 | $54,562.33 | $54,562.33 | $57.94 | $160.83 | $4,271.50 | $1,139.78 | $0.00 |
| 22-Jan-16 | 438 | 1031 | $47,763.05 | $47,763.05 | $0.00 | $207.15 | $3,825.03 | $414.52 | $0.00 |
| 23-Jan-16 | 399 | 1090 | $49,083.53 | $49,083.53 | $0.00 | $66.38 | $3,578.75 | $1,507.98 | $0.00 |
| 24-Jan-16 | 249 | 696 | $32,495.24 | $32,495.24 | $0.00 | $93.15 | $2,211.55 | $1,234.63 | $0.00 |
| 25-Jan-16 | 352 | 1086 | $45,682.02 | $45,682.02 | $0.00 | $81.54 | $2,536.36 | $1,116.35 | $0.00 |
| 26-Jan-16 | 450 | 1408 | $58,283.59 | $58,283.59 | $303.06 | $90.38 | $1,777.25 | $3,388.58 | $0.00 |
| 27-Jan-16 | 986 | 2963 | $131,476.74 | $131,476.74 | $0.00 | $144.08 | $2,908.30 | $4,245.56 | $0.00 |
| 28-Jan-16 | 993 | 2645 | $159,380.00 | $159,380.00 | $92.62 | $92.40 | $3,248.60 | $4,988.79 | $0.00 |
| 29-Jan-16 | 671 | 1753 | $105,042.17 | $105,139.67 | $59.99 | $126.73 | $2,066.74 | $3,587.02 | $97.50 |
| 30-Jan-16 | 596 | 1584 | $89,183.52 | $89,183.52 | $0.00 | $111.11 | $1,842.24 | $2,604.87 | $0.00 |
| 31-Jan-16 | 211 | 601 | $27,172.03 | $27,172.02 | $0.00 | $20.86 | $604.39 | $682.09 | $0.00 |
| 1-Feb-16 | 351 | 1012 | $41,442.82 | $41,442.81 | $59.90 | $81.75 | $1,595.07 | $1,205.66 | $0.00 |
| 2-Feb-16 | 402 | 1112 | $45,388.46 | $45,388.42 | $0.00 | $65.31 | $1,660.78 | $1,384.39 | $0.00 |
| 3-Feb-16 | 525 | 1366 | $54,989.88 | $54,989.80 | $0.00 | $74.52 | $1,952.92 | $1,556.40 | $0.00 |
| 4-Feb-16 | 931 | 2073 | $97,412.95 | $97,412.81 | $0.00 | $68.13 | $3,169.55 | $4,010.24 | $0.00 |
| 5-Feb-16 | 653 | 1481 | $73,351.90 | $73,351.85 | $0.00 | $123.11 | $2,232.49 | $2,326.16 | $0.00 |
| 6-Feb-16 | 470 | 1148 | $54,500.59 | $54,500.95 | $0.00 | $93.09 | $1,792.30 | $1,885.08 | $0.00 |
| 7-Feb-16 | 313 | 811 | $37,115.38 | $37,115.36 | $0.00 | $29.93 | $1,221.12 | $921.96 | $0.00 |
| 8-Feb-16 | 387 | 1041 | $48,669.07 | $48,669.04 | $0.00 | $63.80 | $1,510.19 | $1,787.79 | $0.00 |
| 9-Feb-16 | 458 | 1322 | $57,248.12 | $57,248.07 | $0.00 | $90.56 | $1,898.16 | $2,065.84 | $0.00 |
| 10-Feb-16 | 773 | 1838 | $87,420.09 | $87,419.98 | $570.60 | $69.22 | $2,893.78 | $2,476.34 | $0.00 |
| 11-Feb-16 | 712 | 1674 | $96,267.51 | $96,267.43 | $27.80 | $66.26 | $2,172.28 | $2,676.34 | $0.00 |

FSSTX-086589

003

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 12-Feb-16 | 997 | 2374 | $205,088.07 | $205,088.00 | $0.00 | $141.69 | $3,541.31 | $6,679.09 | $0.00 |
| 13-Feb-16 | 506 | 1263 | $81,542.17 | $81,542.10 | $0.00 | $78.36 | $1,699.99 | $2,297.86 | $0.00 |
| 14-Feb-16 | 380 | 967 | $45,150.07 | $45,150.05 | $189.00 | $37.03 | $1,899.28 | $1,015.54 | $0.00 |
| 15-Feb-16 | 570 | 1429 | $75,320.91 | $75,320.86 | $286.20 | $98.75 | $2,235.79 | $2,410.70 | $0.00 |
| 16-Feb-16 | 511 | 1358 | $64,231.69 | $64,231.63 | $0.00 | $71.43 | $2,843.73 | $1,846.84 | $0.00 |
| 17-Feb-16 | 597 | 1713 | $75,962.89 | $75,962.79 | $0.00 | $89.45 | $2,387.46 | $2,020.63 | $0.00 |
| 18-Feb-16 | 758 | 2107 | $83,589.21 | $83,589.08 | $163.25 | $66.64 | $2,869.46 | $2,023.77 | $0.00 |
| 19-Feb-16 | 797 | 2067 | $92,637.57 | $92,637.42 | $0.00 | $102.64 | $3,139.72 | $2,149.59 | $0.00 |
| 20-Feb-16 | 552 | 1327 | $57,290.23 | $57,290.10 | $0.00 | $117.12 | $2,356.03 | $1,346.42 | $0.00 |
| 21-Feb-16 | 369 | 921 | $39,411.80 | $39,411.71 | $53.90 | $84.74 | $1,532.54 | $731.01 | $0.00 |
| 22-Feb-16 | 511 | 1352 | $58,393.74 | $58,393.62 | $0.00 | $135.48 | $2,081.13 | $1,520.72 | $0.00 |
| 23-Feb-16 | 617 | 1590 | $68,314.53 | $68,314.37 | $0.00 | $124.77 | $2,520.15 | $1,739.46 | $0.00 |
| 24-Feb-16 | 692 | 1744 | $69,319.15 | $69,318.91 | $0.00 | $110.81 | $2,792.15 | $1,428.01 | $0.00 |
| 25-Feb-16 | 589 | 1450 | $56,569.16 | $56,569.00 | $55.25 | $47.26 | $2,586.09 | $1,188.78 | $0.00 |
| 26-Feb-16 | 1037 | 3714 | $102,368.62 | $102,368.26 | $924.29 | $120.06 | $3,164.09 | $25,637.90 | $0.00 |
| 27-Feb-16 | 1709 | 6885 | $179,613.86 | $179,613.46 | $266.70 | $270.25 | $3,147.71 | $76,330.75 | $0.00 |
| 28-Feb-16 | 1319 | 4971 | $141,236.30 | $141,236.05 | $174.93 | $263.94 | $2,504.95 | $57,521.44 | $0.00 |
| 29-Feb-16 | 2930 | 11152 | $334,820.44 | $334,819.96 | $1,345.40 | $716.27 | $4,109.77 | $141,048.14 | $0.00 |
| 1-Mar-16 | 3890 | 15706 | $434,748.05 | $434,747.35 | $302.05 | $765.85 | $5,319.71 | $188,463.90 | $0.00 |
| 2-Mar-16 | 1609 | 5321 | $142,563.32 | $142,562.88 | $0.00 | $279.74 | $3,124.23 | $51,472.50 | $0.00 |
| 3-Mar-16 | 690 | 2543 | $61,384.86 | $61,384.64 | $0.00 | $87.40 | $3,456.33 | $2,202.83 | $0.00 |
| 4-Mar-16 | 661 | 2356 | $54,635.17 | $54,634.97 | $0.00 | $54.61 | $3,665.59 | $1,058.37 | $0.00 |
| 5-Mar-16 | 516 | 2003 | $44,741.78 | $44,741.58 | $147.45 | $64.89 | $2,703.13 | $789.22 | $0.00 |
| 6-Mar-16 | 413 | 1539 | $39,347.59 | $39,347.44 | $0.00 | $73.22 | $2,428.09 | $572.57 | $0.00 |
| 7-Mar-16 | 600 | 2203 | $45,792.27 | $45,792.10 | $0.00 | $94.15 | $2,851.00 | $805.54 | $0.00 |
| 8-Mar-16 | 469 | 1634 | $37,450.25 | $37,450.09 | $26.90 | $33.84 | $2,764.40 | $548.74 | $0.00 |
| 9-Mar-16 | 636 | 2154 | $53,932.65 | $53,932.38 | $0.00 | $62.30 | $2,868.06 | $2,347.28 | $0.00 |
| 10-Mar-16 | 848 | 1983 | $95,319.25 | $95,318.71 | $0.00 | $52.41 | $2,797.06 | $2,783.07 | $0.00 |
| 11-Mar-16 | 500 | 1185 | $55,834.93 | $55,834.56 | $0.00 | $17.05 | $1,570.36 | $1,436.33 | $0.00 |
| 12-Mar-16 | 332 | 768 | $35,122.19 | $35,122.02 | $0.00 | $8.70 | $1,365.77 | $605.57 | $0.00 |
| 13-Mar-16 | 274 | 623 | $26,420.47 | $26,420.32 | $0.00 | $31.02 | $1,160.45 | $532.97 | $0.00 |
| 14-Mar-16 | 569 | 1190 | $59,031.20 | $59,030.95 | $0.00 | $21.26 | $2,248.86 | $1,071.51 | $0.00 |
| 15-Mar-16 | 859 | 1948 | $118,855.69 | $118,855.38 | $99.25 | $78.07 | $3,344.37 | $1,879.53 | $0.00 |
| 16-Mar-16 | 696 | 1599 | $74,826.86 | $74,826.57 | $308.59 | $95.47 | $3,470.72 | $1,164.49 | $0.00 |
| 17-Mar-16 | 803 | 1951 | $67,352.93 | $67,352.61 | $0.00 | $31.64 | $4,052.36 | $1,434.36 | $0.00 |

FSSTX-086589

004

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 18-Mar-16 | 1249 | 3390 | $107,145.61 | $107,145.07 | $0.00 | $126.75 | $6,388.23 | $3,408.79 | $0.00 |
| 19-Mar-16 | 620 | 1722 | $58,049.57 | $58,049.31 | $0.00 | $31.87 | $2,836.85 | $1,222.06 | $0.00 |
| 20-Mar-16 | 529 | 1415 | $45,689.00 | $45,688.70 | $0.00 | $48.22 | $2,720.07 | $1,195.94 | $0.00 |
| 21-Mar-16 | 806 | 2324 | $74,872.72 | $74,872.36 | $0.00 | $66.30 | $3,754.17 | $1,643.37 | $0.00 |
| 22-Mar-16 | 786 | 2106 | $70,282.50 | $70,282.17 | $0.00 | $117.53 | $3,638.63 | $1,849.70 | $0.00 |
| 23-Mar-16 | 618 | 1386 | $55,748.86 | $55,748.61 | $0.00 | $88.65 | $2,391.45 | $1,513.78 | $0.00 |
| 24-Mar-16 | 603 | 1277 | $58,574.64 | $58,574.44 | $0.00 | $30.48 | $2,356.24 | $1,889.53 | $0.00 |
| 25-Mar-16 | 614 | 1493 | $65,128.25 | $65,128.03 | $0.00 | $82.51 | $3,095.44 | $2,300.63 | $0.00 |
| 26-Mar-16 | 403 | 953 | $40,927.18 | $40,927.06 | $0.00 | $41.67 | $1,775.90 | $1,302.60 | $0.00 |
| 27-Mar-16 | 351 | 1019 | $39,723.40 | $39,723.28 | $0.00 | $26.79 | $1,502.77 | $1,486.89 | $0.00 |
| 28-Mar-16 | 474 | 1068 | $44,982.06 | $44,981.88 | $0.00 | $53.18 | $1,588.67 | $1,848.23 | $0.00 |
| 29-Mar-16 | 666 | 1674 | $66,366.03 | $66,365.71 | $0.00 | $123.14 | $1,630.64 | $1,875.02 | $0.00 |
| 30-Mar-16 | 1252 | 2841 | $112,347.84 | $112,347.32 | $0.00 | $93.17 | $2,340.75 | $3,944.08 | $0.00 |
| 31-Mar-16 | 1479 | 3566 | $136,789.74 | $136,788.55 | $0.00 | $68.35 | $3,185.15 | $6,073.92 | $0.00 |
| 1-Apr-16 | 1180 | 2842 | $106,500.48 | $106,499.64 | $0.00 | $161.85 | $2,544.45 | $4,170.20 | $0.00 |
| 2-Apr-16 | 750 | 1837 | $64,553.28 | $64,552.76 | $0.00 | $46.59 | $1,898.78 | $2,534.93 | $0.00 |
| 3-Apr-16 | 557 | 1399 | $50,788.49 | $50,788.07 | $39.90 | $74.89 | $1,589.32 | $2,093.00 | $0.00 |
| 4-Apr-16 | 753 | 1865 | $73,104.65 | $73,104.18 | $0.00 | $84.01 | $1,890.26 | $3,027.23 | $0.00 |
| 5-Apr-16 | 879 | 2350 | $89,174.67 | $89,174.06 | $0.00 | $38.78 | $2,109.23 | $3,558.32 | $0.00 |
| 6-Apr-16 | 1128 | 2829 | $134,427.48 | $134,426.11 | $0.00 | $69.58 | $2,601.08 | $6,306.25 | $0.00 |
| 7-Apr-16 | 1237 | 3146 | $170,499.64 | $170,498.13 | $56.95 | $82.69 | $2,881.19 | $9,935.90 | $0.00 |
| 8-Apr-16 | 958 | 2238 | $109,894.38 | $109,893.42 | $0.00 | $110.31 | $2,100.86 | $5,531.29 | $0.00 |
| 9-Apr-16 | 658 | 1546 | $79,237.68 | $79,236.92 | $0.00 | $98.16 | $1,780.37 | $3,352.70 | $0.00 |
| 10-Apr-16 | 516 | 1244 | $55,722.87 | $55,722.43 | $0.00 | $100.66 | $1,503.36 | $2,624.14 | $0.00 |
| 11-Apr-16 | 745 | 1846 | $80,688.10 | $80,687.47 | $0.00 | $103.87 | $1,704.52 | $5,225.80 | $0.00 |
| 12-Apr-16 | 625 | 1533 | $78,205.72 | $78,369.77 | $0.00 | $120.11 | $1,626.14 | $3,347.53 | $164.51 |
| 13-Apr-16 | 692 | 1815 | $75,090.69 | $75,090.29 | $133.40 | $130.49 | $1,398.33 | $4,359.78 | $0.00 |
| 14-Apr-16 | 1191 | 3059 | $110,601.53 | $110,601.55 | $0.00 | $73.80 | $2,781.93 | $4,228.39 | $0.00 |
| 15-Apr-16 | 1073 | 2766 | $99,817.42 | $99,817.35 | $67.38 | $47.96 | $2,178.29 | $3,649.47 | $0.00 |
| 16-Apr-16 | 752 | 1865 | $70,904.70 | $70,904.50 | $0.00 | $73.34 | $1,717.32 | $2,830.19 | $0.00 |
| 17-Apr-16 | 535 | 1464 | $55,211.11 | $55,211.00 | $0.00 | $52.19 | $1,471.51 | $2,583.83 | $0.00 |
| 18-Apr-16 | 732 | 2011 | $79,924.81 | $79,924.73 | $24.95 | $112.15 | $1,654.65 | $3,157.72 | $0.00 |
| 19-Apr-16 | 931 | 2531 | $90,450.69 | $90,450.58 | $0.00 | $84.67 | $1,905.17 | $4,279.82 | $0.00 |
| 20-Apr-16 | 1144 | 3202 | $112,540.85 | $112,540.71 | $0.00 | $58.62 | $2,151.04 | $4,825.96 | $0.00 |
| 21-Apr-16 | 1028 | 2592 | $99,826.09 | $99,825.91 | $0.00 | $96.14 | $2,182.45 | $3,825.86 | $0.00 |

FSSTX-086589

005

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 22-Apr-16 | 756 | 1915 | $94,070.50 | $94,070.03 | $0.00 | $147.50 | $1,728.31 | $4,451.86 | $0.00 |
| 23-Apr-16 | 575 | 1457 | $69,131.49 | $69,131.01 | $0.00 | $85.91 | $1,452.11 | $2,244.63 | $0.00 |
| 24-Apr-16 | 407 | 997 | $45,865.33 | $45,864.96 | $0.00 | $39.89 | $1,111.74 | $1,497.61 | $0.00 |
| 25-Apr-16 | 717 | 1891 | $104,904.72 | $104,904.28 | $0.00 | $104.47 | $1,852.43 | $5,707.29 | $0.00 |
| 26-Apr-16 | 992 | 2460 | $204,784.59 | $204,784.07 | $187.28 | $105.07 | $2,923.30 | $6,068.03 | $0.00 |
| 27-Apr-16 | 849 | 2469 | $157,163.02 | $157,162.33 | $0.00 | $36.21 | $2,408.47 | $7,599.33 | $0.00 |
| 28-Apr-16 | 980 | 2437 | $143,911.67 | $143,910.79 | $142.25 | $253.56 | $1,979.92 | $4,318.36 | $0.00 |
| 29-Apr-16 | 1184 | 3089 | $211,701.67 | $211,700.65 | $0.00 | $110.14 | $2,667.82 | $7,493.39 | $0.00 |
| 30-Apr-16 | 933 | 2416 | $198,791.23 | $198,790.44 | $59.85 | $138.36 | $2,304.58 | $7,173.46 | $0.00 |
| 1-May-16 | 679 | 1628 | $120,848.88 | $120,848.18 | $0.00 | $61.99 | $1,784.11 | $4,611.99 | $0.00 |
| 2-May-16 | 1118 | 2783 | $236,122.73 | $236,122.19 | $0.00 | $301.44 | $2,287.19 | $7,923.22 | $0.00 |
| 3-May-16 | 1446 | 3731 | $263,614.29 | $263,614.76 | $0.00 | $279.41 | $2,317.73 | $8,568.69 | $0.00 |
| 4-May-16 | 974 | 2492 | $174,305.02 | $174,305.36 | $243.95 | $88.40 | $2,241.59 | $5,320.64 | $0.00 |
| 5-May-16 | 979 | 2562 | $147,266.27 | $147,266.72 | $0.00 | $134.94 | $2,161.74 | $5,683.26 | $0.00 |
| 6-May-16 | 1134 | 2531 | $150,295.68 | $150,295.84 | $0.00 | $60.24 | $2,382.13 | $6,278.27 | $0.00 |
| 7-May-16 | 768 | 1832 | $129,840.49 | $129,840.97 | $0.00 | $215.71 | $1,476.56 | $5,515.63 | $0.00 |
| 8-May-16 | 705 | 1840 | $151,436.72 | $151,436.87 | $0.00 | $107.23 | $1,547.00 | $5,525.64 | $0.00 |
| 9-May-16 | 984 | 2417 | $189,917.40 | $189,917.64 | $17.96 | $172.56 | $2,509.03 | $6,148.12 | $0.00 |
| 10-May-16 | 725 | 1692 | $100,557.56 | $100,557.11 | $0.00 | $134.49 | $1,488.13 | $4,760.26 | $0.00 |
| 11-May-16 | 925 | 2068 | $115,831.18 | $115,830.00 | $0.00 | $138.45 | $2,079.13 | $6,199.79 | $0.00 |
| 12-May-16 | 1120 | 2413 | $135,831.93 | $135,830.58 | $0.00 | $180.07 | $2,901.09 | $5,315.52 | $0.00 |
| 13-May-16 | 901 | 1974 | $114,449.56 | $114,448.58 | $0.00 | $101.24 | $1,981.69 | $4,730.70 | $0.00 |
| 14-May-16 | 697 | 1588 | $92,243.98 | $92,243.14 | $0.00 | $101.46 | $1,559.16 | $3,717.67 | $0.00 |
| 15-May-16 | 567 | 1328 | $83,115.56 | $83,114.85 | $43.45 | $66.67 | $1,483.46 | $3,438.37 | $0.00 |
| 16-May-16 | 779 | 1805 | $109,736.03 | $109,735.27 | $0.00 | $92.71 | $2,555.61 | $4,296.32 | $0.00 |
| 17-May-16 | 899 | 2094 | $126,449.36 | $126,448.51 | $0.00 | $119.31 | $2,802.87 | $4,286.13 | $0.00 |
| 18-May-16 | 872 | 2425 | $101,373.96 | $101,373.60 | $0.00 | $90.94 | $2,985.75 | $4,207.04 | $0.00 |
| 19-May-16 | 1062 | 2981 | $111,806.73 | $111,806.45 | $0.00 | $137.53 | $3,459.23 | $3,631.05 | $0.00 |
| 20-May-16 | 999 | 2931 | $111,293.07 | $111,292.85 | $0.00 | $161.05 | $3,315.17 | $4,692.81 | $0.00 |
| 21-May-16 | 1067 | 3243 | $104,778.95 | $104,778.81 | $199.95 | $142.94 | $3,908.25 | $10,482.65 | $0.00 |
| 22-May-16 | 644 | 1940 | $61,459.30 | $61,459.01 | $92.92 | $59.54 | $2,170.85 | $4,977.49 | $0.00 |
| 23-May-16 | 986 | 3020 | $101,484.73 | $101,484.44 | $0.00 | $186.11 | $2,952.31 | $9,122.50 | $0.00 |
| 24-May-16 | 972 | 2888 | $102,817.80 | $102,817.58 | $0.00 | $137.76 | $3,270.57 | $7,209.40 | $0.00 |
| 25-May-16 | 887 | 2599 | $105,979.63 | $105,979.33 | $0.00 | $126.26 | $2,825.18 | $5,138.30 | $0.00 |
| 26-May-16 | 848 | 2466 | $109,113.95 | $109,113.52 | $0.00 | $130.68 | $3,255.92 | $6,853.74 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 27-May-16 | 1019 | 2968 | $118,248.71 | $118,248.15 | $0.00 | $103.76 | $3,208.27 | $5,864.14 | $0.00 |
| 28-May-16 | 1254 | 4004 | $158,030.70 | $158,030.59 | $0.00 | $132.98 | $4,030.86 | $6,272.65 | $0.00 |
| 29-May-16 | 806 | 2547 | $94,070.30 | $94,070.12 | $0.00 | $106.53 | $2,349.27 | $4,307.97 | $0.00 |
| 30-May-16 | 950 | 3006 | $123,008.91 | $123,008.64 | $0.00 | $83.36 | $2,764.65 | $5,861.98 | $0.00 |
| 31-May-16 | 1072 | 3412 | $140,623.15 | $140,622.98 | $0.00 | $142.27 | $2,687.84 | $5,489.83 | $0.00 |
| 1-Jun-16 | 1123 | 3152 | $134,764.49 | $134,764.07 | $177.30 | $222.70 | $2,705.55 | $5,634.04 | $0.00 |
| 2-Jun-16 | 702 | 1738 | $94,453.13 | $94,452.74 | $414.45 | $196.40 | $1,693.73 | $4,435.61 | $0.00 |
| 3-Jun-16 | 821 | 2237 | $114,500.00 | $114,499.65 | $246.40 | $289.11 | $2,538.03 | $4,807.23 | $0.00 |
| 4-Jun-16 | 697 | 1951 | $89,330.20 | $89,329.88 | $0.00 | $217.38 | $2,591.73 | $3,957.69 | $0.00 |
| 5-Jun-16 | 648 | 1684 | $84,744.60 | $84,743.99 | $0.00 | $209.24 | $1,850.45 | $4,397.91 | $0.00 |
| 6-Jun-16 | 925 | 2275 | $122,545.51 | $122,544.78 | $0.00 | $547.04 | $2,740.43 | $5,741.24 | $0.00 |
| 7-Jun-16 | 1128 | 3022 | $148,365.09 | $148,364.52 | $166.45 | $496.89 | $3,383.55 | $6,505.80 | $0.00 |
| 8-Jun-16 | 929 | 2234 | $106,733.63 | $106,733.01 | $59.90 | $305.31 | $2,961.04 | $3,639.55 | $0.00 |
| 9-Jun-16 | 1450 | 4347 | $174,931.87 | $174,931.31 | $0.00 | $199.22 | $4,705.85 | $5,963.45 | $0.00 |
| 10-Jun-16 | 1149 | 3190 | $131,806.03 | $131,805.40 | $739.80 | $236.76 | $3,336.69 | $5,634.14 | $0.00 |
| 11-Jun-16 | 809 | 2156 | $95,379.78 | $95,379.27 | $87.30 | $141.38 | $2,674.44 | $3,218.22 | $0.00 |
| 12-Jun-16 | 596 | 1552 | $76,002.80 | $76,002.41 | $59.95 | $159.19 | $2,054.88 | $3,263.54 | $0.00 |
| 13-Jun-16 | 955 | 2360 | $108,415.19 | $108,415.19 | $64.90 | $293.15 | $2,277.01 | $4,104.87 | $0.00 |
| 14-Jun-16 | 1095 | 2989 | $138,948.17 | $138,947.67 | $614.70 | $333.74 | $3,157.29 | $5,929.80 | $0.00 |
| 15-Jun-16 | 786 | 1939 | $89,633.34 | $89,632.79 | $0.00 | $261.07 | $2,415.34 | $3,425.40 | $0.00 |
| 16-Jun-16 | 1091 | 3011 | $129,238.80 | $129,238.20 | $0.00 | $179.62 | $3,099.98 | $4,968.72 | $0.00 |
| 17-Jun-16 | 865 | 2235 | $102,915.07 | $102,914.63 | $211.68 | $81.72 | $1,997.07 | $4,164.61 | $0.00 |
| 18-Jun-16 | 494 | 1267 | $60,581.62 | $60,581.23 | $0.00 | $124.33 | $1,346.68 | $2,358.36 | $0.00 |
| 19-Jun-16 | 395 | 1016 | $47,644.60 | $47,644.28 | $0.00 | $55.40 | $1,207.42 | $1,742.85 | $0.00 |
| 20-Jun-16 | 747 | 2148 | $87,806.01 | $87,805.61 | $0.00 | $168.67 | $2,418.44 | $4,969.79 | $0.00 |
| 21-Jun-16 | 983 | 2722 | $103,214.25 | $103,213.83 | $0.00 | $123.57 | $2,977.63 | $8,757.25 | $0.00 |
| 22-Jun-16 | 1188 | 3539 | $112,631.58 | $112,631.16 | $0.00 | $240.88 | $4,119.37 | $8,889.47 | $0.00 |
| 23-Jun-16 | 1299 | 3996 | $121,313.84 | $121,313.54 | $171.77 | $211.58 | $5,108.66 | $9,345.74 | $0.00 |
| 24-Jun-16 | 1004 | 2774 | $89,411.98 | $89,411.37 | $685.15 | $168.10 | $3,887.38 | $6,857.46 | $0.00 |
| 25-Jun-16 | 664 | 1677 | $60,576.21 | $60,575.82 | $0.00 | $115.35 | $2,669.82 | $3,846.69 | $0.00 |
| 26-Jun-16 | 503 | 1274 | $54,318.76 | $54,318.27 | $27.00 | $98.61 | $1,812.86 | $3,514.54 | $0.00 |
| 27-Jun-16 | 691 | 1796 | $71,821.68 | $71,821.27 | $169.90 | $158.00 | $2,813.08 | $4,252.31 | $0.00 |
| 28-Jun-16 | 714 | 1923 | $89,907.63 | $89,907.31 | $89.90 | $199.37 | $2,293.00 | $5,179.90 | $0.00 |
| 29-Jun-16 | 791 | 1895 | $99,579.42 | $99,578.98 | $0.00 | $136.83 | $3,132.32 | $4,384.93 | $0.00 |
| 30-Jun-16 | 918 | 2164 | $174,041.14 | $174,040.25 | $75.52 | $197.21 | $2,430.02 | $5,922.61 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1-Jul-16 | 1071 | 2767 | $193,518.58 | $193,517.99 | $0.00 | $262.94 | $2,834.81 | $8,246.99 | $0.00 |
| 2-Jul-16 | 839 | 2328 | $163,720.51 | $163,720.27 | $0.00 | $286.98 | $2,113.91 | $5,927.19 | $0.00 |
| 3-Jul-16 | 819 | 2340 | $139,090.64 | $139,090.39 | $1,038.12 | $141.80 | $2,502.10 | $4,893.45 | $0.00 |
| 4-Jul-16 | 1184 | 3642 | $291,416.77 | $291,416.39 | $0.00 | $481.78 | $3,594.58 | $10,720.07 | $0.00 |
| 5-Jul-16 | 1231 | 3398 | $277,358.68 | $277,358.20 | $913.60 | $647.36 | $3,699.76 | $10,321.55 | $0.00 |
| 6-Jul-16 | 1189 | 3161 | $190,055.46 | $190,054.85 | $50.21 | $280.60 | $4,237.69 | $6,582.62 | $0.00 |
| 7-Jul-16 | 1124 | 3015 | $196,845.78 | $196,845.23 | $0.00 | $256.72 | $4,525.19 | $7,770.11 | $0.00 |
| 8-Jul-16 | 1408 | 3932 | $262,409.23 | $262,408.74 | $342.30 | $480.31 | $4,382.36 | $9,931.09 | $0.00 |
| 9-Jul-16 | 1109 | 3270 | $219,696.14 | $219,696.36 | $241.60 | $329.70 | $3,717.29 | $7,711.88 | $0.00 |
| 10-Jul-16 | 878 | 2448 | $152,505.90 | $152,506.17 | $0.00 | $353.73 | $2,437.80 | $6,610.19 | $0.00 |
| 11-Jul-16 | 1345 | 3967 | $278,310.19 | $278,310.49 | $162.36 | $342.04 | $3,069.91 | $11,280.39 | $0.00 |
| 12-Jul-16 | 1349 | 3780 | $257,189.29 | $257,189.53 | $0.00 | $548.70 | $3,742.68 | $10,198.97 | $0.00 |
| 13-Jul-16 | 1247 | 3199 | $206,248.26 | $206,248.51 | $152.70 | $169.03 | $3,298.30 | $7,774.60 | $0.00 |
| 14-Jul-16 | 1420 | 3863 | $250,893.24 | $250,893.27 | $0.00 | $206.85 | $3,517.39 | $13,349.81 | $0.00 |
| 15-Jul-16 | 1031 | 2623 | $165,836.64 | $165,836.18 | $210.44 | $209.09 | $2,901.48 | $7,476.53 | $0.00 |
| 16-Jul-16 | 667 | 1681 | $98,182.69 | $98,182.35 | $222.41 | $81.85 | $2,287.54 | $5,176.01 | $0.00 |
| 17-Jul-16 | 602 | 1549 | $79,239.60 | $79,239.22 | $520.68 | $75.96 | $2,137.86 | $3,765.83 | $0.00 |
| 18-Jul-16 | 779 | 2058 | $110,115.24 | $110,114.87 | $1,091.20 | $171.41 | $2,399.01 | $5,864.91 | $0.00 |
| 19-Jul-16 | 803 | 2106 | $114,401.79 | $114,401.38 | $653.79 | $182.36 | $2,525.90 | $8,092.06 | $0.00 |
| 20-Jul-16 | 887 | 2377 | $121,494.60 | $121,494.14 | $0.00 | $138.87 | $3,456.37 | $6,349.37 | $0.00 |
| 21-Jul-16 | 952 | 2335 | $110,571.37 | $110,570.99 | $132.45 | $160.66 | $3,110.61 | $6,011.01 | $0.00 |
| 22-Jul-16 | 639 | 1670 | $63,976.19 | $63,975.77 | $0.00 | $111.78 | $2,314.45 | $3,438.60 | $0.00 |
| 23-Jul-16 | 479 | 1135 | $48,420.05 | $48,419.79 | $0.00 | $111.86 | $2,322.32 | $2,127.96 | $0.00 |
| 24-Jul-16 | 467 | 1131 | $47,504.22 | $47,503.85 | $0.00 | $65.94 | $1,602.02 | $2,061.49 | $0.00 |
| 25-Jul-16 | 729 | 1784 | $66,097.10 | $66,096.72 | $97.43 | $113.76 | $3,114.85 | $3,062.10 | $0.00 |
| 26-Jul-16 | 1398 | 4872 | $166,683.50 | $166,683.72 | $0.00 | $223.39 | $4,040.68 | $7,377.06 | $0.00 |
| 27-Jul-16 | 4161 | 17632 | $524,615.55 | $524,615.67 | $279.67 | $567.52 | $13,125.45 | $33,915.14 | $0.00 |
| 28-Jul-16 | 4730 | 20888 | $640,284.65 | $640,316.10 | $350.11 | $864.23 | $14,556.20 | $39,995.50 | $31.26 |
| 29-Jul-16 | 2378 | 9849 | $306,187.86 | $306,187.95 | $27.94 | $302.32 | $6,935.01 | $19,331.41 | $0.00 |
| 30-Jul-16 | 1322 | 5197 | $177,099.25 | $177,099.30 | $0.00 | $216.57 | $4,599.76 | $7,832.69 | $0.00 |
| 31-Jul-16 | 1398 | 5440 | $174,919.97 | $174,920.06 | $48.91 | $219.26 | $4,414.61 | $11,342.75 | $0.00 |
| 1-Aug-16 | 1796 | 5303 | $188,953.80 | $188,953.79 | $196.51 | $136.37 | $3,941.46 | $6,510.86 | $0.00 |
| 2-Aug-16 | 1384 | 3745 | $148,067.22 | $148,067.22 | $130.00 | $119.78 | $2,977.67 | $4,846.18 | $0.00 |
| 3-Aug-16 | 1324 | 3125 | $121,364.77 | $121,697.86 | $60.21 | $105.34 | $2,586.29 | $4,945.69 | $333.38 |
| 4-Aug-16 | 1279 | 3104 | $116,844.67 | $116,893.91 | $119.85 | $85.47 | $2,535.15 | $5,562.52 | $49.27 |

FSSTX-086589

008

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5-Aug-16 | 1203 | 2940 | $108,085.49 | $108,085.52 | $0.00 | $107.81 | $1,964.72 | $4,431.02 | $0.00 |
| 6-Aug-16 | 793 | 1971 | $75,182.62 | $75,182.44 | $0.00 | $57.40 | $1,330.95 | $3,177.71 | $0.00 |
| 7-Aug-16 | 819 | 2011 | $83,826.71 | $83,826.58 | $0.00 | $34.69 | $1,669.56 | $4,252.98 | $0.00 |
| 8-Aug-16 | 1138 | 2782 | $100,471.46 | $100,471.23 | $0.00 | $139.99 | $1,876.16 | $2,968.50 | $0.00 |
| 9-Aug-16 | 963 | 2420 | $88,837.51 | $88,837.09 | $0.00 | $148.06 | $1,483.18 | $4,343.65 | $0.00 |
| 10-Aug-16 | 1178 | 3992 | $120,428.46 | $120,427.71 | $1,995.00 | $299.51 | $3,983.72 | $4,694.55 | $0.00 |
| 11-Aug-16 | 1160 | 4104 | $111,356.01 | $111,355.13 | $99.50 | $321.71 | $4,025.60 | $4,184.42 | $0.00 |
| 12-Aug-16 | 1072 | 3721 | $113,055.52 | $113,054.72 | $1,995.00 | $141.88 | $3,859.74 | $4,784.18 | $0.00 |
| 13-Aug-16 | 748 | 2276 | $74,819.94 | $74,819.14 | $0.00 | $137.52 | $2,411.68 | $3,117.22 | $0.00 |
| 14-Aug-16 | 743 | 2450 | $83,613.62 | $83,613.03 | $0.00 | $124.19 | $2,411.87 | $3,205.73 | $0.00 |
| 15-Aug-16 | 1630 | 3868 | $138,152.11 | $138,151.47 | $0.00 | $564.43 | $6,990.52 | $4,162.14 | $0.00 |
| 16-Aug-16 | 1567 | 3277 | $127,430.84 | $127,430.25 | $0.00 | $607.63 | $7,302.35 | $3,491.32 | $0.00 |
| 17-Aug-16 | 1398 | 3147 | $119,885.96 | $119,885.25 | $268.85 | $301.22 | $6,262.48 | $3,568.54 | $0.00 |
| 18-Aug-16 | 1295 | 2894 | $110,679.87 | $110,679.16 | $679.95 | $255.24 | $5,524.57 | $3,247.82 | $0.00 |
| 19-Aug-16 | 1226 | 3071 | $115,878.60 | $115,877.89 | $156.51 | $280.26 | $4,909.48 | $3,603.62 | $0.00 |
| 20-Aug-16 | 809 | 1924 | $76,439.66 | $76,439.04 | $0.00 | $322.13 | $3,226.95 | $2,257.06 | $0.00 |
| 21-Aug-16 | 719 | 1673 | $69,411.88 | $69,411.32 | $0.00 | $101.20 | $2,730.08 | $2,316.70 | $0.00 |
| 22-Aug-16 | 1191 | 2928 | $115,900.10 | $115,899.60 | $0.00 | $668.55 | $4,296.40 | $4,232.45 | $0.00 |
| 23-Aug-16 | 1300 | 3032 | $114,048.05 | $114,047.45 | $0.00 | $518.00 | $4,714.78 | $3,340.84 | $0.00 |
| 24-Aug-16 | 1558 | 4104 | $144,574.40 | $144,573.32 | $0.00 | $269.93 | $5,460.71 | $4,297.72 | $0.00 |
| 25-Aug-16 | 1617 | 4279 | $142,646.30 | $142,645.19 | $50.24 | $375.70 | $6,754.03 | $4,384.41 | $0.00 |
| 26-Aug-16 | 2047 | 4936 | $139,966.51 | $139,965.47 | $277.34 | $374.47 | $5,443.73 | $4,016.14 | $0.00 |
| 27-Aug-16 | 1287 | 2983 | $88,283.53 | $88,282.47 | $0.00 | $233.00 | $3,156.73 | $3,195.71 | $0.00 |
| 28-Aug-16 | 994 | 2387 | $79,043.02 | $79,042.27 | $9.95 | $190.14 | $2,801.21 | $2,774.79 | $0.00 |
| 29-Aug-16 | 1330 | 3314 | $103,309.03 | $103,308.34 | $283.20 | $192.93 | $3,330.44 | $3,984.16 | $0.00 |
| 30-Aug-16 | 1417 | 3561 | $110,055.77 | $110,055.15 | $0.00 | $190.79 | $4,163.68 | $4,130.61 | $0.00 |
| 31-Aug-16 | 1430 | 3478 | $109,094.51 | $109,093.86 | $29.85 | $168.31 | $3,924.08 | $3,693.67 | $0.00 |
| 1-Sep-16 | 1384 | 3431 | $107,074.33 | $107,073.59 | $0.00 | $168.45 | $3,501.84 | $4,260.23 | $0.00 |
| 2-Sep-16 | 1279 | 3275 | $101,520.56 | $101,519.95 | $9.95 | $146.84 | $3,446.79 | $3,788.13 | $0.00 |
| 3-Sep-16 | 747 | 1889 | $74,764.61 | $74,764.03 | $114.55 | $63.60 | $2,845.23 | $3,381.18 | $0.00 |
| 4-Sep-16 | 602 | 1461 | $72,276.05 | $72,275.38 | $0.00 | $107.76 | $2,129.34 | $2,713.16 | $0.00 |
| 5-Sep-16 | 827 | 2143 | $84,845.08 | $84,844.40 | $193.91 | $212.47 | $2,679.14 | $3,634.21 | $0.00 |
| 6-Sep-16 | 1135 | 3023 | $131,620.17 | $131,619.48 | $0.00 | $159.38 | $3,350.86 | $6,030.02 | $0.00 |
| 7-Sep-16 | 1026 | 2632 | $141,156.32 | $141,155.60 | $46.17 | $235.12 | $3,157.04 | $4,927.07 | $0.00 |
| 8-Sep-16 | 1041 | 2697 | $125,090.90 | $125,090.13 | $266.70 | $90.58 | $3,507.46 | $5,538.55 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 9-Sep-16 | 1225 | 3172 | $146,228.53 | $146,227.97 | $119.30 | $164.27 | $3,496.35 | $6,607.34 | $0.00 |
| 10-Sep-16 | 870 | 2063 | $96,223.06 | $96,222.84 | $1,707.80 | $129.40 | $2,911.25 | $3,254.03 | $0.00 |
| 11-Sep-16 | 926 | 2379 | $122,855.00 | $122,854.79 | $0.00 | $88.15 | $2,442.52 | $4,639.52 | $0.00 |
| 12-Sep-16 | 1260 | 3059 | $161,644.85 | $161,644.26 | $9.95 | $282.77 | $3,501.38 | $7,143.62 | $0.00 |
| 13-Sep-16 | 1475 | 3887 | $214,877.04 | $214,876.71 | $0.00 | $252.33 | $3,313.76 | $7,378.46 | $0.00 |
| 14-Sep-16 | 1206 | 2933 | $181,475.53 | $181,475.17 | $41.25 | $220.35 | $3,374.20 | $5,861.83 | $0.00 |
| 15-Sep-16 | 1231 | 3042 | $160,564.14 | $160,563.74 | $0.00 | $194.34 | $3,833.24 | $5,731.90 | $0.00 |
| 16-Sep-16 | 1150 | 2929 | $148,588.01 | $148,587.48 | $0.00 | $246.05 | $3,430.18 | $6,504.15 | $0.00 |
| 17-Sep-16 | 742 | 1728 | $99,555.83 | $99,555.46 | $59.95 | $77.84 | $2,340.70 | $3,385.96 | $0.00 |
| 18-Sep-16 | 740 | 1812 | $80,598.72 | $80,598.36 | $57.40 | $20.88 | $2,739.56 | $2,856.60 | $0.00 |
| 19-Sep-16 | 809 | 1956 | $88,861.37 | $88,881.02 | $0.00 | $138.74 | $2,981.38 | $2,960.79 | $19.95 |
| 20-Sep-16 | 1109 | 2736 | $126,455.39 | $126,455.03 | $49.90 | $65.98 | $3,846.93 | $4,113.70 | $0.00 |
| 21-Sep-16 | 1203 | 3279 | $139,154.93 | $139,154.58 | $0.00 | $108.61 | $3,995.51 | $5,093.79 | $0.00 |
| 22-Sep-16 | 1178 | 3156 | $136,020.64 | $136,020.53 | $0.00 | $103.48 | $3,749.91 | $4,652.89 | $0.00 |
| 23-Sep-16 | 1128 | 2817 | $135,641.94 | $135,641.63 | $0.00 | $303.96 | $4,063.49 | $4,698.15 | $0.00 |
| 24-Sep-16 | 775 | 1901 | $78,121.84 | $78,121.40 | $0.00 | $78.12 | $3,049.04 | $3,470.50 | $0.00 |
| 25-Sep-16 | 815 | 2128 | $94,130.94 | $94,130.56 | $232.15 | $184.44 | $2,815.68 | $3,795.68 | $0.00 |
| 26-Sep-16 | 1855 | 4484 | $190,126.91 | $190,126.17 | $79.17 | $133.01 | $3,605.98 | $7,099.76 | $0.00 |
| 27-Sep-16 | 1275 | 3196 | $139,696.68 | $139,696.11 | $150.97 | $84.58 | $2,165.73 | $5,657.62 | $0.00 |
| 28-Sep-16 | 1491 | 3251 | $157,446.09 | $157,444.98 | $0.00 | $166.59 | $2,856.57 | $6,132.85 | $0.00 |
| 29-Sep-16 | 1493 | 3778 | $196,856.94 | $196,855.68 | $49.41 | $186.14 | $3,220.61 | $8,324.89 | $0.00 |
| 30-Sep-16 | 1050 | 2406 | $118,398.34 | $118,397.11 | $0.00 | $137.80 | $2,865.76 | $4,640.06 | $0.00 |
| 1-Oct-16 | 664 | 1561 | $68,326.97 | $68,326.04 | $0.00 | $67.01 | $1,828.09 | $3,471.65 | $0.00 |
| 2-Oct-16 | 702 | 1653 | $74,578.20 | $74,577.37 | $0.00 | $187.35 | $2,460.79 | $3,059.53 | $0.00 |
| 3-Oct-16 | 947 | 2384 | $108,308.82 | $108,307.87 | $0.00 | $118.12 | $3,152.26 | $5,193.46 | $0.00 |
| 4-Oct-16 | 1034 | 2333 | $121,809.47 | $121,808.74 | $0.00 | $102.32 | $3,282.62 | $5,510.94 | $0.00 |
| 5-Oct-16 | 1254 | 3152 | $142,107.19 | $142,106.35 | $0.00 | $215.63 | $4,235.03 | $5,715.62 | $0.00 |
| 6-Oct-16 | 1201 | 2953 | $141,809.64 | $141,808.75 | $0.00 | $185.35 | $4,234.24 | $5,526.75 | $0.00 |
| 7-Oct-16 | 1042 | 2531 | $123,621.62 | $123,620.78 | $104.31 | $134.08 | $3,663.57 | $5,806.40 | $0.00 |
| 8-Oct-16 | 767 | 1849 | $90,640.95 | $90,640.23 | $0.00 | $112.86 | $2,901.30 | $3,695.25 | $0.00 |
| 9-Oct-16 | 820 | 2003 | $89,055.01 | $89,054.41 | $0.00 | $92.00 | $3,409.94 | $3,137.88 | $0.00 |
| 10-Oct-16 | 1063 | 2684 | $122,957.51 | $122,956.77 | $131.30 | $193.81 | $3,880.22 | $5,126.81 | $0.00 |
| 11-Oct-16 | 1149 | 3021 | $147,998.93 | $147,998.14 | $0.00 | $159.82 | $4,231.98 | $6,243.67 | $0.00 |
| 12-Oct-16 | 915 | 2266 | $99,389.28 | $99,388.58 | $0.00 | $125.97 | $3,178.41 | $4,642.20 | $0.00 |
| 13-Oct-16 | 933 | 2574 | $96,360.47 | $96,360.47 | $36.87 | $106.44 | $3,153.78 | $3,050.46 | $0.00 |

FSSTX-086589

010

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 14-Oct-16 | 1039 | 2881 | $96,907.10 | $96,907.10 | $0.00 | $134.53 | $3,889.95 | $3,311.33 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 15-Oct-16 | 777 | 2036 | $67,400.62 | $67,400.62 | $0.00 | $62.53 | $2,727.41 | $2,068.18 | $0.00 |
| 16-Oct-16 | 820 | 2168 | $74,047.96 | $74,047.96 | $95.85 | $158.54 | $2,803.04 | $1,156.71 | $0.00 |
| 17-Oct-16 | 1463 | 4120 | $128,434.00 | $128,433.89 | $267.32 | $257.42 | $4,573.65 | $4,245.20 | $0.00 |
| 18-Oct-16 | 2223 | 5346 | $184,154.31 | $184,152.98 | $31.96 | $213.81 | $5,804.90 | $8,196.28 | $0.00 |
| 19-Oct-16 | 2340 | 5915 | $188,135.94 | $188,964.39 | $485.65 | $285.70 | $4,401.93 | $5,541.19 | $828.96 |
| 20-Oct-16 | 1821 | 4596 | $155,145.47 | $155,144.94 | $44.85 | $215.84 | $3,235.89 | $5,236.32 | $0.00 |
| 21-Oct-16 | 1180 | 3106 | $112,365.49 | $112,365.06 | $0.00 | $188.84 | $3,704.48 | $4,952.05 | $0.00 |
| 22-Oct-16 | 755 | 2022 | $76,672.63 | $76,672.17 | $0.00 | $107.50 | $2,887.74 | $3,149.96 | $0.00 |
| 23-Oct-16 | 822 | 2119 | $75,119.23 | $75,118.60 | $0.00 | $71.37 | $3,107.05 | $3,163.68 | $0.00 |
| 24-Oct-16 | 1266 | 3393 | $110,554.75 | $110,554.14 | $0.00 | $229.66 | $5,094.96 | $4,338.23 | $0.00 |
| 25-Oct-16 | 1098 | 2949 | $101,025.38 | $101,024.97 | $249.54 | $184.87 | $5,013.26 | $3,422.03 | $0.00 |
| 26-Oct-16 | 2018 | 5164 | $210,771.15 | $210,770.44 | $0.00 | $286.71 | $6,697.88 | $8,143.80 | $0.00 |
| 27-Oct-16 | 1647 | 4277 | $183,213.28 | $183,212.53 | $0.00 | $245.71 | $4,168.85 | $7,172.95 | $0.00 |
| 28-Oct-16 | 1369 | 4339 | $186,984.95 | $186,984.08 | $0.00 | $194.99 | $4,316.44 | $12,175.16 | $0.00 |
| 29-Oct-16 | 947 | 2458 | $108,534.30 | $108,533.64 | $301.95 | $78.96 | $3,280.38 | $4,142.39 | $0.00 |
| 30-Oct-16 | 970 | 2460 | $116,888.35 | $116,887.72 | $0.00 | $148.31 | $3,542.34 | $5,151.71 | $0.00 |
| 31-Oct-16 | 1156 | 2972 | $137,533.86 | $137,533.33 | $124.86 | $142.56 | $4,458.97 | $5,822.87 | $0.00 |
| 1-Nov-16 | 1217 | 3102 | $197,667.21 | $197,666.59 | $0.00 | $295.96 | $4,458.67 | $8,177.51 | $0.00 |
| 2-Nov-16 | 1175 | 2848 | $164,967.69 | $164,966.61 | $317.22 | $184.86 | $5,502.22 | $8,636.65 | $0.00 |
| 3-Nov-16 | 1378 | 3441 | $171,436.63 | $171,435.39 | $0.00 | $174.80 | $4,275.10 | $8,373.50 | $0.00 |
| 4-Nov-16 | 1370 | 3522 | $187,956.92 | $187,955.72 | $0.00 | $254.05 | $4,729.67 | $8,350.69 | $0.00 |
| 5-Nov-16 | 1006 | 2670 | $159,610.13 | $159,609.17 | $54.90 | $205.09 | $3,779.36 | $6,196.95 | $0.00 |
| 6-Nov-16 | 1014 | 2595 | $130,542.36 | $130,541.51 | $422.73 | $193.35 | $3,452.21 | $4,098.81 | $0.00 |
| 7-Nov-16 | 2517 | 7929 | $313,221.64 | $313,385.17 | $48.47 | $375.48 | $6,192.33 | $12,736.22 | $164.37 |
| 8-Nov-16 | 6010 | 22511 | $668,721.76 | $668,905.96 | $469.91 | $443.41 | $12,562.38 | $22,203.94 | $184.64 |
| 9-Nov-16 | 8782 | 32117 | $849,754.49 | $849,754.00 | $427.68 | $1,004.96 | $16,270.56 | $22,872.09 | $0.00 |
| 10-Nov-16 | 2929 | 9236 | $285,597.59 | $285,597.51 | $394.81 | $261.06 | $6,324.63 | $10,112.83 | $0.00 |
| 11-Nov-16 | 2119 | 6119 | $203,622.06 | $203,622.16 | $49.84 | $131.23 | $3,624.22 | $7,729.01 | $0.00 |
| 12-Nov-16 | 1346 | 3658 | $126,177.39 | $126,177.41 | $41.94 | $94.14 | $2,998.58 | $3,712.54 | $0.00 |
| 13-Nov-16 | 1456 | 4298 | $154,793.70 | $154,793.70 | $668.68 | $83.27 | $2,864.99 | $4,431.08 | $0.00 |
| 14-Nov-16 | 2363 | 6589 | $234,906.41 | $234,906.23 | $0.00 | $221.68 | $4,489.93 | $7,927.81 | $0.00 |
| 15-Nov-16 | 1216 | 3097 | $128,764.69 | $128,764.32 | $0.00 | $165.60 | $4,454.53 | $3,634.18 | $0.00 |
| 16-Nov-16 | 1121 | 2691 | $87,864.50 | $87,863.85 | $0.00 | $142.41 | $5,124.93 | $2,604.66 | $0.00 |
| 17-Nov-16 | 1497 | 3662 | $130,294.58 | $130,293.58 | $87.40 | $102.13 | $6,240.35 | $5,605.56 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 18-Nov-16 | 1332 | 3101 | $103,513.11 | $103,512.03 | $0.00 | $170.25 | $5,242.99 | $3,217.42 | $0.00 |
| 19-Nov-16 | 968 | 2379 | $79,667.81 | $79,666.96 | $0.00 | $166.29 | $4,889.18 | $2,711.87 | $0.00 |
| 20-Nov-16 | 817 | 1960 | $67,364.29 | $67,855.90 | $0.00 | $74.55 | $3,424.46 | $2,383.40 | $492.30 |
| 21-Nov-16 | 1131 | 2830 | $86,974.12 | $86,973.38 | $0.00 | $102.10 | $2,809.78 | $3,358.21 | $0.00 |
| 22-Nov-16 | 1679 | 4390 | $127,343.23 | $127,342.52 | $29.92 | $94.02 | $3,825.93 | $4,123.10 | $0.00 |
| 23-Nov-16 | 1874 | 4921 | $138,827.89 | $138,827.63 | $0.00 | $142.74 | $4,403.82 | $4,920.36 | $0.00 |
| 24-Nov-16 | 1343 | 3582 | $120,030.42 | $120,030.25 | $56.95 | $67.72 | $4,043.17 | $4,005.48 | $0.00 |
| 25-Nov-16 | 3477 | 12233 | $309,438.61 | $309,438.23 | $71.77 | $215.29 | $6,606.16 | $9,540.43 | $0.00 |
| 26-Nov-16 | 2282 | 8140 | $193,640.11 | $193,639.62 | $34.46 | $152.86 | $5,709.78 | $7,661.72 | $0.00 |
| 27-Nov-16 | 2184 | 7300 | $182,801.91 | $182,801.43 | $303.51 | $126.89 | $4,865.52 | $5,882.14 | $0.00 |
| 28-Nov-16 | 3384 | 10648 | $302,872.38 | $302,871.93 | $0.00 | $272.19 | $7,341.40 | $9,354.45 | $0.00 |
| 29-Nov-16 | 2027 | 6097 | $184,682.19 | $184,681.92 | $160.37 | $178.11 | $6,343.62 | $5,852.46 | $0.00 |
| 30-Nov-16 | 1885 | 5796 | $172,857.83 | $172,857.56 | $0.00 | $158.85 | $5,835.27 | $6,116.52 | $0.00 |
| 1-Dec-16 | 1042 | 2898 | $107,201.93 | $107,201.59 | $454.44 | $91.55 | $4,234.09 | $4,340.88 | $0.00 |
| 2-Dec-16 | 938 | 2176 | $87,600.21 | $87,599.12 | $27.25 | $102.30 | $4,345.54 | $4,376.14 | $0.00 |
| 3-Dec-16 | 776 | 1724 | $67,032.91 | $67,032.05 | $0.00 | $103.62 | $3,384.48 | $3,254.48 | $0.00 |
| 4-Dec-16 | 719 | 1626 | $62,610.07 | $62,609.23 | $298.35 | $110.85 | $2,902.38 | $2,687.63 | $0.00 |
| 5-Dec-16 | 987 | 2263 | $96,446.84 | $96,445.91 | $37.25 | $197.83 | $3,611.69 | $4,494.21 | $0.00 |
| 6-Dec-16 | 1014 | 2451 | $100,386.47 | $100,385.62 | $0.00 | $97.74 | $4,155.80 | $4,149.10 | $0.00 |
| 7-Dec-16 | 1326 | 3238 | $127,604.35 | $127,603.17 | $0.00 | $226.91 | $4,670.63 | $4,859.82 | $0.00 |
| 8-Dec-16 | 1451 | 3673 | $143,674.07 | $143,672.94 | $211.25 | $138.00 | $5,540.97 | $5,724.50 | $0.00 |
| 9-Dec-16 | 1375 | 3323 | $140,778.88 | $140,777.54 | $0.00 | $107.00 | $4,678.20 | $6,080.96 | $0.00 |
| 10-Dec-16 | 892 | 2103 | $93,374.08 | $93,373.12 | $0.00 | $82.47 | $3,263.37 | $3,912.40 | $0.00 |
| 11-Dec-16 | 915 | 2064 | $88,818.44 | $88,817.64 | $0.00 | $82.20 | $2,591.93 | $4,330.90 | $0.00 |
| 12-Dec-16 | 1796 | 5187 | $167,243.86 | $167,243.28 | $0.00 | $210.87 | $3,113.06 | $5,291.86 | $0.00 |
| 13-Dec-16 | 2985 | 9895 | $243,078.85 | $243,078.51 | $0.00 | $457.32 | $5,512.60 | $8,870.36 | $0.00 |
| 14-Dec-16 | 3296 | 10449 | $245,798.39 | $245,797.90 | $9.95 | $519.32 | $5,261.69 | $7,604.97 | $0.00 |
| 15-Dec-16 | 3304 | 11111 | $266,472.61 | $266,472.18 | $78.53 | $522.52 | $5,465.29 | $8,253.06 | $0.00 |
| 16-Dec-16 | 3326 | 11114 | $287,820.75 | $287,820.36 | $9.95 | $475.72 | $4,522.04 | $9,049.77 | $0.00 |
| 17-Dec-16 | 1639 | 4881 | $129,621.53 | $129,621.19 | $4.95 | $202.09 | $2,767.71 | $4,369.08 | $0.00 |
| 18-Dec-16 | 1357 | 4062 | $108,213.98 | $108,213.81 | $4.95 | $201.95 | $2,489.43 | $3,647.45 | $0.00 |
| 19-Dec-16 | 1876 | 5441 | $147,296.69 | $147,296.42 | $89.79 | $221.72 | $3,547.45 | $4,544.24 | $0.00 |
| 20-Dec-16 | 1667 | 5266 | $141,481.65 | $141,481.44 | $4.99 | $218.02 | $3,493.97 | $3,900.22 | $0.00 |
| 21-Dec-16 | 1632 | 4615 | $119,943.03 | $119,942.91 | $0.00 | $144.43 | $3,100.93 | $4,217.78 | $0.00 |
| 22-Dec-16 | 1556 | 4435 | $113,676.38 | $113,676.09 | $121.70 | $193.87 | $3,067.58 | $4,398.43 | $0.00 |

FSSTX-086589

012

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23-Dec-16 | 1311 | 3823 | $100,829.07 | $100,828.80 | $56.65 | $133.81 | $2,433.92 | $3,849.23 | $0.00 |
| 24-Dec-16 | 797 | 2390 | $69,898.19 | $69,898.04 | $0.00 | $29.48 | $1,596.91 | $3,136.59 | $0.00 |
| 25-Dec-16 | 953 | 2445 | $75,393.73 | $75,393.58 | $0.00 | $51.70 | $1,440.40 | $2,770.99 | $0.00 |
| 26-Dec-16 | 956 | 2278 | $77,051.92 | $77,051.70 | $24.47 | $87.50 | $1,894.97 | $3,993.94 | $0.00 |
| 27-Dec-16 | 1524 | 3831 | $129,419.55 | $129,419.18 | $0.00 | $83.93 | $2,605.85 | $4,783.02 | $0.00 |
| 28-Dec-16 | 1665 | 4392 | $149,319.36 | $149,318.92 | $29.90 | $169.94 | $2,853.77 | $5,281.02 | $0.00 |
| 29-Dec-16 | 1500 | 3866 | $131,603.56 | $131,603.29 | $0.00 | $131.90 | $3,048.42 | $4,277.66 | $0.00 |
| 30-Dec-16 | 1610 | 4015 | $138,431.76 | $138,431.43 | $27.01 | $235.44 | $2,549.55 | $6,049.97 | $0.00 |
| 31-Dec-16 | 1409 | 3733 | $129,600.18 | $129,599.93 | $54.90 | $64.30 | $2,290.08 | $4,622.82 | $0.00 |
| 1-Jan-17 | 1146 | 2818 | $96,197.31 | $96,197.03 | $0.00 | $143.97 | $2,437.16 | $2,091.18 | $0.00 |
| 2-Jan-17 | 1427 | 3366 | $123,478.49 | $123,487.13 | $0.00 | $51.44 | $2,437.14 | $2,198.55 | $8.95 |
| 3-Jan-17 | 1358 | 3381 | $153,538.56 | $153,538.23 | $165.45 | $124.67 | $2,596.39 | $2,297.84 | $0.00 |
| 4-Jan-17 | 1443 | 3637 | $141,774.76 | $141,774.53 | $1,748.92 | $244.88 | $3,518.98 | $3,828.76 | $0.00 |
| 5-Jan-17 | 1051 | 2792 | $108,732.74 | $108,732.55 | $266.00 | $187.57 | $4,166.18 | $4,285.06 | $0.00 |
| 6-Jan-17 | 869 | 2177 | $94,092.31 | $94,092.10 | $0.00 | $342.63 | $3,161.87 | $3,005.70 | $0.00 |
| 7-Jan-17 | 836 | 1969 | $86,546.95 | $86,546.69 | $0.00 | $353.01 | $3,290.50 | $3,732.90 | $0.00 |
| 8-Jan-17 | 937 | 2298 | $98,117.08 | $98,116.72 | $89.21 | $83.44 | $4,486.88 | $4,292.11 | $0.00 |
| 9-Jan-17 | 934 | 2226 | $87,658.60 | $87,658.38 | $0.00 | $150.66 | $3,654.69 | $4,160.87 | $0.00 |
| 10-Jan-17 | 1018 | 2569 | $98,524.78 | $98,524.48 | $0.00 | $194.85 | $3,531.29 | $4,710.68 | $0.00 |
| 11-Jan-17 | 1017 | 2663 | $103,267.33 | $103,267.22 | $185.93 | $75.93 | $3,638.97 | $3,635.33 | $0.00 |
| 12-Jan-17 | 979 | 2454 | $105,847.25 | $105,847.26 | $1,501.74 | $95.64 | $4,201.37 | $4,539.10 | $0.00 |
| 13-Jan-17 | 1107 | 2769 | $109,683.34 | $109,683.15 | $541.25 | $135.92 | $4,490.75 | $4,211.56 | $0.00 |
| 14-Jan-17 | 811 | 1968 | $76,616.36 | $76,616.34 | $0.00 | $78.04 | $3,069.10 | $3,388.71 | $0.00 |
| 15-Jan-17 | 737 | 1943 | $77,849.03 | $77,848.86 | $0.00 | $116.12 | $3,108.82 | $3,275.78 | $0.00 |
| 16-Jan-17 | 1052 | 3071 | $123,486.57 | $123,486.41 | $0.00 | $99.61 | $3,900.79 | $6,370.55 | $0.00 |
| 17-Jan-17 | 1061 | 2748 | $116,403.90 | $116,403.83 | $0.00 | $175.54 | $3,694.10 | $3,552.94 | $0.00 |
| 18-Jan-17 | 1195 | 3150 | $135,307.20 | $135,307.21 | $0.00 | $176.99 | $4,858.19 | $4,708.52 | $0.00 |
| 19-Jan-17 | 1327 | 3798 | $156,581.99 | $156,581.95 | $0.00 | $299.43 | $5,200.20 | $5,456.24 | $0.00 |
| 20-Jan-17 | 1897 | 5346 | $219,377.41 | $219,377.34 | $0.00 | $381.73 | $9,060.59 | $5,760.45 | $0.00 |
| 21-Jan-17 | 1052 | 2996 | $112,386.24 | $112,386.13 | $0.00 | $176.11 | $4,232.91 | $3,385.50 | $0.00 |
| 22-Jan-17 | 1232 | 3599 | $147,982.50 | $147,982.47 | $212.28 | $251.93 | $4,588.65 | $5,169.64 | $0.00 |
| 23-Jan-17 | 1575 | 4605 | $168,888.34 | $168,888.17 | $240.29 | $274.50 | $6,620.17 | $6,139.80 | $0.00 |
| 24-Jan-17 | 1866 | 4606 | $146,823.92 | $146,823.66 | $271.90 | $472.20 | $8,730.29 | $4,481.81 | $0.00 |
| 25-Jan-17 | 944 | 2180 | $87,962.89 | $87,961.71 | $129.90 | $228.46 | $4,153.46 | $3,531.16 | $0.00 |
| 26-Jan-17 | 887 | 1998 | $84,469.78 | $84,468.82 | $0.00 | $59.12 | $3,546.56 | $3,389.85 | $0.00 |

FSSTX-086589                                              013

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 27-Jan-17 | 1228 | 2639 | $114,217.69 | $114,216.19 | $0.00 | $178.22 | $5,161.46 | $5,306.09 | $0.00 |
| 28-Jan-17 | 912 | 1956 | $87,359.96 | $87,358.76 | $147.75 | $254.00 | $3,856.28 | $3,669.01 | $0.00 |
| 29-Jan-17 | 855 | 2035 | $92,706.92 | $92,705.98 | $0.00 | $135.40 | $3,384.87 | $3,172.26 | $0.00 |
| 30-Jan-17 | 1023 | 2582 | $135,699.52 | $135,698.41 | $0.00 | $273.83 | $3,770.19 | $5,168.52 | $0.00 |
| 31-Jan-17 | 1301 | 3050 | $132,789.17 | $132,788.24 | $0.00 | $428.90 | $5,769.91 | $4,235.76 | $0.00 |
| 1-Feb-17 | 1481 | 3398 | $143,292.01 | $143,290.58 | $148.50 | $390.08 | $6,629.74 | $4,904.34 | $0.00 |
| 2-Feb-17 | 1184 | 2722 | $128,323.74 | $128,322.64 | $0.00 | $601.95 | $5,956.24 | $4,319.58 | $0.00 |
| 3-Feb-17 | 1391 | 3214 | $143,110.43 | $143,109.36 | $0.00 | $379.17 | $6,231.56 | $4,232.77 | $0.00 |
| 4-Feb-17 | 1064 | 2446 | $115,378.81 | $115,377.89 | $42.45 | $347.09 | $4,790.39 | $3,965.57 | $0.00 |
| 5-Feb-17 | 913 | 2192 | $102,931.60 | $102,930.71 | $0.00 | $354.12 | $3,885.84 | $3,277.39 | $0.00 |
| 6-Feb-17 | 1632 | 3633 | $192,564.25 | $192,562.85 | $0.00 | $1,081.79 | $6,463.25 | $6,948.34 | $0.00 |
| 7-Feb-17 | 2123 | 6158 | $188,039.19 | $188,037.35 | $0.00 | $621.44 | $8,635.71 | $6,526.18 | $0.00 |
| 8-Feb-17 | 2173 | 6543 | $171,372.50 | $171,370.90 | $0.00 | $583.77 | $10,209.01 | $5,124.60 | $0.00 |
| 9-Feb-17 | 2404 | 7085 | $191,320.89 | $191,319.41 | $0.00 | $552.40 | $10,895.32 | $4,945.89 | $0.00 |
| 10-Feb-17 | 2097 | 6085 | $165,459.15 | $165,458.00 | $0.00 | $630.87 | $9,425.98 | $3,942.33 | $0.00 |
| 11-Feb-17 | 1354 | 3856 | $114,627.33 | $114,626.35 | $0.00 | $237.97 | $6,128.59 | $3,380.66 | $0.00 |
| 12-Feb-17 | 1228 | 3337 | $102,112.23 | $102,111.04 | $0.00 | $242.46 | $5,288.76 | $3,099.32 | $0.00 |
| 13-Feb-17 | 1393 | 3967 | $117,896.30 | $117,895.00 | $0.00 | $346.65 | $5,704.96 | $4,013.65 | $0.00 |
| 14-Feb-17 | 1361 | 3892 | $120,859.19 | $120,857.98 | $0.00 | $309.13 | $5,631.90 | $4,425.47 | $0.00 |
| 15-Feb-17 | 2664 | 7506 | $248,852.87 | $248,850.79 | $104.35 | $580.73 | $9,162.08 | $8,248.16 | $0.00 |
| 16-Feb-17 | 1924 | 5325 | $178,087.62 | $178,086.21 | $164.90 | $291.39 | $6,965.05 | $6,254.65 | $0.00 |
| 17-Feb-17 | 1546 | 4002 | $158,571.18 | $158,569.82 | $1,894.00 | $351.88 | $5,229.83 | $5,629.87 | $0.00 |
| 18-Feb-17 | 907 | 2272 | $95,754.92 | $95,754.06 | $0.00 | $154.94 | $2,891.77 | $3,325.33 | $0.00 |
| 19-Feb-17 | 1066 | 2691 | $115,790.84 | $115,789.96 | $288.94 | $201.82 | $3,957.14 | $4,163.95 | $0.00 |
| 20-Feb-17 | 1246 | 2970 | $132,107.70 | $132,106.46 | $130.00 | $224.94 | $3,868.80 | $5,190.78 | $0.00 |
| 21-Feb-17 | 3563 | 10468 | $362,437.68 | $362,612.65 | $213.21 | $875.33 | $11,823.31 | $9,310.51 | $176.28 |
| 22-Feb-17 | 5314 | 15952 | $600,540.91 | $600,540.53 | $90.11 | $1,193.67 | $18,079.73 | $14,450.12 | $0.00 |
| 23-Feb-17 | 3203 | 9252 | $352,667.22 | $352,666.97 | $155.11 | $549.09 | $11,387.89 | $10,702.75 | $0.00 |
| 24-Feb-17 | 2119 | 5906 | $220,724.20 | $220,723.93 | $23.60 | $246.06 | $6,974.18 | $6,563.19 | $0.00 |
| 25-Feb-17 | 1500 | 4099 | $167,611.48 | $167,611.28 | $0.00 | $219.81 | $5,141.78 | $5,313.73 | $0.00 |
| 26-Feb-17 | 1846 | 5354 | $207,132.61 | $207,132.38 | $0.00 | $327.77 | $6,658.33 | $7,103.14 | $0.00 |
| 27-Feb-17 | 2183 | 6022 | $227,027.04 | $227,026.57 | $0.00 | $251.92 | $7,646.32 | $8,610.87 | $0.00 |
| 28-Feb-17 | 2560 | 7348 | $239,171.98 | $239,171.29 | $80.51 | $362.11 | $10,227.81 | $10,661.78 | $0.00 |
| 1-Mar-17 | 3651 | 11407 | $334,008.90 | $334,008.31 | $0.00 | $516.18 | $13,048.74 | $47,897.92 | $0.00 |
| 2-Mar-17 | 2893 | 8727 | $253,947.39 | $253,946.87 | $234.82 | $522.68 | $10,532.87 | $30,367.63 | $0.00 |

FSSTX-086589

014

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3-Mar-17 | 2363 | 6543 | $184,464.19 | $184,463.57 | $0.00 | $455.48 | $9,941.97 | $15,228.07 | $0.00 |
| 4-Mar-17 | 1012 | 2615 | $95,958.36 | $95,957.19 | $30.45 | $245.42 | $3,914.21 | $7,910.91 | $0.00 |
| 5-Mar-17 | 1090 | 2743 | $90,872.96 | $90,872.08 | $55.40 | $324.40 | $4,353.20 | $4,043.66 | $0.00 |
| 6-Mar-17 | 1174 | 2954 | $102,309.42 | $102,308.26 | $62.40 | $219.65 | $4,661.08 | $3,474.67 | $0.00 |
| 7-Mar-17 | 1956 | 4374 | $141,232.59 | $141,231.26 | $0.00 | $483.23 | $3,725.27 | $7,794.00 | $0.00 |
| 8-Mar-17 | 4579 | 9619 | $413,486.37 | $413,483.83 | $234.76 | $952.55 | $7,134.77 | $14,116.75 | $0.00 |
| 9-Mar-17 | 4491 | 9929 | $426,707.96 | $426,785.21 | $267.67 | $1,060.69 | $8,982.55 | $22,784.23 | $79.90 |
| 10-Mar-17 | 3081 | 7082 | $284,112.58 | $284,110.46 | $498.02 | $459.04 | $5,486.04 | $17,319.50 | $0.00 |
| 11-Mar-17 | 2144 | 4865 | $207,367.28 | $207,365.71 | $283.81 | $314.77 | $4,795.36 | $8,179.95 | $0.00 |
| 12-Mar-17 | 1556 | 3577 | $147,117.00 | $147,115.68 | $19.90 | $240.97 | $3,190.37 | $4,803.53 | $0.00 |
| 13-Mar-17 | 2448 | 5873 | $241,937.48 | $241,935.79 | $310.93 | $476.82 | $3,913.19 | $14,822.30 | $0.00 |
| 14-Mar-17 | 1720 | 3894 | $157,598.09 | $157,596.69 | $0.00 | $304.81 | $3,146.06 | $12,908.48 | $0.00 |
| 15-Mar-17 | 1968 | 4233 | $173,055.05 | $173,053.58 | $19.95 | $168.08 | $2,882.75 | $8,561.97 | $0.00 |
| 16-Mar-17 | 1630 | 3580 | $137,833.44 | $137,832.60 | $155.82 | $207.73 | $2,910.47 | $6,419.01 | $0.00 |
| 17-Mar-17 | 1822 | 4024 | $147,362.56 | $147,361.26 | $164.95 | $257.35 | $3,428.15 | $10,370.51 | $0.00 |
| 18-Mar-17 | 1242 | 2787 | $104,787.85 | $104,786.95 | $164.74 | $291.91 | $2,128.53 | $6,872.78 | $0.00 |
| 19-Mar-17 | 1214 | 2637 | $101,173.00 | $101,172.17 | $0.00 | $120.98 | $2,480.40 | $5,059.53 | $0.00 |
| 20-Mar-17 | 2694 | 6653 | $190,308.06 | $190,306.78 | $296.80 | $469.37 | $3,629.23 | $9,254.53 | $0.00 |
| 21-Mar-17 | 2156 | 5873 | $168,982.19 | $168,980.88 | $122.40 | $343.68 | $6,443.74 | $7,733.71 | $0.00 |
| 22-Mar-17 | 2008 | 5663 | $171,451.70 | $171,477.41 | $266.31 | $497.54 | $7,325.49 | $5,976.78 | $27.35 |
| 23-Mar-17 | 1889 | 5139 | $161,326.19 | $161,324.48 | $0.00 | $306.27 | $7,503.21 | $5,281.07 | $0.00 |
| 24-Mar-17 | 1779 | 4914 | $159,499.61 | $159,497.86 | $0.00 | $393.35 | $7,360.91 | $5,881.31 | $0.00 |
| 25-Mar-17 | 1280 | 3236 | $114,537.79 | $114,536.23 | $56.85 | $200.24 | $5,012.03 | $4,342.98 | $0.00 |
| 26-Mar-17 | 1147 | 3045 | $110,684.44 | $110,683.28 | $0.00 | $176.86 | $4,520.56 | $3,600.20 | $0.00 |
| 27-Mar-17 | 1313 | 3669 | $141,258.04 | $141,256.70 | $0.00 | $316.42 | $4,932.07 | $4,662.89 | $0.00 |
| 28-Mar-17 | 1709 | 4967 | $161,536.88 | $161,535.58 | $294.95 | $262.97 | $6,778.95 | $7,294.94 | $0.00 |
| 29-Mar-17 | 1842 | 5347 | $152,769.61 | $152,768.30 | $0.00 | $337.56 | $6,508.17 | $7,117.07 | $0.00 |
| 30-Mar-17 | 1999 | 6040 | $189,135.27 | $189,134.13 | $8,083.95 | $265.43 | $7,058.29 | $6,835.24 | $0.00 |
| 31-Mar-17 | 2483 | 7462 | $237,026.55 | $237,025.51 | $3,594.00 | $151.47 | $8,071.80 | $7,291.57 | $0.00 |
| 1-Apr-17 | 1404 | 4026 | $137,543.27 | $137,542.33 | $4,489.95 | $108.51 | $5,131.99 | $5,332.65 | $0.00 |
| 2-Apr-17 | 1223 | 3603 | $123,551.56 | $123,550.68 | $4,479.75 | $151.21 | $3,913.23 | $4,228.08 | $0.00 |
| 3-Apr-17 | 3547 | 11513 | $321,562.86 | $321,562.16 | $431.49 | $313.84 | $10,802.18 | $8,869.41 | $0.00 |
| 4-Apr-17 | 2229 | 6970 | $210,842.82 | $210,936.69 | $3,943.50 | $364.23 | $7,293.00 | $22,645.87 | $95.00 |
| 5-Apr-17 | 1969 | 5625 | $190,004.39 | $190,002.95 | $157.45 | $259.12 | $6,540.83 | $22,547.30 | $0.00 |
| 6-Apr-17 | 1615 | 4467 | $160,587.17 | $160,585.70 | $99.90 | $210.68 | $5,283.83 | $9,732.06 | $0.00 |

FSSTX-086589

015

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 7-Apr-17 | 1611 | 4547 | $158,786.27 | $158,784.59 | $0.00 | $294.61 | $4,829.02 | $10,827.01 | $0.00 |
| 8-Apr-17 | 1066 | 2634 | $92,570.52 | $92,568.97 | $59.95 | $120.08 | $3,679.47 | $6,435.72 | $0.00 |
| 9-Apr-17 | 1036 | 2399 | $102,101.09 | $102,099.67 | $0.00 | $352.62 | $4,009.82 | $5,182.16 | $0.00 |
| 10-Apr-17 | 1288 | 3325 | $130,110.87 | $130,109.43 | $0.00 | $143.54 | $4,190.26 | $8,700.20 | $0.00 |
| 11-Apr-17 | 1522 | 3807 | $176,818.52 | $176,817.39 | $244.11 | $659.61 | $4,972.34 | $8,726.14 | $0.00 |
| 12-Apr-17 | 2332 | 7231 | $259,095.36 | $259,094.30 | $129.00 | $535.96 | $7,933.44 | $10,381.16 | $0.00 |
| 13-Apr-17 | 1915 | 5871 | $204,471.83 | $204,471.57 | $52.46 | $313.14 | $8,220.74 | $7,046.61 | $0.00 |
| 14-Apr-17 | 1921 | 5914 | $195,766.16 | $195,765.96 | $189.00 | $203.97 | $6,561.55 | $6,992.75 | $0.00 |
| 15-Apr-17 | 1385 | 4115 | $136,898.91 | $136,898.93 | $0.00 | $128.07 | $4,671.19 | $5,291.46 | $0.00 |
| 16-Apr-17 | 1921 | 5814 | $192,057.86 | $192,057.82 | $26.86 | $248.30 | $6,236.08 | $6,778.27 | $0.00 |
| 17-Apr-17 | 2200 | 6819 | $220,987.44 | $220,987.40 | $0.00 | $259.47 | $7,024.32 | $7,137.96 | $0.00 |
| 18-Apr-17 | 2436 | 7753 | $255,625.77 | $255,625.74 | $0.00 | $567.37 | $8,000.72 | $8,723.45 | $0.00 |
| 19-Apr-17 | 2367 | 7301 | $228,904.86 | $228,904.78 | $27.70 | $313.23 | $8,073.31 | $7,752.71 | $0.00 |
| 20-Apr-17 | 1879 | 5452 | $174,519.37 | $174,519.20 | $28.36 | $341.04 | $7,316.16 | $5,531.13 | $0.00 |
| 21-Apr-17 | 1657 | 4525 | $144,618.40 | $144,618.33 | $0.00 | $236.30 | $6,883.60 | $4,523.99 | $0.00 |
| 22-Apr-17 | 1056 | 2731 | $90,559.06 | $90,558.60 | $0.00 | $160.40 | $4,261.90 | $3,670.46 | $0.00 |
| 23-Apr-17 | 1100 | 2905 | $92,531.41 | $92,530.88 | $0.00 | $205.00 | $4,523.08 | $4,614.04 | $0.00 |
| 24-Apr-17 | 1729 | 4523 | $158,320.29 | $158,319.61 | $37.30 | $267.47 | $5,608.08 | $6,793.87 | $0.00 |
| 25-Apr-17 | 2624 | 7178 | $242,940.68 | $242,939.57 | $0.00 | $362.61 | $7,996.81 | $7,514.00 | $0.00 |
| 26-Apr-17 | 2134 | 5680 | $193,742.86 | $193,741.69 | $94.95 | $254.38 | $7,018.47 | $6,763.11 | $0.00 |
| 27-Apr-17 | 2060 | 5465 | $195,463.14 | $195,461.99 | $130.23 | $271.97 | $6,646.82 | $7,837.80 | $0.00 |
| 28-Apr-17 | 2068 | 5297 | $177,397.60 | $177,396.43 | $0.00 | $341.22 | $7,007.68 | $5,746.91 | $0.00 |
| 29-Apr-17 | 1372 | 3190 | $106,075.48 | $106,074.16 | $0.00 | $254.65 | $6,070.20 | $4,100.85 | $0.00 |
| 30-Apr-17 | 1588 | 4036 | $136,596.74 | $136,595.37 | $0.00 | $237.14 | $5,543.28 | $5,611.01 | $0.00 |
| 1-May-17 | 2616 | 7302 | $214,584.25 | $214,582.75 | $119.41 | $359.38 | $8,941.53 | $7,315.82 | $0.00 |
| 2-May-17 | 2414 | 7228 | $194,273.17 | $194,271.77 | $38.45 | $439.07 | $9,182.33 | $7,060.31 | $0.00 |
| 3-May-17 | 2949 | 9397 | $325,636.55 | $325,634.77 | $360.72 | $505.47 | $10,145.86 | $13,660.15 | $0.00 |
| 4-May-17 | 2925 | 9211 | $307,609.97 | $307,609.21 | $522.76 | $474.72 | $10,409.85 | $10,925.16 | $0.00 |
| 5-May-17 | 1956 | 5785 | $196,872.48 | $196,872.02 | $54.86 | $372.10 | $7,280.54 | $7,461.75 | $0.00 |
| 6-May-17 | 1205 | 3477 | $112,304.05 | $112,303.60 | $0.00 | $207.37 | $4,688.04 | $4,724.85 | $0.00 |
| 7-May-17 | 1332 | 3772 | $136,293.80 | $136,432.25 | $48.41 | $228.80 | $4,943.66 | $5,725.90 | $139.29 |
| 8-May-17 | 1558 | 4081 | $155,721.11 | $155,719.77 | $618.65 | $185.32 | $5,634.27 | $6,705.79 | $0.00 |
| 9-May-17 | 1406 | 3449 | $144,522.76 | $144,520.81 | $0.38 | $310.26 | $5,620.79 | $6,613.14 | $0.00 |
| 10-May-17 | 1301 | 3375 | $119,067.46 | $119,065.69 | $94.85 | $183.40 | $5,616.62 | $5,403.39 | $0.00 |
| 11-May-17 | 1350 | 3502 | $118,949.18 | $118,947.65 | $0.00 | $192.93 | $5,448.67 | $4,528.88 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12-May-17 | 1502 | 3912 | $127,941.23 | $127,939.80 | $0.00 | $252.99 | $5,385.65 | $4,742.18 | $0.00 |
| 13-May-17 | 1073 | 2688 | $90,636.02 | $90,634.77 | $17.90 | $160.03 | $3,909.10 | $3,449.50 | $0.00 |
| 14-May-17 | 910 | 2292 | $85,067.20 | $85,066.01 | $366.55 | $116.59 | $3,658.31 | $3,764.38 | $0.00 |
| 15-May-17 | 1676 | 5060 | $138,546.90 | $138,678.43 | $236.95 | $313.96 | $7,064.32 | $4,386.70 | $132.97 |
| 16-May-17 | 1848 | 5420 | $157,013.17 | $157,011.68 | $0.00 | $276.49 | $6,527.01 | $5,194.79 | $0.00 |
| 17-May-17 | 1748 | 5287 | $164,832.71 | $164,831.43 | $26.96 | $412.50 | $6,323.51 | $5,796.51 | $0.00 |
| 18-May-17 | 1324 | 4012 | $117,877.61 | $117,876.51 | $0.00 | $408.93 | $4,855.81 | $4,755.85 | $0.00 |
| 19-May-17 | 1263 | 3809 | $105,765.08 | $105,764.15 | $8.65 | $305.29 | $4,537.12 | $3,654.23 | $0.00 |
| 20-May-17 | 848 | 2447 | $78,005.95 | $78,005.21 | $0.00 | $411.52 | $2,624.64 | $2,910.41 | $0.00 |
| 21-May-17 | 860 | 2549 | $77,916.74 | $77,915.88 | $0.00 | $157.31 | $3,106.91 | $3,165.45 | $0.00 |
| 22-May-17 | 1098 | 3165 | $91,152.05 | $91,150.67 | $0.00 | $156.47 | $3,728.37 | $3,441.89 | $0.00 |
| 23-May-17 | 2337 | 8806 | $235,572.54 | $235,571.20 | $0.00 | $356.70 | $7,446.08 | $9,608.39 | $0.00 |
| 24-May-17 | 2738 | 10294 | $288,885.65 | $288,885.50 | $363.16 | $386.50 | $9,778.57 | $10,314.69 | $0.00 |
| 25-May-17 | 2705 | 10577 | $286,575.15 | $286,574.97 | $339.58 | $402.30 | $9,325.67 | $10,756.61 | $0.00 |
| 26-May-17 | 2447 | 9565 | $252,158.52 | $252,158.14 | $1,199.11 | $416.29 | $9,072.64 | $9,782.34 | $0.00 |
| 27-May-17 | 1794 | 6862 | $189,297.01 | $189,296.82 | $550.00 | $378.45 | $6,584.39 | $6,799.58 | $0.00 |
| 28-May-17 | 1664 | 6427 | $178,195.32 | $178,194.95 | $0.00 | $297.41 | $7,038.17 | $6,826.30 | $0.00 |
| 29-May-17 | 2626 | 10377 | $279,792.55 | $279,792.29 | $31.37 | $509.74 | $4,537.12 | $10,269.20 | $0.00 |
| 30-May-17 | 2732 | 10685 | $286,256.05 | $286,255.78 | $337.55 | $520.89 | $8,193.31 | $11,098.06 | $0.00 |
| 31-May-17 | 2065 | 6798 | $190,892.16 | $190,891.69 | $220.15 | $428.71 | $7,504.50 | $8,258.38 | $0.00 |
| 1-Jun-17 | 1791 | 5839 | $164,835.13 | $164,834.66 | $316.67 | $275.64 | $7,248.19 | $6,967.97 | $0.00 |
| 2-Jun-17 | 1720 | 5522 | $160,315.24 | $160,315.00 | $20.45 | $167.78 | $6,209.02 | $6,226.99 | $0.00 |
| 3-Jun-17 | 1267 | 3967 | $116,839.37 | $116,838.97 | $692.32 | $94.62 | $5,132.68 | $6,381.43 | $0.00 |
| 4-Jun-17 | 1277 | 3909 | $113,483.62 | $113,483.16 | $0.00 | $183.35 | $4,614.33 | $4,746.98 | $0.00 |
| 5-Jun-17 | 2033 | 7525 | $202,942.73 | $202,942.39 | $189.00 | $197.86 | $6,861.30 | $7,617.58 | $0.00 |
| 6-Jun-17 | 1364 | 3818 | $118,809.17 | $118,808.57 | $605.50 | $212.95 | $5,288.11 | $4,881.82 | $0.00 |
| 7-Jun-17 | 1613 | 4439 | $128,238.39 | $128,236.93 | $99.78 | $350.89 | $6,198.08 | $4,832.87 | $0.00 |
| 8-Jun-17 | 1455 | 3984 | $111,436.47 | $111,435.13 | $0.00 | $291.09 | $5,517.68 | $4,762.04 | $0.00 |
| 9-Jun-17 | 1470 | 4038 | $111,000.41 | $110,999.10 | $250.67 | $237.84 | $5,142.36 | $3,892.91 | $0.00 |
| 10-Jun-17 | 911 | 2401 | $72,744.27 | $72,743.26 | $59.85 | $132.83 | $3,253.43 | $2,462.09 | $0.00 |
| 11-Jun-17 | 891 | 2411 | $75,531.75 | $75,530.77 | $0.00 | $132.83 | $3,561.65 | $2,967.81 | $0.00 |
| 12-Jun-17 | 1293 | 3477 | $103,881.93 | $103,880.68 | $15.54 | $200.41 | $5,152.69 | $3,565.10 | $0.00 |
| 13-Jun-17 | 1367 | 3984 | $119,913.26 | $119,912.14 | $29.95 | $324.45 | $5,302.18 | $4,292.97 | $0.00 |
| 14-Jun-17 | 1527 | 3671 | $109,246.04 | $109,244.95 | $0.00 | $243.58 | $3,820.04 | $3,899.97 | $0.00 |
| 15-Jun-17 | 1868 | 4125 | $134,936.67 | $134,935.49 | $380.91 | $500.18 | $2,860.84 | $6,835.93 | $0.00 |

FSSTX-086589

017

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 16-Jun-17 | 1686 | 3899 | $113,984.80 | $113,983.81 | $79.80 | $185.39 | $2,682.24 | $4,863.93 | $0.00 |
| 17-Jun-17 | 1074 | 2608 | $81,655.07 | $81,654.50 | $303.90 | $197.56 | $2,049.84 | $3,420.68 | $0.00 |
| 18-Jun-17 | 1046 | 2397 | $77,390.09 | $77,389.35 | $49.95 | $195.53 | $2,385.00 | $2,841.87 | $0.00 |
| 19-Jun-17 | 1533 | 3560 | $115,358.68 | $115,357.85 | $1,197.68 | $217.01 | $2,271.70 | $2,799.29 | $0.00 |
| 20-Jun-17 | 1417 | 3408 | $115,830.60 | $115,829.62 | $872.20 | $168.09 | $2,778.57 | $3,223.64 | $0.00 |
| 21-Jun-17 | 1690 | 4201 | $136,634.20 | $136,633.25 | $731.31 | $244.94 | $3,192.31 | $4,547.99 | $0.00 |
| 22-Jun-17 | 1706 | 4337 | $133,645.09 | $133,644.61 | $226.17 | $185.11 | $2,903.44 | $5,680.38 | $0.00 |
| 23-Jun-17 | 1936 | 4625 | $148,391.27 | $148,390.81 | $289.08 | $273.58 | $2,755.39 | $4,926.09 | $0.00 |
| 24-Jun-17 | 1280 | 3132 | $98,786.30 | $98,785.98 | $1,396.39 | $94.05 | $2,295.56 | $3,696.54 | $0.00 |
| 25-Jun-17 | 1298 | 3255 | $103,001.99 | $103,001.71 | $695.31 | $207.82 | $2,415.96 | $3,175.56 | $0.00 |
| 26-Jun-17 | 1583 | 3929 | $122,648.98 | $122,648.66 | $653.91 | $471.15 | $2,754.83 | $3,601.16 | $0.00 |
| 27-Jun-17 | 1482 | 3947 | $123,818.72 | $123,818.39 | $205.82 | $228.66 | $3,023.34 | $3,871.71 | $0.00 |
| 28-Jun-17 | 1911 | 4777 | $176,851.06 | $176,850.52 | $195.08 | $339.84 | $3,854.17 | $4,798.73 | $0.00 |
| 29-Jun-17 | 2034 | 4872 | $183,600.67 | $183,600.09 | $739.04 | $339.57 | $4,524.16 | $4,722.39 | $0.00 |
| 30-Jun-17 | 2094 | 5244 | $210,012.45 | $210,011.87 | $4,944.65 | $470.23 | $4,069.69 | $5,700.83 | $0.00 |
| 1-Jul-17 | 1538 | 3931 | $143,419.51 | $143,418.90 | $958.56 | $232.71 | $3,871.67 | $3,397.99 | $0.00 |
| 2-Jul-17 | 1378 | 3273 | $121,417.95 | $121,417.55 | $570.45 | $177.50 | $2,833.54 | $3,627.40 | $0.00 |
| 3-Jul-17 | 1750 | 4131 | $153,860.88 | $153,860.16 | $1,089.39 | $322.12 | $3,358.73 | $4,053.28 | $0.00 |
| 4-Jul-17 | 1941 | 5136 | $182,830.54 | $182,830.01 | $545.85 | $341.10 | $4,213.86 | $4,004.15 | $0.00 |
| 5-Jul-17 | 2139 | 5273 | $248,941.86 | $248,941.75 | $703.27 | $506.02 | $3,946.04 | $5,799.23 | $0.00 |
| 6-Jul-17 | 2408 | 5646 | $267,251.11 | $267,337.83 | $349.30 | $579.06 | $4,595.97 | $5,649.89 | $86.85 |
| 7-Jul-17 | 2075 | 4890 | $223,873.73 | $223,873.58 | $852.24 | $447.59 | $4,537.55 | $5,415.93 | $0.00 |
| 8-Jul-17 | 1285 | 2789 | $123,959.67 | $123,959.33 | $228.75 | $285.09 | $3,204.79 | $2,985.77 | $0.00 |
| 9-Jul-17 | 1254 | 2743 | $117,663.41 | $117,663.06 | $65.49 | $289.62 | $2,135.83 | $2,843.76 | $0.00 |
| 10-Jul-17 | 1792 | 4127 | $183,214.84 | $183,214.52 | $1,847.94 | $302.84 | $3,188.59 | $4,073.07 | $0.00 |
| 11-Jul-17 | 1744 | 4143 | $166,984.20 | $166,983.99 | $221.62 | $274.74 | $3,109.38 | $3,922.54 | $0.00 |
| 12-Jul-17 | 1413 | 3405 | $145,078.22 | $145,077.95 | $337.23 | $217.62 | $3,144.70 | $3,017.12 | $0.00 |
| 13-Jul-17 | 1821 | 4489 | $166,076.98 | $166,076.60 | $276.20 | $391.09 | $3,347.19 | $3,609.38 | $0.00 |
| 14-Jul-17 | 1589 | 4045 | $152,293.48 | $152,293.02 | $107.92 | $262.91 | $3,240.28 | $2,996.74 | $0.00 |
| 15-Jul-17 | 1209 | 2898 | $112,509.95 | $112,509.72 | $168.33 | $405.52 | $2,012.73 | $2,809.08 | $0.00 |
| 16-Jul-17 | 1209 | 2967 | $115,700.72 | $115,700.55 | $571.28 | $249.49 | $2,066.17 | $2,726.61 | $0.00 |
| 17-Jul-17 | 1706 | 4400 | $162,739.18 | $162,738.98 | $219.55 | $413.93 | $3,349.71 | $3,686.93 | $0.00 |
| 18-Jul-17 | 2269 | 5926 | $234,561.85 | $234,561.87 | $345.72 | $409.43 | $4,738.09 | $10,162.64 | $0.00 |
| 19-Jul-17 | 2034 | 5488 | $215,094.67 | $215,094.43 | $860.19 | $530.19 | $3,984.67 | $8,665.88 | $0.00 |
| 20-Jul-17 | 1888 | 4643 | $181,630.38 | $181,630.05 | $418.49 | $359.74 | $4,072.54 | $6,211.93 | $0.00 |

FSSTX-086589

018

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 21-Jul-17 | 2058 | 5675 | $183,815.49 | $183,814.81 | $416.80 | $383.12 | $3,639.50 | $5,278.96 | $0.00 |
| 22-Jul-17 | 1568 | 4313 | $142,463.29 | $142,462.80 | $285.72 | $231.81 | $3,222.23 | $4,623.17 | $0.00 |
| 23-Jul-17 | 1751 | 4915 | $155,983.00 | $155,982.67 | $785.38 | $299.20 | $3,141.54 | $4,823.00 | $0.00 |
| 24-Jul-17 | 2105 | 5544 | $173,979.54 | $173,978.85 | $467.09 | $290.92 | $4,401.64 | $4,626.34 | $0.00 |
| 25-Jul-17 | 1955 | 5416 | $174,366.80 | $174,365.64 | $450.00 | $262.69 | $4,276.69 | $5,501.90 | $0.00 |
| 26-Jul-17 | 2761 | 8010 | $260,237.28 | $260,235.35 | $1,199.30 | $355.21 | $5,153.70 | $7,226.23 | $0.00 |
| 27-Jul-17 | 2363 | 6866 | $223,241.95 | $223,240.54 | $463.28 | $496.09 | $4,260.32 | $6,278.17 | $0.00 |
| 28-Jul-17 | 2228 | 5997 | $191,731.78 | $191,730.18 | $555.84 | $310.89 | $3,626.87 | $5,340.97 | $0.00 |
| 29-Jul-17 | 1557 | 3957 | $136,321.34 | $136,319.90 | $651.69 | $281.49 | $3,269.07 | $4,389.31 | $0.00 |
| 30-Jul-17 | 2141 | 5810 | $196,442.74 | $196,441.22 | $1,998.31 | $639.69 | $3,992.12 | $6,231.03 | $0.00 |
| 31-Jul-17 | 3627 | 10978 | $349,749.36 | $349,747.78 | $1,372.17 | $790.79 | $4,751.94 | $9,355.32 | $0.00 |
| 1-Aug-17 | 2387 | 6415 | $201,898.33 | $201,897.13 | $776.52 | $410.37 | $3,729.78 | $6,392.23 | $0.00 |
| 2-Aug-17 | 2415 | 6111 | $204,438.09 | $204,436.98 | $4,848.69 | $470.65 | $3,872.48 | $5,353.60 | $0.00 |
| 3-Aug-17 | 2684 | 8407 | $219,726.44 | $219,998.07 | $635.87 | $347.56 | $3,461.14 | $6,600.39 | $272.52 |
| 4-Aug-17 | 1937 | 5898 | $160,476.66 | $160,665.95 | $387.44 | $510.86 | $3,506.16 | $5,050.81 | $189.63 |
| 5-Aug-17 | 1331 | 4059 | $118,979.90 | $118,979.66 | $867.91 | $189.33 | $2,478.64 | $4,182.76 | $0.00 |
| 6-Aug-17 | 1276 | 3859 | $106,842.42 | $106,842.19 | $438.28 | $114.59 | $2,957.39 | $3,887.38 | $0.00 |
| 7-Aug-17 | 1428 | 4257 | $129,355.69 | $129,355.26 | $501.33 | $327.53 | $4,268.10 | $3,597.92 | $0.00 |
| 8-Aug-17 | 1348 | 3978 | $131,912.12 | $131,911.68 | $1,117.65 | $380.34 | $4,395.77 | $3,739.18 | $0.00 |
| 9-Aug-17 | 1727 | 5127 | $181,479.99 | $181,479.69 | $3,295.08 | $484.42 | $5,397.44 | $5,854.44 | $0.00 |
| 10-Aug-17 | 1998 | 5853 | $189,279.29 | $189,279.09 | $1,096.77 | $513.61 | $4,049.36 | $4,978.98 | $0.00 |
| 11-Aug-17 | 2177 | 6490 | $203,919.85 | $203,919.79 | $547.86 | $562.92 | $3,612.05 | $6,056.51 | $0.00 |
| 12-Aug-17 | 1628 | 4993 | $152,996.28 | $152,996.02 | $30.46 | $471.97 | $3,009.61 | $4,605.39 | $0.00 |
| 13-Aug-17 | 1420 | 4202 | $122,755.01 | $122,754.92 | $238.25 | $202.26 | $2,187.17 | $3,562.46 | $0.00 |
| 14-Aug-17 | 2015 | 6817 | $211,749.95 | $211,749.79 | $6,269.23 | $493.38 | $3,495.83 | $7,402.10 | $0.00 |
| 15-Aug-17 | 1842 | 5792 | $169,954.85 | $169,954.55 | $258.65 | $350.82 | $3,864.70 | $5,795.51 | $0.00 |
| 16-Aug-17 | 1932 | 6134 | $187,374.00 | $187,373.81 | $1,167.06 | $497.75 | $3,572.61 | $6,675.47 | $0.00 |
| 17-Aug-17 | 1907 | 6267 | $187,200.11 | $187,200.11 | $203.53 | $482.41 | $3,702.04 | $5,911.89 | $0.00 |
| 18-Aug-17 | 1910 | 5931 | $178,412.68 | $178,412.56 | $174.86 | $497.58 | $3,293.53 | $6,004.39 | $0.00 |
| 19-Aug-17 | 1427 | 4116 | $119,835.78 | $119,835.57 | $453.30 | $372.37 | $2,588.92 | $3,314.76 | $0.00 |
| 20-Aug-17 | 1475 | 4543 | $140,971.43 | $140,971.10 | $172.86 | $260.81 | $3,040.78 | $4,081.45 | $0.00 |
| 21-Aug-17 | 2117 | 6623 | $195,545.96 | $195,545.75 | $352.66 | $537.52 | $2,738.05 | $6,428.22 | $0.00 |
| 22-Aug-17 | 2004 | 6130 | $180,648.66 | $180,648.23 | $1,313.76 | $500.14 | $3,688.94 | $6,472.75 | $0.00 |
| 23-Aug-17 | 1884 | 5495 | $177,332.75 | $177,332.28 | $2,928.28 | $434.02 | $3,211.17 | $6,218.09 | $0.00 |
| 24-Aug-17 | 2309 | 7027 | $213,401.00 | $213,400.11 | $318.37 | $216.28 | $5,628.73 | $5,925.15 | $0.00 |

FSSTX-086589                                             019

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 25-Aug-17 | 2347 | 7069 | $226,905.32 | $226,904.34 | $496.49 | $417.44 | $7,498.94 | $6,072.73 | $0.00 |
| 26-Aug-17 | 1361 | 4314 | $137,484.45 | $137,483.79 | $1,173.46 | $338.36 | $5,445.24 | $4,289.95 | $0.00 |
| 27-Aug-17 | 1376 | 4057 | $132,154.37 | $132,153.71 | $673.78 | $233.20 | $5,665.17 | $4,056.74 | $0.00 |
| 28-Aug-17 | 1649 | 4638 | $159,853.56 | $160,170.47 | $4,377.88 | $209.95 | $5,940.69 | $6,442.41 | $317.72 |
| 29-Aug-17 | 1967 | 5422 | $186,755.18 | $186,753.73 | $790.06 | $276.81 | $7,625.60 | $4,891.73 | $0.00 |
| 30-Aug-17 | 1768 | 4769 | $158,047.70 | $158,046.04 | $341.38 | $408.62 | $6,175.12 | $4,790.95 | $0.00 |
| 31-Aug-17 | 1743 | 4565 | $155,034.35 | $155,162.44 | $327.76 | $258.41 | $6,383.70 | $4,829.98 | $129.70 |
| 1-Sep-17 | 2056 | 5560 | $192,751.75 | $192,749.99 | $1,491.57 | $301.47 | $7,642.63 | $5,063.09 | $0.00 |
| 2-Sep-17 | 1912 | 5146 | $184,292.80 | $184,291.43 | $574.49 | $286.48 | $7,034.49 | $4,740.71 | $0.00 |
| 3-Sep-17 | 1495 | 3972 | $139,627.82 | $139,626.50 | $383.88 | $185.63 | $5,341.30 | $4,038.30 | $0.00 |
| 4-Sep-17 | 1997 | 5603 | $206,014.95 | $206,013.42 | $668.57 | $440.45 | $6,645.50 | $5,644.20 | $0.00 |
| 5-Sep-17 | 1626 | 4535 | $162,941.67 | $162,940.32 | $630.33 | $298.65 | $6,053.28 | $4,495.52 | $0.00 |
| 6-Sep-17 | 1696 | 4393 | $191,161.13 | $191,159.87 | $1,366.54 | $649.37 | $5,813.73 | $9,279.28 | $0.00 |
| 7-Sep-17 | 1802 | 4794 | $248,880.17 | $248,879.03 | $2,426.04 | $990.18 | $5,435.68 | $13,403.50 | $0.00 |
| 8-Sep-17 | 1610 | 4257 | $214,702.53 | $214,701.30 | $1,306.39 | $688.15 | $6,052.89 | $13,931.11 | $0.00 |
| 9-Sep-17 | 1136 | 2857 | $155,906.72 | $155,905.70 | $2,124.44 | $622.28 | $4,403.54 | $14,252.10 | $0.00 |
| 10-Sep-17 | 1183 | 3044 | $153,535.41 | $153,534.38 | $2,066.40 | $578.03 | $4,263.86 | $12,960.35 | $0.00 |
| 11-Sep-17 | 1169 | 3038 | $142,879.15 | $142,878.02 | $373.56 | $570.94 | $4,849.05 | $11,970.75 | $0.00 |
| 12-Sep-17 | 1197 | 3152 | $117,803.64 | $117,802.68 | $140.18 | $479.30 | $4,906.20 | $6,902.44 | $0.00 |
| 13-Sep-17 | 1280 | 3311 | $130,468.64 | $130,467.43 | $329.54 | $242.48 | $4,643.01 | $7,646.49 | $0.00 |
| 14-Sep-17 | 1149 | 2977 | $120,091.44 | $120,090.41 | $1,022.02 | $669.24 | $4,030.74 | $7,199.36 | $0.00 |
| 15-Sep-17 | 1442 | 3702 | $165,169.01 | $165,167.92 | $2,454.97 | $302.99 | $4,806.99 | $13,127.55 | $0.00 |
| 16-Sep-17 | 1030 | 2664 | $121,296.10 | $121,295.03 | $62.37 | $133.39 | $3,819.64 | $9,364.43 | $0.00 |
| 17-Sep-17 | 1014 | 2479 | $121,918.90 | $121,918.06 | $1,686.07 | $181.98 | $3,973.09 | $8,828.62 | $0.00 |
| 18-Sep-17 | 1202 | 3244 | $135,241.99 | $135,240.99 | $503.89 | $316.32 | $4,499.50 | $8,522.28 | $0.00 |
| 19-Sep-17 | 1745 | 4577 | $224,210.25 | $224,209.16 | $1,898.87 | $552.03 | $6,196.74 | $19,112.84 | $0.00 |
| 20-Sep-17 | 1704 | 4546 | $224,114.50 | $224,113.38 | $704.75 | $634.37 | $5,156.12 | $19,465.50 | $0.00 |
| 21-Sep-17 | 1578 | 4024 | $192,837.80 | $192,836.53 | $2,812.66 | $409.91 | $5,293.89 | $15,841.72 | $0.00 |
| 22-Sep-17 | 1545 | 3930 | $173,183.38 | $173,182.08 | $292.56 | $567.99 | $5,240.61 | $13,746.96 | $0.00 |
| 23-Sep-17 | 1143 | 2833 | $126,091.29 | $126,090.13 | $74.98 | $208.57 | $4,105.60 | $9,269.98 | $0.00 |
| 24-Sep-17 | 1033 | 2469 | $111,599.36 | $111,598.20 | $584.17 | $158.62 | $4,180.12 | $8,397.29 | $0.00 |
| 25-Sep-17 | 1353 | 3279 | $186,146.14 | $186,144.97 | $959.79 | $379.01 | $4,881.47 | $15,361.04 | $0.00 |
| 26-Sep-17 | 1239 | 3189 | $136,889.83 | $136,888.46 | $565.72 | $378.87 | $4,480.21 | $6,328.24 | $0.00 |
| 27-Sep-17 | 1346 | 3524 | $131,802.30 | $131,800.93 | $450.72 | $403.37 | $4,510.28 | $3,357.04 | $0.00 |
| 28-Sep-17 | 1474 | 4033 | $143,760.00 | $143,758.56 | $594.81 | $285.36 | $5,618.47 | $3,827.49 | $0.00 |

FSSTX-086589

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 29-Sep-17 | 1516 | 4197 | $149,243.73 | $149,242.14 | $3,123.85 | $510.40 | $5,104.92 | $4,637.14 | $0.00 |
| 30-Sep-17 | 1231 | 3095 | $110,949.58 | $110,948.15 | $301.52 | $304.70 | $4,165.08 | $3,624.73 | $0.00 |
| 1-Oct-17 | 1243 | 3240 | $116,079.40 | $116,077.86 | $388.39 | $292.72 | $4,224.48 | $3,629.78 | $0.00 |
| 2-Oct-17 | 2053 | 5979 | $206,398.98 | $206,397.57 | $673.13 | $441.80 | $7,313.56 | $4,803.39 | $0.00 |
| 3-Oct-17 | 2158 | 6207 | $203,911.10 | $203,910.29 | $703.98 | $445.27 | $8,119.81 | $3,703.89 | $0.00 |
| 4-Oct-17 | 2416 | 7614 | $238,277.58 | $238,276.51 | $590.96 | $502.64 | $7,838.88 | $4,779.86 | $0.00 |
| 5-Oct-17 | 1956 | 5901 | $182,589.25 | $182,588.46 | $282.96 | $525.74 | $7,379.57 | $3,703.22 | $0.00 |
| 6-Oct-17 | 2078 | 5993 | $185,426.98 | $185,426.09 | $475.36 | $644.50 | $7,274.60 | $3,250.77 | $0.00 |
| 7-Oct-17 | 1461 | 3948 | $126,659.44 | $126,766.35 | $381.98 | $254.54 | $5,190.61 | $2,678.48 | $107.64 |
| 8-Oct-17 | 1380 | 3905 | $126,457.81 | $126,457.16 | $606.67 | $234.34 | $4,622.40 | $2,612.28 | $0.00 |
| 9-Oct-17 | 2253 | 6580 | $205,631.24 | $205,630.61 | $896.03 | $406.49 | $8,138.11 | $3,529.43 | $0.00 |
| 10-Oct-17 | 2350 | 7363 | $226,827.54 | $226,826.89 | $819.40 | $429.30 | $7,509.92 | $4,702.13 | $0.00 |
| 11-Oct-17 | 2315 | 7071 | $209,798.21 | $209,797.40 | $661.98 | $391.28 | $9,002.40 | $4,283.36 | $0.00 |
| 12-Oct-17 | 1859 | 5717 | $172,494.03 | $172,493.53 | $538.57 | $346.80 | $6,857.93 | $3,529.51 | $0.00 |
| 13-Oct-17 | 1916 | 5677 | $168,515.93 | $168,515.30 | $767.73 | $380.47 | $6,911.54 | $3,803.09 | $0.00 |
| 14-Oct-17 | 1287 | 3821 | $113,391.18 | $113,390.53 | $635.62 | $204.03 | $5,070.61 | $2,819.96 | $0.00 |
| 15-Oct-17 | 1407 | 4062 | $119,067.53 | $119,066.94 | $389.33 | $131.35 | $5,677.23 | $2,850.05 | $0.00 |
| 16-Oct-17 | 1852 | 5414 | $151,764.88 | $151,764.28 | $316.57 | $203.82 | $6,737.28 | $3,483.40 | $0.00 |
| 17-Oct-17 | 2344 | 7384 | $210,388.52 | $210,387.96 | $149.73 | $350.19 | $7,659.42 | $4,395.94 | $0.00 |
| 18-Oct-17 | 2394 | 7436 | $212,580.16 | $212,579.75 | $588.75 | $475.84 | $8,846.23 | $3,970.50 | $0.00 |
| 19-Oct-17 | 2101 | 6483 | $180,708.77 | $180,708.44 | $479.06 | $272.26 | $7,972.29 | $3,651.93 | $0.00 |
| 20-Oct-17 | 2196 | 6658 | $179,709.54 | $179,709.29 | $393.47 | $291.73 | $8,212.84 | $3,880.20 | $0.00 |
| 21-Oct-17 | 1488 | 4204 | $119,513.36 | $119,513.03 | $467.53 | $188.91 | $6,369.81 | $3,093.13 | $0.00 |
| 22-Oct-17 | 1370 | 4404 | $130,281.87 | $130,281.51 | $199.28 | $180.39 | $5,906.54 | $2,535.24 | $0.00 |
| 23-Oct-17 | 1657 | 5156 | $137,047.64 | $137,047.40 | $414.84 | $267.98 | $6,069.66 | $3,540.58 | $0.00 |
| 24-Oct-17 | 2116 | 6939 | $180,080.65 | $180,080.59 | $215.79 | $260.01 | $7,650.84 | $3,998.46 | $0.00 |
| 25-Oct-17 | 1819 | 5781 | $155,573.23 | $155,573.31 | $300.04 | $250.41 | $7,132.99 | $3,680.27 | $0.00 |
| 26-Oct-17 | 1727 | 5513 | $145,928.57 | $145,928.38 | $334.54 | $262.15 | $6,344.74 | $3,510.33 | $0.00 |
| 27-Oct-17 | 1876 | 5731 | $140,513.23 | $140,513.23 | $233.32 | $357.70 | $7,367.19 | $15,417.16 | $0.00 |
| 28-Oct-17 | 1241 | 3510 | $94,732.51 | $94,732.35 | $367.54 | $240.67 | $5,115.31 | $2,235.55 | $0.00 |
| 29-Oct-17 | 1303 | 3861 | $112,235.26 | $112,235.05 | $75.66 | $189.85 | $6,151.59 | $2,580.59 | $0.00 |
| 30-Oct-17 | 2025 | 5941 | $199,839.78 | $199,839.52 | $447.60 | $277.50 | $7,650.80 | $19,959.58 | $0.00 |
| 31-Oct-17 | 2337 | 7278 | $260,268.76 | $260,268.72 | $1,753.14 | $332.42 | $8,985.39 | $20,080.10 | $0.00 |
| 1-Nov-17 | 2228 | 6776 | $230,984.14 | $230,984.00 | $469.57 | $359.32 | $8,128.00 | $4,265.73 | $0.00 |
| 2-Nov-17 | 1811 | 5179 | $180,512.47 | $180,512.41 | $174.32 | $263.49 | $7,644.63 | $3,306.74 | $0.00 |

FSSTX-086589

021

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3-Nov-17 | 1652 | 4469 | $157,183.65 | $157,183.39 | $445.40 | $220.99 | $6,593.40 | $3,308.13 | $0.00 |
| 4-Nov-17 | 1466 | 3933 | $141,998.74 | $141,998.27 | $569.09 | $261.03 | $5,951.09 | $2,781.71 | $0.00 |
| 5-Nov-17 | 1322 | 3706 | $133,730.56 | $133,730.04 | $203.78 | $212.14 | $6,320.87 | $2,470.78 | $0.00 |
| 6-Nov-17 | 1474 | 3901 | $148,299.43 | $148,299.15 | $908.47 | $208.26 | $5,996.18 | $2,665.60 | $0.00 |
| 7-Nov-17 | 1407 | 3844 | $137,274.66 | $137,274.12 | $101.63 | $224.72 | $5,594.07 | $2,506.36 | $0.00 |
| 8-Nov-17 | 3854 | 11546 | $331,276.41 | $331,274.54 | $686.97 | $796.75 | $7,376.30 | $4,922.96 | $0.00 |
| 9-Nov-17 | 4366 | 13722 | $383,257.75 | $383,255.26 | $1,123.84 | $613.81 | $6,538.15 | $5,566.91 | $0.00 |
| 10-Nov-17 | 3009 | 9236 | $263,232.54 | $263,230.49 | $1,014.72 | $580.19 | $5,045.83 | $3,923.06 | $0.00 |
| 11-Nov-17 | 1856 | 5172 | $149,885.28 | $149,883.68 | $220.82 | $328.22 | $3,750.17 | $2,627.77 | $0.00 |
| 12-Nov-17 | 1801 | 5107 | $157,815.45 | $157,813.74 | $486.35 | $265.82 | $3,352.49 | $3,135.49 | $0.00 |
| 13-Nov-17 | 1902 | 4867 | $161,593.77 | $161,592.09 | $544.17 | $229.45 | $3,376.81 | $3,420.80 | $0.00 |
| 14-Nov-17 | 1791 | 4410 | $145,652.66 | $145,651.14 | $375.50 | $320.74 | $2,666.53 | $3,200.38 | $0.00 |
| 15-Nov-17 | 1668 | 4202 | $132,727.42 | $132,725.72 | $374.66 | $226.43 | $2,640.33 | $3,057.69 | $0.00 |
| 16-Nov-17 | 1699 | 4098 | $139,241.12 | $139,239.41 | $194.50 | $335.60 | $2,893.96 | $2,935.58 | $0.00 |
| 17-Nov-17 | 1587 | 3691 | $124,288.16 | $124,286.40 | $184.84 | $160.62 | $2,434.90 | $2,989.83 | $0.00 |
| 18-Nov-17 | 1133 | 2632 | $85,410.59 | $85,409.11 | $74.12 | $142.60 | $2,886.10 | $2,025.44 | $0.00 |
| 19-Nov-17 | 1145 | 2727 | $87,580.43 | $87,578.71 | $362.97 | $131.61 | $2,403.43 | $2,511.51 | $0.00 |
| 20-Nov-17 | 1400 | 3204 | $103,471.99 | $103,470.15 | $708.45 | $161.11 | $2,792.38 | $2,674.77 | $0.00 |
| 21-Nov-17 | 1861 | 5442 | $135,721.95 | $135,720.18 | $171.86 | $214.74 | $3,426.12 | $3,096.26 | $0.00 |
| 22-Nov-17 | 1935 | 5816 | $153,160.13 | $153,158.23 | $27.64 | $166.32 | $3,636.65 | $3,660.74 | $0.00 |
| 23-Nov-17 | 1541 | 4537 | $143,088.43 | $143,086.79 | $1,564.03 | $227.66 | $2,980.80 | $2,633.29 | $0.00 |
| 24-Nov-17 | 2750 | 8807 | $293,128.27 | $293,126.35 | $325.79 | $598.57 | $6,002.55 | $3,714.66 | $0.00 |
| 25-Nov-17 | 2078 | 5977 | $170,739.35 | $170,737.65 | $350.60 | $292.26 | $4,113.52 | $2,947.48 | $0.00 |
| 26-Nov-17 | 2068 | 6264 | $190,338.86 | $190,337.09 | $201.58 | $380.59 | $4,382.29 | $3,301.43 | $0.00 |
| 27-Nov-17 | 5321 | 15701 | $493,217.22 | $493,213.43 | $1,186.04 | $528.42 | $6,876.08 | $7,850.19 | $0.00 |
| 28-Nov-17 | 3423 | 9565 | $315,004.49 | $315,001.70 | $697.74 | $301.90 | $5,551.53 | $5,765.79 | $0.00 |
| 29-Nov-17 | 2850 | 8141 | $258,444.69 | $258,442.35 | $2,019.37 | $269.95 | $4,568.47 | $3,767.57 | $0.00 |
| 30-Nov-17 | 2749 | 7599 | $236,545.44 | $236,543.06 | $1,028.46 | $237.14 | $4,757.13 | $4,093.34 | $0.00 |
| 1-Dec-17 | 2459 | 6749 | $198,768.28 | $198,765.97 | $976.91 | $254.79 | $3,934.38 | $4,213.28 | $0.00 |
| 2-Dec-17 | 1649 | 4396 | $131,622.60 | $131,620.90 | $1,124.01 | $162.26 | $2,690.10 | $2,856.53 | $0.00 |
| 3-Dec-17 | 1649 | 4568 | $127,990.79 | $127,989.06 | $1,375.76 | $185.06 | $2,946.88 | $2,925.97 | $0.00 |
| 4-Dec-17 | 1689 | 4281 | $153,368.94 | $153,367.34 | $1,424.00 | $282.91 | $2,872.33 | $2,685.14 | $0.00 |
| 5-Dec-17 | 1507 | 3788 | $134,654.04 | $134,612.62 | $726.20 | $247.41 | $3,041.83 | $2,603.57 | $0.00 |
| 6-Dec-17 | 1505 | 3732 | $134,755.83 | $134,754.11 | $963.13 | $178.26 | $3,267.28 | $2,454.12 | $0.00 |
| 7-Dec-17 | 2292 | 6192 | $214,762.86 | $214,760.94 | $730.73 | $333.92 | $4,485.25 | $3,797.30 | $0.00 |

FSSTX-086589

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8-Dec-17 | 2182 | 5574 | $184,348.87 | $184,346.83 | $1,434.81 | $276.75 | $4,441.92 | $3,811.41 | $0.00 |
| 9-Dec-17 | 1432 | 3526 | $113,892.15 | $113,890.23 | $568.26 | $235.00 | $2,659.38 | $3,375.10 | $0.00 |
| 10-Dec-17 | 1407 | 3580 | $115,381.28 | $115,379.47 | $163.16 | $163.50 | $2,580.97 | $3,023.62 | $0.00 |
| 11-Dec-17 | 2062 | 5824 | $177,822.12 | $177,820.13 | $430.17 | $296.98 | $3,556.75 | $3,367.46 | $0.00 |
| 12-Dec-17 | 2155 | 6455 | $182,496.89 | $182,495.03 | $639.89 | $289.23 | $3,557.51 | $3,279.96 | $0.00 |
| 13-Dec-17 | 2123 | 6435 | $187,502.95 | $187,501.04 | $387.23 | $315.31 | $3,711.94 | $3,341.09 | $0.00 |
| 14-Dec-17 | 2352 | 6711 | $193,071.72 | $193,069.79 | $1,075.21 | $337.36 | $4,675.15 | $3,155.40 | $0.00 |
| 15-Dec-17 | 2560 | 7651 | $222,710.10 | $222,707.94 | $397.28 | $407.41 | $4,565.40 | $3,873.10 | $0.00 |
| 16-Dec-17 | 1788 | 5324 | $147,441.31 | $147,439.53 | $399.81 | $262.13 | $3,233.87 | $3,115.45 | $0.00 |
| 17-Dec-17 | 1805 | 5709 | $162,066.08 | $162,064.51 | $345.59 | $309.55 | $3,294.97 | $3,066.29 | $0.00 |
| 18-Dec-17 | 3226 | 10664 | $296,590.69 | $296,588.52 | $533.88 | $609.51 | $5,101.20 | $4,473.98 | $0.00 |
| 19-Dec-17 | 2924 | 9334 | $252,771.88 | $252,769.58 | $292.66 | $438.16 | $5,520.10 | $4,151.09 | $0.00 |
| 20-Dec-17 | 3188 | 9727 | $284,567.81 | $284,565.28 | $652.22 | $450.54 | $5,095.52 | $4,477.67 | $0.00 |
| 21-Dec-17 | 2516 | 7644 | $229,076.11 | $229,074.04 | $831.21 | $313.06 | $5,344.63 | $3,371.92 | $0.00 |
| 22-Dec-17 | 2248 | 6782 | $205,519.14 | $205,517.31 | $2,892.27 | $261.55 | $3,824.95 | $3,183.14 | $0.00 |
| 23-Dec-17 | 1565 | 4414 | $133,788.25 | $133,786.73 | $1,158.49 | $237.76 | $2,899.72 | $2,390.23 | $0.00 |
| 24-Dec-17 | 1276 | 3455 | $103,270.96 | $103,269.52 | $640.53 | $110.72 | $2,633.63 | $2,295.69 | $0.00 |
| 25-Dec-17 | 1153 | 3034 | $87,164.14 | $87,162.46 | $1,208.62 | $151.00 | $2,177.45 | $2,382.76 | $0.00 |
| 26-Dec-17 | 1629 | 4366 | $137,356.30 | $137,354.70 | $682.94 | $164.67 | $2,910.96 | $2,641.91 | $0.00 |
| 27-Dec-17 | 1864 | 5304 | $163,541.95 | $163,540.25 | $1,607.46 | $171.31 | $3,506.57 | $2,702.68 | $0.00 |
| 28-Dec-17 | 2137 | 5664 | $172,190.36 | $172,188.35 | $254.78 | $250.21 | $4,167.07 | $3,194.54 | $0.00 |
| 29-Dec-17 | 2250 | 6511 | $196,818.07 | $196,815.88 | $1,438.63 | $288.76 | $3,847.16 | $3,554.50 | $0.00 |
| 30-Dec-17 | 1708 | 4669 | $138,364.82 | $138,363.00 | $264.21 | $199.63 | $3,936.08 | $2,676.19 | $0.00 |
| 31-Dec-17 | 1724 | 4841 | $143,649.68 | $143,647.81 | $416.36 | $197.39 | $3,071.04 | $2,986.28 | $0.00 |
| 1-Jan-18 | 1726 | 4820 | $142,617.65 | $142,615.73 | $326.14 | $187.91 | $3,436.17 | $3,008.90 | $0.00 |
| 2-Jan-18 | 2117 | 6060 | $179,764.65 | $179,762.59 | $501.04 | $328.57 | $3,769.64 | $3,605.48 | $0.00 |
| 3-Jan-18 | 2483 | 7078 | $205,622.24 | $205,620.00 | $627.52 | $371.01 | $4,383.36 | $4,277.23 | $0.00 |
| 4-Jan-18 | 2613 | 7787 | $212,333.02 | $212,331.07 | $1,776.49 | $600.73 | $4,535.26 | $3,752.82 | $0.00 |
| 5-Jan-18 | 2098 | 5543 | $155,117.14 | $155,408.31 | $1,233.78 | $326.43 | $3,475.57 | $3,115.26 | $293.15 |
| 6-Jan-18 | 1485 | 3689 | $106,689.97 | $106,688.25 | $19.95 | $133.02 | $2,929.89 | $2,525.10 | $0.00 |
| 7-Jan-18 | 1581 | 4007 | $120,163.31 | $120,161.36 | $632.98 | $171.89 | $2,243.89 | $2,757.47 | $0.00 |
| 8-Jan-18 | 2208 | 5859 | $165,955.43 | $165,952.96 | $831.34 | $328.49 | $3,457.37 | $4,113.57 | $0.00 |
| 9-Jan-18 | 1763 | 4601 | $139,491.15 | $139,488.97 | $634.61 | $194.52 | $3,429.96 | $3,110.31 | $0.00 |
| 10-Jan-18 | 1494 | 3611 | $106,554.15 | $106,552.30 | $729.07 | $97.62 | $2,668.66 | $2,860.32 | $0.00 |
| 11-Jan-18 | 1431 | 3371 | $104,135.52 | $104,133.91 | $493.56 | $177.09 | $3,246.38 | $2,597.18 | $0.00 |

FSSTX-086589

023

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 12-Jan-18 | 1427 | 3465 | $115,317.12 | $115,315.44 | $97.31 | $164.91 | $5,118.51 | $2,869.13 | $0.00 |
| 13-Jan-18 | 1014 | 2610 | $89,594.74 | $89,593.33 | $284.98 | $97.73 | $4,318.29 | $2,755.37 | $0.00 |
| 14-Jan-18 | 1009 | 2381 | $84,267.92 | $84,266.48 | $328.14 | $145.02 | $4,542.22 | $2,731.90 | $0.00 |
| 15-Jan-18 | 1491 | 3744 | $126,029.34 | $126,027.42 | $814.32 | $137.81 | $5,546.57 | $6,899.92 | $0.00 |
| 16-Jan-18 | 1108 | 2841 | $97,553.94 | $97,552.25 | $707.18 | $210.22 | $5,111.93 | $5,732.42 | $0.00 |
| 17-Jan-18 | 1456 | 3686 | $122,819.45 | $122,817.65 | $424.04 | $129.76 | $5,893.43 | $3,294.24 | $0.00 |
| 18-Jan-18 | 1916 | 4357 | $157,764.19 | $157,762.26 | $365.41 | $239.45 | $7,148.36 | $3,694.54 | $0.00 |
| 19-Jan-18 | 1807 | 4086 | $162,608.51 | $162,606.65 | $412.18 | $400.13 | $6,472.67 | $3,956.48 | $0.00 |
| 20-Jan-18 | 1246 | 2745 | $112,927.31 | $112,925.70 | $212.30 | $305.20 | $4,397.68 | $3,150.74 | $0.00 |
| 21-Jan-18 | 1148 | 2678 | $102,486.11 | $102,484.60 | $169.90 | $86.80 | $4,265.41 | $2,743.36 | $0.00 |
| 22-Jan-18 | 1642 | 3978 | $157,465.07 | $157,463.51 | $3,230.73 | $483.94 | $6,434.76 | $3,172.59 | $0.00 |
| 23-Jan-18 | 1749 | 4201 | $167,107.06 | $167,105.54 | $3,653.89 | $448.86 | $6,547.28 | $3,188.36 | $0.00 |
| 24-Jan-18 | 1739 | 4223 | $161,772.69 | $161,770.89 | $3,779.93 | $259.37 | $5,717.35 | $3,990.44 | $0.00 |
| 25-Jan-18 | 1894 | 4877 | $178,347.24 | $178,345.47 | $255.41 | $348.44 | $7,293.22 | $4,600.32 | $0.00 |
| 26-Jan-18 | 1863 | 4651 | $169,118.19 | $169,115.97 | $437.94 | $242.10 | $6,424.33 | $5,160.04 | $0.00 |
| 27-Jan-18 | 1522 | 3581 | $132,297.00 | $132,294.68 | $135.21 | $220.45 | $5,649.21 | $5,398.38 | $0.00 |
| 28-Jan-18 | 1444 | 3599 | $133,909.32 | $133,907.48 | $478.02 | $171.13 | $4,652.04 | $4,615.01 | $0.00 |
| 29-Jan-18 | 1635 | 3942 | $151,308.87 | $151,307.01 | $543.31 | $224.51 | $5,904.87 | $4,084.45 | $0.00 |
| 30-Jan-18 | 1921 | 4665 | $186,562.14 | $186,559.89 | $1,304.09 | $251.18 | $5,836.76 | $5,788.33 | $0.00 |
| 31-Jan-18 | 1871 | 4828 | $210,164.86 | $210,162.72 | $683.76 | $263.51 | $7,481.63 | $6,242.03 | $0.00 |
| 1-Feb-18 | 2042 | 5204 | $208,631.74 | $208,629.52 | $942.51 | $220.05 | $7,080.69 | $5,952.93 | $0.00 |
| 2-Feb-18 | 2061 | 5268 | $199,310.45 | $199,308.28 | $226.75 | $185.55 | $6,704.05 | $5,554.95 | $0.00 |
| 3-Feb-18 | 1614 | 4664 | $163,954.06 | $163,952.31 | $404.80 | $244.83 | $5,534.90 | $7,530.77 | $0.00 |
| 4-Feb-18 | 1264 | 3415 | $119,908.57 | $119,907.04 | $466.08 | $202.10 | $4,463.12 | $6,645.09 | $0.00 |
| 5-Feb-18 | 1504 | 3762 | $140,385.51 | $140,383.86 | $517.76 | $234.67 | $5,319.83 | $4,516.95 | $0.00 |
| 6-Feb-18 | 1696 | 4230 | $154,441.60 | $154,439.60 | $158.07 | $176.01 | $5,481.94 | $4,517.17 | $0.00 |
| 7-Feb-18 | 2027 | 5451 | $175,766.50 | $175,764.21 | $471.73 | $131.98 | $7,237.06 | $5,614.61 | $0.00 |
| 8-Feb-18 | 1916 | 5125 | $173,321.29 | $173,319.31 | $770.91 | $201.82 | $6,706.37 | $5,052.11 | $0.00 |
| 9-Feb-18 | 1843 | 4966 | $165,719.52 | $165,717.51 | $574.44 | $133.85 | $6,361.30 | $5,440.13 | $0.00 |
| 10-Feb-18 | 1473 | 3974 | $130,391.32 | $130,389.45 | $485.09 | $182.60 | $5,791.83 | $6,355.56 | $0.00 |
| 11-Feb-18 | 1399 | 3862 | $131,901.95 | $131,900.31 | $791.32 | $68.44 | $4,796.39 | $7,021.19 | $0.00 |
| 12-Feb-18 | 1461 | 3863 | $135,521.03 | $135,519.45 | $751.41 | $176.20 | $5,605.34 | $4,357.46 | $0.00 |
| 13-Feb-18 | 1543 | 4080 | $137,172.49 | $137,170.84 | $669.80 | $181.30 | $5,923.65 | $4,224.74 | $0.00 |
| 14-Feb-18 | 1894 | 5354 | $166,208.84 | $166,206.96 | $229.98 | $215.35 | $6,936.43 | $8,605.10 | $0.00 |
| 15-Feb-18 | 1948 | 5737 | $166,769.41 | $166,767.78 | $370.94 | $299.65 | $7,366.13 | $8,009.81 | $0.00 |

FSSTX-086589

024

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 16-Feb-18 | 2063 | 6291 | $182,739.81 | $182,738.20 | $219.99 | $253.86 | $7,966.93 | $5,360.20 | $0.00 |
| 17-Feb-18 | 1650 | 5043 | $148,825.46 | $148,823.96 | $482.40 | $144.06 | $6,642.14 | $6,650.53 | $0.00 |
| 18-Feb-18 | 1664 | 5184 | $149,813.53 | $149,811.99 | $695.91 | $232.75 | $6,050.17 | $6,762.02 | $0.00 |
| 19-Feb-18 | 1883 | 5673 | $167,096.06 | $167,094.60 | $488.49 | $176.49 | $7,540.58 | $5,513.30 | $0.00 |
| 20-Feb-18 | 1637 | 4733 | $141,753.59 | $141,752.33 | $332.41 | $270.11 | $6,344.74 | $4,098.47 | $0.00 |
| 21-Feb-18 | 1562 | 4641 | $142,506.15 | $142,504.87 | $160.05 | $158.09 | $6,520.15 | $4,081.29 | $0.00 |
| 22-Feb-18 | 1711 | 5232 | $164,545.98 | $164,544.76 | $250.97 | $307.45 | $6,276.44 | $3,975.84 | $0.00 |
| 23-Feb-18 | 1807 | 5206 | $166,231.27 | $166,229.79 | $411.71 | $224.43 | $6,550.13 | $4,584.52 | $0.00 |
| 24-Feb-18 | 1468 | 4247 | $130,020.22 | $130,018.88 | $496.59 | $192.14 | $5,647.36 | $3,648.44 | $0.00 |
| 25-Feb-18 | 1568 | 4555 | $142,229.09 | $142,227.80 | $341.27 | $244.36 | $5,303.41 | $4,073.30 | $0.00 |
| 26-Feb-18 | 1984 | 5414 | $191,687.69 | $191,686.03 | $554.52 | $179.40 | $6,826.11 | $4,727.50 | $0.00 |
| 27-Feb-18 | 2091 | 5793 | $218,245.91 | $218,244.21 | $293.83 | $204.36 | $7,628.82 | $4,720.90 | $0.00 |
| 28-Feb-18 | 2289 | 6242 | $211,669.41 | $211,667.91 | $1,263.51 | $325.85 | $7,197.62 | $5,409.70 | $0.00 |
| 1-Mar-18 | 4330 | 11752 | $379,068.55 | $379,068.39 | $2,414.56 | $605.69 | $7,966.74 | $8,226.44 | $0.00 |
| 2-Mar-18 | 3845 | 10551 | $338,662.90 | $338,662.68 | $1,361.65 | $513.72 | $7,384.69 | $7,188.98 | $0.00 |
| 3-Mar-18 | 2104 | 5494 | $174,787.48 | $174,787.24 | $223.13 | $222.47 | $3,996.74 | $4,410.70 | $0.00 |
| 4-Mar-18 | 1940 | 5012 | $166,278.19 | $166,276.47 | $1,864.43 | $225.11 | $3,382.20 | $4,347.95 | $0.00 |
| 5-Mar-18 | 2270 | 5910 | $191,731.27 | $191,730.94 | $116.30 | $168.47 | $3,439.94 | $4,672.92 | $0.00 |
| 6-Mar-18 | 2046 | 5362 | $169,827.73 | $169,827.40 | $181.31 | $202.26 | $4,129.74 | $3,933.50 | $0.00 |
| 7-Mar-18 | 2168 | 5424 | $174,921.37 | $174,921.33 | $289.56 | $351.43 | $4,289.52 | $4,345.47 | $0.00 |
| 8-Mar-18 | 2098 | 5225 | $166,024.71 | $166,023.00 | $147.38 | $261.50 | $3,580.24 | $5,467.59 | $0.00 |
| 9-Mar-18 | 2215 | 5697 | $176,604.98 | $176,604.72 | $832.17 | $210.74 | $4,481.01 | $4,585.67 | $0.00 |
| 10-Mar-18 | 2047 | 5206 | $158,107.57 | $158,106.70 | $352.83 | $352.40 | $4,442.80 | $5,519.07 | $0.00 |
| 11-Mar-18 | 1651 | 4665 | $155,362.20 | $155,362.12 | $418.05 | $126.88 | $3,995.90 | $3,756.90 | $0.00 |
| 12-Mar-18 | 2649 | 7222 | $245,632.55 | $245,632.38 | $674.64 | $258.38 | $4,568.65 | $4,937.18 | $0.00 |
| 13-Mar-18 | 2095 | 5206 | $178,608.75 | $178,608.60 | $221.67 | $240.58 | $5,443.73 | $4,563.29 | $0.00 |
| 14-Mar-18 | 1681 | 3981 | $142,348.25 | $142,347.01 | $952.64 | $118.83 | $5,500.52 | $3,580.40 | $0.00 |
| 15-Mar-18 | 1559 | 3542 | $141,735.14 | $141,733.82 | $668.86 | $269.66 | $5,374.51 | $3,608.63 | $0.00 |
| 16-Mar-18 | 1503 | 3786 | $133,430.26 | $133,428.73 | $70.24 | $262.54 | $5,056.89 | $3,824.98 | $0.00 |
| 17-Mar-18 | 1057 | 2527 | $83,411.61 | $83,410.28 | $33.48 | $76.10 | $3,740.22 | $2,879.49 | $0.00 |
| 18-Mar-18 | 1125 | 2713 | $92,799.15 | $92,797.61 | $323.40 | $120.52 | $4,522.15 | $3,410.22 | $0.00 |
| 19-Mar-18 | 1417 | 3332 | $123,447.22 | $123,479.71 | $1,121.78 | $183.95 | $4,971.68 | $3,505.86 | $34.20 |
| 20-Mar-18 | 1487 | 3582 | $130,288.42 | $130,286.68 | $386.49 | $219.15 | $5,496.94 | $4,196.79 | $0.00 |
| 21-Mar-18 | 1646 | 4071 | $144,593.45 | $144,591.96 | $253.16 | $463.01 | $5,720.84 | $3,829.47 | $0.00 |
| 22-Mar-18 | 1519 | 3846 | $139,166.62 | $139,165.23 | $217.86 | $280.75 | $5,093.86 | $3,960.35 | $0.00 |

FSSTX-086589

025

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 23-Mar-18 | 1434 | 3538 | $137,415.80 | $137,414.24 | $460.03 | $240.51 | $4,872.71 | $3,655.94 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 24-Mar-18 | 1108 | 2688 | $108,226.81 | $108,225.58 | $62.22 | $293.12 | $4,297.14 | $2,855.35 | $0.00 |
| 25-Mar-18 | 1151 | 2808 | $109,309.64 | $109,308.21 | $873.59 | $245.60 | $4,065.32 | $3,356.53 | $0.00 |
| 26-Mar-18 | 2131 | 5904 | $209,907.05 | $209,904.95 | $428.93 | $394.49 | $6,511.16 | $8,131.20 | $0.00 |
| 27-Mar-18 | 2269 | 5989 | $211,939.40 | $211,937.27 | $767.07 | $372.80 | $7,577.01 | $6,305.40 | $0.00 |
| 28-Mar-18 | 2086 | 5140 | $187,413.47 | $187,411.27 | $670.38 | $281.61 | $6,840.34 | $5,816.57 | $0.00 |
| 29-Mar-18 | 1991 | 5321 | $190,636.29 | $190,634.34 | $492.93 | $214.12 | $6,663.86 | $5,273.34 | $0.00 |
| 30-Mar-18 | 1951 | 5161 | $172,091.03 | $172,088.77 | $653.61 | $200.34 | $6,257.87 | $7,782.32 | $0.00 |
| 31-Mar-18 | 1417 | 3537 | $119,379.15 | $119,377.04 | $1,146.04 | $154.92 | $5,381.08 | $6,564.49 | $0.00 |
| 1-Apr-18 | 1379 | 3500 | $126,203.29 | $126,201.26 | $114.58 | $249.54 | $4,829.48 | $5,611.41 | $0.00 |
| 2-Apr-18 | 1787 | 4415 | $157,680.45 | $157,678.27 | $97.79 | $441.31 | $6,129.50 | $5,971.92 | $0.00 |
| 3-Apr-18 | 2153 | 5782 | $210,426.60 | $210,424.64 | $1,227.26 | $290.20 | $7,159.47 | $6,691.19 | $0.00 |
| 4-Apr-18 | 2268 | 5864 | $212,608.58 | $212,606.45 | $1,444.59 | $319.00 | $6,964.12 | $7,038.29 | $0.00 |
| 5-Apr-18 | 2143 | 5466 | $208,167.25 | $208,165.17 | $759.55 | $223.61 | $6,625.44 | $7,244.85 | $0.00 |
| 6-Apr-18 | 2244 | 5953 | $229,926.29 | $229,924.08 | $640.94 | $198.96 | $6,184.17 | $7,297.52 | $0.00 |
| 7-Apr-18 | 1645 | 4238 | $160,145.93 | $160,143.99 | $288.39 | $321.32 | $5,871.31 | $6,621.32 | $0.00 |
| 8-Apr-18 | 1453 | 3576 | $136,563.86 | $136,563.86 | $498.33 | $135.80 | $5,264.81 | $4,902.48 | $0.00 |
| 9-Apr-18 | 2211 | 5798 | $217,543.64 | $217,541.49 | $1,145.75 | $253.63 | $7,099.32 | $7,298.43 | $0.00 |
| 10-Apr-18 | 2371 | 5687 | $209,977.71 | $209,974.67 | $1,718.23 | $280.34 | $9,832.82 | $10,066.33 | $0.00 |
| 11-Apr-18 | 1937 | 5230 | $198,731.00 | $198,729.02 | $1,108.25 | $195.97 | $6,620.05 | $6,336.27 | $0.00 |
| 12-Apr-18 | 2546 | 7182 | $266,963.57 | $266,961.34 | $490.03 | $275.35 | $7,684.40 | $11,770.46 | $0.00 |
| 13-Apr-18 | 2383 | 6558 | $248,233.23 | $248,231.20 | $331.16 | $167.20 | $7,074.52 | $10,771.93 | $0.00 |
| 14-Apr-18 | 1516 | 4209 | $165,318.65 | $165,316.96 | $1,385.01 | $157.12 | $4,998.74 | $7,766.22 | $0.00 |
| 15-Apr-18 | 1652 | 4673 | $175,643.74 | $175,641.82 | $1,109.54 | $137.53 | $5,332.00 | $8,077.00 | $0.00 |
| 16-Apr-18 | 2373 | 6907 | $269,585.31 | $269,583.46 | $544.22 | $193.63 | $7,183.41 | $8,522.56 | $0.00 |
| 17-Apr-18 | 2111 | 5609 | $221,060.52 | $221,058.54 | $332.71 | $193.62 | $6,919.96 | $7,358.83 | $0.00 |
| 18-Apr-18 | 1867 | 4892 | $185,284.29 | $185,282.41 | $920.12 | $148.84 | $6,220.49 | $5,732.27 | $0.00 |
| 19-Apr-18 | 1719 | 4503 | $170,900.55 | $170,898.79 | $378.08 | $130.09 | $5,815.38 | $5,649.40 | $0.00 |
| 20-Apr-18 | 1613 | 4393 | $167,238.89 | $167,237.11 | $493.58 | $147.07 | $5,480.79 | $5,633.52 | $0.00 |
| 21-Apr-18 | 1200 | 3008 | $113,180.56 | $113,179.08 | $26.96 | $72.37 | $4,581.60 | $4,452.75 | $0.00 |
| 22-Apr-18 | 1248 | 3286 | $127,390.58 | $127,389.17 | $252.02 | $127.61 | $4,332.65 | $5,246.62 | $0.00 |
| 23-Apr-18 | 1611 | 4345 | $165,086.18 | $165,084.56 | $827.12 | $125.09 | $5,920.74 | $4,949.20 | $0.00 |
| 24-Apr-18 | 1524 | 4022 | $149,285.69 | $149,283.95 | $424.12 | $154.84 | $5,495.99 | $4,870.50 | $0.00 |
| 25-Apr-18 | 1761 | 4622 | $175,637.46 | $175,635.66 | $288.12 | $137.48 | $6,190.36 | $7,244.97 | $0.00 |
| 26-Apr-18 | 1599 | 4164 | $157,104.14 | $157,102.35 | $437.75 | $145.75 | $5,659.62 | $5,799.79 | $0.00 |

FSSTX-086589

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|------|------|------|-------------|-------------|------------|----------|------------|-------------|--------|
| 27-Apr-18 | 1537 | 3843 | $143,841.62 | $143,839.89 | $2,007.03 | $89.68 | $5,333.87 | $5,224.56 | $0.00 |
| 28-Apr-18 | 1093 | 2705 | $104,304.04 | $104,302.59 | $180.24 | $115.21 | $4,379.99 | $3,441.02 | $0.00 |
| 29-Apr-18 | 1313 | 3294 | $126,404.19 | $126,402.51 | $265.97 | $106.07 | $5,102.83 | $4,415.45 | $0.00 |
| 30-Apr-18 | 1712 | 4456 | $164,523.33 | $164,521.09 | $872.68 | $143.57 | $6,139.52 | $5,695.98 | $0.00 |
| 1-May-18 | 1922 | 4804 | $186,562.22 | $186,559.91 | $1,539.25 | $188.73 | $6,306.64 | $7,955.77 | $0.00 |
| 2-May-18 | 2129 | 5526 | $222,628.04 | $222,625.82 | $484.56 | $123.85 | $6,676.72 | $15,685.65 | $0.00 |
| 3-May-18 | 2165 | 5601 | $223,931.95 | $223,929.77 | $535.35 | $145.69 | $6,646.95 | $14,887.89 | $0.00 |
| 4-May-18 | 1824 | 4659 | $189,678.77 | $189,676.68 | $1,507.55 | $154.48 | $5,739.02 | $8,437.72 | $0.00 |
| 5-May-18 | 1285 | 3533 | $144,358.00 | $144,356.18 | $271.96 | $194.43 | $4,262.75 | $7,771.12 | $0.00 |
| 6-May-18 | 1226 | 3045 | $124,514.60 | $124,512.97 | $238.03 | $194.64 | $4,050.04 | $5,777.72 | $0.00 |
| 7-May-18 | 1632 | 4440 | $151,422.88 | $151,420.92 | $481.77 | $153.61 | $5,731.08 | $7,629.33 | $0.00 |
| 8-May-18 | 1668 | 4700 | $149,768.91 | $149,767.26 | $650.91 | $190.15 | $5,847.69 | $8,467.47 | $0.00 |
| 9-May-18 | 1697 | 4897 | $160,193.32 | $160,191.95 | $589.53 | $146.97 | $5,908.45 | $8,336.82 | $0.00 |
| 10-May-18 | 2167 | 5520 | $176,127.33 | $176,125.01 | $1,031.37 | $289.29 | $8,939.56 | $9,754.11 | $0.00 |
| 11-May-18 | 1718 | 4743 | $164,111.99 | $164,110.51 | $276.41 | $156.32 | $5,655.63 | $7,808.69 | $0.00 |
| 12-May-18 | 1292 | 3685 | $110,438.51 | $110,437.33 | $528.12 | $101.12 | $3,747.29 | $8,429.68 | $0.00 |
| 13-May-18 | 1253 | 3898 | $118,579.40 | $118,578.27 | $239.36 | $115.90 | $4,021.02 | $10,785.97 | $0.00 |
| 14-May-18 | 1420 | 4091 | $140,048.07 | $140,046.82 | $822.57 | $166.52 | $4,811.91 | $6,751.45 | $0.00 |
| 15-May-18 | 1691 | 4584 | $147,659.97 | $147,658.64 | $1,693.77 | $150.84 | $5,580.67 | $7,390.51 | $0.00 |
| 16-May-18 | 1613 | 4539 | $152,120.00 | $152,118.50 | $574.16 | $149.85 | $5,297.09 | $7,937.83 | $0.00 |
| 17-May-18 | 1757 | 4934 | $161,220.03 | $161,218.61 | $1,169.14 | $267.22 | $6,119.77 | $7,635.28 | $0.00 |
| 18-May-18 | 1604 | 4499 | $144,005.31 | $144,003.72 | $1,258.65 | $155.32 | $5,618.82 | $7,268.95 | $0.00 |
| 19-May-18 | 1316 | 3781 | $116,882.47 | $116,881.00 | $4.95 | $102.48 | $4,047.81 | $8,346.28 | $0.00 |
| 20-May-18 | 1341 | 4056 | $121,276.62 | $121,275.33 | $495.20 | $108.31 | $4,583.19 | $9,192.31 | $0.00 |
| 21-May-18 | 1559 | 4753 | $148,062.00 | $148,060.85 | $1,106.38 | $192.95 | $5,555.07 | $7,350.33 | $0.00 |
| 22-May-18 | 1808 | 5744 | $183,282.37 | $183,280.97 | $239.90 | $211.76 | $5,597.36 | $9,616.85 | $0.00 |
| 23-May-18 | 1770 | 5517 | $175,526.13 | $175,524.63 | $732.28 | $150.64 | $6,068.75 | $8,276.75 | $0.00 |
| 24-May-18 | 1783 | 5187 | $162,852.63 | $162,851.14 | $244.73 | $111.06 | $5,209.08 | $8,493.37 | $0.00 |
| 25-May-18 | 1885 | 5234 | $165,096.62 | $165,094.78 | $672.80 | $78.16 | $3,750.66 | $8,151.68 | $0.00 |
| 26-May-18 | 1546 | 4156 | $137,853.33 | $137,851.60 | $1,359.90 | $95.24 | $2,748.37 | $8,593.43 | $0.00 |
| 27-May-18 | 1614 | 4657 | $158,447.04 | $158,445.16 | $1,697.30 | $100.04 | $2,952.23 | $8,410.93 | $0.00 |
| 28-May-18 | 2020 | 6479 | $223,823.92 | $223,822.10 | $1,130.10 | $83.97 | $3,762.30 | $10,324.77 | $0.00 |
| 29-May-18 | 1872 | 5283 | $179,986.42 | $179,984.67 | $513.80 | $145.04 | $3,966.32 | $8,241.85 | $0.00 |
| 30-May-18 | 1811 | 5046 | $159,565.06 | $159,563.08 | $774.57 | $95.88 | $3,394.58 | $7,620.64 | $0.00 |
| 31-May-18 | 1914 | 5142 | $165,283.30 | $165,281.39 | $977.53 | $134.88 | $3,522.04 | $8,229.37 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 1-Jun-18 | 2116 | 5518 | $172,874.74 | $173,744.40 | $1,776.29 | $122.91 | $3,371.16 | $10,159.58 | $871.82 |
|---|---|---|---|---|---|---|---|---|---|
| 2-Jun-18 | 1511 | 3735 | $116,780.10 | $116,778.40 | $420.00 | $85.85 | $2,482.81 | $7,934.78 | $0.00 |
| 3-Jun-18 | 1455 | 4013 | $127,121.95 | $127,120.40 | $462.07 | $139.00 | $3,173.35 | $7,582.44 | $0.00 |
| 4-Jun-18 | 1623 | 4170 | $132,989.87 | $132,988.15 | $321.59 | $87.95 | $3,049.01 | $6,703.93 | $0.00 |
| 5-Jun-18 | 1556 | 3955 | $126,910.03 | $126,908.35 | $322.07 | $161.51 | $2,927.74 | $6,741.68 | $0.00 |
| 6-Jun-18 | 1555 | 4062 | $126,663.28 | $126,661.53 | $389.72 | $136.04 | $3,432.82 | $7,242.90 | $0.00 |
| 7-Jun-18 | 1816 | 4992 | $154,269.35 | $154,267.76 | $264.43 | $112.49 | $3,176.49 | $6,902.81 | $0.00 |
| 8-Jun-18 | 1928 | 5158 | $156,344.83 | $156,343.35 | $791.76 | $104.46 | $3,605.93 | $7,102.18 | $0.00 |
| 9-Jun-18 | 1477 | 4020 | $116,558.29 | $116,557.10 | $697.41 | $123.19 | $2,645.04 | $5,980.22 | $0.00 |
| 10-Jun-18 | 1576 | 4543 | $135,713.65 | $135,712.38 | $748.66 | $116.84 | $3,420.19 | $6,349.97 | $0.00 |
| 11-Jun-18 | 1706 | 4859 | $140,978.04 | $140,976.66 | $336.70 | $82.58 | $2,629.51 | $6,725.61 | $0.00 |
| 12-Jun-18 | 1855 | 5032 | $146,425.97 | $146,424.79 | $226.50 | $157.88 | $3,466.29 | $6,646.43 | $0.00 |
| 13-Jun-18 | 1721 | 4573 | $136,535.95 | $136,534.71 | $1,940.01 | $111.63 | $2,770.64 | $5,986.55 | $0.00 |
| 14-Jun-18 | 1922 | 5545 | $165,192.84 | $165,218.66 | $532.93 | $122.69 | $3,651.88 | $6,702.59 | $27.27 |
| 15-Jun-18 | 2251 | 6534 | $194,026.54 | $194,024.84 | $1,345.07 | $205.30 | $3,731.10 | $8,136.63 | $0.00 |
| 16-Jun-18 | 1506 | 4250 | $122,948.23 | $122,946.56 | $855.40 | $86.83 | $2,679.54 | $5,616.08 | $0.00 |
| 17-Jun-18 | 1535 | 4243 | $122,124.18 | $122,122.43 | $780.67 | $111.04 | $2,847.86 | $5,143.38 | $0.00 |
| 18-Jun-18 | 2179 | 6646 | $197,081.14 | $197,079.40 | $1,301.78 | $133.29 | $4,482.67 | $8,259.73 | $0.00 |
| 19-Jun-18 | 2227 | 6638 | $198,261.59 | $198,259.84 | $1,131.36 | $103.92 | $3,920.63 | $8,745.34 | $0.00 |
| 20-Jun-18 | 1155 | 2862 | $97,002.19 | $97,000.84 | $752.63 | $147.45 | $3,237.40 | $4,384.20 | $0.00 |
| 21-Jun-18 | 923 | 2039 | $75,401.41 | $75,400.63 | $465.41 | $120.98 | $3,063.50 | $3,954.37 | $0.00 |
| 22-Jun-18 | 1108 | 2808 | $92,621.62 | $92,620.77 | $773.33 | $198.06 | $3,682.92 | $4,719.84 | $0.00 |
| 23-Jun-18 | 991 | 2601 | $78,154.68 | $78,154.05 | $822.06 | $178.10 | $3,750.69 | $4,650.40 | $0.00 |
| 24-Jun-18 | 1004 | 2745 | $86,065.02 | $86,064.22 | $360.20 | $161.39 | $3,842.07 | $5,328.05 | $0.00 |
| 25-Jun-18 | 1017 | 2633 | $86,330.11 | $86,329.46 | $63.14 | $129.10 | $4,030.82 | $4,817.56 | $0.00 |
| 26-Jun-18 | 1044 | 2811 | $86,887.90 | $86,887.16 | $330.29 | $119.10 | $4,173.13 | $4,955.85 | $0.00 |
| 27-Jun-18 | 1141 | 2998 | $97,042.71 | $97,042.09 | $338.73 | $279.77 | $3,814.05 | $5,152.38 | $0.00 |
| 28-Jun-18 | 1172 | 3013 | $97,485.93 | $97,485.19 | $232.77 | $249.27 | $4,836.01 | $4,738.41 | $0.00 |
| 29-Jun-18 | 1722 | 4738 | $138,478.92 | $138,478.01 | $1,040.75 | $342.93 | $4,477.53 | $6,408.27 | $0.00 |
| 30-Jun-18 | 1484 | 4138 | $112,801.30 | $112,800.11 | $492.71 | $192.82 | $2,746.49 | $5,669.93 | $0.00 |
| 1-Jul-18 | 1511 | 4097 | $113,571.41 | $113,570.36 | $915.51 | $213.35 | $2,199.31 | $7,112.61 | $0.00 |
| 2-Jul-18 | 1663 | 4558 | $128,268.66 | $128,267.33 | $658.29 | $190.38 | $3,150.33 | $7,371.61 | $0.00 |
| 3-Jul-18 | 1867 | 5567 | $152,308.62 | $152,307.63 | $1,234.04 | $258.04 | $3,119.75 | $7,496.58 | $0.00 |
| 4-Jul-18 | 2038 | 6141 | $168,746.87 | $168,745.73 | $1,521.02 | $329.39 | $3,969.90 | $9,506.81 | $0.00 |
| 5-Jul-18 | 1711 | 4841 | $132,535.67 | $132,534.76 | $750.18 | $204.53 | $2,696.87 | $7,041.43 | $0.00 |

FSSTX-086589

028

## CONFIDENTIAL – ATTORNEY'S EYES ONLY

| 6-Jul-18 | 1797 | 4837 | $138,913.63 | $138,912.54 | $273.31 | $164.39 | $2,951.16 | $7,842.83 | $0.00 |
| 7-Jul-18 | 1355 | 3670 | $102,592.64 | $102,591.55 | $1,140.70 | $128.62 | $2,394.60 | $6,475.54 | $0.00 |
| 8-Jul-18 | 1303 | 3588 | $103,260.11 | $103,259.25 | $1,380.48 | $178.01 | $1,978.95 | $6,060.58 | $0.00 |
| 9-Jul-18 | 1617 | 4547 | $127,122.44 | $127,121.30 | $850.88 | $200.14 | $2,683.45 | $6,320.20 | $0.00 |
| 10-Jul-18 | 1852 | 5440 | $156,139.34 | $156,138.02 | $1,171.90 | $217.24 | $3,209.75 | $7,700.35 | $0.00 |
| 11-Jul-18 | 1712 | 4764 | $134,155.60 | $134,154.67 | $690.69 | $140.90 | $2,734.01 | $5,978.69 | $0.00 |
| 12-Jul-18 | 1594 | 4453 | $118,398.69 | $118,397.67 | $344.86 | $198.84 | $2,522.33 | $7,317.18 | $0.00 |
| 13-Jul-18 | 1504 | 3808 | $105,687.99 | $105,687.07 | $449.82 | $224.54 | $2,436.55 | $5,713.09 | $0.00 |
| 14-Jul-18 | 1270 | 3162 | $91,107.08 | $91,106.09 | $812.40 | $135.78 | $2,262.33 | $6,144.73 | $0.00 |
| 15-Jul-18 | 1196 | 3145 | $91,886.34 | $91,885.43 | $567.84 | $177.27 | $2,306.49 | $5,695.34 | $0.00 |
| 16-Jul-18 | 1524 | 4270 | $118,249.93 | $118,249.07 | $472.53 | $180.65 | $2,887.52 | $6,498.00 | $0.00 |
| 17-Jul-18 | 1668 | 4541 | $129,781.76 | $129,780.86 | $379.71 | $196.87 | $3,576.55 | $6,457.24 | $0.00 |
| 18-Jul-18 | 1716 | 4658 | $133,275.90 | $133,274.95 | $209.33 | $139.60 | $3,214.36 | $6,112.70 | $0.00 |
| 19-Jul-18 | 1597 | 4592 | $133,198.97 | $133,197.99 | $919.39 | $136.67 | $3,265.61 | $6,345.75 | $0.00 |
| 20-Jul-18 | 1623 | 4459 | $126,140.64 | $126,139.83 | $1,544.00 | $88.82 | $3,345.15 | $6,044.53 | $0.00 |
| 21-Jul-18 | 1143 | 3050 | $86,512.74 | $86,512.04 | $686.59 | $83.61 | $2,124.83 | $3,728.62 | $0.00 |
| 22-Jul-18 | 1170 | 3204 | $90,014.11 | $90,013.32 | $600.40 | $92.65 | $2,301.15 | $4,362.93 | $0.00 |
| 23-Jul-18 | 1575 | 4846 | $140,102.12 | $140,101.23 | $2,109.32 | $119.13 | $3,213.84 | $8,659.20 | $0.00 |
| 24-Jul-18 | 1737 | 5140 | $147,148.49 | $147,147.57 | $674.07 | $156.82 | $3,859.60 | $6,790.65 | $0.00 |
| 25-Jul-18 | 1843 | 5107 | $151,748.41 | $151,747.32 | $1,081.29 | $207.48 | $3,894.50 | $7,288.44 | $0.00 |
| 26-Jul-18 | 1592 | 4245 | $125,147.58 | $125,146.45 | $916.73 | $90.11 | $3,246.45 | $6,163.49 | $0.00 |
| 27-Jul-18 | 1519 | 4064 | $116,612.39 | $116,611.55 | $451.65 | $133.95 | $3,581.04 | $5,497.61 | $0.00 |
| 28-Jul-18 | 1132 | 3091 | $88,961.69 | $88,960.83 | $546.89 | $63.51 | $5,544.53 | $5,321.04 | $0.00 |
| 29-Jul-18 | 1153 | 3022 | $94,078.03 | $94,077.07 | $890.02 | $99.35 | $5,276.28 | $4,598.02 | $0.00 |
| 30-Jul-18 | 1228 | 3079 | $100,754.69 | $100,753.73 | $462.40 | $194.76 | $5,885.87 | $5,094.43 | $0.00 |
| 31-Jul-18 | 1361 | 3303 | $113,963.70 | $113,962.33 | $2,128.76 | $150.07 | $6,427.57 | $6,394.35 | $0.00 |
| 1-Aug-18 | 1437 | 3689 | $127,649.90 | $127,648.45 | $1,510.41 | $180.42 | $5,597.02 | $7,305.11 | $0.00 |
| 2-Aug-18 | 1278 | 3304 | $111,295.06 | $111,294.00 | $371.93 | $229.62 | $4,681.32 | $6,138.96 | $0.00 |
| 3-Aug-18 | 1317 | 3296 | $111,496.17 | $111,494.89 | $505.86 | $172.71 | $4,655.95 | $6,077.11 | $0.00 |
| 4-Aug-18 | 934 | 2121 | $73,683.25 | $73,682.32 | $445.28 | $135.74 | $3,489.08 | $4,263.02 | $0.00 |
| 5-Aug-18 | 965 | 2386 | $83,996.37 | $83,995.41 | $673.32 | $122.62 | $3,575.75 | $4,879.47 | $0.00 |
| 6-Aug-18 | 2226 | 5693 | $187,786.72 | $187,785.34 | $2,137.83 | $340.90 | $8,225.11 | $7,540.01 | $0.00 |
| 7-Aug-18 | 2395 | 6612 | $210,378.49 | $210,377.25 | $1,243.31 | $341.29 | $9,814.02 | $7,534.20 | $0.00 |
| 8-Aug-18 | 2431 | 6632 | $200,973.58 | $200,972.30 | $526.01 | $394.27 | $7,102.17 | $7,305.05 | $0.00 |
| 9-Aug-18 | 2153 | 5958 | $175,251.99 | $175,250.97 | $338.59 | $253.47 | $4,488.16 | $6,610.96 | $0.00 |

FSSTX-086589                029

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 10-Aug-18 | 1946 | 5341 | $151,965.39 | $151,964.21 | $258.96 | $255.89 | $2,967.89 | $6,502.69 | $0.00 |
| 11-Aug-18 | 1462 | 3784 | $104,638.10 | $104,637.03 | $693.05 | $163.33 | $2,734.47 | $4,996.19 | $0.00 |
| 12-Aug-18 | 1390 | 3726 | $113,523.45 | $113,522.45 | $459.93 | $215.33 | $2,658.77 | $4,903.35 | $0.00 |
| 13-Aug-18 | 2071 | 6008 | $175,130.84 | $175,594.96 | $547.74 | $261.34 | $4,296.85 | $7,000.96 | $465.24 |
| 14-Aug-18 | 2603 | 7836 | $233,948.82 | $233,947.68 | $1,272.28 | $393.87 | $5,035.32 | $8,050.84 | $0.00 |
| 15-Aug-18 | 2176 | 6279 | $192,112.29 | $192,111.16 | $1,548.75 | $220.50 | $4,920.68 | $6,780.19 | $0.00 |
| 16-Aug-18 | 1949 | 5526 | $171,910.40 | $171,909.27 | $1,007.19 | $219.53 | $3,840.81 | $6,609.11 | $0.00 |
| 17-Aug-18 | 1858 | 5220 | $145,198.12 | $145,196.88 | $1,065.12 | $194.05 | $3,065.99 | $9,190.36 | $0.00 |
| 18-Aug-18 | 1402 | 3883 | $113,499.16 | $113,498.16 | $1,360.72 | $138.27 | $3,132.21 | $6,458.75 | $0.00 |
| 19-Aug-18 | 1387 | 3932 | $118,962.93 | $118,962.04 | $654.70 | $198.43 | $2,675.96 | $4,715.51 | $0.00 |
| 20-Aug-18 | 2245 | 6960 | $203,568.80 | $203,567.85 | $1,667.26 | $240.98 | $4,909.70 | $7,836.74 | $0.00 |
| 21-Aug-18 | 2164 | 6591 | $179,380.87 | $179,379.70 | $2,418.32 | $210.30 | $4,222.04 | $8,673.76 | $0.00 |
| 22-Aug-18 | 1846 | 5059 | $149,063.45 | $149,062.21 | $1,399.57 | $201.94 | $6,032.93 | $7,457.45 | $0.00 |
| 23-Aug-18 | 1650 | 4516 | $141,377.27 | $141,375.85 | $1,563.23 | $214.68 | $7,285.46 | $6,659.23 | $0.00 |
| 24-Aug-18 | 1481 | 3768 | $116,863.66 | $116,862.43 | $709.89 | $154.34 | $6,166.03 | $5,423.74 | $0.00 |
| 25-Aug-18 | 1014 | 2532 | $81,229.07 | $81,227.96 | $1,017.84 | $82.51 | $4,155.90 | $4,649.97 | $0.00 |
| 26-Aug-18 | 1132 | 3053 | $100,589.75 | $100,588.78 | $928.06 | $79.94 | $4,742.86 | $4,813.93 | $0.00 |
| 27-Aug-18 | 1536 | 4401 | $132,952.51 | $132,951.28 | $1,385.33 | $119.22 | $5,571.61 | $6,086.44 | $0.00 |
| 28-Aug-18 | 1762 | 5108 | $157,734.44 | $157,732.95 | $775.12 | $166.24 | $6,304.44 | $7,812.67 | $0.00 |
| 29-Aug-18 | 1785 | 5149 | $159,441.14 | $159,439.66 | $390.94 | $254.89 | $5,953.05 | $7,725.39 | $0.00 |
| 30-Aug-18 | 1723 | 4930 | $153,023.07 | $153,021.67 | $220.28 | $102.86 | $5,111.63 | $7,624.56 | $0.00 |
| 31-Aug-18 | 2127 | 6216 | $187,319.37 | $187,317.74 | $1,229.03 | $214.32 | $7,556.64 | $8,467.04 | $0.00 |
| 1-Sep-18 | 1403 | 3995 | $120,220.99 | $120,219.74 | $307.48 | $167.45 | $5,255.51 | $6,973.34 | $0.00 |
| 2-Sep-18 | 1264 | 3621 | $113,437.39 | $113,436.15 | $533.51 | $75.67 | $5,110.40 | $6,425.30 | $0.00 |
| 3-Sep-18 | 1510 | 4362 | $144,457.93 | $144,652.89 | $860.34 | $160.36 | $5,839.08 | $6,390.33 | $196.17 |
| 4-Sep-18 | 1639 | 4766 | $158,872.28 | $158,871.04 | $2,646.48 | $307.10 | $6,023.71 | $7,213.02 | $0.00 |
| 5-Sep-18 | 1746 | 5314 | $171,441.44 | $171,440.15 | $3,893.00 | $139.85 | $6,701.30 | $8,326.73 | $0.00 |
| 6-Sep-18 | 1699 | 4950 | $152,159.97 | $152,158.57 | $2,128.07 | $282.82 | $6,941.72 | $6,229.11 | $0.00 |
| 7-Sep-18 | 1833 | 4994 | $153,464.80 | $153,463.22 | $1,413.65 | $196.14 | $6,591.77 | $6,539.01 | $0.00 |
| 8-Sep-18 | 1345 | 3962 | $128,383.65 | $128,382.50 | $817.80 | $189.93 | $4,496.65 | $5,469.97 | $0.00 |
| 9-Sep-18 | 1402 | 4232 | $129,988.04 | $129,986.86 | $432.24 | $174.31 | $4,631.68 | $6,291.85 | $0.00 |
| 10-Sep-18 | 2192 | 6780 | $228,888.50 | $228,887.10 | $2,167.15 | $165.53 | $7,562.30 | $8,991.30 | $0.00 |
| 11-Sep-18 | 2384 | 7457 | $254,746.10 | $254,744.86 | $2,042.81 | $211.57 | $7,968.42 | $10,004.48 | $0.00 |
| 12-Sep-18 | 2199 | 6358 | $222,389.98 | $222,388.50 | $1,096.91 | $252.13 | $7,604.11 | $8,465.40 | $0.00 |
| 13-Sep-18 | 1836 | 5399 | $190,307.07 | $190,305.68 | $851.16 | $167.68 | $7,927.75 | $7,400.96 | $0.00 |

FSSTX-086589

030

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14-Sep-18 | 1798 | 4850 | $168,651.07 | $168,649.45 | $1,458.48 | $185.37 | $6,792.41 | $7,133.42 | $0.00 |
| 15-Sep-18 | 1260 | 3479 | $123,108.90 | $123,107.64 | $1,180.98 | $153.26 | $5,735.00 | $5,262.29 | $0.00 |
| 16-Sep-18 | 1245 | 3535 | $120,106.92 | $120,133.18 | $1,110.99 | $169.74 | $4,363.05 | $5,137.32 | $27.55 |
| 17-Sep-18 | 1435 | 4149 | $143,714.58 | $143,713.33 | $382.22 | $142.28 | $5,393.36 | $6,365.56 | $0.00 |
| 18-Sep-18 | 1521 | 4441 | $153,670.99 | $153,669.72 | $1,410.67 | $128.33 | $5,927.67 | $6,029.38 | $0.00 |
| 19-Sep-18 | 1518 | 4297 | $150,826.62 | $150,825.22 | $999.76 | $139.68 | $6,247.23 | $5,741.05 | $0.00 |
| 20-Sep-18 | 1540 | 4589 | $154,849.81 | $154,848.43 | $1,176.39 | $188.85 | $6,094.60 | $6,075.25 | $0.00 |
| 21-Sep-18 | 2425 | 7541 | $263,373.00 | $263,371.55 | $8,145.11 | $255.28 | $8,668.99 | $8,995.97 | $0.00 |
| 22-Sep-18 | 1810 | 5576 | $189,734.17 | $189,732.74 | $2,810.98 | $275.79 | $6,971.69 | $6,947.83 | $0.00 |
| 23-Sep-18 | 1761 | 5356 | $181,281.53 | $181,280.19 | $382.00 | $155.89 | $6,167.63 | $7,297.32 | $0.00 |
| 24-Sep-18 | 1745 | 5625 | $193,485.54 | $193,484.10 | $7,456.02 | $175.52 | $7,117.07 | $7,039.47 | $0.00 |
| 25-Sep-18 | 1808 | 5629 | $184,684.88 | $184,683.87 | $884.57 | $193.48 | $7,026.97 | $7,279.57 | $0.00 |
| 26-Sep-18 | 1688 | 5150 | $162,927.74 | $162,926.68 | $589.91 | $214.52 | $6,341.88 | $6,571.39 | $0.00 |
| 27-Sep-18 | 1444 | 4261 | $133,161.55 | $133,160.61 | $109.48 | $177.16 | $5,395.66 | $5,704.85 | $0.00 |
| 28-Sep-18 | 1815 | 5425 | $170,432.87 | $170,431.85 | $636.73 | $194.49 | $6,448.04 | $7,239.95 | $0.00 |
| 29-Sep-18 | 1377 | 4061 | $129,854.37 | $129,803.58 | $1,480.82 | $122.86 | $4,781.11 | $5,545.13 | $0.00 |
| 30-Sep-18 | 1491 | 4805 | $162,725.34 | $162,724.38 | $1,202.16 | $173.39 | $6,487.78 | $6,678.74 | $0.00 |
| 1-Oct-18 | 1952 | 6126 | $194,807.47 | $194,663.23 | $806.38 | $266.66 | $7,363.21 | $9,446.29 | $0.00 |
| 2-Oct-18 | 1845 | 5713 | $179,952.47 | $179,951.65 | $2,301.82 | $157.24 | $6,609.19 | $9,104.91 | $0.00 |
| 3-Oct-18 | 1622 | 4885 | $156,320.23 | $156,319.37 | $375.65 | $159.06 | $6,460.17 | $7,397.73 | $0.00 |
| 4-Oct-18 | 1531 | 4711 | $143,665.26 | $143,664.38 | $535.41 | $179.81 | $5,060.48 | $7,357.32 | $0.00 |
| 5-Oct-18 | 1454 | 4240 | $130,242.93 | $130,242.01 | $1,957.00 | $168.89 | $5,435.47 | $7,324.38 | $0.00 |
| 6-Oct-18 | 1127 | 2965 | $95,539.86 | $95,538.96 | $572.43 | $123.98 | $4,457.74 | $6,074.20 | $0.00 |
| 7-Oct-18 | 1147 | 3063 | $97,898.81 | $97,897.90 | $1,299.82 | $202.32 | $3,961.77 | $6,078.85 | $0.00 |
| 8-Oct-18 | 2569 | 11882 | $292,293.72 | $292,293.02 | $589.12 | $188.51 | $7,386.39 | $13,347.40 | $0.00 |
| 9-Oct-18 | 2919 | 13189 | $315,371.91 | $315,372.15 | $4,330.15 | $320.59 | $6,249.66 | $12,301.32 | $0.00 |
| 10-Oct-18 | 2761 | 11885 | $282,316.83 | $282,317.04 | $1,397.45 | $307.92 | $5,356.19 | $12,092.26 | $0.00 |
| 11-Oct-18 | 2434 | 10795 | $276,118.64 | $276,118.84 | $4,151.46 | $283.06 | $5,623.60 | $10,263.34 | $0.00 |
| 12-Oct-18 | 2437 | 10291 | $245,074.61 | $245,074.79 | $991.83 | $273.65 | $4,024.54 | $10,475.69 | $0.00 |
| 13-Oct-18 | 1849 | 7723 | $193,576.10 | $193,576.33 | $1,642.12 | $205.76 | $3,692.91 | $7,758.02 | $0.00 |
| 14-Oct-18 | 1873 | 7986 | $198,847.99 | $198,848.33 | $471.97 | $278.38 | $3,905.64 | $8,832.17 | $0.00 |
| 15-Oct-18 | 2244 | 9576 | $243,044.60 | $243,044.84 | $701.18 | $366.81 | $5,094.48 | $9,860.24 | $0.00 |
| 16-Oct-18 | 2071 | 8467 | $226,837.92 | $226,838.28 | $1,798.32 | $245.44 | $4,744.38 | $8,965.05 | $0.00 |
| 17-Oct-18 | 1987 | 7790 | $199,891.79 | $199,891.99 | $1,557.15 | $247.20 | $4,378.66 | $8,043.31 | $0.00 |
| 18-Oct-18 | 1985 | 7472 | $183,967.38 | $183,967.67 | $1,059.00 | $370.82 | $3,735.75 | $7,703.42 | $0.00 |

FSSTX-086589

031

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 19-Oct-18 | 2049 | 8291 | $211,516.58 | $211,516.76 | $1,387.27 | $252.96 | $4,085.79 | $7,892.79 | $0.00 |
| 20-Oct-18 | 1562 | 5741 | $138,519.70 | $138,519.93 | $1,783.06 | $137.67 | $2,706.17 | $6,061.91 | $0.00 |
| 21-Oct-18 | 1512 | 5986 | $145,891.16 | $145,891.14 | $130.35 | $324.62 | $3,592.93 | $6,433.63 | $0.00 |
| 22-Oct-18 | 1848 | 6806 | $180,688.10 | $180,688.30 | $952.12 | $213.07 | $3,693.48 | $7,033.22 | $0.00 |
| 23-Oct-18 | 1955 | 7532 | $195,581.68 | $195,581.81 | $1,414.29 | $264.76 | $4,236.39 | $7,667.40 | $0.00 |
| 24-Oct-18 | 2002 | 7679 | $193,563.29 | $193,563.35 | $377.34 | $201.50 | $3,756.97 | $8,021.86 | $0.00 |
| 25-Oct-18 | 1838 | 6856 | $181,397.83 | $181,398.00 | $534.20 | $177.48 | $4,454.01 | $6,921.02 | $0.00 |
| 26-Oct-18 | 1802 | 6672 | $170,980.23 | $170,980.37 | $412.43 | $142.17 | $3,787.03 | $6,355.85 | $0.00 |
| 27-Oct-18 | 1116 | 5245 | $135,431.26 | $135,431.26 | $1,204.79 | $180.59 | $2,737.54 | $3,508.30 | $0.00 |
| 28-Oct-18 | 1358 | 6162 | $164,770.60 | $164,770.60 | $1,084.73 | $114.19 | $2,316.75 | $4,310.25 | $0.00 |
| 29-Oct-18 | 1735 | 7912 | $205,107.61 | $205,107.57 | $2,086.20 | $216.99 | $3,663.95 | $8,719.91 | $0.00 |
| 30-Oct-18 | 3451 | 15130 | $376,315.57 | $376,315.70 | $3,728.25 | $538.78 | $5,969.67 | $17,326.68 | $0.00 |
| 31-Oct-18 | 3418 | 11593 | $295,127.84 | $295,128.32 | $3,335.63 | $265.01 | $7,538.75 | $15,413.48 | $0.00 |
| 1-Nov-18 | 1842 | 4565 | $132,142.78 | $132,142.28 | $2,025.61 | $151.36 | $3,258.39 | $7,358.66 | $0.00 |
| 2-Nov-18 | 1315 | 2842 | $105,783.55 | $105,782.68 | $1,577.27 | $203.54 | $2,320.06 | $6,369.25 | $0.00 |
| 3-Nov-18 | 914 | 2002 | $73,816.55 | $73,815.75 | $1,172.12 | $53.13 | $2,099.65 | $4,548.96 | $0.00 |
| 4-Nov-18 | 923 | 1936 | $72,984.77 | $72,983.95 | $644.58 | $159.25 | $1,813.86 | $4,062.93 | $0.00 |
| 5-Nov-18 | 1435 | 3988 | $122,740.48 | $122,739.40 | $1,906.01 | $146.43 | $2,324.15 | $6,451.53 | $0.00 |
| 6-Nov-18 | 1658 | 4659 | $133,438.02 | $133,436.72 | $1,084.55 | $334.32 | $3,022.76 | $6,950.85 | $0.00 |
| 7-Nov-18 | 1269 | 3447 | $100,349.11 | $100,347.97 | $766.77 | $169.54 | $2,472.37 | $4,948.28 | $0.00 |
| 8-Nov-18 | 1380 | 3773 | $112,773.65 | $112,772.37 | $888.85 | $180.80 | $2,336.59 | $5,846.68 | $0.00 |
| 9-Nov-18 | 1413 | 3744 | $108,212.23 | $108,210.93 | $297.29 | $155.14 | $2,363.14 | $5,985.44 | $0.00 |
| 10-Nov-18 | 1082 | 3029 | $84,085.51 | $84,084.61 | $628.55 | $123.64 | $1,702.24 | $4,829.58 | $0.00 |
| 11-Nov-18 | 1037 | 2782 | $75,349.10 | $75,347.98 | $670.29 | $89.82 | $1,567.73 | $5,052.31 | $0.00 |
| 12-Nov-18 | 1325 | 3552 | $106,336.80 | $106,335.59 | $357.63 | $249.20 | $1,876.25 | $6,286.24 | $0.00 |
| 13-Nov-18 | 1424 | 3881 | $123,286.00 | $123,284.68 | $876.02 | $407.70 | $2,126.01 | $5,971.47 | $0.00 |
| 14-Nov-18 | 1428 | 3973 | $117,380.80 | $117,379.34 | $602.71 | $342.69 | $2,803.49 | $5,917.17 | $0.00 |
| 15-Nov-18 | 1570 | 4205 | $151,385.81 | $151,384.48 | $833.56 | $491.55 | $2,100.65 | $6,498.07 | $0.00 |
| 16-Nov-18 | 1602 | 4256 | $171,548.50 | $171,547.44 | $2,135.50 | $645.01 | $2,384.35 | $7,077.93 | $0.00 |
| 17-Nov-18 | 1184 | 3084 | $121,232.81 | $121,231.70 | $1,033.99 | $408.12 | $1,948.16 | $5,278.86 | $0.00 |
| 18-Nov-18 | 1369 | 3761 | $138,981.21 | $138,980.20 | $506.69 | $586.21 | $2,118.27 | $5,509.40 | $0.00 |
| 19-Nov-18 | 1679 | 5063 | $164,975.25 | $164,975.47 | $1,295.51 | $500.06 | $2,894.51 | $6,824.21 | $0.00 |
| 20-Nov-18 | 1597 | 4473 | $149,112.76 | $149,113.31 | $886.68 | $482.14 | $2,974.09 | $7,044.61 | $0.00 |
| 21-Nov-18 | 1510 | 4567 | $146,119.84 | $146,120.25 | $649.76 | $405.83 | $2,597.43 | $6,330.38 | $0.00 |
| 22-Nov-18 | 1262 | 3738 | $113,818.91 | $113,819.18 | $567.64 | $287.37 | $2,378.01 | $4,989.76 | $0.00 |

FSSTX-086589

032

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23-Nov-18 | 2129 | 7083 | $227,344.72 | $227,345.08 | $632.59 | $494.10 | $3,404.26 | $9,383.83 | $0.00 |
| 24-Nov-18 | 1422 | 4353 | $130,222.65 | $130,223.06 | $532.23 | $250.27 | $2,448.70 | $6,102.74 | $0.00 |
| 25-Nov-18 | 1526 | 5234 | $161,331.26 | $161,331.60 | $569.53 | $295.35 | $2,693.39 | $6,512.72 | $0.00 |
| 26-Nov-18 | 2234 | 7811 | $239,189.53 | $239,189.78 | $1,661.60 | $571.14 | $3,629.80 | $9,900.12 | $0.00 |
| 27-Nov-18 | 1518 | 4861 | $155,664.83 | $155,665.09 | $827.75 | $428.42 | $2,609.11 | $6,238.58 | $0.00 |
| 28-Nov-18 | 1626 | 5077 | $163,646.62 | $163,646.82 | $1,296.60 | $501.06 | $2,917.30 | $6,035.74 | $0.00 |
| 29-Nov-18 | 1756 | 5278 | $164,536.74 | $164,537.06 | $950.68 | $444.22 | $2,531.64 | $7,220.41 | $0.00 |
| 30-Nov-18 | 2413 | 6508 | $214,405.06 | $214,405.79 | $1,201.91 | $614.43 | $3,752.62 | $9,628.31 | $0.00 |
| 1-Dec-18 | 1933 | 5442 | $181,029.01 | $181,029.53 | $960.11 | $427.68 | $3,403.84 | $8,143.09 | $0.00 |
| 2-Dec-18 | 1779 | 5715 | $199,439.51 | $199,439.96 | $2,670.23 | $806.27 | $2,852.43 | $9,318.35 | $0.00 |
| 3-Dec-18 | 2909 | 9780 | $217,478.44 | $217,478.97 | $1,608.06 | $766.90 | $3,453.27 | $59,298.37 | $0.00 |
| 4-Dec-18 | 2779 | 9087 | $176,960.38 | $176,961.08 | $920.45 | $395.61 | $4,139.91 | $62,607.25 | $0.00 |
| 5-Dec-18 | 3122 | 10101 | $194,981.13 | $194,981.69 | $802.67 | $451.99 | $4,614.27 | $68,286.68 | $0.00 |
| 6-Dec-18 | 2517 | 8461 | $179,273.01 | $179,298.61 | $1,143.34 | $564.61 | $3,214.93 | $52,603.40 | $0.00 |
| 7-Dec-18 | 2596 | 8804 | $175,331.73 | $175,332.35 | $2,066.77 | $477.02 | $3,948.62 | $53,829.09 | $0.00 |
| 8-Dec-18 | 2078 | 7332 | $144,053.62 | $144,054.12 | $745.20 | $314.31 | $3,684.06 | $40,762.57 | $0.00 |
| 9-Dec-18 | 1793 | 6272 | $129,280.15 | $129,280.51 | $526.61 | $219.76 | $3,120.35 | $34,359.42 | $0.00 |
| 10-Dec-18 | 2815 | 9659 | $191,499.96 | $191,500.71 | $929.07 | $354.03 | $3,915.64 | $56,059.92 | $0.00 |
| 11-Dec-18 | 2572 | 9083 | $192,209.82 | $192,210.49 | $1,281.31 | $406.66 | $3,772.54 | $52,767.22 | $0.00 |
| 12-Dec-18 | 2771 | 9005 | $183,245.16 | $183,245.87 | $895.98 | $401.69 | $2,852.19 | $60,150.37 | $0.00 |
| 13-Dec-18 | 3186 | 11839 | $202,507.94 | $202,508.70 | $542.19 | $451.11 | $3,760.37 | $70,845.30 | $0.00 |
| 14-Dec-18 | 3110 | 11974 | $221,778.96 | $221,779.47 | $949.81 | $448.29 | $4,771.53 | $68,963.97 | $0.00 |
| 15-Dec-18 | 2131 | 7960 | $155,021.75 | $155,022.26 | $496.98 | $307.89 | $3,498.20 | $45,226.08 | $0.00 |
| 16-Dec-18 | 1959 | 7519 | $151,421.93 | $151,422.44 | $236.87 | $354.61 | $2,797.55 | $41,005.62 | $0.00 |
| 17-Dec-18 | 2439 | 9437 | $183,531.10 | $183,531.53 | $750.19 | $414.97 | $3,889.42 | $15,791.97 | $0.00 |
| 18-Dec-18 | 2824 | 11659 | $233,898.70 | $233,899.25 | $2,746.80 | $537.14 | $4,512.83 | $8,666.09 | $0.00 |
| 19-Dec-18 | 3487 | 14794 | $290,480.20 | $290,480.67 | $2,587.28 | $777.89 | $5,955.40 | $11,197.27 | $0.00 |
| 20-Dec-18 | 2109 | 8217 | $164,227.41 | $164,227.80 | $443.90 | $305.01 | $3,812.00 | $6,106.31 | $0.00 |
| 21-Dec-18 | 2040 | 7522 | $143,443.95 | $143,444.41 | $889.90 | $228.95 | $3,303.72 | $6,764.26 | $0.00 |
| 22-Dec-18 | 1356 | 4918 | $105,068.12 | $105,068.45 | $814.53 | $118.55 | $2,808.58 | $4,498.62 | $0.00 |
| 23-Dec-18 | 1049 | 3531 | $90,787.33 | $90,787.28 | $497.76 | $265.93 | $1,716.02 | $4,256.34 | $0.00 |
| 24-Dec-18 | 1168 | 3996 | $92,000.20 | $92,000.05 | $663.18 | $244.19 | $1,882.20 | $12,754.84 | $0.00 |
| 25-Dec-18 | 995 | 3272 | $69,255.13 | $69,255.08 | $177.16 | $110.17 | $1,825.01 | $10,845.38 | $0.00 |
| 26-Dec-18 | 1401 | 5137 | $99,483.21 | $99,483.19 | $403.12 | $57.03 | $2,378.08 | $18,326.05 | $0.00 |
| 27-Dec-18 | 1591 | 6203 | $119,440.43 | $119,440.72 | $1,848.80 | $142.00 | $2,239.62 | $20,933.14 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 28-Dec-18 | 1862 | 7351 | $141,988.86 | $141,988.90 | $959.56 | $174.00 | $3,401.95 | $24,960.04 | $0.00 |
| 29-Dec-18 | 1624 | 5864 | $112,704.50 | $112,704.95 | $908.69 | $114.38 | $2,965.50 | $19,790.72 | $0.00 |
| 30-Dec-18 | 2040 | 6341 | $140,199.37 | $140,199.41 | $1,257.93 | $146.56 | $3,575.63 | $21,299.73 | $0.00 |
| 31-Dec-18 | 3419 | 14248 | $284,610.63 | $284,610.76 | $2,104.95 | $258.89 | $5,096.71 | $46,760.74 | $0.00 |
| Total | 1714054 | 4910167 | $165,230,014.62 | $165,221,923.87 | $580,552.61 | $267,021.69 | $4,858,826.51 | $7,589,805.16 | $6,163.12 |

FSSTX-086589                                    034

# Exhibit 7

**DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, ANSWER TO INTERROGATORY REGARDING NET WORTH**

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

  a.  All income and assets whatsoever kind and nature and wherever situated.

  b.  A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

**ANSWER:**

Defendant's current estimated net worth is based on the information in its 2020 balance sheet, which provides assets and liabilities as of December 31, 2020. Defendant is in the process of preparing its reconciliation and year-end balance sheet for 2021 and will further supplement this answer as necessary once that balance sheet for 2021 has been completed. Based on the latest available information from the December 31, 2020 balance sheet, Defendant's net worth is approximately negative $52,880,888.00, which is comprised of the following assets and liabilities (which are again as of December 31, 2020—bank account records for 2021 have been produced but are not included in the current assets and liabilities statement):

- Assets
  - Petty cash = $960.21
  - Bank accounts with cash of approximately $525,328.16
  - Inventory worth approximately $1,334,453.01
  - Pre-paid insurance of $19,847.64
  - Pre-paid software licenses of $120,042.71
  - Prepaid vendor deposits of $244,439.09
  - Pre-paid other of $14,394.78
  - Gross fixed assets of $1,731.877.57
  - Security deposits of $43,376.328
  - Intangible assets of $406,371.59

- Liabilities
  - Credit card liabilities of $388,732.93
  - Current short term liabilities of $198,740.41
  - Long term liabilities of $55,014,222.87 mainly comprised of a significant note payable to PQPR

- o Defendant also has current unknown potential liabilities arising out of current lawsuits

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

STATE OF TEXAS          §
                                   §
COUNTY OF TRAVIS     §

On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he is authorized to execute this verification on behalf of Defendant, Free Speech Systems, LLC, and that he has read Defendant, Free Speech Systems, LLC's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers on behalf of Free Speech Systems, LLC are true and correct to the best of his knowledge.

By: _____

Alex Jones, on behalf of
Free Speech Systems, LLC

SUBSCRIBED AND SWORN TO BEFORE ME on this the 7ᵗʰ day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

_____
NOTARY PUBLIC, STATE OF TEXAS

2

# Exhibit 8

## DEFENDANT, ALEX JONES'S, ANSWER TO INTERROGATORY REGARDING NET WORTH

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

    a. All income and assets whatsoever kind and nature and wherever situated.

    b. A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

## ANSWER:

Defendant's current estimated net worth is negative $20,635,000.00, which is comprised of the following assets and liabilities (including asset of negative equity in Free Speech Systems, LLC):

- Assets
  - Bank accounts with cash of approximately $458,000.00
  - Income beneficiary of a $25,900,000.00 note due to sale of closely held business interest (note is interest only note)
  - Cryptocurrency valued at approximately $206,800 based on current market rates
  - Real estate comprised of 3 properties valued at approximately $2,350,000.00
  - $3,100,000.00 in proceeds of November 2021 sale of homestead, which such proceeds are held in a 1031 exchange trust
  - Equity interest of ($53,000,000) based on book balance of Free Speech Systems, LLC
  - Household items, collectibles, personal property valued at approximately $200,000.00;
  - Vehicles valued at approximately $150,000.00

- Liabilities
  - Current unknown contingent liabilities based on pending lawsuits
  - Defendant is also a personal guarantor of several leases and certain loans for which the current potential liability is unknown.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

STATE OF TEXAS                    §
                                 §
COUNTY OF TRAVIS                 §

On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, that he has read Defendant, Alex Jones's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers are within his personal knowledge and are true and correct to the best of his knowledge.

By: _____

Alex Jones

SUBSCRIBED AND SWORN TO BEFORE ME on this the 7TH day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

_____
NOTARY PUBLIC, STATE OF TEXAS

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 60315511
Status as of 12/29/2021 9:09 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/27/2021 3:22:40 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Ogden | | bill@fbtrial.com | 12/27/2021 3:22:40 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/27/2021 3:22:40 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/27/2021 3:22:40 PM | SENT |

12/30/2021 2:41 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Daniel Smith

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC; AND OWEN | § | |
| SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**DEFENDANT, OWEN SHROYER'S, MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING A LIABILITY DEFAULT JUDGMENT ON PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215**

Defendant, Owen Shroyer, moves the Court to reconsider the Court's October 26, 2021 order granting Plaintiff's motion for default judgment and second motion for contempt, and would show unto the Court as follows:

## I.     BACKGROUND

Owen Shroyer (hereinafter "Mr. Shroyer") is a defendant in only one (1) of the three (3) cases filed by plaintiffs against co-Defendants, Alex Jones; Free Speech Systems, LLC; and InfoWars, LLC; arising out of alleged defamatory comments arising out of the Sandy Hook tragedy. Plaintiff, Neil Heslin, is the only plaintiff who has asserted claims against Mr. Shroyer.

Mr. Heslin's claims against Mr. Shroyer arise out of commentary Mr. Shroyer gave during a June 26, 2017 broadcast of the Alex Jones Show, when Mr. Shroyer was a guest host on the show. During that 3-hour broadcast, Mr. Shroyer briefly commented on an article from another website (known as Zero Hedge), which pointed out inconsistencies between statements made by Plaintiff versus statements issued by government authorities about the Sandy Hook tragedy. *See*

Plaintiff's Third Am. Pet. at 3-5. During this broadcast, Mr. Shroyer stated: "The statement [Plaintiff] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible." *Id.* at 17. Plaintiff further alleges that during this same broadcast, Mr. Shroyer stated: (i) "You would remember if you held your dead kid in your hands with a bullet whole. That's not something you would just misspeak on[;]" (ii) that Mr. Heslin was "making a pretty extreme claim that would be a very vivid thing in your memory, holding his dead child;" and (iii) "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact." *Id.* at 4.

Plaintiff initially filed suit on April 16, 2018 against Mr. Shroyer and the other Defendants asserting claims for defamation—the claims against Mr. Shroyer arose out of Mr. Shroyer's comments in the aforementioned June 26, 2017 broadcast. Shortly after the lawsuit was filed, Defendants filed a TCPA motion to dismiss. In response, Plaintiff moved for limited discovery under the TCPA, which was granted by the then-presiding judge, Judge Jenkins, in an order dated August 31, 2018. Defendants resisted this discovery, resulting in Plaintiff filing a motion for contempt seeking sanctions under Rule 215 of the Texas Rules of Civil Procedure. *See Jones v. Heslin,* No. 03-19-00811-CV, 2020 Tex. App. LEXIS 2441, at *3 (Tex. App.—Austin March 25, 2020, pet. denied) (mem. op.). After Plaintiff filed his motion for contempt, Defendants initiated an appeal on the basis that the district court had not timely ruled on their TCPA motion to dismiss and thus it had been denied as a matter of law. The Third Court of Appeals determined the appeal was premature and dismissed it for lack of jurisdiction.

Plaintiff then filed his First Amended Petition in his defamation lawsuit on June 26, 2019, adding claims for intentional infliction of emotional distress. However, Plaintiff then further amended his petition, ultimately filing his Third Amended Petition—his live pleading—on August 8, 2019, wherein Plaintiff removed the IIED claim entirely. That same day, Plaintiff filed a second lawsuit against Defendants, Alex Jones; InfoWars, LLC; and Free Speech Systems, LLC, re-asserting his cause of action for intentional infliction of emotional distress. Of note, Mr. Shroyer was not a named Defendant in Plaintiff's second IIED lawsuit. Defendants in the IIED claim then filed a TCPA motion to dismiss, and Plaintiff filed a motion for expedited discovery in that case.

After the defamation case was remanded back to the district court following the first attempted appeal, a hearing on Defendants' TCPA motion and Plaintiff's motion for contempt occurred on October 17, 2019. That same hearing also addressed Plaintiff's motion for expedited discovery in the IIED case. At this hearing, Defendants offered to stipulate to or concede facts pleaded by Plaintiff to obviate the need to respond to the TCPA discovery requests in the defamation case. Judge Jenkins subsequently signed orders on October 18, 2019 which: (i) granted Plaintiff's motion for contempt in the defamation case; (ii) denied Defendants' TCPA motion to dismiss in the defamation case; and (iii) granted Plaintiff's motion for expedited discovery in the IIED case. In the order granting Plaintiff's motion for contempt in the defamation case, the Court ordered that "pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burden in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion." *Id.* At the same time, the district court denied Defendants' TCPA motion to dismiss in Plaintiff's defamation case. *Id.* Another hearing in the IIED case occurred on December 18, 2019 regarding Defendants' TCPA motion to dismiss in the IIED case and a motion for sanctions filed by Plaintiff regarding alleged

discovery deficiencies in the IIED case. On December 20, 2019, the trial court denied Defendants'

TCPA motion to dismiss and also granted Plaintiff's motion and awarded $100,000.00 in sanctions

and took Plaintiff's request for a default judgment in the IIED case under advisement.

In November 2019, Defendants again filed an appeal of the trial court's denial of their

TCPA motion to dismiss in the defamation case. Defendants' appeal was ultimately denied both

by the Third Court of Appeals and the Texas Supreme Court, and the case was remanded back to

the trial court on June 4, 2021. Plaintiff then filed a Second Motion for Contempt Under Rule 215

on July 6, 2021, contending that Defendants had failed to comply with the August 31, 2018

discovery order entered by Judge Jenkins and seeking sanctions, including a default judgment

being entered against Defendants. In Plaintiff's motion, he alluded to both his defamation and IIED

claims, failing to inform the Court that Mr. Shroyer was not a named Defendant in the IIED

lawsuit. Furthermore, Plaintiff's motion rehashed the discovery issues in the case, all of which had

already been addressed by Judge Jenkins; however, Plaintiff contended that the December 20,

2019 order in the IIED case warranted the granting of a default judgment against all Defendants,

including Mr. Shroyer, who was not even a party to that lawsuit.

On August 31, 2021, the Court held a hearing on Plaintiff's second motion for contempt

(and other sanctions motions filed by the remaining Plaintiffs in the other cases). At this hearing,

Plaintiff's counsel barely mentioned Mr. Shroyer (or any discovery issues with Mr. Shroyer)

except to point out that his deposition had been ordered via the August 31, 2018 discovery order

by Judge Jenkins—which had not occurred prior to the trial court's denial of the TCPA motion to

dismiss. *See* Ex. 1, Transcript of August 31, 2021 hearing at 41:11-42:2. Indeed, in the motion

itself, Plaintiff makes no direct mention of Mr. Shroyer nor does the motion discuss with any

particularity the alleged discovery abuses by Mr. Shroyer. Rather, Plaintiff's motion only made

generalized allegations that "Defendants have not taken any actions in this Court since remand or responded to their discovery obligations." *See* Plaintiff's Second Mtn. for Contempt at 20.

Despite Plaintiff making essentially no mention of Mr. Shroyer or alleged discovery abuses by Mr. Shroyer, the Court subsequently granted Plaintiff's motion for contempt, ultimately signing an amended order on October 26, 2021 wherein the Court entered a default judgment as to liability against all Defendants, including Mr. Shroyer. In the Court's order, there is no delineation between the individual Defendants. To the contrary, the order discusses: (i) how "Defendants" violated other discovery orders in the other Sandy Hook cases before this Court (despite Mr. Shroyer not being a party to those other lawsuits); (ii) that "Defendants" have engaged in pervasive and persistent obstruction of the discovery process in general; (iii) that "Defendants" refused to produce critical evidence; (iv) that "Defendants" have shown a "deliberate, contumacious, and unwarranted disregard for this Court's authority;" and (v) that the Court found that "Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit." *See* Amended Order dated October 26, 2021 at 3-4. The Court likewise granted Plaintiff monetary sanctions for Plaintiff's attorneys' fees in connection with the motion.

Mr. Shroyer is seeking to have the Court reconsider its ruling on the motion for contempt and deny Plaintiff's motion for default judgment as to Mr. Shroyer. As stated above, in its amended order, the Court made no specific findings as to Mr. Shroyer or any alleged discovery abuses by Mr. Shroyer. The simple reason for this is that there were none to speak of, and Plaintiff certainly did not point out any discovery abuses as the hands of Mr. Shroyer either in his motion or at the hearing on the motion. Instead, Plaintiff's entire motion and argument at the August 31, 2021 hearing on the motion focused on Mr. Jones and Free Speech Systems and their alleged discovery abuses. Unfortunately, it appears the Court inappropriately lumped in Mr. Shroyer with the other

Defendants, attributing alleged conduct by other Defendants to Mr. Shroyer, individually, granting

a default judgment on liability across the board as to all Defendants.

Yet as this case has progressed, it has become readily apparent that Mr. Shroyer did not

abuse the discovery process in any way. Indeed, Mr. Shroyer's deposition has occurred, which was

the only concern at the August 31, 2021 hearing raised by Plaintiff's counsel regarding Mr.

Shroyer. Moreover, Mr. Shroyer was not subject to prior sanctions for any alleged discovery issues

specific to Mr. Shroyer. And given the nature of Plaintiff's defamation claims against him, it is

likewise clear that Mr. Shroyer's defenses to such claims have merit regardless of any alleged

discovery issues. As such, Mr. Shroyer requests the Court reconsider its ruling on Plaintiff's

Second Motion for Contempt and deny Plaintiff's motion for default judgment, allowing this case

to proceed to trial and allow a jury to make determinations on the underlying merits of Plaintiff's

claims against Mr. Shroyer.

## II.  ARGUMENT AND AUTHORITIES

Mr. Shroyer does not contend that the Court does not have the inherent authority under

Rule 215 to enter a default judgment; however, Mr. Shroyer does contend that such sanctions are

completely unwarranted and are so unjust as to violate Mr. Shroyer's due process rights to have

the merits of Plaintiff's defamation case heard by a jury. While a trial court has the power to issue

sanctions, that sanction power is limited in that the court "may not impose a sanction that is more

severe than necessary to satisfy its legitimate purpose." *Cire v. Cummings,* 134 S.W.3d 835, 839

(Tex. 2004) (internal citations omitted)).

Sanctions for discovery abuse serve three legitimate purposes: (1) to secure compliance

with the discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish

violators. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex. 1992). When a party fails to

comply with proper discovery requests or fails to obey an order to provide or permit discovery, the trial court may, after notice and hearing, make such orders in regard to the failure, which includes, among other things, an order striking pleadings, dismissing with or without prejudice the action or proceedings, or rendering a default judgment against the disobedient party. *See* TEX. R. CIV. P. 215.2. Although punishment, deterrence, and securing compliance continue to be valid reasons for imposing sanctions, these considerations alone will not justify "trial by sanctions." *Chrysler Corp.,* 841 S.W.2d at 849; *see also Westfall Family Farms, Inc. v. King Ranch, Inc.,* 852 S.W.2d 587, 591 (Tex. App.—Dallas 1993, writ denied).

Notwithstanding rule 215, discovery abuse sanctions must be "just." *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAm. Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). Moreover, so-called death penalty sanctions are limited by constitutional due process. *TransAm. Nat. Gas Corp.,* 811 S.W.2d at 917. Thus, "a death penalty sanction cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit." *Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 372 S.W.3d 177, 184 (Tex. 2012).

There is no doubt that the default judgment entered by this Court against Mr. Shroyer constitutes a "death penalty" sanction. A death penalty sanction is a severe form of sanction that prevents a party from contesting liability and allows for the determination of liability based on the party's discovery conduct rather than the dispute's merits. *Ring & Ring v. Sharpstown Mall Tex., LLC,* No. 01-16-00341-CV, 2017 WL 3140121, at *18 (Tex. App.—Houston [1st Dist.] July 25, 2017, no pet.) (mem. op.) (citing *TransAmerican,* 811 S.W.2d at 917-18). When a trial court places a defendant in default, the result is that the defaulting defendant admits all pleaded facts establishing liability. *Id.* (citing *Paradigm Oil,* 372 S.W.3d at 186. The imposition of death-penalty

sanctions that permit adjudication based on discovery conduct is limited by constitutional due process. *Id.* (citing *TransAmerican,* 811 S.W.2d at 917).

Absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules, sanctions that prevent a decision on the merits of a case cannot be justified. *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 918. However, even in those cases where death penalty sanctions can be justified, a trial court must first consider less stringent sanctions and if those lesser sanctions would adequately promote compliance, deterrence, and punishment. *Chrysler Corp,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 917. In all but the most exceptional cases, before the trial court may strike a party's pleadings, the record must show that the trial court considered and tested less stringent sanctions. *Cire,* 134 S.W.3d at 842; *see also GTE Commc'n Sys. Corp. v. Tanner,* 856 S.W.2d 725, 730 (Tex. 1993). Therefore, the record must "contain some explanation of the appropriateness of the sanctions imposed." *Spohn Hosp. v. Mayer,* 104 S.W.3d 878, 883 (Tex. 2003). While case determinative sanctions may be imposed in the first instance, that is only in exceptional cases when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules. *GTE,* 856 S.W.2d at 729; *see also Spohn Hosp.,* 104 S.W.3d at 883 (requiring that "the record should contain some explanation of the appropriateness of the sanctions imposed.").

As with other discovery sanctions, death penalty sanctions may not be excessive and must bear some relationship to the offensive conduct. *TransAmerican,* 811 S.W.2d at 917. In addition, the imposition of death penalty sanctions is limited by constitutional due process because the striking of a party's pleading and dismissal of its action necessarily results in the adjudication of the party's claims or defenses "without regard to their merits but based upon the parties' conduct

of discovery." *Id.* at 918. Therefore, before the trial court may impose death penalty sanctions, the court must determine the offensive conduct "justif[ies] a presumption that the offending party's claims or defenses lack merit." *Id.* In other words, the sanctions must be "just" in the context of the alleged discovery abuse. *Id.*

The imposition of the death-penalty sanction is limited by constitutional due process and therefore, "out to be the exception rather than the rule." *TransAmerican,* 811 S.W.2d at 917, 919. "Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Id.* at 918. And sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Id.* Even when a party has demonstrated "flagrant bad faith[,]" "lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender." *Chrysler Corp.,* 841 S.W.2d at 849. The Texas Supreme Court has consistently emphasized the continued validity of the rule that generally lesser sanctions should be tested first. *Cire,* 134 S.W.3d at 842; *see also Hamill v. Level,* 917 S.W.2d 15, 16 n. 1 (Tex. 1996).

In *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex. 1991), the Texas Supreme Court established a two-part test for determining whether a sanctions award is "just." First, a direct relationship must exist between the offensive conduct and the sanction imposed, which means that the sanction must be "directed against the abuse and toward remedying the prejudice caused [to] the innocent party." *Cire,* 134 S.W.3d at 839 (quoting *TransAmerican,* 811 S.W.2d at 917). Second, the sanction must not be excessive, meaning that "[t]he punishment should fit the crime," and the courts must consider the availability of less-stringent sanctions and

whether the less-stringent sanctions would fully promote compliance." *Id.* (quoting *TransAmerican,* 811 S.W.2d at 917); *see also Taylor v. Taylor,* 254 S.W.3d 527, 533 (Tex. App.— Houston [1st Dist.] 2008, no pet.) ("[A] sanction imposed should be no more severe than necessary to satisfy its legitimate purposes, which include securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators.").

Applying the law to the facts of this case regarding Mr. Shroyer as an individual Defendant, there is simply nothing in Plaintiff's motion, argument at the hearing, or the Court's order that truly explains and justifies why a default judgment sanction against Mr. Shroyer was warranted. Rather, all signs point to the determination that a default-judgment sanction against Mr. Shroyer was unwarranted and unjustified. Beyond the sanction not being justified, Plaintiff likewise failed to demonstrate that any alleged discovery abuse(s) by Mr. Shroyer were so offensive as to justify a presumption that his defenses to such defamation claims lack merit. *TransAmerican,* 811 S.W.2d at 917.

Plaintiff did not meet the burdens required by the Texas Supreme Court in *TransAmerican* to be entitled to a default-judgment sanction against Mr. Shroyer. Plaintiff demonstrated no such conduct at all by Mr. Shroyer, much less demonstrate that there was a direct relationship between any such alleged conduct by Mr. Shroyer and the sanction of a default judgment. *TransAmerican,* 811 S.W.2d at 917. Second, a default-judgment sanction against Mr. Shroyer is extremely excessive and in no way fits whatever alleged "crime" Mr. Shroyer allegedly committed as it pertains to discovery in Plaintiff's defamation case. *Id.* More to the point, the Court did not truly consider lesser sanctions and whether they would promote full compliance of any of Mr. Shroyer's discovery obligations as required under the law. *Id.* While it is true that the Court's amended order makes the conclusory statement that it "has considered lesser remedies" before imposing the

default-judgment sanctions, there is no further explanation as to what lesser sanctions the Court actually considered, nor did the Court provide any further explanation to demonstrate that the Court analyzed this "less-stringent sanctions" issue on an individual basis for each Defendant (rather than lumping them together as a collective). *Id.* Indeed, there is no discussion as to whether Mr. Shroyer had even been the subject of prior or lesser sanctions as it relates to discovery issues in this case to justify the default-judgment sanction.

Moreover, the reality is that because Plaintiff's claims against Mr. Shroyer are only for defamation, the broadcast itself—and questions surrounding Mr. Shroyer's statements in the broadcast, which were asked at his recent deposition—are the only evidence needed to determine the merits of Plaintiff's defamation claim. The Texas Supreme Court has consistently held that in the context of defamation claims, a determination of whether a broadcast is defamatory is based on the "broadcast as a whole," the "statements in the broadcast," and the "broadcast's gist." *Neely v. Wilson,* 418 S.W.3d 52, 63-64 (Tex. 2013) (citing *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114-15 (Tex. 2000) ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements")).

Thus, Plaintiff has the entirety of the "evidence" and discovery he needs to argue the merits of his claims to a jury with regard to his defamation claims against Mr. Shroyer. He undoubtedly has the subject June 26, 2017 broadcast, complete discovery responses from Mr. Shroyer, and Plaintiff has deposed Mr. Shroyer about that broadcast and the statements therein. Plaintiff has suffered absolutely no prejudice or otherwise been deterred in his efforts to obtain discovery from Mr. Shroyer regarding his defamation claims against Mr. Shroyer.

Because of this, it is now apparent that the default-judgment sanctions against Mr. Shroyer were not justified and arguably constitute a violation of Mr. Shroyer's due process rights. Even more importantly, the Court should consider how Plaintiff and his counsel did not raise a single issue with regard to Mr. Shroyer and alleging any discovery abuses by Mr. Shroyer in either Plaintiff's Second Motion for Contempt or the hearing on the same. Instead, Plaintiff focused on Mr. Jones and Free Speech Systems, blurring the lines between the individual Defendants and requesting an improper, blanket default-judgment ruling against all Defendants.

Due process and the underlying facts of this case demand that Plaintiff be required to present the merits of his defamation claims against Mr. Shroyer to a jury to decide and that Mr. Shroyer be allowed to defend against such claims, as opposed to the current trial-by-sanction on liability that has occurred. Consequently, Mr. Shroyer respectfully requests the Court reconsider its prior ruling and deny Plaintiff's motion for contempt (and default judgment) as it pertains to Plaintiff's claims against Mr. Shroyer.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant, Owen Shroyer, prays that the Court grant this motion for reconsideration and ultimately deny Plaintiff's motion for contempt and withdrawing the default-judgment sanction entered by the Court's amended order on October 26, 2021, along with such other and further relief to which Defendant, Owen Shroyer, may be justly entitled.


[Signature on next page]

Dated: December 30, 2021.

Respectfully submitted,

By:    */s/ Bradley J. Reeves*
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

<u>**CERTIFICATE OF CONFERENCE**</u>

The undersigned counsel for Defendants has previously conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on December 30, 2021.

Mark Bankston                            *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                         */s/ Bradley J. Reeves*
                         Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60405196
Status as of 12/30/2021 3:29 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| William Ogden | | bill@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/30/2021 2:41:30 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |