**EXHIBIT B  (contd.)**

**Copy of All Filings with State Court**

D-1-GN-18-001835

12/30/2021 2:41 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Daniel Smith

# Exhibit 1 – Transcript of August 31, 2021 Hearing

**Page 1**

```
              REPORTER'S RECORD
            VOLUME 1 OF 1 VOLUME


NEIL HESLIN,              ) IN THE DISTRICT COURT
                         )
    Plaintiff            ) TRAVIS COUNTY, TEXAS
                         )
VS.                      ) 459TH JUDICIAL DISTRICT
                         )
ALEX E. JONES, INFOWARS, )
LLC, ET AL.,             ) TRIAL COURT CAUSE NO.
                         ) D-1-GN-18-001835 AND
    Defendant           ) D-1-GN-19-004651


LEONARD POZNER AND       ) IN THE DISTRICT COURT
VERONIQUE DE LA ROSA,    )
                         ) TRAVIS COUNTY, TEXAS
    Plaintiff           )
                         ) 459TH JUDICIAL DISTRICT
VS.                      )
                         )
ALEX E. JONES, INFOWARS, ) TRIAL COURT CAUSE NOS.
LLC, ET AL.,             ) D-1-GN-18-001842
                         )
    DEFENDANTS          )


SCARLETT LEWIS,          ) IN THE DISTRICT COURT
                         )
    Plaintiff           ) TRAVIS COUNTY, TEXAS
                         )
VS.                      ) 459TH JUDICIAL DISTRICT
                         )
ALEX E. JONES, INFOWARS, )
LLC, ET AL.,             ) TRIAL COURT CAUSE NO.
                         ) D-1-GN-18-006623
    DEFENDANTS          )

---------------------------------------------------



    MOTION TO COMPEL; MOTION FOR SANCTIONS
```

---

**Page 2**

```
            On the 31st day of August, 2021, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

Maya Guerra Gamble, Judge presiding, held in Austin,

Travis County, Texas, held via videoconference;

        Proceedings reported by machine shorthand.
```

---

**Page 3**

```
            A P P E A R A N C E S


FOR THE PLAINTIFFS:

    Mark D. Bankston
    SBOT NO. 24071066
    Kaster Lynch Farrar & Ball, LLP
    1117 Herkimer Street
    Houston, Texas  77008
    (713) 221-8300

FOR THE DEFENDANTS IN CAUSE NOS. D-1-GN-18-001835,
D-1-GN-18-001842, D-1-GN-18-006623 AN D-1-GN-1004651:

    Bradley J. Reeves
    SBOT NO. 24068266
    Reeves Law, PLLC
    702 Rio Grande Street, Suite 306
    Austin, Texas  78701
    (512) 827-2246
```

---

**Page 4**

```
                  I N D E X
                   VOLUME 1
      MOTION TO COMPEL; MOTION FOR SANCTIONS
                AUGUST 31, 2021
```

|  | Page | Vol. |
|---|---|---|
| Announcements......................... | 5 | 1 |
| Argument by Mr. Bankston............... | 7 | 1 |
| Argument by Mr. Reeves................. | 75 | 1 |
| Response by Mr. Bankston............... | 87 | 1 |
| Response by Mr. Reeves................. | 96 | 1 |
| Court Takes Matter Under Advisement.... | 96 | 1 |
| Adjournment............................ | 107 | 1 |
| Reporter's Certificate................. | 108 | 1 |

5

TUESDAY, AUGUST 31, 2021 - MORNING PROCEEDINGS

1    (The following proceedings were held in open

2  court, via YouTube:)

3    THE COURT:  So, we're on the record, we are

4  here today for D-1-GN-18-001835, Heslin versus Jones;

5  D-1-GN-18-001842, Pozner versus Jones -- oh, I have the

6  wrong piece of paper here -- and D-1-GN-18-006623,

7  Lewis versus Jones.

8    Is that right, Mr. Bankston?

9    MR. BANKSTON:  That is correct, Your Honor.

10    THE COURT:  Can I have your announcement for

11  the record, please, Mr. Bankston.

12    MR. BANKSTON:  Sure.  Mark Bankston appearing

13  for all of the plaintiffs in this matter.

14    THE COURT:  All right, and Mr. Reeves.

15    MR. REEVES:  Brad Reeves for defendants in

16  all the matters.

17    THE COURT:  All right.  So, Mr. Bankston and

18  Mr. Reeves, we had a brief conversation about what we

19  were going to cover today.  And now that we're on the

20  record we're going to go ahead and get started.

21    Mr. Bankston, all of the motions today are

22  yours.  Do you have a preference on what order you

23  would like to take them?

24    MR. BANKSTON:  Well, actually, Your Honor, I

6

1  kind of figured, for convenience and efficiency sake,

2  we do a presentation that kind of brings up the

3  histories of the cases and, because these discovery

4  disputes kind of weave in and out of each other, I was

5  planning on dealing with them kind of collectively.

6    THE COURT:  All right.  I think that's fine.

7    MR. BANKSTON:  As opposed to doing the same

8  material over and over again.

9    THE COURT:  I noticed a lot of overlap

10  reading the briefs getting ready for today.  That is an

11  excellent suggestion and I'm ready when you are.

12    MR. BANKSTON:  Okay.  Your Honor, I'm going

13  to share my screen, if that's okay.

14    THE COURT:  Yes, please.

15    MR. BANKSTON:  Let's see if this is working.

16    THE COURT:  It is working.  I do see like

17  your slides and everything.  It's not like the

18  presentation mode, if you care about that.

19    MR. BANKSTON:  I do, actually, and I have it

20  up and now it's on a different screen than what I seem

21  to be sharing.  I take it you can just see the

22  PowerPoint screen, not a full presentation screen.

23    THE COURT:  Correct, correct.  I see the

24  whole behind the scenes.

25    MR. BANKSTON:  I'm not -- hold on.

7

1    MR. REEVES:  If you go to the share screen

2  button, if you have two screens on your computer it

3  should allow you to change to the other screen.

4    MR. BANKSTON:  If I go to the share button to

5  number two.  Oh, man I'm trying here, hold on here.

6    THE COURT:  You can unshare it.

7    MR. BANKSTON:  I got it.

8    Okay.  Now are y'all seeing my presentation?

9    THE COURT:  Yes.

10    MR. REEVES:  Yes.

11    THE COURT:  Okay.  Great.  Okay.  And I'm

12  going to minimize these windows here so I can see.  All

13  right.

14    So, Your Honor, as you know, we're going to

15  be covering all four cases.  And I think there's no

16  better place than to start from the beginning.  So the

17  first thing that we are going to do, if -- oh, great.

18  There we go.  All right.

19    Your Honor, the first case that we're dealing

20  with today is Heslin v Jones.  This was the defamation

21  case involving InfoWars' allegations that Mr. Heslin

22  was lying about holding his dead child after Sandy

23  Hook.  Mr. Heslin had appeared on Megyn Kelly's show to

24  push back against Mr. Jones' allegations that this

25  entire incident was fake.  After he did that, he was

8

1  retaliated against when they said that he was lying

2  about having held his son.

3    That case was brought back in 2018.  And, in

4  fact, a discovery order was entered on August 31st,

5  2018, so it's sort of happy third birthday to our

6  discovery order in this case.  That order, which to

7  this date has never been responded to in any way,

8  shape, or form, required written discovery in

9  deposition of all the defendants.  About 30 pages of

10  written discovery and then for each of the four

11  defendants.  The defendants refused to respond to that

12  discovery.

13    Actually, it's correct to say they did

14  respond, but their responses simply said, the court

15  does not have the authority to order us to answer this

16  discovery, so we're not going to do it.  So they

17  basically just told the court to pound sand.  We

18  immediately filed a motion for contempt, being very

19  alarmed with that.  They appealed the following day.

20  So for a moment let's stick a pin in Mr. Heslin's case,

21  that second motion for contempt, because that went up

22  on appeal.

23    And that brings us to our next case, which is

24  Lewis versus Jones.  Mrs. Lewis is the co-parent with

25  Mr. Heslin of Jesse Lewis, a victim of Sandy Hook.

1  Mrs. Lewis brought her suit a little bit later.  Her
2  suit alleges intentional infliction of emotional
3  distress, because InfoWars made false statements about
4  the circumstances of the death of her child.
5       In that case the court likewise -- in the
6  discovery orders on January 25th and March 8th, 2019,
7  that also required written discovery and deposition of
8  all the defendants.  The defendants refused to respond
9  to that discovery.  They did show up for deposition,
10  but they failed to prepare their corporate
11  representative for the companies.  That was Rob Dew,
12  And, as noted by the court during the hearing, it was a
13  completely useless deposition, Mr. Dew did not have any
14  idea what he was supposed to be talking about, had no
15  idea he was supposed to prepare for the deposition, and
16  basically answered "I don't know" to every single
17  question.
18       We filed a motion for sanctions.  On the eve
19  of that hearing, defendant provided a document dump
20  filled with nonresponsive materials, and we'll talk a
21  little bit more about those materials in a bit here.
22  But for the moment we can just say everybody at that
23  moment was in agreement that this discovery production
24  was a mess.
25       Defendant's counsel, during that hearing,

1  begged the court not to enter actual sanctions on the
2  record and instead said that he would agree to
3  privately pay $8,000 in attorneys fees and surrendered
4  his client's TCPA motion except for a single legal
5  issue:  They wanted to argue, the only thing they
6  wanted to argue, was that Mrs. Lewis could not bring a
7  claim if she had not been personally identified.
8       And we knew this argument was bunk because,
9  for instance, when Natalie Holloway disappeared in
10  Aruba, her mother, Elizabeth Holloway, was able to sue
11  the "National Inquirer" when the "National Inquirer"
12  made false statements about her daughter's
13  disappearance.  So we knew first the identification of
14  the plaintiff wasn't an issue, so we agreed to forego
15  the component of the motion seeking to strike the TCPA
16  motion, because we knew we had it in the bag by then.
17       Those appeals actually turned out to be a
18  little bit differently so we aren't going to be
19  accepting those kind of stipulations in the future, but
20  for the moment that's what's happened there and
21  discovery was still a very big mess.
22       What happened next in the chain of events is
23  actually the Connecticut case was part of the same
24  process.  As you know, there is a different group of
25  parents who are suing in Connecticut.  They are

1  undergoing exactly the same kind of anti-SLAPP process
2  except Connecticut's deadlines on that are a little
3  more generous, so they were actually going a little bit
4  after the Lewis case.
5       So, once the Lewis case happened and that
6  discovery problem, we then had the discovery problems
7  in Lafferty.  And these become relevant to our cases a
8  little bit later.  What had happened there is that, by
9  March of 2019, the defendants had violated numerous
10  discovery orders.  And this is the Connecticut Supreme
11  Court kind of summarizing what happened in that case.
12       Defendants' local counsel at that time, this
13  is, you know, March and April, started saying that he
14  was in an ethically ambiguous position and he could not
15  discharge his obligations on the pending discovery
16  orders in a way that would permit him to put his
17  signature to a document.  He said, the discovery
18  situation is a mess right now.  That's Exhibit 5 to our
19  brief.
20       Judge Bellis gave one final extension and
21  then defendants produced a dozen files of child
22  pornography.
23       Plaintiff's counsel in Connecticut informed
24  the F.B.I., my counterpart Chris Mattei up there.  And
25  after InfoWars was informed, Jones appeared on his show

1  and threatened plaintiff's counsel.  None of this was
2  public at this point, this was Jones making it public.
3  Jones called plaintiff's counsel gang members, offered
4  a bounty on their heads.
5       And you have to remember that, to Jones, all
6  of us are one big group.  We're a conspiracy of
7  democratic operative lawyers who have been recruited
8  and, by his words, by George Soros, who put on payroll
9  and Hillary Clinton is directing us.  And we're the
10  people he's coming after.  Specifically in this video,
11  too, he was threatening Chris Mattei directly.
12       Now, what I want to show you now, Your Honor,
13  this is our plaintiff's hearing Exhibit 1, this is a
14  video clip, uh, from April 2019.  This was actually
15  admitted and played in court in our last hearing in
16  this case, in December 20th, 2019.  The sort of hearing
17  that we're continuing right now.  So this has already
18  been admitted and is part of the record, but I'm going
19  to offer it now because I want to play a video for you
20  of what Jones said right after all of that happened.
21       THE COURT:  All right.
22       MR. BANKSTON:  Also I should warn this -- for
23  the folks who are on the live stream, this video I'm
24  about to play is extremely not safe for work.  Um.  It
25  has a lot of profanity in it.  Also, even if you're

13

14

okay with the profanity, if you have children in the
room this video gets a little frightening at points.
So I just want to warn the live stream people.

THE COURT: Thank you.

(Video recording played off the record.)

MR. BANKSTON: Okay. So, that is what
Mr. Jones said. Obviously that was very, very
disturbing to us.

Right after that, Judge Bellis assessed
sanctions and struck InfoWars's motion to dismiss. She
cited the production of child pornography, the
despicable, potentially criminal, threats. There was
also a fraudulent affidavit submitted up there in
Connecticut that was not actually signed by Mr. Jones.
But the court said, even if you ignore all of that,
which is completely unprecedented, there were still
multiple failures to comply with these discovery
deadlines. Defendants would not fairly comply with
their discovery obligations.

Judge Bellis said at that time that she
wasn't going to grant a default, but if there's
continued obfuscation and delay and tactics like I've
seen up to this point, I will not hesitate, after a
hearing and an opportunity to be heard, to default the
Alex Jones defendants if they, from this point forward,

continue with their behavior with respect to discovery.
You can see that in Exhibit 6.

The next thing that happened was Heslin
versus Jones comes back to Texas. That case, remember,
that case had gone up on appeal after they refused to
answer discovery and we had brought a motion for
contempt. That was dismissed on August 30th, 2019.
For the next month, InfoWars did absolutely nothing.
Just like they've done in this case, actually.

Judge Jenkins then held a hearing on
October 3rd, 2019. And you can see from that hearing
he is extremely puzzled why, after everything that's
happened in this case, these defendants are still
refusing to respond to discovery and will not obey his
orders.

Now, I'm sure you know Judge Jenkins, him
being one of the more senior judges in this last
generation. And lawyers around here will tell you, you
do not get sanctions from Judge Jenkins. Judge
Jenkins, I think to his credit, is a judge who
vigorously pursues conciliatory actions and tries to
work things out and really wants to give people a
chance. You know, he didn't sanction immediately in
the Lewis case.

The idea of Judge Jenkins granting a contempt

15

sanction and a $25,000 fine is pretty extreme in this
courthouse. I haven't found anybody who has ever heard
of it happening. But at that point he was upset and
went ahead and granted the motion and granted our
attorneys fees.

They had another chance to comply, because
right at the same time that that had happened
Mr. Heslin's claim for intentional infliction of
emotional distress came for a hearing on expedited
discovery. And once again for the -- now, again in
Mr. Heslin's case, Judge Jenkins ordered discovery for
the claim -- for the IIED claim. That discovery order
was entered on October 18th, 2019. That required
written discovery and depositions of Jones, Free Speech
Systems, and their chief editor, Paul Watson.

So, let's talk about what happened there.
First, the defendants gave false and evasive answers to
discovery. And what you need to understand, as you see
from our exhibits in here, the written discovery that
was served in the court's discovery order is very
simple stuff. It is very simple. It's stuff like,
identify all the videos about Sandy Hook; identify all
the employees who were involved in those videos;
identify -- for every statement, you know, here are 17
statements you made about Sandy Hook, identify your

16

source for those statements; identify the methods of
communication that's used in the office.

All of them were not answered. They were
given answers with things like, our sources were
newspapers and things we found on the internet. When
asked who was involved in these episodes: Alex Jones
and Rob Dew and maybe some other people. We don't
know. We can't figure it out. They would never tell
me what videos there are. Any of the most basic
information in interrogatories or request for
production, completely evaded.

They failed to prepare Mr. Dew, again. And
this is what's really shocking, Judge Jenkins was
clearly shocked by this, that the exact same deponent,
who was vigorously chewed out about not being prepared,
they show up again and perform the some mockery of the
deposition again. In fact, both depositions.

They failed to remedy the document
production, and we're going to talk about this a little
bit later, there's some really alarming testimony about
what has and hasn't been produced in this case and that
there should be a lot more production that has not
happened, And that was confirmed in some of those
depositions.

And those depositions also revealed other

17

1    alarming irregularities.  We know that there was no

2    discover -- I mean, no litigation hold put out in this

3    case.  It was never until 2019 was there any

4    communication with inside InfoWars to tell people to

5    preserve documents.  And at that point they just sent

6    an email to every employee saying, hey, if you have any

7    documents, collect them and bring them to us.  Nobody

8    actually went and searched or monitored any of this.

9    The very employees who may have been giving the most

10   damning testimony were told to go look for documents on

11   their own files.  And what happened?  Not a single

12   employee returned a single document.

13          The defendants also failed to produce crucial

14   evidence, and this is -- at the heart of it is mostly

15   the videos that are at the heart of plaintiff's claim,

16   which we don't yet have.  As you know from the

17   briefing, very soon after we sued, all of their videos

18   started being taken down off of line.  So none of them

19   are publically available like they used to be.

20   InfoWars has made at this point our best estimate is

21   over a hundred videos on Sandy Hook.  We don't have

22   that.  And of course we don't have their social media.

23          One thing that the briefing gives you a

24   flavor for is all those things, I don't think the

25   briefing quite gives you a flavor for how evasive

18

1    Mr. Jones was on these issues, on things like his

2    sources and identifying those in interrogatories or

3    methods of communication or the videos.  Any of it.

4          And so I want to show you just about ten

5    minutes from Mr. Jones' November 2019 deposition,

6    because I do think it gives you a flavor of the bad

7    faith we've seen in this case.  And this is plaintiff's

8    hearing Exhibit Number 2 which I'm going to play now.

9          THE COURT:  Can you turn the volume up,

10   Mr. Bankston?

11          MR. BANKSTON:  I'm going to see how I can, if

12   I can do that.

13          THE COURT:  Because I already turned it up a

14   lot on my end.

15          MR. BANKSTON:  And I'm wondering if it's --

16          THE COURT:  If that makes it loud.

17          MR. BANKSTON:  -- if you controlled the

18   volume on your end, I don't know.

19          Let me see what I can do here to make sure

20   I'm all the way up.  Okay, let's try this.

21          (Video recording played off the record.)

22          THE COURT:  Can I interrupt you,

23   Mr. Bankston?

24          MR. BANKSTON:  Yes, you sure can.

25          Are you having hearing problems on it?

19

1          THE COURT:  Yes, we just can't hear it.  And

2    I realize I should have made it clear before you

3    started playing videos that, because they're exhibits,

4    I don't ask my court reporter to record the content of

5    the video.

6          MR. BANKSTON:  Sure.

7          THE COURT:  Okay.  So just -- I just realized

8    I should have made that clear, because I think some

9    courts do that differently.

10          MR. BANKSTON:  Okay.

11          THE COURT:  And she also can't understand it

12   well enough to make a record, even if I had asked her

13   to.  She did let me know that.  But typically an

14   exhibit I do not have her record the contents.

15          MR. BANKSTON:  And, Your Honor, I also

16   figured out just now how I can -- the problem was the

17   sound is coming through my speaker to my microphone.  I

18   figured out how I can share the sound directly.

19          THE COURT:  That was the second thing I was

20   going to say is when you share a video you have to

21   click to share audio also.

22          MR. BANKSTON:  Yes, I see that now.

23          THE COURT:  Okay, wonderful.  Let's try

24   again.  It's up to you whether you want to start over.

25          MR. BANKSTON:  I think that's probably for

20

1    the best.

2          THE COURT:  Okay.

3          MR. BANKSTON:  Because we're doing good on

4    time right now.  I'm going to go ahead and start that

5    over.  And I just want to make sure, since I'm sharing

6    again, that you all are seeing the screen in full

7    screen.

8          THE COURT:  The video is fine, it's the audio

9    that's the problem.

10          (Video recording played off the record.)

11          THE COURT:  That's better.

12          MR. BANKSTON:  Is that better?  Okay, great.

13          THE COURT:  Much better.

14          MR. BANKSTON:  All right.

15          (Videotape played off the record.)

16          MR. BANKSTON:  Okay.  So, for November during

17   his deposition, I dealt with that for about three

18   hours.  We didn't get anywhere with Mr. Jones.  Same

19   thing with his corporate representatives, as you saw.

20   The entire thing was a mess.  They, despite everything

21   that happened, were still not cooperating in discovery

22   in any meaningful way.

23          We had a hearing on that motion.  Their

24   counsel at that time said the following, after the

25   hearing did not go too well.  He said:

22

```
1        "I will represent to this court that, you
2   know, regardless if this goes on appeal, that doesn't
3   preclude me from -- it precludes -- it stays the court
4   as far as filing motions, et cetera. It certainly
5   doesn't preclude me from providing additional videos,
6   documents, and information they're seeking during that
7   period of time. And I fully intend to do so. I've
8   already started that process. So again, they're asking
9   now for basically an instruction that, you know." And
10  then he's cut off.
11       Judge Jenkins asks: So, what you're saying
12  is you're going to continue to comply with the order,
13  that includes written discovery, which is the exhibit
14  to my order, ordering you to produce those things?"
15       Mr. Jeffries said, "Absolutely, judge. I'm
16  representing to the court that I have spent countless
17  hours understanding infrastructure, what exists, et
18  cetera, et cetera, and I am certainly going to comply
19  with that 100 percent, stay or no stay, moving forward,
20  absolutely."
21       The court replies: "So, your point is let it
22  come back to the trial judge who is going to try the
23  case and see just how quickly you do that --
24       "Exactly.
25       " -- and how compliant you are with the order
```

23

```
1   sanction by saying, we're going to get this taken care
2   of, we're going to make sure that this happens and that
3   we don't, you know, years don't go by and all this
4   information is lost and we can't ever figure it out
5   again.
6        The court's order says, "Defendants
7   represented at the December 18th hearing that they
8   would continue to supplement discovery to belatedly
9   comply with the October 18th order. The amount of
10  supplemental discovery is a factor that will be
11  considered if the motion for sanctions is reconsidered
12  on remand. That's Exhibit 1 is that order.
13       Now, for the next year and a half we go on
14  the appeals and the defendant did not supplement any
15  discovery, they just completely disregarded their
16  promise to Judge Jenkins. They got out from under fire
17  by using that promise and then they ignored it. They
18  then continued an appeal, where obviously the court of
19  appeals is very frustrated with them in the Lewis
20  appeal and noted that in that record, and then in the
21  second one, in the Heslin appeal, they went ahead and
22  sanctioned them. So now we have another fine against
23  them from the court of appeals because they're still
24  engaging in frivolous litigation.
25       I need to mention right now, too, before we
```

...

before we make potentially outcome-determinative

24

```
1   before we make potentially outcome-determinative
2   decisions."
3        Mr. Jeffries says, "Exactly right."
4        On December 20th, Judge Jenkins granted the
5   motion for sanctions and assessed $100,000 in attorneys
6   fees for all the work that we had done in deposition,
7   bringing the motion, et cetera. The order holds the
8   default judgment under advisement.
9        I think, as you'll see from that order and
10  from the transcript, Judge Jenkins's opinion was that
11  he only needed to decide the things that were
12  immediately important then, which was the TCPA motion
13  and whatever fees we needed. But whatever remedies
14  needed to flow from whatever actions happened here in
15  this court, that needed to be saved for the trial
16  judge, who is going to have more control over the
17  trial. Because he knew he was retiring.
18       I think also another cardinal sort of
19  principle, Judge Jenkins's judicial philosophy, is that
20  if it is possible to decide less, it is necessary to
21  decide less. And in that case he did not want to
22  decide something that he thought you should be
23  deciding, which is, here we're going to give him
24  another chance, the guy made a promise, he made a
25  representation to the court to try to avoid a bigger
```

24

```
1   get kind of caught up to date, about InfoWars' sham
2   defense, because this becomes very important later
3   after they start producing documents. This is in our
4   supplemental brief on page 37.
5        Essentially, InfoWars defended the IIED case
6   in Mr. Heslin's case the same way they did Mrs. Lewis's
7   case, which is to say they argued that, because
8   Mr. Heslin was not identified in any of the videos
9   claiming IIED, as opposed to his defamation claim, that
10  he could not pursue those IIED claims. Obviously we
11  thought this all was bunk, but there's something more
12  important going on, is in Mr. Heslin's case we
13  requested from them transcripts of all these videos,
14  and they wouldn't provide them. They said, we don't
15  have them. They didn't give us any transcripts of
16  these videos.
17       In fact, it came to be that there was never
18  any transcripts of a certain amount of these videos
19  because some of them had come off of YouTube and nobody
20  had any transcripts. In the appeal it's even talked
21  about how there are no transcripts. InfoWars argued
22  because we could not prove -- we had no transcript to
23  prove anything. And they also told the court in
24  multiple representations, in these certain videos that
25  they enumerated, we never identified Mr. Heslin.
```

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 9 of 79

26

Well, it turns out close to the end of the appeal we discovered, buried in the 5,000-page record of the Lewis case, that attached to an unrelated motion was a partial transcript of one of those videos.  And that video, although Mr. Heslin's name was misspelled so we didn't catch it when we searched, they identify Mr. Heslin in that video.

In other words, the entire appeal that InfoWars launched against Mr. Heslin on his IIED case was based on a false representation by InfoWars that they didn't identify him, when they knew that they did.

Now, InfoWars claims that it's all my fault, that I should have found this errant transcript in the giant Lewis record before this happened.  And maybe we should have found it earlier and that's certainly true.  That doesn't excuse them lying about the fact that they didn't identify him to multiple courts.  So all of that was a waste of time.  But that actually becomes way more important later, and we'll talk about that in a minute.

Let's talk now about coming back on remand.  After their appeals failed, they were remanded and the mandate was issued on June 4th.  And so let's talk about what they're out of compliance of at that moment.

THE COURT:  June 4th, 2021.

MR. BANKSTON:  Correct, Your Honor, of this year.  Right.

So, this is just a few month ago.  And they came back and they are out of compliance first with the Heslin IIED discovery order with a default under advisement.  That's everything we just talked about, where they had responded but the responses were absolutely bunk and their depositions were a complete joke.

The next thing they're out of compliance with is the Heslin defamation discovery order, the one from 2018, which they had already been held in contempt for and they had never answered in any way, shape, or form.

They were also out of compliance with the Lewis IIED order, for which they had already paid attorneys fees and admitted that the discovery situation there was a mess.

They were also out of compliance with the Pozner defamation discovery request, the next case that we haven't even talked about yet; because Pozner went up on appeal without any discovery first.  We went ahead and just took that one up on appeal because the case was so strong.  We didn't feel like we needed any discovery, they didn't have any of these complaints like they had in their later cases.  But they had

discovery served at the outset of those cases, and after the TCPA motion was denied, ever since then, they've just completely ignored them.

So that's everything that was pending on remand.  And what I thought was going to happen, Your Honor, because I knew when they made that promise they weren't going to supplement anything during the appeal, I knew that was a lie.  But what I thought might happen is, when we got back on remand, I thought the moment that the Texas Supreme Court dismisses their case they would realize, okay, now we have to do something and at remand they would get in a panic and produce a bunch of things and show that they were in compliance with discovery and that I would have to be arguing to you that that wasn't good enough, that two years later, trying to make sense of any of this all would just be a mess, that's what I was going to have to do.

That is not what happened.  Nothing could be further from what happened.  From June 4th to August 26, 2021, Defendants did absolutely nothing in terms of any kind of discovery.  There's nothing been produced.  It wasn't until a couple of days before this hearing that I was inundated with some documents.

And so let's talk about what's happened during this entire summer that InfoWars has thrown in

the trash.

First there was June.  And for that entire month there was no efforts made to comply with discovery in any case.  This was just like in 2019, when Mr. Heslin's case came back from remand and for an entire month they had done nothing.  And Judge Jenkins held them in contempt for that.  Well, at the end of the month, with them doing nothing, we went ahead and filed our supplemental brief in support of the default sanctions in Mr. Heslin's IIED case.

We move to July.  And in July still nothing has happened.  On July 6 we bring the Heslin and Lewis motions for contempt.  We had reached out to them, and that's an exhibit you'll see is our July 2nd letter.  It's their only exhibit to their response.  And that letter fully explains to them everything that's going on, why aren't you responding.  And they at that point basically say, we have no idea what you're talking about.  Please send us any discovery you say hasn't been responded to.

So at that point it's clear that they haven't even been working on Heslin and Lewis in the motions for contempt, so we filed those motions.  We also at that point sent them the Pozner discovery requests, too, and say, these haven't been responded to.

1        On July 9th, three days later in oral
2  hearing, we all met together and at that time I went
3  through kind of a mini version of what I'm presenting
4  to you now; and we also reminded them of their
5  discovery problems in all three of those cases.  One of
6  the things you'll remember I specifically reminded them
7  of on the record is, because the defendants in Fontaine
8  had just filed a motion to un -- withdraw their deemed
9  admissions, I told you that I expected for this
10  hearing, when we were scheduling this hearing, that I
11  expected one of the things we would have to accommodate
12  was a motion to withdraw deemed admissions in the
13  Pozner case, because those hadn't been answered.  So I
14  was expecting that to happen in a matter of days after
15  the July 9th hearing.  Because if I heard that I would
16  get those denied and served up with a response.
17        Nothing happened.  We gave them a deadline
18  until July 16th, I believe, to respond, and they
19  didn't.  But we went ahead and gave them some more time
20  just to see if they would.  They didn't.  So on
21  July 27th we filed the Pozner motion for sanctions,
22  which goes and describes all of this.  They continued
23  to do nothing.
24        August opens, and there's a couple of
25  developments that happened in Lafferty in August that I

1  need to talk to you about.  We filed a supplemental
2  brief about this on August 10th.
3        So on August 6th, that Friday, there were two
4  orders entered.  First was a sanction order for
5  continuing failure to comply with discovery.  There's
6  still -- they're in the same place we are, they've been
7  remanded, now they're trying to go back and figure out,
8  try to see if any of the discovery is getting answered.
9  They have discovery orders there that they're not being
10  complied with.
11        The second order was that they disclosed
12  confidential information from a plaintiff's deposition.
13  This -- Your Honor, this was astonishing.  They started
14  a plaintiff's deposition which at the beginning of the
15  record was designated as attorneys eyes only,
16  confidential.  Then, during the actual deposition,
17  defendant's counsel, the local counsel Mr. Randazza has
18  working up there in Connecticut, wrote down the things
19  the plaintiff was saying in the deposition, put them in
20  a motion, and filed them publically during the
21  deposition itself.  Didn't even wait for its transcript
22  and filed that publically and disclosed that
23  information.
24        Now, you'll see from the court's orders on
25  this what's clearly about to happen in Lafferty, which

1  is that now that Lafferty, just like in this case, had
2  already threatened a default sanction if any of this
3  keeps up, that's clearly what's been happening now,
4  because the court's orders there takes very extreme
5  language that you can see what it's doing, is saying
6  that the plaintiff is now prejudiced from further
7  prosecuting their claim and that the plaintiff is also
8  prejudiced from taking additional depositions.
9        And the court also says that witnesses are
10  going to be brightly afraid to appear in this case or
11  give forthright testimony, believing that their
12  confidential information will be disclosed.  So all of
13  those things about how the plaintiff can't even
14  prosecute their case anymore, it's pretty obvious
15  what's going to happen in Lafferty.
16        I thought that that would actually be taken
17  care of by the time of this hearing, but their August
18  24th hearing was actually just a status conference
19  call.  They have a hearing set for September 24th.
20  There's actually another sanctions pending motion
21  regarding some analytics information that was produced
22  that is also extremely troubling.  So it's pretty clear
23  where we're heading in Lafferty.  They're heading for
24  the same place.
25        Now, we get into the second week of August,

1  defendants still haven't done anything.  And at this
2  point we get this very strange email where, you'll see
3  in hearing Exhibit 5, is that Mr. Reeves stated that
4  his client does not possess what production has been
5  provided to date.  He asked plaintiffs to, send me the
6  production you have, indeed, received to date.
7        So, I'm not sure how you would even
8  supplement your own discovery if you don't even know
9  what you've produced, but at this point it's now --
10  this, as you may remember, this is six days before the
11  originally-scheduled hearing of this matter, they were
12  asking me to send them the production because they
13  don't even have it.
14        A week later we still don't have anything.
15  And their counsel wrote again, asking if I would agree
16  to a protective order for the overdue documents.
17  Counsel said the documents were ready to produce but
18  were being withheld because defendants require such an
19  order to be entered.  And we told them, very straight
20  up, you cannot seek protection over discovery that is
21  already due.  Rule 192 requires you to make that motion
22  or seek protection within the time period for the
23  responses; and three-year-old discovery that you are
24  already under contempt for not producing, you cannot
25  have a protective order.

34

1    The next week we still don't have documents.
2  We get two emails that day, the first one very early in
3  the morning. Counsel wrote to us asking for consent
4  for a motion for consolidated discovery plan. We have
5  no interest in that. We told them, look, the court
6  asked us to do a discovery plan, we just did it, we're
7  now days before the hearing. We'll talk to you next
8  week after the hearing if you want to talk about this,
9  but we have no interest in doing a discovery plan right
10 now.
11    He said he was finalizing document production
12 which will only be produced in the Lewis matter, due to
13 the confidentiality of certain documents. But counsel
14 stated, You will have these documents today. We did
15 not get those documents.
16    THE COURT: I'm sorry, Mr. Bankston, which of
17 the binders has these exhibits?
18    MR. BANKSTON: Oh, I'm sorry, Your Honor.
19 So, these exhibits I'm talking about right now, hearing
20 exhibits, were uploaded to the Box last night after
21 defendants filed their responses. So they're in --
22    THE COURT: Oh, so they're not in one of the
23 binders you gave me.
24    MR. BANKSTON: No, unfortunately not. These
25 are in response to --

35

1  2500 pages of transcripts buried somewhere in
2  Mr. Jones's corporate files that were difficult to
3  locate and they're just now finding them now, something
4  like that.
5    The problem, Your Honor, is that these
6  transcripts were prepared by a court reporter. These
7  were made -- a great proportion of these transcripts
8  were made in June and July of 2019. They had them
9  commissioned to be made by a court reporter. That was
10 months before they had told me in the Heslin case there
11 were no transcripts and they didn't produce any of
12 these transcripts. But they had them the whole time,
13 prepared by a court reporter.
14    And what's shocking about that, of course, is
15 that, much later in that case, they then attempted to
16 argue to me that they didn't identify Mr. Heslin and
17 that my case was deficient because I didn't have
18 transcripts. And the entire time they had actually
19 prepared them with a court reporter.
20    The other thing that's very disturbing about
21 these transcripts is there are more transcripts than
22 there are videos that I have been produced. And right
23 here on the screen you'll see a list of dates. They're
24 all titled differently, some of them have episode
25 titles, some of them just have dates. All of these

THE COURT: Okay, that's fine, then. I just
thought I would flip through as you were talking.
That's okay.
    MR. BANKSTON: Sure. But they are in there
noted as plaintiff's hearing exhibits.
    THE COURT: Okay.
    MR. BANKSTON: So then later that day, or
that evening, we didn't get the documents. Counsel
wrote us that night and said he will be moving for a
protective order in Heslin and Pozner, and that
defendants intended to withhold confidential documents.
And no documents were produced that day.
    Then on August 26th, just a couple of days
ago, at 6:00 p.m. counsel provided about 6,000 pages of
supplemental production and, as promised, withheld
confidential documents from both Heslin and Pozner
cases, despite the fact that he has no ability to
object to those cases and he's under contempt in the
Heslin case.
    Let's talk about what was produced in that
6,000 pages, because this is where it really starts to
get interesting. The first thing that was produced was
nearly 2500 pages of transcripts of InfoWars' videos,
and there's a lot of reasons why this is very alarming.
First of all, it might be excusable, say, if there was

36

1  dates are dates I don't have videos for. And these are
2  videos that mention Sandy Hook. And they're videos
3  that they obviously provided to a court reporter to
4  transcribe but they never provided to me.
5    This is the tip of the iceberg, too, because
6  I know about a ton of videos that aren't on this list.
7  But it is extremely disturbing to me that these
8  transcripts exist and these videos existed. They were
9  never produced to me and, in fact, hidden and used to
10 try to get Mr. Heslin's case dismissed.
11    The next thing that they produced is, the
12 bulk of what they produced, is 2100 pages of Google
13 Analytics screen shots and Excel spreadsheets. What
14 this is is a bunch of data about entry links, keywords,
15 search terms and exit pages for the InfoWars.com
16 website. This is not responsive to anything in our
17 discovery requests that are issued in this motion.
18 None of the discovery that occurred prior to remand has
19 anything to do with this.
20    There is one request we issued after remand,
21 it's not related to this motion, that was, produce your
22 analytics or web traffic for every video identified in
23 plaintiff's petition. And some of the videos in
24 plaintiff's petition have promotional pages on the
25 InfoWars website here, but ultimately this is kind of

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 12 of 79

38

1  not really responsive to anything.  I mean, there's --
2  buried in here is some responsive information I guess
3  to that, but not fully responsive.  But mostly this has
4  nothing to do with what we're talking about today, we
5  may end up talking about it later.
6       The next thing they gave us is there's this
7  gentleman -- well, not a gentleman --
8       THE COURT:  So, Mr. Bankston, is it your --
9  are you trying to say that they just included that to
10  clog your review?
11      MR. BANKSTON:  I don't want to make that
12  representation, Your Honor.  I certainly hope that's
13  not why.  I mean, him hoping that they thought it was
14  partially responsive to a post remand request.
15  That's -- I'm going to be charitable and say that
16  that's what I think.  Then again, Your Honor, you are
17  right that there is thousands of pages of things that
18  are not responsive to me.  I don't need to know exit
19  pages for InfoWars, things like that.  It is very
20  nonresponsive.
21      The next thing they produced to me, there's a
22  man named Wolfgang Halbig.  He's a conspiracy theorist
23  crank who has pursued these families for years, saying
24  Sandy Hook is fake.  He's been a guest on InfoWars
25  several times.  They produced me, you know, about 600

39

1  pages of strange emails and a transcript of a town
2  meeting he was at.  Which is responsive, that's fine.
3  I'm just saying it doesn't have anything to do with
4  what we are asking for in this motion.
5       They gave us 239 pages of InfoWars articles,
6  some high-quality scams, some from litigation.  All of
7  them were previously produced.  And then there were a
8  few other things they produced.  About 150 pages of
9  messages to the news tip email address.  We already
10  have thousands of those.  I haven't been able to check
11  yet but I'm pretty sure most of those are going to be
12  duplicates.  There are a few dozen pages from another
13  conspiracy theorist blog named Jim Fetzer, who they've
14  cited on occasion, a handful of emails.
15      There's a few dozen internal emails regarding
16  show scheduling and topics.  There's around a dozen
17  press inquiries to InfoWars about this lawsuit.  For
18  some reason there's affidavits from Jones and Dew in
19  March of 2019 regarding Lafferty requests.  And there's
20  David Jones's deposition transcript, which we don't
21  understand why that's in there, either.  That was an
22  exhibit to our sanctions motion, in fact.
23      And there were some interesting things in
24  there, Your Honor.  This is an email actually that was
25  produced in 2019, before remand.  And this is -- what

39

1  you're looking at is an email notification sent to Rob
2  Dew that he got a message on Twitter, a private
3  message, and this message is three days before they
4  defamed Mr. Heslin and it's talking about
5  Mr. Heslin's -- the interview he had with Megyn Kelly.
6  And we obviously can't see the full message because we
7  don't have access to that.
8       But in 2021 they produced this email, which
9  is another notification, and this is a month later, and
10  this one is on the day of the second video that defamed
11  Mr. Heslin.  And as you can see from this email, this
12  person is engaging in a conversation with Rob, with
13  Mr. Dew, who is obviously responding and giving his
14  thoughts.  And they're talking more about these
15  relevant events.
16      So here is -- we know that there are messages
17  from Mr. Dew on Twitter giving their mental state of
18  mind at the exact moment that they defamed Mr. Heslin.
19  We don't have them because this is social media
20  evidence.  We only have these notifications to know
21  that they exist.
22      We got a couple of other surprises.  First we
23  got an email from Chief Editor Paul Watson discussing
24  the messaging application BaseCamp.  And we've never
25  heard of this messaging application in this case.  This

40

1  is one of the things they were supposed to identify.
2  And we don't know that anybody has ever accounted for
3  this or searched this or knows anything about it.
4       We also got an email from Roger Stone to Alex
5  Jones referencing Sandy Hook, and we had been told that
6  Alex Jones doesn't use email to communicate with
7  people.  We had been told that there were no Sandy Hook
8  conversations.  But now all of a sudden there is this
9  single email from Roger Stone about Sandy Hook.  I
10  mean, we think that's because they think that we'll
11  eventually get that email from Roger Stone.  We don't
12  know why we're just now getting one solitary email from
13  Alex Jones.
14      But most importantly let's talk about what we
15  don't have.  Discovery responses.  So first -- the very
16  first one I talked to you about, Mr. Heslin's case, we
17  don't have discovery responses on his defamation claim.
18  32 pages of written discovery, we -- none of that has
19  ever been answered.  And defendants apparently seem to
20  think they have answered it, which is strange to me,
21  but they have not answered that.  They haven't answered
22  any discovery in Pozner.  And then the discovery
23  responses that you have from Mr. Heslin's IIED claim
24  and Mrs. Lewis's claim have both been admitted that
25  they're patently insufficient, but there's never been

22-01023-tmd Doc#1-15 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 13 of 79

42

1    any supplemental discovery responses.

2        We still don't have the most basic

3    information about this case, even like requests for

4    disclosures which are already due, we don't have. We

5    don't know who has knowledge of relevant facts, what

6    the videos are, who was involved, any of it. Documents

7    have never been supplemented in any meaningful way.

8    We're going to talk -- really an important one about

9    this is the amount of emails they should have, and

10   we'll talk about that in just a minute.

11       Depositions. We were owed four different

12   deposition in Mr. Heslin' case that we have never

13   gotten. And one of those -- actually a couple of those

14   are pretty important because, for instance, we were

15   supposed to have the deposition of Owen Shroyer, and we

16   haven't had that in three years. And the problem with

17   that is Mr. Shroyer was just arrested on federal

18   indictment for insurrection activities on January 6th.

19   And so we're not sure if we're ever going to have an

20   opportunity to depose him.

21       And, in fact, in Mr. Shroyer's arrest

22   affidavit, in all the pictures of him breaking the law

23   where he's not supposed to be, Mr. Jones is standing

24   right next to him. So we have a strong suspicion that

25   Mr. Jones is about to face federal indictment, as well,

1    and arrest. But we're not sure we're ever going to get

2    those depositions.

3        The videos have never been supplemented. And

4    as we see now they have videos that I don't have and

5    there are videos out there they should have; and if

6    they were to go through their own documents they would

7    know about tons of more videos and they have not done

8    any reasonable good faith effort to get us those. And

9    we don't have social media evidence and that's all gone

10   now, too. You've seen that talked in about our brief

11   quite a lot.

12       And who knows what else. This is really the

13   important part is that, when there was a promise made

14   to supplement this discovery, it was because discovery

15   had been so badly bumped for a year, waiting another

16   two years wasn't gonna do it. I mean, now we're

17   talking about having to go find people three years out

18   from where we would have normally done it, to see who

19   was involved in this case, who might still have

20   documents, do they still even have them. You know, the

21   quality of the evidence, of people's memories and the

22   physical evidence, all degrades. And we have now been

23   kept from discovering any of the basic facts of our

24   case for three years. We don't know what else is out

25   there.

43

1        For instance, thank gosh that Robert

2    Jacobson, their video editor at one point, decided to

3    approach us and say he felt bad about what happened and

4    needed to testify. We don't know who else is out

5    there. We don't know what other information.

6        Let's talk now, Your Honor, about these

7    responses. And I definitely agree with you that,

8    filing these responses last night, um, or actually I

9    believe they filed them while you were in trial this

10   last afternoon and I was in deposition, and then when

11   we got out we would have had to have been expected to

12   drop everything we were doing and read these last

13   night. And I know you didn't, but I did. I had my

14   wife take care of my kid and spent all night dealing

15   with these.

16       These responses further show defendant's

17   utter conscious disregard for these cases. They're

18   really quite amazing. So I want to talk a little bit

19   about what was said in these responses because you

20   haven't gotten a chance to read them yet. So this will

21   be your first look.

22       First there is the Pozner response I want to

23   talk about, and they just in flatly admit that they

24   have not responded to discovery, they do not dispute

25   that at all. They say, the undersigned had the

44

1    misunderstanding that plaintiff's discovery requests

2    had already been responded to. They say that when

3    plaintiffs's counsel emailed regarding the responses to

4    plaintiff's discovery requests, the undersigned failed

5    to recognize that these outstanding discovery requests

6    had not actually been responded to.

7        This is very strange, Your Honor. Because if

8    you look at their sole exhibit to their motion, to

9    their response, is their -- Exhibit 1 is the July 2nd

10   email. And you'll notice at the bottom of the email is

11   my first email on that one. And I lay out to them on

12   every case exactly what's wrong and what they need to

13   do. And in Pozner it's very simple. I told them,

14   regarding that case, your clients have not responded to

15   plaintiff's initial discovery requests. Those

16   responses were due on September 1st, 2018. When the

17   appeal was initiated the responses were almost two

18   weeks overdue. Upon remand you have made no efforts to

19   respond. Now, the requests are nearly a month and a

20   half overdue. And now they're three and a half months

21   overdue.

22       THE COURT: I'm just going to, because I

23   can't help it, point out that, while I appreciate you

24   taking the time and effort to lay out what they have

25   not responded to yet, that was not your obligation.

46

1  You filed the discovery and it is their obligation to
2  keep track of what they have responded or not.
3        MR. BANKSTON:  I would agree with you, Your
4  Honor.  I definitely agree.  But, this is an unusual
5  case and I sometimes have to do the lifting for both
6  sides in order for anything to make sense.  And so --
7        THE COURT:  Well, I appreciate it.  I just
8  wanted to be clear that that was not in any way your
9  obligation.
10       MR. BANKSTON:  Thank you, Your Honor.
11       But again, you know, Your Honor, it's
12  interesting, I'm right with you there, but one thing I
13  wanted to make sure and do was to put this out there as
14  clear as possible so that we could demonstrate their
15  absolute conscious disregard.  So.
16       And one place I did that again was the
17  July 9th oral hearing.  I reminded them that no
18  response has been served.  I told them they needed to
19  file a motion to undeem the admissions.  And they
20  didn't do that.
21       A whole month, the rest of that month passed,
22  and then on July 27th on the motion for sanctions all
23  of the above was summarized:  That they had never
24  responded to the discovery request; that all of this
25  had happened in oral hearing, that I reminded them to

1  file the motion to withdraw the admissions.  They
2  didn't do any of it.  None of -- they just ignored it.
3  A complete, conscious disregard.
4        August 30th they filed a defamation response
5  in Mr. Heslin's case.  Let's talk about that one really
6  quick.  This one is also astonishing, Your Honor.  They
7  say, the motion fails to provide any pointed
8  explanation as to what alleged discovery abuses by
9  defendants are ongoing which would warrant a contempt
10  finding beyond making the nebulous, conclusory claims
11  that defendants have failed to adhere to their
12  discovery obligations.
13       Defendants have never responded to the
14  August 31st discovery order.  That is 30 page of
15  written discovery.  That is four depositions that they
16  were supposed to give that they first told the court,
17  you don't have authority to make us do this.  Then they
18  launched an appeal with no jurisdiction.  Then they
19  came back, refused to respond, and the court held them
20  in contempt and fined them $25,000.
21       Then they appealed again, launched a
22  frivolous appeal for which they were sanctioned, came
23  back, and still have never responded to these discovery
24  requests.  And now they have the temerity to tell this
25  court that I'm being vexatious and that there is no way

47

1  they could possibly know what they would have to do to
2  comply with this order.  They've never responded.
3        On Heslin contempt Exhibit 10, on July 2nd
4  there's that email that I sent them that we just talked
5  about.  And they were reminded that they never
6  responded.  In very clear language I laid out this
7  exact situation, how in 2018 they chose not to respond;
8  in 2019, they again continued not to respond; and how
9  now, where are the responses, why have they not
10  responded.  Defendants now claim that, hey, how would
11  they ever know what to do.
12       It's frankly, Your Honor, the disregard to
13  respond to a second contempt motion in this way, to not
14  even know that you haven't answered the discovery, when
15  I have provided you that -- I sent them the -- the
16  order has it all set out.  And these are orders of the
17  court.  It's frankly just baffling to me, Your Honor.
18  Also, this is conscious disregard.
19       Let's talk about -- my screen popped up,
20  there we are.  All right.
21       Let's talk about Lewis really quick.  That
22  response they cared -- they say that the plaintiff
23  characterizes the Lewis production as largely
24  containing nonresponsive materials.  Plaintiff truly
25  makes no effort to provide evidentiary support for this

48

1  allegation.
2        If you look at Lewis contempt Exhibit 5, it
3  is a copy of our April 2nd, 2019, Lewis reply on motion
4  for sanctions.  You'll remember, that motion was filed
5  when they had produced nothing and then after the
6  motion was filed on the eve of the hearing they did
7  this document dump.  That reply goes into extreme
8  detail, sets out how the production was deficient and
9  nonresponsive, gives example documents.  It contains a
10  declaration from our expert, who was helping us review
11  it, who describes what an incredible mess it was.  So,
12  from our standpoint, yes, we absolutely have provided
13  support for that.
14       But more importantly, this is sort of just
15  relitigating things that were already decided in 2019.
16  Because they say, for instance, that the Lewis motion
17  does not show how defendants have failed to comply with
18  such orders and how, when, and by what means defendants
19  have abused the discovery process.  But they admitted
20  in that hearing that the Lewis production was
21  inadequate.  They agreed to pay attorneys fees.  They
22  totally understood what a mess they made of the
23  situation and promised to fix it.  And, in fact, right
24  after that their other attorney said that discovery
25  situation was a mess and a short time after that they

22-01023-tmd Doc#1-15 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 15 of 79

50

1 ended up producing child pornography.

2     We all know that the Lewis production is in

3 no way adequate, but they don't seem to want to

4 supplement their answers in any way.

5     Let's talk about the Heslin IIED response

6 now. They say that plaintiff's supplemental brief is

7 nothing more than a veiled attempt to have this court

8 reconsider that ruling and implement additional

9 sanctions when that situation has already been

10 addressed. And, Your Honor, I think we both know that

11 that is a flat misreading of the court's order and the

12 transcript, where this court definitely was in the

13 mindset that, if this discovery was not supplemented as

14 Mr. Jefferies promised, that additional sanctions would

15 be considered. And that he was expressly holding this

16 off to let you decide how to deal with all this

17 situation.

18     They talk about the document situation. I

19 want to address this really well, too. Because they

20 say that, what plaintiff conveniently omits from his

21 briefing is that the scope of discovery in Lafferty is

22 much wider and all-encompassing than the discovery at

23 issue in this case. For example, plaintiff sites to an

24 affidavit of David Jones filed in the Lafferty matter

25 that search terms in that case yielded approximately

1 80,000 emails that were potentially responsive to the

2 Lafferty plaintiff's discovery request, but in no way

3 does that support the idea that those emails are

4 responsive to this plaintiff's limited discovery

5 request.

6     Your Honor, if you'll actually look at that

7 affidavit that's in our response, what Mr. Jones said

8 is that searching for the terms "Sandy Hook" in emails

9 returned nearly 80,000 emails and that they expected

10 similar volumes for other search terms in the Lafferty

11 plaintiff's request.

12     We've obviously requested all emails with

13 Sandy Hook in them. We have about 11,000 total

14 documents in this case and I would just give you a

15 rough estimate of about half of them contain the term

16 "Sandy Hook" in them. So we're not anywhere close to

17 that universe. And most of those emails we have, a

18 good portion of it, Your Honor, is the same 15 people

19 who are writing InfoWars unsolicited, and they are

20 extremely mentally ill and writing 500-page emails to

21 InfoWars on a weekly basis. And it's these same ten

22 people over and over again. So what we're seeing here

23 is not in any way a search of this.

24     We also took the deposition of Michael

25 Zimmerman, who is like a 23-year old IT employee at

1 InfoWars who emailed some of this. And he confirmed

2 for us in this case, David Jones's testimony, that

3 there should be 80,000 emails relating to Sandy Hook.

4     Now, they also talk about messaging systems

5 in their response. They say that Free Speech Systems

6 utilized Slack as a messaging system, but that system

7 has not been utilized since April 2016 and that data

8 has been preserved and to the undersigned's best

9 knowledge has been produced.

10     I don't know what this undersign's best

11 knowledge is, because he doesn't have that knowledge.

12 I mean, this is just -- he's copying and pasting

13 something from 2019 or something, I don't know. I

14 don't think anybody has everybody alleged this Slack

15 data has been preserved or produced. We have testimony

16 on our records showing -- in our motion showing that

17 Slack data has not been preserved and is not available

18 anymore. If it is available, we have notifications

19 from emails that show that Sandy Hook was discussed in

20 the Slack system, so there should be those messages.

21 Those haven't been produced.

22     The same deal with this Rocket.Chat makes the

23 exact same statement. And we don't have any

24 Rocket.Chat production. None. And we don't have any

25 indication that that's been preserved. You'll also

1 notice there's a gap between 2016 and 2018. They don't

2 say what messaging system they were using at that

3 point, but we know that that exists, too, and none of

4 this has been accounted for.

5     This stuff about the undersign's best

6 knowledge, you're going to see this a lot in this case.

7 This is because Mr. Reeves is not getting any

8 cooperation from his client. So the undersign's best

9 knowledge is just a guess on his part.

10     MR. REEVES: Your Honor, I would object to

11 that because he doesn't know what I'm talking about. I

12 mean, I can understand that he's frustrated here, but

13 he doesn't need to be opining on what I'm saying. I

14 can certainly discuss it with you, but I object to that

15 statement there.

16     THE COURT: Well, you can object to it but I

17 can also read and make a conclusion about what that

18 statement means.

19     MR. REEVES: I understand, Your Honor. I'm

20 just -- what I --

21     THE COURT: What it means is you don't know.

22 You don't have any idea. Because if you knew you would

23 say so.

24     Go ahead, Mr. Bankston.

25     MR. BANKSTON: Okay. The other thing that

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 16 of 79

54

the IIED response from them last night addresses is
videos.  It says, while plaintiff's briefing addresses
a couple of videos he says have not been produced by
defendants, plaintiff notably does not provide any
information to the court as how such videos are in any
way relevant or connected to his IIED claims in this
case.

And, Your Honor, this is so ridiculous.
Because if a video is about Sandy Hook, it's obviously
relevant.  I mean, we're alleging a continuing course
of conduct here.  The other thing that's ridiculous
about this is, when you're already under contempt for
not producing it, the idea that it's not relevant is
not a great argument at this point.  This is obviously
directly connected to my case.

It's also way more than a couple of videos.
We identified about six in that brief right there,
we've given them a list with others they haven't
produced, and we know there's ones they have they
haven't given us.  No effort has ever been made to
answer even the most basic interrogatory about what
videos exist.

Then there's social media evidence.  Their
excuse here, you saw in our motion how they had every
opportunity in the world to preserve this, they knew

that it was about to be deleted, they got every thread
over a course of months.  And they said it's our
problem because we haven't given third party subpoenas
to any of the social media companies.  And the problem
here is during the first period of this case up until
this remand I was under discovery stays where I could
only have the expedited discovery against the
defendants that was granted by the court.  I couldn't
just go out and do discovery.

But more importantly, if they have a superior
right of access to this, these are their accounts and
they can get them much easier from FaceBook or Twitter
than I can.  This would be like if I was saying, well,
you know, I have medical records but I'm not going to
try to get them for you, you gotta go get them.  This
is -- in this situation I have no reason whatsoever
that Facebook, Twitter, or YouTube is going to comply
with me in any way.  But they have to make a reasonable
effort to get things that are within their custody and
control, and they haven't tried to do that at all.

The other thing that is said in this response
is that the undersigned counsel was not involved in
those disputes but certainly has reviewed the record
and understands where the issues were alleged to exist
and what has been done to try to remedy those discovery

disputes.  The undersigned has been personally
reviewing over 75,000 documents gathered during this
litigation.

Your Honor, respectfully, from what you've
seen today, this not true.  Mr. Reeves does not
understand where the issues were alleged to have
existed.  He believes he's responded to discovery he's
never even responded to.  Which tells you something,
Your Honor, which tells you that he has never checked
to see in holding his hands the discovery responses
that have been issued in this case.

In other words, he is telling you in a
contempt motion that there is wild, spurious
accusations against them that should never be granted
and they're in compliance because they have responded,
and he told you that without ever laying his hands on
the discovery responses to see if they were compliant.
Because if he had tried he would realize there are
none.  And so to then say he understands what issues
are alleged to exist, no, he doesn't.  And they have
not tried to remedy those discovery disputes.  They
tried to do some eleventh-hour figgely before they
produced us 6,000 papers of mostly useless documents.

He also says the undersigned has been
reviewing all those 75,000 pages?  They surely didn't

even have those until at least August 11th, when they
told us they didn't have them and they wanted us to
give them to them.  I'm not even sure I totally believe
right now that they do have them.  I think maybe they
kind of got embarrassed and said, no, no, okay, we're
okay, don't give us the documents.

So the idea that since August 11th, with the
other briefing the defendants have done, with the other
briefing I know Mr. Reeves has done in another court
with me, there's no way since August 11th you've
reviewed 75,000 pages of documents.  I did that, I
remembered doing that.  I couldn't have done it in that
period of time even with nothing else going on.

There's also a response made about the
pattern of conduct in this case.  Defendants say that
none of the cases cited by plaintiff, the vast majority
of which are non Texas cases, support the position that
the court can consider alleged discovery violations in
entirely separate matters.  I mean, that's just not
true.  First of all, look at page 42, that's *Caron v.
Smaby*, and that's where you had conduct, and this is
from my home district, where it was in one court of the
district in Harris County but there was also discovery
abuse previously in another district court of that
county.  We'll talk about some other cases like that.

58

1  In fact, that's a good place to transition right now to
2  talk about the legal principles.
3          THE COURT:  Let's take a little break, then.
4          MR. BANKSTON:  That's great, that's great,
5  Your Honor.
6          THE COURT:  Yeah.  So let's take like a
7  15-minute break.  We'll come back at 10:30.  My
8  assistant will put up a break sign, but if you don't
9  want whatever you're doing on break visible or audible
10 on YouTube, you need to turn your camera and your sound
11 off.  Okay?
12         MR. BANKSTON:  All right, Your Honor.
13         THE COURT:  See you at 10:30.
14         MR. BANKSTON:  Okay.
15             (Brief recess.)
16         THE COURT:  All right.  Welcome back.
17 Mr. Bankston.  You can pick back up.
18         MR. BANKSTON:  All right.  I think I only
19 have like ten or fifteen more minutes with you,
20 hopefully.
21         THE COURT:  All right.
22         MR. BANKSTON:  Okay.  Y'all got that in front
23 of you?
24         THE COURT:  But it's not the -- it's the
25 wrong screen again.

59

1          And I do feel like that was done in a
2  calculated way so that there would be no time to reply
3  to that, there would be no time to look at that.
4  Luckily, I did have time last night to throw everything
5  to the sidelines and dive into those.  But we actually
6  believe that their failure to address these motions
7  that have been pending for quite some time and are
8  quite serious and the gravity of them, their failure to
9  really respond to those, to us, speaks to the conscious
10 disregard.
11         THE COURT:  I agree with you and I want to
12 make it clear that in all cases in front of me,
13 Mr. Reeves, whether they involve Alex Jones or another
14 party, from now on, when you are the attorney, I'm
15 going to set deadlines for when everything is due.  And
16 particularly in these cases.  And if they're late, I'm
17 not going to consider them.
18         MR. REEVES:  And I understand.  And there was
19 no gamesmanship, Your Honor, there was simply --
20         THE COURT:  Hard to believe.  It's hard to
21 believe.
22         MR. REEVES:  I understand that, Your Honor.
23 But I can tell you for me personally there was no
24 gamesmanship for me.  But I understand what you're
25 going to do and I can appreciate that and I'll make

58

1          MR. BANKSTON:  I'll get that taken care of.
2  Screen number two.  There we go.
3          All right.  Are we looking good now?
4          THE COURT:  Yes.
5          MR. BANKSTON:  Okay.  So, we just wrapped up
6  talking about the responses that were filed yesterday.
7  I did also want to add on that, um, to kind of follow
8  back up on your comments about that, you know, staff
9  attorney Mr. Denton had sent us out a chart of
10 everything for this hearing to get us ready and had
11 asked us, sort of as a convenience, you know, when we
12 were scheduled on August 17th, you know, can you please
13 get me copies, paper copies, of all relevant pleadings
14 by the 6th.
15         That following week defendants had contacted
16 the court and said, hey, we didn't know that
17 necessarily applied to us.  We're going to file our
18 response tomorrow, on the 10th.  And at that time
19 Mr. Denton said, you know, look, hey, this is just to
20 try to be a guideline, there's no court order here
21 setting a deadline.  But the judge would like you to
22 get your pleadings in as soon as you can so she has
23 plenty of time to review them.  And that was back on
24 the 10th.  And they went ahead and just sat on those
25 until the night before the hearing.

60

1  sure that we meet whatever deadlines the court sets.
2          THE COURT:  Which I shouldn't have to do, and
3  I don't in almost any case.
4          All right.
5          MR. BANKSTON:  Let's move on to legal
6  principles underlying this motion.  And as you know,
7  these are -- it's interesting, because they're all
8  essentially motions under 215, right, we're talking
9  about discovery abuse and the powers available to you
10 when a party is engaged in this kind of years of
11 discovery abuse.
12         The first principle that we talked about --
13 first principle we talked about in our motion on
14 page 40 is that persistent discovery abuse justifies
15 presumption that a defense lacks merit.  And when the
16 court can reach a presumption that the defense lacks
17 merit, default sanctions can be granted.  The court in
18 doing so must only consider, and not test, lesser
19 sanctions.
20         Obviously in this case -- in these cases the
21 court has tested all sorts of sanctions.  It's
22 interesting, though, that InfoWars' argument is
23 essentially going to be, because we have only been
24 sanctioned once in each case, or because there's only
25 been discovery violations once each case, you can't

62

1   consider what's happened in the past, you've just got
2   to keep on giving us the lower sanction each and every
3   time we do something in your court.

4          This isn't the law, though.  Because, as we
5   point out on page 41, the trial court may consider
6   action taken in another court when that action is
7   relevant to the case pending before the trial court.
8   And in here it's not even really another court really
9   so much, because so much of this already happened in
10  your court.  Defendants want to say in their response
11  that this sort of law only applies when the same
12  lawsuit has been transferred between courts but you
13  can't consider anything else.  And that's just flatly
14  not true.

15         Not only have we talked about the case of
16  *Caron* earlier, but I actually think *Zenergy* is maybe
17  the most important case for you to look at in this
18  dispute.  We put that into the Box and highlighted it
19  for you.  *Zenergy* is so factually similar here but far
20  less egregious.  *Zenergy* was a corporate dispute where
21  both parties sued each other and in that case the
22  defendants did not provide discovery.  They -- and it
23  wasn't nearly as far ranging as ours, but there was
24  certain information that defendants did not provide.

25         They had also moved for summary judgment at

---

1   the same time, which is dispositive in much the same
2   way a TCPA motion is.  It was discovered that they had
3   hid discovery, didn't fully comply, so there was a
4   sanctions hearing held.

5          And then at that sanctions hearing the court
6   didn't take action, much like in this case.  The court
7   said, well, there's going to be a stay of proceedings
8   for a little while in this case, so we're going to hold
9   off on making a ruling now.  The stay went for a year
10  and then, upon a year, when they came back from the
11  stay, the judge noted, well, Zenergy hasn't done
12  anything to respond to these requests, even though
13  they've known for a year that default sanctions could
14  be imminent and they haven't done anything to get that
15  information in front of the court.

16         There had never been any prior discovery
17  abuse in *Zenergy*.  But what happened is that the judge
18  in that case noted that two of the three same
19  defendants had committed discovery abuse in a previous
20  case.  It's unclear from *Zenergy* whether that was even
21  a state case, that might have been a federal case.  But
22  it was a previous similar lawsuit involving Zenergy in
23  which they had conducted -- had been sanctioned for
24  similar discovery abuse.

25         The judge in that case said, well,

---

63

1   considering this prior conduct, I can assume that my
2   sanctions here are not going to be effective.  So
3   that's why a default was granted.

4          When it was reviewed by the Corpus Christi
5   court they said he was entirely proper to do that
6   because he could rely on the fact that they had been
7   sanctioned by the same conduct before; and that they
8   had repeated it in front of this next judge, that judge
9   did not have any confidence that his sanctions are
10  going to change their behavior.  So in *Zenergy*, under
11  much less worse facts, a default was granted.

12         There's also, we also need to talk a little
13  bit about, the defendant's bad faith.  Defendants are
14  correct that simply bad faith or things you do outside
15  the litigation are not an independent basis for
16  sanctions under 215.  But once the court determines
17  that 215 sanctions are appropriate and it starts to
18  consider whether -- what kind of sanctions would be
19  effective, it is absolutely allowed to consider
20  defendant's bad faith approach to the litigation in
21  general.

22         And one of those first things you can talk
23  about is, I know the video that we played earlier
24  didn't really have volume to it so I may need to play
25  that at the very end of this presentation again, but

---

64

1   you would see from that video Jones has created a
2   hostile atmosphere, and it will discourage people from
3   participating in litigation.  He has shown an abject
4   disrespect for this proceedings and the safety of
5   everybody involved.

6          As you may know from the briefing, right
7   after that video, the judge in Connecticut started
8   getting death threats that the F.B.I. warned her about.
9   The plaintiff's counsel did up there, they actually got
10  police to guard their office.  My wife got a message on
11  her phone after Mr. Jones called me a gremlin and a
12  goblin who was terrorizing InfoWars' audience and he
13  asked them to stand up.  He does this.  He has no
14  problem creating that atmosphere.

15         He also is obsessed with this idea that there
16  is a conspiracy that has made these trials show trials
17  and that there are powerful forces in the democratic
18  party, headed by Hillary Clinton, who apparently
19  control us, who are causing him to become railroaded.

20         He has called Judge Jenkins a hoodwinked
21  mainline liberal who is being manipulated.  He has
22  openly called these lawsuits show trials.  And there's
23  a really good understanding, when you see his conduct
24  of that nature, why he's not participating in discovery
25  and why these sanctions are not effective.

66

1    The defendant's conduct here was egregious,
2  and what I want to really emphasize is how the courts
3  frequently default parties for so much less than this.
4  If we look, for instance, at *Alma Investments*, this was
5  a lawsuit about some condo developments in South Padre
6  Island, multimillion dollar lawsuits, where the
7  companies were suing each other.
8    In that case there were two failures to
9  appear at deposition and a failure to deposit funds in
10  the registry. They said the court twice ordered the
11  Pakidehs to appear for depositions but both orders were
12  not followed. Additionally, the trial court ordered
13  Alma, the company, to deposit $20,000 in the registry
14  of the court to pay an auditor. That's all that
15  happened and those parties lost their ability to defend
16  their claim.
17    And I think you would have to look at that
18  situation and think about the Pakidehs and think, if
19  they were denied the ability to put on their case but
20  Mr. Jones in what he did is going to put on his case?
21  And I think you would have to understand that the
22  Pakidehs would think that was very unfair.
23    The same thing would be true in *Salomon v.*
24  *Lesay*. There there were just three failures to appear
25  at deposition, and one of them occurred after a

1  monetary sanction of a thousand dollars. Which is far
2  less egregious us than what's happened here, with
3  numerous depositions missed, numerous monetary
4  sanctions, numerous cases where they are not responding
5  to discovery and where they're across the board
6  obstructing every other discovery.
7    Here again you would look at somebody like
8  Michel Salomon and what would he think to know that he
9  was kicked out of his case but Mr. Jones is going to
10  keep going in his. I think that would be the reaction
11  basically across the state is that if the people were
12  to see what has happened here and then see Mr. Jones
13  continue, they're -- the reaction would be Alex Jones
14  got away with what? And that has really been the
15  jaw-dropping reaction of everybody who has seen this
16  case.
17    The other thing I want to remind the court is
18  that discovery affects all aspects of these cases. And
19  I've put down here the three elements that we're going
20  to have to prove, for instance, in our defamation
21  cases. And the reason is is because, one of the things
22  the court might be inclined to do in a situation like
23  this, is to pursue a lesser sanction of saying, I'm
24  going to make an evidentiary finding on a certain issue
25  in the case that discovery affected. Something less

67

1  than a default.
2    Well, here I want to go over these elements,
3  right, and how every single one of them has been
4  blocked by discovery.
5    First there is published. And we know that
6  there's a dispute over who published what, as you
7  remember from our last hearings, whether InfoWars, LLC
8  was involved, from the discovery there, and we've been
9  just absolutely obstructed discovery on InfoWars, LLC.
10    We have to prove it's a false statement. And
11  obviously whether the statements are false can be
12  proven with discovery from the defendant, because
13  there's a good chance that they're going to give us
14  discovery that they knew it was false.
15    We also need to prove it was a statement of
16  fact and not an opinion. But if defendants are relying
17  on the idea that they were simply analyzing certain
18  disclosed facts and giving their opinion based on those
19  disclosed facts, if we discover evidence that they knew
20  that those facts were false, then they are not entitled
21  to express that opinion and they do not get that
22  defense.
23    Furthermore, prior statements of the
24  defendant may, in fact, change the meaning of the
25  actual statements in the challenge. So for a lot of

68

1  reasons discovery is important to opinion cases.
2    Then we also have whether it's about the
3  plaintiff. Image with me that InfoWars has a document
4  saying, ha, ha, ha, this new broadcast we're going to
5  do is really going to mess over Lenny Pozner's life.
6  It would be very difficult for them to come back and
7  say then, nobody can possibly interpret that video as
8  being about Lenny Pozner. That impeachment evidence
9  could be critical.
10    The idea that the statement caused the
11  plaintiff reputational harm is my next element. And
12  honestly, that one is not really important here because
13  these are per se cases. So there's the presumption
14  that the plaintiff is caused harm. But even still,
15  there's clearly we can get evidence of reputational
16  harm from the defendant's discovery.
17    And finally, that defendants acted with the
18  required fault. And this one here is pretty obvious to
19  me, too, because everything under the sun that they
20  could produce to us could possibly go to their fault.
21    So those, if all of those are the issues, if
22  any of those are left intact, we are actually still
23  suffering prejudice from this discovery in the fact
24  that it's been absolutely botched and will never be
25  fixed,

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 20 of 79

70

1   The last thing that defendant's counsel
2   leaves you with is his plea, right?  He says to you
3   this plea, that the undersigned requests that the court
4   grant him an opportunity to prove that he has control
5   of this discovery situation.  Well, with respect, he
6   has already had that opportunity and he has thoroughly
7   proven that he does not have control of this discovery
8   situation.  Doesn't even understand the discovery
9   situation, much less have control over it.
10   But what's really interesting to me is that
11   this is the exact same plea given to this court to
12   avoid default sanctions in 2019.  This is exactly the
13   same thing that Mr. Jefferies said to this court and
14   how much time he had put in to getting an understanding
15   of what's going on and they were going to get this
16   fixed.  The exact same excuse.  And what's even more
17   ironic is that was also the same excuse used by the
18   lawyer before him.  And the lawyer before him.  And the
19   lawyer before him.
20   It just keeps going, Your Honor.  It's like
21   that movie "Groundhog's Day" with Bill Murray.  And I
22   remember him saying this line:  One day I went to
23   Mexico and had a great vacation down there.  I spent a
24   whole day on the beach, drank pina coladas.  Why
25   couldn't I have that day over and over and over again.

1   And we really have been stuck in the same situation.
2   So to hear this defense counsel make this
3   exact same plea, after having just completely trashed
4   the entire summer, remember that defendant's counsel
5   came to this court and negotiated and agreed for a
6   discovery plan that has me designating experts in about
7   14 days, and I don't have any discovery to do that.
8   That's not going to stop me, I'm still going to
9   designate my experts, because we realize we've gotten
10   all the discovery we're ever going to get.  There's
11   never ever going to be a fix to this problem.
12   There is a reason, you might wonder and it
13   kind of starts to make sense, why every single counsel
14   comes to you and makes the same plea and why no counsel
15   can ever get control of the discovery situation.  It's
16   because of this man.  We've told you this in our brief.
17   We set this very clearly.  There's a reason why no
18   sanctions have ever been effective at changing this
19   man's behavior.
20   He will continue to introduce chaos, defiance
21   and danger into this lawsuit, because it is built
22   straight into his DNA.  We have had all of these
23   different lawyers and it has been -- one thing that has
24   remained consistent is Mr. Jones' complete disregard
25   for these proceedings and, in fact, his open attacks on

1   these proceedings.
2   And it's really for that reason, Your Honor,
3   is that we now have given you proposed orders on all
4   the cases, and the discovery abuse has gotten so bad
5   these last three months, the conscious disregard is so
6   shocking, that we are asking for a default judgment in
7   all four cases.  Because in every single case you have
8   a long history of discovery abuse you can rely on to
9   show you that anything you try to do right now to
10   compel compliance is not going to work.
11   Your Honor, so that is what we are
12   requesting.  We have added proposed orders to the Box.
13   There is one other thing I would like to do,
14   I've been let known that during the playing of this
15   first video that we're looking at a screen shot right
16   now, Your Honor, that the sound wasn't working so it
17   wasn't able to be heard.  It's a two-minute video and I
18   do think it's important for the court to hear what is
19   heard, so if it's okay with you I would like to close
20   by playing that two-minute video.
21   THE COURT:  All right.  I heard most of it
22   but that's okay, you can play it again.
23   MR. BANKSTON:  Okay.  I just figure for two
24   minutes it's probably not the worst way to end.
25   All right, Your Honor, here we go.

1   THE COURT:  And this is Exhibit 1.
2   MR. BANKSTON:  Correct, Plaintiff's Hearing
3   Exhibit 1.  And this is the broadcast that was made
4   after the discovery of child pornography in Lafferty.
5   Again for the audience who is watching on the
6   live stream, this is extremely not safe for work, there
7   is a lot of profanity, so I do want to give you that
8   warning before I start.
9   (Videotape played off the record.)
10   MR. BANKSTON:  All right, Your Honor, as
11   closing let me just say the person you saw there at the
12   end of that video was Norman Pattis.  He's a local
13   counsel for Mr. Jones in Connecticut.  And the pattern
14   that you see in this case, and I see it over and over
15   and over, is that they select some local counsel, who
16   comes in and takes these, falls on the sword, and it's
17   always a new local counsel that they throw under the
18   bus every single time.
19   And really what the elephant in the room is
20   is the elephant that's not in the room right now, which
21   is Mr. Randazza, and that he has now told you in his
22   briefing that he has actually really been InfoWars'
23   corporate counsel, coordinating the litigation from all
24   over.  And that seems to be accurate.  And you have a
25   party who is non-appearing, a person who is

74

```
 1   non-appearing attorney, who's acting as corporate
 2   counsel. He's general counsel. He's essentially the
 3   party. He is their corporate lawyer.
 4        And you have these attorneys who come in who
 5   are put in these awkward positions, like you can see
 6   Mr. Pattis really found himself in an awkward position
 7   there. And each of these attorneys will then come and
 8   the next local counsel will blame it on the local
 9   counsel before. And so here we have Mr. Reeves again,
10   who is the latest series in that, and I'm expecting,
11   just like Mr. Jefferies, he will blame the one before
12   him. But what you'll see is the consistent behavior of
13   party itself. And that is the reason why we think
14   anything more at this point just becomes ridiculous.
15        So what we're asking is the default judgment
16   and to let a trial proceed forward just on whether
17   Jones' conduct merits punitive damages; what the
18   compensatory damages are; and, if there is a punitive
19   damages finding, what the punitive damages should be.
20   And that's what we're asking for today, Your Honor.
21        THE COURT: So, I printed out your proposed
22   orders. I haven't read them yet because I didn't know
23   they were there until this morning.
24        My concern is you need this discovery even
25   for a damages trial. So, are you asking me to default
```

```
 1   liability and order the discovery still be responded to
 2   again?
 3        MR. BANKSTON: It's interesting. I do think
 4   you're right, that there will need to be some damages
 5   discovery from therein that's directed towards them. I
 6   don't honestly think it's ever -- I'm going to get
 7   much. And I don't -- let me put it this way, I don't
 8   think the discovery that was, um, issued under the
 9   court's prior discovery orders, which was TCPA-directed
10   discovery, all that goes to my burdens. So I don't
11   think we've served any discovery yet that would be
12   subject to these orders that would be damage related.
13        Certainly if we go forward and there's
14   something going on with damages that we need to bring
15   to the court, you know, for -- we could have that. But
16   I'm just kind of hoping that we can go forward and at
17   least put on a damages trial, even if they don't
18   produce us anything.
19        THE COURT: Right. I mean you can, but my
20   question is just, if you're trying to get punitive
21   damages, you probably do need more discovery.
22        MR. BANKSTON: I think that's true.
23        Well, I'm going to tell you, Your Honor, I
24   think I have enough to prove punitive damages right
25   now. I do.
```

75

```
 1        THE COURT: Okay. You might want more, let's
 2   put it that way.
 3        MR. BANKSTON: I do. Exactly. Correct, Your
 4   Honor.
 5        THE COURT: Okay. But your position is
 6   you'll file that later.
 7        MR. BANKSTON: Right.
 8        Right, if we need -- if, for instance, after
 9   this hearing and I have more of an understanding of
10   what the scope of discovery is like going forward, then
11   we'll serve new discovery requests and depositions that
12   we may need. I think that would be very limited.
13        THE COURT: Okay. All right. Thank you.
14   Mr. Reeves.
15        MR. REEVES: Okay. Thank you, Your Honor.
16        You know, Mr. Bankston, he kind of merged
17   everything together and I feel like, for at least my
18   purposes, the best way to approach this is individually
19   with each motion so that we can make sure that we have,
20   you know, a clear understanding of each particular
21   motion, what is requested here.
22        The first thing I want to say is that, you
23   know, the statement at the very end where he pulled out
24   where I asked you to give me basically a chance to deal
25   with the discovery issue is from a brief in Pozner,
```

76

```
 1   whereas my response states, frankly, when the -- he
 2   sent me about a page-long email and when I was
 3   reviewing this I was in the midst of preparing for
 4   trial with Judge Meachum and everything, and my,
 5   frankly, misunderstanding was that every discovery
 6   request issue was in the same posture. As far as
 7   dealing with TCPA discovery, frankly, you know what,
 8   I'm falling on my sword because this is my lack of
 9   understanding. I'm not blaming any prior counsel --
10        THE COURT: I mean, I've been on this case
11   for a few months and you're now the second InfoWars
12   lawyer to come in and claim responsibility for
13   discovery problems. I've only been on the case a few
14   months.
15        MR. REEVES: And I understand that.
16        THE COURT: And I just, before you get too
17   far into this argument, you can make it, but know, I
18   know you know, and I want to make it clear that I know,
19   that you're responsible for whatever any lawyer who
20   came before you did. You had a choice about accepting
21   this representation. You accepted it. Your schedule
22   and the attorneys before you are not my problem.
23        MR. REEVES: And I understand that, Your
24   Honor. And I am not blaming, I'm putting it in
25   context.
```

22-01023-tmd Doc#1-15 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 22 of 79

78

1    Regardless of what anyone has said in the
2  past I have no desire to lay any blame on prior
3  counsel.  I have appeared here, I'm lead counsel here.
4  I know Mr. Bankston spoke about Mr. Randazza because of
5  the fact this pro hac vice is pending and has not been
6  approved by this court, Mr. Randazza frankly has not
7  been involved in these cases because we want to keep --
8  I, personally, want to ensure that we are not having
9  someone practice in these cases where they're not
10 admitted to practice.
11    So I recognize Mr. Bankston has said that,
12 but I'm letting the court know I am the one dealing
13 with these things.  I am the one that's been brought in
14 to try to get everything under control here
15 discovery-wise.
16    The first, you know, the biggest motion --
17 first of all, plaintiff has now said that they want a
18 default in all four cases.  You know, that's not
19 something that's been requested in anything except the
20 one Heslin IIED claim, so I would say that that's not
21 requested relief that's on the board here.
22    But regarding the, you know, the Heslin, the
23 Lewis, those two cases, um, the biggest issues that I
24 want to point out to the court context-wise about the
25 discovery that's at issue, is that every case that

1  plaintiff has cited for support of their motion for
2  their default judgment sanctions has to deal with
3  discovery that is issued in the pendency of the regular
4  litigation merits-based discovery.  Discovery that's at
5  issue here in those cases is only the specific and
6  limited discovery that was allowed by Judge Jenkins
7  that was relevant to the TCPA motion to dismiss.  It
8  wasn't merits-based discovery.
9    You know, obviously there is some overlap
10 between what would be merits-based versus issues
11 dealing with the TCPA motion, but that's not the
12 full -- that discovery doesn't have anything to do with
13 the underlying merits of the claims.  And so that's why
14 we believe that it's -- it would be, you know, it would
15 be extremely excessive to enter a default judgment on
16 discovery that's only supposed to be limited and
17 relevant to the motion to dismiss under the TCPA.
18    Secondly, related to the discovery, um, I am
19 personally reviewing 75,000 different documents to
20 determine what's responsive.  Mr. Bankston has received
21 6,000 of those.  There's still more for me to go.  I'm
22 going as fast as I humanly possibly can.  And I
23 recognize he's entitled to this discovery.  Um, and,
24 frankly, the only other thing I want to point out about
25 the discovery and the status of it was, when I sent him

1  an email asking him to tell me what had been produced,
2  I had incorrectly done the search on this database to
3  determine what had been produced.  And what he didn't
4  tell you was, ten minutes after I sent him that email,
5  I sent him one back saying, I have it, I'm sorry, thank
6  you for being accommodating to me but I have it.
7    So I know what's been produced.  I know -- so
8  I know what's been produced, what's out there.
9    But as far as the Heslin motion for default
10 judgment, there's simply no basis legally, there's no
11 caselaw cited, there's no caselaw that I could find
12 that talks about granting a merits-based sanction based
13 solely on limited discovery allowed under the TCPA.
14 It's only supposed to be relevant to the motion itself.
15 And so, you know, that would be the main argument
16 against why there would be sanctions involved here.
17    In addition, as, you know, counsel
18 recognized, I've already worked to supplement
19 production, I'm continuing to work with that.  I've
20 been working with my client to get -- these
21 interrogatories are not simple.  He says that they ask
22 for simple information.  They are not simple.  InfoWars
23 is a, you know, they have a lot of employees, they have
24 a lot of different people involved.  It requires me to
25 get a lot of different information that I'm gathering

1  to fully respond to these because, as an officer of the
2  court, I recognize that there are objections that have
3  been waived due to not responding to things like that,
4  so I need to give him full and complete answers.  And
5  so, you know, that's what I am trying to do.
6    And, you know, Mr. Bankston, he likes to file
7  his motions for sanctions, and I understand he feels
8  the need to aggressively pursue his case; but, you
9  know, there's just been a lot of things stated today
10 that are just incorrect or flat-out misrepresentations
11 to the court.  You know, first of all, the video that
12 Mr. Bankston just played, you know, I don't know if you
13 noticed but that video was spliced together from
14 different clips.
15    The stuff about the million dollars related
16 to this child porn thing, that was when Mr. Jones was
17 talking about figuring out -- trying to find out who
18 had, you know, potentially done this or put this in
19 here.  There was no accusation from them that the
20 plaintiff's counsel had done it.  Those are just kind
21 of meshed together.
22    You know, and there's other things about --
23 Mr. Bankston mentioned missed depositions.  I don't
24 have any understanding of what depositions have been
25 missed.  I recognize that there have been some

82

1 corporate rep. depositions for the TCPA motion to
2 dismiss that Mr. Bankston was unhappy about the
3 answers, and he brought those to Judge Jenkins's
4 attention and Judge Jenkins entered an order of
5 contempt and a $500 fine on that.
6     But there's been no missed depositions. I
7 haven't received any requests for additional
8 depositions. There's been no pushback from me on him
9 saying he's not entitled to depositions. So I don't
10 know where that comes from.
11     You know, and the last thing about this
12 filing that occurred in the midst of a deposition,
13 Mr. Pattis, who filed that thing in Connecticut, first
14 of all, he didn't identify the plaintiff, he didn't
15 actually provide quotes to transcription of the
16 statements, but he wasn't even in the deposition, that
17 was kind of his thing that he did, he wasn't even the
18 one doing that.
19     But more importantly, I had nothing to do --
20     THE COURT: You just said he wasn't -- that
21 was his thing that he did, he didn't even do that.
22 That's literally what just came out of your mouth.
23     MR. REEVES: No, I'm sorry, I didn't mean
24 that.
25     He -- he did not -- Mr. Pattis was not taking

Alicia DuBois, Texas CSR 5332 · 459th District Court, Travis County

1 the deposition. He did not file the motion as he was
2 taking the deposition. Another lawyer for the
3 defendants was taking the deposition and he just, in
4 the midst of this, filed it. And that was, you know.
5 But he didn't actually do anything as far as
6 identifying the plaintiff or anything like that.
7     But really overall, the overarching point
8 here is that there's nothing in Connecticut that has
9 anything to do with these cases as far as the discovery
10 is concerned. I know Mr. Bankston wants to draw
11 corollaries between them, but the discovery stuff that
12 is at issue in Connecticut is far broader, far more
13 encompassing than the discovery issue here. And so
14 it's not a one-to-one correlation to what's there
15 versus what should be happening.
16     Mr. Bankston also fails to mention that
17 there's also a Virginia case where there has been no
18 discovery issues because, frankly, Mr. Randazza is part
19 of that case now and discovery has proceeded orderly
20 there. There's no issues there. There's been some
21 slight disagreements, but there's been none of this --
22 you know, Connecticut and here, there's a lot of puff
23 up over discovery, lots of motions for sanctions and
24 lots of issues there, but that's, you know.
25     Again, I can't -- I'm here to live in the

Alicia DuBois, Texas CSR 5332 · 459th District Court, Travis County

83

1 present and to take what's here and to move forward and
2 to address the problems. I have already attempted to
3 do that by supplementing the production, I'm working to
4 do that even more, with more production. I'm working
5 as diligently as I can to do that.
6     I just believe that, especially related to
7 the request for default sanctions, that that would be
8 hugely excessive, considering where we stand in these
9 cases as far as procedurally speaking, and the fact
10 that the discovery issue is this TCPA issue, it's not
11 merits-based discovery.
12     That's -- unless you would like to ask me
13 questions about the default motion I can move onto the
14 other ones.
15     THE COURT: Okay.
16     MR. REEVES: Okay. So, regarding the two
17 motions for contempt, they're essentially verbatim.
18 You know, again I have produced supplemental document
19 production. Um, I have already -- and, you know, and
20 again these are not -- these are not questions that I,
21 as lawyer, can answer. These interrogatories. They
22 ask for a lot of identifying information.
23     And, you know, Mr. Bankston wants to opine
24 that I don't have any, you know, control or contact
25 with my client or anything like that. I do. And I'm

Alicia DuBois, Texas CSR 5332 · 459th District Court, Travis County

84

1 working on it. But it's not just I can talk to
2 Mr. Jones and get all this information. He doesn't
3 know a lot of these answers relating to the corporate
4 as far as involvement of who is doing what and things
5 like that within Free Speech Systems. That requires me
6 to speak to other individuals, which I am also doing
7 and getting information, like I said, because what I'm
8 trying to do is give him full, complete, responsive
9 discovery responses so that we are done with these
10 issues and he can move on to finding other issues.
11     I don't want to be in a situation where I
12 give him half of the stuff and then he comes back to
13 the court again and stuff like that. And I also
14 recognize that he's entitled to it. And if he wants to
15 move his expert designation deadline because of
16 this, I'm agreeable to that. I, you know, like I said,
17 I'm here living in the present trying to solve the
18 problems that do exist. And I recognize they exist. I
19 just don't --
20     And, you know, as far as the contempt motions
21 are concerned, from a, you know, purely procedural
22 standpoint, it's unclear whether the plaintiff is
23 seeking criminal or civil contempt findings. If they
24 are criminal contempt findings that they're seeking,
25 that would require actual notice and service upon the

Alicia DuBois, Texas CSR 5332 · 459th District Court, Travis County

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 24 of 79

86

```
1   defendants themselves, not just through their attorney.
2   Um, so if that's what they're seeking that would be
3   improper at this time due to lack of due process and
4   their required notice.
5           And last thing on Pozner.  You know, in the
6   response that I filed, which again, Your Honor, there
7   was no gamesmanship involved, they're very simple
8   responses, but I can understand, you know, the opinion
9   there and I'm not really going to --
10          THE COURT:  Well, I mean, you knew I wanted
11  to read everything in advance.  I wouldn't ask you to
12  deliver it in paper if I wasn't going to look at it
13  before the hearing.
14          MR. REEVES:  And I can understand that, Your
15  Honor, and that's why -- and that's -- and I can
16  understand that, Your Honor.
17          And as far as the motion for default
18  sanctions is concerned, this is really a continuation
19  of his December 2019 filing of it, which defendants had
20  already responded to, I simply filed a response to
21  their supplemental briefing.  So there's already a
22  response on file.  All of those responses are in Box.
23  But I just summed up the default judgment for you.
24          With Pozner, this is the first time we're
25  here from -- on any sort of motion to compel, motion
```

```
1   for sanctions.  I've already told -- in the motion I've
2   already said that I recognize they weren't responded
3   to.  I place no blame or responsibility on anyone but
4   myself for that.
5           As far as the deadlines, I in no way would
6   ever imply that Mr. Bankston would be responsible for
7   keeping track of my deadlines.  I took these cases on,
8   I understand that.  I'm responsible for that.  And I
9   want the court to understand very clearly that that's
10  not the argument I'm making.  I'm not making an
11  argument beyond, I'm preparing these responses, I asked
12  the court for 14 days in my response before the court
13  determines whether or not sanctions are warranted.
14          I do not -- we do not oppose the motion to
15  compel itself.  But what I have asked is the two weeks
16  to be able to get him these full and complete answers.
17  Because there are numerous interrogatories -- it's more
18  the interrogatories.  I've already produced documents
19  in the Pozner case, and I've also told counsel that the
20  defendants have stipulated that discovery in other
21  matters and prior production is discovery for this
22  matter, too.  So he has all that discovery, too.
23          So, you know, but as far as the requests are
24  concerned, it's more the interrogatories that require
25  me to gather a decent amount of information that I am
```

87

```
1   actively working on.
2           But that's really where I stand on all these
3   motions, Your Honor, and I'm happy to answer any
4   questions that you have.
5           THE COURT:  All right.  Mr. Bankston, did you
6   want to respond?
7           MR. BANKSTON:  All right.  Yes, Your Honor, I
8   want a brief rebuttal on that.
9           THE COURT:  All right.
10          MR. BANKSTON:  I'll just go down each of
11  them.
12          First of all, with the idea that a default
13  was not requested in any of the motions but one, these
14  motions are all brought under 215 and default is always
15  one of the available options for the court when it's
16  faced with a 215 sanction.
17          They say that the discovery wasn't
18  merits-based and that it doesn't address the underlying
19  merits.  There's nothing really special about TCPA
20  discovery except that what happens is the discovery
21  stay just vanishes and then the plaintiff can have
22  discovery on anything that's to the motion.  The motion
23  is to require clear and convincing evidence of every
24  element of plaintiff's claims and defendant's defenses.
25  So the discovery literally addresses everything in the
```

88

```
1   case on liability, it just doesn't go to damages.
2   Right?
3           So, the idea -- you can look at some of these
4   other default cases in the past and it's things like
5   not appearing for deposition is a big one that does it,
6   and it's not the entire case has been -- every bit of
7   discovery has been compromised, but often it's these
8   very discreet parts.  But the court says that's so
9   egregious and it's such a thumb in the nose at the
10  court's face that we default.
11          Here every -- everything is spoiled by this.
12  There's nothing it doesn't touch in terms of liability.
13          They said that they produced 6,000 pages and
14  that Mr. Reeves is going through 75,000 pages more to
15  produce.  It was my understanding that, when he said he
16  was going through the 75,000 pages, that was the
17  75,000 pages already produced in this case.  But
18  apparently now Mr. Reeves is saying that there is
19  75,000 pages of documents he is still reviewing, which
20  is astonishing to me.
21          Also, when Mr. Reeves produced those
22  6,000 pages to me a couple of days ago, he wrote to me
23  and said, here is your 6,000 pages, we trust this is
24  going to be sufficient to solve all of your issues of
25  discovery.  That was no indication that there was this
```

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 25 of 79

90

massive trove of information that was still coming.  It was, that's it, that will solve it, here is our eleventh-hour fig leaf over our completely naked contempt.  Now they say there's more.

He tells me the rogs, the interrogatories, are not simple, that they're really hard to answer. So, okay, he couldn't answer them in 30 days maybe. You know, in normal cases he could probably get an extension on that.  But then he couldn't answer them in three and a half months?  They're that complicated? They're not that complicated.

He then talks a bit about Mr. Jones's broadcast there and that that million dollar bounty was not about us, was not about plaintiff's counsel and that actually he was talking about somebody else and then he just happened to be later in the same clip accusing Mr. Mattei and the plaintiff's counsel of being the ones who did all this.

The Connecticut Supreme Court has already rejected all of this and said no, obviously Mr. Jones was threatening a million dollar bounty on the lives of plaintiff's counsel, he has unreasonably caused danger to these proceedings and encouraged people not participate.  The idea that right now we're going to be trying to defend what Mr. Jones did in that video is

absurd to me, but those sanctions have already been affirmed by a high court.

Mr. Reeves also says that he doesn't know of any missed depositions, he only seems to know that there was some corporate representative depositions that are effectively nonappearances.  But Mr. Reeves, even after my presentation, does not seem to understand that in August 31st, 2018, exactly three years ago today, the court issued a discovery order in Heslin that has never been responded to in any way, shape or form.

There's never been any responses to the written discovery, and there was supposed to be a deposition of Alex Jones, of Free Speech Systems, of InfoWars, LLC, and of Owen Shroyer.  That's why I brought up Mr. Shroyer's arrest, because I'm not sure I'll ever depose him.  Mr. Reeves currently does not know those depositions hasn't happened or that discovery hasn't been answered to on a discovery order which he has prior -- that client has prior been held in contempt of court.  And that again is baffling to me.

He briefly addresses Mr. Pattis and the deposition about the Hillary Clinton thing, where he was writing a motion about Hillary Clinton and was

disclosing client's information.  Mr. Pattis was sitting inside the deposition when that happened.  His co-counsel was taking the deposition and he wrote up a motion, typed it on up and sent it off to the court and publically filed it.  And that could very well happen again in this case.

He then goes onto the contempt motions.  And the first again he says that the interrogatories are hard to answer.  But on the contempt motions they haven't even tried to supplement discovery.  And from his perspective he didn't think he would have the need to, is what he was telling us.  He thought that that was just about the request for production and the 6,000 documents would be enough.  But apparently now they're talking about going and answering those interrogatories, and I don't know that that's ever going to happen.

He does offer you a solution to this contempt motion.  His solution is more delay.  Is that now, after all of the delay in the trial court before, all of the frivolous appeals for which they were sanctioned for, and after now just throwing away the entire summer doing nothing, Mr. Reeves' solution is, let's just push all the dates back and give me more time to keep doing this.  That is not a solution to this case; that

definitely prejudices us.

His other argument is that it's unclear whether there are civil or criminal contempt being sought in this motion.  But the motion is captioned motion for contempt under Rule 215 of the Texas civil rules.  Their motion recounts that well, that we're going under Civil Rule 215.  We're not seeking criminal sanctions.

With Pozner his only real response there is that there was no gamesmanship.  And I, you know what, I think I would probably agree with that because I think, in order to play a game, you actually have to care enough to play.  And there was no -- it was a complete conscious disregard.  If you consciously disregard to this extent you're not playing games, you're just not -- not respecting this court's authority is what's happening.

He says that this is the first time, the Pozner was the first time they've ever gotten any kind of trouble on Pozner.  But the thing is is that you see all of these sanction cases talking about you can default a party in the first instance if that instance is coming off of a long pattern of years of discovery abuse and repeated thumbs in the noses of the court. You have to understand that that's perfectly consistent

94

1  with everything else they've done in front of this
2  court.
3          His solution on this one is that he wants
4  14 days.  Just give me 14 more days to answer this
5  discovery.  Again, that's not an acceptable solution.
6          He actually says he does not oppose the
7  motion to compel; in other words, it should be granted.
8  And if that's the case, then Rule 215 is
9  nondiscretionary.  You have to grant fees if that's the
10  case.
11         THE COURT:  I have to do what?
12         MR. BANKSTON:  You have to grant fees if
13  that's the case.  Attorneys fees will have to be
14  granted if that is what their position is.
15         And of course, Your Honor, that's true of
16  every motion.  Each one of those motions, being
17  meritorious, has an entitlement to attorneys fees with
18  it.
19         I hadn't wanted to put more paper in front of
20  you, because I knew you were going to have a lot to
21  review.  And I honestly anticipated you have a lot to
22  review from there.  So I wanted to let you decide to
23  rule first before I gave you any evidence on that.  I
24  can do it however you want, I can give you testimony
25  now or I can give you an affidavit and send it directly

93

1  to the court, however you want to deal with the
2  attorneys fees issues.
3          THE COURT:  I'm fine with an affidavit,
4  unless Mr. Reeves is going to want to, you know, cross
5  your testimony, which he can't -- it's hard to do to an
6  affidavit.
7          MR. BANKSTON:  Right.
8          MR. REEVES:  Your Honor, I'm happy to deal
9  with the attorneys fees on written submission to you.
10  If I have any issues with what Mr. Bankston submits, I
11  will point those out in writing.  I do not need -- we
12  don't need to do that right now, in my opinion.
13         THE COURT:  All right.  Then I'll include it
14  in any orders where it is relevant.  But just so it's
15  clear and on the record now, your response will be due
16  seven days after Mr. Bankston files his affidavit on
17  attorneys fees or motion or any other filing on
18  attorneys fees.
19         MR. REEVES:  Okay.
20         MR. BANKSTON:  And, Your Honor, there was one
21  other note that I had made, just my last point I wanted
22  to make to you on rebuttal is -- I had to flip a page.
23  And this is just from again your orders and everything
24  to understand this.  Mr. Reeves just represented to you
25  that they told us, they informed us a couple of days

95

1  ago, that discovery for prior matters is now discovery
2  for all matters.  Right.
3          And what the court needs to be aware of is
4  there is a prior agreement between counsel in this
5  case.  There's a prior agreement that says, if any of
6  the documents produced in the Lewis matter you contend
7  are responsive to any request in the other cases, like
8  if there's response to the request in Heslin, you
9  don't have to produce those documents again, so long as
10  they are identified by their corresponding Bates
11  numbers in the responses.  And in here we don't have
12  responses.  So none of that works.
13         So the idea that some Lewis production would
14  be somehow partially compliant with any of the other
15  cases or help any of the other cases, that's in
16  violation of the parties' agreement.  So again another
17  small point on that.
18         But with that, that's all the arguments we
19  have today and we ask you to grant the motions.
20         THE COURT:  All right.  Thank you.  Um.
21         MR. REEVES:  Your Honor, if I may really
22  fast.  If that's okay.  I'm sorry, I don't mean to
23  interrupt you.
24         THE COURT:  Well, if what you're going to say
25  is what you meant was they didn't notice a deposition

96

1  and that's why it didn't happen --
2          MR. REEVES:  No.
3          THE COURT:  What are you going to say?
4          MR. REEVES:  No, Your Honor, it's on the --
5          THE COURT:  Then Mr. Bankston is going to
6  talk again.
7          MR. REEVES:  Sure.
8          It's just on the idea that, you know, again
9  he's asked for default across the board and, you know,
10  again that's not relief he requested.  And most
11  definitely in these two contempt motions he asked for
12  finding of contempt.  And so I would just -- I would
13  again point out that that would be far beyond what he's
14  requested here within his motion.  I realize that he
15  said they're under Rule 15, but he specifically
16  requested a contempt finding under Rule 15.  215.
17         THE COURT:  215, right?
18         MR. REEVES:  215, yes, Your Honor.
19         THE COURT:  All right.
20         MR. REEVES:  That's it, Your Honor.
21         THE COURT:  Mr. Bankston?
22         MR. BANKSTON:  I don't need to respond, I
23  think you know what you can do under 215.
24         THE COURT:  Okay.  All right, I'm going to
25  take it under advisement.

98

```
1    I know the other case is still under
2  advisement but honestly I kind of wanted to wait until
3  we were all together again before I issued orders in
4  that case or on the motion for pro hac vice, which is
5  not looking good, by the way.  So that's part of why
6  I've been waiting.  And I'll get this to you pretty
7  quickly.  As quickly as I can.
8         MR. REEVES:  Your Honor, just one brief
9  point.  On the pro hac vice that you mentioned, again I
10 do want to mention to you that Mr. Randazza is involved
11 in this Virginia case where, ever since he's been
12 involved, this discovery has gone fantastically there,
13 it's been dealt with accordingly, it's been dealt with
14 in an orderly fashion.  You know, Mr. Bankston has
15 previously told me that he thinks that my client has
16 tons of lawyers working for him in this case --
17        THE COURT:  Well, he's allowed to, that's
18 fine.  But the question is does that attorney get to
19 appear in this courtroom.  And that's a separate
20 question.  He can work on anything somebody properly
21 hires him to work on behind the scenes.  That's
22 different.
23        Somebody wants to take a chance bringing a
24 lawyer in who is not licensed in this state to give
25 advice on what to do in this litigation, they have the
```

99

```
1  right to do that.  What they don't have the right to do
2  is have him appear and represent him in court.  I get
3  to decide whether he does that or not.
4         MR. REEVES:  And yes, I understand that, Your
5  Honor.
6         THE COURT:  Okay.
7         MR. BANKSTON:  Your Honor, I have one
8  question about this.  Mr. Randazza likes to email me
9  and do stuff on this case.  I don't feel like I have
10 any duty to have to deal with him.  I don't know if
11 it's fine with you for me not to want to deal with
12 Mr. Randazza but to deal with Mr. Reeves instead.
13        THE COURT:  Well, um, Mr. Reeves, as he told
14 us today, is lead counsel for these cases, is the only
15 counsel of record filed with the court that I'm aware
16 of.
17        Right, Mr. Reeves?
18        MR. REEVES:  That's correct, Your Honor.
19        THE COURT:  So, I guess Mr. Randazza could
20 email, similarly to how an associate of Mr. Reeves
21 could email, and be speaking for Mr. Reeves if
22 Mr. Reeves allows him to do that.  I would suggest that
23 that information be written down.
24        MR. REEVES:  And, Your Honor, as far as I
25 know, there's been no direct communication between
```

99

```
1  Mr. Randazza and Mr. Bankston without me involved.
2  It's more the issue of I have included Mr. Randazza on
3  emails as a cc and he has responded sometimes.  But
4  it's not like a -- it's not like just Mr. Bankston is
5  dealing with Mr. Randazza.
6         I'm involved because this is, like I said,
7  I'm lead counsel, I take that very seriously in these
8  cases, especially given their history.  I'm, you know,
9  I take it very seriously, what's going on here and what
10 I'm dealing with.  And so -- and I want the court to
11 understand that and be aware of that.
12        But, you know, that's what Mr. Bankston is
13 referring to is that Mr. Randazza has been included on
14 emails, has responded to some of them, but it's not
15 solely Mr. Randazza doing things without me knowing or
16 being involved in these matters.
17        THE COURT:  So you're telling me that
18 Mr. Randazza is speaking for you in these
19 communications.
20        MR. REEVES:  The only communications that he
21 has spoken for me about was dealing with sanctions that
22 the court of appeals had rendered on a prior appeal,
23 where they determined the appeal was frivolous that
24 hadn't been paid that we were working out details of
25 how to pay that.  That's really it.  But everything
```

100

```
1  else --
2         THE COURT:  Your --
3         MR. REEVES:  I'm not trying to capitulate.
4         THE COURT:  Your response reminds me of a
5  depo transcript I listened to earlier.
6         MR. REEVES:  I'm sorry.  I'm trying to answer
7  the question.
8         THE COURT:  So the question, the question was
9  what you're telling the court is that when Mr. Randazza
10 sends an email it's on your behalf and he is speaking
11 for you.  Is that right?
12        MR. REEVES:  If he -- if it involves these
13 Texas cases I will say yes, Your Honor.
14        THE COURT:  Okay.  Does that help,
15 Mr. Bankston?
16        MR. BANKSTON:  Sure.  That will help for now.
17        THE COURT:  All right.
18        MR. BANKSTON:  The other -- one other thing I
19 wanted to bring up, Your Honor, I don't know if this
20 sounds like a good idea to you, obviously these cases
21 require more judicial babysitting than maybe other
22 cases have required in the past.
23        THE COURT:  I'm definitely learning that.
24        MR. BANKSTON:  Yeah.
25        So, in Lafferty they have come up with a
```

22-01023-tmd  Doc#1-15  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 28 of 79

102

1    system of where they're actually having monthly status
2    conferences to just make sure everything is working.  I
3    don't know if you want to preschedule our next meeting
4    together or how you may want to do that.  I certainly
5    know I would be willing to do something like that.
6          THE COURT:  I mean, it's probably not a bad
7    idea.
8          MR. BANKSTON:  And, you know, there may be
9    cases where you say, hey, do we need to have a status
10   conference this month and both parties say no,
11   everything is swimming smoothly, we don't need to, or
12   whatever.  But something I just thought I would throw
13   it out there.
14         THE COURT:  I think I mentioned at the
15   conclusion of the Fontaine hearing that I had some
16   second thoughts about our trial schedule.  Um.  Mostly
17   I think just for the toll it would take on this court
18   to hear those cases in such rapid succession, assuming
19   that after the first one or two the rest don't settle.
20   Um.  Which I would love to sit here and say, looking at
21   it rationally, this is what I think will happen; I just
22   don't know how helpful that kind of examination of what
23   should happen will be in this case, given the
24   personalities and the subject matter and the emotions
25   involved.

1          So, I don't think I can -- I'm not
2    comfortable setting a schedule for this court that
3    assumes what happens in the first case will affect what
4    happens in the remaining cases.  Does that make sense?
5          MR. BANKSTON:  It does.
6          THE COURT:  Okay.  So, it is my plan to take
7    another look at those schedules and make some changes.
8    I think I mentioned already one of them was like a
9    backup setting, and we are not going to trial that
10   week.  So I haven't issued an order but I've let you
11   guys know that one is not -- there's not going to be a
12   trial that backup setting week.
13         MR. BANKSTON:  One thing I should probably
14   let you know, if you're going to be thinking about
15   trial settings and that sort of thing, is our decision
16   on how to go forward on those cases is obviously going
17   to be heavily affected by the outcome of this motion.
18         THE COURT:  I would assume.
19         MR. BANKSTON:  And so what I would say to
20   that is, just to give the court a heads's up, this is
21   what we would be intending to do, I'm giving the
22   defendant's counsel a head's up, too, that if the
23   disparate liability issues are sort of taken out of the
24   case, like through a default, and there isn't the
25   possibility of jury confusion over the liability

1    issue --
2          THE COURT:  You're going to seek to
3    consolidate?
4          MR. BANKSTON:  All of them for damages.  It's
5    the only thing that makes since under that situation,
6    because then you don't have the jury confusion of those
7    ideas.  And then you're only looking at one trial.
8          So I think to make some of these decisions
9    it's going to have to know what happens in this motion
10   first.
11         THE COURT:  Yeah, okay.  Thank you.  Okay.
12         Well, I think that's it.  I'm going to take
13   it under advisement.  I've got your suggestion,
14   Mr. Bankston, I'll let you guys know, Mr. Reeves and
15   Mr. Bankston, I'll let the two of you know if I'm going
16   to set this for some kind of regular schedule.  At a
17   minimum we will have another schedule to discuss the
18   schedules.  So.
19         MR. REEVES:  And, Your Honor, just a quick,
20   the backup setting you're talking about, do you know if
21   it's the April 25th setting that you're referencing?
22         THE COURT:  I don't know.  When you look at
23   the list it clearly says backup for another case.
24         MR. REEVES:  There's two on the same case.
25   There is Pozner and Lewis are set on the same date.

1    And that's kind of what I figured, I just wanted to
2    make sure I have the correct understanding.
3          THE COURT:  I wouldn't worry about it too
4    much in general because we're going to address those
5    again.  And I also know there are a number of, I think,
6    anyway, that there are several other motions pending
7    that were not set for today, so we're going to have to
8    have another hearing, anyway, on those, right?
9          So when we ended Fontaine with a possible
10   agreement on confidential records, I don't think I've
11   seen that agreement.  Don't talk about it because he's
12   not here, I don't want to make that mistake again.  But
13   we had also discussed wanting a similar agreement or
14   order in these cases.  So, I haven't seen that in any
15   version, so I expect that's coming.
16         MR. BANKSTON:  Actually I'm glad you brought
17   that up because we probably need to set a hearing for
18   that, Your Honor.
19         THE COURT:  Right, that's what I'm saying.
20         MR. BANKSTON:  Yeah, because I'm going to be
21   getting records soon, I would assume.  And yeah, we
22   were able to reach agreement on the other case, but
23   here --
24         THE COURT:  Do I have a copy of it?  I don't
25   think I have a copy.

106

1  MR. BANKSTON: Yeah, that's been filed. Again
2  I'm not going to go into that.
3  THE COURT: But remember, Mr. Bankston, when
4  you file something I don't get it.
5  MR. BANKSTON: Right, it actually wasn't us
6  that filed it. I had assumed that he provided it to
7  you. I guess he hasn't.
8  THE COURT: He should know even better than
9  you that I don't get it, because he works in Travis
10 County.
11 MR. REEVES: You're talking about in the
12 Fontaine matter, Your Honor. That's not -- that hasn't
13 happened in this case.
14 THE COURT: I understand.
15 MR. REEVES: Okay. Just making sure.
16 MR. BANKSTON: In this case Mr. Reeves
17 opposes a protocol for in-camera review, says he wants
18 to subpoena the records himself, not have *in camera*
19 review.
20 THE COURT: Okay. You can set that for
21 hearing but you're going to lose that one because these
22 are sensitive records and I don't -- we're not doing
23 that.
24 MR. REEVES: Okay, and I appreciate that.
25 And what I will do with that, I'll retrace and I'll

1  talk to Mr. Bankston about it. It more had been
2  honestly, Your Honor, the idea that plaintiff was going
3  to be the gatekeeper of what was going to be submitted
4  *in camera.*
5  THE COURT: Right, so that -- he's not the
6  gatekeeper of what's submitted, he's the gatekeeper of
7  what is not submitted *in camera*. And that's standard.
8  We do this all the time for medical and mental health
9  records in every kind of injury case you can think of.
10 So the plaintiff gets the records, goes
11 through them, says, you can have these, if you want
12 these we're going to ask the judge to look at them
13 first. That's super standard.
14 MR. REEVES: Sure.
15 THE COURT: If you oppose that, that's not
16 going to go well. You're going to have a very hard,
17 uphill road convincing me that there's some reason what
18 works in every other case I get won't work in this one.
19 MR. REEVES: And I understand that, Your
20 Honor. And I want you to know I in no way -- I have no
21 desire to waste the court's time with things like that,
22 especially given now what you've said here. I've used
23 that process many times, I represent -- I mean I have
24 personal injury clients and things. I understand the
25 process. It was just the way that Mr. Bankston and I

107

1  discussed it it was -- to me did not comport with that
2  process.
3  But again I will, especially given what you
4  said, I'll revisit it with Mr. Bankston. I'm sure we
5  can come to an agreement so the court doesn't have to
6  waste their time dealing with that. I have no desire
7  to have the court deal with things that we, as the
8  parties, should be able to figure out.
9  THE COURT: Great. So when you reach that
10 agreement and you execute it, send me a copy. Don't
11 just file with the clerk.
12 MR. REEVES: Yes, Your Honor.
13 THE COURT: Okay. Thank you.
14 That's going to conclude the hearing,
15 everyone is excused, and I will get with you as soon as
16 possible. Thanks.
17 MR. REEVES: Thank you, Your Honor.
18 Have a good afternoon.
19 (End of proceedings.)
20
21
22
23
24
25

108

1  REPORTER'S CERTIFICATE
2  THE STATE OF TEXAS        )
3  COUNTY OF TRAVIS          )
4  I, Alicia DuBois, Official Court Reporter in
5  and for the 459th District Court of Travis County,
6  State of Texas, do hereby certify that the above and
7  foregoing contains a true and correct transcription of
8  all portions of evidence and other proceedings
9  requested in writing by counsel for the parties to be
10 included in this volume of the Reporter's Record, in
11 the above-styled and numbered cause, all of which
12 occurred in open court or in chambers and were reported
13 by me.
14 I further certify that this Reporter's Record
15 of the Proceedings truly and correctly reflects the
16 exhibits, if any, offered in evidence by the respective
17 parties.
18 WITNESS MY OFFICIAL HAND this, the 1st day of
19 October, 2021.
20
21 */s/ Alicia DuBois*
   Alicia DuBois, CSR
22 Texas CSR 5332
   Exp. Date: 1/31/22
23 Official Court Reporter
   459th District Court
24 Travis County, Texas
   P.O. Box 1748
25 Austin, Texas 78767
   (512) 854-9301

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60405196
Status as of 12/30/2021 3:29 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| William Ogden | | bill@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/30/2021 2:41:30 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC; AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

### [PROPOSED] ORDER ON DEFENDANT, OWEN SHROYER'S, MOTION FOR RECONSIDERATION OF COURT'S RULING OF DEFAULT JUDGMENT ON PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215

On this day, came to be heard Defendant, Owen Shroyer's, Motion for Reconsideration of the Court's Order Granting a Liability Default Judgment on Plaintiff's Second Motion for Contempt Under Rule 215. The Court, having considered the Motion, Plaintiff's response thereto, along with the arguments of counsel, finds that Defendant's Motion should be GRANTED, and upon further consideration, Plaintiff's request for default judgment as to Defendant, Owen Shroyer, is hereby DENIED. It is therefore ORDERED that Plaintiff's Second Motion for Contempt Under Rule 215 is hereby DENIED in all respects except to the extent monetary sanctions were previously awarded to Plaintiff based on said motion.

SIGNED ON THIS THE _____ DAY OF _____, 2022.

_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:      (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60405196
Status as of 12/30/2021 3:29 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/30/2021 2:41:30 PM | SENT |
| William Ogden | | bill@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/30/2021 2:41:30 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/30/2021 2:41:30 PM | SENT |

12/30/2021 10:53 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Alexus Rodriguez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC; AND OWEN | § | |
| SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**DEFENDANT, ALEX JONES'S, MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING A LIABILITY DEFAULT JUDGMENT ON PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215 AND MOTION FOR DEFAULT JUDGMENT**

Defendant, Alex Jones, moves the Court to reconsider the Court's October 26, 2021 order granting Plaintiff's motion for default judgment and second motion for contempt, and would show unto the Court as follows:

## I.    BACKGROUND

Alex Jones (hereinafter "Mr. Jones") is a defendant in each of the three (3) cases filed by the plaintiffs against co-Defendants, Free Speech Systems, LLC ("Free Speech Systems"); and Infowars, LLC ("Infowars") in the *Lewis* and *Pozner* cases, in addition to co-Defendant, Owen Shroyer, in the *Heslin* matter's defamation claim. In this now-consolidated matter, Plaintiff, Neil Heslin, has asserted claims against Mr. Jones for defamation and intentional infliction of emotional distress, with these claims arising out of alleged defamatory comments pertaining to the Sandy Hook tragedy.

In his live pleadings for each of these claims, Plaintiff goes through a litany of alleged videos, articles, and interviews involving Free Speech Systems and/or Mr. Jones or Mr. Shroyer all the way back to 2013. Yet, upon review of Plaintiff's causes of action, the Court will find:

(i) Plaintiff's defamation claim involves only two (2) broadcasts from June 26, 2017 (the broadcast involving Mr. Shroyer) and July 20, 2017 (alleged rebroadcasting of Mr. Shroyer's June 26, 2017 broadcast);[1] and

(ii) Plaintiff's IIED claim encompasses only nine (9) videos, two (2) of which are the same videos upon which Mr. Heslin has based his defamation claim. The earliest video referenced in Mr. Heslin's IIED cause of action is from November 18, 2016.[2]

Plaintiff initially filed suit on April 16, 2018 against Mr. Jones and the other Defendants asserting claims for defamation. Shortly after the lawsuit was filed, Defendants filed a TCPA motion to dismiss. In response, Plaintiff moved for limited discovery under the TCPA, which was granted by the then-presiding judge, Judge Jenkins, in an order dated August 31, 2018. Defendants resisted this discovery, resulting in Plaintiff filing a motion for contempt seeking sanctions under Rule 215 of the Texas Rules of Civil Procedure. *See Jones v. Heslin,* No. 03-19-00811-CV, 2020 Tex. App. LEXIS 2441, at *3 (Tex. App.—Austin March 25, 2020, pet. denied) (mem. op.). After Plaintiff filed his motion for contempt, Defendants initiated an appeal on the basis that the district court had not timely ruled on their TCPA motion to dismiss and thus it had been denied as a matter of law. The Third Court of Appeals determined the appeal was premature and dismissed it for lack of jurisdiction.

---

[1] *See* Plaintiff's Third Am. Pet. at ¶55.

[2] *See* Plaintiff's Orig. Pet. at ¶71.

Plaintiff then filed his First Amended Petition in his defamation lawsuit on June 26, 2019, adding claims for intentional infliction of emotional distress. However, Plaintiff then further amended his petition, ultimately filing his Third Amended Petition—his live pleading—on August 8, 2019, wherein Plaintiff removed the IIED claim entirely. That same day, Plaintiff filed a second lawsuit against Defendants, Mr. Jones, Infowars, and Free Speech Systems, re-asserting his cause of action for intentional infliction of emotional distress. In that claim, Plaintiff asserts that videos from: (i) November 28, 2016; (ii) March 8, 2017; (iii) April 22, 2017; (iv) June 13, 2017; (v) June 19, 2017; (vi) June 26, 2017; (vii) July 20, 2017; (viii) October 26, 2017; and (ix) April 20, 2018.

After the defamation case was remanded back to the district court following the first attempted appeal, a hearing on Defendants' TCPA motion and Plaintiff's motion for contempt occurred on October 17, 2019. That same hearing also addressed Plaintiff's motion for expedited discovery in the IIED case. At this hearing, Defendants offered to stipulate to or concede facts pleaded by Plaintiff to obviate the need to respond to the TCPA discovery requests in the defamation case. Judge Jenkins subsequently signed orders on October 18, 2019 which: (i) granted Plaintiff's motion for contempt in the defamation case; (ii) denied Defendants' TCPA motion to dismiss in the defamation case; and (iii) granted Plaintiff's motion for expedited discovery in the IIED case. In the order granting Plaintiff's motion for contempt in the defamation case, the Court ordered that "pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burden in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion." *Id.*

At the same time, the district court denied Defendants' TCPA motion to dismiss in Plaintiff's defamation case. *Id.* Another hearing in the IIED case occurred on December 18, 2019 regarding Defendants' TCPA motion to dismiss in the IIED case and a motion for sanctions filed

by Plaintiff regarding alleged discovery deficiencies in the IIED case. On December 20, 2019, the trial court denied Defendants' TCPA motion to dismiss and granted Plaintiff's motion and awarded $100,000.00 in sanctions and took Plaintiff's request for a default judgment in the IIED case under advisement.

In November 2019, Defendants again filed an appeal of the trial court's denial of their TCPA motion to dismiss in the defamation case, and subsequently appealed the denial of the TCPA motion in the IIED claim. Defendants' appeals were ultimately denied both by the Third Court of Appeals and the Texas Supreme Court, and the cases were remanded back to the trial court on June 4, 2021. Plaintiff then filed a Second Motion for Contempt Under Rule 215 on July 6, 2021, contending that Defendants had failed to comply with the August 31, 2018 discovery order entered by Judge Jenkins and seeking sanctions, including a default judgment being entered against Defendants. Plaintiff also filed a supplemental brief in support of his motion for default judgment in the IIED case, contending Mr. Jones, Infowars, and Free Speech Systems had not complied with the district court's December 2019 discovery order in Plaintiff's IIED case.

In each of Plaintiff's motions and supplemental brief in support at issue here, Plaintiff largely focused on rehashing the past TCPA discovery issues in the case, all of which had already been addressed by Judge Jenkins. However, Plaintiff contended that the December 20, 2019 order in the IIED case warranted the granting of a default judgment against all Defendants. Plaintiff's initial briefing barely mentions Mr. Jones, except to criticize him for not being able to remember former employees or know who did exactly what on a day-to-day basis. Yet in Plaintiff's supplemental briefing, Plaintiff focused on situations far outside the confines of the alleged discovery issues at hand. Instead, Plaintiff dedicates a significant portion of his briefing discussing post-lawsuit statements made by Mr. Jones involving the *Lafferty* matter in Connecticut. It also

4

briefly mentions a comment by Mr. Jones making a slight at Plaintiff's counsel. Yet, despite the situation involving statements made about Plaintiffs' counsel in Connecticut, Mr. Jones has made no statements of violence of any sort about any of the parties or the Court. It is true Mr. Jones has at times exercised his First Amendment right to criticize what is going on in these cases from a rulings-standpoint, but that has nothing to do with whether or not Mr. Jones has fulfilled his discovery obligations in these cases.

On August 31, 2021, the Court held a hearing on Plaintiff's second motion for contempt and continuation of Plaintiff's request for a default judgment in the IIED case, along with other sanctions motions filed by the remaining Plaintiffs in the other cases. At this hearing, Plaintiff's counsel again focused on these post-lawsuit comments by Mr. Jones about the Plaintiffs' counsel in Connecticut and other critical comments Mr. Jones has made about the cases. Yet, Plaintiff did *not* actually describe any discovery deficiencies or abuses by Mr. Jones, the individual, except for a claim that they had a copy of a single text with a reporter which Mr. Jones had not produced because he no longer had the phone with that message. Everything else involving Mr. Jones the individual defendant focused on these incendiary post-lawsuit comments that had nothing to do with the actual claims that Mr. Jones had committed discovery abuses so severe that a default judgment was warranted.

Indeed, in the motions themselves, Plaintiff's arguments about alleged discovery abuses deal solely with Free Speech Systems and the alleged failure to preserve relevant evidence. There is no claim that Mr. Jones has not met his discovery obligations other than claims that he provided "evasive" answers in written discovery and that he had some duty to provide information at deposition that he either did not know or did not remember. Rather, Plaintiff's motions only make

generalized allegations that "Defendants have not taken any actions in this Court since remand or responded to their discovery obligations." *See, e.g.,* Plaintiff's Second Mtn. for Contempt at 20.

Notwithstanding that Plaintiff did not specify any serious or obstructive discovery conduct by Mr. Jones beyond being critical of the answers which had been provided, the Court subsequently granted Plaintiff's motion for contempt and motion for default judgment, ultimately signing an amended order on October 26, 2021 wherein the Court entered a default judgment as to liability against all Defendants, including Mr. Jones. In the Court's order, there is no delineation between the individual Defendants. To the contrary, the order discusses: (i) how "Defendants" violated other discovery orders in the other Sandy Hook cases before this Court; (ii) that "Defendants" have engaged in pervasive and persistent obstruction of the discovery process in general; (iii) that "Defendants" refused to produce critical evidence; (iv) that "Defendants" have shown a "deliberate, contumacious, and unwarranted disregard for this Court's authority;" and (v) that the Court found that "Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit." *See* Amended Order dated October 26, 2021 at 3-4. However, the Court did state in its order that part of the Court's consideration for the default sanction included "Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are 'show trials.'" *Id.* at 4. However, the Court did not explain how Mr. Jones's "public threats" which had nothing to do with Plaintiff's cases here or how Mr. Jones's criticisms of these lawsuits in general as "show trials" established Mr. Jones had not complied with his individual discovery obligations. The Court likewise granted Plaintiff monetary sanctions for Plaintiff's attorneys' fees in connection with the motion.

Mr. Jones is seeking to have the Court reconsider its ruling on the motion for contempt and deny Plaintiff's motion for default judgment as to Mr. Jones, individually. As stated above, in its

amended order, the Court made no specific findings as to Mr. Jones and any alleged discovery abuses by Mr. Jones, but again it did reference Mr. Jones's alleged "public threats" and "professed belief" that the lawsuits are "show trials." *See* Am. Order at 4. Similar to Mr. Shroyer's situation, the fact of the matter is that Mr. Jones did and has overall complied with his discovery obligations. Even if the Court disagrees, Plaintiff has never actually specified the precise discovery abuses allegedly committed by Mr. Jones, and certainly has not done so to demonstrate that such alleged conduct was so pervasive as to warrant default-judgment sanctions.

Unfortunately, it appears the inflaming videos and dramatic rhetoric in Plaintiff's briefing and oral argument obscured the fact that Plaintiff had little to no complaints about Mr. Jones's discovery responses. Rather, Plaintiff's real focus was on Free Speech Systems and Infowars and claims that those entity-defendants failed to preserve a whole host of relevant evidence. Yet, the Court made no attempt to distinguish between the individual defendants, and instead lumped them together and attributing alleged conduct by the entity-defendants to the individual defendants, including Mr. Jones, granting a default judgment on liability across the board as to all Defendants.

Yet as this case has progressed, it has become readily apparent that Mr. Jones as an individual has not and has not previously done anything that is so exceptional that default-judgment sanctions would be warranted on claims against Mr. Jones, individually. Indeed, Mr. Jones has now been deposed multiple times, including another deposition in December 2021. He has also produced every document in his possession, care, custody, or control that is responsive to Plaintiff's production requests (and did so prior to the August 31, 2021 hearing on these motions). Moreover, while Mr. Jones was subject to prior sanctions for as a co-Defendant in both the defamation and IIED cases, Judge Jenkins's orders in those cases likewise did not delineate between Defendants. And given the nature of Plaintiff's defamation and IIED claims against Mr.

Jones, it is likewise clear that Mr. Jones's defenses to such claims have merit regardless of any alleged discovery issues. In particular, Mr. Jones has a clear defense to the defamation claims involving Mr. Shroyer's alleged defamatory comments in the June 26, 2-17 broadcast, since he was not even there nor made the statements themselves. Moreover, the Court can actually determine as a matter of law that the singular comment by Mr. Jones in a July 20, 2017 re-broadcast of Mr. Shroyer's report is not defamatory as a matter of law (wherein Mr. Jones says, among other things, that regarding the Sandy Hook tragedy, he is "sure it's all real"). *See* Pl.'s Third Am. Pet. at ¶24. At the very least, the Court can see how regardless of the discovery situation, Mr. Jones has a meritorious defense to Plaintiff's defamation claims which he should be entitled to assert to a jury at trial.

Mr. Jones likewise has meritorious defenses to Plaintiff's IIED claims, including, but not limited to: (i) Plaintiff's IIED claims are truly just defamation claims which are time-barred; and (ii) Plaintiff has no evidence Mr. Jones said or did anything with the specific intent to cause emotional distress to Plaintiff. Because Plaintiff has never actually demonstrated discovery conduct by Mr. Jones in this now-consolidated matter has been so out-of-bounds and in such bad faith as to warrant default-judgment sanctions, Mr. Jones requests the Court reconsider its ruling on Plaintiff's Second Motion for Contempt and Motion for Default Judgment and instead deny Plaintiff's motions to allow this case to proceed to trial so that a jury can make determinations on the underlying merits of Plaintiff's claims against Mr. Jones.

## II.     ARGUMENT AND AUTHORITIES

Mr. Jones understands the Court has the inherent authority under Rule 215 to enter a default judgment as sanctions for alleged discovery abuses; however, Mr. Jones contends that such sanctions are completely unwarranted and are so unjust as to violate Mr. Jones's due process rights

to have the merits of Plaintiff's defamation and IIED claims heard by a jury—to the extent the IIED claims survive summary judgment. While a trial court has the power to issue sanctions, that sanction power is limited in that the court "may not impose a sanction that is more severe than necessary to satisfy its legitimate purpose." *Cire v. Cummings,* 134 S.W.3d 835, 839 (Tex. 2004) (internal citations omitted)).

Sanctions for discovery abuse serve three legitimate purposes: (1) to secure compliance with the discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex. 1992). When a party fails to comply with proper discovery requests or fails to obey an order to provide or permit discovery, the trial court may, after notice and hearing, make such orders in regard to the failure, which includes, among other things, an order striking pleadings, dismissing with or without prejudice the action or proceedings, or rendering a default judgment against the disobedient party. *See* TEX. R. CIV. P. 215.2. Although punishment, deterrence, and securing compliance continue to be valid reasons for imposing sanctions, these considerations alone will not justify "trial by sanctions." *Chrysler Corp.,* 841 S.W.2d at 849; *see also Westfall Family Farms, Inc. v. King Ranch, Inc.,* 852 S.W.2d 587, 591 (Tex. App.—Dallas 1993, writ denied).

Notwithstanding rule 215, discovery abuse sanctions must be "just." *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAm. Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). Moreover, so-called death penalty sanctions are limited by constitutional due process. *Id.* at 917. Thus, "a death penalty sanction cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit." *Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 372 S.W.3d 177, 184 (Tex. 2012).

There is no doubt that the default judgment entered by this Court against Mr. Jones constitutes a "death penalty" sanction. A death penalty sanction is a severe form of sanction that prevents a party from contesting liability and allows for the determination of liability based on the party's discovery conduct rather than the dispute's merits. *Ring & Ring v. Sharpstown Mall Tex., LLC,* No. 01-16-00341-CV, 2017 WL 3140121, at *18 (Tex. App.—Houston [1st Dist.] July 25, 2017, no pet.) (mem. op.) (citing *TransAmerican,* 811 S.W.2d at 917-18). When a trial court places a defendant in default, the result is that the defaulting defendant admits all pleaded facts establishing liability. *Id.* (citing *Paradigm Oil,* 372 S.W.3d at 186). The imposition of death-penalty sanctions that permit adjudication based on discovery conduct is limited by constitutional due process. *Id.* (citing *TransAmerican,* 811 S.W.2d at 917).

Absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules, sanctions that prevent a decision on the merits of a case cannot be justified. *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 918. However, even in those cases where death penalty sanctions can be justified, a trial court must first consider less stringent sanctions and if those lesser sanctions would adequately promote compliance, deterrence, and punishment. *Chrysler Corp,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 917. In all but the most exceptional cases, before the trial court may strike a party's pleadings, the record must show that the trial court considered and tested less stringent sanctions. *Cire,* 134 S.W.3d at 842; *see also GTE Commc'n Sys. Corp. v. Tanner,* 856 S.W.2d 725, 730 (Tex. 1993). Therefore, the record must "contain some explanation of the appropriateness of the sanctions imposed." *Spohn Hosp. v. Mayer,* 104 S.W.3d 878, 883 (Tex. 2003). While case determinative sanctions may be imposed in the first instance, that is only in exceptional cases when they are clearly justified, and it is fully apparent that no lesser sanctions

would promote compliance with the rules. *GTE,* 856 S.W.2d at 729; *see also Spohn Hosp.,* 104 S.W.3d at 883 (requiring that "the record should contain some explanation of the appropriateness of the sanctions imposed.").

As with other discovery sanctions, death penalty sanctions may not be excessive and must bear some relationship to the offensive conduct. *TransAmerican,* 811 S.W.2d at 917. In addition, the imposition of death penalty sanctions is limited by constitutional due process because the striking of a party's pleading and dismissal of its action necessarily results in the adjudication of the party's claims or defenses "without regard to their merits but based upon the parties' conduct of discovery." *Id.* at 918. Therefore, before the trial court may impose death penalty sanctions, the court must determine the offensive conduct "justif[ies] a presumption that the offending party's claims or defenses lack merit." *Id.* In other words, the sanctions must be "just" in the context of the alleged discovery abuse. *Id.*

The imposition of the death-penalty sanction is limited by constitutional due process and therefore, "out to be the exception rather than the rule." *TransAmerican,* 811 S.W.2d at 917, 919. "Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Id.* at 918. And sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Id.* Even when a party has demonstrated "flagrant bad faith[,]" "lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender." *Chrysler Corp.,* 841 S.W.2d at 849. The Texas Supreme Court has consistently emphasized the continued validity of the rule

that generally lesser sanctions should be tested first. *Cire,* 134 S.W.3d at 842; *see also Hamill v. Level,* 917 S.W.2d 15, 16 n. 1 (Tex. 1996).

In *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex. 1991), the Texas Supreme Court established a two-part test for determining whether a sanctions award is "just." First, a direct relationship must exist between the offensive conduct and the sanction imposed, which means that the sanction must be "directed against the abuse and toward remedying the prejudice caused [to] the innocent party." *Cire,* 134 S.W.3d at 839 (quoting *TransAmerican,* 811 S.W.2d at 917). Second, the sanction must not be excessive, meaning that "[t]he punishment should fit the crime," and the courts must consider the availability of less-stringent sanctions and whether the less-stringent sanctions would fully promote compliance." *Id.* (quoting *TransAmerican,* 811 S.W.2d at 917); *see also Taylor v. Taylor,* 254 S.W.3d 527, 533 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("[A] sanction imposed should be no more severe than necessary to satisfy its legitimate purposes, which include securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators.").

Applying the law to the facts of this case regarding Mr. Jones as an individual Defendant, there is simply nothing in Plaintiff's second motion for contempt or motion for default judgment (and supplemental briefing) nor Plaintiff's counsel's argument at the hearing that shows Mr. Jones committed discovery abuses so outrageous as to demand a default judgment as punishment. And while Mr. Jones and the undersigned are cognizant of the Court's prior comments about the degrees of separation between Mr. Jones and Free Speech Systems and/or Infowars, the fact of the matter is that Plaintiff has not pleaded any claim that would implicate liability of either of the entity-defendants to Mr. Jones, individually. The Court must consider Mr. Jones and the entity-defendants as truly separate and distinct defendants, particularly in such a significant trial-by-

sanctions order like the one at issue in this motion. Yet, the Court's order does not truly explain what conduct by Mr. Jones involving the discovery in each of Plaintiff's cases was abusive and how that warranted further sanctions, particularly when Mr. Jones did not have and could not provide any further document production and he has now been deposed on numerous occasions in these cases. The Court similarly did not explain what specific conduct justified the severe death-penalty sanction, except to reference Mr. Jones's alleged "public threats" or his "show trials" comment. But those comments, even if completely true, have no direct relationship to the discovery issues on which Plaintiff was granted a default judgment by this Court.

Mr. Jones asks that the Court review its decision granting a default judgment as to him as an individual defendant to objectively determine that those post-lawsuit critiques have no relation whatsoever to the discovery in Plaintiff's cases. All signs point to the determination that a default-judgment sanction against Mr. Jones was unwarranted and unjustified. Beyond the sanction not being justified, Plaintiff likewise failed to demonstrate that any alleged discovery abuse(s) by Mr. Jones were so offensive as to justify a presumption that his defenses to such defamation claims lack merit. *TransAmerican,* 811 S.W.2d at 917. And the Court's basis for considering whether lesser remedies would be effective instead of a default judgment—"Mr. Jones' public threats and Mr. Jones' professed belief that these proceedings are 'show trials'"—have no ""direct relationship" to the discovery issued raised by Plaintiff about Mr. Jones, individually (as limited as they may be). *See* Am. Order at 4.

Plaintiff simply did not meet the burdens required by the Texas Supreme Court in *TransAmerican* to be entitled to a default-judgment sanction against Mr. Jones. Plaintiff demonstrated no such conduct at all by Mr. Jones and instead just loudly pointed to post-lawsuit comments by Mr. Jones about other Sandy Hook-related litigation and criticism of the lawsuits in

general with the sole intention of inflaming the Court and distracting the Court from his smokescreen that Mr. Jones has had no sanctionable discovery misconduct that would justify default-judgment sanctions. Yet, as stated above, these post-lawsuit comments bear no direct relationship to any alleged discovery misconduct by Mr. Jones. *TransAmerican,* 811 S.W.2d at 917. Second, a default-judgment sanction against Mr. Jones is extremely excessive and in no way fits whatever alleged "crime" Mr. Jones allegedly committed as it pertains to discovery in Plaintiff's defamation and IIED cases. *Id.* More to the point, while the Court states in its order that it considered lesser sanctions, as Mr. Jones has pointed out in this briefing, none of the justifications for not imposing lesser restrictions specify the alleged misconduct by Mr. Jones have any direct relationship to discovery in this case. Indeed, there is no discussion as to whether Mr. Jones as an individual defendant had even been the subject of prior or lesser sanctions as it relates to discovery issues in this case to justify the default-judgment sanction.

Moreover, the reality is that while Plaintiff has asserted defamation and IIED claims against Mr. Jones, and the discovery Plaintiff has complained about has no relevance to the broadcasts which serve as the basis for Plaintiff's defamation and IIED claims. In fact, Mr. Jones and the other Defendants in this lawsuit contend Plaintiff's IIED claims are just defamation claims improperly perched as IIED claims for Plaintiff to try and gain another year's worth of broadcasts for statute-of-limitations purposes. Regardless of the cause of action, the broadcasts themselves— and questions surrounding Mr. Jones's alleged individual liability for in those-listed broadcasts, which he has been questioned on repeatedly—are the only evidence needed to determine the merits of Plaintiff's defamation and IIED claims, to the extent the IIED claim should survive summary dismissal.

For example, the Texas Supreme Court has consistently held that in the context of defamation claims, a determination of whether a broadcast is defamatory is based on the "broadcast as a whole," the "statements in the broadcast," and the "broadcast's gist." *Neely v. Wilson,* 418 S.W.3d 52, 63-64 (Tex. 2013) (citing *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114-15 (Tex. 2000) ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements")).

Plaintiffs' pleadings also clearly demonstrate that the IIED claims are dependent upon the allegedly defamatory statements and conduct of Mr. Jones and the entity-defendants as it may pertain to Plaintiff. In other words, the "extreme and outrageous conduct [Mr. Jones is] alleged to have engaged in is making allegedly defamatory statements about Plaintiff[]." *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.). Because Plaintiff's IIED claims depend on the allegedly defamatory statements of Mr. Jones and other co-Defendants, Plaintiff undoubtedly has (or had) another remedy such that the IIED claims should be dismissed as a matter of law. And even if they are not, Plaintiff's IIED claims as to any video before August 8, 2017 is time-barred as a matter of law (which is seven (7) of the nine (9) videos listed in the IIED claim).[3]

Thus, Plaintiff has the entirety of the "evidence" and discovery he needs to argue the merits of his defamation and IIED claims against Mr. Jones, individually, to a jury. To wit, even if Plaintiff claims he does indeed lack some evidence he claims is relevant to his lawsuit—which only implicates four (4) legally viable and actionable broadcasts that are within the applicable

---

[3] Plaintiff's second lawsuit for the IIED claim was filed August 8, 2019. IIED claims are subject to two-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE § 16.003. Thus, for any videos or broadcasts prior to August 8, 2017, those claims are time barred. Thus, Plaintiff's IIED claims should at most be based upon only the October 26, 2017 and April 20, 2018 broadcasts.

limitations periods—that discovery situation would involve information/documents/videos pertaining to Free Speech Systems and/or Infowars and not any documents or conduct by Mr. Jones as an individual.

In addition, if the Court correctly reconsiders its prior ruling and determines Mr. Jones and his co-Defendant(s) should be allowed to have the full merits of Plaintiff's claims decided by a jury, Plaintiff will truly have suffered no prejudice or otherwise been deterred in his efforts to obtain discovery from Mr. Jones regarding his claims against Mr. Jones, individually.

Because of the foregoing, it is now apparent that the default-judgment sanctions against Mr. Jones were not justified and arguably constitute a violation of Mr. Jones's individual due process rights. Even more importantly, the Court should consider how Plaintiff and his counsel did not raise any specific discovery abuse conduct by Mr. Jones beyond complaining about his "evasive" discovery answers (which the Court previously declined to compel Mr. Jones to respond otherwise) and being critical of Mr. Jones not being able to remember or know everything Plaintiff wanted him to know about broadcasts as far back as 2013.

To reiterate, neither second motion for contempt nor Plaintiff's motion for default judgment or supplemental brief in support specify any alleged discovery abuses or discovery misconduct by Mr. Jones individually which would come remotely close to supporting a default-judgment sanction under Rule 215. Instead, Plaintiff's briefing discusses focuses almost entirely on alleged misconduct or discover deficiencies by the "Infowars" defendants, i.e., Free Speech Systems and Infowars. But Plaintiff's motions—and more importantly the order submitted by Plaintiff and signed by the Court—improperly blur the lines between the individual Defendants and the entity-Defendants and the alleged discovery abuses that have been committed. And Plaintiff essentially distracted the Court away from the lack of any discovery-conduct complaints

16

about Mr. Jones individually by re-directing and focusing on post-litigation commentary that bore no direct relationship at all to the alleged discovery abuses at issue in Plaintiff's motions. This tactic by Plaintiff unfortunately proved successful and resulted in what Mr. Jones contends is an improper, blanket default-judgment ruling against all Defendants, which obviously includes Mr. Jones's contention that a liability-default on all of Plaintiff's claims against Mr. Jones, individually, was wholly improper and an abuse of discretion.

Yet, Mr. Jones believes that an objective review of the Court's rulings and findings, and the issues previously briefed by Plaintiff, simply do not demonstrate any misconduct by Mr. Jones that justifies imposing default-judgment sanctions. Due process and the underlying facts of this case demand that Plaintiff be required to present the merits of his defamation and IIED claims against Mr. Jones to a jury to decide and that Mr. Jones be allowed to defend against such claims, as opposed to the current trial-by-sanction on liability that has occurred. Even if the Court finds some sort of significant discovery misconduct by Mr. Jones has occurred—which it has not— discovery has nothing to do with the merits of Mr. Jones's defenses to Plaintiff's defamation claims and the merits and legal defenses to Plaintiff's IIED claims (especially the statute-of-limitations defense as to seven (7) of the nine (9) videos referenced in Plaintiff's IIED cause of action). Consequently, Mr. Jones respectfully requests the Court reconsider its prior ruling and withdraw its prior default0judgment sanctions as to Mr. Jones and deny Plaintiff's motion for contempt and motion for default judgment as it pertains to Plaintiff's claims against Mr. Jones, individually.

### **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant, Alex Jones, prays that the Court grant this motion for reconsideration and ultimately deny Plaintiff's motion for contempt and motion for default judgment, withdrawing the default-judgment sanction entered by the Court's

amended order on October 26, 2021, along with such other and further relief to which Defendant, Alex Jones, may be justly entitled.

Dated: December 30, 2021.

Respectfully submitted,

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF CONFERENCE

The undersigned counsel for Defendants has previously conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.

/s/ Bradley J. Reeves_____
Bradley J. Reeves

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on December 30, 2021.

Mark Bankston                               *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

___/s/ Bradley J. Reeves_____
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60413885
Status as of 1/5/2022 10:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/30/2021 10:53:50 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/30/2021 10:53:50 PM | SENT |
| William Ogden | | bill@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/30/2021 10:53:50 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC; AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON DEFENDANT, ALEX JONES'S, MOTION FOR RECONSIDERATION OF COURT'S RULING OF DEFAULT JUDGMENT ON PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215 AND MOTION FOR DEFAULT JUDGMENT**

On this day, came to be heard Defendant, Ales Jones's, Motion for Reconsideration of the Court's Order Granting a Liability-Default Judgment on Plaintiff's Second Motion for Contempt Under Rule 215 and Motion for Default Judgment. The Court, having considered the Motion, Plaintiff's response thereto, along with the arguments of counsel, finds that Defendant's Motion should be GRANTED, and upon further consideration, Plaintiff's request for default judgment as to Defendant, Alex Jones, is hereby DENIED. It is therefore ORDERED that Plaintiff's Second Motion for Contempt Under Rule 215 and Motion for Default Judgment are hereby DENIED in all respects except to the extent monetary sanctions were previously awarded to Plaintiff based on said motions.

SIGNED ON THIS THE _____ DAY OF _____, 2022.

_____

HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:       (512) 827-2246
Facsimile:       (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60413885
Status as of 1/5/2022 10:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/30/2021 10:53:50 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/30/2021 10:53:50 PM | SENT |
| William Ogden | | bill@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/30/2021 10:53:50 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/30/2021 10:53:50 PM | SENT |

12/31/2021 3:53 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Sheila Collins

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC; AND OWEN | § | |
| SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**DEFENDANTS, FREE SPEECH SYSTEMS, LLC'S AND INFOWARS, LLC'S, MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING A LIABILITY DEFAULT JUDGMENT ON PLAINTIFF'S SECOND MOTION FOR CONTEMPT UNDER RULE 215 AND MOTION FOR DEFAULT JUDGMENT**

Defendants, Free Speech Systems, LLC ("Free Speech Systems") and Infowars, LLC ("Infowars"), move the Court to reconsider the Court's October 26, 2021 order granting Plaintiff's motion for default judgment and second motion for contempt, and would show unto the Court as follows:

## I. BACKGROUND

Free Speech Systems and Infowars are defendants in each of the three (3) cases filed by the plaintiffs against co-Defendants, Alex Jones ("Mr. Jones") in the *Lewis* and *Pozner* cases, along with another co-Defendant, Owen Shroyer ("Mr. Shroyer"), in the *Heslin* matter's defamation claim. In this now-consolidated matter, Plaintiff, Neil Heslin, has asserted claims against Free Speech Systems and Infowars for defamation and intentional infliction of emotional distress, with these claims arising out of alleged defamatory comments pertaining to the Sandy Hook tragedy.

In his live pleadings for each of these claims, Plaintiff goes through a litany of alleged videos, articles, and interviews involving Free Speech Systems and/or Infowars that go as far back as 2013. Yet, upon review of Plaintiff's causes of action, the Court will find:

(i)     Plaintiff's defamation claim involves only two (2) broadcasts from June 26, 2017 (the broadcast involving Mr. Shroyer) and July 20, 2017 (alleged rebroadcasting of Mr. Shroyer's June 26, 2017 broadcast);[1] and

(ii)    Plaintiff's IIED claim encompasses only nine (9) videos, two (2) of which are the same videos upon which Plaintiff has based his defamation claim. The earliest video referenced in Plaintiff's IIED cause of action is from November 18, 2016.[2]

Plaintiff initially filed suit on April 16, 2018 against Free Speech Systems and Infowars asserting claims for defamation. Shortly after the lawsuit was filed, Defendants filed a TCPA motion to dismiss. In response, Plaintiff moved for limited discovery under the TCPA, which was granted by the then-presiding judge, Judge Jenkins, in an order dated August 31, 2018. Defendants resisted this discovery, resulting in Plaintiff filing a motion for contempt seeking sanctions under Rule 215 of the Texas Rules of Civil Procedure. *See Jones v. Heslin,* No. 03-19-00811-CV, 2020 Tex. App. LEXIS 2441, at *3 (Tex. App.—Austin March 25, 2020, pet. denied) (mem. op.). After Plaintiff filed his motion for contempt, Defendants initiated an appeal on the basis that the district court had not timely ruled on their TCPA motion to dismiss and thus it had been denied as a matter of law. The Third Court of Appeals determined the appeal was premature and dismissed it for lack of jurisdiction.

---

[1] *See* Plaintiff's Third Am. Pet. at ¶55.

[2] *See* Plaintiff's Orig. Pet. at ¶71.

Plaintiff then filed his First Amended Petition in his defamation lawsuit on June 26, 2019, adding claims for intentional infliction of emotional distress. However, Plaintiff then further amended his petition, ultimately filing his Third Amended Petition—his live pleading—on August 8, 2019, wherein Plaintiff removed the IIED claim entirely. That same day, Plaintiff filed a second lawsuit against Defendants, Mr. Jones, Infowars, and Free Speech Systems, re-asserting his cause of action for intentional infliction of emotional distress. In that claim, Plaintiff asserts that videos from: (i) November 28, 2016; (ii) March 8, 2017; (iii) April 22, 2017; (iv) June 13, 2017; (v) June 19, 2017; (vi) June 26, 2017; (vii) July 20, 2017; (viii) October 26, 2017; and (ix) April 20, 2018.

After the defamation case was remanded back to the district court following the first attempted appeal, a hearing on Defendants' TCPA motion and Plaintiff's motion for contempt occurred on October 17, 2019. That same hearing also addressed Plaintiff's motion for expedited discovery in the IIED case. At this hearing, Defendants offered to stipulate to or concede facts pleaded by Plaintiff to obviate the need to respond to the TCPA discovery requests in the defamation case. Judge Jenkins subsequently signed orders on October 18, 2019 which: (i) granted Plaintiff's motion for contempt in the defamation case; (ii) denied Defendants' TCPA motion to dismiss in the defamation case; and (iii) granted Plaintiff's motion for expedited discovery in the IIED case. In the order granting Plaintiff's motion for contempt in the defamation case, the Court ordered that "pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burden in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion." *Id.*

At the same time, the district court denied Defendants' TCPA motion to dismiss in Plaintiff's defamation case. *Id.* Another hearing in the IIED case occurred on December 18, 2019 regarding Defendants' TCPA motion to dismiss in the IIED case and a motion for sanctions filed

by Plaintiff regarding alleged discovery deficiencies in the IIED case. On December 20, 2019, the trial court denied Defendants' TCPA motion to dismiss and granted Plaintiff's motion and awarded $100,000.00 in sanctions and took Plaintiff's request for a default judgment in the IIED case under advisement.

In November 2019, Defendants again filed an appeal of the trial court's denial of their TCPA motion to dismiss in the defamation case, and subsequently appealed the denial of the TCPA motion in the IIED claim. Defendants' appeals were ultimately denied both by the Third Court of Appeals and the Texas Supreme Court, and the cases were remanded back to the trial court on June 4, 2021. Plaintiff then filed a Second Motion for Contempt Under Rule 215 on July 6, 2021, contending that Defendants had failed to comply with the August 31, 2018 discovery order entered by Judge Jenkins and seeking sanctions, including a default judgment being entered against Defendants. Plaintiff also filed a supplemental brief in support of his motion for default judgment in the IIED case, contending Free Speech Systems and Infowars had not complied with the district court's December 2019 discovery order in Plaintiff's IIED case.

In each of Plaintiff's motions and supplemental brief in support at issue here, Plaintiff largely focused on rehashing the past TCPA discovery issues in the case, all of which had already been addressed by Judge Jenkins. However, Plaintiff contended that the December 20, 2019 order in the IIED case warranted the granting of a default judgment against all Defendants for all of Plaintiff's claims. In his briefing, Plaintiff has a number of complaints regarding the entity-Defendants' alleged discovery misconduct. As laid out in Plaintiff's supplemental brief in support of his motion for default judgment, Plaintiff contends the following discovery abuse(s) have occurred:

(i)      Infowars "refused to prepare its corporate representative" in a second deposition;

(ii)     Infowars withheld tens of thousands of emails;

(iii)    Infowars provided "false and evasive discovery responses;"

(iv)     Infowars failed to order a litigation hold until almost a year after being sued;

(v)      Infowars improperly relied on individual employees to search their own files and devices for responsive documents, and not a single employee returned a single responsive document;

(vi)     Infowars failed to preserve and search all its electronically stored data, including file storage servers, cloud servers, and devices held by employees;

(vii)    Infowars failed to preserve and search its internal messaging services;

(viii)   Infowars failed to preserve its social media accounts despite multiple warnings from the social media companies, which led to their deletion; and

(ix)     Infowars failed to preserve and produce the relevant videos about Sandy Hook, the evidence at the heart of Plaintiff's claims.

*See* Plaintiff's Supp. Brief in Support of Mtn. for Default Judgment at 14-15.

To support these allegations, Plaintiff's briefing mainly focuses on situations and testimony given in the *Lafferty* matter in Connecticut, which consists of a much broader scope of discovery and other discovery-related issues that go far beyond the scope of Plaintiff's discovery in this case. For example, Plaintiff's supplemental brief cites to testimony from Dr. David Jones, Mr. Jones's father, given in the *Lafferty* case wherein he stated that it was his understanding a search for the term "Sandy Hook" had yielded about 80,000 emails. *See* Pl.'s Supp. Brief at 18. But Plaintiff does not mention that the search result referenced by Dr. Jones involved included what has since been determined to be multiple duplicates of the same emails.

Plaintiff also discusses issues with prior corporate representative depositions, while failing to remind the Court that those issues were dealt with by Judge Jenkins when he issued monetary sanctions and denied Defendants' TCPA motion to dismiss in December 2019. And it is difficult

to understand how the corporate representative situation—which was not a current discovery deficiency issue at the time of the Court's order granting default-judgment sanctions—has any direct bearing or relationship to the document production issues Plaintiff discusses at length in its briefing.

As shown in the list above, most of Plaintiff's briefing deals with Plaintiff's contentions of discovery misconduct by Free Speech Systems and/or Infowars in failing to preserve relevant evidence. Despite the myriad of allegations against the entity-Defendants in this case, there is absolutely no evidence that Free Speech Systems and/or Infowars intentionally destroyed or tampered with any relevant evidence. *See* Ex. 2, Declaration of Alex Jones at ¶11. At worst, Plaintiff's allegations describe a potential spoliation situation where the Court must determine the extent of any duty the entity-Defendants had to preserve things like social media accounts that are outside the bounds of the nine (9) broadcasts referenced in Plaintiff's defamation and IIED causes of action—only four (4) of which are legally viable due to statute-of-limitations issues—and give a negative-inference instruction to the jury, if appropriate. But the reality of this whole situation is that while the Court may dislike the Defendants in this case and the underlying facts of this case, the conduct complained of by Plaintiff simply does not constitute the type of "exceptional" conduct that would support imposing death-penalty sanctions.

On August 31, 2021, the Court held a hearing on Plaintiff's second motion for contempt and continuation of Plaintiff's request for a default judgment in the IIED case, along with other sanctions motions filed by the remaining Plaintiffs in the other cases. At this hearing, Plaintiff's counsel again went through the litany of past, moot TCPA-discovery issues that had already been dealt with by Judge Jenkins. Plaintiff also spent an inordinate amount of time focusing on post-lawsuit comments by Mr. Jones about the Connecticut cases, the plaintiffs, and their counsel and

other critical comments Mr. Jones has made about the cases. However, Plaintiff did *not* connect the dots between these post-lawsuit comments by Mr. Jones and the alleged discovery abuses by Free Speech Systems and Infowars for which Plaintiff sought a default judgment.

Indeed, Plaintiff's motion arguments about alleged discovery abuses deal almost exclusively with Free Speech Systems and/or Infowars and the alleged failure by those Defendants to preserve relevant evidence. The alleged failure to preserve evidence—particularly video broadcasts Plaintiff claims go to the "heart" of his claims—is not the same type of sanctionable conduct like the alleged failure or intentional refusal to produce those video broadcasts as has been implied by Plaintiff throughout this litigation. Failing to produce the video broadcasts if the entity-Defendants were in possession, custody, or control of those video broadcasts would fall within the category of possible discovery misconduct. On the other hand, it is not discovery misconduct or intentional obstruction of the discovery process when neither Free Speech Systems nor Infowars had custody, possession, or control of any other responsive production—especially as it pertains to producing copies of video broadcasts and not being able to do so because Defendants were surprisingly permanently banned from using the platform Defendants utilized to store those video broadcasts.

As a reminder, Free Speech Systems and/or Infowars maintained those video broadcasts almost entirely on YouTube's servers, and when that platform suddenly permanently banned Infowars, all access to and control of those videos was lost. *See* Ex. 2, Declaration of Alex Jones at ¶9. Again, that is a spoliation of evidence concern, not discovery misconduct warranting death-penalty sanctions. And, to the extent Free Speech Systems and/or Infowars have copies of any video broadcasts cited in Plaintiff's live pleadings, they have been produced to Plaintiff. *Id.* at ¶10.

7

The fact of the matter is that the Court's previous findings to the contrary, Free Speech Systems and Infowars have produced all documents, videos, etc. that are within their care, custody, possession, and/or control which are responsive to Plaintiff's requests. To wit, Free Speech Systems has produced over 90,000 pages of documents and copies of at least eighty-five (85) video broadcasts. *See* Ex. 2 at ¶¶7-8; *see also* Plaintiff's Supp. Brief in Support of Mtn. for Default Judgment at 32 (describing Free Speech Systems producing 29 videos, then produced 42 additional videos, followed by production of 14 more videos).  Plaintiff's Second Motion for Contempt does not cite to any specific alleged discovery misconduct by Free Speech Systems and/or Infowars beyond making generalized allegations that "Defendants have not taken any actions in this Court since remand or responded to their discovery obligations." *See, e.g.,* Plaintiff's Second Mtn. for Contempt at 20.

One of the main issues with Plaintiff's default-judgment sanctions request which Defendants attempted to discuss with the Court at the August 31, 2021 hearing is how the Court was considering (and subsequently granted) merit-determinative, default-judgment sanctions, based on overblown allegations of discovery abuses pertaining to limited TCPA discovery—not full-fledged written discovery under the normal procedural circumstances in civil cases. *See* Ex. 1, Transcript of August 31, 2021 hearing at 77:22-78:17. That discovery. by its very nature of being limited TCPA discovery, was intended to be constrained in scope and solely for the purposes of allowing Plaintiff an adequate opportunity to develop potential evidence to overcome Defendants' TCPA motions to dismiss. Consequently, as the discovery at issue was solely under the TCPA, the need for Defendants to fully respond to Plaintiff's limited TCPA discovery essentially became moot or was otherwise unnecessary as soon as Judge Jenkins denied Defendants' TCPA motions to dismiss.

8

Even if the Court disagrees with that position, Plaintiff's motion for default judgment and second motion for contempt at best supports the possibility that the Court could consider whether a spoliation finding and/or instruction is appropriate. There is no evidence in this case that Defendants have destroyed or tampered with relevant evidence. At most, the record reflects that Defendants were alleged to have not fully complied with Plaintiff's TCPA discovery requests and the argument that Defendants also did not comply with a subsequent order to do so. But this certainly does not constitute behavior that is "exceptional misconduct" to justify the trial court's refusal to test lesser sanctions before rendering a default judgment on the merits. *Cire v. Cummings,* 134 S.W.3d 835, 842 (Tex. 2004) (internal citations omitted)).

Moreover, for the Court to impose sanctions based on the alleged failure to produce documents in discovery, the law requires that Court must "determine that the complaining party proved that the alleged offending party failed to produce a document within its possession, custody, or control." *GTE Commc'ns Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex. 1993). While Plaintiff lodged numerous allegations to this effect in its motion for default judgment, supplemental brief in support, and second motion for contempt, Plaintiff overall failed to provide any concrete evidence that proved Free Speech Systems and/or Infowars had possession, custody, or control of certain documents (or video broadcasts) and failed to produce them. *Id.* As referenced above, Plaintiff's briefs only point to Dr. Jones's testimony about the estimated results of an email search utilizing search terms provided by the plaintiffs in the *Lafferty* matter in Connecticut. Again, that involves a much broader scope of discovery and included multiple duplicates of the same emails (which have been produced in this litigation), but it is not evidence that Free Speech Systems and/or Infowars has failed to produce any other documents in its care, custody, or control.

Plaintiff's briefs and arguments at the August 31, 2021 hearing centered on Defendants' inability to produce certain documents/video broadcasts in response to Plaintiff's requests because

Defendants did not save, store, or otherwise "preserve" such documents, which Plaintiff contends Defendants had a duty to do so. Plaintiff also generally alleged Defendants had not supplemented their production responses, without even considering the idea that Defendants had very few to no documents with which to supplement their production, since all responsive documents had already been previously produced (and thus Defendants had no obligation to supplement anything). *See, e.g.,* Ex. 2 at ¶¶3, 9, 11. Despite these significant flaws in Plaintiff's motions, and without determining whether Defendants had any such duties to preserve the evidence Plaintiff complained in his motions is no longer available, the Court concluded that default-judgment sanctions were warranted. The Court even went so far as to find that the last batch of approximately 6,000 pages documents produced by Defendants a few days before the August 31st hearing "[did] not satisfy" Defendants' outstanding obligations." *See* Am. Order at 3. The Court issued this conclusive finding even though the Court had not reviewed the supplemental production, nor did Plaintiff put on any admissible evidence detailing what all comprised this supplemental production. Rather, Plaintiff's counsel made the bald, conclusory statement in Plaintiff's response briefing and at the oral hearing that the supplemental production failed to satisfy any of the complained-of discovery obligations.

Seemingly taking Plaintiff's claims entirely at face value, the Court subsequently granted Plaintiff's motion for contempt and motion for default judgment, ultimately signing an amended order on October 26, 2021 wherein the Court entered a default judgment as to liability against all Defendants, including Free Speech Systems and Infowars. In the Court's order, there is no delineation between the individual Defendants, or the alleged discovery misconduct attributed to each Defendant. To the contrary, the order discusses: (i) how "Defendants" violated other discovery orders in the other Sandy Hook cases before this Court; (ii) that "Defendants" have

engaged in pervasive and persistent obstruction of the discovery process in general; (iii) that "Defendants" refused to produce critical evidence; (iv) that "Defendants" have shown a "deliberate, contumacious, and unwarranted disregard for this Court's authority;" and (v) that the Court found that "Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit." *See* Amended Order dated October 26, 2021 at 3-4. The Court likewise granted Plaintiff monetary sanctions for Plaintiff's attorneys' fees in connection with the motion.

Free Speech Systems and Infowars are seeking to have the Court reconsider its ruling on the motion for contempt and deny Plaintiff's motion for default judgment as to Free Speech Systems and Infowars, because the reality is Defendants had produced essentially every responsive document they could prior to the August 31, 2021 hearing. In fact, it appears the Court granted the default-judgment sanctions against Free Speech Systems and Infowars based on their *inability* to produce documents which were *not* in Defendants' care, possession, custody, or control and thus could not actually produce, which directly contradicts prevailing Texas law. *See GTE,* 856 S.W.2d at 729 (holding that a trial court must first determine Defendants failed to produce documents which are within their possession, custody, or control before being able to impose sanctions). As stated above, the complaints made by Plaintiff about Defendants' duty to preserve evidence and failure to do so raises spoliation concerns, not default-judgment sanctions. *See Wal-Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 721-22 (Tex. 2003) (explaining that in situations involving unavailable, lost, altered, or destroyed evidence, a spoliation instruction may be warranted depending on the impact that unavailable evidence has on the party's ability to present its case and the reasons for its unavailability—i.e., intentional destruction versus the unintended loss of custody, control, or possession of evidence).

in its amended order, the Court made no specific findings as to Free Speech Systems or Infowars nor does the Court's order discuss specific conduct of these entity-Defendants beyond general statements that Defendants violated prior discovery orders in this case and other, separate cases with different circumstances, including the *Lafferty* case in Connecticut. *See* Am. Order at 3-4. Without providing further details, the Court found that "[i]n sum, Defendants have been engaged in pervasive and persistent obstruction of the discovery process in general." *Id.* at 4.

The Court also determined that the alleged conduct, or lack of participation in discovery, justified the presumption that Defendants' defenses to Plaintiff's claims lack merit. *Id.* That is simply incorrect, particularly as to the defenses on the merits and the underlying law applicable to Plaintiff's claims which are not impacted in any way by discovery or the alleged lack thereof. And given the nature of Plaintiff's defamation and IIED claims against Defendants, it is likewise clear that Free Speech Systems's and Infowars's defenses to such claims have merit regardless of any alleged discovery issues. For example, these entity-Defendants have the obvious, merits-based defense to the defamation claims, in part based on the argument that the statements by Mr. Shroyer in the June 26, 2017 broadcast (and re-aired on July 20, 2017) are substantially true or are otherwise not defamatory. At the very least, the Court can see how regardless of the discovery situation, these entity-Defendants have meritorious defenses to Plaintiff's defamation claims which they should be entitled to assert to a jury at trial for a full determination of Plaintiff's claims entirely on the merits.

Free Speech Systems and Infowars similarly have meritorious defenses to Plaintiff's IIED claims, including, but not limited to: (i) Plaintiff's IIED claims are truly just defamation claims which are time-barred; and (ii) Plaintiff has no evidence Free Speech Systems and/or Infowars said, advocated for, or otherwise did anything with the specific intent to cause emotional distress

12

to Plaintiff. Because Plaintiff has never actually demonstrated discovery conduct by the entity-Defendants in this now-consolidated matter has been so out-of-bounds and in such bad faith as to warrant default-judgment sanctions, Free Speech Systems and Infowars request the Court reconsider its ruling on Plaintiff's Second Motion for Contempt and Motion for Default Judgment and instead deny Plaintiff's motions to allow this case to proceed to trial so that a jury can make determinations on the underlying merits of Plaintiff's claims against these Defendants.

## II.    ARGUMENT AND AUTHORITIES

The Court does indeed have the inherent authority under Rule 215 to enter a default judgment as sanctions for alleged discovery abuses; however, Free Speech Systems and Infowars contend that such sanctions are completely unwarranted and are so unjust as to violate each of these Defendant's due process rights to have a jury hear the merits of the case on both liability and damages and render a verdict based on the merits of Plaintiff's defamation and IIED claims—to the extent the IIED claims survive summary judgment. None of the alleged discovery issues complained of by Plaintiff justify the extreme measure of death-penalty sanctions. While a trial court has the power to issue sanctions, that sanction power is limited in that the court "may not impose a sanction that is more severe than necessary to satisfy its legitimate purpose." *Cire,* 134 S.W.3d at 839.

Sanctions for discovery abuse serve three legitimate purposes: (1) to secure compliance with the discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex. 1992). When a party fails to comply with proper discovery requests or fails to obey an order to provide or permit discovery, the trial court may, after notice and hearing, make such orders regarding the failure, which includes, among other things, an order striking pleadings, dismissing with or without prejudice the

action or proceedings, or rendering a default judgment against the disobedient party. *See* TEX. R. CIV. P. 215.2. Although punishment, deterrence, and securing compliance continue to be valid reasons for imposing sanctions, these considerations alone will not justify "trial by sanctions." *Chrysler Corp.,* 841 S.W.2d at 849; *see also Westfall Family Farms, Inc. v. King Ranch, Inc.,* 852 S.W.2d 587, 591 (Tex. App.—Dallas 1993, writ denied).

Notwithstanding rule 215, discovery abuse sanctions must be "just." *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAm. Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). Moreover, so-called death penalty sanctions are limited by constitutional due process. *Id.* at 917. Thus, "a death penalty sanction cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit." *Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 372 S.W.3d 177, 184 (Tex. 2012).

The default judgment entered by this Court against Free Speech Systems and Infowars undoubtedly constitutes a "death penalty" sanction. A death penalty sanction is a severe form of sanction that prevents a party from contesting liability and allows for the determination of liability based on the party's discovery conduct rather than the dispute's merits. *Ring & Ring v. Sharpstown Mall Tex., LLC,* No. 01-16-00341-CV, 2017 WL 3140121, at *18 (Tex. App.—Houston [1st Dist.] July 25, 2017, no pet.) (mem. op.) (citing *TransAmerican,* 811 S.W.2d at 917-18). When a trial court places a defendant in default, the result is that the defaulting defendant admits all pleaded facts establishing liability. *Id.* (citing *Paradigm Oil,* 372 S.W.3d at 186). The imposition of death-penalty sanctions that permit adjudication based on discovery conduct is limited by constitutional due process. *Id.* (citing *TransAmerican,* 811 S.W.2d at 917).

14

Absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules, sanctions that prevent a decision on the merits of a case cannot be justified. *Chrysler Corp.,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 918. However, even in those cases where death penalty sanctions can be justified, a trial court must first consider less stringent sanctions and if those lesser sanctions would adequately promote compliance, deterrence, and punishment. *Chrysler Corp,* 841 S.W.2d at 849; *see also TransAmerican,* 811 S.W.2d at 917. In all but the most exceptional cases, before the trial court may strike a party's pleadings, the record must show that the trial court considered and tested less stringent sanctions. *Cire,* 134 S.W.3d at 842; *see also GTE,* 856 S.W.2d at 730. Therefore, the record must "contain some explanation of the appropriateness of the sanctions imposed." *Spohn Hosp. v. Mayer,* 104 S.W.3d 878, 883 (Tex. 2003). While case determinative sanctions may be imposed in the first instance, that is only in exceptional cases when they are clearly justified, and it is fully apparent that no lesser sanctions would promote compliance with the rules. *GTE,* 856 S.W.2d at 729; *see also Spohn Hosp.,* 104 S.W.3d at 883 (requiring that "the record should contain some explanation of the appropriateness of the sanctions imposed.").

As with other discovery sanctions, death penalty sanctions may not be excessive and must bear some relationship to the offensive conduct. *TransAmerican,* 811 S.W.2d at 917. In addition, the imposition of death penalty sanctions is limited by constitutional due process because the striking of a party's pleading and dismissal of its action necessarily results in the adjudication of the party's claims or defenses "without regard to their merits but based upon the parties' conduct of discovery." *Id.* at 918. Therefore, before the trial court may impose death penalty sanctions, the court must determine the offensive conduct "justif[ies] a presumption that the offending party's

claims or defenses lack merit." *Id.* In other words, the sanctions must be "just" in the context of the alleged discovery abuse. *Id.*

The imposition of the death-penalty sanction is limited by constitutional due process and therefore, "out to be the exception rather than the rule." *TransAmerican,* 811 S.W.2d at 917, 919. "Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Id.* at 918. And sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Id.* Even when a party has demonstrated "flagrant bad faith[,]" "lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender." *Chrysler Corp.,* 841 S.W.2d at 849. The Texas Supreme Court has consistently emphasized the continued validity of the rule that generally lesser sanctions should be tested first. *Cire,* 134 S.W.3d at 842; *see also Hamill v. Level,* 917 S.W.2d 15, 16 n. 1 (Tex. 1996).

In *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex. 1991), the Texas Supreme Court established a two-part test for determining whether a sanctions award is "just." First, a direct relationship must exist between the offensive conduct and the sanction imposed, which means that the sanction must be "directed against the abuse and toward remedying the prejudice caused [to] the innocent party." *Cire,* 134 S.W.3d at 839 (quoting *TransAmerican,* 811 S.W.2d at 917). Second, the sanction must not be excessive, meaning that "[t]he punishment should fit the crime," and the courts must consider the availability of less-stringent sanctions and whether the less-stringent sanctions would fully promote compliance." *Id.* (quoting *TransAmerican,* 811 S.W.2d at 917); *see also Taylor v. Taylor,* 254 S.W.3d 527, 533 (Tex. App.—

Houston [1st Dist.] 2008, no pet.) ("[A] sanction imposed should be no more severe than necessary to satisfy its legitimate purposes, which include securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators.").

Applying the law to the facts of this case regarding Free Speech Systems and Infowars, there is simply nothing in Plaintiff's second motion for contempt or motion for default judgment (and supplemental briefing) nor Plaintiff's counsel's arguments at the hearing that shows these Defendants committed discovery abuses so offensive as to support the default-judgment sanction. While Plaintiff (and the Court) have been frustrated with these discovery concerns with Defendants, there has been no evidence that Defendants have intentionally destroyed or lost evidence or that Defendants have failed or refused to produce documents/videos/etc. that are within their care, custody, possession, or control. Quite the contrary, the only evidence in that regard is that Defendants have produced everything to which Defendants have access which is responsive to Plaintiff's discovery requests. *See* Ex. 2 at ¶3. But the Court should not issue default-judgment sanctions against Free Speech Systems and Infowars based on these Defendants' being unable to produce additional documents or video broadcasts (or other data) since they no longer have access to certain third-party platforms where these documents/videos/social media posts/etc. were posted and being stored.

As such, Free Speech Systems and Infowars respectfully ask that the Court review its decision granting a default judgment to objectively determine even if some discovery misconduct or deficiencies occurred early on in this litigation, Defendants' alleged conduct simply does not rise to such a shocking level that would make this an "exceptional case" warranting death-penalty sanctions. A default-judgment sanction against Free Speech Systems and Infowars was simply not justified based on the state of Texas law analyzing such default-judgment sanction issues. Beyond

17

the sanctions not being justified, Plaintiff likewise failed to demonstrate that any alleged discovery abuse(s) by Free Speech Systems and/or Infowars were so offensive as to justify a presumption that his defenses to such defamation claims lack merit. *TransAmerican,* 811 S.W.2d at 917. And the Court's basis for considering whether lesser remedies would be effective instead of a default judgment—Defendants' "general bad faith approach to litigation"—without more, is simply an insufficient, conclusory basis justifying the default-judgment sanction. *See* Am. Order at 4.

Despite Plaintiff's dramatic briefing and arguments to the contrary, Plaintiff simply did not meet the burdens required by the Texas Supreme Court in *TransAmerican* to be entitled to a default-judgment sanction against Free Speech Systems and/or Infowars. The alleged conduct of these Defendants highlighted by Plaintiff in his briefing at most shows that the Court may have grounds to consider whether a spoliation instruction would be appropriate (if Plaintiff requests one). But none of the conduct allegedly committed by Free Speech Systems and/or Infowars supports the severe sanction of a default judgment, particularly where the issue is Defendants no longer have custody, possession, or control of certain evidence, allegedly failed to preserve evidence, and otherwise were (and still are) unable to produce documents because Defendants do not have them. With no intentional destruction of evidence or anything to prove any concerted effort by either entity-Defendant to refuse to produce relevant documents or fail to produce documents of which they do have possession, custody, or control, Texas law does not support the imposition of the death-penalty sanctions order by the Court.

Second, a default-judgment sanction against Free Speech Systems and Infowars is extremely excessive and in no way fits whatever alleged "crime" these Defendants allegedly committed as it pertains to discovery in Plaintiff's defamation and IIED cases. *Id.* More to the point, while the Court states in its order that it considered lesser sanctions, as Defendants have

pointed out in this briefing, none of the justifications provided by the Court as reasons for not imposing lesser restrictions ever specify the alleged misconduct by Free Speech Systems or Infowars (beyond generalized statements that Defendants violated discovery orders and engaged in "pervasive and persistent obstruction of the discovery process in general."). *See* Am. Order at 4.

Furthermore, while Plaintiff has asserted defamation and IIED claims against Free Speech Systems and Infowars, and the discovery Plaintiff has complained about has essentially no relevance to the broadcasts Plaintiff specifically cites as the basis for his defamation and IIED claims. In fact, these Defendants (and their co-Defendants) continue to contend Plaintiff's IIED claims are just defamation claims improperly perched as IIED claims for statute-of-limitations purposes as a way for Plaintiff to try and bring in front of the jury another year's worth of broadcasts he contends are defamatory or intentionally inflicted emotional distress but should be time-barred based on the one-year statute of limitations for defamation claims. Regardless of the cause of action, the broadcasts themselves—and questions surrounding Defendants' alleged liability for in those-listed broadcasts—are the only evidence needed to determine the merits of Plaintiff's defamation and IIED claims, to the extent the IIED claim should survive summary dismissal.

For example, the Texas Supreme Court has consistently held that in the context of defamation claims, a determination of whether a broadcast is defamatory is based on the "broadcast as a whole," the "statements in the broadcast," and the "broadcast's gist." *Neely v. Wilson,* 418 S.W.3d 52, 63-64 (Tex. 2013) (citing *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114-15 (Tex. 2000) ("the meaning of a publication, and thus whether it is false and defamatory, depends

on a reasonable person's perception of the entirety of a publication and not merely on individual statements")).

Plaintiffs' pleadings also clearly demonstrate that the IIED claims are dependent upon the allegedly defamatory statements and conduct of Free Speech Systems and/or Infowars, either directly or based on vicarious liability for Mr. Shroyer and/or Mr. Jones. In other words, the "extreme and outrageous conduct [Free Speech Systems and Infowars] are alleged to have engaged in is making allegedly defamatory statements about Plaintiff[]." *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.). Because Plaintiff's IIED claims depend on the allegedly defamatory statements of these Defendants (or vicarious liability based on these statements), Plaintiff undoubtedly has (or had) another remedy such that the IIED claims should be dismissed as a matter of law. And even if they are not, Plaintiff's IIED claims as to any video broadcast before August 8, 2017 are time-barred as a matter of law based on the applicable two-year statute of limitations (which is seven (7) of the nine (9) videos listed in the IIED claim).[3]

Thus, Defendants contend that Plaintiff has the entirety of the "evidence" and discovery he needs to argue the merits of his defamation and IIED claims against Free Speech Systems and Infowars. To wit, even if Plaintiff claims he does is lacking some sort of important evidence he claims is relevant to his lawsuit—which only implicates four (4) legally viable and actionable broadcasts that are within the applicable limitations periods—that does not justify the Court granting default-judgment sanctions. Indeed, Plaintiff has made no effort to obtain discovery from any of the third-party platforms, specifically YouTube, to see if YouTube still has any of these

---

[3] Plaintiff's second lawsuit for the IIED claim was filed August 8, 2019. IIED claims are subject to two-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE § 16.003. Thus, for any videos or broadcasts prior to August 8, 2017, those claims are time barred. Thus, Plaintiff's IIED claims should at most be based upon only the October 26, 2017 and April 20, 2018 broadcasts.

video broadcasts and data for those video broadcasts. That is Plaintiff's burden to try and obtain

to prove the merits of its case, which the Court has currently removed by granting death-penalty

sanctions based on Defendants being unable to produce further documents to Plaintiff. In addition,

if the Court correctly reconsiders its prior ruling and determines Defendants should be allowed

their day in Court with a jury determining the full merits of Plaintiff's claims, Plaintiff will truly

have suffered no prejudice or otherwise been deterred in any significant way in his efforts to obtain

discovery from Free Speech Systems and Infowars.

Because of the foregoing, it is now apparent that the default-judgment sanctions against

Free Speech Systems and Infowars were not justified and arguably constitute a violation of these

Defendants' due process rights. Yet, Free Speech Systems and Infowars believe that an objective

review of the Court's prior default-judgment ruling and findings when compared to the alleged

discovery issues previously briefed by Plaintiff, simply do not demonstrate any misconduct by

Free Speech Systems or Infowars that is so exceptional and so out-of-bounds to justify imposing

default-judgment sanctions.

Due process and the underlying facts of this case demand that Plaintiff be required to

present the merits of his defamation and IIED claims against Free Speech Systems and Infowars

to a jury to decide and that these Defendants be allowed to defend against such claims, as opposed

to the current trial-by-sanction on liability that has occurred. Even if the Court finds some sort of

significant discovery misconduct by Free Speech Systems and/or Infowars has occurred—which

it has not—discovery has nothing to do with the merits of these Defendants' defenses to Plaintiff's

defamation claims and the merits and legal defenses to Plaintiff's IIED claims (especially the

statute-of-limitations defense as to seven (7) of the nine (9) videos referenced in Plaintiff's IIED

cause of action). Consequently, Free Speech Systems and Infowars respectfully request the Court

reconsider its prior ruling and withdraw its prior default0judgment sanctions as to Free Speech Systems and Infowars and deny Plaintiff's motion for contempt and motion for default judgment as it pertains to Plaintiff's claims against these entity-Defendants.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendants, Free Speech Systems, LLC and Infowars, LLC, pray that the Court grant this motion for reconsideration and ultimately deny Plaintiff's motion for contempt and motion for default judgment, withdrawing the default-judgment sanction entered by the Court's amended order on October 26, 2021, along with such other and further relief to which Defendants, Free Speech Systems, LLC and Infowars, LLC, may be justly entitled.

[Signature on next page]

Dated: December 30, 2021.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____ _
Bradley J. Reeves
Texas Bar No. 24068266

**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## **CERTIFICATE OF CONFERENCE**

The undersigned counsel for Defendants has previously conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on December 30, 2021.

Mark Bankston                                    *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

   */s/ Bradley J. Reeves*
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60414264
Status as of 1/5/2022 12:41 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 12/31/2021 3:53:17 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 12/31/2021 3:53:17 AM | SENT |
| William Ogden | | bill@fbtrial.com | 12/31/2021 3:53:17 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/31/2021 3:53:17 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/31/2021 3:53:17 AM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 12/31/2021 3:53:17 AM | SENT |