**<u>EXHIBIT B  (contd.)</u>**

**Copy of All Filings with State Court**

3/4/2022 1:11 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Gilberto Diaz Rios

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION

> THE COURT: If we have a similar experience file a motion again, Mr. Bankston. Because then I'll just -- in fact, then send me the transcript, you can put the new motion on top of it. You don't need to pull out every single excerpt, you can just send me the whole transcript, I'll read the whole transcript and, um, then I'll need a proposed order if this happens again.

(*See* Ex. 1, January 14, 2022 Transcript, p. 83).

Plaintiffs bring this Motion for Sanctions Regarding Corporate Deposition because this Court's explicit instructions for the deposition were not followed in any respect. Once again, the deposition was totally inadequate with the new representative giving the same types of non-answers as the previous representatives. Pursuant to the Court's instructions, Plaintiffs have provided the transcript, and this Motion will not feature pull-outs of the

1

testimony. Instead, Plaintiffs will briefly summarize the salient points of this catastrophic failure to follow the Court's instructions.

## FACTS

On January 14th, this Court once again ordered Defendants to provide corporate testimony after they failed to prepare their latest designee, Daria Karpova. At the hearing, Defendants' counsel Jacquelyn Blott told the Court that she was "relatively certain that it will be more than one person" designated by Defendants for this fifth remedial deposition. (Ex. 1, January 14, 2022 Transcript, p. 85). The Court ordered the deposition to occur within a month, and Ms. Blott stated she would "dedicate all my time to that." (*Id.* at p. 85-86).

Defendants waited two weeks before selecting and preparing any designee. On February 1, 2022, a single designee was selected and informed that she would be testifying. This designee began her preparation that day, and she was scheduled to testify on February 14th. The same designee was also selected to testify for the corporate deposition in the *Fontaine* case the following day on February 15th. At that point, the designee had 12 remaining days to prepare for 16 distinct topics in two separate corporate depositions.

The choice of designee was certainly odd. Defendants selected Brittany Paz, a Connecticut criminal defense lawyer in her tenth year of practice with no prior connection to the company. Ms. Paz has no special expertise in any of the topic areas, and no connection to these lawsuits except one: Ms. Paz previously worked for several years as a junior associate of Norm Pattis, the attorney representing Defendants in the *Lafferty* case in Connecticut. Ms. Paz was initially offered $25,000 to act as corporate representative, but she negotiated the amount to $30,000. This amount was finalized before Ms. Paz ever performed any work.

Ms. Paz's preparation can be summarized as follows:

- She claimed to have spent a bit over 100 hours watching videos, reviewing documents, and interviewing employees. This preparation was split between the 16 topics in the two depositions.

- Ms. Paz did not watch all the videos in the Plaintiffs' petitions, nor did anyone catalog their content for her. She did not review all the documents produced by Defendants.

- To prepare for deposition, neither Ms. Paz nor the company engaged in any additional search for documents beyond what was already produced. None of the company's various communications systems were searched.

- Ms. Paz spent three days interviewing the following InfoWars employees:

| | |
|---|---|
| Alex Jones | Defendant |
| Daria Karpova | Sound engineer for the events of the suit. |
| Rob Dew | Writer/anchor |
| Kit Daniels | Writer |
| Adan Salazar | Writer |
| Paul Watson | Contractor/UK-based editor |
| Melinda Flores | Bookkeeper |
| Robert Roe | Outside accountant consultant |

Ms. Paz also spoke with two former employees: Michael Zimmerman, a former IT employee, and Nico Aguilar, a former production assistant.

In preparing for deposition, Ms. Paz did not speak or try to speak with any of the following individuals:

| | |
|---|---|
| Owen Shroyer | Host / Defendant |
| Tim Fruge | Operations Manager, in charge of evidence preservation |
| Scott Bronson | Manager of InfoWars Affiliate Relations Department |
| Jamie White | Editor |
| Mikael Thalen | Former editor. Kit Daniels testified in *Lafferty* that Mr. Thalen oversaw fact-checking from 2014-2018. |
| Buckley Hamman | One of the two most senior people at InfoWars during the Sandy Hook coverage, according to Editor Paul Watson.<br><br>Mr. Hamman is Alex Jones' cousin.<br><br>Mr. Hamman is part of several key emails, including the email warning that Jones' sources were "batshit crazy." |
| Anthony Gucciardi | The other of the two most senior people at InfoWars during the Sandy Hook coverage, according to Paul Watson.<br><br>Mr. Gucciardi was also part of the "batshit crazy" discussion. |
| Kurt Nimmo | Former head writer, 2008-2018 |
| Aaron Dykes | Former writer for Sandy Hook coverage |
| Melissa Melton | Former writer for Sandy Hook coverage |
| Jakari Jackson | Former on-air-reporter / writer during the Sandy Hook coverage |
| Darren McBreen | Former editor for Sandy Hook coverage |
| David Knight | Former anchor who left in 2020, researched Neil Heslin, features heavily in Ms. Paz's notes. |

| | |
|---|---|
| LeAnne McAdoo | Former on-air-reporter / writer who covered Sandy Hook, articles appear in relevant videos |
| Dan Bidondi | Former on-air-reporter / writer who traveled to Newtown multiple times and harassed local residents |
| Rob Jacobson | Video editor from 2000-2017, complained about Sandy Hook coverage |
| Joshua Owens | Video editor circa 2014-2017, complained about Sandy Hook coverage |
| InfoWars Archivist | Archivist employee described by Mr. Jones on his December 29, 2021 show as a "bloodhound who can find anything." |
| "Mr. Love" | The company's accountant |
| Steve Pieczenik | InfoWars source for Sandy Hook |
| Jim Fetzer | InfoWars source for Sandy Hook |
| Wolfgang Halbig | InfoWars source for Sandy Hook |

As shown in the deposition transcript, the company did not follow this Court's instructions in preparing the designee. (*See* Ex. 2, Deposition of Brittany Paz). Ms. Paz was unable to give adequate testimony on *any* of the eight topics ordered by the Court.

## ARGUMENT

### I.   Defendants did not Follow the Court's Instructions in Preparing Ms. Paz.

### A.   Ms. Paz was not prepared to discuss the sourcing and research for the videos described in Plaintiffs' petitions.

Concerning this topic, the Court gave specific instructions:

> They should watch every video in the weeks leading up to the deposition. They should identify for themselves, for the

company, every statement that they believe in those videos has a source and they should make efforts to determine what that source was and they should be able to answer intelligently as to the sources and the efforts they have taken to determine those sources. They need to be able to speak about everything Alex Jones said in any of those videos, about every piece of paper he holds up, every piece of paper he shows on that desk camera. They need to search for every person quoted in each video. And by that I mean they need to search every single thing InfoWars or Free Speech Systems or Alex Jones has in their possession on paper, in email, on a text, on any other communication system or in the mind of any employee or former employee or guest of the show. Anything and everything. And they need to be prepared to identify and describe the role of every employee involved with every video.

(*See* Ex. 1, January 14, 2022 Transcript, p. 79-80).

Ms. Paz and the company did not even come close to following these instructions. She did not watch every video in the Plaintiffs' petitions, nor did anyone at InfoWars watch all the videos and make information available to her. Ms. Paz claimed that many of the key videos were unavailable to her even though Ms. Kaprova had been shown the same videos by Defendants' counsel for her December 2021 deposition.

Ms. Paz and the company did not identify and make efforts to determine all the sources in the videos. Ms. Paz had not reviewed the relevant "Daily Show Logs" for the videos. Ms. Paz and the company did not search for the individuals quoted in the videos. Ms. Paz and the company did not search any emails, texts, and other communications systems whatsoever. Ms. Paz and the company did not reach out to the former employees involved in its Sandy Hook coverage. Ms. Paz prepared an excel chart of videos she viewed, but many of the videos she devoted time to watching were not in Plaintiffs' petition, with many of them occurring after the suit was filed when Jones was commenting on the lawsuits themselves. (*See* Ex. 3, Ms. Paz's Chart of Videos). In addition, while this chart contains spaces for listing

the InfoWars' employees who researched the videos and the sources they used, the overwhelming majority of the spaces are empty. (*Id.*). Many of those spaces listed people at InfoWars who Mr. Paz did not speak with. (*Id.*). Sample pages are shown below:

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| "1. Why Nurse disappears, 2. people walking in circles, 3. Why did they say they didn't catch anyone in the woods when they did, 4. why was the school closed before then after, 5 why Bloomberg sent an email the day before, 6, why didn't they launch emergency helicopters, 6. Tell us why ambulance is parked for an hour and half..." | | | | |
| "Tell us why this appears to be phonier than a 13 bill." | | | | |
| AJ- "Copyright claims defeated." | | | | |
| AJ- "They'll probably take you out." "That's how they do it now, they kill you and your family." | | | | |
| Have documents now that the school never existed. | | | | |
| | | | | Infowars article: "Six year old child suspended for making gun shape with hand." |
| Break | | | | |
| "Bombshell Info." breaking today, school suddenly reopened then tore it down, school is filthy." | | Halbig | | |
| AJ "It didn't look like a real school, then you add everything together and it looks like a prop, a drill" | | | | |
| "Did they kill real kids? Maybe, maybe not!" "Just doesn't add up." | | | | |
| Bombshell-- subpoenas have been issued. | | | | |
| Thinks it will show that school was not in operation. Turned off default training. | | | | |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| Don't let paramedics inside school. | | | | |
| AJ "So they override the default settings? YOU'RE saying Standard OP ignored?" | | | | |
| Declared legally dead in 8 mins. | | | | |
| Where did the 500 children go that day? | | | | |
| Biohazard company to decontaminate school | | | | |
| AJ- "Continuing with the 16 points." | | | | |
| Lieutenant working a construction detail less than 2 miles away but stayed at his off duty job for 4 hours. Another female officer left the duty site to go to the shooting but he didn't? | | | | |
| "They want me to stop asking these questions. Why?" | | | | |
| "SH elementary school had highest level of lead, paint and asbestos and PCP." | | | | |
| AJ- "bulldozed school now." | | | | |
| AJ- "Green screen with Anderson cooper and staged interviews and actors playing parts of multiple people." | | | | |
| What is your take? We know they've staged other stuff. | | | | |
| Halbig- using supposedly live feed. | | | | |
| AJ- about Anderson cooper and cut to wider shot can see garbage blowing and thenblows back like its on a loop." | | | | Cut of video of Anderson Cooper interview |
| Halbig- where did this script come from? | | | | |
| 14:50- AJ says that Bloomberg had his networks ready 2 days before. | | | | Source? |
| 14:55 AJ says Anderson Cooper was in the CIA, runs the hoaxes at CNN. | | | | Cut to footage of CNN pretending they were in Syria on a green screen. |

**B.    Ms. Paz was not prepared to discuss the individuals involved in the production of the videos described in Plaintiffs' petitions.**

For this topic, the Court gave the same instructions as the previous topic, which the company did not follow. As a result, Ms. Paz could not testify about the individuals involved in the videos and the roles they played, nor did she take appropriate steps to find out. Ms. Paz brought a two-page document to deposition which had a list of employees for the dates of ten of the twenty-two videos in the Plaintiffs' petitions. (*See* Ex. 4, List of Employees). It only covered dates from 2013-2015. Some dates only listed a single employee.



Ms. Paz did not know the origin of this document or the meaning of the highlights. Ms. Paz only spoke to three people on this entire list, and she had no information regarding the other employees and former employees or their roles in the videos. Ms. Paz openly admitted she could not address this topic.

**C.    Ms. Paz was not prepared to discuss internal editorial discussions regarding InfoWars' coverage of the Sandy Hook shooting.**

For this topic, the Court gave the same instructions as the previous topic, which the company did not follow. As such, Ms. Paz could not testify. In fact, Ms. Paz gave the same answer as the former representative Ms. Karpova, claiming that <u>the company had no</u>

<u>editorial discussions whatsoever</u>. Because Ms. Paz claimed there were no editorial discussions, she claimed that no preparation was even needed on this topic.

**D.**     **Ms. Paz was not prepared to discuss the company's knowledge of the Plaintiffs.**

For this topic, the Court gave the following instructions:

> The company's knowledge of the plaintiffs. Clearly the representative who was sent did not even try to determine what the company knew, since she had no knowledge of documents that were provided by the company she was there representing in the discovery in these cases. So, I consider it to be minimum efforts for the corporate representative to review every document produced by the company in this litigation prior to their deposition.

(*See* Ex. 1, January 14, 2022 Transcript, p. 81).

Ms. Paz did not review every document, nor did the company have individuals review the documents and make information available to her. Ms. Paz had never seen key documents, videos, and communications relating to the Plaintiffs, nor spoken to the individuals involved. Ms. Paz was questioned at length about the Plaintiffs, and she was unable to give meaningful testimony about the company's knowledge or any of the problems raised in Plaintiffs' previous sanctions motion.

**E.**     **Ms. Paz was not prepared to discuss the documents produced by the company in response to Plaintiffs' discovery requests.**

For this topic, the Court gave the same instructions as the previous topic. Yet as noted above, Ms. Paz did not review every document, nor did the company have individuals review documents and make information available to her about their contents or organization. Ms. Paz was also totally unfamiliar with the production process, including where documents were originated or where they were stored.

**F.**     **Ms. Paz was not prepared to discuss the audience reach of the videos described in Plaintiffs' petitions.**

For this topic, the Court gave the same requirements, but also added the following instruction:

> The audience reach of the videos described in the plaintiff's petition. If it is the case that Free Speech Systems, InfoWars, and Alex Jones do not track who plays their videos, I know it is the case that they track where the stuff they sell gets sold; and that information will need to be provided so that we can go around in the back to see where these videos were played. Does that make sense? I mean, the videos are Alex Jones talking, Alex Jones selling some stuff. He may not know who plays it because he puts it on the internet and says, play it if you want. Maybe that's true. But he knows who is buying his stuff. And so, we'll need that information to answer the audience reach of these videos.

(*See* Ex. 1, January 14, 2022 Transcript, p. 82-83).

Ms. Paz had no knowledge of the various ways in which Mr. Jones' show was broadcast. Just like Ms. Karpova, Ms. Paz knew nothing about which or how many radio stations, cable packages, over-the-air television, OTT systems, satellite, shortwave or other mediums by which InfoWars programming is disseminated. She had never heard of GCN, the company's co-defendant in *Lafferty* which distributes InfoWars on various radio stations. Audience data from GCN was featured in Plaintiffs' motion for sanctions.

In the previous corporate deposition, Ms. Kaprova testified that she would need to consult with InfoWars' Affiliate Relations Department to answer these questions about audience reach. InfoWars' Affiliate Relations Department and its manager Scott Bronson were discussed in Plaintiffs' sanctions motion and during the oral hearing. Yet Ms. Paz had never even heard of an Affiliate Relations Department or Mr. Bronson.

As a result, Ms. Paz had no knowledge of internal audience figures. She was also unaware that Defendants recently produced a deposition transcript in the *Lafferty* case which references an exhibit containing specific audience figures. That exhibit has never been produced in Texas, and Ms. Paz wrongly believed the company has never utilized such audience figures. Ms. Paz admitted she could testify about the figures cited in the *Lafferty* email. Finally, Ms. Paz testified that she took no specific steps to utilize the company's sales information to try and produce useful conclusions about audience reach.

### G.      Ms. Paz was not prepared to discuss efforts made by the company to preserve potential evidence.

Concerning this topic, the Court gave the following instructions:

> Seven, efforts made by the company to preserve potential evidence. Similar. If she shows up again, or I'm sure we'll get a new one because that's the way this works, and that person says, "I don't know," then they will have disregarded the orders I am making today. Your client, Ms. Blott, will have violated the orders I am making today. I do not want, "I don't know," "I'm guessing," "I think," "maybe," or "I infer" to be part of the answer at all…Not, "I think maybe something happened somewhere, I'm new to the company." I don't care if it's their first day with the company. If you designate them, they better have answers.

(*See* Ex. 1, January 14, 2022 Transcript, p. 81-82).

Ms. Paz did not give unequivocal answers. In the 100-page condensed transcript, Ms. Paz answered 219 times with the phrase "I think," another 92 times with the phrase "I don't think," and 51 times with the phrase "I believe," not to mention ceaseless variations of could, might, may, possibly or potentially.

As it concerns the topic of evidence preservation, Ms. Paz did not know anything about when and what the company did to preserve evidence. Much like Ms. Karpova, she did not know when a litigation hold was issued or how that happened. In addition, Ms. Paz did

not even talk to InfoWars Operations Manager Tim Fruge, who was identified as the individual who coordinated InfoWars' efforts to preserve evidence.

Ms. Paz knew nothing about efforts to preserve or search various communications systems inside InfoWars, such as Rocket.Chat, Slack, Wire, BaseCamp, or Pigeon. Shortly before Ms. Paz's deposition, Defendants produced a deposition transcript from *Lafferty* of InfoWars former head writer Kurt Nimmo being shown a BaseCamp message from a colleague warning about "crisis actors" that was never produced in this case. Ms. Paz confirmed that none of these systems were searched for this deposition, and she had no idea what steps at preservation or search were ever taken.

### F.    Ms. Paz was not prepared to discuss the company's business structure and relationship with other parties.

For this topic, the Court gave the following instructions:

> The last is the company's business structure and relationship with other parties. Honestly, the idea that I have to explain what that means to a corporation is again ridiculous. No more answers of, well, I didn't talk to Mr. Jones, I'm not really sure, I'm new, nobody works here, it's just all, I don't know, fairy dust that makes these videos go out. None of that. They know. This company knows. Mr. Bankston gets to know.

(*See* Ex. 1, January 14, 2022 Transcript, p. 83).

Ms. Paz could not answer basic questions about the business structure and the company's relations with other parties. In addition, Defendants recently produced a deposition transcript from the *Lafferty* case which references a company organizational chart which was never produced in Texas, but Ms. Paz testified that no such charts exist. Ms. Paz also could not testify about InfoWars, LLC and whether it conducted business operations relevant to this suit.

This summary only scratches the surface of the deficiencies in Ms. Paz's deposition. A review of the transcript shows that Defendants ignored every instruction given by the Court and that she was unprepared to testify about every single one of the ordered topics.

## II.   The Selection of Ms. Paz was Irrational and Shows Bad Faith.

Courts have recognized there are occasions where it makes sense to designate someone outside the company as a corporate representative. Perhaps a lawyer who has represented the company for many years could be suitable due to his wealth of knowledge. Sometimes a former employee can be a useful designee when they are well equipped to answer based on their past knowledge. On rare occasions, a company might designate an expert or outside vendor if the specific deposition topic is highly technical.

Yet in this case, there was no rational reason to select Ms. Paz to testify. Ms. Paz indicated she had no special knowledge of the company, no special expertise in news media, no special expertise in corporate finance, and no special expertise in information technology. She had no prior connection to the company and no understanding of any relevant facts prior to February 1, 2022. Defendants selected Ms. Paz to provide a buffer and to obfuscate on InfoWars' behalf.

An identical situation arose in the *Actos* MDL. As described by Judge Rebecca Doherty:

> Only one witness was presented and that witness *had no personal or first hand corporate knowledge of any kind* of any of the topics about which he was questioned. Rather, the PSC argues he was, in effect, merely a hired gun brought in by Takeda to provide a buffer and to obfuscate on Takeda's behalf—and this Court, after review of the 30(b)(6) deposition, cannot say the deposition does not support that argument.

*In re Actos (Pioglitazone) Products Liab. Litig.,* No. 6:11-MD-2299, 2014 WL 2872299, at *8 (W.D. La. June 23, 2014) (emphasis in original). In this case, a review of Ms. Paz's deposition

transcript leads to the same conclusion. Much like in this case, the Takeda representative in

*Actos* had only reviewed selected information and talked to limited employees:

> Takeda had designated Daniel L. Regard, II, *an electronic discovery consultant* who *did not and does not work for any Takeda entity,* other than as a consultant, but rather, was retained, it would seem, solely for the purpose(s) of this litigation and to act as Takeda's 30(b)(6) designee. In preparation for the deposition, Mr. Regard – again, who had no personal or first hand corporate knowledge of any kind of any Takeda entity – testified he conducted dozens of employee interviews, went on site visits, and reviewed numerous Takeda documents and policies in preparation for the deposition. However, it is clear from a review of the interviews he conducted that Mr. Regard spoke only to certain and select Takeda employees about certain and select issues related to the subject matter designated for the 30(b)(6) deposition. For example, it is not at all clear that Mr. Regard spoke to many information technology ("IT") employees at Takeda, and, his deposition reflects, he did not have a strong grasp of Takeda's actual IT procedures and their interplay with litigation hold policies and procedures.

*Id.* at *9 (emphasis in original). The *Actos* court noted that even for the employees which

were interviewed, important subject matters were omitted. *Id.* ("[I]t is clear from the

deposition transcript there were a number of important issues related to the litigation holds

that Mr. Regard simply did not question Ms. Calahan about."). Faced with this same situation,

the *Actos* court found itself "perplexed" by the selection and preparation of the deponent:

> As Mr. Regard had *no personal knowledge* or *first hand corporate knowledge* concerning these issues himself – having never worked for Takeda other than as a consultant and having only been retained to answer questions at Takeda's 30(b)(6) deposition – the Court is perplexed as to how Mr. Regard could have been expected to provide definitive and comprehensive answers to the many questions specifically ordered by the magistrate judge and, in fact, a careful review of his deposition shows that in large part, he did not.

*Id.* at *34 (emphasis in original). As in *Actos,* the selection of Ms. Paz made no sense except as a device "to provide a buffer and to obfuscate on [InfoWars'] behalf." *Id.* at 8.

### III.   The Topics Required More than One Designee.

Ms. Paz repeatedly testified in both of her depositions that no single person could possibly carry out the preparation required for all of the topics. Plaintiffs agree. The law requires that more than one individual must be designated if more than one is needed to testify fully about the notice's subject matters. *See In re Fina Oil & Chem. Co.*, No. 13-98-640-CV, 1999 Tex. App. LEXIS 1751, at *14–15 (Tex. App.—Corpus Christi Mar. 11, 1999, orig. proceeding) (Rule "consistently construed to require that a corporation 'must not only produce such number of persons as will satisfy the request, but more importantly, prepare them so that they may give complete, knowledgeable, and binding answers on behalf of the corporation.'") (first quoting *Marker*, 125 F.R.D. at 126 (M.D.N.C. 1989); then quoting *Allstate Tex. Lloyds v. Johnson*, 784 S.W.2d 100, 103 (Tex. App.—Waco 1989, orig. proceeding)); cf. *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) ("The law is well-settled that corporations have an 'affirmative duty' to make available as many persons as necessary to give 'complete, knowledgeable, and binding answers' on the corporation's behalf.") (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999)); *SEC v. Goldstone*, 301 F.R.D. 593, 646-47 (D.N.M. 2014) (same); *Myrdal v. State*, 248 F.R.D. 315, 317 (D.D.C. 2008) (A corporation "is under a duty to designate more than one deponent if it is necessary to do so in order to respond to the relevant areas of inquiry.").

In this case, no one person could be reasonably capable of testifying to all the topics in both the Fontaine and Sandy Hook deposition notices, especially with 12 days of

preparation beforehand. By sending Ms. Paz, a single designee with no prior knowledge or expertise, Defendants guaranteed that full and adequate preparation would be impossible.

## IV.    Defendants Failed to Timely Designate and Prepare Ms. Paz.

When faced with a deposition notice, the rules require an organization to respond a reasonable time *before* the deposition setting forth its designee(s):

> In response, the organization named in the notice must - a reasonable time before the deposition - designate one or more individuals to testify on its behalf and set forth, for each individual designated, the matters on which the individual will testify.

Tex. R. Civ. P. 199(b)(1); *see also* 3 Tex. Prac. Guide Pers. Inj. 2d § 8:336, Corporate depositions ("The response must be made a reasonable time before the deposition."). Here, Defendants did not provide any response or disclose the identity of their designee in the month before the deposition. With two business days remaining before the deposition, Plaintiffs' counsel asked Defendants to explain why they had not identified their witness. (Ex. 5, February 9, 2022 emails between counsel). As short time later, Defendants' counsel stated that Brittany Paz had been selected. Defendants' counsel stated:

> FSS is designating her as the corporate representative *now* as FSS has ultimately decided that she meets the requirements as enunciated by Judge Guerra Gamble in her ruling from the bench with respect to what is required of the corporate representative. (*Id.*) (emphasis added).

Even ignoring the eleventh-hour disclosure – which itself is impermissible under the Rules – even Ms. Paz admits that Defendants waited two weeks before telling her to begin her preparations. Under these circumstances, and bearing the burden alone, Ms. Paz was guaranteed to be an ill-prepared and evasive witness.

## V.    The Court Should Grant the Remedies Requested by Plaintiffs in their Prior Motion.

During the prior sanctions hearing, this Court stated, "I am not going to designate facts as established until after this next deposition and then only if I have to, because I think it may come to that..." (Ex. 1, January 14 Hearing, p. 84). The Court also stayed the remaining discovery obligations of the Plaintiffs. Because Defendants failed to comply with the Court's instructions, Plaintiffs now ask the Court to enter those remedies under Rule 215, along with a substantial punitive money sanction that will finally catch the attention of these Defendants. As such, Plaintiffs have prepared an order 1) providing jury instructions for the topics in the order; 2) disallowing any further discovery from Defendants; and 3) ordering punitive sanctions.

## CONCLUSION

Because Defendants have ignored the Court's instructions and presented yet another unprepared representative, Plaintiffs pray the Court grant their Motion.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

_____
MARK D. BANKSTON

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2022, the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

**ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS
REGARDING CORPORATE DEPOSTION**

---

On this day, the Court considered Plaintiffs' Motion for Sanctions Regarding Corporate Deposition. For the reasons below, the Court finds that the Motion should be granted.

## BACKGROUND

Defendants' pattern egregious discovery abuse is well-detailed in the many prior orders of this Court,[1] but a brief history of Plaintiffs' attempts to take a corporate deposition is as follows:

On August 31, 2018, the Court ordered Defendants to appear for depositions in Mr. Heslin's defamation claim (D-1-GN-18-001835). Defendants refused to appear for the depositions or respond to written discovery. After Plaintiff filed a Motion for Sanctions, Defendants initiated an appeal.

On January 25, 2019, this Court ordered Defendants to respond to court-approved discovery requests and appear for depositions in Ms. Lewis' IIED case (D-1-GN-18-006623). Defendants presented Rob Dew as a corporate designee, who was unable to give any testimony. The Court chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition." Defendants agreed to stipulate to Plaintiff's petition

---

[1] In addition to discovery abuse in these cases, the Court has considered Defendants' consistent pattern of bad faith litigation tactics and discovery abuse in other cases and courts. First, as described in this Court's prior orders, InfoWars has also committed discovery abuse in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a defamation lawsuit relating to the Stoneman Douglass High School shooting. In that case, InfoWars failed to timely answer written discovery. After InfoWars provided untimely and evasive responses, Mr. Fontaine was forced to bring a motion to compel InfoWars' compliance, for which this Court awarded sanctions and attorney's fees on September 15, 2021. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar lawsuit brought after the instant cases by a different set of Sandy Hook parents in the Superior Court of Connecticut, ultimately resulting in a default judgment on liability several weeks after this Court's entry of default judgment. The Court further notes that Defendants have been sanctioned by the Texas Court of Appeals for bringing a frivolous appeal in Mr. Heslin's case. Finally, as noted in the Court's default judgment order, Mr. Jones has publicly declared that he considers these lawsuits to be a "show trial," showing clear signs that Defendants' discovery violations are the result of bad faith. Mr. Jones' recent deposition confirmed these signs, during which Mr. Jones testified about his indifference to his discovery obligations.

for the purposes of the TCPA motion and voluntary pay $8,100 in attorney's fees to avoid sanctions at that time.

Following the events in *Lewis,* the premature appeal in Mr. Heslin's defamation case was dismissed for lack of jurisdiction. Upon remand to this Court in the fall of 2019, InfoWars again refused to respond or appear for deposition. On October 18, 2019, this Court assessed sanctions of $25,875, while also ruling that Plaintiff's burdens were taken as established for the purposes of the TCPA motion.

On October 18, 2019, this Court ordered Defendants to appear for deposition in Mr. Heslin's IIED case (D-1-GN-18-004651).[2] Again, Rob Dew was produced as the corporate designee. Again, Mr. Dew had not been prepared and was unable to offer any meaningful testimony. On December 20, 2019, the Court assessed sanctions totaling $100,000 and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court held a default judgment under advisement based on representations by Defendants that discovery would be promptly supplemented during the appellate stay.

All the cases were remanded in June 2021. Defendants had not taken any steps to address the discovery situation during the appeal, and for the next three months following remand, Defendants ignored Plaintiffs' demands for compliance. On September 27, 2019, this Court issued a default judgment on liability and awarded attorney's fees of $45,925.

### THE DECEMBER 3, 2021 CORPORATE DEPOSITION

Following the default judgment, Plaintiffs again sought the Defendants' depositions to secure testimony relevant to the trial on compensatory and punitive damages. Defendants produced Daria Karpova for the deposition. The transcript of Ms. Karpova's deposition

---

[2] Subsequently consolidated with D-1-GN-18-001835.

shows that she was not prepared to discuss any of the eight topics for which she had been designated. Her testimony as a whole demonstrated profound disrespect for the discovery process. Ms. Karpova's lack of preparation was flagrant and egregious, especially given the repeated refusal to prepare a designee.

On January 14, 2022, the Court heard argument on Plaintiffs' Motion for Sanctions concerning Ms. Karpova's deposition. The Court granted the Motion, awarded costs, and ordered the Defendants to appear one more time. The Court provided detailed instructions for preparing the designee(s).

## THE FEBRUARY 2022 CORPORATE DEPOSITION

On February 14-15, 2022, Defendants presented Brittany Paz as the designee in both the Sandy Hook and Fontaine cases. A review of the deposition transcript shows that Defendants flagrantly disobeyed the Court's order in preparing Ms. Paz. As a result, she was unable to give adequate testimony on any of the topics. Indeed, it appears Ms. Paz was selected to provide a buffer and to obfuscate on InfoWars' behalf. Plaintiffs have now faced five non-appearances at corporate depositions on the issues at the heart of their claims despite every remedial action taken the Court, including the severe sanction of default and over $200,000 in cumulative attorney's fees.

## FINDINGS

. The Court finds that, once again, Defendants have intentionally thwarted the legitimate discovery process in these cases. There is no other way to interpret the refusal to prepare its designee(s) as anything but obstruction of the highest order. The egregiousness and repetitiveness of Defendants' obstruction exhibits a total disregard for and disrespect of the integrity of this Court and our judicial system. Plaintiffs' discovery of facts necessary to

properly present their claim for damages has been irreparably prejudiced in virtually all respects. Absent severe action from this Court, Defendants will ultimately profit from their sabotage of the discovery process.

The Court therefore ORDERS that:

1.      Pursuant to Rule 215(b)(1), the Court disallows any further discovery by Defendants. Any obligation of the Plaintiffs to respond to any pending discovery is terminated.

2.      Pursuant to Rule 215(b)(2), the Court orders that Defendants shall pay all of the expenses of discovery and taxable court costs in these lawsuits. Plaintiffs shall submit evidence setting forth any court costs or attorney's fees relating to discovery or discovery motions, excepting those costs or attorney's fees which were already awarded in any prior order of the Court.

3.      Pursuant to Rule 215(b)(3), the Court orders that designated facts shall be taken to be established for the purposes of the action. Specifically, the jury will be instructed that any factual dispute relating to the following topics shall be taken as established in favor the Plaintiffs:

- Sourcing and research for the videos described in Plaintiffs' petitions.
- Individuals involved in the production of the videos described in Plaintiffs' petitions.
- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.
- The company's knowledge of the Plaintiffs.
- The audience reach of the videos described in Plaintiffs' petitions.
- The documents produced by the company in response to Plaintiffs' discovery requests.
- Efforts made by the company to preserve potential evidence.
- The company's business structure and relationship with other parties.

4.      The Court orders that Defendants shall pay additional punitive monetary sanctions in the amount of $1,000,000. The Court finds that there is a direct relationship between additional monetary sanctions and the egregiousness and repetitiveness of Defendants' obstruction. Defendants' pattern of discovery abuse is a truly exceptional case and exemplifies a course of misconduct which must be deterred lest future litigants pursue the same path. Given the outrageous nature of the misconduct, the total failure of prior sanctions, and the massive prejudice to Plaintiffs' claims, the Court finds that additional monetary sanctions are appropriate, just, and not excessive. Defendant shall pay this sanction within 30 days of this Order.

Dated _____, 2022.

_____

Hon. Maya Guerra Gamble

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 26 of 211

1

| | | |
|---|---|---|
| 1 | | REPORTER'S RECORD |
| | | VOLUME 1 OF 1 VOLUME |
| 2 | MARCEL FONTAINE, ) | IN THE DISTRICT COURT |
| | ) | |
| 3 | Plaintiff ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| 4 | VS. ) | 459TH JUDICIAL DISTRICT |
| | ) | |
| 5 | ALEX E. JONES, INFOWARS, ) | |
| | LLC, ET AL., ) | TRIAL COURT CAUSE NO. |
| 6 | ) | D-1-GN-18-001605 |
| | Defendants ) | |
| 7 | | |
| | NEIL HESLIN, ) | IN THE DISTRICT COURT |
| 8 | ) | |
| | Plaintiff ) | TRAVIS COUNTY, TEXAS |
| 9 | ) | |
| | VS. ) | 459TH JUDICIAL DISTRICT |
| 10 | ) | |
| | ALEX E. JONES, INFOWARS, ) | |
| 11 | LLC, ET AL., ) | TRIAL COURT CAUSE NO. |
| | ) | D-1-GN-18-001835 AND |
| 12 | Defendant ) | D-1-GN-19-004651 |
| 13 | LEONARD POZNER AND ) | IN THE DISTRICT COURT |
| | VERONIQUE DE LA ROSA, ) | |
| 14 | ) | TRAVIS COUNTY, TEXAS |
| | Plaintiff ) | |
| 15 | ) | 459TH JUDICIAL DISTRICT |
| | VS. ) | |
| 16 | ) | |
| | ALEX E. JONES, INFOWARS, ) | TRIAL COURT CAUSE NOS. |
| 17 | LLC, ET AL., ) | D-1-GN-18-001842 |
| | ) | |
| 18 | DEFENDANTS ) | |
| 19 | SCARLETT LEWIS, ) | IN THE DISTRICT COURT |
| | ) | |
| 20 | Plaintiff ) | TRAVIS COUNTY, TEXAS |
| | ) | |
| 21 | VS. ) | 459TH JUDICIAL DISTRICT |
| | ) | |
| 22 | ALEX E. JONES, INFOWARS, ) | |
| | LLC, ET AL., ) | TRIAL COURT CAUSE NO. |
| 23 | ) | D-1-GN-18-006623 |
| | DEFENDANTS ) | |
| 24 | | |
| | ------------------------------------------------------------ | |
| 25 | MOTION FOR SANCTIONS; MOTION TO COMPEL | |

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 27 of 211

79

1    hurt their case.  Or some language to that effect.  I

2    just don't know that we're there today on these issues

3    after one shameful corporate rep. deposition on

4    damages.

5              And so my, um, you know, I would really

6    like to have one corporate deposition where the witness

7    actually prepares, and by that I mean, um, let's see if

8    I can find the list of the seven topics.

9              Where are they easy for me to find.  Oh,

10   here we go.  Actually I have eight topics, by the way,

11   in the motion, but today you only mentioned seven, so.

12             MR. BANKSTON:  I believe I left one out,

13   Your Honor, you're right about that.

14             THE COURT:  Okay.  So, sourcing and

15   research for the videos described in Plaintiff's

16   petition.  This is not, what I'm about to describe, the

17   universe of preparation that a corporate deposition

18   should do.  What I'm about to describe is the minimum

19   preparation a corporate deposition should do to respond

20   to that topic.

21             They should watch every video in the

22   weeks leading up to the deposition.  They should

23   identify for themselves, for the company, every

24   statement that they believe in those videos has a

25   source and they should make efforts to determine what

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 28 of 211

80

1  that source was and they should be able to answer

2  intelligently as to the sources and the efforts they

3  have taken to determine those sources.

4          They need to be able to speak about

5  everything Alex Jones said in any of those videos,

6  about every piece of paper he holds up, every piece of

7  paper he shows on that desk camera.  They need to

8  search for every person quoted in each video.  And by

9  that I mean they need to search every single thing

10  InfoWars or Free Speech Systems or Alex Jones has in

11  their possession on paper, in email, on a text, on any

12  other communication system or in the mind of any

13  employee or former employee or guest of the show.

14  Anything and everything.  And they need to be prepared

15  to identify and describe the role of every employee

16  involved with every video.

17          And if they are going to show up and say,

18  we don't keep records on these things, then they need

19  to show up and be definitive in every response.  No

20  more guessing, assuming, or thinking.  They need to

21  know.  Because if the answer is Free Speech Systems

22  does not care who the source is so we don't -- we don't

23  check them, we don't write them down, we don't talk

24  about them and we don't keep a record of them, then the

25  jury needs to hear that.

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 29 of 211

81

1          I think I've covered the second one and

2     the third one in that description of the minimum

3     required preparation for the next corporate

4     representative deposition.

5          The company's knowledge of the

6     plaintiffs.  Clearly the representative who was sent

7     did not even try to determine what the company knew,

8     since she had no knowledge of documents that were

9     provided by the company she was there representing in

10    the discovery in these cases.  So, I consider it to be

11    minimum efforts for the corporate representative to

12    review every document produced by the company in this

13    litigation prior to their deposition.  That covers

14    request or topic five.  No, let's see.  Six, as well.

15         Seven, efforts made by the company to

16    preserve potential evidence.  Similar.  If she shows up

17    again, or I'm sure we'll get a new one because that's

18    the way this works, and that person says, I don't know,

19    then they will have disregarded the orders I am making

20    today.  Your client, Miss Blott, will have violated the

21    orders I am making today.  I do not want, "I don't

22    know," "I'm guessing," "I think," "maybe," or "I infer"

23    to be part of the answer at all.  Any answer by a

24    corporate representative designated by the corporation.

25    You choose, we don't.  Mr. Bankston doesn't choose, the

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 30 of 211

82

1    court doesn't choose.  You choose who is going to

2    represent the company at this deposition.

3              So, if the answer is, we destroy

4    everything as fast as we can, then I want them to come

5    and say that.  And if the answer is, we don't care

6    where it comes from so we don't ever create a record,

7    they need to say that in that way.

8              MS. BLOTT:  Understood.

9              THE COURT:  Not, "I think maybe something

10   happened somewhere, I'm new to the company."  I don't

11   care if it's their first day with the company.  If you

12   designate them, they better have answers.

13             Number, let's see, number five, the

14   audience reach of the videos described in the

15   plaintiff's petition.  If it is the case that Free

16   Speech Systems, InfoWars, and Alex Jones do not track

17   who plays their videos, I know it is the case that they

18   track where the stuff they sell gets sold; and that

19   information will need to be provided so that we can go

20   around in the back to see where these videos were

21   played.  Does that make sense?

22             I mean, the videos are Alex Jones

23   talking, Alex Jones selling some stuff.  He may not

24   know who plays it because he puts it on the internet

25   and says, play it if you want.  Maybe that's true.  But

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 31 of 211

83

1    he knows who is buying his stuff.  And so, we'll need

2    that information to answer the audience reach of these

3    videos.

4              The last is the company's business

5    structure in relationship with other parties.

6    Honestly, the idea that I have to explain what that

7    means to a corporation is again ridiculous.  No more

8    answers of, well, I didn't talk to Mr. Jones, I'm not

9    really sure, I'm new, nobody works here, it's just all,

10   I don't know, fairy dust that makes these videos go

11   out.  None of that.  They know.  This company knows.

12   Mr. Bankston gets to know.

13             Then if we have a similar experience file

14   a motion again, Mr. Bankston.  Because then I'll

15   just -- in fact, then send me the transcript, you can

16   put the new motion on top of it.  You don't need to

17   pull out every single excerpt, you can just send me the

18   whole transcript, I'll read the whole transcript and,

19   um, then I'll need a proposed order if this happens

20   again.

21             So, um, essentially the motion is

22   granted.  And all the costs for this second deposition

23   are to be borne by the defendant for the plaintiff's

24   side.  I am not going to designate facts as established

25   until after this next deposition and then only if I

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 32 of 211

84

1  have to, because I think it may come to that, but

2  that's not what anybody who believes in our legal

3  system wants.

4          Now, I'm confident that there are people

5  who don't want our legal system to work and will be

6  happy to have me forced into deciding almost everything

7  about this case, but that's not what I want.  I want it

8  to work, but it only works if discovery works.  And

9  what I have seen so far is literal years of blatant

10  discovery abuse and intentional discovery abuse, and

11  I'm tired of that.

12          Um, Mr. Bankston does not need to respond

13  to any discovery until after this corporate deposition

14  is taken again and, um, until at least -- a minimum of

15  two weeks after the deposition.  And if he files

16  another motion along the lines of this one, then the

17  stay will continue.  So, it's essentially his

18  responses -- the deadlines for Mr. Bankston's responses

19  to any discovery requests are stayed until further

20  order of the court.

21          Anything else?

22          MR. BANKSTON:  That's it from the

23  plaintiffs, Your Honor.

24          THE COURT:  I'll ask you to prepare an

25  order for me, Mr. Bankston, send it to Miss Blott.

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 33 of 211

85

```
 1              Mr. Reeves, are you even still counsel on
 2  the Sandy Hook cases?
 3              MR. REEVES:  I am, Your Honor.
 4  Miss Blott is lead counsel but I am still counsel in
 5  the cases, Your Honor.
 6              THE COURT:  All right.  And you're the
 7  only attorney on the Fontaine case now.
 8              MR. REEVES:  That's correct, Your Honor.
 9              THE COURT:  Okay.
10              MS. BLOTT:  Your Honor, um, may I ask,
11  just for purposes of my scheduling, how soon or what
12  period of time will have elapsed before this deposition
13  of the corporate representative takes place?  I want to
14  have everyone prepared to fully respond.
15              THE COURT:  Do you know who will be
16  designated or if there will be more than one person
17  designated to respond to these topics?
18              MS. BLOTT:  I will have the answer to
19  that by the end of today, and I am relatively certain
20  that it will be more than one person.
21              THE COURT:  All right.  Then I'm going to
22  leave it to you and Mr. Bankston to attempt to schedule
23  those depositions.  I think within a month.  Does that
24  seem fair to you, Miss Blott and Mr. Bankston?
25              MS. BLOTT:  I will dedicate all my time
```

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 34 of 211

86

1    to that, Your Honor.

2              THE COURT:  All right.  I don't think

3    we're going to trial on March 28th but I could be

4    proven wrong.  Do we want to leave that trial setting

5    or do we want to -- what do we want to do?  I'm -- I

6    think it's important to have trial settings.  If the

7    deadlines roll from trial settings, the pressure is put

8    on with them.

9              I'll be honest, I don't know that I want

10   to have this Voir Dire on Zoom.  Um.

11             I don't know how much the two of you --

12   or the three of you, sorry, Mr. Reeves, have thought

13   about numbers for a panel.  Um.  I'm expecting it to be

14   a larger-than-normal panel request, I just don't know

15   how much larger.  Um.  And I just don't know -- I don't

16   know exactly what's going to happen with this Voir

17   Dire.  But I have done five or six virtual jury trials,

18   I've got another one in a week and a half.  Or in week,

19   rather.

20             We do virtual Voir Dire.  We did it.

21   It's real hard.  I mean it's not hard in the sense that

22   it doesn't work, it totally works.  It's exhausting,

23   and that's coming from me.  I spend eight hours a day

24   on Zoom, have for almost two years now, so I'm used to

25   Zoom.  It's exhausting for the jurors; it's exhausting

```
 1                          D-1-GN-18-001835

 2   NEIL HESLIN                        )
                                        ) IN DISTRICT COURT OF
 3   VS.                               )
                                        ) TRAVIS COUNTY, TEXAS
 4   ALEX E. JONES, INFOWARS,          )
     LLC, FREE SPEECH SYSTEMS,         ) 261ST DISTRICT COURT
 5   LLC, and OWEN SHROYER             )

 6
                            D-1-GN-18-001842
 7
     LEONARD POZNER AND                )
 8   VERNONIQUE DE LA ROSA             )
                                        ) IN DISTRICT COURT OF
 9   VS.                               )
                                        ) TRAVIS COUNTY, TEXAS
10   ALEX E. JONES, INFOWARS,          )
     LLC, and FREE SPEECH              ) 345TH DISTRICT COURT
11   SYSTEMS, LLC                      )

12
                            D-1-GN-18-006623
13
     SCARLETT LEWIS                    )
14                                      ) IN DISTRICT COURT OF
     VS.                               )
15                                      ) TRAVIS COUNTY, TEXAS
     ALEX E. JONES, INFOWARS,          )
16   LLC, and FREE SPEECH              ) 98TH DISTRICT COURT
     SYSTEMS, LLC                      )

17

18

19

20

21

22

23

24

25
```

Paz, Brittany                                                    02-14-2022

---

**Page 2**

1
2       ****************************************
3               VIDEO DEPOSITION OF
4                   BRITTANY PAZ
5               FEBRUARY 14, 2022
6       ****************************************
7
8           VIDEO DEPOSITION OF BRITTANY PAZ, produced as a
9   Witness at the instance of the PLAINTIFFS and duly
10  sworn, was taken in the above-styled and numbered cause
11  on FEBRUARY 14, 2022, from 9:06 a.m. to 5:25 p.m.,
12  before Logan Kislingbury, Texas CSR, RPR, in and for
13  the State of Texas, reported by machine shorthand, at
14  the Law Offices of Kirker Davis, LLP, 8310-1 N. Capital
15  of Texas Hwy #350, Austin, Texas, pursuant to the Texas
16  Rules of Civil Procedure.
17
18
19
20
21
22
23
24
25

---

**Page 4**

1                          INDEX
                                                    PAGE
2   Appearances.......................................  3
3   BRITTANY PAZ
4   EXAMINATION BY MR. BANKSTON.......................  5
5   Changes and Signature............................ 402
    Reporter's Certificate........................... 405
6   Reporter's Further Certification................. 407
7                        EXHIBITS
8   NO.            DESCRIPTION                      PAGE
9   Exhibit 1   David Knight E-mail.................  72
    Exhibit 2   David Knight E-mail.................  73
10  Exhibit 3   Photos.............................  93
    Exhibit 4   Article............................ 113
11  Exhibit 5   Show Log........................... 131
    Exhibit 6   Employee Records................... 136
12  Exhibit 7   E-mail............................. 167
    Exhibit 8   Research Binder.................... 212
13  Exhibit 9   Heslin Original Petition........... 216
    Exhibit 10  Video Screenshot................... 257
14  Exhibit 11  David Jones E-mail................. 345
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1           A P P E A R A N C E S
2   FOR THE PLAINTIFFS:
3   Mr. Mark D. Bankston
    Kaster, Lynch, Farrar & Ball, LLP
4   1117 Herkimer
    Houston, Texas 77008
5   T: 713-221-8300
    mark@fbtrial.com
6
    Mr. William R. Ogden
7   Kaster, Lynch, Farrar & Ball, LLP
    1117 Herkimer
8   Houston, Texas 77008
    T: 713-221-8300
9   bill@fbtrial.com
10
    FOR THE DEFENDANTS:
11
    Ms. Jacquelyn Blott
12  Law Offices of Jacquelyn W. Blott
    100 University Blvd., Suite 225 #251
13  Round Rock, Texas 78665
    T: 512-639-9904
14  jblott@jblottlaw.com
15
    ALSO PRESENT:
16
        Mr. Tim Bishop, Videographer
17
18
19
20
21
22
23
24
25

---

**Page 5**

1           BRITTANY PAZ,
2       having first been duly sworn, testified as follows:
3           THE VIDEOGRAPHER:  This is the
4   deposition of Brittany Paz.  The date is February 14,
5   2022 and the time is 9:06.  May swear in the witness.
6           MS. BLOTT:  And before we get started,
7   I'd like the record to reflect that I'm handing
8   Mr. Bankston a check which represents the amount of the
9   sanctions in the amount of 19,000-plus dollars, and
10  also that the deposition is being taken pursuant to the
11  protective orders entered in these causes of action.
12          EXAMINATION
13  QUESTIONS BY MR. BANKSTON:
14      Q.  All right.  Ma'am, can you tell us your name.
15      A.  Sure.  My name is Brittany Paz, P-A-Z.
16      Q.  You are not an employee of Mr. Jones or Free
17  Speech Systems?
18      A.  No, I was contracted to be their corporate
19  representative in --
20      Q.  You've --
21      A.  -- connection with these depositions.
22      Q.  Excuse me, sorry.
23      A.  That's okay.
24      Q.  You've never been an employee of Mr. Jones or
25  Free Speech Systems?

Paz, Brittany                                          02-14-2022

6

1    A.  I am currently contracted.  But am I on the
2 payroll?  No, I've never been an employee.
3    Q.  All right.  You understand the difference
4 when I say an employee versus a contractor; right?
5    A.  Yes.
6    Q.  You've never been an employee?
7    A.  No.
8    Q.  Okay.  You're an attorney; right?
9    A.  Yes.
10    Q.  You primarily practice criminal defense in
11 Connecticut?
12    A.  I do.
13    Q.  You represent any of the defendants as an
14 attorney?
15    A.  No.
16    Q.  Have you ever represented any of the
17 defendants as an attorney?
18    A.  No.
19    Q.  Mr. Jones' company decided to hire to you to
20 testify as if you were the company itself; correct?
21    A.  Yes.
22    Q.  When were you selected to act as Free Speech
23 Systems' corporate representative?
24    A.  I think that I was officially hired the last
25 week in -- I'm sorry, excuse me.  The last week in

7

1 January, first week in February.  So January 31st,
2 February 1stish.  That week.  It's been about two
3 weeks.
4    Q.  When you say officially -- and let me back
5 up.  You understand that there was a designation filed
6 designating you as the corporate representative?  And I
7 think that was last week, maybe Wednesday.  Are you
8 aware of that?
9    A.  I don't know when it was filed.
10    Q.  Okay.
11    A.  I didn't file it.
12    Q.  As far as an official selection, that was
13 done well before that?
14    A.  I don't -- I wouldn't say well before that,
15 but it was done before that if it was filed last week.
16    Q.  Right.  So a few weeks before that, at least?
17    A.  Not a few weeks.  I've only been the
18 corporate rep for two weeks.  I think as of today, it's
19 been two weeks.
20    Q.  Okay.  You've had two weeks.  Okay.  Yeah,
21 that makes sense because you said January 31st,
22 February 1st.
23    A.  I think that was a Monday, January 31st.  So
24 that probably was the day when everything got
25 finalized.

8

1    Q.  Is February -- I'm sorry.  January 31st,
2 February 1st, that time period --
3    A.  That's right.
4    Q.  -- is that when you began your preparation?
5    A.  Yes.
6    Q.  Okay.  Prior to that time, you had no
7 meaningful knowledge regarding any of the topics you're
8 here to testify about?
9    A.  No.
10    Q.  So everything you're going to testify about
11 here today is because someone either told it to you or
12 because you read it in a document; right?
13    A.  Or watched videos, yes.
14    Q.  Okay.  Or came out of a video?
15    A.  Yes.
16    Q.  For this deposition, because this is how
17 we've been talking about it in discovery, I want you to
18 conceptualize a document as not just written things.
19 Okay?  And I'd like for our discussion for you to
20 conceptualize it as any generally representational
21 tangible thing; right?
22      So videos, any sort of notes, handwritten
23 notes, anything.  So not just typewritten documents.
24 And so when I say documents, I want you to think about
25 the universe of things that you may have drawn

9

1 information from.  Does that make sense?
2    A.  Sure.
3    Q.  Okay.  You have any special expertise or
4 credentials in news media or journalism?
5    A.  No.
6    Q.  Do you have any special expertise or
7 credentials in corporate finance?
8    A.  No.
9    Q.  Do you have any special expertise or
10 credentials concerning the practices and protocols in
11 information technology?
12    A.  No.
13    Q.  Okay.  I've -- so I've had depositions
14 before.  And I think as an attorney, you're familiar
15 with what a deposition is?
16    A.  Yes.
17    Q.  Okay.  I've had corporate representative
18 depositions before where sometimes I've had an attorney
19 who's represented the company for a long time, so
20 they're -- have a lot of knowledge.  Or I'll have a
21 former employee who no longer works for the company
22 come testify because that person has a lot of
23 knowledge.
24      Or I might have an expert in a certain field
25 that that -- that that corporate representative is

Paz, Brittany                                              02-14-2022

10

1  supposed to testify and they come in to testify about
2  it. So for those areas, I'm usually pretty
3  understanding why the person is here. For you, what I
4  want to ask you is I'm just trying to figure out how
5  you got selected.
6          And is it just that you're an attorney that
7  Norm Pattis knows, or do you have some sort of special
8  expertise outside of criminal law that makes you
9  well-suited for this deposition?
10     A.  I think the reason why I was selected was
11  that there needed to be a person to represent the
12  company who had a broad knowledge of the topics that
13  are listed in the deposition notice. I think you've
14  previously deposed a couple of people that did not have
15  that knowledge.
16          The reason for that being that the company is
17  just not structured that way with one person having
18  singular knowledge about everything in the company.
19  And so I think they needed somebody who had the time
20  and ability to familiarize themselves with that
21  information and that was me.
22     Q.  Okay. And when you said there was nobody
23  they were looking at to select for this deposition who
24  possessed that broad knowledge, you don't possess it
25  either; correct? Or did not, at least as of February

11

1  1st?
2     A.  I didn't as of February 1st, no. But as I
3  sit here today, I believe I do.
4     Q.  Okay. How much money total will you be paid
5  in connection with being Info Wars' corporate
6  representative in this case?
7     A.  I've already been paid, but my fee was
8  $30,000 plus costs.
9     Q.  Okay. How did you arrive at that figure?
10     A.  That was a internal discussion, just
11  negotiation between myself and the company.
12     Q.  When you say negotiation, can you explain
13  that? Did you offer a figure and they counter offered?
14  How did that work?
15     A.  No. I think I was offered a figure to start
16  and then we went from there.
17     Q.  What do you mean, you went from there? What
18  does that mean?
19     A.  I mean there was a starting number --
20     Q.  Okay.
21     A.  -- as any negotiations go, and --
22     Q.  Can you tell me what that starting number
23  was?
24     A.  I think the number was 25. And then I just
25  negotiated a little bit higher, 30.

12

1     Q.  Okay. And that number was negotiated and
2  finalized before you did any work?
3     A.  Yes.
4     Q.  Okay. Have Alex Jones or the company -- have
5  -- have Alex Jones or any company related to Alex Jones
6  paid you for anything else?
7     A.  Other than my testimony for this deposition?
8     Q.  Uh-huh.
9     A.  No.
10     Q.  Do they plan to?
11     A.  I think I may be representing the company up
12  in Connecticut for the corporate rep deposition. I
13  believe that's going to be sometime in March. But
14  aside from that, no.
15     Q.  Okay. Now, you understand you're a fact
16  witness; right?
17     A.  Yes.
18     Q.  You understand that payments to such
19  witnesses must be carefully circumscribed? Do you know
20  what I mean by that?
21     A.  Can you --
22     Q.  Sure. Circumscribe means to do an action
23  carefully to ensure that it fits in with relevant
24  rules, regulations, and standards.
25     A.  Okay.

13

1     Q.  You understand that payments to you must be
2  carefully circumscribed; right?
3     A.  Sure.
4     Q.  Okay. You understand you have professional
5  responsibilities as an attorney that may affect how
6  much you can and cannot be paid for fact testimony;
7  right?
8     A.  I don't think that I'm acting here in a
9  capacity as an attorney. So I don't know that I would
10  agree with that.
11     Q.  So let's put it this way. In other words,
12  because you're not representing anybody, you just
13  happen to be an attorney --
14     A.  Yes.
15     Q.  -- you don't think you have the same
16  professional responsibilities you would have in your
17  attorney work as you do sitting in that chair right
18  now?
19     A.  I don't have certain -- I don't have certain
20  ethical responsibilities to the client. I think my
21  only -- my only real obligation is to testify
22  accurately and truthfully, as any witness.
23     Q.  Okay. Can you tell me everyone you talked to
24  for this deposition to prepare.
25          MS. BLOTT:  I'm going to object to the

Paz, Brittany                                                    02-14-2022

14

1 extent that it's asking you to identify attorneys who
2 are retained by any of the defendants.
3          Go ahead.
4     Q.  (BY MR. BANKSTON)  You can answer.
5     A.  Sure.  So I spoke to numerous employees of
6 Free Speech.  I spoke to Mr. Jones.  I spoke to
7 Melinda, I believe her last name is Flores.  I spoke to
8 Mr. Daniels, he goes by Kit.  I spoke to Adan Salazar.
9 I spoke to Bob Coe.  I think he's a consultant with
10 the -- with the company.
11         I spoke to Daria Karpova.  Who else did I
12 speak to?  I spoke to a lot of people.  I feel like I'm
13 missing somebody.  Oh, I did speak to Mr. Watson over
14 in London via Zoom.
15    Q.  Okay.
16    A.  I spoke to Rob Dew via Zoom also because he
17 wasn't available while I was here.  And I think that
18 might be it.  Oh, no, no, I'm sorry.  I also spoke to
19 Nico Aguilar on the phone.  That might be it.
20    Q.  Okay.  Now, you have listed here in addition
21 to Mr. Jones --
22    A.  Uh-huh.
23    Q.  -- numerous employees.
24    A.  Yes.
25    Q.  Or former employees, in the case of one.  And

15

1 Nico is not an employee; correct?
2     A.  No, he's not.
3     Q.  Okay.  And you started by saying you spoke to
4 numerous employees.  And I want to make sure that these
5 are the employees, there are no other employees.
6     A.  I'm just trying to make sure I didn't miss
7 anybody.
8     Q.  I know.
9     A.  I think that's it.
10    Q.  Okay.  When you said Bob Coe --
11    A.  Uh-huh.
12    Q.  -- you mean Robert Roe, an accountant?
13    A.  Yes.
14    Q.  Okay.
15    A.  Robert Roe.
16    Q.  Okay.
17    A.  He's not -- I don't believe he's the
18 accountant for the company, though.  I believe he's a
19 consultant.
20    Q.  What do you -- what do you mean?  How's that
21 different?
22    A.  I mean that we have someone that is an
23 official accountant for the company that prepares our
24 tax returns.  So he's not -- he does not do those
25 functions.

16

1     Q.  Okay.  Well, I've seen, like, a UCC financing
2 statement with his accounting company listed on it.
3 Have you seen that?
4     A.  Maybe.
5     Q.  Okay.  So maybe he is the company's
6 accountant; right?
7     A.  I don't know.  I don't think he's the
8 company's accountant.  I think there's a Mr. Love --
9 Love.  He's the company's accountant.
10    Q.  Okay.  So you don't know why Rob Roe's name
11 appears on the financing statements?
12    A.  I don't know why that would be.  But I don't
13 think he's the company's accountant.
14    Q.  Okay.  And did you talk to the company's
15 accountant?
16    A.  I did not speak to Mr. Love, no.
17    Q.  Okay.  To prepare for this deposition, did
18 you review every document produced in this litigation?
19    A.  Every single document?
20    Q.  Uh-huh.
21    A.  No, I didn't review every single document.
22    Q.  Okay.
23    A.  I don't think it's possible to review every
24 single document.
25    Q.  Well, I certainly would agree that it's not

17

1 possible for one person to do it within the time period
2 of this deposition; right?
3     A.  Yes.
4     Q.  It would take multiple people to do that?
5     A.  I think for the purposes of this deposition,
6 if you'd like to go through the universe of documents
7 that I did review, I'm happy to do that.
8     Q.  That's not what I'm asking you.
9     A.  Okay.
10    Q.  What I'm asking you is, if someone wanted or
11 if a company wanted to prepare itself for this
12 deposition by reviewing every document produced in this
13 litigation, one person in two weeks could not do that?
14    A.  One person in two weeks could not do that,
15 no.
16    Q.  Okay.  And the company did not undertake
17 steps to make sure that multiple people reviewed all of
18 those documents; correct?
19    A.  I was the only person that was retained to do
20 that.
21    Q.  Okay.  So you had told me that you basically
22 could give me a universe of the documents you did
23 review?
24    A.  Yes.  I can try to undertake that, if you'd
25 like me to do that now.

Paz, Brittany                                                    02-14-2022

18

1    Q.  Why don't you do that now.
2    A.  Sure.  So at first, I wanted to just make
3  sure that I reviewed the videos that -- that we had on
4  the Dropbox.  So the videos that were produced in
5  connection with the -- the discovery as well as review
6  those for the source material.
7        I also reviewed articles that were published
8  by the company that were produced in connection with
9  the discovery.  I reviewed most, if not all, of the
10  depositions that have been conducted in connection with
11  this litigation.  I reviewed the documents that were
12  admitted as exhibits to those depositions because I
13  felt that those would be probably the most relevant
14  documents to hone in on.
15        I also reviewed a lot of e-mails, although I
16  don't think anybody could review all the e-mails.  A
17  lot of them are, like, unopened e-mails and e-mails
18  from the general public.  But I did review a lot of
19  e-mails.  I also reviewed the filings in connection
20  with the plaintiffs' complaints.  And I think that's
21  it.
22    Q.  Okay.  When you say complaints, down here, we
23  call them lawsuit petitions, down in Texas.
24    A.  Okay.
25    Q.  Is that what you mean, those petitions?

19

1    A.  Yes.
2    Q.  Okay.
3    A.  In Connecticut, we call them complaints.
4    Q.  Yeah.  So I have videos on Dropbox, I have
5  articles, I have depos --
6    A.  Uh-huh.
7    Q.  -- I have the exhibits in those depos --
8    A.  Uh-huh.
9    Q.  -- some universe of e-mails, and then the
10  petitions?
11    A.  Yes.
12    Q.  Okay.  When you talk about that universe of
13  e-mails, how many documents are you talking about?
14    A.  At least thousands.
15    Q.  Okay.
16    A.  Some of them are duplicates, though.  So it's
17  really hard to say how many documents.  But, you know,
18  the Bates stamps.  So they're all Bates stamped.  They
19  have individual Bates stamps.  But a lot of them are
20  duplicates.
21    Q.  How did you select which documents you wanted
22  to review in terms of e-mails?
23    A.  Good question.  So what I did was I did a
24  search to try to hone in what I was focusing on.  So I
25  did a search for things that -- documents, I'm sorry --

20

1  that would have the plaintiffs' names on them.  I did a
2  search that would have Sandy Hook in them.
3        Some of those documents don't really pertain
4  to Sandy Hook.  Like, so, for example, some are just on
5  general gun control.  Some are on other shootings.
6  Some are on other events that were ongoing in the
7  country.  But I did try to hone my search to documents
8  specifically related to the Sandy Hook litigation.
9    Q.  Okay.  So when you did the search for Sandy
10  Hook --
11    A.  Uh-huh.
12    Q.  -- which returned the phone book in this
13  case, how did you -- did you review every document that
14  had Sandy Hook in it, or did you select some
15  subuniverse of documents that had Sandy Hook in it?
16    A.  So, like you said, it did return a lot of
17  documents.  So I tried to review as many of those,
18  like, lay eyes on as many of those documents as I
19  could.
20    Q.  Just randomly?
21    A.  No.  As -- as time was available, I would
22  review documents.  So is your question whether I got
23  through all of those documents?  I probably didn't.
24    Q.  Right.  How many do you think you did?
25    A.  Thousands.

21

1    Q.  Thousands of documents?
2    A.  I've reviewed thousands of documents.
3    Q.  Okay.  Do you have any idea sitting here
4  today about how many pages of documents have the word
5  Sandy Hook in them?
6    A.  I can't give you a number.  I don't remember
7  the number.
8    Q.  Would you dispute with me less than 30,000
9  pages?
10    A.  If I reviewed 30,000 pages?  Is that what
11  you're asking me?
12    Q.  No.  I'm asking you if you --
13    A.  If it returned 30,000 pages?
14    Q.  If you would dispute with me that there --
15  the word Sandy Hook appear in about 30,000 pages.
16    A.  No.  I probably wouldn't dispute that, no.
17    Q.  Okay.  Let's talk about everything you
18  actually physically did.  I want to know the times of
19  it.  So in terms of reviewing documents, how many hours
20  did you spend reviewing documents?
21    A.  I think total review of everything -- is that
22  also including the discussion -- the interviews I've
23  had with everybody?
24    Q.  No.
25    A.  Okay.  So total review of documents, I

Paz, Brittany                                    02-14-2022

---

22

1 probably estimate I have about 70 or 75 hours. All
2 told, I probably have, you know, between interviewing
3 people, I probably have over a hundred hours of review.
4    Q.   Okay.  Well, that's -- let's talk first about
5 the documents.  Those 75 hours, when did you do that?
6    A.   When?
7    Q.   Uh-huh.
8    A.   Between the period of January 31st, when I
9 was retained, and this morning.  I was reviewing
10 documents this morning.
11    Q.   All right.  So in terms of interviews, did
12 those happen before the document review or before some
13 of it, after some of it, like, give me the order on
14 that.
15    A.   I think they've all been done simultaneously.
16 So I didn't arrive here until Tuesday night.  So
17 interviews didn't really start until Wednesday.  So I
18 was doing interviews from Wednesday through Saturday.
19    Q.   Okay.  So if you started -- let's say you did
20 an interview Wednesday.
21    A.   Uh-huh.
22    Q.   Let's talk about last Wednesday, for
23 instance; right?
24    A.   This past Wednesday?
25    Q.   Sure.  Okay.  Let's say you interviewed

---

23

1 somebody that day.  And then you reviewed documents,
2 you said, even this morning; right?
3    A.   Yeah.
4    Q.   And maybe last night too?
5    A.   Yes.
6    Q.   Okay.  So if you hit a document last night
7 and it involved one of those people that you
8 interviewed, you didn't go back and interview them
9 about whatever you saw in that document; right?
10    A.   You mean, did I reinterview them?
11    Q.   Correct.
12    A.   No.
13    Q.   Okay.  How many hours did you spend watching
14 videos?
15    A.   Watching videos, plus taking notes on the
16 videos and the sourcing, probably about 35 hours.
17    Q.   Okay.  When you said you watched the videos
18 on Dropbox --
19    A.   Uh-huh.
20    Q.   Okay.  You have an understanding of what
21 those videos were?  Like, do you -- do you know --
22 well, let me put it back this way.  One of the things
23 you were asked to do is to prepare for all of the
24 videos that are mentioned in plaintiffs' petitions;
25 correct?

---

24

1    A.   Yes.  So I did try to locate all of the
2 videos that are mentioned in the petition.
3    Q.   Okay.  Were you able to do that?
4    A.   Not all of them.
5    Q.   Okay.
6    A.   I don't think some of them are available just
7 due to the deplatforming, so I don't know that we have
8 a couple of them.
9    Q.   That's interesting, because I got all of
10 them.
11    A.   One of them that I know that I couldn't find
12 was the video specifically relating to the addresses
13 and the map of the HONR -- the location of the HONR
14 company.  That was one of the ones I couldn't find.
15    Q.   Were you aware that the last corporate
16 representative, Daria Karpova, she was shown that
17 video?
18    A.   She was shown the video, or you showed her
19 the video?
20    Q.   I didn't show it to her.
21    A.   I don't know.
22    Q.   In terms of preparation, you don't know what
23 Ms. Karpova did to prepare?
24    A.   I read her deposition.
25    Q.   Okay.  Well, let me make sure I get an answer

---

25

1 to the question.  Do you think that that means you know
2 what she did to prepare?
3    A.   I don't think she did very much to prepare,
4 to be honest.
5    Q.   I don't think she did either, but I do think
6 Brad Reeves showed her some videos.  Do you -- do you
7 know about that?
8    A.   I don't know what Brad Reeves showed her, no.
9    Q.   Okay.
10    A.   I haven't spoken to Mr. Reeves.
11    Q.   Okay.  So we've got the docs and documents in
12 the videos, then you read depositions.  Do you count
13 that in your time in document review, or is that
14 something separate?
15    A.   No, I think that's document review.
16    Q.   Okay.  And then that also includes the
17 exhibits of that depositions; right?
18    A.   That's correct.
19    Q.   Okay.  And then another thing you did is the
20 complaints.  You read the -- I mean the petitions?
21    A.   Yes.
22    Q.   Right?  And that's also in your document
23 review number?
24    A.   Yes.
25    Q.   Okay.  And then you did interviews?

---

Paz, Brittany                                02-14-2022

26

1    A.  Yes.
2    Q.  Tell me how long you spent doing interviews.
3    A.  Between Saturday and Saturday, I was at
4  InfoWars at the -- the primary location at InfoWars all
5  day, every day Wednesday through Friday.  And then we
6  interviewed Mr. Watson for an hour on Saturday.  So
7  I -- I spent a great deal of time Wednesday through
8  Friday interviewing -- interviewing people.
9    Q.  Since Wednesday, Thursday, Friday, you spent
10  a full workday?
11    A.  Full workday.
12    Q.  Okay.
13    A.  Actually, I don't think we left until after
14  7.  It was a long time.
15    Q.  Okay.  So what I was going to say is three
16  times eight is 24, so that would be 24 hours spent
17  interviewing.  But you think you probably spent a
18  little more than that; right?  Let's call it 30.  Does
19  that sound right?
20    A.  Let's say 25 just to be safe, because I don't
21  -- I don't know if it's -- if it's 30.  Because some of
22  those hours were also, you know, viewing -- viewing the
23  location, viewing documents, pulling documents,
24  discussions -- privileged discussions with counsel.
25  You know, some of it isn't full workdays full of

27

1  interviews.
2    Q.  Sure.  Okay.  When you say viewing location,
3  do you mean the actual premises of InfoWars?
4    A.  That's correct.
5    Q.  Okay.  When you talk meeting with counsel,
6  are there additional hours, or is that included as part
7  of your interview time?
8    A.  I think the -- no, it's not included with the
9  interview time, no.
10    Q.  Okay.  How much time did you spend talking to
11  counsel?
12    A.  With Attorney Blott, you mean?
13    Q.  No, I mean any attorney.
14    A.  Okay.  So maybe a few hours.
15    Q.  Okay.  Which attorneys did you talk to?
16    A.  I spoke to Attorney Blott and I spoke to --
17  his first time is Dustin.  I'm so sorry, I don't
18  remember his last name.
19    Q.  I know who you're talking about.  It's okay.
20    A.  And then I spoke to Attorney Pattis in
21  Connecticut.
22    Q.  Those are the only three?
23    A.  Yes.
24    Q.  Let's give a gentleman.  You may not know
25  he's an attorney.  Do you know a gentleman named Eric

28

1  Taube?
2    A.  I've heard the name.  I've not met him or
3  spoken to him.
4    Q.  Okay.  And have you talked to Marc Randazza?
5    A.  No.
6    Q.  Or Jay Wolman?
7    A.  No.
8    Q.  Okay.  Okay.  So what we've described is time
9  reviewing documents, time reviewing videos, time doing
10  interviews.  Is there any other time that you contend
11  that you spent preparing for this deposition?
12    A.  No, I think that -- that covers it.
13    Q.  Okay.  What is the first -- when is the first
14  time that the company did something to preserve
15  potential evidence?
16    A.  I think that this was probably sometime after
17  the lawsuit was filed, although I can't give you a
18  specific date.  I have interviewed employees as to when
19  they became aware of when there was a spoliation
20  letter.  And unfortunately, nobody has any knowledge of
21  receiving such a letter.
22       So I can't really pinpoint a date when that
23  happened.  Although, I, in connection with my
24  interviews, have tried to ascertain what was done to
25  try to get access to the YouTube videos that were lost

29

1  as a result of the deplatforming, which happened prior
2  to the lawsuit.
3       I believe they hired some company to help
4  them do that, but I'm not really sure what the dates
5  are.
6    Q.  All right.  A lot of things I want to ask you
7  about that.
8    A.  Sure.
9    Q.  First, the deplatforming.  Did that happen
10  before the lawsuit?
11    A.  According to Mr. Jones, that happened in
12  2017.
13    Q.  Okay.  It actually didn't.
14    A.  Uh-huh.
15    Q.  So the deplatforming of Mr. Jones' stuff
16  happened kind of as a result of this lawsuit.
17    A.  Uh-huh.
18    Q.  Happened actually, like, in August 2018,
19  months after the lawsuit.
20    A.  Okay.
21    Q.  You didn't know that?
22    A.  I didn't know that.
23    Q.  Okay.  Second, when you said that nobody
24  knows when a spoliation letter is sent out, are you
25  talking about a spoliation, like, an evidence

Paz, Brittany                                                    02-14-2022

---

30

1  preservation letter from the plaintiffs, or are you
2  talking about a letter inside the company?
3      A.  No, I'm talking about a letter that was
4  received from you and your clients.
5      Q.  Nobody has that?
6      A.  No.
7      Q.  Okay.
8      A.  Nobody has any knowledge of receiving that.
9      Q.  Nobody asked Mr. Taube for it?
10     A.  The company is not aware of a spoliation
11  letter.
12     Q.  I didn't ask that.  And you know that, you're
13  an attorney; right?  And I kind of expect that from
14  certain witnesses to, like, evade the very question I'm
15  asking.  But you know I didn't ask that question.  You
16  asked, does -- has the attorney -- has anybody in the
17  company talked Mr. Taube about the spoliation letter.
18     A.  I have not talked to Mr. Taube about it.
19     Q.  Okay.  Again, has anybody in the company
20     A.  I'm not aware of anybody being aware of the
21  spoliation letter or speaking to Mr. Taube about it.
22  Anybody that I interviewed about this letter, nobody is
23  aware of it.
24     Q.  Did you make any efforts to determine who
25  represented the company at the time the suit was filed?

---

31

1      A.  We had a number of attorneys, so I think that
2  Mr. Taube represented the company at that time.  But
3  that -- if he had that letter, it was not conveyed to
4  the company.
5      Q.  Ms. Paz, I'm not asking you any of those
6  things.  I'm not asking you what Mr. Taube's witness or
7  Taube did or anything like that.  I'm asking you if you
8  undertook any efforts to determine who represented the
9  company at the outset of suit.
10     A.  I think I answered that.  I think I said, I
11  think Mr. Taube represented --
12     Q.  I don't want to know the answer to the
13  question.  I want to know, did you undertake efforts to
14  find out?
15     A.  I've spoken to the employees of the company,
16  I've spoken to Mr. Jones, I've spoken to the attorneys,
17  and it's my understanding that Mr. Taube represented
18  the company at that time.
19     Q.  In other words -- okay.  So here's what I'm
20  asking.  When you spoke to members of the company,
21  one of the things that you wanted to get from them in
22  terms of information, hey, who was representing you at
23  the time the suit started?
24     A.  Sure.
25     Q.  Okay.  So once you had that information, you

---

32

1  didn't talk to Mr. Taube?
2      A.  I haven't talked to Mr. Taube.  He doesn't
3  represent the company anymore.
4      Q.  When you say -- when you say the company,
5  doesn't represent the company, he doesn't represent
6  Free Speech Systems?
7      A.  Not anymore as far as I know.
8      Q.  Okay.  He does, perhaps, represent other
9  affiliated businesses.  Do you know anything about
10  that?
11     A.  I don't know.
12     Q.  Okay.  And does he represent Mr. Jones, do
13  you know that?
14     A.  I don't know.
15     Q.  Okay.  So, first of all, when we talk about a
16  spoliation letter, you haven't laid hands on that;
17  right?
18     A.  No.
19     Q.  Okay.  What about a litigation hold?
20     A.  On?
21     Q.  First of all, do you know what a litigation
22  hold is inside of a company?
23     A.  You mean on the documents, on anything that's
24  produced inside the company?
25     Q.  Not produced, per se.  I'm saying that at

---

33

1  some point in -- first of all, you're not a civil
2  attorney?
3      A.  No, I'm not.
4      Q.  Okay.  So --
5      A.  And I don't practice here either, so --
6      Q.  Sure.
7      A.  -- you may use --
8      Q.  Well --
9      A.  -- different terms here.
10     Q.  Okay.  A litigation hold is a common term in
11  civil law that when a company gets sued, it needs to
12  undertake steps to notify everybody within the
13  constituent organization that documents need to be
14  preserved.  Do you understand that?
15     A.  Yeah.
16     Q.  Okay.  When did that litigation hold happen?
17     A.  You mean the -- I just want to make sure I
18  understand the question.  The notification that once
19  the company was sued, notification to employees of Free
20  Speech to preserve any relevant material?
21     Q.  Yes, except one caveat, which is that may
22  have occurred before suit because the company may have
23  anticipated litigation before suit.  So that may have
24  occurred before suit, I don't know.
25     A.  I don't think that any such efforts were made

---

34

1  before the suit.

2      Q.  Okay.  Can you tell me when it did happen?

3      A.  It would have been sometime after the suit.

4  I'm not sure exactly what date.

5      Q.  Okay.  And you know that doesn't really help

6  me at all; right?

7      A.  I know it doesn't.  But I'm sorry, I can't --

8  I'm not going to make a guess.

9      Q.  Okay.  And you've reviewed the depositions in

10  this case?

11      A.  Yes, most of them.

12      Q.  Okay.  Here's the problem I'm having, Ms. Paz

13  --

14      A.  Sure.

15      Q.  -- because I really wanted to talk to you

16  today a lot about preservation of evidence; right?  I

17  really -- that's something I wanted to talk to you

18  about.  And the question of when it started in terms of

19  litigation hold, I didn't think was going to be a

20  difficult question for you to answer since

21  Mr. Zimmerman testified to it.

22      I thought we'd be able to jump right in

23  because you'd know that.  But in terms of whatever

24  Mr. Zimmerman said about when the company issued a

25  litigation hold, in terms of his deposition, you don't

35

1  know that here sitting here today?

2      A.  I believe I reviewed Mr. Zimmerman's

3  deposition.  I think Mr. Zimmerman's testimony was

4  specifically related to the website and the website

5  analytics.

6      Q.  Okay.  That's -- that's -- you believe his

7  testimony wasn't about litigation holds or

8  preservations of evidence?

9      A.  Most -- most of what I recall about that

10  deposition was about Google analytics.

11      Q.  All right.  So you don't know anything about

12  a 2019 letter from Tim Fruge?

13      A.  I don't.  I'm sorry.

14      Q.  Okay.  Or any of his testimony about what he

15  told employees to do in terms of evidence preservation

16  in that letter?

17      A.  I have not seen that letter.

18      Q.  Okay.  That's unfortunate.  Can you tell me

19  -- can you at least tell me everything Free Speech

20  Systems did to preserve evidence?  If you can't tell me

21  when they did it, can you tell me what they did?

22      A.  Sure.  To my knowledge, I think that there

23  were efforts undertaken to produce all of the e-mails

24  that were given.  There were certain search term

25  parameters that were given to the company to search the

36

1  e-mails.  There were certain parameters done to try to

2  access the videos, such that we could access the

3  videos.

4      There -- and I believe I testified earlier

5  that there was a -- there was a third party company

6  that was helping with that, although I'm not sure what

7  the name is.  I think Attorney Blott could probably get

8  that information for you.

9      I think that as far as social media goes, I

10  think that the testimony previously has been that that

11  information can -- that can be accessed through

12  Twitter.  Are you -- do you also want to know about the

13  -- the finances of the company and the documents

14  related to the finances, or are we just now in the

15  universe of e-mails, articles, and -- and videos?

16      Q.  Well, let's -- let's deal with that first

17  answer first --

18      A.  Sure.

19      Q.  -- because what I heard you talking about is

20  there were efforts to make -- to search for the

21  e-mails?

22      A.  Yes.

23      Q.  And efforts made to access the videos?

24      A.  Yes.

25      Q.  Right?  And these sound to me like things

37

1  that were done to attempt to locate documents for

2  production in the lawsuit; right?

3      A.  Uh-huh.

4      Q.  Right.  What I didn't hear is about any

5  efforts to preserve documents before that happened.  In

6  other words, you understand if I'm going to go search

7  for documents to produce them, it's important that I

8  preserve those documents before that happens.  You

9  understand what I'm saying?

10      A.  Well, I do understand what you're saying.

11  And I don't think that there's been any deletion of any

12  of that information.  So, I mean, once they were

13  required to be produced and we did the search through

14  the databases, I don't have any reason to believe any

15  of that information was deleted.

16      Q.  Okay.  Do you have any idea when InfoWars'

17  e-mail server was secured and preserved in its current

18  state?

19      A.  As far as a date, no, I don't.

20      Q.  Sure.

21      A.  I don't know the date.

22      Q.  Okay.  Well, let's just -- let me do a little

23  testifying for you.  And you can take my representation

24  or you can leave it; right?  But from what I understand

25  from Mr. Zimmerman's testimony --

Paz, Brittany                                                    02-14-2022

38

1    A.  Uh-huh.
2    Q.  -- from the company's discovery answers, no
3  efforts were made to look for any documents, just to do
4  these things you're talking about.  Search for e-mails,
5  search for videos.  None of that was done until
6  February 2019 when discovery was ordered in the Lewis
7  case.  All right?
8         And what I'm wondering is, is if between
9  April 2018 and the following year in February 2019, if
10  there was an employee who had an e-mail on the InfoWars
11  e-mail server and it was personally incriminating to
12  them, there is nothing stopping them from taking that
13  e-mail off the server before that search happened;
14  right?
15    A.  I don't think that that's accurate.  I think
16  it would still have been in a deleted e-mail box.  So
17  I -- I don't think that that's accurate.  But -- and I
18  don't -- I don't -- I don't want to agree or disagree
19  with the dates because I don't know the answer to it.
20    Q.  Sure.
21    A.  So, I mean, if those are your
22  representations, that's fine.  But I just don't know.
23  But I don't have any reason to believe that somebody
24  deleted it off of the server and that I wouldn't still
25  be able to access it.

39

1    Q.  Well, if there have been no efforts to
2  preserve anything, then we don't know.  You wouldn't
3  have any basis to know whether something's been deleted
4  or not; right?
5    A.  I think we produced a lot of things that were
6  in deleted folders and spam boxes.  So I don't have a
7  reason to believe that there was anything that was
8  deleted.
9    Q.  All right.  You have no special expertise in
10  IT, we've talked about that; right?
11    A.  No, I don't.
12    Q.  All right.  And so if somebody like
13  Mr. Zimmerman, who has a bunch of expertise in IT,
14  wanted to get an e-mail off that server, you don't
15  doubt that that could be possible; right?  You don't --
16  you don't have enough information sitting here today
17  whether to know that is possible or not.
18    A.  I'm sorry, is the question whether -- does
19  Mr. Zimmerman have the ability to get e-mails off of
20  the server?
21    Q.  More specifically, that you don't possess the
22  knowledge to know whether he does or not.
23    A.  I don't think that's accurate.  I think he
24  can -- can get information off the server.
25    Q.  I don't think you're understanding the

40

1  question.
2    A.  Okay.
3    Q.  My question's not whether he can get -- get
4  information off.  Like, you're talking about pulling it
5  off so he can produce it.  I'm saying he wants to get
6  rid of it.  I'm saying he wants to delete it --
7    A.  Oh, oh, oh --
8    Q.  -- and make sure nobody ever sees it.  He can
9  do that.
10    A.  Oh, I don't know.  I don't know the answer to
11  that, I'm sorry.
12    Q.  Okay.  So it would be fair to say that your
13  testimony here today is that you don't know if anything
14  has been done to preserve the e-mails on the InfoWars
15  server before the time it was that they were to produce
16  those documents?
17    A.  I don't know the time period, no.
18    Q.  Okay.  And more than that, you don't know --
19  beyond time period, you don't know that anything was
20  ever done to preserve the e-mails themselves; right?
21    A.  Aside from pulling them off the server, no.
22    Q.  Right.  Well, I understand this is again
23  something you may not know about, I would not expect
24  you to know about.  But in February 2019, an entire
25  mirror image copy was -- like, a backup.

41

1         A secure backup was created of the e-mail
2  system.  All right?  Do you understand how that process
3  works?
4    A.  I know that it can be done, yes.
5    Q.  Okay.
6    A.  I don't know -- I don't know the
7  technologicals of how it's done, but I do know it can
8  be done.
9    Q.  And before I just told you that, you didn't
10  know it happened; right?
11    A.  I didn't know the date that it happened.
12    Q.  Okay.  But you did know that there was a
13  mirror copy made of the entire e-mail server?
14    A.  Yes.
15    Q.  Okay.  That would be -- that would be an
16  effort to preserve the e-mails; right?
17    A.  Yes, I just don't know when it was.
18    Q.  Okay.  All right.  Because I know that you
19  don't know when it was.  I just want to make sure, now
20  that you've told me that there were efforts made to
21  preserve the e-mails, do you know of anything else that
22  was made to preserve anything?
23    A.  Aside from the e-mails?
24    Q.  Uh-huh.
25    A.  Can you be more specific as to what you're --

Paz, Brittany                                                    02-14-2022

42

1  what you're talking about?
2      Q.  I'm -- I'm saying that I asked you here to
3  testify to me about InfoWars' efforts to preserve
4  evidence.  And so far, I haven't heard anything.  And
5  I'm wondering what was done following suit to make sure
6  that potential evidence was available for use in this
7  lawsuit.
8      A.  I think part of the issue here -- and I just
9  want to -- if I can go back a little bit to talk about
10  the employees that I interviewed -- is the structure of
11  the company.
12      Q.  Okay.
13      A.  And there's -- and that's probably the
14  problem that we're getting into.  And it was -- and
15  it's my issue as well of getting this information is
16  that there is no one person at the company that's
17  designated to do such things.  There are different
18  departments and one department does not have any
19  communication with another department.
20          And that's just based on my interviews and
21  observations over the last couple of weeks.  But -- so
22  essentially, if there were documents that were produced
23  by one department, they have their own specific
24  policies and procedures and ways they do things there
25  as far as preservation of what they do.

43

1          Like, so for -- for example, right,
2  production.  The production department may produce on a
3  daily basis news articles that they print out for the
4  hosts; right?  Those particular news articles that they
5  print out for the hosts, those are not retained.  Those
6  -- those are, you know, shredded and they get rid of
7  it.
8          There's no retention policy for those
9  documents.  There's also no retention policy for, like,
10  initial video clips.  So, like, the final product -- so
11  if you're interested in video clips or raw footage of
12  things before it was cut into a finalized version,
13  those things aren't saved either.
14          So there's no -- in any individual
15  department, there's really not a retention policy like
16  that to retain those types of documents.  So if that's
17  what you're interested in, nobody is really retaining
18  those documents themselves.
19          As far as the e-mail go -- e-mails go,
20  there's Mr. Zimmerman, who is, you know, the IT person.
21  And he handles things related to the website.  There's
22  also a separate person that handles information in
23  connection with PQPR, which is a separate company, for
24  the sales end of things.  And those things are all
25  separate too.

44

1          These are all separate departments that
2  really aren't talking to each other.  So I think that
3  was a bit of the difficulty that we're having in
4  answering your specific question, if that makes sense.
5      Q.  It does.
6          MR. BANKSTON:  Objection.
7  Nonresponsive.
8      Q.  (BY MR. BANKSTON)  If there was a person at
9  Free Speech Systems in charge of preserving documents
10  for this litigation who had that as part of their
11  duties, you haven't spoken to that person?
12      A.  There is no such person.
13      Q.  Okay.  So if Mr. Fruge -- Tim Fruge, you know
14  who that is?
15      A.  I've heard the name.
16      Q.  Okay.  You haven't spoken to him?
17      A.  I have not spoken with him.
18      Q.  Okay.  So if that person was the person who
19  was in charge of preserving documents for this
20  litigation, you have no information from him?
21      A.  I don't know that that's accurate.  I'll --
22  just based on your representation.  I don't know that
23  --
24      Q.  In fact, let's go ahead and get that
25  question.  I think that's a good -- that's a better way

45

1  to ask that question.  If Tim Fruge had any involvement
2  or management of the preservation of documents involved
3  in this case, that is information you don't have?
4      A.  No.
5      Q.  Whether that's true or not?
6      A.  Right.
7      Q.  Okay.  When it came to produce -- time to
8  produce documents in this lawsuit, who was responsible
9  for searching the company's e-mail server?
10      A.  I think that would have been Mr. Zimmerman
11  who would have done the search.  When I talked to
12  Mr. Zimmerman -- did I -- did I put him on my list
13  earlier?
14      Q.  You did not.
15      A.  I'm sorry.  I did talk to Mr. Zimmerman.
16  Let's add him.
17      Q.  Okay.  Let's go ahead and make sure before we
18  go on any further, is there anybody else we need to
19  add?  Because I don't -- I don't want -- what I don't
20  want to happen is, coming to other questions and going,
21  oh, no.  Actually, I can answer that question because
22  here's this other person I talked to I never told you
23  about.
24      A.  I understand.  I'm doing my best here to
25  remember everybody I spoke to.  I don't have --

Paz, Brittany                                     02-14-2022

---

46

1    Q.  Do you have any notes on who you talked to?
2    A.  You know, I did have it in my notes, but
3  unfortunately, I didn't print that page.  That page is
4  missing.
5    Q.  Okay.
6    A.  So I did not print that page.  I did write it
7  down, but it's not in there -- in my notes for some
8  reason.
9    Q.  Okay.
10    A.  But I did speak to Mr. Zimmerman.  I'm sorry,
11  can you repeat the original question.
12    Q.  I just -- was -- I believe what you answered,
13  he was the person responsible for searching the e-mail
14  server?
15    A.  Yes.  And I think he -- he testified to that
16  as well at some point.
17    Q.  Now, when it came to anything besides
18  e-mails, besides stuff that came off the e-mail
19  servers, when it came to documents that may have been
20  on any individual devices among any individual
21  employees, who was responsible for collecting those
22  documents?
23    A.  You mean like the work computers?
24    Q.  Sure.
25    A.  I think that that would have fallen in the

---

47

1  IT, so I think Mr. Zimmerman would have done that as
2  well.
3    Q.  Okay.  Do you remember actually him
4  testifying that it was actually the individual
5  employees, that he didn't do that at all?
6    A.  I don't remember, I'm sorry.
7    Q.  Okay.  So -- because I wanted to ask you
8  about this idea that Free Speech Systems just left it
9  up to complete individual employees to go search their
10  individual systems and return their documents.  And you
11  aren't going to be able to talk about that process?
12    A.  Whether or not the individual employees had
13  gone through their devices themselves?
14    Q.  Uh-huh.
15    A.  Are we including their phones, their personal
16  phones?
17    Q.  Sure, why not.
18    A.  Okay.  I know that they went through their
19  personal phones themselves.  But as far their work
20  computers, I'm not sure.
21    Q.  You're not sure if that happened?
22    A.  No, I think it happened.  But I don't know
23  whether they did it or Mr. Zimmerman did it.
24    Q.  Okay.  Because, see, here's the problem that
25  I have, is I have the testimony is that the employees

---

48

1  did it, or, did it, quote, unquote.  And that not a
2  single document -- not a single employee, single one of
3  them, returned a single document.  Does that sound
4  accurate to you?
5    A.  I don't think it's outside of the realm of
6  possibility just given what I know about how the
7  company operates.
8    Q.  But that would just be total inference on
9  your part?  You don't have any firsthand information
10  about whether any employees returned any documents in
11  the search for documents in this case?
12    A.  I believe that it's true that they did not
13  return any documents on their personal -- on their work
14  computers.  So I believe I read that.  But, again, I
15  don't think that that's out of the realm of what is
16  normal, given the structure and the way the company
17  operates.
18    Q.  You -- you think -- for -- okay.  For how
19  this particular company operates?
20    A.  Yes.
21    Q.  It's very unusual for a company who's been
22  sued that needs to preserve and produce evidence to
23  just tell every individual employee who might be
24  involved in that malfeasance to just go look for
25  documents themselves.  That is unusual; right?

---

49

1    A.  It's not how I would have done it.
2    Q.  Okay.  Now, you were talking earlier about
3  document retention, but there is a document retention
4  policy at InfoWars; right?
5    A.  I don't think that's accurate.
6    Q.  All right.  You understand that there are
7  messaging systems which have been used inside InfoWars
8  other than e-mail; correct?
9    A.  Yes.
10    Q.  For this deposition, did you search those
11  systems or have someone search them for you?
12    A.  Did I, personally?  No.  I've relied on
13  what's been produced already in the document
14  production.
15    Q.  Got you.  So anything that you looked at was
16  already produced long time ago?
17    A.  I don't think that's the entire universe of
18  what I looked at.  So I definitely have updated
19  financials so that I could speak to them at the
20  deposition.  I have updated information as far as, you
21  know, employees who work there or didn't work there.
22        So there are documents that I reviewed that
23  aren't in the production.  So I don't think it's the
24  entire universe.
25    Q.  Let's stick to the -- just the messaging

---

Paz, Brittany                                                    02-14-2022

50

1  systems. Let's stick to messaging systems used inside
2  of InfoWars that are not e-mail. Okay?
3      A. Okay.
4      Q. In terms of those documents --
5      A. Uh-huh.
6      Q. -- all right? Anything, and, well, let's
7  just -- has anything in the -- the -- in the history of
8  this litigation, are there any documents produced from
9  those systems? From systems other than e-mail?
10     A. Whether -- you mean whether they were
11 produced?
12     Q. Uh-huh.
13     A. I know that Alex has produced a lot of
14 documents and I know that there was a time that they
15 stopped using specific platforms. Like, so, for
16 example, Yahoo! Messenger, they had used at a point in
17 time and then they stopped using it. Slack as well,
18 they stopped using.
19         So as far as the time period for those, I'm
20 not really sure whether those were produced, because
21 they stopped using them.
22     Q. Well, I mean, InfoWars is to this day using,
23 like, Rocket.Chat; right?
24     A. I don't know if they're using it to this day,
25 but I think that it's -- has been used prolifically.

51

1      Q. All right. So let's go back to -- the
2  question I asked was, have there been any documents
3  produced from any messaging system that isn't e-mail?
4      A. I don't know.
5      Q. Okay. And then as far as for this
6  deposition, when you had topics to go prepare for --
7      A. Uh-huh.
8      Q. -- if there is any information that's in any
9  of those systems, you didn't go look for it for this
10 deposition?
11     A. I didn't -- I did not, no.
12     Q. Okay. And nobody in the company went and
13 searched through those; right? For this deposition.
14     A. For this deposition?
15     Q. Correct.
16     A. I don't -- I don't know. I don't think so.
17     Q. Okay. So you mentioned that you're aware of
18 what rocket slack is?
19     A. Yes.
20     Q. All right? I mean, I'm sorry. I said that
21 because Rocket.Chat is what I meant to say.
22     A. Rocket.Chat, yes.
23     Q. Rocket.Chat is like a self-hosted version of
24 Slack; right? You understand that?
25     A. I don't know how it works, to be honest.

52

1      Q. Okay.
2      A. I'm not that technologically savvy.
3      Q. Okay. And Rocket.Chat was used, I mean, I'd
4  say to the present day. And you may be right, maybe
5  they stopped using it yesterday. But throughout the
6  events since they've been sued, the company has been
7  using Rocket.Chat?
8      A. You mean 2018 forward?
9      Q. Correct.
10     A. I -- I do believe that in the period after
11 2018, they were using Rocket.Chat.
12     Q. Okay. Were those logs preserved?
13     A. I'm not really sure.
14     Q. Okay. Were they searched ever?
15     A. So here's my -- here's the problem I have
16 with that specific question, is because depending on
17 the agreement with those particular servers, like, for
18 example, I know that Slack doesn't save all of the
19 chats unless you're, you know, you pay them monthly.
20 Some of these are free -- free plans.
21         And then it will only save up to a certain
22 period of time. And then to go back to the -- to -- to
23 way prior chats, you would have to reach out to Slack
24 itself --
25     Q. Okay.

53

1      A. -- in order to get those documents. So I
2  don't know that the company has access to those things
3  going back that far just because I don't think that --
4      Q. What do you mean, that far?
5      A. 2018 was four years ago.
6      Q. Okay.
7      A. So I don't think they -- I don't know that
8  they can go back four years --
9      Q. Well, here's what I'm --
10     A. -- in their chat logs.
11     Q. Okay. Here's what I'm really asking, is the
12 company --
13     A. Sure.
14     Q. -- was sued in April 2018?
15     A. Sure.
16     Q. All right. So let's go to May 2018.
17     A. Uh-huh.
18     Q. The company had possession of whatever the
19 Rocket.Chat logs were in May 2018; right?
20     A. For what time period?
21     Q. For May 2018.
22     A. For that month?
23     Q. Sure.
24     A. Sure.
25     Q. And were anything done to preserve that?

Paz, Brittany                                    02-14-2022

54

1    A.  I don't know.

2    Q.  Okay.  Okay.  So another messaging system

3  that was used was -- so we talked about Rocket.Chat;

4  right?  Another messaging system that was used was

5  Slack.  And do you know when the company stopped using

6  Slack?

7    A.  I'm -- honestly, I'm not sure.  It was -- it

8  was a while ago.  It's been a while.  They have not

9  used Slack in a long time.

10    Q.  What does that mean?  I don't know what a

11  long time means.

12    A.  Within the last couple years.

13    Q.  Okay.  What about since they've been sued?

14    A.  I'm not sure.

15    Q.  Okay.  And I take it, then, you don't know if

16  Slack has been preserved?

17    A.  As I said, I don't think Slack -- the way

18  that their plan worked, I don't think you can go back

19  that far.  So, like, for example, say you were -- we

20  were sued in 2018.

21    Q.  Uh-huh.

22    A.  It really only -- you can only go back a week

23  or so in the -- in the chat logs.

24    Q.  Are you -- when you say you can only go back

25  a week or so in the chat logs, what are you basing that

55

1  on?  Is that just something --

2    A.  I have experience with Slack.  I've used

3  Slack in my -- in my professional life.

4    Q.  Okay.

5    A.  So I know that unless you pay for a plan, you

6  can't go back to -- to your entire universe of

7  conversations.  They're not preserved.

8    Q.  Okay.  Because one thing I'm having some

9  confusion on is because we have a pleading in this

10  case --

11    A.  Uh-huh.

12    Q.  -- from counsel of record in this case that

13  says the Slack logs were preserved.

14    A.  Okay.

15    Q.  Do you know if that's accurate or not?

16    A.  I don't know.  And I don't know what time

17  period that would be from.

18    Q.  Okay.  And then you also said something

19  about, like, you would have to reach out to Slack for

20  -- to check on this information.  Has that ever been

21  done?

22    A.  I don't know if Slack even preserves that

23  information, to be honest.

24    Q.  Well, you're the one who said you would have

25  to reach out to Slack.

56

1    A.  Yeah, to find out.

2    Q.  Did the -- did the company ever do that?

3    A.  I did not do that, no.

4    Q.  I'm not asking what you did.  I'm asking what

5  the company did.

6    A.  I don't know.

7    Q.  Okay.  Do you know what Wire is, messaging

8  system called Wire?

9    A.  I've heard of it.

10    Q.  Oh, was that preserved?

11    A.  I don't know.

12    Q.  Was it searched?

13    A.  I don't know.  I think you'd have to ask

14  Mr. Zimmerman that.  He's more technologically

15  available for it.

16    Q.  Well, here's the thing, Ms. Paz.  I did ask

17  Mr. Zimmerman about it.  This is the fifth time I've

18  tried to take this deposition.  All right?  And -- and

19  I did try to talk to Mr. Zimmerman.  That didn't work

20  so well.  I tried to talk to Mr. Dew, tried to talk to

21  Mr. Karpova -- in terms of --

22    A.  Ms. Karpova.

23    Q.  Ms. Karpova.  So if you are going to be

24  referring me to other people who have already been

25  deposed, I don't care about what they say that I need

57

1  to talk to them.  I'm here to talk to you.  And from

2  what I hear you saying, is that you don't know the

3  answer to that question --

4    A.  I don't.

5    Q.  -- of whether that's -- okay.  Do you know

6  anything about Basecamp?  Do you know what Basecamp is?

7    A.  No.

8    Q.  Okay.  So InfoWars employees, you don't know

9  if they've used Basecamp to communicate about stories

10  in Sandy Hook?

11    A.  I don't know.

12    Q.  Okay.  So have you read just the depositions

13  in this case, or have you read testimony taken up in

14  Connecticut?

15    A.  I've read one or two of the depositions in

16  Connecticut.  I don't think I've read them all.

17    Q.  Okay.  Well, here's the thing is Mr. Salazar

18  testified up in Connecticut.  Have you read his --

19    A.  I did not read his deposition.

20    Q.  Okay.  Well, he testified that they talked

21  about Basecamp and I'm just wondering --

22    A.  Okay.

23    Q.  -- has -- has there been any effort to find

24  those conversations?

25    A.  I don't know.

Paz, Brittany                                                02-14-2022

58

1    Q.   You've never reviewed any conversations that
2  are --
3    A.   No.
4    Q.   -- Basecamp messages?
5    A.   No.
6    Q.   Okay.  Do you know who Kurt Nimmo is?
7    A.   Yes.
8    Q.   Okay.  Kurt Nimmo was deposed in Lafferty.
9  You understand that?
10    A.   Sure.
11    Q.   Did you read his deposition?
12    A.   I don't remember.  I might have, but I don't
13  remember.
14    Q.   All right.  Well, because Exhibit 8 -- I'm
15  sorry.  Exhibit 13 to Kurt Nimmo's deposition --
16    A.   Uh-huh.
17    Q.   -- on page 103 of his Lafferty deposition --
18    A.   Uh-huh.
19    Q.   -- there's a question and answer exchange I
20  want to ask you about.  And the --
21    A.   Sure.
22    Q.   -- question is, "Would it be fair to say that
23  plaintiffs' Exhibit 13 is a Basecamp message from Paul
24  Watson?"  The answer is, "Right."  Then the next
25  question is, "And it's warning, quote, be careful to

59

1  avoid stuff about crisis actors and claims that stories
2  were published the day before the event.  This is
3  radical.  This info."
4        And I'm -- I'm curious because I don't have
5  any Basecamp messages.  I certainly don't have that
6  one, which is very interesting to me.
7    A.   I have not seen that message.
8    Q.   Okay.  That's going to be my question is, you
9  have not seen this message about crisis actors on
10  Basecamp that's being referred to in Mr. Nimmo's
11  deposition?
12    A.   No.
13    Q.   If that document does exist, it's not
14  something that was provided to you?
15    A.   I haven't seen it.
16    Q.   Okay.  He's -- so Kurt Nimmo, you understand
17  he's -- tell me who he is.
18    A.   Well, I know who he was because he's no
19  longer employed by the company.  But I think that in a
20  relevant time period, I believe 20 -- maybe '18 and
21  prior, he was the head writer at InfoWars.
22    Q.   Did you talk to him?
23    A.   I was not able to locate him.  He's not a
24  current employee.  But I did make efforts to try to
25  find out his current information, but we were not able

60

1  to talk to him.
2    Q.   What do you mean, you tried to find out his
3  -- and make efforts to find out?
4    A.   I just -- I wasn't able to reach out to him.
5    Q.   He was deposed in Lafferty.  Everybody has
6  his information.
7    A.   Okay.  But I tried to reach out to him.  He
8  --
9    Q.   Wait.  Hold on.  Let's make sure I understand
10  this.
11    A.   Sure.
12    Q.   Because I thought you just said that you
13  couldn't find his information.
14    A.   I think what I said was, I tried to reach out
15  to him.
16    Q.   Okay.  Because I -- I -- we're going to maybe
17  need to stop at a break and go look at what was said on
18  the court reporter here.
19    A.   Okay.
20    Q.   Because I thought what you were saying is you
21  were unable to locate his contact information.
22    A.   I don't know that I was unable to locate it.
23  I think that we tried to --
24    Q.   How did you try?
25    A.   -- reach out to him by phone.

61

1    Q.   Okay.  So if I go talk to Kurt Nimmo, he's
2  going to have a phone record of an InfoWars number or
3  your number calling him?
4    A.   I don't know.
5    Q.   Well, I mean, if your testimony's truthful
6  today, that would be the case; right?
7    A.   I didn't -- I wasn't able to get in contact
8  with him.
9    Q.   I'm not -- I'm -- that's not what I'm asking
10  you.  I'm asking, did you call him?
11    A.   I called a lot of people.  I think I did try
12  to call him.
13    Q.   Okay.  So -- but -- but your testimony would
14  be --
15    A.   I didn't speak to him, though, no.
16    Q.   Your testimony is that either you or somebody
17  at InfoWars called him for this deposition?
18    A.   I know we tried to -- I know we tried to get
19  his contact information.  I asked Melinda for his
20  contact information, she didn't have it.  I don't know
21  whether I called him and left a voicemail and he didn't
22  pick up.  I know I haven't talked to him, so I'm not
23  honestly sure.
24    Q.   Okay.  So I just want to make sure when you
25  say you're not honestly sure, not you are sure you

Paz, Brittany                                                   02-14-2022

---

62

1 haven't talked to him?
2      A.  I am sure I haven't talked to him.
3      Q.  What you're not sure of is if you've tried to
4 talk to him?
5      A.  I know I asked for his contact information,
6 but I'm not sure if I actually called.
7      Q.  Okay.  That's -- before we go on any
8 further --
9      A.  Sure.
10      Q.  -- are there people you tried to talk to and
11 couldn't, other than Kurt Nimmo?
12      A.  I think Kurt was the only one.
13      Q.  Okay.
14      A.  Most people were pretty responsive.
15      Q.  Okay.  You don't remember leaving voicemails
16 for anybody else?
17      A.  I left a couple of voicemails for Nico.  He
18 returned my call, though, and we did speak.
19      Q.  Okay.
20      A.  We went back and forth with Mr. Watson.
21 There was a time difference there, but ultimately, we
22 were able to speak.
23      Q.  I'm just talking about people you tried to --
24      A.  Yeah.
25      Q.  -- but couldn't.

---

63

1      A.  I think Kurt is the only one.
2      Q.  Kurt.  Okay.  Okay.  Do you know what Pidgin
3 is?  Not the bird.
4      A.  No.
5      Q.  Okay.  Pidgin's a messaging communication
6 system.  Did you know that was used inside of InfoWars?
7      A.  I don't know.
8      Q.  Okay.  You didn't make any efforts to go find
9 anything from Pidgin?
10      A.  No.
11      Q.  You don't know if anything was preserved from
12 Pidgin?
13      A.  I don't know anything about Pidgin.
14      Q.  Okay.  There are text messages between
15 employees talking about Sandy Hook.  That was something
16 that's happened over the years; right?
17      A.  I'm sure it has.
18      Q.  Okay.  Did you do anything to try to figure
19 that out, if there were any?
20      A.  If -- if there -- if the employees produced
21 any, or if they actually --
22      Q.  Let's -- let's -- let's do a big one so you
23 can give me the whole answer.
24      A.  Sure.
25      Q.  Which is, did you do anything to verify, one,

---

64

1 whether any such text messages currently exist and are
2 available to you, two, whether they ever existed, and
3 three, if anything was ever done to preserve them?
4      A.  I think that when the lawsuit happened and
5 when we got notice that we needed to preserve these
6 things, we asked the employees to go through their cell
7 phones to find any information.  And if there was, they
8 were -- they were given to us and then we were -- we
9 gave them to our attorneys.
10      Q.  Why do you think that?  Why do you think the
11 employees were told that?  Who told you that?
12      A.  I don't want to say anything that's
13 privileged because I had a number of conversations with
14 counsel.
15      Q.  Okay.  I mean, let's do it this way.  We know
16 it's not a document because you don't have a litigation
17 hold.  You don't know when that happened?
18      A.  No.  I don't -- I don't think it's a
19 document, no.
20      Q.  Okay.  And so we know, I mean, at least
21 I know you didn't talk to Tim Fruge; right?
22      A.  No, I didn't.
23      Q.  All right.  So where does this information
24 come from, the idea that -- that, yeah, I mean --
25 I mean, if you're just going to have to say counsel,

---

65

1 you can say counsel, I guess.
2      A.  I think it came from counsel.
3      Q.  Okay.
4      A.  So I don't want to talk about my
5 conversations with counsel.
6      Q.  And you've never talked to any employees
7 about any other text messages?
8      A.  No.  I don't want -- I don't think that
9 that's accurate.  So I -- when I spoke to Rob Dew, I
10 had a long conversation with Rob -- Rob Dew.  He and I
11 talked about him looking through his phone and things
12 like that.  So I don't think that it's accurate that
13 the employees didn't talk to me about it.
14      Q.  Okay.  In terms of what was done to preserve
15 cell phone records, text messages, or who produced
16 them or what may exist, you don't know that?
17      A.  I think in terms of what was done, the
18 employees were asked to review their phones.
19      Q.  And again, you have no personal knowledge of
20 that and no information from any employee that says
21 that that happened; right?
22      A.  That's not accurate.
23      Q.  Okay.  Which employee told you that there
24 were directions made to search their phone?
25      A.  As I previously indicated, I think I spoke to

---

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 52 of 211

Paz, Brittany                                                    02-14-2022

66

1 Rob Dew about it and I think Rob Dew indicated he
2 searched his phone.
3     Q.  I get that you testified that Rob Dew said he
4 searched his phone.
5     A.  Yeah.
6     Q.  I'm asking you about conversations about the
7 company's instructions to employees about their phone.
8     A.  Oh, I don't know.
9     Q.  Did Rob Dew tell you anything about that?
10    A.  Oh, I don't know.
11    Q.  Okay.  Have we talked about all the
12 applications and messaging systems that InfoWars
13 employees have messaged each other on in terms of
14 preserving documents?
15    A.  Did we talk about Yahoo! Messenger?
16    Q.  Yes, you briefly talked about that.
17    A.  Okay.  Slack.  I think that's it.
18    Q.  Okay.  Now, Mr. Jones' text messages, when
19 were those preserved?
20    A.  I don't know.
21    Q.  When were they searched?
22    A.  I don't know.
23    Q.  You know about Ms. Williamson's -- the New
24 York Times reporter's texts to Mr. Jones that she sent
25 to us, do you know anything about that?

67

1     A.  No.
2     Q.  Okay.  One of the things you didn't review
3 for this deposition is any of the briefing on
4 plaintiffs' sanctions; correct?
5     A.  I did not, no.
6     Q.  Okay.  So you don't know --
7     A.  There was a lot of documents on those.
8     Q.  You don't know any of the issues that
9 plaintiffs raised in terms of why previous depositions
10 have been adequate in this case?
11    A.  I know that there was an issue -- there were
12 issues related specifically to Ms. Karpova's deposition
13 and Mr. Dew's deposition, which was part of the reason
14 why I was retained.  But aside from that, no.
15    Q.  Okay.  Like, in terms of specifically what
16 was wrong with those depositions, you're not really up
17 to speed on what we said about that; right?
18    A.  I know that there were issues related to the
19 inability of Mr. Dew or Mr. -- Ms. Karpova, excuse me,
20 to testify intelligently as to the material and the
21 videos and the sourcing done for those videos, because
22 nobody had rewatched those videos.
23        So I made sure to undertake an effort to do
24 that.  But as I indicated previously, I don't know that
25 it's really possible for a person to review every

68

1 single piece of paper in two weeks' time, so --
2     Q.  I agree.
3     A.  -- so to that -- to that end, I think that I
4 tried to hone in on the things that were most
5 important.  So I did try to address some of the things
6 that were wrong with the last two depositions that were
7 done.
8     Q.  All right.  One of the things that went wrong
9 with the last two depositions were done was testimony
10 about the preservation of documents.  And one of those
11 had to do with Mr. Jones' text messages.
12    A.  Uh-huh.
13    Q.  Which you don't know when they were preserved
14 or when they were searched?
15    A.  I'm sorry, I don't.
16    Q.  Okay.  And, for instance, one of the things
17 that was -- let me ask you this way.  Do you believe
18 Mr. Jones has produced all of his text messages
19 relating to Sandy Hook that he had in his possession
20 after the anticipation of litigation?
21    A.  And here's the problem, that is that I don't
22 know what he has on his phone because I don't know what
23 he -- what, if anything, would have been on the phone
24 at that time period.  And the reason -- only reason why
25 I say that is I know that he's gotten new phones, so he

69

1 doesn't have access to anything that's on prior phones.
2        And then -- or he wouldn't have anything
3 that's for prior phones.  I'm sure that if he -- well,
4 actually, I don't want to say that because I'm not
5 sure.  But in any event, like I said, I don't know when
6 he would have gotten a new phone such that he would
7 have access to those messages anymore.
8     Q.  You read Mr. Jones' November 2019
9 deposition?
10    A.  I read the March 2019 deposition.  I don't
11 think I got to the November one.
12    Q.  Okay.  Because, see, Mr. Jones testified
13 something totally opposite what you just said --
14    A.  Okay.
15    Q.  -- which is that he got new phones, but they
16 have the same SIM card and offer Cloud storage and he
17 doesn't lose text messages.
18    A.  Okay.
19    Q.  Do you have any reason to dispute that?
20    A.  No.
21    Q.  Okay.  And so are you aware that I possess a
22 text message that was sent to me from 2019 that says
23 Sandy Hook in it and discusses Sandy Hook sent by a New
24 York Times reporter.  Do you know I have that message?
25    A.  No, I don't.

Paz, Brittany                                                    02-14-2022

70

1    Q.  Okay.
2    A.  I haven't reviewed any text messages.
3    Q.  Okay.  So in terms of why I have that message
4  and why Mr. Jones didn't produce it or why it wasn't
5  preserved, you don't know the answer to that question?
6    A.  I don't.
7    Q.  Okay.  Can you summarize for me what the
8  company knows about Neil Heslin?
9    A.  Could you be more specific?
10    Q.  No, not now.  Can you summarize what the
11  company does know?  I mean, I -- let me put it this
12  way.  Neil -- company has no relationship with Neil
13  Heslin; right?
14    A.  Correct.
15    Q.  Nobody at the company has ever met Neil
16  Heslin?
17    A.  I don't believe so.
18    Q.  Doesn't -- doesn't transact any business with
19  Neil Heslin?
20    A.  No.
21    Q.  Shouldn't have a ton of information about
22  Neil Heslin; right?
23    A.  I don't know that that's accurate.  I'm sure
24  that in relationship to the litigation, certain
25  documents may have been produced.

71

1    Q.  I haven't produced anything.
2    A.  No, by the company.  The company may have
3  produced documents or my attorneys may have produced
4  documents.  I don't know.
5    Q.  That's what -- okay.  You don't know what the
6  company may have or may not have produced about Neil
7  Heslin?
8    A.  Before or after the litigation?
9    Q.  Both.
10    A.  So before the litigation, I don't think that
11  the company had many -- much, or if at all, information
12  about Neil Heslin.
13    Q.  Okay.  What about after?
14    A.  After, I'm aware that there was some
15  information about some legal issues that he may or may
16  not have had in Connecticut.
17    Q.  You mean after the lawsuit was filed,
18  somebody went and found out about that?
19    A.  I -- I believe so.
20    Q.  Okay.  Prior to this lawsuit --
21    A.  Uh-huh.
22    Q.  -- in terms of its Sandy Hook coverage, has
23  the company ever done any research on Neil Heslin?
24    A.  I don't believe so.
25    Q.  Again, one of the things I want to make sure

72

1  that you haven't reviewed is the plaintiff submitted --
2  wait.  Hold on.  Back up.  Yeah.  Okay.  One of the
3  things you haven't reviewed is the plaintiff has
4  submitted various exhibits in support of his sanctions
5  for Ms. Karpova's deposition.  Did you know that?
6    A.  I didn't review that --
7    Q.  Okay.
8    A.  -- sanctions motion.
9    Q.  Okay.
10        MR. BANKSTON:  Do you have exhibit
11  stickers?  Okay.  Can you mark this as 1 and give it to
12  the witness.
13        THE COURT REPORTER:  Can you give me a
14  moment to grab them.
15        MR. BANKSTON:  Absolutely.  Not a
16  problem at all.
17    A.  Thanks.
18    Q.  (BY MR. BANKSTON)  All right.  Ms. Paz, I
19  have handed you what's been marked as Exhibit 1.  Do
20  you see this e-mail here from David Knight?
21        (Exhibit No. 1 marked.)
22    A.  Yes.
23    Q.  (BY MR. BANKSTON)  You understand who David
24  Knight is?
25    A.  I believe that he was a former host.

73

1    Q.  Okay.  Do you know why the night of June
2  19th, 2017 might be important in this case?
3    A.  No.
4    Q.  Okay.  That's the night that Mr. Heslin
5  appeared on Megyn Kelly's show.  Do you understand what
6  that --
7    A.  Okay.
8    Q.  -- appearance was?
9    A.  Yes.
10    Q.  Okay.  So that's the night -- as the night
11  that Mr. Heslin appeared on Megyn Kelly's show,
12  Mr. Knight is e-mailing himself articles on
13  Mr. Heslin's past, isn't he?
14    A.  That's what this document is.
15    Q.  Okay.  Let me show you --
16        MR. BANKSTON:  Can you mark that as 2?
17  Or I got it.  Gave me some stickers.
18    Q.  (BY MR. BANKSTON)  I mark that as Exhibit 2.
19  That's also from the same day; right?
20        (Exhibit No. 2 marked.)
21    A.  It's from the next day.
22    Q.  (BY MR. BANKSTON)  Is that -- is that the
23  20th?
24    A.  It's the 9th.  One is the 18th and --
25    Q.  One is the 9th?

Paz, Brittany                                                    02-14-2022

74

1      A.   -- one is the 20th.
2      Q.   Okay.
3      A.   19th, sorry.
4      Q.   19th.  Okay.  And so this one is titled,
5  Connecticut Carry releases the troubled past of Neil
6  Heslin; right?
7      A.   It's a link to an article that -- or I'm
8  assuming is an article.  But that's what it says.
9      Q.   Well, I was actually talking about the
10  subject line of the e-mail.  That's what it's titled;
11  right?
12      A.   Yes, I think that's the name of the story and
13  the link that's in the body.
14      Q.   Probably the -- probably the headline of that
15  story; right?
16      A.   Yes.
17      Q.   Okay.
18      A.   That's what it looks like.
19      Q.   So here we have Mr. Knight.  Also, on the
20  other e-mail that you're looking at, do you see a
21  different e-mail address, seekthetruth?
22      A.   Are you talking about Exhibit 1?
23      Q.   Yes.
24      A.   Yes.
25      Q.   Okay.  And that's also another InfoWars

75

1  employee; right?
2      A.   You know what, I'm not sure.
3      Q.   Okay.  Do you know who Darrin McBreen is?
4      A.   Yes.
5      Q.   Okay.  So what we have here is contrary to
6  what you had believed prior to this lawsuit, the
7  company had indeed been conducting research on Neil
8  Heslin?
9      A.   I don't think that that's an accurate
10  statement.  I think that as you represented, this is
11  the day that he went on Megyn Kelly.
12      Q.   Uh-huh.
13      A.   So it would have been in -- in addressing
14  that interview, which I believe that interview was
15  directly -- directed at the company.  Well, Mr. Jones,
16  maybe, individually.  But generally at the company.
17      So I don't know that the -- the right way to
18  describe what you see here is we were conducting
19  research on an individual for no reason.
20      Q.   Oh, I'm not saying for no reason.
21      A.   Okay.
22      Q.   I a hundred percent know the reason.
23      A.   Okay.
24      Q.   Mr. Heslin got on Megyn Kelly's show and said
25  some bad things about InfoWars.  Said that InfoWars was

76

1  saying things that he wished they stop -- would stop
2  saying.  And then as the next thing that happens from
3  Mr. Knight's point of view is he goes up and digs up
4  dirt on Mr. Heslin; right?  And that's what's happening
5  here; right?
6      A.   I don't know that he dug it up.  I think he
7  sent himself an article.
8      Q.   You have no idea how he got it, do you?
9      A.   It says he sent it to himself.
10      Q.   Right.  But where did he get the article?
11  I mean, he put the -- I know that he put a link in an
12  e-mail to himself and sent it to him.  We don't know
13  how he got that link, do we?
14      A.   I don't know how he got this link, no.
15      Q.   You haven't talken to Mr. Knight, have you?
16      A.   I have not spoken and he's not a current
17  employee.
18      Q.   And you didn't even try, did you?
19      A.   I didn't try to talk to him, no.
20      Q.   Okay.  And so this, interestingly enough, I
21  asked Ms. Karpova this.  And you read her deposition;
22  right?
23      A.   Yes.
24      Q.   Okay.  I asked her the same question, has the
25  company ever done any research on Neil Heslin.  She

77

1  told me the same thing, no, it's never done any
2  research on Neil Heslin.  And I told her,
3  unfortunately, yes, it has.
4      When -- when I -- when you read that, did you
5  go try to find out if the company had ever done any
6  research on Neil Heslin?
7      A.   I wouldn't consider this doing research on
8  Neil Heslin.
9      Q.   Okay.  Well, that's where we disagree.  But
10  in terms of -- did you go to try to find out if the
11  company had ever tried to get any information or had
12  been exchanging with itself any information about Neil
13  Heslin?
14      A.   Aside from speaking to the individuals I've
15  already said I spoke to and doing the searches on the
16  Dropbox for the production, no.
17      Q.   Well, I mean, that's a good point; right?  If
18  you searched every document with Neil Heslin's name in
19  it, these documents would have come up; right?
20      A.   I think I did see these.
21      Q.   Okay.  Tell me all the sources of information
22  for InfoWars' knowledge about Neil Heslin.
23      A.   I'm sorry, can you be more specific?
24      Q.   I can't, no.  No.  The company had got
25  information about Neil Heslin, some of it which it put

Paz, Brittany                                                02-14-2022

78

1  out into the world on its videos.  And I asked you to
2  get prepared on the company's knowledge of the
3  plaintiff.
4      A.  Well --
5      Q.  I want to know all the sources of information
6  about knowledge of Neil Heslin.
7      A.  Some of the documents that were returned in
8  my search were things that other people send to us.
9      Q.  Uh-huh.
10     A.  So, like, I'm sure you know that many of the
11  e-mails are thousands and thousands of e-mails from the
12  general public.  Some of them send information to
13  InfoWars to general InfoWars mailboxes that may or may
14  not be monitored.  I can't say whether that is in the
15  company's knowledge, because like I said, nobody was
16  really reviewing those with any regularity.
17          I see what you're saying that these obviously
18  were in David Knight's purview because he sent them to
19  himself.  But aside from those, I didn't -- I don't
20  think that I saw anything else.  I did see -- like I
21  said, there were some -- he had some legal issues in
22  Connecticut.
23     Q.  Okay.  Here's what I'm not understanding, is
24  InfoWars has made multiple videos about Neil Heslin;
25  right?  I mean, they're being sued for two of them;

79

1  right?
2      A.  When you say multiple, I don't -- I don't
3  know --
4      Q.  I didn't --
5      A.  -- how many you're referring to.  But I don't
6  know how -- I don't think that there are a lot of
7  videos specifically naming Neil Heslin.
8      Q.  Okay.  Well, let's just go with two.
9      A.  Sure.
10     Q.  All right?  Let's talk about the two that
11  they're being sued for.
12     A.  Yes.
13     Q.  You know those two videos exist?
14     A.  I do.
15     Q.  You know there are sources of information
16  about Neil Heslin in those videos?
17     A.  Yes.
18     Q.  Where did it come from?
19     A.  You mean where were they sourced from?
20     Q.  Yeah.  I want to know every piece of
21  information about Neil Heslin that the company put on
22  air.  Where did it come from?
23     A.  I know that Owen Shroyer's video was
24  specifically sourced from that article.  I believe it
25  was from Zero Hedge.  So that was a source of that

80

1  particular video.  And I think that that source came
2  from iBankCoin, if I'm not mistaken.  Then the Megyn
3  Kelly interview.
4      Q.  Okay.
5      A.  I think I already said I was aware of his
6  legal issues in Connecticut, but that may have been
7  sourced from these articles.  I'm not really sure what
8  the original source was for those, like, his legal
9  troubles in Connecticut.
10     Q.  Okay.
11     A.  And as far as documents I reviewed, I think
12  that's probably it.
13     Q.  What about Mr. Fetzer?
14     A.  Mr. Fetzer's book, you mean?
15     Q.  Not necessarily.
16     A.  Mr. Fetzer --
17     Q.  Anything from Mr. Fetzer about Mr. Heslin.
18     A.  I don't think that Mr. Fetzer was very
19  involved with the company or with individuals inside
20  the company.  And the reason why I say that is because
21  based on my conversations with Mr. Jones and
22  Mr. Watson, Mr. Fetzer was not really on friendly terms
23  with Mr. Jones.
24     Q.  Okay.
25     A.  And Mr. Jones' position is he really didn't

81

1  use Fetzer as a source.  So Mr. Jones' position is also
2  he didn't think he read the book that Mr. Fetzer has
3  produced.
4      Q.  Here's --
5      A.  So whether or not it's in the company's
6  materials, it may be in the materials.  But I don't
7  know that it was ever reviewed by anybody.  I don't
8  know that it was ever in the company's purview in any
9  way.
10     Q.  You watched Owen Shroyer's video, right,
11  about Neil Heslin?
12     A.  Yes.
13     Q.  That video quotes Mr. Fetzer.  For the
14  sources in the claim, it quotes him; right?
15     A.  You mean in the video regarding the Megyn
16  Kelly interview?
17     Q.  Whether Mr. Heslin held his son or not.
18  Right.  That all comes from Mr. Fetzer.  It's quoted in
19  the video.  Do you not know that?
20     A.  No.  The source of that video is the Zero
21  Hedge article that I just referenced.
22     Q.  Actually --
23     A.  And so that may have been quoted from the
24  Zero -- Zero Hedge may have used that as a source.  But
25  I'm not aware of Owen using that as a source.

Paz, Brittany                                                    02-14-2022

82

1    Q.  It's -- it's shown on, like, right -- that's
2  the thing that's shown is, Mr. Fetzer says, blah, blah,
3  blah.
4    A.  Right.  But I think that the source that Owen
5  got it from was Zero Hedge.  Not from -- directly from
6  Mr. Fetzer.  Do you see what I'm saying?
7    Q.  Sure.  I mean, we could just keep cycling --
8  it could be iBankCoin gives it to Zero Hedge, give it
9  to somebody, give it to somebody, give it to somebody.
10   A.  Right.
11   Q.  And then when you put the article in, it's
12  Mr. Fetzer says X, Y, and Z.
13   A.  Right.
14   Q.  Mr. Fetzer's being quoted in that video;
15  right?
16   A.  I think the only reason why he was quoted is
17  because it was quoted in the original article.  That
18  was the source that Owen used.  So I don't think
19  that -- if you're asking me whether Owen went to
20  Mr. Fetzer as a source or went and read his -- his book
21  or went and read any independent research into
22  Mr. Fetzer's information that he -- that he had
23  available to him, I don't think that that is what
24  happened.
25       I think what happened was, as is typical in

83

1  the company, is that he woke up that morning, there
2  were source of a bunch of material that was produced to
3  him that morning.  That morning, that Zero Hedge
4  article was produced and that was the entirety of the
5  source material that he used to produce that video.
6    Q.  Right.  So he gets the Zero Hedge article.
7    A.  Yes.
8    Q.  Somebody said, hey, you should look at this.
9  He looks at this and he sees, Mr. Fetzer says blah,
10  blah, blah.
11   A.  Uh-huh.
12   Q.  And he says, I'm going to put this on the
13  air; right?
14   A.  The source in the Zero Hedge article?
15   Q.  Right.
16   A.  Whatever the source that Zero Hedge had
17  produced?
18   Q.  Right.  Because Zero Hedge is not a -- that's
19  not a person; right?
20   A.  No.
21   Q.  That's a completely anonymous blog; right?
22   A.  I don't think it's a blog.
23   Q.  All right.  I don't -- I don't know what else
24  it would be.  What else would it be?
25   A.  I think that the point of Zero Hedge is that

84

1  it accumulates articles from all kinds of different
2  sources.  So it's -- it's an accumulator.
3    Q.  All right.  So who wrote the article on Zero
4  Hedge?  Where does it come from?
5    A.  That article --
6    Q.  Uh-huh.
7    A.  -- I believe, was originally sourced from
8  iBankCoin.
9    Q.  Well, the article is written by Zero Point
10  Now.  Do you know what that is?
11   A.  No.
12   Q.  Okay.  Does the company contend that
13  Mr. Heslin is a gun regulation advocate?
14   A.  At what point in time?
15   Q.  Any time.
16   A.  I'm -- I'm not really sure how to answer
17  that.
18   Q.  Okay.  Okay.  So the company does not know if
19  Mr. Heslin is a gun control advocate, gun regulation --
20   A.  I'm not sure as I sit here today, no.
21   Q.  Okay.  So if that is knowledge the company
22  has about the plaintiff, you wouldn't be prepared to
23  speak about it today?
24   A.  Right.
25   Q.  Okay.  Got you.  Are there any people from

85

1  whom the company received information about Scarlett
2  Lewis?
3    A.  I'm sorry, can you repeat that?
4    Q.  Yeah.  Are there any people from whom the
5  company received information about Scarlett Lewis?
6    A.  I don't know.  Do you have a document that
7  you could show me?
8    Q.  I -- no.  I -- I -- I mean, part of it is
9  because I want to know what I haven't been shown.
10  Because this -- this company has not at all cooperated
11  in good faith in discovery.  So part of the reason I
12  have you here is for you to tell me.  So has -- is
13  there anybody the company's gotten information about
14  Scarlett Lewis?
15   A.  I don't know.  If you could show me a
16  document, that would be helpful.
17   Q.  Well --
18   A.  But as far as my communications with people
19  in the company and what I've done, my due diligence to
20  testify here today, nobody has -- is aware of any aside
21  from what's been produced.
22   Q.  Well, what do you mean, aside from what's
23  been produced?
24   A.  If there's --
25   Q.  What has been produced?

Paz, Brittany                                                    02-14-2022

86

1    A.  If there's anything that's been produced.  I
2 don't think that there's anything regarding Ms. Lewis.
3    Q.  Okay.
4    A.  I have not -- I don't think I've seen
5 anything.
6    Q.  Let me -- let's go back.  Part of your job
7 today was to get prepared on the company's knowledge of
8 the plaintiff.
9    A.  Right.
10    Q.  Do you feel like you've done that for
11 Scarlett Lewis?
12    A.  I feel like I have asked the employees what,
13 if anything, they had for the plaintiffs.  And their
14 response to me was that they didn't have anything.
15    Q.  Okay.  Have you read every document with
16 Scarlett's name on it?
17    A.  I did a search --
18    Q.  Okay.
19    A.  -- in the Dropbox material that we have.
20    Q.  That's not what I'm asking, though.  Did you
21 read every document with Scarlett Lewis' name on it?
22    A.  I don't know that I've read every single
23 document.
24    Q.  Okay.  So you'll -- you'll concede to me
25 sitting here today, there are -- there are -- there are

87

1 possibly documents in this case that have even been
2 produced that have Scarlett's name on them that you may
3 have not read, that's what you're telling me?
4    A.  Perhaps.
5    Q.  Okay.  So in other words, when you did a
6 search of documents for Scarlett Lewis, were you
7 searching the entire production?  Did you have a
8 capability to search the entire production?
9    A.  I have a capability of searching the
10 production on our Dropbox.  I -- I can -- I understand
11 that there have been some issues regarding the various
12 attorneys and what's been produced where.  But it's my
13 understanding that from the company's perspective,
14 we've not ever used Ms. Lewis' name on the air.
15    Q.  Oh, I don't doubt that, no.
16    A.  So we don't have -- when I asked people what,
17 if anything, they have -- have or produced on
18 Ms. Lewis, and if they told me that they don't have
19 anything, that makes sense to me because I don't think
20 they've ever used her name.
21    Q.  Wouldn't it not make sense to you, though,
22 after you read Ms. Karpova's deposition and you saw
23 e-mails from Wolfgang Halbig directly harassing
24 Ms. Lewis?  Wouldn't--
25    A.  I think --

88

1    Q.  Wouldn't you think then, oh, maybe there are
2 documents with Ms. Lewis' name on them?
3    A.  I mean, there may very well be missed
4 documents, but that doesn't mean that it was in the
5 company's knowledge.  Many of those documents, after a
6 certain point, were not being opened.
7    Q.  Okay.  So from your standpoint, because you
8 don't know whether certain documents were opened or
9 not, you just ignored them?
10    A.  No, that's not correct.
11    Q.  Okay.  So you knew the -- the company
12 possessed documents with Scarlett Lewis' name on them;
13 right?  You knew that?
14    A.  Sure, there's some e-mails.  But I don't know
15 whether they were ever in the company's knowledge as
16 far as information that was provided by an outside
17 source.  Mr. Halbig -- I know Mr. Halbig has sent a
18 variety of e-mails and copied numerous, numerous
19 people.
20        They read like spam.  And when I talk to
21 various employees, their position is at a certain
22 point, they stopped opening his e-mails.
23    Q.  Wonderful.  When you say it's -- you're not
24 sure if the documents we talked about in Ms. Karpova's
25 deposition are in the company's knowledge, they're in

89

1 the company's knowledge now, aren't they?
2    A.  Now, they are, yeah.
3    Q.  Right.  Okay.  So when I served you a notice
4 of deposition for the company's knowledge of the
5 plaintiffs, did you see a time limitation on that?
6    A.  No.  I've reviewed a lot of e-mails.
7    Q.  Okay.
8    A.  I've seen some of the e-mails you're
9 referring to.  You mean the, like, the e-mails from
10 Halbig to Ms. Lewis, Halbig to various other victims in
11 the Sandy Hook --
12    Q.  Right.
13    A.  -- massacre?  I've seen those e-mails.
14    Q.  That's -- okay.  So going forward in this
15 deposition, when I ask you stuff like, can you tell me
16 the people who have provided information that now
17 consist of the knowledge that the company has about
18 this individual like Ms. Lewis --
19    A.  Uh-huh.
20    Q.  -- I -- I want you to tell me about documents
21 like that that you know about instead of telling me
22 that there aren't any documents.  All right?  What I
23 want to know is other than Mr. Halbig, then, because
24 you've seen that one now?
25    A.  Uh-huh.

Paz, Brittany                                    02-14-2022

90

1    Q.   Where has the company gotten information
2  about Scarlett Lewis?
3    A.   As far as what's been -- what -- I guess I --
4  I don't understand the question.  So when you say where
5  we have gotten information from Scarlett Lewis, you
6  mean is this information that we have sourced on her?
7  Like, we've gone out into the world to try to find, or
8  this is just information that people are giving us at
9  any point in time?
10   Q.   Let's -- let's talk about what knowledge
11 means just for a minute.  Because I want to make sure
12 you understand what this topic means.  When this is the
13 -- the company's knowledge about the plaintiffs, you
14 would agree with me that there's various ways that a
15 company can acquire knowledge about an individual?
16   A.   Sure.
17   Q.   They can go get that knowledge and go out
18 and, like, go to the library and start looking stuff
19 up; right?
20   A.   Sure.
21   Q.   Somebody can send in an e-mail?
22   A.   Sure.
23   Q.   Somebody can watch a video?
24   A.   You mean if I went out and I -- and I saw a
25 video and then I brought -- and I was, like, okay.

91

1  Here's a video of Ms. Lewis --
2    Q.   Sure.
3    A.   -- here's a video of Ms. Heslin?  Sure.
4    Q.   Yeah.  The company -- somebody outside the
5  company could have a phone call with the company and
6  tell them something about Ms. Lewis?
7    A.   Sure.
8    Q.   Tons of different ways we can get information
9  about Ms. Lewis.
10   A.   Sure.
11   Q.   I want to know about all of them.
12   A.   Okay.
13   Q.   So when I say, where did the company get any
14 information that it currently possesses about Ms. Lewis
15 and any knowledge that it has about Ms. Lewis, I want
16 to know everybody.  Where did it get that information?
17   A.   Aside from what we see in the e-mails, I
18 think that the company only has information that has
19 been provided to them through outside sources.  But
20 like I said, I don't know that anybody really paid any
21 attention to it.
22   Q.   Okay.  Outside what we see in the e-mails,
23 what do we see in the e-mails?
24   A.   The e-mails that we were talking about
25 earlier about Mr. Halbig sending her e-mails.  Aside

92

1  from that, I don't think the company did any research
2  into Ms. Lewis.
3    Q.   I'm not asking if they did research.  We just
4  talked about that.
5    A.   Uh-huh.
6    Q.   We literally just talked about that.  I'm
7  asking, any other individuals other than Mr. Halbig has
8  ever given the company any information?
9    A.   I don't know how to answer that, sir.  Random
10 people could have sent the e-mails into the e-mail
11 server.
12   Q.   Absolutely, they could have.
13   A.   Random people from all over the world could
14 have done that.
15   Q.   They absolutely could have.
16   A.   And I don't know the -- I don't know how to
17 answer that.
18   Q.   But the company does?
19   A.   I can't manage -- I -- the company cannot
20 name every -- a name, specific names of the people who
21 have sent e-mails.
22   Q.   Why not?  Why can't it do that?
23   A.   Why can't I here tell you of random names of
24 people that may have sent e-mails?
25   Q.   Sure.  You could have written them down,

93

1  couldn't you?  It's not -- it's not physically
2  impossible at all, is it?
3    A.   I did not do that.
4    Q.   Okay.  You see what I've marked as Exhibit 3?
5       (Exhibit No. 3 marked.)
6    A.   Yes.
7    Q.   (BY MR. BANKSTON)  You see it has FSSTX04 --
8  I'm sorry.  043896?
9    A.   Yes.
10   Q.   Okay.  That's a company that's been produced
11 out of the company's corporate files?
12   A.   It appears to be.
13   Q.   Why does the company have this?  What is
14 this?
15   A.   I don't know.
16   Q.   Okay.  This is -- do you know who this is
17 pictures of?
18   A.   No.
19   Q.   Okay.  That's -- that's Scarlett Lewis.  Do
20 you recognize where this top picture was taken?  Do you
21 understand what this picture is?
22   A.   You mean the top right-hand corner?
23   Q.   I'm sorry, no.  In the top left.
24   A.   The top left-hand corner?
25   Q.   Uh-huh.  Do you know where that's taken?

Paz, Brittany                                                    02-14-2022

94

1    A.   No, sir.
2    Q.   Okay.
3    A.   I don't know how the company came into
4  possession of this.
5    Q.   Do you know about the -- about Scarlett Lewis
6  and the coffee?  Do you understand what I mean when
7  I talk about Scarlett Lewis and the coffee?
8    A.   I believe that I read somewhere that there
9  was something about Ms. Lewis or someone connected to
10 Ms. Lewis going to get coffee for some people that were
11 on scene of the shooting that day.
12   Q.   All right.  So that's some knowledge that
13 somebody gave the company about Ms. Lewis; right?  Or
14 at least that it thinks that it has about Ms. Lewis;
15 right?
16   A.   I think that that was in the news cycle
17 around that time.  So --
18   Q.   Okay.
19   A.   -- I think that that's what the source of
20 that information was.
21   Q.   Maybe it could be the e-mail where Wolfgang
22 Halbig was harassing Ms. Lewis.  Could it maybe be
23 that?
24   A.   Like I said, I don't know that anybody had
25 ever read that e-mail.

95

1    Q.   Did you check?
2    A.   Did I check about that specific e-mail?
3    Q.   Uh-huh.
4    A.   No.
5    Q.   Okay.
6    A.   Generally --
7    Q.   So in terms of whether the company was aware
8  that Wolfgang Halbig was harassing Ms. Lewis, you don't
9  know?
10   A.   As far as a time period, I know that after --
11 I'm sorry.  So let me just go back.  When I spoke to
12 Nico about Mr. Halbig and his communications with
13 Mr. Halbig, getting him on the show and things like
14 that, pretty much, he -- his point of view that he
15 stopped looking at Mr. Halbig's e-mails after he
16 stopped coming on the show.
17        So -- and then Rob Dew was reading the
18 generalized e-mail boxes for a period of time and then
19 stopped because it was taking up too much time.  So I
20 can't say after the time period he stopped appearing on
21 the show, whether anybody was reading his e-mails
22 anymore.
23   Q.   Do you -- and you can't say when he was
24 harassing Ms. Lewis, can you?
25   A.   I don't know that, no.

96

1    Q.   Okay.  So it very well could have been --
2  happened before he got on the show?
3    A.   I don't know.
4    Q.   Or during the time he was on the show?
5    A.   He was on the show for a pretty discrete
6  period of time.
7    Q.   What time do you think that is?
8    A.   He came into the company's purview in early
9  2014 and then he appeared on the show through mid to
10 late 2015.  And then he hadn't been on the show.
11   Q.   Okay.  And then the information that
12 Mr. Halbig gave the company, you understand that
13 Mr. Halbig gave the company various claims about Sandy
14 Hook that he said were true?
15   A.   You mean his 16 points?
16   Q.   A lot more than that, but sure.
17   A.   He keeps -- he adds to them periodically.
18 But if that's what you're referring to, yes, I'm aware
19 of them.
20   Q.   Okay.  And the company kept broadcasting that
21 well into 2017?
22   A.   I don't know that I would agree with the --
23 with broadcasting.  Can --
24   Q.   We'll talk about that later.
25   A.   Sure.

97

1    Q.   Okay.  Let's -- let's put a pin in what
2  InfoWars may have been doing in videos in 2017.  We'll
3  come back that.
4    A.   Sure.
5    Q.   Do you -- does the company contend Ms. Lewis
6  is a gun regulation advocate?
7    A.   I think Ms. Lewis operates a nonprofit
8  organization.  I believe I did read some material in
9  the disclosure in the discovery materials that she
10 operates a nonprofit for school safety.
11   Q.   Does it have anything to do with guns?
12   A.   I guess that depends on what guns -- what
13 school safety means.
14   Q.   And you don't know, do you?  You don't know
15 what the Jesse Lewis Choose Love Movement does or
16 advocates, do you?
17   A.   I don't know what she says it advocates for,
18 but I know that there are different interpretations as
19 to what school safety means.
20   Q.   Okay.  I just to want put this really clear,
21 because --
22   A.   Sure.
23   Q.   -- you seem to -- you seem to be trying to
24 insinuate that there's a potential interpretation of
25 Ms. Lewis' charity that it is gun regulation related in

Paz, Brittany                                              02-14-2022

98

1  some way.  Is that accurate?
2      A.  I don't know.  But what I'm saying is she
3  operates a nonprofit.  That nonprofit has a goal and a
4  stated directive.  And however anyone wants to
5  interpret that is a matter of opinion.  But she
6  operates a nonprofit charity.
7      Q.  I -- I get that.  Does the company contend
8  she's a gun regulation advocate?
9      A.  I guess that depends on someone's definition
10  of what school safety means.
11      Q.  That's why I'm asking what the company
12  contends.  Does the company contend that she is a gun
13  --
14      A.  She could be, depending on someone's opinion.
15      Q.  I'm not asking someone's opinion.  I'm asking
16  the company's opinion.  Does the company contend she's
17  a gun regulation advocate?
18      A.  She could be.
19      Q.  I'm not asking if she could or might be, who
20  knows, whatever, I don't want -- I want, does the
21  company contend that she is?
22      A.  In the opinion of individual people that work
23  for the company, she could be.  That's my response.
24      Q.  So they -- it does -- they don't know, is
25  what you're saying?

99

1      A.  That's not what I'm saying.
2      Q.  Well, could does not imply knowledge.
3      A.  What I'm saying is, is that there are
4  different people there that work there that have their
5  own individual opinions.  And the company -- the
6  company isn't a person; right?  So --
7      Q.  It needs to have opinions, though.  And you
8  need to testify to it.
9      A.  That's a murky area.  And the reason why I
10  think that's a murky area is because these are
11  individuals.  They have their own specific opinions.
12  Everybody's opinions are different.  Like, so for
13  example, there are people within the company that are
14  way more into or have bigger or -- I don't want to say
15  bigger opinions, but have more opinions on Sandy Hook
16  than others; right?
17          So we could agree that one person employee at
18  the company may not be as interested as somebody else
19  in the company.
20      Q.  Okay.
21      A.  One person may want to cover a certain angle
22  of Sandy Hook that another person may not want to
23  cover.  That is within their discretion and their
24  opinions as writers and as hosts.
25      Q.  Sure.

100

1      A.  So, I mean, personally, am I sitting here
2  today saying that she's a gun control advocate?  No.
3  But what I'm saying is I think that the hosts and
4  writers at InfoWars in their opinion could interpret
5  that as being gun control advocacy.
6      Q.  Do they?
7      A.  Individually, as individual writers and
8  individual hosts?  I can't testify as to what they
9  think.
10      Q.  All right.  Let's just testify, then, to what
11  the company thinks.
12      A.  Sure.
13      Q.  Is she a gun control advocate?  Does -- does
14  the company contend that?  Before you answer that, you
15  understand I'm going to trial.  I need to discover what
16  the company is or is not going to argue about these
17  plaintiffs.  What knowledge it has, what its
18  contentions are.
19          I think it's fair, don't you think, that if
20  the company is going to contend Scarlett Lewis is a gun
21  advocate, I get to know that; right?
22      A.  I think it is a reasonable interpretation of
23  the nonprofit that she could be a gun control advocate.
24  And if a host or a writer wanted to argue that from
25  that angle, I think it's a reasonable interpretation of

101

1  that activity.
2      Q.  Of -- of the activity of her charity?
3      A.  Yes.
4      Q.  Teaching emotional intelligence to children
5  in schools?
6      A.  If that's what it does.
7      Q.  Okay.  So first of all, let's start here.
8  You have no idea what Ms. Scarlett Lewis' charity does;
9  right?
10      A.  I have not done any independent research on
11  her charity.
12      Q.  Okay.  So in terms of asking what the company
13  contends Ms. Scarlett Lewis does with her charity, in
14  terms of what its advocacy is, company has no
15  information; right?
16      A.  I know what she says it does.
17      Q.  Okay.  What does the company know that
18  Ms. Lewis says it does?
19      A.  What she says it does is advocate for --
20  advocate for safe space for children to express
21  themselves emotionally.
22      Q.  Okay.  How could that be gun control
23  advocacy?
24      A.  Like I said, it depends on the opinion of the
25  person.

Paz, Brittany                                          02-14-2022

---

**102**

1    Q.   And you were the one who said it could be.

2    A.   It could be.

3    Q.   So tell me -- tell me how.

4    A.   How -- how can school safety be construed as

5    gun control advocacy?

6    Q.   Teaching children emotional things.  How does

7    that --

8    A.   If that's in fact what it does, I don't know.

9    Q.   You're the one who just told me --

10   A.   No.

11   Q.   -- that you said that --

12   A.   What I --

13   Q.   -- that's what she did.

14   A.   What I told you, that is what she says her

15   company does.  I don't know whether that is an actual

16   statement of fact.

17   Q.   There might be something surreptitious that

18   Scarlett Lewis is actually after?  She might not be

19   telling the truth about what her charity -- that's the

20   point?

21   A.   I don't know.  I haven't done any research

22   into her company.

23   Q.   Right.  Okay.  Okay.  Got you.  Got you.

24   Now, I get it.  I'm sorry.  I was -- I was having

25   trouble because I was thinking that the company's

---

**103**

1    knowledge about what Ms. Lewis does, you were taking

2    Ms. Lewis at her word.  But because the company can't

3    verify that and has done nothing to verify that, you

4    can't say?

5    A.   That's right.

6    Q.   Got you.  All right.

7    A.   Is this a good time for --

8    Q.   Yeah, you can get a --

9    A.   Oh, you have water.  Oh, no.  I'm just -- I

10   would just like another water.

11          MS. BLOTT:  Can we take a --

12   Q.   (BY MR. BANKSTON)  Yeah, you need a -- well,

13   hold on.

14   A.   Yeah.  Can we take a -- potty break too,

15   because --

16   Q.   Yeah, because we got a good -- we -- this --

17   this will work.

18   A.   Is this a good break?

19   Q.   This is fine, yeah.  I had a few things I

20   wanted to ask you, but I'm not going to push them.

21          THE VIDEOGRAPHER:  10:38 off the

22   record.

23          (Recess from 10:38 a.m. to 10:50 a.m.)

24          THE VIDEOGRAPHER:  We are on the

25   record at 10:49.

---

**104**

1    Q.   (BY MR. BANKSTON)  Ms. Lewis' charity, the

2    Jesse Love -- excuse me.  Ms. Lewis' charity, the Jesse

3    Lewis Choose Love Movement, did you review any

4    documents about that organization?

5    A.   No.

6    Q.   Okay.  Well, let me -- okay.  When I talk

7    about H-O-N-R --

8    A.   Yes.

9    Q.   -- HONR.  You know what that is?

10   A.   Yes.

11   Q.   What does the company -- what does the

12   company believe that is?

13   A.   I believe that's a company that is run by

14   Mr. Pozner.  And the goal of that company is to take --

15   what it believes is misinformation off of the Internet.

16   Q.   Okay.  Let me just correct you going forward.

17   Just so you'll know going forward, it's Pozner.

18   Mr. Pozner.

19   A.   Okay.

20   Q.   Okay.  The company agrees that it has

21   publicized information about Mr. Pozner and HONR;

22   right?

23   A.   About Mr. Pozner individually, or --

24   Q.   Sure.  And HONR.  Both of them.

25   A.   I agree that the company has published

---

**105**

1    information about HONR and it may be Mr. Pozner in

2    connection with his relationship with HONR.

3    Q.   Well, it's published things from Mr. Pozner;

4    right?  Not HONR.  Like Mr. Pozner's e-mail address,

5    he's put that on air; right?

6    A.   As far as its connection to HONR, I believe

7    so, yes.

8    Q.   No, lenpozner@gmail.com.

9    A.   You mean his personal e-mail address?

10   Q.   Uh-huh.

11   A.   Perhaps, I'm not sure.

12   Q.   Well, you've watched that episode; right?

13   You know what I'm talking about?

14   A.   Yes.

15   Q.   Okay.  The company agrees its employees

16   researched business filings related to Mr. Pozner?

17   A.   Are you referring to a background check?

18   Q.   No.

19   A.   Okay.  I don't know that there was any

20   independent research done as far as the company.  I

21   know that there was a discussion about the P.O.box at

22   U-Haul that was associated with the company.  I don't

23   -- I don't remember seeing any records relating to the

24   filings of the company.

25   Q.   You've read all the articles that were

---

Paz, Brittany                                           02-14-2022

106

1  produced; right?  You taught me that?
2      A.  Yes, I've read -- I've read the articles.
3      Q.  So you've read the articles the company wrote
4  about Leonard Pozner?
5      A.  Yes.
6      Q.  Okay.  And in those -- in those -- there's
7  article that links to his business filing; right?
8      A.  Okay.  I don't remember.
9      Q.  You wouldn't dispute that, though?  You don't
10  know what I'm talking about?
11     A.  I don't remember.
12     Q.  Okay.  You understand what I mean when I talk
13  about Independent Media Solidarity?
14     A.  Yes.
15     Q.  Okay.  Can you describe to me what
16  Independent Media -- Independent Media Solidarity,
17  sometimes called IMS, can you describe to me what that
18  is?
19     A.  I'm aware that there was a documentary that
20  was produced by that company.  I don't know if I would
21  call them a company, but they're a loosely collected
22  group of individuals that produced a documentary about
23  Sandy Hook.  I believe that was sometime in early 2014.
24  And then that Rob Dew, I think, did a -- did a show
25  interviewing anonymously the people that were involved

107

1  in that production.
2      Q.  Okay.  That film, just for your reference,
3  that's We Need to Talk About Sandy Hook.
4      A.  Yes.
5      Q.  Okay.  And you've read the articles about
6  that film?
7      A.  Yes.
8      Q.  Okay.  You understand that that's the source
9  of the controversy between Mr. Pozner and -- and the
10  company in terms of YouTube strikes?
11     A.  Sure.
12     Q.  Okay.  You would agree with me that it
13  regards the sourcing of the videos in plaintiffs'
14  petition, IMS was a source for some of InfoWars' Sandy
15  Hook coverage?
16     A.  Which videos?
17     Q.  You tell me.  Any of them, were they a source
18  for any of them?
19     A.  No.  I think the only real source for the
20  video -- any of the videos was that -- that video that
21  Rob Dew did interviewing Independent Media Solidarity.
22     Q.  All right.  Well, you know the video we were
23  talking about with the PO box and the addresses?
24     A.  Sure.
25     Q.  Okay.  They're on that video too; right?

108

1      A.  Who, Independent Media Solidarity?
2      Q.  Uh-huh.  Yeah, guests.
3      A.  They were guests on that video?
4      Q.  Uh-huh.
5      A.  I don't recall, I'm sorry.
6      Q.  Giving out information about Mr. Pozner, you
7  don't remember that?
8      A.  That IMS did?
9      Q.  Uh-huh.
10     A.  I don't recall.
11     Q.  Okay.  So I take it you haven't tried to talk
12  to those people?
13     A.  No, I did not.
14     Q.  All right.
15     A.  Those people are not associated with the
16  company.
17     Q.  I get that.  I -- believe me, I understand
18  that.  What I'm saying is those people -- let's put it
19  this way.  If those people were quoted in the February
20  12th, 2015 video that's in plaintiffs' petition, if
21  that is the case that they are quoted in there and
22  talking there and provide information about Mr. Pozner,
23  whatever they had to say, you -- you don't know right
24  now; right?
25     A.  No, I don't know.

109

1      Q.  Okay.
2      A.  I mean, whatever they had to say, that was
3  their sourcing.  So we were just reporting on their
4  sourcing.
5      Q.  I get it.  Okay.  So in terms -- so if those
6  people are quoted and appeared and talked and gave
7  information about Mr. Pozner in the February 12th, 2015
8  video, one thing we can agree with is you haven't
9  spoken, then, to everybody who was quoted in that video
10  if they did appear; right?
11     A.  No, I didn't talk to the people quoted in the
12  video.
13     Q.  Okay.  You're familiar, then -- the article
14  I'm actually referring to, maybe this will help us with
15  our timeline.  You had said early 2014.  I actually
16  know there's a December 9th, 2014 article called
17  Internet Censors the Viral Sandy Hook Truth
18  Documentary.  So would you agree with me that this is
19  probably the end of 2014?
20     A.  2024 or 2015?  I'm sorry.
21     Q.  2014.  Right, that's when the video was
22  hosted by InfoWars?
23     A.  I can check my notes on that, but I thought
24  it was in the beginning of 2014, Rob Dew did a We Need
25  to Talk About Sandy Hook segment, which was the title

Paz, Brittany                                          02-14-2022

---

**110**

1 of the documentary.

2    Q.  Maybe on the next break, check your notes to
3 refresh your timeline.

4    A.  Sure.  Sure.

5    Q.  Because it was December 9th, 2014.

6    A.  Okay.

7    Q.  And you -- you have an awareness that the
8 company actually hosted that video for distribution;
9 right?

10    A.  What do you mean by hosted it for
11 distribution?

12    Q.  Like, it has a YouTube channel, company does;
13 right?

14    A.  It did.

15    Q.  Okay.  And at that time, the company hosted
16 that video?

17    A.  You mean it --

18            MS. BLOTT:  I apologize.  The company,
19 are you talking about Free Speech Systems, or --

20            MR. BANKSTON:  What other company
21 would I be talking about?  She's here to testify for
22 them.  Yes, I'm talking about Free Speech Systems.

23            MS. BLOTT:  Thank you.

24    A.  So you mean it republished the documentary on
25 our YouTube channel?

---

**111**

1    Q.  (BY MR. BANKSTON)  I'm saying, yeah, it was
2 --

3    A.  Is that what you mean?

4    Q.  I mean, it was a source for distribution was
5 that it was hosted on the InfoWars YouTube page;
6 correct?  I mean --

7    A.  I know that there were links to -- and -- and
8 this is common whenever the company covers a story or
9 pieces of information, that what they will do is will
10 link to that source.  So that makes sense that it would
11 be linked to our articles, it would be -- it would have
12 been published in Mr. Dew's broadcast to show them, the
13 viewership, the source of the material.  So --

14    Q.  That's not what I mean, actually.

15    A.  Okay.

16    Q.  What I mean is that Independent Media
17 Solidarity was having some trouble keeping its video up
18 online.  And InfoWars agreed to distribute and host the
19 video on its own YouTube page.  Do you understand that?

20    A.  I don't know that.

21    Q.  Okay.  And that was the first copyright
22 strike that Mr. Pozner got against the company.  That
23 was -- that was where that all started.  You didn't
24 understand that that was the first YouTube strike?

25    A.  I understand that that is an issue that he's

---

**112**

1 raised in his petition.  But what I guess I'm having a
2 problem with is the terminology you're using, is
3 agreeing to host it.  So what the company does is takes
4 a piece of information that is in the media and it will
5 see what is newsworthy.

6            And the position, or in the case of
7 Independent Media Solidarity, this video had been
8 viewed many millions of times and it came to the
9 company's attention because of how many views it was
10 getting.  And so that's how it came into the purview of
11 the company to begin with.

12            And then once it comes into the company's
13 purview, what will happen is they will want, you know,
14 whoever, whatever host it was, in this case, it was Rob
15 Dew, will want to do a segment on it.  And then will
16 publish how to get access to the information to the
17 viewership.  So that's the only problem I'm having is
18 just your terminology.

19    Q.  Saying hosting?

20    A.  Yes.

21    Q.  All right.  Okay.  Got you.  Definitely got
22 you.  All right.  So what I want to do is I want to
23 show you a document.  But unfortunately, the way it's
24 been produced makes it pretty unreadable on this page.
25 So I'm going to enter this into the record and then I'm

---

**113**

1 going to show it to you electronically.  Do you
2 understand what I mean?

3    A.  Yes.

4    Q.  You see, because here's an article.  And
5 unless you've got a really good magnifying glass, you
6 are not going to be able to read this.

7    A.  I'm not going to be able to see it.

8    Q.  Okay.  So what we're going to do is we're
9 going to put this in the record and then hopefully,
10 we're going to be able to get to the court reporter a
11 much more readable copy of this.  But luckily, this is
12 a video that -- I mean, an article that's produced that
13 we all have.

14            So here's the copy.  You'll be able to see
15 the headline.  And I just want to show you just the
16 beginning of this article.  So first, I'm going to mark
17 this as Exhibit 4.  And can you look at that and you
18 can see the headline, right, you can read that part of
19 it?

20            (Exhibit No. 4 marked.)

21    A.  Yes, I can see the headline.

22    Q.  (BY MR. BANKSTON)  Okay.  Okay.  And that
23 headline is Internet Censors Viral Sandy Hook Truth
24 Documentary?

25    A.  Yes.

---

Paz, Brittany                                    02-14-2022

114

1    Q.  Okay.  Now, I'm going to show this to you
2  electronically and I'm going to give you my screen here
3  because it's a touch screen, so you can just scroll it.
4  Okay?  And I'm just going to come over here so I can
5  show it to you.  And you see this is the same article?
6    A.  Yes.
7    Q.  Okay.  Now, what I want to show you here is
8  if we go down here, and I want to read these first few
9  paragraphs.  And I'm going to read these to you.  Okay?
10  And you can tell me if I read them correctly.  "Last
11  Monday, an organization known as the Independent Media
12  Solidarity released an epic documentary entitled We
13  Need to Talk About Sandy Hook, which they hosted on
14  their own site, as well as YouTube.
15         Within hours of the video's upload, it was
16  well on its way to going viral.  However, its success
17  was short-lived.  Shortly after InfoWars began hosting
18  the video, the following Tuesday morning, it was
19  suddenly removed from YouTube due to a copyright claim
20  by Lenny Pozner."  I read all that correctly?
21    A.  Yes.
22    Q.  All right.  So while you may have a problem
23  with my terminology of InfoWars hosting the video,
24  InfoWars doesn't have a problem with that terminology;
25  correct?

115

1    A.  So this article was written by Mr. Salazar.
2    Q.  Okay.
3    A.  So Mr. Salazar, that's the terminology that
4  he used.  I don't know that the company would
5  necessarily endorse that terminology, but --
6    Q.  Well, it published this, didn't it?
7    A.  It did publish this, yes.
8    Q.  Okay.  So I want to read a little more of
9  this article.  Okay?
10    A.  Sure.
11    Q.  And I want -- right here, we have some areas.
12  And you see how there's some highlighted areas?
13    A.  Yes.
14    Q.  Okay.  What it basically is, is that any time
15  that there's a highlighted area in a sentence, that I
16  would like you to stop at the end of the highlight
17  because I want to ask you a question about it.  But do
18  you think you could read us what we see here in the
19  article right there?
20    A.  Just the highlighted portions?
21    Q.  No, no.  Actually, go through the whole part.
22  But just at the end of the highlighted portions, if you
23  can stop, because I'm going to want to ask you a
24  question.
25    A.  "Pozner is reportedly the parent of one of

116

1  the children supposedly killed at Sandy Hook and is an
2  outspoken critic of people who claim the shooting to be
3  a staged event.  It is..." -- oh, you want me to stop.
4    Q.  Yeah.  So that first sentence there where it
5  says that Pozner is reportedly a parent of a child who
6  supposedly died at Sandy Hook.
7    A.  Yes.
8    Q.  Company now admits there's no reason to say
9  that?  He is a parent of a child who died at Sandy
10  Hook?
11    A.  That's correct.
12    Q.  Okay.  Can you keep going through the article
13  here.
14    A.  "It is noted in the documentary that he is
15  also the chairman and CEO of Traxware, a company that
16  specializes in the removal of Internet slander,
17  Internet defamation, mug shots, defamations of
18  character, and online public records.
19         This guy's -- quote, this guy's company would
20  come in handy to any Sandy Hook hoax perpetrators with
21  prior convictions, YouTube researcher MrStosh314 states
22  in the film.  Quote, he would ultimately remove any
23  negative associations from the Internet.
24         Could he be hanging around online bloggers
25  and researchers for the purpose of protecting the Sandy

117

1  Hook parents, end quote."
2    Q.  Okay.  And in that section right there where
3  it's talking about Mr. Pozner's business; right?  And
4  -- and how he could be helping Sandy Hook hoax
5  perpetrators; right?  The company admits that that was
6  reckless speculation it was publishing; correct?
7         It was publishing this person's reckless
8  speculation?  Does the company agree with that or not?
9    A.  No, that looks like that person's opinion.
10    Q.  Correct.  And the company was publishing;
11  right?  That?  Chose to publish that?
12    A.  He's -- he's quoting someone else's opinion.
13    Q.  Correct.  That person's opinion that he is
14  quoting and that the company decided to publish and
15  give to its viewers, the company now admits that that
16  opinion was reckless speculation?
17    A.  No.
18    Q.  Does it admit that or not?
19    A.  No.
20    Q.  Okay.  The company does not believe that was
21  reckless speculation?
22    A.  No.
23    Q.  Okay.  Can you read the last part of it for
24  me, this last paragraph here.
25    A.  Sure.  "After InfoWars swapped out the video

Paz, Brittany                                           02-14-2022

118

1  for an alternate copy, the video was again pulled.
2  This time, quote, due to a copyright claim by HONR
3  Network."  There's a misspelling in there.
4       "End quote.  A group which seeks, quote, to
5  bring awareness to hoaxer activity and to criminally
6  and/or civilly prosecute those who wittingly and
7  publicly defame, harass, and emotionally abuse the
8  victim of high profile tragedies and/or their family
9  members, end quote.  HONR Network is apparently also
10 linked to Pozner."
11      Q.  Okay.  And then you see where it says, also
12 linked to Pozner, there's an Internet link there;
13 right?
14      A.  Apparently also is -- looks like a link.  The
15 words apparently and also.
16      Q.  I think, actually, if you just do this.
17      A.  Oh, okay.  The whole thing looks like a link.
18      Q.  Yeah.  Okay.  So there's a link there
19 directing their audience that says HONR is apparently
20 linked to Pozner; correct?
21      A.  I don't know where that link leads, though.
22      Q.  I don't either.  I was -- I was going to
23 know, like, I was -- that's what I wanted to ask you.
24 What -- what -- what information did the company have
25 about Mr. Pozner being linked to HONR?

119

1       A.  I don't know where that links to, so I don't
2  know how the answer --
3       Q.  Okay.  So when you saw this article and saw
4  that the company was disclosing information, not merely
5  about Mr. Pozner's personal business, but about the
6  nonprofit charity front that he started to keep his
7  name out of things.
8            When you saw that they were disclosing that,
9  did you follow up on this in any way to figure out
10 where this came from?
11      A.  I don't know that that link links to personal
12 information about Mr. Pozner, so I can't answer that.
13      Q.  I don't either.  I -- I wish you could.
14      A.  I wish I could too.  But unfortunately, I
15 can't.
16      Q.  All right.  We'll move on to something else.
17      A.  Thank you.
18      Q.  You're not going to know that.  How does the
19 company today feel about the fact that it was
20 disclosing this kind of information about a Sandy Hook
21 parent to the public, to millions of people?  How does
22 it feel about that?
23      A.  I think that Mr. Pozner is an activist in
24 many ways.  I think that his -- his company is engaged
25 in political speech and I think his company is a public

120

1  company that could be commented on publicly.
2       Q.  What politics is -- what -- what do you mean,
3  politically?  What's the ideology of Mr. Pozner?
4       A.  Of Mr. -- of HONR?
5       Q.  Sure.
6       A.  The company's position is that he's engaged
7  in anti First Amendment activity.
8       Q.  Thank you.  Now, were there any
9  communications between Mr. Pozner and the company?
10      A.  I am aware that Mr. Pozner had reached out to
11 -- to the company and was responded to by someone who
12 works with Mr. Jones.
13      Q.  Wait.  Okay.  So when did that happen?
14      A.  Unfortunately, I don't recall the year.  But
15 I do recall that Mr. Pozner wrote an e-mail basically
16 expressing that he was at one time a fan of the show.
17 That he was upset as to the coverage of InfoWars about
18 the tragedy, and that he wanted to speak to Mr. Jones
19 directly.
20           And I think one of his assistants responded
21 directly to him saying, you know, Mr. Jones is really
22 sorry for your loss.  Will you be able to meet -- talk
23 to him at a specific time.  Mr. Pozner responded
24 saying, I don't want to go on the air.  And the
25 response to that was, no, Mr. Jones is available at

121

1  this time and I don't know that that conversation ever
2  happened.
3            But there was a discussion about trying to
4  get the two of them to connect on the phone.
5       Q.  Wow.  Okay.  I -- I haven't seen that.  I --
6  I've seen -- so I know about a 2013 e-mail, right, that
7  I thought you were talking about, which is Mr. Pozner
8  writing in and complaining.  And then Mr. Watson
9  replying to him saying, sir, we haven't done the whole
10 actors thing.
11      A.  I'm aware of that too.
12      Q.  We think the tragedy's very real.  And so
13 then you think there's another --
14      A.  There is another one.
15      Q.  -- there's -- there's -- there's -- trying to
16 set up a phone conference between Mr. Pozner and
17 Mr. Jones?
18      A.  Yes.
19      Q.  Okay.
20      A.  It was in the production that I read.
21      Q.  Okay.  And then do you think that that --
22 those series of communications there off that complaint
23 where Mr. Pozner said he was a fan and isn't anymore,
24 do you think that's the only communications the
25 company's had with him?

122

1     A.  I'm sure there are others.  That's the one
2 that I recall specifically.
3     Q.  All right.  Well, I'm trying to find out if
4 there are others.
5     A.  Okay.  That's the only e-mail I recall.  I
6 don't think that they ever touched base on the phone.
7 But there was a discussion back and forth about trying
8 to schedule one.
9     Q.  All right.  Years later, are there any other
10 communications with Mr. Pozner?
11    A.  I don't think so.
12    Q.  Okay.  What did you do to find that out?
13    A.  I reviewed the material that we already
14 discussed.  I spoke to Mr. Jones about it.  Mr. Jones
15 wasn't aware of any other direct communication that he
16 had with Mr. Pozner.  I talked to the other people that
17 we already spoke about.
18    Q.  So if the company in this case has produced
19 e-mails between Mr. Pozner and Rob Dew a couple years
20 later in 2015, that's not something you've seen?  Or
21 let me put it this way.
22    A.  I'm sorry, let me -- okay.
23    Q.  Let me pull that back.
24    A.  Sure.
25    Q.  If the company has produced documents from

123

1 2015 years later of Mr. Dew and Mr. Pozner
2 corresponding, you wouldn't be prepared to talk to me
3 about those today?
4     A.  I'm just trying to recall if I had seen
5 e-mails like that.  I don't recall.  If you have copies
6 of them, I'm happy to look at them.
7     Q.  Okay.
8     A.  I don't recall as I sit here right now.
9     Q.  Okay.  Mr. Pozner started all of this by
10 privately complaining to InfoWars; right?
11    A.  He did.
12    Q.  He was polite about it, wasn't he?
13    A.  I believe so.
14    Q.  Okay.  And then he complained again, this
15 time, to YouTube in 2014 regarding this documentary
16 we're talking about right here, right, the Sandy Hook
17 viral documentary that's talked about in that article;
18 right?
19    A.  I know he complained to YouTube.  He made a
20 copyright claim.
21    Q.  Okay.  And then that video came down; right?
22    A.  I believe so, yes.
23    Q.  Okay.  And you understand that the following
24 month, InfoWars wrote an article and made a video about
25 Noah Pozner.  Do you know about that?

124

1     A.  Which video are you talking about?
2     Q.  Yeah.  Do you -- so if I ask you about the
3 whole thing about Noah dying in Pakistan --
4     A.  Yes.
5     Q.  -- do you know what I'm talking about?
6     A.  Yes.
7     Q.  Okay.  So that was called Sandy Hook Victim
8 Dies Again In Pakistan; right?
9     A.  I believe again is in parentheses.
10    Q.  Sure.
11    A.  Yes.
12    Q.  Okay.  Well, let me do it this way just so we
13 can kind of, like, just, like, Sandy Hook Victim Dies,
14 and then there's a parenthesis, Again in Pakistan.
15    A.  Yes.
16    Q.  All right?  Okay.  The company can understand
17 why that headlining is very upsetting; right?
18    A.  To Mr. Pozner?
19    Q.  Sure.
20    A.  I can understand why that's upsetting to
21 Mr. Pozner.
22    Q.  You can understand why it's upsetting to me;
23 right?
24    A.  I can understand why it's upsetting.
25    Q.  You can understand why it's upsetting to

125

1 pretty much any decent person; right?
2     A.  I understand why it is upsetting.
3     Q.  Okay.  And the company understood that?
4     A.  I understand that.  The company understands
5 that now as we're sitting here, yes.
6     Q.  Okay.  Let's -- let's do that.  That's --
7 that's great.  I appreciate that the company
8 understands that sitting here now.  On January 2nd,
9 2015 when it published it, the company knew that that
10 would be upsetting?
11    A.  So to understand just how that -- how that
12 article came to be sourced and came to be, we could
13 talk a little bit -- I don't know if this is the time
14 you want to do that.  Talk a little bit about how that
15 the articles in general come to be.
16        But that article, I believe, was written by
17 Mr. Salazar.  And as I said, there are certain people
18 in the company that are more interested in this topic,
19 or at that time, more interested in this topic more
20 than others.  Mr. Salazar, I think, has made it clear
21 that he was one of the people that were more interested
22 than others.
23        The company's position was, you know, within
24 some loose parameters, write what you want to write.
25 You know, so they would go and source things from the

Paz, Brittany                    02-14-2022

126

1 current day's news. This particular occasion,
2 Mr. Salazar viewed some footage of a -- I want to say
3 it was a protest in Pakistan following a school
4 shooting there.
5        And it was a BBC news correspondent article
6 with video that he linked to his article. And that has
7 since been edited to take out the -- the section that
8 he was relying on regarding that particular claim. But
9 more specifically, it was the reporter from BBC walking
10 past a wall of pictures. I think you know what I'm
11 talking about, the wall of pictures.
12        And I don't -- I don't know if we want to
13 call him by his first name, but essentially, Noah's
14 photo was on that wall. And that correspondent
15 represented that these were the victims of that
16 particular tragedy. He also sourced that material from
17 some Facebook posts that were on the school's web --
18 Facebook page. And from there, wrote that article.
19        So as far as the question goes, the title,
20 the reason why again is in parentheses is because of
21 the confusion or perhaps mistake that these other news
22 articles were -- these other news sources were making
23 as the representation of that particular photograph
24 being in Pakistan at that time.
25        I think that's why when I said it's in

127

1 parentheses, I think that's why it's in parentheses.
2    Q. Okay.
3        MR. BANKSTON: Objection.
4 Nonresponsive.
5    Q. (BY MR. BANKSTON) Do you know what question
6 you were just answering?
7    A. You asked me about the title and whether or
8 not the company knew at the time the title would be
9 upsetting.
10    Q. Bingo. Okay. So can we get back to that.
11    A. No, the company didn't know it would be
12 upsetting and I just explained the reason why. Because
13 the reason it was in parentheses was to make sure that
14 it was understood, the purpose and the content and the
15 position the article was making at the time.
16    Q. Okay. Mr. Pozner had previously made the
17 company aware that these sorts of coverage was
18 upsetting to him; right?
19    A. Yes.
20    Q. Okay. A month later -- so hold on. And I
21 want to make sure I understand this. Kind of the
22 position is here on this, Mr. Salazar was really
23 interested in Sandy Hook, basically able to publish
24 whatever you want. So when we see Sandy Hook Victim
25 Dies Again in Pakistan, that's not Mr. Jones, that's

128

1 Mr. Salazar; right?
2    A. Yes.
3    Q. Okay. Mr. Jones doesn't necessarily endorse
4 that, is what you're saying?
5    A. That's correct.
6    Q. Okay. Great. And you remember about a month
7 after that happened, that January video about Sandy
8 Hook Victim Dies Again in Pakistan, then a month later,
9 Mr. Jones made a video heavily about Mr. Pozner after
10 Mr. Pozner got that video removed. Do you remember
11 that?
12    A. If you could let me know which video we're
13 talking about.
14    Q. Yeah. That's February 12th, 2015. It
15 doesn't have a title. I was actually hoping maybe you
16 could tell me the title.
17    A. Does it have a -- well, the company uses a
18 bunch of -- a combination of letters and numbers. If
19 you could tell me the --
20    Q. No, I don't know the -- the production --
21    A. Okay. What's the date?
22    Q. February 12th, 2015. To help you, it's the
23 video we've been talking about with the P.O. Box
24 address.
25    A. Oh, you know what, that's -- I think I said

129

1 early on in that -- in our conversation that I wasn't
2 able -- I didn't see that video on the Dropbox. I saw
3 the article, but I didn't see the video on the Dropbox.
4 I think we talked about that early on.
5    Q. Wait, what -- what article?
6    A. The article that talks about the U-Haul and
7 the map. I'm pretty sure there was an article about
8 it.
9    Q. You have an article about that?
10    A. I thought there was an article. I thought
11 I saw an article about it. I thought we talked about
12 it.
13    Q. Okay.
14    A. But I don't think I saw that video.
15    Q. That goes along with the February 12th, 2015
16 show?
17    A. February 4th, you said?
18    Q. 12th.
19    A. 12th? Yeah, I don't have that as been
20 reviewed by me.
21    Q. Okay.
22    A. The video.
23    Q. All right. Did you review --
24    A. That's --
25    Q. Okay. So when you found out that you didn't

Paz, Brittany                                                    02-14-2022

130

1  have any documents about that video, I mean, I'm sorry.
2  When you found out that you didn't have that video to
3  review --
4      A.  Yeah.
5      Q.  -- did you go look for any documents about
6  that video?
7      A.  I did.  So that's why I said I'm pretty sure
8  I saw an article on it.
9      Q.  Okay.  No, I meant about the video, not maybe
10  an article.
11      A.  Oh, no.  I -- so I did try to reach out to --
12  we have somebody that is trying to help us find
13  documents.  So there's -- as you're aware, there's
14  various litigation in multiple states.  And various
15  things have been produced and I'm not really sure where
16  they were produced.
17          So I did try to -- we have -- we have or had
18  at one time a liaison trying to help me out with that.
19  I did ask him to try to find it for me and he wasn't
20  able to locate it.
21      Q.  Okay.
22          MR. BANKSTON:  I need to note for the
23  record that we have actually just been joined by my
24  co-counsel, William Ogden, also representing the
25  plaintiffs.

131

1      Q.  (BY MR. BANKSTON)  Ms. Paz, I have handed you
2  what I have marked as Exhibit 5.  I take it you've
3  never seen this document before; right?
4          (Exhibit No. 5 marked.)
5      A.  May I just have a minute?
6      Q.  (BY MR. BANKSTON)  Uh-huh.
7      A.  Oh, it's double-sided.  Okay.  No.
8  Specifically, this document -- no.  But I am aware that
9  the company does produce daily logs of the show.
10      Q.  Okay.  And -- and you didn't look at them?
11      A.  Not all of them.  There's a -- there -- we do
12  three three-hour -- two -- three three-hour segments.
13  So -- and they're all broken down into these -- these
14  -- these individual segments, which are then produced
15  into video clips.  So that would have been hundreds of
16  videos or hundreds of logs, so to speak.  But --
17      Q.  No, there's -- there's 20 -- there's 20 --
18  you would agree with me there is about 20 individual
19  videos identified in plaintiffs' petition of 20
20  different dates?
21      A.  Dates, right.  So there's about 40, 43, or 45
22  videos that I watched.  Each of --
23      Q.  All right.  That's not all of --
24      A.  Right.
25      Q.  -- the plaintiffs' petition, though; right?

132

1      A.  No.  But the entire universe of Sandy Hook
2  videos --
3      Q.  Sure.
4      A.  -- is probably about 40, 43 videos, or 45
5  videos, something like that.
6      Q.  We're going to need to talk about what that
7  number is.  We'll talk about that later.
8      A.  Sure.
9      Q.  But when you discovered that you did not have
10  access to the February 12th, 2015 video, you did not go
11  get the daily show log for the February 12th, 2015
12  video; correct?
13      A.  No, I didn't -- I don't think I reviewed it.
14      Q.  Okay.  So you see how it has up here in giant
15  red letters, do not upload any video of show to
16  YouTube?
17      A.  Yes.
18      Q.  You can't tell me anything about that; right?
19      A.  I don't know why that's there.
20      Q.  Yeah.  I wanted to ask you about that, and
21  that's not something you can tell me?
22      A.  I don't know, unfortunately.  I'm sorry.
23      Q.  And so you wouldn't know who put that there?
24      A.  I -- I don't know.  I think that generally
25  speaking, just based on my conversations with -- with

133

1  Daria --
2      Q.  Well, hold on.  Can I -- can I stop you
3  before you answer that question?
4      A.  I just know who produces these documents in
5  general.
6      Q.  Right.  But I want to caution you not to make
7  guesses or inferences based on--
8      A.  No, I don't know --
9      Q.  I want you to talk what you know.
10      A.  Right.  I don't know who produced this
11  specific video, but based on my conversations with
12  Daria, the assistant producers started producing these
13  -- these types of logs to make it easier to try to find
14  video clips later on.  Because she -- she said it's
15  like finding a needle in a haystack.
16          It was ultimately, you know, they were saved
17  on a drive, but there was no real way to search for
18  those clips.  And so, you know, if one of the hosts
19  said, hey, I want to find this clip.  Nobody would
20  really know on what day.  So they started producing
21  these logs to make that easier to see what -- what
22  people were talking about on a specific day.
23          But as far as which -- which producer
24  produced this, which assistant associate producer
25  produced this, I -- I don't know.

Paz, Brittany                                        02-14-2022

---

**134**

1    Q.  So you don't have any idea of -- of what
2  employees played what role in this show?
3    A.  I know a -- a producer would have produced
4  this, an associate producer would have produced this.
5    Q.  I'm sure.
6    A.  But I don't know --
7    Q.  I'm sure a producer would have been involved.
8    A.  Right.  Right.
9    Q.  Okay.  But my question is, you don't know
10  what employees played any particular roles in the
11  creation of this video?
12    A.  As far as this video?  So the video is just
13  looking -- looking at the document, I could tell you
14  who played a role in producing -- in the production of
15  the video.  So Alex Jones hosted it and Rob Dew and
16  David Knight were also cohosting it.
17    Q.  Right, I can read the document too.
18    A.  Right.  And then it's also citing to Adan
19  Salazar's article.
20    Q.  Sure.
21    A.  So --
22    Q.  But, I mean, in terms of who produced this,
23  we don't know?
24    A.  Produced the document or the show?
25    Q.  The show.

---

**135**

1    A.  I -- well, you mean the employees that were
2  working on that particular day?
3    Q.  Yeah.  I want to know who the producer is.
4  You don't know, do you?
5    A.  I could tell you who was working on this
6  particular day as a producer.
7    Q.  Is that, like, you have a document of that?
8    A.  I have -- I think you requested for us to try
9  to find out who was working on each particular day.
10    Q.  I know what I requested.  I'm asking --
11    A.  Right.
12    Q.  -- do you have a document of it?
13    A.  I think that we've -- we've made that
14  determination.
15    Q.  I don't know -- I don't -- I'm not asking if
16  you made a determination.  I'm asking, do you have a
17  document of that?
18    A.  I can -- if I could consult with counsel,
19  because I think that --
20    Q.  Hold on.  I don't want you to consult with
21  counsel about whether you should answer that question.
22    A.  I just don't have the list on me right now,
23  but I believe that we have a list of who was working on
24  the show on that particular day.
25    Q.  All right.  That's the same thing Ms. Karpova

---

**136**

1  told me, exact same thing.
2    A.  Okay.
3    Q.  And then she didn't have a list to give me.
4    A.  Okay.
5    Q.  Are you telling me right now --
6    A.  I think -- I think Attorney Blott's going in
7  her bag.  You want to mark it?
8    Q.  I do.  Okay.  I'm going to mark both -- we'll
9  put them together.  Okay.  I'm going to call this 6.
10  I'm going to hand this to you to just -- first of all,
11  if you can verify to me, this is the list that you --
12  first of all, what is this?
13       (Exhibit No. 6 marked.)
14    A.  So in request -- in response to your request
15  as to who had been working on the days that -- that
16  various videos in the petition had been produced.
17    Q.  (BY MR. BANKSTON)  Uh-huh.
18    A.  The company went back into its records and
19  searched -- essentially searched, you know, its -- its
20  internal records to determine who was working on those
21  particular days.
22    Q.  Okay.  Who prepared this list?
23    A.  You know what, I'm not a hundred percent sure
24  who prepared it.
25    Q.  Who did you get it --

---

**137**

1    A.  I --
2    Q.  Did you get it from counsel, or --
3    A.  I got it from counsel.  So I don't know who
4  prepared it.
5    Q.  Okay.  Can you hand me it back real quick,
6  because I --
7    A.  Sure.
8    Q.  -- I don't have a copy of it, so I need to
9  kind of look at it.  And I'll hand it back to you for
10  this question.  Okay.  What I'm seeing here is lists of
11  names for ten different videos.
12    A.  That's what it looks like, yes.
13    Q.  Okay.  All right.  So those are the -- are
14  those the days you can tell me when people were
15  working?
16    A.  Yes.
17    Q.  Okay.  So if there are videos that didn't
18  happen on that day, you can't tell me who was working
19  those days?
20    A.  No.  I know there are other videos aside from
21  these --
22    Q.  Sure.
23    A.  -- these particular videos.  Because like we
24  said, there's -- there are -- there are 40-something
25  videos, maybe 45 videos.

---

Paz, Brittany                                                    02-14-2022

138

1    Q.   Well, there's -- there's certainly some in
2  plaintiffs' petition; right?
3    A.   Yes.
4    Q.   And then part of that was you were to get up
5  to speed on the employees who were involved in those
6  videos; right?
7    A.   I know that we are talking currently about
8  this February 2015 video.
9    Q.   I'm just asking you, you were --
10   A.   That's on here.
11   Q.   Yeah.  You were asked to get up to speed on
12 who was involved in the videos in plaintiffs' petition;
13 right?
14   A.   Right.  I don't know these dates offhand.  I
15 don't know if these are the dates of those particular
16 videos.
17   Q.   Well, one thing we know for certain is it's
18 not all of the videos in plaintiffs' petition, is it?
19   A.   I don't know.  I didn't produce this.  So I
20 don't know -- I don't know the answer to that.
21   Q.   All right.  Can I see that again?
22   A.   Sure.
23   Q.   Okay.  So when you got these documents here
24 of who was working, somebody gave these to you?
25   A.   Yeah.

139

1    Q.   Did you inquire if these are all the videos
2  in the plaintiffs' petition?
3    A.   No.  I don't know who produced that.
4    Q.   Okay.  What do the highlights mean?
5    A.   I don't know.  I did not highlight them.
6    Q.   Okay.  So you didn't ask what these
7  highlights mean; right?
8    A.   No.
9    Q.   Okay.  Well, I noticed there's one day -- so
10 I got, like, one day here.  We got September 25th, 2014
11 and I'm seeing about a dozen people on here.  And then
12 I see, like, 12/27/2014, there's only one name.  Do you
13 know what that is about?
14   A.   May I see it?
15   Q.   Yeah, sure.  Was he the only guy working that
16 day, or what's going on there?  I don't understand why
17 there's just one name.
18   A.   That means to me that based on our records,
19 that's all we know about who was working that day.  So,
20 you know, part of the problem that I was indicating
21 earlier, and I -- and I know that it's -- it may not
22 make a whole lot of sense because you look at a media
23 corporation, like, you know, CNN.
24       And they have very, very intricate records
25 and they have very intricate procedures and policies.

140

1  I've spent a lot of time in the last week with this
2  company and it's not that way.
3    Q.   No, it's not.
4    A.   So there are not a lot of records.  There
5  aren't a lot of communication between departments.  So,
6  you know, generally speaking, in the event that there
7  were people working, like, in production in one
8  department, sometimes, we just wouldn't know in another
9  department.
10       Like, so, in all likelihood, what happened
11 with these records was that our HR person went through
12 and tried to figure out who was there that day.  But
13 that doesn't mean she went to the production department
14 and personally questioned everybody, and I certainly
15 didn't do that.  Were you here on this day, this day,
16 this day, this day.  You know what I'm saying?
17   Q.   I do.
18   A.   So when I -- and I believe if -- I believe
19 Melinda did that, you know, to the best of her
20 information, tried to get these lists.  But like I
21 said, because they don't talk to each other, the
22 different departments, and there's no real records as
23 to who's checking in and checking out on a various day,
24 it's -- it's hard to give a definitive answer as to --
25   Q.   I get it.

141

1    A.   -- who was there that day.
2    Q.   What I'm trying to get at, though, is -- is I
3  understand you're telling me a lot of stuff about why
4  things were hard, all this sort of stuff.  What I'm
5  trying to get at is some of these -- some of these
6  entries have, like, a ton of people's names.  Like, a
7  dozen names.
8    A.   Right.
9    Q.   And some of them only have, like, one or two.
10 And -- and from what I understand you're saying is, is
11 you were making certain inferences about why that's
12 true.
13   A.   I think the reason --
14   Q.   You don't know why that's true, you're just
15 making inferences; right?
16   A.   Well, yes.  I think the reason why that is,
17 is because that was the only information Melinda was
18 able to source for those particular days.
19   Q.   Did you talk to her about this list?
20   A.   I didn't talk to her about this list
21 specifically.
22   Q.   Okay.
23   A.   But I've -- I've spoken to her about, you
24 know, why there aren't many documents.
25   Q.   Okay.  Can you -- can I see that real quick?

Paz, Brittany                                    02-14-2022

142

1    A.  Sure.
2    Q.  Okay.  So what did -- do you know what Nico
3   Acosta did for this video, for this 2015 video?
4    A.  Nico Acosta did the programming for Alex
5   Jones, The Alex Jones Show.
6    Q.  Okay.
7    A.  So his job was to coordinate guests such that
8   there were guests available.  And to, you know, do the
9   basic scheduling for that day.  So that's what his role
10  would have been.
11   Q.  I noticed that David Knight and Travis Knight
12  are both on this list -- on this video.
13   A.  David Knight.  Yes, I think David Knight
14  per -- per Exhibit 5 was one of the hosts.
15   Q.  That's one of the people you didn't talk to;
16  right?
17   A.  I did not talk to David, no.  He's not a
18  current employee.
19   Q.  Okay.  And Josh -- I understand he's not a
20  current employee.  I get that.  Josh Owens, he's on
21  this list; right?
22   A.  Yes.
23   Q.  I'm just going to show you Josh Owens is on
24  this list.
25   A.  Yes.

143

1    Q.  Did you speak to Mr. Owens?
2    A.  No.
3    Q.  Mikael Thalen's on this list; right?
4    A.  Sure.  I don't have a copy of it in front of
5   me.  I'm just --
6    Q.  Yeah, okay.  Yeah.  What did Mr. Thalen do
7   with this video?
8    A.  I don't know.
9    Q.  Okay.  We're not --
10   A.  Just -- I just want to clarify.  Just because
11  they're on this list doesn't mean they had anything to
12  do with this video.
13   Q.  In fact, somebody would have to go check with
14  them to figure out if they did have something to do
15  with that video; right?
16   A.  Right.  This is only the list of who was
17  working that particular day.  That doesn't mean that
18  they sourced this -- that they had anything to do with
19  this particular video.
20   Q.  I understand that completely.
21   A.  Sure.
22   Q.  Let's -- can you go back to this document
23  here that is --
24   A.  Sure.  Exhibit 5.
25   Q.  -- Exhibit -- Exhibit 5.  Okay.  So we talked

144

1   the first page really quick on -- I talked about this
2   red part here.
3    A.  Yes.
4    Q.  But now, I want to go to page 2.  And so
5   that's actually going to be on the reverse side.
6    A.  Sure.
7    Q.  Okay.  And we'll see here it talks about hour
8   number one; right?
9    A.  Yes.
10   Q.  And then you see segment number one; right?
11   A.  Yes.
12   Q.  And then it says right there, mystery, Sandy
13  Hook victim dies, parentheses, again, closed
14  parentheses, in Pakistan?
15   A.  Yes.
16   Q.  Right?  Okay.  So this was a show Mr. Jones
17  was doing; right?
18   A.  He was the host of the show, yes.
19   Q.  Yeah.  So Mr. Jones kept saying that Noah
20  died again in Pakistan even though the company knew
21  Mr. Pozner was distressed by it; right?
22   A.  I don't know that he said Noah died in
23  Pakistan.  I think what he was saying was, here is an
24  article that we wrote and here's a cut to the BBC
25  footage and Noah -- Noah's photo is in that footage.

145

1    Q.  Well, what I -- what I want to get to is we
2   had talked earlier about how that article was just
3   Mr. Salazar and that's not necessarily Mr. Jones
4   endorsing this or anything.  But here is Mr. Jones
5   literally reading that same headline on his show;
6   right?
7    A.  He's reading a headline that was -- that was
8   reported by somebody else, yes.
9    Q.  Well, no.  I mean, we understand Mr. Salazar
10  doesn't do -- he doesn't report or publish anything.
11  Free Speech Systems publishes things; right?
12   A.  Well, he is a writer for Free Speech.  So
13  yes, Free Speech publishes it.
14   Q.  I'm just -- I'm just trying to -- is there
15  any reason why you're -- why the company's trying to
16  disclaim responsibility for what Mr. Salazar wrote?
17   A.  No, he wrote it.
18   Q.  Right.  And the company published it.
19   A.  And the company published it.
20   Q.  And then Mr. Jones came on again; right?
21  Right?
22   A.  What do you mean, he came on the show?
23   Q.  Right.  Mr. Jones came on the show and
24  published that headline again; right?
25   A.  He published the headline, yes.

Paz, Brittany

146

1    Q.  Sure.  So Mr. Jones did that even though he
2  knew it would cause Mr. Pozner distress; right?
3    A.  I don't know that he knew that it would cause
4  Mr. Pozner distress.
5    Q.  Well, first of all, we know that the company
6  sitting here now understands that that headline would
7  have caused Mr. Pozner distress?
8    A.  Right.
9    Q.  Right.  But Mr. Jones didn't understand that?
10   A.  I don't know if Mr. Jones personally had any
11  involvement in those e-mails that Mr. -- because
12  Mr. Jones doesn't have an e-mail address, I'm sure
13  you're aware of that.
14   Q.  Yes, he does.
15   A.  Well, he doesn't use e-mail.  Let's put it
16  that way.
17   Q.  Okay.  I mean, again, I'm very concerned that
18  you would sit here in testimony under oath and tell me
19  Mr. Jones doesn't have an e-mail address, because he
20  absolutely does.
21   A.  He does not use his e-mail.
22   Q.  Okay.  So let's -- let's try to say that
23  instead of the thing that wasn't true.
24   A.  Sure.
25   Q.  Okay.

147

1    A.  So he doesn't use e-mail.  The e-mails that
2  we were referring to earlier on about Mr. Pozner
3  communicating his displeasure with the coverage were
4  not responded to by Mr. Jones.  They were responded to
5  by other people.  I don't know what Mr. Jones knew or
6  didn't know about Mr. Pozner's communication of
7  displeasure at this point in time.
8    Q.  Because you didn't read his deposition,
9  right, where he talked about it; right?
10   A.  But assuming that, I will also say that this
11  is not altogether uncommon where you source another
12  article and publish the article.  I don't know that
13  necessarily this is an adoption by Mr. Jones of what
14  the content of the article is.
15   Q.  Now -- okay.  Actually, I was about to say,
16  well, you know it is because you watched the video.
17  But you didn't watch the video, so --
18   A.  No, that was the one -- that was the video --
19   Q.  Yeah.
20   A.  No, no.  This video?  Let me -- I'm sorry.
21  Yes, I didn't watch this video.
22   Q.  Okay.  Because Mr. Jones says in this video
23  that either the Pakistan thing is fake or the Sandy
24  Hook thing is fake.  One of these has to be fake.  Do
25  you know he said that?

148

1    A.  I don't know.  I didn't watch that video.
2    Q.  Okay.  All right.  You testified that
3  Mr. Jones didn't have any involvement or have any
4  knowledge of the communications of Mr. Pozner?
5    A.  I said I didn't know.
6    Q.  Did you ask him?
7    A.  I'm trying to remember my conversation with
8  Mr. Jones.  I don't think we talked about that.
9    Q.  Okay.  So in terms of what knowledge
10  Mr. Jones has about Mr. Pozner and what he's told the
11  company, you didn't talk to Mr. Jones about that?
12   A.  No.  But as you said, he's been deposed, so
13  --
14   Q.  Sure.  And one of the interesting things
15  about that is do you think there's any testimony in
16  there about him in these communications?
17   A.  About?
18   Q.  Mr. Jones not only being aware, but being
19  involved in these communications.
20   A.  Oh, I don't know.
21   Q.  Okay.  Yeah, can I understand which
22  depositions of Mr. Jones you read?
23   A.  I know he's done a few, so I --
24   Q.  He's done three.
25   A.  Right.  So I read the most recent one, which

149

1  was in December.
2    Q.  Uh-huh.
3    A.  And I've read the March one, but I don't
4  think I read the March 2019 one.
5    Q.  Okay.
6    A.  But I don't think I read the third one.
7    Q.  Okay.  If you look at segment two --
8    A.  Sure.
9    Q.  -- down at the bottom, it says it again,
10  right, Mystery Sandy Hook Victim Dies Again in
11  Pakistan?
12   A.  Yes, I see that.
13   Q.  Okay.  And there's some Sandy Hook
14  commentary.  Do you see where it says that?
15   A.  Oh, right above that?
16   Q.  Yeah.
17   A.  Yes.
18   Q.  You're not able to talk to me about what that
19  commentary was?
20   A.  No.
21   Q.  Okay.  It says he showed a copyright claim
22  document on camera.  Do you know what that refers to?
23   A.  I think it probably refers to Mr. Pozner's
24  attempts to get videos removed.
25   Q.  Are you -- do you know that, or is that just

Paz, Brittany                                         02-14-2022

150

1  kind of something you're thinking might be true right
2  now?
3      A.   I think that that's what's true.
4      Q.   But have you done anything to figure that
5  out?
6      A.   No.
7      Q.   So that document -- and actually, can you go
8  ahead and flip the page again for me now.
9      A.   On the first page?
10     Q.   Yeah.  Now, we're going -- no.  Now, we're
11  going to the one that says 924.  So it's -- keep going.
12  It would be the next page.  Do you see the Bates number
13  924?
14     A.   Yes.
15     Q.   Okay.  And on this page on segment four, it
16  also talks about showed copyright claim document on
17  camera.
18     A.   Yes.
19     Q.   Okay.  If this is the complaint or some sort
20  of complaint from Mr. Pozner --
21     A.   Uh-huh.
22     Q.   -- you haven't done anything to locate it or
23  figure out what it is?
24     A.   No, but what this means to me is that during
25  this segment, he showed the actual document.

151

1      Q.   On his document camera?
2      A.   On his document camera.
3      Q.   On his desk camera?
4      A.   Right.
5      Q.   Exactly.  He did.  Let's go to the next page.
6  See the page, and it's Bates number 925?
7      A.   Uh-huh.
8      Q.   Okay.  Do you see segment four?
9      A.   Yes.
10     Q.   It says, HONR Network physical address
11  discrepancy slash donations.  Do you see where it says
12  that?
13     A.   Yes.
14     Q.   What did the company mean by physical address
15  discrepancies and donations?
16     A.   I think --
17     Q.   First of all, let me ask you.  Let me --
18     A.   Sure.
19     Q.   Have you undertaken any steps to understand
20  what the company -- before coming to this room, what
21  the company meant by HONR Network physical address
22  discrepancies and donations?
23     A.   Yeah.  So when I spoke to Rob Dew, I did
24  speak to Rob Dew about the claims that were made in
25  connection with Mr. Pozner and his -- and the video --

152

1      I believe it's this video -- about the -- the address.
2  And I think this was when we had the discussion about
3  his U-Haul address.
4          And -- and I think at the time, the problem
5  was that they didn't understand that the U-Haul has
6  P.O. boxes.  And so they were wondering why the
7  address, the official address, would be at a U-Haul.
8      Q.   Really?  That's --
9      A.   And that's what they were talking about --
10     Q.   That's --
11     A.   -- with the physical discrepancy.
12     Q.   That's the discrepancy?
13     A.   I think that's the discrepancy.
14     Q.   Okay.
15     A.   When I talked to Rob Dew, that was his -- his
16  understanding.
17     Q.   Well, you know he -- he identified a UPS
18  store.  You remember him identifying a UPS store?
19     A.   I thought it was a U-Haul store.
20     Q.   He did that too.  But do you remember the --
21  do you know anything about the UPS store?
22     A.   No, I don't.
23     Q.   Obviously, it's not -- even somebody like Rob
24  Dew know's there's P.O. boxes at a UPS store; right?
25     A.   I can't testify as to what Rob Dew knows.

153

1      Q.   You certainly didn't ask him, did you?
2      A.   I didn't ask him, no.
3      Q.   Okay.  How did they know that was where Lenny
4  was picking up his mail?  How did they know that was
5  his address?
6      A.   You mean where did they get that address
7  from?
8      Q.   Sure.
9      A.   Well, when I asked Rob -- I did ask Rob Dew
10  that question.  And his information was that when he
11  did a search on the HONR Network, that address came up
12  as a mailing address.
13     Q.   Okay.  So he did some research into the
14  issue?
15     A.   I think he looked for the HONR Network
16  because the HONR Network was being -- was engaged in
17  getting information taken off of the YouTube page.  So
18  it led him to looking into that particular
19  organization.
20     Q.   Those are those anti First Amendment
21  activities you referenced earlier; right?
22     A.   That's correct.
23     Q.   Okay.  When it says there next, the
24  HONR Network group going after the Second Amendment,
25  what does the company mean by that?

Paz, Brittany                                              02-14-2022

154

1   A.  I think that the opinion was that the HONR
2   Network, in addition to this First Amendment activity,
3   is involved in Second Amendment activity.
4   Q.  What do you mean -- what -- okay.  First of
5   all, did you talk to Rob Dew about that?  Is that
6   something you talked to him about?
7   A.  Rob Dew.  I don't know if it was in my
8   conversation with Rob Dew or with -- with Mr. Jones.
9   But I think that the general understanding is that the
10  HONR Network is engaged in that type of political
11  speech for First Amendment speech and Second Amendment.
12  Q.  Second Amendment.  What do you -- Second
13  Amendment's about guns; right?
14  A.  Yes.
15  Q.  Okay.  And -- and so you're testifying here
16  is that company's understanding is that the HONR
17  Network engages in Second Amendment activities related
18  -- what -- what activities is it engaged in relating to
19  the Second Amendment?
20  A.  So this -- this goes back to -- this circles
21  back to the conversation we were having about Ms. Lewis
22  as well, about individual people's opinions about the
23  things that companies are engaged in or the activities
24  that they're engaged in.
25  Q.  Sure.

155

1   A.  So it -- it's not -- for example, it's not
2   the company's position that Ms. Lewis is engaged in
3   anti -- anti gun control stuff.  But individual people
4   in the company may interpret her -- her associations as
5   such; right?  And I think that that is -- is what is
6   being discussed here.
7       You know, Rob Dew and David Knight are on the
8   show.  And Rob Dew, you know, as I said, Mr. Dew was
9   one of those people that were more interested in Sandy
10  Hook than others at -- at the company.  And I think
11  it's Mr. Dew's opinion that the HONR Network was
12  engaged in Second Amendment activity.
13  Q.  What facts is that based off of?  Do you have
14  -- do you have any idea?
15  A.  I can't testify to Rob Dew's opinions.  I
16  don't -- I don't know, in all honesty.
17  Q.  Yeah.  Because I'm -- I'm trying to figure
18  out how this got on air.  How it got on air that
19  InfoWars told its audience that Lenny Pozner was coming
20  after the Second Amendment.  I want to know how that --
21  A.  That's an opinion statement.  It's an opinion
22  statement based on Rob Dew's opinion.
23  Q.  Right.  And so --
24  A.  And possibly David Knight's opinion.
25  Q.  Possibly, but we have -- we don't know.

156

1   A.  Possibly, I don't know.  But it's an opinion
2   statement.
3   Q.  Sure.  And so what I asked you to be prepared
4   for was the company's knowledge of the plaintiffs.
5   A.  Uh-huh.
6   Q.  And I'm assuming that any opinions the
7   company has about the plaintiffs are informed by what
8   knowledge it has about the plaintiffs.  Certainly, the
9   company is not going to make opinions based on no
10  knowledge.  Do you understand what I'm saying?
11  A.  Well, the company's opinions and the
12  individual hosts' opinions are two different things.
13  Q.  Absolutely.  And that's why I've also asked
14  you about sourcing and research for the plaintiffs'
15  petition.
16  A.  Right.
17  Q.  So that's why I want to know Rob Dew's
18  opinion and I want to know the company's opinion.
19  A.  I -- and I've testified that I believe Rob
20  Dew's opinion is that they are engaged in this type of
21  activity.
22  Q.  And I'm asking you, what knowledge does --
23  does -- was ever researched or does the company possess
24  about Lenny Pozner that would support that opinion?
25  A.  I don't know what Rob Dew based his opinion

157

1   on.  Like I said, I didn't watch this particular video.
2   Q.  And in terms of the -- excuse me.  The
3   sourcing or research that went into making this
4   statement, you don't know that either?
5   A.  No, because I didn't watch the video.
6   Q.  Okay.  Or -- and -- and let's make it clear.
7   You didn't just not watch the video, you didn't review
8   any documents about the video; right?
9   A.  Aside from this -- what you've produced to me
10  right here and -- oh, well -- actually, no.  That's not
11  -- that's not a hundred percent accurate because I did
12  review this Sandy Hook Victim Dies Again in Pakistan
13  article.  But aside from those things, I'm not aware of
14  any other documents that exist.
15  Q.  Okay.  Can you summarize any other
16  information the company has about Mr. Pozner?
17  A.  Has as we sit here today?
18  Q.  Uh-huh.
19  A.  I have seen a background check that was
20  produced in the production.
21  Q.  Okay.  Tell me about that.  Where did that
22  come from?
23  A.  You know, interestingly enough, I cannot
24  determine where that came from.
25  Q.  That's less interesting than you might think.

Paz, Brittany                                                    02-14-2022

158

1    A.  Okay.
2    Q.  No, so when you say you can't determine where
3  it came from, let's -- let's -- let me back up, because
4  I may have started at a bad place.
5    A.  Sure.
6    Q.  When you understood that that background
7  report exists, what did you do to find out where it
8  came from?
9    A.  So I have spoken to Mr. Jones.  I've spoken
10 to Mr. Dew.  I've tried to go through the production
11 material in the e-mails to find out if it was -- if it
12 was produced in an e-mail.  I don't see it connected to
13 an e-mail.  Mr. Jones is not aware of where it came
14 from.  Mr. Dew is not aware of where it came from.
15       I can speculate, but I don't want to do that
16 because I don't honestly know where it came from.
17   Q.  Okay.
18   A.  I do know it is amongst the materials in the
19 production, but I can't testify as to when it -- when
20 or how it came to be there.
21   Q.  Well, somebody put it in there; right?
22   A.  I don't know how it came to be there.
23   Q.  Well, I -- I know that.  I know you don't
24 know that.
25   A.  Yeah.

159

1    Q.  But somebody put it in there; right?
2    A.  It had to have gotten there somehow.
3    Q.  Yeah, exactly.  So -- so somebody had to have
4  this year, because this is when it was produced.  Wait.
5    A.  Oh, I don't know -- I can't --
6    Q.  You don't know when it was produced?
7    A.  I don't know when it was produced and I don't
8  know when it came to the company.  So I don't know if
9  it was produced -- if it came into our attention this
10 year.  I don't know.
11   Q.  Okay.
12       THE WITNESS:  Attorney Blott, can you
13 give me another water, please.  Thank you.
14   Q.  (BY MR. BANKSTON)  So I know you can't talk
15 to me about what you talked to them about.
16   A.  What I talked to them about?
17   Q.  Hold on.  Hold on.  Let me get the whole
18 question out.
19   A.  Sure.
20   Q.  In fact, preface, we -- we just talked about
21 you talking to a couple people, Mr. Dew, Mr. Jones,
22 about this background report.  And I know you can't
23 talk to me about the substance of conversations you've
24 had with attorneys.
25       But considering that attorneys were the ones

160

1  who are the last person in the chain of custody who
2  gave it to me, have you talken to attorneys about where
3  this came from?
4        MS. BLOTT:  You can indicate whether
5  you have spoken to attorneys, but not conversations
6  you've had with them.
7    A.  I have spoken to attorneys about where it
8  could have come from, yes.
9    Q.  (BY MR. BANKSTON)  Okay.  As not any
10 descriptions of those -- of those discussions, but it's
11 fair to say that after the conclusions of those
12 discussions, you are not able to give me any
13 information about where it came from?
14   A.  That's accurate.
15   Q.  Okay.
16   A.  Oh, and if I may, I -- I guess I should say
17 there are -- there are two background checks that I saw
18 in those productions relating to Mr. Pozner.
19   Q.  Okay.
20   A.  One is longer and one is shorter.  I'm pretty
21 sure -- and I think I know where the first -- the --
22 the shorter one came from.  I believe that was produced
23 in connection with a lawsuit that Mr. Halbig and
24 Mr. Pozner have.
25   Q.  Okay.

161

1    A.  And somehow, that came to be in our
2  documents, whether Mr. Halbig e-mailed that to us or
3  whatever.  But I believe the allegation is that, at
4  least Mr. Pozner's allegation in connection with that
5  lawsuit, that Mr. Halbig produced that background
6  check.
7    Q.  Got you.
8    A.  I believe it's 99 pages or a hundred pages
9  long.  It's, like, a shorter background check.
10   Q.  Sure.
11   A.  So I -- I did see the both of them.
12   Q.  Okay.
13   A.  But the longer one, I am not sure.  I can't
14 testify as to where that came from.
15   Q.  Okay.  I know you don't know where you came
16 from, but do you know who found it in the files?
17   A.  I don't know.
18   Q.  Do you know where it resided in InfoWars'
19 files?
20   A.  No.  And that's -- that's the interesting
21 part, is I tried to determine if it came to us in an
22 e-mail or if it came to us in some other fashion.  And
23 I can't find the origin.
24   Q.  Okay.  So we had the first -- we had the
25 first background report that I was talking about with

Paz, Brittany                                02-14-2022

162

1  Ms. Karpova, the big one; right?  But I -- I want to
2  talk to you about the second one you've talked about,
3  the shorter one.
4      A.  Sure.
5      Q.  That one for Mr. Halbig, who saved that?  Why
6  -- why -- how did that get saved?
7      A.  What do you mean, how did it get saved?
8      Q.  Like, where -- first of all, where did it
9  come from in InfoWars' files?  Do you know that?
10     A.  I believe it might have been in an e-mail.
11  But in all honestly, I'm not a hundred percent sure.
12     Q.  Okay.
13     A.  We did not produce it.  Like, so we didn't
14  ask for it to be produced.  I think it was sent to us.
15  I'm just not sure how.
16     Q.  How do you know it was sent to you?
17     A.  Because I think that it originated with
18  Mr. Halbig.
19     Q.  How do you know that?
20     A.  Because it was in with -- so there are a
21  bunch of e-mails, at least in our production, related
22  to Mr. Halbig's litigation with Mr. Pozner, which is
23  not connected to this case.  He appears that he -- and
24  I don't know if you see that Mr. Halbig e-mails very
25  numerous people in a lot of his e-mails.

163

1      Q.  Sometimes, uh-huh.
2      A.  So it appears that he has sent to us a lot of
3  the information concerning that litigation.  And I --
4  in the materials that are in our production, there were
5  a bunch of litigation materials connected to that case.
6  And I think it was in there.  I also saw some e-mail
7  chains between Halbig and Mr. Pozner about -- about
8  this particular background check.
9      Q.  Okay.  So when you say you think it came from
10  the litigation, that's because it was in proximity,
11  physical proximity in the production to documents that
12  related to that litigation?
13     A.  Right.
14     Q.  All right.  You understand with me, though,
15  you've gone through, I hope, enough InfoWars documents
16  to know that there's not really much of a rhyme or
17  reason to the order of those documents?
18     A.  I see that.
19     Q.  Right.  So there could be just random
20  documents thrown in the middles of other places.  So
21  I'm wondering why do you think that that's from
22  litigation if you've never run down and figured that
23  out?
24     A.  The reason is because some of those e-mails,
25  communications between Mr. Halbig and Mr. Pozner and

164

1  Mr. Halbig and Mr. Pozner's attorney relating to that
2  litigation is specifically referencing that background
3  check.
4      Q.  Okay.  But -- but all you know is that
5  there's -- something went on between Pozner and -- and
6  Halbig.  And so you assume that that document that you
7  have must have come from that; right?  Is that --
8  there's nothing you've done to independently run down
9  --
10     A.  I haven't independently verified it, no.  I
11  -- I -- and I don't see the actual e-mail that it's
12  connected to.
13     Q.  Okay.  This brings me to my next point, is
14  InfoWars knew about the legal action between Mr. Pozner
15  and Mr. Halbig; right?
16     A.  Well, this goes back to issues relating to
17  not opening Mr. Halbig's e-mails.  So, I mean, as I sit
18  here now, yes, I am aware of it because I reviewed the
19  production.  But at the time, I mean, pursuant to my
20  conversations with numerous employees, his e-mails were
21  not being opened.
22     Q.  There are -- okay.  Let's -- first of all,
23  there are other places the company can get information
24  about that lawsuit other than Mr. Halbig; right?
25     A.  Sure.

165

1      Q.  Just first of all.
2      A.  You can do a Google search on it.
3      Q.  So let me ask you that.  Has the company
4  gotten information from anybody else about that
5  lawsuit?
6      A.  No.
7      Q.  Okay.  And do you think that, or you know
8  that?  I'm trying -- have you verified that?  I went
9  through --
10     A.  I don't see anything in the production that
11  would have indicated that we did any independent
12  research on that.
13     Q.  Okay.
14     A.  But I didn't talk to anybody relating to that
15  specific litigation.
16     Q.  All right.
17     A.  My information on that litigation just comes
18  from the production.
19     Q.  Okay.  Let's look at something in there.
20  Okay.  You read Ms. Karpova's deposition; right?
21     A.  Yes.
22     Q.  So you saw the discussion in that deposition
23  about Mr. Halbig and Mr. Pozner's lawsuit; right?
24     A.  Is this the one in Florida?
25     Q.  Yeah, that lawsuit would have been in

Paz, Brittany                                                    02-14-2022

166

1 Florida.
2     A.  Okay.  Yes.
3     Q.  So you did know things about that from
4 Ms. Karpova's deposition?
5     A.  Yes.
6     Q.  So you know that the answers you just gave
7 about people not giving any information to the company
8 about those lawsuits, that's not right.  That was
9 discussed in Ms. Karpova's deposition; right?
10    A.  What are you referring to?
11    Q.  I'll give it to you --
12    A.  Sure.
13    Q.  -- since we'll go through that again.  What
14 exhibit number are we on?
15    A.  6.
16    Q.  Let's go to 7.  Okay.  This is an exhibit
17 that I assume you've read from Ms. Karpova's --
18    A.  Oh, no.  It would be 6, I'm sorry.  Because
19 we were on --
20    Q.  Got you.
21    A.  Yeah.
22    Q.  Okay.  I'm going to hand you Exhibit 6 --
23          THE COURT REPORTER:  We've done 6
24 already.
25          THE WITNESS:  Where's 6?

167

1          MS. BLOTT:  Where is it?
2          THE COURT REPORTER:  I've -- I marked
3 it down on my sheet that you admitted Exhibit 6.  This
4 is it.
5          MR. BANKSTON:  Got you.
6          THE WITNESS:  Okay.  I'm sorry, you're
7 right.
8     Q.  (BY MR. BANKSTON)  Okay.
9     A.  They were out of order.
10    Q.  Okay.  This is a document that was read
11 verbatim in Ms. Karpova's deposition.  Are you familiar
12 with this document, before you --
13          (Exhibit No. 7 marked.)
14    A.  Let me -- can I read it?
15    Q.  (BY MR. BANKSTON)  You may.
16    A.  Okay.
17    Q.  Okay.  So this is a document that, contrary
18 to your last answer, is somebody from outside the
19 company giving the company information about Wolfgang
20 Halbig's legal action; right?
21    A.  That's what appears.  And I did read this in
22 connection with Ms. Karpova's deposition.
23    Q.  I understand that.  Doesn't really match your
24 testimony, though, does it?
25    A.  I disagree.  So the company receives a lot of

168

1 e-mails like this about -- not just about Halbig, but
2 various people that we either have calling in on the
3 station or various people that we're reporting on or
4 commentators on, you know, whatever the case may be.
5     Q.  Uh-huh.
6     A.  This document is very common.  This type of
7 thing would be common.  And when I asked Mr. Dew about
8 not only this document, but I believe there's one or
9 two other comments from other people about Mr. Halbig's
10 credentials, whether anything was done or conveyed to
11 anybody else internally about it.  And the answer is
12 no.
13          So I -- I agree with you that this was
14 forwarded to somebody, but I don't think that anybody
15 would have necessarily followed up with it.  Does that
16 make sense?
17    Q.  So Nico sent it -- Nico is a producer; right?
18    A.  Was he a producer?
19    Q.  I think at that time.
20    A.  Right.  So I -- well, I think his more
21 specific job description, even though there's no
22 official job descriptions, was that he -- he was the
23 person who was coordinating The Alex Jones Show.  But
24 yes, I -- so I see that it was forwarded to Nico.
25    Q.  No, actually, it wasn't.  It was sent from

169

1 Nico.
2     A.  Oh, yes.  I'm sorry.  From Nico to Rob.  Yes.
3     Q.  Right.  Okay.  To --
4     A.  Right.
5     Q.  And Rob -- Rob Dew is nightly news director?
6     A.  I don't know that that's his title or was his
7 title at the time.  So this looks like it was --
8     Q.  Okay.
9     A.  -- sent to a general mailbox,
10 mediacontacts@infowars.
11    Q.  Right.  But what --
12    A.  And then it was being monitored and forwarded
13 along to Rob.  Whether Rob saw it or did anything with
14 it, I don't know.
15    Q.  We know Nico saw it.  We know Nico did
16 something with it.
17    A.  Nico saw it, right.
18    Q.  And he did something with it?
19    A.  Aside from forwarding it to Rob?
20    Q.  Well, that's something, isn't it?
21    A.  Well, if -- forwarded it to Rob.
22    Q.  And then told him, here are some comments on
23 Halbig's last interview.
24    A.  Right.  Nico's not controlling -- Nico
25 doesn't control the content of anything that's done on

Paz, Brittany                                                    02-14-2022

170

1  air.  Or never did.
2      Q.  Okay.  What I'm trying to get at, this is an
3  internal editorial discussion about Mr. Halbig's
4  appearance on the show?
5      A.  No.
6      Q.  Can you tell me why you would take issue with
7  that?
8      A.  Because I don't -- because I don't agree with
9  the term editorial discussion.  And I don't know
10  whether there was an actual discussion.
11     Q.  Okay.  Yeah.  So let's go ahead and break
12  that down, first of all.  He's making some comments
13  here to Rob and directing him to see those comments.
14  He's saying, hey, look.  Here's some comments from
15  Halbig's last interview; right?
16     A.  It's not telling him to look at it.  It's
17  just here -- some comments on Halbig's last interview.
18  It's not telling him to do anything with that
19  information.
20     Q.  You just said it's not -- it's not telling
21  him to look at it.  Do you think that's a forthright
22  answer, Ms. Paz?
23     A.  It says some comments on Halbig's last
24  interview.  It's not telling him whether to do anything
25  with it or anything like that.  It's just --

171

1      Q.  I'm not saying about whether doing that.
2      A.  Okay.
3      Q.  You know that he intended him to look at it;
4  right?
5          MS. BLOTT:  Objection.  Argumentative.
6          She's asked and -- or answered the
7  question.
8          MR. BANKSTON:  And I'm -- I'm asking
9  her.
10     Q.  (BY MR. BANKSTON)  Do you think that answer
11  was reasonable?
12     A.  Yes, I do.
13     Q.  Okay.  What is an editorial discussion?
14     A.  Your definition of editorial discussion or
15  mine?
16     Q.  Absolutely not mine.  No, yours.  Because you
17  were the one who didn't object to these topics and then
18  told the court you were going to go get prepared on
19  them.  I want to know what you say editorial discussion
20  is.
21     A.  The company doesn't really adhere to the term
22  editorial discussion, which is why I said I didn't
23  agree with the term.  So, I mean, in terms of editorial
24  discussions as a big media company would term it, the
25  company doesn't really engage in editorial discussions.

172

1          So there's no daily group roundtable as to
2  what we should cover and what we shouldn't cover or how
3  we should cover it or how we shouldn't cover it.  So
4  that's why I don't agree with the term.
5      Q.  So when it comes down to that topic,
6  editorial discussions on Sandy Hook, I would take it
7  that would have been the easiest topic for you to
8  prepare for because there are none; right?
9      A.  We don't have -- that's correct.  We don't
10  have editorial discussions.
11     Q.  Okay.
12     A.  There's no such thing as an editorial
13  discussion.
14     Q.  That's -- that's what Ms. Karpova told me
15  too.  So I'm glad y'all are on the sage page there,
16  that y'all are going to go with that.  Before this
17  lawsuit -- okay.  Hold on here.  Hold on.
18          In terms of the company, I believe what you
19  testified for me earlier is notwithstanding that e-mail
20  we just saw, which, for instance, you say there was no
21  directions to do anything and nobody may have followed
22  up on it or anything, the company did not take an
23  interest, any sort of specialized interest or publish
24  any information about the lawsuit involving Mr. Halbig
25  and Mr. Pozner.  Is that what you're saying?

173

1      A.  I haven't seen any information published
2  about that particular lawsuit.
3      Q.  Have you watched the March 4th, 2015 video
4  with Mr. Halbig that was in the plaintiffs' petition?
5      A.  Let me see.  What date is that, March --
6      Q.  March 4th, 2015.
7      A.  And you don't know the ID number for that?
8      Q.  No, I don't.  I got a title for it, but
9  I don't -- yeah.
10     A.  Do you know what the title is?
11     Q.  New Bombshell Information Inbound.
12     A.  Okay.  Yes.  So March 4th, I did -- yes, I
13  did review that.
14     Q.  All right.  What's that bombshell
15  information?  You know what that is; right?
16     A.  Let -- so just for reference, the company's
17  ID number is _7ib5WkULBY.
18     Q.  Okay.
19     A.  So if I could just go to my notes regarding
20  that.  At some point, I ran out of tabs, so -- sorry, I
21  just want to go through my notes.  And I ran out of
22  tabs, so I apologize.
23     Q.  That's all right.  We'll take as long as we
24  need.
25     A.  Sure.  Okay.  I found it.  Thank you.

Paz, Brittany                                                    02-14-2022

174

1    Q.  Okay.  So now, we're talking about the March
2  4th, 2015 video with the New Bombshell Information
3  Inbound.
4    A.  Yes.
5    Q.  You know what the bombshell information is;
6  right?
7    A.  Yes.
8    Q.  That's the subpoenas in that lawsuit with
9  Mr. Pozner and Mr. Halbig; right?
10    A.  Just let me review my notes for just one
11  second.
12    Q.  Sure.
13    A.  No.  Well, so --
14    Q.  I mean, I'm quoting you a question and answer
15  of Mr. Jones.
16    A.  They -- they asked -- so -- and here's the
17  problem.  The -- there are subpoenas that were also
18  issued in connection with the FOIA litigation.
19    Q.  That's right.
20    A.  Which is not the same thing as the Florida
21  litigation.  And so they -- I thought -- my
22  understanding was they were talking about subpoenas
23  relating to the FOIA --
24    Q.  Maybe we'll pull up that video again.
25    A.  -- case.  But I could be mistaken.  But --

175

1    Q.  Yeah.  Because, I mean, what happens in that
2  video, I'll just tell you, is he says -- asks him what
3  the bombshell information is, and he says about the
4  subpoenas.
5    A.  Uh-huh.
6    Q.  And he's talking about Mr. Pozner's lawsuit.
7  And then he says, and also, I got this other stuff
8  going on up with the FOIA stuff too.
9    A.  Right.
10    Q.  So that's real interesting too.
11    A.  Right.  They -- we did -- we did discuss on
12  many occasions in multiple videos the FOIA litigation.
13  I think it was over, like, three hearing dates.
14    Q.  Right.  But what I'm asking is, the bombshell
15  information here is that he had served his subpoenas to
16  Mr. Pozner?
17    A.  So I don't recall -- in my notes, just based
18  on my notes, I didn't write down the name and I don't
19  know if the name of the case was ever specified.  But
20  like I said, there was a lot of litigation and that's
21  what they were talking about was the subject of it was
22  that subpoenas had been issued.
23    Q.  All right.  Did you tell --
24    A.  But I'm not sure which case, is my point.
25    Q.  For these notes that you're taking about

176

1  these things Mr. Halbig was talking about --
2    A.  Yes.
3    Q.  -- that InfoWars is putting on the air, did
4  you talk to Mr. Halbig about them?
5    A.  No, I have never spoken to Mr. Halbig.
6    Q.  Did you try?
7    A.  No.
8    Q.  Okay.  Why was the company interested in the
9  legal action between Pozner and Halbig?
10    A.  Why?
11    Q.  Uh-huh.
12    A.  I think during this time period, it was in
13  the coverage of -- it was -- this time period
14  simultaneously was the time period that the FOIA
15  hearings were happening or going to happen.  And what
16  usually we do as far as the -- what is in the news
17  cycle, we talk about what's in the news cycle.  And so
18  this would have been something that was in the news
19  cycle.
20    Q.  Mr. Pozner's lawsuit was in the news cycle?
21    A.  I don't know.
22    Q.  All right.  That's -- I'm not asking you
23  about the FOIA stuff.  I get why they were interested
24  in the FOIA stuff.
25    A.  The FOIA stuff was in the news cycle.

177

1    Q.  Right.  Well, I mean, I'm not sure.  When you
2  say news cycle, what does that mean that FOIA stuff was
3  in the news cycle?
4    A.  So when I say news cycle, that's a good
5  question.  So news cycle means that they source every
6  day from a variety of different places.  And so every
7  day, they will kind of scan, you know, for example,
8  Twitter, what is trending.  They'll -- they'll source
9  various news sites.
10        They'll source social media as to what's
11  trending on social media.  And then they'll decide what
12  is trending in the news cycle that way.
13    Q.  Who is -- who is in the news cycle -- who is
14  covering FOIA besides InfoWars and Dan Bidondi?
15    A.  You mean another news source?
16    Q.  Yeah.  How did it get in the news cycle?
17    A.  I don't know which source are you -- are you
18  referring to.  Are you referring to, like, a news media
19  source, or one of the sources that they are sourcing
20  for their information?
21    Q.  No.  I mean, you say they were discussing it
22  because -- FOIA because it was in the news cycle.
23    A.  Right.  It was relevant at the time because
24  it was something that they had seen in the news cycle.
25    Q.  Where did they see it?

Paz, Brittany                                           02-14-2022

178

1    A.  I don't know.  I'm not sure.
2    Q.  All right.  Because I --
3    A.  They don't mention it -- the video.
4    Q.  There's no reporters at that FOIA hearing
5  besides Dan Bidondi.  And Mr. Halbig's there along with
6  her -- his lawyer.  I'm just trying to understand who's
7  covering that.
8    A.  But that doesn't mean it's not in the news
9  cycle.  That doesn't mean that there's not Internet
10  chatter about it.  And that was a source of what
11  they --
12    Q.  Got you.
13    A.  -- found to be trending.  So just because
14  there wasn't a newspaper article there doesn't mean
15  that it wasn't trending on the Internet or trending in
16  social media or something that -- an interest was put
17  forth in some way.
18    Q.  Let me -- let me make sure.  Do you have any
19  idea sitting here today whether it was trending on
20  social media, or is that just a theoretical popularity?
21    A.  This particular -- this particular article?
22    Q.  Uh-huh.
23    A.  No, I don't.
24    Q.  All right.  So when you say they were
25  covering FOIA because it was trending in the news

179

1  cycle, you have no idea if that's true?
2    A.  I'm saying that this is their general
3  procedure as how things are covered.
4    Q.  Right.  But you don't understand how they
5  covered FOIA; right?
6    A.  This -- the FOIA hearings?
7    Q.  Yeah.
8    A.  How it came into their purview?
9    Q.  Uh-huh.
10    A.  I don't know.
11    Q.  Right.  And so if Mr. Halbig was
12  communicating with Nico or anybody else about how to
13  set this up and make this happen, you haven't seen any
14  of that?
15    A.  No, I don't think that's accurate.  So I -- I
16  do know that they were in communication about
17  coordination of getting him onto the air.  I do know
18  that.
19    Q.  Okay.  All right.
20    A.  But -- but that would have only had happened
21  if they -- somebody had made a determination that this
22  was relevant or worth talking about.  And then also,
23  caveat to that is, these are based on -- well, whoever
24  was interested in it at that time; right?  So --
25    Q.  All right.  Well, we've gotten a lot of why

180

1  they might be interested in the FOIA hearing.
2    A.  Yes.
3    Q.  And we know that they sent a reporter up
4  there, Halbig went up there, we -- we know about that.
5  What I'm interested in is why is the company interested
6  in that Florida lawsuit between Mr. Pozner and
7  Mr. Halbig, which has nothing to do with the FOIA.  Why
8  is it interested in that?
9    A.  So at this point in time, Mr. Jones
10  references specifically the copyright claims that were
11  going on in the YouTube -- for YouTube.  So it was
12  interested in the actions that Mr. Pozner was taking.
13  He specifically references the copyright claims in that
14  video.  And so that particular aspect of it, I think,
15  would have made Mr. Jones continuing to be interested
16  in it.
17    Q.  Okay.  So we can agree that the company was
18  to some extent following that lawsuit?
19    A.  Sure, to the extent that Mr. Halbig came on
20  and talked about the subpoenas that were being issued.
21    Q.  And to the extent that Nico was sending
22  information to Rob Dew about the lawsuit.
23    A.  I don't know that Rob had ever read it.  But
24  I -- but it is in the company's e-mail, so yes.
25    Q.  Right.  And, I mean, Nico certainly read it.

181

1  We know that.
2    A.  It appears so.
3    Q.  And was interested enough into it to turn it
4  on over to the nightly news director; right?
5    A.  I don't know what his policies and practices
6  are regarding forwarding information.  I don't know if
7  he just forwards everything regarding a particular
8  guest.  He knew that Rob would have been interested in
9  that particular guest and so forwarded it.  So I don't
10  know what his policy is.
11    Q.  And you didn't ask to find out what that
12  policy was; right?
13    A.  I didn't ask him that, no.
14    Q.  Now, before this lawsuit was filed, the
15  company knew that Mr. Pozner was being harassed by
16  Mr. Halbig; right?
17    A.  I'm sorry, repeat the question.
18    Q.  Yeah.  Before this lawsuit was filed, the
19  company knew that Mr. Pozner was being harassed by
20  Mr. Halbig.
21    A.  I don't -- I don't know that, no.  Because I
22  think we talked about earlier, I don't know at what
23  point anybody became aware of what he was doing just
24  because they stopped reading his e-mails.
25    Q.  Because he's kind of crazy; right?

Paz, Brittany                                          02-14-2022

182

1    A.  I think that his e-mail communications got
2  more and more bizarre as time gone -- went on.
3    Q.  So we --
4    A.  I think that was the word that Nico used was
5  bizarre.
6    Q.  Hold on.  You've -- you've read a lot of
7  Wolfgang Halbig e-mails, I'm taking it?
8    A.  I did, yes.
9    Q.  So you've read e-mails from him, like, in
10  2014 and you've probably read e-mails from him up in
11  2017; right?
12    A.  Yes, I've read a lot of e-mails.
13    Q.  Are you going to tell me that the e-mails he
14  sent in 2014 are any less crazy than the e-mails he
15  sent in 2017?
16    A.  I think they've gotten crazier.
17    Q.  Okay.  But we can both agree that there are
18  plenty of e-mails he sent in 2014 that the company did
19  in fact read and thanked him for --
20    A.  Sure.
21    Q.  -- that are -- that are crazy?
22    A.  Yes.
23    Q.  Okay.  And you understand InfoWars, of
24  course, you -- you may not know if they're even aware
25  of them, but they produced e-mails where Mr. Pozner was

183

1  being harassed by Mr. Halbig?
2    A.  We have produced those -- those types of
3  e-mails, yes.
4    Q.  Okay.  But you sitting here today don't even
5  know if the company even knew about them; right?
6    A.  At the time, no.  I don't know.
7    Q.  Okay.
8    A.  We know about them now, obviously.
9    Q.  Sure.  Sure.  When did you find out?
10    A.  Find out what?
11    Q.  When the company find out that Mr. Halbig was
12  harassing Mr. Pozner?
13    A.  I don't know.  I'm not sure if they reviewed
14  the e-mails as -- as a result of this lawsuit, going
15  back.  But as I said, he stopped coming onto the air.
16  It was a discrete period of time and then he wasn't on
17  the air anymore.  And then there weren't any real
18  communications with him.
19    Q.  All right.  Does the company contend
20  Mr. Pozner is a gun regulation advocate?
21    A.  Did we -- did we talk about this?
22    Q.  We haven't talked about Mr. Pozner yet,
23  huh-uh.
24    A.  Mr. Pozner individually, or in his connection
25  with the HONR Network, or both?

184

1    Q.  Let's do both, sure.
2    A.  I think that that would be an accurate
3  description.  I think the company does make a claim
4  that he is a advocate in connection with the First
5  Amendment and the Second Amendment.
6    Q.  Okay.  Do you -- does the company have any
7  facts, any evidence, any knowledge whatsoever that
8  Mr. Pozner has ever said a word publicly ever about
9  guns?
10    A.  I don't know the answer to that.  But also,
11  there is, I mean, I know that they're divorced, but his
12  ex-wife has made some comments and political activism
13  regarding gun control.
14    Q.  Come on, you know that's not relevant to my
15  question.  You have to know that.  I mean, I -- I --
16  look.  I know you're not an uneducated witness.  You're
17  a lawyer, you're an attorney.  And when I sit here and
18  -- and I ask you, does the company have any -- any
19  evidence that Mr. Pozner has ever said any information
20  about guns and you start speculating about what his
21  ex-wife said.  That --
22    A.  I'm not speculating.  I've reviewed documents
23  about that.  But I understand your question.
24    Q.  Let's put it this way.  No, and I don't think
25  you do.  Because what I'm asking you is you start

185

1  giving me information speculating about what
2  Mrs. Pozner's statements at some point in her life
3  reflect on what Mr. Pozner may or may not be in terms
4  of a gun regulation advocate.  You know that's not
5  relevant; right?
6    A.  I don't think that it's not relevant.  But I
7  think that in connection with Sandy Hook and the Second
8  Amendment, HONR in -- specifically, I don't have any
9  information as I sit here today about Second Amendment.
10  First Amendment, yes.  Second Amendment, I don't have
11  any information as I sit here today.
12    Q.  Well, we just talked about -- you had told
13  that the company had reason to say in the February
14  12th, 2015 video that HONR was engaged in anti Second
15  Amendment activities.  You remember us talking about
16  that?
17    A.  That's not what I said.  What I said was,
18  Mr. Dew had an opinion about that that he aired and
19  that was his opinion.
20    Q.  All right.  So here's what I'm trying to get
21  at.  What facts inform that opinion?
22    A.  And as we talked about earlier, I told you I
23  didn't know that.
24    Q.  Okay.  But the problem is, is that I believe
25  that you testified that the company just now does

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 82 of 211

Paz, Brittany                                                                02-14-2022

186

1 interpret it in a way that Mr. Pozner is a Second
2 Amendment advocate.  Does it or doesn't it?  I mean,
3 that's what I'm trying to get at.
4     A.  Like I said, I don't -- I can't point to any
5 specific material as I sit here today regarding gun --
6 the gun control aspect of it.
7     Q.  Okay.  Has your husband ever said anything
8 you don't agree with?
9     A.  My husband?
10    Q.  Yeah.
11    A.  Sure.
12        MS. BLOTT:  Objection.  Argumentative.
13 Outside the scope.
14    Q.  (BY MR. BANKSTON)  Do you think you should be
15 -- do you think you should be held to have participated
16 in everything that your husband said?
17    A.  No.
18    Q.  Okay.  You know what information the company
19 has on Veronique De La Rosa?
20    A.  As far as Ms. De La Rosa goes, I am aware of
21 the comments that she made in connection with gun
22 control in connection with her son's funeral and the
23 governor, I believe, attending the funeral.  I believe
24 there might also -- there was also an interview.  And
25 aside from that, I -- I don't think I'm aware of

187

1 anything else.
2     Q.  How did you -- what did you do to find out
3 what the company knows about Ms. De La Rosa?
4     A.  As we discussed earlier, I did do a search in
5 the documents that were produced.  I did talk to
6 Mr. Jones about Ms. De La Rosa.
7     Q.  Do you -- so when you search, you just search
8 for Veronique De La Rosa?
9     A.  Yes, or -- or Pozner.  I didn't know what
10 name it would be under because I wasn't sure when their
11 divorce happened, so --
12    Q.  I'm going to correct you once again.  That's
13 Pozner is their names.
14    A.  Oh, I'm sorry.  Pozner, yes.
15    Q.  Right.  Their names are Pozner.
16    A.  So I -- like I said, I didn't know when their
17 divorce happened, so I didn't know which name she was
18 using.
19    Q.  Okay.  And did you find any documents?
20    A.  Aside from the documents that we listed?
21    Q.  What do you mean, the documents you listed?
22 What does that mean?
23    A.  I mean, the information in connection with
24 her statements at the funeral on gun control.
25    Q.  You saw some documents about that?

188

1     A.  I -- I want to say I saw an article about it,
2 and then the interview.
3     Q.  Which -- what are you talking about?
4     A.  She did -- did an interview.  Was that the
5 interview with -- with Anderson Cooper?
6     Q.  She's done an interview with Anderson Cooper,
7 yeah.
8     A.  That's the only interview that I've seen.
9     Q.  You saw that?
10    A.  Yes.
11    Q.  Okay.  Where did you get that video?
12    A.  I believe that was a video that we had posted
13 and was referenced numerous times by Mr. Jones on the
14 show.
15    Q.  No, no.  I understand Mr. Jones many, many
16 times --
17    A.  Yes.
18    Q.  -- has posted a video of the last five
19 seconds of that interview with --
20    A.  Right.
21    Q.  -- no sound where Mr. Anderson Cooper's head
22 is turning and his nose disappears; right?
23    A.  Yes.
24    Q.  But there's nothing -- Ms. De La Rosa isn't
25 talking in those; right?

189

1     A.  No, no.  It was mostly just shots of Anderson
2 Cooper.
3     Q.  Right.
4     A.  Right.
5     Q.  So how did you see the interview?
6     A.  I don't think I watched the entire interview.
7 I think that's the entirety -- my knowledge is just
8 what was posted about that interview.
9     Q.  There's -- I don't understand, Ms. Paz.
10 There's nothing about guns -- I mean, Ms. De La Rosa
11 isn't talking.  So how do you understand what she said?
12    A.  I'm sorry, I don't understand the question.
13    Q.  When -- when Ms. De La Rosa is featured on
14 InfoWars --
15    A.  Right.
16    Q.  -- in all these videos of --
17    A.  Right.
18    Q.  -- Anderson Cooper's nose disappearing --
19    A.  Right.
20    Q.  -- she's not talking.
21    A.  Right.  But the topic --
22    Q.  So how do you know what she said?
23    A.  But that topic of that conversation, it was
24 related to Anderson Cooper's coverage of the shooting.
25    Q.  Sure.

Paz, Brittany                                    02-14-2022

190

1    A.   Right.
2    Q.   So how do you know she was talking about
3 guns?
4    A.   I think that that was what was represented as
5 the topic of that interview.
6    Q.   Represented by who?
7    A.   By the media.
8    Q.   Why do you -- I'm trying to --
9    A.   -- reason it was covered.
10   Q.   Look, I know -- you don't have any personal
11 knowledge.  You don't -- you -- you -- you had nothing
12 to do with this thing until two weeks ago.  So when you
13 come in here and tell me that -- that Ms. De La Rosa
14 was talking about guns in an interview, where did you
15 get that?
16   A.   As I said, I think that was the topic of the
17 conversation of the interview.
18   Q.   I -- I know you're saying that.
19   A.   Yes, that's my answer.
20   Q.   Where did you -- where did you get that piece
21 of information?
22   A.   From the videos that I watched.
23   Q.   All right.  So what video does that come
24 from?  I don't understand, because like we've said,
25 you've never seen --

191

1    A.   Comes from the videos that were produced by
2 InfoWars.
3    Q.   Okay.  So at what -- what point was it ever
4 -- did you see Ms. De La Rosa ever talking about guns?
5    A.   Did I personally watch the entirety of that
6 video, that interview?
7    Q.   I -- that's not what I'm asking, actually.
8 Because now, you're telling me that you got this
9 information not from the interview itself, which
10 I believe you told me you watched, and then actually we
11 just saw the -- saw that.
12   A.   No.  I watched the video of Anderson Cooper.
13   Q.   Right.
14   A.   That's what I watched.
15   Q.   Right.  So now you're telling me that
16 somehow, you got it from the InfoWars videos that
17 Ms. De La Rosa was talking about guns.  Where did you
18 get that?
19   A.   No.  What I said was, that the reason that
20 interview was covered was because the topic of it from
21 Anderson Cooper's perspective was guns.
22   Q.   Who said that?  Who said that the topic of
23 Anderson Cooper's interview from that perspective is
24 guns?
25   A.   That's what I understood that the topic was.

192

1    Q.   I -- I -- I don't -- I'm not asking you what
2 you understood.  I'm wondering how did you arrive at
3 that understanding?
4    A.   And I testified my basis for my conclusion
5 was watching the videos that InfoWars posted.
6    Q.   Okay.  The InfoWars videos.
7    A.   Yes.
8    Q.   All right.  So let us talk about those videos
9 you watched.
10   A.   Sure.
11   Q.   What part of those videos, any of those
12 videos, anything from any of those videos, who said or
13 what part of it did you glean from that that interview
14 was about guns?
15   A.   That was the reason why that was being
16 covered.
17   Q.   I don't -- you've got to understand there's a
18 disconnect here.  I heard --
19   A.   I don't understand the disconnect.
20   Q.   I a hundred percent understand your testimony
21 that you believe based on some information you saw that
22 that topic of that interview was about guns.  I
23 understand that completely, hundred percent.  That for
24 some reason or another, an interview that you knew
25 nothing about two weeks ago, you now believe has

193

1 something to do with guns.
2        And I'm trying to figure out what -- and I
3 know you say that because it came from the videos.  And
4 I'm trying to figure out what in those videos at any
5 point led you to the conclusion that Ms. De La Rosa was
6 talking about guns?
7    A.   And again, I'm going to testify -- and I
8 understand you don't understand my answer.  I can't
9 help you understand it other than to say that I watched
10 the videos, that it appears that the purpose and reason
11 why Mr. Jones wanted to cover it was because that
12 interview was based on that topic.  But --
13   Q.   Again, did Mr. -- is this something you
14 gained from something Mr. Jones said, something Ms. De
15 La Rosa said, something another person said?  I don't
16 -- I don't understand where this is coming from that
17 you just say, I watched these videos and now I
18 understand the purpose of that interview was about
19 guns.
20        MS. BLOTT:  Objection.  Asked and
21 answered.
22   Q.   (BY MR. BANKSTON)  Do you know -- do you know
23 what person that comes from?
24   A.   Do I know which person it comes from?
25   Q.   Yeah, why you believe that, in other words.

Paz, Brittany                                              02-14-2022

                                                                    194

1 The -- the information, who it came from that that's
2 why you believe that.
3     A.  Like I said, it would have been in the
4 videos.  So if the particular video was being hosted by
5 Mr. Jones, he thought that that video was relevant for
6 that purpose, so it probably came from Mr. Jones just
7 based on the videos.
8     Q.  Okay.  How do you know what Mr. Jones
9 thought?  Is he -- is this something you got from an
10 interview with him or something you saw in a video?
11    A.  No.  I'm just -- like I said, the totality of
12 my knowledge is based on the videos.
13    Q.  Okay.  And so that video itself, you -- do
14 you remember any specific things Mr. Jones said in that
15 video about guns?
16    A.  Which -- which video?  Because he talks about
17 --
18    Q.  I don't know.
19    A.  -- that interview a number of times.
20    Q.  I don't know.  You're telling me that that's
21 where you came from it.
22    A.  Well, so he talks about the -- well, most of
23 the subsequent information that he talks about is just
24 about Anderson Cooper and the nose disappearing.  But
25 as far as the first time that he references that video,

                                                                    195

1 mostly what he talks about is -- is the nose
2 disappearing.
3         But I think the reason, like I said, the
4 topic of it, that's the reason why he covered it.
5     Q.  Do you -- do you recall any InfoWars videos
6 that you've watched during this litigation --
7     A.  Sure.
8     Q.  -- in which you have seen Anderson Cooper
9 talking about guns?
10    A.  No.  Just because I think that the videos
11 that they posted didn't have any sound.  The purpose of
12 showing the video and the argument that was made of the
13 video was that his nose was disappearing and Alex's
14 opinion that it was greenscreened or bluescreened, I
15 can't remember which.
16    Q.  Okay.
17    A.  But I don't think that that -- Anderson
18 Cooper had any audio.
19    Q.  Or my client; right?  You've never heard --
20 you've never heard Veronique De La Rosa speak, I would
21 take it?
22    A.  No, I've never heard her speak.
23    Q.  Okay.  Now, Mr. Jones' position about what
24 that interview was for --
25    A.  Uh-huh.

                                                                    196

1     Q.  -- being gun related.  Is that a -- is that a
2 factual claim or is that an editorial opinion?  What do
3 you think that is?
4     A.  You mean is it Mr. Jones' opinion?
5     Q.  Or what -- it's tough because I don't really
6 know what you're drawing this from still.  So I'm --
7 I'm going to say whatever information it is that you're
8 drawing that Free Speech Systems put in a video that
9 makes you think that that interview is about guns.  Is
10 that a fact or an editorial opinion that you're drawing
11 that from?
12    A.  Well, so I don't know that I would
13 necessarily term it as an editorial opinion.  But I
14 think that broadly speaking, the company's coverage of
15 Sandy Hook was surrounding gun control and how in the
16 aftermath of the tragedy, there was a push for gun
17 control.
18        So that underlying coverage would inform that
19 opinion.  I don't know that I would necessarily term it
20 editorial discussions or opinions.
21    Q.  Sure.  Based on what the company knows --
22 okay.  Again, talking about what it knows.  First of
23 all, before we move on from Veronique, I just want to
24 make sure -- I may have gotten confused.  In terms of
25 documents that you have reviewed relating to Veronique

                                                                    197

1 De La Rosa, that's pretty much limited to the InfoWars
2 videos?  Do you have written documents you reviewed
3 about Veronique?
4     A.  I don't recall.  Like I said, I've reviewed a
5 lot of documents, so --
6     Q.  Okay.
7     A.  -- I don't recall.
8     Q.  Based on what the company knows, based on its
9 knowledge of the plaintiffs, does the company have any
10 reason to contend that any of these parents have been
11 faking their level of distress over InfoWars' actions
12 as it regards Sandy Hook?
13    A.  No.  I think there is a distinction between
14 distress related to the shooting and distress related
15 to the coverage, which should be litigated.  But also,
16 I think there's a distinction -- should -- probably
17 should be made between InfoWars airing other people's
18 coverages and then the original source of the coverage.
19    Q.  Are you saying that as a matter of the
20 company's personal opinion, or is this the company's
21 legal opinion, what is this?
22    A.  I think it's a legal opinion as to much of
23 the sourcing.
24        MS. BLOTT:  I'm going to object to the
25 extent that you're getting into any conversations

02-14-2022

198

1 you've had with any of the attorneys for Mr. Jones,
2 InfoWars, Free Speech Systems, Inc., or Mr. Shroyer.
3        MR. OGDEN:  Or Kit Daniels.
4        THE WITNESS:  That's tomorrow, I
5 think.
6        MS. BLOTT:  Kit Daniels is not an
7 attorney.
8        MR. OGDEN:  I understand that.  The
9 other is Mr. Shroyer.
10    A.  The original --
11       MR. BANKSTON:  That's a good point.
12    A.  The original sourcing of the --
13       MS. BLOTT:  But they are defendants in
14 this lawsuit for which she's here today.
15       MR. BANKSTON:  Yeah, but if she had
16 conversations with an attorney about Kit Daniels or
17 anything that related to attorney-client privilege,
18 that would be equally privileged in this case.  And you
19 know that, come on now.
20    Q.  (BY MR. BANKSTON)  Is that -- is that
21 basically the --
22    A.  The sourcing -- the original sourcing of the
23 material, so, like, for example, Free Speech Systems'
24 position is that it is a -- it is a blogger, it is a
25 punditry, it's commentary.  We're not doing independent

199

1 resource -- resourcing or research and we're not really
2 engaged 99 percent of the time in journalism.
3        So the original sourcing of these materials
4 is another person, is a third party person.
5        MR. BANKSTON:  We'll talk about that
6 later.
7    A.  So I guess the question is to what extent
8 those people are responsible for their -- their
9 opinions unassociated with --
10    Q.  (BY MR. BANKSTON)  Got you.
11    A.  -- free speech.
12    Q.  So if Wolfgang Halbig's on air, it's the
13 company's position that maybe it doesn't have any
14 responsibility for what Wolfgang Halbig says?
15    A.  That's correct.
16    Q.  We'll see how that goes.  Based on what the
17 company knows, does the company have any reason to
18 dispute that these parents' grieving process of its --
19 of their children has been impacted by InfoWars'
20 actions as it regards Sandy Hook?
21    A.  I think it's subject to the same answer from
22 my last question.
23    Q.  But, I mean, in other words, that's why I'm
24 trying to kind of follow up on here.  Is I understand
25 you think there may be distinctions that need to be

200

1 made about grief that was caused directly by the
2 shooting itself and maybe things that were said
3 afterwards; right?
4        And that there may also need to be
5 distinctions about who said it.  Maybe it was third
6 parties, maybe it was InfoWars.  And I get that those
7 distinctions exist.  But notwithstanding those
8 distinctions and whatever slices need to be cut out of
9 this pie, you will agree with me that these parents'
10 grieving process has been affected by what InfoWars did
11 about Sandy Hook?
12    A.  By what InfoWars did, by what other people
13 who are posting on the Internet did, by, you know, any
14 other third party, any other news media coverage, yes,
15 I'm sure it has.
16    Q.  Okay.
17    A.  Not just InfoWars.
18    Q.  Not just InfoWars?
19    A.  That's correct.
20    Q.  Okay.  Can you tell me another major -- major
21 media organization who has covered Sandy Hook from the
22 same perspective as InfoWars wars, i.e., saying that
23 my -- my clients are fake.  Do you know anybody else
24 who's done that?
25    A.  Other news media organizations have covered

201

1 it.  I don't know necessarily from the same
2 perspective.
3    Q.  Well, I mean, you're saying that there's
4 other people who are responsible?
5    A.  There are other people's opinions that have
6 been talked and discussed.  I just saw an article
7 yesterday that is still claiming that Sandy Hook didn't
8 happen and this article was not amplified in any way by
9 InfoWars.  So these people are still out there and you
10 can Google search it and it will still come up on a
11 Google search.
12    Q.  Now, you're -- you're aware enough to -- to
13 realize that if somebody was writing about Sandy Hook
14 being faked today, there is a substantial likelihood
15 that they were influenced by InfoWars' coverage.
16 That's a possibility; right?
17    A.  It's also a possibility they're doing their
18 own independent research.
19    Q.  Hundred percent.
20    A.  It also is a possibility they're basing their
21 opinions on Halbig's.  There's also of an -- based on
22 somebody else.  I don't know where their information is
23 coming from.
24    Q.  Even if they based it on Halbig, there's a
25 substantial possibility they know about Halbig because

Paz, Brittany                                           02-14-2022

202

1 of him being brought to public consciousness through
2 InfoWars.  That's a possibility; right?
3     A.  I don't know how it's being brought to their
4 consciousness.
5     Q.  Exactly.  So what I want to -- I want to get
6 to is, can you name me everybody else's who's, like, I
7 mean, I think you -- you've -- you've -- you've
8 acknowledged that some of the impact on the grieving
9 process of my parents came from InfoWars.  Can you tell
10 me everybody else who needs to be blamed?
11    A.  Whoever's doing their own individual
12 reporting on the -- on the issue.  So, like, for
13 example, like I said, I saw an article that was written
14 yesterday.  Much of the opinions that were written --
15 written in that article, it was, like, 150 pages long,
16 had nothing to do with anything InfoWars had ever
17 talked about.
18    Q.  Really?
19    A.  Right.
20    Q.  Okay.
21    A.  So it's -- so they're doing their own
22 independent -- I don't -- I don't want to call it
23 research, but, you know, their opinions are based on
24 things that are not connected in any way to this.
25    Q.  Okay.  Can you -- can you produce that for

203

1 me?  Do you have that article you saw?
2     A.  I can e-mail it, I'm sure, if --
3     Q.  Okay.  I just to want make sure --
4     A.  -- Attorney Blott --
5     Q.  -- it's a thing that you could find again if
6 you needed to.
7     A.  Sure.
8     Q.  Okay.  And -- and your representation is you
9 read all 150 pages of that and none of it comes from
10 InfoWars?
11    A.  I did not read all -- I scanned it.  So,
12 like -- so for example, some of it was -- in there was
13 based on a lawsuit Mr. Pozner filed against Mr. Fetzer
14 in either Wisconsin or Michigan, I'm not really sure
15 which state, for defamation.  I don't believe we've
16 ever covered that defamation suit in any way.
17       She also cites to some other photographs that
18 I don't think we ever covered.  So these are -- those
19 are things that really are not being advised by us.
20    Q.  All right.  When you --
21    A.  They're getting them in other places.
22    Q.  When you say InfoWars, you do not believe has
23 covered the Fetzer versus Pozner defamation suit?
24    A.  The one that was -- was it Wisconsin?
25    Q.  Uh-huh.

204

1     A.  I don't know that we've covered it in any
2 substantive way.  Like I said, Fetzer really wasn't --
3     Q.  I want to make -- I want to make that
4 distinction.
5     A.  Sure.
6     Q.  You don't know; right?
7     A.  I've not seen any material that -- that shows
8 that.  If you want to show me it --
9     Q.  For sure.
10    A.  -- I'd be happy to look.
11    Q.  Right.  And that's what I -- I don't need
12 to show it to you --
13    A.  Sure.
14    Q.  -- because I -- I don't want to get into
15 that.  What I want to make sure I understand is that
16 you don't know if InfoWars has covered that.
17    A.  I don't believe it's been covered.  I've not
18 seen any information to that effect.
19    Q.  Okay.  And -- and I want to make sure from
20 this last question we talked about on the grieving
21 process because I know you're making a distinction that
22 other people may be responsible too.  The company does
23 not dispute that it bears some responsibility for the
24 impact that it had on the grieving process of these
25 families?

205

1     A.  I don't know that I would necessarily agree
2 with that.
3     Q.  Okay.  But we -- you did agree that InfoWars,
4 its coverage did impact that grieving process, you just
5 don't think they have any responsibility for it; right?
6     A.  That's correct.
7     Q.  Okay.  If, over the course of years, InfoWars
8 was telling the world that Sandy Hook is fake and that
9 controversy stays alive, does the company understand
10 that it might be hard for my clients to have closure on
11 the death of their children?
12    A.  I don't think that -- and I -- maybe we need
13 to talk about what fake means.  So when you said fake,
14 is that -- does that mean children didn't die --
15    Q.  Yeah.  Let's -- let's do those.
16    A.  -- does that mean it is a fake flag, does
17 that -- what does -- what does fake mean?
18    Q.  No, I -- I get what you're saying, I do.  And
19 let's just go ahead and make sure we both are on the
20 same page.
21    A.  Sure.
22    Q.  I -- I don't think we do need to split a lot
23 of hairs about what fake is or is not.  And would you
24 agree with me that the reason that we don't need to do
25 that is because many, many times, people on InfoWars

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 87 of 211

Paz, Brittany                                                    02-14-2022

206

1  including Mr. Jones have unequivocally said that Sandy
2  Hook is completely fake, totally synthetic,
3  manufactured?  Do you agree with that?
4      A.  I agree those are direct quotes on Mr. Jones'
5  opinions, yes.
6      Q.  Okay.  So let's go back to the question.
7  Because now we can both -- we both understand and we
8  both agree that many, many times, it was said on
9  InfoWars that Sandy Hook was totally fake.  And if
10  that's a true thing, if that's the reality that that
11  was said many, many times, the company can understand
12  that if that keeps the controversy alive, my clients
13  might have a hard time having closure on the death of
14  their children; right?
15      A.  And here's the problem that I'm having, is I
16  think that the distinction is important because I think
17  there is a big difference between saying something is
18  synthetic in the sense that it could be a false flag, a
19  government operation, is not the same thing as saying,
20  your children did not die.
21      Q.  Very -- okay.  Let's make it really clear,
22  then.  Let's make sure we're really on the -- because
23  we talked about, yes, they did say it was totally fake,
24  totally manufactured; right?  But that may mean,
25  according to you, that kids could have died or they may

207

1  have not died; right?
2      A.  He said that numerous times.
3      Q.  Right.  But we both know that numerous times,
4  he said kids did not die.  We know that; right?
5      A.  I don't think that I agree with that
6  statement.  I think numerous times, he's questioned
7  some anomalies that -- or what he viewed as anomalies.
8  Numerous times, he did say, I think kids died.  Maybe
9  on one or two occasions, he's like, oh, maybe I'm not
10  sure if -- if they did or didn't die, I'm not sure.
11      I can't make a decision either way.  But I
12  think that upon review of the videos, I think that
13  Mr. Jones, his opinion was that on the whole, children
14  died.
15      Q.  Okay.  All right.  Probably -- probably what
16  we're going to need to do after the break, because I
17  didn't plan I'd be showing you videos today.  But I did
18  not think that there would be any resistance to the
19  idea of Mr. Jones saying, yeah, I used to think kids
20  died.  Nope, they sure didn't.  I didn't think there'd
21  be resistance to that idea.  So we may need to watch
22  some videos on that.
23      A.  Like I said --
24      Q.  But --
25      A.  -- I think there is one video clip, and I

208

1  think it's in -- I might want to say I can review my
2  notes.
3      Q.  We'll get -- trust me, we'll get to it.
4      A.  There is one video clip where he does say
5  that direct quote.  But there's numerous other quotes
6  where he says, I believe kids died and I -- or --
7  and/or I'm not sure whether kids died, but something
8  smells funny, or look at this issue, or look at that
9  issue.
10      Q.  Do you --
11      A.  So I think there is one video clip where he
12  says that.  But on the whole, numerous other times,
13  that is not what the coverage was.
14      Q.  He said in other videos, there are pictures
15  of kids they said that died that are still alive;
16  right?
17      A.  Can you point me to the video?
18      Q.  I will.  We'll get there.  I'm just wondering
19  if you know it right now.
20      A.  Off the top of my head, no.
21      Q.  Okay.  Let's take a break.  You need lunch?
22      A.  Yeah, that would be nice.
23      Q.  Okay.
24          THE VIDEOGRAPHER:  12:34 off.
25          (Recess from 12:34 p.m. to 1:45 p.m.)

209

1          THE VIDEOGRAPHER:  1:45 on the record.
2      Q.  (BY MR. BANKSTON)  One of the things we
3  talked about right before you left is that you saw an
4  article recently saying that Sandy Hook was fake.  You
5  remember that?
6      A.  Yes.
7      Q.  Okay.  And you told me that you wanted to
8  make sure it was clear that InfoWars didn't amplify
9  that article.
10      A.  Yes.
11      Q.  Okay.  But InfoWars, by that answer, I take
12  it you understand InfoWars does amplify things said by
13  other people about Sandy Hook.
14      A.  Amongst other things, but yes.
15      Q.  Okay.  And that's a choice InfoWars makes of
16  who to amplify and who not to amplify; correct?
17      A.  Yes.
18      Q.  Okay.  Have you ever been in a deposition
19  before?
20      A.  You mean, have I taken one, or have I given
21  one?
22      Q.  Ever been in a room where a deposition was
23  happening?
24      A.  Yes.
25      Q.  Okay.  Are those -- did you -- have you taken

Paz, Brittany                                                    02-14-2022

210

1 criminal law depositions or been present for civil law
2 depositions?
3     A.  There's no such thing as a criminal
4 deposition.  But yes, I've been in civil depositions.
5     Q.  We have them here in Texas, actually.
6     A.  Oh, we don't have any in -- in Connecticut.
7 Not allowed to take criminal depositions.
8     Q.  Okay.  Have you ever been in deposition
9 representing somebody in a civil deposition?
10    A.  Yes.
11    Q.  Okay.  So you've done some civil work, I take
12 it?
13    A.  Yes.
14    Q.  Okay.  How long have you practiced?
15    A.  This is my tenth year.
16    Q.  Okay.  Have you ever been a corporate
17 representative before?
18    A.  No.
19    Q.  I assume that you have a written agreement
20 for your work in this case.
21    A.  You know what, and I don't think I ever
22 actually got a written agreement.  I don't think I
23 signed an agreement.
24    Q.  Okay.  Do you have an invoice?
25    A.  That I sent to the company?

211

1     Q.  Uh-huh.
2     A.  Yeah, I believe so.
3     Q.  Okay.  So in other words, the amount of money
4 you were paid was documented at some point?
5     A.  Yes, through my internal documenting system.
6 I use Clio.
7     Q.  Okay.  Now, you understand there's a
8 protective order in this case?
9     A.  Yes.
10    Q.  And I haven't seen a signed protective order
11 acknowledgment from you.  Have you done that?
12    A.  I have not been provided one, but I'm happy
13 to do it.
14    Q.  Okay.  But, in other words, before being
15 exposed to my client's confidential information, you
16 didn't sign a protective order?
17    A.  No, I haven't signed anything.
18    Q.  Okay.
19        MR. BANKSTON:  Can you give me --
20 where's my book?  Oh, no, that's the notice.
21    Q.  (BY MR. BANKSTON)  Okay.  So the first thing
22 I want to put on the record is that you have given me
23 this notebook; right?
24    A.  Yes.
25    Q.  I have marked it as Exhibit 8.  Do you see

212

1 that right there?
2        (Exhibit No. 8 marked.)
3     A.  Yes.
4     Q.  (BY MR. BANKSTON)  Okay.  From what I'm able
5 to tell, this notebook contains a couple of things.
6 And one of the things it seems to contain is a chart of
7 videos that you've reviewed; right?
8     A.  Yes.
9     Q.  And some notes you've taken on that?
10    A.  Yes.
11    Q.  There also seem to be some notes you've taken
12 on interviews and depositions and various things like
13 that?
14    A.  Yes.
15    Q.  And then there seem to be a lot of tabbed
16 pages with Bates numbers codes on them for videos;
17 right?
18    A.  Right.  That's generally my expanded notes on
19 the videos.
20    Q.  Okay.
21    A.  So the first chart you're referencing is,
22 like, my reference chart.  And then the spreadsheet
23 with the tabs that you're referencing, those are my
24 more in-depth notes --
25    Q.  Okay.

213

1     A.  -- on the videos.
2     Q.  Did you make this?
3     A.  Yes.
4     Q.  Okay.
5        MR. BANKSTON:  Good point, man.
6 That's strange.  Okay.
7     Q.  (BY MR. BANKSTON)  Let me just get that out
8 of the way right -- actually.  Because we're going to
9 start talking about some videos.  Do you see the video
10 on here that starts with professor claims?
11    A.  Yes.
12    Q.  Okay.  And then I see you've taken some notes
13 over to the side; right?
14    A.  Yes.  Like I said, this is just my basic
15 bullet point clip of what that video is about.  And
16 then I have more in-depth notes later on.
17    Q.  Okay.  And so one of the notes that you've
18 taken on that video -- first, can you tell me the date
19 on that video?
20    A.  1/10/2013.
21    Q.  Okay.  And then you have some notes in there
22 about Owen Shroyer?
23    A.  Yeah.
24    Q.  Can you tell me what that means?
25    A.  It might have been Owen was either in that

Paz, Brittany                                                    02-14-2022

214

1 video or did the interview --
2    Q.  Uh-huh.
3    A.  -- or something to that effect.
4    Q.  Or maybe was the source for the information
5 or something, some way involved?
6    A.  No, I don't think it would have been the
7 source.  It would have been the person who was doing
8 the video.
9    Q.  Okay.
10    A.  But I could be mistaken on it.  Can I check
11 my more in-depth notes --
12    Q.  Yeah, I mean --
13    A.  -- on that video?  It's -- let's see.  Yeah.
14 So for that video, I have the reporter as Owen Shroyer.
15    Q.  Okay.
16    A.  And his source was James Tracy and his -- his
17 website and various other sources.
18    Q.  I have -- I'm a little concerned about
19 that answer.
20    A.  Okay.
21    Q.  Because Owen Shroyer didn't start working at
22 InfoWars until 2016.
23    A.  Okay.
24    Q.  Did you know that?
25    A.  I did.  So you know what, might -- might be a

215

1 typo on my part.
2    Q.  Okay.
3    A.  I reviewed that video pretty early on, so I
4 might have gotten his -- him mixed up with somebody
5 else.  But you see where I have its reporter?
6    Q.  Uh-huh.
7    A.  And that's where I would have put the name of
8 whoever was hosting that particular video.  So it -- it
9 probably is just a typo on my part.
10    Q.  Or a mistake.
11    A.  Yeah.
12    Q.  It's not accurate, in other words.
13    A.  No, you're right.  It's not accurate.
14    Q.  Okay.  So just from off the bat, we can say
15 we know at least some of the information in this chart
16 is not accurate.
17    A.  Well, I made this chart.  It's a hundred
18 pages long in the last two weeks.  So --
19    Q.  Yeah.  I mean, I -- look.  I agree with you.
20    A.  So I did my best and there might be some
21 typos in there and there might be some -- some errors,
22 yes.  There might be.
23    Q.  Let me just make sure we're clear going
24 forward in the deposition.
25    A.  Sure.

216

1    Q.  Because I -- I -- I understand the situation
2 you're in.  And let me make sure I make it very clear
3 to you as an individual that I 1,000 percent agree with
4 you that asking one person to create all of this is
5 pretty unreasonable.  I agree with that.  Okay?
6        But what I'm asking you is, because you were
7 just the one person who had to somehow assimilate all
8 of this information, there's going to be mistakes in
9 there?
10    A.  Oh, of course.
11    Q.  Okay.  Now, let's talk about -- let me give
12 you a stapled copy, or this is going to get messy.  And
13 this goes in your binder where you had it in the front.
14    A.  Thanks.
15    Q.  Okay.  And then I am marking -- this will be
16 Exhibit 9.  I've handed you Exhibit 9, which is a
17 file-stamped copy of Neil Heslin's original petition in
18 his intentional infliction of emotional distress case.
19 That's something you've reviewed; right?
20        (Exhibit No. 9 marked.)
21    A.  Yes, I've seen this.
22    Q.  (BY MR. BANKSTON)  Or, actually, no.  Go
23 ahead.  You can hang on to that.  Okay.  Can you go to
24 paragraph 61 for me.
25    A.  Okay.

217

1    Q.  So what we're going to do is work backwards
2 in time from -- from recent videos to older videos.
3 Okay?  And part of the reason we're going to do that is
4 because there's going to be some things that we talk
5 about in these recent videos that are also talked about
6 in the old videos.
7        But in other words, once we cover a topic, we
8 won't have to repeat it for the later videos.  Okay?
9 So that's why I'm doing it in that direction is I'm
10 going backwards.
11    A.  Okay.
12    Q.  So, for instance, there may be things I ask
13 you about in this video that are also talked about in
14 this video.  But hopefully if we can get the source
15 first here, we won't have to repeat them again.  You
16 understand what I'm saying?
17    A.  Uh-huh.
18    Q.  Because I think you'll agree with me that
19 some of the factual assertions made about Sandy Hook
20 have been made repeatedly in several videos; right?
21    A.  Yes.
22    Q.  Okay.  So let's talk about this.  And you see
23 there in paragraph 61, it talks about an October 26,
24 2017 video that was entitled, JFK Assassination
25 Documents to Drop Tonight.  Do you see where it says

Paz, Brittany                                                    02-14-2022

218

1  that?
2      A.  Yes.
3      Q.  Okay.  Have you watched that video?
4      A.  If I may check my notes.
5      Q.  Uh-huh.
6      A.  No.  It's not on the list of videos that I
7  reviewed.
8      Q.  Okay.
9      A.  Probably because the main -- the main source
10  -- not source, but the main topic of this particular
11  video is JFK and the documents that were released in --
12  in a declassification by the government, I believe.
13      Q.  How do you know that?  How do you know that
14  that's the main --
15      A.  Just by the title.
16      Q.  Okay.  So you know that's the title.  But you
17  don't know that's the main topic of the video?  You
18  don't know that; right?
19      A.  I know they did covering of these particular
20  documents, the JFK documents.
21      Q.  How do you know that?
22      A.  Just by being familiar with some of the
23  things that the company has talked about in the past.
24      Q.  From interviews, you mean?
25      A.  From interviews, from looking at the website,

219

1  from reviewing the materials that I've read.  I just
2  haven't watched this particular video.
3      Q.  Okay.  So you've gone to the website and seen
4  things about JFK on the website?
5      A.  Not about JFK.  Just things that they've
6  covered in the past.  Like, the documents that we've
7  reviewed that we've also -- that we've talked about
8  that we've reviewed.
9      Q.  No, I'm trying to understand how you know the
10  main topic of this video.  Is it -- is it from
11  anything --
12      A.  I just answered that --
13      Q.  No.  Right.  I know what --
14      A.  -- I've read the title of the video.
15      Q.  Okay.  That's what I want to know.  It's from
16  the title -- you're assuming that the title describes
17  -- and again, this is generally how titles work, I
18  think you'd agree; right?
19      A.  Right.
20      Q.  That that's, like, a main idea or a main
21  thesis?
22      A.  Yes.
23      Q.  But sometimes, things don't always follow
24  intuitively at InfoWars.  You'd -- you'd agree with
25  that, that titles don't always necessarily reflect --

220

1      A.  Sure.  I mean, and there's a lot of reasons
2  for that.  Generally, you know, Alex comes on the air
3  and I don't think he even really knows what he wants to
4  talk about.  He'll have a general idea of what he wants
5  to talk about, and then he'll go into a tangent on
6  something else.  And then maybe for one or two minutes,
7  talk about a completely unrelated topic and then switch
8  back to the general topic.
9      So when I say that the general topic of this
10  particular video is JFK Assassination Documents to Drop
11  Tonight, that's the general topic.  And he may have
12  talked about other things unrelated to that topic in
13  the video as a tangent and then recircled back.  But as
14  I said, the general topic.
15      Q.  Okay.  So is the reason you didn't watch this
16  video is because it had a different general topic and
17  you didn't think it was really about what we were
18  talking about today?
19      A.  I did not see that particular video on the
20  Dropbox.  I reviewed all the videos that were on the
21  Dropbox.
22      Q.  Let's talk about this Dropbox.  Is this
23  something the company maintains?
24      A.  So I think we talked about a little bit how
25  there's been some issues with production versus --

221

1  here, production in Connecticut, there's a bunch of
2  cases.  So we've had a lot of trouble figuring out what
3  has been disclosed in the various cases.  And we've
4  been trying to maintain a general, you know, one source
5  of information.
6      It's in the process of being reorganized.  So
7  if it wasn't on the Dropbox, I couldn't find it.
8      Q.  Okay.  Do you know if the company has this
9  video?
10      A.  That, I don't know either because I know that
11  some of the videos that are alleged in this petition
12  were produced by the plaintiffs and -- because we
13  didn't have them.  So I don't know if we have this
14  video.
15      Q.  What did you do to try to find out?
16      A.  About this particular video?
17      Q.  Uh-huh.
18      A.  I did not ask anybody about this particular
19  video.
20      Q.  Okay.  You read Ms. Karpova's deposition;
21  right?
22      A.  Yes.
23      Q.  She watched this video.  You know that;
24  right?
25      A.  In preparation for the deposition?

Paz, Brittany                                              02-14-2022

222

1    Q.  Absolutely.  Well, I wouldn't necessarily
2  describe it as preparation.  I would describe it as she
3  got kind of caught having not watched anything and then
4  during the break, attempted to prepare herself, but
5  yes.
6    A.  I think that was my recollection too.  I
7  don't think she watched the entire video.  I think she
8  watched clips of the video on a break.
9    Q.  I think she skimmed through it, yeah.
10    A.  Right.  I think that's what her testimony is.
11    Q.  Because, see, I think with Ms. Karpova, her
12  being a producer, she's familiar enough with the
13  standard format of the show that she can kind of skim
14  through and know where topics start and stop.  And so I
15  think she was able to skim through it.  You -- you --
16  you haven't done that?
17    A.  I don't know if -- if that's the case.  I
18  think that that's the point of them making those --
19  those notes was to know where things were in
20  particular.  Production, just because they were having
21  problems with that, like, what segment was -- what they
22  were talking about in what segment.  That's the reason
23  why they were producing those -- those logs.  So I
24  don't know if she can tell --
25    Q.  Okay.

223

1    A.  Yeah.  I don't know if she can tell just by
2  looking at a video where certain statements would
3  appear in a video unless she had reviewed the logs.
4    Q.  Yeah, I agree.
5    A.  Yeah.
6    Q.  I definitely agree with that.  So in terms of
7  whatever claims were made in this video about Sandy
8  Hook that the plaintiffs are talking about, or,
9  actually, just any claims about Sandy Hook, those
10  aren't going to be things you can talk to me about
11  today; right?
12    A.  I can -- I can talk to you about -- about
13  some specific allegations.  Like, for example, this
14  claim that they bulldozed the house and got rid of it.
15  That's not only -- that's not a claim that was just
16  made in that video.
17    Q.  Sure.
18    A.  I'm sure that it was made in other videos.
19    Q.  Uh-huh.
20    A.  So I've watched other videos that have
21  contained this particular claim of the house being
22  bulldozed.
23    Q.  Okay.
24    A.  Would you like to talk about that?
25    Q.  Yeah, where does that come from?

224

1    A.  This house being bulldozed?
2    Q.  Sure.
3    A.  You mean where did Alex Jones get the belief
4  that the house was bulldozed?
5    Q.  Right.
6    A.  I believe that there were property records
7  that had indicated that the house was bulldozed.
8    Q.  Have you seen those?
9    A.  I have not seen the documents, no.
10    Q.  Have you tried to locate them?
11    A.  No.
12    Q.  Okay.
13    A.  I don't think they were amongst the documents
14  that the company has.
15    Q.  All right.  Do you understand the story that
16  was -- that this -- okay.  So this video covers a story
17  by LeAnne McAdoo.  Do you understand that story?
18    A.  Sure.
19    Q.  Okay.  You know who LeAnne McAdoo is?
20    A.  Yes.
21    Q.  Okay.  She's somebody whose work is featured
22  in this video.
23    A.  Yes.
24    Q.  Okay.  Did you talk to her?
25    A.  No, I didn't.

225

1    Q.  You try to talk to her?
2    A.  No, I didn't try to talk to her.
3    Q.  Okay.  Do you know what employees researched
4  or vetted the information that was being produced in
5  that video?  Well, hold on.  Let me -- let me make
6  sure.
7    A.  Sure.
8    Q.  Because that's a bad question.  Because we
9  both can agree you don't really know all the
10  information that was in that video; right?
11    A.  In this video, no.  But, you know, like I
12  said, just from the title, it's not really clear that
13  that was the main focus of that video.
14    Q.  I'm -- I'm -- I'm a hundred percent sure that
15  there was no main focus of that video.  Because like
16  you say, the -- the idea of Alex Jones having a
17  cohesive main topic is sort of silly.  It doesn't --
18  that's not what he does.  That's simply not the
19  protocol or format of what he does on air.
20    A.  Right.
21    Q.  But we know for a hundred percent sure that
22  Sandy Hook was discussed in this video.
23    A.  Oh, yeah.  I'm sure he discussed it and I'm
24  sure -- I'm -- I mean, I'm not disputing that these
25  statements were made in that particular video.  They

Paz, Brittany                                                    02-14-2022

226

1  were also made other places too.
2      Q.  And you would think that plaintiffs have a
3  right to ask about that --
4      A.  Sure.
5      Q.  -- and how that happened; right?  But you
6  sitting here today don't know all the claims about
7  Sandy Hook in that video?
8      A.  In this particular video?
9      Q.  Uh-huh.
10     A.  No.  But like I said, these statements were
11 made in other videos.
12     Q.  Not -- okay.  Hold on.  I want to make sure,
13 because I know what was said in that video.
14     A.  Okay.
15     Q.  I know very well what was said in the video.
16     A.  Okay.
17     Q.  And there are many things said in that video
18 that were never said in any other video.  And so when
19 you say that all the claims in that video were made in
20 other videos, you can't verify that, can you?
21     A.  No, that's not accurate.
22     Q.  Okay.
23     A.  So, for example, this claim, phony as a
24 three-dollar bill.
25     Q.  Uh-huh.

227

1      A.  Just looking at my notes, I see that that
2  almost exact statement, tell us why this appears to be
3  phonier than a three-dollar bill, was made in New
4  Bombshell Sandy Hook Information Inbound in that 7ib
5  video we talked about earlier.
6      Q.  Sure.  No, no.  And I understand there are
7  going to be things in that video that was said before.
8      A.  That's right.
9      Q.  In fact, that's how I prefaced this entire
10 discussion.  I'm saying, you're going off of what
11 you're reading right there in the petition; right?
12     A.  Going off of what?
13     Q.  When you say, for instance, when you just
14 talked about the house being bulldozed.
15     A.  Yes.
16     Q.  Or fake as a three-dollar bill, you're
17 reading that out of plaintiffs' petition.
18     A.  Well, yeah, I read --
19     Q.  Right.
20     A.  -- the statements; right?
21     Q.  Okay.  You don't know what else was said
22 about Sandy Hook other than what was in that petition?
23     A.  For this particular video?
24     Q.  Right.
25     A.  No.  For JFK Assassination Documents to Drop

228

1  Tonight, no.
2      Q.  No, you don't?  Okay.
3      A.  No.
4      Q.  Well, let's move on that from video, then.
5  Oh, wait.  Actually, do you know -- do you know what
6  employees were involved in creating that video?
7      A.  Unless it's on that list that we've
8  previously marked.  Do you want to --
9      Q.  Yeah, let's take out that list.  Yeah, take
10 out that list.  Tell me if it is.
11     A.  So this is Exhibit 6.
12     Q.  Uh-huh.
13     A.  October 26, 2017.  No, that's not one of the
14 dates that's on here.
15     Q.  So in other words, you won't be able to tell
16 me what employees were involved in creating this video?
17     A.  No.  These dates go from 2013 through 2015.
18     Q.  Correct.  So one of the most recent videos in
19 plaintiffs' petition, one that was published mere
20 months before Mr. Jones was sued, that's not part of
21 the information you secured about what employees were
22 involved in creating it; right?
23     A.  I don't -- like I said, I don't know if we
24 even have this video.
25     Q.  I -- I'm not asking you about the video and

229

1  if you were able to find the video.  I'm asking you
2  about a different topic, which is the employees
3  involved in making that video.
4      A.  Oh, no.  If it's not on that list, I don't
5  have it.
6      Q.  Okay.  Let's go to paragraph 59.
7      A.  Okay.
8      Q.  Do you see that talks about a June 26, 2017
9  video entitled, Zero Hedge Discovers Anomaly in Alex
10 Jones Hit Piece?
11     A.  I don't know the title of the video just by
12 looking at paragraph -- is it 59?  I'm sorry.
13     Q.  Yeah, you're right.  It doesn't have the
14 title in that paragraph.  You're right.
15     A.  Okay.
16     Q.  But you -- in other words, this may help you.
17 This is the video that Mr. Heslin is suing the company
18 for defamation about involving Owen Shroyer in which
19 Mr. Shroyer claimed that he couldn't have held his
20 child.  You understand what that video is?
21     A.  Yes.
22     Q.  Okay.
23     A.  I did watch that video.
24     Q.  Okay.  You watched that video.  Okay.  Do you
25 know what employees were involved in creating that

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 93 of 211

Paz, Brittany                                                02-14-2022

230

1 video?
2    A.  Sure.  Let me just -- if I may look at my
3 notes.
4    Q.  Uh-huh.
5    A.  Oh, I mean, I'm sorry.  Are you asking me
6 whether there were, like, for a list of employees for
7 that video?
8    Q.  I want to know for that employee, every
9 employee who was involved and what their role was.
10    A.  I don't know what the answer to that question
11 is.  All I can know as far as the sourcing, I think we
12 already talked about the sourcing material.  But if
13 you're asking me --
14    Q.  Yeah, that's --
15    A.  -- every single person that worked on that
16 particular day, if it's not on this list of Exhibit 6,
17 I don't know.  So that date is not on these lists.
18    Q.  Okay.  So when you had this video to get
19 prepared for it --
20    A.  Yeah.
21    Q.  -- and you knew you'd have to be prepared on
22 the employees who were involved in it, what did you do
23 to make sure you were prepared?
24    A.  To talk about that video?  I'm prepared to
25 talk about the sourcing of the video, which I think we

231

1 already talked about.  And when we spoke to Melinda, we
2 tried to have her pull as much as possible the
3 information for the people that was working -- were
4 working that day, which was not an easy task for her.
5       So -- and she put together that document
6 because she was the one that was reviewing the records.
7    Q.  Okay.
8    A.  But as far as other people that were working
9 on that video, I mean, the content of the video.  If --
10 if you're asking, you know, the sourcing for the video
11 and --
12    Q.  No.
13    A.  All the other stiff like who was the producer
14 for that, they wouldn't have had any involvement
15 regarding the content of what's on that video.  So,
16 like, the production manager that was -- that was doing
17 the video or doing the sound or whatnot, they're not --
18 they don't have -- they don't have any involvement in
19 that.
20       So when I talk to production and people
21 involved in the production, my understanding from
22 talking to them was that the host sources their
23 content.  They pick what they want to talk about and
24 then the producers get them the information that they
25 request as far as video clips.  And then the host is

232

1 the one that does the sourcing.
2    Q.  Okay.
3    A.  So that's just based on my conversations with
4 how they do things.  But from my understanding,
5 production doesn't have any involvement in the content.
6    Q.  Okay.  So I would take it if you were going
7 to try to figure out what went on in this video, a
8 person you might want to talk to is Owen Shroyer?
9    A.  I -- I read his deposition, yes.
10    Q.  Did you interview him?
11    A.  I didn't talk to him.  I don't -- I don't
12 know that he was available.  I can't remember.
13    Q.  Okay.  But you did read his deposition?
14    A.  I did.
15    Q.  All right.  The reason I'm troubled is
16 because he just -- he testified to the exact opposite
17 of what you said.
18    A.  That what?
19    Q.  He said -- he said that he'd had nothing to
20 do with picking the story or sourcing it or anything,
21 that somebody on production staff, one of the producers
22 of the production staff, got that material, researched
23 and sourced it, and gave it to him and he just read it
24 on the air.  Do you think he's wrong?
25    A.  I don't think that that's -- I don't think

233

1 that's what the context of his testimony was.  The
2 context, I believe, of his testimony is that every day,
3 and this is not just for Owen, but for any host, is
4 that the associate producers put together a printoff of
5 whatever sources that host likes.
6       So, for example, Alex has a list of sources
7 that he gets printed out on a daily basis.  Owen has a
8 list of sources that he uses.  The assistant -- the
9 producer is the one that provides all this material and
10 says, here, this -- this is the material that's off the
11 list that you get -- that is your list.
12       And then the host reviews that material and
13 decides what he wants to talk about.
14    Q.  All right.  We'll leave that right there.
15 All right.  And in terms of who those associate
16 producers were --
17    A.  On that particular day, no.
18    Q.  -- in that room, you don't know?  You don't
19 know?
20    A.  But again, that would -- it would just be
21 pulling the information off of the -- off of the
22 Internet based on their list.
23    Q.  What does that -- what do you mean, a list?
24 What does that mean?
25    A.  So like I said earlier, each of the hosts has

Paz, Brittany                                                    02-14-2022

234

1 a list of sources that they pull from. So Zero Hedge
2 is a source that is on that list that they pull from.
3 And so they'll print off the articles for them off of
4 that list.
5      Q. So what I'm -- I'm trying -- I think I hear
6 is that it's, like, just every day Owen wants
7 everything that was on Zero Hedge printed and brought
8 to him?
9      A. Right.
10     Q. Okay.
11     A. All the articles that were on for that day.
12     Q. Okay.
13     A. And then he'll filter through that and
14 decide.
15     Q. Okay. Do you know what was done to research
16 or vet this information before it was put on the air?
17     A. To vet the information that was in the Zero
18 Hedge article?
19     Q. And everything that Owen said too.
20     A. Can you be more specific about what he said?
21 Because -- so -- and those are two different --
22     Q. Absolutely not. No.
23     A. Okay. Well, those are two separate
24 questions. So the information in the Zero Hedge
25 article would have been vetted by Zero Hedge or

235

1 whomever produced the article. And as far as sourcing
2 for the video that was used in that article, the source
3 was the video that was on Zero Hedge.
4      Q. Okay. So let's first -- okay. Let's first
5 start with the things that were in the Zero Hedge
6 article were vetted by Zero Hedge; is that right?
7      A. Or whoever produced that article.
8      Q. Okay. And do you know who that is?
9      A. I think it was -- I think originally -- I
10 think we talked about this. It came from iBankCoin
11 originally and then it was picked up by Zero Hedge. So
12 whoever produced it would have been iBankCoin
13 originally.
14     Q. Actually, just to help you out, Zero Point
15 Now writes for both -- he -- he reposts his articles.
16     A. Okay.
17     Q. Like, they're just posted in both places.
18     A. Okay.
19     Q. It's not like there's a -- a guy at a -- a
20 thing called iBankCoin and then Zero Hedge was, like,
21 wow, we saw that, we picked it up. I just want you to
22 know for your benefit Zero Point Now is the author of
23 that article. And he's the author of it at iBankCoin
24 too.
25     A. Okay.

236

1      Q. Have you talked to Zero Point Now?
2      A. No.
3      Q. Okay. When you say that Zero Hedge vetted
4 that, I take that to mean InfoWars did nothing to vet
5 that before it was put on the air at InfoWars.
6      A. InfoWars used that article as a source and
7 quoted to that source.
8      Q. That -- I -- I think you know that's not what
9 I'm asking.
10     A. It is what you're asking.
11     Q. I -- I know that -- I understand they quoted
12 it as a source. I understand it was on the video. I'm
13 trying to understand that one of two things happened.
14 One is that Owen Shroyer or whoever got it, was handed
15 a video or handed this document and gone, all right.
16 Let's put this on the air. And nothing was done
17 internally in InfoWars to verify the factual accuracy
18 of the things being said in that article.
19     Or two, there were steps taken by InfoWars to
20 make sure that the things said in that article were
21 true before they got put on the air.
22     A. No. InfoWars --
23     Q. Which of those is true?
24     A. The company relies on the reporting done by
25 other -- other news sources to vet their information.

237

1      Q. Is Zero Point Now a news source?
2      A. It's a source for their information. So it's
3 on the list of sources that they use to get information
4 from.
5      Q. Is it a news source?
6      A. I don't know if you'd call it news, but I'd
7 say source.
8      Q. I'm bringing up that word because you said
9 news source. So I'm trying to figure out --
10     A. It's a source -- it's on their list of
11 sources that they pull from on a daily basis.
12     Q. Okay. So these --
13     A. It's my understanding that Zero Hedge is,
14 like, an accumulator of other various sites. So it's,
15 like, they have other -- they're citing to a variety of
16 other places and that's why they're using it as an
17 accumulator of sorts.
18     Q. Okay. Just because we may talk about Zero
19 Hedge --
20     A. Sure.
21     Q. -- more, Zero Hedge is not like Reddit or an
22 aggregator or a news site --
23          MR. OGDEN: Drudge.
24     Q. (BY MR. BANKSTON) Drudge or something like
25 that. You know who Tyler Durden is?

Paz, Brittany                                          02-14-2022

238

1    A.  No.
2    Q.  All right.  You may know --
3    A.  Oh, but I know Drudge is an accumulator.
4    Q.  All right.
5    A.  Yes.
6    Q.  So, like, you may know Tyler Durden.  He's
7  the main character in Fight Club that Brad Pitt played.
8    A.  Oh, yeah.
9    Q.  But that's -- that's the name of the person
10  who runs Zero Hedge.
11    A.  Okay.
12    Q.  Or at least what they call themselves.
13    A.  Okay.
14    Q.  And that person writes articles for Zero
15  Hedge.  And then there's other contributors like Zero
16  Point Now and they write for Zero Hedge; right?
17    A.  Okay.
18    Q.  So what I want to make sure that you
19  understand is that this wasn't something that Zero
20  Hedge aggregated from.  This was something Zero Hedge
21  wrote.  You understand that?
22    A.  Okay.
23    Q.  Okay.  So as far as the person -- the source
24  that was quoted here, InfoWars, for this deposition,
25  did nothing to try to talk to them or get any

239

1  information from them?
2    A.  To talk to someone at Zero Hedge?
3    Q.  Uh-huh.
4    A.  No, I did not.
5    Q.  Okay.  By the same token, any of the videos
6  that were used by Mr. Shroyer in that broadcast that
7  came from Zero Hedge or are alleged to have come from
8  Zero Hedge, you've done nothing to track down those
9  videos?
10    A.  The one that was on the Zero Hedge article
11  and then was subsequently reaired on InfoWars?
12    Q.  See, I can't make that representation because
13  the Zero Hedge article, none of those videos actually
14  work in them.  They were all removed a long time ago.
15    A.  Okay.
16    Q.  All right?  So when you say that those --
17  those videos in -- in -- in Mr. Shroyer's video came
18  from Zero Hedge, I'd like very much to verify that.
19  I'd like to know where they came from.
20    A.  Right.  So -- and I -- and I think I do have
21  an answer for that just based on my conversations with
22  -- with various people in -- in the company over the
23  last week.  Which is -- and I don't know that Owen
24  really knew it either in his deposition because I
25  believe you asked him that question and he wasn't sure.

240

1    Q.  Uh-huh.
2    A.  But the source of the video was the Zero
3  Hedge article.  They did not -- because I asked, you
4  know, I interviewed and asked video people is, like,
5  all right.  Well, did you guys cut this video?  Because
6  at some point, they have the whole video of Wayne
7  Carver.
8        But they didn't use the whole video and then
9  cut it.  The video that they got was from that article.
10  It was already precut.  They didn't do anything to cut
11  that video.
12    Q.  Who told you that?
13    A.  I believe that information came from -- it
14  was either Daria or -- it wasn't Owen because I didn't
15  talk to Owen.  Oh, no.  You know who it was, I -- when
16  I spoke to Rob Dew, Rob Dew told me that that's where
17  it came from.
18    Q.  Rob Dew wasn't involved in making this video;
19  right?
20    A.  I don't think he was.  But at the time, I
21  want to say he was the -- he was a -- not supervisor.
22  But you know they don't have titles there.  But he was
23  overseeing Owen.
24    Q.  I don't -- Rob Dew definitely has been -- had
25  titles.

241

1    A.  I think he gave himself a title, but nobody
2  there really has an official title.
3    Q.  Okay.  And so Rob Dew, does he know firsthand
4  that those videos were taken unedited from the Zero
5  Hedge site, or is that his guess based on how he thinks
6  things work inside the company?
7    A.  No.  When I asked Rob, Rob was sure that
8  that's where it was from.
9    Q.  I mean, I'm not understanding how he would
10  know what went on in that room that day.
11    A.  I don't know either.  I'm not -- I wasn't
12  there.
13    Q.  Okay.
14    A.  But I did ask Rob and that was his answer.
15    Q.  Okay.  Can you tell me -- okay.  So these
16  list of sources that are -- InfoWars chooses to
17  amplify; right?
18    A.  Well, chooses to source from.  But yeah.
19    Q.  What's your problem with the word amplify?
20  Isn't that the word you used earlier?
21    A.  So my problem is, is that even if a article
22  is being sourced from these places, they're not
23  amplifying every single article that is being sourced
24  from these places.  They're being printed and presented
25  to the host.

Paz, Brittany                                    02-14-2022

242

1    Q.  Got you.
2    A.  And then the host is choosing from amongst
3  those.
4    Q.  Okay.  So instead of me saying that -- the
5  sources that are amplified, when I say that there's a
6  list of sources who's -- some of the articles from
7  those sources are amplified --
8    A.  Yes.
9    Q.  -- right?  Who makes the decision -- who made
10  the decision here that Zero Point -- Zero Point Now or
11  Zero Hedge was a reliable place to be getting
12  information from?
13    A.  So you mean in general, is there some company
14  rule as to which sources are reliable and which sources
15  are not reliable?
16    Q.  Not really a rule, but just anything that's
17  ever done.
18    A.  So these are -- these are sources that are
19  generally trusted by the hosts.  These lists, so to
20  speak, of -- of sources change over time.  So, like,
21  for example, when I spoke to Nico, Nico's position to
22  me was Alex's source list was shorter than it is now.
23  When I talked to Daria, he has a -- he has a list of
24  sources, like, seven or eight long.
25        But -- so it evolves over time.  And

243

1  ultimately, it -- it -- the information that is
2  preferred comes from the host.  So the host would
3  choose which sources they like to get information from.
4  Like, other hosts, such as -- such as Mr. Knight,
5  according to Daria, he didn't have a list that they
6  produced for him on a daily basis.
7        He would just -- he would himself read the
8  news -- read -- read the Internet and send to her
9  already, I want you to print this and be prepared to
10  talk about this on my show.  So ultimately, the list is
11  made by the host.
12    Q.  Okay.  So -- so the kind of short version for
13  this particular video --
14    A.  Uh-huh.
15    Q.  -- for this particular video, who decided
16  that it would be reliable, answer to that is Owen
17  Shroyer?
18    A.  Yes.
19    Q.  Okay.  Jim Fetzer's quoted in this video?
20    A.  Yes.  To the extent, I believe, that it's
21  quoted in -- in the -- in the original article.
22    Q.  Okay.  And we -- I think we've already
23  covered this, but you didn't speak to Mr. Fetzer;
24  right?
25    A.  No.

244

1    Q.  Didn't -- didn't try to speak to Mr. Fetzer?
2    A.  No, I did not.
3    Q.  Okay.  And Owen had made some sort of
4  judgment, you would agree with me, that it was
5  appropriate to rely on Mr. Fetzer's conclusions about
6  this; right?
7    A.  Which conclusion are you talking about?
8    Q.  The conclusions made by Fetzer in the June
9  26, 2017 --
10    A.  Can you please specify the conclusion you're
11  talking about?
12    Q.  Yeah, I mean, I can go ahead and pull
13  everything Fetzer said, but you -- you'll understand
14  that -- the point of that video; right?
15    A.  I -- I understand the point --
16    Q.  The central
17    A.  -- of the video is that there is a claim that
18  was made by Mr. Heslin in the Megyn Kelly interview
19  that he held his son and had a bullet hole in his head.
20    Q.  Uh-huh.
21    A.  And then there was a cut to the clip of
22  Mr. Carver's interview, which wasn't a whole contextual
23  comment by Ms. -- by Dr. Carver.
24    Q.  Uh-huh.
25    A.  And then the comment that was made was these

245

1  two things are inconsistent, which is it, essentially.
2  Is that -- and that is what you're representing is the
3  comment attributed to Mr. Fetzer?  I want to make sure
4  that --
5    Q.  Yeah, and I think you've mostly got it.  I
6  think where you were -- the little bit left is the
7  conclusion of -- of where you reach from those is that
8  Mr. Heslin's version of events cannot be accurate.
9    A.  I -- I disagree that that's what the purpose
10  or conclusion that was conveyed by Mr. Shroyer.
11    Q.  I'm not -- that's not what I'm saying.  I'm
12  saying by Mr. Fetzer.
13    A.  Oh, okay.  Well, if that's what Mr. Fetzer
14  was concluding, that's not what Owen Shroyer concluded
15  in his -- in his video.
16    Q.  Okay.  He -- Mr. Shroyer -- let's go ahead
17  and get to Mr. Shroyer.  He literally said in his video
18  that Mr. Heslin said he held his kid.
19    A.  Yes.
20    Q.  Now, according to fact-checkers, that is not
21  possible; right?
22    A.  According to this video by Dr. Carver, who
23  says X, these two things cannot both be true.  Can we
24  get a clarification.  I don't think we're going to get
25  a clarification.  But can we get a clarification either

Paz, Brittany                                               02-14-2022

246

1  from Mr. Heslin or Megyn Kelly. And then he said I
2  doubt -- I doubt that's going to happen or something to
3  that effect.
4      Q. I think that's a fairly good paraphrase.
5      A. Right.
6      Q. I think you did a good job there. In other
7  words, at some point when coming to his decisions about
8  what he was going to put on the air, Mr. Shroyer had to
9  decide that Mr. Fetzer was an okay thing to be sharing
10 with the InfoWars audience; right?
11     A. I think he made a decision that the -- that
12 the report on Zero Hedge was an okay thing to be
13 sharing with the -- with the audience.
14     Q. Right. And that contains Jim Fetzer's
15 conclusions; right?
16     A. It contained information in there and
17 quotations from another person, yes.
18     Q. Yes. So by logical extension, by the way the
19 rules of logic works, if Mr. Shroyer decided that that
20 Zero Hedge article was appropriate to -- to share,
21 which communicates directly information from
22 Mr. Fetzer, then he also decided that it was
23 appropriate to share with his audience the information
24 that Mr. Fetzer was communicating; right?
25     A. I'm -- is this a question that you're --

247

1  you're asking me whether he made a determination as to
2  the credibility of Mr. Fetzer? Is that what you're
3  asking?
4      Q. I -- I think I asked appropriate.
5      A. Yeah, but -- but you're not making him make a
6  credibility determination. When you say appropriate,
7  what do you mean by appropriate?
8      Q. I -- okay. How does InfoWars
9  decide what's appropriate to share in terms of sources?
10     A. Is it -- are you asking what is reliable as a
11 -- as a -- as a source?
12     Q. If -- if that's one of the things that
13 InfoWars cares about in determining whether a source is
14 appropriate, then yeah, I would expect that to be in
15 the answer.
16     A. So I think that that just has to do with the
17 relationship with, you know, the prior history of the
18 particular source. So if that particular source has
19 been credible in the past, for example, Zero Hedge,
20 they've reported on Zero -- they have rereported, I
21 should speak, on Zero Hedge articles in the past.
22 Those have seemed to be reliable, so they would
23 continue to rely on it on the -- in the future.
24     Q. Same thing for Mr. Fetzer?
25     A. I don't know that they've ever really

248

1  amplified Mr. Fetzer's information.
2      Q. Really? You've seen -- certainly, you've
3  seen discussions about Mr. Fetzer; right?
4      A. I have seen discussions about Mr. Fetzer.
5      Q. And about how InfoWars was relying on them?
6      A. I don't think he was being relied on to a
7  very -- to a very high degree. I don't think that that
8  was a big source of their information. And the reason
9  why I say this is because first, when I talked to
10 Mr. Watson, Mr. Watson made clear that there was no
11 good relationship at the time between Alex Jones and
12 Mr. Fetzer. They did not like one another.
13     Q. Right.
14     A. Second is, you know, in my conversations with
15 Alex, he had never even read Fetzer's material. I
16 don't even think he knows what's in there.
17     Q. I agree.
18     A. So I don't know -- I don't think that it's
19 accurate to say that Mr. Jones relied on Fetzer in any
20 real meaningful way.
21     Q. Okay. This is where I may be getting caught
22 up is the real meaningful way. Because to me, I can
23 understand what you're saying if you're saying, I don't
24 think they relied on him a bunch. But you would agree
25 with me that there are multiple videos we're going to

249

1  be talking about today where the assertion of fact
2  comes directly from Mr. Fetzer?
3      A. Mr. Fetzer was never a guest on the show
4  talking about this particular issue. But I do see in
5  some of the videos that he is quoted as a source
6  amongst other sources.
7      Q. See, this is where I'm really drawing a
8  problem is because there has been criticism inside the
9  company for relying on Mr. Fetzer as a source; right?
10 For Sandy Hook, I'm talking about.
11     A. Well, and -- and you're referring
12 specifically to an e-mail that Mr. Watson has -- has
13 promulgated. And I know which e-mail you're talking
14 about. I specifically asked about that e-mail and his
15 position is, is that he understands Mr. Fetzer wasn't
16 being relied on to a really -- to any real degree.
17     He knows Fetzer was not being relied on that
18 heavily. There were other people that were listed in
19 that e-mail aside from Fetzer.
20     Q. Jeff Rense; right?
21     A. Right.
22     Q. They actually probably didn't rely on Jeff
23 Rense much at all, did they?
24     A. I don't even see that man referred to much in
25 the material.

Paz, Brittany                                                    02-14-2022

250

1    Q.  Yeah.  It's more Fetzer, really.
2    A.  Well, I mean, like I said, I don't even see
3 Fetzer referred to much in the material.  I understand
4 that Mr. Watson made that -- did that e-mail.  But as
5 far as the video goes, he's --
6    Q.  Do you --
7    A.  -- he's not on a lot of the videos.
8    Q.  Do you think that's the only criticism of
9 Mr. Fetzer inside the company is that e-mail that you
10 saw?
11   A.  That's the only e-mail that I can recall at
12 this point.
13   Q.  And certainly when reviewing the production,
14 you saw the volume of e-mails from Jim Fetzer?
15   A.  I know Jim Fetzer sent a volume of e-mails.
16 I can't speak to whether they were read by the company
17 for the same e-mail -- for the same reason as
18 Mr. Halbig.
19   Q.  Right.  Because after a guy sends you maybe
20 your sixth, 8,000th, 12,000th e-mail, you start just
21 ignoring it; right?
22   A.  Maybe even before that.
23   Q.  Maybe before that.  Maybe even before that.
24   A.  That's why I'm saying I understand that he
25 sends e-mails.  But I don't know that anybody really

251

1 read it and/or responded to it or anything like that.
2    Q.  So -- so -- well, first of all, did you ask
3 anybody if they had ever looked at Mr. Fetzer's
4 e-mails?
5    A.  So I talked to Mr. Jones about Mr. Fetzer and
6 Mr. Jones' position is he didn't really -- he didn't
7 rely on Mr. Fetzer.
8    Q.  All right.  Let's see here.  You would agree
9 with me that by June 26, 2017, the company had -- I
10 mean, in other words, before this video, prior to this
11 video on June 26, 2017 that discusses information from
12 Mr. Hetzer -- Mr. Fetzer, the company had in its
13 possession an extremely large volume of e-mails from
14 Mr. Fetzer which clearly reveal to any rational person
15 that Mr. Fetzer is not mentally balanced; correct?
16   A.  Are you asking whether they're in our
17 possession --
18   Q.  Yes.
19   A.  -- or whether we -- yes, they're in our
20 possession.  They're on our e-mail server.
21   Q.  And you never read them?
22   A.  I can't answer as to whether they were ever
23 read unless there is something forwarding it from
24 somebody else or there was a response to it in any way.
25 But generally, if -- what he does is, is -- and what I

252

1 saw is what he does is he copies very many people in
2 his e-mails.
3    Q.  I think you're thinking of Mr. Halbig,
4 actually.
5    A.  He -- I think he had a bunch of e-mails
6 copied to random people as well.
7    Q.  Did he?  Okay.
8    A.  But, I mean, I could be wrong.  But in any
9 event, like I said, unless -- if it's to either a
10 general mailbox like info@ or writers@infowars.  But
11 even specific e-mails, like to Nico, they're not --
12 they weren't responding or monitoring his e-mails.
13   Q.  I -- see, and I think what you just testified
14 is you don't know if they read these e-mails.  And now
15 you're saying they didn't.
16   A.  I don't know if they read them.  I don't know
17 if they read them.  But what I'm saying to you is when
18 I spoke to Nico, his position is, I didn't even bother
19 responding or even reading these e-mails because I knew
20 he wasn't going to be on the show.  It wasn't relevant
21 to me because unless I need to book them to be on the
22 show --
23   Q.  Uh-huh.
24   A.  -- I don't pay attention to these e-mails.
25 So -- and I think we already know that Mr. Jones

253

1 doesn't pay attention to the e-mails.  So it -- in all
2 likelihood, nobody was reading those e-mails.
3    Q.  And before his information was used on June
4 26, 2017, nobody read those e-mails to your knowledge?
5    A.  Not to my knowledge.
6    Q.  Okay.  But if somebody had, if somebody had
7 taken the effort before putting Mr. Fetzer's stuff on
8 the air in 2017 of reading those e-mails, they would
9 have come to the conclusion that Mr. Fetzer is not a
10 well man.  You would agree with that?
11   A.  I mean, I think that that's kind of
12 speculation at this point because nobody -- I don't
13 think anybody read the e-mails.
14   Q.  Have you?
15   A.  Read those e-mails in the production?
16   Q.  Yeah, from Mr. Fetzer.
17   A.  I've read some of his e-mails.
18   Q.  Yeah, they're not good, are they?
19   A.  No, they're not.
20   Q.  They're -- they're not a man who's not -- my
21 mom used to say not with a full deck.  You know what
22 that means?
23   A.  I do know what that means.
24   Q.  Okay.
25   A.  I don't think he has a full deck.

22-01023-tmd Doc#1-17 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 99 of 211

Paz, Brittany                                                    02-14-2022

254

1    Q.  And I don't -- I don't -- I don't want --
2  yeah.  I mean, again, I'm not trying to get InfoWars to
3  here give psychological opinions or whatever.  But if
4  InfoWars had read those e-mails, and now you as the
5  corporate representative who's had, they would
6  understand that that is not a good man to be relying
7  on; right?
8    A.  I think it was more so they were relying on
9  the Zero Hedge reporting more so than Mr. Fetzer.
10    Q.  I'm saying if they had.  If they had.
11    A.  I'm saying if they -- if they had, I don't --
12  I can't answer that because it's speculating.  But what
13  I'm saying is, is even if someone -- just for example.
14  I have -- I -- I'm a criminal defense attorney.  You
15  know this; right?  I have people that are not operating
16  with full decks.  They have psychological issues.
17        That doesn't mean that everything that they
18  say is false.  So it -- it -- it just doesn't.  It's
19  just -- you know.
20    Q.  Okay.
21    A.  So it's hard to pick and choose what is false
22  and what is not false.  However, I would say that the
23  reliability of Mr. Shroyer is not on Mr. Fetzer, it's
24  on the reporting of Zero Hedge.  Do you understand what
25  I'm saying?  So --

255

1    Q.  I do.  No, I get it.  Yeah.
2    A.  -- Zero Hedge would have -- in publishing the
3  article, would have vetted the claim.
4    Q.  Would they?
5    A.  That's what the -- so --
6    Q.  How do you know that?
7    A.  Because InfoWars' entire premise is you're --
8  it's just commentating, like I said.  It's a -- it's a
9  -- it's a -- it's like a citizen blogger, commentator,
10  pundit, whatever.  Okay?  So we're not doing
11  independent -- independent analysis or independent
12  journalism or -- I'm not investigating these things.
13  We're not investigative reporters.
14        So we're pulling other articles from the
15  Internet.  Those people are writing their articles.
16  We've seen those -- the -- those sources have been
17  reliable in the past and we are relying on those people
18  to vet their own sources.
19    Q.  Okay.
20    A.  If they don't vet their own sources, that's
21  -- that's on them.
22    Q.  That's their fault?
23    A.  That's correct.
24    Q.  Not on -- not -- InfoWars is hands clean for
25  anything they put on the show that they didn't

256

1  themselves write is what you're saying?
2    A.  That's the position.
3    Q.  Okay.  Let's go to paragraph 55 of that
4  exhibit.  Do you see a video discussed on June 13th,
5  2017?
6    A.  Yes.
7    Q.  And that's entitled Media Refuses to Report
8  Alex Jones' Real Statements on Sandy Hook?
9    A.  Yes.
10    Q.  And you've seen that; right?
11    A.  If I could just go back to my notes.
12    Q.  I got a number on that if it will help you.
13    A.  Yeah, just -- no, just give me one second.
14    Q.  Okay.
15    A.  It's fine.  The date is fine.  6/13.  Yes.
16    Q.  Okay.  Fantastic.  Let's see here.  This is
17  9, is that where we're at?
18        MS. OGDEN:  10.
19        MR. BANKSTON:  10.  Thank you, sir.
20    Q.  (BY MR. BANKSTON)  Do you recognize this from
21  the video?
22    A.  Yes.
23    Q.  Okay.  So this is a screenshot from the June
24  13th, 2017 video.  And you understand that at one point
25  in the video, Mr. Jones puts this list up that

257

1  contained his questions on Sandy Hook; right?
2        (Exhibit No. 10 marked.)
3    A.  Yes.
4    Q.  (BY MR. BANKSTON)  Okay.
5    A.  So this is -- this is -- just to make sure,
6  this is the one -- the video that's in response to the
7  Megyn Kelly interview?
8    Q.  It's actually not in response, it's more
9  preemptive.  He knows --
10    A.  That he had already done the interview, but
11  it hadn't aired yet.  That's right.  Exactly.
12    Q.  Exactly.  He knows it's coming out.
13    A.  Let me just -- if I can, I'm going to go to
14  my specific information.
15    Q.  Okay.
16    A.  Sorry, this is where I ran out of tabs.  At
17  some point, you will get to where I didn't run out of
18  tabs.
19    Q.  Okay.
20    A.  Date, June 13th.  Okay.  Here we go.
21    Q.  Okay.  Are you ready to talk about this one?
22    A.  Yes.
23    Q.  Okay.  So what I have in front of you, again,
24  that we had talked about was some questions that
25  Mr. Jones has that he put up under his What Alex Jones

Paz, Brittany                                                02-14-2022

258

1  Really Believes video; right?
2    A.  Yes.
3    Q.  Okay.  So the first question that we see is
4  why does the Sandy Hook Elementary School website have
5  zero traffic for four years.  Do you see that?
6    A.  Yes.
7    Q.  All right.  You know where that comes from?
8    A.  Yes.  I believe that the topic -- the source
9  for that particular contention was the Wayback Machine.
10    Q.  All right.  So is it your -- so you're --
11  first of all, are you saying InfoWars went and figured
12  this out, went to the Wayback Machine and came up with
13  this theory on its own?
14    A.  Oh, you mean where is the source -- the
15  original source for this belief?  I'm not sure.  But I
16  know that we have amongst our documents a printout from
17  the Wayback Machine.  So at the very least, if it
18  wasn't originated here, it was checked into because we
19  have the Wayback Machine.
20    Q.  Right.
21    A.  I believe he -- he even put that on -- if it
22  wasn't in this video, it might have been in another
23  video.  He did, like, a screenshot.  Like, a desk cam
24  --
25    Q.  Yeah.

259

1    A.  -- to the Wayback Machine.
2    Q.  Desk cam of this Wayback Machine stuff?
3    A.  Yes.
4    Q.  Where does that come from?  Where did he get
5  that?
6    A.  You mean where did he get the idea to go
7  there?  I don't know.
8    Q.  I don't think -- he didn't go there.
9    A.  I'm sorry?
10    Q.  He didn't go there.
11    A.  Well --
12    Q.  That picture, I know where that picture's
13  from.
14    A.  Okay.
15    Q.  So I'm trying to figure out if you
16  know where that picture's from.
17    A.  All I can testify is to the document that I
18  saw from the Wayback Machine.
19    Q.  Okay.  That's a chapter in Jim Fetzer's book.
20  Did you know that?
21    A.  Okay.  I did not know that.
22    Q.  He wrote a book called Nobody Died at Sandy
23  Hook; you know that?
24    A.  I know he wrote a book, yes.
25    Q.  Yeah.  And the whole Wayback Machine thing

260

1  that is totally false and not real --
2    A.  Okay.
3    Q.  -- comes from Jim Fetzer.  You didn't know
4  that?
5    A.  I didn't know that.
6    Q.  Okay.
7    A.  I didn't go to the Wayback Machine myself to
8  check.
9    Q.  Well, yeah.  I mean, you wouldn't know -- how
10  would you even go there?  I mean, what -- what would
11  you look up?
12    A.  I don't know.  I didn't go to check it out
13  myself.  All I saw was the document from the Wayback
14  Machine.  That's all I saw.
15    Q.  You just saw that there was something from
16  the Wayback Machine --
17    A.  Yes.
18    Q.  -- which is shown in the video.  They show a
19  picture of it.
20    A.  Yes.  Yes.
21    Q.  And you did nothing to follow up to figure
22  out where that came from?
23    A.  I -- aside from looking at the document that
24  was produced as the source, no.
25    Q.  Okay.  And so you didn't ask anybody about

261

1  this claim?
2    A.  About the Wayback Machine?
3    Q.  Uh-huh.
4    A.  I asked Alex Jones and Alex Jones' contention
5  is that he saw it on the Wayback Machine.  I think he
6  -- I don't know.  I'm pretty sure he testified to it.
7    Q.  I think you're thinking -- maybe thinking
8  Ms. Karpova said that.
9    A.  Yes, she did.  You're right.
10    Q.  Uh-huh.  She just said the Wayback Machine.
11    A.  The Wayback Machine.
12    Q.  Like as though that's a source or something;
13  right?  Like -- like, but what I was trying to figure
14  out --
15    A.  Well, I mean, it is a -- it is a source.
16  Whether it's an accurate source or not is up for
17  debate.  But it -- it is a -- source, all that means is
18  where does this information come from as far as your --
19    Q.  Yeah, but what I'm getting at is that -- that
20  screenshot --
21    A.  Yes.
22    Q.  -- isn't it just a screenshot of the web page
23  the Wayback Machine?
24    A.  Uh-huh.
25    Q.  It's a screenshot of some stuff, some various

Paz, Brittany                                                02-14-2022

262

1  stuff from the Wayback Machine.  Somebody put that
2  together.
3      A.  I don't know who put that together.
4      Q.  Okay.  And so if it was Mr. Fetzer, you
5  wouldn't know anything about that?
6      A.  I don't know.
7      Q.  Okay.  Several reports of other shooters
8  dressed in camouflage who fled into the woods, one of
9  whom police allegedly detained.  Where does that come
10  from?  What are those reports?
11      A.  Actually, there were a few reports.  So on
12  the day of the shooting, and this is pretty common when
13  there are active shooter events --
14      Q.  Uh-huh.
15      A.  -- for there to be incoming news or breaking
16  news that maybe necessarily won't be accurate that
17  particular time, but would be checked later on and may
18  be clarified.  But on the day of the shooting,
19  Mr. Jones did cut to a couple of different sources for
20  this claim.
21          The first claim being that there was some
22  helicopter footage of someone running around in the
23  woods.  He did cut to that footage.  There were also a
24  couple of other news sources that -- that cut -- that
25  listed possible second shooter.  Then, there are also

263

1  -- there was a -- there was a interview with a person
2  on the scene who says that he saw someone being taken
3  out of the woods dressed in camouflage and handcuffs.
4  And he cut to the video footage of that particular
5  individual.
6      Q.  Okay.  So let's talk about this first one,
7  this helicopter footage.
8      A.  Yes.
9      Q.  Do you understand there's helicopter footage
10  of some people in the woods and the police questioning
11  them?
12      A.  Whether that particular person was
13  questioned, I don't know.  But the -- the purpose of
14  that footage was just to show that there were people
15  chasing someone else in the woods.  So --
16      Q.  Okay.  Those -- those, though, that video
17  comes from well into the afternoon well after the
18  shooting; right?  Did you know that?
19      A.  I know there is a timestamp on the video,
20  yes.
21      Q.  Okay.  And so if you were to see that, you --
22  and because those are reporters is that what is.
23  There's some reporters who started walking into the
24  woods.  If -- if there's a video that's taken hours
25  after everything's all over and there's all sorts of

264

1  media all over the place, that's not a second shooter;
2  right?
3      A.  I don't --
4      Q.  Do you agree with that?
5      A.  Well, first of all, I don't know if that
6  person that was running and being chased in the woods
7  was a reporter.  There were also some secondary reports
8  of an off-duty SWAT officer that was found in the
9  woods.  I don't know if that's the same person.  So
10  yeah, there -- it could -- there --
11      Q.  You're saying --
12      A.  -- could be any number of reasons why
13  someone's running around in the woods.
14      Q.  You're saying a SWAT officer was detained in
15  those woods?
16      A.  So I think that after those -- those articles
17  -- not articles, but reports of a possible second
18  shooter and this person being taken out in handcuffs,
19  because of the video footage and the question of there
20  being a potential shooter, it came out somewhere that
21  there was an off-duty SWAT officer that was in the
22  woods at that time.
23      Q.  Or just -- have you been able to find that?
24      A.  The reports of that?
25      Q.  Any of the -- I mean, any of these.

265

1      A.  Yeah.  I -- yeah.  Yeah.  That's in the
2  disclosures.  But I will say, I mean, I --
3      Q.  Hold on.  Whoa.  Whoa.  Back up.  Hold on.
4  What does disclosures mean?  What do you mean?
5      A.  I mean it's in the discovery material that I
6  was reviewing -- that I reviewed.  It's in one of the
7  documents.  But also, I just will say that --
8      Q.  Okay.
9      A.  -- it's pretty common for that day.  I mean,
10  I lived in Connecticut.  The SWAT -- SWAT teams from
11  all over the state were called in.  So it wasn't really
12  something that was out of the realm that it would be an
13  -- a SWAT officer out there.
14      Q.  You're just speculating on that.
15      A.  I'm not -- I know that other --
16      Q.  Based on your own personal life of what you
17  think goes on in law enforcement.  But you cannot tell
18  me if there was a single person on scene that day
19  dressed in SWAT gear, can you?
20      A.  Actually, yes, I can.
21      Q.  Okay.
22      A.  Just because we pointed to the evidence that
23  was in the record of a person who was taken out of the
24  woods in SWAT gear.  And secondly, there was an -- a
25  statement put out that there was an officer -- an

22-01023-tmd Doc#1-17 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 102 of 211

Paz, Brittany                                                   02-14-2022

266

1 off-duty officer taken off the property. So --
2    Q.  Right. So he's not in SWAT gear.
3    A.  I don't know whether he was in SWAT gear.
4    Q.  You think SWAT officers walk around off duty
5 geared up in SWAT material?
6    A.  Depends.
7    Q.  Does it?
8    A.  Yeah, it does.
9    Q.  So -- never mind. That's ridiculous. Okay.
10 Let's go to the next question here. Why was -- why
11 were port-o-potties, sandwich, fruits, drinks, and
12 chips brought and set up for people at the crime scene
13 to eat inside the school. What's the source for that?
14    A.  So I think that the source of this in just my
15 discussions with -- with all the various employees
16 were, this was one of or maybe two of Halbig's 16
17 questions that he asked and that he found to be, quote,
18 unquote, anomalies in his opinion.
19    Q.  Okay. So how do you know that's -- so how
20 did they know that's Halbig's stuff is just -- just
21 personal knowledge of the employees you talked to is
22 what you're saying?
23    A.  How do I know this is Halbig's stuff?
24    Q.  Yeah.
25    A.  All of this -- these questions -- these

267

1 particular questions really didn't appear until
2 Halbig's first interview. In Halbig's first interview,
3 he does go over these particular allegations.
4    Q.  Okay. So let's -- stop talking allegations
5 plural because we know number one allegation about the
6 Wayback Machine, Halbig's never said anything about
7 that; right?
8    A.  No. I'm talking about -- we're still on the
9 same bullet point.
10    Q.  Right.
11    A.  But the reason why I'm breaking it up is
12 because -- I don't want to write on this, this is an
13 exhibit. But port-o-potties, he made one allegation --
14 I don't know if you've read Mr. Halbig's 16 points, but
15 he breaks these down into separate points. One was the
16 port-o-potties. Another was the sandwiches and fruit
17 drinks that were brought in --
18    Q.  Got you.
19    A.  -- for the -- the officers and eaten at a
20 various -- whatever point in time he was claiming. And
21 then that -- and then there was a separate one where he
22 was saying that people were eating lunch inside the
23 school amongst the crime scene.
24    Q.  Okay. And InfoWars just took Halbig's word
25 for this; right?

268

1    A.  He was the source for those particular
2 claims.
3    Q.  InfoWars has done absolutely nothing to
4 verify any of that claim beyond just listening to
5 Halbig?
6    A.  No, there's been no independent research into
7 those claims.
8    Q.  InfoWars has never seen a video of anybody
9 eating food inside the school or anything like that?
10    A.  I -- no. To my knowledge, I don't think
11 there's ever been any video footage from the inside of
12 the school.
13    Q.  Okay. As far as the port-o-potties, InfoWars
14 never did anything to verify when those showed up;
15 right?
16    A.  No. I -- I believe that was the subject of
17 Mr. Halbig's FOIA request. But -- and then those were
18 covered in subsequent broadcasts, his attempts to get
19 that information.
20    Q.  You know InfoWars has made attempts to secure
21 the dashcam -- dashcam cameras of the police cars that
22 were sitting in the parking lot.
23    A.  Has InfoWars? I'm -- honestly, I -- I don't
24 know. I know Halbig has. I know Halbig was -- went up
25 and did a FOIA request and he was disclosed that --

269

1 well, maybe not disclosed. But he was given the
2 opportunity to view the dashcam footage.
3    Q.  Rob Dew's also talked about the dashcam
4 footage; right?
5    A.  He has, yes.
6    Q.  Okay. So InfoWars knows that there's a video
7 recording of everything that shows up into that parking
8 lot?
9    A.  I don't want to say everything. Dashboard --
10 dashboard cam does not capture everything. But there
11 is dashboard camera footage of the parking lot.
12    Q.  Dashcam footage might have trouble detecting
13 a mosquito showing up in that parking lot; right?
14    A.  Well, I'm not talking about mosquitos, sir.
15 I'm talking about, like, angles. I don't know if it
16 picked up the entire parking lot. Not every car at
17 that time had dashboard camera footage. Now, body
18 camera footage is very prolific. But at that time, I
19 don't think anybody had body camera footage.
20        So when I say I don't know if it captured
21 everything, I don't know what the angles of those
22 dashboards -- the dashboard cameras are. So I'm not
23 talking about mosquitos. I'm talking about angles and
24 whether it captured the entire parking lot.
25    Q.  And the company doesn't know any of that

Paz, Brittany                                                        02-14-2022

270

1  either; right?
2      A.  No.
3      Q.  Never tried to find out; right?
4      A.  No.  As I said, we didn't do any independent
5  research into this.
6      Q.  Okay.  Let's go to the next one, Sandy Hook
7  Father Robbie Parker Getting Into Character.
8      A.  Yes.
9      Q.  That's the -- that's -- that's an allegation
10  from inside InfoWars; right?  That doesn't come from
11  any source, that's just Mr. Jones and Mr. Dew saying
12  they believe Robbie Parker looks like an actor; right?
13      A.  So -- so -- yes.  I think that originally,
14  this -- this is an opinion of the -- the video that
15  they viewed of Mr. Parker before giving that interview.
16  I believe it was the same day.
17          And I'm sure, as you know, Mr. Dew is a -- or
18  was a theater major.  And so in his opinion based on
19  his studies when he saw that video, he believed it was
20  getting into character.
21      Q.  What does the company believe was happening
22  there?
23      A.  On that video?
24      Q.  Uh-huh.
25      A.  I mean, this goes into the distinction we've

271

1  been talking about, about how individual people in the
2  -- in the company have their own positions.  But the
3  company does not have a position on that issue.  I
4  don't have an opinion on whether that was getting into
5  character.
6      Q.  How does the company feel about Mr. Jones and
7  Mr. Dew saying that?
8      A.  I think that that's their opinion and they're
9  entitled to it.
10      Q.  No.  Okay.  I can understand that's what the
11  company may feel about their right or their ability to
12  say it.
13      A.  Uh-huh.
14      Q.  Does the company have an opinion on what they
15  said?
16      A.  On whether or not this was getting into
17  character and whether it was nice?
18      Q.  No, not necessarily that so much.  Not so
19  much the accuracy.  But sort of, like, is the company
20  proud of that?
21      A.  Am I proud of the --
22      Q.  What Mr. Jones and Mr. Dew said about
23  Mr. Parker.  Is the company proud of that?
24      A.  I don't think the company takes a position on
25  it.

272

1      Q.  Does the company --
2      A.  It's an opinion that --
3      Q.  Right.  Okay.
4      A.  -- belongs to two individual people.
5      Q.  Is the company --
6      A.  And the company doesn't have a belief that --
7  that it's getting into character, but it's based on
8  their opinion.
9      Q.  Who owns the company, now, again?
10      A.  Alex Jones owns the company.
11      Q.  Okay.
12      A.  He's an individual, though.
13      Q.  So does the company feel embarrassed by what
14  Mr. Jones or Mr. Dew said about Mr. Parker?
15      A.  No, I think it's an opinion.
16      Q.  Does the company feel any remorse about what
17  Mr. Jones or Mr. Dew said about Mr. Parker?
18      A.  Remorse?  Do I think that the company feels
19  bad that Mr. Parker was upset about the coverage?
20  Sure.  But as far as the statement, it's -- it's an
21  opinion.  And it's -- could be drawn from, you know, it
22  is a -- an opinion that could be drawn from what you
23  see on that video.
24      Q.  Okay.  So in other words, the company may
25  have a greater latitude in terms of what it may think

273

1  is appropriate or not appropriate or what it may be
2  embarrassed of or proud of or remorseful for.  It may
3  matter whether the thing being said is a fact or an
4  opinion; right?
5      A.  Sure.
6      Q.  Okay.  So there are -- this particular thing,
7  you can say, for instance, this is not something that's
8  -- this is a personal viewpoint.  I saw that and it
9  looked -- this is how it looked to me.  So that's
10  clearly an opinion; right?
11      A.  Yes.
12      Q.  Okay.  There are other things Jones and
13  InfoWars have said about Sandy Hook that are not
14  opinions, they are very much statements of fact.  You
15  would agree with that?
16      A.  I would agree that they have stated pieces of
17  information that have been gleaned from other sources
18  and taken those as fact.
19      Q.  Well -- and let's go back to the Wayback
20  Machine thing.
21      A.  Yes.
22      Q.  Right?  Nobody -- they're not repeating
23  anybody's words there, according to you.  They just --
24  that's the source is the Wayback Machine.  They said
25  that; right?  InfoWars said this is what the Wayback

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 104 of 211

Paz, Brittany                                                02-14-2022

274

1 Machine says; right?
2     A.  I think we said, I'm not really sure where
3 that original -- originally came --
4     Q.  Okay.
5     A.  How that came to their attention, I'm not
6 sure --
7     Q.  Okay.
8     A.  -- how it originally came -- but I know that
9 he put that screenshot on his camera.
10    Q.  And have never tracked down that screenshot
11 or where it came from; right?
12    A.  I don't know where the screenshot came from.
13    Q.  Got you.  Okay.  An FBI crime stat which says
14 no murders occurred in Newtown in 2012.
15    A.  Yes.
16    Q.  That's a piece of InfoWars' independent
17 research; right?  Nobody else researched that?
18    A.  Yeah.  So that was -- I did speak to our
19 staff on this particular claim.  So this is a source
20 that was actually sourced from the FBI.gov website, a
21 screenshot of which was put onto and attached to the
22 article.  It was written by Adan Salazar.  I think you
23 -- he was deposed in connection with this article.
24    Q.  Not here.  Just wanted to make sure you
25 understand not in Texas.

275

1     A.  Yeah.  It might -- you're right, it was in
2 Connecticut.  And so essentially what happened with the
3 article -- and it was not reported from another source.
4 He -- so it was original reporting on -- in -- in the
5 context of Mr. Salazar because it was not found from
6 another source.
7         He went to the FBI.gov and he saw this.  And
8 then the problem with the number, it does say zero for
9 Newtown for 2012.  But the problem for the --
10    Q.  Does it, or does it say that for Newtown
11 Police Department?
12    A.  If you'd let me finish.  What it says is the
13 FBI.gov stats is per town, not per department.  So per
14 town, Newtown says zero.  But if you scroll to the very
15 bottom, like at the end of the list of towns, there is
16 an asterisk that says the state police do not report to
17 the FBI.  So that is the source of the confusion, so to
18 speak, or the error --
19    Q.  Error?
20    A.  -- for that particular stat.  But it does
21 say -- if you scroll down to Newtown, it does say zero.
22 But he didn't scroll all the way down the page to see
23 the asterisk.  And honestly, I don't know the answer as
24 to why the state police don't report to the FBI.  Every
25 other department individually reports to the FBI their

276

1 statistics.
2     Q.  Okay.  Just to make sure that you're not
3 putting things on the record that are evidence; right?
4     A.  Sure.
5     Q.  They absolutely one hundred percent do report
6 to the FBI.  There's actually a 500-page report that
7 that chart is generated from.  It has departments from
8 every department in Connecticut.
9     A.  Yeah.
10    Q.  Has for the Connecticut State Police list the
11 27 children murdered at Sandy Hook has an asterisk
12 saying these are the 27 -- I just wanted to make sure
13 you understand that is reported.
14    A.  Okay.  At the bottom of that article.  Not
15 the article, but at the bottom of the FBI.gov, all
16 that's really in there is the asterisk.  It does not
17 include state police statistics.  That's all it says.
18    Q.  Right.
19    A.  So you would -- he would have had to go and
20 research the reason why that the state police do -- did
21 not report for that particular -- those particular
22 numbers and things like that.
23    Q.  Or he would need to pull up the document
24 referred to on that chart, the UCR.  You know what the
25 UCR is?

277

1     A.  Right.  But what I'm saying is he didn't
2 scroll all the way to the bottom.
3     Q.  No.  But up at the top of the document.
4     A.  Oh, okay.
5     Q.  Where it says that these figures on here come
6 from the UCR --
7     A.  Okay.
8     Q.  -- he never went and got the UCR?
9     A.  No.  No.
10    Q.  Okay.
11    A.  All he did was look at the chart, saw the
12 big, fat zero, and then reported it.
13    Q.  All right.  And we talked about how this
14 didn't come from anybody else, this was independent
15 research done by InfoWars on Sandy Hook; right?
16    A.  Right.  That was a report that he did not get
17 from someplace else.  Apparently, as far as I know, it
18 was something that somebody had seen.  He might've
19 gotten a tip on, you know, hey, look, this looks weird.
20 Go check it out.  And saw it and then reported on it
21 himself.
22    Q.  That's a guess, though?
23    A.  No.  That's -- when I talked to Adan, that's
24 what he told me, that he got a tip.
25    Q.  No -- oh, so he did -- this isn't maybe he

Paz, Brittany

278

1 got a tip, he did get a tip?
2     A.   No, he got a tip.  And, I mean, if you're
3 asking me, he went just randomly to the FBI database
4 because he wanted to check, no.  He got a tip.  Hey,
5 check this out, this looks weird, and he looked at it.
6     Q.   Who tipped him out?
7     A.   So that -- that's a source of confliction.
8 I'm not really sure.  So he said he thinks that
9 Mr. Daniels tipped it.  But Mr. Daniels said he doesn't
10 recall ever tipping him out on that.
11     Q.   Okay.
12     A.   So in all honesty, I'm not sure where that
13 tip came from.  But Adan's position is that it was a
14 tip.
15     Q.   One thing we do know is InfoWars does do
16 independent research, investigative journalism into
17 Sandy Hook?
18     A.   I would say that on the whole, the answer is
19 no.  These are very out-of-character articles that we
20 do not usually publish.  So there were a couple here
21 that Adan did that I -- as I said earlier, Adan was
22 more into this than most of the other people involved
23 in -- in InfoWars.
24          And so he did a couple of independent pieces
25 that really were out of -- out of the realm of what is

279

1 usually done by the company.  So, like, for example, he
2 did that Batman article.  I don't know if you read
3 that.
4     Q.   I know about that one.
5     A.   Right.  So he got a tip from somebody on
6 social media and -- and saw that -- like, oh, okay.
7 Wow.  That looks pretty cool.  And he -- he did this
8 dive into, you know, the three Batman movies and then
9 what that area was called in the comics, and then he
10 wrote that article.
11          So that was independent reporting on his
12 part.  It's out -- it's really not the usual piece that
13 the company would do.
14     Q.   When -- when Adan got tipped off that the
15 appearance of the name Sandy Hook on the Dark Knight
16 map could suggest predictive programming that suggests
17 foreknowledge of the Sandy Hook attack being staged by
18 globalist illuminati types, he thought that was cool?
19     A.   Does he think it's cool?  Is that a question?
20     Q.   No.  Did -- he did.  He did think that was
21 cool.
22     A.   Are you asking me whether he did --
23     Q.   That's the word you used, I'm just trying to
24 confirm it.
25     A.   I -- no.  I don't -- I think that what he

280

1 thought was interesting and cool was that, oh, look.
2 Here's this -- this common denominator -- not a common
3 denominator.  But look, Sandy Hook is referenced here
4 and it wasn't referenced in the first video.  And then
5 he was interested because he thought that the names and
6 the commonality between the names was cool.  He did a
7 similar article about a slasher thriller thing --
8     Q.   I was about to ask you.
9     A.   -- Sandy Hook too.  Which he just found to be
10 interesting just because of the name commonality.  But
11 as far as the other things sourced in there, I don't
12 know that he thought that was cool.  But the name
13 commonality, I think, he thought was cool.
14     Q.   Let's take a detour over to the slasher film.
15     A.   Sure.
16     Q.   Sandy Hook Lingerie Party Massacre.
17     A.   Yes.
18     Q.   Okay.  You -- you've read documents about
19 that?
20     A.   I believe I read the article and I spoke to
21 Adan about it, yes.
22     Q.   And you've got e-mails that he sent to people
23 about it; right?
24     A.   He did tell me he reached out to the producer
25 of that video.

281

1     Q.   Have you seen those -- those e-mails?  Those
2 have been in deposition before.
3     A.   Yeah, I don't know if I've read the specific
4 e-mails.  I may have, but I just don't remember.  I
5 know they exist, though.
6     Q.   I'm just -- I'm just trying to remember if
7 you remember Adan saying to that person who ran that
8 horror slasher movie blog, we know this is ridiculous,
9 but we're going to run it anyway.  Do you remember him
10 saying that to him?
11     A.   I don't dispute -- I don't remember it, in
12 all honesty.  But he could have very well said that.
13     Q.   Okay.  And --
14     A.   All it is, is just an interesting commonality
15 between the names, that's all.
16     Q.   Well, actually, no.  Mr. Salazar wrote an
17 e-mail to the guy who ran that blog basically accusing
18 him of foreknowledge of the Sandy Hook attack, didn't
19 he?
20     A.   Oh, I don't know.  I didn't read any e-mail
21 like that.
22     Q.   So you don't remember -- you didn't read an
23 e-mail back from the guy at the horror blog telling me,
24 don't ever contact me again, you bunch of weirdos?
25     A.   No, I didn't read any e-mail like that.  When

Paz, Brittany                                          02-14-2022

282

1  I spoke to Adan, Adan's position was that he received a
2  response back from the producer that he had received a
3  lot of communication about the name of the video
4  following Sandy Hook and that he wanted to be left
5  alone and he thought it was ridiculous.
6      Q.  Okay.  This next statement on the chart here
7  that says, why didn't they let paramedics and EMTs into
8  the building after 27 children declared dead in eight
9  minutes --
10     A.  Uh-huh.
11     Q.  -- where does that come from?
12     A.  So this is another of Halbig's 16 points.
13  And it's not just one point.  It's a couple of points
14  he breaks it down into.  So he breaks it down into one,
15  why didn't they let paramedics and EMTs in the
16  building.  And two, children were declared dead within
17  eight minutes.
18     Q.  Okay.
19     A.  So the source -- the original source of that
20  is Mr. Halbig.
21     Q.  InfoWars did nothing to check that; right?
22     A.  No.
23     Q.  Because we know paramedics and EMTs were let
24  in the building.
25     A.  They were.  I did read the portions of the

283

1  final Sandy Hook report.
2      Q.  And that's something InfoWars had in its
3  possession that Rob Dew went out and got in 2013;
4  right?
5      A.  I don't know if he went out and got it, but
6  it was sent to him.  It was in an e-mail chain.  He did
7  receive it.
8      Q.  Yeah.
9      A.  Yes.
10     Q.  And he's actually talked about it with other
11  people?
12     A.  I don't know if he talked about it with other
13  people, but I know they had it.
14     Q.  The next one is why was Adam Lanza's home
15  burned down by the bank.  Where does that come from?
16     A.  This -- this might be a mischaracterization
17  of the claim that Adam Lanza's house was -- was
18  bulldozed.  I don't think it was burned down.  But I
19  think it's the claim -- this goes back to that claim
20  that the -- the house was taken down.
21     Q.  All right.  I understand we know about
22  something from property records or something about
23  bulldozing.  But what I'm wondering is how did -- how
24  did we get to burn down?
25     A.  That's why I'm saying it's -- I think it's a

284

1  mischaracterization of that same claim, that the house
2  is no longer standing.
3      Q.  Mischaracterization by Jones himself?
4      A.  That it was burned instead of being
5  bulldozed.
6      Q.  Sure.  That's what I'm trying to -- that's --
7      A.  Yes.
8      Q.  -- Mr. Jones who did that.  It's not -- it's
9  not somebody else was responsible for telling Jones
10  that it was burned down?
11     A.  No.
12     Q.  Mr. Jones just mischaracterized --
13     A.  Right.  I think that it's a
14  mischaracterization of the fact that the house is no
15  longer standing.
16     Q.  Okay.
17     A.  It wasn't necessarily burned down.
18     Q.  Okay.  Can you go to -- in your petition, can
19  you go to paragraph 54 for me.
20     A.  Sure.
21     Q.  And let's just do a couple of others and then
22  we'll take a break if that sounds good to you.
23     A.  Sure.  I could -- I could use the bathroom.
24  That would be great.
25     Q.  Okay.  Let's get through this one here.  This

285

1  is Sandy Hook Vampires Exposed on April 22nd, 2017.
2  You're familiar with that video; right?
3      A.  Yes.  Let me just go back to my chart.
4      Q.  And I'll just ask you while you're looking,
5  because I'm sure you'll pull it up, you did watch this
6  video?
7      A.  Yes, I remember watching this video.
8      Q.  Okay.
9      A.  Yeah.  Sandy Hook Vampires Exposed, yes.
10     Q.  Okay.  So this video repeats a bunch of
11  things said by Mr. Halbig.  You'd agree with that?
12     A.  Yes.  Just give me one second while I can
13  pull up that -- my detailed notes on that video.  Okay.
14  What was your question?
15     Q.  First of all, is -- I was wondering, what's
16  -- is there any particular significance to the orange
17  and yellow on these charts?
18     A.  That's just to differentiate between where it
19  ends.  Where one video ends and one video begins --
20     Q.  That's what I thought.
21     A.  -- just so I can -- so I can easily see where
22  the notes for one end and one begins.
23     Q.  Okay.  The question was, this video has a
24  bunch of stuff from Wolfgang Halbig.  A bunch of
25  different claims from Wolfgang Halbig that are being

Paz, Brittany                                                    02-14-2022

286

1  repeated in this video.
2      A.  So this -- this is -- if I recall correctly,
3  this was an extremely long video.  There were a lot of
4  things that were talked about in this video.  But some
5  of the things that are in this video, for example, they
6  also talk about Pizzagate, Iraq -- children die in
7  Iraq, WMDs.  There's a lot of things that are talked
8  about in this video.  It's a long video.
9      Q.  Right.
10     A.  So -- but yes.
11     Q.  Well, how long are InfoWars' videos usually?
12     A.  Well, that depends because Mr. Jones is going
13  to do -- he'll do a three-hour -- three three-hour
14  segments.  And those will be broken up sometimes into
15  shorter clips.  Or sometimes, it will be just kept as
16  longer clips.  So, like, some of these videos were two
17  hours long.
18     Q.  Okay.  This one, what do we -- do you think
19  this is one of those?
20     A.  I think this was a very long video.
21     Q.  I think it may be less than half that,
22  actually.
23     A.  I don't think it was two hours, but it was a
24  long video.
25     Q.  Right.  I think it's actually about 39

287

1  minutes.
2      A.  No, it's longer.  So I have notes up here,
3  for example, 59 minutes, 60 minutes.  It's at least an
4  hour long.
5      Q.  Let's see.
6      A.  So -- see, this one, we have it as -- we have
7  saved it as a video file.  A video file that we have is
8  -- I'll read to you the name.  RUN1JKHWTXL.  And that
9  video file was an hour long.  So, you know, you may be
10  -- it may be accurate that it -- there were some clips
11  that were shorter that you may have -- you may have
12  access to.  But it is in -- it is a part of a larger
13  video file.
14     Q.  Okay.  Well, I'm not sure I have that.
15  Excuse me.  Sorry, the volume's on.  Okay.  So is it
16  your understanding that this came out of a larger
17  four-hour video?
18     A.  I don't know if it was four hours, but this
19  clip, that particular clip, that -- I don't want to say
20  clip, but that particular segment for -- let's see.
21  I'm sorry, I lost my place.
22     Q.  April 22nd, 2017.
23     A.  No, no.  I'm just looking for the title.  So
24  Sandy Hook Vampires Exposed, what we have for that
25  title is this longer one-hour long video.

288

1      Q.  Okay.  Well, what I'm trying to understand is
2  that some videos, for instance, Owen Shroyer's little
3  five-minute video about Mr. Heslin.
4      A.  Yes.
5      Q.  That's a clip from a full -- full episode of
6  the Alex Jones show.  It's a four-hour show.  Okay?
7  There are other videos here.  For instance, the video
8  we just talked about, What Alex Jones Really Believes
9  about Sandy Hook.  That wasn't from an InfoWars
10  episode; right?  Because that's just recorded inside
11  Mr. Jones' home.  Do you understand?
12     A.  You know what, I'm not a hundred percent sure
13  on that.  I'm sorry.
14     Q.  Okay.  But in other words, there are some
15  times where he might make a little special video just
16  inside his home.  Might be a few minutes long.
17     A.  Yeah.
18     Q.  Sometimes, they're going to come from a full
19  InfoWars show.  Sometimes, he might make special video.
20     A.  Yes.
21     Q.  Like, I have a special video about Russiagate
22  and it's 20 minutes long.
23     A.  Yes.
24     Q.  All right?  Okay.  This video, does this come
25  from an Alex Jones show?  Because I'm trying --

289

1      A.  Yeah.
2      Q.  -- to find the full video.
3      A.  Yeah.  I -- so like I said, our full video,
4  it looks like it was from a full show and it was more
5  than an hour long.  It was at least an hour long.  My
6  notes go up to an hour.
7      Q.  Well, no.  That's what I'm trying to get at.
8  An episode of The Alex Jones Show is four hours long.
9  So does this come --
10     A.  They're -- they're -- they're three-hour
11  segments.  So they're three-hour segments.  You mean --
12  do you mean all three-hour segments?  There are three
13  three-hour segments?
14     Q.  No.  I mean, in general, including the pill
15  stuff where they're selling the pills and going off on
16  that.
17     A.  Uh-huh.
18     Q.  It takes -- you -- you -- you start watching
19  an Alex Jones episode, it's four hours is the amount of
20  time that passes when it signs off.
21     A.  Oh, okay.  So the way that the files are
22  saved by the company, they're not saved in four-hour --
23  four-hour chunks like that.
24     Q.  Okay.
25     A.  So this particular video file that has this

Paz, Brittany                                                02-14-2022

290

1 particular title, Sandy Hook Vampires Exposed, on this
2 date, that's our -- our name for the document and it's
3 not four hours long.
4     Q.  Do you possess -- does the company possess
5 the entire episode of The Alex Jones Show on April
6 22nd, 2017?
7     A.  I possess this -- this -- this video under
8 that name, you know, the RUN name.  It's not four
9 hours, though.
10     Q.  The thing is, is yeah, the name Sandy Hook
11 Vampires Exposed, for instance, is a YouTube title;
12 right?
13     A.  Right.
14     Q.  And that's not going to be the --
15     A.  No, but it's the date of that video.  It's
16 the same date.
17     Q.  Correct.
18     A.  Right.  Right.
19     Q.  You're 100 percent right on that.  And, in
20 fact, what's weird about the InfoWars thing, the -- for
21 instance, the Owen Shroyer video is June 26, 2017.
22 That actually didn't happen that day.  That was
23 actually an Alex Jones episode from June 25th.
24     A.  Right.  Those were the upload dates.
25     Q.  Right.

291

1     A.  Right.
2     Q.  So what I'm trying to figure out is some day,
3 there was a full episode of The Alex Jones Show which
4 included all these comments that are now in Sandy Hook
5 Vampires Exposed.  Does the company have that full
6 episode?  Because we know this video is not the full
7 episode.
8     A.  Right.  So the video that I have is
9 definitely longer than the video you have if you say
10 it's only, you know, 40 minutes long.  This video that
11 I have for --
12     Q.  Okay.
13     A.  -- that title on that date is definitely
14 longer than that.  So I don't know if you don't have
15 this -- this length of the video.  And it could be
16 produced to you.  That -- that's fine.
17     Q.  No.  What I'm saying --
18     A.  But I don't know if your question to me is,
19 do I know whether this is the full Alex Jones Show?  I
20 don't know.
21     Q.  Well, we know it's not, though; right?
22 Because Alex Jones' show isn't just an hour long;
23 right?
24     A.  I don't -- I don't know --
25     Q.  Okay.

292

1     A.  -- in all honesty.  And I don't --
2     Q.  All right.
3     A.  -- and, like I said, this -- this video, it's
4 -- this is how it's saved on, you know, on our system.
5     Q.  Okay.  We've talked, I think, about one of
6 the claims in this video, which is that the police
7 found people in the backwoods dressed up in SWAT gear.
8 Does the company contend that that is true?
9     A.  One second.  I think that he was specifically
10 referencing the issue that we were talking about
11 earlier about the individual that was pulled out of the
12 woods and put into the back of the police car and he
13 was wearing SWAT gear.
14     Q.  Okay.
15     A.  So that was the basis for that particular
16 claim.
17     Q.  Is that true?
18     A.  There is video of an interview with a person
19 who says he saw a person being taken out of the woods
20 in SWAT gear.
21     Q.  Really?
22     A.  Yes.
23     Q.  Okay.  Have you seen that video?
24     A.  I have.
25     Q.  Okay.  So if I needed that, I could get a

293

1 copy of that?
2     A.  It's in the videos that I watched.
3     Q.  So there's a -- a witness who was there at
4 Sandy Hook that day; right?
5     A.  He was interviewed by the media.
6     Q.  Because here's the thing that I know about a
7 witness.  I know about a witness who's on video who's
8 talking about a gentleman named Chris Mandefronia.
9 Chris Mandefronia is the Sandy Hook parent who came to
10 the school that day.  He was actually there to help his
11 daughter with a gingerbread house project.
12     A.  Yeah.
13     Q.  And then he was arrested in the parking lot.
14 He wasn't in the woods or anything.
15     A.  This is not the same thing.
16     Q.  Okay.  And Mr. Mandefronia was wearing camo
17 pants; right?
18     A.  So --
19     Q.  And so what I'm wondering is, I'm trying to
20 figure out, because I -- I feel like after three years,
21 I know a lot about Sandy Hook coverage.  And the idea
22 that there was a witness in the parking lot that day or
23 something who was talking to the news media and said
24 somebody was arrested in SWAT gear is totally new to
25 me.

Paz, Brittany                                    02-14-2022

294

1      And so if that video exists, I want to try to
2  be able to figure out where it is. And so do you know
3  what -- was it in an episode that you saw that?
4      A.  Yeah, so it's in one of these videos. I
5  don't know if it's in my clipped notes. I think
6  that -- that Alex did a -- he did a show that was
7  something to the effect of -- the title was New York
8  Times Makes Odd Claim or Baffling Claim About the
9  Second Shooter.
10      And it might have been in there. But he's
11  shown this clip a number of times on a variety of
12  different episodes. I've seen it multiple times on
13  multiple videos where he cuts to an interview done with
14  a person by a news organization who was there saying he
15  saw a guy get pulled out of the woods, he was wearing
16  camouflage pants, he was in handcuffs.
17      He's saying, it wasn't me, I didn't do it.
18  And they put him in the back of a police car.
19      Q.  Okay. Hold on. Because now we're back to
20  camo pants.
21      A.  Yes.
22      Q.  All right. Not SWAT gear?
23      A.  I think -- SWAT gear. You know what, let me
24  -- let me just think about what he said.
25      Q.  Please do.

295

1      A.  I'm not sure if he said SWAT gear or
2  camouflage pants.
3      Q.  Okay.
4      A.  But this is the -- that is the direct source
5  of that information.
6      Q.  So it's very possible that Mr. Jones saw an
7  interview about Chris Mandefronia, a Sandy Hook parent
8  being briefly detained by police who happened to be
9  wearing pants that were camouflage, which is pretty
10  common in Sandy Hook area.
11      A.  I don't -- you know what, I don't -- I don't
12  know. And the reason is because there is also the
13  reference to these -- these off-duty SWAT officer that
14  I had been seeing also in here who was never really
15  identified or he might have been identified and I just
16  don't know his name.
17      But -- so it may have been that as well. But
18  those two pieces of information in connection with his
19  interview, that's the source.
20      Q.  It's also possible that Mr. Jones' claim
21  about somebody being dressed up in the woods in SWAT
22  gear is simply Mr. Jones conflating and confusing
23  mistakenly all these different separate ideas; right?
24  Mandefronia, the reporters in the woods, all of this
25  could just be conflated by Mr. Jones to just carelessly

296

1  say, somebody was arrested in SWAT gear. You would
2  agree with that?
3      A.  No. I think that the video -- I think that
4  the question that he was asking was, I've seen these
5  sources say someone was pulled out of the woods and
6  someone was arrested. We've not heard anything about
7  this person. Why haven't we heard anything about this
8  person?
9      I think that there is a legitimate source --
10  a question as to whether or not a person was pulled out
11  of the woods and why and who this person was, and that
12  was his question.
13      Q.  It -- what -- do you -- I don't -- because I
14  don't recall a question. What I recall him saying,
15  I have it written down here, police found people in the
16  backwoods dressed up in SWAT gear.
17      A.  That was one of the anomalies that he is
18  pointing to as why he was questioning the Sandy Hook
19  story. So he was pointing to the -- those sources.
20      Q.  Right. That's not a question; right? That
21  is, here is an anomaly. This happened?
22      A.  Yeah. Yeah. This is an anomaly. This is a,
23  you know, this is something that I think should be
24  answered. It's an anomaly.
25      Q.  What's -- what needs to be -- we know the

297

1  answer.
2      A.  Who is the person in the woods that was taken
3  out of the woods?
4      Q.  Got you. Okay.
5      A.  Yes.
6      Q.  So the question is, who is this man in SWAT
7  gear who was arrested?
8      A.  Who is the person that was taken out of the
9  woods, yes.
10      Q.  In SWAT gear; right? That's what you're
11  saying.
12      A.  So like I said, I don't -- I -- I don't know
13  the exact quote on whether it was SWAT gear or
14  camouflage. But the interview with the person that he
15  was citing said one or the other, and I'm not sure.
16      Q.  Well, see, here's the thing. When I deposed
17  Mr. Jones in the deposition you did read, there was a
18  big discussion of, do you think that somebody wearing
19  camo pants is SWAT gear. This was discussed at length
20  for a good period of that deposition how those two
21  things are not the same. And Mr. Jones agreed those
22  are not the same.
23      A.  They're not the same, no.
24      Q.  He's not talking about the guy in camo pants;
25  right? So I'm wondering --

Paz, Brittany                                                    02-14-2022

298

1    A.  I don't know that he's not talking about the
2  guy in camo pants.  So -- so quite similarly, and I've
3  seen this by Mr. Jones a couple of times.  And this is
4  something that he -- that he tends to do, which is this
5  is not a scripted proceeding.  This is something he's
6  just thinking out loud.  It's coming out as the
7  thoughts are coming.
8        And sometimes, he's conflating certain
9  things.  So, like, this is a perfect example of, did
10 Adam Lanza's house burn down, or was it bulldozed.  So
11 these are something that is maybe not exactly what was
12 said.  Maybe it wasn't SWAT gear, maybe it was
13 camouflage and it came out when he repeated it as SWAT
14 gear.
15       But that doesn't mean that the two things
16 he's talking about are different.  He might have just
17 characterized it differently and it wasn't the same
18 term that was used.  Does that -- does that make sense?
19    Q.  Sort of.  Did he ever correct himself?
20    A.  On the issue of --
21    Q.  Saying that the police arrested somebody in
22 SWAT gear.
23    A.  Did he ever make a correction as to whether
24 it was camouflage or SWAT gear?  No, I don't think he
25 ever restated the camouflage versus SWAT gear issue.

299

1    Q.  And the reason Mr. Jones might get things
2  wrong like that, saying that a parent in camo pants was
3  in SWAT gear or that a house that was bulldozed was
4  burned down is because he's not particularly careful
5  with the facts he puts on air.  You'd agree with that?
6    A.  I wouldn't say that he's not careful.  I'm --
7  like, I'm saying there's no teleprompter.  It's not
8  previously scripted.  He comes in in the morning and is
9  just talking.  And these are his -- these are his
10 unfiltered opinions based on what he remembers or
11 recalls about certain things.
12       So, you know, you and I are lawyers.  So,
13 obviously, we know words matter.  And so we try to the
14 best of our efforts to use specific words by specific
15 people, but he's not an attorney.  And so he's just off
16 the cuff saying what he remembers of that source.  And
17 what he remembered of that source was, he remembered
18 somebody in SWAT gear.
19       It may have been instead camouflage pants,
20 but that doesn't change the fact that there was
21 somebody taken out of the woods on that particular day
22 in handcuffs that a witness saw.  And that there was a
23 question about whether there was a second shooter.
24    Q.  Okay.  I want to make sure that I have you --
25 because now, you've basically just stated that as fact.

300

1  And I want to make sure --
2    A.  Stated what as fact?
3    Q.  That -- I want to know the difference between
4  these two things if it is fact or --
5    A.  Sure.
6    Q.  -- if there's just a report.  You seem to
7  claim that Mr. Jones said that he saw reports of
8  someone saying that someone was arrested in the woods,
9  brought out in handcuffs from the woods; right?
10   A.  Yes.
11   Q.  In handcuffs and SWAT gear, pants or whatever
12 it is.  Are you saying that that happened, or --
13   A.  That there was that witness?
14   Q.  -- are you -- that -- no.  That the company's
15 saying that that happened?  Right.
16   A.  I saw that video, yes.
17   Q.  That that witness exists?  Okay.  Okay.  I
18 just wanted to make sure that that's where we're at.
19 Okay.  When you say that, you know, we're lawyers.  We
20 know that words matter.  Media organizations should
21 know that too, shouldn't they?
22   A.  I think that the problem that the plaintiffs
23 have is that this is not a large media organization.
24 And I know you see that there's a lot of
25 disorganization, there's a lot of things that weren't

301

1  done probably as they should have been done.  This was
2  a organization that was put together by someone who got
3  his start in, like, access, like, you know, as a -- as
4  a commentator.
5        He started out with, like, five people in an
6  office and then it's expanded.  And I don't think he
7  ever knew how to do that appropriately.  Like, I know a
8  lot of lawyers, for example, that really only want to
9  practice law and don't understand the business aspect
10 of practicing law.  And so are really, really great
11 attorneys, but are really bad businesspeople.
12       And I think that's what you see here.  I
13 think that this is a -- an -- an organization that grew
14 really quickly from a person who didn't have a lot of
15 savvy as to the business aspect of it and then found
16 that he has had some issues that he had to take care of
17 later on.
18   Q.  Well, I want to make a distinction between
19 the business aspect of it and the journalism aspect of
20 it.  Mr. Jones was very savvy on the business aspect.
21 You'd agree with that?
22   A.  No, I don't agree with that.
23   Q.  Okay.  Well, now you've got a man who, like
24 you say, started with five people at a public access.
25 And he created a media organization that's pulling in

302

1  tens and millions of dollars in years of revenue. You
2  -- you agree with that?
3      A.  I don't know if it's tens of millions of
4  dollars, but he does pull in revenue from the sale of
5  some -- of some products, yes.
6      Q.  Okay.  Well, you read Ms. Karpova's
7  deposition --
8      A.  Yes.
9      Q.  -- and so you understand that between 2018
10 and 2016, the company generated 165 million dollars in
11 revenue; right?
12     A.  Whether the revenue is based off of the --
13 I'm sorry, what -- what was the number you said?
14     Q.  165 million.
15     A.  Between what years?
16     Q.  2016 and 2018.
17     A.  Let me just review what numbers.
18     Q.  I mean, we had the spreadsheets in front of
19 her.  That's what she testified to.  I don't know what
20 --
21     A.  Yeah, those were the -- I think that was the
22 testimony based on our QuickBooks accounts; is that
23 correct?
24     Q.  I don't think that was a QuickBooks account.
25     A.  I don't remember.  But in any event, I think

303

1  that -- no, I don't agree that the business end of it
2  is run particularly well, if that's the question.
3      Q.  Man, I'd hate to see one run poorly.  Because
4  that -- that sounds really good to me.  I mean, I don't
5  make that kind of money.  But that does sound great to
6  me.  But --
7      A.  It sounds good on paper, but when you look to
8  the nitty-gritty of it, that money is -- there is --
9  there is not that kind of money there.
10     Q.  We'll talk about that tomorrow.
11     A.  Sure.
12     Q.  Let's put that -- a pin in that.  You would
13 agree with me, though, that for an organization that's
14 generating that kind of revenue, Mr. Jones is not
15 operating the journalism aspect of that business on a
16 level commiserate with the responsibility that would be
17 owed by a business that large and with that large of a
18 viewership.  You agree with that?
19     A.  No, because we're not practicing journalism.
20     Q.  See, Mr. Jones says he did; right?  Like, you
21 read his deposition.  He says this is journalism.
22     A.  No.  What he said was, I am a pundit.  I am a
23 commentator.  And a vast majority of what we do is not
24 journalism.  I may do journalism sometimes.  It's not
25 mostly what we do.

304

1      Q.  Well, you just --
2      A.  98 percent of what we do is commentary and is
3  punditry and is basically a blogger type commenting on
4  -- on other things we see.  It is not journalism.
5      Q.  Okay.  I mean, I'm having a problem because
6  multiple people have testified to me that they do
7  journalism.  And now you're telling me that it's 98
8  percent of the time they don't.  Is that what you're
9  saying?
10     A.  Actually, I've read a few of the depositions.
11 In fact, I read Mr. Watson's deposition where he was
12 quite clear that he was not a journalist.
13     Q.  That's an interesting one.  Mr. Watson's a --
14 super interesting.  Because that one did -- that one
15 surprised me too.  Because Mr. Watson testified that
16 Mr. Jones doesn't have journalistic ethics because he
17 doesn't feel -- he doesn't feel he needs to abide by
18 those ethics because he's not doing journalism.  Would
19 you agree with Mr. Watson's conclusion?
20     A.  I think that Mr. Watson, what he was saying
21 was that because we do not practice journalism and
22 we're commentating, that those rules don't really --
23 aren't -- aren't something that they should be aware of
24 or should be practicing just because we're not
25 practicing journalism.

305

1      So I don't think it's accurate to say, oh,
2  well, he doesn't think he should abide by these rules
3  and these are rules he should be abiding by.  I don't
4  think that was an -- that's an accurate
5  characterization of what Mr. Watson said.
6      Q.  Well, Mr. Watson directly testified InfoWars
7  should be held to a lower standard because it's not a
8  -- a -- I believe what he said, mainline journalism
9  operation or middle of the road journalism operation.
10     A.  I don't think it's lower standards.  I just
11 think those particular journalistic standards don't
12 apply.
13     Q.  Okay.  So Mr. Jones doesn't have to be as
14 careful as other media organizations because the nature
15 of what he does isn't careful, it's punditry; right?
16     A.  It's punditry, yes.
17     Q.  Okay.  When you say that he doesn't have to
18 follow those rules, by rules, one of the things you're
19 referring to is the sort of traditional checks and
20 balances on truthfulness; right?  That are found in
21 journalism.
22     A.  I think if you're a journalist and you're
23 doing an investigative reporting, you check your
24 sources and vet your sources.  I think that this -- the
25 model, the business model of Free Speech is that they

306

1 are -- they are relying on the source that they are
2 pulling from to vet their own sources.
3    Q.  Okay.  I get what you're saying.  All right.
4 Let's go to paragraph 44.
5    A.  Is this a good time to --
6    Q.  Yeah, Let's do it.
7        MS. BLOTT:  Thank you.
8        THE VIDEOGRAPHER:  3:18 off.
9        (Recess from 3:18 p.m. to 3:33 p.m.)
10        THE VIDEOGRAPHER:  We are on the
11 record at 3:33.
12    Q.  (BY MR. BANKSTON)  All right.  I want you to
13 go now to paragraph 44 of that petition.
14    A.  Sure.  Okay.
15    Q.  And that talks about a November 18th, 2016
16 video called Final Statement on Sandy Hook.
17    A.  Okay.  Let me just go there.  I do recall
18 seeing that video.  November -- what day did you say?
19    Q.  18.
20    A.  18?  Okay.  The date is just not in the
21 petition.  Okay.  Yes.
22    Q.  Okay.  So first of all, did you watch that
23 video?
24    A.  Yes.
25    Q.  Okay.  So there's been some discussion, and

307

1 me and Mr. Jones have talked about this in deposition
2 too, of a Bloomberg e-mail where Bloomberg allegedly
3 sent an e-mail the day before Sandy Hook telling his
4 people, get ready for the next 24 hours for a big
5 event.
6    A.  Yes.
7    Q.  I've been trying to figure out where that
8 comes from.  Can you tell me?
9    A.  So as best as I can see, but let me pull up
10 my handy-dandy notebook and I will tell you
11 specifically.  All right.  So MWUD.  Okay.  See, if I
12 hadn't run out of tabs, this would have been easier, so
13 I apologize.  While I'm looking, just that particular
14 article or e-mail, so I think this is another -- as far
15 as I can determine, because I did try to look into the
16 source of that claim.
17        As far as I can tell, just based on my
18 interviews with -- oh, here it is.  As far as I can
19 tell, based on the context of that statement and me
20 speaking to Mr. Jones, that e-mail or reference to an
21 e-mail is based on -- Mayor Bloomberg at the time was
22 in this kind of coalition of other mayors that were for
23 gun control, so to speak.
24        I believe the Aurora shooting was very close
25 in time to the Sandy Hook shooting.  And essentially,

308

1 there was an internal communication between the
2 Bloomberg people just in connection with that coalition
3 just telling his people to get ready for the next --
4 whatever the next event is, because another event is
5 going to happen at some point.
6        And let's be ready to put forth our -- you
7 know, be ready to run with it when it happens.  As far
8 as it being the day before, I -- or a representation
9 about the e-mail going out the day before, I don't see
10 that there's any way that that e-mail went out the day
11 before, or if it went out the day before.  I don't know
12 when that e-mail went out.  But that's what he's
13 referencing.
14    Q.  Okay.  So everything you just told me is just
15 what Mr. Jones told you?
16    A.  Right.  I've not ever laid eyes on such an
17 e-mail.  I don't recall seeing any such thing in the
18 production.  So based on my communications, that's what
19 it is.  And it very well may be another example of,
20 like, for example, in Exhibit 10 where you're seeing
21 house burned down versus it was bulldozed.
22        There's this internal e-mail and he's
23 representing that it was the day before, when honestly,
24 I'm not really sure when it was or how -- how far in
25 relationship it was.

309

1    Q.  You don't even know there was an e-mail?
2    A.  I don't know where he saw that, no.  I don't
3 see the document that he sourced.
4    Q.  You don't have anything else to give me other
5 than basically what Mr. Jones said on the show; right?
6 Same stuff.
7    A.  As far as that particular claim, yes.
8    Q.  Yeah.  Mr. Jones had told me he could find
9 this for me.
10    A.  I have not been able to locate anything like
11 that.
12    Q.  Okay.  What did you do to try?
13    A.  I asked Mr. Jones, I have spoken to other
14 people, like I said earlier, the other employees that I
15 spoke to.  And I've looked through the documents that
16 have been produced.
17    Q.  Did you read the article Aaron Dykes wrote
18 about this?
19    A.  I may have, in all -- all honesty.  I read a
20 lot of documents.
21    Q.  All right.  Well, because, I mean, at one
22 point in Mr. Jones discussing this whole thing, he puts
23 up an article on InfoWars which I don't have, which
24 isn't available anymore.
25    A.  Okay.

310

1    Q.  But it's an article about -- from Aaron Dykes
2 and apparently talking about this Bloomberg stuff.  And
3 I -- I'm wondering if that's -- didn't get into your
4 notes somehow.
5    A.  If I may just look at my notes.
6    Q.  Sure.
7    A.  So no, I don't have anything like that in my
8 notes.  But I do recall him mentioning a Bloomberg
9 e-mail.  At various points, he has termed that e-mail
10 as the day before.  Sometimes, he's said a different
11 time period.  But as far as that particular e-mail
12 goes, I don't have a copy of it.
13    Q.  When you just said he, you're referring to
14 Mr. Jones, not Mr. Dykes?
15    A.  Right.
16    Q.  Okay.  You understand who Aaron Dykes is;
17 right?
18    A.  Yes, but I have not spoken to Mr. Dykes.
19    Q.  Okay.  That's -- well, I mean, that's one of
20 the things I wanted to ask you about.  Mr. Dykes,
21 during a substantial period of Sandy Hook coverage, was
22 one of the primary writers at InfoWars; right?
23    A.  He was a writer.  I don't know if he was a
24 primary writer.
25    Q.  Okay.

311

1    A.  He -- I don't think he was in a supervisory
2 position, if that's the question.
3    Q.  InfoWars doesn't have titles.
4    A.  They don't have titles, but that doesn't mean
5 there's not a person that's in a supervisory position.
6 Like, Kurt Nimmo was in a supervisory writer position
7 in that time period.
8    Q.  Okay.  And you don't think Aaron Dykes was?
9    A.  I don't think so.
10    Q.  Okay.
11    A.  I think in that time period, Kurt Nimmo was
12 the -- in that supervisory position.
13    Q.  What makes you -- what makes you -- who did
14 you talk to about Aaron Dykes?
15    A.  What do you mean, talk to --
16    Q.  Well, I mean, you had to come up -- you
17 didn't -- before this deposition, you didn't know Aaron
18 Dykes from anybody on the street.  And now you're
19 telling me he's not a supervisory person.  So who did
20 you talk to about Aaron Dykes?
21    A.  When I talked to -- I didn't talk to anybody
22 about Aaron Dykes.  I talked to people about who was in
23 a supervisory position during that time period, and I
24 was informed it was Kurt Nimmo.
25    Q.  Well, there were other people during that

312

1 time period who had supervisory positions too; right?
2    A.  In other departments?
3    Q.  In writing.
4    A.  As far as I know, Kurt Nimmo was the one that
5 was in the supervisory position in this time period.
6    Q.  Okay.
7    A.  He left around 2018, at which point Kit --
8 Kit Daniels became the person in that supervisory
9 position.
10    Q.  Well, you remember Kit Daniels testifying
11 that Mikael Thalen was the person in charge of fact
12 checking at InfoWars from 2014 to 2018?
13    A.  Fact checking?
14    Q.  Uh-huh.  He was the editor.  The guy -- the
15 supervising editor who checked other writers' work.
16    A.  There -- we -- so fact checking, I don't -- I
17 don't agree with that.
18    Q.  Okay.
19    A.  So I don't know if that's what he said, but
20 -- but there is nobody that checks facts like that.  So
21 essentially, during this time period as well as now
22 currently, the rule of -- the general rule is to make
23 sure that your article has more than one source.  So
24 there is checking of the articles to make sure that
25 they're appropriately backed, but I don't want to say

313

1 that they are fact checked by anybody.
2       So, for example, now, my conversation based
3 on Kit Daniels' interview with him is basically, they
4 write the articles in WordPress and the supervisor,
5 whoever that is, does have access to review that
6 material prior to.  But as far as, quote, fact
7 checking, I don't think that they're doing that.  I
8 think they're doing it to make sure that the article is
9 appropriately sourced, but they're not necessarily fact
10 checking.
11    Q.  Okay.  You know who Melissa Melton is; right?
12    A.  I'm sorry, I don't.
13    Q.  That's Aaron Dykes' wife.  She was also a
14 writer at InfoWars during this time.
15    A.  Okay.
16    Q.  I mean, in other words, what I'm saying is
17 Aaron and Melissa are the source of a lot of the early
18 Sandy Hook stuff; right?
19    A.  The early Sandy Hook Stuff?
20    Q.  Yeah.
21    A.  How early are you talking?
22    Q.  Well, I mean, let's go ahead and just -- from
23 the day of Sandy Hook till about -- let's go ahead and
24 do it from the day of Sandy Hook till about two years
25 out.  You would agree that Melissa Melton and Aaron

Paz, Brittany
02-14-2022

314

1 Dykes were a source for a significant amount of that
2 material?
3     A.  I don't -- I don't think so.  You mean -- so
4 here's my -- here's my concern and here's what I --
5 what I think is that a lot of this material, like I
6 said, is just reposting of other articles that are
7 already out there; right?  So sure, there are articles
8 on Sandy Hook that they were, like, you know,
9 resourcing on a daily basis.
10        So at any given day, the writers are putting
11 out dozens of articles a day.  And most of those
12 articles, like we've said, are not original content.
13 Most of those articles are, I saw another article in
14 CNN.  I saw another article on Drudge.  I saw this
15 article.  And then resummarizing it, maybe putting our
16 spin on it or our opinion in there.
17        But ultimately, it's a report on another
18 article.  So if she was -- Melissa was doing that
19 between when Sandy Hook happened and 2015 or 2016,
20 sure.  I'm sure that's -- she was one of the writers.
21 If she's one of the writers, that's what she would have
22 been doing.
23     Q.  Okay.  So Aaron Dykes, Melissa Melton, two
24 people you haven't spoken to; right?
25     A.  I have not spoken to them, no.

315

1     Q.  Mikael -- Mikael Thalen, you haven't spoken
2 to him either?
3     A.  No.
4     Q.  Okay.  Let's talk about in that article -- I
5 mean, in that video in paragraph 44, the statement that
6 the school was shut down, that's what the records show.
7 What records are being referred to there?
8     A.  I'm sorry, which paragraph are you referring
9 to?
10     Q.  I'm referring to the -- the final statement
11 on Sandy Hook, which is paragraph 44.
12     A.  Right.
13     Q.  It's a November 18th, 2016 video.  One of the
14 statements of fact in there was the school was shut
15 down, that's what the records show.  What are the
16 records that he's talking about?
17     A.  Which allegation -- which paragraph is that
18 allegation in?
19     Q.  It's -- I'm not even positive it's in the
20 petition.
21     A.  Well, that's -- that's what I'm asking,
22 sorry.  I don't know that that is -- is made in the --
23 in that video.  But --
24     Q.  Okay.
25     A.  -- I will review my notes and we will see.

316

1     Q.  Okay.  So in this particular video, there appears to be
2 -- there's a bunch of claims made in this -- in this
3 video.
4     Q.  Indeed.
5     A.  One of which appears to be that the school
6 was shut down.  And again, he shows the website to that
7 school and its traffic from 2008 to 2013 and then cites
8 the Wayback Machine.
9     Q.  No, I know that happens --
10     A.  Right.
11     Q.  -- and the point in the video is that the
12 school has no Internet traffic.
13     A.  Yes.
14     Q.  I'm talking about later in the video,
15 Mr. Jones says, and that school was shut down, that's
16 what the records show.
17     A.  That's what the record he is referring to is
18 the Wayback Machine.
19     Q.  Well, he refers to in other -- in other
20 videos that we're going to talk about, he refers to
21 e-mails between the school board and the school showing
22 that the school was shut down.  Those are the records;
23 right?
24     A.  I don't know that from this video.  That's
25 not in this video.

317

1     Q.  Okay.  Well, I guess we'll have to get to it
2 when we get to that in another video.
3     A.  Right.
4     Q.  The other one is the -- the infamous video
5 that Mr. Jones shows of kids going around in circles
6 around the building.  You know a video I'm talking
7 about?
8     A.  I believe it's -- mostly what he's referring
9 to is some photographs.  But I think there is a video
10 of kids in a parking lot that he refers to a few times.
11 There are a couple of photographs.
12     Q.  The parking lot, not of the school?
13     A.  I don't know where it is.  And I think
14 Mr. Jones says that, is that he --
15     Q.  Well, that's what I wanted to know.
16     A.  Right.  I don't think Mr. Jones knew if it
17 was at the school or if it was another location.
18 Because I know there was an issue about the firehouse
19 as well.
20     Q.  Yeah.  Well, he said it was the school.  We
21 know that; right?
22     A.  I think he believed it was the school.
23     Q.  Right.  Okay.  So that video and that
24 allegation that there were kids going around in circles
25 around the building, where did he get that video?

318

1  Where did he get that allegation?
2      A.  From that video that he saw.
3      Q.  Right.  That's what I'm saying, where does
4  that video come from?
5      A.  That's a video that he would have found on
6  the news.  That was --
7      Q.  No.
8      A.  -- reported in the news -- in the news
9  cycle --
10     Q.  No, ma'am.
11     A.  -- around that particular time.  So that's
12  his opinion based on what he was seeing.  So if he's
13  seeing this video and he thinks it looks like kids are
14  walking around in circles, that's his opinion.
15     Q.  All right.  I'm having a bit of the same
16  struggle I'm having with Ms. Karpova's deposition,
17  which is that -- that like any good lawyer, I come into
18  this case and there's -- there's -- honestly, there's a
19  lot of things I don't know.  There are a lot of things
20  I don't know.  More than average on a case that I don't
21  know.  But there are a lot of things I do know.  All
22  right?
23         And one of those things is that that video
24  did not come from the news media.  All right?  That
25  video is -- I think you saw in that video is very

319

1  edited because it starts having the people go back,
2  forward, back, forward, back, forward.  All right?  And
3  then it says in titles on the video, going in circles.
4  All right?  Somebody made that video.
5      A.  Somebody edited the video.
6      Q.  Yeah.  Somebody --
7      A.  I don't know the answer to that.
8      Q.  Right.  There's a source of this.  Somebody
9  took a piece of footage that they saw and edited and
10  tried to make it seem like this was supporting the
11  conspiracy of Sandy Hook.  And then Mr. Jones or
12  somebody at InfoWars saw that and started using that on
13  their show.  I want to know where it comes from.
14     A.  I don't know the answer to that.
15     Q.  Okay.  And as far as trying to hunt down that
16  video, you didn't do anything to try to hunt down where
17  that allegation comes from?
18     A.  As far as I know, Mr. Jones saw a video and
19  that was -- he -- what he was basing his opinion on.
20  If he saw the edited version of the video and that's
21  why he was basing his opinion on it, I don't know.  But
22  I don't know where the edited version came from.
23     Q.  Right.  We know it didn't come from the news,
24  though?
25     A.  I don't know where it -- where he saw it

320

1  originally, so I can't say.  So it could be the same
2  thing as the Drudge Report, you know.  So the Drudge
3  Report had that edited -- edited video of -- of
4  Dr. Carver's interview.  I don't know if it came from
5  somewhere like that.  I don't know where the -- where
6  he saw this video or if he saw it edited or -- I just
7  don't know.
8      Q.  All right.  Let me just stop for a second.
9  Because you said that Drudge Report had an edited copy
10  of the video.
11     A.  Oh, no.  Is it Drudge -- Zero Point Now, I'm
12  sorry.
13     Q.  Okay.
14     A.  Zero Now.
15     Q.  Okay.
16         MR. OGDEN:  Zero Hedge.
17     A.  I meant Zero Hedge.  My mistake.
18     Q.  (BY MR. BANKSTON)  Okay.  For this video, The
19  Final Statement on Sandy Hook, can you tell me what
20  employees were involved in making, researching,
21  producing this video?
22     A.  Well, as far as making and researching it,
23  Mr. Jones researched this video.  So his position -- so
24  let me just see in my notes.  Final Statement on Sandy
25  Hook.  Okay.  So based on my conversations, it was

321

1  researched by Rob Dew and Mr. Jones.
2         But as we discussed earlier, as far as
3  researching the videos, the hosts research the content
4  for the videos and the producers don't have say in the
5  content of the videos.  So, I mean, I could check the
6  document that we produced earlier as far as whether
7  Melinda did her research for who was working that day.
8  But again --
9      Q.  Okay.
10     A.  -- these are not the people that would have
11  been involved in the content.
12     Q.  Well, here's my problem.  I know that you
13  don't know --
14     A.  It's not on this.
15     Q.  Okay.  So there's -- you don't have a list of
16  employees who were involved in the video?
17     A.  For that -- for that day, no.
18     Q.  Okay.  So if I wanted to know every employee
19  who was involved in that video and what their specific
20  roles is, that's something you can't tell me?
21     A.  No.
22     Q.  Okay.  In terms of all of the -- who edited,
23  who created the screenshots, who put all the stuff
24  together that went up on the screen in front of
25  Mr. Jones, we don't know that?

Paz, Brittany                                                    02-14-2022

322

1    A.   Well, Mr. Jones, there was the video clip --
2  so in that particular video, he had put up on the
3  screen the video clip of the witness regarding the
4  second shooter.  So I know that there was a question
5  you had asked earlier where this video from this
6  witness was.  So this is shown in that video.
7    Q.   Okay.  I'll go check that.
8    A.   Then, there's a CBS news clip of John -- from
9  John Miller reporting for CBS regarding the second
10 shooter.  So there was a CBS broadcast stating second
11 shooter, he put that on the screen.  There was a clip
12 of Obama giving a press conference after Sandy Hook
13 because he has this claim about fake crying and Obama
14 was fake crying regarding the children.
15        So he put up the clip of Obama's press
16 conference.  He put up the clip of Robbie Parker.  He
17 put up the clip of Lieutenant Vance regarding
18 misinformation.  He put up some clips from the FOIA
19 hearing.  He put up the Wayback Machine.
20   Q.   Okay.  Mr. --
21   A.   He put up a lot of clips.
22   Q.   Mr. Jones didn't put up any clips?  He
23 doesn't actually do that?
24   A.   No, the producer.
25   Q.   Right.

323

1    A.   So like we -- yeah.  So like we -- like we
2  discussed earlier, he would tell his producers, I have
3  clips for this.  Go find it.  And so Mr. Jones would be
4  responsible for saying, I want these clips.
5    Q.   Right.
6    A.   And they would just pull them.
7    Q.   That's what I want to know.
8    A.   Right.
9    Q.   Right?  Is because I don't know where that
10 thing comes from, the kids going around in circles.  I
11 want to find out --
12   A.   Oh, I don't know where -- like I -- like I
13 said earlier, I don't know where that originated from.
14   Q.   I know you don't.
15   A.   Right.
16   Q.   So it's not useful to talk to you.  I want to
17 know who I should be talking to.  Who is the producer?
18   A.   The producer for that?
19   Q.   Uh-huh.
20   A.   I -- honestly, I don't have that.  Let me
21 see.  So for that day, it would have been in 2016.  I
22 mean, Daria would have been there during that time
23 period.
24   Q.   Well, we know from her testimony that she
25 wasn't the one; right?

324

1    A.   Right.  I don't think she was the one.
2    Q.   Okay.  All right.  Well, let's go on to the
3  next video.  Let's go to paragraph 38.
4    A.   Sure.
5    Q.   You see the video there from July 7th, 2015
6  entitled Government is Manufacturing Crises; right?
7    A.   Okay.  Let me just go to my July 7th.
8    Q.   I believe you're going to find two different
9  videos on July 7th.  Let me know which one you're
10 referring to.
11   A.   So I have -- I have the video Retired FBI
12 Agent Investigates Sandy Hook Mega Massive Cover-up.
13   Q.   That's the next paragraph.  We'll talk about
14 that.
15   A.   Right.  But I don't have in my chart the one
16 before that.
17   Q.   Okay.  So the -- the video that's identified
18 in plaintiffs' petition called Government is
19 Manufacturing Crises, you haven't watched that?
20   A.   I don't -- no, I don't have it on my list.
21 So no, I haven't watch it.
22   Q.   Okay.  So as far as the claims made in that
23 video, if there are any claims that are in that video
24 that are there unique to that video, you can't speak
25 about them today; right?

325

1    A.   No.
2    Q.   Okay.
3    A.   But I can -- I can talk about the other one.
4    Q.   Honestly, if you -- let's just stick with
5  this video.
6    A.   Sure.
7    Q.   Right?  There's no point in asking you any
8  questions about this video.  You didn't even watch it.
9    A.   I didn't watch that particular video, no.
10   Q.   Let's move on to the next one.  Paragraph 39,
11 you do -- you say you do have a copy of this video,
12 July 7th, 2015 Retired FBI Agent Investigates Sandy
13 Hook Mega Massive Cover-up?
14   A.   Yes.
15   Q.   Who is the retired FBI agent?
16   A.   Rob Dew's uncle.
17   Q.   Did you talk to him?
18   A.   No.
19   Q.   Did you try to talk to him?
20   A.   No.
21   Q.   Okay.  It says the ambulances came half an
22 hour later.  Do you have a source on that?
23   A.   Let me just pull up my notes on that.
24   Q.   And I'm going to ask you for the deposition
25 tomorrow, if you could make sure -- I'll give you some

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 117 of 211

Paz, Brittany

02-14-2022

326

1  tabs if you need.  You can tab up everything that
2  you're going to be using tomorrow.
3      A.  Thanks.
4      Q.  Just so we can maybe get you on your flight.
5      A.  Sorry, I don't have a printer at the hotel.
6  So I was relying on some other people to print it out
7  for me and didn't have enough tabs.  Here we go.  Okay.
8  I'm sorry, what was your question?
9      Q.  I don't even remember.  Ambulance came half
10  an hour later.  What's the source on that?
11      A.  So according to my notes, this is a -- this
12  is a broadcast that Rob Dew and Alex Jones were talking
13  about the FOIA hearings.
14      Q.  Uh-huh.
15      A.  And they go through Halbig's 16 questions and
16  why the official story doesn't add up.  So these are
17  one of Halbig's 16 questions.
18      Q.  The ambulances came an hour and a half later
19  is one of Halbig's 16 questions, that's your testimony?
20      A.  It's -- well, like I -- like we talked about,
21  they've expanded over time.  Sometimes, there's
22  20-something questions.  It started out as 16
23  questions, but he's expanded those over time.
24      Q.  So if I go and I look through Halbig's stuff,
25  I will find him somewhere saying the ambulances came

327

1  half an hour -- an hour and a half later?
2      A.  I think what he says is, the ambulances were
3  not allowed through, that there was -- it was blocked
4  and that the ambulances were not allowed up to the
5  school.  So I think that was his conversation regarding
6  the ambulances.
7      Q.  Okay.  When they say DHF, an hour and a half
8  later with the time stamp, said put -- put up signs
9  saying sign-in here, that's from Mr. Bidondi going up
10  to that hearing and reporting on it; right?
11      A.  No, that -- that's originally from
12  Mr. Halbig.  So Mr. Halbig produces this photograph and
13  says, where did this sign come from?  And made a
14  representation that it was taken an hour and a half
15  after the shooting.  And then he submitted some FOIA
16  record requests to the town as to where the sign came
17  from.  So again, this is another one of Mr. Halbig's 16
18  questions.
19      Q.  Right.  Well, what I'm saying is Dan Bidondi
20  went to -- to Connecticut with Mr. Halbig.  You
21  understand that?
22      A.  He went to the FOIA hearings, yes.
23      Q.  Right.  And did reporting on the ground from
24  the FOIA hearings.
25      A.  He covered -- yeah, he covered the FOIA

328

1  hearings, yes.
2      Q.  One of the things that Mr. Bidondi told the
3  company in his reportings is that Mr. Halbig was able
4  to prove that DHS approved this sign-in sign and put it
5  out in front of Sandy Hook; right?
6      A.  That's -- no, that's not what he said.  He
7  said at the second FOIA hearing, what came out at the
8  FOIA hearing was that the town does not have any
9  records relating to this sign.  And then the questions
10  were, how could it be, where did the sign come from.
11  And then the town disclosed that they believe that the
12  Department of Homeland Security had ordered that sign
13  and that's why they had no records.
14      Q.  Right.  That's --
15      A.  So that's where the origin of that statement
16  came from.
17      Q.  Right.  So that's not -- that's not something
18  that came out of Wolfgang Halbig's 16 points, that's
19  something that came out of the FOIA meeting that he
20  participated in?
21      A.  That DHS ordered that -- that --
22      Q.  Sure.
23      A.  -- sign?  Yes, that came from the FOIA
24  hearings.
25      Q.  Right.  And that was reported to InfoWars by

329

1  Dan Bidondi?
2      A.  Yes.  He videod it.
3      Q.  Okay.  Right.  And Dan Bidondi covered -- is
4  -- multiple times went up there with Wolfgang Halbig to
5  Connecticut; right?
6      A.  Well, he -- he lives up there.  He lives -- I
7  want to say in Rhode Island or something.  He doesn't
8  live very far.  He doesn't live here.  But yes, he did
9  go there with Wolfgang Halbig.
10      Q.  That's all I'm asking.  He went to multiple
11  trips --
12      A.  Yes.
13      Q.  -- to -- and I know you want to try to say,
14  well, look.  It wasn't that big of a deal because he
15  lives right next door to there.  And I know you throw
16  in little advocacy like that.  But I'm just trying to
17  ask you simple questions.
18          And I'm going to tell you, if you want to
19  make that plane flight, those kind of answers are not
20  going to help you.  I'm just trying to help you out
21  because you want to make that plane flight.
22      A.  I'm sorry, are you -- are you -- are you
23  threatening to --
24      Q.  No, I'm saying this takes longer time.  This
25  takes more time, when you add in an answer to a

330

1 question that I'm not asking. When all I'm asking, the
2 very simple thing I'm asking is, did Dan Bidondi go
3 multiple times to Newtown.
4    A.  He did.
5    Q.  And you start going off to me about, well,
6 yeah, you know, he lives near there and all this sort
7 of stuff. I -- you know I don't care that Dan Bidondi
8 lives near Newtown. All I'm trying to confirm is a
9 very simple fact so I can have it for the record. Did
10 Dan Bidondi go multiple times to Newtown?
11    A.  Yeah. I think --
12    Q.  I'm not threatening you in any way. All I'm
13 trying --
14    A.  I think he went two or three times, yes.
15    Q.  All I'm trying to communicate to you is the
16 more times we have answers that don't match up to what
17 we're talking about, talking about Leonard Pozner's
18 ex-wife and what she believes and things like -- any
19 time we do that is time that I would not otherwise be
20 spending with you.
21        And I just want you to understand that we're
22 on the same page that way because I do want to get you
23 on that flight. I don't want to be the reason that
24 you're not on that flight. And so that's what I'm
25 trying to tell you right now. And I -- I promise you,

331

1 because I know that came out of your mouth, it is not
2 in any way a threat to you. I really do want that to
3 happen because I don't want to be here late tomorrow.
4 I -- believe me, I got better places to be.
5        When Dan Bidondi, who's done multiple reports
6 with Wolfgang Halbig from Newtown reporting on that FOA
7 process that has made it into InfoWars videos, have you
8 spoken to Dan Bidondi at any point?
9    A.  No.
10    Q.  Did you try to speak to Dan Bidondi?
11    A.  No. He doesn't work for the company.
12    Q.  Okay. Is that -- is that the reason you
13 didn't speak to him, because he doesn't work for the
14 company?
15    A.  No, that's not the reason. But he doesn't
16 work for the company and he doesn't -- I don't think
17 he's associated anymore with the company.
18    Q.  You spoke to Nico?
19    A.  I did.
20    Q.  Okay. I just want to make sure Nico doesn't
21 work for the company.
22    A.  Not anymore, no.
23    Q.  So the idea of whether or not Dan Bidondi
24 works for the company is irrelevant to whether you
25 talked to him; right? That isn't what decided whether

332

1 you were going to talk to him?
2    A.  No, it's not. Yeah.
3    Q.  Okay. Again. This is the video I wanted to
4 put a pin in earlier. This is a video where Mr. Jones
5 said, we have the e-mails from the city council back
6 and forth and the school talking about it being shut
7 down a year before. What is he talking about?
8    A.  Is the video -- are we still on the same
9 video?
10    Q.  Uh-huh. On paragraph 39. Uh-huh.
11    A.  Okay. So here -- and I think this is another
12 example of the characterization of -- of a certain
13 piece of information. So I think that what he's
14 referring to here is also specifically one of Halbig's
15 claims that Mr. Halbig has some e-mails that are not
16 necessarily confirming that the school was closed, but
17 e-mails relating to the condition of the school and his
18 request -- requests in connection with the condition of
19 the school because certain reports have to be generated
20 by certain times.
21        And in his opinion, those documents show that
22 the school wasn't functional because those reports were
23 not produced by the school or by the town.
24    Q.  Okay. This is what you think?
25    A.  That -- that's what it appears to be

333

1 referencing in here. But again, it's -- it is not
2 e-mails confirming that the school was shut down.
3    Q.  You've never -- you don't even know if
4 there's e-mails. Have you seen these e-mails?
5    A.  I've seen discussions from Mr. Halbig --
6 wait. Let me just go back. So Mr. Halbig requested --
7 put in a bunch of FOIA requests. Some of those FOIA
8 requests included requests that are in connection with
9 an environmental study done at the school.
10        Those environmental studies, in his research
11 opinion, estimation, based on his research of the legal
12 regulations up there, is that those records need to be
13 produced within a certain period of time. And the fact
14 that the school did not have any such records
15 responsive to that request show the school was not in
16 operation.
17        Again, that isn't the same thing as there's
18 e-mails being back and forth. And I agree with you,
19 I've not seen any such e-mails. But I think that it's
20 relating to those FOIA requests.
21    Q.  That is the inference you've been able to
22 make --
23    A.  Yes.
24    Q.  -- just by what you think you know about
25 Mr. Halbig and what his claims were; right?

Paz, Brittany

334

1    A.   Not just about that claim, but about the
2 things that Mr. Jones is saying in this video.
3    Q.   Okay.  And so you were able to arrive at that
4 inference?
5    A.   Right.
6    Q.   Without ever having to see the e-mails or
7 anything like that, that's -- you can arrive --
8    A.   I -- I -- I'm not in possession of any such
9 e-mail like that.
10    Q.   Got you.
11    A.   I have not reviewed any -- seen any e-mails
12 in the production like that.
13    Q.   Okay.  And you didn't talk to Mr. Halbig;
14 right?
15    A.   No.
16    Q.   Okay.  Let's talk about paragraph 36.  March
17 4th, 2015.  Do you see that?
18    A.   Yes.
19    Q.   New Bombshell Information Sandy Hook
20 Information Inbound.
21    A.   Yes.
22    Q.   We've talked a little bit about this video
23 before.  So we already know the guest was Wolfgang
24 Halbig.
25    A.   Yes.

335

1    Q.   You've watched this video?
2    A.   Yes.
3    Q.   Have not spoken to Mr. Halbig?
4    A.   No.
5    Q.   Okay.  Have you reviewed documents about the
6 sourcing of this video?
7    A.   Yes.  Let me just -- okay.  Here we go.  Oh,
8 yeah.  This is the -- I think we already talked about
9 this video.
10    Q.   We have talked about it a little bit.  I'm
11 wondering what documents you've reviewed to about the
12 sourcing of this video.
13    A.   Okay.  Sourcing of this video.  So --
14    Q.   Yeah.  What -- not -- I don't want to know
15 the source of different claims.  I want to know first
16 what documents did you review about the sourcing of
17 this video?
18    A.   So the sources that are specifically cited in
19 this video, there's a couple of -- well, first, there
20 is Mr. Halbig's website.  He posts up there.
21 Sandyhookjustice.com.  Then there's an article on
22 InfoWars, Nation All Over the World Admit to False Flag
23 Terrorism.
24       Then there's another article, Six-year-old
25 Child Suspended for Making Gun Shape With Hand.  The --

336

1 then there's another article, InfoWars article, Shooter
2 James Holmes and DARPA Weird Science.  Then there's
3 some cuts to news footage about the man in the woods.
4 And then most of the sourcing here are things that
5 are -- Halbig is saying.
6    Q.   Okay.  So first of all, of all those
7 documents you just listed off to me, you reviewed all
8 those documents?
9    A.   Have I read each and every one of these
10 articles?  I'm -- I'm not sure that I've read each and
11 every article.
12    Q.   All right.  That's -- that was what my
13 question is.
14    A.   Sure.
15    Q.   Because I don't -- I -- I know you wanted to
16 tell me what was sourced and all of this sort of stuff,
17 different question.  I just want to know what
18 documents, physical documents relating to this video
19 you've reviewed.
20    A.   Okay.  In all honesty, I don't know whether I
21 reviewed all -- I read each and every source.
22    Q.   Okay.  And you certainly didn't contact each
23 and every source; right?
24    A.   No.
25    Q.   Okay.  And then there -- a lot of these

337

1 claims come from Wolfgang Halbig; right?
2    A.   Right.
3    Q.   Do you -- have you reviewed any documents
4 about the booking process for Wolfgang Halbig for this
5 particular show?
6    A.   You mean how -- how was he -- how did he come
7 to be on the show that particular day?
8    Q.   And -- and what materials did he provide the
9 company prior to his booking to -- about this booking,
10 anything like that?
11    A.   So -- okay.  So -- and that's a good
12 question.  So I did do interviews with -- with Nico
13 about how -- when clients are -- not clients, but
14 guests are booked on the air, the procedure by that --
15 which that happens and whether after that, anything
16 else subsequently happens as far as resourcing their
17 material.
18       So usually how the process goes is the person
19 -- host, I should say, will go and say, I want to bring
20 this particular person on.  And then Nico or whomever
21 the person in charge there is will pull some
22 information about the person just to basically verify
23 this person is the person they say they are.
24       Because they do have people that pretend to
25 be other people, aren't real people.  There's fake

338

1  Facebook pages, I mean, you know how that goes.  So
2  they will pull some information off the Internet to
3  just verify this person is, in fact, who he says he is.
4  Provide that to the host.
5        The host will make their own determination as
6  to whether they want this person on the air or not.
7  And then the -- the person will just be booked.  So
8  Nico essentially was just the liaison.
9    Q.  Okay.
10    A.  As far as how Mr. Halbig came to become a
11  guest, essentially, Mr. Salazar wrote that article in
12  early 2014.  It was an article about Mr. Halbig being,
13  quote, unquote, threatened by the police.  And that
14  came to the attention of Mr. Knight.  Mr. Knight
15  reached out to Nico to say, I want to book this person.
16        At the time, Mr. Knight had the authority to
17  book his own -- his own guests.  Now, that's not the
18  case.  Well, he's not there anymore.  But now that's
19  not the case.  And so Nico proceeded to just pull some
20  basic information about his website, about Mr. Halbig's
21  website, so that it could be put onto the broadcast
22  when it's done during the interview.
23    Q.  Okay.
24    A.  And that's pretty much how Mr. Halbig came to
25  be a guest.  Now, after that, he's already a guest.

340

1    Q.  Nope.
2    A.  I saw one e-mail like that.  But like I said,
3  it would have been at the behest of the host.  So Nico
4  isn't the one that would say, okay.  Well, I want to
5  get Mr. Halbig on.  I don't know what prompted that
6  series of e-mails is --
7    Q.  You know what I mean when I say the Super
8  Bowl picture?
9    A.  Yes, I know the Super Bowl picture.
10    Q.  All right.  You know that was provided to the
11  company; right?
12    A.  For Mr. Halbig?  Yes.
13    Q.  For this episode.
14    A.  That picture was not aired on this --
15    Q.  I didn't --
16    A.  -- on this --
17    Q.  I never said that.
18    A.  It was provided to the company, but it was
19  never used.
20    Q.  And it was thank -- the company thanked him
21  for it; right?
22    A.  If that's what the e-mail says.
23    Q.  Right.  Okay.  So what we do know is that
24  before Mr. Halbig was put back on the air, and you had
25  an InfoWars person, the person who was responsible for

339

1  And so there's not any -- anything else done after that
2  to either pull more material from him or anything like
3  that.
4    Q.  Okay.  So in terms of what information
5  Mr. Halbig provided the company that prompted his
6  booking on this show on March 24th, 2015, you haven't
7  seen anything like that?
8    A.  On this particular show?
9    Q.  For that video, uh-huh.
10    A.  No.  As far as it appears, it appears that
11  Mr. Jones is talking about the issue specifically
12  related to the copyright claims on his YouTube page,
13  and that may have been the impetus.  But I don't -- I
14  don't know the -- I don't know for sure.
15    Q.  Again, here's another strange one for me.
16  Because when I was in Ms. Karpova's deposition, there
17  was a document discussed in her deposition that's
18  e-mails between Mr. Halbig and -- and Nico about this
19  show.  You have seen this?
20    A.  To book his show?
21    Q.  Yeah, and the materials that Mr. Halbig
22  provided.  Have you not seen that?
23    A.  I saw an e-mail that doesn't have any
24  documents attached.  Is that the e-mail that you're
25  referring to?

341

1  booking -- getting the guests set up and coming on the
2  show, had been directly provided a copy of the Super
3  Bowl picture; right?
4    A.  I don't think that that -- I don't -- I don't
5  agree with your phrasing.  I'm sorry.  I think what
6  you're -- what you're saying is that Nico requested
7  documents and then he provided them and he thanked him
8  and he reviewed what attached prior to thanking him
9  as if he was actually going to use these documents.
10  And I don't know that that was the case.
11    Q.  You -- I mean, I -- I would like to know.
12    A.  I don't think that that was the case.
13  Especially because it wasn't used.  I don't know that
14  Nico reviewed --
15    Q.  Look.  I'm -- I've got to make this real
16  clear for you and that this is going to be true
17  tomorrow too.  I'm not terribly interested in answers
18  that start with, I don't think, or, I think, or, it
19  might be, or, it could be, or, my assumption is, or, my
20  inference is.  I'm -- going forward, I'm not interested
21  in those answers.
22        What I -- what I -- I want you to tell me if
23  you can testify to today, right, is that prior to this
24  episode, that there were communications between Nico
25  and Mr. Halbig that included the Super Bowl picture and

22-01023-tmd Doc#1-17 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 121 of 211

Paz, Brittany                                                02-14-2022

342

1 you did not review them before coming to this
2 deposition?
3     A. I reviewed the e-mail with the Super Bowl
4 picture. I've seen that.
5     Q. Okay.
6     A. But any other e-mails besides that, I -- I
7 don't know if I reviewed anything like that.
8     Q. Okay.
9     A. If you could point me to it and I could look
10 at it, maybe I could testify a little bit better. But
11 as I sit here right now, I can't recall.
12     Q. I brought you here to point me to things.
13 I'm tired of pointing you to things.
14     A. Sir, there's a hundred thousand plus
15 documents.
16     Q. Yeah, so maybe you shouldn't have been the
17 only designee.
18     A. I'm sorry, but I am.
19     Q. I -- I don't -- sorry's not going to cut it.
20 I can tell you that. Ms. -- Ms. Blott knows what's
21 coming up and it's not an apology. That's not what's
22 happening. Okay? But I understand. I completely
23 sympathize with you.
24         Like I've said before, I understand that as
25 you as one person, no way you can answer all these

343

1 topics. There is no way you can possibly assimilate
2 all of this stuff. Do you agree with that?
3         MS. BLOTT: Is there a question?
4         MR. BANKSTON: I just asked her one,
5 does she agree with that. Yeah, that's a question,
6 Jacquelyn.
7     A. I can't cite to a specific page based on a
8 hundred thousand pages of documents.
9     Q. (BY MR. BANKSTON) It would be impossible for
10 you to do that.
11     A. It's not possible -- humanly possible.
12     Q. Right. For one person to cover any number of
13 this stuff; right?
14     A. I don't think so.
15     Q. Right. It -- it's -- for -- let's talk about
16 paragraph 35. Do you see paragraph 35?
17     A. Yeah.
18     Q. Okay.
19     A. February 12, 2015.
20     Q. Uh-huh. You don't need to go looking because
21 you haven't watched this one.
22     A. Okay.
23     Q. So this is the video we discussed earlier
24 about Mr. Pozner. Do you remember us talking about a
25 video about Mr. Pozner and his address?

344

1     A. Yes.
2     Q. Okay. And so this is a video -- one of the
3 things we had just talked about how it is difficult, if
4 not impossible, for you to testify about the broad
5 depth of all of these things. But it's certainly
6 impossible to testify about this video if you haven't
7 watched it; right?
8     A. I don't have this video, so no. I can't
9 testify as to it.
10     Q. Yeah. And you don't know the title of it, do
11 you? Because I've been trying to figure that out.
12     A. No, I don't.
13     Q. Okay. There are -- do you know that there
14 are people interviewed on that show who gave
15 information about Mr. Pozner?
16     A. I don't know anything about the video, sir.
17     Q. Okay. Have you reviewed any documents about
18 the video?
19     A. Aside from my conversation with Mr. Dew about
20 the video, I don't recall seeing much in the
21 production. But if you can direct my attention.
22         MR. BANKSTON: Are we on 11?
23         THE COURT REPORTER: Yes.
24     Q. (BY MR. BANKSTON) Can you tell me if you've
25 ever seen that before?

345

1         (Exhibit No. 11 marked.)
2     A. Yes.
3     Q. (BY MR. BANKSTON) You talked to Dr. Jones?
4     A. No. Dr. Jones, unfortunately, is not a good
5 source of information.
6     Q. What do you mean by that?
7     A. I mean that he has some medical issues that
8 makes his memory a little poor.
9     Q. Okay.
10     A. So he wouldn't have been -- it wouldn't have
11 been a very productive conversation.
12     Q. When did he leave the company?
13     A. That, I -- that, I do not know.
14     Q. Very recently; right?
15     A. I don't know. I know that he still has
16 ownership interest in the -- in PQPR. But aside from
17 the ownership interests he has in PQPR, I don't know
18 when he left Free Speech.
19     Q. In fact, because of the circumstances of this
20 lawsuit and what it may mean, it was advantageous if
21 Mr. Jones no longer worked for the company, you would
22 agree with that?
23     A. No.
24         MS. BLOTT: Objection. Argumentative.
25 And not -- assumes facts not in evidence.

346

1   A.  I don't -- I don't know what Dr. Jones would
2 have to do with that at all.
3   Q.  (BY MR. BANKSTON)  Really?  When Mr. Jones is
4 the owner of the entity where all the money's being
5 put?
6   A.  All the money is not being put into Free
7 Speech.
8   Q.  That's exactly what I mean.  He's not -- I'm
9 talking about David Jones.
10   A.  You mean Dr. Jones?
11   Q.  Dr. Jones, yes.
12   A.  So your question regarding Dr. Jones is what?
13   Q.  Right.  That it's important, it is useful, it
14 is advantageous for him to no longer work for Free
15 Speech Systems, given the consequences of this
16 potential lawsuit?
17   A.  I don't know that that's true, no.
18   Q.  Okay.  Do you know who Mr. Enoch is, talked
19 about in this e-mail?
20   A.  I think that was one of our attorneys at the
21 time.
22   Q.  Okay.  And then they're talking about an
23 apology that should be made part of a landing spot in
24 public relations.  Do you know what apology they're
25 talking about?

347

1   A.  No, not specifically.  I know Mr. --
2 Mr. Jones has done a number of apologies.  Maybe that's
3 one of the ones they're referring to, but I'm not sure.
4   Q.  Okay.  So again, I'm going to ask you some
5 statements about this video.  I know you've already
6 told me you don't know anything about it, so I don't --
7 I don't expect anything.  But I need to ask these.  Is
8 -- when Mr. Jones said, is HONR partnered with Fox on
9 their fraud on the First Amendment, when did he -- do
10 you know what he meant by that?
11   A.  Is HONR -- HONR, the company, partnered with
12 Fox?
13   Q.  Uh-huh.
14   A.  No, I don't know.
15   Q.  Okay.  They said on that episode, it was a
16 felony to release birth certificates or death
17 certificates.  Do you know about that claim?
18   A.  I don't know about that claim, no.
19   Q.  Okay.  And so you haven't talked to anybody
20 or done any research to figure out where that came
21 from; right?  I would think if you don't know the
22 claim.
23   A.  I don't know what he's referring to with that
24 claim, so I -- I really can't speak to it.
25   Q.  Okay.  There's a part on that show where

348

1 there's a guest on the show, an Independent Media
2 Solidarity member, who says, Lenny, your day is coming,
3 my friend.  It is coming.  And Mr. Jones replies, they
4 made a major mistake involving us.  And then the person
5 says, go after them, Alex.  Crush them.  And then Alex
6 says, I'm not somebody to mess with.  Okay?  You've
7 never seen that; right?
8   A.  I've never seen that, no.
9   Q.  All right.  By the same token -- well, we've
10 already talked -- you've already told me there's no
11 editorial discussion.  So I -- I don't know how exactly
12 to ask this.  But were there any kind of discussions in
13 the family about saying that stuff to a Sandy Hook
14 parent, the stuff I just quoted?
15   A.  What do you mean, in the family?
16   Q.  I mean, inside -- I'm sorry.  Let me rephrase
17 that question.
18   A.  Sure.
19   Q.  Were there any discussions inside the company
20 about saying that kind of stuff to a Sandy Hook parent?
21   A.  No.
22   Q.  Okay.  Does the company right now feel that
23 it was appropriate to threaten him in front of millions
24 of people?
25   A.  I don't think that that's a threat.

349

1   Q.  When I -- can you go to paragraph 30 for me.
2   A.  30, three zero?
3   Q.  Uh-huh.
4   A.  Okay.
5   Q.  That is December 29th, 2014.  America, the
6 False Democracy.  Have you watched that video?
7   A.  I might have it as a different upload date.
8 And the reason why I say that is because -- and I don't
9 know if you -- you have our ID on it.  Because I have a
10 -- I have a couple of videos around that date.  One
11 second.  Yeah, it might be saved under a different
12 name.  But I remember seeing those or hearing, watching
13 those particular statements by Mr. Jones.
14   Q.  What -- I don't understand.  What -- what
15 name?
16   A.  So around the same time, I have videos on
17 12/12.
18   Q.  Okay.
19   A.  Two videos on 12/12.  And then I have videos
20 on 12/16, 12/27.
21   Q.  Okay.
22   A.  But no videos specifically on 12/29.  And
23 that could be that just they were -- they were uploaded
24 on a different day.  So -- but like I said, I -- I
25 recall watching -- seeing these particular statements.

350

1     Q.   Well, as you may -- as I'm sure you recall,
2  Mr. Jones repeats himself quite a lot.  So I -- I'm --
3  I don't have any way to verify -- I mean, I guess right
4  now, the answer is you don't know if you watched this
5  video?
6     A.   I don't -- I don't know just because, you
7  know, the way that your -- in your petition referencing
8  videos is not the way internally we reference videos.
9     Q.   Okay.
10    A.   So --
11    Q.   All right.  Well, let's skip that video, I
12  guess.
13    A.   Well, we could try to talk about it.
14    Q.   I'd -- I'd rather not waste your time.  Can
15  you go to paragraph 25.
16    A.   Sure.
17    Q.   Do you see there's a September 25th, 2014
18  video?  In fact --
19    A.   Yes.
20    Q.   I'm sorry.  The video before that too, just
21  to make sure I have it on the record, you don't know
22  who worked on that video?
23    A.   What video before that?
24    Q.   The one that you don't know if you've watched
25  it.  The one from December 29.  You don't know who

351

1  worked on that video?
2     A.   Who worked on it, no.  I could review the
3  document and see if it's on there.  Let me just check.
4  So I'm looking at Exhibit 6.
5     Q.   Uh-huh.
6     A.   So on 12/27 -- oh, 12/29, yes.  So this
7  document does have a list of all of the people working
8  on 12/29/2014.  So yes.
9     Q.   Okay.  So that would be -- that'd be a
10  different day than 12/27.  Do you also -- do you also
11  have a listing for 12/27?
12    A.   This is -- your -- paragraph 30 says 12/29.
13    Q.   I know.
14    A.   And this says 12/29.
15    Q.   I know.
16    A.   So there is another separate list for 12/27,
17  yes.
18    Q.   That's what I'm asking.  Okay.
19    A.   There are two of those.
20    Q.   So in other words, the video that you thought
21  you may have watched that was that video that's on
22  12/27, it's not, there's a different list for that?
23    A.   There's two separate lists here.
24    Q.   Right.
25    A.   12/27 and 12/29.

352

1     Q.   Got you.  So -- so -- so watching the 12/27
2  video does not necessarily mean you've watched the
3  12/29 video?
4     A.   Right.
5     Q.   Got you.
6     A.   I'm just not sure that they're the same
7  video.  Or --
8     Q.   I'm not either.
9     A.   -- videos.  Yeah.
10    Q.   I don't know either.
11    A.   But -- but yes, I can tell you who's working
12  on 12/29.
13    Q.   Can I see that list real quick.
14    A.   Sure.
15    Q.   On 12/27, that's the day we only have one
16  name; right?
17    A.   Right.
18    Q.   Okay.  All right.  Well, let me start asking
19  you about some of these people later, I guess.  We'll
20  do that all at one time.  You can go ahead and have
21  that back.  All right.  So here we are again at -- at
22  paragraph 25, which is September 25th, 2014.  All
23  right?  You're with me so far?
24    A.   Yeah.
25    Q.   Okay.  The title of the video is Connecticut

353

1  PD has FBI Falsify Crime Statics; right?
2     A.   Yeah, I see it.
3     Q.   Can you explain what that refers to?  What's
4  that title mean?
5     A.   That is specifically referencing that article
6  that Adan wrote regarding the FBI crime statistics that
7  we've previously talked about.
8     Q.   No, I understand the article -- there's an
9  article much later than this called Nobody -- FBI Says
10  Nobody Died At Sandy Hook.  Do you understand that?
11    A.   Uh-huh.
12    Q.   Okay.  And do you know when that article was?
13    A.   When did Adan write that article?
14    Q.   Yeah, because this is in -- I mean, I'll tell
15  you it's in 2015.
16    A.   Okay.
17    Q.   So this is before that.  And I don't
18  understand what the Connecticut PD would have to do --
19    A.   Well, I don't know which police department
20  they're referring to there, but --
21    Q.   What do you mean, Connecticut PD?
22    A.   There's no such thing as Connecticut PD.
23    Q.   I guess not; right?  Like, I don't know -- so
24  yeah, I don't know either.  Can you help me?  I don't
25  know anything about this.  That's what I'm trying to

Paz, Brittany                                                          02-14-2022

354

1 figure out.
2    A.  So let me just go to my notes and see if I
3 watched it.  So it was September 24, 2014.  Okay.  So
4 on September 25th, 2014, which may very well be the
5 same video.  Because like I said, these are just being
6 uploaded on different dates.
7    Q.  Okay.
8    A.  These are all upload dates.  So our title
9 that we have here, I don't know where this title came
10 from, Connecticut PD Has FBI Falsify Crime Statistics.
11 The title I have here is Sandy Hook Deaths Missing From
12 FBI Report.
13    Q.  Okay.
14    A.  And Jakari Jackson did that segment and he
15 was talking about the FBI crime statistics.  They were
16 the same crime statistics that were -- were being
17 discussed in that article by Adan.
18    Q.  All right.  And Jakari is a figure -- I guess
19 -- I know he didn't have a title.  But, like, I'm going
20 to call him a reporter.  Are you okay with me calling
21 him that?
22    A.  Sure.  Sure.
23    Q.  Okay.  Jakari is a reporter who was active at
24 InfoWars over most of the years that we're talking
25 about here; right?

355

1    A.  Yes.
2    Q.  Okay.  Have you talked to him?
3    A.  No.
4    Q.  Okay.  Let's go ahead and go to paragraph 17.
5    A.  Sure.  Okay.
6    Q.  That one has a video that's April 16th, 2013
7 entitled Shadow Government Strikes Again.  Do you see
8 that?
9    A.  Yes.
10    Q.  All right.  Did you watch that video?
11    A.  Just give me one second.  Okay.  So again,
12 this is another thing where it's -- the videos that we
13 have, there's a different date.  So the date that's in
14 this -- in the petition is April 16, 2013.
15    Q.  Uh-huh.
16    A.  I have -- I have one dated for 1/20/13.  That
17 was a interview with Dr. Pieczenik.
18    Q.  Right.  That's --
19    A.  It might -- it might be the same video or it
20 might be a different video.
21    Q.  I -- I -- I really don't want answers of it
22 might.  I don't.
23    A.  Well, like I said, I don't -- your -- so your
24 -- your internal -- our internal system is saving them
25 in different ways than you're mentioning them.

356

1    Q.  I don't know what to tell you.
2    A.  And they're also not full videos, you know,
3 so, like, you might -- Shadow Government Strikes Again
4 may be the title of a clip, but it's not the entire
5 broadcast.  And so the way we're saving it is not the
6 same.
7    Q.  I get that.  But I -- I -- we don't know, do
8 we?
9    A.  I know.  I mean, but if you have the whole
10 show or it's -- if it's in the production, I mean,
11 we've produced it.
12    Q.  Do -- do -- is it the same, do we know?
13    A.  I don't know if it's the same because your
14 date is not the same date that I have.
15    Q.  Right.  So --
16    A.  And it also might not be the same date
17 because this is a clip --
18    Q.  Maybe?
19    A.  -- being cut from the original show.
20    Q.  Maybe?
21    A.  Maybe, right.
22    Q.  You don't even know that, do you, Ms. Paz?
23    A.  Do I know what you're referencing here?
24    Q.  No, no.  You don't even know whether this is
25 a full clip or a full episode.  You don't know that.

357

1    A.  Well, this -- I don't know.  And the reason
2 is because that's not how we maintain our videos.
3 Like, how you're referencing them here is not how we
4 save them.
5    Q.  Okay.  I mean, so at the end of the day, we
6 don't know if you've watched this video; right?
7    A.  I don't know.  I can tell you about the video
8 that I watched at this -- that was posted -- uploaded
9 around this time period and if it's the same video.
10    Q.  No, because we really need to make sure on
11 the fifth time I'm trying to take this deposition that
12 we're actually talking about what we need to talk
13 about.  So I don't want you to guess about what video
14 might be this video and let's talk about that.  I don't
15 want to do that.
16    A.  Right.  So, I mean --
17    Q.  Okay.  So we don't -- the easiest is, we
18 don't know if you watched this video; correct?
19    A.  I don't know if it's the same video that's --
20 that you're referencing, no.
21    Q.  You know who Buckley Hamman is?
22    A.  Yes.
23    Q.  Okay.
24    A.  I did not speak to him, though.
25    Q.  You should have, shouldn't you?  Shouldn't

358

1  that be somebody you speak to?
2      A.  I don't know that he's with the company
3  anymore.
4      Q.  I don't think that matters.
5      A.  Right.  But the -- like I said, there's only
6  so much time in a day.  So I did not speak to him.
7      Q.  You would understand that he is, according to
8  -- Mr. Watson testified to this.  During these events
9  we're talking about, one of the two most senior people
10  at InfoWars.  You know that?
11      A.  Well, so Mr. Watson is a correspondent and
12  he's a consultant.  So he really doesn't have that much
13  say in the operation or day-to-day.  And he's not even
14  in the country, he's on the other side of the world.
15  But Mr. Hamman, I think, was a direct liaison with
16  Mr. Jones.
17          And his position was that to speak to
18  Mr. Jones, it would be easier to go through Mr. Hamman
19  because of his access to Mr. Jones.  So I think that's
20  probably a more apt way to describe it, not that he was
21  a senior person there.
22      Q.  Okay.  Well, I'm going to go with Mr. Watson
23  because he works there.  I --
24      A.  He doesn't work there, he's a consultant.
25      Q.  Well, we'll see about that.  But -- but when

359

1  I talk about the batshit crazy e-mail, you know what
2  I'm talking about?
3      A.  Yes.
4      Q.  Okay.  Because I know there's a lot of
5  e-mails in this, like, I'm talking -- I'm not just
6  saying there's an e-mail that's batshit crazy, there's
7  a lot of those.  I'm talking about there's an e-mail
8  that specifically uses the phrase batshit crazy.  You
9  know what I'm talking about?
10      A.  Yes, Mr. Watson used it.
11      Q.  Okay.  Okay.  And -- and Mr. Hamman's on that
12  e-mail; right?
13      A.  I think he's copied on that e-mail, yes.
14      Q.  He actually responds too, doesn't he?
15      A.  Yes.
16      Q.  And he talks about steps that he wants to
17  take?
18      A.  In his opinion, that he thinks should be
19  taken, yes.
20      Q.  Okay.  Who is the other person on the e-mail,
21  do you know?
22      A.  I don't recall, I'm sorry.
23      Q.  Anthony Gucciardi.  You know who that is?
24      A.  Not off the top of my head.
25      Q.  Okay.  He's the other person.  He's -- of the

360

1  two most senior people at the company, right, then --
2  that Mr. Watson says to find about, he's the other one.
3  Did you know that?
4      A.  Again, I don't just agree with the way you're
5  characterizing them as senior people.
6      Q.  Well, let's go ahead and just try to do it
7  this way.  Both Buckley Hamman and Anthony Gucciardi
8  are management-level employees at InfoWars when they
9  were there.  You agree with that?
10      A.  To the extent that there was management.  I
11  -- I don't know that there was such a structure there.
12      Q.  Well, we've already talked about that you've
13  already told me that people had supervisory powers at
14  InfoWars.
15      A.  There were people who supervised specific
16  departments, yes.
17      Q.  And these people supervised quite a few
18  people, didn't they?
19      A.  I don't know who they supervised.
20      Q.  That's troubling.  When -- you haven't talken
21  -- you haven't spoken to Buckley or Anthony; right?
22      A.  No.
23      Q.  Okay.  And haven't made any efforts to speak
24  to either one of them?
25      A.  No.

361

1      Q.  Buckley wouldn't be hard to get a hold of
2  because that's Alex's cousin; right?
3      A.  I don't know if he is or isn't.
4      Q.  All right.  I --
5          THE COURT REPORTER:  Mr. Bankston?
6          MR. BANKSTON:  Yeah?
7          THE COURT REPORTER:  I could use a
8  break when you get to a stopping point.
9          MR. BANKSTON:  Let's do it right now.
10  Perfect time.
11          THE VIDEOGRAPHER:  4:31 off.
12          (Recess from 4:31 p.m. to 4:47 p.m.)
13          THE VIDEOGRAPHER:  On the record.
14  4:47.
15      Q.  (BY MR. BANKSTON)  Okay.  I had asked you
16  earlier if you had talked to Jakari Jackson and I know
17  you said no.
18      A.  Right.
19      Q.  Did you try to talk to Jakari Jackson?
20      A.  No.
21      Q.  Okay.  Darrin McBreen, that's another person
22  you didn't talk to; right?
23      A.  Right.
24      Q.  Did you try to talk to Darrin?
25      A.  No.

Paz, Brittany                                                    02-14-2022

362

1    Q.   Okay.  Mr. Jones very recently, and we --
2  actually, this was in a court hearing, we played this.
3  Talked about his archivist.  Do you know who I'm
4  talking about?  All right.  Mr. Jones, there was a --
5    A.   No.
6    Q.   -- clip we played in -- in a hearing.  And we
7  actually played it in Mr. Jones' deposition too, I
8  believe.  That Mr. Jones says, I have an archivist on
9  staff.  He does incredible work.  He should be paid
10  about $100,000 a year.  Instead, he's only paid $20,000
11  a year, which is a terrible shame.
12        But I don't understand that because Mr. Jones
13  is the one who pays him.  But he says the guy is like a
14  bloodhound and can find anything.  Do you know who he's
15  talking about?
16    A.   I'm sorry, I don't know who he's talking
17  about.
18    Q.   Okay.  I don't either.
19    A.   I don't know.
20    Q.   Do you know if an archivist exists at
21  InfoWars?
22    A.   I -- I don't have any reason to believe that,
23  but, I mean, he may be referring to a third party
24  company.  But I don't -- I've not been able to find
25  anyone at InfoWars that has such a job.

363

1    Q.   Okay.  And I notice you said, like, for
2  instance, Mr. Jones himself -- or really the company
3  itself really isn't in the business of research; right?
4  They're -- they're a punditry company; right?
5    A.   Yes.
6    Q.   So Mr. Jones hasn't, like, done research on
7  Sandy Hook; right?
8    A.   I think that he -- in the sense that he's
9  seen other things in other places, he does use the term
10  research.  But as far as verifying what he's seeing,
11  no.  But when he's informing his own opinion on
12  something, he may call it research.  But that goes back
13  to, you know, Mr. Jones has a lot of terms and words
14  that he uses that aren't necessarily the words that you
15  and I would use.
16    Q.   Okay.  So, I mean, in other words, it might
17  be -- it might be to say that he did research in a more
18  casual way than what we would normally think of as
19  research.  He does more casual stuff.  But he's not out
20  there doing deep research?
21    A.   He's not doing deep research, but when he's
22  saying research, I think what he means is that he is --
23  he is looking at the things that we are -- that we're
24  referencing.
25    Q.   Uh-huh.

364

1    A.   And that he's using that to inform his
2  opinion.
3    Q.   Okay.
4    A.   But no, he's not doing -- he's not doing
5  investigative research.
6    Q.   Okay.  I want to -- and I'm just going to use
7  this to mark where it is on the page, basically.  Right
8  around here.  That area of the page.  Do you see where
9  it talks about a paragraph 30 somewhere in there?  See
10  the line that starts with paragraph 30?
11    A.   Yes, so these are my notes.
12    Q.   Right.  And part of your notes says that
13  Mr. Jones represents that he did deep research;
14  correct?
15    A.   That's what he says in that video.
16    Q.   Okay.
17    A.   I quoted the video.
18    Q.   Okay.  Can you -- actually, let me see that
19  page again.  I'm sorry.  I wish --
20    A.   Oh, see, I did watch the video.
21    Q.   There's one.  Wow, yeah, that's one that you
22  didn't seem to think you did watch, did you?
23    A.   Right.  That's what I'm saying is that I
24  think that, you know, the issues that we have is just
25  the naming of the certain videos and how they're saved.

365

1    Q.   Doesn't seem to be an issue at all here.  It
2  says 12/29/14 video, America the False Democracy.
3    A.   Right.  But that's not -- what I'm saying is
4  that's not how it's saved in our -- in our documents.
5    Q.   Okay.  All right.
6    A.   It might have been the title of the video
7  once it was played, but it's not how it's saved.
8    Q.   Do you see a reference -- do you see a
9  reference page 97?
10    A.   One second.
11    Q.   You'll see a list of page numbers --
12    A.   Yes, yes.  I think this was the deposition.
13    Q.   Yeah --
14    A.   Yes.
15    Q.   -- that's Ms. Karpova's deposition.
16    A.   Yes.
17    Q.   What I want to ask you about is you have a
18  note written down there and it says, Alex said these
19  kids didn't die because he has a big heart and he
20  wanted to hold out hope they weren't dead.  That was
21  the company's testimony from Ms. Karpova; correct?
22    A.   That is Ms. Karpova's --
23    Q.   Okay.
24    A.   -- testimony.
25    Q.   And that's the company's testimony; right?

366

1    A.  She was a representative, at the time, of the
2  company, so yes.
3    Q.  Does the company still stand by that
4  testimony or does the company think maybe it should
5  change that testimony?
6    A.  I think what I said earlier was that a vast
7  majority of Mr. Jones' opinions as -- as broadcast were
8  that, I don't know if kids died.  I'm not sure.  I
9  don't know enough to form that opinion, but this may be
10  a false flag operation.  Maybe the government was
11  involved.  That kind of thing.
12    Q.  That's not what this is; right?
13    A.  I don't know what she's referencing here.  I
14  think what she's saying and what the context of that
15  is, is that if he said kids didn't die, this is the
16  reason why he said it.  That's what I took that to
17  mean.
18    Q.  And he did say that; right?  He did say kids
19  didn't die --
20    A.  I can reference --
21    Q.  -- multiple times?
22    A.  I don't know about multiple times, but I do
23  know of at least one time that he said kids didn't die.
24  But on the whole, more times than not, he said he
25  didn't know whether kids died.

367

1    Q.  That's -- I mean, good for him; right?  He
2  should be saying -- like, that's -- if that's our
3  floor, you know what I mean?  Like, does that -- let me
4  ask you this question.  Is it the company's position
5  that its nondefamatory statements cancel out its
6  defamatory statements?
7    A.  The company's position is that that is an
8  opinion.
9    Q.  Okay.  Well, it's not the court's position,
10  so that's a good thing.  Let -- let me actually take
11  you back.  I believe you did watch the video and I
12  didn't get the chance to ask you about this.  On
13  September 25th, 2014 on paragraph 25, the one we were
14  talking about Connecticut PD has FBI Falsify Crime
15  Statistics.
16    A.  I'm sorry, which paragraph?
17    Q.  25.
18    A.  Okay.  Yes.
19    Q.  One of the claims in that video was there are
20  photos of kids who are still -- and were still alive
21  that they said died.  What photos are being talked
22  about here?  What is Mr. Jones talking about?
23    A.  This is in that broadcast, the September
24  25th, 2014?
25    Q.  Yup.

368

1    A.  Is this one of the ones I said I didn't have
2  that exact date?  I think that might be --
3    Q.  Maybe that's why we didn't get to cover that.
4    A.  Right.
5    Q.  I think you're right.
6    A.  I think that's the one where I don't know if
7  I watched it just because the dates are not --
8    Q.  Yeah, I didn't -- you're -- you're a hundred
9  percent right.  I didn't update my own notes.
10    A.  Okay.
11    Q.  That's my fault.  Okay.  So that's -- that
12  one, we can't talk about.  Let me -- can you go to page
13  14 of your notes.
14    A.  Sure.  Okay.
15    Q.  At the very bottom of the page, who is
16  identified as researchers?
17    A.  This is my notes about Rob Dew's corporate
18  rep deposition.  And in his deposition, he was asked
19  who researchers were.  And he made these -- he named a
20  few names.
21    Q.  Okay.  Can you tell me what those names are
22  right there?
23    A.  Darrin McBreen, Nico, Buckley Hamman, and
24  Darrin does graphics.  That's what he said.
25    Q.  Okay.  So let's first start with those three

369

1  people.  The only person you talked to there was Nico;
2  right?
3    A.  Yes.
4    Q.  Didn't talk to Buckley?
5    A.  I don't -- no, I didn't.  I don't think I
6  talked to Buckley.
7    Q.  Didn't talk to Darrin McBreen?
8    A.  No.
9    Q.  Didn't try to talk to Darrin McBreen?
10    A.  No.
11    Q.  Okay.  There are some other people that he
12  keeps listing.
13    A.  Yeah.
14    Q.  Are those more researchers?
15    A.  No.  I think that that part of the
16  deposition, he moved on and he just started listing --
17  or no, maybe that wasn't even him.  It was you.  You
18  had asked about a number of different people in the
19  deposition.  That's why there were question marks.  So
20  no, those are not researchers.
21    Q.  Okay.
22    A.  Or he named as researchers.
23    Q.  Okay.  Let's talk a little bit -- have you
24  reviewed any documents that set forth a figure for
25  InfoWars' audience size during any of the times

370

1 relevant to this lawsuit?
2    A.  So as far as the audience size, and I'm aware
3 that there was -- that's one of the topics that we need
4 to discuss today in the deposition regarding the
5 audience side.  And based on my conversations with
6 Mr. Jones, it's really not possible to accurately state
7 what the audience size is for a variety of reasons.
8        A, not only is he on a bunch of stations,
9 but, you know, he's on the Internet and it's free to
10 air and everyone all over the world can broadcast it.
11 So, I mean, if you want to see what his reach is, I
12 mean, the whole planet is the reach.  I don't think
13 that there really is a way to narrow that down in any
14 real fashion.
15    Q.  Okay.  That wasn't the question I asked.  The
16 question --
17    A.  Sure.
18    Q.  -- I asked you was, have you reviewed any
19 documents that set forth InfoWars' total audience size.
20 And I'm going to take it by your answer that the
21 implication is that no, you have not.
22    A.  I don't think there are any documents that
23 exist like that.
24    Q.  Yeah, there are.
25    A.  There are Google analytics about the website

371

1 and the website traffic.  I've reviewed those.  But
2 aside from that, I don't --
3    Q.  If I was to tell you that there were 8.1
4 million unique viewers in January 2017, would you know
5 if I'm -- if I'm right or not?
6    A.  Are you talking about the Google analytics?
7    Q.  Nope.
8    A.  I don't know the answer to that.
9    Q.  Okay.
10    A.  I reviewed the Google analytics.
11    Q.  If I told you that there were 46.3 million
12 global views in January 2016, would you know if I'm
13 right about that?
14    A.  I wouldn't know if you're right about that.
15 But --
16    Q.  That's before the company started using
17 Google analytics; right?
18    A.  I don't know the answer to that.
19    Q.  Okay.
20    A.  But just because those are the number of
21 views doesn't mean that's the number -- the audience
22 size.
23    Q.  I -- I know.  I mean, I need to start asking
24 questions about that.
25    A.  Right.

372

1    Q.  But you haven't seen this document.  And I'm
2 guessing --
3    A.  I don't know what you're referring to.
4    Q.  And I'm about to tell you.  That you
5 understand Mr. Daniels had his deposition taken in
6 Lafferty; right?
7    A.  Yes.
8    Q.  Okay.  Exhibit 6 to Mr. Daniels' deposition
9 is an e-mail from Kit Daniels to Patrick Riley.  You
10 know who Patrick Riley is?
11    A.  I'm not sure.
12    Q.  Okay.  Mr. Daniels was writing an e-mail to
13 Patrick Riley to set forth for Mr. Riley's request to
14 provide him with copy to give him the audience figures
15 for InfoWars.  And that e-mail from June 28th, 2017 in
16 the Lafferty deposition talks about 8.1 million unique
17 viewers in January 2017 and 46.3 million global views
18 in January 2016.  You've never seen that document;
19 right?
20    A.  No.
21    Q.  Okay.
22    A.  And I don't want to speculate as to what's in
23 it.
24    Q.  I definitely don't want you to do that.  And
25 if that document exists, in fact, you don't know what

373

1 viewership it's describing, whether it might be viewers
2 of the live show, whether it might be visitors to the
3 website, whether it might be YouTube views, whether it
4 might be drawn from whatever source, you wouldn't be
5 able to testify about that?
6    A.  No, because I don't know what document you're
7 talking about.
8    Q.  Exactly.  Now, in terms of talking to
9 Mr. Daniels, did he ever mention that he was working on
10 documents that have audience size in them?
11    A.  No.  And that's not really his job
12 description.
13    Q.  So what did you do exactly to determine what
14 audiences were reached by the videos in plaintiffs'
15 petitions?
16    A.  So I reviewed the Google analytics data and I
17 spoke to Mr. Zimmerman about how to read that data.
18    Q.  Okay.
19    A.  And I spoke to Mr. Jones as how to try to
20 narrow down the number of people that are viewed or
21 reached, rather, by his broadcasts.  But I think that
22 that's -- that's the universe of what I've reviewed.
23    Q.  And so the Google analytics, that would tell
24 you visitors to the InfoWars.com website; right?
25    A.  Yes.

Paz, Brittany                                                    02-14-2022

374

1    Q.   That would not tell you anything about any of
2  the viewers to any of the other ways that InfoWars
3  videos are distributed; right?
4    A.   I'm sorry, I don't understand.
5    Q.   Well, you understand InfoWars videos are
6  distributed far more ways than just on the InfoWars.com
7  website; right?
8    A.   Yes.
9    Q.   Okay.  So those analytics don't tell you
10 anything about how -- how many people saw those videos;
11 right?
12   A.   No.  All it would show is the number of
13 clicks that articles on the site --
14        (Coughing interruption)
15        THE COURT REPORTER:  Can you please --
16        (Coughing interruption)
17        THE COURT REPORTER:  -- repeat your
18 last few words.
19        THE WITNESS:  Sure.
20   A.   All that would show is the number of clicks
21 that the website would have.
22   Q.   (BY MR. BANKSTON)  Right.  And that doesn't
23 even track the number of viewers of the livestream on
24 the website; right?  If you click on the livestream,
25 that doesn't -- you don't get independent numbers for

375

1  that; right?
2    A.   I don't think that's accurate.  I think if it
3  --
4    Q.   Okay.
5    A.   -- has a -- an InfoWars URL, I think that it
6  tracks the livestream.
7    Q.   You're right.  You're right.  Okay.  So if
8  you click infowars.com/watch --
9    A.   Yes.
10   Q.   -- you'll hit the livestream?
11   A.   Right.
12   Q.   But you cannot tell for any particular video,
13 because each of -- so for any day that I want to watch
14 InfoWars, I'm not clicking on a link that's -- that's
15 unique to that date.  I'm just clicking on the
16 livestream; right?
17   A.   So -- so that -- and the answer to that, I
18 think, is that depends.  So, for example, some of these
19 videos are posted or embedded in certain articles.
20   Q.   Okay.
21   A.   And so if it is embedded in an article, it
22 would be -- have an InfoWars URL.  Some of these videos
23 were -- we had stored only on YouTube.  And so then it
24 would not -- if those YouTube links aren't there
25 anymore, it would not be possible to track it.  But to

376

1  the extent that those YouTube -- those links were
2  embedded in videos -- in -- in articles, I'm sorry.
3        Then I would be able to track those
4  particular articles in the tracking, and the traffic to
5  those articles.
6    Q.   Did you do that?
7    A.   I think what Mr. Zimmerman did and produced
8  was he produced the website traffic and all of the --
9  the landing pages and which URLs were -- were related
10 to Sandy Hook and whatnot.  And he did that.
11   Q.   Is that -- is that something you've reviewed?
12   A.   I did see in the production many thousands of
13 landing pages associated with the website, not
14 including -- not just Sandy Hook.  Just all of the
15 landing pages.
16   Q.   No, what I'm trying to figure out is did you
17 take that information, that raw data and attempt to do
18 anything with it for this deposition?
19   A.   No, I just reviewed the raw data.  I talked
20 to Mr. Zimmerman about it.  I looked at some of the
21 landing pages associated with Sandy Hook to see what
22 their website traffic was.
23   Q.   Okay.  Do you know who Scott Bronson is?
24   A.   I'm sorry, no.
25   Q.   And -- and maybe you'll correct me on this,

377

1  because I'm going to use a title; right?
2    A.   Uh-huh.
3    Q.   And I know they don't have them.  But Scott
4  Bronson is the affiliate relations manager at InfoWars.
5  Did you know that?
6    A.   I don't know that.
7    Q.   Do you know what the affiliate relations
8  department is?
9    A.   No.
10   Q.   You know Ms. Karpova testified about the
11 affiliate relations department.  Do you remember that?
12   A.   I'm sorry.
13   Q.   Do you remember that Ms. Karpova said in
14 order to answer my questions about dissemination of the
15 InfoWars videos, where they were, what audiences they
16 reach, she would need to talk to affiliate relations.
17 Do you remember her testifying that?
18   A.   I don't know if by affiliate relations, she
19 means the IT department.
20   Q.   No.
21   A.   I don't know what she's terming -- what she's
22 referencing there.
23   Q.   She's referencing Scott Bronson, who runs the
24 affiliate relations department for InfoWars affiliates.
25 And that's somebody you've never spoken to; right?

Paz, Brittany                                            02-14-2022

378

1   A.  I haven't spoken to him, no.
2   Q.  Okay.  You know what GCN is?
3   A.  I'm sorry?
4   Q.  GCN.  You know what that is?
5   A.  Yes.
6   Q.  Okay.  And so can you tell the ladies and
7 gentlemen of the jury what GCN is, what do they do?
8   A.  You know, I don't want to misstate it, so I'm
9 not --
10   Q.  Okay.
11   A.  -- I'd rather -- I don't -- I'm not that
12 educated on it to -- to verbalize it that way.
13   Q.  Are you able to verbalize it at all?  Like,
14 you have any even rough idea what GCN is?
15   A.  I just don't want to misstate what it is
16 because I'm not a hundred percent sure.
17   Q.  I mean, like, you -- I want -- I want to know
18 what your understanding is, even if it's wrong.  Do you
19 understand that?  Like, what do you understand GCN to
20 be?  Not what --
21   A.  I just -- like I said, I'm not sure.  So I'd
22 rather -- I don't know.
23   Q.  Do you know what it has to do with, what it's
24 associated with?  Is it associated with videos?
25   A.  I thought it was associated with IT, but I

379

1 could be wrong, which is why I didn't want to say in
2 the first place because I'm not a hundred percent sure.
3   Q.  IT, meaning the management of technology
4 inside of InfoWars?
5   A.  Right.
6   Q.  Okay.  That's definitely not what GCN is.
7   A.  Right.
8   Q.  Okay.
9   A.  Which is why --
10   Q.  Let's -- okay.  Do you know who Ted Anderson
11 is?
12   A.  No.
13   Q.  Okay.  Ted Anderson runs GCN.  GCN is a
14 syndicate, like, GCN is where all of InfoWars radio is
15 -- maybe not all of it, but a very large substantial
16 component of InfoWars radio is through GCN.  Do you
17 know that?
18   A.  No.
19   Q.  Okay.  Okay.  Genesis and Ted Anderson are
20 codefendants in Lafferty.
21   A.  Okay.
22   Q.  Did you know that?
23   A.  I'm not sure.
24   Q.  Okay.  The GCN network, they possess
25 information about where InfoWars' shows are broadcast

380

1 on radio; right?  Or do you know?
2   A.  I don't know.
3   Q.  GCN -- InfoWars has in the past relied
4 frequently on GCN for audience data; right?  Or do you
5 know?
6   A.  I don't know.
7   Q.  Do you know in 2017 or any of the times
8 relevant to this lawsuit, do you know how many radio
9 stations InfoWars was carried on?
10   A.  I don't know the number.
11   Q.  Do you know how many over-the-air television
12 stations?
13   A.  No, I don't know the number.  But in the --
14 and it's changed over time, too.  So --
15   Q.  Do you know the max that it ever was?
16   A.  No.
17   Q.  Can you even ballpark it?  Do you have -- I
18 mean --
19   A.  I don't know.
20   Q.  I mean, you have no idea if -- do you even
21 know if InfoWars has ever appeared on over-the-air
22 television?
23   A.  I -- I don't understand the question.
24   Q.  Okay.  Do you know what over-the-air
25 television is?  Let's start there.

381

1   A.  You mean is it being broadcast not just on
2 the radio, on TV?
3   Q.  Uh-huh.
4   A.  I don't think it's being broadcast on TV, no.
5   Q.  Okay.
6   A.  So I'm not --
7   Q.  Unfortunately.
8   A.  But the problem is when I've spoken to
9 Mr. Jones about this, he hasn't -- so -- and I
10 understand what you're saying about GCN.  But I don't
11 -- when I spoke to Mr. Jones, they're not keeping track
12 of this data in any real way.  So I don't know that GCN
13 does this.  It's based on your -- like, I don't know.
14   Q.  Over the years, InfoWars has frequently
15 published GCN audience data on its website, hasn't it?
16   A.  GCN data or InfoWars data?
17   Q.  GCN.
18   A.  I don't know that that has anything to do
19 with InfoWars' viewership data.
20   Q.  That's where InfoWars' show is played, GCN.
21 That's a network.  That's a radio network.
22   A.  Okay.
23   Q.  So it does have something to do with
24 InfoWars.
25   A.  Okay.  But it's -- it's --

Paz, Brittany

382

1    Q.  Never mind.  I'm sorry.  I -- I forgot you
2  don't have any idea about GCN.
3    A.  I don't know, right.
4    Q.  Right.  Okay.  How many cable packages has
5  InfoWars been carried on?
6    A.  I don't know.
7    Q.  How many OTT services?
8    A.  I think Mr. Jones testified to this.  I mean,
9  he was on Roku, but then he was taken off of Roku.  So
10  at various points in time, there were different OT --
11  OTT services.
12    Q.  That's why I got you here today.  I know what
13  he said --
14    A.  Right.
15    Q.  And he said --
16    A.  Apart from what he knows -- I don't know
17  anything else apart from what he knows.
18    Q.  And you didn't do anything to find out?
19    A.  No.  I asked Mr. Jones, and that was what he
20  knew.
21    Q.  You asked Mr. Jones how many OTT services
22  they were on?
23    A.  Right.
24    Q.  Okay.
25    A.  I talked to Mr. Jones about it and apart from

383

1  his knowledge on the issue, I don't know.
2    Q.  And you did not talk to anybody else but
3  Mr. Jones about what OTT services they're on; right?
4    A.  Right.
5    Q.  Okay.  How many satellite services?
6    A.  I don't know.
7    Q.  Is that the same answer, that the only person
8  you asked was Mr. Jones?
9    A.  Generally, when I spoke to Mr. Jones on this
10  topic, his position was he doesn't know and there's
11  really no meaningful way to -- to understand what the
12  reach of -- of the viewership is.
13    Q.  Satellite services, there's no -- there's no
14  way to know how many satellite services InfoWars is on?
15    A.  I don't know the answer to that.
16    Q.  Okay.  Certainly, you didn't do anything
17  yourself other than ask Mr. Jones?
18    A.  No.
19    Q.  And did you ask Mr. Jones specifically about
20  satellites?
21    A.  About satellites, no.  I just -- we had a
22  general conversation about his viewership.  And how we
23  could go about calculating in some meaningful way the
24  viewership.  And it's just --
25    Q.  And he didn't --

384

1    A.  -- he's not keeping track -- it's not
2  something he's keeping track of.
3    Q.  He didn't tell you to go to affiliate
4  relations?
5    A.  No.
6    Q.  How many short-wave -- short-wave stations is
7  InfoWars carried on?
8    A.  I don't know.
9    Q.  You understand that it is carried on
10  short-wave; correct?
11    A.  I don't know.
12    Q.  Okay.  Worldwide Christian Radio, do you know
13  anything about that?
14    A.  No.
15    Q.  Okay.  So Worldwide Christian Radio might
16  have viewership data on what is received for InfoWars
17  programming on WWCR.  Do you -- do you admit to that?
18    A.  I don't know.
19    Q.  Because you don't know what WWCR is; right?
20    A.  I don't know what they have.  I don't know
21  what they have.  It's not something that we have.
22    Q.  I know that.  Well, you don't know
23  necessarily what you have; right?
24    A.  I know what's been produced and what's in the
25  documents and what we've asked --

385

1    Q.  You don't know what's in the documents.  You
2  haven't reviewed every document, have you?
3    A.  I haven't reviewed every specific document,
4  but I did try to make an effort to testify cogently on
5  the eight topics that were notified in this deposition.
6    Q.  I get you.  You made all the effort you
7  could.
8    A.  I did.
9    Q.  You were in a tough spot, I don't doubt that.
10  I don't doubt that at all.  And I'm sure you worked as
11  hard as you could, I'm positive of that.  But what I'm
12  trying to get at is, sitting here today, you don't know
13  the answer to these questions about these things --
14    A.  No.
15    Q.  -- and you did no independent research to do
16  --
17    A.  I did no independent research, no.
18    Q.  Got you.  Okay.
19    A.  Aside from what was in -- already in the
20  documents, no.
21    Q.  Okay.  So, for instance, InfoWars collects
22  sales data?
23    A.  Well, PQPR collects sales data.
24    Q.  It's available to InfoWars.
25    A.  It is available.

22-01023-tmd  Doc#1-17  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
132 of 211

Paz, Brittany                                                02-14-2022

386

1    Q.  A hundred percent.  Mr. Jones can have --
2  I mean, I don't want to play the shell game here.
3    A.  It's not the same -- no.  It's not the same
4  company, but it is available, yes.
5    Q.  Yes, hundred percent available to you.  All
6  right.  That means it's available to you; right?
7    A.  The sales data, yes.
8    Q.  Okay.  That sales data, what have you done
9  with that sales data?
10   A.  So I have made an attempt to find out the
11 sales data.  So I did go to the warehouse and review
12 the warehouse.  And, well, looked at the warehouse and
13 spoke to the warehouse person.  As well as we have a
14 person named Blake, and I think he's been deposed.  He
15 is in charge of the warehouse and the sales end of it.
16   Q.  Okay.
17   A.  So in 2015, we changed our programming.  So
18 from 2012 to 2015, we can pull the number of clicks per
19 article.  So for a -- for a certain article, say it's a
20 Sandy Hook article, if there was an ad in that article,
21 which most -- most of the articles have ads in them, we
22 could tell who was redirected from the website based on
23 a click from that ad to the store.
24   Q.  Okay.
25   A.  We can't tell the conversion rate, whether

387

1  anybody purchased anything once they were redirected
2  from that ad on that article to the store.  But we can
3  tell how many times somebody was redirected from that
4  page to the store.
5    Q.  Okay.
6    A.  Post 2015 through present, we can tell how
7  many times a person clicked on an ad in an article --
8  in a specific article, was redirected to the store, and
9  had purchased something from the store.
10   Q.  Okay.  So what I want to ask you is, how --
11 what -- what steps did you undertake, if any?  I
12 understand that you found yourself in a situation where
13 you had an absence of data on audience reach.  Okay?
14   A.  Yes.
15   Q.  I'm wondering, as maybe a workaround, did you
16 go try to use the sales data in any way to try to
17 cross-reference that or create some new data set that
18 could help you inform the audience size of InfoWars?
19 Did you use the sales --
20   A.  I don't think there's -- I don't think
21 there's a way to do that just because the only real
22 thing that informs as who's clicking on what particular
23 articles from -- from the website.  It's not telling me
24 how the person ultimately gets to my website.  So it's
25 not telling me they were redirected from another source

388

1  to the website.
2        It's just telling me, you're now at the
3  website, you know, and you've clicked this ad on this
4  particular article and you're being redirected.
5    Q.  All right.
6    A.  So I don't think there's a way to --
7    Q.  The other thing InfoWars keeps track of --
8    A.  -- extrapolate that.
9    Q.  The other thing InfoWars keeps track of is
10 everywhere it sends products.
11   A.  I'm sorry, what do you mean?
12   Q.  Well, the product's got to get to the
13 customer somehow; right?
14   A.  I think PQPR maintains records of the
15 customers and where their products are being sent once
16 they're ordered.  So --
17   Q.  Did you get those -- did you get those
18 records?
19   A.  No, I don't -- PQPR is not Free Speech.  Free
20 Speech maintains those records.  You mean the records
21 of specific customers and --
22   Q.  Yeah, where it went.
23   A.  No.
24   Q.  Where you ship stuff to.
25   A.  No.

389

1    Q.  Okay.  And so if -- if there's any data there
2  that could perhaps be useful or -- or -- or manipulated
3  in some way to help us understand better audience reach
4  to ideas.  That's not something you undertook to do?
5    A.  No, I don't have the names and where these
6  products are being shipped.
7    Q.  Perfect.  Okay.
8    A.  So what -- what I could -- could say is how
9  many total orders were placed on a particular day.
10 Like, for example, if a video was uploaded on a
11 particular day, how many orders on that day, stuff like
12 that.
13   Q.  But one of the things we can say is that you
14 did not yourself -- I just want to make sure I
15 understand the things you did; right?
16   A.  Uh-huh.
17   Q.  You did not yourself attempt to take any
18 sales data, order data, request things from PQPR and
19 use that in some way, I mean, I'm just spitballing
20 here, to -- to try to create an audience statistic or
21 any sort of information informing audience reach?
22   A.  I mean, I don't know that that can be done.
23   Q.  I don't either.
24   A.  But I -- I don't know.  Yeah.  But did I do
25 anything to try --

Paz, Brittany                                                    02-14-2022

390

1    Q.  I'm not --
2    A.  -- to do that, no.  I didn't.
3    Q.  I'm not suggesting that.
4    A.  Okay.
5    Q.  I'm just asking if that happened or not.
6    A.  No.
7    Q.  Okay.  Okay.  Did you review any
8  organizational chart for the company to tell you how it
9  was structured?
10   A.  As far as reviewing a chart, no.  I based my
11 conclusions on the organization of the company based on
12 my conversations with -- primarily with Melinda.
13   Q.  Okay.  Well, I'm -- the reason I'm concerned
14 is because I requested an organizational chart and I
15 didn't get one.
16   A.  Okay.
17   Q.  And then surprise, surprise, Lafferty
18 deposition, Kurt Nimmo Exhibit 7 is an organizational
19 chart of the company with everybody's roles and what
20 they do.  And I'm wondering if you've ever seen that.
21   A.  I don't recall seeing that.  When you -- when
22 you say roles and what they do, you mean Free Speech,
23 who and which departments there are and who works in
24 each department and who is headed to each department?
25 No, I don't recall seeing that.  I'm sorry.

391

1    Q.  Okay.  So in terms of seeing the company's
2  business structure, if there does exist in plaintiffs'
3  Exhibit 7 in the Lafferty deposition of Kurt Nimmo, an
4  organizational chart of the company, you -- you didn't
5  review that in trying to get ready for this topic?
6    A.  No.
7    Q.  Okay.  Can you describe to me what InfoWars,
8  LLC is?
9    A.  InfoWars, LLC, I don't think actually
10 conducts any business.  I think it's just a holder.  I
11 think all of the business is conducted through Free
12 Speech.
13   Q.  You think that?
14   A.  Actually, I know that.  All the business is
15 --
16   Q.  That's what -- I mean --
17   A.  -- conducted through Free Speech.  I don't
18 think InfoWars does any actual business.  InfoWars,
19 LLC.
20   Q.  Don't think it does?
21   A.  It doesn't.
22   Q.  Do you know it does?
23   A.  Free Speech does all of the business.
24   Q.  Because if -- if -- let me put it this way.
25 If you are saying to me right now, I know InfoWars, LLC

392

1  has never done any business, you'd be the first person
2  who'd be able to tell me that.  Is that what you're
3  telling me today?
4    A.  I don't know whether it's ever done any
5  business.  I can tell you now it doesn't do any
6  business.
7    Q.  No, I want to know for the entire pendency of
8  the suit did it do any business?
9    A.  I -- I don't know how long that it's been,
10 but I can tell you right now it doesn't do any
11 business.
12   Q.  Okay.  I mean, like, for instance, I've --
13 when I first brought this, you know, years ago,
14 InfoWars, LLC is the entity listed on the InfoWars
15 website.  InfoWars, LLC is the entity listed on the
16 terms of use for the website.  Do you know anything
17 about that?
18   A.  So I know that there's been a lot of
19 entanglement between the various LLCs.  And there's
20 been efforts undergone to make everything more clear
21 and structured and organized.  So -- and that's -- but
22 that's been in the last, you know, handful of years.
23       So I don't know how long InfoWars has not
24 been conducting any business for.  I know that it's not
25 being conducted now under InfoWars, LLC.

393

1    Q.  So we can say now, you understand -- right
2  now, you understand what the relationship between
3  InfoWars, LLC and Free Speech Systems is, which is
4  nothing, really, because InfoWars doesn't do anything;
5  right?
6    A.  Right.
7    Q.  Okay.  But in terms of what it used to be,
8  during the periods of some of this lawsuit, what the
9  relationship between Free Speech Systems and InfoWars,
10 LLC is, that's not something you're prepared to
11 testify?
12   A.  I don't know about that, no.
13   Q.  Okay.  Thanks.  Can you tell me when is the
14 first time in the company that an employee expressed
15 there was a problem with InfoWars' coverage of Sandy
16 Hook?
17   A.  Could you be more specific?
18   Q.  Huh-uh.  No, I want to know -- I mean, I want
19 to know any time this has happened.  I would assume
20 that that's something that we've looked into.
21   A.  I'm sorry.  I've -- like I said, I've
22 reviewed a lot of documents.  And if -- if you can
23 redirect me to a specific point in time, then that --
24   Q.  No, because I want something -- here's --
25 here's the problem.  So much of what you're telling me

Paz, Brittany                                          02-14-2022

394

1 is, well, if you already point -- if you can just point
2 to the discovery we've already given you, the discovery
3 we've been repeatedly sanctioned for, if you can point
4 to that discovery, I can testify.
5        My purpose here is not to deal with that
6 discovery.  I'm here to find out what still exists that
7 wasn't produced, that hasn't been done.  And --
8    A.  The company's position is that we've produced
9 everything that we have.  Whether you have that or not,
10 the company's position is we have produced everything
11 that we have.
12    Q.  Okay.  So since you now have that universe to
13 deal with, can you tell me when was the first time that
14 a person inside the company expressed a problem with
15 InfoWars' coverage of Sandy Hook?
16    A.  I don't -- I don't know.  Because like I
17 said, I've reviewed a lot of documents.
18    Q.  Okay.  Can you tell me -- maybe you can't
19 tell me the first time, but do you know -- do you know
20 who was the first person to raise that?
21    A.  I don't know who the first person was.  I
22 know we've talked about Mr. Watson, who had an issue.
23 I know that -- I can't remember his name.  He was
24 deposed.  He was a former video person.  He was with
25 the company for a long time.  I know that he had

395

1 expressed some concern.
2        But aside from those two people affiliated
3 with the company, I'm -- I -- I don't know that I can
4 specifically reference.
5    Q.  Well, I was hoping to talk about discussions
6 --
7    A.  Jacobson.  I'm sorry.  That was his name.
8 Jacobson.
9    Q.  Okay.  I was hoping to talk about discussions
10 with -- inside the company, the various discussions
11 that have happened where people raised problems based
12 on Sandy Hook.  You're not totally up to speed on those
13 discussions, I would take it?
14    A.  I think that you're assuming there are --
15 there were such discussions aside from the two that
16 I've mentioned --
17    Q.  I am.
18    A.  -- and I don't believe that there have been.
19    Q.  Okay.
20    A.  Based on my conversations with the people
21 that work there.
22    Q.  And the selection of documents that you chose
23 to review out of the entire documents; right?  You
24 didn't see that in the selection of documents you
25 reviewed?

396

1    A.  No, I -- I saw Mr. Jacobson's deposition and
2 I saw Mr. Watson's e-mail.
3    Q.  Let me rephrase that again --
4    A.  Sure.
5    Q.  -- because that's what I'm trying to get at.
6 Other than the two things that you just mentioned to
7 me, those two discussions, you didn't come across any
8 other discussions in the limited set of documents you
9 reviewed?
10    A.  No.  There was nothing else in the documents.
11 But there was also nothing else in the conversations
12 that I had with InfoWars employees that would have led
13 me to believe there were other such discussions.
14    Q.  You find those to be credible people?  Your
15 interviews with them, do you think you can rely on
16 those interviews alone, or do you think they need to be
17 fact checked?  Knowing what you know now about
18 InfoWars, what do you think?
19    A.  I mean, I think I was tasked with
20 interviewing people and I did that.
21    Q.  I think -- I think you were actually tasked
22 with trying to come up with all information that the
23 company had reasonably available to it.  And I want you
24 to know, do you -- I want to ask you, do you think just
25 simply interviewing some of these employees, knowing

397

1 what you know about them now, do you think that's good
2 enough, or do you think you should be looking at all of
3 the information the company has?
4    A.  I did look at all the information.
5    Q.  You didn't read all the documents, ma'am.
6    A.  I can't read 100,000 pages --
7    Q.  Then you didn't -- then you did not -- then
8 you did not do that; right?
9    A.  I did a search for the topics that I was
10 trying to testify cogently on.  And I did not see
11 anything else in the documents that were produced that
12 were available to me that relate to that specific type
13 of information.
14    Q.  Let's go back.  Those -- all the documents
15 were available to you.  When you say documents that
16 were available to you, you're talking about the limited
17 set that was provided or that you somehow created.  All
18 the documents were available to you; right?
19    A.  The documents that are in the Dropbox, you
20 mean?
21    Q.  No, I mean every document that's been
22 produced in this case is available to you.
23    A.  You see, and that's another issue that we are
24 having just because I know that there are documents
25 that are produced in the Connecticut case.  There are

Paz, Brittany

398

1 documents that are produced here. I don't know what
2 universe, if any, those documents overlap.
3        But like I said, the documents that are on
4 the Dropbox that were -- that were in production, I did
5 search terms for those and also the interviews. When I
6 talk about interviews, there really aren't other
7 conversations between people that -- of people raising
8 concerns.
9        So, like, for example, Mr. Jacobson in his
10 deposition specifically references a conversation with
11 Adan regarding a conversation they had in his office.
12 I asked Adan about that conversation. I asked how that
13 came to be, what was the content of the conversation.
14 I confirmed that that conversation happened.
15        There was a dispute as to the context of the
16 conversation. But that's in any -- any conversation
17 with a person, there's going to be three sides to every
18 story. So that's not surprising to me.
19    Q.   All right. So you know we've got -- let me
20 just ask you this. We -- we've got this lawsuit which
21 is now heading to trial, going to be in front of a
22 jury. The question of the plaintiffs' compensatory and
23 punitive damages, that's what we're facing right now.
24 And I'm wondering, going into that process, does the
25 company understand what it did wrong?

399

1    A.   I understand that there's been a default
2 judgment, which is -- I don't think the same thing as
3 morally doing something wrong or legally doing
4 something wrong. I guess that that's what my question
5 is.
6    Q.   Let's not -- let's do it all.
7    A.   Okay. So is your question whether the
8 company thinks it's legally responsible?
9    Q.   Let's start there.
10    A.   No.
11    Q.   Okay. How does it feel morally? Does it
12 understand what it did wrong?
13    A.   I think that there are different opinions
14 within the company as far as the coverage. I think
15 Mr. Watson made that clear, that he felt one way about
16 the coverage.
17    Q.   Mr. Watson's not in the company.
18    A.   Mr. Watson is a consultant. He sent those
19 e-mails --
20    Q.   I'm sorry. I don't mean to interrupt you
21 here, but you made a big point of telling me that no,
22 he's not an employee.
23    A.   He's not an employee.
24    Q.   And when I said he -- I'm going to trust him
25 because he's inside the company, he knows. You told

400

1 me, huh-uh, he's a consultant. He doesn't know. He's
2 outside the company.
3    A.   That was about the structure of the company.
4    Q.   Okay.
5    A.   Those were the --
6    Q.   But now when it's convenient for the
7 company --
8        THE COURT REPORTER: Can you please
9 talk one at a time.
10    Q.   (BY MR. BANKSTON) Now when it's convenient
11 for the company that Mr. Watson is a source of
12 information, now he is part of the company; isn't that
13 right?
14    A.   No, we've cited to an e-mail and you've
15 relied on an e-mail Mr. Watson has written. He had an
16 independent opinion about the content and how it was
17 being portrayed and that was his opinion as a
18 consultant. We were referencing earlier the business
19 structure and whether he had anything to say about the
20 business structure of the company.
21    Q.   Okay.
22    A.   Those two things are different.
23    Q.   Well, I don't want to know about consultants.
24 I want to know --
25    A.   Okay. You want to know about just employees?

401

1    Q.   No, I want about the company.
2    A.   Okay.
3    Q.   Company has an opinion. The company's a
4 separate thing from its employees; right?
5    A.   Right.
6    Q.   The company -- company has subjective beliefs
7 and I want to know what they are.
8    A.   I don't know if the company has -- takes a
9 position on the morality of the statements.
10    Q.   Thank you. All right. We're done here.
11        THE VIDEOGRAPHER: 5:24 off.
12        THE COURT REPORTER: Mr. Bankston, did
13 you want to get your order on the record?
14        MR. BANKSTON: Let me just put it on
15 the record with you that I would like to get an
16 expedited copy of the transcript as soon as you can
17 make it available to me.
18        The other thing I'll put on the record
19 too is that we're going to be making a copy of Exhibit
20 Book 8 and giving it to you so that Ms. Paz has that
21 for her own use as well.
22        THE COURT REPORTER: Ms. Blott, would
23 you like to order a copy of the transcript?
24        MS. BLOTT: Yes.
25

Paz, Brittany

02-14-2022

---

**402**

```
1              CHANGES AND SIGNATURE
2  Witness Name: BRITTANY PAZ
3  DATE OF DEPOSITION: FEBRUARY 14, 2022
4  PAGE    LINE    CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

---

**404**

```
1            D-1-GN-18-001835
2  NEIL HESLIN                 )
                               ) IN DISTRICT COURT OF
3  VS.                         )
                               ) TRAVIS COUNTY, TEXAS
4  ALEX E. JONES, INFOWARS,    )
   LLC, FREE SPEECH SYSTEMS,   ) 261ST DISTRICT COURT
5  LLC, and OWEN SHROYER       )
6            D-1-GN-18-001842
7  LEONARD POZNER AND          )
   VERONNIQUE DE LA ROSA       )
8                              ) IN DISTRICT COURT OF
   VS.                         )
9                              ) TRAVIS COUNTY, TEXAS
   ALEX E. JONES, INFOWARS,    )
10 LLC, and FREE SPEECH        ) 345TH DISTRICT COURT
   SYSTEMS, LLC                )
11
            D-1-GN-18-006623
12
   SCARLETT LEWIS             )
13                            ) IN DISTRICT COURT OF
   VS.                        )
14                            ) TRAVIS COUNTY, TEXAS
   ALEX E. JONES, INFOWARS,   )
15 LLC, and FREE SPEECH        ) 98TH DISTRICT COURT
   SYSTEMS, LLC                )
16
17
18
19
20
21
22
23
24
25
```

---

**403**

```
1       I, BRITTANY PAZ, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted herein.
4
5  _____
6  BRITTANY PAZ
7
8  STATE OF             )
9  COUNTY OF            )
10
11     BEFORE ME, _____, on this day
12 personally appeared BRITTANY PAZ, known to me (proved
13 to me on the oath of _____ or
14 through _____ (description of identity
15 card or other document)) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
17 to me same was executed for the purposes and
18 consideration therein expressed.
19
20     Given under my hand and seal of office this _____
21 day of _____, _____.
22
23                _____
24                NOTARY PUBLIC IN AND FOR
25                THE STATE OF _____
```

---

**405**

```
1          REPORTER'S CERTIFICATION
            DEPOSITION OF BRITTANY PAZ
2              FEBRUARY 14, 2022
3      I, LOGAN KISLINGBURY, Certified Shorthand Reporter
   in and for the State of Texas, hereby certify to the
4  following:
       That the Witness, BRITTANY PAZ, was duly sworn by
5  the officer and that the transcript of the oral
6  deposition is a true record of the testimony given by
   the Witness;
7
       That the deposition transcript/errata sheet was
8  submitted on _____ to the
   Witness or to the attorney for the Witness for
9  examination, signature and return to me by
   _____;
10
       That the amount of time used by each party at the
11 deposition is as follows:
12    Mr. Mark D. Bankston: 6 hours, 24 minutes
      Mr. William R. Ogden:
13    Ms. Jacquelyn Blott:
14     That pursuant to information given to the
   deposition officer at the time said testimony was
15 taken, the following includes Counsel for all parties
   of the record:
16
      Mr. Mark D. Bankston
17    Mr. William R. Ogden
      Ms. Jacquelyn Blott
18
19
20
21
22
23
24
25
```

Paz, Brittany

02-14-2022



406

1      I further certify that I am neither Counsel for,
       related to, nor employed by any of the parties or

2    attorneys in the action in which this proceeding was
       taken, and further that I am not financially or

3    otherwise interested in the outcome of the action.

4      Certified to me by this _____ day of _____,
       _____.

5

6

7                    LOGAN KISLINGBURY, Texas CSR 11388
                     Expiration Date: 3-31-2022

8                    Res Ipsa Litigation Support, LLC
                     Firm Registration No. 11371

9                    501 Congress Avenue, Suite 150
                     Austin, Texas 78701

10                   Tel: 512.334.6777

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

407

1                 FURTHER CERTIFICATION

2

3      That $_____ is the deposition officer's charges

4    to the _____ for

5    preparing the original deposition transcript and any

6    copies of exhibits;

7      That the deposition was delivered in accordance

8    with Rule 203.3, and that a copy of this certificate

9    was served on all parties shown herein on _____

10   and filed with the Clerk.

11     Certified to by me this _____ day of _____,

12   _____

13

14                   Res Ipsa Litigation Support, LLC

15                   Firm Registration No. 11371
                     501 Congress Avenue, Suite 150

16                   Austin, Texas 78701
                     Tel: 512.334.6777

17

18

19

20

21

22

23

24

25



| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | Dan Bidondi | Wolfgang Halbig | FOIA HEARING in Newport, CT | |
| 2/18/2014 | School Shooting Expert Threatened Over Sandy Hook Investigation | Adan Salazar | | | American Free Press |
| | | | | | Newtown School Board Meeting 05/06/2014 |
| | Interview with Norm Pattis (Epstein) | | Norm Pattis | | Legal Top Gun - Newsday |
| 1_1000- Infowars Wins Sandy Hook Appeal Request | Schumer got thousands in donations from Jeffrey Epstein 07/10/2019 | Nikki Schwab | | | Metro |
| | Video | | Secretary of State Alex Acosta | | |
| | Facebook: Updates Deletes Policy Allowing Violent Threats Against Dangerous Individuals (July 10, 2019) | Paul Joseph Watson | | | |
| | Connecticut News: current.com | | | | |
| | Hartford Courant; *Connecticut Supreme Court Agrees to hear appeal in lawsuit by Sandy Hook parents against InfoWars broadcaster Alex Jones* (July 10,2019) | Dave Altimari | | | Hartford Courant |
| | | Rob Dew | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| 4T8_WYzH SS | "We Need to Talk about Hook", and it is noted in the documentary that he is also the chaiman and CEO of Traxware, "a company that specialized in removal of internet slander, internet defamation, bugshots, defamations of character and online public records." | | | | |
| 12/12/2014 | Independent Media Solidarity (Tyranny News Network)(mediasolitary.com) | | QKUltra and Tyranny (Anonymous). Their source was Mr. Stosh 314 (Youtube handle) | | youtube.com/qkult ra; insanemedia.net- reporter "Swan Song" |
| | | | | | CNN inteview with Robby Parker |
| | "Sandy Hook Documentary Phenomenon, the Fortress and What's Inside" | | QKUltra | | |
| | | | | | Youtube source SherryQuestionin g All |
| | Special Report: Why People Think Sandy Hook is a Hoax  (January 27, 2013) | | | | InfoWars.com |
| | | | Wolfgang Halbig | | |
| | | | | | Professor Noom; FreeRock Revolution' UpNorth of the 49th |
| 5dl79t7Mrw | Interview regarding the FOIA Hearing | David Knight | Wolfgang Halbig | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| 6w6b | "I have looked at the evidence and I firmly believe there was a second person. | Rob Dew |  |  | Video Connecticut State Police News Conference: Lt. J. Paul Vance |
|  |  |  |  |  |  |
|  | *Facebook Suspends Account for Questioning Official Narrative on Shooting* (December 18, 2012)-- Account was suspended for a photo of Adam Lanza questioning whether the official narrative that he was a 20 yr Autistic kid who never shot before (we're not sure about that) a gun but then kills people with accuracy and people blindly believe it. | Paul Joseph Watson |  |  | Facebook |
|  | *Misidentification of Ryan Lanza* |  |  |  |  |
|  | *Second Connecticut School shooter suspect in custody* | Matt Bushey, Digital Designer/Pro ducer |  |  | Fox42 Central Pennsylvania (WSFB) "second CT school shooter suspect in custody." Article goes on to quote a witness who said that they saw a second man in custody who was taken outo f the woods in camo and telling people at scene "I did not do it." |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | *Evidence of 2nd and 3rd Shooter at Sandy Hook* | | | | At 6:20 cut to aerial footage of cops fanned out in the woods. |
| | THERE WAS A MAN WHO WAS ARRESTED IN THE WOODS BUT NOBODY EVER HEARD ANYTHING ABOUT HIM. | | | | |
| | | | | | |
| | | | | | |
| 7CfulOdisU M | (What Went Wrong with the Shooter in Newton, CT) | **Aaron Dykes** | Charlotte ISERBYT | | The Deliberate Dumbing Down of America, by Charlotte Iserbyt |
| 12/22/2012 | *Creating a Shooter* (December 15, 2012) | | | | lowtechgrannie |
| | "School Choice/Charter Schools will Kill Private Education | | | | deliberatedumbingd own.com |
| | americandeception.com | | | | americandeception. com |
| | *Carnegie Corporation: Conclusions and Recommendations (1934)* | | | | |
| | *Project BEST: Better Education Skills Through Technology* | | | | US Dept of Education |
| | *Conclusions and Recommendations for the Social Studies .* | | | | americandeception. com |
| | Bill and Melinda Gates: Corporate Facism | | | | |
| | Austin Charter School: Local school was killed. Know nothing about education. Another hispanic school was gutted of books, etc...and computers were put in. Money that used to go to school districts is now going to be going to follow the individual child (in Texas). | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | ELDERLY LADY WHO WAS IN EDUCATION UNDER REAGAN.  INTERVIEW ABOUT HER BOOK.  TALKS ABOUT PUNISHMENT AND REWARD. CHILDREN HAVE HAD THEIR VALUE SYSTEM COMPLETELY SCREWED AROUND. Federal funding is a nightmare for education. |  |  |  |  |
| 8cZkHDH16 nQ | Town is in shock.  He was a Cub Scout leader.  Wife involved in the school.  One of those killed was previously son's tutor and was a really good girl.  Son loved her.  She saved a lot of people. | Alex Jones | Tim, who lives down from the school.  His daughter previously attending Sandy Hook |  |  |
| 12/19/2012 | Media and all their trucks and satellite dishes are all there. Alex, "I think they're like Vampires. They're there to suck every bit of pain they can out of the parents. The parents have said that they are sick of them stalking them." "Is the official story accurate?" |  |  |  |  |
|  | Victoria Soto, Amazing Heroine of Sandy Hook (December 15, 2012) |  |  |  | The American Sentinel |
|  | "Man arrested in woods, handcuffed in police car and you never hear anything about it anymore." |  |  |  | Tim |
|  | Alex, "They are not letting a horrible situation go to waste."  Obama fake cries. |  |  |  |  |
|  | FBI New Number Sheet on Violent Crimes - 2007-2011.  20% Reduction |  |  |  | Professor Lot |
|  | "Gun Sales Surge After Connecticut Massacre" |  |  |  |  |
| A2ZOzUZBn 7k | Shocked about the horrific events that took place at Sandy Hook. | Jakari Jackson |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Lanza's dad said video of person entering building should not be shown. | | | | |
| | Believes that the incident Happened and I do believe people died there that day | | | | |
| | FBI Says No One Killed at Sandy Hook | | | | Image: Wiki Commons |
| | Zero murders in Newton, CT. He does believe that the incident happened. "Maybe it's a typo." Suspicious. | | | | fbi.gov |
| | Halbig coming on later in the week | | | | |
| | Discussed bills regarding gun control and the requirements to get your CHL. | | | | Adan Salazar article re: FBI crime statistics |
| AfvhhcXPCps | **Special Live Report**: 40 plus page latest lawsuits against InfoWars | | | | |
| 5/23/2018 | Clinton: Trump Refuses to Condemn Racist Remarks | | | | Fox Business |
| | Clinton: I inherited nothing from Democratic Party | | | | CNBC |
| | Six More Families Sue Alex Jones over Sandy Hook Conspiracy Claims (Brandy Zadrozny, May 23, 2018) | | | Brandy Zadrozny | Peacock news |
| | Families of Sandy Hook victims, FBI agent file defamation lawsuit against right-wing radio host Alex Jones (Aaron Katersky. May 23, 2018) | | | Aaron Katersky | ABC News |
| | Sandy Hook Parents Hit Alex Jones With Defamation Lawsuit (Sebastian Murdock. April 17, 2018) | | | Sebastian Murdock | Huffington Post |
| | Alex Jones sues by more families over Sandy Hook hoax claims. (Ruth Brown. May 23, 2018) | | | Ruth Brown | New York Post |
| | Families of Sandy Hook Victims Sue Infowars' Alex Jones . (May 23, 2018) | | | | Associated Press |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | *More Sandy Hook Families, FBI Agent File Lawsuit Against Infowars' Alex Jones.* | | | David Altimari | Hartford Courant |
| | Alex, "My listeners saw some of the anomalies. A lot saying it didn't happen. We looked at both sides. A couple of years later, Wolfgang and others getting mad at me...I'm done with this. I did not say that people didn't die. Wolfgang does not work for us. The lawsuit is bizarre. I said people died at Sandy Hook | | | | |
| | *Truth in a Post-Truth Era: Sandy Hook Families Sue Alex Jones, Conspiracy Theorist* (May 23, 2018) | | | Elizabeth Williamson | The New York Times |
| | "I ask the families of Sandy Hook victims to actually admit that I have invited you on for years and admit that I have said for years that it really happened, and if I have caused you any pain by debating both sides of it I am sorry for your pain, but this is a big public event that has been seized on politically to take our rights,' Jones said." (May 23, 2018 | | | David Altimari | More Sandy Hook Families, FBI Agent File Lawsuit Against Infowars' Alex Jones. , Hartford Courant (May 23, 2018) |
| | Megan Kelly totally edited the interview making it seem that I said things I did not say? | | | | |
| | The media keeps misrepresenting what I have said. | | | | |
| | *Summons* ; Connecticut Suit | | | | |
| | *Connecticut PD Has FBI Falsify Crime Statistics* Alex Jones Channel. September 25, 2014), *"This was the last time I spoke with Halbig."* | | | | |
| | *Sandy Hook: The Lies Keep Growing - Infowars Nightly News - 05/28/2015)* | | | | 24:00:00 |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | *School Administrator Exposes Sandy Hook Stonewall* (May 29, 2015) | | | | |
| | *New Sandy Hook Questions Arise from FOIA Hearing* (May 29, 2015) | | | | |
| | I have never said it didn't happen. I have hosted debates on whether or not it happened. | | | | |
| | Alex Jones and Lawyer Respond to Sandy Hook Show Trials | Alex Jones | Robert Barnes | | |
| ? | *New Defense Lawyer Switches Strategy in Alex Jones Case* ( | | | | Austin American-Statesman |
| 2019 | Is there a zone of danger? Press cannot comment and say anything? Certain subjects taboo? | | | | |
| | *CNN Cries "Racist" After Tucker Carlson's Ratings Higher than its Entire Prime Time Line Up* (April 4, 2019) | | | | Steve Watson-Infowars |
| | *Tucker Carlson Beats CNN's Entire Line-Up Combined, So Now CNN Targets his Advertisers* (April 3, 2019) | | | | Paul Joseph Watson |
| | *CNN Host Says, "Lock Her Up" Chants Should Have Been Shut Down For "Hate Speech."* Christiane Amanpour wanted FBI to silence Trump Supporters *(April 2, 2019)* | | | | Paul Joseph Watson |
| | *The Comey Interview: Comey on Trump's Threat to Investigate the Investigators* | | | | CNN Live |
| | Tells emplooyees to call he doesn't text. | | | | |
| | In Defamation lawsuit, lawyers for Sandy Hook families accuse Alex Jones of More Stonewalling. (April 2, 2019) | | Dave Altimari | | Hartford Courant |
| | "Direct from my brain to the listeners."-- AJ | | | | |
| | Alex Jones' Official Statement on Roku Ban and Sandy Hook | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Reads from a Washington Post Article (day of broadcast) |  |  |  |  |
|  | Roku defends hosting InfoWars |  |  |  |  |
|  | The democratic party chose to make SH and statements about it their centerpiece of the campaign. Hillary Clinton and media twisted and exaggerated what was said. It became mythological. |  |  |  |  |
|  | "I have been typecast. Labeled the SH denier" |  |  |  |  |
|  | SH is less than .01% of what we've covered within the first 4-5 years. In the following 3 years, the media began to hype to get people to not listen to him on a host of other issues. |  |  |  |  |
|  | False flags- internet questioned SH and looked at anomalies. Taken out of context. |  |  |  |  |
|  | Some of the investigators were so cooky and so aggressive, so he couldn't say it was false. |  |  |  |  |
|  |  | **Alex Jones** | Robert Barnes |  |  |
|  | Bill Maher Mocks "Chef Boyardee" Red State Voters, Says Blue States for Rich & Educated (February 23, 2019) |  |  | Bill Maher clip interviewing | The Alex Jones Radio Show |
| Bfy |  | **David Knight** |  |  |  |
|  | Police are Using Social Media Posts to Determine "Threat Score" of Suspects (December 16, 2014) |  |  | Paul Joseph Watson | InfoWars.com |
|  | Police Union Caught Putting GPS on Rival Polician's Car and Framing him for DUI (December 14, 2014) |  |  | John Vibes | TheFreeThoughtPr oject.com |
|  | L.A. Times: Vivek Murthy's Confirmation Meands Guns Now a Healthcare Issue" |  |  | AWR Hawkins | L.A. Times |
|  | Washington State Pro-Gun Rally Draws Thousands (December 15, 2014) |  |  | Bob Adelmann |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Spokane Police Department Faces Protest Over Sheriff Deputy's Shocking Comments (December 16, 201) | | | Paul Joseph Watson | InfoWars.com |
| | Anomolies about SH noted by Halbig. One of the things that was unusual about it was no lawsuit. | | | | |
| | Sandy Hook Families to Sue Bushmaster (December 15, 2014) | | | Dean Garrison | |
| | Newtown (sic) Families Sue Gun Maker for Sandy Hook Massacre | | | NBC News | |
| | Police: Armored Military Vehicles Needed for 'Constitutionalists' with Firearms (December 14, 2014 | | | Mikael Thalen | InfoWars |
| | Caller Max in Ohio- Bushmaster should hire Halbig. Caller thinks that Halbig has pointed out good things. When they sue the company, theydon't have to go into the detail of the incident as much. With this, allows an end-around around the details of SH. Ingenius strategy. | | Max in Ohio | | |
| | The Ultimate Sandy Hook Debate as the 2nd Anniversary Looms (December 12, 2013) | Owen Shroyer | Wolfgang Halbig/Keith Johnson (American Free Press) | InfoWars | imbedded in interview. Article |
| | Magic Bullet: DOD Wants Bullet That Can Change Directions After Being Fired (December 15, 2014) | | | Matthew M. Burke/Stars and Stripes | |
| | Caller: DavidCarlsonFund.com | | | | |
| | Caller Wayne in Texas. Sandy Hook Families Suing Bushmaster | | | Caller Wayne in Texas | |
| | Black Lives Matter_Inside Secrets Exposed by Top Lawyer | Alex Jones | Robert Barnes | | InfoWars.com |
| BwsBy | Re: Second FOIA Request by Wolfgang Halbig | | Rob Dew | | InfoWars.com |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | "no check in list per 'Everyone Must Sign In' sign" |  |  |  |  |
|  | "Gene Rosen Conforted CT Students he Found in Driveway" |  |  |  | FOX News |
|  | Video of 2nd FOIA Request hearing in Sany Hook [Homeland Security Must have it] |  | Owen Shoyer |  |  |
|  | clip of Dan Bidondi interviewing Owen's Uncle at the hearing. |  |  |  |  |
|  | clip of Connecticut State Police News Conference (same as above) |  |  |  |  |
|  | Owen: "Wolfgang was initially investigating to see how we make sure this doesn't happen again." |  |  |  |  |
| D8GxrK | "Professor claims SH massacre MSM misinformation" | Owen Shroyer |  |  | James Tracy |
|  | James Tracy on KPFA's Guns and Butter |  |  |  | memoryhole.com |
|  | Newtown official furious after Florida professor makes outrageous conspiray claims saying that Sandy Hook shooting may not have happened. (January 10, 2013) |  |  |  | Mail Online |
|  | He's not saying that it didn't happen, but that it didn't happen in the way the media portrayed it. |  |  |  |  |
|  | FAU prof stirs controversy by disputing Newtown massacre . (January 7, 2013) |  |  | Mike Clary | SunSentinel.com |
|  | The Sandy Hook Massacre: Unanswered Questions and Missing Information |  |  | James Tracy | memoryhole.com |
|  | Sandy Hook School Massacre Timeline (January 6, 2013) |  |  | James Tracy | memoryhole.com |
|  | Photo of children being led out of School with article |  |  | Shannon Hicks | The Newtown Bee |
|  | Clip: Evidence of 2nd and 3rd Shooter at Sandy Hook. |  |  |  |  |
|  | Sandy Hook gunman Adam Lanza shot his way through school door. (Monday, December 31) |  |  |  | The Times |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Analyzing the Newtown Narrative: Sandy Hook's Disappearing Shooter Suspects | | | James Tracy | memoryhole.com |
| dWJph. | | Alex Jones | | | |
| | Boy Scouts to provide condoms at upcoming World Jamboree | | | | The Washington Times |
| | Alex Jones things these documents prove the CIA is making you itchy (May 22, 2018) | | | Joshua Eaton | ThinkProgress |
| | Trump's Cozy Relationship with Conspiracy Theorists | | | | InfoWars.com |
| | Trump Returns to LI today to talk about MS-13 | | | Laura Figueroa Hernandez | Newsday |
| | Clip from the Political View | | | Joy Baher | The Political View |
| | SPYGATE could be one of the biggest political scandals in history (May 23, 2018) | | | | Donald J. Trump@realDonald Trump |
| | Trump: Criminal Deep State Caught up in Major Spy Scandal. May 23, 2018) | | | Steve Watson | InfoWars.com |
| | WITCH HUNT (May 23, 2018) | | | | Donald J. Trump@realDonald Trump |
| Shroyer Depo Ex9 video re: Heslin | "I don't know if Alex even know about this." Megyn Kelly fails to fact check SH father claim re: holding his son. "This broke today." | Shroyer | | | ZeroHedge (ZeroPointNow) |
| | To Megyn Kelly or Heslin to explain the "contraction." | | | | Video clip from interview with Heslin-- Megyn Kelly Show |
| | "Vivid in his memory." Just more questions from conspiracy theorists. | | | | Video clip from interview with Carver |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Clarification from Heslin or Megyn Kelly? I wouldn't hold my breath. |  |  |  |  |
| AJ responds to SH child pornography Set up | truth is weapon but losing financially. Speech under attach-- Orwellian. When is the right time to say we're sinking? | Alex Jones | Norm Pattis |  |  |
|  | On 6/14 I had a real meltdown on air and I apologize. |  |  |  |  |
|  | At end of 4 hr broadcast got angry because found out that FBI has been investigating them for kiddie porn for 2 weeks. |  |  |  |  |
|  | Million dollar reward clarification. |  |  |  |  |
|  | FBI said that Infowars is the victim, but whoever sent this, that shows the insanity. |  |  |  |  |
|  | Googleanalytics show less than .02% on SH on the show. |  |  |  |  |
|  | Threatening over SH and it was unopened to set them up. |  |  |  |  |
|  | Correction-- $100k for information on who sent that. |  |  |  |  |
|  | Norm didn't want some part of the reward contigent on the outcome of the case and so would have an interest in the outcome. |  |  |  |  |
|  | Halbig raised 16 questions/anomolies. It's not a crime to ask questions. |  |  |  |  |
|  | Suggestion that it didn't happen is outrageous but have a right to say that. |  |  |  |  |
|  | No one at Infowars had any knowledge of the emails. They were not opened. Video or pdfs. |  |  |  |  |
|  | upset at Chris mattei who is a former federal prosecutor. |  |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | There is no marketing plan or secret sauce. | | | | |
| | Secret group gives a rating which other uses to ban you. | | | | |
| F2mru | Tears in eyes more like get ready and watch your 6. Angel of death flapping around. | | | | |
| 12/17/2012 | Prayer. | | | | |
| | Democrats murdering people everywhere- force people to have abortions, Apple factories where they do forced abortions but lecture him about caring for children. | Alex Jones | | | |
| | Republicans fool us to make us think there is opposition so we don't get involved. Compromisers. | | | | |
| | death of 20 kids on SH-- never felt anything close to this. Gut feeling and can't control it. 10 or 20x anything I've ever felt. | | | | |
| | Repent for abortions and all the bad things we've done and open their eyes and stand up against evil. | | | | |
| | Wicked dem operatives are. | | | | |
| | Cut to FEMA not being able to help people when natural disasters happen, and ad to preparedness items. | | | | |
| | 10:24 back. | | | | |
| | Youtube video- "SH in batman movie! Another reference to mass shooting." | | | | |
| | Play clip of Batman movie-- Sandyhook on map. | | | | |
| | 13:44- cut to video montage. | | | | |
| Fus1f | Doomsday 2012- 12/22/2012 end of worlders call NASA. | Jakarri | | | |
| 12/21/2012 | 1:50- Confirmed sections of Gotham renamed "SandyHook" | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | One of researchers came up to him and asked him what he thought and he was skeptical but then he was shown the still from the movie. |  | Link to infowars.com article by Adan Salazar re: Batman |  |  |
|  | May be more than a coicidence. |  |  |  |  |
|  | Put up map of what Gotham looked like in First batman movie. |  |  |  |  |
|  | Then put up what it's called in the latest movie. |  |  |  |  |
|  | "tricorner" - movie "Gothamknight" as a bridge between movies. |  |  |  |  |
|  | Tricorner replaced with Sandyhook. |  |  |  |  |
|  | 4:44- Quote of the day from most recent batman movie "Not allowed to believe in coincidences anymore." |  |  |  |  |
|  | Cut away to infowars video Merry Christmas to the slaves from the fed. |  |  |  |  |
| Gmgdn | Many incidents of gov't staging events. Right to question any big event especially when it's used to justify gun rights. | Alex Jones |  |  |  |
| 4/17/2018 | I questioned the talking points around the SH massacre. Very quickly, came to believe that the massacre happened and was a police standdown of Lanza. And the media diverted off into the hoax argument. |  |  |  |  |
|  | I had both sides of the argument on and played devil's adovocate. Media gave short clips out of context to decieve. If you look at what I really said and realized I was having a debate. |  |  |  |  |
|  | Lawsuits filed by democratic connected firms. Parents are roped into this as victims. Been saying for years I believe their children died. |  |  |  |  |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | I believe your children died, I didn't kill them and gun owners did not kill your children. |  |  |  |  |
|  | Baby and incubator claim again, fake WMDs, hillary being given the questions before hand. |  |  |  |  |
|  | Bloodthirsty media and corporate gov't. What pressure are parents being put under. |  |  |  |  |
|  | SH happened and early on was being bullied by ppl on internet to say noone died and when wouldn't say that, they would say that AJ was a gov't agent and AJ was a crisis actor, claimed that he was Beau Bridges, and an actor covering up SH. |  |  |  |  |
|  | Dem were ready that day. Just like in Parkland, cops stood down. |  |  | i |  |
|  | When said Aurora was staged-- he said he was under mind control and cops stood down. |  |  |  |  |
|  | Have invited SH parents on the air. Sorry for pain but this is a public event seized on to take our rights. Being targeted. |  |  |  |  |
|  | Been clear for years and years but MSM misrepresented his positions. |  |  |  |  |
|  |  |  |  |  |  |
| Google Analytics prove no SH marketing | AJ says we barely covered it over the last 7 years. Articles about SH accounted for .02% of traffic to website since 2012. | Alex Jones | Michael Zimmerman |  |  |
|  | They make me cover it. |  |  |  |  |
|  | Zimmerman helping comply with discovery. |  |  |  |  |
|  | Keep going to Judge up there and asking for Marketing on SH. |  |  |  |  |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | They know our marketing is whatever the specials are in the plugs. |  |  |  |  |
|  | 3:00- document cam shot to binder and manila folder to ad marketing. |  |  |  |  |
|  | Google ads at one point. |  |  |  |  |
|  | Judge agrees AJ covering up "SH Bonanza" |  | NewsTimes Article- New trouble for AJ in court fight with SH families. |  |  |
|  | Never run a paid report with Google. Impossible order. |  |  |  |  |
|  | Claim is that it's $100k to run a basic report. |  |  |  |  |
|  | Number of users and graph of traffic by day. |  |  |  |  |
|  | Can ask for specific reports,but they have not. |  |  |  |  |
|  | AJ never asked for a report. |  |  |  |  |
|  | Report search for SH- of all the traffic, articles about SH account for .02% of traffic. |  |  |  |  |
|  | Ad to Space Force apparel. |  |  |  |  |
| h90t | 12/14/2014- Plastic guns, Guy Fawkes Masks. | Jakarri Jackson | Breibart article- "Mother of SH victim: background checks would not have prevented." |  |  |
| 2/5/2013 | SH- background checks would not have prevented tragedy. |  |  |  |  |
|  | Stole gun from legal gun owner. |  |  |  |  |
|  | 3D printed gun ban from Congress. |  |  |  |  |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| Howard Stern mocks dead SH children | Mancow.com. |  |  |  |  |
|  | 1:05- Birthday Shoutout, young crisis actor victim in SH shooting. |  |  |  |  |
|  | 2:00- Discussing Muslims. |  |  |  |  |
|  | Something about raping corpse on day of father's funeral and used mom's saliva. Ugliness. |  |  |  |  |
|  | Mixing with what they say with comedy and news. They're just mean. |  | Gainsville.com "Howard Stern and Free Speech" Not after today" |  |  |
|  | AJ is a unified front of fraud. |  |  |  |  |
|  | Lizard people are the retilian elite, CIA. |  |  |  |  |
|  | 9:25 Birthday time: 13th birthday young SH crisis actor. |  |  |  |  |
|  | He's making fun of dead kids and pretending that I did it. |  |  |  |  |
|  | Stolen my identity and in my name saying things I never said. |  |  |  |  |
|  | Other radio hosts making fun of Alex Jones. |  |  |  |  |
|  | Howward Stern someone pretending to be AJ. |  |  |  |  |
| kk8c | Female caller- what's going to happen in 2015 re: lawsuit against gun manufacturers. That should open up discovery of how fake it is. Caller talks about movie Runaway Jury. | Alex Jones |  |  |  |
| 12/27/2014 | 2:46 refer again to FBI statistics that report 0 murders in Newtown in 2012. |  | Guest: Doug Hagman |  | Article by Adan Salazar re FBI statistics |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | What do you think about Halbig? Successful school safety guy, wrote the book on it. |  |  |  |  |
|  | Saw kids doing circles in the parking lot, people in anti-terror outfits in the woods, then denied that was in the news. |  |  |  |  |
|  | "Something's being hidden there." |  |  |  |  |
|  | "What do you really think happened?" -- AJ |  |  |  |  |
|  | Hagman-- I don't know, but the official narrative is not what really happened. Behavior of coroner struck him. |  |  |  |  |
|  | Blood splatter analyst himself and never saw anything like that |  |  |  |  |
|  | "Pilot" possibly, not saying it didn't happen, but didn't happen the way they said. Manipulate news coverage. Practicing how to propagandize and put out a product that is a fraud. Heavy scripting, parents laughing. |  |  |  |  |
| Lawyer breaks down the real SH conspiracy | 2/23/2019- not just 2nd amendment, but 1st amendment. |  | Attorney Robert Barnes |  |  |
|  | ever since trump elected, try to shut up conservative voice. AJ's voice and audient'ce right to access his voice. Want audience to be afraid of listening to him. |  |  |  |  |
|  | Lawusit's goal is to deplatform him. Suits on behalf of peoplen who don't claim they were ever ID'd by name. |  |  |  |  |
|  | ACLU admits it is a campaign to silence. |  |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Built straw man- saw in Ralph Nader case. The parties got together to coordinate an attack on Nader. Coordinate legal actions and trying it in court of public opinion. | | | | |
| | Same modus opperandi-- false and defamatory story and then coordinate legal strategy three diff cases in three diff places. | | | | |
| | Use existence of lawsuit to deplatform to third parties. | | | | |
| | All "fake news" is anything they disagree with it. | | | | |
| | discovery- use legal process to get information | | | | |
| | did this guy really just cite to GIRSOWOLD V CT which guarantees right to privacy in ABORTION cases!?!?!?!?!? | | | | |
| | get info on people who listen to him. | | | | |
| iomi4 | Updates in SH case. | Rob dew | | | |
| | FOIA hearing with Halbig. | | | | |
| | Second hearing-- First Selectwoman re: check in signs. | | | | |
| | Photo of Gene Rosen with check in sign in the background. | | | | |
| | Clip from second FOIA hearing. | | | | |
| | Town didn't put sign there, who put it there? First Selectwoman believes it was homeland security. | | | | |
| | In History of Homeland security they have never been involved in a school shooting. | | | | |
| | Voiuching for credibility of his uncle who attended hearing-- he's not getting paid by anybody to check this out. Own curiosity | | | | |
| | Interview with uncle by Dan Biondi afterward saying it was very strange former Navy SEAL, naval academy. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 4:00- makes claim that there are no permission slips to take the SH choir to the superbowl, relating back to the superbowl photo claim by Halbig. | | | | |
| | 4:26- cut back to FOIA hearing re: porta pottie claim. Circle still photos of protapotties at the school. 'portapotties magically appear." | | | | |
| | again claim couldn't get ambulance in but could get portapotties in. | | | | |
| | 5:58- These people are lying blatantly on the stand. "Dazzled." | Dan Biondi | | | |
| mh6h | Video footage of Halbig trying to get into United Way with police presence. | | | | |
| 5/13/2014 | Cut to first FOIA hearing. | | | | |
| | Repeats some of his 16 "questions." | | | | |
| MSM use Shto cover up gun control agenda | trump's tweet re: twitter better watch it. | Alex Jones | Robert Barnes | | |
| | Trump tweet 6/9/2019 re: twitter banning ocnservative voices. | | | | |
| | Matt Bracken- expert on Iran. Believes Iran is behind attacks on ships. | | Newswars article: Iran admits to bombing ships, vows more terror attacks. | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Former US attorney appointed by obama brought down governor of CT. | | Newstimes article: new trouble in court case against SH families | | |
| | Discussing ruling from previous day about google analystics. | | | | |
| | We're not experts in marketing, we're experts in organized crime. | | | | |
| | 8:58- everything at the show is focused on ideas and sharing/spreading ideas. | | | | |
| | 9:23 he's been over paying his taxes like an idiot. | | | | |
| | Never did product studies. | | | | |
| | Everyone is sick of SH. In comparison, videos are not performing as well as others. | | | | |
| | 11:15 google tracks a video range of data for their purposes and google only provides it to people on a limited basis. | | | | |
| | deliberate attempt to decieve the judge. | | | | |
| | Instead of focusing on school safety, focusing on gun control | | | | |
| | 24:44 Shroyer-- your leaders Pelosi and Nadler are struggling (clips of the two of them looking dehydrated and grasping for words and use this as an ad for "brain force plus.") | | | | |
| | | | | | |
| MSM Uses tragic suicide of Sh to smear AJ | Very sad. It's the corporate media that says it's the worst thing to question a mass event. Then use my name to bring out hurtful stories. | | | | News Channel 3 clip of coverage of the suicide. |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | being used to attack 1st amendment. Dems believe that AJ got trump elected. We're mom and pop. | | | | NH Register- SH dad kills himself as defamation suit continues, 3/25/19 |
| | Shot himself in front of the town hall. How do I get a fair trial with stuff like this? I've never said this guy's name. | | | | NY Post: Father of SH victim Avielle Richman dead of apparent suicide, 3/25/19 |
| | Is there going to be a police investigation? Are there surveilliance cameras? SH thing is getting crazier. | | | | |
| | People suspicous when media blamed all americans for what happened. Pray for family of this poor gentleman. | | | | |
| | Article after article and you read them and it's about me, with my face-- photo of AJ. | | | | Westportnews: "AJ and Jeremy Richman:SH dad kills himself as defamation case continues." |
| | Doing my apology tour for years. Dealt with some of these crazies. Can't get the families and lawyer to stop saying I'm currently doing it and that way it is a clear and present issue. | | | | |
| | he's one of many people suing me that I've never said his name. | | | | |
| | 13:39 cut to a news broadcast on news channel 3. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Created avielle foundation focused on preventing violence. Had an office at the town hall where he was found. People involved with Parkland had just committed suicide in the past week. | | | | |
| | Corporate media is the one who says it's the worse thing to question a mass event, then use my name to bring out the hurtful stories over and over which causes copy cats to doit more. | | | | |
| | Don't know if he took his life but that's what it's leaning towards, very sad and bizarre. | | | | |
| | Going to send cease and desist letters to media outlets, that you know it's been years and years of me saying it's staged. They would clip what he said out of context and replay it and claim he's currently doing it. | | | | |
| | ad to products | | | | |
| | 19:45 they thijnk, not sure a suicide, at the community center. Turn internet on and the articles link back to AJ. | | | | |
| | That's what they do, they decieve. Twilight zone. | | | | |
| | Good guy- foundation for mentally ill people which makes sense bc of Lanza. | | | | |
| | Parents are good people, let's pray for them. | | | | |
| New SH hoax Launched by AP | Scope of 1st amendment and will be seminal case. | | | | |
| | Had initially waived attorneys fees but they keep filing more and more suits so not going ot be able to do that. | | Robert Barnes | | |
| | | | | | AJ seeks $100k from SH families |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | This article says that AJ wrote a book with Fetzer that I never read. | | | | Father of SH victim wins defamation lawsuit against AJ- AP article |
| | Declare I lost to scare everyone. | | | | |
| | SC of CT got involved with public interest appeal. | | | | |
| | Political objective to scare people from listening to him. | | | | "Jones Loses TX appeal in ongoing lawsuit with SH" Ethan Fry |
| | | | | | "Infowars loses appeal in SH defamation lawsuit." Jared Holt 9/4/19 |
| | WAPO, Nytimes all saying we're ending 1st amendment using Jones we don't need it anymore. | | | | |
| | AP refuses to retract the story. | | | | |
| | 8:40 after break | | | | |
| | 17:30 ad to end. | | | | |
| nwcc | Weinstein is a monstrous pig. Clips of Weinstein. | | Mark Randazza | | Nytimes "Truth in a post-truth era: SH families sue AJ, conspiracy theorist." |
| 5/25/2018 | 1st amendment lawyer. SH latest rounds of suits. Legal commentary- look at a complaint with 394 paragraphs, the facts are relatively simple. Logical contortions. | | | | CNN- "6 more SH families sue alex jones," Aaron Cooper, 5/24/18 |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Implausible conspiracy among you and the viewers. | | | | |
| | added 1 defendant in CT, diversity of citizenship for federal jurisdiction. Don't want to be in federal court bc perceived to be more defendant friendly. | | | | |
| | CT judges are appointed for 8 years, and can be reappointed and so if politically charged, more likey judge won't make a politically unpopular decision. | | • | | Infowars: "AJ statement on new SH lawsuit" 5/23/18 |
| | Federal judge is lifetime appointment. | | | | |
| | Streisand effect | | | | |
| | Can't discount actual people's feelings but some of this is outside SOL (2 years in CT). | | | | |
| | The cherry picked statements are out of context. | | | | |
| NY Times releases bizarre SH 2nd shooter story | Video clip of one of the depositions of AJ. Left hates America. Clip from a 3 hr 40 min depo in SH, and what they chose to attack me on was things we legitimately questioned but when read the article, Alex is a consolation prize, but at least we're destroying AJ. | | | | NYTimes Magazine: "AJ under oath is antidote to a 'post-truth' age." |
| | #resistance consolation prize. "Post truthification" | | | | |
| | Goes through article which claims AJ says SH is a hoax contrived by victim's parents. Never said that. | | | | |
| | Symbol of victory for the left. | | | | |
| | Put up a 3 min clip of the depo-- pinned down | | | | |
| | Does the Nytimes claim they didn't run a story about 2 shooters or a man arrested in cammo? | | | | |
| | Coverup of the slow police response and SH vampires are the lawyers. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 8:22 If you crossed Golum with a lawyer you would get Mark Bankston. | | | | Business Insider: "Footage of police arresting second man in woods right after SH shooting." Michael B Kelly 12/17/12 |
| | Months later worried about a second shooter targeting the families. | | | | AP video aerial footage of people mrunning in woods |
| | | | | | Audio of interview with witness claiming to see police walk a guy out of the woods and put him in the police crusier. |
| | | | | | WCCC600- live news broadcast. "Two shooters is this the latest?" Mike Bellamy |
| | | | | | Local Newtown Beat- Police Union Seeks funding for trauma treatment. A man with the gun that was pulled from the woods was a SWAT officer from another town. |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Drills they were running that day. |  |  |  | *Skeptoid Blog:* "Terror attacks and drills: coindicence or conspiracy?" |
|  | Audio of deposition where Bankston accuses him of making this up. |  |  |  | SH DA cites potential "suspects" fears witness safety. February 2013. |
| ogpw | Experience as educator and law enforcement and school safety consultant. | David Knight | Wolfgang Halbig |  | Halbig's site--schoolsafetyinstitute.com (shows summary of his experience) |
| 2/20/2014 | Halbig runs the child safety institute (CSI). Here he says he was a US customs agent, but other places he said he's former FBI. |  |  |  | Daily News article: "Social media users spreading false information about SH massacre could face charges, say police." |
|  | Appointed by Jeb Bush to be on school safety commission. |  |  |  | Cut to article by Adan Salazar 2/14/14 re: Halbig being "threatened" over SH investigation |
|  | Working on this for over 10 months through FOIA process but then intimidated him. |  |  |  |  |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| If they wanted to make schools safer, they would have an open transparent conversation about what went wrong. | | | | |
| Second visit from law enforcement. Must be listening to AmericanFreePress | | | | |
| 6:11 Knight alleges that Obama does stuff like this against his political enemies by sending the IRS to attack them. Want to intimidate people. | | | | |
| Deputies said Newtown Police want to know if you own a handgun. | | | | |
| Want to make all guns dangerous to people and if gunowner DHS is training everyone to think you're a terrorist. | | | | |
| 8:00  portapotty allegation. W/in 3 hrs. Who is thinking about ordering those that morning? Called the company who ordered them and when? Secretary refused to give info. Portapotties are confidential? The next morning a Southbury PD called and told him to stop harassing the portapotty company. | | | | |
| Everything is a top secret state secret. | | | | |
| 9:36- asked about his biggest "red flag." | | | | |
| "Clock starts ticking" 9:35 shots fired. First 10 minutes, neutralize the threats. These cops parked .25 mile away and come through the woods. | | | | |
| No Trauma helicopters? | | | | |
| 11:35; so many false flags, more concerned about portapotties than EMS services. Delivered on golf carts. | | | | |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| 12:10- Says he went to a store and randomly asked a lady behind him whether she had heard of SH and whether she believed children actually died that day. | | | | |
| "I think this is the biggest hoax that FEMA and DHS has ever done against American people." | | | | |
| Instantly matches their agenda and then so many things start to surface. | | | | |
| Biggest red Flags? Who didn't order the helicopters? Who made a decision not to let EMTs inside school. | | | | |
| Columbine first time SWAT came out and said I made a mistake. | | | | |
| 14:50- body count within 11 minutes? Who declared them legally dead? | | | | NY Times: "2.53 million deal ends some columbine lawsuits" 4/20/01. |
| No lawsuits from the parents. | | | | |
| 16:19- why does it take 4 hrs to find a RN in the front office? | | | | |
| "That's what we see with the events that are typically false flags." | | | | |
| It was an illusion. Put puzzle together. | | | | |
| What do you hope to accomplish in Newtown? Want to have a convo with the school board members. | | | | |
| Who is the surveillance contractor that installed the security system? | | | | |
| Who is the surveillance contractor that installed the security system? | | | | |
| Which environmental company did they contract to clean up the biohazard? | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | "you did this because that's your profession" |  |  |  |  |
|  | One that really sticks out, listen to the police transmission, at 9:55:31am officer who is inside the school and says "multiple weapons, rifles and a shotgun." Where's the shotgun? He was in room 10 where supposedly Lanza committed suicide. |  |  |  |  |
|  | Video footage of them pulling shotgun out of the trunk so wasn't in the school. |  |  |  |  |
|  | "Whoever directed it and created a script it was a 2-3 year project." |  |  |  |  |
|  | This isn't the first time they've done a false flag, many different areas. Some executed some not. We've seen it over and over again in history and our government is a master at it.-- Knight |  |  |  |  |
|  | SH justice trust fund to fund Halbig. |  |  |  | Facebook-Wolfgang W. Halbig |
|  | "Man of integrity who is imminetly qualified to do this type of investigation." |  |  |  |  |
| oo74 | Sandy Hook AR15 hoax? Still no school surveillance footage released? |  |  |  | Article- Mike Adams, Natural News, 1/14/13 |
| 1/15/2014 | Maybe AR15 was not used, but a handgun. |  |  |  | Matt Lauer |
|  | Cited a Matt Lauer piece saying that officials were sayign AR15 not used. |  |  |  |  |
|  | This would debunk allegation that AR15 was used so we need a ban on Assault rifles. |  |  |  |  |
|  | Doctoring the video? |  |  |  |  |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Rob Dew- testimony that someone had seen another individual next to the school in cammo with a gun, police questioning him but no one knows what happened with him. |  |  |  |  |
| QjjC | 2hrs 48mins long |  |  |  | Jamie White infowars.com "Nojoke: Judge who forced cohen to ID hannity performed Soros wedding." |
|  | Two more lawsuits filed yesterday. Two lawyers told me frivolous. |  |  |  | Kimba Wood: 5 Fast facts you need to know 4/17/18 |
|  | I can't 100% say kids didn't die there but there are people out there who believe it. |  |  |  | Judge in Michael Cohen's case officiated Soros Wedding- Jeff Murdoch, WATimes |
|  | False flags- gov't has done it before. Right to investigate it. |  |  |  | Bloomberg Politics-SH Families Sue infowars' AJ for Defamation, Polly Mosendz, 4/17/18 |
|  | About 1 year after SH I said you know I think people died there and pulled back because some groups out there were even saying he was other people. |  |  |  | VICE Hit piece: Infowars started Parkland 'crisis actor' conspiracy. 3/29/18 |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Last April visited by Megyn Kelly and after interview aired on father's day I watched one of SH parents say I said no one died there, despite that I've said for 3 years before that that ppl died there. | | | | AJ Files lawsuit against Georgetown U School of Law. 4/12/18 |
| | Reference Wall Street Journal article allegedly saying "we have a formula to shut Alex Jones down." | | | | |
| | Talking about slavery and how people alive today aren't related to people alive today who had slaves. | | | | |
| | "Exploding tire lawyers." | | | | |
| | Went and watched the videos and what they say we said isnt there. | | | | |
| | Invited them on the show. | | | | |
| | Cut to "Final Statement on SH" Published 11/18/16 on Youtube. | | | | |
| | AJ is being called a crisis actor himself, called him Beau Bridges. | | | | Wikipedia: "Tar baby" definition |
| | Tried to host debates with both sides. Think there's holes in your arguments. | | | | |
| | Hillary faking stuff, people don't believe anything anymore and they think I'm in on the deception. | | | | |
| | 14:10 break, switch topic of conversation to the Judge in Michael Cohen's case. | | | | |
| | At 20:25 pivots back to the lawsuits against him and the collusion of the media and the lawyers. | | | | |
| | 22:30- break. Comes back on and talks about Judge. | | | | |
| | 26:19- don't think parents at SH were actors. | | | | |
| | Go after these people- report it,. Lots of politics including war, Hillary, Trump, abortion | | | | |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| Video of blind woman dumped draino in her eyes. | | | | |
| "Strike back legally and lawfully." | | | | |
| 46:25 back from break and redirects to lawsuit. Talking about firm that filed the suit as ambulance chasers. | | | | |
| Got cut and pasted-- they are identical. | | | | |
| 47:30- document cam shot to the lawsuit. The last suit had Kit Daniels as a Defendant but this onethey took out Daniels and replaced with Shroyer. | | | | |
| 53:45- take callers. Counteroffensive that left wing has launched. | | | | |
| 55:50- financially a big challenge to Infowars. Gotten 8 lawsuits thrown out but 9 more going. | | | | |
| There isnt' a retraction to make because you didn't say these things but... | | | | |
| Temper tantrums. | | | | |
| 1:11:55 pivots to other topics. | | | | |
| Kind of seems like he relates everything back to SH lawsuits. | | | | |
| Keps going back to database and Judge that married Soros. | | | | |
| 1:28:34-back from break. Witchhunt from Russia. Judge again. | | | | "Wood was Famously Dubbed the Love Judge After Romantic Scandal"-- Dana Manister |
| 1:29:35- back to lawsuit again | | | | |
| Going through lawsuit. Fake news will just spew it out. | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | 1:32:21 caller David from PA re: trump. Wants martial law. |  |  |  |  |
|  | Caller- wants to confront Comey at Barnes & noble at hs book tour. |  |  |  |  |
|  | 1:46:09- It's been 4 years and I've looked it up I played devil's advocate. |  |  |  |  |
|  | Beau Bridges and Bo Hicks. Doesn't mean interview didn't happen. CNN saves $ by not going there. |  |  |  |  |
|  | He goes in and out talking about SH and Parkland. There was a stand down. |  |  |  | NY Times: ISIS uses chemical arms at least 52 times in Syria, Iraq |
|  | I can't look at these parents and say they didn't lose a child. |  |  |  | Syria fake video |
|  |  |  |  |  | Clip-progressivechangeinstitute re: maternal mortality. |
|  | Re: trump/Stormy Daniels. |  |  |  | Hannity clip of him being a client of Michael Cohen |
|  | 2:07:36 About incereased migration of Africans to Europe. | Paul Watson |  |  | Colbert clip re: Cohen. |
|  |  |  |  |  |  |
| Media Matters | Talking about Obama's push for gun control, crying over dead children in SH but does bomb strikes killing children in Syria. |  |  |  |  |
| Para 37 of Pozner Comlaint | "I didn't kill your kids."-- ACKNOWLDGING THE CHIDLREN ARE DEAD |  |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | "Open and shut it's a government operation at the movie theatre"-- talking about Aurora CO shooting at opening of batman. | | | | |
| | Shooter all drugged up and is a patsy. | | | | |
| | SH's got inside job written all over it. "The Parents always working for DARPA." | | | | |
| Megyn Kelly Interview with AJ | 1.3 billion views on Youtube. | | | | |
| 6/18/2017 | Suicide Bomber in Manchester England. | | | | |
| | "Liberal trendies" | | | | |
| | Media misrepresenting and clipping the comments. Ages of victims weren't even known. | | | | |
| | Clip with Donald trump appearing on Infowars. | | | | |
| | "Access to the seat of power" Temporary press pass to WH to first time. | | | | |
| | Discussions about the 2016 election. | | | | |
| | It costs 45-50m/yr to run everything. Anything made put back into business. | | | | |
| | 8:15 mark clips of interview with Heslin. | | | | |
| | 8:50- "AJ repreatedly claimed the shooting never happened." | | | | |
| | Clip of AJ 12/2014- "It took me about a year to come to drips with the whole thing was fake. I did deep research and my gosh it didn't happen." | | | | |
| | We know there's mass shooting and these things happen, there was some manipulation.Played devil's advocate. | | | | |
| | 9:50- the coroner did autopsies of the bodies. "They blocked allt hat and won't release it that's unprecendented." | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 10:!2- "The entire thing was fake" that is him playing devil's advocate. | | | | |
| | Looks like a drill- | | | | |
| | "Parent's faked their children's death." | | | | |
| | Never completely disavowed his previous statements. | | | | |
| | 12:41- Pizzagate | | | | |
| | Chobani lawsuit re: AJ allegation that employee committed a sexual assault in Idaho. | | | | |
| | "That was a publicity stunt." Year long sexual assault investigation | | | | |
| | Had to issue a retraction that we were covering other people's reports. | | | | |
| | Infowars was only media outlet that reported on the lie that forced a retraction. | | | | |
| | No script- piles of articles off the internet. Discussing an article. | | | | |
| | 15:50- what is the vetting process? | | | | |
| | 16:04- infowars staffers have free reign to cover whatever they want with virtually no oversight | | | | Clip of Owen Shroyer Interview |
| | Shroyer- look at the news, rarely get directives from Alex. | | | | |
| | Don't like calling myself a journalist. "The Deplorables." | | | | |
| yix | How the school board refuses to answer questions, just filing FOIA requests. | Alex Jones | Wolfgang Halbig | | Sandyhookjustice.com |
| 5/13/2014 | Teach them how to respond to FOIA requests. | | | | Video of first FOIA hearing |
| | References video of FOIA hearing, and Halbig to send video of him going to United Way and being blocked. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Who is the surveillance contractor that installed the security system? There should be emails regarding history of the surveillance. | | | | |
| | As a school safety expert, leading national expert | | | | |
| | Red Flag- United Way. Follow the money. Amount of money poured into Newtown, it all starts at United Way. | | | | |
| | Advertised three days before shooting. | | | | |
| | Bloomberg false started the day before, claim that there was going to be a mass casualty event and to be ready to take advantage. | | | | See Heslin 19-000074 Infowars article Aaron Dykes "How Bloomberg Planned to Seize upon gun tragedy" 3/12/13 |
| | Letters written to United Way and SH Promise Fund )pass through). A lot of money. Motive | | | | Observer Politics Article on Bloomberg's premeditated explotiation campaign. |
| | Trauma helicopters not ordered. | | | | |
| | AJ- bottom line there was a stand down. Asked Halbig about kids going back and forth? Guy in the woods? | | | | |
| | Coverup is the prima facie proof of the larger crime and that we're being lied to." | | | | Newtown Bee Article: Man in woods was an off duty tactical squad police officer form another town. |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Being a customs officer and a Police officer, iknow bull when you see it. | | | | |
| | 9:49- Anderson Cooper on green screens saying he's out there then jumping the gun (referenced alleged Bloomberg article "false start.") | | | | |
| | Admire Dan Biondi because he went there during boston bombing which was a drill and the older brother is a CIA operative 2 years before then after bombing Russians had blown spies covers and giving a list of names, work with extremist groups. Did he get turned? | | | | |
| | Filthy school- groundwater is contaminated. | | | | |
| | "Clearly it's a drill just like the boston bomnbing. I don't know exactly what's going on but the official story isn't true." "Just from a lay investigative journalist perspective something is rotten here." | | | | |
| | 14:48- Halbig says "until they answer these 16 questions, I can tell you children did not die." | | | | |
| | There isn't a navy seal within 8 minutes that has a 99% kill rate. Adam Lanza couldn't have done that. | | | | |
| | Steve Sedensky's report 7000 pages. | | | | Newtimes.com: "Final SH report still leaves questions" 1/1/14 |
| | United Wway is an anti-gun organization. | | | | video clip of Halbig at United Way |
| xp9 | Time it took to get into the building and analyzing police response. Examining inconsistencies. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 11/23/2013 Looking through footage from cruisers | | | | Dave Altamarri, Hartford Courant article 11/22/13 " |
| "Final Statement on SH" | | Alex Jones | | | Video clip of witness re: second shooter |
| mwud | | | | | CBS news clip of John Miller re: second shooter. |
| | AJ on "Obama fake crying." | | | | Clip of Obama giving press conference after SH |
| | | | | | Clip of Robbie Parker |
| | | | | | Clip of Lt Vance re: misinformation |
| | | | | | Clip of Halbig at FoIA hearing |
| | "I don't know if they staged this one, but the same familiar tell tale signs are now coming out." | | | | |
| | "Corporate media wants to misrepresent what I said." | | | | |
| | Shows traffic for http://newtown.k12.ct.us/~sh-- no traffic from 2008-2013. | | | | Waybackmachine |
| | Word is that school system was shut down for those years. | | | | |
| | "I don't put anything past those anti gunners." | | | | |
| | Kids going in circles around the building | | | | |
| | Emergency helicopters weren't called but portapotties. | | | | |
| | Man in the woods- | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 9:50 Anderson cooper nose disappears. | | | | Clip of anderson Cooper interview with Veronique De La Rosa |
| | Got everything after Columbine and that was in the 90s. | | | | NiemanLab, Kristen Bergman, "Privacy vs. Transparency: CT bans access to many homicide records post-Newtown" 6/11/13 |
| | | | | | Inofwars article re: Halbig getting threatened 2/18/14 |
| | | | | | Infowars article re: Lanza home being demolished 3/25/15 |
| | Lawsuit against Buschmaster even though Lanza did not purchase gun. | | | | |
| | School demolished. | | | | "Non-disclosure required for SH school crew" Nanci Hutson 10/14/13 |
| | Rob Dew's uncle, respected FBI agent who runs his own security firm is at the FOIA hearing | | | | Infowars: Retired FBI agent investigates SH" 7/7/15 |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | "All these beauracracies have paper trails." Uncle said he never sat in a court proceeding like that. Small town, biggest event in their history and there is no paperwork and no one knows anythign. | | | | Clip to Rob Dew |
| | When MSM attacks you, it's because it's your strongest information and they want to discourage you. Want to discredit you. | | Keith Johnson (American Free press) vs. Halbig | | |
| | Hosted a debate showing both sides. | | | | |
| | 15:09- out of context, said IDK what happened,but it should be looked into. Why should we be afraid to look into it if nothing to hide? Shakespeare's hamlet. | | | | |
| | If children were lost at SH, my heart goes out to each and everyone. | | | | |
| | "Only problem is I've watched a lot of soap opers and movies and I know when I'm watching something real. Let's look into SH." | | | | |
| tm5 | *This documentary had received millions of views on Youtube* | Rob Dew | | | |
| "Why People Think SH is a hoax" | MSM calls anyone who questions as conspiracy theorist. | | | | |
| | SH has some of the tell tale signs of being an inside job, same signs you will see if gov't is just using a good crisis. | | | | Clip of Rahm Emmanuel "don't let a serious crisis go to waste." |
| | Evidence is beginning to come out that points more in that direction | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | People behaving like actors. | | | | FAIR: "Why were gov't propaganda experts working on news at CNN?" |
| | 2:35 blue screen situation with CNN. This is why we question these things. | | | | CNN footage re: them faking being in Saudi Arabia but weren't. |
| | US gov't used terrorists to stage terrorist attacks. | | | | WAPO Jeff Stein Article "CIA unit's wacky idea: depict sadaam as gay." |
| | | | | | "Terrorists helped by CIA to stop rise of left in Italy" - The guardian Phil Willan 3/25/01. |
| | Goes into false flag of OKC bombing. | | | | OKC bombing first responder 12/22/11. |
| | 8:04- I clearly believe from the evidence children were really killed | | | | |
| | re: second shooter. | | | | |
| | Robbie Parker clip. | | | | |
| | Comparison of US crime rates 1992 vs. 2011 | | | | Larry Pratt on the batman Shooting 7/26/12 |
| | TX shooting | | | | |
| | 13:15 Anderson Cooper video footage- COOPER has some explaining to do, not Veronique de la rosa. Don't trust CNN anymore. | | | | archive.org |
| u8r | Children of Sh to play at superbowl | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| 2/2/2013 | conditioning of the public to give up their gun rights, TSA will be patting down. | | | | USA today "Newtown students to sign at superbowl" 1 month after shooting |
|  | After game, will be talking about Beyonce if she was lipsyncing. | | | | |
|  | Does not show that fake sueprimposed picture. | | | | |
| 5efy | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | Alex Jones | Dr. Steve Pieczenik | | Steve Piecenik's website. |
|  | 3:46- first topic is Bin Laden. About maintaining the narrative. | | | | |
|  | 17:08 break, ads. | | | | |
|  | 22:58 another break | | | | |
|  | 27:15- SH is finally mentioned in the context of politics surrounding gun restrictions. | | | | |
|  | "Sh was a total false flag." There weren't 24 kids who were killed. | | | | |
|  | False flags repeatedly with this president. | | | | |
| Shqsv | Not feeling depressed. | Alex Jones | Dr. Steve Pieczenik | | |
| 4/1/2013 | Aurora, CO gag order. | | | | |
|  | Psychiatric diagnosis | | | | |
|  | GAG ORDER Obama broke on SH no one died but if they had, federal offense of a gag order. | | | | |
|  | Sentenced top consecutive life sentences and it is meaningless. | | | | |
|  | Defense attorney broke a gag order, indcitment of the false flag of SH. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | AJ- a lot of evidence of false flags at SH. Want to give him truth serum to plead guilty, I see false flags all over the place, not just SH. | | | | |
| | President put a line in the sand and these poor kids who were never killed, never present. Beginning of end of false flags (AJ doesn't say this) | | | | |
| | 8:16 AJ- get they do false flags, how do you figure no kids were killed? Might as well kill some kids. | | | | |
| | 9:45 back from break | | | | |
| | What is your take? Bloomberg was ready the month before and people look like actors?-- AJ | | | | |
| | Susan Collins out of script from one of her books. | | | | |
| | Whole group of actors, IS42- social media management. | | | | crisisactors- ad for actors for simulation training. |
| | Kids in various acting schools before. | | | | |
| | Worked in Greenwich CT so know SH very well (Greenwhich is like a full hour away). | | | | |
| | White wealthy community filled with guns and alochol but no evidence of killing, violation of gag order and everyone violated the gag order. | | | | |
| | 12:20- Why do they want our guns so bad? AJ | | | | |
| | Sociopath to destroy the system. Not competent to serve. Degradation of people going into politics. Obama is self-destructive | | | | |
| | Impeachment, but then biden is on deck. | | | | |
| | Not worrked about China or banking system. THEY LITERALLY CUT HIM OFF MID-SENTENCE | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Back from break and he hasn't even stopped talking. |  |  |  |  |
|  | Trying to start a civil war coming after our guns? |  |  |  |  |
|  | 38:30 cut him off mid sentence again. |  |  |  |  |
|  | 39:20 back from break. AJ- what is America's underlying core that made us so successful. |  |  |  |  |
|  | 39;40 cameback from break and took a caller who disagrees with Pieczek. |  | Caller: Dr. D. |  | Infowars article: Dodgeball now banned in public schools as nanny state goes insane. |
|  | No-bama character. |  |  |  |  |
|  | Re: Dr. Pieczek's concerns about China. |  |  |  |  |
|  | 40:45 Pieczek interrupts caller on issue of water. |  |  |  |  |
| eslva | List his credits | Alex Jones | Halbig |  |  |
| 3/14/2014 | "I've looked at it, coverup there's actors and caught liars. Preplanning." |  |  |  | Adan Salazar article: "School shooting expert threatened over SH investigation" 2/18/14 |
|  | "regardless they're not letting a good crisis go to waste." |  |  |  |  |
|  | FBI new haven office classify the SH shooting. FBI has never classified a school shooting. |  |  |  |  |
|  | Called the NH field office, told it's classified. Demand a copy of report with leaders. |  |  |  |  |
|  | "Using children and teachers as a ploy to scare people." |  |  |  |  |
|  | Trauma helicopters. |  |  |  |  |
|  | AJ- "video of kids going in circles. Unmistaken drill." |  |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Don't let paramedics inside school. | | | | |
| | AJ "So they overrode the default settings? YOU"RE saying Standard OP ignored?" | | | | |
| | Declared legally dead in 8 mins. | | | | |
| | Where did the 500 children go that day? | | | | |
| | Biohazard company to decontaminate school | | | | |
| | AJ- "Continuing with the 16 points." | | | | |
| | Lieutenant working a construction detail less than 2 miles away but stayed at his off duty job for 4 hours. Another female officer left the duty site to go to the shooting but he didn't? | | | | |
| | "They want me to stop asking these questions. Why?" | | | | |
| | "SH elementary school had highest level of lead paint and asbestos and PCP." | | | | |
| | AJ- "bulldozed school now." | | | | |
| | AJ- "Green screen with Anderson cooper and staged interviews and actors playing parts of multiple people." | | | | |
| | What is your take?  We know they've staged other stuff. | | | | |
| | Halbig- using supposedly live feed, | | | | |
| | AJ- about Anderson cooper and cut to wider shot can see garbage blowing and thenblows back like its on a loop." | | | | Cut of video of Anderson Cooper interview |
| | Halbig- where did this script come from? | | | | |
| | 14:30- AJ says that Bloomberg had his networks ready 2 days before. | | | | Source? |
| | 14:55 AJ says Anderson Cooper was in the CIA, runs the hoaxes at CNN. | | | | Cut to footage of CNN pretending they were in Syria on a green screen. |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | "I pray to god that I'm wrong." | | | | |
| | People need to go to jail. | | | | |
| | AJ- Boston bombing was staged as well, was a drill. They're running hoaxes. | | | | |
| | Break, AJ "we want to send reporters up there with you." | | | | www.shjustice.com |
| rSL | 1st FOIA hearing | Dan Bidondi | Halbig | | Adan Salazar article: "School shooting expert threatened over SH investigation" 2/18/14 |
| | Inspired by threats. | | | | Video from hearing |
| | Biggest red flag in your head? | | | | |
| | Submit to gun control don't ask questions. | | | | |
| | Imagine a country where you can't ask questions | | | | |
| x2A | After Halbig came back from FOIA hearing. | Alex Jones | Halbig | | "Newtown School board shuts down conspiracy theorists" 5/11/2014 |
| 5/13/2014 | Refuse to respond to FOIA request | | | | |
| | Teach them how to respond to FOIA requests. | | | | |
| | Halbig- "Think they're not answering questions because will expose their scam." | | | | |
| | When you don't respond, it raises the red flag. | | | | |
| | United Way | | | | |
| | AJ- Bloomberg false started the day before as well. | | | | Source? |
| | T"hey're all working together it's a coverup no doubt." | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Globalists- of course they would stage something like this to get our guns. | | | | |
| 6ak | Not conspiracy parents were involved in. | Dew | Halbig and Keith Johnson Debate | | |
| | hoax against the truth movement. Spun into a conspiracy theory. | | | | |
| | Called into Question Tracy and Fetzer with deliberate disinformation. | | | | |
| | Did investigation on Independent Media Solidarity. Same old speculation and debunked theories. | | | | |
| | Dew- this stuff leads to gun restrictions. | | | | |
| | Halbig-"What are YOUR conclusions." | | | | |
| | Halbig quoted Keith Johnson's article entitled "Wolfgang Halbig is a Fraud." Calls him a school resource officer and called him a "school resource officer." | | | | |
| | Cited redacted final report. | | | | |
| | Where are autopsy reports? | | | | |
| | Dew- people don't trust the government. When you type in SH conspiracy, there are millions of videos out there. | | | | |
| | "You're always going to get the crazies out there like anything." | | | | |
| | Dew- Enough to demand answers. | | | | |
| | Keith Johnson "Mr. Halbig you are a fraud." Was a highway patrolman.  Has previously said he was a homicide investigator. | | | | |
| | Columbine reports- his name is not on any consult list. | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | So many people believe you're an expert. National Incident management systems of a 3 hour online course. | | | | |
| | "You're the source." | | | | |
| | Have not seen anyone with any credible law enforcement experience. There is never any law enforcement or medical experts. | | | | Newtownpostexaminer.com |
| | Theory re: hole in broken glass. Read exerpts re: real experts. | | | | |
| | People he's actually interviewed. | | | | |
| | "Why are you so interested in keeping up with me, don't you have a job a life/"- Halbig | | | | |
| | Final Sedensky Report report says Lanza's body found in classroom 10 but Lt Vance said found in the hallway. | | | | |
| | Now Halbig wants to focus on "lie" of where the body was found. | | | | |
| | 18:38 Dew moves on to another topic of the squad car video. | | | | |
| | Portapotties-- they didn't come until the 11:00 hour, big reason why they would need to have food. So they have food? What does that prove to me? It's not even an issue. People have to eat. | | | | |
| | Dew- That's fair, but they seem nonchalant. | | | | |
| | Dew- Firestation walking in circles? | | | | |
| | This is a looped video. | | | | |
| | Sign in sign-- that sign wasn't brought in until the following Monday. No evidence that sign was there the same day. | | | | |
| | Provided ID cards for the days afterward. | | | | |
| | Halbig- goes back to food. | | | | |
| | School was operating? | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Keith- helicopters. Last mass casualty incident at Brewery, there are helicopters were standing by because they figured they could transport the victims easier by ambulance. Only 1 or 2 vicitms via helicopters. | | | | |
| | identifies Halbig as the SOLE source of these theories. | | | | |
| | 11,000 page script that Fetzer claims Halbig is in possesion of, in a Youtube video Halbig says that it wasn't an 11,000 page script. | | | | |
| | Who were the first 3 people inside the school?  Start doing a quiz. | | | | |
| | Dew- If the school has been in operation, there would be work orders. Why not just give him the work orders? | | | | |
| | He has not posted a formal request. | | | | |
| | Dew- move on. What does Halbig have to gain? | | | | |
| | Regurgitate something someone else said. | | | | |
| | 36:00- female school principal would never have allowed her school to look so filthy. | | | | |
| | Toxic waste dump. The doors are rotten, mold, mildew. "Deplorable." | | | | |
| | Dew- re: security system. Push a buzzer, person looks on monitor and buzzes in. Not a recording feature.  Report says that clearly. Installed in 2006. | | | | |
| | System installed in 2006 (6 years previously).  Halbig acknowledges this. | | | | |
| | New security system after that sent by letter to parents. | | | | |

| | | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|---|
| | | References article that came out in the Courant-Principal outlined new procedures. "Will be implementing a security system." They outline the system. There was no date on this. | | | | |
| | | Halbig redirects to "filthy school." | | | | |
| | | What does it prove even if it was dirty? | | | | |
| | | Wayback machine has been debunked. | | | | |
| | | Dew- 46:00 "I'm still not convinced one way or the other." | | | | |
| | | We're talking about parents, small town. Can't attack these people without solid proof. | | | | |
| | | Dew- I agree with that statement." | | | | |
| | | Halbig- 51:20 "I'm not questioning any parents. I simply want to know." | | | | |
| | | Dew- I don't think either one of you are frauds. Love the debate. | | | | |
| 7ib | | Many topics-- | Alex Jones | Guest: Halbig | | "Nations all over the world admit to false flag terrorism." Infowars |
| | 3/4/2015 | | | | | Sandyhookjustice.com |
| | | People trying to shut down our Youtube page. | | | | |
| | | Asked Halbig- outline why it doesn't add up and now they're trying to shut us up just tell us why.,... | | | | |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| "1. Why Nose disappears; 2. people walking in circles; 3. Why did they say they didn't catch anyone in the woods when they did; 4. why was the school closed before then after; 5 why Bloomberg sent an email the day before; 5. why didn't they launch emergency helicopters; 6. Tell us why ambulance is parked for an hour and half..." | | | | |
| "Tell us why this appears to be phonier than a $3 bill." | | | | |
| AJ- "Copyright claims defeated." | | | | |
| AJ- "They'll probably take you out." "That's how they do it now, they kill you and your family." | | | | |
| Have documents now that the school never existed. | | | | |
| Break | | | | Infowars article: "Six year old child suspended for making gun shape with hand." |
| "Bombsell Info" breaking today: school suddenly reopened then tore it down, school is filthy." | | Halbig | | |
| AJ "It didn't look like.a real school, then you add everything together and it looks like a prop, a drill" | | | | |
| "Did they kill real kids? Maybe, maybe not" "Just doeesn't add up." | | | | |
| Bombshell-- subpoenas have been issued. | | | | |
| Thinks it will show that school was not in operation. | | | | |
| Turned off default training. | | | | |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| Used to do active shooter training, which is to get into school as quickly as possible. | | | | |
| AJ "Why was every standard procedure ignored? Why do they want to shut us up?" | | | | |
| Break 14:49 | | | | |
| "I know 120 incidents staged and blamed on political enemies." | | | | |
| Boston bomber. | | | | |
| "False flags are the bread and butter within totalitarian governments." | | | | |
| No Diatribes against one side or the other, just serious questions from callers. | | | | |
| Fake green screen, loops. | | | | |
| "All the signs, they were so ready that day how they rolled out the groups." | | | | |
| Aurora CO shooter | | | | Infowars Article-"Shooter James Holmes and DARPA weird science" 7/24/12 |
| "I'm not saying that happened at Sandy Hook. I'm saying it was a drill. A giant piece of theatre. Did they really kill some kids? I don't know, but the school appears to never have been open." | | | | |
| ads | | | | |
| Back to Halbig- Know it wasn't operating because the board says there are no safety inspection records and the records are mandated to be produced. | | | | |
| 24:00- not calling emergency helicopters, that is the default position. | | | | |
| No Helicopters but called portapotties. | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | 24:56- AJ "Same actors to break down and cry. So stupid use the same actors" |  |  |  | See FSSTX-015322 |
|  | AJ- "Maybe they're real parents or whatever,but when you someone who is laughing and smiling |  |  |  |  |
|  | Bloomberg internal email- "Get ready we're about to launch a major operation." |  |  |  |  |
|  | Halbig- This is so well planned, 2 years, millions of dollars. |  |  |  |  |
|  | Alelgation eating lunch inside the school. |  |  |  |  |
|  | 29:00 AJ- I looked you up when you started going public last year, top 2-3 groups consulting. |  |  |  |  |
|  | Lawsuit filed in FL because that's where I live |  |  |  |  |
|  | AJ-"It's phony, the question is what's going on? We just know it's fake. How fake? We don'tk now. |  |  |  |  |
|  | Break |  |  |  |  |
|  | Halbig- Need an environmental study before demolishing a building. |  |  |  |  |
|  | Caller- re: bus driver who picked up students and took them to his house. |  |  |  |  |
|  | Halbig's claim re: hole shot through the window. |  |  |  |  |
|  | Caller- Robbie Parker works for the CHIP program, register your kids into a database to find your kids. |  |  |  |  |
|  | Caller re: bushmaster lawsuits being proof that this was all about gun control. |  |  |  |  |
|  | 42:38- WE have debates on here about SH. |  |  |  |  |
|  | Man in woods at 12:23pm. |  |  |  | Cut to clip of news footage at 12:23pm |
|  | Rifle did it but news rifle found in car? |  |  |  |  |
| 5cll | FOIA hearing. | David Knight | Guest: Halbig |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | What did you learn at this hearing? | | | | |
| | Told witnesses not to show up. | | | | |
| | Missing time stamp. Are they edited? | | | | |
| | Perjury by Mike Keho police chief. | | | | |
| | "Unwanted person call" initially. | | | | |
| | Everyone must sign in sign. | | | | |
| | Janitor- | | | | |
| | mold- | | | | |
| | "Fired my first attorney b ecause I think he's in collusion with the other attorney." Hired another attorney. | | | | |
| | 12:07- went to governnor's office and filmed. | | | | |
| | Pitch to get money for legal expenses. | | | | |
| | 14:48: we want to know where those kids are that sang at the superbowl, we can't find them anywhere. | | | | |
| | We often get these contradictions out of the government because they are covering something up. | | | | |
| | Anyone who does an investigation is dismissed as a conspiracy theorist. | | | | |
| | Halbig- Need an environmental study before demolishing a building. | | | | |
| | He has investigated other school shootings and has never seen anything like this before. | | | | |
| so8 | Immediately after SH gun control. | David KNight | Dan Bidondi | | Cut to article by Adan Salazar 2/14/14 re: Halbig being "threatened" over SH investigation |
| | | | | | |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | "Wolfgang was a principal of a school and a police officer, so combined those." |  |  |  | video feed of meeting 5/16/14 |
|  | "I'm a national school safety consultant and I travel the country." Never had this kind of resistance, intimidation. |  |  |  | 3:53- cut back to video from the meeting. |
|  | Dan Bidondi- interview with Halbig at FOIA hearing. |  |  |  |  |
|  | What are the biggest red flags? Helicopter has no audio. |  |  |  |  |
|  | Flight log- says assist in locating shooter in woods. |  |  |  |  |
|  | "I was at Columbine, 14 children who died, all the parents filed a lawsuit." |  |  |  |  |
|  | Don't give a damn about the town- wants stuff from the police department and the school, but the town represents those entities. |  |  |  |  |
|  | Copies of videos but the videos they reviewed had time stamps. |  |  |  |  |
|  | 4:48- they sent police to my house not once, but twice. |  |  |  |  |
|  | "Bullying tactics, typical police tactics, expect us to keep our mouths shut and not ask questions." |  |  |  | Video montage of MSM. |
| jco |  | Alex Jones |  |  |  |
| 7/7/2015 | "These things don't add up and when ppl investigated they were threatened." | Rob Dew |  |  |  |
|  | Official story doesn't add up-- goes through Halbig's 16 questions. |  |  |  |  |
|  | Bloomberg the day before prepare to roll. |  |  |  |  |
|  | "I began to investigate" |  |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Few's uncle, retired FBI Navy seal. | | | | Infowars: Official claims DHS involved in SH 6/5/15 |
| | Uncle "investigates SH." | | | | |
| | 4:14: I don't want to believe it's a false flag, I don't know if kids really got killed." | | | | |
| | | | | | |
| | "I don't know what happened. I don't know how they do it but it's not real. It's staged." | | | | |
| | Dew- Called and spoke to his uncle. What made you want to go up there? A friend of mine said I should go up and check it out. | | | | "Who is Wolfgang Halbig" -- his CV |
| | Lawyer has an interest in keeping SH alive. He told people not tos how up who were subpoenaed. | | | | |
| | "It's little things...:" Uncle said, "I never sat like a proceeding like this. Biggest event in their history and no one knows anything and there's no paper trail." | | | | |
| | he used to go after the mob. Stuff is being delivered and no one knows how it got there. He thought that the check in sign was important that DHS was there. | | | | |
| | At first uncle said he believed the official story. They should just be giving the paperwork and moving on. No one acts like that if nothing's going on. | | | | |
| | Videos without timestamps. AJ "Mega Massive coverup." | | | | |
| | Based on all of his experience as FBI agent, | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 13:00 on green screens and everything. Manhattan project of gun grabbers. | | | | |
| | No permission slips for SH kids to go to the superbowl. This is one of Halbig's questions. Didn't make an deal of the kids going to the superbowl. | | | | Adan Salazar- "SH victim dies (again) in Pakistan." 1/2/15 |
| | "We are onto something big here." | | | | Clip of Bidondi's interview with John Dew. |
| | Closing arguments in FOIA hearing tomorrow. | | | | |
| kf2 | | Alex Jones | | | |
| "Media Refusees to Report AJ's Real Statements on SH" | #1 story Megan Kelly/Alex Jones-- response to Kelly interview. | | | | |
| | MSM won't report his actual comments. Kelly interview should be shelved. Misrepresented my views on SH. | | | | |
| | put out 2 years ago probably happened. | | | | |
| | Devil's advocate statement arguing both sides out of context. | | | | |
| | Put out 2 days ago a video saying it happened. | | | | |
| | Megan Kelly is in with the SH groups. | | | | |
| | Interivew is going to be edited to misrepresent.  In promo she is making it seem like I said it didn't happen. | | | | |
| | Saudi Arabia declassifed docs- family came out and said ISIS bombed them | | | | |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Questions MSM in real time. | | | | NY Times: Syrian Boy who became image of civil war reappears 6/7/17 |
| | Intimidation if you question official narrative. | | | | |
| | Kelly told me I'm not getting into SH. | | | | |
| | Public is distrusting and there were anomalies. | | | | |
| | gov'ts are famous for staging or using an incident to its advantage. | | | | Infowars: Watson-"MSNBC pretends obama campaign director random woman on the street." 6/13/17 |
| | | | | | More examples of actors below it. (ex: interviewing their own camera people) |
| | Actual quotes in there from his past videos. | | | | ZeroHedge: "AJ implores NBC not to air interview with 'liar' Megan Kelly" 6/15/17, ibankcoin.com originally |
| | ISIS rebels using nerve gas and blaming it on the russians.  Staged events over and over. | | | | Aleppy Boy versus |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | Dinosaur media panicking. |  |  |  | Megan Kelly dropped as host for SH group's gala over Alex Jones interview- Travis Andrews 6/13/17 |
|  | not what I said-- I said I believed people died. |  |  |  | Independent- "AJ doubles down on SH conspiracy theory in 'disgusting' Megan kellyn interview." |
|  | British Ambassador chemical attack carried out by rebels, but really was ISIS, incubators, CNN caught doing fake town halls. |  |  |  |  |
|  | Zero Hedge article republishes his questions about SH, many of which are regurgitations of Halbig's 16 questions-- these are questions that the public has. |  |  |  |  |
|  | Anderson has been caught in the past fakingh is location via blue screen. |  |  |  |  |
|  | "Ibelieve kids have died." |  |  |  |  |
|  | Owen Shroyer next in studio. |  |  |  |  |
| syf | Civil war against globalism. | Alex Jones |  |  |  |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Dems throwing temper tantrum over russia investigation | | | | CNBC article "Dem party files suit alleging Russia and trump campaign conspired to disrupt 2016 election |
| | 4:00- Megan Kelly Interview because all over the news. | | | | CNN "Is trump right? Could a 400lb couch potato have hacked the DNC?" |
| | "Anomalies"- done with tar baby about 1 year into it. Gov't standdowns. | | | | 4/17/18- "AJ responds to SH lawsuit." |
| | "I'm a real journalist" | | | | Youtube- AJ Megan kelly full interview leaked 6/15/17 |
| | On audio telling him I'm not going to talk about SH but then gets on her show the next day with some of the parents and says "isn't it horrible he keeps bringing it up." | | | | CNN: SH families sue AJ for defamation. |
| | 10:31- back to Kelly interview. | | | | CNN associates infowars with Pedo channel in bid to shut down its competition |
| | Stop bullying us why won't he go away? | | | | tweet-4/19/18 |

|  | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
|  | I'm not bringing it up. Responding to media and when they're in the media. |  |  |  | Newstimes: SH father calls out AJ on Megan Kelly Show |
| v2L | They have 4 sec clips Hillary edited for ads. | Alex Jones |  |  |  |
|  | 33,000 articles on Megan kelly interview |  |  |  |  |
|  | 1:50 Email from Lenny Pozner in 2013- giving him condolences and asking him on the show. |  |  |  |  |
|  | Devil's advocate discussion. |  |  |  |  |
|  | 2:55- pizzagate. |  |  |  |  |
|  | 6:00 re: Veronique de la Rosa re: lawsuit. Wants accountability. "Relentless period of years to peddle falsehoods and profit from them." |  |  |  | CNN interview: |
|  | Part of lawsuit includes an interview that Cooper and she did together. |  |  |  |  |
|  | "desecrate my son's memory" |  |  |  |  |
|  | "We both know the pain that came from that night." |  |  |  |  |
|  | I'm not saying this lady is lying, All I'm saying maybe they were in a studio. |  |  |  |  |
| mi3 | Why globalists want disorder | David Knight |  |  |  |
| 5/29/2015 | Discussion on article of rights of chimpanzees. |  |  |  |  |
|  | Peter Singer |  |  |  |  |
|  | Rise of robots. |  |  |  |  |
|  | DARPA |  |  |  |  |
|  | Outbreak |  |  |  |  |
|  | Interview re: second FOIA hearing and third hearing coming up. |  | Wolfgang Halbig |  |  |
|  | 28:53 "Investigated many school shootings." |  |  |  |  |
|  | "school safety consultant." |  |  |  |  |
|  | Cut to interview with Halbig at FOIA hearing. | Dan Bidondi |  |  |  |

| DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|
| Interview starts at 40:26 | | | | |
| Told people subpoenaed not to show | | | | |
| No time stamps on video provided. | | | | |
| Police chief committed perjury. | | | | |
| Next date 6/30/15 | | | | |
| "we're going to file perjury charges." First 911 call is a woman says shots fired in school. | | | | |
| However, the logs were dispatched as an "unwanted person" call. | | | | |
| Re: check in log. | | | | |
| Whole purpose of governmnent is to keep us safe. If they're not going to tell us what happened they have a different agenda-- knight. | | | | |
| CT state trooper 1 flight log, but claim there is no communication with the helicopter. Reason in logs were to help in search for suspect in the woods. | | | | cut to aerial video of people running in woods. |
| Janitor- person who is supposed to initiate work orders. Work orders completed in Summer 2013. Why would you work on a school that is going to be demolished? | | | | |
| Conditions of the school. | | | | |
| Governor Malloy's lie- he started out by saying Lt. Governor and I were spoken to about something like this might happen in our state. Malloy denied saying this. | | | | |
| Knight- how can people support you? | | | | |
| 6/3/15 hearing- subpoenaed the pilot of the helicopter, the janitor, and the new principal from SH elementary school re: the kids who were at the superbowl in 2013. | | | | |

| | | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|---|
| | | 55:15 Knight says that one of the parents whose children died put a false claim on youtube re: a copyright issue with Fox. | | | | |
| | | At the end, Knight vouches for his history-- "Halbig has investigated other school shootings, was involved in Columbine, and never saw this type of stonewalling. What is underneath this? | | | | |
| rUn | | Investigations into Wikileaks. | Alex Jones | | | |
| | 4/22/2017 | New SH information. | | | | |
| | | 500,000 Iraqi Kids dying was a "reasonable price to pay"- Madeline Albright. Tie that into SH. | | | | CBS news |
| | | Sadaam was a CIA operative, US ambassador told him it was OK. | | | | |
| | | Lied to about WMDs in 2003. | | | | |
| | | We don't choose sides except for the truth and it's not easy to find. | | | | |
| | | Media has said I said attacks never happened. 7 debates with both sides. | | | | Infowars "Explosive debate over SH" 12/13/14 |
| | | I believe mass shootings happen. But 5000+ articles say Moon landings never happened, loch ness monster real. | | | | Cut to web search of articles. |
| | | | | | | Breitbart: "Sweden: Ban Cars to stop terror" |
| | | | | | | Edmund Kozak "Media meltdown over Trump correctly calling Paris attack terror" |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | Article claims that Jones said no one was hurt at SH, they were actors. | | | | New Yorker Magazine "Donald Trump and the Amazing Alex Jones" 6/23/16 |
| | Cobra Commander-- part he played during election. | | | | The Hill: "AJ "Playing a character" |
| | Making fun of people who are paranoid as satire. He's backed off of satire over last couple of years. | | | | Cut to clip of Alex wearing a joker face. |
| | 25:25- New SH info. I've said I believe people died, played devil's advocate. | | | | infowars: Megyn kelly caught editing tape to demonize Alex Jones. |
| | Talking about Anderson Cooper nose disappearing and how CNN has been caught in the past not being at the site but claiming they were. | | | | The Guardian "Migrant Slave booming in Libya" |
| | Pizzagate | | | | International Business Times: "Migrants form West Afra being sold in Libyan markets for $200" 4/12/17 |
| | We've never seen the traffic to the site as did during the election. Record support. | | | | New Republic: "Earth day too white and out of touch with reality." |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | 35:54; back to SH.  Why is one of the headlines about our "vampires exposed?"Vampires are the corporate media. Don't let a good crisis go to waste, bloomberg, email. Should be investigated. Kill the shooter as a patsy. We've entertained the idea because a lot of people online were. | | | | WND: "Salon deletes articles defending pedophilia from site." 2/21/17 |
| | 38:00 "Why do I call these people vampires"? They lie over and over. Goes into discussion of politics they are lying about. | | | | Hand drawing information vs. knowledge (43:26) |
| | 35 is the peak in physical and mental prowess. Discussion of how historically we were adults by 16 but now we're waiting till 35-40 to start our lives. | | | | |
| | Fights, sex, rituals rights of passage. | | | | |
| | Am I bad for questioning a government doing all this evil? | | | | |
| | Did I say no kids died? They took a clip out of context in a debate. | | | | |
| | | | | | |
| | False flag video montage. | | | | First part are clips are babies in incubators. Second part about Vietnam |
| | 58:08:00 | | | | CNN gets caught not in Syria using green screen. |
| | 59:00- SH is a quagmire.  So secretive and so that's why people questioning. Wrong name of shooter, finding people in back woods. | Rob Dew | | | Hillary, chemical weapon attack in Syria by Assad. |

| | DESCRIPTION | REPORTER | INTERVIEWED | LOCATION | SOURCES |
|---|---|---|---|---|---|
| | AJ repeats many of Halbig's 16 queestions. Dew adds dash cam footage of cops eating. | | | | Daily Mail Online: "Bizarre moment CNN anchores try to pretend they're not in the same parking lot." |
| | Dew- never any blurred photos of bodies. We saw nerve gas kids in Syria. | | | | |
| | Dew- n teleprompters. We have subjects we may concentrate on but get on there and find the news. Libertarian/conservative. | | | | |
| | Placeboing is site that splices his videos and makes parodies. | | | | Youtube placeboing of Alex "Trendy" |
| | That was him engaged in satire and they don't get it. | | | | |
| "America the False Democracy: 12/24/2014 | Race issues following death of Michael Brown, Ferguson MO protests, MANY topics | Alex Jones | | | |
| | Callers. One specific caller about SH on p. 46. "The whole thing's a total hoax." | | | | |
| | p. 47 AJ repeats claim school was closed the year before | | | | |
| | Kids going in circles | | | | |
| | Green screen re: Anderson cooper. | | | | |
| | "Took me about a year to come to grips with the fact the whole thing was fake." | | | | |
| | "It just pretty much didn't happen." | | | | |
| | Caller- false flags coming in 2015. | | | | |

| 1/27/2013 | 4/9/2013 | 4/16/2013 | 3/14/2014 | 5/13/2014 |
|---|---|---|---|---|
| Chris Alaniz | Nico Acosta | Nico Acosta | Nico Acosta | Nico Acosta |
| Kristi Hightower | Chris Alaniz | Chris Alaniz | Jon Bowne | Jon Bowne |
| | Sarah Czak | Jon Bowne | Sarah Czak | Sarah Czak |
| | Derek Einkauf | Derek Einkauf | Kit Daniels | Kit Daniels |
| | Lee Ann Fleissner | Lee Ann Fleissner | Lee Ann Fleissner | Lee Ann Fleissner |
| | Jakari Jackson | Jakari Jackson | Jakari Jackson | Jakari Jackson |
| | Rob Jacobson | Will Jones | Joseph Jennings | Joseph Jennings |
| | Christopher Jordan | Christopher Jordan | Christopher Jordan | Christopher Jordan |
| | Molly Maroney | David Knight | David Knight | Travis Knight |
| | Darrin McBreen | Molly Maroney | Darrin McBreen | Darrin McBreen |
| | Kurt Nimmo | Darrin McBreen | Marcos Morales | Marcos Morales |
| | Robert Reeger | Marcos Morales | Kurt Nimmo | Kurt Nimmo |
| | Molly Rogers | Kurt Nimmo | Josh Owens | CJ Oden |
| | Adan Salazar | Robert Reeger | Robert Reeger | Robert Reeger |
| | Louis Serrtuche | Molly Rogers | Molly Rogers | Molly Rogers |
| | Heath Speakman | Adan Salazar | Adan Salazar | Adan Salazar |
| | Carter Watkins | Louis Serrtuche | Louis Serrtuche | Louis Serrtuche |
| | | Carter Watkins | Heath Speakman | Heath Speakman |
| | | | Carter Watkins | Carter Watkins |



EXHIBIT
6
Logan Kislingbury, CSR

| 9/25/2014 | 12/27/2014 | 12/29/2014 | 1/13/2015 | 2/12/2015 |
|---|---|---|---|---|
| Nico Acosta | Louis Serrtuche | Nico Acosta | Nico Acosta | Nico Acosta |
| Joseph Biggs | | Joseph Biggs | Joseph Biggs | Joseph Biggs |
| Jon Bowne | | Lee Ann Fleissner | Jon Bowne | Jon Bowne |
| Kit Daniels | | Richard Gaines | Kit Daniels | Kit Daniels |
| Lee Ann Fleissner | | Jakari Jackson | Lee Ann Fleissner | Lee Ann Fleissner |
| Richard Gaines | | Joseph Jennings | Richard Gaines | Richard Gaines |
| Jakari Jackson | | David Knight | Jakari Jackson | Jakari Jackson |
| Joseph Jennings | | Travis Knight | Joseph Jennings | Joseph Jennings |
| David Knight | | Darrin McBreen | David Knight | David Knight |
| Travis Knight | | Marcos Morales | Travis Knight | Travis Knight |
| Darrin McBreen | | CJ Oden | Darrin McBreen | Darrin McBreen |
| Marcos Morales | | Adan Salazar | Marcos Morales | Marcos Morales |
| CJ Oden | | Louis Serrtuche | CJ Oden | CJ Oden |
| Robert Reeger | | Ryan Sheridan | Josh Owens | Josh Owens |
| Adan Salazar | | Mikael Thalen | Robert Reeger | Robert Reeger |
| Louis Serrtuche | | | Ryan Sheridan | Adan Salazar |
| Mikael Thalen | | | Mikael Thalen | Louis Serrtuche |
| | | | | Mikael Thalen |

| | |
|---|---|
| **From:** | Jacquelyn Blott |
| **To:** | Mark Bankston |
| **Subject:** | RE: Depositions |
| **Date:** | Wednesday, February 9, 2022 11:29:09 AM |

Mr. Bankston:

The corporate representative is Brittany Paz.

Again, you are making assumptions.  FSS is designating her as the corporate representative now as FSS has ultimately decided that she meets the requirements as enunciated by Judge Guerra Gamble in her ruling from the bench with respect to what is required of the corporate representative.

Best regards,

Jacquelyn W. Blott

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Wednesday, February 09, 2022 11:04 AM
**To:** Jacquelyn Blott <jblott@jblottlaw.com>
**Cc:** Bill Ogden <bill@fbtrial.com>
**Subject:** Depositions

Ms. Blott,

You never provided the identity of your corporate representative for the depositions next week. Can you explain why you chose not to?

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62311009
Status as of 3/8/2022 10:23 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/4/2022 1:11:35 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 3/4/2022 1:11:35 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:11:35 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:11:35 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:11:35 PM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:11:35 PM | SENT |

Case Contacts

| Name |
|------|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62311009
Status as of 3/8/2022 10:23 AM CST

Case Contacts

| William Ogden | | bill@fbtrial.com | 3/4/2022 1:11:35 PM | SENT |
|---|---|---|---|---|
| Carmen Scott | | carmen@fbtrial.com | 3/4/2022 1:11:35 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:11:35 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/4/2022 1:11:35 PM | SENT |