## EXHIBIT B  (contd.)

**Copy of All Filings with State Court**

3/4/2022 1:20 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Gilberto Diaz Rios

# D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| KIT DANIELS | § | 459th DISTRICT COURT |

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

## PLAINTIFFS' MOTION FOR LEAVE TO DESIGNATE EXPERT ON NET WORTH

This Court may permit a party to designate an expert outside the discovery period for good cause. Plaintiff submits the attached designation for expert Bernard Pettingill so that he may give an opinion on Defendants' net worth. This designation has become necessary

because Defendants failed to comply with this Court's discovery order and did not provide adequate evidence or testimony of net worth.

## BACKGROUND

Defendants were ordered to respond to net worth discovery and provide deposition testimony on the topic of net worth. In response to the Court's net worth order:

- Free Speech Systems produced a one-page partially redacted document purporting to be a "balance sheet" for 2020. That document is not certified and audited. (Ex. 1, Redacted Balance Sheet)

- Free Speech Systems provided an incomplete and vague interrogatory answer with a promise to supplement. (Ex. 2, Free Speech Systems Interrogatory Response).

- Mr. Jones did not produce any financial statement whatsoever reflecting his net worth. Mr. Jones only provided an incomplete interrogatory answer with a promise to supplement. (Ex. 3, Alex Jones Interrogatory Response).

- Both Defendants provided banking records for 2021, but these records were almost completely redacted with no authority to do so.

- Neither Defendant responded to the Order to provide:

    "A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed."

- On February 15, 2022, Free Speech Systems appeared for its net worth deposition. The designee failed to give unequivocal answers regarding net worth, could not explain the documents produced, could not explain the discovery answers, had no understanding of basic finance terms, and claimed she was "not good with numbers." (*See* Plaintiff's Motion for Sanctions Regarding Corporate Deposition).

- The designee brought notes to deposition which do not square with her testimony or the company's discovery answers, including personal draws by Alex Jones of $18 million from 2018-2021. The notes also disclose $10 million in "developing facilities," and an alleged $18 million "in costs associated with litigation." (Ex. 4, Paz Notes).

- The net worth deposition revealed that the company had withheld numerous financial documents relevant to net worth which had been reviewed by the witness. (*Id.*).

Defendants failed to comply with the Court's order in numerous respects, and the evidence and testimony they provided is not adequate proof of net worth under well-established case law. As such, Plaintiff will require expert testimony to examine the information provided, along with the company's revenue data and other documents previously produced, to formulate an opinion as to the company's net worth. This motion has been filed as soon as possible after the failed net worth deposition, and thus there is good cause to grant the motion based on the company's failure to comply with the order.

## ARGUMENT

### I.  Defendants' Discovery Responses and Testimony are Inadequate Proof of Net Worth.

"[I]n *Ramirez,* the Texas Supreme Court described the type of discovery that would be adequate to obviate the need [for additional net worth discovery]." *In re Brewer Leasing, Inc.,* 255 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2008, no pet.), citing *Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 559 (Tex. 1992). In *Ramirez*, "Sears disclosed its net worth 'by providing its audited and certified annual reports' and by including an affidavit by the Manager of Federal Income Tax Returns for Sears that stated that the annual reports accurately reflected Sears's net worth. *Id.,* quoting *Ramirez* at 559. By contrast, in *Brewer,* the Houston court was faced was uncertified, unaudited balance sheets, which it described as follows:

> [E]ach of the corporations produced a balance sheet in response to the requests for production. The balance sheets were each preceded by an accountant's letter describing how the figures

were calculated. The accountant who prepared the balance sheet for Brewer said that it was "prepared on the cash basis of accounting which is a comprehensive basis of accounting other than generally accepted accounting principles." The accountant who prepared the balance sheet for Texas Stretch stated that it was prepared "in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants." In each letter, the accountant stated that he did "not express an opinion or any other form of assurance" on the balance sheet because the information came from the corporation's financial statements, which had not been audited or reviewed.

*Id.* at 711. Under that scenario, the *Brewer* court did not "agree that the balance sheets provided by [defendant] are the equivalent of Sears's annual report found adequate to constitute the sole evidence of net worth in Ramirez" because "[u]nlike the Sears disclosure of net worth, here the balance sheets are not audited, not certified, and do not include any affidavit or other statement[1] to represent that they accurately reflect the net worth of the corporations." *Id* at 713. Because the court in *Brewer* "determined that the balance sheets were inadequate evidence of the net worth of the corporations," it acted properly by allowing additional discovery. *Id.* Here, the information and testimony produced by Defendants was not compliant with the order, and under *Ramirez,* that unaudited balance sheets produced by Defendants cannot stand as sole evidence of net worth. As such, Plaintiffs require testimony from an expert to arrive an opinion on net worth.

---

[1] The balance sheet for Free Speech Systems, LLC includes a verification signed by Alex Jones, stating the answers are true "to the best of his knowledge." Ironically, Defendants themselves pointed out in prior correspondence in *Fontaine* that "to the best of his knowledge" is not legally sufficient for a verification. *See e.g. Burke v. Satterfield*, 525 S.W.2d 950, 954-55 (Tex. 1975) (concluding that affidavit stating facts were "true and correct to the best of his knowledge'" was not sufficient); *Perez v. State*, No. 03-08-00131-CR, 2009 WL 2059078, *6 (Tex. App.- Austin July 16, 2009, no pet.) (finding affidavit that asserted that allegations "are true and correct to the best of my knowledge and belief" was insufficient).

## II. The Credibility of Defendants' Representations about Net Worth is Severely Undermined Due to Sanctions Involving its Retained Litigation Accountant.

During the corporate deposition, the designee revealed that her statements about the company's net worth and financial structure came directly from an outside consultant, Robert Roe. Given Mr. Roe's history, his conclusions cannot be accepted as adequate evidence of net worth. Mr. Roe was found "not credible" after he was involved in Defendants providing manipulated balance sheets to the *Lafferty* plaintiffs. (*See* Plaintiffs' February 22nd Motion for Sanctions for Evidence Tampering, p. 9). The *Lafferty* court noted that the documents provided by Roe "contain trial balances that did not balance." (*Id.*). The court granted a default in part because "[t]hese sanitized, inaccurate records created by Roe were simply not responsive to the plaintiff's request or to the Court's order." (*Id.*).

Following the corporate deposition, Plaintiffs now know that any information concerning net worth has been filtered through Mr. Roe. Furthermore, by presenting an unprepared corporate designee, Plaintiffs were prevented from shining any light on Mr. Roe's work or his conclusions. Since Defendants have not fully complied, and since the information they did provide comes from a source already found not to be credible, Plaintiffs should have the opportunity to offer expert testimony to fill the gap in the evidence.

## CONCLUSION

For the above reasons, Plaintiffs pray this Court grants them leave to designate Bernard Pettingill on the subject of net worth.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax


## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel about this Motion, who confirmed that Defendants are opposed.


_____
MARK D. BANKSTON


## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2021 the forgoing document was served upon all counsel of record via electronic service.


_____
MARK D. BANKSTON

# D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| KIT DANIELS | § | 459th DISTRICT COURT |

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO DESIGNATE EXPERT

---

On this day, the Court considered Plaintiffs' Motion for Leave to Designate Expert. After considering the Motion, the Court finds there is good cause to permit the designation of a net worth expert. Plaintiffs' Motion is therefore granted.

Dated _____, 2022.


_____
Hon. Maya Guerra Gamble

## D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| KIT DANIELS | § | 459th DISTRICT COURT |

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

**PLAINTIFFS' SUPPLEMENTAL DESIGNATION OF EXPERTS**

---

COMES NOW, Plaintiffs, and files this Supplemental Designation of Expert Witnesses, and in supplementation of all prior discovery requests requesting identification of fact and expert witnesses, state as follows:

**Supplemental Retained Expert Witness**

Bernard Pettingill
93 Sandbourne Lane
Palm Beach Gardens, Florida, 33418
561-622-0330

Mr. Pettingill is a forensic economist. Mr. Pettingill will provide opinions about the net worth and financial condition of the Defendants. Mr. Pettingill will review Defendants' net worth interrogatory answers, documents produced in response to net worth discovery, the deposition of Brittany Paz as Free Speech Systems' corporate representative on the topic of net worth, the document produced by Defendants purporting to set forth operating expenditures and profit-loss figures, the documents and notes brought by Ms. Paz to deposition, the purported 2020 balance sheet, the 2020 UCC financing statement,  and FSSTX-086585 – FSSTX-086615. Mr. Pettingill's CV is attached as Exhibit "1."

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2022, the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON



# BERNARD F. PETTINGILL, JR., PH.D.
## Consulting Economist

## EDUCATION

Manchester University
*Manchester, England*

Graduate, January 1977, Ph.D. - Economics
Department of Economics and Social Administration
Dissertation: "Cost-Benefit Analysis of the Treatment of Arthritis – A Comparison of Five Hospitals"

Tulane University
*New Orleans, Louisiana*

Graduate, June 1973 – MPH – Master Public Health
Department of Health Economics and Medical Care Administration

Loyola University
*New Orleans, Louisiana*

Graduate, June 1971. MBA – Economics, June 1969
BBA – Business Administration

## ORGANIZATI0NS

• Member, American Society of Health Economists, 2008-Present

• Member, City of Palm Beach Gardens Budget Committee, 2007-2012

• Member, AAEFE, 1989-Present

• Member, American Economic Association, 1983-Present

• Member, National Association of Forensic Economists, 1989-Present

• Member, National Association of Business Economists, 1990-Present (Health Roundtable)

• Member, Health Economics Study Group, Great Britain, 1973-Present

• Member, Gideons International, 1978-Present (Past President)

• Member, Rotary International, 1983-2012

• Referee Journal of Forensic Economics (2 years)

• Licensed, State of Florida and State of Louisiana, Health and Life Insurance. No. 43972-6317 (FL)

• Associate Member, National Structured Settlements  Trade Association

## Contact

ADDRESS:

#93 SANDBOURNE LANE

PGA NATIONAL

PALM BEACH GARDENS, FL 33418

PHONE:

561-622-0330

561-346-7828

888-577-7747

FAX:

561-624-2854

WEB PAGE:

www.bpettingill.com

EMAIL:

biffpett@gmail.com

Bernard F. Pettingill, Jr., Ph.D.
Consulting Economists
Page 2

## EXPERIENCE

| | |
|---|---|
| 1985 to Present | FORENSIC ECONOMIST/MEDICAL & PROFESSIONAL PRACTICE<br>Financial Analysis, Structured Settlement Negotiations |
| 1988 to 1998 | FLORIDA INSTITUTE OF TECHNOLOGY<br>*Graduate Business School*<br>*Treasure Coast Graduate Center*<br>*Stuart, Florida.*<br><br>Professor of Economics - Taught Advanced Macroeconomics, Managerial Economics, Health Care Economics, Advanced Microeconomics (Retired) |
| 1987 to 1988 | PALM BEACH ATLANTIC COLLEGE<br>*Rinker School of Business*<br>*West Palm Beach, Florida*<br><br>Professor of Economics - Taught Microeconomics, Macroeconomics, Free Enterprise System and International Economics |
| 1980 to 1987 | UNIVERSITY OF SOUTHWESTERN LOUISIANA<br>*Lafayette, Louisiana.*<br>*College of Business Administration*<br><br>Associate Professor - Taught undergraduate and graduate courses in Economics, Finance and Management |
| 1978 to 1980 | LSU MEDICAL CENTER<br>*New Orleans, Louisiana*<br>*Department of Medicine*<br><br>Associate Professor and Administrative Assistant - Principal duties at Medical School included lectures in Medical Economics, grant writing, and computer-assisted data analysis for drug research |
| 1977 to 1978 | UNIVERSITY OF NEW ORLEANS<br>*New Orleans, Louisiana*<br>*Department of Economics and Management*<br><br>Assistant Professor - Taught undergraduate courses in Economics and Health Care |
| 1975 to 1977 | UNIVERSITY OF MANCHESTER<br>*Manchester, England*<br>*Department of Economics and Social Administration*<br><br>Research Associate - Dual appointment: Lecturer in Economics and Course Coordinator of the Administrative Development Course for Hospital Administrators |
| 1974 to 1975 | CENTRE FOR STUDIES IN ECONOMICS AND SOCIAL POLICY<br>*London, England*<br><br>Research Fellow - Primary task was a case study of Wigan Community Health Council. Research published in a sequel to the book, <u>Politics of Consumer Representation</u>, by R. Klein and J. Lewis, Centre for Studies in Social Policy, London, England. |

Bernard F. Pettingill, Jr., Ph.D.
Consulting Economists
Page 3

## PUBLICATIONS

Pettingill, B. "Wigan Community Health Council." in <u>Community Health Councils: Four Case Studies</u>; ed. Janet Lewis (Centre for Studies in Social Policy, Publ.) 1976 pp. 87-98.

Pettingill, B. "Cost Effectiveness of Chiropractic Treatment in Louisiana – A Feasibility Study." <u>Louisiana Journal of Chiropractics</u>, September-October 1977 pp. 9-10.

Pettingill, B. "Review of a History of Economic Thought." by William J. Barber. <u>Review of Business and Economic Research</u> XIII, Fall 1977 pp. 111-112.

Pettingill, B. "A Feasibility Study of the Cost-Effectiveness Analysis of Rheumatoid Arthritis in Great Britain." Ph.D., Thesis, <u>Manchester Business School Publication</u>, January 1977, p. 275.

Pettingill, B.F. "Cost-Effectiveness Analysis in the Hospital." <u>Dimensions in Health Services</u> Canada, January 1978, pp. 19-20.

Pettingill, B. and Langdon, C. "View on Youth Employment: A Survey of Businessmen and Vocational Counselors in the Greater New Orleans Area." <u>Business Review</u> Louisiana Tech Publishers, March 1979, pp. 23-28.

Pettingill, B. "Physicians' Estimates of Disability vs Patients' Reports of Pain." <u>Psychosomatics,</u> December 1979, Vol. 20, No. 12, pp. 827-830.

Pettingill, B. and Langdon, C. "The Problem of Teenage Workers as Viewed by the New Orleans Businessmen." <u>Louisiana Business Survey</u>, Fall 1979. pp.6-8.

Langdon, C., Pettingill, B.F., Bhatia, S. "Vocational-Technical Education in Region I of Louisiana." Research Study 44, <u>Division of Business and Economic Research</u>, University of New Orleans, May 1982. p. 124.

Payne, Stephen L and Pettingill, B.F. "How Much Theft Can You Tolerate?" <u>Security Management</u>, August 1982. pp. 100-102.

Langdon, Charles, Pettingill, B.F., and Bhatia, S. "Vo-Tech in Metro New Orleans: The Student and the Schools." <u>Louisiana Business Survey</u>, Summer 1982. pp. 9-11.

Pettingill, B.F., Bhatia, S., and Langdon, C. "The Counselor-Firstline Manager in the Vocational Technical Educational System." <u>Vocational Guidance Quarterly</u>, December 1985. pp. 14-17.

Payne, S. and Pettingill, B.F. "Theft Perceptions." <u>The Personnel Administrator</u>. October 1983. pp. 102-111.

Pettingill, B.F. and Payne, S. "Shrinkage-Another Area of Supply Cost." <u>Hospital Topics</u>. May-June 1984. pp. 12-15.

Bernard F. Pettingill, Jr., Ph.D.
Consulting Economists
Page 4

## PUBLICATIONS

Pettingill, B.F., et al. "A Hospital Linen Cost Control System." <u>Southern Hospitals</u>, May-June 1984. pp. 62-64.

Pettingill, B.F., and Stafford, John, M.D. "The Insurance Carriers Can Contribute to the Reduction of Health Care Costs." <u>City Business</u>. January 1984. pp. 4-5.

Pettingill, B.F., and Watson, Marie. "One System of Health Care Delivery Hospital Administrators Cannot Afford to Overlook." <u>Hospital Topics</u>. September 1984. pp. 111-114.

Pettingill, B.F., and Westell, Hariette. "Management of Diagnostic Related Groups." <u>Hospital Topics</u>. Vol. 62, No. 4. August 1984. pp. 68-70.

Pettingill, B.F. "Competition for the Consumer." <u>Citybusiness</u>. July 1984. pp. 14-16.

Pettingill, B.F. "Award Winning Tax Angle." <u>Tax Angle</u>. Vol. X, No. 4. April 1984. pp 28-29.

Pettingill, B.F., and Payne, S. "Coping with Organizational Politics." <u>Supervisory Management</u>. April 1986. pp, 28-32.

Pettingill, B.F., and Payne, S. "Obstacles to Improving Student Creativity in Management for Business." <u>Journal of Education for Business</u>. March 1986. Vol. 61 No. 6. pp. 271-275.

Pettingill, B.F., and Payne, S. "Management and Values Education." Published in <u>SMA Proceedings</u>. November 1985. pp. 349-352.

Pettingill, B.F., and Perrin, Warren A. 'Estimating Future Medical Maintenance Expenses." <u>Louisiana Bar Journal</u>. October 1986. pp., 149-152.

Pettingill, B.F., and Payne, S. "Management and Value Education." <u>Organizational Behavior Teaching Review</u>. Vol. XI, No. 1. 1986-87. pp. 18-27.

Pettingill, B.F., and Payne, S. "Faculty Perceptions of Student Values." <u>Southern Management Association</u>. Dennis F. Ray (ed.) pp. 437-440.

Pettingill, B.F. "How an Economist Sets a Value on Human Life." Editorial. <u>Palm Beach Post</u> [West Palm Beach, FL] May 1989.

Pettingill, B.F., and Eriksen, Michael. "Case Management: Evaluating a Firm's Caseload Using a Cost-Benefit Approach." <u>The Trial Lawyer</u>. Vol. 22, No. 5. September-October 1999.

Bernard F. Pettingill, Jr., Ph.D.
Consulting Economists
Page 5

## PUBLICATIONS

Pettingill, B.F., "Estimating the Full Value of Household Services Damages: Inclusion of Nighttime Protection and Care Services. "The Earnings Analyst, Vol. 16, Fall 2019.

Lichtblau, Craig M.D., Pettingill, B.F., Cardillo, Trish, Meli, Gabrielle, and Warburton, Christopher. "Cost of Future Medical Care in the United States: The Unique Contribution of the Physiatrist." International Journal of Physical Medicine & Rehabilitation. Vol. 7, Issue 4, 2019.

Pettingill, Bernard F., Goldenberg, David I., Tewes, Federico R.. "Life Expectancy: A Brief International Comparison." International Journal of Medical Science and Clinical Intervention. January 24, 2020.

Pettingill, Bernard F. "A Multidisciplinary Approach to Reducing Lifetime Medical Costs of Catastrophically Injured Patients in Litigation." World Journal of Physical and Rehabilitation Medicine, Vol. 4, Issue 1, February 18, 2020.

Pettingill, B.F., Tewes, Federico R, "Analysis and Forecast of Nursing Care Costs." IMedPub Journals, Vol.5, No. 1:78, May 11, 2020.

Pettingill, B.F., Tewes, FR, "Exploring Doctor Shortages during and after the Pandemic of 2020: Some Dire Consequences but Few Solutions." HSOA Journal of Physical Medicine, Rehabilitation & Disabilities, 2020 6:048, June 5, 2020

Pettingill, Bernard F., "Internet Telemedicine is Forever Changing Traditional Medicine in the United States." International Journal of Orthopaedics Research, Vol.3, Issue 3, 143, October 5, 2020.

Pettingill, Bernard F., PhD and Tewes, Federico R., BA, "Follow the Money: Life Insurance Agent Commissions and How to Protect Them." News and Analysis of the Life and Health Insurance Industry, ThinkAdvisor. November 2020.

Pettingill, Bernard F., Jr., PhD and Tewes, Federico R., B.A. "What Attorneys Should Understand about Medicare Set-Aside Allocations: How Medicare Set-Aside Allocation is Going to be Used to Accelerate Settlement Claims in Catastrophic Personal Injury Cases." Clinical Medicine and Medical Research, CMMR 2 (2), 121-124 (2021), February 5, 2021.

Pettingill, Bernard F. and Tewes, Federico H. "Factors to Consider During and After Job Loss or Displacement from Coronovirus 2020." Journal of Psychology and Neuroscience. July 12, 2020.

Pettingill, Bernard Jr., "Why Orthopedic Surgery for Elderly Indicates that the Maryland Total Cost of Care Model Should be Universally Adopted." Journal of Health Care and Research, Vol II, Issue 1. April 26, 2021.

Bernard F. Pettingill, Jr., Ph.D.
Consulting Economists
Page 6

## PATENTS

Tin Based Scented Candle: Pub No. U.S. 2008/0157431 A/July 3, 2006.

Filed April 11, 2006. Granted July 3, 2008.

Doolys, Reg. No. 3,757,315. Dual Eyewear Strap.

Filed/First Use in Commerce September 11, 2007.

Puzzle 8 – Awaiting Publication DatePandemgear – Awaiting Publication Date\\

## PHONE/ANDROID APPLICATIONS

JDSM – Jury Deliberation Selection Measure. 5 Minute Patented Video used as a Jury Selection Tool. (Patent No. U.S. 13/712,354. 2014-06-12)

iFi Game – International Financial Games -10 Modules to Teach Finance to Children. Reg. No. 3,984,206. First used in Commerce 07-01-2010.

ITWEET – Interactive Program to Translate Tweet Abbreviations into Common English Phrases. (Patent Applied for July 2015), www.youtube.com/watch?4=44aV2Thx4e A8+ = 75$

## MOVIES AND EDITORIALS

Executive Producer –

"City of A Million Dreams" 89 minute on History of New Orleans and Jazz Through Funerals. See www.NYTimes.com/video/opinion/1000000007768852 - YouTube.

"Don't Let the World Swallow You," First in a Series of Conversations with God, by James Tuthill, J.D. (9781689519267) published January 2020. The Greatest Heroes in the Bible.

3:40 PM

12/03/21

Accrual Basis

# Free Speech Systems, LLC
# Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 10500 · Petty Cash | 960.21 |
| 10700 · ███████████ | 525,368.16 |
| **Total Checking/Savings** | 526,328.37 |
| **Accounts Receivable** | |
| **Other Current Assets** | |
| 12100 · Inventory | 1,334,453.01 |
| 12200 · Pre-paid Insurance | 19,847.64 |
| 12225 · Pre-Paid Software Licenses | 120,042.71 |
| 12250 · Pre-paid Vendor Deposits | 244,439.08 |
| 12350 · Pre-paid Other | 14,394.78 |
| **Total Other Current Assets** | 1,733,177.22 |
| **Total Current Assets** | 2,259,505.59 |
| **Fixed Assets** | |
| 15000 · Gross Fixed Assets | 6,614,555.12 |
| 17000 · Accumulated Depreciation | (4,882,677.55) |
| **Total Fixed Assets** | 1,731,877.57 |
| **Other Assets** | |
| 18700 · Security Deposits | 43,376.38 |
| 19000 · Intangible Assets | 406,371.59 |
| **Total Other Assets** | 449,747.97 |
| **TOTAL ASSETS** | **4,441,131.13** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 20000 · Accounts Payable | 1,720,323.04 |
| **Total Accounts Payable** | 1,720,323.04 |
| **Credit Cards** | |
| 22000 · FSS ████████ | 388,762.21 |
| 22500 · FSS ████████ | (29.28) |
| **Total Credit Cards** | 388,732.93 |
| **Other Current Liabilities** | |
| 23000 · Accrued Liabilities | (20.00) |
| 23100 · Interest Payable - PQPR | 198,604.37 |
| 27400 · Due to PQPR | 156.04 |
| **Total Other Current Liabilities** | 198,740.41 |
| **Total Current Liabilities** | 2,307,796.38 |
| **Long Term Liabilities** | |
| 28000 · Deferred Rent | 25,884.44 |
| 29000 · Note Payable PQPR | 54,876,000.00 |
| 29500 · Note Payable ████████ | 112,338.43 |
| **Total Long Term Liabilities** | 55,014,222.87 |
| **Total Liabilities** | 57,322,019.25 |
| **Equity** | |
| 30000 · Member's Equity | (55,525,620.63) |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER -
ATTORNEY'S EYES ONLY

FSS_NET_0204

**3:40 PM**

**12/03/21**

**Accrual Basis**

**Free Speech Systems, LLC**

**Balance Sheet**

**As of December 31, 2020**

| | Dec 31, 20 |
|---|---|
| **32000 · Retained Earnings** | 9,672,565.92 |
| **Net Income** | (7,027,833.41) |
| **Total Equity** | (52,880,888.12) |
| **TOTAL LIABILITIES & EQUITY** | 4,441,131.13 |

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - ATTORNEY'S EYES ONLY**

FSS_NET_0205

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| Defendants, | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

## **DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, ANSWER TO INTERROGATORY REGARDING NET WORTH**

To:     Plaintiff, Neil Heslin, by and through his attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

To:     Plaintiffs, Leonard Pozner and Veronique De La Rosa, by and through their attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

To:     Plaintiff, Scarlett Lewis, by and through her attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

Pursuant to Rule 197 of the Texas Rules of Civil Procedure and in accordance with the Court's Order dated November 4, 2021, and subject to the Confidentiality and Protective Order entered in this case, Defendant, Free Speech Systems, LLC, provides the following answer to the Interrogatory Regarding Net Worth. Defendant will further supplement its answer as necessary in accordance with the Texas Rules of Civil Procedure.

Dated: December 8, 2021.

Respectfully submitted,

**REEVES LAW, PLLC**

By:   _/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

***Attorney for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on December 8, 2021.

Mark Bankston                                           *via email*
William Ogden
KASTER LYNCH FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves

<u>**DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, ANSWER TO INTERROGATORY REGARDING NET WORTH**</u>

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

    a.   All income and assets whatsoever kind and nature and wherever situated.

    b.   A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

<u>**ANSWER:**</u>

Defendant's current estimated net worth is based on the information in its 2020 balance sheet, which provides assets and liabilities as of December 31, 2020. Defendant is in the process of preparing its reconciliation and year-end balance sheet for 2021 and will further supplement this answer as necessary once that balance sheet for 2021 has been completed. Based on the latest available information from the December 31, 2020 balance sheet, Defendant's net worth is approximately negative $52,880,888.00, which is comprised of the following assets and liabilities (which are again as of December 31, 2020—bank account records for 2021 have been produced but are not included in the current assets and liabilities statement):

- Assets
  - Petty cash = $960.21
  - Bank accounts with cash of approximately $525,328.16
  - Inventory worth approximately $1,334,453.01
  - Pre-paid insurance of $19,847.64
  - Pre-paid software licenses of $120,042.71
  - Prepaid vendor deposits of $244,439.09
  - Pre-paid other of $14,394.78
  - Gross fixed assets of $1,731.877.57
  - Security deposits of $43,376.328
  - Intangible assets of $406,371.59

- Liabilities
  - Credit card liabilities of $388,732.93
  - Current short term liabilities of $198,740.41
  - Long term liabilities of $55,014,222.87 mainly comprised of a significant note payable to PQPR

- o   Defendant also has current unknown potential liabilities arising out of current lawsuits

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| *Defendants,* | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## **VERIFICATION**

STATE OF TEXAS                §
                              §
COUNTY OF TRAVIS              §

     On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he is authorized to execute this verification on behalf of Defendant, Free Speech Systems, LLC, and that he has read Defendant, Free Speech Systems, LLC's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers on behalf of Free Speech Systems, LLC are true and correct to the best of his knowledge.

By: _____

Alex Jones, on behalf of
Free Speech Systems, LLC

     SUBSCRIBED AND SWORN TO BEFORE ME on this the 7th _____ day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

_____
NOTARY PUBLIC, STATE OF TEXAS

2

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| Defendants, | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

## **DEFENDANT, ALEX JONES'S, ANSWER TO INTERROGATORY REGARDING NET WORTH**

To:     Plaintiff, Neil Heslin, by and through his attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

To:     Plaintiffs, Leonard Pozner and Veronique De La Rosa, by and through their attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

To:     Plaintiff, Scarlett Lewis, by and through her attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street Houston, TX 77008.

Pursuant to Rule 197 of the Texas Rules of Civil Procedure and in accordance with the Court's Order dated November 4, 2021, and subject to the Confidentiality and Protective Order entered in this case, Defendant, Alex Jones, provides the following answer to the Interrogatory Regarding Net Worth. Defendant will further supplement his answer as necessary in accordance with the Texas Rules of Civil Procedure.

Dated: December 8, 2021.

Respectfully submitted,

**REEVES LAW, PLLC**

By:   */s/ Bradley J. Reeves*
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

***Attorney for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on December 8, 2021.

Mark Bankston                                            *via email*
William Ogden
KASTER LYNCH FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves

## DEFENDANT, ALEX JONES'S, ANSWER TO INTERROGATORY REGARDING NET WORTH

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

   a. All income and assets whatsoever kind and nature and wherever situated.

   b. A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

## ANSWER:

Defendant's current estimated net worth is negative $20,635,000.00, which is comprised of the following assets and liabilities (including asset of negative equity in Free Speech Systems, LLC):

- Assets
   o Bank accounts with cash of approximately $458,000.00
   o Income beneficiary of a $25,900,000.00 note due to sale of closely held business interest (note is interest only note)
   o Cryptocurrency valued at approximately $206,800 based on current market rates
   o Real estate comprised of 3 properties valued at approximately $2,350,000.00
   o $3,100,000.00 in proceeds of November 2021 sale of homestead, which such proceeds are held in a 1031 exchange trust
   o Equity interest of ($53,000,000) based on book balance of Free Speech Systems, LLC
   o Household items, collectibles, personal property valued at approximately $200,000.00;
   o Vehicles valued at approximately $150,000.00

- Liabilities
   o Current unknown contingent liabilities based on pending lawsuits
   o Defendant is also a personal guarantor of several leases and certain loans for which the current potential liability is unknown.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| Defendants, | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| Defendants, | § | 459th JUDICIAL DISTRICT |

**VERIFICATION**

STATE OF TEXAS          §
                                    §

COUNTY OF TRAVIS     §

      On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, that he has read Defendant, Alex Jones's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers are within his personal knowledge and are true and correct to the best of his knowledge.

By: _____

        Alex Jones

      SUBSCRIBED AND SWORN TO BEFORE ME on this the 7TH day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

NOTARY PUBLIC, STATE OF TEXAS

2 years ago.

Business Model-

Free Speech LLC 100% owned by AJ. Reported in his personal tax return.

PQPR Holdings- buys product. They own the product. Sales commission on the product. Sales tax issues in other states. 70% of the sale gets retained by PQPR and 30% to free speech.

From 2015- August 2021, this wasn't happening in actual practice.

Free speech got 100% of the money and gave PQPR whatever it wanted. PQPR sent invoices but they weren't paid. $53m debt.

$18m in costs associated with litigation.

$10m developing facilities.

AJ paid a salary $625000/year. Periodically he would withdraw additional funds.

2018-2021- draws totaling $18m.

PQPR- 80% owned by PLJR, LLC and 20% by Dr. and Mrs. Jones. PLJR owned 10% by Carol Jones, and 90% by Trust. Effectively the trust owns 72% of PQPR.

Trust was created as a result of estate planning in motion prior to lawsuits.

Promissory note to AEJ Holdings, LLC bears interest at .032% no principal until it matures in 2048. 30 year loan interest only. $25.9 million total value of principal. $780,000 per year. It's never been paid regularly. Was supposed to be paid annually.

Trust- beneficiaries. David Jones settlor of trust. AJ grantor. Kids have first interest in the corpus of the trust. Original corpus was $10,000 but then added the corpus of PLJR holdings. Alex is remainderman. If children got the money, it is subject to the loan in the note. Alex is paid the income.

PQPR holdings buys and sells dietary supplements acquired from various suppliers. At one point was being collected by Free speech systems. More often than not fulfilling its responsibilities. AEJ 2018 trust—AJ is income beneficiary. His children are corpus beneficiares and AJ the man is the remainderman. 72% of PQPR holdings is owned by AEJ trust. (90% divided by 80 percent is 72%), that is worth the $25.9m.

Interest accrued and principal paid to as a result of the note goes to AEJ holdings, and it gets reported on AJ's individual tax returns.

Interest from original $10,000 it gets paid to AJ.

Interest earned on note to AEJ holdings. If AEJ holding earns interest by the bank, it gets paid directly to AJ.

Bank statements:

Frost bank kicked him out a year ago. Since 2020, Security Bank of Crawford TX. Not a member of the fed.

4 primary accounts:

Lydia used to be the accountant and had experience and left 3-4 years ago and Melinda took over. Started as a payroll clerk 9/2016, but now does Quickbooks for both FSS and PQPR.

Entering invoices, accounts payable. Also does HR. Background checks by Department. Onboarding process—welcome packet. ADP for payroll, employee handbook w/ offer letter, rate, position and supervisor, ADP policies, NDA, I9, direct deposit.

Head of production used to be Rob Dew, but he left and is now a contractor. Each department would have its own rules and policies. For example, Kelly has warehouse policies. Doesn't know about verbal policies.

Disciplinary procedure in handbook. Verbal/written warning up to termination. This has happened 2-3 times that it has escalated to that point, but most discipline is handled within the individual departments.

Roe was brought in by Baker Hofsteter on behalf of PQPR in order to review the financial entanglement between FSS and PQPR. At some point, Mark Balon had to withdraw because of his wife's employment and then Mr. Roe's consulting terminated. Financial issues were resolved before contract terminated—all of the notes. August 2021 retained by FSS as a consultant to address.

New process- Auriam- 3rd party process in the middle to run credit cards. $500,000 per year to guarantee the credit card transactions. No one wants to deal with Alex Jones. Received all the money from the credit card processor. Auriam gets paid 10% plus 4.9% to the cc processor.

FSS has its own products. To catch up on the debt to PQPR, FSS pays $11,000 per business day plus 80% of their products (has since been amended to 60%). Mostly paying interest. Still owe $53m.

Employee Handbook- effective date 10/2012 and hasn't been updated since.

Monthly break even is $5m including a budget for litigation.   Only took in a little over $1m in January.

**Kurt Nimmo Deposition-**
Was fired.
For 2 years was a contract employee.
Needed someone to update the website and also write new content and be a writer.
Had a blog- Another Day in the Empire. Considered himself as engaged in journalism.
No training.
Within 2 years, they had a professional company design the website so he was strictly writing and editing.
He hired Adan and Kit Daniels
The writers had authority to post on the website independently.
No independent review of articles.
Want to give his writers autonomy.
Paul Watson operated prison planet p. 58

21

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62311581
Status as of 3/8/2022 10:34 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/4/2022 1:20:34 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 3/4/2022 1:20:34 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:20:34 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:20:34 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:20:34 PM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:20:34 PM | SENT |

Case Contacts

| Name |
|------|

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62311581
Status as of 3/8/2022 10:34 AM CST

Case Contacts

| William Ogden | | bill@fbtrial.com | 3/4/2022 1:20:34 PM | SENT |
|---|---|---|---|---|
| Norman Pattis | | npattis@pattisandsmith.com | 3/4/2022 1:20:34 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/4/2022 1:20:34 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/4/2022 1:20:34 PM | SENT |

3/8/2022 3:19 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

**CAUSE NO. D-1-GN-18-001835**

| | |
|---|---|
| **NEIL HESLIN,**<br>　　　　**Plaintiff;** | **IN THE 53RD** |
| **v.** | **DISTRICT COURT OF** |
| **ALEX E. JONES, INFOWARS, LLC,**<br>**FREE SPEECH SYSTEMS, LLC, AND**<br>**OWEN SHROYER.**<br>　　　　**Defendants.** | **TRAVIS COUNTY, TEXAS** |

## NOTICE OF APPEARANCE

Defendants Alex E. Jones, Infowars LLC, and Free Speech Systems LLC., hereby notifies this Court that F. Andino Reynal, 917 Franklin Street, Suite 600, Houston, Texas  77002, (713.228.5900), State Bar No. 24060482, will appear as counsel in the above cause.

Please send copies of all notices, correspondence, or communications of any kind regarding the above-styled and numbered cause to F. Andino Reynal at 917 Franklin Street, Suite 600, Houston, Texas 77002, (713,228.5900), areynal@frlaw.us.

Respectfully submitted,

 /s/ F. Andino Reynal
F. Andino Reynal
Texas Bar No. 24060482
815 Walker St., Suite 1553
Houston, Texas 77002
Phone: (713) 228-5900

ATTORNEY FOR Alex E. Jones,
Infowars LLC, and Free Speech Systems LLC.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 62413634
Status as of 3/10/2022 9:57 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 3/8/2022 3:19:20 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 3/8/2022 3:19:20 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 3/8/2022 3:19:20 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 3/8/2022 3:19:20 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 3/8/2022 3:19:20 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 3/8/2022 3:19:20 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 3:19:20 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 3/8/2022 3:19:20 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 3/8/2022 3:19:20 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/8/2022 3:19:20 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/8/2022 3:19:20 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 3:19:20 PM | SENT |
| Federico Reynal | 24060482 | areynal@frlaw.us | 3/8/2022 3:19:20 PM | SENT |
| William Ogden | | bill@fbtrial.com | 3/8/2022 3:19:20 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 3:19:20 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 3:19:20 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name |
|------|
| Jacquelyn W.Blott |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 62413634
Status as of 3/10/2022 9:57 AM CST

Associated Case Party: INFOWARS LLC

| | | | | |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 3:19:20 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 3:19:20 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 3:19:20 PM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 3:19:20 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/8/2022 3:19:20 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 3/8/2022 3:19:20 PM | SENT |

3/8/2022 4:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Nancy Rodriguez

**CAUSE NO. D-1-GN-18-001835**

| | |
|---|---|
| **NEIL HESLIN,**<br>      **Plaintiff;** | **IN THE 53RD** |
| **v.** | **DISTRICT COURT OF** |
| **ALEX E. JONES, INFOWARS, LLC,**<br>**FREE SPEECH SYSTEMS, LLC, AND**<br>**OWEN SHROYER.**<br>      **Defendant.** | **TRAVIS COUNTY, TEXAS** |

## AMENDED NOTICE OF APPEARANCE

Defendant Alex E. Jones, Infowars LLC, and Free Speech Systems LLC., hereby notifies this Court that F. Andino Reynal, 917 Franklin Street, Suite 600, Houston, Texas 77002, (713.228.5900), State Bar No. 24060482, will appear as counsel in the above cause.

Please send copies of all notices, correspondence, or communications of any kind regarding the above-styled and numbered cause to F. Andino Reynal at 917 Franklin Street, Suite 600, Houston, Texas 77002, (713,228.5900), areynal@frlaw.us.

Respectfully submitted,

/s/ F. Andino Reynal
F. Andino Reynal
Texas Bar No. 24060482
917 Franklin St., Suite 600
Houston, Texas 77002
Phone: (713) 228-5900

ATTORNEY FOR Alex E. Jones,
Infowars LLC, and Free Speech Systems LLC.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 62418687
Status as of 3/10/2022 10:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 3/8/2022 4:15:41 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 3/8/2022 4:15:41 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 3/8/2022 4:15:41 PM | SENT |
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 3/8/2022 4:15:41 PM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 3/8/2022 4:15:41 PM | SENT |
| William Ogden | | bill@fbtrial.com | 3/8/2022 4:15:41 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 4:15:41 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 3/8/2022 4:15:41 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 3/8/2022 4:15:41 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 3/8/2022 4:15:41 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/8/2022 4:15:41 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/8/2022 4:15:41 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 4:15:41 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Federico Reynal | 24060482 | areynal@frlaw.us | 3/8/2022 4:15:41 PM | SENT |
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 4:15:41 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 4:15:41 PM | SENT |

Associated Case Party: NEIL HESLIN

| Name |
|------|
| William R.Ogden |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Tish Swearington on behalf of F. Reynal
Bar No. 24060482
tish@frlaw.us
Envelope ID: 62418687
Status as of 3/10/2022 10:36 AM CST

Associated Case Party: NEIL HESLIN

| | | | | |
|---|---|---|---|---|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/8/2022 4:15:41 PM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 3/8/2022 4:15:41 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 4:15:41 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 4:15:41 PM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/8/2022 4:15:41 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 4:15:41 PM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 4:15:41 PM | SENT |

3/8/2022 11:58 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 261st JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 98th JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION.

Defendants, Alex E. Jones, Free Speech Systems, LLC, Infowars, LLC and Owen Shroyer file this their response to *Plaintiffs' Motion for Sanctions Regarding Corporate Deposition* and in support thereof show as follows:

## A.      INTRODUCTION

On January 14, 2022, this Court granted Plaintiffs' Motion for Sanctions and ordered Defendant Free Speech Systems, LLC "to present within the next 30 days a fully prepared corporate representative for the topics previously noticed."

The deposition notice issued to FSS required FSS to designate one or more persons to testify about eight topics:

1.  Sourcing and research for the videos described in Plaintiffs' petitions.

2.  Individuals involved in the production of the videos described in Plaintiffs' petitions.

3.  Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.

4.  The documents produced by the company in response to Plaintiffs' discovery requests.

5.  The audience reach of the videos described in Plaintiffs' petitions.

6.  The company's knowledge of the Plaintiffs.

7.  Efforts made by the company to preserve potential evidence.

8.  The company's business structure and relationship with other parties.

Defendants endeavored to identify one or more individuals to comply with the Court's order keeping in mind the onerous task this individual or individual(s) would have to undertake to review Defendants' production and interview individuals who could fully inform the corporate representative of the information required to fully comply. [1]

---

[1] Rob Dew and Daria Karpova were previously found to have not sufficiently prepared when they were presented as corporate representatives on behalf of Defendant Free Speech Systems, LLC. ("FSS"). Daria Karpova, a single mother, was not in a position to spend the hours required in order to prepare. Rob Dew is no longer employed by FSS. Michael Zimmerman, who previously testified regarding the efforts made by the Defendants to preserve potential evidence, is no longer employed by FSS. Although contacted, neither Mr. Dew nor Mr. Zimmerman were able to take time away from their current employment to dedicate the hours necessary to prepare based on the Court's requirements.

2

**FACTS IN SUPPORT OF RESPONSE**

After two weeks spent trying to identify an individual or group of individuals to testify on behalf of the corporation, it became readily apparent that FSS would need to hire someone to fulfill that role. So, Defendant FSS reached out and found an individual, Brittany Paz, to familiarize herself with the topics contained in the Notice of Deposition.

Ms. Paz was retained on January 31, 2022. Over the course of the next two weeks, she immersed herself in acquiring the knowledge she needed to testify as FSS's corporate representative. Ms. Paz spent over one-hundred hours preparing for the deposition. Deposition of Brittany Paz dated February 14, 2022 ("Paz Dep."), p. 21, l. 25 through p. 22, l. 3, attached hereto as Exhibit A and incorporated herein by reference as if set forth in full.

**Ms. Paz testified adequately**

1. **Sourcing**

Ms. Paz spent approximately thirty (30) hours watching videos and documenting the sourcing. Paz Dep. 23:13-16. She was not able to identify the videos she watched by date, as requested by Plaintiffs, because the videos are identified by a unique bates label and the videos themselves do not contain the date. Paz Dep. 128:6-19. To that extent, she does not know if the videos she reviewed are all the videos listed in the Plaintiffs' Original Petitions. Paz Dep. 138:11-16.

Plaintiffs make inaccurate assumptions about Ms. Paz' excel spreadsheet on sourcing. Plaintiffs assume that if a cell was "blank," then no effort was made to identify the sources. That is an inaccurate statement. The excel spreadsheet lists the topic(s), host, interviewees, and articles on every video as well as the sources of clips and articles shown in the videos to which she referred and also contained information regarding the videos. *See*, Binder of Brittany Paz, Exhibit B, pp.

5 through 10 and pp. 36 through 103, attached hereto and incorporated herein by reference as if set forth in full.  In addition to the Excel Spreadsheet, Ms. Paz took over twenty-two (22) pages of notes. *Id*., p. 11 through 33, attached hereto and incorporated herein by reference as if set forth in full.  Finally, Plaintiffs' suggestion that Wolfgang Halbig's sources are "reasonably available" to FSS is inaccurate.  *See* Tex. R. Civ. Pro. 199.2(b)(1)("A corporation must designate an individual to testify on behalf of the corporation as to matters that are known or reasonably available to the organization.").  Mr. Halbig is a third party over which FSS has no control.

      2.     **Individuals involved in video production**.

Ms. Paz interviewed employees who were directly involved in the Sandy Hook broadcasts and articles.  She interviewed current employees Alex Jones, Daria Karpova, Kit Daniels, Adan Salazar and Melinda Flores.  Paz Dep. 14:5-8.  She spoke with contract employee Paul John Watson, Paz Dep. 14:13-14.  She spoke with former employees Rob Dew, Michael Zimmerman and Nico Aguilar.  Paz Dep. 14:16-18 and 45:10-16.

      **3.**     **Sandy Hook Editorial Discussions.**

Ms. Paz confirmed that the company does not have editorial discussions.  Paz Dep. 170:2 through 172:15.

      **4.**     **Defendant's document production**.

Ms. Paz spent between seventy to seventy-five hours reviewing documents.  Ms. Paz reviewed the videos, the articles that were published in connections with the discovery, most of the depositions taken to date, the documents admitted as exhibits to those depositions, the Original Petitions, and e-mails.  Paz Dep. 18:2-21.  The e-mails alone comprised thousands of pages.  Paz Dep. 29:12-14.

While she may not have understood the document process, she did have access to the document production and reviewed thousands of pages of documents. While it is true that Ms. Paz could not specifically identify a specific page in the thousands of documents, Plaintiffs only provided a limited number of pages from the production upon which to question Ms. Paz.

### 5. **Audience Reach.**

By way of instruction, the Court directed that the corporate representative research the number of orders that were placed for the products sold on The Alex Jones Show, which she did. Ms. Paz acquired the number of orders placed during each day of the broadcasts. *See*, Exhibit B, p. 5 through 7.  Although Ms. Paz testified that she collected sales data from PQPR, the vendor through whom FSS sells its supplements, Plaintiffs chose not to ask Ms. Paz specific questions about this information.  Paz Dep. 385:23 through 389:12.

### 6. **Knowledge of Plaintiffs**.

Ms. Paz educated herself on the information Defendant FSS had on the Plaintiffs.  She testified that the information Defendant FSS had on Neil Heslin was from ZeroHedge, iBankCoin and the Megyn Kelly interview. Paz Dep. 79:15-80:3. Ms. Paz could not recall any information obtained by Defendant FSS about Scarlett Lewis. Paz Dep. 84:25 through 148:[2] Ms. Paz' testimony regarding Defendant FSS' knowledge about Leonard Pozner begins on p. 104 and concludes at page 164. Ms. Paz' testimony regarding Defendant FSS' knowledge about Ms. de la Rosa begins on page 186 and concludes on page 197.

---

[2] Many of the e-mails produced, including emails sent by Wolfgang Halbig, were not opened and, therefore, not within Defendant FSS' knowledge.  They read like spam.  As such, Defendant FSS quit opening his emails.  She has seen some of the e-mails from Wolfgang Halbig about Scarlett Lewis.

7.      **Preservation of Evidence**

Ms. Paz' testimony regarding preservation of evidence begins on page 28:13 of her deposition and ends on page 60 of her deposition with other testimony in response to random questions throughout.

8.      **Business Structure and Relationship**.

There is no organization chart for FSS that Ms. Paz of which Ms. Paz is aware.   The only information with regard to business structure and relationships was that between FSS and InfoWars, LLC.  Paz Dep. 390:7 through 393:12.

In summary, Ms. Paz testified for over six (6) hours comprising over 400 pages of transcription regarding the topics upon which she was designated in the Notice of Deposition.

### ARGUMENTS & AUTHORITIES

A.      **FSS is the only party properly before the Court on this motion.**

Plaintiffs address Defendants collectively throughout their Motion for Sanctions and in their proposed order, but the only party properly before the Court on this motion is FSS. FSS was the only recipient and only named party in Plaintiffs' notice of corporate representative deposition. To issue sanctions for presenting an unprepared corporate representative against a party that is not a corporation or against a corporation that was not the subject of the discovery request does not meet the standards set by the Supreme Court in *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991). Accordingly, should the Court issue sanctions, the only party it should sanction is Defendant FSS.

B.      **Ms. Paz's testimony, while not perfect, adequately addressed the topics in Plaintiffs' notice.**

As described in the fact section of this response, Ms. Paz adequately met the thrust of the eight topics Plaintiffs noticed. See ¶¶ TK-TK. It is not the job of the corporate deponent to invent

knowledge where none exists or to fit the facts to the plaintiffs' theory of the case. Ms. Paz testified as she did and FSS is bound by her answers.

## C.     No Basis For A Punitive Monetary Sanction In the Amount of $1,000,000

The most egregious example of the overreaching seen throughout the motion for sanctions is the request that this Court order defendants to pay a $1 million fine.  The fact that the plaintiffs themselves describe this amount as "punitive" is *ipso facto* reason to reject this absurd request.

While Plaintiff's second proposed sanction is that "the Court orders that Defendants shall pay all of the expenses of discovery and taxable court costs in these lawsuits", they do not attach any such evidence.

Trial courts have discretion to impose monetary sanctions within limits, but any sanctions must be directed toward remedying prejudice caused to the innocent party. *See* Tex. R. Civ. P. 215.2; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003).  Rule 215.2 allows a trial court to require the party who failed to obey a discovery order to pay "the reasonable expenses, including attorney fees, caused by the failure" and to make such orders regarding the failure as are just. Tex. R. Civ. P. 215.2(b), (b)(8). But to be just, a sanction must be based on a direct relationship between the particular offensive conduct and the sanction imposed, and the sanction must not be excessive vis-a-vis that conduct. *Petrol. Solutions, Inc. v. Head*, 454 S.W.3d 482, 489 (Tex.2014); *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991).

These sanctions are designed to rectify discovery abuse by compensating the aggrieved party for expenses incurred. See Tex. R. Civ. P. 215.2(b)(8); *Ford Motor Co. v. Tyson*, 943 S.W.2d 527, 533 (Tex.App.—Dallas 1997, orig. proceeding).  Consequently, when a party seeks attorney's fees as sanctions, the burden is on that party to put forth some affirmative evidence of attorney's fees incurred and how those fees resulted from or were caused by the sanctionable conduct. *See*

*Glass v. Glass*, 826 S.W.2d 683, 688–89 (Tex.App.—Texarkana 1992, writ denied).  However, while properly proved bills showing attorney's fees the plaintiffs incurred as a result of discovery abuse *might* qualify as legally sufficient evidence to support a monetary sanction, no such evidence is attached to the motion *sub judice*.

The most obvious reason no legal invoices are attached to the motion is that it would be arithmetically impossible to reach a sum of $1 million in attorney time when the underlying order sought to be vindicated was only entered 6 weeks ago.

**D.     The Defendants Are Inviting Reversible Error In Their Request That Designated Facts Be Deemed Established**

The hallmark Texas Supreme Court Case reversing a sanction taking the form of designated facts deemed as established is *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 883 (Tex. 2003) (reversible error for trial court to sanction late production of witness statements by designating facts as established). In *Spohn Hosp.*, the Court stated that under *TransAmerican*, there must be "a direct nexus among the offensive conduct, the offender, and the sanction imposed." *Id.* at 882. The Court noted that discovery sanctions that are so severe as to inhibit presentation of the merits of a case should be reserved to address a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. *TransAmerican*, 811 S.W.2d at 918. Sanctions such as the one proposed here are the type which inhibit the presentation of the merits. *See Braden v. Downey*, 811 S.W.2d 922, 929 (Tex.1991).

This Court should find that FSS exercised good faith by designating Ms. Paz as corporate representative. Plaintiffs designated eight very broad topics of inquiry. Finding no qualified employee, FSS took the extraordinary step of hiring an individual to become as acquainted as possible, within the time limits established by the Court, with the eight topics Plaintiffs designated. Accordingly, even if, ultimately, this Court decides that Ms. Paz's testimony failed to meet its

8

standards, the remedy should not be to turn a lack of evidence into affirmative evidence. At most, the Court should bar FSS from presenting evidence at trial on topics that Ms. Paz professed no knowledge of. Any other remedy would encourage aggressive plaintiffs to use corporate rep depositions not as a discovery tool, but to manufacture affirmative evidence where none exists.

## E.        No Basis To Disallow Further Discovery

Courts of appeals have reversed when a trial court imposed the sanction of disallowing further discovery: When the sanction of disallowing discovery under Texas Rule of Civil Procedure 215(2)(b)(1) is imposed, it must be no more severe than necessary to satisfy its legitimate purposes. *Global Services, Inc. v. Bianchi*, 901 S.W.2d 934, 938 (Tex.1995) (orig. proceeding). Prohibiting FSS from conducting any further discovery prevents it from possibly obtaining evidence from Plaintiffs and would hamper the preparation for trial. Under such circumstances, the sanction would be inappropriate and excessive, and to impose it was a clear abuse of discretion. *See Tjernagel v. Roberts*, 928 S.W.2d 297, 304 (Tex. App.—Amarillo 1996).

### CONCLUSION

Defendant FSS presented the most knowledgeable available person to testify on its behalf with respect to the eight topics designated in the Notice of Deposition.  The record clearly reflects that Ms. Paz was prepared to testify and did testify as fully as any corporate representative could testify under the circumstances.

Defendants respectfully request that Plaintiffs' Motion for Sanctions be DENIED and for such other and further relief, both at law and equity, to which Defendants may show they are justly entitled.

9

Respectfully submitted,

LAW OFFICE OF JACQUELYN W. BLOTT
200 University Boulevard, Suite #225 250
Round Rock, Texas 78665
Telephone: (512) 639-9904

Jacquelyn W. Blott
SBN: 07473250
Email: jblott@jblottlaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Response has been forwarded to all counsel of record pursuant to Rule 21a of the Texas Rules of Civil Procedure on this the 8th day of March 2022 as follows:

Mark Bankston                              Email: mark@fbtrial.com
William Ogden                              Email: bill@fbtrial.com
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, Texas 77008

Jacquelyn W. Blott

10

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 62398049
Status as of 3/11/2022 10:19 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/8/2022 11:58:31 AM | SENT |
| Mark D.Bankston | | mark@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Case Contacts

| Name |
|---|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 62398049
Status as of 3/11/2022 10:19 AM CST

Case Contacts

| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 3/8/2022 11:58:31 AM | SENT |
|---|---|---|---|---|
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 3/8/2022 11:58:31 AM | SENT |
| William Ogden | | bill@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/8/2022 11:58:31 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

3/8/2022 11:58 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION**

---

# EXHIBIT A

1                  D-1-GN-18-001835

2 | NEIL HESLIN                      )

                                   ) IN DISTRICT COURT OF

3 | VS.                              )

                                   ) TRAVIS COUNTY, TEXAS

4 | ALEX E. JONES, INFOWARS,      )

LLC, FREE SPEECH SYSTEMS,     ) 261ST DISTRICT COURT

5 | LLC, and OWEN SHROYER       )

6

7                   D-1-GN-18-001842

8 | LEONARD POZNER AND          )

VERNONIQUE DE LA ROSA       )

9                                    ) IN DISTRICT COURT OF

| VS.                              )

                                   ) TRAVIS COUNTY, TEXAS

10 | ALEX E. JONES, INFOWARS,      )

LLC, and FREE SPEECH         ) 345TH DISTRICT COURT

11 | SYSTEMS, LLC                )

12

13                   D-1-GN-18-006623

14 | SCARLETT LEWIS             )

                                   ) IN DISTRICT COURT OF

| VS.                              )

15                                    ) TRAVIS COUNTY, TEXAS

| ALEX E. JONES, INFOWARS,      )

16 | LLC, and FREE SPEECH         ) 98TH DISTRICT COURT

SYSTEMS, LLC               )

17

18

19

20

21

22

23

24

25

EXHIBIT A

22-01023-tmd  Doc#1-18  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 57 of 183

Paz, Brittany                    02-14-2022

2

1

2            ************************************

3                    VIDEO DEPOSITION OF

4                       BRITTANY PAZ

5                    FEBRUARY 14, 2022

6            ************************************

7

8       VIDEO DEPOSITION OF BRITTANY PAZ, produced as a

9   Witness at the instance of the PLAINTIFFS and duly

10   sworn, was taken in the above-styled and numbered cause

11   on FEBRUARY 14, 2022, from 9:06 a.m. to 5:25 p.m.,

12   before Logan Kislingbury, Texas CSR, RPR, in and for

13   the State of Texas, reported by machine shorthand, at

14   the Law Offices of Kirker Davis, LLP, 8310-1 N. Capital

15   of Texas Hwy #350, Austin, Texas, pursuant to the Texas

16   Rules of Civil Procedure.

17

18

19

20

21

22

23

24

25

EXHIBIT A

Paz, Brittany                    02-14-2022

3

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3   Mr. Mark D. Bankston
     Kaster, Lynch, Farrar & Ball, LLP
 4   1117 Herkimer
     Houston, Texas 77008
 5   T: 713-221-8300
     mark@fbtrial.com
 6
     Mr. William R. Ogden
 7   Kaster, Lynch, Farrar & Ball, LLP
     1117 Herkimer
 8   Houston, Texas 77008
     T: 713-221-8300
 9   bill@fbtrial.com

10
     FOR THE DEFENDANTS:
11
     Ms. Jacquelyn Blott
12   Law Offices of Jacquelyn W. Blott
     100 University Blvd., Suite 225 #251
13   Round Rock, Texas 78665
     T: 512-639-9904
14   jblott@jblottlaw.com

15
     ALSO PRESENT:
16
         Mr. Tim Bishop, Videographer
17

18

19

20

21

22

23

24

25
```

EXHIBIT A

Paz, Brittany                          02-14-2022

4

1                        INDEX

                                                  PAGE
2   Appearances.......................................  3

3   BRITTANY PAZ

4   EXAMINATION BY MR. BANKSTON.......................  5

5   Changes and Signature............................ 402
    Reporter's Certificate........................... 405
6   Reporter's Further Certification................. 407

7                       EXHIBITS

8   NO.              DESCRIPTION                    PAGE

9   Exhibit 1    David Knight E-mail.................. 72
    Exhibit 2    David Knight E-mail.................. 73
10  Exhibit 3    Photos.............................. 93
    Exhibit 4    Article............................ 113
11  Exhibit 5    Show Log........................... 131
    Exhibit 6    Employee Records................... 136
12  Exhibit 7    E-mail............................. 167
    Exhibit 8    Research Binder.................... 212
13  Exhibit 9    Heslin Original Petition........... 216
    Exhibit 10   Video Screenshot................... 257
14  Exhibit 11   David Jones E-mail................. 345

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A

5

```
 1                    BRITTANY PAZ,
 2        having first been duly sworn, testified as follows:
 3                    THE VIDEOGRAPHER:  This is the
 4    deposition of Brittany Paz.  The date is February 14,
 5    2022 and the time is 9:06.  May swear in the witness.
 6                    MS. BLOTT:  And before we get started,
 7    I'd like the record to reflect that I'm handing
 8    Mr. Bankston a check which represents the amount of the
 9    sanctions in the amount of 19,000-plus dollars, and
10    also that the deposition is being taken pursuant to the
11    protective orders entered in these causes of action.
12                        EXAMINATION
13    QUESTIONS BY MR. BANKSTON:
14        Q.   All right.  Ma'am, can you tell us your name.
15        A.   Sure.  My name is Brittany Paz, P-A-Z.
16        Q.   You are not an employee of Mr. Jones or Free
17    Speech Systems?
18        A.   No, I was contracted to be their corporate
19    representative in --
20        Q.   You've --
21        A.   -- connection with these depositions.
22        Q.   Excuse me, sorry.
23        A.   That's okay.
24        Q.   You've never been an employee of Mr. Jones or
25    Free Speech Systems?
```

**EXHIBIT A**

Paz, Brittany                    02-14-2022

11

1   1st?

2       A.   I didn't as of February 1st, no.  But as I

3   sit here today, I believe I do.

4       Q.   Okay.  How much money total will you be paid

5   in connection with being Info Wars' corporate

6   representative in this case?

7       A.   I've already been paid, but my fee was

8   $30,000 plus costs.

9       Q.   Okay.  How did you arrive at that figure?

10      A.   That was a internal discussion, just

11  negotiation between myself and the company.

12      Q.   When you say negotiation, can you explain

13  that?  Did you offer a figure and they counter offered?

14  How did that work?

15      A.   No.  I think I was offered a figure to start

16  and then we went from there.

17      Q.   What do you mean, you went from there?  What

18  does that mean?

19      A.   I mean there was a starting number --

20      Q.   Okay.

21      A.   -- as any negotiations go, and --

22      Q.   Can you tell me what that starting number

23  was?

24      A.   I think the number was 25.  And then I just

25  negotiated a little bit higher, 30.

EXHIBIT A

Paz, Brittany                           02-14-2022

1      Q.   Okay.  And that number was negotiated and

2  finalized before you did any work?

3      A.   Yes.

4      Q.   Okay.  Have Alex Jones or the company -- have

5  -- have Alex Jones or any company related to Alex Jones

6  paid you for anything else?

7      A.   Other than my testimony for this deposition?

8      Q.   Uh-huh.

9      A.   No.

10      Q.   Do they plan to?

11      A.   I think I may be representing the company up

12  in Connecticut for the corporate rep deposition.  I

13  believe that's going to be sometime in March.  But

14  aside from that, no.

15      Q.   Okay.  Now, you understand you're a fact

16  witness; right?

17      A.   Yes.

18      Q.   You understand that payments to such

19  witnesses must be carefully circumscribed?  Do you know

20  what I mean by that?

21      A.   Can you --

22      Q.   Sure.  Circumscribe means to do an action

23  carefully to ensure that it fits in with relevant

24  rules, regulations, and standards.

25      A.   Okay.

**EXHIBIT A**

22-01023-tmd  Doc#1-18  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg 63 of 183

Paz, Brittany                    02-14-2022

13

1      Q.    You understand that payments to you must be
2   carefully circumscribed; right?

3      A.    Sure.

4      Q.    Okay.  You understand you have professional
5   responsibilities as an attorney that may affect how
6   much you can and cannot be paid for fact testimony;
7   right?

8      A.    I don't think that I'm acting here in a
9   capacity as an attorney.  So I don't know that I would
10  agree with that.

11     Q.    So let's put it this way.  In other words,
12  because you're not representing anybody, you just
13  happen to be an attorney --

14     A.    Yes.

15     Q.    -- you don't think you have the same
16  professional responsibilities you would have in your
17  attorney work as you do sitting in that chair right
18  now?

19     A.    I don't have certain -- I don't have certain
20  ethical responsibilities to the client.  I think my
21  only -- my only real obligation is to testify
22  accurately and truthfully, as any witness.

23     Q.    Okay.  Can you tell me everyone you talked to
24  for this deposition to prepare.

25              MS. BLOTT:  I'm going to object to the

Paz, Brittany                    02-14-2022

1  extent that it's asking you to identify attorneys who

2  are retained by any of the defendants.

3                    Go ahead.

4       Q.   (BY MR. BANKSTON)  You can answer.

5       A.   Sure.  So I spoke to numerous employees of

6  Free Speech.  I spoke to Mr. Jones.  I spoke to

7  Melinda, I believe her last name is Flores.  I spoke to

8  Mr. Daniels, he goes by Kit.  I spoke to Adan Salazar.

9  I spoke to Bob Coe.  I think he's a consultant with

10 the -- with the company.

11                  I spoke to Daria Karpova.  Who else did I

12 speak to?  I spoke to a lot of people.  I feel like I'm

13 missing somebody.  Oh, I did speak to Mr. Watson over

14 in London via Zoom.

15      Q.   Okay.

16      A.   I spoke to Rob Dew via Zoom also because he

17 wasn't available while I was here.  And I think that

18 might be it.  Oh, no, no, I'm sorry.  I also spoke to

19 Nico Aguilar on the phone.  That might be it.

20      Q.   Okay.  Now, you have listed here in addition

21 to Mr. Jones --

22      A.   Uh-huh.

23      Q.   -- numerous employees.

24      A.   Yes.

25      Q.   Or former employees, in the case of one.  And

**EXHIBIT A**

Paz, Brittany                           02-14-2022

15

1   Nico is not an employee; correct?

2       A.   No, he's not.

3       Q.   Okay.  And you started by saying you spoke to

4   numerous employees.  And I want to make sure that these

5   are the employees, there are no other employees.

6       A.   I'm just trying to make sure I didn't miss

7   anybody.

8       Q.   I know.

9       A.   I think that's it.

10      Q.   Okay.  When you said Bob Coe --

11      A.   Uh-huh.

12      Q.   -- you mean Robert Roe, an accountant?

13      A.   Yes.

14      Q.   Okay.

15      A.   Robert Roe.

16      Q.   Okay.

17      A.   He's not -- I don't believe he's the

18  accountant for the company, though.  I believe he's a

19  consultant.

20      Q.   What do you -- what do you mean?  How's that

21  different?

22      A.   I mean that we have someone that is an

23  official accountant for the company that prepares our

24  tax returns.  So he's not -- he does not do those

25  functions.

EXHIBIT A

Paz, Brittany                           02-14-2022

16

1     Q.    Okay.  Well, I've seen, like, a UCC financing

2   statement with his accounting company listed on it.

3   Have you seen that?

4     A.    Maybe.

5     Q.    Okay.  So maybe he is the company's

6   accountant; right?

7     A.    I don't know.  I don't think he's the

8   company's accountant.  I think there's a Mr. Love --

9   Love.  He's the company's accountant.

10     Q.    Okay.  So you don't know why Rob Roe's name

11   appears on the financing statements?

12     A.    I don't know why that would be.  But I don't

13   think he's the company's accountant.

14     Q.    Okay.  And did you talk to the company's

15   accountant?

16     A.    I did not speak to Mr. Love, no.

17     Q.    Okay.  To prepare for this deposition, did

18   you review every document produced in this litigation?

19     A.    Every single document?

20     Q.    Uh-huh.

21     A.    No, I didn't review every single document.

22     Q.    Okay.

23     A.    I don't think it's possible to review every

24   single document.

25     Q.    Well, I certainly would agree that it's not

EXHIBIT A

17

1  possible for one person to do it within the time period

2  of this deposition; right?

3       A.   Yes.

4       Q.   It would take multiple people to do that?

5       A.   I think for the purposes of this deposition,

6  if you'd like to go through the universe of documents

7  that I did review, I'm happy to do that.

8       Q.   That's not what I'm asking you.

9       A.   Okay.

10       Q.   What I'm asking you is, if someone wanted or

11  if a company wanted to prepare itself for this

12  deposition by reviewing every document produced in this

13  litigation, one person in two weeks could not do that?

14       A.   One person in two weeks could not do that,

15  no.

16       Q.   Okay.  And the company did not undertake

17  steps to make sure that multiple people reviewed all of

18  those documents; correct?

19       A.   I was the only person that was retained to do

20  that.

21       Q.   Okay.  So you had told me that you basically

22  could give me a universe of the documents you did

23  review?

24       A.   Yes.  I can try to undertake that, if you'd

25  like me to do that now.

EXHIBIT A

Paz, Brittany                    02-14-2022

18

1     Q.    Why don't you do that now.

2     A.    Sure.  So at first, I wanted to just make

3  sure that I reviewed the videos that -- that we had on

4  the Dropbox.  So the videos that were produced in

5  connection with the -- the discovery as well as review

6  those for the source material.

7           I also reviewed articles that were published

8  by the company that were produced in connection with

9  the discovery.  I reviewed most, if not all, of the

10  depositions that have been conducted in connection with

11  this litigation.  I reviewed the documents that were

12  admitted as exhibits to those depositions because I

13  felt that those would be probably the most relevant

14  documents to hone in on.

15          I also reviewed a lot of e-mails, although I

16  don't think anybody could review all the e-mails.  A

17  lot of them are, like, unopened e-mails and e-mails

18  from the general public.  But I did review a lot of

19  e-mails.  I also reviewed the filings in connection

20  with the plaintiffs' complaints.  And I think that's

21  it.

22     Q.    Okay.  When you say complaints, down here, we

23  call them lawsuit petitions, down in Texas.

24     A.    Okay.

25     Q.    Is that what you mean, those petitions?

EXHIBIT A

Paz, Brittany                           02-14-2022

19

1       A.   Yes.

2       Q.   Okay.

3       A.   In Connecticut, we call them complaints.

4       Q.   Yeah.  So I have videos on Dropbox, I have

5   articles, I have depos --

6       A.   Uh-huh.

7       Q.   -- I have the exhibits in those depos --

8       A.   Uh-huh.

9       Q.   -- some universe of e-mails, and then the

10  petitions?

11      A.   Yes.

12      Q.   Okay.  When you talk about that universe of

13  e-mails, how many documents are you talking about?

14      A.   At least thousands.

15      Q.   Okay.

16      A.   Some of them are duplicates, though.  So it's

17  really hard to say how many documents.  But, you know,

18  the Bates stamps.  So they're all Bates stamped.  They

19  have individual Bates stamps.  But a lot of them are

20  duplicates.

21      Q.   How did you select which documents you wanted

22  to review in terms of e-mails?

23      A.   Good question.  So what I did was I did a

24  search to try to hone in what I was focusing on.  So I

25  did a search for things that -- documents, I'm sorry --

**EXHIBIT A**

Paz, Brittany                    02-14-2022

20

1  that would have the plaintiffs' names on them.  I did a

2  search that would have Sandy Hook in them.

3            Some of those documents don't really pertain

4  to Sandy Hook.  Like, so, for example, some are just on

5  general gun control.  Some are on other shootings.

6  Some are on other events that were ongoing in the

7  country.  But I did try to hone my search to documents

8  specifically related to the Sandy Hook litigation.

9       Q.   Okay.  So when you did the search for Sandy

10 Hook --

11      A.   Uh-huh.

12      Q.   -- which returned the phone book in this

13 case, how did you -- did you review every document that

14 had Sandy Hook in it, or did you select some

15 subuniverse of documents that had Sandy Hook in it?

16      A.   So, like you said, it did return a lot of

17 documents.  So I tried to review as many of those,

18 like, lay eyes on as many of those documents as I

19 could.

20      Q.   Just randomly?

21      A.   No.  As -- as time was available, I would

22 review documents.  So is your question whether I got

23 through all of those documents?  I probably didn't.

24      Q.   Right.  How many do you think you did?

25      A.   Thousands.

EXHIBIT A

Paz, Brittany                    02-14-2022

1    Q.    Thousands of documents?

2    A.    I've reviewed thousands of documents.

3    Q.    Okay.  Do you have any idea sitting here

4  today about how many pages of documents have the word

5  Sandy Hook in them?

6    A.    I can't give you a number.  I don't remember

7  the number.

8    Q.    Would you dispute with me less than 30,000

9  pages?

10   A.    If I reviewed 30,000 pages?  Is that what

11  you're asking me?

12   Q.    No.  I'm asking you if you --

13   A.    If it returned 30,000 pages?

14   Q.    If you would dispute with me that there --

15  the word Sandy Hook appear in about 30,000 pages.

16   A.    No.  I probably wouldn't dispute that, no.

17   Q.    Okay.  Let's talk about everything you

18  actually physically did.  I want to know the times of

19  it.  So in terms of reviewing documents, how many hours

20  did you spend reviewing documents?

21   A.    I think total review of everything -- is that

22  also including the discussion -- the interviews I've

23  had with everybody?

24   Q.    No.

25   A.    Okay.  So total review of documents, I

**EXHIBIT A**

Paz, Brittany                    02-14-2022

22

1   probably estimate I have about 70 or 75 hours.  All

2   told, I probably have, you know, between interviewing

3   people, I probably have over a hundred hours of review.

4        Q.   Okay.  Well, that's -- let's talk first about

5   the documents.  Those 75 hours, when did you do that?

6        A.   When?

7        Q.   Uh-huh.

8        A.   Between the period of January 31st, when I

9   was retained, and this morning.  I was reviewing

10  documents this morning.

11       Q.   All right.  So in terms of interviews, did

12  those happen before the document review or before some

13  of it, after some of it, like, give me the order on

14  that.

15       A.   I think they've all been done simultaneously.

16  So I didn't arrive here until Tuesday night.  So

17  interviews didn't really start until Wednesday.  So I

18  was doing interviews from Wednesday through Saturday.

19       Q.   Okay.  So if you started -- let's say you did

20  an interview Wednesday.

21       A.   Uh-huh.

22       Q.   Let's talk about last Wednesday, for

23  instance; right?

24       A.   This past Wednesday?

25       Q.   Sure.  Okay.  Let's say you interviewed

EXHIBIT A

Paz, Brittany                              02-14-2022

1  somebody that day.  And then you reviewed documents,

2  you said, even this morning; right?

3      A.   Yeah.

4      Q.   And maybe last night too?

5      A.   Yes.

6      Q.   Okay.  So if you hit a document last night

7  and it involved one of those people that you

8  interviewed, you didn't go back and interview them

9  about whatever you saw in that document; right?

10     A.   You mean, did I reinterview them?

11     Q.   Correct.

12     A.   No.

13     Q.   Okay.  How many hours did you spend watching

14  videos?

15     A.   Watching videos, plus taking notes on the

16  videos and the sourcing, probably about 35 hours.

17     Q.   Okay.  When you said you watched the videos

18  on Dropbox --

19     A.   Uh-huh.

20     Q.   Okay.  You have an understanding of what

21  those videos were?  Like, do you -- do you know --

22  well, let me put it back this way.  One of the things

23  you were asked to do is to prepare for all of the

24  videos that are mentioned in plaintiffs' petitions;

25  correct?

EXHIBIT A

Paz, Brittany                    02-14-2022

1   as a result of the deplatforming, which happened prior

2   to the lawsuit.

3             I believe they hired some company to help

4   them do that, but I'm not really sure what the dates

5   are.

6        Q.   All right.  A lot of things I want to ask you

7   about that.

8        A.   Sure.

9        Q.   First, the deplatforming.  Did that happen

10  before the lawsuit?

11       A.   According to Mr. Jones, that happened in

12  2017.

13       Q.   Okay.  It actually didn't.

14       A.   Uh-huh.

15       Q.   So the deplatforming of Mr. Jones' stuff

16  happened kind of as a result of this lawsuit.

17       A.   Uh-huh.

18       Q.   Happened actually, like, in August 2018,

19  months after the lawsuit.

20       A.   Okay.

21       Q.   You didn't know that?

22       A.   I didn't know that.

23       Q.   Okay.  Second, when you said that nobody

24  knows when a spoliation letter is sent out, are you

25  talking about a spoliation, like, an evidence

EXHIBIT A

1  to ask that question.  If Tim Fruge had any involvement

2  or management of the preservation of documents involved

3  in this case, that is information you don't have?

4       A.    No.

5       Q.    Whether that's true or not?

6       A.    Right.

7       Q.    Okay.  When it came to produce -- time to

8  produce documents in this lawsuit, who was responsible

9  for searching the company's e-mail server?

10      A.    I think that would have been Mr. Zimmerman

11 who would have done the search.  When I talked to

12 Mr. Zimmerman -- did I -- did I put him on my list

13 earlier?

14      Q.    You did not.

15      A.    I'm sorry.  I did talk to Mr. Zimmerman.

16 Let's add him.

17      Q.    Okay.  Let's go ahead and make sure before we

18 go on any further, is there anybody else we need to

19 add?  Because I don't -- I don't want -- what I don't

20 want to happen is, coming to other questions and going,

21 oh, no.  Actually, I can answer that question because

22 here's this other person I talked to I never told you

23 about.

24      A.    I understand.  I'm doing my best here to

25 remember everybody I spoke to.  I don't have --

EXHIBIT A

Paz, Brittany                    02-14-2022

1   right?

2        A.    When you say multiple, I don't -- I don't

3   know --

4        Q.    I didn't --

5        A.    -- how many you're referring to.  But I don't

6   know how -- I don't think that there are a lot of

7   videos specifically naming Neil Heslin.

8        Q.    Okay.  Well, let's just go with two.

9        A.    Sure.

10       Q.    All right?  Let's talk about the two that

11  they're being sued for.

12       A.    Yes.

13       Q.    You know those two videos exist?

14       A.    I do.

15       Q.    You know there are sources of information

16  about Neil Heslin in those videos?

17       A.    Yes.

18       Q.    Where did it come from?

19       A.    You mean where were they sourced from?

20       Q.    Yeah.  I want to know every piece of

21  information about Neil Heslin that the company put on

22  air.  Where did it come from?

23       A.    I know that Owen Shroyer's video was

24  specifically sourced from that article.  I believe it

25  was from Zero Hedge.  So that was a source of that

EXHIBIT A

Paz, Brittany                    02-14-2022

84

1  it accumulates articles from all kinds of different

2  sources.  So it's -- it's an accumulator.

3      Q.   All right.  So who wrote the article on Zero

4  Hedge?  Where does it come from?

5      A.   That article --

6      Q.   Uh-huh.

7      A.   -- I believe, was originally sourced from

8  iBankCoin.

9      Q.   Well, the article is written by Zero Point

10 Now.  Do you know what that is?

11     A.   No.

12     Q.   Okay.  Does the company contend that

13 Mr. Heslin is a gun regulation advocate?

14     A.   At what point in time?

15     Q.   Any time.

16     A.   I'm -- I'm not really sure how to answer

17 that.

18     Q.   Okay.  Okay.  So the company does not know if

19 Mr. Heslin is a gun control advocate, gun regulation --

20     A.   I'm not sure as I sit here today, no.

21     Q.   Okay.  So if that is knowledge the company

22 has about the plaintiff, you wouldn't be prepared to

23 speak about it today?

24     A.   Right.

25     Q.   Okay.  Got you.  Are there any people from

EXHIBIT A

Paz, Brittany                                    02-14-2022

1   whom the company received information about Scarlett

2   Lewis?

3        A.   I'm sorry, can you repeat that?

4        Q.   Yeah.  Are there any people from whom the

5   company received information about Scarlett Lewis?

6        A.   I don't know.  Do you have a document that

7   you could show me?

8        Q.   I -- no.  I -- I -- I mean, part of it is

9   because I want to know what I haven't been shown.

10  Because this -- this company has not at all cooperated

11  in good faith in discovery.  So part of the reason I

12  have you here is for you to tell me.  So has -- is

13  there anybody the company's gotten information about

14  Scarlett Lewis?

15       A.   I don't know.  If you could show me a

16  document, that would be helpful.

17       Q.   Well --

18       A.   But as far as my communications with people

19  in the company and what I've done, my due diligence to

20  testify here today, nobody has -- is aware of any aside

21  from what's been produced.

22       Q.   Well, what do you mean, aside from what's

23  been produced?

24       A.   If there's --

25       Q.   What has been produced?

EXHIBIT A

Paz, Brittany                  02-14-2022

86

1      A.    If there's anything that's been produced.  I
2  don't think that there's anything regarding Ms. Lewis.
3      Q.    Okay.
4      A.    I have not -- I don't think I've seen
5  anything.
6      Q.    Let me -- let's go back.  Part of your job
7  today was to get prepared on the company's knowledge of
8  the plaintiff.
9      A.    Right.
10     Q.    Do you feel like you've done that for
11  Scarlett Lewis?
12     A.    I feel like I have asked the employees what,
13  if anything, they had for the plaintiffs.  And their
14  response to me was that they didn't have anything.
15     Q.    Okay.  Have you read every document with
16  Scarlett's name on it?
17     A.    I did a search --
18     Q.    Okay.
19     A.    -- in the Dropbox material that we have.
20     Q.    That's not what I'm asking, though.  Did you
21  read every document with Scarlett Lewis' name on it?
22     A.    I don't know that I've read every single
23  document.
24     Q.    Okay.  So you'll -- you'll concede to me
25  sitting here today, there are -- there are -- there are

**EXHIBIT A**

Paz, Brittany                    02-14-2022

87

1  possibly documents in this case that have even been

2  produced that have Scarlett's name on them that you may

3  have not read, that's what you're telling me?

4        A.    Perhaps.

5        Q.    Okay.  So in other words, when you did a

6  search of documents for Scarlett Lewis, were you

7  searching the entire production?  Did you have a

8  capability to search the entire production?

9        A.    I have a capability of searching the

10  production on our Dropbox.  I -- I can -- I understand

11  that there have been some issues regarding the various

12  attorneys and what's been produced where.  But it's my

13  understanding that from the company's perspective,

14  we've not ever used Ms. Lewis' name on the air.

15        Q.    Oh, I don't doubt that, no.

16        A.    So we don't have -- when I asked people what,

17  if anything, they have -- have or produced on

18  Ms. Lewis, and if they told me that they don't have

19  anything, that makes sense to me because I don't think

20  they've ever used her name.

21        Q.    Wouldn't it not make sense to you, though,

22  after you read Ms. Karpova's deposition and you saw

23  e-mails from Wolfgang Halbig directly harassing

24  Ms. Lewis?  Wouldn't--

25        A.    I think --

EXHIBIT A

Paz, Brittany                          02-14-2022

1      Q.    Wouldn't you think then, oh, maybe there are

2   documents with Ms. Lewis' name on them?

3      A.    I mean, there may very well be missed

4   documents, but that doesn't mean that it was in the

5   company's knowledge.  Many of those documents, after a

6   certain point, were not being opened.

7      Q.    Okay.  So from your standpoint, because you

8   don't know whether certain documents were opened or

9   not, you just ignored them?

10      A.    No, that's not correct.

11      Q.    Okay.  So you knew the -- the company

12   possessed documents with Scarlett Lewis' name on them;

13   right?  You knew that?

14      A.    Sure, there's some e-mails.  But I don't know

15   whether they were ever in the company's knowledge as

16   far as information that was provided by an outside

17   source.  Mr. Halbig -- I know Mr. Halbig has sent a

18   variety of e-mails and copied numerous, numerous

19   people.

20            They read like spam.  And when I talk to

21   various employees, their position is at a certain

22   point, they stopped opening his e-mails.

23      Q.    Wonderful.  When you say it's -- you're not

24   sure if the documents we talked about in Ms. Karpova's

25   deposition are in the company's knowledge, they're in

EXHIBIT A

Paz, Brittany                          02-14-2022

89

1    the company's knowledge now, aren't they?

2          A.    Now, they are, yeah.

3          Q.    Right.  Okay.  So when I served you a notice

4    of deposition for the company's knowledge of the

5    plaintiffs, did you see a time limitation on that?

6          A.    No.  I've reviewed a lot of e-mails.

7          Q.    Okay.

8          A.    I've seen some of the e-mails you're

9    referring to.  You mean the, like, the e-mails from

10   Halbig to Ms. Lewis, Halbig to various other victims in

11   the Sandy Hook --

12         Q.    Right.

13         A.    -- massacre?  I've seen those e-mails.

14         Q.    That's -- okay.  So going forward in this

15   deposition, when I ask you stuff like, can you tell me

16   the people who have provided information that now

17   consist of the knowledge that the company has about

18   this individual like Ms. Lewis --

19         A.    Uh-huh.

20         Q.    -- I -- I want you to tell me about documents

21   like that that you know about instead of telling me

22   that there aren't any documents.  All right?  What I

23   want to know is other than Mr. Halbig, then, because

24   you've seen that one now?

25         A.    Uh-huh.

**EXHIBIT A**

Paz, Brittany                    02-14-2022

90

1      Q.    Where has the company gotten information
2  about Scarlett Lewis?

3      A.    As far as what's been -- what -- I guess I --
4  I don't understand the question.  So when you say where
5  we have gotten information from Scarlett Lewis, you
6  mean is this information that we have sourced on her?
7  Like, we've gone out into the world to try to find, or
8  this is just information that people are giving us at
9  any point in time?

10     Q.    Let's -- let's talk about what knowledge
11 means just for a minute.  Because I want to make sure
12 you understand what this topic means.  When this is the
13 -- the company's knowledge about the plaintiffs, you
14 would agree with me that there's various ways that a
15 company can acquire knowledge about an individual?

16     A.    Sure.

17     Q.    They can go get that knowledge and go out
18 and, like, go to the library and start looking stuff
19 up; right?

20     A.    Sure.

21     Q.    Somebody can send in an e-mail?

22     A.    Sure.

23     Q.    Somebody can watch a video?

24     A.    You mean if I went out and I -- and I saw a
25 video and then I brought -- and I was, like, okay.

EXHIBIT A

Paz, Brittany                    02-14-2022

1   Here's a video of Ms. Lewis --

2        Q.   Sure.

3        A.   -- here's a video of Ms. Heslin?  Sure.

4        Q.   Yeah.  The company -- somebody outside the

5   company could have a phone call with the company and

6   tell them something about Ms. Lewis?

7        A.   Sure.

8        Q.   Tons of different ways we can get information

9   about Ms. Lewis.

10       A.   Sure.

11       Q.   I want to know about all of them.

12       A.   Okay.

13       Q.   So when I say, where did the company get any

14  information that it currently possesses about Ms. Lewis

15  and any knowledge that it has about Ms. Lewis, I want

16  to know everybody.  Where did it get that information?

17       A.   Aside from what we see in the e-mails, I

18  think that the company only has information that has

19  been provided to them through outside sources.  But

20  like I said, I don't know that anybody really paid any

21  attention to it.

22       Q.   Okay.  Outside what we see in the e-mails,

23  what do we see in the e-mails?

24       A.   The e-mails that we were talking about

25  earlier about Mr. Halbig sending her e-mails.  Aside

Paz, Brittany                02-14-2022

1  from that, I don't think the company did any research

2  into Ms. Lewis.

3       Q.   I'm not asking if they did research.  We just

4  talked about that.

5       A.   Uh-huh.

6       Q.   We literally just talked about that.  I'm

7  asking, any other individuals other than Mr. Halbig has

8  ever given the company any information?

9       A.   I don't know how to answer that, sir.  Random

10 people could have sent the e-mails into the e-mail

11 server.

12      Q.   Absolutely, they could have.

13      A.   Random people from all over the world could

14 have done that.

15      Q.   They absolutely could have.

16      A.   And I don't know the -- I don't know how to

17 answer that.

18      Q.   But the company does?

19      A.   I can't manage -- I -- the company cannot

20 name every -- a name, specific names of the people who

21 have sent e-mails.

22      Q.   Why not?  Why can't it do that?

23      A.   Why can't I here tell you of random names of

24 people that may have sent e-mails?

25      Q.   Sure.  You could have written them down,

EXHIBIT A

Paz, Brittany                    02-14-2022

1   couldn't you?  It's not -- it's not physically

2   impossible at all, is it?

3          A.   I did not do that.

4          Q.   Okay.  You see what I've marked as Exhibit 3?

5               (Exhibit No. 3 marked.)

6          A.   Yes.

7          Q.   (BY MR. BANKSTON)  You see it has FSSTX04 --

8   I'm sorry.  043896?

9          A.   Yes.

10         Q.   Okay.  That's a company that's been produced

11  out of the company's corporate files?

12         A.   It appears to be.

13         Q.   Why does the company have this?  What is

14  this?

15         A.   I don't know.

16         Q.   Okay.  This is -- do you know who this is

17  pictures of?

18         A.   No.

19         Q.   Okay.  That's -- that's Scarlett Lewis.  Do

20  you recognize where this top picture was taken?  Do you

21  understand what this picture is?

22         A.   You mean the top right-hand corner?

23         Q.   I'm sorry, no.  In the top left.

24         A.   The top left-hand corner?

25         Q.   Uh-huh.  Do you know where that's taken?

EXHIBIT A

Paz, Brittany                    02-14-2022

94

1      A.    No, sir.

2      Q.    Okay.

3      A.    I don't know how the company came into

4   possession of this.

5      Q.    Do you know about the -- about Scarlett Lewis

6   and the coffee?  Do you understand what I mean when

7   I talk about Scarlett Lewis and the coffee?

8      A.    I believe that I read somewhere that there

9   was something about Ms. Lewis or someone connected to

10  Ms. Lewis going to get coffee for some people that were

11  on scene of the shooting that day.

12     Q.    All right.  So that's some knowledge that

13  somebody gave the company about Ms. Lewis; right?  Or

14  at least that it thinks that it has about Ms. Lewis;

15  right?

16     A.    I think that that was in the news cycle

17  around that time.  So --

18     Q.    Okay.

19     A.    -- I think that that's what the source of

20  that information was.

21     Q.    Maybe it could be the e-mail where Wolfgang

22  Halbig was harassing Ms. Lewis.  Could it maybe be

23  that?

24     A.    Like I said, I don't know that anybody had

25  ever read that e-mail.

EXHIBIT A

Paz, Brittany                    02-14-2022

95

1    Q.   Did you check?

2    A.   Did I check about that specific e-mail?

3    Q.   Uh-huh.

4    A.   No.

5    Q.   Okay.

6    A.   Generally --

7    Q.   So in terms of whether the company was aware

8  that Wolfgang Halbig was harassing Ms. Lewis, you don't

9  know?

10    A.   As far as a time period, I know that after --

11  I'm sorry.  So let me just go back.  When I spoke to

12  Nico about Mr. Halbig and his communications with

13  Mr. Halbig, getting him on the show and things like

14  that, pretty much, he -- his point of view that he

15  stopped looking at Mr. Halbig's e-mails after he

16  stopped coming on the show.

17         So -- and then Rob Dew was reading the

18  generalized e-mail boxes for a period of time and then

19  stopped because it was taking up too much time.  So I

20  can't say after the time period he stopped appearing on

21  the show, whether anybody was reading his e-mails

22  anymore.

23    Q.   Do you -- and you can't say when he was

24  harassing Ms. Lewis, can you?

25    A.   I don't know that, no.

EXHIBIT A

Paz, Brittany                    02-14-2022

1      Q.   Okay.  So it very well could have been --
2   happened before he got on the show?

3      A.   I don't know.

4      Q.   Or during the time he was on the show?

5      A.   He was on the show for a pretty discrete
6   period of time.

7      Q.   What time do you think that is?

8      A.   He came into the company's purview in early
9   2014 and then he appeared on the show through mid to
10  late 2015.  And then he hadn't been on the show.

11     Q.   Okay.  And then the information that
12  Mr. Halbig gave the company, you understand that
13  Mr. Halbig gave the company various claims about Sandy
14  Hook that he said were true?

15     A.   You mean his 16 points?

16     Q.   A lot more than that, but sure.

17     A.   He keeps -- he adds to them periodically.
18  But if that's what you're referring to, yes, I'm aware
19  of them.

20     Q.   Okay.  And the company kept broadcasting that
21  well into 2017?

22     A.   I don't know that I would agree with the --
23  with broadcasting.  Can --

24     Q.   We'll talk about that later.

25     A.   Sure.

EXHIBIT A

Paz, Brittany                    02-14-2022

1      Q.   Okay.  Let's -- let's put a pin in what

2   InfoWars may have been doing in videos in 2017.  We'll

3   come back that.

4      A.   Sure.

5      Q.   Do you -- does the company contend Ms. Lewis

6   is a gun regulation advocate?

7      A.   I think Ms. Lewis operates a nonprofit

8   organization.  I believe I did read some material in

9   the disclosure in the discovery materials that she

10  operates a nonprofit for school safety.

11     Q.   Does it have anything to do with guns?

12     A.   I guess that depends on what guns -- what

13  school safety means.

14     Q.   And you don't know, do you?  You don't know

15  what the Jesse Lewis Choose Love Movement does or

16  advocates, do you?

17     A.   I don't know what she says it advocates for,

18  but I know that there are different interpretations as

19  to what school safety means.

20     Q.   Okay.  I just to want put this really clear,

21  because --

22     A.   Sure.

23     Q.   -- you seem to -- you seem to be trying to

24  insinuate that there's a potential interpretation of

25  Ms. Lewis' charity that it is gun regulation related in

EXHIBIT A

Paz, Brittany                    02-14-2022

98

1  some way.  Is that accurate?

2      A.   I don't know.  But what I'm saying is she

3  operates a nonprofit.  That nonprofit has a goal and a

4  stated directive.  And however anyone wants to

5  interpret that is a matter of opinion.  But she

6  operates a nonprofit charity.

7      Q.   I -- I get that.  Does the company contend

8  she's a gun regulation advocate?

9      A.   I guess that depends on someone's definition

10 of what school safety means.

11     Q.   That's why I'm asking what the company

12 contends.  Does the company contend that she is a gun

13 --

14     A.   She could be, depending on someone's opinion.

15     Q.   I'm not asking someone's opinion.  I'm asking

16 the company's opinion.  Does the company contend she's

17 a gun regulation advocate?

18     A.   She could be.

19     Q.   I'm not asking if she could or might be, who

20 knows, whatever, I don't want -- I want, does the

21 company contend that she is?

22     A.   In the opinion of individual people that work

23 for the company, she could be.  That's my response.

24     Q.   So they -- it does -- they don't know, is

25 what you're saying?

EXHIBIT A

Paz, Brittany                    02-14-2022

99

1    A.    That's not what I'm saying.

2    Q.    Well, could does not imply knowledge.

3    A.    What I'm saying is, is that there are

4   different people there that work there that have their

5   own individual opinions.  And the company -- the

6   company isn't a person; right?  So --

7    Q.    It needs to have opinions, though.  And you

8   need to testify to it.

9    A.    That's a murky area.  And the reason why I

10   think that's a murky area is because these are

11   individuals.  They have their own specific opinions.

12   Everybody's opinions are different.  Like, so for

13   example, there are people within the company that are

14   way more into or have bigger or -- I don't want to say

15   bigger opinions, but have more opinions on Sandy Hook

16   than others; right?

17         So we could agree that one person employee at

18   the company may not be as interested as somebody else

19   in the company.

20    Q.    Okay.

21    A.    One person may want to cover a certain angle

22   of Sandy Hook that another person may not want to

23   cover.  That is within their discretion and their

24   opinions as writers and as hosts.

25    Q.    Sure.

EXHIBIT A

Paz, Brittany                    02-14-2022

1      A.   So, I mean, personally, am I sitting here
2   today saying that she's a gun control advocate?  No.
3   But what I'm saying is I think that the hosts and
4   writers at InfoWars in their opinion could interpret
5   that as being gun control advocacy.

6      Q.   Do they?

7      A.   Individually, as individual writers and
8   individual hosts?  I can't testify as to what they
9   think.

10     Q.   All right.  Let's just testify, then, to what
11  the company thinks.

12     A.   Sure.

13     Q.   Is she a gun control advocate?  Does -- does
14  the company contend that?  Before you answer that, you
15  understand I'm going to trial.  I need to discover what
16  the company is or is not going to argue about these
17  plaintiffs.  What knowledge it has, what its
18  contentions are.

19          I think it's fair, don't you think, that if
20  the company is going to contend Scarlett Lewis is a gun
21  advocate, I get to know that; right?

22     A.   I think it is a reasonable interpretation of
23  the nonprofit that she could be a gun control advocate.
24  And if a host or a writer wanted to argue that from
25  that angle, I think it's a reasonable interpretation of

**EXHIBIT A**

Paz, Brittany                    02-14-2022

1  that activity.

2      Q.   Of -- of the activity of her charity?

3      A.   Yes.

4      Q.   Teaching emotional intelligence to children

5  in schools?

6      A.   If that's what it does.

7      Q.   Okay.  So first of all, let's start here.

8  You have no idea what Ms. Scarlett Lewis' charity does;

9  right?

10     A.   I have not done any independent research on

11 her charity.

12     Q.   Okay.  So in terms of asking what the company

13 contends Ms. Scarlett Lewis does with her charity, in

14 terms of what its advocacy is, company has no

15 information; right?

16     A.   I know what she says it does.

17     Q.   Okay.  What does the company know that

18 Ms. Lewis says it does?

19     A.   What she says it does is advocate for --

20 advocate for safe space for children to express

21 themselves emotionally.

22     Q.   Okay.  How could that be gun control

23 advocacy?

24     A.   Like I said, it depends on the opinion of the

25 person.

**EXHIBIT A**

Paz, Brittany                    02-14-2022

1    Q.   And you were the one who said it could be.

2    A.   It could be.

3    Q.   So tell me -- tell me how.

4    A.   How -- how can school safety be construed as

5  gun control advocacy?

6    Q.   Teaching children emotional things.  How does

7  that --

8    A.   If that's in fact what it does, I don't know.

9    Q.   You're the one who just told me --

10   A.   No.

11   Q.   -- that you said that --

12   A.   What I --

13   Q.   -- that's what she did.

14   A.   What I told you, that is what she says her

15  company does.  I don't know whether that is an actual

16  statement of fact.

17   Q.   There might be something surreptitious that

18  Scarlett Lewis is actually after?  She might not be

19  telling the truth about what her charity -- that's the

20  point?

21   A.   I don't know.  I haven't done any research

22  into her company.

23   Q.   Right.  Okay.  Okay.  Got you.  Got you.

24  Now, I get it.  I'm sorry.  I was -- I was having

25  trouble because I was thinking that the company's

EXHIBIT A

22-01023-tmd Doc#1-18 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 96 of 183

Paz, Brittany                    02-14-2022

103

1   knowledge about what Ms. Lewis does, you were taking

2   Ms. Lewis at her word.  But because the company can't

3   verify that and has done nothing to verify that, you

4   can't say?

5        A.   That's right.

6        Q.   Got you.  All right.

7        A.   Is this a good time for --

8        Q.   Yeah, you can get a --

9        A.   Oh, you have water.  Oh, no.  I'm just -- I

10  would just like another water.

11                 MS. BLOTT:  Can we take a --

12       Q.   (BY MR. BANKSTON)  Yeah, you need a -- well,

13  hold on.

14       A.   Yeah.  Can we take a -- a potty break too,

15  because --

16       Q.   Yeah, because we got a good -- we -- this --

17  this will work.

18       A.   Is this a good break?

19       Q.   This is fine, yeah.  I had a few things I

20  wanted to ask you, but I'm not going to push them.

21                 THE VIDEOGRAPHER:  10:38 off the

22  record.

23                 (Recess from 10:38 a.m. to 10:50 a.m.)

24                 THE VIDEOGRAPHER:  We are on the

25  record at 10:49.

**EXHIBIT A**

Paz, Brittany                     02-14-2022

104

1       Q.   (BY MR. BANKSTON)  Ms. Lewis' charity, the

2   Jesse Love -- excuse me.  Ms. Lewis' charity, the Jesse

3   Lewis Choose Love Movement, did you review any

4   documents about that organization?

5       A.   No.

6       Q.   Okay.  Well, let me -- okay.  When I talk

7   about H-O-N-R --

8       A.   Yes.

9       Q.   -- HONR.  You know what that is?

10      A.   Yes.

11      Q.   What does the company -- what does the

12  company believe that is?

13      A.   I believe that's a company that is run by

14  Mr. Pozner.  And the goal of that company is to take --

15  what it believes is misinformation off of the Internet.

16      Q.   Okay.  Let me just correct you going forward.

17  Just so you'll know going forward, it's Pozner.

18  Mr. Pozner.

19      A.   Okay.

20      Q.   Okay.  The company agrees that it has

21  publicized information about Mr. Pozner and HONR;

22  right?

23      A.   About Mr. Pozner individually, or --

24      Q.   Sure.  And HONR.  Both of them.

25      A.   I agree that the company has published

EXHIBIT A

105

1 information about HONR and it may be Mr. Pozner in

2 connection with his relationship with HONR.

3      Q.   Well, it's published things from Mr. Pozner;

4 right?  Not HONR.  Like Mr. Pozner's e-mail address,

5 he's put that on air; right?

6      A.   As far as its connection to HONR, I believe

7 so, yes.

8      Q.   No, lenpozner@gmail.com.

9      A.   You mean his personal e-mail address?

10      Q.   Uh-huh.

11      A.   Perhaps, I'm not sure.

12      Q.   Well, you've watched that episode; right?

13 You know what I'm talking about?

14      A.   Yes.

15      Q.   Okay.  The company agrees its employees

16 researched business filings related to Mr. Pozner?

17      A.   Are you referring to a background check?

18      Q.   No.

19      A.   Okay.  I don't know that there was any

20 independent research done as far as the company.  I

21 know that there was a discussion about the P.O.box at

22 U-Haul that was associated with the company.  I don't

23 -- I don't remember seeing any records relating to the

24 filings of the company.

25      Q.   You've read all the articles that were

EXHIBIT A

106

1  produced; right?  You taught me that?

2      A.   Yes, I've read -- I've read the articles.

3      Q.   So you've read the articles the company wrote

4  about Leonard Pozner?

5      A.   Yes.

6      Q.   Okay.  And in those -- in those -- there's

7  article that links to his business filing; right?

8      A.   Okay.  I don't remember.

9      Q.   You wouldn't dispute that, though?  You don't

10  know what I'm talking about?

11      A.   I don't remember.

12      Q.   Okay.  You understand what I mean when I talk

13  about Independent Media Solidarity?

14      A.   Yes.

15      Q.   Okay.  Can you describe to me what

16  Independent Media -- Independent Media Solidarity,

17  sometimes called IMS, can you describe to me what that

18  is?

19      A.   I'm aware that there was a documentary that

20  was produced by that company.  I don't know if I would

21  call them a company, but they're a loosely collected

22  group of individuals that produced a documentary about

23  Sandy Hook.  I believe that was sometime in early 2014.

24  And then that Rob Dew, I think, did a -- did a show

25  interviewing anonymously the people that were involved

EXHIBIT A

Paz, Brittany                    02-14-2022

107

1   in that production.

2       Q.   Okay.  That film, just for your reference,

3   that's We Need to Talk About Sandy Hook.

4       A.   Yes.

5       Q.   Okay.  And you've read the articles about

6   that film?

7       A.   Yes.

8       Q.   Okay.  You understand that that's the source

9   of the controversy between Mr. Pozner and -- and the

10  company in terms of YouTube strikes?

11      A.   Sure.

12      Q.   Okay.  You would agree with me that it

13  regards the sourcing of the videos in plaintiffs'

14  petition, IMS was a source for some of InfoWars' Sandy

15  Hook coverage?

16      A.   Which videos?

17      Q.   You tell me.  Any of them, were they a source

18  for any of them?

19      A.   No.  I think the only real source for the

20  video -- any of the videos was that -- that video that

21  Rob Dew did interviewing Independent Media Solidarity.

22      Q.   All right.  Well, you know the video we were

23  talking about with the PO box and the addresses?

24      A.   Sure.

25      Q.   Okay.  They're on that video too; right?

EXHIBIT A

Paz, Brittany                    02-14-2022

108

1      A.    Who, Independent Media Solidarity?

2      Q.    Uh-huh.  Yeah, guests.

3      A.    They were guests on that video?

4      Q.    Uh-huh.

5      A.    I don't recall, I'm sorry.

6      Q.    Giving out information about Mr. Pozner, you

7  don't remember that?

8      A.    That IMS did?

9      Q.    Uh-huh.

10     A.    I don't recall.

11     Q.    Okay.  So I take it you haven't tried to talk

12  to those people?

13     A.    No, I did not.

14     Q.    All right.

15     A.    Those people are not associated with the

16  company.

17     Q.    I get that.  I -- believe me, I understand

18  that.  What I'm saying is those people -- let's put it

19  this way.  If those people were quoted in the February

20  12th, 2015 video that's in plaintiffs' petition, if

21  that is the case that they are quoted in there and

22  talking there and provide information about Mr. Pozner,

23  whatever they had to say, you -- you don't know right

24  now; right?

25     A.    No, I don't know.

EXHIBIT A

Paz, Brittany                    02-14-2022

109

1      Q.   Okay.

2      A.   I mean, whatever they had to say, that was

3   their sourcing.  So we were just reporting on their

4   sourcing.

5      Q.   I get it.  Okay.  So in terms -- so if those

6   people are quoted and appeared and talked and gave

7   information about Mr. Pozner in the February 12th, 2015

8   video, one thing we can agree with is you haven't

9   spoken, then, to everybody who was quoted in that video

10  if they did appear; right?

11     A.   No, I didn't talk to the people quoted in the

12  video.

13     Q.   Okay.  You're familiar, then -- the article

14  I'm actually referring to, maybe this will help us with

15  our timeline.  You had said early 2014.  I actually

16  know there's a December 9th, 2014 article called

17  Internet Censors the Viral Sandy Hook Truth

18  Documentary.  So would you agree with me that this is

19  probably the end of 2014?

20     A.   2024 or 2015?  I'm sorry.

21     Q.   2014.  Right, that's when the video was

22  hosted by InfoWars?

23     A.   I can check my notes on that, but I thought

24  it was in the beginning of 2014, Rob Dew did a We Need

25  to Talk About Sandy Hook segment, which was the title

EXHIBIT A

Paz, Brittany                    02-14-2022

110

1  of the documentary.

2      Q.   Maybe on the next break, check your notes to

3  refresh your timeline.

4      A.   Sure.  Sure.

5      Q.   Because it was December 9th, 2014.

6      A.   Okay.

7      Q.   And you -- you have an awareness that the

8  company actually hosted that video for distribution;

9  right?

10     A.   What do you mean by hosted it for

11 distribution?

12     Q.   Like, it has a YouTube channel, company does;

13 right?

14     A.   It did.

15     Q.   Okay.  And at that time, the company hosted

16 that video?

17     A.   You mean it --

18                MS. BLOTT:  I apologize.  The company,

19 are you talking about Free Speech Systems, or --

20                MR. BANKSTON:  What other company

21 would I be talking about?  She's here to testify for

22 them.  Yes, I'm talking about Free Speech Systems.

23                MS. BLOTT:  Thank you.

24     A.   So you mean it republished the documentary on

25 our YouTube channel?

EXHIBIT A

Paz, Brittany                          02-14-2022

111

1      Q.    (BY MR. BANKSTON)   I'm saying, yeah, it was

2   --

3      A.    Is that what you mean?

4      Q.    I mean, it was a source for distribution was

5   that it was hosted on the InfoWars YouTube page;

6   correct?   I mean --

7      A.    I know that there were links to -- and -- and

8   this is common whenever the company covers a story or

9   pieces of information, that what they will do is will

10  link to that source.   So that makes sense that it would

11  be linked to our articles, it would be -- it would have

12  been published in Mr. Dew's broadcast to show them, the

13  viewership, the source of the material.   So --

14     Q.    That's not what I mean, actually.

15     A.    Okay.

16     Q.    What I mean is that Independent Media

17  Solidarity was having some trouble keeping its video up

18  online.   And InfoWars agreed to distribute and host the

19  video on its own YouTube page.   Do you understand that?

20     A.    I don't know that.

21     Q.    Okay.   And that was the first copyright

22  strike that Mr. Pozner got against the company.   That

23  was -- that was where that all started.   You didn't

24  understand that that was the first YouTube strike?

25     A.    I understand that that is an issue that he's

EXHIBIT A

Paz, Brittany                     02-14-2022

112

1  raised in his petition.  But what I guess I'm having a

2  problem with is the terminology you're using, is

3  agreeing to host it.  So what the company does is takes

4  a piece of information that is in the media and it will

5  see what is newsworthy.

6             And the position, or in the case of

7  Independent Media Solidarity, this video had been

8  viewed many millions of times and it came to the

9  company's attention because of how many views it was

10 getting.  And so that's how it came into the purview of

11 the company to begin with.

12            And then once it comes into the company's

13 purview, what will happen is they will want, you know,

14 whoever, whatever host it was, in this case, it was Rob

15 Dew, will want to do a segment on it.  And then will

16 publish how to get access to the information to the

17 viewership.  So that's the only problem I'm having is

18 just your terminology.

19       Q.   Saying hosting?

20       A.   Yes.

21       Q.   All right.  Okay.  Got you.  Definitely got

22 you.  All right.  So what I want to do is I want to

23 show you a document.  But unfortunately, the way it's

24 been produced makes it pretty unreadable on this page.

25 So I'm going to enter this into the record and then I'm

EXHIBIT A

Paz, Brittany                    02-14-2022

113

1   going to show it to you electronically.  Do you

2   understand what I mean?

3       A.  Yes.

4       Q.  You see, because here's an article.  And

5   unless you've got a really good magnifying glass, you

6   are not going to be able to read this.

7       A.  I'm not going to be able to see it.

8       Q.  Okay.  So what we're going to do is we're

9   going to put this in the record and then hopefully,

10  we're going to be able to get to the court reporter a

11  much more readable copy of this.  But luckily, this is

12  a video that -- I mean, an article that's produced that

13  we all have.

14          So here's the copy.  You'll be able to see

15  the headline.  And I just want to show you just the

16  beginning of this article.  So first, I'm going to mark

17  this as Exhibit 4.  And can you look at that and you

18  can see the headline, right, you can read that part of

19  it?

20          (Exhibit No. 4 marked.)

21      A.  Yes, I can see the headline.

22      Q.  (BY MR. BANKSTON)  Okay.  Okay.  And that

23  headline is Internet Censors Viral Sandy Hook Truth

24  Documentary?

25      A.  Yes.

EXHIBIT A

Paz, Brittany                    02-14-2022

114

1        Q.    Okay.  Now, I'm going to show this to you
2    electronically and I'm going to give you my screen here
3    because it's a touch screen, so you can just scroll it.
4    Okay?  And I'm just going to come over here so I can
5    show it to you.  And you see this is the same article?
6        A.    Yes.
7        Q.    Okay.  Now, what I want to show you here is
8    if we go down here, and I want to read these first few
9    paragraphs.  And I'm going to read these to you.  Okay?
10   And you can tell me if I read them correctly.  "Last
11   Monday, an organization known as the Independent Media
12   Solidarity released an epic documentary entitled We
13   Need to Talk About Sandy Hook, which they hosted on
14   their own site, as well as YouTube.
15              Within hours of the video's upload, it was
16   well on its way to going viral.  However, its success
17   was short-lived.  Shortly after InfoWars began hosting
18   the video, the following Tuesday morning, it was
19   suddenly removed from YouTube due to a copyright claim
20   by Lenny Pozner."  I read all that correctly?
21       A.    Yes.
22       Q.    All right.  So while you may have a problem
23   with my terminology of InfoWars hosting the video,
24   InfoWars doesn't have a problem with that terminology;
25   correct?

EXHIBIT A

115

1      A.    So this article was written by Mr. Salazar.

2      Q.    Okay.

3      A.    So Mr. Salazar, that's the terminology that

4  he used.  I don't know that the company would

5  necessarily endorse that terminology, but --

6      Q.    Well, it published this, didn't it?

7      A.    It did publish this, yes.

8      Q.    Okay.  So I want to read a little more of

9  this article.  Okay?

10     A.    Sure.

11     Q.    And I want -- right here, we have some areas.

12  And you see how there's some highlighted areas?

13     A.    Yes.

14     Q.    Okay.  What it basically is, is that any time

15  that there's a highlighted area in a sentence, that I

16  would like you to stop at the end of the highlight

17  because I want to ask you a question about it.  But do

18  you think you could read us what we see here in the

19  article right there?

20     A.    Just the highlighted portions?

21     Q.    No, no.  Actually, go through the whole part.

22  But just at the end of the highlighted portions, if you

23  can stop, because I'm going to want to ask you a

24  question.

25     A.    "Pozner is reportedly the parent of one of

EXHIBIT A

Paz, Brittany                    02-14-2022

116

1  the children supposedly killed at Sandy Hook and is an

2  outspoken critic of people who claim the shooting to be

3  a staged event.  It is..." -- oh, you want me to stop.

4       Q.   Yeah.  So that first sentence there where it

5  says that Pozner is reportedly a parent of a child who

6  supposedly died at Sandy Hook.

7       A.   Yes.

8       Q.   Company now admits there's no reason to say

9  that?  He is a parent of a child who died at Sandy

10 Hook?

11      A.   That's correct.

12      Q.   Okay.  Can you keep going through the article

13 here.

14      A.   "It is noted in the documentary that he is

15 also the chairman and CEO of Traxware, a company that

16 specializes in the removal of Internet slander,

17 Internet defamation, mug shots, defamations of

18 character, and online public records.

19           This guy's -- quote, this guy's company would

20 come in handy to any Sandy Hook hoax perpetrators with

21 prior convictions, YouTube researcher MrStosh314 states

22 in the film.  Quote, he would ultimately remove any

23 negative associations from the Internet.

24           Could he be hanging around online bloggers

25 and researchers for the purpose of protecting the Sandy

EXHIBIT A

Paz, Brittany                    02-14-2022

117

1   Hook parents, end quote."

2       Q.   Okay.  And in that section right there where

3   it's talking about Mr. Pozner's business; right?  And

4   -- and how he could be helping Sandy Hook hoax

5   perpetrators; right?  The company admits that that was

6   reckless speculation it was publishing; correct?

7            It was publishing this person's reckless

8   speculation?  Does the company agree with that or not?

9       A.   No, that looks like that person's opinion.

10      Q.   Correct.  And the company was publishing;

11  right?  That?  Chose to publish that?

12      A.   He's -- he's quoting someone else's opinion.

13      Q.   Correct.  That person's opinion that he is

14  quoting and that the company decided to publish and

15  give to its viewers, the company now admits that that

16  opinion was reckless speculation?

17      A.   No.

18      Q.   Does it admit that or not?

19      A.   No.

20      Q.   Okay.  The company does not believe that was

21  reckless speculation?

22      A.   No.

23      Q.   Okay.  Can you read the last part of it for

24  me, this last paragraph here.

25      A.   Sure.  "After InfoWars swapped out the video

EXHIBIT A

Paz, Brittany                    02-14-2022

1   for an alternate copy, the video was again pulled.

2   This time, quote, due to a copyright claim by HONR

3   Network."  There's a misspelling in there.

4            "End quote.  A group which seeks, quote, to

5   bring awareness to hoaxer activity and to criminally

6   and/or civilly prosecute those who wittingly and

7   publicly defame, harass, and emotionally abuse the

8   victim of high profile tragedies and/or their family

9   members, end quote.  HONR Network is apparently also

10  linked to Pozner."

11       Q.   Okay.  And then you see where it says, also

12  linked to Pozner, there's an Internet link there;

13  right?

14       A.   Apparently also is -- looks like a link.  The

15  words apparently and also.

16       Q.   I think, actually, if you just do this.

17       A.   Oh, okay.  The whole thing looks like a link.

18       Q.   Yeah.  Okay.  So there's a link there

19  directing their audience that says HONR is apparently

20  linked to Pozner; correct?

21       A.   I don't know where that link leads, though.

22       Q.   I don't either.  I was -- I was going to

23  know, like, I was -- that's what I wanted to ask you.

24  What -- what -- what information did the company have

25  about Mr. Pozner being linked to HONR?

EXHIBIT A

Paz, Brittany                    02-14-2022

1      A.   I don't know where that links to, so I don't

2   know how the answer --

3      Q.   Okay.  So when you saw this article and saw

4   that the company was disclosing information, not merely

5   about Mr. Pozner's personal business, but about the

6   nonprofit charity front that he started to keep his

7   name out of things.

8           When you saw that they were disclosing that,

9   did you follow up on this in any way to figure out

10  where this came from?

11     A.   I don't know that that link links to personal

12  information about Mr. Pozner, so I can't answer that.

13     Q.   I don't either.  I -- I wish you could.

14     A.   I wish I could too.  But unfortunately, I

15  can't.

16     Q.   All right.  We'll move on to something else.

17     A.   Thank you.

18     Q.   You're not going to know that.  How does the

19  company today feel about the fact that it was

20  disclosing this kind of information about a Sandy Hook

21  parent to the public, to millions of people?  How does

22  it feel about that?

23     A.   I think that Mr. Pozner is an activist in

24  many ways.  I think that his -- his company is engaged

25  in political speech and I think his company is a public

EXHIBIT A

Paz, Brittany                          02-14-2022

120

1    company that could be commented on publicly.

2         Q.    What politics is -- what -- what do you mean,

3    politically?  What's the ideology of Mr. Pozner?

4         A.    Of Mr. -- of HONR?

5         Q.    Sure.

6         A.    The company's position is that he's engaged

7    in anti First Amendment activity.

8         Q.    Thank you.  Now, were there any

9    communications between Mr. Pozner and the company?

10        A.    I am aware that Mr. Pozner had reached out to

11   -- to the company and was responded to by someone who

12   works with Mr. Jones.

13        Q.    Wait.  Okay.  So when did that happen?

14        A.    Unfortunately, I don't recall the year.  But

15   I do recall that Mr. Pozner wrote an e-mail basically

16   expressing that he was at one time a fan of the show.

17   That he was upset as to the coverage of InfoWars about

18   the tragedy, and that he wanted to speak to Mr. Jones

19   directly.

20             And I think one of his assistants responded

21   directly to him saying, you know, Mr. Jones is really

22   sorry for your loss.  Will you be able to meet -- talk

23   to him at a specific time.  Mr. Pozner responded

24   saying, I don't want to go on the air.  And the

25   response to that was, no, Mr. Jones is available at

EXHIBIT A

Paz, Brittany                                                    02-14-2022

1   this time and I don't know that that conversation ever

2   happened.

3           But there was a discussion about trying to

4   get the two of them to connect on the phone.

5       Q.   Wow.  Okay.  I -- I haven't seen that.  I --

6   I've seen -- so I know about a 2013 e-mail, right, that

7   I thought you were talking about, which is Mr. Pozner

8   writing in and complaining.  And then Mr. Watson

9   replying to him saying, sir, we haven't done the whole

10  actors thing.

11      A.   I'm aware of that too.

12      Q.   We think the tragedy's very real.  And so

13  then you think there's another --

14      A.   There is another one.

15      Q.   -- there's -- there's -- there's -- trying to

16  set up a phone conference between Mr. Pozner and

17  Mr. Jones?

18      A.   Yes.

19      Q.   Okay.

20      A.   It was in the production that I read.

21      Q.   Okay.  And then do you think that that --

22  those series of communications there off that complaint

23  where Mr. Pozner said he was a fan and isn't anymore,

24  do you think that's the only communications the

25  company's had with him?

EXHIBIT A

Paz, Brittany                    02-14-2022

122

1        A.    I'm sure there are others.  That's the one

2   that I recall specifically.

3        Q.    All right.  Well, I'm trying to find out if

4   there are others.

5        A.    Okay.  That's the only e-mail I recall.  I

6   don't think that they ever touched base on the phone.

7   But there was a discussion back and forth about trying

8   to schedule one.

9        Q.    All right.  Years later, are there any other

10  communications with Mr. Pozner?

11       A.    I don't think so.

12       Q.    Okay.  What did you do to find that out?

13       A.    I reviewed the material that we already

14  discussed.  I spoke to Mr. Jones about it.  Mr. Jones

15  wasn't aware of any other direct communication that he

16  had with Mr. Pozner.  I talked to the other people that

17  we already spoke about.

18       Q.    So if the company in this case has produced

19  e-mails between Mr. Pozner and Rob Dew a couple years

20  later in 2015, that's not something you've seen?  Or

21  let me put it this way.

22       A.    I'm sorry, let me -- okay.

23       Q.    Let me pull that back.

24       A.    Sure.

25       Q.    If the company has produced documents from

EXHIBIT A

Paz, Brittany                    02-14-2022

123

1  2015 years later of Mr. Dew and Mr. Pozner

2  corresponding, you wouldn't be prepared to talk to me

3  about those today?

4      A.   I'm just trying to recall if I had seen

5  e-mails like that.  I don't recall.  If you have copies

6  of them, I'm happy to look at them.

7      Q.   Okay.

8      A.   I don't recall as I sit here right now.

9      Q.   Okay.  Mr. Pozner started all of this by

10  privately complaining to InfoWars; right?

11     A.   He did.

12     Q.   He was polite about it, wasn't he?

13     A.   I believe so.

14     Q.   Okay.  And then he complained again, this

15  time, to YouTube in 2014 regarding this documentary

16  we're talking about right here, right, the Sandy Hook

17  viral documentary that's talked about in that article;

18  right?

19     A.   I know he complained to YouTube.  He made a

20  copyright claim.

21     Q.   Okay.  And then that video came down; right?

22     A.   I believe so, yes.

23     Q.   Okay.  And you understand that the following

24  month, InfoWars wrote an article and made a video about

25  Noah Pozner.  Do you know about that?

EXHIBIT A

Paz, Brittany                    02-14-2022

124

```
1       A.    Which video are you talking about?

2       Q.    Yeah.  Do you -- so if I ask you about the

3  whole thing about Noah dying in Pakistan --

4       A.    Yes.

5       Q.    -- do you know what I'm talking about?

6       A.    Yes.

7       Q.    Okay.  So that was called Sandy Hook Victim

8  Dies Again In Pakistan; right?

9       A.    I believe again is in parentheses.

10      Q.    Sure.

11      A.    Yes.

12      Q.    Okay.  Well, let me do it this way just so we

13  can kind of, like, just, like, Sandy Hook Victim Dies,

14  and then there's a parenthesis, Again in Pakistan.

15      A.    Yes.

16      Q.    All right?  Okay.  The company can understand

17  why that headlining is very upsetting; right?

18      A.    To Mr. Pozner?

19      Q.    Sure.

20      A.    I can understand why that's upsetting to

21  Mr. Pozner.

22      Q.    You can understand why it's upsetting to me;

23  right?

24      A.    I can understand why it's upsetting.

25      Q.    You can understand why it's upsetting to
```

**EXHIBIT A**

Paz, Brittany                    02-14-2022

125

1  pretty much any decent person; right?

2       A.    I understand why it is upsetting.

3       Q.    Okay.  And the company understood that?

4       A.    I understand that.  The company understands

5  that now as we're sitting here, yes.

6       Q.    Okay.  Let's -- let's do that.  That's --

7  that's great.  I appreciate that the company

8  understands that sitting here now.  On January 2nd,

9  2015 when it published it, the company knew that that

10  would be upsetting?

11       A.    So to understand just how that -- how that

12  article came to be sourced and came to be, we could

13  talk a little bit -- I don't know if this is the time

14  you want to do that.  Talk a little bit about how that

15  the articles in general come to be.

16            But that article, I believe, was written by

17  Mr. Salazar.  And as I said, there are certain people

18  in the company that are more interested in this topic,

19  or at that time, more interested in this topic more

20  than others.  Mr. Salazar, I think, has made it clear

21  that he was one of the people that were more interested

22  than others.

23            The company's position was, you know, within

24  some loose parameters, write what you want to write.

25  You know, so they would go and source things from the

EXHIBIT A

Paz, Brittany                                    02-14-2022

126

1    current day's news.  This particular occasion,

2    Mr. Salazar viewed some footage of a -- I want to say

3    it was a protest in Pakistan following a school

4    shooting there.

5            And it was a BBC news correspondent article

6    with video that he linked to his article.  And that has

7    since been edited to take out the -- the section that

8    he was relying on regarding that particular claim.  But

9    more specifically, it was the reporter from BBC walking

10   past a wall of pictures.  I think you know what I'm

11   talking about, the wall of pictures.

12           And I don't -- I don't know if we want to

13   call him by his first name, but essentially, Noah's

14   photo was on that wall.  And that correspondent

15   represented that these were the victims of that

16   particular tragedy.  He also sourced that material from

17   some Facebook posts that were on the school's web --

18   Facebook page.  And from there, wrote that article.

19           So as far as the question goes, the title,

20   the reason why again is in parentheses is because of

21   the confusion or perhaps mistake that these other news

22   articles were -- these other news sources were making

23   as the representation of that particular photograph

24   being in Pakistan at that time.

25           I think that's why when I said it's in

EXHIBIT A

Paz, Brittany                          02-14-2022

127

1   parentheses, I think that's why it's in parentheses.

2         Q.   Okay.

3                      MR. BANKSTON:  Objection.

4   Nonresponsive.

5         Q.   (BY MR. BANKSTON)  Do you know what question

6   you were just answering?

7         A.   You asked me about the title and whether or

8   not the company knew at the time the title would be

9   upsetting.

10        Q.   Bingo.  Okay.  So can we get back to that.

11        A.   No, the company didn't know it would be

12  upsetting and I just explained the reason why.  Because

13  the reason it was in parentheses was to make sure that

14  it was understood, the purpose and the content and the

15  position the article was making at the time.

16        Q.   Okay.  Mr. Pozner had previously made the

17  company aware that these sorts of coverage was

18  upsetting to him; right?

19        A.   Yes.

20        Q.   Okay.  A month later -- so hold on.  And I

21  want to make sure I understand this.  Kind of the

22  position is here on this, Mr. Salazar was really

23  interested in Sandy Hook, basically able to publish

24  whatever you want.  So when we see Sandy Hook Victim

25  Dies Again in Pakistan, that's not Mr. Jones, that's

EXHIBIT A

Paz, Brittany                     02-14-2022

128

1   Mr. Salazar; right?

2       A.   Yes.

3       Q.   Okay.  Mr. Jones doesn't necessarily endorse

4   that, is what you're saying?

5       A.   That's correct.

6       Q.   Okay.  Great.  And you remember about a month

7   after that happened, that January video about Sandy

8   Hook Victim Dies Again in Pakistan, then a month later,

9   Mr. Jones made a video heavily about Mr. Pozner after

10  Mr. Pozner got that video removed.  Do you remember

11  that?

12      A.   If you could let me know which video we're

13  talking about.

14      Q.   Yeah.  That's February 12th, 2015.  It

15  doesn't have a title.  I was actually hoping maybe you

16  could tell me the title.

17      A.   Does it have a -- well, the company uses a

18  bunch of -- a combination of letters and numbers.  If

19  you could tell me the --

20      Q.   No, I don't know the -- the production --

21      A.   Okay.  What's the date?

22      Q.   February 12th, 2015.  To help you, it's the

23  video we've been talking about with the P.O. Box

24  address.

25      A.   Oh, you know what, that's -- I think I said

EXHIBIT A

Paz, Brittany                     02-14-2022

1  early on in that -- in our conversation that I wasn't

2  able -- I didn't see that video on the Dropbox.  I saw

3  the article, but I didn't see the video on the Dropbox.

4  I think we talked about that early on.

5        Q.   Wait, what -- what article?

6        A.   The article that talks about the U-Haul and

7  the map.  I'm pretty sure there was an article about

8  it.

9        Q.   You have an article about that?

10       A.   I thought there was an article.  I thought

11 I saw an article about it.  I thought we talked about

12 it.

13       Q.   Okay.

14       A.   But I don't think I saw that video.

15       Q.   That goes along with the February 12th, 2015

16 show?

17       A.   February 4th, you said?

18       Q.   12th.

19       A.   12th?  Yeah, I don't have that as been

20 reviewed by me.

21       Q.   Okay.

22       A.   The video.

23       Q.   All right.  Did you review --

24       A.   That's --

25       Q.   Okay.  So when you found out that you didn't

EXHIBIT A

130

1 have any documents about that video, I mean, I'm sorry.

2 When you found out that you didn't have that video to

3 review --

4        A.    Yeah.

5        Q.    -- did you go look for any documents about

6 that video?

7        A.    I did.  So that's why I said I'm pretty sure

8 I saw an article on it.

9        Q.    Okay.  No, I meant about the video, not maybe

10 an article.

11       A.    Oh, no.  I -- so I did try to reach out to --

12 we have somebody that is trying to help us find

13 documents.  So there's -- as you're aware, there's

14 various litigation in multiple states.  And various

15 things have been produced and I'm not really sure where

16 they were produced.

17             So I did try to -- we have -- we have or had

18 at one time a liaison trying to help me out with that.

19 I did ask him to try to find it for me and he wasn't

20 able to locate it.

21       Q.    Okay.

22             MR. BANKSTON:  I need to note for the

23 record that we have actually just been joined by my

24 co-counsel, William Ogden, also representing the

25 plaintiffs.

EXHIBIT A

Paz, Brittany                          02-14-2022

131

1        Q.    (BY MR. BANKSTON)  Ms. Paz, I have handed you
2   what I have marked as Exhibit 5.  I take it you've
3   never seen this document before; right?
4              (Exhibit No. 5 marked.)
5        A.    May I just have a minute?
6        Q.    (BY MR. BANKSTON)  Uh-huh.
7        A.    Oh, it's double-sided.  Okay.  No.
8   Specifically, this document -- no.  But I am aware that
9   the company does produce daily logs of the show.
10       Q.    Okay.  And -- and you didn't look at them?
11       A.    Not all of them.  There's a -- there -- we do
12  three three-hour -- two -- three three-hour segments.
13  So -- and they're all broken down into these -- these
14  -- these individual segments, which are then produced
15  into video clips.  So that would have been hundreds of
16  videos or hundreds of logs, so to speak.  But --
17       Q.    No, there's -- there's 20 -- there's 20 --
18  you would agree with me there is about 20 individual
19  videos identified in plaintiffs' petition of 20
20  different dates?
21       A.    Dates, right.  So there's about 40, 43, or 45
22  videos that I watched.  Each of --
23       Q.    All right.  That's not all of --
24       A.    Right.
25       Q.    -- the plaintiffs' petition, though; right?

**EXHIBIT A**

Paz, Brittany          02-14-2022

132

1     A.   No.  But the entire universe of Sandy Hook

2  videos --

3     Q.   Sure.

4     A.   -- is probably about 40, 43 videos, or 45

5  videos, something like that.

6     Q.   We're going to need to talk about what that

7  number is.  We'll talk about that later.

8     A.   Sure.

9     Q.   But when you discovered that you did not have

10 access to the February 12th, 2015 video, you did not go

11 get the daily show log for the February 12th, 2015

12 video; correct?

13    A.   No, I didn't -- I don't think I reviewed it.

14    Q.   Okay.  So you see how it has up here in giant

15 red letters, do not upload any video of show to

16 YouTube?

17    A.   Yes.

18    Q.   You can't tell me anything about that; right?

19    A.   I don't know why that's there.

20    Q.   Yeah.  I wanted to ask you about that, and

21 that's not something you can tell me?

22    A.   I don't know, unfortunately.  I'm sorry.

23    Q.   And so you wouldn't know who put that there?

24    A.   I -- I don't know.  I think that generally

25 speaking, just based on my conversations with -- with

EXHIBIT A

133

1    Daria --

2        Q.    Well, hold on.  Can I -- can I stop you

3    before you answer that question?

4        A.    I just know who produces these documents in

5    general.

6        Q.    Right.  But I want to caution you not to make

7    guesses or inferences based on--

8        A.    No, I don't know --

9        Q.    I want you to talk what you know.

10       A.    Right.  I don't know who produced this

11   specific video, but based on my conversations with

12   Daria, the assistant producers started producing these

13   -- these types of logs to make it easier to try to find

14   video clips later on.  Because she -- she said it's

15   like finding a needle in a haystack.

16            It was ultimately, you know, they were saved

17   on a drive, but there was no real way to search for

18   those clips.  And so, you know, if one of the hosts

19   said, hey, I want to find this clip.  Nobody would

20   really know on what day.  So they started producing

21   these logs to make that easier to see what -- what

22   people were talking about on a specific day.

23            But as far as which -- which producer

24   produced this, which assistant associate producer

25   produced this, I -- I don't know.

EXHIBIT A

Paz, Brittany                     02-14-2022

                                                          134

1        Q.    So you don't have any idea of -- of what

2    employees played what role in this show?

3        A.    I know a -- a producer would have produced

4    this, an associate producer would have produced this.

5        Q.    I'm sure.

6        A.    But I don't know --

7        Q.    I'm sure a producer would have been involved.

8        A.    Right.   Right.

9        Q.    Okay.   But my question is, you don't know

10   what employees played any particular roles in the

11   creation of this video?

12       A.    As far as this video?   So the video is just

13   looking -- looking at the document, I could tell you

14   who played a role in producing -- in the production of

15   the video.   So Alex Jones hosted it and Rob Dew and

16   David Knight were also cohosting it.

17       Q.    Right, I can read the document too.

18       A.    Right.   And then it's also citing to Adan

19   Salazar's article.

20       Q.    Sure.

21       A.    So --

22       Q.    But, I mean, in terms of who produced this,

23   we don't know?

24       A.    Produced the document or the show?

25       Q.    The show.

EXHIBIT A

Paz, Brittany                    02-14-2022

135

1        A.    I -- well, you mean the employees that were

2    working on that particular day?

3        Q.    Yeah.  I want to know who the producer is.

4    You don't know, do you?

5        A.    I could tell you who was working on this

6    particular day as a producer.

7        Q.    Is that, like, you have a document of that?

8        A.    I have -- I think you requested for us to try

9    to find out who was working on each particular day.

10       Q.    I know what I requested.  I'm asking --

11       A.    Right.

12       Q.    -- do you have a document of it?

13       A.    I think that we've -- we've made that

14   determination.

15       Q.    I don't know -- I don't -- I'm not asking if

16   you made a determination.  I'm asking, do you have a

17   document of that?

18       A.    I can -- if I could consult with counsel,

19   because I think that --

20       Q.    Hold on.  I don't want you to consult with

21   counsel about whether you should answer that question.

22       A.    I just don't have the list on me right now,

23   but I believe that we have a list of who was working on

24   the show on that particular day.

25       Q.    All right.  That's the same thing Ms. Karpova

EXHIBIT A

Paz, Brittany                    02-14-2022

136

1   told me, exact same thing.

2        A.    Okay.

3        Q.    And then she didn't have a list to give me.

4        A.    Okay.

5        Q.    Are you telling me right now --

6        A.    I think -- I think Attorney Blott's going in

7   her bag.  You want to mark it?

8        Q.    I do.  Okay.  I'm going to mark both -- we'll

9   put them together.  Okay.  I'm going to call this 6.

10  I'm going to hand this to you to just -- first of all,

11  if you can verify to me, this is the list that you --

12  first of all, what is this?

13            (Exhibit No. 6 marked.)

14       A.    So in request -- in response to your request

15  as to who had been working on the days that -- that

16  various videos in the petition had been produced.

17       Q.    (BY MR. BANKSTON)  Uh-huh.

18       A.    The company went back into its records and

19  searched -- essentially searched, you know, its -- its

20  internal records to determine who was working on those

21  particular days.

22       Q.    Okay.  Who prepared this list?

23       A.    You know what, I'm not a hundred percent sure

24  who prepared it.

25       Q.    Who did you get it --

EXHIBIT A

Paz, Brittany                    02-14-2022

137

1        A.    I --

2        Q.    Did you get it from counsel, or --

3        A.    I got it from counsel.  So I don't know who

4   prepared it.

5        Q.    Okay.  Can you hand me it back real quick,

6   because I --

7        A.    Sure.

8        Q.    -- I don't have a copy of it, so I need to

9   kind of look at it.  And I'll hand it back to you for

10  this question.  Okay.  What I'm seeing here is lists of

11  names for ten different videos.

12       A.    That's what it looks like, yes.

13       Q.    Okay.  All right.  So those are the -- are

14  those the days you can tell me when people were

15  working?

16       A.    Yes.

17       Q.    Okay.  So if there are videos that didn't

18  happen on that day, you can't tell me who was working

19  those days?

20       A.    No.  I know there are other videos aside from

21  these --

22       Q.    Sure.

23       A.    -- these particular videos.  Because like we

24  said, there's -- there are -- there are 40-something

25  videos, maybe 45 videos.

EXHIBIT A

Paz, Brittany                           02-14-2022

138

1      Q.   Well, there's -- there's certainly some in
2  plaintiffs' petition; right?

3      A.   Yes.

4      Q.   And then part of that was you were to get up
5  to speed on the employees who were involved in those
6  videos; right?

7      A.   I know that we are talking currently about
8  this February 2015 video.

9      Q.   I'm just asking you, you were --

10     A.   That's on here.

11     Q.   Yeah.  You were asked to get up to speed on
12  who was involved in the videos in plaintiffs' petition;
13  right?

14     A.   Right.  I don't know these dates offhand.  I
15  don't know if these are the dates of those particular
16  videos.

17     Q.   Well, one thing we know for certain is it's
18  not all of the videos in plaintiffs' petition, is it?

19     A.   I don't know.  I didn't produce this.  So I
20  don't know -- I don't know the answer to that.

21     Q.   All right.  Can I see that again?

22     A.   Sure.

23     Q.   Okay.  So when you got these documents here
24  of who was working, somebody gave these to you?

25     A.   Yeah.

EXHIBIT A

Paz, Brittany                                    02-14-2022

139

1      Q.   Did you inquire if these are all the videos

2  in the plaintiffs' petition?

3      A.   No.  I don't know who produced that.

4      Q.   Okay.  What do the highlights mean?

5      A.   I don't know.  I did not highlight them.

6      Q.   Okay.  So you didn't ask what these

7  highlights mean; right?

8      A.   No.

9      Q.   Okay.  Well, I noticed there's one day -- so

10  I got, like, one day here.  We got September 25th, 2014

11  and I'm seeing about a dozen people on here.  And then

12  I see, like, 12/27/2014, there's only one name.  Do you

13  know what that is about?

14      A.   May I see it?

15      Q.   Yeah, sure.  Was he the only guy working that

16  day, or what's going on there?  I don't understand why

17  there's just one name.

18      A.   That means to me that based on our records,

19  that's all we know about who was working that day.  So,

20  you know, part of the problem that I was indicating

21  earlier, and I -- and I know that it's -- it may not

22  make a whole lot of sense because you look at a media

23  corporation, like, you know, CNN.

24           And they have very, very intricate records

25  and they have very intricate procedures and policies.

**EXHIBIT A**

Paz, Brittany                           02-14-2022

140

1   I've spent a lot of time in the last week with this

2   company and it's not that way.

3        Q.   No, it's not.

4        A.   So there are not a lot of records.  There

5   aren't a lot of communication between departments.  So,

6   you know, generally speaking, in the event that there

7   were people working, like, in production in one

8   department, sometimes, we just wouldn't know in another

9   department.

10           Like, so, in all likelihood, what happened

11  with these records was that our HR person went through

12  and tried to figure out who was there that day.  But

13  that doesn't mean she went to the production department

14  and personally questioned everybody, and I certainly

15  didn't do that.  Were you here on this day, this day,

16  this day, this day.  You know what I'm saying?

17       Q.   I do.

18       A.   So when I -- and I believe if -- I believe

19  Melinda did that, you know, to the best of her

20  information, tried to get these lists.  But like I

21  said, because they don't talk to each other, the

22  different departments, and there's no real records as

23  to who's checking in and checking out on a various day,

24  it's -- it's hard to give a definitive answer as to --

25       Q.   I get it.

EXHIBIT A

Paz, Brittany                    02-14-2022

141

1       A.    -- who was there that day.

2       Q.    What I'm trying to get at, though, is -- is I

3    understand you're telling me a lot of stuff about why

4    things were hard, all this sort of stuff.  What I'm

5    trying to get at is some of these -- some of these

6    entries have, like, a ton of people's names.  Like, a

7    dozen names.

8       A.    Right.

9       Q.    And some of them only have, like, one or two.

10   And -- and from what I understand you're saying is, is

11   you were making certain inferences about why that's

12   true.

13      A.    I think the reason --

14      Q.    You don't know why that's true, you're just

15   making inferences; right?

16      A.    Well, yes.  I think the reason why that is,

17   is because that was the only information Melinda was

18   able to source for those particular days.

19      Q.    Did you talk to her about this list?

20      A.    I didn't talk to her about this list

21   specifically.

22      Q.    Okay.

23      A.    But I've -- I've spoken to her about, you

24   know, why there aren't many documents.

25      Q.    Okay.  Can you -- can I see that real quick?

EXHIBIT A

Paz, Brittany                    02-14-2022

142

1      A.    Sure.

2      Q.    Okay.  So what did -- do you know what Nico

3   Acosta did for this video, for this 2015 video?

4      A.    Nico Acosta did the programming for Alex

5   Jones, The Alex Jones Show.

6      Q.    Okay.

7      A.    So his job was to coordinate guests such that

8   there were guests available.  And to, you know, do the

9   basic scheduling for that day.  So that's what his role

10  would have been.

11     Q.    I noticed that David Knight and Travis Knight

12  are both on this list -- on this video.

13     A.    David Knight.  Yes, I think David Knight

14  per -- per Exhibit 5 was one of the hosts.

15     Q.    That's one of the people you didn't talk to;

16  right?

17     A.    I did not talk to David, no.  He's not a

18  current employee.

19     Q.    Okay.  And Josh -- I understand he's not a

20  current employee.  I get that.  Josh Owens, he's on

21  this list; right?

22     A.    Yes.

23     Q.    I'm just going to show you Josh Owens is on

24  this list.

25     A.    Yes.

EXHIBIT A

Paz, Brittany                    02-14-2022

143

1     Q.   Did you speak to Mr. Owens?

2     A.   No.

3     Q.   Mikael Thalen's on this list; right?

4     A.   Sure.  I don't have a copy of it in front of

5   me.  I'm just --

6     Q.   Yeah, okay.  Yeah.  What did Mr. Thalen do

7   with this video?

8     A.   I don't know.

9     Q.   Okay.  We're not --

10    A.   Just -- I just want to clarify.  Just because

11  they're on this list doesn't mean they had anything to

12  do with this video.

13    Q.   In fact, somebody would have to go check with

14  them to figure out if they did have something to do

15  with that video; right?

16    A.   Right.  This is only the list of who was

17  working that particular day.  That doesn't mean that

18  they sourced this -- that they had anything to do with

19  this particular video.

20    Q.   I understand that completely.

21    A.   Sure.

22    Q.   Let's -- can you go back to this document

23  here that is --

24    A.   Sure.  Exhibit 5.

25    Q.   -- Exhibit -- Exhibit 5.  Okay.  So we talked

EXHIBIT A

144

1  the first page really quick on -- I talked about this

2  red part here.

3       A.   Yes.

4       Q.   But now, I want to go to page 2.  And so

5  that's actually going to be on the reverse side.

6       A.   Sure.

7       Q.   Okay.  And we'll see here it talks about hour

8  number one; right?

9       A.   Yes.

10      Q.   And then you see segment number one; right?

11      A.   Yes.

12      Q.   And then it says right there, mystery, Sandy

13 Hook victim dies, parentheses, again, closed

14 parentheses, in Pakistan?

15      A.   Yes.

16      Q.   Right?  Okay.  So this was a show Mr. Jones

17 was doing; right?

18      A.   He was the host of the show, yes.

19      Q.   Yeah.  So Mr. Jones kept saying that Noah

20 died again in Pakistan even though the company knew

21 Mr. Pozner was distressed by it; right?

22      A.   I don't know that he said Noah died in

23 Pakistan.  I think what he was saying was, here is an

24 article that we wrote and here's a cut to the BBC

25 footage and Noah -- Noah's photo is in that footage.

EXHIBIT A

22-01023-tmd  Doc#1-18  Filed 04/18/22  Entered 04/18/22 14:16:53  Exhibit B contd. Pg
138 of 183

Paz, Brittany                    02-14-2022

145

1      Q.    Well, what I -- what I want to get to is we

2  had talked earlier about how that article was just

3  Mr. Salazar and that's not necessarily Mr. Jones

4  endorsing this or anything.  But here is Mr. Jones

5  literally reading that same headline on his show;

6  right?

7      A.    He's reading a headline that was -- that was

8  reported by somebody else, yes.

9      Q.    Well, no.  I mean, we understand Mr. Salazar

10 doesn't do -- he doesn't report or publish anything.

11 Free Speech Systems publishes things; right?

12     A.    Well, he is a writer for Free Speech.  So

13 yes, Free Speech publishes it.

14     Q.    I'm just -- I'm just trying to -- is there

15 any reason why you're -- why the company's trying to

16 disclaim responsibility for what Mr. Salazar wrote?

17     A.    No, he wrote it.

18     Q.    Right.  And the company published it.

19     A.    And the company published it.

20     Q.    And then Mr. Jones came on again; right?

21 Right?

22     A.    What do you mean, he came on the show?

23     Q.    Right.  Mr. Jones came on the show and

24 published that headline again; right?

25     A.    He published the headline, yes.

EXHIBIT A

Paz, Brittany                    02-14-2022

146

1     Q.   Sure.  So Mr. Jones did that even though he
2   knew it would cause Mr. Pozner distress; right?
3     A.   I don't know that he knew that it would cause
4   Mr. Pozner distress.
5     Q.   Well, first of all, we know that the company
6   sitting here now understands that that headline would
7   have caused Mr. Pozner distress?
8     A.   Right.
9     Q.   Right.  But Mr. Jones didn't understand that?
10    A.   I don't know if Mr. Jones personally had any
11  involvement in those e-mails that Mr. -- because
12  Mr. Jones doesn't have an e-mail address, I'm sure
13  you're aware of that.
14    Q.   Yes, he does.
15    A.   Well, he doesn't use e-mail.  Let's put it
16  that way.
17    Q.   Okay.  I mean, again, I'm very concerned that
18  you would sit here in testimony under oath and tell me
19  Mr. Jones doesn't have an e-mail address, because he
20  absolutely does.
21    A.   He does not use his e-mail.
22    Q.   Okay.  So let's -- let's try to say that
23  instead of the thing that wasn't true.
24    A.   Sure.
25    Q.   Okay.

EXHIBIT A

Paz, Brittany                    02-14-2022

147

1      A.    So he doesn't use e-mail.  The e-mails that
2    we were referring to earlier on about Mr. Pozner
3    communicating his displeasure with the coverage were
4    not responded to by Mr. Jones.  They were responded to
5    by other people.  I don't know what Mr. Jones knew or
6    didn't know about Mr. Pozner's communication of
7    displeasure at this point in time.
8      Q.    Because you didn't read his deposition,
9    right, where he talked about it; right?
10     A.    But assuming that, I will also say that this
11   is not altogether uncommon where you source another
12   article and publish the article.  I don't know that
13   necessarily this is an adoption by Mr. Jones of what
14   the content of the article is.
15     Q.    Now -- okay.  Actually, I was about to say,
16   well, you know it is because you watched the video.
17   But you didn't watch the video, so --
18     A.    No, that was the one -- that was the video --
19     Q.    Yeah.
20     A.    No, no.  This video?  Let me -- I'm sorry.
21   Yes, I didn't watch this video.
22     Q.    Okay.  Because Mr. Jones says in this video
23   that either the Pakistan thing is fake or the Sandy
24   Hook thing is fake.  One of these has to be fake.  Do
25   you know he said that?

EXHIBIT A

Paz, Brittany                           02-14-2022

148

1     A.    I don't know.  I didn't watch that video.

2     Q.    Okay.  All right.  You testified that

3  Mr. Jones didn't have any involvement or have any

4  knowledge of the communications of Mr. Pozner?

5     A.    I said I didn't know.

6     Q.    Did you ask him?

7     A.    I'm trying to remember my conversation with

8  Mr. Jones.  I don't think we talked about that.

9     Q.    Okay.  So in terms of what knowledge

10 Mr. Jones has about Mr. Pozner and what he's told the

11 company, you didn't talk to Mr. Jones about that?

12    A.    No.  But as you said, he's been deposed, so

13 --

14    Q.    Sure.  And one of the interesting things

15 about that is do you think there's any testimony in

16 there about him in these communications?

17    A.    About?

18    Q.    Mr. Jones not only being aware, but being

19 involved in these communications.

20    A.    Oh, I don't know.

21    Q.    Okay.  Yeah, can I understand which

22 depositions of Mr. Jones you read?

23    A.    I know he's done a few, so I --

24    Q.    He's done three.

25    A.    Right.  So I read the most recent one, which

EXHIBIT A

Paz, Brittany                    02-14-2022

149

1   was in December.

2        Q.   Uh-huh.

3        A.   And I've read the March one, but I don't

4   think I read the March 2019 one.

5        Q.   Okay.

6        A.   But I don't think I read the third one.

7        Q.   Okay.  If you look at segment two --

8        A.   Sure.

9        Q.   -- down at the bottom, it says it again,

10  right, Mystery Sandy Hook Victim Dies Again in

11  Pakistan?

12       A.   Yes, I see that.

13       Q.   Okay.  And there's some Sandy Hook

14  commentary.  Do you see where it says that?

15       A.   Oh, right above that?

16       Q.   Yeah.

17       A.   Yes.

18       Q.   You're not able to talk to me about what that

19  commentary was?

20       A.   No.

21       Q.   Okay.  It says he showed a copyright claim

22  document on camera.  Do you know what that refers to?

23       A.   I think it probably refers to Mr. Pozner's

24  attempts to get videos removed.

25       Q.   Are you -- do you know that, or is that just

EXHIBIT A

Paz, Brittany                    02-14-2022

150

1   kind of something you're thinking might be true right

2   now?

3         A.    I think that that's what's true.

4         Q.    But have you done anything to figure that

5   out?

6         A.    No.

7         Q.    So that document -- and actually, can you go

8   ahead and flip the page again for me now.

9         A.    On the first page?

10        Q.    Yeah.  Now, we're going -- no.  Now, we're

11  going to the one that says 924.  So it's -- keep going.

12  It would be the next page.  Do you see the Bates number

13  924?

14        A.    Yes.

15        Q.    Okay.  And on this page on segment four, it

16  also talks about showed copyright claim document on

17  camera.

18        A.    Yes.

19        Q.    Okay.  If this is the complaint or some sort

20  of complaint from Mr. Pozner --

21        A.    Uh-huh.

22        Q.    -- you haven't done anything to locate it or

23  figure out what it is?

24        A.    No, but what this means to me is that during

25  this segment, he showed the actual document.

EXHIBIT A

Paz, Brittany                    02-14-2022

151

1      Q.   On his document camera?

2      A.   On his document camera.

3      Q.   On his desk camera?

4      A.   Right.

5      Q.   Exactly.  He did.  Let's go to the next page.

6  See the page, and it's Bates number 925?

7      A.   Uh-huh.

8      Q.   Okay.  Do you see segment four?

9      A.   Yes.

10     Q.   It says, HONR Network physical address

11 discrepancy slash donations.  Do you see where it says

12 that?

13     A.   Yes.

14     Q.   What did the company mean by physical address

15 discrepancies and donations?

16     A.   I think --

17     Q.   First of all, let me ask you.  Let me --

18     A.   Sure.

19     Q.   Have you undertaken any steps to understand

20 what the company -- before coming to this room, what

21 the company meant by HONR Network physical address

22 discrepancies and donations?

23     A.   Yeah.  So when I spoke to Rob Dew, I did

24 speak to Rob Dew about the claims that were made in

25 connection with Mr. Pozner and his -- and the video --

EXHIBIT A

22-01023-tmd Doc#1-18 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 145 of 183
Paz, Brittany                02-14-2022

152

1  I believe it's this video -- about the -- the address.

2  And I think this was when we had the discussion about

3  his U-Haul address.

4          And -- and I think at the time, the problem

5  was that they didn't understand that the U-Haul has

6  P.O. boxes.  And so they were wondering why the

7  address, the official address, would be at a U-Haul.

8      Q.  Really?  That's --

9      A.  And that's what they were talking about --

10     Q.  That's --

11     A.  -- with the physical discrepancy.

12     Q.  That's the discrepancy?

13     A.  I think that's the discrepancy.

14     Q.  Okay.

15     A.  When I talked to Rob Dew, that was his -- his

16 understanding.

17     Q.  Well, you know he -- he identified a UPS

18 store.  You remember him identifying a UPS store?

19     A.  I thought it was a U-Haul store.

20     Q.  He did that too.  But do you remember the --

21 do you know anything about the UPS store?

22     A.  No, I don't.

23     Q.  Obviously, it's not -- even somebody like Rob

24 Dew know's there's P.O. boxes at a UPS store; right?

25     A.  I can't testify as to what Rob Dew knows.

EXHIBIT A

Paz, Brittany                02-14-2022

153

1      Q.   You certainly didn't ask him, did you?

2      A.   I didn't ask him, no.

3      Q.   Okay.  How did they know that was where Lenny

4   was picking up his mail?  How did they know that was

5   his address?

6      A.   You mean where did they get that address

7   from?

8      Q.   Sure.

9      A.   Well, when I asked Rob -- I did ask Rob Dew

10  that question.  And his information was that when he

11  did a search on the HONR Network, that address came up

12  as a mailing address.

13     Q.   Okay.  So he did some research into the

14  issue?

15     A.   I think he looked for the HONR Network

16  because the HONR Network was being -- was engaged in

17  getting information taken off of the YouTube page.  So

18  it led him to looking into that particular

19  organization.

20     Q.   Those are those anti First Amendment

21  activities you referenced earlier; right?

22     A.   That's correct.

23     Q.   Okay.  When it says there next, the

24  HONR Network group going after the Second Amendment,

25  what does the company mean by that?

EXHIBIT A

Paz, Brittany                     02-14-2022

154

1        A.    I think that the opinion was that the HONR

2    Network, in addition to this First Amendment activity,

3    is involved in Second Amendment activity.

4        Q.    What do you mean -- what -- okay.  First of

5    all, did you talk to Rob Dew about that?  Is that

6    something you talked to him about?

7        A.    Rob Dew.  I don't know if it was in my

8    conversation with Rob Dew or with -- with Mr. Jones.

9    But I think that the general understanding is that the

10   HONR Network is engaged in that type of political

11   speech for First Amendment speech and Second Amendment.

12       Q.    Second Amendment.  What do you -- Second

13   Amendment's about guns; right?

14       A.    Yes.

15       Q.    Okay.  And -- and so you're testifying here

16   is that company's understanding is that the HONR

17   Network engages in Second Amendment activities related

18   -- what -- what activities is it engaged in relating to

19   the Second Amendment?

20       A.    So this -- this goes back to -- this circles

21   back to the conversation we were having about Ms. Lewis

22   as well, about individual people's opinions about the

23   things that companies are engaged in or the activities

24   that they're engaged in.

25       Q.    Sure.

Paz, Brittany                          02-14-2022

155

1      A.    So it -- it's not -- for example, it's not
2   the company's position that Ms. Lewis is engaged in
3   anti -- anti gun control stuff.  But individual people
4   in the company may interpret her -- her associations as
5   such; right?  And I think that that is -- is what is
6   being discussed here.

7           You know, Rob Dew and David Knight are on the
8   show.  And Rob Dew, you know, as I said, Mr. Dew was
9   one of those people that were more interested in Sandy
10  Hook than others at -- at the company.  And I think
11  it's Mr. Dew's opinion that the HONR Network was
12  engaged in Second Amendment activity.

13     Q.    What facts is that based off of?  Do you have
14  -- do you have any idea?

15     A.    I can't testify to Rob Dew's opinions.  I
16  don't -- I don't know, in all honesty.

17     Q.    Yeah.  Because I'm -- I'm trying to figure
18  out how this got on air.  How it got on air that
19  InfoWars told its audience that Lenny Pozner was coming
20  after the Second Amendment.  I want to know how that --

21     A.    That's an opinion statement.  It's an opinion
22  statement based on Rob Dew's opinion.

23     Q.    Right.  And so --

24     A.    And possibly David Knight's opinion.

25     Q.    Possibly, but we have -- we don't know.

EXHIBIT A

Paz, Brittany                    02-14-2022

156

1      A.    Possibly, I don't know.  But it's an opinion
2   statement.

3      Q.    Sure.  And so what I asked you to be prepared
4   for was the company's knowledge of the plaintiffs.

5      A.    Uh-huh.

6      Q.    And I'm assuming that any opinions the
7   company has about the plaintiffs are informed by what
8   knowledge it has about the plaintiffs.  Certainly, the
9   company is not going to make opinions based on no
10  knowledge.  Do you understand what I'm saying?

11     A.    Well, the company's opinions and the
12  individual hosts' opinions are two different things.

13     Q.    Absolutely.  And that's why I've also asked
14  you about sourcing and research for the plaintiffs'
15  petition.

16     A.    Right.

17     Q.    So that's why I want to know Rob Dew's
18  opinion and I want to know the company's opinion.

19     A.    I -- and I've testified that I believe Rob
20  Dew's opinion is that they are engaged in this type of
21  activity.

22     Q.    And I'm asking you, what knowledge does --
23  does -- was ever researched or does the company possess
24  about Lenny Pozner that would support that opinion?

25     A.    I don't know what Rob Dew based his opinion

Paz, Brittany                     02-14-2022

157

1   on.   Like I said, I didn't watch this particular video.

2        Q.   And in terms of the -- excuse me.  The

3   sourcing or research that went into making this

4   statement, you don't know that either?

5        A.   No, because I didn't watch the video.

6        Q.   Okay.  Or -- and -- and let's make it clear.

7   You didn't just not watch the video, you didn't review

8   any documents about the video; right?

9        A.   Aside from this -- what you've produced to me

10  right here and -- oh, well -- actually, no.  That's not

11  -- that's not a hundred percent accurate because I did

12  review this Sandy Hook Victim Dies Again in Pakistan

13  article.  But aside from those things, I'm not aware of

14  any other documents that exist.

15       Q.   Okay.  Can you summarize any other

16  information the company has about Mr. Pozner?

17       A.   Has as we sit here today?

18       Q.   Uh-huh.

19       A.   I have seen a background check that was

20  produced in the production.

21       Q.   Okay.  Tell me about that.  Where did that

22  come from?

23       A.   You know, interestingly enough, I cannot

24  determine where that came from.

25       Q.   That's less interesting than you might think.

EXHIBIT A

Paz, Brittany                    02-14-2022

158

1     A.   Okay.

2     Q.   No, so when you say you can't determine where

3  it came from, let's -- let's -- let me back up, because

4  I may have started at a bad place.

5     A.   Sure.

6     Q.   When you understood that that background

7  report exists, what did you do to find out where it

8  came from?

9     A.   So I have spoken to Mr. Jones.  I've spoken

10 to Mr. Dew.  I've tried to go through the production

11 material in the e-mails to find out if it was -- if it

12 was produced in an e-mail.  I don't see it connected to

13 an e-mail.  Mr. Jones is not aware of where it came

14 from.  Mr. Dew is not aware of where it came from.

15          I can speculate, but I don't want to do that

16 because I don't honestly know where it came from.

17    Q.   Okay.

18    A.   I do know it is amongst the materials in the

19 production, but I can't testify as to when it -- when

20 or how it came to be there.

21    Q.   Well, somebody put it in there; right?

22    A.   I don't know how it came to be there.

23    Q.   Well, I -- I know that.  I know you don't

24 know that.

25    A.   Yeah.

EXHIBIT A

Paz, Brittany                                    02-14-2022

159

1      Q.    But somebody put it in there; right?

2      A.    It had to have gotten there somehow.

3      Q.    Yeah, exactly.  So -- so somebody had to have

4  this year, because this is when it was produced.  Wait.

5      A.    Oh, I don't know -- I can't --

6      Q.    You don't know when it was produced?

7      A.    I don't know when it was produced and I don't

8  know when it came to the company.  So I don't know if

9  it was produced -- if it came into our attention this

10 year.  I don't know.

11     Q.    Okay.

12                 THE WITNESS:  Attorney Blott, can you

13 give me another water, please.  Thank you.

14     Q.    (BY MR. BANKSTON)  So I know you can't talk

15 to me about what you talked to them about.

16     A.    What I talked to them about?

17     Q.    Hold on.  Hold on.  Let me get the whole

18 question out.

19     A.    Sure.

20     Q.    In fact, preface, we -- we just talked about

21 you talking to a couple people, Mr. Dew, Mr. Jones,

22 about this background report.  And I know you can't

23 talk to me about the substance of conversations you've

24 had with attorneys.

25                 But considering that attorneys were the ones

EXHIBIT A

Paz, Brittany                    02-14-2022

160

1  who are the last person in the chain of custody who

2  gave it to me, have you talken to attorneys about where

3  this came from?

4              MS. BLOTT:  You can indicate whether

5  you have spoken to attorneys, but not conversations

6  you've had with them.

7      A.   I have spoken to attorneys about where it

8  could have come from, yes.

9      Q.   (BY MR. BANKSTON)  Okay.  As not any

10 descriptions of those -- of those discussions, but it's

11 fair to say that after the conclusions of those

12 discussions, you are not able to give me any

13 information about where it came from?

14     A.   That's accurate.

15     Q.   Okay.

16     A.   Oh, and if I may, I -- I guess I should say

17 there are -- there are two background checks that I saw

18 in those productions relating to Mr. Pozner.

19     Q.   Okay.

20     A.   One is longer and one is shorter.  I'm pretty

21 sure -- and I think I know where the first -- the --

22 the shorter one came from.  I believe that was produced

23 in connection with a lawsuit that Mr. Halbig and

24 Mr. Pozner have.

25     Q.   Okay.

EXHIBIT A

Paz, Brittany                    02-14-2022

161

1      A.    And somehow, that came to be in our

2  documents, whether Mr. Halbig e-mailed that to us or

3  whatever.  But I believe the allegation is that, at

4  least Mr. Pozner's allegation in connection with that

5  lawsuit, that Mr. Halbig produced that background

6  check.

7      Q.    Got you.

8      A.    I believe it's 99 pages or a hundred pages

9  long.  It's, like, a shorter background check.

10      Q.    Sure.

11      A.    So I -- I did see the both of them.

12      Q.    Okay.

13      A.    But the longer one, I am not sure.  I can't

14  testify as to where that came from.

15      Q.    Okay.  I know you don't know where you came

16  from, but do you know who found it in the files?

17      A.    I don't know.

18      Q.    Do you know where it resided in InfoWars'

19  files?

20      A.    No.  And that's -- that's the interesting

21  part, is I tried to determine if it came to us in an

22  e-mail or if it came to us in some other fashion.  And

23  I can't find the origin.

24      Q.    Okay.  So we had the first -- we had the

25  first background report that I was talking about with

EXHIBIT A

Paz, Brittany                                          02-14-2022

162

1   Ms. Karpova, the big one; right?  But I -- I want to

2   talk to you about the second one you've talked about,

3   the shorter one.

4        A.   Sure.

5        Q.   That one for Mr. Halbig, who saved that?  Why

6   -- why -- how did that get saved?

7        A.   What do you mean, how did it get saved?

8        Q.   Like, where -- first of all, where did it

9   come from in InfoWars' files?  Do you know that?

10       A.   I believe it might have been in an e-mail.

11  But in all honestly, I'm not a hundred percent sure.

12       Q.   Okay.

13       A.   We did not produce it.  Like, so we didn't

14  ask for it to be produced.  I think it was sent to us.

15  I'm just not sure how.

16       Q.   How do you know it was sent to you?

17       A.   Because I think that it originated with

18  Mr. Halbig.

19       Q.   How do you know that?

20       A.   Because it was in with -- so there are a

21  bunch of e-mails, at least in our production, related

22  to Mr. Halbig's litigation with Mr. Pozner, which is

23  not connected to this case.  He appears that he -- and

24  I don't know if you see that Mr. Halbig e-mails very

25  numerous people in a lot of his e-mails.

EXHIBIT A

Paz, Brittany                    02-14-2022

163

1    Q.    Sometimes, uh-huh.

2    A.    So it appears that he has sent to us a lot of

3    the information concerning that litigation.  And I --

4    in the materials that are in our production, there were

5    a bunch of litigation materials connected to that case.

6    And I think it was in there.  I also saw some e-mail

7    chains between Halbig and Mr. Pozner about -- about

8    this particular background check.

9    Q.    Okay.  So when I say you think it came from

10   the litigation, that's because it was in proximity,

11   physical proximity in the production to documents that

12   related to that litigation?

13   A.    Right.

14   Q.    All right.  You understand with me, though,

15   you've gone through, I hope, enough InfoWars documents

16   to know that there's not really much of a rhyme or

17   reason to the order of those documents?

18   A.    I see that.

19   Q.    Right.  So there could be just random

20   documents thrown in the middles of other places.  So

21   I'm wondering why do you think that that's from

22   litigation if you've never run down and figured that

23   out?

24   A.    The reason is because some of those e-mails,

25   communications between Mr. Halbig and Mr. Pozner and

EXHIBIT A

Paz, Brittany                    02-14-2022

164

1  Mr. Halbig and Mr. Pozner's attorney relating to that
2  litigation is specifically referencing that background
3  check.

4       Q.   Okay.  But -- but all you know is that
5  there's -- something went on between Pozner and -- and
6  Halbig.  And so you assume that that document that you
7  have must have come from that; right?  Is that --
8  there's nothing you've done to independently run down
9  --

10      A.   I haven't independently verified it, no.  I
11  -- I -- and I don't see the actual e-mail that it's
12  connected to.

13      Q.   Okay.  This brings me to my next point, is
14  InfoWars knew about the legal action between Mr. Pozner
15  and Mr. Halbig; right?

16      A.   Well, this goes back to issues relating to
17  not opening Mr. Halbig's e-mails.  So, I mean, as I sit
18  here now, yes, I am aware of it because I reviewed the
19  production.  But at the time, I mean, pursuant to my
20  conversations with numerous employees, his e-mails were
21  not being opened.

22      Q.   There are -- okay.  Let's -- first of all,
23  there are other places the company can get information
24  about that lawsuit other than Mr. Halbig; right?

25      A.   Sure.

EXHIBIT A

Paz, Brittany                    02-14-2022

186

1   interpret it in a way that Mr. Pozner is a Second

2   Amendment advocate.  Does it or doesn't it?  I mean,

3   that's what I'm trying to get at.

4        A.    Like I said, I don't -- I can't point to any

5   specific material as I sit here today regarding gun --

6   the gun control aspect of it.

7        Q.    Okay.  Has your husband ever said anything

8   you don't agree with?

9        A.    My husband?

10       Q.    Yeah.

11       A.    Sure.

12             MS. BLOTT:  Objection.  Argumentative.

13   Outside the scope.

14       Q.    (BY MR. BANKSTON)  Do you think you should be

15   -- do you think you should be held to have participated

16   in everything that your husband said?

17       A.    No.

18       Q.    Okay.  You know what information the company

19   has on Veronique De La Rosa?

20       A.    As far as Ms. De La Rosa goes, I am aware of

21   the comments that she made in connection with gun

22   control in connection with her son's funeral and the

23   governor, I believe, attending the funeral.  I believe

24   there might also -- there was also an interview.  And

25   aside from that, I -- I don't think I'm aware of

EXHIBIT A

Paz, Brittany                    02-14-2022

187

1  anything else.

2      Q.   How did you -- what did you do to find out

3  what the company knows about Ms. De La Rosa?

4      A.   As we discussed earlier, I did do a search in

5  the documents that were produced.  I did talk to

6  Mr. Jones about Ms. De La Rosa.

7      Q.   Do you -- so when you search, you just search

8  for Veronique De La Rosa?

9      A.   Yes, or -- or Pozner.  I didn't know what

10  name it would be under because I wasn't sure when their

11  divorce happened, so --

12     Q.   I'm going to correct you once again.  That's

13  Pozner is their names.

14     A.   Oh, I'm sorry.  Pozner, yes.

15     Q.   Right.  Their names are Pozner.

16     A.   So I -- like I said, I didn't know when their

17  divorce happened, so I didn't know which name she was

18  using.

19     Q.   Okay.  And did you find any documents?

20     A.   Aside from the documents that we listed?

21     Q.   What do you mean, the documents you listed?

22  What does that mean?

23     A.   I mean, the information in connection with

24  her statements at the funeral on gun control.

25     Q.   You saw some documents about that?

EXHIBIT A

Paz, Brittany                                    02-14-2022

188

1       A.    I -- I want to say I saw an article about it,
2    and then the interview.

3       Q.    Which -- what are you talking about?

4       A.    She did -- did an interview.  Was that the
5    interview with -- with Anderson Cooper?

6       Q.    She's done an interview with Anderson Cooper,
7    yeah.

8       A.    That's the only interview that I've seen.

9       Q.    You saw that?

10      A.    Yes.

11      Q.    Okay.  Where did you get that video?

12      A.    I believe that was a video that we had posted
13    and was referenced numerous times by Mr. Jones on the
14    show.

15      Q.    No, no.  I understand Mr. Jones many, many
16    times --

17      A.    Yes.

18      Q.    -- has posted a video of the last five
19    seconds of that interview with --

20      A.    Right.

21      Q.    -- no sound where Mr. Anderson Cooper's head
22    is turning and his nose disappears; right?

23      A.    Yes.

24      Q.    But there's nothing -- Ms. De La Rosa isn't
25    talking in those; right?

EXHIBIT A

Paz, Brittany                    02-14-2022

189

1      A.   No, no.   It was mostly just shots of Anderson

2   Cooper.

3      Q.   Right.

4      A.   Right.

5      Q.   So how did you see the interview?

6      A.   I don't think I watched the entire interview.

7   I think that's the entirety -- my knowledge is just

8   what was posted about that interview.

9      Q.   There's -- I don't understand, Ms. Paz.

10   There's nothing about guns -- I mean, Ms. De La Rosa

11   isn't talking.  So how do you understand what she said?

12      A.   I'm sorry, I don't understand the question.

13      Q.   When -- when Ms. De La Rosa is featured on

14   InfoWars --

15      A.   Right.

16      Q.   -- in all these videos of --

17      A.   Right.

18      Q.   -- Anderson Cooper's nose disappearing --

19      A.   Right.

20      Q.   -- she's not talking.

21      A.   Right.  But the topic --

22      Q.   So how do you know what she said?

23      A.   But that topic of that conversation, it was

24   related to Anderson Cooper's coverage of the shooting.

25      Q.   Sure.

EXHIBIT A

Paz, Brittany                02-14-2022

190

1      A.    Right.

2      Q.    So how do you know she was talking about

3   guns?

4      A.    I think that that was what was represented as

5   the topic of that interview.

6      Q.    Represented by who?

7      A.    By the media.

8      Q.    Why do you -- I'm trying to --

9      A.    -- reason it was covered.

10     Q.    Look, I know -- you don't have any personal

11   knowledge.  You don't -- you -- you -- you had nothing

12   to do with this thing until two weeks ago.  So when you

13   come in here and tell me that -- that Ms. De La Rosa

14   was talking about guns in an interview, where did you

15   get that?

16     A.    As I said, I think that was the topic of the

17   conversation of the interview.

18     Q.    I -- I know you're saying that.

19     A.    Yes, that's my answer.

20     Q.    Where did you -- where did you get that piece

21   of information?

22     A.    From the videos that I watched.

23     Q.    All right.  So what video does that come

24   from?  I don't understand, because like we've said,

25   you've never seen --

EXHIBIT A

22-01023-tmd Doc#1-18 Filed 04/18/22 Entered 04/18/22 14:16:53 Exhibit B contd. Pg 163 of 183

Paz, Brittany                    02-14-2022

191

1        A.    Comes from the videos that were produced by

2   InfoWars.

3        Q.    Okay.  So at what -- what point was it ever

4   -- did you see Ms. De La Rosa ever talking about guns?

5        A.    Did I personally watch the entirety of that

6   video, that interview?

7        Q.    I -- that's not what I'm asking, actually.

8   Because now, you're telling me that you got this

9   information not from the interview itself, which

10  I believe you told me you watched, and then actually we

11  just saw the -- saw that.

12       A.    No.  I watched the video of Anderson Cooper.

13       Q.    Right.

14       A.    That's what I watched.

15       Q.    Right.  So now you're telling me that

16  somehow, you got it from the InfoWars videos that

17  Ms. De La Rosa was talking about guns.  Where did you

18  get that?

19       A.    No.  What I said was, that the reason that

20  interview was covered was because the topic of it from

21  Anderson Cooper's perspective was guns.

22       Q.    Who said that?  Who said that the topic of

23  Anderson Cooper's interview from that perspective is

24  guns?

25       A.    That's what I understood that the topic was.

www.res-ipsa.com
512.334.6777                    EXHIBIT A

Paz, Brittany                    02-14-2022

192

1      Q.   I -- I -- I don't -- I'm not asking you what
2  you understood.  I'm wondering how did you arrive at
3  that understanding?

4      A.   And I testified my basis for my conclusion
5  was watching the videos that InfoWars posted.

6      Q.   Okay.  The InfoWars videos.

7      A.   Yes.

8      Q.   All right.  So let us talk about those videos
9  you watched.

10     A.   Sure.

11     Q.   What part of those videos, any of those
12  videos, anything from any of those videos, who said or
13  what part of it did you glean from that that interview
14  was about guns?

15     A.   That was the reason why that was being
16  covered.

17     Q.   I don't -- you've got to understand there's a
18  disconnect here.  I heard --

19     A.   I don't understand the disconnect.

20     Q.   I a hundred percent understand your testimony
21  that you believe based on some information you saw that
22  that topic of that interview was about guns.  I
23  understand that completely, hundred percent.  That for
24  some reason or another, an interview that you knew
25  nothing about two weeks ago, you now believe has

**EXHIBIT A**

Paz, Brittany                    02-14-2022

193

1  something to do with guns.

2              And I'm trying to figure out what -- and I

3  know you say that because it came from the videos.  And

4  I'm trying to figure out what in those videos at any

5  point led you to the conclusion that Ms. De La Rosa was

6  talking about guns?

7       A.   And again, I'm going to testify -- and I

8  understand you don't understand my answer.  I can't

9  help you understand it other than to say that I watched

10 the videos, that it appears that the purpose and reason

11 why Mr. Jones wanted to cover it was because that

12 interview was based on that topic.  But --

13      Q.   Again, did Mr. -- is this something you

14 gained from something Mr. Jones said, something Ms. De

15 La Rosa said, something another person said?  I don't

16 -- I don't understand where this is coming from that

17 you just say, I watched these videos and now I

18 understand the purpose of that interview was about

19 guns.

20              MS. BLOTT:  Objection.  Asked and

21 answered.

22      Q.   (BY MR. BANKSTON)  Do you know -- do you know

23 what person that comes from?

24      A.   Do I know which person it comes from?

25      Q.   Yeah, why you believe that, in other words.

EXHIBIT A

Paz, Brittany                    02-14-2022

194

1  The -- the information, who it came from that that's

2  why you believe that.

3        A.    Like I said, it would have been in the

4  videos.  So if the particular video was being hosted by

5  Mr. Jones, he thought that that video was relevant for

6  that purpose, so it probably came from Mr. Jones just

7  based on the videos.

8        Q.    Okay.  How do you know what Mr. Jones

9  thought?  Is he -- is this something you got from an

10 interview with him or something you saw in a video?

11       A.    No.  I'm just -- like I said, the totality of

12 my knowledge is based on the videos.

13       Q.    Okay.  And so that video itself, you -- do

14 you remember any specific things Mr. Jones said in that

15 video about guns?

16       A.    Which -- which video?  Because he talks about

17 --

18       Q.    I don't know.

19       A.    -- that interview a number of times.

20       Q.    I don't know.  You're telling me that that's

21 where you came from it.

22       A.    Well, so he talks about the -- well, most of

23 the subsequent information that he talks about is just

24 about Anderson Cooper and the nose disappearing.  But

25 as far as the first time that he references that video,

EXHIBIT A

Paz, Brittany                    02-14-2022

195

1  mostly what he talks about is -- is the nose

2  disappearing.

3              But I think the reason, like I said, the

4  topic of it, that's the reason why he covered it.

5       Q.   Do you -- do you recall any InfoWars videos

6  that you've watched during this litigation --

7       A.   Sure.

8       Q.   -- in which you have seen Anderson Cooper

9  talking about guns?

10      A.   No.  Just because I think that the videos

11  that they posted didn't have any sound.  The purpose of

12  showing the video and the argument that was made of the

13  video was that his nose was disappearing and Alex's

14  opinion that it was greenscreened or bluescreened, I

15  can't remember which.

16      Q.   Okay.

17      A.   But I don't think that that -- Anderson

18  Cooper had any audio.

19      Q.   Or my client; right?  You've never heard --

20  you've never heard Veronique De La Rosa speak, I would

21  take it?

22      A.   No, I've never heard her speak.

23      Q.   Okay.  Now, Mr. Jones' position about what

24  that interview was for --

25      A.   Uh-huh.

Paz, Brittany                    02-14-2022

196

1      Q.    -- being gun related.  Is that a -- is that a

2    factual claim or is that an editorial opinion?  What do

3    you think that is?

4      A.    You mean is it Mr. Jones' opinion?

5      Q.    Or what -- it's tough because I don't really

6    know what you're drawing this from still.  So I'm --

7    I'm going to say whatever information it is that you're

8    drawing that Free Speech Systems put in a video that

9    makes you think that that interview is about guns.  Is

10   that a fact or an editorial opinion that you're drawing

11   that from?

12     A.    Well, so I don't know that I would

13   necessarily term it as an editorial opinion.  But I

14   think that broadly speaking, the company's coverage of

15   Sandy Hook was surrounding gun control and how in the

16   aftermath of the tragedy, there was a push for gun

17   control.

18           So that underlying coverage would inform that

19   opinion.  I don't know that I would necessarily term it

20   editorial discussions or opinions.

21     Q.    Sure.  Based on what the company knows --

22   okay.  Again, talking about what it knows.  First of

23   all, before we move on from Veronique, I just want to

24   make sure -- I may have gotten confused.  In terms of

25   documents that you have reviewed relating to Veronique

EXHIBIT A

Paz, Brittany                     02-14-2022

197

1  De La Rosa, that's pretty much limited to the InfoWars

2  videos?  Do you have written documents you reviewed

3  about Veronique?

4       A.   I don't recall.  Like I said, I've reviewed a

5  lot of documents, so --

6       Q.   Okay.

7       A.   -- I don't recall.

8       Q.   Based on what the company knows, based on its

9  knowledge of the plaintiffs, does the company have any

10  reason to contend that any of these parents have been

11  faking their level of distress over InfoWars' actions

12  as it regards Sandy Hook?

13       A.   No.  I think there is a distinction between

14  distress related to the shooting and distress related

15  to the coverage, which should be litigated.  But also,

16  I think there's a distinction -- should -- probably

17  should be made between InfoWars airing other people's

18  coverages and then the original source of the coverage.

19       Q.   Are you saying that as a matter of the

20  company's personal opinion, or is this the company's

21  legal opinion, what is this?

22       A.   I think it's a legal opinion as to much of

23  the sourcing.

24            MS. BLOTT:  I'm going to object to the

25  extent that you're getting into any conversations

EXHIBIT A

Paz, Brittany                    02-14-2022

385

1      Q.    You don't know what's in the documents.   You

2  haven't reviewed every document, have you?

3      A.    I haven't reviewed every specific document,

4  but I did try to make an effort to testify cogently on

5  the eight topics that were notified in this deposition.

6      Q.    I get you.   You made all the effort you

7  could.

8      A.    I did.

9      Q.    You were in a tough spot, I don't doubt that.

10  I don't doubt that at all.   And I'm sure you worked as

11  hard as you could, I'm positive of that.   But what I'm

12  trying to get at is, sitting here today, you don't know

13  the answer to these questions about these things --

14      A.    No.

15      Q.    -- and you did no independent research to do

16  --

17      A.    I did no independent research, no.

18      Q.    Got you.   Okay.

19      A.    Aside from what was in -- already in the

20  documents, no.

21      Q.    Okay.   So, for instance, InfoWars collects

22  sales data?

23      A.    Well, PQPR collects sales data.

24      Q.    It's available to InfoWars.

25      A.    It is available.

EXHIBIT A

Paz, Brittany                    02-14-2022

386

1    Q.   A hundred percent.  Mr. Jones can have --

2  I mean, I don't want to play the shell game here.

3    A.   It's not the same -- no.  It's not the same

4  company, but it is available, yes.

5    Q.   Yes, hundred percent available to you.  All

6  right.  That means it's available to you; right?

7    A.   The sales data, yes.

8    Q.   Okay.  That sales data, what have you done

9  with that sales data?

10   A.   So I have made an attempt to find out the

11  sales data.  So I did go to the warehouse and review

12  the warehouse.  And, well, looked at the warehouse and

13  spoke to the warehouse person.  As well as we have a

14  person named Blake, and I think he's been deposed.  He

15  is in charge of the warehouse and the sales end of it.

16   Q.   Okay.

17   A.   So in 2015, we changed our programming.  So

18  from 2012 to 2015, we can pull the number of clicks per

19  article.  So for a -- for a certain article, say it's a

20  Sandy Hook article, if there was an ad in that article,

21  which most -- most of the articles have ads in them, we

22  could tell who was redirected from the website based on

23  a click from that ad to the store.

24   Q.   Okay.

25   A.   We can't tell the conversion rate, whether

Paz, Brittany                          02-14-2022

1  anybody purchased anything once they were redirected

2  from that ad on that article to the store. But we can

3  tell how many times somebody was redirected from that

4  page to the store.

5      Q.  Okay.

6      A.  Post 2015 through present, we can tell how

7  many times a person clicked on an ad in an article --

8  in a specific article, was redirected to the store, and

9  had purchased something from the store.

10     Q.  Okay. So what I want to ask you is, how --

11 what -- what steps did you undertake, if any? I

12 understand that you found yourself in a situation where

13 you had an absence of data on audience reach. Okay?

14     A.  Yes.

15     Q.  I'm wondering, as maybe a workaround, did you

16 go try to use the sales data in any way to try to

17 cross-reference that or create some new data set that

18 could help you inform the audience size of InfoWars?

19 Did you use the sales --

20     A.  I don't think there's -- I don't think

21 there's a way to do that just because the only real

22 thing that informs as who's clicking on most particular

23 articles from -- from the website. It's not telling me

24 how the person ultimately gets to my website. So it's

25 not telling me they were redirected from another source

EXHIBIT A

Paz, Brittany                    02-14-2022

388

1  to the website.

2           It's just telling me, you're now at the

3  website, you know, and you've clicked this ad on this

4  particular article and you're being redirected.

5       Q.   All right.

6       A.   So I don't think there's a way to --

7       Q.   The other thing InfoWars keeps track of --

8       A.   -- extrapolate that.

9       Q.   The other thing InfoWars keeps track of is

10 everywhere it sends products.

11      A.   I'm sorry, what do you mean?

12      Q.   Well, the product's got to get to the

13 customer somehow; right?

14      A.   I think PQPR maintains records of the

15 customers and where their products are being sent once

16 they're ordered.  So --

17      Q.   Did you get those -- did you get those

18 records?

19      A.   No, I don't -- PQPR is not Free Speech.  Free

20 Speech maintains those records.  You mean the records

21 of specific customers and --

22      Q.   Yeah, where it went.

23      A.   No.

24      Q.   Where you ship stuff to.

25      A.   No.

EXHIBIT A

Paz, Brittany                    02-14-2022

389

1      Q.   Okay.  And so if -- if there's any data there
2  that could perhaps be useful or -- or -- or manipulated
3  in some way to help us understand better audience reach
4  to ideas.  That's not something you undertook to do?
5      A.   No, I don't have the names and where these
6  products are being shipped.

7      Q.   Perfect.  Okay.

8      A.   So what -- what I could -- could say is how
9  many total orders were placed on a particular day.
10  Like, for example, if a video was uploaded on a
11  particular day, how many orders on that day, stuff like
12  that.

13     Q.   But one of the things we can say is that you
14  did not yourself -- I just want to make sure I
15  understand the things you did; right?

16     A.   Uh-huh.

17     Q.   You did not yourself attempt to take any
18  sales data, order data, request things from PQPR and
19  use that in some way, I mean, I'm just spitballing
20  here, to -- to try to create an audience statistic or
21  any sort of information informing audience reach?

22     A.   I mean, I don't know that that can be done.

23     Q.   I don't either.

24     A.   But I -- I don't know.  Yeah.  But did I do
25  anything to try --

EXHIBIT A

Paz, Brittany                02-14-2022

390

1      Q.   I'm not --

2      A.   -- to do that, no.  I didn't.

3      Q.   I'm not suggesting that.

4      A.   Okay.

5      Q.   I'm just asking if that happened or not.

6      A.   No.

7      Q.   Okay.  Okay.  Did you review any

8  organizational chart for the company to tell you how it

9  was structured?

10     A.   As far as reviewing a chart, no.  I based my

11 conclusions on the organization of the company based on

12 my conversations with -- primarily with Melinda.

13     Q.   Okay.  Well, I'm -- the reason I'm concerned

14 is because I requested an organizational chart and I

15 didn't get one.

16     A.   Okay.

17     Q.   And then surprise, surprise, Lafferty

18 deposition, Kurt Nimmo Exhibit 7 is an organizational

19 chart of the company with everybody's roles and what

20 they do.  And I'm wondering if you've ever seen that.

21     A.   I don't recall seeing that.  When you -- when

22 you say roles and what they do, you mean Free Speech,

23 who and which departments there are and who works in

24 each department and who is headed to each department?

25 No, I don't recall seeing that.  I'm sorry.

EXHIBIT A

Paz, Brittany                    02-14-2022

391

1        Q.   Okay.  So in terms of seeing the company's
2   business structure, if there does exist in plaintiffs'
3   Exhibit 7 in the Lafferty deposition of Kurt Nimmo, an
4   organizational chart of the company, you -- you didn't
5   review that in trying to get ready for this topic?
6        A.   No.
7        Q.   Okay.  Can you describe to me what InfoWars,
8   LLC is?
9        A.   InfoWars, LLC, I don't think actually
10  conducts any business.  I think it's just a holder.  I
11  think all of the business is conducted through Free
12  Speech.
13       Q.   You think that?
14       A.   Actually, I know that.  All the business is
15  --
16       Q.   That's what -- I mean --
17       A.   -- conducted through Free Speech.  I don't
18  think InfoWars does any actual business.  InfoWars,
19  LLC.
20       Q.   Don't think it does?
21       A.   It doesn't.
22       Q.   Do you know it does?
23       A.   Free Speech does all of the business.
24       Q.   Because if -- if -- let me put it this way.
25  If you are saying to me right now, I know InfoWars, LLC

EXHIBIT A

Paz, Brittany                    02-14-2022

392

1  has never done any business, you'd be the first person

2  who'd be able to tell me that.  Is that what you're

3  telling me today?

4      A.   I don't know whether it's ever done any

5  business.  I can tell you now it doesn't do any

6  business.

7      Q.   No, I want to know for the entire pendency of

8  the suit did it do any business?

9      A.   I -- I don't know how long that it's been,

10  but I can tell you right now it doesn't do any

11  business.

12      Q.   Okay.  I mean, like, for instance, I've --

13  when I first brought this, you know, years ago,

14  InfoWars, LLC is the entity listed on the InfoWars

15  website.  InfoWars, LLC is the entity listed on the

16  terms of use for the website.  Do you know anything

17  about that?

18      A.   So I know that there's been a lot of

19  entanglement between the various LLCs.  And there's

20  been efforts undergone to make everything more clear

21  and structured and organized.  So -- and that's -- but

22  that's been in the last, you know, handful of years.

23           So I don't know how long InfoWars has not

24  been conducting any business for.  I know that it's not

25  being conducted now under InfoWars, LLC.

EXHIBIT A

Paz, Brittany                    02-14-2022

393

1       Q.    So we can say now, you understand -- right

2   now, you understand what the relationship between

3   InfoWars, LLC and Free Speech Systems is, which is

4   nothing, really, because InfoWars doesn't do anything;

5   right?

6       A.    Right.

7       Q.    Okay.  But in terms of what it used to be,

8   during the periods of some of this lawsuit, what the

9   relationship between Free Speech Systems and InfoWars,

10  LLC is, that's not something you're prepared to

11  testify?

12      A.    I don't know about that, no.

13      Q.    Okay.  Thanks.  Can you tell me when is the

14  first time in the company that an employee expressed

15  there was a problem with InfoWars' coverage of Sandy

16  Hook?

17      A.    Could you be more specific?

18      Q.    Huh-uh.  No, I want to know -- I mean, I want

19  to know any time this has happened.  I would assume

20  that that's something that we've looked into.

21      A.    I'm sorry.  I've -- like I said, I've

22  reviewed a lot of documents.  And if -- if you can

23  redirect me to a specific point in time, then that --

24      Q.    No, because I want something -- here's --

25  here's the problem.  So much of what you're telling me

EXHIBIT A

Paz, Brittany                           02-14-2022

404

1                        D-1-GN-18-001835

2    NEIL HESLIN                      )
                                      )  IN DISTRICT COURT OF
3    VS.                              )
                                      )  TRAVIS COUNTY, TEXAS
4    ALEX E. JONES, INFOWARS,         )
     LLC, FREE SPEECH SYSTEMS,        )  261ST DISTRICT COURT
5    LLC, and OWEN SHROYER            )

6                        D-1-GN-18-001842

7    LEONARD POZNER AND               )
     VERNONIQUE DE LA ROSA            )
8                                     )  IN DISTRICT COURT OF
     VS.                              )
9                                     )  TRAVIS COUNTY, TEXAS
     ALEX E. JONES, INFOWARS,         )
10   LLC, and FREE SPEECH             )  345TH DISTRICT COURT
     SYSTEMS, LLC                     )
11
                         D-1-GN-18-006623
12
     SCARLETT LEWIS                   )
13                                    )  IN DISTRICT COURT OF
     VS.                              )
14                                    )  TRAVIS COUNTY, TEXAS
     ALEX E. JONES, INFOWARS,         )
15   LLC, and FREE SPEECH             )  98TH DISTRICT COURT
     SYSTEMS, LLC                     )
16

17

18

19

20

21

22

23

24

25

EXHIBIT A

Paz, Brittany                                    02-14-2022

405

1                        REPORTER'S CERTIFICATION
                        DEPOSITION OF BRITTANY PAZ
2                          FEBRUARY 14, 2022

3        I, LOGAN KISLINGBURY, Certified Shorthand Reporter
    in and for the State of Texas, hereby certify to the
4   following:

5        That the Witness, BRITTANY PAZ, was duly sworn by
    the officer and that the transcript of the oral
6   deposition is a true record of the testimony given by
    the Witness;

7

         That the deposition transcript/errata sheet was
8   submitted on _____ to the
    Witness or to the attorney for the Witness for
9   examination, signature and return to me by
    _____;

10

         That the amount of time used by each party at the
11  deposition is as follows:

12       Mr. Mark D. Bankston: 6 hours, 24 minutes
         Mr. William R. Ogden:
13       Ms. Jacquelyn Blott:

14       That pursuant to information given to the
    deposition officer at the time said testimony was
15  taken, the following includes Counsel for all parties
    of the record:

16

         Mr. Mark D. Bankston
17       Mr. William R. Ogden
         Ms. Jacquelyn Blott

18

19

20

21

22

23

24

25

EXHIBIT A

Paz, Brittany                          02-14-2022

406

1       I further certify that I am neither Counsel for,
related to, nor employed by any of the parties or
2  attorneys in the action in which this proceeding was
taken, and further that I am not financially or
3  otherwise interested in the outcome of the action.

4       Certified to me by this _____ day of _____,

5  _____.

6

7                              _____
                               LOGAN KISLINGBURY, Texas CSR 11388
8                              Expiration Date: 3-31-2022
                               Res Ipsa Litigation Support, LLC
9                              Firm Registration No. 11371
                               501 Congress Avenue, Suite 150
10                             Austin, Texas 78701
                               Tel: 512.334.6777

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.res-ipsa.com
512.334.6777

**EXHIBIT A**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 62398049
Status as of 3/11/2022 10:19 AM CST

Associated Case Party: NEIL HESLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |
| Avishay Moshenberg | | avi.moshenberg@mhllp.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Warren Lloyd Vavra | 786307 | warren.vavra@traviscountytx.gov | 3/8/2022 11:58:31 AM | SENT |
| Velva Lasha Price | 16315950 | velva.price@traviscountytx.gov | 3/8/2022 11:58:31 AM | SENT |
| William Ogden | | bill@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/8/2022 11:58:31 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/8/2022 11:58:31 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: OWEN SHROYER

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 62398049
Status as of 3/11/2022 10:19 AM CST

Associated Case Party: OWEN SHROYER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |

Associated Case Party: FREE SPEECH SYSTEMS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/8/2022 11:58:31 AM | SENT |